## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) |
|  | ) |

## SYNCORA CAPITAL ASSURANCE INC. AND SYNCORA GUARANTEE INC.'S OBJECTION TO THE DEBTOR'S PLAN OF ADJUSTMENT

KE 30840345

# TABLE OF CONTENTS

**Page**

I.   Preliminary Statement ...................................................................................1

II.  The Debtor's Renaissance Is Illusory, and the Debtor is Keeping Billions of Dollars in Value from Creditors ...............................................4

III. Confirmation Objections .............................................................................8

    A.   The Plan Is Not in the Best Interests of Creditors.................................8

    B.   The Plan Unfairly Discriminates Between Classes of Similar Claims......................................................................................................21

    C.   The Plan Is Not Fair and Equitable .....................................................46

    D.   The Plan Violates Michigan Law.........................................................57

    E.   The Plan Is Not Proposed in Good Faith. ...........................................59

    F.   The Plan Is Not Feasible. ....................................................................65

IV.  Conclusion .................................................................................................67

KE 30840345

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp.*
  *(In re Adelphia Commc'ns Corp.)*,
  361 B.R. 337 (S.D.N.Y. 2007)..............................................................10

*Am. Axle & Mfg., Inc. v. City of Hamtramck*,
  604 N.W.2d 330 (Mich. 2000)..............................................................19

*Ashton v. Cameron Cnty. Water Improvement Dist. No. 1*,
  298 U.S. 513 (1936)..............................................................................7

*Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 North LaSalle Street P'ship*,
  526 U.S. 434 (1999) ...................................................................... 10, 36

*Bd. of Trustees of Policemen/Firemen Ret. Sys. of*
  *City of Detroit v. City of Detroit*,
  No. 253343, 260060, 2005 WL 1314197 (Mich Ct. App. June 2, 2005)............39

*Creekstone Apartments Assoc., L.P. v. Resolution Trust Corp.*
  *(In re Creekstone Apartments Assoc., L.P.)*,
  168 B.R. 639 (Bankr. M.D. Tenn. 1994)...........................................41

*Ernest Clark v. City of Benton Harbor*,
  Case No. C-9651-B (Aug. 14, 1984) ...................................................39

*Fano v. Newport Heights Irr. Dist.*,
  114 F.2d 563 (9th Cir. 1940) ....................................................... 47, 48

*Hammond v. Place*,
  74 N.W. 1002 (Mich. 1898).................................................................19

*In re AutoStyle Plastics, Inc.*,
  269 F.3d 726 (6th Cir. 2001) ..............................................................45

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989).......................... 21, 41, 42, 44

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass. 1994) ...................................................................23

*In re Brothby*,
303 B.R. 177 (9th Cir. BAP 2003) ......................................................................36

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990)...................................................................44

*In re BWP Transport, Inc.*,
462 B.R. 225 (Bankr. E.D. Mich. 2011)..............................................................22

*In re City of Detroit, Mich.*,
504 B.R. 191 (Bankr. E.D. Mich. 2013)............................................... 7, 38, 58, 66

*In re City of San Bernardino, Cal.*,
499 B.R. 766 (Bankr. C.D. Cal. 2013) ................................................................60

*In re City of Stockton, Cal.*,
463 B.R. 772 (Bankr. E.D. Cal. 2013)................................................................67

*In re Cnty. of Orange*,
191 B.R. 1005 (Bankr. C.D. Cal. 1996) ...............................................................9

*In re Cranberry Hill Assocs., L.P.*,
150 B.R. 289 (Bankr. D. Mass. 1993) .................................................................23

*In re Crosscreek Apartments, Ltd.*,
213 B.R. 521 (Bankr. E.D. Tenn. 1997) ......................................................... 23, 43

*In re Dow Corning Corp.*,
244 B.R. 696 (Bankr. E.D. Mich. 1999)........................................... 21, 22, 24, 35

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................................63

*In re Graphic Commc'ns, Inc.*,
200 B.R. 143 (Bankr. E.D. Mich. 1996)..............................................................21

*In re Great Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................... 23, 26

iii

*In re Gregory Boat Co.*,
144 B.R. 361 (Bankr. E.D. Mich. 1992)................................................59

*In re HNRC Dissolution Co.*,
396 B.R. 461 (B.A.P. 6th Cir. 2008) ...................................................27

*In re Lightsquared Inc.*,
Case No. 12-12080 (Bankr. S.D.N.Y. May 8, 2014)............................45

*In re Mount Carbon Metro Dist.*,
242 B.R. 18 (Bankr. D. Colo. 1999) ........................................... passim

*In re Multiut Corp.*,
449 B.R. 323 (Bankr. N.D. Ill. 2011) ........................................... 63, 64

*In re Pierce Cnty. Hous. Auth.*,
414 B.R. 712 (Bankr. W.D. Wash. 2009).................................... passim

*In re Rand*,
2010 WL 6259960 (9th Cir. BAP Dec. 10, 2007 ................................64

*In re Sanitary & Improvement Dist.*,
98 B.R. 970 (Bankr. D. Neb. 1989) .............................................. 9, 57

*In re Snyders Drug Stores, Inc.*,
307 B.R. 889 (Bankr. N.D. Ohio 2004)........................................ 41, 42

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*,
165 B.R. 60 (Bankr. D.N.H. 1994) ....................................................43

*In re Tucson Self-Storage, Inc.*,
166 B.R. 892 (9th Cir. BAP 1994) ....................................................23

*In re W.R. Grace & Co.*,
475 B.R. 34 (Bankr. D. Del. 2012) ...................................................64

*Int'l Assn. of Firefights, Local 1186 v. City of Vallejo
(In re City of Vallejo)*,
408 B.R. 280 (9th Cir. BAP 2009) ....................................................60

*Kammer Asphalt Paving Co., Inc. v. East China Twp. Schools*,
504 N.W.2d 635 (1993) ...................................................................54

iv

*Kelley v. Everglades Drainage Dist.*,
   319 U.S. 415 (1943) ...........................................................................................10

*Lorber v. Vista Irrigation Dist.*,
   127 F.2d 628 (9th Cir. 1942) ....................................................................... 10, 46

*Mason v. Paradise Irr. Dist.*,
   326 U.S. 536 (1946) ...........................................................................................36

*Mission Indep. Sch. Dist. v. State of Tex.*,
   116 F.2d 175 (5th Cir. 1940) ..............................................................................24

*Polite Enter. Corp. Pty. Ltd. v. N. Am. Safety Prods., Inc.*,
   No. 13 C 01089, 2014 WL 321668 (N.D. Ill. Jan 29, 2014) ...............................36

*Smith v. Royal Oak Twp.*,
   No. 2010-113507-CK, 2013 WL 6405315 (Mich. Cir. Ct. Oct. 9, 2013) ............20

*Tenn-Fla Partners v. First Union Nat'l Bank of Fla.*,
   229 B.R. 720 (W.D. Tenn. 1999).................................................................. 62, 63

*U.S. v. Bekins*,
   304 U.S. 27 (1938) ........................................................................................ 8, 46

*W. Coast Life Ins. Co. v. Merced Irrigation Dist.*,
   114 F.2d 654 (9th Cir. 1940) ......................................................................... 9, 46

**Statutes**

11 U.S.C. § 1123(a) ...........................................................................................62

11 U.S.C. § 1129(a)(3)................................................................................... 57, 59

11 U.S.C. § 1129(b)(2)........................................................................................46

11 U.S.C. § 502(b) ..............................................................................................27

11 U.S.C. § 507(a) ..............................................................................................45

11 U.S.C. § 522...................................................................................................48

11 U.S.C. § 547(a)(2)...........................................................................................37

11 U.S.C. § 943(b)(4)...........................................................................................57

11 U.S.C. § 943(b)(7)...................................................................................65

MCL § 117.36a............................................................................................19

MCL § 141.1565(3) ......................................................................................19

MCL § 141.2303(7) ......................................................................................18

MCL § 141.2303(7)(b)..................................................................................18

MCL § 141.2303(7)(c)..................................................................................18

MCL § 566.35...............................................................................................58

MCL § 600.6093 ..................................................................................... 18, 39

MCL § 600.6097 ..................................................................................... 18, 39

Mich. Comp. Laws § 141.164(1)..................................................................57

Mich. Comp. Laws § 141.164(3)..................................................................57

Mich. Comp. Laws § 141.2701(7)................................................................59

Mich. Comp. Laws § 141.2704(6)................................................................57

Mich. Comp. Laws § 141.2705(1)................................................................57

Mich. Comp. Laws § 141.2705(2)................................................................57

**Other Authorities**

1982 Mich. Op. Atty Gen. 575 (Mich. A.G.), 1982 WL 183534 ...........................58

4 *Collier on Bankruptcy* ¶ 943.03(7)(a) (16th ed. 1995) ...........................9

6 *Collier* ¶ 943.03(7)(a) (16th ed. rev. 2009)............................................9

6 Collier on Bankruptcy, ¶ 943.03[1][f][i][B] (16th ed. 2013) ...............46

Brent Snavely,
   *Detroit Reaches Tentative 5-Year Deal with 14 Unions in Bankruptcy Case*,
   The Detroit Free Press (Apr. 28, 2014 8:37 PM,
   http://www.freep.com/article/20140428/NEWS01/304280084/Detroit-
   bankruptcy-unions-deal...........................................................................56

KE 30840345

Bruce A. Markell,
*A New Perspective on Unfair Discrimination in Chapter 11*,
72 Am. Bankr. L.J. 227 (1998) ............................................................24

Chad Holcom,
*Pension in play in Detroit bankruptcy: What's equitable*,
CRAIN'S DETROIT BUSINESS (Dec. 8, 2013, 8:00 AM) .........................6

Chad Livengood and Michael H. Hodges,
*Investor groups prepare bids for DIA's treasurers but
EM says city can't be forced to sell artwork under bankruptcy*,
THE DETROIT NEWS (April 9, 2014, 9:32 PM)....................................50

H.R. Rep. 94-686, U.S.C.C.A.N. 539, 571 .............................................24

H.R. Rep. 95-595, H.R. Rep. No. 595, 95th Cong., 1st Sess. 1977, 1978
U.S.C.C.A.N. 5963, 6087, 1977 WL 9628........................................48

H.R. Rep. No. 95-595 (1977)...................................................................60

Joe Guillen,
*Detroit council OKs transfer of 16,000 properties to city's land bank*,
DETROIT FREE PRESS (April 15, 2014, 6:10 PM)................................51

Joe Guillen,
*Detroit Red Wings' new stadium land transfer approved by City Council*,
DETROIT FREE PRESS (Feb. 4, 2014, 9:07 PM) ...................................53

Joe Guillen,
*Information technology: Upgrade needed for obsolete, inefficient systems*,
DETROIT FREE PRESS (June 16, 2013)....................................................6

Mark Stryker and John Gallagher,
*DIA's art collection could face sell-off to satisfy Detroit's creditors*,
DETROIT FREE PRESS (May 24, 2013, 1:53 PM)....................................7

Melanie Hicken,
*Detroit pensions: Brides, a $5,000 poker chip and a big financial hole*,
CNNMONEY (Aug. 28, 2013, 6:10 AM)..................................................5

Nathan Bomey and John Gallagher,
*How Detroit went broke: The answers may surprise you - and don't blame
Coleman Young*,
DETROIT FREE PRESS (Sept. 15, 2013, 1:10AM) ...................................................6

Nathan Bomey, *Kevyn Orr targeting pensions: Legal fight expected*,
DETROIT FREE PRESS (June 14, 2013, 1:53 PM)....................................................6

*Offering Circular, Taxable Certificates of Participation Series 2006* ...................40

Pat Garofalo and Travis Waldron,
*If You Build It, They Might Not Come:*
*The Risky Economics of Sports Stadiums*,
THE ATLANTIC (Sept. 7, 2012, 2:37 PM) .............................................................54

Steve Yaccino, *Kwame M. Kilpatrick,*
*Former Detroit Mayor, Sentenced to 28 Years in Corruption Case*,
NEW YORK TIMES (Oct. 10, 2013) ......................................................................5

*Three construction companies would become team that builds*
*new Red Wings arena*,
CRAIN'S DETROIT BUSINESS (April 9, 2013, 4:59 PM).........................................53

KE 30840345

# I. PRELIMINARY STATEMENT[1]

1.    The Debtor's Plan[2] is hopelessly defective.  If it were an automobile, it would be pronounced a lemon and promptly sent to the scrapyard.  It fails every material requirement incorporated in chapter 9 of the Bankruptcy Code. Confirmation must be denied.

2.    Specifically, the Plan fails the best interests of creditors test because the paltry recovery it offers to the least favored classes is far less than they would realize if the case were dismissed.  The uniform state law remedies of various stakeholders would do what this Plan does not — level the playing field — and result in a far more equitable outcome.  And all the value creditors would achieve by enforcing their legal rights through normal channels would be over and above the already greater recovery available under the Debtor's own projections if the case were dismissed.

---

[1]    The *Fourth Amended Plan of Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392] and the *Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4391] were filed just seven days before the Plan objection deadline.  Confirmation discovery has only recently commenced.  And pretrial briefs are due July 21, 2014.   [Docket No. 4202].   Accordingly, Syncora preserves all rights regarding objecting to confirmation of the Plan, including to amend, expand, or otherwise supplement this objection and including under paragraphs 18 and 19 of the Scheduling Order.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392].

3. The Plan fails the unfair discrimination test because it enshrines extraordinary and unprecedented disparities of treatment between creditors of equal priority. Though disguised through a combination of massive denominator creep for some and an overvaluing of currency offered to others, in reality favored unsecured creditor classes, based on preliminary analysis, will receive nearly 100 percent — or even higher — recoveries under the Plan while those not so fortunate receive a single-digit recovery. This separate and highly unequal treatment is so extreme that it amounts to a *de facto* reordering of the priorities of the Bankruptcy Code — a result the original drafters of chapter 9 would never have dreamed and for which no subsequent Congress has ever provided.

4. The Plan fails the fair and equitable test because it hides in plain sight billions of dollars of indisputably non-core assets — primarily, but not exclusively, the Debtor's art collection — that could be monetized for the benefit of creditors *writ large*. Instead, the Debtor has cobbled together a transaction that realizes only a fraction of what a market-driven deal would yield and adds insult to injury by using every dollar to fund its illegal discrimination between creditor classes. Though the Debtor cannot be compelled to monetize the art (and other non-core assets) in a rational and value-maximizing manner, its stubborn refusal to do so deals the Plan a lethal blow. Inactions, as much as actions, have consequences, and the Debtor has made its bed.

KE 30840345

5. The Plan fails the feasibility test. Among other things, the Debtor's financial projections are unsound and unsubstantiated, making it impossible to discern whether the Debtor will be able to fund its amorphous reinvestment plan. Additionally, the Plan proposes to overinvest in blight remediation and ignore other pressing needs, and by its own account fails to arrest Detroit's continued decline. It remains unclear whether the reinvestment plan will address the operational dysfunctionality that plagued the Debtor and its departments prior to bankruptcy. Throwing money around without addressing core competency issues is a pointless exercise. The Debtor simply has not met its burden to show that Plan would solve the Debtor's issues, and that the Debtor would not be back at the restructuring table in short order.

6. And the Plan has not been proposed in good faith and in accordance with the law. As if violating bankruptcy law were not enough, the Plan impermissibly redirects tax revenues from holders of UTGO Claims (including Syncora) to pensioners in clear violation of Michigan law. Of course, in light of all — or any one — of the above, it cannot possibly be the case that the Debtor proposed its plan in good faith.

7. How could the Debtor have gotten it so wrong? The answer appears to lie in its fundamental misreading (or exploitation) of this Court's admonition to move as quickly as possible. Detroit's rise to being one of the most affluent cities

3

on the planet happened over a period of decades. So too did its slow and seemingly intractable decline take years. While the Court's — and indeed every person of good faith's — desire to fix Detroit's problems as quickly as possible is entirely understandable, that is not a license for the Debtor to enter into ill-conceived and expedient deals as if there were "a gun to [the Debtor's] head." (Hr'g Tr. Dec. 18, 2013, 109:11).

8.     In the final analysis, the Plan is a short cut to nowhere. The citizens of the City deserve much better. So do its creditors, and so does this Court.

## II. THE DEBTOR'S RENAISSANCE IS ILLUSORY, AND THE DEBTOR IS KEEPING BILLIONS OF DOLLARS IN VALUE FROM CREDITORS

9.     The City once was remarkable as the beacon for American industrialism. From 1900 to 1930, it was the fastest-growing city in the world. Its population base reached nearly 2,000,000 people. It was a metropolis. *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11]. But that was then.

10.     The City lost approximately 150,000 manufacturing jobs between 1947 and 1963 to global competition. The oil crisis in the 1970s caused a 30 percent decrease in automobile production — the City's key economic driver. Many of the City's residents emigrated to find employment and, as more people

left, economic activity declined further. *Id.* More recently, the automotive industry crisis associated with the global financial downturn of 2008 contributed to the City's further decline. *Id.* And corruption and mismanagement at various levels of an already ineffectual city government, including in the mayor's office and the pension systems, compounded the City's problems.[3] In fact, as a result of the mismanagement of the pension systems, the systems were seriously underfunded as of 2005. Indeed, it was the investors in and insurers of the COPs that provided the City the funds to remedy its past bad behavior — the same COPs for which the City provides virtually no recovery under the Plan while permitting the Pension Systems (as defined herein) to continue to benefit from the approximately $1.4 billion of funding provided by the COPs.

11. Now the City's population is fewer than 700,000 people — less than 40 percent of its peak — dispersed across the massive and dilapidated geography of a once great city. *Id.* The City's tax base is eroded. *Id.* Its substantial legacy

---

[3] Steve Yaccino, *Kwame M. Kilpatrick, Former Detroit Mayor, Sentenced to 28 Years in Corruption Case*, NEW YORK TIMES (Oct. 10, 2013), http://www.nytimes.com/2013/10/11/us/former-detroit-mayor-kwame-kilpatrick-sentencing.hmtl?_r=0; Melanie Hicken, *Detroit pensions: Brides, a $5,000 poker chip and a big financial hole*, CNNMONEY (Aug. 28, 2013, 6:10 AM), http://money.cnn.com/2013/08/28/news/economy/detroit-pensions.

5

liabilities continue to grow as its population ages and retires.[4] And its government remains bloated, inefficient, and underperforming.[5]

12. At the beginning of Mr. Orr's term as Emergency Manager, he clearly stated that "*[t]here must be significant cuts in accrued, vested pension amounts* for both active and currently retired persons."[6] Additionally, he stated "the city's pension obligations are an unsecured claim just like any other, such as general obligation bonds, and the *pension obligations shouldn't get special consideration without other creditors agreeing to it.*"[7] Further, this Court recognized Mr. Orr's statements that "the City's plan of adjustment will propose to impair pensions

---

[4] Nathan Bomey and John Gallagher, *How Detroit went broke: The answers may surprise you - and don't blame Coleman Young*, DETROIT FREE PRESS (Sept. 15, 2013, 1:10AM), http://www.freep.com/interactive/article/20130915/NEWS01/120801004/Detroit-Bankruptcy-history-1950-debt-pension-revenue ("It has been obvious for at least a quarter-century that governments and industry were going to face massive legacy costs as more workers aged and retired.").

[5] Joe Guillen, *Information technology: Upgrade needed for obsolete, inefficient systems*, DETROIT FREE PRESS (June 16, 2013), http://www.freep.com/article/20130616/NEWS01/306160067/detroit-city-crisis-information-technology (noting that the Debtor is a "hotbed for government waste").

[6] Nathan Bomey, *Kevyn Orr targeting pensions: Legal fight expected*, DETROIT FREE PRESS (June 14, 2013, 1:53 PM), http://www.freep.com/apps/pbcs.dII/article?AID=2013306140096 (emphasis added).

[7] Chad Holcom, *Pension in play in Detroit bankruptcy: What's equitable*, CRAIN'S DETROIT BUSINESS (Dec. 8, 2013, 8:00 AM) http://www.crainsdetroit.com/article/20131208/NEWs/312089960/pensions-in-play-in-detroit-bankruptcy-whats-equitable (emphasis added).

6

because **the Debtor is unable to propose a plan that does not impair pensions**." *In re City of Detroit, Mich.*, 504 B.R. 191, 194 (Bankr. E.D. Mich. 2013) (emphasis added). Relatedly, regarding non-core asset monetization, Bill Nowling, spokesman for the Emergency Manager, said that the Debtor has to "look at everything on the table . . . . As much as it would pain us to do it, and it does, I'm a great lover of art and so is Kevyn [Orr], we've got a responsibility to rationalize all the assets of the city."[8] But Mr. Orr's and Mr. Nowling's words — like so many promises made in Detroit over the decades — now ring hollow. The Plan diverts hundreds of millions of dollars to pensions from similarly situated and equal-priority creditors and does not account for billions of dollars in non-core assets in unsecured creditor recoveries.

13.    In examining the Plan, it is important to consider the purpose of chapter 9 and its predecessor statutes. Congress was clear. Chapter 9's purpose is: "to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with **minimum (and in many cases, no) loss to its creditors**." H.R. Rep. No. 95-595, at 6221 (1977) (emphasis added). Courts hold the same. *Ashton v. Cameron Cnty. Water Improvement Dist. No. 1*, 298 U.S. 513, 514 (1936)

---

[8]    Mark Stryker and John Gallagher, *DIA's art collection could face sell-off to satisfy Detroit's creditors*, DETROIT FREE PRESS (May 24, 2013, 1:53 PM), http://www.freep.com/article/20130523/NEWS01/305230154/DIA-Kevyn-Orr-Detroit-bankruptcy-art.

(Cardozo, J., dissenting) (noting the primary purpose of chapter 9 was "to provide a forum where distressed cities . . . may meet with creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters *upon a plan deemed mutually advantageous*") (emphasis added); *U.S. v. Bekins*, 304 U.S. 27, 51 (1938) (reaffirming the same). Consistent with the purpose of chapter 9, recoveries for financial creditors as low as those proposed under the Plan are simply unheard of. *See e.g.*, *In re Jefferson Cnty., Ala.*, No. 11-05736 (Bankr. N.D. Ala. Nov. 22, 2013) (confirming plan under which sewer warrants recovered between 65-80% of principal amount plus cash distribution and school warrants were paid in full); *In re Valley Health Sys.*, 429 B.R. 692, 705 n.32 (Bankr. D. Colo. 2010) (confirming plan where certificates of participation paid in full). To be sure, the Debtor blatantly disregards Congressional intent and judicial decree.

## III. CONFIRMATION OBJECTIONS

### A. The Plan Is Not in the Best Interests of Creditors.

14. Section 943(b)(7) of the Bankruptcy Code requires that a plan of adjustment be in "the best interest of creditors." For chapter 9 purposes, "[t]he 'best interest' test has been described as a 'floor requiring a *reasonable effort at payment of creditors by the municipal debtor*.'" *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 712, 718 (Bankr. W.D. Wash. 2009) (citations omitted) (emphasis

8

added).  This means that a plan of adjustment ***must*** afford creditors more than what

they could expect to receive if the case was dismissed.  *See In re Cnty. of Orange*,

191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (quoting 4 *Collier on Bankruptcy* ¶

943.03(7)(a) (16th rev. ed. 1995); *see also In re Sanitary & Improvement Dist.*, 98

B.R. 970, 974 (Bankr. D. Neb. 1989); *see also* 6 *Collier* ¶ 943.03(7)(a) (16th ed.

rev. 2009) ("The courts must . . . apply the [best interests] test to require a

reasonable effort by the municipal debtor ***that is a better alternative to its creditors***

***than dismissal of the case***.  On this basis of a flexible standard, creditors can hope

to receive a reasonable recovery in a chapter 9 case, and the municipality can retain

sufficient tax revenues to provide the services that its inhabitants require.")

(emphasis added); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D.

Colo. 1999) ("The 'best interest' requirement of § 943(b)(7) is generally regarded

as ***requiring*** that a proposed plan provide a better alternative for creditors than

what they already have . . . [and] their only alternative to a debtor's plan is

dismissal.") (emphasis added).[9]  And the Debtor agrees.  (Plan, 78 ("To satisfy this

---

[9]    When determining whether a plan of adjustment is in the best interests of
creditors, courts also look at whether the plan affords creditors all they could
reasonably expect under the circumstances.  *See W. Coast Life Ins. Co. v.
Merced Irrigation Dist.*, 114 F.2d 654, 678 (9th Cir. 1940) (noting that a plan is
in "the best interests of creditors," if the creditors' recovery was "all that could
reasonably be expected in all the existing circumstances").  This test is
substantially subsumed in the fair and equitable standard discussed *infra*
requiring that "the amount proposed to be paid under the plan was all that

9

"best interests of creditors" test, a chapter 9 debtor must establish that confirmation of its proposed plan of adjustment, more likely than not, would leave the debtor's creditors in a better position than would dismissal of the debtor's chapter 9 bankruptcy case.")); *see also Brief in Opposition to [Docket No. 1833]* [Docket No. 2021] (citing *In re Mount Carbon Metro Dist.*, 242 B.R. at 34) ("The 'only alternative to a debtor's plan is dismissal.'").

15.     The best interests test applies to all ***individual*** dissenting creditors, even those whose claims are classified within a class that has accepted the plan. *Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."). Additionally, the best interests test "is designed to protect individual creditors even in the face of majority support for a plan." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 367 (S.D.N.Y. 2007). This principle applies equally to restructurings under chapters 9 and 11 of the Bankruptcy Code. *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 418-19 (1943) ("[M]inorities under the various reorganization sections of the Bankruptcy Act cannot be deprived of the benefits of the statute by reason of a waiver,

---

creditors could reasonably expect under the circumstances." *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942).

10

acquiescence or approval by the other members of the class. The applicability of that rule to proceedings under Ch. IX is plain . . . . [T]he fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent.").

16. The Debtor bears the burden of proving by a preponderance of the evidence that the Plan satisfies the best interests of creditors test.[10] *E.g.*, *In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 715 (citing *In re Mount Carbon*, 242 B.R. at 31) ("The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence.") (citing *In re Mount Carbon*, 242 B.R. at 31). Accordingly, the Debtor must establish that dismissal of the chapter 9 case would not put individual creditors in a better position than they would be in if the Plan were confirmed. The Debtor has not proven — indeed cannot prove — that the Plan satisfies the best interests test.

---

[10] Neither the Court nor the Debtor should construe the schedule set forth in the *Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 4202] (the "*Scheduling Order*"), which provides that parties' objections to the Plan are due before the Debtor has filed its arguments in support of confirmation, as in any way shifting this burden of proof as it relates to the best interests test and all other confirmation standards. Although the Scheduling Order does not explicitly require the Debtor to file a legal brief in support of confirmation, to satisfy its burden of proof, The Debtor must address each and every confirmation requirement, whether objected to or not.

KE 30840345

### 1. COP Holders Would Receive Greater Recoveries than Under the Plan if the Case Was Dismissed.

17.     Holders and insurers of COPs would receive greater recoveries on account of their respective claims if the case was dismissed.  The Debtor has not met its burden to show otherwise.   Indeed, unsecured creditors' rights to accelerated payment are materially reduced outside of bankruptcy and the City expects to generate cash surpluses.[11]  Thus, the Debtor — over time — would be substantially better able to service its COP Claim obligations than is reflected in Plan recoveries.   Additionally, outside of bankruptcy, COP Claim holders have strong remedies and associated enforcement rights that would ensure the parity of treatment denied under the Plan and thus allow for — indeed guarantee — greater recoveries.  Thus, the Plan fails the best interests test.

### a. The Debtor Would Be Substantially Better Able to Service its COP Claim Obligations Outside of Bankruptcy Than Is Reflected in Plan Recoveries.

18.     We start with the Debtor's own numbers — a damning indictment of the Plan's "best interest" deficiencies.  Based just on the ***Debtor's*** projections, if the case was dismissed today, the Debtor would be able to pay approximately

---

[11]  For purposes of the best interests test analysis here, no acceleration of COPs or UTGO payment obligations is assumed.  Syncora preserves its rights in that regard.

KE 30840345

forty-five percent[12] on account of the COP Claims in the ordinary course and without consideration of the Debtor's many available cash flow improvement opportunities versus the stated (notional) ten percent[13] recovery under the Plan on account of COP Claims.[14]  (Disclosure Statement, Ex. 2 to Ex. J, Ex. M).   Thus, the Plan must fail the best interests test.

19.    Specifically, if the case were dismissed, the Debtor's monthly payment obligations[15] on account of unsecured claims in aggregate would be approximately $42.2 million.[16]   Key components of this amount include the following:[17]

---

[12]  The figure represents the average recovery on account of COPs obligations through 2023.

[13]  The percentage recovery stated in the Plan on account of COPs claims is based on the notional amount of the New B Notes.  In actuality, the value of the New B Notes is considerably less and, thus, so is the actual percentage recovery.

[14]  This analysis reflects currently available information and is subject to ongoing discovery and analysis.

[15]  All claim payment obligations are based on ten year averages and are converted to monthly payment obligations for purposes of this analysis.

[16]  The following assessment is based on obligations as of the present time and not as of the Petition Date.  As a result, for example, potential risks associated with the Swaps as of the Petition Date are not addressed due to the City's postpetition settlement with the Swap Counterparties.

[17]  The Debtor has obligations to other unsecured creditors; however, the Debtor has not provided a breakdown of the Other Unsecured Claims.

13

- *OPEB*.  The Debtor projects owing approximately $42.2 million on account of OPEB obligations per year, or, approximately $3.5 million per month.

- *Pensions*.  The Debtor would owe approximately $291.1 million on account of Pension obligations per year, or, approximately $24.3 million per month.[18]

- *COPs*.  The Debtor owes quarterly and semi-annual principal and interest payments on account of its floating- and fixed-rate COPs, respectively.  Assuming monthly payment obligations, the Debtor's total estimated average monthly payment obligation on account of the COP Claims would be approximately $6.1 million.

- *UTGOs*.[19]  The Debtor owes annual principal and semi-annual interest payments on account of its UTGOs.  Assuming monthly payment obligations, the Debtor's total estimated average monthly payment obligation on account of the UTGO Claims would be approximately $4.4 million.

- *LTGO*.  The Debtor owes annual principal and semi-annual interest payments on account of the LTGOs.  Assuming monthly payment obligations, the Debtor's total estimated average monthly payment on account of the LTGO Claims would be approximately $3.9 million.

20.  The Debtor's available surplus cash to defray unsecured claim obligations in the ordinary course *after* paying for operating expenditures would be approximately $25.3 million[20] per month, again without considering additional

---

[18]  Pension obligations assume that no changes to GRS or PFRS are made if the case is dismissed.

[19]  For purposes of this analysis, UTGO claims are assumed to be unsecured. However, the UTGO obligations reflect the UTGO Claim holders' claim to proceeds of the UTGO Bond Tax Levy.

[20]  This is the average amount net of operating expenses for the entire 10 year period included in the Debtor's projections.

14

cash that the Debtor may generate by improving operations or monetizing assets, or by other available means — and without creditors resorting to remedies available under Act 236 of 1961, the Revised Judicature Act (the "*RJA*"). (City of Detroit Ten Year Plan at 6, 8).[21] Taking into account unsecured creditors' claims on and to particular revenue streams, and otherwise assuming unsecured creditor recoveries on a pro rata basis, COP Claims would achieve materially greater recoveries in the ordinary course than those offered under the Plan — 45.2 percent v. notional 10 percent. Additionally, taking into account the City's proposed and imprudent reinvestment spending, approximately $921 million over the first ten years, the City could still provide 25 percent recoveries to unsecured creditors, which is materially greater than the 10 percent nominal COP Claims recovery under the Plan. (Disclosure Statement, Ex. I.) Thus, the Plan fails the best interests test.

21.    Additionally, if the case was dismissed, total unsecured claim amounts immediately due and payable would be far less than the $12 billion of unsecured claims in this case. In the aggregate, unsecured claim amounts due and

---

[21]  This analysis does not account for the cash and cash equivalents on the balance sheet at the time of case dismissal.

KE 30840345

payable by the Debtor upon case dismissal would be approximately $276.3 million.

Key components of this amount include the following:[22]

- **OPEB**.  The Debtor is current on account of its OPEB obligations.

- **PFRS**.  According to the 2013 Independent Audit Reports for the PFRS, the Debtor failed to make 2012 and 2013 payments to the PFRS totaling $71 million.  If the bankruptcy case was dismissed today, the Debtor would owe $71 million to the PFRS.

- **GRS**.  According to the 2013 Independent Audit Reports for the GRS, the Debtor failed to make 2013 payments to the GRS of approximately $35.8 million.  If the bankruptcy case was dismissed today, the Debtor would owe $35.8 million to the GRS.

- **COPs**.  On June 15, 2013, September 15, 2013, December 15, 2013, and March 15, 2014, the Debtor failed to make principal and/or interest payments on the COPs.  In response, Syncora and FGIC made payments to insured COP holders in accordance with their insurance obligations.  The Debtor now owes an aggregate amount of $60.4 million on account of these missed payments.

- **UTGOs**.[23]  On October 1, 2013 and April 1, 2014, the Debtor failed to make interest payments on the UTGOs.  Instead, Syncora, Ambac, National, and Assured made these payments in accordance with their insurance obligations. The Debtor now owes such insurers an aggregate amount of approximately $56.9 million on account of these missed payments.

- **LTGO**.[24]  On October 1, 2013 and April 1, 2014, the Debtor failed to make interest payments on the LTGOs.  Instead, Ambac and

---

[22] Due to the Debtor's failure to provide a breakdown of Other Unsecured Claims, it is unclear what amount would be due and owing on account of the Other Unsecured Claims if the bankruptcy case was dismissed.

[23] Missed payments do not include those that are secured by Distributable State Aid.

[24] Missed payments do not include those that are secured by Distributable State Aid.

16

National made these payments in accordance with their insurance obligations. The Debtor now owes such insurers an aggregate amount of approximately $52.1 million on account of these missed payments.

22. Assuming no monetization of non-core assets or other means of generating extra cash, based on the Debtor's stated available cash and cash equivalents, the Debtor could pay approximately 61 percent of immediately due and payable unsecured claims — including those owed on account of the COPs — if the case were dismissed.[25]  (Data Room Document 4.6.3).  Again, this amount exceeds (approximately quadruples) the recovery on account of COP Claims under the Plan even before taking into account COP Claim holders' enforcement rights. The Plan must fail.

**b.    The Debtor Would Have to Raise Taxes to Pay COP Holders Outside of Bankruptcy, Which Would Provide a Superior Recovery Compared to that Under the Plan.**

23. If the bankruptcy case was dismissed, the Debtor would have sufficient cash on hand to pay COP Claim holders *materially more* than what is offered under the Plan on account of due or past due payments, as well as future payments.  Considering enforcement rights, COP Claim holders would receive *even more*.

---

[25]  Assumptions regarding the City's ability pay outstanding unsecured claims is based on the City's cash position net of property tax distributions as of April 30, 2014.

KE 30840345

24.     Outside of bankruptcy, COP holders could receive substantial incremental recovery on account of unpaid claims.  COP holders could bring an action against the Debtor seeking a judgment for amounts owed.  If COP holders obtained such a judgment, they would be able to enforce it against the Debtor under the RJA.  Under the RJA, the Debtor would be obligated to raise taxes or issue bonds sufficient to satisfy the COP holders' judgment.

25.     The RJA requires a Debtor to either raise taxes (**debt limits notwithstanding**) or issue bonds under Act 34 of 2001, the Revised Municipal Finance Act (the "*RMFA*") to pay a judgment creditor.   MCL § 600.6093, MCL § 600.6097.   Because the Debtor has defaulted on several of its debt payments and is under the control of the Emergency Manager, it currently would not be allowed to issue bonds under the RMFA.  MCL § 141.2303(7) (requiring the Debtor to obtain written approval from the Michigan Treasury prior to issuing securities);  MCL §§ 141.2303(7)(b), MCL § 141.2303(7)(c) (prohibiting the Treasury department from approving the Debtor's request for issuance of new securities unless (a) the Debtor can show that it will be able to make payments on the new securities when due and (b) the Debtor has rectified its debt payment defaults and is no longer operating under the Emergency Manager act).  However, the Debtor has significant assets on hand that it could liquidate or otherwise monetize and other means to generate cash sufficient to remedy its debt defaults

and rectify the financial emergency requiring Emergency Manager oversight. *See* MCL § 141.1565(3) (stating that the governor can remove a municipality from Emergency Manager oversight if he agrees that the municipality's financial emergency has been rectified).[26] Accordingly, the Debtor would be able to issue bonds to satisfy COP Claims if it so chose, and the Debtor has not shown — and surely cannot show — otherwise.

26. In lieu of the Debtor electing to issue bonds, the Debtor would be forced to raise taxes under the RJA to satisfy COP Claims, which taxes may be raised in excess of the maximum rate authorized by the Michigan Constitution, the Home Rule Cities Act, and the Debtor Charter. *See Am. Axle & Mfg., Inc. v. Debtor of Hamtramck*, 604 N.W.2d 330, 333–34 (Mich. 2000) (finding that the RJA does not require voter approval of tax levies in excess of statutory limits); *id.* at 365 (holding that the RJA is not subject to the tax limits set forth in the Home Rule Cities Act); *Hammond v. Place*, 74 N.W. 1002, 1003 (Mich. 1898) (finding that the RJA provides for the payment of judgments, exclusive of the limitations to taxation established by municipal charters). The Debtor has made no showing that it would not be able to generate revenue sufficient to pay COP holders by raising taxes. The Debtor merely stated that it "assumed that the Michigan Legislature . . .

---

[26] Moreover, Act 279 of 1909, the Home Rule Cities Act, gives the Debtor the ability to issue "financial recovery bonds" in excess of its normal debt limitations if a financial emergency exists under the EM Act. MCL § 117.36a.

will not approve either the increase of any existing taxes currently levied by the City or the imposition of any new taxes by the City," but it has provided no evidence in support of this assumption. (Disclosure Statement, 82). Further, there is nothing in the Disclosure Statement to suggest that the Debtor cannot raise taxes other than its unsupported belief that increasing tax rates would not lead to increased revenues. (Disclosure Statement, 168 ("[T]he City believes that increasing its already-high tax rates would have a negative impact on the City's revenue going forward.

27. To be sure, if the bankruptcy case was dismissed today and all creditors (most prominently, indenture trustees of much of the City's funded debt) raced to the courthouse and obtained judgments enforceable under the RJA, the Debtor would negotiate with those creditors regarding how real estate taxes should be raised to allow for payment over time, and these creditors would participate collectively in this process much like what should have happened in this case, but did not. *See*, *e.g.*, *Smith v. Royal Oak Twp.*, No. 2010-113507-CK, 2013 WL 6405315, at *2 (Mich. Cir. Ct. Oct. 9, 2013) (entering consent judgment allowing defendant township to pay judgment through ad valorem taxes levied over a period of six years). Higher taxes would yield incremental value without leading to population decline and a shrinking tax base. Alternately, the Debtor could generate revenue through other means, including monetizing non-core assets

20

or imposing alternative taxes, which would yield additional revenue to repay creditors without impairing the Debtor. The Debtor chose the path of least political resistance — despite all of its brave talk about shared sacrifice. While the Debtor's hurried capitulation to holders of certain unsecured claims may have cured its political migraine, it caused an outcome in which creditors with billions of dollars of claims would fare far better with a case dismissal. The Plan fails the best interests test.

### B. The Plan Unfairly Discriminates Between Classes of Similar Claims.

28. Similar claims placed in different classes may receive different treatment as long as such treatment does not amount to "unfair discrimination." *In re Aztec Co.*, 107 B.R. 585, 588–89 (Bankr. M.D. Tenn. 1989). The Bankruptcy Court for the Eastern District of Michigan has applied two tests to determine whether disparate treatment under a plan amounts to "unfair discrimination," the more recently adopted rebuttable presumption standard, also known as the "Markell" test,[27] and the older, four-factor *Aztec* test.[28] The Sixth Circuit has not chosen between them. No matter. Applying either test, the Plan discriminates unfairly and must be denied.

---

[27] The Markell test was adopted by the Bankruptcy Court for the Eastern District of Michigan in 1999 in *In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999).

[28] *In re Aztec*, 107 B.R. 585 (Bankr. M.D. Tenn. 1989); *In re Graphic Commc'ns, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996).

### 1. The Plan Unfairly Discriminates between COP Claims and Pension Claims Under the Markell Test.

29.     Under the Markell test, a rebuttable presumption of unfair discrimination exists if, under the plan of adjustment, there is:

(a) a dissenting class;[29]

(b) another class of the same priority; and

(c) a difference in the plan's treatment of the two classes that results in either

(i) a materially lower percentage recovery for the dissenting class, or

(ii) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*In re Dow Corning Corp.*, 244 B.R. at 702.

30.     Regarding the second element of the Markell test, the focus is on claims of the same seniority. *In re BWP Transport, Inc.*, 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011) ("[T]he appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, *i.e.* [among holders of] 'Administrative Claims,' 'Secured Claims,' 'Priority Claims,' etc."). Here, COP Claims fall under the broad rubric of Unsecured Claims, as do the *pari passu* Pension Claims.

---

[29] While Plan solicitation has not yet started, this objection assumes — safely — that the COP Claims class will reject the Plan and its *de minimis* recovery.

31.     As to the third element, "[t]here is no bright line test which establishes whether a given difference in percentage recovery results in unfair discrimination . . . ." *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000).  But, "[c]ourts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (***50% or more***) to similarly situated creditors." *Id.* at 231 (emphasis added); *see also In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537–58 (Bankr. E.D. Tenn. 1997) (finding unfair discrimination where class of unsecured trade debt would be paid in full while another class comprising secured creditor's deficiency claim was receiving approximately 50 percent); *In re Cranberry Hill Assocs., L.P.*, 150 B.R. 289, 290-91 (Bankr. D. Mass. 1993) (same); *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994) (holding that 90 percent disparity between recoveries to classes of unsecured creditors was unfair discrimination); *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994) (denying confirmation on basis of discrimination where one unsecured class of claims received 100 percent recovery and another unsecured class received 15 percent recovery).

32.     A plan proponent can rebut the presumption of unfair discrimination by showing that, outside of bankruptcy, the dissenting class would receive similarly less than the class of the same priority that is being favored under the

plan of adjustment, or that the alleged preferred class has infused new value (*i.e.*, money) into the reorganization which exceeds the value of its plan recovery. *In re Dow Corning Corp.*, 244 B.R. at 702. Alternatively, the plan proponent may rebut the presumption of unfair discrimination by showing that the allocation of risk of recovery under the plan of adjustment is consistent with the allocation of risk of recovery that the relevant parties' assumed before the bankruptcy. *Id.*; Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 252 (1998) (explaining that "[t]hese expectations and assumptions are typically embodied in the risk inherent in the instrument evidencing the prepetition claim or interest").

33.    Importantly, the legislative history of chapter 9 indicates that a plan proponent may not discriminate against certain creditors on the basis that the favored claimants are residents or a legislative body. *See* H.R. Rep. 94-686, 33 ("This paragraph also requires that the plan not discriminate unfairly in favor of any creditor or class of creditors . . . . It prohibits special treatment of any creditor, such as a fiscal agent or resident of the taxing district."); *see also Mission Indep. Sch. Dist. v. State of Tex.*, 116 F.2d 175, 177-78 (5th Cir. 1940) (noting that the Bankruptcy Code "makes no provision for separate or preferential treatment" of a creditor even if the creditor is a political body, such as a state).

34.     Here, the Plan unfairly and without justification widely favors Pension Claim holders to other unsecured creditors.  It recognizes — as it must — that both the Pension Claims and COP Claims are unsecured claims.  Yet, COP Claim recovery under the Plan is *vastly* lower than Pension Claims recoveries under the Plan.  And, as set forth below, the allocation of risk of recovery to COP Claims under the Plan is materially greater than the allocation of risk of recovery to Pension Claims under the Plan.  Both Pension Claim and COP Claim recovery *and* risk allocation under the Plan are wildly inconsistent with Pension Claim and COP Claim recovery and risk allocation outside of bankruptcy — and the Debtor cannot show otherwise.  Indeed, outside of bankruptcy, the COP holders would have the same remedies against the City available to the Pension Claim holders.  *See Offering Circular, Taxable Certificates of Participation Series 2006*, 10 (stating that the remedy available to COP holders in the event of non-payment "*is the same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the tradition funding mechanism*") (emphasis added).  Thus, the Plan unfairly discriminates and cannot be confirmed.

> a.     **COP Claim Recovery under the Plan is Far Lower than Pension Claims Recoveries under the Plan.**

35.     On its face, the Plan creates a rebuttable presumption of unfair discrimination against the COP Claims.  It provides PFRS Claims a 59 percent

25

recovery, GRS Claims a 60 percent recovery, and COP Claims only a notional 10 percent recovery. As a result, a rebuttable presumption of unfair discrimination exists based on claim recoveries as stated in the Plan. *In re Greate Bay Hotel & Casino*, 251 B.R. at 231 ("Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors."). Thus, a rebuttable presumption of unfair discrimination exists.

36.    But, worse still, the true disparity between Pension Claims recoveries and the COP Claim recovery is far greater than 50 percent. Pension Claims under the Plan are grossly inflated because they are calculated using a forward-looking unfunded accrued actuarial liability ("*UAAL*") instead of a UAAL equal to the unfunded present value of accrued benefits ("*UPVAB*"). (Disclosure Statement, 12–13.) And the Debtor's discount rate and rate of return assumptions are inappropriate, thus artificially lowering the percentage recovery for Pension Claims. While there are additional errors with the Debtor's calculations of the Pension Claim recoveries, these issues alone result in a substantial increase to those recoveries. The Plan states that the PFRS Claims and GRS Claims are receiving recoveries of between 39 percent and 59 percent, and 48 percent and 60 percent, respectively. (Disclosure Statement, 37, 39.) In fact, with appropriate, and limited, corrections to the Debtor's recovery calculations, the PFRS Claims

KE 30840345

and GRS Claims are receiving recoveries of up to 155 percent[30] and 92 percent, respectively.

37. **UAAL v. UPVAB**. Let's consider the size of the Pension Claim based on UPVAB instead of UAAL. The Debtor's estimated UAAL is based on a forward-looking metric that accounts for benefits individuals currently in the pension systems will earn over time. Retirees have earned all pension benefits. Active employees, however, have not. As to active employees, the Debtor's UAAL necessarily includes the value of benefits not yet earned and thus not vested and to which such employees have no right to payment as of the Petition Date. 11 U.S.C. § 502(b) (The court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition*.") (emphasis added)); *see In re HNRC Dissolution Co.*, 396 B.R. 461, 466 (B.A.P. 6th Cir. 2008) (noting that "[u]nfunded vested benefits (sometimes referred to as 'UVBs') are defined under [ERISA] as the difference between the present value of *vested benefits* and the current value of the plan's assets") (emphasis added).

38. Instead, the Debtor should be calculating Pension Claim amounts using UPVAB. That is, Pension Claims should represent only those unfunded

---

[30] This means that individual PFRS Claim holders will be paid in full and the PFRS will be actuarially overfunded.

benefits that pensioners have **_earned_** and **_accrued_** as of the Petition Date.[31] Calculating the size of the Pension Claims based on UPVAB (using the Debtor's 6.75 percent discount rate to determine the size of the claim and 6.75 percent rate of return on Pension Systems[32] assets, as the Debtor employs as described in the Disclosure Statement) results in increased PFRS Claim recoveries of between 61 percent and 85 percent and GRS Claims recoveries of between 60 percent and 72 percent.

39. **Discount Rate**.   Next, let's consider not only the size of the Pension Claims based on UPVAB but also the City's assumed discount rate. If the Pension Claims are calculated using a 7.5 percent discount rate, as was the Debtor's assumption as of the Petition Date (but continuing to assume a 6.75 percent rate of return on Pension System assets), the PFRS Claim recovery increases to between 87 percent and 121 percent and GRS Claim recovery increases to between 71 percent and 85 percent.

---

[31] The Debtor apparently agrees, stating that Pension Claims should be "equal to the difference between the market value of the assets in the [Pension Systems] . . . and the present value of the [Pension Systems] (in other words, the total amount of all [Pension System] pension benefits _accrued_ . . ." Plain Language Insert - Class 10 PFRS Claims [Docket No. 4276] (emphasis added). Yet, this is not how the Debtor calculates Pension Claims.

[32] "Pension Systems" means the GRS and PFRS.

40.  **Rate of Return**.  Finally, let's consider the rate of return used to calculate Pension Claim recoveries.  If the Pension Systems achieve a rate of return on their assets of 7.5 percent, which is the prevailing market rate, PFRS Claim recoveries would increase further to between 121 percent and 155 percent and GRS Claim recoveries would increase further to between 78 percent and 92 percent.  Moreover, these adjusted recovery numbers do not even reflect additional recovery on account of 50 percent of the upside of a consummated post-emergence DWSD transaction.  (Disclosure Statement, 66).

41.  To summarize the above discussion, based on adjusted PFRS and GRS Claim amounts as set forth above and the distribution property allocated to PFRS[33] and GRS Claims[34] under the Plan, the following sets forth *actual* PFRS and GRS Claims recovery ranges:

---

[33]  PFRS Claims will be funded by (i) State, Foundation, and DIA contributions from 2015–2023, (ii) Debtor contributions after 2023, and (iii) 40.6% of the UTGO Settlement Funds to be "gifted" to Pension Claims.

[34]  GRS Claims will be funded by (i) DWSD contributions from 2015-2023, (ii) State, Foundation, and DIA contributions from 2024–2033, (iii) Debtor contributions after 2023, (iv) 59.4% of the UTGO Settlement Funds to be "gifted" to Pension Claims; and (v) 50% of the upside of a Qualifying DWSD Transaction.

KE 30840345

| Claims | Range Stated in Plan | Range Adj. for UPVAB[35] as UAAL | | |
| --- | --- | --- | --- | --- |
| | | discounted at 6.75%[36] with 6.75% return on assets (*"Adj. 1"*) | discounted at 7.5% with 6.75% return on assets (*"Adj. 2"*) | discounted at 7.5% with 7.5% return on assets (*"Adj. 3"*) |
| Class 10 PFRS Claims | 39% and 59% | 61% and 85% | 87% and 121%[37] | 121% and 155% |
| Class 11 GRS Claims | 48% and 60% | 60% and 72% | 71% and 85% | 78% and 92% |

---

[35] Based on the City's discussion in the Disclosure Statement's introduction, it is assumed that the savings created by the Annuity Savings Recoupment (which the City estimates is $230 million) is deducted from the UPVAB for Claims purposes, consistent with the City's apparent calculation of UAAL for Claims purposes.

[36] Low end of the recovery range assumes no contributions from the State, Foundations, or DIA. High end of the recovery range assumes contributions from the Debtor, State, Foundations, DIA, DWSD, and UTGO Settlement.

[37] Although pensioners themselves likely will not receive greater than 100% of their individual claims, the Pension Claims are held by the Pension Systems, which could receive recoveries in excess of 100%, resulting in overfunded systems.

30

42.     Compared to the COP Claim recovery stated in the Plan, the disparity is striking.

| Claims | Disparity between Pension Claim and COP Claim Recovery | Adj. 1 Disparity between Pension Claim and COP Claim Recovery | Adj. 2 Disparity between Pension Claim and COP Claim Recovery | Adj. 3 Disparity between Pension Claim and COP Claim Recovery |
|---|---|---|---|---|
| Class 10 PFRS Claims | Up to 49% | Up to 75% | Up to 111% | Up to 145% |
| Class 11 GRS Claims | Up to 50% | Up to 62% | Up to 75% | Up to 82% |

43.     Notably, the substantial distribution property contributed exclusively to the PFRS and GRS to fund pensioners' stated recoveries is a result of the Debtor diverting over a billion dollars of value from multiple sources, including the DIA and Foundations on account of the art, State Contribution Agreement, UTGO Settlement, and the DWSD, solely for the benefit of Pension Claims.[38]   This

---

[38] Although not explicitly addressed in the Plan, the Disclosure Statement indicates that the remaining 50% of the proceeds of a Qualifying DWSD Transaction will go to the Debtor, and further suggests that the Debtor may distribute such proceeds to holders of Allowed Claims in Classes 7 (Limited Tax General Obligation Bond Claims), 13 (Downtown Development Authority Claims) or 14 (Other Unsecured Claims).   (Disclosure Statement § VIII.L.3.(d).ii.)  To the extent the Debtor intends to distribute proceeds of a Qualifying DWSD Transaction to holders of Allowed Claims in Classes 7, 13 or 14, and not to holders of COP Claims in Class 9, Syncora submits that this

unfavorable diversion of value away from other unsecured claim holders results in grossly different treatment of equally situated creditors. Even using the Debtor's stated but suspect claim and distribution amounts, if the fruits of the various settlements struck by the City were distribution property shared among unsecured creditors fairly and on a pro rata basis, holders of COP Claims would receive an incremental 11 percent recovery (more than doubling the proposed recovery under the Plan). Importantly, this incremental recovery does not take into account pension restoration. It includes only consideration attributable to the DIA Settlement, State Contribution Agreement, UTGO Settlement, cash, and new notes. Additionally, because the Pension Claims are overstated in the Plan, the true incremental value available to COP Claim holders if the distribution property was shared fairly is even higher.[39]

44. Compounding the sin of understating Pension Claims recoveries, the Plan also overstates COP Claims recovery. COP Claims are entitled to their pro rata share of the New B Notes, which have a stated initial principal amount of $650 million. (Plan, Ex. I.A.183.) COP Claims would share the New B Notes with,

---

constitutes impermissible unfair discrimination pursuant to section 1129(b)(1) under the standards articulated herein, and reserves all rights to supplement this argument.

[39] Syncora also believes the OPEB Claim is overstated and reserves all rights to object to the size of the OPEB Claim.

among others, OPEB Claims, Downtown Development Authority Claims, and Other Unsecured Claims. Assuming COP Claims are Allowed in full and based on the stated principal amount of the New B Notes, COP Claims would be receiving a 10 percent recovery under the Plan. But the New B Notes are not worth anything approximating par. The 30 year tenor of the notes and the risks associated with the notes paying principal and interest over time (the notes do not even pay principal for the first ten years after issuance) make them worth far less than their face amount. The Debtor acknowledges that the New B Notes may not trade at par. (Disclosure Statement, 83 (discussing risk factors under the plan, including that "[h]olders of the New Securities (including holders of the New B Notes) may encounter limited market acceptance of City credit upon any attempt to sell City debt obligations, making sales at or near par potentially difficult.")). Yet, even assuming a 10 percent recovery on COP Claims, the true Pension Claims recoveries under the Plan, considering claim and investment return adjustments, are vastly greater than the COP Claims recovery.

45.    Because the disparity in recoveries between similarly situated creditors here is *so great*, Plan confirmation must be denied.

KE 30840345

**b.** **The Plan Allocates Materially Greater Risk to the COP Claim Recovery than it Does to the Pension Claim Recoveries.**

46.     It cannot be a matter of serious dispute that the Plan allocates materially greater risk to the COP Claim recovery than it does to the Pension Claim recovery.  Under the Plan, the State, Foundations, and the DIA Funding Parties will fund, in cash, 100 percent of the PFRS Claim recovery through June 30, 2023 and approximately 20 percent of the GRS Claim recovery from June 30, 2024 through June 30, 2033 in accordance with the Plan, State Contribution Agreement, and the DIA Settlement.  The State,[40] the Foundations, and the DIA Funding Parties are stable, low-risk sources of funds.  (*See* **Schedule 1** attached hereto).  In contrast, the COP Claim recovery is being funded with the New B Notes over 30 years with sole recourse to the City.  The New B Notes do not begin to amortize until the 11th year after they are issued.  Prior to that, payments on the New B Notes are interest only and will come from the Debtor's General Fund — a

---

[40]   *Credit Rating,* Open Michigan, https://www.michigan.gov/midashboard/0,1607,7-256-58012_58016_58492---,00.html (last visited May 9, 2014) (2013 "High Grade" Credit Ratings: Moody's, Aa2 (positive); Standard & Poor's, AA- (positive); Fitch, AA (stable)); *Update 3-Michigan's economic rebound brightens credit prospects,* Apr. 2, 2013, http://www.reuters.com/article/2013/04/02/usa-michigan-rating-idUSL2N0CP16F20130402 ("Michigan's economic upswing won the state a higher credit rating from Fitch Ratings and a positive outlook from Standard & Poor's Ratings Services…'based on the state's rebounding economic performance, including the improved competitive posture of the state's auto industry after its restructuring.'").

KE 30840345

riskier source of funds than the State, the Foundations, and the DIA Funding Parties. If the Debtor fails to achieve its projected financial performance, there could be insufficient funds in the General Fund with which to make interest and principal payments on account of the New B Notes. (Disclosure Statement, 82 (discussing risk factors under the Plan)). Accordingly, considering payment schedules, sources of funds, and recourse, the COP Claim recovery is at substantially greater risk than the Pension Claim recoveries. This is yet another form of unfair discrimination and an independent basis for creating a presumption of unfair discrimination.

### c. The Debtor Cannot Rebut the Presumption of Unfair Discrimination.

47. As set forth above, the vast disparity in treatment creates a compelling presumption of unfair discrimination here. The Markell test, thus, lays a heavy burden on the Debtor to rebut that presumption. The Debtor must show either:

> (i)     that the Pension Claim holders have infused new value into the reorganization that offsets their recovery under the Plan; or
>
> (ii)    that the difference in treatment between Pension Claims and COP Claims under the Plan (percentage recoveries, risk allocation) would exist outside of bankruptcy.

*In re Dow Corning Corp.*, 244 B.R. at 702. The Debtor can show neither.

48. *First*, courts have not addressed the definition of "new value" within the context and application of the presumption-based test for unfair discrimination.

35

However, in at least one chapter 9 case, the Supreme Court held that preferred treatment of a creditor did not unfairly discriminate because that creditor "ventured the capital necessary to effectuate the plan of composition" under review "by underwrit[ing] the whole refinancing program." *Mason v. Paradise Irr. Dist.*, 326 U.S. 536, 541 (1946) (noting that "[i]t has long been recognized in reorganization law that those who put ***new money*** into the distressed enterprise may be given a participation in the reorganization plan reasonably equivalent to their contribution.") (emphasis added).

49.    Courts have addressed the meaning of "new value" in several other contexts, including under the absolute priority rule exception, also known as the "new value corollary," and the avoidance of preferential transfers exception.  In none of those contexts has a court held that "sweat equity" or past performance, however, amounts to new value.  In all of those contexts, "new value" means money or its close equivalent that is either necessary to or facilitates the reorganization.  *See*, *e.g.*, *Polite Enter. Corp. Pty. Ltd. v. N. Am. Safety Prods., Inc.*, No. 13 C 01089, 2014 WL 321668, at *7 (N.D. Ill. Jan. 29, 2014) ("Courts have recognized an exception to the absolute priority rule where a pre-bankruptcy equity investor invests new capital in exchange for equity in the reorganized debtor.") (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 442 (1999)); *In re Brothby*, 303 B.R. 177, 195 (9th Cir. BAP

36

2003) ("The new value exception to the absolute priority rule allows junior interest holders (*e.g.*, shareholders of a corporate debtor) to receive a distribution of property under a plan if they offer 'value' to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received."); 11 U.S.C. § 547(a)(2) (defining "new value" as "money or money's worth in goods, services, or new credit"). It is no slight to state the obvious — Pension Claim holders have infused no new value whatsoever here to justify their enormously preferential treatment. And there is ***no legal*** basis — whatever one's sympathies — to ***reward*** some creditors for past services by hugely discriminating against others. By definition, historical services however ably performed cannot be "new value."

50. ***Second***, there is no evidence at all that retirees and COP holders took on different legal risks prior to the Petition Date. The Debtor funded its debt service obligations ***on both the COPs and pensions from its General Fund***. Thus, the COPs and pensions drank from the same exact well and had the same exact risk regarding the strength of the source of payment.

51. Outside of bankruptcy, COP Claims and Pension Claims are both contractual obligations of the Debtor. *See* COP Service Contract § 4.02(b) ("The obligations of the City hereunder, including its obligation to make Contract

KE 30840345
13-53846-tjt   Doc 4679   Filed 05/12/14   Entered 05/12/14 23:04:47   Page 46 of 83

Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City."); *In re City of Detroit, Mich.*, 504 B.R. at 153–54, 161 (concluding that "pension benefits are a contractual obligation of the municipality" and "the only remedy for impairment of pensions is a claim for breach of contract"). Outside of bankruptcy, the Debtor cannot impair its contractual obligations, including those obligations related to the pensions and the COPs. U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts"); Mich. Const. art. I, § 10 ("No . . . law impairing the obligation of contract shall be enacted."); Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."). Similarly, although PA 436 gives an emergency manager some authority to impair the Debtor's contractual obligations when it is in receivership, COP Claims and Pension Claims are both exempt. MCL § 141.1552(12)(1)(j) (providing that an emergency manager may "[r]eject, modify, or terminate 1 or more terms and conditions of an existing contract"); *id.* at § 11(1)(b) (requiring the Emergency Manager's financial and operating plan to provide for "[t]he payment in full of the scheduled debt service requirements on all . . . contract obligations in anticipation of which bonds, notes and municipal securities are issued"); *id.* at § 12(m)(ii) ("The emergency manager

38

shall fully comply with . . . section 24 of article IX of the state constitution of 1963 . . . ."). In light of the above, it simply cannot be said that COP Claim holders assumed greater risk than pensioners prior to the Petition Date. Any claim to the contrary is frivolous.

52. **Third**, as previously discussed, outside of bankruptcy, COP Claim holders can enforce a judgment against the Debtor under the RJA. The Debtor would have to raise taxes or issue New Bonds with proceeds sufficient to satisfy the judgment. MCL §§ 600.6093, 600.6097. The Debtor has the ability to do either, *see* supra Section III.A.1.b. The Pension Systems would similarly be able to obtain a judgment against the Debtor requiring the Debtor to appropriate funds sufficient to make its annual contributions. *See Bd. of Trustees of Policemen/Firemen Ret. Sys. of City of Detroit v. City of Detroit*, No. 253343, 260060, 2005 WL 1314197, at *1 (Mich Ct. App. June 2, 2005) (affirming mandamus[41] requiring City to appropriate approximately $44.8 million for two years of missed annual contributions); *Ernest Clark v. Debtor of Benton Harbor*, Case No. C-9651-B (Aug. 14, 1984) (ordering city of Benton Harbor to pay $2.6 million of unfunded pension liabilities).

---

[41] If the Debtor does not have sufficient funds on hand to satisfy the mandamus, the Pension Systems would have to seek relief under the RJA, placing them in the **exact** same position as COP Claim holders.

39

53.     The Offering Circular that was used to sell the COPs in the first instance makes clear that COP Claim holders and the Pension Systems have *identical* enforcement rights.  *Offering Circular, Taxable Certificates of Participation Series 2006*, 10 (stating that the remedy available to COP holders in the event of non-payment "is the ***same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the tradition funding mechanism***") (emphasis added).  Because the COP Claim holders' enforcement rights are ***precisely*** the same as the Pension Systems' enforcement rights, the percentage difference in Pension Claim and COP Claim recoveries under the Plan could not exist outside of bankruptcy nor is it anything but frivolous to suggest that the COP holders took some additional quantum of risk.  Accordingly, the Plan unfairly discriminates under the Markell test and cannot be confirmed.

### 2.     The Plan Unfairly Discriminates Against the COP Claims under the *Aztec* Test.

54.     Even if the Court decides to analyze the Plan under the older *Aztec* test, the result is the same.  The *Aztec* test consists of a four factor inquiry:

> (a) whether the discrimination is supported by a reasonable basis; (b) whether the debtor can confirm and consummate a plan without the discrimination; (c) whether the discrimination is proposed in good faith; and (d) the treatment of the classes discriminated against.

40

*In re Aztec*, 107 B.R. at 590. The burden is on the plan proponent to provide evidence of why the discrimination is ***reasonable and necessary*** to consummate the plan. *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 892 (Bankr. N.D. Ohio 2004) (refusing to permit an enhanced distribution to trade creditors precisely because the debtor made no meaningful showing that its trade creditors required preferential treatment). The test is conjunctive, thus the Debtor must satisfy all four elements to show that the discrimination is fair.

55. Under the *Aztec* test, courts have permitted some degree of discrimination as reasonable if the purpose is to "***protect a relationship with specific creditors that the debtor need[s] to reorganize successfully***," such as with certain trade creditors. *In re Graphic Commc'ns, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996) (emphasis added) (quoting *Creekstone Apartments Assoc., L.P. v. Resolution Trust Corp. (In re Creekstone Apartments Assoc., L.P.)*, 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994)). Indeed, the plan proponent must provide evidence that the plan cannot be confirmed absent such discrimination. *See In re Snyders Drug Stores*, 307 B.R. at 895 (finding the test was not satisfied because the record did not substantiate the debtor's claim that creditors would not have agreed to the deal absent the proposed discriminatory treatment). Also, in determining whether discrimination is "unfair," courts consider "whether there is a meaningful recovery for creditors disadvantaged by the discrimination."

41

*In re Aztec*, 107 B.R. at 591; *In re Snyders Drug Stores*, 307 B.R. at 896 (finding that zero recovery did not amount to meaningful recovery). But the Debtor has provided no justification that the discrimination proposed under the Plan is either reasonable or necessary.[42]

56. Moreover, analyzing the relationship between and relative importance of COP Claim holders to Pension Claim holders, the COP Claims holders are just as, if not more, important to the Debtor's post-emergence success. As a preliminary matter, the COPs were issued to fill a $1.4 billion underfunding in the Pension Systems, without which, the Pension Claims would be greater by approximately $1.4 billion. Additionally, COP Claim holders are financial creditors who are regular participants in the municipal securities market, which the Debtor may need to tap again if it fails to satisfy its obligations, including its pension obligations, in the long-term. Providing significantly inferior recoveries to COP Claim holders is likely to result in higher borrowing costs for the Debtor post-emergence.[43] Access to the capital markets is essential to any city's ability to

---

[42] The perverse irony of the Debtor's proposed discriminatory treatment is that every dollar of proceeds from the COPs went to shore the Pension Systems, and retirees benefited directly from the issuance of the COPs — proving no good deed goes unpunished.

[43] Press Release, Fitch Ratings, Fitch: Detroit Plan of Adjustment Hostile to Bondholders (Feb. 24, 2014), *available at* http://www.fitchratings.com/creditdesk/press_release/detail.cfm?print=1$pr_id =821493.

42

fund its operations. Finally, any argument that Pension Claim holders are more important to the Debtor's recovery because they will reinvest their recovery in the local economy is largely without merit as 65 percent of retired Pension Claim holders do not reside within the City's limits. (Dataroom 3.6, Retiree by City.)

57. The discriminatory treatment certainly is not necessary. The Debtor has not shown, indeed, cannot show, otherwise. The Debtor has offered ***no evidence*** that it could not pay COP Claims and Pension Claims similarly. *In re Crosscreek Apartments, Ltd.*, 213 B.R. at 537 ("[N]o explanation has been offered as to why the [favored class] cannot simply be paid the same amount as [the unfavored class] . . . ."). So what is the explanation for the discrimination? The same dynamic that has plagued Detroit these many years — short-sighted, politically expedient decision making. Nothing more, and nothing less.

58. The Debtor cannot show that the discrimination was proposed in good faith. As discussed *infra*, the Debtor has attempted to shield its non-core assets from monetization, purposefully withholding value that could otherwise increase recoveries to COP Claim holders. *C.f. In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994) (noting that, in the context of eligibility, "[a] commercial party can hardly 'negotiate in good faith' regarding unpaid obligations if it . . . ***refuses to acknowledge or throw into the negotiating equations a large and significant asset it holds***") (emphasis added); *see also*

43

*In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 719 (noting that "an attempt to cut-off potential sources of funds for payment of claims . . . raises the issue of whether the City's Amended Plan has been proposed in good faith"). Further, any value the Debtor has created is being funneled only to specific groups of politically favored creditors in a further attempt to prevent a meaningful recovery to COP Claim holders. The discrimination provided under the Plan is a product of the Debtor's evasion of its duty to maximize value for all stakeholders and is not proposed in good faith.

59.    Finally, the treatment provided under the Plan cannot be considered a "meaningful recovery." *In re Aztec*, 107 B.R. at 591. The nominal value of the COP Claim recovery is 10 percent assuming COP Claims are allowed in full. There is no bright line test for what constitutes a "meaningful" recovery. Instead, the recovery provided to the disfavored class must be viewed in relation to the recovery provided to the favored class. *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (examining whether "the degree of discrimination is in ***direct proportion to its rationale***") (emphasis added). The Debtor has provided ***no rationale*** for the discrimination proposed under the Plan, let alone a rationale sufficient to justify the 62 percent (assuming only the preliminary adjustment of UPVAB as UAAL) — or greater — differential between recoveries to COP Claims and Pension Claims. *See* Transcript of Bench Decision on

Confirmation of Plan of Debtors at 146–47, *In re Lightsquared Inc.*, Case No. 12-12080 (Bankr. S.D.N.Y. May 8, 2014) (rejecting the proposed treatment on the basis that the discrimination is neither necessary nor in proportion to its rationale and noting that,

> "[I]t is difficult to imagine discrimination that could be much more unfair than that contemplate [*sic*] by the plan. Close to full payment in cash on confirmation [for the favored unsecured class], . . . versus an equity-like deeply subordinate seven-year third lien pick [*sic*] interest note for [the unfavored unsecured class], treatment that, even if possibly yielding payment of the value of the [unfavored unsecured class] claim seven years down the road, for all intents and purposes puts [the unfavored unsecured class] at the mercy of the rest of the proposed post-confirmation capital structure").

60.    There is no legally permissible basis for the discrimination and the Plan must fail.[44]

---

[44] Indeed, the discrimination under the Plan is so extreme that it is tantamount to equitable subordination or a reordering of claim priorities. The Debtor has put forth no theory of inequitable conduct to justify equitable subordination of the COP Claims to the Pension Claims. *See In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 744 (6th Cir. 2001) (holding that equitable subordination is permissible, though not required, upon a showing that "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act"). And ***none*** exists. Additionally, the claim priority scheme under the Bankruptcy Code is up to Congress — which is fully capable of adopting priorities when it sees fit. *See* 11 U.S.C. § 507(a). Congress has not created a new priority for Pension Claims. The law of this case is that Pension Claims may be impaired and the Debtor has classified Pension Claims as unsecured. (Eligibility Opinion, 80; Disclosure

45

## C. The Plan Is Not Fair and Equitable

61.    Where, as here, a debtor desires to "cram down" a plan of adjustment on dissenting creditors, the debtor must prove that the plan is fair and equitable. 11 U.S.C. § 1129(b)(2). In the chapter 9 context, a plan is fair and equitable if "the amount proposed to be paid under the plan was all that the creditors could reasonably expect under the circumstances." *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (citing *W. Coast Life Ins. Co. v. Merced Irrigation Dist.*, 114 F.2d 654, 678 (9th Cir. 1940)); *see also* 6 Collier on Bankruptcy, ¶ 943.03[1][f][i][B] (16th ed. 2013) (noting that the "fair and equitable rule has additional content in chapter 9 cases" while quoting the "reasonable expectations" standard set forth in *Lorber*).

62.    In chapter 9, a debtor is supposed to seek to minimize creditors' losses. *Bekins*, 304 U.S. at 51. That is what bankruptcy law demands and what creditors can reasonably expect. The Debtor cannot show that COP Claim holders are receiving what they could reasonably expect under the circumstances when the Debtor is proudly shouting from the rooftops its intent to avoid maximizing the

---

Statement, 36.) The Debtor may not elevate Pension Claims to secured status by treating unencumbered assets, such as the art collection, as if they were encumbered for Pension Claim holders' sole benefit. The discrimination under the Plan is so pervasive and so without justification that it simply cannot stand.

value of any non-core assets and instead funnel virtually all available value to specific classes of unsecured creditors.

63. Courts hold that municipal debtors cannot ignore assets when crafting a plan of adjustment. For example, in *Fano v. Newport Heights Irr. Dist.*, the court examined whether a municipality could, via a plan of adjustment, force its creditors to accept reduced recoveries and still satisfy the "fair and equitable" and "best interests of creditors" standards. 114 F.2d 563, 566 (9th Cir. 1940). In that case, a municipal irrigation district defaulted on interest payments to its bondholders. *Id.* at 564. As part of the contested plan confirmation, the municipality argued that it was unable to collect sufficient taxes and thus could not satisfy its debt obligations. In response, the bondholders argued that the missed interest payments resulted from the municipality's failure to monetize certain assets and excessive expenditures on repairs, maintenance, and construction of its irrigation system. *Id.* The evidence demonstrated that the municipality had not merely repaired and maintained its irrigation system, but had instead practically rebuilt the system on a scale unwarranted by the circumstances. *See id.* at 565.

64. The court in *Fano* found that the debtor's inability to pay its bondholders was "caused by the reconstruction of the [irrigation] system and the diversion of tax moneys to the payment therefor." *Id.* Additionally, the court found that the municipality owned certain unencumbered, non-monetized assets

47

that exceeded the amount of its indebtedness as a result of such public improvement investments, and that "it would be highly unjust to allocate their cost to the bondholders." *Id.* Based on these two pieces of evidence — *i.e.*, the municipality's excessive revitalization project and its failure to monetize certain assets — the *Fano* court ultimately held that the municipal debtor's plan of adjustment was not fair, equitable, or in the best interest of creditors. *Id.* at 564–66. The Debtor has more than ignored assets here. It has purposefully and unjustifiably sheltered them.

1. **The Plan Is Not Fair and Equitable Because It Shields Non-Core Assets, Resulting in Lower than Reasonably Expected Recoveries.**

65. The Debtor's behavior in this case runs contrary to the basic principles of bankruptcy law and creditors' reasonable expectations by shielding non-core assets.[45] Perhaps most notoriously, the Plan seeks to irrevocably transfer

---

[45] Notably, the Debtor is treating the art collection as if it were exempted property. Congress provided that "an ***individual*** debtor may exempt from property of the estate the property listed" in specific subsections of the Bankruptcy Code. 11 U.S.C. § 522 (emphasis added). The purpose of section 522 is "to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge." H.R. Rep. 95-595, H.R. Rep. No. 595, 95th Cong., 1st Sess. 1977, 1978 U.S.C.C.A.N. 5963, 6087, 1977 WL 9628. Of course, exemptions are not available for a municipal debtor. Even if section 522 of the Bankruptcy Code did apply to a municipal debtor, the Debtor could not establish that the art collection is a "necessity of life" to justify its exemption. Similar to reordering of priorities, exemptions are within the purview of Congress, not the Debtor, and Congress has taken no steps

48

— for the sole benefit of one group of unsecured creditors and to the exclusion of all others — the Debtor's *entire* art collection and *all* associated real estate, intellectual property, and other assets to the DIA Corp., the non-profit organization that manages the DIA. The price to be paid is less than the low end of Christie's valuation range of just 5 percent of the art collection.[46] (Disclosure Statement, 152).[47] The present value of the purchase price under the Plan is only $483.3 million, and the transaction permits prepayment at a discount. (Plan, Ex. I.A.91). And 39.4 percent of that amount is actually attributable to consideration under the State Contribution Agreement, which, if even consummated, will be in exchange

---

indicating that a chapter 9 debtor should be able to use section 522 of the Bankruptcy Code to shield its non-core assets from creditors.

[46] Contrary to the Debtor's unfounded position, the Debtor is not restricted from selling the art collection because no trust was created at the time the Detroit Museum of Arts, the DIA's predecessor, was formed to prevent the art's transfer, and no trust was created subsequently. The Court recognized that the issue of whether the art collection can be sold remains open. (Hr'g Tr. April 28, 2014, 56–57) ("[T]he extent to which the art held by the Detroit Institute of Arts should be taken into account in evaluating whether the city's plan meets the best interest test of the Bankruptcy Code is a substantial issue in the case, one that has not been pre-judged or determined by the Court at all . . . .").

[47] In addition to the *entire* art collection, the transaction provides for the transfer of: (1) the Museum Building; (2) the Frederick Lot; (3) the cultural center underground garage; (4) all assets of any kind located on or within the real estate described in 1-4 and used in the operations of the Museum including easements and property rights; (5) intangible property rights; and (6) monies held by the Debtor designated for the DIA. (Plan, Exhibit I.A.91, Ex. A.) The value of these assets — along with many others — is unknown because the Debtor has not bothered to value them.

49

for Pension Claim holder and OPEB Claim holder releases in favor of the State and other specified parties — not the art assets. Based on various indications of interest received for the art collection (all of which the Debtor has openly dismissed out of hand), the art collection may be monetized for up to $2 billion,[48] eclipsing the value of the Debtor's deal for its art assets. However, the Emergency Manager has dismissed the opportunity to generate substantially greater value, noting that, "the reality is they can't make us sell the art."[49] Said differently, the Emergency Manager asserted the Debtor cannot be forced to even attempt to achieve fair value for non-core assets, and instead prefers a transaction that yields less than 25 percent of market value. Notably, the $2 billion offer does not require that all of the art leave Detroit[50] and does not include the additional value of non-art collection art assets transferred under the Plan. And even more value can be generated in a proper auction of the assets.

---

[48] *Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the City to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts* [Docket No. 3925].

[49] Chad Livengood and Michael H. Hodges, *Investor groups prepare bids for DIA's treasurers but EM says city can't be forced to sell artwork under bankruptcy*, THE DETROIT NEWS (April 9, 2014, 9:32 PM) http://www.detroitnews.com/article/20140409/METRO01/304090074.

[50] Even if the art did have to leave the City, it would provide no basis for refusing to realize its value — hoarding it for a specific class of creditors.

KE 30840345

66.    The Debtor also has a bounty of real estate assets to which the Debtor attributes no value to creditor recoveries.  More specifically, the Debtor owns approximately 60,000 parcels of land with an estimated value of hundreds of millions of dollars.  (Disclosure Statement, 97).  The Plan provides for huge expenditures for blight removal yet assumes no value for the cleared land, provides no plan for monetizing the land, and provides creditors no recovery value on account of the land.  The Debtor could securitize all or a portion of the approximately 60,000 parcels of Debtor-owned vacant land to create currency for creditors under the Plan.  Interestingly, on April 15, 2014, the City Council authorized the transfer of over 16,000 parcels of land to a land bank to be demolished, rehabilitated, or put up for auction.[51]  Notably, the Debtor did not disclose in its Fourth Amended Disclosure Statement filed on May 5, 2014, that it is auctioning off land held by the land bank, and the Debtor certainly is providing creditors no value on account of the auctioned proceeds.

67.    There are many other non-core assets excluded from creditor recoveries.  Again, the Debtor did not deign to disclose the existence or value of many non-core assets — no doubt to throw a roadblock in the way of creditors

---

[51]  Joe Guillen, *Detroit council OKs transfer of 16,000 properties to city's land bank*, DETROIT FREE PRESS (April 15, 2014, 6:10 PM) http://www.freep.com/article/20140415/NEWS01/304150108/Detroit-land-bank-homes.

quantifying potential proceeds ring-fenced from those with legitimate — but disfavored — claims.[52] (*See* Disclosure Statement, 99 ("The foregoing discussion in Section VII.A.5 is not intended to exhaustively describe all Debtor-owned property, but rather provides an overview of the Debtor's most significant assets. Accordingly, not all non-core Debtor-owned assets are described in this Disclosure Statement.")).

68.    Further, prior to filing its Plan, the Debtor transferred various assets, including Belle Isle and 39 parcels of land in the midtown area, to third parties for little to no consideration and no benefit to creditors.  In September 2013, the Debtor agreed to lease Belle Isle to the State for up to 60 years.  Prior to the transaction, the Debtor's cost to run and maintain Belle Isle was about $6 million per year.  Under the terms of the lease, the Debtor will continue to fund the park's water and sewer systems at a cost of between about $1.5 million and $2.5 million annually.  The Debtor will receive an $11 per vehicle per year fee from visitors arriving by car at the park.  Upon information and belief, the Debtor likely will not receive sufficient revenue from vehicle fees to offset its ongoing obligations on account of Belle Isle.  This transaction was executed notwithstanding at least one

---

[52]    Non-disclosed non-core Debtor-owned assets include, but are not limited to, the following:  (a) Detroit Historical Society, including 62 classic cars valued at $12 million; (b) 4 golf courses, including Rackham golf course, valued at over $5.5 million; (c) Detroit Fire Dept. Headquarters Building, valued at $1.1 million; and (d) UAW Ford National Programs Center, valued at $3.5 million.

KE 30840345

alternate offer to monetize Belle Isle for $1 billion.  Upon information and belief, the Emergency Manager did not even consider this offer or any other alternatives for monetizing Belle Isle prior to executing the lease with the State.  Again, he chose a short-term expedient deal to the detriment of stakeholders and missed a potential $1 billion value opportunity for the creditors and the City itself.  Did the Debtor's stakeholders really need an Emergency Manager to make these short-sighted decisions?

69.     In February 2014, the Debtor transferred over 39 parcels of land with an appraised value of $2.9 million to a third party for only $1.  Olympia Development, in turn, is leasing the land from the third party for up to 95 years and plans to build a $650-million entertainment venue, including a hockey arena.  The transaction requires that over half of the construction work force on the project be comprised of Detroit residents,[53] but there is no requirement that Detroiters work at the new arena once it is completed.[54]  Additionally, the Debtor secured for its stakeholders no revenue stream in connection with the land — the development

---

[53] *Three construction companies would become team that builds new Red Wings arena*, CRAIN'S DETROIT BUSINESS (April 9, 2013, 4:59 PM) http://www.crainsdetroit.com/article/20140407/NEWS/140409874/three-construction-companies-would-become-team-that-builds-new-red.

[54] *See* Joe Guillen, *Detroit Red Wings' new stadium land transfer approved by City Council*, DETROIT FREE PRESS (Feb. 4, 2014, 9:07 PM), http://www.freep.com/article/20140204/nEWS01/302040074/City-council-votes-today-on-Red-Wings-arena-deal.

KE 30840345

company will retain *all* revenues from arena operations and the Debtor will not collect any property taxes on the arena. The Debtor hopes to generate tax revenues from businesses that sprout up around the arena. But the "build it and they will come" strategy has failed before and, at best, the Debtor's attempt now is a Hail Mary. It is widely accepted that building a sports arena rarely brings about the promised economic boon.[55] Despite this fact, the Debtor again failed to maximize value with yet another bad deal.

70.    It is not possible — in the absence of the Debtor making any effort to minimize unsecured creditors' losses — that the Plan is fair and equitable.[56] And,

---

[55] Pat Garofalo and Travis Waldron, *If You Build It, They Might Not Come: The Risky Economics of Sports Stadiums*, THE ATLANTIC (Sept. 7, 2012, 2:37 PM) http://www.theatlantic.com/business/archive/2012/09/if-you-build-it-they-might-not-come-the-risky-economics-of-sports-stadiums/260900.

[56] Not only does the Plan make no effort to minimize creditors' losses, it attempts to strip rights currently held by certain unsecured creditors, namely, litigation rights. The Plan includes the GRS and PFRS in its definition of exculpated parties. (Plan, 19 ("'Exculpated Parties' means, collectively and individually, . . . (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors . . .").) Exculpated Parties are exculpated for "any act or omission in connection with, relating to or arising out of the Debtor's restructuring efforts and the Chapter 9 case." (Plan, 50.) Syncora maintains that the COPs are valid instruments and were entered into as a part of a legal transaction. However, if the COPs were invalidated in the current litigation, COP Claim holders and COP insurers would have claims against the GRS and PFRS for unjust enrichment and related claims arising from the transaction. *See Kammer Asphalt Paving Co., Inc. v. East China Twp. Schools*, 504 N.W.2d 635, 640 (1993) (finding that plaintiff could maintain unjust enrichment claim against defendant that benefited from a third party's fraudulent transaction under the rule that "[a] person who has been unjustly

KE 30840345

although the Court cannot force the Debtor to dispose of its assets in any particular manner, it can deny the Plan for failure to meet the confirmation standards. *In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 719 (denying confirmation of a plan that precluded creditors from maximizing the value of a non-core asset, a litigation claim, acknowledging that such preclusion was "an attempt to cut-off potential sources of funds for payment of claims"). As a result, denial of the Plan is required.

2. **The Plan Fails to Maximize Savings and Cost Reduction Through Operational Restructuring, Resulting in Lower than Reasonably Expected Recoveries.**

71. The Debtor filed for chapter 9 in the face of declining revenues and substantial structural liabilities and operational inefficiencies. Yet, as the evidence will show at trial, among other things, the Debtor has not consolidated, eliminated, outsourced, regionalized, or privatized any of its many departments to increase efficiency and service quality and reduce cost. During this case, the Debtor entered into five collective bargaining agreements without disclosing any terms, which, upon information and belief, do not improve the operating status of the

---

enriched at the expense of another is required to make restitution to the other.") (citation omitted). Thus, the Plan may not effectively release the GRS and PFRS from their liability in connection with the Plan to the extent it would limit parties' unjust enrichment and related claims. Syncora reserves all rights to object to the releases, exculpation, injunction, and discharge provisions of the Plan.

Debtor.[57]  And the Debtor admits that "significant labor cost reductions may be possible by restructuring jobs and streamlining work rules for both represented and unrepresented workers." (Disclosure Statement, 166.)  But it has not changed — or has not disclosed any changes in — work rules for many employees to ensure a higher level of service provision or sought to achieve the correct employee mix. Indeed, with no explanation, the Debtor has not taken steps to remedy several of the root causes of the bankruptcy case, namely, outsized legacy liabilities, inefficient government operations, and ineffective work rules.

72.    A rational economic actor would have used this opportunity in chapter 9 to effect an operational restructuring to reduce costs and, where possible, improve revenues.  Certainly, prudence counsels that creating a sustainable Detroit requires an operational restructuring.  Further, it is reasonable for creditors to believe that they, as well as citizens, would benefit from such efforts given the purpose of chapter 9 and considerations of how best to effect a "renaissance."  By not seeking to capitalize on the opportunities bankruptcy provides to eliminate operational inefficiencies and bad past practices, the Debtor clearly has deprived creditors of value they reasonably could have expected to receive.

---

[57]  Brent Snavely, *Detroit Reaches Tentative 5-Year Deal with 14 Unions in Bankruptcy Case*, The Detroit Free Press (Apr. 28, 2014 8:37 PM, http://www.freep.com/article/20140428/NEWS01/304280084/Detroit-bankruptcy-unions-deal.

KE 30840345

## D. The Plan Violates Michigan Law.

73.     A plan of adjustment may not be confirmed if it violates state law.  11 U.S.C. § 943(b)(4) (plan may be confirmed only if the debtor is not prohibited by law from taking action necessary to carry out the plan); *id.*§ 1129(a)(3) (plan may be confirmed only if the plan has not been proposed by any means forbidden by law); *see e.g.*, *In re Sanitary & Improvement Dist.*, 98 B.R. at 975 (denying confirmation of plan under section 943(b) because plan provided payments to warrants despite bonds not recovering in full in violation state law, which established a higher priority in recovery for certain bonds over warrants).

74.     And the Plan violates Michigan law.  It redirects UTGO tax levy proceeds under the UTGO settlement to the pension systems.  (Plan Art. IV.D ("Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the . . . GRS and PFRS".)  But under Michigan law, the Debtor may only use UTGO tax levy proceeds to pay UTGO Claims.    MCL § 141.164(1),  (3) ("However, the tax which may be levied shall not be in excess of a rate or amount sufficient for payment of the [UTGO] obligations."); *Id.* § 141.2509 (UTGO tax levy proceeds must be set aside into segregated accounts "***solely for the payment of principal and interest on the [UTGO] bonds***") (emphasis added); *Id.* § 141.2705(1) (UTGO tax levy funds "***shall be used only to retire the [UTGO] municipal securities***") (emphasis added); *Id.* § 141.2705(2), (4) (UTGO tax levy

terminates upon payment in full of the debt or at such time as the segregated accounts contain sufficient funds for repayment in full of the debt).[58]

75.    Since the UTGO tax levy proceeds must be used solely to pay the UTGO Claims, the Plan cannot be confirmed.  The Debtor knows this.  And when this Court called the Debtor on it, the Debtor played the issue off as political: "THE COURT:  . . . [if] it is determined that these [UTGO] bonds can be impaired and the plan impairs them, either in principal, or in interest, or in amortization, whatever the plan says.  What happens to the tax?  MR. BENNETT:  Your Honor, that's between the taxpayers and the city. . . ."  (Hr'g Tr. Feb. 19, 2014).  It is not.  Paying the UTGO tax levy proceeds to pensioners is illegal.[59]  Even if it were

---

[58] The Michigan Attorney General has also conclusively stated that money in a debt retirement segregated account may not be used for any purposes other than repayment of the applicable debt.  *See* 1982 Mich. Op. Atty Gen. 575 (Mich. A.G.), 1982 WL 183534, at \*4.

[59] The Plan also violates Michigan law in another distinct way.  The DIA Settlement amounts to a fraudulent transfer under Michigan law since the value the Debtor will receive is less than reasonably equivalent value.  Michigan law provides that a transfer is constructively fraudulent where (i) there is a creditor with a claim predating the transfer, (ii) the debtor was insolvent at the time of the transfer, and (iii) the debtor received less than reasonably equivalent value in exchange for the transferred property.  MCL § 566.35.  The Debtor is both insolvent and has prepetition claims pending against it.  *See In re City of Detroit, Mich.*, 504 B.R. at 113, 169 (finding the Debtor insolvent and noting that "[t]he evidence [presented in support of the Debtor's eligibility] was overwhelming that the Debtor is unable to pay its debts as they become due").  And as evidenced above, the DIA Settlement proceeds fall far short of "reasonably equivalent value."  The DIA Settlement, therefore, violates Michigan law and, as a consequence, the Debtor cannot satisfy section

legal, using **all** of the savings from the UTGO Settlement for Pension Claims violates the unfair discrimination test.[60]

### E. The Plan Is Not Proposed in Good Faith.

76. Section 1129(a)(3) of the Bankruptcy Code — made applicable to chapter 9 by section 901 of the Bankruptcy Code — requires a plan proponent to prove that a plan "has been proposed in good faith." 11 U.S.C. § 1129(a)(3). This Court, and other courts in the Sixth Circuit, have acknowledged three interpretations of the "good faith" standard for purposes of confirming a plan of adjustment (i) "if the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code;" (ii) if the plan is "proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected;" and (iii) "fundamental fairness in dealing with one's creditors." *See In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992). The Debtor cannot satisfy the good faith standard under any of those interpretations.

---

943(b)(4). Syncora reserves all rights regarding all preferential and fraudulent transfers.

[60] Syncora reserves all rights regarding the Plan's exculpation provision, which potentially violates Michigan law by releasing City officials who willfully fail to perform duties required by the RMFA from potential personal liability thereunder. Mich. Comp. Laws § 141.2701(7).

KE 30840345

**1. The Plan is Not Proposed in Good Faith Because it Is Inconsistent with the Principles Underlying the Bankruptcy Code.**

77. A debtor may not file chapter 9 to "evade creditors" by not paying its debts. *In re City of San Bernardino, Cal.*, 499 B.R. 766, 786 (Bankr. C.D. Cal. 2013) (*quoting Int'l Assn. of Firefights, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 295 (9th Cir. BAP 2009)). Congress articulated that "the primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims ***with minimum (and in many cases, no) loss to its creditors***." H.R. Rep. No. 95-595, at 6221 (1977) (emphasis added). This dual purpose requires that a chapter 9 debtor create a plan of adjustment that ***minimizes*** creditor losses. *See In re Mount Carbon Metro Dist.*, 242 B.R. at 32 (emphasis added). The Plan rejects this well-established and key chapter 9 purpose and, thus, must be denied.

78. ***First***, the Plan embodies a restructuring premised on reducing creditor recoveries to minimum levels to fund an extraordinary (non-essential and poorly calibrated) $1.4 billion of spending. The Debtor hastily developed its reinvestment plan without concern for how it would fund the spending and then consciously determined to materially dilute creditors' recoveries as a source of funding. (*See* Moore Dep. 92:7–14, Dec. 4, 2013) (admitting that the Debtor "***was not considering what was fair and equitable to the City's creditors***" when creating the

60

reinvestment plan that is a cornerstone of its Plan) (emphasis added); (*id.* at 42:11–13) (stating that Debtor developed its spending plan in ***just 90 days*** before the bankruptcy filing "***without regard to what cash was available*** [to the City].") (emphasis added). Indeed, the Debtor is not shy about treating creditors' recoveries as an afterthought and a lower priority than reinvestment spending. (*See id.* at 85:1-11 (articulating that creditor recoveries were determined based on the money ***left over*** after accounting for the revenue coming into the City, the expenses that would remain, and the reinvestment spending the City desired))). The Debtor purposefully ascribed a lower priority to creditor recoveries — and a lower priority still to COP recovery — than reinvestment spending in an attempt to avoid repaying its prepetition obligations. The Debtor disavowed its core obligation under chapter 9 — to adjust rather than obliterate debt — from the very beginning. As a result, the Plan does not meet the good faith standard.

79. ***Second***, as previously discussed, the Debtor is retaining or transferring to non-creditors billions of dollars in value of non-core assets. *See* supra Section III.C.1. The Plan proposes to transfer all art museum assets, with a potential market value of $2 billion or more, including all real estate, intellectual property, etc. to the DIA Corp. for $293.2 million on a present value basis.[61] *See*

---

[61] This number reflects the present value of the DIA Settlement, excluding consideration on account of the State Contribution Agreement.

*id.* Additionally, the Debtor previously transferred Belle Isle to the State for no consideration despite a proposal to purchase Belle Isle for $1 billion. *See id.* Finally, the Debtor is retaining non-core assets of substantial value, including buildings and vacant land. *See id.* The Plan cannot be said to be in good faith when it purposefully shields monumental value to the detriment of creditors.

## 2. The Plan is Not Proposed in Good Faith Because it Is Not Proposed with Honesty and Good Intentions.

80. The Plan is not proposed in good faith because it is not proposed with honesty and good intentions. To propose a plan of adjustment with "honesty," the debtor must, among other things, account for the true value of its property in its plan of adjustment. *Tenn-Fla Partners v. First Union Nat'l Bank of Fla.*, 229 B.R. 720, 734 (W.D. Tenn. 1999) (denying plan confirmation under section 1129(a)(3) due to debtor's failure to "disclose the true interest in the property"). In *Tenn-Fla Partners*, the court found that the debtor "knew of willing and able buyers but temporarily spurned their offers and 'parked' their interests, all for the purpose of preventing the secured bondholders from realizing or capturing the true value of their collateral." *Id.* (internal quotation marks omitted). The court held that the debtor "was obligated to disclose the true interest in the property" in order to comply with the Bankruptcy Code's requirement that a plan be proposed in good faith. *Id.* (citing 11 U.S.C. § 1123(a)).

62

81.     Additionally, to be proposed with "honesty," a plan must accurately reflect creditors' claim amounts.  *See*, *e.g.*, *In re Multiut Corp.*, 449 B.R. 323, 341 (Bankr. N.D. Ill. 2011) (holding that the plan's "failure to accurately state the value of unsecured claims, and the substantially inaccurate calculation of the Plan's minimum percentage distribution to unsecured creditors demonstrates to the Court that the Plan has not been proposed in good faith.").

82.     ***First***, the Debtor has not accurately accounted for the true value of its property in the Plan.  As previously discussed, the Debtor uses Christie's valuation of 5 percent of the art collection as a proxy for the value of the entire art collection and all other Museum Assets.  *See supra* Section III.C.1.  No value is attributed to land and other real estate assets.  *See id*.  Additionally, the Debtor failed to disclose a number of its non-core assets and the value thereof in the Disclosure Statement.  This fact alone supports denial of confirmation.  *See Tenn-Fla Partners*, 229 B.R. at 734; *In re Frascella Enters., Inc.*, 360 B.R. 435, 449 (Bankr. E.D. Pa. 2007) (holding the debtor's plan was not proposed in good faith due to its repeated failure to make full and complete disclosures).

83.     ***Second***, the Plan does not accurately state the value of unsecured claims.  In fact, it grossly overstates the value of the Pension Claims with the obvious purpose of camouflaging the effect of its discrimination.  *See supra*

63

Section III.B.1.a. A plan of adjustment that misstates certain claims is not proposed honestly and, thus, not in good faith. *See In re Multiut*, 449 B.R. at 341.

84. To propose a plan of adjustment with "good intentions," the debtor must, at the very least, *try* "to maximize the return to the creditors within the confines of the rules." *In re Rand*, No. AZ-10-1160-BaPaJu, 2010 WL 6259960, at *8 (9th Cir. BAP Dec. 10, 2007) (finding that an individual chapter 11 debtor's plan was not filed in good faith because the debtor was attempting to use chapter 11 to achieve for creditors a result that was no better than what they would have received in a chapter 7 and yet benefitted the debtor more than he or she would be able to benefit in a chapter 7). Like the debtor in *Rand*, the Debtor is trying to provide for itself a superior outcome than what it could achieve if the bankruptcy case was dismissed — the elimination of debts and retention of all non-core assets. However, in this case, the Debtor is not even providing creditors what they would receive if the bankruptcy case was dismissed. *See supra* Section III.A.1.a. The Plan fails the good faith test.

### 3. The Plan Is Not Proposed in Good Faith Because It Does Not Treat Creditors in a Fundamentally Fair Manner.

85. To propose a plan of adjustment "in a fundamentally fair manner," the debtor must "treat *all* parties fairly." *In re W.R. Grace & Co.*, 475 B.R. 34, 89 (Bankr. D. Del. 2012) (emphasis added) (citing *In re Mount Carbon Metro. Dist.*, 242 B.R. at 39). A plan, like the Plan, that restricts creditor recovery, "does not

64

exhibit sincerity or fairness in dealing with its unsecured creditors." *In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 721.

86.     The unfair discrimination contained in the Plan evidences both the Debtor's ability to provide creditor recoveries and the Debtor's decision to unfairly and inequitably divert resources to specific unsecured creditors at the expense of other unsecured creditors. *See supra* Section III.B.1.a (discussing diversion of DIA Settlement funds specifically to Pension Claims). Additionally, the architect of the Debtor's reinvestment plan, which underpins the Plan, admitted that creditor recoveries, specifically unsecured creditor recoveries, were not taken into account when creating the reinvestment plan. (*See* Moore Dep. 85:1–11) (articulating that creditor recoveries were determined based on the money left over after accounting for the revenue coming into the City, the expenses that would remain, and the reinvestment spending the City desired). By not treating all creditors fairly, the Plan clearly is not proposed in good faith.

**F.  The Plan Is Not Feasible.**

87.     Section 934(b)(7) of the Bankruptcy Code requires that a chapter 9 plan be feasible. 11 U.S.C. § 943(b)(7). And, as this Court has recognized, it is the Debtor's burden to establish feasibility. (Hr'g Tr. Apr. 28, 2014, 10:16-19) ("THE COURT: Well, I have to stop you [the City] there because even if everyone settles, as I have said before, the burden will be on you to prove feasibility . . .");

65

*see also In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 715 ("The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence.") (citing *In re Mount Carbon Metro Dist.*, 242 B.R. at 31.)  The Debtor has not met this burden.

88.    The Debtor's financial projections — the cornerstone for any debtor seeking to meet its burden of establishing post-emergence feasibility — are indiscernible.   Likewise, the methodology used by the Debtor to develop the forecasts is at best cryptic, and likely flawed.  At multiple stages throughout this case, the Debtor's various creditors sought discovery to help understand how these projections were constructed.  [Docket Nos. 1342, 1538, 1544, 1570, 1638, 1640, 1688, and 1706].  To date, however, the Debtor has failed to produce adequate information in that regard, effectively stymieing any creditor's — and indeed this Court's — ability to ascertain whether the Debtor has met its burden.  *See, e.g.*, *Motion to Compel the Production of Documents* [Docket No. 4565].

89.    In rendering its opinion on eligibility in this chapter 9 case, this Court adopted a position that, when assessing a municipality's insolvency, the focus in not just on financial wherewithal, but also, what the Court coined "service delivery insolvency."[62]   Now, after having been determined to be 'service delivery

---

[62] *See In re City of Detroit, Mich.*, 504 B.R. at 263) ("Service delivery insolvency 'focuses on the municipality's ability to pay for all costs of providing services at the level and quality that are required for the health, safety, and welfare of the

66

insolvent' upon its entry into bankruptcy, it therefore only follows that, to exit bankruptcy, the Debtor must show, as part of its feasibility burden, that it is no longer 'service delivery insolvent.' But the Debtor cannot. Without reliable projections, the Debtor cannot meet its burden to prove that it will have sufficient cash on hand to provide adequate services to residents going forward. [63]

## IV. CONCLUSION

90. The Debtor's Plan is dead on arrival. It fails to satisfy multiple fundamental confirmation standards, including, among others, the best interests of creditors, unfair discrimination, good faith, and feasibility. The Plan does not address the root causes of this bankruptcy case, such as outsized legacy liabilities and operational inefficiencies. The Debtor's projections are opaque and unreliable. Yet, those same projections are the basis for the Debtor's proposed $1.4 billion spending initiative, which is funded at the expense of creditor recoveries and is not calibrated to address the Debtor's needs in a logical or systematic manner. This

community.'") (citing *In re City of Stockton, Cal.*, 463 B.R. 772, 789 (Bankr. E.D. Cal. 2013)). Although Syncora disagrees that service delivery insolvency is the proper standard for determining insolvency in the chapter 9 context, for purposes of this objection, Syncora acknowledges that the Court has adopted this standard.

[63] Syncora also objects to the Debtor's request for a waiver of the 14-day automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). *See* Plan § VIII.J) (providing that "[t]he Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e)"). The Debtor has not provided any justification for such relief and it should not be granted.

bankruptcy case offered the Debtor the opportunity for a fresh start. However, the Debtor has declined to capitalize on this opportunity and instead has hastily proposed a plan that will leave the City no better off than it was prior to filing this case. For no less than an avalanche of reasons, the Plan must be denied.

KE 30840345

Dated:  May 12, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Ryan Blaine Bennett*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

## Schedule 1

## <u>Schedule of DIA Settlement Foundation Funders</u>

1. **Ford Foundation, contributing 125,000,000.** *See Top 100 U.S. Foundations by Asset Size,* Foundation Center, http://foundationcenter.org/findfunders/topfunders/top100assets.html (last visited May 9, 2014) (ranking the Ford Foundation second with assets valued at $11,238,035,011); *Top 100 U.S. Foundations by Total Giving,* Foundation Center, http://foundationcenter.org/findfunders/topfunders/top100giving.html (last visited May 9, 2014) (ranking the Ford Foundation sixth with total giving of $593,753,416); *How Our Endowment Works,* FordFoundation, http://www.fordfoundation.org/about-us/how-our-endowment-works (last visited May 9, 2014) ("The Ford Foundation is the second largest private foundation in the United States, with an endowment of over $10 billion.").

2. **The Kresge Foundation, contributing 100,000,000.** *See Top 100 U.S. Foundations by Asset Size,* Foundation Center, http://foundationcenter.org/findfunders/ topfunders/top100assets.html (last visited May 9, 2014) (ranking The Kresge Foundation 17th with assets valued at $3,301,625,267); *Top 100 U.S. Foundations by Total Giving,* Foundation Center, http://foundationcenter.org/findfunders/topfunders/top100giving.html (last visited May 9, 2014) (ranking The Kresge Foundation thirty-ninth with total giving of $141,959,580); *2012 Kresge Annual Report,* The Kresge Foundation (2012), at 30, *available at* http://kresge.org/sites/default/files/2012_annualreport.pdf ("For the five years ending Dec. 31, 2012, the endowment has returned 3.1 percent per annum…[and the] return in 2012 was 13.6 percent, well ahead of our internal benchmarks."); *2012 Audited Financial Statements,* The Kresge Foundation (Jun. 13, 2013), at 3, *available at* http://kresge.org/sites/default/files/Uploaded%20Docs/Kresge-Audited-Financial-Statements-2012.pdf (listing total assets of $3,312,171,008 in 2012).

3. **W. K. Kellogg Foundation, contributing 40,000,000.** *See Top 100 U.S. Foundations by Asset Size,* Foundation Center, http://foundationcenter.org/ findfunders/topfunders/ top100assets.html (last visited May 9, 2014) (ranking W.K. Kellogg Foundation fifth with assets valued at $8,155,292,105); *Top 100 U.S. Foundations by Total Giving,* Foundation Center, http://foundationcenter.org/ findfunders/topfunders/top100giving.html (last visited May 9, 2014) (ranking the W.K. Kellogg Foundation twentieth with

total giving of $259,898,647); *2013 Financial Statements,* W.K. Kellogg Foundation (Nov. 22, 2013), at 3, *available at* http://www.wkkf.org/~/media/pdfs/ audited%20financials/2013%20kellogg %20foundation%20and%20trust%20financial%20statements.pdf (listing total consolidated assets of $8,155,292,105 in 2013).

4. **John S. and James L. Knight Foundation, contributing 30,000,000.** *See Top 100 U.S. Foundations by Asset Size,* Foundation Center, http://foundationcenter.org/ findfunders/topfunders/top100assets.html (last visited May 9, 2014) (ranking the John S. and James L. Knight Foundation thirty-second with assets valued at $2,099,590,969); *Top 100 U.S. Foundations by Total Giving,* Foundation Center, http://foundationcenter.org/ findfunders/topfunders/top100giving.html (last visited May 9, 2014) (ranking the Knight Foundation fifty-seventh with total giving of $99,205,159); *Financial Information,* Knight Foundation, http://www.knightfoundation.org/about/financial-info/ (last visited May 9, 2014) (listing assets of $2,179,634,480 in 2012).

5. **William Davidson Foundation, contributing 25,000,000.** *See 2011 Return of Private Foundation,* IRS Form 990-PF (2011), at 2, *available at* http://990s.foundationcenter.org/ 990pf_pdf_archive/203/203899187/203899187_201112_990PF.pdf (listing total assets of $368,665,601 and net assets or fund balances of $351,199,596).

6. **Community Foundation for Southeast Michigan, contributing $10,000,000.** *See CFSE 2012 Return of Organization Exempt from Income Tax,* IRS. Form 990 (2012), at 11-12, *available at* http://990s.foundationcenter.org/ 990_pdf_archive/382/382530980/ 382530980_201212_990.pdf (listing total assets of $543,610,972 and net assets or fund balances of $529,575,725).

7. **The Fred A. and Barbara M. Erb Family Foundation, contributing 10,000,000.** *See The Fred. A. & Barbara M. Erb Family Foundation 2011 Return of Private Foundation,* IRS Form 990-PF (2011), at 2, *available at* 990s.foundationcenter.org/990pf_pdf_archive/ 205/205966333/205966333_201206_990PF.pdf (listing total assets of $106,529,587 and total net assets or fund balances of $105,357,955).

2

8. **Hudson-Webber Foundation, contributing 10,000,000.** *See Hudson-Webber Foundation 2011 Return of Private Foundation,* IRS Form 990-PF (2011), at 2, *available at* http://990s.foundationcenter.org/990pf_pdf_archive/386/386052131/386052131_201112_990PF.pdf (listing total assets of $153,914,930 and total net assets or fund balances of $144,211,083); *Financials,* Hudson-Webber Foundation, http://www.hudson-webber.org/financials (last visited May 9, 2014) (listing total assets of $167,180,120 in 2012).

9. **Charles Stewart Mott Foundation, contributing 10,000,000.** *See Top 100 U.S. Foundations by Asset Size,* Foundation Center, http://foundationcenter.org/findfunders/topfunders/top100assets.html (last visited May 9, 2014) (ranking the Charles Stewart Mott Foundation twenty-seventh with assets valued at $2,304,865,937); *Top 100 U.S. Foundations by Total Giving,* Foundation Center, http://foundationcenter.org/findfunders/topfunders/top100giving.html (last visited May 9, 2014) (ranking the Charles Stewart Mott Foundation at sixty-third with total giving of $87,641,301); *Statements of Financial Position,* 2012 Annual Report (Jun. 24, 2013), *available at* http://www.mott.org/files/pubs/AR2012Finance.pdf (listing total assets of $2,301,140,574 in 2012).

10. **McGregor Fund, contributing 6,000,000.** *See McGregor Fund 2011 Return of Private Foundation,* IRS Form 990-PF (2011), at 2, *available at* http://990s.foundationcenter.org/990pf_pdf_archive/380/380808800/380808800_201206_990PF.pdf (listing total assets of $154,524,344 and net total assets or fund balances of $139,168,776); *Financial Report,* McGregor Fund (Jun. 30, 2013), at 3, *available at* http://www.mcgregorfund.org/wp-content/uploads/2013/12/McGregor-Fund-6-30-13-Final-FS.pdf (listing total assets of $164,403,286 in 2013).

11. **A. Paul and Carol C. Schaap Foundation, contributing 5,000,000.** *See The A. Paul and Carol C. Schaap Foundation 2012 Return of Private Foundation,* IRS Form 990-PF (2012), at 2, *available at* http://990s.foundationcenter.org/990pf_pdf_archive/207/207097647/207097647_201212_990PF.pdf (listing total assets of $5,583,957 and total net assets or fund balances of $5,248,437).

12. **Max M. and Marjorie S. Fisher Foundation, contributing 2,500,000.** *See Max. M. and Marjorie S. Fisher Foundation 2011 Return of Org. Exempt from Income Tax,* IRS Form 990 (2011), at 2, *available at*

3

http://www.mmfisher.org/docs/2011%20MMF-MSF%20Foundation%20Federal%20Tax%20Returns_2012%2011%2015.pdf, at 6 (listing total assets of $235,216,60 and net assets or fund balances of $229,848,033); *Financial Report,* Max M. and Marjorie S. Fisher Foundation, Dec. 31, 2011, http://www.mmfisher.org/docs/audited_financial_statements_2012.pdf (listing total assets for $235,216,760 in 2011).

4