## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
                                    :
In re                               : Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          : Case No. 13-53846
                                    :
                          Debtor.   : Hon. Steven W. Rhodes
                                    :
                                    :
                                    :
-----------------------------------------------------x

## CITY OF DETROIT'S
## COUNTER-DESIGNATION OF THE CONTENTS OF THE RECORD

Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure,

appellee the City of Detroit (the "City") hereby submits this counter-designation of

the contents of the record in response to *Appellant's Designation of the Contents of*

*the Record and Statement of Issues on Appeal* [Docket No. 4314] filed by

appellants Syncora Guarantee Inc. and Syncora Capital Assurance Inc.

(collectively, "Syncora") on April 29, 2014.

## Designation of Additional Items to Be Included in the Record On Appeal

### A. Case No. 13-53846

| Item No. (Attached) | Docket No. | Description |
|---|---|---|
| 1. | 935 | The Objectors' Motion in Limine to Preclude Debtor From Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection With Its Debtor-in-Possession Financing Efforts |
| 2. | 2050 | Order Denying Motions to Preclude Debtor from Offering Evidence [Dkts. 933 and 935] |
| 3. | 2185 | Exhibit Lists and Objections for Hearing Regarding City of Detroit's Assumption Motion and Motion to Approve Postpetition Financing |
| 4. | 2195 | Order Denying Motion to Adjourn Hearing |
| 5. | 2357 | Amended Exhibit Lists and Objections for Hearing re City of Detroit's Assumption Motion and Motion to Approve Post-Petition Financing |
| 6. | 2364 | Second Amended Exhibit Lists and Objections for Hearing regarding City of Detroit's Assumption Motion and Motion to Approve Postpetition Financing |
| 7. | 3031 | Notice of Filing of Certain Marked Transaction Documents Relating to Presentment of Final Order |
| 8. | 3173 | Order Requiring the City of Detroit to Provide Additional Information Regarding the Postpetition Quality of Life Financing |
| 9. | 3280 | Reply of the Debtor to Objections to Notice of Presentment of Order Approving Postpetition Financing |
| 10. | 3817 | Corrected Transcript of April 2, 2014 Hearing |

NYI-4585714v2

## B. City's Exhibits[1]

| Item No. (Attached) | Exhibit No. | Description |
|---|---|---|
| N/A | City Ex 36 | City of Detroit Proposal for Creditors [Orr Declaration Ex. A] |
| N/A | City Ex 56 | Email from Doak to Gerbino regarding City of Detroit financing, including attachments |
| N/A | City Ex 61 | Response to City of Detroit RFP from J.P. Morgan |
| N/A | City Ex 88 | Miller Buckfire, "Post-Petition Financing Discussion" |
| N/A | City Ex 89 | Miller Buckfire, "Draft Detroit Post-Petition Financing Commitment Letter Summaries |
| N/A | City Ex 90 | Miller Buckfire, "Briefing Materials Prepared for Members of City Council" |
| N/A | City Ex 91 | Miller Buckfire, "Briefing Materials Prepared for City Council Closed Session" |
| N/A | City Ex 94 | Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City |
| N/A | City Ex 96 | Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing |
| N/A | City Ex 97 | Letter from State Treasurer Dillon to Orr Approving Financing |
| N/A | City Ex 98 | Email from Hayes to City Council attaching October 11, 2013 Letter from Orr to All City Council Members re Emergency Manager's Order No. 17 |
| N/A | City Ex 106 | Project Piston Cash Flow Forecast- Monthly (Fys 2013, 14, 15 Scenario) |
| N/A | City Ex 108 | Ernst & Young, Project Piston Cash Flow Forecast- through FY 2017 (DIP Financing Scenario) |

---

[1]      Copies of the Trial Exhibits will be provided by at the request of the appellate court.

| | | |
|---|---|---|
| N/A | City Ex 109 | Ernst & Young, Project Piston Cash Flow Forecast- through FY 2017 (No Casino Trap; No DIP) |
| N/A | City Ex 110 | Ernst & Young, Project Piston Cash Flow Forecast- through FY 2017 (Casino Trap; No DIP) |
| N/A | City Ex 111 | Ernst & Young, Illustrative Cash Chart |
| N/A | City Ex 115 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |
| N/A | City Ex 142 | Local Emergency Financial Assistance Loan Board Order 2013-21: Order of Approval of Financial Recovery Bonds Upon the Application of the City of Detroit |
| N/A | N/A | City's PowerPoint Presentation Used For Demonstrative Purposes Only During Closing Arguments (January 2014) |

NYI-4585714v2

Dated: May 13, 2014          Respectfully submitted,


/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

**Item 1**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Expedited Consideration** |
|  | ) **Requested** |

## THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

## Preliminary Statement

By this motion, the Objectors[1] seek to preclude the introduction of evidence and argument by the debtor, the City of Detroit (the "City"), regarding the City's post hoc rationalization for the Forbearance Agreement, i.e., that it needed to cut a deal with the Swap Counterparties in order to free up the casino revenues as collateral for post-petition debtor-in-possession ("DIP") financing. The City's

---

[1] This motion is joined by Syncora Capital Assurance and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., DEPFA Bank PLC, Retiree Association Parties, Retired Detroit Police Members Association, Ambac Assurance Corporation, National Public Finance Guarantee Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

motion and supporting exhibits never referenced this purported justification.[2] Instead, it surfaced for the very first time during the depositions of the City's representatives. Still, while the City's witnesses testified that the ability to collateralize the casino revenue for DIP financing was a driving factor and a business justification for the Forbearance Agreement, they refused to provide information regarding the request for proposals or the anticipated DIP loan collateral package on the grounds that such information was "commercially sensitive." The Objectors anticipate that the City will argue that its need for collateralization of the casinos revenues in order to obtain post-petition financing supports its exercise of business judgment and the fairness and equity of the settlement purportedly effectuated by the Forbearance Agreement. Because the City has refused to provide any information regarding its efforts to secure DIP financing, it should be precluded from offering any evidence at the hearing of its new-found theory that the need for casino revenue collateralization justified the Forbearance Agreement.

---

[2] This motion relates to the September 23, 2013 hearing on the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant [to] Rule 9019, and (III) Granting Related Relief* (the "Assumption Motion") [Docket No. 17].

2

## I. Collateralization of the Casino Revenue Is a Post Hoc Justification for the Forbearance Agreement.

Neither the City's motion to approve the Forbearance Agreement nor any of its supporting exhibits cite collateralization of the casino revenue as a business reason supporting this settlement. The City's motion cited three reasons why the Forbearance Agreement purportedly constituted a sound exercise of business judgment and was fair and equitable: (1) it would allow the City access to cash flow; (2) it provides a workable unwind of the swap obligations; and (3) it avoids litigation with the swap counterparties. (*See* Assumption Motion ¶ 41.) These three reasons were discussed in the City's moving papers at length. Nowhere in its papers does the City discuss DIP financing or the need to offer a lien on casino revenues as part of the DIP collateral package. This purported justification was raised for the very first time during the depositions of the City's witnesses, Emergency Manager Kevyn Orr and the lead negotiator of the Forbearance Agreement, Kenneth Buckfire. Notably, these depositions occurred just after the City had issued a request for DIP financing proposals to more than thirty parties. (Buckfire Dep. 73:9-11.)

## II. The City and Its Representatives Have Barred Inquiry into Key Aspects of the DIP Financing.

While Mr. Buckfire and Mr. Orr suddenly testified that the Forbearance Agreement was necessary so that the City could offer collateralization of the

3

casino revenues in a DIP loan, the City's counsel blocked the Objectors from inquiring into details regarding the collateral package being offered as part of the City's DIP financing. Over 15 times throughout these depositions, it was claimed that this information could not be disclosed because it was "commercially sensitive."[3]

Mr. Buckfire would not, for instance, discuss the covenants in the term sheet, the collateral package (aside from the casino revenues), or the parties potentially involved in the financing.

> MR. SUMMERS: What covenants, if any, are included in the RFP as being acceptable or not acceptable?
>
> MR. BUCKFIRE: I'm not going to discuss that. It's commercially sensitive.

(Buckfire Dep. 73:24-74:2)

> MR. CULLEN: . . . So, we're not going to answer questions about individual parties, we're not going to answer questions about the strategy of negotiating with those parties . . . You can go through those general items, but the actual strategy, the terms of arrangements with individual parties I'm not going to have him go into now.

(Buckfire Dep 72:7-22.)

Mr. Buckfire also refused to answer any questions about the collateral package being offered as part of the DIP financing on the basis of the claim that this information was commercially sensitive.

---

[3] The City never sought a protective order with respect to this information; it merely directed its witnesses to refuse to answer the Objectors' questions.

MR. SUMMERS: What other [in addition to a lien on casino revenues] collateral is the City offering to secure the DIP financing loan?

MR. BUCKFIRE: I'm not going to answer that question.

(Buckfire Dep. 74:12-14.)

MR. SUMMERS: Is the City offering art work as collateral?

MR. BUCKFIRE: I'm not going to discuss the terms of the term sheet, sorry.

(Buckfire Dep. 75:2-4.)

Specifically, Mr. Buckfire would not discuss at all whether the City had considered alternate sources of funding from the State of Michigan or federal government, continuing to claim that this is commercially sensitive information.

MR. SUMMERS: Has the City looked into possible sources of funding from the State of Michigan?[4]

MR. BUCKFIRE: I'm not going to discuss that.

MR. SUMMERS: Has the City looked into possible sources of funding from the federal government?

MR. BUCKFIRE: I'm not going to discuss that either.

MR. SUMMERS: On what basis?

MR. BUCKFIRE: Commercially sensitive information.

---

[4] Mr. Orr stated in his deposition that, though the information regarding aid from the State of Michigan and the Federal Government was commercially sensitive, he understood that neither liquidity nor credit enhancement would be provided by the State of Michigan or the Federal Government in connection with the DIP financing. (Orr Dep 207:6-21.) He did not provide specifics and admitted that Mr. Buckfire is leading the DIP financing process for the City. (Orr Dep 201:10-17.) Mr. Buckfire, as noted above, refused to answer the relevant questions.

5

13-53846-swr Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 11 of 321
13-53846-swr Doc 985 Filed 09/18/13 Entered 09/18/13 13:53:06 Page 5 of 32

(Buckfire Dep. 107:12-19.)

> MR. HACKNEY: And why aren't you going to tell me about [alternate sources of funding from the State or federal government]?

> MR. BUCKFIRE: It's commercially sensitive information,

(Buckfire Dep. 162:20-163:2.)

Mr. Buckfire also declined to provide specifics about the operation of the collateral package being offered in connection with the DIP financing, even though he had stated the DIP would be in part collateralized with casino revenues:

> MR. HACKNEY: As the banker who is leading the DIP, what's your understanding of the role the casino revenues will play in the collateral package offered in connection with the DIP?

> MR. BUCKFIRE: They will be part of the collateral package.

> MR. HACKNEY: So, they will be part, and when you say they, do you mean a specific period of time of the casino revenues or do you mean casino revenues projecting into the future?

> MR. BUCKFIRE: It's commercially sensitive so I'm going to decline to answer it.

(Buckfire Dep. 142:19-143:4.)

Finally, the City's counsel also invoked commercial sensitivity in Mr. Orr's deposition:

> MR. HACKNEY: Is the -- is the City considering pledging art as collateral?

6

MR. SHUMAKER: Again, I'm going to get into now the -- this is a very commercially sensitive subject.

MR. HACKNEY: I'm just asking the questions. You guys got to decide --

MR. SHUMAKER: I'm just stating my objection, and the fact of the matter is, as was stated yesterday with -- with Mr. Buckfire, is that when we get into the -- as you said, the RFP, the DIP RFP process is just started. We're not going to go into strategy or what the terms are or what the specifics are, because we do not believe that this is something that would be down to the City's benefit.

(Orr Dep. 209:21-210:10.)

Thus, the City blocked from discovery all of the Objectors' inquiry into the content of the DIP financing collateral package, while at the same time contending that the collateral package was one of the reasons that justified entering into the Forbearance Agreement.

## Argument

I. **The City Will Provide Evidence Regarding the Fairness and Equity of the Forbearance Agreement and the City's Use of Business Judgment in Entering the Forbearance Agreement.**

In order to approve a settlement under Rule 9019 of the Bankruptcy Code, a court must determine that the settlement is fair and equitable. *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988) *citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The City has the burden to establish that a settlement is fair and equitable. *See In re Hallet*, 33 B.R. 564, 565 (Bankr. D. Me. 1983). In meeting that burden, the City

7

must provide the court with a factual basis for concluding that the settlement is fair and equitable. *Reynolds* 861 F.2d 469, 473 (6th Cit. 1988).

A debtor's decision to assume or reject a contract under section 365 of the Bankruptcy Code is reviewed under the "business judgment" standard. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The business judgment standard "presupposes that the estate will assume a contract only where doing so will be to its economic advantage . . . ." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008). To satisfy this standard, "[t]he act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is . . . beneficial to the estate." *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 672 (S.D.N.Y. 2012) (quoting *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.*), 208 F.3d 498, 505 (5th Cir. 2000).).

The Objectors anticipate that, in representing to the Court that the Forbearance Agreement is fair and equitable under Rule 9019 and a sound exercise of business judgment under section 365, the City will now attempt to argue that a sound business reason that justifies approval of the Forbearance Agreement is that it will allow for the casino revenues to be collateralized, which is necessary in order to obtain the post-petition DIP financing it seeks. (Orr Dep. 213:9-15.) However, as explained below, the City should not be permitted to make this newly

discovered argument because it has blocked the Objectors' inquiry into key features of the DIP financing and its collateral package.

## II. To the Extent the City seeks to Support Its Argument In Favor of Approving the Forbearance Agreement By Reference to Its Need For Casino Revenues in Connection With the DIP Loan, It Should be Precluded from Doing So Because It Has Blocked the Objectors' Inquiry into the Issue.

A party is not permitted to withhold information during discovery and then introduce it at trial to support its claims. *See, e.g., In re Lott*, 139 F. App'x 658, 660 (6th Cir. 2005) ("[L]itigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. 'The attorney-client privilege cannot at once be used as a shield and a sword.'") *quoting United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991). If a party intends to rely on information as evidence at trial, it is required to permit discovery of that information or waive its use at trial. *See, e.g., Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ("[A] party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver of the advice-of-counsel defense . . . ."); *see also Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) ("[Defendant] waived any available advice of counsel defense by objecting . . . to [Plaintiff's] discovery requests . . . .").

9

13-53846-tjt Doc 4727 Filed 05/13/13 Entered 05/13/13 15:27:43 Page 15 of 321
13-53846-swr Doc 985 Filed 09/13/13 Entered 09/13/13 13:53:06 Page 9 of 321

Thus, where a litigant prevents an adversary's inquiry regarding facts relevant to the claims at issue, he should not be permitted to introduce evidence of those facts at trial. *See In re Residential Capital, LLC*, 491 B.R. 63, 72 (Bankr. S.D.N.Y. 2013); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 (S.D.N.Y. 2000) aff'd, 4 F. App'x 81 (2d Cir. 2001) ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel."). In *In re Residential Capital*, a debtor sought court approval of a settlement with certain parties under Rule 9019. *Id.* In the discovery phase leading up to the hearing on its 9019 motion, the debtor claimed privilege throughout its document productions and depositions. *Id.* In deposition, the debtor's CEO was instructed by counsel not to reveal the basis for any of the decisions to enter the settlement in question. *Id.* Objectors to the settlement argued that the debtor should be precluded from introducing the evidence because the debtor had blocked access to the information throughout the discovery period. *Id.* The court agreed, and ruled that "A court should exclude any testimony or evidentiary presentations by the Defendants at trial if that same testimony or evidence was withheld from Plaintiffs during discovery . . . ." *Id.* at 69.

Here, it is bad enough that this purported rationale supporting the Forbearance Agreement was never even mentioned in the City's moving papers. But the fact that the City then proffered the rationale, while denying any discovery

on it whatsoever, is wholly improper. To the extent the City seeks to justify its decision to enter into the Forbearance Agreement by reference to its need for collateralization of the casino revenues, it should not be permitted do so by relying on the casino revenues' use in the DIP loan's collateral package. The City should not be permitted to block all inquiry by the Objectors into the nature of the DIP loan's collateral and terms while, at the same time, advancing an argument in favor of the Forbearance Agreement that depends on this feature of the DIP loan's collateral package. Specifically, because the Objectors have not been given an opportunity to examine whether the City is using other sources of collateral and how much, relative to the casino revenues, might be available to the City from other sources, the Objectors would be unfairly prejudiced if evidence and arguments regarding the City's need for casino revenues in connection with the DIP loan were introduced at the hearing. The Objectors cannot adduce information regarding funding and collateral alternatives from any source other than the City. The City should therefore be precluded from introducing any evidence regarding the City's need for collateralization of casino revenues in connection with its DIP financing efforts.

## <u>Conclusion</u>

For the foregoing reasons, the Objectors respectfully request that this Court preclude the City from introducing evidence and argument concerning City's need

for collateralization of the casino revenues in connection with its DIP financing efforts as a business justification for the Forbearance Agreement and enter an order substantially similar to that attached herein as Exhibit 1.

Dated:  September 18, 2013

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:   (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: _/s/ Vincent J. Marriott, III_____
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan  48084

12

Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428
Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

By: _/s/ Karen V. Newbury_____
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  knewbury@schiffhardin.com
E-mail:  mott@schiffhardin.com

13

*Attorneys for DEPFA Bank PLC*

By: _/s/ Thomas R. Morris_
Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
Telephone:  (248) 539-1330
Facsimile:  (248) 539-1355
E-mail:  morris@silvermanmorris.com
E-mail:  avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
Telephone:  (248); 646-8292
Facsimile:  (248) 646-8375
E-mail:  bokeefe@lippittokeefe.com
E-mail:  rplecha@lippittokeefe.com

*Attorneys for Retiree Association Parties*

By: _/s/Meredith E. Taunt_
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
**STROBL & SHARP, P.C.**
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304-2376
Telephone:  (248) 540-2300
Facsimile:  (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

14

*Attorneys for Retired Detroit Police Members Association*

By: /s/ Caroline Turner English
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By: /s/ Guy S. Neal
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034

15

Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
E-mail:  jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
E-mail:  gneal@sidley.com

*Attorneys for National Public Finance Guarantee Corporation*


By:  */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY  100166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
E-mail:  llarose@winston.com
E-mail:  skohn@winston.com
E-mail:  chardman@winston.com

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX  77002-5242
Telephone:  (713) 651-2600
Facsimile:  (713) 651-2700
E-mail:  sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By:  */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:  EJEssad@wwrplaw.com
E-mail:  mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:  Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By:  */s/Robert D. Gordon*
Robert D. Gordon

17

Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
E-mail: rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

By: */s/ Carole Neville*
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York 10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

18

## Summary of Attachments

Exhibit 1 - Proposed Order

Exhibit 2 - Notice

Exhibit 3 - Brief [Not Required]

Exhibit 4 - Certificate of Service [To be Filed]

Exhibit 5 - Affidavits [Not Applicable]

Exhibit 6-A - Excerpts of Deposition of Kenneth Buckfire

Exhibit 6-B - Excerpts of Deposition of Kevyn D. Orr

K&E 27925136.1

13-53846-tjt Doc 4787-1 Filed 05/14/13 Entered 05/14/15 27:43 Page 25 of 321
13-53846-swr Doc 935-1 Filed 09/10/13 Entered 09/10/13 13:53:06 Page 2 of 21

**Exhibit 1**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## ORDER GRANTING THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

This matter having come before the Court on the motion of the Objectors for the entry of an order precluding the City of Detroit from offering evidence regarding the City's need to obtain casino revenues in connection with its debtor-in-possession financing efforts, the Court having reviewed the Objectors' motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1.      The Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection With Its Debtor-In-Possession Financing Efforts is GRANTED.

2.      The Debtor, the City of Detroit, is precluded from introducing evidence regarding the City's need to obtain casino revenues in connection with its debtor-in-possession financing at the hearing on the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief.

3.     The joining Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____
STEVEN W. RHODES
United States Bankruptcy Judge

**<u>Exhibit 2</u>**

**Notice of Motion and Opportunity to Object**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## NOTICE OF THE OBJECTORS'
## MOTION *IN LIMINE* TO PRECLUDE DEBTOR
## FROM OFFERING EVIDENCE REGARDING THE CITY'S
## NEED TO OBTAIN CASINO REVENUES IN CONNECTION
## WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

**PLEASE TAKE NOTICE** that on September 18, 2013, the Objectors, filed its *Motion* in *Limine to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-In-Possession Financing Efforts* (the "Motion *in Limine*") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to preclude the introduction of evidence and argument by the debtor, the City of Detroit (the "City"), regarding the need for the City to obtain access to casino revenues in connection with its efforts to secure post-petition debtor-in-possession financing.

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Motion *in Limine*. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors Motion *in Limine*, or you want the Bankruptcy Court to consider your views on the Motion *in Limine*, by **October 3, 2013 at 4:00 p.m. (EDT)** you or your attorney must:[1]

---

[1] Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline. The Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Objector will file and serve notice of the new response deadline.

27923097_4.DOC

13-53846-swr Doc 4727-3 Filed 05/09/14 Entered 05/09/14 15:27:48 Page 30 of 321
13-53846-swr Doc 935-3 Filed 09/18/13 Entered 09/18/13 13:53:06 Page 2 of 10

1.  File with the court a written response to the Motion *in Limine*, explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:     (248) 646-5070
Facsimile:     (248) 646-5075

2.  If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion *in Limine* and you will be served with a notice of the date, time and location of the hearing.

    **PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion in Limine and may enter an order granting such relief.**

---

[2]     A response must comply with F. R. Civ. P. 8(b), (c) and (e).

27923097_4.DOC
13-53846-tjt   Doc 4727   Filed 05/19/14   Entered 05/19/14 15:27:48   Page 31 of 321
13-53846-swr   Doc 935-3   Filed 09/16/13   Entered 09/16/13 15:53:06   Page 3 of 10

Dated: September 18, 2013

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: _/s/ Vincent J. Marriott, III_
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan  48084
Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**

27923097_4.DOC
13-53846-tjt  Doc 4727-3  Filed 05/19/14  Entered 05/19/14 15:27:48  Page 32 of 321
13-53846-swr  Doc 935-3  Filed 09/18/13  Entered 09/18/13 16:53:06  Page 24 of 30

1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428
Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund*
*Kommunalkreditbank Aktiengesellschaft in*
*Luxemburg S.A.*

By: */s/ Karen V. Newbury*
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  knewbury@schiffhardin.com
E-mail:  mott@schiffhardin.com

*Attorneys for DEPFA Bank PLC*

By: */s/ Thomas R. Morris*
Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200

4

27923097_4.DOC
13-53846-tjt  Doc 4727-3  Filed 05/09/14  Entered 05/09/14 15:27:48  Page 33 of 321
13-53846-swr  Doc 935-3  Filed 09/19/13  Entered 09/19/13 15:53:06  Page 35 of 20

Farmington Hills, Michigan 48334
Telephone:  (248) 539-1330
Facsimile:  (248) 539-1355
E-mail:  morris@silvermanmorris.com
E-mail:  avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
Telephone:  (248); 646-8292
Facsimile:  (248) 646-8375
E-mail:  bokeefe@lippittokeefe.com
E-mail:  rplecha@lippittokeefe.com

*Attorneys for Retiree Association Parties*

By:  /s/Meredith E. Taunt_____
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
**STROBL & SHARP, P.C.**
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304-2376
Telephone:  (248) 540-2300
Facsimile:  (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

*Attorneys for Retired Detroit Police Members
Association*

By:  /s/ Caroline Turner English_____
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**

5

27923097_4.DOC
13-53846-swr  Doc 4727-3  Filed 05/09/14  Entered 05/09/14 15:27:48  Page 34 of 321
13-53846-swr  Doc 935-3  Filed 09/16/13  Entered 09/16/13 15:53:06  Page 4 of 10

1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By:  _/s/ Guy S. Neal_____
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034
Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**

6

27923097_4.DOC
13-53846-tjt  Doc 4727-3  Filed 05/13/14  Entered 05/13/14 15:27:48  Page 35 of 321
13-53846-swr  Doc 935-3  Filed 09/16/13  Entered 09/16/13 15:53:06  Page 35 of 320

555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
E-mail: jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: gneal@sidley.com

*Attorneys for National Public Finance Guarantee Corporation*


By: */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 100166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
E-mail: llarose@winston.com
E-mail: skohn@winston.com
E-mail: chardman@winston.com

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 651-2600

7

27923097_4.DOC
13-53846-tjt Doc 4727-3 Filed 05/19/14 Entered 05/19/14 15:27:48 Page 36 of 321
13-53846-swr Doc 935-3 Filed 09/16/13 Entered 09/16/13 15:53:06 Page 36 of 321

Facsimile:  (713) 651-2700
E-mail:  sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By:  */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:  EJEssad@wwrplaw.com
E-mail:  mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:  Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By:  /s/Robert D. Gordon
Robert D. Gordon
Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI  48009
Telephone:  (248) 988-5882
Facsimile:  (248) 988-2502
E-mail:  rgordon@clarkhill.com

8

27923097_4.DOC
13-53846-tjt   Doc 4727-3   Filed 05/09/14   Entered 05/09/14 15:27:48   Page 37 of 321
13-53846-swr   Doc 935-3   Filed 09/16/13   Entered 09/16/13 13:53:06   Page 9 of 10

*Counsel to the Police and Fire Retirement System
of the City of Detroit and the General Retirement
System of the City of Detroit*

By: /s/ Carole Neville
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York  10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

27923097_4.DOC
13-58846-swr   Doc 4737-3   Filed 05/02/14   Entered 05/02/14 15:27:43   Page 38 of 321
13-53846-swr   Doc 4935   Filed 09/18/13   Entered 09/18/13 18:53:06   Page 10 of 10

**<u>Exhibit 3</u>**

**None [Brief Not Required]**

**<u>Exhibit 4</u>**

**None [Separate Certificate of Service to be Filed]**

**Exhibit 5**

**None**

**Exhibit 6A**

**Excerpts of Deposition of Kenneth Buckfire**

Page 69

1  A.  I would recommend it.
2     BY MR. SUMMERS:
3  Q.  Okay.
4     MR. SUMMERS: Let's mark that for follow-up
5  after the deposition.
6     BY MR. SUMMERS:
7  Q.  You testified that as of the last analysis your
8  understanding is the estimated amount of the
9  termination payment that would be due is roughly three
10  hundred million dollars, is that correct?
11  A.  Well, it clearly moves around as the interest rate
12  curve moves around.  I think the most recent number is
13  somewhere reaching 275 and 300 million dollars.
14  That's before the application of the applicable
15  discount that we had provided for in the termination
16  agreement.
17  Q.  And that last analysis, when was that performed?
18  A.  A few days ago.
19  Q.  How does the City plan to get the cash necessary to
20  make the termination payment?
21     MR. CULLEN: Objection.  Foundation.  Form.
22     BY MR. SUMMERS:
23  Q.  Does the City have a plan at this point for how it
24  will obtain the cash necessary to pay the termination
25  payment?

Page 70

1     MR. CULLEN: Objection, foundation, form,
2  but you can address the question.
3  A.  Yes, the City has a plan.
4     BY MR. SUMMERS:
5  Q.  And what is that plan?
6  A.  The City intends to secure a debtor in possession
7  financing of sufficient proceeds to fund the
8  termination payment as well as provide sufficient cash
9  for the City to execute on its reinvestment program
10  during the bankruptcy.
11  Q.  And what is -- what actions, if any, has the City
12  taken toward obtaining debtor in possession financing?
13  A.  We have contacted a large universe of potentially
14  interested investors, many of whom have signed
15  nondisclosure agreements, NDAs, pursuant to which they
16  have received the request for proposal, the RFP which
17  went out yesterday.
18  Q.  And is Miller Buckfire leading the effort to obtain
19  debtor in possession financing?
20  A.  Yes.
21  Q.  And when you say a large universe of potential
22  investors, do you know approximately how many have
23  been talked to?
24  A.  At the moment it's in excess of 30.
25  Q.  And how many have -- how many have signed

Page 71

1  nondisclosure agreements?
2  A.  That's the universe I'm discussing, approximately 30
3  or more.
4  Q.  So, everybody you've talked to signed?
5  A.  No, some people didn't want to participate.  I can't
6  tell you how many we called.  I can tell you how many
7  we sent NDAs to which have been returned to us, it's
8  in excess of 30.
9  Q.  Are some of the people or some of the potential
10  sources of financing that Miller Buckfire have spoken
11  to said no, we're not interested?
12  A.  Yes.
13  Q.  And approximately how many have said no?
14  A.  Hasn't been that many, maybe ten.  Would your client
15  like one?
16  Q.  And do you know who those ten entities are that have
17  said they are not interested?
18  A.  I do, yes.
19  Q.  And who are they?
20  A.  I'm not going to tell you that.
21  Q.  On what basis?
22  A.  It's commercially sensitive information.
23     MR. CULLEN: Counsel, maybe it will help,
24  and I don't know whether you want this on the record
25  or not, but the position we are going to take with

Page 72

1  respect to this is that this is a competitive process
2  and the best result in that process is achieved by us
3  being able to negotiate with the individual parties
4  who are out there, and not to litigate the negotiating
5  strategy before we have something to bring back to the
6  court to approve.
7     So, we're not going to answer questions
8  about individual parties, we're not going to answer
9  questions about the strategy of negotiating with those
10  parties and we're not at liberty to give out the
11  information with respect to the people who responded
12  to the NDAs because they understandably don't want to
13  be shopped, don't want to take up a lot of your time.
14  We can fight this through a lot of objections and so
15  forth, and if we want to fight about that at some
16  later time, perfectly fine.
17     You can ask about his general strategy on
18  this, you can ask about the basis for his confidence
19  or nonconfidence in it.  You can go through those
20  general items, but the actual strategy, the terms of
21  arrangements with individual parties I'm not going to
22  have him go into now.  Hopefully by the time we get to
23  the hearing, we'll have an agreement that you will be
24  on a --
25     MR. SUMMERS: Let's go -- I think let's

1   go -- move through the questions and see how we do.
2      MR. CULLEN: Okay.
3      MR. SUMMERS: I understand the City's
4   position on it.
5      MR. CULLEN: Okay.
6   BY MR. SUMMERS:
7   Q.  You said an RFP went out yesterday?
8   A.  Correct.
9   Q.  Approximately how many people was the RPF sent to
10   yesterday?
11   A.  The 30 plus people who signed the NDA.
12   Q.  How much debtor-in-possession financing does the City
13   hope to obtain?
14   A.  Three hundred fifty million dollars, up to three
15   hundred fifty million dollars.
16   Q.  And does the City have a goal on the interest rate?
17   A.  The lowest possible interest rate.
18   Q.  Does the RFP attempt to define what that lowest
19   possible interest rate is?
20   A.  No.
21   Q.  Does it define whether the interest rate needs to be
22   fixed or variable?
23   A.  No.
24   Q.  What covenants, if any, are included in the RFP as
25   being acceptable or not acceptable?

1   A.  I'm not going to discuss that.  It's commercially
2   sensitive.
3   Q.  How long of maturity on the DIP financing is the City
4   looking to obtain?
5   A.  Through the pendency of the end of the case.
6   Q.  And is the City offering a lien on casino revenues in
7   connection with the DIP financing?
8   A.  In part.
9   Q.  I assume the City does not expect to obtain unsecured
10   financing?
11   A.  I would take it if it was offered.
12   Q.  No doubt.  What other collateral is the City offering
13   to secure the DIP financing loan?
14   A.  I'm not going to answer that question.
15   Q.  Does the RFP define what collateral would be
16   available?
17   A.  Yes, it does.
18   Q.  And that's been sent out to potential investors?
19   A.  Who have signed nondisclosure agreements.
20   Q.  If somebody new came and said I would be interested in
21   providing DIP financing, you would have them sign an
22   NDA and then provide them the RFP?
23   A.  If they wanted to make an unsolicited proposal without
24   the benefit of the RPF, we would be happy to accept
25   it.  Are you suggesting your client is interested in

1   is submitting a proposal?
2   Q.  Is the City offering art work as collateral?
3   A.  I'm not going to discuss the terms of the term sheet,
4   sorry.
5   Q.  Well, we kind of picked and choose what terms in the
6   RFP we are discussing and not discussing.
7      MR. CULLEN: We have in the attempt to
8   accommodate your desire for information and to
9   maintain control of the integrity of this process
10   which we believe is best negotiated as a negotiation
11   and not a litigation.
12      MR. SUMMERS: I guess I struggle with
13   understanding why the collateral that's offered in the
14   RPF that's been sent out when we know the interest
15   rate, the amount of the financing the debtor seeks,
16   why that puts the City at a competitive disadvantage.
17      MR. CULLEN: We didn't say the interest
18   rate.
19      MR. SUMMERS: The lowest possible.
20      MR. CULLEN: This is the beginning of a
21   negotiation.  It's the beginning of a negotiation that
22   isn't at an end yet, that hasn't had any response to
23   the RFPs yet, it's an initial offer, and that's what
24   it is, and he's discussing it as such and willing to
25   testify about it as such, but I'm not going to read

1   the terms of the RFP in the newspaper and our bidders
2   are not going to read the terms of the RFP in the
3   newspaper because that would hamper the process and
4   hamper our ability to get best value.
5      MR. SUMMERS: But we already have in the
6   record that the casino revenues are part of the
7   collateral that's being offered, so, what's wrong with
8   finding out what the rest of the collateral that's
9   being offered?
10      MR. CULLEN: Not going to argue with you,
11   Counsel.  I'm telling you what the position is.  I've
12   tried to be accommodating.  It's as far as I am going
13   to go.
14   BY MR. SUMMERS
15   Q.  Has the City had discussions with the State of
16   Michigan about providing financing?
17   A.  I'm not going to discuss that.
18   Q.  What is the City's view about what has to happen in
19   order to be able to obtain debtor-in-possession
20   financing -- let me put a finer point.
21      Are there certain events that the City
22   believes has to happen in the case for it to be able
23   to realistically obtain debtor-in-possession
24   financing?
25   A.  Yes, there are events in the case.

1  all of the gaming revenues until that claim has been
2  fully satisfied.
3      Now, simple math will tell you if we have
4  170 million of gaming revenues and we have a three
5  hundred million dollar termination payment and we have
6  an implied interest rate on that termination payment
7  it will probably take somewhere between two and three
8  years to pay it off in full.
9  Q.  That presumes that the lien held by the Swap
10  counterparties against the casino revenues is a valid
11  and enforceable lien, correct?
12  A.  That's what the agreement specifies.
13  Q.  Well --
14  A.  The 2009 agreement specifies.
15  Q.  Right, but --
16  A.  That's the agreement the City is bound by if the
17  forbearance agreement is not approved.
18  Q.  Unless there's a litigation claim that exists that
19  might invalidate the liens?
20  A.  In which case who knows what the Swap counterparties
21  might do and what we might have access to in terms of
22  gaming revenue.
23  Q.  So, the legal analysis is important to informing --
24  A.  Any risk the City is being asked to take that doesn't
25  have access to gaming revenues is an unacceptable risk

1  from the point of view of the City's ability to
2  rehabilitate itself.
3  Q.  Have you evaluated noncore assets as a source of funds
4  for the City?
5      MR. CULLEN:  Objection.  Foundation.  Form.
6  A.  Yes.
7      BY MR. SUMMERS:
8  Q.  And what evaluation have you performed?
9  A.  As we've identified in the June 14th plan we did
10  identify for the benefit of the public and the
11  creditors all potential noncore assets that might have
12  value that could be used pursuant to the plan of
13  adjustment.
14  Q.  And on August 5th you announced the City had hired
15  Christie's to appraise the collection at the Detroit
16  Institute of Art, correct?
17  A.  I didn't announce that.
18  Q.  The City announced it.
19  A.  The City announced it.
20  Q.  That they hired Christie's, correct?  Do you have an
21  understanding of the approximate value of the City's
22  art collection?
23  A.  No.
24  Q.  Do you have an understanding as to when the City
25  expects to receive the appraisal from Christie's?

1  A.  Yes, by the end of October 2013.
2  Q.  What is the City's intention with respect to analyzing
3  the appraisal and making a determination as to the art
4  work once it receives the appraisal?
5      MR. CULLEN:  Objection.  Foundation.  Form.
6  A.  I can't even speculate as to what we'll do until we
7  have some facts as to what value we're dealing with.
8  That's why they were retained.
9      BY MR. SUMMERS:
10  Q.  Has the City considered selling or leasing Belle Isle?
11  A.  Not to my knowledge.
12  Q.  Has the City looked into possible sources of funding
13  from the State of Michigan?
14  A.  I'm not going to discuss that.
15  Q.  Has the City looked into possible sources of funding
16  from the federal government?
17  A.  I'm not going to discuss that either.
18  Q.  On what basis?
19  A.  Commercially sensitive information.
20      MR. SUMMERS:  I'm going to propose we take
21  maybe -- why don't we stop the tape for a minute.
22      VIDEO TECHNICIAN:  The time is 12:18 p.m.
23  we are off the record.
24      (Recess taken at 12:18 p.m.)
25      (Back on the record at 1:21 p.m.)

1      VIDEO TECHNICIAN:  We are back on the
2  record at 1:21 p.m.  This marks the beginning of tape
3  number three.
4      EXAMINATION
5      BY MR. HACKNEY:
6  Q.  Mr. Buckfire, good afternoon.  My name is Steve
7  Hackney.  I'm an attorney at Kirkland & Ellis, and I
8  represent Syncora Capital Assurance and Syncora
9  Guaranty.  Nice to meet you.
10  A.  Likewise.
11  Q.  I think we had a brief conversation which you
12  suggested there might have been something you'd like
13  to correct with respect to a name from the morning's
14  testimony.
15  A.  Yes, thank you, Mr. Hackney.  I incorrectly identified
16  the attorney from Cadwalader who was present at the
17  June 4th meeting.  His correct name is Larry
18  Stromfeld, S T R O M F E L D.  That's his correct name
19  and that's who attended the meeting.
20  Q.  If you think of any other corrections, don't hesitate
21  to stop me and let me know and we'll give you an
22  opportunity to make them.
23  A.  Thank you.
24  Q.  So, I've been listening to your testimony.  It's not
25  my intention to re-ask you all the questions that were

1 would have demanded Syncora made good on its Swap
2 insurance and let Syncora try and stick around and
3 collect the casino revenues, correct?
4     MR. CULLEN: Objection. Foundation. Form.
5 Calls for speculation.
6 **A. It wasn't an issue for the City.**
7     BY MR. HACKNEY:
8 Q. I'm asking whether you thought that was a possibility
9 back at the time you were negotiating the forbearance
10 agreement?
11 **A. It wasn't an issue for the City. Had no impact on the**
12 **City's access to cash.**
13 Q. But if Syncora was a party that might come in in lieu
14 of the Swap counterparties, didn't you want to find
15 out whether you might be able to cut a better deal
16 with Syncora?
17     MR. CULLEN: Objection. Foundation. Form.
18 Calls for speculation.
19 **A. I can't speculate to that.**
20     BY MR. HACKNEY:
21 Q. All you can say is that you never did, correct?
22 **A. Correct.**
23 Q. And in fact between June 29th when you spoke to
24 Mr. Snyder and today, there have never been
25 substantive negotiations between the City and Syncora

1 to your knowledge, isn't that correct?
2 **A. Not on this, no.**
3 Q. I wanted to clarify something that you said about the
4 DIP earlier and it was mainly that -- you used the
5 phrase I didn't understand with respect to the casino
6 revenues, you said -- you either said that the casino
7 revenues would be a part of the collateral package or
8 that part of the casino revenues would be in the
9 collateral package, and I wanted to clarify that.
10     MR. CULLEN: Objection. Foundation. Form.
11 I don't think he said either.
12 **A. I didn't.**
13     BY MR. HACKNEY:
14 Q. Oh, okay. Well, I thought for sure you had said one
15 of those two, but let me understand what you
16 anticipate -- this is subject to counsel's concern,
17 but I think there has been testimony about the casino
18 revenues as part of the collateral package.
19 As the banker who is leading the DIP,
20 what's your understanding of the role the casino
21 revenues will play in the collateral package offered
22 in connection with the DIP?
23 **A. They will be part of the collateral package.**
24 Q. So, they will be part, and when you say they, do you
25 mean a specific period of time of the casino revenues

1 or do you mean casino revenues projecting into the
2 future?
3 **A. It's commercially sensitive so I'm going to decline to**
4 **answer it.**
5     MR. HACKNEY: Okay. I'll just reserve on
6 that. I obviously don't think there's a bunch of
7 value we have going back and forth. I understand your
8 position about this. On some of the other ones, we
9 may come to those briefly and talk about it, but I get
10 the DIP one.
11     BY MR. HACKNEY:
12 Q. You agree that the goal of the forbearance agreement
13 is to get the collateral agreement to terminate so
14 that the City can get access to the casino revenues,
15 correct?
16     MR. CULLEN: Objection. Foundation. Form.
17 **A. That is one of the goals.**
18     BY MR. HACKNEY:
19 Q. That is one of the goals. And isn't it true that your
20 current expectation is that you need the postpetition
21 financing, the DIP loan to close in order to be able
22 to exercise the option under the forbearance
23 agreement, correct?
24 **A. Correct.**
25 Q. And there was testimony on that today because you

1 don't have the money otherwise, right, Mr. Buckfire?
2 **A. That is part of the collateral package, yes.**
3 Q. I'm talking about the use of proceeds of the DIP just
4 so we're clear. Part of the use of proceeds of the
5 DIP will be to exercise the option under the
6 forbearance agreement, correct?
7 **A. Correct.**
8 Q. You understand that you won't have unfettered access
9 to the casino revenues until you exercise the option
10 that leads to the termination of a Swap in the
11 collateral agreement, correct?
12 **A. Yes.**
13 Q. Isn't this a bit circular?
14 **A. Regrettably.**
15 Q. How did you factor that consideration into the
16 determination as to whether to engage in the
17 forbearance agreement?
18 **A. Well, this is why the Swap collateral agreement is**
19 **such a problem for the City. Unless we can eliminate**
20 **the collateral and regain control over gaming revenues**
21 **without risk of loss because of defaults that would**
22 **trap it, we need to rationalize and clean this up in**
23 **order to put the City on a sound financial basis.**
24 Q. So, there are two parts -- there are -- there may be
25 many parts but two of the important parts of the

1  City's plan is are the investments that Mr. Orr wants
2  to make, right?
3  **A.  Right.**
4  Q.  And the cost reductions he wants to make, right?
5  **A.  And the increase in staffing levels across services to**
6  **provide higher level services to the City.**
7  Q.  But that's in the reinvestment, right?
8  **A.  No, it's actually hard to break out that way because a**
9  **lot of it is actually in the salaries line and the HR**
10  **lines.**
11  **So, you have to go back to the numbers and**
12  **ask me a lot of those questions.**
13  Q.  The proposed investments that he wants to make, that
14  he proposes to make that I'm so ruthlessly omitting,
15  they are in this document, right?
16  **A.  Not in this projection.**
17  Q.  They're not in this projection, but they are in this
18  proposal?
19  **A.  That's right.**
20  Q.  He laid them all out in gory detail?
21  **A.  Yes, he did.**
22  Q.  He also lays out a number of cost cutting initiatives,
23  isn't that correct?
24  **A.  Yes, he does.**
25  Q.  And one of his goals is also to make the City more

1  efficient, correct?
2  **A.  Yes.**
3  Q.  At the same time he also wants to make it operate
4  better, correct?
5  **A.  Correct.**
6  Q.  Those two things from a net operating standpoint work
7  in tension with one another, right?
8  **A.  They do over time, but you have to consider the**
9  **timetable and when these things are done.**
10  Q.  I want to ask you a question about state and federal
11  aid but I don't want to mix it up into the DIP which I
12  understand -- which I took to mean earlier was one of
13  the sensitivities there.  I want to go back to June 4,
14  2011.
15  Prior to June 4, 2011 had you undertaken
16  any effort to evaluate whether there was either state
17  aid or federal aid that you could use in lieu of
18  having to negotiate this deal with the Swap
19  counterparties?
20  **A.  We are assuming there is no aid available to the City.**
21  Q.  You were assuming that there was none, but had you
22  undertaken an effort to determine whether there could
23  be some?
24  **A.  I've already testified that I'm not going to discuss**
25  **that.**

1  **Q.  And why aren't you going to tell me about that?**
2  **A.  It's commercially sensitive information.**
3  Q.  Why?
4  **A.  That's my answer.**
5  Q.  Well, I can understand why if you are seeking estate
6  guarantee of a DIP or other things today, I get that,
7  and I'm not going to ask you about that, but I am
8  going to say that I think I deserve an answer on what
9  happened prior to June 4 in terms of finding
10  alternative ways to address the City's liquidity
11  crisis because after all what's been presented to us
12  was if we didn't do this deal, the City would die, and
13  I do think we are entitled to ask well, what had you
14  tried to do with other actors, so, can we get over it
15  or --
16  MR. CULLEN:  You could certainly ask if he
17  had received any assurance of the availability of any
18  other funding from any other source during that time
19  period.
20  MR. HACKNEY:  Well, I do appreciate that
21  but I often tend to ask my own questions.    Let me
22  try and ask it in a way that hopefully serves your
23  concerns.
24  BY MR. HACKNEY:
25  Q.  And let me first ask you, Mr. Buckfire, had your firm,

1  you or your firm undertaken any analysis of this
2  question?  You don't have to tell me what it was.
3  Let's go in stages.
4  Had you analyzed the problem?
5  **A.  Yes, we did.**
6  Q.  You had analyzed the problem.  And is it your
7  testimony that divulging the results of that analysis
8  would be commercially sensitive?
9  **A.  Yes.**
10  Q.  Is part of the reason for that because of the way any
11  potential aid from the City or from the state or the
12  feds might interplay with the DIP process, is it the
13  way they knit up, is that the problem?
14  **A.  Yes.**
15  Q.  All right.
16  MR. HACKNEY:  Let me suggest a short break.
17  I think that it may be time for me to pass the baton.
18  MR. CULLEN:  Okay.
19  VIDEO TECHNICIAN:  The time is 2:19 p.m.
20  This marks the end of tape number three.  We are off
21  the record.
22  (Recess taken at 2:19 p.m.)
23  (Back on the record at 2:30 p.m.)
24  VIDEO TECHNICIAN:  We are back on the
25  record at 2:30 p.m.  This marks the beginning of tape

# Exhibit 6B
## Excerpts of Deposition of Kevyn D. Orr

6A Kenneth Buckfire Cover sheet.doc
13-53846-tjt Doc 4727-5 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 48 of 321
13-53846-swr Doc 935-8 Filed 09/16/13 Entered 09/16/13 16:33:06 Page 2 of 21

1 Q. Your view of those legacy expenditures in the
2 bankruptcy is that they are unsecured claims, correct?
3 **A. Yes. Many of them are, yes. There are some**
4 **expenditures that are secured with regard to the water**
5 **department and parking and some miscellaneous, but the**
6 **roughly 11 and a half, 12 billion dollars that we put**
7 **out there we view as unsecured.**
8 Q. So let's go back to sourcing this termination payment.
9 **A. Yes.**
10 Q. It was my understanding of his testimony that
11 Mr. Buckfire who, by the way, is the individual tasked
12 with obtaining the City's post petition financing,
13 correct?
14 **A. Yes.**
15 Q. And is presumably the individual that's most
16 knowledgeable about that effort?
17 **A. Yes.**
18 Q. It was -- I'll represent to you that his testimony was
19 that the proceeds for the optional termination payment
20 would likely come from the post -- the proceeds of the
21 post petition financing?
22 **A. Yes.**
23 MR. JURGENS: Objection to form.
24 BY MR. HACKNEY:
25 Q. Is that also your understanding?

1 **A. Yes.**
2 Q. Okay. Now, isn't it also true that the City hopes to
3 pledge the casino revenues as part of the collateral
4 package for the post petition financing?
5 MR. SHUMAKER: I'm going to object here.
6 We're getting into an area where it is incredibly
7 commercially sensitive as to what sort of post
8 petition financing that the City is seeking.
9 MR. HACKNEY: Let me not be rude. I will
10 tell you I'm just going to ask him questions that
11 Buckfire asked yesterday -- answered. So I'm not
12 going to try and play the whole thing, but there were
13 absolutely areas where Buckfire answered. I think
14 there were a lot of other people in the room that were
15 there. I think any of your colleagues --
16 MR. SHUMAKER: Okay, that's fine.
17 MR. HACKNEY: Any of your colleagues.
18 MR. SHUMAKER: I just want to caution you.
19 MR. HACKNEY: I understand. I understand
20 the sensitivity. There were absolutely areas, though,
21 that Buckfire talked about. This was one of them. I
22 mean can I get an Amen or --
23 (Consensus Amen.)
24 **A. Okay.**
25 BY MR. HACKNEY:

1 Q. Okay. So I think there -- if I'm not mistaken, your
2 father was an amen minister.
3 **A. Great grandfather, grandfather and father.**
4 Q. So maybe --
5 **A. Yeah, took me back to -- over in the corner with the**
6 **deacons, yeah, took me back.**
7 Q. Okay. I won't compare myself to your father,
8 grandfather and great grandfather, but I can aspire.
9 **A. Yeah.**
10 Q. So I do want to talk about -- this is important.
11 Okay. This is -- isn't it true that one aspect of the
12 DIP -- I'm not going to get into the others -- is that
13 the casino revenues will be pledged or anticipated to
14 be pledged as collateral for the post petition
15 financing?
16 **A. Let me say this. That is certainly under**
17 **consideration.**
18 Q. Okay. Now, isn't it also true, though, that the
19 casino revenues have not currently been freed up on a
20 permanent basis because the City has not currently
21 exercised the option, correct?
22 **A. The certainty that we hope to get out of the**
23 **forbearance agreement has not been approved yet,**
24 **correct.**
25 Q. Well, even if it is approved by the Court, you still

1 won't have exercised the option.
2 **A. That is true with regard to the optional termination**
3 **payment.**
4 Q. Right.
5 **A. Yes.**
6 Q. And you need to exercise the option to terminate the
7 hedge, right?
8 **A. Yes.**
9 Q. You need to terminate the hedge to terminate the
10 collateral agreement.
11 **A. I think that's --**
12 MR. SHUMAKER: Object to form, to the
13 extent calls for a legal conclusion.
14 **A. Yeah, without getting into legal conclusions --**
15 COURT REPORTER: I'm sorry. This is --
16 BY MR. HACKNEY:
17 Q. You think it's a fair characterization that you need
18 to get the hedge terminated to get the collateral
19 agreement terminated?
20 **A. Yes.**
21 Q. And the good part for the City, if those things
22 happen, is that now you have unchanneled access to the
23 casino revenues going into the future?
24 **A. Yes, as we've said today, that certainty is one of the**
25 **motivations to enter into the agreement.**

Min-U-Script® Bienenstock Court Reporting & Video (51) Pages 201 - 204
13-53846-tjt Doc 4735-3 Filed 05/10/14 Entered 05/10/14 15:27:43 Page 2 of 3
13-53846-swr Doc 925-8 Filed 08/16/13 Entered 08/16/13 18:40:06 Page 2 of 21

Page 205

1 Q. But do you also understand that you can't currently
2 pledge the casino revenues to a post petition lender
3 in a -- prior to having exercised the option under the
4 forbearance agreement?
5 A. Well, let's be careful without drawing legal
6 conclusions. You can always enter into agreements
7 that have contingencies attached to them and the
8 parties will wait for those contingencies to occur.
9 That certainly has happened with a number of different
10 negotiations, not just in this case, but happens all
11 the time.
12 Q. That's fair that you absolutely -- you make a pledge
13 that's contingent on something else. But isn't it
14 true that, as a general matter, post petition lenders
15 typically like to make sure that they have clean
16 collateral before they make a loan that's secured by
17 that collateral?
18 MR. SHUMAKER: Objection, calls for
19 speculation.
20 A. I think that's generally a fair characterization;
21 however, there have been cases that I've been involved
22 with outside of this one where post petition lenders
23 have been willing to make pledges or commitments
24 subject to certain contingencies.
25 BY MR. HACKNEY:

Page 206

1 Q. Isn't it your expectation today, though -- is it -- is
2 it your expectation today that any post petition
3 lender will want clear -- a clear lien on the casino
4 revenues before it's willing to lend? Is that your
5 current expectation?
6 A. Well, my current expectation is it might well want
7 clear lien before it's willing to fund. I would think
8 in many of the bankruptcy cases that I've been
9 involved in, post petition lenders, for instance, are
10 willing to make commitments subject to the Court
11 approving their super priority liens, and then once
12 that approval is granted, they fund the loan, so
13 that's fairly common.
14 Q. I'm going to confirm for the record that conversations
15 with the State of Michigan about providing DIP
16 financing or with the federal government about
17 providing DIP financing are still questions that you
18 will refuse to answer on the grounds of commercial
19 sensitivity?
20 MR. SHUMAKER: I think you can ask Mr. Orr
21 those questions. I don't want to -- I don't want to
22 categorically exclude you from doing that.
23 BY MR. HACKNEY:
24 Q. Are they commercially sensitive?
25 A. They are commercially sensitive, but I don't want to

Page 207

1 mislead you. It is my assumption that, while they're
2 commercially sensitive, that's not going to be
3 forthcoming.
4 Q. Oh, really?
5 A. Yes.
6 Q. So just to tie it up, you tried to get a -- whether
7 it's credit enhancement or liquidity from the State
8 and the Feds, and your expectation is that you won't
9 be able to?
10 A. My understanding at the State level is that there's
11 certain prohibitions of the State law on the ability
12 of the State to lend to the City, and at the Federal
13 level my understanding is that it's not going to be
14 forthcoming, direct aid.
15 Q. Interesting. And what about credit enhancement by the
16 State?
17 A. Here again, it's highly commercially insensitive --
18 sensitive. I don't want to say anything that
19 forecloses it, but we -- let me answer it this way.
20 We are operating on the assumption that that will not
21 come -- be forthcoming.
22 Q. The casino revenues are about 170 million dollars a
23 year; isn't that correct?
24 A. Yeah, 170, 180 somewhere in there.
25 Q. Yeah. In fact, that -- it's interesting because the

Page 208

1 DIP proceeds you're seeking are up to 350; is that
2 correct?
3 A. Here again, those are commercially sensitive, but I
4 think that's fair. Yes, I think that's fair.
5 Q. Okay. And that's the equivalent of two years' worth
6 of casino revenues, correct?
7 A. Yes.
8 Q. Okay. And that's something that you think you may be
9 able to get without having to pledge a clear lien on
10 the casino revenues, right?
11 A. No. What I'm trying to say is you can certainly enter
12 into commitments. I'm drawing commitments different
13 from funding. You can certainly have a lender which
14 is quite common in bankruptcy cases to make a
15 commitment subject to approval of its security
16 interest or priorities to actually fund.
17 Q. Okay.
18 A. So that can occur.
19 Q. So the fact that that can occur means that there can
20 be uncertainty in connection with the casino revenues
21 and it won't hamstring your DIP process, correct?
22 A. Yeah, it's not so much -- well, to a degree what
23 you're saying is correct. It's not so much
24 uncertainty with casino revenues because that's math.
25 It may be some uncertainty with regard to the ability

# **Item 2**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                                  Chapter 9
City of Detroit, Michigan,                              Case No. 13-53846
       Debtor.                                        Hon. Steven W. Rhodes
_____/

## Order Denying Motions to Preclude Debtor from Offering Evidence
### [Dkts. #933 and #935]

Several objectors have filed these two motions. Upon review, the Court concludes that no hearing is necessary to resolve these motions. Accordingly, the hearings that are presently set are cancelled.

The Court further concludes that the motions should be denied without prejudice, because the issues raised in the motions are more efficiently and properly addressed within the context of the trial itself. Further, the Court finds no cause to consider the issues in advance of trial.

It is so ordered.

.

Signed on December 11, 2013

                                      /s/ Steven Rhodes
                                  Steven Rhodes
                                  United States Bankruptcy Judge

# **Item 3**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
:
In re                             :          Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :          Case No. 13-53846
:
                Debtor.     :          Hon. Steven W. Rhodes
:
:
-------------------------------------------------------x

## EXHIBITS LISTS AND OBJECTIONS FOR HEARING RE CITY OF DETROIT'S ASSUMPTION MOTION AND MOTION TO APPROVE POST-PETITION FINANCING

1.    For purposes of the hearing on the City's Assumption Motion [Dkts. 17, 157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "Combined Hearing"), scheduled to take place on December 17, 18, and 19, 2013, the City identifies the following list of exhibits and objections thereto.

2.    The exhibits and objections reflect information received by the City as of 5:30 p.m. on December 16, 2013.

| Party | Exhibit No | Exhibit Description | Objection |
|-------|-----------|---------------------|-----------|
| City | 1 | ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule | |
| City | 2 | ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related Schedule | |
| City | 3 | Term Sheet | Hearsay; Relevance |
| City | 4 | SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | |
| City | 5 | UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | |
| City | 6 | Waiver and Consent of Insurer | |
| City | 7 | Detroit City Code § 18-16-4 | |
| City | 8 | Transcript from the hearing before Judge Annette J. Berry in Third Circuit Court for the County of Wayne | Hearsay |
| City | 9 | Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit (the "Orr Affidavit") | Hearsay; Relevance |
| City | 10 | City of Detroit ("City") Proposal for Creditors Executive Summary | Hearsay; Relevance |
| City | 11 | Collateral Agreement | |
| City | 12 | Correspondence from the City to U.S. Bank National Association ("USBNA") | Hearsay; Relevance |
| City | 13 | Correspondence from Syncora Capital Assurance, Inc. ("Syncora") to USBNA | |
| City | 14 | Correspondence between and among counsel to USBNA, Syncora and the City | Hearsay; Relevance |
| City | 15 | Correspondence from Syncora's counsel to counsel to USBNA | Relevance |
| City | 16 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 17 | Correspondence from Syncora to the City | Relevance |
| City | 18 | Forbearance and Optional Termination Agreement | |
| City | 19 | Correspondence from Syncora to SBS Financial Product Company, LLC ("SBS") | |
| City | 20 | Correspondence from Syncora to the City | Relevance |
| City | 21 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 22 | Correspondence from SBS to Syncora | Hearsay; Relevance |

2

13-53846-tjt   Doc 1727-85   Filed 05/13/14   Entered 05/13/14 15:24:43   Page 55 of 321
13-53846-swr   Doc 2185   Filed 12/16/13   Entered 12/16/13 21:38:24   Page 52 of 113

| City | 23 | Declaration of Gaurav Malhotra in Support of the Debtor's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") | Hearsay; Relevance |
|------|----|----|----|
| City | 24 | Cash Flow Forecasts [Malhotra Declaration Ex. A] | Hearsay; Relevance |
| City | 25 | Ten-Year Projections [Malhotra Declaration Ex. B] | Hearsay; Relevance |
| City | 26 | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] | Hearsay; Relevance |
| City | 27 | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] | Hearsay; Relevance |
| City | 28 | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] | Hearsay; Relevance |
| City | 29 | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] | Hearsay; Relevance |
| City | 30 | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] | |
| City | 31 | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] | Hearsay |
| City | 32 | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] | Hearsay; Relevance |
| City | 33 | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] | Hearsay; Relevance |
| City | 34 | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] | Hearsay; Relevance |
| City | 35 | Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") | Hearsay; Relevance |
| City | 36 | City of Detroit Proposal for Creditors [Orr Declaration Ex. A] | Hearsay; Relevance |
| City | 37 | City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] | Hearsay; Relevance |
| City | 38 | Report of the Detroit Financial Review Team [Orr Declaration Ex. D] | Hearsay; Relevance |
| City | 39 | Financial Stability Agreement [Orr Declaration Ex. E] | Hearsay; Relevance |
| City | 40 | Preliminary Review of the City of Detroit [Orr Declaration Ex. F] | Hearsay; Relevance |
| City | 41 | Report of the Detroit Financial Review Team [Orr Declaration Ex. G] | Hearsay; Relevance |
| City | 42 | letter from Governor Richard Snyder to the City [Orr Declaration Ex. H] | Hearsay; Relevance |
| City | 43 | Ambac Comments on Detroit [Orr Declaration Ex. I] | Hearsay; Relevance |

| City | 44 | Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] | Hearsay; Relevance |
|------|-----|------|------|
| City | 45 | Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] | Hearsay; Relevance |
| City | 46 | Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] | Hearsay; Relevance |
| City | 47 | UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement | |
| City | 48 | SBS Insurance Policies for Scheduled Paymentw of GRS Service Corporation under June 7, 2006 Master Agreement | |
| City | 49 | Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) | |
| City | 50 | First Amendment to Forbearance and Optional Termination Agreement | |
| City | 51 | Second Amendment to Forbearance and Optional Termination Agreement | |
| City | 52 | Third Amendment to Forbearance and Optional Termination Agreement | |
| City | 53 | Fourth Amendment to Forbearance and Optional Termination Agreement | |
| City | 54 | Fifth Amendment to Forbearance and Optional Termination Agreement | |
| City | 55 | Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. | Hearsay; Relevance |
| City | 56 | E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments [DTPFF00015602-DTPFF00015638] | |
| City | 57 | Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] | Hearsay; Relevance |
| City | 58 | Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario)  [DTPFF00014812-DTPFF00014824] | Hearsay; Relevance |
| City | 59 | Ernst & Young, 13-Week Cash Flow Forecast - Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] | Hearsay; Relevance |
| City | 60 | Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] | Hearsay; Relevance |
| City | 61 | Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] | Hearsay |

4

| City | 62 | Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] | Hearsay |
|------|----|-----|------|
| City | 63 | Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] | Hearsay |
| City | 64 | Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] | Hearsay |
| City | 65 | Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] | Hearsay |
| City | 66 | Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] | Hearsay |
| City | 67 | Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation [DTPPF00000826-DTPPF00000837] | Hearsay |
| City | 68 | Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP.[DTPPF00001006- DTPPF00001010] | Hearsay |
| City | 69 | Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] | Hearsay; Relevance |
| City | 70 | Silver Point Finance, LLC:  "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] | Hearsay |
| City | 71 | Letter from Gerbino to Miller Buckfire, attaching Barclay's [DTPPF00000856-DTPPF00000902] | Hearsay |
| City | 72 | Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent - Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] | Hearsay |
| City | 73 | Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP. [DTPPF00000908-DTPPF00000943] | Hearsay |

| City | 74 | "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP. [DTPPF00000838-DTPPF00000855] | Hearsay |
|------|-----|-----|-----|
| City | 75 | Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP. [DTPPF00000821-DTPPF00000825] | Hearsay |
| City | 76 | Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP. [DTPPF00000959-DTPPF00000960] | Hearsay |
| City | 77 | Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP.  [DTPPF00013170-DTPPF00013195] | Hearsay |
| City | 78 | Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Suncora") and Financial Guaranty Insurance Company's ("FGIC) DIP financing proposal [DTPPF00000035-DTPPF00000037] |  |
| City | 79 | Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] |  |
| City | 80 | Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] |  |
| City | 81 | Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377-DTPPF00003404] | Hearsay |
| City | 82 | Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] | Hearsay |
| City | 83 | Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] | Hearsay |
| City | 84 | Goldman Sachs' Draft Commitment Letter, including Annex A and B  [DTPPF00001543- DTPPF00001567] | Relevance; Hearsay |
| City | 85 | Goldman Sachs' Draft Fee Letter [DTPPF00001568-DTPPF00001571] | Relevance; Hearsay |
| City | 86 | Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing"  [DTPPF00001058-DTPPF00001086] | Relevance; Hearsay |
| City | 87 | Letter from Kersten to The City of Detroit regarding  CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] | Hearsay |

| | | | |
|---|---|---|---|
| City | 88 | Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] | |
| City | 89 | Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226- DTPPF00020231] | |
| City | 90 | Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] | Hearsay |
| City | 91 | Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " [DTPPF00012993- DTPPF00013024] | Relevance; Hearsay |
| City | 92 | Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] | Relevance; Hearsay |
| City | 93 | Barclay's Fee Letter fully executed by Barclay's and City [Filed as Docket No. 1761] | |
| City | 94 | Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City [Filed as Docket No. 1520; Exhibit 6A] | Duplicative |
| City | 95 | Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement [Filed as Docket No. 1520; Exhibit 6B] | Hearsay |
| City | 96 | Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] | Relevance; Hearsay |
| City | 97 | Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] | Relevance; Hearsay |
| City | 98 | Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re: Emergency Manager's Order No. 17 [DTPPF00019623-DTPPF00019655] | |
| City | 99 | Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter from Orr to Mayor Bing regarding Emergency Manager's Order No. 17 [DTPPF00019592-DTPPF00019622] | Relevance; Hearsay |
| City | 100 | Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board | |
| City | 101 | Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5A] | Relevance; Hearsay |
| City | 102 | Declaration of James Doak In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5B] | Hearsay; Relevance (with respect to certain topics of testimony to the extent they are inconsistent w |

| | | | the Court's Adjournment Order) |
|---|---|---|---|
| City | 103 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 104 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 105 | Funding for Detroit Announced by Federal Government | Relevance; Hearsay |
| City | 106 | Project Piston Cash Flow Forecast - Monthly (FYs 2013, 14, 15) | Relevance; Hearsay |
| City | 107 | Project Piston Cash Flow Forecast (including Restructuring Scenario) | Relevance; Hearsay |
| City | 108 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Relevance; Hearsay |
| City | 109 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) | Relevance; Hearsay |
| City | 110 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) | Relevance; Hearsay |
| City | 111 | Ernst & Young, Illustrative Cash Chart | Hearsay; Relevance; Subject to Expert Testimony |
| City | 112 | Waiver and Consent of Insurer by Financial Guaranty Insurance Company | |
| City | 113 | Moody's Investors Service, Rating Action: Moody's downgrades FGIC to Caa3 and will withdraw ratings | |
| City | 114 | Draft Financial Recovery Bond Trust Indenture Between City of Detroit and Trustee | Hearsay |
| City | 115 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Relevance; Hearsay |
| City | 116 | Annual Report of the Board of Trustees of the GRS for the Year Ended June 20, 2004 | |
| City | 117 | Annual Report of the Board of Trustees of the PFRS for the Year Ended June 20, 2004 | |
| City | 118 | City Ordinance No. 03-05 | |

| | | | |
|---|---|---|---|
| City | 119 | City Ordinance No. 04-05 | |
| City | 120 | GRS Service Contract 2005 | |
| City | 121 | PFRS Service Contract 2005 | |
| City | 122 | City Ordinance No. 05-05 | |
| City | 123 | City Ordinance No. 05-09 | |
| City | 124 | June 12, 2006 Trust Agreement by and among the Service Corporations and U.S. Bank National Association as Trustee | |
| City | 125 | June 12, 2006 XL Capital Assurance Municipal Bond Insurance Policy CA03049A | |
| City | 126 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010249 | |
| City | 127 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010250 | |
| City | 128 | GRS Service Contract 2006 | |
| City | 129 | PFRS Service Contract 2006 | |
| City | 130 | Contract Administration Agreement | |
| City | 131 | July 19, 2013 Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation | |
| City | 132 | May 25, 2005 1992 ISDA Master Agreement Local Currency Single Jurisdiction between UBS and the GRS Service Corporation | |
| City | 133 | June 26, 2009 Amended and Restated Schedule to the ISDA between UBS and the GRS Service Corporation | |
| City | 134 | June 26, 2009 Revised Confirmation to the GRS Service Corporation from UBS | |
| City | 135 | June 12, 2006 FGIC Swap Surety Policy Number 0602052 | |
| City | 136 | June 12, 2006 FGIC Swap Surety Policy Numbers 06010253, 06010254, and 06010255 | |
| City | 137 | SBS Amended Schedules | |
| City | 138 | PFRS Revised Confirmation | |
| City | 139 | October 23, 2013 Email from Thomas Gavin to Irvin Corley re: Fabian Quotes. | |
| <span style="color:red">■</span> | | | |
| Syncora | 201 | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City | |
| Syncora | 202 | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City | |
| Syncora | 203 | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) | |

9

| Syncora | 204 | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) | |
|---------|-----|------------------------------------------------------------|---|
| Syncora | 205 | Contract Administration Agreement, dated June 12, 2006 | |
| Syncora | 206 | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee | |
| Syncora | 207 | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 | |
| Syncora | 208 | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 | |
| Syncora | 209 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation | |
| Syncora | 210 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation | |
| Syncora | 211 | City Ordinance No. 03-05 (Pérez Decl. Ex. A) | |
| Syncora | 212 | City Ordinance 04-05 (Pérez Decl. Ex. B) | |
| Syncora | 213 | City Ordinance No. 05-05 (Pérez Decl. Ex. C) | |
| Syncora | 214 | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) | |
| Syncora | 215 | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) | Misidentified document |
| Syncora | 216 | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) | Misidentified document |
| Syncora | 217 | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) | |
| Syncora | 218 | Jones Day - Syncora NDA (Swap Proposal) | Relevance |
| Syncora | 219 | Forbearance and Optional Termination Agreement term sheet | Hearsay; Relevance |
| Syncora | 220 | Email from Cheryl Johnson to A. Neely re Status of Swap | Hearsay; Relevance |
| Syncora | 221 | Email from Reuters to Press Secretary re Status of Swap Contract | Hearsay; Relevance |
| Syncora | 222 | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association | Hearsay; Relevance |
| Syncora | 223 | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) | |

| | | | |
|---|---|---|---|
| Syncora | 224 | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) | Hearsay; Relevance; Improper Expert Testimony |
| Syncora | 225 | Letter Dated Aug. 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) | |
| Syncora | 226 | Email from K. Buckfire (DTMI80335) | Relevance |
| Syncora | 227 | Email from Erin Smith (DTMI00107294) | Hearsay; Relevance |
| Syncora | 228 | Email from Bill Nowling (DTMI00111238) | Relevance |
| Syncora | 229 | Abernathy MacGregor Invoice (DTMI00112208) | Relevance |
| Syncora | 230 | 6/12/13 email from Andrew Dillon (DTMI00114984) | Relevance |
| Syncora | 231 | 6/24/13 email from Kevyn Orr (DTMI00114531) | Relevance |
| Syncora | 232 | 6/24/13 email from Kevyn Orr (DTMI00115562) | Relevance |
| Syncora | 233 | Responses to Inquiries from City Council (DTPPF00020357) | |
| Syncora | 234 | Transcript of 8/30/2013 Deposition of Kevyn D. Orr | |
| Syncora | 235 | Transcript of 8/29/2013 Deposition of Kenneth Buckfire | |
| Syncora | 236 | Transcript of 12/5/2013 Deposition of James Doak | |
| Syncora | 237 | Transcript of 12/9/2013 Deposition of Kevyn D. Orr | |
| Syncora | 238 | Transcript of 12/10/2013 Deposition of Kenneth Buckfire | |
| Syncora | 239 | Questions for Consultants on $350 DIP Financing (DTPPF00020380) | Hearsay; Relevance; Compendium Exhibit |
| Syncora | 240 | Transcript of 12/12/2013 Continuation of Deposition of Kevyn D. Orr | |
| | | | |
| FGIC | 301 | Articles of Incorporation (Pérez Dec. Ex. D) | |
| FGIC | 302 | GRS Service Contract 2006 (Pérez Dec. Ex. G) | Misidentified document |
| FGIC | 303 | Termination Consent Letter (Pérez Dec. Ex. I) | |
| FGIC | 304 | TRO (Pérez Dec. Ex. S) | |
| FGIC | 305 | FGIC Order of Rehabilitation, dated June 28, 2012 | Hearsay; Relevance |

| | | | |
|---|---|---|---|
| FGIC | 306 | FGIC Rehabilitation Plan Approval Order, dated June 11, 2013 | Hearsay; Relevance |
| FGIC | 307 | Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP), dated 10/3/13 8:04 PM | |
| FGIC | 308 | Quarterly Report of the Emergency Manager, dated October 15, 2013 | |
| FGIC | 309 | Project Piston Cash Flow Forecast - through FY2017 (DIP Financing Scenario) (DTPPF00020367) | |
| | | | |
| Ambac | 401 | Detroit City Code § 18-5-120 *et seq.* (Ambac Assumption Objection Ex. 1 [Dkt. 348-2]) | |
| Ambac | 402 | GRS Articles of Incorporation (Ambac Assumption Objection Ex. 2 [Dkt. 348-3]) | |
| Ambac | 403 | PFRS Articles of Incorporation (Ambac Assumption Objection Ex. 3 [Dkt. 348-4]) | |
| Ambac | 404 | Offering Circular for 2006 COPs (Ambac Assumption Objection Ex. 6 [Dkt. 348-7]) | Hearsay; Relevance |
| Ambac | 405 | City of Detroit 2012 Comprehensive Annual Fiscal report (Ambac Assumption Objection Ex. 7 [Dkt. 348-8]) | |
| Ambac | 406 | Detroit City Code § 18-16-1 *et seq.* (Ambac Assumption Objection Ex. 8 [Dkt. 348-9]) | |
| Ambac | * | Ambac reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| Ambac | ** | Ambac reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| Ambac | *** | Ambac reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. No. 17/.157 and 1520. | Objections Reserved |
| | | | |
| EEPK | 801 | Solicitation Materials to Prospective Lenders (Letter and Term Sheet) (DTPPF00016682) | |
| EEPK | 802 | Post-Petition Financing Discussion dated September 26, 2013 (DTPPF00020215) | |
| EEPK | 803 | Bond Purchase Agreement - Quality of Life Loan | |
| EEPK | 804 | Engagement Letter for Exit Financing (DTPPF00012973) | |
| EEPK | 805 | City Council Resolution | |
| EEPK | 806 | Email correspondence and attachments (DTPPF00000162) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |

| | | | |
|---|---|---|---|
| Retirement Systems | 1001 | Emails between Anne Langan and Irv Corley dated October 14, 2013 (DTPPF00002139) | Relevance; Hearsay |
| Retirement Systems | 1002 | Email from Jonathan Stern to James Doak dated October 2, 2013 (DTPPF00013241) | Hearsay |
| Retirement Systems | 1003 | Emails from James Doak dated August 29 and 30, 2013 (DTPPF00004951-4952); | Hearsay |
| Retirement Systems | 1004 | Email from Thomas Gavin dated 11/8/2013 (SOM20009484); | Hearsay |
| Retirement Systems | 1005 | Email from Thomas Gavin to James Doak with attached Orrick legal opinion | Hearsay; Legal Conclusion |
| Retirement Systems | 1006 | Email from Thomas Gavin to Irvin Corley dated 10/21/2013 | Hearsay |
| Retirement Systems | 1007 | Memorandum dated 10/24/2013 from Brett Hartzell to Kevyn Orr re request for reallocation of $95 million for FY2014 budget (Moore Dep Ex. 11; Orr Dep. Ex. 3) | Relevance |
| Retirement Systems | 1008 | Response, dated September 16, 2013, received from the Michigan | Document Missing - Objection Reserved |
| Retirement Systems | 1009 | Addendum #1 to Change Order #1 regarding Miller Buckfire contract | Relevance |
| Retirement Systems | 1010 | Email from James Doak to Jones Day forwarding email from Thomas Gavin | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1011 | Emails from Jerry Pokorski dated October 24, 2013 (DTPPF00020413-14); | Hearsay; Relevance |
| Retirement Systems | 1012 | City Council Resolution denying DIP financing; | |
| Retirement Systems | 1013 | Email correspondence between James Bonsall, Kevyn Orr and James Doak dated October 9, 2013 (DTPPF0019241-42); | None |
| Retirement Systems | 1014 | Email correspondence from David A. Hall regarding Responses to Inquiries of City Council Regarding Postpetition Financing and its attachment (DTPPF00020357-366); | None |
| Retirement Systems | 1015 | November 6, 2013 correspondence from Harold W. Bulger, Jr., Miller Canfield, Paddock and Stone, P.L.C. to Mr. Harlan Goodrich, Secretary, Local Emergency Financial Assistance Loan Board, and attachments (DTPPF00020232-356); | |

| | | | |
|---|---|---|---|
| Retirement Systems | 1016 | Email from Corinne Ball to Jeffrey B. Ellman dated January 15, 2013 (DTMI00235218, RSCD Exhibit 866-001) | Hearsay; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1017 | Memoranda dated October 16 and 17, 2013 – with handwritten notes – regarding post-petition financing (DTPPF00020380-8, DTPPF00020389-93, DTPPF00020401-12). | Hearsay; Compendium Exhibit |
| Retirement Systems | 1018 | Email from James Doak to Irvin Corley, Jr. dated October 16, 2013 (DTPPF00020423-24). | Relevance |
| Retirement Systems | 1019 | Email with attachment from James Doak to Irvin Corley, Jr., dated October 21, 2013 (DTPPF00020419-22). | No |
| Retirement Systems | 1020 | Handwritten notes of Irvin Corley, Jr., regarding post-petition financing (DTPPF00020415-18). | Hearsay; Relevance |
| Retirement Systems | 1021 | Handwritten notes of Irvin Corley, Jr., and others regarding postpetition financing, October 15, 22 and 25, 2013 (DTPPF00020382-88, DTPPF00020394-400, DTPPF00020415-18). | Hearsay; Relevance; Compendium Exhibit |
| Retirement Systems | 1022 | Email and attachment from David A. Hall to Irvin Corley, Jr., dated October 20, 2013 (DTPPF00020357-66) (Langan Deposition Exhibit 5). | Duplicative of 1014 |
| Retirement Systems | | Any document used in any deposition; | Objections Reserved |
| Retirement Systems | | Any document attached to Dkt. Nos. 17, 157 and/or 1520; | Objections Reserved |
| Retirement Systems | | Any document listed by any other party; | Objections Reserved |
| Retirement Systems | | Any document necessary for rebuttal. | Objections Reserved |
| <span style="color:red">█████</span> | | | |
| Sole | 1301 | 2009 Swap Confirmations -- Docket 1857-2, p 4 | |
| Sole | 1302 | LIBOR Rates | Hearsay; Completeness Legibility |
| Sole | 1303 | Barclay Loan Terms | |
| Sole | 1304 | Barclay Commitment Letter | Misidentified document |
| Sole | 1305 | $95 million appropriation for "restructuring" | |
| Sole | 1306 | Automatic Stay Order | |
| Sole | 1307 | Fitch and Standard and Poors at City Council table – Docket 1857-4, p 14 | Hearsay; Relevance |
| Sole | 1308 | City Council resolution disapproving Barclay loan -- Docket 1857-4, p 15 | |
| Sole | 1309 | City Council resolution calling for SEC investigation | Misidentified document |
| Sole | 1310 | Turbeville CV (attached) | |

14

| | | | |
|---|---|---|---|
| Sole | 1311 | Demos report, The Detroit Bankruptcy, dated November 2013 (attached) | Hearsay |
| Sole | 1312 | July 2006 POC and Interest Rate Swap documents | |
| Sole | 1313 | 2006 POC reflecting no security interest – Docket 361-5- p. 2 | Completeness |
| Sole | 1314 | June 2009 Amended POC and Interest Rate Swap documents -- Confirmations and City 4 and 5 | |
| Sole | 1315 | May 12, 2013 EM Financial Plan Docket 361-6, p 4 | Completeness |
| Sole | 1316 | July 14, 2013 EM Financial Report to Creditors – Orr, August 30, 2013 deposition, Exhibit 6 | |
| Sole | 1317 | Bloomberg article on Termination Fees | Hearsay; Relevance |
| Sole | 1318 | BBC article on UBS Libor rigging | Hearsay; Relevance |
| Sole | 1319 | Article on ISDA Fix | Relevance; Improper Expert Testimony |
| Sole | 1320 | Articles on conviction of UBS executive and indictment of BofA executive | Hearsay; Relevance |
| Sole | 1321 | Final Judgment on UBS municipal bond rigging | Hearsay; Relevance |
| Sole | 1322 | Article on BofA Muni misdoing | Hearsay; Relevance |
| Sole | 1323 | Article on UBS sub-prime lending | Hearsay; Relevance |
| Sole | 1324 | Senate Select Committee Report on Wall Street and the Financial Crisis | Hearsay; Relevance; Improper Expert Testimony |
| Sole | 1325 | Detroit Retirement Fund lawsuit against UBS for mortgage fraud -- Docket 361-9 | Hearsay; Relevance |
| Sole | 1326 | City of Detroit, January 2009 Planning and Development Department Neighborhood Stablization Program Plan | Relevance; Completeness |
| Sole | 1327 | Gavin email -- DTPPF00000162-173 (Orrick Memorandum) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Sole | 1328 | July 31, 2012 SEC Report on the Municipal Market Securities Market, www.sec.gov/spotlight/municipalsecurities. | Hearsay |
| Sole | 1329 | Sean Werdlow biography -- http://sbsco.com/firmPage/firm1/bankingteam/seanwerdlow.aspx | Relevance |

15

13-53846-tjt  Doc 4217  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 68 of 318
13-53846-swr  Doc 2185  Filed 12/16/13  Entered 12/16/13 22:33:24  Page 15 of 18

| | | | |
|---|---|---|---|
| Sole | **1330** | 2009 City Council Resolution | Non-specific; Non-compliant with Local Rule 7016-1(a)(9) |
| Sole | **1331** | Tuberville Revised Expert Report | Hearsay; Timeliness |
| | | | |
| NPFG | **1** | Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated October 15, 2013 | |
| NPFG | **2** | Emergency Manager Report Pursuant to Section 17 of Local Financial | |
| NPFG | * | National reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| NPFG | ** | National reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| NPFG | *** | National reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. Nos. 17/157 and 1520. | Objections Reserved |

Dated:  December 16, 2013

Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

 - and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

*Counsel for the City of Detroit*

17

## CERTIFICATE OF SERVICE

        I, Bruce Bennett, hereby certify that the foregoing Exhibit Lists and Objections was filed and served via the Court's electronic case filing and noticing system on this 16th day of December, 2013.

<u>/s/ Bruce Bennett</u>

**Item 4**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                      Chapter 9
City of Detroit, Michigan,                  Case No. 13-53846
      Debtor.                              Hon. Steven W. Rhodes

_____/

<u>Order Denying Motion to Adjourn Hearing</u>

For the reasons stated on the record in open Court on December 13, 2013, it is hereby

ordered that the motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to adjourn

hearing on the debtor's assumption motion [Dkt. #17 and #157] and motion to approve post-

petition financing [Dkt. #1520] is denied.

.

**Signed on December 17, 2013**

                        **/s/ Steven Rhodes**
                    **Steven Rhodes**
                    **United States Bankruptcy Judge**

**Item 5**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
----------------------------------------------------x
                                        :
In re                                   :         Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :         Case No. 13-53846
                                        :
                          Debtor.       :         Hon. Steven W. Rhodes
                                        :
                                        :
----------------------------------------------------x
```

## AMENDED EXHIBIT LISTS AND OBJECTIONS FOR HEARING RE CITY OF DETROIT'S ASSUMPTION MOTION AND MOTION TO APPROVE POST-PETITION FINANCING

1.      For purposes of the hearing on the City's Assumption Motion [Dkts. 17, 157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "Combined Hearing"), scheduled to take place on December 17, 18, and 19, 2013, and continued to January 3, 2014, the City identifies the following list of exhibits and objections thereto.

2.      The exhibits and objections reflect information received by the City as of 4 pm on January 2, 2014.

| Party | Exhibit No | Exhibit Description | Objection |
|---|---|---|---|
| City | 1 | ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule | No objection – admitted |
| City | 2 | ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related Schedule | No objection – admitted |
| City | 3 | Term Sheet | Hearsay; Relevance |
| City | 4 | SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | No objection – admitted |
| City | 5 | UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | No objection – admitted |
| City | 6 | Waiver and Consent of Insurer | No objection – admitted |
| City | 7 | Detroit City Code § 18-16-4 | No objection – admitted |
| City | 8 | Transcript from the hearing before Judge Annette J. Berry in Third Circuit Court for the County of Wayne | Hearsay |
| City | 9 | Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit (the "Orr Affidavit") | Hearsay; Relevance |
| City | 10 | City of Detroit ("City") Proposal for Creditors Executive Summary | Hearsay; Relevance |
| City | 11 | Collateral Agreement | No objection – admitted |
| City | 12 | Correspondence from the City to U.S. Bank National Association ("USBNA") | Hearsay; Relevance |
| City | 13 | Correspondence from Syncora Capital Assurance, Inc. ("Syncora") to USBNA | No objection – admitted |
| City | 14 | Correspondence between and among counsel to USBNA, Syncora and the City | Hearsay; Relevance |
| City | 15 | Correspondence from Syncora's counsel to counsel to USBNA | Relevance |
| City | 16 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 17 | Correspondence from Syncora to the City | Relevance |
| City | 18 | Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 19 | Correspondence from Syncora to SBS Financial Product Company, LLC ("SBS") | No objection – admitted |

2

| City | 20 | Correspondence from Syncora to the City | Relevance |
|------|-----|-----------------------------------------|-----------|
| City | 21 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 22 | Correspondence from SBS to Syncora | Hearsay; Relevance |
| City | 23 | Declaration of Gaurav Malhotra in Support of the Debtor's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") | Hearsay; Relevance |
| City | 24 | Cash Flow Forecasts [Malhotra Declaration Ex. A] | Hearsay; Relevance |
| City | 25 | Ten-Year Projections [Malhotra Declaration Ex. B] | Hearsay; Relevance |
| City | 26 | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] | Hearsay; Relevance |
| City | 27 | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] | Hearsay; Relevance |
| City | 28 | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] | Hearsay; Relevance |
| City | 29 | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] | Hearsay; Relevance |
| City | 30 | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] | No objection – admitted |
| City | 31 | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] | Hearsay |
| City | 32 | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] | Hearsay; Relevance |
| City | 33 | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] | Hearsay; Relevance |
| City | 34 | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] | Hearsay; Relevance |
| City | 35 | Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") | Hearsay; Relevance |
| City | 36 | City of Detroit Proposal for Creditors [Orr Declaration Ex. A] | Pages 49-50 and 97-98 admitted over objection on 12/17/2013 |
| City | 37 | City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] | Hearsay; Relevance |
| City | 38 | Report of the Detroit Financial Review Team [Orr Declaration Ex. D] | Hearsay; Relevance |
| City | 39 | Financial Stability Agreement [Orr Declaration Ex. E] | Hearsay; Relevance |

| City | 40 | Preliminary Review of the City of Detroit [Orr Declaration Ex. F] | Hearsay; Relevance |
|------|-----|---|---|
| City | 41 | Report of the Detroit Financial Review Team [Orr Declaration Ex. G] | Hearsay; Relevance |
| City | 42 | letter from Governor Richard Snyder to the City [Orr Declaration Ex. H] | Hearsay; Relevance |
| City | 43 | Ambac Comments on Detroit [Orr Declaration Ex. I] | Hearsay; Relevance |
| City | 44 | Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] | Hearsay; Relevance |
| City | 45 | Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] | Hearsay; Relevance |
| City | 46 | Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] | Hearsay; Relevance |
| City | 47 | UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement | No objection – admitted |
| City | 48 | SBS Insurance Policies for Scheduled Paymentw of GRS Service Corporation under June 7, 2006 Master Agreement | No objection – admitted |
| City | 49 | Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) | No objection – admitted |
| City | 50 | First Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 51 | Second Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 52 | Third Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 53 | Fourth Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 54 | Fifth Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 55 | Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. | Hearsay; Relevance |
| City | 56 | E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments [DTPFF00015602-DTPFF00015638] | No objection – admitted |
| City | 57 | Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] | Hearsay; Relevance |
| City | 58 | Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario)  [DTPFF00014812-DTPFF00014824] | Hearsay; Relevance |
| City | 59 | Ernst & Young, 13-Week Cash Flow Forecast - Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] | Hearsay; Relevance |

| | | | |
|---|---|---|---|
| City | 60 | Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] | Hearsay; Relevance |
| City | 61 | Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] | Admitted to show it was received on 12/17/2013 |
| City | 62 | Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] | Hearsay |
| City | 63 | Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] | Hearsay |
| City | 64 | Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] | Hearsay |
| City | 65 | Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] | Hearsay |
| City | 66 | Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] | Hearsay |
| City | 67 | Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation  [DTPPF00000826-DTPPF00000837] | Hearsay |
| City | 68 | Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP.[DTPPF00001006- DTPPF00001010] | Hearsay |
| City | 69 | Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] | Hearsay; Relevance |
| City | 70 | Silver Point Finance, LLC:  "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] | Hearsay |
| City | 71 | Letter from Gerbino to Miller Buckfire, attaching Barclay's [DTPPF00000856-DTPPF00000902] | Hearsay |

5

13-53846-tjt   Doc 4723-7   Filed 05/12/14   Entered 05/12/14 15:27:43   Page 79 of 321
13-53846-swr   Doc 2357   Filed 01/02/14   Entered 01/02/14 16:57:44   Page 5 of 13

| City | 72 | Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent - Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] | Hearsay |
|------|-----|--------------------------------------------------------------|----------|
| City | 73 | Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP. [DTPPF00000908-DTPPF00000943] | Hearsay |
| City | 74 | "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP. [DTPPF00000838-DTPPF00000855] | Hearsay |
| City | 75 | Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP. [DTPPF00000821-DTPPF00000825] | Hearsay |
| City | 76 | Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP. [DTPPF00000959-DTPPF00000960] | Hearsay |
| City | 77 | Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP.  [DTPPF00013170-DTPPF00013195] | Hearsay |
| City | 78 | Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Suncora") and Financial Guaranty Insurance Company's ("FGIC) DIP financing proposal [DTPPF00000035-DTPPF00000037] | No objection – admitted |
| City | 79 | Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] | No objection – admitted |
| City | 80 | Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] | No objection – admitted |
| City | 81 | Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377-DTPPF00003404] | Hearsay |
| City | 82 | Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] | Hearsay |
| City | 83 | Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] | Hearsay |
| City | 84 | Goldman Sachs' Draft Commitment Letter, including Annex A and B  [DTPPF00001543- DTPPF00001567] | Relevance; Hearsay |
| City | 85 | Goldman Sachs' Draft Fee Letter [DTPPF00001568-DTPPF00001571] | Relevance; Hearsay |

| City | 86 | Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing" [DTPPF00001058-DTPPF00001086] | Relevance; Hearsay |
|---|---|---|---|
| City | 87 | Letter from Kersten to The City of Detroit regarding CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] | Hearsay |
| City | 88 | Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] | No objection – admitted |
| City | 89 | Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226-DTPPF00020231] | No objection – admitted |
| City | 90 | Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] | Admitted over objection on 12/17/2013 |
| City | 91 | Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " [DTPPF00012993- DTPPF00013024] | Admitted over objection to show what was provided on 12/17/2013 |
| City | 92 | Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] | Relevance; Hearsay |
| City | 93 | Barclay's Fee Letter fully executed by Barclay's and City [Filed as Docket No. 1761] | No objection - admitted |
| City | 94 | Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City [Filed as Docket No. 1520; Exhibit 6A] | Admitted over objection on 12/18/2013 |
| City | 95 | Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement [Filed as Docket No. 1520; Exhibit 6B] | Hearsay |
| City | 96 | Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] | Admitted over objection on 12/18/2013 |
| City | 97 | Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] | Admitted over objection on 12/18/2013 |
| City | 98 | Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re: Emergency Manager's Order No. 17 [DTPPF00019623-DTPPF00019655] | No objection - admitted |
| City | 99 | Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter from Orr to Mayor Bing regarding Emergency Manager's Order No. 17 [DTPPF00019592-DTPPF00019622] | Relevance; Hearsay |
| City | 100 | Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board | No objection - admitted |

| City | 101 | Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5A] | Relevance; Hearsay |
|------|-----|-----|-----|
| City | 102 | Declaration of James Doak In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5B] | Hearsay; Relevance (with respect to certain topics of testimony to the extent they are inconsistent w the Court's Adjournment Order) |
| City | 103 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 104 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 105 | Funding for Detroit Announced by Federal Government | Relevance; Hearsay |
| City | 106 | Project Piston Cash Flow Forecast - Monthly (FYs 2013, 14, 15) | Admitted over objection on 12/17/2013 |
| City | 107 | Project Piston Cash Flow Forecast (including Restructuring Scenario) | Relevance; Hearsay |
| City | 108 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Admitted over objection on 12/17/2013 |
| City | 109 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) | Admitted over objection on 12/17/2013 |
| City | 110 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) | Admitted over objection on 12/17/2013 |
| City | 111 | Ernst & Young, Illustrative Cash Chart | Admitted over objection on 12/17/2013 |
| City | 112 | Waiver and Consent of Insurer by Financial Guaranty Insurance Company | No objection – admitted |
| City | 113 | Moody's Investors Service, Rating Action: Moody's downgrades FGIC to Caa3 and will withdraw ratings | No objection - admitted |
| City | 114 | Draft Financial Recovery Bond Trust Indenture Between City of Detroit and Trustee | Hearsay |

8

| City | 115 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Admitted over objection on 12/17/2013 |
|------|-----|---------------------------------------------------------------------------------------------|--------------------------------------|
| City | 116 | Annual Report of the Board of Trustees of the GRS for the Year Ended June 20, 2004 | No objection – admitted |
| City | 117 | Annual Report of the Board of Trustees of the PFRS for the Year Ended June 20, 2004 | No objection – admitted |
| City | 118 | City Ordinance No. 03-05 | No objection – admitted |
| City | 119 | City Ordinance No. 04-05 | No objection – admitted |
| City | 120 | GRS Service Contract 2005 | No objection – admitted |
| City | 121 | PFRS Service Contract 2005 | No objection – admitted |
| City | 122 | City Ordinance No. 05-05 | No objection – admitted |
| City | 123 | City Ordinance No. 05-09 | No objection – admitted |
| City | 124 | June 12, 2006 Trust Agreement by and among the Service Corporations and U.S. Bank National Association as Trustee | No objection – admitted |
| City | 125 | June 12, 2006 XL Capital Assurance Municipal Bond Insurance Policy CA03049A | No objection – admitted |
| City | 126 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010249 | No objection – admitted |
| City | 127 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010250 | No objection – admitted |
| City | 128 | GRS Service Contract 2006 | No objection – admitted |
| City | 129 | PFRS Service Contract 2006 | No objection – admitted |
| City | 130 | Contract Administration Agreement | No objection – admitted |
| City | 131 | July 19, 2013 Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation | No objection – admitted |
| City | 132 | May 25, 2005 1992 ISDA Master Agreement Local Currency Single Jurisdiction between UBS and the GRS Service Corporation | No objection - admitted |
| City | 133 | June 26, 2009 Amended and Restated Schedule to the ISDA between UBS and the GRS Service Corporation | No objection – admitted |
| City | 134 | June 26, 2009 Revised Confirmation to the GRS Service Corporation from UBS | No objection – admitted |
| City | 135 | June 12, 2006 FGIC Swap Surety Policy Number 0602052 | No objection – admitted |
| City | 136 | June 12, 2006 FGIC Swap Surety Policy Numbers 06010253, 06010254, and 06010255 | No objection - admitted |

9

| | | | |
|---|---|---|---|
| City | 137 | SBS Amended Schedules | No objection – admitted |
| City | 138 | PFRS Revised Confirmation | No objection – admitted |
| City | 139 | October 23, 2013 Email from Thomas Gavin to Irvin Corley re: Fabian Quotes. | No objection – admitted |
| City | 140 | Swap Payments v. Swap Termination Loan [Demonstrative] | Admitted for demonstrative purposes only on 12/17/2013 |
| City | 141 | Sixth Amendment to Forbearance and Optional Termination Agreement | Reserved |
| <span style="color:red">███</span> | | | |
| Syncora | 201 | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City | No objection – admitted |
| Syncora | 202 | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City | No objection – admitted |
| Syncora | 203 | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) | No objection – admitted |
| Syncora | 204 | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) | No objection – admitted |
| Syncora | 205 | Contract Administration Agreement, dated June 12, 2006 | No objection – admitted |
| Syncora | 206 | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee | No objection – admitted |
| Syncora | 207 | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 | No objection – admitted |
| Syncora | 208 | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 | No objection – admitted |
| Syncora | 209 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation | No objection – admitted |
| Syncora | 210 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation | No objection – admitted |
| Syncora | 211 | City Ordinance No. 03-05 (Pérez Decl. Ex. A) | No objection – admitted |
| Syncora | 212 | City Ordinance 04-05 (Pérez Decl. Ex. B) | No objection – admitted |
| Syncora | 213 | City Ordinance No. 05-05 (Pérez Decl. Ex. C) | No objection – admitted |
| Syncora | 214 | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) | No objection - admitted |

| | | | |
|---|---|---|---|
| Syncora | 215 | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) | Misidentified document |
| Syncora | 216 | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) | Misidentified document |
| Syncora | 217 | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) | No objection - admitted |
| Syncora | 218 | Jones Day - Syncora NDA (Swap Proposal) | Relevance |
| Syncora | 219 | Forbearance and Optional Termination Agreement term sheet | Hearsay; Relevance |
| Syncora | 220 | Email from Cheryl Johnson to A. Neely re Status of Swap | Hearsay; Relevance |
| Syncora | 221 | Email from Reuters to Press Secretary re Status of Swap Contract | Hearsay; Relevance |
| Syncora | 222 | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association | Hearsay; Relevance |
| Syncora | 223 | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) | No objection - admitted |
| Syncora | 224 | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) | Hearsay; Relevance; Improper Expert Testimony |
| Syncora | 225 | Letter Dated Aug. 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) | No objection - admitted |
| Syncora | 226 | Email from K. Buckfire (DTMI80335) | Relevance |
| Syncora | 227 | Email from Erin Smith (DTMI00107294) | Hearsay; Relevance |
| Syncora | 228 | Email from Bill Nowling (DTMI00111238) | Relevance |
| Syncora | 229 | Abernathy MacGregor Invoice (DTMI00112208) | Relevance |
| Syncora | 230 | 6/12/13 email from Andrew Dillon (DTMI00114984) | Relevance |
| Syncora | 231 | 6/24/13 email from Kevyn Orr (DTMI00114531) | Relevance |
| Syncora | 232 | 6/24/13 email from Kevyn Orr (DTMI00115562) | Relevance |
| Syncora | 233 | Responses to Inquiries from City Council (DTPPF00020357) | No objection – admitted |
| Syncora | 234 | Transcript of 8/30/2013 Deposition of Kevyn D. Orr | No objection – admitted |
| Syncora | 235 | Transcript of 8/29/2013 Deposition of Kenneth Buckfire | No objection – admitted |
| Syncora | 236 | Transcript of 12/5/2013 Deposition of James Doak | No objection – admitted |

| | | | |
|---|---|---|---|
| Syncora | 237 | Transcript of 12/9/2013 Deposition of Kevyn D. Orr | No objection – admitted |
| Syncora | 238 | Transcript of 12/10/2013 Deposition of Kenneth Buckfire | No objection – admitted |
| Syncora | 239 | Questions for Consultants on $350 DIP Financing (DTPPF00020380) | Hearsay; Relevance; Compendium Exhibit |
| Syncora | 240 | Transcript of 12/12/2013 Continuation of Deposition of Kevyn D. Orr | No objection - admitted |
| | | | |
| FGIC | 301 | Articles of Incorporation (Pérez Dec. Ex. D) | No objection - admitted |
| FGIC | 302 | GRS Service Contract 2006 (Pérez Dec. Ex. G) | Misidentified document |
| FGIC | 303 | Termination Consent Letter (Pérez Dec. Ex. I) | No objection - admitted |
| FGIC | 304 | TRO (Pérez Dec. Ex. S) | No objection - admitted |
| FGIC | 305 | FGIC Order of Rehabilitation, dated June 28, 2012 | Hearsay; Relevance |
| FGIC | 306 | FGIC Rehabilitation Plan Approval Order, dated June 11, 2013 | Hearsay; Relevance |
| FGIC | 307 | Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP), dated 10/3/13 8:04 PM | No objection – admitted |
| FGIC | 308 | Quarterly Report of the Emergency Manager, dated October 15, 2013 | No objection – admitted |
| FGIC | 309 | Project Piston Cash Flow Forecast - through FY2017 (DIP Financing Scenario) (DTPPF00020367) | No objection - admitted |
| | | | |
| Ambac | 401 | Detroit City Code § 18-5-120 *et seq.* (Ambac Assumption Objection Ex. 1 [Dkt. 348-2]) | No objection – admitted |
| Ambac | 402 | GRS Articles of Incorporation (Ambac Assumption Objection Ex. 2 [Dkt. 348-3]) | No objection – admitted |
| Ambac | 403 | PFRS Articles of Incorporation (Ambac Assumption Objection Ex. 3 [Dkt. 348-4]) | No objection – admitted |
| Ambac | 404 | Offering Circular for 2006 COPs (Ambac Assumption Objection Ex. 6 [Dkt. 348-7]) | Hearsay; Relevance |
| Ambac | 405 | City of Detroit 2012 Comprehensive Annual Fiscal report (Ambac Assumption Objection Ex. 7 [Dkt. 348-8]) | No objection – admitted |
| Ambac | 406 | Detroit City Code § 18-16-1 *et seq.* (Ambac Assumption Objection Ex. 8 [Dkt. 348-9]) | No objection - admitted |

| | | | |
|---|---|---|---|
| Ambac | * | Ambac reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| Ambac | ** | Ambac reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| Ambac | *** | Ambac reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. No. 17/.157 and 1520. | Objections Reserved |
| | | | |
| EEPK | 801 | Solicitation Materials to Prospective Lenders (Letter and Term Sheet) (DTPPF00016682) | No objection – admitted |
| EEPK | 802 | Post-Petition Financing Discussion dated September 26, 2013 (DTPPF00020215) | No objection – admitted |
| EEPK | 803 | Bond Purchase Agreement - Quality of Life Loan | No objection – admitted |
| EEPK | 804 | Engagement Letter for Exit Financing (DTPPF00012973) | No objection – admitted |
| EEPK | 805 | City Council Resolution | No objection - admitted |
| EEPK | 806 | Email correspondence and attachments (DTPPF00000162) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| | | | |
| Retirement Systems | 1001 | Emails between Anne Langan and Irv Corley dated October 14, 2013 (DTPPF00002139) | Relevance; Hearsay |
| Retirement Systems | 1002 | Email from Jonathan Stern to James Doak dated October 2, 2013 (DTPPF00013241) | Hearsay |
| Retirement Systems | 1003 | Emails from James Doak dated August 29 and 30, 2013 (DTPPF00004951-4952); | Admitted over objection on 12/18/2013 |
| Retirement Systems | 1004 | Email from Thomas Gavin dated 11/8/2013 (SOM20009484); | Hearsay |
| Retirement Systems | 1005 | Email from Thomas Gavin to James Doak with attached Orrick legal opinion | Admitted on 12/18/2013 to show what he did |
| Retirement Systems | 1006 | Email from Thomas Gavin to Irvin Corley dated 10/21/2013 | Hearsay |
| Retirement Systems | 1007 | Memorandum dated 10/24/2013 from Brett Hartzell to Kevyn Orr re request for reallocation of $95 million for FY2014 budget (Moore Dep Ex. 11; Orr Dep. Ex. 3) | Relevance |
| Retirement Systems | 1008 | Response, dated September 16, 2013, received from the Michigan | Document Missing - Objection Reserved |

| | | | |
|---|---|---|---|
| Retirement Systems | 1009 | Addendum #1 to Change Order #1 regarding Miller Buckfire contract | Relevance |
| Retirement Systems | 1010 | Email from James Doak to Jones Day forwarding email from Thomas Gavin | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1011 | Emails from Jerry Pokorski dated October 24, 2013 (DTPPF00020413-14); | Hearsay; Relevance |
| Retirement Systems | 1012 | City Council Resolution denying DIP financing; | No objection – admitted |
| Retirement Systems | 1013 | Email correspondence between James Bonsall, Kevyn Orr and James Doak dated October 9, 2013 (DTPPF0019241-42); | No objection - admitted |
| Retirement Systems | 1014 | Email correspondence from David A. Hall regarding Responses to Inquiries of City Council Regarding Postpetition Financing and its attachment (DTPPF00020357-366) | No objection – admitted |
| Retirement Systems | 1015 | November 6, 2013 correspondence from Harold W. Bulger, Jr., Miller Canfield, Paddock and Stone, P.L.C. to Mr. Harlan Goodrich, Secretary, Local Emergency Financial Assistance Loan Board, and attachments (DTPPF00020232-356); | No objection - admitted |
| Retirement Systems | 1016 | Email from Corinne Ball to Jeffrey B. Ellman dated January 15, 2013 (DTMI00235218, RSCD Exhibit 866-001) | Hearsay; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1017 | Memoranda dated October 16 and 17, 2013 – with handwritten notes – regarding post-petition financing (DTPPF00020380-8, DTPPF00020389-93, DTPPF00020401-12). | Hearsay; Compendium Exhibit |
| Retirement Systems | 1018 | Email from James Doak to Irvin Corley, Jr. dated October 16, 2013 (DTPPF00020423-24). | Relevance |
| Retirement Systems | 1019 | Email with attachment from James Doak to Irvin Corley, Jr., dated October 21, 2013 (DTPPF00020419-22). | No objection - admitted |
| Retirement Systems | 1020 | Handwritten notes of Irvin Corley, Jr., regarding post-petition financing (DTPPF00020415-18). | Hearsay; Relevance |
| Retirement Systems | 1021 | Handwritten notes of Irvin Corley, Jr., and others regarding postpetition financing, October 15, 22 and 25, 2013 (DTPPF00020382-88, DTPPF00020394-400, DTPPF00020415-18). | Hearsay; Relevance; Compendium Exhibit |
| Retirement Systems | 1022 | Email and attachment from David A. Hall to Irvin Corley, Jr., dated October 20, 2013 (DTPPF00020357-66) (Langan Deposition Exhibit 5). | Duplicative of 1014 |
| Retirement Systems | | Any document used in any deposition; | Objections Reserved |

| | | | |
|---|---|---|---|
| Retirement Systems | | Any document attached to Dkt. Nos. 17, 157 and/or 1520; | Objections Reserved |
| Retirement Systems | | Any document listed by any other party; | Objections Reserved |
| Retirement Systems | | Any document necessary for rebuttal. | Objections Reserved |
| <span style="color:red"></span> | | | |
| Sole | 1301 | 2009 Swap Confirmations -- Docket 1857-2, p 4 | No objection – admitted |
| Sole | 1302 | LIBOR Rates | Hearsay; Completeness Legibility |
| Sole | 1303 | Barclay Loan Terms | No objection - admitted |
| Sole | 1304 | Barclay Commitment Letter | Misidentified document |
| Sole | 1305 | $95 million appropriation for "restructuring" | No objection - admitted |
| Sole | 1306 | Automatic Stay Order | No objection - admitted |
| Sole | 1307 | Fitch and Standard and Poors at City Council table – Docket 1857-4, p 14 | Hearsay; Relevance |
| Sole | 1308 | City Council resolution disapproving Barclay loan -- Docket 1857-4, p 15 | No objection - admitted |
| Sole | 1309 | City Council resolution calling for SEC investigation | Misidentified document |
| Sole | 1310 | Turbeville CV (attached) | No objection - admitted |
| Sole | 1311 | Demos report, The Detroit Bankruptcy, dated November 2013 (attached) | Hearsay |
| Sole | 1312 | July 2006 POC and Interest Rate Swap documents | No objection - admitted |
| Sole | 1313 | 2006 POC reflecting no security interest – Docket 361-5- p. 2 | Completeness |
| Sole | 1314 | June 2009 Amended POC and Interest Rate Swap documents -- Confirmations and City 4 and 5 | No objection - admitted |
| Sole | 1315 | May 12, 2013 EM Financial Plan Docket 361-6, p 4 | Completeness |
| Sole | 1316 | July 14, 2013 EM Financial Report to Creditors – Orr, August 30, 2013 deposition, Exhibit 6 | No objection - admitted |
| Sole | 1317 | Bloomberg article on Termination Fees | Hearsay; Relevance |
| Sole | 1318 | BBC article on UBS Libor rigging | Hearsay; Relevance |
| Sole | 1319 | Article on ISDA Fix | Relevance; Improper Expert Testimony |

| | | | |
|---|---|---|---|
| Sole | 1320 | Articles on conviction of UBS executive and indictment of BofA executive | Hearsay; Relevance |
| Sole | 1321 | Final Judgment on UBS municipal bond rigging | Hearsay; Relevance |
| Sole | 1322 | Article on BofA Muni misdoing | Hearsay; Relevance |
| Sole | 1323 | Article on UBS sub-prime lending | Hearsay; Relevance |
| Sole | 1324 | Senate Select Committee Report on Wall Street and the Financial Crisis | Hearsay; Relevance; Improper Expert Testimony |
| Sole | 1325 | Detroit Retirement Fund lawsuit against UBS for mortgage fraud -- Docket 361-9 | Hearsay; Relevance |
| Sole | 1326 | City of Detroit, January 2009 Planning and Development Department Neighborhood Stablization Program Plan | Relevance; Completeness |
| Sole | 1327 | Gavin email -- DTPPF00000162-173 (Orrick Memorandum) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Sole | 1328 | July 31, 2012 SEC Report on the Municipal Market Securities Market, www.sec.gov/spotlight/municipalsecurities. | Admitted over objection on 12/17/2013 |
| Sole | 1329 | Sean Werdlow biography -- http://sbsco.com/firmPage/firm1/bankingteam/seanwerdlow.aspx | Relevance |
| Sole | 1330 | 2009 City Council Resolution | Non-specific; Non-compliant with Local Rule 7016-1(a)(9) |
| Sole | 1331 | Tuberville Revised Expert Report | Hearsay; Timeliness |
| | | | |
| NPFG | 1 | Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated October 15, 2013 | No objection - admitted |
| NPFG | 2 | Emergency Manager Report Pursuant to Section 17 of Local Financial | No objection - admitted |
| NPFG | * | National reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| NPFG | ** | National reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| NPFG | *** | National reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. Nos. 17/157 and 1520. | Objections Reserved |

Dated:  January 2, 2014         Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

 - and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

*Counsel for the City of Detroit*

17

## CERTIFICATE OF SERVICE

I, Bruce Bennett, hereby certify that the foregoing Amended Exhibit Lists and Objections was filed and served via the Court's electronic case filing and noticing system on this 2nd day of January, 2014.

/s/ Bruce Bennett

**Item 6**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
--------------------------------------------------x
                                          :
In re                                     :        Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :        Case No. 13-53846
                                          :
                       Debtor.            :        Hon. Steven W. Rhodes
                                          :
                                          :
--------------------------------------------------x
```

## SECOND AMENDED EXHIBIT LISTS AND OBJECTIONS FOR HEARING RE CITY OF DETROIT'S ASSUMPTION MOTION AND MOTION TO APPROVE POST-PETITION FINANCING

1.      For purposes of the hearing on the City's Assumption Motion [Dkts. 17, 157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "Combined Hearing"), scheduled to take place on December 17, 18, and 19, 2013, and continued to January 3, 2014,  the City identifies the following list of exhibits and objections thereto.

2.      The exhibits and objections reflect information received by the City as of 8 pm on January 2, 2014.

| Party | Exhibit No | Exhibit Description | Objection |
|-------|-----------|---------------------|-----------|
| City | 1 | ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule | No objection – admitted |
| City | 2 | ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related Schedule | No objection – admitted |
| City | 3 | Term Sheet | Hearsay; Relevance |
| City | 4 | SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | No objection – admitted |
| City | 5 | UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | No objection – admitted |
| City | 6 | Waiver and Consent of Insurer | No objection – admitted |
| City | 7 | Detroit City Code § 18-16-4 | No objection – admitted |
| City | 8 | Transcript from the hearing before Judge Annette J. Berry in Third Circuit Court for the County of Wayne | Hearsay |
| City | 9 | Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit (the "Orr Affidavit") | Hearsay; Relevance |
| City | 10 | City of Detroit ("City") Proposal for Creditors Executive Summary | Hearsay; Relevance |
| City | 11 | Collateral Agreement | No objection – admitted |
| City | 12 | Correspondence from the City to U.S. Bank National Association ("USBNA") | Hearsay; Relevance |
| City | 13 | Correspondence from Syncora Capital Assurance, Inc. ("Syncora") to USBNA | No objection – admitted |
| City | 14 | Correspondence between and among counsel to USBNA, Syncora and the City | Hearsay; Relevance |
| City | 15 | Correspondence from Syncora's counsel to counsel to USBNA | Relevance |
| City | 16 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 17 | Correspondence from Syncora to the City | Relevance |
| City | 18 | Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 19 | Correspondence from Syncora to SBS Financial Product Company, LLC ("SBS") | No objection – admitted |

| City | 20 | Correspondence from Syncora to the City | Relevance |
|------|----|-----------------------------------------|-----------|
| City | 21 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 22 | Correspondence from SBS to Syncora | Hearsay; Relevance |
| City | 23 | Declaration of Gaurav Malhotra in Support of the Debtor's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") | Hearsay; Relevance |
| City | 24 | Cash Flow Forecasts [Malhotra Declaration Ex. A] | Hearsay; Relevance |
| City | 25 | Ten-Year Projections [Malhotra Declaration Ex. B] | Hearsay; Relevance |
| City | 26 | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] | Hearsay; Relevance |
| City | 27 | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] | Hearsay; Relevance |
| City | 28 | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] | Hearsay; Relevance |
| City | 29 | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] | Hearsay; Relevance |
| City | 30 | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] | No objection – admitted |
| City | 31 | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] | Hearsay |
| City | 32 | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] | Hearsay; Relevance |
| City | 33 | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] | Hearsay; Relevance |
| City | 34 | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] | Hearsay; Relevance |
| City | 35 | Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") | Hearsay; Relevance |
| City | 36 | City of Detroit Proposal for Creditors [Orr Declaration Ex. A] | Pages 49-50 and 97-98 admitted over objection on 12/17/2013 |
| City | 37 | City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] | Hearsay; Relevance |
| City | 38 | Report of the Detroit Financial Review Team [Orr Declaration Ex. D] | Hearsay; Relevance |
| City | 39 | Financial Stability Agreement [Orr Declaration Ex. E] | Hearsay; Relevance |

| City | 40 | Preliminary Review of the City of Detroit [Orr Declaration Ex. F] | Hearsay; Relevance |
|------|----|------------------------------------------------------------------|--------------------|
| City | 41 | Report of the Detroit Financial Review Team [Orr Declaration Ex. G] | Hearsay; Relevance |
| City | 42 | letter from Governor Richard Snyder to the City [Orr Declaration Ex. H] | Hearsay; Relevance |
| City | 43 | Ambac Comments on Detroit [Orr Declaration Ex. I] | Hearsay; Relevance |
| City | 44 | Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] | Hearsay; Relevance |
| City | 45 | Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] | Hearsay; Relevance |
| City | 46 | Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] | Hearsay; Relevance |
| City | 47 | UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement | No objection – admitted |
| City | 48 | SBS Insurance Policies for Scheduled Paymentw of GRS Service Corporation under June 7, 2006 Master Agreement | No objection – admitted |
| City | 49 | Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) | No objection – admitted |
| City | 50 | First Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 51 | Second Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 52 | Third Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 53 | Fourth Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 54 | Fifth Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 55 | Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. | Hearsay; Relevance |
| City | 56 | E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments [DTPFF00015602-DTPFF00015638] | No objection – admitted |
| City | 57 | Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] | Hearsay; Relevance |
| City | 58 | Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario)  [DTPFF00014812-DTPFF00014824] | Hearsay; Relevance |
| City | 59 | Ernst & Young, 13-Week Cash Flow Forecast - Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] | Hearsay; Relevance |

| City | 60 | Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] | Hearsay; Relevance |
|------|-----|------|------|
| City | 61 | Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] | Admitted to show it was received on 12/17/2013 |
| City | 62 | Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] | Hearsay |
| City | 63 | Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] | Hearsay |
| City | 64 | Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] | Hearsay |
| City | 65 | Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] | Hearsay |
| City | 66 | Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] | Hearsay |
| City | 67 | Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation  [DTPPF00000826-DTPPF00000837] | Hearsay |
| City | 68 | Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP.[DTPPF00001006- DTPPF00001010] | Hearsay |
| City | 69 | Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] | Hearsay; Relevance |
| City | 70 | Silver Point Finance, LLC:  "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] | Hearsay |
| City | 71 | Letter from Gerbino to Miller Buckfire, attaching Barclay's [DTPPF00000856-DTPPF00000902] | Hearsay |

| City | 72 | Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent - Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] | Hearsay |
|------|----|----|----|
| City | 73 | Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP. [DTPPF00000908-DTPPF00000943] | Hearsay |
| City | 74 | "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP. [DTPPF00000838-DTPPF00000855] | Hearsay |
| City | 75 | Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP. [DTPPF00000821-DTPPF00000825] | Hearsay |
| City | 76 | Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP. [DTPPF00000959-DTPPF00000960] | Hearsay |
| City | 77 | Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP.  [DTPPF00013170-DTPPF00013195] | Hearsay |
| City | 78 | Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Syncora") and Financial Guaranty Insurance Company's ("FGIC") DIP financing proposal [DTPPF00000035-DTPPF00000037] | No objection – admitted |
| City | 79 | Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] | No objection – admitted |
| City | 80 | Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] | No objection – admitted |
| City | 81 | Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377-DTPPF00003404] | Hearsay |
| City | 82 | Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] | Hearsay |
| City | 83 | Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] | Hearsay |
| City | 84 | Goldman Sachs' Draft Commitment Letter, including Annex A and B  [DTPPF00001543- DTPPF00001567] | Relevance; Hearsay |
| City | 85 | Goldman Sachs' Draft Fee Letter [DTPPF00001568-DTPPF00001571] | Relevance; Hearsay |

| City | 86 | Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing" [DTPPF00001058-DTPPF00001086] | Relevance; Hearsay |
|------|----|-----|------|
| City | 87 | Letter from Kersten to The City of Detroit regarding CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] | Hearsay |
| City | 88 | Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] | No objection – admitted |
| City | 89 | Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226-DTPPF00020231] | No objection – admitted |
| City | 90 | Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] | Admitted over objection on 12/17/2013 |
| City | 91 | Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " [DTPPF00012993- DTPPF00013024] | Admitted over objection to show what was provided on 12/17/2013 |
| City | 92 | Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] | Relevance; Hearsay |
| City | 93 | Barclay's Fee Letter fully executed by Barclay's and City [Filed as Docket No. 1761] | No objection - admitted |
| City | 94 | Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City [Filed as Docket No. 1520; Exhibit 6A] | Admitted over objection on 12/18/2013 |
| City | 95 | Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement [Filed as Docket No. 1520; Exhibit 6B] | Hearsay |
| City | 96 | Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] | Admitted over objection on 12/18/2013 |
| City | 97 | Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] | Admitted over objection on 12/18/2013 |
| City | 98 | Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re: Emergency Manager's Order No. 17 [DTPPF00019623-DTPPF00019655] | No objection - admitted |
| City | 99 | Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter from Orr to Mayor Bing regarding Emergency Manager's Order No. 17 [DTPPF00019592-DTPPF00019622] | Relevance; Hearsay |
| City | 100 | Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board | No objection - admitted |

| City | 101 | Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5A] | Relevance; Hearsay |
|------|-----|------|------|
| City | 102 | Declaration of James Doak In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5B] | Hearsay; Relevance (with respect to certain topics of testimony to the extent they are inconsistent w the Court's Adjournment Order) |
| City | 103 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 104 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 105 | Funding for Detroit Announced by Federal Government | Relevance; Hearsay |
| City | 106 | Project Piston Cash Flow Forecast - Monthly (FYs 2013, 14, 15) | Admitted over objection on 12/17/2013 |
| City | 107 | Project Piston Cash Flow Forecast (including Restructuring Scenario) | Relevance; Hearsay |
| City | 108 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Admitted over objection on 12/17/2013 |
| City | 109 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) | Admitted over objection on 12/17/2013 |
| City | 110 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) | Admitted over objection on 12/17/2013 |
| City | 111 | Ernst & Young, Illustrative Cash Chart | Admitted over objection on 12/17/2013 |
| City | 112 | Waiver and Consent of Insurer by Financial Guaranty Insurance Company | No objection – admitted |
| City | 113 | Moody's Investors Service, Rating Action: Moody's downgrades FGIC to Caa3 and will withdraw ratings | No objection - admitted |
| City | 114 | Draft Financial Recovery Bond Trust Indenture Between City of Detroit and Trustee | Hearsay |

8

| City | 115 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Admitted over objection on 12/17/2013 |
|------|-----|------|------|
| City | 116 | Annual Report of the Board of Trustees of the GRS for the Year Ended June 20, 2004 | No objection – admitted |
| City | 117 | Annual Report of the Board of Trustees of the PFRS for the Year Ended June 20, 2004 | No objection – admitted |
| City | 118 | City Ordinance No. 03-05 | No objection – admitted |
| City | 119 | City Ordinance No. 04-05 | No objection – admitted |
| City | 120 | GRS Service Contract 2005 | No objection – admitted |
| City | 121 | PFRS Service Contract 2005 | No objection – admitted |
| City | 122 | City Ordinance No. 05-05 | No objection – admitted |
| City | 123 | City Ordinance No. 05-09 | No objection – admitted |
| City | 124 | June 12, 2006 Trust Agreement by and among the Service Corporations and U.S. Bank National Association as Trustee | No objection – admitted |
| City | 125 | June 12, 2006 XL Capital Assurance Municipal Bond Insurance Policy CA03049A | No objection – admitted |
| City | 126 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010249 | No objection – admitted |
| City | 127 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010250 | No objection – admitted |
| City | 128 | GRS Service Contract 2006 | No objection – admitted |
| City | 129 | PFRS Service Contract 2006 | No objection – admitted |
| City | 130 | Contract Administration Agreement | No objection – admitted |
| City | 131 | July 19, 2013 Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation | No objection – admitted |
| City | 132 | May 25, 2005 1992 ISDA Master Agreement Local Currency Single Jurisdiction between UBS and the GRS Service Corporation | No objection - admitted |
| City | 133 | June 26, 2009 Amended and Restated Schedule to the ISDA between UBS and the GRS Service Corporation | No objection – admitted |
| City | 134 | June 26, 2009 Revised Confirmation to the GRS Service Corporation from UBS | No objection – admitted |
| City | 135 | June 12, 2006 FGIC Swap Surety Policy Number 0602052 | No objection – admitted |
| City | 136 | June 12, 2006 FGIC Swap Surety Policy Numbers 06010253, 06010254, and 06010255 | No objection - admitted |

| City | 137 | SBS Amended Schedules | No objection – admitted |
|------|-----|------------------------|-------------------------|
| City | 138 | PFRS Revised Confirmation | No objection – admitted |
| City | 139 | October 23, 2013 Email from Thomas Gavin to Irvin Corley re: Fabian Quotes. | No objection – admitted |
| City | 140 | Swap Payments v. Swap Termination Loan [Demonstrative] | Admitted for demonstrative purposes only on 12/17/2013 |
| City | 141 | Sixth Amendment to Forbearance and Optional Termination Agreement | Reserved |
| City | 142 | Local Emergency Financial Assistance Loan Board Order 2013-21:  Order of Approval of Financial Recovery Bonds Upon the Application of the City of Detroit | Reserved |
| <span style="color:red"> </span> | | | |
| Syncora | 201 | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City | No objection – admitted |
| Syncora | 202 | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City | No objection – admitted |
| Syncora | 203 | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) | No objection – admitted |
| Syncora | 204 | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) | No objection – admitted |
| Syncora | 205 | Contract Administration Agreement, dated June 12, 2006 | No objection – admitted |
| Syncora | 206 | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee | No objection – admitted |
| Syncora | 207 | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 | No objection – admitted |
| Syncora | 208 | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 | No objection – admitted |
| Syncora | 209 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation | No objection – admitted |
| Syncora | 210 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation | No objection – admitted |
| Syncora | 211 | City Ordinance No. 03-05 (Pérez Decl. Ex. A) | No objection – admitted |
| Syncora | 212 | City Ordinance 04-05 (Pérez Decl. Ex. B) | No objection – admitted |
| Syncora | 213 | City Ordinance No. 05-05 (Pérez Decl. Ex. C) | No objection – admitted |

| | | | |
|---|---|---|---|
| Syncora | 214 | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) | No objection - admitted |
| Syncora | 215 | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) | Misidentified document |
| Syncora | 216 | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) | Misidentified document |
| Syncora | 217 | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) | No objection - admitted |
| Syncora | 218 | Jones Day - Syncora NDA (Swap Proposal) | Relevance |
| Syncora | 219 | Forbearance and Optional Termination Agreement term sheet | Hearsay; Relevance |
| Syncora | 220 | Email from Cheryl Johnson to A. Neely re Status of Swap | Hearsay; Relevance |
| Syncora | 221 | Email from Reuters to Press Secretary re Status of Swap Contract | Hearsay; Relevance |
| Syncora | 222 | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association | Hearsay; Relevance |
| Syncora | 223 | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) | No objection - admitted |
| Syncora | 224 | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) | Hearsay; Relevance; Improper Expert Testimony |
| Syncora | 225 | Letter Dated Aug. 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) | No objection - admitted |
| Syncora | 226 | Email from K. Buckfire (DTMI80335) | Relevance |
| Syncora | 227 | Email from Erin Smith (DTMI00107294) | Hearsay; Relevance |
| Syncora | 228 | Email from Bill Nowling (DTMI00111238) | Relevance |
| Syncora | 229 | Abernathy MacGregor Invoice (DTMI00112208) | Relevance |
| Syncora | 230 | 6/12/13 email from Andrew Dillon (DTMI00114984) | Relevance |
| Syncora | 231 | 6/24/13 email from Kevyn Orr (DTMI00114531) | Relevance |
| Syncora | 232 | 6/24/13 email from Kevyn Orr (DTMI00115562) | Relevance |
| Syncora | 233 | Responses to Inquiries from City Council (DTPPF00020357) | No objection – admitted |
| Syncora | 234 | Transcript of 8/30/2013 Deposition of Kevyn D. Orr | No objection – admitted |
| Syncora | 235 | Transcript of 8/29/2013 Deposition of Kenneth Buckfire | No objection – admitted |

| | | | |
|---|---|---|---|
| Syncora | 236 | Transcript of 12/5/2013 Deposition of James Doak | No objection – admitted |
| Syncora | 237 | Transcript of 12/9/2013 Deposition of Kevyn D. Orr | No objection – admitted |
| Syncora | 238 | Transcript of 12/10/2013 Deposition of Kenneth Buckfire | No objection – admitted |
| Syncora | 239 | Questions for Consultants on $350 DIP Financing (DTPPF00020380) | Hearsay; Relevance; Compendium Exhibit |
| Syncora | 240 | Transcript of 12/12/2013 Continuation of Deposition of Kevyn D. Orr | No objection - admitted |
| | | | |
| FGIC | 301 | Articles of Incorporation (Pérez Dec. Ex. D) | No objection - admitted |
| FGIC | 302 | GRS Service Contract 2006 (Pérez Dec. Ex. G) | Misidentified document |
| FGIC | 303 | Termination Consent Letter (Pérez Dec. Ex. I) | No objection - admitted |
| FGIC | 304 | TRO (Pérez Dec. Ex. S) | No objection - admitted |
| FGIC | 305 | FGIC Order of Rehabilitation, dated June 28, 2012 | Hearsay; Relevance |
| FGIC | 306 | FGIC Rehabilitation Plan Approval Order, dated June 11, 2013 | Hearsay; Relevance |
| FGIC | 307 | Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP), dated 10/3/13 8:04 PM | No objection – admitted |
| FGIC | 308 | Quarterly Report of the Emergency Manager, dated October 15, 2013 | No objection – admitted |
| FGIC | 309 | Project Piston Cash Flow Forecast - through FY2017 (DIP Financing Scenario) (DTPPF00020367) | No objection - admitted |
| | | | |
| Ambac | 401 | Detroit City Code § 18-5-120 *et seq.* (Ambac Assumption Objection Ex. 1 [Dkt. 348-2]) | No objection – admitted |
| Ambac | 402 | GRS Articles of Incorporation (Ambac Assumption Objection Ex. 2 [Dkt. 348-3]) | No objection – admitted |
| Ambac | 403 | PFRS Articles of Incorporation (Ambac Assumption Objection Ex. 3 [Dkt. 348-4]) | No objection – admitted |
| Ambac | 404 | Offering Circular for 2006 COPs (Ambac Assumption Objection Ex. 6 [Dkt. 348-7]) | Hearsay; Relevance |

| | | | |
|---|---|---|---|
| Ambac | 405 | City of Detroit 2012 Comprehensive Annual Fiscal report (Ambac Assumption Objection Ex. 7 [Dkt. 348-8]) | No objection – admitted |
| Ambac | 406 | Detroit City Code § 18-16-1 *et seq.* (Ambac Assumption Objection Ex. 8 [Dkt. 348-9]) | No objection - admitted |
| Ambac | * | Ambac reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| Ambac | ** | Ambac reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| Ambac | *** | Ambac reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. No. 17/.157 and 1520. | Objections Reserved |
| | | | |
| EEPK | 801 | Solicitation Materials to Prospective Lenders (Letter and Term Sheet) (DTPPF00016682) | No objection – admitted |
| EEPK | 802 | Post-Petition Financing Discussion dated September 26, 2013 (DTPPF00020215) | No objection – admitted |
| EEPK | 803 | Bond Purchase Agreement - Quality of Life Loan | No objection – admitted |
| EEPK | 804 | Engagement Letter for Exit Financing (DTPPF00012973) | No objection – admitted |
| EEPK | 805 | City Council Resolution | No objection - admitted |
| EEPK | 806 | Email correspondence and attachments (DTPPF00000162) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| | | | |
| Retirement Systems | 1001 | Emails between Anne Langan and Irv Corley dated October 14, 2013 (DTPPF00002139) | Relevance; Hearsay |
| Retirement Systems | 1002 | Email from Jonathan Stern to James Doak dated October 2, 2013 (DTPPF00013241) | Hearsay |
| Retirement Systems | 1003 | Emails from James Doak dated August 29 and 30, 2013 (DTPPF00004951-4952); | Admitted over objection on 12/18/2013 |
| Retirement Systems | 1004 | Email from Thomas Gavin dated 11/8/2013 (SOM20009484); | Hearsay |
| Retirement Systems | 1005 | Email from Thomas Gavin to James Doak with attached Orrick legal opinion | Admitted on 12/18/2013 to show what he did |
| Retirement Systems | 1006 | Email from Thomas Gavin to Irvin Corley dated 10/21/2013 | Hearsay |

| Retirement Systems | 1007 | Memorandum dated 10/24/2013 from Brett Hartzell to Kevyn Orr re request for reallocation of $95 million for FY2014 budget (Moore Dep Ex. 11; Orr Dep. Ex. 3) | Relevance |
|---|---|---|---|
| Retirement Systems | 1008 | Response, dated September 16, 2013, received from the Michigan | Document Missing - Objection Reserved |
| Retirement Systems | 1009 | Addendum #1 to Change Order #1 regarding Miller Buckfire contract | Relevance |
| Retirement Systems | 1010 | Email from James Doak to Jones Day forwarding email from Thomas Gavin | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1011 | Emails from Jerry Pokorski dated October 24, 2013 (DTPPF00020413-14); | Hearsay; Relevance |
| Retirement Systems | 1012 | City Council Resolution denying DIP financing; | No objection – admitted |
| Retirement Systems | 1013 | Email correspondence between James Bonsall, Kevyn Orr and James Doak dated October 9, 2013 (DTPPF0019241-42); | No objection - admitted |
| Retirement Systems | 1014 | Email correspondence from David A. Hall regarding Responses to Inquiries of City Council Regarding Postpetition Financing and its attachment (DTPPF00020357-366); | No objection – admitted |
| Retirement Systems | 1015 | November 6, 2013 correspondence from Harold W. Bulger, Jr., Miller Canfield, Paddock and Stone, P.L.C. to Mr. Harlan Goodrich, Secretary, Local Emergency Financial Assistance Loan Board, and attachments (DTPPF00020232-356); | No objection - admitted |
| Retirement Systems | 1016 | Email from Corinne Ball to Jeffrey B. Ellman dated January 15, 2013 (DTMI00235218, RSCD Exhibit 866-001) | Hearsay; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1017 | Memoranda dated October 16 and 17, 2013 – with handwritten notes – regarding post-petition financing (DTPPF00020380-8, DTPPF00020389-93, DTPPF00020401-12). | Hearsay; Compendium Exhibit |
| Retirement Systems | 1018 | Email from James Doak to Irvin Corley, Jr. dated October 16, 2013 (DTPPF00020423-24). | Relevance |
| Retirement Systems | 1019 | Email with attachment from James Doak to Irvin Corley, Jr., dated October 21, 2013 (DTPPF00020419-22). | No objection - admitted |
| Retirement Systems | 1020 | Handwritten notes of Irvin Corley, Jr., regarding post-petition financing (DTPPF00020415-18). | Hearsay; Relevance |

| | | | |
|---|---|---|---|
| Retirement Systems | 1021 | Handwritten notes of Irvin Corley, Jr., and others regarding postpetition financing, October 15, 22 and 25, 2013 (DTPPF00020382-88, DTPPF00020394-400, DTPPF00020415-18). | Hearsay; Relevance; Compendium Exhibit |
| Retirement Systems | 1022 | Email and attachment from David A. Hall to Irvin Corley, Jr., dated October 20, 2013 (DTPPF00020357-66) (Langan Deposition Exhibit 5). | Duplicative of 1014 |
| Retirement Systems | | Any document used in any deposition; | Objections Reserved |
| Retirement Systems | | Any document attached to Dkt. Nos. 17, 157 and/or 1520; | Objections Reserved |
| Retirement Systems | | Any document listed by any other party; | Objections Reserved |
| Retirement Systems | | Any document necessary for rebuttal. | Objections Reserved |
| <span style="color:red"> </span> | | | |
| Sole | 1301 | 2009 Swap Confirmations -- Docket 1857-2, p 4 | No objection – admitted |
| Sole | 1302 | LIBOR Rates | Hearsay; Completeness Legibility |
| Sole | 1303 | Barclay Loan Terms | No objection - admitted |
| Sole | 1304 | Barclay Commitment Letter | Misidentified document |
| Sole | 1305 | $95 million appropriation for "restructuring" | No objection - admitted |
| Sole | 1306 | Automatic Stay Order | No objection - admitted |
| Sole | 1307 | Fitch and Standard and Poors at City Council table – Docket 1857-4, p 14 | Hearsay; Relevance |
| Sole | 1308 | City Council resolution disapproving Barclay loan -- Docket 1857-4, p 15 | No objection - admitted |
| Sole | 1309 | City Council resolution calling for SEC investigation | Misidentified document |
| Sole | 1310 | Turbeville CV (attached) | No objection - admitted |
| Sole | 1311 | Demos report, The Detroit Bankruptcy, dated November 2013 (attached) | Hearsay |
| Sole | 1312 | July 2006 POC and Interest Rate Swap documents | No objection - admitted |
| Sole | 1313 | 2006 POC reflecting no security interest – Docket 361-5- p. 2 | Completeness |
| Sole | 1314 | June 2009 Amended POC and Interest Rate Swap documents - - Confirmations and City 4 and 5 | No objection - admitted |
| Sole | 1315 | May 12, 2013 EM Financial Plan Docket 361-6, p 4 | Completeness |

| | | | |
|---|---|---|---|
| Sole | 1316 | July 14, 2013 EM Financial Report to Creditors – Orr, August 30, 2013 deposition, Exhibit 6 | No objection - admitted |
| Sole | 1317 | Bloomberg article on Termination Fees | Hearsay; Relevance |
| Sole | 1318 | BBC article on UBS Libor rigging | Hearsay; Relevance |
| Sole | 1319 | Article on ISDA Fix | Relevance; Improper Expert Testimony |
| Sole | 1320 | Articles on conviction of UBS executive and indictment of BofA executive | Hearsay; Relevance |
| Sole | 1321 | Final Judgment on UBS municipal bond rigging | Hearsay; Relevance |
| Sole | 1322 | Article on BofA Muni misdoing | Hearsay; Relevance |
| Sole | 1323 | Article on UBS sub-prime lending | Hearsay; Relevance |
| Sole | 1324 | Senate Select Committee Report on Wall Street and the Financial Crisis | Hearsay; Relevance; Improper Expert Testimony |
| Sole | 1325 | Detroit Retirement Fund lawsuit against UBS for mortgage fraud -- Docket 361-9 | Hearsay; Relevance |
| Sole | 1326 | City of Detroit, January 2009 Planning and Development Department Neighborhood Stabilization Program Plan | Relevance; Completeness |
| Sole | 1327 | Gavin email -- DTPPF00000162-173 (Orrick Memorandum) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Sole | 1328 | July 31, 2012 SEC Report on the Municipal Market Securities Market, www.sec.gov/spotlight/municipalsecurities. | Admitted over objection on 12/17/2013 |
| Sole | 1329 | Sean Werdlow biography -- http://sbsco.com/firmPage/firm1/bankingteam/seanwerdlow.aspx | Relevance |
| Sole | 1330 | 2009 City Council Resolution | Non-specific; Non-compliant with Local Rule 7016-1(a)(9) |
| Sole | 1331 | Turbeville Revised Expert Report | Hearsay; Timeliness |
| | | | |
| NPFG | 1 | Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated October 15, 2013 | No objection - admitted |
| NPFG | 2 | Emergency Manager Report Pursuant to Section 17 of Local Financial | No objection - admitted |

| NPFG | * | National reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
|------|------|------|------|
| NPFG | ** | National reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| NPFG | *** | National reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. Nos. 17/157 and 1520. | Objections Reserved |

Dated: January 2, 2014     Respectfully submitted,

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:   (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

- and -

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075

Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

*Counsel for the City of Detroit*

## CERTIFICATE OF SERVICE

I, Deborah Kovsky-Apap, hereby certify that on January 2, 2014, I caused the foregoing Exhibit Lists and Objections to be filed and served via the Court's electronic case filing and noticing system, which sends notice to all counsel of record registered to receive notice in this case.

Dated: January 2, 2014                    /s/ Deborah Kovsky-Apap

# Item 7

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

------------------------------------------------------x
:
In re : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No. 13-53846
:
Debtor. : Hon. Steven W. Rhodes
:
------------------------------------------------------x

## NOTICE OF FILING OF
## CERTAIN MARKED TRANSACTION DOCUMENTS
## RELATING TO PRESENTMENT OF FINAL ORDER [DOCKET NO. 2921]

### PLEASE TAKE NOTICE THAT:

1.    On March 6, 2014, the above-captioned debtor, the City of Detroit (the "City"), filed the Notice of Presentment of Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Status and (III) Modifying Automatic Stay [Docket No. 2921] (the "Final PPF Order Notice").

2.    In response to the Final PPF Order Notice, certain parties filed objections and, among other things, requested copies of certain amended transaction documents (the "PPF Documents") marked against prior filed-versions of PPF Documents.

CHI-1923909v1

13-53846-swr  Doc 4737  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 1 of 301
13-53846-swr  Doc 3031  Filed 03/17/14  Entered 03/17/14 17:21:39  Page 1 of 321

3.    Attached as Exhibit 1 hereto is a "blackline" comparing (a) the Financial Recovery Bonds Series 2014B (Quality of Life) Bond Purchase Agreement attached as Exhibit B to the proposed order attached as Exhibit A to the Third Notice of Revised Proposed Order in Connection with Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay, dated December 31, 2013 [Docket No. 2353] (the "Prior PPF Order Notice"), against (b) the Financial Recovery Bonds — Series 2014 Bond Purchase Agreement attached as Exhibit C to the Final PPF Order Notice.

4.    Attached as Exhibit 2 hereto is a "blackline" comparing (a) the Financial Recovery Bond Trust Indenture attached as Exhibit C to the proposed order attached as Exhibit A to the Prior PPF Order Notice against (b) the Financial Recovery Bond Trust Indenture attached as Exhibit D to the Final PPF Order Notice.

CHI-1923909v1
-2-
13-53846-tjt    Doc 4731    Filed 05/13/14    Entered 05/13/14 15:27:48    Page 115 of 321
13-53846-swr    Doc 3031    Filed 03/17/14    Entered 03/17/14 21:39    Page 5 of 301

Dated: March 17, 2014

Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601-1692
Telephone: (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY

CHI-1923909v1
-3-
13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 116 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 17:21:39 Page 6 of 8

# CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Notice of Filing of Certain Marked Transaction Documents Relating to Presentment of Final Order [Docket No. 2921] was filed and served via the Court's electronic case filing and noticing system on this 17th day of March, 2014.


/s/ David G. Heiman

CHI-1923909v1
-4-
13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:48 Page 117 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 17:21:39 Page 4 of 32

# **EXHIBIT 1**

CHI-1923909v1

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:48 Page 118 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 14:21:39 Page 8 of 301

**CITY OF DETROIT, MICHIGAN**

**FINANCIAL RECOVERY BONDS**
**SERIES 2014B (QUALITY OF LIFE)**

------------------------------------------------

**BOND PURCHASE AGREEMENT**

------------------------------------------------

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 10:00 A.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1.  **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____120,000,000 aggregate principal amount of Financial Recovery Bonds Series 2014B (Quality of Life) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have priority over all administrative expenses in the Bankruptcy Case, over all other

CHI-1918821v4

13-53846-tjt Doc 4731 Filed 05/13/14 Entered 05/13/14 15:27:48 Page 118 of 301
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 14:21:39 Page 8 of 301

postpetition claims against the City and over all prepetition unsecured claims against the City.  The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b)  The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the ~~QOL~~ Bond Documents and (iv) _____ [*the date that is two years and six months after the Closing Date]* (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date").  Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date.  Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c)  As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest).  Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without without the payment of any premium.

(d)  As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations ~~and on a ratable basis with the Swap Termination Bonds,~~ from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").  Asset Proceeds Collateral shall not include assets owned by the City, or assets in which the City holds an interest, which, in either case, are held by the Detroit Institute of Arts.

(e)  The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. ~~2013-21~~_____ of the

CHI-1918821v4  -2-

13-53846-tjt  Doc 4731  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 120 of 321
13-53846-swr  Doc 3031  Filed 03/17/14  Entered 03/17/14 14:21:39  Page 27 of 301

Local Financial Emergency Loan Board dated ~~December 20~~_____, ~~2013~~2014 (the "ELB Order"), and the City of Detroit, Michigan Financial Recovery Bond Trust Indenture (the "Indenture") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $~~_____~~120,000,000 (the "Purchase Price").

(f) The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by ~~(i)~~ a first priority lien on (~~a) taxes owing to the City in respect of the gross receipts earned by each~~i) except for the portion of income tax revenues transferred into the budget of the City's ~~casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996~~police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals, for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL ~~432.201~~141.1151, et~~.~~ seq. ~~(or any replacement or successor statute) (the "Pledged Wagering Tax Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the~~, the remaining revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et~~.~~ seq. (the "Pledged Income Tax Revenue"~~;~~) and ~~together with the Pledged Wagering Tax Revenue and~~(ii) the Asset Proceeds Collateral (together with the Pledged Income Tax Revenue, collectively, the "Bond Collateral"). ~~The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Bonds on a first priority basis.~~

~~(g) The QOL Bond Documents shall require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Wagering Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default (as defined in the Indenture) to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full. Subject to the terms of the Wagering Tax Control Agreements, the City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.~~

(~~h~~g) The ~~QOL~~ Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Income Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the ~~QOL~~ Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the

CHI-1918821v4 -3-

13-53846-swr Doc 4731 Filed 05/13/14 Entered 05/13/14 15:27:48 Page 121 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 14:21:39 Page 8 of 301

outstanding amounts owing with respect to the ~~Swap Termination~~ Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to ~~redeem the Swap Termination~~pay principal and interest on the Bonds until ~~such Swap Termination~~the Bonds are paid in full ~~and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Bonds~~.  Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(~~i~~h) The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the ~~QOL~~ Bond Documents ~~and approved by the Bankruptcy Court,~~ as more specifically provided in the ~~QOL~~ Bond Documents.

~~(j)    Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Bonds") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, as amended from time to time, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other hand, to terminate the underlying swaps.~~

2.    **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)  In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)  The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other

CHI-1918821v4  -4-

13-53846-tjt  Doc 4731  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 122 of 321
13-53846-swr  Doc 3031  Filed 03/17/14  Entered 03/17/14 14:21:39  Page 9 of 30

person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)  The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.  **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect ~~and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter~~.  Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4.  **Private Placement of Bonds; Absence of Disclosure Document.**  The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5.  **Closing.**  At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"), one registered bond in the denomination equal to the principal amount of the Bonds (the "Bond Certificate"), to be delivered to the Trustee as custodian for DTC.  Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $~~_____~~120,000,000 by wire transfer for the account of the City.  The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6.  **Representations of the City.**  The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

CHI-1918821v4  -5-

13-53846-tjt  Doc 7731  Filed 05/03/14  Entered 05/03/14 15:27:39  Page 123 of 321
13-53846-swr  Doc 3731  Filed 05/03/14  Entered 05/03/14 14:12:43  Page 123 of 321

(a)     The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the ~~QOL~~ Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ~~QOL~~ Bond Documents.

(b)     The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ~~QOL~~ Bond Documents.

(c)     The ~~Asset Proceeds~~Bond Collateral~~, the Pledged Wagering Tax Revenue and the Pledged Income Tax Revenue~~ may legally be pledged as collateral for the Bonds ~~and the Swap Termination Bonds, as applicable,~~ as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)     This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms.  When executed and delivered, as set forth in the Post-Petition Financing Order, the ~~QOL~~ Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the ~~QOL~~ Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the

execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the ~~QOL~~ Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)    All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the ~~QOL~~ Bond Documents is in full force and effect.

(i)    The execution, delivery and performance of the terms and conditions of the ~~QOL~~ Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the ~~QOL~~ Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)    Except as described on Appendix __ hereto, and other than as described in the ~~QOL~~ Bond Documents ~~and the ST Bond Documents and in Section 8(i) below~~, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

~~(k)    As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.~~

(~~l~~k)    Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(~~m~~l)    The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the ~~QOL~~ Bond Documents.

(~~n~~m)    The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets

CHI-1918821v4 -7-

13-53846-tjt-swr  Doc 4731  Doc 7031  Filed 05/13/14  Filed 05/08/17  Entered 05/13/14 15:27:43  Entered 05/08/17 14:21:39  Page 125 of 321  Page 125 of 321

(irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the ~~QOL~~ Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City Council and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds. No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member~~,~~ of City Council or officer, attorney, agent or employee of the City in an individual capacity. No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any ~~officer,~~ member of City Council or officer, agent, attorney or employee, in an individual or personal capacity.

7. **Covenants and Agreements of the City.** The City hereby covenants and agrees as follows:

(a) In ~~the event of any payment default on~~ connection with syndication of the Bonds as provided in Section 18, the City agrees to (i) cooperate with the Purchaser to deliver a ~~Private Placement~~ Confidential Syndication Memorandum or similar disclosure document in a timely manner if requested to do so ~~and the City shall~~, (ii) enter into any continuing disclosure agreement if required and (iii) execute the First Supplemental Indenture as authorized pursuant to the City's Sale Order, and (iv) provide bring-down opinions of Jones Day and Miller Canfield Paddock & Stone in the forms attached hereto.

(b) The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the ~~QOL~~ Bond Documents.

(c)     The City covenants that it will not seek to invalidate or refute the enforceability of any ~~QOL~~ Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d)     The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or ~~the Swap Termination Bonds or~~ (b) is secured by a lien on any of the ~~collateral securing the Bonds and/or the Swap Termination Bonds~~ Bond Collateral as long as the Bonds are outstanding under the Indenture.  The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds ~~or the Swap Termination Bonds~~.

8.     **Conditions to Closing.**     The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.  In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the ~~QOL~~ Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "<u>Commitment Date</u>") and prior to the Closing Date: (i) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges

CHI-1918821v4  -9-

13-53846-tjt  swr  Doc 4731  Doc 3731  Filed 05/13/14  Filed 05/03/14  Entered 05/13/14 15:27:43 14:21:39  Page 127 of 321  Page 14 of 30

for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the ~~QOL~~ Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the ~~liens~~lien and security interests in respect of the Pledged Income Tax Revenue ~~and Pledged Wagering Tax Revenue~~.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

~~(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.~~
~~(g)     Evidence of the effectiveness of the definitive documents in respect of the Swap Termination Bonds (the "ST Bond Documents") reasonably satisfactory to the Purchaser.~~
~~(h)     The satisfaction of all of the conditions precedent to the issuance of the Swap Termination Bonds set forth in the ST Bond Documents and the simultaneous issuance of the Swap Termination Bonds.~~
~~(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to~~

CHI-1918821v4 -10-

13-53846-tjt  Doc 4731  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 128 of 321
13-53846-swr  Doc 3731  Filed 03/17/14  Entered 03/17/14 14:24:39  Page 15 of 30

~~termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.~~

(~~j~~f)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(~~k~~g)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(~~l~~h)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(~~m~~i)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds ~~and the Swap Termination Bonds~~, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(~~n~~j)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(~~o~~k)     The Bonds and the ~~QOL~~ Bond Documents shall contain the terms set forth in Section 1 hereof.

(~~p~~l)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the ~~QOL~~ Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);.

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Wagering Tax Control Agreements and Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into QOL Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue in favor of the Bonds;

(98)    The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(109) A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(1110) A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(1211) A specimen Bond;

(~~13~~12) A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(~~14~~13) An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(~~15~~14) Officers' and public officials' certifications regarding the Bonds~~, and~~ the ~~QOL~~ Bond Documents~~, the Swap Termination Bonds, the ST Bond Documents and the Swap Agreements~~;

(~~16~~15) Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the ~~QOL~~ Bond Documents (defined below);

(~~17~~16) An executed copy of the Bond Authorizing Order;

(~~18~~17) An executed copy of the Sale Order; and

(~~19~~18) Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture, this Bond Purchase Agreement and each of the documents set forth in clauses (5), (6), (~~17~~16) and (~~18~~17) above are referred to herein as the "~~QOL~~ Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9. **Fees and Expenses.** Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall ~~also~~ pay ~~(i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii)~~ all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10. **Notices.** Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall

CHI-1918821v4 -13-

13-53846-tjt Doc 4732 Filed 05/13/14 Entered 05/13/14 15:27:39 Page 131 of 321
~~13-53846-swr Doc 3731 Filed 03/31/14 Entered 03/31/14 14:24:39 Page 18 of 30~~

be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11. **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.** This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser). No other person shall acquire or have any right hereunder or by virtue hereof. All the representations, warranties, covenants and agreements contained in this Bond Purchase Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification.** To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City)

CHI-1918821v4 -14-

13-53846-tjt Doc 4732 Filed 05/13/14 Entered 05/13/14 15:27:39 Page 132 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 14:21:39 Page 129 of 130

which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the ~~Swap Termination Bonds, the~~ Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the ~~Bonds or the Swap Termination~~ Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; <u>provided</u> that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any ~~QOL~~ Bond Documents ~~or ST Bond Documents (collectively, the "Bond Documents")~~ are executed and delivered or any bonds are purchased or extensions of credit are made under the ~~Bonds or the Swap Termination~~ Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the ~~Bonds or the Swap Termination~~ Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the ~~QOL~~ Bond Documents~~, the Swap Termination Bonds~~, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the ~~Bonds or the Swap Termination~~ Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the ~~QOL~~ Bond Documents~~, the Swap Termination Bonds~~, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds ~~or the Swap Termination Bonds~~. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14. **Counterparts.** This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15. **Governing Law.** This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16. **Jurisdiction.** To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17. **Waiver of Jury Trial.** Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18. **Syndication.** (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds ~~or the Swap Termination Bonds~~ by assigning or selling participations in the Bonds ~~and the Swap Termination Bonds to a group of~~to one or more banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request). Notwithstanding

the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b) The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, and (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c) In the event that the Closing Date has occurred and the QOL Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, the City hereby agrees, at its own expense, to take all such action as may be required in order to effect any amendments to the Bonds and the Swap Termination Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19. **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By: _____

John Gerbino
Managing Director

Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**

By: _____

CHI-1918821v4 -19-

13-53846-tjt Doc 4737 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 137 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 14:21:39 Page 24 of 30

## <u>Appendix A</u>

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated ~~November 5, 2013~~_____, 2014 authorizing the issuance of the Bonds for the purposes set forth therein and described in the ~~QOL~~ Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section ~~13~~8 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013, as may be amended from time to time.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013, as may be amended from time to time.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(h̶g) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(h̶g) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

Appendix A
Page 2

CHI-1918821v4

13-53846-tjt  Doc 4732  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 139 of 321
13-53846-swr  Doc 3731  Filed 05/03/14  Entered 05/03/14 14:12:39  Page 26 of 80

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the ~~QOL~~ Bond Documents, LIBOR shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

~~"*Pledged Wagering Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.~~

CHI-1918821v4

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as _____, 2014 [Docket No. __], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Reserve Percentage*" means ~~the~~, relative to any day of any interest period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve ~~requirement~~requirements (including all basic, emergency, supplemental, marginal and other reserves) ~~which is imposed on member banks~~and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System ~~against~~(the "Board") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liabilities consisting of "Eurocurrency Liabilities" as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such interest period.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the ~~QOL~~ Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Swap Termination Bonds*" shall have the meaning assigned to such term in Section 1(j) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

"*Wagering Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Wagering Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

CHI-1918821v4

13-53846-tjt  Doc 4737  Filed 05/13/14  Entered 05/13/14 15:27:43  Page 142 of 321
13-53846-swr  Doc 3731  Filed 03/17/14  Entered 03/17/14 14:21:39  Page 29 of 80

| Summary report: Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 3/14/2014 4:20:42 PM | |
|---|---|
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original filename:** Bond Purchase Agreement (Series 2014B QOL) 12.31.2013 (FOR THIRD REVISED ORDER).doc | |
| **Modified DMS:** iw://CHI/CHI/1918821/4 | |
| **Changes:** | |
| Add | 80 |
| Delete | 148 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 228 |

# EXHIBIT 2

**FINANCIAL RECOVERY BOND**

**TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

**UMB BANK, N.A.**

as Trustee

$[_____]

$120,000,000

**FINANCIAL RECOVERY BONDS, SERIES 2014A**

and

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014B**

Dated as of [_____], 2014

i

CHI-1918768v4

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS AND INTERPRETATION ..................................................... 2

     Section 101      Definitions........................................................................................ 2

     Section 102      Interpretation .................................................................... ~~9~~8

ARTICLE II      TERMS OF BONDS.................................................................... ~~10~~9

     Section 201      Authorization for Indenture and Bonds; Indenture to Constitute a Contract ......................................................................... ~~10~~9

     Section 202      Authorization of Bonds.................................................... ~~10~~9

     Section 203      Issuance and Delivery of Bonds ..................................... ~~10~~9

     Section 204      Conditions Precedent to Delivery of Bonds............................... 10

ARTICLE III      GENERAL TERMS AND PROVISIONS OF BONDS......................... ~~12~~11

     Section 301      Designation of Bonds; Form of Bonds ......................... ~~12~~11

     Section 302      Book-Entry Only System for the Bonds ......................... ~~12~~11

     Section 303      Interchangeability of Bonds.................................................... 13

     Section 304      Negotiability, Transfer and Bond Registry................................... ~~14~~13

     Section 305      Transfer of Bonds ........................................................... ~~14~~13

     Section 306      Regulations With Respect to Exchanges and Transfers ................... 14

     Section 307      Bonds Mutilated, Destroyed, Stolen or Lost........................... ~~15~~14

     Section 308      Cancellation and Destruction of Bonds ........................................ ~~15~~14

     Section 309      Redemption .................................................................... ~~15~~14

     Section 310      Selection of Bonds to be Redeemed ................................... 15

     Section 311      Notice of Redemption ....................................................... ~~16~~15

     Section 312      Payment of Redeemed Bonds ................................................. 16

ARTICLE IV      PLEDGE OF INDENTURE; SOURCES OF PAYMENT ~~AND SECURITY FOR THE BONDS~~ ....................................................... ~~17~~ 16

     Section 401      The Bonds; Pledge of Indenture; Grant of Security Interest.......... ~~17~~16

     Section 402      Creation of Liens................................................................ ~~18~~17

ARTICLE V      ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS .................................................................................... ~~18~~17

     Section 501      Debt Service Fund............................................................. ~~18~~17

~~ii~~

CHI-1918768v4

| | | |
|---|---|---|
| Section 502 | Costs of Issuance Fund | ~~19~~18 |
| Section 503 | Bond Proceeds Fund | ~~20~~18 |
| Section 504 | Amounts Remaining in Funds and Accounts | ~~20~~19 |
| Section 505 | Approval of Account Control ~~Agreements~~Agreement | ~~20~~19 |

ARTICLE VI  INVESTMENT OF FUNDS ...... ~~21~~19

| | | |
|---|---|---|
| Section 601 | Permitted Investments | ~~21~~19 |
| Section 602 | Valuation and Sale of Investments | ~~22~~20 |

ARTICLE VII  PARTICULAR COVENANTS OF THE CITY ...... ~~22~~21

| | | |
|---|---|---|
| Section 701 | Payment of Bonds | ~~22~~21 |
| Section 702 | Power to Issue Bonds and Pledge Revenues, Funds and Other Property | ~~22~~21 |
| Section 703 | Maintenance of Perfected Security Interests; Further Assurances; Notices of Default | ~~23~~21 |
| Section 704 | Tax Covenants | ~~23~~21 |
| Section 705 | Compliance With Conditions Precedent | ~~23~~22 |
| Section 706 | Accounts and Reports | ~~23~~22 |
| Section 707 | Issuance of Additional Obligations | ~~23~~22 |
| Section 708 | ~~Wagering Tax and~~ Income Tax Revenues and Accounts | ~~24~~22 |
| Section 709 | Asset Proceeds Collateral | ~~24~~22 |
| Section 710 | Contesting Enforceability | ~~24~~22 |

ARTICLE VIII  THE TRUSTEE ...... ~~24~~23

| | | |
|---|---|---|
| Section 801 | Powers and Duties of Trustee | ~~24~~23 |
| Section 802 | Fees and Expenses of Trustee | ~~26~~25 |
| Section 803 | Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale | ~~27~~25 |
| Section 804 | Removal of Trustee | ~~28~~26 |
| Section 805 | Appointment of and Transfer to Successor Trustee | ~~28~~26 |

ARTICLE IX  EVENTS OF DEFAULT AND REMEDIES ON DEFAULT ...... ~~28~~26

| | | |
|---|---|---|
| Section 901 | Events of Default | ~~28~~27 |
| Section 902 | Remedies | ~~30~~28 |
| Section 903 | Waiver of Default | ~~32~~29 |
| Section 904 | Possession of Bonds by Trustee Not Required | ~~32~~29 |
| Section 905 | Remedies Cumulative | ~~32~~30 |

iii

CHI-1918768v4

13-53846-tjt Doc 4737 Filed 05/13/14 Entered 05/13/14 15:27:39 Page 147 of 321
13-53846-swr Doc 7331 Filed 08/17/14 Entered 08/17/14 14:21:39 Page 34 of 130

Section 906        Knowledge by Trustee of an Event of Default .............................. 3230

Section 907        Application of Monies .................................................................. 3230

ARTICLE X        SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS
                 INDENTURE .................................................................................. 3230

Section 1001        Modifications and Amendments Not Requiring Consent ............. 3230

Section 1002        Amendments Requiring Consent .................................................. 3331

Section 1003        Consent of Trustee ...................................................................... 3432

Section 1004        General Provisions Relating to Supplemental Indentures ............ 3432

ARTICLE XI        MISCELLANEOUS ...................................................................... 3533

Section 1101        Notices ........................................................................................ 3533

Section 1102        Termination .................................................................................. 3533

Section 1103        Defeasance ................................................................................... 3533

Section 1104        Severability .................................................................................. 3634

Section 1105        Headings ....................................................................................... 3634

Section 1106        Indenture Executed in Counterparts ............................................ 3634

Section 1107        Parties Interested Herein .............................................................. 3634

Section 1108        Jurisdiction .................................................................................. 3634

EXHIBIT A    FORM OF SERIES 2014A BOND ........................................................... A-1

EXHIBIT B    FORM OF SERIES 2014B BOND ........................................................... B-1

EXHIBIT CB  FORM OF ACCOUNT CONTROL AGREEMENT ................................... C-B-1

iv

CHI-1918768v4

# FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of [_____], 2014 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and UMB Bank, N.A., and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H :

**WHEREAS**, pursuant to the Local Government Fiscal Responsibility Act, Act 436, Public Acts of Michigan, 2012 ("Act 436"), the Governor (the "Governor") of the State of Michigan (the "State") determined that a local government financial emergency exists in the City of Detroit, County of Wayne, Michigan (the "City"), and an emergency manager, as defined in Act 436, Kevyn D. Orr (the "Emergency Manager") was appointed for the City by the Governor on March 28, 2013 in accordance with Act 436; and

**WHEREAS**, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief (the "Case") pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

**WHEREAS**, on ~~October 11~~_____, ~~2013~~2014, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City ~~his Order No. 17 Approval of Postpetition~~the key terms and conditions of the Series 2014 Bonds (the "Secured Financing ~~("Order No. 17"~~"); and

~~**WHEREAS**, Order No. 17 proposes the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") to provide certain post-bankruptcy petition financing for the City upon the terms and conditions and parameters set forth in Order No. 17 and the term sheets attached thereto (the "Secured Financing"); and~~

~~**WHEREAS**, on October 21, 2013, in accordance with Section 19(1) of Act 436, the City Council of the City (the "City Council") disapproved the Secured Financing; and~~

~~**WHEREAS**, pursuant to Section 19(2) of Act 436, the City Council was afforded 7 days following its disapproval of the Secured Financing to propose an "alternative proposal that would yield substantially the same financial result as" the Secured Financing to the Emergency Financial Assistance Loan Board (the "Board"); and~~

~~**WHEREAS**, the City Council failed to offer an alternative proposal to the Board during the time period prescribed in Section 19(2) of Act 436 and as a consequence, the Emergency Manager submitted an Order to authorize the Secured Financing through the issuance of Bonds to the Board for approval and implementation of the Secured Financing by the Emergency Manager; and~~

**WHEREAS**, on [_____], ~~2013~~2014, the Bankruptcy Court issued an order [Docket No. \_\_] authorizing the Secured Financing (the "Bankruptcy Court Order"), pursuant to which super priority liens have been established under Sections 364(c), 503 and 507(a)(2) of the Bankruptcy Code for the certain collateral securing the bonds authorized for issuance hereunder; and

**WHEREAS**, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board established pursuant to Act 243, Public Acts of Michigan, 1980, as amended; and

**WHEREAS**, on ~~December 20~~_____, ~~2013~~2014, the Board issued an ~~Order~~order (the "Board Order") approving the issuance of the Series 2014~~A Bonds and the Series 2014B~~ Bonds by the City as finally determined in the Sale Order of the Emergency Manager, subject to the terms and conditions for each series of Bonds approved by the Board in the Board Order; and

**WHEREAS**, in connection with the issuance of the Bonds, the Trustee shall enter into the Account Control ~~Agreements~~Agreement (as hereinafter defined) with the City and the Depository ~~Banks for purposes of perfecting the security interests granted by the City in favor of the Registered Owners of the Series 2014A Bonds and the Series 2014B Bonds in certain tax revenue and other collateral of the City described herein to secure repayment of the City's obligations owing in respect of the Bonds.~~Bank.

**NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH** that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101    <u>Definitions</u>.  In addition to the terms defined in the preambles to this Indenture, and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"***1 Month LIBOR Rate***" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a 1-Month LIBOR Reset Date; provided,

2

CHI-1918768v4

however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Indenture, the 1-Month LIBOR Rate shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term 1-Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the 1-Month LIBOR Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1-Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*1-Month LIBOR Reset Date*" means the first Business Day of each calendar month.

"*Account*" means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

"*Account Control* ~~*Agreements*" means, collectively the~~ *Agreement*" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee, and the Depository Bank in favor of the Trustee with respect to the Pledged Income Tax Account ~~Control Agreement and~~ that holds the ~~Wagering~~ Pledged Income Tax ~~Account Control Agreement~~ Revenue.

"*Act 279*" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"*Act 284*" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

"*Act 436*" means Act No. 436, Public Acts of Michigan, 2012.

"*Asset Proceeds Collateral*" shall mean all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10 million, which net cash proceeds are pledged by the City hereunder, on the terms and conditions set forth hereunder, in favor of the Registered Owners of the Series 2014~~A Bonds and the Series 2014B Bonds.~~ Bonds. Asset Proceeds Collateral shall not include assets owned by the City, or assets in which the City holds an interest, which, in either case, are held by the Detroit Institute of Arts.

"*Authorized Denominations*" shall mean denominations of Bonds equal to multiples of $100,000 or integral multiples of $5,000 in excess thereof.

"*Authorized Officer*" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City or his or her designee, ~~or~~ (ii) if the City is operating under a financing emergency pursuant to Act 436 but no Emergency Manager (or successor thereto) has

3

been appointed, any person or entity with legal authority to act on behalf of the City or (iii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"***Bankruptcy Case***" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"***Bankruptcy Court Order***" has the meaning set forth in the recitals hereto.

"***Board***" has the meaning set forth in the recitals hereto.

"***Bond***" or "***Bonds***" means ~~singularly or collectively,~~ the Series 2014~~A Bonds and the Series 2014B~~ Bonds.

"***Bondowner***", "***Owner***" or "***Registered Owner***" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 304.

"***Bond Authorizing Order***" means that Order of the Emergency Manager dated ~~November 5, 2013~~_____, 2014 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"***Bond Counsel***" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"***Bond Orders***" means collectively the Bond Authorizing Order and the Sale Order.

"***Bond Proceeds Fund***" means the fund established pursuant to Section 503 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"***Bond Purchase*** ~~*Agreements*~~*Agreement*" means~~, collectively,~~ that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014~~A Bonds and that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014B~~ Bonds.

"***Bond Rate***" means the sum of the 1-Month LIBOR Rate and the Spread.

"***Bond Registry***" means the books for the registration of Bonds maintained by the Trustee.

"***Business Day***" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized

4

CHI-1918768v4

or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Calculation Agent*" means Barclays Capital Inc.

"*Case*" has the meaning set forth in the recitals hereto.

"*Certificate*" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"*City*" means the City of Detroit, County of Wayne, Michigan.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Costs of Issuance Fund*" means the fund established under Section 502 hereof for the payment of the costs of issuance of the Bonds.

"*Date of Original Issue*" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"*Debt Service* ~~Accounts" means, collectively,~~*Account*" means the Account established within the Debt Service Fund for the benefit of the Series 2014~~A Debt Service Account and Series 2014B Debt Service Account~~ Bonds pursuant to Section 501 of this Indenture.

"*Debt Service Fund*" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

"*Debt Service Requirement Amount*" means, as applicable, an amount equal to (i) the interest due on the Bonds on the next succeeding Interest Payment Date <u>plus</u> if such Interest Payment Date is also a Redemption Date, any principal and premium owing on such Redemption Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Maturity Date plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"~~*Depository Banks*" means the Income Tax~~*Depository Bank* ~~and the Wagering Tax Depository~~" means Comerica Bank and any successor thereto.

"*Emergency Manager*" has the meaning set forth in the recitals hereto.

"*Event of Default*" has the meaning attributed to it in Section 901 hereof.

"*Financing* ~~*Document*~~*Documents*" means this Indenture, the Bond Purchase ~~Agreements~~Agreement, the Account Control ~~Agreements~~Agreement, the Series 2014~~A Bonds,~~

5

CHI-1918768v4

13-53846-tjt  Doc 4731  Filed 05/13/14  Entered 05/13/14 15:27:39  Page 153 of 321
13-53846-swr  Doc 3031  Filed 03/17/14  Entered 03/17/14 14:21:39  Page 40 of 80

~~the Series 2014B~~ Bonds, the Bond Orders, the Bankruptcy Court Order, the Fee Letter and any other document related to the issuance, sale or delivery of the Bonds.

"***Fiscal Year***" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"***Governmental Obligations***" means non- callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or any Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

~~"*Income Tax Account Control Agreement*" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee, and the Income Tax Depository Bank in favor of the Trustee with respect to the Comerica Lockbox Account that holds the Pledged Income Tax Revenues.~~

~~"*Income Tax Depository Bank*" means Comerica Bank and any successor thereto.~~

"***Income Tax Revenues***" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284 or pursuant to any other applicable State or local law.

"***Indenture***" means this Trust Indenture, dated as of [_____], 2014, as supplemented and amended.

"***Interest Payment Date***" means (i) each 1-Month LIBOR Reset Date; (ii) with respect only to Bonds being redeemed, in whole or in part, the Redemption Date; and (iii) the Maturity Date.

~~"*Law 1*" means the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State, effective December 5, 1996, as amended, and any replacement or successor thereto.~~

"***LIBOR Floor***" means 1.00% per annum.

"***London Banking Day***" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"***Maturity Date***" means the earliest to occur of (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to this Indenture, and (iv) [_____,] the date that is two years and six months after the Date of Original Issue.

6

CHI-1918768v4.

13-53846-tjt  Doc 4731  Filed 05/13/14  Entered 05/13/14 15:27:39  Page 154 of 321
13-53846-swr  Doc 3731  Filed 05/08/14  Entered 05/08/14 14:12:43  Page 41 of 80

"**Non-Arbitrage and Tax Compliance Certificate**" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"**Outstanding**" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A) Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B) Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C) Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

(D) Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E) Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"**Payment Date**" means each Interest Payment Date, and the Maturity Date of the Bonds.

"**Permitted Investments**" means those investments specified in Article VI of this Indenture.

"**Petition Date**" has the meaning set forth in the recitals hereto.

"**Pledged Income Tax Account**" means that certain bank account established at Comerica Bank, Account No. [_____] that collects solely Income Tax Revenues.

"**Pledged Income Tax Revenue**" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014 Bonds. Pledged Income Tax Revenue does not include that portion of income tax revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals, for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, *et seq.*

"~~**Pledged Income Tax Revenues**~~" ~~means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014A Bonds and on a second priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.~~

7

CHI-1918768v4

13-53846-tjt Doc 4731 Filed 05/13/14 Entered 05/13/14 15:27:39 Page 155 of 321
13-53846-swr Doc 3731 Filed 05/13/14 Entered 05/13/14 14:27:39 Page 420 of 630

"*Pledged Revenues*" means, collectively, the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral.

"*Pledged Wagering Tax Account*" means that certain bank account established at Comerica Bank, Account No. [___] that collects the Wagering Tax Revenues.

"*Pledged Wagering Tax Revenues*" means the Wagering Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"*Post Petition Date Debt*" means any payment obligation of the City first ~~arising~~incurred on or following the Petition Date.

"*Purchaser*" means Barclays Capital Inc. or any permitted party designated pursuant to the Bond Purchase Agreement, as approved by the City, which such approval shall not be unreasonably withheld.

"*Quality of Life Projects*" means those certain projects determined by the Emergency Manager in the Sale Order to be financed with the proceeds of the Series 2014~~B~~ Bonds.

"*Record Date*" means the fifteenth (15th) day prior to any Interest Payment Date.

"*Redemption Date*" means the date upon which Bonds are to be called for redemption, in whole or in part, pursuant to this Indenture.

"*Redemption Price*" means, with respect to any Bond, the principal amount thereof plus the applicable premium, if any, payable upon redemption thereof.

"*Reserve Percentage*" means, relative to any day of any interest period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the "Board") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liability consisting of "Eurocurrency Liabilities," as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such interest period.

"*Sale Order*" means that Order of the Emergency Manager dated [_____], 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"*Series 2014A Bonds*" means the City's Financial Recovery Bonds, Series 2014~~A~~.

"*Series 2014A Debt Service Account*" means the Account established within the Debt Service Fund for the benefit of the Series 2014A Bonds pursuant to Section 501 of this Indenture.

8

CHI-1918768v4

"***Series 2014B Bonds***" means the City's Financial Recovery Bonds, Series 2014B.

"***Series 2014B Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2014B Bonds pursuant to Section 501 of this Indenture.

"***Spread***" means, so long as no Event of Default has occurred and is continuing, 250 basis points, and upon the occurrence of and continuance of an Event of Default, 450 basis points.

"***State***" has the meaning set forth in the recitals hereto.

"***State Treasurer***" means the Treasurer of the State of Michigan.

"***Supplemental Indenture***" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"***Tax-Exempt Bonds***" means those Bonds, the interest on which is excluded from gross income for federal tax purposes.

"***Trustee***" means initially, UMB Bank, N.A., as trustee, as bond ~~register~~registrar, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

"***Trust Estate***" shall have the meaning set forth in Section 401 hereof.

"***Wagering Tax Account Control Agreement***" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee and the Wagering Tax Depository Bank in favor of the Trustee with respect to the Pledged Wagering Tax Account that holds the Pledged Wagering Tax Revenues.

"***Wagering Tax Depository Bank***" means Comerica Bank and any successor thereto.

"***Wagering Tax Revenues***" means revenues collected by the City from taxes in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Law 1.

Section 102    Interpretation.  (A) In this Indenture, unless the context otherwise requires:

(1)    the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)    words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

9

CHI-1918768v4

(3)     words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)     any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)     this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)     references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)     references to time shall mean the applicable local time in New York City, New York; and

(8)     references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)     Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof. All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)     If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

CHI-1918768v4

# ARTICLE II

## TERMS OF BONDS

Section 201      Authorization for Indenture and Bonds; Indenture to Constitute a Contract. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City and the principal amount of Bonds that may be issued hereunder is not limited except as provided herein or by law.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Series or Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202      Authorization of Bonds.  In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in one or more series.  No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203      Issuance and Delivery of Bonds.  After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.  No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 301 of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204      Conditions Precedent to Delivery of Bonds.  The Bonds of each Series shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)      a copy of the Bond Orders authorizing each such series, executed by the City and the Trustee, which shall specify:

11

CHI-1918768v4

13-53846-tjt   Doc 7231   Filed 05/13/14   Entered 05/13/14 15:27:39   Page 159 of 321
13-53846-swr   Doc 3731   Filed 03/11/14   Entered 03/11/14 14:21:39   Page 46 of 30

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of ~~each such Series of~~the Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of ~~each series of~~the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     **a** Bond Counsel's Opinion to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Agreements; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 503, which shall be conclusively established by the executed certificate of the Trustee so stating.

12

CHI-1918768v4



**ARTICLE III**

**GENERAL TERMS AND PROVISIONS OF BONDS**

Section 301    Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.* Bonds designated as "Financial Recovery Bonds, Series 2014A" and "Financial Recovery Bonds, Series 2014B" are hereby authorized to be issued pursuant to the provisions of this Indenture in the respective principal amounts of [_____ ($_____)] and [_____ ($_____)]. Both series ofamount of $120,000,000. The Bonds shall bear a Date of Original Issue of [_____, 2014.] The Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations. The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation. Each Bond shall be numbered as determined by the City. The Bonds shall be substantially in the formsform set forth in Exhibit A and Exhibit B, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order. The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America. Principal and interest on the Bonds shall be due and payable as set forth in the form of BondsBond set forth in Exhibit A and Exhibit B. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed. The principal amount of the Bonds of each series shall be payable on the Maturity Date. The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment on the Bonds.* Principal of, and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the corporate trust office of the Trustee. Interest on the Bonds will be paid by check or draft drawn upon the Trustee and mailed to Owners at the registered addresses, provided that, at the written request of the Owner of at least $1,000,000 principal amount of Bonds (which request may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time prior to an Interest Payment Date by subsequent written notice to the Trustee), interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Trustee and the City. Payment as aforesaid shall be made in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Section 302    Book-Entry Only System for the Bonds. (a) Except as provided in Section 302(b) hereof, the ownership of the Bonds shall be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery

13

CHI-1918768v4.

13-53846-tjt  Doc 4731  Filed 05/13/14  Entered 05/13/14 15:27:39  Page 161 of 321
13-53846-swr  Doc 3731  Filed 05/13/14  Entered 05/13/14 15:27:39  Page 484 of 630

to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b) In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City or the Trustee shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture. The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c) Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on the Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations. The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

14

CHI-1918768v4.

Section 303    Interchangeability of Bonds.    In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity bearing the same rate of interest and having the same terms of any of the authorized denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 304    Negotiability, Transfer and Bond Registry.    All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee, which may be one or more banks or trust companies or national banking associations appointed by the City, books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 305    Transfer of Bonds.    (A) The registration of each Bond is transferable, in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request), only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)    Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306    Regulations With Respect to Exchanges and Transfers.    (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of

15

CHI-1918768v4.

this Indenture. All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

(B)     For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)     The Trustee shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 307    Bonds Mutilated, Destroyed, Stolen or Lost.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of the owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen.  ~~In~~If any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 308    Cancellation and Destruction of Bonds.  All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled.  Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed.  Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 309    Redemption.  The Bonds shall be subject to optional and mandatory redemption as set forth in the form of Bonds attached hereto as Exhibit A ~~and Exhibit B~~.  The Bonds shall only be redeemed in Authorized Denominations.  No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

16

CHI-1918768v4

Section 310    <u>Selection of Bonds to be Redeemed</u>.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such Outstanding Bond a distinctive number for each minimum denomination of the principal amount thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected.  For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Any integral multiple of a minimum denomination may, if so specified by the provisions of a Supplemental Indenture, be utilized in connection with the partial redemption of Bonds issued pursuant to such Supplemental Indenture and such Bonds shall be subject to selection for redemption in the amount of such multiple but otherwise in accordance with this Section.

Section 311    <u>Notice of Redemption</u>.  When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds.  Such notice shall specify the Series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed.  Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable.  Such notice shall be given by first class mail or registered or certified mail, return receipt requested, not less than ten (10) business days nor more than sixty (60) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure ~~so~~ to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Bond Order or Supplemental Indenture as to Bonds issued pursuant to such Bond Order or Supplemental Indenture.  As directed by the City, further notice shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

17

CHI-1918768v4.

Section 312    Payment of Redeemed Bonds.  Notice having been given by mail in the manner provided in Section 311, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the Redemption Date.  If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the authorized denominations.  If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable.  If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

## ARTICLE IV
## PLEDGE OF INDENTURE; SOURCES OF PAYMENT
## AND SECURITY FOR THE BONDS

Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest.  The City hereby grants a valid, binding, enforceable, non-avoidable, continuing postpetition security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever, on a first priority lien basis, all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)    All rights and interests of the City in the Pledged Income Tax ~~Revenues, the Pledged Wagering Tax Revenues~~Revenue and the Asset Proceeds Collateral (collectively the "Collateral") ~~in the following order of priority:~~.

> (i)    ~~With respect to the Series 2014A Bonds: A first priority lien on (a) the Pledged Income Tax Revenues and (b) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014B Bonds (items (a) and (b), collectively, the "Series 2014A Bonds Collateral").~~

> (ii)    ~~With respect to the 2014B Bonds: (a) A first priority lien on (i) the Pledged Wagering Tax Revenues and (ii) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014A Bonds, and (b) a second priority lien (second only to the lien securing the Series 2014A Bonds) on the Pledged Income Tax Revenues (items (a) and (b), collectively, the "Series 2014B Bonds Collateral"); and~~

18

CHI-1918768v4

(b)     Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations.  The Bonds have been granted super-priority claim status under Section 364(c)(1) of the Bankruptcy Code (without the need to file any proof of claim) and shall also be payable in the manner provided by the Bankruptcy Court Order.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim.  Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402     Creation of Liens.  In order to ~~effectuate~~further implement the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control ~~Agreements~~Agreement with the Depository ~~Banks~~Bank, and the Trust Estate shall include the Trustee's rights thereunder in and to the Pledged Income Tax Account.

## ARTICLE V

## ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS

Section 501     Debt Service Fund.

(a) *Establishment of Debt Service Fund and Accounts.*   There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Bonds, Common Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

~~Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Common Debt Service Account" (hereinafter referred to as the "Series 2014A Debt Service Account").~~

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014~~B~~ – Common Debt Service Account" (hereinafter referred to as the "~~Series 2014B~~ Debt Service Account")~~,~~), and ~~with~~within the ~~Series 2014A~~ Debt Service Account~~,~~

19

CHI-1918768v4

~~collectively, the "~~ two subacounts entitled "Scheduled Debt Service ~~Accounts")~~ Subaccount" and "Asset Proceeds Collateral Mandatory Redemption Subaccount."

(b) *Deposits to Debt Service Fund.* Five Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount ~~for each Series of Outstanding Bonds~~ and the Trustee shall deposit the Debt Service Requirement ~~Amounts~~Amount into the Debt Service Fund, for deposit to the ~~applicable Accounts~~Scheduled Debt Service Subaccount of the Debt Service Account, for the payment of amounts owing with respect to the Bonds on such Interest Payment Date. Two Business Days prior to a scheduled Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for ~~each Series of~~the Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement ~~Amounts~~Amount into the Scheduled Debt Service Subaccount of the Debt Service Fund, for deposit to the ~~applicable Accounts~~Scheduled Debt Service Subaccount of the Debt Service Account, for the payment of all outstanding principal, premium, if any, and interest on the Bonds.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the ~~2014A~~Scheduled Debt Service Subaccount of the Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the ~~Series 2014A~~ Bonds on such Interest Payment Date, the Trustee shall send the ~~Income Tax~~ Depository Bank a Notice of Deficiency and Requisition under the ~~Income Tax~~ Account Control Agreement and withdraw funds from the Pledged Income Tax Account in accordance with the terms of the ~~Income Tax~~ Account Control Agreement and deposit into the ~~2014A~~Scheduled Debt Service Subaccount of the Debt Service Account, an amount sufficient to make the balance of the ~~2014A~~Scheduled Debt Service Subaccount of the Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

~~If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014B Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014B Bonds on such Interest Payment Date, the Trustee shall send the Wagering Tax Depository Bank a Notice of Deficiency and Requisition under the Wagering Tax Account Control Agreement and withdraw funds from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date. In the event that, following the foregoing application of amounts on deposit in the Pledged Wagering Tax Account, there remains a shortfall in the 2014B Debt Service Account with respect to the Debt Service Requirement Amount owing on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient therefrom to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.~~

If, following the foregoing deposits, the amounts on deposit in ~~a~~the Scheduled Debt Service Subaccount of the Debt Service Account do not equal the Debt Service Requirement

20

Amount owing on such Interest Payment Date in respect of ~~either or both series of~~the Bonds, the Trustee shall withdraw funds from the Bond Proceeds Fund in an amount sufficient to make the balance in the ~~applicable~~Scheduled Debt Service ~~Fund~~Subaccount of the Debt Service Account equal to the Debt Service Requirement for the applicable series of Bonds owing on such Interest Payment Date.

Asset Proceeds Collateral, if any, shall be transferred by the City within three (3) Business Days of receipt to the Trustee. The Trustee shall deposit the Asset Proceeds Collateral into the Debt Service Fund, for ~~further pro rata~~ deposit into the ~~2014A~~Asset Proceeds Collateral Mandatory Redemption Subaccount of the Debt Service Account ~~and the 2014B Debt Service Account, respectively, based on the then Outstanding amount of the Bonds in each Series~~ for the mandatory redemption of Bonds on the next succeeding Interest Payment Date as provided in the Bonds.

(c) *Withdrawals from the Debt Service Fund.* The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the ~~applicable~~Scheduled Debt Service Subaccount of the Debt Service Account the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

Section 502 <u>Costs of Issuance Fund</u>. There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds Costs of Issuance Fund" (the "Costs of Issuance Fund"). Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds. Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds.

Section 503 <u>Bond Proceeds Fund</u>. There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund"). There shall be deposited into the Bond Proceeds Fund the remainder of the net proceeds of the Bonds after the deposit of amounts necessary to pay Costs of Issuance into the Costs of Issuance Fund pursuant to Section 502 hereof as specified by the Emergency Manager in the Bond Orders.

~~Within the Bond Proceeds Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A — Bond Proceeds Account" (hereinafter referred to as the "Series 2014A Bond Proceeds Account"). Moneys on deposit in the Series 2014A Bond Proceeds Account shall be used only to fund the obligations owing in respect of the termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as set forth in the Bond Orders. Any balance remaining in such Account after such payment shall be transferred to the Series 2014B Bond Proceeds Account.~~

21

CHI-1918768v4

13-53846-swr Doc 4731 Filed 05/13/14 Entered 05/13/14 15:27:39 Page 169 of 321
13-53846-tjt Doc 3731 Filed 05/08/14 Entered 05/08/14 14:24:39 Page 56 of 130

There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014~~B~~ – Bond Proceeds Account" (hereinafter referred to as the "~~Series 2014B~~ Bond Proceeds Account"). Moneys on deposit in the ~~Series 2014B~~ Bond Proceeds Account shall be used only to pay for the Quality of Life Projects all in such amounts and for such Quality of Life Projects as specified by the Emergency Manager in the Sale Order and shall also be available, for so long as any ~~fund~~funds remain on deposit therein, for deposit to the Debt Service Fund in accordance with Section 501(b), <u>provided</u>, <u>however</u>, that the City shall not be required to seek the Trustee's approval for Quality of Life Project expenditures and shall not be required to keep any funds on deposit in the ~~Series 2014B~~ Bond Proceeds Account following the date or dates on which Quality of Life Project expenditures are made. Any balance remaining in such Account after the Maturity Date shall be deposited in the Series ~~2014B~~ Debt Service Account.

Section 504    <u>Amounts Remaining in Funds and Accounts</u>. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

Section 505    <u>Approval of Account Control ~~Agreements~~Agreement</u>. The City shall cause to be deposited ~~100% of the Pledged Wagering Tax Revenues into the Pledged Wagering Tax Account, and~~ greater than 90% of the Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and ~~accounts~~account shall be governed by the Account Control ~~Agreements~~Agreement at all times. The Pledged ~~Wagering Tax Account and the Pledged~~ Income Tax Account ~~constitute~~constitutes part of the Trust Estate; <u>provided</u>, <u>however</u>, that, subject to Sections 708(a) and 902(~~b~~c) hereof, the City shall be authorized to use all Pledged ~~Wagering Tax Revenues and Pledged~~ Income Tax ~~Revenues~~Revenue for any purpose permitted by law, without limitation at any time, including during an Event of Default.

**ARTICLE VI**

**<u>INVESTMENT OF FUNDS</u>**

Section 601    <u>Permitted Investments</u>. All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City. If the Trustee does not receive written investment direction from the City, the Trustee shall invest all money held by it as provided in subsection ~~[(f)]~~ hereof. For purposes of this Article ~~III~~VI, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a) bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b) certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

22

CHI-1918768v4

(c) commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d) repurchase agreements consisting of instruments listed in subdivision (a);

(e) Bankers' acceptances of United States banks rated at least A2/A/A;

[(f) mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

(i) the purchase of securities on a when-issued or delayed delivery basis,

(ii) the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii) the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g) obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

(h) investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118; and

(i) The investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150.]

Section 602    Valuation and Sale of Investments.    In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)      as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)      as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

23

CHI-1918768v4.

(c)     as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)     as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CITY

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701     Payment of Bonds.  The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702     Power to Issue Bonds and Pledge Revenues, Funds and Other Property. As of the date hereof, the City is duly authorized to authorize and issue the Bonds and to enter into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided.  As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto prior to the pledge created hereby, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken.  As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture.  The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the ~~Pledged Revenues~~Trust Estate and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.  The City shall not sell, transfer, encumber or hypothecate the Pledged Income Tax Revenue.

Section 703     Maintenance of Perfected Security Interests; Further Assurances; Notices of Default.  At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Bondowners first priority security interests in the Trust Estate.  The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of

24

CHI-1918768v4

Default hereunder, including, for the avoidance of doubt, any failure to comply with Section 708 hereof.

Section 704    [Tax Covenants.  The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section ~~144(b)~~103 of the Code, or any successor provisions thereto.  The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds.]

Section 705    Compliance With Conditions Precedent.  Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist, have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706    Accounts and Reports.  The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account, the ~~Pledged Wagering Tax Account, the~~ Asset Proceeds Collateral and all Accounts established by this Indenture which shall at all reasonable times be subject to the inspection of the Trustee.

Section 707    Issuance of Additional Obligations.  The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Collateral or that has a superior payment priority to the Bonds.  The issuance of any series of bonds hereunder, other than the Bonds, shall require compliance with Section 1002 of this Indenture.

Section 708    ~~Wagering Tax and~~ Income Tax Revenues and Accounts.  The City shall at all times:

(a)   maintain a minimum balance of no less than $5,000,000 in ~~each of the Pledged Wagering Tax Account and~~the Pledged Income Tax Account;

(b)   maintain Pledged ~~Wagering~~Income Tax ~~Revenues~~Revenue at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

~~(c)   maintain Pledged Income Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and~~

(~~d~~c)   (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax ~~Revenues and the Pledged Wagering Tax Revenue~~Revenue to the maximum extent authorized by applicable law and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax ~~Revenues and the Pledged~~

25

CHI-1918768v4.

~~Wagering Tax Revenues~~Revenue to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

Section 709    Asset Proceeds Collateral.    The City shall deposit Asset Proceeds Collateral with the Trustee within three (3) Business Days of receipt thereof, for deposit in accordance with Section 501(b) hereof.  Furthermore, the City hereby covenants that as long as the Bonds are outstanding, no Asset Proceeds Collateral shall be used for any purpose other than payment of the principal of and interest on the Bonds, unless the City shall request in writing a use for such proceeds other than as set forth in this Section 709, and majority of Bondowners shall consent in writing.

Section 710    Contesting Enforceability.  The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

## ARTICLE VIII

## THE TRUSTEE

Section 801    Powers and Duties of Trustee.

(a)    The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

~~(b)    In the event that any of the Bonds are issued on a tax-exempt basis to finance working capital expenditures by the City, the Trustee hereby covenants, commencing [_____], 2015 and each [_____] thereafter so long as the Tax-Exempt Bonds are outstanding, to send an Authorized Officer of the City notice requesting the City to engage Bond Counsel to provide a Continuing Exclusion Opinion (as defined in the Bond Authorizing Order). The Emergency Manager has covenanted in the Bond Orders on behalf of the City that upon receipt of such notice from the Trustee, the City shall cause Bond Counsel to provide the Continuing Exclusion Opinion as required above.  The City may conclusively rely on such Continuing Exclusion Opinion in complying with the provisions therein.  In the event the City fails to obtain the Continuing Exclusion Opinion, or Bond Counsel determines that the conditions necessary to provide the Continuing Exclusion Opinion for the Tax-Exempt Bonds that remain outstanding after the next succeeding Extraordinary Redemption Date (as defined in the Bond Authorizing Order) do not exist, the City shall redeem the Tax-Exempt Bonds in accordance with the provisions set forth in the Sale Order and this Indenture.~~

26

CHI-1918768v4

13-53846-swr  Doc 3731  Filed 05/08/14  Entered 05/08/14 14:24:39  Page 61 of 80

(~~c~~b)     The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(~~d~~c)     The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(~~e~~d)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(~~f~~e)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be found to secure the same.

(~~g~~f)     The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than its [gross] negligence or willful misconduct.  The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(~~h~~g)     The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(~~i~~h)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as amended, or by law.  The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(~~j~~i)     The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts created by this Indenture or in the enforcement of any rights and powers under this Indenture until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(~~k~~j)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, except for liability for its own gross negligence or willful misconduct.

(~~l~~k)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit

27

CHI-1918768v4.

any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding.

(~~m~~l)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(~~n~~m)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(~~o~~n)     The Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(~~p~~o)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control ~~Agreements~~Agreement, relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(~~q~~p)     The Trustee is authorized and directed by the City to enter into the Account Control ~~Agreements~~Agreement.

(~~r~~q)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs in exercising any rights or remedies or performing any of its duties hereunder.

Section 802     <u>Fees and Expenses of Trustee</u>.     (a) The Trustee shall be entitled to reasonable fees for services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)     If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service ~~Funds~~Fund, and shall be entitled to a preference therefor over any Outstanding Bonds.

28

CHI-1918768v4

Section 803    Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale. (a)    The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.   Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged ~~Wagering Tax Revenues, Pledged~~ Income Tax ~~Revenues~~Revenue and Asset Proceeds Collateral, and transfer and assign its right, title and interest in the Indenture to the successor Trustee.   The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)    In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the successor Trustee.  If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder.  Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)    Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

29

CHI-1918768v4.

Section 804    Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the  Trustee and the City and signed by  the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding.  No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof. Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805    Appointment of and Transfer to Successor Trustee.  If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended.  The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

# ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES ON DEFAULT

Section 901    Events of Default.  Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a)     The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

(b)     The failure of the City to pay, when due, any principal or premium, if any, of any or all Bonds, whether on the Maturity Date or ~~redemption~~Redemption Date thereof,

(c)     The City shall default in the performance or observance of any of the other covenants, agreements or conditions on its part contained in this Indenture (other than covenants otherwise specifically covered by this Section 901) and such default is not remedied within fifteen (15) days following receipt by the City of notice from the Trustee of such default;

30

CHI-1918768v4

(d)     If (i) the City shall fail to make a scheduled payment in excess of $25,000,000, when due and owing, in respect of Post-Petition Date Debt (other than the obligations with respect to the Bonds), or (ii) Post-Petition Date Debt in an outstanding aggregate principal amount exceeding $25,000,000 is accelerated, which results in such debt becoming immediately due and payable, and in the case of either (i) or (ii), such event is not cured within any grace period provided therefor in the applicable documents;

(e)     If material post-petition judgments, which are final and nonappealable, are rendered against the City involving liability in an aggregate amount exceeding $25,000,000 and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable;

(f)     If a court of competent jurisdiction finds that any of the Financing Documents are invalid or unenforceable and such finding is not stayed pending appeal;

(g)     If there is a written assertion by the City or an Authorized Officer that any Financing Document or the Bankruptcy Court Order is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication;

(h)     If the Bankruptcy Case is dismissed prior to the confirmation of a plan of adjustment, and the order dismissing the Bankruptcy Case is not stayed pending appeal;

(i)     The reversal or modification, by the entry of an order that is not stayed pending appeal and in a manner adverse to the Registered Owners, of the Bankruptcy Court's order dated December 5, 2013 [Docket No. 1945] granting the City chapter 9 bankruptcy relief;

(j)     If the City shall file, consent to, or fail to file a written opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion;

(k)     If the Bankruptcy Court shall grant any super-priority claim pursuant to sections 364(c)(1), 503 and 507(a)(2) of the Bankruptcy Code in favor of any party other than the Registered Owners (other than as permitted under the Financing Documents);

(l)     If there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the Registered Owners holding 51% of the Outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Bankruptcy Court Order in a manner adverse to the Registered Owners, or (ii) an order of a court of competent jurisdiction reversing, vacating or staying the effectiveness of the Bankruptcy Court Order, and in either (i) or (ii), such order is not stayed pending appeal;

(m)     If the liens or super-priority claims granted in the Bankruptcy Court Order in respect of the Bonds shall cease to be valid, perfected and enforceable in all respects with the priority described herein and therein;

31

CHI-1918768v4

(n)     The failure of the City to comply with the provisions of Section 708(a) with respect to Pledged Wagering Tax Revenues and the Wagering Tax Revenue Account and such failure is not cured within two (2) Business Days;

(~~o~~n)     The failure by the City to comply with the provisions of Section 708(a) with respect to Pledged Income Tax ~~Revenues~~Revenue in the Income Tax Revenue Account and such failure is not cured within two (2) Business Days;

(~~p~~o)     If the City ceases to be under the control of the Emergency Manager, or successor emergency manager, for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds, or a designee or successor as consented to by the City (which consent shall not be unreasonably withheld), to ensure continued financial responsibility shall have been established pursuant to Act 436 or any successor statute; or

(~~q~~p)     Any representation or warranty made by the City in this Indenture, any Financing Document or in any certificate, document, instrument, opinion or financial statement made or delivered pursuant to or in connection with this Indenture or with any of the other Financing Documents, shall prove to have been incorrect, incomplete or misleading in any material respect as of the time of such representation or warranty.

Section 902     <u>Remedies</u>.  (a)  *General*.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture, including without limitation, the acceleration of the Bonds in accordance with Section 902(b) below.

(b)     *Acceleration.*  Upon the occurrence and continuation of an Event of Default, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed, in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by declaring the principal of and interest on the Bonds to be immediately due and ordering payment in the manner provided by Section 902(c)(i) and/or Section 902(c)(ii) hereof provided that interest shall continue to accrue on unpaid principal at the Default Rate until paid in full.  Following acceleration, the Trustee shall send the Depository ~~Banks~~Bank a Notice of Control under the Account Control ~~Agreements~~Agreement.

(c)     *Post-Acceleration Debt Service*.  Upon an Event of Default, and following acceleration of the Bonds pursuant to Section 902(b):

(i)     The Trustee, on behalf of the Bondowners ~~of the Series 2014A Bonds~~, shall be entitled to accelerated, mandatory payment of principal and interest of the ~~Series 2014A~~ Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to $4,000,000 per month from the Pledged Income Tax ~~Revenues~~Revenue and payable from the Pledged Income Tax Account in accordance with the terms of the ~~Income Tax~~ Account Control Agreement, plus the ~~pro rata~~ proceeds of any Asset Proceeds Collateral~~, shared with the Series 2014B Bonds~~.

32

CHI-1918768v4

(ii) ~~The Trustee, on behalf of the Bondowners of the Series 2014B Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014B Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to (i) $4,000,000 per month from the Pledged Wagering Tax Revenues and payable from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement, and (ii) following payment in full of the Series 2014A Bonds, an additional $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014A Bonds;~~

(~~iii~~ii) Upon any acceleration of the Bonds following the occurrence of an Event of Default under Section 901(a), (b), (f), (g), (h), (i), (j), (k), (l), or (m), the Trustee, on behalf of the Bondowners of the Bonds, shall be entitled to apply any moneys remaining on deposit in the Bond Proceeds Fund to the Bonds; and

(~~iv~~iii) Payment on the Bonds is not limited to the Trust Estate, and the Trustee, on behalf of the Bondowners of all of the Bonds, may be entitled to seek payment from the City, (without the need to file any proof of claim), in accordance with the Section 364(c)(1) superpriority claim status of the Bankruptcy Court Order~~, and~~.

(~~v~~d) The monthly payment provisions of ~~subsections (i) and (ii~~subsection (i) above do not modify the obligation of the City to pay the Bonds in full upon (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, or (iii) [_____], the date that is two years and six months after the Date of Original Issue [ which obligation is automatic and does not require action by the Trustee or Bondholders under Section 902(b).

(~~d~~e)   *Enforcement.*   Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the Obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(~~e~~f)   *Owner Right of Action.*   If the Registered Owners holding 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the ~~Owner~~Owners of all Outstanding Bonds.

Section 903   Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding 51% of the Outstanding amount of the Bonds, waive

33

CHI-1918768v4.

an Event of Default hereunder and annul its consequences. No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904    Possession of Bonds by Trustee Not Required. All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto. Any action instituted by the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905    Remedies Cumulative. The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906    Knowledge by Trustee of an Event of Default. The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until it shall have actual knowledge thereof, or shall have received written notice thereof from any Bondowner at its address and location specifically designated for receiving notices pursuant hereto. Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907    Application of Monies. All moneys received by the Trustee and deposited in the Debt Service Fund pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

# ARTICLE X

## SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE

Section 1001    Modifications and Amendments Not Requiring Consent. Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)    To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)    To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

(c)    To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

CHI-1918768v4

(d)     To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)     To appoint separate or successor trustees, paying agents or bond registrars.

(f)     To implement a change to the definitions of "LIBOR Floor" or "Spread" and such other changes in connection with any syndication of the Bonds by the Purchaser consistent with the terms of the Financing Documents.

(fg)     To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books. The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders. Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1002   Amendments Requiring Consent. Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental or amendatory indenture unless approved by the holders of all outstanding Bonds. Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books. The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds. The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this

35

CHI-1918768v4

Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003   Consent of Trustee.  Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section 1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section.  Such certificate shall specifically request the Trustee to enter into such supplement.  Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004   General Provisions Relating to Supplemental Indentures.  This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X.  Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

A copy of every Supplemental Indenture entered into pursuant to this Indenture shall be accompanied by a Bond Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or

36

CHI-1918768v4.

13-53846-tjt  swr  Doc 4730-1  Doc 3731  Filed 05/03/14  Filed 05/13/14  Entered 05/03/14 15:12:43  Entered 05/13/14 17:23:39  Page 184 of 331  Page 710 of 831

permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

## ARTICLE XI

## MISCELLANEOUS

Section 1101 <u>Notices</u>. Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

A.  If to the City, to:          City of Detroit

Detroit, Michigan 48226
Attention: _____

B.  If to the Depository Bank, to:      _____

C.  If to the Trustee, to:        _____

The City and the Trustee may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102  <u>Termination</u>. This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees owed to the Trustee have been paid in full.  Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103  <u>Defeasance</u>.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments

37

CHI-1918768v4

upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee. Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Registered Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this ~~Order~~Indenture for the benefit of such Bonds shall be discharged.

Section 1104  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105  <u>Headings</u>.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106  <u>Indenture Executed in Counterparts</u>.  This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107  <u>Parties Interested Herein</u>.  Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser.

Section 1108  <u>Jurisdiction</u>.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Indenture (including, without limitation, any actions by the Trustee or the Registered Owners pursuant to Section 902 hereof), or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court <u>whether or not the Case has been dismissed</u>; provided, <u>however</u>, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.  Each of the parties hereto agrees that a final judgment in any such

38

action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

39

CHI-1918768v4

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and UMB Bank, N.A. to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

      Its:  Emergency Manager

UMB BANK, N.A.,

as Trustee

By _____

Its: _____

40

CHI-1918768v4

**EXHIBIT A**

**FORM OF SERIES 2014~~A~~ BOND**

A-1

CHI-1918768v4

**EXHIBIT B**

**FORM OF SERIES 2014B BOND**

B-1

CHI-1918768v4

13-53846-tjt Doc 4737 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 190 of 321
13-53846-swr Doc 3031 Filed 03/17/14 Entered 03/17/14 14:21:39 Page 197 of 301

**EXHIBIT C**

# FORM OF ACCOUNT CONTROL AGREEMENT

C-2

| Summary report: | |
|---|---|
| **Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 3/14/2014 4:26:29 PM** | |
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original filename:** Indenture (12.31.2013) (FOR THIRD REVISED ORDER).docx | |
| **Modified DMS:** iw://CHI/CHI/1918768/4 | |
| **Changes:** | |
| Add | 196 |
| Delete | 268 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 464 |

**Item 8**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                              Chapter 9

City of Detroit, Michigan,                          Case No. 13-53846

       Debtor.                                      Hon. Steven W. Rhodes

_____/

### Order Requiring the City of Detroit to Provide Additional
### Information Regarding the Postpetition Quality of Life Financing

On March 6, 2014, debtor City of Detroit filed a Notice of Presentment of Final Order

pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921,

and 922. (Dkt. #2921). The proposed order, if entered as presented, would approve the

proposed postpetition quality of life financing, grant certain liens, provide superpriority status,

and modify the automatic stay.

Several parties have filed objections to the proposed final order. The objections seek, in

part, additional information regarding the terms and conditions for the proposed final financing.

Having reviewed the objections, the Court concludes that its consideration of this matter

would be more efficient for all concerned if the City made certain information available before

the hearing scheduled for April 2, 2014. Accordingly it is hereby ordered that by March 28,

2014, the City shall provide the following information relating to the proposed final financing:

1. Final copies of the documents that will be executed and delivered in connection with
the financing.

2. Clear disclosure of **all** material terms of the loan including the interest rate, term, fees,
costs and whether the loan is subject to market flex provisions (and if so, the terms of the
market flex provisions).

3. A comparison of the material terms of the proposed final quality of life financing with
the terms of the initial quality of life financing preliminarily approved by the Court on

January 16, 2014.

4.  Disclosure of information regarding the specific use of loan proceeds i.e. a schedule of quality of life expenditures and budgets.

.

**Signed on March 24, 2014**

                                                    **_____/s/ Steven Rhodes_____**
                                                    **Steven Rhodes**
                                                    **United States Bankruptcy Judge**

**Item 9**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 9 |
|  | : | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | : | Hon. Steven W. Rhodes |
| Debtor, | : |  |
|  | : |  |

## REPLY OF THE DEBTOR TO OBJECTIONS TO NOTICE OF PRESENTMENT OF ORDER APPROVING POSTPETITION FINANCING

The City of Detroit (the "City") hereby files this reply (the "Reply") to the two objections (the "Objections")[1] to the City's Notice of Presentment (the "NOP") [Docket No. 2921], which contained a revised order for the City's proposed quality of life financing with Barclays.[2]  The Court previously approved this financing in its January 16, 2014 ruling in open court, subject to submission by the City of a revised order consistent with that ruling.

1.      Both Objections complain that blacklines of the financing documents were not filed with the NOP, making it "impossible" to determine what changes were made to those documents since they last were filed with the Court.  The City promptly filed such blacklines (Docket No. 3031), thus rendering this objection

---

[1]  The Objections are at Docket No. 3012 (the "Unsecured Lender Objection") and Docket No. 3015 (the "Retirement Systems Objection").

[2]  Capitalized terms not defined herein have the meanings given to them in the NOP.

moot.  The Retirement Systems Objection essentially did not raise any other

points.[3]

2.　　The remainder of the Unsecured Lender Objection relies on the faulty

premise that the Amended QOL Financing constitutes an "entirely new agreement"

(Unsecured Lender Objection at ¶ 17) with "materially different" terms than the

financing approved by the Court (Unsecured Lender Objection at ¶ 8).  Thus, it

argues, a new motion must filed with this Court to approve the "new" financing,

whereby the objectors would be afforded yet another round of expensive

discovery, more delay and additional days of contested evidentiary hearings.[4]

3.　　The Unsecured Lender Objection fails to offer a single example of

where the Amended QOL Financing differs materially from the quality of life

portion of the Initial PPF Financing previously approved by the Court, nor could it.

The only material change is the reduction in collateral supporting the loan — an

amendment expressly contemplated by this Court in its January 16 ruling (see Jan.

---

[3]　　The Retirement Systems Objection did complain that it is unclear
whether the proceeds of the Amended QOL Financing will be used to fund any
amended settlement between the City and certain swap counterparties, should such
a settlement be approved by this Court.  The City represents that the proceeds from
the Amended QOL Financing will not be used to fund any such swap settlement.

[4]　The Unsecured Lender Objection thus ironically asserts that the Amended
QOL Financing differs "materially" from the Initial PPF Financing while at the
same time arguing that it is "impossible" to determine the terms of the Amended
QOL Financing.

2

CHI-1924165v8

13-53846-swr Doc 4737 Filed 05/13/14 Entered 05/13/14 15:27:42 Page 199 of 321
13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 15:17:16 Page 2 of 46

16, 2014 Hearing Transcript (attached hereto as <u>Exhibit A</u>) at p. 27, 6-12).  Instead of pledging both gaming and income tax revenue for the loan, the City now is pledging only income tax revenue, an amendment that benefits the City.[5]

4.    The Unsecured Lender Objection argues that the City has failed to disclose the "actual amount" of fees and costs associated with the Amended QOL Financing; the interest rate; whether the Amended QOL Financing is subject to market flex; and the marketing process undertaken in connection with the Amended QOL Financing.  These assertions are mistaken, as all of such information is contained in the documents attached to the NOP.  The fees and costs are unchanged (except for the $1 million refund to the City), as is the interest rate, which is subject to the same market flex as previously disclosed.  In any case, in further response to this point, and in connection with the Court's request in its order dated March 24, 2014 (the "<u>March 24 Order</u>") [Docket No. 3173], attached hereto as <u>Exhibits C</u> and <u>D</u> are (1) a term sheet of the material terms of the Amended QOL Financing and (2) a comparison chart setting forth the differences

---

[5]    One other revision, reflected in the Letter Agreement attached to the NOP, relates to the commitment fee paid by the City to Barclays.  At closing $1.0 million of that fee will be refunded to the City, again a benefit to the City.

CHI-1924165v8

3

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:27:42  Page 200 of 321
13-53846-swr  Doc 3280  Filed 03/28/14  Entered 03/28/14 13:17:16  Page 3 of 46

in the material terms of the Initial PPF Financing and the Amended QOL Financing.[6]

5.    Ultimately, the Amended QOL Financing is the same loan approved by this Court on January 16, 2014, when the Court found that the financing was the best available for the City.  See Jan. 16, 2014 Hearing Transcript at 23, 9-15 ("Specifically, the Court finds that the city has established by a preponderance of the evidence that this loan is in the best interest of the city; that it needs the money; that the terms are market terms and the best available to the city; that they were negotiated in good faith; and that they were negotiated at arm's length.").  The evidentiary record on these points was well established, and nothing has changed.

6.    Because the Amended QOL Financing is not a new transaction, no further discovery in connection with the proposed financing order is appropriate.[7] E.D. Mich. L.R. 9021-1(a)(4), which permits orders to be presented to the Court for entry following a ruling in open court, is not designed to "re-open" every issue that may have been relevant in connection with the underlying motion.  The 7-day objection period contemplated under E.D. Mich. L.R. 9021-1(a)(4) is to allow

---

[6]    Also set forth on Exhibit B hereto is a summary of the City's compliance with the March 24 Order.

[7]    In any case, given that the NOP has been on file for over three weeks and no party has sought discovery notwithstanding an upcoming hearing on the NOP, discovery should be deemed waived.

CHI-1924165v8

4

13-53846-tjt   Doc 4737   Filed 05/13/14   Entered 05/13/14 15:27:16   Page 201 of 321
13-53846-swr   Doc 3280   Filed 03/24/14   Entered 03/24/14 23:17:16   Page 4 of 36

parties to object to the proposed order on the basis that it does not comport with the Court's ruling. The Court has ruled on the factual and legal issues underlying the City's request to have the Amended QOL Financing approved. The amendments to the transaction, as noted above, were simply made to further comply with the Court's ruling.[8]

7.      In another puzzling objection, the Unsecured Lender Objectors argue that the NOP fails to comply with Bankruptcy Rule 4001 because, although the City attached all of the relevant financing documents to the NOP, there "are a number of exhibits that were not attached to the proposed financing documents." See Unsecured Lender Objection at ¶ 22. Bankruptcy Rule 4001 only applies to motions seeking approval of postpetition financing. The NOP is not a motion, and, thus, the requirements set forth in Bankruptcy Rule 4001 are inapplicable. In any case, the City attached five transaction documents to the NOP, which comprise the material documents that govern the Amended QOL Financing, including the Indenture, Bond Purchase Agreement, Supplemental Indenture, DACA and Letter

---

[8] Similarly, contrary to the assertions in the Unsecured Lender Objection (see ¶ 26), the efforts by the City to obtain Detroit City Council and Local Emergency Financial Assistance Loan Board approval for the Amended QOL Financing simply comport with the Court's suggestion in its January 16, 2014 ruling that seeking such approvals might be appropriate (see Jan. 16, 2014 Hearing Transcript at p. 27, 13-19). Such approvals now have been obtained by the City.

CHI-1924165v8

13-53846-tjt  Doc 4728-0  Filed 05/13/14  Entered 05/13/14 15:27:16  Page 202 of 321
13-53846-swr  Doc 4280  Filed 05/13/14  Entered 05/13/14 15:17:16  Page 6 of 16

Agreement.  Additionally, the Proposed Order was also attached to the NOP.

Thus, the NOP more than complies with Bankruptcy Rule 4001.

8.      Finally, the Unsecured Lender Objection contends that the City has

failed to provide a "schedule of quality of life expenditures and budgets" and has

provided "no detail about how it plans to use these funds."  <u>See</u> Unsecured Lender

Objection at ¶ 13.  On December 13, 2013, following extensive briefing, the Court

ruled that:

> On the debtor in possession financing motion under Section
> 364, the Court basically agrees with the city's position that
> Section 904 of the Bankruptcy Code prohibits any review of
> what the city proposes to do with the proceeds of the loan and
> actually prohibits any review beyond the narrow review that
> Section 364 itself requires to determine the reasonableness of
> the terms of the borrowing given the current market conditions
> for similar kinds of loans and the other technical requirements
> of Section 364, including the city's inability to obtain a loan on
> any better terms.

<u>See</u> Dec. 13, 2013 Hearing Transcript at 42, 3-16 (attached hereto as <u>Exhibit E</u>).

As such, the information requested is not relevant to approval of the financing.

Nonetheless, pursuant to the Court's March 24 Order, attached hereto as <u>Exhibit F</u>

is information regarding the proposed uses of Amended QOL Financing proceeds.

In addition, as was agreed by the City previously, the City will make available to

creditors a schedule of spending as set forth in paragraph 17 of the Proposed Order.

9.     It should be noted that the Unsecured Lender Objection does also question the need of the City to borrow at all (Unsecured Lender Objection at ¶¶ 13, 27). Again, however, on this point, the Court has already spoken:

> Finally, the Court will overrule the objection that this loan should be approved only in the context of plan confirmation. The city has determined out of necessity to pursue this loan now. Section 364 of the Bankruptcy Code permits the city to do that. Under Section 904 it is not for this Court to review the city's political and governmental decisions, which pursuing this loan plainly is.

See Jan. 16, 2014 Hearing Transcript at pp. 27-28, 24-25 and 1-2. As such, the objection is without merit.

## CONCLUSION

Therefore, for the reasons set forth above, the City submits that the Objections should be overruled and the Proposed Order entered.

CHI-1924165v8

Dated: March 28, 2014              Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601
Telephone:  (312) 269-3939
Facsimile:  (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

CHI-1924165v8

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

CHI-1924165v8

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:27:42  Page 206 of 321
13-53846-swr  Doc 3280  Filed 03/28/14  Entered 03/28/14 15:17:16  Page 9 of 36

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Reply of the Debtor to Objections to Notice of Presentment of Order Approving Postpetition Financing was filed and served via the Court's electronic case filing and noticing system on this 28th day of March, 2014.

/s/ David G. Heiman

# **EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .     Docket No. 13-53846
        MICHIGAN,                 .
                                  .     Detroit, Michigan
                                  .     January 16, 2014
                    Debtor.       .     2:00 p.m.
. . . . . . . . . . . . . . . . .

                    BENCH OPINION
        BEFORE THE HONORABLE STEVEN W. RHODES
        UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  GREGORY SHUMAKER
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Jones Day
                     By:  CORINNE BALL
                     222 East 41st
                     New York, NY  10017-6702
                     (212) 326-7844

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For UBS and Bank     Warner, Norcross & Judd, LLP
of America           By:  SCOTT WATSON
Merrill Lynch:       111 Lyon Avenue, NW - Suite 900
                     Grand Rapids, MI  49503
                     (616) 752-2465

For UBS AG:          Bingham McCutchen, LLP
                     By:  JARED R. CLARK
                     399 Park Avenue
                     New York, NY  10022-4689
                     (212) 705-7770

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By: WILLIAM E. ARNAULT<br>300 North LaSalle<br>Chicago, IL 60654<br>(312) 862-3062 |
| For Detroit Retirement Systems-General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By: JENNIFER K. GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI 48226<br>(313) 965-8300<br><br>Clark Hill, PLC<br>By: ROBERT D. GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882 |
| For Erste Europaische Pfandbrief-und Kommunalkreditbank Aktiengesellschaft in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By: VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA 19103-7599<br>(215) 864-8236 |
| For David Sole: | Jerome D. Goldberg, PLLC<br>By: JEROME D. GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI 48207<br>(313) 393-6001 |
| For Financial Guaranty Insurance Company: | Williams, Williams, Rattner &<br>  Plunkett, PC<br>By: MARK R. JAMES<br>380 N. Old Woodward Ave., Suite 300<br>Birmingham, MI 48009<br>(248) 642-0333 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By: CAROLINE TURNER ENGLISH<br>1717 K Street, NW<br>Washington, DC 20036-5342<br>(202) 857-6178 |
| For FMS Wertmanagement: | Schiff Hardin, LLP<br>By: RICK FRIMMER<br>233 South Wacker Drive, Suite 6600<br>Chicago, IL 60606<br>(312) 258-5573 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC By: RYAN C. PLECHA 370 East Maple Road, 3rd Floor Birmingham, MI 48009 (248) 723-6263 |
| Court Recorder: | Letrice Calloway United States Bankruptcy Court 211 West Fort Street 21st Floor Detroit, MI 48226-3211 (313) 234-0068 |
| Transcribed By: | Lois Garrett 1290 West Barnes Road Leslie, MI 49251 (517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1  could to approve the settlement.  As the city argued, the law

2  prefers settlements.  But it could not find a way.  It's just

3  too much money, and the Court must insist that any settlement

4  be rational, as the law itself requires.  In its eligibility

5  opinion, the Court found that the city had entered into a

6  series of bad deals to solve its financial problems.  The law

7  says that when the city filed this bankruptcy, that must

8  stop.  It also says that this Court must be the one to stop

9  it, if necessary.  It is necessary here.  Accordingly, the

10  motion is denied.  In these circumstances, it is unnecessary

11  to address the consent rights issue.

12          Turning now to the motion for post-petition

13  financing, 11 U.S.C., Section 364(c), provides, "If a trustee

14  is unable to obtain unsecured credit allowable under section

15  503(b)(1) of this title as an administrative expense, the

16  court, after notice and a hearing, may authorize the

17  obtaining of credit or the incurring of debt - (1) with

18  priority over any or all administrative expenses of the kind

19  specified in section 503(b) or section 507(b) of this title;

20  (2) secured by a lien on property of the estate that is not

21  otherwise subject to a lien."  The city seeks to borrow $285

22  million from Barclay and to grant Barclay a lien in casino

23  revenues, income tax revenues, utility tax revenues, and

24  water and sewerage revenue.  Of that amount, $165 million was

25  proposed to go to the swap counterparties to settle that

1   claim or those claims, and $120 million would go for quality

2   of life improvements, which may include increase in police

3   staffing, purchase of emergency vehicles, blight removal, and

4   updating the city's technology resources.  Because the motion

5   to assume the forbearance agreement and settlement agreement

6   is denied, the request for the loan to fund that settlement

7   must be denied as well.  However, the Court finds that the

8   request for approval to borrow $120 million on a secured

9   basis should be granted with conditions.  Specifically, the

10  Court finds that the city has established by a preponderance

11  of the evidence that this loan is in the best interest of the

12  city; that it needs the money; that the terms are market

13  terms and the best available to the city; that they were

14  negotiated in good faith; and that they were negotiated at

15  arm's length.  Indeed, the Court finds that there was no

16  substantial contradictory evidence on these points.

17          The objecting parties raise these arguments:  one,

18  the city did not attempt to obtain an unsecured loan; two,

19  the city did not provide the City Council with sufficient

20  information to evaluate the loan and did not comply with the

21  legal requirements for disclosure to the City Council; three,

22  the city has not adequately explained the proposed use of the

23  quality of life loan proceeds; and, four, this approval

24  should await the plan confirmation process.

25          With respect to the first objection, the Court

1  concludes that the city has adequately established that the
2  unsecured credit would not have been available to the city.
3  The objecting parties cite cases holding that the city was
4  required to actually attempt to obtain unsecured credit and
5  that the city did not do that here.  The Court finds these
6  cases unpersuasive because they impose a requirement that is
7  simply not in the statutory language of Section 364(c).  That
8  section simply requires the Court to find that the debtor has
9  established by a preponderance of the evidence that it is
10  unable to obtain unsecured credit.  There are, of course,
11  many ways to prove that fact.  Showing that the debtor
12  actually attempted and failed to do that is only one way to
13  prove it.  In this case, the Court concludes that there was
14  credible evidence that the city is unable to obtain unsecured
15  credit.  That evidence makes sense, in the Court's
16  experience, and it was uncontradicted in the evidence.
17  Accordingly, the Court finds that the city has established by
18  a preponderance of the evidence that it is unable to obtain
19  unsecured credit.

20       With respect to the second objection, Public Act
21  436, Sections 19(1) and (2), require the emergency manager to
22  submit his proposed action to the City Council.  The City
23  Council then has a period of time to propose comparable or
24  better terms for the action.  Plainly, the adequacy of the
25  disclosure to the City Council should be determined based on

1    whether the disclosure by the emergency manager allowed the

2    city to take advantage of its statutory opportunity to

3    propose an alternative.  Here the Court concludes that the

4    disclosures that the city made to City Council, especially as

5    they pertained to the proposed interest rates, were

6    sufficient to permit it to evaluate the loan and for the City

7    Council to go out into the marketplace to attempt to obtain

8    an alternative.  Accordingly, the Court concludes that there

9    was substantial compliance with PA 436, and this objection is

10   overruled.

11         It is next asserted that the city has not adequately

12   explained the uses of the loan proceeds.  In the Court's

13   view, this objection overlaps with the question of the

14   conditions that the Court has determined must be placed on

15   the loan.  The problem arises because the record is

16   contradictory on what the proceeds of this loan would be used

17   for.  In recognition of the limitations on the use of gaming

18   revenues under state law, some evidence suggests that the

19   city will use the proceeds for, quote, "quality of life,"

20   close quote, purposes.  Other evidence, however, suggests

21   that the proceeds will simply be working capital.  The city

22   contends that even if gaming revenue is provided as security,

23   the limitations of the Gaming Act do not apply because

24   Section 364 authorizes this Court to approve the loan without

25   regard for any state law limitations.  The Court rejects this

1   view of its authority under Section 364 and concludes that
2   any offer of security for a loan under Section 364 must
3   comply with state law unless, of course, Section 364
4   expressly provides otherwise.  As the city points out, the
5   Court can, under Section 364, give a senior or priming lien
6   to existing liens which might be or would be in derogation of
7   state law; however, nothing in Section 364 suggests that a
8   Court can allow a municipality to use its property in
9   violation of state law.  The Court does conclude that
10  offering gaming revenue as security for a loan would comply
11  with the Gaming Control Act but only if the proceeds of the
12  loan that are so secured are used as limited by state law.
13  Accordingly, if this loan is secured by gaming revenues, the
14  proceeds must be used for the purposes identified in the
15  Gaming Act.  The Court must caution the city here, however.
16  While the Act does permit the use of gaming revenues to
17  improve quality of life in the city, that authorization
18  cannot be applied so broadly that it effectively eliminates
19  the statutorily imposed limitations.  Specifically, nothing
20  in the Act authorizes proceeds to be used for working
21  capital.  To enforce this state statutory limitation, the
22  Court will condition this approval on a process by which the
23  city gives 14 days' written and filed notice of its intent to
24  use the proceeds during which interested parties can object
25  on the grounds that the proposed use is not consistent with

1  the Gaming Act.  The Court would then schedule a prompt

2  hearing and promptly resolve the objection.  Consistent with

3  Section 904, however, the Court will not review any aspect of

4  the use of the proceeds other than its compliance with the

5  Gaming Act.

6        In the alternative, of course, subject to Barclays'

7  approval, the city could use as security other property for

8  this loan such as other revenue streams that carry with them

9  no such restrictions under state law.  In that event, the

10 Court -- excuse me.  In that event, the process that the

11 Court outlined would not be necessary and would not be

12 imposed.

13       The Court further cautions the city that if it does

14 decide to pursue only the quality of life loan at this time,

15 it may want to consider whether under state law it is

16 necessary to present the revised loan to the City Council

17 under PA 436 and to the Emergency Loan Board for its

18 approval.  This caution, however, is not intended to be a

19 ruling on this issue.

20       Finally, the Court will overrule the objection that

21 this loan should be approved only in the context of plan

22 confirmation.  The city has determined out of necessity to

23 pursue this loan now.  Section 364 of the Bankruptcy Code

24 certainly permits the city to do that.  Under Section 904 it

25 is not for this Court to review the city's political and

1   governmental decisions, which pursuing this loan plainly is.
2   Accordingly, this objection is overruled.
3           Finally, the Court must emphasize that the parties
4   should not interpret this Court's denial of this particular
5   settlement to mean that they should not continue to attempt
6   to resolve these issues through negotiations.  They
7   absolutely should.  The Court agrees that the settlement of
8   the swaps claims is better for everyone than litigation and
9   hopes that everyone still agrees with that.  If the city
10  feels the need to pursue immediate litigation, so be it, but
11  even so, litigation and negotiation can and should be pursued
12  at the same time.  In any event, the Court strongly
13  encourages the parties to continue to negotiate.
14          At this time, the Court is going to conduct a closed
15  conference with counsel, and so I'm going to ask everyone in
16  the courtroom who is not an attorney in the case to leave the
17  courtroom.  We're also going to shut down the closed circuit
18  feeds and turn off CourtCall.
19      (Proceedings concluded at 2:49 p.m.)

INDEX

WITNESSES:

    None

EXHIBITS:

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            January 18, 2014
_____        _____
Lois Garrett

# EXHIBIT B

13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 13:17:16 Page 23 of 46

## Summary of Compliance with March 24 Order

| March 24 Order | City's Compliance |
|---|---|
| Provide Final copies of the documents that will be executed and delivered in connection with the financing | Final copies of the material transaction documents (the "Transaction Documents") that will be executed and delivered in connection with the financing were filed with the Court on March 6, 2014 with the NOP (see Docket No. 2921).[1] The Transaction Documents include the Indenture, Supplemental Indenture, Bond Purchase Agreement and Account Control Agreement. |
| Clear disclosure of all material terms of the loan | All material terms of the loan were publicly disclosed on March 6, 2014 when the Transaction Documents were filed with the NOP. For ease of reference, however, the City has filed, as Exhibit C to the Reply, a term sheet summarizing the material terms of the Amended QOL Financing. |
| Comparison of the material terms of the proposed final quality of life financing with the terms of the initial quality of life financing preliminarily approved by the Court on January 16, 2014 | The City filed blacklines of the Indenture and relevant Bond Purchase Agreement on March 17, 2014 (see Docket No. 3031), which showed the changes in the material terms of the Amended QOL Financing from the Initial PPF Financing. Additionally, the City has filed, as Exhibit D to the Reply, a comparison chart showing the differences between the two proposed transactions. |
| Disclosure of information regarding the specific use of loan proceeds | A chart summarizing the proposed uses of loan proceeds is attached to the Reply as Exhibit F. |

---

[1]     Minor technical revisions to the Indenture and Account Control Agreement have been made since the March 6, 2014 filing, which are not material and, thus, have not been filed with the Court. Blacklines of these documents may be made available to parties in interest upon request to counsel for the City.

CHI-1925120v2

13-53846-tjt   Doc 3280   Filed 05/13/14   Entered 05/13/14 15:27:16   Page 221 of 321
13-53846-swr   Doc 3280   Filed 05/13/14   Entered 05/13/14 15:27:16   Page 224 of 321

**EXHIBIT C**

CHI-1924165v8

13

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 222 of 321
13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 16:14:16 Page 25 of 46

<u>City of Detroit</u>
<u>$120,000,000 Post-Petition Bond Financing</u>
<u>Summary of Terms and Conditions</u>

*Set forth below is a summary of certain key terms for the Bonds (as defined below). This summary of indicative terms and conditions (this "<u>Term Sheet</u>") does not purport to summarize all terms of the Bonds and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:                   The City of Detroit (the "<u>City</u>").  On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>"). The City's bankruptcy case bears case number 13-53846 (the "<u>Bankruptcy Case</u>") and has been assigned to the Honorable Steven W. Rhodes.  On December 5, 2013, the Bankruptcy Court entered an order granting the City chapter 9 bankruptcy relief (the "<u>Order for Relief</u>") [Docket No. 1945].

Purchaser and Sole      Barclays Capital Inc.
Lead Arranger:

Agent:                   Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:        A Bond Purchase Agreement governing the one-time purchase of financial recovery bonds (the "<u>Bonds</u>") as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "<u>Post-Petition Facility</u>") in an aggregate principal amount of up to $120,000,000 (the "<u>Facility Amount</u>").

Purposes:               Proceeds from the issuance of the Bonds shall be used to fund expenditures that are designed to contribute to the improvement of the quality of life in the City.

Maturity:               The Bonds will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Bonds is accelerated pursuant to the Bond Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "<u>Maturity Date</u>").

CHI- 1924800v2

13-53846-tjt  Doc 4738-0  Filed 05/13/14  Entered 05/13/14 15:17:16  Page 223 of 321
13-53846-swr  Doc 3280  Filed 03/28/14  Entered 03/28/14 16:13:16  Page 226 of 246

| | |
|---|---|
| Tax-exemption of Interest: | Interest on the Bonds may be exempt from gross income for federal and state income tax purposes subject to usual and customary qualifications. |
| Closing Date: | The Closing Date shall be not later than the third business day (or as soon thereafter as practical) after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "<u>Post-Petition Financing Order</u>"), authorizing the Post-Petition Facility, authorizing the City to enter into the Bond Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser and (ii) the date on which all conditions precedent to the issuance of the Bonds under the Bond Documents are satisfied. |
| Bond Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Market Flex and the Default Interest Rate set forth below. |
| Bond Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum, subject to the terms of the Market Flex. |
| Market Flex | The Bond Interest Rate shall be subject to market flex as follows, in order to achieve a Successful Syndication within 90 days of the closing date: |
| | - The LIBOR Floor may be increased by up to 1.00% per annum; and |
| | - The Spread may be increased by up to 2.00% per annum |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Bonds in full on the Maturity Date, the Spread shall automatically be increased by 200 basis points. |

CHI- 1924800v2

13-53846-tjt  Doc 3280  Filed 05/23/14  Entered 05/23/14 15:37:16  Page 224 of 321
13-53846-swr  Doc 4737  Filed 05/13/14  Entered 05/13/14 15:14:16  Page 227 of 304

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Bonds (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Bonds may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Bond Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which proceeds do not constitute Asset Proceeds Collateral (as defined below) may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds exceeding $10 million (the "Asset Proceeds Collateral") to redeem the Bonds on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Asset Proceeds Collateral shall not include assets owned by the City, or assets in which the City holds an interest which, in either case, are held by the Detroit Institute of Arts. |
| | Principal outstanding in respect of the Bonds will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Bonds to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Bonds without the consent of the City. |

CHI- 1924800v2

13-53846-tjt Doc 4737 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 225 of 321
13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 15:17:16 Page 28 of 46

## 4. COLLATERAL AND PRIORITY

Collateral:

The obligations owing by the City under the Post-Petition Facility shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (i) the income tax revenues of the City (the "Pledged Income Tax Revenue") and (ii) the Asset Proceeds Collateral (together with the Pledged Income Tax Revenue, collectively, the "Collateral").

The Bond Documents will require that the Pledged Income Tax Revenue be deposited into a bank account (the "Income Tax Revenue Account"), which bank account shall be subject to a control agreement in favor of the Indenture Trustee, provided, however, that the Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4 million per month, all of which shall be applied to the payment of amounts due under the Bonds until the Bonds are paid in full. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default, subject to the requirement that the City maintain not less than $5 million on deposit at all times in the Income Tax Revenue Account.

Under no circumstances shall the Collateral include revenues of the Detroit water and sewer systems or any other assets pledged to secure Water/Sewer Bonds (as defined in the Post-Petition Financing Order).

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of the Bonds:

Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims.

| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations and such non-performance is not remedied within fifteen (15) days following receipt of notice from the Indenture Trustee; incorrectness of representations and warranties in any material respect as of the time of such representation or warranty; cross default in respect of a payment of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million (subject to applicable grace periods); material post-petition judgments, which are final and non-appealable, involving liability in an amount exceeding $25 million and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable; a court of competent jurisdiction finds that any of the Bond Documents are invalid or unenforceable and such finding is not stayed pending appeal; written assertion by an authorized officer of the City that any Bond Document or court order with respect thereto is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication; dismissal of the Bankruptcy Case and the order dismissing the Bankruptcy Case is not stayed pending appeal; reversal or modification in a manner adverse to the Registered Owners of the Order for Relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion; granting of any super-priority claim (other than as permitted under the Bond Documents); if there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the registered owners of the Bonds holding 51% of the outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to such owners, or (ii) an order of a court of competent jurisdiction reversing, vacating or staying the effectiveness of the Post-Petition Financing Order, and in either (i) or (ii), such order is not stayed pending appeal; cessation of liens or super-priority claims granted in respect of the Bonds to be valid, perfected and enforceable in all respects with the priority described herein; failure of (i) the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for all consecutive 3-month periods measured in complete calendar months or (ii) the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times, and in the case of either (i) or (ii), such failure |

CHI- 1924800v2

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:14:16  Page 227 of 321
13-53846-swr  Doc 3780  Filed 03/28/14  Entered 03/28/14 15:17:16  Page 230 of 346

is not cured within two (2) business days; and the City ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds to ensure continued financial responsibility shall have been established.

Remedies:                Upon any Event of Default, the Indenture Trustee may declare the principal of the Bonds to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month plus any Asset Proceeds Collateral.

Prohibition of
Additional
Borrowings:              The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the Collateral. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds.

## 5. CERTAIN OTHER PROVISIONS

Bond Documents:          Each in form and substance satisfactory to the Purchaser:
- Bond Purchase Agreement
- DTC-eligible Bonds, issued in denominations of not less than $100,000
- State and bankruptcy law opinions in form and substance agreed among the parties
- Local emergency financial assistance loan board approval of the terms and conditions of the Bonds
- All necessary approvals from the Bankruptcy Court for the Bonds and security interests in the Collateral, including lifting of automatic stay and "good faith" finding
- Account control agreement with respect to the Pledged Income Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of the Bonds, entry into Bond Documents and grant of Pledged Income Tax Revenue
- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law

CHI- 1924800v2
13-53846-swr  Doc 4737-80  Filed 05/13/14  Entered 05/13/14 15:17:16  Page 228 of 321
13-53846-tjt  Doc 3280  Filed 03/28/14  Entered 03/28/14 15:17:16  Page 310 of 346

- Other financing documents to be determined by Purchaser's counsel and City's counsel

The Indenture and Bond Purchase Agreement contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions.

The foregoing documents are collectively referred to herein as the "<u>Bond Documents</u>".

| | |
|---|---|
| Conditions Precedent: | Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the Bond Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in the form and substance agreed upon among the parties; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; accuracy of representations and warranties in all material respects; and absence of defaults. |
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent, pursuant to Bankruptcy Code section 904, to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Indenture Trustee, upon the consent of all bondholders, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall |

CHI- 1924800v2

13-53846-swr Doc 4327 Filed 05/13/14 Entered 05/13/14 15:27:16 Page 229 of 321
13-53846-tjt Doc 3280 Filed 03/28/14 Entered 03/28/14 15:17:16 Page 32 of 46

| | |
|---|---|
| | retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary Relationship: | The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The Bond Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses and Commitment Fee: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the Bond Documents, except as provided herein. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the Bond Documents. Additionally, the City will be responsible to Purchaser for any reasonable legal fees and legal expenses incurred by Purchaser solely to the extent that such legal fees and legal expenses are incurred by Purchaser as a result of third-party discovery or third-party litigation, in each case directed at |

Purchaser in its capacity as lender, in connection with the City's efforts to obtain approval of the Post-Petition Facility in the Bankruptcy Court. Purchaser hereby agrees that as of the date hereof, the City is not liable, in any respect, for any professional fees or expenses incurred to date by Purchaser in connection with the Post-Petition Facility or otherwise. Finally, the parties agree that if the closing of the Post-Petition Facility has not occurred as of April 15, 2014 and not as a result of any action or inaction of Purchaser, then it is the expectation of Purchaser that it will not be requested to close the Post-Petition Facility unless the City reimburses it for transactional legal fees and expenses incurred after April 15, 2014 and through the date of closing; provided, however, that the City will not actually be liable for any such legal fees or expenses after April 15, 2014 unless there is a further written agreement between the parties evidencing such obligation.

The City has paid to Purchaser a commitment fee of $4.375 million (the "Commitment Fee") in connection with the Post-Petition Facility. The Purchaser has agreed to refund the City $1 million of the Commitment Fee at the closing of the Post-Petition Facility.

Indemnification:

To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Bond proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

CHI- 1924800v2
13-53846-swr Doc 4720 Filed 05/13/14 Entered 05/13/14 15:14:16 Page 231 of 321
13-53846-tjt Doc 3280 Filed 03/28/14 Entered 03/28/14 15:17:16 Page 34 of 46

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Bond Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan. |

CHI- 1924800v2

13-53846-tjt  Doc 4730  Filed 05/13/14  Entered 05/13/14 15:27:16  Page 232 of 321
13-53846-swr  Doc 2780  Filed 03/28/14  Entered 03/28/14 15:14:16  Page 35 of 124

# **EXHIBIT D**

# CITY OF DETROIT
# POST-PETITION FINANCING

Comparison of Key Terms of the Quality of Life Notes

March 26, 2014

MILLER BUCKFIRE
A Stifel Company

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 234 of 321
13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 15:14:16 Page 37 of 46

# SELECTED ECONOMIC TERMS OF THE QOL NOTES

| | QOL NOTE - DECEMBER 2013 | QOL NOTE - MARCH 2014 |
|---|---|---|
| **FACILITY SIZE & STRUCTURE** | ■ $120 million Note | ■ Same |
| **COMMITMENT** | ■ Fully underwritten: Subject to terms, Barclays has committed to fund the full amount of the Financing | ■ Same |
| **MATURITY** | ■ Earliest of (i) dismissal of the Chapter 9 case, (ii) effective date of a Plan of Adjustment under Chapter 9, and (iii) 30 months from Closing of the Financing | ■ Same |
| **AMORTIZATION** | ■ None prior to maturity | ■ Same |
| **OPTIONAL REDEMPTION** | ■ Year 1: Redeemable at par plus a make-whole through end of Year 1<br>■ Thereafter: Redeemable at par | ■ Same |
| **PRICING** | ■ LIBOR + 250 bps (100 bps LIBOR floor)<br>■ Market flex provisions allow up to 200 bps increase in interest rate and 100 bps increase in LIBOR floor to facilitate a successful syndication<br>■ Tax exemption of interest to be determined (most likely tax-exempt) | ■ Same |
| **FEES** | ■ Commitment Fee of 1.25% ($4.37 million on entire $350 million commitment); extended commitment expired on January 31<br>■ Exit Fee of 0.50% if investment grade; 0.75% otherwise | ■ No further commitment fees; expectation of closing by April 15<br>■ $1 million returned to City on closing<br>■ Same Exit Fees |
| **EXPENSES** | ■ City responsible for its out-of-pocket expenses; Barclays responsible for its own expenses | ■ Same, except City responsible for certain Barclays expenses related to litigation or post-April 15 closing |

MILLER BUCKFIRE
A Stifel Company
1

13-53846-tjt   Doc 4727-80   Filed 05/13/14   Entered 05/13/14 15:27:43   Page 235 of 321
13-53846-swr   Doc 3280   Filed 03/28/14   Entered 03/28/14 15:17:16   Page 38 of 46

# SELECTED LEGAL TERMS OF THE QOL NOTES

| | QOL NOTE - DECEMBER 2013 | QOL NOTE - MARCH 2014 |
|---|---|---|
| **COLLATERAL** | ■ Priority lien on wagering tax revenues and a second priority lien, behind Swap Termination Note, on income tax revenues<br>– In a Default, Noteholders can collect up to $4 million a month to pay interest and principal<br>■ Asset Proceeds Collateral (see below) | ■ Priority lien on income tax revenues<br><br>■ Same default payment provisions and Asset Proceeds Collateral (other than exemption of DIA treatment in POA) |
| **COLLATERAL ADMINISTRATION** | ■ City shall deposit all pledged tax revenues in a lockbox account | ■ Same |
| **MANDATORY PREPAYMENTS** | ■ Asset monetization net proceeds in excess of $10 million<br>■ Asset monetizations are not required and cannot be forced by the Noteholders<br>■ Maturity accelerates following an event of default | ■ Same |
| **SELECTED COVENANTS** | ■ City income tax revenue must be above $30 million for any rolling three-month period<br>■ City cannot cease to be under control of an Emergency Manager for a period of thirty days, unless a Transition Advisory Board or a consent agreement with the State has been established<br>■ $5 million minimum balance in pledged income tax account | ■ Same |
| **MATERIAL CLOSING CONDITIONS** | ■ Approval by Emergency Manager in compliance with Act 436 and Act 279<br>■ Emergency Loan Board authorization under 36a | ■ Same |

2

# **EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,　　　．　　Docket No. 13-53846
　　　MICHIGAN,　　　　　　　　．
　　　　　　　　　　　　　　　　．　　Detroit, Michigan
　　　　　　　　　　　　　　　　．　　December 13, 2013
　　　　　　　　Debtor.　　　　．　　10:01 a.m.
． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ．


HEARING RE. MOTION TO ADJOURN HEARING; MOTION TO COMPEL
THE PRODUCTION OF PRIVILEGE LOG; PRETRIAL CONFERENCE
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:　　　Jones Day
　　　　　　　　　　　By:　ROBERT W. HAMILTON
　　　　　　　　　　　325 John H McConnell Blvd., Suite 600
　　　　　　　　　　　Columbus, OH　43215
　　　　　　　　　　　(614) 469-3939

　　　　　　　　　　　Jones Day
　　　　　　　　　　　By:　GREGORY M. SHUMAKER
　　　　　　　　　　　51 Louisiana Avenue, N.W.
　　　　　　　　　　　Washington, DC　20001-2113
　　　　　　　　　　　(202) 879-3679

For Syncora　　　　　Kirkland & Ellis, LLP
Guarantee and　　　　By:　STEPHEN HACKNEY
Syncora Capital　　　300 North LaSalle
Assurance:　　　　　　Chicago, IL　60654
　　　　　　　　　　　(312) 862-2074


For Erste　　　　　　 Ballard Spahr, LLP
Europaische　　　　　 By:　VINCENT J. MARRIOTT, III
Pfandbrief-und　　　　1735 Market Street, 51st Floor
Kommunalkreditbank　 Philadelphia, PA　19103-7599
Aktiengesellschaft　 (215) 864-8236
in Luxemburg, S.A.:


For UBS:　　　　　　　 Bingham McCutchen, LLP
　　　　　　　　　　　By:　JARED R. CLARK
　　　　　　　　　　　399 Park Avenue
　　　　　　　　　　　New York, NY　10022-4689
　　　　　　　　　　　(212) 705-7770

APPEARANCES (continued):

```
For Detroit          Clark Hill, PLC
Retirement Systems-  By:  JENNIFER GREEN
General Retirement   500 Woodward, Suite 3500
System of Detroit,   Detroit, MI  48226
Police and Fire      (313) 965-8300
Retirement System
of the City of
Detroit:

For David Sole:      Jerome D. Goldberg, PLLC
                     By:  JEROME GOLDBERG
                     2921 East Jefferson, Suite 205
                     Detroit, MI  48207
                     (313) 393-6001

For FGIC:            Weil, Gotshal & Manges, LLP
                     By:  KELLY DIBLASI
                     767 5th Avenue
                     New York, NY  10153
                     (212) 310-8032

For Ad Hoc COP       Allard & Fish, PC
Holders:             By:  DEBORAH L. FISH
                     535 Griswold, Suite 2600
                     Detroit, MI  48226
                     (313) 961-6141


Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    All right. I think that's as much as I want to say

2    about the 9019, 365 motion.

3    On the debtor in possession financing motion under

4    Section 364, the Court basically agrees with the city's

5    position that Section 904 of the Bankruptcy Code prohibits

6    any review of what the city proposes to do with the proceeds

7    of the loan and actually prohibits any review beyond the

8    narrow review that Section 364 itself requires to determine

9    the reasonableness of the terms of the borrowing given the

10   current market conditions for similar kinds of loans and the

11   other technical requirements of Section 364, including the

12   city's inability to obtain a loan on any better terms. And,

13   of course, the Court welcomes any evidence on the issue of

14   whether the debtor in possession financing was negotiated in

15   good faith, but the city's proposed use of the proceeds is

16   not a matter for this Court's consideration next week.

17   Having concluded all of that, the Court must

18   conclude that the record fails to establish cause for any

19   adjournment. Accordingly, it is denied.

20   Now, can we move to the final pretrial conference on

21   this? Did you all prepare a joint pretrial statement?

22   MR. SHUMAKER: Good morning, your Honor. Greg

23   Shumaker of Jones Day for the City of Detroit. Yes, your

24   Honor, we did prepare a joint statement of facts in

25   connection with the -- what we've referred to as the

# **EXHIBIT F**

CHI-1924165v8

16

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 241 of 321
13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 16:14:16 Page 44 of 46

## Proposed Uses of Amended QOL Loan Proceeds

| City Department | Proposed Budget | Selected Initiatives |
|---|---|---|
| **Police Department** | $36.2 million | — Purchasing fleet vehicles<br>— Construction of new precincts and training facility<br>— Upgrades to IT systems<br>— Hiring to reach adequate levels of staffing<br>— Purchase of equipment (i.e., radios, vests, tasers, cameras) |
| **Blight Removal** | $35.6 million | — Residential blight removal |
| **Fire Department** | $28.5 million | — Purchasing fleet vehicles and maintenance<br>— Repairs and maintenance to existing facilities<br>— Upgrades to IT system<br>— Hiring to reach adequate levels of staffing |
| **Finance Department** | $25.4 million | — Hiring to reach adequate levels of staffing<br>— IT systems data back-up solution<br>— Upgrades to IT systems |
| **General Services Department** | $24.8 million | — Park upgrades and ground maintenance fleet replacement<br>— City-wide facility improvements and repairs<br>— Hiring to reach adequate levels of staffing |
| **Department of Health and Wellness Promotion** | $5.1 million | —Demolition of Herman Kiefer Building |
| **Planning & Development** | $4.5 million | —Facility consolidation |

CHI-1925066v4

13-53846-tjt   Doc 4727   Filed 05/13/14   Entered 05/13/14 15:27:43   Page 242 of 321
13-53846-swr   Doc 3280   Filed 03/28/14   Entered 03/28/14 15:17:16   Page 45 of 46

| Department | | — Hiring City planning and other labor resources |
|---|---|---|
| **City Wide Training** | $3.4 million | — Cost for training City-wide employees |
| **Department of Transportation** | $2.7 million | — Facility improvements and upgrades<br>— Costs associated with increased department services |
| **Recreation Department** | $3.2 million | — Repair and maintenance of recreation facilities<br>— Park and recreation facility improvements |
| **Legal Department** | $1.6 million | — Hiring to reach adequate levels of staffing |
| **Elections Department** | $0.8 million | — Deferred maintenance and improvements |
| **Human Resources** | $0.6 million | — Hiring to reach adequate levels of staffing |
| **Airport Capital Expenditures** | $0.5 million | — Hiring employees to comply with applicable law |
| **Other** | $6.1 million | — Multiple miscellaneous initiatives |
| **Total** | **$179.0 million** | |

The project categories and the total proposed expenditures set forth herein are based on current needs and priorities of the City in the near-term. The allocation of expenditures set forth herein are for illustrative purposes only. The City reserves the right to re-allocate spending within project categories based on the evolving needs of the City, project readiness and availability of funds.

CHI-1925066v4

13-53846-tjt Doc 4737 Filed 05/13/14 Entered 05/13/14 15:27:43 Page 243 of 321
13-53846-swr Doc 3280 Filed 03/28/14 Entered 03/28/14 15:17:16 Page 46 of 46

## Item 10

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,              .
                              .        Detroit, Michigan
                              .        April 2, 2014
                Debtor.       .        9:00 a.m.
. . . . . . . . . . . . . . .

HEARING RE. NOTICE OF PRESENTMENT OF ORDER BY:
DEBTOR IN POSSESSION CITY OF DETROIT (#2921);
ORDER TO SHOW CAUSE WHY EXPERT WITNESSES SHOULD NOT BE
APPOINTED (#3170); MOTION TO ADJOURN HEARING REGARDING
THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER, PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
AGREEMENT AND GRANTING RELATED RELIEF HEARING (#3287);
EX PARTE MOTION TO EXTEND RE. DISCLOSURE STATEMENT
APPROVAL SCHEDULE (#3317)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRAD ERENS
                     77 West Wacker Drive
                     Chicago, IL  60601
                     (312) 269-4050

                     Jones Day
                     By:  THOMAS CULLEN
                     51 Louisiana Ave., N.W.
                     Washington, DC  20001-2113
                     (202) 879-3924

                     Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

APPEARANCES (continued):

```
For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For the Official       Dentons US, LLP
Committee of           By:  SAM J. ALBERTS
Retirees:              1301 K Street, NW, Suite 600, East Tower
                       Washington, DC  20005
                       (202) 408-7004

                       Dentons US, LLP
                       By:  CAROLE NEVILLE
                       1221 Avenue of the Americas, 25th Floor
                       New York, NY  10020-1089
                       (312) 632-8390

For the State of       Dickinson Wright
Michigan:              By:  STEVEN HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT GORDON
General Retirement     151 South Old Woodward, Suite 200
System of Detroit,     Birmingham, MI  48009
Police and Fire        (248) 988-5882
Retirement System
of the City of
Detroit:

For the Detroit        Erman, Teicher, Zucker &
Fire Fighters            Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police         400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI 48034
tion and the           (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For Ambac              Arent Fox, LLP
Assurance              By:  CAROL CONNOR COHEN
Corporation:           1717 K Street, NW
                       Washington, DC  20036-5342
                       (202) 857-6054
```

APPEARANCES (continued):

For FMS:             Schiff Hardin, LLP
Wertmanagement:      By:  RICK FRIMMER
                     233 South Wacker Drive
                     Chicago, IL  60606-6473
                     (312) 258-5511

For Detroit Retired  Lippitt O'Keefe, PLLC
City Employees       By:  RYAN C. PLECHA
Association,         370 East Maple Road, 3rd Floor
Retired Detroit      Birmingham, MI  48009
Police and Fire      (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  STEPHEN HACKNEY
Syncora Guarantee         NOAH ORNSTEIN
Inc., and Syncora    300 North LaSalle
Capital Assurance,   Chicago, IL  60654
Inc.:                (312) 862-3062

For Bank of          Davis, Polk & Wardwell, LLP
America:             By:  MARSHALL S. HUEBNER
                     450 Lexington Avenue
                     New York, NY  10017
                     (212) 450-4099


Court Recorder:      Kristel Trionfi
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1       THE CLERK:  Court is in session.  Please be seated.
2   Case Number 13-53846, City of Detroit, Michigan.
3       THE COURT:  Good morning.  I'd like to begin with
4   the notice of presentment regarding the financing order,
5   please.
6       MR. ERENS:  Good morning, your Honor.  Brad Erens,
7   E-r-e-n-s, of Jones Day on behalf of the city.  Your Honor,
8   we're pleased to be here for hopefully approval of the
9   quality of life financing that your Honor previously approved
10  on a preliminary basis in January.  We presented the revised
11  order to you as part of our notice of presentment.  We do
12  have some objections.  I think most of the objections relate
13  to procedurally where we are.  It's the city's view that,
14  again, your Honor approved this loan subject to presentment
15  of an order that comported with your ruling on January 16th,
16  and that's what we did.  The objections take the position
17  that this is a completely new financing.  For the reasons we
18  set forth in our reply to those objections, that's not the
19  case.  If your Honor has any questions, we're happy to answer
20  them.
21      Your Honor issued an order on March 24th asking us
22  to provide additional information.  We attached that as
23  exhibits to our reply.  We filed blacklines of the financing
24  documents.  We provided a schedule of expenditures and budget
25  as Exhibit F to the reply to the objections, and we provided

1    some other information just showing that the loan is no

2    different than the portion of the loan previously sought and

3    approved by your Honor on January 16th, so to the city that's

4    where we are.  Again, happy to answer any questions or we can

5    just go to the objections, but we'd reserve time to reply.

6            THE COURT:  All right.  Thank you.  Who would like

7    to be heard regarding this?

8            MR. MARRIOTT:  Good morning, your Honor.  Vince

9    Marriott, Ballard Spahr, representing EEPK and affiliates,

10    although I rise on behalf of a group of objectors and will

11    speak on their behalf as well as my own clients.

12            Mr. Erens is correct.  Our objection to the proposed

13    order for the latest iteration of post-petition financing was

14    procedural.  In other words, it is our view that the city

15    needs to proceed by motion rather than by mere presentment of

16    a proposed order.  The presentment comes some six weeks after

17    the hearing on the original proposed financing and is with

18    respect to a different loan than the city was proceeding with

19    respect to the last time around.  This Court may have offered

20    guidance to the city the last time around as to what it would

21    approve, but what the Court indicated it would approve then

22    was not the loan the city had at the time.  In other words,

23    the Court was not approving this loan because this loan did

24    not exist six weeks ago.  That matters, your Honor, because

25    circumstances have changed from where they were the last time

1    the city filed a motion seeking approval of post-petition

2    financing, and the city should be required to make a case for

3    this loan under present circumstances, not a different loan

4    under prior circumstances.

5           Now, what are the present circumstances and why do

6    they require a new showing by the city following a new motion

7    and a new hearing?  Well, for one thing, Judge, we're six

8    months past the RFP that went out with respect to the prior

9    financing, which, in any event, was for a different loan,

10   different purposes, different amount.  A determination that

11   the terms and conditions reflected in the loan -- new loan

12   are the best available to the city for a smaller loan with a

13   different purpose today can't be made from the record of the

14   last hearing.

15          Judge, moreover, because the uses of the loan are

16   not the same, questions as to need and structure arise that

17   the city should have to address.  Specifically, no part of

18   this loan is being used to retire existing debt.  Its only

19   use now is for what the city used to call quality of life

20   purposes but which it indicated at the last hearing was

21   really for working capital purposes.  Nonetheless, the loan

22   is still structured as a term loan with all the proceeds

23   advanced at once rather than as a revolving credit, which is

24   far more typical of short-term working capital financing.

25   This results in what is likely to be unnecessary interest

1    expense since the city will be paying interest on loan

2    proceeds that it is not using until it -- unless it expends

3    all of the loan proceeds on the day of funding, which there's

4    no evidence it will do, which leads your Honor to an even

5    more fundamental question, which is whether at this stage of

6    the case with confirmation three and a half months away under

7    the present schedule it needs to borrow any money at all or

8    this will just result in expense but no benefit.

9         The Court requested that the city provide a schedule

10   of proposed expenditures to support the new loan.  To my

11   understanding of schedule, the city did not do that.  The

12   city provided you with illustrative but not binding

13   categories of potential expenditures.  The real question,

14   your Honor, at this stage of the case is how much of these

15   proceeds can actually be spent between now and the end of the

16   case when the loan comes due.  Are there any, quote, unquote,

17   shovel ready projects?  If so, what are they, how much will

18   they cost, and why would the city be borrowing and paying

19   interest on more than those shovel ready costs, if any?

20        In short, Judge, the case that the city made the

21   last time around doesn't make the case for this loan this

22   time around.  Accordingly, the city should not be permitted

23   to proceed by presentment of a form of order but should be

24   required to proceed in the normal fashion by motion and a

25   hearing, and that's our view.

1    THE COURT:  Thank you, sir.  Would anyone else like
2  to be heard?  Response, please.
3    MR. ERENS:  Thank you, your Honor.  I guess we heard
4  two points, two main points in the objections.  One is
5  somewhat new or at least a little different than what was
6  filed, which is why is the city doing this now, especially
7  with confirmation arguably on the horizon.  There are clear
8  answers to that, your Honor.  Again, that wasn't really the
9  main point of the filed objection, but we will respond.  The
10  city has numerous projects that it really needs to attend to.
11  I think it's sort of obvious to everybody that there is a lot
12  of work to be done in the city.  This loan originally, from
13  the city's perspective, was scheduled to close at the end of
14  2013, of course, subject to the court process.  It couldn't
15  be guaranteed that that was the case, but the city had
16  projects ready to go back then and has projects ready to go
17  right now and is in the position that actually it has
18  deferred this infrastructure spending for some time and it is
19  ready to go the date the loan closes.
20    In terms of the argument that the loan is just being
21  used for working capital, I don't quite understand that, your
22  Honor.  We did provide a schedule, again, at your request to
23  indicate what the city intends to use the money for, and,
24  again, the illustrative examples are police and fire, fleet,
25  maintenance, repair, staffing.  This is not working capital

1  in the sense of just funding deficits and the like.  We have

2  actual hard asset projects that are ready to go, also blight

3  removal, another major category.  So with respect to that

4  type of issue, again, the city would simply say we're ready

5  to go.  We have projects that we want to spend the money on,

6  and we will be spending the money on those projects if and

7  when the loan closes.

8          With respect to the issues about why now with

9  confirmation so close, again, it's the same issue.  I mean

10  this is money that the city intends to spend, and it has

11  deferred these types of projects for some time and would like

12  to go forward.

13          With respect to the procedural issue, I guess, which

14  is what was really in the filed objection, the notice of

15  presentment has now been out for approximately -- I believe

16  we filed it on March 6, so it's not like we filed the notice

17  of presentment and were here two days later.  This process

18  has been out there now for more than three weeks.  I guess I

19  would say, one, a motion was not something we think was

20  required based on the Court's prior ruling.  Your Honor

21  preliminarily approved the loan.  But, nonetheless, we don't

22  really see the prejudice.  We filed the order.  The parties

23  responded with the objection that they responded to, and

24  we're now at the hearing.

25          With respect to the record, which I suppose is the

1    other aspect that was raised, does the record reflect -- or

2    does the record support, I suppose I should say, the entry of

3    the order, we think, yes, your Honor, clearly it does.  The

4    record reflected a process whereby the city solicited

5    interest in this loan.  Parties were asked and some did

6    submit proposals just for this portion of the loan rather

7    than the entirety of the loan at the time, which, again, was

8    the swap portion and then this portion.  And it is the city's

9    and its advisors' collective wisdom that this is the best

10   loan available for this portion of the financing, the quality

11   of life financing.  The Barclays offer has always been the

12   best offer, and there's no reason to believe there is a

13   better offer out there.  I suppose the issue about

14   confirmation cuts both ways in the sense of this loan is

15   really only expected to be out for a relatively short period

16   of time from now until confirmation, so if you think about

17   it, if the city were to go out and solicit interest in a new

18   process, which would take a lot of time, it probably means

19   the loan would not actually close before confirmation.  And

20   we don't expect to get a better deal, but we would have to

21   pay another commitment fee for a new loan, and with the loan

22   only being out for a short period of time, it's unrealistic

23   really to believe that the city would save money through a

24   new process.  I can go through those details if you'd like to

25   understand better, but a commitment fee for a new process

1   would almost invariably eat up any benefit to a party

2   offering a lower price, but, again, the city doesn't believe

3   a lower price is out there, and that's reflected in the

4   testimony that was given to your Honor back, I believe, in

5   December and January and based on the collective wisdom of

6   the city and its advisors.

7           So, your Honor, we're ready to go.  We're eager to

8   go.  We've got projects to fund, and we are hopeful that you

9   will approve the loan at this time.  Thank you.

10          THE COURT:  All right.  Thank you.  Stand by,

11  please.  Okay.  Would anyone else -- are you all set?

12          MR. ERENS:  Yes, I think so.

13          THE COURT:  Okay.  Would anyone else like to be

14  heard?  All right.  The Court is going to enter the order

15  that was submitted by the city or an order with minor

16  modifications to it if that's appropriate at this point in

17  time.  The Court will overrule the objections at this time.

18  As the Court sees it, there are three such objections.  One

19  is as to the adequacy of the record previously made to

20  justify the present loan and the present order approving that

21  loan.  The second is as to the timing of this loan, and the

22  third is the question of whether the procedure that the city

23  has employed for the entry of this order violates any of the

24  procedural rights of the objecting parties.

25          The Court concludes that the record is adequate,

1    indeed, more than adequate to support the Court's approval of

2    the loan as it presently has been requested.  The loan, as it

3    has been requested now, is sufficiently similar to the

4    loan -- the portion of the loan that the Court previously

5    approved that there is, in the Court's conclusion, no need

6    for any further development of the record in order to justify

7    this present loan.  The considerations that led the Court to

8    approve the loan the last time, in the Court's view, still

9    apply and still support the approval of the loan.

10             As to the timing, the Court concludes that the

11   record does establish a certain urgency to obtain these funds

12   to begin the projects that the city feels the need to

13   commence at this time.  This Court has previously held that

14   the city is service delivery insolvent.  It is not providing

15   sufficient services to meet the basic needs of its citizens,

16   and this loan will provide the city with the means to begin

17   to make up that deficit, and it's important and urgent for

18   the city to do that.  The city recognizes that importance and

19   that urgency, and the time to begin is now, if not before

20   now.

21             As to the procedural rights of the objecting

22   parties, the Court concludes that the process that the city

23   has employed, this notice of presentment process, has given

24   all of the objecting parties a fair opportunity to object and

25   to be heard regarding the relief that the city seeks here.

1  Could the city have filed a new motion?  Of course it could
2  have, but was it required to in order to provide the
3  objecting parties with a sufficient opportunity to understand
4  what the city was trying to do and to object to it if they
5  did object?  It did, so you may submit an appropriate order.

6         MR. ERENS:  All right.  Thank you very much, your
7  Honor.  Your Honor mentioned minor modifications.  Is that
8  something your Honor intends to do or directions?

9         THE COURT:  If you're satisfied with the order that
10  was attached to the notice, that's fine.  I just didn't know
11  if there were changes that needed to be made in the meantime.

12         MR. ERENS:  I don't believe so, your Honor, but we
13  will confirm and get back to your chambers.

14         THE COURT:  Okay.

15         MR. ERENS:  Thank you.

16         THE COURT:  Let's turn our attention to the order to
17  show cause why an expert witness should not be appointed.
18  Who'd like to be heard regarding this matter?

19         MR. CULLEN:  I'll go first, your Honor.

20         THE COURT:  All right.

21         MR. CULLEN:  Thomas Cullen of Jones Day representing
22  the city.  May it please the Court, good morning, your Honor.
23  I'd like to emphasize at least two things with respect to the
24  city's response to this.  Number one, we were basically
25  meaning to affirm the Court's broad discretion to do what the

1   Court feels it needs to build the record we all need to
2   accomplish our common work here.  We made certain suggestions
3   that we thought could be included in such an order, which we
4   thought furthered some of those objectives.  These are not
5   must things, of course.  These are considered things within
6   the Court's broad authority, which we recognize under 706,
7   and we think the overall process is a good one.  And we think
8   that if the Court gets the experts that it needs or the
9   stature of person that the record might need for this that
10  those people will be the kind of people who set their own
11  agenda to some degree.
12          I thought it was -- I think it might be necessary
13  for us to address some of the talk about the city trying to
14  hijack the process or something of the sort, and if I could
15  digress briefly, what happened was is that we were working on
16  a draft 706 order to submit to the Court at the time the
17  Court's order came down and had been thinking about the issue
18  for some time.  And in order to look at the feasibility of
19  that, we had gone out to talk to what we thought was a
20  preeminent expert who had refused to be a paid expert because
21  he thought it inconsistent with his scholarly integrity, and
22  he made the handsome offer that is reflected in our papers.
23  That happened before the Court's order came down.  So far
24  from trying to hijack the process, I was left in -- we were
25  left in a position where we'd done some thinking about this.

1  We'd contacted an eminent individual who made a handsome
2  offer, and I could either be cute about that or share that
3  with the Court, which is what we decided to do.  But the
4  basic message is that we think that the input of such expert
5  or experts would be useful to the Court.  We think that a
6  procedure here, because we have a fast track, as other
7  motions will indicate this morning -- the procedure here
8  requires some thought, and that's why we suggested the mini
9  hearing, joint deposition, deposition in front of the Court,
10  call it what you will, I think clearly within the Court's
11  powers under 706 to get the expert's views in front of the
12  Court and the parties in an open forum subject to cross-
13  examination but at a point prior to the actual confirmation
14  hearing so that we could -- all the parties and the Court
15  could use those views, which would be part of the record, to
16  inform our positions and to, as we said in our papers, enrich
17  the record and direct our questioning and our focus better as
18  we move forward.  That's where we were coming from with these
19  things.  It is all in aid of -- we've got a common job of
20  work here.  It's a hard job.  Outside help from eminent
21  individuals beholden to no one is a great idea to help us all
22  do our work on behalf of the city, so that's -- we're in
23  favor.  We think it's within the Court's authority.  It's
24  within the Court's authority to do it any of the which ways
25  suggested to the Court, so we submit these ideas to the

1   Court's discretion and prudence.

2           THE COURT:  Thank you, sir.

3           MR. MARRIOTT:  Good morning again, your Honor.

4   Vince Marriott, EEPK and affiliates, again speaking for a

5   larger group.  We filed a comment as well as a suggested

6   edited version of both orders.  Our concern, as we expressed

7   in our papers, is not with the idea of the court-appointed

8   expert but with the scope that that appointment would

9   involve.  Our concern is that feasibility narrowly defined is

10  too limiting a scope for such an expert.  Determining whether

11  or not the city can meet or can reasonably be expected to

12  meet the obligations under its plan tends to push the plan

13  process in a direction toward the city limiting itself to the

14  minimum possible, the less the plan provides the city will do

15  for creditors and itself.

16          THE COURT:  I'm not sure I understand why that's so.

17  I assume that parties who object to the plan on the grounds

18  that the plan does not meet the best interest of creditors

19  test will submit evidence of that, and that issue will have

20  to be dealt with as part of the plan confirmation process.

21          MR. MARRIOTT:  We will submit evidence of that,

22  Judge, but because the requirements of the Bankruptcy Code

23  tie feasibility and best interest of creditors together,

24  they're really two sides of the same coin.  It seems to us

25  that limiting the expert's scope to feasibility and not

1  having the expert also look at issues relative to best

2  interest such as, yes, the city -- what the city proposes to

3  do works, but so would other things that would be better for

4  creditors and result in a greater return to creditors, would

5  be better for the city and result in a better revitalization

6  of the city --

7          THE COURT:  No, but here's what --

8          MR. MARRIOTT:  I think all the --

9          THE COURT:  Here's what motivated me to suggest

10  this, and it is precisely the argument you've just made.  I

11  have doubted that any creditor will argue that the city's

12  plan is not feasible.  Quite to the contrary, creditors will

13  argue that the city can do more.  And it was that lack of

14  adversary process as to feasibility together with the

15  extraordinary importance of feasibility that led me to

16  suggest this.  I have no doubt but that the adversary process

17  will work fully as to the best interest of creditors test.

18  What concerns me and what led to this hearing this morning is

19  whether the adversary process will work as to feasibility.

20          MR. MARRIOTT:  And our concern is sort of a

21  corollary, which is if the expert is limited to feasibility

22  narrowly construed --

23          THE COURT:  Um-hmm.

24          MR. MARRIOTT:  -- that that will push the process

25  toward, for want of a better word, privileging feasibility

1    over best interests, and it is our view that you can't

2    privilege feasibility over best interests, that they are

3    joined at the hip, both are required to confirm a plan, and

4    that if there is to be a court-appointed expert on one piece

5    of the whole, that to prevent that from being privileged and

6    to give the Court and the parties the opportunity to explore

7    independently best interests as well, that the scope of the

8    expert's engagement really should be both.  And I don't know

9    that it meaningfully burdens the expert beyond feasibility

10   only.  The expectation is the expert is going to be looking

11   at what the city plans to do and in looking at what the city

12   plans to do will no doubt have views as to whether or not the

13   city could be doing different things that would result in

14   better outcomes.  And our concern, again, is pushing the

15   process toward feasibility, being put on a pedestal and best

16   interest being secondary -- and that would be an outcome

17   that, in our view, would be not only inconsistent with

18   Chapter 9 but would result in a confirmation process that was

19   not going to lead to the best possible result.  Do you have

20   any other questions of what we submitted?  I think it's

21   relatively self-explanatory.

22          Oh, the other thing -- I'm sorry.  I should make one

23   other point.  The other thing that concerned us about the

24   form of order was that it suggested that the expert, whatever

25   his or her scope, would consult with the city only.

1    THE COURT:  Yeah.  I agree with you about that, and

2   that's a change that will have to be made.

3        MR. MARRIOTT:  Okay.  That was the other thing.

4        THE COURT:  Right.

5        MR. MARRIOTT:  Do you have anything further for me,

6   your Honor?

7        THE COURT:  No, just to thank you for the

8   suggestions you and the city and the others made in response

9   to my order to show cause.  I found many of them to be very

10  helpful and will incorporate many of them in the final order.

11       MR. MARRIOTT:  There may be others who wish to speak

12  who I was --

13       THE COURT:  Sure.

14       MR. MARRIOTT:  -- not speaking on behalf of.

15       MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

16  from Dentons on behalf of the Official Committee of Retirees.

17  We join in with the statements that have been made by Mr.

18  Marriott about the concern of balance.  I would just like to

19  add one other point on that.  I think that it is important

20  that if this Court were to retain an expert for himself --

21  and I understand the purpose of it and the desire to keep a

22  close eye on whether feasibility truly is met or whether or

23  not it's just being sort of sloughed off to the side to cut a

24  deal, but there is an issue of perception, and I think that

25  this case is very visible.  There is a lot of concern in the

1  community that the process is fair and that the various

2  interests of the party are being perceived equally by those

3  that are involved in the process.  And what I would suggest

4  is that it is important for this expert not just to focus on

5  the feasibility side of the test but also the best interest

6  side because in addition to giving, I think, that expert a

7  more fulsome view of the case and what may be truly doable

8  and feasible, it will also give, I think, more confidence to

9  people who are looking at this process that the expert is

10 truly looking at the right issues in a balanced way.  And I

11 realize that in normally the adversarial process the city

12 would be arguing on one side.  We'd be arguing on the other.

13 The Court has its own experts.  I think that people are going

14 to want to know that this Court is being informed in a

15 balanced way, so I would rise to suggest that is another

16 reason for expanding the scope.

17        Now, with that said, I don't think the scope should

18 be as an uber-expert, and I don't think that's what the Court

19 was suggesting, some expert that would override all of the

20 other experts in this case, but as someone who was helping to

21 inform the Court.  So with that, your Honor, unless the Court

22 has any questions --

23        THE COURT:  Yeah.  It is the Court's intent that

24 this expert, assuming we can find one, would be treated in

25 all practical senses like the other experts.

 1          MR. ALBERTS:  Okay.  Thank you very much, your

 2   Honor.

 3          MR. HOWELL:  Good morning, your Honor.

 4          THE COURT:  Mr. Howell.

 5          MR. HOWELL:  Steven G. Howell, Dickinson Wright,

 6   special assistant attorney general appearing on behalf of the

 7   State of Michigan.  We are here this morning to support the

 8   Court's order.  We share the Court's concern on feasibility.

 9   We have expressed that concern numerous times to the city and

10   to the other parties that we have spoken to during the course

11   of this case.  We have pushed on that issue on a regular

12   basis.  We believe that the greatest opportunity for success

13   in this case exists now, and we must get it right the first

14   time.  We believe that the success achieved must be long-term

15   and lasting.  Feasibility is the key to that.  And we defer

16   to the Court to judge best what it feels is most helpful in

17   coming to its decision, and so, your Honor, we stand in

18   support of the Court's entry of an order for an expert on

19   feasibility.  Thank you, your Honor.

20          THE COURT:  Thank you, sir.

21          MR. GORDON:  Good morning, your Honor.  Robert

22   Gordon on behalf of the Detroit Retirement Systems.  I'll be

23   brief.  I will presume that the Court has seen our papers as

24   well.  We suggested some wordsmithing around some of the

25   order to make clear what retentions are relevant, both the

1  applicants and the applicants' firm and things of that

2  nature.  We also generally express concern about the

3  nomination process and other things that would ensure an

4  arm's length process.

5       The only other thing I wanted to mention is that we

6  do join in the general concern about elevating feasibility

7  over best interests.  I certainly understand and would

8  respect the Court's concern about a lack of adversarial

9  process with respect to the feasibility issue itself, but we

10  would just simply urge the Court to consider ways to make

11  sure that feasibility does not become the end-all, be-all and

12  elevate it over the other issues, so we just wanted to

13  join --

14       THE COURT:  I do have a couple of questions for you

15  about issues that I think your paper raised.  As a general

16  matter, I think that any party who has information that the

17  expert decides in his or her judgment he or she needs ought

18  to cooperate with that expert.  I take it there couldn't be

19  any objection to that.

20       MR. GORDON:  None, your Honor.

21       THE COURT:  Okay.  The question then becomes what to

22  order, if anything, about how such requests for information

23  are actually accomplished and how the responses to those

24  requests for information are actually accomplished.  It

25  strikes me as potentially cumbersome to involve the Court

1   every time an expert wants something from a party and that we

2   ought to be able to devise some less formal but nevertheless

3   properly transparent process to do that, so that's my goal --

4   excuse me -- that's my goal for that. It doesn't seem to me

5   to be appropriate or even necessary to prohibit ex parte

6   communications, per se, between the expert and the parties to

7   the extent the expert in his or her judgment wants

8   information to go directly to the party. I do think it's

9   appropriate to prohibit ex parte communication between the

10  expert and the Court, and I indicated, I think, in one of the

11  suggested orders that any of those kinds of communications

12  ought to be in writing. Are we together so far?

13          MR. GORDON: Yes, your Honor, although I think

14  I've -- in certain situations I could imagine where the

15  expert may have -- I'm actually sort of thinking out loud,

16  and I shouldn't be doing that and may be saying something

17  against my own interest, but I would want the expert to have

18  some flexibility to be able to confer with you. It is the

19  court-appointed expert, and I understand that in other cases

20  there has been some methodology in limited circumstances for

21  communication with the Court, so I'm less troubled about that

22  than I am about --

23          THE COURT: Well, I appreciate that, but --

24          MR. GORDON: Sure.

25          THE COURT: -- as Mr. Alberts has pointed out,

1  everything -- everyone is watching everything we do here.

2          MR. GORDON:  Yes, your Honor.

3          THE COURT:  So I'm going to -- I want to try to

4  devise some means by which the expert can expeditiously

5  obtain the information needed to do the job that is at the

6  same time as transparent as possible, and, of course, any

7  such communications are subject to discovery, depositions or

8  cross-examination, et cetera.  Okay.

9          The other question I had for you, the one you

10  mentioned about the actual selection process, it will be --

11  it would be extremely helpful to me to have input in the

12  selection process.  Again, the question becomes how to

13  balance the need to do this expeditiously with the importance

14  of that input, so what I'm thinking of doing is inviting a

15  small subset of you all to participate with me in the

16  interview process and to do that interview actually in open

17  court on the record so that anyone who's interested can at

18  least sit in on if not participate in the interviews.  And I

19  certainly agree with whoever made the comment that this

20  interview is not a Daubert hearing.  To the extent we need a

21  Daubert hearing, we can do that later.  This is just a

22  selection interview.  Okay.

23          MR. GORDON:  Agreed.

24          THE COURT:  So what I'm thinking of is one

25  representative of the city to participate and two

 1   representatives from the objecting parties' side, so I want

 2   to ask the city to nominate someone, and I want all of you on

 3   the objecting side to meet and confer and nominate four

 4   attorneys from a cross-section of you from which I will

 5   select two.  Is there any objection to that?  So I and three

 6   of you will interview this person -- or these applicants, I

 7   should say.  So we'll set a deadline for the applications.  I

 8   will narrow the field down to the -- I don't know -- three or

 9   four or five to be interviewed, and then we'll conduct the

10   interviews.  Sir.

11              MR. ALBERTS:  Your Honor -- I apologize, your Honor.

12   When you say the nomination of four, you mean four attorneys

13   to help the Court interview the witness.  Does the Court also

14   ask from the other parties to -- or give us an opportunity to

15   nominate potential experts as well, or is that --

16              THE COURT:  Well, I have very mixed feelings about

17   that specific question.  My concern is that, as some of you

18   observed in your papers, if a party nominates a witness,

19   there's a public perception of some kind of connection, and I

20   don't want that, so my preference would be for you to solicit

21   applications yourselves if that's what you want to do.  Now,

22   I will forewarn you when you do that that one of the

23   interview questions will be, "Who have you spoken to about

24   this nomination?" so I mean eventually it's all going to come

25   out.

1          MR. ALBERTS:  Right.

2          THE COURT:  But I think the optics of it are better

3    if we follow that route rather than you make nominations.  I

4    know the rule allows for that.  I don't think it requires

5    that, though.

6          MR. ALBERTS:  Okay.  I appreciate that, your Honor.

7    So if an expert witness or somebody may be interested, they

8    should contact the Court directly?

9          THE COURT:  They should submit an application.

10         MR. ALBERTS:  Yeah.  Okay.  Thank you very much,

11   your Honor.

12         THE COURT:  Yeah.

13         MS. PATEK:  Good morning, your Honor.  Barbara Patek

14   on behalf of the public safety unions.  And I think a lot of

15   what I'm going to say is going to be addressed, but I did

16   want to, for the record, make a couple of comments on behalf

17   of the public safety unions because we are the group who

18   stands, I think, on both sides of the feasibility

19   determination.  And I think with the process that the Court

20   has indicated is going to be put in place, a lot of our

21   concerns are going to be addressed, but I think mainly what I

22   wanted to say is obviously there are a number of tremendous

23   advocates in this courtroom, and we're all advocates for our

24   particular constituency.  And I think that it's very

25   important that this expert be truly independent if there can

 1   be such a thing and, you know, that economics, as we know, if
 2   that's the direction we're going, is not a science in the
 3   same way that calculus or chemistry is a science.  And given
 4   the city's great political latitude in terms of framing the
 5   feasibility question, one thing that the public safety unions
 6   do not want to see get lost in the mix is the idea that it's
 7   not just are the dollars and cents there to pay what has to
 8   be paid going forward, which is obviously important to us
 9   because if we're going to make an agreement with the city, we
10   want to know that we're going to continue to be paid, but the
11   flip side of that, as the Court recognized in its eligibility
12   opinion and in the comments it made earlier today about the
13   service delivery insolvency, is that particularly in the case
14   of public safety, you're dealing with a group of people who
15   the record in front of the Court says, you know, the morale
16   is low.  They're underpaid.  They're undermanned.  They're
17   working in very difficult conditions, and they're now facing
18   not only cuts in their paychecks but in their pensions going
19   forward.  And I think the need -- included in the need to
20   provide those essential services has to be that human part of
21   the equation.  And I'm not talking about as a sympathy factor
22   but is the city going to be able to keep and retain a high
23   quality group of people to continue to perform those
24   services, and I think those are my comments, for the record.
25   Thank you, your Honor.

1              THE COURT:  Thank you.

2              MS. CONNOR COHEN:  Carol Connor Cohen from Arent Fox

3    for Ambac Assurance Corporation.  Your Honor, I will be very

4    brief.  I just want to return briefly to the feasibility,

5    best interest issue.  I think that -- and we very much

6    appreciate your Honor's comments that you will view this

7    independent expert like the other experts in the case, but

8    the reality is that the independent expert is going to be

9    likely viewed as somehow more independent, more influential

10   because he or she is independent and not, you know, one of

11   the parties', you know, hired guns, to use a pejorative

12   phrase.  And for that reason, we think it really is important

13   that the independent expert look at both sides of the coin,

14   look at both feasibility and best interest, because if

15   they're only looking at whether the city can make the plan

16   work and not whether the city has also done everything it can

17   do, it's likely to skew the analysis, and that's all I want

18   to say.  Thank you.

19             THE COURT:  Thank you.  Would anyone else like to be

20   heard?  Mr. Cullen.

21             MR. CULLEN:  Briefly, your Honor.  With respect to

22   the small issue of how to arrange the communications, it's

23   between the expert and the parties.  It seems to me that

24   there are two alternatives available, one slightly more

25   formal, one slightly less.  One is that the experts and the

1    parties could just keep a log of contacts and the nature of

2    the contacts and then make those logs available at a given

3    time.  If that's -- if that provides insufficient control or

4    is thought to, then we could just have the expert or the

5    parties memorialize in a brief letter or note when such

6    contacts occurred, either one, so then you'd have kind of

7    real time notice of what was going on.

8              THE COURT:  Um-hmm.

9              MR. CULLEN:  Either would be acceptable to the city.

10   I think either would be workable without putting a logjam in

11   the process.  And with respect to the interview process, I

12   assume that one of the -- one of the other things it won't be

13   like is a confirmation hearing that won't be -- you know, no

14   French kissing in high school as an objection or anything of

15   that nature, but also with respect to --

16             THE COURT:  I won't ask you what you meant by that.

17             MR. CULLEN:  Well, let's not reminisce, your Honor,

18   but the -- but I think that in the nomination process or in

19   the identification process -- and I would regard what we did

20   with Professor Glaeser as more of an identification than a

21   nomination, but that's terminology.  But there may be other

22   people that come to us, and we might encourage them to -- we

23   might encourage them to apply as well.

24             THE COURT:  Um-hmm.

25             MR. CULLEN:  And I would -- and I would urge the

 1   Court, as it thinks about these things -- and maybe it's
 2   responsive to what the parties have said -- that it may help
 3   the Court to have more than one, and it may be interesting or
 4   not interesting to the Court that some might offer or prefer
 5   to do it pro bono.  I think that's an -- I think that's an
 6   interesting point for the Court to wrestle with.  All right.
 7   Thank you, your Honor.
 8            THE COURT:  All right.  Sir.
 9            MR. FRIMMER:  Good morning, your Honor.  Rick
10   Frimmer, Schiff Hardin, representing FMS.  More of an
11   observation than anything else, as you correctly point out,
12   the world is sort of watching.  Ever since the docket
13   reflected the order to show cause, I know I have and I'm sure
14   other people have heard from many industry professionals
15   wanting to know how they get in on the action, so to speak.
16   I would suggest to your Honor that you're going to be
17   inundated with RFP's.
18            THE COURT:  Um-hmm.
19            MR. FRIMMER:  So I was wondering whether you had any
20   thoughts about what -- the paradigm qualifications you're
21   looking for and whether you intend to narrow the field.  Are
22   you looking for an academic, financial industry type folks?
23   It just might be helpful to narrow it if you had notions
24   about that --
25            THE COURT:  Um-hmm.

1    MR. FRIMMER:  -- because -- or else you may have

2  hundreds of responses to your RFP.

3    THE COURT:  Thank you.  To be less flip, again, I'm

4  of two minds on the subject.  On the one hand, I'm interested

5  in efficiency, which I think is the concern you're expressing

6  here.  On the other hand, I don't want to be so efficient

7  that I exclude by definition someone who might be really

8  good, and I'm not sure that academic versus nonacademic makes

9  sense, so so far in my thinking I've declined to be any more

10  specific than I outlined in the proposed order.

11    MR. FRIMMER:  As I say, mine is just an observation

12  that the --

13    THE COURT:  Thank you.

14    MR. FRIMMER:  -- panel of three, so to speak, that

15  ultimately will assist you are going to have to weed through

16  probably three categories of folks that are going to respond

17  to this.  You know, some may be what I would refer to -- what

18  I could refer to as urban planner types.

19    THE COURT:  Right.

20    MR. FRIMMER:  Some -- most, I think, will be the

21  kind of financial advisory firms that do M&A work and all of

22  whom will be eminently qualified to --

23    THE COURT:  Yeah.

24    MR. FRIMMER:  -- numbers, so to speak.

25    THE COURT:  Right.  And you raise a good point.  The

1    urban planning person who can look at the city's assumptions
2    may not be the same person who can look at the Excel
3    spreadsheet on the cash flows and projections.
4            MR. FRIMMER:  That's my point.
5            THE COURT:  So that's why I sort of left open the
6    possibility in the order that it may be two experts or maybe
7    more.  I don't know.  I'm open to what makes sense --
8            MR. FRIMMER:  Well, again --
9            THE COURT:  -- without burdening the process --
10           MR. FRIMMER:  Yeah, and without delay.
11           THE COURT:  -- and without compromising the
12    efficiency we all need.  Thank you.
13           MR. FRIMMER:  So I made the point.  I mean it's
14    really more for you to think about, but --
15           THE COURT:  Thank you.
16           MR. FRIMMER:  -- you know, the consequences are
17    that, you know, if the panel -- that three-person panel along
18    with your Honor -- if it's more of an academic type, that
19    person will have to likely retain the numbers crunchers.  If
20    it's a numbers cruncher, they'll probably have to work with
21    an urban planner because -- I think the city noted this in
22    their papers, and I think this was a perfectly legitimate
23    observation that feasibility, if you will, broadened or not,
24    still involves not only the question on do the numbers add up
25    but also the underlying assumptions --

1          THE COURT:  Right.

2          MR. FRIMMER:  -- from a planning standpoint --

3          THE COURT:  Correct.

4          MR. FRIMMER:  -- so that's why I pointed it out.

5          THE COURT:  Thank you, sir.  I think there was one

6   more or a couple more.  Okay.  Sir.

7          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

8   on behalf of the retiree association parties.  I rise briefly

9   just to suggest to the Court that on the creditors' side, it

10  may be prudent to increase the number above two for the wide

11  array of creditors in this case without getting cumbersome,

12  but I think limiting it to two could possibly have a negative

13  impact, and to maybe allow the creditors to caucus and

14  suggest a number that's above two but in the realm of

15  efficiency I think would be prudent.

16         THE COURT:  Okay.

17         MR. PLECHA:  Thank you.

18         THE COURT:  No.  That's fine.  If you all think we

19  can do this efficiently with more than two on your side, I'm

20  certainly willing to consider that.  Mr. Alberts, was there

21  something further you wanted to say?

22         MR. ALBERTS:  No.  Mr. Plecha had said his own

23  piece.

24         THE COURT:  He said it.  Okay.  All right.  Well,

25  let's see.  Today is Wednesday.  By Monday or Tuesday of next

1  week, can you get me your suggestions to serve on the
2  interview committee?  I do want to get the solicitation order
3  out today, so I will make the revisions to that and get that
4  entered today, and then we'll set a deadline for the
5  applications and an interview date.  All right.

6          We will next turn our attention to the motion to
7  adjourn tomorrow's hearing.

8          MR. HACKNEY:  Your Honor, good morning.  Stephen
9  Hackney on behalf of Syncora.  I rise on behalf of a number
10  of parties.  I think a large majority of the objectors have
11  joined in the motion.  I'd like to briefly run through the
12  rationale behind the motion and then also bring one
13  additional concern to the Court's attention that has sort of
14  come into focus this week with the depositions rather than
15  waiting to spring it on you tomorrow if we do go forward.

16          The continuance we've requested -- we've asked for a
17  continuance on the order of seven to ten days, and it's
18  principally in the -- principally of the view of just
19  allowing us better time to prepare and organize the hearing.
20  While we've had the term sheet, as you know, since early
21  March, we did not have the rather lengthy legal briefs that
22  were filed until a week ago Friday.  We did not have the
23  settlement agreement itself and the proposed order until late
24  last Wednesday.  And as you know, these are detailed complex
25  documents in their own right that in themselves relate to

1    other detailed and complicated contracts, and so our point

2    was just a simple one, which is that we believe a short

3    continuance also taking in light of the fact that we were

4    just in depositions on Monday will allow the parties to

5    better prepare their arguments and also better organize the

6    hearing, for example, by doing things like reaching some

7    agreement about -- with respect to the prior hearing, which

8    exhibits should still come in and which portions of that

9    hearing people think should be applicable to this hearing and

10   which should not.  That's something that's more efficiently

11   done outside of the courtroom rather than trying to negotiate

12   it in front of you and having there be ambiguity about what's

13   in evidence and what isn't until we start the hearing, so

14   that is an example of a mechanical benefit that we could get

15   from a short adjournment.  There won't be any prejudice to

16   the city by a short adjournment, your Honor, because, of

17   course, they will --

18              THE COURT:  Didn't I already suggest that I didn't

19   see any reason why everything in the prior hearing can't be

20   considered evidence in this hearing?

21              MR. HACKNEY:  What I took your statement to mean at

22   the last hearing was you had a colloquy with Mr. Hertzberg

23   where he said the prior hearing should come in in its

24   entirety, and I thought that you said can't it all just be

25   submitted and then I'll decide which of it is relevant and

1  which of it is not, but I may have misunderstood your point.

2  I know there are times where in bench trials, right, you --

3          THE COURT:  Well, I said that in utter agreement of

4  what Mr. Hertzberg was saying, not to suggest anything

5  different.

6          MR. HACKNEY:  Okay.  Well, I misunderstood then.  I

7  would note, I guess, for example, Mr. Buckfire testified at

8  length in the prior hearing about the prior forbearance

9  agreement.  That's the type of thing where there may be

10  portions of Mr. Buckfire's testimony that are still relevant.

11  It seems to me that there are large portions of his testimony

12  that might not be relevant.  My suggestion is that it would

13  be better for the parties to have clarity, to the extent they

14  can, about what they're contending from the prior hearing and

15  what they're not.

16          Your Honor, it's a short continuance, and it's a

17  small point, which is just that there is a lot going on in

18  this motion.  It's very important.  It's complicated.  I can

19  tell you, as one of the lawyers that's preparing on it, that

20  it was just to make an argument that we think that we can put

21  the hearing together for you better if we have a little

22  additional time.

23          I do want to raise something that is more important

24  and more substantial.  I don't want to wait till tomorrow to

25  bring it to your attention, assuming I lose my adjournment

1   motion.  There is a -- there's an emerging issue that's

2   important and that is factually intensive that relates to the

3   service corporations, so if you go back to the original term

4   sheet, what I would submit was less clear in that term

5   sheet -- it was clear the liens were all going to be released

6   on the collateral.  I would submit that the injunction and

7   how the service corps were going to be handled was less clear

8   to me.  You'll then see that a wave of objections come in

9   that are raising points about the structuring problems

10  relating to the service corporations trying to understand now

11  you're not including these service corporations, how are you

12  deciding their rights.  And this goes to the core of the

13  motion because the city's goal here is to free up the gaming

14  collateral, and the lien is on the gaming collateral that's

15  held at least in the first instance -- and this is hotly

16  debated -- by the service corporations, so this is an

17  important issue.

18        Now, if I can say something that I would say is a

19  little bit of a recurring issue in this case is there's a

20  tendency by the city to file these motions that are a bit

21  threadbare when it comes to sort of the rationale of

22  relatively complicated legal issues.  Then the objections do

23  a lot of work that try and suss out what all the objections

24  are, and then right before the hearing the city will file

25  very lengthy, very detailed briefs detailing all of these

 1   things, what their responses are, what their thinking was
 2   about why they can do what they're doing in the motion.  And
 3   that happened certainly on the first forbearance agreement.
 4   I would say it's happened again here because the original
 5   motion was basically like this settlement is basically the
 6   same as the other settlement, so all the reasons from the
 7   first settlement rationale in that hearing, they all apply,
 8   and it basically just quoted all the different parts of the
 9   transcript from that hearing.  But then when we all pointed
10   out, no, no, no, there are major structural and legal
11   differences here that you have to take account of, then what
12   we get back are 90 pages of briefs a week ago Friday that do
13   go into a lot of different issues that you will not see in
14   the prior pleadings.  Of equal importance, though, is the
15   fact that this service corp question -- on a week ago Friday
16   when they filed their briefs, the city came out with a new
17   rationale for why you can decide the rights of the service
18   corporations, and it was somewhat twofold.  The first thing
19   they said is, well, the service corporations have acquiesced
20   in the motion, so they haven't objected, so you can do
21   whatever you want to them.  And then the flip side of that,
22   they said, well, the service corporations are a shell, and so
23   you can disregard them and do whatever you want with their
24   rights.  Those were the two rationales.
25             Now, let me first note that this issue is a big

1  ticket issue in the COP and validity lawsuit.  This is one of

2  the city's core allegations in that lawsuit, so this is not

3  some kind of modest, you know, factual issue.  This has

4  implications for many different things.  Many large financial

5  issues kind of relate to this structure, the use of the

6  service corps at the center of this structure, the nature of

7  the composition of the service corps, which have city

8  employees, city council members, et cetera.  I'm sure that

9  you've seen a lot of the pleadings on this.  And I should

10 note also that this issue is further contentious by the fact

11 that the city and the swap counterparties themselves disagree

12 between each other with respect to this issue of the service

13 corporations because, of course, the swap counterparties in

14 their brief do a pretty thorough job establishing the

15 legality and vitality of the service corporations, so it

16 isn't just me saying that this is a big ticket disagreement

17 issue that has wide-ranging implications.  You can actually

18 see it in their briefs.

19         This issue is, you know, further nuanced a bit by

20 the fact that the service corporations were apparently

21 sufficiently alive and well in July of last year to sign up

22 to the forbearance agreement and represent that they were

23 validly existing and authorized to enter into the agreement

24 but now are apparently sham corporations that are lying there

25 dormant and incapable of doing anything, and I would say it's

1   also further -- raises important due process questions like,

2   for example, my review of the motion that was filed, and I

3   will -- I've checked this personally.  I believe others in my

4   office have checked it.  I don't think that motion was served

5   on the service corporations, so making this acquiescence

6   argument when the motion itself wasn't served on the service

7   corporations I think has significant due process issues, and

8   it's complicated further by the fact that in the COP and

9   validity case recently, the service corporations' counsel

10  appeared and negotiated a stipulation about what they are

11  going to do in that case.  And I don't know what the story is

12  behind how that law firm was retained or how it came to

13  represent the service corporations.  My point is simple.

14  There is a lot going on here with respect to the service

15  corporations, and I think that my view coming into today's

16  hearing was to say to you that if tomorrow's hearing is not

17  going to decide the rights of the service corporations,

18  including not obliterate their liens or bind them to

19  agreements they haven't signed, then I don't think that this

20  is a basis to continue the hearing.  But if the city's

21  rationale of acquiescence or the fact that they're a shell

22  corporation is something that they are going to attempt to

23  put forward despite the fact that neither of the witnesses

24  that we deposed this week have any firsthand knowledge about

25  the service corporations -- both were clear that they

 1   disclaimed any knowledge -- there isn't any documentary

 2   evidence on the exhibits that have been disclosed.  If they

 3   are going to attempt to have you base your ruling on those

 4   rationales or make findings about those things, then I think

 5   we have to all take a step back and consider, wait a second,

 6   how is this going to work from the standpoint of discovery

 7   and litigating this issue, does it need to be coordinated

 8   with the other proceeding, et cetera.  That was the way I saw

 9   this breaking down.  I didn't want to stand up and say that

10   tomorrow because you can see the way it dovetails with our

11   continuance motion.  To the extent you agree it is an issue,

12   you can see it could affect the schedule, and that was what I

13   wanted to bring to your attention.  Thank you.

14          THE COURT:  Thank you, sir.

15          MR. MARRIOTT:  Your Honor, Vince Marriott on behalf

16   of EEPK.  I just want to, before the city has their

17   opportunity, emphasize the significance of this issue of

18   whether or not the service corporations are shells.  That

19   allegation was made in support of approval of the settlement

20   agreement for the first time that I'm aware of in the city's

21   omnibus response to objections.  It is significant to the

22   validity of litigation where billions of dollars are -- well,

23   nominal billions are at issue where an allegation has been

24   made in support of invalidity that the service corporations

25   existed only on paper and are shams.  Insofar as the city

1    intends at the hearing on the settlement agreement to seek

2    approval of the settlement agreement in part on the basis

3    that the service corporations are shell corporations, that

4    has implications far beyond the settlement agreement.  It is

5    a complex factual and legal question as to which we would be

6    entitled to significant discovery.  When I asked Mr. Orr at

7    his deposition on Monday whether the city intended to

8    introduce evidence at the hearing on the swap settlement in

9    support of the assertion that the service corporations are

10   shell entities, his response was, "I don't know."

11          Insofar as the city wants to reserve the ability to

12   argue and present evidence on that point in connection with

13   the settlement agreement, we think that it has to be stopped

14   and we have to have a discovery schedule to deal with that

15   specific issue.  If the city is prepared to say, no, we will

16   not seek a finding on that point and we will not seek

17   approval of the settlement agreement on the basis in whole or

18   in part of an allegation that the service corporations are

19   shell corporations, then I -- then this concern goes away.

20          THE COURT:  Thank you, sir.

21          MR. HERTZBERG:  Your Honor, Robert Hertzberg on

22   behalf of the city, Pepper Hamilton.  Unlike counsel prior to

23   me, I'm not going to do my opening statement today on the

24   service corp issues.  I'd like to address first a couple of

25   the issues raised and then get into some of the allegations

1  made in the motion.

2  First, counsel for Syncora was concerned that we

3  didn't follow the proper process on service of the motion to

4  compromise on the service corps.  If you look at the

5  docket -- and I'm sure he could have looked at the docket --

6  he would have seen that we served Lewis & Munday with the

7  motion on March 12th and that they're the registered agents.

8  We also have served Butzel Long, who's now appeared on behalf

9  of the service corps in the COPs litigation, as soon as they

10  appeared with this motion also, so service isn't an issue.

11  Second, I want to clear up another misunderstanding

12  that was put on the record.  Mr. Hackney indicated that they

13  have seen the term sheet since early March.  In fact, Syncora

14  has had the term sheet since mid-February.  As I indicated at

15  the prior hearing, we gave it to them or the bank -- we

16  authorized the banks to give it to Syncora in mid-February,

17  and they did.  So when they stand up today and say that we've

18  had the term sheet since March, it's a little disingenuous,

19  to say the least.

20  In regard to the service corporations, Mr. Marriott

21  indicates to the Court that the motion or the omnibus reply

22  all of a sudden indicated that the service corps were shams.

23  Well, in fact, the COPs complaint, as we call it, which was

24  filed on January 31st of this year, had an allegation that

25  the service corporations were shams in it, so it didn't just

1   come in.  This has been a known fact that it was the city's

2   position in the COPs complaint as early as January 31st.  We

3   are only seeking in the settlement an injunction against the

4   service corps suing.

5         Now, let's address some of the issues raised

6   actually in the motion now and a little background.  The

7   depositions, as required, were taken on Monday at my offices

8   of Mr. Gaurav Malhotra and Mr. Kevyn Orr.  They had their

9   time.  Each party -- several parties examined the witnesses

10   on the depositions.  And shortly thereafter on Monday the

11   rough drafts of the transcripts were sent out by the court

12   reporter, Monday, the same day as the depositions.  Second,

13   on yesterday, Tuesday, the actual final drafts or final

14   deposition transcripts came out.

15         The settlement agreement that they complain about

16   not having adequate time to examine was served on -- as we

17   told the Court it would be, on March 26, and one of the

18   complaints is -- and by the way, they make an issue about a

19   supplemental settlement agreement being filed the next day.

20   As everyone knows and just to point out for the Court's

21   benefit the reason a supplemental was filed, there was a

22   corruption in the document.  The document is identical.

23   There was some corruption when it got filed in the document

24   itself.  Nothing changed.  Not a word on the document

25   changed.  So it was filed on the 26th like we promised the

1    Court.  They claim they haven't had time to adequately review
2    the settlement agreement, a 28-page settlement agreement.
3    When you look at the actual settlement agreement, if you take
4    out the signature pages and that, it's really a 20-page
5    agreement, 20 pages.  These are some of the largest most
6    preeminent law firms in the country who have come before this
7    Court and said they can't get through a 20-page settlement
8    agreement in eight days prior to a hearing on the settlement.
9    I'm just not buying that, your Honor.  It's not that hard,
10   especially when it almost identically tracks the term sheet
11   previously produced.

12        Their second basis for the adjournment is that there
13   was massive discovery dumped on them and they haven't had an
14   opportunity to sort their way through it.  Once again,
15   massive law firms, preeminent law firms in the country,
16   haven't had the opportunity to do this.

17        What was produced?  Well, first, let's back up to
18   the depositions.  Only four of the documents or e-mails that
19   were produced were actually used at the depositions of the
20   two witnesses.  Second, here's the documents that were
21   produced.  The Court can look at them.  I would suggest to
22   the Court that over 95 percent of these are simply minor e-
23   mails that say, "We'll do a conference call at four."  "No.
24   How about two?  How about tomorrow?  Can we talk about this
25   issue?"  There's not substance in these.  We, through an

1  overabundance of caution, produced a mass of e-mails.
2  There's nothing in them except for about ten of them.  If the
3  Court is willing, we would give this to the Court.  I bet you
4  the Court could get through these in a one- to two-hour
5  period, but they'll tell you they haven't had adequate time
6  to get through this stuff.  I'm not buying that, your Honor.
7  There's nothing in there that couldn't be reviewed within a
8  two-hour period at most.

9        They say that novel claims are involved here, and
10 that's why they need an adjournment.  There's nothing novel
11 here.  It's an $85 million settlement that has a bar order in
12 it and provides for releases.  There's nothing novel.
13 They've all seen it before in their career a hundred times.

14       They claim that there's -- Syncora points out or
15 claims there's two material differences from the term sheet,
16 and then they tell you in the motion to adjourn what they
17 are.  One is the use of the words "specified plan."  Yes,
18 it's a definitional term, but what it defines is already
19 something that was in the term sheet, so it only puts in a
20 definitional term.

21       Second, they claim that the settlement diminishes
22 the obligation of the city to make payment.  That's not what
23 it says.  The city is 100 percent obligated to make payment.
24 There was only a provision put in that the city would use its
25 best efforts if the money became trapped within the holding

1    accounts.  Nothing changed, your Honor, no material

2    differences, one adding a term to a definition, the other

3    making sure the city uses its best efforts.

4            Then they complain about the blackline order, that

5    there's this massive blacklined order that they haven't had

6    an opportunity to get through.  One, we did it as a courtesy

7    to the Court and to the parties to give the blackline order

8    well before the hearing.  This was a courtesy.  We had no

9    obligation to do it.  We did it eight days before to give

10   them the opportunity so if there is an issue at the hearing,

11   they can come before the Court and raise the issue or discuss

12   it with us in advance.  While they were busy preparing,

13   especially Syncora, all these different motions, DIA

14   subpoena, public lighting appeal briefs, motion to adjourn

15   the disclosure, motion to adjourn this, they could have been

16   reviewing these documents or the 20-page settlement

17   agreement.  They've had more than adequate opportunity.

18           Then they allege that we didn't produce the draft

19   term sheets and the settlement agreements.  This Court

20   specifically said we did not have to produce them.  At the

21   hearing in which the Retiree Committee requested them in

22   number two of their request, the Court specifically said we

23   do not have to produce the items set forth in number two.

24   That was term sheets and settlement agreements.  So when we

25   produced this stack of documents, we took out the drafts of

1   the term sheet and the drafts of the settlement agreements

2   because you said we didn't have to produce them, and we

3   didn't.

4           Syncora has objected to everything in this case.

5   They've taken the carpet bombing approach.  Everything that

6   the city tries to accomplish, they move to adjourn or they

7   object to or they raise issues at the hearing.  The service

8   corps are not an issue before the Court tomorrow.  They've

9   been properly served.  Court have any questions?

10          THE COURT:  So just to pin you down on this --

11          MR. HERTZBERG:  Okay.

12          THE COURT:  -- it's not the city's intent to request

13  a finding as a result of the hearing on this motion, the

14  motion to approve the settlement, that the service corps are

15  shell or sham corporations.

16          MR. HERTZBERG:  No, your Honor.

17          THE COURT:  That's correct?

18          MR. HERTZBERG:  That's correct.

19          THE COURT:  Thank you.

20          MR. HUEBNER:  Good morning, your Honor.  For the

21  record, I'm Marshall Huebner of Davis, Polk & Wardwell on

22  behalf of Bank of America.  Your Honor, suffice it to say

23  that we find the procedural motion before us to be rather

24  without merit and do take a little bit of exception to the

25  opening argument on one issue at tomorrow's hearing that they

took a shot at today, so let me be very surgical and precise
with respect to what's actually up today.

Number one, my memory, your Honor, is exactly as
yours.  I thought you actually were quite clear in your
ruling when we were actually before you properly about the
scheduling of this hearing that all the evidence from the
prior multi-day trial could, in fact, be used and was
admissible.  They're welcome to use whatever they like.  I
actually don't think it'll be the focus of tomorrow's
hearing.  It's just not an open issue.  And to suggest that
really it would go much better for you if we all just took a
bunch of days and fought about this, that's what the month
was for.  As a reminder, your Honor denied the debtor's
request to expedite this hearing and, in fact, set it for
substantially longer than is required either by the local
rules or by the national rules, and they've had 31 days to
prepare for this hearing.  To say now the day before, "We
haven't had time yet," is really totally inappropriate.

Number two, your Honor, the fact that Mr. Hackney
didn't tether his argument about the service corporations in
any of the documents but just said it kind of shows you what
you need to know, which is that he's just throwing dust in
your eyes, and it's not really there, and let me explain why
quite precisely.  Number one, there's a substantial section
of the term sheet called "Concerning the Service

1   Corporations."  What was originally agreed to is exactly what
2   is going forward tomorrow.  Number two, there's specific
3   sections of the order that did not change that were filed
4   almost a month ago that addressed the service corporations.
5   Nothing is new.  Three, there is a section of the debtor's
6   brief, the opening brief, that is 42 pages long and actually
7   measurably longer than their reply brief, contrary to what
8   was suggested to you, that addresses the service
9   corporations.  And, four, most importantly, is exactly the
10  colloquy you just had.  There is no finding of any kind about
11  the service corporations and whether or not they're shams
12  because unsurprisingly, your Honor, we disagree very
13  vehemently.  Our view, as you know, on the merits, were they
14  ever to be reached, which they are not because this is a 9019
15  settlement, is that the transactions were appropriate, the
16  liens were appropriate, the service corporations were
17  appropriate.  Their view is to the contrary, and that's what
18  we've settled.  So if Mr. Marriott stood up and said, "Your
19  Honor, here it is.  Paragraph 39 of the order says I hereby
20  find the service corporations are shells, and we're not ready
21  to litigate tomorrow and it's not fair.  They just snuck it
22  into the order," maybe that would be a legitimate basis for
23  an improper motion to reconsider your scheduling order,
24  improper, by the way, for lots of reasons, including the fact
25  that a week ago there was a contested discovery hearing, and

1   your Honor ruled on precisely with even more exactitude and

2   delineation what the schedule would be for this hearing,

3   including what day things were being filed and by when the

4   depositions were, and it was very finely reticulated.  And so

5   what do they actually have; right?  What they actually have

6   is we'd like a little more time.  And to reiterate and not at

7   great length but some of what Mr. Hertzberg said -- and also

8   I should note that, you know, the schedule that your Honor

9   set, we should not actually lose sight of its generosity.

10  The reply briefs, which, as we all know, are often filed 48

11  hours before a contested hearing, were filed 13 days before

12  the contested hearing.  Oftentimes plan support agreements,

13  all sorts of documents are filed five days before a voting

14  deadline or ten days before a voting deadline, and there are

15  hundreds or even thousands of pages of documents that

16  sophisticated law firms need to digest to appear at

17  confirmation.  This is one settlement agreement.  And by the

18  way, the two examples that they chose were -- they actually

19  proved the case.  I'm not sure I could have come up with

20  better examples of how nothing has changed.  What are their

21  two examples?  The term sheet says the debtors shall keep

22  paying the monthly amounts and the counterparties shall

23  receive it.  And in doing the documentation they said, you

24  know, "Once we've paid it, we can't promise that you'll

25  receive it.  What if a nuclear bomb hits the custodian and

 1   the money is just vaporized; right?"  So we said, "Okay.  You
 2   know what?  That's reasonable.  You can't promise who you
 3   don't control, so just say 'best effort.'  We're fine with
 4   that."  That's an example of a radical change that a party
 5   makes a motion to a federal court, needs to adjourn a
 6   hearing?  And the second one, your Honor, on specified plan,
 7   I'm actually holding -- and I will not go through it because
 8   I think it would not be necessary unless the Court wanted it,
 9   but I have a color blackline showing how every single concept
10   basically of specified plan is right there in the term sheet.
11   The term sheet said we'll vote in favor of a plan that
12   provides the treatment contained herein, and then sprinkled
13   throughout the term sheet are these chunky sections that say
14   what a plan has to say.  We just put them in one place and
15   used a defined term with a few other relatively minor
16   changes, and so the notion that, you know, the Court should
17   essentially pass the deadline for even making a motion to
18   reconsider, they should have a third or a fourth bite at the
19   scheduling of this hearing is really entirely inappropriate.
20        You know, leaving aside the content of this, I would
21   also note that the notion that Kirkland & Ellis, which has
22   potentially the largest litigation department in the United
23   States, actually filed a pleading that said there were 516
24   pages of discovery, not 516,000, not 516 million, 516 pages,
25   total pieces of paper, and eight days is not sufficient for

1  us to prepare for a hearing, I could not have signed that

2  pleading, and I'll leave it at that.

3          But suffice it to say, your Honor, that the

4  depositions happened.  Everyone got to ask all the questions

5  they wanted.  They were not particularly cut off in time.

6  Nobody left the hearing angry and frustrated, as far as we

7  can -- the depositions -- they put the documents they wanted

8  to in front of the witnesses proving that they had time to do

9  what they wanted to, and this like fifth bite at the apple to

10  move it onto their schedule.  None of their substantive

11  arguments bear any weight, and they've had so much more time

12  than the debtors asked for or that any rule requires, and

13  there is no factual basis.

14          The last thing I would say in terms of the proposed

15  order, your Honor, which, again, we could walk through right

16  now if it were helpful to the Court, but to be clear, we went

17  out and tried to resolve objections.  We listened hard.  We

18  e-mailed everybody, including the remaining objectors, and

19  said, "Please communicate with us.  We want to work things

20  out wherever we can narrow issues, wherever we can take your

21  language."  So we're twice being penalized for doing the

22  right thing.  Probably 90 or 80 or 70 percent of the

23  relatively minimal changes in the blackline order were to

24  resolve other objections, and two of them are now resolved,

25  and so it's a double courtesy.  One, we had a highly

1 communicative process to narrow the hearing as much as

2 possible, and we're still working on language with Mr.

3 Marriott, for example, and with others to try to further

4 resolve everything we can.  I will stay up all night.  I'm

5 here in Detroit.  Let me make a public announcement.  We want

6 to resolve everything we can.  But to say that because we had

7 the extreme courtesy to everybody to say in case you're

8 interested, here's the current version of the order mostly

9 because we're taking relatively minor changes to address

10 others' concerns, now the whole hearing should be adjourned,

11 it's crazy.

12          So, your Honor, it's a very troubling motion in

13 addition to the fact that they, frankly, slipped in a bunch

14 of oral argument about the service corporations, which really

15 has no place.  There's no finding about them.  There's one

16 narrow injunction.  They were properly served.  We're all in

17 Detroit.  We're ready to go.  This is a 9019 settlement.  We

18 know what the facts are, and we'd like to proceed tomorrow.

19 Thank you.

20          THE COURT:  Thank you.  Would anyone else like to be

21 heard?

22          MR. HACKNEY:  Do you mind if I respond?

23          THE COURT:  No, no.  Go ahead, sir.

24          MR. HACKNEY:  There were a number of things that

25 were said.  I'd like to just try and confine my response to

1  some of the more important ones.  The first thing I wanted to
2  follow up on, your Honor, is that the notion of acquiescence,
3  the idea that the service corps have acquiesced in the motion
4  and haven't objected and asserted their rights, is something
5  that I think is highly connected to the allegation that they
6  are a shell corporation because both of these -- both of
7  these parties are saying --
8      THE COURT:  Okay.  But I invite you to make that
9  argument at the hearing.
10     MR. HACKNEY:  Fair enough.  And I raise it today to
11  not surprise you at the hearing.  That's part of how I view
12  my role as an officer of the court because I do think it is a
13  big issue, and it is an argument that we will be raising.
14     The second thing I wanted to say, your Honor, is
15  that there's no question that we -- if we have to, we can try
16  up a hearing at anytime.  You can try up something in an
17  hour.  You could try it up tomorrow.  You can pick an issue,
18  and we'll show up and try the issue to you.  But I am someone
19  who is experienced in trial work, and I do have the judgment
20  and experience to make suggestions to the Court about how we
21  can better organize things, and this was my professional
22  judgment.  These things have come in.  The devil is in the
23  details with a lot of these pleadings, and remember it's easy
24  for Mr. Huebner to say it's all clear as a bell.  They're the
25  ones that are doing all of this drafting.  They're the ones

that have been in control of these documents for a long time.
Remember, we heard that this was a big emergency on April
2nd, but they didn't actually give us the settlement
agreement for over three and a half weeks, so the way the
schedule is being described here I think is kind of
misleading.  It's like we're supposed to understand
everything about the settlement agreement and the revised
order from the term sheet even though there are changes and
even though we don't have the legal rationale until they give
us their reply briefs.  I view it -- I'm living it -- as
being much more compressed than the way it is being
portrayed, and I will add this.  This is a big motion.  You
may recall from the last time we were in front of you you
asked Mr. Hertzberg what is the emergency.  That was my
argument.  What's the emergency?  You asked Mr. Hertzberg
that.  I don't think he really answered the question.  I
think he said this agreement drives the plan, and I think
what you have to understand is that whether the -- if the
agreement were continued one month or two months, it has no
impact on the cash flow of the city because they're going to
comply with the terms of the collateral agreement as they've
been doing to date through the end of the plan, and then
there are different ways they pay off the remainder, so
there's no emergency from the standpoint of the city or
relating to this motion.  What they want to do is they want

to take this very controversial settlement agreement that is
a settlement between only parties A and B of a complicated
structure that everyone has agreed is complicated and has
many different parties involved and that we assert that this
settlement between A and B trods upon the rights of C and the
rights of D and that that itself is a controversial concept
in the area of Rule 9019 -- what I'm saying is not disputed.
They want to -- it's not disputed in the sense that that's --
these are controversial legal issues. They want to take this
agreement around, and they want to bang away at retirees and
bang away at bondholders and say, "Now we've got you. We're
going to cram you down. And we're going to use this impaired
assenting class, and we're going to -- and that's what we're
going to do, so you better get in the boat." So this is very
important, and that is why we are suggesting that we
shouldn't just kind of sidle into court with part of the
theory that's emerged ten days ago being, "Oh, the service
corporations that are manned by city employees and city
council members, they've acquiesced in the city's motion to
destroy their liens and to bind them to the agreement as if
they had signed it even though they haven't." That's a big
issue, and neither of them have said because they can't,
"Well, we're not asking you to make that finding."

One last point, and then I'll sit down. Thank you
for your patience. I have to take exception to the notion

1   that Syncora is a carpet bomber; that we are a terrorist.

2   You know, you saw public statements by the city this week

3   demeaning Syncora and saying Syncora is throwing the kitchen

4   sink at everything and, you know, Syncora is just -- this is

5   their scorched earth strategy.  You know, we asked for a one-

6   week continuance.  Mr. Huebner says he couldn't even deign to

7   sign that pleading, and the city's press statements say that

8   we're engaged in a scorched earth litigation strategy.  You

9   know, in the disclosure statement context, we get a bunch of

10  material dumped on us three days before our objection is due,

11  and we put a motion in in advance of that saying, "Shouldn't

12  there be some adjustment to the schedule here?"  And that is

13  decried as well as more scorched earth litigation from

14  Syncora.  And what I would say here, your Honor, is that

15  there are many times when you are asserting your legal rights

16  that it may not be popular to do so but that the way the

17  legal system works is that you have to assert those rights in

18  order to be heard on them, and it may not be popular or it

19  may not be what the city wants us to do, but I think it's

20  unfair.  I think the constant ad hominem attacks against

21  Syncora as if we are, you know, committing war crimes when we

22  submit these briefs to the Court, I think it's unhealthy, and

23  I take exception to that suggestion that we've done anything

24  improper in the way we've proceeded in this court.

25          THE COURT:  Thank you.  All right.  The Court will

1  take this under advisement for ten minutes, and we'll

2  reconvene at 10:35, please.

3        THE CLERK:  All rise.  Court is in recess.

4      (Recess at 10:29 a.m., until 10:40 a.m.)

5        THE CLERK:  All rise.  Court is in session.  Please

6  be seated.  Recalling Case Number 13-53846, City of Detroit,

7  Michigan.

8        THE COURT:  The Court concludes that the record does

9  not establish cause to adjourn tomorrow's hearing.

10  Accordingly, the motion to adjourn it is denied.  Since the

11  city has agreed that the issue of whether the service

12  corporations are shell corporations or sham corporations will

13  not be a matter for litigation tomorrow, all that remained to

14  the argument for the adjournment that the Court heard was a

15  matter of convenience and not a matter of addressing any

16  specific issue of prejudice or harm by proceeding tomorrow,

17  so, in the Court's view, this does not establish cause.

18        Let's turn our attention to --

19        MR. HERTZBERG:  Your Honor --

20        THE COURT:  Sir.

21        MR. HERTZBERG:  -- one thing I just want to clarify.

22  Is the record from the prior hearing in evidence for

23  tomorrow?

24        THE COURT:  It is.

25        MR. HERTZBERG:  Okay.  Thank you.  And all the

1  exhibits that were introduced?

2          THE COURT:  Yes.

3          MR. HERTZBERG:  Thank you.

4          THE COURT:  Let's turn our attention now to the

5  final hearing regarding the schedule for the disclosure

6  statement approval.  Before we do that, however, I'd like to

7  ask you all to consider a matter of personal favor for me.

8  In your arguments to the Court, let's keep the war analogies

9  to a minimum, if not eliminate them from our discussion

10  altogether.  Phrases like "scorched earth" and "nuclear" and

11  "carpet bombing" really are not necessary or appropriate in a

12  courtroom context, so let's just not use them.  Okay.

13          MR. ORNSTEIN:  Good morning, your Honor.  Noah

14  Ornstein from Kirkland & Ellis on behalf of Syncora.

15  Unfortunately, with accommodating that favor, I'll have to

16  redo my entire opening.

17          THE COURT:  And let me guess.  You'd like an

18  adjournment to do that.

19          MR. ORNSTEIN:  Appreciate it.  No, your Honor.  I'll

20  try to keep the presentation very short.  There are a number

21  of people I know who would like to get up and speak also.

22  Your Honor, we really do think this is ultimately about

23  efficiency and fairness.

24          THE COURT:  Could you pull that microphone closer to

25  you --

1          MR. ORNSTEIN:  Certainly; certainly.

2          THE COURT:  -- or aimed more towards you?

3          MR. ORNSTEIN:  And I'll kneel a little, too.

4          THE COURT:  There you go.

5          MR. ORNSTEIN:  We really do think it's about

6   efficiency and fairness, your Honor.  Your Honor, typically a

7   debtor files a robust or a somewhat robust disclosure

8   statement and then the 28-day clock begins to click even if

9   that disclosure statement does require that it be

10  supplemented.  Your Honor, that wasn't the case here.  On

11  February 21st the city filed a disclosure statement that was

12  substantially and materially incomplete by its own terms, and

13  then the city did not provide disclosures on a rolling basis,

14  as I believe it said it would, thereafter.  And then on March

15  31st, your Honor, 38 days later, the city filed what is a

16  monster of a disclosure statement amendment, hundreds and

17  hundreds of pages of new material for parties to digest and

18  reconcile to understand.  The city did, of course, obtain an

19  extension, as is appropriate, but it was only a two-day

20  extension.  And, your Honor, we have made substantial efforts

21  to review the amended disclosure statement and the plan, of

22  course, and to form an educated view on the whys and hows and

23  the implications of the many changes, but, your Honor, we

24  don't think that there is enough time presently in the

25  schedule for parties to really figure out what they

1    reasonably still need to know, what all those implications

2    truly are, and we think that the process, for the city's

3    benefit also, will be benefitted by having some more time for

4    parties to be able to make those determinations, to actually

5    be able to confer with the city to produce refined objections

6    so that hopefully the issues around information gaps are

7    substantially narrowed from where they might be today if

8    parties were to file their objections, and ultimately we

9    think that will lead to what should be a smoother disclosure

10   statement hearing.

11           Your Honor, we think it's reasonable and required

12   that parties do have a reasonable period for review of the

13   disclosure statement.  It is effectively a new document that

14   we've now had in our hands for 48 hours, and we don't think

15   that the request for two weeks is unreasonable.  We are

16   willing, of course, and open to being constructive around

17   scheduling, but we do think it is warranted, your Honor, that

18   there be an extension of the timetable to permit parties to

19   do the work they need to do around the disclosure statement.

20           THE COURT:  Thank you.

21           MR. MARRIOTT:  Good morning again, your Honor.

22   Vince Marriott, EEPK.  I rise in part to make a point that I

23   made last time we were here, which is that this case really

24   isn't the City versus Syncora.  There are large groups of

25   constituencies that have views regarding how the city has

1   conducted the case that are not altogether positive.  I think
2   your order to show cause regarding an expert was interesting
3   because of the responses.  I think the responses illuminated
4   some interesting things about the dynamics of this case.  I
5   thought it was of particular interest to see so many of the
6   constituencies grasping at the idea of an expert as a
7   lifeline for somebody who might actually take a hard look at
8   assets and operations with an eye toward maximizing creditor
9   recoveries within the context of recovery for Detroit.
10          Monday the city filed a revised plan and disclosure
11  statement, which, while bearing structural similarities to
12  the previous plan, is materially different and worse for
13  creditors economically.  It is a plan that, you know, at
14  least as of 8 a.m. this morning has the support of no major
15  constituency.  We are eight months into this case, and the
16  city has just filed a plan that moves backwards away from
17  consensus rather than towards it.  In my view, this is
18  because the city has not engaged in a collaborative effort
19  toward consensus but, rather, has been trying to beat
20  creditors into submission.
21          There needs to be, in my view anyway, some sort of
22  reset here.  A selected and appropriately charged court-
23  appointed expert would be one element of such a reset which
24  would bring creditors back into the process in a way that
25  they have not been for awhile.  The other would be putting an

1   end to city-created unrealistic, inefficient, and unfair time

2   frames within which to respond to complex documents affecting

3   billions of dollars of claims and the future of Detroit.  If

4   the plan process is going to continue with moving target

5   plans and disclosure statements, creditors and parties in

6   interest should at least have a reasonable period of time to

7   respond to each iteration.  This is a major change from what

8   was there before.  Tacking a couple of days on to review

9   hundreds of pages just is not affording to creditors and

10  ultimately to the Court the sort of review and comment that

11  this case really calls for.  Thank you.

12          THE COURT:  I appreciate the depth of concern that

13  your comments reflect, but my question to you is we're

14  talking about a disclosure statement which, in my experience,

15  admittedly in Chapter 11, not in Chapter 9, but,

16  nevertheless, material, I think, is that of all of the papers

17  in a case, the disclosure statement may be the least

18  important in that nobody but the lawyers who are retained to

19  object to it actually read it, so what are we talking about

20  here?

21          MR. MARRIOTT:  I have an answer to that, your Honor,

22  which doesn't directly rebut what you just said.  The answer

23  to that is this.  The disclosure statement approval, while

24  perhaps in a vacuum, is a relatively -- is relatively less

25  consequential than, of course, confirmation.

1          THE COURT:  Um-hmm.

2          MR. MARRIOTT:  It, nevertheless, begins a process,

3    including solicitation, and where this plan process will

4    break down is if we have a disclosure statement and a plan

5    that changes materially again.

6          THE COURT:  It undoubtedly will when and if

7    settlements are reached.

8          MR. MARRIOTT:  Correct.  And sending out something

9    that's --

10         THE COURT:  If our --

11         MR. MARRIOTT:  But once we -- once solicitation --

12         THE COURT:  If we adjourn confirmation every time

13   there's a settlement, we'll never get there.

14         MR. MARRIOTT:  But once the plan -- once the plan

15   has gone out for solicitation -- first of all, we know that

16   this plan is -- doesn't work for anybody because it's worse

17   than the last plan, and nobody was happy with the last plan.

18   It seems to me to be not advantageous to the process to keep

19   it moving to then start soliciting a plan that is just --

20   can't use a martial metaphor here but that will prompt

21   vigorous --

22         THE COURT:  Thank you.

23         MR. MARRIOTT:  -- opposition from all concerned.  It

24   just seems to -- the point I'm making is although the request

25   here for a two-week extension is focused --

1          THE COURT:  Isn't a better answer to that for you
2  all to get serious in mediation?
3          MR. MARRIOTT:  Judge, it would be unwise for me to
4  comment on the success of the mediation process so far.
5          THE COURT:  Then I'll withdraw my question.
6          MR. MARRIOTT:  But the two-week extension sought
7  here as and to the extent that it would -- and it would
8  require a rollout of some of the other dates, although
9  nominally with respect to disclosure statement alone, in
10  fact, preserves, at least in my view, the integrity of the
11  process insofar as, you know, rushing to approve a disclosure
12  statement that relates to a plan that is going to result in
13  vigorous and extended opposition seems unproductive.
14          THE COURT:  But if I take that to its logical
15  conclusion, we don't send out a disclosure statement or a
16  plan for balloting until when?  A whole lot more people agree
17  to it?
18          MR. MARRIOTT:  Well, I understand, Judge, that any
19  argument can prove too much, and I can certainly understand
20  how mine could as well, but in the context of a -- what
21  amounts to a whole new plan and a whole new disclosure
22  statement filed two days ago --
23          THE COURT:  Um-hmm.
24          MR. MARRIOTT:  And when I say "whole new," I
25  understand that there are structural similarities --

1      THE COURT:  Right.

2      MR. MARRIOTT:  -- but economically it's meaningfully

3  different, and the disclosure statement has been meaningfully

4  supplemented by an exhibit package and by significant other

5  documents that without arguing to you now that we need to

6  keep rolling it and rolling it and rolling it, it seems to me

7  it makes sense to do it this time for that reason.

8      THE COURT:  And just for the record, even though I

9  retracted the question, I will clarify it that when I meant

10  you all should get serious about mediation, I meant the city,

11  too, but still the question is withdrawn.

12      MR. MARRIOTT:  Okay.  Other questions?

13      THE COURT:  No.  Thank you.

14      MR. MARRIOTT:  Thank you.

15      MS. NEVILLE:  Carole Neville from Dentons on behalf

16  of the Retiree Committee.  Your Honor, we second what Mr.

17  Marriott has just said, but on a much more mundane level, we

18  sent the city a very detailed commentary on the original

19  disclosure statement --

20      THE COURT:  Um-hmm.

21      MS. NEVILLE:  -- and got back on March 28th we'll

22  either fix this or we won't and then two days later got a

23  major revision.  Just on a mundane level, I would have to

24  file a very voluminous objection to disclosure that can be

25  resolved if we had a little bit more time.  In two days or

1  three days, whatever we have left, I can't go back to Mr.

2  Bennett and Ms. Lennox -- and we've been working very hard on

3  the retiree solicitation package -- and resolve all of the

4  issues that I raised, and they're serious.  There are

5  seriously misleading statements in the disclosure statement

6  that we would like to have fixed.

7          THE COURT:  Um-hmm.

8          MS. NEVILLE:  So I'm asking for more time just for

9  what you normally do in a disclosure statement is to resolve

10  the objections that we have.

11          THE COURT:  Um-hmm.  Thank you.

12          MR. CULLEN:  Good morning, your Honor.  Thomas

13  Cullen, Jones Day, for the city.  A couple of observations.

14  All of this has occurred within the context of your Honor's

15  March 6th order, which I have in front of me here, which the

16  city understood and I think we all understood established a

17  schedule that had several characteristics.  One, it was very

18  close-knit in terms of the relationship of one day to another

19  in the process.  Number two, it was geared to get us to a

20  conclusion with the plan and to put pressure on the parties

21  to get to conclusions on various aspects of the plan because

22  the city needs to move through this process.  Number three,

23  it's a very demanding schedule.  It's hard on the horses.

24  There's no doubt about it.  I take that as an agricultural

25  rather than a military, but --

1    THE COURT:  I'm never going to hear the end of this,
2  am I?

3    MR. CULLEN:  I'm sorry, your Honor.  Part of the
4  process --

5    THE COURT:  Why is Mr. Hertzberg laughing the
6  loudest?

7    MR. HERTZBERG:  I just heard it.  I didn't hear it
8  the first time.  Mr. Erens had to tell me.

9    THE COURT:  Okay.

10    MR. CULLEN:  And so as part of this, you know, kind
11  of iterative process -- and this came up at the original
12  hearing -- February 21st the original plan, March 6th the
13  order, March 14th the deadline for parties to make objections
14  and issues, and we got a lot.  We got a lot of objections and
15  issues, and we've been working hard to respond to those.  And
16  I think that as the Court's order says in the block in the
17  middle on page 1 that this is only part of the process
18  between the parties of sharing information about the plan and
19  what can and can't be done with respect to the plan.  It is
20  going on alongside a process of mediation, and that process
21  of mediation has been vigorous, has consumed a lot of time,
22  has consumed a lot of emotion on both sides, but has been
23  going on at a fairly vigorous rate.  So it's been going on on
24  two levels at that time, and the voluminousness of the
25  objections led to a voluminous amount of changes.  And what

1  we thought and came to your Honor with was the idea that

2  incorporating these changes took us longer than we thought.

3  We were going to miss our deadline by a couple of days, so we

4  moved a couple of the other deadlines by the same couple of

5  days attempting to maintain the integrity of your Honor's

6  schedule.

7          One of the particularly chewy items of disclosure

8  has been the plain language disclosure to go to the retirees

9  or the people who aren't financial professionals, and Ms.

10  Lennox, as was pointed out on our side, has been taking the

11  lead on that and working hard at that.  We're hoping -- we're

12  trying to make progress on that.  With the best faith in the

13  world, it is very difficult to make lawyers think like real

14  people, so we're working at that, and we hope to -- we do

15  hope to have some progress on that, but what we're afraid of

16  here with respect to this motion -- and we are sympathetic to

17  the demands on everyone.  This has been a demanding process,

18  but it has been a demanding process for the city beyond the

19  realm of the professionals as well, and we'd like to move it

20  along.  And we would not like to do things in this schedule

21  that would actually push off the solicitation date, that

22  would push off the other dates that really drive attention to

23  the plan.

24          I would note in passing that nearly all of the

25  objections to the disclosure fly into the teeth of 1125.

1  Apparently the disclosure is adequate enough for everybody to
2  say they don't like it, and 1125 really says is there
3  adequate information to give the parties a meaningful basis
4  to say yes or no.  And what they're telling you is with
5  respect to the current configuration of the plan, there's
6  adequate information.  It tells me no.  We're hoping to
7  change that in the course of the mediation process and
8  continuing negotiation.  We're hoping to have emendations and
9  settlements to the plan as we move forward.  That's what
10 we're all working on, but as of right now, the plan, as your
11 Honor has said, has served that at least modest function set
12 forth in the statute, which is have I told you enough to let
13 you know whether or not you want to say yes or no.  Well,
14 that, unfortunately, is, yes, I know enough to say no.  So
15 what we're trying to do here is maintain the integrity of the
16 Court's schedule while recognizing we have an iterative
17 multi-level process going on, recognizing that we're going to
18 want to change the plan.  We want this not to be the last
19 iteration of this, I think.  I think that the parties -- all
20 the parties want it not to be the last iteration, but the
21 parties also want -- and the Court's schedule does this -- a
22 balance between a fair consideration of the alternatives
23 available to the city and the parties and the need to push
24 this along, the need to put the pressure of time and process
25 on those parties, so that's all I have, your Honor.

1    THE COURT:  Thank you.  All right.  The Court is

2  going to take this under advisement and look at the issue of

3  whether there is a bit of slippage in the schedule that we

4  can take advantage of here but to maintain at the same time

5  the confirmation hearing schedule that we have established,

6  so I will issue a new scheduling order if that's appropriate

7  hopefully by the end of today.

8        Before we conclude, however, I do want to have a

9  conversation with Ms. Lennox.  Will you approach the lectern,

10  please?  Since you have been nominated as the point person

11  for the city on retiree disclosure issues --

12    MS. LENNOX:  Yes, sir.

13    THE COURT:  Is that a fair nomination?

14    MS. LENNOX:  That is a fair nomination.

15    THE COURT:  It has been widely reported by the press

16  that retirees who vote for the plan will receive more under

17  the plan than retirees who vote against the plan or not to

18  accept the plan.  After spending an hour with a really bright

19  law clerk diving into the weeds of your plan and disclosure

20  statement, we came to the conclusion that while that may be

21  true in some circumstances, it is not true in all

22  circumstances.  Is that correct?

23    MS. LENNOX:  Let me explain how certain provisions

24  of the plan work, and it all has to do --

25    THE COURT:  Well, I don't want the explanation.

1    What I want from you is your commitment again --

2              MS. LENNOX:  Yes.

3              THE COURT:  -- that in whatever explanation you

4    provide to the retirees and to the public as to what retirees

5    will be paid and when and under what circumstances some may

6    receive more of a cut than others, it is perfectly

7    understandable.

8              MS. LENNOX:  I commit to that, your Honor.  And, in

9    fact, I am not doing this in a vacuum.  I am doing this --

10   I've been having three weeks of discussion with the Retiree

11   Committee counsel, the pension fund counsel, counsel for the

12   retiree associations, counsel for the safety unions, and

13   counsel for AFSCME.  They've all seen the drafts.  I've

14   received several rounds of comments on them for this exact

15   reason.  We all want to be sure that what we give to people

16   is clear, accurate, and understandable, so I would expect to

17   be filing something with the Court in the near term for the

18   Court's approval to get the process started.  That document

19   will undoubtedly change between now and the disclosure

20   statement hearing as the plan changes, and I think we have

21   made significant progress.  I think there's one technical

22   issue that we're trying to work through now, but, please, I

23   want the Court to be assured that the city is not taking it

24   upon itself to do this without the input from the affected

25   parties, and we take the Court's --

1      THE COURT:  And I appreciate that, but I'm

2  reconsidering here as I think about this my decision to let

3  go of my question to you --

4      MS. LENNOX:  Okay.

5      THE COURT:  -- because I'm concerned about the press

6  reporting of the plan because people will make decisions

7  probably much more on what they read in the newspaper than

8  what they read in the disclosure statement; right?

9      MS. LENNOX:  I think, unfortunately, that's true.

10      THE COURT:  So I mean is it accurate what the press

11  has reported that under your present plan --

12      MS. LENNOX:  Under the present plan --

13      THE COURT:  -- simply and straightforwardly, if a

14  retiree votes to reject the plan, they will receive less

15  pension?

16      MS. LENNOX:  No.  The decision is based on a class

17  vote.  The class vote determines whether the outside funding

18  comes in or not.

19      THE COURT:  All right.  Well, to the extent you can

20  work with the media to correct any misimpressions they have

21  about not only how the plan deals with these claims but any

22  other claims, it's in everyone's best interest to have

23  accurate reporting.

24      MS. LENNOX:  I wholeheartedly agree, your Honor.

25      THE COURT:  So I encourage you to deal with those

1  people.

2       MS. LENNOX:  We do deal with them on a daily basis,

3  and we do answer their calls.  I can certainly see if there's

4  an education --

5       THE COURT:  Well, but this is more than just

6  answering their calls.  This is taking a proactive --

7       MS. LENNOX:  Active education session.

8       THE COURT:  -- approach in contacting reporters

9  whose stories need correction.

10       MS. LENNOX:  Understood, your Honor.

11       THE COURT:  My own dealing with them is that --

12  suggests that they want to report accurately, and they're

13  doing the best they can, and they're by and large doing a

14  really good job.

15       MS. LENNOX:  I don't disagree, your Honor.

16       THE COURT:  But there are occasionally details that

17  need correction, and they're happy to do that when you help

18  them --

19       MS. LENNOX:  Understood.

20       THE COURT:  -- or when they are helped, yeah.

21       MS. LENNOX:  We'll devise a plan to reach out --

22       THE COURT:  All right.  Anything else for today?

23  Yes, ma'am.

24       MS. NEVILLE:  Your Honor, I'd like to add to what

25  Ms. Lennox has said because we have been working very closely

1  on that supplement, and it is very clear what happens to the

2  retirees when they vote.  The document that has been filed is

3  not, and that is why I really wanted more time.

4          THE COURT:  I agree with you.

5          MS. NEVILLE:  And the press is reporting on that.

6          THE COURT:  I agree with you.  It literally took my

7  really bright law clerk and I an hour to wade through this to

8  try to figure out what retirees will be paid.  It was very

9  complex --

10          MS. NEVILLE:  Right.

11          THE COURT:  -- and it won't work.

12          MS. NEVILLE:  The supplement we've been working on

13  is really clear --

14          THE COURT:  Okay.  Thank you.

15          MS. NEVILLE:  -- but this document isn't.

16          THE COURT:  Right.  All right.  Anybody else have

17  anything for today?  All right.  We're in recess.

18      (Proceedings concluded at 11:09 a.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett          April 4, 2014
_____     _____
Lois Garrett