## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
                :

In re                : Chapter 9
                :
CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
                :
          Debtor.     : Hon. Steven W. Rhodes
                :
                :
-----------------------------------------------------x

## CITY OF DETROIT'S
## COUNTER-DESIGNATION OF THE CONTENTS OF THE RECORD

Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure,

appellee the City of Detroit (the "City") hereby submits this counter-designation of

the contents of the record in response to *EEPK's Designation of Items to be*

*Included in the Record on Appeal and Statement of Issues to be Presented on*

*Appeal* [Docket No. 4324] filed by Appellants Hypothekenbank Frankfurt AG,

Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief-

und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively,

"EEPK"), on April 30, 2014.

**Designation of Additional Items to Be Included in the Record On Appeal**

A.  **Case No. 13-53846**

| Item No. (Attached) | Docket No. | Description |
|---|---|---|
| 1. | 935 | The Objectors' Motion in Limine to Preclude Debtor From Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection With Its Debtor-in-Possession Financing Efforts |
| 2. | 1983 | Debtor's List of Exhibits for Hearing on the City of Detroit's Assumption Motion [Dkts. 17 and 157] and Motion to Approve Post-Petition Financing [Dkt. 1520] |
| 3. | 2030 | Opposition of Debtor the City of Detroit, Michigan to Objectors' Motion in Limine to Preclude Debtor From Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection With its Debtor-in-Possession Financing Efforts |
| 4. | 2050 | Order Denying Motions to Preclude Debtor from Offering Evidence [Dkts. 933 and 935] |
| 5. | 2082 | Debtor's Amended List of Exhibits for Hearing on the City of Detroit's Assumption Motion [Dkts. 17 and 157] and Motion to Approve Post-Petition Financing [Dkt. 1520] |
| 6. | 2148 | Notice of Revised Proposed Order in Connection With Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay |

| | | |
|---|---|---|
| 7. | 2177 | Second Notice of Revised Proposed Order in Connection With Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay |
| 8. | 2353 | Third Notice of Revised Proposed Order in Connection With a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay |
| 9. | 2357 | Amended Exhibit Lists and Objections for Hearing re City of Detroit's Assumption Motion and Motion to Approve Post-Petition Financing |

**B.  City's Exhibits[1]**

| Item No. (Attached) | Exhibit No. | Description |
|---|---|---|
| N/A | City Ex 36 | City of Detroit Proposal for Creditors [Orr Declaration Ex. A] |
| N/A | City Ex 115 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |

---

[1]  Copies of the Trial Exhibits will be provided at the request of the appellate court.  Additionally, EEPK designated a number of trial exhibits, as well as deposition transcripts, that were not admitted into evidence by the Bankruptcy Court for the Eastern District of Michigan.  The City reserves its rights to object to the inclusion of these items in the record in the instant appeal and/or move to strike such items from the record.

| | | |
|---|---|---|
| N/A | City Ex 142 | Local Emergency Financial Assistance Loan Board Order 2013-21: Order of Approval of Financial Recovery Bonds Upon the Application of the City of Detroit |
| N/A | N/A | City's PowerPoint Presentation Used For Demonstrative Purposes Only During Closing Arguments (January 2014) |

NYI-4585376v2

Dated: May 13, 2014    Respectfully submitted,


/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601-1692
Telephone: (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# **Item 1**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Expedited Consideration** |
|  | ) **Requested** |

## THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

### Preliminary Statement

By this motion, the Objectors[1] seek to preclude the introduction of evidence and argument by the debtor, the City of Detroit (the "City"), regarding the City's post hoc rationalization for the Forbearance Agreement, i.e., that it needed to cut a deal with the Swap Counterparties in order to free up the casino revenues as collateral for post-petition debtor-in-possession ("DIP") financing. The City's

---

[1] This motion is joined by Syncora Capital Assurance and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., DEPFA Bank PLC, Retiree Association Parties, Retired Detroit Police Members Association, Ambac Assurance Corporation, National Public Finance Guarantee Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

motion and supporting exhibits never referenced this purported justification.[2] Instead, it surfaced for the very first time during the depositions of the City's representatives. Still, while the City's witnesses testified that the ability to collateralize the casino revenue for DIP financing was a driving factor and a business justification for the Forbearance Agreement, they refused to provide information regarding the request for proposals or the anticipated DIP loan collateral package on the grounds that such information was "commercially sensitive." The Objectors anticipate that the City will argue that its need for collateralization of the casinos revenues in order to obtain post-petition financing supports its exercise of business judgment and the fairness and equity of the settlement purportedly effectuated by the Forbearance Agreement. Because the City has refused to provide any information regarding its efforts to secure DIP financing, it should be precluded from offering any evidence at the hearing of its new-found theory that the need for casino revenue collateralization justified the Forbearance Agreement.

---

[2] This motion relates to the September 23, 2013 hearing on the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant [to] Rule 9019, and (III) Granting Related Relief* (the "Assumption Motion") [Docket No. 17].

2

13-53846-tjt Doc 4728 Filed 05/13/14 Entered 05/13/14 15:29:33 Page 8 of 594
13-53846-swr Doc 735 Filed 09/16/13 Entered 09/16/13 16:33:36 Page 2 of 594

## Background

### I.  Collateralization of the Casino Revenue Is a Post Hoc Justification for the Forbearance Agreement.

Neither the City's motion to approve the Forbearance Agreement nor any of its supporting exhibits cite collateralization of the casino revenue as a business reason supporting this settlement.  The City's motion cited three reasons why the Forbearance Agreement purportedly constituted a sound exercise of business judgment and was fair and equitable:  (1) it would allow the City access to cash flow; (2) it provides a workable unwind of the swap obligations; and (3) it avoids litigation with the swap counterparties.  (*See* Assumption Motion ¶ 41.)  These three reasons were discussed in the City's moving papers at length.  Nowhere in its papers does the City discuss DIP financing or the need to offer a lien on casino revenues as part of the DIP collateral package.  This purported justification was raised for the very first time during the depositions of the City's witnesses, Emergency Manager Kevyn Orr and the lead negotiator of the Forbearance Agreement, Kenneth Buckfire.  Notably, these depositions occurred just after the City had issued a request for DIP financing proposals to more than thirty parties. (Buckfire Dep. 73:9-11.)

### II.  The City and Its Representatives Have Barred Inquiry into Key Aspects of the DIP Financing.

While Mr. Buckfire and Mr. Orr suddenly testified that the Forbearance Agreement was necessary so that the City could offer collateralization of the

3

casino revenues in a DIP loan, the City's counsel blocked the Objectors from inquiring into details regarding the collateral package being offered as part of the City's DIP financing. Over 15 times throughout these depositions, it was claimed that this information could not be disclosed because it was "commercially sensitive."[3]

Mr. Buckfire would not, for instance, discuss the covenants in the term sheet, the collateral package (aside from the casino revenues), or the parties potentially involved in the financing.

> MR. SUMMERS: What covenants, if any, are included in the RFP as being acceptable or not acceptable?
>
> MR. BUCKFIRE: I'm not going to discuss that. It's commercially sensitive.

(Buckfire Dep. 73:24-74:2)

> MR. CULLEN: . . . So, we're not going to answer questions about individual parties, we're not going to answer questions about the strategy of negotiating with those parties . . . You can go through those general items, but the actual strategy, the terms of arrangements with individual parties I'm not going to have him go into now.

(Buckfire Dep 72:7-22.)

Mr. Buckfire also refused to answer any questions about the collateral package being offered as part of the DIP financing on the basis of the claim that this information was commercially sensitive.

---

[3] The City never sought a protective order with respect to this information; it merely directed its witnesses to refuse to answer the Objectors' questions.

4

13-53846-tjt Doc 4723-5 Filed 05/13/13 Entered 05/13/13 15:38:32 Page 10 of 594
13-53846-swr Doc 935 Filed 09/16/13 Entered 09/16/13 18:53:06 Page 4 of 13

> MR. SUMMERS: What other [in addition to a lien on casino revenues] collateral is the City offering to secure the DIP financing loan?
>
> MR. BUCKFIRE: I'm not going to answer that question.

(Buckfire Dep. 74:12-14.)

> MR. SUMMERS: Is the City offering art work as collateral?
>
> MR. BUCKFIRE: I'm not going to discuss the terms of the term sheet, sorry.

(Buckfire Dep. 75:2-4.)

Specifically, Mr. Buckfire would not discuss at all whether the City had considered alternate sources of funding from the State of Michigan or federal government, continuing to claim that this is commercially sensitive information.

> MR. SUMMERS: Has the City looked into possible sources of funding from the State of Michigan?[4]
>
> MR. BUCKFIRE: I'm not going to discuss that.
>
> MR. SUMMERS: Has the City looked into possible sources of funding from the federal government?
>
> MR. BUCKFIRE: I'm not going to discuss that either.
>
> MR. SUMMERS: On what basis?
>
> MR. BUCKFIRE: Commercially sensitive information.

---

[4]  Mr. Orr stated in his deposition that, though the information regarding aid from the State of Michigan and the Federal Government was commercially sensitive, he understood that neither liquidity nor credit enhancement would be provided by the State of Michigan or the Federal Government in connection with the DIP financing.  (Orr Dep 207:6-21.)  He did not provide specifics and admitted that Mr. Buckfire is leading the DIP financing process for the City.  (Orr Dep 201:10-17.)  Mr. Buckfire, as noted above, refused to answer the relevant questions.

5

(Buckfire Dep. 107:12-19.)

> MR. HACKNEY: And why aren't you going to tell me about [alternate sources of funding from the State or federal government]?

> MR. BUCKFIRE: It's commercially sensitive information,

(Buckfire Dep. 162:20-163:2.)

Mr. Buckfire also declined to provide specifics about the operation of the collateral package being offered in connection with the DIP financing, even though he had stated the DIP would be in part collateralized with casino revenues:

> MR. HACKNEY: As the banker who is leading the DIP, what's your understanding of the role the casino revenues will play in the collateral package offered in connection with the DIP?

> MR. BUCKFIRE: They will be part of the collateral package.

> MR. HACKNEY: So, they will be part, and when you say they, do you mean a specific period of time of the casino revenues or do you mean casino revenues projecting into the future?

> MR. BUCKFIRE: It's commercially sensitive so I'm going to decline to answer it.

(Buckfire Dep. 142:19-143:4.)

Finally, the City's counsel also invoked commercial sensitivity in Mr. Orr's deposition:

> MR. HACKNEY: Is the -- is the City considering pledging art as collateral?

MR. SHUMAKER: Again, I'm going to get into now the -- this is a very commercially sensitive subject.

MR. HACKNEY: I'm just asking the questions. You guys got to decide --

MR. SHUMAKER: I'm just stating my objection, and the fact of the matter is, as was stated yesterday with -- with Mr. Buckfire, is that when we get into the -- as you said, the RFP, the DIP RFP process is just started. We're not going to go into strategy or what the terms are or what the specifics are, because we do not believe that this is something that would be down to the City's benefit.

(Orr Dep. 209:21-210:10.)

Thus, the City blocked from discovery all of the Objectors' inquiry into the content of the DIP financing collateral package, while at the same time contending that the collateral package was one of the reasons that justified entering into the Forbearance Agreement.

## Argument

I. **The City Will Provide Evidence Regarding the Fairness and Equity of the Forbearance Agreement and the City's Use of Business Judgment in Entering the Forbearance Agreement.**

In order to approve a settlement under Rule 9019 of the Bankruptcy Code, a court must determine that the settlement is fair and equitable. *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988) *citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The City has the burden to establish that a settlement is fair and equitable. *See In re Hallet,* 33 B.R. 564, 565 (Bankr. D. Me. 1983). In meeting that burden, the City

7

must provide the court with a factual basis for concluding that the settlement is fair and equitable. *Reynolds* 861 F.2d 469, 473 (6th Cit. 1988).

A debtor's decision to assume or reject a contract under section 365 of the Bankruptcy Code is reviewed under the "business judgment" standard. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The business judgment standard "presupposes that the estate will assume a contract only where doing so will be to its economic advantage . . . ." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008). To satisfy this standard, "[t]he act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is . . . beneficial to the estate." *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 672 (S.D.N.Y. 2012) (quoting *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.*), 208 F.3d 498, 505 (5th Cir. 2000).).

The Objectors anticipate that, in representing to the Court that the Forbearance Agreement is fair and equitable under Rule 9019 and a sound exercise of business judgment under section 365, the City will now attempt to argue that a sound business reason that justifies approval of the Forbearance Agreement is that it will allow for the casino revenues to be collateralized, which is necessary in order to obtain the post-petition DIP financing it seeks. (Orr Dep. 213:9-15.) However, as explained below, the City should not be permitted to make this newly

discovered argument because it has blocked the Objectors' inquiry into key features of the DIP financing and its collateral package.

**II.    To the Extent the City seeks to Support Its Argument In Favor of Approving the Forbearance Agreement By Reference to Its Need For Casino Revenues in Connection With the DIP Loan, It Should be Precluded from Doing So Because It Has Blocked the Objectors' Inquiry into the Issue.**

A party is not permitted to withhold information during discovery and then introduce it at trial to support its claims. *See, e.g., In re Lott*, 139 F. App'x 658, 660 (6th Cir. 2005) ("[L]itigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. 'The attorney-client privilege cannot at once be used as a shield and a sword.'") *quoting United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991).  If a party intends to rely on information as evidence at trial, it is required to permit discovery of that information or waive its use at trial.  *See, e.g., Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ("[A] party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver of the advice-of-counsel defense . . . ."); *see also Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) ("[Defendant] waived any available advice of counsel defense by objecting  . . . to [Plaintiff's] discovery requests . . . .").

9

13-53846-tjt  Doc 4723-5  Filed 05/13/13  Entered 05/13/13 15:33:06  Page 15 of 594
13-53846-swr  Doc 935  Filed 09/16/13  Entered 09/16/13 13:53:06  Page 9 of 19

Thus, where a litigant prevents an adversary's inquiry regarding facts relevant to the claims at issue, he should not be permitted to introduce evidence of those facts at trial. *See In re Residential Capital, LLC*, 491 B.R. 63, 72 (Bankr. S.D.N.Y. 2013); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 (S.D.N.Y. 2000) aff'd, 4 F. App'x 81 (2d Cir. 2001) ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel."). In *In re Residential Capital*, a debtor sought court approval of a settlement with certain parties under Rule 9019. *Id.* In the discovery phase leading up to the hearing on its 9019 motion, the debtor claimed privilege throughout its document productions and depositions. *Id.* In deposition, the debtor's CEO was instructed by counsel not to reveal the basis for any of the decisions to enter the settlement in question. *Id.* Objectors to the settlement argued that the debtor should be precluded from introducing the evidence because the debtor had blocked access to the information throughout the discovery period. *Id.* The court agreed, and ruled that "A court should exclude any testimony or evidentiary presentations by the Defendants at trial if that same testimony or evidence was withheld from Plaintiffs during discovery . . . ." *Id.* at 69.

Here, it is bad enough that this purported rationale supporting the Forbearance Agreement was never even mentioned in the City's moving papers. But the fact that the City then proffered the rationale, while denying any discovery

on it whatsoever, is wholly improper. To the extent the City seeks to justify its decision to enter into the Forbearance Agreement by reference to its need for collateralization of the casino revenues, it should not be permitted do so by relying on the casino revenues' use in the DIP loan's collateral package. The City should not be permitted to block all inquiry by the Objectors into the nature of the DIP loan's collateral and terms while, at the same time, advancing an argument in favor of the Forbearance Agreement that depends on this feature of the DIP loan's collateral package. Specifically, because the Objectors have not been given an opportunity to examine whether the City is using other sources of collateral and how much, relative to the casino revenues, might be available to the City from other sources, the Objectors would be unfairly prejudiced if evidence and arguments regarding the City's need for casino revenues in connection with the DIP loan were introduced at the hearing. The Objectors cannot adduce information regarding funding and collateral alternatives from any source other than the City. The City should therefore be precluded from introducing any evidence regarding the City's need for collateralization of casino revenues in connection with its DIP financing efforts.

## Conclusion

For the foregoing reasons, the Objectors respectfully request that this Court preclude the City from introducing evidence and argument concerning City's need

for collateralization of the casino revenues in connection with its DIP financing efforts as a business justification for the Forbearance Agreement and enter an order substantially similar to that attached herein as Exhibit 1.


Dated: September 18, 2013

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: _/s/ Vincent J. Marriott, III_____
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084

Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428
Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

By:  */s/ Karen V. Newbury*
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  knewbury@schiffhardin.com
E-mail:  mott@schiffhardin.com

13

*Attorneys for DEPFA Bank PLC*

By: _/s/ Thomas R. Morris_
Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
Telephone:  (248) 539-1330
Facsimile:  (248) 539-1355
E-mail:  morris@silvermanmorris.com
E-mail:  avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
Telephone:  (248); 646-8292
Facsimile:  (248) 646-8375
E-mail:  bokeefe@lippittokeefe.com
E-mail:  rplecha@lippittokeefe.com

*Attorneys for Retiree Association Parties*

By: _/s/Meredith E. Taunt_
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
**STROBL & SHARP, P.C.**
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304-2376
Telephone:  (248) 540-2300
Facsimile:  (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

14

*Attorneys for Retired Detroit Police Members Association*

By: /s/ Caroline Turner English
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By: /s/ Guy S. Neal
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034

15

Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
E-mail:  jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
E-mail:  gneal@sidley.com

*Attorneys for National Public Finance Guarantee Corporation*

By:  */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY  100166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
E-mail:  llarose@winston.com
E-mail:  skohn@winston.com
E-mail:  chardman@winston.com

16

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX  77002-5242
Telephone:  (713) 651-2600
Facsimile:  (713) 651-2700
E-mail:  sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By: */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:  EJEssad@wwrplaw.com
E-mail:  mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:  Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By:  */s/Robert D. Gordon*
Robert D. Gordon

17

Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
E-mail: rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

By: */s/ Carole Neville*
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York 10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

18

## Summary of Attachments

Exhibit 1 - Proposed Order

Exhibit 2 - Notice

Exhibit 3 - Brief [Not Required]

Exhibit 4 - Certificate of Service [To be Filed]

Exhibit 5 - Affidavits [Not Applicable]

Exhibit 6-A - Excerpts of Deposition of Kenneth Buckfire

Exhibit 6-B - Excerpts of Deposition of Kevyn D. Orr

K&E 27925136.1

13-53846-tjt   Doc 4785-1   Filed 05/16/13   Entered 05/16/13 20:52:06   Page 25 of 594
13-53846-swr   Doc 785-1   Filed 09/10/13   Entered 09/10/13 18:32:06   Page 2 of 4

**Exhibit 1**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

This matter having come before the Court on the motion of the Objectors for the entry of an order precluding the City of Detroit from offering evidence regarding the City's need to obtain casino revenues in connection with its debtor-in-possession financing efforts, the Court having reviewed the Objectors' motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1. The Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection With Its Debtor-In-Possession Financing Efforts is GRANTED.

2. The Debtor, the City of Detroit, is precluded from introducing evidence regarding the City's need to obtain casino revenues in connection with its debtor-in-possession financing at the hearing on the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief.

3.      The joining Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____
STEVEN W. RHODES
United States Bankruptcy Judge

**Exhibit 2**

**Notice of Motion and Opportunity to Object**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## NOTICE OF THE OBJECTORS'
## MOTION *IN LIMINE* TO PRECLUDE DEBTOR
## FROM OFFERING EVIDENCE REGARDING THE CITY'S
## NEED TO OBTAIN CASINO REVENUES IN CONNECTION
## WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

**PLEASE TAKE NOTICE** that on September 18, 2013, the Objectors, filed its *Motion* in *Limine to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-In-Possession Financing Efforts* (the "Motion *in Limine*") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to preclude the introduction of evidence and argument by the debtor, the City of Detroit (the "City"), regarding the need for the City to obtain access to casino revenues in connection with its efforts to secure post-petition debtor-in-possession financing.

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Motion *in Limine*. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors Motion *in Limine*, or you want the Bankruptcy Court to consider your views on the Motion *in Limine*, by **October 3, 2013 at 4:00 p.m. (EDT)** you or your attorney must:[1]

---

[1] Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline. The Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Objector will file and serve notice of the new response deadline.

27923097_4.DOC

13-53846-swr Doc 4728 Filed 05/12/14 Entered 05/12/14 15:29:32 Page 30 of 594
13-53846-swr Doc 935-3 Filed 09/18/13 Entered 09/18/13 18:58:06 Page 2 of 10

1. File with the court a written response to the Motion *in Limine*, explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:     (248) 646-5070
Facsimile:     (248) 646-5075

2. If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion *in Limine* and you will be served with a notice of the date, time and location of the hearing.

   **PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion in Limine and may enter an order granting such relief.**

---

[2]     A response must comply with F. R. Civ. P. 8(b), (c) and (e).

27923097_4.DOC
13-53846-tjt   Doc 4728-3   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 31 of 594
13-53846-swr   Doc 935-3   Filed 09/16/13   Entered 09/16/13 13:58:06   Page 3 of 10

Dated: September 18, 2013

**KIRKLAND & ELLIS LLP**

By: */s/ Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

By: */s/ Vincent J. Marriott, III*
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Telephone: (248) 649-1200
Facsimile: (248) 649-2920
E-mail: howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**

27923097_4.DOC
13-53046-swr Doc 4728-3 Filed 05/19/14 Entered 05/19/14 15:29:32 Page 32 of 594
13-53046-swr Doc 935-3 Filed 09/16/13 Entered 09/16/13 18:58:06 Page 24 of 50

1735 Market Street, 51st Flr.
Philadelphia, PA 19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Telephone: (302) 252-4428
Facsimile: (410) 361-8930
E-mail: summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

By: */s/ Karen V. Newbury*
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5600
Facsimile: (312) 258-5600
E-mail: rfrimmer@schiffhardin.com
E-mail: knewbury@schiffhardin.com
E-mail: mott@schiffhardin.com

*Attorneys for DEPFA Bank PLC*

By: */s/ Thomas R. Morris*
Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200

4

27923097_4.DOC
13-53846-tjt Doc 4728-3 Filed 05/09/14 Entered 05/09/14 15:29:32 Page 33 of 594
13-53846-swr Doc 935-3 Filed 09/16/13 Entered 09/16/13 18:58:06 Page 35 of 96

Farmington Hills, Michigan 48334
Telephone:  (248) 539-1330
Facsimile:  (248) 539-1355
E-mail:  morris@silvermanmorris.com
E-mail:  avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
Telephone:  (248); 646-8292
Facsimile:  (248) 646-8375
E-mail:  bokeefe@lippittokeefe.com
E-mail:  rplecha@lippittokeefe.com

*Attorneys for Retiree Association Parties*

By: _/s/Meredith E. Taunt_____
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
**STROBL & SHARP, P.C.**
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304-2376
Telephone:  (248) 540-2300
Facsimile:  (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

*Attorneys for Retired Detroit Police Members*
*Association*

By: _/s/ Caroline Turner English_____
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**

5

27923097_4.DOC
13-53846-tjt  Doc 4728-3  Filed 05/13/14  Entered 05/13/14 15:29:32  Page 34 of 594
13-53846-swr  Doc 935-3  Filed 09/16/13  Entered 09/16/13 18:58:06  Page 4 of 10

1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By:  /s/ Guy S. Neal_____
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034
Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**

6

27923097_4.DOC
13-53846-tjt  Doc 4728-3  Filed 05/09/14  Entered 05/09/14 15:29:32  Page 35 of 594
13-53846-swr  Doc 935-3  Filed 09/16/13  Entered 09/16/13 18:58:06  Page 57 of 94

555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
E-mail: jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: gneal@sidley.com

*Attorneys for National Public Finance Guarantee*
*Corporation*


By: */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 100166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
E-mail: llarose@winston.com
E-mail: skohn@winston.com
E-mail: chardman@winston.com

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 651-2600

7

27923097_4.DOC
13-53846-tjt Doc 4728-3 Filed 05/19/14 Entered 05/19/14 15:29:32 Page 36 of 594
13-53846-swr Doc 935-3 Filed 09/16/13 Entered 09/16/13 18:58:06 Page 8 of 10

Facsimile:  (713) 651-2700
E-mail:  sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By:  */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:  EJEssad@wwrplaw.com
E-mail:  mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:  Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By:  /s/Robert D. Gordon
Robert D. Gordon
Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI  48009
Telephone:  (248) 988-5882
Facsimile:  (248) 988-2502
E-mail:  rgordon@clarkhill.com

8

27923097_4.DOC
13-53846-tjt  Doc 728-3  Filed 05/09/14  Entered 05/09/14 15:29:32  Page 37 of 594
13-53846-swr  Doc 935-3  Filed 09/16/13  Entered 09/16/13 18:58:06  Page 9 of 20

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

By: /s/ Carole Neville
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York  10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

27923097_4.DOC
13-53846-swr   Doc 4726-3   Filed 05/03/14   Entered 05/03/14 15:29:32   Page 38 of 594
13-53846-swr   Doc 428   Filed 09/18/13   Entered 09/18/13 18:53:06   Page 9 of 9

**Exhibit 3**

**None [Brief Not Required]**

**<u>Exhibit 4</u>**

**None [Separate Certificate of Service to be Filed]**

**<u>Exhibit 5</u>**

**None**

**Exhibit 6A**
**Excerpts of Deposition of Kenneth Buckfire**

1  A.  I would recommend it.
2      BY MR. SUMMERS:
3  Q.  Okay.
4      MR. SUMMERS: Let's mark that for follow-up
5  after the deposition.
6      BY MR. SUMMERS:
7  Q.  You testified that as of the last analysis your
8  understanding is the estimated amount of the
9  termination payment that would be due is roughly three
10  hundred million dollars, is that correct?
11  A.  Well, it clearly moves around as the interest rate
12  curve moves around.  I think the most recent number is
13  somewhere reaching 275 and 300 million dollars.
14  That's before the application of the applicable
15  discount that we had provided for in the termination
16  agreement.
17  Q.  And that last analysis, when was that performed?
18  A.  A few days ago.
19  Q.  How does the City plan to get the cash necessary to
20  make the termination payment?
21      MR. CULLEN: Objection.  Foundation.  Form.
22      BY MR. SUMMERS:
23  Q.  Does the City have a plan at this point for how it
24  will obtain the cash necessary to pay the termination
25  payment?

1      MR. CULLEN: Objection, foundation, form,
2  but you can address the question.
3  A.  Yes, the City has a plan.
4      BY MR. SUMMERS:
5  Q.  And what is that plan?
6  A.  The City intends to secure a debtor in possession
7  financing of sufficient proceeds to fund the
8  termination payment as well as provide sufficient cash
9  for the City to execute on its reinvestment program
10  during the bankruptcy.
11  Q.  And what is -- what actions, if any, has the City
12  taken toward obtaining debtor in possession financing?
13  A.  We have contacted a large universe of potentially
14  interested investors, many of whom have signed
15  nondisclosure agreements, NDAs, pursuant to which they
16  have received the request for proposal, the RFP which
17  went out yesterday.
18  Q.  And is Miller Buckfire leading the effort to obtain
19  debtor in possession financing?
20  A.  Yes.
21  Q.  And when you say a large universe of potential
22  investors, do you know approximately how many have
23  been talked to?
24  A.  At the moment it's in excess of 30.
25  Q.  And how many have -- how many have signed

1  nondisclosure agreements?
2  A.  That's the universe I'm discussing, approximately 30
3  or more.
4  Q.  So, everybody you've talked to signed?
5  A.  No, some people didn't want to participate.  I can't
6  tell you how many we called.  I can tell you how many
7  we sent NDAs to which have been returned to us, it's
8  in excess of 30.
9  Q.  Are some of the people or some of the potential
10  sources of financing that Miller Buckfire have spoken
11  to said no, we're not interested?
12  A.  Yes.
13  Q.  And approximately how many have said no?
14  A.  Hasn't been that many, maybe ten.  Would your client
15  like one?
16  Q.  And do you know who those ten entities are that have
17  said they are not interested?
18  A.  I do, yes.
19  Q.  And who are they?
20  A.  I'm not going to tell you that.
21  Q.  On what basis?
22  A.  It's commercially sensitive information.
23      MR. CULLEN: Counsel, maybe it will help,
24  and I don't know whether you want this on the record
25  or not, but the position we are going to take with

1  respect to this is that this is a competitive process
2  and the best result in that process is achieved by us
3  being able to negotiate with the individual parties
4  who are out there, and not to litigate the negotiating
5  strategy before we have something to bring back to the
6  court to approve.
7      So, we're not going to answer questions
8  about individual parties, we're not going to answer
9  questions about the strategy of negotiating with those
10  parties and we're not at liberty to give out the
11  information with respect to the people who responded
12  to the NDAs because they understandably don't want to
13  be shopped, don't want to take up a lot of your time.
14  We can fight this through a lot of objections and so
15  forth, and if we want to fight about that at some
16  later time, perfectly fine.
17      You can ask about his general strategy on
18  this, you can ask about the basis for his confidence
19  or nonconfidence in it.  You can go through those
20  general items, but the actual strategy, the terms of
21  arrangements with individual parties I'm not going to
22  have him go into now.  Hopefully by the time we get to
23  the hearing, we'll have an agreement that you will be
24  on a --
25      MR. SUMMERS: Let's go -- I think let's

1  go -- move through the questions and see how we do.

2  **MR. CULLEN:** Okay.

3  **MR. SUMMERS:** I understand the City's

4  position on it.

5  **MR. CULLEN:** Okay.

6  **BY MR. SUMMERS:**

7  Q.  You said an RFP went out yesterday?

8  **A.  Correct.**

9  Q.  Approximately how many people was the RPF sent to

10  yesterday?

11  **A.  The 30 plus people who signed the NDA.**

12  Q.  How much debtor-in-possession financing does the City

13  hope to obtain?

14  **A.  Three hundred fifty million dollars, up to three**

15  **hundred fifty million dollars.**

16  Q.  And does the City have a goal on the interest rate?

17  **A.  The lowest possible interest rate.**

18  Q.  Does the RFP attempt to define what that lowest

19  possible interest rate is?

20  **A.  No.**

21  Q.  Does it define whether the interest rate needs to be

22  fixed or variable?

23  **A.  No.**

24  Q.  What covenants, if any, are included in the RFP as

25  being acceptable or not acceptable?

1  **A.  I'm not going to discuss that.  It's commercially**

2  **sensitive.**

3  Q.  How long of maturity on the DIP financing is the City

4  looking to obtain?

5  **A.  Through the pendency of the end of the case.**

6  Q.  And is the City offering a lien on casino revenues in

7  connection with the DIP financing?

8  **A.  In part.**

9  Q.  I assume the City does not expect to obtain unsecured

10  financing?

11  **A.  I would take it if it was offered.**

12  Q.  No doubt.  What other collateral is the City offering

13  to secure the DIP financing loan?

14  **A.  I'm not going to answer that question.**

15  Q.  Does the RFP define what collateral would be

16  available?

17  **A.  Yes, it does.**

18  Q.  And that's been sent out to potential investors?

19  **A.  Who have signed nondisclosure agreements.**

20  Q.  If somebody new came and said I would be interested in

21  providing DIP financing, you would have them sign an

22  NDA and then provide them the RFP?

23  A.  If they wanted to make an unsolicited proposal without

24  the benefit of the RPF, we would be happy to accept

25  it.  Are you suggesting your client is interested in

1  is submitting a proposal?

2  Q.  Is the City offering art work as collateral?

3  **A.  I'm not going to discuss the terms of the term sheet,**

4  **sorry.**

5  Q.  Well, we kind of picked and choose what terms in the

6  RFP we are discussing and not discussing.

7  **MR. CULLEN:** We have in the attempt to

8  accommodate your desire for information and to

9  maintain control of the integrity of this process

10  which we believe is best negotiated as a negotiation

11  and not a litigation.

12  **MR. SUMMERS:** I guess I struggle with

13  understanding why the collateral that's offered in the

14  RPF that's been sent out when we know the interest

15  rate, the amount of the financing the debtor seeks,

16  why that puts the City at a competitive disadvantage.

17  **MR. CULLEN:** We didn't say the interest

18  rate.

19  **MR. SUMMERS:** The lowest possible.

20  **MR. CULLEN:** This is the beginning of a

21  negotiation.  It's the beginning of a negotiation that

22  isn't at an end yet, that hasn't had any response to

23  the RFPs yet, it's an initial offer, and that's what

24  it is, and he's discussing it as such and willing to

25  testify about it as such, but I'm not going to read

1  the terms of the RFP in the newspaper and our bidders

2  are not going to read the terms of the RFP in the

3  newspaper because that would hamper the process and

4  hamper our ability to get best value.

5  **MR. SUMMERS:** But we already have in the

6  record that the casino revenues are part of the

7  collateral that's being offered, so, what's wrong with

8  finding out what the rest of the collateral that's

9  being offered?

10  **MR. CULLEN:** Not going to argue with you,

11  Counsel.  I'm telling you what the position is.  I've

12  tried to be accommodating.  It's as far as I am going

13  to go.

14  BY MR. SUMMERS

15  Q.  Has the City had discussions with the State of

16  Michigan about providing financing?

17  **A.  I'm not going to discuss that.**

18  Q.  What is the City's view about what has to happen in

19  order to be able to obtain debtor-in-possession

20  financing -- let me put a finer point.

21  Are there certain events that the City

22  believes has to happen in the case for it to be able

23  to realistically obtain debtor-in-possession

24  financing?

25  A.  Yes, there are events in the case.

1　all of the gaming revenues until that claim has been
2　fully satisfied.
3　　　Now, simple math will tell you if we have
4　170 million of gaming revenues and we have a three
5　hundred million dollar termination payment and we have
6　an implied interest rate on that termination payment
7　it will probably take somewhere between two and three
8　years to pay it off in full.
9　Q.　That presumes that the lien held by the Swap
10　counterparties against the casino revenues is a valid
11　and enforceable lien, correct?
12　A.　That's what the agreement specifies.
13　Q.　Well --
14　A.　The 2009 agreement specifies.
15　Q.　Right, but --
16　A.　That's the agreement the City is bound by if the
17　forbearance agreement is not approved.
18　Q.　Unless there's a litigation claim that exists that
19　might invalidate the liens?
20　A.　In which case who knows what the Swap counterparties
21　might do and what we might have access to in terms of
22　gaming revenue.
23　Q.　So, the legal analysis is important to informing --
24　A.　Any risk the City is being asked to take that doesn't
25　have access to gaming revenues is an unacceptable risk

1　from the point of view of the City's ability to
2　rehabilitate itself.
3　Q.　Have you evaluated noncore assets as a source of funds
4　for the City?
5　　　MR. CULLEN: Objection. Foundation. Form.
6　A.　Yes.
7　　　BY MR. SUMMERS:
8　Q.　And what evaluation have you performed?
9　A.　As we've identified in the June 14th plan we did
10　identify for the benefit of the public and the
11　creditors all potential noncore assets that might have
12　value that could be used pursuant to the plan of
13　adjustment.
14　Q.　And on August 5th you announced the City had hired
15　Christie's to appraise the collection at the Detroit
16　Institute of Art, correct?
17　A.　I didn't announce that.
18　Q.　The City announced it.
19　A.　The City announced it.
20　Q.　That they hired Christie's, correct? Do you have an
21　understanding of the approximate value of the City's
22　art collection?
23　A.　No.
24　Q.　Do you have an understanding as to when the City
25　expects to receive the appraisal from Christie's?

1　A.　Yes, by the end of October 2013.
2　Q.　What is the City's intention with respect to analyzing
3　the appraisal and making a determination as to the art
4　work once it receives the appraisal?
5　　　MR. CULLEN: Objection. Foundation. Form.
6　A.　I can't even speculate as to what we'll do until we
7　have some facts as to what value we're dealing with.
8　That's why they were retained.
9　　　BY MR. SUMMERS:
10　Q.　Has the City considered selling or leasing Belle Isle?
11　A.　Not to my knowledge.
12　Q.　Has the City looked into possible sources of funding
13　from the State of Michigan?
14　A.　I'm not going to discuss that.
15　Q.　Has the City looked into possible sources of funding
16　from the federal government?
17　A.　I'm not going to discuss that either.
18　Q.　On what basis?
19　A.　Commercially sensitive information.
20　　　MR. SUMMERS: I'm going to propose we take
21　maybe -- why don't we stop the tape for a minute.
22　　　VIDEO TECHNICIAN: The time is 12:18 p.m.
23　we are off the record.
24　　　(Recess taken at 12:18 p.m.)
25　　　(Back on the record at 1:21 p.m.)

1　　　VIDEO TECHNICIAN: We are back on the
2　record at 1:21 p.m. This marks the beginning of tape
3　number three.
4　　　EXAMINATION
5　　　BY MR. HACKNEY:
6　Q.　Mr. Buckfire, good afternoon. My name is Steve
7　Hackney. I'm an attorney at Kirkland & Ellis, and I
8　represent Syncora Capital Assurance and Syncora
9　Guaranty. Nice to meet you.
10　A.　Likewise.
11　Q.　I think we had a brief conversation which you
12　suggested there might have been something you'd like
13　to correct with respect to a name from the morning's
14　testimony.
15　A.　Yes, thank you, Mr. Hackney. I incorrectly identified
16　the attorney from Cadwalader who was present at the
17　June 4th meeting. His correct name is Larry
18　Stromfeld, S T R O M F E L D. That's his correct name
19　and that's who attended the meeting.
20　Q.　If you think of any other corrections, don't hesitate
21　to stop me and let me know and we'll give you an
22　opportunity to make them.
23　A.　Thank you.
24　Q.　So, I've been listening to your testimony. It's not
25　my intention to re-ask you all the questions that were

Min-U-Script®　　　Bienenstock Court Reporting & Video　　　(27) Pages 105 - 108

13-53846-tjt　Doc 4785　Filed 05/10/13　Entered 05/24/13 20:82　Page 4 of 94
13-53846-swr　Doc 985-4　Filed 09/10/13　Entered 09/10/13 04:08:00　Page 46 of 594

1  would have demanded Syncora made good on its Swap
2  insurance and let Syncora try and stick around and
3  collect the casino revenues, correct?
4    MR. CULLEN: Objection. Foundation. Form.
5  Calls for speculation.
6  **A. It wasn't an issue for the City.**
7    BY MR. HACKNEY:
8  Q. I'm asking whether you thought that was a possibility
9  back at the time you were negotiating the forbearance
10  agreement?
11  **A. It wasn't an issue for the City. Had no impact on the**
12  **City's access to cash.**
13  Q. But if Syncora was a party that might come in in lieu
14  of the Swap counterparties, didn't you want to find
15  out whether you might be able to cut a better deal
16  with Syncora?
17    MR. CULLEN: Objection. Foundation. Form.
18  Calls for speculation.
19  **A. I can't speculate to that.**
20    BY MR. HACKNEY:
21  Q. All you can say is that you never did, correct?
22  **A. Correct.**
23  Q. And in fact between June 29th when you spoke to
24  Mr. Snyder and today, there have never been
25  substantive negotiations between the City and Syncora

1  to your knowledge, isn't that correct?
2  **A. Not on this, no.**
3  Q. I wanted to clarify something that you said about the
4  DIP earlier and it was mainly that -- you used the
5  phrase I didn't understand with respect to the casino
6  revenues, you said -- you either said that the casino
7  revenues would be a part of the collateral package or
8  that part of the casino revenues would be in the
9  collateral package, and I wanted to clarify that.
10    MR. CULLEN: Objection. Foundation. Form.
11  I don't think he said either.
12  **A. I didn't.**
13    BY MR. HACKNEY:
14  Q. Oh, okay. Well, I thought for sure you had said one
15  of those two, but let me understand what you
16  anticipate -- this is subject to counsel's concern,
17  but I think there has been testimony about the casino
18  revenues as part of the collateral package.
19    As the banker who is leading the DIP,
20  what's your understanding of the role the casino
21  revenues will play in the collateral package offered
22  in connection with the DIP?
23  **A. They will be part of the collateral package.**
24  Q. So, they will be part, and when you say they, do you
25  mean a specific period of time of the casino revenues

1  or do you mean casino revenues projecting into the
2  future?
3  **A. It's commercially sensitive so I'm going to decline to**
4  **answer it.**
5    MR. HACKNEY: Okay. I'll just reserve on
6  that. I obviously don't think there's a bunch of
7  value we have going back and forth. I understand your
8  position about this. On some of the other ones, we
9  may come to those briefly and talk about it, but I get
10  the DIP one.
11    BY MR. HACKNEY:
12  Q. You agree that the goal of the forbearance agreement
13  is to get the collateral agreement to terminate so
14  that the City can get access to the casino revenues,
15  correct?
16    MR. CULLEN: Objection. Foundation. Form.
17  **A. That is one of the goals.**
18    BY MR. HACKNEY:
19  Q. That is one of the goals. And isn't it true that your
20  current expectation is that you need the postpetition
21  financing, the DIP loan to close in order to be able
22  to exercise the option under the forbearance
23  agreement, correct?
24  **A. Correct.**
25  Q. And there was testimony on that today because you

1  don't have the money otherwise, right, Mr. Buckfire?
2  **A. That is part of the collateral package, yes.**
3  Q. I'm talking about the use of proceeds of the DIP just
4  so we're clear. Part of the use of proceeds of the
5  DIP will be to exercise the option under the
6  forbearance agreement, correct?
7  **A. Correct.**
8  Q. You understand that you won't have unfettered access
9  to the casino revenues until you exercise the option
10  that leads to the termination of a Swap in the
11  collateral agreement, correct?
12  **A. Yes.**
13  Q. Isn't this a bit circular?
14  **A. Regrettably.**
15  Q. How did you factor that consideration into the
16  determination as to whether to engage in the
17  forbearance agreement?
18  **A. Well, this is why the Swap collateral agreement is**
19  **such a problem for the City. Unless we can eliminate**
20  **the collateral and regain control over gaming revenues**
21  **without risk of loss because of defaults that would**
22  **trap it, we need to rationalize and clean this up in**
23  **order to put the City on a sound financial basis.**
24  Q. So, there are two parts -- there are -- there may be
25  many parts but two of the important parts of the

1   City's plan is are the investments that Mr. Orr wants
2   to make, right?
3   **A.   Right.**
4   Q.   And the cost reductions he wants to make, right?
5   **A.   And the increase in staffing levels across services to**
6   **provide higher level services to the City.**
7   Q.   But that's in the reinvestment, right?
8   **A.   No, it's actually hard to break out that way because a**
9   **lot of it is actually in the salaries line and the HR**
10  **lines.**
11      **So, you have to go back to the numbers and**
12  **ask me a lot of those questions.**
13  Q.   The proposed investments that he wants to make, that
14  he proposes to make that I'm so ruthlessly omitting,
15  they are in this document, right?
16  **A.   Not in this projection.**
17  Q.   They're not in this projection, but they are in this
18  proposal?
19  **A.   That's right.**
20  Q.   He laid them all out in gory detail?
21  **A.   Yes, he did.**
22  Q.   He also lays out a number of cost cutting initiatives,
23  isn't that correct?
24  **A.   Yes, he does.**
25  Q.   And one of his goals is also to make the City more

1   efficient, correct?
2   **A.   Yes.**
3   Q.   At the same time he also wants to make it operate
4   better, correct?
5   **A.   Correct.**
6   Q.   Those two things from a net operating standpoint work
7   in tension with one another, right?
8   **A.   They do over time, but you have to consider the**
9   **timetable and when these things are done.**
10  Q.   I want to ask you a question about state and federal
11  aid but I don't want to mix it up into the DIP which I
12  understand -- which I took to mean earlier was one of
13  the sensitivities there.  I want to go back to June 4,
14  2011.
15      Prior to June 4, 2011 had you undertaken
16  any effort to evaluate whether there was either state
17  aid or federal aid that you could use in lieu of
18  having to negotiate this deal with the Swap
19  counterparties?
20  **A.   We are assuming there is no aid available to the City.**
21  Q.   You were assuming that there was none, but had you
22  undertaken an effort to determine whether there could
23  be some?
24  **A.   I've already testified that I'm not going to discuss**
25  **that.**

1   Q.   And why aren't you going to tell me about that?
2   **A.   It's commercially sensitive information.**
3   Q.   Why?
4   **A.   That's my answer.**
5   Q.   Well, I can understand why if you are seeking estate
6   guarantee of a DIP or other things today, I get that,
7   and I'm not going to ask you about that, but I am
8   going to say that I think I deserve an answer on what
9   happened prior to June 4 in terms of finding
10  alternative ways to address the City's liquidity
11  crisis because after all what's been presented to us
12  was if we didn't do this deal, the City would die, and
13  I do think we are entitled to ask well, what had you
14  tried to do with other actors, so, can we get over it
15  or --
16      MR. CULLEN:  You could certainly ask if he
17  had received any assurance of the availability of any
18  other funding from any other source during that time
19  period.
20      MR. HACKNEY:  Well, I do appreciate that
21  but I often tend to ask my own questions.    Let me
22  try and ask it in a way that hopefully serves your
23  concerns.
24      BY MR. HACKNEY:
25  Q.   And let me first ask you, Mr. Buckfire, had your firm,

1   you or your firm undertaken any analysis of this
2   question?  You don't have to tell me what it was.
3   Let's go in stages.
4       Had you analyzed the problem?
5   **A.   Yes, we did.**
6   Q.   You had analyzed the problem.  And is it your
7   testimony that divulging the results of that analysis
8   would be commercially sensitive?
9   **A.   Yes.**
10  Q.   Is part of the reason for that because of the way any
11  potential aid from the City or from the state or the
12  feds might interplay with the DIP process, is it the
13  way they knit up, is that the problem?
14  **A.   Yes.**
15  Q.   All right.
16      MR. HACKNEY:  Let me suggest a short break.
17  I think that it may be time for me to pass the baton.
18      MR. CULLEN:  Okay.
19      VIDEO TECHNICIAN:  The time is 2:19 p.m.
20  This marks the end of tape number three.  We are off
21  the record.
22      (Recess taken at 2:19 p.m.)
23      (Back on the record at 2:30 p.m.)
24      VIDEO TECHNICIAN:  We are back on the
25  record at 2:30 p.m.  This marks the beginning of tape

# Exhibit 6B
## Excerpts of Deposition of Kevyn D. Orr

6A Kenneth Buckfire Cover sheet.doc

13-53846-tjt  Doc 4728-5  Filed 05/10/14  Entered 05/10/14 15:28:32  Page 48 of 594
13-53846-swr  Doc 995-8  Filed 09/16/13  Entered 09/16/13 19:32:06  Page 2 of 54

1 Q. Your view of those legacy expenditures in the
2 bankruptcy is that they are unsecured claims, correct?
3 **A. Yes. Many of them are, yes. There are some**
4 **expenditures that are secured with regard to the water**
5 **department and parking and some miscellaneous, but the**
6 **roughly 11 and a half, 12 billion dollars that we put**
7 **out there we view as unsecured.**
8 Q. So let's go back to sourcing this termination payment.
9 **A. Yes.**
10 Q. It was my understanding of his testimony that
11 Mr. Buckfire who, by the way, is the individual tasked
12 with obtaining the City's post petition financing,
13 correct?
14 **A. Yes.**
15 Q. And is presumably the individual that's most
16 knowledgeable about that effort?
17 **A. Yes.**
18 Q. It was -- I'll represent to you that his testimony was
19 that the proceeds for the optional termination payment
20 would likely come from the post -- the proceeds of the
21 post petition financing?
22 **A. Yes.**
23 MR. JURGENS: Objection to form.
24 BY MR. HACKNEY:
25 Q. Is that also your understanding?

1 **A. Yes.**
2 Q. Okay. Now, isn't it also true that the City hopes to
3 pledge the casino revenues as part of the collateral
4 package for the post petition financing?
5 MR. SHUMAKER: I'm going to object here.
6 We're getting into an area where it is incredibly
7 commercially sensitive as to what sort of post
8 petition financing that the City is seeking.
9 MR. HACKNEY: Let me not be rude. I will
10 tell you I'm just going to ask him questions that
11 Buckfire asked yesterday -- answered. So I'm not
12 going to try and play the whole thing, but there were
13 absolutely areas where Buckfire answered. I think
14 there were a lot of other people in the room that were
15 there. I think any of your colleagues --
16 MR. SHUMAKER: Okay, that's fine.
17 MR. HACKNEY: Any of your colleagues.
18 MR. SHUMAKER: I just want to caution you.
19 MR. HACKNEY: I understand. I understand
20 the sensitivity. There were absolutely areas, though,
21 that Buckfire talked about. This was one of them. I
22 mean can I get an Amen or --
23 (Consensus Amen.)
24 **A. Okay.**
25 BY MR. HACKNEY:

1 Q. Okay. So I think there -- if I'm not mistaken, your
2 father was an amen minister.
3 **A. Great grandfather, grandfather and father.**
4 Q. So maybe --
5 **A. Yeah, took me back to -- over in the corner with the**
6 **deacons, yeah, took me back.**
7 Q. Okay. I won't compare myself to your father,
8 grandfather and great grandfather, but I can aspire.
9 **A. Yeah.**
10 Q. So I do want to talk about -- this is important.
11 Okay. This is -- isn't it true that one aspect of the
12 DIP -- I'm not going to get into the others -- is that
13 the casino revenues will be pledged or anticipated to
14 be pledged as collateral for the post petition
15 financing?
16 **A. Let me say this. That is certainly under**
17 **consideration.**
18 Q. Okay. Now, isn't it also true, though, that the
19 casino revenues have not currently been freed up on a
20 permanent basis because the City has not currently
21 exercised the option, correct?
22 **A. The certainty that we hope to get out of the**
23 **forbearance agreement has not been approved yet,**
24 **correct.**
25 Q. Well, even if it is approved by the Court, you still

1 won't have exercised the option.
2 **A. That is true with regard to the optional termination**
3 **payment.**
4 Q. Right.
5 **A. Yes.**
6 Q. And you need to exercise the option to terminate the
7 hedge, right?
8 **A. Yes.**
9 Q. You need to terminate the hedge to terminate the
10 collateral agreement.
11 **A. I think that's --**
12 MR. SHUMAKER: Object to form, to the
13 extent calls for a legal conclusion.
14 **A. Yeah, without getting into legal conclusions --**
15 COURT REPORTER: I'm sorry. This is --
16 BY MR. HACKNEY:
17 Q. You think it's a fair characterization that you need
18 to get the hedge terminated to get the collateral
19 agreement terminated?
20 **A. Yes.**
21 Q. And the good part for the City, if those things
22 happen, is that now you have unchanneled access to the
23 casino revenues going into the future?
24 **A. Yes, as we've said today, that certainty is one of the**
25 **motivations to enter into the agreement.**

Page 205

1 Q. But do you also understand that you can't currently
2 pledge the casino revenues to a post petition lender
3 in a -- prior to having exercised the option under the
4 forbearance agreement?
5 A. Well, let's be careful without drawing legal
6 conclusions. You can always enter into agreements
7 that have contingencies attached to them and the
8 parties will wait for those contingencies to occur.
9 That certainly has happened with a number of different
10 negotiations, not just in this case, but happens all
11 the time.
12 Q. That's fair that you absolutely -- you make a pledge
13 that's contingent on something else. But isn't it
14 true that, as a general matter, post petition lenders
15 typically like to make sure that they have clean
16 collateral before they make a loan that's secured by
17 that collateral?
18 MR. SHUMAKER: Objection, calls for
19 speculation.
20 A. I think that's generally a fair characterization;
21 however, there have been cases that I've been involved
22 with outside of this one where post petition lenders
23 have been willing to make pledges or commitments
24 subject to certain contingencies.
25 BY MR. HACKNEY:

Page 206

1 Q. Isn't it your expectation today, though -- is it -- is
2 it your expectation today that any post petition
3 lender will want clear -- a clear lien on the casino
4 revenues before it's willing to lend? Is that your
5 current expectation?
6 A. Well, my current expectation is it might well want
7 clear lien before it's willing to fund. I would think
8 in many of the bankruptcy cases that I've been
9 involved in, post petition lenders, for instance, are
10 willing to make commitments subject to the Court
11 approving their super priority liens, and then once
12 that approval is granted, they fund the loan, so
13 that's fairly common.
14 Q. I'm going to confirm for the record that conversations
15 with the State of Michigan about providing DIP
16 financing or with the federal government about
17 providing DIP financing are still questions that you
18 will refuse to answer on the grounds of commercial
19 sensitivity?
20 MR. SHUMAKER: I think you can ask Mr. Orr
21 those questions. I don't want to -- I don't want to
22 categorically exclude you from doing that.
23 BY MR. HACKNEY:
24 Q. Are they commercially sensitive?
25 A. They are commercially sensitive, but I don't want to

Page 207

1 mislead you. It is my assumption that, while they're
2 commercially sensitive, that's not going to be
3 forthcoming.
4 Q. Oh, really?
5 A. Yes.
6 Q. So just to tie it up, you tried to get a -- whether
7 it's credit enhancement or liquidity from the State
8 and the Feds, and your expectation is that you won't
9 be able to?
10 A. My understanding at the State level is that there's
11 certain prohibitions of the State law on the ability
12 of the State to lend to the City, and at the Federal
13 level my understanding is that it's not going to be
14 forthcoming, direct aid.
15 Q. Interesting. And what about credit enhancement by the
16 State?
17 A. Here again, it's highly commercially insensitive --
18 sensitive. I don't want to say anything that
19 forecloses it, but we -- let me answer it this way.
20 We are operating on the assumption that that will not
21 come -- be forthcoming.
22 Q. The casino revenues are about 170 million dollars a
23 year; isn't that correct?
24 A. Yeah, 170, 180 somewhere in there.
25 Q. Yeah. In fact, that -- it's interesting because the

Page 208

1 DIP proceeds you're seeking are up to 350; is that
2 correct?
3 A. Here again, those are commercially sensitive, but I
4 think that's fair. Yes, I think that's fair.
5 Q. Okay. And that's the equivalent of two years' worth
6 of casino revenues, correct?
7 A. Yes.
8 Q. Okay. And that's something that you think you may be
9 able to get without having to pledge a clear lien on
10 the casino revenues, right?
11 A. No. What I'm trying to say is you can certainly enter
12 into commitments. I'm drawing commitments different
13 from funding. You can certainly have a lender which
14 is quite common in bankruptcy cases to make a
15 commitment subject to approval of its security
16 interest or priorities to actually fund.
17 Q. Okay.
18 A. So that can occur.
19 Q. So the fact that that can occur means that there can
20 be uncertainty in connection with the casino revenues
21 and it won't hamstring your DIP process, correct?
22 A. Yeah, it's not so much -- well, to a degree what
23 you're saying is correct. It's not so much
24 uncertainty with casino revenues because that's math.
25 It may be some uncertainty with regard to the ability

# **Item 2**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
:
In re                              :        Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :        Case No. 13-53846
:
               Debtor.       :        Hon. Steven W. Rhodes
:
:
-------------------------------------------------------x

## DEBTOR'S LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

1.     As contemplated by the proposed Scheduling Order filed by the City on December 6, 2013, and for purposes of the hearing on the City's Assumption Motion [Dkts. # 17, #157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "City's Motions"), scheduled to take place on December 17, 18 and 19, 2013, the City identifies the following exhibits that it may use at the Evidentiary Hearings related to the City's Motions.

| City's Exhibit No. | Exhibit Description |
|---|---|
| 1. | June 7, 2006, ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule |
| 2. | June 7, 2006. ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Schedule |
| 3. | March 30, 2009, Term Sheet: Summary of Terms for Settlement between SBS, Merrill Lynch Capital Services, Inc., and UBS AG (collectively, the "Counterparties), and GRS Service Corporation and the Detroit Police and Fire Retirement System ("PFRS") Service Corporation (collectively the "Service Corporations) |
| 4. | June 26, 2009, SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 5. | June 26, 2009, UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 6. | June 26, 2009, Waiver and Consent of Insurer Syncora, with Exhibits |
| 7. | Detroit, Mich. Code § 18-16-4 |
| 8. | July 5, 2013, Transcript of Hearing, City of Detroit v. Syncora, No. 13-008858-CZ, 3rd Cir. Ct. Co. of Wayne (Hon. A. J. Berry, presiding) |
| 9. | July 4, 2013, Affidavit of Kevyn D. Orr, City of Detroit v. Syncora Guar. Inc., No.: 2:13-cv-12987 (E.D. Mich) |
| 10. | June 14, 2013, City of Detroit ("City") Proposal for Creditors Executive Summary |
| 11. | June 15, 2009, Collateral Agreement among the City, the Service Corporations, and U. S. Bank National.Association ("USBNA") |
| 12. | June 13, 2013, Letter from Orr to USBNA regarding Written Instructions to Custodian Under Collateral Agreement |
| 13. | June 17, 2013, Letter from LeBlanc (Syncora) to USBNA regarding Collateral Agreement dated June 15, 2009 regarding Detroit Retirement Systems with U.S. Bank as Custodian |
| 14. | June 24, 2013, Email from Bennett (Syncora) to Smith (USBNA) regarding USB – Detroit – Casino Revenue Collateral Account, forwarding June 24, 2013 email from Smith to Ball. |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 15. | June 24, 2013, Letter from Bennett (Syncora) to Smith (USBNA) regarding General Receipts Subaccount under the Collateral Agreement dated June 15, 2009 |
| 16. | June 25, 2013, Letter from Orr to Syncora regarding Instructions to Custodian under Collateral Agreement |
| 17. | June 26, 2013, Letter from LeBlanc (Syncora) to the City regarding Instructions to Custodian Under Collateral Agreement |
| 18. | July 15, 2013, Forbearance and Optional Termination Agreement among the Service Corporations, the City, the Emergency Manager, UBS AG, and Merrill Lynch Capital Services, Inc. |
| 19. | July 15, 2013, Letter from Lundy (Syncora) to SBS |
| 20. | July 16, 2013, Letter from LeBlanc (Syncora) to Orr |
| 21. | July 17, 2013, Letter from Orr to LeBlanc (Syncora) regarding July 16 Letter |
| 22. | July 17, 2013, Letter from Carter (SBS) to Lundy (Syncora) |
| 23. | July 18, 2013, Declaration of Gaurav Malhotra In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") |
| 24. | Annual Cash Flow Summary FY 2012-FY 2015; Monthly Cash Flow Forecast FY 2014 and FY 2015 – Base Case [Malhotra Declaration Ex. A] |
| 25. | Ten-Year Financial Projections [Malhotra Declaration Ex. B] |
| 26. | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] |
| 27. | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] |
| 28. | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] |
| 29. | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 30. | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] |
| 31. | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] |
| 32. | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] |
| 33. | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] |
| 34. | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] |
| 35. | July 18, 2013, Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") |
| 36. | June 14, 2013, City of Detroit Proposal for Creditors [Orr Declaration Ex. A] |
| 37. | January 13, 2013, City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] |
| 38. | March 26, 2013, Report of the Detroit Financial Review Team [Orr Declaration Ex. D] |
| 39. | April 4, 2012, Financial Stability Agreement Between the City and the Michigan Department of Treasury [Orr Declaration Ex. E] |
| 40. | December 14, 2012, Preliminary Review of the City of Detroit [Orr Declaration Ex. F] |
| 41. | February 19, 2013, Report of the Detroit Financial Review Team; Supplemental Documentation of the Detroit Financial Review Team [Orr Declaration Ex. G] |
| 42. | March 1, 2013, Letter from Governor Snyder to Bing and the City Council [Orr Declaration Ex. H] |
| 43. | July 8, 2013, Ambac Comments on Detroit [Orr Declaration Ex. I] |
| 44. | July 16, 2013, Letter from Orr to Governor Snyder and Treasurer Dillon regarding Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] |
| 45. | July 18, 2013, Letter from Governor Snyder to Orr and |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Treasurer Dillon regarding Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] |
| 46. | July 18, 2013, Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] |
| 47. | June 12, 2006, UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement |
| 48. | June 12, 2006, SBS Insurance Policies for Scheduled Paymentw of GRS Service Corporation under June 7, 2006 Master Agreement |
| 49. | 2009 Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) |
| 50. | July 31, 2013, First Amendment to Forbearance and Optional Termination Agreement |
| 51. | August 12, 2013, Second Amendment to Forbearance and Optional Termination Agreement |
| 52. | August 23, 2013, Third Amendment to Forbearance and Optional Termination Agreement |
| 53. | August 29, 2013, Fourth Amendment to Forbearance and Optional Termination Agreement |
| 54. | September 4, 2013, Fifth Amendment to Forbearance and Optional Termination Agreement |
| 55. | October 15, 2013, Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. |
| 56. | September 3, 2013, E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments of September 3, 2013, Letter from Miller Buckfire to Gerbino, July 15, 2013, Forbearance and Optional Termination Agreement, and Undated Model "Summary of Certain Key Terms and Conditions" [DTPFF00015602- DTPFF00015638] |
| 57. | September 4, 2013, Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] |
| 58. | September 4, 2013, Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario) |

5

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPFF00014812- DTPFF00014824] |
| 59. | September 30, 2013, Ernst & Young, 13-Week Cash Flow Forecast – Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] |
| 60. | October 2013, Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] |
| 61. | July 5, 2013, Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] |
| 62. | July 5, 2013, Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] |
| 63. | September 16, 2013, Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] |
| 64. | September 16, 2013, Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] |
| 65. | September 2013, Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] |
| 66. | Undated, Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] |
| 67. | September 16, 2013, Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation, with attached "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00000826-DTPPF00000837] |
| 68. | September 16, 2013, Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP.[DTPPF00001006-DTPPF00001010] |
| 69. | September 16, 2013, Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] |
| 70. | Undated, Silver Point Finance, LLC: "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] |
| 71. | September 16, 2013, Letter from Gerbino to Miller Buckfire, attaching Barclay's "Summary of Indicative Terms and Conditions of Swap Termination Note," "Summary of Indicative Terms and Conditions of Quality of Life Note," "Summary of Indicative Terms and Conditions of the Replacement Swap Transaction," and "Muni Swap Confirmation," responding to City of Detroit Financing RFP [DTPPF00000856-DTPPF00000902] |
| 72. | September 16, 2013, Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent – Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] |
| 73. | September 16, 2013, Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP. [DTPPF00000908-DTPPF00000943] |
| 74. | September 16, 2013, "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP. [DTPPF00000838-DTPPF00000855] |
| 75. | September 16, 2013, Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP. [DTPPF00000821-DTPPF00000825] |
| 76. | September 12, 2013, Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP. [DTPPF00000959-DTPPF00000960] |
| 77. | October 8, 2013, Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP. [DTPPF00013170-DTPPF00013195] |
| 78. | October 3, 2013, Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Syncora") and Financial Guaranty Insurance Company's ("FGIC") DIP financing proposal [DTPPF00000035- DTPPF00000037] |

7

| City's Exhibit No. | Exhibit Description |
|---|---|
| 79. | October 25, 2013, Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] |
| 80. | September 2013, Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] |
| 81. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377- DTPPF00003404] |
| 82. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] |
| 83. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] |
| 84. | September 30, 2013, Goldman Sachs' Draft Commitment Letter, including Annex A and B [DTPPF00001543- DTPPF00001567] |
| 85. | September 30, 2013, Goldman Sachs' Draft Fee Letter [DTPPF00001568- DTPPF00001571] |
| 86. | September 30, 2013, Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing" [DTPPF00001058- DTPPF00001086] |
| 87. | October 2, 2013, Letter from Kersten to The City of Detroit regarding CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] |
| 88. | September 26, 2013, Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] |
| 89. | October 3, 2013, Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226- DTPPF00020231] |
| 90. | October 7, 2013, Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] |
| 91. | October 17, 2013, Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " |

8

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPPF00012993- DTPPF00013024] |
| 92. | November 4, 2013, Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] |
| 93. | October 6, 2013, Barclay's Fee Letter fully executed by Barclay's and City  [Filed as Docket No. 1761] |
| 94. | October 6, 2013, Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City  [Filed as Docket No. 1520; Exhibit 6A] |
| 95. | 2013 Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement  [Filed as Docket No. 1520; Exhibit 6B] |
| 96. | October 8, 2013, Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] |
| 97. | October 11, 2013, Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] |
| 98. | October 11, 2013, Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re:  Emergency Manager's Order No. 17: Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan;" and, Undated City Council Resolution Approving Post Petition Financing [DTPPF00019623-DTPPF00019655] |
| 99. | October 11, 2013, Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter  from Orr to Mayor Bing regarding Emergency Manager's Order No. 17:  Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; and, Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan" [DTPPF00019592-DTPPF00019622] |
| 100. | November 6, 2013, Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board |
| 101. | November 5, 2013,  Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), |

| City's Exhibit No. | Exhibit Description |
|---|---|
|  | 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5A] |
| 102. | November 5, 2013, Declaration of James Doak In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5B] |
| 103. | November 11, 2013, City of Detroit, Operational Restructuring Summary |
| 104. | November 12, 2013, City of Detroit, Operational Restructuring Summary |
| 105. | September 27, 2013, Funding for Detroit Announced by Federal Government |
| 106. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast – Monthly (FY 2013, FY 2014, FY 2015) |
| 107. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast (including Restructuring Scenario) |
| 108. | September 16, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |
| 109. | October 3, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) |
| 110. | September 17, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) |
| 111. | September 18, 2013, Ernst & Young, Illustrative Cash Chart |

2.      The City reserves the right to supplement its list of exhibits, as provided for in the proposed Scheduling Order.

3.      The City will exchange copies of its exhibits on counsel for any objecting parties on a mutually agreeable schedule.

4.     The City also reserves the right to utilize demonstrative exhibits at either a deposition or the Evidentiary Hearing.  The City will serve copies of any such demonstratives on counsel for any objecting party in advance of its use at a deposition or the Evidentiary Hearing.

5.     As of the date of this filing, some objectors have filed Exhibit Lists.  However, no objector has provided copies of the exhibits listed, which are necessary in light of the sometimes vague and inadequate descriptions of the listed exhibits.  Therefore, the City reserves its rights to assert objections to any exhibits identified by an objecting party after such exhibits have been both identified, and provided, to the City.

Dated:  December 9, 2013                  Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

 - and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

ATTORNEYS FOR THE CITY OF
DETROIT

12

## Certificate of Service

I, Bruce Bennett, hereby certify that the foregoing **DEBTOR'S LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]** was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter on this 9th day of December 2013.

/s/ Bruce Bennett_____

Bruce Bennett

**Item 3**

-----------------------------------------------------x
                         :

In re:                      :       Chapter 9

                         :

CITY OF DETROIT, MICHIGAN,   :       Case No. 13-53846

             Debtor.    :       Hon. Steven W. Rhodes

                         :

                         :

-----------------------------------------------------x

**OPPOSITION OF DEBTOR THE CITY OF DETROIT, MICHIGAN TO OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS**

Objectors[1] move to preclude the introduction of evidence and argument by

the City of Detroit, Michigan (the "City"), debtor in the above-captioned case,

regarding the City's intent to leverage Casino Revenues in connection with its

post-petition financing efforts in support of its Motion of the Debtor for Entry of

---

[1] The Objectors who have joined the Motion *In Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-in-Possession Financing Efforts are Syncora Capital Assurance and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxembourg S.A., DEPFA Bank PLC, the Retiree Association Parties, Retired Detroit Police Members Association, Ambac Assurance Corporation, National Pubic Finance Guarantee Corporation, Assured Guaranty Municipal Corporation, Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief (the "Assumption Motion") [Dkt. 17].  Objectors seek to preclude such evidence and argument on the grounds that (1) the ability to collateralize the Casino Revenues supposedly represents a surprising and undisclosed justification for the Forbearance and Optional Termination Agreement (the "Settlement") and (2) the City has allegedly barred inquiry into "key aspects" of the City's post-petition financing efforts.

These contentions are baseless.  The City has long indicated that access to cash is critical here, and its ability to leverage the Casino Revenues for any post-petition financing it requires is an obvious use of such funds.  To the extent the City kept any information confidential regarding its post-petition financing efforts – months ago when that competitive bidding process was still underway – that information was irrelevant, appropriately withheld, and, regardless, has since been provided to Objectors through post-petition financing discovery and the City's dataroom.  Objectors' Motion should therefore be denied.

### Objectors' Motion

Objectors argue in their motion that, because it has blocked all inquiry by Objectors into its post-petition financing efforts and collateral package, the City

2

should be precluded from offering any evidence regarding its intent to leverage Casino Revenues in connection with post-petition financing as a business justification in support of the Settlement.

First, Objectors attempt to characterize this use of the Casino Revenues as a *post hoc* rationalization for the Settlement. Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenue in Connection with its Debtor-in-Possession Financing Efforts (the "Motion *in Limine*") [Dkt. 935] at 3. Objectors concede that the City cites and discusses at length three reasons supporting that Settlement as a sound exercise of business judgment and that it is fair and equitable – namely, (1) it allows the City access to cash flow; (2) it offers a workable unwind of the City's swap obligations; and (3) it avoids litigation with Swap Counterparties. Mot. *in Limine* at 3. Objectors assert, however, that the City's papers do not explicitly discuss post-petition financing or the City's need to leverage its Casino Revenues as part of the post-petition financing package. According to Objectors, the City's intent to leverage its Casino Revenues in support of post-petition financing arose for the first time during the depositions of Kevyn Orr, the Emergency Manager, and Kenneth Buckfire of Miller Buckfire, the lead negotiator for the Settlement.

Second, Objectors contend that the City blocked Objectors from inquiring into the City post-petition financing efforts and the planned post-petition collateral

3

package on the grounds that information was "commercially sensitive." Mot. *in Limine* at 3-4. Specifically, Objectors contend that the City precluded questions during the deposition of Mr. Buckfire regarding the covenants in the term sheet, the collateral package (aside from the Casino Revenues) or its operation, the identity of parties potentially involved in the financing, and whether the City had considered alternate sources of funding from the State of Michigan or federal government. Mot. *in Limine* at 4-6. Objectors further contend that the City similarly invoked a commercial sensitivity bar to certain questions during the deposition of Mr. Orr regarding elements of the City's post-petition financing efforts. Mot. *in Limine* at 6-7.

According to Objectors the City should be precluded from offering any evidence regarding its intent to collateralize the Casino Revenues in support of its post-petition financing.

<u>Argument</u>

I.       **Objectors' Motion is Moot.**

Since Objectors filed their motion on September 18, 2013, the City has disclosed extensive information regarding its post-petition financing efforts, through its dataroom and discovery, and as a result, Objectors motion is now moot. *See Powell v. McCormack*, 395 U.S. 486, 497 (1969) (holding a matter is moot when the issues presented are no longer "live"). Mootness is found only after

4

determining if an actual controversy between the parties exists in light of intervening circumstances. *In re Asmar, Inc.*, Case Nos. 12-15053, 12-15064, 2013 WL 628581 (E.D. Mich. 2013) (*citing Fleet Aerospace Corp. v. Holderman*, 848 F.2d 720, 723 (6th Cir. 1988)).

Objectors' motion is premised on the City's refusal to provide information in response to a few deposition questions related to its efforts to obtain post-petition financing. Specifically, Objectors sought information regarding the covenants in the post-petition financing term sheet, the potential and final collateral package, the identity of parties involved in the financing, efforts to obtain alternate sources of funding, including funding from the State of Michigan and/or the federal government, and the operation of the collateral package.

In the months since Objectors filed their motion, however, the City has provided substantial information regarding its post-petition financing efforts. On November 5, 2013, the City filed a motion seeking the Court's approval for post-petitioning which described at length the City's post-petition loan solicitation process. *See* Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superiority Claim Status and (III) Modifying Automatic Stay (the "Post-Petition Financing Motion") [Dkt. 1520]. In support of the Post-Petition Financing Motion, the City

included a Declaration from James Doak, which further described the post-petition financing solicitation process and provided additional details specifically requested by Objectors during the depositions of Mr. Orr and Mr. Buckfire. Declaration of James Doak in Support of Motion of Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superiority Claim Status and (III) Modifying Automatic Stay (the "Doak Declaration") [Dkt. 1520, Ex. 5B]. Notably, Mr. Doak stated that the negotiation process involved soliciting over 50 potential financing sources, including 13 traditional lending institutions and 37 alternative financing sources. Doak Decl. ¶ 5. Doak further stated in his declaration that the City settled on Barclay's bid as the best financing package available under the circumstances based, in part on its pricing, which with an effective interest rate of 3.5% was extremely favorable, and debt service obligations, which, assuming no events of default, were limited to interest payments that annually amounted to nearly $38 million less than the City's current debt service obligations under the Swap Agreements. *See* Doak Decl. ¶¶ 9-11. The Post-Petition Financing Motion and Doak Declaration together already significantly address the information Objectors sought.

In connection with the Post-Petition Financing Motion, Syncora issued a 2004 request seeking materials related to the City's post-petition financing and the

City used that request as a guide for its document production.  *See* Motion of

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue

Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and

Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy

Procedure 2004 [Dkt. 1342].  As a result of that exercise, the City produced

approximately 20,000 pages of documents to objectors.  The City has also

continued to update its dataroom as information on its post-petition financing

becomes available and might be appropriately disclosed, including information

regarding its efforts to seek funding from the State of Michigan and the federal

government.

Moreover, Objectors have had the opportunity to depose, among others,

James Doak of Miller Buckfire, who was the City's lead negotiator in its post-

petition financing efforts.  Objectors have already, or will, depose Mr. Orr and Mr.

Buckfire this week in connection to the Post-Petition Financing Motion.  Objectors

have therefore had ample opportunity to obtain the very information at issue and

no longer have a basis for the relief which they seek.

## II.     Objectors' Motion Fails on the Merits.

Mootness aside, Objectors' motion fails on the merits.  First, leveraging the

City's revenue streams is not a new and distinct rationale for assumption of the

Settlement but, instead, a foreseeable and reasonable application of the Casino

Revenues to accomplish the City's well-articulated plans.  Second, even prior to discovery on the Post-Petition Financing Motion, the City had provided Objectors with appropriate information regarding its post-petition financing efforts.  The City only denied Objectors answers to a limited number of deposition questions, and the specific information sought by Objectors is not relevant to the Assumption Motion before the Court.  Finally, even if the information Objectors sought were relevant, it was properly withheld at the time under the business strategy privilege, and, as noted above, has been subsequently disclosed, once it was no longer commercially sensitive.

### A.    The Use of Additional Cash as Collateral for Post-Petition Financing is an Obvious Benefit from Free Access to the Casino Revenues.

Objectors miscast the City's plan to employ the Casino Revenues unencumbered by the Settlement as collateral for its post-petition financing as a separate and *post hoc* justification for assumption of the Settlement.  Rather, collateralizing these cash flows is merely a natural and logical consequence of unencumbering the Casino Revenues and a means to accomplishing the City's stated objectives.

As the Objector's note, the City has cited three core reasons that the Settlement constitutes a sound exercise of business judgment and is fair and equitable, including that it "allows the City access to much needed cash flows."

8

Assumption Mot. ¶¶ 41-42; *see* Mot. *in Limine* at 3.  The City has consistently justified assumption of the Settlement in order to "provide [it] with crucial liquidity and cash flow going forward," on the grounds that these funds – namely the Casino Revenues – are critical not only to the City's ability to finance its operations but also to its ability to engage in crucial reinvestment that will allow it to emerge from bankruptcy.  Assumption Mot. ¶¶ 43-44; Deposition of Kenneth Buckfire ( the "Buckfire Deposition") Tr. at 37:3-9, 15-17; 155:19-23 (August 29, 2013).

First, given the cash-starved and insolvent state of the City, access to the Casino Revenues is critical to the ongoing operations of the City.  Assumption Mot. ¶ 42; Deposition of Kevyn Orr (the "Orr Deposition") Tr. at 213:5-8 (August 30, 2013); Buckfire Depos. 37:3-9.  As Mr. Orr testified, if, among other things, the City does not free the Casino Revenues, the City is projected to run out of cash by the end of the year.  Orr Depos. 200:9-14.  Further, if the Casino Revenues are trapped by the Swap Counterparties, a possible outcome if they remain encumbered, it might be necessary to reduce existing City services.  Buckfire Depos. 100:22-23.

Second, access to the Casino Revenues is crucial to enable the degree of reinvestment necessary "to improve Detroit residents' quality of life" which "is an essential touchstone of any restructuring plan."  Assumption Mot. ¶ 44; *see*

9

Buckfire Depos. 37:3-9, 15-17 ("[B]y freeing up the gaming revenues, it will give the City financing options as part of a plan of adjustment that it otherwise might not have.").  As Mr. Orr has asserted, every day that the City does not begin to reinvest in itself "is a dangerous day." Orr Depos. 59:13-14.  And, "every day that we don't have access to casino revenue, we cannot make the necessary reinvestment in this City to provide for the health, safety and welfare of the citizens."  Orr Depos. 68:5-8.

The Casino Revenues are a necessary component to the City's reinvestment and restructuring plans.  Orr Depos. 213:9-21.  Without reinvestment, and access to the Casino Revenues, "there's a very real chance that the City will have no chance to stabilize and grow and the creditors will see no opportunity for any benefit because the City would . . . continue to decline, revenue from other streams would continue to decline, and the City's ability to satisfy its obligations to the creditors will continue to decline."  Orr Depos. 214:14-22; Buckfire Depos. 100:19-20; 104:10-13 ("[i]f we don't have the gaming revenues . . ., we can't even start the reinvestment plan.").

Employing the Casino Revenues as collateral for post-petition financing is merely a tool to accomplish these objectives.  Mr. Buckfire testified to that very point.  Buckfire Depos. 70:6-10 ("The City intends to secure a debtor in possession financing of sufficient proceeds to fund the termination payment [for the

10

Settlement] as well as provide sufficient cash for the City to execute on its reinvestment program during the bankruptcy."); 79:17-21 ("We'll use the proceeds to terminate the Swaps at the discount provided for in [the Settlement] and the balance of the DIP loan will be retained by the City as working capital and to support its reinvestment program.").

Objectors offer no substantive basis to preclude evidence of the City's intent to use the Casino Revenues in this fashion. Instead, Objectors' motion rests on the City's purported failure to expressly state that it planned to leverage the Casino Revenues for post-petition financing in its opening motion. Absent such an explicit statement, Objectors feign surprise to hear deposition testimony regarding the City's plans. Use of regular or fixed municipal cash flows as leverage for immediate access to funds, however, is hardly a new or novel idea. Doing so is, in fact, standard practice and might be reasonably anticipated where, as here, a city is in dire and immediate need of cash. Nowhere do Objectors explain why collateralizing the Casino Revenues is an unreasonable or unforeseeable use of such revenue streams.

In fact, the City made no secret of its intent to apply cash flows unencumbered by the Settlement for its daily operations as well as for substantial reinvestment. On June 14, 2013, Mr. Orr outlined a restructuring plan that contemplated investing $1.25 billion over the next 10 years, including $500 million

11

in the next 6 years, to address blight, increase property values, and improve the City's infrastructure and services. Assumption Mot. ¶ 22. Moreover, the Emergency Manager and the City's advisors have consistently indicated the need for that reinvestment to begin immediately. *See e.g.*, Orr Depos. 59:13-14. Objectors cannot, therefore, be surprised that the City might use the Casino Revenues, once freed, to obtain more extensive, immediate funding. Regardless, the City has articulated its need for unencumbered cash flows and the purposes for which they are required.

### B. Objectors Were Provided With Appropriate Information Regarding the City's Post-Petition Financing Efforts and Were Denied Only Limited and Irrelevant Information.

Objectors also misconstrue the extent to which they were denied discovery into the collateral package offered by the City as part of its post-petition financing and the relevance of the limited details that City witnesses would not disclose. Objectors protest that the City denied them discovery regarding the covenants in the term sheet, the collateral package (aside from the Casino Revenues) or its operation, the identity of parties potentially involved in the financing, and whether the City had considered alternate sources of funding from the State of Michigan or federal government. The City's refusals to comply with these requests were entirely justified. First, limiting a small number of deposition questions into these areas hardly constitutes wholesale preclusion. The City, in fact, provided

12

significant information regarding its post-petition financing plans and only withheld information that would impact the integrity of the bidding process. Second, the granular level of information regarding the City's post-petition financing sought by Objectors is not relevant to the issues before the Court.

### 1. To the Extent Objectors Inquired, the City Provided Ample Information Regarding Its Post-Petition Financing Efforts.

Objectors portray the City's refusal to divulge information regarding its post-petition financing efforts as nearly universal whereas, in fact, the City withheld only limited and specific details that were still subject to negotiation with potential investors. The City otherwise provided substantial testimony regarding its post-petition financing plans and efforts.

As an initial matter, with the exception of a few isolated questions about the collateral package and state and federal aid, to which Mr. Orr's responses mirrored those of Mr. Buckfire, Objectors asked Mr. Orr no questions regarding the City's post-petition financing efforts. Objectors, therefore, cannot now claim their inquiry was precluded. In any event, Mr. Buckfire provided sufficient testimony regarding the parameters of the City's plans and efforts.

While Mr. Buckfire did not provide testimony regarding specific covenants in the post-petition financing term sheet on the grounds that they were commercially sensitive, Buckfire Depos. 73:24-74:2, he provided testimony regarding numerous other terms. Mr. Buckfire, for instance, provided substantial

13

testimony regarding the City's interest rate objectives – that it be the "lowest possible interest rate," and that the request for proposals did not define that possible interest rate or require whether it must be fixed or variable. Buckfire Depos. 73:16-23. He further testified that the maturity of the financing would be "the pendency of the end of the case." Buckfire Depos. 74:3-5. He also testified to the City's anticipated timeline to obtain post-petition financing. Buckfire Depos. 77:15-79:6. Objectors did not ask any other questions about the term sheet.

Although he refused to delve into commercially sensitive specifics of the collateral package, which remained subject to an active request for proposals, Mr. Buckfire provided testimony on its general parameters. For instance, he testified that the City anticipated offering a lien on the Casino Revenues, in part. Buckfire Depos. 74:6-8; 142:20-23. Mr. Buckfire only declined to provide further details as to the extent to which the Casino Revenues would be offered as collateral or other forms of collateral, such as the City's art collection, which may be negotiated with the potential investors.

Mr. Buckfire testified that the City had spoken with "in excess of 30" potential investors regarding post-petition financing, Buckfire Depos. 70:24, of whom ten already appeared to have no interest. Buckfire Depos. 71:14. Mr. Buckfire would not, however, disclose the identities of the potentially uninterested

investors.  Buckfire Depos. 71:16-22.  Objectors never asked about the identities of any interested investors.

Finally, while neither Mr. Orr nor Mr. Buckfire testified to the specifics of the City's discussions with the State of Michigan or the federal government regarding the provision of alternate sources of funding, both testified to having considered such funding.  Objectors concede that Mr. Orr stated in his deposition that, although the information was commercially sensitive, he understood that neither liquidity nor credit enhancement would be provided by the State of Michigan or the federal government in connection with post-petition financing. Mot. *in Limine* at 5, fn 4; *see* Orr Depos. 207:6-21; 201:10-17.  Although Objectors contend Mr. Buckfire refused to answer question on this topic, he, in fact testified that the City "considered, for example state and federal aid" in connection with post-petition financing, and merely declined to discuss any further specifics. Buckfire Depos. 180:9-10.  Notably, Objectors appeared to understand the sensitivities involved with disclosing that information.  Buckfire Depos. 163:5-7 ("Well, I can understand why [its commercially sensitive] if you are seeking estate guarantee of a DIP or other things today, I get that and I'm not going to ask you about that ….") (Mr. Hackney).

15

13-53846-tjt  Doc 7203  Filed 05/13/13  Entered 05/13/13 15:28:32  Page 80 of 594
13-53846-swr  Doc 2030  Filed 12/10/13  Entered 12/10/13 13:33:40  Page 15 of 30

## 2. The Discovery Sought by Objectors Is Not Relevant to the Assumption Motion.

The specific information sought by Objectors is not relevant to the Court's consideration of the Settlement. In order to approve the Settlement, the Court must determine whether it constitutes a sound exercise of business judgment, is fair and equitable and in the best interests of the City. *See* Assumption Mot. ¶ 41.

The City has justified assumption of the Settlement on the grounds that it "allows the City to access much needed cash flows, provides for a workable unwind of its swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions." *Id.* At least in connection with the Assumption Motion, which was the motion under consideration when the depositions at issue took place, information regarding the covenants in the post-petition financing term sheet, the potential collateral package, operation of the collateral package, the parties involved in the post-petition financing, and efforts to obtain alternate sources of post-petition funding, including funding from the State of Michigan and/or the federal government is simply not relevant to the Court's consideration of the Settlement's justifications.[2] The City's need for free access to the Casino Revenues, as discussed above, extends beyond its use as collateral for post-petition financing, and has no bearing on the importance of ridding the City of its swap obligations or the associated risk of litigation.

---

[2] Of course, such information is relevant to the now-pending Post-Petition Financing Motion, and therefore, has been provided to Objectors.

16

Accordingly, while discovery may be broad, the information sought by Objectors undoubtedly falls outside the bounds of relevant evidence to the Court.

**C.      Even if Relevant, the City Properly Withheld the Discovery Sought by Objectors Under the Business Strategy Privilege.**

Even if the information denied to Objectors was relevant, it was appropriately withheld as commercially sensitive and protected by the business strategy privilege. Courts routinely recognize a "business strategy privilege" that, while limited in scope and duration, provides a qualified immunity to discovery similar to the attorney work product doctrine under Federal Rule of Civil Procedure Rule 26(c) that protects from disclosure "the strategic business plans, proposals, or alternatives under consideration" by a party from whom discovery is sought where disclosure "would irreparably harm and prejudice" the party. *See Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 418 (M.D.N.C. 1992); *Grand Metro. PLC v. Pillsbury Co.*, Fed. Sec. L. Rep. P. 94,096; 14 Del. J. Corp. L. 1045, 1050 (Del. Ch. Nov. 21, 1988).

While this privilege has most commonly been asserted in contests for corporate control, it is not limited to that context. *See e.g.*, *Gioia v. Texas Air Corp.*, Case No. 9500, 1988 Del. Ch. LEXIS 30 (Del. Ch. Mar. 3, 1988) (applying the privilege in a shareholder suit to preclude discovery of corporate plans to deal with possible labor strikes by its work force); *In re Heizer Corp.*, Case No. 7949, slip op. (Del. Ch. Nov. 9, 1987) (applying the privilege to preclude the disclosure

of ongoing negotiations with third parties in a suit by a trustee related to the disbursement of trust assets); *Dedde v. Orrox*, Case No. 6409, slip op. (Del. Ch. Apr. 8, 1981) (applying the privilege to protect a dissident shareholder from discovery in a proxy fight). The principles underlying the privilege similarly justify its application here because the privilege recognizes and protects a responding party's ongoing responsibility to manage its affairs in the best interests of its constituents even in the face of challenges to those efforts. *Parsons*, 141 F.R.D. at 418-19. In essence, the privilege seeks to balance "inconsistent yet valid interests … on the one hand, the requesting party's need for information in order to fairly prepare for trial; and on the other, the responding party's need to be able to carry out an ongoing strategy." *Id.* at 419.

In the interests of balance, the business strategy privilege is limited in scope and precludes only "information concerning options still being actively considered" where disclosure would harm the responding party's interests. *Grand Metro.*, 14 Del. J. Corp. L. at 1051. Even within that limitation, the privilege typically precludes disclosure of the categories of information sought by Objectors. *See e.g.*, *id.* at 1051-54 (precluding the identity of and subject of discussions with any potential alternate investors with "a still lively interest" and materials related to a contemplated recapitalization). Here, disclosure of the covenants in the post-petition financing term sheet, the potential collateral package, operation of the

18

collateral package, the identity of parties involved in the post-petition financing, and efforts to obtain alternate sources of post-petition funding, including funding from the State of Michigan and/or the federal government, would have necessarily injured the City's post-petition financing negotiating position.

At the very least, disclosure would have revealed the City's baseline acceptable provisions to which all of its possible investors would have flocked. This result would almost certainly have ensured the City might only obtain post-petition financing on its worst possible terms.  Such a result is quintessentially what the business strategy privilege is designed to prevent, and the information sought by Objectors accordingly warrants protection under the privilege.  Indeed, Syncora has refused to disclosure similar information on the grounds that it is commercially sensitive and, presumably, protected by the business strategy privilege.  Schwarzman Depos. 80:1-25.

Finally, while the business strategy privilege is further limited by its duration, that limitation is no longer at issue in the instant matter.  "[O]nce a decision has been made," the requesting party may test its validity and inquire into its underlying basis. *Parsons*, 141 F.R.D. at 419; *see also Plaza Securities Co. v. Office*, Del. Ch., C.A. No. 8737, 1986 WL 14417 (Dec. 15, 1986).  As a result, a requesting party will not be denied discovery forever. *Parsons*, 141 F.R.D. at 419 (citations omitted).

19

Here, as explained earlier, Objectors have not been indefinitely denied discovery into the City's post-petition financing efforts, plans, and proposed collateral package. Now that the City has completed its post-petition financing negotiations, it has provided – through discovery in connection with the Post-Petition Financing Motion and its dataroom – extensive information regarding the City's post-petition financing efforts. In particular, the City has provided Objectors with the very information they sought during discovery related to the Settlement – namely, the covenants in the post-petition financing term sheet, the potential and final collateral package, the identity of parties involved in the financing, efforts to obtain alternate sources of funding, including funding from the State of Michigan and/or the federal government, and the operation of the collateral package. Accordingly, Objectors can no longer argue that they have been prejudiced by lack of access to the information they sought during discovery related to the Settlement.

## Conclusion

For the foregoing reasons, the City respectfully requests that this Court deny Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-in-Possession Financing Efforts.

20

Dated:  December 10, 2013           Respectfully submitted,


 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center

21

Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

*Counsel for the City of Detroit*

## SUMMARY OF ATTACHMENTS

| Exhibit 1 | Excerpts from the Deposition of Kevyn Orr |
| Exhibit 2 | Excerpts from the Deposition of Kenneth Buckfire |

# EXHIBIT 1

### *Excerpts from the Deposition of Kevyn Orr*

# In The Matter Of:

*City of Detroit*

---

*Kevyn Orr*
*August 30, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File ORR_KEVYN.txt*
*Min-U-Script® with Word Index*

1    UNITED STATES BANKRUPTCY COURT

2    FOR THE EASTERN DISTRICT OF MICHIGAN

3    SOUTHERN DIVISION

4

5  In Re:

6

7  City OF DETROIT, MICHIGAN         Chapter 9

8                                    Case No.13-53846

9           Debtor.         Hon. Steven Rhodes

10                                   /

11

12

13      The Videotaped Deposition of KEVYN ORR,

14      Taken at 1114 Washington Boulevard,

15      Detroit, Michigan,

16      Commencing at 8:32 a.m.,

17      Friday, August 30, 2013,

18      Before Cindy Mendenhall, RPR, CSR-5220.

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

 3   GREGORY M. SHUMAKER

 4   DAN T. MOSS

 5   Jones Day

 6   51 Louisiana Avenue N.W.

 7   Washington, D.C. 20001

 8   202.879.3939

 9       Appearing on behalf of the City of Detroit.

10

11   ROBERT S. HERTZBERG

12   Pepper Hamilton LLP

13   4000 Town Center, Suite 1800

14   Southfield, Michigan 48075

15   248.359.7300

16       Appearing on behalf of the City of Detroit.

17

18   MATTHEW G. SUMMERS

19   Ballard Spahr, LLP

20   919 North Market Street, 11th floor

21   Wilmington, Delaware 19801

22   302.252.4465

23       Appearing on behalf of EEPK.

24

25
```

```
1   VINCENT J. MARRIOTT III
2   Ballard Spahr LLP
3   1735 Market Street
4   51st Floor
5   Philadelphia, Pennsylvania 19103
6   215.665.8500
7        Appearing on behalf of EEPK.
8
9   STEPHEN HACKNEY
10  LALLY GARTEL
11  Kirkland & Ellis, LLP
12  300 North LaSalle
13  Chicago, Illinois 60654
14  312.862.2157
15       Appearing on behalf of Syncora.
16
17  JENNIFER GREEN
18  FRANK GUADAGNINO
19  Clark Hill, P.L.C.
20  500 Woodward Avenue, Suite 3500
21  Detroit, Michigan 48226
22  313.965.8300
23       Appearing on behalf of Police and Fire Retirement
24       System and Police and Fire General Retirement System.
25
```

```
 1   FRANK J. GUADAGNINO
 2   Clark Hill Thorp Reed
 3   One Oxford Centre
 4   301 Grant Street, 14th Floor
 5   Pittsburgh, PA 15219
 6   412.394.2329
 7        Appearing on behalf of Police and Fire Retirement
 8        System and Police and Fire General Retirement
 9        System.
10
11   KELLY DIBLASI
12   Weil, Gotshal & Manges, LLP
13   767 Fifth Avenue
14   New York, New York 10153
15   212.310.8032
16        Appearing on behalf of Financial Guaranty Insurance
17        Company.
18
19   ERNEST J. ESSAD, JR.
20   Williams, Williams, Rattner & Plunkett, P.C.
21   380 North Old Woodward, Suite 300
22   Birmingham, Michigan 48009
23   248.642.0333
24        Appearing on behalf of Financial Guaranty Insurance
25        Company.
```

```
 1   KAREN NEWBURY

 2   RICK L. FRIMMER

 3   Schiff Hardin, LLP

 4   233 South Wacker Drive, Suite 6600

 5   Chicago, Illinois 60606

 6   312.258.5522

 7        Appearing on behalf of Depfa Bank, PLC, as agent for

 8        DFS WertManagement.

 9

10   CAROLINE TURNER ENGLISH

11   Arent Fox, LLP

12   1717 K Street, NW

13   Washington, D.C. 20036

14   202.857.6000

15        Appearing on behalf of Ambac.

16

17   BIANCA FORDE

18   Winston & Strawn, LLP

19   200 Park Avenue

20   New York, New York 10166

21   212.294.4733

22        Appearing on behalf of Assured Municipal Guaranty

23        Corp.

24

25
```

```
 1   JASON JURGENS
 2   Cadwalader, Wickersham & Taft, LLP
 3   One World Financial Center
 4   New York, New York 10281
 5   212.504.6102
 6       Appearing on behalf of Merrill Lynch Capital Services.
 7
 8   GUY S. NEAL
 9   Sidley Austin, LLP
10   1501 K. Street, N.W.
11   Washington, D.C. 20005
12   202.736.8041
13       Appearing on behalf of National Public Finance
14       Guarantee Corp.
15
16   STEVEN WILAMOWSKY
17   Bingham McCutchen, LLP
18   399 Park Avenue
19   New York, New York 10022
20   212.705.7960
21       Appearing on behalf of UBS.
22
23
24
25
```

1    CLAUDE D. MONTGOMERY

2    Dentons

3    620 Fifth Avenue

4    New York, New York 10020

5    212.632.8390

6       Appearing on behalf of Official Committee of Retirees.

7

8    JEROME D. GOLDBERG

9    Jerome D. Goldberg, PLLC

10    2921 East Jefferson, Suite 205

11    Detroit, Michigan 48207

12    313.393.6001

13       Appearing on behalf of David Sole, Party in Interest.

14

15

16    ALSO PRESENT:

17    Bailey Wellman – Video Technician

18

19

20

21

22

23

24

25

1   Q.   Was there anything that you can recall today that

2        happened on July 5th that was so urgent it couldn't

3        wait six hours?

4   A.   Every -- every day -- let me be clear about this, so

5        we can just get by it.  Every day that the City does

6        not make reinvestment in the City that has tens of

7        thousands of abandoned structures, that has four of

8        the most dangerous neighborhoods in the country, that

9        has police cars with over 250,000 miles on them, that

10       has police officers I believe during this time, one of

11       whom got shot in the head by a perpetrator that nine

12       cars had surrounded and remains in the hospital today,

13       every day that this City does not make reinvestment is

14       a dangerous day.

15   Q.   Were there any negotiations scheduled for July 5th,

16       2013, the day after July 4?

17   A.   I don't -- I don't recall.  If there's something you

18       can refresh my recollection.  I believe there was --

19       there was something on July 5th.  I'm just not

20       recalling what it was.

21   Q.   Did this letter cause the negotiations to cease

22       between June 17th and when you're able to obtain the

23       TRO on July 5th?

24   A.   I wouldn't say whether it caused them to cease.  As I

25       said before, it had an impact and it was disruptive.

1  A.   I told you, lives are at stake in the City every day.

2  Q.   Are they at stake with respect to access to the --

3  A.   Every day --

4  Q.   -- casino revenues?

5  A.   I will say again, every day that we don't have access

6       to casino revenue, we cannot make the necessary

7       reinvestment in this City to provide for the health,

8       safety and welfare of the citizens, and that's a true

9       statement.

10 Q.   If I said that lives are at stake with respect to the

11      casino revenues, can you agree with that statement?

12                 MR. SHUMAKER:  Objection, asked and

13      answered.

14 A.   I've answered your question.

15 BY MR. HACKNEY:

16 Q.   Can you -- can you agree with my statement?

17 A.   I've answered your question.

18 Q.   I disagree that you've answered my question.  We'll

19      take the objection up at the -- with the Court, but

20      are lives at stake with respect to access to the

21      casino revenues?

22 A.   I've answered your question.

23                 (Whereupon Rick Frimmer left the

24                 deposition at 9:41 a.m.)

25                 MR. HACKNEY:  Well, we're going to have to

1       the City.

2    A.    It's an important aspect of the City.

3    Q.    Do you still project that you're going to run out of

4          cash by the end of the year?

5    A.    If we don't have this agreement, there's a very real

6          chance, yes, in a steady state, we will run out of

7          cash.

8    Q.    And by -- what do you mean by a steady state?

9    A.    If we don't do anything such as secure this casino

10         revenue, if we don't go to the capital markets and

11         borrow additional funds, which appears unlikely which

12         the City has done every other year since 2008 to make

13         up the difference, yes, the projections show that by

14         December of this year, we will run out of cash.

15   Q.    Are those the pre-bankruptcy projections?

16   A.    Yes.  I believe so.

17   Q.    Those are the projections that we'll get into in a

18         moment that -- but that assumes that the City's paying

19         its legacy expenditures on a current basis, right?

20   A.    Yes.  As we have -- as we have represented, we intend

21         to continue doing that throughout the year.

22   Q.    The legacy expenditures?

23   A.    Well, certainly with regard to healthcare and other

24         employees, if we get this agreement, that may change

25         our risk for the termination payment.

1    Q.    Your view of those legacy expenditures in the
2          bankruptcy is that they are unsecured claims, correct?
3    A.    Yes.  Many of them are, yes.  There are some
4          expenditures that are secured with regard to the water
5          department and parking and some miscellaneous, but the
6          roughly 11 and a half, 12 billion dollars that we put
7          out there we view as unsecured.
8    Q.    So let's go back to sourcing this termination payment.
9    A.    Yes.
10   Q.    It was my understanding of his testimony that
11         Mr. Buckfire who, by the way, is the individual tasked
12         with obtaining the City's post petition financing,
13         correct?
14   A.    Yes.
15   Q.    And is presumably the individual that's most
16         knowledgeable about that effort?
17   A.    Yes.
18   Q.    It was -- I'll represent to you that his testimony was
19         that the proceeds for the optional termination payment
20         would likely come from the post -- the proceeds of the
21         post petition financing?
22   A.    Yes.
23                    MR. JURGENS:  Objection to form.
24   BY MR. HACKNEY:
25   Q.    Is that also your understanding?

1    mislead you.  It is my assumption that, while they're

2    commercially sensitive, that's not going to be

3    forthcoming.

4  Q.  Oh, really?

5  A.  Yes.

6  Q.  So just to tie it up, you tried to get a -- whether

7    it's credit enhancement or liquidity from the State

8    and the Feds, and your expectation is that you won't

9    be able to?

10 A.  My understanding at the State level is that there's

11   certain prohibitions of the State law on the ability

12   of the State to lend to the City, and at the Federal

13   level my understanding is that it's not going to be

14   forthcoming, direct aid.

15 Q.  Interesting.  And what about credit enhancement by the

16   State?

17 A.  Here again, it's highly commercially insensitive --

18   sensitive.  I don't want to say anything that

19   forecloses it, but we -- let me answer it this way.

20   We are operating on the assumption that that will not

21   come -- be forthcoming.

22 Q.  The casino revenues are about 170 million dollars a

23   year; isn't that correct?

24 A.  Yeah, 170, 180 somewhere in there.

25 Q.  Yeah.  In fact, that -- it's interesting because the

1      monthly basis under the forbearance agreement --

2  A.   Yes.

3  Q.   -- you net about 11 million?

4  A.   I think that's correct.

5  Q.   Okay.  Your claim is that these revenues are necessary

6      to the operation of the City.  I think we discussed

7      that earlier.

8  A.   Yes.

9  Q.   And in fact it's your expectation that you will use

10     these revenues to fund the reinvestment program that

11     you have planned with respect to the 1.25 billion

12     dollars of reinvestment in the City over the next ten

13     years?

14  A.   Yes, that's correct.  An average of 125 million a year

15     which a big component of it is this revenue.

16  Q.   Okay.  So fair statement, you're going to take the

17     casino revenues and you're going to plow them into the

18     City, correct?

19  A.   More -- I mean, money goes into a bathtub, but yes.

20     The casino -- we don't have the casino revenue.  We

21     have no other source to make reinvestment in the City.

22  Q.   And that's what you want to do?

23  A.   Yes.

24  Q.   And so as a creditor, I'm going to make the obvious

25     point that you don't plan to take the casino revenues

1          and give them to the unsecured creditors, correct?

2   A.   I think that's generally a fair characterization.

3   Q.   So isn't it fair that other than perhaps certainly

4          benefitting the people of Detroit if you reinvested in

5          the City, the creditors themselves will not see their

6          recoveries enhanced by the fact that the City has

7          gained access to these casino revenues, correct?

8                    MR. SHUMAKER:  Objection, calls for

9          speculation.

10  A.   Yeah, I'm going to be careful here because one of the

11         things we've offered in our proposal, June 14th

12         proposal, is a 2 billion dollar note that has some

13         capacity to fluctuate.  Generally speaking, your

14         statement is true, but there's another concept that

15         without this reinvestment there's a very real chance

16         that the City will have no chance to stabilize and

17         grow and the creditors will see no opportunity for any

18         benefit because the City would have an inability of --

19         continue to decline, quality of life will continue to

20         decline, revenue from other streams will continue to

21         decline, and the City's ability to satisfy its

22         obligations to the creditors will continue to decline.

23  Q.   Now, I understand that distinction, and we're talking

24         now about the proposal you've made to creditors that

25         you would give all of the unsecureds --

# EXHIBIT 2

*Excerpts from the Deposition of Kenneth Buckfire*

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

```
 1              UNITED STATES BANKRUPTCY COURT

 2            FOR THE EASTERN DISTRICT OF MICHIGAN

 3                     SOUTHERN DIVISION

 4

 5   In Re:

 6

 7   CITY OF DETROIT, MICHIGAN   Chapter 9

 8                              Case No.13-53846

 9            Debtor.           Hon. Steven Rhodes

10                                    /

11

12

13        The Video Deposition of KENNETH BUCKFIRE,

14        Taken at 1114 Washington Boulevard,

15        Detroit, Michigan,

16        Commencing at 9:31 a.m.,

17        Thursday, August 29, 2013,

18        Before  Nora Morrissy, RMR, CRR, CSR-2642.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3   THOMAS CULLEN, JR.

 4   BENJAMIN ROSENBLUM

 5   Jones Day

 6   51 Louisiana Avenue N.W.

 7   Washington, D.C. 20001

 8   202.879.3939

 9       Appearing on behalf of the City of Detroit.

10

11   MATTHEW G. SUMMERS

12   Ballard Spahr, LLP

13   919 North Market Street, 11th floor

14   Wilmington, Delaware 19801

15   302.252.4465

16       Appearing on behalf of EEPK.

17

18   STEPHEN HACKNEY

19   LALLY GARTEL

20   Kirkland & Ellis, LLP

21   300 North LaSalle

22   Chicago, Illinois 60654

23   312.862.2157

24       Appearing on behalf of Syncora.

25
```

```
 1   JENNIFER GREEN
 2   FRANK GUADAGNINO
 3   Clark Hill, P.L.C.
 4   500 Woodward Avenue, Suite 3500
 5   Detroit, Michigan  48226-3435
 6   313.965.8300
 7       Appearing on behalf of Police and Fire Retirement
 8   System and Police and Fire General Retirement System.
 9
10   KELLY DIBLASI
11   Weil, Gotshal & Manges, LLP
12   767 Fifth Avenue
13   New York, New York 10153
14   212.310.8032
15       Appearing on behalf of Financial Guaranty Insurance
16   Company.
17
18   ERNEST J. ESSAD, JR.
19   Williams, Williams, Rattner & Plunkett, P.C.
20   380 North Old Woodward, Suite 300
21   Birmingham, Michigan  48009
22   248.642.0333
23       Appearing on behalf of Financial Guaranty Insurance
24   Company.
25
```

```
 1   KAREN NEWBURY
 2   Schiff Hardin, LLP
 3   233 South Wacker Drive, Suite 6600
 4   Chicago, Illinois 60606
 5   312.258.5522
 6        Appearing on behalf of Depfa Bank, PLC, as agent for
 7   DFS WertManagement.
 8
 9   CAROLINE TURNER ENGLISH
10   Arent Fox, LLP
11   1717 K Street, NW
12   Washington, D.C. 20036
13   202.857.6000
14        Appearing on behalf of Ambac.
15
16   BIANCA FORDE
17   Winston & Strawn, LLP
18   200 Park Avenue
19   New York, New York 10166
20   212.294.4733
21        Appearing on behalf of Assured Municipal Guaranty
22   Corp.
23
24
25
```

```
 1   JASON JURGENS
 2   Cadwalader, Wickersham & Taft, LLP
 3   One World Financial Center
 4   New York, New York 10281
 5   212.504.6102
 6        Appearing on behalf of Merrill Lynch Capital Services.
 7
 8
 9   GUY S. NEAL
10   Sidley Austin, LLP
11   1501 K. Street, N.W.
12   Washington, D.C. 20005
13   202.736.8041
14        Appearing on behalf of National Public Finance
15   Guarantee Corp.
16
17   STEVEN WILAMOWSKY
18   Bingham McCutchen, LLP
19   399 Park Avenue
20   New York, New York  10022
21   212.705.7960
22        Appearing on behalf of UBS.
23
24   ALSO PRESENT:
25   Bailey Wellman, Video Technician
```

1  Q.  What do you believe to be the benefits to the City of
2      entering into the forbearance agreement?
3  A.  Well, there are three.  Most important is continued
4      and reliable access to the City's net share of the
5      gaming revenues.  By that I mean the amount remaining
6      after paying off the fixed Swap payments.  That's a
7      critical element to the City's ability to operate in
8      the ordinary course and invest in its reinvestment
9      program.
10         Second, obviously the opportunity to
11     terminate the Swaps and eliminate this class of
12     creditors from a plan of adjustment at a discount
13     particularly since it's a secured party is of economic
14     value to the City, it saves real cash.
15         Lastly, by freeing up the gaming revenues,
16     it will give the City financing options as part of the
17     plan of adjustment that it otherwise might not have.
18  Q.  With respect to -- with respect to freeing up the
19     gaming revenues, how in your view does the forbearance
20     agreement provide the City with better access to those
21     revenues?
22  A.  Well, by the action of the collateral agreement today
23     the City receives the net revenues after paying the
24     Swap payments on a monthly basis.
25  Q.  The City -- the City today has access to the casino

1          MR. CULLEN:  Objection, foundation, form,

2     but you can address the question.

3  A.    Yes, the City has a plan.

4  BY MR. SUMMERS:

5  Q.    And what is that plan?

6  A.    The City intends to secure a debtor in possession

7        financing of sufficient proceeds to fund the

8        termination payment as well as provide sufficient cash

9        for the City to execute on its reinvestment program

10       during the bankruptcy.

11 Q.    And what is -- what actions, if any, has the City

12       taken toward obtaining debtor in possession financing?

13 A.    We have contacted a large universe of potentially

14       interested investors, many of whom have signed

15       nondisclosure agreements, NDAs, pursuant to which they

16       have received the request for proposal, the RFP which

17       went out yesterday.

18 Q.    And is Miller Buckfire leading the effort to obtain

19       debtor in possession financing?

20 A.    Yes.

21 Q.    And when you say a large universe of potential

22       investors, do you know approximately how many have

23       been talked to?

24 A.    At the moment it's in excess of 30.

25 Q.    And how many have -- how many have signed

1      nondisclosure agreements?

2 A.   That's the universe I'm discussing, approximately 30

3      or more.

4 Q.   So, everybody you've talked to signed?

5 A.   No, some people didn't want to participate.  I can't

6      tell you how many we called.  I can tell you how many

7      we sent NDAs to which have been returned to us, it's

8      in excess of 30.

9 Q.   Are some of the people or some of the potential

10      sources of financing that Miller Buckfire have spoken

11      to said no, we're not interested?

12 A.   Yes.

13 Q.   And approximately how many have said no?

14 A.   Hasn't been that many, maybe ten.  Would your client

15      like one?

16 Q.   And do you know who those ten entities are that have

17      said they are not interested?

18 A.   I do, yes.

19 Q.   And who are they?

20 A.   I'm not going to tell you that.

21 Q.   On what basis?

22 A.   It's commercially sensitive information.

23           MR. CULLEN:  Counsel, maybe it will help,

24      and I don't know whether you want this on the record

25      or not, but the position we are going to take with

1          go -- move through the questions and see how we do.

2                    MR. CULLEN:  Okay.

3                    MR. SUMMERS:  I understand the City's

4          position on it.

5                    MR. CULLEN:  Okay.

6     BY MR. SUMMERS:

7     Q.   You said an RFP went out yesterday?

8     A.   Correct.

9     Q.   Approximately how many people was the RPF sent to

10         yesterday?

11    A.   The 30 plus people who signed the NDA.

12    Q.   How much debtor-in-possession financing does the City

13         hope to obtain?

14    A.   Three hundred fifty million dollars, up to three

15         hundred fifty million dollars.

16    Q.   And does the City have a goal on the interest rate?

17    A.   The lowest possible interest rate.

18    Q.   Does the RFP attempt to define what that lowest

19         possible interest rate is?

20    A.   No.

21    Q.   Does it define whether the interest rate needs to be

22         fixed or variable?

23    A.   No.

24    Q.   What covenants, if any, are included in the RFP as

25         being acceptable or not acceptable?

1   A.   I'm not going to discuss that.  It's commercially
2        sensitive.
3   Q.   How long of maturity on the DIP financing is the City
4        looking to obtain?
5   A.   Through the pendency of the end of the case.
6   Q.   And is the City offering a lien on casino revenues in
7        connection with the DIP financing?
8   A.   In part.
9   Q.   I assume the City does not expect to obtain unsecured
10       financing?
11  A.   I would take it if it was offered.
12  Q.   No doubt.  What other collateral is the City offering
13       to secure the DIP financing loan?
14  A.   I'm not going to answer that question.
15  Q.   Does the RFP define what collateral would be
16       available?
17  A.   Yes, it does.
18  Q.   And that's been sent out to potential investors?
19  A.   Who have signed nondisclosure agreements.
20  Q.   If somebody new came and said I would be interested in
21       providing DIP financing, you would have them sign an
22       NDA and then provide them the RFP?
23  A.   If they wanted to make an unsolicited proposal without
24       the benefit of the RPF, we would be happy to accept
25       it.  Are you suggesting your client is interested in

1  Q.   And what is that deal?

2           MR. CULLEN:  Objection to the extent it

3       calls for a legal conclusion.

4  A.   Well, we have to find a willing lender, that's number

5       one.  Number two, we have to have a court order

6       approving the form of the DIP financing, and, number

7       three, we believe we need to have approval of the

8       forbearance and termination agreements we get the

9       benefit of the elimination of the collateral pledge

10      and the benefit of the discount.

11  BY MR. SUMMERS:

12  Q.   Do you need a determination on eligibility as well?

13  A.   Probably as a condition to closing but not as a

14      condition to getting a loan commitment.

15  Q.   And what time line does the City hope to secure

16      debtor-in-possession financing?

17  A.   Well, it's a large group of potential lenders, and,

18      therefore, we have requested preliminary indications

19      of interest by September the 6th, next Friday.  We

20      want to determine who really has a serious interest

21      and therefore encourage their ability to do due

22      diligence in a rational way because they will all have

23      due diligence requirements.

24           We simply can't handle all 30.  If they all

25      decide they want to put in proposals, we'll do the

1    best we can, but I'm assuming a smaller number when

2    they see the RFP will want to proceed to the second

3    stage which is to propose actual terms in response to

4    our RFP.  The date for that I believe is September the

5    16th.

6  Q.  Has a time line for the DIP financing because the view

7    of what the time line should be for the DIP financing

8    beyond the September 16th deadline?

9  A.  Well, we will receive I hope on the 16th multiple

10    serious indications of interest back by term sheets.

11    At that point we will look at how many we have and

12    we'll determine whether there's one that is so

13    superior to the others that we'll negotiate with that

14    party exclusively.

15        If we have a lot that are very competitive,

16    we may decide to negotiate with several of them at the

17    same time.

18        So, I don't have a clear view at this time

19    what date we'll actually select our lender, but it

20    will clearly be something we'll focus on after the

21    16th of September.  The goal will be to do it as soon

22    as possible.

23  Q.  Based on your experience in other cases do you have a

24    view as to what -- how long the selection of the

25    lender is likely to take?

1   A.   Depends on how many proposals I get back.

2   Q.   If you get 15 back, do you have a view of how long

3        it's likely to take?

4   A.   We should be so lucky.  I think that will take several

5        weeks, probably two weeks to come up with a winning

6        bid as it were.

7   Q.   And then the intent would be to as quickly as possible

8        present that to the bankruptcy court, is that correct?

9   A.   Yes.

10  Q.   And if the City obtains a debtor-in-possession

11       financing, what's the intended use of the financing?

12                 MR. CULLEN:  Asked and answered but you can

13       address it again.

14  A.   I've already answered it.

15  BY MR. SUMMERS:

16  Q.   Why don't you go ahead, say it again.

17  A.   We'll use proceeds to terminate the Swaps at the

18       discount provided for in the forbearance agreement and

19       the balance of the DIP loan will be retained by the

20       City as working capital and to support its

21       reinvestment program.

22  Q.   Are there any other intended uses to the DIP financing

23       other than the two you just said?

24  A.   Not that I'm aware of.

25  Q.   And the amount of the casino revenues that are

1  forbearance agreement a valid contract?

2  MR. CULLEN: Objection. Asks for a legal

3  conclusion.

4  A.  I can't answer that. It calls for a legal conclusion.

5  BY MR. SUMMERS:

6  Q.  If the court doesn't approve the forbearance

7  agreement, will the City still attempt to perform

8  under the forbearance agreement?

9  MR. CULLEN: Objection. Calls for

10  speculation.

11  A.  I can't answer that question. I don't understand it.

12  BY MR. SUMMERS:

13  Q.  Have you ever discussed with Mr. Orr what the City

14  will do with respect to the Swaps if the forbearance

15  agreement is not approved?

16  A.  The financial consequences of not having the

17  forbearance agreement approved would be very dire for

18  the City of Detroit. We could no longer count on our

19  access to gaming revenues, we would no longer be able

20  to execute on the reinvestment plan which has been

21  described to the public and to the creditors on June

22  14th. We might be required to in fact reduce existing

23  City services in order to live within our cash

24  resources. I'm only identifying some of the concerns

25  we would immediately have to review in order to come

1   A.   Our June 14th plan and proposal to creditors pursuant

2       to which we proposed a two billion dollar note be

3       given out to all of our unsecured creditors assumes

4       that the City is able to execute its reinvestment

5       program over the next ten years which assumes that we

6       have access to the cash flows embodied in that plan

7       including the gaming revenues.

8   Q.   It's not -- it's access to the gaming revenues to

9       grant a lien on them again?

10   A.   Not necessarily.  But the point is if we don't have

11       the gaming revenues because the actions of the Swap

12       counterparties, we can't even start the reinvestment

13       plan.

14   Q.   The City intends, correct me if I'm wrong, but I

15       thought that the City intends to enter into DIP

16       financing and grant a lien on the casino revenues as

17       the next step after approval of the forbearance

18       agreement?

19              MR. CULLEN:   Objection.  Foundation.

20       Form.

21   A.   If we have no forbearance agreement and we have to

22       live with the current Swap termination rights and the

23       Swap counterparties were to terminate officially and

24       require the City to pay three hundred million dollars

25       to them, by action of the agreement they would seize

1        to your knowledge, isn't that correct?

2   A.   Not on this, no.

3   Q.   I wanted to clarify something that you said about the

4        DIP earlier and it was mainly that -- you used the

5        phrase I didn't understand with respect to the casino

6        revenues, you said -- you either said that the casino

7        revenues would be a part of the collateral package or

8        that part of the casino revenues would be in the

9        collateral package, and I wanted to clarify that.

10            MR. CULLEN: Objection. Foundation. Form.

11        I don't think he said either.

12   A.   I didn't.

13  BY MR. HACKNEY:

14   Q.   Oh, okay.  Well, I thought for sure you had said one

15        of those two, but let me understand what you

16        anticipate -- this is subject to counsel's concern,

17        but I think there has been testimony about the casino

18        revenues as part of the collateral package.

19            As the banker who is leading the DIP,

20        what's your understanding of the role the casino

21        revenues will play in the collateral package offered

22        in connection with the DIP?

23   A.   They will be part of the collateral package.

24   Q.   So, they will be part, and when you say they, do you

25        mean a specific period of time of the casino revenues

1     which is the base case recovery we presented on June

2     14th.

3  Q.  Right.  So, if the court grants the motion and you get

4     access to it, that will be consistent with the base

5     case which is consistent with the two billion dollar

6     offer, right?

7  A.  Correct.

8  Q.  So, it won't go up if the court grants you the access

9     that you're assuming you'll get?

10  A.  But it will go down if the court does not.

11  Q.  That's a different question.  I'll get to that in a

12     moment.

13         It  won't go up if the court grants the

14     motion, correct?

15  A.  Correct.

16  Q.  Your argument if I understood it was that the

17     casino revenues will be used to invest in the City,

18     correct?

19  A.  Revenues of the City are fungible.  All I'm saying if

20     you don't have access to those revenues, then you

21     don't have the billion dollar plus of revenues that

22     you thought you had which is supporting not only

23     current operations but the reinvestment plan.

24  Q.  And I will say that I had understood you earlier to

25     say if you didn't have access to casino revenues, that

1   Q.   And why aren't you going to tell me about that?

2   A.   It's commercially sensitive information.

3   Q.   Why?

4   A.   That's my answer.

5   Q.   Well, I can understand why if you are seeking estate

6        guarantee of a DIP or other things today, I get that,

7        and I'm not going to ask you about that, but I am

8        going to say that I think I deserve an answer on what

9        happened prior to June 4 in terms of finding

10       alternative ways to address the City's liquidity

11       crisis because after all what's been presented to us

12       was if we didn't do this deal, the City would die, and

13       I do think we are entitled to ask well, what had you

14       tried to do with other actors, so, can we get over it

15       or --

16            MR. CULLEN:  You could certainly ask if he

17       had received any assurance of the availability of any

18       other funding from any other source during that time

19       period.

20            MR. HACKNEY:  Well, I do appreciate that

21       but I often tend to ask my own questions.    Let me

22       try and ask it in a way that hopefully serves your

23       concerns.

24  BY MR. HACKNEY:

25   Q.  And let me first ask you, Mr. Buckfire, had your firm,

```
 1        other than we've got now the novation idea and finding
 2        another lender to fund the termination of the Swaps.
 3   A.   Those are the two principal alternatives.
 4   Q.   Principal alternatives.  Were there other not
 5        principal alternatives but still alternatives?
 6   A.   We reviewed the noncore assets of the City to
 7        determine whether there was any source of ready cash
 8        that we could access to use to fund the termination
 9        payment.  We considered alternate source of funding,
10        for example, state and federal aid as I already
11        testified I'm not going to address.  We considered
12        everything.
13   Q.   Prior to June 4th, did you submit a request to the
14        state for aid on behalf of the City?
15   A.   I'm not going to answer that question.
16   Q.   You will not answer even whether the City made a
17        request for state aid prior to June 4th?
18   A.   It's commercially sensitive information.  I
19        respectfully cannot answer that question.
20   Q.   Was there a request for state aid that was rejected
21        prior to June 4th?
22   A.   I'm not going to answer that question.
23   Q.   On what basis won't you answer whether there was one
24        that was rejected?
25   A.   Commercially sensitive information.
```

**<u>Item 4</u>**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Chapter 9
City of Detroit, Michigan,                      Case No. 13-53846
      Debtor.                                   Hon. Steven W. Rhodes
_____/

### Order Denying Motions to Preclude Debtor from Offering Evidence
### [Dkts. #933 and #935]

Several objectors have filed these two motions.  Upon review, the Court concludes that no hearing is necessary to resolve these motions.  Accordingly, the hearings that are presently set are cancelled.

The Court further concludes that the motions should be denied without prejudice, because the issues raised in the motions are more efficiently and properly addressed within the context of the trial itself.  Further, the Court finds no cause to consider the issues in advance of trial.

It is so ordered.

.

**Signed on December 11, 2013**

_____/s/ Steven Rhodes_____
**Steven Rhodes**
**United States Bankruptcy Judge**

# Item 5

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------x
                                :

In re                         :        Chapter 9
                                :

CITY OF DETROIT, MICHIGAN,  :        Case No. 13-53846
                                :

              Debtor.      :        Hon. Steven W. Rhodes
                                :
                                :
                                :
-------------------------------------------------------x

## DEBTOR'S AMENDED LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

1.      As contemplated by the proposed Scheduling Order filed by the City on December 6, 2013, and for purposes of the hearing on the City's Assumption Motion [Dkts. # 17, #157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "City's Motions"), scheduled to take place on December 17, 18 and 19, 2013, the City identifies the following exhibits that it may use at the Evidentiary Hearings related to the City's Motions.

| City's Exhibit No. | Exhibit Description |
|---|---|
| 1. | June 7, 2006, ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule |
| 2. | June 7, 2006, ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Schedule |
| 3. | March 30, 2009, Term Sheet: Summary of Terms for Settlement between SBS, Merrill Lynch Capital Services, Inc., and UBS AG (collectively, the "Counterparties), and GRS Service Corporation and the Detroit Police and Fire Retirement System ("PFRS") Service Corporation (collectively the "Service Corporations) |
| 4. | June 26, 2009, SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 5. | June 26, 2009, UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 6. | June 26, 2009, Waiver and Consent of Insurer Syncora, with Exhibits |
| 7. | Detroit, Mich. Code § 18-16-4 |
| 8. | July 5, 2013, Transcript of Hearing, City of Detroit v. Syncora, No. 13-008858-CZ, 3rd Cir. Ct. Co. of Wayne (Hon. A. J. Berry, presiding) |
| 9. | July 4, 2013, Affidavit of Kevyn D. Orr, City of Detroit v. Syncora Guar. Inc., No. 2:13-cv-12987 (E.D. Mich) |
| 10. | June 14, 2013, City of Detroit ("City") Proposal for Creditors Executive Summary |
| 11. | June 15, 2009, Collateral Agreement among the City, the Service Corporations, and U. S. Bank National Association ("USBNA") |
| 12. | June 13, 2013, Letter from Orr to USBNA regarding Written Instructions to Custodian Under Collateral Agreement |
| 13. | June 17, 2013, Letter from LeBlanc (Syncora) to USBNA regarding Collateral Agreement dated June 15, 2009, regarding Detroit Retirement Systems with U.S. Bank as Custodian |
| 14. | June 24, 2013, Email from Bennett (Syncora) to Smith (USBNA) regarding USB – Detroit – Casino Revenue Collateral Account, forwarding June 24, 2013 email from Smith to Ball |

2

13-53846-tjt Doc 472-2 Filed 05/13/13 Entered 05/13/14 15:29:32 Page 30 of 594
13-53846-swr Doc 2082 Filed 12/12/13 Entered 05/12/14 15:29:27 Page 32 of 53

| City's Exhibit No. | Exhibit Description |
|---|---|
| 15. | June 24, 2013, Letter from Bennett (Syncora) to Smith (USBNA) regarding General Receipts Subaccount under the Collateral Agreement dated June 15, 2009 |
| 16. | June 25, 2013, Letter from Orr to Syncora regarding Instructions to Custodian under Collateral Agreement |
| 17. | June 26, 2013, Letter from LeBlanc (Syncora) to the City regarding Instructions to Custodian Under Collateral Agreement |
| 18. | July 15, 2013, Forbearance and Optional Termination Agreement among the Service Corporations, the City, the Emergency Manager, UBS AG, and Merrill Lynch Capital Services, Inc. |
| 19. | July 15, 2013, Letter from Lundy (Syncora) to SBS |
| 20. | July 16, 2013, Letter from LeBlanc (Syncora) to Orr |
| 21. | July 17, 2013, Letter from Orr to LeBlanc (Syncora) regarding July 16 Letter |
| 22. | July 17, 2013, Letter from Carter (SBS) to Lundy (Syncora) |
| 23. | July 18, 2013, Declaration of Gaurav Malhotra In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") |
| 24. | Annual Cash Flow Summary FY 2012-FY 2015; Monthly Cash Flow Forecast FY 2014 and FY 2015 – Base Case [Malhotra Declaration Ex. A] |
| 25. | Ten-Year Financial Projections [Malhotra Declaration Ex. B] |
| 26. | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] |
| 27. | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] |
| 28. | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] |
| 29. | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 30. | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] |
| 31. | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] |
| 32. | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] |
| 33. | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] |
| 34. | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] |
| 35. | July 18, 2013, Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") |
| 36. | June 14, 2013, City of Detroit Proposal for Creditors [Orr Declaration Ex. A] |
| 37. | January 13, 2013, City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] |
| 38. | March 26, 2013, Report of the Detroit Financial Review Team [Orr Declaration Ex. D] |
| 39. | April 4, 2012, Financial Stability Agreement Between the City and the Michigan Department of Treasury [Orr Declaration Ex. E] |
| 40. | December 14, 2012, Preliminary Review of the City of Detroit [Orr Declaration Ex. F] |
| 41. | February 19, 2013, Report of the Detroit Financial Review Team; Supplemental Documentation of the Detroit Financial Review Team [Orr Declaration Ex. G] |
| 42. | March 1, 2013, Letter from Governor Snyder to Mayor Bing and the City Council [Orr Declaration Ex. H] |
| 43. | July 8, 2013, Ambac Comments on Detroit [Orr Declaration Ex. I] |
| 44. | July 16, 2013, Letter from Orr to Governor Snyder and Treasurer Dillon regarding Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] |
| 45. | July 18, 2013, Letter from Governor Snyder to Orr and |

4

13-53846-tjt  Doc 4720-2  Filed 05/12/14  Entered 05/12/14 15:29:32  Page 132 of 594
13-53846-swr  Doc 2082  Filed 12/14/13  Entered 12/14/13 15:07:29  Page 4 of 13

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Treasurer Dillon regarding Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] |
| 46. | July 18, 2013, Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] |
| 47. | June 12, 2006, UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement |
| 48. | June 12, 2006, SBS Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement |
| 49. | 2009 Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) |
| 50. | July 31, 2013, First Amendment to Forbearance and Optional Termination Agreement |
| 51. | August 12, 2013, Second Amendment to Forbearance and Optional Termination Agreement |
| 52. | August 23, 2013, Third Amendment to Forbearance and Optional Termination Agreement |
| 53. | August 29, 2013, Fourth Amendment to Forbearance and Optional Termination Agreement |
| 54. | September 4, 2013, Fifth Amendment to Forbearance and Optional Termination Agreement |
| 55. | October 15, 2013, Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. |
| 56. | September 3, 2013, E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments of September 3, 2013, Letter from Miller Buckfire to Gerbino, July 15, 2013, Forbearance and Optional Termination Agreement, and Undated Model "Summary of Certain Key Terms and Conditions" [DTPFF00015602- DTPFF00015638] |
| 57. | September 4, 2013, Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] |
| 58. | September 4, 2013, Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario) |

| City's Exhibit No. | Exhibit Description |
|---|---|
|  | [DTPFF00014812- DTPFF00014824] |
| 59. | September 30, 2013, Ernst & Young, 13-Week Cash Flow Forecast – Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] |
| 60. | October 2013, Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] |
| 61. | July 5, 2013, Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] |
| 62. | July 5, 2013, Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] |
| 63. | September 16, 2013, Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] |
| 64. | September 16, 2013, Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] |
| 65. | September 2013, Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] |
| 66. | Undated, Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] |
| 67. | September 16, 2013, Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation, with attached "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00000826-DTPPF00000837] |
| 68. | September 16, 2013, Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP [DTPPF00001006-DTPPF00001010] |
| 69. | September 16, 2013, Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] |
| 70. | Undated, Silver Point Finance, LLC: "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] |
| 71. | September 16, 2013, Letter from Gerbino to Miller Buckfire, attaching Barclay's "Summary of Indicative Terms and Conditions of Swap Termination Note," "Summary of Indicative Terms and Conditions of Quality of Life Note," "Summary of Indicative Terms and Conditions of the Replacement Swap Transaction," and "Muni Swap Confirmation," responding to City of Detroit Financing RFP [DTPPF00000856-DTPPF00000902] |
| 72. | September 16, 2013, Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent – Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] |
| 73. | September 16, 2013, Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP [DTPPF00000908-DTPPF00000943] |
| 74. | September 16, 2013, "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP [DTPPF00000838-DTPPF00000855] |
| 75. | September 16, 2013, Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP [DTPPF00000821-DTPPF00000825] |
| 76. | September 12, 2013, Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP [DTPPF00000959-DTPPF00000960] |
| 77. | October 8, 2013, Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP [DTPPF00013170-DTPPF00013195] |
| 78. | October 3, 2013, Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Syncora") and Financial Guaranty Insurance Company's ("FGIC") DIP financing proposal [DTPPF00000035- DTPPF00000037] |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 79. | October 25, 2013, Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] |
| 80. | September 2013, Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] |
| 81. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377- DTPPF00003404] |
| 82. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] |
| 83. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] |
| 84. | September 30, 2013, Goldman Sachs' Draft Commitment Letter, including Annex A and B [DTPPF00001543- DTPPF00001567] |
| 85. | September 30, 2013, Goldman Sachs' Draft Fee Letter [DTPPF00001568- DTPPF00001571] |
| 86. | September 30, 2013, Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing" [DTPPF00001058- DTPPF00001086] |
| 87. | October 2, 2013, Letter from Kersten to The City of Detroit regarding CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] |
| 88. | September 26, 2013, Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] |
| 89. | October 3, 2013, Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226- DTPPF00020231] |
| 90. | October 7, 2013, Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] |
| 91. | October 17, 2013, Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " |

8

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPPF00012993- DTPPF00013024] |
| 92. | November 4, 2013, Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] |
| 93. | October 6, 2013, Barclay's Fee Letter fully executed by Barclay's and City [Filed as Docket No. 1761] |
| 94. | October 6, 2013, Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City [Filed as Docket No. 1520; Exhibit 6A] |
| 95. | 2013 Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement [Filed as Docket No. 1520; Exhibit 6B] |
| 96. | October 8, 2013, Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] |
| 97. | October 11, 2013, Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] |
| 98. | October 11, 2013, Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re: Emergency Manager's Order No. 17: Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan;" and, Undated City Council Resolution Approving Post Petition Financing [DTPPF00019623-DTPPF00019655] |
| 99. | October 11, 2013, Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter from Orr to Mayor Bing regarding Emergency Manager's Order No. 17: Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; and, Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan" [DTPPF00019592-DTPPF00019622] |
| 100. | November 6, 2013, Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board |
| 101. | November 5, 2013, Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), |

9

| City's Exhibit No. | Exhibit Description |
|---|---|
|  | 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5A] |
| 102. | November 5, 2013, Declaration of James Doak In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5B] |
| 103. | November 11, 2013, City of Detroit, Operational Restructuring Summary |
| 104. | November 12, 2013, City of Detroit, Operational Restructuring Summary |
| 105. | September 27, 2013, Funding for Detroit Announced by Federal Government |
| 106. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast – Monthly (FY 2013, FY 2014, FY 2015) |
| 107. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast (including Restructuring Scenario) |
| 108. | September 16, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |
| 109. | October 3, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) |
| 110. | September 17, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) |
| 111. | September 18, 2013, Ernst & Young, Illustrative Cash Chart |
| 112. | June 26, 2009, Waiver and Consent of Insurer by Financial Guaranty Insurance Company |
| 113. | March 24, 2009, Moody's Investors Service, Rating Action: Moody's downgrades FGIC to Caa3 and will withdraw ratings |
| 114. | 2013, Draft Financial Recovery Bond Trust Indenture Between City of Detroit and Trustee |
| 115. | December 9, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |

2.      The City reserves the right to supplement its list of exhibits, as provided for in the proposed Scheduling Order.

3.      The City will exchange copies of its exhibits on counsel for any objecting parties on a mutually agreeable schedule.

4.      The City also reserves the right to utilize demonstrative exhibits at either a deposition or the Evidentiary Hearing.  The City will serve copies of any such demonstratives on counsel for any objecting party in advance of its use at a deposition or the Evidentiary Hearing.

5.      As of the date of this filing, some objectors have filed Exhibit Lists.  However, only one objector has provided copies of the exhibits listed, which are necessary in light of the sometimes vague and inadequate descriptions of the listed exhibits.  Therefore, the City reserves its rights to assert objections to any exhibits identified by an objecting party after such exhibits have been both identified, and provided, to the City.

6.      The City further reserves the right to introduce exhibits not listed on this Exhibit List as rebuttal or impeachment to any testimony or evidence presented by the Objectors, and to use or rely upon exhibits identified or introduced by any Objector.  By reserving the right to use or rely upon exhibits identified by Objectors, the City does not waive any objections to admissibility on any grounds.

11

Dated:  December 12, 2013          Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

  - and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

ATTORNEYS FOR THE CITY OF
DETROIT

**Certificate of Service**

I, Bruce Bennett, hereby certify that the foregoing **DEBTOR'S AMENDED LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]** was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter on this 12th day of December 2013.

/s/ Bruce Bennett_____

Bruce Bennett

# **Item 6**

```
-------------------------------------------------------x
                                                       :
In re                                                  :  Chapter 9
                                                       :
CITY OF DETROIT, MICHIGAN,                             :  Case No. 13-53846
                                                       :
                             Debtor.                   :  Hon. Steven W. Rhodes
                                                       :
-------------------------------------------------------x
```

**NOTICE OF REVISED PROPOSED ORDER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

**PLEASE TAKE NOTICE THAT:**

1.      On November 5, 2013, the City of Detroit, Michigan  ("Detroit" or the "City") filed the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (Docket No. 1520) (the "Financing Motion").  Attached to the Financing Motion as Exhibit 1 is the proposed Order granting the Financing Motion (the "Proposed Order").

2.      Based on comments to the Proposed Order by parties in interest and the statements of parties in interest and the Court at the pre-trial conference on

December 13, 2013, the City has made certain modifications to the Proposed

Order.  Accordingly, a revised Proposed Order (the "<u>Revised Proposed Order</u>")

with these modifications is attached hereto as <u>Exhibit A</u>.

       3.     A blackline comparing the Revised Proposed Order with the

original Proposed Order is attached hereto as <u>Exhibit B</u>.

Dated: December 16, 2013                    Respectfully submitted,


                                            /s/ David G. Heiman
                                            David G. Heiman (OH 0038271)
                                            Heather Lennox (OH 0059649)
                                            JONES DAY
                                            North Point
                                            901 Lakeside Avenue
                                            Cleveland, Ohio  44114
                                            Telephone:  (216) 586-3939
                                            Facsimile:  (216) 579-0212
                                            dgheiman@jonesday.com
                                            hlennox@jonesday.com

                                            Brad B. Erens (IL 6206864)
                                            JONES DAY
                                            77 West Wacker
                                            Chicago, Illinois  60601-1692
                                            Telephone:  (312) 782-3939
                                            Facsimile: ( 312) 782-8585
                                            bberens@jonesday.com

                                            Bruce Bennett (CA 105430)
                                            JONES DAY
                                            555 South Flower Street
                                            Fiftieth Floor
                                            Los Angeles, California  90071
                                            Telephone:  (213) 489-3939
                                            Facsimile:  (213) 243-2539
                                            bbennett@jonesday.com


                                            ATTORNEYS FOR THE CITY

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Notice of Revised Proposed Order was filed and served via the Court's electronic case filing and noticing system on this 16th day of December, 2013.


/s/ David G. Heiman

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

### ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),  503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),  904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the

United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order that are

Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and

defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to

3

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:29:38  Page 150 of 594
13-53846-swr  Doc 2248  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 9 of 122

other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "<u>Fee Letter</u>"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 28 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "<u>Filed Bond Documents</u>"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "<u>Hearing</u>"); and notice of the Hearing having been given in accordance with

them by the Bankruptcy Code.

4

Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this case was entered on December 5, 2013.

B. *Jurisdiction and Venue*. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of

5

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:23:10  Page 152 of 594
13-53846-swr  Doc 2448  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 52 of 172

Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *City's Stipulations*. The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D. *Findings Regarding the Postpetition Financing*.

(i)     *No Credit Available on More Favorable Terms*. Given its

13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 53 of 172

current financial condition and financing arrangements, the City is unable to obtain

adequate financing on terms more favorable than the Post-Petition Facility. The

City has been unable to obtain unsecured credit allowable under Bankruptcy Code

Section 503(b)(1) as an administrative expense. Adequate financing on a

postpetition basis is not otherwise available without granting the Purchaser, the

Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided

herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the

Bond Documents, (2) superpriority claims and Liens and (3) the other protections set

forth in the Bond Documents and this Order.

       (ii)    *Use of Proceeds of the Post-Petition Facility.*  As a condition to

the entry into the Bond Documents and the extension of credit under the

Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds

of the Post-Petition Facility shall be used, in each case in a manner consistent with

the terms and conditions of the Bond Documents, solely (a) with respect to the

Quality of Life Bond, for purposes permitted by law, including to fund expenditures

designed to contribute to the improvement of the quality of life in the City and (b)

with respect to the Swap Termination Bond, to pay amounts required under the

Forbearance and Optional Termination Agreement dated as of July 15, 2013, among

the City, the Emergency Manager of the City, the Detroit General Retirement

System Service Corporation, the Detroit Police and Fire Retirement System Service

7

Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E. _Section 506(c)_. Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F. _Good Faith and Jurisdictional Matters_.

(i) _Willingness to Provide Financing_. The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to: (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee

8

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 55 of 572
13-53846-swr   Doc 1448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 53 of 59

and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii) *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e).* The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties. Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses

9

that are permitted by law, and not in violation of the Bankruptcy Code. The Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

G.     *Act 436 Approval Not Required.*  On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility. The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909. Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H.     *Notice.*  Notice of the Hearing and the relief requested in the Motion has been provided by overnight delivery and electronic mail or facsimile to: (a) the

10

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 157 of 594
13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 15 of 52

trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. <u>Motion Approved</u>. The Motion is granted, the Financing (as defined

11

13-53846-tjt   Doc 4728   Filed 05/13/43   Entered 05/13/43 15:29:31   Page 58 of 594
13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 58 of 172

below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2. <u>Objections Overruled</u>. All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

## <u>Post-Petition Facility Authorization</u>

3. <u>Authorization of the Financing and Bond Documents</u>. The Filed Bond Documents are hereby approved. The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents. The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents. Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4. <u>Authorization to Borrow</u>. Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the

12

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:31   Page 159 of 594
13-53846-swr   Doc 2248   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 59 of 172

Bond Obligations (collectively, the "Financing").

5.     Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.     Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to

Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the

Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in

accordance with the terms of the Indenture, continuing, valid, binding, enforceable,

non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing,

enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in

respect of the gross receipts earned by each of the City's casinos (the

"Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as

defined in the Bond Documents, on a *pari passu* basis with the holders of

Swap Termination Bond, and (b) a valid, binding, continuing, enforceable,

fully-perfected second priority Lien (second only to the Liens securing the

Swap Termination Bond) on the income tax revenues of the City (the

"Pledged Income Tax Revenue", and together with the Pledged Wagering Tax

Revenue and the Asset Proceeds Collateral, each as described in this clause (I),

the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing,

enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax

Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the

holders of Quality of Life Bond (the Pledged Income Tax Revenue and the

Asset Proceeds Collateral, collectively, as described in this clause (II), the

14

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 161 of 594
13-53846-swr  Doc 2448  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 69 of 172

"Swap Termination Bond Collateral", and together with the Quality of Life Bond Collateral, the "Collateral").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds. This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral. The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds. The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

15

13-53846-tjt   Doc 4728   Filed 05/13/43   Entered 05/13/43 15:29:31   Page 162 of 594
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 20 of 172

7.    Direction of Pledged Wagering Tax Revenue.  On, and after the
Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall
deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax
Account in the name of the City held at the Wagering Tax Depository Bank pursuant
to irrevocable directions (the "Irrevocable Directions") by the City in the form
attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this Order is
intended to modify the payment obligations of the City's casinos under the Michigan
Gaming Control and Revenue Act (the "Gaming Act"), or their certified
development agreements.

8.    Lien Priority.  The Liens shall be senior in priority and superior to any
lien on or claim to any of the Collateral.  Other than as set forth herein and in the
Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien
or security interest heretofore or hereinafter granted in the Case or otherwise and
shall be valid and enforceable against the City under Sections 921(e) and 364(e) of
the Bankruptcy Code notwithstanding any reversal, modification, vacatur,
amendment, reargument or reconsideration of this Order, any order finding
jurisdiction, the order for relief or any other order and notwithstanding the dismissal
of the Case for any reason.  The Liens shall not be subject to Section 506(c) or 510 of
the Bankruptcy Code.  No lien or interest avoided and preserved pursuant to Section
551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

16

9.    Superpriority Claims.  Upon the Closing Date, the Purchaser, the

Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of

the Bankruptcy Code, an allowed superpriority claim (collectively, the

"Superpriority Claim") for all Bond Obligations (without the need to file any proof

of claim), with priority over (i) any and all administrative expenses of the City at any

time existing or arising, of any kind or nature whatsoever, including all

administrative expenses arising under any section of the Bankruptcy Code, whether

or not such expenses or claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment, (ii) all other post-petition claims against the

City, and (iii) pre-petition unsecured claims against the City.  There is litigation

pending before the Court between certain bond insurers of certain of the limited and

unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect

of ad valorem property tax revenue (the "Property Tax Revenue").  To the extent this

Court finds and determines (and pending such finding or determination), or

approves any settlement or confirms any plan of adjustment that provides that any

Property Tax Revenue of the City is subject to a property interest (such as a lien or

pledge) of any holders of limited or unlimited tax general obligation bonds issued by

the City or that such Property Tax Revenue is not generally available for use by the

City other than for payment of such limited or unlimited general obligation bonds

and is not available for distribution to general unsecured creditors as part of a plan of

17

adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10.     <u>No Obligation to Extend Credit</u>.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11.     <u>Amendment of the Bond Documents</u>. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements.  Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the

18

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 165 of 594
13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 23 of 172

City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.     Modification of Automatic Stay.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance

19

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 166 of 594
13-53846-swr   Doc 2248   Filed 12/30/13   Entered 12/30/13 12:39:10   Page 24 of 172

with the terms of the Bond Documents, the Post-Petition Facility and this Order; and

(e) authorize the City to pay, and the Indenture Trustee to retain and apply, all

payments required to be made to the Indenture Trustee, in accordance with the terms

of the Bond Documents, the Post-Petition Facility and this Order.

  13. <u>Perfection of Liens</u>. This Order shall be conclusive evidence of the

validity, perfection and priority of the Liens without the necessity of filing or

recording any financing statement, mortgage, notice or other instrument or

document which may otherwise be required under the law or regulation of any

jurisdiction or the taking of any other action (including entering into any deposit

account control agreement, mortgages or deeds of trust) to validate or perfect (in

accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser,

the Indenture Trustee and the Bondholders to the Liens and priorities granted herein.

Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that

certain Collateral Agreement among the City, Detroit General Retirement System

Service Corporation, Detroit Police and Fire Retirement System Service

Corporation, U.S. Bank National Association (the "<u>Custodian</u>") and the Other

Persons Party thereto dated as of June 15, 2009 (the "<u>Collateral Agreement</u>"), the

Collateral Agreement shall terminate and any lien, security interest or other interest

in the Pledged Wagering Revenues under the Collateral Agreement shall be

terminated.  The Custodian shall timely perform its obligations in connection with

the termination of the Collateral Agreement, including, without limitation, the

obligations set forth in Section 14.4 thereof and in particular, but also without

limitation, paying any and all amounts due to the City under the Collateral

Agreement and giving notice to the appropriate parties that the "Irrevocable

Instructions" (as defined in the Collateral Agreement) are terminated and no longer

of any force or effect.

14.    <u>Right to Take Actions to Perfect</u>.  Notwithstanding the foregoing, the

Purchaser, the Indenture Trustee and the Bondholders are authorized, but not

required, to file and obtain, as each deems necessary in its sole discretion, such

financing statements, notices of liens, control agreements and other security

documents to perfect in accordance with applicable non-bankruptcy law, or take

constructive control over assets, take any other action, in each case, to validate and

perfect the Liens and all such financing statements, notices, control agreements and

other security documents shall be deemed to have been filed or recorded as of the

date of entry of this Order; <u>provided</u>, <u>however</u>, that no such filing or recordation

shall be necessary or required in order to create or perfect the Liens.  The City is

authorized and directed to execute and deliver promptly upon demand to the

Purchaser or the Indenture Trustee all such financing statements, notices, control

agreements and other security documents as the Purchaser or the Indenture Trustee

may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file

21

a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording.  For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15.     Proceeds of Subsequent Financing.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16.     Maintenance of Collateral.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

22

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 12:39:10  Page 69 of 594
13-53846-swr  Doc 2248  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 29 of 172

maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17.     Disposition of Collateral.

(a)     Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any Collateral (a "Collateral Disposition"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18.     Maturity Date.  Upon the earliest to occur (such earliest date, the "Maturity Date") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

19.     No Dismissal.  The Bond Obligations shall be indefeasibly paid in full

23

in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless

otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders,

and this Court or the United States District Court for the Eastern District of

Michigan shall retain jurisdiction to enforce this Order.

20. <u>Events of Default</u>. The occurrence of an "Event of Default" under the

Bond Documents or any violation of the terms of this Order shall constitute an event

of default under this Order ("<u>Event of Default</u>"), unless waived in writing by the

Indenture Trustee, upon consent of the Bondholders in accordance with the Bond

Documents.

21. <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the

occurrence and during the continuation of an Event of Default, the Indenture Trustee,

upon the direction of the Bondholders in accordance with the Bond Documents, may,

among other things, declare all Bond Obligations owing under the Bond Documents

to be immediately due and payable in accordance with the terms of the Bond

Documents, but without affecting any of the Liens or the Bond Obligations (any

such declaration, a "<u>Termination Declaration</u>"). The Termination Declaration shall

be given by electronic transmission as provided in the Bond Documents (the date

any such Termination Declaration is made, the "<u>Termination Declaration Date</u>").

Following the Termination Declaration Date, the Indenture Trustee, on behalf of the

Bondholders, shall be entitled to enforce its rights and remedies under the Bond

24

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 171 of 594
13-53846-swr  Doc 2148  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 29 of 57

Documents without further order or approval from this Court.

22. _Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order_. The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

23. _Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order_. In accordance with Section 921(e) of the Bankruptcy Code, in the event any

25

13-53846-swr Doc 4728 Filed 05/13/14 Entered 05/13/14 15:29:10 Page 72 of 592
13-53846-swr Doc 2448 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 50 of 57

or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

26

13-53846-tjt Doc 4728 Filed 05/13/14 Entered 05/13/14 15:29:31 Page 173 of 594
13-53846-swr Doc 2448 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 31 of 172

25. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

26. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a

27

manner that is not permitted by the Bond Documents; (c) objecting or challenging in

any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser,

the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting

any claims or causes of action, including any actions under chapter 5 of the

Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the

Bondholders or any of their respective affiliates, agents, attorneys, advisors,

professionals, officers, directors and employees; (e) prosecuting or supporting an

objection to, or contesting in any manner, or raising any defenses to, the validity,

extent, amount, perfection, priority or enforceability of any of the Bond Obligations,

the Liens or any other rights or interests of any of the Purchaser, the Indenture

Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or

contesting in any manner, the order for relief; or (g) taking any action which is

contrary, in a manner that is material and adverse to the Purchaser, the Indenture

Trustee or the Bondholders, to any term or condition set forth in the Bond

Documents or this Order.

      27.   <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this

Order does not create any rights for the benefit of any third party, creditor or any

direct, indirect or incidental beneficiary.

      28.   <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or

expenses incurred in the Case or by the City at any time shall be charged against the

28

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 75 of 594
13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 53 of 172

Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

29.     <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

30.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32.     <u>No Waiver by Seeking Relief</u>.  Neither the filing of the Motion nor

29

anything herein shall constitute a waiver of any right of the City to take any action,

including with respect to the Post-Petition Facility, without approval of the Court, to

the extent permitted under Section 904, nor shall the filing of the Motion or the entry

of this Order be deemed to constitute the City's consent, pursuant to Section 904 of

the Bankruptcy Code, to this Court's interference with (a) any of the political

powers of the City, (b) any of the property or revenues of the City or (c) the City's

use or enjoyment of any income-producing property, other than as required in

connection with the enforcement by the Purchaser, the Indenture Trustee or the

Bondholders of their respective rights in connection with the Bond Documents.

33.    <u>Binding Effect of Order</u>.  Immediately upon execution by this Court,

the terms and provisions of this Order shall become valid and binding upon the City,

the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any

committee appointed in the Case and all other parties in interest and their respective

successors and assigns, including upon dismissal of the Case.

34.    <u>No Modification of Order</u>.  Until and unless the Bond Obligations have

been indefeasibly paid in full in cash (such payment being without prejudice to any

terms or provisions contained in the Bond Documents that by their terms survive

such discharge), the City irrevocably waives the right to seek and shall not seek or

consent to, directly or indirectly, without the prior written consent of the Purchaser

(if such action is to be taken prior to the issuance of the Bonds) or the Indenture

30

13-53846-tjt  Doc 4729  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 77 of 594
13-53846-swr  Doc 2448  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 36 of 52

Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents). The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

35. <u>Order Controls</u>. In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

36. <u>Survival</u>. The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the

31

13-53846-tjt    Doc 4728    Filed 05/13/14    Entered 05/13/14 15:29:10    Page 78 of 592
13-53846-swr    Doc 2148    Filed 12/16/13    Entered 12/16/13 12:39:10    Page 36 of 57

Case.  Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above.  The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

37.  <u>Effect of this Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

38.  <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

32

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 79 of 594
13-53846-swr  Doc 2448  Filed 12/30/13  Entered 12/30/13 12:39:10  Page 39 of 172

**Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

# CITY OF DETROIT, MICHIGAN

## FINANCIAL RECOVERY BONDS
## SERIES 2014A (SWAP TERMINATION)

---

## BOND PURCHASE AGREEMENT

---

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 1:00 P.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1. **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2014A (Swap Termination) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b)   The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the ST Bond Documents and (iv) _____ *[the date that is two years and six months after the Closing Date]* (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c)   As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d)   As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Quality of Life Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e)   The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-__ of the Local Financial Emergency Loan Board dated _____ (the "ELB Order"), and the City of

-2-

Detroit, Michigan Financial Recovery Bond Trust Indenture (the "<u>Indenture</u>") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "<u>Purchase Price</u>").

(f)  The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (a) the Asset Proceeds Collateral and (b) the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "<u>Pledged Income Tax Revenue</u>", and together with the Asset Proceeds Collateral, the "<u>Bond Collateral</u>"). The lien on (i) the Asset Proceeds Collateral shall also secure the Quality of Life Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Quality of Life Bonds on a second lien basis.

(g)  The ST Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Income Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements (the "<u>Income Tax Control Agreements</u>") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the ST Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(h)  The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the ST Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the ST Bond Documents.

(i)  Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "<u>Quality of Life Bonds</u>") for the purpose of funding certain quality of life projects for the City.

2.  **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding

-3-

13-53846-tjt  Doc 4728  Filed 05/13/13  Entered 05/13/13 15:23:10  Page 93 of 592
13-53846-swr  Doc 2148  Filed 12/16/13  Entered 12/16/13 15:39:10  Page 93 of 172

obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)  In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)  The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)  The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.  **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter.  Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4.  **Private Placement of Bonds; Absence of Disclosure Document.**  The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5.  **Closing.**  At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("<u>DTC</u>"), one registered bond in the denomination equal to the principal amount of the Bonds (the "<u>Bond Certificate</u>"), to be delivered to the Trustee as custodian

-4-

for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the ST Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(b) The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(c) The Asset Proceeds Collateral and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d) This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms. When executed and delivered, as set forth in the Post-Petition Financing Order, the ST Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the ST Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the ST Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the ST Bond Documents is in full force and effect.

(i)     The execution, delivery and performance of the terms and conditions of the ST Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the ST Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the ST Bond Documents and the QOL Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have

-6-

13-53846-tjt   Doc 4728   Filed 05/13/13   Entered 05/13/13 15:29:10   Page 186 of 594
13-53846-swr   Doc 2248   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 26 of 172

fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the ST Bond Documents.

(n)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the ST Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds.  No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity.  No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7.     **Covenants and Agreements of the City.**  The City hereby covenants and agrees as follows:

(a)     In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b)     The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use

-7-

or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the ST Bond Documents.

(c)     The City covenants that it will not seek to invalidate or refute the enforceability of any ST Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d)     The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Quality of Life Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Quality of Life Bonds as long as the Bonds are outstanding under the Indenture.  The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Quality of Life Bonds.

8.  **Conditions to Closing.**   The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.  In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the ST Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may be been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities

-8-

that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the ST Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Quality of Life Bonds (the "QOL Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Quality of Life Bonds set forth in the QOL Bond Documents and the simultaneous issuance of the Quality of Life Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Quality of Life Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)     The Bonds and the ST Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond

-10-

counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the ST Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into ST Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

-11-

[(10)   A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)   A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)   A specimen Bond;

(13)   A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)   An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)   Officers' and public officials' certifications regarding the Bonds, the ST Bond Documents, the Quality of Life Bonds, the QOL Bond Documents and the Swap Agreements;

(16)   Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the ST Bond Documents (defined below);

(17)   An executed copy of the Bond Authorizing Order;

(18)   An executed copy of the Sale Order; and

(19)   Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "ST Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.   **Fees and Expenses.**   Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City;

-12-

and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10. **Notices.** Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11. **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.** This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser). No other person shall acquire or have any right hereunder or by virtue hereof. All the representations, warranties, covenants and agreements contained in this Bond Purchase Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify

-13-

13-53846-tjt Doc 4728 Filed 05/13/43 Entered 05/13/43 15:29:30 Page 83 of 594
13-53846-swr Doc 2248 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 83 of 172

upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any ST Bond Documents or QOL Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Quality of Life Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Quality of Life Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other

-14-

13-53846-tjt   Doc 7208   Filed 05/13/43   Entered 05/13/43 15:23:30   Page 94 of 592
13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 92 of 572

person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14. **Counterparts.** This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15. **Governing Law.** This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16. **Jurisdiction**. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17. **Waiver of Jury Trial**. Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond

-15-

13-53846-tjt Doc 4728 Filed 05/13/14 Entered 05/13/14 15:23:10 Page 85 of 594
13-53846-swr Doc 2148 Filed 12/16/13 Entered 12/16/13 23:39:10 Page 83 of 172

Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18. **Syndication**. (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Quality of Life Bonds by assigning or selling participations in the Bonds and the Quality of Life Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request). Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b) The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c) In the event that the Closing Date has occurred and the ST Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, the City hereby agrees, at its own expense, to take

-16-

13-53846-tjt  Doc 4728  Filed 05/13/13  Entered 05/13/13 15:29:10  Page 196 of 594
13-53846-swr  Doc 2148  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 96 of 172

all such action as may be required in order to effect any amendments to the Bonds and the Quality of Life Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19. **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

-17-

Very truly yours,

**BARCLAYS CAPITAL INC.**


By: _____
         John Gerbino
         Managing Director


Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**


By: _____

-18-

13-53846-tjt   Doc 4720   Filed 05/13/14   Entered 05/13/14 15:29:31   Page 198 of 594
13-53846-swr   Doc 2448   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 96 of 172

## Appendix A

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the $350,000,000 Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the $350,000,000 Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

Appendix A
Page 2
13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 200 of 594
13-53846-swr  Doc 2148  Filed 12/16/13  Entered 12/16/13 12:39:30  Page 98 of 172

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the ST Bond Documents, LIBOR shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" means taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute).

Appendix A
Page 3
13-53846-tjt Doc 4728 Filed 05/13/13 Entered 05/13/13 12:39:10 Page 201 of 594
13-53846-swr Doc 2148 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 69 of 172

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Quality of Life Bonds*" shall have the meaning assigned to such term in Section 1(i) of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

Appendix A
Page 4

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:29:31  Page 202 of 594
13-53846-swr  Doc 2148  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 80 of 172

**<u>Exhibit B</u>**
Bond Purchase Agreement
Quality of Life Bond

# CITY OF DETROIT, MICHIGAN

**FINANCIAL RECOVERY BONDS
SERIES 2014B (QUALITY OF LIFE)**

───────────────────────────

## BOND PURCHASE AGREEMENT

───────────────────────────

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "<u>Purchaser</u>") offers to enter into this Bond Purchase Agreement (this "<u>Bond Purchase Agreement</u>") with City of Detroit, County of Wayne, State of Michigan (the "<u>City</u>") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 1:00 P.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>") and that the City's bankruptcy case bears Case No. 13-53846 (the "<u>Bankruptcy Case</u>") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1. **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2014B (Quality of Life) (the "<u>Bonds</u>"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b)  The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the QOL Bond Documents and (iv) _____ [*the date that is two years and six months after the Closing Date*] (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c)  As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d)  As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Swap Termination Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e)  The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-__ of the Local Financial Emergency Loan Board dated _____ (the "ELB Order"), and the City of

Detroit, Michigan Financial Recovery Bond Trust Indenture (the "<u>Indenture</u>") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "<u>Purchase Price</u>").

(f)  The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute) (the "<u>Pledged Wagering Tax Revenue</u>") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "<u>Pledged Income Tax Revenue</u>", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "<u>Bond Collateral</u>"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Bonds on a first-priority basis.

(g)  The QOL Bond Documents shall require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Wagering Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements (the "<u>Wagering Tax Control Agreements</u>") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default (as defined in the Indenture) to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full. Subject to the terms of the Wagering Tax Control Agreements, the City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

(h)  The QOL Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Income Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements (the "<u>Income Tax Control Agreements</u>") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Swap Termination Bonds until such Swap Termination Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(i)   The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the QOL Bond Documents.

(j)   Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Bonds") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, as amended from time to time, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other hand, to terminate the underlying swaps.

2.   **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)   In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)   The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)   The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.   **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is

-4-

unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter. Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4. **Private Placement of Bonds; Absence of Disclosure Document.** The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5. **Closing.** At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("<u>DTC</u>"), one registered bond in the denomination equal to the principal amount of the Bonds (the "<u>Bond Certificate</u>"), to be delivered to the Trustee as custodian for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "<u>Closing Documents</u>"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the QOL Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate

-5-

the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(b)    The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(c)    The Asset Proceeds Collateral, the Pledged Wagering Tax Revenue and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds and the Swap Termination Bonds, as applicable, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)    This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms.   When executed and delivered, as set forth in the Post-Petition Financing Order, the QOL Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)    When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)    By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the QOL Bond Documents and this Bond Purchase Agreement.

(g)    No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the QOL Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)    All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the QOL Bond Documents is in full force and effect.

-6-

(i)     The execution, delivery and performance of the terms and conditions of the QOL Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the QOL Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the QOL Bond Documents and the ST Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the QOL Bond Documents.

(n)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the QOL Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

-7-

13-53846-tjt   Doc 4728   Filed 05/13/13   Entered 05/13/13 12:39:10   Page 210 of 594
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 60 of 172

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds. No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity. No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7.    **Covenants and Agreements of the City.**  The City hereby covenants and agrees as follows:

(a)    In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b)    The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the QOL Bond Documents.

(c)    The City covenants that it will not seek to invalidate or refute the enforceability of any QOL Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d)    The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Swap Termination Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Swap Termination Bonds as long as the Bonds are outstanding under the Indenture. The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Swap Termination Bonds.

-8-

13-53846-tjt  Doc 4728  Filed 05/13/13  Entered 05/13/13 23:39:10  Page 211 of 594
13-53846-swr  Doc 2148  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 69 of 172

8.     **Conditions to Closing.**   The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.   In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the QOL Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general

-9-

character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the QOL Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Swap Termination Bonds (the "ST Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Swap Termination Bonds set forth in the ST Bond Documents and the simultaneous issuance of the Swap Termination Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it

-10-

reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)    There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)    The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Swap Termination Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)    The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)    The Bonds and the QOL Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)    On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)    A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)    A State law supplemental opinion in respect of the QOL Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)    A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed

-11-

13-53846-tjt   Doc 4720   Filed 05/13/13   Entered 05/13/13 15:29:10   Page 214 of 594
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 72 of 172

with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Wagering Tax Control Agreements and Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into QOL Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(10)     A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)     A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)     A specimen Bond;

(13)     A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)     An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)     Officers' and public officials' certifications regarding the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the ST Bond Documents and the Swap Agreements;

(16)     Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the QOL Bond Documents (defined below);

(17)     An executed copy of the Bond Authorizing Order;

(18)     An executed copy of the Sale Order; and

(19)     Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture, this Bond Purchase Agreement and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "QOL Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.     **Fees and Expenses.**  Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10.  **Notices.**  Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11.  **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.**  This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser).  No other person shall acquire or have any right hereunder or by virtue hereof.   All the representations, warranties, covenants and agreements contained in this Bond Purchase

-13-

Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12.   **Disclaimer of Purchaser.**  It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder.  The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13.   **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified

-14-

13-53846-tjt   Doc 4728   Filed 05/13/13   Entered 05/13/13 15:39:10   Page 217 of 594
13-53846-swr   Doc 2248   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 75 of 172

Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; _provided_ that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any QOL Bond Documents or ST Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Swap Termination Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Swap Termination Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

-15-

14.    **Counterparts.**   This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15.    **Governing Law.**   This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16.    **Jurisdiction**.   To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17.    **Waiver of Jury Trial**.   Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18.    **Syndication**.   (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Swap Termination Bonds by assigning or selling participations in the Bonds and the Swap Termination Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date.  For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date.  Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase

-16-

Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b)     The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c)     In the event that the Closing Date has occurred and the QOL Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, the City hereby agrees, at its own expense, to take all such action as may be required in order to effect any amendments to the Bonds and the Swap Termination Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19.     **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than

-17-

the projections and other forward looking information (the "<u>Projections</u>")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

-18-

Very truly yours,

**BARCLAYS CAPITAL INC.**

By: _____

John Gerbino
Managing Director

Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**

By: _____

-19-

13-53846-swr Doc 4728 Filed 05/13/14 Entered 05/13/14 15:29:31 Page 222 of 594
13-53846-swr Doc 2448 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 60 of 172

**Appendix A**

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the $350,000,000 Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the $350,000,000 Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

Appendix A
Page 2
13-53846-tjt   Doc 4728   Filed 05/13/13   Entered 05/13/13 15:29:10   Page 224 of 594
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 82 of 172

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the QOL Bond Documents, LIBOR shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

Appendix A
Page 3
13-53846-tjt   Doc 4728   Filed 05/13/13   Entered 05/13/13 12:39:10   Page 225 of 594
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 63 of 172

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Swap Termination Bonds*" shall have the meaning assigned to such term in Section 1(j) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

"*Wagering Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Wagering Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

**Exhibit C**
Indenture

**FINANCIAL RECOVERY BOND**

**TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

**UMB BANK, N.A.**

as Trustee

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014A**

and

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014B**

Dated as of [_____], 2014

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETATION .................................................. 2
    Section 101    Definitions.................................................................................... 2
    Section 102    Interpretation............................................................................... 9
ARTICLE II TERMS OF BONDS ........................................................................... 10
    Section 201    Authorization for Indenture and Bonds; Indenture to Constitute a
                      Contract.................................................................................... 10
    Section 202    Authorization of Bonds.............................................................. 10
    Section 203    Issuance and Delivery of Bonds ................................................ 10
    Section 204    Conditions Precedent to Delivery of Bonds................................ 10
ARTICLE III GENERAL TERMS AND PROVISIONS OF BONDS........................... 12
    Section 301    Designation of Bonds; Form of Bonds ....................................... 12
    Section 302    Book-Entry Only System for the Bonds ...................................... 12
    Section 303    Interchangeability of Bonds....................................................... 13
    Section 304    Negotiability, Transfer and Bond Registry.................................. 14
    Section 305    Transfer of Bonds ..................................................................... 14
    Section 306    Regulations With Respect to Exchanges and Transfers ............. 14
    Section 307    Bonds Mutilated, Destroyed, Stolen or Lost.............................. 15
    Section 308    Cancellation and Destruction of Bonds ..................................... 15
    Section 309    Redemption .............................................................................. 15
    Section 310    Selection of Bonds to be Redeemed .......................................... 15
    Section 311    Notice of Redemption ............................................................... 16
    Section 312    Payment of Redeemed Bonds .................................................... 16
ARTICLE IV PLEDGE OF INDENTURE; SOURCES OF PAYMENT AND SECURITY
    FOR THE BONDS ..................................................................................... 17
    Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest.................... 17
    Section 402    Creation of Liens....................................................................... 18
ARTICLE V ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS.......... 18
    Section 501    Debt Service Fund..................................................................... 18
    Section 502    Costs of Issuance Fund ............................................................. 19
    Section 503    Bond Proceeds Fund ................................................................. 20
    Section 504    Amounts Remaining in Funds and Accounts............................... 20
    Section 505    Approval of Account Control Agreements ................................... 20
ARTICLE VI INVESTMENT OF FUNDS............................................................... 21
    Section 601    Permitted Investments............................................................... 21
    Section 602    Valuation and Sale of Investments ............................................ 22
ARTICLE VII PARTICULAR COVENANTS OF THE CITY...................................... 22
    Section 701    Payment of Bonds..................................................................... 22
    Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other
                      Property.................................................................................... 22
    Section 703    Maintenance of Perfected Security Interests; Further Assurances;
                      Notices of Default .................................................................... 23

i

Section 704    Tax Covenants ................................................................... 23
Section 705    Compliance With Conditions Precedent ............................ 23
Section 706    Accounts and Reports ........................................................ 23
Section 707    Issuance of Additional Obligations ................................... 23
Section 708    Wagering Tax and Income Tax Revenues and Accounts ........ 24
Section 709    Asset Proceeds Collateral .................................................. 24
Section 710    Contesting Enforceability .................................................. 24
ARTICLE VIII THE TRUSTEE ...................................................................... 24
Section 801    Powers and Duties of Trustee ............................................ 24
Section 802    Fees and Expenses of Trustee ............................................ 27
Section 803    Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale ................................... 27
Section 804    Removal of Trustee ............................................................ 28
Section 805    Appointment of and Transfer to Successor Trustee ........... 28
ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ON DEFAULT ............ 28
Section 901    Events of Default ................................................................ 28
Section 902    Remedies ............................................................................ 30
Section 903    Waiver of Default ............................................................... 32
Section 904    Possession of Bonds by Trustee Not Required .................. 32
Section 905    Remedies Cumulative ........................................................ 32
Section 906    Knowledge by Trustee of an Event of Default .................. 32
Section 907    Application of Monies ........................................................ 32
ARTICLE X SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE ............................................................................................... 32
Section 1001   Modifications and Amendments Not Requiring Consent ........ 32
Section 1002   Amendments Requiring Consent ....................................... 33
Section 1003   Consent of Trustee ............................................................. 34
Section 1004   General Provisions Relating to Supplemental Indentures ........ 34
ARTICLE XI MISCELLANEOUS ................................................................... 35
Section 1101   Notices ............................................................................... 35
Section 1102   Termination ........................................................................ 35
Section 1103   Defeasance ......................................................................... 35
Section 1104   Severability ........................................................................ 36
Section 1105   Headings ............................................................................. 36
Section 1106   Indenture Executed in Counterparts ................................. 36
Section 1107   Parties Interested Herein .................................................... 36
Section 1108   Jurisdiction ......................................................................... 36

EXHIBIT A    FORM OF SERIES 2014A BOND ................................. A-1
EXHIBIT B    FORM OF SERIES 2014B BOND ................................. B-1
EXHIBIT C    FORM OF ACCOUNT CONTROL AGREEMENT ........ C-1

ii

# FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of [_____], 2014 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and UMB Bank, N.A., and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H :

**WHEREAS**, pursuant to the Local Government Fiscal Responsibility Act, Act 436, Public Acts of Michigan, 2012 ("Act 436"), the Governor (the "Governor") of the State of Michigan (the "State") determined that a local government financial emergency exists in the City of Detroit, County of Wayne, Michigan (the "City"), and an emergency manager, as defined in Act 436, Kevyn D. Orr (the "Emergency Manager") was appointed for the City by the Governor on March 28, 2013 in accordance with Act 436; and

**WHEREAS**, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

**WHEREAS**, on October 11, 2013, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City his Order No. 17 Approval of Postpetition Financing ("Order No. 17"); and

**WHEREAS**, Order No. 17 proposes the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") to provide certain post-bankruptcy petition financing for the City upon the terms and conditions and parameters set forth in Order No. 17 and the term sheets attached thereto (the "Secured Financing"); and

**WHEREAS**, on October 21, 2013, in accordance with Section 19(1) of Act 436, the City Council of the City (the "City Council") disapproved the Secured Financing; and

**WHEREAS**, pursuant to Section 19(2) of Act 436, the City Council was afforded 7 days following its disapproval of the Secured Financing to propose an "alternative proposal that would yield substantially the same financial result as" the Secured Financing to the Emergency Financial Assistance Loan Board (the "Board"); and

**WHEREAS**, the City Council failed to offer an alternative proposal to the Board during the time period prescribed in Section 19(2) of Act 436 and as a consequence, the Emergency Manager submitted an Order to authorize the Secured Financing through the issuance of Bonds to the Board for approval and implementation of the Secured Financing by the Emergency Manager; and

WHEREAS, on [_____], 2013, the Bankruptcy Court issued an order [Docket No. __] authorizing the Secured Financing (the "Bankruptcy Court Order"), pursuant to which super priority liens have been established under Sections 364(c), 503 and 507(a)(2) of the Bankruptcy Code for the certain collateral securing the bonds authorized for issuance hereunder; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board established pursuant to Act 243, Public Acts of Michigan, 1980, as amended; and

WHEREAS, on [_____], 2013, the Board issued an Order (the "Board Order") approving the issuance of the Series 2014A Bonds and the Series 2014B Bonds by the City in an aggregate principal amount not to exceed $350,000,000 and as finally determined in the Sale Order of the Emergency Manager, subject to the terms and conditions for each series of Bonds approved by the Board in the Board Order; and

WHEREAS, in connection with the issuance of the Bonds, the Trustee shall enter into Account Control Agreements (as hereinafter defined) with the City and the Depository Banks for purposes of perfecting the security interests granted by the City in favor of the Registered Owners of the Series 2014A Bonds and the Series 2014B Bonds in certain tax revenue and other collateral of the City described herein to secure repayment of the City's obligations owing in respect of the Bonds.

NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101    Definitions.  In addition to the terms defined in the preambles to this Indenture, and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"*1 Month LIBOR Rate*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a 1-Month LIBOR Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic

2

mean of all such rates; provided further, however, that, for purposes of this Indenture, the 1-Month LIBOR Rate shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term 1-Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the 1-Month LIBOR Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1-Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"***1-Month LIBOR Reset Date***" means the first Business Day of each calendar month.

"***Account***" means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

"***Account Control Agreements***" means, collectively the Income Tax Account Control Agreement and the Wagering Tax Account Control Agreement.

"***Act 279***" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"***Act 284***" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

"***Act 436***" means Act No. 436, Public Acts of Michigan, 2012.

"***Asset Proceeds Collateral***" shall mean all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10 million, which net cash proceeds are pledged by the City hereunder, on the terms and conditions set forth hereunder, in favor of the Registered Owners of the Series 2014(A) Bonds and the Series 2014(B) Bonds.

"***Authorized Denominations***" shall mean denominations of Bonds equal to multiples of $100,000 or integral multiples of $5,000 in excess thereof.

"***Authorized Officer***" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"***Bankruptcy Case***" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"***Bankruptcy Court Order***" has the meaning set forth in the recitals hereto.

3

"***Board***" has the meaning set forth in the recitals hereto.

"***Bond***" or "***Bonds***" means singularly or collectively, the Series 2014A Bonds and the Series 2014B Bonds.

"***Bondowner***", "***Owner***" or "***Registered Owner***" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 304.

"***Bond Authorizing Order***" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"***Bond Counsel***" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"***Bond Orders***" means collectively the Bond Authorizing Order and the Sale Order.

"***Bond Proceeds Fund***" means the fund established pursuant to Section 503 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"***Bond Purchase Agreements***" means, collectively, that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014A Bonds and that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014B Bonds.

"***Bond Rate***" means the sum of the 1-Month LIBOR Rate and the Spread.

"***Bond Registry***" means the books for the registration of Bonds maintained by the Trustee.

"***Business Day***" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"***Calculation Agent***" means Barclays Capital Inc.

"***Certificate***" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"***City***" means the City of Detroit, County of Wayne, Michigan.

"***Code***" means the Internal Revenue Code of 1986, as amended.

4

"***Costs of Issuance Fund***" means the fund established under Section 502 hereof for the payment of the costs of issuance of the Bonds.

"***Date of Original Issue***" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"***Debt Service Accounts***" means, collectively, the Series 2014A Debt Service Account and Series 2014B Debt Service Account.

"***Debt Service Fund***" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

"***Debt Service Requirement Amount***" means, as applicable, an amount equal to (i) the interest due on the Bonds on the next succeeding Interest Payment Date plus if such Interest Payment Date is also a Redemption Date, any principal and premium owing on such Redemption Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Maturity Date plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"***Depository Banks***" means the Income Tax Depository Bank and the Wagering Tax Depository Bank.

"***Emergency Manager***" has the meaning set forth in the recitals hereto.

"***Event of Default***" has the meaning attributed to it in Section 901 hereof.

"***Financing Document***" means this Indenture, the Bond Purchase Agreements, the Account Control Agreements, the Series 2014A Bonds, the Series 2014B Bonds, the Bond Orders, the Bankruptcy Court Order, the Fee Letter and any other document related to the issuance, sale or delivery of the Bonds.

"***Fiscal Year***" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"***Governmental Obligations***" means non- callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

"***Income Tax Account Control Agreement***" means that certain Account Control Agreement dated as of [____], 2014 by and among the City, the Trustee, and the Income Tax

5

Depository Bank in favor of the Bondowners with respect to the Comerica Lockbox Account that holds the Pledged Income Tax Revenues.

"***Income Tax Depository Bank***" means Comerica Bank and any successor thereto.

"***Income Tax Revenues***" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284.

"***Indenture***" means this Trust Indenture, dated as of [_____], 2014, as supplemented and amended.

"***Interest Payment Date***" means (i) each 1-Month LIBOR Reset Date; (ii) with respect only to Bonds being redeemed, in whole or in part, the Redemption Date; and (iii) the Maturity Date.

"***Law 1***" means the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State, effective December 5, 1996, as amended, and any replacement or successor thereto.

"***LIBOR Floor***" means 1.00% per annum.

"***London Banking Day***" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"***Maturity Date***" means the earliest to occur of (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to this Indenture, and (iv) [_____,] the date that is two years and six months after the Date of Original Issue.

"***Non-Arbitrage and Tax Compliance Certificate***" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"***Outstanding***" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A)     Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B)     Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

6

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"***Payment Date***" means each Interest Payment Date, and the Maturity Date of the Bonds.

"***Permitted Investments***" means those investments specified in Article VI of this Indenture.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Pledged Income Tax Account***" means that certain bank account established at Comerica Bank, Account No. [_____] that collects solely Income Tax Revenue.

"***Pledged Income Tax Revenues***" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014A Bonds and on a second priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"***Pledged Revenues***" means, collectively, the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral.

"***Pledged Wagering Tax Account***" means that certain trust account established at U.S. Bank, Account No. [__] that collects the Wagering Tax Revenue.

"***Pledged Wagering Tax Revenues***" means the Wagering Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"***Post Petition Date Debt***" means any payment obligation of the City first arising on or following the Petition Date.

"***Purchaser***" means Barclays Capital Inc. or any permitted party designated pursuant to the Bond Purchase Agreement, as approved by the City, which such approval shall not be unreasonably withheld.

"***Quality of Life Projects***" means those certain projects determined by the Emergency Manager in the Sale Order to be financed with the proceeds of the Series 2014B Bonds.

"***Record Date***" means the fifteenth (15th) day prior to any Interest Payment Date.

"***Redemption Date***" means the date upon which Bonds are to be called for redemption, in whole or in part, pursuant to this Indenture.

"***Redemption Price***" means, with respect to any Bond, the principal amount thereof plus the applicable premium, if any, payable upon redemption thereof.

"***Sale Order***" means that Order of the Emergency Manager dated [_____], 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"**Series 2014A Bonds**" means the City's Financial Recovery Bonds, Series 2014A.

"**Series 2014A Debt Service Account**" means the Account established within the Debt Service Fund for the benefit of the Series 2014A Bonds pursuant to Section 501 of this Indenture.

"**Series 2014B Bonds**" means the City's Financial Recovery Bonds, Series 2014B.

"**Series 2014B Debt Service Account**" means the Account established within the Debt Service Fund for the benefit of the Series 2014B Bonds pursuant to Section 501 of this Indenture.

"**Spread**" means, so long as no Event of Default has occurred and is continuing, 250 basis points, and upon the occurrence of and continuance of an Event of Default, 450 basis points.

"**State**" has the meaning set forth in the recitals hereto.

"**State Treasurer**" means the Treasurer of the State of Michigan.

"**Supplemental Indenture**" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"**Tax-Exempt Bonds**" means those Bonds, the interest on which is excluded from gross income for federal tax purposes.

"**Trustee**" means initially, UMB Bank, N.A., as bond register, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

"**Trust Estate**" shall have the meaning set forth in Section 401 hereof.

"**Wagering Tax Account Control Agreement**" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee and the Wagering Tax Depository Bank in favor of the Bondowners with respect to the U.S. Bank Trust Account that holds the Pledged Wagering Tax Revenues.

"**Wagering Tax Depository Bank**" means U.S. Bank National Association and any successor thereto.

"**Wagering Tax Revenues**" means revenues collected by the City from taxes in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Law 1.

8

Section 102    Interpretation.  (A) In this Indenture, unless the context otherwise requires:

(1)    the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)    words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(3)    words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)    any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)    this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)    references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)    references to time shall mean the applicable local time in New York City, New York; and

(8)    references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)    Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof.  All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)    If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

9

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:23:10  Page 240 of 594
13-53846-swr  Doc 2248  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 90 of 172

## ARTICLE II

## TERMS OF BONDS

Section 201    <u>Authorization for Indenture and Bonds; Indenture to Constitute a Contract</u>. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City and the principal amount of Bonds that may be issued hereunder is not limited except as provided herein or by law.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Series or Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202    <u>Authorization of Bonds</u>.  In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in one or more series.  No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203    <u>Issuance and Delivery of Bonds</u>.  After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.  No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 301 of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204    <u>Conditions Precedent to Delivery of Bonds</u>.  The Bonds of each Series shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)    a copy of the Bond Orders authorizing each such series, executed by the City and the Trustee, which shall specify:

10

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of each such Series of Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of each series of the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     a Bond Counsel's Opinion to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Agreements; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 503, which shall be conclusively established by the executed certificate of the Trustee so stating.

# ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

Section 301    Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.*  Bonds designated as "Financial Recovery Bonds, Series 2014A" and "Financial Recovery Bonds, Series 2014B" are hereby authorized to be issued pursuant to the provisions of this Indenture in the respective principal amounts of [_____ ($_____)] and [_____ ($_____)].  Both series of Bonds shall bear a Date of Original Issue of [_____, 2014.]  Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations.  The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation.  Each Bond shall be numbered as determined by the City.  The Bonds shall be substantially in the forms set forth in Exhibit A and Exhibit B, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order.  The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America.  Principal and interest on the Bonds shall be due and payable as set forth in the form of Bonds set forth in Exhibit A and Exhibit B. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed.  The principal amount of the Bonds of each series shall be payable on the Maturity Date.  The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment on the Bonds.* Principal of, and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the corporate trust office of the Trustee.  Interest on the Bonds will be paid by check or draft drawn upon the Trustee and mailed to Owners at the registered addresses, provided that, at the written request of the Owner of at least $1,000,000 principal amount of Bonds (which request may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time prior to an Interest Payment Date by subsequent written notice to the Trustee), interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Trustee and the City.  Payment as aforesaid shall be made in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Section 302    Book-Entry Only System for the Bonds.  (a) Except as provided in Section 302(b) hereof, the ownership of the Bonds shall be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds.  Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the

12

payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b) In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City or the Trustee shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture. The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c) Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations. The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

Section 303 _Interchangeability of Bonds_. In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the

13

Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity bearing the same rate of interest and having the same terms of any of the authorized denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 304     Negotiability, Transfer and Bond Registry.   All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request). So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee, which may be one or more banks or trust companies or national banking associations appointed by the City, books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 305     Transfer of Bonds.   (A) The registration of each Bond is transferable, in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request), only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)     Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306     Regulations With Respect to Exchanges and Transfers.   (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of this Indenture.  All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

(B)     For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)     The Trustee shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 307     <u>Bonds Mutilated, Destroyed, Stolen or Lost</u>.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of the owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen.  In any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 308     <u>Cancellation and Destruction of Bonds</u>.  All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled.  Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed.   Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 309     <u>Redemption</u>.  The Bonds shall be subject to optional and mandatory redemption as set forth in the form of Bonds attached hereto as Exhibit A and Exhibit B.  The Bonds shall only be redeemed in Authorized Denominations.  No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

Section 310     <u>Selection of Bonds to be Redeemed</u>.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such Outstanding Bond a distinctive number for each minimum denomination of the principal amount

15

thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected. For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Any integral multiple of a minimum denomination may, if so specified by the provisions of a Supplemental Indenture, be utilized in connection with the partial redemption of Bonds issued pursuant to such Supplemental Indenture and such Bonds shall be subject to selection for redemption in the amount of such multiple but otherwise in accordance with this Section.

Section 311     Notice of Redemption.  When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds.  Such notice shall specify the Series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed.  Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable.  Such notice shall be given by first class mail or registered or certified mail, return receipt requested, not less than ten (10) business days nor more than sixty (60) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure so to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Bond Order or Supplemental Indenture as to Bonds issued pursuant to such Bond Order or Supplemental Indenture.  As directed by the City, further notice shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 312     Payment of Redeemed Bonds.  Notice having been given by mail in the manner provided in Section 311, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the

Redemption Price plus interest accrued and unpaid to the Redemption Date. If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the authorized denominations. If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable. If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

## ARTICLE IV
## PLEDGE OF INDENTURE; SOURCES OF PAYMENT AND SECURITY FOR THE BONDS

Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest.  The City hereby grants a valid, binding, enforceable, non-avoidable, continuing postpetition security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)    All rights and interests of the City in the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral (collectively the "Collateral") in the following order of priority:

(i)    With respect to the Series 2014A Bonds: A first priority lien on (a) the Pledged Income Tax Revenues and (b) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014B Bonds (items (a) and (b), collectively, the "Series 2014A Bonds Collateral").

(ii)    With respect to the 2014B Bonds: (a) A first priority lien on (i) the Pledged Wagering Tax Revenues and (ii) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014A Bonds, and (b) a second priority lien (second only to the lien securing the Series 2014A Bonds) on the Pledged Income Tax Revenues (items (a) and (b), collectively, the "Series 2014B Bonds Collateral"); and

(b)    Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations. The Bonds have been granted

super-priority claim status under Section 364(c)(1) of the Bankruptcy Code (without the need to file any proof of claim) and shall also be payable in the manner provided by the Bankruptcy Court Order.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim. Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402    Creation of Liens.  In order to effectuate the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control Agreements with the Depository Banks.

## ARTICLE V

## ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS

Section 501    Debt Service Fund.

(a) *Establishment of Debt Service Fund and Accounts.*  There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Bonds, Common Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Common Debt Service Account" (hereinafter referred to as the "Series 2014A Debt Service Account").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014B – Common Debt Service Account" (hereinafter referred to as the "Series 2014B Debt Service Account" and with the Series 2014A Debt Service Account, collectively, the "Debt Service Accounts").

(b) *Deposits to Debt Service Fund.*  Five Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for deposit to the applicable Accounts, for the payment of amounts owing with respect to the Bonds on such Interest Payment Date. Two Business Days prior to a scheduled Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for

18

deposit to the applicable Accounts, for the payment of all outstanding principal, premium, if any, and interest on the Bonds.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014A Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014A Bonds on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014A Debt Service Account, an amount sufficient to make the balance of the 2014A Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014B Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014B Bonds on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date. In the event that, following the foregoing application of amounts on deposit in the Pledged Wagering Tax Account, there remains a shortfall in the 2014B Debt Service Account with respect to the Debt Service Requirement Amount owing on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient therefrom to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, following the foregoing deposits, the amounts on deposit in a Debt Service Account do not equal the Debt Service Requirement Amount owing on such Interest Payment Date in respect of either or both series of Bonds, the Trustee shall withdraw funds from the Bond Proceeds Fund in an amount sufficient to make the balance in the applicable Debt Service Fund equal to the Debt Service Requirement for the applicable series of Bonds owing on such Interest Payment Date.

Asset Proceeds Collateral, if any, shall be transferred by the City within three (3) Business Days of receipt to the Trustee. The Trustee shall deposit the Asset Proceeds Collateral into the Debt Service Fund, for further pro-rata deposit into the 2014A Debt Service Account and the 2014B Debt Service Account, respectively, based on the then Outstanding amount of the Bonds in each Series for the mandatory redemption of Bonds on the next succeeding Interest Payment Date as provided in the Bonds.

(c)  *Withdrawals from the Debt Service Fund.*  The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the applicable Debt Service Account the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

Section 502    Costs of Issuance Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial

19

Recovery Bonds Costs of Issuance Fund" (the "Costs of Issuance Fund"). Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds. Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds.

Section 503    Bond Proceeds Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund").  There shall be deposited into the Bond Proceeds Fund the remainder of the net proceeds of the Bonds after the deposit of amounts necessary to pay Costs of Issuance into the Costs of Issuance Fund pursuant to Section 502 hereof as specified by the Emergency Manager in the Bond Orders.

Within the Bond Proceeds Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Bond Proceeds Account" (hereinafter referred to as the "Series 2014A Bond Proceeds Account").  Moneys on deposit in the Series 2014A Bond Proceeds Account shall be used only to fund the obligations owing in respect of the termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as set forth in the Bond Orders.  Any balance remaining in such Account after such payment shall be transferred to the Series 2014B Bond Proceeds Account.

There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014B – Bond Proceeds Account" (hereinafter referred to as the "Series 2014B Bond Proceeds Account"). Moneys on deposit in the Series 2014B Bond Proceeds Account shall be used only to pay for the Quality of Life Projects all in such amounts and for such Quality of Life Projects as specified by the Emergency Manager in the Sale Order and shall also be available, for so long as any fund remain on deposit therein, for deposit to the Debt Service Fund in accordance with Section 501(b), provided, however, that the City shall not be required to seek the Trustee's approval for Quality of Life Project expenditures and shall not be required to keep any funds on deposit in the Series 2014B Bond Proceeds Account following the date or dates on which Quality of Life Project expenditures are made.  Any balance remaining in such Account after the Maturity Date shall be deposited in the Series 2014B Debt Service Account.

Section 504    Amounts Remaining in Funds and Accounts. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

Section 505    Approval of Account Control Agreements. The City shall cause to be deposited 100% of the Pledged Wagering Tax Revenues into the Pledged Wagering Tax Account, and greater than 90% of the Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and accounts shall be governed by the Account Control Agreements at all times. The Pledged Wagering Tax Account and the Pledged Income Tax Account constitute part of the Trust Estate; provided, however, that, subject to Sections 708(a)

and 902(b) hereof, the City shall be authorized to use all Pledged Wagering Tax Revenues and Pledged Income Tax Revenues for any purpose permitted by law, without limitation at any time, including during an Event of Default.

## ARTICLE VI

## INVESTMENT OF FUNDS

Section 601    Permitted Investments.  All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City.  If the Trustee does not receive written investment direction from the City, the Trustee shall invest all money held by it as provided in subsection [(f)] hereof.  For purposes of this Article III, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a) bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b) certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

(c) commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d) repurchase agreements consisting of instruments listed in subdivision (a);

(e) Bankers' acceptances of United States banks rated at least A2/A/A;

[(f) mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

(i) the purchase of securities on a when-issued or delayed delivery basis,

(ii) the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii) the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g) obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

21

(h) investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118; and

(i) The investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150.]

Section 602    Valuation and Sale of Investments.    In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)    as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)    as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(c)    as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)    as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CITY

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701    Payment of Bonds.    The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other Property. As of the date hereof, the City is duly authorized to authorize and issue the Bonds and to enter

22

into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided. As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto prior to the pledge created hereby, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken. As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture. The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Revenues and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.

Section 703    Maintenance of Perfected Security Interests; Further Assurances; Notices of Default. At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Bondowners first priority security interests in the Trust Estate. The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of Default hereunder.

Section 704    [Tax Covenants. The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section 144(b) of the Code, or any successor provisions thereto. The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds.]

Section 705    Compliance With Conditions Precedent. Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist, have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706    Accounts and Reports. The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account, the Pledged Wagering Tax Account, the Asset Proceeds Collateral and all Accounts established by this Indenture which shall at all reasonable times be subject to the inspection of the Trustee.

Section 707    Issuance of Additional Obligations. The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Collateral or that has a superior payment priority to the Bonds. The issuance of any series of bonds hereunder, other than the Bonds, shall require compliance with Section 1002 of this Indenture.

Section 708    Wagering Tax and Income Tax Revenues and Accounts.  The City shall at all times:

(a)   maintain a minimum balance of no less than $5,000,000 in each of the Pledged Wagering Tax Account and Pledged Income Tax Account;

(b)  maintain Pledged Wagering Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(c)  maintain Pledged Income Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(d)  (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent authorized by applicable law and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

Section 709    Asset Proceeds Collateral.   The City shall deposit Asset Proceeds Collateral with the Trustee within three (3) Business Days of receipt thereof, for deposit in accordance with Section 501(b) hereof.  Furthermore, the City hereby covenants that as long as the Bonds are outstanding, no Asset Proceeds Collateral shall be used for any purpose other than payment of the principal of and interest on the Bonds, unless the City shall request in writing a use for such proceeds other than as set forth in this Section 709, and majority of Bondowners shall consent in writing.

Section 710    Contesting Enforceability.  The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

## ARTICLE VIII

## THE TRUSTEE

Section 801    Powers and Duties of Trustee.

(a)      The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)     In the event that any of the Bonds are issued on a tax exempt basis to finance working capital expenditures by the City, the Trustee hereby covenants, commencing [_____], 2015 and each [_____] thereafter so long as the Tax-Exempt Bonds are outstanding, to send an Authorized Officer of the City notice requesting the City to engage Bond Counsel to provide a Continuing Exclusion Opinion (as defined in the Bond Authorizing Order). The Emergency Manager has covenanted in the Bond Orders on behalf of the City that upon receipt of such notice from the Trustee, the City shall cause Bond Counsel to provide the Continuing Exclusion Opinion as required above.  The City may conclusively rely on such Continuing Exclusion Opinion in complying with the provisions therein.  In the event the City fails to obtain the Continuing Exclusion Opinion, or Bond Counsel determines that the conditions necessary to provide the Continuing Exclusion Opinion for the Tax-Exempt Bonds that remain outstanding after the next succeeding Extraordinary Redemption Date (as defined in the Bond Authorizing Order) do not exist, the City shall redeem the Tax-Exempt Bonds in accordance with the provisions set forth in the Sale Order and this Indenture.

(c)     The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(d)     The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(e)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(f)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be found to secure the same.

(g)     The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than its [gross] negligence or willful misconduct.  The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(h)     The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(i)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as

13-53846-swr   Doc 7208   Filed 05/21/14   Entered 05/21/14 12:39:32   Page 256 of 594

amended, or by law. The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(j)     The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts created by this Indenture or in the enforcement of any rights and powers under this Indenture until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(k)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, except for liability for its own gross negligence or willful misconduct.

(l)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding.

(m)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(n)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(o)     The Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(p)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control Agreements, relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(q)     The Trustee is authorized and directed by the City to enter into the Account Control Agreements.

(r)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. If an Event of Default shall have occurred

26

and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs in exercising any rights or remedies or performing any of its duties hereunder.

Section 802  Fees and Expenses of Trustee.  (a) The Trustee shall be entitled to reasonable fees for services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)  If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service Funds, and shall be entitled to a preference therefor over any Outstanding Bonds.

Section 803  Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale. (a)  The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.  Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged Wagering Tax Revenues, Pledged Income Tax Revenues and Asset Proceeds Collateral, and transfer and assign its right, title and interest in the Indenture to the successor Trustee.  The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)  In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the successor Trustee.  If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor Trustee.  Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of

at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)     Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 804     Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the  Trustee and the City and signed by  the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding.  No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof. Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805     Appointment of and Transfer to Successor Trustee.  If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended.  The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES ON DEFAULT

Section 901     Events of Default.  Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a)     The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

(b)     The failure of the City to pay, when due, any principal or premium, if any, of any or all Bonds, whether on the Maturity Date or redemption thereof,

(c)     The City shall default in the performance or observance of any of the other covenants, agreements or conditions on its part contained in this Indenture (other than covenants otherwise specifically covered by this Section 901) and such default is not remedied within fifteen (15) days following receipt by the City of notice from the Trustee of such default;

(d)     If (i) the City shall fail to make a scheduled payment in excess of $25,000,000, when due and owing, in respect of Post-Petition Date Debt (other than the obligations with respect to the Bonds), or (ii) Post-Petition Date Debt in an outstanding aggregate principal amount exceeding $25,000,000 is accelerated, which results in such debt becoming immediately due and payable, and in the case of either (i) or (ii), such event is not cured within any grace period provided therefor in the applicable documents;

(e)     If material post-petition judgments, which are final and nonappealable, are rendered against the City involving liability in an aggregate amount exceeding $25,000,000 and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable;

(f)     If a court of competent jurisdiction finds that any of the Financing Documents are invalid or unenforceable and such finding is not stayed pending appeal;

(g)     If there is a written assertion by the City or an Authorized Officer that any Financing Document or the Bankruptcy Court Order is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication;

(h)     If the Bankruptcy Case is dismissed prior to the confirmation of a plan of adjustment, and the order dismissing the Bankruptcy Case is not stayed pending appeal;

(i)     The reversal or modification, by the entry of an order that is not stayed pending appeal and in a manner adverse to the Registered Owners, of the Bankruptcy Court's order dated December 5, 2013 [Docket No. 1945] granting the City chapter 9 bankruptcy relief;

(j)     If the City shall file, consent to, or fail to file a written opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion;

(k)     If the Bankruptcy Court shall grant any super-priority claim pursuant to sections 364(c)(1), 503 and 507(a)(2) of the Bankruptcy Code in favor of  any party other than the Registered Owners (other than as permitted under the Financing Documents);

(l)     If there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the Registered Owners holding 51% of the Outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Bankruptcy Court Order in a

29

manner adverse to the Registered Owners, or (ii) an order of a court of competent jurisdiction reversing, vacating or staying the effectiveness of the Bankruptcy Court Order, and in either (i) or (ii), such order is not stayed pending appeal;

(m)     If the liens or super-priority claims granted in the Bankruptcy Court Order in respect of the Bonds shall cease to be valid, perfected and enforceable in all respects with the priority described herein and therein;

(n)     The failure of the City to comply with the provisions of Section 708(a) with respect to Pledged Wagering Tax Revenues and the Wagering Tax Revenue Account and such failure is not cured within two (2) Business Days;

(o)     The failure by the City to comply with the provisions of Section 708(a) with respect to Pledged Income Tax Revenues the Income Tax Revenue Account and such failure is not cured within two (2) Business Days;

(p)     If the City ceases to be under the control of the Emergency Manager, or successor emergency manager, for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds, or a designee or successor as consented to by the City (which consent shall not be unreasonably withheld), to ensure continued financial responsibility shall have been established pursuant to Act 436 or any successor statute; or

(q)     Any representation or warranty made by the City in this Indenture, any Financing Document or in any certificate, document, instrument, opinion or financial statement made or delivered pursuant to or in connection with this Indenture or with any of the other Financing Documents, shall prove to have been incorrect, incomplete or misleading in any material respect as of the time of such representation or warranty.

Section 902     Remedies.  (a)  *General*.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture, including without limitation, the acceleration of the Bonds in accordance with Section 902(b) below.

(b)     *Acceleration.*  Upon the occurrence and continuation of an Event of Default, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed, in its own name,  to protect or enforce the rights of the Trustee and the holders of the related Bonds by declaring the principal of and interest on the Bonds to be immediately due and ordering payment in the manner provided by Section 902(c)(i) and/or Section 902(c)(ii) hereof provided that interest shall continue to accrue on unpaid principal at the Default Rate until paid in full.

(c)     *Post-Maturity Debt Service*.   Upon an Event of Default, and following acceleration of the Bonds pursuant to Section 902(b):

(i)     The Trustee, on behalf of the Bondowners of the Series 2014A Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014A Bonds on a monthly basis (such monthly payment date constituting a Redemption

30

Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro-rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014B Bonds.

(ii)     The Trustee, on behalf of the Bondowners of the Series 2014B Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014B Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to (i) $4,000,000 per month from the Pledged Wagering Tax Revenues and payable from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement, and (ii) following payment in full of the Series 2014A Bonds, an additional $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014A Bonds;

(iii) Upon any acceleration of the Bonds following the occurrence of an Event of Default under Section 901(a), (b), (f), (g), (h), (i), (j), (k), (l), or (m), the Trustee, on behalf of the Bondowners of the Bonds, shall be entitled to apply any moneys remaining on deposit in the Bond Proceeds Fund to the Bonds;

(iv) Payment on the Bonds is not limited to the Trust Estate, and the Trustee, on behalf of the Bondowners of all of the Bonds, may be entitled to seek payment from the City, (without the need to file any proof of claim), in accordance with the Section 364(c)(1) superpriority claim status of the Bankruptcy Court Order; and

(v) The monthly payment provisions of subsections (i) and (ii) above do not modify the obligation of the City to pay the Bonds in full upon (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, or (iii) [_____], the date that is two years and six months after the Date of Original Issue.

(d)     *Enforcement.*     Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the Obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(e)     *Owner Right of Action.*     If the Registered Owners holding 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the

13-53846-swr   Doc 4728   Filed 05/21/13   Entered 05/21/13 22:39:10   Page 262 of 594

Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the Owner of all Outstanding Bonds.

Section 903    Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding 51% of the Outstanding amount of the Bonds, waive an Event of Default hereunder and annul its consequences.  No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904    Possession of Bonds by Trustee Not Required.  All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto.  Any action instituted by the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905    Remedies Cumulative.  The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906    Knowledge by Trustee of an Event of Default.  The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until it shall have actual knowledge thereof, or shall have received written notice thereof from any Bondowner at its address and location specifically designated for receiving notices pursuant hereto.  Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907    Application of Monies.  All moneys received by the Trustee and deposited in the Debt Service Fund pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

## ARTICLE X

## SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE

Section 1001    Modifications and Amendments Not Requiring Consent.  Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)    To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)    To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

(c)     To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

(d)     To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)     To appoint separate or successor trustees, paying agents or bond registrars.

(f)     To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders.  Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1002   Amendments Requiring Consent.  Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental or amendatory indenture unless approved by the holders of all outstanding Bonds.  Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds.  The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this

Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003   Consent of Trustee.  Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section 1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section.  Such certificate shall specifically request the Trustee to enter into such supplement.  Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004   General Provisions Relating to Supplemental Indentures.  This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X.  Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

A copy of every Supplemental Indenture entered into pursuant to this Indenture shall be accompanied by a Bond Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture

and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

## ARTICLE XI

## **MISCELLANEOUS**

Section 1101   Notices.   Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

A.  If to the City, to:             City of Detroit

                                      Detroit, Michigan 48226
                                      Attention: _____

B.  If to the Depository Bank, to:    _____

C.  If to the Trustee, to:         _____

The City and the Trustee may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102   Termination.   This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees owed to the Trustee have been paid in full.   Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103   Defeasance.   Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon,

35

as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Registered Owners of such Bonds.  After such deposit, such Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

Section 1104  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105  <u>Headings</u>.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106  <u>Indenture Executed in Counterparts</u>.  This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107  <u>Parties Interested Herein</u>.  Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser.

Section 1108  <u>Jurisdiction</u>.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Indenture (including, without limitation, any actions by the Trustee or the Registered Owners pursuant to Section 902 hereof), or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; <u>provided</u>, <u>however</u>, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

36

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and UMB Bank, N.A. to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

    Its:  Emergency Manager

UMB BANK, N.A.,

as Trustee

By _____

Its: _____

**EXHIBIT A**

**<u>FORM OF SERIES 2014A BOND</u>**

**EXHIBIT B**

**<u>FORM OF SERIES 2014B BOND</u>**

**EXHIBIT C**

**<u>FORM OF ACCOUNT CONTROL AGREEMENT</u>**

## Exhibit D
Irrevocable Direections

# IRREVOCABLE DIRECTIONS
_____, 2014

_____
_____
_____

**Re:  Wagering Tax Payments to be made to the City of Detroit (the "City")**

Ladies and Gentlemen:

Please be advised that:

1.  All payments by _____ of all taxes owing to the City of Detroit in respect of the adjusted gross receipts earned by you and payable pursuant to the City of Detroit pursuant to Detroit City Code Section 18-14-3, as amended and any replacement or successor thereto and the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State of Michigan, effective December 5, 1996, as amended, and any replacement or successor thereto, together with any interest and penalties payable thereon (collectively, the "Pledged Wagering Taxes") shall be paid to the City by wire transfer in immediately available funds for credit to the City's account at Comerica Bank (the "Bank") as follows:

_____
_____
_____

For the avoidance of doubt, Pledged Wagering Taxes include Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, (all as defined in Detroit City Code Section 18-14-2) including any interest and penalties thereon and all proceeds.

2.  No change to these Instructions shall be effective for any purpose without the prior written consent of UMB Bank, N.A., as Trustee (the "Trustee") under a Financial Recovery Bond Trust Indenture between the City of Detroit and UMB Bank, N.A., as Trustee, dated _____, 2014, (the "Indenture").

3.  These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Trustee.

4.  These Instructions shall terminate upon written notice of the Bank and the Trustee that the Indenture has been terminated.

5.  These Irrevocable Directions amend, restate and replace in their entirety those certain Irrevocable Instructions given by the City of Detroit to you on June 23, 2009.

6.  These Instructions are binding on you, your successors and assigns.

CITY OF DETROIT


_____

Kevyn Orr, Emergency Manager

Acknowledged and Agreed:

[SEPARATE ACKNOWLEDGMENT BLOCK TO BE ADDED FOR EACH CASINO]

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | § Chapter 9 |
| | § |
| CITY OF DETROIT, MICHIGAN, | § Hon. Steven W. Rhodes |
| | § |
| Debtor. | § Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),  503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),  904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)    authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment

that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings

Letter and the Fee Letter, the "<u>Bond Documents</u>"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)   granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "<u>Bond Obligations</u>") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)   granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)   authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "<u>Fee Letter</u>"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees,

assigned to them by the Bankruptcy Code.

3

the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)     vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)     authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 28 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the ~~Declarations~~**Declaration** of James Doak ~~and Charles M. Moore~~ in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion ~~held~~**commencing** on [●]**December 17**, 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and

4

in the best interests of the City, ~~its creditors and all parties in interest~~; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.   *Petition Date*.  On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case.  The order for relief in this case was entered on [~~—~~ ~~]~~**December 5**, 2013.

B.   *Jurisdiction and Venue*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  *City's Stipulations*.  The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D.  *Findings Regarding the Postpetition Financing*.

(i)  ~~*Need for Postpetition Financing*.  The City's obtaining credit pursuant to the Post-Petition Facility will enable the City to continue revitalization efforts, save tens of millions of dollars in annual debt service (in the form of scheduled swap payments) and provide for investment in the City's delivery of municipal services to its businesses and residents.~~

6

(iii) *No Credit Available on More Favorable Terms*.  Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility.  The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

(iiii) *Use of Proceeds of the Post-Petition Facility*.  As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General

Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.     *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.     *Good Faith and Jurisdictional Matters*.

(i)     *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond

8

~~Obligation~~**Obligations**, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii)    *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express

9

reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for ~~valid~~ purposes and uses **that are permitted by law**, and not in violation of the Bankruptcy Code. The Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

G.      *Act 436 Approval Not Required*. On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility. The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909. Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H.      *Notice*. Notice of the Hearing and the relief requested in the Motion

has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Motion Approved.  The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2.      Objections Overruled.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**Post-Petition Facility Authorization**

3.      Authorization of the Financing and Bond Documents.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.      Authorization to Borrow.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the

12

Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the "Financing").

5.    Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    Liens and Collateral.  **(a)** In order to secure the Bond Obligations, effective ~~immediately~~ upon ~~entry of this Order~~**the Closing Date** and without the necessity of the execution, recordation of filings by the City of financing

13

statements, notices of liens, control agreements or other security documents, or the

possession or control by the Purchaser, the Indenture Trustee or the Bondholders

over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the

City is authorized to grant, and the Purchaser, the Indenture Trustee and the

Bondholders are hereby granted, in accordance with the terms of the Indenture,

continuing, valid, binding, enforceable, non-avoidable postpetition security

interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing,

enforceable, fully-perfected first priority Lien on (i) taxes owing to the City

in respect of the gross receipts earned by each of the City's casinos (the

"Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as

defined in the Bond Documents, on a *pari passu* basis with the holders of

Swap Termination Bond, and (b) a valid, binding, continuing, enforceable,

fully-perfected second priority Lien (second only to the Liens securing the

Swap Termination Bond) on the income tax revenues of the City (the

"Pledged Income Tax Revenue", and together with the Pledged Wagering

Tax Revenue and the Asset Proceeds Collateral, each as described in this

clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing,

enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax

14

Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "<u>Swap Termination Bond Collateral</u>", and together with the Quality of Life Bond Collateral, the "<u>Collateral</u>").

**(b)      Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee,"  "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No.**

**1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.**

7.     Direction of Pledged Wagering Tax Revenue.  ~~Any~~**On, and after the Closing Date, any** entity that collects or holds Pledged Wagering Tax Revenue, shall deposit ~~daily~~ such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account **in the name of the City** held at the Wagering Tax Depository Bank pursuant to ~~instructions by the City, and consistent with the terms of the Wagering Tax Account Control Agreement.~~**irrevocable directions (the "Irrevocable Directions") by the City in the form attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified development agreements.**

8.     Lien Priority.  The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral.  Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise

16

and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.     Superpriority Claims.  Upon ~~entry of this Order~~**the Closing Date**, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "Superpriority Claim") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.  **There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the**

17

y

z

w

u

t

s

r

q

p

o

n

m

k

j

h

g

f

e

d

c

b

a

and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.     Superpriority Claims.  Upon ~~entry of this Order~~**the Closing Date**, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "Superpriority Claim") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.  **There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the**

17

**one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "Property Tax Revenue"). To the extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.**

10.    <u>No Obligation to Extend Credit</u>.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

18

~~11.     Use of Post-Petition Facility Proceeds.  From and after the Petition~~
~~Date, the City shall use the Post-Petition Facility only for the purposes specifically~~
~~set forth in this Order and the Bond Documents.~~

**Provisions Common to Financings**

~~12~~**11**. Amendment of the Bond Documents. The City is authorized, without

further approval of this Court, to perform all acts and to make, execute and deliver

all instruments and documents that may be reasonably required to effect one or

more amendments, modifications or supplements to any of the Bond Documents as

provided in the Fee Letter or that are solely ministerial amendments, modifications

or supplements.  **Subject to paragraph 7 hereof, nothing in this paragraph 11**

**shall be construed to (i) entitle the City, without the prior written consent of**

**each of the City's casinos, to amend, modify or supplement the Bond**

**Documents, including without limitation the Irrevocable Directions to be**

**given to and accepted by the City's casinos, or (ii) entitle the Trustee to**

**enforce the Bond Documents, including without limitation the Irrevocable**

**Directions, in the case of either (i) or (ii), in a way that would (a) modify the**

**payment obligations of the City's casinos under the Gaming Act or their**

**certified development agreements, all in the amounts, at the times and to the**

**payees set forth therein; (b) create a lease, pledge, borrowing or loaning of**

**money against any license, permit or authorization issued to the City's casinos**

**by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.**

~~13~~**12**.  Modification of Automatic Stay.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order; and (e) authorize the City to pay, and the Indenture Trustee to retain and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order.

~~14~~**13**.  Perfection of Liens.  This Order shall be conclusive evidence of the

20

validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein. **Upon satisfaction of the conditions to termination set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated. The Custodian shall timely perform its obligations in connection with the termination of the Collateral Agreement, including, without limitation, the obligations set forth in Section 14.4 thereof and in particular, but also without limitation, paying any and all amounts due to the City under the Collateral Agreement and giving notice to the appropriate parties that the "Irrevocable Instructions" (as**

21

**defined in the Collateral Agreement) are terminated and no longer of any force or effect.**

14.     **Right to Take Actions to Perfect.**  Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law, or take constructive control over assets, take any other action, in each case, to validate and perfect the Liens and all such financing statements, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the date of entry of this Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the Liens.  The City is authorized and directed to execute and deliver promptly upon demand to the Purchaser or the Indenture Trustee all such financing statements, notices, control agreements and other security documents as the Purchaser or the Indenture Trustee may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording.

For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15.     Proceeds of Subsequent Financing.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16.     Maintenance of Collateral.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17.     Disposition of Collateral.

(a)     Except as otherwise provided for in the Bond Documents, the

City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18.     <u>Maturity Date</u>.  Upon the earliest to occur (such earliest date, the "<u>Maturity Date</u>") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

19.     <u>No Dismissal</u>.  The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

20.     Events of Default.  The occurrence of an "Event of Default" under the

Bond Documents or any violation of the terms of this Order shall constitute an

event of default under this Order ("Event of Default"), unless waived in writing by

the Indenture Trustee, upon consent of the Bondholders in accordance with the

Bond Documents.

21.     Rights and Remedies Upon Event of Default.  Immediately upon the

occurrence and during the continuation of an Event of Default, the Indenture

Trustee, upon the direction of the Bondholders in accordance with the Bond

Documents, may, among other things, declare all Bond Obligations owing under

the Bond Documents to be immediately due and payable in accordance with the

terms of the Bond Documents, but without affecting any of the Liens or the Bond

Obligations (any such declaration, a "Termination Declaration").  The Termination

Declaration shall be given by electronic transmission as provided in the Bond

Documents (the date any such Termination Declaration is made, the "Termination

Declaration Date").  Following the Termination Declaration Date, the Indenture

Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and

remedies under the Bond Documents without further order or approval from this

Court.

22.     Good Faith Under Section 364(e) of the Bankruptcy Code; No

Modification or Stay of this Order.  The Indenture Trustee, on behalf of the

Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

23. <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other

court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24.  Proofs of Claim.  The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds.  Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

25.  Rights of Access and Information. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and

Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

26. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging

in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

27.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor or any direct, indirect or incidental beneficiary.

28.    <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective

claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

29. <u>No Marshaling/Applications of Proceeds</u>. The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

30. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32. <u>No Waiver by Seeking Relief</u>.  Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

33. <u>Binding Effect of Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

34. <u>No Modification of Order</u>.  Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not

seek or consent to, directly or indirectly, without the prior written consent of the

Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the

Indenture Trustee (if such  action is to be taken after the issuance of the Bonds), in

each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to

this Order or the order for relief in a manner adverse to the Purchaser, the

Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing

or hereafter arising of any kind or nature whatsoever, including any administrative

expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy

Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the

Collateral with priority equal or superior to the Liens (except as specifically

provided in the Bond Documents).  The City irrevocably waives any right to seek

any amendment, modification or extension of this Order without the prior written

consent of the Purchaser (if such action is to be taken prior to the issuance of the

Bonds) or the Indenture Trustee (if such  action is to be taken after the issuance of

the Bonds), in each case, in its sole discretion.

    35.    <u>Order Controls</u>.  In the event of any inconsistency between the terms

and conditions of the Bond Documents and this Order, the provisions of this Order

shall govern and control.

    36.    <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions

of this Order and any actions taken pursuant hereto shall survive entry of any order

that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case. Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

      37.    Effect of this Order. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

      38.    Retention of Jurisdiction. The Court has and will retain jurisdiction to

enforce this Order according to its terms.

**<u>Exhibit A</u>**
Bond Purchase Agreement
~~Quality of Life~~**<u>Swap Termination</u>** Bond

**Exhibit B**
Bond Purchase Agreement
~~Swap Termination~~**Quality of Life** Bond

**Exhibit C**
Indenture

[[NYCORP:3434754v13:3136D: 11/04/2013--11:55 AM]]

**Exhibit D**
**Irrevocable Direections**

[[NYCORP:3434754v13:3136D: 11/04/2013--11:55 AM]]

13-53846-swr   Doc 4728   Filed 05/16/14   Entered 05/16/14 15:29:32   Page 313 of 594
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 171 of 172

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 12/16/2013 11:03:07 AM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** Financing Proposed Order - FILING VERSION 11.5.2013.doc | |
| **Original DMS:** | |
| **Modified Filename:** Financing Order (REVISED for hearing 12.16.13).doc | |
| **Modified DMS:** | |
| **Changes:** | |
| Add | 30 |
| Delete | 24 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| Table Delete | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 54 |

**<u>Item 7</u>**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
------------------------------------------------------x
                                        :
In re                                   :  Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :  Case No. 13-53846
                                        :
                        Debtor.         :  Hon. Steven W. Rhodes
                                        :
------------------------------------------------------x
```

**SECOND NOTICE OF REVISED PROPOSED ORDER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

**PLEASE TAKE NOTICE THAT:**

1.    On November 5, 2013, the City of Detroit, Michigan  ("<u>Detroit</u>" or the "<u>City</u>") filed the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (Docket No. 1520) (the "<u>Financing Motion</u>").  Attached to the Financing Motion as <u>Exhibit 1</u> is the proposed Order granting the Financing Motion (the "<u>Proposed Order</u>").

2.    Based on comments to the Proposed Order by parties in interest and the statements of parties in interest and the Court at the pre-trial conference on

December 13, 2013, the City made certain modifications to the Proposed Order and filed a revised Proposed Order on December 16, 2013 [Docket No. 2148] (the "Revised Proposed Order").  Based on additional discussions between the City and certain parties in interest, the City has agreed to make additional revisions to the Proposed Order to resolve certain objections to the Financing Motion.

3.      Accordingly, a further revised Proposed Order (the "Second Revised Proposed Order") with these modifications is attached hereto as Exhibit A. A blackline comparing the Second Revised Proposed Order with the Revised Proposed Order is attached hereto as Exhibit B.

-2-

13-53846-tjt  Doc 2177  Filed 05/13/14  Entered 05/13/14 15:29:22  Page 2 of 59
13-53846-swr  Doc 2317  Filed 12/16/13  Entered 12/16/13 18:18:10  Page 317 of 594

Dated: December 16, 2013

Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601-1692
Telephone: (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com


ATTORNEYS FOR THE CITY

# <u>CERTIFICATE OF SERVICE</u>

   I, David G. Heiman, hereby certify that the foregoing Second Notice of Revised Proposed Order was filed and served via the Court's electronic case filing and noticing system on this 16th day of December, 2013.


      /s/ David G. Heiman   

-4-

13-53846-tjt  Doc 2177  Filed 12/16/13  Entered 12/16/13 18:18:10  Page 4 of 33
13-53846-swr  Doc 2177-1  Filed 05/12/14  Entered 05/12/14 15:29:22  Page 319 of 594

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the

United States Bankruptcy Court for the Eastern District of Michigan (the "Local

Rules") seeking entry of an order (this "Order") *inter alia*:[1]

(i)     authorizing the City to obtain senior secured post-petition financing on

a superpriority basis in the form of the Quality of Life Bond and the Swap

Termination Bond in an aggregate principal amount of up to $350,000,000

(collectively, the "Post-Petition Facility") pursuant to the terms and conditions of

the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit

A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between

the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture

substantially in the form attached hereto as Exhibit C (the "Indenture"), by and

between the City and the Indenture Trustee, on behalf of itself, the Purchaser and

those other entities to whom the Purchaser either assigns or sells participations in the

Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase

Agreements and all other related bond documents, including the Indenture, the

Bonds, the Wagering Tax Control Agreements and the Income Tax Control

Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local

---

[1] Capitalized terms used but not defined herein shall have the meanings given to
them in each of the Bond Purchase Agreements (as defined below) and the Indenture
(as defined below), as applicable. Uncapitalized terms used in this Order that are

2

13-53846-tjt  Doc 4728-7  Filed 05/13/14  Entered 05/13/14 15:29:32  Page 322 of 594
13-53846-swr  Doc 2577  Filed 02/14/14  Entered 02/14/14 15:18:10  Page 7 of 53

Emergency Financial Assistance Loan Board Order and the documents relating to

the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended,

supplemented, restated, or otherwise modified from time to time, collectively, and

together with the Bond Purchase Agreements, the Commitment Letter and the Fee

Letter, the "<u>Bond Documents</u>"), entered into by and among, variously, the City,  the

Purchaser, the Indenture Trustee, and other third parties, and to perform such other

acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder

and under the Bond Documents (collectively, and including all obligations under or

with respect to the Bond Documents, the "<u>Bond Obligations</u>") allowed superpriority

claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders

automatically attached and perfected security interests in and Liens (as defined

below) on the Quality of Life Bond Collateral (as defined below) and the Swap

Termination Bond Collateral (as defined below) as applicable, which Liens shall be

subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond

Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and

---

defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to

3

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:29:22  Page 323 of 594
13-53846-swr  Doc 2977  Filed 12/16/13  Entered 12/16/13 18:16:10  Page 3 of 33

other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "<u>Fee Letter</u>"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 30 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "<u>Filed Bond Documents</u>"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "<u>Hearing</u>"); and notice of the Hearing having been given in accordance with

them by the Bankruptcy Code.

4

13-53846-tjt  Doc 4728-7  Filed 05/12/14  Entered 05/12/14 15:29:22  Page 324 of 594
13-53846-swr  Doc 2317  Filed 12/16/13  Entered 12/16/13 18:13:10  Page 9 of 83

Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this case was entered on December 5, 2013.

B. *Jurisdiction and Venue*. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of

Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *City's Stipulations*. The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D. *Findings Regarding the Postpetition Financing*.

    (i) *No Credit Available on More Favorable Terms*. Given its

6

current financial condition and financing arrangements, the City is unable to obtain

adequate financing on terms more favorable than the Post-Petition Facility. The

City has been unable to obtain unsecured credit allowable under Bankruptcy Code

Section 503(b)(1) as an administrative expense. Adequate financing on a

postpetition basis is not otherwise available without granting the Purchaser, the

Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided

herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the

Bond Documents, (2) superpriority claims and Liens and (3) the other protections set

forth in the Bond Documents and this Order.

(ii) *Use of Proceeds of the Post-Petition Facility.* As a condition to

the entry into the Bond Documents and the extension of credit under the

Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds

of the Post-Petition Facility shall be used, in each case in a manner consistent with

the terms and conditions of the Bond Documents, solely (a) with respect to the

Quality of Life Bond, for purposes permitted by law, including to fund expenditures

designed to contribute to the improvement of the quality of life in the City and (b)

with respect to the Swap Termination Bond, to pay amounts required under the

Forbearance and Optional Termination Agreement dated as of July 15, 2013, among

the City, the Emergency Manager of the City, the Detroit General Retirement

System Service Corporation, the Detroit Police and Fire Retirement System Service

7

Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.  *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.  *Good Faith and Jurisdictional Matters*.

(i)  *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee

8

and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii)     *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses

9

that are permitted by law, and not in violation of the Bankruptcy Code. The

Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full

protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and

this Order and shall not be affected by any reversal, modification, vacatur,

amendment, reargument or reconsideration of this Order, any order finding

jurisdiction, the order for relief or any other order.

G.    *Act 436 Approval Not Required.*  On October 21, 2013, in accordance

with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL

141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council")

disapproved the Post-Petition Facility.  The City Council failed to offer an

alternative proposal during the time period prescribed in Section 19(2) of Act 436.

The City has requested approval of the Post-Petition Facility by the Emergency

Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the

Michigan Home Rule City Act, Public Act 279 of 1909.  Because the City Council

failed to offer a timely alternative proposal, approval of the Post-Petition Facility by

the Board under Act 436 is not required to authorize the City to enter into the Bond

Documents, which are valid and enforceable according to their terms as a result of

this Order and applicable non-bankruptcy law.

H.    *Notice.*  Notice of the Hearing and the relief requested in the Motion

has been provided by overnight delivery and electronic mail or facsimile to: (a) the

trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. <u>Motion Approved</u>.  The Motion is granted, the Financing (as defined

below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2. <u>Objections Overruled</u>.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

## Post-Petition Facility Authorization

3. <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4. <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the

12

13-53846-tjt  Doc 2277  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 332 of 594
13-53846-swr  Doc 4728  Filed 05/16/13  Entered 05/16/13 18:18:10  Page 27 of 83

Bond Obligations (collectively, the "Financing").

5.      Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to

13

Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the

14

"Swap Termination Bond Collateral", and together with the Quality of Life Bond Collateral, the "Collateral").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7.  <u>Direction of Pledged Wagering Tax Revenue</u>.  On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "<u>Irrevocable Directions</u>") by the City in the form attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "<u>Gaming Act</u>"), or their certified development agreements.

8.  <u>Lien Priority</u>.  The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral.  Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason.  The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code.  No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.     Superpriority Claims.  Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "Superpriority Claim") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.  There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "Property Tax Revenue").  To the extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of

adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10. <u>No Obligation to Extend Credit</u>. The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11. <u>Amendment of the Bond Documents</u>. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements. Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the

18

City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance

19

13-53846-tjt   Doc 4272-77   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 24 of 54
13-53846-swr   Doc 2277   Filed 12/16/13   Entered 12/16/13 18:18:10   Page 339 of 594

with the terms of the Bond Documents, the Post-Petition Facility and this Order; and

(e) authorize the City to pay, and the Indenture Trustee to retain and apply, all

payments required to be made to the Indenture Trustee, in accordance with the terms

of the Bond Documents, the Post-Petition Facility and this Order.

      13.   <u>Perfection of Liens</u>.  This Order shall be conclusive evidence of the

validity, perfection and priority of the Liens without the necessity of filing or

recording any financing statement, mortgage, notice or other instrument or

document which may otherwise be required under the law or regulation of any

jurisdiction or the taking of any other action (including entering into any deposit

account control agreement, mortgages or deeds of trust) to validate or perfect (in

accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser,

the Indenture Trustee and the Bondholders to the Liens and priorities granted herein.

Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that

certain Collateral Agreement among the City, Detroit General Retirement System

Service Corporation, Detroit Police and Fire Retirement System Service

Corporation, U.S. Bank National Association (the "<u>Custodian</u>") and the Other

Persons Party thereto dated as of June 15, 2009 (the "<u>Collateral Agreement</u>"), the

Collateral Agreement shall terminate and any lien, security interest or other interest

in the Pledged Wagering Revenues under the Collateral Agreement shall be

terminated.  The Custodian shall timely perform its obligations in connection with

the termination of the Collateral Agreement, including, without limitation, the

obligations set forth in Section 14.4 thereof and in particular, but also without

limitation, paying any and all amounts due to the City under the Collateral

Agreement and giving notice to the appropriate parties that the "Irrevocable

Instructions" (as defined in the Collateral Agreement) are terminated and no longer

of any force or effect.

14. <u>Right to Take Actions to Perfect</u>. Notwithstanding the foregoing, the

Purchaser, the Indenture Trustee and the Bondholders are authorized, but not

required, to file and obtain, as each deems necessary in its sole discretion, such

financing statements, notices of liens, control agreements and other security

documents to perfect in accordance with applicable non-bankruptcy law, or take

constructive control over assets, take any other action, in each case, to validate and

perfect the Liens and all such financing statements, notices, control agreements and

other security documents shall be deemed to have been filed or recorded as of the

date of entry of this Order; <u>provided</u>, <u>however</u>, that no such filing or recordation

shall be necessary or required in order to create or perfect the Liens. The City is

authorized and directed to execute and deliver promptly upon demand to the

Purchaser or the Indenture Trustee all such financing statements, notices, control

agreements and other security documents as the Purchaser or the Indenture Trustee

may request. The Purchaser or the Indenture Trustee, each in its discretion, may file

a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording.  For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15.    <u>Proceeds of Subsequent Financing</u>.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16.    <u>Maintenance of Collateral</u>.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17. <u>Disposition of Collateral</u>.

(a) Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b) In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18. <u>Reporting reinvestment/revitalization spending</u>. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending from the Quality of Life Financing (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "<u>Revised Plan</u>"). Proceeds of the Quality of Life Financing will be placed in a segregated account (the "<u>Quality of Life Account</u>") that will be drawn

23

13-53846-tjt Doc 4722-77 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 342 of 594
13-53846-swr Doc 2877 Filed 03/11/14 Entered 03/11/14 15:19:10 Page 28 of 93

upon as approved, appropriated and budgeted quality of life projects are invoiced and require payment. Quality of life projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

19.     _Overall general fund financial condition_. Within 30 days after the closing of the Postpetition Financing, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "Revised Forecast") consistent with the "DIP Forecast" format previously presented by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

20.     _Maturity Date_. Upon the earliest to occur (such earliest date, the

24

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:29:32  Page 344 of 594
13-53846-swr  Doc 2277  Filed 12/16/13  Entered 12/16/13 18:10:10  Page 29 of 59

"Maturity Date") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

21. <u>No Dismissal</u>. The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

22. <u>Events of Default</u>. The occurrence of an "Event of Default" under the Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("<u>Event of Default</u>"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Bond Documents.

23. <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond Obligations owing under the Bond Documents to be immediately due and payable in accordance with the terms of the Bond

Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "Termination Declaration Date"). Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond Documents without further order or approval from this Court.

24.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.  The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith.  Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby.  Any liens or claims

26

13-53846-tjt  Doc 2277  Filed 05/13/13  Entered 05/13/13 19:32:10  Page 346 of 594
13-53846-swr  Doc 2277  Filed 05/13/13  Entered 05/13/13 19:32:10  Page 346 of 594

granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25. <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code.  Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby.  Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

26. <u>Proofs of Claim</u>.  The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds.  Any order entered by the Court in

27

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14  15:29:32  Page 347 of 594
13-53846-swr  Doc 2277  Filed 05/13/13  Entered 05/13/13  18:18:10  Page 320 of 593

relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

27. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room)

28

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 348 of 594
13-53846-swr Doc 2277 Filed 12/16/13 Entered 12/16/13 18:03:10 Page 33 of 83

provided to Bondholders in connection with the Post-Petition Facility.

28. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond

Documents or this Order.

29.  <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this

Order does not create any rights for the benefit of any third party, creditor or any

direct, indirect or incidental beneficiary.

30.  <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or

expenses incurred in the Case or by the City at any time shall be charged against the

Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims

or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code,

or otherwise, without the prior written consent of the Indenture Trustee.

31.  <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture

Trustee and the Bondholders shall not be subject to the equitable doctrine of

"marshaling" or any other similar doctrine with respect to any of the Collateral and

proceeds shall be received and applied pursuant to the Bond Documents and this

Order.

32.  <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the

entry of this Order is without prejudice to, and does not constitute a waiver of,

expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the

Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b)

to request modification of the automatic stay of Section 362 or 922 of the

Bankruptcy Code.

33.    No Waiver by Failure to Seek Relief.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

34.    No Waiver by Seeking Relief.  Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

35.    Binding Effect of Order.  Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

36.     _No Modification of Order_.  Until and unless the Bond Obligations have

been indefeasibly paid in full in cash (such payment being without prejudice to any

terms or provisions contained in the Bond Documents that by their terms survive

such discharge), the City irrevocably waives the right to seek and shall not seek or

consent to, directly or indirectly, without the prior written consent of the Purchaser

(if such action is to be taken prior to the issuance of the Bonds) or the Indenture

Trustee (if such  action is to be taken after the issuance of the Bonds), in each case, in

its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or

the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the

Bondholders; (ii) any claim against the City (now existing or hereafter arising of any

kind or nature whatsoever, including any administrative expense of the kind

specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or

superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with

priority equal or superior to the Liens (except as specifically provided in the Bond

Documents).  The City irrevocably waives any right to seek any amendment,

modification or extension of this Order without the prior written consent of the

Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the

Indenture Trustee (if such  action is to be taken after the issuance of the Bonds), in

each case, in its sole discretion.

37.     _Order Controls_.  In the event of any inconsistency between the terms

32

13-53846-tjt   Doc 4727   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 352 of 594
13-53846-swr   Doc 2277   Filed 12/16/13   Entered 12/16/13 18:18:10   Page 37 of 83

and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

38. <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case.  Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "<u>Commitment Letter</u>"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond

33

13-53846-tjt  Doc 472877  Filed 05/13/13  Entered 05/12/16/13 15:29:32:10  Page 353 of 594
13-53846-swr  Doc 2277  Filed 05/13/13  Entered 05/12/16/13 15:18:18:10  Page 38 of 53

Obligations.

39.    <u>Effect of this Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

40.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

**<u>Exhibit A</u>**
Bond Purchase Agreement
Swap Termination Bond

**<u>Exhibit B</u>**
Bond Purchase Agreement
Quality of Life Bond

**Exhibit C**
Indenture

# **Exhibit D**
Irrevocable Directions

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | § Chapter 9 |
| | § |
| CITY OF DETROIT, MICHIGAN, | § Hon. Steven W. Rhodes |
| | § |
| Debtor. | § Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment

---

that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings

2

13-53846-tjt   Doc 4727   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 361 of 594
13-53846-swr   Doc 2277   Filed 12/16/13   Entered 12/16/13 18:10:10   Page 46 of 83

Letter and the Fee Letter, the "<u>Bond Documents</u>"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "<u>Bond Obligations</u>") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "<u>Fee Letter</u>"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees,

assigned to them by the Bankruptcy Code.

3

13-53846-tjt   Doc 2277   Filed 05/13/13   Entered 05/13/13 15:29:10   Page 362 of 594
13-53846-swr   Doc 472-7   Filed 05/13/13   Entered 05/13/13 18:18:10   Page 47 of 83

the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 28**30** below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it

4

further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     *Petition Date*.  On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case.  The order for relief in this case was entered on December 5, 2013.

B.     *Jurisdiction and Venue*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     *City's Stipulations*.  The City stipulates and acknowledges that: (a)

except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

     D.    *Findings Regarding the Postpetition Financing*.

     (i)    *No Credit Available on More Favorable Terms*. Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility. The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the

Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

(ii)    *Use of Proceeds of the Post-Petition Facility*.  As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

7

E.     *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.     *Good Faith and Jurisdictional Matters*.

(i)     *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

8

(ii)     *Prudent Judgment, Jurisdictional Matters and Good Faith*

*Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and

the Bond Documents and the fees to be paid thereunder are fair, reasonable, and

the best available to the City under the circumstances, reflect the City's exercise of

prudent judgment, are supported by reasonably equivalent value and fair

consideration, are at the request, and with the consent, of the City and are within

the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy

Code. The Post-Petition Facility was selected by the City after review of multiple

proposals received during a full and fair marketing process conducted by the City

and its agents and advisors. The Post-Petition Facility and the Bond Documents

were negotiated in good faith, without fraud or collusion and at arms' length

among the parties.  Credit extended under the Post-Petition Facility and the Bond

Documents under Section 364(c) of the Bankruptcy Code is extended in good faith

within the meaning of Section 364(e) of the Bankruptcy Code and in express

reliance upon the protections offered by Section 364(e) of the Bankruptcy Code,

for purposes and uses that are permitted by law, and not in violation of the

Bankruptcy Code.  The Purchaser, the Indenture Trustee and the Bondholders

therefore qualify for the full protection and benefits of Sections 364(e) and 921(e)

of the Bankruptcy Code and this Order and shall not be affected by any reversal,

modification, vacatur, amendment, reargument or reconsideration of this Order,

9

any order finding jurisdiction, the order for relief or any other order.

G. *Act 436 Approval Not Required*. On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility. The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909. Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H. *Notice*. Notice of the Hearing and the relief requested in the Motion has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing

certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Motion Approved.  The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2.    Objections Overruled.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

11

13-53846-tjt   Doc 4727   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 370 of 594
13-53846-swr   Doc 2277   Filed 12/16/13   Entered 12/16/13 16:18:10   Page 55 of 83

**Post-Petition Facility Authorization**

3.     <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.     <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the "<u>Financing</u>").

5.     <u>Bond Obligations</u>.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order,

12

the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents. The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents. No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.     Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

13

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 372 of 594
13-53846-swr  Doc 2277  Filed 12/16/13  Entered 12/16/13 18:13:10  Page 370 of 593

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "Swap Termination Bond Collateral", and together with the Quality of Life Bond Collateral, the "Collateral").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues

14

13-53846-tjt  Doc 472877  Filed 05/13/14/13  Entered 05/13/14/13-19:19:10  Page 373 of 594
13-53846-swr  Doc 2877  Filed 05/13/13  Entered 05/13/13-18:19:10  Page 58 of 59

of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds. This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral. The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds. The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/Sewer Bonds.

7.  Direction of Pledged Wagering Tax Revenue. On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax

15

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 374 of 594
13-53846-swr Doc 2277 Filed 12/16/13 Entered 12/16/13 19:10:10 Page 59 of 83

Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "Irrevocable Directions") by the City in the form attached hereto as Exhibit D. Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified development agreements.

8. Lien Priority. The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral. Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9. Superpriority Claims. Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1)

16

of the Bankruptcy Code, an allowed superpriority claim (collectively, the

"Superpriority Claim") for all Bond Obligations (without the need to file any proof

of claim), with priority over (i) any and all administrative expenses of the City at

any time existing or arising, of any kind or nature whatsoever, including all

administrative expenses arising under any section of the Bankruptcy Code, whether

or not such expenses or claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment, (ii) all other post-petition claims against

the City, and (iii) pre-petition unsecured claims against the City.  There is litigation

pending before the Court between certain bond insurers of certain of the limited

and unlimited tax obligation bonds, on the one hand, and the City, on the other, in

respect of ad valorem property tax revenue (the "Property Tax Revenue").  To the

extent this Court finds and determines (and pending such finding or

determination), or approves any settlement or confirms any plan of adjustment that

provides that any Property Tax Revenue of the City is subject to a property interest

(such as a lien or pledge) of any holders of limited or unlimited tax general

obligation bonds issued by the City or that such Property Tax Revenue is not

generally available for use by the City other than for payment of such limited or

unlimited general obligation bonds and is not available for distribution to general

unsecured creditors as part of a plan of adjustment in this case, then the

Superpriority Claim granted hereunder shall not, in such circumstance, be paid

17

from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10.  No Obligation to Extend Credit.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11.  Amendment of the Bond Documents. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements.  Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a

18

way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12. _Modification of Automatic Stay_.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order; and (e) authorize the City to pay, and the Indenture Trustee to retain

and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order.

13.    Perfection of Liens.  This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein.  Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated.  The Custodian shall timely perform its obligations in connection with the termination of the Collateral Agreement,

20

13-53846-tjt  Doc 2877  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 379 of 594
13-53846-swr  Doc 2277  Filed 05/13/13  Entered 05/13/13 18:18:10  Page 84 of 93

including, without limitation, the obligations set forth in Section 14.4 thereof and in particular, but also without limitation, paying any and all amounts due to the City under the Collateral Agreement and giving notice to the appropriate parties that the "Irrevocable Instructions" (as defined in the Collateral Agreement) are terminated and no longer of any force or effect.

14.    <u>Right to Take Actions to Perfect</u>.  Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law, or take constructive control over assets, take any other action, in each case, to validate and perfect the Liens and all such financing statements, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the date of entry of this Order; <u>provided</u>, <u>however</u>, that no such filing or recordation shall be necessary or required in order to create or perfect the Liens.  The City is authorized and directed to execute and deliver promptly upon demand to the Purchaser or the Indenture Trustee all such financing statements, notices, control agreements and other security documents as the Purchaser or the Indenture Trustee may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording

21

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:29:32  Page 380 of 594
13-53846-swr  Doc 2277  Filed 05/16/13  Entered 05/16/13 18:18:10  Page 65 of 83

office or with any registry of deeds or similar office, in addition to or in lieu of

such financing statements, notices of lien or similar instrument, and all filing

offices are hereby authorized to accept such photocopy for filing and recording.

For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy

Code shall be modified to the extent necessary to permit the Purchaser, the

Indenture Trustee and the Bondholders to take all actions, as applicable, referenced

in this paragraph.

15.     Proceeds of Subsequent Financing.  If the City obtains credit or incurs

debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the

Bond Documents at any time prior to the indefeasible repayment in full of all Bond

Obligations and the satisfaction of the Superpriority Claims, including after the

confirmation of any plan of adjustment filed in the Case, and such facilities are

secured by any Collateral, then, in addition to any remedies that may be available

to the Purchaser, the Indenture Trustee and the Bondholders under the Bond

Documents, all the cash proceeds derived from such credit or debt shall

immediately be turned over to the Indenture Trustee, to be applied as set forth in

the Bond Documents and this Order.

16.     Maintenance of Collateral.  Until the indefeasible payment in full of

all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

maintain: (a) the Collateral as required under the Bond Documents; and (b) the

cash management system as required by the Bond Documents.

17. <u>Disposition of Collateral</u>.

(a)     Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

**18.     Reporting reinvestment/revitalization spending. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending from the Quality of Life Financing (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "Revised Plan"). Proceeds of the Quality of Life Financing will be placed in a segregated account (the "Quality of Life Account") that will be drawn upon as approved, appropriated and budgeted**

**quality of life projects are invoiced and require payment. Quality of life projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.**

**19. Overall general fund financial condition. Within 30 days after the closing of the Postpetition Financing, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "Revised Forecast") consistent with the "DIP Forecast" format previously presented by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.**

24

18**20**. <u>Maturity Date</u>.  Upon the earliest to occur (such earliest date, the "<u>Maturity Date</u>") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

19**21**. <u>No Dismissal</u>.  The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

20**22**. <u>Events of Default</u>.  The occurrence of an "Event of Default" under the Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("<u>Event of Default</u>"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Bond Documents.

21**23**. <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond Obligations owing under

25

13-53846-tjt  Doc 472877  Filed 05/13/14  Entered 05/13/16 15:29:32  Page 384 of 594
13-53846-swr  Doc 2877  Filed 05/16/13  Entered 05/16/13 18:18:10  Page 369 of 583

the Bond Documents to be immediately due and payable in accordance with the terms of the Bond Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "<u>Termination Declaration</u>"). The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "<u>Termination Declaration Date</u>"). Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond Documents without further order or approval from this Court.

~~22~~**24**. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or

enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

~~23~~**25**. Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

27

13-53846-tjt Doc 4727 Filed 05/13/14 Entered 05/13/14 15:29:10 Page 386 of 594
13-53846-swr Doc 2277 Filed 12/16/13 Entered 12/16/13 18:13:10 Page 386 of 593

24**26**. <u>Proofs of Claim</u>.  The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds.  Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

25**27**. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the

28

13-53846-tjt   Doc 2277   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 387 of 594
13-53846-swr   Doc 2277   Filed 05/13/14   Entered 05/13/14 15:29:10   Page 387 of 594

extent required by the Bond Documents.  All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

2628. Limitations on the Post-Petition Facility and the Collateral.  The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the

29

13-53846-tjt   Doc 4727   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 388 of 594
13-53846-swr   Doc 2977   Filed 05/16/13   Entered 05/16/13 18:10:10   Page 73 of 83

Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

27**29**. <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor or any direct, indirect or incidental beneficiary.

28**30**. <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

29**31**. <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

30**32**. <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary,

30

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:29:10  Page 389 of 594
13-53846-swr  Doc 2277  Filed 12/16/13  Entered 12/16/13 18:18:10  Page 34 of 59

the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31**33**. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32**34**. <u>No Waiver by Seeking Relief</u>. Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture

31

13-53846-tjt  Doc 4727  Filed 05/13/14  Entered 05/13/14 15:29:32  Page 390 of 594
13-53846-swr  Doc 2277  Filed 12/16/13  Entered 12/16/13 18:18:10  Page 32 of 63

Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

3335. Binding Effect of Order. Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

3436. No Modification of Order. Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the

Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents). The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

35**37**. Order Controls. In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

36**38**. Survival. The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case. Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding

33

13-53846-tjt Doc 2877 Filed 05/13/14 Entered 05/13/14 15:29:10 Page 392 of 594
13-53846-swr Doc 2277 Filed 12/16/13 Entered 12/16/13 16:13:10 Page 27 of 59

such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

3739. Effect of this Order.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3840. Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

34

13-53846-tjt Doc 4772 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 393 of 594
13-53846-swr Doc 2277 Filed 12/16/13 Entered 12/16/13 18:16:10 Page 78 of 83

## **Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

**Exhibit C**
Indenture

Exhibit D
Irrevocable ~~Direections~~**Directions**

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 12/16/2013 4:48:46 PM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** Financing Order (REVISED for hearing 12.16.13).doc | |
| **Original DMS:** | |
| **Modified Filename:** Financing Order (REVISED for hearing 12.16.13)(2).doc | |
| **Modified DMS:** | |
| **Changes:** | |
| ~~Add~~ | 25 |
| ~~Delete~~ | 23 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 48 |

**Item 8**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
                                   :

In re                             : Chapter 9
                                   :

CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
                                   :

               Debtor.     : Hon. Steven W. Rhodes
                                   :

-------------------------------------------------------x

## THIRD NOTICE OF REVISED PROPOSED ORDER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

**PLEASE TAKE NOTICE THAT:**

1.      On November 5, 2013, the City of Detroit, Michigan  ("Detroit" or the "City") filed the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (Docket No. 1520) (the "Financing Motion").  Attached to the Financing Motion as Exhibit 1 is the proposed Order granting the Financing Motion (the "Proposed Order").

2.　　On December 16, 2013, the City filed revised forms of the Proposed Order.　<u>See</u> [Docket No. 2148] (the "<u>Revised Proposed Order</u>") and [Docket No. 2177] (the "<u>Second Revised Proposed Order</u>").

3.　　The City hereby files a further revised Proposed Order (the "<u>Third Revised Proposed Order</u>") attached hereto as <u>Exhibit A</u>.　A blackline comparing the Third Revised Proposed Order with the Second Revised Proposed Order is attached hereto as <u>Exhibit B</u>.

-2-

13-53846-tjt Doc 4728 Filed 05/12/14 Entered 05/12/14 15:29:32 Page 401 of 594
13-53846-swr Doc 2353 Filed 12/31/13 Entered 12/31/13 14:57:47 Page 2 of 575

Dated: December 31, 2013                    Respectfully submitted,


                                            /s/ David G. Heiman
                                            David G. Heiman (OH 0038271)
                                            Heather Lennox (OH 0059649)
                                            JONES DAY
                                            North Point
                                            901 Lakeside Avenue
                                            Cleveland, Ohio  44114
                                            Telephone:  (216) 586-3939
                                            Facsimile:  (216) 579-0212
                                            dgheiman@jonesday.com
                                            hlennox@jonesday.com

                                            Brad B. Erens (IL 6206864)
                                            JONES DAY
                                            77 West Wacker
                                            Chicago, Illinois  60601-1692
                                            Telephone:  (312) 782-3939
                                            Facsimile: ( 312) 782-8585
                                            bberens@jonesday.com

                                            Bruce Bennett (CA 105430)
                                            JONES DAY
                                            555 South Flower Street
                                            Fiftieth Floor
                                            Los Angeles, California  90071
                                            Telephone:  (213) 489-3939
                                            Facsimile:  (213) 243-2539
                                            bbennett@jonesday.com


                                            ATTORNEYS FOR THE CITY

## <u>CERTIFICATE OF SERVICE</u>

I, David G. Heiman, hereby certify that the foregoing Third Notice of Revised Proposed Order was filed and served via the Court's electronic case filing and noticing system on this 31st day of December, 2013.


/s/ David G. Heiman

-4-

13-53846-tjt  Doc 4728  Filed 05/12/14  Entered 05/12/14 15:29:32  Page 403 of 594
13-53846-swr  Doc 2353  Filed 12/31/13  Entered 12/31/13 14:57:47  Page 4 of 176

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the

United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $285,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order that are

2

13-53846-tjt Doc 4728-3 Filed 05/13/14 Entered 05/13/14 15:29:47 Page 406 of 594
13-53846-swr Doc 2353 Filed 12/31/13 Entered 12/31/13 14:57:47 Page 9 of 176

Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii) granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv) granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 8 of this Order and in the Bond Documents;

(v) authorizing the City to pay the principal, interest, fees, expenses and

---

defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to

3

13-53846-tjt   Doc 4728-3   Filed 05/13/14   Entered 05/13/14 15:29:47   Page 407 of 594
13-53846-swr   Doc 2353   Filed 12/31/13   Entered 12/31/13 14:57:47   Page 8 of 176

other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "<u>Fee Letter</u>"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 30 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "<u>Filed Bond Documents</u>"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "<u>Hearing</u>"); and notice of the Hearing having been given in accordance with

them by the Bankruptcy Code.

4

13-53846-tjt  Doc 4728-3  Filed 05/13/14  Entered 05/13/14 15:29:47  Page 408 of 594
13-53846-swr  Doc 2353  Filed 12/31/13  Entered 12/31/13 14:57:47  Page 9 of 176

Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. _Petition Date_. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this case was entered on December 5, 2013.

B. _Jurisdiction and Venue_. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of

Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  *City's Stipulations*.  The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens, any rights of Comerica Bank in the Collateral referenced in section 2.02(c) of the DACA (defined in paragraph 8 below) that exist on the date hereof, and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

6

D.     *Findings Regarding the Postpetition Financing*.

(i)     *No Credit Available on More Favorable Terms*.  Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility.  The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 8 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

(ii)     *Use of Proceeds of the Post-Petition Facility*.  As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among

7

the City, the Emergency Manager of the City, the Detroit General Retirement

System Service Corporation, the Detroit Police and Fire Retirement System Service

Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc.,

on the other (as amended from time to time, the "Forbearance Agreement") to

terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above,

to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent

applicable).

E.    *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture

Trustee and the Bondholders are each entitled to a waiver of the provisions of

Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to

the contention of the Purchaser, the Indenture Trustee or the Bondholders that

Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred

pursuant to Section 364 of the Bankruptcy Code).

F.    *Good Faith and Jurisdictional Matters*.

(i)    *Willingness to Provide Financing*.  The Purchaser has indicated

a willingness to provide financing to the City pursuant to the Bond Documents

subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the

Post-Petition Facility and the Bond Documents; and (c) entry of findings by this

Court that such financing is in the best interests of the City, that the Purchaser, the

Indenture Trustee and the Bondholders are extending credit to the City pursuant to

8

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 412 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 12 of 176

the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii)     *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the

9

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:28:27   Page 413 of 594
13-53846-swr   Doc 2263   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 13 of 176

meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the

protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses

that are permitted by law, and not in violation of the Bankruptcy Code. The

Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full

protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and

this Order and shall not be affected by any reversal, modification, vacatur,

amendment, reargument or reconsideration of this Order, any order finding

jurisdiction, the order for relief or any other order.

G.     *Act 436 Approval Not Required.*  On October 21, 2013, in accordance

with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL

141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council")

disapproved the Post-Petition Facility.  The City Council failed to offer an

alternative proposal during the time period prescribed in Section 19(2) of Act 436.

The City has requested approval of the Post-Petition Facility by the Emergency

Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the

Michigan Home Rule City Act, Public Act 279 of 1909.  Because the City Council

failed to offer a timely alternative proposal, approval of the Post-Petition Facility by

the Board under Act 436 is not required to authorize the City to enter into the Bond

Documents, which are valid and enforceable according to their terms as a result of

this Order and applicable non-bankruptcy law.

10

13-53846-tjt   Doc 7283   Filed 05/13/14   Entered 05/13/14 15:28:27   Page 414 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 15 of 176

H. _Notice_. Notice of the Hearing and the relief requested in the Motion has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

11

13-53846-tjt  Doc 4728  Filed 05/13/14  Entered 05/13/14 15:28:27  Page 415 of 594
13-53846-swr  Doc 1283  Filed 12/31/13  Entered 12/31/13 14:37:47  Page 15 of 176

IT IS HEREBY ORDERED that:

1.    <u>Motion Approved</u>.  The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2.    <u>Objections Overruled</u>.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**<u>Post-Petition Facility Authorization</u>**

3.    <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.    <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the

Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the "Financing").

5.    Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control

agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the

holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "<u>Swap Termination Bond Collateral</u>", and together with the Quality of Life Bond Collateral, the "<u>Collateral</u>").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or any other assets pledged to secure any of the Water/Sewer Bonds. This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "<u>Trustee</u>," "<u>Systems</u>" and "<u>Water/Sewer Bonds</u>," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds.  The term "<u>Holders</u>" shall mean the holders of the Water/Sewer Bonds.  The term "<u>Bond</u>

15

13-53846-tjt   Doc 4723   Filed 05/13/14   Entered 05/13/14 15:28:27   Page 419 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 120 of 176

Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7. <u>Direction of Pledged Wagering Tax Revenue</u>. On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "<u>Irrevocable Directions</u>") by the City in the form attached hereto as Exhibit D. Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "<u>Gaming Act</u>"), or their certified development agreements.

8. <u>Lien Priority</u>. The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral and shall expressly apply to any Collateral deposited at Comerica Bank pursuant to the Deposit Account Control Agreements among the City, UMB Bank, N.A., as Indenture Trustee, and Comerica Bank (collectively, the "<u>DACA</u>") except that, notwithstanding anything to the contrary in this Order or the Bond Documents, the Liens shall be subject to the rights of Comerica Bank with respect to any Collateral deposited at Comerica Bank as provided in section 2.02(c) of the DACA. Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien

16

13-53846-tjt  Doc 4783  Filed 05/13/14  Entered 05/13/14 15:29:27  Page 420 of 594
13-53846-swr  Doc 2283  Filed 12/31/13  Entered 12/31/13 14:37:47  Page 29 of 176

or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.     Superpriority Claims. Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "Superpriority Claim") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City. There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect

17

of ad valorem property tax revenue (the "Property Tax Revenue"). To the extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10.     No Obligation to Extend Credit.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11.     Amendment of the Bond Documents. The City is authorized, without

further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements. Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the

19

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 423 of 594
13-53846-swr   Doc 1283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 24 of 176

City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the

Indenture Trustee and the Bondholders to request, and the City to perform, such acts

as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may

request, each in its sole discretion to assure the perfection and priority of the Liens

granted herein; (c) permit the City to incur all liabilities and obligations to the

Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents,

the Post-Petition Facility and this Order; (d) authorize the City to pay, and the

Purchaser to retain, all payments required to be made to the Purchaser, in accordance

with the terms of the Bond Documents, the Post-Petition Facility and this Order; (e)

authorize the City to pay, and the Indenture Trustee to retain and apply, all payments

required to be made to the Indenture Trustee, in accordance with the terms of the

Bond Documents, the Post-Petition Facility and this Order; and (f) authorize

Comerica Bank to exercise its rights and to comply with its obligations under and as

referenced in the DACA.

13.     Perfection of Liens.  This Order shall be conclusive evidence of the

validity, perfection and priority of the Liens without the necessity of filing or

recording any financing statement, mortgage, notice or other instrument or

document which may otherwise be required under the law or regulation of any

jurisdiction or the taking of any other action (including entering into any deposit

account control agreement, mortgages or deeds of trust) to validate or perfect (in

20

13-53846-tjt  Doc 7283  Filed 05/13/13  Entered 05/13/13 15:23:27  Page 424 of 594
13-53846-swr  Doc 1283  Filed 12/31/13  Entered 12/31/13 14:37:47  Page 25 of 176

accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein. Upon satisfaction of the conditions to termination set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated. The Custodian shall timely perform its obligations in connection with the termination of the Collateral Agreement, including, without limitation, the obligations set forth in Section 14.4 thereof and in particular, but also without limitation, paying any and all amounts due to the City under the Collateral Agreement and giving notice to the appropriate parties that the "Irrevocable Instructions" (as defined in the Collateral Agreement) are terminated and no longer of any force or effect.

14. Right to Take Actions to Perfect. Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security

21

13-53846-tjt Doc 7283 Filed 05/13/13 Entered 05/13/14 15:23:27 Page 425 of 594
13-53846-swr Doc 2283 Filed 12/31/13 Entered 12/31/13 14:37:47 Page 425 of 576

documents to perfect in accordance with applicable non-bankruptcy law, or take

constructive control over assets, take any other action, in each case, to validate and

perfect the Liens and all such financing statements, notices, control agreements and

other security documents shall be deemed to have been filed or recorded as of the

date of entry of this Order; provided, however, that no such filing or recordation

shall be necessary or required in order to create or perfect the Liens.  The City is

authorized and directed to execute and deliver promptly upon demand to the

Purchaser or the Indenture Trustee all such financing statements, notices, control

agreements and other security documents as the Purchaser or the Indenture Trustee

may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file

a photocopy of this Order as a financing statement with any filing or recording office

or with any registry of deeds or similar office, in addition to or in lieu of such

financing statements, notices of lien or similar instrument, and all filing offices are

hereby authorized to accept such photocopy for filing and recording.  For the

avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code

shall be modified to the extent necessary to permit the Purchaser, the Indenture

Trustee and the Bondholders to take all actions, as applicable, referenced in this

paragraph.

      15.    Proceeds of Subsequent Financing.  If the City obtains credit or incurs

debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the

Bond Documents at any time prior to the indefeasible repayment in full of all Bond

Obligations and the satisfaction of the Superpriority Claims, including after the

confirmation of any plan of adjustment filed in the Case, and such facilities are

secured by any Collateral, then, in addition to any remedies that may be available to

the Purchaser, the Indenture Trustee and the Bondholders under the Bond

Documents, all the cash proceeds derived from such credit or debt shall immediately

be turned over to the Indenture Trustee, to be applied as set forth in the Bond

Documents and this Order.

16.     <u>Maintenance of Collateral</u>.  Until the indefeasible payment in full of all

Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash

management system as required by the Bond Documents.

17.     <u>Disposition of Collateral</u>.

(a)     Except as otherwise provided for in the Bond Documents or the

DACA, the City shall not grant a lien on or transfer any interests in any portion of the

Collateral in any way inconsistent with the Bond Documents or without the prior

written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any

Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the

Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of

23

13-53846-tjt   Doc 4783   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 427 of 594
13-53846-swr   Doc 1283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 26 of 176

such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18. <u>Reporting reinvestment/revitalization spending</u>. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending from the Quality of Life Financing (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "<u>Revised Plan</u>"). Proceeds of the Quality of Life Financing will be placed in a segregated account (the "<u>Quality of Life Account</u>") that will be drawn upon as approved, appropriated and budgeted quality of life projects are invoiced and require payment. Quality of life projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

19. <u>Overall general fund financial condition</u>. Within 30 days after the closing of the Postpetition Financing, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "<u>Revised

Forecast") consistent with the "DIP Forecast" format previously presented by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

20. <u>Maturity Date</u>. Upon the earliest to occur (such earliest date, the "<u>Maturity Date</u>") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

21. <u>No Dismissal</u>. The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

25

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:29:27   Page 429 of 594
13-53846-swr   Doc 2303   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 30 of 176

22.     Events of Default.  The occurrence of an "Event of Default" under the

Bond Documents or any violation of the terms of this Order shall constitute an event

of default under this Order ("Event of Default"), unless waived in writing by the

Indenture Trustee, upon consent of the Bondholders in accordance with the Bond

Documents.

23.     Rights and Remedies Upon Event of Default.  Immediately upon the

occurrence and during the continuation of an Event of Default, the Indenture Trustee,

upon the direction of the Bondholders in accordance with the Bond Documents, may,

among other things, declare all Bond Obligations owing under the Bond Documents

to be immediately due and payable in accordance with the terms of the Bond

Documents, but without affecting any of the Liens or the Bond Obligations (any

such declaration, a "Termination Declaration").  The Termination Declaration shall

be given by electronic transmission as provided in the Bond Documents (the date

any such Termination Declaration is made, the "Termination Declaration Date").

Following the Termination Declaration Date, the Indenture Trustee, on behalf of the

Bondholders, shall be entitled to enforce its rights and remedies under the Bond

Documents without further order or approval from this Court.

24.     Good Faith Under Section 364(e) of the Bankruptcy Code; No

Modification or Stay of this Order.  The Indenture Trustee, on behalf of the

Bondholders, and the Purchaser have acted in good faith, as that term is used in

Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25.    Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order.  In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal,

27

13-53846-tjt  Doc 7283  Filed 05/13/14  Entered 05/13/14 15:28:27  Page 431 of 594
13-53846-swr  Doc 2283  Filed 12/31/13  Entered 12/31/13 14:37:47  Page 32 of 176

modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

26. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

27. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable

28

13-53846-tjt  Doc 4783  Filed 05/13/14  Entered 05/13/14 15:28:27  Page 432 of 594
13-53846-swr  Doc 1283  Filed 12/31/13  Entered 12/31/13 14:37:47  Page 33 of 176

access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

28. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the

29

Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

29. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party who is not expressly referenced in this Order, any creditor or any direct, indirect or incidental beneficiary.

30. <u>Section 506(c) Claims</u>. Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

30

13-53846-tjt Doc 4736 Filed 05/13/14 Entered 05/13/14 15:29:27 Page 434 of 594
13-53846-swr Doc 2283 Filed 12/31/13 Entered 12/31/13 14:37:47 Page 35 of 176

31.     No Marshaling/Applications of Proceeds.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

32.     Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

33.     No Waiver by Failure to Seek Relief.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

34.     No Waiver by Seeking Relief.  Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry

31

of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

35. <u>Binding Effect of Order</u>. Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

36. <u>No Modification of Order</u>. Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the

32

13-53846-tjt Doc 2283 Filed 12/31/13 Entered 12/31/13 14:37:27 Page 36 of 176
13-53846-swr Doc 728 Filed 05/13/13 Entered 05/13/13 15:23:32 Page 436 of 594

Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents). The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

37. <u>Order Controls</u>. In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

38. <u>Survival</u>. The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case. Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this

33

13-53846-tjt Doc 4238 Filed 05/13/14 Entered 05/13/14 15:29:37 Page 437 of 594
13-53846-swr Doc 1283 Filed 12/3/13 Entered 12/3/13 15:48:27 Page 38 of 176

Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

39.     Effect of this Order.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

40.     Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

**Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

# CITY OF DETROIT, MICHIGAN

## FINANCIAL RECOVERY BONDS
## SERIES 2014A (SWAP TERMINATION)

---

### BOND PURCHASE AGREEMENT

---

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 10:00 A.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1. **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2014A (Swap Termination) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b)  The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the ST Bond Documents and (iv) _____ *[the date that is two years and six months after the Closing Date]* (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c)  As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d)  As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Quality of Life Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e)  The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-21 of the Local Financial Emergency Loan Board dated December 20, 2013 (the "ELB Order"), and the

-2-

13-53846-tjt  Doc 4283  Filed 05/13/14  Entered 05/13/14 15:28:27  Page 441 of 594
13-53846-swr  Doc 2283  Filed 12/31/13  Entered 12/31/13 14:37:27  Page 442 of 576

City of Detroit, Michigan Financial Recovery Bond Trust Indenture (the "Indenture") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "Purchase Price").

(f)     The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (a) the Asset Proceeds Collateral and (b) the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "Pledged Income Tax Revenue", and together with the Asset Proceeds Collateral, the "Bond Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Quality of Life Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Quality of Life Bonds on a second lien basis.

(g)     The ST Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Income Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the ST Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(h)     The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the ST Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the ST Bond Documents.

(i)     Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Bonds") for the purpose of funding certain quality of life projects for the City.

2.     **Representations of the Purchaser.** The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding

-3-

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 442 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 43 of 176

obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a) In connection with its business the Purchaser holds an extensive portfolio of investment securities. It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds. It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b) The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation. The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c) The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3. **Failure to Close; Termination of Bond Purchase Agreement.** In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter. Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4. **Private Placement of Bonds; Absence of Disclosure Document.** The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5. **Closing.** At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"), one registered bond in the denomination equal to the principal amount of the Bonds (the "Bond Certificate"), to be delivered to the Trustee as custodian

-4-

for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "<u>Closing Documents</u>"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6.    **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a)    The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the ST Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(b)    The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("<u>Act 436</u>") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(c)    The Asset Proceeds Collateral and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)    This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms. When executed and delivered, as set forth in the Post-Petition Financing Order, the ST Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the ST Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the ST Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the ST Bond Documents is in full force and effect.

(i)     The execution, delivery and performance of the terms and conditions of the ST Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the ST Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the ST Bond Documents and the QOL Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have

-6-

13-53846-tjt   Doc 7283   Filed 05/13/13   Entered 05/13/14 15:23:27   Page 445 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 45 of 176

fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the ST Bond Documents.

(n)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the ST Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds.  No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity.  No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7.     **Covenants and Agreements of the City.**  The City hereby covenants and agrees as follows:

(a)     In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b)     The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use

or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the ST Bond Documents.

(c)     The City covenants that it will not seek to invalidate or refute the enforceability of any ST Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d)     The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Quality of Life Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Quality of Life Bonds as long as the Bonds are outstanding under the Indenture.  The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Quality of Life Bonds.

8.   **Conditions to Closing.**   The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.  In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the ST Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may be been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "<u>Commitment Date</u>") and prior to the Closing Date: (i) the United States shall become engaged in hostilities

-8-

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 447 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 48 of 176

that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the ST Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Quality of Life Bonds (the "QOL Bond Documents") reasonably satisfactory to the Purchaser.

-9-

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 448 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 48 of 176

(h)     The satisfaction of all of the conditions precedent to the issuance of the Quality of Life Bonds set forth in the QOL Bond Documents and the simultaneous issuance of the Quality of Life Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Quality of Life Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)     The Bonds and the ST Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond

-10-

13-53846-tjt   Doc 4283   Filed 05/13/13   Entered 05/13/13 15:23:27   Page 449 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 12:48:27   Page 50 of 176

counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the ST Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into ST Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

-11-

13-53846-tjt   Doc 7283   Filed 05/13/13   Entered 05/13/13 15:23:27   Page 450 of 594
13-53846-swr   Doc 1283   Filed 12/31/13   Entered 12/31/13 14:38:27   Page 51 of 176

[(10) A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11) A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12) A specimen Bond;

(13) A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14) An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15) Officers' and public officials' certifications regarding the Bonds, the ST Bond Documents, the Quality of Life Bonds, the QOL Bond Documents and the Swap Agreements;

(16) Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the ST Bond Documents (defined below);

(17) An executed copy of the Bond Authorizing Order;

(18) An executed copy of the Sale Order; and

(19) Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "<u>ST Bond Documents</u>".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9. **Fees and Expenses.** Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City;

-12-

and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10.    **Notices.**  Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11.    **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.**  This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser).  No other person shall acquire or have any right hereunder or by virtue hereof.   All the representations, warranties, covenants and agreements contained in this Bond Purchase Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12.    **Disclaimer of Purchaser.**  It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder.  The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13.    **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify

-13-

13-53846-tjt   Doc 7283   Filed 05/13/43   Entered 05/13/43 15:23:27   Page 452 of 594
13-53846-swr   Doc 1283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 53 of 176

upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any ST Bond Documents or QOL Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Quality of Life Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Quality of Life Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other

-14-

13-53846-tjt   Doc 7283   Filed 05/13/13   Entered 05/13/13 15:23:27   Page 453 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 54 of 176

person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14. **Counterparts.** This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15. **Governing Law.** This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16. **Jurisdiction**. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17. **Waiver of Jury Trial**. Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond

-15-

13-53846-tjt Doc 4283 Filed 05/13/14 Entered 05/13/14 15:28:27 Page 454 of 594
13-53846-swr Doc 2283 Filed 12/31/13 Entered 12/31/13 14:38:47 Page 55 of 176

Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18. **Syndication**. (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Quality of Life Bonds by assigning or selling participations in the Bonds and the Quality of Life Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request). Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b) The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c) In the event that the Closing Date has occurred and the ST Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, the City hereby agrees, at its own expense, to take

-16-

13-53846-tjt Doc 7283 Filed 05/13/13 Entered 05/13/14 15:23:27 Page 455 of 594
13-53846-swr Doc 1283 Filed 12/31/13 Entered 12/31/13 14:38:27 Page 55 of 176

all such action as may be required in order to effect any amendments to the Bonds and the Quality of Life Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19. **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By: _____
                  John Gerbino
                  Managing Director

Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**

By: _____

-18-

13-53846-tjt   Doc 4733   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 457 of 594
13-53846-swr   Doc 2083   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 58 of 176

<u>**Appendix A**</u>

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

Appendix A
Page 2

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:28:27   Page 459 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 50 of 176

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the ST Bond Documents, LIBOR shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" means taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute).

Appendix A
Page 3

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 460 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 60 of 176

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Quality of Life Bonds*" shall have the meaning assigned to such term in Section 1(i) of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

Appendix A
Page 4

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:29:27   Page 461 of 594
13-53846-swr   Doc 1283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 62 of 176

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

# CITY OF DETROIT, MICHIGAN

## FINANCIAL RECOVERY BONDS
## SERIES 2014B (QUALITY OF LIFE)

---

### BOND PURCHASE AGREEMENT

---

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 10:00 A.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1.  **Sale Purchase Price and Terms of the Bonds.**  (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2014B (Quality of Life) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City.  The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b)   The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the QOL Bond Documents and (iv) _____ [*the date that is two years and six months after the Closing Date*] (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date").  Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date.  Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c)   As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest).  Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d)   As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Swap Termination Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e)   The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-21 of the Local Financial Emergency Loan Board dated December 20, 2013 (the "ELB Order"), and the

-2-

13-53846-tjt  Doc 4283  Filed 05/13/14  Entered 05/13/14 15:23:27  Page 464 of 594
13-53846-swr  Doc 2283  Filed 12/31/13  Entered 12/31/13 14:37:27  Page 65 of 176

City of Detroit, Michigan Financial Recovery Bond Trust Indenture (the "Indenture") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "Purchase Price").

(f) The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute) (the "Pledged Wagering Tax Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Bond Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Bonds on a first-priority basis.

(g) The QOL Bond Documents shall require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Wagering Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default (as defined in the Indenture) to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full. Subject to the terms of the Wagering Tax Control Agreements, the City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

(h) The QOL Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Income Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Swap Termination Bonds until such Swap Termination Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(i)   The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the QOL Bond Documents.

(j)   Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Bonds") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, as amended from time to time, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other hand, to terminate the underlying swaps.

2.   **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)   In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)   The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)   The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.   **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is

-4-

13-53846-swr   Doc 7283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 466 of 594
13-53846-tjt   Doc 7283   Filed 05/13/14   Entered 05/13/14 14:37:27   Page 467 of 576

unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter. Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4. **Private Placement of Bonds; Absence of Disclosure Document.** The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5. **Closing.** At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"), one registered bond in the denomination equal to the principal amount of the Bonds (the "Bond Certificate"), to be delivered to the Trustee as custodian for DTC. Subject to the terms and conditions hereof, the DTC will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the QOL Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate

-5-

13-53846-tjr Doc 2283 Filed 05/13/13 Entered 05/13/13 15:23:27 Page 467 of 594
13-53846-swr Doc 2283 Filed 12/31/13 Entered 12/31/13 14:37:47 Page 68 of 176

the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(b)     The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(c)     The Asset Proceeds Collateral, the Pledged Wagering Tax Revenue and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds and the Swap Termination Bonds, as applicable, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)     This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms.  When executed and delivered, as set forth in the Post-Petition Financing Order, the QOL Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the QOL Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the QOL Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the QOL Bond Documents is in full force and effect.

-6-

13-53846-tjt   Doc 4723   Filed 05/13/13   Entered 05/13/13 15:23:27   Page 468 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 69 of 176

(i)    The execution, delivery and performance of the terms and conditions of the QOL Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the QOL Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)    Except as described on Appendix __ hereto, and other than as described in the QOL Bond Documents and the ST Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)    As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)    Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)    The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the QOL Bond Documents.

(n)    The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the QOL Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

-7-

13-53846-tjt   Doc 7283   Filed 05/13/13   Entered 05/13/13 15:23:27   Page 469 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 470 of 576

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds. No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity. No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7. **Covenants and Agreements of the City.** The City hereby covenants and agrees as follows:

(a) In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b) The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the QOL Bond Documents.

(c) The City covenants that it will not seek to invalidate or refute the enforceability of any QOL Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d) The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Swap Termination Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Swap Termination Bonds as long as the Bonds are outstanding under the Indenture. The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Swap Termination Bonds.

-8-

13-53846-tjt Doc 7283 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 470 of 594
13-53846-swr Doc 2283 Filed 12/31/13 Entered 12/31/13 14:37:27 Page 470 of 576

8.      **Conditions to Closing.**   The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.   In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)      The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)      As of the Closing Date, (i) this Bond Purchase Agreement and the QOL Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)      The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general

character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the QOL Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Swap Termination Bonds (the "ST Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Swap Termination Bonds set forth in the ST Bond Documents and the simultaneous issuance of the Swap Termination Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it

-10-

reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Swap Termination Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)     The Bonds and the QOL Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the QOL Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed

-11-

with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Wagering Tax Control Agreements and Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into QOL Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(10)    A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)    A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)    A specimen Bond;

(13)    A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)    An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)    Officers' and public officials' certifications regarding the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the ST Bond Documents and the Swap Agreements;

(16)    Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the QOL Bond Documents (defined below);

(17)    An executed copy of the Bond Authorizing Order;

(18)    An executed copy of the Sale Order; and

(19)    Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture, this Bond Purchase Agreement and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "QOL Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.   **Fees and Expenses.**  Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10.  **Notices.**  Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11.  **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.**  This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser).  No other person shall acquire or have any right hereunder or by virtue hereof.   All the representations, warranties, covenants and agreements contained in this Bond Purchase

-13-

13-53846-tjt   Doc 7283   Filed 05/13/14   Entered 05/13/14 15:28:27   Page 475 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 15:48:27   Page 475 of 576

Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified

Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment).  Regardless of whether the Closing Date occurs or any QOL Bond Documents or ST Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Swap Termination Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Swap Termination Bonds.  It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person.  No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.  Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

-15-

14.  **Counterparts.**  This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15.  **Governing Law.**  This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16.  **Jurisdiction**.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17.  **Waiver of Jury Trial**.  Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18.  **Syndication**.  (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Swap Termination Bonds by assigning or selling participations in the Bonds and the Swap Termination Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date.  For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date.  Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase

-16-

Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b)     The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c)     In the event that the Closing Date has occurred and the QOL Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, the City hereby agrees, at its own expense, to take all such action as may be required in order to effect any amendments to the Bonds and the Swap Termination Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19.     **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than

-17-

the projections and other forward looking information (the "<u>Projections</u>")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

-18-

13-53846-tjt   Doc 4728   Filed 05/13/13   Entered 05/13/14 15:29:27   Page 480 of 594
13-53846-swr   Doc 2383   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 81 of 176

Very truly yours,

**BARCLAYS CAPITAL INC.**


By:  _____

John Gerbino
Managing Director


Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**


By:  _____

-19-

13-53846-tjt   Doc 4728   Filed 05/13/14   Entered 05/13/14 15:29:27   Page 481 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 82 of 176

<u>**Appendix A**</u>

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

Appendix A
Page 2

13-53846-tjt   Doc 7283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 482 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 84 of 176

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the QOL Bond Documents, LIBOR shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

Appendix A
Page 3

13-53846-tjt  Doc 4283  Filed 05/13/13  Entered 05/13/13 15:23:27  Page 484 of 594
13-53846-swr  Doc 1283  Filed 12/31/13  Entered 12/31/13 14:37:47  Page 85 of 176

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Swap Termination Bonds*" shall have the meaning assigned to such term in Section 1(j) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

"*Wagering Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Wagering Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

Appendix A
Page 4

13-53846-tjt   Doc 4283   Filed 05/13/14   Entered 05/13/14 15:23:27   Page 485 of 594
13-53846-swr   Doc 2283   Filed 12/31/13   Entered 12/31/13 14:37:47   Page 86 of 176

Appendix A
Page 5
13-53846-tjt Doc 4728 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 486 of 594
13-53846-swr Doc 2383 Filed 12/31/13 Entered 12/31/13 14:37:47 Page 87 of 176

**Exhibit C**
Indenture

**FINANCIAL RECOVERY BOND**

**TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

**UMB BANK, N.A.**

as Trustee

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014A**

and

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014B**

Dated as of [_____], 2014

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND INTERPRETATION ............................................................... 2
    Section 101    Definitions............................................................................................. 2
    Section 102    Interpretation........................................................................................ 9
ARTICLE II TERMS OF BONDS ......................................................................................... 10
    Section 201    Authorization for Indenture and Bonds; Indenture to Constitute a
                  Contract............................................................................................. 10
    Section 202    Authorization of Bonds..................................................................... 10
    Section 203    Issuance and Delivery of Bonds ....................................................... 10
    Section 204    Conditions Precedent to Delivery of Bonds..................................... 10
ARTICLE III GENERAL TERMS AND PROVISIONS OF BONDS..................................... 12
    Section 301    Designation of Bonds; Form of Bonds ............................................ 12
    Section 302    Book-Entry Only System for the Bonds ........................................... 12
    Section 303    Interchangeability of Bonds .............................................................. 13
    Section 304    Negotiability, Transfer and Bond Registry....................................... 14
    Section 305    Transfer of Bonds ............................................................................. 14
    Section 306    Regulations With Respect to Exchanges and Transfers .................... 14
    Section 307    Bonds Mutilated, Destroyed, Stolen or Lost.................................... 15
    Section 308    Cancellation and Destruction of Bonds ........................................... 15
    Section 309    Redemption ....................................................................................... 15
    Section 310    Selection of Bonds to be Redeemed ................................................ 15
    Section 311    Notice of Redemption ...................................................................... 16
    Section 312    Payment of Redeemed Bonds .......................................................... 16
ARTICLE IV PLEDGE OF INDENTURE; SOURCES OF PAYMENT AND SECURITY
    FOR THE BONDS ............................................................................................ 17
    Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest.................... 17
    Section 402    Creation of Liens............................................................................... 18
ARTICLE V ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS.......... 18
    Section 501    Debt Service Fund............................................................................. 18
    Section 502    Costs of Issuance Fund ..................................................................... 20
    Section 503    Bond Proceeds Fund ......................................................................... 20
    Section 504    Amounts Remaining in Funds and Accounts.................................... 20
    Section 505    Approval of Account Control Agreements ....................................... 21
ARTICLE VI INVESTMENT OF FUNDS............................................................................. 21
    Section 601    Permitted Investments....................................................................... 21
    Section 602    Valuation and Sale of Investments ................................................... 22
ARTICLE VII PARTICULAR COVENANTS OF THE CITY................................................ 22
    Section 701    Payment of Bonds ............................................................................ 23
    Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other
                  Property ............................................................................................. 23
    Section 703    Maintenance of Perfected Security Interests; Further Assurances;
                  Notices of Default ............................................................................ 23

i

Section 704    Tax Covenants .................................................................. 23
Section 705    Compliance With Conditions Precedent ................................. 23
Section 706    Accounts and Reports ........................................................ 23
Section 707    Issuance of Additional Obligations ....................................... 24
Section 708    Wagering Tax and Income Tax Revenues and Accounts ............ 24
Section 709    Asset Proceeds Collateral ................................................... 24
Section 710    Contesting Enforceability ................................................... 24
ARTICLE VIII THE TRUSTEE ................................................................... 24
Section 801    Powers and Duties of Trustee ............................................. 24
Section 802    Fees and Expenses of Trustee ............................................. 27
Section 803    Resignation; Appointment of Successor Trustee; Successor Trustee
                 Upon Merger, Consolidation or Sale ................................... 27
Section 804    Removal of Trustee ........................................................... 28
Section 805    Appointment of and Transfer to Successor Trustee .................. 28
ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ON DEFAULT ............ 29
Section 901    Events of Default .............................................................. 29
Section 902    Remedies ......................................................................... 30
Section 903    Waiver of Default .............................................................. 32
Section 904    Possession of Bonds by Trustee Not Required ....................... 32
Section 905    Remedies Cumulative ......................................................... 32
Section 906    Knowledge by Trustee of an Event of Default ........................ 32
Section 907    Application of Monies ........................................................ 32
ARTICLE X SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS
    INDENTURE ..................................................................................... 33
Section 1001   Modifications and Amendments Not Requiring Consent ........... 33
Section 1002   Amendments Requiring Consent .......................................... 33
Section 1003   Consent of Trustee ........................................................... 34
Section 1004   General Provisions Relating to Supplemental Indentures .......... 35
ARTICLE XI MISCELLANEOUS ................................................................. 35
Section 1101   Notices ........................................................................... 35
Section 1102   Termination ...................................................................... 35
Section 1103   Defeasance ...................................................................... 36
Section 1104   Severability ...................................................................... 36
Section 1105   Headings ......................................................................... 36
Section 1106   Indenture Executed in Counterparts ..................................... 36
Section 1107   Parties Interested Herein ..................................................... 36
Section 1108   Jurisdiction ...................................................................... 36

EXHIBIT A    FORM OF SERIES 2014A BOND ................................................ A-1
EXHIBIT B    FORM OF SERIES 2014B BOND ................................................ B-1
EXHIBIT C    FORM OF ACCOUNT CONTROL AGREEMENT ......................... C-1

ii

# FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of [_____], 2014 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and UMB Bank, N.A., and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H :

**WHEREAS**, pursuant to the Local Government Fiscal Responsibility Act, Act 436, Public Acts of Michigan, 2012 ("Act 436"), the Governor (the "Governor") of the State of Michigan (the "State") determined that a local government financial emergency exists in the City of Detroit, County of Wayne, Michigan (the "City"), and an emergency manager, as defined in Act 436, Kevyn D. Orr (the "Emergency Manager") was appointed for the City by the Governor on March 28, 2013 in accordance with Act 436; and

**WHEREAS**, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

**WHEREAS**, on October 11, 2013, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City his Order No. 17 Approval of Postpetition Financing ("Order No. 17"); and

**WHEREAS**, Order No. 17 proposes the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") to provide certain post-bankruptcy petition financing for the City upon the terms and conditions and parameters set forth in Order No. 17 and the term sheets attached thereto (the "Secured Financing"); and

**WHEREAS**, on October 21, 2013, in accordance with Section 19(1) of Act 436, the City Council of the City (the "City Council") disapproved the Secured Financing; and

**WHEREAS**, pursuant to Section 19(2) of Act 436, the City Council was afforded 7 days following its disapproval of the Secured Financing to propose an "alternative proposal that would yield substantially the same financial result as" the Secured Financing to the Emergency Financial Assistance Loan Board (the "Board"); and

**WHEREAS**, the City Council failed to offer an alternative proposal to the Board during the time period prescribed in Section 19(2) of Act 436 and as a consequence, the Emergency Manager submitted an Order to authorize the Secured Financing through the issuance of Bonds to the Board for approval and implementation of the Secured Financing by the Emergency Manager; and

**WHEREAS**, on [_____], 2013, the Bankruptcy Court issued an order [Docket No. __] authorizing the Secured Financing (the "Bankruptcy Court Order"), pursuant to which super priority liens have been established under Sections 364(c), 503 and 507(a)(2) of the Bankruptcy Code for the certain collateral securing the bonds authorized for issuance hereunder; and

**WHEREAS**, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board established pursuant to Act 243, Public Acts of Michigan, 1980, as amended; and

**WHEREAS**, on December 20, 2013, the Board issued an Order (the "Board Order") approving the issuance of the Series 2014A Bonds and the Series 2014B Bonds by the City as finally determined in the Sale Order of the Emergency Manager, subject to the terms and conditions for each series of Bonds approved by the Board in the Board Order; and

**WHEREAS**, in connection with the issuance of the Bonds, the Trustee shall enter into Account Control Agreements (as hereinafter defined) with the City and the Depository Banks for purposes of perfecting the security interests granted by the City in favor of the Registered Owners of the Series 2014A Bonds and the Series 2014B Bonds in certain tax revenue and other collateral of the City described herein to secure repayment of the City's obligations owing in respect of the Bonds.

**NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH** that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101    <u>Definitions</u>.  In addition to the terms defined in the preambles to this Indenture, and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"*1 Month LIBOR Rate*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a 1-Month LIBOR Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Indenture, the 1-

2

13-53846-tjt   Doc 4283   Filed 05/13/13   Entered 05/13/14 15:28:37   Page 492 of 594
13-53846-swr   Doc 1283   Filed 12/31/13   Entered 12/31/13 14:37:27   Page 93 of 176

Month LIBOR Rate shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term 1-Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the 1-Month LIBOR Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1-Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*1-Month LIBOR Reset Date*" means the first Business Day of each calendar month.

"*Account*" means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

"*Account Control Agreements*" means, collectively the Income Tax Account Control Agreement and the Wagering Tax Account Control Agreement.

"*Act 279*" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"*Act 284*" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

"*Act 436*" means Act No. 436, Public Acts of Michigan, 2012.

"*Asset Proceeds Collateral*" shall mean all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10 million, which net cash proceeds are pledged by the City hereunder, on the terms and conditions set forth hereunder, in favor of the Registered Owners of the Series 2014A Bonds and the Series 2014B Bonds.

"*Authorized Denominations*" shall mean denominations of Bonds equal to multiples of $100,000 or integral multiples of $5,000 in excess thereof.

"*Authorized Officer*" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"*Bankruptcy Case*" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"*Bankruptcy Court Order*" has the meaning set forth in the recitals hereto.

"**Board**" has the meaning set forth in the recitals hereto.

"**Bond**" or "**Bonds**" means singularly or collectively, the Series 2014A Bonds and the Series 2014B Bonds.

"**Bondowner**", "**Owner**" or "**Registered Owner**" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 304.

"**Bond Authorizing Order**" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"**Bond Counsel**" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"**Bond Orders**" means collectively the Bond Authorizing Order and the Sale Order.

"**Bond Proceeds Fund**" means the fund established pursuant to Section 503 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"**Bond Purchase Agreements**" means, collectively, that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014A Bonds and that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014B Bonds.

"**Bond Rate**" means the sum of the 1-Month LIBOR Rate and the Spread.

"**Bond Registry**" means the books for the registration of Bonds maintained by the Trustee.

"**Business Day**" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"**Calculation Agent**" means Barclays Capital Inc.

"**Certificate**" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"**City**" means the City of Detroit, County of Wayne, Michigan.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Costs of Issuance Fund**" means the fund established under Section 502 hereof for the payment of the costs of issuance of the Bonds.

"**Date of Original Issue**" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"**Debt Service Accounts**" means, collectively, the Series 2014A Debt Service Account and Series 2014B Debt Service Account.

"**Debt Service Fund**" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

"**Debt Service Requirement Amount**" means, as applicable, an amount equal to (i) the interest due on the Bonds on the next succeeding Interest Payment Date plus if such Interest Payment Date is also a Redemption Date, any principal and premium owing on such Redemption Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Maturity Date plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"**Depository Banks**" means the Income Tax Depository Bank and the Wagering Tax Depository Bank.

"**Emergency Manager**" has the meaning set forth in the recitals hereto.

"**Event of Default**" has the meaning attributed to it in Section 901 hereof.

"**Financing Document**" means this Indenture, the Bond Purchase Agreements, the Account Control Agreements, the Series 2014A Bonds, the Series 2014B Bonds, the Bond Orders, the Bankruptcy Court Order, the Fee Letter and any other document related to the issuance, sale or delivery of the Bonds.

"**Fiscal Year**" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"**Governmental Obligations**" means non- callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

"**Income Tax Account Control Agreement**" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee, and the Income Tax

5

Depository Bank in favor of the Trustee with respect to the Comerica Lockbox Account that holds the Pledged Income Tax Revenues.

"***Income Tax Depository Bank***" means Comerica Bank and any successor thereto.

"***Income Tax Revenues***" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284.

"***Indenture***" means this Trust Indenture, dated as of [_____], 2014, as supplemented and amended.

"***Interest Payment Date***" means (i) each 1-Month LIBOR Reset Date; (ii) with respect only to Bonds being redeemed, in whole or in part, the Redemption Date; and (iii) the Maturity Date.

"***Law 1***" means the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State, effective December 5, 1996, as amended, and any replacement or successor thereto.

"***LIBOR Floor***" means 1.00% per annum.

"***London Banking Day***" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"***Maturity Date***" means the earliest to occur of (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to this Indenture, and (iv) [_____,] the date that is two years and six months after the Date of Original Issue.

"***Non-Arbitrage and Tax Compliance Certificate***" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"***Outstanding***" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A)    Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B)    Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C)    Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

6

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"***Payment Date***" means each Interest Payment Date, and the Maturity Date of the Bonds.

"***Permitted Investments***" means those investments specified in Article VI of this Indenture.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Pledged Income Tax Account***" means that certain bank account established at Comerica Bank, Account No. [_____] that collects solely Income Tax Revenues.

"***Pledged Income Tax Revenues***" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014A Bonds and on a second priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"***Pledged Revenues***" means, collectively, the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral.

"***Pledged Wagering Tax Account***" means that certain bank account established at Comerica Bank, Account No. [___] that collects the Wagering Tax Revenues.

"***Pledged Wagering Tax Revenues***" means the Wagering Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"***Post Petition Date Debt***" means any payment obligation of the City first arising on or following the Petition Date.

"***Purchaser***" means Barclays Capital Inc. or any permitted party designated pursuant to the Bond Purchase Agreement, as approved by the City, which such approval shall not be unreasonably withheld.

"***Quality of Life Projects***" means those certain projects determined by the Emergency Manager in the Sale Order to be financed with the proceeds of the Series 2014B Bonds.

"***Record Date***" means the fifteenth (15th) day prior to any Interest Payment Date.

"***Redemption Date***" means the date upon which Bonds are to be called for redemption, in whole or in part, pursuant to this Indenture.

"***Redemption Price***" means, with respect to any Bond, the principal amount thereof plus the applicable premium, if any, payable upon redemption thereof.

"***Sale Order***" means that Order of the Emergency Manager dated [_____], 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

7

"***Series 2014A Bonds***" means the City's Financial Recovery Bonds, Series 2014A.

"***Series 2014A Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2014A Bonds pursuant to Section 501 of this Indenture.

"***Series 2014B Bonds***" means the City's Financial Recovery Bonds, Series 2014B.

"***Series 2014B Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2014B Bonds pursuant to Section 501 of this Indenture.

"***Spread***" means, so long as no Event of Default has occurred and is continuing, 250 basis points, and upon the occurrence of and continuance of an Event of Default, 450 basis points.

"***State***" has the meaning set forth in the recitals hereto.

"***State Treasurer***" means the Treasurer of the State of Michigan.

"***Supplemental Indenture***" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"***Tax-Exempt Bonds***" means those Bonds, the interest on which is excluded from gross income for federal tax purposes.

"***Trustee***" means initially, UMB Bank, N.A., as bond register, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

"***Trust Estate***" shall have the meaning set forth in Section 401 hereof.

"***Wagering Tax Account Control Agreement***" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee and the Wagering Tax Depository Bank in favor of the Trustee with respect to the Pledged Wagering Tax Account that holds the Pledged Wagering Tax Revenues.

"***Wagering Tax Depository Bank***" means Comerica Bank and any successor thereto.

"***Wagering Tax Revenues***" means revenues collected by the City from taxes in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Law 1.

Section 102    Interpretation.  (A) In this Indenture, unless the context otherwise requires:

(1)    the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)    words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(3)    words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)    any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)    this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)    references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)    references to time shall mean the applicable local time in New York City, New York; and

(8)    references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)    Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof.  All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)    If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

# ARTICLE II

## TERMS OF BONDS

Section 201    <u>Authorization for Indenture and Bonds; Indenture to Constitute a Contract</u>. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City and the principal amount of Bonds that may be issued hereunder is not limited except as provided herein or by law.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Series or Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202    <u>Authorization of Bonds</u>.  In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in one or more series.  No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203    <u>Issuance and Delivery of Bonds</u>.  After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.  No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 301 of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204    <u>Conditions Precedent to Delivery of Bonds</u>.  The Bonds of each Series shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)    a copy of the Bond Orders authorizing each such series, executed by the City and the Trustee, which shall specify:

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of each such Series of Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of each series of the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     a Bond Counsel's Opinion to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Agreements; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 503, which shall be conclusively established by the executed certificate of the Trustee so stating.

**ARTICLE III**

**GENERAL TERMS AND PROVISIONS OF BONDS**

Section 301    Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.* Bonds designated as "Financial Recovery Bonds, Series 2014A" and "Financial Recovery Bonds, Series 2014B" are hereby authorized to be issued pursuant to the provisions of this Indenture in the respective principal amounts of [_____ ($_____)] and [_____ ($_____)]. Both series of Bonds shall bear a Date of Original Issue of [_____, 2014.] Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations. The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation. Each Bond shall be numbered as determined by the City. The Bonds shall be substantially in the forms set forth in Exhibit A and Exhibit B, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order. The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America. Principal and interest on the Bonds shall be due and payable as set forth in the form of Bonds set forth in Exhibit A and Exhibit B. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed. The principal amount of the Bonds of each series shall be payable on the Maturity Date. The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment on the Bonds.* Principal of, and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the corporate trust office of the Trustee. Interest on the Bonds will be paid by check or draft drawn upon the Trustee and mailed to Owners at the registered addresses, provided that, at the written request of the Owner of at least $1,000,000 principal amount of Bonds (which request may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time prior to an Interest Payment Date by subsequent written notice to the Trustee), interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Trustee and the City. Payment as aforesaid shall be made in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Section 302    Book-Entry Only System for the Bonds. (a) Except as provided in Section 302(b) hereof, the ownership of the Bonds shall be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the

payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b) In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City or the Trustee shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture. The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c) Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations. The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

Section 303 <u>Interchangeability of Bonds</u>. In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the

Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity bearing the same rate of interest and having the same terms of any of the authorized denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 304    Negotiability, Transfer and Bond Registry.  All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee, which may be one or more banks or trust companies or national banking associations appointed by the City, books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 305    Transfer of Bonds.  (A) The registration of each Bond is transferable, in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request), only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)    Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306    Regulations With Respect to Exchanges and Transfers.  (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of this Indenture.  All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

(B)     For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)     The Trustee shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 307     <u>Bonds Mutilated, Destroyed, Stolen or Lost</u>.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of the owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen.  In any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 308     <u>Cancellation and Destruction of Bonds</u>.  All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled.  Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed.   Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 309     <u>Redemption</u>.  The Bonds shall be subject to optional and mandatory redemption as set forth in the form of Bonds attached hereto as Exhibit A and Exhibit B.  The Bonds shall only be redeemed in Authorized Denominations.  No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

Section 310     <u>Selection of Bonds to be Redeemed</u>.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such Outstanding Bond a distinctive number for each minimum denomination of the principal amount

15

thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected.  For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Any integral multiple of a minimum denomination may, if so specified by the provisions of a Supplemental Indenture, be utilized in connection with the partial redemption of Bonds issued pursuant to such Supplemental Indenture and such Bonds shall be subject to selection for redemption in the amount of such multiple but otherwise in accordance with this Section.

Section 311    Notice of Redemption.  When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds.  Such notice shall specify the Series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed.  Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable.  Such notice shall be given by first class mail or registered or certified mail, return receipt requested, not less than ten (10) business days nor more than sixty (60) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure so to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Bond Order or Supplemental Indenture as to Bonds issued pursuant to such Bond Order or Supplemental Indenture.  As directed by the City, further notice shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 312    Payment of Redeemed Bonds.  Notice having been given by mail in the manner provided in Section 311, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the

Redemption Price plus interest accrued and unpaid to the Redemption Date. If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the authorized denominations. If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable. If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

## ARTICLE IV
## PLEDGE OF INDENTURE; SOURCES OF PAYMENT
## AND SECURITY FOR THE BONDS

Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest. The City hereby grants a valid, binding, enforceable, non-avoidable, continuing postpetition security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)      All rights and interests of the City in the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral (collectively the "Collateral") in the following order of priority:

(i)      With respect to the Series 2014A Bonds: A first priority lien on (a) the Pledged Income Tax Revenues and (b) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014B Bonds (items (a) and (b), collectively, the "Series 2014A Bonds Collateral").

(ii)      With respect to the 2014B Bonds: (a) A first priority lien on (i) the Pledged Wagering Tax Revenues and (ii) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014A Bonds, and (b) a second priority lien (second only to the lien securing the Series 2014A Bonds) on the Pledged Income Tax Revenues (items (a) and (b), collectively, the "Series 2014B Bonds Collateral"); and

(b)      Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations. The Bonds have been granted

17

super-priority claim status under Section 364(c)(1) of the Bankruptcy Code (without the need to file any proof of claim) and shall also be payable in the manner provided by the Bankruptcy Court Order.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim. Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402    Creation of Liens.    In order to effectuate the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control Agreements with the Depository Banks.

## ARTICLE V

## ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS

Section 501    Debt Service Fund.

(a) *Establishment of Debt Service Fund and Accounts.*    There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Bonds, Common Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Common Debt Service Account" (hereinafter referred to as the "Series 2014A Debt Service Account").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014B – Common Debt Service Account" (hereinafter referred to as the "Series 2014B Debt Service Account" and with the Series 2014A Debt Service Account, collectively, the "Debt Service Accounts").

(b) *Deposits to Debt Service Fund.*    Five Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for deposit to the applicable Accounts, for the payment of amounts owing with respect to the Bonds on such Interest Payment Date. Two Business Days prior to a scheduled Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for

18

deposit to the applicable Accounts, for the payment of all outstanding principal, premium, if any, and interest on the Bonds.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014A Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014A Bonds on such Interest Payment Date, the Trustee shall send the Income Tax Depository Bank a Notice of Deficiency and Requisition under the Income Tax Account Control Agreement and withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014A Debt Service Account, an amount sufficient to make the balance of the 2014A Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014B Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014B Bonds on such Interest Payment Date, the Trustee shall send the Wagering Tax Depository Bank a Notice of Deficiency and Requisition under the Wagering Tax Account Control Agreement and withdraw funds from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date. In the event that, following the foregoing application of amounts on deposit in the Pledged Wagering Tax Account, there remains a shortfall in the 2014B Debt Service Account with respect to the Debt Service Requirement Amount owing on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient therefrom to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, following the foregoing deposits, the amounts on deposit in a Debt Service Account do not equal the Debt Service Requirement Amount owing on such Interest Payment Date in respect of either or both series of Bonds, the Trustee shall withdraw funds from the Bond Proceeds Fund in an amount sufficient to make the balance in the applicable Debt Service Fund equal to the Debt Service Requirement for the applicable series of Bonds owing on such Interest Payment Date.

Asset Proceeds Collateral, if any, shall be transferred by the City within three (3) Business Days of receipt to the Trustee. The Trustee shall deposit the Asset Proceeds Collateral into the Debt Service Fund, for further pro-rata deposit into the 2014A Debt Service Account and the 2014B Debt Service Account, respectively, based on the then Outstanding amount of the Bonds in each Series for the mandatory redemption of Bonds on the next succeeding Interest Payment Date as provided in the Bonds.

(c) *Withdrawals from the Debt Service Fund.* The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the applicable Debt Service Account

the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

Section 502  Costs of Issuance Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds  Costs of Issuance Fund" (the "Costs of Issuance Fund").  Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds.  Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds.

Section 503  Bond Proceeds Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund").  There shall be deposited into the Bond Proceeds Fund the remainder of the net proceeds of the Bonds after the deposit of amounts necessary to pay Costs of Issuance into the Costs of Issuance Fund pursuant to Section 502 hereof as specified by the Emergency Manager in the Bond Orders.

Within the Bond Proceeds Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Bond Proceeds Account" (hereinafter referred to as the "Series 2014A Bond Proceeds Account").  Moneys on deposit in the Series 2014A Bond Proceeds Account shall be used only to fund the obligations owing in respect of the termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as set forth in the Bond Orders.  Any balance remaining in such Account after such payment shall be transferred to the Series 2014B Bond Proceeds Account.

There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014B – Bond Proceeds Account" (hereinafter referred to as the "Series 2014B Bond Proceeds Account").  Moneys on deposit in the Series 2014B Bond Proceeds Account shall be used only to pay for the Quality of Life Projects all in such amounts and for such Quality of Life Projects as specified by the Emergency Manager in the Sale Order and shall also be available, for so long as any fund remain on deposit therein, for deposit to the Debt Service Fund in accordance with Section 501(b), provided, however, that the City shall not be required to seek the Trustee's approval for Quality of Life Project expenditures and shall not be required to keep any funds on deposit in the Series 2014B Bond Proceeds Account following the date or dates on which Quality of Life Project expenditures are made.  Any balance remaining in such Account after the Maturity Date shall be deposited in the Series 2014B Debt Service Account.

Section 504  Amounts Remaining in Funds and Accounts. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

Section 505    Approval of Account Control Agreements. The City shall cause to be deposited 100% of the Pledged Wagering Tax Revenues into the Pledged Wagering Tax Account, and greater than 90% of the Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and accounts shall be governed by the Account Control Agreements at all times. The Pledged Wagering Tax Account and the Pledged Income Tax Account constitute part of the Trust Estate; provided, however, that, subject to Sections 708(a) and 902(b) hereof, the City shall be authorized to use all Pledged Wagering Tax Revenues and Pledged Income Tax Revenues for any purpose permitted by law, without limitation at any time, including during an Event of Default.

## ARTICLE VI

## **INVESTMENT OF FUNDS**

Section 601    Permitted Investments.  All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City.  If the Trustee does not receive written investment direction from the City, the Trustee shall invest all money held by it as provided in subsection [(f)] hereof.  For purposes of this Article III, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a)  bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b) certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

(c) commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d) repurchase agreements consisting of instruments listed in subdivision (a);

(e) Bankers' acceptances of United States banks rated at least A2/A/A;

[(f) mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

(i) the purchase of securities on a when-issued or delayed delivery basis,

(ii) the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii) the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g) obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

(h) investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118; and

(i) The investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150.]

Section 602     Valuation and Sale of Investments.    In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)     as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)     as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(c)     as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)     as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CITY

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701    <u>Payment of Bonds</u>.  The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702    <u>Power to Issue Bonds and Pledge Revenues, Funds and Other Property</u>.  As of the date hereof, the City is duly authorized to authorize and issue the Bonds and to enter into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided.  As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto prior to the pledge created hereby, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken.  As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture.  The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Revenues and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.

Section 703    <u>Maintenance of Perfected Security Interests; Further Assurances; Notices of Default</u>.  At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Bondowners first priority security interests in the Trust Estate.  The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of Default hereunder, including, for the avoidance of doubt, any failure to comply with Section 708 hereof.

Section 704    [<u>Tax Covenants</u>.  The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section 144(b) of the Code, or any successor provisions thereto.  The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds.]

Section 705    <u>Compliance With Conditions Precedent</u>.  Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist, have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706    <u>Accounts and Reports</u>.  The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account, the Pledged

23

Wagering Tax Account, the Asset Proceeds Collateral and all Accounts established by this Indenture which shall at all reasonable times be subject to the inspection of the Trustee.

Section 707    Issuance of Additional Obligations.  The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Collateral or that has a superior payment priority to the Bonds.  The issuance of any series of bonds hereunder, other than the Bonds, shall require compliance with Section 1002 of this Indenture.

Section 708    Wagering Tax and Income Tax Revenues and Accounts.  The City shall at all times:

(a)   maintain a minimum balance of no less than $5,000,000 in each of the Pledged Wagering Tax Account and Pledged Income Tax Account;

(b)   maintain Pledged Wagering Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(c)   maintain Pledged Income Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(d)   (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent authorized by applicable law and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

Section 709    Asset Proceeds Collateral.    The City shall deposit Asset Proceeds Collateral with the Trustee within three (3) Business Days of receipt thereof, for deposit in accordance with Section 501(b) hereof.  Furthermore, the City hereby covenants that as long as the Bonds are outstanding, no Asset Proceeds Collateral shall be used for any purpose other than payment of the principal of and interest on the Bonds, unless the City shall request in writing a use for such proceeds other than as set forth in this Section 709, and majority of Bondowners shall consent in writing.

Section 710    Contesting Enforceability.  The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

## ARTICLE VIII

## THE TRUSTEE

Section 801    Powers and Duties of Trustee.

(a)     The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)     In the event that any of the Bonds are issued on a tax exempt basis to finance working capital expenditures by the City, the Trustee hereby covenants, commencing [_____], 2015 and each [_____] thereafter so long as the Tax-Exempt Bonds are outstanding, to send an Authorized Officer of the City notice requesting the City to engage Bond Counsel to provide a Continuing Exclusion Opinion (as defined in the Bond Authorizing Order). The Emergency Manager has covenanted in the Bond Orders on behalf of the City that upon receipt of such notice from the Trustee, the City shall cause Bond Counsel to provide the Continuing Exclusion Opinion as required above.  The City may conclusively rely on such Continuing Exclusion Opinion in complying with the provisions therein.  In the event the City fails to obtain the Continuing Exclusion Opinion, or Bond Counsel determines that the conditions necessary to provide the Continuing Exclusion Opinion for the Tax-Exempt Bonds that remain outstanding after the next succeeding Extraordinary Redemption Date (as defined in the Bond Authorizing Order) do not exist, the City shall redeem the Tax-Exempt Bonds in accordance with the provisions set forth in the Sale Order and this Indenture.

(c)     The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(d)     The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(e)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(f)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be found to secure the same.

(g)     The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than

25

its [gross] negligence or willful misconduct. The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(h)     The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(i)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as amended, or by law.  The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(j)     The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts created by this Indenture or in the enforcement of any rights and powers under this Indenture until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(k)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, except for liability for its own gross negligence or willful misconduct.

(l)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding.

(m)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(n)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(o)     The Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(p)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control Agreements, relating to the conduct or

affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(q)     The Trustee is authorized and directed by the City to enter into the Account Control Agreements.

(r)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs in exercising any rights or remedies or performing any of its duties hereunder.

Section 802     Fees and Expenses of Trustee.  (a) The Trustee shall be entitled to reasonable fees for services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)     If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service Funds, and shall be entitled to a preference therefor over any Outstanding Bonds.

Section 803     Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale.  (a)     The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.   Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged Wagering Tax Revenues, Pledged Income Tax Revenues and Asset Proceeds Collateral, and transfer and assign its right, title and interest in the Indenture to the successor Trustee.  The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)     In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the

27

successor Trustee.  If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder.  Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)     Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 804    Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the  Trustee and the City and signed by  the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding.  No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof.  Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805    Appointment of and Transfer to Successor Trustee.  If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended.  The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the

28

Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

## ARTICLE IX

## <u>EVENTS OF DEFAULT AND REMEDIES ON DEFAULT</u>

Section 901    <u>Events of Default</u>.  Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a)    The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

(b)    The failure of the City to pay, when due, any principal or premium, if any, of any or all Bonds, whether on the Maturity Date or redemption thereof,

(c)    The City shall default in the performance or observance of any of the other covenants, agreements or conditions on its part contained in this Indenture (other than covenants otherwise specifically covered by this Section 901) and such default is not remedied within fifteen (15) days following receipt by the City of notice from the Trustee of such default;

(d)    If (i) the City shall fail to make a scheduled payment in excess of $25,000,000, when due and owing, in respect of Post-Petition Date Debt (other than the obligations with respect to the Bonds), or (ii) Post-Petition Date Debt in an outstanding aggregate principal amount exceeding $25,000,000 is accelerated, which results in such debt becoming immediately due and payable, and in the case of either (i) or (ii), such event is not cured within any grace period provided therefor in the applicable documents;

(e)    If material post-petition judgments, which are final and nonappealable, are rendered against the City involving liability in an aggregate amount exceeding $25,000,000 and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable;

(f)    If a court of competent jurisdiction finds that any of the Financing Documents are invalid or unenforceable and such finding is not stayed pending appeal;

(g)    If there is a written assertion by the City or an Authorized Officer that any Financing Document or the Bankruptcy Court Order is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication;

(h)    If the Bankruptcy Case is dismissed prior to the confirmation of a plan of adjustment, and the order dismissing the Bankruptcy Case is not stayed pending appeal;

(i)    The reversal or modification, by the entry of an order that is not stayed pending appeal and in a manner adverse to the Registered Owners, of the Bankruptcy Court's order dated December 5, 2013 [Docket No. 1945] granting the City chapter 9 bankruptcy relief;

29

(j)     If the City shall file, consent to, or fail to file a written opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion;

(k)     If the Bankruptcy Court shall grant any super-priority claim pursuant to sections 364(c)(1), 503 and 507(a)(2) of the Bankruptcy Code in favor of any party other than the Registered Owners (other than as permitted under the Financing Documents);

(l)     If there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the Registered Owners holding 51% of the Outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Bankruptcy Court Order in a manner adverse to the Registered Owners, or (ii) an order of a court of competent jurisdiction reversing, vacating or staying the effectiveness of the Bankruptcy Court Order, and in either (i) or (ii), such order is not stayed pending appeal;

(m)     If the liens or super-priority claims granted in the Bankruptcy Court Order in respect of the Bonds shall cease to be valid, perfected and enforceable in all respects with the priority described herein and therein;

(n)     The failure of the City to comply with the provisions of Section 708(a) with respect to Pledged Wagering Tax Revenues and the Wagering Tax Revenue Account and such failure is not cured within two (2) Business Days;

(o)     The failure by the City to comply with the provisions of Section 708(a) with respect to Pledged Income Tax Revenues the Income Tax Revenue Account and such failure is not cured within two (2) Business Days;

(p)     If the City ceases to be under the control of the Emergency Manager, or successor emergency manager, for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds, or a designee or successor as consented to by the City (which consent shall not be unreasonably withheld), to ensure continued financial responsibility shall have been established pursuant to Act 436 or any successor statute; or

(q)     Any representation or warranty made by the City in this Indenture, any Financing Document or in any certificate, document, instrument, opinion or financial statement made or delivered pursuant to or in connection with this Indenture or with any of the other Financing Documents, shall prove to have been incorrect, incomplete or misleading in any material respect as of the time of such representation or warranty.

Section 902     Remedies. (a) *General*.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture, including without limitation, the acceleration of the Bonds in accordance with Section 902(b) below.

(b)     *Acceleration.*  Upon the occurrence and continuation of an Event of Default, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed, in its own name,  to protect or enforce the rights of the Trustee

30

and the holders of the related Bonds by declaring the principal of and interest on the Bonds to be immediately due and ordering payment in the manner provided by Section 902(c)(i) and/or Section 902(c)(ii) hereof provided that interest shall continue to accrue on unpaid principal at the Default Rate until paid in full. Following acceleration, the Trustee shall send the Depository Banks a Notice of Control under the Account Control Agreements.

(c)     *Post-Acceleration Debt Service.*  Upon an Event of Default, and following acceleration of the Bonds pursuant to Section 902(b):

(i)     The Trustee, on behalf of the Bondowners of the Series 2014A Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014A Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro-rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014B Bonds.

(ii)     The Trustee, on behalf of the Bondowners of the Series 2014B Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014B Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to (i) $4,000,000 per month from the Pledged Wagering Tax Revenues and payable from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement, and (ii) following payment in full of the Series 2014A Bonds, an additional $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014A Bonds;

(iii) Upon any acceleration of the Bonds following the occurrence of an Event of Default under Section 901(a), (b), (f), (g), (h), (i), (j), (k), (l), or (m), the Trustee, on behalf of the Bondowners of the Bonds, shall be entitled to apply any moneys remaining on deposit in the Bond Proceeds Fund to the Bonds;

(iv) Payment on the Bonds is not limited to the Trust Estate, and the Trustee, on behalf of the Bondowners of all of the Bonds, may be entitled to seek payment from the City, (without the need to file any proof of claim), in accordance with the Section 364(c)(1) superpriority claim status of the Bankruptcy Court Order; and

(v) The monthly payment provisions of subsections (i) and (ii) above do not modify the obligation of the City to pay the Bonds in full upon (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, or (iii) [_____], the date that is two years and six months after the Date of Original Issue, which obligation is automatic and does not require action by the Trustee or Bondholders under Section 902(b).

31

(d)  *Enforcement*.  Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the Obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(e)  *Owner Right of Action*.  If the Registered Owners holding 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the Owner of all Outstanding Bonds.

Section 903  Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding 51% of the Outstanding amount of the Bonds, waive an Event of Default hereunder and annul its consequences.  No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904  Possession of Bonds by Trustee Not Required.  All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto.  Any action instituted by the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905  Remedies Cumulative.  The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906  Knowledge by Trustee of an Event of Default.  The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until it shall have actual knowledge thereof, or shall have received written notice thereof from any Bondowner at its address and location specifically designated for receiving notices pursuant hereto.  Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907  Application of Monies.  All moneys received by the Trustee and deposited in the Debt Service Fund pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

# ARTICLE X

## SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE

Section 1001   Modifications and Amendments Not Requiring Consent.  Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)      To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)      To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

(c)      To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

(d)      To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)      To appoint separate or successor trustees, paying agents or bond registrars.

(f)      To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders.  Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1002   Amendments Requiring Consent.  Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a

privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental and amendatory indenture unless approved by the holders of all outstanding Bonds.  Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds.  The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto.  If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003   <u>Consent of Trustee</u>.  Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section 1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section.  Such certificate shall specifically request the Trustee to enter into such supplement.  Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004   General Provisions Relating to Supplemental Indentures.  This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X.  Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

A copy of every Supplemental Indenture entered into pursuant to this Indenture shall be accompanied by a Bond Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

## ARTICLE XI

## MISCELLANEOUS

Section 1101   Notices.   Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

A.  If to the City, to:                 City of Detroit

                                        Detroit, Michigan 48226
                                        Attention: _____

B.  If to the Depository Bank, to:      _____

C.  If to the Trustee, to:              _____

The City and the Trustee may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102   Termination. This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to

defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees owed to the Trustee have been paid in full.  Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103  <u>Defeasance</u>.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Registered Owners of such Bonds.  After such deposit, such Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

Section 1104  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105  <u>Headings</u>.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106  <u>Indenture Executed in Counterparts</u>.  This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107  <u>Parties Interested Herein</u>.  Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser.

Section 1108  <u>Jurisdiction</u>.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the

36

Bankruptcy Court in any action or proceeding arising out of or relating to this Indenture (including, without limitation, any actions by the Trustee or the Registered Owners pursuant to Section 902 hereof), or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and UMB Bank, N.A. to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

    Its:  Emergency Manager

UMB BANK, N.A.,

as Trustee

By _____

Its: _____

**EXHIBIT A**

**FORM OF SERIES 2014A BOND**

A-1

**EXHIBIT B**

**FORM OF SERIES 2014B BOND**

**EXHIBIT C**

**FORM OF ACCOUNT CONTROL AGREEMENT**

**<u>Exhibit D</u>**
Irrevocable Directions

# IRREVOCABLE DIRECTIONS
_____, 2014

_____

_____

_____

**Re:  Wagering Tax Payments to be made to the City of Detroit (the "City")**

Ladies and Gentlemen:

Please be advised that:

1. All payments by _____ of all taxes owing to the City of Detroit in respect of the adjusted gross receipts earned by you and payable pursuant to the City of Detroit pursuant to Detroit City Code Section 18-14-3, as amended and any replacement or successor thereto and the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State of Michigan, effective December 5, 1996, as amended, and any replacement or successor thereto, together with any interest and penalties payable thereon (collectively, the "Pledged Wagering Taxes") shall be paid to the City by wire transfer in immediately available funds for credit to the City's account at Comerica Bank (the "Bank") as follows:

_____

_____

_____

For the avoidance of doubt, Pledged Wagering Taxes include Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, (all as defined in Detroit City Code Section 18-14-2) including any interest and penalties thereon and all proceeds.

2. No change to these Instructions shall be effective for any purpose without the prior written consent of UMB Bank, N.A., as Trustee (the "Trustee") under a Financial Recovery Bond Trust Indenture between the City of Detroit and UMB Bank, N.A., as Trustee, dated _____, 2014, (the "Indenture").  You shall be given 48 hours prior notice of the effective date of any change in these Instructions.

3. These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Trustee.

4. These Instructions shall terminate upon written notice of the Bank and the Trustee that the Indenture has been terminated.

5.  These Irrevocable Directions amend, restate and replace in their entirety those certain Irrevocable Instructions given by the City of Detroit to you on June 23, 2009.

6. These Instructions are binding on you, your successors and assigns.

CITY OF DETROIT

_____

Kevyn Orr, Emergency Manager

Acknowledged and Agreed:

[SEPARATE ACKNOWLEDGMENT BLOCK TO BE ADDED FOR EACH CASINO]

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | § Chapter 9 |
| | § |
| CITY OF DETROIT, MICHIGAN, | § Hon. Steven W. Rhodes |
| | § |
| Debtor. | § Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order

(i)      authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $~~350,000,000~~**285,000,000** (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended, supplemented, restated, or otherwise modified from time to time,

that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings

collectively, and together with the Bond Purchase Agreements, the Commitment Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City,  the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)     granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)     granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7**8** of this Order and in the Bond Documents;

(v)     authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City,

assigned to them by the Bankruptcy Code.

3

including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)    authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 30 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the

4

relief requested is fair and reasonable and in the best interests of the City; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.  *Petition Date*.  On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Court</u>") commencing this Case.  The order for relief in this case was entered on December 5, 2013.

B.  *Jurisdiction and Venue*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *City's Stipulations*.  The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens**, any rights of Comerica Bank in the Collateral referenced in section 2.02(c) of the DACA (defined in paragraph 8 below) that exist on the date hereof,** and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D. *Findings Regarding the Postpetition Financing*.

(i) *No Credit Available on More Favorable Terms*.  Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility.  The

City has been unable to obtain unsecured credit allowable under Bankruptcy Code

Section 503(b)(1) as an administrative expense. Adequate financing on a

postpetition basis is not otherwise available without granting the Purchaser, the

Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided

herein) the Collateral with the priorities set forth in paragraph ~~7~~**8** hereof and in the

Bond Documents, (2) superpriority claims and Liens and (3) the other protections

set forth in the Bond Documents and this Order.

(ii)     *Use of Proceeds of the Post-Petition Facility.*   As a condition to

the entry into the Bond Documents and the extension of credit under the Post-

Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of

the Post-Petition Facility shall be used, in each case in a manner consistent with the

terms and conditions of the Bond Documents, solely (a) with respect to the Quality

of Life Bond, for purposes permitted by law, including to fund expenditures

designed to contribute to the improvement of the quality of life in the City and (b)

with respect to the Swap Termination Bond, to pay amounts required under the

Forbearance and Optional Termination Agreement dated as of July 15, 2013,

among the City, the Emergency Manager of the City, the Detroit General

Retirement System Service Corporation, the Detroit Police and Fire Retirement

System Service Corporation, on the one hand, and UBS AG and Merrill Lynch

Capital Services, Inc., on the other (as amended from time to time, the

"Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.    *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.    *Good Faith and Jurisdictional Matters*.

(i)    *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the

Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii) *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*. The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties. Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code. The Purchaser, the Indenture Trustee and the Bondholders

9

therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

G. *Act 436 Approval Not Required.* On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility. The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909. Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H. *Notice.* Notice of the Hearing and the relief requested in the Motion has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the

10

list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Motion Approved</u>.  The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and

11

conditions set forth in this Order.

2.  <u>Objections Overruled</u>.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**Post-Petition Facility Authorization**

3.  <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.  <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the "<u>Financing</u>").

5.     Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.     Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and

the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "Swap Termination Bond Collateral", and together with the Quality of Life

14

Bond Collateral, the "Collateral").

(b)    Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or ~~of~~ any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7.     Direction of Pledged Wagering Tax Revenue.  On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "Irrevocable Directions") by the City in the form attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified development agreements.

8.     Lien Priority.  The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral **and shall expressly apply to any Collateral deposited at Comerica Bank pursuant to the Deposit Account Control Agreements among the City, UMB Bank, N.A., as Indenture Trustee, and Comerica Bank (collectively, the "DACA")  except that, notwithstanding anything to the contrary in this Order or the Bond Documents, the Liens shall be subject to the rights of Comerica Bank with respect to any Collateral deposited at Comerica Bank as provided in section 2.02(c) of the DACA**. Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable

16

against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9. <u>Superpriority Claims</u>. Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "<u>Superpriority Claim</u>") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City. There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "<u>Property Tax Revenue</u>"). To the

extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10.     <u>No Obligation to Extend Credit</u>.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11.     <u>Amendment of the Bond Documents</u>. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver

18

all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements.  Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.     Modification of Automatic Stay.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the

19

Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order; ~~and~~ (e) authorize the City to pay, and the Indenture Trustee to retain and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order**; and (f) authorize Comerica Bank to exercise its rights and to comply with its obligations under and as referenced in the DACA**.

13.     Perfection of Liens.  This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the

Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein. Upon satisfaction of the conditions to termination set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated. The Custodian shall timely perform its obligations in connection with the termination of the Collateral Agreement, including, without limitation, the obligations set forth in Section 14.4 thereof and in particular, but also without limitation, paying any and all amounts due to the City under the Collateral Agreement and giving notice to the appropriate parties that the "Irrevocable Instructions" (as defined in the Collateral Agreement) are terminated and no longer of any force or effect.

14. <u>Right to Take Actions to Perfect</u>. Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law, or take

21

constructive control over assets, take any other action, in each case, to validate and perfect the Liens and all such financing statements, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the date of entry of this Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the Liens.  The City is authorized and directed to execute and deliver promptly upon demand to the Purchaser or the Indenture Trustee all such financing statements, notices, control agreements and other security documents as the Purchaser or the Indenture Trustee may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording. For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15.    Proceeds of Subsequent Financing.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond

Obligations and the satisfaction of the Superpriority Claims, including after the

confirmation of any plan of adjustment filed in the Case, and such facilities are

secured by any Collateral, then, in addition to any remedies that may be available

to the Purchaser, the Indenture Trustee and the Bondholders under the Bond

Documents, all the cash proceeds derived from such credit or debt shall

immediately be turned over to the Indenture Trustee, to be applied as set forth in

the Bond Documents and this Order.

16.     Maintenance of Collateral.  Until the indefeasible payment in full of

all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

maintain: (a) the Collateral as required under the Bond Documents; and (b) the

cash management system as required by the Bond Documents.

17.     Disposition of Collateral.

(a)     Except as otherwise provided for in the Bond Documents **or**

**the DACA**, the City shall not grant a lien on or transfer any interests in any portion

of the Collateral in any way inconsistent with the Bond Documents or without the

prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any

Collateral (a "Collateral Disposition"), the City shall, to the extent required by the

Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of

such Collateral Disposition for application in accordance with the Bond

Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18.     <u>Reporting reinvestment/revitalization spending</u>. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending from the Quality of Life Financing (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "<u>Revised Plan</u>").  Proceeds of the Quality of Life Financing will be placed in a segregated account (the "<u>Quality of Life Account</u>") that will be drawn upon as approved, appropriated and budgeted quality of life projects are invoiced and require payment. Quality of life projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements.  Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

19.     <u>Overall general fund financial condition</u>. Within 30 days after the closing of the Postpetition Financing, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "<u>Revised Forecast</u>") consistent with the "DIP Forecast" format previously presented by the

City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

20. <u>Maturity Date</u>. Upon the earliest to occur (such earliest date, the "<u>Maturity Date</u>") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

21. <u>No Dismissal</u>. The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

22. <u>Events of Default</u>. The occurrence of an "Event of Default" under the

Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("Event of Default"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Bond Documents.

23.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond Obligations owing under the Bond Documents to be immediately due and payable in accordance with the terms of the Bond Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "Termination Declaration Date").  Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond Documents without further order or approval from this Court.

24.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.  The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in

Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25. <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the

protections provided in Section 921(e) of the Bankruptcy Code. Any such

reversal, modification, amendment or vacatur shall not affect the validity or

enforceability of the Bond Obligations or any Lien, claim (including the

Superpriority Claim) or priority authorized or created hereby. Any liens or claims

granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder

arising prior to the effective date of any such reversal, modification, amendment or

vacatur shall be governed in all respects by the original provisions of this Order,

including entitlement to all rights, remedies, privileges and benefits granted herein.

26. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the

Bondholders are not required to file proofs of claim in the Case to assert any claim

in the Case against the City in respect of the Bonds. Any order entered by the

Court in relation to the establishment of a bar date in the Case shall not apply to the

Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the

Indenture Trustee and each Bondholder is hereby authorized and entitled, in its

sole discretion, but not required, to file (and amend and/or supplement, in its

discretion) a proof of claim and/or aggregate proofs of claim in the Case for any

claim authorized under this Order.

27. <u>Rights of Access and Information</u>. Without limiting the rights of

access and information afforded the Purchaser, the Indenture Trustee and

Bondholders under the Bond Documents, the City shall afford representatives,

agents or employees of the Purchaser, the Indenture Trustee or the Bondholders

reasonable access to the City's books and records in accordance with the Bond

Documents and shall reasonably cooperate, consult with, and provide to such

persons all such information as may be reasonably requested. In addition, the City

shall authorize its independent certified public accountants, financial advisors,

investment bankers and consultants to cooperate, consult with, and provide to the

Indenture Trustee, on behalf of the Bondholders, all such information as may be

reasonably requested with respect to the financial condition of the City to the

extent required by the Bond Documents. All Bondholders who have agreed to

keep such information confidential on terms consistent with the Bond Purchase

Agreements will be provided access by the City to all information (including via a

virtual data room) provided to Bondholders in connection with the Post-Petition

Facility.

28.     Limitations on the Post-Petition Facility and the Collateral. The Post-

Petition Facility and the Collateral may not be used in connection with: (a)

preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or

the Bondholders' enforcement or realization upon any of the Collateral once an

Event of Default has occurred; (b) any act that seeks to use or uses such assets in a

manner that is not permitted by the Bond Documents; (c) objecting or challenging

in any way any claims, Liens or Collateral held by or on behalf of any of the

Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

29.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party~~,~~ **who is not expressly referenced in this Order, any** creditor or any direct, indirect or incidental beneficiary.

30.    <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective

claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

31. <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

32. <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

33. <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

34. <u>No Waiver by Seeking Relief</u>. Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

35. <u>Binding Effect of Order</u>. Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

36. <u>No Modification of Order</u>. Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not

seek or consent to, directly or indirectly, without the prior written consent of the

Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the

Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in

each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to

this Order or the order for relief in a manner adverse to the Purchaser, the

Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing

or hereafter arising of any kind or nature whatsoever, including any administrative

expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy

Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the

Collateral with priority equal or superior to the Liens (except as specifically

provided in the Bond Documents). The City irrevocably waives any right to seek

any amendment, modification or extension of this Order without the prior written

consent of the Purchaser (if such action is to be taken prior to the issuance of the

Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of

the Bonds), in each case, in its sole discretion.

37.   <u>Order Controls</u>.  In the event of any inconsistency between the terms

and conditions of the Bond Documents and this Order, the provisions of this Order

shall govern and control.

38.   <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions

of this Order and any actions taken pursuant hereto shall survive entry of any order

that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case. Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

39.    Effect of this Order. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

40.    Retention of Jurisdiction. The Court has and will retain jurisdiction to

enforce this Order according to its terms.

## Exhibit A
Bond Purchase Agreement
Swap Termination Bond

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

**Exhibit C**
Indenture

# **Exhibit D**
Irrevocable Directions

| Summary Report: | |
|---|---|
| **Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 12/31/2013 11:01:08 AM** | |
| **Style Name:** JD Blackline | |
| **Original Filename:** Financing Order (REVISED for hearing 12.16.13)(2).doc | |
| **Original DMS:** | |
| **Modified Filename:** THIRD REVISED Financing Order (REVISED for hearing 12.30.13).doc | |
| **Modified DMS:** | |
| **Changes:** | |
| Add | 8 |
| Delete | 6 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| Table Delete | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 14 |

# Item 9

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                            :
In re                                       :        Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                  :        Case No. 13-53846
                                            :
                    Debtor.                 :        Hon. Steven W. Rhodes
                                            :
                                            :
-------------------------------------------------------x
```

## AMENDED EXHIBIT LISTS AND OBJECTIONS FOR HEARING RE CITY OF DETROIT'S ASSUMPTION MOTION AND MOTION TO APPROVE POST-PETITION FINANCING

1.      For purposes of the hearing on the City's Assumption Motion [Dkts. 17, 157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "Combined Hearing"), scheduled to take place on December 17, 18, and 19, 2013, and continued to January 3, 2014, the City identifies the following list of exhibits and objections thereto.

2.      The exhibits and objections reflect information received by the City as of 4 pm on January 2, 2014.

| Party | Exhibit No | Exhibit Description | Objection |
|---|---|---|---|
| City | 1 | ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule | No objection – admitted |
| City | 2 | ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related Schedule | No objection – admitted |
| City | 3 | Term Sheet | Hearsay; Relevance |
| City | 4 | SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | No objection – admitted |
| City | 5 | UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 | No objection – admitted |
| City | 6 | Waiver and Consent of Insurer | No objection – admitted |
| City | 7 | Detroit City Code § 18-16-4 | No objection – admitted |
| City | 8 | Transcript from the hearing before Judge Annette J. Berry in Third Circuit Court for the County of Wayne | Hearsay |
| City | 9 | Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit (the "Orr Affidavit") | Hearsay; Relevance |
| City | 10 | City of Detroit ("City") Proposal for Creditors Executive Summary | Hearsay; Relevance |
| City | 11 | Collateral Agreement | No objection – admitted |
| City | 12 | Correspondence from the City to U.S. Bank National Association ("USBNA") | Hearsay; Relevance |
| City | 13 | Correspondence from Syncora Capital Assurance, Inc. ("Syncora") to USBNA | No objection – admitted |
| City | 14 | Correspondence between and among counsel to USBNA, Syncora and the City | Hearsay; Relevance |
| City | 15 | Correspondence from Syncora's counsel to counsel to USBNA | Relevance |
| City | 16 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 17 | Correspondence from Syncora to the City | Relevance |
| City | 18 | Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 19 | Correspondence from Syncora to SBS Financial Product Company, LLC ("SBS") | No objection – admitted |

2

13-53846-swr Doc 2357 Filed 05/13/14 Entered 05/13/14 15:29:52 Page 578 of 594
13-53846-swr Doc 2357 Filed 05/13/14 Entered 05/13/14 18:57:44 Page 2 of 18

| City | 20 | Correspondence from Syncora to the City | Relevance |
|------|----|------|------|
| City | 21 | Correspondence from the City to Syncora | Hearsay; Relevance |
| City | 22 | Correspondence from SBS to Syncora | Hearsay; Relevance |
| City | 23 | Declaration of Gaurav Malhotra in Support of the Debtor's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") | Hearsay; Relevance |
| City | 24 | Cash Flow Forecasts [Malhotra Declaration Ex. A] | Hearsay; Relevance |
| City | 25 | Ten-Year Projections [Malhotra Declaration Ex. B] | Hearsay; Relevance |
| City | 26 | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] | Hearsay; Relevance |
| City | 27 | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] | Hearsay; Relevance |
| City | 28 | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] | Hearsay; Relevance |
| City | 29 | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] | Hearsay; Relevance |
| City | 30 | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] | No objection – admitted |
| City | 31 | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] | Hearsay |
| City | 32 | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] | Hearsay; Relevance |
| City | 33 | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] | Hearsay; Relevance |
| City | 34 | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] | Hearsay; Relevance |
| City | 35 | Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") | Hearsay; Relevance |
| City | 36 | City of Detroit Proposal for Creditors [Orr Declaration Ex. A] | Pages 49-50 and 97-98 admitted over objection on 12/17/2013 |
| City | 37 | City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] | Hearsay; Relevance |
| City | 38 | Report of the Detroit Financial Review Team [Orr Declaration Ex. D] | Hearsay; Relevance |
| City | 39 | Financial Stability Agreement [Orr Declaration Ex. E] | Hearsay; Relevance |

3

13-53846-tjt-swr   Doc 4712357   Filed 05/13/14   Entered 05/13/14 15:29:32   Page 579 of 594
13-53846-swr   Doc 2357   Filed 03/02/14   Entered 03/02/14 16:57:44   Page 3 of 18

| | | | |
|------|----|------|------|
| City | 40 | Preliminary Review of the City of Detroit [Orr Declaration Ex. F] | Hearsay; Relevance |
| City | 41 | Report of the Detroit Financial Review Team [Orr Declaration Ex. G] | Hearsay; Relevance |
| City | 42 | letter from Governor Richard Snyder to the City [Orr Declaration Ex. H] | Hearsay; Relevance |
| City | 43 | Ambac Comments on Detroit [Orr Declaration Ex. I] | Hearsay; Relevance |
| City | 44 | Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] | Hearsay; Relevance |
| City | 45 | Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] | Hearsay; Relevance |
| City | 46 | Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] | Hearsay; Relevance |
| City | 47 | UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement | No objection – admitted |
| City | 48 | SBS Insurance Policies for Scheduled Paymentw of GRS Service Corporation under June 7, 2006 Master Agreement | No objection – admitted |
| City | 49 | Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) | No objection – admitted |
| City | 50 | First Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 51 | Second Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 52 | Third Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 53 | Fourth Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 54 | Fifth Amendment to Forbearance and Optional Termination Agreement | No objection – admitted |
| City | 55 | Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. | Hearsay; Relevance |
| City | 56 | E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments [DTPFF00015602- DTPFF00015638] | No objection – admitted |
| City | 57 | Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] | Hearsay; Relevance |
| City | 58 | Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario)  [DTPFF00014812- DTPFF00014824] | Hearsay; Relevance |
| City | 59 | Ernst & Young, 13-Week Cash Flow Forecast - Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] | Hearsay; Relevance |

4

13-53846-tjt  Doc 2357  Filed 05/13/14  Entered 05/13/14 15:29:32  Page 580 of 594
13-53846-swr  Doc 2357  Filed 05/13/14  Entered 05/13/14 16:57:44  Page 4 of 18

| | | | |
|---|---|---|---|
| City | 60 | Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] | Hearsay; Relevance |
| City | 61 | Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] | Admitted to show it was received on 12/17/2013 |
| City | 62 | Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] | Hearsay |
| City | 63 | Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] | Hearsay |
| City | 64 | Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] | Hearsay |
| City | 65 | Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] | Hearsay |
| City | 66 | Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] | Hearsay |
| City | 67 | Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation  [DTPPF00000826-DTPPF00000837] | Hearsay |
| City | 68 | Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP.[DTPPF00001006- DTPPF00001010] | Hearsay |
| City | 69 | Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] | Hearsay; Relevance |
| City | 70 | Silver Point Finance, LLC:  "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] | Hearsay |
| City | 71 | Letter from Gerbino to Miller Buckfire, attaching Barclay's [DTPPF00000856-DTPPF00000902] | Hearsay |

| City | 72 | Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent - Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] | Hearsay |
|------|----|-----|------|
| City | 73 | Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP. [DTPPF00000908-DTPPF00000943] | Hearsay |
| City | 74 | "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP. [DTPPF00000838-DTPPF00000855] | Hearsay |
| City | 75 | Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP. [DTPPF00000821-DTPPF00000825] | Hearsay |
| City | 76 | Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP. [DTPPF00000959-DTPPF00000960] | Hearsay |
| City | 77 | Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP. [DTPPF00013170-DTPPF00013195] | Hearsay |
| City | 78 | Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Syncora") and Financial Guaranty Insurance Company's ("FGIC") DIP financing proposal [DTPPF00000035-DTPPF00000037] | No objection – admitted |
| City | 79 | Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] | No objection – admitted |
| City | 80 | Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] | No objection – admitted |
| City | 81 | Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377-DTPPF00003404] | Hearsay |
| City | 82 | Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] | Hearsay |
| City | 83 | Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] | Hearsay |
| City | 84 | Goldman Sachs' Draft Commitment Letter, including Annex A and B  [DTPPF00001543- DTPPF00001567] | Relevance; Hearsay |
| City | 85 | Goldman Sachs' Draft Fee Letter [DTPPF00001568-DTPPF00001571] | Relevance; Hearsay |

| City | 86 | Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing" [DTPPF00001058-DTPPF00001086] | Relevance; Hearsay |
|------|-----|-----|-----|
| City | 87 | Letter from Kersten to The City of Detroit regarding CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] | Hearsay |
| City | 88 | Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] | No objection – admitted |
| City | 89 | Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226-DTPPF00020231] | No objection – admitted |
| City | 90 | Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] | Admitted over objection on 12/17/2013 |
| City | 91 | Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " [DTPPF00012993- DTPPF00013024] | Admitted over objection to show what was provided on 12/17/2013 |
| City | 92 | Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] | Relevance; Hearsay |
| City | 93 | Barclay's Fee Letter fully executed by Barclay's and City [Filed as Docket No. 1761] | No objection - admitted |
| City | 94 | Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City [Filed as Docket No. 1520; Exhibit 6A] | Admitted over objection on 12/18/2013 |
| City | 95 | Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement [Filed as Docket No. 1520; Exhibit 6B] | Hearsay |
| City | 96 | Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] | Admitted over objection on 12/18/2013 |
| City | 97 | Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] | Admitted over objection on 12/18/2013 |
| City | 98 | Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re: Emergency Manager's Order No. 17 [DTPPF00019623-DTPPF00019655] | No objection - admitted |
| City | 99 | Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter from Orr to Mayor Bing regarding Emergency Manager's Order No. 17 [DTPPF00019592-DTPPF00019622] | Relevance; Hearsay |
| City | 100 | Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board | No objection - admitted |

7

13-53846-swr Doc 2357 Filed 01/02/14 Entered 01/02/14 16:57:44 Page 7 of 18
13-53846-tjt Doc 4723-7 Filed 05/13/14 Entered 05/13/14 15:29:32 Page 583 of 594

| | | | |
|---|---|---|---|
| City | 101 | Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5A] | Relevance; Hearsay |
| City | 102 | Declaration of James Doak In Support of Motion of the Debtor for a Final Order [Filed as Docket No. 1520; Exhibit 5B] | Hearsay; Relevance (with respect to certain topics of testimony to the extent they are inconsistent w the Court's Adjournment Order) |
| City | 103 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 104 | City of Detroit, Operational Restructuring Summary | Relevance; Hearsay |
| City | 105 | Funding for Detroit Announced by Federal Government | Relevance; Hearsay |
| City | 106 | Project Piston Cash Flow Forecast - Monthly (FYs 2013, 14, 15) | Admitted over objection on 12/17/2013 |
| City | 107 | Project Piston Cash Flow Forecast (including Restructuring Scenario) | Relevance; Hearsay |
| City | 108 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Admitted over objection on 12/17/2013 |
| City | 109 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) | Admitted over objection on 12/17/2013 |
| City | 110 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) | Admitted over objection on 12/17/2013 |
| City | 111 | Ernst & Young, Illustrative Cash Chart | Admitted over objection on 12/17/2013 |
| City | 112 | Waiver and Consent of Insurer by Financial Guaranty Insurance Company | No objection – admitted |
| City | 113 | Moody's Investors Service, Rating Action: Moody's downgrades FGIC to Caa3 and will withdraw ratings | No objection - admitted |
| City | 114 | Draft Financial Recovery Bond Trust Indenture Between City of Detroit and Trustee | Hearsay |

8

| City | 115 | Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) | Admitted over objection on 12/17/2013 |
|------|-----|---|---|
| City | 116 | Annual Report of the Board of Trustees of the GRS for the Year Ended June 20, 2004 | No objection – admitted |
| City | 117 | Annual Report of the Board of Trustees of the PFRS for the Year Ended June 20, 2004 | No objection – admitted |
| City | 118 | City Ordinance No. 03-05 | No objection – admitted |
| City | 119 | City Ordinance No. 04-05 | No objection – admitted |
| City | 120 | GRS Service Contract 2005 | No objection – admitted |
| City | 121 | PFRS Service Contract 2005 | No objection – admitted |
| City | 122 | City Ordinance No. 05-05 | No objection – admitted |
| City | 123 | City Ordinance No. 05-09 | No objection – admitted |
| City | 124 | June 12, 2006 Trust Agreement by and among the Service Corporations and U.S. Bank National Association as Trustee | No objection – admitted |
| City | 125 | June 12, 2006 XL Capital Assurance Municipal Bond Insurance Policy CA03049A | No objection – admitted |
| City | 126 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010249 | No objection – admitted |
| City | 127 | June 12, 2006 FGIC Municipal Bond New Issue Insurance Policy Number 06010250 | No objection – admitted |
| City | 128 | GRS Service Contract 2006 | No objection – admitted |
| City | 129 | PFRS Service Contract 2006 | No objection – admitted |
| City | 130 | Contract Administration Agreement | No objection – admitted |
| City | 131 | July 19, 2013 Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation | No objection – admitted |
| City | 132 | May 25, 2005 1992 ISDA Master Agreement Local Currency Single Jurisdiction between UBS and the GRS Service Corporation | No objection - admitted |
| City | 133 | June 26, 2009 Amended and Restated Schedule to the ISDA between UBS and the GRS Service Corporation | No objection – admitted |
| City | 134 | June 26, 2009 Revised Confirmation to the GRS Service Corporation from UBS | No objection – admitted |
| City | 135 | June 12, 2006 FGIC Swap Surety Policy Number 0602052 | No objection – admitted |
| City | 136 | June 12, 2006 FGIC Swap Surety Policy Numbers 06010253, 06010254, and 06010255 | No objection - admitted |

9

| | | | |
|---|---|---|---|
| City | 137 | SBS Amended Schedules | No objection – admitted |
| City | 138 | PFRS Revised Confirmation | No objection – admitted |
| City | 139 | October 23, 2013 Email from Thomas Gavin to Irvin Corley re: Fabian Quotes. | No objection – admitted |
| City | 140 | Swap Payments v. Swap Termination Loan [Demonstrative] | Admitted for demonstrative purposes only on 12/17/2013 |
| City | 141 | Sixth Amendment to Forbearance and Optional Termination Agreement | Reserved |
| <td colspan="4" style="background:red"></td> |
| Syncora | 201 | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City | No objection – admitted |
| Syncora | 202 | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City | No objection – admitted |
| Syncora | 203 | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) | No objection – admitted |
| Syncora | 204 | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) | No objection – admitted |
| Syncora | 205 | Contract Administration Agreement, dated June 12, 2006 | No objection – admitted |
| Syncora | 206 | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee | No objection – admitted |
| Syncora | 207 | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 | No objection – admitted |
| Syncora | 208 | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 | No objection – admitted |
| Syncora | 209 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation | No objection – admitted |
| Syncora | 210 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation | No objection – admitted |
| Syncora | 211 | City Ordinance No. 03-05 (Pérez Decl. Ex. A) | No objection – admitted |
| Syncora | 212 | City Ordinance 04-05 (Pérez Decl. Ex. B) | No objection – admitted |
| Syncora | 213 | City Ordinance No. 05-05 (Pérez Decl. Ex. C) | No objection – admitted |
| Syncora | 214 | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) | No objection - admitted |

| Syncora | 215 | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) | Misidentified document |
|---------|-----|------|------|
| Syncora | 216 | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) | Misidentified document |
| Syncora | 217 | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) | No objection - admitted |
| Syncora | 218 | Jones Day - Syncora NDA (Swap Proposal) | Relevance |
| Syncora | 219 | Forbearance and Optional Termination Agreement term sheet | Hearsay; Relevance |
| Syncora | 220 | Email from Cheryl Johnson to A. Neely re Status of Swap | Hearsay; Relevance |
| Syncora | 221 | Email from Reuters to Press Secretary re Status of Swap Contract | Hearsay; Relevance |
| Syncora | 222 | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association | Hearsay; Relevance |
| Syncora | 223 | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) | No objection - admitted |
| Syncora | 224 | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) | Hearsay; Relevance; Improper Expert Testimony |
| Syncora | 225 | Letter Dated Aug. 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) | No objection - admitted |
| Syncora | 226 | Email from K. Buckfire (DTMI80335) | Relevance |
| Syncora | 227 | Email from Erin Smith (DTMI00107294) | Hearsay; Relevance |
| Syncora | 228 | Email from Bill Nowling (DTMI00111238) | Relevance |
| Syncora | 229 | Abernathy MacGregor Invoice (DTMI00112208) | Relevance |
| Syncora | 230 | 6/12/13 email from Andrew Dillon (DTMI00114984) | Relevance |
| Syncora | 231 | 6/24/13 email from Kevyn Orr (DTMI00114531) | Relevance |
| Syncora | 232 | 6/24/13 email from Kevyn Orr (DTMI00115562) | Relevance |
| Syncora | 233 | Responses to Inquiries from City Council (DTPPF00020357) | No objection – admitted |
| Syncora | 234 | Transcript of 8/30/2013 Deposition of Kevyn D. Orr | No objection – admitted |
| Syncora | 235 | Transcript of 8/29/2013 Deposition of Kenneth Buckfire | No objection – admitted |
| Syncora | 236 | Transcript of 12/5/2013 Deposition of James Doak | No objection – admitted |

| | | | | |
|---|---|---|---|---|
| Syncora | 237 | Transcript of 12/9/2013 Deposition of Kevyn D. Orr | | No objection – admitted |
| Syncora | 238 | Transcript of 12/10/2013 Deposition of Kenneth Buckfire | | No objection – admitted |
| Syncora | 239 | Questions for Consultants on $350 DIP Financing (DTPPF00020380) | | Hearsay; Relevance; Compendium Exhibit |
| Syncora | 240 | Transcript of 12/12/2013 Continuation of Deposition of Kevyn D. Orr | | No objection - admitted |
| | | | | |
| FGIC | 301 | Articles of Incorporation (Pérez Dec. Ex. D) | | No objection - admitted |
| FGIC | 302 | GRS Service Contract 2006 (Pérez Dec. Ex. G) | | Misidentified document |
| FGIC | 303 | Termination Consent Letter (Pérez Dec. Ex. I) | | No objection - admitted |
| FGIC | 304 | TRO (Pérez Dec. Ex. S) | | No objection - admitted |
| FGIC | 305 | FGIC Order of Rehabilitation, dated June 28, 2012 | | Hearsay; Relevance |
| FGIC | 306 | FGIC Rehabilitation Plan Approval Order, dated June 11, 2013 | | Hearsay; Relevance |
| FGIC | 307 | Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP), dated 10/3/13 8:04 PM | | No objection – admitted |
| FGIC | 308 | Quarterly Report of the Emergency Manager, dated October 15, 2013 | | No objection – admitted |
| FGIC | 309 | Project Piston Cash Flow Forecast - through FY2017 (DIP Financing Scenario) (DTPPF00020367) | | No objection - admitted |
| | | | | |
| Ambac | 401 | Detroit City Code § 18-5-120 et seq. (Ambac Assumption Objection Ex. 1 [Dkt. 348-2]) | | No objection – admitted |
| Ambac | 402 | GRS Articles of Incorporation (Ambac Assumption Objection Ex. 2 [Dkt. 348-3]) | | No objection – admitted |
| Ambac | 403 | PFRS Articles of Incorporation (Ambac Assumption Objection Ex. 3 [Dkt. 348-4]) | | No objection – admitted |
| Ambac | 404 | Offering Circular for 2006 COPs (Ambac Assumption Objection Ex. 6 [Dkt. 348-7]) | | Hearsay; Relevance |
| Ambac | 405 | City of Detroit 2012 Comprehensive Annual Fiscal report (Ambac Assumption Objection Ex. 7 [Dkt. 348-8]) | | No objection – admitted |
| Ambac | 406 | Detroit City Code § 18-16-1 et seq. (Ambac Assumption Objection Ex. 8 [Dkt. 348-9]) | | No objection - admitted |

12

13-53846-tjt   Doc 4723   Filed 05/12/14   Entered 05/12/14 15:29:32   Page 588 of 594
13-53846-swr   Doc 2357   Filed 05/12/14   Entered 05/12/14 16:57:44   Page 126 of 154

| | | | |
|---|---|---|---|
| Ambac | * | Ambac reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| Ambac | ** | Ambac reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| Ambac | *** | Ambac reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. No. 17/.157 and 1520. | Objections Reserved |
| <td colspan="4" style="background:red"></td> |
| EEPK | 801 | Solicitation Materials to Prospective Lenders (Letter and Term Sheet) (DTPPF00016682) | No objection – admitted |
| EEPK | 802 | Post-Petition Financing Discussion dated September 26, 2013 (DTPPF00020215) | No objection – admitted |
| EEPK | 803 | Bond Purchase Agreement - Quality of Life Loan | No objection – admitted |
| EEPK | 804 | Engagement Letter for Exit Financing (DTPPF00012973) | No objection – admitted |
| EEPK | 805 | City Council Resolution | No objection - admitted |
| EEPK | 806 | Email correspondence and attachments (DTPPF00000162) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| <td colspan="4" style="background:red"></td> |
| Retirement Systems | 1001 | Emails between Anne Langan and Irv Corley dated October 14, 2013 (DTPPF00002139) | Relevance; Hearsay |
| Retirement Systems | 1002 | Email from Jonathan Stern to James Doak dated October 2, 2013 (DTPPF00013241) | Hearsay |
| Retirement Systems | 1003 | Emails from James Doak dated August 29 and 30, 2013 (DTPPF00004951-4952); | Admitted over objection on 12/18/2013 |
| Retirement Systems | 1004 | Email from Thomas Gavin dated 11/8/2013 (SOM20009484); | Hearsay |
| Retirement Systems | 1005 | Email from Thomas Gavin to James Doak with attached Orrick legal opinion | Admitted on 12/18/2013 to show what he did |
| Retirement Systems | 1006 | Email from Thomas Gavin to Irvin Corley dated 10/21/2013 | Hearsay |
| Retirement Systems | 1007 | Memorandum dated 10/24/2013 from Brett Hartzell to Kevyn Orr re request for reallocation of $95 million for FY2014 budget (Moore Dep Ex. 11; Orr Dep. Ex. 3) | Relevance |
| Retirement Systems | 1008 | Response, dated September 16, 2013, received from the Michigan | Document Missing - Objection Reserved |

| | | | |
|---|---|---|---|
| Retirement Systems | 1009 | Addendum #1 to Change Order #1 regarding Miller Buckfire contract | Relevance |
| Retirement Systems | 1010 | Email from James Doak to Jones Day forwarding email from Thomas Gavin | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1011 | Emails from Jerry Pokorski dated October 24, 2013 (DTPPF00020413-14); | Hearsay; Relevance |
| Retirement Systems | 1012 | City Council Resolution denying DIP financing; | No objection – admitted |
| Retirement Systems | 1013 | Email correspondence between James Bonsall, Kevyn Orr and James Doak dated October 9, 2013 (DTPPF0019241-42); | No objection - admitted |
| Retirement Systems | 1014 | Email correspondence from David A. Hall regarding Responses to Inquiries of City Council Regarding Postpetition Financing and its attachment (DTPPF00020357-366) | No objection – admitted |
| Retirement Systems | 1015 | November 6, 2013 correspondence from Harold W. Bulger, Jr., Miller Canfield, Paddock and Stone, P.L.C. to Mr. Harlan Goodrich, Secretary, Local Emergency Financial Assistance Loan Board, and attachments (DTPPF00020232-356); | No objection - admitted |
| Retirement Systems | 1016 | Email from Corinne Ball to Jeffrey B. Ellman dated January 15, 2013 (DTMI00235218, RSCD Exhibit 866-001) | Hearsay; Impermissible Legal Opinion; Speculation |
| Retirement Systems | 1017 | Memoranda dated October 16 and 17, 2013 – with handwritten notes – regarding post-petition financing (DTPPF00020380-8, DTPPF00020389-93, DTPPF00020401-12). | Hearsay; Compendium Exhibit |
| Retirement Systems | 1018 | Email from James Doak to Irvin Corley, Jr. dated October 16, 2013 (DTPPF00020423-24). | Relevance |
| Retirement Systems | 1019 | Email with attachment from James Doak to Irvin Corley, Jr., dated October 21, 2013 (DTPPF00020419-22). | No objection - admitted |
| Retirement Systems | 1020 | Handwritten notes of Irvin Corley, Jr., regarding post-petition financing (DTPPF00020415-18). | Hearsay; Relevance |
| Retirement Systems | 1021 | Handwritten notes of Irvin Corley, Jr., and others regarding postpetition financing, October 15, 22 and 25, 2013 (DTPPF00020382-88, DTPPF00020394-400, DTPPF00020415-18). | Hearsay; Relevance; Compendium Exhibit |
| Retirement Systems | 1022 | Email and attachment from David A. Hall to Irvin Corley, Jr., dated October 20, 2013 (DTPPF00020357-66) (Langan Deposition Exhibit 5). | Duplicative of 1014 |
| Retirement Systems | | Any document used in any deposition; | Objections Reserved |

14

| | | | |
|---|---|---|---|
| Retirement Systems | | Any document attached to Dkt. Nos. 17, 157 and/or 1520; | Objections Reserved |
| Retirement Systems | | Any document listed by any other party; | Objections Reserved |
| Retirement Systems | | Any document necessary for rebuttal. | Objections Reserved |
| <span style="color:red"> </span> | | | |
| Sole | 1301 | 2009 Swap Confirmations -- Docket 1857-2, p 4 | No objection – admitted |
| Sole | 1302 | LIBOR Rates | Hearsay; Completeness Legibility |
| Sole | 1303 | Barclay Loan Terms | No objection - admitted |
| Sole | 1304 | Barclay Commitment Letter | Misidentified document |
| Sole | 1305 | $95 million appropriation for "restructuring" | No objection - admitted |
| Sole | 1306 | Automatic Stay Order | No objection - admitted |
| Sole | 1307 | Fitch and Standard and Poors at City Council table – Docket 1857-4, p 14 | Hearsay; Relevance |
| Sole | 1308 | City Council resolution disapproving Barclay loan -- Docket 1857-4, p 15 | No objection - admitted |
| Sole | 1309 | City Council resolution calling for SEC investigation | Misidentified document |
| Sole | 1310 | Turbeville CV (attached) | No objection - admitted |
| Sole | 1311 | Demos report, The Detroit Bankruptcy, dated November 2013 (attached) | Hearsay |
| Sole | 1312 | July 2006 POC and Interest Rate Swap documents | No objection - admitted |
| Sole | 1313 | 2006 POC reflecting no security interest – Docket 361-5- p. 2 | Completeness |
| Sole | 1314 | June 2009 Amended POC and Interest Rate Swap documents -- Confirmations and City 4 and 5 | No objection - admitted |
| Sole | 1315 | May 12, 2013 EM Financial Plan Docket 361-6, p 4 | Completeness |
| Sole | 1316 | July 14, 2013 EM Financial Report to Creditors – Orr, August 30, 2013 deposition, Exhibit 6 | No objection - admitted |
| Sole | 1317 | Bloomberg article on Termination Fees | Hearsay; Relevance |
| Sole | 1318 | BBC article on UBS Libor rigging | Hearsay; Relevance |
| Sole | 1319 | Article on ISDA Fix | Relevance; Improper Expert Testimony |

15

13-53846-tjt   Doc 4728   Filed 05/12/14   Entered 05/12/14 15:29:32   Page 591 of 594
13-53846-swr   Doc 2857   Filed 05/01/14   Entered 05/01/14 16:57:44   Page 591 of 594

| | | | |
|---|---|---|---|
| Sole | 1320 | Articles on conviction of UBS executive and indictment of BofA executive | Hearsay; Relevance |
| Sole | 1321 | Final Judgment on UBS municipal bond rigging | Hearsay; Relevance |
| Sole | 1322 | Article on BofA Muni misdoing | Hearsay; Relevance |
| Sole | 1323 | Article on UBS sub-prime lending | Hearsay; Relevance |
| Sole | 1324 | Senate Select Committee Report on Wall Street and the Financial Crisis | Hearsay; Relevance; Improper Expert Testimony |
| Sole | 1325 | Detroit Retirement Fund lawsuit against UBS for mortgage fraud -- Docket 361-9 | Hearsay; Relevance |
| Sole | 1326 | City of Detroit, January 2009 Planning and Development Department Neighborhood Stablization Program Plan | Relevance; Completeness |
| Sole | 1327 | Gavin email -- DTPPF00000162-173 (Orrick Memorandum) | Hearsay; Relevance; Impermissible Legal Opinion; Speculation |
| Sole | 1328 | July 31, 2012 SEC Report on the Municipal Market Securities Market, www.sec.gov/spotlight/municipalsecurities. | Admitted over objection on 12/17/2013 |
| Sole | 1329 | Sean Werdlow biography -- http://sbsco.com/firmPage/firm1/bankingteam/seanwerdlow.aspx | Relevance |
| Sole | 1330 | 2009 City Council Resolution | Non-specific; Non-compliant with Local Rule 7016-1(a)(9) |
| Sole | 1331 | Tuberville Revised Expert Report | Hearsay; Timeliness |
| | | | |
| NPFG | 1 | Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated October 15, 2013 | No objection - admitted |
| NPFG | 2 | Emergency Manager Report Pursuant to Section 17 of Local Financial | No objection - admitted |
| NPFG | * | National reserves the right to use any Exhibits listed by the Debtor with respect to the Hearing regarding Dkt. Nos. 17/157, and 1520. | Objections Reserved |
| NPFG | ** | National reserves the right to use any Exhibits marked or identified in depositions of the Debtor's and Objectors' witnesses with respect to Dkt. Nos. 17/157 and 1520. | Objections Reserved |
| NPFG | *** | National reserves the right to use any Exhibits listed by any of the other Objectors with respect to the Hearing regarding Dkt. Nos. 17/157 and 1520. | Objections Reserved |

Dated:  January 2, 2014          Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

- and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

*Counsel for the City of Detroit*

17

## CERTIFICATE OF SERVICE

I, Bruce Bennett, hereby certify that the foregoing Amended Exhibit Lists and Objections was filed and served via the Court's electronic case filing and noticing system on this 2nd day of January, 2014.

/s/ Bruce Bennett