# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

----------------------------------------------------x
:
In re                         :        Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :        Case No. 13-53846
:
            Debtor.       :        Hon. Steven W. Rhodes
:
:
----------------------------------------------------x

## OBJECTION OF THE CITY OF DETROIT, PURSUANT TO SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1, TO PROOF OF CLAIM NUMBER 1404 FILED BY ERNEST FLAGG, AS NEXT FRIEND OF JONATHON BOND, A MINOR

The City of Detroit (the "City") hereby: (a) objects, pursuant to sections 105 and 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 3007-1 of the Local Rules of the Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") to proof of claim number 1404 (the "Claim") filed by Ernest Flagg, as next friend of Jonathon Bond, a minor (the "Claimant") because the City has no liability to the Claimant on account of the Claim; and (b) seeks the entry of an order, substantially in the form attached hereto as Exhibit 1 (the "Proposed Order"), disallowing and expunging the Claim.

A copy of the Claim is attached hereto as <u>Exhibit 2</u>. In support of this Objection, the City respectfully represents as follows:

## <u>General Background</u>

1.      On July 18, 2013, the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

2.      As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities). As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

3.      In February 2013, a state review team determined that a local government financial emergency exists in the City. Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "<u>Emergency Manager</u>") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, <u>et</u> <u>seq.</u> ("<u>PA 436</u>"). Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case. MCL § 141.1558.

4.      On May 5, 2014, the City filed the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (as it may be

further amended, modified or supplemented from time to time, the "<u>Plan</u>") and the Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4391) (the "<u>Disclosure Statement</u>").  That same day, the Court entered the Order Approving the Proposed Disclosure Statement (Docket No. 4401), thereby approving the Disclosure Statement as containing "adequate information" with respect to the Plan, pursuant to section 1125(a)(1) of the Bankruptcy Code.

## Background Regarding the Claims Process

5.      On November 21, 2013, the Court entered the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782) (the "<u>Bar Date Order</u>"). The Bar Date Order established February 21, 2014 at 4:00 p.m., Eastern Time, as the general deadline for the filing of proofs of claim in the City's chapter 9 case.

6.      On December 24, 2013, the Court entered the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302) (the "<u>ADR Order</u>").  The ADR Order established procedures (the "<u>ADR Procedures</u>") for the liquidation of certain prepetition claims (collectively, the "<u>Designated Claims</u>").  In addition, the ADR Order provisionally

identified certain claims (collectively, the "Initial Designated Claims") as Designated Claims and, therefore, subject to the ADR Procedures. The Initial Designated Claims consist of: (a) personal injury tort or wrongful death claims, (b) property damage claims; and (c) claims, to the extent not satisfied in the ordinary course, relating to the operation of motor vehicles for which the City is self-insured pursuant to chapter 31 of Michigan's Insurance Code of 1956, M.C.L. §§ 500.3101, et seq. The ADR Order further referred for mediation all lawsuits alleging claims under 42 U.S.C. § 1983 that are pending in the United States District Court for the Eastern District of Michigan (the "District Court") to Chief United States District Judge Gerald Rosen ("Chief Judge Rosen"). ADR Order, at ¶ 20.

## Relief Requested

7. Pursuant to sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, the City seeks the entry of an order disallowing and expunging the Claim because the Claim asserts alleged liabilities that have already been adjudicated on a final basis in the City's favor.

## The Court's Jurisdiction to Disallow and Expunge the Claim

8. This Court has jurisdiction to consider this matter pursuant to section 1334 of title 28 of the United States Code (the "Judicial Code"). Venue is proper before this Court pursuant to sections 1408 and 1409 of the Judicial Code.

9. Section 157(b) of the Judicial Code sets forth various "core proceedings" with respect to which bankruptcy courts are authorized to enter final orders, subject only to appellate review under section 158 of the Judicial Code. See 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.").

10. Section 157(b)(2) of the Judicial Code provides a nonexclusive list of core proceedings, including proceedings for the "allowance or disallowance of claims,"[1] but excepts from such proceedings "the liquidation or estimation of

---

[1]      With respect to the allowance and disallowance of claims, section 157(b)(2)(B) of the Judicial Code provides that core proceedings include proceedings for the:

> allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11 . . . .

28 U.S.C. § 157(b)(2)(B).  As a technical matter, therefore, section 157(b) of the Judicial Code does not provide that proceedings relating to the allowance or disallowance of claims against a chapter 9 debtor constitute core proceedings because there is no estate in chapter 9.  See 11 U.S.C. § 901 (not incorporating into chapter 9 practice section 541 of the Bankruptcy Code, which provides for the creation of the estate).  Nevertheless, the

contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11" (any such claim, a "Tort/Wrongful Death Claim").  28 U.S.C. § 157(b)(2)(B); see also 28 U.S.C. § 157(b)(2)(O) (providing that "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship" constitute core proceedings "except personal injury tort or wrongful death claims").

11.     The Judicial Code further provides that Tort/Wrongful Death Claims "be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending."  28 U.S.C. § 157(b)(5).

12.     The Judicial Code therefore establishes that the trial of Tort/Wrongful Death claims for the purpose of liquidating or estimating the claims be conducted in the appropriate district court.  Courts consistently hold, however, that threshold challenges to the validity of Tort/Wrongful Death Claims may be adjudicated on a final basis by bankruptcy courts.  See, e.g., In re Chateaugay Corp., 111 B.R. 67, 73-74 (Bankr. S.D.N.Y. 1990) (where debtors filed objections to numerous Personal Injury Claims on grounds that such claims were (a) asserted

---

allowance and disallowance of claims is equally central to the bankruptcy process in chapter 9, and the enumerated list of core proceedings in section 157 of the Judicial Code is expressly nonexclusive.

against the wrong defendants and (b) barred by the "government contractor defense," holding that the bankruptcy court had jurisdiction to resolve the objections because "[a]lthough [section] 157(b)(2)(B) restricts a bankruptcy court's power to liquidate or estimate personal injury tort or wrongful death claims for purposes of distribution, *it imposes no corollary restriction upon a bankruptcy court's ability to disallow such claims in the first instance if they are not sustainable at law*") (emphasis added), aff'd in relevant part and rev'd on other grounds, 146 B.R. 339 (S.D.N.Y. 1992); In re Dow Corning Corp., 215 B.R. 346, 352 (Bankr. E.D. Mich. 1997) (where the debtor (a) objected to certain Personal Injury Claims on grounds that the claimants could not scientifically prove that the claimants' injuries were caused by the debtor's products and (b) moved for summary judgment seeking disallowance of all similar claims, applying Chateaugay in holding that "a bankruptcy court may enter a final order on a motion for summary judgment disallowing a personal injury claim without running afoul of the 'but not the liquidation' clause of [section] 157(b)(2)(B)"), modified, 215 B.R. 526 (Bankr. E.D. Mich. 1997) (recommending withdrawal of reference for purposes of judicial economy); In re UAL Corp., 310 B.R. 373, 383 (Bankr. N.D. Ill. 2004) (relying upon Dow Corning, among other cases, in holding that the bankruptcy court had jurisdiction to sustain debtors' objection seeking disallowance of a personal injury claim; "[A]n objection to the legal validity of a

personal injury tort claim does not fall within the personal injury exception to the core bankruptcy jurisdiction conferred by [section] 157(b)(2)(B), and this court may enter a final order dealing with the debtors' pending objection to the [claimants'] claim.").

13.     The City believes that the Claim may be a Tort/Wrongful Death Claim within the meaning of section 157 of the Judicial Code.  The City has reviewed the Claim, however, and has determined that threshold infirmities render the Claim invalid against the City as a matter of law.  Specifically, as more fully discussed below, the Claim asserts alleged liabilities that already have been adjudicated on a final basis in the City's favor.  Accordingly, this proceeding is a core proceeding, and the Court is authorized to enter a final order disallowing and expunging the Claim.

## Request to Disallow the Claim

14.     Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a debtor only to the extent that it has a "right to payment" for the asserted liability.  See 11 U.S.C. §§ 101(5), 101(10).[2]  By contrast, there is no right to payment — and therefore no claim — to the extent that the asserted

---

[2]     Section 101(10) of the Bankruptcy Code defines a "creditor" in pertinent part as "an entity that has a claim against the debtor."  11 U.S.C. § 101(10). Section 101(5) in turn defines a "claim" as a "right to payment" or "the right to an equitable remedy for breach of performance if such breach gives rise to a right for payment."  11 U.S.C. § 101(5).

liability is not due and owing by a debtor.  Section 502(b)(1) of the Bankruptcy

Code further provides that a claim asserted in a proof of claim shall be allowed,

except to the extent "such claim is unenforceable against the debtor and property of

the debtor, under any agreement or applicable law."  11 U.S.C. §502(b)(1).[3]

        15.    The City has reviewed the Claim and the alleged facts and

circumstances surrounding the Claim and has determined that the Claim is not a

valid liability of the City.  The Claim asserts damages in the amount of

$154,999,979.33 arising from a lawsuit in the District Court (the "Lawsuit")

against the City, former mayor Kwame Kilpatrick (together with the City,

the "Remaining Defendants") and certain other defendants that were voluntarily

dismissed from the Lawsuit by the Claimant and the other plaintiffs (collectively,

the "Plaintiffs").  The Lawsuit alleged counts of denial of, and conspiracy to deny,

access to the courts in connection with the homicide of Tamara Greene on April 3,

2003.  See Claim, at Ex. 4.  On November 1, 2011, Chief Judge Rosen entered his

opinion and order granting the motions for summary judgment of the Remaining

Defendants and thereafter dismissed the Lawsuit.  A copy of the District Court's

Judgment of Dismissal is attached hereto as Exhibit 3.  On April 25, 2013, the

United States Court of Appeals for the Sixth Circuit (the "Sixth Circuit") entered

---

[3]      Section 502 of the Bankruptcy Code is made applicable in the City's
chapter 9 case by section 901 of the Bankruptcy Code.  See 11 U.S.C. § 901.

-9-

its Judgment, a copy of which is attached hereto as <u>Exhibit 4</u>, affirming the District Court's Judgment of Dismissal.  On June 18, 2013, the Sixth Circuit further entered an order, a copy of which is attached as <u>Exhibit 5</u>, denying a rehearing <u>en</u> <u>banc</u> of the Plaintiffs' appeal.  The District Court's Judgment of Dismissal is now final.  The City therefore has determined that the Claimant possesses no right to payment on account of the Claim, and the Claim should be disallowed.

## Reservation of Rights

16.     The City files this Objection without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

## Notice

17.     Notice of this Objection has been given to the Claimant and all parties that have requested notice in this case pursuant to Bankruptcy Rule 2002.  The City submits that no other or further notice need be provided.

## No Prior Request

18.     No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, the City respectfully requests that the Court: (a) enter the Proposed Order granting the relief requested herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated:  May 15, 2014                    Respectfully submitted,


                                         /s/  Heather Lennox
                                        David G. Heiman (OH 0038271)
                                        Heather Lennox (OH 0059649)
                                        Thomas A. Wilson (OH 0077047)
                                        JONES DAY
                                        North Point
                                        901 Lakeside Avenue
                                        Cleveland, Ohio  44114
                                        Telephone:  (216) 586-3939
                                        Facsimile:  (216) 579-0212
                                        dgheiman@jonesday.com
                                        hlennox@jonesday.com
                                        tawilson@jonesday.com

                                        Bruce Bennett (CA 105430)
                                        JONES DAY
                                        555 South Flower Street
                                        Fiftieth Floor
                                        Los Angeles, California 90071
                                        Telephone:  (213) 243-2382
                                        Facsimile:  (213) 243-2539
                                        bbennett@jonesday.com

                                        John A. Simon (P61866)
                                        Tamar N. Dolcourt (P73425)
                                        FOLEY & LARDNER LLP
                                        500 Woodward Avenue, Suite 2700
                                        Detroit, Michigan 48226
                                        Telephone:  (313) 234-7100
                                        Facsimile:  (313) 234-2800
                                        jsimon@foley.com
                                        tdolcourt@foley.com

                                        ATTORNEYS FOR THE CITY

Form B20B (Official Form 20B)
12/1/2010

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Michigan

In re:

**CITY OF DETROIT, MICHIGAN,**

**Chapter: 9**

**Case No.: 13-53846**

          **Debtor.**

**Judge:  Hon. Steven W. Rhodes**

Address:  2 Woodward Avenue, Suite 1126
      Detroit, Michigan  48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any):  38-6004606

## NOTICE OF OBJECTION OF THE CITY OF DETROIT, PURSUANT TO SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1, TO PROOF OF CLAIM NUMBER 1404 FILED BY ERNEST FLAGG, AS NEXT FRIEND OF JONATHON BOND, A MINOR

The City of Detroit (the "<u>City</u>") has filed an objection to your claim in this bankruptcy case.

**<u>Your claim may be reduced, modified, or denied.</u>  You should read these papers carefully and discuss them with your attorney, if you have one.**

If you do not want the Court to deny or change your claim, then on or before June 18, 2014, you or your lawyer must:

1.      File with the Court a written response to the objection, explaining your position, at:

**United States Bankruptcy Court**
United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, Michigan  48226

If you mail your response to the Court for filing, you must mail it early enough so that the Court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

You must also mail a copy to:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539

John A. Simon, Esq.
Tamar N. Dolcourt, Esq.
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone:  (313) 234-7100
Facsimile:  (313) 234-2800

2.      Attend the hearing on the objection, scheduled to be held on June 25, 2014, at 10:00 a.m. in Courtroom 100, Theodore Levin U.S. Courthouse, 231 W. Lafayette, Detroit, Michigan 48226, unless your attendance is excused by mutual agreement between yourself and counsel for the City.  (Unless the matter is disposed of summarily as a matter of law, the hearing shall be a pre-trial conference only; neither testimony nor other evidence will be received.  A pre trial scheduling order may be issued as a result of the pre-trial conference.)

**If you or your attorney do not take these steps, the Court may deem that you do not oppose the objection to your claim, in which event the hearing will be canceled, and the objection sustained.**

Dated:  May 15, 2014    Respectfully submitted,


    /s/  Heather Lennox
    David G. Heiman (OH 0038271)
    Heather Lennox (OH 0059649)
    Thomas A. Wilson (OH 0077047)
    JONES DAY
    North Point
    901 Lakeside Avenue
    Cleveland, Ohio  44114
    Telephone:  (216) 586-3939
    Facsimile:  (216) 579-0212
    dgheiman@jonesday.com
    hlennox@jonesday.com
    tawilson@jonesday.com

    Bruce Bennett (CA 105430)
    JONES DAY
    555 South Flower Street
    Fiftieth Floor
    Los Angeles, California 90071
    Telephone:  (213) 243-2382
    Facsimile:  (213) 243-2539
    bbennett@jonesday.com

    John A. Simon (P61866)
    Tamar N. Dolcourt (P73425)
    FOLEY & LARDNER LLP
    500 Woodward Avenue, Suite 2700
    Detroit, Michigan 48226
    Telephone:  (313) 234-7100
    Facsimile:  (313) 234-2800
    jsimon@foley.com
    tdolcourt@foley.com

    ATTORNEYS FOR THE CITY

ATI-2604530v1    -3-

13-53846-tjt  Doc 4854  Filed 05/15/14  Entered 05/15/14 15:22:26  Page 15 of 116

# **EXHIBIT 1**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                      :
In re                                 :        Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            :        Case No. 13-53846
                                      :
                         Debtor.      :        Hon. Steven W. Rhodes
                                      :
                                      :
                                      :
-------------------------------------------------------x
```

## ORDER DISALLOWING AND EXPUNGING
## CLAIM NUMBER 1404 FILED BY ERNEST FLAGG,
## AS NEXT FRIEND OF JONATHON BOND, A MINOR

This matter coming before the Court on the Objection of the City of

Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy

Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 1404 Filed by Ernest

Flagg, as Next Friend of Jonathon Bond, a Minor (the "Objection"),[1] filed by the

City of Detroit (the "City"); the Court having reviewed the Objection and having

heard the statements of counsel regarding the relief requested in the Objection at a

hearing before the Court (the "Hearing"); the Court finding that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2) and (c) notice of the Objection

---

[1]     Capitalized terms not otherwise defined herein have the meanings given to
them in the Objection.

ATI-2604530v1

and the Hearing was sufficient under the circumstances and in full compliance with the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules; and the Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Objection is SUSTAINED.

2.      Pursuant to section 502(b) of the Bankruptcy Code, the Claim is disallowed and expunged in its entirety.

3.      The City, the City's claims and noticing agent and the Clerk of this Court are authorized to take any and all actions that are necessary or appropriate to give effect to this Order.

# **EXHIBIT 2**

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT   EASTERN DISTRICT of MICHIGAN | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor:<br><br>City of Detroit, Michigan | Case Number:<br><br>13-53846 |
|---|---|

**FILED**

FEB 1 8 2014

US Bankruptcy Court
MI Eastern District

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Ernest Flagg, as Next Friend of Jonathan Bond, a mino

Name and address where notices should be sent:
Norman Yatooma & Associates, P.C.
1900 South Telegraph Road, Suite 201
Bloomfield Hills, MI 48302

Telephone number: (248) 481-2000     email:  jbaker@normanyatooma.com

❑ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
   (*If known*)

Filed on:_____

Name and address where payment should be sent (if different from above):




Telephone number:          email:

❑ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim.  Attach copy of statement giving particulars.

1. **Amount of Claim as of Date Case Filed:**     $_____154,999,979.33

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

**RECEIVED**

FEB 2 4 2014

**KURTZMAN CARSON CONSULTANTS**

☑Check this box if the claim includes interest or other charges in addition to the principal amount of the claim.  Attach a statement that itemizes interest or charges.

2. **Basis for Claim:**  See Attached Exhibits _____
   (See instruction #2)

3. **Last four digits of any number by which creditor identifies debtor:**

   7  2  9  2

**3a. Debtor may have scheduled account as:**

   _____
   (See instruction #3a)

**3b. Uniform Claim Identifier (optional):**

   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
   (See instruction #3b)

4. **Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❑Real Estate  ❑Motor Vehicle  ❑Other
**Describe:**

**Value of Property: $**_____

**Annual Interest Rate**_____% ❑Fixed  or  ❑Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

   $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____

**Amount Unsecured:** $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).  If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

❑ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

❑ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

❑ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

❑ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

❑ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

❑ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

6. **Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

13538461402180000000000068

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

RECEIVED

FEB 2 4 2014

KURTZMAN CARSON CONSULT...

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.   ☑ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor,   ☐ I am a guarantor, surety, indorser, or other codebtor.
or their authorized agent.   (See Bankruptcy Rule 3005.)
(See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

| | | |
|---|---|---|
| Print Name: | Howard Yale Lederman | |
| Title: | Attorney | |
| Company: | Norman Yatooma & Associates, P.C. | /s/ Howard Yale Lederman           02/14/2014 |
| Address and telephone number (if different from notice address above): | 1900 South Telegraph Road, Suite 201 | (Signature)                           (Date) |
| | Bloomfield Hills, MI 48302 | |

Telephone number: (248) 481-2000   email: hlederman@normanyatooma.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## FLAGG PROOF OF CLAIM LIST OF EXHIBITS

Exhibit 1, 10/26/07 Ernest G. Flagg-Norman Yatooma & Associates Engagement Agreement.

Exhibit 2, 4/21/08 Brian D. Greene-Norman Yatooma & Associates Engagement Agreement.

Exhibit 3, 4/21/08 Taris A. Jackson-Norman Yatooma & Associates Engagement Agreement.

Exhibit 4, 11/7/05 Flagg v. City of Detroit Original Summons & Complaint.

Exhibit 5, 9/5/08 Flagg v. City of Detroit Third Amended Complaint.

Exhibit 6, 2/13/14 Flagg Proof of Claim Amounts.

flagg\notes and memos\proof of claim list of exhibits 02 13 14

# Exhibit 1



October 26, 2007

Mr. Ernest G. Flagg
1099 Van Dyke, Apt. 304           **VIA HAND DELIVERY**
Detroit, MI 48219
ernestgflagg@comcast.net

RE:    Attorney Engagement Agreement

Dear Mr. Flagg:

This letter will serve to confirm the engagement of Norman Yatooma & Associates, P.C. ("The Firm") as legal counsel on behalf of Mr. Ernest Flagg, individually and as next friend and parent of Jonathan Bond ("The Client"). We have agreed that The Firm will represent The Client in connection with a certain lawsuit pending before the Honorable Gerald Rosen in the United States District Court, Eastern District of Michigan, and assigned case number 05CV74253. ("The Litigation").

We have agreed to the following terms and conditions with respect to The Firm's legal representation of The Client:

1.    Engagement of The Firm. The Client retains and engages The Firm in the legal representation of The Client. The Firm accepts this engagement and agrees to represent The Client in this matter. The Firm may, however, terminate this Agreement and its representation of The Client at any time, and, specifically, if The Client is in breach of any obligations under this Agreement, or if The Firm is otherwise required or permitted to do so in accordance with the rules of professional conduct governing attorneys as adopted by the Supreme Court for the State of Michigan.

2.    Retainer and Compensation of The Firm. The Firm's fees for attorneys range from $195.00 to $475.00 per hour and $150.00 per hour for any legal assistant that The Firm, in its sole discretion, shall utilize. The Firm's hourly rates for services may be increased from time to time. The Firm has, however, waived its hourly fees in favor of its contingent fee. The Client shall pay The Firm a contingent fee in the amount of one-third (1/3) of the net amount of any recovery in The Litigation, whether by judgment at trial, arbitration award, settlement, debt reduction, sale of property, or otherwise, if the Litigation that is commenced on behalf of the Client is filed against any third party and/or entity.

The fees shall be paid as follows:

a.    Minimum and Continuous Retainer. The Firm has waived the retainer.

     b.    <u>Billing Statements.</u>  Billing statements shall include costs and expenses of The Firm's Litigation.  The Client agrees to pay The Firm's statement upon receipt.

    3.    <u>Payment of Costs and Expenses.</u>  In addition to paying fees for legal services, The Client is responsible for and agrees to pay all out-of-pocket costs and expenses that The Firm incurs in representing The Client.  These costs and expenses include, but are not limited to, filing fees and other court costs, expert fees, witness fees, deposition and transcript costs, court reporting fees, investigation expenses, document reproduction costs, travel expenses, and costs for all forms of mailing and telephone charges.  The Firm shall, at its own option, either pay such expenses on The Client's behalf and submit statements to The Client for reimbursement, or forward statements for such expenses to The Client for direct payment to the third parties owed for such expenses.  If paid by The Firm, any costs and expenses shall be billed to and paid by The Client, in accordance with paragraph 2 above.  Costs and expenses paid by the Client shall be subtracted from the gross recovery before calculation of any contingency fee recovery.

    4.    <u>No Estimate of Total Bills.</u>  The Client understands that the ultimate amount of costs and expenses are a factor of the nature and complexity of The Firm's representation.  It can neither be estimated nor determined in advance how long it will take to complete this matter, nor can it be determined in advance what amount of fees will be generated or what amount of costs and expenses will be incurred in The Litigation by The Firm

    5.    <u>Late Payment.</u>  If the costs or expenses are not paid in full within thirty (30) days of mailing the statements, The Client's balance shall accrue compound interest at the rate of 7% from the date of mailing the unpaid statement(s) until such amount is repaid by The Client in full; provided, however, that such rate shall not exceed the maximum rate permitted by law.  In that event, The Client shall pay the maximum rate allowed by law.

    6.    <u>Settlements.</u>  The Firm shall inform The Client of any offers or counteroffers that are made to settle the dispute and The Firm shall not settle any claims without the approval of The Client.

    7.    <u>The Firm Lien.</u>  The Client hereby grants to The Firm all general, possessory, and retaining liens, and all special or charging liens known to common law, for The Firm's unpaid fees, costs, and expenses, on any money, property, or forgiveness of debt recovered in the matter from any source by judgment at trial, arbitration award, settlement, sale of property, or otherwise, and hereby irrevocably directs that any check or draft in settlement of payment of The Client's claims be made payable to The Firm.  The Firm is entitled to receive the money and/or properties recovered and deduct the amounts owed before delivering the balance to The Client.

    8.    <u>No Guarantee.</u>  The Firm has not made and does not make any promise or guarantee concerning the potential outcome of The Firm's representation.

    9.    <u>Scope of Agreement.</u>  The Firm agrees to provide services under this Agreement through and including judgment after a trial, or arbitration award, on the merits of The Client's claims.  This Agreement does not cover any additional proceedings after the judgment or award,

including new trials, post-judgment/award motions and proceedings, appeals, and proceedings to enforce or collect on the judgment, award, or settlement.

10.   Disclosure.  The Client agrees that The Firm may disclose representation of The Client in The Firm's publications, through the media, or otherwise.

11.   Entire Agreement.  This Agreement constitutes the full understanding of the parties.  There are no other prior written or oral agreements between the parties concerning the subject matter of this Agreement, and any prior agreements are merged into and superseded by this Agreement.

12.   Modifications.  The terms of this Agreement may only be modified by a future writing that is signed by both The Client and The Firm.

13.   Counterparts.  This Agreement can be executed in one or more counterparts, each and all of which shall be deemed for all purposes to be one and the same Agreement enforceable in accordance with the terms and conditions contained herein.

14.   Miscellaneous.

a.   It is understood and agreed that should any provision of this Agreement be found to be unenforceable, such unenforceable provision shall not affect the remaining portions or provisions of this Agreement.

b.   This Agreement is binding on, and shall inure to the benefit of, the successors and assigns of the parties, and shall not be assignable except with the prior written consent of all the parties hereto.

c.   This Agreement shall not be construed against either of the parties.

d.   This Agreement shall be governed by the laws of the State of Michigan, County of Oakland, which is hereby designated as the exclusive forum for the litigation of any disputes arising out of this Agreement.  In the event The Firm incurs any attorneys' fees, court costs or other costs or expenses enforcing the obligations of The Client under this Agreement, The Client shall reimburse The Firm for all such attorneys' fees, costs and expenses incurred by The Firm upon demand, in addition to any other damages to which The Firm may be entitled.  The Client agrees that the Oakland County Circuit Court of the State of Michigan shall issue such an Order.

e.   The undersigned certify that they have read the foregoing terms of this Agreement and that they fully understand the provisions stated herein and have agreed to the same.

f.   RELEASE OF CLAIMS AND WAIVER OF LIABILITY FOR PRE-EXISTING ACTS OR OMISSIONS:  Client understands that The Litigation has been pending for almost two years prior to retaining The Firm to represent The Client in The



Litigation. Client hereby releases The Firm, its attorneys, employees, shareholders, agents and principals from any and all liability for claims, sanctions, damages, losses, attorney fees, costs, complaints, whether known or unknown, that arose in whole or in part prior to The Firm's filing of an appearance in the Litigation on behalf of the Client. CLIENT ACKNOWLEDGES THAT HE HAS SOUGHT OUT THE ADVICE OF OTHER, INDEPENDENT COUNSEL BEFORE SIGNING THIS DOCUMENT, UNDERSTANDS THAT BY SIGNING THIS DOCUMENT THE CLIENT WAIVES THE RIGHT TO SUE THE FIRM FOR ALL CAUSES OF ACTION ARISING IN WHOLE OR IN PART PRIOR TO THE FILING OF FIRM'S APPEARANCE IN THE LITIGATION, AND AGREES TO SAME.

Please confirm your agreement to the above terms and conditions by signing this original Agreement and returning the same to the undersigned. Also, please retain a copy of the executed Agreement for your files.

I again wish to express my appreciation for the opportunity to serve your legal interests and look forward to continuing my affiliation with you in the future. As always, if you have any comments or questions regarding The Firm's legal representation, please feel free to contact me at your convenience.

NORMAN YATOOMA & ASSOCIATES, P.C.

By: _____
Robert S. Zawideh, Managing Attorney

The terms and conditions of this Engagement Agreement are agreed to and accepted this 26 day of October, 2007.

By:     Ernest G. Flagg, individually and as next friend to
Jonathan Bond

Signature: _____

# Exhibit 2



— Original —

April 21, 2008

Dr. Brian D. Greene
5914 Blue Jay Drive
Kalamazoo, MI 49009

RE:    **Attorney Engagement Agreement**

Dear Dr. Greene:

    This letter will serve to confirm the engagement of Norman Yatooma & Associates, P.C. ("The Firm") as legal counsel on behalf of Dr. Brian D. Greene, individually and as next friend and Guardian of India Bond ("The Client"). We have agreed that The Firm will represent The Client in connection with a certain lawsuit pending before the Honorable Gerald Rosen in the United States District Court, Eastern District of Michigan, and assigned case number 05CV74253. ("The Litigation").

    We have agreed to the following terms and conditions with respect to The Firm's legal representation of The Client:

    1.    <u>Engagement of The Firm.</u>  The Client retains and engages The Firm in the legal representation of The Client.  The Firm accepts this engagement and agrees to represent The Client in this matter.  The Firm may, however, terminate this Agreement and its representation of The Client at any time, and, specifically, if The Client is in breach of any obligations under this Agreement, or if The Firm is otherwise required or permitted to do so in accordance with the rules of professional conduct governing attorneys as adopted by the Supreme Court for the State of Michigan.

    2.    <u>Retainer and Compensation of The Firm.</u>  The Firm's fees for attorneys range from $195.00 to $475.00 per hour and $150.00 per hour for any legal assistant that The Firm, in its sole discretion, shall utilize.  The Firm's hourly rates for services may be increased from time to time.  The Firm has, however, waived its hourly fees in favor of its contingent fee.  The Client shall pay The Firm a contingent fee in the amount of one-third (1/3) of the net amount of any recovery in The Litigation, whether by judgment at trial, arbitration award, settlement, debt reduction, sale of property, or otherwise, if the Litigation that is commenced on behalf of the Client is filed against any third party and/or entity.

    The fees shall be paid as follows:

    a.    <u>Minimum and Continuous Retainer.</u>  The Firm has waived the retainer.

219 ELM STREET • BIRMINGHAM, MI 48009-6306 • TEL: (248) 642-3600 • FAX: (248) 642-3601
WWW.NORMANYATOOMA.COM • EMAIL: INFO@NORMANYATOOMA.COM

13-53846-tjt   Doc 4854   Filed 05/15/14   Entered 05/15/14 15:22:26   Page 29 of 116

      b.    <u>Billing Statements.</u> Billing statements shall include costs and expenses of The Firm's Litigation. The Client agrees to pay The Firm's statement upon receipt.

      3.    <u>Payment of Costs and Expenses.</u> In addition to paying fees for legal services, The Client is responsible for and agrees to pay all out-of-pocket costs and expenses that The Firm incurs in representing The Client. These costs and expenses include, but are not limited to, filing fees and other court costs, expert fees, witness fees, deposition and transcript costs, court reporting fees, investigation expenses, document reproduction costs, travel expenses, and costs for all forms of mailing and telephone charges. The Firm shall, at its own option, either pay such expenses on The Client's behalf and submit statements to The Client for reimbursement, or forward statements for such expenses to The Client for direct payment to the third parties owed for such expenses. If paid by The Firm, any costs and expenses shall be billed to and paid by The Client, in accordance with paragraph 2 above. Costs and expenses paid by the Client shall be subtracted from the gross recovery before calculation of any contingency fee recovery.

      4.    <u>No Estimate of Total Bills.</u> The Client understands that the ultimate amount of costs and expenses are a factor of the nature and complexity of The Firm's representation. It can neither be estimated nor determined in advance how long it will take to complete this matter, nor can it be determined in advance what amount of fees will be generated or what amount of costs and expenses will be incurred in The Litigation by The Firm

      5.    <u>Late Payment.</u> If the costs or expenses are not paid in full within thirty (30) days of mailing the statements, The Client's balance shall accrue compound interest at the rate of 7% from the date of mailing the unpaid statement(s) until such amount is repaid by The Client in full; provided, however, that such rate shall not exceed the maximum rate permitted by law. In that event, The Client shall pay the maximum rate allowed by law.

      6.    <u>Settlements.</u> The Firm shall inform The Client of any offers or counteroffers that are made to settle the dispute and The Firm shall not settle any claims without the approval of The Client.

      7.    <u>The Firm Lien.</u> The Client hereby grants to The Firm all general, possessory, and retaining liens, and all special or charging liens known to common law, for The Firm's unpaid fees, costs, and expenses, on any money, property, or forgiveness of debt recovered in the matter from any source by judgment at trial, arbitration award, settlement, sale of property, or otherwise, and hereby irrevocably directs that any check or draft in settlement of payment of The Client's claims be made payable to The Firm. The Firm is entitled to receive the money and/or properties recovered and deduct the amounts owed before delivering the balance to The Client.

      8.    <u>No Guarantee.</u> The Firm has not made and does not make any promise or guarantee concerning the potential outcome of The Firm's representation.

      9.    <u>Scope of Agreement.</u> The Firm agrees to provide services under this Agreement through and including judgment after a trial, or arbitration award, on the merits of The Client's claims. This Agreement does not cover any additional proceedings after the judgment or award,

including new trials, post-judgment/award motions and proceedings, appeals, and proceedings to enforce or collect on the judgment, award, or settlement.

10. <u>Disclosure.</u> The Client agrees that The Firm may disclose representation of The Client in The Firm's publications, through the media, or otherwise.

11. <u>Entire Agreement.</u> This Agreement constitutes the full understanding of the parties. There are no other prior written or oral agreements between the parties concerning the subject matter of this Agreement, and any prior agreements are merged into and superseded by this Agreement.

12. <u>Modifications.</u> The terms of this Agreement may only be modified by a future writing that is signed by both The Client and The Firm.

13. <u>Counterparts.</u> This Agreement can be executed in one or more counterparts, each and all of which shall be deemed for all purposes to be one and the same Agreement enforceable in accordance with the terms and conditions contained herein.

14. <u>Miscellaneous.</u>

a. It is understood and agreed that should any provision of this Agreement be found to be unenforceable, such unenforceable provision shall not affect the remaining portions or provisions of this Agreement.

b. This Agreement is binding on, and shall inure to the benefit of, the successors and assigns of the parties, and shall not be assignable except with the prior written consent of all the parties hereto.

c. This Agreement shall not be construed against either of the parties.

d. This Agreement shall be governed by the laws of the State of Michigan, County of Oakland, which is hereby designated as the exclusive forum for the litigation of any disputes arising out of this Agreement. In the event The Firm incurs any attorneys' fees, court costs or other costs or expenses enforcing the obligations of The Client under this Agreement, The Client shall reimburse The Firm for all such attorneys' fees, costs and expenses incurred by The Firm upon demand, in addition to any other damages to which The Firm may be entitled. The Client agrees that the Oakland County Circuit Court of the State of Michigan shall issue such an Order.

e. The undersigned certify that they have read the foregoing terms of this Agreement and that they fully understand the provisions stated herein and have agreed to the same.

f. RELEASE OF CLAIMS AND WAIVER OF LIABILITY FOR PRE-EXISTING ACTS OR OMISSIONS: Client understands that The Litigation has been pending for almost two years prior to retaining The Firm to represent The Client in The

Litigation. Client hereby releases The Firm, its attorneys, employees, shareholders, agents and principals from any and all liability for claims, sanctions, damages, losses, attorney fees, costs, complaints, whether known or unknown, that arose in whole or in part prior to The Firm's filing of an appearance in the Litigation on behalf of the Client. CLIENT ACKNOWLEDGES THAT HE HAS SOUGHT OUT THE ADVICE OF OTHER, INDEPENDENT COUNSEL BEFORE SIGNING THIS DOCUMENT, UNDERSTANDS THAT BY SIGNING THIS DOCUMENT THE CLIENT WAIVES THE RIGHT TO SUE THE FIRM FOR ALL CAUSES OF ACTION ARISING IN WHOLE OR IN PART PRIOR TO THE FILING OF FIRM'S APPEARANCE IN THE LITIGATION, AND AGREES TO SAME.

Please confirm your agreement to the above terms and conditions by signing this original Agreement and returning the same to the undersigned. Also, please retain a copy of the executed Agreement for your files.

I again wish to express my appreciation for the opportunity to serve your legal interests and look forward to continuing my affiliation with you in the future. As always, if you have any comments or questions regarding The Firm's legal representation, please feel free to contact me at your convenience.

NORMAN YATOOMA & ASSOCIATES, P.C.

By: _____
Norman A. Yatooma, President

The terms and conditions of this Engagement Agreement are agreed to and accepted this 26 day of April, 2008.

By: Brian D. Greene, individually and as next friend to and Guardian of India Bond

Signature: _____

# Exhibit 3



A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

— ORIGINAL

April 21, 2008

Mr. Taris A. Jackson
4683 Firestone
Dearborn, MI 48126


RE:   Attorney Engagement Agreement

Dear Mr. Jackson:

This letter will serve to confirm the engagement of Norman Yatooma & Associates, P.C. ("The Firm") as legal counsel on behalf of Mr. Taris A. Jackson, individually and as next friend and father of Ashly S. Jackson ("The Client"). We have agreed that The Firm will represent The Client in connection with a certain lawsuit pending before the Honorable Gerald Rosen in the United States District Court, Eastern District of Michigan, and assigned case number 05CV74253, and any related lawsuits and proceedings ("The Litigation").

We have agreed to the following terms and conditions with respect to The Firm's legal representation of The Client:

1.   **Engagement of The Firm.** The Client retains and engages The Firm in the legal representation of The Client. The Firm accepts this engagement and agrees to represent The Client in this matter. The Firm may, however, terminate this Agreement and its representation of The Client at any time, and, specifically, if The Client is in breach of any obligations under this Agreement, or if The Firm is otherwise required or permitted to do so in accordance with the rules of professional conduct governing attorneys as adopted by the Supreme Court for the State of Michigan.

2.   **Retainer and Compensation of The Firm.** The Firm's fees for attorneys range from $195.00 to $475.00 per hour and $150.00 per hour for any legal assistant that The Firm, in its sole discretion, shall utilize. The Firm's hourly rates for services may be increased from time to time. The Firm has, however, waived its hourly fees in favor of its contingent fee. The Client shall pay The Firm a contingent fee in the amount of one-third (1/3) of the net amount of any recovery in The Litigation, whether by judgment at trial, arbitration award, settlement, debt reduction, sale of property, or otherwise, if the Litigation that is commenced on behalf of the Client is filed against any third party and/or entity.

The fees shall be paid as follows:

a.   <u>Minimum and Continuous Retainer.</u> The Firm has waived the retainer.

219 Elm Street • Birmingham, MI 48009-6306 • Tel: (248) 642-3600 • Fax: (248) 642-3601
www.normanyatooma.com • email: info@normanyatooma.com

13-53846-tjt   Doc 4854   Filed 05/15/14   Entered 05/15/14 15:22:26   Page 34 of 116

     b.    <u>Billing Statements.</u> Billing statements shall include costs and expenses of The Firm's Litigation. The Client agrees to pay The Firm's statement upon receipt.

    3.    <u>Payment of Costs and Expenses.</u> In addition to paying fees for legal services, The Client is responsible for and agrees to pay all out-of-pocket costs and expenses that The Firm incurs in representing The Client. These costs and expenses include, but are not limited to, filing fees and other court costs, expert fees, witness fees, deposition and transcript costs, court reporting fees, investigation expenses, document reproduction costs, travel expenses, and costs for all forms of mailing and telephone charges. The Firm shall, at its own option, either pay such expenses on The Client's behalf and submit statements to The Client for reimbursement, or forward statements for such expenses to The Client for direct payment to the third parties owed for such expenses. If paid by The Firm, any costs and expenses shall be billed to and paid by The Client, in accordance with paragraph 2 above. Costs and expenses paid by the Client shall be subtracted from the gross recovery before calculation of any contingency fee recovery.

    4.    <u>No Estimate of Total Bills.</u> The Client understands that the ultimate amount of costs and expenses are a factor of the nature and complexity of The Firm's representation. It can neither be estimated nor determined in advance how long it will take to complete this matter, nor can it be determined in advance what amount of fees will be generated or what amount of costs and expenses will be incurred in The Litigation by The Firm

    5.    <u>Late Payment.</u> If the costs or expenses are not paid in full within thirty (30) days of mailing the statements, The Client's balance shall accrue compound interest at the rate of 7% from the date of mailing the unpaid statement(s) until such amount is repaid by The Client in full; provided, however, that such rate shall not exceed the maximum rate permitted by law. In that event, The Client shall pay the maximum rate allowed by law.

    6.    <u>Settlements.</u> The Firm shall inform The Client of any offers or counteroffers that are made to settle the dispute and The Firm shall not settle any claims without the approval of The Client.

    7.    <u>The Firm Lien.</u> The Client hereby grants to The Firm all general, possessory, and retaining liens, and all special or charging liens known to common law, for The Firm's unpaid fees, costs, and expenses, on any money, property, or forgiveness of debt recovered in the matter from any source by judgment at trial, arbitration award, settlement, sale of property, or otherwise, and hereby irrevocably directs that any check or draft in settlement of payment of The Client's claims be made payable to The Firm. The Firm is entitled to receive the money and/or properties recovered and deduct the amounts owed before delivering the balance to The Client.

    8.    <u>No Guarantee.</u> The Firm has not made and does not make any promise or guarantee concerning the potential outcome of The Firm's representation.

    9.    <u>Scope of Agreement.</u> The Firm agrees to provide services under this Agreement through and including judgment after a trial, or arbitration award, on the merits of The Client's claims. This Agreement does not cover any additional proceedings after the judgment or award,

including new trials, post-judgment/award motions and proceedings, appeals, and proceedings to enforce or collect on the judgment, award, or settlement.

10.    Disclosure.    The Client agrees that The Firm may disclose representation of The Client in The Firm's publications, through the media, or otherwise.

11.    Entire Agreement.    This Agreement constitutes the full understanding of the parties.   There are no other prior written or oral agreements between the parties concerning the subject matter of this Agreement, and any prior agreements are merged into and superseded by this Agreement.

12.    Modifications.    The terms of this Agreement may only be modified by a future writing that is signed by both The Client and The Firm.

13.    Counterparts.    This Agreement can be executed in one or more counterparts, each and all of which shall be deemed for all purposes to be one and the same Agreement enforceable in accordance with the terms and conditions contained herein.

14.    Miscellaneous.

a.    It is understood and agreed that should any provision of this Agreement be found to be unenforceable, such unenforceable provision shall not affect the remaining portions or provisions of this Agreement.

b.    This Agreement is binding on, and shall inure to the benefit of, the successors and assigns of the parties, and shall not be assignable except with the prior written consent of all the parties hereto.

c.    This Agreement shall not be construed against either of the parties.

d.    This Agreement shall be governed by the laws of the State of Michigan, County of Oakland, which is hereby designated as the exclusive forum for the litigation of any disputes arising out of this Agreement.   In the event The Firm incurs any attorneys' fees, court costs or other costs or expenses enforcing the obligations of The Client under this Agreement, The Client shall reimburse The Firm for all such attorneys' fees, costs and expenses incurred by The Firm upon demand, in addition to any other damages to which The Firm may be entitled.   The Client agrees that the Oakland County Circuit Court of the State of Michigan shall issue such an Order.

e.    The undersigned certify that they have read the foregoing terms of this Agreement and that they fully understand the provisions stated herein and have agreed to the same.

f.    RELEASE OF CLAIMS AND WAIVER OF LIABILITY FOR PRE-EXISTING ACTS OR OMISSIONS:  Client understands that The Litigation has been pending for almost two years prior to retaining The Firm to represent The Client in The

Litigation. Client hereby releases The Firm, its attorneys, employees, shareholders, agents and principals from any and all liability for claims, sanctions, damages, losses, attorney fees, costs, complaints, whether known or unknown, that arose in whole or in part prior to The Firm's filing of an appearance in the Litigation on behalf of the Client. CLIENT ACKNOWLEDGES THAT HE HAS SOUGHT OUT THE ADVICE OF OTHER, INDEPENDENT COUNSEL BEFORE SIGNING THIS DOCUMENT, UNDERSTANDS THAT BY SIGNING THIS DOCUMENT THE CLIENT WAIVES THE RIGHT TO SUE THE FIRM FOR ALL CAUSES OF ACTION ARISING IN WHOLE OR IN PART PRIOR TO THE FILING OF FIRM'S APPEARANCE IN THE LITIGATION, AND AGREES TO SAME.

Please confirm your agreement to the above terms and conditions by signing this original Agreement and returning the same to the undersigned. Also, please retain a copy of the executed Agreement for your files.

I again wish to express my appreciation for the opportunity to serve your legal interests and look forward to continuing my affiliation with you in the future. As always, if you have any comments or questions regarding The Firm's legal representation, please feel free to contact me at your convenience.

NORMAN YATOOMA & ASSOCIATES, P.C.

By: _____
Norman A. Yatooma, President

The terms and conditions of this Engagement Agreement are agreed to and accepted this _26_ day of April, 2008.

By:    Taris A. Jackson, individually and as next friend and
       Father of Ashly S. Jackson

Signature: _____

# Exhibit 4

JS 44 (Rev. 11/04)

County in which this action arose *Wayne*

**CIVIL COVER SHEET**

*o6163*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** *ERNEST FLAGG*

**DEFENDANTS** *City of Detroit*

**(b)** County of Residence of First Listed Plaintiff *Wayne*
(EXCEPT IN U.S. PLAINTIFF CASES)

*o6163*

County of Residence of First Listed Defendant *Wayne*
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) *Delicia Coleman 23300 Greenfield Ste. 111 Oak Park MI 48237*

Attorneys (If Known)

MAGISTRATE JUDGE R. STEVEN WHALEN

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen | | | | | 5 |
| Citizen | | | | | 5 |
| Foreig | | | | | |

JUDGE : Rosen, Gerald E.
DECK : S. Division Civil Deck
DATE : 11/07/2005 @ 10:15:06
CASE NUMBER : 2:05CV74253
CMP ERNEST FLAGG V CITY OF
DETROIT ET AL (JLC)

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability
PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 610
☐ 620
☐ 625
☐ 630
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☒ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

*440*

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): *Section 1983*
Brief description of cause: *Violation of due process right of access of court*

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ *$75000*
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE *Michael Callahan*
DOCKET NUMBER *PLA*

DATE *11/04/05*
SIGNATURE OF ATTORNEY OF RECORD *D Coleman*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.  Is this a case that has been previously dismissed?

☐ Yes
☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.  Other than stated above, are there any pending or previously
    discontinued or dismissed companion cases in this or any other
    court, including state court? (Companion cases are matters in which
    it appears substantially similar evidence will be offered or the same
    or related parties are present and the cases arise out of the same
    transaction or occurrence.)

☒ Yes
☐ No

If yes, give the following information:

Court: _Wayne County District Court_

Case No.: _____

Judge: _Michael Callahan_

Notes: _Alvin Boman v. City of Detroit_

RECEIPT NUMBER

38208

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND
**Plaintiff**

-vs-

CITY OF DETROIT, A MUNICIPAL CORPORATION, DETROIT POLICE CHIEF, ELLA
BULLY CUMMINGS, DEPUTY POLICE CHIEF CARA BEST, JOHN DOE POLICE
OFFICERS, ATTORNEY GENERAL MIKE COX-STATE OF MICHIGAN, FORMER CHIEF
OF POLICE OF DETROIT JERRY OLIVER, MAYOR OF CITY OF DETROIT KWAME
KILPATRICK, FORMER CHIEF OF STAFF FOR MAYOR OF CITY OF DETROIT,
CHRISTINE BEATTY

**Defendants, jointly and severa**"−

|  |  |
|---|---|
| **COMPLAINT** | JUDGE : Rosen, Gerald E.<br>DECK : S. Division Civil Deck<br>DATE : 11/07/2005 @ 10:15:06<br>CASE NUMBER : 2:05CV74253<br>CMP ERNEST FLAGG V CITY OF<br>DETROIT ET AL (JLC) |

JURISDICTION

MAGISTRATE JUDGE R STEVEN WHALEN
Magistrate Judge R Steven Whalen

NOW COMES PLAINTIFF, ERNEST FLAGG – BIOLOGICAL/CUSTODIAL PARENT

AND NEXT OF FRIEND OF JONATHAN BOND - BY AND THROUGH HIS ATTORNEY,

DELICIA COLEMAN, and state for HIS complaint:

1. That Plaintiff, Ernest Flagg, AS NEXT OF FRIEND OF Jonathan Bond, is a resident of
   the State of Michigan, County of Wayne and City of Detroit.

2. That Jurisdiction is conferred on this court pursuant to Title 28 USC § 1331.

3. That Defendant, City of Detroit, is a Municipal Corporation, organized under the laws
   of the State of Michigan.

4. That the Defendant, Ella Bully-Cummings, is a resident of the State of Michigan,
   County of Wayne, City of Detroit.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND

5. That the Defendant, Cara Best, is resident of the State of Michigan, County of Wayne, City of Detroit.

6. That Defendant, Kwame Kilpatrick, Mayor of City of Detroit, is a resident of the State of Michigan, County of Wayne, and City of Detroit.

7. That Defendant, Mike Cox, Attorney General for State of Michigan, maintains an office in the State of Michigan, County of Wayne and City of Detroit.

8. That Defendant, Christine Betty, former Chief of Staff for the Mayor of Detroit, is a resident of the State of Michigan, County of Wayne, and City of Detroit.

9. That Defendant, Jerry Oliver, former Chief of Police of the Detroit Police Department of the City of Detroit, is a resident of the State of Arizona, County of Maricopa, and City of Phoenix.

10. That Defendant, John Does, agents of the City of Detroit, are residents of the State of Michigan, County of Wayne, and City of Detroit.

11. That the amount in controversy is greater than $75,000.

## COUNT I - VIOLATION OF THE FOURTEENTH AMENDMENT CONSTITUITONAL DUE PROCESS - RIGHT OF ACCESS TO THE COURTS PURSUANT TO TITLE 42, §1983, §1985(2)(3), §1986 and §1988

12. That on or about April 3, 2003, at approximately 3:40 a.m., 27-year-old Tamara Greene, was gunned down as she sat in her car on Roselawn with a friend who sat in the front passenger seat.

13. Ms. Greene's murderer drove up to her vehicle, fired several shots into her vehicle, striking Ms. Greene in the head and injuring the other occupant of the car, and drove off.

14. Ms Greene died at the scene.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    2

15. Ms. Greene had been employed as an exotic dancer in various clubs in Detroit and was well known by her stage name, "Strawberry."

16. As of the date of this complaint, the police have not arrested anyone for Ms. Greene's murder and, on information and belief, have not developed any good suspects.

17. Nine days after Greene's murder, Deputy Chief Gary Brown was fired as the head of the Department's Internal Affairs Bureau allegedly investigating a party at the Manoogian Mansion involving exotic dancers.

18. Five days after Brown was terminated, a memo was distributed to the news media by Defendant Beatty through the Mayor's press consultant and campaign manager, Robert Berg, who identified Police Officer Harold Neltrope as the source of the information concerning misconduct of certain members of Kilpatrick's Executive Protection Unit and the Manoogian Mansion party.

19. Shortly after these events, an investigative journalist for a Detroit newspaper developed information concerning the identity of three dancers who performed at the Manoogian party, one of whom was allegedly Tamara Greene (AKA Strawberry).

20. The investigative journalist passed this information on to several members of the Department and very little was done to investigate Ms. Greene's murder largely because Detroit Homicide detectives reportedly considered it a "hot potato" and did not want to end up like Deputy Chief Brown or Police Officer Harold Neltrope.

21. During the remainder of 2003, the case was passed around several squads within Homicide, but very little was being done to find Ms. Greene's killer(s).

22. That Tamara Greene was the mother of Jonathan Bond, a minor child.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                                    3

23. That the Detroit Police Department, Homicide Section, was assigned to investigate and solve the murder of Tamara Greene.

24. That Defendants, Detroit Police Department and City of Detroit, through its agents/employees within eleven months of Greene's death, placed the homicide case of Tamara Greene in the cold case file after less than one year – diametrically opposing customs that a case had to be at least two years old before the Cold Case Squad would accept it, further delaying her murder investigation, thusly depriving the right of access of court from the child.

25. That the assignment of this case to the SAS or Special Assignment Section would have been more advantageous to the investigation and thusly increasing the chance of solving the murder.

26. That the City of Detroit and members of its Police Department deliberately avoided sending spent .40 caliber bullet casings and retrieved bullets remaining at the scene of the murder to the appropriate agency to determine if the weapon belonged to an officer or was registered.

27. That the City of Detroit and members of its Police Department deliberately avoided interviewing key individuals who could have offered valuable information in the investigation of this murder.

28. That the City of Detroit and members of its Police Department refused to subpoena critical documents which could have potentially enhanced Greene's murder investigation.

29. That Lt. Al Bowman of the Detroit Homicide section of the Detroit Police Department was a detective investigating the Greene homicide.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    4

30. That Bowman as a part of his investigation of the Greene homicide began sharing information with Michigan State Police who was concurrently investigating allegations about a party at the Mayor's residence, the Manoogian Mansion.

31. That he was called into a meeting with Police Chief Ella Bully-Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson and was directed to cease investigating Greene's homicide and to put the file away.

32. That shortly after the said meeting, Bowman was transferred out of the Homicide Section of the Police Department to the 2nd Precinct to a different position to ensure that he discontinued the investigation of Greene's murder.

33. That Defendants, Detroit Police Department and City of Detroit, through its agents, employees, acting under color of state law and with malicious intention, deprived the plaintiff of his due process right of access of court.

34. That Defendants, Detroit Police Department and City of Detroit, engaged in a laxity in investigation, deliberately ignored and actively concealed material evidence in the investigation of Greene's death in an effort to avoid inflicting damaging information upon and the potential implication of high city officials in Greene's murder, including Mayor Kwame Kilpatrick and his wife, Carlita Kilpatrick.

35. That the actions of defendants, Detroit Police Department and City of Detroit, resulted in a delay of decedent's murder investigation, thereby, causing evidence to grow stale and the fading of materials facts in the minds of witnesses and potential witnesses.

36. That Defendants, the City of Detroit and several John Does had knowledge of the wrongs conspired to be done, possess the power to prevent or aid in preventing and that reasonable diligence could have prevented any of the wrong.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    5

37. That these and a myriad of other deliberate and malicious acts occurred through Mayor of the City of Detroit, other executive leadership and throughout the official decision-making channel which included policy makers.

38. That without adequate investigation, Defendants have shielded from the public and the plaintiff, meaningful and effective material facts that could have lead to the apprehension of the perpetrator(s) and form the basis for the plaintiff's state court claim for redress.

39. That it would be futile to file a state court claim when plaintiff have no one to file against.

**COUNT II - CONSPIRACY TO DENY FOURTEENTH AMENDMENT CONSTITUITONAL DUE PROCESS - RIGHT OF ACCESS TO THE COURTS PURSUANT TO TITLE 42, §1983, §1985(2)(3), §1986 §1988**

Plaintiff incorporates by reference paragraphs 1-39 of Count I as if herein actually stated.

40. That Defendants, Mike Cox, Attorney General, State of Michigan, Kwame Kilpatrick, Mayor of City of Detroit, Jerry Oliver, former Chief of Police, City of Detroit, and Christine Betty, former Chief of Staff for Mayor of City of Detroit, entered into an agreement with malicious intention to deprive plaintiff of his constitutional due process right to access of courts.

41. That Defendants, Detroit Police Department and City of Detroit, engaged in a laxity in investigation, deliberately ignored and actively concealed material evidence in an effort to avoid inflicting damaging information upon and the potential implication of high city officials including the Mayor of Detroit Kwame Kilpatrick and his wife, Carlita, in

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    6

Greene's murder, thereby, depriving her child of his due process right of access to court
to bring a wrongful death suit against his mother's murderer(s).

42. That Defendants and the City of Detroit had knowledge of the wrongs conspired to be
done, possess the power to prevent or aid in preventing and that reasonable diligence
could have prevented any of the wrong.

43. That these deliberate actions and inactions resulted in a delay of decedent's murder
investigation, thereby, causing evidence to grow stale and the fading of materials facts
in the minds of witnesses and potential witnesses, further impairing the child's access
to state court.

44. That the investigation of the homicide of Tamara Greene was assigned to the Detroit
Police Department, Homicide Section.

45. That Detective, Al Bowman, in investigating the homicide of Tamara Greene, was led
to exchange information with the Michigan State Police, which was investigating
allegations relative to a party held at the Mayor's official residence ~ the Manoogian
Mansion.

46. That the homicide investigation of Tamara Greene by the Homicide Section has led to
inquiries and events and connections to an alleged party at the Mayor's official
residence.

47. That the Defendant, Mike Cox engaged in the murder investigation.

48. That Mike Cox's interrogation of Mayor Kwame Kilpatrick and Carlita Kilpatrick was
the epitome of a **façade**, a deliberate attempt to shield Kwame and Carlita Kilpatrick
from potentially damaging information.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    7

57. That Brown had received information from a police officer who made allegations of impropriety by city officials.

58. That among the allegations Brown was investigating was that a "stripper" had been beaten at the Mayor's official residence during a "wild party."

59. That a meeting between Brown and former Chief of Police Oliver occurred about one week prior to his termination.

60. That during this meeting Chief Oliver asked Brown to draft a memo delineating the activities of his investigation into Kilpatrick security force.

61. That former Police Chief Oliver, Mayor Kilpatrick, former Chief of Staff Betty and other City officials had a meeting regarding Brown's investigation.

62. That a decision was made at the meeting to terminate Brown.

63. That Defendant, Mayor Kwame Kilpatrick, fired Deputy Police Chief Gary Brown on or about May, 2004 to avoid further investigation into the allegations of "wild party."

64. That the Defendant's conduct was 'malicious, wanton or oppressive or in reckless disregard of the plaintiff's rights.

65. That Defendants, Detroit Police Department and City of Detroit conspiracy have permeated throughout the City of Detroit, the State Attorney General's Office and beyond...adversely impacting witnesses, evidence, and mainly the plaintiff - giving rise to a world class **administrative and police cover-up.**

Plaintiff requests compensatory and punitive damages including attorney fees.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    9

49. That Mike Cox failed to formally interrogate Mayor Kwame Kilpatrick or Carlita Kilpatrick specifically about the occurrence of the party or even Greene's murder.

50. That Mike Cox **deliberately** did not tape record the interview with the Mayor and his wife.

51. That Mike Cox **deliberately** did not use prewritten questions during the interview/interrogation of the Mayor and his wife.

52. That Mike Cox failed to allow the State Police lead investigator to be present during the interview of the Mayor.

53. That Mike Cox **refused** to issue subpoenas to the Michigan State Police in support of the investigation into the alleged party at the Mayor official residence or the murder of Greene.

54. That Mike Cox's **publicly** announced investigative conclusion that the allegations had the **"earmarks of an urban legend"** served as a profound **discouragement** to any individual(s) who might have come forward with valuable information to contribute to the investigation of this notorious murder.

55. That the conspiracy efforts, active concealment and hands-off approach to the murder investigation of Greene by Defendant, Mayor Kwame Kilpatrick, and Defendant, Mike Cox, and Defendant, Jerry Oliver, and Defendant, Christine Betty, consequently sealed the state court door closed.

56. That Gary Brown, Deputy Police Chief over Internal Affairs of the Detroit Police Department, began an investigation of possible criminal acts of police officers of the Mayor's security detail and into allegations of a "wild party" and of criminal conduct by the Mayor.

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                    8

**WHEREFORE**, Plaintiffs respectfully request this court enter a judgment in their favor and against Defendants and the City jointly and severally for whatever amount Plaintiffs are found to be entitled, plus costs, attorneys' fees and statutory interest form the date this Complaint is filed.

### DEMAND FOR JURY TRIAL

Plaintiffs by and through their attorney Delicia Coleman demands a jury trial.

BY: _____
Delicia Coleman P-56278
Attorney for Plaintiffs
23300 Greenfield Road , Ste 111
Oak Park, Michigan 48237
(248) 967-6293

Dated: November 04, 2005

ERNEST FLAGG, AS NEXT OF FRIEND OF JONATHAN BOND                                    10

# Exhibit 5

UNITED STATES OF AMERICA
IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHAN BOND, a minor,
TARIS JACKSON, as Next Friend of
ASHLY JACKSON, a minor; and
DR. BRIAN GREENE, as Next Friend of
INDIA BOND, a minor;

        Plaintiff,

-vs-

CITY OF DETROIT, a municipal corporation;
DETROIT POLICE CHIEF ELLA BULLY-CUMMINGS;
DEPUTY DETROIT POLICE CHIEF CARA BEST
JOHN DOE POLICE OFFICERS 1 - 20;
ASST. DEPUTY POLICE CHIEF HAROLD CURETON;
COMMANDER CRAIG SCHWARTZ;
MAYOR KWAME M. KILPATRICK,
CHRISTINE BEATTY, jointly and severally

        Defendants.

Case No.: 05-CV-74253
Hon. Gerald Rosen

**THIRD AMENDED**
**COMPLAINT AND**
**DEMAND FOR JURY**
**TRIAL**

---

**NORMAN YATOOMA & ASSOCIATES, P.C.**
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

**JAMES C. THOMAS, P.C.**
By: James C. Thomas (P23801)
Attorney for Defendant Kilpatrick
535 Griswold Street, Suite 2632
Detroit, Michigan 48226
(313) 963-2420

**PLUNKETT COONEY**
By: Kenneth L. Lewis (P26071)
By: Said A. Taleb (P66030)
By: Randal M. Brown (P70031)
Attorneys for Defendant Ella Bully-Cummings
535 Griswold, Suite 2400
Detroit, MI 48226
(313) 983-4790

**CITY OF DETROIT LAW DEPARTMENT**
By: John A. Schapka (P36731)
Attorney for Defendants City of Detroit,
Craig Schwartz, Cara Best and Harold
Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3018

**WILLIAMS, WILLIAMS, RATTNER & PLUNKETT**
By: Thomas G. Plunkett (P18957)
By: David E. Plunkett (P66696)
Attorneys for Bell Industries, Inc., d/b/a SkyTel

**CITY OF DETROIT LAW DEPARTMENT**
By: Krystal A. Crittendon (P49981)
Attorney for Defendants City of Detroit,
Craig Schwartz, Cara Best and Harold

380 N. Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
(248) 642-0333

Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3062

HONIGMAN MILLER SCHWARTZ & COHN
By: Herschel P. Fink (P13427)
Attorney for Intervenor Detroit Free Press
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226-3583
(313) 465-7000

MORGANROTH & MORGANROTH, PLLC
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorneys for Defendant Christine Beatty
3000 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 355-3084

MOSS & COLELLA PC
By: David Moss (P36757)
By: Vince Colella (P49747)
Co-Counsel for Plaintiffs Ashly Jackson and
India Bond Only
29100 Northwestern Hwy., Suite 310
Southfield, Michigan 48034
(248) 945-0100

NORMAN YATOOMA & ASSOCIATES, P.C.

NOW COME THE PLAINTIFFS, JONATHAN BOND, a minor, through his Next Friend

ERNEST FLAGG; ASHLY JACKSON, a minor, through her Next Friend TARIS JACKSON;

and INDIA BOND, a minor, through her Next Friend, DR. BRIAN GREENE; by and through

their attorneys, Norman Yatooma & Associates, P.C., who state the following in support of this

Third Amended Complaint:

1.    Plaintiff JONATHAN BOND, is a resident of the State of Michigan, County of

Oakland and Township of West Bloomfield, and resides there with his father and Next Friend,

ERNEST FLAGG.

2..    Plaintiff ASHLY JACKSON is a resident of the State of Michigan, County of Wayne

and City of Dearborn, and resides there with her father and Next Friend, TARIS JACKSON.

2

3.    Plaintiff INDIA BOND is a resident of the State of Michigan, County of Kalamazoo and City of Kalamazoo, and resides there with her guardian and Next Friend, DR. BRIAN GREENE.

4.    Jurisdiction is conferred on this Court pursuant to Title 28 U.S.C. §§ 1331 and 1343(a)(3), (4).

5.    Defendant CITY OF DETROIT is a municipal corporation organized under the laws of the State of Michigan.

6.    On information and belief, Defendant ELLA BULLY-CUMMINGS is a resident of the City of Detroit, County of Wayne, State of Michigan.

7.    On information and belief, Defendant CARA BEST is a resident of the City of Detroit, County of Wayne, State of Michigan.

8.    On information and belief, Defendant HAROLD CURETON is a resident of the City of Detroit, County of Wayne, State of Michigan.

9.    On information and belief, Defendant CRAIG SCHWARTZ is a resident of the City of Detroit, County of Wayne, State of Michigan.

10.    On information and belief, Defendant KWAME M. KILPATRICK current Mayor of the City of Detroit, is a resident of the City of Detroit, County of Wayne, State of Michigan.

11.    On information and belief, Defendant CHRISTINE BEATTY the former Chief of Staff for Defendant Kwame M. Kilpatrick, is a resident of the City of Detroit, County of Wayne, State of Michigan.

NORMAN YATOOMA & ASSOCIATES, P.C.

3

## GENERAL ALLEGATIONS

12.    Tamara Greene was the mother of Plaintiff JONATHAN BOND, a 15 year-old minor child, Plaintiff ASHLY JACKSON, a 12 year-old minor child, and Plaintiff INDIA BOND, a 6 year-old minor child.

13.    Tamara Greene was a licensed exotic dancer and employed in various clubs in the City of Detroit and by private parties. Ms. Greene, also known as Tamara Bond Greene, performed under the stage name of "Strawberry".

14.    Sometime in the fall of 2002, a wild party occurred at the Manoogian Mansion.[1] It was rumored that Defendant Kilpatrick attended this party,[2] as well as several of his close friends, certain Detroit Police Officers, and nude exotic dancers, including Tamara Greene. According to various accounts, it is alleged that Defendant Kilpatrick's wife, Carlita Kilpatrick arrived at the party unexpectedly, and assaulted Tamara Greene, and possibly one other dancer. **See Affidavit of Joyce Rogers, attached hereto as Exhibit 1; see also Michigan State Police Supplemental Report dated August 6, 2003, attached hereto as Exhibit 2.**

15.    On information and belief, that night, following the alleged attack by Mrs. Kilpatrick, Defendant Kwame Kilpatrick's security detail, known as the Executive Protection Unit, or "EPU," escorted, transported, or otherwise accompanied the injured dancer to the emergency room of a local hospital.

16.    On information and belief, at least one Emergency Medical Technician ("EMT") reported to the media that, on or about the time of the alleged Manoogian party, individuals who appeared to be members of the EPU brought in an injured woman for treatment and arranged for

NORMAN YATOOMA & ASSOCIATES, P.C.

---

[1] The Manoogian Mansion is the traditional residence of the Mayor of the City of Detroit and his or her family.
[2] On information and belief, Defendant Kilpatrick and his family had not as yet moved into the Manoogian Mansion, as it was undergoing renovations at the time.

4

all EMTs to be removed from the emergency room. **See Michigan State Police Supplemental Report Dated April 12, 2005, attached hereto as Exhibit 3.**

17.    On or about the time of the alleged party, and at all relevant times thereafter, Harold Nelthrope ("Nelthrope") was a detective in the EPU before he was transferred.

18.    Beginning in March of 2003, Nelthrope reported allegations of illegal conduct and misconduct by fellow EPU officers and by Detroit Mayor Kwame Kilpatrick and his wife to the Detroit Police Department's Professional Accountability Bureau. These allegations included claims that close friends of Defendant Kwame Kilpatrick on EPU were claiming overtime pay to which they were not entitled, and were drinking on the job.

19.    Specifically, the close friends referred to by Nelthrope are former EPU Police Officers Loronzo ("Greg") Jones and Mike Martin.

20.    On information and belief, Jones was a high school football buddy of Mayor Kilpatrick. **See Affidavit of Lt. Alvin Bowman, attached hereto as Exhibit 4.**

21.    On information and belief, Officer Martin was a close friend of Jones. Both EPU Officers came out of the 2nd Precinct, which was widely viewed by those in the Detroit Police Department as the "Wild Wild West." *Id.*

22.    It was widely believed by those in the Detroit Police Department that both Jones and Martin had great influence over Mayor Kilpatrick, that they essentially had authority to do virtually anything they chose without fear of repercussions, and that where they were concerned, there was no chain of command. For example, even though he never exceeded the rank of Police Officer, Officer Jones had *de facto* control over the EPU, despite the fact that at all relevant times, Lieutenants and Sergeants were also assigned to the Executive Protection Unit. *Id.*

5

NORMAN YATOOMA & ASSOCIATES, P.C.

23.    Further evidence of Jones' close ties to Defendant Kilpatrick is that his climb to the top of the EPU occurred despite his tarnished record. On information and belief,

    a.    A misdemeanor gun charge from 1992 has been expunged from Jones' criminal record;

    b.    In 1995, while off duty, Jones and several on-duty officers he called for help were sued for firing their guns during a car chase in which a man was shot to death. Jones was accused of shooting into a man's car but was dropped from a civil lawsuit because another officer fired the fatal shots; and

    c.    In 1996, while off duty, Jones fought with Police Officer Eugene Brown after he pulled over Jones' car. Jones was unsuccessfully prosecuted for resisting arrest and later sued Brown.

24.    On information and belief, on or about April 26, 2003, Nelthrope was interviewed by an Officer from the Public Corruption Unit. In addition to discussing the above allegations, Nelthrope - **for the first time -** discussed the allegations that Carlita Kilpatrick assaulted one or more of the dancers at a party at the Manoogian Mansion in the fall of 2002. Nelthrope went on to discuss the efforts to cover up these crimes. **See the April 30, 2003 Memorandum, attached hereto as Exhibit 5, hereafter the "April 30[th] Memo.**

25.    This interview with Nelthrope was summarized in a 5-page memorandum inaccurately dated April 24 and April 30, 2003.[3] Gary Brown, then Deputy Chief of the Professional Accountability Bureau, authorized a preliminary investigation into these allegations. **Exhibit 5.**

26.    According to the April 30th Memo, "[t]he most serious allegation made by Officer Nelthrope is that Mrs. Carlita Kilpatrick was involved in a physical altercation with a female dancer, causing bodily injury requiring medical attention. If this allegation is proven to be fact, the potential for assault charges to be filed against Mrs. Carlita Kilpatrick as well as potential

---

[3]    See April 30th Memo, attached hereto as Exhibit 5. On information and belief, a problem with the word processing software used to prepare the memorandum is responsible for the appearance of the date "April 24, 2003." It is believed that the April 30th Memo was actually completed on April 30, 2003.

6

NORMAN YATOOMA & ASSOCIATES, P.C.

obstruction of justice charges and or misconduct in office charges against anyone found to have collected and destroyed activity logs will warrant national headlines and severely damage the political future of Mayor Kilpatrick." **Exhibit 5.**

27.    On the morning of April 30, 2003, at approximately 3:40 in the morning, Tamara Greene was shot dead while sitting in her car with a friend in the driveway of her home. Ms. Greene was shot with a .40 caliber weapon, the kind of weapon that is issued to members of the Detroit Police Department. **Exhibit 4.** Her friend survived the shooting.

28.    On information and belief, two days after Nelthrope discussed the Manoogian Mansion party with Internal Affairs, and hours after Ms. Greene was shot dead, Jones sent the following text message to Defendant Christine Beatty: "When you get a chance, could you give me a call," to which Defendant Beatty answered "Yes." **See Page 4 of Attorney Michael Stefani's Supplemental Motion for Attorney Fees, attached hereto as Exhibit 6.**

29.    At the request of then Chief of Police, Jerry Oliver, Brown prepared another memorandum regarding Nelthrope's allegations. **See Memorandum dated May 6, 2003, attached hereto as Exhibit 7 (hereafter, the May 6th Memo). At Chief Oliver's direction, the conclusion of the May 6th Memo was rewritten to recommend that no further investigation be conducted.**

30.    In the May 6, 2003 Memo, it was reported that Nelthrope made a point of saying that he was wearing a bulletproof vest because "he didn't trust many police officers."

31.    The May 6, 2003 Memo was given to Chief Oliver, and then passed along to Defendant Christine Beatty, who at the time was Defendant Kilpatrick's Chief of Staff and paramour, and possibly to others in Defendant Kilpatrick's office.

NORMAN YATOOMA & ASSOCIATES, P.C.

7

32.     At all relevant times, Defendant Kilpatrick, Defendant Beatty, Defendant Ella Bully-Cummings and others within the Detroit Police Department and Defendant Kilpatrick's administration conspired to terminate Brown, a decorated, well-respected twenty-year member of the Detroit Police Department.

33.     In furtherance of that conspiracy, on May 9, 2003, Defendant Mayor Kwame Kilpatrick fired Deputy Police Chief Gary Brown.  **See Defendant Kilpatrick's May 9, 2003, letter to Brown, attached hereto as Exhibit 8**.

34.     Brown was fired to avoid further investigation into the allegations of the "wild party," or that Defendant Kilpatrick's wife, Carlita Kilpatrick, assaulted Tamara Greene at that party.

35.     Further, members of Defendant Kwame Kilpatrick's office then identified Nelthrope as being the source of the allegations of misconduct to the media, and the mayor publicly called Nelthrope a liar.  **See June 26, 2004, Deposition Transcript of Defendant Kwame Kilpatrick, pp. 60-62, attached hereto in its entirety as Exhibit 9.**

36.     Twelve .40 caliber shell casings were found at Ms. Greene's murder scene.  Witnesses reported that the shooter left the scene in a "white Trailblazer." **Exhibit 4.**

37.     The .40 caliber Glock, Model 22, is the standard issue weapon for members of the Detroit Police Department. **Exhibit 4.**

38.     The Detroit Police Department, Homicide Section, Squad 8, was assigned to investigate the murder of Tamara Greene. **Exhibit 4.**

39.     Lt. Al Bowman was the head of Squad 8, and participated in the investigation of the Greene homicide.

NORMAN YATOOMA & ASSOCIATES, P.C.

8

40.    Sgt. Marian Stevenson, a former homicide investigator who worked under Lt. Bowman, was also assigned to the Tamara Greene murder investigation.  Sgt. Stevenson concluded that someone ordered Greene's murder.  The basis for her belief was that (1) Greene was shot first, and (2) that Greene's passenger was able to exit the vehicle, and (3) an eyewitness reported that the shooter's vehicle turned around after shooting Greene and had the opportunity to shoot the passenger as well, but did not.

41.    Every witness contacted by Squad 8 investigators in connection with the Greene murder investigation felt threatened and intimidated against coming forward on this case and testifying.  Specifically, they feared retaliation by those close to the Mayor, individuals such as EPU Police Officers Loronzo Jones and Mike Martin.  **Exhibit 4.**

42.    From the start, the Greene homicide investigation was treated differently than any other homicide investigated by the department.  First of all, the file commanded an unexplainable amount of attention from then Chief of Police Jerry Oliver, and later from his successor, Defendant Ella Bully-Cummings.  Both of these individuals answered to Defendants Kilpatrick and Beatty.  **Exhibit 4.**

43.    Regarding Chief Oliver, on numerous occasions, he requested the file be sent to his office for his review.  **Exhibit 4.**

44.    On each occasion, the file was returned to Squad 8 with reports missing from the file.  **Exhibit 4.**

45.    After she replaced Chief Oliver, Defendant Ella Bully-Cummings called Lt. Bowman into her office, along with Defendants Cureton and Schwartz, and Lt. Billy Jackson.

46.    At this meeting, which occurred on or about March 10, 2004, Defendant Ella Bully-Cummings indicated that she was aware of the connection between the Tamara Greene

9

investigation and the Mayor. She also stated due to the nature and sensitivity of this case, that this case was not to be discussed outside of her office. In fact, she required the file to be placed away in safekeeping and not to be discussed openly with anybody. **Exhibit 4.**

47.    At that point Defendant Cureton, who at the time held the number two position in the Detroit Police Department asked: "Why can't this shit just go away?" **Exhibit 4.**

48.    Lt. Bowman explained to them that while he was not there to investigate any rumors of a wild party involving Defendant Kilpatrick; that he had a duty, a responsibility and an obligation to bring closure to Ms. Greene's death and to investigate it properly and thoroughly, even if that meant chasing rumors to the Manoogian Mansion, Mayor Kilpatrick and those close to him. **Exhibit 4.**

49.    Nonetheless, Lt. Billy Jackson took the file and put it in a combination locked safe. Lt. Bowman did not have the combination to that safe. **Exhibit 4.**

50.    Sgt. Marion Stevenson told Lt. Bowman that her case notes on the Tamara Greene murder investigation were erased from her computer hard drive. Further, she stated that her 'zip' storage files disappeared from a locked cabinet inside the police department. She further informed Lt. Bowman that she learned this was the work of City IT personnel. **Exhibit 4.**

51.    All Squad 8 members feared that they may lose their jobs and even feared for their physical safety if they continued to investigate Ms. Greene's murder. **Exhibit 4.**

52.    Lt. Bowman's meeting with Defendant Bully-Cummings occurred on a Wednesday during his vacation, so when he left Chief Bully-Cummings' office, he did not return until the following Monday, approximately March 15, 2004. **Exhibit 4; see also Lt. Bowman's April 21, 2004, Whistleblower Complaint attached hereto as Exhibit 10.**

NORMAN YATOOMA & ASSOCIATES, P.C.

10

53.    When Lt. Bowman returned, Lt. Billy Jackson told him that the Tamara Greene investigation had been transferred to Cold Case. When Lt. Bowman asked him why, Lt. Jackson said that he [Bowman] had been asking too many questions about the Strawberry case. **Exhibit 4.**

54.    At the time, the Tamara Greene murder investigation did not meet the criteria for transfer to the Cold Case Squad because it was less than a year old and was being actively investigated. Pursuant to the policies and practices that were in place at the Detroit Police Department at that time, an investigation must be at least two years old to be designated as a "cold case." **Exhibit 4.**

55.    Defendants Bully-Cummings, Cureton and Schwartz ordered that the file be transferred to Cold Case in order to prevent anyone from investigating anything that may relate to the Manoogian Mansion party. **Exhibit 4.**

56.    Sgt. Odell Godbold, head of the Cold Case Squad responsible for investigating Ms. Greene's murder told Bowman that Greene's murder investigation is a "hot potato" and that he was "not going to investigate this case." He then explained that he feared retribution because of Ms. Greene's connection with the Manoogian Mansion. Godbold also informed Lt. Bowman that his nephew had a sexual relationship with Tamara Greene. **Exhibit 4.**

57.    On or about April 6, 2004, Bowman was transferred out of the homicide division to the 2nd Precinct, working the desk midnights in a uniform. According to Lt. Billy Jackson, Lt. Bowman was transferred because he asked too many questions about the Tamara Greene Case. **Exhibit 4.** Defendant Best attempted to cover-up the true reason for the transfer, however, by explaining to Lt. Bowman, a decorated 31-year veteran of the Detroit Police Department, that he

11

NORMAN YATOOMA & ASSOCIATES, P.C.

was being transferred because in a report, he allegedly misspelled the word "homicide." **Exhibit 4.**

58.     The officers on Squad 8 would have vigorously investigated the case if it had no ties or connections or rumors or allegations of a nexus to the party, to Defendant Kilpatrick, or his acquaintances. **Exhibit 4.**

59.     Squad 8 would have solved Ms. Greene's murder but for the interference by Defendants Kilpatrick, Christine Beatty, Chief Ella Bully-Cummings, Former Chief Jerry Oliver, Cara Best, Commander Schwartz and Harold Cureton. **Exhibit 4.**

60.     The officers on Squad 8 were aware or otherwise believed that Gary Brown was fired because Mayor Kilpatrick and his Chief of Staff Christine Beatty did not want there to be an investigation of the Manoogian Mansion party. **Exhibit 4.**

61.     The officers of Squad 8 were aware or otherwise believed that the file was given to Cold Case and that Bowman was transferred because neither Defendant Kilpatrick nor his Chief of Staff and paramour Christine Beatty wanted there to be an investigation of the Manoogian Mansion party. **Exhibit 4.**

62.     The officers of Squad 8 also believed that Defendants Ella Bully-Cummings and Harold Cureton reported directly to Kilpatrick and/or Beatty about the Greene homicide investigation and that they believed that the Tamara Greene homicide investigation would have overlapped with an investigation of the Manoogian Mansion party. **Exhibit 4.**

63.     As of May 19, 2005, Defendants, acting in conspiracy or concert both with each other and with others not parties to this action, made it impossible to investigate, let alone solve the murder of Tamara Greene. They disposed of reports that were contained in the homicide file,

12

concealed or destroyed evidence and retaliated against anyone that dared investigate the Manoogian Mansion party, even if it involved the death of Tamara Greene. **Exhibit 4.**

64.     Defendants Kilpatrick, Bully-Cummings, and Beatty, together with former Chief Jerry Oliver and others under the control of Defendants, created a culture of fear and intimidation that not only scared off investigators and made them fear for the jobs and safety, but also scared off witnesses; witnesses who heard the rumors of Ms. Greene dancing at the party, saw what happened to Ms. Greene, learned of the retaliation against police officers who tried to investigate; these witnesses believed that if the good cops could not protect themselves or Ms. Greene, that they certainly could not protect the witnesses. **Exhibit 4.**

65.     Lt. Alvin Bowman, and more recently former Detective Harold Nelthrope and former Deputy Chief Gary Brown of the Detroit Police Department were successful in convincing two different Wayne County juries that several of these defendants retaliated against them for investigations that involved or were related to Ms. Greene's death.

66.     These Defendants, acting either individually or in concert with each other or with third parties not named herein, have actively, intentionally and deliberately worked to terminate or otherwise hinder the Greene homicide investigation, and to deter qualified homicide detectives from investigating Tamara Greene's murder.

67.     Defendants' conduct as described herein was motivated by an evil motive or intent; namely a desire to protect the mayoral administration of Kwame Kilpatrick from embarrassing allegations regarding himself or his family and to protect his political future.

68.     Defendants' conduct as described herein involves reckless or callous indifference to the federally-protected rights of others, particularly these Plaintiffs' right to meaningful access to the Courts.

NORMAN YATOOMA & ASSOCIATES, P.C.

13

69.    On information and belief, as a direct and proximate result of Defendants' actions, the investigation into the murder of Tamara Greene has been effectively terminated.

70.    As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, the pertinent three-year statute of limitations has expired, thus barring a wrongful death action that may have been brought against the murderer of Tamara Greene.

71.    As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, key evidence or witness testimony has been irretrievably lost, and others have expressed fear for their careers and their very safety should they offer assistance of any kind in investigating the murder of Tamara Greene.

72.    As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs are foreclosed from bringing a state-court wrongful death action against "John Doe" defendants, which in turn would have provided a vehicle for discovery concerning any alleged concealment of evidence or any promising leads that were abandoned in the local and state investigations of Tamara Greene's death.

73.    As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs have been denied the opportunity to learn the identity of their mother's killer.

74.    As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs have been denied the opportunity to see their mother's killer brought to justice.

75.    As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs have been denied the opportunity to recover damages as a

14

state court or jury would have considered fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses; reasonable compensation for the pain and suffering, while conscious, undergone by Tamara Greene during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of their mother.

## COUNT I - VIOLATION OF THE 1ST AND 14TH AMENDMENTS (RIGHT OF ACCESS TO COURTS) PURSUANT TO TITLE 42 U.S.C. §1983.

76.     That Plaintiffs repeat, reallege and incorporate by reference the allegations in paragraphs 1 through 75 above with the same force and effect as if herein set forth.

77.     Defendants, acting individually, in their official capacities, or in concert with one another and/or with third parties not named herein, deliberately and continuously delayed and obstructed the Greene murder investigation, and deliberately ignored and actively concealed material evidence in the investigation of Greene's death, and threatened and retaliated against anyone who investigated or otherwise pursued any aspect of the investigation.

78.     Defendants' acts described herein deprived Plaintiffs of their right of access to the Courts by denying them of the ability to receive the proceeds of a wrongful death action in state court.

79.     As a proximate result of Defendants' actions, the filing of a state court action would be futile and meaningless because:

    a)  Under the law of the State of Michigan there is no civil cause of action for "spoliation of evidence" that could be brought against the City of Detroit Police Department.

    b)  The Plaintiffs cannot bring an action against the City of Detroit for negligence in the investigation of the homicide of Greene because under Michigan law, police owe no duty to any one particular individual in performing their duties, and,

therefore, it would be a frivolous lawsuit that would subject plaintiffs to sanctions by the Court.

c) The Plaintiffs do not have a sufficient factual basis to file a "John Doe" suit in state court due to the fact that the investigation has been terminated and otherwise tampered with by these Defendants to the point that Defendants have rendered Ms. Greene's homicide unsolvable.

d) Further, the filing of a "John Doe" lawsuit does not toll the running of the statute of limitation applicable to an action under Michigan law. Defendants not specifically named in a "John Doe" complaint are not yet parties to the suit, and if added later are considered new parties to the litigation. Accordingly, amendments to a complaint that add new defendants do not relate back to the original complaint.

e) The Plaintiffs are precluded by the applicable statute of limitations from bringing any action in state court for the wrongful death of Tamara Greene. This preclusion is not circumvented by MCL §600.5855 (Fraudulent concealment of claim or identity of person liable) because concealment of the identity of parties liable, or concealment of the parties, has been held not to constitute concealment of the cause of action, and not to be available to avoid the running of the statute of limitations.

f) Michigan does not have a tolling provision, either common law or statutory, that will operate to save Plaintiffs' wrongful death action if the identity of the killer is discovered beyond the three-year statute of limitations period. *Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 738 N.W.2d 664 (2007).

g) Further, the act of a third person in concealing a cause of action against the Defendant does not constitute a concealment so as to prevent the running of the statute of limitations in favor of the Defendant.

h) All applicable statutes of limitations have expired, barring Plaintiffs' state law claims.

i) Given the above enumerated facts of the case, there is no state court remedy available to Plaintiffs for damages.

j) The actions of Defendants resulted in the termination of Tamara Greene's murder investigation. Not only have Defendants' actions caused evidence to grow stale and cause the fading of material facts in the minds of witnesses and potential witnesses such that testimony and evidence have been irretrievably lost, but Defendants have also frightened and intimidated witnesses from coming forward, and have deterred officers from vigorously investigating Tamara Greene's murder.

16

80.    Defendants' actions were performed under color of state law, and violated Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution, as well as their right to petition the government for a redress of grievances guaranteed under the First Amendment to the United States Constitution.

81.    As a proximate result of Defendants' actions as described herein, Plaintiffs, or anyone acting on Plaintiffs' behalf, have been foreclosed from filing suit in state court and seeking a meaningful state court remedy.  It would be completely futile for the Plaintiffs to attempt to access the state court system given (1) the missing evidence, (2) the expired statute of limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation of the murder and related misconduct, (4) the spoliation of evidence, (5) destroyed information, (6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any viable suspects, and other pre-filing abuses by Defendants.

82.    Defendants' conduct was willful and exhibited a flagrant disregard for Plaintiffs' federally secured rights. Accordingly, the Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

83.    The Plaintiffs have suffered damages as a proximate result of the acts of Defendants, including but not limited to compensatory and punitive damages under 42 U.S.C. § 1983.

84.    The damages set forth in this complaint, otherwise provided for in the Michigan Wrongful Death Act, MCL § 600.2922, may only be awarded to Plaintiffs under 42 U.S.C. § 1983 as a proximate result of the acts of Defendants as described throughout this Complaint that caused the deprivation of their federally guaranteed rights.

17

## COUNT II- CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONALLY GURANTEED RIGHT OF ACCESS TO COURTS

85.    Plaintiffs repeat, reallege and incorporate by reference the allegations in paragraphs 1 through 84 above with the same force and effect as if herein set forth.

86.    Defendants Police Chief Ella Bully-Cummings, Deputy Police Chief Cara Best, Asst. Deputy Police Chief Harold Cureton, Commander Craig Schwartz, Mayor Kwame Kilpatrick, Defendant Christine Beatty, and JOHN DOE POLICE OFFICERS entered into an agreement with malicious intention to deprive the Plaintiffs of their constitutional due process right of access to the Courts, as evidenced, without limitation by the following:

    a)    Defendant Mayor Kilpatrick, Defendant Beatty and other City officials fired former Deputy Chief Gary Brown from his position as head of the Professional Accountability Bureau based on his investigation of the Manoogian Mansion party and the alleged crimes that were rumored to have occurred there;

    b)    Former Police Chief Oliver, together with Defendant Harold Cureton instructed Commander Parshall and Inspector Dolunt to stop investigating Defendant Kilpatrick;

    c)    Defendants Beatty and Kilpatrick, in coordination with others directed the release of the confidential May 6th Memo to the media to frighten and intimidate Nelthrope; Defendant Kilpatrick furthered this objective by publicly calling Nelthrope a liar;

    d)    Lt. Al Bowman attended a meeting with Police Chief Ella Bully-Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson, where he was directed by them to cease investigating Greene's homicide and to put the Tamara Greene homicide file away; and

    e)    Systematic and administration-wide retaliation against Brown, Nelthrope and Bowman by several of these Defendants for their investigation of the alleged Manoogian Mansion party, the death of Tamara Greene and other alleged misconduct by members of Defendant Kilpatrick's security detail.

87.    Defendants' actions resulted in the termination of Tamara Greene's murder investigation. Not only have Defendants' actions caused evidence to grow stale, and caused the

18

fading of material facts in the minds of witnesses and potential witnesses such that testimony and evidence have been irretrievably lost, but Defendants have also frightened and intimidated witnesses from coming forward, as well as deterred homicide investigators from vigorously investigating Tamara Greene's murder.

88.    Defendants' conduct as described herein coupled with the retaliatory actions taken against Bowman, Brown and Nelthrope was part of an on-going conspiracy to obstruct justice by covering up Greene's murder in order to avoid any embarrassment to Defendant Kilpatrick and his family.

89.    As a proximate result of Defendants' actions as described herein, Plaintiffs, or anyone acting on Plaintiffs' behalf, have been foreclosed from filing suit in state court and seeking a meaningful state court remedy.  It would be completely futile for the Plaintiffs to attempt to access the state court system given (1) the missing evidence, (2) the expired statute of limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation of the murder and related misconduct, (4) the spoliation of evidence, (5) destroyed information, (6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any viable suspects and other pre-filing abuses by Defendants

90.    The Plaintiffs have suffered damages as a result of this conspiracy.

91.    That at all times relevant herein, the Defendants were state actors and their conduct was subject to and governed by 42 U.S.C. §§1983, 1985 and 1988.

WHEREFORE, Plaintiffs respectfully requests this Honorable Court to enter a Judgment in their favor and against Defendants, jointly and severally, for the violation of their civil rights for all actual, general, special and compensatory damages in the amount of Fifty Million ($50,000,000.00) Dollars, and punitive damages in the amount of One Hundred Million

NORMAN YATOOMA & ASSOCIATES, P.C.

19

($100,000,000.00) Dollars, in addition to costs, interest and attorney fees, and such other relief as this Court deems Plaintiffs to be entitled.

Dated: September 5, 2008                    Respectfully Submitted,


                                            /s/ Norman Yatooma
                                            **Norman Yatooma & Associates, P.C.**
                                            By: Norman A. Yatooma (P54746)
                                            By: Robert S. Zawideh (P43787)
                                            Attorneys for Plaintiffs
                                            219 Elm Street
                                            Birmingham, Michigan 48009
                                            (248) 642-3600


## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their counsel of record, hereby demand a trial by jury.


Dated: September 5, 2008                    Respectfully Submitted,


                                            /s/ Norman Yatooma
                                            **Norman Yatooma & Associates, P.C.**
                                            By: Norman A. Yatooma (P54746)
                                            By: Robert S. Zawideh (P43787)
                                            Attorneys for Plaintiffs
                                            219 Elm Street
                                            Birmingham, Michigan 48009
                                            (248) 642-3600

NORMAN YATOOMA & ASSOCIATES, P.C.

20

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2008 I electronically filed the PLAINTIFF'S THIRD AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system on the following:

PLUNKETT COONEY
By: Kenneth L. Lewis (P26071)
By: Said A. Taleb (P66030)
By: Randal M. Brown (P70031)
Attorneys for Defendant Ella Bully-Cummings
535 Griswold, Suite 2400
Detroit, MI 48226
(313) 983-4790

JAMES C. THOMAS, P.C.
By: James C. Thomas (P23801)
Attorney for Defendant Kilpatrick
535 Griswold Street, Suite 2632
Detroit, Michigan 48226
(313) 963-2420

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT
By: Thomas G. Plunkett (P18957)
By: David E. Plunkett (P66696)
Attorneys for Bell Industries, Inc., d/b/a SkyTel
380 N. Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
(248) 642-0333

CITY OF DETROIT LAW DEPARTMENT
By: John A. Schapka (P36731)
Attorney for Defendants City of Detroit, Craig Schwartz, Cara Best and Harold Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3018

HONIGMAN MILLER SCHWARTZ & COHN
By: Herschel P. Fink (P13427)
Attorney for Intervenor Detroit Free Press
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226-3583
(313) 465-7000

CITY OF DETROIT LAW DEPARTMENT
By: Krystal A. Crittendon (P49981)
Attorney for Defendants City of Detroit, Craig Schwartz, Cara Best and Harold Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3062

MOSS & COLELLA PC
By: David Moss (P36757)
By: Vince Colella (P49747)
Co-Counsel for Plaintiffs Ashly Jackson and India Bond Only
29100 Northwestern Hwy., Suite 310
Southfield, Michigan 48034
(248) 945-0100

MORGANROTH & MORGANROTH, PLLC
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorneys for Defendant Christine Beatty
3000 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 355-3084

NORMAN YATOOMA & ASSOCIATES, P.C.

September 5, 2008

/s/ Norman A. Yatooma
**Norman Yatooma & Associates, P.C.**
By:  Norman A. Yatooma (P54746)
By: Robert S. Zawideh (43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com

NORMAN YATOOMA & ASSOCIATES, P.C.

# Exhibit 6

**FLAGG PROOF OF CLAIM AMOUNTS:**

Claimed Compensatory Damages: $50,000,000

Claimed Punitive Damages: $100,000,000

Attorney Fees (10/23/07 to 7/18/13): $4,858,239.50

Costs (10/23/07 to 7/18/13): $141,739.83

Grant Total: $154,999,979.33

flagg\notes and memos\proof of claim amounts 02 10 14

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT of MICHIGAN | CHAPTER 9 PROOF OF CLAIM |
|---|---|

| Name of Debtor: **City of Detroit, Michigan**     Case Number: **13-53846** | |

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Norman Yatooma & Assoc Pc**

COURT USE ONLY

Name and address where notices should be sent:    NameID: 11634621

Norman Yatooma & Assoc Pc
Attn Accounts Payable
1900 S Telegraph Rd Ste 201
Bloomfield Hills, MI 48302

Telephone number:        email:

❏ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
(*If known*)

Filed on: _____

Name and address where payment should be sent (if different from above):




Telephone number:        email:

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**        $_____

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** _____
    (See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**    **3a. Debtor may have scheduled account as:** _____
                                                                                          (See instruction #3a)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Nature of property or right of setoff: ❏ Real Estate  ❏ Motor Vehicle  ❏ Other
Describe:

Basis for perfection: _____

Value of Property: $_____

Amount of Secured Claim: $_____

Annual Interest Rate (when case was filed) _____% ❏ Fixed  or ❏ Variable

Amount Unsecured: $_____

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).**    $_____

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §** _____.    $_____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**8. Signature:** (See instruction # 8)
Check the appropriate box.

❏ I am the creditor.  ❏ I am the creditor's authorized agent.    ❏ I am the trustee, or the debtor,    ❏ I am a guarantor, surety, indorser, or other codebtor.
                                                                      or their authorized agent.                (See Bankruptcy Rule 3005.)
                                                                      (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: _____
Title: _____
Company: _____
Address and telephone number (if different from notice address above): _____    (Signature)        (Date)


Telephone number: _____    email: _____

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

13-53846-tjt   Doc 4854   Filed 05/15/14   Entered 05/15/14 15:22 ...   Page ...

1353846131125134750120805

| UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT of MICHIGAN | CHAPTER 9 PROOF OF CLAIM |
|---|---|

| Name of Debtor: **City of Detroit, Michigan** | Case Number: **13-53846** | |
|---|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Norman Yatooma & Assoc Pc**

COURT USE ONLY

Name and address where notices should be sent:    NameID: 11634621

**Norman Yatooma & Assoc Pc**
**Attn Accounts Payable**
**1900 S Telegraph Rd Ste 201**
**Bloomfield Hills, MI 48302**

❏ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
 *(If known)*

Filed on:_____

Telephone number:           email:

Name and address where payment should be sent (if different from above):

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:           email:

**1. Amount of Claim as of Date Case Filed:**       $_____

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** _____
   (See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**      **3a. Debtor may have scheduled account as:**_____
                                                        (See instruction #3a)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Amount of arrearage and other charges, as of the time case was filed,** included in secured claim, if any:
                    $_____

**Nature of property or right of setoff:** ❏ Real Estate  ❏ Motor Vehicle  ❏ Other
**Describe:**

**Basis for perfection:** _____

**Value of Property: $**_____

**Amount of Secured Claim:**    $_____

**Annual Interest Rate (when case was filed)**_____%  ❏ Fixed  or  ❏ Variable

**Amount Unsecured:**    $_____

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).**      $_____

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §**_____.      $_____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature: (See instruction # 8)**
Check the appropriate box.

❏ I am the creditor.  ❏ I am the creditor's authorized agent.      ❏ I am the trustee, or the debtor,      ❏ I am a guarantor, surety, indorser, or other codebtor.
                                                or their authorized agent.          (See Bankruptcy Rule 3005.)
                                                (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: _____
Title: _____
Company: _____
Address and telephone number (if different from notice address above):        (Signature)            (Date)

_____
_____

Telephone number:           email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

13-53846-tjt    Doc 4854    Filed 05/15/14    Entered ...

1353846131125134750120805

-------------------------------------------------------------x
                         :

In re                          :          Chapter 9
                              :

CITY OF DETROIT, MICHIGAN,     :        Case No. 13-53846
                              :

                   Debtor.     :        Hon. Steven W. Rhodes
                              :
                              :
-------------------------------------------------------------x

## INFORMATION ABOUT DEADLINES TO FILE CLAIMS

### OVERVIEW – KEY POINTS

- This document is a legal notice concerning the bankruptcy case of the City of Detroit, Michigan. This document is being sent to all parties that may be owed money by the City (known as "creditors").

- **The Overview on this page describes the key terms of this document. Please read the entire document carefully for further details. On the following pages, each section of this document includes a summary of the main points, followed by more detailed information.**

- In bankruptcy, creditors may be required to file claim forms stating the amount of money owed to them as of the day the bankruptcy was filed. This document explains how to file claims.

- **Many creditors in the City's bankruptcy case are not required to file a claim.** This document explains who is required to file a claim and who is not required to file a claim. If you are not required to file a claim, then you do not need to take any action at this time to preserve your right to vote on or receive payments under a restructuring plan.

- **The following parties are not required to file a claim** (*for further information, see Section 1 of this document*):

  o **City retirees and their beneficiaries** are not required to file claims for pension or healthcare benefits or other post-employment welfare benefits.

  o **City employees and their beneficiaries** are not required to file claims for pension or healthcare benefits, routine wages or other employment benefits.

  o **Taxpayers** are not required to file claims for routine income tax refunds.

  o **Bondholders** holding any of the bonds identified on the "Schedule of Secured Bonds" on the last two pages of this document and **holders of Certificates of Participation** issued by the City are not required to file claims for the repayment of principal, interest and/or other applicable fees and charges.

  o **Other bondholders** holding general obligation bonds are not required to file claims to receive their *pro rata* share of distributions on account of the amount of principal and interest calculated by the City.

- If you are required to file a claim against the City, you must do so by **February 21, 2014 at 4:00 p.m., Eastern Time**. A form that you may use to file your claim is provided with this document. *For further information, and other special deadlines for certain creditors, see Sections 3 and 4 of this document.*

- Claims may be mailed or hand delivered to the City's agent (Kurtzman Carson Consultants) or to the Court at the addresses provided in Section 5 of this document.

- After reading this document, if you have any questions regarding the filing of a claim, you may contact the City of Detroit Claims Hotline toll-free between the hours of 10:00 a.m. and 6:00 p.m., Eastern Time, at **(877) 298-6236**. Please note that the people answering the hotline phone number are not able to provide legal advice. If you have questions about your legal rights, including whether you need to file a claim, you should talk to a lawyer.

**TO ALL PERSONS AND ENTITIES WITH CLAIMS**
**AGAINST THE CITY OF DETROIT, MICHIGAN (THE "CITY"):**

On November 21, 2013, the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") entered an order (Docket No. 1782) (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim in the chapter 9 bankruptcy case of the City.

By the Bar Date Order, the Court established **February 21, 2014 at 4:00 p.m., Eastern Time** (the "General Bar Date"), as the general claims bar date for filing proofs of claim in the City's case. As described below, certain claimants are not required to file proofs of claim with respect to their claims, and the Bar Date Order also establishes different bar dates with respect to certain categories of claims. See Section 1 for more information. *To determine if you need to file a proof of claim in this case and the applicable deadline and instructions for filing a proof of claim, please read this Notice carefully.*

### List of Claims

On September 30, 2013, the City filed its Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), which constitutes the City's list of claims (as amended or supplemented from time to time, the "List of Claims") under section 925 of title 11 the United States Code (the "Bankruptcy Code"). Any claim identified on the List of Claims is referred to herein as a "Scheduled Claim."

### Proof of Claim Form

For your convenience, enclosed with this Notice is a proof of claim form (the "Claim Form"), which identifies on its face the amount, nature and classification of your claim(s), if any, listed in the City's List of Claims. *If you are the holder of a general obligation bond (defined in Section 1 as GO Bonds), please note that the List of Claims identifies the City's calculation of the total bond debt by series as of commencement of the City's bankruptcy case on July 18, 2013, and the List of Claims does not identify the amount owed to any particular bondholder. If you are a holder of a GO Bond, the amount listed by the City in the List of Claims for each series of GO Bonds is provided with your Claim Form.*

A blank copy of the Claim Form is available on the City's restructuring website at www.kccllc.net/detroit, along with all other documents filed in the City's bankruptcy case.

### Certain Definitions

The following definitions come from the Bankruptcy Code and are provided for your convenience.

As used in this Notice the term "entity" has the meaning given to it in section 101(15) of the Bankruptcy Code and includes, among other things, individuals, partnerships, corporations, joint ventures and trusts.

As used in this Notice, the term "claim" means, as to or against the City and in accordance with section 101(5) of the Bankruptcy Code: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

## SECTION 1 — WHO IS NOT REQUIRED TO FILE A PROOF OF CLAIM

---

### SUMMARY

- **Section 1 describes which of the City's creditors are not required to file claims. It states that the following creditors, among others, are not required to file claims:**

  o **City retirees and their beneficiaries** are not required to file claims for pension or healthcare benefits or other post-employment welfare benefits. *The City will work with retiree representatives to establish an appropriate process for retirees and their beneficiaries to vote on and receive payments under any restructuring plan.*

  o **City employees and their beneficiaries** are not required to file claims for pension or healthcare benefits, routine wages or other employment benefits. *The City will work with employee representatives to establish an appropriate process for employees to vote on and receive payments under any restructuring plan.*

  o **Taxpayers** are not required to file claims for routine income tax refunds. *The City will continue to process routine income tax refunds according to its usual procedures.*

  o **Bondholders** holding any of the bonds identified on the "Schedule of Secured Bonds" on the last two pages of this Notice and **holders of Certificates of Participation** issued by the City are not required to file claims for the repayment of principal, interest and/or other applicable fees and charges. *In each case, the applicable trustee or other agent has agreed to file the claim on behalf of the holders.*

  o **Other bondholders** holding general obligation bonds are not required to file claims to receive their *pro rata* share of distributions on account of the amount of principal and interest listed on the City's list of claims. *See Section 8 for more details about the list of claims.*

- A restructuring plan is a document that explains how the City proposes to pay the amounts it owes to its creditors. Once filed, this plan will be available for creditors to review. **If you are not required to file a claim, you do not need to complete and return a claim form, and you will still keep your rights to vote on a restructuring plan and receive payments under the plan.** Who gets to vote on the plan will be determined at a later date. The amount you may receive under the plan also will be determined later. The plan may propose that you receive less than the amount you are owed.

- **Even if you are not required to file a claim form, you are permitted to do so.**

---

The Bar Date Order provides that entities holding the following claims **are not required to** file proofs of claim on account of such claims to preserve any right they may have to receive distributions from the City and vote on any chapter 9 plan of adjustment (a "Plan") proposed by the City:

    (a)    Claims of retirees, employees or other beneficiaries for (i) post-employment benefits under the City's Health and Life Insurance Benefit Plan, the Supplemental Death Benefit Plan or other non-pension post-employment welfare benefits, including unfunded actuarially accrued liabilities (any such claim, a "Retirement Healthcare Claim") and (ii) pension benefits (any such claim, a "Pension Claim") under the City's two retirement systems, the General Retirement System and the Police and Fire Retirement System (together, the "Retirement Systems"). In consultation with the Official Committee of Retirees appointed in the Chapter 9 Case (the "Retiree Committee"), other groups representing the interests of current and future recipients of post-employment healthcare and pension benefits and, in the case of Pension Claims, the Retirement Systems, the City intends to establish an appropriate mechanism for such retirees, employees or other beneficiaries to vote on any Plan with respect to any pension and healthcare claims they may possess.

    (b)    Claims of active employees for ordinary course compensation and employment benefits including, without limitation, wages, salaries, employee medical benefits and insurance benefits ("Ordinary Course Compensation Claims"). The City intends to continue to pay Ordinary Course Compensation Claims in the normal course. Accordingly, active employees need not file proofs of claim on account of Ordinary Course Compensation Claims. For the avoidance of doubt, claims asserted or to be asserted in any lawsuit or similar proceeding are not Ordinary Course

Compensation Claims even where the claims assert as damages an entitlement to wages, salaries, employee medical benefits and/or insurance benefits.

(c) Any claim by a holder for the repayment of principal, interest and/or other applicable fees and charges on or under (i) the bonds identified on the "Schedule of Secured Bonds" on the last two pages of this Notice (collectively, the "Secured Bonds") or (ii) any certificates of participation issued by the City (collectively, the "COPs"). In each case, the trustee or similar entity with respect to the applicable series of Secured Bonds or COPs has informed the City that, consistent with Bankruptcy Rule 3003(c), it intends to: (i) file any proofs of claim against the City on behalf of the holders of the Secured Bonds and the COPs; and (ii) provide notice to the holders of the Secured Bonds and the COPs.

(d) Any claim by a holder for the repayment of principal or interest on or under the City's unlimited tax general obligation bonds, limited tax general obligation bonds and general fund bonds (collectively, the "GO Bonds" or "general obligations bonds") to preserve its right to a *pro rata* share of payments on account of the amount of principal and interest under such bonds listed in the List of Claims. Holders of GO Bonds with claims for amounts beyond principal and interest under these bonds are required to file claims for those additional amounts unless another exception applies. Also, the insurers of the GO Bonds must file any claims relating to the GO Bonds by the General Bar Date. The classification, priority and treatment of claims for principal and interest under the GO Bonds pursuant to any Chapter 9 Plan shall not be affected by any provision of the Bar Date Order or by whether or not the holders of GO Bonds file or do not file proofs of claim.

(e) Any claim arising from an ordinary course entitlement to an income tax refund (to the extent of such claimed entitlement) asserted through the City's established income tax refund procedures, provided, however, that entities holding any other Prepetition Claims or causes of action related to income tax matters that are not properly asserted through the City's established income tax refund procedures must file a proof of claim by the General Bar Date.

(f) Any claim with respect to which the holder already has filed a signed proof of claim against the City with the Clerk of this Court in a form substantially similar to Official Bankruptcy Form No. 10.

(g) Any claim that is listed on the List of Claims if (i) the claim is not listed as "disputed," "contingent" or "unliquidated;" and (ii) such entity agrees with the amount, nature and priority of the claim as set forth in the List of Claims.

(h) Any claim that previously has been allowed by order of the Court.

(i) Any claim that has been paid in full by the City.

(j) Any claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration (other than any 503(b)(9) Claim or any portion of a Rejection Damages Claim asserting administrative priority under section 503(b) of the Bankruptcy Code).

*For the avoidance of doubt, nothing herein or in the Bar Date Order affects any right that the claimants identified in subsections (a) through (h) of this Section 1 may have to vote on and receive distributions under any Plan proposed by the City. Further, nothing herein or in the Bar Date Order should be construed as an agreement by the City or a determination by the Court that any particular party is the proper holder of any specific claim against the City with the right to vote on any Plan proposed by the City and receive distributions from the City on account of such claim.*

*Nothing in this Section 1 limits the right of any entity (including, without limitation, the City, the Retiree Committee, the Retirement Systems or the City's unions, employees, retirees, bondholders, bond insurers, trustees, paying agents or any other entity) to (a) assert any proof of claim authorized under the Bankruptcy Code or (b) object to any proof of claim on any grounds to the extent permitted under the Bankruptcy Code.*

-4-

## SECTION 2 — WHO MUST FILE A PROOF OF CLAIM

<table>
<tr><td colspan="2" align="center">**SUMMARY**</td></tr>
<tr><td>•</td><td>**Section 2 explains who must file a claim. If none of the exceptions in Section 1 apply to you, then you must file a claim.**</td></tr>
<tr><td>•</td><td>Note that the instructions in this document are for filing claims for any amounts owed to you by the City that "arose" before July 18, 2013, when this bankruptcy case was filed. That may include amounts promised to you before July 18, 2013, even if they were not due until later.</td></tr>
<tr><td>•</td><td>If you are the holder of a bond listed at the end of this document, or the holder of a Certificate of Participation, a trustee or agent has indicated that it will file a claim on your behalf.</td></tr>
<tr><td>•</td><td>If you hold general obligation bonds, you are not required to file claims for your *pro rata* share of distributions on account of the amount of principal and interest listed on the City's list of claims. *See Section 8 for more details about the list of claims.* Claims for other amounts should be filed by the deadline.</td></tr>
<tr><td>•</td><td>**Even if you are not required to file a claim form, you are permitted to do so.**</td></tr>
</table>

If none of the exceptions described in Section 1 applies, and if you have a claim that arose or is deemed to have arisen prior to the Filing Date (any such claim, a "Prepetition Claim"), you MUST file a proof of claim to share in distributions from the City's bankruptcy case and to vote on a Plan. Claims based on acts or omissions of the City that occurred before the Filing Date must be filed on or prior to the applicable Bar Date, even if such claims are not now fixed, liquidated or certain or did not mature or become fixed, liquidated or certain before the Filing Date.

Except where one of the exceptions described in Section 1 applies (or where the Rejection Damages Bar Date, the Amended Claims List Bar Date or the Governmental Bar Date applies to establish a different deadline), the following entities must file proofs of claim on or before the General Bar Date:

    (a)    any entity (i) whose Prepetition Claim against the City is not listed in the City's List of Claims or is listed as "disputed," "contingent" or "unliquidated" and (ii) that desires to share in any distribution in this bankruptcy case and/or otherwise participate in the proceedings in this bankruptcy case associated with the confirmation of any Plan; and

    (b)    any entity that believes its Prepetition Claim is improperly classified in the List of Claims or is listed in an incorrect amount or priority and that desires to have its claim allowed in a classification, priority or amount other than that identified in the List of Claims, *provided that* any holder of GO Bonds asserting a claim for principal and interest in connection with such bonds is not required to file a proof of claim to preserve its right to a *pro rata* share of distributions on account of the amount of principal and interest under such bonds listed in the City's List of Claims.

    *Note that the Bar Date Order should not be construed as an agreement by the City or a determination by the Court that any particular party is the proper holder of any specific claim against the City with the right to vote on any Plan proposed by the City and receive distributions from the City on account of such claim.*

---

**SUMMARY**

- Section 3 states that the general deadline for creditors to file claims is **February 21, 2014 at 4:00 p.m., Eastern Time.**

- "Bar date" is the legal term for the deadline to file a claim form.

- There are other later deadlines for filing claims that apply to certain parties. Additional information about these deadlines will be sent to those parties. These deadlines also are explained in Section 3.

---

The Bar Date Order establishes the following bar dates for filing proofs of claim in this case (collectively, the "Bar Dates"):

(a)    The General Bar Date. Pursuant to the Bar Date Order, except as described below, all entities holding claims against the City that arose (or are deemed to have arisen) prior to the commencement of this case are required to file proofs of claim by the General Bar Date (i.e., by February 21, 2014 at 4:00 p.m., Eastern Time). This case was commenced on July 18, 2013 (the "Filing Date"). The General Bar Date applies to all types of claims against the City that arose prior to the Filing Date, including secured claims, unsecured priority claims and unsecured nonpriority claims. For the avoidance of doubt, the General Bar Date applies to all claims asserting administrative expense priority under section 503(b)(9) of the Bankruptcy Code, subject to Section 4 below.

(b)    The Rejection Damages Bar Date. Pursuant to the Bar Date Order, any entity asserting claims arising from or relating to the rejection of executory contracts or unexpired leases, in accordance with section 365 of the Bankruptcy Code and pursuant to an order entered prior to the confirmation and effectiveness of a Plan (any such order, a "Rejection Order"), or claims otherwise related to such rejected agreements, including (i) secured claims, unsecured priority claims and unsecured nonpriority claims that arose or are deemed to have arisen prior to the Filing Date and (ii) administrative claims under section 503(b) of the Bankruptcy Code (collectively, "Rejection Damages Claims") are required to file proofs of claim by the later of (A) the General Bar Date and (B) 4:00 p.m., Eastern Time, on the first business day that is at least 30 days after the entry of the relevant Rejection Order. The later of these dates is referred to in this Notice as the "Rejection Damages Bar Date." *For the avoidance of doubt, all prepetition and postpetition claims of any kind or nature arising from or relating to executory contacts or unexpired leases rejected by a Rejection Order must be filed by the Rejection Damages Bar Date.* In accordance with the Bar Date Order, any Rejection Order entered by the Bankruptcy Court will specify the Rejection Damages Bar Date applicable to any executory contracts or unexpired leases rejected thereunder.

(c)    The Amended Claims List Bar Date. Pursuant to the Bar Date Order, if, subsequent to the date of this Notice, the City amends or supplements its List of Claims to: (i) reduce the undisputed, noncontingent and liquidated amount of a claim; (ii) change the nature, classification or priority of a Scheduled Claim in a manner adverse to the listed creditor; or (iii) add a new Scheduled Claim to the List of Claims with respect to a party that was not previously served with notice of the Bar Dates (in each case, a "Modified Claim"), the affected claimant shall be permitted to file a proof of claim, or amend any previously filed proof of claim, in respect of the Modified Claim in accordance with the procedures described herein by the later of (A) the General Bar Date; and (B) 4:00 p.m., Eastern Time, on the first business day that is at least 30 days after the date that notice of the applicable amendment to the List of Claims is served on the claimant (the "Amended Claims List Bar Date"). The City will provide notice of any Amended Claims List Bar Date to affected claimants. Affected claimants that previously filed a proof of claim (any such claim, a "Filed Claim") with respect the liabilities giving rise to any Modified Claim need not refile their proof of claim because the Filed Claim is deemed to supersede and replace the original Scheduled Claim and the Modified Claim. In addition, if the City's amendment to the List of Claims improves the amount or treatment of a Scheduled Claim or a Filed Claim, a claimant that previously was served with a notice of the Bar Dates is not permitted to file additional claims by

the Amended Claims List Bar Date; provided, however, that nothing contained in the Bar Date Order shall be construed to limit, enhance or otherwise affect a claimant's right to amend a timely filed proof of claim. In addition, notwithstanding the foregoing, nothing contained herein precludes the City from objecting to any Scheduled Claim or Filed Claim on any grounds.

(d)    The Governmental Bar Date. Governmental units (as defined in section 101(27) of the Bankruptcy Code) are not subject to the General Bar Date. Pursuant to Bankruptcy Rule 3002(c)(1), the date by which governmental units must file proofs of claim in this case (the "Governmental Unit Bar Date") is the later of: (i) the first business day that is at least 180 days following the date of the entry of an order for relief in this case; and (ii) any Rejection Damages Bar Date or Amended Claims List Bar Date applicable to the governmental unit. No order for relief has been entered in the City's chapter 9 case as of the date of this Notice. If the City prevails in establishing eligibility, the Court will enter an order for relief consistent with section 921(d) of the Bankruptcy Code. The City will provide notice of the entry of an order for relief to all known creditors that are governmental units of the Court's entry of an order for relief and the resulting Governmental Bar Date.

## SECTION 4 — WHAT TO FILE

### SUMMARY

- Section 4 explains the paperwork for filing a claim.

- The claim form is sometimes called a "proof of claim."

- You must complete and sign the claim form and provide all necessary supporting documentation or a summary of this documentation.

- The amount owed to you must be listed in U.S. dollars, and the form must be filled out in English.

- The claim form includes instructions and explanations to assist you.

- A claim form is enclosed. Extra copies are available for free on the internet at www.kccllc.net/detroit.

As noted above, the City is enclosing a Claim Form for use in this case, or you may use another proof of claim form that conforms substantially to Official Bankruptcy Form No. 10. If your claim is listed by the City on its List of Claims (other than claims arising from GO Bonds), the attached Claim Form sets forth: (a) the amount of your claim (if any) as listed by the City; (b) whether your claim is listed as disputed, contingent or unliquidated; and (c) whether your claim is listed as a secured claim or an unsecured nonpriority claim. *If you are the holder of a GO Bond, please note that the List of Claims identifies the City's calculation of the total bond debt by series as of the Filing Date, and the List of Claims does not identify the amount owed to any particular bondholder. If you are a holder of a GO Bond, the amount listed by the City in the List of Claims for each series of GO Bonds is provided with your Claim Form.*

You will receive a different Claim Form for each claim listed in your name by the City. You may utilize the Claim Form(s) provided by the City to file your claim. Additional proof of claim forms may be obtained at the following websites: (a) www.kccllc.net/detroit for a blank Claim Form designed specifically for this case or (b) www.uscourts.gov/bkforms for a copy of Official Bankruptcy Form No. 10.

All proof of claim forms must be **signed** by the claimant or by an authorized agent of the claimant. The proof of claim form must be written in English and be denominated in United States currency. You should attach to your completed proof of claim form any documents on which the claim is based (the "Supporting Documents") (or, if the Supporting Documents are voluminous, you may attach a summary) or an explanation as to why the documents are not available. If you file a summary of the Supporting Documents because they are voluminous, you must transmit the Supporting Documents to (a) the City of Detroit Claims Processing Center (as defined below) and (b) the City within ten days after the date of a written request by the City for such documents.

-7-

Each entity asserting a Rejection Damages Claim with an administrative claim component must file, along with its proof of claim, a detailed statement describing the nature and basis of the portion of the Rejection Damages Claim asserting an administrative priority under section 503(b) of the Bankruptcy Code (the "Administrative Claim Supplement").

Under the Bar Date Order, the filing of a proof of claim form satisfies the procedural requirements for the assertion of any administrative priority claims under section 503(b)(9) of the Bankruptcy Code. Likewise, the filing of a proof of claim form, along with an attached Administrative Claim Supplement, if applicable, satisfies the procedural requirements for the assertion of a Rejection Damages Claim (including any administrative claim included therein). Claims asserting administrative expense priority (a) under section 503(b)(9) of the Bankruptcy Code or (b) as a portion of a Rejection Damages Claim must be filed by the General Bar Date and the Rejection Damages Bar Date, respectively.

*All other administrative claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code will not be deemed proper if asserted by proof of claim. The City intends to establish a process for the assertion of such claims at a future date if and to the extent necessary or appropriate. Note that the claim priorities provided under subsections (a)(1) and (a)(3) through (a)(10) of section 507 of the Bankruptcy Code are inapplicable in chapter 9 pursuant to section 901(a) of the Bankruptcy Code.*

## SECTION 5 — WHEN AND WHERE TO FILE

### SUMMARY

- Section 5 explains that claims may be mailed or hand delivered to *either:* (a) the City's Claims Processing Center in California or (b) the Clerk's Office at the Bankruptcy Court in Detroit, Michigan.

- The addresses for filing are listed in Section 5 below.

- All claims must be received by **February 21, 2014 at 4:00 p.m., Eastern Time**, if that deadline applies to you.

- **All claims must be mailed or delivered by hand. Fax and e-mail submissions are not allowed. Also, electronic filing of claims on the Court's docketing system is not permitted.**

- If you would like to receive an acknowledgment of your filing, you must provide an extra copy of your claim. If you are filing your claim by mail, or delivering it to the claims center in California, you also must provide a self-addressed, postage prepaid return envelope.

All proofs of claim must be mailed or delivered so as to be received **on or before the applicable Bar Date**, at either one of the following two locations:

(a) the City of Detroit Claims Processing Center at the following address:

**City of Detroit Claims Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

-or-

(b)     the Clerk's office at the Court (the "Clerk's Office") at the following address:

**Office of the Clerk of Court**
**United States Bankruptcy Court**
**for the Eastern District of Michigan**
**211 West Fort Street**
**Suite 1700**
**Detroit, MI  48226**

Proofs of claim will be deemed filed only when **actually received** by the City of Detroit Claims Processing Center or the Clerk's Office on or before the applicable Bar Date.  **Proofs of claim may NOT be delivered by facsimile or electronic mail transmission**.  Any submissions by facsimile, electronic mail or electronic (ECF) court filing will not be accepted and will not be deemed filed until a proof of claim is submitted by one of the methods described above.

Proof of claim forms will be collected from the City of Detroit Claims Processing Center and the Clerk's Office, docketed and maintained by the City's claims agent, KCC.  If you wish to receive acknowledgement of receipt of a proof of claim, you must submit by the applicable Bar Date and concurrently with submitting your original proof of claim (a) a copy of the original proof of claim and (b) for claims submitted to KCC or by mail to the Clerk's Office, a self-addressed, postage prepaid return envelope.

## SECTION 6 — EXECUTORY CONTRACTS AND UNEXPIRED LEASES

<div style="border:1px solid black">

### SUMMARY

- Section 6 provides special rules for creditors asserting claims arising from contracts that the City rejects during its bankruptcy case.
- "Rejecting" a contract is a special bankruptcy power that allows the City to stop performing certain agreements upon approval of the Bankruptcy Court.

</div>

As described in Section 3 above, any entity wishing to assert a Rejection Damages Claim must file a proof of claim for any prepetition or postpetition damages caused by such rejection, or any other prepetition or postpetition claims of any kind or nature whatsoever relating to the rejected agreement, by the Rejection Damages Bar Date.

## SECTION 7 — CONSEQUENCES OF FAILURE TO FILE
## A PROOF OF CLAIM BY THE APPLICABLE BAR DATE

<div style="border:1px solid black">

### SUMMARY

- Section 7 explains what happens if you are required to file a claim by the deadline, but do not.
- In that case, you will lose the right to vote on or receive payments under the City's restructuring plan.

</div>

ANY ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM WITH RESPECT TO A PARTICULAR CLAIM AGAINST THE CITY, BUT THAT FAILS TO DO SO BY THE APPLICABLE BAR DATE DESCRIBED IN THIS NOTICE, SHALL BE FOREVER BARRED, ESTOPPED AND ENJOINED FROM THE FOLLOWING:  (A) ASSERTING ANY CLAIM AGAINST THE CITY OR PROPERTY OF THE CITY THAT (I) IS IN AN AMOUNT THAT EXCEEDS THE AMOUNT, IF ANY, THAT IS IDENTIFIED IN THE LIST OF CLAIMS ON BEHALF OF SUCH ENTITY AS UNDISPUTED, NONCONTINGENT AND

LIQUIDATED OR (II) IS OF A DIFFERENT NATURE OR A DIFFERENT CLASSIFICATION OR PRIORITY THAN ANY CLAIM IDENTIFIED IN THE LIST OF CLAIMS ON BEHALF OF SUCH ENTITY (ANY SUCH CLAIM BEING REFERRED TO IN THIS NOTICE AS AN "UNSCHEDULED CLAIM"); (B) VOTING UPON, OR RECEIVING DISTRIBUTIONS UNDER, ANY PLAN IN THIS CHAPTER 9 CASE IN RESPECT OF AN UNSCHEDULED CLAIM; OR (C) WITH RESPECT TO ANY 503(B)(9) CLAIM OR ADMINISTRATIVE PRIORITY CLAIM COMPONENT OF ANY REJECTION DAMAGES CLAIM, ASSERTING ANY SUCH PRIORITY CLAIM AGAINST THE CITY OR PROPERTY OF THE CITY.

## SECTION 8 — THE CITY'S LIST OF CLAIMS

---

### SUMMARY

- Section 8 explains that the City filed a list of the claims that it believes it owes.

- The enclosed claim form will show how the City listed your claim. A copy of the claim list also is available on the internet at www.kccllc.net/detroit.

- Note that the City's bond debt was listed by bond series. Individual bondholders were not listed. The claim form sent to holders of general obligation bonds will include a list of all series of general obligation bonds, showing the City's calculation of the total principal and interest as of the date the bankruptcy was filed.

- If your claim is on the claim list, that means the City may have filed a claim for you. Please review the information carefully. If the City listed your claim with any of these labels, you cannot rely on the City's claim: "contingent" or "unliquidated" or "disputed." If you see any of these words next to your claim, you must file the claim form by the deadline if the claim deadline applies to you. *The parties listed in Section 1 do not have to file a claim form by the deadline.*

---

You may be listed as the holder of a claim against the City in the City's List of Claims. To determine if and how you are listed on the List of Claims, please refer to the descriptions set forth on the enclosed proof of claim form(s) regarding the nature, amount and status of your claim(s). See Section 10 below for instructions regarding how to access the List of Claims. If you received postpetition payments from the City on account of your claim, the information on the enclosed proof of claim form may reflect the net remaining amount of your claims.

If you rely on the City's List of Claims, it is your responsibility to determine that the claim is accurately listed in the List of Claims. However, you may rely on the enclosed form, which sets forth (a) the amount of your claim (if any) as listed; (b) specifies whether your claim is listed in the List of Claims as disputed, contingent or unliquidated; and (c) identifies whether your claim is listed as a secured, unsecured priority or unsecured nonpriority claim. *If you are the holder of a GO Bond, please note that the List of Claims identifies the City's calculation of the total bond debt by series as of the Filing Date, and the List of Claims does not identify the amount owed to any particular bondholder. If you are a holder of a GO Bond, the amount listed by the City in the List of Claims for each series of GO Bonds is provided with your Claim Form.*

As described above, if you agree with the nature, amount and priority of your claim as listed in the City's List of Claims, and if your claim is not described in the Schedules as "disputed," "contingent" or "unliquidated," you do not need to file a proof of claim. Otherwise, or if you decide to file a proof of claim, you must do so before the applicable Bar Date in accordance with the procedures set forth in this Notice.

## SECTION 9 — RESERVATION OF RIGHTS

+------------------------------------------------------------------+
| **SUMMARY**                                                      |
|                                                                  |
| • Section 9 explains that the City has the right to "object" to  |
|   any claim you may file.                                        |
|                                                                  |
| • This means that the City can challenge your claim in Court. If |
|   the City challenges your claim, you will be notified.          |
+------------------------------------------------------------------+

      The City reserves the right to (a) dispute, or to assert offsets or defenses against, any filed claim or any claim listed or reflected in the List of Claims as to nature, amount, liability, priority, classification or otherwise; (b) subsequently designate any listed claim as disputed, contingent or unliquidated; and (c) otherwise amend or supplement the List of Claims. Nothing contained in this Notice shall preclude the City from objecting to any claim, whether listed or filed, on any grounds. Nothing herein or in the Bar Date Order limits, or is intended to limit, any claimant's rights to defend against any objection.

## SECTION 10 — ADDITIONAL INFORMATION

+------------------------------------------------------------------+
| **SUMMARY**                                                      |
|                                                                  |
| • Section 10 explains how you can get more information.          |
|                                                                  |
| • If you have questions, you can call the **City of Detroit      |
|   Claims Hotline, toll-free, at (877) 298-6236** between 10:00   |
|   a.m. and 6:00 p.m., Eastern Time, Monday through Friday. Or    |
|   you can write to the address below.                            |
|                                                                  |
| • Information also will be available on the internet at          |
|   www.kccllc.net/detroit.                                        |
|                                                                  |
| • The people at the hotline cannot give you legal advice. Legal  |
|   advice cannot be provided through the mailing address below    |
|   or the City's website. If you want legal advice, you must      |
|   contact a lawyer.                                              |
+------------------------------------------------------------------+

      Copies of the City's List of Claims, the Bar Date Order and other information and documents regarding the City's chapter 9 case are available free of charge on KCC's website at www.kccllc.net/detroit or for a fee at the Court's website at https://ecf.mieb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information through the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov. The List of Claims and other documents filed in this case may be accessed electronically, between the hours of 8:30 a.m. and 4:00 p.m., Eastern Time, Monday through Friday, at the public access terminals located in the Clerk's Office on the 17th Floor of the courthouse at 211 West Fort Street, Detroit, Michigan 48226. Copies of documents may be printed at the Clerk's Office for a charge.

      If you require additional information regarding the filing of a proof of claim, you may contact the City of Detroit Claims Hotline, toll-free, at **(877) 298-6236** between 10:00 a.m. and 6:00 p.m., Eastern Time, Monday through Friday. You also may contact the City's claims agent, KCC, directly by writing to:

<div align="center">

City of Detroit Claims Processing Center
c/o Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245

</div>

      **PLEASE NOTE THAT KCC IS NOT PERMITTED TO PROVIDE LEGAL ADVICE. YOU <u>CANNOT</u> GET LEGAL ADVICE BY CALLING THE CITY OF DETROIT CLAIM HOTLINE OR BY WRITING TO THE CITY OF DETROIT CLAIMS PROCESSING CENTER. YOU SHOULD CONSULT AN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE OR FOR ANY LEGAL ADVICE, SUCH AS WHETHER YOU SHOULD FILE A PROOF OF CLAIM.**

Dated: November 25, 2013              BY ORDER OF THE COURT

## SCHEDULE OF SECURED BONDS

The applicable trustee or similar entity with respect to the following series of bonds has informed the City that it intends to: (a) file any proofs of claim against the City on behalf of the holders of these bonds; and (b) provide notice to the holders of the bonds.

| Secured Bond | Trustee or Similar Entity | Secured Bond | Trustee or Similar Entity |
|---|---|---|---|
| Sewage Disposal System Revenue Bond Series 1998-A | U.S. Bank National Association ("U.S. Bank") | Sewage Disposal System State Revolving Fund Revenue Bonds Series 2004-SRF2 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 1998-B | U.S. Bank | Sewage Disposal System State Revolving Fund Revenue Bonds Series 2004-SRF3 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 1999-A | U.S. Bank | Sewage Disposal System State Revolving Fund Revenue Bonds Series 2007-SRF1 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2001-B | U.S. Bank | Sewage Disposal System State Revolving Fund Revenue Bonds Series 2009-SRF1 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2001(C)(1) | U.S. Bank | Sewage Disposal System State Revolving Fund Revenue Bonds Series 2010-SRF1 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2001(C)(2) | U.S. Bank | Sewage Disposal System State Revolving Fund Revenue Bonds Series 2012-SRF1 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2001-D | U.S. Bank | | |
| Sewage Disposal System Revenue Bond Series 2001-E | U.S. Bank | Water Supply System Revenue Bond Series 1993 | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2003-A | U.S. Bank | Water Supply System Revenue Bond Series 1997-A | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2003-B | U.S. Bank | Water Supply System Revenue Bond Series 2001-A | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2004-A | U.S. Bank | Water Supply System Revenue Bond Series 2001-C | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2005-A | U.S. Bank | Water Supply System Revenue Bond Series 2003-A | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2005-B | U.S. Bank | Water Supply System Revenue Bond Series 2003-B | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2005-C | U.S. Bank | Water Supply System Revenue Bond Series 2003-C | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2006-A | U.S. Bank | Water Supply System Revenue Bond Series 2003-D | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2006-B | U.S. Bank | Water Supply System Revenue Bond Series 2004-A | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2006-C | U.S. Bank | Water Supply System Revenue Bond Series 2004-B | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2006-D | U.S. Bank | Water Supply System Revenue Bond Series 2005-A | U.S. Bank |
| Sewage Disposal System Revenue Bond Series 2012-A | U.S. Bank | Water Supply System Revenue Bond Series 2005-B | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1992-B SRF | U.S. Bank | Water Supply System Revenue Bond Series 2005-C | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1993-B SRF | U.S. Bank | Water Supply System Revenue Bond Series 2006-A | U.S. Bank |

| Secured Bond | Trustee or Similar Entity | Secured Bond | Trustee or Similar Entity |
|---|---|---|---|
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1997-B SRF | U.S. Bank | Water Supply System Revenue Bond Series 2006-B | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1999-SRF1 | U.S. Bank | Water Supply System Revenue Bond Series 2006-C | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1999-SRF2 | U.S. Bank | Water Supply System Revenue Bond Series 2006-D | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1999-SRF3 | U.S. Bank | Water Supply System Revenue Bond Series 2011-A | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 1999-SRF4 | U.S. Bank | Water Supply System Revenue Bond Series 2011-B | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2000-SRF1 | U.S. Bank | Water Supply System Revenue Bond Series 2011-C | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2000-SRF2 | U.S. Bank | Water Supply System State Revolving Fund Revenue Bonds Series 2005-SRF1 | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2001-SRF1 | U.S. Bank | Water Supply System State Revolving Fund Revenue Bonds Series 2005-SRF2 | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2001-SRF2 | U.S. Bank | Water Supply System State Revolving Fund Revenue Bonds Series 2006-SRF1 | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2002-SRF1 | U.S. Bank | Water Supply System State Revolving Fund Revenue Bonds Series 2008-SRF1 | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2002-SRF2 | U.S. Bank | | |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2002-SRF3 | U.S. Bank | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation) Series 2010-A | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2003-SRF1 | U.S. Bank | Distributable State Aid General Obligation Limited Tax Bonds Series 2010 | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2003-SRF2 | U.S. Bank | Distributable State Aid Third Lien Bonds (Limited Tax General Obligation) Series 2012-A(2), (A2-B), (B) & (B)(2) | U.S. Bank |
| Sewage Disposal System State Revolving Fund Revenue Bonds Series 2004-SRF1 | U.S. Bank | | |
| | | Detroit Building Authority Bonds: Revenue Refunding Bonds Parking System-Series 1998-A | The Bank of New York Mellon Trust Company, National Association |

# **EXHIBIT 3**

ATI-2604530v1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ERNEST FLAGG, as Next Friend of J. B.,
a minor; TARIS JACKSON, as Next Friend          Case No. 05-74253
of A. J., a minor; and BRIAN GREENE, as         Hon. Gerald E. Rosen
Next Friend of I. B., a minor,

       Plaintiffs,

v.

CITY OF DETROIT and KWAME M. KILPATRICK,

       Defendants.
_____/

**JUDGMENT OF DISMISSAL**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____November 1, 2011_____

PRESENT:  Honorable Gerald E. Rosen
           Chief Judge, United States District Court

The Court having this day entered an opinion and order granting the two remaining

Defendants' motions for summary judgment, and the claims against all other Defendants

having previously been voluntarily dismissed,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED that this case is DISMISSED WITH PREJUDICE.


                              s/Gerald E. Rosen
                              Chief Judge, United States District Court

Dated:  November 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on November 1, 2011, by electronic and/or ordinary mail.

                              s/Ruth A. Gunther
                              Case Manager

2

# **EXHIBIT 4**

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0119p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

————————

ERNEST FLAGG, as Next Friend of J.B., a
minor; TARIS JACKSON, as Next Friend of
A.J., a minor; and DR. BRIAN GREENE, as
Next Friend of I.B., a minor,

         *Plaintiffs-Appellants,*

       v.

CITY OF DETROIT, a municipal corporation;
and KWAME M. KILPATRICK, jointly and
severally,

         *Defendants-Appellees.*

No. 11-2501

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:05-CV-74253—Gerald E. Rosen, Chief District Judge.

Argued: November 27, 2012

Decided and Filed: April 25, 2013

Before: SILER, COLE, and SUTTON, Circuit Judges.

————————

### COUNSEL

**ARGUED:** Norman A. Yatooma, NORMAN YATOOMA & ASSOCIATES, P.C.,
Bloomfield Hills, Michigan, for Appellants. Linda D. Fegins, CITY OF DETROIT
LAW DEPARTMENT, Detroit, Michigan, for Appellee City of Detroit. Michael C.
Naughton, THOMAS & NAUGHTON, P.C., Detroit, Michigan, for Appellee Kilpatrick.
**ON BRIEF:** Norman A. Yatooma, Howard Yale Lederman, NORMAN YATOOMA
& ASSOCIATES, P.C., Bloomfield Hills, Michigan, for Appellants. John A. Schapka,
CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellee City of
Detroit. Michael C. Naughton, James C. Thomas, THOMAS & NAUGHTON, P.C.,
Detroit, Michigan, for Appellee Kilpatrick.

————————————

**OPINION**

————————————

COLE, Circuit Judge.   Plaintiffs-Appellants J.B., A.J., and I.B., the minor children of Tamara Greene, appeal the district court's grant of summary judgment in favor of Defendants-Appellees Kwame Kilpatrick and City of Detroit on Plaintiffs' § 1983 claims of conspiracy to deny and denial of access to the courts.  Plaintiffs claim that Defendants denied them access to the courts by obstructing the investigation of their mother's death, thereby preventing Plaintiffs from obtaining a remedy in state court. Plaintiffs appeal: (1) the district court's decision to exclude evidence of the firing of former Deputy Chief Brown and Defendants' alleged interference with an investigation by the State of Michigan; (2) a grant of summary judgment in favor of Defendant Kilpatrick; (3) a grant of summary judgment in favor of the City of Detroit; and (4) the district court's sanctioning the City of Detroit with a permissive adverse inference instruction instead of a mandatory adverse inference instruction.   We affirm the judgment of the district court.

I.

A.

Plaintiffs allege that, in or around fall of 2002, then-Mayor Kwame Kilpatrick and several members of his Executive Protection Unit (EPU) were present at a party at the Manoogian Mansion, Detroit's mayoral residence.  It was rumored that Tamara Greene performed at this party as an exotic dancer, and that Carlita Kilpatrick, Kwame Kilpatrick's wife, arrived at the party unexpectedly and assaulted Greene.

On April 30, 2003, at approximately 3:40 a.m., Tamara Greene was shot to death in her car.  The morning after the shooting, Sergeant Marian Stevenson of Detroit Police Department (DPD) Homicide Squad 8, one of the officers who had answered the initial call to the scene, was chosen to lead the murder investigation.  According to Stevenson, the "talk through Homicide" that day was that "there was a connection between the death

of Tammy Greene and the incident at the [Manoogian] mansion." Other officers told Stevenson they would not "want to be [her]," that they would not want to work with her on the case, or even "walk side by side with" her because she "might get shot like Tammy." As Stevenson pursued the investigation, circumstantial evidence arguably consistent with, but at best vaguely indicating, a coverup began to emerge.

According to Plaintiffs' witnesses, the Greene investigation, as well as the possibility of a link between Greene and the alleged party, aroused the interest of DPD officers. On May 21, 2003, an anonymous caller to DPD linked Greene to the party. The next day, Commander Fred Campbell of the DPD's Central Services Bureau, who was three levels above Stevenson in the chain of command, met with Stevenson and Lieutenant Billy Jackson, who headed Squad 8 until his promotion in the fall of 2003, to discuss the investigation. Campbell also briefed several DPD superiors. As the investigation proceeded, then-Chief of Police Jerry Oliver allegedly requested the investigative file "numerous" times, after which file items went missing on multiple occasions.

Stevenson discovered that case notes concerning the Greene murder investigation had been erased from her computer hard drive, and that four floppy disks containing investigation materials had been taken from a locked case on her desk. Stevenson later realized that additional materials were missing from the Greene file, including a spiral notebook in which Stevenson recorded her investigative activities and handwritten notes from witness interviews. Also missing was a videotape of Greene's funeral, which purportedly showed "a couple" of police officers from DPD Homicide and two members of the EPU in attendance.

On March 10, 2004, after ongoing discussions within DPD of potential links between Greene and the rumored party at the mayoral residence, Chief of Police Ella Bully-Cummings approved the reassignment of the Greene case to the DPD Cold Case squad. According to Squad 8 Lieutenant Alvin Bowman, Bully-Cummings said that she wanted the Greene file "put away in a safe place" and that the case was not to be discussed "outside of this room." According to Jackson and Stevenson, cases usually

were not sent to the Cold Case squad as quickly as Greene's, with most being transferred at least one and a half to two years after the commencement of an investigation. Sergeant Odell Godbold of the Cold Case Squad, one of the three squad members assigned to the Greene investigation, testified that the usual practice was to transfer cases after at least two years from the opening of the initial file, that he had never received a case less than two years old, and the squad's federal funding was conditioned on a requirement that the transferred cases be at least two years old.

Stevenson testified that she had never had a homicide investigation "taken" from her, and was on the verge of pursuing leads that would have led her to question members of Kilpatrick's EPU and staff. Shortly after the transfer of the Greene investigation, Stevenson, Bowman and Jackson were allegedly transferred to inferior positions within DPD without credible explanation. Also, Stevenson testified that after her transfer, among other things, her house was broken into twice and she repeatedly observed DPD officers near her residence. These incidents caused Stevenson to be concerned for her safety and motivated her to move out of the precinct.

According to Godbold, the Cold Case squad initially perceived no limits on its ability to conduct its investigation. Godbold claims he initially believed that Greene's friend and passenger on the night of the shooting, Eric Mitchell, was the shooter's real target, and that is why he ignored evidence that led back to Greene's performance at the alleged party.

Beginning in late 2004, Godbold's investigation into Greene's murder began to run into obstacles, including Godbold's reassignment to a building that did not house the case file and the disappearance of a cell phone recovered from the murder scene. Godbold testified that he was permitted to continue the Greene investigation for a few months, until Assistant Chief of Police Walter Martin discovered that Godbold had shown the Greene file to the head of DPD's Major Crimes division at his request. According to Godbold, after that, Martin took the file away from him. In August 2005, Godbold arrived at work to find the Cold Case squad shut down. Godbold was

assigned—by whom, he did not know—to a non-leadership role in Squad 6, a demotion practically, if not officially, which contributed to his decision to retire in 2006.

After retirement, Godbold claims to have learned that potentially helpful tips were concealed from him while he was investigating Greene's death. At that time, Crime Stoppers, an organization that gathers anonymous tips in an effort to solve crimes, faxed a number of tips regarding Greene's murder to DPD. Godbold claims he never received those tips. After retiring, Godbold worked at Crime Stoppers and re-sent the tips to DPD. He claims that the file produced by DPD in discovery in this case only contained "some of them."

In late 2005, around the time the present suit was filed, Martin had the Greene file delivered to the Wayne County prosecutor's office. The case was not returned to DPD until December 2007, when a reconstituted Cold Case unit headed by Sergeant Michael Russell took charge of it. Russell actively investigated the Greene case from December 2007 to September 2008. During this time, Russell did not investigate the claim of a party at the Manoogian Mansion at which Greene danced because he felt there was no evidence connecting any such party to the shooting.

From September 2008 until spring or early summer 2010, the Greene investigation was inactive, due, according to Russell, to the absence of new evidence or witnesses. In 2010, the case was forwarded to the Violent Crimes Task Force for review. The task force made little progress. To date, Greene's murder has not been solved and the investigation appears to be inactive.

In addition to deficiencies in DPD's investigation of Greene's murder, Plaintiffs cite certain DPD promotions as evidence of Kilpatrick's desire to stall the DPD investigation. They claim Kilpatrick appointed Bully-Cummings as Chief of Police with the expectation that she would be loyal to him, citing Bully-Cummings's past assistance to Carlita Kilpatrick with obtaining a city vehicle and the text messages wherein Bully-Cummings appeared to be colluding with Kilpatrick on matters related to Brown's removal. Plaintiffs suggested that Lieutenant Brian Stair was promoted to head of the DPD's Internal Affairs section as a reward for allegedly sharing a memorandum by

No. 11-2501        *Flagg, et al. v. City of Detroit, et al.*                    Page 6

Brown—which discussed allegations against Kilpatrick's EPU as well as the alleged party—with Kilpatrick and his chief of staff, Christine Beatty.  Plaintiffs also cited Godbold's suspicions that Lieutenant Tolbert, Deputy Police Chief Saunders, and Assistant Police Chief Martin were promoted in exchange for hindering the Greene murder investigation.

<div align="center">B.</div>

On November 7, 2005, Plaintiffs, the three minor children of Tamara Greene, filed this lawsuit.  The Third Amended Complaint, filed on September 5, 2008, names Kwame Kilpatrick and the City of Detroit (City), among others, as defendants and alleges two counts against each claiming denial of access to the courts under 42 U.S.C. § 1983.  Count I alleges that Kilpatrick and the City deprived Plaintiffs of their right of access to the courts by obstructing the investigation of Greene's death and thereby depriving Plaintiffs of the ability to recover damages in a state court wrongful death action against Greene's killer.  Plaintiffs allege that the applicable statutes of limitation had expired and Defendants' actions "rendered Ms. Greene's homicide unsolvable."  Count II alleges that Defendants conspired to deny Plaintiffs their right of access to the courts.  The other defendants—DPD officers and Beatty—were voluntarily dismissed from the suit.

As part of the extensive discovery in this case, Plaintiffs filed a motion for preservation of evidence on February 1, 2008.  Among other things, the motion identified "[copies] of any and all records of incoming and outgoing emails, including the actual emails . . . originating from or received by [Kwame Kilpatrick, Ella Bully-Cummings, Christine Beatty, Mike Martin, Loronzo Jones and others, not including the City's corporate counsel Ruth Carter]."  The request was limited to emails beginning on September 1, 2002, and continuing past June 30, 2003.  On March 5, 2008, the district court entered an order granting Plaintiffs' motion and directing Defendants to "take all necessary and appropriate steps to preserve the materials identified."

On July 30, 2010, Plaintiffs requested discovery of "[a]ll incoming and outgoing emails for Kwame Kilpatrick, Ella Bully-Cummings, Christine Beatty, Ruth Carter,

No. 11-2501          *Flagg, et al. v. City of Detroit, et al.*          Page 7

Mike Martin, and Loronzo Jones for all City of Detroit e-mail addresses in use for City employees for the time period of August 1, 2002 through June 30, 2003." After Plaintiffs filed a followup motion to compel discovery, the City responded that "[u]pon their resignations during February of 2008, Beatty and Kilpatrick's email accounts and collected emails . . . were deleted and purged from the electronic storage system."

The district court concluded, and the City does not dispute on appeal, that the City "clearly acted culpably and in bad faith" in destroying emails sent and received by Kilpatrick, Beatty, Carter and Bully-Cummings. The district court denied Plaintiffs' motion for default judgment, but granted Plaintiffs' request for a permissive adverse inference instruction as to the emails in question, to be directed at Defendant City of Detroit only. The district court rejected Plaintiffs' arguments for a harsher sanction, such as default judgment or a mandatory adverse inference instruction.

As of September 2010, only Kilpatrick and the City remained as defendants. Kilpatrick and the City filed motions for summary judgment, which the district court granted. In the same order, the district court excluded two significant categories of evidence as inadmissible propensity evidence under Federal Rule of Evidence 404: evidence regarding Defendants' alleged actions (1) causing Deputy Chief Gary Brown and Officer Harold Nelthrope's departures from the DPD; and (2) interfering with the State of Michigan's investigation into the alleged party, Brown's firing and alleged misconduct by the EPU.

II.

Plaintiffs appeal both grants of summary judgment, as well as the district court's decision to exclude the aforementioned evidence. Plaintiffs also appeal the district court's decision to sanction the City's spoliation of evidence during trial with a permissive adverse inference instruction, rather than a mandatory, non-rebuttable, inference instruction.

A.

The Supreme Court has recognized a constitutional right of access to the courts, whereby a plaintiff with a nonfrivolous legal claim has the right to bring that claim to a court of law. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (collecting cases). Plaintiffs' denial of access claims here involve three components, only one of which is substantive. First, 42 U.S.C. § 1983 permits individuals to bring suit against a state actor who deprives them of a federal right, either constitutional or statutory, without due process of law. *Ziegler v. Aukerman*, 512 F.3d 777, 781 (6th Cir. 2008). Section 1983 creates no substantive rights, but "merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000) (citation omitted). Neither does the right to access the courts; a denial-of-access plaintiff must have an arguable, nonfrivolous underlying cause of action. *See Christopher*, 536 U.S. at 415 (right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury"). Plaintiffs claim that Defendants deprived them of their constitutional right (§ 1983 component) to access the courts (denial of access component) to bring a claim of wrongful death (underlying substantive component) against their mother's shooter(s).

Denial of access to the courts claims may be "forward-looking" or "backward-looking." *See id.* at 415. In forward-looking claims, the plaintiff accuses the government of creating or maintaining some "frustrating condition," that stands between the plaintiff and "the courthouse door." *Id.* at 413. The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate, *see Pena v. Mattox*, 84 F.3d 894, 902 (7th Cir. 1996), to sue on some underlying legal claim. *See Christopher*, 536 U.S. at 413 (collecting cases). In backward-looking claims, such as those at issue in the instant case, the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim. *See id.* at 413-14. Backward-looking claims are much less established than forward-looking claims, *see Sousa v. Marquez*, 702 F.3d 124, 127-28 (2d Cir. 2012) (pointedly assuming *arguendo*, instead of holding, that

No. 11-2501       *Flagg, et al. v. City of Detroit, et al.*                     Page 9

backward-looking claims are cognizable at all), but this Court has recognized them and the Supreme Court has provided additional guidance as to the elements of a viable backward-looking claim.

In *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997), Dolores Swekel claimed that local police denied her access to the courts by covering up the identity of one of two drivers who hit and killed her husband. *Id.* at 1260. Swekel successfully sued the other driver for her husband's wrongful death, but claimed the coverup prevented her from suing the second driver, a high-ranking police officer's son, whose identity she did not find out until after the state statute of limitations had run and she had already sued for denial-of-access. *Id.* at 1261. We agreed that the alleged coverup "would [have] substantially prejudice[d]" Swekel's ability to recover in state court, but ultimately affirmed the dismissal of Swekel's claim because she failed to either "attempt[] to go to the state court" or present evidence that it would be futile to do so because the state court would be unable to adequately address the prejudice caused by the coverup. *See id.* at 1264, 1264 n.2.

In *Christopher*, the Supreme Court held that a backward-looking denial of access claim requires the plaintiff to identify "an underlying cause of action for relief that the plaintiff would have raised had it not been for the deception alleged," 536 U.S. at 405, and to seek relief that would be unavailable otherwise. *Id.* at 406. Jennifer Harbury sued several federal agencies and their individual members for concealing her husband's death after a Guatemalan colonel and paid agent of the CIA ordered his killing. *Id.* at 407-08. The "basic theory" of her denial of access claim was that if the officials had not "affirmatively misl[ed her] into thinking they were doing something," she would have "take[n] appropriate actions to save her husband's life," such as seeking emergency injunctive relief. *See id.* at 409-10, 419.

In *Christopher*, the Supreme Court assumed without deciding the correctness of *Swekel* and other decisions recognizing backwards-looking claims. *Id.* at 414 n.9. The Court held that Harbury failed to state a valid denial of access claim because her complaint "failed to identify the underlying cause of action that the alleged deception

had compromised, going no further than the protean allegation that [Defendants'] false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress." *Id.* at 418 (internal quotation marks omitted). The Court ultimately held that, even if Harbury had identified a viable underlying claim, her denial of access claim would have failed because the court could not provide her with the remedy she claimed to have lost, an injunction to save her husband's life. *See id.* at 421-22.

Swekel and *Christopher* permit us to enumerate the elements of a backward-looking denial of access claim: (1) a non-frivolous underlying claim, *see id.* at 415 (citing *Lewis v. Casey*, 518 U.S. 343, 353 and n.3 (1996)); (2) obstructive actions by state actors, *see Swekel*, 119 F.3d at 1262-63 (discussing cases); (3) "substantial[] prejudice" to the underlying claim that cannot be remedied by the state court, *see id.* at 1264; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable, *see Christopher*, 536 U.S. at 421-22. Plaintiffs must make out the denial-of-access elements against each defendant in conformance with the requirements of § 1983.

Under § 1983, there is no *respondeat superior* or vicarious liability. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992). When suing an individual actor, such as Kilpatrick, for constitutional violations under § 1983, a plaintiff must demonstrate that the actor "directly participated" in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). To prove acquiescence, it is not enough to show that the actor merely failed to act against misconduct of which he was aware. *See id; Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).

When suing a municipality, such as the City, for constitutional violations under § 1983, a plaintiff must prove that the deprivation occurred pursuant to a municipal "policy or custom." *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994). A single decision can constitute a policy, if that decision is made by an official

No. 11-2501          *Flagg, et al. v. City of Detroit, et al.*                    Page 11

who "possesses final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986), which means that his decisions are "final and unreviewable and are not constrained by the official policies of superior officials." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (internal quotation marks omitted).

<p style="text-align:center">B.</p>

Plaintiffs seek the admission of the two disputed categories of evidence to make out the second element—obstruction—by bolstering their "reasonabl[e] infer[ence]" that Kilpatrick implemented a policy "of preventing any real investigation into the Manoogian Mansion party or Greene's homicide." First, the district court excluded evidence regarding Kilpatrick and the City's alleged past retaliation against DPD officers who investigated Kilpatrick and his EPU. On June 2, 2003, Deputy Chief Gary Brown, former head of the DPD's Professional Accountability Bureau (PAB), and Officer Harold Nelthrope, a former member of Kilpatrick's EPU, filed a whistleblower suit in Wayne County Circuit Court in Michigan. Brown and Nelthrope alleged that DPD and others had retaliated against them for investigating the behavior of Kilpatrick and the EPU. A jury awarded them a total of $6.5 million in damages. Brown and Nelthrope ultimately settled with the City and Kilpatrick. Second, the district court excluded evidence that Kilpatrick and the City allegedly interfered with the State of Michigan's investigation into Brown's firing, the alleged party and purported EPU misconduct. These allegations were supported by, among other things, a number of text messages between Kilpatrick and other City officials and testimony from MSP investigators. *See Flagg v. City of Detroit*, 827 F. Supp. 2d 765, 786-91 (E.D. Mich. 2011) (providing detailed narratives on both topics).

The district court held that Federal Rule of Evidence 404(b) barred Plaintiffs from introducing evidence on either subject. On appeal, Plaintiffs argue in the alternative that (1) Rule 404(b) does not apply because the evidence is admissible as an "intrinsic act"; or (2) the evidence was admissible under Rule 404(b). We review the district court's decision to exclude the evidence under an abuse-of-discretion standard.

*See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) (citations omitted).  An abuse of discretion exists only if the Court is "firmly convinced that the district court has made a mistake." *United States v. Logan*, 250 F.3d 350, 366 (6th Cir. 2001) (citation omitted). This standard of review is "deferential" because a trial judge has "broad discretion on evidentiary rulings." *United States v. Hart*, 70 F.3d 854, 858 (6th Cir. 1995) (internal quotation marks omitted).

Rule 404(b) bars the admission of "propensity evidence," defined as "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  However, it permits the admission of prior "bad acts" for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Rule 404(b) does not apply to evidence that is "intrinsic to" or "inextricably intertwined with evidence of" the central alleged wrong.  *See United States v. Henderson*, 626 F.3d 326, 338 (6th Cir. 2010) (citations omitted).  Intrinsic acts are "part of a single [] episode" or "a continuing pattern of illegal activity" that includes the central alleged offense.  *See United States v. Gonzalez*, 501 F.3d 630, 639 (6th Cir. 2007) (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)).  This Court has also described intrinsic acts as "background evidence" that "has a causal, temporal or spatial connection with the charged offense . . .[,] is a prelude to the [central allegation], is directly probative of the [central allegation], arises from the same events as the [central allegation], forms an integral part of a witness's testimony, or completes the story of the [central allegation]." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (citation omitted).

One could construct plausible arguments that the excluded evidence is intrinsic to the denial of access allegations central to this case, but Plaintiffs do not do so.  We note that the district court's analysis dwells unduly on the point that Brown's firing and the interference with the State's investigation were not done specifically in furtherance of denying Plaintiffs access to the courts.  Even without such specific intent, there may

still be a causal connection between events.  However, any connection between the excluded evidence and the Greene investigation is highly speculative.  Accordingly, Plaintiffs fail to "firmly convince[]" us that the district court abused its discretion in finding the excluded evidence to be extrinsic and applying Rule 404(b).

Where Rule 404(b) applies, there are three steps to determining admissibility. First, the court must determine whether there is sufficient evidence for a reasonable jury to find that the prior act(s) in question took place.  *See United States v. Clay*, 667 F.3d 689, 699 (6th Cir. 2012) (citation omitted); *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc).  Second, it must determine whether the prior acts are admissible for a proper purpose—one other than propensity.  *See Gessa*, 971 F.2d at 1261; *Clay*, 667 F.3d at 693.  Third, it must determine whether, under the balancing determination in Rule 403, the danger of unfair prejudice substantially outweighs the probative value of the evidence.  *See Gessa*, 971 F.2d at 1262;  *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007); Fed. R. Evid. 403.  Assuming, without deciding, that the first element of sufficient evidence was met, we nonetheless conclude that the district court did not abuse its discretion in excluding this evidence due to lack of a proper purpose.

Plaintiffs cite several cases where "other acts" evidence was admitted in § 1983 cases, but these are inapposite.  One involved housing discrimination, where a "pattern or practice" of discrimination is a statutory element, and made no mention of Rule 404(b).  *See United States v. Balistrieri*, 981 F.2d 916, 929-30 (7th Cir. 1992).  In both of the remaining cases, prior acts were admitted to demonstrate something other than the conduct underlying the central charge.  *See Parrish v. Luckie*, 963 F.2d 201, 205-06 (8th Cir. 1992) (prior violent acts by police officer admissible to show that the city-employer knew he could be violent and engage in sexual assault); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 572-75 (1st Cir. 1989) (prior acts were used to prove supervisory liability).  Plaintiffs do not explain how these cases are like the instant case nor do they explain how these cases should guide this Court to admit the evidence in question.

The district court rejected motive as a proper purpose for admitting the evidence regarding Brown's firing because, without a propensity inference, any proof of motive would have "extremely limited value." The Plaintiffs' argument that "[t]he jury will want to know why Kilpatrick acted as he did," is a valid reason to admit allegations that the Manoogian Mansion party occurred (since its coverup is the alleged motive for stalling the Greene murder investigation), but does not explain why evidence of Kilpatrick's interference with Brown's and the State's investigations should be admitted. Plaintiffs' observation that the City destroyed potential evidence of motive may describe grounds for sanctions, but it is irrelevant to the proper purpose analysis. The district court did not abuse its discretion by refusing to admit the evidence to prove motive.

Because the evidence was properly excluded for lack of a proper purpose under Rule 404, we need not reach the issue of whether the evidence would have violated Rule 403.

## C.

Plaintiffs challenge the district court's decision to impose a permissive, as opposed to mandatory, adverse inference sanction against the City for destroying "e-mails sent and received by four former high-ranking Detroit officials, including . . . Kilpatrick, . . . Beatty, . . . Carter, and . . . Bully-Cummings, for the period from August 1, 2002 through June 30, 2003," *after* it was obligated to preserve them. *Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634245 at *1 (E.D. Mich. Oct. 5, 2011). The non-rebuttable mandatory adverse inference requested by Plaintiffs would have required the fact-finder to find that City employees, at the direction of City policymakers, *see Pembaur*, 475 U.S. at 481, intentionally interfered with or obstructed the Greene investigation.

We review the district court's decision for abuse of discretion. *See Phillips v. Cohen*, 400 F.3d 388, 396 (6th Cir. 2005) (citation omitted). Federal Rule of Civil Procedure 37(b)(2)(A) permits a district court to "render[] a default judgment" against a party who disobeys a discovery order, and the district court has "broad discretion" to permit the jury to make an adverse inference. *See Adkins v. Wolever*, 554 F.3d 650, 651

(6th Cir. 2009) (en banc); *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010).

An adverse inference is "an inference that 'the party fears [producing the evidence]; and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party.'" *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (quoting 2 *Wigmore on Evidence*, § 285 at 192 (Chadbourn rev. 1979)).

> "A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Beaven*, 622 F.3d at 553 (alterations and internal quotation marks omitted).

When the requirements for an adverse inference instruction are met, the district court should issue an instruction. "*[S]o long as* the district court did not err in determining that [the movant for an adverse inference instruction] had not satisfied at least one of the prongs, its determination that a spoliation sanction was not warranted should not be upset." *Adkins v. Wolever*, 692 F.3d 499, 504 (6th Cir. 2012) (emphasis added). Although the district court's findings receive deferential review, *see id.* at 506, presumably its judgment *should* be upset if the movant clearly met all three prongs and yet an instruction was not granted. However, the district court has discretion in determining the strength of the inference to be applied. Whether an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault. *See Adkins*, 554 F.3d at 652-53. The court may also consider the facts and evidentiary posture of each case. *Id.* at 653.

First, Plaintiffs argue that the district court's harsh condemnations of the City's behavior with respect to discovery are incompatible with its decision to grant only a permissive adverse inference instruction. If the severity of a spoliation sanction were

No. 11-2501        *Flagg, et al. v. City of Detroit, et al.*        Page 16

required to be based solely on the sanctioned party's degree of fault, this Court likely would be compelled to agree with Plaintiffs that the district court abused its discretion. After all, "intentionality" is the highest degree of fault contemplated by this Court, *see Beaven*, 622 F.3d at 554, and the district court found it to be present in this case. Thus, it would be reasonable to conclude that the highest form of sanction, a mandatory non-rebuttable adverse inference instruction, should be imposed.

However, consistent with this Court's recurring statement that a district court has "broad discretion to craft proper [spoliation] sanctions," *Adkins*, 692 F.3d at 503, the district court here properly considered the facts and evidentiary posture of the case in addition to the degree of fault. The district court noted that making the adverse inference non-rebuttable would "be tantamount to the entry of judgment in Plaintiffs' favor and against the Defendant City" and that Plaintiffs had been given "considerable latitude" in discovery, producing a "voluminous record." In such a case, refusing to grant a non-rebuttable adverse inference instruction was wholly consistent with the district court's thoughtful determination, unchallenged by Plaintiffs, that default judgment was not appropriate.

Second, Plaintiffs argue that a mandatory adverse inference instruction is the only way to "level[] the playing field" and avoid granting the City an undeserved evidentiary windfall. However, a permissive adverse inference instruction does not guarantee anyone a windfall; it leaves the decision in the hands of the jury. Under the circumstances, the district court did not abuse its discretion.

### D.

Having resolved all evidentiary issues, we come to the district court's grants of summary judgment. We review a district court's grant of summary judgment de novo. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004) (citation omitted). In reviewing a grant of summary judgment, we must view the facts in the light most favorable to the non-moving party. *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009). If the facts are disputed, the court "must presume the [non-movant]'s version." *Id.*

No. 11-2501          *Flagg, et al. v. City of Detroit, et al.*                    Page 17

Even if Plaintiffs had a viable underlying wrongful death claim and the City and Kilpatrick both had a custom or policy of obstructing the Greene investigation to which all suspicious transfers, reassignments and evidence disappearances are attributed, Plaintiffs' conspiracy and denial-of-access claims cannot survive because the third element of denial of access, prejudice, is absent. There is no genuine dispute of material fact as to whether, in fact, the obstruction substantially and irreparably prejudiced Plaintiffs' ability to recover on their wrongful death claim by making it impossible to find Greene's killer. *See Swekel*, 119 F.3d at 1264.

Demonstrating substantial and irreparable prejudice does not require a plaintiff to prove that he would have won his underlying claim in the absence of government obstruction. As the Supreme Court pointed out in an earlier denial-of-access case, merely "arguable claims are settled, bought, and sold." *Lewis*, 518 U.S. at 353 n.3. Where there is a known or easily discoverable defendant with whom to bargain on the underlying claim, even a marginal weakening of the underlying claim might suffice to demonstrate substantial and irreparable prejudice because it might have irreversibly reduced the amount for which the defendant would be willing to settle. *See Christopher*, 536 U.S. at 414 (mentioning "inadequate settlement"). However, when there is no defendant with whom to bargain over a settlement, the logic of *Lewis* cannot apply. Without a defendant for the underlying claim, the only way to demonstrate that the obstruction, as a matter of fact, reduced the value of the claim is to show that, without the obstruction, there would have been at least some reasonable likelihood of identifying a defendant.

Plaintiffs fail to point to anything indicating any reasonable probability of Greene's killer being found in the absence of the alleged obstruction. If Stevenson's missing disks and notes contained information likely to lead to Greene's killer, Stevenson should have been able to describe that information. Greene's missing cell phone might have shed light on the killer's identity, but records of the calls made to and from the phone were in the homicide file, and there is no indication of what additional value the phone might have had. Plaintiffs' expert, William R. Rice, testified that the

No. 11-2501        *Flagg, et al. v. City of Detroit, et al.*                    Page 18

transfers of the Greene investigation led to losing continuity and trust with witnesses and "interfered with the progress of the investigation," but did not point to any concrete productive lead or witness relationship lost. Even assuming that all missing items and counterproductive personnel assignments were pursuant to a policy of obstruction, Plaintiffs fail to raise a genuine question of disputed fact as to whether a reasonable probability exists that Greene's killer would have been found absent the alleged policy. Thus, the district court did not err in granting summary judgment in favor of Kilpatrick and the City of Detroit.

III.

For the foregoing reasons, we affirm the judgment of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 11-2501

ERNEST FLAGG, as Next Friend of J.B., a minor;
TARIS JACKSON, as Next Friend of A.J., a minor;
and DR. BRIAN GREENE, as Next Friend of
I.B., a minor,
          Plaintiffs - Appellants,

v.

CITY OF DETROIT, a municipal corporation; and
KWAME M. KILPATRICK, jointly and
severally,
          Defendants - Appellees.

> **FILED**
> *Apr 25, 2013*
> DEBORAH S. HUNT, Clerk

Before: SILER, COLE, and SUTTON, Circuit Judges.

## JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk

# EXHIBIT 5

No. 11-2501

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Jun 18, 2013**
DEBORAH S. HUNT, Clerk

ERNEST FLAGG, AS NEXT FRIEND OF J.B., A MINOR; TARIS )
JACKSON, AS NEXT FRIEND OF A.J., A MINOR; AND DR. BRIAN )
GREENE, AS NEXT FRIEND OF I.B., A MINOR, )
                                                          )
        Plaintiffs-Appellants,                            )
                                                          )
v.                                                        )        O R D E R
                                                          )
CITY OF DETROIT, A MUNICIPAL CORPORATION; AND KWAME M. )
KILPATRICK, JOINTLY AND SEVERALLY,                        )
                                                          )
        Defendants-Appellees.                             )
                                                          )

**BEFORE:**    SILER, COLE, and SUTTON, Circuit Judges.


        The court having received a petition for rehearing en banc, and the petition having been

circulated not only to the original panel members but also to all other active judges of this court,

and no judge of this court having requested a vote on the suggestion for rehearing en banc, the

petition for rehearing has been referred to the original panel.

        The panel has further reviewed the petition for rehearing and concludes that the issues

raised in the petition were fully considered upon the original submission and decision of the case.

Accordingly, the petition is denied.


                        **ENTERED BY ORDER OF THE COURT**


                        **Deborah S. Hunt, Clerk**

<u>**CERTIFICATE OF SERVICE**</u>

  I, Heather Lennox, hereby certify that the foregoing Objection of the City of Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 1404 Filed by Ernest Flagg, as Next Friend of Jonathon Bond, a Minor was filed and served via the Court's electronic case filing and noticing system on this 15th day of May, 2014.

       /s/  Heather Lennox