# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                    :
In re                               :          Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :          Case No. 13-53846
                                    :
                        Debtor.     :          Hon. Steven W. Rhodes
                                    :
                                    :
-------------------------------------------------------x
```

## OBJECTION OF THE CITY OF DETROIT, PURSUANT TO SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1, TO PROOF OF CLAIM NUMBER 2851 FILED BY THE COALITION OF DETROIT UNIONS

The City of Detroit (the "City") hereby:  (a) objects, pursuant to

sections 105 and 502(b) of title 11 of the United States Code (the "Bankruptcy

Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rule 3007-1 of the Local Rules of the Bankruptcy Court for

the Eastern District of Michigan (the "Local Rules") to proof of claim

number 2851 (the "Claim") filed by the Coalition of Detroit Unions (the "Claimant

Coalition")[1] because the City has no liability to the Claimant Coalition on account

---

[1]     The Claim provides that the Claimant Coalition is comprised of the
        following labor organizations:  (a) Michigan AFSCME Council 25 and its
        affiliated Detroit local unions (collectively, "AFSCME"); (b) the Association
        of Professional and Technical Employees ("APTE"); (c) the Detroit Police

of the Claim; and (b) seeks the entry of an order, substantially in the form attached hereto as Exhibit 1 (the "Proposed Order"), disallowing and expunging the Claim. A copy of the Claim is attached hereto as Exhibit 2. In support of this Objection, the City respectfully represents as follows:

## General Background

1. On July 18, 2013, the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

2. As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities). As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

3. In February 2013, a state review team determined that a local government financial emergency exists in the City. Thereafter, in March 2013,

---

Detention Officers Association; (d) the Senior Accountants, Analysts and Appraisers Association ("SAAA"); (e) Teamsters, Local 214 ("Teamsters"); (f) the Association of Municipal Inspectors ("AMI"); (g) the Michigan Building Trades Council and its affiliated unions (collectively, "MBTC"); (h) the International Union of Operating Engineers, Local 324 ("IUOE"); (i) UAW PAA Local 2211 ("UAW"); (j) the Association of City of Detroit Supervisors ("ACDS"); (k) Detroit Income Tax Investigators Association ("DITIA"); and (l) SEIU Local 517M ("SEIU").

Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("PA 436").  Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case.  MCL § 141.1558.

4.      On May 5, 2014, the City filed the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (as it may be further amended, modified or supplemented from time to time, the "Plan") and the Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4391) (the "Disclosure Statement").  That same day, the Court entered the Order Approving the Proposed Disclosure Statement (Docket No. 4401), thereby approving the Disclosure Statement as containing "adequate information" with respect to the Plan, pursuant to section 1125(a)(1) of the Bankruptcy Code.

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409

## Background Regarding the Tentative Agreement and the CETs

6.     In early 2012, the City participated in concessionary bargaining with a coalition of unions (the "Bargaining Coalition")[2] in an attempt to secure cost savings necessary to address the City's deteriorating financial condition.  As a result of these negotiations, on February 1, 2012, the City and the Bargaining Coalition entered into a tentative agreement (the "Tentative Agreement") that contemplated the establishment of a framework for three-year collective bargaining agreements to be entered into individually between the City and each of the Bargaining Coalition unions.  A copy of the Tentative Agreement is attached hereto as Exhibit 3.

7.     Among other concessions, the Tentative Agreement contemplated an across-the-board 10% wage reduction (subject to a City deficit trigger), healthcare benefit reductions and modifications to pension benefits for

---

[2]     The Bargaining Coalition consisted of (a) AFSCME, (b) the Amalgamated Transit Union, (c) ACDS, (d) IUOE, (e) MBTC, (f) the International Brotherhood of Electrical Workers Local 58, (g) SAAA, (h) UAW, (i) AMI, (j) Teamsters, (k) the Supervisors Chapter of the DOT Foreman's Association, (l) DITIA and (m) SEIU.  Although the Claim describes APTE and the Police Officers Labor Council − Detention Facility Officers ("POLC") (referred to in the Claim as the Detroit Police Detention Officers Association) as members of the Claimant Coalition, neither entity was party to the 2012 negotiations or the resulting tentative agreement described below.

future retirees.  The Tentative Agreement would have become effective upon the approval of the Detroit City Council.

8.      The State did not approve the Tentative Agreement.  <u>See</u> <u>Valenti v. Snyder</u>, 853 F. Supp. 2d 691, 693-694 (E.D. Mich. 2012) (denying the Bargaining Coalition's motion for temporary restraining order seeking to require the City to finalize and be bound by the Tentative Agreement).  Under the circumstances, therefore, the Detroit City Council also did not approve the Tentative Agreement and instead, on April 10, 2012, the City entered into a Financial Stability Agreement (the "<u>Financial Stability Agreement</u>") with the State, consistent with Section 13(c) of Public Act 4 of 2011 ("<u>PA 4</u>").  A copy of the Financial Stability Agreement is attached hereto as <u>Exhibit 4</u>.

9.      Section 4.4 of the Financial Stability Agreement generally provides that, in accordance with Section 14a(10) of PA 4, 30 days after the effective date of the Financial Stability Agreement, the City would not be subject to its statutory duty to collectively bargain (which otherwise would exist pursuant to Section 15(1) of Public Act 336 of 1947, as amended, MCL § 423.215).  Thus, effective May 10, 2012, the City's duty to bargain under Michigan law was suspended.

10.     After the suspension of the duty to bargain, the City took certain actions to secure critical cost savings to address the City's dire financial

condition.  Among these actions, on July 18, 2012, the City implemented the

so-called City Employment Terms (the "CETs") covering various bargaining units,

including the unions that comprise the Claimant Coalition.[3]  The CETs mandated

(a) a virtually across-the-board 10% wage reduction, (b) reductions in pension

benefits for future retirees, (c) limitations on the inclusion of accrued sick leave in

an employee's average final compensation for pension purposes,

(d) the establishment of a defined contribution pension plan for new hires (in lieu

of defined retirement benefits from the General Retirement System of the City of

Detroit) and (e) the establishment of a framework for implementing changes to the

health care plan design.  See, e.g., CET covering AFSCME Non-Supervisory

Employees, a copy of which is attached hereto as Exhibit 5.  Additionally, among

other changes, the CETs:  (a) reduced funeral leave benefits; (b) capped the accrual

of sick leave; (c) reduced shift premiums; and (d) eliminated longevity payments,

merit and step increases, double-time overtime, swing holidays and jury duty pay.

### Background Regarding the Claims Process and the Claim

11.    On November 21, 2013, the Court entered the Order, Pursuant

to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002

---

[3]      Specifically, the City implemented CETs covering:  (a) AFSCME Locals 62, 207, 229, 273, 457, 542, 836, 1206, 1220, 1227, 1642, 2394, 2799, 2920, and 6087;  (b) ACDS;  (c)  AMI;  (d) APTE;  (e) MBTC;  (f) DITIA; (g) Teamsters; (h) IUOE; (i) POLC; (j) SAAA; (k) SEIU; and (l) UAW.

and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving

Form and Manner of Notice Thereof (Docket No. 1782) (the "Bar Date Order").

The Bar Date Order established February 21, 2014 at 4:00 p.m., Eastern Time

(the "General Bar Date"), as the general deadline for the filing of proofs of claim in

the City's chapter 9 case.

12.     On the General Bar Date, the Claimant Coalition filed

the Claim.  The Claim asserts liabilities against the City in the total amount of not

less than $242,586,116.50 arising from the City's failure to approve the Tentative

Agreement followed by its failure to bargain and the subsequent imposition of the

CETs.  See Claim, at 1; Ex. 1.

## Relief Requested

13.     Pursuant to sections 105 and 502(b) of the Bankruptcy Code,

Bankruptcy Rule 3007 and Local Rule 3007-1, the City seeks the entry of an order

disallowing and expunging the Claim because the City has no liability to the

Claimant Coalition on account of the alleged liabilities asserted in the Claim.

## Request to Disallow the Claim

14.     Pursuant to section 101 of the Bankruptcy Code, a creditor

holds a claim against a debtor only to the extent that it has a "right to payment" for

the asserted liability.  See 11 U.S.C. §§ 101(5), 101(10).[4]  By contrast, there is no

right to payment — and therefore no claim — to the extent that the asserted

liability is not due and owing by a debtor.  Section 502(b)(1) of the Bankruptcy

Code further provides that a claim asserted in a proof of claim shall be allowed,

except to the extent "such claim is unenforceable against the debtor and property of

the debtor, under any agreement or applicable law."  11 U.S.C. §502(b)(1).[5]

　　　　15.　　The City has reviewed the Claim and the alleged facts and

circumstances surrounding the Claim and has determined that the Claim is not a

valid liability of the City.  In particular, as described above, the City's actions in

declining to approve the Tentative Agreement and entering into the Financial

Stability Agreement, together with the suspension of the City's duty to bargain and

the imposition of the CETs, were necessary and appropriate under applicable

Michigan law.  Thus, there is no basis for the damages asserted by the Claimant

Coalition in the Claim arising from these events or the resulting cuts imposed on

the membership of the Claimant Coalition unions.  The City, therefore, has

---

[4]    Section 101(10) of the Bankruptcy Code defines a "creditor" in pertinent part as "an entity that has a claim against the debtor."  11 U.S.C. § 101(10). Section 101(5) in turn defines a "claim" as a "right to payment" or "the right to an equitable remedy for breach of performance if such breach gives rise to a right for payment."  11 U.S.C. § 101(5).

[5]    Section 502 of the Bankruptcy Code is made applicable in the City's chapter 9 case by section 901 of the Bankruptcy Code.  See 11 U.S.C. § 901.

determined that the Claimant Coalition possesses no right to payment on account of the Claim, and the Claim should be disallowed in its entirety.

### Reservation of Rights

16. The City files this Objection without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

### Notice

17. Notice of this Objection has been given to the Claimant Coalition and all parties that have requested notice in this case pursuant to Bankruptcy Rule 2002. The City submits that no other or further notice need be provided.

### No Prior Request

18. No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, the City respectfully requests that the Court: (a) enter the Proposed Order granting the relief requested herein and (b) grant such other and further relief to the City as the Court may deem proper.

Dated:  May 15, 2014        Respectfully submitted,


 /s/  Heather Lennox          
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

John A. Simon (P61866)
Tamar N. Dolcourt (P73425)
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone:  (313) 234-7100
Facsimile:  (313) 234-2800
jsimon@foley.com
tdolcourt@foley.com

ATTORNEYS FOR THE CITY

Form B20B (Official Form 20B)
12/1/2010

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Michigan

**In re:**

**CITY OF DETROIT, MICHIGAN,**

Chapter: 9

Case No.: 13-53846

**Debtor.**

Judge:  Hon. Steven W. Rhodes

Address:  2 Woodward Avenue, Suite 1126
      Detroit, Michigan  48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any):  38-6004606

## NOTICE OF OBJECTION OF THE CITY OF DETROIT, PURSUANT TO SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1, TO PROOF OF CLAIM NUMBER 2851 FILED BY THE COALITION OF DETROIT UNIONS

The City of Detroit (the "City") has filed an objection to your claim in this bankruptcy case.

**Your claim may be reduced, modified, or denied.  You should read these papers carefully and discuss them with your attorney, if you have one.**

If you do not want the Court to deny or change your claim, then on or before June 18, 2014, you or your lawyer must:

1.      File with the Court a written response to the objection, explaining your position, at:

**United States Bankruptcy Court**
United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, Michigan  48226

If you mail your response to the Court for filing, you must mail it early enough so that the Court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

You must also mail a copy to:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539

John A. Simon, Esq.
Tamar N. Dolcourt, Esq.
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone:  (313) 234-7100
Facsimile:  (313) 234-2800

2.      Attend the hearing on the objection, scheduled to be held on June 25, 2014, at 10:00 a.m. in Courtroom 100, Theodore Levin U.S. Courthouse, 231 W. Lafayette, Detroit, Michigan 48226, unless your attendance is excused by mutual agreement between yourself and counsel for the City.  (Unless the matter is disposed of summarily as a matter of law, the hearing shall be a pre-trial conference only; neither testimony nor other evidence will be received.  A pre trial scheduling order may be issued as a result of the pre-trial conference.)

**If you or your attorney do not take these steps, the Court may deem that you do not oppose the objection to your claim, in which event the hearing will be canceled, and the objection sustained.**

Dated:  May 15, 2014                  Respectfully submitted,


                                      /s/  Heather Lennox
                                      David G. Heiman (OH 0038271)
                                      Heather Lennox (OH 0059649)
                                      Thomas A. Wilson (OH 0077047)
                                      JONES DAY
                                      North Point
                                      901 Lakeside Avenue
                                      Cleveland, Ohio  44114
                                      Telephone:  (216) 586-3939
                                      Facsimile:  (216) 579-0212
                                      dgheiman@jonesday.com
                                      hlennox@jonesday.com
                                      tawilson@jonesday.com

                                      Bruce Bennett (CA 105430)
                                      JONES DAY
                                      555 South Flower Street
                                      Fiftieth Floor
                                      Los Angeles, California 90071
                                      Telephone:  (213) 243-2382
                                      Facsimile:  (213) 243-2539
                                      bbennett@jonesday.com

                                      John A. Simon (P61866)
                                      Tamar N. Dolcourt (P73425)
                                      FOLEY & LARDNER LLP
                                      500 Woodward Avenue, Suite 2700
                                      Detroit, Michigan 48226
                                      Telephone:  (313) 234-7100
                                      Facsimile:  (313) 234-2800
                                      jsimon@foley.com
                                      tdolcourt@foley.com

                                      ATTORNEYS FOR THE CITY

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                            :
In re                                       :        Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                   :        Case No. 13-53846
                                            :
                    Debtor.                  :        Hon. Steven W. Rhodes
                                            :
                                            :
-------------------------------------------------------x
```

## ORDER DISALLOWING AND EXPUNGING PROOF OF CLAIM NUMBER 2851 FILED BY THE COALITION OF DETROIT UNIONS

This matter coming before the Court on the Objection of the City of

Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy

Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2851 Filed by the

Coalition of Detroit Unions (the "Objection"),[1] filed by the City of Detroit

(the "City"); the Court having reviewed the Objection and having heard the

statements of counsel regarding the relief requested in the Objection at a hearing

before the Court (the "Hearing"); the Court finding that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2) and (c) notice of the Objection

and the Hearing was sufficient under the circumstances and in full compliance with

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Objection.

ATI-2604777v3

the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules; and the Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Objection is SUSTAINED.

2.    Pursuant to section 502(b) of the Bankruptcy Code, the Claim is disallowed and expunged in its entirety.

3.    The City, the City's claims and noticing agent and the Clerk of this Court are authorized to take any and all actions that are necessary or appropriate to give effect to this Order.

**EXHIBIT 2**

| UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT of MICHIGAN | CHAPTER 9<br>PROOF OF<br>**FILED** |
|---|---|

| Name of Debtor: **City of Detroit, Michigan** | Case Number: 13-53846 | **FEB 2 1 2014** |
|---|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

**US Bankruptcy Court**
~~City of Detroit~~ **MI Eastern District**

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>**Coalition of Detroit Unions** | |
|---|---|
| Name and address where notices should be sent:<br>Richard Mack Jr.<br>Miller Cohen, PLC<br>600 W. Lafayette Blvd. 4th Floor<br>Detroit, MI 48226<br><br>Telephone number: 313-964-4454    email: richardmack@millercohen.com | **RECEIVED**<br><br>FEB 2 4 2014<br><br>KURTZMAN CARSON CONSULTANTS | ☐ Check this box if this claim amends a previously filed claim.<br><br>**Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number:    email: | | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

**1. Amount of Claim as of Date Case Filed: $242,586,116.50**

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim: See attached Addendum for additional details.**

**3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** _____
(See instruction #3a)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:** $ _____

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other

**Basis for perfection: See Attached**

**Describe:**

**Value of Property:**    **Amount of Secured Claim:**  **$0**

**Annual Interest Rate (when case was filed)** _____ % ☐ Fixed or ☐ Variable  **Amount Unsecured:**

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).**  $ 0

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §** _____.  $ _____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain: **See attached Addendum. Further, the documents involved are voluminous and, on information and belief, in the possession of the city**

**8. Signature: (See instruction # 8)**
Check the appropriate box.

☐ I am the creditor.  ☒ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Richard G. Mack Jr.
Title: Attorney for the Coalition of Detroit Unions
Company: Miller Cohen, PLC

_____ (Signature)    2/21/14 (Date)

Address and telephone number (if different from notice address above):
600 W. Lafayette Blvd. 4th Floor
Detroit, MI 48226
313-964-4454    email: richardmack@millercohen.com

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 35*

### Addendum to the Proof of Claim of
### The Coalition of Detroit Unions

This proof of claim (the "Claim") is for all claims due to the Coalition of Detroit Unions

and the unions within and their members and former members/retirees (or future retirees with

pension or other post-employment benefit obligations vested prior to the City of Detroit's (the

"City") bankruptcy filing). The membership of the Detroit Coalition of Unions includes:

> Michigan AFSCME Council 25 and its affiliated Detroit local unions
> Association of Professional and Technical Employees
> Detroit Police Detention Officers Association
> Senior Accountants, Analysts and Appraisers Association
> Teamsters, Local 214
> Association of Municipal Inspectors
> Michigan Building Trades Council and its affiliated unions
> International Union of Operating Engineers, Local 324
> UAW PAA Local 2211
> Association of City of Detroit Supervisors
> Detroit Income Tax Investigators Association
> SEIU Local 517M

The chief claim of the Coalition of Detroit Unions ("Claimant" or "Coalition") is rooted

in the City's failure to sign the Coalition Tentative Agreement in March 2012 which would have

established a 3 year contract through to March 2015, followed by the failure to bargain and

unilateral imposition of employment terms. In July 2012, the City unilaterally imposed its own

Employment Terms ("CET") in place of the Tentative Agreement. **The calculated aggregate**

**amount owed pursuant to this claim amounts to not less than $242,586,116.50**. The not less

than **$242,586,116.50** amount asserted in this Claim consists of several separate changes which

were implemented or failed to be implemented as a result of the overall claim.[1] (See attachment)

---

[1] The amounts set forth in this Claim are estimates based on data provided to Claimant by the City, Collective Bargaining Agreements, the City's General Retirement System or other third parties. Claimant reserves the right to amend this Claim to include updated data, any appropriate changes in applicable actuarial assumptions which serve as the basis for the calculations of the amounts set forth herein, and any appropriate updates for Claimant's members or former

On November 21, 2013, the Court entered its order establishing bar dates For filing proofs of claim and approving the form and manner of notice thereof [Docket No. 1782] (the "Bar Date Order") establishing February 21, 2014 at 4:00 p.m. Eastern Time as the general claims bar date for filing poofs of claim in this case. Notably, while individuals or entities holding claims for, *inter alia*, Pension Obligations and OPEB Obligations were not required to file proofs of claim pursuant to the Bar Date Order, as the City has not (to date) determined how the claims for Pension Obligations and/or OPEB Obligations will be asserted and/or allowed, Claimant has filed portions of this Claim as a protective measure.

As the documents supporting this Claim – including without limitation the relevant statutes, charter and ordinances, grievances, unfair labor practice charges, collective bargaining agreements, Coalition Tentative Agreement, City Employment Terms, the books and records of the City's General Retirement System, and the City's communications with its employees and retirees – are voluminous, they are not attached to this Claim. Copies of the relevant documents supporting this Claim are or should be, upon information and belief, in the possession of the City.

Claimant expressly reserves the right to amend this Claim to re-characterize or further characterize all or any portion of these claims as administrative expenses or priority claims or to include such modifications, deletions or additions as may be just and proper.

Pursuant to the Bar Date Order, individual members of AFSCME Council 25, its affiliated Locals and the members of the Coalition have a right to file a proof of claim on their own behalf. Thus, Claimant reserves the right for other units or individual members to file proof

---

Claimant members who have or may become eligible in the future for pension benefits but whose data was not included in the herein calculations.

of claims in addition to this claim. Notably, the Coalition is filing an aggregate proof of claim for all outstanding claims—including those made by its affiliated unions. Claimant has put forth a good faith effort to provide an exhaustive list of all outstanding claims while avoiding duplicative filings; any unnecessary duplication is not intentional and will be resolved.

The filing of this Proof of Claim is not intended to and should not be construed to be a consent or submission to the jurisdiction of this Court for any reason.

The filing of this Claim is not and should not be deemed a waiver of any Claimants' challenge to the legal validity of this bankruptcy or any legal claims relating to the bankruptcy and/or Detroit's assets. Furthermore, this Claim shall not be deemed or construed to be a waiver of the rights of the Claimant (1) to have final orders with respect to non-core matters entered only after *de novo* review by the United States District Court, (2) to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases, (3) to have the United States District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (4) to assert any other rights, claims, actions, setoff or recoupments to which the Claimant is or may be entitled in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupment the Claimant expressly reserves, and (5) to assert any and all rights or claims against others jointly or severally liable for the sums claimed herein.

## EXHIBIT 1 FOR COALITION OF DETROIT UNIONS PROOF OF CLAIM

| ISSUE NAME | DESCRIPTION |
|---|---|
| Financial losses due to imposition | In July 2012, The City unilaterally imposed the City Employment Terms. Because of the implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members suffered significant losses due to the imposition of wage and benefit concessions. These loses are from at least as early as 2012 and continue into the future for present employees and employees who have/will retire. Additionally, Coalition members and their unions have suffered losses due to the breaches of collective bargaining agreements, CET terms and orders or actions of the Emergency Manager. |
| Agency Shop | Had the Coalition TA been executed as a contract, employee union security clauses in Coalition contracts would have been continued through the end of the CBA term. Thus, any loss of dues compensation to the union due to the absence of this contract is a claim. |
| Dues Check off without charge | The July 2012 City Employment Terms provided that the City charge a 2% fee for the collection of all dues. This fee would not have been present had the City signed the Coalition TA, or bargained in good faith. |
| Grievance / Discipline | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, employee past records used for the determination of discipline went from 14 months to 3 years. Thus, any employee disciplined/fired due to past record between 14 months and 3 years old is a claimant. The union lost dues for any such separated employee as well. |
| Seniority | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the employee probationary period expanded from 3 months to 6 months. Any probationary employee discharged within the 3 – 6 month window is a claimant. The union lost potential dues for any such separated employee. |
| Outsourcing | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, unions and employees lost the contractual protections in place when the City sought to privatize union work. Under protections in the Coalition TA, employees could not lose overtime or their position as a result of their work being outsourced the Coalition lost dues from the separated employee as well. |
| Maintenance of conditions | Under the Coalition union contracts, the Employer agreed to maintain the employment conditions which were in place at the time the contract was signed, even if not specified in the union contract. Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the employees lost various benefits which would have been protected under the maintenance of conditions clauses. |
| Successor clause | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the City eliminated the "successor clause" in Coalition union contracts. This clause required any third parties which were assigned City operations to take the obligations of the union contract, as well as the employees. |
| "Me Too" language | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition union contracts lost the economic disadvantage provision ("me too") – where any union employee compensation enhancements offered elsewhere in the City would have also been given to Coalition union members. |

| | |
|---|---|
| Sick Leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, all employees and anyone who retired after July 18, 2012 lost any sick time accrued from that point forward, for potential payout (even though the Coalition TA placed a limit on the use of sick time for Final Average Compensation). |
| Sick leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost accrual of sick leave beyond a cap of 300 hours. Sick leave is accumulated at 1 sick day (8 hours) per month. Coalition members have lost sick time for every hour they would have accrued beyond 300 hours in the future. |
| Sick leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost reserve sick time. Employees with at least 1600 hours on payroll through the year earn five Reserve Sick Days. The benefit is awarded each year on July 1st. |
| Sick leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition members lost bonus vacation days. Coalition union contracts awarded 1-6 bonus vacation days for unused sick days. The benefit is awarded each year on July 1st. |
| Shift Premium | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition members lost shift premium. The afternoon shift went from $.70 to $.25 and night shift from $.75 to $.50, per hour. |
| Overtime | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost double-time both for work on Sundays and work beyond 16 hours in one shift. |
| Holidays | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost three annual swing days and a fourth election (or excused time) day. |
| Vacation | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost prorated accrual of vacation for employees with less than 20, or less than 15, years of service. A new vacation schedule was established, which resulted in a significant reduction of vacation hour accruals. |
| Health care | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition employees had significant losses in health insurance coverage and increased cost-sharing. |
| Workers Compensation | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost certain policy provisions surrounding City workers compensation coverage. |
| Death and Life Benefits | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost certain policy provisions surrounding City death and life benefit coverage. |
| Clothing Allowance | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost annual clothing and uniform allowance, to having it paid bi-annually. |
| 2013 furloughs | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, a number of the Coalition members were forced to work at less than a full 40 hour week, beginning in February 2013, and for the bulk of the year 2013. |
| **TOTAL CLAIM AMOUNT** | **Not less than $255,496,436.50 (estimate)** |

# EXHIBIT 3

TENTATIVE AGREEMENT 2-1-2012
LETTER OF UNDERSTANDING ("Agreement")
BETWEEN
CITY OF DETROIT
AND
THE COALITION OF CITY OF DETROIT UNIONS

The Coalition Employees are the members of the bargaining units who have joined this Coalition. The Coalition was created to respond to a fiscal crisis in the City of Detroit. The Coalition is made up of the following unions (evolving list, given as of this date): Michigan AFSCME Council 25 Non-supervisory unit, Supervisory unit, Forestry and Landscape unit, Emergency Service Operators (yet the entirety of this Agreement will not apply to this unit, as outlined below) Amalgamated Transit Unit, Association of City of Detroit Supervisors, I.U.O.E – Operating Engineers Local 324, Building & Construction Trades Council, I.B.E.W. Local 58, S.A.A.A., UAW Local 2211 – PAA, A.M.I., Teamsters Local 214, Supervisors Chapter of the DOT Foreman's Association, Income Tax Investigators, and SEIU Local 517. This Agreement excludes the AFSCME units of crossing guards, and Motor City Seasonals.

## I. GENERAL PRINCIPLES

### A. Coalition Employees And Their Union Contracts

All Coalition Employees work under various collective bargaining agreements of the Coalition Unions. Except for the specific terms outlined below, the terms of the successor collective bargaining agreements for all Coalition Unions will be executed concurrently with the execution of this Agreement and will remain in full force and effect until three years following the execution of this Agreement. The City will execute successor collective bargaining agreements with each Coalition Union simultaneously with execution of this Agreement, and the terms of the successor bargaining agreements shall be identical to the most recent bargaining agreements, which are incorporated in full, except as modified below and except as to the following Unions wherein the successor bargaining agreements are identical to the attached bargaining proposals: ***. The parties acknowledge that these successor bargaining agreements are not extensions of the previous agreement, as addressed in MCLA sec. 423.215b. Also, for each Coalition Union, the terms of the prior bargaining agreement have been in full force and effect up until the execution of the new bargaining agreement. All new Coalition Union bargaining agreements shall remain in full force and effect until three years from the date of the execution of this Agreement.

The bargaining agreements of the Coalition Unions will be modified as reflected below. All changes below are prospective modifications of all Coalition Union bargaining agreements. In other words, the below changes do not have any impact on the respective bargaining units prior to the date of execution of this Agreement.

For each Union contract of this Coalition, the contract will be renewed and extended year-by-year, following the termination date, unless either the Union or City provides written notice of a desire to modify or amend or terminate the Agreement, by or before six (6) months before

1

contract termination. If either side provides such notice, the contract will extend on a monthly basis unless terminated upon 30 days written notice by either party. Any changes to this Agreement shall be agreed to in writing.

The bargaining agreements of the Coalition Unions will be modified as reflected below. All changes below are prospective modifications of all Coalition Union bargaining agreements. In other words, the below changes do not have any impact on the respective bargaining units prior to the date of execution of this Agreement.

This Agreement does not apply to employees who work within the Detroit Water and Sewage Department, due to the pending opinion of Judge Sean Cox in case number 77-71100.

### B.    "Me Too"

1) All concessions described below must apply equally to all City employees, including public officials (including the mayor, city councilpersons, the city clerk, and other persons appointed or elected who are employed by the City), appointees, management, civilians, and exempt and non-exempt employees, with the exception of Public Safety employees in bargaining units eligible for Act 312 arbitration, who are addressed below, employees in the Detroit of Water and Sewerage Department, crossing guards, Motor City Seasonals, and employees working under grants which prohibit the actions taken by this Agreement. Additionally, Emergency Service Operators and their supervisors (who are Coalition Employees) will receive parity with public safety employees, as to their wages, just as in previous bargaining agreements for those units. During the period for which the Coalition Employees are undergoing wage concessions, no Non-Coalition management level employee or appointee shall receive merit pay or step increases (only Coalition Employees receive such). All step or merit pay increases called for in the White Book, or elsewhere for Non-Coalition management/supervisory level employees, shall be frozen during the period of wage concessions for the Coalition Employees. Wage increases due to a bona fide promotion will not violate this provision, provided the base wage for the new position has been reduced by ten percent. The same shall apply for new hires. If any Non-Coalition employee/official receives any concession lower than a Coalition Employee, then all Coalition Employees will receive the concession applicable to the Non-Coalition employee/official.

2) Notwithstanding the above, if any Non-Coalition employee/official receives an increase in any form of compensation (wages or fringe benefits) from December 20, 2011 and throughout the term of this Agreement, then all Coalition Employees will receive an equivalent amount of an increase in compensation. These "Me Too" changes will take place immediately.

3) The Union Coalition will have the ability to receive all information, within seven (7) days of request of such, related to all wages and benefits received by any employee/official (Coalition and Non-Coalition employees alike).

2

4) In the event a Non-Coalition Union or non-Union Employee agrees to take economic concessions which are equivalent economically, but not identical to the Wage Concession set forth in this Agreement, such arrangement shall not violate this "Me Too" clause.

5) All parties acknowledge that the City of Detroit will assure shared sacrifice from all employees in fixing the City's fiscal concerns. At least one week prior to the ratification of this Agreement but following tentative execution of this Agreement, the City will share with the Coalition Unions all concessions to which public safety employees have agreed, along with all available information substantiating the value of said concessions for the next three years. This information shall be shared with the Coalition Union by no later than three days following agreements being reached with public safety employees. If the Coalition Unions are dissatisfied with the concessions of the public safety employees or the information provided concerning them, they may withdraw from any terms of this Agreement at their choosing, and may make alternative proposals to the City concerning any area of this Agreement. If the City has not ratified agreements with the public safety employees by April 1, 2012, the parties will discuss the consequence of the failure to attain public safety agreements, since the Coalition Unions will not have ratified by that point.

6) Notwithstanding the above, all City employees (including public safety) shall be governed by the same healthcare plan designs, options, and costs, as provided for elsewhere in this Agreement, or else the remedies of this section shall apply. This provision does not apply (a) if the public safety employees have a health care plan which is equal to or less in costs, for the public safety group, than the plan proposed by the Coalition Unions as spelled out below or (b) to the COPS Trust plan — with the understanding that the participation in the COPS Trust plan is being frozen at its current participants, or that the plan's costs and/or benefits are comparable to the plan of the Coalition Unions. Further, if the Coalition Unions are dissatisfied with the public safety agreements concerning the COPS Trust plan, when the Coalition reviews the public safety ratified agreements prior to the ratification of this Agreement (see paragraph 5 above), then the Coalition may resort to the remedies outlined above.

7) For bargaining units represented by unions who do not sign on as members of the Coalition, or sign the agreement as a separate signatory (except with regard to the "Me Too" in Section I.B.1), the City shall have until July 1, 2013 to implement wage and benefits concessions at levels and length similar to that agreed to by the Coalition Unions in this Agreement. If such changes are not implemented by July 1, 2013, the Coalition Employees shall receive an economic adjustment in their wages, at that time, so that the Coalition Employees will receive no greater concession ~~over the life of this Agreement~~ than the non-Coalition Employees. for a three year term

Any of the Coalition Unions shall have the ability to file a grievance for a violation of this Me Too provision, pursuant to the Dispute Resolution section below. This may be a

3

joint grievance when filed, or any Coalition Union may join in the grievance. Once a grievance has been filed concerning this Me Too provision, the City shall have twenty-one (21) days to review and cure the violation of the Me Too provision, before any Coalition Employee is entitled to sanctions for violation of such clause.

C. Dispute Resolution

A violation of any provision of this Agreement shall be subject to the following process. Either the City or a Coalition Union may grieve a violation of this Agreement. The grievance may be filed jointly on behalf of any or all Unions within the Coalition. There is no time limit within which to file a grievance concerning the violation of this Agreement. The grievance shall be addressed as normal in the contractual grievance steps. The grievance may be filed at the Labor Relations step (i.e., step 4) of the grievance process, the step immediately prior to the arbitration step. Once the grievance reaches the step of arbitration, the parties shall first submit the grievance to the JBS Committee (described in Section III below). Both the City and the grieving union(s) may have additional representatives involved in the grievance discussions. The Committee shall have its first meeting within 10 days of the grievance being filed, and shall exercise all reasonable efforts to try to resolve the grievance. As necessary, the Committee may meet with any City Department Head, Group Executive, Chief Operating Officer, Chief of Staff, and the Mayor, and those meetings shall take place as soon as possible after request. The Committee shall have 45 days to try to resolve the grievance. If the grievance is not resolved, it shall be submitted to a neutral arbitrator, pursuant to the Grievance Procedure language of the bargaining agreement of the lead Union which filed the grievance. This arbitration shall be expedited to the fullest extent possible, but by no means shall the grievance take longer than six months from the date of filing in order to have an arbitrator issue his/her ruling on the grievance.

If the arbitrator finds a violation of any provision of the Agreement, the arbitrator may order specific performance (ordering the City or Union to take certain action or refrain from certain action to comply with the Agreement). Specific performance shall be the sole remedy for any violation by the City or Union for the commitments made in Section III of this Agreement, "Lean Optimization Commitment and Union Deficit Benchmarks"; except that if an individual employee suffers a wage loss as a result of a violation of Section III, paragraphs 7.g and 10, then the arbitrator may order that the employee be made whole. In addition, in any grievance arbitration in which a grievance claims a violation of Section III of this agreement, the arbitrator shall award costs and reasonable attorneys fees to the prevailing party in such arbitration. If the arbitrator finds a violation of the provisions of Section I, "General Principles," or Section II, "Employee Concessions," he/she may award financial and other remedies. The arbitrator's remedy is subject to an action to enforce or vacate the arbitration award in Circuit Court. The parties stipulate that such action to enforce or vacate shall be expedited, and placed before the court as quickly as possible.

The foregoing provisions do not preempt the rights of an individual employee or Coalition Union to enforce other provisions of collective bargaining agreements through the contractual grievance procedures, or pursuant to law.

4

The Union and City shall have the right to request information from the other party, to be received at least one week prior to the hearing on the arbitration.
The arbitrator shall require the losing party to pay all arbitration fees and costs, unless there is a split decision in which case the costs are evenly split between the parties.

## II. EMPLOYEE CONCESSIONS

1. <u>Wage Concessions</u>. The Coalition Employees will incur a reduction in wages of ten (10%) of the base. The concessions will be modified or eliminated as spelled out below. The furlough days being served by the Coalition Employees are terminated. The Wage Concessions hereby terminate at 11:59 pm on the day prior to the termination date of this Agreement, or earlier as outlined otherwise in this Agreement.

<u>A. Trigger of Reduction of the City Deficit</u>. If the City general fund achieves a $40 million net surplus for fiscal years 2012, 2013 or 2014, regardless of the overall Fund Balance Deficit, then Coalition Employee wages will be adjusted upwards by 2.5% during the next fiscal year starting on the subsequent July 1st. If the City general fund achieves a $40 million net accumulated surplus over a combination of two or more fiscal years during the life of this Agreement, regardless of the overall Fund Balance Deficit, then Coalition Employee wages will be adjusted up by 2.5% during the next fiscal year on the subsequent July 1st. For any subsequent fiscal year, or combination of fiscal years during the life of this Agreement, where the City achieves a surplus of an additional $40 million regardless of the overall Fund Balance Deficit, the wages will be adjusted up by another 2.5%. If the City completely eliminates the Fund Balance Deficit, then wages will go back to their original levels prior to the 10% reduction, during the following fiscal year as of July 1st. See examples below.

Example A.

Fiscal year 2012 has a surplus of $70 million. Thus, in fiscal year 2013, wages are increased by 2.5%

Fiscal year 2013 has a surplus of $20 million; therefore accumulated surplus of $90 million. Thus, in fiscal year 2014 wages are increased by an additional 2.5%, equating to a total of a 5% increase in wages and leaving 5% in concession.

Example B

Fiscal year 2012 has a surplus of $80 million. Thus, in fiscal year 2013 wages are increased by 2.5%.

Fiscal year 2013 has a surplus of $120 million and the general fund balance deficit is eliminated. Thus, in fiscal year 2014 the wages are increased by an additional 6%.

Example C

5

Fiscal year 2012 has a deficit of $50 million. Thus, in fiscal year 2013 there is no change in the wages.

Fiscal year 2013 has a surplus of $80 million ; therefore Accumulated Surplus of $30 million deficit over the combination of fiscal years 2012-2013. Yet, due to the surplus in fiscal year 2013, wages are increased by 2.5%.

A net surplus is defined as the general fund revenues, less expenses, in that one fiscal year, regardless of the overall Fund Balance Deficit at the time, but not including funds received due to new debt issuance, any one-time surplus resulting from a refinancing transaction (however, savings beyond the initial one time revenue increase from the refinance – such as interest rate reduction – will be included in the calculation of the net surplus addressed in this section), asset sales and any debt principal repayment made beyond its scheduled date of maturity. With respect to proceeds from asset sales, the parties will negotiate regarding any portion of the proceeds of such sale to be included in the net surplus. A net accumulated surplus is defined as the general fund revenues, less expenses, in that combination of two or more fiscal years, regardless of the overall Fund Balance Deficit at the time, but not including funds received due to new debt issuance, any one-time surplus resulting from a refinancing transaction transaction (however, savings beyond the initial one time revenue increase from the refinance – such as interest rate reduction – will be included in the calculation of the net surplus addressed in this section), asset sales any debt principal repayment made beyond its scheduled date of maturity. With respect to proceeds from asset sales, the parties will negotiate regarding any portion of the proceeds of such sale to be included in the net surplus. Fund Balance Deficit means the City's accumulated deficit in its general fund, which is $196 million as of June 30, 2011. A fiscal year runs from July 1st through June 30th of the following year.

For every year of this Agreement, the City will receive an assessment of the net surplus in its general fund and the overall Fund Balance Deficit, by or before January 5th of each year of this Agreement, for that current fiscal year. This information will be conveyed to the Coalition Union also by that date. The Coalition Union may have access to all data pertinent to such an assessment.

2. Healthcare.

a. The City has indicated that it needs to attain $60 million in health care savings (excluding the DWSD employees and the Weiler class retirees), annually, either paid by or subsidized by the general fund. While the Coalition Unions do not bargain concerning retirees' healthcare and nothing regarding this Agreement shall be construed as Coalition involvement in such, ~~Yet,~~ the Coalition Unions agree to changes in the benefit plan design for prescription drugs and medical, dental and vision care which will achieve the active employees' share of this savings target. If the City includes the COPS Trust healthcare plan in the package offered to employees, the calculation for the healthcare savings desired by the City will be reduced by the value of savings to the City's healthcare costs by the amount of money which would have been realized in savings had

6

COPS Trust been excluded. The Coalition Unions shall discuss plan design costs with healthcare providers. These cost changes shall be applied to all City employees, including public officials, appointees, management, public safety employees, civilians, and exempt and non-exempt employees, however, this provision shall not be violated if the City maintains the COPS Trust plan. Any changes to the above plan design changes will be agreed upon between the parties. The carriers will include Blue Cross & Blue Shield PPO, Health Alliance Plan, Total Health-Care, Golden Dental, Dent-Cap, Blue Cross & Blue Shield Dental, Heritage Vision, and Co-op Optical.

b. By or before February 6, 2012, the Coalition Union will report on health care plan design costs from the carriers and provide the data demonstrating such. If the City is not satisfied that the Coalition Union has demonstrated sufficient savings, then it may seek review of the Coalition Union's package by a third party neutral. She will review the data presented by the Coalition Union, as well as the City's proposed plan option (Option 3), in order to assess each package and offer recommendations of employee design plan change ideas to the parties.

c. The plan design proposed by the Coalition Union members for the duration of this Agreement is as follows. The changes will be implemented as soon as possible: The City shall pay no more than 80% of the cost of healthcare, as required by state law in effect at the time of execution of this Agreement.

Plan Deductible: $250/$500

Insurance maximum: $1000/$2000
Office visit/urgent care: $15

Prescription Drug co-pay (purchased through CVS Caremark): $5/$15/$30. [copayment costs of drugs for generic/brand name/formulary]Elimination of Blue Care Network

Elimination of U.S. Health provider

Emergency Room visit: $75

Hospital visit: no co-pay

Dental contribution: 20%

Vision contribution: 20%

d. There were Coalition Employees who were under different healthcare plans, prior to the execution of this Agreement. As of the execution of this Agreement, all Coalition Employees will receive the same healthcare plan options and plan designs as all other Coalition Employees.

7

e. The City shall engage in all reasonable efforts to explore a relationship with Detroit-based hospitals to provide healthcare in direct relationship with City employees, as opposed to going through a health insurance company. The success of said efforts shall be explored in the Joint Budgetary Savings and Revenue Initiatives Committee meetings described below.

3.  Pension Concessions. The Coalition Employees will agree to the following Pension Concessions and changes set forth in the attached Exhibit B. These changes are effective as of February 28, and are applicable prospectively only. For those employees who have submitted a written application of intent to retire prior to February 28, 2012, those employees shall not be impacted by the changes in the pension benefits, and shall receive pension benefits in effect prior to February 28, 2012. The City represents that it will seek approval of all retirement benefits by all applicable government agencies, including the Internal Revenue Service. If any retirement benefit change fails to attain necessary government agency approval, all other benefits shall remain in effect for the duration of this Agreement.

4.  Early Retirement

The Coalition Employees will agree to the below early out program for employees who have between 27 and 29 years of service and are any age, employees who have between 7 and 10 years of service and are at least 60 years old, and employees with between 22 and 25 years of service and intend to retire with the Actuarially Reduced 25 Year Option of the Retirement Plan: The City will offer such Coalition Employees the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits, for employees who have more than [1,000] hours of banked time (i.e., sick time, furlough, vacation or compensatory time) and who relinquish all of their banked time. The City will offer Coalition Employees to retire two years earlier than otherwise eligible under the contract, with benefits, for employees who have between [500] and [1,000] hours of banked time, and who relinquish a maximum of 1000 of banked time. The City will offer Coalition Employees to retire one (1) year earlier than otherwise eligible under the contract, with benefits, for employees who have less than [500] hours of banked time, and who relinquish a maximum of 500 hours of banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

Employees may purchase service time, to retire early, using their annuity. The City will provide data on the cost of the service time to be purchased by April 1, 2012.

The City will widely advertise the early out program to its employees. The open period for employees to initially apply for the early retirement option shall be no less than 21 days. Upon voluntary retirement, employees will be expected to sign a separation agreement and waiver and release of claims (the terms of which shall be agreed upon by the City and Coalition Unions), and the City will comply with all applicable federal and state laws, and regulations, concerning this early out program.

§

The City will facilitate quick meetings and exit interviews with employees who seek to retire in conformity with this Agreement.

Coalition Employees who are veterans shall have the ability to purchase service time, at the actuarially determines service cost, for all active duty military service.

## III. LEAN OPTIMIZATION COMMITMENT AND UNION DEFICIT BENCHMARKS

### A. General Principles Of Lean Optimization

During the 2011 negotiations, the parties discussed the role of the labor management cooperation and collaboration in providing more efficient delivery of services to the people of Detroit. The parties recognize that the efficient delivery of service to the public should be mindful of the cost effectiveness, quality of delivery, accountability and public interest. The parties agree that all stakeholders must work together in an open dialogue manner to achieve best in class public service.

The parties agreed to approach the issue jointly with the goal of facilitating the development of positive programs relative to the effective use of resources. Such effective use of resources may include self-directed work teams or other empowerment initiatives as agreed by the parties to provide front line workers with the support needed to effectively perform their jobs.

The parties recognize that Lean Optimization can be a valuable tool in achieving the effective use of resources. Lean Optimization has the simple goal of helping city government work better for both its customers and its employees. Lean practices rely on joint participation between employees and management at all levels within the City. World class service cannot occur without such employee involvement.

The Mayor and all levels of his administration, and City Council, agree that the below Deficit Benchmarks and all other aspects of this Agreement are among the necessary tools that must be pursued in order to have the City attain financial stability. By executing this Agreement, they agree to comply with these Deficit Benchmarks and all other aspects of this Agreement.

For the below Committees, coordinated training for the Coalition Unions and the City will take place within (30) days after ratification of this Agreement.

### B. Committee Creation

1. Joint Budgetary Savings and Revenue Initiatives Committee - Within twenty (20) days after the effective date of this Agreement, a Joint Budgetary Savings and Revenue Initiatives Committee ("JBS Committee") will be established to explore innovative initiatives to deliver better customer service and pursue better value from those who deliver the services. The parties agree to meet on a monthly basis, and shall be responsible for reporting their progress to the City Administration's Chief Operations Officer and the Coalition Unions. The City Representatives to this Committee shall be decided by the City's Director of Labor Relations and the Chief Operating Officer, and the Coalition Unions may elect up to 6 representatives to be on this Committee, and the City shall have 6 representatives appointed to such Committee.

9

Representatives from the Departments may participate as needed. The Committee will determine the meeting schedule and agenda. The parties agree on the value of utilizing outside independent facilitators trained in business lean practices and will explore funding alternatives to engage mutually agreed upon lean consultants. The any member of the Committee shall have access to all information pertinent to the performance of their duties, from either the Administration or the City Council. Upon request, the information shall be conveyed within seven days of request.

The Committee's responsibility shall also be to monitor the achievement of the Union Deficit Benchmarks spelled out in Section III below, and otherwise to assure compliance with this Agreement.

**2. Joint Healthcare Committee - Healthcare Cost Containment.** During the 2011 negotiations, the parties discussed the mutual goal of designing and implementing healthcare plans, including ancillary plans, that effectively manage costs and that work to keep members healthy. The Coalition Unions may elect up to 6 representatives to be on this Committee, and the City shall have 6 representatives appointed to such Committee, within 30 days of execution of this Agreement. The Committee will be jointly chaired by the designee of the City and Coalition Unions. To that end, the City and the Coalition Unions will convene a Joint Healthcare Committee (the "Committee") whose charges will include, but not be limited to:

a. Analysis of current plan performance identifying opportunities for improvement;

b. Investigate potential savings opportunities from re-contracting pharmacy or other carrier contracts;

c. Review the current specialty pharmacy program and identify best-in-class specialty programs to use as a benchmark;

d. Analyze current HMO plans to determine if they are a cost-effective means of providing high quality healthcare;

e. Investigate impact on outcomes and costs of Value Based Benefit Designs;

f. Identify opportunities for cost-containment programs and carve out programs;

g. Investigate opportunities to save costs by modifying or otherwise limiting medical, professional and pharmacy networks;

h. Review current chronic care management programs to determine effectiveness as well as ongoing member compliance;

i. Investigate workplace health and wellness programs and make recommendations with the goal of educating and motivating employees toward improved health and well-being;

10

j. Make recommendations to increase voluntary participation in health and wellness screenings and benefits included in current health plans;

k. Identify educational opportunities relative to facility and professional provider quality data, as well as designated centers of excellence.

As mutually agreed by the parties, independent subject matter experts and consultants may be called upon to assist the Committee in carrying out their charges.

Monthly meetings of the Committee shall be scheduled with the first being held no later than 45 days following the effective date of the Agreement.

**3. Contracting Out Committee** – In order to attain the 10% reduction from third party contractors (discussed in benchmarks below) and otherwise attain savings and efficient practices in privatization, representatives of the City Administration and Union Coalition will form a Contracting Out Committee ("Committee"), with six persons from each group. The Committee will review all contracts with third party persons or entities, that are paid in some part directly, or indirectly, from the general fund. The Committee will oversee the process of the 10% reduction in the gross contract value being asked of all contractors. The Committee will also make recommendations to the Administration on ways to attain efficiencies and savings in the contract procurement process. In making their assessment, the Contracting Committee may:

- schedule meetings with the contractor and bidders, to discuss the price being offered for the goods/service;
- review current and proposed contracts for compliance with the Privatization Ordinance;
- Seek evaluation of the contracts by an outside expert mutually agreed to by the City and the Coalition Unions;
- recommend termination of the contract in conformity with its terms and seeking alternative sources of supply for the services;
- Study and consideration of a plan for the work being performed by City employees rather than outside contractors where an objective, demonstrable cost savings can be established.

The Committee will also review contracts which are paid with dollars from the City's enterprise funds, and recommend similar adjustments to such contracts to the heads of those Departments. The Committee will have access to all data surrounding the contracts of general and enterprise funds.

The Committee will also explore potential savings with insourcing work that is currently being done by a contractor. The Committee will look at objective, and demonstrable savings to be realized by having city employees perform work that contractors now perform. In-sourcing analysis may include the retention of an outside consultant, who shall be mutually acceptable to both the City and the Union Coalition.

11

The Committee will meet once per month, the first meeting being 10 days following execution of this Agreement, and will report to the City Chief Operating Officer and the Union Coalition chief spokesperson. Their reports will include all of the above information.

## C. Deficit Benchmarks

**1. 125k Plan.** The City will implement a Section 125 Plan for flexible spending accounts, dependent care accounts, and medical contribution pre-tax accounts. This plan will permit employees to contribute to these accounts, pre-tax. It will begin April 1, 2012. The provider of this plan will be Colonial Life, assuming that the package offered by Colonial is deemed reasonable by both parties.

2.  **Reducing Contractor Costs.** The City acknowledges that cost reduction efforts should not be limited to employee concessions in wages and benefits. The City will aggressively seek a ten percent (10%) reduction in the gross value of each and every contract the City has with a contractor. Contractor is defined as any person or entity which receives payment from the City's general fund directly or indirectly (i.e., an enterprise fund which is subsidized by the general fund), and includes contracts let through a City agency (i.e., Detroit Building Department), but excluding contracts let to the federal government.

All City Contractors will be told that they have until February 15, 2012 to indicate that their contract can be amended to provide for a 10% reduction in the gross value of the contract.

By February 15, 2012 or one week following ratification, whichever date is the latter, each City Department using Contractors will prepare a written summary of all Contractors that it utilizes. The list will indicate for each Contractor: the name of the Contractor and the contact person, the value of the contract, the services provided by the Contractor, the gross amount of invoices submitted by the Contractor within the 2011 calendar year, the total paid to the Contractor within the 2011 calendar year, whether or not the Contractor has been asked for a 10% reduction, and the response of the Contractor. The information shall be forwarded to the Union Coalition.

For all Contractors who agree to a 10% reduction in the gross value of the contract, then the City (including the Purchasing Director and City Council) shall immediately modify the contract and adjust the payments to the Contractor accordingly. For those Contractors who either fail to respond, or respond by agreeing to no reduction or a reduction of less than 10%, upon recommendation of the Committee, the Purchasing Director shall promptly send out the previous request for proposal with scope of services to other persons/entities who the Purchasing Director or the Committee feel may be able to replace the current Contractor.

The Committee will oversee the Purchasing Director's submission of the scope of services and request for proposals to other Contractors, which will take place within two weeks of the Contractor's response, or at the latest by February 24, 2012. The bids are due within thirty (30) days, and the bid price sought should be at 10% less than the current Contractor's cost. The Committee will review the bids once submitted and assess

12

whether the work could be done, or goods can be offered, by any of the bidders for less than the current contractor's cost.

The City and Committee will utilize the services of at least one expert in contract procurement to assist with this evaluation. If the Purchasing Director determines that the work/goods can be offered by another bidder for less than the current Contractor, then the Purchasing Director will terminate the current Contractor's contract, as permitted by law, and initiate the process for securing the contract with the bidder. The Contracting Committee may review the decision of the Purchasing Director, and will have access to all data pertinent to the decision of the Purchasing Director. If any member on the Committee disagrees with the Purchasing Director's decision about whether a bidder should replace the current contractor, then the neutral expert in contract procurement, that the Committee had previously designated to hear such disputes, will make the final determination, after having access to all data pertinent to the current contract and bidders on the contract.

3.  **Elimination of Daily Overtime.** The City will eliminate payment of daily overtime for all City employees, except as required by state or federal law or regulation.

4.  **Elimination of 35 Hour Work Week.** The City will eliminate the 35 hour work week for all City employees, except as required by state or federal law or regulation.

5.  **Quarterly Review of Financials.** The City will conduct a quarterly financial review meeting to which a representative of the Union Coalition will be invited. Each Department Head (or designee) shall appear at the meeting to review all actual expenditures of his/her Department. The Department must demonstrate the amount of all actual expenditures and how actual expenditures track the budgeted spending allotments. If the Department is spending more than allotted, at that point in time, it shall adjust its spending accordingly or seek an amendment of the overall budget, with good cause. The Union Coalition may request pertinent financial information to assist in the departmental financial review.

6.  **Efforts for Increased Revenue Collection.**

    The City and the Union Coalition believe that there are serious opportunities for the collection of increased revenue as a vital component in meeting the City's fiscal crisis. Accordingly, the following revenue collection measures will be implemented and supported by the City, the Coalition Unions, and Coalition Employees.

    a.  Beginning on or before the date of execution of this Agreement, the City will widely advertise an amnesty plan for past due taxes (income taxes, personal property taxes, corporate taxes, property taxes which have not been transferred to Wayne County via revolving fund arrangement), parking tickets, tickets for ordinance, and other outstanding debts. The debtors will be told that they may enter into a payment plan, and if they pay or begin a payment plan between March 15, 2012 through May 15, 2012, the debtors will be relieved of payment of the accrued penalties. Following the end of the amnesty period, the Administration

13

shall provide to the Union Coalition all data related to the amount of the outstanding debts and the amount of money collected in the amnesty period.

b. The City shall engage in all reasonable efforts to have state law changed/clarified to require all Employers of City residents to withhold City income taxes via payroll deduction, require Employers within the City to withhold City income taxes via payroll deduction, and to require all Employers to transmit the City withheld income taxes electronically to the City, automatically. Also, the City shall seek all necessary changes in state law to grant it more ability to utilize parking boots on automobiles where owners have past due parking tickets. The Union Coalition will assist in this regard.

c. As soon as approved by City Council, but certainly no later than February 15, 2012, the Administration and City Council shall increase the corporate tax rate to 2.0% for all applicable entities in the City. This tax rate shall remain at 2.0% for the duration of this three-year Agreement, and certainly as long as Union Coalition members are incurring Wage Concessions.

d. The City shall continue to take electronic payment for property taxes and will investigate additional areas to set up electronic payments.

e. The City will engage all reasonable efforts to streamline, and make more efficient and effective, the process and bureaucracy for the use of City services which concern the payment of fees or monies by the public.

f. The City will continue to actively engage the State of Michigan in seeking a change in state law to permit taxes on non-resident wagering. The Union Coalition will assist in this regard.

g. Within thirty (30) days of the execution of this Agreement, the JBS Committee will implement and oversee an operational plan for the trial hire of additional employees directly involved in collection of debts owed to the City. The Union Coalition suggested operational plan staffing is outlined below. The JBS Committee will review the below plan and a majority of the Committee may make alterations in the plan. Subject to JBS Committee alteration, the following number of employees will be hired, as soon as they can be successfully recruited by the City, in the following classifications:

    i.      10 – Income Tax Investigator

    ii.      10 – Office Assistant II

    iii.      10 – Senior Clerks

    iv.      10 – lawyers

    v.      8 - legal secretaries

14

      vi.    7 - legal assistants

      vii.   3 - Parking Meter Collection Assistants

      viii.  3 – Meter Repairmen

      xi.   15 – Parking Enforcement Officers

      x.    10 – Building Inspectors

Any employees hired for this project shall be hired as temporary employees for a period of up to six (6) months. During the period of temporary employment, the employees will receive the salary levels as outlined in the relevant Union Contract and have union representational rights, but will not be eligible for accrued time contractual benefits; will not have seniority accrual rights or healthcare. If the employee hired under this plan, collectively, result in revenue being brought in and collected to the City, in an amount 1.5 times greater than what is paid to the entire group of employees in wages, then the entire group of employees will receive all applicable contract benefits and become a full time, permanent employee. The assessment of the employees' revenue brought to the City will be measured by the last five months of the six month period.

The trial period concludes at the end of the six months. If, following the trial period, the trial plan did not result in the entire group bringing in revenue at least as much as 1.5 times the cost of the wages of the employees in the trial plan, the City shall have the right to discontinue the program and such action will not be opposed by the Union Coalition, except to challenge the finding that the above metric was not met.

During this six month trial period, no employees in the above classifications and in the departments and divisions of the operational plan, shall be laid off by the City.

    h.    The City's efforts in collecting outstanding revenue, such as past due debts, may also include the hiring of an outside revenue consultant. Should a consultant be hired, he/she shall be agreed upon mutually by the City and designee(s) of the Coalition Unions.

7.   **Removing City-Owned Residential Parcels and Vacant Lots From Tax Roles.** The City will use its best efforts to have City-owned residential parcels and vacant lots purchased by private owners. The City represents to the Union Coalition, however, that the vast majority of the residential parcels are not in desirable areas and/or may not be habitable, and that there is currently little demand for the purchase of vacant lots.

8.   **Re-Negotiate and Consolidate Leases.** The City shall continue its current efforts to renegotiate its leased property with its landlords, and attain a reduction in the price of all

15

rent paid. The City shall also continue its current efforts to consolidate its office with the objective that it is not spending money on leased space unnecessarily. The City anticipates having a plan in place in January 2012 with the objective of saving the City approximately $1.8 million over the next one to two years.

9.    Supervisory Ratios.  In furtherance of principles of Lean Optimization, the City will evaluate appropriate supervisory/hourly employee ratios in each department or operation. Within thirty (30) days after the execution of this Agreement, the JBS Committee shall provide the City a list of identified departments/operations where it believes an evaluation of supervisory/hourly employee ratios should be performed, and a reduction in the supervisory workforce shall take place. The City shall engage in all reasonable efforts to implement a plan by or before July 1, 2012.

10.   Taxes on Non-Resident Wagering.  The City shall engage all reasonable efforts to have state law changed to permit taxes on non-resident wagering. The Union Coalition will assist in this regard.

11.   Reduction of Expenses.  No City employee or public official will be permitted to utilize City equipment for personal use, unless required by law or by contract. This includes City vehicles.

16

CITY OF DETROIT

By: _____ 2/1/12

Its: COO

UNION COALITION

By: _____

Its: _____ 2/1/12

SAAA

A.M.I.

IUOE 324

PAA UAW 2211

Joseph Walker AFSCME 1227

John W. E. Scallen Mech. Bldg. Trd.

_____ AFSCME 62

Robert A. S. _____ AFSCME N 23

Richard King ACODS

Sheree Farrington AFSCME 1023

Yvonne B. _____ AFSCME #2799

Gerald Thompson AFSCME 1220

Dan O'Rourke IUOE 324

_____ AFSCME LOCAL 229

_____ AFSCME UAW 45

Kene M. Thompson-Mitchell Local 164.

DIFIA

_____ AFSCME 836

_____ SEIU 517M

Arlene _____ AFSCME Local 1206

_____ AFSCME 2394

Thomas B. Johnson II AFSCME 1920

_____ AFSCME Local 542

Jason M Glenn S.A.A.A.

Nathan Davenport IUOE 324

President AFSCME 273

Walter Ashbury AFSCME 214

_____ P. _____ Assistant Supervisors

17

**EXHIBIT B**
## PENSION CONCESSIONS

1. **Reduction of Multiplier.** Effective upon settlement, reduce multiplier to 1.5, per year, for all years of credited service accrued by non-vested Union members after the execution of this Agreement.

2. **Defined Contribution Plan for New Hires.** All bargaining unit members hired into the City after July 1, 2012, herein will not accrue any benefits under the present defined benefit plan between the parties. Rather, they will receive benefits only pursuant to the defined contribution plan described below:

    **Employee Contribution Account**

    a. **Basic Employer Contributions.** The employer shall contribute an amount equal to five (5%) percent of the participant's base salary to each participant's employer contribution account each pay period.

    b. For members on duty disability, the amount contributed shall be equal to five (5%) percent of the participant's base salary on the date of disability.

    c. **Employee Contribution.** The employee shall contribute an amount equal to five (5%) percent of the participant's base salary to each participant's employee contribution account each pay period.

    d. Employee contributions shall be made on a pre-tax basis subject to the approval of the Internal Revenue Service.

    **Periods of Absence Due to Non-Duty Disability.** Employees on non-duty disability are no longer active participants in the Plan and may not receive employer contributions or make employee contributions.

    **Vesting.** All account balances are subject to the following vesting schedule:

    a. **Employee Contribution Account.** A participant shall always be one hundred (100%) percent vested in such participant's employee contribution account.

    b. **Employer Contribution Account.** A participant shall be vested in the balance of such participant's employer contribution account as follows:

    | Years of Service | Percentage Vested |
    |---|---|
    | 5 or more | 100%] |

3. Effective upon settlement, distributions to Participant Annuity Accounts may not exceed actual earnings by the Fund, but shall neither be greater than the assumed rate of return for the plan year, nor less than zero.

18

Participant annuity accounts shall be ratably adjusted, not less frequently than once a year based upon actual returns experienced by the retirement system during the fiscal year preceding the crediting date, provided that such return shall neither be greater than the assumed rate of return as is expressed in the Plan's valuation for that year, nor less than zero. Any final distribution of the account balance to a participant or beneficiary shall be delayed until the final adjustment has been made.

Other than as provided above, bargaining unit members shall not be entitled to any assets, including but not limited to, interest, dividends, or other income of any kind derived from the investments of the retirement system, gifts and bequests received by the retirement system, and all other assets of the retirement system, which shall be used exclusively to fund pension payments on the basis of service performed, disability benefits and death benefits as provided herein.

4. Limitation on Unused Accumulated Sick Leave Inclusion in Final Average Compensation.

a. Any employee with more than 240 hours of unused accumulated sick leave as of the date of ratification of this Agreement may have all such hours included in the employee's final average compensation ("FAC") upon the employee's retirement (unless such hours are subsequently used by the employee for sick time). Any additional unused, accumulated sick leave earned by the employee after the date of ratification of this Agreement may not be included in the employee's FAC upon retirement.

Employees with more than 240 hours of sick time may elect to contribute the full value of all sick time above 240 hours to the employee's participant annuity account. This option is exercised as opposed to the employee receiving a cash payment for the sick time. This sick time contributed to the annuity shall not be withdrawn by the employee, prior to timely distribution upon retirement.

b. Any employee with 240 or less hours of unused, accumulated sick leave as of the date of ratification of this Agreement, and all new City hires after the date of execution of this Agreement, may accumulate a maximum of 240 hours of unused, accumulated sick leave that may be used in determining their FAC upon retirement.

c. If an employee who had more than 240 hours of unused, accumulated sick leave as of the date of ratification of this Agreement, subsequently uses sick leave and falls below the 240 hour level at any time, s/he shall be subject to the maximum 240 hour cap set forth above in determining their FAC upon retirement.

# **EXHIBIT 4**

STATE OF MICHIGAN

RECEIVED/FILED
MICHIGAN DEPT OF STATE

2012 APR 10 PM 1: 33

OFFICE OF THE GREAT SEAL

In the matter of the City of Detroit, the
Financial Review Team for the City of Detroit
the Michigan Department of Treasury and
Governor of the State of Michigan

CONSENT AGREEMENT

---

## AFFIDAVIT OF PERSONAL SERVICE

STATE OF MICHIGAN )
                ) ss.
COUNTY OF INGHAM )

Caleb Buhs, being duly sworn, deposes and says that on April _10_, 2012, he personally
served a copy of the **Financial Stability Agreement** with the **The Office of the Great Seal**,
Michigan Department of State by personally handing said document to:
_Bev Vogt_ _Bev Vogt_ _4/10/2012_ .

Caleb Buhs, Office of Communications
Michigan Department of Treasury

Subscribed and sworn to before me
this_11th_ day of April, 2012

Karyn Howd, Notary Public
County of Ingham, Michigan
Acting in Ingham County
My commission expires: 02-14-2013

KARYN HOWD
NOTARY PUBLIC, STATE OF MI
COUNTY OF INGHAM
MY COMMISSION EXPIRES Feb 14, 2013

# FINANCIAL STABILITY AGREEMENT

WHEREAS, the City of Detroit (the "City"), like many industrial cities throughout the United States, has experienced a prolonged period of economic change stretching over several decades which has eroded the quality of life of the City's residents and businesses; and

WHEREAS, the City currently confronts daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions, aggravated by the deterioration in revenues received from property taxes, income taxes, interest earnings, utility revenues, and intergovernmental revenues resulting from the recent serious recession in the U.S. and Michigan economies; by the growth in the City's legacy costs concurrently with the City's diminished ability to carry such costs; and by the difficulty in rapidly restructuring the City's operations so as to bring short-term and long-term expenditures in line with current and projected revenues; and

WHEREAS, a financially stable and vibrant City is important as a catalyst for the State of Michigan's overall image and success in economic development, business attractiveness, quality of life, and a host of other factors; and

WHEREAS, fundamentally changing the City's current trajectory can restore the quality of life which families, businesses and visitors have a right to expect and enjoy; and

WHEREAS, the City, through the Mayor and City Council, seeks to pursue this long-term vision by achieving, first, financial stability for the City, and, second, a sustainable and stable platform for growth ensuring the City's financial integrity in a manner that enables the City to grow, prosper and thrive; and

WHEREAS, the People of the State of Michigan have required the establishment of the Department of Treasury as a principal department of state government under Section 3 of Article V of the State Constitution of 1963 (the "Treasury Department") and provided that the State Treasurer, a constitutional officer appointed by the Governor with the advice and consent of the Michigan Senate (the "State Treasurer"), shall serve as the head of the Department, which is vested with responsibilities related to local government finance, budgeting and administration under state law; and

WHEREAS, the City is a political subdivision of the State of Michigan organized as a body corporate under Act 279, Public Acts of Michigan, 1909, as amended, the Home Rule City Act ("Act 279"), with the People of Detroit having created and provided for their continuing control of the municipal government of the City by adopting a Home Rule Charter of the City of Detroit (the "Charter"), and the People of the State of Michigan conferring comprehensive home rule power to the City through the State Constitution of 1963, subject to the limitations on the exercise of that power contained in the Constitution or the Charter, or imposed by statute;

WHEREAS, the Treasury Department desires to undertake jointly with the City efforts for the betterment of the residents of the City and the State of Michigan (the "State") as a whole through the adoption of this Financial Stability Agreement (this "Agreement"); and

WHEREAS, as a commitment to the long-term cooperative process established in this Agreement, the Mayor and the City Council desire to authorize and perform certain initial restructuring actions detailed herein with the Treasury Department; and

-2-

WHEREAS, the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas; and

WHEREAS, this Agreement contains the terms and conditions authorizing a cooperative undertaking between public agencies for efficiently restructuring the City's operations and tackling the City's systemic issues and accumulated deficit with the goals of (i) ensuring that the City remains a safe and secure environment where residents and visitors can live and work, (ii) promoting the delivery of quality, efficient, and effective public services to residents and businesses, and (iii) creating a civic culture and environment that attracts as well as retains investment, businesses, jobs and new residents to the City and the State; and

WHEREAS, approval of this Agreement is intended to reaffirm the role of the City's executive and legislative branches under the Charter in the development of the strategy, policies and long-term vision of a revitalized City; and

WHEREAS, under this Agreement the City and the Treasury Department agree to jointly exercise powers relating to public finance, budgeting, and administration that they share in common and that each may exercise separately, including, but not limited to, the powers, privileges and authorities of the Treasury Department to protect the credit of the State and municipalities in the State, and to aid, advise and consult with the municipalities with respect to fiscal questions and certain other matters under Act 34,

-3-

Public Acts of Michigan, 2001, as amended, the Revised Municipal Finance Act ("Act 34"), and to require local units of government to agree to plans to correct deficit conditions under Act 140, Public Acts of Michigan, 1971, as amended, the Glenn Steil State Revenue Sharing Act of 1971 ("Act 140"), and under other applicable law; and the power and authority of the City under Act 34 and Act 140 in respect of the foregoing, and the comprehensive home rule and other powers, privileges and authority of the City to enter into contracts on matters of municipal concern including, but not limited to, under Act 279, the Charter, and other applicable law; and

WHEREAS, under Act 140 the City previously has submitted to the Treasury Department a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140; and

WHEREAS, this Agreement shall update, supplement and restate the City's deficit elimination plan currently on file with the Treasury Department, as the same may be modified from time to time, and constitutes the City's request that the Treasury Department assist and cooperate with the City in the joint formulation of the financial plan to correct the City's deficit condition.

NOW, THEREFORE, the parties hereby agree as set forth below. Without limiting the foregoing, the City, through its Mayor (the holder of such office at any given time, the "Mayor") and the City Council of the City of Detroit (the holders of such offices, collectively, at any given time, the "City Council"), hereby agree and promise to undertake the steps outlined in this Agreement in consideration of and reliance upon: (i) subject to the terms of this Agreement, the Treasury Department maintaining existing discretionary state revenue sharing initiatives and agreements under Act 140; (ii) subject to the terms of this Agreement, the City's continuing ability to issue new

-4-

municipal securities with appropriate approvals under Act 34 until such time as the City achieves "qualified status;" (iii) subject to the terms of this Agreement, the City's ability to obtain additional financing pursuant to Act 243, Public Acts of Michigan, 1980, as amended, the Emergency Municipal Loan Act ("Act 243") with appropriate approvals; and (iv) the other agreements and commitments made herein by and on behalf of the Treasury Department.

## 1.     FINANCIAL ADVISORY BOARD

### 1.1.   Establishment and Purpose.

(a)     Pursuant to this Agreement and applicable law, a financial advisory board (the "Financial Advisory Board") shall be immediately established to administer and execute this Agreement.  The Financial Advisory Board shall be a public body politic and an intergovernmental entity that is neither a commission, board or council of the City nor a commission, board or council of the State.

(b)     The parties agree that the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas the City may identify from time to time (the "Support Subjects").  In response to those needs, the Financial Advisory Board is charged with: (a) consulting with and assisting the City regarding implementation of systems and improvements in the Support Subjects; (b) monitoring and reporting upon the City's ongoing financial performance; (c) making certain findings and recommendations to and assisting the City with the City's preparation,

-5-

implementation and execution of an annual Triennial Budget and General Appropriations Act (as described in Section 3.7 of this Agreement, the "Triennial Budget"), which shall include the City's annual Budget (defined below); (d) assisting the City in achieving Financial Stability (defined below); (e) monitoring compliance with this Agreement; and (f) taking certain actions respecting, and pursuing remedies for, non-compliance with this Agreement as provided in this Agreement.

    1.2.  <u>Composition</u>.  The Financial Advisory Board shall be composed of nine members, each of whom shall possess professional qualifications in the Support Subjects and character suitable for the rendering of well-informed judgments within the context of highly complex transactions. The initial Financial Advisory Board shall be appointed by the Governor of the State of Michigan (the holder of such office at any given time, the "<u>Governor</u>"), the Mayor, the City Council, and the State Treasurer (for purposes of this Section 1.2, each respectively an "<u>Appointing Entity</u>") as follows:

    (a)    Three individuals appointed by the Governor;

    (b)    Two individuals appointed by the Mayor;

    (c)    Two individuals appointed by the City Council;

    (d)    One individual appointed jointly by the Governor and the Mayor and subject to confirmation by the City Council; and

    (e)    One individual appointed by the State Treasurer.

Each member of the Financial Advisory Board (any such member, a "<u>Member</u>") shall possess at least ten years' experience with one or more of (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, or (e) local government management with government units having consolidated revenues of $250

million or more. Prior to appointment of an individual as a Member, the Appointing Entity shall request independent confirmation that the individual possesses the qualifications required under this Section 1.2 from the Michigan Association of Certified Public Accountants or the Michigan Government Finance Officers Association.

Members shall not be officers or employees of the City or the State, or of the Mayor's executive staff, or a member or former member of the City Council. The terms of all Members shall be three years, provided that the members initially appointed (a) of the Members identified in Section 1.2(a), one shall be appointed for an initial 24-month term and one shall be appointed for an initial 12-month term; (b) of the Members identified in Section 1.2(b), one shall be appointed for an initial 24-month term; (c) of the Members identified in Section 1.2(c), one shall be appointed for an initial 12-month term; and (d) the Member identified in Section 1.2(d) shall be appointed for an initial 12-month term; and provided further that one of the Members identified in Section 1.2(c) and the Member identified in Section 1.2(e) shall be appointed to and serve at the will of the respective Appointing Entity (the "At-Will Members"). After the initial appointments, subsequent appointments shall be made in the same manner as the original appointment. Vacancies shall be filled by the Appointing Entity for the balance of the unexpired term. Excepting the At-Will Members, Members may only be removed by the respective Appointing Entity for Cause. "Cause" means misfeasance, malfeasance, gross neglect of duty, corrupt conduct in office, pleading to or conviction of a felony, absence from 3 consecutive meetings without being formally excused, or at the discretion of the Appointing Entity, absence from more than 15% of meetings within a calendar year. Upon the formation of the Financial Advisory Board and thereafter, the Governor and the Mayor shall jointly designate a Member to serve as the Chair of the

Financial Advisory Board (the "Board Chair"). The Board Chair shall serve as such officer at the will of the Governor and the Mayor.

1.3    Compensation. Members shall be entitled to annual compensation in the amount of $25,000.00 (such compensation, the "Annual Compensation") during their terms of service, provided that (a) such Annual Compensation shall be payable in four equal installments on a quarterly basis, (b) such Annual Compensation shall be prorated as necessary in the event that a Member serves less than a full quarter for any reason, and (c) a Member may elect to serve without compensation by notifying the Board Chair of the election in writing within 30 days of his or her appointment and while serving without compensation shall not be considered employed by the Board, the City or the Treasury Department.

. All Members shall be entitled to reimbursement of actual, reasonable, necessary and documented expenses in accordance with applicable standards in force for State employees and appointees (including, but not limited to, expenses related to travel, meals and lodging) incurred in connection with their service as Members of the Financial Advisory Board (such expenses, the "Reimbursable Expenses"). The City shall be responsible for the payment of each Member's Annual Compensation, with 50% of each Member's Annual Compensation reimbursed by the Treasury Department. The City shall be responsible for the payment of each Member's Reimbursable Expenses of up to $3,000.00 each, with 50% of each Member's Reimbursable Expenses of up to $3,000.00 reimbursed by the Treasury Department. Reimbursable Expenses for each Member in excess of $3,000.00 may be 100% reimbursed by the Treasury Department but only with the approval of the State Treasurer. Reimbursement shall be made by the Treasury Department no later than the earlier of (a) 45 days after

-8-

the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made and (ii) incorporated in the Budget (defined below), provided that neither the State, the City, the Treasury Department nor any other entity shall be responsible for the payment of any Reimbursable Expense that is not evidenced by a copy of the corresponding receipt. The Financial Advisory Board shall adopt procedures and policies having the objective of using current technology, communication and other means to constrain Reimbursable Expenses to the extent reasonably practicable.

    1.3a <u>Standards of Conduct, Conflicts of Interest and Ethics</u>

(a)    Members of the Financial Advisory Board are public officials in a position of public trust. Upon appointment, each Member shall take the constitutional oath of office under Article XI, § 1 of the State Constitution of 1963.

(b)    Members of the Financial Advisory Board are public servants subject to the provisions of Act 317, Public Acts of Michigan, 1968, as amended ("<u>Act 317</u>"), pertaining to contracts of public servants with public entities.

(c)    Within thirty (30) days of its initial meeting, the Financial Advisory Board shall adopt a Standards of Conduct, Conflicts of Interest and Ethics Policy ("<u>Policy</u>"). The Policy shall be designed to assure that governmental decisions are made in the public's best interest by prohibiting members of the Board and its employees and contractors from participating in matters that affect their personal or financial interests. The Policy shall be no less stringent than requirements under (a) Act 317; (b) Act 196, Public Acts of Michigan, 1973, as amended; and (c) Section 2-106 et seq. of the Charter. The Policy also shall include, without limitation, all of the following:

-9-

(i)     Provision for the reasonable disclosure of substantial financial interests held by any Member or employee of the Board who regularly exercises significant authority over the approval or renewal of any contracts.

(ii)     Standards of conduct designed to assure the ethical behavior of Members and employees and contractors of the Board.

(iii)     A Member or employee or agent of the Board shall discharge the duties of his or her position in a nonpartisan manner, with good faith, and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging the duties, a Member or an employee or agent, when acting in good faith, may rely upon the opinion of counsel for the Board, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Board or the City represented to the Member or employee or agent of the Board to be correct by the person having charge of its books or account, or stated in a written report by a certified public accountant or firm of certified public accountants fairly to reflect the financial condition of the Board or the City.

(iv)     A Member shall not make, participate in making, or in any way attempt to use his or her position as a Member to influence a decision providing a personal, family or business benefit to the Member.

(v)     A Member or employee or agent of the Board shall not engage in any conduct that constitutes a conflict of interest and shall immediately advise the Board Chair in writing of the details of any incident or circumstances that may present the existence of a conflict of interest with respect to the performance of the Board-related

work or duty of the member, employee, or agent. The Board Chair will immediately advise the Treasurer and the Mayor of any personal conflict of interest.

(vi)     A Member with a conflict of interest related to any matter before the Board shall disclose the conflict of interest before the Board takes any action with respect to the matter, which disclosure shall become a part of the record of the Board's official proceedings. The member with the conflict of interest shall refrain from doing all of the following with respect to the matter that is the basis of the conflict of interest:

(A) Voting in the Board's proceedings related to the matter.

(B) Participating in the Board's discussion of and deliberation on the matter.

(C) Being present at the meeting of the Board when the discussion, deliberation, and voting on the matter take place.

(D) Discussing the matter with any other Member.

(vii)    Members may not directly or as a result of their affiliation with other organizations do business with the City, have any contracts with the City, respond to any RFPs or seek or be seeking any no-bid contracts (pending or future), nor have immediate family or "close kin" relationships with officers or employees of the City.

(ix)    Members may not have or acquire financial interest in any property or asset owned by the City, nor have an interest in any provider of goods and services to the City, unless such interest comes through ownership of publicly-traded shares constituting not more than 0.1% ownership in such provider.

(x)     Members will be required to formally attest to their independence and understanding of the Standards of Conduct, Conflicts of Interest and Ethics Policy.

(xi)    Except as otherwise provided by applicable law, Members or employees or agents of the Board shall not knowingly:

-11-

A. Willfully or grossly neglect the discharge of his or her duties;

B. Use or disclose confidential information concerning the property, government or affairs of the Board not available to members of the public and gained by reason of his or her official position;

C. Engage in or accept private employment or render services when such employment or service is in conflict or incompatible with the proper discharge of his or her official duties or would tend to impair his or her independence of judgment or action in the performance of official duties;

D. Represent a private person, business or organization in any action or proceeding pending before the Board or the City or any office, department or agency thereof.

E. Vote or otherwise participate in the approval of any contract, or any other type of transaction, with any business entity in which he or she or an immediate family member has a financial interest; or

F. Use his or her official position, in violation of applicable law, to improperly influence a decision of the Board, the Mayor, City Council members, City Clerk, appointees or other City employees.

G. Attempt to influence any decision to fill a position in City government with an immediate family member.

(xii)    A Member shall not accept gifts, gratuities, honoraria, or other things of value from any person or company doing business or seeking to do business with the City or the Board, is seeking official action from the City or the Board, has interests that could be substantially affected by the performance of the person's official duties, except as specifically provided in the Policy.

-12-

(xiii)   The Policy may, by reference, incorporate ethics policies of the City that impact the Board.

(xiv)   By a vote of six members of the Board, the Board may waive a portion of this Policy on a case-by-case basis when the Board determines a waiver is in the public interest.

1.4   <u>Board Organizational Matters</u>.  The Financial Advisory Board may:

(a)   Adopt rules of procedure governing the conduct of its business, including, but not limited to, the (i) identification of the responsibilities of the Board Chair (which will include the role of chairing Revenue Conferences (defined below)), (ii) appointment of its officers as necessary and appropriate and (iii) adoption of specific procedures governing the Board's performance of its purposes described in this Agreement.

(b)   Hire, employ, appoint and/or supervise professional staff to assist in the completion of its duties and to assist State and local officials. The City shall be responsible for the payment of all reasonable fees and expenses incurred by the Financial Advisory Board in connection with such professionals' services up to an annual maximum of not more than $250,000.00 or such other amount as shall be agreed to by the City and the Treasury Department, with 50% of all such payments by the City to be (i) reimbursed by the Treasury Department no later than the earlier of (a) 45 days after the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made; and (ii) incorporated in the Budget (defined below).

(c)   Enter into contracts to assist in the completion of its duties and sue and be sued in its own name.

(d)   Obtain appropriate levels of insurance for its Members, including director and officer insurance or its equivalent. The Treasury Department shall be responsible for the payment of all reasonable premiums and expenses incurred by the Financial Advisory Board in connection with such insurance.

1.5   <u>Board Authority</u>. Consistent with this Agreement and applicable law, the Financial Advisory Board shall have authority to do all of the following:

(a)   Recommend financial and operational metrics by which the City's financial performance and operations shall be monitored and evaluated consistent with best management practices for local government entities.

-13-

(b) Monitor the City's financial and operational performance and the timely implementation of the Triennial Budget consistent with the terms of this Agreement and periodically advise the Governor, the Mayor, and the City Council of the Board's conclusions. Reports of the Financial Advisory Board under this subsection shall be made available to the public.

(c) Evaluate the City's existing debt structure and recommend means of achieving rating and credit improvements; and, from and after July 20, 2012, receive from the Mayor, and review, assist, and advise prior to submission to City Council by the Mayor, (i) any material capital markets transaction (including transactions involving new or existing swaps) proposed to be entered into by the City (including, but not limited to, any proposed exchange offers), and (ii) any proposed changes to the City's debt structure or restructuring of the City's outstanding debt; and assist, advise and provide technical support to the City in respect to ratings presentations and other presentations to third-party capital markets participants.

(d) With respect to debt instruments, securities, financing leases, installment contracts and other financial instruments or securities which are not otherwise subject to Treasury Department approval under Act 34, review and approve or disapprove the issuance of such instruments following City Council approval of appropriate authorizing resolutions or ordinances.

(e) Provide assistance, advice and technical support to the City in respect of the Support Subjects and in the preparation of the City's annual proposed operating and capital budgets (any such budget a "Budget") and the Triennial Budget. The Budget shall be prepared on a consistent basis with the Triennial Budget.

(f) As part of the Revenue Estimation process under Sections 3.1 and 3.2 of and Annex C to this Agreement, review and approve the Revenue Estimation, including any Set-Aside (defined below) for deficit reduction or budget stabilization, to be included in the Budget to be prepared by the Mayor.

(g) Review, assist, advise and comment to the Mayor and City Council on the financial impact of (i) any proposed amendment or modification to any material contracts to which the City is party (including, but not limited to, the Support Subjects), (ii) any proposed sale of any material asset of the City, and (iii) any other proposed action by the City that could have a material impact on the financial condition of the City.

(h) Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding any plan or proposed transaction related to the consolidation, disposition or elimination of City departments, including with respect to the impact of such transactions on the Triennial Budget.

(i) Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding proposed changes to the organizational

-14-

structure of the City involving any positions appointed by or that report directly to the Mayor or City Council.

(j) Receive from the Mayor, and review, evaluate, analyze and comment on proposed judgment levies before submission to a court pursuant to Public Act 236 of 1961, the Revised Judicature Act of 1961.

(k) Monitor the performance by the City and the Treasury Department of compliance with this Agreement.

(l) Take remedial steps set forth in Section 6.3 of this Agreement in the event of a determination by the Board of a material breach of this Agreement under Section 6.2 of this Agreement; supervise the Program Management Director's (defined below) actions in the event of a Reform Default (defined below) as provided in Section 6.4 of this Agreement; and exercise the authority assigned to it by the Mayor and the City Council to take certain additional actions under this Agreement in the event of a material breach of this Agreement.

(m) Consent to the approval of City settlements of claims as provided in Section 5.1 of this Agreement.

1.6     Quorum and Voting. A majority of the members of the Financial Advisory Board appointed and serving shall constitute quorum. Except as otherwise provided in this Agreement, the Financial Advisory Board may act by a majority vote of its Members present and voting, provided that a declaration of a default under Section 6.2 of this Agreement or of a Reform Default under Section 6.4 of this Agreement shall require a majority vote of all Members then in office.

1.7     Meetings.  The Financial Advisory Board shall be subject to and comply with Act 267, Public Acts of Michigan, 1976, as amended, the Open Meetings Act.

1.8.    Procurement.   The Financial Advisory Board shall adopt rules and/or regulations governing its procurement practices.  As an intergovernmental entity, the Financial Advisory Board is not subject to City rules and/or regulations governing procurement activities or requirements applicable to procurement by State departments or agencies. The City's and Treasury Department's aggregate obligation for all costs and expenses incurred by the Financial Advisory Board, inclusive of procurement, shall

not exceed $1,000,000.00 each per year unless otherwise expressly agreed to by the Mayor, the City Council and the Treasury Department.

1.9.  Taxes and Incurring Debt.  The Financial Advisory Board is not authorized under this Agreement to levy any type of tax within the boundaries of the City or to in any way indebt the City, except as otherwise expressly authorized in this Agreement. The Financial Advisory Board is not authorized under this Agreement to in any way indebt the Treasury Department or the State.

## 2.  THE MAYOR AND CITY COUNCIL

2.1  Powers and Authority.  The Mayor and the City Council shall continue to exercise all such powers, privileges and authorities as are granted to each under the Charter and applicable law.  The Mayor and the City Council each have determined, in the exercise of their discretion and in furtherance of the joint exercise of power and cooperative undertaking detailed in this Agreement, to restrain their respective exercise of powers, privileges and authorities in certain circumstances as provided in this Agreement.

2.2  Chief Financial Officer.

(a)  Within 7 days after the effective date of this Agreement, the Mayor shall create the position of Chief Financial Officer as a group executive within the executive office of the Mayor.  The Chief Financial Officer shall supervise all finance and budget activities of the City, shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor.  The Chief Financial Officer shall directly assist the Chief Operating Officer, the Program Management Director and other Directors, senior executive staff and financial staff on all strategic and tactical matters as they relate to budget management, financial management, financial reporting, cost benefit analysis,

forecasting needs, the securing of new funding, and adherence to the Budget and the Triennial Budget. The Chief Financial Officer shall be responsible for completing a comprehensive examination of the Budget in order to improve services and promote efficiency. The Directors of the Budget Department and the Finance Department shall report directly to the Chief Financial Officer. The Chief Financial Officer shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Chief Financial Officer shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving.

(b)    Not more than 30 days after the creation of the position of Chief Financial Officer, the Mayor shall appoint a Chief Financial Officer from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have substantial experience with at least 2 of the following disciplines:  (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, and (e) local government management with government units having aggregated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Chief Financial Officer. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Chief Financial Officer. In the event of a vacancy in the office of Chief Financial Officer, the Mayor immediately shall appoint an interim Chief

Financial Officer with substantially the same qualifications as required by this Section 2.2(b) for the Chief Financial Officer. Within 60 days of the occurrence of the vacancy, the Mayor shall appoint a successor Chief Financial Officer from a list of 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor as set forth above. The Chief Financial Officer from time to time may propose amendments to the projects, priorities and timing set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department. The Chief Financial Officer's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor and the City Council shall approve such amendments to the City's 2011-2012 Official Compensation Schedule (the "White Book") as necessary to reflect the agreed-to compensation.

2.3    Program Management Office; Director.

(a)    Within 7 days after the effective date of this Agreement, the Mayor shall create the Program Management Office within the executive office of the Mayor, headed by the position of Program Management Director as a group executive. The Program Management Office shall implement the Reform Program (defined below) projects set forth on Annex B, as amended and updated from time to time (the "Reform Initiatives" and each a "Reform Initiative"). The Program Management Director shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Program Management Director shall supervise each Reform Initiative and shall have primary responsibility for designing, developing, managing, implementing and executing each Reform Initiative, including acting in the place and stead of the Mayor and the City Council with respect to a Reform Initiative in the event that the Financial Advisory Board

-18-

finds a Reform Default of this Agreement in respect of a Reform Initiative, as provided in and subject to Section 6.4 of this Agreement. The Program Management Director shall coordinate implementation of the Reform Initiatives with the Chief Operating Officer and the Chief Financial Officer to minimize disruptions in City services resulting from the Reform Initiatives. The Program Management Director from time to time may propose amendments to the projects set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department.

(b)     Not more than 30 days of the creation of the position of Program Management Director, the Mayor shall appoint an individual as Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have not less than fifteen years' experience with 1 or more of (a) Support Subjects in the context of distress and transition environments, (b) complex, multi-dimensional governmental restructurings, or (c) local government management with government units having consolidated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Program Management Director. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Program Management Director.

(c)     The Program Management Director shall directly assist the Chief Operating Officer, the Chief Financial Officer and other Directors and senior executive staff, and shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Program Management Director shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to

the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving. In the event of a vacancy in the office of Program Management Director, the Mayor, within 60 days of the occurrence of the vacancy, shall appoint a successor Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. The Program Management Director's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor, and the City Council shall approve such amendments to the White Book as necessary to reflect the agreed-to compensation.

(d)     The Program Management Director shall make periodic reports to the City Council, as requested by the City Council but no less often than monthly, in respect of the Reform Initiatives.

2.4     Implementation of Phase I Reform.

(a) The City desires to implement a number of actions in fiscal years 2012 and 2013 including, but not limited to, the development and implementation of the City's "Operational Reform Program" attached hereto as Annex B (the "Phase I Reform"). The Mayor and/or City Council may make modifications to Annex B from time to time, and shall promptly make modifications which are required to efficiently accomplish the Reform Program (defined below), including establishing measurable outcomes and metrics and establishing specific program timelines, with the approval of the Financial Advisory Board. In the event that the Mayor and City Council cannot agree to modifications to Annex B, the Financial Advisory Board may modify Annex B but only with the consent of either the Mayor or the City Council.

(b)    By approval of this Agreement, the City Council has approved of the "Operational Reform Program" attached hereto as Annex B and authorized its implementation. The City Council shall make such other changes in ordinances and resolutions and coordinate its staff as may be necessary or convenient to fully implement Annex B as contemplated by this Agreement, as well as approve other actions consistent with the Reform Program.

2.5.    <u>Support of Phase I Reform</u>.    Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the Phase I Reform actions taken by the City under Sec. 2.4:

(a)    <u>Cash stabilization transaction</u>:  The Treasury Department will assist with structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012.   The anticipated aggregate size of the refinancing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses.  Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

(b)    <u>Technical and financial assistance</u>:  The Treasury Department shall provide the City with technical assistance (which may include in-kind financial assistance) and support to the City in rapidly implementing the following information technology projects:

(1)    Completion of a payroll system upgrade.

(2)    Integration of budgeting, accounting and financial reporting systems.

(3)    Implementation of a new grants management system.

(c)    <u>Income tax collection</u>:  The Treasury Department will assist the City in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and

improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and distribution of the City income tax in conjunction with the collection and distribution of the State income tax.

(d)   <u>Legislative assistance</u>:  The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.4 (Phase I Reform) objectives, including, but not limited to legislation:

   (1)   Enabling PLD changes;

   (2)   Enabling Bus Rapid Transit legislation;

   (3)   If determined appropriate by the Financial Advisory Board, enabling the long-term funding of unfunded pension and other post-employment benefit liabilities.

   (4)   Enabling appropriations proportional to the City's progress in achieving Reform Initiatives.

The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase I Reform objectives.

2.6   <u>Implementation of Phase II Reform—Following Actions</u>. Consistent with Mayor's and City Council's development of the strategy, policies and long-term vision of a revitalized City and to preserve financial integrity, following the implementation of the Phase I Reform actions detailed in Section 2.4, the City intends to implement a number of additional actions (the "<u>Phase II Reform</u>"), including, but not limited to, the development and implementation of plans related to (a) the further consolidation, disposition or elimination of City departments, (b) grants management restructuring, (c) property management review, and (d) the implementation of "best practices" with respect to the City's pension and other post-employment benefits in consultation with the Financial Advisory Board and in furtherance of the long-term vision. (The Phase I

-22-

Reform and the Phase II Reform are referred to collectively in this Agreement as the "Reform Program.")

   2.7   Support of Phase II Reform.   Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the City's Phase II Reform actions taken under Sec. 2.6:

   (a)   Legislative assistance:  The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.6 (Phase II Reform) objectives, including but not limited to legislation enabling greater intergovernmental cooperation. The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase II Reform objectives.

   (b)   Health plan and post-employment benefits:  The Treasury Department agrees to work cooperatively with the City in formulating options for statewide medical plan designs, retiree health care, and other post-employment benefits funding management and consolidation to achieve administrative simplicity and economies of scale.

   (c)   Demolition of structures:  The Treasury Department, at the City's request, will provide technical assistance and support to the City in pursuing and administering federal grant funds to pay for the demolition of abandoned structures.

   (d)   Real estate management:  The Treasury Department, at the City's request, will provide technical assistance and support in respect of the City's real estate management efforts.

   2.8   Reporting Requirements.

   (a)   In addition to any other reporting requirements herein, the Chief Financial Officer shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding (a) the City's financial performance in respect of the financial and operational metrics recommended under Section 1.5(a) and (b) the City's adherence to the Budget and the

Triennial Budget. Any such updates shall be reported in writing to the Financial Advisory Board and the Treasury Department and shall be posted to the City's website.

(b)    In addition to any other reporting requirements herein, the Program Management Director shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding the status of Reform Initiatives and completion of Annex B projects. Any such updates shall be reported in writing to the Financial Advisory Board and shall be posted to the City's website.

(c)    Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall submit to the Treasury Department a detailed listing of all accounts payable in amounts of $250,000.00 or more, together with the total aggregate amount of all accounts payable, which are more than 30 days beyond each respective due date. For each detailed account payable, the listing shall specify the date upon which payment originally was due, the amount of the payment due including any accrued interest, the name of the person, business, unit of government, or other entity to which payment is due, and a proposed schedule for timely payment. The detailed listing required by this paragraph shall be in a format prescribed by the Treasury Department.

(d)    Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall prepare and maintain a forecast of monthly cash demands to meet the expenditures planned in the Budget. The cash flow forecast, prepared in a format acceptable to the Treasury Department, shall be updated and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month. A monthly report

-24-

of actual revenues and expenditures, prepared in a format acceptable to the Treasury Department, shall be prepared and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.

2.9 _Appropriation; Limitation._ The Treasury Department's obligation to provide financial assistance in the form of money to the Reform Program under this Agreement shall at all times be subject to the mandate under Section 17 of Article IX of the State Constitution of 1963 that no money may be paid out of the state treasury except in pursuance of appropriations made by law.

## 3. FINANCIAL AND BUDGET PROCESS; REVENUE CONFERENCES; TRIENNIAL BUDGET

3.1 _Revenue Conferences; Conduct._

(a) Consistent with Section 8-213 of the Charter, the Directors of the Finance Department, Budget Department, Auditor General and City Council's Fiscal Analysis Division shall hold a revenue estimating conference ("_Revenue Conference_") each January and July, or such other dates as shall be determined by the Board Chair of the Financial Advisory Board or agreed to by the participants in the Revenue Conference, for the purpose of arriving at a consensus estimate of revenues to be available for the then current fiscal year of the City and the next fiscal year beginning the following July 1st (such estimate, a "_Revenue Estimation_"). The Board Chair of the Financial Advisory Board or his or her designee and the Chief Financial Officer shall attend and participate in the revenue estimating conference. The Board Chair of the Financial Advisory Board shall set the meeting dates of the Revenue Conference and shall preside over the Revenue Conference or, in the absence of the Board Chair, the Chief Financial Officer

shall preside. The revenues under consideration shall include all general fund, solid waste fund, and risk-management fund revenues, revenues of enterprise agencies that require a general fund subsidy, and all other revenues of the City. The parties shall also compile and consider any and all outstanding delinquent receivables in the possession of City agencies, departments and entities and, in conjunction with Corporation Counsel, recommend to the Mayor, the Chief Financial Officer, the City Council and the Financial Advisory Board the most efficient means to collect this revenue, which may include collection procedures undertaken by the Law Department. Revenue Conference reports should adhere to the reporting standards recommended by the City Council's Fiscal Analysis Division except as otherwise determined by the Financial Advisory Board.

     (b)    At or in connection with a Revenue Conference, the Revenue Conference may (a) take testimony from persons with municipal finance, budgetary, economic or related expertise and (b) request and receive from all public officers, departments, agencies and authorities of the City or the Treasury Department any assistance and information necessary to arrive at a Revenue Estimation (together with all other information considered by the Revenue Conference, such testimony, assistance and information, the "Revenue Estimation Evidence").

     (c)    The Revenue Estimation shall include a determination by the Revenue Conference of the amount of revenue to be applied to reduce any accumulated deficit or, if there is no accumulated deficit, to a budget stabilization account (the "Set-Aside").

     (d)    The Revenue Estimation, including any Set-Aside, shall be reviewed and approved by the Financial Advisory Board as provided in Section 1.5(f) and thereafter shall be effective and binding for the Budget period to which it applies.

-26-

(e)    For purposes of the City's fiscal year 2013 Budget, and in lieu of the foregoing procedure, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the applicable Revenue Estimation and Set-Aside, which shall be provided to the State Treasurer for approval in lieu of approval by the Financial Advisory Board.

3.2    <u>Revenue Conferences; Limitation on Adjournment</u>.    A Revenue Conference shall not be adjourned until the Board Chair, in the Board Chair's discretion, determines that either (a) a consensus regarding the Revenue Estimation based upon reasonable assumptions (economic and otherwise) has been reached or (b) sufficient Revenue Estimation Evidence exists to allow for a Revenue Estimation, despite any inability to reach a consensus with respect to such Revenue Estimation. A Revenue Estimation shall set forth discrete revenue estimates from each of the City's major revenue sources, in a form consistent with Treasury Department pronouncements, including all of the following: (a) property taxes; (b) income taxes; (c) casino gaming taxes; (d) State revenue sharing and other State grants; (e) federal grants; (f) licenses, fees, and permits; (g) interest income; (h) proceeds from the sale or lease of any City-owned assets; (i) operating transfers or reimbursements from other funds; and (i) other funds if required by the Charter. If a consensus cannot be reached with respect to a Revenue Estimation within 14 days after the beginning of the Revenue Conference, the Revenue Estimation Evidence shall be submitted by the Board Chair to the State Treasurer, who shall determine the Revenue Estimation, including any Set-Aside, for the upcoming Budget period.

3.3    <u>Limitation on Mayor's Budget Proposal</u>. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the Mayor shall not develop or propose

a Budget or any amendment to a Budget that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 (as defined below) or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

3.4    Limitation on City Council's Budget Approval. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the City Council shall not approve a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

3.5.    Budget Proceedings and Adoption. The Budget adopted for each fiscal year for the City shall comply with the following requirements:

(a)    Subject to Sections 3.1 to 3.4 of this Agreement, each Budget shall be prepared and presented, and each appropriations act proposed by the City shall be adopted, in accordance with the provisions of Act 2, Public Acts of Michigan, 1968, as amended, the Uniform Budgeting and Accounting Act ("Act 2"), applicable provisions of the Charter, and Secs. 18-2-16 through 18-2-25 of the Detroit City Code, as amended from time to time. The milestones for annual Budget adoption, including Revenue Conferences, are set forth on Annex C hereto.

(b)    Beginning with the first Budget adopted after the execution of this Agreement, the proposed Budget for each fiscal year shall be transmitted by the Mayor to the Financial Advisory Board not later than March 29 of each year.

-28-

(c)     During the period covered by any Budget, the Mayor shall propose such amendments to the existing Budget as are necessary (e.g., the reduction of budgeted expenditures under Section 3.6 of this Agreement; the adjustment of quarterly allotments) on a timely basis so as to prevent an expenditure from being made for which adequate revenues are unavailable or are projected to be unavailable (e.g., on account of a shortfall in actual revenue, or unusual or extraordinary expenditures) or otherwise to support the initiatives in the Triennial Budget. No amendments or modifications proposed by the Mayor to any proposed or approved Budget or approved by City Council shall become effective unless such amendments are consistent with the Triennial Budget, as certified by the Chief Financial Officer.

(d)     Each Budget shall be designed to ensure that the City shall not end the relevant fiscal year with an operating deficit in any fund (any such deficit, an "Operating Deficit"), provided that, upon the recommendation of the Financial Advisory Board, the Mayor shall have the authority to propose, and the City Council shall have the authority to approve, Operating Deficits proposed in Budgets or amendments thereto in the Financial Advisory Board's sole discretion.

(e)     If, during a fiscal year, it appears to the Mayor, the Chief Financial Officer or the City Council that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and other proceeds permitted by law, and will be insufficient to satisfy projected expenditures, the Mayor, within 30 days of notification of such revenue shortfall, shall present to the City Council the Chief Financial Officer's recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

(f)     During the term of this Agreement, no officer or employee of the City shall make or authorize any obligation or other liability (i) not authorized by the Budget or (ii) in excess of any amount authorized in the Budget unless approved by the Mayor and the Financial Advisory Board in compliance with applicable law.

(g)     If during a fiscal year the Chief Financial Officer becomes aware of a proposed contract, financial transaction or settlement of claim which, in the Chief Financial Officer's judgment, will have a material adverse impact on the Budget or on City's long-term ability to achieve and maintain Financial Stability, the Chief Financial Officer shall report the Chief Financial Officer's concerns respecting the proposed contract, transaction

-29-

or settlement to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department.

3.6    Budget Reductions; Ordinance; Impasse.  Within 60 days of the effective date of this Agreement, the City Council shall adopt an amendment to the Finance and Taxation Ordinance or other appropriate provisions of the Detroit City Code providing that if the Chief Financial Officer reports to the Mayor, or if the Council Fiscal Analysis Director reports to the City Council and the Chief Financial Officer concurs, that expenditures during a fiscal year have exceeded or are likely to exceed appropriated levels, (i) the Mayor, consistent with Section 3.5(e) of this Agreement, shall submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit; and the City Council promptly shall amend appropriations to avoid the deficit; and further if City Council fails to so amend the appropriation ordinance to avoid the deficit within 30 days after the submittal of the proposed appropriation amendment, then the requested appropriation amendment submitted by the Mayor becomes effective; and further (ii) if the Mayor fails to so submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit within 30 days of notice by the Chief Financial Officer, the Council may introduce and adopt such an amendment on its own motion.  The powers and actions authorized by this Section 3.6 shall be granted pursuant to MCL 141.1514a and MCL 141.1519(1)(b) to the extent necessary to implement this Section 3.6, but only to the limited extent and limited time necessary to implement this Section 3.6.

3.7    Triennial Budget.    (a) As a means of addressing the City's fiscal imbalances and accumulated deficit and to permit continuous planning at least three

fiscal years in the future, beginning with fiscal year 2013 the City, in consultation with the Financial Advisory Board, shall develop and maintain a Triennial Budget for adoption by the City Council. The Triennial Budget shall contain specific and realistic operational metrics, expenditure reductions, revenue set-asides, or specific and realistic revenue enhancements, or any combination of them, in an amount sufficient to address, within a period of not to exceed 5 years, any current or accumulated deficit in any fund maintained by the City. The Financial Advisory Board may approve modifications to the period within which the accumulated deficit will be eliminated. In addition, the Triennial Budget shall provide for the liquidation of all significant inter-fund payables and receivables, not regularly settled, in not to exceed 5 years from the date of this Agreement. The Financial Advisory Board may approve modifications to the period within which the inter-fund payables and receivables will be settled. The Triennial Budget shall include details of the budget appropriation, reductions in employee salary, wages, employee retirement systems, other fringe benefits, debt retirement, and operating expenditures or revenue enhancements.

(b)     The initial Triennial Budget shall be prepared and adopted prior to the end of the Transition Period (defined below), or such other date determined by the Chief Financial Officer and reported to the Financial Advisory Board and the Treasury Department, and shall include the subjects set forth on <u>Annex A-1</u> hereto. When adopted by the City and approved by the Treasury Department, the initial Triennial Budget shall be attached as <u>Annex A-2</u> hereto. The Triennial Budget shall be a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140, provided that the Treasury Department shall review compliance with the Triennial Budget annually, and shall retain full discretion under law to annually approve

-31-

of or disapprove of the then-current Triennial Budget as a satisfactory deficit elimination plan.

(c)     Beginning with the City's fiscal year 2014 Budget, a copy of the proposed Triennial Budget shall be filed with the Treasury Department not later than April 12 of each year concurrently with submittal of the Mayor's annual Budget to City Council under the City's Finance and Taxation Ordinance. The City shall approve of and amend the Budget from time to time as necessary to give full effect to the Triennial Budget. The Chief Financial Officer shall have primary responsibility under the Mayor for the development of and adherence to the Triennial Budget. The Triennial Budget shall be posted on the City's website.

## 4.    COLLECTIVE BARGAINING AGREEMENTS

4.1     Authority.  The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

4.2     Collective Bargaining Agreements; Restriction.  The parties hereto agree that the Mayor shall not propose or execute, and the City Council shall not approve, any instrument which modifies, amends, extends, supplements or replaces the terms or conditions of, or is a successor agreement to, any collective bargaining agreement in effect as of the effective date of this Agreement or thereafter unless such modification, amendment, extension, supplement, replacement or successor agreement satisfies the requirements of Annex D as determined by the Financial Advisory Board or if a modification, amendment, extension, supplement, or replacement is required by law. For purposes of this Section 4.2, "collective bargaining agreement" includes an

-32-

arbitration award, excepting an arbitration award resulting from an arbitration proceeding concluded prior to the effective date of this Agreement.

    4.3    <u>Collective Bargaining Agreements; Approval</u>.  The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director. Upon the prior approval of the Financial Advisory Board following consultation with the Program Management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program Management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3.

    4.4.    <u>Duty to Bargain</u>. It is the State Treasurer's determination pursuant to MCL 141.1514a(10) that beginning 30 days after the effective date of this Agreement, the City is not subject to Sec. 15(1) of Act 336, Public Acts of Michigan, 1947, as amended, MCL 423.215, for the remaining term of this Agreement.

-33-

## 5. PENDING LITIGATION REPORT

5.1 <u>Report; Filing</u>. Beginning on July 15, 2012, and continuing thereafter on a quarterly basis, the City's Law Department shall submit to the Financial Advisory Board a report (the "<u>Pending Litigation Report</u>") identifying all pending lawsuits or other legal actions or proceedings (including, but not limited to, lawsuits, actions or proceedings related to workers' compensation claims) to which the City is a party (any such lawsuit, action or proceeding, a "<u>Pending Action</u>"). Each Pending Litigation Report shall identify, with respect to each Pending Action: (a) all plaintiffs; (b) all defendants; (c) the court and judge before which the Pending Action is pending; (d) legal counsel representing the City (if other than the Law Department); (e) the specific cause(s) of action; (f) the length of time the Pending Action has been pending; (g) an estimate as to the budgetary impact upon the City (if any) from a disposition of the Pending Action unfavorable to the City; (h) the applicability of any liability insurance maintained by the City; (i) an assessment of the likely outcome of such Pending Action (which section of the Pending Litigation Report shall remain subject to any and all applicable privileges); and (j) any proposed settlement or disposition of any Pending Action. The City shall not settle or otherwise dispose of any Pending Action in an amount of $250,000.00 or more without the prior written consent of the Financial Advisory Board under Section 1.5(m) of this Agreement or, prior to the first meeting of the Financial Advisory Board, the State Treasurer. For purposes of the Pending Litigation Report, the Financial Advisory Board shall be the client of the City's Law Department and shall be entitled to the attorney-client privilege, the attorney work product privilege, and all other privileges and duties afforded to clients under the Michigan Rules of Professional Conduct.

-34-

## 6.    DEFAULTS AND REMEDIES

6.1    <u>Obligations of the parties</u>. (a) The City, through its officers and the City Council and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement. Timely achievement of the Reform Program and performance of the financial and operational requirements set forth in this Agreement are of the essence of this Agreement. The Mayor and the City Council (and all departments, agencies and other entities organized within, and all officers acting on behalf of, the Mayor and the City Council, including in particular the Program Management Director and the Program Management Office) shall provide the Financial Advisory Board with access to all information, documentation and personnel as may be reasonably requested by the Financial Advisory Board from time to time, with respect to all matters related to the Reform Program and/or addressed in this Agreement. During the term of this Agreement, no officer or employee of the City shall knowingly (a) take any action in violation of the terms of, or shall fail or refuse to take any action reasonably required by, this Agreement; or (b) prepare, present or certify any information (including any projections or estimates) or report for the Mayor, the Chief Financial Officer, the Program Management Office, the City Council, the Revenue Conference or the Financial Advisory Board that is false or misleading in any material respect, or, upon learning that any such information is false or misleading in a material respect, shall fail promptly to advise the Financial Advisory Board or the Mayor, the Chief Financial Officer and the Program Management Director thereof. The parties intend that this Agreement may be deemed and function as an agreement entered into under MCL 141.1513.

-35-

(b)     The Treasury Department, through the State Treasurer and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement, consistent with applicable law.

6.2     <u>Material Breach; Default</u>. (a) For purposes of this Agreement, a breach of the obligations set forth in this Agreement, if uncured, shall be considered a material breach of this Agreement if, in the judgment of the Financial Advisory Board, the breach (i) materially impairs the timely and complete implementation of the Reform Program, (ii) materially impairs the Financial Advisory Board's ability to exercise its express responsibilities under this Agreement, or (iii) materially adversely affects the completion of 1 or more Reform Initiatives. Without limiting the foregoing, the obligations set forth in Section 1 (Financial Advisory Board), Section 2 (The Mayor and City Council), Section 3 (Financial and Budget Process; Revenue Conferences; Triennial Budget), Section 4.2, Annex B and Annex D shall be considered of primary importance in the achievement of the Reform Program whose performance is essential to the achievement of this Agreement's urgent public purposes.

(b)     If the Financial Advisory Board determines that a material breach of this Agreement has occurred or is occurring, the Financial Advisory Board shall immediately notify the Mayor, the City Council and the Treasury Department of its determination. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the material breach within 30 days, or, if the material breach is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department. The Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the cure or attempted cure by the

-36-

Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the material breach and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the material breach has been adequately cured. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement. A declaration that a default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

6.3 <u>Default; Remedies</u>. A declaration of default on account of a material uncured breach of this Agreement as provided in Section 6.2 may result in (a) the suspension by the Treasury Department of (i) discretionary State revenue sharing initiatives and agreements between the Treasury Department or the State and the City pursuant to Act 140 and/or (ii) Economic Vitality Incentive Program payments or other intergovernmental assistance between the Treasury Department or the State and the City pursuant to Act 140 and other applicable law, in each case to the extent permitted by law; (b) the withholding by the Treasury Department of approvals to enter the capital markets under Act 34; (c) accelerating or exercising other rights and remedies by the Treasury Department for collection of any existing loans from the State to the City under, <u>e.g.</u>, Act 243 or other applicable law; (d) the filing of court proceedings by the Financial Advisory Board or the State Treasurer in the Circuit Court for Wayne County, Michigan, or the U.S. District Court for the Eastern District of Michigan seeking mandamus, an injunction, appointment of a referee, or other equitable relief consistent with the urgent public purposes of this Agreement so as to cause the obligations of this

-37-

Agreement to be fully and timely performed; (e) the placement by the State Treasurer of the City in receivership as provided in MCL 141.1515; and/or (f) other remedies available to the Treasury Department or under State law. The remedies provided in this Section 6.3 shall be cumulative.

6.4    <u>Program Management Director; Board; Reform Initiative Remedies</u>. Timely achievement of the Reform Program being of the essence of this Agreement, in addition to the other remedies provided in this Agreement, the City and the Treasury Department agree that the following provisions shall apply in respect of individual Reform Initiatives:

(a)    If in the judgment of the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department a breach in the provisions of this Agreement, including the Annexes, has occurred or is imminently likely to occur which is materially frustrating or will materially frustrate the timely implementation of one or more Reform Initiatives (a "<u>Reform Default Condition</u>"), the Program Management Director shall provide written notice of the Reform Default Condition to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the Reform Default Condition within 30 days, or, if the Reform Default Condition is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.

(b)    Upon receipt of the notice of a Reform Default Condition, the Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the

-38-

cure or attempted cure by the Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the Reform Default Condition and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the Reform Default Condition has been adequately cured so as to prevent a material breach of this Agreement respecting one or more Reform Initiatives. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement in respect of one or more Reform Initiatives has occurred (a "Reform Default"). A declaration that a Reform Default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

(c)     In the event of a determination of a Reform Default by the Financial Advisory Board, and immediately upon the approval of the declaration that a Reform Default has occurred, the Mayor shall be deemed to have delegated his executive authority with respect of the Reform Initiative or Initiatives for which a Reform Default has been declared, but only in respect of such Reform Initiative or Initiatives, to the Program Management Director; and the City Council, by approval of this Agreement, shall be deemed to have given full legislative approval and authority to proceed with the implementation and execution of such Reform Initiative or Initiatives, but only in respect of such Reform Initiative or Initiatives. The Program Management Director thereafter shall exercise all lawful authority of the City in respect of the accomplishment, implementation and execution of the Reform Initiative or Initiatives for which the Reform Default was declared, provided that the Program Management Director shall be under

-39-

the supervision of, and shall report frequently, but not less often than monthly, to the Financial Advisory Board, the Treasury Department, the Mayor and the City Council in respect of the Program Management Director's actions, and the Financial Advisory Board shall review and approve or disapprove the proposed actions of the Program Management Director, including specifically the approval of any contracts proposed to be executed by the Program Management Director. The powers and actions of the Program Management Director authorized by this Section 6.4(c) additionally shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i) to the extent necessary to implement this Section 6.4(c), but only to the limited extent and limited time necessary to implement this Section 6.4(c).

(d)     Upon the earlier of (i) the accomplishment of the Reform Initiative or Initiatives for which the Financial Advisory Board had declared a Reform Default or (ii) the elimination or cure of the event or condition which was the basis of the Reform Default, the Financial Advisory Board, upon the recommendation of the Program Management Director or on its own motion, shall, by majority vote, declare the Reform Default terminated. The Financial Advisory Board also may consider a declaration that the Reform Default is terminated upon petition by the Mayor or the City Council. Immediately upon such declaration, the executive authority of the Mayor and the legislative approval of the City Council temporarily empowering the Program Management Director in respect of the specific Reform Initiative or Initiatives shall be deemed restored to the Mayor and City Council and the grants under Section 6.4(c) shall be withdrawn.

6.5     <u>Additional Forbearance by Treasury Department</u>.     Provided that this Agreement remains in effect and there is no material failure to comply with, or adhere

to, this Agreement on the part of the City, the Treasury Department and the Financial Advisory Board shall forbear from exercising any of its respective remedies under Section 6.3.

6.6 <u>Obligation Not Discharged by Contingencies</u>. The obligations of the City as expressed and agreed to herein are not subject to release or discharge due to any contingencies within the City's reasonable control, including, but not limited to, clerical errors, computer failures, late mailings or the failure to comply with reporting due dates or other scheduled due dates excepting due to adverse weather, acts of God, acts of third parties or compliance with court orders. If the due date for a report, listing or other document falls on a weekend or legal holiday, then the report, listing, or other document shall be due on the first day thereafter that is not a weekend or legal holiday.

6.7 <u>Transitional Provisions</u>.

(a) The parties acknowledge that on account of inadequate systems and other operational constraints, the City will be unable to satisfy the reporting and budgeting requirements set forth in this Agreement as of the effective date of this Agreement. The parties agree that from the effective date of this Agreement until 60 days after the date that the Chief Financial Officer commences serving (the "<u>Transitional Period</u>"), the City will make every effort to comply with the reporting requirements set forth in this Agreement, but any failure to comply with the any such reporting requirements during the Transitional Period shall not be deemed to be a material breach of this Agreement.

(b) The parties acknowledge that as of the effective date of this Agreement and during the Transitional Period, the City will be in the midst of its budget preparation process for the fiscal year 2013 Budget, and that therefore the Budget provisions of this Agreement, including the responsibilities of the Financial Advisory Board and the

-41-

adoption of the initial Triennial Budget, cannot be fully accomplished for the fiscal year 2013 Budget. The City and the Treasury Department agree that during the Transitional Period, the City will make every effort to comply with the Budget process requirements set forth in this Agreement, and any failure to comply with any such Budget process requirements during the Transitional Period may be waived by the State Treasurer. Until the Board Chair of the Financial Advisory Board has been appointed and the Chief Financial Officer has commenced serving, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the Revenue Estimation for fiscal year 2013, and State Treasurer shall approve of the Revenue Estimation in lieu of the Financial Advisory Board under Sections 3.1 and 3.2 of this Agreement, which shall form the basis of the Mayor's proposed fiscal year 2013 Budget submitted pursuant to Section 3.3 of this Agreement and the City Council's approved fiscal year 2013 Budget pursuant to Section 3.4 of this Agreement. Notwithstanding the provisions of this Section 6.7(b), the Mayor and the City Council shall fully perform their respective obligations under Act 2 and the Charter in respect of the fiscal year 2013 Budget preparation and shall cause the fiscal year 2013 Budget and the 2013 general appropriations ordinance to be in effect as of July 1, 2012. During the Transitional Period, the Mayor shall not propose, and the City Council shall not approve, a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that reflects revenues in excess of, or collected from sources not included in, the applicable Revenue Estimation, net of any Set-Aside, for the 2013 Budget year.

7.    **AMENDMENT; WAIVER OF PROVISIONS**

7.1    <u>Amendment; Waiver</u>.  This Agreement and the Annexes hereto may be amended only in writing by the mutual consent of the Financial Advisory Board, the

-42-

State Treasurer and the City (or their respective successors or permitted assigns), evidenced by all necessary and proper authority. By agreement of the parties, the Financial Advisory Board, in its sole discretion, may waive or forbear from any provision of this Agreement that requires an act by the City, provided that, for the avoidance of doubt, no entity other than the Financial Advisory Board shall be permitted to waive or forbear from any provision hereof that otherwise relates to a power reserved for the Financial Advisory Board. No waiver of or forbearance from any provision of this Agreement shall arise from any action or inaction of the Financial Advisory Board, except pursuant to an instrument in writing expressly waiving or forbearing from the provision executed by the party entitled to the benefit of the provision. The parties anticipate that Annex B to this Agreement will be amended and updated from time to time to reflect the dynamic nature of the Reform Program. Amendments to Annex B may be adopted by the Mayor and City Council with the approval of the Financial Advisory Board, as set forth in Section 2.4(a) of this Agreement. Amendments to Annex B may be proposed by the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department.

8.   **DURATION OF AGREEMENT; RELEASE**

    8.1   Duration of Agreement; Termination; City's Release from Obligations. This Agreement shall remain in effect until both of the following occur ("Financial Stability"):

    (a)   The date of the earlier of:

        (i)   the end of the third consecutive fiscal year of the City in which each of the following conditions have been satisfied: (A) the City's audited financial statements indicate, on the basis of accounting

-43-

principles generally accepted in the United States, that the City general fund, excluding any revenues derived from borrowed funds, is not in a deficit condition; and (B) the City's accumulated deficit has been eliminated; or

(ii)     the City has achieved and maintained for at least two consecutive calendar years a credit rating by two or more nationally recognized securities rating agencies (without regard to any third party credit enhancement) on the City's outstanding long-term unsubordinated debt in any of the four highest long-term debt rating categories of such rating agency (BBB/Baa or higher), without regard to any refinement or gradation of such rating category by numerical modifier or otherwise; and

(b)     The date that the State Treasurer certifies to the Governor that no material condition exists within the City, and that no action has been taken, or is being contemplated, by City officials, that would (A) implicate the need for a deficit elimination plan under Sec. 21 of Act 140, excepting for fund deficits of an immaterial nature; or (B) require implementation of the Treasury Department's authority under Sec. 802 of Act 34.

(c)     The Mayor, with the approval of the City Council, may apply to the Financial Advisory Board to be released from the terms and conditions of this Agreement. If the financial conditions set forth in Section 8.1(a) and (b) have been satisfied by the City, the Financial Advisory Board shall release the City from the terms and conditions of this Agreement.

(d)     Notwithstanding the provisions of subsections 8.1(a), (b) and (c) of this Section 8.1, this Agreement shall be earlier terminated by the Financial Advisory Board, with the consent of the State Treasurer, if requested by the Mayor and the City Council on behalf of City or by the Treasury Department.

-44-

## 9. CONTINUING EFFECT; EMPLOYEES; SEVERABILITY

9.1 <u>Continuing Effect</u>. This Agreement shall remain in effect until terminated or until the Financial Advisory Board has released the City from the terms and conditions of this Agreement pursuant to Sections 8.1(c) or 8.1(d).

9.2 <u>Joint Exercise of Power; Transfer</u>. While this Agreement represents a joint exercise of power by the City and the Treasury Department, this Agreement does not transfer functions or services from the City or the Treasury Department to the Financial Advisory Board. Nothing in this Agreement prohibits the City from subsequently entering into a contract with the Financial Advisory Board for the transfer of functions or services from the City to the Financial Advisory Board, to the extent authorized under 1967 (Ex Sess) PA 8, as amended, MCL 124.531 to 124.536. The City and the Treasury Department intend that this Agreement be construed as an agreement between the City and the Treasury Department authorized under Act 7, Public Acts of Michigan, Extra Session of 1967, as amended, the Urban Cooperation Act of 1967, with the exception of the provisions of this Agreement authorized solely under MCL 141.1501 to 141.1531.

9.3 <u>Employees</u>. In no event shall this Agreement direct, permit or enable the transfer of employees or groups of employees from the City to the Financial Advisory Board or otherwise to merge or create a "workforce" of the Financial Advisory Board.. Nothing in this Agreement creates an employment relationship between the employees of the City or the Treasury Department and the Financial Advisory Board. The City shall function as the employer of personnel and staff of the City needed for the joint exercise of power under this Agreement. The Treasury Department shall function as the employer of personnel and staff of the Treasury Department needed for the joint

-45-

exercise of power under this Agreement. The Financial Advisory Board shall function as the employer of any personnel and staff of the Financial Advisory Board not otherwise employed by the City or the Treasury Department needed for the joint exercise of power under this Agreement. No employees of the City or the Treasury Department are transferred from the City or the Treasury Department to the Financial Advisory Board under this Agreement.

9.4    Management and Direction.    The Financial Advisory Board has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Financial Advisory Board performed or exercised by the Financial Advisory Board under this Agreement. The City has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the City performed or exercised by the City under this Agreement. The State Treasurer has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Treasury Department performed or exercised by the Treasury Department under this Agreement. The functions or services of the Financial Advisory Board, the City, and the Treasury Department, respectively, under this Agreement are deemed to be in the interests of the public health, safety and welfare, and the accomplishment of the objectives of this Agreement is an urgent public purpose.

9.5    Severability.    If any provision of this Agreement, or its application to any person, party or circumstance, is determined to be invalid or unenforceable for any reason, the remainder of this Agreement and its application to other persons, parties or circumstances shall not be affected and shall remain enforceable to the full extent permitted by law.  On account of the urgent public purpose and the protection of the

-46-

public health, safety and welfare sought to be accomplished by this Agreement, It is the intent of the parties to continue to implement the provisions of this Agreement, in whole or in part, to the fullest extent possible under applicable law.

## 10.    COUNTERPARTS

10.1    Counterparts; Signatures.  This Agreement may be executed in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Execution may be accomplished by delivery of original or electronic copies of the signature page hereto (e.g., by facsimile or email).

## 11.    EFFECTIVE DATE

11.1    Effective Date.   The effective date ("Effective Date") for this Agreement and the joint exercise of power under this Agreement shall be the date on which the last of all of the following have occurred: (a) the Agreement is approved and executed by the Mayor; (b) the Agreement is approved by the City Council, (c) the Agreement is approved and executed by the State Treasurer; (e) the Agreement is approved by the Governor; (d) the Agreement is filed with the Clerk for the Charter County of Wayne, Michigan, (e) the Agreement is filed with the Clerk for the County of Ingham, Michigan; and (f) the Agreement is filed in the Office of the Great Seal, Michigan Department of State.

-47-

IN WITNESS WHEREOF, the parties, by their designated representatives, have signed and executed this Agreement on this __4th__ day of __April__, 2012.

**ON BEHALF OF THE CITY OF DETROIT:**

_____
Kirk J. Lewis, Deputy Mayor  (Acting As Mayor)


_____
Dave Bing, Mayor



**ON BEHALF OF THE MICHIGAN DEPARTMENT OF TREASURY:**

_____
Andy Dillon, State Treasurer

Consistent with my duty under Section 8 of Article V of the State Constitution to take care that the laws be faithfully executed, I find that this Agreement is in proper form, and is compatible with the laws of the State of Michigan.


Dated: 4/5/12

Richard D. Snyder, Governor

## CERTIFICATION

I, Janice M. Winfrey, City Clerk for the City of Detroit, hereby certify that the foregoing Agreement has been duly authorized by resolution adopted by the City Council of the City of Detroit, County of Wayne, State of Michigan, at a Special Session held on April 4, 2012, that said resolution remains in effect, and that the foregoing meeting was conducted and public notice of said meeting was given pursuant to and in full compliance with the Open Meetings Act, being Act 267, Public Acts of Michigan, 1976, and that the minutes of said meeting were kept and will be or have been made available as required by said Act.

Janice M. Winfrey, City Clerk

Date of Certification: April 9, 2012

Time of Certification: 4:27 , p.m.

-2-

**BY THE FINANCIAL REVIEW TEAM FOR THE CITY OF DETROIT:**

_____
Andy Dillon

_____
Glenda D. Price

_____
Frederick Headen

_____
Irvin D. Reid

_____
Jack Martin

_____
Doug Ringler

_____
Conrad Mallett, Jr.

_____
Shirley R. Stancato

_____
Isaiah McKinnon

_____
Brom Stibitz

**APPROVED AS STATE FINANCIAL AUTHORITY:**

_____
Andy Dillon, State Treasurer

## ANNEX A-1

The Triennial Budget and General Appropriations Act shall, at a minimum, include all of the following:

(a)    A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that, subject to exceptions, the City's general fund expenditures will not exceed its general fund revenues and that any existing deficits will be eliminated during the projected budget period.

(b)    A cash flow projection for the budget period.

(c)    An operating plan for the budget period.

(d)    A plan showing reasonable and necessary maintenance and capital expenditures for the budget period.

(e)    An evaluation of the costs associated with pension and postemployment health care obligations for which the City is responsible and a plan for how those costs will be addressed over the budget period.

(f)    A provision for submitting quarterly compliance reports to the Financial Advisory Board demonstrating compliance with the Triennial Budget.

The Triennial Budget shall be updated annually as part of the approval of the annual Budget under Act 2 and the Charter.

-4-

## ANNEX A-2

*[Initial Triennial Budget to be included pursuant to Section 3.7(b)*
*upon approval following appointment of CFO]*

## ANNEX B

### City's Operational Reform Program

**(Prioritization and timing to be mutually agreed upon by Mayor and Council and approved by Financial Advisory Board as provided in the Agreement)**

1. Public safety initiatives;
2. Lighting Department Changes;
3. DDOT Changes;
4. Income tax collection;
5. Implementation of payroll system upgrade if needed – following a review of other options that streamline payroll process and implement;
6. Implementation of new grants management system to streamline requisition and monitoring process of grants;
7. Integration of budgeting, accounting and financial reporting system with appropriate process mapping;
8. Demolition of structures;
9. Implementation of medical and pension changes;
10. Labor reform to streamline and consolidate number of collective bargaining agreements into single template and evaluating integration with statewide plans as available;
11. Health and Wellness Department changes;
12. Human Services Department changes;
13. Real estate management;
14. Workers Compensation Reform;
15. Employee Training;
16. Bank Project to improve AR and AP process;
17. Fire Authority review;
18. Permits;
19. Planning and Development to DEGC;
20. Claim/Risk Management for reducing claims costs;
21. Long-Term Liability Restructuring;

## ANNEX C

## Revenue Estimation and Budget Approval Calendar

| Date (on or before) | Action |
|---|---|
| December 8 | All officers, departments, commissions and boards of the City are required to transmit to the Budget Director their estimates of the amounts of money required for each activity within their respective Departments for the ensuing fiscal year. |
| January 31* | Semi-annual Revenue Conference |
| February 22 | The Budget Director shall transmit to the Mayor an estimated Budget showing the Budget Director's estimate of the total amount of money required to be raised for each of the City's funds. |
| March 15 | Revenue Estimation for next fiscal year established by Financial Advisory Board following Revenue Conference. |
| March 29 | The Mayor shall complete a revision of the Budget and return the Budget to the Budget Director for tabulation. The Mayor shall submit the proposed Budget and Triennial Budget to Financial Advisory Board |
| April 12 | The Mayor shall transmit the Budget (including Triennial Budget) to City Council. The Mayor shall transmit the Triennial Budget to the Treasury Department. |
| May 24 | The City Council shall complete its consideration of the Budget. |
| May 27 | The City Council shall transmit the Budget to the Mayor for the Mayor's approval or rejection. |
| May 27 + 3 business days | The Mayor shall return the Budget to the City Council with the Mayors' approval, or, if the Mayor shall disapprove the whole or any item or items, with a statement of reasons for the disapproval. |
| Later of 3 calendar days or 2 business days following maximum return date of the Budget by the Mayor | The City Council shall act upon any item that shall have been disapproved by the Mayor. |
| July 1 | Beginning of Fiscal Year |
| July 31* | Semi-annual Revenue Conference |

\* Or as otherwise determined by the Revenue Confernce or Financial Advisory Board

-7-

13-53846-tjt    Doc 4874    Filed 05/15/14    Entered 05/15/14 17:47:51    Page 101 of 153

## ANNEX D

## Required Provisions of Collective Bargaining Agreements

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012. The newly negotiated agreements shall include among other items the following terms and conditions, which shall set the pattern for future agreements:

1. Uniformity goal: All new labor agreements will be structured so as to achieve the goal of creating a common base form of agreement enabling a known, measurable basis for cost evaluation and comparison.

2. Joint committees, if any, will be patterned in structure and role after the committees included in the contracts recently negotiated between the State and unions representing State employees.

3. Outsourcing will be permitted where service improvements or cost savings can be achieved. Language shall require the City to provide advance notice of competitive bids to its Unions and enabling Unions to bid on the work.

4. Departmental consolidation shall be permitted where service improvements or cost savings can be achieved.

5. There may be no snap-back provisions during the term or at expiration of the agreement. Wage increases shall be subject to negotiation.

6. New hires will have a defined contribution retirement health care benefit.

7. Merit-based promotions shall be permitted for certain key positions (specific positions to be defined by the common agreement form).

8. Current resources should be maximized, therefore to exercise bumping rights an employee must have current or prior year service in the classification into which they are bumping and employees shall be permitted to work outside their classification.

9. Existing favorable concessions negotiated in the TAs shall remain, especially those dealing with wages, benefits and pension multipliers, as approved by the Project Management Director, Labor Relations Director, and the Financial Advisory Board.

10. Multi-year term of the new agreement to be determined by the Labor Relations Director, Project Management Director, and Financial Advisory Board as required to support the City's financial restructuring.

11. Dispute resolution procedures shall be made simpler and the process expedited to achieve predictability for both sides.

12. The parties will agree to address work rule modifications during the first year of the new agreement where changes will support the City's financial restructuring, achieve efficient use of labor resources, and/or improve cost-effective service.

## ANNEX E

## SUPPORTIVE ACTIVITIES OF TREASURY DEPARTMENT AND STATE

### Introduction

The Treasury Department and the State remain committed to the overall growth and health of Michigan cities, and particularly so with the city of Detroit, the State's largest municipality. Ways to ensure this growth and health are emerging through a number of supportive initiatives.

Supportive activities already in process include:

### Improve Quality of Life and Safety for Detroiters

- *Street lighting* – Improve public lighting by working with the city to create a separate authority to manage and finance streetlights. State legislation can create a new option for separate governmental authorities (similar to those for sewers) that allow for independent bonding authority against revenue as well as general funds. Detroit can then create such an entity to make financing more attractive to bondholders and thus lower the overall cost of the upgrades. This group would also have to develop multi-year lighting plans with the revenue to support them.
- *Law Enforcement* – As discussed in the governor's public safety message, over the next two years MSP will graduate two trooper classes – meaning approximately 180 troopers will be added, and will support our strategy to increase law enforcement resources in four Michigan cities, including Detroit.
- *Demolition* – Streamline, coordinate and accelerate demolition activities in the city.
- *Land Stewardship* – Improve the state's stewardship of its own land in the city with an emphasis on redevelopment, including undertaking a full review to determine what land can be redeveloped effectively and responsible ways to transition other parcels to successional landscapes.
- *Client Service* – The state will continue to enhance its presence within the city to better serve the client base for both DHS assistance and unemployment insurance.
- *Auto insurance* – Reduce auto insurance costs for residents through the Michigan Automobile Insurance Placement Facility, creating a base rate that reflects a more neutral score, resulting in noticeable rate reductions.

### Enhance Education

- *K-12* – Ensure a quality school for every Detroit child through continued reforms of DPS, a strong start for the Education Achievement Authority, and support for Excellent Schools Detroit. Continue to drive a philanthropic agenda to provide post-secondary scholarship funding to Detroit graduates.
- *Early Childhood Education* – Ensure high quality early childhood education through a partnership with the Office of Great Start and increased collaboration with private and non-profit entities involved in providing these services to Detroiters.
- *Foundations for Learning* – Provide better access to services that enhance a child's learning process by moving DHS family independence specialists out of county offices and stationing them within 50 Detroit elementary schools. This will help eligible families access resources immediately, before barriers such as transportation, child care, housing instability, food insecurity, and access to healthcare impede a child's learning process.

-9-

**Invest in Transportation Infrastructure**
- Move ahead with the New International Trade Crossing project.
- Expand and facilitate the Detroit Intermodal Freight Terminal, ensuring that southeast Michigan has regional facilities with sufficient capacity and interconnectivity to provide for existing and future intermodal demand and reducing time, monetary costs, and congestion.
- Establish the authority and board for, and develop a funding mechanism for, the new Regional Transit Authority. Invest in a regional, multi-modal system including BRT, bike paths and walkability.
- Working with CN and Amtrak, create a commuter rail station and stop at the former state fairgrounds, expand the West Grand Blvd. station to include better facilities for transfers and assist in the rebuilding of the Royal Oak and Troy stops.
- Accelerate a capacity improvement project for I-94 from I-96 to Conner Avenue, supporting more than 13,000 jobs between 2012 and 2020.
- Complete final engineering and start construction this summer for the West Detroit Junction Railroad Project to provide a shorter, faster route for intercity passenger trains, relieve congestion for freight trains, and help lay the groundwork for future commuter rail service between Ann Arbor and Detroit.

**Invest in Physical Assets and Economic Drivers**
- *Citywide* –
  - Consolidate the planning and economic development functions for the city within the Detroit Economic Growth Corporation to avoid duplication, enable the development of unified strategy and execution, and simplify the process for new economic development within the city.
  - Coordinate and/or consolidate the state, Wayne County and city land banks to ensure the creation and execution of a common plan.
  - Devote $3 million of state funds to clearing title on parcels identified by DEGC to ready them for speedy economic development.
- *Eastern Market* – Contribute to the revitalization of Eastern Market by investing in the conversion of Shed 1 (including incubator kitchens, entrepreneurial training, and business start-ups) and the renovation of Shed 5 into a full-scale grocery. Position the market as a Regional Food Innovation Cluster, focusing on science, technologies and enhanced management practices that will reshape food production and business. Assist the market in applying for a federal TIGER grant to create a seamless trail system from the Riverfront through the Eastern Market, Brush Park, and Wayne State University areas.
- *Riverfront* – Develop the Globe Building, expand Milliken State Park, dedicate a new launch for citizens near Riverfront Park and assist DEGC with resources and talent to transform Hart Plaza.
- *Belle Isle* – Create park funding for Belle Isle while ensuring continued City ownership by designating Belle Isle as a part of a cooperative relationship with Milliken State Park. This would include a long-term lease that would accrue the cost of the park's maintenance and improvements out of the Park Endowment Fund. We will partner with Belle Isle Conservancy and the City to implement a master plan for the Island.
- *Fairgrounds* – Transfer ownership of the former state fairgrounds to the State Land Bank and create a neighborhood and commercial center on the site.
- *Cobo Center* – Encourage its continued expansion in coordination with the Metropolitan Detroit CVB, and support improvements.

-10-

- *Midtown* – Continue to be a key partner in local efforts to create a Regional Innovation Cluster in Midtown through MEDC investments in the incubation and growth of small business, as well as support for residential, commercial and retail development projects.
- *Community Ventures* – A public-private partnership will identify employers willing to create new jobs and organizations that can provide training and other job readiness services for the structurally unemployed. For the first time, state agencies like MEDC, Workforce Development Agency and Department of Human Services will bring together employers, job readiness partners and private funders in a comprehensive and measurable program to assist young people aged 15 to 29 and ex-offenders. The outcome will create new, long-term jobs in Detroit.
- *Detroit-Focused Economic Gardening* – Use a comprehensive set of tools for accelerating entrepreneurship, business growth, access to capital, placemaking and talent enhancement.
- *Detroit Works Project* – Support concentrated services of blight elimination and rehabilitation for four city-targeted neighborhoods contiguous to important economic development anchors. This will be supported through coordination with MSHDA's Neighborhood Stabilization Program and the MEDC's Community Revitalization Program.

**Improve Detroit's Capacity to Collect Tax Revenues**
- Enhance city revenue collection capacity as requested by city of Detroit through technical assistance for collections, audit and city income tax administration.
- *Create a common assessment template* – Move the property assessment function from the city to the county to allow for efficiencies, commonality of method and improvements in communication between taxing entities as well as between property owners.

**Municipal Assistance/Services Authority**
- The Department of Treasury will partner with municipal governments in this state to establish the Municipal Assistance/Services Authority. The Authority will function as a center of best practices for the delivery of local government services and provide enhanced opportunities for local governments in Michigan to engage in service sharing and consolidation of activities, with State support.

-11-

# EXHIBIT 5

# CITY EMPLOYMENT TERMS

## BETWEEN THE

## CITY OF DETROIT

## AND

## AFSCME
## NON SUPERVISORY

# City Employment Terms
# Non-Uniform Employees

## TABLE OF CONTENTS

**ARTICLE**                                                                                      **PAGE**

     Preamble...................................................................................1
1.   Purpose and Intent.....................................................................1
2.   Union Recognition......................................................................2
3.   Management Rights and Responsibilities...........................................2
4.   Union Rights and Obligations.........................................................4
5.   Agency Shop..............................................................................4
6.   Dues Check-Off..........................................................................5
7.   Service Fee Check-Off...................................................................5
8.   Union Representation....................................................................6
9.   Grievance and Arbitration Procedures...............................................7
10. Disciplinary Procedure.................................................................10
11. Special Conference.....................................................................11
12. Health and Safety.......................................................................11
13. Seniority..................................................................................12
14. Seniority of Union Representatives..................................................15
15. Reduction in Force, Lay Off, Demotion and Recall................................15
16. Transfers and Promotions.............................................................18
17. Contractual Work........................................................................18
18. Leaves of Absence......................................................................19
19. Union Bulletin Board...................................................................19
20. Strikes and Lockouts...................................................................19
21. Severability Clause.....................................................................20
22. Successor Clause........................................................................20
23. Employee Assistance Program........................................................20
24. Career Development and Training.....................................................21
25. Equal Employment Opportunity and Affirmative Action Statement..............21
26. Defense and Indemnification of Employees against Damage Suits, Claims......22
27. HR / Payroll Systems...................................................................22
28. Confidential Employees.................................................................22
29. Joint Labor Management Committees.................................................22
30. Copies of the City Employment Terms (CET).......................................22
31. Economic Advantage/Disadvantage..................................................22
32. Modification and Duration.............................................................23
33. Unemployment Benefits................................................................23
34. Funeral Leave............................................................................23
35. Sick Leave................................................................................24
36. Work Week, Work Day, Shift Premium..............................................24
37. Overtime..................................................................................25

# City Employment Terms
# Non-Uniform Employees

## TABLE OF CONTENTS

**ARTICLE**                                                                 **PAGE**

| | | |
|---|---|---|
| 38. | Holidays and Excused Time off | 27 |
| 39. | Unused Sick Leave on Retirement | 29 |
| 40. | Vacations | 29 |
| 41. | Temporary Assignments | 30 |
| 42. | Jury Duty | 31 |
| 43. | Hospitalization, Medical, Dental and Optical Care Insurance | 31 |
| 44. | Workers' Compensation | 33 |
| 45. | Death Benefits and Life Insurance | 33 |
| 46. | Wages | 33 |
| 47. | Clothing and Uniform Allowances | 34 |
| 48. | Retirement | 35 |
| 49. | General Retirement System, Board Composition | 39 |
| 50. | Private Care Mileage Reimbursement | 40 |
| 51. | Long Term Disability Benefits (Income Protection Plan) | 41 |

EXHIBIT 1- Health Care Plan Design..................................................42

# CITY EMPLOYMENT TERMS FOR ALL NON-UNIFORM EMPLOYEES

## PREAMBLE

Pursuant to the Financial Stability Agreement ("FSA") entered into between the City of Detroit and the State of Michigan on April 4, 2012, these City Employment Terms ("CET") sets forth the terms and conditions of employment of certain employees and the terms of representation by the Union of those employees. Any provisions in the most recently expired Collective Bargaining Agreements, memorandums of understandings, practices, and/or supplemental agreements that are not expressly referenced in this CET or any addendum and are inconsistent with the terms in this CET or any addendum are null and void as of the effective date of this CET. Arbitration awards or other dispositions relating to such inoperative provisions shall be deemed not binding or precedential with respect to the terms of this CET. The relevant provisions of the FSA, and all modifications thereof, are incorporated herein.

**NOTE:** The headings used in this CET and Exhibits neither add to nor subtract from the meanings but are for reference only.

## 1.    PURPOSE AND INTENT

A.    The purpose of this CET is to set forth wages, hours, terms and conditions of employment for the duration of this CET and to promote orderly and peaceful employment relations in the interest of serving the citizens of the City of Detroit.

B.    To effectuate this purpose, this CET serves to establish employment relations and workplace processes and functions that serve the interest of the community and achieve the goal of customer service excellence for citizens, businesses and visitors of Detroit and achieve financial stability for the government of the City of Detroit and provide effective community policing, safe and stimulating programs for young people, and improving the environment in neighborhoods to instill civic pride and encourage new development.

C.    The City is legally and morally obligated to provide equality of opportunity, consideration, and treatment of all employees of the City and, accordingly, to establish policies, practices and rules that insure such equality of opportunity, consideration and treatment of all persons employed in all phases of the employment process, without regard to race, color, creed, national origin, age, political orientation, sex, sexual orientation, marital status, or disability in accordance with applicable State and Federal laws. The City shall continue to comply with all other applicable state federal and laws and regulations.

## 2. UNION RECOGNITION

A.    The Employer recognizes the bargaining unit as the representative, for the purposes set out in this CET, of the employees who hold the classified positions covered by the bargaining unit.

B.    The classified positions are subject to change in title, duties, responsibilities and qualifications pursuant to the Employer's rights under the Management Rights provision of this CET. The positions may also be added to or eliminated. The Employer will give the Union reasonable notice and the opportunity to discuss and provide input with respect to proposed permanent changes prior to implementation. Positions covered shall be realigned consistent with current practice.

## 3. MANAGEMENT RIGHTS AND RESPONSIBILITIES

A.    The City has the right and obligation to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority in accordance with applicable law and the FSA.

B.    Every incidental duty connected with operations enumerated in job descriptions is not always specifically described.

C.    The City shall have the right and obligation to determine and establish the policies, goals and scope of its operations. Consistent with this right the City has the right to determine and implement work schedules/shifts, vacation schedules, and flex time and to establish the goals, methods and processes by which such work is performed and the qualifications of employees assigned to do the work. These rights and obligations include, but are not limited to:

    1.    Implement changes in the structure of Department operations, including establishment or consolidation of service areas and work locations within the Department;

    2.    Cease or outsource functions or operations;

    3.    Initiate new functions or operations;

    4.    Achieve uniformity of employment terms across the Department;

    5.    Provide appropriate training, education, performance evaluation and job assignments for employees;

    6.    Establish wage and benefits for new and existing employees that achieve the goal of financial stability in City Government;

    7.    Establish qualifications and methods for hire, transfer, assignment, position retention and promotion in employment;

    8.    Revise, create, combine, and/or eliminate classifications, duties and/or positions;

9. Determine classification, status and tenure of employees;

10. Initiate promotions and disciplinary actions;

11. Determine personnel hiring and reductions;

12. Discipline and discharge employees for just cause;

13. Recruit, assign, transfer employees to positions within the Department;

14. Suspend, demote, discharge or take other disciplinary action against employees for just cause;

15. Establish rules and policies; adopt and enforce work rules and policies applicable to this unit and/or all employees, including but not limited to, the Universal Work Rules promulgated by the City;

16. Determine the requirements and payments related to an employee's job functions including, but not limited to, equipment, tools, clothing and uniforms;

17. Suspend past practice;

18. Enforce state and local licensing and other requirements;

19. Assign employees to any function or duties in the Department involving direct supervision of other bargaining unit members;

20. Assign employees to any function or duties in the Department not involving direct supervision of other bargaining unit members without payment of "out-of-class" compensation;

21. Relieve employees from duties because of lack of work, lack of funds or for disciplinary reasons;

22. Determine methods, means and employees necessary for departmental operations;

23. Control the departmental budget;

24. Determine and implement such other actions deemed appropriate to achieve the City's goals and objectives.

D. The City reserves the right to amend or modify this CET and any addendums, supplements, MOUs, letters of agreement, and all other writings and practices. The City, where practical, shall provide reasonable notice and an opportunity to discuss changes with the Union.

## 4. UNION RIGHTS AND OBLIGATIONS

A.     Any member shall have the right to discussion or services of Union Representative. When such a request is made to the supervisor, permission for services or discussion shall be granted without undue delay unless such request adversely impacts operations. Permission shall not be unreasonably withheld. This right shall not be abused. If the employee's requested Union Representative is unavailable, the Union will promptly substitute another union representatives in the represented unit, if on duty and available.

B.     The Union shall have the right and obligation to assist and cooperate with the City in effectuating the provisions of this CET and to encourage its members to do the same.

C.     The Union shall have the right and obligation to educate its members regarding the intent of this CET and the terms contained herein.

D.     The Union shall have the right to grieve the interpretation and application of the terms herein and to exercise such other rights as are set forth in this CET.

E.     Activities involving internal management of the Union such may be conducted during non-working hours. These activities shall not interfere with normal work operations of any department or work area of the City.

F.     Requests for meetings by Union officials other than Special Conferences shall be scheduled at a mutually agreeable time.

G.     When a union representative goes into a City operation for the purpose of conducting Union business, the Division Head must be notified of his/her presence and the nature of their business, prior to arrival, and obtain permission from the Division Head. If it is necessary for a Steward or Union President to speak to an employee about a grievance, management will notify the employee's immediate supervisor and arrangement will be made to accommodate the meeting with due regard for Departmental operations.

## 5. AGENCY SHOP

A.     All employees in the bargaining unit shall be required, as a condition of employment, to pay the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union for the duration of this Agreement. Such requirement shall be in effect 31 days after the effective date of the Agreement, and for new full-time employees, 31 days after they commence full-time employment.

B.     An employee shall be deemed to be in compliance within the meaning of this section, if they are not more than sixty (60) days in arrears in payment of membership dues.

C.     Once the Employer receives written notice of the Union's intent to seek the discharge of an employee for failure to meet his/her financial obligations to the Union, the employee shall have a ten (10) day grace period to meet their financial obligations or the Union's demand shall be honored.

D. The Union agrees that, in the event of litigation against the City, its agents or employees arising out of this provision, it will co-defend, indemnify, and hold harmless the City, its agents or employees from any monetary award arising out of such litigation.

## 6. DUES CHECK-OFF

A. The Employer agrees to deduct from the wages of any employee who is a member of this Union, all union membership dues and initiation fees uniformly required, if any, as provided in a written authorization executed by the employee. The written authorization for union dues deduction shall remain in full force and effect during the period of this contract and may be revoked only by written notice given during the period thirty (30) days immediately prior to expiration of this CTE. The termination notice must be given both to the Employer and to the Union.

B. Dues and initiation fees will be authorized, levied and certified in accordance with the constitution and By-Laws of the local union. Each employee and the Union hereby authorize the City to rely upon and to honor certifications by the Secretary-Treasurer of the local union, regarding the amounts to be deducted and the legality of the adopting action specifying such amounts of union dues and/or initiation fees.

C. The Employer shall continue the dues check-off except that the union shall reimburse the City an amount equal to 2% for all union dues amounts remitted to the Union. If the Union fails to reimburse the City within 45 days of the dues remittance by the City to the Union, the City shall have no further obligation to continue dues check-off.

D. The Dues Deduction Check-Off Card shall be presented to the bargaining unit member within thirty (30) days of his or her arrival in the employing department. If the dues deduction is stopped during the term of this CET because the employee left the payroll, the employing department shall have the bargaining unit member resubmit a Dues Deduction Check-Off Card on each occasion that the employee returns to the payroll.

E. The Employer agrees to deduct from the wages of any employee who authorizes a deduction for a Union Political Action Committee as provided for in a written authorization in accordance with the standard form used by the Employer, provided that the said form shall be executed by the employee. This deduction may be revoked by the employee at any time by giving written notice to both the Finance Department and to the Union. Article 4-E, F and G shall apply to this section.

## 7. SERVICE FEE CHECK-OFF

A. The Employer agrees to deduct from the wages of any employee who is not a member of the Union, all Union service fees as provided in a written authorization executed by the employee. The written authorization for service fee deduction shall remain in full force and effect during the period of this Contract and may be revoked only by written notice given during the period thirty (30) days immediately prior to expiration of this CTE. The termination notice must be given both to the Employer and to the Union.

B.   The amount of such fees will be as provided and determined by Article 4 and 5 of this CTE.

C.   The Employer shall continue the existing service fee check-off structure except that the union shall reimburse the City an amount equal to 2% for all service fee amounts remitted to the Union. If the Union fails to reimburse the City within 45 days of the dues remittance by the City to the Union, the City shall have no further obligation to continue dues check-off.

D.   The Service Fee Check-Off Card shall be presented to the bargaining unit member within thirty (30) days of his or her arrival in the employing department. If the service fee check-off is stopped during the term of this CET because the employee left the payroll, the employing department shall have the bargaining unit member re-submit a Service Fee Check-Off Card on each occasion the employee returns to the payroll.

## 8.   UNION REPRESENTATION

A.   It is mutually recognized that the principle of proportionate representation is a sound and sensible basis for determining the number of Union representatives.

B.   In each Department, district, building, work location, unit, area, site, division or floor ("Work Unit"), the employees on each shift shall be represented by one Union representative who shall be a regular employee working in that work unit on that shift. Work Units shall be defined by the Employer. Where such work unit is permanently or temporarily discontinued in its current form, union representation shall be adjusted consistent with this paragraph. In the absence of the union representative, an alternate Union representative shall represent the employees in that work unit. The Union shall promptly notify each employing department with copy to the Human Resources Department of the names and locations of representatives selected. At the request of the Union, the Labor Relations Division may agree to exceptions to this provision.

In the absence of a Union representative and his alternate, the Union will notify the department of a designated representative and shall promptly confirm such designation in writing.

C.   The number of Union representatives and districts shall be that number negotiated between the Union and the City's representatives for each department. Absent agreement between the parties, the City shall designate the number of Union representatives and districts.

D.   The Union shall reimburse the Employer for all full-time and part-time paid Union officials, including any additional compensation arrangements (including un-worked overtime) paid to employees holding union positions. If the Union fails to reimburse the City within 45 days of the end of a calendar month the City shall have no further obligation to pay such officials for union time thereafter until all reimbursement obligations and arrears are satisfied. Union representatives may elect to use vacation or compensatory time for attendance at Union meetings, conferences, conventions and other time on union activities, or take unpaid time off.

E.   Working Stewards and Chief Stewards shall request time off for Weingarten representation duties or grievance processing from their supervisor and the supervisor shall grant or deny such requests in writing.

## 9.   GRIEVANCE AND ARBITRATION PROCEDURES

A.   Should any dispute arise between the City and the Union concerning the application or interpretation of this CET, an earnest effort shall be made to settle such dispute promptly in accordance with the following Grievance Procedure:

### Step 1.      Employee, Supervisor and Steward

Any employee having a grievance may report the same to his Supervisor and an endeavor shall be made to adjust the grievance between the employee and the Supervisor. If a satisfactory adjustment is not obtained, the employee may request a Steward, and the three will attempt to resolve the matter. Where the matter involves imposition of disciplinary suspension or above, Step 1 does not apply and grievances shall be filed at Step 2.

### Step 2.      Department Head Level

If a satisfactory adjustment is not obtained under Step 1, the grievance shall be reduced to writing on a standard grievance form setting forth all facts believed to be relevant to the dispute, and the grievance shall be signed by the employee or employees involved. The written grievance must then be submitted to the Department Head. A meeting shall be held at a mutually convenient date and time to discuss the grievance. Up to two (2) Union Representatives, other than the Grievant, may attend the Step 2 meeting. Any resolution reached at this meeting shall be reduced to writing. The Department Head shall endeavor to furnish the Union with his/her written decision within fifteen (15) working days of the Step 2 meeting, excluding Saturdays, Sundays and holidays.

### Step 3.      Labor Relations Division Level

If a satisfactory adjustment is not obtained under Step 2, the Union may request a Step 3 meeting with the Labor Relations Director. Such appeal and request for a Step 3 meeting must be submitted in writing to the Labor Relations Director within five (5) working days from the receipt of the Department Head's Step 2 answer. Not more than two (2) Union Representatives may attend the Step 3 meeting, and the Labor Relations Director may designate members of his staff to represent the City. Any resolution reached at this meeting shall be reduced to writing. The Labor Relations Director or his or her designee shall endeavor to furnish the Union with his/her decision within thirty (30) working days of the Step 3 meeting.

Step 4.        Arbitration

a.      If a grievance is not settled after it has gone through Step 3 of the
        Grievance Procedure, the Union must file a written notice with the Labor
        Relations Director of appeal and intent to submit the dispute to
        arbitration. The Notice of Intent to Arbitrate must be filed within fourteen
        (14) calendar days of its receipt of the Labor Relation Director's Step 3
        answer. If the Union fails to request arbitration in writing within this time
        limit, the grievance shall be deemed settled on the basis of the Step 3
        answer and not eligible to go to arbitration.

b.      Arbitrations shall generally be heard by a member of a permanent umpire
        panel consisting of individuals mutually agreed-to by the City and the
        Union. Arbitrators will hear cases on a rotating basis. In non-disciplinary
        contract interpretation cases, however, the City may, at its election,
        choose to have the dispute arbitrated pursuant to the Labor Arbitration
        Rules of the American Arbitration Association. The Arbitration's fees
        and expenses shall be borne equally by the parties, and all other expenses
        shall be borne by the party incurring them. The Grievant, one (1) witness,
        and one (1) Union Representative shall not lose pay for time off the job
        while attending the arbitration proceeding.

c.      The decision of the Arbitrator shall be final and binding on the Union and
        its members, the employees involved and the City. The Arbitrator shall
        have no power to add to, subtract from, or modify any of the terms of this
        CET, and shall have due regard for the rights and responsibilities of the
        Employer set forth in Article 2 of the CET "Management Rights." The
        Arbitrator shall have no power to grant any wage increases or decreases,
        and shall not uphold any grievance against the City on the basis of past
        practice. The Authority of the Arbitrator is limited to interpretation and
        application of the provisions of this CET. The Arbitrator shall have no
        authority to apply or interpret the provisions of the expired collective
        bargaining agreement between the Union and the City, unless the
        grievance at issue was submitted during the term of that agreement, or
        grant any right or relief for any alleged grievance under the terms of the
        expired collective bargaining agreement between the Union and the City,
        unless the grievance at issue was submitted during the term of that
        agreement.

B.    A grievance shall be deemed untimely, settled and withdrawn unless a written Step 2
      grievance is filed with the Department Head within five (5) working days (excluding
      Saturdays, Sundays and holidays) after the Grievant first knew, or should have known, of
      the facts giving rise to the grievance. Grievances concerning a continuing practice or
      continuing act of the Employer must be grieved within ten (10) working days of the date
      the Grievant first knew, or should have known, of the act or practice. Any extensions of
      these time limits must be agreed to by the City in writing.

C.    In the event the Employer fails to respond to a grievance or schedule a meeting within the time periods provided in any steps of the Grievance Procedure, said grievance shall be denied and the Union may make a written request that the grievance be referred to the next step.

D.    Any agreement reached between the Employer and the Union under the Grievance Procedure shall be binding upon the Employer, the Union and the employees concerned and cannot be changed by any individual. No settlement at any stage of the grievance procedure, except an arbitration decision, shall be a precedent in any arbitration and shall not be admissible in evidence in any future arbitration proceeding.

E.    The City shall not be required to pay back wages more than five working days prior to the date a written grievance is filed.

F.    All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation received for temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Department of Health and Human Services, City-Funded Long-Term Disability Insurance, Sickness and Accident Insurance or Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein.

G.    In the case of a pay shortage in which the employee would not have been aware before receiving his pay, any adjustment made shall be retroactive to the beginning of the pay period covered by such pay, if a grievance is filed within the twenty (20) working days within receipt of such paycheck.

H.    Exchanging, pertinent information regarding a grievance is beneficial to both parties in attempting to resolve the grievance.

The Union shall be advised of the factors considered in the imposition of discipline and shall have the right to request copies of available written documents or statements pertaining thereto. If the Union requests information regarding a grievance from an employee's personnel file, the Union must present written authorization from the employee to release the information. Management shall be advised of the basis of the grievance and have the right to request copies of available written information or statements pertaining thereto and which the Union proposes to present in support of the grievance.

It is agreed that any information requested in accordance with the above provisions which is not made available to the other party shall not be admissible as evidence in any arbitration hearing provided that a written request has been made to the appropriate Local Union President or Departmental Representative.

I.    The grievance procedure contained in this CET shall be the exclusive grievance procedure and remedy for all members of the bargaining unit claiming a violation of this CET.

## 10.   DISCIPLINARY PROCEDURE

A.   The City retains the right to promulgate, amend and modify disciplinary rules, procedures and penalties.

B.   All disciplinary action taken against an employee shall be for just cause and subscribe to the general philosophy that the primary purpose of disciplinary action is to correct employee behavior or conduct. The City will make an effort to utilize a progressive discipline process; however, the City reserves the right to invoke more severe discipline, up to and including, termination. The issuance of disciplinary action shall take place in a timely manner with due regard for the Employer's right to conduct workplace investigations of employee misconduct. Any dispute regarding the timeliness of the discipline shall be resolved through the grievance procedure.

C.   **NOTIFICATION REQUIREMENTS:**  Notification shall be given to the appropriate union representative of any disciplinary action taken against any member which may result in any official entries being added to the employee's personnel file. Both employee and the Union representative shall be given a copy of such official entry.

In all cases when a supervisor contemplates issuance of disciplinary action, the supervisor shall inform the employee and allow the employee the opportunity to have union representation. If the employee's requested representative is unavailable, the Union shall promptly substitute other union representatives in the represented unit, if on duty and available. If the employee declines union representation, he/she shall indicate so in writing and a copy shall be given to the Union.

When the department has decided to issue discipline, the employee will be allowed adequate time and an available area to discuss the discipline with his/her steward, or in the absence of a steward an appropriate union representative. In the case of a suspension or discharge, where Union representation is available, this discussion will take place prior to the employee leaving City property. Upon request the management representative who is present and issuing the action will discuss the disciplinary action with the employee and his/her steward. Exceptions to this procedure would be in situations where the suspended or discharged employee is absent without leave, or the parties agree that such discussion would not be beneficial at this time.

In the case of an oral reprimand, a notation by date and subject only shall be placed in the employee's personnel file.

D.   All disciplinary actions shall be subject to the grievance procedure. It shall be the responsibility of the grievant to keep the Union and City informed of his/her mailing address and telephone number(s) at which he/she may be reached for purposes of notification. Certified mail to the address of record shall constitute proper notification to the grievant.

E.   During investigation, an employee shall have the right to request to have his/her steward present if the employee reasonably believes that his/her statements may lead to

disciplinary action. Before an employee is required to make any statements pertaining to his/her possible misconduct, the employee shall have the opportunity to discuss the matter first with his/her steward.

F.    **PERSONNEL RECORDS:** All employees within the bargaining unit shall have the right to review his/her personnel records pursuant to applicable law.

G.    **USE OF PAST RECORD:** In imposing any discipline on a current charge or in evaluating an employee for promotion or transfer, management will not take into account any prior infractions or disciplinary action taken which occurred more than three years previously.

H.    **GUIDELINES FOR ADMINISTRATION OF A CORRECTIVE DISCIPLINE PROGRAM:**

    1.    Disciplinary action should be appropriate and take into account both the offense and the employee.

        Factors which should be considered in imposing discipline in each case are:

        a.    The seriousness and circumstances of the particular offense.
        b.    The employment history of the employee involved including length of service.
        c.    The recency and nature of prior disciplinary action taken with respect to the employee.
        d.    Prior departmental action in comparable stipulations.

    2.    Any published departmental standards or rules governing employee conduct or expected work performance should be fairly and consistently applied.

## 11.    SPECIAL CONFERENCE

Special Conferences for important matters including problems of health and safety and periodic discussions of substantial issues which are of concern to Union members may be arranged upon mutual agreement between the Union President and the Department Head or his/her designated representative upon the request of either party. Such meeting shall be between representatives of the department, and no more than three (3) and at least two (2) representatives of the Union.

## 12.    HEALTH AND SAFETY

A.    The City recognizes its responsibility to provide safe and healthful working conditions, and the Union recognizes it's their obligation to cooperate in the maintenance and improvement of those conditions.

B.    All existing safety practices and provisions in expired agreements shall remain in effect until such time as amended by the City.

C.    All protective equipment and devices, first aid kits or similar provisions, physical examination or other tests required by the Employer shall be provided at no cost to the employee.

D.    The City shall act in compliance with Federal, State and Local legislation relating to use or storage of hazardous materials and incidence of contagious disease in the work place. Union representatives will be informed of any testing of employees or precautionary steps taken because of exposure to hazardous materials or a contagious disease which has occurred within the worksite where members of his/her Union are employed.

## 13.    SENIORITY

A.    **SENIORITY** is hereby defined as the length of continuous service beginning on the date of legal certification to a position in the classified service of the City of Detroit. Seniority, as defined above and in accordance with Human Resources Department Rules incorporated herein by reference, is established to serve as a basis for determining employee seniority rights provided for in this CET including the order of demotion or lay off in the event of a reduction in force and the reemployment rights of employees. Note: Seniority is not the same as "service time" as utilized for the various economic benefit provisions.

The seniority date of employees in the bargaining unit who were initially hired into Federal Economic Opportunity Act (FEOA) Service classes shall be made retroactive to the date of placement to a position in such FEOA Service class.

B.    **CONTINUOUS SERVICE** shall mean employment by the City of Detroit without interruption or breaks. The following shall not be considered breaks in service.

**Note:** Seniority is not the same as "service time" as utilized for the various economic benefit provisions.

1.    Service in the Armed Forces of the United States up to four (4) years, or five (5) years if requested by the Government as provided under Federal law.
2.    Absence from work due to injuries compensated for under the Workers' Compensation Act of the State of Michigan.
3.    Duty-disability retirement.
4.    Appointment or election to an exempt non-classified position of the City of Detroit.
5.    Lay off as a result of a reduction in force for a period not exceeding two (4) years.
6.    Leave of absence to serve in a qualifying employee labor organization for the term of said employment.
7.    Leaves of absence for Peace Corps service up to two (2) years.
8.    Other approved leaves of absence for a period not exceeding one (1) year.
9.    Non-duty disability retirement for a period not exceeding one (1) year.

Employees may be granted a personal leave by the City for up to one (1) year. Seniority

accrued prior to the leave will be retained but employees will not accumulate additional seniority for the period of the leave, except that this provision shall not apply to leaves related to military or Peace Corps.

C.   **LOSS OF SENIORITY:** An employee shall lose his/her seniority for the following reasons only:

   1.   Discharge or permanent removal from the payroll and the separation is not reversed through the grievance procedure.

   2.   Regular service retirement.

   3.   Resignation or voluntary quit, which shall include:

      a.   Failure to report within five (5) working days after receiving notice of recall from lay off.

      b.   Failure to report back to work within five (5) working days after expiration of an approved leave of absence or extension thereof.

      c.   Absence from work for three (3) consecutive working days without notice to the Employer unless he/she can demonstrate that he/she was physically or mentally incapable of notifying the department of his/her inability to come to work.

   4.   For Seasonal Employees, failure to report for work in any given season within five (5) days of the date of notice to report for work for that season.

D.   **ADJUSTMENT FOR SEASONAL, TEMPORARY OR PART-TIME EMPLOYMENT:** If an employee in a special service classification employed on a seasonal, temporary or part-time basis is subsequently placed in a regular full-time classified position the following adjustments to seniority shall be made:

   1.   In the case of the seasonal or temporary employee, for each twelve (12) month period of employment in which the employee worked six (6) months or less, six (6) months shall be deducted from the length of continuous employment.

   2.   In the case of the part-time employee, for each period of employment in which the employee worked on a half-time or less basis, the employee shall be awarded one-half seniority credit and the length of continuous employment adjusted accordingly.

   Any adjustment of seniority under this section shall be made from the employee's certification date as a seasonal, temporary or part-time employee.

13-53846-tjt   Doc 4874   Filed 05/15/14   Entered 05/15/14 17:47:51   Page 122 of 153

E.  **RESOLVING TIES IN SENIORITY**:

  1.  Where two or more persons have the same seniority date, the employee with the highest standing (examination rating) on the eligible register from which the employees were certified shall be deemed as having the greater seniority. In the event of identical examination ratings, the employee with the earliest examination date shall be deemed as having the greater seniority. In the further event of identical examination dates, the employee who first submitted his/her employment application (as measured by the examination number) shall be deemed as having the greater seniority.

  2.  In the case of inducted employees with the same seniority date, employees will be ranked in accordance with their length of continuous service in the department, agency or activity in which they were employed when inducted into the classified service. Insofar as possible to determine, such continuous service shall include any adjustments in accordance with procedures outlined in this Article.

  3.  Notwithstanding the above, in all cases of identical seniority dates, persons entitled to preference under the Michigan Veteran's Preference Act shall be deemed as having greater seniority than those employees without such preference.

F.  **PROBATIONARY EMPLOYEES:** New employees hired by the City and others initially placed into the bargaining unit shall be considered as probationary employees for the first six (6) months of their employment depending on the classification except as provided below. The City may extend in its sole discretion this probationary period for up to an additional six (6) months. This decision may not be grieved. The reasons for the extension will be given in writing to the employee, and a copy given to the Union upon request.

The Union shall represent probationary employees for the purposes set forth in this CET except separation from City service or reversion to the formerly held title for reasons other than union activities. For probationary employees with prior City service, the Union shall represent such employees when a department issues a suspension or discharge for cause instead of taking action to revert the employee to his/her prior status.

G.  **SENIORITY LISTS:** The City will furnish to the Union quarterly, a seniority list and a separation list showing each employee's name, address, department, classification, , and total City seniority date. Upon request, the City will annually furnish a Union its relevant city wide seniority list by classification. These computer generated lists will be based on official Human Resources Department documents which have been approved and processed as of the date submitted. Any questions concerning this information or alleged errors should be submitted to the Administrative Services Division of the Human Resources Department. When the City has the capability, such lists will be provided to the Union on compact disks (CDs).

H.    **CLASSIFICATION SENIORITY**: Classification seniority shall be preserved where it is utilized in prior agreements.

### 14.    SENIORITY OF UNION REPRESENTATIVES

A.    Except as follows and as provided in Article 37 - Overtime, there shall be no exceptions or special seniority provisions for Union officers. Notwithstanding their position on the seniority list, all Union Representatives who provide "Weingarten" representation to employees in the bargaining unit, or who are responsible for the adjustment of grievances, shall in the event of a layoff or reduction in force, be retained in employment so long as there are:

  1.    Full-time positions remaining in their current classification in their respective Department;

  2.    Full-time positions remaining in their current classification in any other Departments within the bargaining unit; and

  3.    Full-time positions remaining in any classification other than their current one in which the employee has had prior year service or occupational series and be able to perform the duties and functions of the new job as determined by the Employer.

B.    The provisions of this Article shall apply only so long as Union Representatives engage in the representation and grievance adjustment functions set forth above.

C.    Should a Union Representative lose his/her Weingarten representation or grievance adjustment functions, they shall be subject to displacement by employees with greater seniority who have been laid off or demoted as a result of reductions in force made prior to the former representative's loss of representation or grievance adjustment functions.

### 15.    REDUCTION IN FORCE, LAY OFF, DEMOTION, AND RECALL

A.    The City reserves the right to reduce the work force.

B.    **NOTICE TO THE UNION:** Where practical, the City will provide advance notice to the Union who may receive such notice fourteen (14) days prior to issuance of any layoffs.

C.    **ORDER OF REMOVAL:** Reduction in force shall be by job classification in a City department. Within the department, the following categories of employees in the class shall be removed first in the following order.

  1.    Provisionally-hired employees.
  2.    Newly-hired employees who have not completed the probationary period.
  3.    Employees hired on a seasonal, temporary or other limited term basis.
  4.    Seniority employees who have recently been promoted into the class and have not completed the required trial period, and employees promoted to the class on a

limited-term basis. Such employees shall revert to the classification in the department from which they were promoted.

5.      Seniority employees who are in the class on a permanent basis and have completed the required trial period. Such employees shall be removed from the class in accordance with their total City seniority and have those displacement rights described below.

D.   **DEPARTMENTAL DISPLACEMENT RIGHTS:** Permanent seniority employees who are being removed from a given class shall have the following optional displacement rights in their department:

    1.      To displace the least seniority employee in a lower class in the same occupational series, provided that they have prior year service in such classification within the last three (3) years and can perform the duties of the new position.

    2.      To displace the least seniority employee in some other classification which the senior employee previously held within the last three (3) years, provided that they can perform the duties of the new position.

In addition, employees who are unable to displace lesser seniority employees in their department may be transferred or demoted to other available vacant positions in the department for which they are adjudged to be qualified.

Those employees who are unable to displace lesser seniority employees or are not status-changed to other available vacancies in the department shall be laid off by issuance of a layoff notice from their department. Such laid off employees shall then have those City-wide displacement rights described below.

Employees who have an opportunity to displace a lesser seniority employee in the next lower class in their occupational series, but elect not to exercise such displacement rights and request to be laid off instead, shall not be eligible for these City-wide displacement rights. However, such employees will have those recall, reemployment and restoration rights set forth in Section F.

E.   **CITY-WIDE DISPLACEMENT RIGHTS:** Permanent seniority employees laid off from a department or demoted to a lower classification due to reduction in force shall have the following displacement rights on a City-wide basis:

    1.      To displace provisional hires, probationary employees and limited term employees in the laid-off class in any other City department in that order.

    2.      If the employee was laid off, to displace the least seniority employee in the laid-off class in any other City department; and, if there are no lesser seniority employees in the class, to displace the least seniority employee in a lower class in the same occupational series, provided that they have prior year service in such classification within the last three (3) years and can perform the duties of the new position.

    3.      If the employee was demoted to a lower class, to displace the least seniority

employee in the class from which he/she was demoted in any other City department, provided that they have prior year service in such classification within the last three (3) years and can perform the duties of the new position.

Such displacement across departmental lines shall coincide with the effective date of the layoff of the employees having such displacement rights, if possible, but, in any event shall be implemented within sixty (60) calendar days of the layoff date. Where two or more laid-off employees have City-wide displacement rights, employees will be given a choice of available displacement opportunities in their class, in order of their seniority. However, employees who do not report for displacement as instructed will waive this right.

F.   **EMPLOYEE RECALL, REEMPLOYMENT AND RESTORATION RIGHTS**:

Employees will be recalled by seniority for available positions either: (a) in their current classification, or (b) in the classification in the same occupational series; provided they have prior year service in such classification within the last three (3) years and can perform the duties in the position they are recalled into. Specific recall and notification procedures shall be determined and modified by the Human Resources Department. Any Human Resources rules or procedures concerning employee recall shall not be interpreted to limit or impair the City's right to fill vacancies through transfer, promotion, or new hire in accordance with the Management Rights or the Transfer and Promotion provisions of this CET. Any existing Human Resource rules or procedures with conflicting provisions shall be modified to conform to this CET.

G.   **MULTIPLE TITLES:** In determining an employee's rights under this Article, an employee can have permanent seniority in only one (1) class at a time. An employee who carries a multiple title shall be treated as having permanent seniority in the lowest part of his/her multiple title.

Exceptions to this general rule would be where the employee previously held a higher part of the multiple title on a single title basis, or where the parties agree that the employee's permanent seniority should be in a higher part of the multiple title based on the employee's nature and history of employment. Such agreement must be in effect no later than ninety (90) days prior to the announcement of a reduction in force.

H.   **NOTICE REQUIREMENTS:** Following notice, a representative of the department shall meet with the Union to discuss the circumstances of the department's reduction in force.

   1.   Employees to be laid off shall receive notice of layoff no less than two (2) calendar weeks prior to the effective date of the separation. A union representative will be permitted to attend the notification meeting. A copy of such notice will be sent to the Union.

   2.   Employees displaced as a result of a reduction in force, including those displaced and laid off as a result of City-wide displacements, shall receive notice of displacement and/or layoff no less than one (1) calendar week prior to the

demotion or separation. A union representative will be permitted to attend the notification meeting. A copy of such notice shall be sent to the Union.

3. Notice of recall or offer of reemployment to laid off employees shall be sent by certified mail to the person's last address of record. It shall be the responsibility of the laid off employee to notify the Human Resources Department immediately of any change of address. Failure of the laid off employee to report to Human Resources within five (5) calendar days of the date of the notice shall be considered a voluntary quit and result in loss of seniority unless good cause for the employee's failure to report is shown.

4. Exceptions to the above notice requirements shall be allowed in individual cases where the failure to give timely notice resulted from error or unforeseen circumstances beyond the control of management.

I. To exercise bumping rights, an employee must have prior year service in such classification within the last three (3) years and can perform the duties of the new position. Employees shall be permitted to work outside their classification.

## 16.    TRANSFERS AND PROMOTIONS

The City shall have the right to transfer and/or promote employees within any department or to any new department in its sole discretion that may take into account an employee's seniority, training, education, expertise, performance, attendance, and work/discipline history, as well as any possible disruption that may result from an inter-departmental transfer and whether it will impede the City's ability to consolidate services or departments. Such transfer and/or promotion shall be on a three (3) month probationary period, during which time the City may determine that the transferred employee is unable to perform the duties and functions of the new position and may exercise its right to transfer that person back to their old position or to another position. Such transfers, promotions and reversions shall occur in accordance with Human Resource Policies.

## 17.    CONTRACTUAL WORK

A. The right of contracting or subcontracting is vested in the City.

B. In cases of outsourcing, contracting or subcontracting city operations affecting employees represented by the Union, the City will provide advance notice to Union prior to letting the contract. Union representatives will be advised of the nature and scope of the work or operations to be outsourced or contracted. The Union will be permitted to participate in the competitive bidding process for the work under the same terms and conditions as all other bidders.

## 18.   LEAVES OF ABSENCE

A.   **FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA):** The City will promulgate FMLA policies in accordance with the current state of the law. A full explanation of the employee's FMLA rights shall be included in the New Employee Orientation.

B.   **CITY LEAVES OF ABSENCES:** Leaves for purposes covered under the FMLA may be extended, and leaves for other purposes may be granted, at the City's sole discretion pursuant to policies promulgated and modified by Human Resources.

C.   **UNION LEAVES OF ABSENCE**: Members of the Union elected or selected by the Union to do work which takes them from their employment shall, at the written request of the Union, receive leaves of absence without pay or benefits for the period of employment with the Union, and upon return shall be re-employed without any loss of seniority.

## 19.   UNION BULLETIN BOARD

A.   The City will furnish adequate space for the Union one (1) adequate bulletin board at locations to be agreed on by the Union and the Employer.  The boards shall be used only for the following notices:

   1.   Recreational and social affairs of the Union.
   2.   Union meetings.
   3.   Union elections.
   4.   Reports of the Union.
   5.   Rulings or policies of the Union.

B.   Notices and announcements shall not contain anything political or of a libelous nature. All notices shall be signed by a union representative or his/her designated representative.

   The Union's right to bulletin boards shall be contingent on its adherence to the requirements of paragraph A.

## 20.   STRIKES AND LOCKOUTS

A.   Interference with Work:  Employees shall not engage in any strike, work stoppage, slowdown, refusal to cross picket lines, sympathy strike or otherwise neglect of, or interference of any kind with, the operations of the City.

B.   The City will not lockout any employee in furtherance of a labor dispute.  However, if any employee is unable to work because equipment or facilities are not available due to a strike, work stoppage, slowdown or other interference by other employees, such inability to work shall not be deemed a lockout under the provisions of this section.

## 21. SEVERABILITY CLAUSE

If any Article or Section of this CET or any Supplement thereto, should be held invalid by operation of Law or by any Tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such Tribunal, the remainder of this CET and supplements shall not be affected thereby, and Employer may implement a satisfactory replacement for such Article or Section.

## 22. SUCCESSOR CLAUSE

This CET, nor any other terms and conditions of City employment regardless of source shall not be binding upon the successors and assignees of the Employer by the consolidation, merger, sale, transfer, lease, or assignment of the Employer in any respect whatsoever by a change of any kind of the ownership or management of either party hereto of any separable, independent segment of either party hereto.

## 23. EMPLOYEE ASSISTANCE PROGRAM

A.    The City and the Union recognize and acknowledge that behavioral-medical problems have an adverse effect on the employee's job performance and merits special attention. Examples of these problems include but are not limited to substance abuse, including alcohol and drugs, physical illness, mental or emotional illness, marital or family maladjustments and other personal problems. These behavior-medical problems impair the employee's ability to function, and contribute to increased absenteeism and tardiness, and violations of other rules, regulations, and procedures. The combination of factors is recognized as having potentially damaging effects on the employee, the work site and the well-being of co-workers. The City and Union believe most behavioral-medical problems are treatable. The Employee Assistance Program is designed to provide assistance to employees who are experiencing behavior-medical problems that may result in deteriorating job performance.

B.    The Employer may continue to provide an Employee Assistance Program through a third party vendor.

C.    Nothing in this statement is to be interpreted as constituting any waiver of management's responsibility to maintain discipline or the right to invoke progressive disciplinary measures when applicable in the case of misconduct which may result from or be associated with the abuse of any substance or other personal problem; the union may exercise its right to process grievances concerning such matters in accordance with the CET.

D.    During or following treatment, the employee should not expect any special privileges or exemptions from standard personnel practices; however, employees with substance abuse problems or personal problems will be allowed to liquidate sick leave for the purpose of treatment or rehabilitation upon presentation of satisfactory medical evidence.

E. When a leave of absence is necessary so that an employee may undergo behavioral-medical treatment for alcoholism, drug abuse, or other personal problems in or from an appropriate facility in accordance with this program, and when the employee has voluntarily submitted himself for such treatment, he/she may be granted a leave of absence if the employee has completed one (1) year of continuous classified service immediately prior to the leave.

F. The confidential nature of medical records of affected employees will be preserved in the strictest manner as all other medical records. To the extent feasible, employee assistance facilities will be located in areas separate from other City activities.

## 24. CAREER DEVELOPMENT AND TRAINING

A. The City and the Union recognize the need to provide training and career development opportunities for employees which will develop their skills, knowledge, and abilities to effectively carry out duties and responsibilities of their current classification, and to qualify for more responsible positions in the future.

B. The City subscribes to the principle of promotion from within, and, in keeping with that principle, the City agrees to focus some of its resources toward those employees in lower job classifications in order to provide opportunities to train and enter new careers.

C. The City and the Union agree that a major goal of training and career development is improvement of the status of female and minority employees in order to fulfill the City's and Union's commitment to effective affirmative action programs, and to make the work force at all levels reasonably representative of the sex and ethnic composition of the City.

D. The City and the Union recognize that technological or other changes may occur during the term of this CET. Whenever such changes occur, bargaining unit members may be offered opportunity for training, retraining or reassignment whenever possible. (Example: Detroit Resource Management System [DRMS]).

E. To insure that employees are adequately trained, The Human Resources Department may conduct periodic training need assessments and employee performance reviews.

## 25. EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION STATEMENT

A. The City will adhere to a policy of equal opportunity for all employees and continue to prohibit discrimination because of race, color, creed, national origin, age, political orientation, sex, sexual orientation, or disability, continue to comply with all federal state and local civil rights laws, ordinances and regulations and promote a full realization of equal employment opportunity through a positive and continuing effort.

B.    The City may, upon request, provide the Union with copies of statistical minority employment information reports and such reports concerning policies and programs for equal opportunity in employment regarding City employees.

## 26.    DEFENSE AND INDEMNIFICATION OF EMPLOYEES AGAINST DAMAGE SUITS, CLAIMS, ETC.

Current City policy regarding the defense of and indemnification of employees against damage suits, claims, etc. is set forth in the Detroit City Code Chapter 13, Article 11.

## 27.    HR / PAYROLL SYSTEMS

The two-tier systems, referenced herein and in prior agreements, shall be implemented when the HR/Payroll/Benefit system can accommodate each specific change.

## 28.    CONFIDENTIAL EMPLOYEES

The parties agree that certain City employees are designated as confidential employees and are, therefore, to be exempt from membership in the bargaining unit covered by this CET. These employees are those holding the positions as outlined in the Memorandum of Understanding reached by the parties and submitted, and approved by the Michigan Employment Relations Commission in connection with Case No. C79 D-110 as well as the Decision and Order of the Commission in that case dated June 4, 1980. The City shall not designate other employees as confidential without the agreement of the Union; but may, if the Union fails to so agree, petition the Michigan Employment Relations Commission to approve such designation.

## 29.    JOINT LABOR-MANAGEMENT COMMITTEES

All current Labor Management Committees are suspended pending further review and discussion between the City and the Union. Joint committees, if any, shall be patterned in structure and role after the committees included in the contracts recently negotiated between the State and Unions representing state employees.

## 30.    COPIES OF THE CET

The City of Detroit will provide the Union with three (3) original copies of the CET and supplements to the CETs without charge. The Employer and the Union shall each bear the expense of reproducing and distributing their own copies.

## 31.    ECONOMIC ADVANTAGE/DISADVANTAGE

The Employer shall have the right to negotiate terms and conditions of employment with each bargaining unit without any obligation to provide similar terms to this unit. All existing protection and "me too" provisions shall be eliminated

## 32. MODIFICATION AND DURATION

This CET, any subsequent modifications thereof by the Employer, and any supplements thereto, shall be in effect until such time as they are further modified by a collectively bargained agreement or pursuant to Public Act 4 of 2011.

## 33. UNEMPLOYMENT BENEFITS

Employees covered by this Agreement shall receive unemployment benefits in accordance with the unemployment insurance plan administered by the Michigan Employment Security Commission under the Michigan Employment Security Act.

## 34. FUNERAL LEAVE

A.  If a death occurs among members of the employee's immediate family or household, the employee, provided he/she attends the funeral and submits documentation of such upon return to work, will be granted two (2) days leave not to be charged to sick leave. An employee may take an additional three (3) days of funeral leave to be charged against current sick leave and then reserve sick leave upon his/her request.

B.  **DEFINITION OF IMMEDIATE FAMILY**: The immediate family is defined as wife, husband, son, daughter, brother, sister, father, mother, step-father, step-mother, step-son, step-daughter, grandmother and grandfather.

C.  If a death occurs among the relatives of the employee, the employee will be granted one (1) day leave, not to be charged to sick leave provided he/she attends the funeral and submits documentation of such upon return to work. If the funeral which the employee attends is more than 300 miles from the City of Detroit, the employee may extend the leave by two (2) days to be charged against current sick leave and then reserve sick leave upon his/her request.

D.  **DEFINITION OF RELATIVES:** Relatives are defined as grandson, granddaughter, brother-in-law, sister-in-law, uncle, aunt, mother-in-law, and father-in-law.

E.  If the Local Union President is not available to attend the funeral of a City employee who is a member of his/her local, a representative of the Union, with proper notification to the department head, shall be allowed one (1) funeral day, not to be charged to sick leave, to attend the funeral, provided he/she submits documentation of such upon return to work.

The two-tier system for new hires referenced in this Note will be implemented when the City's Payroll System has the capability.

## 35.    SICK LEAVE

A.      All employees who have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Current sick leave banks will be frozen at existing levels. Future accrual of current sick leave banks will be capped at 300 hours. Hours currently banked that exceed 300 will be retained, with no additional accrual unless the bank falls below 300, and any accrual thereafter shall not exceed the 300 hours cap. The award of reserve sick days is eliminated and existing reserve banks are frozen. .

All employees must be on the payroll for the entire month to be credited with sick leave.

B.      Sick leave may not be granted in anticipation of future service.

C.      Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

NOTE: The two-tier system for new hires referenced in this Article will be implemented when the City's Payroll System has the capability.

## 36.    WORK WEEK, WORK DAY, SHIFT PREMIUM

### A.    STANDARD SERVICE WEEK:

1.      The standard payroll work week shall begin at 12:01 a.m. Monday, and end at 12:00 p.m. Sunday. It shall consist of five (5) regularly scheduled eight (8) hour work periods on as many work days. The two (2) remaining days in the payroll work week shall be known as "off days." In accordance with the Management Rights Clause, the City reserves the right to determine, and change start and quit times, as well as modify employee schedules.

2.      The first scheduled "off day" within the payroll work week shall be designated as the "sixth day" and the second scheduled "off day" within the payroll work week shall be designated as the "seventh day."

3.      Off days in the work week shall be scheduled consecutively unless such scheduling shall adversely affect or add cost to operations of the department.

4.      The City and the Union will review departmental work schedules which currently do not provide for consecutive off days. If the parties can agree that scheduling changes which allow for consecutive off days are feasible, such changes will be implemented, provided that such charges do not result in increased costs or loss of productivity.

5.      The City and the Union will also review those departmental operations which currently require rotating shifts. If the parties can agree that a more productive schedule can be established without an increase in cost, the City will take the steps necessary to implement such schedules.

6. Employees will be allowed to submit shift preferences within locations for any new work schedules established pursuant to reviews made in accordance with Section A-3 and A-4.

**B. SERVICE DAY AND WORK DAY:**

1. The thirty five hour work week shall be eliminated.

2. Two (2) coffee breaks of not less than fifteen (15) minutes per shift shall be permitted.

3. When an employee is called to work, he/she shall be guaranteed no less than four (4) hours of pay for "show up" time at the appropriate rate.

4. A flex-time work schedule may be established in certain departments where the appropriate working conditions exist.

5. Employees assigned to seven day operations shall be required to call in two (2) hours prior to the start of their shift when requesting a sick day.

**C. AFTERNOON AND NIGHT SHIFTS:**

1. **Shift Premium Rates:** Employees who work regularly scheduled afternoon and night shifts shall receive, in addition to their regular pay, a premium of twenty-five cents (25¢) per hour for the afternoon shift and a premium of fifty cents (50¢) per hour for the night, if the employee works their entire regularly scheduled shift.

2. **Shift Premium Times:** The afternoon shift shall be any full-time shift commencing between the hours of 11:00 a.m. and 6:59 p.m.

   The night shift shall be any full-time shift commencing at the hour of 7:00 p.m. or between the hours of 7:00 p.m. and 3:59 a.m. in accordance with Chapter 13, Article 2, Section 12, of the Municipal Code of the City of Detroit.

D. Unless provided for otherwise within this labor agreement, all of the provisions of this Article shall be in accordance with Chapter 13. Article 2, Section 12, of the Municipal Code of the City of Detroit.

E. Currently, all hourly paid employees shall receive their pay for regularly scheduled hours not later than Friday following the payroll week in which it is worked. When the City's payroll system has the capability, such employees will be paid on a bi-weekly basis.

## 37. OVERTIME

A. The City has the right to schedule overtime work and to require employees to work mandatory overtime.

## 38.  HOLIDAYS AND EXCUSED TIME OFF

A.  Employees shall be entitled to the following seven (7) holidays: New Year's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day, during which premium time will be paid for time worked as set forth below. Employees shall be granted eight (8) hours of "Excused Time" on Good Friday or eight (8) hours on the last scheduled paid day prior to Good Friday, and eight (8) hours of "Excused Time" on the last scheduled paid day before Christmas Day and before New Year's Day and for Veteran's Day, and the day after Thanksgiving. Employees will be paid holiday pay for excused time days, but if employees are required to work on such days, only straight time pay will be paid for hours worked.

Entitlement to swing holidays shall be discontinued after the award of such holidays on July 1, 2012 and for all new hires.

B.  Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Where a holiday is concurrent with the employee's sixth or seventh work day, the Department Head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the Department Head.

C.  An employee shall be eligible for holiday pay or excused time pay provided he/she has received at least eight (8) hours of pay (exclusive of overtime and sick leave) the workday before and the day after the holiday or excused time day. Provided, however, the employee continues on the payroll through the holiday or excused time day and is otherwise qualified for the holiday or excused time day.

For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, or is on a formal leave of absence granted by the Human Resources Department (generally over 30 days), is on workers' compensation, or is laid off. An employee's payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D.  If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

E.  Time and one half (1.5) will be paid for all hours worked on a holiday in addition to the straight time holiday pay due for a holiday as such.

F.  Premium payments shall not be duplicated for the same hours worked.

G.  Employees who are scheduled to work on any holiday, but who fail to report to work, shall not be eligible for holiday pay.

H.    For the purpose of this Article, an employee shall be considered off the payroll if he/she engages in a work stoppage which extends through a holiday or excused time day. All benefits under this Article will be forfeited for the holiday or excused time in question.

I.    If a holiday or excused time day falls on Saturday it shall be observed on the preceding Friday, and if a holiday or excused time day falls on Sunday it shall be observed on the following Monday for all employees except those assigned to six and seven day operations. Should two (2) consecutive holidays or excused time days occur on a Friday and Saturday, or on a Sunday and Monday, Friday and Monday, respectively, shall be designated as the official holidays.

J.    If an employee engaged in six or seven day operations works either the actual calendar holiday or the substitute holiday, he/she shall receive the holiday premium, but he/she will not be allowed to pyramid holiday premium for working both days.

1.    An employee assigned to a six or seven day operation may be scheduled off for the holiday on either the calendar holiday or the substitute holiday.

2.    When an employee works both the calendar holiday and the substitute holiday, the day selected as a holiday for pay purposes shall be the day which allows the employee the maximum pay credit for working both days.

3.    If an employee works either the calendar holiday or the substitute holiday, but not both, he/she shall be paid holiday premium for the day worked.

4.    If an employee is off sick on the calendar holiday, or the substitute holiday, or both, he/she shall receive sick pay. If he/she works either of the two days he/she shall receive holiday premium.

5.    If an employee is AWOL on the actual calendar holiday, but works the substitute holiday, he/she shall not be entitled to holiday pay or holiday premium.

K.    The City shall have the option to close all or part of its facilities for the Christmas and New Year's holiday season consistent with operating needs and the public service. Employees shall have the option of using vacation, swing holidays (if applicable), compensatory time or no-pay for any days off during this period. If an employee has none of the above listed accrued time, departmental leave may be used if available. If an employee has no paid time accrued, and wishes to work, the Department will make every attempt to place an employee in his/her department on a job assignment consistent with their job classification and ability to perform the work.

The City shall determine optional holiday season closing dates and shall notify the Union by November 1st of each year of whether it intends to implement a holiday closedown.

Any scheduled time off or uses of departmental leave days during these periods shall not be counted against the employees' attendance records nor adversely affect their benefits.

**NOTE:** The two-tier system for new hires as well as other new changes referenced in this Article will be implemented when the City's Payroll System has the capability.

### 39. UNUSED SICK LEAVE ON RETIREMENT

A. Employees shall be entitled to payment for unused sick leave on retirement as follows:

Upon retirement, or death with twenty (20) years of service, an employee shall be entitled to payment of sixty percent (60%) of their unused sick leave accrued prior to the effective date of this CET. All sick leave accumulated after the effective date of this CET and remaining unused upon retirement or death shall not be paid.

This payment shall be made pursuant to City policy, which may be amended at the City's discretion.

B. The payments will be made as part of the Employee's Pension Program, or the Employee's Benefit Plan, or through the Finance Department.

C. The City reserves the right, for purposes of retirement payouts, to cap the number of hours a member may accumulate in their sick leave and compensatory time banks or, to the extent allowed by law, cap the amounts of payout from such banks upon retirement.

### 40. VACATIONS

Employees inducted during the course of the fiscal year shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for a least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. Once employees have earned at least sixteen hundred (1600) hours of paid time, exclusive of overtime, and have attained status as employees for at least twelve (12) months, they are entitled to five (5) additional vacation days. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of ten (10) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis. The City reserves the right to make changes to any aspect of vacation, including but not limited to, the number of vacation days/units and selection process.

Employees hired on or after effective date of the CET, shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for a least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of five

(5) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis.

The maximum vacation days earned in a fiscal year shall be as follows: Twenty (20) days for employees with fifteen years of service hired before September 28, 2010; fifteen (15) days for employees with fifteen years of service hired on or after September 28, 2010. Maximum annual accrual amounts at less than fifteen years of service shall be in accordance with the vacation policy promulgated by the Human Resources Department, as amended from time to time, at the sole discretion of the City. The vacation policy will govern all aspects of vacations

**NOTE:** The two-tier system for new hires as referenced in this Article will be implemented when the City's Payroll System has the capability.

## 41. TEMPORARY ASSIGNMENTS

A.   The Employer reserves the right to assign employees to positions outside their classification on a temporary basis.

B.   **OUT-OF-CLASS ASSIGNMENTS**:

   1.   For purposes of this Article, an employee is deemed to be working "out-of-class" if he/she is reassigned by management from his/her regularly assigned duties to perform duties and responsibilities not normally performed and characteristic of and requiring the qualifications of a higher classification. Assignment of some duties normally performed by an absent employee shall not constitute an out-of-class assignment if such duties are appropriate to the classification of the person assigned.

   2.   If an employee is so assigned the duties of a higher classification to replace an absent employee for thirty (30) or more consecutive work days, he/she shall be compensated on an out-of-class basis at the rate for the appropriate classification for all such out-of-class hours worked.

   3.   For out-of-class assignments, the most senior pre-qualified employee shall be offered the out-of-class work provided he/she is readily available and able to do the work. Pre-qualified shall mean being on the most recent promotional list for the class. If there is no pre-qualified employee in the work unit, the out-of-class assignment shall be offered to the most senior person provided he/she is readily available and able to do the work.

   4.   The parties recognize that out-of-class work assignments shall not be used to circumvent established procedures for filling vacant positions by transfer or promotion as provided in this CET, nor shall supervisors avoid out-of-class payment by arbitrarily alternating out-of-class assignments.

C.  **TEMPORARY PLACEMENT OF EMPLOYEES INTO OTHER DUTIES AND/OR DEPARTMENTS**:

   1.  Employees temporarily placed under these provisions shall not lose his or promotional opportunity at the transferred-out location and shall be treated as if he or she had not been temporarily placed in other duties/department.

   2.  Any vacation period the moved employee had approved at the transferred-in location will continue to be honored at the transferred-out location so long as the vacation does not adversely impact operations.

## 42. JURY DUTY

A.  An employee shall be allowed to attend jury duty without pay. An employee may elect to use paid leave for any days he/she serves on Jury Duty. Jury duty time shall not be counted as time worked for the purpose of computing overtime.

B.  In order to use a paid leave day during jury duty, an employee must have been regularly scheduled to work on a non-overtime basis, must give prompt prior notice to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she requests paid leave, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential.

C.  When properly notified by an employee under the terms of Section B, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract.

D.  The employee must notify the department of his/her desire to use paid leave prior to the first date of jury service.

## 43. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

**MEDICAL**

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a hospitalization and medical insurance plan in accordance with the plan design approved by the Employer, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees shall have the same hospitalization and medical insurance plan options and contribution structure as active employees and will also be

In any represented unit where overtime is not equalized, overtime work shall be offered starting with the senior employee. When there are not enough volunteers, overtime assignments shall be made according to inverse seniority. Seniority-based overtime offers shall not be required where an unexpected emergency arises or it is impractical to seek volunteers. Existing super seniority practices for Union stewards who engage in activities defined in Article 14 for purposes of overtime shall be maintained.

In any represented unit where the City currently equalizes overtime, the Department shall determine the equalization scheme and the sole remedy for a violation of the equalization scheme shall be working the next available overtime opportunity and not payment of any back pay. In no circumstance shall employees be paid for time not worked. Departments may discontinue equalization of overtime with prior notice to the union and approval of Labor Relations Director.

In certain cases, Departments, with the written approval of the Labor Relations Director may use the following factors in overtime assignments: experience, work performance, demonstrated abilities and seniority.

B.   **TIME AND ONE-HALF OVERTIME**:

1.   **Employees** – Time and one-half [one-hundred and fifty percent (150%)] will be paid to hourly-rated employees for all hours worked over forty (40) in one (1) service week inclusive of a seventh day or a holiday. Overtime hours worked (not to be credited at premium time) in excess of four (4) hours and not exceeding sixteen (16) hours in one (1) service week may, at the discretion of the Department, be substituted in lieu of an equal amount of an employee's regularly assigned forty (40) hours.

2.   When a schedule indicates a lunch period but conditions make it impractical to enjoy same, the employee or employees involved will be paid the prevailing overtime rate in lieu of his/her lunch period. The provisions of this section shall not apply to employees whose work day is designated on a measured task basis. In no instance shall payments be made for lunch periods not worked.

3.   Premium payments shall not be duplicated for the same hours worked.

4.   The Employer shall not be required to pay any overtime compensation that is not required by the Fair Labor Standards Act or other applicable law.

5.   Except for any contrary provisions above, all of the above shall be in accordance with Chapter 13, Article 2 of the Municipal Code of the City of Detroit and the Michigan Minimum Wage Law.

subject to such changes as may be determined by the Employer. Non-duty disability retirees are not eligible for hospitalization-medical or prescription drug insurance coverage.

## DENTAL

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a dental plan in accordance with the plan design approved by the City, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, dental networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees are not eligible for dental insurance coverage.

## OPTICAL

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a optical plan in accordance with the plan design approved by the City, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, dental networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees are not eligible for optical insurance coverage.

## PRESCRIPTION DRUG

Employees in the bargaining unit shall have the option of participating in the BCBSM/CVS Caremark plan (or any successor health care plan made available to City employees generally); provided, that the City's maximum contribution for any health plan shall be no more than 80% of the plan offered by **BCBSM/CVS** Caremark. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein.

All health habits, reproductive (fertility), and lifestyle prescription drugs EXCEPT FOR SMOKING CESSATION AND WEIGHT LOSS will not be covered under the City's prescription drug program.

## FLEXIBLE SPENDING ACCOUNTS (SECTION 125 PLANS)

The City shall provide health care plan participants with a pre-tax premium or illustrative rate contribution, which ever is applicable. The City will implement Flexible Spending accounts for medical, dependent care and commuter accounts. Eligibility for participation in these Flexible Spending Accounts is consistent with Health Care Plan enrollment eligibility. This plan will permit employees to contribute to these accounts, pre-tax.

**Note:** The two-tier system for new hires referenced in this Article will be implemented when the City's Payroll System has the capability.

## 44. WORKERS' COMPENSATION

All employees shall be covered by the applicable Workers' Compensation laws and the City's Worker's Compensation Policy, as may be amended at the discretion of the Employer. An

**Note:** In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by the CET. Those deductions will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

## 45. DEATH BENEFITS AND LIFE INSURANCE

### A. DEATH BENEFITS:

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 13, Article 8, Section 8, currently provides a death benefit of $10,000.

1.  Membership shall be mandatory for regular employees.

2.  Contributions shall be determined by the City

### B. PAYMENT FOR EMPLOYEES KILLED OR PERMANENTLY DISABLED IN LINE OF DUTY:

1.  A lump sum duty death benefit of $10,000 will be paid to the beneficiaries or estate of employees who are killed or who die as a direct result of injuries sustained in the actual performance of their duties, as determined by City policy which may be amended in the discretion of the City.

2.  Employees who receive a permanent disability payment under this Article shall be ineligible for the $10,000 Duty Death Benefit described above.

## 46. WAGES

**A.** **WAGE DECREASE:** All classifications and positions shall receive a 10% wage reduction, effective the date of implementation of this CET.

**B.** **LONGEVITY:** all longevity payments are hereby eliminated effective the date of this CET.

**C.** **BUDGET REQUIRED FURLOUGHS:** All budget required furloughs are hereby eliminated effective the date of this CET; however, the City reserves the right to reinstitute future furloughs as a means of cost containment.

**D.**   **MERIT & STEP INCREASES:** All employees will no longer be eligible for merit and step increases effective the date of this CET, except that all formal certified apprenticeship programs shall not be affected.

**E.**   **MISCELLANEOUS:**

1.   All salaried employees will have their hourly rate computed by dividing their annual salary by 2080 hours.

2.   Salary and Rate Adjustments:

a.   The pay rates of hourly-rated employees shall be rounded up to the nearest whole cent.

b.   Each employee covered by this CET, whose wages are classified as a yearly salary with minimum and maximum rates more than $20,000 annually, and which rates, as a result of any required change to be made to their wages causes the resulting amounts to fall between even hundred-dollar levels, shall have these rates adjusted to the next higher hundred dollar level.

3.   When it is administratively feasible, the pay check for all employees shall be transmitted via direct deposit or payroll debit card

**F.**   **CORRECTION OF PAYROLL ERRORS:**

Where by payroll error an employee is underpaid or overpaid the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment pursuant to applicable law.

The City reserves the right to seek immediate recovery through appropriate legal proceedings.

## 47.   CLOTHING AND UNIFORM ALLOWANCES

A.   For employees who are required to wear and maintain specific clothing and/or shoes, the clothing allowance shall be $170 every two years.

B.   For employees who are required to furnish a specific uniform at their own expense, the allowance will be $350 every two years.

C.   Clothing and uniform allowances will be paid by the last pay period in September.

D.   This Article shall be administered according to the Resolution of the City Council of May 9, 1974 (J.C.C. p. 1107).

## 48.  RETIREMENT

A.  Eligibility for Service Retirement Allowance – Any employee who is covered by the provisions of this CET and who is a member of the General Retirement System of the City of Detroit who has thirty (30) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty nor more than ninety days, subsequent to the execution and filing of said written application, he/she desires to be retired.  On the date so specified for his/her retirement he/she shall be retired, notwithstanding that pending such period of notification he/she may have separated from City service.  Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code.  Employees may retire on or after July 1, 1992, with 25 years of credited service but less than 30 and receive an actuarially reduced pension which shall be known as the Actuarially Reduced 25 Year Option of the Retirement Plan.  Employees who are receiving a duty or a non-duty disability pension or Income Protection benefits may elect to convert to this new option if they otherwise meet the qualifications.

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.
After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.

Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than ninety (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.

Employees who began receiving Income Protection Benefits after July 1, 1992, may convert to this option anytime after they have had twenty-five (25) years of service with the City.

The above paragraphs notwithstanding, employees hired after January 1, 1996, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age.  This age requirement shall apply to both the Regular Service Retirement with thirty (30) years of service and for pension calculation purposes to the Early Service Retirement (actuarially reduced) with twenty-five (25) or more years of service.

B.  Retirement benefits shall be modified to include an optional coordination of benefits between regular retirement benefits and Social Security benefits for those employees who retire from the City with a regular retirement or the Actuarially Reduced 25 Year Option prior to becoming eligible for Social Security payments.  Such coordination of benefits shall cause an approximate leveling of total monthly benefits derived from both the City's retirement system and Social Security without creating any additional actuarial costs.

C.     For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirement.

D.     For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1986, shall not be factored into the formula for determining their pension benefit until they shall have attained age 62. This provision will not affect the current practice governing disabled employees.

In the event that any law, state or federal is passed during the term of this CTE which permits employees to vest their pension prior to meeting the vesting requirements set forth in this contract, any employee who vests his/her pension in such a manner shall not be eligible for any pension benefits until his/her sixty-second (62nd) birthday.

E.     Employees who become eligible for a pension under the vesting provisions of the plan, shall be ineligible for any of the hospital, medical, optical or dental benefits provided for other retirees, spouses, dependents or beneficiaries.

F.     Subject to the provisions in Section O, employee contributions to the general retirement annuity fund shall be optional. Balances in the fund standing to the individual credit of employees discontinuing contribution shall be maintained with accumulated interest to be paid out to the employee upon separation from the City. Employees qualified under the pension vesting provision of the general retirement system may withdraw their annuity with accumulated interest upon separation.

Upon attainment of twenty-five (25) years of service, an employee shall be eligible to withdraw, one time only prior to retirement, all or part of his/her annuity savings.

Non-Duty and Duty Disability retirees shall be eligible to withdraw, one time only, all or part of their annuity savings.

G.     At the time of retirement, members of the general City pension system may elect an option which shall entitle them to change their pension option from either option 2 or option 3 to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. This shall be known as the Pop-Up Option. The actuarial cost of the change in benefit shall be borne by the member who selects this change in his/her option election.

H.     Employees who retire on or after July 1, 1998, shall have their pensions computed according to the following formula. Using the highest paid 36 consecutive months out of the last 120 including longevity payments, as Average Final Compensation; 1.6% of Average Final Compensation for each year of service for the first 10 years; 1.8% of Average Final Compensation for each year of service for the second 10 years; 2.0% of Average Final Compensation for each year of service greater than 20 years up to 25 years; and 2.2% of Average Final Compensation in excess of 25 years; plus $12 for each year of City service not to exceed $120. In no case shall benefits paid by the Retirement

System exceed ninety percent (90%) of Average Final Compensation except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992. For all years of credited service accrued by Union members after July 1, 2012, the multiplier shall be reduced to 1.5% of Average Final Compensation per year.

I.    Effective for bargaining unit members who retire on or after July 1, 1999, they shall have the Unused Sick Leave On Retirement payment benefit provided for in Article 25 of this CTE.

J.    Effective January 1, 1999, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.

      The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased from $2,400 to $5,700 per annum.

K.    Effective September 28, 2010, any employee covered by this CET, who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner (IME). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City of Detroit, the employee shall not be eligible for the duty disability retirement.

L.    Effective January 1, 1999, minor dependents under age 19 or permanently mentally or physically impaired dependent children who become impaired prior to age 19 of employees who die with 20 years of service without a surviving spouse shall receive a payment of $9,000 per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age 19 or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.

M.    In addition to in-service death pension benefits which already exist for employees with 20 or more years of service, effective July 1, 1998, if a bargaining unit member dies after having attained 15 or more but less than 20 years of creditable service at any age below 60, the surviving spouse will be paid a 50% joint and survivor election. Dependent children, if there is no eligible surviving spouse, are to be paid a total of $6,000 which shall be divided equally amongst all eligible dependents until the youngest child reaches age 19, or for life if a child is permanently physically or mentally impaired.

N.    After the effective date of this CET, employees will no longer receive the 2.25% per annum escalation.

O.    Pension – Employer Contribution (414h Plan):

      Upon notification by the Union to the City of its desire to activate a 414(h) Plan, the City will take steps to implement the provisions contained in the following paragraphs. The Union initiated the discussions and proposed the provisions contained in the paragraphs

and the parties recognize and agree that it will take some time before this program can become operational due to the necessity of making changes in the City's computerized payroll system.

It is hereby agreed that every member of this bargaining unit shall be required to make contributions in the amount of 5% of their annual compensation to the Annuity Savings Fund of the General Retirement System. The said 5% employee contribution to the Retirement system Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

These provisions shall not affect the amount or benefits level of the retirement allowance, or the City of Detroit's obligation thereto.

The City shall not be responsible for any adverse ruling, if any, and monetary penalty, judgment, or damages to the City as a consequence of the City's compliance with the provisions of this CET.

P.      Employees shall have the option of selecting from two additional surviving beneficiary options of 25% and 75%.

Q.      Annuity Contribution Amounts: The City will offer employees who choose to contribute to the annuity plan the option of 3% up to the Social Security maximum salary which would then be increased to 5%, a straight 5%, or a straight 7% contribution.

R.      Members of the bargaining unit shall have the option of belonging to the City's current defined benefit/defined contribution retirement plan or a new defined contribution retirement plan in accordance with the rules the City will issue for a defined contribution plan. The parties agree that the defined contribution plan the Executive Branch will propose for acceptance by the City Council, although not specifically detailed at this time, is intended to be primarily in accordance with the provisions which were last advocated by the Executive Branch in November-December, 1997.

S.      Effective July 1, 2003, the membership of the General Retirement System, Board of Trustees [Article II, Section 2, Subsection (1)] shall be modified to provide that one of the trustees is: "The Mayor of the City or his/her designated representative, ex-officio. Such designated person shall be a full-time appointive or classified City employee."

T.      To the extent that employees in the bargaining unit participate in any supplemental retirement plans other than the General City Retirement System, the City reserves the right to withdraw from such supplemental plans at any time and in accordance with applicable law.

U.  All Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this CET or Ordinance 2-93, J.C.C. Page 133.

V.  **Defined Contribution Plan for Current and New Hires** – The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan for current employees and new hires, which may include a Defined Contribution Retirement health care plan.

W.  Upon the effective date of this CET, all vision and dental benefits shall no longer be provided for any future retires after January 1, 2013.

X.  The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.

## 49. GENERAL RETIREMENT SYSTEM, BOARD COMPOSITION

The membership of the Board of Trustees of the General Retirement System (GRS) shall be changed to consist of 11 trustees as follows:

1.  The Mayor, ex-officio or designee.

2.  The President of the City Council, ex-officio.

3.  The City Treasurer, ex-officio.

4.  The Budget Director, ex-officio.

5.  The Finance Director, ex-officio.

6.  The Human Resources Director, ex-officio.

7.  Three members of the retirement system to be elected by the members of the retirement system, under such rules and regulations as may be from time to time adopted by City Council; except that no more than one trustee shall be from any one department.

8.  The Mayor shall appoint, subject to the approval of City Council, as a trustee, an individual with a background in investment and/or municipal finance.

9.  The Mayor shall appoint, subject to the approval of City Council, a retiree who is receiving benefits under the retirement system.

The City reserves the right to change the composition, structure and decision making procedures of the Pension Board.

Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modifications, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the amendment.

## 50. PRIVATE CAR MILEAGE REIMBURSEMENT

### A. RATES OF PAYMENT:

When an employee covered by this CET is assigned to use his/her automobile to perform his or her job, he or she shall be paid mileage at the current IRS per mile rate, subject to change when that rate changes higher or lower.

### B. DEFINITION OF REIMBURSABLE MILEAGE:

1. Trips from home to headquarters and back home shall not constitute reimbursable mileage.

2. Trips in either direction between home and any officially designated point (when there is no specific headquarters) shall not constitute reimbursable mileage.

3. Trips from headquarters (or from the designated starting point if the employee has no headquarters) to a job, from job to job, and if directed, back to headquarters or starting point, shall constitute reimbursable mileage.

C. In the event of an automobile breakdown during regular working hours, the time, which an employee is allowed for servicing and repairing his automobile is to be determined by departmental policies.

D. When an employee covered by this CET is regularly assigned to a job which requires the use of an automobile during his normal working hours, he/she shall be required to furnish said car.

E. In order to receive mileage reimbursement an employee must actually use an automobile on City business.

F. Employees shall be subject to the City's Private Car Mileage Reimbursement Policy, which may be amended from time to time in the discretion of the City. In case of conflict, the Policy shall take precedence.

## 51. LONG TERM DISABILITY BENEFITS (INCOME PROTECTION PLAN)

Employees shall be eligible for the City's Long Term Disability Benefits ("Income Protection") Plan, to the extent allowed by City policy, which may be amended from time to time at the City's discretion.

## EXHIBIT I

## Health Care Plan Design

| PPO Plan, HAP/BCN plan(s), THC plan | In-Network | Out-of-Network |
|---|---|---|
| Participant Premium Contribution | 20% for all plans | 20% for all plans |
| Plan Deductible | $250/$500 | $500/$1000 |
| Co-insurance % | 20% | 40% |
| Co-insurance maximum (OOP Max) | $1,500/$3,000 | $2,500/$5,000 |
| Office visit | $25 | $25 |
| Urgent care co-pay | $25 | $25 |
| Emergency room | $100 | $100 |
| Hospital co-pay | $100 | $100 |
| | | |
| **Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $10/$35/$50 | $10/$35/$50 |
| Mandatory mail | After 34 days | After 34 days |
| Mandatory generic | Required | Required |
| Traditional generic – step therapy | Required | Required |
| Exclusion of lifestyle drugs | Required | Required |
| | | |
| **Other Changes** | | |
| Participants contribute 20% for dental and vision coverage | | |
| **Vision Plans** | | |
| a. The City will no longer offer the Co-Op Optical plan | | |

The above City Employment Terms were presented on the

**18**th day of **July** 2012

to the AFSCME, Non Supervisory.

Lamont D. Satchel, Director
Labor Relations Division

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Objection of the City of Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2851 Filed by the Coalition of Detroit Unions was filed and served via the Court's electronic case filing and noticing system on this 15th day of May, 2014.

/s/ Heather Lennox