UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,     .     Docket No. 13-53846
        MICHIGAN,           .
                            .     Detroit, Michigan
                            .     May 12, 2014
                Debtor.     .     10:00 a.m.
. . . . . . . . . . . . . . .

HEARING RE. (#4532) LETTER FROM EXPERT WITNESS MARTHA E.M.
   KOPACZ; (#4511) MOTION TO COMPEL WAYNE, MACOMB AND
OAKLAND COUNTY, MICHIGAN TO PRODUCE A PRIVILEGE LOG FILED
   BY OFFICIAL COMMITTEE OF RETIREES, ANY REMAINING
OBJECTIONS TO WRITTEN DISCOVERY (#4202) (#4508); (#4437)
RESPONSE TO DISCOVERY -- OBJECTION TO SUBPOENA FROM THE
   OFFICIAL RETIREE'S COMMITTEE FOR DEBTOR -- FILED BY
INTERESTED PARTY WAYNE COUNTY CORPORATION; (#4537)
EXPEDITED MOTION TO WITHDRAW AS ATTORNEY BY BARBARA A.
   PATEK FOR THE LAW FIRM OF ERMAN, TEICHER, ZUCKER &
FREEDMAN, P.C.; (#4409) MOTION TO COMPEL THE DEBTOR TO
   PROVIDE MORE SPECIFIC DESCRIPTIONS OF THE SUBJECTS
THAT EACH FACT WITNESS WILL ADDRESS FILED BY INTERESTED
   PARTIES SYNCORA CAPITAL ASSURANCE, INC., SYNCORA
GUARANTEE, INC.; (#4565) MOTION TO COMPEL THE PRODUCTION
   OF DOCUMENTS FILED BY INTERESTED PARTIES SYNCORA
CAPITAL ASSURANCE, INC., SYNCORA GUARANTEE, INC.; (#4557)
   MOTION TO COMPEL RESPONSES TO SYNCORA'S FIRST SET OF
   INTERROGATORIES TO THE CITY OF DETROIT (DOC NO.
4036) MOTION TO COMPEL RESPONSES TO INTERROGATORIES
        FILED BY INTERESTED PARTIES SYNCORA CAPITAL
ASSURANCE, INC., SYNCORA GUARANTEE, INC.; (#4580) MOTION
TO COMPEL FULL CLAWBACK OF DEBTOR'S DOCUMENT PRODUCTION
   AND RELATED RELIEF FILED BY CREDITOR ASSURED
        GUARANTY MUNICIPAL CORP.
   BEFORE THE HONORABLE STEVEN W. RHODES
   UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:     Jones Day
                    By:  HEATHER LENNOX
                    222 East 41st Street
                    New York, NY  10017
                    (212) 326-3837

APPEARANCES (continued):

```
                         Jones Day
                         By:  GEOFFREY IRWIN
                              GEOFFREY STEWART
                         51 Louisiana Avenue, N.W.
                         Washington, D.C.  20001-2113
                         (202) 879-3768

                         Pepper Hamilton, LLP
                         By:  ROBERT S. HERTZBERG
                         4000 Town Center, Suite 1800
                         Southfield, MI  48075-1505
                         (248) 359-7333
```

For the Detroit       Erman, Teicher, Zucker &
Fire Fighters            Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police        400 Galleria Officentre, Suite 444
Officers Associa-     Southfield, MI 48034
tion and the          (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For Erste             Ballard Spahr, LLP
Europaische           By:  VINCENT J. MARRIOTT, III
Pfandbrief-und        1735 Market Street, 51st Floor
Kommunalkreditbank    Philadelphia, PA  19103-7599
Aktiengesellschaft    (215) 864-8236
in Luxemburg, S.A.:

For National Public   Sidley Austin, LLP
Finance Guarantee     By:  GUY NEAL
Corp.:                1501 K Street, NW
                      Washington, D.C.  20005
                      (202) 736-8041

For Assured           Chadbourne & Parke, LLP
Guaranty Municipal    By:  ROBERT SCHWINGER
Corp.:                30 Rockefeller Plaza
                      New York, NY  10112
                      (212) 408-5364

For Financial         Weil, Gotshal & Manges, LLP
Guaranty Insurance    By:  ALFREDO R. PEREZ
Company:              700 Louisiana Avenue, Suite 1600
                      Houston, TX  77002
                      (713) 546-5040

APPEARANCES (continued):

```
For Ambac                Arent Fox, LLP
Assurance Corp.:         By:  MARK ANGELOV
                         1675 Broadway
                         New York, NY  10019
                         (212) 457-5491

For the Official         Dentons, LLP
Committee of             By:  CLAUDE MONTGOMERY
Retirees:                1221 Avenue of the Americas, 25th Floor
                         New York, NY  10020-1089
                         (212) 632-8390

For County of            Dechert, LLP
Macomb, Michigan:        By:  ALLAN S. BRILLIANT
                              DEBRA O'GORMAN
                         1095 Avenue of the Americas
                         New York, NY  10036
                         (212) 698-3600

For County of            Young and Associates
Oakland, Michigan:       By:  JAYE QUADROZZI
                         27725 Stansbury Blvd., Suite 125
                         Farmington Hills, MI  48334
                         (248) 353-8620

For County of            Butzel Long, PC
Wayne, Michigan:         By:  MAX J. NEWMAN
                         Stoneridge West
                         41000 Woodward Avenue
                         Bloomfield Hills, MI  48304
                         (248) 258-2907

For International        International Union, UAW
Union:                   By:  MICHAEL NICHOLSON
                         8000 East Jefferson Ave.
                         Detroit, MI  48214
                         (313) 926-5216

For UAW:                 Cohen, Weiss & Simon, LLP
                         By:  BABETTE A. CECCOTTI
                         330 West 42nd Street
                         New York, NY  10036-6976
                         (212) 356-0227

For Detroit              Clark Hill, PLC
Retirement               By:  JENNIFER GREEN
Systems:                 500 Woodward Ave., Suite 3500
                         Detroit, MI  48226
                         (313) 965-8300
```

APPEARANCES (continued):

For U.S. Bank as          Waller Lansden Dortch & Davis, LLP
Trustee for Water         By:  PAUL DAVIDSON
and Sewer Bonds:          Nashville City Center
                          511 Union Street, Suite 2700
                          Nashville, TN  37219
                          (615) 850-8942

For Ad Hoc Water          Kramer Levin Naftalis & Frankel, LLP
and Sewer                 By:  CRAIG SIEGAL
Bondholders:              1177 Avenue of the Americas
                          New York, NY  10036
                          (212) 715-9432

For Berkshire             Garan Lucow Miller, PC
Hathaway Assurance        By:  THOMAS P. CHRISTY
Corporation:              1111 West Long Lake Road, Suite 300
                          Troy, MI  48098
                          (248) 641-7600

For Ad Hoc COPs           Allard and Fish
Holders:                  By:  DEBORAH FISH
                          2600 Buhl Building
                          535 Griswold
                          Detroit, MI  48226
                          (313) 961-6141

For Deutsche Bank:        Katten Muchin Rosenman, LLP
                          By:  JOHN RAMIREZ
                          575 Madison Avenue
                          New York, NY  10022
                          (212) 940-6435

For Syncora               Kirkland & Ellis, LLP
Holdings, Ltd.,           By:  STEPHEN HACKNEY
Syncora Guarantee              WILLIAM ARNAULT
Inc., and Syncora         300 North LaSalle
Capital Assurance,        Chicago, IL  60654
Inc.:                     (312) 862-2157

```
Court Recorder:       Kristel Trionfi
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning.  We have a number of

4  matters on our docket for today.  Let me tell you what the

5  order of them will be.  We will start with the motion to

6  withdraw and then move to Ms. Kopacz's letter and then the

7  motion to compel the clawback and then the motion to compel

8  the counties to provide a privilege log and then the three

9  Syncora motions to provide more specific description of

10  witnesses' subjects, to compel the production of documents

11  and to compel responses to interrogatories and then

12  everything else.  Okay.  The motion to withdraw.

13    MS. PATEK:  Good morning, your Honor.  Barbara

14  Patek, Erman, Teicher, Zucker & Freedman.  As the Court is

15  aware, throughout these proceedings Erman Teicher has

16  represented the four Detroit public safety unions, the

17  Detroit Police Command Officers Association, the Detroit

18  Police Lieutenants and Sergeants Association, the Detroit

19  Police Officers Association, and the Detroit Fire Fighters

20  Association.  As a result of the exhaustive efforts that took

21  place in mediation, two of the four public safety unions have

22  reached a resolution of their main economic issues with the

23  city and will be supporting the plan of adjustment.  The

24  Detroit Police Officers Association and the Detroit Fire

25  Fighters Association have not been able to reach agreement

1   with the city.  As a result, we find ourselves in a situation

2   where we have clients who going forward are going to be in

3   directly adverse positions, and we have obtained the consent

4   of all clients, their representatives in the courtroom of all

5   the clients, and we are seeking an order allowing us to

6   continue representing the two objecting public safety unions.

7           THE COURT:  All right.  Thank you.  Is there anyone

8   who'd like to say anything about this matter?  The Court

9   concludes that the record does establish cause for the relief

10  sought.  The motion is granted.  You may submit an order, and

11  the Court will waive further presentment.

12          MS. PATEK:  Thank you, your Honor.

13          THE COURT:  All right.  Stand by one moment, please.

14  All right.  Let's turn our attention then to Ms. Kopacz's

15  letter.

16          MS. KOPACZ:  Good morning, Judge.  I sent you a

17  letter last week asking for clarification of the

18  confidentiality provision that is part of the order

19  appointing me as well as a request to hire counsel for

20  limited purposes.  I tried to provide you some examples in

21  the letter of questions that are being raised by parties

22  which, again, I want to be real clear.  I'm not complaining.

23  I understand that people are concerned that if they give me

24  information, other people may have access to it.  Parties are

25  concerned if they provide me information that has never been

1    provided to another party, that somehow they're waiving

2    privilege.  There's also been a request to participate in

3    interviews that I conduct on some basis, so really just here

4    asking for some guidance and some help.

5          THE COURT:  Okay.  Thank you for your letter.  I

6    want to try to get this resolved as promptly as possible, and

7    I seek the input of counsel here, too.  I think we want to

8    balance the interests of all concerned in this matter with my

9    interest and I assume the city's interest in having

10   Ms. Kopacz do her work as efficiently as possible.  Frankly,

11   in my order, when I referred to confidentiality, I obviously

12   was not clear enough, but what I had in mind was little more

13   than not talking with anyone not directly associated with the

14   case about the case or about your work, so, for example,

15   media or other strangers to the case.  I had little more in

16   mind than just that.

17         In terms of the confidentiality of the information

18   you gather vis-a-vis other parties in the case, what I

19   foresaw was that all such information that you had gathered

20   during your investigation would either be a part of your

21   report or a part of the attachments to your report where you

22   reflected in your log what communications you had had with

23   various people who had provided you with information and some

24   description of what that information was, so I don't know.

25   Does that help to limit the conversation to any extent?

 1          MS. KOPACZ:  No.  I'm sorry.  No.  It really goes to

 2     the information that I am trying to gather.  Okay.  So, for

 3     example, there are creditor constituencies whose financial

 4     advisors I have met with, talked with, who have information

 5     from their work, their analyses, that I believe would be very

 6     helpful to my task.

 7          THE COURT:  Um-hmm.

 8          MS. KOPACZ:  And while those parties have not said

 9     they're unwilling to provide me with their financial

10     advisors' work product, they are concerned that if they

11     provide it to me that it then becomes available to others.

12     There's also a concern some parties have raised if they give

13     me information that they have never given anyone else that

14     they would waive privilege to that.  And, again, I don't

15     know.

16          THE COURT:  What kind of privilege is that?

17          MS. KOPACZ:  I have no idea.

18          THE COURT:  You don't know.

19          MS. KOPACZ:  I would -- maybe some of the attorneys

20     are willing to speak to their concerns.

21          THE COURT:  Okay.  Anyone want to address this?

22          MR. HACKNEY:  Your Honor, good morning.  Stephen

23     Hackney on behalf of Syncora.  I guess what I would say

24     briefly is that I actually think this first question is

25     relatively simply solved by reference to the federal rules

1  because I think Ms. Kopacz is required to produce all the

2  facts and data that she considered --

3        THE COURT:  Um-hmm.

4        MR. HACKNEY:  -- so I don't think there's any choice

5  around that, and I think that given that rule, what I think

6  we want creditors to know is that if you give her something,

7  you should expect that it will be produced either because she

8  does so voluntarily or because it's often customary to

9  subpoena the expert anyway to the extent they have documents

10  not attached, so I actually view that as an --

11        THE COURT:  Yeah.

12        MS. KOPACZ:  -- unfortunate fact of the way the

13  federal rules work, but --

14        THE COURT:  I'm inclined to agree with that.  Does

15  anyone disagree with that?

16        MR. MARRIOTT:  Good morning, your Honor.  Vince

17  Marriott, Ballard Spahr, EEPK.  No, I don't, which is sort of

18  what raises the issue insofar as materials prepared by our

19  experts would be subject to a privilege either as work

20  product or in the form of materials prepared by consulting

21  experts rather than testifying experts which would otherwise

22  not be discoverable becomes discoverable the minute we give

23  it to Ms. Kopacz, and that's the --

24        THE COURT:  Right.

25        MR. MARRIOTT:  That's the nub of the issue.

1          THE COURT:  Right.  So I think the answer here,

2    Ms. Kopacz, is that anything that anyone gives you is subject

3    to eventual disclosure, and you cannot assure anyone

4    otherwise.

5          MS. KOPACZ:  Okay.

6          THE COURT:  If someone is concerned about whether

7    information that you are asking for should be given to you on

8    this ground, I suppose your response to them should be to

9    consult with whoever hired them or whoever they feel

10   comfortable consulting with to determine whether the

11   information is privileged and should be subject to

12   nondisclosure to you.

13         MS. KOPACZ:  Okay.  So that will limit what I am

14   available to review and look at.

15         THE COURT:  It will.

16         MS. KOPACZ:  Yeah.  Okay.  And I will just --

17         THE COURT:  And I ask you and I urge you to keep

18   track of information requests that you make that are denied

19   on --

20         MS. KOPACZ:  Right.  I have --

21         THE COURT:  -- the grounds that whoever wants to

22   keep it confidential has elected to do so.

23         MS. KOPACZ:  I have the situation now with the city

24   where members of my team who are working diligently with

25   Ernst & Young and Conway MacKenzie on understanding the

1    models, the projections, how they've changed over time and

2    the inputs to that.  Any information that has not been

3    provided to the parties already is being withheld from us,

4    so, you know, again, there's nothing I can do other than

5    simply say that I've asked for -- you know, perfect example

6    is I've asked for the economics behind the settlement with

7    the unions to really understand how the -- how those costs

8    are going to be incorporated over time and what the cost of

9    that is going to be.  That has not been provided to anyone.

10   It does exist, but I don't have it, so, again, I don't know

11   what else I do at this point other than, you know, use the

12   information that people are willing to give me.  Is there any

13   way I can --

14          THE COURT:  Well, hold on.

15          MS. KOPACZ:  Okay.

16          THE COURT:  Hold on that judgment for a moment.  Is

17   there someone here from the city who'd like to defend that

18   position?  And before you do so -- oh, I'll let you put your

19   name on the record.

20          MS. LENNOX:  Thank you, Judge.  Heather Lennox of

21   Jones Day on behalf of the city.

22          THE COURT:  I'm disappointed to have to remind you

23   that the city has the burden of proving the feasibility of

24   the plan and that it strikes me, at least, that any and all

25   information that goes to the issue of feasibility is

1   discoverable not only by my own witness but by everybody.

2          MS. LENNOX:  Yes, Judge.  Let me clarify.

3          THE COURT:  And one more thing.  I said to Jones Day

4   before, and I'm disappointed that I have to repeat it, the

5   fact that something is subject to a privilege doesn't mean

6   you have to claim it.

7          MS. LENNOX:  Understood, your Honor.

8          THE COURT:  It could very well be in your client's

9   best interest on an issue as to which the city bears the

10  burden of proof not to claim privilege as to something which

11  could be claimed privilege.

12         MS. LENNOX:  Or, your Honor, there is another way to

13  work around it, which we have proposed on this particular

14  item to Ms. Kopacz, where there are some information that was

15  subject to mediation privilege.  We have decided to go and

16  prepare a comprehensive comparison that Ms. Kopacz has asked

17  for instead of giving her piecemeal and incomplete data.  We

18  are preparing a comprehensive piece of data to give to her to

19  comply with the requests she has for these kinds of

20  comparisons, so we have been, I think, extraordinarily open

21  with Ms. Kopacz, and we do want her to have full access to

22  information so she can prepare a fair report.  We are

23  absolutely in accord with that.  And where we are running

24  into certain either incomplete information -- we are

25  endeavoring to work around it and prepare her another form of

 1    the information that she needs, and we are, indeed, working

 2    on this very item right now.

 3         THE COURT:  With the understanding that eventually

 4    it will be disclosed to the Court and the other parties.

 5         MS. LENNOX:  Understood, your Honor.

 6         THE COURT:  All right.  Ms. Kopacz, I'm not sure

 7    that we can make any more progress on this at this time.  I'm

 8    willing to accept Ms. Lennox's representation --

 9         MS. KOPACZ:  Okay.  That's fine.

10         THE COURT:  -- that they want you to have all the

11    information that you need, and I would encourage you to be

12    patient with them as they develop that for you, not too

13    patient because the clock is ticking, and that if you do run

14    into a situation where you find that there is information

15    that you need that has not been produced or the production is

16    refused to write me another letter.

17         MS. KOPACZ:  Okay.  I will.  I will do that.

18         THE COURT:  All right.  Any other questions apart

19    from the attorney question?

20         MS. KOPACZ:  The other question had to do with

21    attorney participation in interviews.

22         THE COURT:  Um-hmm.

23         MS. KOPACZ:  I'm not opposed to that.  I just didn't

24    know, you know, what the boundaries were for that or

25    whatever, so --

1          THE COURT:  Um-hmm, um-hmm.  Let's ask counsel their

2   views on this question.

3          MS. KOPACZ:  Okay.

4          MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper

5   Hamilton.  We want to participate in the form of just

6   watching, listening, and taking notes.  We do not want to

7   actively participate in questions or interact with the expert

8   during this process.  We think if our witnesses are present,

9   we should be able to have a representative of Jones Day or

10  Pepper there just to take notes.  That's all we want to do.

11         THE COURT:  So this is a request that applies to the

12  individuals on your witness list, not everybody else?

13         MR. HERTZBERG:  Correct.

14         THE COURT:  Okay.  And, Ms. Kopacz, you say you

15  don't oppose that?

16         MS. KOPACZ:  I don't oppose it at all because it

17  won't affect the questions I ask.  It won't affect what I'm

18  seeking to find from these --

19         THE COURT:  Okay.

20         MS. KOPACZ:  -- individuals.  I don't know if it

21  will affect the individuals obviously in how they interact

22  with me, but so be it.  And then the only other thing that I

23  did want to clarify -- and I do have agreement with the city,

24  but I wanted you to be aware of it.  In the ongoing day-to-

25  day work that's going on between my team and people at the

1  city, counsel for the city has said they don't need to

2  participate in those working sessions, so --

3           THE COURT:  Right.

4           MS. KOPACZ:  And I think, again, it's more just an

5  efficiency concern on my part as my team --

6           THE COURT:  Right.  Well, so what Mr. Hertzberg said

7  was they only want to be present when you talk to the people

8  on their witness list.

9           MS. KOPACZ:  Talk to the witnesses on their list;

10  right.

11           THE COURT:  And, Mr. Hertzberg, I hope counsel will

12  be available so that Ms. Kopacz's efficiency in doing those

13  discussions and interviews will not be impaired.

14           MR. HERTZBERG:  Yes.  We have someone scheduled to

15  participate in that process.

16           MS. KOPACZ:  Yeah.

17           MR. HERTZBERG:  It will not be an issue.

18           MS. KOPACZ:  Yeah.

19           THE COURT:  Okay.

20           MS. KOPACZ:  So --

21           THE COURT:  Anyone else want to be heard on this?

22           MR. HACKNEY:  Your Honor, Stephen Hackney on behalf

23  of Syncora.  Sort of an unprecedented situation here, but

24  what we were wondering was just to prevent there from being

25  sort of an asymmetry between who knows what about these

1   interviews, could there be creditor representatives, so

2   rather than having 20 people in the interview, can there be a

3   DWSD --

4           THE COURT:  For what purpose?

5           MR. HACKNEY:  For understanding what information is

6   being conveyed to Ms. Kopacz.  You can ask about it after in

7   a deposition, but remember the city will be there taking it

8   live, and it's often difficult for people to remember in

9   depositions later what was discussed in interviews that

10  happened over a period of time, so --

11          THE COURT:  Sir.  I'll get back to you, Mr.

12  Hertzberg.  Let me guess.  You join in the request.

13          MR. NEAL:  No.

14          THE COURT:  No?

15          MR. NEAL:  No.

16          THE COURT:  Object to the request.

17          MR. NEAL  I stand neutral.  Your Honor, Guy Neal,

18  Sidley Austin, for National Public Finance Guarantee.  I just

19  simply rose to echo what Mr. Hertzberg said and to give you a

20  concrete example.  Ms. Kopacz will be meeting with our

21  consulting experts tomorrow, and I plan to join in that

22  meeting --

23          THE COURT:  Um-hmm.

24          MR. NEAL:  -- along the same lines that Mr.

25  Hertzberg said, just simply be there.

1           THE COURT:  Okay.

2           MR. NEAL:  This consultant is not a testifying

3   witness.  That's the only clarification I rise to make clear.

4           THE COURT:  Okay.

5           MR. NEAL:  But I will simply be there as an observer

6   largely to protect the privilege.

7           THE COURT:  Okay.

8           MR. NEAL:  And is that okay with you, Ms. Kopacz?

9           MS. KOPACZ:  Absolutely.

10          MR. HERTZBERG:  Your Honor, we're not looking to sit

11  in when the other witnesses are interviewed.  We have no

12  desire to.  For example, if Syncora witnesses are being

13  interviewed, we have no desire to sit there.  I think it

14  would be -- it should be the same with our witnesses.  We

15  just want to observe what our witnesses are saying so when we

16  prepare them for trial we know what has gone on.

17          THE COURT:  Yeah.  It strikes me that the interests

18  of parties other than the party whose witnesses or employees

19  are being interviewed can be and are being adequately

20  protected by the normal discovery and trial process, so I'll

21  limit the participation or attendance of lawyers in

22  Ms. Kopacz's interviews to lawyers for the entity that has

23  either employed the witness who she's interviewing or are

24  employees of the party who the attorney represents.

25          MR. HERTZBERG:  Your Honor, I'd like to just clarify

1  one thing based upon the statement you made.  There are

2  witnesses that we've put on our witness list that we haven't,

3  quote, employed or are not employees of the city, but they're

4  listed witnesses.

5          THE COURT:  Yeah.  If they're on your witness list,

6  you can be there.

7          MR. HERTZBERG:  Okay.  Thank you.

8          THE COURT:  And the same with other parties' witness

9  lists.  Okay.  Any other questions before we get to the

10  attorney question?

11         MS. KOPACZ:  Yes.  There are many people that I have

12  already interviewed both in terms of the city's side and in

13  terms of the creditors' side.  Those are clearly all on my

14  contact log.

15         THE COURT:  Um-hmm.

16         MS. KOPACZ:  I don't really need to go back and redo

17  those to have somebody participate?  Okay.

18         THE COURT:  No.

19         MS. KOPACZ:  Okay.

20         THE COURT:  What's done is done.

21         MS. KOPACZ:  Thank you.

22         THE COURT:  The attorney question?

23         MS. KOPACZ:  Yes, please.

24         THE COURT:  Okay.  So tell me why you think you need

25  an attorney because I need to be convinced.

1          MS. KOPACZ:  You need to be convinced.  I don't

2     believe this will be the last of these sorts of questions

3     and, again, either concerns that the city has, concerns the

4     creditors have --

5          THE COURT:  This is your polite way of saying we

6     have a contentious case.

7          MS. KOPACZ:  Yes.  Okay.  And while I do believe

8     that at this stage everybody does believe it's probably in

9     their best interest to help me as much as they can, right, I

10    am -- I have spent, to my way of thinking, too much time

11    addressing these issues when I'm really not qualified to

12    address them.  We're here now today, and I think that's good,

13    and we're getting better clarity.  I think it would be

14    helpful to me if I had someone who could speak to lawyers

15    with the same, you know, understanding, knowledge of what the

16    rules are, how this works.  I think we could have ironed much

17    of this out without having to come before you if I had had

18    counsel, but I was just -- I was floundering.

19         The other thing that does concern me is when it

20    comes time for my deposition, I have -- I am not concerned

21    about my own testimony.  I'm not concerned about my report.

22    I have no legal conclusions to reach as part of my job.  With

23    that said, I do believe that as part of the deposition, part

24    of my testimony in court, you'll protect me when I'm here.

25    When I'm in the consolidated deposition, my sense is that,

1   you know, attorneys will try to make me their witness or try
2   to not make me their witness, and just knowing what the
3   boundaries are of what I should say and not say, I'm just --
4   I'm concerned.
5          THE COURT:  Of course, at your deposition I'm only a
6   phone call away.
7          MS. KOPACZ:  Yes, I would guess, but I can't talk to
8   you, remember?
9          THE COURT:  Well, no.  In that context --
10         MS. KOPACZ:  I can?
11         THE COURT:  -- I would permit that, absolutely.  If
12  you have a question about whether you should answer a
13  question or not answer a question or if parties object and
14  you're not comfortable answering a question until an
15  objection is resolved --
16         MS. KOPACZ:  Yeah.  You know, I have -- I'm already
17  developing my own list of questions as to -- I've collected a
18  lot of data, and we're continuing to collect a lot of data.
19  And I have asked people to give me information that they
20  think might help me.  Okay.  Whether or not it becomes
21  information that I deem helpful, whether it becomes stuff
22  that I include in my report or not, I don't really know.  And
23  to be honest with you, I don't know what I do from a
24  production perspective about all that sort of stuff once I
25  put my report together and whatever, so --

1    THE COURT:  Um-hmm.  Well, I've already imposed your

2  fees and expenses on the city, so let me ask the city if it

3  has a position on whether it would be willing to pay the

4  expenses of an attorney for Ms. Kopacz given the limited

5  purposes for which she seeks counsel.

6    MS. LENNOX:  Your Honor, again, for the purpose of

7  facilitating this process, which we believe is a very helpful

8  one to the Court and to the parties, the city would be

9  willing to do that as long as they are limited -- very

10  limited, as your Honor would direct.

11    THE COURT:  All right.  All right.  You have my

12  authorization and the city's to hire counsel with the

13  understanding that their participation will be as limited as

14  you have described and with the further understanding that I

15  am still here to answer your questions and help facilitate

16  your work.

17    MS. KOPACZ:  Thank you, and I really appreciate

18  that.  And thank you.  I appreciate it.  We're rolling.

19    THE COURT:  Okay.

20    MS. KOPACZ:  All right.

21    THE COURT:  I'll prepare an appropriate order.

22    MS. KOPACZ:  Thank you.

23    THE COURT:  Okay.  Let's turn our attention to the

24  motion to compel full clawback of debtor's document

25  production.

1          MR. SCHWINGER:  Good morning, your Honor.

2          THE COURT:  Sir.

3          MR. SCHWINGER:  Robert Schwinger from Chadbourne &

4  Parke for Assured Guaranty.  The city produced documents, I

5  guess, on Tuesday night by FedEx'ing out to various parties a

6  hard drive with its document production.  People got them on

7  Wednesday and started to load them and look at them.  By

8  Thursday morning, at least at the earliest that we're aware

9  of, the city was contacted by one of the parties to say that

10  they had discovered they were mediation-related documents

11  that were covered by the mediation privilege and order in the

12  production.  The city --

13          THE COURT:  And did you get this production as well?

14          MR. SCHWINGER:  We did.  Apparently all the parties

15  got the exact same production.  We understand that the city

16  responded with an e-mail.  One of the attorneys sent back an

17  e-mail saying, "Yes, we know there are problems with the --

18  with including some of these documents in the production.

19  We're going to do a clawback."  We then -- I personally sent

20  the city a response, and I said, "Look, don't start clawing

21  back individual documents to put a spotlight on what's in

22  there," because, you know, you can't unring a bell when

23  people see it and then people say, well, if I see one

24  mediation-related document, they'll start looking for what

25  else might be in there.  I said, "Look, you know, it's early

1   on.  We just got the disks yesterday.  Just claw back

2   everything, clean up the production, and send -- you know,

3   and send out the new disk and be done with it," and the city

4   did not do that.  Instead they sent out a clawback letter

5   listing a number of the -- of more documents that were

6   subject to mediation privilege issues for clawback.  This

7   letter, however, still did not capture everything that needed

8   to be captured.  On Friday we notified the city again that

9   there were documents that were missing, and I got a response

10  back saying, "Oh, yes, we know.  We're doing a thorough

11  review.  We have lots more documents to add," and so on, but

12  even still, so far as I know, unless something has come in in

13  the last hour or so on my Blackberry that I haven't yet seen,

14  that further letter has not yet come out, and this is

15  obviously disturbing on a number of levels.  One is that, you

16  know, just to introduce a little reality, you know, what the

17  parties got, your Honor, simply is this, this little, you

18  know, hard drive.  That's all it is.  We didn't get cartons

19  of documents.  It would have been the simplest thing in the

20  world for the city to just say, "Look, everyone, send them

21  back.  Delete what you loaded up on your computers -- and you

22  couldn't have processed much in the time you've had it -- and

23  we'll get out a clean version and be done with it."  Instead,

24  the city put a spotlight on all the documents.  The parties

25  have now had them for closing in on, what, six full days to

1    rummage through them and to find these documents if not even

2    on purpose but by accident, and these are mediation-related

3    documents that are not just related to my particular clients.

4    You know, we saw that they were documents relating to issues

5    of UTGO, COPs, swaps, pensions, retirees, OPEB.  Obviously we

6    don't have to belabor for the Court, you know, the

7    confidentiality is the linchpin around whether the mediation

8    process works.  And the issue here, of course, is that for

9    certain parties such as the bond insurers like my clients

10   there are issues here that may go beyond this case.  This may

11   not be the last municipal bankruptcy that is heard in

12   America, and these kind of issues are of grave concern to us.

13   I don't know what the status is of all the other mediations

14   that are out there and if they affect them, but there's

15   certainly a decent potential for a lot of things to be

16   disturbingly tainted by this.  And the city, it seems to me,

17   has sort of -- I don't know if I would -- they did not take

18   the simplest and obvious way to nip this thing in the bud,

19   and instead they essentially have let it fester, and it's

20   still continuing to fester through this morning.  What we

21   would ask is that the city claw back the entire production,

22   get those things straightened out, and then reproduce it.  A

23   helpful suggestion was made that the city should, to the

24   extent that they are reproducing, keep all the Bates numbers

25   lined up so whatever work product people have done on the

1  existing documents they don't have to lose that way, and

2  that's fine.  You could replace them with blank pages or

3  something.  But we need to get this thing taken care of now

4  and immediately.  This issue may also be affected by issues

5  which I think we'll get to later in the day about sort of

6  more general issues with the city's production, so in terms

7  of the impact this may have on the forward motion of the

8  case, it may have to be considered in light of what the Court

9  hears and decides with respect to those issues, so I just

10  wanted to mention that as part of the process.

11       The last thing I'll mention is this.  I mean

12  obviously clawback is a well-known remedy when things get

13  produced that shouldn't be produced, but there's something

14  very important that's different here.  If I'm doing my own

15  document production and I inadvertently let out an attorney-

16  client privileged document, it's my error, and if clawback is

17  a less than hundred percent perfect remedy, well, the person

18  that made the error has to bear the burden of that, but here

19  the city's error on this thing doesn't -- it may affect the

20  city, but it also affects many other parties who had no role

21  in the process of not being diligent enough to make sure this

22  material didn't get out, and so there's a mismatch, I think,

23  and that my have something to do with the city's degree of

24  attention and alacrity in dealing with this issue because the

25  people who bear the burden of what happens here are not the

1  ones who are really in a position to clean it up or to have

2  prevented it in the first place.  So we would ask that the

3  city be directed to swoop everything back up, get this

4  cleaned up once and for all, get it certified, have all the

5  parties certify in writing that they have destroyed all

6  copies they have of what was sent out up to date, and we get

7  this issue taken off the table once and for all.

8          THE COURT:  Thank you, sir.

9          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin

10  from Jones Day for the city.  The city deeply regrets that

11  these mistakes were made.  I hate having to be here and have

12  this conversation with the Court.  I would, however, like to

13  make the representation that these were not intentional.

14  They happened in connection with a very large document

15  production that took place over a very compressed period of

16  time.

17          THE COURT:  How did it happen?

18          MR. IRWIN:  It happened with reviewer error.  There

19  are people --

20          THE COURT:  What does that mean?

21          MR. IRWIN:  We have document reviewers who have

22  eyeballs on every one of the documents that goes out the

23  door.  We started with a collection -- and I'm sure we'll

24  have reason to talk about this later this morning as to why

25  it was so large.  We collected almost 1.2 million documents

1 | to review in response to this.

2 | THE COURT:  Were these people instructed to exclude
3 | mediation confidential documents?

4 | MR. IRWIN:  Absolutely, and the system worked.  We
5 | were able to screen and protect against production --

6 | THE COURT:  It sort of worked.

7 | MR. IRWIN:  -- of multiples of more documents.

8 | THE COURT:  It sort of worked.

9 | MR. IRWIN:  I agree.  I'm sorry.  Your Honor, I
10 | apologize.  It worked when it was executed by the people
11 | who --

12 | THE COURT:  It worked when it worked.

13 | MR. IRWIN:  -- we relied upon.  It worked when it
14 | worked.  Fair enough.  We had -- there were obviously
15 | documents that made it through the system, and there were
16 | people who missed --

17 | THE COURT:  How many?

18 | MR. IRWIN:  So we now believe -- and the reason --
19 | one of the reasons we haven't, you know, put the order out,
20 | we wanted to see how the Court wanted to deal with it this
21 | morning.  We wanted to be sure.  We wanted to be right.  So
22 | we've been working this issue very hard since Thursday.  We
23 | think, based on the information that's available to me, it's
24 | about 120 documents.  Now, I recognize that's a --

25 | THE COURT:  Do you have any objection to the relief

1    that's sought here today?

2            MR. IRWIN:  I don't want to slow down the schedule.

3    The city's concern is that the time it will take to reproduce

4    the documents, which we can do, and --

5            THE COURT:  You haven't done it already?

6            MR. IRWIN:  We have not reproduced the entire file.

7    We needed to know what the documents were.  We needed to know

8    what documents --

9            THE COURT:  But you already told me you know those.

10   It's 120.

11           MR. IRWIN:  Yes, as of late last night.  I now know

12   what the universe of documents is.

13           THE COURT:  How long does it take to produce a new

14   hard drive?

15           MR. IRWIN:  Probably takes two or three days to do

16   this I'm told.

17           THE COURT:  How many hard drives do you need to send

18   out?

19           MR. IRWIN:  There are two dozen or so parties who

20   have propounded discovery on the city.

21           THE COURT:  It takes two days to produce two dozen

22   hard drives?

23           MR. IRWIN:  To go into the system, yes.  I'm told

24   the electronic vendor that we use, to go into the system and

25   manually remove the documents that we have now identified as

1  of last night will probably take a day or two, and then we

2  need to produce the hard drives, so it will just take --

3  it'll take a couple days.

4          THE COURT:  And your concern about that is what?

5          MR. IRWIN:  My concern about -- I don't have a

6  concern about that, and the city is willing to do that.  My

7  concern is --

8          THE COURT:  Well, let me just ask again what -- do

9  you object to the relief that's sought here today?

10          MR. IRWIN:  I don't object to reproducing the

11  documents.  What I object to is the notion that everyone who

12  has the hard drives that were produced last week has to stand

13  down and destroy those and destroy any searches that they've

14  run against those materials because I predict people will

15  then say because we didn't get the new hard drives and

16  because we had to start over on Wednesday or Thursday or

17  Friday of this week, they will say the schedule now needs to

18  change in the following ways that I can't predict, and my

19  suggestion is simply that we are willing to reproduce the

20  hard drives, but it shouldn't impact parties' ability to

21  use -- to run their searches and use the disks that they have

22  right now and abide by the new clawback letter that I am

23  perfectly prepared to put out later today now that I know the

24  universe of documents, but we will do as the Court instructs.

25          THE COURT:  If parties have to reproduce work

 1    because of a violation of this Court's mediation order,

 2    mediation confidentiality order, shouldn't the city be

 3    responsible for that?

 4          MR. IRWIN:  Responsible in which way, your Honor?

 5          THE COURT:  Economically.

 6          MR. IRWIN:  You mean to pay for the hard drives that

 7    go out?

 8          THE COURT:  No.  If parties have to reproduce work,

 9    redo work as a direct result of the city's violation of the

10    mediation confidentiality order, shouldn't the city be

11    responsible for the cost of that?

12          MR. IRWIN:  I think that's what I'm trying to say is

13    that my proposal is and the city's position is they should

14    not have to redo work.  They should be able to rely on the

15    data and the documents that were released in connection with

16    the first --

17          THE COURT:  Well, but that does nothing to reverse

18    the violation of the confidentiality that occurred.  You're

19    leaving the confidential documents in the hands of people who

20    shouldn't have them.

21          MR. IRWIN:  Fair, your Honor.  I understand that.  I

22    would also -- there are, again, over a hundred documents that

23    we're talking about.  I have had a chance to look through a

24    number of them.  I have not looked through all of them.  And

25    I'm not going to talk about the substance of any documents or

1    things like that, but I can also say that in many of these

2    cases what has happened is -- or the contents are city

3    communications, city internal that liken them much more to

4    what we've heard about an inadvertent production of your own

5    attorney-client documents.  There will be an e-mail that'll

6    be a request for information, a standard set of information

7    requests that then gets kicked around among counsel five or

8    six times saying in a different e-mail how should we respond.

9    That could be five or six of the 120 documents as to which

10   there is absolutely no prejudice to anyone except perhaps the

11   city in terms of deciding what we should do about these

12   things.  To be clear, there are plainly documents in here as

13   to which I am quite sure the participants to this mediation

14   believed and hoped and expected under the terms of the order

15   that would remain confidential, but I don't believe that the

16   magnitude of the problem is that we have 120 exchanges of

17   information where there are terms that would put a third

18   party in a position where it feels like this is information I

19   fully expected would stay confidential.

20            THE COURT:  Anything further?

21            MR. IRWIN:  Your Honor, we would only point to the

22   fact that under Federal Rule 37 an inadvertent mistake is not

23   sanctionable, and that's what we have here.  This is not a

24   deliberate or intentional violation of the Court's order.

25            THE COURT:  Well, perhaps so, but if parties have to

1  do extra work because of your violation of a court order, why

2  should they bear the burden of that?

3  　　　　MR. IRWIN:  And, again, your Honor, that's why I'm

4  suggesting they shouldn't have to do that.

5  　　　　THE COURT:  All right.  Does anyone else want to be

6  heard regarding this matter?

7  　　　　MR. PEREZ:  One second, your Honor.  Your Honor,

8  Alfredo Perez on behalf of FGIC.  I think part of the problem

9  arises from the fact that they produced the same documents to

10  everybody whether they were responsive to your document

11  request or not.  And, for instance --

12  　　　　THE COURT:  Is this where you ask them not to do

13  that in round two?

14  　　　　MR. PEREZ:  Well, you know --

15  　　　　THE COURT:  Sir --

16  　　　　MR. PEREZ:  I'm sure that they did it -- I'm sure

17  that they did that in order to be quick, but I don't know

18  whether that's -- whether they can do that or not do that

19  because they certainly haven't identified what documents

20  relate to what request, but the --

21  　　　　THE COURT:  All right.  I'm going to ask you to hold

22  on that one until we address it more directly later.

23  　　　　MR. PEREZ:  Yeah.  What I was going to say --

24  　　　　THE COURT:  We have a very specific problem we're

25  trying to solve here, and your raising that issue doesn't

1    help us.

2          MR. PEREZ:  Your Honor, what I was going to say --

3    and I got a little sidetracked, but what I was going to say,

4    we made proposals to them in the context of mediation.  Those

5    were produced to everybody.  That's the kind of thing that

6    I'm concerned about.

7          THE COURT:  Right.  Sir.

8          MR. IRWIN:  May I --

9          THE COURT:  One second.

10         MR. IRWIN:  Okay.

11         MR. ANGELOV:  Good morning, your Honor.  Mark

12   Angelov for Ambac Assurance Corporation.  There's a practical

13   way to limit the impact of this production and the defect in

14   the production on the work product that the parties have

15   done, and that's something that's been alluded to before.

16   People will not necessarily have to redo the searches and

17   whatever marking and foldering they have done with the

18   documents that have been produced if the city is careful in

19   repeating the production in such a way that all the control

20   numbers and the Bates numbers line up, and so in that event

21   people wouldn't have to go back to square one.  Thank you.

22         MR. IRWIN:  Two brief points.  That's actually what

23   I was referring to when I said if people could preserve their

24   work product.  If the city were to reproduce, we would

25   produce it in such a way that would allow them to --

1          THE COURT:  All right.  If there's a technological

2     solution to this, great, but in the meantime I'm going to

3     order you, sir, and the others who have spoken up here today

4     and really anyone who has an interest in this to meet and

5     confer during our breaks today, perhaps over lunch, to see if

6     you can come to an agreement on how to solve this problem.

7     In the Court's view, this is a major problem that needs to be

8     solved today.

9          MR. IRWIN:  Understood, your Honor.  Thank you.

10          THE COURT:  Let's turn our attention to the motion

11    to compel Wayne, Macomb, and Oakland Counties to produce a

12    privilege log.

13          MR. MONTGOMERY:  Good morning, your Honor.  Claude

14    Montgomery, Dentons, for the Retiree Committee.  We are the

15    movants today.  Your Honor, we filed our motion.  I believe

16    Macomb filed an opposition, Oakland filed an opposition, and

17    Wayne did not, but it had a pending objection to discovery,

18    which includes the rejection of producing privileged

19    information.  I think we have a practical problem in that

20    everybody understands the rule.  Everybody understands that

21    there's an obligation to produce a privilege log except when

22    it would be extraordinarily burdensome, and then they can go

23    the category route if you follow the advisory committee's

24    role and the party that is resisting has sought a protective

25    order.  Here we've sort of conflated the matters, and we're

1  kind of in front of you dealing with the same thing.

2        The basic proposition is that a substantial number

3  of the documents that appear to have been responsive have

4  been withheld on grounds of privilege.  For example, the --

5  Macomb produced 3,700 documents, approximately, but withheld

6  2,100 documents or 35 percent of the total documents they had

7  available were withheld on privilege grounds which they

8  purported to categorize in five simple sentences basically

9  saying we either sought communications from counsel or we

10 didn't or it was work product, and for Macomb no indication

11 of deliberative privilege being asserted, just attorney-

12 client privilege and attorney work product.

13       Oakland County produced 2,967 documents but withheld

14 3,557 documents, meaning of the documents they thought were

15 responsive to our inquiry, most of them were privileged in

16 some form or another, and, again, no privilege log as to the

17 hows and whys, although in their response they put the

18 general descriptions.  They include one deliberative

19 privilege document and approximately 1,700 common interest

20 privilege documents.

21       Now, your Honor has been faced before with the

22 necessity of precision on common interest, and you will

23 recall last fall the common interest privilege between the

24 state and the city was the subject of intense scrutiny, and

25 your Honor required some precision through use of privilege

1  logs and large-scale productions by the state and the city in
2  that regard.  Here the size of the productions are nothing
3  close to the 250,000 pages that the city has produced this
4  time.  We're talking about under 30,000 documents, which in
5  normal parlance I think is, you know, like ten Bankers Boxes
6  used to be the way we thought about it.  Now I have no idea
7  how many megs it is, but I think that given the relatively
8  large assertion of privilege relative to the responsive
9  documents, that the producing parties can do more than simply
10  give us a sentence that we've met the rules, and these are
11  privileged.  Their statements to the Court and statements to
12  us are essentially trust us, we did it right, and, of course,
13  the whole purpose of a privilege log is, yes, you probably
14  did most of it right, maybe even all of it right, but we're
15  entitled to know and challenge where appropriate.  And we
16  think where there are serious questions as to whether or not
17  there is common interest, where there's all too likely a
18  possibility that cc's were regarded as communications for
19  counsel -- that is, one business person communicating to
20  another business person, cc'ing a lawyer and asking
21  everybody, "Do you have any questions?" -- sometimes that's
22  privileged, sometimes that's not, your Honor, and we think
23  that a privilege log is the only reasonable way to meet the
24  requirements of 26(b)(5) in this regard, and so we'd ask you
25  to order it.

1          THE COURT:  What is the litigation or the issue

2     between these counties and your client, and how is the

3     documents that you have requested relevant to that issue?

4          MR. MONTGOMERY:  Let us -- I think it sort of goes

5     to the point that Macomb raised, well, haven't you settled,

6     and why aren't you -- why aren't you simply standing down

7     here.  Well, as your Honor well knows, on the basic

8     proposition of whether or not we will be favoring

9     confirmation or not favoring confirmation depends on three

10    major factors.

11         THE COURT:  Right.

12         MR. MONTGOMERY:  One, does the state come through

13    with its promised funds on the terms that it put in the plan,

14    not a different set of terms, but on the terms that it put in

15    the plan; two, whether the Classes 10 and 11 as pension or 12

16    as OPEB actually vote for the plan because if they don't vote

17    for the plan, then we could be opposing cramdown; and last

18    but not least, your Honor, the city is proposing to undertake

19    a transaction or transactions that might be either a regional

20    authority or privatization authority, and the retirees have a

21    specific interest in that, not just as retirees of a given

22    plan -- form of the transaction might say something about

23    that -- but because there is something called a DWSD CDR in

24    the plan in which we have a direct economic interest in any

25    upside gained by the city, so Macomb and Oakland have said

1   they -- in their disclosure statement objections that they

2   are opponents to the plan process.  They are asserting unfair

3   discrimination between Classes 10, 11, 12 on one side and

4   whatever class they are in even though they are only

5   contingent creditors and I think the city at one point said

6   they were going to be assumed, so they're not going to be

7   voting as creditors anyway, but assuming they are creditors

8   and assuming they are opposing the plan on a voting basis,

9   they have said they're our opponents.  They oppose the

10   treatment that we're proposing.  They're also opposing

11   apparently the city's ability to do the transactions, at

12   least according to the disclosure statement, and so since we

13   have an economic interest in those, we need to understand

14   what it is the counties are trying to do because it may

15   actually simply be a case of they're trying to transfer value

16   from retirees to county water and sewer payers.  If it's that

17   simple, we may be fighting.

18        THE COURT:  And generally speaking, what are the

19   documents?

20        MR. MONTGOMERY:  The documents that have been

21   produced are basically --

22        THE COURT:  No.  Requested.

23        MR. MONTGOMERY:  Oh, we've requested information

24   that relates to the functioning of DWSD from their vantage

25   point, any challenges they have with respect to the

1  computations of retirement benefits and the cost because that

2  was one of the challenges and sort of a -- sort of a pretty

3  standard broad tell us -- give us the documents that are

4  relevant to the operation of DWSD for a specific time period,

5  basically from the appointment of the emergency manager

6  forward basically.

7          THE COURT:  Thank you, sir.

8          MR. MONTGOMERY:  Thank you.

9          MS. O'GORMAN:  Good morning, your Honor.  My name is

10  Debra O'Gorman, and I'm here for Macomb County by and through

11  its public works commissioner, Anthony Marrocco.  Your Honor

12  hit on a very important point when you asked counsel for the

13  Retirees' Committee what their interest is in this dispute.

14  As we know, they have reached a settlement in principle of

15  their claims.  In fact, there was a recent stipulation that

16  was filed extending deadlines for the Retirees' Committee and

17  their own discovery obligations, so it really is quite ironic

18  that they're here requesting municipal parties with limited

19  resources to undergo the burden and expense of providing a

20  privilege log.  As we all know, the counties will be filing

21  an objection to the plan.  The city will be responding and

22  dealing with that objection, and the city is capably

23  represented by numerous counsel who can oversee the discovery

24  process as against the counties.  And the important thing to

25  keep in mind here, your Honor, is that the city is not

1    requesting a privilege log from any of the counties.  In
2    fact, no other party here with the very limited exception of
3    Syncora requesting a privilege log on one discrete issue of
4    the city -- no other party in this courtroom is being asked
5    to provide a privilege log, and there really is simply no
6    basis to burden the counties only with this very large and
7    expensive task.
8            THE COURT:  Well, how large and expensive is it?
9            MS. O'GORMAN:  Well, it requires us to go through
10   each and every one of the documents withheld on the basis of
11   privilege to review each one and identify the basis for the
12   privilege, prepare a listing.  You know, what will also
13   likely happen is we'll be back before you with questions and
14   challenges and requests for in camera review of documents
15   withheld on the basis of privilege, and, you know, that will
16   take more time and effort on the part of many of us here.
17   And, you know, this case is moving very quickly.  Macomb
18   worked, you know, very diligently to make a production of
19   documents.  It was a substantial production.  It's being
20   minimized, you know, but our role is really very discrete
21   here, and it is a large production, you know, even compared
22   against the city's production.  Our set is deduped, so the
23   number of documents that we produced are discrete individual
24   documents.  They're not duplicates of the same thing.  You
25   know, it really is a large effort, and it --

1        THE COURT:  Does your client oppose confirmation of

2   the debtor's plan?

3        MS. O'GORMAN:  I'm sorry.  I didn't hear you.

4        THE COURT:  Does your client oppose confirmation of

5   the debtor's plan?

6        MS. O'GORMAN:  We do.

7        THE COURT:  On the grounds that Mr. Montgomery

8   indicated?

9        MS. O'GORMAN:  Yes.  He's generally correct in that

10  regard, but I also would like to bring to your Honor's

11  attention --

12       THE COURT:  Doesn't that litigation position in

13  Bankruptcy Court carry with it certain burdens, including

14  privilege log?

15       MS. O'GORMAN:  Yeah, it does.  We, you know, are not

16  looking to shirk our responsibilities.  That's not why we're

17  here, but we, you know, would like to bring to the Court's

18  attention the fact that, you know, this magnifying glass is

19  being put on the counties.  You know, the suggestion that

20  because a common interest privilege may exist between the

21  counties and may be asserted requires a privilege log, you

22  know, for some special reason really is just not supported by

23  anything.  I don't think that anybody would really contest

24  that the counties do not have a common interest with regard

25  to the issues here, the possible creation of the regional

 1    authority, the treatment of the DWSD assets.  The counties
 2    have and should work together in that regard and have
 3    asserted and will assert, you know, a common interest
 4    privilege.  And to what benefit of the Retirees' Committee
 5    would this privilege log be?  And as we said before, the
 6    chief opponent of the counties is the city.  The city is not
 7    requesting a privilege log of us.  What role does the
 8    Retirees' Committee have?  They have no special expertise in
 9    the DWSD or discovery related to that --
10             THE COURT:  Well, but Mr. Montgomery says they have
11    a significant and at least in one respect special unique
12    stake in the outcome of your objections.
13             MS. O'GORMAN:  They do, but the types of documents
14    they've asked for, you know, likely would not go directly to
15    those issues.  I'm just not sure where that connection really
16    lies.
17             The other thing I would like to ask your Honor if
18    you are considering requesting a privilege log that it would
19    be a basis for cost-shifting to the Retirees' Committee.  If
20    they really, you know, insist that this be provided, they
21    should bear the expense.  You know, they are the only --
22             THE COURT:  Of course, their costs are paid by the
23    city.
24             MS. O'GORMAN:  Well, and the city is not requesting
25    a privilege log, so, you know, that is, you know, very good

1    evidence in and of itself that because of the pace at which

2    this matter is moving, the many things that we all have to do

3    going forward in the next few weeks, stopping everything to

4    create a privilege log, to litigate over privilege issues is

5    just not going to advance the ball forward, you know, given

6    the roles of both the counties and the Retirees' Committee,

7    so we ask that the motion be denied.

8           MS. QUADROZZI:  Good morning, your Honor.  Jaye

9    Quadrozzi on behalf of Oakland County.  Oakland County

10   concurs in the position just articulated by Macomb, and I

11   don't want to waste this Court's time with duplicating the

12   able arguments that were made.  I do want to make a couple of

13   points, quite frankly, to reflect what I'm sure was just a

14   mix-up in terms of the numbers.  The documents -- and let me

15   back up just one step.  The documents requested of the

16   counties, particularly Oakland County obviously, primarily

17   are from a time frame, as noted by counsel, moving from the

18   point of the appointment of the emergency manager forward,

19   and so the suggestion that, yes, a large number of those

20   documents are privileged makes perfect sense because

21   obviously in that, you know, 13 months or so since that

22   happened, the discussion of the regional authority had not

23   previously -- with the exception of a very brief period of

24   time in front of Judge Cox, had not been a subject, so we're

25   looking at a very compressed period of time.  To the extent

 1   that they sought records relating to the operation of DWSD,

 2   while we have some of those documents, precious few of those

 3   documents are things that do not already exist at the city

 4   and that anybody has access to, so that is why we had a large

 5   number of documents withheld.  In terms of the numbers

 6   withheld, counsel identified that there were 1,700 documents

 7   withdrawn -- or withheld on the basis of the common interest

 8   and one on governmental deliberative process.  That's

 9   actually the reverse.  We only withheld one document, and I'm

10   referring to paragraph 11 of our response, on the basis of

11   the common interest privilege.  The remaining 1,700 were the

12   deliberative process, which, as I say, is really as a result

13   of the fact that that deliberation was taking place in the

14   context of the analysis of a regional authority over the past

15   13 months, and we would ask that Macomb -- that the Retirees'

16   Committee motion be denied.

17            THE COURT:  Thank you.

18            MR. NEWMAN:  Your Honor, Max Newman on behalf of

19   Wayne County.  We did actually file a response on Saturday to

20   this motion, and we are objecting to it.  And I concur in the

21   arguments made by able counsel before me.  I just wanted to

22   give the Court an idea of the magnitude of the task that the

23   county has gone through.  Obviously it's not what the city

24   went through with over a million documents, but there were

25   substantial documents that were reviewed.  After a couple of

 1    days of investigation to figure out, you know, where these
 2    documents were located, we employed the Stout Risius Ross
 3    firm to create a database of the needed documents.  Then we
 4    employed reviewers from the Kelly Services firm in order to
 5    get what we originally had as a two-week time frame -- the
 6    Court later extended that by an additional ten days, but, you
 7    know, at the beginning there was a real fire drill because we
 8    really had to get this done quickly.  To give the Court the
 9    magnitude of the difference between inspecting the documents
10    for privilege and actually doing a privilege log, when the
11    discussion came up among the counties and the decision was
12    made to respond without a privilege log, we went from having
13    five attorneys at 20 hours each to one attorney at about 40
14    hours to inspect the documents for privilege, so we're
15    talking about 60, 70 hours' worth of attorneys' time in
16    addition to create a privilege log, which is a substantial
17    burden to Wayne County, and we do believe that, as news media
18    reports have indicated, Wayne County is not exactly flush
19    with cash at the moment either, and the cost-shifting
20    argument is certainly something that we're interested in
21    here, you know.  Despite it being shifted to the city, on the
22    other hand, given our role in the proceedings, it's not fair
23    to burden us with this when no one else is being burdened
24    with this specific requirement.  And, therefore, for the
25    reasons I just stated and the reasons stated by counsel

1  before me, we would oppose the motion.

2          MR. MONTGOMERY:  Your Honor, I just wanted to bring

3  your attention back to a discussion you had with -- I believe

4  it was Mr. Gordon last fall regarding <u>Reed</u> versus <u>Baxter</u>, the

5  Sixth Circuit decision on common interest privilege in which

6  the Sixth Circuit makes it clear that just because a lawyer

7  is in the room for one side when other people are talking

8  about something doesn't mean that a common interest privilege

9  exists with respect to nondisclosure, and that very issue

10  about whether or not a lawyer for one side can be in the room

11  while business people for both sides are there is an

12  important one and gets flagged through the use of privilege

13  logs.  And, your Honor, that is probably further highlighted

14  here in which Macomb in its response doesn't indicate there

15  are any common interest privilege withheld documents, but

16  Oakland says there -- apparently I got it reversed -- there

17  are 1,700 documents that have a common interest privilege,

18  and --

19          THE COURT:  Hold on one second.  Ma'am --

20          MS. QUADROZZI:  One.  One document we filed on

21  common interest.

22          MR. MONTGOMERY:  One common, but there are 1,700

23  deliberative interest.  Sorry.  She's correct.  And so

24  there -- something has transpired here in the way they are

25  approaching the issue of privilege, and I think it warrants

1  when a party decides they want to jump into a big fight and
2  they want to take on and challenge recoveries proposed by the
3  city and method of delivering -- means of implementation of a
4  plan that specifically affects one group of people in a
5  unique way and they assert that a large number of documents
6  are privileged, they should be put to the burden of
7  establishing that privilege in some reasonable fashion, and
8  the simple categorization that they used in their responses
9  should be regarded as insufficient.  Thank you.
10      THE COURT:  All right.  I'm going to take this under
11  advisement and give you a decision from the bench here when
12  we reconvene after lunch.  I want to proceed with our next
13  matter, but give me a moment before we do that.  Chris, may I
14  see you?  Okay.  Let's turn our attention then to the three
15  Syncora motions, please, and I'll let you choose which of the
16  three you'd like to start with.
17      MR. HACKNEY:  Thank you, your Honor.  Your Honor,
18  good morning.  Stephen Hackney on behalf of Syncora.  Your
19  Honor, when we got your order for today's hearing, I think
20  that we understood you to envision a hearing where the Court
21  would hopefully sift discrete objections that had been made
22  to producing certain types of documents and we could go back
23  and forth about whether the objection was well-taken, and
24  whoever won or lost, you could say go produce discrete
25  category "X" of documents.  Consistent with that, you asked

1   us to prepare something that went response by response,

2   objection by objection, and I will tell you that we have done

3   that and are prepared to do that later today.  It is a 152-

4   page beast, and I wanted to explain to you why it looks like

5   this and also give you some thoughts about why this may not

6   be the most efficient way to proceed today or use your time

7   or our time, and --

8           THE COURT:  I'd be interested in that.

9           MR. HACKNEY:  I thought you might.  Everyone loves a

10  152-page spreadsheet.  So let me tell you, your Honor, that

11  that's why we filed the motion to compel.  The motion to

12  compel is designed to put up in lights for you important meta

13  issues that relate to the methodology by which they collected

14  documents, and at the end of this presentation I have

15  suggestions for the Court for its consideration about how we

16  might proceed, but I want to say that we stand ready to go

17  one by one.

18          Your Honor, in our view, the ability to conduct

19  today's hearing has been substantially frustrated by the way

20  that the city has gone about producing the documents.  The

21  city's document responses identify a large number of

22  objections, what are called general objections, and then they

23  incorporate all of the general objections into all of their

24  responses to their document requests, so what that means,

25  your Honor, is that if you pick up document request of ours

1   number one, which I believe relates to, you know, identify

2   the works of art that are in the DIA, they will say subject

3   to the general objections, we'd be happy to produce documents

4   that relate to that subject.  The problem is that by

5   incorporating all of the general objections into the

6   response, the proponent, me, is left uncertain as to what

7   documents it is that they are producing and what it is that

8   they are not producing.  This is important, your Honor,

9   because there are objections that are demonstrably

10   problematic.  For example, the city has said we will not

11   produce documents that go back before January 1, 2013, so I

12   don't need to go through the entire production, and I will

13   tell you that I haven't yet, and I will tell you why we

14   haven't yet.  This is the unique case where I'm moving to

15   compel related to a document production that I haven't

16   reviewed, and I acknowledge that's somewhat unusual, but it's

17   the press of the schedule as well as the fact that the

18   responses themselves tell us that we have a methodological

19   issue with respect to the documents the way they were

20   collected.   That's why we're driving the issue to you today,

21   so I wanted to get that up front.

22        The city has also made an important objection that

23   was concerning to me where the city said we'll only search

24   for and locate documents that we can reasonably get to under

25   the schedule, and you know that's something that's of concern

1    to me because we were of the view that we needed more time in

2    order to do this the right way, and we expressed that.  The

3    city took a different view.  The city said, "No, we can go

4    fast, and we would like the more expedited schedule," which

5    is fine, but you can't bootstrap your way then into

6    withholding relevant evidence, I don't think, because you

7    say, "Well, I'm not able to get to it under the schedule that

8    I advocated for."  These are just two examples of general

9    objections that to just the plain read give concern to me

10   because to tie it up and make it practical, your Honor, if

11   you take a document request and the city says, "Well, I'm

12   producing documents to you, but it's subject to my objection

13   that I'm only going to produce documents that I can

14   reasonably get to within the few weeks that we've had your

15   request," then you're left not knowing what they did and

16   didn't do, and that is inefficient, your Honor, because what

17   will happen is we have issued a 30(b)(6) deposition request

18   of the city, so at some point down the road we will take a

19   deposition on the method by which they collected and produced

20   documents.  And if you learn then that there were important

21   document categories that were not produced, then we've lost

22   more time.  Again, that's why we're driving the issue to you

23   today and we have these specific suggestions.

24           Compounding matters, the production is 250,000

25   pages, and the size of the production I would say doesn't

1  worry me particularly, but the fact that it's not indexed in
2  any way has been a substantial difficulty for us on the other
3  side trying to understand what's in it and what's not.  You
4  don't want to get to the point where with respect to any of
5  your requests you have to go through the entire production
6  and have a sense of what you think should have been in there
7  and wasn't.

8          So what we did is we had a meet and confer with the
9  city in this past week where we said, look, you know, we're
10 not really even at the stage where we can say, "Why aren't
11 you producing Bucket X, why aren't you producing Bucket Y?"
12 We're at the "What did you guys do here?" stage.  And, you
13 know, the city has obviously been operating under a very
14 expedited schedule, and, you know, I don't envy Mr. Irwin's
15 position, but the answer was, "Well, we had a large team of
16 people, and no one person can really tell you what it is that
17 we've done, so ask those questions, and I'll come back to
18 you."  We said to the city, "Look, we think it would be a
19 good idea if you identified the custodians who you searched,
20 the search terms that you used for electronically stored
21 information.  You know, paint a picture for us.  Tell us what
22 you did here so that we can sit back and look at the picture
23 you painted and say what about this, what about that, what
24 about this," and the city has not yet been willing to agree
25 to do that, and I think that's something that will be

1  included in my suggestions to the Court.

2       The clawback issue has also had an impact on us.  We

3  got these documents Wednesday morning, and we shipped them

4  out to a vendor to be uploaded by the vendor.  You have to

5  like process the documents before you can review them.  If

6  you like want to be bored to tears and have your eyeballs

7  melt out of your head, I'll explain to you how all that

8  works, but I'm going to assume that you don't.  What we

9  did -- so we got caught up in the clawback issue a little bit

10  ourselves both because apparently there are Syncora proposals

11  that are in the production but also because we did not want

12  our teams to start coding the production until we knew that

13  it wasn't going to change because then if you do a bunch of

14  coding over the weekend and we do the reboot, then you have

15  to go back and do it over, so we waited and came today with

16  the hope that we would get that threshed out.

17       So the purpose of today's hearing is to resolve the

18  specific objections to the specific requests, but I'm here to

19  tell you that I don't think we're in a position to do that

20  because we don't know what we don't know, and we're not able

21  to speak meaningfully about this production.  And I want to

22  talk a little bit about the impact on that and then offer the

23  Court our views, but the impact of this is critical.  This is

24  having a crippling impact on two things.  First, it's having

25  a crippling impact on our experts because our experts need to

1  get, for example, forecast-related information.  The data and
2  assumptions behind the forecast is critical.  And remember
3  the way this works because when you're the city, your experts
4  have open and unfettered access to city employees, to the
5  treasury department at the state.  They literally call them
6  up on the phone and get information that way.  Creditors'
7  experts have to go through the more cumbersome process of
8  requesting the discovery, and Ms. Kopacz -- I'm envious of
9  her because she's going to be somewhat more like a city
10 witness in that they're going to kind of let her in, and
11 their folks at E&Y will do working sessions with her and
12 teach her things, and that's great for her, but I wanted to
13 make clear that we don't have that, and so that's an
14 important -- that's what makes the document discovery -- the
15 written discovery so important, which is it's a bottleneck
16 for our experts, and remember that our experts are 43 days
17 away from rendering opinions on things as complicated as are
18 these ten- and forty-year forecasts solid, so fact-intensive
19 issues where we're waiting, waiting, waiting.  So it's very
20 important on that front, and it's also important to
21 depositions because not only do we have to make sure that we
22 got all the documents and then we have to review them and
23 synthesize them so that we can use them meaningfully in the
24 depositions, but that is like a gating issue to being able to
25 prepare for the depositions.  And remember on that front that

1    we are now five days into a deposition period that I believe
2    ends on or about June 24th, so that's why, again, the pace of
3    all this is very much on my mind.  It's why I'm driving
4    issues to you with respect to a document production that I
5    haven't yet reviewed.

6         So I have suggestions for the Court to consider, and
7    I will offer them now.  The first thing I would suggest, your
8    Honor, is I would order the city to produce a certification,
9    an affidavit from someone who will describe what the city
10   did.  It will describe the repositories of documents that
11   were searched to the extent they're not in the hands of a
12   custodian.  It will describe the custodians of the documents
13   that were searched.  And with respect to ESI or
14   electronically stored information, it will describe the
15   search terms that the city employed to produce documents.
16   And I think to the extent the city just knows of certain
17   document repositories that it didn't search, it could also
18   identify -- put up in lights for us now we did not search
19   this, we didn't search that, we're not producing this.  So
20   let's be concrete about what's been done and what's been not
21   done so that we can speak more meaningfully before you about
22   what should be done.

23        Second, I would ask the Court to rule on the
24   clawback issue just so people know what we're doing
25   technologically with the hard drives that were produced.

1          Third, we would recommend that the city be ordered

2     to produce an index of the documents.  It doesn't have to be

3     a document-by-document index, although if they have that

4     technological capability, that would be good, but at least a

5     subject matter index of what is in the production so that we

6     can understand it.  That could be part of the certification

7     they're doing.

8          THE COURT:  Let me ask you to pause for just one

9     second, please.

10          MR. HACKNEY:  Sure.

11          THE COURT:  Go ahead, sir.

12          MR. HACKNEY:  So then what I would do, your Honor,

13     is I would reschedule this hearing with respect to the city's

14     responses to the creditors' document requests until after the

15     city has done these things, and what we would do is we'll all

16     move in parallel, which is the creditors will leave here

17     today and begin to crawl all over the production.  The city

18     will leave here today and build for us a practical

19     description attested to by someone under oath that here's

20     what we did, here's what we didn't do.  That will facilitate

21     meet and confers between us and the city.  That will avoid

22     things like this.  Okay.  So I'm very -- you know, and then

23     the way I would propose, your Honor, what I would do with the

24     rest of the hearing is from where I sit, I think you can

25     meaningfully address the city's interrogatory responses, so I

1  would propose that we use today to do that.  I think that you

2  can meaningfully address whether we creditors have adequately

3  responded to the city's discovery, and there are things like

4  our motion to clarify the witness description, so I believe

5  that there's still a lot of wood that we could chop today,

6  and I'm of the view that we should chop it, but I will tell

7  you that with respect to document production, you have to --

8  you have to be very practical as lawyers with each other in

9  order to facilitate getting to the point where you can have

10 disputes, and this can be done one of two ways.  The sort of

11 textbook way is where you can pick up the responses to the

12 document requests and the document requests -- the responses

13 themselves teach you, yeah, they assert the general

14 objections.  Everyone does that, of course.  You want to

15 preserve your objections.  But then what they do is either in

16 each individual response or what we did was we did like a

17 preliminary statement where we explained to the city what we

18 were going affirmatively to do.  You want to be able to pick

19 up the responses and say I understand at a general level what

20 they did.

21      The other -- the second way that I would say is

22 probably more common is that there's kind of an initial -- I

23 call it like the armadas meeting out in the sea, which is

24 there are all these requests that go over here, and there are

25 all these responses that come over here, and if you picked

1    them up and looked at them, you can't really tell what people
2    did.  The meat of what gets that process going is after that
3    where people have practical conversations, "Look, what are
4    you really looking for?  I know you have 60 requests, but can
5    you give me subject matters that you're most focused in?"
6    And then when you make the production, you go to the
7    proponent of the production.  You say, "Look, tell us what
8    you did.  Tell us what you didn't do."  If I regard you with
9    suspicion the whole time and I'm, you know, kind of cagey and
10   unwilling to do that, we end up here, okay, which is I don't
11   know what they haven't produced and why they haven't produced
12   it, and I can't tell from their document request, but I know
13   that there are problems with the objections they're
14   asserting.  So that was how we had envisioned the motion to
15   compel.  The motion to compel on the document request has
16   certain specific areas in it that it calls out.  It talks
17   about -- the forecast is for me paramount.  It's one of the
18   most important issues in the case.  I know that Ms. Kopacz is
19   probably nodding her head because we've got to get this stuff
20   out.  And as an example on that one, the city said, "Well" --
21   in some respects the city refused to give us historical
22   revenue information, which made no sense to me, but in other
23   instances what it said is, "Well, this is going to be handled
24   as part of expert discovery."  And you got to remember the
25   forecasts are already in the plan, so this isn't -- you know,

1    there's no reason to wait for expert reports to get whoever

2    the expert is the forecast that he's doing and his reliance

3    materials and so on at that point.  And by the way, we can't

4    because our experts can't wait until that time to begin

5    responding to that, so we need to treat the forecasts as they

6    are what they are, which is they're a part of the plan.

7    There's data and assumptions that went into them.  Triage

8    those to the front, like get those produced today.  There

9    must be a file somewhere.  We're talking about forecasts that

10   have been in existence subject to refinement for almost a

11   year, so there's got to be an E&Y file that says here's

12   everything that goes into the forecast.  Put it on a disk and

13   give it to us.  Stage that forward.  We have other aspects of

14   the motion to compel that talk about the way boilerplate

15   objections are typically handled and that they're often

16   overruled by courts who say, "Look, it's not concrete enough

17   in terms of informing your adversary what you have or have

18   not done."

19           And then we do have an issue at the end of the

20   motion to compel with respect to privilege logs, and I

21   understand the city's position in part because I'm taking the

22   same position with respect to privilege logs.  In cases like

23   these where there is so much privileged communication, such a

24   low likely yield of a review of those documents, it is often

25   more efficient to not do a log, and I acknowledge that.  It's

 1  a little bit scary because it means that that will just never
 2  be subject to process, but it is what it is.  What we have
 3  said is, okay, why don't we reserve on the issue of privilege
 4  logs and treat it in a pragmatic way as we go along, but one
 5  issue we know we should talk about now is the issue of the
 6  art in two respects.  One of them is what are the privileged
 7  communications that went into Mr. Orr's seeming decision, you
 8  know, to proceed with the grand bargain rather than doing
 9  alternatives, and, second, to what extent is the mediation
10  privilege being invoked to apply to communications with the
11  charitable foundations?  This plays into a couple important
12  issues.  One of the important issues is one that you and I
13  had a colloquy on about a few weeks ago about how is the
14  grand bargain going to be proved up at trial.  And I suspect
15  that -- well, I guess I have suspicions about how they're
16  going to do it that make it relevant to understand what
17  communications with different parties went into the way that
18  deal came together.  I think it's going to drive an important
19  issue to the Court about the scope of the mediation privilege
20  and how it will interact with the city's attempt at trial to
21  say this was very -- this was negotiated hard or this was all
22  that could be gotten in this negotiation.  We did the best
23  that we could.  So there's a potential collision course with
24  issues of mediation privilege and attorney-client privilege
25  with respect to what I'll call some of the settlement-like

1  issues, and you heard Ms. Kopacz talk about it today with

2  respect to the union negotiations where I'm sure the city's

3  initial position was the economics that relate to the union

4  negotiations and the perceived benefits of the CBA revisions

5  and so forth, those are within the scope of the mediation

6  privilege, so that's an important issue that is out there

7  that I think relates to why we're saying today at least do a

8  privilege log on the art.

9        We also have a motion to compel on interrogatories,

10  your Honor, but I had not meant to step our interrogatory

11  responses up to the front of the queue.  It was more in the

12  way of identifying global issues with respect to

13  interrogatories.  I'm happy to fall into line and argue my

14  interrogatory points rog by rog.  That's part of -- it's a

15  smaller part of this large spreadsheet that we've prepared.

16  But that was all I had to say on the motion to compel on the

17  document front.  Thank you, your Honor.

18        MR. IRWIN:  Your Honor, in terms of what the city

19  did and what the circumstances were in connection with its

20  document production, the schedule is what the schedule is.

21  The city was in receipt of document requests from more than

22  two dozen parties.  There were approximately 900 total

23  document requests.  There were almost 250 interrogatories,

24  and they were all on a production or compliance schedule,

25  which we understood to mean document production and not just

1 the submission of written responses and objections

2 approximately -- well, exactly two weeks after they were

3 delivered to us.  Of the 1,150 or so discovery requests that

4 we were responding to, 800 of them came in on the last day

5 that they were due.  It literally took through the weekend

6 with people working nonstop simply to organize the discovery

7 requests into massive spreadsheets that we could, in fact,

8 attack as aggressively as we could.  Now, we didn't wait for

9 these discovery requests to come in.  We knew what they were

10 doing.  We had our team and our machinery in place.  We were

11 ready to go, and we, in fact, attacked them very

12 aggressively.  And as I previewed for the Court earlier, the

13 process in its totality included reviewing 1.2 million

14 documents, which we applied -- to which we applied search

15 terms and a date restriction because you have to have a date

16 restriction when you're reviewing electronic information, and

17 that's the way people do business these days.  That's how

18 they work with information.  That's how they share

19 information.  That's how they communicate.  It was a very

20 robust fully federal rules compliant ESI document search that

21 the city did that it applied to almost 90 custodians at the

22 city and its various advisors.  After that process, when we

23 had, again, 300,000 documents to review, many of which, in

24 fairness, after they were reviewed, were not responsive

25 because if you think of the funneling that has to take place

1  here to apply -- some of the search terms we used returned

2  numbers of documents that were not responsive and not related

3  to the issues in this case.  That number was further reduced

4  to a production number of about 30,000 documents.  It was

5  about 250,000 pages.  It would be impossible for the city or

6  it would take an extraordinarily long time to go back or to

7  even have done at the time it was being done since the

8  production deadline at that point was two weeks -- it was

9  later expanded to three weeks.  When you get toward the end

10  of the two-week period, using the kind of technology that we

11  use to produce documents, it's not just pushing a button, you

12  know.  On the Monday or Tuesday of the week that it's due,

13  you got to be locking things down and have your production

14  more or less ready.

15       The other thing to sort of bear in mind,

16  particularly as we're responding to interrogatories, is that

17  the fourth amended plan went in on -- I believe it was the

18  5th.  The document production was -- and the interrogatories

19  were eventually due on the 6th, Tuesday, the 6th, of last

20  week.  The plan went in on Monday, and the monumental task of

21  responding accurately and fairly to 240 interrogatories,

22  which are very complex -- these are not just identify your

23  witnesses.  These involve complex narratives for someone to

24  sit down and write or pay attention to, often require the

25  input of lots of people, advisors, people at the city, Jones

1   Day lawyers.  Lots of people have to weigh in on these, on
2   any individual request.  Many of the people whose input was
3   required were working on the plan or are in mediation, so
4   people are very, very busy.  It's a very short period of
5   time.  We produced documents, again, as --
6           THE COURT:  So you agree with Mr. Hackney that I
7   didn't allow enough time for discovery?
8           MR. IRWIN:  No.  We produced -- we met the schedule,
9   and we produced documents.  I'm saying when Mr. Hackney or
10  other people complain that we haven't cross-referenced every
11  document or created an index cross-referencing every document
12  that we've produced against 900 requests, it's simply not
13  reasonable under these circumstances, and I don't think the
14  federal rules require it when you're producing -- making an
15  e-mail production, which is what we have largely done.  Now,
16  we had that, and we also had -- there are certainly requests
17  or categories of requests that don't lend themselves to an
18  ESI search; right?  If somebody asks us for, you know, the
19  last several years of CAFRs, I'm not going to rely on my
20  custodial search and sweep of e-mail records to do that, and
21  so we had dozens and dozens and dozens of separate
22  adventurers chasing down information as it responded to
23  specific requests, but I think for purposes of today's
24  hearing, my point is simply this.  If we're here to address
25  general objections or specific objections -- if we're here to

 1   resolve the city's written responses, the posture that the
 2   city has technically taken with regard to the responses,
 3   where I think everyone is is we've said subject to our
 4   general objections, which are not controversial things --
 5   well, people could dispute the date, but we have to pick an
 6   end date or a start date somewhere, so subject to a date
 7   restriction, subject to the fact that we're not going to give
 8   mediation-related materials, subject to the fact that we're
 9   not going to waive privilege, subject to the fact that we, in
10   fact, are not going to produce expert materials to you in
11   advance of what's required by the schedule, we will
12   produce -- that's what our responses say -- subject to a few
13   general objections, we're going to give you this information.
14   So I understand when Mr. Hackney says he doesn't know exactly
15   what was produced, and it is a large production, and it will
16   take time to get through, but another path here and the
17   recourse that's available to any party is to say, well, city,
18   you acknowledged in your responses that you were going to
19   produce responsive materials.  Setting aside privilege, you
20   were going to respond and produce materials in this request.
21   We have indicated that we have made an appropriate search,
22   and the robustness of our production corroborates that, I
23   would hope, to some degree.  If someone comes to us later and
24   says, "I don't see the responsive materials in here.  You
25   said you were going to give it to me, but it's not here.

1  Show me where it is," the city will, of course, cooperate and
2  try to make that effort to identify places in the production
3  where the documents exist, but that --
4         THE COURT:  Is there a list of art in the DIA in
5  what you produced?
6         MR. IRWIN:  So the DIA is a separate issue, and
7  that's a -- I know it's a part of the motion, and this is a
8  little --
9         THE COURT:  Is that a "no"?
10         MR. IRWIN:  -- frustrating for the city as well.
11         THE COURT:  Is that a "no"?
12         MR. IRWIN:  The DIA has produced it.
13         THE COURT:  So the city didn't produce it?
14         MR. IRWIN:  The city produced responsive records
15  that the city has.  If there were requests that said produce
16  inventories of art --
17         THE COURT:  Mr. Irwin --
18         MR. IRWIN:  Yes.
19         THE COURT:  -- for the third time, did or did not
20  the city produce a list of the art in the DIA?
21         MR. IRWIN:  No.  The city is not in possession of
22  that.
23         THE COURT:  Did you say you're not in possession of
24  it?
25         MR. IRWIN:  I believe we said we will produce -- we

1  will search for and produce responsive documents.

2          THE COURT:  Did you say you're not in possession of

3  it?

4          MR. IRWIN:  I don't believe in respect to that

5  specific request, no, your Honor.

6          THE COURT:  Wouldn't that have been a really easy

7  response?

8          MR. IRWIN:  The written responses to these 900 --

9          THE COURT:  Because when you get a request for

10  production of documents that you're not in possession of, do

11  you have to say anything more than "we don't have it" ever?

12          MR. IRWIN:  The DIA -- the list of documents -- the

13  list of the art inventory was the subject of specific

14  negotiations between the objectors and the DIA, and there is

15  a written agreement pursuant to which the DIA is providing

16  this.

17          THE COURT:  Forget all that.  You got a request for

18  a list of the art in the DIA, and instead of saying, "We

19  don't have it," you did --

20          MR. IRWIN:  I believe --

21          THE COURT:  -- something else much more contorted.

22          MR. IRWIN:  Well, I don't -- well, I think in this

23  example, your Honor, where there was an -- and I don't have

24  perfect command of these 1,150 discovery requests.  I believe

25  for the DIA-related requests, there was an interrogatory that

1  says -- setting the documents aside, an interrogatory that
2  says identify the inventory at DIA.  Give us the major works.
3  Give us the -- you know, all 60,000 pieces that exist at DIA.
4  And in connection with that -- and that's a separate
5  complaint, but I'll wrap it into this conversation.  In
6  connection with that exercise, we, in fact, said, "Go see the
7  DIA.  You've negotiated with the DIA.  See the DIA documents
8  because they've agreed to provide it to you.  It's exactly
9  what you asked for from them."  And now, you know, the
10 complaint is, "Well, you've referred to the DIA documents
11 generally, but you haven't referred to them specifically."  I
12 don't even have the DIA documents, so I can't refer to a
13 specific DIA document, but I can read the letter agreement
14 between creditors and the DIA where they say give us a list
15 of inventory or a list of art.  Here are the terms of it, and
16 here's what DIA --
17         THE COURT:  But you don't have to do that.  In fact,
18 that's a nonresponsive response.  If you don't have what
19 they've requested, just say, "I don't have it."
20         MR. IRWIN:  We absolutely -- your Honor, you're
21 absolutely right.  Under the circumstances, we did not have
22 the -- we did not -- we're not able to go back in terms of
23 the 900 requests, and where there was a direct request for a
24 direct document and a specific example like that and we knew
25 that we didn't have that exact document, I'm sure there are

1   examples where we weren't able to do that.  We ran our
2   searches.  We produced the documents that the city had, and
3   we indicated that we were, as a consequence, complying with
4   the request, but we couldn't be that specific.  Just the
5   sheer number of the requests didn't permit it.

6               THE COURT:  Why no index of the documents that you
7   did produce?

8               MR. IRWIN:  Well, they would be -- so many of them
9   would be e-mails.  I'm not quite sure how to index a
10  collection of e-mails because the e-mails were generated
11  because they were created by a search that included search
12  terms, so I'm not quite sure how we would go about doing
13  that.  I've never been in receipt of an index of e-mails in
14  connection with a document production that has been made by
15  an adversary in any case that I've been a part of --

16              THE COURT:  Well, have you ever --

17              MR. IRWIN:  -- because you'd have to --

18              THE COURT:  Have you ever been in a case where in
19  response to two dozen document requests, you threw 250,000
20  pages of documents at everybody?

21              MR. IRWIN:  In response to two dozen, no.

22              THE COURT:  Isn't that what you told me there were,
23  two dozen document requests, or --

24              MR. IRWIN:  No, two dozen parties.  There were
25  nine --

1    THE COURT: Two dozen. That's what I meant.
2 Document requests from two dozen parties.
3    MR. IRWIN: I have never been in a case where I have
4 had so many requests. Is that --
5    THE COURT: Yeah. And so instead of responding
6 party by party by party, you threw all the same documents at
7 everyone and said, "The documents that you want are somewhere
8 in here."
9    MR. IRWIN: Yes, your Honor.
10    THE COURT: So I ask again why no index so that
11 people can figure out whether you responded to their document
12 requests appropriately or not without having to make them
13 fish through all of those pages?
14    MR. IRWIN: I just -- I don't think that's possible
15 in the circumstances, your Honor, to index all of the -- to
16 cross-reference all of the -- all of the documents because
17 they would apply to more than one. Someone would have to
18 manually sit down with the 900 requests, go document by
19 document and --
20    THE COURT: Well, no. The index that I would be
21 referring to is just a list of the documents.
22    MR. IRWIN: A list of the title of the documents
23 because so many of them --
24    THE COURT: Some way to identify them.
25    MR. IRWIN: I wonder if the metadata that's provided

1   with an e-mail production like this doesn't allow people to,

2   you know, generate lists like that of the documents that

3   we've produced.  The city will do what the Court requests in

4   this regard, but it would be a -- there are -- the devil is

5   in the details.

6           THE COURT:  How did you choose the date?

7           MR. IRWIN:  The date was a date that was chosen

8   because it was a clean date that was six --

9           THE COURT:  Any date is a clean date.

10          MR. IRWIN:  Well --

11          THE COURT:  Why did you choose the date you chose?

12          MR. IRWIN:  It wasn't a random day in February;

13  right?  It was January 1st, 2013.  It was six months before

14  the --

15          THE COURT:  January 1st is as random as any other

16  date.

17          MR. IRWIN:  It was six months before the bankruptcy

18  petition and several months before Mr. Orr was appointed, and

19  we felt like that would capture the analysis and the events

20  that are the most relevant in this proceeding.  Going back

21  further in time just increases those numbers that we're

22  talking about that we felt were --

23          THE COURT:  Mr. Hackney wants a list of your search

24  terms and a list of the repositories.

25          MR. IRWIN:  The repositories.  Do you mean the

1  custodians?

2          THE COURT:  Custodians.

3          MR. IRWIN:  The custodians.  The custodians are in

4  the metadata.  The identity of the custodians -- every

5  document the way it's produced, at least in our system, is --

6  comes with metadata, and there is source code in the metadata

7  that identifies the custodian to whom each document is

8  sourced.

9          THE COURT:  He also wants a list of the custodians

10  you didn't access.

11          MR. IRWIN:  The custodians we didn't access.  That

12  could be, I suppose, everyone that we didn't --

13          THE COURT:  Well, city custodians.

14          MR. IRWIN:  You mean a list of everyone at the city

15  who we didn't ask to -- well, I mean give him the directory,

16  I suppose.  We identified the custodians who we thought would

17  have the most relevant information, and we searched those

18  individuals.  I think that's going to be self-evident from

19  the metadata, but that's something that we can provide, your

20  Honor.  And everyone who's on our witness list and everyone

21  who's associated with an advisor group or someone who's at

22  the city is --

23          THE COURT:  Okay.  So why not disclose documents

24  just because they're in the hands of your experts?

25          MR. IRWIN:  That is not what we're saying, your

1  Honor.  We're saying that we're not going to produce -- we're
2  not going to -- we're not going to pre-produce expert
3  reports.
4          THE COURT:  He didn't ask for that.
5          MR. IRWIN:  Well, and that's -- I'm glad because I
6  wanted to sort of make this point because this has come up in
7  the nonstop meet and confers that I've been having over the
8  last five days in connection with all of this, and Mr.
9  Hackney references this in his submission, so I know he's
10  quite aware of that, and I think he made the Court aware of
11  it.  But in connection with the projections, the -- and the
12  plan is -- it's a core part of the plan; right?  The ten-year
13  projections, the forty-year projections, all of the work that
14  Ernst & Young has done, all of the assumptions that went into
15  it, all the forecasting, the city data that, you know, these
16  projections rest upon, it's the city's view that it could
17  take the position that this is all expert analysis and that
18  we will wait for the point in time under the Court's
19  scheduling order that we will release this in connection with
20  the appropriate expert report.  We have committed to do that
21  now.  We could stand on that.  We're not standing on that.
22  The problem is all of these people were working furiously on
23  plan-related issues and mediation-related issues up until
24  Monday, May 5th, when the fourth amended plan went in.  It is
25  our understanding that Ernst & Young is dedicating the

1   appropriate amount of resources to put together what they are

2   referring to as the binder, and the binder is going to be

3   literally spreadsheet based on spreadsheet based on

4   spreadsheet all in one place so that Mr. Hackney and the

5   people who are interested in it can have it in one place.

6   And we'll do it the right way, and we'll --

7         THE COURT: Okay. So when will that be?

8         MR. IRWIN: It's going to take a couple of weeks to

9   do based on the work they started after --

10        THE COURT: A couple weeks from May 5th or a couple

11   weeks from now?

12        MR. IRWIN: May 5th, a couple weeks from May 5th.

13        THE COURT: Oh, so another week.

14        MR. IRWIN: Yeah. We'd have to check. I'd have to

15   check, but my understanding is that's right, and so we've

16   committed to do that. We're going to -- we're going to

17   provide that, and I think that -- you know, that answers --

18   no. I'm not going to characterize the objections, but that

19   is a -- one of the principal objections baked into not only

20   Syncora's motion but a lot of the conversations I've been

21   having with people as well. And, you know, I've been talking

22   with folks about this as well. In a related vein, the city

23   could stand on the actuarial analysis that is behind the

24   settlements, the OPEB settlements, the pension claims, that

25   is being done by the city's actuaries. It's not simple math.

1   It is clearly the subject of expert opinion and testimony,

2   but there are existing documents right now in the form of

3   letters typically where the conclusions are spelled out, and

4   we are prepared to give that.  Now, we're not going to stand

5   on the -- we're not going to take the position that we could

6   take, which is you'll get this when, you know, we disclose

7   our expert reports and we tell you who authored the letters

8   and who's going to be speaking about those.  We're going to

9   provide those now.  So the city is willing to do these

10  things.  We've tried to take a view in our search under these

11  circumstances that we're just going to comply.  We're going

12  to provide information.  And I know that the responses --

13  some of the general objections and the responses don't always

14  say that.  I'm not trying to defend that we have been, you

15  know, as clear as Mr. Hackney would like us to be in those

16  responses.  I think, again, with the time that we were

17  working under and trying to get everything out the door, we

18  did the best job that we could with the full expectation that

19  there would be opportunities after the fact for people to

20  come and ask what we did and how we did it and whether they

21  have that information assuming that they're sharing some of

22  this work, too, that they are, in fact, reviewing the

23  document production.  It is fully searchable.  Everyone can

24  run searches on this thing and find information that is

25  relevant to the issues that they are looking for.  I know

1  that doesn't solve all the problems.  I'm not suggesting that
2  it does.  But the parties can work together to get to a place
3  where the city would cooperate with reasonable requests to
4  investigate and figure out for someone, if the request is
5  limited, how and what we did to get the information and
6  whether they have it.  If the exercise is just do this for
7  all 900 requests, it's extraordinarily burdensome and time-
8  consuming and expensive.  It was very hard for us to do at
9  the time.  It's no easier to do now.

10       THE COURT:  I guess I'd like to see it myself, but I
11  hesitate to look at it if it has mediation confidential
12  documents in it, so maybe I should wait.

13       MR. IRWIN:  We will have that clean production
14  within the next couple of days, your Honor.  You mean the
15  production itself?

16       THE COURT:  Right.

17       MR. IRWIN:  Yeah.  We could have that in a few days.

18       THE COURT:  All right.  Anything further, sir?

19       MR. IRWIN:  Oh, I should mention with regard to the
20  priv log, the burden would be the same.  The burden for the
21  city to generate a priv log around a specific issue would not
22  necessarily be dramatically reduced, and we'd have to review
23  the same group of documents to generate an appropriate priv
24  log.  I don't want to belabor -- a lot of the same points
25  have been made by county counsel in connection with motions

1   to compel directed at them, but in this particular exercise,

2   in these circumstances, I know that Syncora, like almost

3   everyone in the room, I believe, is taking the view that priv

4   logs are not a good use of resources in these circumstances

5   and that it is my view that there should be a good reason to

6   compel even a limited priv log.  And I did not hear the

7   articulation of why it is that some of these communications

8   should be probed further as they relate to the grand bargain.

9   It would be an exercise in, you know, us spending all of the

10  time and the money that it would require to have people

11  generate this log, and I just -- I don't see to what end.

12          THE COURT:  Any reply, Mr. Hackney?

13          MR. HACKNEY:  Your Honor, I do, but because this

14  motion, I think, does implicate other people, I know that Mr.

15  Marriott --

16          THE COURT:  Oh, all right.  Yes.  Go ahead.

17          MR. MARRIOTT:  Good morning again, your Honor.

18  Vince Marriott, Ballard Spahr, EEPK.  I understand Mr.

19  Irwin's concern in the time allotted to tag documents

20  responsive to each document request.  I have a different view

21  on interrogatories, which we'll get to when we get to the

22  interrogatories, but on the document requests I'm sympathetic

23  to the problem.  On the other hand, it seems to me it's not

24  unduly burdensome.  When we speak about an index, in my mind,

25  what I'm -- what that means to me is these documents

necessarily fall into categories, documents relevant to the
value of assets, documents relevant to the build-up of the
projections, documents relevant to calculation of the pension
claims, those sorts of things.  It seems to me it ought not
to be too terribly burdensome and it wouldn't surprise me if
it already exists in some form unless the production was
handled simply by saying, "Pull everything from Spot X, Y,
and Z.  We'll strip it for privilege, and then we'll produce
it."  I'm assuming that there has been some categorization
done already, and that alone --

THE COURT:  But Mr. Irwin's response to that is the
documents are fully searchable, so if you want all of the
documents relevant to, for example, art, you can search on
art or DIA or some other pertinent term.

MR. MARRIOTT:  Well, I guess the short answer to
that is it would surprise me if the city already doesn't have
some sort of broad categorization -- categorizations of the
documents that were produced that could be provided to the
parties to whom the documents were produced.  If that hasn't
been done even by the city, it seems to me as the producing
party it really is the city's burden to do that and not the
burden of all of us who just -- who got this document dump to
create our own categories by doing our -- I mean our own
searches.  I don't think the federal rules contemplate the
burden being allocated in that fashion.

1          The other point I wanted to make -- and it sounds as

2    though the city has evolved in its -- how it will handle

3    this, but Mr. Hackney made an important point, and we had a

4    specific request in our document request directed to that

5    point, and that is the city will be putting forth various

6    experts to testify as to various points critical to the plan,

7    pension claim amounts, projections, all of that.  The

8    creditors have no access to the information from which those

9    expert opinions will ultimately be built up.

10          THE COURT:  You mean no access outside of this

11   process?

12          MR. MARRIOTT:  Outside of this process.  And one of

13   our requests, for example, was all documents concerning facts

14   or data supplied by the city to any witness the city intends

15   to call as an expert.  The city's response to that was you'll

16   get that as and to the extent appropriate in connection with

17   the expert discovery schedule.  I don't think the facts and

18   data provided to their experts -- that's fact discovery.

19   That's not expert discovery.  The report may be expert

20   discovery, but the facts and data are fact discovery, and, in

21   fact, we might be precluded from seeking it if we had only

22   asked for it in connection with expert discovery.  Now, if I

23   understand what Mr. Irwin said, although there will be a

24   delay, the city recognizes that -- or whether it concedes the

25   point I've just made or not, will be providing what I've just

1    described, facts or data supplied to those experts the city
2    intends to call.  Is that a fair understanding of where the
3    city is now?
4         MR. IRWIN:  Well, I would state it a little bit
5    differently, but the city is agreeing to provide the letters
6    that constitute the analysis that will ultimately take the
7    form of an expert report, I suspect, and baked into that will
8    be --
9         THE COURT:  Well, but that's a different question.
10   What I hear Mr. Marriott asking for is you hire expert "X"
11   and you give that expert facts and data which -- with a
12   request to analyze those facts and data and come to a
13   conclusion on something.  He wants those facts and that data;
14   right?
15        MR. MARRIOTT:  Yes, which I think we're entitled to.
16        THE COURT:  Are you willing to give that, or is that
17   already in the documents you have given?
18        MR. IRWIN:  Yeah.  That's in the documents he's
19   going to get, your Honor.
20        MR. MARRIOTT:  Going to get or --
21        MR. IRWIN:  That I indicated that if they're not
22   swept -- part of the problem is I suspect -- and I can't have
23   perfect -- again, I can't have perfect command of these
24   250,000 pages.  I suspect that what has happened is if it's
25   facts or if it's data, it was probably captured by the sweep.

1   It was probably exchanged with someone, and it probably

2   exists somewhere in the production.  We didn't go in and

3   separate --

4          THE COURT:  Well, but I urge you to be careful

5   because if an expert relies on a single document in coming to

6   a conclusion about which that expert testifies that wasn't

7   produced in discovery, we've got a problem.

8          MR. IRWIN:  I understand.  I'm not saying that.  I'm

9   trying to say something different.

10         THE COURT:  You don't want -- you don't want to feed

11  that.

12         MR. IRWIN:  And that's why we did not go in and try

13  to deliberately remove from our sweep anything --

14         THE COURT:  It's not a question of deliberate or

15  intentional --

16         MR. IRWIN:  It's not.  Remove.

17         THE COURT:  -- or it may not be.  I don't want to

18  prejudge that issue.  We don't even -- we don't even want to

19  have to deal with that issue.

20         MR. IRWIN:  And that's why we didn't have anything

21  in our system to do that.  We didn't remove information

22  because we thought an expert might rely on it, and all I'm

23  saying is it could very well exist in the document

24  production, but it doesn't matter.  I'm just making that

25  statement and that observation.

1         THE COURT: Okay.

2         MR. IRWIN: It doesn't matter because we're going to

3 give it to them now.

4         THE COURT: All right. Fine.

5         MR. IRWIN: So some of the language --

6         THE COURT: The answer to your question is yes.

7         MR. IRWIN: -- is to protect ourselves.

8         MR. MARRIOTT: That's all. I just wanted to make

9 sure that I understood the answer was yes. Thank you.

10 That's all I have until we get to the interrogatories other

11 than --

12         THE COURT: Okay.

13         MR. MARRIOTT: -- to echo Mr. Hackney's concerns.

14         MR. STEWART: Your Honor, I'm Geoffrey Stewart of

15 Jones Day, and I'm hesitant to stand up at all much less in

16 the middle of their presentation. However, the question just

17 raised does implicate a much broader issue that I think

18 actually we are probably not in disagreement on. I'm going

19 to refer to the E&Y analysis, which leads to the forecasts.

20         THE COURT: Um-hmm.

21         MR. STEWART: And we talked about the binder which

22 is being prepared. E&Y has been working for the city for a

23 long time, and their work starts -- and at least describe

24 what they do, and then we can go to what the issue is. They

25 have to start by capturing the financial information,

 1   which -- where they start with city reports, but the city's
 2   records aren't what they could be.  And you've heard Mr.
 3   Malhotra --
 4            THE COURT:  Right.
 5            MR. STEWART:  -- testify.  So E&Y goes back and
 6   looks at other documents and gets more reports and keeps
 7   analyzing.  Now, if Mr. Marriott or others would like a
 8   warehouse full of reports, raw reports, I'm sure we can have
 9   the truck deliver them to him.
10            THE COURT:  Um-hmm.
11            MR. STEWART:  But the objection that's been made --
12   and Mr. Hackney had made this some time ago -- was that's not
13   what they want.  What they want and what they're going to get
14   is E&Y compiling all those reports into a usable form, and
15   it's going to be a spreadsheet in native format so their
16   experts can pick it up and just start working with it.  And
17   that then is the foundation of the pyramid that leads to
18   E&Y's forecast.  I didn't want anyone, though, to be under a
19   misapprehension or to run into an issue with the Court as we
20   get to the confirmation hearing that E&Y produces these
21   incredibly intricate spreadsheets, but the bales of canceled
22   checks and boxes of property tax records and those other raw
23   documents haven't been produced.  E&Y had access to them.
24   I'm sure that over the years they've been working they looked
25   at them.  Those haven't been produced, and we weren't

1    intending to produce them, but if anyone --

2              THE COURT:  But you could offer to produce them.

3              MR. STEWART:  If anyone wants a warehouse full of

4    raw documents, many of which are not very accurate, let me

5    know now because I will give them the key, and they can go

6    sit in the warehouse all day, but what we've done is a

7    different approach, and I didn't want there to be any

8    misunderstanding about that.

9              THE COURT: All right.  Thank you, sir.  I

10   appreciate that clarification.

11             MR. STEWART:  Maybe, Mr. Hackney, before -- I don't

12   know whether, Steve, you or Vince wanted to deal with it

13   since I just added that after --

14             MR. HACKNEY:  I can wait.

15             MR. STEWART:  Okay.

16             THE COURT:  Go ahead, sir.

17             MR. NEAL:  I'll be very brief, your Honor.  Guy

18   Neal, Sidley Austin, for National Public Finance Guarantee.

19   As you know, we filed a statement of unresolved issues, which

20   we'll probably get to after lunch, but I want to make you

21   aware that -- I mean I rise to join this time into what

22   Mr. Hackney requested in terms of an affidavit or

23   certification regarding the production, and here's why.  We

24   have sought -- when I say "we," it's U.S. Bank as indenture

25   trustee for the DWSD bonds, the ad hoc committee of DWSD

1  bondholders, National, Assured, have asked for documents

2  largely going to the DWSD.  We got the same production as

3  everyone else in the courtroom.  I don't know if that

4  production is largely responsive to Mr. Hackney's requests or

5  largely responsive to mine and not to his, and that's why

6  we're having this hearing.  The documents being sought are --

7       THE COURT:  So what would help you?  What would help

8  you make that determination?

9       MR. NEAL:  Well, your Honor, it would either be an

10  index broadly speaking by category, by Bates range for the

11  documents, or, as Mr. Hackney indicated, some sort of

12  affidavit or certification as to how and from whom they

13  collected these documents.  To give you one data point, there

14  is a folder in the production, DWSD folder.  It has 51

15  documents from what I can see.  My review is not complete.

16  There is no custodian for the director of DWSD, no custodian

17  identified, no custodian for the CFO of DWSD.  So standing

18  here today, I have no idea whether they've collected

19  documents from the director or CFO of the DWSD.  I raised

20  this concern last week on Thursday with Mr. Irwin.  He said

21  he would get back to me.  But the way to get back to me and

22  to all of us would be a certification, absent that an index,

23  preferably both.  Thank you.

24       MR. BRILLIANT:  Your Honor, Allan Brilliant on

25  behalf of Macomb County by and through its county agency, the

1  public works commissioner.  And, your Honor, I'm a little
2  confused about the procedure here today, so I'm going to try
3  to be brief and, you know, seek a little bit of direction
4  from your Honor.  We join in Syncora's, you know, general
5  objections as well.  We also had individual objections, many
6  that had to do with relevance that came out in connection
7  with the meet and confers that we had with the city.  Unlike,
8  you know, Syncora, we believe that those can be and should be
9  dealt with today.  We had put together --
10       THE COURT:  All right.  I want to do that, but I
11  want to resolve this issue first --
12       MR. BRILLIANT:  Okay.
13       THE COURT:  -- if that's okay with you, sir.
14       MR. BRILLIANT:  Okay.  There's one issue that we
15  have that is on our list, and, you know, that we do have a
16  common issue with Syncora, and I don't know if your Honor
17  wants slightly different arguments.  You want to resolve
18  things as it only relates to Syncora?
19       THE COURT:  What is that issue?
20       MR. BRILLIANT:  That issue is the date, you know.
21  You know, we had --
22       THE COURT:  Yeah.
23       MR. BRILLIANT:  We had four specific document
24  requests that requested documents prior to January 1, 2013,
25  and we had, you know -- you know, we're willing to live with

1 | the January, you know, 1, 2013, date with respect to our

2 | other requests, but with respect to those four, we had asked

3 | for confirmation from the city that they had gone back and

4 | searched --

5 | THE COURT:  Okay.

6 | MR. BRILLIANT:  -- for those documents, and we

7 | haven't gotten that, so I don't know --

8 | THE COURT:  I'm sure you're not the only one in that

9 | category.

10 | MR. BRILLIANT:  Yes, your Honor.  Would it be

11 | helpful, your Honor?  Maybe we can do this before we break.

12 | We can give you a couple of copies of our list.  We shared

13 | them with the city yesterday, so we have --

14 | THE COURT:  That would not be helpful.  Let me ask

15 | you just to hold onto that until we get to that phase of our

16 | hearing.

17 | MR. BRILLIANT:  Thank you, your Honor.

18 | THE COURT:  Sir.

19 | MR. ANGELOV:  Your Honor, Mark Angelov for Ambac

20 | Assurance Corporation.  I will also try to be brief.  I

21 | wanted to give the Court an example of what we believe is a

22 | fairly substantial category of documents that is not included

23 | in the production and, based on discussion today, doesn't

24 | sound like it will be forthcoming, and --

25 | THE COURT:  Go ahead.

1          MR. ANGELOV:  -- this has to do with the manner in

2    which the city calculated the amount of its OPEB claim.  This

3    number has changed at least four times from the original

4    proposal to creditors and then through the four subsequent

5    revisions of the plan.  We've asked for things backing up the

6    calculations, including assumptions, work papers and such,

7    and we are not seeing any of the backup material with the

8    exception of the very first $5.7 billion valuation.  And just

9    to add also, I think to say that the documents are tech

10   searchable and they will enable us to find this is a little

11   bit of an oversimplification.  We've searched for the word

12   OPEB.  We came up with hundreds of -- with hundreds of Excel

13   spreadsheets and other large documents.  And it's just not

14   a -- frankly, a very productive effort.

15          With respect to metadata also -- and I've raised

16   this with Mr. Irwin -- the metadata does seem to be flawed.

17   We have documents --

18          THE COURT:  Seem to be what?

19          MR. ANGELOV:  Flawed.  We have documents that

20   identify individuals as custodians, and when you look at the

21   metadata as to who was on the e-mail, including bcc's, that

22   person is not listed, so that makes it very difficult to

23   review.  Two more points I'd like to make.  One is with

24   respect to the date, and I will not touch upon the January 1,

25   2013, limitation.  It's really the other end of the city's

1 objection.  I understand from the meet and confer the city is

2 taking the position by saying that they will search for

3 documents as of the date of their response that they will not

4 be supplementing their production as new documents come into

5 possession of the city, and we think that's problematic also

6 considering how much will likely occur in this case between

7 now and the confirmation hearing.

8          I would also like to add to the list of suggestions

9 that Mr. Hackney had one more item.  It is not altogether

10 clear to us with respect to certain requests whether a search

11 was undertaken.  I don't want to go into the specific

12 requests that Ambac made at this juncture.  I understand

13 that's -- we're going to save that for later, but one of the

14 requests we propounded on the city sought information related

15 to the water and sewer department.  During the meet and

16 confer, Mr. Irwin indicated that no search was undertaken

17 with respect to those documents.  However, to the extent they

18 happen to be in the production, they didn't pull them out

19 either, and the concern I have with that is the response to

20 this particular document request states that subject to the

21 objections, the city responds that it will produce

22 nonprivileged documents in its possession, custody, or

23 control to the extent they exist that are reasonably

24 responsive to this request as the city understands it.

25 That's the same boilerplate that we have in response to every

1   single one of our document requests, and we just can't tell

2   sitting here today whether the city actually undertook the

3   search with respect to all the other document requests that

4   we made.  And we think that if the city were to provide the

5   requesting parties with specific information as to which

6   requests they did searches for and which ones they did not,

7   that would be very helpful.  Thank you.

8           MR. HACKNEY:  Your Honor, I'll try to be brief if I

9   can.  First, I just want to say that, you know, this isn't

10  like treat Geoff Irwin like a pinata day.  I know Mr. Irwin.

11  He's a good guy, and I will tell you what I told him a week

12  ago, which is I said that I didn't envy his --

13          THE COURT:  He doesn't look very satisfied by that.

14          MR. HACKNEY:  Well, I told him a week ago -- I said,

15  "I think that you have no chance of getting this right under

16  the schedule, and I don't envy you," but we are all living

17  under the schedule.  We have to figure out our way out of

18  this, and I want to give you an example of what I'm looking

19  at as someone who's reading this response.  So this is our

20  request Number 71, and it is for every revenue line item in

21  Exhibit H to the disclosure statement, provide the following

22  documents or data: "A," in Microsoft Excel format comparable

23  data for every fiscal year from 1980 through 2007, so we're

24  trying to look back at the city's history; "B," documents

25  sufficient to show the related tax rates as applicable during

1   that period, documents sufficient to show forecasted tax

2   rates, documents sufficient to show all changes in any tax

3   provision or computational element, documents sufficient to

4   show all forecasted changes in any tax provision.  These are

5   the heart and soul of a municipality's forecast.  The

6   response to this request was, "No."  It was not, "We'll give

7   it to you in expert discovery, you know.  We'll get it to you

8   at some point."  It was, "No."  So that's the type of

9   response when you pick it up and you look at that request,

10  you see that response, and then when we get together and

11  we're under this expedited process and the city says, "Maybe

12  we'll be magnanimous and we'll produce this factual data to

13  you in two or three weeks," where my experts are waiting for

14  the data, that doesn't work.  The January 1, 2013, limitation

15  does not work in a case where two of the key issues are the

16  forecasts, which everyone knows are based on historical

17  information, number one, and, number two, the art, which is

18  this longstanding historical issue that played out over --

19          THE COURT:  Why do you need 35 years?

20          MR. HACKNEY:  What's that?

21          THE COURT:  Why do you need 35 years?

22          MR. HACKNEY:  I guess the -- I think the answer with

23  respect to forecasting is that more is better.  I mean if

24  they come back and say, "Look, we can get you ten" --

25          THE COURT:  Okay.  Then why not a 135?

1    MR. HACKNEY:  Well, because I guess we were trying
2    to be reasonable to the city.  I will tell you, your Honor, I
3    got that one answered no matter which way you go.  We got
4    this forecast from our economist, so we said what goes into a
5    forecast, what do you need to do to understand it and what do
6    you need to do to build your own, and so he gave us this.  I
7    don't think there's anything magical about 1980.  I think
8    there's an expectation that to the extent the data is
9    available, we'd like to see it.  If they say, look, this is
10   where the -- this is where you have to be practical.  We
11   cannot be playing this out in front of you because it doesn't
12   work.  I mean you can just see we're at "C" here.  Okay.  And
13   if they came back to us and said the computer systems were
14   different through '85, and then they brought in this system
15   that we do sort of have access to, then we'd say, fine, go
16   back to '85.  I mean we can work it out, but we've got to
17   have the methodology that went into their collection first.
18   And I'm not trying to relieve creditors of our obligation to
19   review the documents that we've requested.  There's no
20   question that we all have to take it upon ourselves to go
21   through the production and bring our own affirmative view of
22   what should have been produced but wasn't.  What I am saying
23   is make the city in parallel provide a certification that
24   describes the methodology by which they collected all of this
25   because what I'm really doing here, your Honor, is I'm kind

 1    of -- I'm encouraging you to make an efficiency bet that
 2    rebooting this hearing for 14 days from now after they've
 3    produced to us a document that describes the method by which
 4    they collected the documents and we've gone through the
 5    documents so that we can meet in the middle and understand is
 6    a more efficient course, but in some respects I almost feel
 7    like it's the only course because here's the problem.  If you
 8    say, "I'm going to sustain all the objections and we're
 9    not" -- you know, we're not given access to the information
10    before January 1, 2013, that's going to be a big problem for
11    the case.  If you say, "I'm overruling that limitation
12    today," well, then the city has got to go back and redo the
13    entire production to pick up historical information, so if
14    the city wants to continue forward, they need to work more
15    practically with us and build a practical understanding of
16    what was and was not produced.
17           And I wanted to make one last point on the DIA, your
18    Honor, because I think there's something that's important
19    going on here with respect to the DIA, and that is this.  You
20    know, when art motion one was up, as it's been described --
21    art motion two is the one on Thursday -- Bruce Bennett got up
22    and said words.  Counsel to the city, Mr. Bennett, got up and
23    said words to the effect of the DIA Corp. is the custodian of
24    these documents, but we will facilitate people's access to
25    the documents.  And I think what's happened here with the

1　city is when we've asked the city, "We'd like an inventory of
2　all the art," the city has said, "Well, subject to our
3　general objections, we'll produce it to you," and the answer
4　today was eventually, "I don't think we did produce one, but
5　they're getting access to the DIA." What I want to know is
6　if the city is saying all of the art-related information is
7　in the hands of the DIA, then so be it. I will work through
8　my subpoena with the DIA. First of all, I question that.
9　There were a lot of historically important documents that
10　happened back in the 1919 time period and 1920s that if
11　someone can say, "No, no, it all went over to the DIA," fine,
12　certify to that, but also say, you know, "That's not how we
13　archive documents," or, "This is where the city's like
14　historical records are. Let's be clear about that," fine.
15　But second of all, in the course of deciding to enter into
16　the grand bargain, Mr. Orr must have had documents pulled
17　together for his review and consideration so that he could
18　decide what to do here, so if the city is saying not only was
19　the inventory just generally maintained by the DIA but even
20　today we don't have one, we don't have a sense of what's in
21　the art collection or we don't have anything when it comes to
22　value outside of Christie's, that's fine, but they need to
23　say that. I think what's happened, if you read their
24　responses, there's kind of an effort to move it around a
25　little bit here because I don't think they want to concede,

1  no, we didn't diligence this issue down to the screws and

2  then come back and make a decision to do the grand bargain.

3  We looked at this thing and said, "Ah, it's generally

4  complicated.  We're going to go the route of the grand

5  bargain," and I think creditors are trying to understand what

6  exactly did you do to understand this.  This is a potential

7  multi-billion dollar issue, so it's just one example of

8  wanting to be clear about what do they have that relates to

9  the art.  If they're saying nothing, then we will work

10  through our subpoena with the DIA.  If they are going to at

11  trial say, "No.  We did do an investigation, and we obtained

12  documents from the DIA in order to inform our decision," then

13  produce them so that we can see what you got and what form --

14  inform the decision.  That's all I had.

15          MR. NICHOLSON:  Your Honor, Michael Nicholson for

16  International Union UAW.  Just briefly I want to report to

17  the Court that in terms of the index issue and the

18  searchability issue, we were able to search -- we had a

19  particular concern about the Detroit Public Library as it is

20  implicated by the plan, and we were able to put a good

21  paralegal on this and segregate out the documents in an hour

22  or so, so I just wanted to affirm what Mr. Irwin said about

23  that.

24          THE COURT:  Okay.

25          MR. NICHOLSON:  We found it to be satisfactory.

1 Your Honor, also, before you break for lunch, if I'm the last

2 lawyer standing, Ms. Lennox and I have an issue to raise with

3 you, a time-sensitive issue on another matter if you'll

4 permit.  It'll take about a minute.

5          THE COURT:  Okay.  Hold on that.  We'll see if

6 there's anyone else who wants to say anything on this.  No.

7 All right.  What is your issue, sir?

8          MR. NICHOLSON:  Your Honor, you entered an order

9 approving a stipulation between the city and the UAW on

10 Friday, I believe, and we discovered an error, and the

11 parties have agreed to submit papers to you to get that

12 approved.  I'm informed by Ms. Ceccotti that they've been

13 having some difficulty with your chambers figuring out the

14 right format, and we need to get that entered so we don't

15 have to meet today's objection deadline.  And they couldn't

16 get your clerk and wanted to reach you over lunch.

17          THE COURT:  She's here.

18          MR. NICHOLSON:  So if you could deal with this over

19 lunch, it would be much appreciated.

20          THE COURT:  So did you submit a Word version of an

21 order amending the order that has the mistake in it?

22          MR. NICHOLSON:  Jones Day is -- was doing the

23 submitting, so I can't speak to that, but your colleague --

24          MS. LENNOX:  And I have been in court, your Honor --

25          MR. NICHOLSON:  Right.

1          MS. LENNOX:  -- so we can certainly find out.

2          THE COURT:  Okay.  I will make this assurance to

3     you.  If there is an order that has been submitted, I will

4     review it over the lunch hour.

5          MR. NICHOLSON:  Okay, your Honor.  We'll try to get

6     it to you.

7          THE COURT:  So you need to -- you need to see that

8     that happens.

9          MR. NICHOLSON:  Okay.  Thank you.

10          THE COURT:  All right.  We will break for lunch now.

11     I'm going to take this matter and the other matter under

12     advisement.  In the meantime, I want you to use your time to

13     see if you can work out an agreement that's acceptable to all

14     on the clawback issue and report back to me.  And we'll

15     reconvene at 1:30, please.

16          THE CLERK:  All rise.  Court is in recess.

17        (Recess at 12:07 p.m., until 1:30 p.m.)

18          THE CLERK:  All rise.  Court is in session.  Please

19     be seated.  Recalling Case Number 13-53846, City of Detroit,

20     Michigan.

21          THE COURT:  All right.  Who'd like to address what

22     you've worked out on the issue of the disclosure of the

23     confidential documents?

24          MR. SCHWINGER:  Your Honor, Robert Schwinger from

25     Chadbourne & Parke for Assured Guaranty.  We have been able

1   to work out a procedure with the attorneys for the city.
2   What we've worked out is that all the parties who received a
3   disk drive will return the disk drive.  Everyone who's
4   received the disk drive is going to purge any paper or
5   electronic copies that were made of that -- of the
6   information or of anything they've prepared with information
7   that's derived from that subject to one exception, which I'll
8   get to in a minute.  Everyone who is doing this purging and
9   returning will certify and file a certification with the
10  Court that they have done and completed this process.  The
11  exception that I mentioned is is that we've all agreed that
12  to the extent that the city is going to do the reproduction,
13  which I understand from Mr. Irwin to take place in a few
14  days, two, three days, it should keep Bates numbers on
15  documents the same except to the extent when a document is
16  pulled, it'll just be an empty Bates number, won't be
17  anything there.  And if a party has prepared, say, a list of
18  what's often referred to as issue tags for a particular Bates
19  number, they can just keep the list of Bates numbers and
20  tags, so, for example, if they know that document number six
21  deals with DIA, they can keep that information so when they
22  get the replacement set, they can just pop in the DIA code
23  back to that document, but the substantive content of the
24  document itself will have been eradicated, and this way we,
25  you know, stop the bleeding immediately by having everyone

1    immediately return the disks.

2           With regard to the issue of costs which were talked

3    about, that we did not resolve anything on because that

4    involves obviously issues beyond just my client, but

5    everyone -- the point is -- obviously is that parties will

6    have costs of various kind depending on what they've done and

7    how this remedy affects them.  We, for example, you know, did

8    processing of our own of the documents to the point where we

9    saw this.  We had the cost of making this motion and so on,

10   and so those are issues which we're not marking as disposed,

11   but we're just leaving them for the Court's further

12   consideration as the Court sees fit and in such a time and

13   manner as the Court sees fit.

14          THE COURT:  Thank you.  Is that your agreement, sir?

15          MR. IRWIN:  Yes, it is, your Honor.

16          THE COURT:  Does anyone have anything further to say

17   about this matter?

18          MR. HACKNEY:  I just wanted to ask a question of

19   counsel or make a suggestion, which was it might be a good

20   idea just to run some similar types of searches to the ones

21   that found the documents in question rather than just

22   excising the 120 or whatever that have been identified like

23   searching for Rosen or Roberts or different things like that,

24   nothing exhaustive, but I had heard from other people that

25   the ones that have been identified weren't the extent of it,

1   so I just thought before we reproduce the new hard drives, we

2   might just want to at least make an effort to make sure that

3   we got them all to the best of our ability.

4           MR. IRWIN:  Yes.  Your Honor, the first letter that

5   attempted to claw these back identified about two dozen or so

6   that were subject to the mediation privilege.  When I say we

7   now have something in the 120 or so range, that's what I

8   mean.  We ran additional searches, and we -- as of right now,

9   we think this is a -- we've got our arms around it, and we'll

10  certainly --

11          THE COURT:  Okay.

12          MR. IRWIN:  -- do our very best when we reproduce.

13          MS. GREEN:  Good afternoon.  Jennifer Green on

14  behalf of the Retirement Systems.  Would it be possible to be

15  exempt from the process if the minute we got the clawback

16  letter we took all those out of our database before anybody

17  saw them so we can keep coding?  We've been coding for three

18  days, and I have people at the office coding right now, so

19  I've never seen the documents.  Bob Gordon has never seen the

20  documents.  We took them out the minute we got the letter.

21  Is there any way we can make an exception for people that are

22  furiously coding and trying to categorize the documents as

23  quickly as possible?  I don't see how it would be any

24  different if we had to return the hard drive and go through

25  the whole rigmarole.  I could sign a certification that I

1  haven't seen the documents and that no one else has, but I
2  leave that to your Honor and that the city would be willing
3  to take that stipulation.  Thank you.
4          MR. SCHWINGER:  Your Honor, to address that point,
5  the problem is is that, you know, as of now the city has only
6  identified a small portion.  There's two dozen or so out of
7  120, so there are plenty of documents out there which are
8  being looked at and reviewed, and the whole idea is, as I
9  said, to stop the bleeding right now immediately and
10 having -- shutting it down with people preserving their issue
11 coding seems to be the best way to do that.  And I presume
12 also that part of this process -- and it's essentially
13 implicit -- that the city is known to -- have to essentially
14 certify that they have now completed everything and be done
15 and not -- you know, not have another round of this crop out
16 in a week, but I would assume that was implicit in the --
17         THE COURT:  I think any exceptions, Ms. Green, would
18 become administratively burdensome because your client won't
19 be the only one who wants such an exception, and then the
20 whole enterprise loses value, so all right.  I will accept
21 your resolution of this.  Did you plan to do an order?
22         MR. SCHWINGER:  We can submit an order, yes, your
23 Honor.
24         THE COURT:  All right.  And in the order say that
25 any request for reimbursement of expenses or costs by any

1   party should be by motion, and we'll process any such

2   requests in the ordinary course of our motion practice.

3           MR. SCHWINGER:  Yes, your Honor.  Thank you.

4           MR. IRWIN:  Your Honor, may I make one clarification

5   in connection with the last part of --

6           THE COURT:  Yes.

7           MR. IRWIN:  -- your comment?  My understanding of

8   the agreement certainly from the city's perspective is that

9   that coding can be preserved, so I wouldn't want anyone to

10  leave here today, I would hope, and destroy coding that they

11  would then later incorporate into some sort of motion for

12  reimbursement.

13          THE COURT:  I agree.  Looks like we got some volume

14  back into our microphones.  Okay.  Let me turn attention then

15  to the Official Retiree Committee's motion to compel Wayne,

16  Macomb, and Oakland County to produce a privilege log.  It is

17  certainly the default and the standard that a privilege log

18  be maintained; however, the case law establishes that in

19  certain circumstances the Court does retain the authority to

20  excuse the requirement that would otherwise apply to produce

21  a privilege log.  The standard that the cases seem to apply

22  is that the requirement to produce a privilege log can be

23  excused by the Court when the costs associated with

24  production of such a privilege log substantially outweigh any

25  potential benefit to the process that might result from

1  granting the motion.  In these circumstances here, the Court
2  has determined to exercise its discretion to excuse the
3  production of the privilege log by the three counties.  The
4  record isn't very strong on this point, but it is sufficient
5  for the Court to find that in the case of each of these three
6  parties, it would create an extraordinary burden for them to
7  produce the log that the Official Committee of Retirees seek
8  here, and the record further establishes that the benefit to
9  the process of receiving such a log is uncertain or minimal
10  at best.

11       The Court also took into account that the city,
12  who's, among all of the parties in the room, the most highly
13  motivated to obtain the confirmation of its plan, has
14  determined that it can proceed to seek confirmation of its
15  plan without this privilege log, so in the circumstances the
16  motion is denied.

17       Turning next to -- so much of Syncora's motion to
18  compel as it argued here today, the Court must conclude that
19  it was unfair, inappropriate, and inefficient for the city to
20  send out to all of the parties who requested the production
21  of documents the same production without any methodology for
22  determining what parts, if any, of the production would apply
23  to the request that that party made and without identifying
24  how the documents that were produced were determined should
25  be produced, so the Court will grant Syncora's motion, will

1   require the city to provide an affidavit or certification as

2   to how it compiled the documents that it did, what search

3   terms it used, what custodians it accessed.  It will also

4   require the city to provide a kind of an index of the

5   documents, and this index should not merely list the

6   documents but list the documents by what matter or issue in

7   the case the document relates to.

8          The Court is troubled by the city's selection of the

9   look-back period for the production, if that's the right

10  terminology, of January 1st, 2013.  The Court certainly

11  agrees that for purposes of proceeding the way the city chose

12  to proceed, it had to choose a date, but that date appears to

13  the Court to be perhaps too -- would result in perhaps too

14  much under-inclusion of the requested documents, so while

15  I'll permit the city to proceed in the way it did, it appears

16  to the Court it should go back to January 1st, 2012, as a

17  default.  Certainly there are specific requests for

18  production of documents that go back before then, and so this

19  order is without prejudice to the right of any party in

20  seeking rulings on its specific requests for production of

21  documents to seek requests -- to seek documents that go back

22  even before then.  And the Court will prepare orders on those

23  two matters.

24         Mr. Irwin, how much time do you think it would take

25  to provide -- or to comply with the order that the Court is

1  entering here today?

2          MR. IRWIN:  It would certainly -- it would take a

3  few days.  I would say we should be able to do it by Friday.

4          THE COURT:  Okay.

5          MR. IRWIN:  May I ask one point of clarification?

6  It would certainly -- we could certainly prepare the

7  declaration by then.  The indexing I -- we'll do the best job

8  we can by then.  We'll do the very best we can.

9          THE COURT:  Well, I want to give you a deadline.

10         MR. IRWIN:  We'll deliver it by --

11         THE COURT:  So I need a commitment from you.

12         MR. IRWIN:  -- Friday, and we'll do the best we can

13  to --

14         THE COURT:  Now, I'll say that it can be extended

15  upon a showing of good cause, but I want to give you --

16         MR. IRWIN:  Yes.

17         THE COURT:  -- a deadline at this point at least you

18  think you can meet.

19         MR. IRWIN:  Yes.

20         THE COURT:  What do you think?

21         MR. IRWIN:  Friday.

22         THE COURT:  All right.  I'll give you till Monday.

23         MR. IRWIN:  Thank you.

24         THE COURT:  All right.  With that ruling, I am

25  willing to consider -- let's see.  We have to do -- we have

1  to deal with Syncora's request to compel answers to

2  interrogatories and then the witness list thing, too, but

3  more than that, I'm certainly willing to consider any more

4  specific issues that any party is interested in presenting to

5  me or if you choose to wait until after this new production

6  comes out with the certification, you can choose to do that,

7  so we'll handle that on an attorney-by-attorney or case-by-

8  case basis.

9        MR. MARRIOTT:  May I speak briefly?

10        THE COURT:  Yes.

11        MR. MARRIOTT:  Vince Marriott, Ballard Spahr, on

12  behalf of EEPK.  We have interrogatory issues as well as I

13  believe other parties do.

14        THE COURT:  Um-hmm.

15        MR. MARRIOTT:  There are some sort of global issues

16  with interrogatory responses that are sort of easily at least

17  iterated today.

18        THE COURT:  Um-hmm.

19        MR. MARRIOTT:  We're also prepared to go into the

20  weeds of individual interrogatory issues as is Syncora.

21  Whether to do that today or whether to sort of give you the

22  high-level issues and then deal with the details at the same

23  time we deal with the document production issues leave to the

24  Court, whatever the Court --

25        THE COURT:  Well, I want to get as much done today

1  as you all reasonably think we can and are willing to present

2  to me today.

3          MR. MARRIOTT:  Okay.

4          THE COURT:  And if we have to go to tomorrow, I'm

5  here tomorrow, too.

6          MR. STEWART:  Your Honor, Geoffrey Stewart, Jones

7  Day, for the city.  The city has probably a couple of dozen

8  document requests or interrogatories to which it seeks

9  answers.  Now, we've narrowed these substantially by meets

10 and confer -- meet and confers, but there are still a number

11 of them.  These would not depend on anything the city was

12 going to next do.  This obviously --

13         THE COURT:  Right.

14         MR. STEWART:  -- is coming the other way.  My guess

15 is we could get all of that done in less than one hour and

16 maybe 45 minutes even, but I think that's ripe for

17 adjudication today.

18         THE COURT:  Okay.  One second, please.  Do you want

19 to be heard?

20         MS. O'GORMAN:  Your Honor, Debra O'Gorman again on

21 behalf of Macomb by its public works commissioner.  We have a

22 couple of issues to raise with respect to the city's

23 objections to request for production.  One relates to time

24 period, and I do hope that that will get resolved at least

25 partially by your order.  There are two relevance issues --

 1  well, relevance issue and one confidentiality issue that the

 2  city has raised that do require your consideration today.

 3  One relates to the city's --

 4          THE COURT:  I need to cut you off because I want to

 5  get back to Syncora because we haven't quite finished up with

 6  them yet.

 7          MS. O'GORMAN:  Okay.  Thank you.

 8          THE COURT:  Thank you for your patience.

 9          MR. HACKNEY:  Thank you, your Honor.  Stephen

10  Hackney on behalf of Syncora.  So, first of all, Mr.

11  Hertzberg has asked and we've agreed, to the extent the Court

12  is agreeable, to have the motion to clarify witness testimony

13  handled now because he has some conflicts later.

14          THE COURT:  That's fine.

15          MR. HACKNEY:  With respect to the interrogatories,

16  as I said earlier, we are actually of the view that we could

17  go rog by rog and go through them, and so I stand ready to do

18  that whenever the Court wants to.  Like I said, I didn't mean

19  to jump us up to the head of whatever creditor process you

20  had, but Mr. Arnault is going to argue the witness

21  description --

22          THE COURT:  Okay.

23          MR. HACKNEY:  -- motion, so I'd ask him to take it.

24          THE COURT:  Go ahead, sir.

25          MR. ARNAULT:  Good afternoon, your Honor.  Bill

1  Arnault on behalf of Syncora.  I'd like to actually begin by

2  addressing some of the comments and the notion that occurs in

3  the city's response that this is just another instance of

4  Syncora bringing a motion to bring a motion and being

5  litigious just for the sake of being litigious.  And I think

6  it's helpful to provide a little bit of context and a little

7  bit of background as to how this came about and what's

8  actually driving our motion for more descriptive witness

9  descriptions.

10       THE COURT:  Well, before you do that, I have to just

11  throw out to you in the hope that you'll answer it at some

12  point the question that bugs me about your motion.

13       MR. ARNAULT:  Sure.

14       THE COURT:  Isn't the precise kind of information

15  you seek by this motion done ordinarily in all other

16  litigation in the context of interrogatories, and, if so, why

17  wasn't that done here, or maybe it was?

18       MR. ARNAULT:  Well, I think it was in connection

19  with your order where you required the city to provide

20  witness descriptions and descriptions of the topics that they

21  would be testifying about, and we believe that that

22  information was not sufficient, so while we could have asked

23  it in an interrogatory, it seemed as though the Court also

24  wanted the city to provide that information to presumably

25  streamline the process and make depositions go a little bit

1 | more smoothly and just continue moving along at the pace that
2 | we've been moving along. So while we certainly could have
3 | done that in the interrogatories, we also believe that there
4 | was -- the city had an independent duty to provide the
5 | information given the Court's order.

6 | So, anyways, to back up and just -- so starting with
7 | the Court's order requiring the city to provide the witness
8 | descriptions, on April 18th we received the city's amended
9 | witness list, and as part of that list they identified 30
10 | witnesses. And as part of the descriptions for those
11 | witnesses, they provided descriptions like plan feasibility
12 | or DIA settlement and museum issues or the best interest of
13 | creditors. And we didn't really find those witness
14 | descriptions to be all that enlightening, so on April 28th, I
15 | think, about two weeks ago, we actually reached out to the
16 | city and sent them a note and said, "Hey, listen, this isn't
17 | very helpful. We think we're going to run into problems when
18 | we get into depositions, so would it be possible to update
19 | these and provide more practical, more detailed descriptions
20 | to hopefully make everybody's lives a little bit easier?"

21 | THE COURT: Give me an example of a witness and what
22 | more information you would have thought would be necessary to
23 | comply with the Court's order.

24 | MR. ARNAULT: So, for example, Kevyn Orr is one of
25 | the witnesses who is listed, and under Mr. Orr they list the

1    topic of plan feasibility.  So plan feasibility obviously

2    encompasses a lot of different things, but it certainly

3    encompasses the forecasts and the assumptions that go into

4    those forecasts and the data that's utilized to build those

5    forecasts, so it would be helpful to know when we're prepping

6    to take his deposition whether he's planning on talking about

7    the forecasts and the ten-year projections or whether he's

8    going to defer that to Mr. Malhotra, and that way we're not

9    spending a couple hours or probably more than that preparing

10   and then questioning him about those topics during his

11   deposition or to take an example the DIA issues, so right now

12   they've listed DIA settlement and museum issues.  It would be

13   helpful to know who's going to speak about the restrictions

14   on alienability.  Who's going to talk about the process that

15   went into the grand bargain?  Who's going to talk about the

16   COP issues?  So rather than these big general plan

17   feasibility which they've listed for seven or eight

18   witnesses, if we could get some more specificity, that's

19   going to go a long way towards streamlining the process and

20   just making sure that it's a better process for both the city

21   and the creditors as well.

22        THE COURT:  Well, if I were to grant your motion and

23   put the words "more specificity" into my order, Mr. Hertzberg

24   is not going to know how to comply with that --

25        MR. ARNAULT:  Well --

 1          THE COURT:  -- because as far as he's concerned --

 2    and I don't know if he's right about this or not -- it could

 3    be argued here that Syncora would never be satisfied

 4    regarding the specificity unless it had his direct

 5    examination script.  Is that the specificity you want?

 6          MR. ARNAULT:  No, no, no, definitely not.

 7          THE COURT:  No, but so you see my problem here.

 8    More specificity doesn't help me.

 9          MR. ARNAULT:  Well --

10          THE COURT:  What do you want?

11          MR. ARNAULT:  Well, it would be helpful to have for

12    each witness that they plan to call a short narrative

13    describing the topics that they are going to address beyond

14    just this plan feasibility and the best interest of

15    creditors.  We don't need a bullet-by-bullet here's the

16    questions that we're going to ask, but certainly the topic

17    of, again, for example, plan feasibility can be broken down

18    to more discrete subparts than what it's currently broken out

19    to.

20          THE COURT:  Right.  Give me ordering language that

21    you want me to consider.

22          MR. ARNAULT:  The Court orders that the city shall

23    provide witness descriptions that -- or shall provide a short

24    narrative describing the specific topics that each of the

25    witnesses will address, and we're even willing to provide

1   language that doesn't limit the city, so if they want to come

2   up with new topics, they're not going to be restricted to

3   those topics, but -- so I mean there is a -- it doesn't have

4   to be bullet by bullet, but there is a middle ground that I

5   think we can all agree on, and they certainly haven't found

6   that middle ground given these general descriptions.

7        THE COURT:  The language you just dictated is hardly

8   more helpful than more specific than they already have

9   because what you said was a narrative that more

10  specifically -- that provides more specifics as to what the

11  witness will testify to.

12       MR. ARNAULT:  Yeah.

13       THE COURT:  I need language from you that will avoid

14  a second motion by Syncora which says, "Your Honor, we got

15  this order, and the city gave us some more information, but

16  it's not complying with the order."

17       MR. ARNAULT:  Sure, and certainly we can work with

18  the city on that if your Honor agrees that the descriptions

19  aren't satisfactory as they currently are.  We're happy to go

20  back and come up with some language that provides the city

21  with the specificity and the particularity that they need in

22  order to provide adequate witness descriptions.

23       THE COURT:  One second.  Your proposed order says

24  the debtor shall provide specific descriptions of the

25  subjects that each of its fact witnesses will address,

1  specific descriptions of the subjects.  Anything further?

2          MR. ARNAULT:  No.  Thank you, your Honor.

3          THE COURT:  All right.  Mr. Hertzberg.

4          MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper

5  Hamilton, on behalf of the city.  Let's start with the

6  witness that was brought forth by Syncora for example

7  purposes, Kevyn Orr, in which we say that Mr. Orr is going to

8  speak to the feasibility issues, et cetera, in our witness

9  descriptions.  It's hard for me to believe that they can

10  stand there with a straight face and say that they need

11  further information, for example, on what Mr. Orr is going to

12  testify to.  To refresh the Court's memory, they have deposed

13  Mr. Orr, I believe, four times, maybe five times throughout

14  this process.  They've had him on the stand on cross-

15  examination three, four times on all issues related to

16  eligibility, related to the swaps.  They've gone into several

17  issues on depositions.  And to say now that they're concerned

18  that they don't know what he'll testify to as to plan

19  feasibility, I don't know how they can really say that to the

20  Court with a straight face.  They know exactly what our

21  witnesses are going to testify to.  It's specified within the

22  witness list, and let me give you a few examples.  They want

23  us to go through all the witnesses, so let's just take a

24  couple and see what they're asking for.  Charles Moore,

25  Conway MacKenzie, plan feasibility.  The plan was proposed in

good faith.  I'm sure they know what the good faith standard
is under the Bankruptcy Code.  The city's historical,
current, and future ability to provide adequate levels of
municipal services.  That's pretty clear what he's going to
testify to as to the services and the ability to provide
adequate levels.  The city's ability to make payments
contemplated in the plan.  That's pretty clear that he's
going to testify as to whether they can make those payments
that they've put in their plan and whether the plan is fair
and equitable, in the best interest of the city, businesses,
citizens, and creditors.  That's pretty clear, too.  I want
to just give the Court a couple more examples and show why
it's not reasonable what they're doing here and why it's
really a hyper-reflective act that they've done, once again,
to file an emergency motion with this Court.  James E. Craig,
Detroit police chief.  Plan feasibility.  If the Court --
refresh the Court's memory.  Chief Craig testified as to
service insolvency, so they already know what he's going to
testify to because he was here.  They cross-examined him on
that.  The city's historical, current, and future ability to
provide adequate levels of police services.  I think that's
pretty clear what he's going to testify to.  Let's just get
another category.

THE COURT:  We don't have that same sort of added
specificity for Mr. Orr.

1          MR. HERTZBERG:  No, but they've deposed Mr. Orr five

2     times.  They know exactly the type of testimony Mr. Orr is

3     going to give.  The same as to Mr. Malhotra.

4          THE COURT:  Have they deposed him in regard to the

5     plan?

6          MR. HERTZBERG:  No, but they deposed him in regard

7     to eligibility.  They went into his whole background in

8     regard to the swaps on I think it was three depositions

9     during the swap period.  Might be two; might be three.  My

10    memory is not a hundred percent on that, but they've gone

11    over in detail.  They've probably got over 20 hours of

12    deposition testimony from Mr. Orr plus probably another six

13    to eight hours that he was on the stand.  They've got like 30

14    hours of him testifying.  They know exactly what his

15    knowledge base is.  They're sophisticated attorneys, and

16    they've sent out interrogatories.  If they want more

17    information, they got it through interrogatories or they

18    should have asked through interrogatories.  It's not our

19    obligation to write up summaries that are really discovery

20    answers for them in advance of depositions.  That's what

21    depositions are for.

22          And I want to give the Court one more example just

23    so -- from these different categories.  I'm trying to break

24    them into categories.  Dan Gilbert.  Plan feasibility.

25    That's a generic term.  We all know what plan feasibility is,

1   and it's used as a generic term throughout the witness list.

2   Importance from a business and investment standpoint of the

3   city, ability to capitalize and build on the efforts

4   contemplated in the plan post-bankruptcy, the importance and

5   effect of addressing the plan, among other things, the city

6   blight, public safety, and urban revitalization.  And I can

7   keep going example after example, but they point to the --

8   the two obvious ones is what they're going to point to, Kevyn

9   Orr, Ken Buckfire -- or three of them, and Mr. Malhotra from

10  E&Y.  These are all parties.  They know what they've -- what

11  the divisions are and responsibilities, for example, what Mr.

12  Buckfire has been involved in.  They know.  They've deposed

13  him.  Same with Mr. Malhotra, who's built up the projections.

14  We all know what he's going to testify to, so it was just, in

15  my opinion -- I don't know why the motion was filed.  We

16  tried to be reasonable on it.  We never said we wouldn't do

17  it.  We don't have a requirement to do it.  I believe the

18  descriptions are adequate, but we offered to do it as we got

19  closer to the deposition of the individuals.  We're in the

20  process of interviewing our witnesses.  I can tell you I did

21  two of them last week, at the end of last week, so we're just

22  getting the testimony together.  I offered in our pleading

23  five days before to give further descriptions to help them,

24  which I don't believe we needed to do, but we offered it, and

25  it's still not enough.  I don't believe that we have to do

1   what they're asking.  I think what our offer is to give them

2   additional information five days before is more than

3   adequate.  I think the information contained within the

4   descriptions that we've already given is more than adequate,

5   but we'll give them a little more detail.  Thank you, your

6   Honor.

7           MR. ARNAULT:  Very briefly, your Honor, just to

8   address a few points that Mr. Hertzberg made.  First of all,

9   we actually did not depose Mr. Orr in connection with

10  eligibility.  We certainly deposed him in connection with the

11  swaps trial, but simply because we deposed him in connection

12  with those topics doesn't mean that he revealed information

13  relating to plan confirmation.

14          Secondly, Mr. Hertzberg mentioned numerous times

15  that we all know what they're going to say and what people

16  are -- what the witnesses are going to say, and if that's the

17  case, it doesn't seem like it would be overly burdensome to

18  provide additional information.

19          And then my final point, your Honor, is, again,

20  going back to Mr. Orr and this idea that he's going to be

21  testifying about plan feasibility -- and actually during the

22  break Mr. Hackney talked with Mr. Hertzberg and asked him

23  whether Mr. Orr would be testifying about, for example, the

24  plan forecasts and the projections and the assumptions that

25  went into that because that's a huge part of feasibility, and

1    Mr. Hertzberg said, "I don't know," so, again, that's just

2    the type of clarity we're looking for so we're not spending

3    hours and hours preparing for a witness who's not actually

4    going to testify about those topics even though they are

5    listed in their witness list.  Thank you.

6              THE COURT:  All right.  The Court concludes that the

7    witness list that was provided does adequately and fully

8    comply with the Court's order.  Accordingly, the motion is

9    denied.  If Syncora or really any party had sought further

10   information about what each proposed witness' testimony would

11   cover, that is ordinarily the subject of interrogatories and

12   could have been and may well have been here in this case.

13             Let's talk about Syncora's interrogatories.  And

14   this is the process I foresee, ladies and gentlemen, where

15   we're just going to slog through one by one with a ruling,

16   and we'll work until we exhaust ourselves today, and we'll

17   come back tomorrow.

18             MR. HACKNEY:  Your Honor, Stephen Hackney on behalf

19   of Syncora.  I actually -- I have the charts that we prepared

20   for you at your request.  I'm happy to hand them up.  They

21   are -- they tend to be somewhat repetitive because of the way

22   the city handled its objections, but maybe I will just hand

23   up the portion that relates --

24             THE COURT:  Okay.

25             MR. HACKNEY:  -- to the interrogatories.

1    THE COURT:  Whatever you think will make our process

2  more efficient is fine with me.

3    MR. HACKNEY:  May I approach?

4    THE COURT:  Excuse me one second.  You can take a

5  break for a second.  I've been advised that this time-

6  sensitive order is here, so I want to get that done, so just

7  stand down for a moment.  So, Ms. Lennox, this order with

8  the -- or the stipulation with the UAW for a new order, the

9  new order is an order that amends or replaces the one that

10  was entered on Friday?

11    MS. LENNOX:  Correct, your Honor.  It's just a

12  corrected order.

13    THE COURT:  All right.  Can I call it a corrected

14  order then?

15    MS. LENNOX:  Absolutely, your Honor.

16    THE COURT:  All right.  I'll make that change.  And

17  then just so the record is clear, where the order refers to

18  the stipulation, I'll also refer to the docket number of the

19  new stipulation.  Okay.  Does that solve those problems,

20  Chris?  Yeah.  Okay.  All right.  Okay.  All right.  I've

21  signed that order.  I assume it will be processed by the

22  clerk's office right away.

23    MS. LENNOX:  Thank you, your Honor.

24    THE COURT:  All right.

25    MS. CECCOTTI:  Your Honor, Babette Ceccotti for the

1  Auto Workers.  Thank you very much for taking care of that

2  for us.

3            THE COURT:  Oh, all right.  Well, you're welcome.

4            MR. HACKNEY:  Are you waiting on me?  Oh, I'm sorry.

5  So --

6            THE COURT:  But if you need to discuss something,

7  that's fine.

8            MR. HACKNEY:  No.  That's okay.  I didn't mean to

9  stand with my back turned there.  So what happened in the

10  interim, your Honor, was that certain folks have said --

11  while I'm sure many people have flights home tonight -- I

12  know I do and would like to go home tonight -- there are some

13  who maybe have actual conflicts tomorrow.

14            THE COURT:  Okay.

15            MR. HACKNEY:  And so some have suggested to me that

16  there may be an efficient way to organize the afternoon that

17  allows certain people to vent out of the courtroom and get

18  back to work, and so I wanted to -- I don't know how to suss

19  that out, but I wanted to suggest it to you.

20            MR. STEWART:  Geoffrey Stewart, Jones Day, for the

21  city.  Your Honor, I think we have probably eight or nine

22  respondents whose discovery responses we challenge, although

23  these are not blunderbuss issues.  These tend to be very

24  selective.  They could be resolved fairly quickly, and, if

25  so, a number of the lawyers here would certainly -- we'd be

1   done with them, at least.  I know Mr. Perez has mentioned

2   that might --

3               THE COURT:  Okay.

4               MR. STEWART:  -- work for him and some others.  I

5   don't mean to jump the line, though, because I know there's

6   so many things, but I think this might be able to go pretty

7   fast.

8               THE COURT:  Are there any creditors who believe that

9   their objections or requests for additional information from

10  the city could be handled very efficiently or promptly?

11  Okay.  So I'll give you the number two slot.

12              MS. QUADROZZI:  Your Honor, if you put me behind

13  Macomb, you might resolve mine before we get to --

14              THE COURT:  Okay.  I'll give you number three in

15  case.  Anybody else?

16              MR. NEAL:  The DWSD discovery parties as well.

17              THE COURT:  All right.  Four and five.  All right.

18  Let's go that far and see how far we -- what time it is at

19  that point.  Mr. Stewart.

20              MR. STEWART:  Thank you, your Honor.  In keeping

21  with your Honor's order, we've prepared a binder, and I think

22  everyone has the sheets within it, but if they don't, we have

23  spare binders.

24              THE COURT:  Okay.

25              MR. STEWART:  If I may approach with a --

1          THE COURT:  Yes.

2          MR. STEWART:  -- couple of copies.  So, your Honor,

3     the way we've prepared this is there's an inside table of

4     contents with tabs listing everybody who we did have an issue

5     with, but we resolved a number of these already today.  Let

6     me get another pen, though, because I left my pen there.

7     And, in particular, we've already resolved today the issues

8     for Number 4, which is National Public Finance Guarantee

9     Corporation, Number 11, and Number 12, and we've

10    significantly narrowed Number 2.  A lot of the others are

11    only single answer and, therefore, can go pretty quickly.

12    The ones that will take the longest are going to be Ambac and

13    Syncora, and I can take those in either order.  It might be

14    best, though, to start with Syncora because the way Syncora

15    has done it, although we don't agree with the outcome, has

16    been efficient.  And what they -- most of their individual

17    objections relate to things like commercial confidentiality,

18    so -- which your Honor already dealt with with your

19    confidentiality order.  The principal -- and if I misstate

20    it, Mr. Hackney --

21         MR. ARNAULT:  Yes.  Mr. Hackney just left the --

22         THE COURT:  Is he going to be arguing for you?

23         MR. ARNAULT:  Yeah.  He's going to be arguing, so

24    you may want to --

25         MR. STEWART:  Well, why don't we move then over to

1    Ambac so --

2             THE COURT:  Yep.

3             MR. STEWART:  -- we don't -- thank you.  Okay.  Your

4    Honor, Ambac is Tab Number 1.

5             THE COURT:  Okay.

6             MR. STEWART:  And what we've done, we have a

7    separate sheet for each discovery matter in dispute that

8    lists the document, what the request is, what the objections

9    are, and what our reasons are.  Okay.  And some of these --

10   and I did speak with counsel for Ambac, and so some of these

11   are now moot, but there are about four or five that are not,

12   and so I would just start with the first one, which is Number

13   4.  Number 4, your Honor -- and our document requests

14   basically were the same with small tweaks to everybody, so

15   Number 4 here will be like Number 4 to others, and it's self-

16   evident.  What it says is give us your documents about how

17   the plan would impact your claims.  And things like claims

18   and so on I think were defined terms, but it's pretty

19   obvious.  Similar to Number 4 is the next one, Number 6, and

20   I'm going to group three of these together because I think

21   they can be decided together, which are documents showing

22   your projected recoveries or other -- or condition or others

23   under different recovery levels, and then Number 14, which

24   Ambac has said is duplicative, meaning whatever the

25   resolution is of the other two will resolve this one as well.

 1   And the main arguments here really are not relevance.  It's

 2   that it's either privileged or burdensome.  I don't think the

 3   burden is very great, and we're going to put to one side

 4   things that are truly privileged because obviously those

 5   don't get discovered, but matters that a monoline insurance

 6   company analyzes in the normal course of its business for a

 7   credit that it has insured presumably is contained in just a

 8   few files.  We're not talking about a mammoth search of

 9   everything.  This should be pretty confined, so I don't think

10   the burden would be very great.  As mentioned, we have --

11   privilege will be excepted from this.  One of the objections

12   is we already have copies of some of this.  I'm not sure what

13   they're talking about.  Obviously we don't want to waste our

14   own time.  On the other hand, we are allowed to get

15   nonconforming copies of things.  But I view this as a pretty

16   narrow request, and we're happy to make it more narrow, but

17   what we're trying to get here is what documents they have

18   that are not privileged that analyze what this plan will do

19   for them or to them and how would they fare or others fare

20   under alternative recoveries if the plan were different,

21   which both of those, of course, relate to feasibility.  And

22   so maybe the best thing is for me to sit down, and we can

23   just resolve that one and then move along.

24           THE COURT:  Please.

25           MR. ANGELOV:  Your Honor, Mark Angelov for Ambac

1  Assurance Corporation.  I don't have hard copies of the slip
2  sheet, so I'm using my iPad.  It's in airplane mode.
3          THE COURT:  There you go.
4          MR. ANGELOV:  Okay.  Thanks.
5          THE COURT:  Tab 1.
6          MR. ANGELOV:  Your Honor, with respect to these
7  first three requests that the city raised, the main concern
8  here is really burden and relevance.  Just to set the
9  background, what these requests really go to is how much
10  Ambac would recover under the plan or under some alterative
11  to the plan.  The underlying financial information on which
12  this type of analysis might be done is already in the city's
13  possession.  In fact, we are attempting to obtain that
14  information through discovery from the city.  These requests
15  also reference the plan, which inherently puts the date
16  period to starting sometime when the first plan appeared.
17  It's very difficult to fathom how anything that a party in
18  litigation has done with this type of analysis would not be
19  work product, and so given the limited relevance of this,
20  which we still don't quite understand, and the amount of
21  effort it would go to conduct these searches and the
22  relatively large amount of privileged material that would
23  turn up, it just does not seem that the burden is worth the
24  evidentiary value, if any, that these materials would have.
25          I would also add that when we discussed this in the

1   hallway trying to narrow the issues, counsel was insisting on

2   a full ESI search, and the requests are very broad.  They

3   asked for any report reviewed by Ambac, so this really would

4   be a massive undertaking, again, to find something where at

5   best --

6              THE COURT:  Fourteen?

7              MR. ANGELOV:  I'm sorry.

8              THE COURT:  Are you looking at 14?

9              MR. ANGELOV:  I'm looking at 4, 6, and 14.  On 14

10  there is another issue, and it's really this.  This really

11  goes also to how little of this would be discoverable.  Ambac

12  has itself gone through a reorganization.  It doesn't write

13  new business.  It doesn't analyze the creditworthiness of

14  municipalities as an ongoing business concern, so, to the

15  extent that it received any of this information or has

16  generated it, it would be in connection with this litigation.

17             There's one more point that I'd like to add.  Again,

18  it's not clear to us exactly what the city is looking for,

19  but to the extent that they're looking for perhaps some

20  document which we don't think exists where somebody is

21  opining us to what the recovery might be under the plan and

22  whether that alternative would result in some sort of

23  analysis under the best interest of creditors test, we're not

24  sure that that's for anyone but this Court to decide.  It

25  really goes to a legal issue that may be the ultimate issue

1    in this case.  We're just not sure what kind of probative

2    evidence these requests are attempting to discover.

3           THE COURT:  All right.  Any reply?  Stand by,

4    please.  All right.  The Court concludes that Ambac should be

5    ordered to produce documents in response to the city's

6    documents requests 4, 6, and 14 except to the extent that

7    they are attorney work product privilege, and if they are,

8    there should be a privilege log provided with respect to

9    them.  What's next?

10          MR. STEWART:  Next thing, your Honor, would be 15.

11   We asked Ambac to produce common interest agreements.  That's

12   a standard request.  Most of the other parties have produced

13   them or have agreed to.  The reason for it is that one of the

14   privileges invoked is common interest in response.  It's hard

15   to know what -- how to deal with that unless we know what the

16   agreement is, when it was signed, who it is among and all

17   that.  In conversations with certain people -- and I'm not

18   suggesting it relates to this one -- I was troubled by a

19   misunderstanding that I found with the common interest

20   agreement, which is why it's all the more important to get

21   these.  Something doesn't become privileged because I have a

22   common interest agreement with Mr. Hackney and send him

23   something.  It has to be a document that already is

24   privileged and doesn't lose its privilege by dint of the

25   transfer.  So I want to make sure that no one is under a

1   misapprehension about that privilege, but I can't even go to
2   first base without seeing the agreements, and that's all
3   we're asking for on this one.
4          MR. ANGELOV:  Your Honor, we do have a written
5   common interest agreement with a number of parties in this
6   case.  We have oral common interest agreements with some
7   other parties.  We just don't see what disclosure of the
8   actual document, which, by the way, contains in it a
9   confidentiality provision, how that would aid the city's
10  analysis.  The existence of common interest can be determined
11  just based on the facts and circumstances of the case, and
12  here there's very little dispute that we had common interest
13  with the other monoline insurers and with other parties with
14  whom, frankly, at the Court's direction, we cooperated as a
15  part of the swaps trial.
16         THE COURT:  So your objection is relevance?
17         MR. ANGELOV:  It's relevance, but it's also the fact
18  that the agreement does contain a confidentiality provision.
19         THE COURT:  Well, but parties can't protect
20  something from discovery just by asserting its
21  confidentiality.  No.  I agree that its relevance is arguable
22  here, so you'll be required to produce your common interest
23  agreements with other parties in the case.  Next, please.
24         MR. STEWART:  Your Honor, there's only one more for
25  Ambac, which is the very last one, which is Number 37, which

1 asks for presentations to any executive team, board of
2 directors, or committee addressing the City of Detroit or its
3 debt, including but not limited to a certain person who they
4 identified in their interrogatories.  We're not asking for
5 privileged information, but it's not uncommon in corporations
6 for a board or other executive group to be briefed on
7 something, and it's important to us to know what they were
8 told, what was said about our plan and alternatives to the
9 plan and alternative recoveries because that does go to
10 feasibility.  It's not just it's not necessarily something we
11 might use in our case in chief, but they could put a witness
12 up.  We have the right to challenge and test their testimony,
13 and that's the purpose of that request.  Let me add that the
14 main objection to it that I got -- I don't mean to be
15 flippant about it -- was that this might be privileged
16 because lawyers had looked at it and maybe edited some
17 things.  I don't know the full scope of that, but my
18 understanding was that even if a lawyer did contribute to it,
19 that doesn't mean there's the wholesale withholding of the
20 document.  Instead, it would have to be redacted to eliminate
21 any privileged matters, and we're not asking for privileged
22 matters.  We think most of this is the sort of thing
23 corporations do all the time as a matter of good management
24 and that it is not principally a legal issue, particularly
25 for an insurance company that is in the business of handling

1  claims.  That's the very business.  Thank you.

2      MR. ANGELOV:  Your Honor, again, the concern here is

3  that by teeing this up as something that might be a statement

4  relating to the plan, this puts it awfully close to the

5  current time and certainly well after Detroit filed for

6  bankruptcy, so the concern here is, again, that what little

7  value these documents might have is going to be outweighed by

8  the massive search and privilege review that we're going to

9  have to conduct.  The attorneys at Ambac I can tell you are

10  involved in preparing these presentations.  It's not just

11  that documents get channeled through attorneys to cloak them

12  with privilege.  Attorneys prepare these.  They comment on

13  them.  They make revisions.  And that becomes a part of the

14  legal advice that's given to the company.

15      THE COURT:  Well, the city does not seek that, and

16  certainly the Court is in no position to order it, but there

17  may be presentations by nonattorneys, so in the

18  circumstances, I will order the production in compliance with

19  this document request subject to attorney-client privilege

20  but at the same time with a privilege log to the extent that

21  such a privilege is claimed.

22      MR. STEWART:  That's all with respect to Ambac, your

23  Honor.  Your Honor, the next is Syncora, and the way Syncora

24  fashioned its objections was to have a preliminary statement

25  with objections, which I thought was well done and useful,

1    and then the specific objections tended to be quite narrow,

2    so I think the major issue that we have, not the only one but

3    the major issue has to do with the threshold objection.  I

4    think there's been a lot of progress since that was written.

5    And just to define what's not at issue, the city is not

6    asking Syncora to search the files of its lawyers, any of its

7    lawyers, okay, nor prepare a privilege log, and so as I

8    understand it, this comes down to really two things.  One is

9    should Syncora be required to review the files of its

10   consultants, of which it identifies two, FTI and I think it's

11   Rothschild, and, second, should they be required, as the city

12   was, to search for electronically stored information as

13   opposed to things that are in hard copy.  Now, and if I

14   misstated that Mr. Hackney will correct me, I know, but

15   that's how I read it.  And just to be simple about it and to

16   take them in reverse order --

17            MR. HACKNEY:  Can I just interpose a question, your

18   Honor?  I'm working off this document that I received

19   yesterday at five o'clock.

20            MR. STEWART:  Is that another release, Steve?  I

21   think it should be the same thing.  But those were the

22   preliminary statement, and I think Mr. Hackney earlier today

23   referred to it, and so those are the scope issues.  Once

24   those are resolved, most of the rest of the issues with a

25   couple exceptions go away.  And I'll be brief.  I think just

1  like we had to go through the files of Conway MacKenzie and

2  E&Y and others, so, too, should Syncora go through its

3  advisors.  And in this day and age, almost everything is

4  stored electronically.  Faxing things and sending papers over

5  is very rare now.  It's the exception.  So a search that

6  doesn't look for electronic information is a search that

7  won't find very much, so those are the -- those are the

8  threshold issues.  And I believe -- and let's let Mr. Hackney

9  speak -- if I misconstrued it, he will correct me, but I

10 believe once we get past that, I got only a few narrow issues

11 left.

12         MR. HACKNEY:  Good afternoon, your Honor.  Stephen

13 Hackney on behalf of Syncora.  I will express no small amount

14 of frustration at the way this has been handled.  When they

15 gave us their document requests, I did two things.  The first

16 thing is I made a decision that we were not just going to

17 stiff-arm the city.  I think there is a realistic argument to

18 be had here about why is the city imposing all of this

19 discovery expense on its creditors when the overwhelming bulk

20 of the information is in the city's possession.  They have

21 the burden at trial.  The creditors like my client are

22 proposed to lose 90 cents on the dollar, and yet now they're

23 engaging in expensive discovery as well.  And the utility was

24 questionable, but I made a decision that I wanted to spend

25 time trying to chop wood on information that was reasonably

1    in my possession that related to the ordinary course of

2    Syncora.  But I told the city once the city went into

3    distress and everybody lawyers up and FA's up and people

4    begin working in teams on the unbelievably complicated legal

5    issues that go into this Chapter 9, they're all enmeshed in

6    the financial issues.  It's always just -- it's a tangle.  I

7    said once people lawyer up in connection with the distress of

8    the city, the burden of sorting that out of trying to look

9    through different advisors and even the client becomes far in

10   excess of the benefit that can be had.  And so I -- what I

11   did then was I put their request to one side, and I thought

12   what are documents that Syncora has that it generated in the

13   ordinary course of its business that relate to the COPs or

14   that relate to the GO bonds, and we list out all the stuff we

15   produced.  We produced very sensitive documents.  We produced

16   our underwriting manual.  It tells you like how Syncora

17   thinks about underwriting a bond insurance offering.  We

18   produced the credit files, the surveillance files, statutory

19   reports, annual financial reports.  I mean we made an honest

20   to God real production to them, and what I said in my two

21   meets and confer with them where I tried to understand what

22   it is they were targeting, I've conveyed this burden issue

23   from the start.  You'll remember also that we filed our

24   responses early to the city, so we filed a week earlier than

25   everybody else did, so they've had this for a long time.  I

1  spoke with Mr. Irwin in Detroit -- here in Detroit last
2  Monday, and I said, you know, what remaining issues are
3  there.  I really feel like I've been a stand-up guy about
4  this.  I think Mr. Irwin was beset by the meets and confer.
5  Folks were driving to him because he never got back to us
6  with respect to what remaining issues there were for us other
7  than to say we're very close.  Then yesterday at five o'clock
8  I get this thing in the mail that has all of these new issues
9  that are coming back to the fore, commutation, bond
10 purchases, bond sales, trustee communications, analysis of
11 debt limits for LTGO bonds that we don't even wrap, all
12 insurance department communications, every single one,
13 doesn't matter whether it relates to Detroit or not, all
14 public finance obligations on which we've ever established a
15 case reserve ever, all of them, all reinsurance treaties, all
16 commutation and settlement agreements.  I am here to ask,
17 your Honor, that our objections be sustained to this.  They
18 are rooting around in -- and what they're trying to do here
19 when they're asking about bond purchases, commutation,
20 settlements, they are trying to find out what we think about
21 value under the city's plan, what the lawyers and the FA's
22 and the client have worked together to think, and there are
23 open negotiations -- well, maybe one day there will be, but
24 there could be negotiations with us, your Honor, at which
25 this information could be used against us to try and suss

1    out, you know, what can -- what will Syncora take.  And I'll
2    tell you that when I took their witnesses' depositions, when
3    I took Ken Buckfire's deposition in the midst of him trying
4    to go out and source the DIP loan and I said, "Tell me what
5    you're asking people for.  Tell me what they're offering you.
6    I want to hear it," both he and Mr. Kohn said, "We are
7    absolutely not going to tell you that.  It is commercially
8    sensitive."  So I run through all of these requests.  I see
9    things that relate to commutation, bond purchases, bond
10   sales, and I say that is commercially sensitive information
11   that we ought not to be required to produce.  What is the
12   relevance to the city's, you know, case in chief on plan
13   confirmation?  When I look at things like all insurance
14   department communications, all public finance obligations on
15   which we establish a reserve, all reinsurance treaties, you
16   have not seen narrowly tailored requests, and I think that we
17   are the one party in this case, your Honor, who really
18   grappled -- or one of the parties in this case that really
19   grappled with our discovery responses, made a meaningful
20   production, showed our work, invited them to confer with us,
21   and to stick us with this yesterday at five o'clock I don't
22   think is good enough, your Honor.  I'm happy to talk about
23   specific requests here and there, but I really feel like I've
24   done my part to make this work.
25            MR. STEWART:  Your Honor, I was actually just

1  dealing with the threshold issue of where they should search

2  and should electronic information be --

3         THE COURT:  Well, I find that I can't deal with an

4  issue on a global basis.

5         MR. STEWART:  I see.  Okay.

6         THE COURT:  For a specific request, I have to weigh

7  and balance the burden and the benefit, so --

8         MR. STEWART:  Okay.  So perhaps we could just go to

9  these because they're --

10        THE COURT:  So, you know, pick one you want to start

11  with, and let's talk about that.

12        MR. STEWART:  Okay.  Let's start with Number 8,

13  which is the second sheet in here under Tab 3, your Honor.

14        THE COURT:  Okay.

15        MR. STEWART:  Okay.  This is documents relating to

16  any City of Detroit debt that they pay, dates they acquired,

17  and so on.  The objection is not relevance here.  The

18  objection is it's commercially sensitive, and there's a

19  mediation privilege.  But it is subject -- when Mr. Hackney

20  earlier today talked about general objections and specific

21  objections and how confounding it is, I wanted to applaud him

22  because that's exactly true.  When someone says I make a

23  general objection, and subject to that these are my specific

24  objections, and subject to that maybe I'll give you

25  something, it's very hard to know what you're getting and not

1   getting.  So I'm going to just assume here that if the

2   documents were produced -- ordered produced -- and maybe you

3   will and maybe you won't -- Mr. Hackney's general objection

4   about I don't want to look for electronic documents and I

5   don't want to have to go to our consultants would be swept up

6   in your decision.

7          THE COURT:  Well, but let's begin with question one,

8   which is why is the debt held by Syncora and the price it

9   paid for it and the date it acquired it relevant to any

10  confirmation issue?

11         MR. STEWART:  Syncora, in addition to insuring

12  various COPs obligations and swaps obligations, has been an

13  active buyer in the market of Detroit securities, and we

14  don't know the details other than I think their proof of

15  claim said they now hold $200 million worth.  That to me is

16  probative of what they think recovery is going to be.  It's

17  something I might cross-examine a witness of theirs about if

18  the witness were to make -- you know, take a certain position

19  on the plan.  I think it suggests other things as well.  If

20  someone is saying I think your plan is not in the best

21  interest of creditors, you might say is that why you went and

22  bought $200 million of these securities that were in default,

23  and you bought them on this and that date, and you paid this

24  amount for them or you paid that amount for them.  Mr.

25  Hackney has said we might not need this in our case in chief,

1    and he could well be right about that, but our case in chief

2    doesn't stop with our witnesses.  They put up witnesses, too,

3    and we have to be prepared for their witnesses.  And I think

4    the fact that Syncora is a major buyer of Detroit debt or at

5    least was for a time is certainly probative of what they

6    thought the economics of this plan looked like and what they

7    may be thinking, and there could be another plan or the best

8    interest of the creditors reflects something else, so that's

9    why we ask this.

10          THE COURT:  Mr. Hackney, what is your objection to

11    Number 8 here?

12          MR. HACKNEY:  Well, I want to be clear about

13    something that I think has not been well quite right said,

14    which is with respect to our responses, we always said

15    subject to our general objections, so we incorporate the

16    general objections.  Where appropriate, we will add a

17    specific objection, and then we have -- then we refer you

18    back to the preliminary statement, so there are two things

19    that are going on in a response.  The first is we are

20    preserving all of our objections, and then to allow you to

21    understand what we did or did not do if we're refusing to

22    produce information like on this one, we just refuse.  If we

23    are agreeing to produce information, we refer you back to the

24    preliminary statement so that you can see what is being

25    produced.  So I disagree that we did not lodge a relevance

1  objection, and I disagree that we did not lodge a reasonably
2  calculated objection, which is these are big parts of our
3  objection, which is the potential utility of this information
4  is sufficiently distended, your Honor, that it is not worth
5  the burden to Syncora to have to go produce this, especially
6  where it is commercially sensitive information, so it's not
7  only commercially sensitive in the sense of being
8  available -- sensitive to the market.  It's also commercially
9  sensitive vis-a-vis the city, which is why the existence of
10 the confidentiality order that you were kind enough to enter
11 doesn't protect us vis-a-vis the city.  I mean they are --
12 they want to see what we think about value.  That's basically
13 what he's indicating to you at a time when we hope to one day
14 have negotiations with the city that could allow for a
15 consensual plan.  I mean letting them --
16      THE COURT:  Right.  I agree that the prejudice to
17 Syncora from this production does outweigh its probative
18 value, so this request will be denied.  Next.
19      MR. STEWART:  Your Honor, Number 9 also deals with
20 debt.  It's debt they sold, the price they sold it for and
21 the date they sold it.  This really would be the same as the
22 previous one.  It is probative.  I mean if they put a witness
23 up who's starting to give an opinion about the plan or the
24 city or the feasibility, I would want to cross-examine that
25 witness about, you know, money speaks more than words does,

1   and this is a very, you know, important part of what we do.

2   Now, if he's concerned -- Mr. Hackney is concerned the city

3   will somehow use it in negotiations, I'll agree this will be

4   attorneys' eyes only as would documents for the previous one.

5   I won't share them with anyone outside of Jones Day.  Maybe

6   when it becomes an issue at a hearing, we deal with it then,

7   but I think we can deal with the prejudice issue, but I do

8   think it does have probative value.

9           THE COURT:  Once again, the Court will not order

10  this.  By the way, these rulings are not rulings regarding

11  the relevance of these questions at trial.  That's a

12  different context and maybe a different result.

13          MR. STEWART:  Okay.  Your Honor, the next one is 18,

14  and it had to do with limited tax general obligations.

15  Mr. Hackney has said they did not write insurance with

16  respect to those.  We'll take that then as that there are no

17  documents, so --

18          THE COURT:  Okay.

19          MR. STEWART:  -- we move on beyond that one.  Okay.

20  The next two have to do with communications with state

21  insurance departments.  What we're trying to get here -- I

22  think this is -- could have been written more narrowly -- is

23  any disclosures by Syncora to insurance regulators or similar

24  people as to what they anticipate their recoveries will be

25  under the plan or perhaps recoveries under some alternative

1   other than the plan, that's what we're trying to get at, and

2   we're trying now to go to communications with a third party.

3   And we'll content ourselves with response that is no broader

4   than that if there is one.

5          THE COURT:  And what's the relevance of that?

6          MR. STEWART:  It's the same as some of the earlier

7   ones which they have complied with, which is on the subject

8   of the feasibility of the plan and alternatives to the plan

9   in terms of what creditors would get under different

10  scenarios.  It would be revealing to us what they told their

11  regulator.  And if they were to say to the regulator, "Here's

12  what we get under the plan.  We don't like this, but it's

13  certainly better than we're going to get under any other

14  alternative," that would be very important to us because it

15  goes straight to the issue of best interest of creditors and

16  alternatives to the plan.  They may well have nothing, and

17  that could be dealt with very simply if they have nothing.

18  And this, by the way, doesn't involve consultants, shouldn't

19  even involve electronic discovery.  Either they sent that to

20  the insurance department or they didn't.

21          THE COURT:  Mr. Hackney.

22          MR. HACKNEY:  I guess a couple responses, your

23  Honor, which is I think that when you ask the question how is

24  this something that you could potentially use, when you get

25  the answer back from Mr. Stewart that is along the lines of

1   if they told the New York Department of Financial Regulation,

2   "We're only getting ten cents under the plan, but we're

3   thrilled because it's so much better than would have happened

4   if they hadn't filed for Chapter 9," I think the Court is

5   entitled to look at that example of what they are looking for

6   here and say that that is sufficiently unlikely to exist that

7   I'm not going to put Syncora to the burden of searching for

8   that information while Syncora is at the same time trying to

9   deal with all of the press of its affirmative discovery of

10   the city on an aggressive schedule.  Does it mean that --

11   does it mean that it satisfy -- that it doesn't satisfy the

12   specific tests that we would use for potential relevance in a

13   litigation?  No.  It could potentially be relevant.  There

14   could potentially maybe be a hearsay admission from someone

15   against their interest saying that the plan's ten-cent

16   treatment provision is better than we hoped.  That is not the

17   reality of what communications with the Department of

18   Regulation are likely to show, and I think, again, it's the

19   reasonable calculation of the discovery requests that are

20   important.  And what I would say to the city is remember the

21   city is -- we're hoping to work through all these document

22   requests by us of them, too, and they are going to be coming

23   to us asking us to make sure our requests are reasonably

24   calculated.  That's the only way we're going to get through

25   this thing together.  And so if they've got me off searching

1  for communications with the regulator for -- on the if come

2  maybe that someone said ten cents is better than we hoped, I

3  would submit to the Court that that is not an efficient use

4  of time by creditors and specifically Syncora.

5  THE COURT: I agree that the identified relevance of

6  these documents is sufficiently attenuated that their

7  discovery and production should not be required.

8  MR. STEWART: Your Honor, the next I'm going to jump

9  to is Number 39 and Number 41. Okay. They both deal with

10  reinsurance, and the reason we ask for that has to do with a

11  narrow issue as to whether or not the claim here really is a

12  Syncora claim or by reinsurance it belongs to somebody else,

13  and they can perhaps just make a representation and we can be

14  done, but we do need -- we do have the right to know that.

15  THE COURT: Sir.

16  MR. HACKNEY: This request was not limited to the

17  Detroit debt, and I'm assuming that you --

18  MR. STEWART: It is, of course.

19  MR. HACKNEY: -- intend it to be. Yeah. Okay. I'm

20  not certain enough to make a representation to the Court that

21  I could guarantee was correct. I have a strong suspicion

22  that --

23  THE COURT: Well, don't tell me your suspicions.

24  MR. HACKNEY: I won't. So it feeds into whether

25  it's a problem to collect it because if they don't exist, it

1   wouldn't be.  What I was going to say, though, is, you know,

2   maybe I'm misunderstanding a little bit, but, you know, we're

3   not litigating Syncora's proof of claim here, as I understand

4   it, today, and so if I'm mistaken, I'm mistaken with respect

5   to plan confirmation, but I'm thinking of the standards from

6   the Bankruptcy Code that relate to their affirmative duty

7   under plan confirmation.  If there is an issue --

8         THE COURT:  Well, isn't there an arguable standing

9   issue if there's reinsurance?

10         MR. HACKNEY:  I'm not smart enough to know the

11   answer to that.  I would have to look at it.  I will tell you

12   this came up last night when I landed, so, you know, I'm

13   sorry I'm not prepared on that.  I am.  But I just don't

14   know.  I've had my hands out like this saying come talk to me

15   so we can tie this up to avoid that, so I just don't know,

16   your Honor.  Mr. Perez is smarter than I am, and, you know --

17         THE COURT:  Well, all right.  Let me ask you to

18   first determine whether there is any reinsurance and then to

19   consult more directly with city's counsel to see if you can

20   work this one out.

21         MR. HACKNEY:  I'll do that.

22         THE COURT:  I'm inclined to think it is relevant to

23   the extent there is reinsurance.

24         MR. HACKNEY:  I'll do that.

25         MR. STEWART:  Now, your Honor, that takes care of

1   the specific ones we had in mind.  However, Mr. Hackney had

2   said something which takes me back to where I began.  He had

3   said, well, so we looked at the things that Syncora had, and

4   we turned those over because we did this and we did that, we

5   did the other, and that was fine.  However, not included in

6   his search were exactly those categories of documents that

7   either were in the hands of a consultant or advisor to

8   Syncora because he excluded that from his work or that

9   existed in electronic form.  Even those areas where he said,

10  okay, it was relevant, I'm turning it over, I think we're

11  entitled from Syncora just as they have received from us to

12  get responsive documents that are electronically stored or

13  are in the hands of their advisors because that is a choke

14  point on their discovery up front that limits what we're

15  getting even as to things that he said --

16          THE COURT:  All right.  Let me hear -- let me hear

17  from Mr. Hackney on this.  If discovery is otherwise --

18  requested discovery is otherwise relevant, why is it an

19  objection that it's in electronic form or that it's in the

20  hands of a consultant?

21          MR. HACKNEY:  Yeah.  I agree.

22          THE COURT:  Okay.

23          MR. HACKNEY:  Well, it may not be -- standing alone

24  those may not be sufficient, but I want to make sure I give

25  the background here --

1          THE COURT:  Okay.

2          MR. HACKNEY:  -- okay -- because what I have said to

3     them from the start is that the way Syncora's professionals

4     work together is that the economic and financial analysis of

5     a Rothschild that is involved in every aspect of the case is

6     highly informed by the legal advice from Kirkland & Ellis.

7     They just go hand in glove because of the nature of the

8     bankruptcy overlay, so you can't say, oh, you know,

9     Rothschild, tell us a little bit about the type of DIP that

10    they're going to solicit, for example, or the terms of the

11    DIP they're going to get like you could to a regular banker

12    maybe out there in the world who literally is going to just

13    say here's what the debt market is doing.  You're talking X,

14    Y, and Z.  It's always going to be informed by the legal

15    process overlay.  That's a common aspect of bankruptcy.  So

16    our point here -- and by the way, I -- you know, I've raised

17    this for multiple weeks, and this was not something that I

18    had heard a problem of.  What I heard, to the contrary, was

19    make the representation that I just made to them, that that's

20    how these professionals and lawyers work together, and they

21    would back down on that.  That's what I thought the state of

22    play was.  What this does play directly into, your Honor, is

23    burden and reasonable calculation because what happens is you

24    have to go toss the files of all the people that work at

25    Rothschild or the other financial advisory firm that's

1  advising the client, and then you have to collect all of
2  their e-mail and then review all of the requests against that
3  in order to see whether there is potentially a nonprivileged
4  piece of information.  And what we say in our preliminary
5  statement is, look, the yield of that exercise is not
6  sufficiently worthwhile to merit the cost and the burden of
7  doing it, and, you know, the city is obviously just raising
8  this now from yesterday, and I thought that this was put to
9  bed, but this is one of the more classic burden issues, your
10 Honor, that I would say the likely outcome of it is
11 sufficiently unlikely to yield a nonprivileged document that
12 we shouldn't have to undertake the collection, the searching,
13 the review, and then the cataloging on a privilege log.
14        MR. STEWART:  Your Honor, this is not only what the
15 city did.  It's also what every other monoline insurer did.
16 The only insurer who said they couldn't do this and it would
17 be too burdensome has been Syncora.  FGIC, Ambac, Assured,
18 National, the others don't seem to have this problem.  It
19 seems to me that --
20        THE COURT:  Did what?
21        MR. STEWART:  In producing electronically stored
22 information or in speaking with their consultants or others
23 they work with.  Of all the monolines, only Syncora has
24 raised this as an issue, which suggests to me --
25        THE COURT:  Okay.  But you said the city did.

1        MR. STEWART:  The city has done this, has done

2   exactly this.

3        THE COURT:  Yeah, but the city didn't produce a

4   privilege log, did it?

5        MR. STEWART:  No.  I'm not -- and we're not asking

6   for a privilege log.  With Mr. Hackney from -- we've always

7   agreed no privilege log, and you don't have to search any law

8   firm's files either.  All we're saying is please, if it's

9   otherwise --

10       THE COURT:  So you want Syncora to search its own

11  files and its consultants' files --

12       MR. STEWART:  Correct.

13       THE COURT:  -- for documents that are responsive to

14  requests for production that are otherwise relevant and that

15  it otherwise complied with.

16       MR. STEWART:  Correct, and we know which ones are

17  relevant because Mr. Hackney has told us which ones he deemed

18  relevant.  We'll take his choice of relevance.

19       MR. HACKNEY:  Your Honor, can I respond to this

20  because --

21       THE COURT:  Yes.

22       MR. HACKNEY:  -- this is very important?  With

23  electronically stored information, you cannot just dip your

24  toe in the pool.  That's the problem.  That's why I took

25  their request -- so when they say all documents relating to

1   the COPs, that seems relevant. COPs are a creditor in the

2   Detroit bankruptcy. What documents do you have relating to

3   COPs, Mr. Hackney? What does Syncora have? The problem is

4   that to comply with that seemingly relevant request you have

5   to go collect tens or hundreds of thousands of electronic

6   records from all these different custodians at Syncora and

7   run searches against them, and the vast majority of the

8   documents that you'll get back in the last, you know, 18 to

9   24 months from the time when the city started entering

10   distress and everyone started lawyering up is, number one,

11   you're going to get a huge volume of information, and, number

12   two, it's going to be privileged. That's why I took their

13   requests, and I looked at them, and I said this is not going

14   to work. This is going to impose too much burden on Syncora

15   to have to review all of its electronic information for all

16   of these requests. You can't just do a little bit of it.

17   You have to collect everything in order to find out what's

18   responsive to a particular request. I've done a ton of these

19   productions in my life, unfortunately. What we did then

20   instead was I went back and stated affirmatively what we

21   could do, and that's when I went to my client. I said, look,

22   what are the types of business documents that you maintain

23   that are in a discrete locatable place like the credit memo

24   or the surveillance memos that they write over the years as

25   their -- if Fitch comes out and rates Detroit bonds or

1  downgrades it, Syncora will say do we agree with that. That

2  type of information was produced, so they have the source

3  business documents that were created in the ordinary course

4  that relate to Syncora's decision to wrap the COPs, its

5  decision to wrap the UTGOs, its underwriting manual, its

6  surveillance of those positions over time, its financial

7  reporting. They've got the stuff that relates to the

8  business proper. When they get --

9            THE COURT: But only if Syncora stored it in paper.

10            MR. HACKNEY: No, no. If it was electronic, we also

11  produced it. It was all electronic, but the difference, your

12  Honor, is the way we collected it. It was -- we absolutely

13  did not refuse to produce -- let me make this clear. I

14  haven't done a good job.

15            THE COURT: Take your time.

16            MR. HACKNEY: We have never said that we would not

17  produce electronic information, full stop. All of the things

18  that we promised to produce affirmatively -- virtually all of

19  them in the modern era were electronic documents that were

20  produced. What I am trying to say today is that when it

21  comes to things that are other than those that are readily

22  identifiable by a business person at Syncora, so if it's

23  other than the surveillance memos -- if you say the

24  surveillance memos to someone at Syncora, that actually means

25  something, and sometimes they're actually in a definable

1    electronic file on a drive that you can -- that you can get

2    at.  If you say I want all documents relating to the COPs,

3    that's where you fall into the pool and go down a hundred

4    feet of -- and you're just in the mix of all sorts of

5    electronic information.  You have to collect tons of it from

6    all the different custodians, run the searches against it.

7    That's where I told them, look, the reasonably calculated

8    lever flips over at that point because now I'm doing an

9    enormous amount of searching and collecting.  It's very

10   expensive and time-consuming.  And the yield is going to be

11   what?  It's going to be what?  Hearsay statements by someone

12   that happen to not be privileged that are based on reactions

13   to source information that's in the city's possession?  I

14   mean what's the point of the exercise?  That's where we push

15   back on them.  So if Mr. Irwin -- if Mr. Stewart is able to

16   come around at the end here and say, "Hey, we just want them

17   to run a few searches," then I can tell you -- now I've got a

18   more fundamental problem because now I'm right back to the

19   thing that I was trying to avoid by structuring our

20   production in the way that we did, and I will say it's a bad

21   idea to do it, but if we're going to be ordered to do it,

22   it's going to take a very long time.  We won't be able to do

23   that quickly.  It's too much information.  That's how all of

24   these firms are nowadays, your Honor.  You just can't get

25   away from the electronic information.  That's why you have to

1  be so practical about how you make your production.

2          THE COURT:  Mr. Stewart.

3          MR. STEWART:  I think we've beat this to death, your

4  Honor.

5          THE COURT:  Okay.

6          MR. STEWART:  I don't think there should be a double

7  standard is all.

8          THE COURT:  The Court wants to be sensitive to the

9  expenses of this litigation and has demonstrated that

10  sensitivity here today.  The difference here, however,

11  appears to be that the information sought by the city is of

12  more than just arguable relevance.  It's of admitted

13  relevance, so in the circumstances, the fact that it will

14  take time and money and effort to cull it out of Syncora's

15  files or those of its consultants or others doesn't seem to

16  justify excusing its production, so the Court will grant the

17  city's request to Syncora to require Syncora to produce this.

18          MR. HACKNEY:  So, your Honor, just so I can clarify,

19  I now have to go back and take all of the requests and run

20  searches against all of the documents at Syncora and --

21          THE COURT:  Well, I wouldn't say all but those that

22  you don't argue relevance about.

23          MR. HACKNEY:  The problem is it's -- your Honor,

24  it's a misnomer to say we don't argue relevance because the

25  entire theory of the production was reasonably calculated, so

1  reasonable calculation relates to a balancing of the

2  likelihood that the effort is going to yield a relevant

3  document versus the burden, so to say, "Hey, well, you didn't

4  say that this wasn't relevant," my response is what I said

5  was the low likelihood of yielding a relevant document did

6  not justify the burden of making me search for it.

7          THE COURT:  But the relevant -- but the documents

8  that would be yielded are relevant.

9          MR. HACKNEY:  Potentially if they're not privileged.

10          THE COURT:  That's the difference.

11          MR. HACKNEY:  But no, no.  You have to consider the

12  burden.

13          THE COURT:  Oh, no.

14          MR. HACKNEY:  No.  I'm sorry.  I mean the reasonable

15  calculation analysis invariably acknowledges that there could

16  be a relevant document, the outcome of the massive search,

17  but I mean I have no small measure of frustration over this,

18  your Honor, because I specifically tried to get out in front

19  of this issue with the city.  I specifically structured our

20  production to make sense of the problem, and the city has had

21  this for weeks and then does not come to me at any time in

22  the last week and say this is the problem and brings it up at

23  the end of this argument.  I just --

24          THE COURT:  Yeah.  I don't like that either, but

25  here we are.  Let's move past this.  What's next?

1    MR. HACKNEY:  Well, your Honor, we will need a

2  substantial amount of time to comply.

3    THE COURT:  How much are you talking about?

4    MR. HACKNEY:  Ninety days.  I'm not kidding.  I mean

5  because remember -- I'm not being flippant -- because what

6  I'm concerned about here, your Honor, is I've been one of the

7  people in front of you that's saying let's not characterize

8  each other's motivations.  Okay.  And I'm not going to do

9  that to the city.  I do want to tell you what the impact will

10  be on me and Mr. Arnault and the people that are actively

11  working on trying to get this trial ready for you in July,

12  which is it is going to be a nontrivial distraction for us.

13  So at a time when we -- when I try to triage this forward and

14  get through it, now I'm -- and I should be pivoting to

15  getting their discovery and getting ready for these

16  depositions of which there could be 50 in the next, you know,

17  40-some days, getting expert reports ready, now we have to

18  pivot back to running all of these searches of Syncora's

19  files when there hasn't been a showing that, for example, the

20  credit memos that I gave them, the surveillance reports, the

21  underwriting memorandum that I gave them -- I gave them the

22  documents of the business.  Mr. Stewart hasn't gotten up and

23  said, "Yeah, that doesn't work for us.  That's not

24  sufficient.  We want Document X."  This is having the result

25  of a fishing expedition on me, your Honor, and it's going to

1  be nontrivial amounts of distraction.  It's a difficult pill

2  to swallow when my entire philosophy of engaging with the

3  city was designed to skin this cat, and I told them that from

4  the start, and we were working, I thought, constructively to

5  narrow, not broaden, because this undoes everything that I

6  tried to do.  And if that's the answer, that's the answer,

7  but --

8          THE COURT:  I am sure the city didn't like my ruling

9  regarding their production of documents this morning either.

10         MR. HACKNEY:  But you know what, your Honor?  Number

11 one, the city is the one who advocated for the accelerated

12 schedule, and the city is admittedly the repository of rafts

13 of information that are absolutely essential to confirmation.

14 Syncora is not.  Syncora is one creditor of many.

15         THE COURT:  Well, but Syncora is a major litigant in

16 this case --

17         MR. HACKNEY:  It is.

18         THE COURT:  -- and either has or will file

19 significant objections, so this is the price of litigation.

20 We need to move on.

21         MR. STEWART:  Your Honor, we only have three or --

22 we have about four more, and these will go very quickly.  Tab

23 4 has been resolved for now.  Tab 5 we have one issue on --

24 it's very narrow -- with Assured, and that's simply time.

25 Although we had asked, I think, for documents back to the

1   beginning of 2013, they said they're only going to produce

2   documents from the petition date forward and simply ask that

3   the date be pushed back to the beginning of --

4           THE COURT:  I'm sorry.  Can you refer me back to

5   where you are?

6           MR. STEWART:  Tab 5, your Honor, which is Assured.

7           THE COURT:  Okay.

8           MR. STEWART:  We only have one.

9           THE COURT:  We need to close the loop on one Syncora

10  issue, which is time.  Mr. Hackney says he needs 90 days.

11          MR. STEWART:  We did a much bigger production in two

12  weeks, your Honor.

13          MR. HACKNEY:  Well, except that they really didn't.

14          MR. STEWART:  Three weeks.  Three weeks.  It didn't

15  take us 90 days.

16          MR. HACKNEY:  But, see, that's the problem, your

17  Honor, because when I say that I'm going to do it, I'm going

18  to do it the right way.

19          THE COURT:  Not only did they produce what they were

20  required to, they produced what they weren't permitted to.

21          MR. STEWART:  We get credit for that.

22          THE COURT:  No.

23          MR. STEWART:  I know.

24          THE COURT:  What were you going to say, sir?

25          MR. HACKNEY:  Well, I'm just saying that I'm going

1    to do this the right way.

2                THE COURT:  Great.

3                MR. HACKNEY:  And that's why I know what goes into

4    it.  That's why I'm not making 90 days up just to wrong-foot

5    you and say, ha, now I'm going to defeat your ruling.

6                THE COURT:  It feels a little like that.

7                MR. HACKNEY:  Yeah, but you got -- you know, your

8    Honor, if I could --

9                THE COURT:  Careful here.

10               MR. HACKNEY:  I could, yeah, but --

11               THE COURT:  Be very careful where you go here.

12               MR. HACKNEY:  Well, no, but what I want to talk to

13   you about is the challenges of electronic discovery.  It

14   is -- it's not easy.

15               THE COURT:  I'm going to give you 30 days.  If you

16   just -- if you are working diligently on it and need more

17   time, you file a motion to extend, and I will grant it.

18               MR. HACKNEY:  Is there any way that we could target

19   what it is I'm searching for because if it's all of the

20   requests --

21               THE COURT:  I think that's a great idea.  I think

22   the two of you should talk and narrow this electronic

23   discovery as much as you possibly can.

24               MR. HACKNEY:  What is the --

25               MR. STEWART:  I'd welcome that.  And Mr. Hackney and

1  I, I'm sure, can work on that.

2        THE COURT:  Please, and then prepare an order.

3        MR. STEWART:  Good.  All right.

4        THE COURT:  But 30 days subject to extension for

5  cause shown.

6        MR. STEWART:  Okay.  Thank you.  So, your Honor,

7  we're now on Assured, and there's only this one issue with

8  Assured.

9        THE COURT:  Okay.

10        MR. STEWART:  And that's the time they in their

11  general objection said they were only going to start on the

12  petition date.  I think we asked for the beginning of the

13  year, and that would still be fine with us, but we think

14  the -- just confining it to the petition date forward is an

15  artificial limitation.  Outside of that, we have no other

16  issues with Assured.

17        MR. SCHWINGER:  Robert Schwinger for Assured.  I

18  think he may have misstated there what Assured stated in its

19  responses.  Our position was is that in terms of producing

20  documents, we would cut off production as of the petition

21  date because at that point we've gone into an attorney work

22  product mode, and virtually everything is going to be -- is

23  going to be privileged at that point the way parties

24  typically do where productions tend to get cut off at the

25  time litigation is filed.  We didn't have any objection to

1  producing prior to that, and our position on that was to the

2  extent it bore upon the issues, we were happy to produce it,

3  and we've gone through that.  We have, by the way -- and I

4  have no idea what other parties have done in terms of

5  production.  Assured produced closing in on 20,000 pages of

6  documents, and that's just one party.  The city did 250,000

7  pages, you know, for everyone, and we've produced e-mail,

8  electronic discovery and so on, so we've made a very

9  substantial production here.  I don't think we've unfairly

10  cut everything off.

11         THE COURT:  Mr. Stewart, the issue is the production

12  of documents since the petition, not before the petition.

13         MR. STEWART:  Yeah.  He's right, Judge.  He's right,

14  and I'm wrong, so we don't have an issue.

15         THE COURT:  All right.

16         MR. SCHWINGER:  Okay.

17         THE COURT:  You're all set, sir.

18         MR. SCHWINGER:  Thank you.

19         MR. STEWART:  Next is U.S. Bank.  It's Tab 6, U.S.

20  Bank National Association.

21         THE COURT:  Is anyone here from U.S. Bank?  Yes,

22  yes.  Two.  We have two.

23         MR. STEWART:  Oh, we'll welcome either of you or

24  both.  All right.  This I think relates to water and sewer

25  bonds, and I believe -- or the end result is U.S. Bank did

1    not agree to produce anything and has not answered any

2    interrogatory, so we have gotten zero from U.S. Bank.  And

3    they said that the reason was that everything would be in

4    expert materials, and maybe it is, but there's no evidence

5    they actually made a search -- God bless you -- to determine

6    that, and if they're right, so much the better, but I

7    question whether or not it's appropriate to interpose that

8    kind of a blanket objection and provide no discovery

9    whatsoever.

10          THE COURT:  Well, can you give me an example, just

11   an example, of a document request --

12          MR. STEWART:  Give me a moment.  Could I see the

13   U.S. trust document?  Excuse me, your Honor.

14          THE COURT:  Sure.  All right.  While you're doing

15   that, I'm going to consult with Chris for a second.

16          MR. DAVIDSON:  Your Honor, this is Paul Davidson for

17   U.S. Bank on the telephone, and I'd like to be heard after

18   the city finishes.

19          THE COURT:  Yes, sir.

20          MR. DAVIDSON:  Thank you.

21          MR. STEWART:  Your Honor, here's one, if I may.

22          THE COURT:  Yes.

23          MR. STEWART:  Number 7.  It says all documents

24   relating to any research, studies, reports, or analysis

25   conducted by, requested, reviewed, or received by you or on

1   your behalf regarding valuations of DWSD.  There are others
2   that --
3            THE COURT:  Okay.  That gives me a idea.  Thank you.
4   Did we lose Mr. Davidson?
5            MR. DAVIDSON:  No, your Honor.  Mr. Davidson is
6   here.
7            THE COURT:  All right.  Can you move that mike down
8   so I can hear him a little better?  All right.  You may go
9   ahead, sir.
10           MR. DAVIDSON:  Yes, sir.  In response to both
11  document requests and the interrogatories, we have explained
12  to the city that there is no analysis that the U.S. Bank has
13  performed independent of work that the attorneys and its
14  consultants have done post the filing of this case, so, in
15  other words, the lawyers have engaged consultants in
16  preparation for trial after the case was filed, and any
17  analysis that would be responsive to the interrogatories and
18  the document request would be privileged communications.  We
19  thought that we made that clear, but if not we'd like to make
20  it clear now that that is the case.  The custodians that
21  would have had responsive documents are the account
22  administrators for the bonds, and they have searched for
23  documents, and we're happy to represent that to the city.
24           MR. STEWART:  All right.
25           MR. DAVIDSON:  And I would -- your Honor, Paul

1   Davidson again.  I would add that prior to responding to the

2   interrogatories and the document requests, I had a

3   conversation with Mr. Irwin, and we agreed that neither the

4   city nor the bank would be required to produce a privilege

5   log with respect to these requests.

6           MR. STEWART:  Agreed.  So my question -- I believe

7   Mr. Davidson talked about documents prepared post-filing, and

8   if he's saying there are no post-filing documents, we'll

9   accept his representation since he's the --

10          THE COURT:  He says there are no pre-filing

11  documents in response to your request, and he says that all

12  of the post-filing documents are privileged.

13          MR. STEWART:  Okay.

14          THE COURT:  Does that about cover it, Mr. Davidson?

15          MR. DAVIDSON:  That's correct, your Honor.

16          MR. STEWART:  Then we're done with Mr. Davidson.

17          THE COURT:  Right.  Then you're done.  All right.

18          MR. STEWART:  The next is Tab 7, the ad hoc

19  committee of DWS bondholders.  I don't know who represents --

20          MR. SIEGAL:  On the phone, your Honor, this is Craig

21  Siegal from Kramer Levin on behalf of the ad hoc committee of

22  DWSD bondholders.

23          THE COURT:  Thank you, sir.

24          MR. STEWART:  Your Honor, this -- we have various

25  requests.  The answer was that they had not conducted any

1 studies and so on. We've not gotten any discovery

2 whatsoever. If counsel will make the representation a search

3 was made and no documents were found, I'll accept it.

4          THE COURT: Sir.

5          MR. SIEGAL: Yes, your Honor. This is Craig Siegal.

6 We make that representation just like with respect to the

7 trustee.

8          THE COURT: Thank you.

9          MR. STEWART: And we're done. Next is Tab 8, and,

10 your Honor, I think we're getting -- we have one more after

11 this. Tab 8 is Berkshire Hathaway Assurance Corporation.

12 There they -- we made various requests. We got a general

13 objection that we sought documents that are not relevant to

14 whether the plan can or should be confirmed as with respect

15 to the water and sewer department, and that is kind of all we

16 got. And I think we asked for more, and I don't think that

17 relevance is confined to that. It's a broader test, as we've

18 discussed earlier.

19          THE COURT: And so what kinds of documents did you

20 request from this creditor?

21          MR. STEWART: It was the same as -- I'm told it was

22 the same as we did with respect to U.S. Bank, Judge, so I

23 could just -- what's that? This will be more like we've done

24 with Syncora and others. A good example, your Honor, would

25 be -- I'll just choose one, your Honor, more or less at

1  random, which would be document request Number 6, and this

2  was the same document request that most of the parties got

3  from us.  All documents related to any research, studies, and

4  so on, regarding your financial -- projected financial

5  conditions of other creditors under different recovery

6  levels, and that may not be the best one to have chosen, but

7  it's the same set of document requests we've been dealing

8  with with pretty much everybody else.

9          MR. CHRISTY:  Good afternoon, your Honor.  Tom

10  Christy on behalf of Berkshire Hathaway.  First of all, let

11  me state that we've given them over 5,000 pages of documents.

12  To say "that's all we got" I think is a little understating

13  the case.  All I got from them at 5 p.m. last night was a

14  one-page objection stating their problem with our discovery

15  was that we repeated the same general objection over and over

16  again to every question, and if you go through most of the

17  questions, yes, we repeated that general objection just like

18  I heard Mr. Hackney complaining that the city itself did in

19  response to Syncora's request.  The mere fact we've repeated

20  the general objection I don't think is the point.  And if you

21  go through our interrogatory requests -- responses and our

22  request for production, we have very often given them

23  everything we did.  We've simply exerted the objection as an

24  abundance of caution just like the city has.  And you can

25  look at Interrogatories 1 through 10 where they request the

1   identification of witnesses, and we've asserted this same

2   objection but then given them the name of the witness.  If

3   they have specific questions they feel we've been

4   nonresponsive to, I'd like to know what there is.  I did not

5   receive any call as to meet and confer.  As far as I know,

6   nobody in our New York counsel has received any call as to a

7   meet and confer on these particular questions.  I think we've

8   been responsive to most of them.  They may not like the bound

9   where we're drawing relevancy, but I'd like to latch onto

10   Mr. Hackney's argument earlier, which you granted, you know.

11   There's a bounds here to where relevancy is, and I would ask

12   you to uphold our objections on the same ground that you

13   upheld some of his earlier.  Thank you.

14         MR. STEWART:  Your Honor, I'd suggest -- we'll look

15   at their document, but I think our concern had been that they

16   did produce things -- and I did misstate that, for which I

17   apologize -- with the limiting statement up front we don't

18   know what they withheld on grounds of relevance, so it's hard

19   to know.  It is the same issue Mr. Hackney identified.  The

20   best way through it, I think, will be let me look at their

21   production.

22         THE COURT:  All right.

23         MR. STEWART:  If I have a problem, I'll call them.

24   Our last one has to do with Macomb County.

25         MR. BRILLIANT:  Thank you, your Honor.  If I could

1  be heard just for one moment.  Allan Brilliant on behalf of

2  Macomb County by and through the public works commissioner.

3          THE COURT:  One second.  I need you to get nearer to

4  a microphone.

5          MR. BRILLIANT:  Again, for the record, Allan

6  Brilliant on behalf of Macomb County by and through its

7  county agency public works commissioner.  Your Honor, the

8  last one, Tab 9, is really not directed towards my client,

9  instead to the county executive of Macomb County, Mr. John

10  Schapka, who's the corporation county (sic) for Macomb

11  County.  He sat here all day, but he needed to leave at three

12  o'clock to go to the second floor in connection with, you

13  know, the mediation that your Honor ordered.

14          THE COURT:  Okay.

15          MR. BRILLIANT:  He asked me to tell your Honor when

16  he left that his expectation is that he could be back by four

17  or 4:30 today.  If that doesn't work for the Court and for

18  counsel, he could be available tomorrow.

19          THE COURT:  You're going to settle that that quick,

20  huh?

21          MR. BRILLIANT:  Well, you know, I think it's just a

22  preliminary meeting, your Honor, but he thought it would last

23  about an hour.

24          THE COURT:  Oh, all right.  Thank you for bringing

25  that to our attention, sir.  We'll accommodate him if not

1   today another time.

2           MR. BRILLIANT:  Thank you, your Honor.

3           MR. STEWART:  Your Honor, then we will put that off

4   until later.

5           THE COURT:  Right.

6           MR. STEWART:  Then with that we are done.

7           THE COURT:  Okay.

8           MR. HACKNEY:  Can I clarify one matter, your Honor?

9           THE COURT:  Sir.

10          MR. HACKNEY:  Just in some of these subsequent

11  motions, there were, you know, exceptions made for the post-

12  petition documents, and I wanted to know whether -- is there

13  a reason -- does that apply to me as well or does it not

14  because I thought the city was saying, yep, we understand

15  post-petition there's a lot of attorney -- you know, there's

16  a lot of privileged --

17          THE COURT:  What do you think about that, Mr.

18  Stewart?

19          MR. STEWART:  I think this is one of those where

20  instead of -- given the history of our argument here today,

21  it may well be that post-petition there's a putative

22  protection to privilege on most things, and I'd suggest

23  Mr. Hackney and I talk it through.  I've tried to be

24  reasonable on these.  We don't want any more documents than

25  we have to read, and we should be able to resolve it, and if

1  we can't, we'll come back to your Honor.

2         THE COURT:  All right.  It feels like it should

3  apply.  All right.  Who did I give the next slot to?

4         MR. ANGELOV:  May I have just one question, your

5  Honor?

6         THE COURT:  Yes.

7         MR. ANGELOV:  Mark Angelov for Ambac Assurance.  We

8  actually had an agreement with the city that the city would

9  not seek a privilege log, and this was communicated between

10  us and also documented in our objections and responses.  And

11  I was just wondering if the Court would amend its order to

12  comply with that agreement.

13         THE COURT:  Is that your agreement?

14         MR. STEWART:  It's fine.  No privilege log is fine.

15         MR. ANGELOV:  Thank you.

16         THE COURT:  You're all set, sir.  All right.  Who

17  did I give the next slot to?  We're talking about requests by

18  creditors for information from the city that the city has not

19  complied with or has objected to.

20         MS. O'GORMAN:  I know I had the second slot, but I

21  didn't know if that was the second slot in -- your Honor,

22  Debra O'Gorman --

23         THE COURT:  Go ahead.

24         MS. O'GORMAN:  -- again, counsel for Macomb County

25  by and through its public works commissioner.  If I might

1    hand up the list of objections to your Honor.

2          THE COURT:  Please.  Does the city have that, too?

3          MS. O'GORMAN:  Yes, it does.

4          THE COURT:  Okay.

5          MS. O'GORMAN:  If your Honor could please disregard

6    the first item on that list.  That was resolved today --

7          THE COURT:  Okay.

8          MS. O'GORMAN:  -- as a result of your order on the

9    privilege log.  The second objection that we've raised is to

10   the time period that the city has applied to its production,

11   and based on your order that the production will now go back

12   to 2012, there are just two requests for production of Macomb

13   that we would like the city to go back beyond 2012.  That's

14   request four, which seeks financial results of the DWSD from

15   2009 forward, and request 48, which seeks information on the

16   retail customers of the DWSD from 2009 forward.

17         THE COURT:  What specific information regarding the

18   customers?

19         MS. O'GORMAN:  We are just asking for information as

20   to the identity of retail customers, customers in similar

21   situations to Macomb and the other counties.

22         THE COURT:  Like who?

23         MS. O'GORMAN:  Other --

24         THE COURT:  I don't know the phraseology "retail

25   customer."

1            MS. O'GORMAN:  People other than individual

2    consumers, so any --

3            THE COURT:  Like businesses you mean?

4            MS. O'GORMAN:  No.  We mean other agencies or

5    authorities, counties, cities.

6            MR. BRILLIANT:  Maybe I can help, your Honor.

7            THE COURT:  Okay.

8            MR. BRILLIANT:  We're not asking for the names, but

9    we're -- your Honor, there's an issue.  As your Honor knows,

10   the number of citizens in Detroit has diminished.  Macomb

11   provides wholesale services.  You know, the Macomb County

12   public works agency, you know, takes service from the city,

13   and then we, you know, sell it to the other municipalities in

14   Macomb County.  The city itself, though, is a city.  It's not

15   a county.  So its customers are actually retail customers.

16   They're individuals.  They're businesses.  And we had asked

17   for information regarding, you know, the amount and number of

18   the, you know, particular --

19           THE COURT:  Okay.  Okay.

20           MR. BRILLIANT:  -- because it has to do with the

21   financial projections, so we --

22           THE COURT:  And going back now how far?  What did

23   you say?

24           MR. BRILLIANT:  I believe four years.

25           MS. O'GORMAN:  2009.

1          MR. BRILLIANT:  2009, your Honor, five years.

2          THE COURT:  All right.  What's the city's position

3    regarding this?

4          MS. LENNOX:  Good afternoon, your Honor.  Heather

5    Lennox on behalf of the city with respect to this.  With

6    respect to the financial records of the system, I would note

7    that DWSD posts its audited financials back to 2010 on its

8    website, so they're publicly available.  2013 is unaudited

9    and is not yet available on the website, but that's the

10   information that we put in the disclosure statement, so I

11   think that is a sufficient response.

12         THE COURT:  Is 2009 available?

13         MS. LENNOX:  I would have to check, your Honor, and

14   I'm not sure since I don't --

15         THE COURT:  All right.  If it is, I'll order it.  If

16   it's not, it's not.

17         MS. LENNOX:  Okay.  And with respect to the retail

18   customers, what a retail customer in the City of Detroit

19   means is every single person we deliver water and sewer

20   services to.  These are individuals.  These are individual

21   businesses.  I can't for the life of me --

22         THE COURT:  I think they just wanted a count.

23         MS. LENNOX:  -- understand the relevance of this.

24   Well, if they want a count, I can give them a count, but I

25   think what they're talking about are customer agreements and

1  who they are and --

2         THE COURT:  Oh, I didn't hear that.  Ma'am --

3         MS. LENNOX:  Am I mistaken?

4         MS. O'GORMAN:  Request 48 asks for documents

5  regarding the number of retail customers for the fiscal years

6  2009 through 2013 and projections for fiscal years 2014 to

7  2003, so the number --

8         THE COURT:  Yeah.  So it's just like a census.

9         MS. O'GORMAN:  Correct.

10        THE COURT:  Any objection to that?

11        MS. LENNOX:  I have no objection to that, your

12  Honor.

13        THE COURT:  All right.

14        MS. O'GORMAN:  And with respect to request four,

15  which seeks the financial information going back, it's not

16  just the financial statements that we're looking for.  We're

17  asking for documents relating to DWSD's financial --

18  historical financial results, including the financial

19  statements, balance sheets, cash flows, and so forth, so

20  there's a, you know, list of financial information.

21        THE COURT:  Did you see what's on the publicly

22  available website to see if that meets your needs or not?

23        MS. O'GORMAN:  I'm certain that all of these aren't,

24  you know, but this was a matter that Mr. Irwin and I were in

25  the midst of meet and confer discussions, but we never got

1  the opportunity to fully discuss what the city was willing to

2  produce back to 2009, what they were going to produce in the

3  future, what was in the production, so, you know, this may

4  be --

5           THE COURT:  So what are the documents you want?

6           MS. O'GORMAN:  We're looking for audited financial

7  statements, pro forma and actual --

8           THE COURT:  All right.  That's on line.  What's pro

9  forma?  What does that mean?

10          MS. O'GORMAN:  Would be the -- my understanding is

11  that it would be the sort of drafts and --

12          THE COURT:  You want drafts of financial statements?

13          MS. O'GORMAN:  Of balance sheets.

14          THE COURT:  Drafts of balance sheets, not --

15          MS. O'GORMAN:  Pro forma and actual balance sheets,

16  cash flow statements, auditors' reports.

17          THE COURT:  All right.  All I'm hearing in addition

18  so far are cash flow statements and balance sheets.

19          MS. O'GORMAN:  Okay.  We're also asking for

20  documents showing historical volumetric use, revenue, and

21  rate tariff by customer rate class and geographic service

22  area.

23          THE COURT:  Is that available?

24          MS. O'GORMAN:  The important thing is, your Honor,

25  that the city has agreed to produce all of the documents

1   we've requested in request number four with the exception of

2   the date limiter that they applied, so they're not objecting

3   to these types of documents.  They're simply only --

4           THE COURT:  Yeah.

5           MS. O'GORMAN:  -- willing to go back to 2013.

6           THE COURT:  All right.  Well, if you have them, I

7   think you should produce them going back to 2009.  If you

8   don't, you don't.

9           MS. LENNOX:  Your Honor, I think everything she

10  asked for in financial statements she'll find on line, and we

11  said we'd look for 2009, so we will.  We also produced a

12  document to them about historic volumetric use.  It's at

13  Bates Number 216883.

14          THE COURT:  Going back to 2009?

15          MS. LENNOX:  I don't know if it's back to 2009, but

16  it's historic, so I can confirm, your Honor.

17          THE COURT:  All right.  Anything else?

18          MS. O'GORMAN:  Yes, your Honor.  The most -- there's

19  two very significant issues that Macomb would like the Court

20  to address with respect to the city's production.  One is an

21  objection that the city interposed to a number of specific

22  requests, about a dozen specific requests, all of which

23  related to the DWSD, and that objection states that the city

24  objects to this document request as overbroad insofar as it

25  seeks documents relating to the GWA, the GLWA, or the DWSD

1  transaction or related bonds or financing as neither of them

2  is currently contemplated by the plan or disclosure

3  statement. Accordingly, this request is not reasonably

4  calculated to lead to the discovery of admissible evidence.

5  So essentially the city has deemed these issues to be

6  completely irrelevant at this point and is refusing to

7  produce any documents related to the potential creation of

8  the water authority or what was defined as the DWSD

9  transaction, which was, you know, that --

10      THE COURT:  And what's the problem with that?

11      MS. O'GORMAN:  Well, the problem with that is that,

12  first of all, the city has included numerous requests for

13  this very information in its request for production on the

14  counties, and at no time did the city ever say, "Hey, forget

15  about that. We're not interested in that anymore. We don't

16  deem that relevant," so for the city to make requests for

17  production and then tell us the essentially identical

18  requests are irrelevant is, you know, really inappropriate.

19  But more importantly, the -- this information is clearly

20  relevant to the plan that's under consideration. As you

21  reminded us earlier, the city has the burden of proof on that

22  plan. The city has the burden to show that the plan is in

23  the best interest of the creditors and that it's feasible.

24      THE COURT:  Give me an example of a document that

25  the city has asserted this objection to.

1    MS. O'GORMAN:  Okay.  Well, here's one, and it's a

2  little bit hard for us to determine exactly what the city is

3  leaving out of its production.

4    THE COURT:  Okay.  But that wasn't my question.  My

5  question was what is your request?

6    MS. O'GORMAN:  Our request number seven of the city

7  is all documents showing financial projections related to the

8  regional authority prepared by DWSD management, the city, the

9  emergency --

10    THE COURT:  When you say "the regional authority,"

11  what are you referring to?

12    MS. O'GORMAN:  The Great Lakes regional authority

13  that was under consideration and is still -- you know,

14  potentially could come back in as part of the plan.

15    THE COURT:  Okay.  But it's not in the plan now?

16    MS. O'GORMAN:  Correct; correct, but --

17    THE COURT:  So how is it relevant?

18    MS. O'GORMAN:  Because when that plan was under --

19  when the regional authority was under consideration,

20  obviously the city did work to examine the financial

21  viability of that regional authority, the financial

22  projections that would result in that regional authority, the

23  amount of capital improvements that would be needed, the

24  effect of rates and pension obligations.

25    THE COURT:  I assume all that is true, but why is it

1   relevant to this plan?

2           MS. O'GORMAN:  Because what the city considered with

3   respect to the regional authority would still be relevant

4   today.

5           THE COURT:  Why?

6           MS. O'GORMAN:  Because those projections might still

7   tell us how the city looked at an issue, how -- are they

8   consistent with the projections that we're seeing today?

9           THE COURT:  Ms. Lennox.  Sir, do you want to be

10  heard on this?

11          MR. NEAL:  Your Honor, if I may.  It overlaps with

12  an issue that I was going to raise following Macomb.  Guy

13  Neal, Sidley Austin, for National Public Finance Guarantee.

14  We made very similar requests for documents.  Recall, your

15  Honor, the deadline to send the request for production

16  predated several versions of the plan, so things have changed

17  and definitions have changed.  We asked for documents

18  relating to the DWSD transaction as defined in the plan and

19  the GLWA, but we broadened that definition to include any

20  consideration of the transfer of assets or functions of the

21  water or sewer authorities.  We know that the city has a

22  request for information outstanding seeking to -- a possible

23  privatization of its management, and it is pursuing that --

24          THE COURT:  Okay.  But that's a different question

25  than Macomb is raising.

1          MR. NEAL:  Macomb is looking for documents as it
2    relates to the city's desire to essentially monetize --
3          THE COURT:  I have a sense that your presentation is
4    making this consideration of Macomb's request more complex,
5    not less complex, so let me ask you to stand down, and --
6          MR. NEAL:  I will stand down.
7          THE COURT:  -- I will deal with yours.
8          MR. NEAL:  I will stand down.  Thank you.
9          MS. QUADROZZI:  Your Honor, if I may, Jaye Quadrozzi
10   on behalf of Oakland County.  Oakland County's requests are
11   very, very similar, if not identical, to Macomb County's.
12         THE COURT:  Um-hmm.
13         MS. QUADROZZI:  So if I may on this particular
14   point, Oakland County had two issues with respect to
15   objections raised by the city.  The first one is the one that
16   was raised by Macomb, and your Honor asked the question how,
17   since it is no longer in the plan, could a request --
18         THE COURT:  Right.
19         MS. QUADROZZI:  -- relating be relevant, and my
20   answer to that is this.  During the time period that the
21   regional authority was being put forth in the plan as a
22   possibility, there were financial analyses that basically
23   said there is enough money in DWSD to allow some entities to
24   take $47 million a year out by way of a lease payment and to
25   pay it back to the city to monetize.  How that's relevant is

1    because we are currently looking at objections to the plan

2    talking about the feasibility, the ability of DWSD in the

3    current formation to continue to provide the services that it

4    provides.  And if, in fact, the city has analyses that show

5    DWSD is so flush that it has this extra $47 million a year

6    that is available to it, that is relevant or could lead to

7    relevant information in connection with our objections

8    about --

9            THE COURT:  You're asserting that the city has an

10   analysis showing that the department has $47 million extra a

11   year?

12           MS. QUADROZZI:  That is the transaction that was

13   under discussion in --

14           THE COURT:  I thought the transaction that was under

15   discussion was not that the DWSD had $47 million a year.  It

16   was that the counties would pay that to the city.

17           MS. QUADROZZI:  That the counties would pay that to

18   the city and that it would have no effect on rates and that

19   the amount would be able to be drawn from increased savings

20   that DWSD would now have as a result of an improved bond

21   rating that the new authority would have as well as reduced

22   costs by way of operational efficiencies that have been

23   gained.  That was where the money was supposed to come from.

24   And if they have, in fact, those analyses --

25           THE COURT:  And that's relevant to what's before the

1  Court today how?

2          MS. QUADROZZI:  It's relevant because the financial

3  stability of DWSD going forward is very relevant to determine

4  whether or not, in fact, it can continue to perform under the

5  contracts that it has with the counties, certainly Oakland

6  County.  If they believe that there is that much excess money

7  within the system, if it existed, we think that it is

8  relevant to our analysis.  It certainly is likely to lead to

9  the discovery of relevant information, which is the

10  threshold.

11          THE COURT:  Ms. Lennox.

12          MS. LENNOX:  Couple of things with respect to this,

13  your Honor.  First, it sounds like what Macomb and Oakland

14  are arguing are they're making arguments trying to dispute

15  whether the authority is a good idea or not, and I don't

16  think that's relevant for our plan because, as your Honor

17  pointed out, the plan, as drafted, does not contain an

18  authority.  The plan, as drafted, indicates that DWSD is

19  going to remain a department of the city, and it provides

20  financial information for DWSD remaining a department of the

21  city and projections for DWSD going forward as Exhibits L and

22  M to the disclosure statement, and we've already discussed

23  that historical financial information for DWSD standing on

24  its own is on its website.  So I think this is wholly

25  irrelevant.  Nevertheless, I also find it odd coming from

1  Macomb and Oakland, who are the parties in the room
2  negotiating the authority with us, and all this information
3  was provided to them during those negotiations.
4  Nevertheless, as a part of the production, we did produce
5  two -- and we shared this already with all creditors,
6  including Mr. Neal's clients.  When we were originally
7  thinking about an authority back in the fall of 2013, there
8  were three very big decks that the advisors and DWSD produced
9  with respect to a potential authority transaction, and those,
10  indeed, have been produced.  They were produced before as
11  well notwithstanding the fact that this is not part of the
12  plan and is not relevant.  So I think, your Honor, that
13  anything related to this authority which is not part of our
14  plan and which we don't have to prove up -- we have to prove
15  up that the plan, as drafted, is feasible.  The plan, as
16  drafted, includes DWSD remaining a department of the city,
17  and separate financials with respect to DWSD have been
18  provided so that the creditors and the people that we deal
19  with with respect to that department can understand it
20  separately from the rest of the general fund.  So I think any
21  further search and production on this is wholly irrelevant to
22  the plan that's before the Court.
23          THE COURT:  How do you deal with the argument that
24  whatever financial analyses were prepared then in support of
25  that proposed transaction bear upon whatever forecasts and

1    projections the city has made in connection with this plan?

2         MS. LENNOX:  I think there -- I think you're talking

3    apples and oranges, your Honor.  One of the reasons we

4    thought that it might be a good idea to do an authority with

5    the three counties and remove this -- these operations from

6    parts of the city are to do things like improve credit

7    ratings, have a different form of management, have a

8    different form of governance.  None of that is relevant to

9    what we're doing in the plan.  And so while the operating

10   financials probably aren't going to change very much, it's

11   those atmospherics and those potential credit rating

12   decisions that may change with an authority, but that's not

13   part of our plan.  That's not what we have to prove to the

14   Court in a few months.  So, again, I understand why people

15   are highly interested in this because it was being discussed,

16   but it's not being discussed now.  Something may happen with

17   mediation, which, as I understand, is just getting off the

18   ground, and maybe it won't, but we're dealing in discovery

19   with the plan that's before the Court for confirmation.  If

20   things change, then people will have a right to ask questions

21   about how things have changed in the future.

22        MS. O'GORMAN:  Just one more thing briefly on this

23   point, your Honor.  We do feel that we should have a right to

24   look at the documents related to the regional authority, test

25   and see how projections have changed, if at all, and, you

1    know, make that determination.

2         THE COURT:  Ms. Lennox represented that the city had

3    provided your clients with information about the financials

4    in support of the authority from back in 2013 or whenever it

5    was proposed the first time and discussed.  Is that not true?

6         MS. O'GORMAN:  I don't doubt that that's the case,

7    but it's documents from the city that we wouldn't otherwise

8    have that we're looking for, and with --

9         THE COURT:  Like what?

10        MS. O'GORMAN:  I would have no way of knowing what

11   that would be, but there's a wholesale refusal based on

12   relevance to produce anything on the regional authority, and

13   the city didn't address the fact that they asked for

14   documents on this very issue of the counties and possibly

15   other parties.

16        THE COURT:  All right.  The Court must conclude that

17   this documentation that the counties seek is of arguable

18   relevance.  Accordingly, the Court will require the city to

19   produce it.

20        MS. O'GORMAN:  Thank you, your Honor.  And there's

21   one final issue that Macomb would like to raise, and that is

22   with respect to --

23        THE COURT:  And I should say as to both Oakland and

24   Macomb Counties.  Go ahead.  I'm sorry.

25        MS. O'GORMAN:  That is with respect to the objection

 1    interposed by the city to request for production 12, which
 2    seeks all documents relating to the RFI's, including but not
 3    limited to, and then we're asking for information on the
 4    responses received from potential private operators,
 5    documents relating to meetings or negotiations with those
 6    parties, documents sent or received by the potential private
 7    operators, and any memorandum shared with those private
 8    operators.  The city interposed an objection that to the
 9    extent it requires the production of documents containing
10    commercially sensitive information, they will not be
11    produced.  And in initial meet and confer discussions with
12    Mr. Irwin last Thursday and Friday, he indicated that he
13    wasn't sure what documents, if any, would have been withheld
14    on the basis that they contain commercially sensitive
15    information.  I learned yesterday afternoon from Mr. Irwin
16    that the city did, in fact, withhold documents.  Mr. Irwin
17    told me that, "I was reminded by my team that the city
18    withheld documents relating to Miller Buckfire's current
19    efforts to find a buyer/operator for the DWSD on the basis of
20    commercial sensitivity."  And, your Honor, while those
21    documents may be sensitive, that doesn't, as you said before,
22    absolve the city of the obligation to produce them if they're
23    otherwise relevant.  The remedy would, of course, be a
24    protective order, and we would certainly be willing to
25    discuss that with the city and the appropriate terms,

1  consider an attorneys' eyes only protective order subject to

2  coming back to the Court should the need arise, but it is

3  just not appropriate to refuse to produce that information.

4      MS. LENNOX:  Your Honor, we have disclosed in the

5  disclosure statement that we have put out an RFI -- that RFI

6  has been produced to all of the creditors -- with respect to

7  a potential public-private partnership or some third-party

8  privatization of DWSD.  We have also disclosed in the

9  disclosure statement the status of that process, and the

10 status of that process is we're in the middle of it.  We are

11 in the middle of a potential sale process, and we are trying

12 to get a few parties to submit some definitive bids by June

13 1st of this year.  The ongoing process and the discussions

14 with potential parties -- third parties are fluid, and they

15 are commercially sensitive.  This is like any other sort

16 of -- if you liken it to an asset sale process, it would be

17 appropriate to let the creditor parties know the outcome of

18 the process, but it would also be highly disruptive to the

19 process when you're in the middle of it and talking about

20 things with third parties, including where they may come out

21 on things, where they may not come out on things.  They're

22 not going to want to share information with us, and they are

23 not going to want to continue with their dialogue with us if

24 they think that all the communications for a bid they may or

25 may not ever submit are going to be subject to creditor

 1   review and creditor interference in a discovery process.  It
 2   would definitely chill this process and definitely chill the
 3   potential of ever getting a transaction like this done, so we
 4   do think this is commercially sensitive.  I would also point
 5   out that even under the FOIA rules under MCL 15.243(l) sub
 6   (i) none of this would be discoverable until the bids or --
 7   the time for submitting bids or proposals have expired at the
 8   end of June, so, again, I think it's perfectly appropriate to
 9   let the creditors know how this process comes out, but I
10   think it's absolutely inappropriate and would disrupt it and,
11   in fact, chill the process if we were required to produce
12   discovery to litigating creditors in the middle of an ongoing
13   process.
14          THE COURT:  I agree with the city's position on
15   this.  Their objection is sustained.  It's time for us to
16   take a recess, so we'll be in recess until four o'clock,
17   please.
18          THE CLERK:  All rise.  Court is in recess.
19      (Recess at 3:43 p.m., until 4:00 p.m.)
20          THE CLERK:  All rise.  Court is in session.  Please
21   be seated.  Recalling Case Number 13-53846, City of Detroit,
22   Michigan.
23          MR. IRWIN:  Geoff Irwin, your Honor, Jones Day, for
24   the city.  Just may I request a clarification revisiting some
25   of the issues we dealt with this morning?  I was conferring

1  with Mr. Hackney during the break, and we were discussing a

2  few things.  I want to make sure I understand my obligations

3  with regard to some of the rulings this morning.  I think

4  most of them are straightforward enough I understand them.

5            THE COURT:  Okay.

6            MR. IRWIN:  Within several days I will be

7  reproducing the city's document production.  That I

8  understand.  By Monday of next week I will be delivering a

9  declaration that sets out the procedures and the search

10  protocols, things like that, and the index that we can put

11  together to allow someone to navigate the city's production.

12  That I understand.  The Court made reference to the date

13  restriction or the date fields that were used on the search.

14            THE COURT:  Yes.

15            MR. IRWIN:  The clarification would be helpful for

16  me in connection with what the city is expected to do with

17  regard to searching earlier in time.  If the order or the

18  expectation is that the city also go back and rerun its

19  search, the ESI search -- again, the --

20            THE COURT:  Yes.

21            MR. IRWIN:  -- dipping the toe in the pool, across

22  all of its 88 custodians or so and redo this from January

23  1st, 2012, through the end of 2012 to supplement the

24  production, if that's -- I would ask clarification as to

25  whether or not that is the order.  If it is -- and I think

1   that would be tremendously burdensome on the city to do -- it

2   would certainly take time.  That is not something that I was

3   representing to the Court that we could do by Monday with

4   everything else.  If we've got all of our discovery team

5   resources doing the very best we can to make sure this doc

6   reproduction is what it needs to be, which has to immediately

7   turn around into building this index and making this

8   declaration right for the parties for Monday, I don't have

9   the resources or it would be very difficult to marshal the

10  resources and incredibly expensive to go back and also rerun

11  searches on a new time period.  If we have to do it, we'll do

12  it, but that is not something we could do for Monday.

13          THE COURT:  How long would that take?

14          MR. IRWIN:  I honestly do not know.  I don't know if

15  we have the data that's been -- I would like to think but I

16  really don't know if the data that we've collected and run

17  our original searches against is the complete set of data and

18  we would just run a search again, but that takes time.  It

19  takes time to run the searches.  It takes time to load the

20  data on computers.  It takes time for folks to review it.

21  And, again, I just -- I feel like we wouldn't have a quick

22  start to that because of everything that's --

23          THE COURT:  Well, I will ask you or whichever of

24  your colleagues will be here on Thursday to make a report to

25  me on how long that will take.

1          MR. IRWIN:  Okay.  Yes, your Honor.  We can do that.

2          THE COURT:  All right.  Who's next?

3          MR. BRILLIANT:  Your Honor, Allan Brilliant, you

4     know, again on behalf of the Macomb County public works

5     commissioner.  You know, I have good news, your Honor.  Mr.

6     Schapka came back from the second floor, met with Ms. Lennox,

7     and we believe that this issue is resolved at least for --

8     you know, for today --

9          THE COURT:  Okay.

10         MR. BRILLIANT:  -- subject to further discussion, so

11    with that there will be no need to put that back on --

12         THE COURT:  Thank you.

13         MR. BRILLIANT:  -- the calendar for today.

14         THE COURT:  Okay.

15         MR. NEAL:  Okay.  Good afternoon again.  Guy Neal

16    for National Public Finance Guarantee.  I rise to address the

17    statement of unresolved issues that we filed on Friday

18    afternoon.  We filed that on behalf of National, Assured,

19    Berkshire Hathaway Assurance Corporation, U.S. Bank National

20    Association, and the ad hoc committee for the DWSD

21    bondholders.  The good news is, as it relates to the

22    documents, I think we can confirm very quickly that those

23    issues have been resolved based on prior rulings today.  We

24    raised three in our brief.  If I could quickly go over

25    them --

1          THE COURT:  Um-hmm.

2          MR. NEAL:  The first one is the easiest.  That

3    concerns the city's bulk document production.  That has been

4    addressed.  The second one concerns the date, reach-back

5    period of January 1, 2013.  That has been addressed, I

6    believe, in part, although I'd like confirmation.  We just

7    heard of the colloquy as it relates to going back to January

8    1, 2012.  I understand that.  The DWSD parties also sought

9    specific documents going back to 2009.  We cited examples in

10   our submission on page 5.  Just to pull some of them out for

11   you, your Honor, we sought all financial statements and

12   supporting schedules going back to 2009.  I believe you

13   addressed that in your ruling as it relates to Macomb's issue

14   earlier today.  If they exist, the city will produce them.

15   We also requested information going back to 2009 as it

16   relates to calculation of pension and OPEB benefits

17   specifically as they relate to the DWSD employees.  I assume,

18   again, to the -- should not assume anything.  To the extent

19   that information exists, I believe the city should produce

20   it.  I have a high degree of confidence that they have that

21   information.  It's not something that they would have to

22   create or go through great searches for given all the pension

23   and OPEB issues in this case.  So that's my issue number two

24   on the documents.

25          My issue number three on the documents, I believe,

1  was just addressed, and I apologize to the extent I tried to

2  confuse matters when I rose earlier.  And that concerns

3  objections as to the DWSD transaction, which is a defined

4  term in the plan, back in the day, or the GLWA.  As I rose to

5  state 15, 20 minutes ago, we included a definition that we

6  would like any documents that relate to any transfer of the

7  assets or functions of DWSD.  We heard a couple things.  One,

8  the request for information about a private-public

9  partnership or a private management agreement.  That process

10  is ongoing.  We should be able to obtain those documents that

11  exist today and that may be produced during the course of

12  this process.  Also, one point that was not raised that I do

13  wish to underscore, and that is less than a month ago I

14  believe your Honor said it would be a shame more or less to

15  waste a perfectly good bankruptcy and not pursue potential

16  for an authority, and the parties, as we understand it, are

17  in mediation today and ongoing mediation on that issue.

18  Should that resurface and should that resurface late, your

19  Honor, we should get those documents such that we don't have

20  to start this process over again.  Again, based on your

21  ruling with respect to Macomb's issue, you said there was

22  possible relevance to this material.  You ordered they be

23  produced, so I think, again, we are covered there.  So that's

24  it for the documents.  Now I want to turn to the

25  interrogatories, your Honor.

1    THE COURT:  Well, let me deal with that much of it

2    at this point.

3    MR. NEAL:  Very good.

4    MS. LENNOX:  Thank you, your Honor.  We did discuss

5    the financials.  I note that the financials back to 2010 are

6    on line, and the parties can pull them.  We will look for --

7    or 2010.  We will look for 2009.

8    THE COURT:  Okay.

9    MS. LENNOX:  With respect to the other request that

10   goes back to 2009, the pension and OPEB benefits, we can go

11   back that far.  In fact, I note that on page 92 of the

12   disclosure statement we list the pension contributions from

13   2009 to 2013, so we already disclosed them, so we can go back

14   for those limited items that far as well, and I think the

15   rest is otherwise resolved by your Honor's rulings.

16   THE COURT:  Okay.  Interrogatories?

17   MR. NEAL:  Before I turn to the interrogatories, I

18   pulled out pension and OPEB as one of the examples of the

19   requests that go back to '09.  The debtor did state that they

20   would produce the information we requested on issues --

21   financial issues, in particular, going back to '09.  I just

22   don't want to limit when I stand up here today, and say,

23   well, it's just pension and OPEB.  It goes beyond that.  We

24   had enumerated several requests in our statement of

25   unresolved issues, numerous document requests that do call

1   for information that go back to '09 and some that potentially

2   go back to '09, so I -- the city perhaps --

3          THE COURT:  Well, to the extent it's available, it

4   should be turned over.

5          MR. NEAL:  Very good.  Thank you.  All right.

6   Turning to the interrogatories, your Honor, this is page 9 of

7   our submission.  I understand the general reluctance to

8   prepare responsive interrogatories.  It takes hard work, and

9   it takes precision.  We prepared a chart that we appended as

10  Exhibit E to our statement of unresolved issues.  I do not

11  have any intention to go through it.  It's not the Syncora-

12  sized phone book chart, your Honor.  It's much more narrower,

13  not to --

14         MR. HACKNEY:  Obviously jealous.

15         MR. NEAL:  We tried to limit -- although we found

16  many of the responses to be completely nonresponsive or

17  incomplete, we're going to try to narrow this to six broad

18  categories as listed on page 9, and I just intend to go

19  through them, your Honor.  Interrogatory Number 1 --

20         THE COURT:  One second, please.

21         MR. NEAL:  Yes.

22         THE COURT:  All right.  Can you give me the docket

23  number of what you are looking at?

24         MR. NEAL:  Yes, your Honor.  I have an extra copy

25  should your Honor want it.  This is Document Number 4568,

1    page 9 of 45 --

2           THE COURT:  Actually, if you have a copy there, that

3    would be even more convenient.  Okay.

4           MR. NEAL:  May I approach, your Honor?

5           THE COURT:  Yes, please.  Okay.

6           MR. NEAL:  For ease of reference -- for ease of your

7    Honor's reference, I handed you a copy of the statement

8    itself and only Exhibit E.  Exhibit E is the chart of all the

9    interrogatories.  Again, I'm not going to walk you through

10   all of the interrogatories, but if you turn to page 9 of the

11   statement itself, Interrogatory Number 1, we asked for the

12   financial and accounting basis for the DWSD funding of the

13   GRS, UAAL.  Let me put that in plain English.  As your Honor

14   may note from the plan, the city proposes that the DWSD pay

15   approximately $428.5 million over the course of nine years

16   for its what the city claims to be the DWSD's unfunded

17   actuarial liability, so that's 428 million coming out of the

18   system, and arguably it's coming out on top of the debt

19   service payments as to which my clients insure.  The city

20   essentially punted on this response, didn't provide a

21   complete answer, and the default mode for the city on

22   questions related to the plan is to direct parties to the

23   plan and the financial projections in the plan.  They do not

24   provide a narrative response.  Same as it relates to

25   Interrogatory Number 2, the methodology and supporting

1   assumptions for projections of the city's pension
2   contributions.  Again, this directly impacts my client, which
3   insures about 1.8 billion with a "B" dollars worth of water
4   and sewer bonds, also impacts, of course, the other parties
5   that I am standing up here today for the DWSD parties.
6   Again, lack of a narrative direction to the plan and
7   disclosure statement.
8           Then there are about five interrogatories, 5 through
9   10, that go back to the DWSD transaction of the GLWA.
10  Recognizing those are off the table, there, nonetheless, is
11  this qualified -- it's a new defined term in the latest
12  version of the plan -- a qualified DWSD transaction, which by
13  and large is the optionality of the city to pursue lease,
14  sale or other disposition of the systems, perhaps private
15  management company.  We are looking for information relating
16  to that transaction.  If the GLWA and the DWSD transaction
17  are off the table, this other qualified transaction appears
18  to be on the table as well as the request for information
19  that they have circulated and is still outstanding.
20          The last three, your Honor, I'll go over them
21  quickly.  Interrogatory 13, the methodology, basis, and
22  justification for the city's interest rate reset chart.  Your
23  Honor, what the city proposes to do -- and you'll see it
24  clearly in our objection to be filed tonight -- is to lower
25  the interest rate on a series of these bonds, not all of

1    them, but to impair the DWSD bondholders by lowering interest

2    rates to what they perceive to be the market rate, the market

3    rate of the bonds for the city upon its emergence from

4    Chapter 9.  We asked them to provide, in essence, kind of the

5    facts or data.  This would probably be an expert witness

6    issue, no doubt, but, again, the facts or data supporting

7    that justification should be explained in this interrogatory.

8         Number 14, the city is also proposing to impair the

9    bonds by stripping the bonds of their call protection and

10   call protection premium.  We asked them for a narrative

11   response as to the value and the risks associated with

12   removing those call protections.

13        And lastly, your Honor, saving the easiest one for

14   last, is Interrogatory 21, which asked them specifically --

15   this has kind of been a recurring theme throughout the day --

16   please identify the persons on your witness list who may

17   testify with respect to DWSD matters.  At present, there is

18   no such identification.  There are 30 to 33 witnesses so

19   identified.  And with all due respect to Mr. Hackney,

20   Mr. Marriott, and others, we have limited, if any, interest

21   in matters involving the DIA, the grand bargain, et cetera,

22   but we would like to know which witnesses the city may call

23   to testify as to DWSD.  So with that I'll turn the podium

24   over to Ms. Lennox.

25        MS. LENNOX:  Okay, your Honor.  Why don't we take

1    these one by one?  And I'm going to focus on the ones that
2    Mr. Neal focused you on.  The first one is Number 1.  And if
3    you read the request, which takes up a full page, of what
4    they want us to respond to via interrogatory, I will state
5    that we produced -- first of all, let me make this clear
6    because it's not clear to everybody in this case, and it took
7    some of the retirees' groups a little bit longer to
8    understand this.  The city is not the Retirement Systems.
9    The city doesn't calculate pension contributions.  The city
10   doesn't calculate who owes what.  The city doesn't calculate
11   the allocation between the general fund and DWSD.  That's all
12   done by the general retirement system.  So the city may have
13   some documents in its possession because it has those
14   documents or they're available on line, but they are not city
15   documents, per se.  So with that clarification, we did
16   produce to the other side the GRS financials and valuations
17   that we did have.  I would also point out to them that if
18   they go to the GRS website, they will find them on the
19   website as well.  And those -- parts of those documents show
20   the -- what the general retirement system allocates to --
21   what portion of the UAAL the general retirement system
22   allocates to DWSD, so those documents are what they are.  The
23   system calculated them.  They can look at those.
24           We also, as I pointed out, on page 92 of the
25   disclosure statement, set forth what DWSD's historical

contributions to the pension were going back to 2009. The
remainder of this interrogatory -- so I think they can rely
on the documents produced under Federal Rule 33(d) on that.
The rest of it of what they want the basis for treating the
amounts as operations and maintenance expenses under the DWSD
bond documents, that calls for a legal argument that I think
I'm going to see in their objection that they filed today,
and interrogatories are inappropriate places to set forth
legal arguments. And if they want to know whether the
prefunding -- what they're calling prefunding, what I'm
calling a payment of a UAAL -- will impair the bonds, it
doesn't. I'll just state that on the record. So I think we
have done what we can do in terms of particularly with
producing documents to respond to the concern that they have
with respect to this particular interrogatory.

With respect to Number 2, again, what they're
looking for here is an essay question. It's describe with
particularity the nature, derivation, and basis and
methodology used and underlying support and assumptions for
any of our projections for annual contributions to the GRS
and PFRS. Again, these are not something that the city does.
This is something that the Retirement Systems do. And to the
extent that we had documents in our possession from the
Retirement Systems -- and, again, I note they are all on
line -- we produced them. Moreover, to the extent that

1  they're really looking for actuarial assumptions or something
2  that is unclear to me from this from the city, that would be
3  the subject of expert testimony and not an appropriate
4  interrogatory question.
5       With respect to Number 5 through 10, I think Mr.
6  Neal conceded that they have been dealt with in other
7  portions of your Honor's colloquy with me this afternoon, but
8  he does mention the new qualified DWSD transaction, which is
9  a fancy way of saying if there is some DWSD transaction in
10  the future, then, you know, here's how we would allocate
11  whatever value comes out of that, so it is not a transaction
12  that is currently on the table.  It is not a transaction that
13  we can answer for because it is purely a hypothetical.  It is
14  should the authority arise in the future, then maybe that
15  could be a qualified DWSD transaction or if the RFI that
16  we've had a colloquy over produces a third-party transaction,
17  then that might arise in the future, so, again, I'm not sure
18  what we can say about a qualified DWSD transaction other than
19  one might occur, and when and if one does, we'll let you know
20  about it.
21       So I think that takes us to Number 13.  Whoops.
22  Skip that one.  And this goes to the interest rate reset
23  chart, which is Exhibit I.A. 159 to the plan -- well, used to
24  be Exhibit I.A. 159 to the plan, but it is still an exhibit
25  to the plan.  Again, with respect to this interest rate reset

1   chart and what we think the market rate interest rates of the

2   DWSD bonds that are being impaired may be -- and, again, I

3   remind your Honor that not all of them will be impaired -- we

4   did in our production give them nonprivileged documents with

5   respect to that, so I think they can look at the documents

6   and come to their own conclusions.  With respect to the rest

7   of this, Mr. Neal correctly identified that he expects that

8   this will be the subject of expert testimony, and it will, so

9   we believe that to answer this any more specifically right

10  now would be premature.

11          With respect to Interrogatory Number 14 where they

12  ask for the value and risks associated with removing call

13  protections from the bonds, I, frankly, don't understand what

14  value and risks associated with removing call protections are

15  because we don't view any risks to the city.  What I think

16  they're asking for, again, is expert testimony of how this is

17  perceived in the market and/or they may be asking for a legal

18  argument with respect to whether it's proper and can be done

19  under applicable law to remove call protections from a

20  document.  Again, we viewed this as either looking for expert

21  testimony or a legal analysis and does not lend itself to an

22  appropriate interrogatory response other than the one that

23  was provided.

24          And I think that takes us to Number 21, which is

25  which of our witnesses may testify with respect to DWSD.  As

1   DWSD, we view this as part of the feasibility analysis.  I

2   would say witnesses that are identified as testifying as to

3   feasibility are potential DWSD witnesses.  We can certainly

4   go through our witness list and be a little more precise for

5   Mr. Neal and his colleagues.

6           THE COURT:  Thank you.  Mr. Neal, anything further?

7           MR. NEAL:  Very briefly.  On 1 and 2, Ms. Lennox

8   refers to the Retirement Systems and the retirement plans and

9   it's their calculations, but it is the city's plan, and it is

10  the city's projections, and they would have this information

11  and could provide complete responses.

12          Otherwise, your Honor, as to what she deems to be

13  either expert issues or premature, again, your Honor, facts

14  or data considered, facts or data they have that would not be

15  premature -- this goes to 13 and 14 -- should be provided.

16          Lastly, on 21 I'll accept her representation that

17  those witnesses who are identified as feasibility experts --

18  not feasibility experts -- excuse me -- designated as

19  testifying as to issues regarding feasibility will also cover

20  DWSD, but to the extent there are any others, we'll -- we

21  want them in writing in the interrogatory.  We also have a

22  separate issue -- perhaps it's not for today; perhaps it's

23  Thursday -- as it relates to the deposition notices that are

24  outstanding and how we conduct that issue with 30(b)(6)

25  representatives.

1          THE COURT:  Okay.

2          MR. NEAL:  But with that, your Honor, it's been a

3    very long day, and I thank you for your patience.

4          THE COURT:  Okay.  Stand by, please.  All right.

5    With respect to the matters asserted by National Public

6    Finance, Assured, Berkshire Hathaway and the others, the

7    Court sustains the city's objections regarding

8    Interrogatories 1, 2, 5 through 10, 13, and 14.  The Court

9    will require the city to provide a more complete answer or a

10   fully complete answer as to Interrogatory 21.

11         MR. MONTGOMERY:  Your Honor, if I may, just to knock

12   something off your calendar, I spoke with counsel for Wayne

13   County, and their objections to a response to discovery,

14   which is Docket Number 4437, has been resolved through the

15   meet and confer process, and their rolling production is

16   underway, and so there are no issues between us.

17         THE COURT:  Thank you.

18         MS. GREEN:  We had a meet and confer on Friday, and

19   I believed at that time that all of our issues --

20         THE COURT:  Your appearance again, please.

21         MS. GREEN:  Jennifer Green on behalf of the

22   Retirement Systems.  I'm sorry.  We had a meet and confer,

23   and I thought that all of our issues were resolved, but

24   throughout the day today I've learned some new information

25   that I think there may be an issue out there I'd like to

1  raise now to get it on everyone's radar.  We had requested
2  several documents relating to the DIA, including insurance
3  policies, appraisals that may have been performed in
4  connection with those insurance policies, copies of any
5  instruments gifting or bequeathing, you know, artwork to the
6  DIA, things of that nature.  The response from the city was
7  subject to our general objections, we'll produce what we have
8  to you.  And then today I heard Mr. Irwin say that they did
9  not give, for instance, a list of all the artwork, and I'm
10  concerned that several creditors have directly subpoenaed the
11  DIA.
12          THE COURT:  Um-hmm.
13          MS. GREEN:  We did not based on the representation
14  from the city at the art committee motion that we could
15  direct our document requests to the city.  I went back to the
16  motion hearing transcript, and at that time Mr. Bennett
17  stated that although -- "the city, although it is not
18  actually the repository of data relating to the DIA or the
19  city collection -- that's largely what I call the DIA Corp.,
20  which is the entity that manages the museum -- we will
21  cooperate with information requests that people have with
22  respect to the art and with respect to issues relating to the
23  art, period, end of story," end quote.  That was from the
24  22nd of January.  So we did not directly subpoena the DIA,
25  and I understand that several creditors did and that there is

1  a much larger production being compiled by the DIA that I do

2  not have access to.  While I would be okay with just going

3  that route and getting the documents from the DIA, I now

4  understand there's some sort of letter agreement between

5  certain creditors and the DIA that we are not a part of as

6  well as a pro rata share of some sort of cost associated with

7  compiling the documents, and it's pretty high.  It's like

8  15,000 per party if I'm not mistaken.  That's what I was

9  given as a rough number today.  To me that seems a little

10  unfair like it's shifting the burden from the city, who had

11  affirmatively represented to everyone that we could direct

12  all of our requests to them, and now I have to go to a

13  different party, and I have to pay 15,000 to get the

14  documents that I have already requested from the city.  I

15  don't know if that's something that Mr. Irwin can deal with

16  in his certification of who they got documents from and the

17  index.  I think it falls kind of outside of that.  And I

18  bring it to your attention.  I can do it by motion, but since

19  we're here today, I thought I would raise the issue.  Thank

20  you, your Honor.

21          THE COURT:  Would either of you like to address

22  this?

23          MR. IRWIN:  I can address it briefly, your Honor.

24  Ms. Green and I had not previously discussed this.  I wasn't

25  aware of this issue.  I tried to articulate the city's

1  positions on many of these art requests earlier this morning,
2  which is the city in receipt of the document request searched
3  its own files and did, in fact, produce responsive documents
4  but that -- and I've told anyone who has asked in our various
5  meet and confer sessions that we expect and believe that the
6  vast majority of documents and information that creditors are
7  asking for is in the hands of the DIA, and as I understand
8  and read the agreement in plain terms, they are getting that
9  information from the DIA.  I would be more than happy to work
10 with Ms. Green in terms of how she can intersect with that
11 process and benefit from the many, many documents that are
12 being produced.  And if she is not satisfied that she is
13 getting those documents, I suppose we can revisit that at
14 that time, but the city can't do any more than produce what
15 it has.
16       THE COURT:  Well, I don't think Ms. Green is
17 concerned about that.  I think she's concerned about having
18 to write a check for $15,000 after Mr. Bennett said that the
19 city would cooperate with creditors in providing these
20 documents.
21       MR. IRWIN:  And that's what I meant when I said
22 that's something I would be willing to work with Ms. Green
23 about.
24       THE COURT:  All right.  Let me see if the two of you
25 can work this out between now and Thursday without the

1  necessity of any formal process and report to me then.

2          MR. IRWIN:  Yes, your Honor.

3          THE COURT:  Who else would like to be heard today?

4  Sir.

5          MR. ANGELOV:  Your Honor, Mark Angelov for Ambac

6  Assurance Corporation.  I have one specific interrogatory

7  response that I'd like to raise with the Court --

8          THE COURT:  Okay.

9          MR. ANGELOV:  -- and one general issue that I

10  alluded to earlier.  May I hand up something we --

11         THE COURT:  Yes, please.

12         MR. ANGELOV:  -- filed on the docket earlier?

13         THE COURT:  Your Honor, this is in connection with

14  Ambac's Interrogatory Number 11 to the city.  This begins on

15  page 4 of the document I handed up.

16         THE COURT:  Okay.

17         MR. ANGELOV:  Interrogatory 11 seeks -- asks the

18  city to describe the amount and nature of the administrative

19  claims referenced in the plan and disclosure statement.  It

20  also asks to identify all documents that relate to the

21  administrative claims, and then there's a corresponding

22  request for production that seeks the production of those

23  documents.  The city did not respond to the interrogatory.

24  They generally reference the disclosure statement, which, of

25  course, just gives a total amount of all administrative

1    claims.  The basis for not responding is vagueness, which

2    "administrative claims" is a term that's defined under the

3    plan.  It's not vague, nor is Ambac seeking information about

4    all potential administrative claims as the response suggests.

5    We're just asking for essentially a list of what is summed up

6    in the disclosure statement and the corresponding documents,

7    so that's Interrogatory 11.

8            The general issue that I raised earlier this morning

9    with your Honor is the fact that we understood the city to be

10   objecting to supplementing its document production going

11   forward as additional documents become available.

12           THE COURT:  Oh, yes.  You did mention that.  All

13   right.  Let's deal with that.  Thank you, sir.

14           MR. IRWIN:  Your Honor, we don't particularly see

15   the relevance of the information requested in Interrogatory

16   Number 11, but as Mr. Angelov has articulated it, if he wants

17   that information, we think we can provide it.

18           THE COURT:  Okay.  What about the issue of the duty

19   to supplement in the meantime?

20           MR. IRWIN:  Boy, it's -- where do you sort of grab

21   on that?  I mean we have the same problem that we would

22   encounter with regard to going back a year, we would have

23   that going forward a year only this time we'd have to go out

24   and re-retrieve the electronic records of all of our

25   custodians.  I just don't know how we would do that.  If

1 there was some limited category of information in terms of
2 new developments --

3       THE COURT: I like that idea. If creditors' counsel
4 or really any counsel seek supplementation of specific
5 documents, I would urge them to forward that information to
6 Mr. Irwin right away, and we'll see if that becomes
7 burdensome. I would hope that they would keep those
8 categories as limited as possible.

9       On the subject of administrative expenses, I was
10 actually going to bring this up on Thursday in our status
11 conference. As I read through the plan, it wasn't clear to
12 me whether the term "administrative expenses" included
13 ordinary course of business expense, wage expenses. The
14 language is broad enough to include all of that stuff, but it
15 was incomprehensible to me that you actually intended that,
16 so I was going to ask you what you did intend to mean by the
17 phrase "administrative claims," and we can discuss that on
18 Thursday. We don't need to do it today. And part of the
19 agenda for Thursday will be a bunch of questions I have about
20 the plan. These are not in the nature of objections because
21 I don't object, but it is important, I think, for the plan to
22 be as clear as we can make it to avoid issues, disputes, and
23 potential litigation later, so when I ask these questions,
24 it's not for the purpose of ruling on anything or suggesting
25 an outcome. It's just for purposes of clarity. And someone

1  is going to have to explain to me and justify the usage in

2  the plan on a gazillion occasions the phrase "and/or."

3           MR. ANGELOV:  Just to clarify, your Honor -- Mark

4  Angelov again for Ambac Assurance Corporation -- is your

5  Honor holding the ruling on Interrogatory 11 in abeyance

6  pending Thursday?

7           THE COURT:  No.  I think they've agreed to answer

8  it.

9           MR. IRWIN:  Yes.

10          MR. ANGELOV:  Thank you.

11          THE COURT:  Yeah.  That's what I heard.  Okay.

12 Anything else for today?

13          MR. HACKNEY:  So we still have our --

14          THE COURT:  Yes.  A microphone.

15          MR. HACKNEY:  Stephen Hackney on behalf of Syncora,

16 your Honor.  We still have our interrogatory requests of the

17 city.  I will tell you that of the 25 of them, about 18 are

18 at issue.

19          THE COURT:  Um-hmm.

20          MR. HACKNEY:  And I know it's been a long day, and

21 it's very --

22          THE COURT:  Will you be here on Thursday?

23          MR. HACKNEY:  I will be.  I will be.

24          THE COURT:  Do you want to deal with them then?

25          MR. HACKNEY:  We're at your leisure, your Honor.

1          MR. MARRIOTT:  Your Honor, Vince Marriott, EEPK.  We

2    also have ours, and I will be here on Thursday, so --

3          THE COURT:  All right.

4          MR. MARRIOTT:  -- Thursday would be satisfactory to

5    me.

6          THE COURT:  All right.  Let's shoot for that then.

7    Ms. Fish.

8          MS. FISH:  Deborah Fish on behalf of Dexia.  I will

9    be here on Thursday also, your Honor.

10          THE COURT:  You have interrogatories to deal with

11    also?

12          MS. FISH:  That's correct.

13          THE COURT:  How many do you have?

14          MS. FISH:  We only have a couple.

15          THE COURT:  A couple.  Do you want to deal with a

16    couple -- do you want to deal with a couple now?

17          MS. FISH:  Generally, I'd go after Mr. Marriott,

18    so --

19          THE COURT:  Oh, all right.  All right.

20          MS. FISH:  -- if that's all right with the Court --

21          THE COURT:  All right.

22          MS. FISH:  Thank you.

23          THE COURT:  Anything else?  Sir?

24          MR. BRILLIANT:  Allan Brilliant on behalf of Macomb.

25    Your Honor, do you have a problem with people appearing on

1  Monday by phone who don't have any more discovery disputes?

2          THE COURT:  No.  You say Monday.  You mean Thursday?

3          MR. BRILLIANT:  Thursday.  I'm sorry.

4          THE COURT:  No.  My policy is anyone can appear

5  anytime they like by phone whether they have something they

6  want to contribute or just want to listen in on.

7          MR. BRILLIANT:  Thank you, your Honor.

8          MR. RAMIREZ:  Your Honor, good afternoon.

9          THE COURT:  Sir.

10         MR. RAMIREZ:  This is John Ramirez from Katten

11 Muchin Rosenman, LLP, on behalf of Deutsche Bank.  We also

12 have a couple of interrogatories that we have some issues

13 with but would also like to go after Mr. Marriott on

14 Thursday.

15         THE COURT:  Okay.  All right.  That's fine, too,

16 then.

17         MR. MONTGOMERY:  Your Honor, inquiry.  On Thursday,

18 will you be handling the adversary proceeding matter

19 separately from the main calendar on Thursday?  I believe you

20 have the city's adversary proceeding on the COPs litigation

21 on then.

22         THE COURT:  I haven't decided the order in which we

23 will proceed if that's what your question was.

24         MR. MONTGOMERY:  It is essentially the question,

25 your Honor.

1          THE COURT:  Yeah.  If it's important to you, I can

2    try to provide a notice of that like tomorrow after I review

3    the docket.

4          MR. MONTGOMERY:  That would be wonderful.

5          THE COURT:  Would that be helpful to you?

6          MR. MONTGOMERY:  Thank you, your Honor.

7          THE COURT:  Yes?

8          MR. MONTGOMERY:  Yes, it would be.

9          THE COURT:  Okay.  Chris, would you remind me to do

10   that, please?  Okay.  Thank you.  We'll be in recess.

11         THE CLERK:  All rise.  Court is adjourned.

12       (Proceedings concluded at 4:38 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett           May 17, 2014
_____    _____
Lois Garrett