UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: | Chapter 9 |
| City of Detroit, Michigan, | No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

_____/

### *CORRECTED* OBJECTIONS TO FOURTH AMENDED PLAN OF ADJUSTMENT BY DETROIT POLICE OFFICERS ASSOCIATION

The Detroit Police Officers Association (the "DPOA"), through their counsel, Erman, Teicher, Zucker & Freedman, P.C., state as follows for their *Corrected* Objections to the Fourth Amended for the Adjustment of Debts of the City of Detroit (May 5, 2014) (the "Objections"):

### INTRODUCTION

1. As this chapter 9 bankruptcy case proceeds towards the confirmation hearing, the DPOA, one of the City's two largest public safety unions, has been unable to reach terms on a collective bargaining agreement with the City. The DPOA and its members stand squarely on both sides of the feasibility issue. On the one hand, they strongly support the City's restructuring efforts to aid them in their ability to provide the City's residents, businesses and visitors with more effective police protection. On the other hand, the DPOA's members are creditors of the City, who, as a result of the freeze on their accrued pension benefits and the proposed New PFRS Pension Formula, face additional and significant cuts to their pension benefits—a critical condition of their employment, since City police officers lack the protection of Social Security for retirement or disability.

1

2. As this Court has recognized, the services provided by all of the Public Safety Unions, including the DPOA, are at the "core" of the "essential services" for which the Eligibility Opinion found the City was "service delivery insolvent." Eligibility Opinion, R. 1945, pg. 114; Nov. 4 Trial Transcript, R. 1605, pg. 32.

3. Having used PA 436 and the timing of the bankruptcy filing to strip the DPOA of its collective bargaining rights under state law, the City, with the support and approval of the State, now proposes, through the Plan[1] [Docket No. 4392] and its proposed treatment of the DPOA members' PFRS Pension Claims: (a) to freeze and impair DPOA members constitutionally protected, accrued pension benefits,[2] (b) to impose on them, as part of their PFRS Pension Claim, a pension benefit that, effective July 1, 2014, is significantly less generous than the New PFRS Pension benefit that will be provided to members of public safety unions who have reached tentative settlements with the City and (c) after imposing this less generous benefit, to block the DPOA, in direct conflict with State and federal labor law, from the right to bargain collectively to improve those pension benefits until at least June of 2023.

4. The City's cynical treatment of the men and women who provide "core" and "essential" police protection is the punishment the members of the DPOA stand to receive because they have reached what would otherwise be a readily resolvable impasse with the City as to economic terms of a collective bargaining agreement. Ironically, the very mechanism that State public policy provides to address such an impasse—the right to arbitration—has been made unavailable to them by the effects of PA 436 and the stay in place in these chapter 9 proceedings.

---

[1] Unless otherwise indicated, all capitalized terms are as defined by the Plan.
[2] The effect of the June 30, 2014 hard freeze on active police officers' accrued pension benefits results in greater cuts to those benefits the further the officer is from retirement.

5. The DPOA recognizes the broad powers the State and City have over the City's creditors under Sections 903 and 904 of the Code. However, the City cannot violate either the plain terms of Bankruptcy Code Sections 1123(a)(4) (imposing a significantly smaller recovery on DPOA members compared to settling public safety union members) and 943(a)(4) (stripping their mandatory, State law right to bargain about this mandatory condition of employment until at least June of 2023) in order to punish DPOA members for the failure to reach terms on a tentative collective bargaining agreement.

6. The DPOA is the exclusive bargaining representative of the City's police officers. The DPOA, like the Detroit Fire Fighters' Association ("DFFA")—the City's other large public safety union-- now finds itself in the eye of a storm of other objecting creditors, many of whom claim that the treatment of the pension claims is unfairly discriminatory (i.e., too rich) and/or that the Plan is not feasible for a variety of other reasons. Given the undisputed challenges that DPOA members face in providing the City with "core" and "essential" police protection, it is imperative that these objections not get lost in the tsunami of financial data and projections that are also an important component of the Court's feasibility analysis.

7. The actions of the City toward the DPOA (and DFFA) members, as proposed by the Plan, are illegal and punitive. The Plan cannot be confirmed unless the DPOA's objections are allowed, and the City consents to modify the Plan.

**FACTUAL AND PROCEDURAL BACKGROUND**

8. In July of 2013, the DPOA joined forces with the City's three other uniformed public safety unions and through their leadership, the four public safety unions reached out to the City in an effort to play a constructive role in the City's restructuring efforts.

3

9. Although the City responded to those efforts by thanking the leaders of the four public safety unions for their "strong cooperation," see attached Exhibit 1, DPSU Exhibit 705, Eligibility Trial, the following day, the City filed its chapter 9 petition for relief [Docket No. 1].

10. On December 5, 2013, this Court found the City eligible for relief under chapter 9 of the Bankruptcy Code. *In re City of Detroit*, 504 BR 97 (E.D. Mich. Bankr. 2013). The Court also specifically found that the City had failed to negotiate in good faith with its creditors, including the DPOA, and found that the City's conduct "bordered on disingenuous" in its claims that it had. *Id* at 176. On August 20, 2013, the Court ordered each of the Detroit public safety unions, including the DPOA, and other key creditors of the City into mediation (the "Orders for Mediation") [Docket Nos. 333 and 527].

11. For more than seven months, the DPOA has participated with the other public safety unions in extensive and exhaustive mediation sessions pursuant to Orders for Mediation. Those sessions were conducted by Court appointed mediators, the Hon. Victoria Roberts and Eugene Driker with the active assistance and participation of Chief Judge Gerald Rosen. They have involved representatives of the City, including the Emergency Manager and the Mayor, and Jones Day.

12. As a result of those exhaustive efforts, two of the four public safety unions reached tentative settlements with the City. However, the DFFA and DPOA, the two largest public safety unions, have not, as of the date of these Objections, been able to reach an agreement.

13. As this Court recognized in its Eligibility Opinion, the challenges faced by the members of the DPOA in providing effective police protection to the City's residents, businesses

4

and visitors are enormous and daunting, 504 BR at 120, 169-170. At the time the Petition was filed, "the City had reduced the number of City employees by more than 22% since fiscal year 2010," and had imposed wage and benefit cuts on union employees under expired collective bargaining agreements. Orr Declaration, R. 11, pg. 14.

14. The City's Disclosure Statement notes that the number of City police officers has been reduced by over 40% during the last 10 years and that, until the recent appointment of current City Police Chief James Craig ("Chief Craig"), its officers had been forced into working 12 hour shifts [Docket No. 4391, p. 133]

15. This Court's Eligibility Opinion recognized that the City could not, ". . . reduce its employee expenses without further endangering public safety," Eligibility Opinion, R. 1945, pg. 30. However, the City, when it filed its petition for relief, sought to do exactly that by seeking to impair its active police and fire fighters' accrued pension rights.

16. At the eligibility trial, Chief Craig addressed the challenges the City and its police officers faced in their efforts to provide essential police protection. Oct. 25 Trial Transcript, R. 1501, pgs. 177-215. Among those challenges was the very low morale of City public safety workers. According to Craig, the morale of the City's police officers ". . . was the lowest . . . [he had] . . . seen of any police department [he'd] ever worked, including when . . . [he] . . . worked . . . [in Detroit] . . . in the 70's." *Id.*, pg. 192. That low morale was caused, in significant part, by a ten percent pay cut and 12 hour work day schedule forced on them and their lack of voice and decision making in the department. *Id.,* pg. 193. The chief told the court that the City's police department was undermanned, its officers underpaid and their working conditions "deplorable," and that the City's fire department and its firefighters faced similarly deplorable conditions. *Id.*,

pgs. 204-05. Trial testimony established the dangerous and life-threatening work done by City police officers and fire fighters. *Id.*, pg. 207; pg. 154.

17. The eligibility trial record also established that the City's police officers and fire fighters lacked the safety net of Social Security benefits upon retirement or disability, and that those hired prior to 1986 also lacked the protection afforded by Medicare. Nov. 4 Trial Transcript, R.1605, pgs. 34-35; Oct. 28 Trial Transcript, R. 1502, pg. 212; Nov. 7 Trial Transcript, R. 1681, pgs. 165-67, 178.

18. Faced with these challenges, the DPOA and the City have worked exhaustively for more than seven months to attempt to reach agreement on key issues that would form the basis of a collective bargaining agreement. To date, they have been unable to do so.

19. As an apparent result of this inability, the Plan subjects the DPOA to (a) significantly less favorable pension treatment than the other active public safety employees in Class and (b) a non-consensual, 10 year injunction that bars them from any negotiations on their pension rights – a mandatory subject of bargaining under any applicable labor law.

20. Given DPOA members' critical role in the City's restructuring and their proposed illegal treatment under the Plan, the DPOA objects to the Plan.

## ARGUMENT

- **The Plan cannot be confirmed as proposed because, contrary to Code Section 1123(a)(4), it imposes less favorable treatment on DPOA members than are afforded other members of Class 10, and DPOA members have not agreed to the less favorable treatment.**

21. 11 U.S.C. §1123(a)(4) applies to these proceedings pursuant to 11 U.S.C. §901(a). Section 1123(a)(4) requires that the Plan, "provide the same treatment for each claim or interest

of a particular class, unless a holder of a claim or interest agrees to less favorable treatment of such particular claim or interest." The City's Plan turns Section 1123(a)(4) on its head. It proposes less favorable treatment for the prospective pension benefits of DPOA members because they have <u>not</u> reached agreement with the City through their exclusive bargaining representatives.

22.  Under the Plan, all active, uniformed public safety employees have Class 10 PFRS Pension Claims. In its current form, the Plan provides substantively different treatment for active public safety employees whose bargaining units have reached tentative settlements and those who have not.

The Plan defines the "New PFRS Active Pension Formula" as follows:

New PFRS Active Pension Plan Formula' means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

See Plan Definitions [Docket No. 4392, p. 23]

23.  Article II, Section B.3.q.ii, which provides for the treatment of Class 10 PFRS Pension Claims, describes the treatment to be afforded to Class 10 pension benefits that accrue on or after July 1, 2014 as "consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan." [Docket No. 4392, Art II, Sec B.3.q.iiE, p. 39].

7

24. However, as set forth on Exhibit I.A.191.b to the Plan [Docket No. 4449, pp. 5-10], the "Principal Terms of New PFRS Active Pension Plan" are different than the terms of the New PFRS Active Pension Formula. Specifically, while Exhibit I.A.191.b. provides a reduced future benefit to all City public safety employees, the benefit for DPOA members is significantly reduced compared to settling unions members' benefits.

25. The significant differences in treatment include a different "final average compensation" formula,[3] a COLA of 1% for DPLSA and DPCOA members, and different ages for eligibility for retirement.

26. This disparate treatment is illegal, in the absent of the consent of the Holders of these Class 10 claims under Section 1123(a)(4) because it fails to provide them with the "same treatment" as other active members of Class 10.

27. Furthermore, precisely because the DPOA is the exclusive bargaining representative of its members, in the absence of a collective bargaining agreement after June 30, 2014, there is no mechanism by which the Holders of these claims can agree to this disparate treatment.

28. Upon information and belief, the assumptions that underlie the City's Plan (as it applies to its future pension obligations to public safety) do not require this less favorable and punitive treatment of DPOA members.

---

[3] Pension benefits are calculated, in part, based upon a "look back" at an employee's historical compensation. Under the New PFRS Pension Formula, that formula is being made significantly less generous by excluding certain components of pay, such as accrued sick leave, from the formula. However, for DPLSA and DPCOA members, the pension received is calculated based upon the last five (5) years of earnings, whereas for DPOA and DFFA members, it is based upon the last ten (10) years. Because public safety employees' income tends to increase with years of service, the ten year look back provides a significantly less generous formula to DFFA and DPOA members.

29. Furthermore, this punitive treatment is unwarranted since the City has consistently maintained that DPOA members remain subject to whatever terms the Emergency Manager chooses to impose on them under his largely unfettered authority. Under PA 436, the Emergency Manager "act[s] exclusively on the [City's] behalf" in these chapter 9 bankruptcy proceedings.[4] MCL 141.1558 (1). This unnecessary and disparate treatment violates the plain terms of Section 1123(a)(4) and cannot be permitted.

30. The Sixth Circuit directly addressed the application of Section 1123(a)(4) in connection with disparate treatment of certain claims which were purported to be "paid in full" under the debtor's plan of reorganization in that case. *In re Dow Corning Corp.*, 280 F.3rd 648, 660-61 (6th Cir 2002). The *Dow* Court, in addressing treatment of government providers' claims resulting from personal injuries, found that the plan violated Section 1123(a)(4) because, although it facially provided for payment in full for Class 15 government payers, who included the U.S. and Canada, the treatment was not the same because their opportunity to receive full payment for their claims were materially different. *Id.* Specifically, the Canadian government's recovery under the plan was protected by a separate British Columbia Class Action Settlement Agreement which established procedural protections that helped ensure its payment in full, which the U.S. Government did not have. *Id.*

31. The *Dow* Court found that, while the treatment purported to be the same, the additional procedural protections the settlement afforded the Canadian government resulted in a

---

[4] Arguably, the only limitations on the EM's unchecked authority to address wage, pension and other labor issues in chapter 9 are the limitations imposed by 11 U.S.C. § 365 (which were rendered essentially inapplicable by the State the City's pre-bankruptcy planning here); any "contingencies" the Governor chose to put on that authority when the filing of the Petition was authorized, MCL 141.1558(1) (here, none); that the EM serves "at the pleasure of the governor; " MCL 141.1549(3)(d); and, finally, that he is subject to impeachment for corrupt conduct, crimes or misdemeanors. *Id.,* see also, Mich. Const., Art. XI, Sec. 7. As addressed in Issue I, the City's Plan, as proposed by the EM, seeks to wipe out the prospective rights of the DFFA and DPOA to bargain for their members' pension benefits for the 9-year term of the non-consensual (i.e., imposed) injunction that is part of the treatment of Class 10 claims.

9

substantively different opportunity for recovery which violated Section 1123(a)(4). See also, *In re W. R. Grace & Co.,* 729 F.3d 311, 327-28 (3rd Cit. 2013).

32. The City's Plan, goes well beyond this. It imposes through June of 2023 a significantly reduced pension benefit for active Class 10 members who belong to non-settling unions, that is substantively different than the benefit for members of settling unions.

33. This disparate treatment is indefensible, given that the City proposed (and indeed is the only one who could propose) the classification of pension claims; that the City, through the Emergency Manager, claims full authority to impose any other economic terms it chooses on DPOA members; and that the stay in place in these bankruptcy proceedings deprives the DPOA of the very mechanism— binding arbitration—that, outside of bankruptcy, would have allowed it to efficiently and peacefully resolve impasse that is the apparent cause of this disparate treatment.

34. Although PA 436 temporarily suspends the City's obligation to bargain, it remains the public policy of the State that, "in police and fire departments, where the right of employees to strike is by law prohibited, . . . requisite to the high morale of such employees and the efficient operation of such departments . . . ," a mechanism—compulsory, binding arbitration—is available to resolve such disputes. See PA 312, MCL 423.231(1). Under that mechanism, in resolving such disputes, the panel <u>must</u> give the financial ability of the unit of government to pay the most significance. MCL 423.239(2).

35. The City has articulated a desire to reach collective bargaining agreements with all of its public safety unions, but reached an impasse with the DPOA. The City is certainly entitled to present DPOA with a last best offer in order to reach an agreement with them, and

where an agreement cannot be reached, to exercise its claimed right to impose terms the Emergency Manager deems appropriate.

36. What the City cannot do is to punish DPOA members with a significantly less generous pension benefit than those benefits received by others in their class because they were unable to reach agreement.

37. This indefensibly punitive action is particularly egregious in light of the City's proofs in the eligibility trial, which established the extremely low morale, poor working conditions, and underpaid status of DPOA members. The DPOA objects to this punitive and disparate treatment, as it violates the plain requirements of Section 1123(a)(4).

- **The Plan cannot be confirmed because it proposes to enjoin the DPOA from bargaining for improved pension benefits until at least June of 2023, in violation of applicable law.**

38. Under Bankruptcy Code Section 943(b)(4), the Plan cannot propose any action prohibited by law. The National Labor Relations Act (NLRA), 29 U.S.C. §151 et seq. governs private sector labor relations and collective bargaining. The Public Employees Relations Act ("PERA") governs public sector labor relations and collective bargaining in Michigan. MCL 423.215. *et seq*. Under PA 436, PERA's "duty to bargain" obligation is temporarily suspended once an Emergency Manager is appointed. MCL 141.1567(3).

39. For many years, under either the NLRA or PERA, (29 U.S.C. §159(d); M.C.L. §423.215(1)), pension plans have been recognized as a mandatory subject of bargaining. *Allied Chemical and Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 160 (1971) ("Under the [NLRA], as amended, mandatory subjects of

11

collective bargaining include pension…for active employees…."); *Detroit Police Officers Ass'n v. City of Detroit*, 212 Mich. App. 383 (1995) ("We again hold that pensions and the significant provisions of a pension plan are mandatory subjects of collective bargaining.").

40. Here, the Plan not only proposes a less generous pension benefit for DPOA members than is proposed to other active members of Class 10, it proposes to freeze that benefit and block the DPOA from any further bargaining about it until at least June of 2023. As stated in the Plan:

> Except as may be required to maintain the tax-qualified status of the PFRS, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section I.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law."

See Plan, Art. II., Section B.3.q.ii.G, [Docket No. 4392, p. 40].

41. This Court cannot confirm the Plan unless it complies with applicable law. See *In re Sanitary & Improvement Dist. #7, 98 BR 970 (D. Neb. Bankr. 1989)*. See *also U.S. v. Bekins*, 304 U.S. 27, 49 (1938), noting that an analogous provision in the municipal bankruptcy code at that time "manifestly refers to the law of the State." See also, *In re Fracella Enterprises*, 360 B.R. 435, 445-446 (E.D. Pa. 2007); *In re Rent Rite Super Kegs West Ltd*, 484 BR 799(Bankr.

D.Colo. 2012), (applying the analogous chapter 11 provision under Section 1129(a)(3) that plan cannot be proposed "by any means forbidden by law").

42. As set forth more fully in the separately filed DFFA Plan objections, the terms of this proposed injunction, to which the DPOA and its members have not agreed, violate both State and federal labor law, and, as such do not comply with Section 943(b)(4). The Plan improperly enjoins any change in the New PFRS Active Pension Plan through June of 2023. In doing so, without the DPOA's consent, it illegally deprives the DPOA of its right to bargain on a mandatory subject of bargaining.

43. There is no legal authority for the City to prospectively and non-consensually abrogate this right for a longer period than authorized by Sec. 27(3) of PA 436, and unless the DPOA's consent is obtained, the DPOA must be carved out of this injunction for the Plan to be confirmed. In asserting this objection, the DPOA also joins in the DFFA's objection on this issue.

- **The DPOA's Objections to the treatment of its members PFRS Pension Claims must be allowed for the Plan to be feasible.**

44. In determining whether the Plan is feasible under Section 943(b)(7), the Court must independently determine that the City can provide essential government services. *See, e.g., In re Mount Carbon Metropolitan District*, 242 BR 18, 34-35 (D. Colo. 1999).

45. As this Court recognized when it adopted Chief Craig's testimony at the eligibility trial, the City has struggled to provide police protection, in part, because the City's police officers were underpaid, undermanned and their morale was extremely low. This Court

13

found the City service delivery insolvent, including its ability to provide an "essential" police and fire protection for its residents, businesses and visitors. 504 BR at 170.

46. Among the eligibility trial evidence that supports this Court's finding of service delivery insolvency was an arbitration award received by the DPOA on March 25, 2013. See Docket No. 512-2 (also, Elig. Tr. Exhibit 706) (the "Arbitration Award"). Consistent with Chief Craig's testimony that City police officers were underpaid, the Arbitration Award specifically found that City police officers were paid significantly less than similarly situated officers in the City of Flint – another city decimated by the recession, loss of jobs and State funding, and under the control of an emergency manager at the time of the award.

47. In making findings about comparable pay of City police officers in similarly distressed urban areas, the arbitrator noted the wide discrepancy between pay in Detroit by comparison to Flint (also under an emergency financial manager) and Saginaw (financially distressed). As the Arbitration Award found:

> ". . . in each of those cities, the police officers are paid more than Detroit's current $47,914 based on an annual base wage at 2,080 straight time hours for a five year Officer, the top pay in Detroit."

See Arb. Award at p 104, Docket No. 512-4, p 15.

48. The arbitrator included in his findings a "chart comparing the base wage and total compensation between Detroit at the current $47,916 top rate." *Id.* That chart showed:

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

*Id.*

49. These numbers include the 10% pay cut imposed on DPOA members before the City's petition was filed. The DPOA acknowledges (and indeed, on a daily basis, its members live and work in) the City's service delivery insolvency. They do not include this chart in seeking the same rate of pay as Flint or Saginaw police officers, although certainly the work they do is no less and probably more daunting and dangerous.

50. Rather, the chart is included because it demonstrates (a) an objective reason for their low morale and (b) how well the binding arbitration requirement of Act 312 has worked to hold down salaries to well below levels in other Michigan cities. Yet, in this case, rather than use the tool of binding arbitration, the City has chosen to further punish DPOA members for declining to reach agreement, without the benefit of its usual tool to do so.

51. It is not without irony that, as creditors work to reach binding agreements that will inevitably aid the confirmation process, the loss of this very tool - binding arbitration - that, for more than forty years, has allowed the City and the DPOA to resolve their differences, deprives both parties of the ability to resolve their impasse. The City is wise to want collective bargaining agreements with its employees.

52. The evidence at the eligibility trial suggests that the City well recognizes the importance of that good will and the significant problem it faces with police morale. However, rather than resort to a readily available tool that could efficiently solve the problems, the City chooses to impose a Plan that further impairs DPOA members.

53. The DPOA respectfully suggests that these actions not only fail to comply with the Bankruptcy Code, they will inevitably hurt rather than help the City's ability to deliver core and essential public safety services.

## MISCELLANEOUS OBJECTIONS

54. The DPOA objects to the Plan to the extent that pending State legislation would undo or materially alter the terms of the Plan and/or the rights and benefits of the DPOA, as set forth in the Plan and Disclosure Statement, in violation of Bankruptcy Code Section 942.

55. The DPOA further objects to the Plan to the extent that, if these objections are not allowed, any of the releases or injunctions set forth in the Plan, including but not limited to the injunction set forth in Art. II, Section B.3.q.ii. G of the Plan or any proposed third party releases, can improperly be construed to release the prospective rights of the DPOA or its members in violation of applicable bankruptcy law, applicable labor laws and/or the Michigan Constitution.

## RESERVATION OF RIGHTS

56. The DPOA hereby reserves and preserves all of its rights and remedies that are in any way related to this Objection, including but not limited to its right, as set forth herein, to assert any potential legal challenges to any enabling or other legislation enacted for the purported purpose of implementing, effectuating or undoing the effect of the Plan; objections to the scope of the Plan releases and Plan Injunction(s), including but not limited to the proposed scope of the injunction governing pension terms; objections to any effort by the City to use the Plan releases and/or Plan Injunction to avoid, release or discharge the City for (a) its ordinary course labor obligation to the DPOA and/or its current or former members, (b) any obligations of the City, the State and/or its Related Entities' obligations to the DPOA and its current and/or former members for indemnification and/or grievance claims, (c) any of the City and its Related Entities' post-petition obligations to the DPOA and its current and/or former members under applicable State labor laws, the City Charter or any other

applicable term of employment; and to object to any modification of the Plan that occur after this Objection is filed.

57. The DPOA reserves its rights to amend, supplement or make any other applicable arguments as a result of information learned through discovery in this matter. The DPOA also reserves its rights to make and/or join in any objections or arguments in support thereof made by any other objecting party in these proceedings with respect to the Plan, including its joinder and concurrence in the objections of the DFFA as to be more fully set forth in the DFFA's Plan objections.

WHEREFORE, the Detroit Police Officers Association (the "DPOA") respectfully requests, for all the reasons contained herein, that this Honorable Court allow its objections and deny confirmation of the Plan in its present form.

Respectfully submitted,

ERMAN, TEICHER, ZUCKER & FREEDMAN, P.C.

By: */s/ Barbara A. Patek*
Barbara A. Patek (P34666)
Earle I. Erman (P24296)
Counsel for the Detroit Police Officers Association
400 Galleria Officentre, Suite 444
Southfield, MI 48034
Telephone: (248) 827-4100
Facsimile: (248) 827-4106
E-mail: bpatek@ermanteicher.com

DATED: May 17, 2014

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                    Chapter 9

City of Detroit, Michigan,                                No. 13-53846

        Debtor.                                    Hon. Steven W. Rhodes
_____/

**CERTIFICATE OF SERVICE**

      The undersigned certifies that on May 17, 2014, the *Corrected* Objections to Fourth Amended Plan of Adjustment by Detroit Police Officers Association and Certificate of Service were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

                                      ERMAN, TEICHER, ZUCKER & FREEDMAN, P.C.

                              By: */s/ Barbara A. Patek*
                                   Barbara A. Patek (P34666)
                                   Earle I. Erman (P24296)
                                   Counsel for the Detroit Police Officers Association
                                   400 Galleria Officentre, Suite 444
                                   Southfield, MI 48034
                                   Telephone: (248) 827-4100
                                   Facsimile: (248) 827-4106
                                   E-mail: bpatek@ermanteicher.com

DATED: May 17, 2014