## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
                                                    :

In re                                         :          Chapter 9

                                                 :

CITY OF DETROIT, MICHIGAN,         :          Case No. 13-53846

                                                 :

                          Debtor.           :          Hon. Steven W. Rhodes

                                                 :

                                                 :

-----------------------------------------------------x

## <u>NOTICE OF AFFIDAVIT OF MARY L. HALE</u>

**PLEASE TAKE NOTICE** that:

1.       The City of Detroit, through the undersigned counsel, hereby submits the attached affidavit pursuant to the Court's Order Granting Motion to Compel the Production of Documents, dated May 16, 2014 [Dkt. 4896] (the "<u>Order</u>").

2.       Mary L. Hale, Of Counsel at Jones Day, who oversaw the review and production of documents with respect to the Plan of Adjustment litigation has prepared the Affidavit enclosed with this notice as <u>Exhibit 1</u> in response to the Court's request.

Dated:   May 19, 2014          Respectfully submitted,


 /s/  Heather Lennox
Heather Lennox (OH 0059649)
David G. Heiman (OH 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
hlennox@jonesday.com
dgheiman@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center
Suite 1800
Southfield, MI  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

# **EXHIBIT 1**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

----------------------------------------------------x
:
:
In re:                                              :        Chapter 9
                                                    :
CITY OF DETROIT, MICHIGAN,                           :        Case No. 13-53846
                                                    :
                            Debtor.                  :        Hon. Steven W. Rhodes
                                                    :
                                                    :
----------------------------------------------------x

## <u>AFFIDAVIT OF MARY L. HALE</u>

     I, Mary L. Hale, hereby declare under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

     1.     I am Of Counsel at Jones Day, which currently serves as counsel to the City of Detroit, Michigan (the "City"), with respect to the above-captioned bankruptcy. I have had primary oversight of the City's production of documents in this matter, including most recently in connection with the filing of the Plan for the Adjustment of Debts of the City of Detroit ("Plan of Adjustment") [Dkt. 2708], and the accompanying Disclosure Statement with Respect to Plan for the

Adjustment of Debts of the City of Detroit ("Disclosure Statement") [Dkt. 2709] on February 21, 2014.

2.      I have worked for Jones Day since October 1985 and have extensive experience in large complex multi-party litigation.  Specifically, on multiple occasions over the past nearly thirty years, I have been responsible for the review and production of large quantities of documents under extreme time pressures, usually due to the nature of the relief demanded (for example, where a party was seeking a preliminary injunction or temporary restraining order).   These extensive document productions have taken place in the context of large complex litigation involving multiple parties, and hundreds of thousands of documents.  On occasion, the circumstances have required that the review take place while the collection of documents is ongoing, sometimes before an actual document request is received, in conditions (schedules, identity of custodians, document requests received) which are constantly changing.

3.      I reviewed the initial Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Dkt. 2727] ("Scheduling Order") upon its issuance on February 24, 2014.  It was clear to me and my colleagues that adherence to the schedule would require extreme and in some ways anticipatory action on the part of the City's counsel.  Almost

immediately after receiving the Court's Scheduling Order, in early March, 2014, I initiated preparations for the collection and production of the City's documents relevant to the City's Plan of Adjustment, even though document requests and interrogatories had yet to be served. In my experience, this is not unusual in the context of an expedited review. Waiting until the requests were due (at the time April 1, 2014), or even until the first requests were filed would not have allowed sufficient time to collect, review and produce the tens of thousands of pages of documents that I and my colleagues believed would be requested by parties interested in the Plan of Adjustment. Only in this manner could we possibly be in a position to meet the challenging time frame for production in the Scheduling Order.

4.     The First Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment ("First Amended Scheduling Order") established April 1st as the deadline for the parties to serve discovery requests on the City, and April 18th as the date to comply. First Amended Scheduling Order (Feb. 25, 2014) [Dkt. 2755] at ¶ 3(c) and 8. Amended Scheduling Orders were subsequently issued three times during the course of the document collection and review effort. These orders ultimately pushed the date to serve discovery requests to April 11, 2014 and the production back to May 6, 2014.

5.      The first Plan of Adjustment and accompanying Disclosure Statement were filed on February 21, 2014.  During the pendency of our document collection and review, four amended versions of the Plan of Adjustment and Disclosure Statement were filed on March 31, 2013, April 16, 2014, April 25, 2014, and May 5, 2014.  [Dkts. 2708, 2709, 3380, 3382, 4140, 4141, 4271, 4272, 4391 and 4392].  Also during this time, mediations with various parties were on-going and settlements were being reached with various groups.  In addition, there were negotiations outside the context of mediations which impacted the substance of the Plan of Adjustment.  Each of these filings and events added documents that needed to be reviewed and produced to parties interested in the Plan of Adjustment.

Planning for the Document Collection

6.      The threshold task in conducting the City's document production was to understand the legal and factual issues that would be litigated in the Plan of Adjustment confirmation phase of the litigation.  I reviewed the Disclosure Statement and Plan of Adjustment and received an extensive briefing from my colleague, Heather Lennox, a Jones Day partner familiar with most issues in the Plan of Adjustment and attendant litigation, to ensure that I understood the elements of proof, the applicable legal principles, the factual scenarios that might be used to prove the legal standards, and the anticipated objections to the Plan.

7. Almost every document production requires a relevant time frame from which documents possibly relevant to the case are to be drawn. I considered several factors in determining that January 1, 2013 would be an appropriate start date. First, the primary factual issues in this stage of the bankruptcy litigation involved the Plan of Adjustment, and whether it met the legal standards for confirmation. I also knew that our resources were not limitless, and wanted to be prudent with the City funds that were needed here. Most of the Plan of Adjustment was developed after the City filed for bankruptcy on July 18, 2013. After discussing this with my colleagues, it was our judgment that searching for documents created after January 1, 2013 would cover all of the issues relevant to the Plan and generate the best and most relevant returns under the circumstances. This date was several months before March 27, 2013, when Kevyn Orr was appointed as the Emergency Manager, Moreover, my understanding was, and continues to be, that each of the financial advisors retained by the City of Detroit to assist with restructuring activities, and potentially a bankruptcy, were either retained after January 1, 2013, or under terms specifying that their restructuring work would begin after January 1, 2013.

8. Our date restriction was not without exception. For example, after my team began collecting documents, I became aware that Conway MacKenzie did some limited pro bono work for the City in the last quarter of 2012, even though

they were not retained as a restructuring advisor until January 16, 2013. Upon learning this, I immediately instructed that a date restriction of October 1, 2012 be used for Conway MacKenzie's data.

9.     My next task was to develop a list of search terms for retrieving relevant electronic information from our custodians. Search terms are words or phrases that an attorney familiar with the relevant issues believes might appear in documents relevant to the issues in the litigation. Searches for these terms are then run on the large amounts of electronically stored information ("ESI") – principally email accounts – that have been collected from the computers of identified document custodians of possibly relevant documents. Care must be taken in deciding on the appropriate search terms. If the search terms are too broad, too much data will be flagged as having potentially relevant information and the cost and time necessary for reviewing it will be prohibitive. If, however, the search terms are too narrow, relevant material could be inadvertently excluded from the review stage.

10.     Based on the Disclosure Statement and the Plan of Adjustment, the understanding I had developed of potential issues, and the intervening filing of the Ambac Assurance Corporation's First Request for Documents to Debtor (Mar. 17, 2014) [Dkt. 3056], my team and I created a list of search terms that we could use to

filter the large amounts of data I was expecting to result from collecting ESI from many custodians. Because of the broad range of topics addressed in the Plan of Adjustment and Disclosure Statement, I was concerned that the list would be overbroad and not sufficiently filter out irrelevant data. Notwithstanding this concern, I chose to use a set of search terms that I believed would yield a very broad universe of documents for attorney review because I wanted to ensure relevant documents were not missed during the filtering process. The search terms used are attached hereto as Exhibit A.

Identifying the Vendors and Staff

11.    In early March, I began to plan for the collection and review with the three vendors that provide litigation support to the City. I had originally chosen these vendors in connection with the collection of documents for the eligibility litigation on the basis of their expertise, my past experience with them, and/or the experience that Jones Day had had with each of them in the past. I believed that efficiencies would be realized by the City by using the same firms again.

12.    The use of contract attorneys for large, expedited document reviews has become standard procedure in the legal industry. Contract attorneys are licensed lawyers that work on an hourly basis to review and code documents into a computer database. They allow a great deal of flexibility in the number of lawyers

that can be assigned to a review on short notice, and at a far lower billing rate than those of law firm associates. Further, with appropriate training and supervision, the results achieved with contract attorneys are comparable to the results with law firm associates. The use of contract attorneys has become so accepted that I believed that if the City did not use them in this case, the cost to the City of using Jones Day associates to review the documents would have been prohibitive.

13. Based on the expedited nature of this review, the amount of data we expected to review and these cost considerations, Jones Day decided to again use contract attorneys to review the documents, as was done in the eligibility and post-petition financing litigation. I chose Black Letter/Discovery ("Black Letter"), to provide the contract attorneys, based on Jones Day's experience with them, and the fact that they had previously provided the contract attorneys for both the eligibility and post-petition financing phases of the bankruptcy.

14. I decided to use the Black Letter's facility in Columbus, Ohio, for the review for several reasons. First, some of the contract attorneys that would be recruited to participate in the review had previously participated in either the eligibility review and/or the post-petition financing document review, and had some familiarity with the case. Second, the physical layout of the Columbus facility was preferable because it allowed Jones Day attorneys to sit in the same

large room with the Black Letter contract attorneys during the review, promoting communication between them and ensuring that issues could be addressed quickly. Finally, the cost of the contract attorneys in that location was reasonable comparable to other locations.

15.     The other two vendors assisting with data collection and hosting were Xact Data Discovery ("Xact Data") and AlphaLit. Xact Data Discovery provides expertise in ESI collection, and is especially skilled in extracting data from the City's antiquated email system known as Groupwise. AlphaLit provides services related to the processing, storage and management of the data, as well as a database platform, eDirect, which allows the sorting and searching of the data.

16.     I also identified the Jones Day lawyers that I wanted to participate in the review based on their experience and past involvement with the eligibility and/or post-petition financing document review: Lydia Floyd, a 7th year associate from Jones Day's Cleveland office, Matthew Chisman, a 4th year associate from the Columbus office, Jonathon Roth, a 2nd year associate from our Boston office, Wendy Aeschlimann, a Senior Staff Attorney from our Chicago office, Uchechi Amadi, a 3rd year associate from our Atlanta office, Saira Draper, a 3rd year associate from our Atlanta office, and Patrick Hubbard, a Senior Staff Attorney in our Washington office who specializes in privilege review and the production of

9

privilege logs and is very familiar with the current law on privilege. In addition, I asked Laird Nelson, a 5th year associate in the Business Restructuring & Reorganizations group with experience in bankruptcy law, and specifically with the issues in the City of Detroit case, to participate in the review to provide the team with bankruptcy expertise.

Initial Document Collection from City of Detroit Custodians

17. During the first week of March, I made appointments to meet with and interview the City of Detroit custodians from whom I knew we would be collecting all electronically stored information (ESI), regardless of the specific content of the anticipated document requests: Kevyn Orr, the Emergency Manager; Stacy Fox, the Deputy Emergency Manager; Sonya Mays, the Senior Advisor to the Emergency Manager; and John Hill, the Chief Financial Officer.

18. I later made arrangements with Xact Data to accompany me to the offices of those custodians with a Jones Day paralegal who collected hard copy documents (which were then imaged with the originals returned to the custodian); at the same time Xact Data collected electronic data off the computers or other devices, if applicable, of the custodians. This data was then transferred to AlphaLit for processing.

19.     Because we had previously collected all of Kevyn Orr's and Sonya

Mays' emails in the context of the eligibility litigation, I requested that AlphaLit

copy all the emails from these custodians from January 1, 2013 to July 18, 2013

over from the Eligibility database to the Plan of Adjustment database for review,

including emails that had previously been coded non-responsive and/or privileged,

to ensure by re-review that those emails were, in fact, non-responsive in this

context or privileged.  I gave this instruction to ensure there would be enough

relevant material in the pipeline so that review could begin immediately during the

last week of March.

The Identification of Relevant Custodians

20.     During the document collection interview, I asked Mr. Orr and Ms.

Fox, who both said they had broad involvement with the development of the Plan

of Adjustment and its underlying premises, for the names of the individuals with

whom they had worked on restructuring and Plan of Adjustment-related projects,

at both the City and the City's advisors.  Mr. Orr identified Ms. Fox and Mr. Hill

as the City's employees with involvement in Plan of Adjustment related matters.

He identified the following individuals at the City advisors:

(a)     Ernst & Young:  Guarav Malhotra, Dan Jerneycic, and Juan
        Santambrogio,

(b)     Conway MacKenzie:  Kevin Hand, Chuck Moore, Chris Gannon,
        Glen Kushner and Mike Hausman, and

(c)    Miller Buckfire:  Kevin Haggard, Jim Doak, and Ken Buckfire.

21.    Mr. Orr stated that he had no personal involvement with Milliman, an actuarial advisor to the City, but had asked Evan Miller, a Jones Day partner who was heavily involved in mediations with the unions, Retiree Committee and others regarding pension and OPEB-related issues, to deal with Milliman personnel.  Mr. Orr also stated that the interaction with the Miller Canfield law firm on the Plan of Adjustment had been minimal, but he identified Jonathon Green as the contact at that firm.

## Collection of Documents From Advisors

22.    On March 10, 2014, I contacted both Harold Neu, the then-General Counsel of Miller Buckfire and Kevin Hand, a Director at Conway MacKenzie to inform them that we expected expansive document requests shortly.  I also provided them with a copy of the First Amended Scheduling Order, and asked for their assistance in meeting the production deadlines.  I also requested their assistance in identifying potential custodians at their firms who would have relevant documents, providing the names that Mr. Orr and Ms. Fox had provided me as a starting point.

23.    On March 11, 2014, I contacted Mr. Miller regarding whether we should collect documents from custodians at Milliman, the actuarial advisor on pensions and OPEB to the City.   Mr. Miller advised that based on his experience

with the documents, most of the documents in Milliman's possession were prepared in connection with, and used in, confidential mediation proceedings, and would be subject to both the mediation privilege and the work-product doctrine. Even in the absence of an applicable privilege, Mr. Miller indicated that the pension analyses Milliman had undertaken were expected to change one or more times in the coming weeks because updated pension liability data and the soon-to-be-revised Plan of Adjustment were not yet available. Mr. Miller indicated that the Milliman analysis would not likely be needed until expert discovery commenced, and after consulting with colleagues, I concurred.

24.     On that basis, at that time I did not undertake to communicate with Milliman regarding the collection of documents. In early April, I contacted Miguel Eaton, an associate in our Washington office, who was working with Mr. Miller on pension related issues to revisit the issue of whether we should take data from Milliman. After consultation with Mr. Miller, because of the various privileges likely applicable to the documents, and the fact that Mr. Miller intended to list Milliman witnesses as experts, it was decided that documents already available from the "Data Room,"[1] or produced in other phases of the litigation, were the best

---

[1] In early June 2013, Miller Buckfire & Co., LLC ("Miller Buckfire"), the City's investment banker, established an online database (the "Data Room") to facilitate creditors' timely access to documents containing information relevant to the City's proposed restructuring actions, as well as the City's past, present and projected financial and operational performance. Shortly thereafter, beginning on June 21, 2013, Miller Buckfire began issuing user names and passwords to creditors' representatives and advisors so that they could view the documents

sources for responding to the document requests regarding Milliman documents, and I did not collect documents from Milliman custodians.

25.     On March 12, 2014, I sent both Mr. Hand and Mr. Neu the draft search terms intended to be used to filter emails to ensure only relevant emails were made available for review.  Both Mr. Neu and Mr. Hand contacted me after that with concerns regarding the breath of the search terms and suggested that use of these terms would yield a significant number of documents and possibly many that would be irrelevant to the Plan of Adjustment.  I explained to Mr. Hand that we expected numerous requests about a broad range of topics, which was reflected by the search terms, and that there really was no way to narrow the search terms without all of the requests in hand.  Eventually, Mr. Hand agreed to use the search terms Jones Day had written, attached at Exhibit A.

26.     Based on my conversations with Mr. Orr, Mr. Hand and several Jones Day lawyers, we collected electronic documents from the following Conway MacKenzie custodians:  Charles Moore, Kevin Hand, Chris Gannon, Michael Hausman, Wade Johnston, Glenn Kushiner and Carl Sekely.

---

(continued…)

posted to the Data Room.  Moreover, since that time, the City has continued to upload documents that address a range of issues, including information relating to current and former employees and retirees, as well as other creditor constituencies. The City is continuing to populate the Data Room as additional documents become available or specific information requests are received from creditors.

27.     Mr. Neu was likewise concerned about the breadth of the search, but was also concerned that the terms would sweep in many documents related to other clients of Miller Buckfire.  He did not want to violate the firm's duties to those clients through disclosure of emails and other documents related to them in this litigation.  After some negotiation, we agreed to a slightly different set of search terms for Miller Buckfire, intended to filter out documents related to clients that were not related to the City of Detroit bankruptcy.  That list of search terms is attached as Exhibit B.

28.     Based on my conversations with Mr. Orr, Mr. Neu and several Jones Day lawyers, we collected electronic documents from the following Miller Buckfire custodians:  Kenneth Buckfire, James Doak, Kevin Haggard, Kyle Herman, and Sanjay Marken.

29.     On or about March 18, 2014, I contacted Wayne Flick, a partner at Latham & Watkins, who represents Ernst & Young in this matter.  I provided Mr. Flick with a high level case outline, as well as Ambac Assurance's First Request for Documents, which had just been filed.  Mr. Flick stated that he would initiate the document collection effort.  I sent him the list of search terms, which he eventually used in their document collection to identify documents for the City's review.

30.     Based on conversations with Kevyn Orr and several Jones Day lawyers, the Ernst & Young custodians whose electronic documents were reviewed were the following: Nick Bugden, Daniel Jerneycic, Gaurav Malhotra, Deven Patel, Juan Santambrogio, and Shavi Sarna.

Initial Document Requests

31.     On March 18, 2014, Ambac Assurance filed its First Request for Documents to Debtor [Dkt. 3057].  As expected, they were expansive, numbering 102 document requests in total, not including subparts.  On March 19, 2014, I sent a copy of these document requests, as well as Ambac Assurance Corporation's First Set of Interrogatories to Debtor (March 18, 2014) [Dkt. 3056], as well as internal Jones Day memoranda regarding the case to the Jones Day attorneys scheduled to participate in the document review.

32.     At that time, I also began building an excel spreadsheet for keeping track of any and all interrogatories and document requests received by the City by topic, for making notes about potential responses, and for drafting the City's final responses.  As each party's document requests and interrogatories were received, I assigned them topics and subtopics, in order to keep track of what it was we needed to collect and produce.

33.     Once I had broken out the Ambac document requests and interrogatories in a spreadsheet, I contacted Thomas Wilson, a partner in Jones Day's Bankruptcy and Restructuring Practice, with primary responsibility for the drafting of the Disclosure Statement and Plan of Adjustment, to get his insights as to what he knew regarding each document request, who might have knowledge about them, and/or where the documents requested might be located.  I had lengthy conversations with Mr. Wilson on March 21st and 24th, 2014.

Training of Document Review Team

34.     The contract attorneys were thoroughly trained on the responsive topics and instructed to interpret them broadly when reviewing documents for responsiveness to these topics.  The training binder of materials is attached hereto as Exhibit C.  It includes both the Disclosure Statement and the Plan of Adjustment, as well as instructions for coding the documents, a discussion of applicable privileges, a list of attorneys, guidelines for redacting personally identifiable information of third parties, a listing of terms used in the Plan, the text-searchable excel spreadsheet of Ambac's documents requests, and the actual document requests submitted by Ambac.

35.     On March 24, 2014, a team of 17 "first level" reviewers, 3 "QC" reviewers, a project manager, and a review process consultant, from Black Letter

were trained for the document review.  That morning, the contract attorneys were each provided with the training binder of materials that is Exhibit C to this Affidavit.

36.     In the afternoon, I made a presentation providing an overview of the different phases of the bankruptcy litigation generally, the specific issues raised by the Disclosure Statement and the Plan of Adjustment, and the role of various parties involved in the litigation.  The contract attorneys were provided with an opportunity to ask any questions regarding either the material they reviewed or the subsequent presentation, and told that Jones Day attorneys would be in the room with them to answer any questions they might have.   The contract attorneys were then trained by AlphaLit on how to use the e-Direct platform to review and code documents, even though many of the reviewers were already familiar with that system.

37.     Subsequent to that presentation, and as part of the training, the contract attorneys then began reviewing documents as a group.  As questions arose, Jones Day attorneys were present  to ensure consistent interpretation and application of the protocol to the documents.  The Black Letter's QC leads (i.e. lawyers trained to ensure a consistent level of document review) and Project Manager circulated among the reviewers in the review room to monitor the

consistency of the review process and to elevate questions to the Jones Day team as necessary.

38.     The next morning, on March 25, 2014, the training continued with the reviewers being assigned their first "batches" of documents to review.[2]  After review of 100 documents, the team members exchanged documents, with each reviewer looking at the documents previously reviewed by the other.  If there was disagreement as to the coding on specific documents, the two reviewers would consult.  If they could not agree, the disagreement was raised to the Black Letter Project Manager and, if that did not resolve it, to a Jones Day attorney. The contract attorneys began reviewing documents without this exchange of documents during the afternoon of March 26, 2014.

39.     On March 28, 2014, the contract attorneys were instructed on the applicability of the "mediation privilege."  It was explained that the privilege stemmed from this Court's Order for Mediation (Aug. 13, 2013) [Dkt. 322], and that it applied to a number of  ongoing mediations with different parties relating to various issues in the bankruptcy.  The contract attorneys were instructed to interpret this mediation privilege broadly when reviewing the documents. Documents relating to the "Grand Bargain" and how the mediation privilege

---

[2] A batch is simply a limited number – usually 200 – of documents put in an electronic file which is then assigned by number to a specific reviewer.

applied to them were discussed specifically. The contract attorneys were provided with an updated training binder on March 29, 2014 that contained a copy of the Mediation Order. Although the documents reviewed before the contract attorneys were provided with the Mediation Order were unlikely to contain mediation-privileged material – because those documents were from before the date of that Order – all documents that had been coded as "responsive" and "not privileged" were re-reviewed to ensure they did not in fact contain mediation privileged material.

Additional Requests for Production

40.     Syncora Capital Assurance Inc., and Syncora Guarantee Inc. (collectively "Syncora") filed their document requests on March 28, 2014 [Dkt. 3314]. They consisted of 80 requests, not counting subparts. Shortly after that, U.S. Bank National Association, in its role as trustee for the outstanding water and sewer bonds issued by the City, and the Ad Hoc Bondholder Committee, filed their First Request for the Production of Documents to Debtor (Apr. 3, 2014) [Dkt. 3766]. It contained fifty-six different document requests. On April 8, 2014, U.S. Bank filed a Second Request [Dkt. 3916] containing two more requests. The Official Committee of Retirees filed its First Set of Requests to the Debtor for the Production of Documents on April 10, 2013 [Dkt. 3941]. Its numbered an additional 63 requests.

41.     As each additional document request came in, the requests were put into searchable excel spreadsheets categorizing the requests by topic and sub-topics, as well as listing the objector, document request number and the full text of the requests.  As these text searchable charts were updated, they were provided to the contract attorneys reviewing documents.

42.     On Friday, April 11, 2013, 15 more document requests for the City were filed by various parties.  The 548 additional requests on this day increased the number of requests to the City to over 900.  By Monday, April 14, 2014, the master excel spreadsheet had been updated to capture all these requests.  Each document request was also assigned a topic and subtopic so that they could be grouped together.  This master text-searchable spreadsheet was distributed to the contract attorneys reviewing documents on April 15, 2014.

Additional ESI Document Collection

43.     After the document review began, on March 30, 2014, I returned to Detroit to interview Mayor Mike Duggan, and collect his electronic and hard copy documents.  Because Mayor Duggan stated that he had used his personal computer in the transition period when he became a City employee, we later also took emails off of this personal email account.  We used a different date restriction for Mayor Duggan's personal email accounts because we assumed he might have been doing

City-related business from the time of his election; so we applied a November 2, 2013 date restriction to that data.

Additional Efforts to Find Relevant Documents

44.     In addition to reviewing the documents collected from the ESI of the custodians listed above, I and other Jones Day attorneys undertook extensive efforts to locate additional responsive materials, particularly with respect to requests that did not appear likely to be answered through review of e-mail or other ESI.

45.     First, we identified and searched for material relevant to the requests that might have been stored in other databases related to the City of Detroit bankruptcy, and transferred that material to the Plan of Adjustment database to be reviewed for production.

46.     Second, Ms. Nelson looked at the index of documents in the Data Room and determined which were relevant to pending document requests.  She then arranged for those to be transferred to the Plan of Adjustment review database.

47.     Third, Ms. Nelson, Mr. Eaton and I investigated who might have documents relevant to specific requests or groups of requests and if they did

possibly posses relevant documents, we requested that those documents be sent for inclusion in the Plan of Adjustment review database.

48.    For example, with respect to the requests related to the Detroit Water & Sewerage Department ("DWSD"), I extracted requests related to the DWSD from the master excel spreadsheet. Ms. Nelson and I took that spreadsheet to a meeting with William Wolfson, the Chief Operating and Chief Compliance Officer/General Counsel of the DWSD. We went through every DWSD-related request at that meeting and on a subsequent conference call to determine where the potentially responsive documents might be located. Mr. Wolfson then undertook to gather the relevant documents from appropriate personnel at the DWSD (the names of those personnel are identified on the List Of Custodians Searched or Requested to Assist, attached hereto as Exhibit D, under the "Affiliation" "Detroit Water & Sewerage Department") and forwarded those documents to us, which were then included in the review. Ms. Nelson or I also contacted Michael J. Hausman, a Managing Director at Conway MacKenzie, Wade Johnston, a Senior Associate at Conway MacKenzie, Kevin Haggard, a Director at Miller Buckfire, and Sanjay Marken, a Vice President at Miller Buckfire, for information about responsive documents relating to the DWSD generally, and also with respect to specific requests. Finally, I contacted Amanda Van Dusen, a Partner at Miller Canfield, Nicolette Bateson, the DWSD Chief Financial Officer, Daniel Jerneycic,

an Ernst & Young Restructuring Advisor and Brian Sedlak, a Jones Day Partner, regarding documents potentially responsive to other specific DWSD-related requests.

49.     Ms. Nelson, Mr. Eaton or I undertook similar investigations with respect to various categories of document requests listed on the master spreadsheet. These included, among others, those regarding the Detroit Institute of Arts Museum /Christie's Appraisal (custodians searched or requested to assist were Hill, Naglick, Higgs, Whittaker, Keelean, and Edwards), Asset Valuation (Doak, Herman), Parking/Parking Violation Bureau/Parking Bonds (Sekely), Accounts Receivable (Naglick, Duncan, Higgs, Jamison), Internal Controls (Hill, Lockridge), Contracts Assumed or Rejected (Tiller), "Essential" Vendors (Hoffman), Modification of Vendor Contracts (Tiller), Judgments Under Judicature Act (Keelean, Richard), New Plan B Notes (Van Dusen), Community Services Block Grants (Tiller), Funds Available from State or Local Government/Grants (Johnson, Gannon, McLain, Anthony, Minter, Kushiner, Green) , Installment Notes and Loans (Tiller), Interfund Loans (Naglick, Higgs, Drumb), City-owned Automotive Insurance Company (Raimi), Mayor Duggan's Job Creation Plans (Raimi, Lewand), Mayor Duggan's Parks Initiative (Raimi), Interest Rate Reset (Marken), Delinquent Income Taxes (Naglick, Stoudemire), Delinquent Property Taxes (Sekely, Herman, Duncan), Millage (Van Dusen, Doak,

Santambrogio, Herman, Jerneycic), State Revenue Sharing (Sarna, Jerneycic, Jamison, Drumb), Police (Hand, Gannon, Iafrate), Fire (Hand, McLain, Hill), Detroit Department of Transportation (Kushiner), Service Corporations (Keelean, Edwards), Swaps Settlement (Rosenblum), Swaps Payments (Rosenblum, Flick, Jerneycic); Recoveries for Creditors Outside Chapter 9 (Flick, Jerneycic); Wayne County Delinquent Tax Revolving Fund (Naglick, Duncan), Consultant Reviews of Tax Collection System (Herman, Sekely, Kushiner, Jerneycic, Patel, Flick), Current Property Tax Roll (Duncan, Bawol), Efforts to Improve Collections (Duncan, Herman, Jerneycic), Ad Valorem Taxes (Naglick, Duncan, Herman), 36th District Court (Gannon, Walsh, Shifman), and the Decrease in Tax Revenue from 2011 to 2013 (Drumb, Higgs).

50.     The names of individuals contacted with respect to specific requests or groups of requests, are set forth more completely in the Index of Topics and Custodians Regarding City's Plan of Adjustment Document Production, attached as Exhibit E.  Also attached at Exhibit F is a listing of each source that we collected documents from that were produced, with the corresponding production bates ranges.

51.     Our initial production to the 28 parties requesting documents from the City was made on May 6, 2014, but our efforts are ongoing.

52.     I believe that the judgments I and others on the Jones Day team made during the collection and review process, as well as the resulting collection of documents, comply with the obligations imposed on litigants by the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.  After application of the date restriction and filter search terms, we reviewed over 330,000 documents for responsiveness to over 900 document requests, in addition to engaging in an intensive and broad endeavor to identify other responsive documents, as well as responding to 240 interrogatories.   Assuming 8.2 pages per document (the average size of the documents produced), we reviewed over 2.7 million pages of documents.  Reviewing that number of documents and pages is equivalent to reviewing over 900 boxes of hard copy documents.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 19, 2014                    by:  /s/ Mary Hale_____
                                                        Mary Hale