UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          May 15, 2014
                      Debtor.     .          10:00 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. (#3925) CORRECTED MOTION OF CREDITORS FOR
ENTRY OF AN ORDER PURSUANT TO 105(a) OF THE
BANKRUPTCY CODE DIRECTING THE DEBTOR TO COOPERATE WITH
INTERESTED PARTIES SEEKING TO CONDUCT DUE DILIGENCE
ON THE ART COLLECTION HOUSED AT THE DETROIT INSTITUTE
OF ARTS; (#4557) MOTION TO COMPEL RESPONSES TO
INTERROGATORIES; (#4508) ORDER REGARDING HEARING ON
OUTSTANDING OBJECTIONS TO WRITTEN DISCOVERY; (#4202) STATUS
CONFERENCE RE. PLAN CONFIRMATION PROCESS (FOURTH AMENDED
ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING
DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street, Fiftieth Floor
                     Los Angeles, CA  90071
                     (213) 243-2382

                     Jones Day
                     By:  DAVID HEIMAN
                     North Point, 901 Lakeside Avenue
                     Cleveland, OH  44114
                     (216) 586-7175

                     Jones Day
                     By:  THOMAS CULLEN, JR.
                          GEOFFREY S. IRWIN
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3924

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

APPEARANCES (continued):

                        Foley & Lardner, LLP
                        By:  TAMAR N. DOLCOURT
                        500 Woodward Avenue, Suite 2700
                        Detroit, Might  48226
                        (313) 234-7161

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  ALFREDO R. PEREZ
Company:               700 Louisiana Avenue, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  STEPHEN C. HACKNEY
Syncora Guarantee           MARC KIESELSTEIN
Inc., and Syncora      300 North LaSalle
Capital Assurance,     Chicago, IL  60654
Inc.:                  (312) 862-2157

For Interested         Honigman, Miller, Schwartz & Cohn, LLP
Party The Detroit      By:  ARTHUR T. O'REILLY
Institute of Arts,     2290 First National Building
a Michigan not-        660 Woodward Avenue
for-profit corp.       Detroit, MI  48226
(DIA Corp.):           (313) 465-7628

For National Public    Sidley Austin, LLP
Finance Guarantee      By:  GUY NEAL
Corp.:                 1501 K Street, NW
                       Washington, D.C.  20005
                       (202) 736-8041

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For Deutsche Bank      Katten Muchin Rosenman, LLP
AG, London:            By:  JOHN RAMIREZ
                       575 Madison Avenue
                       New York, NY  10022-2585
                       (212) 940-6435

For Ad Hoc Water       Kramer Levin Naftalis & Frankel, LLP
and Sewer              By:  JONATHAN M. WAGNER
Bondholders:           1177 Avenue of the Americas
                       New York, NY  10036
                       (212) 715-9393

APPEARANCES (continued):

| | |
|---|---|
| For Oakland County, Michigan: | Carson Fischer, PLC<br>By:  JOSEPH M. FISCHER<br>4111 Andover Road, West - Second Floor<br>Bloomfield Hills, MI  48302-1924<br>(248) 644-4840 |
| | Young and Associates<br>By:  JAYE QUADROZZI<br>27725 Stansbury Blvd., Suite 125<br>Farmington Hills, MI  48334<br>(248) 353-8620 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By:  RANDALL BRATER<br>1717 K Street, NW<br>Washington, DC  20036-5342<br>(202) 715-8472 |
| For Assured Guaranty Municipal Corp.: | Chadbourne & Parke, LLP<br>By:  SAMUEL S. KOHN<br>30 Rockefeller Plaza<br>New York, NY  10112<br>(212) 408-1060 |
| For the Official Committee of Retirees: | Dentons US, LLP<br>By:  CLAUDE MONTGOMERY<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY  10020-1089<br>(212) 632-8390 |
| For County of Wayne, Michigan: | Butzel Long, PC<br>By:  MAX J. NEWMAN<br>Stoneridge West<br>41000 Woodward Avenue<br>Bloomfield Hills, MI  48304<br>(248) 258-2907 |
| For the State of Michigan: | Michigan Department of Attorney General<br>By:  MATTHEW SCHNEIDER<br>525 Ottawa Street, Fl. 7<br>P.O. Box 30212<br>Lansing, MI  48909<br>(517) 241-8403 |
| For the Detroit Retirement Systems: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward Avenue, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |

Court Recorder:     Kristel Trionfi
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:     Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1       THE CLERK:  All rise.  Court is in session.  Please
2  be seated.  Case Number 13-53846, City of Detroit, Michigan.
3       THE COURT:  Good morning.  Let's begin with the
4  swearing in of a new attorney for the Bar of the Court.  Are
5  you Dana Kaufman?
6       MS. KAUFMAN:  Yes.
7       THE COURT:  Okay.  Are you prepared to take the oath
8  of admission to the Bar of the Court?
9       MS. KAUFMAN:  Yes.
10       THE COURT:  All right.  Please raise your right
11  hand.  Do you affirm that you will conduct yourself as an
12  attorney and counselor of this Court with integrity and
13  respect for the law, that you have read and will abide by the
14  civility principles approved by the Court, and that you will
15  support and defend the Constitution and laws of the United
16  States?
17       MS. KAUFMAN:  Yes.
18       THE COURT:  All right.  Welcome.
19       MS. KAUFMAN:  Thank you.
20       THE COURT:  We'll take care of your paperwork for
21  you.  You're all set.  One moment, please.  Okay.  Let's
22  begin with the motion relating to the art, please.
23       MR. PEREZ:  Good morning, your Honor.  Alfredo Perez
24  on behalf of FGIC.  Your Honor, as the Court is aware, in
25  November of last year we filed the first motion relating to

1   the art, and on November 22nd -- on January 22nd we had a

2   hearing in which the Court denied that motion.  In essence,

3   the Court ruled that it didn't have authority under 105 and

4   1102, and then it went on to state that even if it did have

5   authority, it wouldn't grant the motion because it -- for

6   several reasons.  It deemed the motion to be premature at

7   that point.  The city was 37 days away from filing its plan.

8   And the Court went on to say that once the city had filed its

9   plan, that the treatment of the art would raise several

10  issues, first of which was what was the city's interest in

11  the art.  Second, does the city meet the best interest test

12  under 943(b)(7) with respect to whatever interest it had in

13  the art?  Third, the Court asked, you know, what role does

14  the art play in the long-term revitalization of the city, and

15  how does that affect the feasibility of the plan?

16          So, your Honor, now fast forward to May.  The city

17  has filed its plan.  The transfer of the art is a central

18  component of that plan.  The DIA settlement pursuant to which

19  the art is transferred is a central component of that plan,

20  so we have clearly the issue of what's the city's interest

21  and the best interest test.  Additionally, your Honor, we

22  have the city has its burden to meet its burden under Rule

23  9019 with respect to the reasonableness and the fairness of

24  the settlement.  And, your Honor, we submit that the Court

25  and the parties really can't inform the Court and have a real

1   meaningful discussion as to the fairness of the settlement

2   whether the city has met the best interest test if we don't

3   know what the value is of what's being conveyed.  And there's

4   no question, your Honor, but that the art --

5          THE COURT:  Well, why isn't that by itself a

6   sufficient grounds to object to the settlement and the

7   confirmation?

8          MR. PEREZ:  Well, your Honor, we have, but to the

9   extent that the Court overrules that objection, we'd also

10  like to present evidence with respect to what is the value of

11  the art.  And, your Honor, there's no question but that --

12         THE COURT:  But you didn't answer my question.

13         MR. PEREZ:  Well, your Honor --

14         THE COURT:  My question is why isn't it sufficient

15  to protect your client's interest to object to the settlement

16  and the plan on the grounds that we don't know what the value

17  of the art is?

18         MR. PEREZ:  Well, your Honor, we actually have.  I

19  mean we're saying that they can't meet their standard because

20  we don't know that, and the reason --

21         THE COURT:  Okay.  So why are we here?

22         MR. PEREZ:  Because, your Honor --

23         THE COURT:  Why do you need more than that?

24         MR. PEREZ:  Because it would be -- it would be

25  important for the Court and the parties to know what it is

1  that we're giving up.  Okay.

2          THE COURT:  Why?

3          MR. PEREZ:  Right now --

4          THE COURT:  Why?

5          MR. PEREZ:  Well, I would surmise, your Honor, that

6  if the art was worth $4 billion free and clear, that would be

7  a fact that I think would be meaningful and important for the

8  Court to consider.  It certainly would be meaningful and

9  important for my client to present in the context of the

10  confirmation hearing because what we're doing is there's a

11  transfer for approximately $500 million going to parties that

12  aren't all the unsecured creditors.  That's a different

13  issue.  That's not for today.  But if it's $5 billion, if

14  it's worth $4 billion, I think that's important to know.  I

15  think it -- I think that to the extent that there's any basis

16  to say that this is a reasonable settlement, how can you make

17  an assessment whether it's a reasonable settlement if you

18  don't know what's being conveyed?

19          THE COURT:  You just made the argument -- I asked

20  you whether it was sufficient or not.  You just said if we

21  don't know what the value of the art is, how can we assess

22  its reasonableness.

23          MR. PEREZ:  Correct, your Honor.

24          THE COURT:  And my question is why do we need more

25  than that, or why do you need more than that?

1        MR. PEREZ: Well, because the Court may determine

2    that that is sufficient, and so I would like to present

3    evidence to show what, in fact, the true value of the art is.

4    I think that's the main reason because I don't want to be

5    caught without the ability to actually demonstrate to the

6    Court what's being transferred.

7        So, your Honor, so we have best interest. We have

8    the 9019 standard. And then to the extent that Class 9,

9    which is the COPs, rejects the plan -- and right now we're

10   basically being offered three cents on the dollar -- we also

11   are going to have a best interest -- a fair and equitable

12   test under 1129(b)(2) that they're going to have to meet. So

13   after the hearing in January, we heard what the Court said,

14   and we did basically three things. First, we served the

15   subpoena with everyone on the DIA. We've been looking at

16   documents. That addresses the first issue, which is what is

17   their interest in the art. Second, because of LaSalle and

18   the fact that the Supreme Court says market value is the best

19   indication of what the real value is, we tasked Houlihan to

20   do what they did. Second, your Honor -- and the main reason

21   we did that was really predicated -- or one of the reasons we

22   did it was predicated on the Christie's appraisal.

23   Christie's looked at 2,700 pieces. They appraised 1,700

24   pieces. They had a range of 454 to 867. That's almost a

25   hundred-percent difference swing. How could that be helpful

1   to the Court where you have basically a hundred-percent swing

2   in the value?  So we thought that in order to get a more

3   precise determination of what the market value is, you really

4   needed to see what the market would indicate.  Houlihan put

5   in a tremendous --

6           THE COURT:  So do I understand correctly by your

7   argument here that it is not the creditors' intent here to

8   force or insist that the city sell this art?

9           MR. PEREZ:  Your Honor, correct.  Correct.  We have

10  not filed anything.  Whether that ultimately occurs, I don't

11  know, but we're looking at this in the context of what is the

12  true market value of what's being conveyed pursuant to the

13  plan and what are they getting in return.  So Houlihan --

14          THE COURT:  So your agent, Houlihan, has solicited

15  these, I guess, expressions of interest is the --

16          MR. PEREZ:  Correct.

17          THE COURT:  -- best way to phrase it, presumably

18  knowing that they're never actually going to get the art?

19          MR. PEREZ:  Well, your Honor, I don't know that I

20  would go so far as to say -- I mean the -- we attached what

21  we sent out, so the Court saw that.

22          THE COURT:  Well, the city has said they're never

23  going to sell the art.

24          MR. PEREZ:  The city has indicated currently that

25  it's not going to sell the art.  The city in the June 14th

1  plan said that it was looking at all options to monetize the
2  art, so the city currently and the plan currently doesn't --
3  well, I think it does include a sale because you're, in
4  essence, transferring it for consideration.  You're
5  transferring it, and it's very interesting what they say in
6  the disclosure statement.  The purpose for the transfer is to
7  shield it from third-party creditors of the city.  It says
8  that point blank in the disclosure statement.  That's a
9  classic -- you know, they're trying to get it so that no
10  creditor could ever have a call on it.  Now, they wouldn't
11  have said that if they didn't mean it, so Houlihan was able
12  to go out on the basis of publicly available information.
13        THE COURT:  What rights do creditors have to this
14  art outside of bankruptcy?
15        MR. PEREZ:  Well, that's a good question, your
16  Honor, and that's going to be the subject of a bunch of
17  testimony at the confirmation hearing.  In essence, your
18  Honor, we believe that in the context of -- if we were
19  outside of bankruptcy and we had a judgment and the city felt
20  that it couldn't satisfy the judgment on the basis of raising
21  the tax rate, that the smart decision would be to sell
22  noncore assets.
23        THE COURT:  A smart decision, but that wasn't
24  exactly my question.  My question was a legal question.
25        MR. PEREZ:  Your Honor, I am not prepared to say

1  that the city's noncore assets could not be subject to use

2  for satisfaction.  I think that most of the cases say that

3  that's not a remedy.  Most of the cases say that your only

4  remedy is to submit the judgment to the finance director, and

5  they would have to do it.  But the City of Detroit has sold

6  many --

7         THE COURT:  It's your position that this art is

8  quote, unquote, noncore?

9         MR. PEREZ:  That's correct, your Honor.  It is my

10  position on that.  And as the Court is aware --

11         THE COURT:  The city probably doesn't agree with you

12  on that.

13         MR. PEREZ:  They may or they may not agree, and they

14  may have agreed with me back in June 14th, and they may not

15  agree with me now because certainly on June 14th it was on

16  the table.

17         THE COURT:  Did your client -- or was there a single

18  bondholder who, when agreeing to do business with the city on

19  whatever basis it did or purchasing art -- purchasing bonds

20  or debt of the city, thought about art, knew about the art,

21  contemplated the art, was aware of the art?

22         MR. PEREZ:  I have no indication that my client had

23  any knowledge of that at the time.

24         THE COURT:  Was it mentioned in any offering

25  circular, any balance sheet, any prospectus?

1          MR. PEREZ:  I can't say, your Honor, but I would
2     doubt that.

3          THE COURT:  Are these important considerations?

4          MR. PEREZ:  I don't believe so, your Honor.  I don't
5     believe so because if the city had -- if at the time that we
6     had -- we did our transactions with the city back in 2005 and
7     2006, you know, the balance sheet didn't reflect that there
8     was any cash on the balance sheet, but tomorrow there was $4
9     billion on the balance sheet, cash or marketable securities,
10    it may not have been in the offering circular, but that's an
11    asset of the city that we could look for for satisfaction, so
12    I don't think those are key considerations.

13         So, your Honor, Houlihan went out there.  Based on
14    publicly available information, we had -- at the time we had
15    not gotten anything from the DIA.  What we've gotten by the
16    DIA is subject to a confidentiality agreement, so we haven't
17    shared anything with Houlihan -- and got these indications of
18    interest.  The Christie's report, by the way, made several
19    recommendations as to how to monetize the assets.

20         THE COURT:  Pause one second.  Why is what you've
21    gotten from the DIA subject to a confidentiality agreement?

22         MR. PEREZ:  Because that's the condition pursuant to
23    which we were allowed to see it.  I think there are two
24    components of the confidentiality agreement.  One is the
25    personally identifiable information of donors, which I think

1   everybody agrees is --

2          THE COURT:  Okay.

3          MR. PEREZ:  -- not an issue.

4          THE COURT:  Fair enough.

5          MR. PEREZ:  I think there's a second component that

6   we maybe end up coming back to talk to you about, but the

7   personal identification --

8          THE COURT:  Okay.

9          MR. PEREZ:  -- of donors I think --

10         THE COURT:  But what's the other piece?  Does it

11  cover everything else?

12         MR. PEREZ:  Well, it covers -- yeah.  It basically

13  covers everything else.  I mean there's a protocol about how

14  we can use it, so it's not like we won't ever be able to use

15  it, but I think out of an abundance of caution -- and I don't

16  fault the DIA for that at all.  I mean I'm not complaining in

17  the least.  They were concerned that there might be some

18  personally identifiable information of some of the donors.

19         THE COURT:  That part is fine.

20         MR. PEREZ:  Yeah.  So --

21         THE COURT:  All right.  If we have to deal with it

22  in the future, we will, but, you know, if these are documents

23  relating to public assets, I just wonder why those documents

24  themselves wouldn't be public or at least publicly available.

25         MR. PEREZ:  We chose the path of least resistance --

1    THE COURT:  All right.

2    MR. PEREZ:  -- with respect to that.

3    THE COURT:  Fair enough.

4    MR. PEREZ:  So Christie's report said one of the

5  ways to monetize it would be through a loan.  One of the

6  proposals that we have is a loan for $2 billion, four times

7  the consideration that's being given currently, and the

8  Court -- I mean everybody says 816, but it's really about a

9  little bit less than 500 million that's actually coming.

10  Second, your Honor, we have a proposal for the sale of the

11  art, and then we have two other proposals for pieces,

12  including one that's only for 116 pieces, potentially a

13  billion five, three times the -- three times the amount of

14  the DIA settlement, three times the amount.  Your Honor, when

15  our client looks like it's going to get about total

16  consideration over 20 years under the plan of maybe 60, $80

17  million on a billion four, I just don't know how you can say

18  that you can't look -- determine whether this asset is

19  available, one, and, two, determine whether the city has met

20  the best interest test, whether they've satisfied the

21  standards under 9019, or whether it -- you know, they've

22  satisfied the fair and equitable standard if you don't know

23  what it is on the other end.  You just have to know.

24    THE COURT:  The DIA is concerned about the potential

25  and the risk of damage to the art.

1    MR. PEREZ:  Your Honor, absolutely valid concern.

2  We are prepared to work with any reasonable restrictions on

3  that.  I think that the -- that is really -- it's a red

4  herring, your Honor.  These are all very, very --

5    THE COURT:  I'm not quite sure the DIA would agree

6  with you on that.

7    MR. PEREZ:  Well, your Honor, they may not agree,

8  but I think at the end of the day if we're allowed to go

9  forward, the Court would determine that it is basically a red

10  herring.  These are all very sophisticated people.  They are

11  all people in the business.  These aren't like somebody

12  coming off the street.  And they would be able to satisfy any

13  reasonable concern that the DIA may have.

14    THE COURT:  We don't really have any evidence of who

15  these people are, do we?

16    MR. PEREZ:  Well, your Honor --

17    THE COURT:  I mean we have a bunch of LL --

18    MR. PEREZ:  -- yes and no.  Yes and no.

19    THE COURT:  We have a bunch of LLC names.

20    MR. PEREZ:  Yes and no.  And Mr. Spencer is here and

21  prepared to testify to the extent the Court -- you know,

22  there's an issue as to that evidence.  He did put in a

23  declaration.  In his declaration he said that these were, in

24  essence, reputable people and that -- and also, your Honor,

25  that we were only scratching the top, the tip of the iceberg

1   in terms of what the value is here, so he's here. He's

2   prepared to testify to the extent that's an issue. I don't

3   think certainly the --

4           THE COURT: He doesn't really explain why it's

5   necessary to remove the art from the walls to accomplish what

6   you and your client -- and your clients and the other movants

7   want to do here, does he?

8           MR. PEREZ: He does not, and remember, your Honor,

9   that was -- that came in as a result of the Court's order to

10  be more specific in terms of what the order would be, and,

11  frankly, the reason we put the order in a general fashion is

12  because we anticipated that we would have negotiations with

13  the DIA about what it was that we were doing. The only

14  reason --

15          THE COURT: Well, let me just ask why is it that

16  removal from the walls is necessary to accomplish your

17  ultimate goals here?

18          MR. PEREZ: Your Honor, we went back to the bidders,

19  if you will, and they indicated that in order to determine

20  the authenticity that they really would have to inspect.

21          THE COURT: Is there doubt about that?

22          MR. PEREZ: I don't think so, but --

23          THE COURT: Then why is it necessary?

24          MR. PEREZ: Well, I think it's necessary, your

25  Honor -- and, again, we would -- this would be a subject of

1  negotiation, but what we were told -- what we were told, your

2  Honor, the reason it was necessary is because in order to

3  appraise it in a way that you're going to make a firm bid,

4  you really need to inspect it.  And, frankly, the DIA agrees

5  with that.  In their papers they say if it were going to be

6  sold, somebody would have to inspect the front and back.

7  They don't contest that, your Honor, that that's needed, so

8  to the extent -- and it's not 12,000 pieces.  I mean we

9  specifically put 3,000, and it's not 12,000.  I mean there's

10  a parade of horribles in the DIA's filing that I think are

11  just complete red herrings, your Honor.

12        THE COURT:  Would you include in that the disruption

13  to the museum's operations?

14        MR. PEREZ:  Your Honor, no, no, and we've been very

15  cognizant of that.  And I think it could be done in a way

16  that it doesn't disrupt the museum.

17        THE COURT:  How would that be?  Nights and Mondays?

18        MR. PEREZ:  Nights and Mondays or, you know, in a

19  way that only one person is there at a time.  Right now, your

20  Honor, we've got people there.  It's three people from set

21  times.  There's not a lot of people.  There's not a lot of --

22  there's not a lot of disruption at all, and we've met

23  every -- literally every condition that the DIA has imposed

24  upon us, and I have no doubt but that any of these potential

25  interested parties would also meet every condition, so,

1  again --

2          THE COURT:  Paying for overtime?

3          MR. PEREZ:  Paying for overtime?  We'd have to pay

4  for overtime, yes, your Honor.  Yes, absolutely.  I mean

5  we're paying now for the -- for all of the copying and, you

6  know, the special handling and copying and all of that.

7  We're paying for that right now.

8          THE COURT:  Okay.

9          MR. PEREZ:  So it's not -- and, you know, to the

10 extent there's a question there, to the extent these are the

11 city's assets, whether we should be doing it, but, again, we

12 took the path of least resistance with respect to that.  So

13 for all those reasons, your Honor, I think that we would

14 request that the Court enter an order granting the motion

15 obviously subject to a further discussion with the DIA about

16 how something like this could be done.  Thank you.

17         THE COURT:  Okay.

18         MR. KIESELSTEIN:  Good morning, your Honor.

19         THE COURT:  Sir.

20         MR. KIESELSTEIN:  Marc Kieselstein, Kirkland &

21 Ellis, on behalf of Syncora.  Your Honor, we filed a joinder

22 to FGIC's motion.  I don't want to repeat what Mr. Perez

23 said.  I rise briefly to make a few additional points if --

24         THE COURT:  Go ahead.

25         MR. KIESELSTEIN:  -- that's all right.  Your Honor,

1    first on exclusivity, your Honor, I know the city said in its
2    response papers they viewed this as an encroachment on
3    exclusivity.  Obviously we disagree with that.  As far as
4    we're concerned, the city has exclusivity today.  They have
5    exclusivity tomorrow.  They have exclusivity forever.  You
6    know, we get that, that that's how this works in Chapter 9.
7    And if Mr. Orr and the city are bound and determined not to
8    even look this gift horse in the mouth to see if it's
9    Secretariat on the one hand or a broken-down nag on the
10   other, we don't like it.
11            THE COURT:  Well. hold on.  "Gift horse" is a little
12   bit of an exaggeration.
13            MR. KIESELSTEIN:  Well, we don't know.
14            THE COURT:  It's not a gift.
15            MR. KIESELSTEIN:  It's not a gift, but it's an --
16            THE COURT:  It's not a gift.
17            MR. KIESELSTEIN:  It's an opportunity to generate
18   potentially a great deal more proceeds than what's on the
19   table, potentially.  We don't know, and that's part of the
20   point.
21            THE COURT:  Fair enough, but that doesn't make it a
22   gift horse.
23            MR. KIESELSTEIN:  Well, it may be the broken down
24   nag variety, Judge.  We don't know, but you're absolutely
25   right.  But if that's the city's position, we're powerless to

1   change that, and we understand that, which leads to my second

2   point.  And, Judge, that's that, in our view, not only best

3   interest but fair and equitable tests, confirmation are

4   implicated by how the city chooses to proceed here or chooses

5   not to proceed, and we, in our view, believe that they have a

6   duty to take all reasonable steps to minimize creditor

7   losses, and that's a confirmation issue.

8           THE COURT:  Okay.  Okay.  Let's just pause right

9   there.

10          MR. KIESELSTEIN:  Sure.

11          THE COURT:  And I'm going to ask you the same

12  question I asked Mr. Perez.  Why isn't it sufficient to

13  protect your client's interest to argue that the city's

14  refusal to do what you just said it had a duty to do means

15  they can't meet their burden of proving fair and equitable

16  and best interest of creditors and, therefore, the plan

17  should not be confirmed?  Why isn't that sufficient?

18          MR. KIESELSTEIN:  That's an argument, no doubt, your

19  Honor, and the question I think is whether at this stage of

20  the proceeding we need to decide which argument -- which of

21  our arguments is the better argument.  If I knew, for

22  instance, there would be an adverse inference drawn from the

23  city's declining this opportunity sort of in the rule of

24  evidence sense that if a document is not produced, you then

25  draw an adverse inference against the party that didn't

1  produce it, that would be one thing, but the city has
2  exceptionally skilled counsel here, and I think I can safely
3  predict what we will hear if this baby is smothered in the
4  cradle, so to speak, at confirmation.  I expect we will hear,
5  Judge, that kid would never have amounted to anything anyway,
6  and anyone who suggests otherwise is exercising in sheer
7  conjecture.  And if we're in the state of saying what might
8  have been, we will be speculating.  Now, if that speculation
9  is going to be inferred against the city, that's one thing,
10 but I don't know that standing here today, and so it's
11 important.  We may lose our argument about what might have
12 been if we go forward on this motion and it turns out these
13 deals are not real.  That's a risk, I think, FGIC and the
14 other COP holders are willing to take, and the reason we're
15 willing to take it is because based on what we've seen, we
16 think there's more upside in pursuing this than downside in
17 losing this argument that your Honor has rightly raised.
18 Just, you know, keep in mind, your Honor, that to us the
19 grand bargain is not so grand.  For us the grand bargain is
20 more grandiose than grand because we're not getting anything
21 out of this bargain.  We have our nose pressed up against the
22 glass.  Other people are clinking glasses and shaking hands,
23 and we're not getting anything out of it, so we would like to
24 pursue this alternative.  And, candidly, if it was pursued,
25 one out of two things would happen, Judge.  Either these

1   options would prove out and prove to be real, and that would
2   be meaningful information in terms of best interest and fair
3   and equitable and 9019, or, two, as the city suggests, these
4   might prove to be illusory, in which case it would be
5   meaningful information on best interest, fair and equitable,
6   and 9019.  And, again, we're willing to take that risk.  And
7   at first we didn't candidly understand why a fiduciary would
8   not want to know if the answer is behind door number one or
9   door number two, but --
10          THE COURT:  Is the city a fiduciary?
11          MR. KIESELSTEIN:  Is the city a fiduciary?  Well,
12  perhaps not a formal fiduciary, but they do have this duty to
13  minimize creditor losses, so if that's six -- maybe that's
14  six of one, half dozen of the other.  I'm not exactly sure.
15  But I believe they do have that duty, and so we were
16  struggling, frankly, to understand why no one wanted to know
17  the answer to this question, and it's occurred to us as we've
18  gone through this that even if that seems to be perhaps
19  economically irrational behavior, that the art lies on a much
20  higher plane than rationality.  We know this is a world-class
21  collection.
22          THE COURT:  Well, is there a single case out there
23  that holds that a municipality in Chapter 9 has an
24  unconditional right -- an unconditional obligation to
25  minimize creditor losses?

1          MR. KIESELSTEIN:  We think the case law, _Fano_ and

2     other Chapter 9 cases, say that that's exactly what the city

3     has to do.

4          THE COURT:  What about the obligation to provide

5     city services?

6          MR. KIESELSTEIN:  And I understand, your Honor, and

7     that goes to whether this is a core asset or not a core

8     asset.  And we obviously have some --

9          THE COURT:  Okay.  So you agree there isn't an

10    absolute unconditional obligation --

11         MR. KIESELSTEIN:  It's not an absolute --

12         THE COURT:  -- to minimize creditor losses.

13         MR. KIESELSTEIN:  -- certainly not an absolute --

14         THE COURT:  Okay.

15         MR. KIESELSTEIN:  -- certainly not an

16    unconditional --

17         THE COURT:  All right.

18         MR. KIESELSTEIN:  -- obligation.  Our view of it is

19    that at least in terms of one step at a time, having this

20    information would be useful to the city.  You asked Mr.

21    Perez, you know, outside of bankruptcy or even inside of

22    bankruptcy can you force the city to sell this.  I believe

23    the answer to that question is no, but that doesn't mean

24    that, one, if circumstances change, the city's position

25    wouldn't change.  If, for instance, they --

1          THE COURT:  Well, but if the answer to the question

2     is no outside of bankruptcy, why should creditors do better

3     inside of bankruptcy?

4          MR. KIESELSTEIN:  Well, outside of bankruptcy --

5          THE COURT:  That's a little bit of topsy-turvy.

6          MR. KIESELSTEIN:  Well, I don't think so, your

7     Honor, because outside of bankruptcy we have other remedies

8     that the automatic stay and the discharge that will --

9          THE COURT:  Like what?

10          MR. KIESELSTEIN:  Like the Revised Judicature Act

11     and the ability to get a judgment.  That is something we

12     talked about in our objection, and I know there is --

13          THE COURT:  A judgment is a piece of paper.

14          MR. KIESELSTEIN:  Well --

15          THE COURT:  What does that get you?

16          MR. KIESELSTEIN:  Your Honor, I think one of the

17     urban legends populating this case is that there would be a

18     chaotic race to the courthouse of thousands of creditors and

19     the boat would tip over to one side, and it's not an issue

20     for today, but we will -- intend to show at confirmation that

21     that, in fact, would not play out, number one, and, number

22     two, when you're getting a notional ten cents -- Mr. Perez

23     referred to it as three cents --

24          THE COURT:  What's your best case scenario outside

25     of bankruptcy?

1          MR. KIESELSTEIN:  I think it --

2          THE COURT:  You get a judgment.  Then what?

3          MR. KIESELSTEIN:  I think the city's revenues, which

4    we think are understated under their forecast, would be

5    sufficient when you take into account what the monthly nut is

6    for the city, who's accelerated and who's not.  We think we

7    do orders of magnitude better than what's in the plan.

8          THE COURT:  Okay.  Why isn't it sufficient --

9    legally sufficient to argue that in lieu of all of this art?

10         MR. KIESELSTEIN:  I don't think I have to elect my

11   remedies or my arguments at this stage, your Honor,

12   respectfully.  I think we have a panoply of arguments.  They

13   have the burden on every element.  We hope to win one, your

14   Honor, and whether it's that one or a different one, we're

15   indifferent.  We think we should win them all, but we're not

16   objective, so you would expect me to say that.  So, you know,

17   the last point I want to make --

18         THE COURT:  I won't hold you to that.

19         MR. KIESELSTEIN:  Okay.  I appreciate that, your

20   Honor.  Anytime people don't hold me to stuff, I really

21   appreciate it.  Your Honor, the last point I want to make is

22   we understand, you know, how important the art is to the city

23   in terms of it's part of its cultural heritage.  It's a

24   glittering link to the glory days of Detroit.  Any creditor

25   who is not acknowledging that is cold, unfeeling, and stupid,

1  and we hope we're none of those three things.  That said --

2  and based on that, we can only imagine the pressures that the

3  city and Mr. Orr have been under with respect to the art.  We

4  can only imagine what may have been said under the mediation

5  code of silence on this subject, and we get that, but in

6  bankruptcy when you invoke the Court's jurisdiction, some of

7  those rarified things, some of those edifying things have to

8  yield to things that are perhaps more base, perhaps more --

9  you know, some people would even say sort of grubby, and that

10  is the requirement to try and minimize the losses of your

11  creditors.  We think proceeding on this motion would allow us

12  to flesh that out.  We may gain a stronger argument.  We may

13  find out we have a weaker argument, but we think in the

14  absence of the city's willingness or ability to go down this

15  road, we should be able to do it.  I'd say FGIC -- they've

16  done the heavy lifting here -- should be able to do that with

17  the city's reasonable assistance, and we would ask that the

18  motion be granted.

19          THE COURT:  Thank you, sir.

20          MR. KIESELSTEIN:  Thank you.

21          THE COURT:  Anyone else to speak in favor of the

22  motion?  All right.

23          MR. BENNETT:  Your Honor, can I have one minute to

24  speak to my colleague about one point?

25          THE COURT:  Yes.

1      MR. BENNETT:  Thank you, your Honor.  It's kind of

2  interesting the way this motion has moved.  It started out

3  that we were facilitating due diligence to implement some

4  offers, and then when the movants realized that that runs

5  into 904 and 941, 904 on the exclusive control over property,

6  941 on exclusive right to file a plan, it moved over to be,

7  well, those things might be inconsistent with this request,

8  but now we see this as an aid of our objections to

9  confirmation.  And I think that's -- there's something pretty

10  significant there that I will go into, but I think that boils

11  down to three points of reality that I think has to animate

12  the discussion, and I suspect your Honor has detected all of

13  them based upon your comments today, but let me put them on

14  the surface.

15      Reality number one.  The core-noncore distinction

16  applied not to proceedings in Bankruptcy Court but to assets

17  of a debtor is an invention and terms of art in this case and

18  this case alone.  Even Fano, which is a case that's really

19  short, so we can analyze every sentence and word together

20  very easily, but even Fano doesn't involve such a

21  distinction, and it's the case that everyone is going to talk

22  about as somehow indicating that assets have to be addressed

23  or be sold.  I'll talk about it in a minute.  It doesn't say

24  that at all, but that's number one, first reality.  And your

25  Honor suspected that the city would take the position -- a

1  different position on the core-noncore question with respect

2  to the art, and, your Honor, we do.  It's core in many

3  respects, and I think that in a lot of ways Mr. Kieselstein

4  acknowledged that.

5          The second reality is that the bidders or the

6  potential financing source -- alone, by the way, the city has

7  no ability to repay, so that's a deferred sale.  You borrow

8  the money, and then there's a foreclosure someday.  But in

9  any event, those -- the bidders or the financing source are

10  here for two reasons.  Number one, because they've been told

11  that FGIC and/or FGIC other creditor -- and the rest of the

12  supporters of the motion are going to urge a sale and by

13  participating in this round of, quote, unquote, bidding, they

14  will acquire an inside track.  That's the reality.  That's

15  what happened here.  And the third reality --

16          THE COURT:  And how do we know that?

17          MR. BENNETT:  I can't imagine any other reason for

18  them to be here.

19          THE COURT:  It's just a matter of inference.

20          MR. BENNETT:  Correct.  It's a matter of inference.

21  We did not do discovery.  I will say that if we continue down

22  this road -- and there's all kinds of reasons I don't think

23  we will -- all of the bidders and the financing source will,

24  of course, be added to the already very long lists of

25  witnesses and people to be deposed.  And I'm not saying that

1    because I think that's a great idea.  It's just reality.

2            The third reality point, I think, now is also --

3    suggests an interesting legal question, which is what's

4    happening here is that we have an effort by a party to

5    manufacture nonexpert evidence.  They want to say this is

6    some -- because none of these people are experts that would

7    be permitted to testify as to value in this court or they're

8    not being offered that way, but they want to manufacture some

9    kind of percipient evidence in the middle of the proceeding,

10   and they want us to help them do it.  That's really at the

11   end of the day what's going on here.  And I'm having a hard

12   time figuring out why that's a proper use of discovery

13   because that's where we are.  Remember, they've changed the

14   motion to say this is all in aid of things happening at the

15   confirmation hearing, so it's become a flavor of discovery,

16   and the flavor of discovery it is, it's a flavor of discovery

17   that's going to enable someone in the middle of a proceeding

18   to manufacture some evidence.  And as much and as long as and

19   hard as I've thought of what discovery is supposed to be

20   about, I don't think discovery is supposed to be about that.

21   And I think, frankly, the -- as a legal matter -- a legal and

22   technical matter, the use of 105 is improper in light of the

23   fact that 904 and 941 really says selling assets is the

24   province of the city if it's going to be in that business

25   pursuant to a plan or not pursuant to a plan, so nobody else

1   has got any business talking even hypothetically about sales

2   of city property, and that to the extent that this is a

3   dressed up discovery motion to aid the creation of evidence

4   for the confirmation hearing, it's an inappropriate use of

5   discovery.  We do expect to see expert testimony from people

6   about topics like this, and that, of course, is something

7   that's fair game.

8           Okay.  One of the really important points also --

9   and I think your Honor may have foreshadowed that you've seen

10  this -- is that the words I think were used, "We want to find

11  out what it's worth," and I think the most important word in

12  that sentence is "it's."  What is "it's"?  The kind of offers

13  that people are -- or that the -- that FGIC and the other

14  creditors behind the motion want to bring before the Court is

15  a sale value free and clear of every conceivable restriction

16  or other right under the sun, and that's not terribly

17  relevant, and it's not terribly relevant for two reasons.

18  One, as we've indicated before, whether people like them or

19  not, there is a wide variety of arguments as to why the art

20  in total could not be sold, some that have been embodied in

21  the attorney general's opinion, others that have been

22  advanced by what I call the DIA Corp.  And there is a

23  multitude of restrictions that have been imposed in

24  connection with the manner in which different works of art

25  have been acquired.  To say that there is power in the

1   Bankruptcy Code under 363(f) to sell free and clear, which,
2   by the way, may have been a clearer proposition years ago --
3   these days there are issues with respect to exactly how far
4   363(f) goes -- doesn't actually answer this question because
5   everyone asserting a claim, right, interest in the art in the
6   form of a restriction or anything else is going to stand up
7   and say, "I'm entitled to be adequately protected," so there
8   is not a scenario that the city can think of where its worth
9   is going to turn out to be for all pieces the retail price at
10  an auction because it's just not where we are.  And even if
11  we could get there with respect to some works, we are many,
12  many years away from it.  So I think another point that we
13  question is we're dealing with evidence that ones would
14  manufacture with a view to bringing it to the Court at the
15  confirmation hearing about a sale context that isn't real,
16  and that's another reason to say why are we going through all
17  of this.
18          A couple of clean-up points that came up in the
19  argument, just for clarity, on June 14th we said this is an
20  asset.  People are talking about it.  We don't know what we
21  could or should do about it.  It has to be studied.  And,
22  frankly, I don't know that we ever finished all of the
23  studying, so I don't think that -- has the city really
24  decided it -- you know, what it would do if the grand bargain
25  fell apart, the city has not, so -- and many people have

 1    inquired.  And, secondly, for clarity, the art -- there is

 2    actually some art on the books of the City of Detroit, but

 3    it's statues in squares and in the front of the City Hall.

 4    There's actually no -- none of the art on the books of the

 5    City of Detroit is the art in the DIA, and it has never been

 6    on the balance sheet or on any financial statements with

 7    respect to the city.

 8         Okay.  You know, last point on this is that we --

 9    there's a lot of issues that relate actually to how this

10    would go about the expense and inconvenience.  I think that

11    the city sees all these points as well, but I think there's a

12    representative of the DIA Corp. that would like to address

13    the Court on those matters directly.

14         THE COURT:  Okay.  Thank you.

15         MR. HACKNEY:  Okay.

16         MR. O'REILLY:  Good morning, your Honor.  Arthur

17    O'Reilly for the DIA or, as Mr. Bennett calls it, the DIA

18    Corp.  Your Honor has already focused pretty clearly on the

19    concerns that the DIA expressed and put it in its objection.

20    I'm standing here to address any concerns that the Court may

21    have that haven't been answered but also to respond to some

22    of the things that Mr. Perez said.  On the one hand, he says

23    that there is no jeopardy.  On the other hand, he says it's a

24    valid concern.  What he's asking to do or what he's asking

25    the Court to do is to order the city to order the DIA to

1    allow interested purchasers to come in, pull works of art off
2    the wall, pull backings off potentially, unroll tapestries,
3    all of these things.  That is absolutely an interference and
4    absolutely creates a potential for harm.  He seems to believe
5    that it doesn't matter as long as you do it well enough with
6    the right people.  The trouble there, your Honor, is that if
7    you're talking about 3,000 works being done in this
8    compressed time frame, that's just not correct.  In order to
9    take Cotopaxi off the wall, which is one of the most singular
10   unique pieces in our collection, you need lifts, scaffolds,
11   six technicians.  You've got to move statues left and right.
12   All of this -- all of that movement creates the potential for
13   risk.  The very best way to keep art safe is not to touch it,
14   is to leave it in place.  He has no response as long -- as
15   far as I heard, to the notion that Christie's didn't have to
16   do this.  When Christie's came in, they came in on off days,
17   and they reviewed and they looked at the works right as they
18   laid in front of them.  I reject the proposition that there
19   isn't the potential for risk in what they're planning to do
20   here.
21          In terms of the burden, I think your Honor has also
22   sort of hit it on the head there.  Could it be done?
23   Absolutely.  But you'd have to close off sections of the
24   museum.  You would have to hire full-time help to do this.
25   By the way, the Christie's engagement probably took one full-

1 time employee time about six months.  What they're doing or

2 what they're proposing doing is far more than that because

3 Christie's didn't take things off the wall.  That process

4 cannot be done fast.  If you do it fast, you risk harm to the

5 works.

6       The other point that your Honor focused on I think

7 is quite right.  It's just not necessary.  To do what

8 Christie's did is wholly sufficient in these circumstances.

9 Now, he says that we drop a footnote that says if there's

10 actually a sale, you might actually look at the work.  Yeah,

11 probably so.  If you're actually selling the work, you'd

12 probably look at the work, but that's not required to do the

13 process they're talking about here.

14       He also touched a little bit on the discovery issue.

15 I'm, frankly, a little bit flabbergasted by the process here.

16 We've been trying to work helpfully and cooperatively with

17 this group, reached a discovery agreement, in fact, on all

18 these issues.  I was surprised, to say the least, to say that

19 they want to dive back in on 3,000 more works, pull up donor

20 files, object files, root through those records once again to

21 do that, and he's never talked to me about it before

22 following the revised proposed order last Thursday.  Unless

23 your Honor has any questions --

24       THE COURT:  Well, why a confidentiality order other

25 than as to personally identifying information or personally

1   sensitive information?

2       MR. O'REILLY:  Well, the confidentiality order was

3   precisely for that purpose.  We have donor files that include

4   wills, trusts, and other things like that, and, frankly, the

5   pace and the cadence with which we did this didn't allow us

6   to go through and do that and say this is certainly not

7   confidential.  These are massive amounts of records, and we

8   were trying to work collaboratively, so that's why it

9   existed.  Now, Mr. Perez talked about that being one part for

10  the confidentiality issue, and then he said we hadn't joined

11  issue on something else, and I'm not sure what that something

12  else is, so I can't really address that, but we've done -- at

13  least in broad brush strokes we've tried to categorize those

14  things that are likely to contain confidential material and

15  those that are not.  And if at such time they say this

16  doesn't seem to have any, absolutely we'd be --

17          THE COURT:  Okay.

18          MR. O'REILLY:  -- more than pleased to remove that.

19          THE COURT:  Thank you.

20          MR. O'REILLY:  Thank you, your Honor.

21          THE COURT:  Anyone else in opposition to the motion?

22  Reply, please.

23          MR. PEREZ:  Your Honor, just a couple of points.

24  Number one, Mr. Bennett talked about the distinction between

25  noncore -- core and noncore asset.  Your Honor, 436

1   specifically authorizes the sale of noncore assets, so

2   there's no issue but that there is a distinction between

3   assets that are core that you need for the health, safety,

4   and welfare of the citizens, and assets that aren't core, and

5   they are specifically authorized to dispose of those assets

6   under 436.

7          Second, your Honor, I'm honored that Mr. Bennett

8   thinks that we are so clairvoyant as to be able -- as to be

9   doing this in order to manufacture evidence and obtain this

10  discovery.  Your Honor, we read LaSalle.  We read what the

11  Court has said.  We want to provide a meaningful value for

12  the art.  That's all we're trying to do.  And although,

13  again, Mr. Bennett attributes -- or infers what's being said,

14  if the Court can read the documents, it clearly says we don't

15  own it, we can't sell it, we probably can't compel the city

16  to sell it.  That was all in the documents, your Honor.

17         And with respect to counsel for DIA, we've acted

18  responsibly in this whole case.  There's no reason to think

19  that we're not going to continue to act responsibly.  If the

20  issue of taking it off the wall and inspecting the front and

21  back is the gating issue, I'm happy to have a conversation

22  about that with the bidders.  I mean, in essence, your Honor,

23  we had a very broad order that just basically said let's talk

24  about how to do this.  At the Court's suggestion, we went out

25  and said, "Okay.  Well, tell me what it is you want," and, in

1  fact, a lot of the information that's already been produced
2  to us will satisfy some of that information --

3          THE COURT:  Is there anything --

4          MR. PEREZ:  -- assuming we could use it.

5          THE COURT:  Is there anything preventing you, your
6  appraisers, the bidders from spending as much time as they
7  want at the Detroit Institute of Art inspecting the art
8  that's on the walls and gathering whatever conclusions about
9  that art they --

10          MR. PEREZ:  Your Honor, I suspect --

11          THE COURT:  -- need to gather?

12          MR. PEREZ:  I suspect they've done that already.  I
13  suspect that they've done that already.  I know that
14  Houlihan --

15          THE COURT:  So the answer is no.  There's nothing to
16  prevent that.

17          MR. PEREZ:  Correct, your Honor.  Correct.  But I'm
18  not sure that really gets us where we want to be because
19  they've done that already.

20          THE COURT:  What else is there besides taking the
21  wall off -- the art off the wall --

22          MR. PEREZ:  Well, your Honor, I --

23          THE COURT:  -- or the wall off the art?

24          MR. PEREZ:  Well, first of all, access to all of the
25  files, which obviously they don't have, to determine, you

 1    know, who owned it and the circumstances.

 2            THE COURT:  Okay.  But why isn't access to documents

 3    a matter of ordinary discovery, and why isn't it a matter of

 4    what you've already been working out with the DIA?  I mean it

 5    was quite a massive subpoena you laid on them.

 6            MR. PEREZ:  And we negotiated something that was

 7    acceptable to them.

 8            THE COURT:  What kinds of documents do you need did

 9    you either not ask for or they have refused to give you?

10            MR. PEREZ:  Well, your Honor, the biggest issue is

11    is that we have, in essence, been limited to two days of

12    inspection of documents, one week and two days.  It was

13    inspection of documents this week.  We have three people

14    there.  Those are --

15            THE COURT:  So you need more time?  That's what this

16    is about?

17            MR. PEREZ:  No.  No, your Honor, we don't.  It's not

18    about needing more time.  It's about trying to figure out if

19    there's somebody out there, as Mr. Kieselstein said, who

20    will, in fact, say, "I'm going to, you know, belly up to the

21    bar, and I'm going to put" --

22            THE COURT:  Right.  I get that, but my question is

23    why isn't the publicly accessible hours of the DIA, whatever

24    they are, sufficient to accomplish that purpose?

25            MR. PEREZ:  Your Honor, any reasonable person who's

 1  going to put out a billion and a half, two billion dollars is
 2  going to -- is going to -- is going to want to be able to
 3  understand what it is that they're paying, and so when the
 4  bidder tells you --

 5       THE COURT:  They know what they're paying.  What you
 6  meant was what they're buying.

 7       MR. PEREZ:  Exactly.  Correct, your Honor, and --

 8       THE COURT:  Okay.  But it's there for them to see
 9  except for the back, and you already told me that you're not
10  sure why they need the back.

11       MR. PEREZ:  Well, I think they need the back --
12  well, I don't know.  I'm not an art expert.

13       THE COURT:  Well, first you said authenticity.  Then
14  I said, well, is there really any doubt about that, and you
15  said no, so I'm at a loss to understand what's really at
16  issue here.  You can get all the documents you need by
17  ordinary discovery.  You can get all the access to the art it
18  appears you need by paying the admission fee if there still
19  is any.  I'm not even sure.

20       MR. PEREZ:  There is unless you're from the --

21       THE COURT:  What's left?  What is this motion about?

22       MR. PEREZ:  This motion is about getting some
23  cooperation.

24       THE COURT:  But to do what?

25       MR. PEREZ:  To be able to do diligence as you would

1    normally do.  It's not discovery.  It's diligence.  There's a

2    big difference between --

3            THE COURT:  But, see, that's too vague for me.  I

4    got to know what you're asking me to order them to do.  It's

5    more than provide documents --

6            MR. PEREZ:  It's more than provide documents.

7            THE COURT:  -- presumptively.  It's to give access

8    to the art, but you have access to the art just like everyone

9    does.

10           MR. PEREZ:  Well, we don't have access to the art.

11   We don't have access to all of the art.  Okay.

12           THE COURT:  Oh, you want access to the art that's

13   not publicly displayed?

14           MR. PEREZ:  May want.  We may want some access to

15   that art.  Okay.  So there's only 9,000 pieces on display,

16   roughly, and it's possible that we may want access to some of

17   that art, so it's not all on display.

18           THE COURT:  Do you know what art that's not on

19   display you do --

20           MR. PEREZ:  I do not.

21           THE COURT:  -- want access to?

22           MR. PEREZ:  I do not, your Honor.  I do not.  We

23   haven't got -- I mean we haven't gotten that far, and it

24   could be that, you know, after some discussion we would know

25   what that is, but I do think --

1          THE COURT:  Um-hmm.  Okay.

2          MR. PEREZ:  But I do think, your Honor, that the

3   requests -- I mean we didn't make up what was in the order.

4   I mean we talked to each of the interested parties to say

5   what is it, what is it that you would want.

6          THE COURT:  Okay.

7          MR. PEREZ:  Thank you, your Honor.

8          THE COURT:  Mr. O'Reilly -- oh, I'm sorry.  I didn't

9   know you were busy.

10          MR. O'REILLY:  I'm sorry.  I was occupied.  Yes,

11   your Honor.

12          THE COURT:  What's the DIA's position on granting

13   access to works of art that are not currently on display?

14          MR. O'REILLY:  It depends on what you mean by

15   "access," but we -- subject --

16          THE COURT:  An opportunity to inspect.

17          MR. O'REILLY:  An opportunity to review them.  It

18   depends on which ones they are, by the way, your Honor --

19          THE COURT:  Um-hmm.

20          MR. O'REILLY:  -- because some of them are in

21   storage in a way that's not actually easily accessible, but

22   some are on racks which can be pulled out fairly easily and

23   put back in.

24          THE COURT:  Um-hmm.

25          MR. O'REILLY:  Where I think the DIA has --

1          THE COURT:  So you have no opposition to it in

2     principle.  It's just a question of working out the --

3          MR. O'REILLY:  Its potential, its scope, its number

4     and things like that and burden and all those things, which,

5     by the way, it would have been one thing if they had raised

6     this --

7          THE COURT:  Right.

8          MR. O'REILLY:  -- with me before, but they didn't do

9     that.

10          THE COURT:  Right.

11          MR. O'REILLY:  Thank you, your Honor.

12          THE COURT:  Thank you, sir.  All right.  Anybody

13     else have anything further on this?  All right.  I'm going to

14     take this under advisement until after lunch, and I will give

15     you a decision then.

16          (Recess at 10:53 a.m., until 2:00 p.m.)

17          THE CLERK:  All rise.  Court is in session.  Please

18     be seated.  Recalling Case Number 13-53846, City of Detroit,

19     Michigan.

20          THE COURT:  I'd like to resolve first the motion of

21     the creditors directing the debtor to cooperate with

22     interested parties seeking to conduct due diligence on the

23     art collection at the Detroit Institute of Arts, and then

24     we'll get back to concluding the arguments on the motions to

25     intervene.  The Court concludes that this motion should be

```
 1   denied.  Initially, the Court concludes that the city's
 2   objection that the Court lacks the authority to grant the
 3   motion should be overruled.  The Court concludes that it does
 4   have the authority under the Federal Rules of Civil Procedure
 5   if not Section 105 to grant the relief that is requested in
 6   its discretion.  In the circumstances here, however, the
 7   Court concludes that the circumstances do not warrant
 8   granting the relief sought.  Drilling down with counsel in
 9   the specifics of the relief that is sought, it appears to the
10   Court that there are three specific types of relief sought.
11   The first is with regard to document production relating to
12   documents in the possession of the Detroit Institute of Arts.
13   The second is in regard to removing art from the walls or
14   other locations that it may be in there at the Detroit
15   Institute of Arts for purposes of inspection and appraisal.
16   And the third is the opportunity to inspect art that is not
17   on display and not publicly available.
18            Addressing first the motion as it pertains to
19   documents, the record does not establish any cause to grant
20   this motion as to documents.  There are the usual document
21   production mechanisms that are not only available but have
22   been utilized by these very creditors in the case, and the
23   Court -- and the rules state a -- or have a preference for
24   the use of those procedures.  To the extent, of course,
25   there's any dispute about whether a document or a group of
```

1  documents or a list of documents should be turned over, the

2  Court is, of course, willing to resolve that dispute even on

3  an informal basis on the telephone, but there's no cause to

4  grant this motion as to a broad category of documents while

5  the parties are attempting to work it out.

6       As to art that is on the walls that the moving

7  parties seek authorization or permission to remove, again,

8  the Court concludes that the record fails to justify this

9  extraordinary relief.  It just doesn't appear in the record

10  that it is necessary to remove art from the walls and give

11  parties an opportunity to inspect the reverse sides of art to

12  accomplish any purpose that's related to their objections to

13  plan confirmation.  The record doesn't justify a finding that

14  that's needed.  Rather, the record establishes that the

15  access that parties have simply by going to the museum like

16  everyone else to look at and inspect the art is sufficient

17  for the purposes that the moving parties assert here.

18       Apart from that, of course, is the issue of the risk

19  to the art that would result from granting the relief that

20  these moving parties seek here.  The record establishes that

21  this is a substantial risk and not one that should be

22  undertaken lightly or in the absence of extraordinary cause,

23  and in the absence of such cause here, the Court denies this

24  relief as well.

25       Finally, as to the issue of access to art which is

1  not on public display, the Court understands that the DIA is

2  willing to allow that access on reasonable terms, and there

3  is no reason why that can't be worked out between the moving

4  parties and the DIA.  The record does not establish any cause

5  for the Court to get involved at this stage.  Once again,

6  however, if there is a dispute about the terms or the extent

7  of access, the Court is certainly available to resolve any

8  such disputes even on an informal telephonic basis.

9        For these reasons, therefore, the motion is denied.

10  The Court will prepare an order.

11     (Recess at 2:06 p.m., until 2:46 p.m.)

12        THE COURT:  And let's return our attention in the

13  bankruptcy case itself, please, to our continuing discussions

14  on discovery.

15        THE CLERK:  Recalling Case Number 13-53846, City of

16  Detroit, Michigan.

17        MR. HACKNEY:  Good afternoon, your Honor.  Stephen

18  Hackney on behalf of Syncora.

19        THE COURT:  Good afternoon.

20        MR. HACKNEY:  What was technically up -- sorry about

21  that.

22        THE COURT:  Just let things settle down a little

23  bit.

24        MR. HACKNEY:  Raring to go.

25        THE COURT:  Me, too, I assure you.  Okay.

1          MR. HACKNEY:  Thank you, your Honor.  What was
2    technically up for you today for me, for Syncora, were our
3    efforts to compel answers to our interrogatories.
4          THE COURT:  Right.
5          MR. HACKNEY:  Between the time of our hearing on
6    Monday and today, I sat with Mr. Irwin over the phone and
7    attempted to resolve via meet and confer that issue so that
8    we could take it off your plate.  That conversation bled into
9    a broader conversation about certain things that transpired
10   on Monday with respect to, for example, the January 1, 2013,
11   date and some of the other things that came out of the motion
12   to compel, and I'll note as an aside right now that those are
13   issues that I think are broader than just Syncora and may
14   impact other creditors at well, so I am -- as well, and so
15   what I wanted to do was to lay out for the Court a grand
16   bargain of our own, so to speak, that -- or, as Mr.
17   Kieselstein would say, a grandiose bargain, but --
18         THE COURT:  Does it involve $800 million?
19         MR. HACKNEY:  Yes, yeah.  And actually Syncora is
20   now going home because Mr. Irwin gave it to me, and we're all
21   good.
22         THE COURT:  We're all set.  Okay.
23         MR. HACKNEY:  So --
24         THE COURT:  Better cash that check today.
25         MR. HACKNEY:  Yes, yeah.

1    MR. IRWIN:  Good luck.

2    MR. HACKNEY:  So I think -- I believe that he and I

3    came to a good arrangement that's fair, but it implicates

4    certain things that were, I think, ostensibly part of your

5    order on Monday, and so we didn't want to just kind of come

6    and announce it to you in the way of this is what we are

7    going to do because it implicates things that are in your

8    order, so perhaps I can lay out the main components.

9    THE COURT:  Sure.

10   MR. HACKNEY:  The issue around the January 1, 2012,

11   look-back, which is something the Court sort of suggested

12   ordered at the hearing on Monday, Mr. Irwin said that's going

13   to cause the city a burden because it will have to rerun the

14   searches on all 90 custodians back now a year and review and

15   produce those documents.  And what I said to Mr. Irwin was

16   our concern about the January 1, 2013, cutoff that they

17   applied is somewhat category specific.  For example, I don't

18   really have a problem with it as it applies to the

19   restructuring and reinvestment initiatives because those

20   didn't exist prior to January 1, 2013.  By contrast, I told

21   you that with respect to historical revenue data, that's one

22   where the January 1, 2013, was an obvious problem for us, and

23   so what I proposed to him was that if the city would give

24   Syncora more responsive answers to our interrogatories that I

25   have narrowed and clarified in certain circumstances to

facilitate that, and if the city would commit to me that it

will sit with me to understand the specific categories of

documents where the Jan. 1, 2013, limiter is a problem or

where the other aspects of its objections are a problem, and

we will work together to say let's get all of the needed

historical revenue documents or Document X or Document Y but

in discrete categories that I thought it would be acceptable

to me -- and I've spoken to some other creditors who have

made similar signals -- that the city not go back and do the

Jan. 1, 2012, review of all the custodians because even that

effort might not address what we're talking about now, so

this may be a better way to skin the cat but also one that

saves the city burden.  And we also agreed as part of that

that the city would deem Syncora's discovery responses to

date sufficient.  So that is the main parts of the bargain

that we proposed.

        Now, I will note that it involves, you know,

compromise on both sides.  It also involves on my part some

trust in the city that they will, in fact, give me these

answers to the interrogatories.  They will, in fact, sit with

me and help me get these categories of documents that as yet

we haven't threshed out, and so it's possible that we may

have to come back to you later if there's a problem.  We will

hope not to, but I don't want to say, oh, it's all tied up in

a bow, and it's all done.

1          THE COURT:  Right.

2          MR. HACKNEY:  There was a last issue that I wanted

3  to bring to your attention because it impacted the order that

4  the Court had asked us to submit after the motion to compel,

5  and it related to the index that the Court had ordered.  And

6  what the city has signaled to us is that trying to index all

7  of the documents by reference to the requests and say this

8  document relates to these requests of these, you know,

9  different creditors or this one relates to these different

10  creditors was going to be too difficult for them to do

11  because it would involve a document-document by review and

12  tag.  What Mr. Irwin proposed to me instead was that the city

13  is going through the different requests, and what it does in

14  response to a request is it says information responsive to

15  this request can be found in custodians A, B, and C, and they

16  can be located at ranges X, Y, Zed of the production.  And I

17  have talked to others, and I think I've signaled to him,

18  okay, you know, obviously you'd love as much detail as you

19  can, but we understand under the circumstances that there are

20  limits on what you can do, and so as part of this we would

21  also propose to accept that limitation as a way of minimizing

22  the burden on the city.

23          So those were the key components of what we

24  discussed, but within that framework what it means is that I

25  don't think that we need to argue our motion to compel the

```
 1    interrogatories today.  The only thing I might say was
 2    perhaps Mr. Irwin might want to step up and see if I got it
 3    about right.  Thank you, your Honor.
 4             THE COURT:  Thank you for your efforts in working
 5    through all of this.  Sir.
 6             MR. IRWIN:  Thank you, your Honor.  I think that's
 7    fair.  That's what we've discussed.  I had a lot of homework
 8    after Monday, and I've been very busy sitting down talking to
 9    Mr. Hackney and other folks trying to make sure that the city
10    can deliver to the creditors the information that they need
11    the most, and in some respects it's easier to triage or
12    create lists so that I can go back and I can make sure it's
13    in the production already, or if it's not, I can get it
14    relatively quickly, and that -- the kinds of information that
15    I think Mr. Hackney is talking about, the categories that
16    we've discussed so far, are the ones that lend themselves to
17    that sort of an exercise, data or recurring reports, things
18    like that, that, quite frankly, the city never meant to stand
19    on a January 1st, 2013, date restriction in the first place.
20    It was really for our ESI search.  So we have no problem with
21    that.  We stand ready to sit down with Mr. Hackney or anyone
22    else, deliver those information -- deliver the information or
23    point to our production in terms of where it is and move
24    forward in that regard.
25             I would also simply add that consistent with the
```

1  Court's order and expectation, we will be delivering the new

2  hard drives with the new document production from the city

3  tonight for receipt tomorrow morning, so we are, of course,

4  very sorry for the false start, but the city --

5         THE COURT:  Where do you stand in the clawback?

6         MR. IRWIN:  In --

7         THE COURT:  In getting the first hard drives back

8  from people.

9         MR. IRWIN:  Some of them are -- they've been

10  delivered to different places.  Some of them have been

11  delivered to the vendor because they were sent out by our

12  vendor directly to the objectors, so some go to the vendor,

13  some are sent to me, some are sent to my colleagues, and I

14  don't have an accurate number of that right now, but we did

15  start receiving them.  And we believe we are --

16         THE COURT:  I've seen a number of declarations on

17  the docket.

18         MR. IRWIN:  Yes, yes.  I just -- in terms of the

19  physical receipt of the actual hard drives, I don't have a

20  number for the Court right now, but I --

21         THE COURT:  Okay.

22         MR. IRWIN:  -- can provide that.

23         THE COURT:  All right.  So I think at this point I

24  should just ask whether any counsel do have any outstanding

25  requests for interrogatories or documents from the city that

1   they would like a ruling on.

2           MR. NEAL:  Good afternoon, your Honor.  Guy Neal,

3   Sidley Austin, for National Public Finance Guarantee.  No as

4   to your question, but if I may have two minutes to address a

5   discovery issue that is separate and apart from Syncora, I

6   believe many of the parties in this courtroom are having

7   productive meet and confers with Jones Day, and I'm not going

8   to belabor the record to put down everything we've discussed

9   except to state that yesterday Mr. Irwin reached out to me to

10  ask National, Assured, and Berkshire and perhaps other DWSD

11  parties and perhaps even the counties to prioritize their

12  document requests as it relates to DWSD materials.  And as to

13  the January 1, 2012, cutoff, while that was not part of our

14  discussion, there is an understanding based on your Court's

15  rulings from Monday that as to specific document requests and

16  historic financial information the city will endeavor to look

17  for those documents from the appropriate custodians, and

18  those requests may go back as far as January 1, 2009.

19          THE COURT:  Right.  Thank you.

20          MR. NEAL:  One more point, your Honor, and this may

21  be addressed later at the end of the day.  The hard drive

22  that we expect to receive, the new hard drive, tomorrow I

23  don't believe is going to have documents responsive to the

24  DWSD parties' discovery requests from three or four weeks

25  ago, so that is part of the meet and confer process to try to

1  get those documents in the door as quickly as possible to

2  review.  But even as of May 16th, which is tomorrow's date,

3  we're not going to have those documents.  I just want to make

4  that point on the record.  Thank you.

5          THE COURT:  All right.

6          MR. MARRIOTT:  Good afternoon, your Honor.  Vince

7  Marriott, EEPK and affiliates, and Mr. Irwin and I have also

8  been conferring, and I thought it would be worthwhile just to

9  give you a status on where we are.  We filed our response to

10 the objections of the city to our interrogatories.  I don't

11 know whether you have it up there or would like it.  It would

12 be easier to follow if you --

13         THE COURT:  Sure.

14         MR. MARRIOTT:  -- had this in front of you.  May I

15 approach?

16         THE COURT:  Yes.

17         MR. MARRIOTT:  I think I can relatively quickly run

18 through where I understand us to be, and Mr. Irwin can

19 correct me if I get any of this wrong.  Starting on page 2,

20 Interrogatory Number 3, our principal objection to the

21 response to Interrogatory Number 3 was that the city had made

22 reference to produced documents dealing with blight but have

23 not identified those documents.  It is my understanding that

24 when the index comes out, it will be -- the buckets that will

25 be included as part of that index will be sufficient to

1  direct us to the documents that are responsive to

2  Interrogatory Number 3. You know, if that turns out to be

3  different, we'll address it with Mr. Irwin, but that's my

4  understanding of --

5          THE COURT:  Okay.

6          MR. MARRIOTT:  -- the resolution of that.  Number --

7  Interrogatory Number 5 on page 4, I am told by Mr. Irwin that

8  the answer to Interrogatory Number 5 is contained in the

9  actual agreement or agreements memorializing the grand

10  bargain, which are either attached to the plan or will --

11  that was circulated or will be provided to us, and that's a

12  satisfactory response to that interrogatory.

13          Interrogatory Number 9 on page 8, this was asking

14  for information regarding the post-effective date governance

15  of the city. The response was too much of a moving target.

16  I agree with that response. It remains too much of a moving

17  target. I'm aware of all the legislation that's pending and

18  who knows, so that -- we're not pressing an objection to that

19  response.

20          Interrogatory Number 10 was maybe not as clear as it

21  ought to have been. I have spoken with Mr. Irwin.  What

22  we're looking for in Interrogatory Number 10 is whether there

23  is any legislation the city believes necessary from the State

24  of Michigan other than the legislation necessary to implement

25  the grand bargain. And with the question clarified in that

1  fashion, Mr. Irwin has indicated that the city will supply an

2  answer.

3          As to all other interrogatories as to which we have

4  complained about their response, Mr. Irwin indicates that the

5  city will take another stab, will review them, and if

6  satisfactory, that will be that.  If not, then we'll meet and

7  confer and maybe be back.

8          THE COURT:  Okay.

9          MR. MARRIOTT:  In terms of the document -- we also

10  filed sort of an objection to the documents that was

11  principally based upon the inability to find anything easily.

12  The index -- we'll look at the index, and hopefully that will

13  take care of that issue.  The date range issue I'm aware of

14  what Mr. Hackney and Mr. Irwin have been talking about in

15  terms of how to resolve that issue.  We think that seems like

16  a sensible path forward in terms of further discussions.

17          THE COURT:  Thank you, sir.

18          MR. MARRIOTT:  Before I -- there were, I know -- I

19  don't know whether Mr. Ramirez is on the phone for Deutsche

20  Bank, and I don't know whether Kramer wanted to speak to the

21  interrogatories that they had submitted.  I know that they

22  may have some issues as yet unresolved.

23          MR. RAMIREZ:  Good afternoon, your Honor.  This is

24  John Ramirez from Katten Muchin Rosenman, LLP, on behalf of

25  Deutsche Bank.  Just hearing what Vince -- Mr. Marriott said,

1   I'll reach out to Mr. Irwin and see if we can get ours

2   resolved.  I mean we're talking about maybe four

3   interrogatories, so I think we may be able to get them

4   resolved without having to continue with this process.  Thank

5   you, your Honor.

6           MR. WAGNER:  Your Honor, Jonathan Wager from Kramer

7   Levin representing the Dexia entities.  We had two

8   outstanding interrogatories.  I've spoken to Mr. Irwin, and

9   he tells me the responses to those interrogatories, which

10  were addressed to pension issues, will be found in Milliman

11  documents that will be produced by the city.

12          THE COURT:  All right.  Thank you.

13          MR. HACKNEY:  Your Honor, can I raise one additional

14  issue with you?  It relates to the order that we're drafting

15  for you that we'll modify according to what was discussed

16  today, but the one thing that we didn't discuss last time

17  together was the idea that what we -- what we're sort of

18  doing is we're trying to do a reboot of the document

19  production, and we're trying to do it in a way that makes it

20  more efficient for the parties to review and understand what

21  was done, but it doesn't mean we have actually resolved

22  whether or not the production was adequate, and so I had -- I

23  just put a date into the order that suggested that we would

24  all get together again on May 27th, which is two weeks from

25  last Tuesday, which is a date that's designed to allow the

1    parties to get the certification Mr. Irwin is going to give

2    us on Monday, get the hard drives tomorrow, upload them to

3    their system and have people begin to canvass them and

4    hopefully spend the next week, you know, dominating that

5    production and then leave a little time hopefully to engage

6    Mr. Irwin and then yet move quickly enough so that if we have

7    problems, we have them in front of you.  And that was my open

8    issue in terms of what should be in that order and whether

9    that was something that you thought was a good idea.

10           THE COURT:  I think I am available on that date

11   subject, of course, to us finding a courtroom, so we'll track

12   that down.

13           MR. HACKNEY:  It was just a suggestion.

14           THE COURT:  No.  It's fine.  Anyone else?

15           MR. HACKNEY:  Mr. Irwin points out to me that I,

16   number one, must be a cyborg and, number two, that I've

17   forgotten that the Monday is Memorial Day and that perhaps it

18   might be hard on people to come on Memorial Day.  The last

19   one was after Mother's Day, so we're hitting a lot of the

20   holidays here on the -- what's that?

21           MR. NEAL:  There's a hearing on Wednesday, the 28th.

22           THE COURT:  Would you prefer the 28th, Wednesday?

23           MR. NEAL:  We have a hearing -- your Honor, Guy

24   Neal.  There's a hearing scheduled for that date as it

25   relates to the fee examiner motion on water, sewer issues at

1   10 a.m.

2          MR. HACKNEY:  Perhaps that's --

3          THE COURT:  All right.  So we'll be here then

4   anyway, and we know we have a courtroom, right, Chris?  All

5   right.  So let's shoot for that date then.  All right.  If

6   there are no other discovery matters, let's turn our

7   attention to a status conference more generally with regard

8   to plan confirmation.  I have an agenda, but I'm perfectly

9   willing to defer to others first.

10         MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper

11  Hamilton, on behalf of the city.  I had four items I'd like

12  to bring up to the Court and see if we can get some

13  resolution on, and I felt that the status conference was the

14  appropriate forum to do it at.  May I approach the bench,

15  your Honor?

16         THE COURT:  Yes.

17         MR. HERTZBERG:  As the Court knows, we're in the

18  middle of the discovery process, and the depositions are

19  about ready to commence.  If you look at the deposition

20  witnesses that were filed, all the lists that came in this

21  week, on the list you'll see -- and I'm going to give the

22  Court some numbers, and if you look at the chart I had passed

23  up to you just now, there is 196 witnesses identified, and

24  the ones that are in the blacklined area are the ones that

25  are --

1       THE COURT:  Now, you said deposition witnesses.  You

2  meant trial witnesses.

3       MR. HERTZBERG:  These are witnesses that were

4  listed, yes, trial witnesses, will call or may call.  If you

5  look at the list, in the darkened area, shaded area, is the

6  city's witnesses.  Of 196 witnesses now listed, 30 are listed

7  by the city.

8       THE COURT:  And these don't include experts; right?

9       MR. HERTZBERG:  That's what I was just going to add.

10  These do not include experts or rebuttal experts, and --

11       THE COURT:  The answer is no.

12       MR. HERTZBERG:  Answer on what?

13       THE COURT:  Calling 196 witnesses plus experts.

14       MR. HERTZBERG:  Well, that's what we're going to get

15  to.  I knew the Court was going to say that, so I've got the

16  perfect solution for the Court.  If the Court would give me a

17  second, I'll walk the Court through it, but I want to give

18  you some more figures just so you can get a real flavor for

19  what's going on here.  Local AFSCME -- remember national

20  AFSCME has settled out.  Local has listed 23 witnesses on

21  their witness list.  Ambac listed 28 witnesses.  DPOA, 12.

22  36th District Court, the officers, 16 witnesses.  Oakland

23  County, 48 witnesses.  Yes, I did say 48 witnesses they've

24  listed on the sewer issue.  David Sole, 14 witnesses.

25  Syncora, 37 witnesses.  Wayne County, 15 witnesses.  That's

1    just giving you a flavor.  You can go through my chart at

2    your leisure, but that's what we're seeing has been listed in

3    the witness list.  As you indicated, the parties have yet to

4    name rebuttal or experts or rebuttal experts.  Several

5    witnesses appear on several different witness lists.  Just

6    for example purposes, Mr. Orr, Mr. Buckfire, Mr. Malhotra,

7    several other of the city witnesses.  The rule is clear that

8    they should be given one day, seven hours, under 30(d) to

9    take the deposition of the witnesses.  And I'd suggest to the

10   Court it's also clear that they can't call them on several

11   occasions.  Each one who listed them doesn't get seven hours.

12   It's one day, seven hours.  And as a side note to the Court,

13   they've all been deposed, these lead witnesses of the city,

14   Mr. Orr and Mr. Malhotra and Mr. Buckfire, et cetera, on

15   numerous occasions.  Everyone knows what they're going to

16   testify to.  Everyone has sat through those depositions.

17          THE COURT:  You know, you said that before, Mr.

18   Hertzberg, and I have to say I have a hard time accepting

19   that because while we know what they said before, we don't

20   know what they're going to say at the trial on plan

21   confirmation.  The issues are different.

22          MR. HERTZBERG:  They're different, but many of the

23   issues have been discussed during the depositions, but that's

24   fine, your Honor.  I'll accept that as so.

25          THE COURT:  Okay.

1     MR. HERTZBERG:  But they're still entitled to one

2   day, seven hours, and they can't combine it.  If ten people

3   have listed it doesn't mean that Mr. Orr, for example, should

4   have to sit for ten days.  He sits one day, seven hours, and

5   we'll make him available for that.  We should do like we did

6   in the eligibility trial, have a lead counsel or a lead

7   questioner put in place with the other parties to fill in

8   where needed.  That way the depositions have some control

9   over them during the process.

10     I also have another suggestion to the Court.  Just

11  as the Court said we are not having 196 witnesses -- and by

12  the way, by the time we get done it's probably going to grow

13  to 230 or 240 -- I suggest to the Court that the Court should

14  limit each objecting party to three witnesses.  There's no

15  reason the city should be put in the burden, the cost, the

16  time, et cetera, to have to depose 160 witnesses plus the

17  experts and rebuttal experts.

18     THE COURT:  Why three?

19     MR. HERTZBERG:  Because I think it's a fair number.

20  The city has the burden on feasibility, and I can hear the

21  thundering herd behind me coming up to the podium saying this

22  is outrageous, how could he suggest this, we have rights, we

23  have a right to object, we have the right to call the

24  witnesses, this Court doesn't have the authority to do it.

25  The court has the absolute authority to limit the witnesses,

1  and the reason it's three, it's more than adequate to make

2  their case because remember they're going to cross-examine

3  our 30 witnesses we put on, so they're going to have the

4  right to bring their three witnesses forward to the Court to

5  make their case.  That's more than enough witnesses.  There's

6  no reason we should have the amount of witnesses they want

7  because otherwise, to be real frank with the Court, we'll be

8  here for two years trying this case if they get what they

9  want.  Doesn't make sense.  The Court has the right to

10  control its docket.  I'm asking the Court to limit it to

11  three, which I think is more than reasonable.

12      Next, we have the 30(b)(6) deposition notices.  We

13  received three of them.  The rule is not clear, and I suggest

14  to the Court because I recently had this issue in another

15  case on whether the witness has to appear twice if it's a

16  witness who's going to testify to a 30(b)(6) issue and then

17  also be a witness subject to another deposition.  I'm asking

18  the Court to make it clear now --

19      THE COURT:  I'm sorry.  What's the ambiguity there?

20      MR. HERTZBERG:  Well, there is no -- I don't know if

21  there's an ambiguity.  What I'm asking the Court is to make

22  the following ruling.  They've served 30(b)(6) notices on us,

23  three of them.  We have to identify the witnesses that are

24  going to address specific issues, which we stand prepared to

25  do.  For example, if Mr. Orr is going to address "X" issue

1    and Mr. Buckfire is going to address "Y" issue, there's no

2    reason that either of them should have to come to a 30(b)(6)

3    deposition, testify, and then a week later, two weeks later,

4    three weeks later appear before the same parties for another

5    seven-hour deposition.  They should be combined.  I suggest

6    to the Court, having dealt with this issue in a case

7    recently, case law supports that approach.  One appearance,

8    not two because of the 30(b)(6).  We will identify the

9    witness for the issue, but they should only appear once for

10   one deposition, seven hours, as required by the rules.

11        We will have some issues, just so the Court is

12   aware, but we will bring them through the procedure of a

13   protective order on some of the 30(b)(6) requests.  Just to

14   give you a couple examples of the kind of stuff that was put

15   in the 30(b)(6) requests, Syncora, number one, asked for,

16   quote, "the historical causes of the city's financial

17   instability and bankruptcy filing."  Oakland County in Number

18   15 of their 30(b)(6) wants, quote, "the identity, location,

19   financial position of the city retirees."  I can go on, but

20   I'm not going to burden the Court today.  I'm just

21   highlighting these so that you know we're coming with this.

22   We're going to ask for a protective order because some of

23   these are just too far afield and shouldn't be allowed.

24        So, in summary, as to the first issue -- and I guess

25   I combined two of them, the 30(b)(6) and the limiting of the

 1   time and the witnesses -- we're also going to ask for a third
 2   thing as part of that first request.  Right now I believe
 3   it's June 27th is the date for fact witness discovery to be
 4   completed.  I don't think it's reasonable even when the Court
 5   limits each party, as I suggested, to three witnesses.  What
 6   I think would make more sense and I'm suggesting to the Court
 7   is -- and I assume the parties will support this -- is that
 8   we move that date -- not move any of the other dates but move
 9   that date out to July 15th.  Makes more sense.  We're right
10   in the throes right now of the document discovery and the
11   interrogatories being responded to.  Parties are going to
12   need time to depose witnesses.  Otherwise what's going to
13   happen is not just to the city but to the objectors, we're
14   going to be in a situation where we're all going to have to
15   put together six teams of litigators in order to schedule six
16   different depositions each day at different locations with
17   different teams handling it.  That doesn't make a lot of
18   sense.  In order to do it more efficiently, to grab off
19   another 15 days or so I think makes a lot of sense, so just
20   in summary on point one, and then I can move on to point two
21   and three unless the Court wants to address that first, one
22   witness for the 30(b)(6), if it's the same witness, only
23   appear once, seven hours, one day, have a lead questioner
24   appointed to handle it and let the others fill in as needed,
25   extend the date to July 15th and limit each of the objectors

1   to three witnesses, your Honor.  Would you like me to address

2   the other issues I have?  Okay.

3            We're about -- I think about two months now from the

4   actual starting of the trial.  City has been thinking long

5   and hard about what it wants to present to the Court and how

6   it wants to present its evidence to the Court.  And as we

7   discussed it, we think -- how are we going to educate the

8   Court to our case, a lot of issues involving blight, what's

9   going to be done with the city, the M-1 rail, how are the

10  neighborhoods, what's going on with the midtown area, the

11  downtown area.  And we can get up, and we can have witnesses

12  testify to it, but I thought a good approach might be -- and

13  I suggest to the Court and I would hope the Court would go

14  along with it -- is to go on a bus tour with us, and we can

15  set up a situation where we can have representatives of the

16  different parties and the Court's experts on the bus.  We

17  could figure out the logistics later.  But I think it's

18  important for the Court to come out with us as part of our

19  case to see what's going on in the city.  We can get up here

20  and have a witness, for example, testify to the Court that

21  we're going to run the M-1 rail from midtown to downtown and

22  what impact it's going to have and where the stadium that's

23  proposed to be built is going to sit, but unless the Court

24  sees that, I don't believe the Court is going to get a full

25  understanding of what's going on in the city.  By actually

1   getting out on a bus and driving that -- because I did it the
2   other day.  I happened to be with Mr. Shumaker and Mr. Moss,
3   and I said, "I want to show you what's going to go on, and I
4   want to show you the M-1 route so that you can understand
5   it."  And we went up and down that, and I pointed out the
6   different highlights, the new stuff that's going on, how it
7   will impact the city, what's going on in the neighborhoods,
8   the blight and the blight removal, how that will impact the
9   schools, et cetera, so my feeling is -- and I hope the Court
10  would go along with this -- is that we could do a city tour
11  as the opening part of our case for the Court to really get
12  an understanding of what I refer to as the good, the bad, and
13  the ugly, but there's a lot of hope out here for the city,
14  and the Court will be able to see that so that when the
15  witnesses get on that stand, the judge -- you, as the judge,
16  will say, "I've seen that.  I've got a better idea now what
17  they're talking about."  So that was my second request.
18          My third request and final request is that we be
19  allowed to amend our witness list, and you're going to say,
20  "You just told me how you had 196 witnesses."  We want to add
21  two, one the Court suggested, the first one being a member of
22  the City Council.  We want to be able to amend -- no
23  depositions have started.  The Court suggested -- and we've
24  taken the Court's suggestion to heart.  We'd like to amend
25  our list and add a member of the City Council to testify.

1        THE COURT:  I made that suggestion before the

2   deadline --

3        MR. HERTZBERG:  Well, maybe we'll withdraw that.

4        UNIDENTIFIED SPEAKER:  Fire drill.

5        THE COURT:  Hum?

6        UNIDENTIFIED SPEAKER:  Fire drill.

7        THE COURT:  Fire drill?

8        UNIDENTIFIED SPEAKER:  Yeah.

9        THE COURT:  All right.  We're going to be in recess.

10       (Recess at 3:18 p.m., until 4:20 p.m.)

11       THE CLERK:  All rise.  Court is in session.  Please

12   be seated.  Recalling Case Number 13-53846, City of Detroit,

13   Michigan.

14       MR. HERTZBERG:  Your Honor, Robert Hertzberg on

15   behalf of the city.  I think we were at the point in time

16   when the alarm went off, and I could only suspect who pulled

17   that on me, but you had asked me the question why, I think --

18   you were just starting to ask why we hadn't amended earlier

19   when you had suggested the City Council person, and I was

20   about ready to respond, and I was going to tell the Court the

21   following.  Immediately after you made the suggestion, we've

22   been in touch with City Council.  Myself and a couple people

23   from Jones Day have had several conversations with Brenda

24   Jones, the president of City Council.  We're in discussions

25   on whether they will appear as a witness, and I think because

1   of that, I wasn't about ready to come before the Court and
2   commit that we were going to add a witness till I got a sense
3   that I thought that they were willing to do it.  I'm not sure
4   a hundred percent yet, but I thought because the Court has
5   set periodic status conferences that it's more or less open
6   mike to tell the Court our thoughts on where we're at and
7   what we think should be going on within the case, and that
8   was the purpose of it, deal with discovery issues, witness
9   issues and stuff, and let the Court know our thinking.  I
10  thought it was appropriate at this time because we don't have
11  another one for awhile to let the Court know that we will
12  probably be amending our witness list to add a member of City
13  Council, most likely Brenda Jones possibly, and one other
14  witness.  The city has recently hired an IT person, Beth
15  Niblock, I believe it is, who's a new hire of the city to
16  head up the IT Department, and we want to add her to testify
17  to the systems, the improvements needed, and the cost.  I
18  preface it once again by two things, one, that the
19  depositions have not started at this point in time -- we're
20  just in the document and interrogatory process -- and,
21  second, I understand that I stood up before the Court and
22  said, "Guess what?  There's so many witnesses," and then out
23  of the next breath I take I tell the Court I wanted to add
24  two, but as the Court is aware, we have the burden in this
25  case to prove that our plan is feasible and all the other

1    requirements of the Bankruptcy Code.  Because of that, when

2    we had a new hire in the IT Department, which is a critical

3    piece of our plan, I thought it was necessary to come before

4    the Court when we had the opportunity today to notify the

5    Court of that.  Does the Court have any questions on the

6    three asks that I made of the Court?

7                THE COURT:  No.

8                MR. HERTZBERG:  Thank you.

9                THE COURT:  Thank you.

10               MR. NEAL:  Good afternoon again, your Honor.  Guy

11   Neal, Sidley Austin, National Public Finance Guarantee.  To

12   say that the objecting parties were surprised by

13   Mr. Hertzberg's request to make a series of adjustments,

14   modifications, procedural and substantive limitations to the

15   discovery process and the scheduling order, that would be an

16   understatement.  We were going to ask for a brief recess,

17   and, thank you, we had a brief recess and had time to confer.

18   I hope you were warm, your Honor, and in a place where there

19   were not 40-mile-an-hour winds.  But back to the request, to

20   say that we were surprised is genuine because each one of us

21   has had separate meet and confers on a variety of discovery

22   matters, and at four o'clock today it's the first we heard of

23   any of these procedural and substantive modifications.

24               We would submit that the process -- if the meet and

25   confer process is to mean anything, we should meet and confer

1    over this process, perhaps work on a pretrial order or an

2    amendment to the existing scheduling order, which I'll get to

3    in a second, to talk about these matters.  In the absence of

4    that, your Honor, we can, as objecting parties, as discovery

5    parties, put together I think perhaps even a combined

6    response to this in writing, and perhaps this matter can be

7    set for a hearing next week or the debtor can proceed in

8    writing with its request, which is probably the better

9    procedural way to proceed.  It could be heard on an expedited

10   basis.  We can get a response on an expedited basis.  And,

11   again, I will represent to the Court I will endeavor to get

12   everyone on the objecting side on the phone so we can get you

13   a combined response that we can lay out for you next week,

14   but I can give you the short form version right now in about

15   five minutes.  What we have heard over today and what we've

16   heard over the past 72 hours is a couple things.  One, the

17   city cannot meet, did not meet its May 6 discovery production

18   deadline.  As to water and sewer, as I said earlier, I won't

19   repeat, they have not searched for nor have produced nor will

20   produce water, sewer-related documents by May 6 or by

21   tomorrow.  Again, I believe they searched one custodian,

22   produced 50 documents.  We've heard now that the city cannot

23   meet the June 27th fact witness discovery cutoff, which means

24   they cannot meet the expert report deadline, which is June

25   24.  Now, granted, that's three days before that cutoff, but

1   the idea was that the bulk of fact discovery would be

2   completed before experts can prepare their reports.  Expert

3   reports are based on the facts and the fact depositions.  So

4   a three-week -- two- to three-week delay in documents, a

5   three-week delay in the fact discovery cutoff, that's five to

6   six weeks.  To the extent all dates are adjusted -- I don't

7   speak for everyone here, but to the extent dates are

8   adjusted, all dates should get bumped out five to six weeks

9   to make this accommodation.

10          It's important to stress -- and I've been trying to

11  stress it at least as of Monday -- that water, sewer and COPs

12  and Syncora -- I'm not sure what to call you other than

13  Syncora -- are very, very different.  Water, sewer, $6

14  billion worth of bonds.  You've got U.S. Bank as indenture

15  trustee.  You have three bond insurance companies.  You have

16  ad hoc committee of DWSD bondholders.  And you can include,

17  although in the courtroom today we have Oakland, Macomb, and

18  Wayne Counties -- they have very specific water, sewer

19  issues.  They are related to our issues, the health, the

20  viability of these systems.  We have an economic interest.

21  They have a political interest.  They, too, have an economic

22  interest in the viability of these systems.  City proposes

23  drastic changes in their plan to the bonds and to the systems

24  stripping liens, lowering interest rates, subordinating debt.

25  My issues -- I said this on Monday, but it bears repeating --

do not overlap perhaps even in the slightest with
Mr. Hackney, with Mr. Marriott, half with Mr. Perez because
he has a foot in both camps, but, again, I don't care about
grand bargain. I don't care about DIA. I don't think the
other DWSD parties care about that as it relates to their
economic interest. I don't speak for them on that. I am
making this point just to underscore that what Mr. Hertzberg
said about limiting hours of depositions, limiting the number
of depositions and witnesses is entirely unworkable.
Mr. Hackney and his colleagues have questions -- legitimate
questions for Mr. Buckfire, for Mr. Malhotra, for Mr. Moore
and for Mr. Orr entirely unrelated to water, sewer and vice
versa. We cannot be expected, again, with my side having $6
billion at issue, to divide a seven-hour day and only to be
able to call a witness once. We are happy to work together.
We've worked together very well across the board. And I
don't think anyone here has an objection to the lead
questioner. That's how it's proceeded in every deposition,
to my knowledge, both in eligibility and swaps. No one wants
to plow the same row over and over again, but these various
limitations, the one day, seven hour, cannot call twice, the
30(b)(6), witness can only appear either for a fact witness
or for a 30(b)(6), never the two shall meet, that does not
work. As to limiting the number of witnesses, I'm not rising
to speak to that. I have one. My list has one fact witness,

 1   so that is not a battle that I am prepared to fight.  Others
 2   may have issues with that.  So I know Mr. Hackney has some
 3   words to say, perhaps others as well.  To repeat, this should
 4   be the subject of a meet and confer.  Absent that, the
 5   motions practice with the city filing the motion, endeavor to
 6   get a response within 36 hours from the objecting parties,
 7   and we can have a hearing on these modifications, but what
 8   we're hearing from the city is they can't meet these
 9   deadlines.  The deadlines were tight to begin with, so if
10   dates need to move out two to three weeks on document
11   production and three weeks on facts, five- to six-week bump-
12   out of all dates.  Thank you.
13           MR. HACKNEY:  I'll try to be brief and add to what
14   Mr. Neal said rather than repeat it, your Honor, and first
15   I'll apologize for pulling the fire alarm.  I was getting
16   tired of sitting next to Mr. Neal, but I -- you know, all
17   levity aside, I'm going to check my frustration a little bit
18   at the way the city has proceeded here at the pretrial
19   conference.  The issue -- there are issues that we have to
20   figure out for you and amongst each other in order to bring
21   order out of chaos with respect to all of these different
22   witnesses and getting the testimony, integrating it with the
23   document review.  There's a lot that we have to do, but, your
24   Honor, this is too complex a process to proceed by springing
25   things as substantive as you can only have three witnesses at

1   a trial when you are people that relate to a billion four in

2   debt that's proposed to be nearly wiped out or we will under

3   no circumstances give you more than seven hours with any

4   witness.  You know, that's not the tone of practicality that

5   will allow us to see our way through this, and so what I

6   would suggest that we might be able to accomplish today, your

7   Honor, is more modest, which is I think that we can work with

8   liaison counsel to serve as representative of --

9   representatives of creditor groups as a means of simplifying

10  for the city who it needs to talk to and putting some burden

11  on the creditors, for example, to go back and coordinate with

12  their creditor classes and speak as a unified voice.  And so

13  I will tell you that we did a lot of that in connection with

14  the swaps trial, and Mr. Neal is right.  We did well at it,

15  frankly, and I'm offering to do it again.  I have no pride of

16  authorship as to whether it's me or Mr. Perez or Mr.

17  Marriott, but we can figure out who it is.  And Mr. Neal has

18  been serving in a de facto position with the DWSD, and so the

19  idea of having a liaison counsel or even like at a deposition

20  having a lead questioner model is the type of thing that is

21  and can be efficient, but the city needs to work more

22  proactively with us in order to thresh out some of these

23  issues rather than coming into court hoping to catch us by

24  surprise and see if they can get you to rule at the outset of

25  a case where we haven't even gotten the documents about how

1   many witnesses we're going to get to have at trial.  That's

2   something that I think breeds a sense of unfairness, and so I

3   think we need to proceed more cautiously and force people to

4   try and collaborate and meet and confer and use the liaison

5   counsel to do that.

6            The one extra thing that I wanted to say, your

7   Honor, is that there is a certain irony, which is that when

8   there is a tight schedule, one of the things that becomes

9   very important is coordination, but sometimes you almost need

10  a little time to get coordinated because I think what you're

11  seeing with a lot of the witness lists are a lot of defensive

12  lawyering by people because they're being -- they're doing

13  the witness list at the outset before they have the

14  documents, and so they're saying, "I don't want to be

15  precluded from calling a witness later, but I don't know what

16  they're going to testify to, so I'm going to put people on my

17  list."  Syncora is not going to call 37 witnesses at trial,

18  and those witnesses are may call witnesses, so this is an

19  effort to put out to the city these are the types of people

20  that we think may have discoverable information and of whom

21  we may seek to take depositions.  What Mr. Hertzberg didn't

22  mention to you is that many of the people on our witness list

23  are under his control.  There's only one Syncora witness on

24  the Syncora witness list, so this was a way to articulate a

25  number of different people that may be people that have

1  relevant information outside of the city's list.  Threshing

2  out who the key players are, who needs to be deposed, whose

3  depositions ought to go in excess of seven hours, so on and

4  so forth, is something that's going to take the parties

5  working together and time to try and narrow the number of

6  disputes.  That's all.

7          THE COURT:  Well, you didn't win the prize for

8  naming the most witnesses.

9          MR. HACKNEY:  I told --

10          THE COURT:  That honor goes to Mr. Fischer.

11          MR. HACKNEY:  I told Mr. Heiman that we were

12  appropriately disappointed that we hadn't won that one, but,

13  for example, we put -- I'll give you an example.  We put, I

14  believe, all of the City Council members, the present City

15  Council members, on our witness list.  I don't think that we

16  will take all of their depositions.  It's possible we could.

17  We put that on there defensively because we're not sure how

18  the post-emergence enforcement mechanisms are going to play

19  out, so that's just an example where that's probably six

20  names, your Honor, but I don't think it'll be six witnesses

21  at trial, and I don't think it'll be six depositions.  But I

22  also don't think it was a bad idea for me to put those on as

23  may call witnesses.  I don't know how -- I mean I could have

24  just left them off, but then we'd still be trying to suss out

25  which of them we should notice and take their deposition, so

1  you end up in the same place, and it will ultimately be a

2  practical place that's driven by the evidence at trial and

3  what you need to make your case, so I would propose, your

4  Honor, that we be less audacious than trying to decide if the

5  Court is going to take a bus tour as part of the trial or,

6  you know, how many witnesses exactly Syncora is going to get.

7  We're going to decide that today. Rather, maybe we take a

8  step back and say let's get some liaison counsel set up on

9  behalf of the creditor constituencies. Let's have the city

10 put somebody out front that understands that we have to be

11 pragmatic and work together to get through this, and then

12 let's develop an understanding of what the schedule should be

13 going forward. Thank you, your Honor.

14       MR. FISCHER: Good afternoon, your Honor. Joe

15 Fischer from Carson Fischer on behalf of Oakland County

16 together with Jaye Quadrozzi.

17       THE COURT: Forty-five witnesses?

18       MR. FISCHER: He said 48. May I respond?

19       THE COURT: It's outrageous, Mr. Fischer.

20       MR. FISCHER: No. I think --

21       THE COURT: You should be ashamed of yourself.

22       MR. FISCHER: Respectfully --

23       THE COURT: It's bizarre. It undermines your

24 credibility, which was otherwise unimpeachable before this

25 Court before this, and I won't tolerate it. You're not going

1   to call that number of witnesses.

2           MR. FISCHER:  And we don't --

3           THE COURT:  You're just not.

4           MR. FISCHER:  No.  And we don't intend on doing so.

5           THE COURT:  Then why did you list them?

6           MR. FISCHER:  Your Honor, I think that Mr. Hackney

7   really sort of hit upon it, and that is we had not had the

8   benefit of discovery.  It was more of a defensive move in

9   order to make sure that we complied with your Honor's

10  timeline, and I will indicate to the Court --

11          THE COURT:  It wasn't an attempt on your part to

12  intimidate this Court and the debtor?

13          MR. FISCHER:  I have never tried to intimidate this

14  Court, and I'll stand on my record with that.  And as far as

15  this debtor is concerned --

16          THE COURT:  Well, then I invite you to file an

17  amended witness list by tomorrow.

18          MR. FISCHER:  Your Honor, we'll make a good faith

19  effort at doing so, but may I --

20          THE COURT:  You'll do it.

21          MR. FISCHER:  Of course we will.  Your Honor asked

22  for it.  We will do it.  I'm accepting --

23          THE COURT:  Now, what do you want to say?

24          MR. FISCHER:  Well, I'd like to defer to Ms.

25  Quadrozzi, but I think it has a lot to do with the discovery

1    issues.  And before I leave the lectern, your Honor, we were

2    not trying to be disrespectful of the Court.

3         MS. QUADROZZI:  Your Honor, I just have one brief

4    point that is in addition and not over the top because I do

5    share in the comments that have been made by fellow counsel,

6    but with respect to an effort to attempt to streamline, prior

7    to serving our 30(b)(6) notice, I actually reached out to Mr.

8    Irwin, got an e-mail back from him, but did not have a

9    chance -- we did not connect.  I now hear in front of you

10   this morning that -- or this afternoon -- excuse me -- that

11   they are intending to file a motion for a protective order.

12   In addition to my reach-out before I served my request, my

13   30(b)(6) notice, I reached out again and said, "Please talk

14   to me about this.  Let me know who you're going to call."

15   Second time, third time.  I haven't gotten any response, so

16   it's difficult for me to think that they are going to come

17   here and suggest that my 30(b)(6) categories are out of

18   bounds without first reaching out and talking to me because

19   certainly the one illustration that they gave your Honor

20   today, to the extent that they misunderstood it -- and it

21   sounds like they might have -- I'd be happy to talk with them

22   about narrowing it specifically.  We certainly are not in a

23   situation where we want to waste any time.  I will note that

24   we were not in the eligibility hearing, so we haven't taken

25   any depositions.  We haven't examined any witnesses.  We

1  certainly will attempt to get those transcripts, avoid
2  duplication, and work with counsel, but it's got to be a two-
3  way street, your Honor.  Thank you.
4        THE COURT:  All right.  Well, let me just ask before
5  any further comments by counsel, I like the idea of a
6  committee that I'm going to call arbitrarily the discovery
7  and trial efficiency committee to carry out the functions
8  that Mr. Hackney has identified here on the condition that
9  there will be a prompt convening of this committee and a
10  resolution of your issues to the extent you can and a
11  presentation to me of the issues to the extent you can't.
12  I'm actually thinking of a date late next week.  Anybody
13  object to this?  Can I leave it --
14        MR. HERTZBERG:  I don't object at all.  I'm just not
15  around next week, but someone else can convene it.
16        THE COURT:  Well, I'm going to let you all pick your
17  representatives, however many you want, and you all pick your
18  representatives, however many you want, but don't make it so
19  large that it doesn't function on both sides.  All right.
20  I'll so order that.  Now, given that, I'm willing to consider
21  any other comments anyone would like to make, and then I have
22  an additional agenda.
23        MR. BRATER:  Thank you, your Honor.  Randy Brater on
24  behalf of Ambac.  The only thing I would note is that Ambac's
25  witness list had a number of people on it, but it was

1  identical to the city's witness list, and for the reasons

2  identified by Mr. Neal and Mr. Hackney, we just -- that list

3  is pretty general at this point without discovery. And, you

4  know, once we take depositions, et cetera, we'll be able to

5  hopefully narrow that, but we didn't want to be limited to

6  simply how and why the city was calling their witnesses.

7           I just wanted -- and I apologize for somewhat

8  backtracking, but I needed to confirm with Mr. Irwin that

9  with respect to the discovery, Ambac also entered into an

10  agreement with the city in terms of discovery that somewhat

11  modified the Court's order on Monday. All the issues we

12  talked about earlier we had a very -- we had a similar

13  agreement with the city.

14           THE COURT:  Okay.

15           MR. BRATER:  But I'll just note that with respect to

16  the city's interrogatories to Ambac, we agreed that they

17  would respond to Interrogatory Number 11 that dealt with

18  administrative claims. And for Ambac's responsibilities, we

19  would provide one document to the city in response to Request

20  Number 30 but that we would have no further obligation with

21  respect to Request Number 4, 6, 14, and 37. We have an e-

22  mail with Mr. Irwin that lays all this out. I just wanted to

23  put it on the record so we didn't have to deal with any more

24  paper. Thank you.

25           THE COURT:  Thank you, sir.

1         MR. IRWIN:  That is consistent with the city's

2  understanding, your Honor.

3         THE COURT:  Okay.

4         MR. KOHN:  Your Honor, Samuel Kohn, Chadbourne &

5  Parke, on behalf of Assured Guaranty.  Mr. Neal said

6  everything that we needed to say about DWSD.  Just as a

7  clarification, your Honor, about this committee, I just want

8  to point out one issue as an example that could come back to

9  your Honor.

10         THE COURT:  Um-hmm.

11         MR. KOHN:  Because they're interested in moving the

12  deadline for fact discovery from June 27th until July 15th,

13  before that there was a -- Number 18 in the fourth amended

14  order was the deadline that parties would timely file a

15  supplemental objection as a result of discovery.  In other

16  words, based on fact discovery, creditors had three weeks --

17  close to three weeks to prepare those supplemental

18  objections, your Honor.

19         THE COURT:  I know.

20         MR. KOHN:  And the second thing that I just wanted

21  to say is that, you know, we were all working together until

22  right before the alarm with Mr. Irwin on meet and confers and

23  documents even though Mr. Irwin told us that with respect to

24  the DWSD specific documents, he thinks that it could be two

25  to three weeks or at least that, so we were still working

1   very consensually with them, and then we were just outright
2   outraged. I know your Honor used that word, but I don't want
3   to reuse it. That's all I wanted to say. Thank you, your
4   Honor.

5          THE COURT: All right. Mr. Irwin, is that true?
6          MR. IRWIN: This has been mentioned several times
7   that the city only searched one custodian for DWSD records.
8   That is not -- it is true in the sense that there was an
9   individual at DWSD through whom all of our inquiries went and
10  on whom we relied to collect the documents that we produced.
11  Yes, we had to claw the production back, and it's going out
12  again, but there are many DWSD documents in our production.
13  We do need to go back and do more work in this regard. That
14  is absolutely true, but in part it turns on the ruling from
15  Monday and our objection that was overruled as to the DWSD
16  transaction, and so that reset the clock for us a little bit,
17  and that's part of what we have offered to go back and do and
18  work collaboratively with the DWSD bondholders and the
19  counties to go back and make sure that we get that right.
20  And part of my offer to them, which they have taken me up on,
21  to send me a prioritized list of documents or reports or data
22  that they would like right away, which, again, I have
23  committed to do for them as with everyone else, to produce on
24  a much faster track, how long it will take to search all the
25  custodians -- and I've been provided with custodians that are

1   numerous that I think we're going to have to work through.  I

2   can't -- well, I can do anything given enough time and space,

3   but the requests are a dozen, more than a dozen, 20 people to

4   drain their computers and search all of their e-mail at DWSD.

5   I would submit that the better way to proceed is for us to

6   try to narrow those issues, and that's going to drive the

7   time on all that.

8           THE COURT:  All right.  Thank you, sir.

9           MR. MONTGOMERY:  Your Honor, Claude Montgomery for

10  the Retiree Committee.  Just two -- one observation and one

11  question for the Court.  The observation is, as you know, we

12  are hoping very much that we're going to be on the city's

13  side in the confirmation process, and so I would ask the

14  Court to ask the debtor to invite us into their side for

15  purposes of this conversation, although we may -- if the

16  state doesn't do what we're hoping it's going to do, we may

17  end up on the other side.

18          The second question, though, is perhaps more

19  serious, your Honor, which is --

20          THE COURT:  What's your prediction?

21          MR. MONTGOMERY:  I'm a bad gambler, your Honor.

22          THE COURT:  Strike that question.

23          MR. MONTGOMERY:  I'm a bad gambler.  The second

24  question is whether or not either the city or the Court has

25  had any opportunity to think what it's going to do with the

1  individual objectors, particularly those who are in our
2  constituency as retirees who appear to be opposing our
3  approach to the plan and how you're going to handle that.  We
4  would ask that consideration of that be part of this meet and
5  confer process because although I haven't kept a tally, there
6  appear to be a number of individual objections that have been
7  filed.

8        THE COURT:  Um-hmm, yes.  I think at this point we
9  have over 200, maybe even over 300 at this point, objections
10  to confirmation from individual creditors.  Now, I don't know
11  if they're all retirees or not, but my thought there,
12  although it hasn't been fully crystallized, was to give them
13  the same kind of opportunity to present their objection to
14  the Court in court as we did for eligibility, although
15  because of the numbers, I may have to limit the invitation
16  somehow.

17        MR. MONTGOMERY:  Your Honor, I think that's a good
18  idea, and I would suggest that you instruct the debtor and
19  the other parties to just sort of think about how that might
20  be effectively used as part of a total record on
21  confirmation.  Thank you.

22        THE COURT:  Okay.

23        MR. PEREZ:  Your Honor, this is Alfredo Perez on
24  behalf of FGIC.  This is a mundane matter, but in the fourth
25  amended, there is a May 26 deadline for a couple of things,

1  and that's Memorial Day.  I just want to either move it to

2  the 27th or -- so just that everybody is on the same page.

3          THE COURT:  I think that's automatic as a matter of

4  law anyway, but sure.

5          MR. PEREZ:  Okay.

6          THE COURT:  Yeah.  Okay.  All right.  What I want to

7  do, frankly, at this point is take a ten-minute recess and

8  ask you on each side to convene and nominate your selections

9  for this committee because I want to work with them on how

10  this is going to play out after that.  Any objections?  All

11  right.  We'll reconvene at five o'clock.

12          THE CLERK:  All rise.  Court is in recess.

13      (Recess at 4:49 p.m., until 5:01 p.m.)

14          THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Calling Case Number 13-53846, City of Detroit,

16  Michigan.

17          MR. CULLEN:  Your Honor, we've discussed within

18  ourselves and with the other side briefly over the break -- I

19  think it is our predisposition -- and neither of them are

20  here and know they're taking the black marble on this, but

21  we're going to make our team on this a combination of either

22  Mr. Shumaker or Mr. Stewart and Mr. Irwin.  We figured it

23  would be best to focus the responsibility in that way, and

24  I'm going to -- as soon as I can get them in person. I'll

25  figure out which one of those two will be part of that team

1    if that's okay with the Court.

2            THE COURT:  That's fine.  Would you let us know?

3    And would you please put your appearance on the record,

4    please?

5            MR. CULLEN:  Oh, I'm sorry.  May it please the

6    Court, Thomas Cullen of Jones Day on behalf of the city.

7    Sorry, your Honor.

8            MR. NEAL:  Good afternoon again, your Honor.  Guy

9    Neal, Sidley Austin, National Public Finance Guarantee.  As

10   for the DWSD parties not including the counties, there'd be

11   three representatives, myself, Guy Neal, for National, and

12   then Bob or Robert Schwinger for Assured Guaranty and Paul

13   Davidson for U.S. Bank as indenture trustee who would be

14   representing -- well, as indenture trustee.

15           MR. HACKNEY:  Sorry, your Honor.  Stephen Hackney on

16   behalf of Syncora.  Your Honor, we've conferred, and for the

17   COPs and the LTGO creditors, we would propose four

18   representatives, which are myself, Mr. Perez, Mr. Marriott,

19   and Mr. Randy Brater of the Arent Fox firm.  He spoke earlier

20   today.  And then --

21           THE COURT:  What was that last name, sir?

22           MR. HACKNEY:  It was Brater; right?

23           MR. BRATER:  Brater, B-r-a-t-e-r.

24           THE COURT:  Thank you.

25           MR. HACKNEY:  And, your Honor, Ms. Patek, who

1    represents some of the police and fire unions, mentioned to

2    me that she will be objecting and would appreciate it if she

3    could have almost like a ghosting role in terms of kind of

4    being made aware of the issues that are -- she doesn't fit

5    squarely within some of the --

6              THE COURT:  Yeah.  Okay.

7              MR. HACKNEY:  -- groups we talked about.  The only

8    thing I was going to ask your Honor is I think this committee

9    is a really good idea, and I view it as something that might

10   be a means to driving consensus and helping the Court order

11   things, but I guess I would say that we would want to make

12   certain that any individual member of the committee might be

13   able to take a position that was different from the

14   committee.  I just wanted to clarify that in case there's --

15   you could see a situation where the DWSD folks might take a

16   different position vis-a-vis --

17             THE COURT:  Sure.

18             MR. HACKNEY:  -- something, so thank you, your

19   Honor.

20             THE COURT:  All right.  Is it reasonable to ask you

21   to convene -- yes, sir.

22             MR. PEREZ:  Your Honor, I think -- excuse me.

23   Alfredo Perez.  I think when we were outside we also

24   indicated that one of the counties would also be

25   participating in the committee.

1    MR. NEWMAN:  Max Newman on behalf of Wayne County.

2  It's my honor to nominate somebody else to this committee,

3  which is Jaye Quadrozzi, who's representing Oakland County.

4    THE COURT:  Okay.  Thank you, ma'am.  All right.  Is

5  it reasonable to ask this group -- oh, one more.  Yes, sir.

6    MR. MONTGOMERY:  As expected, no one invited us to

7  play, and so that we would ask that this nominee --

8    THE COURT:  That's what happens when you have one

9  foot on each side.

10   MR. MONTGOMERY:  That's true.  That is clearly true.

11 Jen Green for the Retirement Systems and Dan Barnowski for

12 the Retiree Committee would be our participants in this

13 process.

14   THE COURT:  Okay.  Anybody else?  Okay.  So my

15 question remains is it reasonable to ask you to convene

16 promptly and to report back to the Court at an adjourned

17 status conference late next week on what you have been able

18 to agree to and what you have not been able to agree to?

19   MR. NEAL:  Yes, your Honor.

20   THE COURT:  All right.  Subject to the availability

21 of a courtroom -- hold on one second -- I'm thinking of

22 Thursday, the 22nd.

23   MR. NEAL:  Very good, your Honor.

24   THE COURT:  All right.

25   MR. HACKNEY:  Your Honor, may I?  There are

1   certainly a lot of obvious topics that we know to talk about

2   and we will talk about.  Are there any in particular that you

3   would like to make sure that we do talk about?  If there

4   are --

5           THE COURT:  I'm hesitant to add to your list.

6           MR. HACKNEY:  Okay.

7           THE COURT:  No.  I think you all have to think about

8   this issue of the number of witnesses, you know.  To me

9   that's sort of driving everything here --

10          MR. HACKNEY:  Yeah.

11          THE COURT:  -- so that's as much as I feel

12  comfortable saying about that at this point.

13          MR. HACKNEY:  Fair enough.  Thank you.

14          THE COURT:  Okay.  One second, please.  Oh, yes.  I

15  indicated in court the other day that I was in the process of

16  reviewing the latest filed plan with a view towards trying to

17  identify those pieces or parts of the plan that I thought

18  needed clarification because I want to avoid wherever

19  possible questions or litigation about what the plan means

20  later.  I have completed that review, and it has resulted in

21  a four- or five-page list.  I'm feeling like now is not the

22  time to embark upon this list, and yet I don't want to go too

23  long before I share it with you, so let's put it on the

24  agenda for next Thursday as well.  And in the process, maybe

25  I'll try to figure out a way to distribute it appropriately,

1  which might facilitate our discussion, although I want to say

2  to you now -- and I'll say it again next week -- this is not

3  a list of questions that I want answers to on the spot by any

4  means.  These are -- this is just me highlighting questions

5  for you to consider whether these are areas in your plan you

6  want to clarify.  It hardly matters to me what the

7  clarifications are.  It's your plan.  But these are issues

8  that I can see questions arising about.  So when we go

9  through the list, I'm not going to be asking for answers.

10 That's not what the purpose of this is.  Am I correct that

11 not all of the exhibits are attached to the existing plan;

12 right?

13         MR. BENNETT:  That's correct, your Honor.  Some of

14 them --

15         THE COURT:  When do you foresee those?

16         MR. BENNETT:  I don't remember exactly when the

17 deadline for the plan supplement is.  One second.  July 14th

18 for the --

19         THE COURT:  Okay.  And I just -- in response to the

20 earlier question about what I'd like the committee to

21 consider, there is one thing.  At our eligibility trial and I

22 think also at the swaps hearing, the swaps compromise

23 hearing, I imposed a time limit on each side of a certain

24 number of minutes.  I want you all to think about how that

25 could work in the context of our plan confirmation trial.

1           MR. BENNETT:  Would that apply to witness testimony

2   as well as to argument or just to argument?

3           THE COURT:  Everything.

4           MR. BENNETT:  Everything.

5           THE COURT:  That's lectern time.  Did I see -- am I

6   correct that in the legislation that the Michigan House is

7   considering there is proposed a deadline for the entry of an

8   order of confirmation of September 30th?  Anybody know the

9   answer to that?

10          MR. BENNETT:  Your Honor, I believe that's correct

11  and then a deadline of December 31st for the plan going

12  effective, if I recall correctly.

13          MR. SCHNEIDER:  Good afternoon, your Honor.  Matthew

14  Schneider on behalf of the state.  I believe that's correct

15  as well, but I'd be happy to look into that and more

16  specifically get back with you.

17          THE COURT:  Well, I feel compelled to comment that

18  there are a gazillion things that could happen between now

19  and September 30th, none of which we can predict, that would

20  prevent us from actually entering an order on September 30th,

21  and I would hate to have to deal with the consequences of

22  failing to meet that deadline if it's in a piece of

23  legislation because if it is, it would take another piece of

24  legislation to extend it, and we all know where the

25  legislature will be on October 1st, and it isn't in Lansing.

1  So I hope somehow someone will convey this message to the

2  appropriate members of the legislature to suggest

3  reconsideration of that and whether it's really necessary to

4  have any deadline at all.

5       MR. SCHNEIDER:  I will make sure --

6       THE COURT:  If they want a deadline, okay, but

7  September 30th may be unrealistic.  Does anyone else want to

8  join with me in this communication to our legislature?

9       MR. MONTGOMERY:  Your Honor, if I may, I think the

10  reason the legislature picked it is because it's actually --

11  excuse me.  Claude Montgomery.  That date appears in the

12  state contribution agreement.  I think that's where the

13  legislature got it from, and all they're doing is in that

14  case trying to follow that.  Your advice is still well-taken,

15  however.

16       THE COURT:  Right.

17       MR. HEIMAN:  We will endeavor to convey it along

18  with the Attorney General's Office.

19       MR. SCHNEIDER:  I'll make sure that the leadership

20  in both the House and the Senate are aware of this.

21       THE COURT:  All right.  Thank you.  Anyone else want

22  to bring up anything else today?  Ma'am.  We have two

23  customers.  Yes.

24       MS. DOLCOURT:  Tamar Dolcourt of Foley & Lardner on

25  behalf of the city.  We are in the process of working with

1   Jones Day on a series of claim objections, and so --

2           THE COURT:  Oh, yes, yes, yes.  We were going to

3   talk about that today, yes.

4           MS. DOLCOURT:  We were going to talk about that

5   today --

6           THE COURT:  Thank you for stepping forward.

7           MS. DOLCOURT:  -- and so I just wanted to bring it

8   to your attention.  What we would propose is starting with a

9   monthly series of omnibus claim objection hearing dates to

10  separate it from the issues.  I see you've got a lot of

11  issues every day, so I want to have a separate hearing.  We

12  were thinking of starting in mid- to late August.  I

13  understand the Court will be very busy in July, so I thought

14  we'd --

15          THE COURT:  Well, I'm going to be very busy in

16  August.

17          MS. DOLCOURT:  Probably true.  So if August is

18  convenient to the Court, maybe starting mid- to late August

19  and then every month thereafter, have a set hearing date just

20  for noticing purposes.

21          THE COURT:  Well, if the purpose of the hearing is

22  just to have a hearing date and just for the purpose of

23  putting whatever settlements you've reached with those who

24  you have objected to hearings with on the record or just for

25  the purpose of adjourning whatever is set for that date in

1   August, that's fine, but it strikes me as unrealistic to

2   actually have any substantive hearings on claims objections

3   in August.  Maybe September.

4           MS. DOLCOURT:  Understood.  We could start in

5   September, whatever is --

6           THE COURT:  Okay.

7           MS. DOLCOURT:  -- more convenient for the Court.

8   August was just sort of the first date that came to our mind.

9           THE COURT:  All right.  So I will work with Chris

10  and with you on a series of dates.

11          MS. DOLCOURT:  Thank you so much, your Honor.  I

12  appreciate it.

13          THE COURT:  Okay.  Mr. Gordon, you have something.

14          MR. GORDON:  Thank you, your Honor.  Thank you, your

15  Honor.  For the record, Robert Gordon of Clark Hill on behalf

16  of the Retirement Systems.  I just wanted to mention

17  something that I think can probably hopefully be folded into

18  a discussion at a later hearing, doesn't necessarily have to

19  be addressed today, but I didn't want it to go by the wayside

20  completely.  At the last status conference we expressed some

21  concerns with respect to how the scheduling order would work

22  as to certain issues we had, and it sounds like the

23  scheduling order will be discussed further at other times,

24  but pursuant to that expression of concern at the last

25  hearing, a stipulated order was entered by the Court last

1    week between the city and the parties that you described as

2    having maybe one foot in the settlement camp and one foot not

3    in the settlement camp yet.  That stipulation in large part

4    pushes off the time for those parties to begin to develop a

5    record in the event that there may or may not be a cramdown

6    process, and we can look at that again in June.

7            One issue that I had raised at the last hearing that

8    still isn't really addressed by the stipulation is the

9    following.  There could be a scenario where come late June

10   the funding issues have been properly resolved and it appears

11   that the city is proceeding towards an alterative A plan and

12   not a cramdown plan as to the semi-settled parties, and so

13   those parties would not be anticipating a cramdown at that

14   time.  It is possible that the Retirement Systems and the

15   Retiree Committee may learn for the very first time only on

16   July 21 when the vote tabulation comes in three days before

17   trial that either Class 10 and/or Class 11 has not voted in

18   favor of the plan, that we're heading towards cramdown.

19   We're still struggling then with when we would be perhaps

20   calling certain witnesses to develop whatever record we need

21   in that regard, and so, again, I don't think that's something

22   we need to address necessarily today, but I didn't want to

23   let it go too long without at least letting the Court know

24   that that's what we're still working on.

25           THE COURT:  No.  I know.  That's a concern.

1          MR. GORDON:  Yes.

2          THE COURT:  All right.  Anybody else?  All right.

3    Thank you.  We're in recess.

4          MR. HACKNEY:  Thank you.

5          THE CLERK:  All rise.  Court is adjourned.

6        (Proceedings concluded at 5:16 p.m.)

INDEX


<u>WITNESSES:</u>

     None

<u>EXHIBITS:</u>

     None


          I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    May 20, 2014
_____             _____
Lois Garrett