**EXHIBIT 1: CLAIM 3683**

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT | EASTERN DISTRICT of MICHIGAN | CHAPTER 9 PROOF OF CLAIM **RECEIVED** |
|---|---|---|

**Name of Debtor:** City of Detroit, Michigan    **Case Number:** 13-53846

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

**MAY 0 5 2014**

**KURTZMAN CARSON CONSULTANTS**

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
Macomb Interceptor Drain Drainage District by and through the Macomb County Public Works Commissioner

☐ Check this box if this claim amends a previously filed claim.

**Name and address where notices should be sent:**
Allan S. Brilliant
Counsel for Macomb County,
Public Works Commissioner
1095 Avenue of the Americas
New York, New York 10036
Telephone number: +1 212 698 3500
Email: Allan.Brilliant@Dechert.com

Anthony V. Marrocco, Commissioner
Richard P. Sulaka, Jr., Deputy Commissioner
William Misterovich, Chief Deputy
Macomb County Public Works
21777 Dunham Road
Clinton Township, Michigan 48036
Telephone number: +1 586 469 7424
Email: Richard.Sulaka@macombgov.org; William.Misterovich@macombgov.org

**Telephone number:**      email:

**Court Claim Number:** _____
(If known)

Filed on: _____

**Name and address where payment should be sent** (if different from above):
Anthony V. Marrocco, Commissioner
Richard P. Sulaka, Jr., Deputy Commissioner
William Misterovich, Chief Deputy
Macomb County Public Works
21777 Dunham Road
Clinton Township, Michigan 48036
**Telephone number:** +1 586 469 7424    email: Richard.Sulaka@macombgov.org; William.Misterovich@macombgov.org

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**    $ not less than $26 million (see attachment)

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

■ **Date Stamped Copy Returned**
☐ **No self addressed stamped envelope**
☐ **No copy to return**

**2. Basis for Claim:** breach of contract, fraud, misrepresentation (see attachment)
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 4606

**3a.** Debtor may have scheduled account as: _____
(See instruction #3a)

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:** $_____

**Annual Interest Rate** (when case was filed) _____%  ☐ Fixed  or ☐ Variable

**Amount of arrearage and other charges, as of the time case was filed,** included in secured claim, if any:
$_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).**    $_____

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §** _____.    $_____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**8. Signature:** (See instruction # 8)
Check the appropriate box.

☐ I am the creditor.  ✓ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

**Print Name:** Anthony V. Marrocco
**Title:** Commissioner
**Company:** Macomb County Public Works
**Address and telephone number** (if different from notice address above):

_____

**Telephone number:**       email:

x _Anth V. Marrocco_ (Signature)    4/30/14 (Date)

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment

13-53846-tjt  Doc 4954-2  Filed 05/20/14  Entered 05/20/14 14:14:11  Page 2 of 117

1353846140505000000000027



1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

STEPHEN WOLPERT

stephen.wolpert@dechert.com
+1 212 698 3836 Direct
+1 212 698 0621 Fax

May 2, 2014

**VIA FEDERAL EXPRESS**

City of Detroit Claims Processing Center
c/o Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245

Re:  <u>In re City of Detroit, Michigan, Case No. 13-53846 (Bankr. E.D. Mich.)</u>

Dear Sir/Madam:

Please find enclosed two original copies of a proof of claim to be filed on behalf of the Macomb Interceptor Drain Drainage District in the above-listed chapter 9 bankruptcy case.  Please indicate receipt on one of the copies and return to me in the enclosed self-addressed envelope.

Very truly yours,

Stephen Wolpert

SMW/jt

Enclosure

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| In re: )<br><br>CITY OF DETROIT, MICHIGAN )<br><br>Debtor ) | Case No. 13-53846<br><br>Chapter 9<br><br>Hon. Steven W. Rhodes |

## ATTACHMENT TO PROOF OF CLAIM BY
## MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT

Macomb Interceptor Drain Drainage District by and through the Macomb County Public Works Commissioner hereby files this proof of claim for all claims, damages or other amounts due in the amount of not less than $26 million arising from the allegations in the attached complaint.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,
     Plaintiff,

vs.

Case No: 13-    -CZ
Hon.

CITY OF DETROIT, a municipal corporation,
and its Detroit Water and Sewerage Department,
     Defendant.

_____/

KIRK, HUTH, LANGE &
BADALAMENTI, P.L.C.
By: ROBERT W. KIRK (P35627)
RAECHEL M. BADALAMENTI (P64361)
Attorneys for Plaintiff
19500 Hall Road, Ste. 100
Clinton Township, MI 48038
(586) 412-4900
rkirk@khlblaw.com
rbadalamenti@khlblaw.com

O'REILLY RANCILIO, P.C.
By: LAWRENCE M. SCOTT (P30228)
ALBERT B. ADDIS (P31084)
Co-Counsel for Plaintiff
12900 Hall Road, Ste. 350
Sterling Heights, MI 48313
(586) 997-6462
lscott@orlaw.com
aaddis@orlaw.com

WILLIAM W. MISTEROVICH (P32512)
Chief Deputy, Macomb County Public
Works Commissioner's Office
21777 Dunham Rd
Clinton Township, MI 48036
(586) 307-8210
william.misterovich@macombgov.org

_____/

No other pending case or controversy exists between these parties. However, a prior case involving these parties from which the contract at issue in this complaint arose was before the United States Eastern District Court, being Case No. 77-cv-71100 but is now closed and a matter in which these parties have both asserted claims related to the same subject matter is now pending in the United States Eastern District Court, being Case No. 11-cv-13101.

Raechel M. Badalamenti (P64361)

## COMPLAINT

**NOW COMES** Plaintiff Macomb Interceptor Drain Drainage District, by and through its

counsel Kirk, Huth, Lange & Badalamenti, P.L.C. and O'Reilly Rancilio, P.C. and for its

Complaint, states as follows:

1

## PARTIES, JURISDICTION AND VENUE

1.     The Plaintiff Macomb Interceptor Drain Drainage District ("MIDDD") is a special purpose public corporation established under the Michigan Drain Code of 1956, Mich. Comp. L. 280.1 *et seq.*, operating and existing under the Michigan Constitution and the laws of the State of Michigan.

2.     Defendant City of Detroit ("Detroit") is a municipal corporation located principally in Wayne County, Michigan.   As set forth in more detail in the Acquisition Agreement between the parties, at the relevant time, the Detroit Water and Sewer Department ("DWSD") operated and exercised authority in Macomb County over the system now known as the Macomb Interceptor System.   This exercise of authority included ownership and control of "all of the interceptor sewers, meters, pump station and appurtenant facilities and associated tangible and intangible personal property commonly known as the Clintondale Pump Station and the Romeo Arm, Garfield, 15 Mile, Macomb and Lakeshore and Lakeshore Extension Interceptors, and commencing in several branches northwards and eastwards from the intersection of the Edison Corridor Interceptor and 15 Mile Road, [in] Macomb County, Michigan..."

3.     Currently the DWSD, among other things, provides water and wastewater treatment services to residents of Wayne, Oakland and Macomb Counties.   Defendant DWSD is governed by a Board of Water Commissioners (the "Water Board").

4.     The amount of money in controversy in this cause, exclusive of costs, interest, and attorney fees is in excess of Twenty Five Thousand ($25,000.00) Dollars, and it is otherwise within the jurisdiction of this Court.

2

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

5.     Venue is properly established in this Court pursuant to MCL 600.1615 given that Plaintiff is located and exercises authority exclusively in Macomb County and Defendant Detroit exercised its authority in Macomb County with respect to the sewer system that is the subject matter of the Acquisition Agreement and over the sewer repair project described herein, both of which specifically give rise to this cause of action.

## GENERAL AND FACTUAL BACKGROUND

6.     The primary cause of this action is a breach of contract/fraudulent inducement to contract by Detroit relating to the sale of assets, including, but not limited to, the Macomb Interceptor System, which is set forth with more particularity in the Macomb Acquisition Agreement at **Exhibit A** hereto.

7.     In or about 1977, the case captioned *United States v. City of Detroit, Detroit Water and Sewerage Department and State of Michigan*, E.D. Mich. Case No. 77-71100 was asserted to, among other things, enforce the Clean Water Act, 33 U.S.C. § 1251 *et seq*. The matter was assigned to Judge John Feikens until 2010 when it was reassigned to Judge Sean Cox.

8.     On or about December 3, 2001, Judge Feikens appointed Former Mayor Kwame Kilpatrick ("Kilpatrick") as the Court's Special Administrator of DWSD, effective as of January 1, 2002 via an "Order Continuing Special Administratorship for the Detroit Water and Sewerage Department," that granted Kilpatrick (as prior orders of the Court had granted to former Mayors Coleman Young and Dennis Archer) broad federal powers over DWSD, including authority over the operation of the Water Board and DWSD's contracting and procurement operations.

9.     The Order dated 12/3/01 gave Kilpatrick authority over all other departments of Detroit insofar as their powers affected compliance with the Clean Water Act or any other of the

3

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

numerous consent judgments entered by the Court related to environmental issues in and about the City of Detroit.

10.    The Order dated 12/3/01 further designated Kilpatrick as the official in charge of finding and hiring a Director of the DWS to "be clearly and completely responsible for the overall success of the [DWSD] in achieving its mission, goals and objectives . . . ."

11.    In or about June 2002, Kilpatrick appointed Victor Mercado ("Mercado") as the Director of DWSD.

12.    Also in 2002, Kilpatrick appointed his former Deputy Chief of Staff Derrick A. Miller ("Miller") as the Chief Administrative Officer and Miller became involved in the bidding and awarding of DWSD contracts.

13.    Thereafter, Kilpatrick, Mercado and Miller used their position with the Defendant to receive financial compensation out of various sewer projects for themselves and for their long-time co-conspirator Bobby W. Ferguson and his business Ferguson's Enterprises, Inc. f/k/a Ferguson Enterprises, Inc. (collectively hereinafter "Ferguson").

14.    Of relevance, in or about June 2002, as alleged in the *First Superseding Indictment*,[1] Inland Waters Pollution Control Company Inc. ("Inland") and Ferguson entered into a side agreement wherein a Ferguson-controlled company would become a subcontractor on the CS-1368 Sewer Rehabilitation Contract and would get at least $10 million of work thereon with an assured minimum profit of about $1.5 million unrelated to any work that Ferguson would perform on the contract.

---

[1] The *First Superseding Indictment* was the Federal Prosecution of Kilpatrick, Bernard Kilpatrick, Mercado, Miller and Ferguson in regards to Corruption and Extortion; this was filed as Case No. CR-10-20403-NGE.

4

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

15.     Following this side agreement and through the Spring of 2003, repairs under CS-1368 were assigned to subcontractors through DWSD's otherwise competitive bidding process with Ferguson-controlled entities received some, but still a limited, amount of the work.

16.     However, in or about the Spring of 2003, the DWSD and Inland agreed to set fixed unit prices for subcontractor work on CS-1368. Upon information and belief, Kilpatrick, Mercado, and Inland made this change from competitive bidding to fixed unit pricing to allow them to simply award work to themselves and Ferguson without considering other potential, competing subcontractors.

17.     Around the same time, Inland began discussing with Kilpatrick, Mercado and Miller and/or other representatives of the Defendant of the prospect of being awarded an As-Needed Point Repairs work contract.

18.     In or about May 2003, Inland and Ferguson reached an agreement regarding the share of work Ferguson would receive on the As-Needed Point Repairs work. Thereafter, the Defendant' representatives conspired to take the As-Need Point Repairs Contract (CS-1361) away from bidder Lake Shore, Inc. d/b/a Lakeshore Engineering Services, Inc.), to whom it had already been awarded, and give it to Inland as an amendment to Inland's existing CS-1368 contract.

19.     By May 27, 2003, Inland submitted to DWSD its proposal to incorporate the As-Needed Point Repair work into CS-1368 that modified the pricing structure on CS-1368 to allow for unit prices for repair work and the method for selection and approval of subcontractors.

20.     By September 2003, the DWSD approved Inland's proposal to include the As-Needed Point Repair work in Inland's existing sewer lining contract CS-1368 as a first amendment known as CS-1368-1.

5

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

21.     On or about November 17, 2004, DWSD and Inland Waters executed CS-1368-1 for the specific purpose of allowing Ferguson, with the assistance and direction of Kilpatrick, Mercado, Miller and others, to unlawfully use influence and power to obtain more work from contractors and subcontractors and/or to camouflage bribery, extortion payments and overcharges as valid on DWSD contracts.

22.     Inland thereafter retained L. D'Agostini & Sons, Inc. ("LDS") as its "primary subcontractor" even though Inland had represented to DWSD that LDS would not to be awarded more than 3.3% of work on CS-1368.

23.     As alleged in the *First Superseding Indictment*, Ferguson advised Kilpatrick that Inland would be overseeing the Project and LDS was in charge of hiring and coordinating the work assignments of all the subcontractors for the Project.  As alleged in the *First Superseding Indictment*, Kilpatrick responded: "Perfect! That's what I needed," to which Ferguson replied: "We need to mee [meet] on how, I move in [to get the work], I got a great idea sir."

24.     According to the *First Superseding Indictment*, Kilpatrick would thereafter personally review LDS's invoices to ensure that Ferguson was getting his share and instructed Ferguson as follows: "just let victor [Mercado] know [if LDS] makes 2.00 fei [FEI] needs to make 2.00 also you will look at the invoices to make sure."

25.     Upon information and belief, during the repair of the Project, the contractors and subcontractors (specifically Inland and LDS) knew that Ferguson had a close personal relationship with Kilpatrick, that a by-product of this close personal relationship was that Kilpatrick wanted Ferguson to get whatever work Ferguson wanted on the Project, and that Ferguson took advantage of this relationship to secure payment for work which was not done and/or for equipment that was not used.

6

26. Upon information and belief, Inland and LDS knew that their subcontractors requests for payment included work which was not done and/or equipment that was not used but nonetheless submitted these payment requests by representing that they were accurate and complete and later even representing that the same had been audited and found to be accurate and complete.

27. DWSD paid all invoices submitted by Inland and/or LDS.

28. During the Project, Inland and LDS knew that the process of submitting false invoices and passing on extraordinary costs was intended to conceal and did conceal the unlawful nature, source, ownership, and/or control of proceeds that they, Ferguson, Kilpatrick, Mercado, Miller and/or others gained through bribery, extortion, and other unlawful conduct in connection with the Project.

## The 15 Mile Interceptor Project

29. On or about August 22, 2004, there was a large-scale collapse of the Macomb Interceptor Sewer at 15 Mile Road in the City of Sterling Heights, County of Macomb, State of Michigan.

30. The Macomb Interceptor Sewer system was stabilized and a repair project was initiated. The stabilization and repair of the Macomb Interceptor sewer at 15 Mile Road in the City of Sterling Heights will hereinafter be referred to as the "Project".

31. On or about September 28, 2004, despite the fact the Macomb Interceptor was already stabilized, DWSD issued Special Administrator Order Number 2004-5 authorizing Mercado to enter into an "emergency" amendment to CS-1368 that effectively increased Inland's contract by $35 million, to a total in excess of $95 Million. This amendment is more commonly referred to as CS-1368-2. **Exhibit B.**

7

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

32. On information, and as alleged in the *First Superseding Indictment*, Order Number 2004-5 was issued by DWSD as a result of Kilpatrick, Mercado and/or Miller's influence to ensure that the Project would be awarded to Inland because Inland had already demonstrated willingness to participate in the larger illegal scheme.

33. As alleged in the *First Superseding Indictment*, Inland and other sewer repair contractors and subcontractors benefited from the routine amendment of their contracts without scrutiny, oversight, or competitive bidding, which gave them opportunities to collect excessive and unlawful profits, mark-ups, fees, expenses, and costs. In return for these unlawful and excessive contract awards, profits, fees, expenses, and costs, the contractors and subcontractors made unlawful payments and/or provided unlawful gratuities to Kilpatrick, Ferguson, and Miller.

34. Inland subsequently subcontracted work on CS-1368 to FEI and others willing to participate in the scheme or turn a blind eye to it in exchange for a bidding advantage and/or approval of excessive charges on the Project and other work performed.

35. The scheme resulted in excessive overcharges on the Project. To wit, Inland had estimated the Project would costs a total of $35,000,000.00 initially, and on September 30, 2004 revised that estimate to $33,702,881.70. However, the Project charges totaled: $54,467,200.00. **Exhibit A.**

36. On May 18, 2005, Kilpatrick issued Special Administrative Order No. 2005-07 authorizing Mercado to enter into Amendment 3 to CS-1368 with Inland Waters to add funding to complete repairs and restoration at the 15 Mile Road site.

37. Amendment 3 added another $23 Million Dollars to CS-1368 increasing the new total amount of the contract to approximately $118 Million Dollars.

8

KIRK, HUTH, LANGE & SADALAMENTI, P.L.C.

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

38.     In July, 2005, a fourth amendment to CS-1368 was proposed, which would add another $12 Million Dollars to the original project. As alleged in the *First Superseding Indictment* and attested to in the Federal Prosecution, in furtherance of the secret scheme Inland Waters and Soave paid a bribe of $350,000.00 to Ferguson for Inland to receive this additional amendment and paid the sum of $250,000.00 to the contractor that Ferguson was replacing on CS-1368.

39.     On or about June 28, 2006, Amendment 5 was authorized. CS-1368-5 provided an additional $8 Million Dollars for the contract, thereby increasing the total amount of CS-1368 to $138 Million Dollars. Again, the terms of Amendment 5 were identical to those of the original contract.

40.     This grossly inflated Project total became the Plaintiff's direct responsibility by Order of Judge Feikens dated December 18, 2008 and the subsequent Acquisition Agreement entered into between Plaintiff and Defendant to comply with the December 18, 2008 Order.

41.     At the time of this ruling, the scheme and its production of grossly inflated overcharges was concealed from Judge Feikens and MIDDD, but known to executives of Defendant who were either members of the Kilpatrick Enterprise or were actively assisting the Federal Prosecution investigate the Kilpatrick Enterprise.

42.     On or about September 2, 2010 the parties herein executed the Macomb Acquisition Agreement, as part of a global settlement in Case No. 77-71100. **Exhibit A.**

43.     The Macomb Acquisition Agreement and accompanying Bill of Sale (**Exhibit C**) provided for the transfer of all tangible property and all intangible rights and assets[2] associated with the Macomb Interceptor on the following relevant terms:

---

[2] Judge Cleland has already determined by Opinion and Order the meaning of the language set forth herein, which is addressed in the paragraphs that follow.

9

a. Acquisition Agreement Paragraphs 2.4 and 2.9(b)(8) assign to the Plaintiff any and all rights held by the City of Detroit "under any contracts, warranties or guaranties that apply to services or goods" relating to the Project;

b. Bill of Sale, page 2 grants MIDDD the "full power of substitution and re-substitution, in whole or in part, in the name and stead of Detroit;"

c. Bill of Sale, page 3 provides that MIDDD has the right "(a) to demand, receive and collect any and all of the Transferred Assets and to give receipts and releases for and with respect to the same, or any part thereof; (b) to institute and prosecute, in the name of Detroit or otherwise, any and all proceedings at law, in equity or otherwise, that the District or its successors and assigns may deem proper in order to collect or reduce to possession any of the Transferred Assets and in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be; and (c) to do all things legally permissible, required or reasonably deemed by the District to be required to recover and collect the Transferred Assets and to use Detroit's name in such manner as the District may reasonably deem necessary for the collection and recovery of same."

d. Acquisition Agreement Paragraph 1.6 defines the term "claim" as "any Order, any investigation announced or performed by a Governmental Entity, or any actual or alleged complaints, claims or charges, demands for relief or damages, suits, hearings, causes of action, proceedings, or litigation which the parties hereto may become legally and/or contractually obligated to pay or defend against, whether direct, indirect or consequential, whether based upon any alleged violation of the federal or the state constitution, any federal or state statute, rule, regulation, or any alleged violation of the federal or state common law, whether any such claims are brought in law or equity, tort, contract, or otherwise, and/or whether commenced or threatened, which are related in any way to the Macomb System.

44. The term "Transferred Assets" for the purposes of the preceding subsections is

defined in the Bill of Sale as follows:

a. The physical facilities including associated fixtures described in Schedule 1.20 to the Acquisition Agreement;

b. All of the MID System that is tangible personal property;

c. All of the MID System that is intangible personal property; and

d. All contracts, warranties and guarantees that apply to services or goods related to the facilities comprising the MID System, including without limitation, those contracts listed on Schedule 3.9 to the Acquisition Agreement.

10

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

45. Plaintiff paid Defendant the sum of $89,996,704.00 to acquire the tangible and intangible assets contemplated by the Acquisition Agreement, including payment in full of the $54,467,200.00 Project total per Schedule 3.8 to the Acquisition Agreement. **Exhibit A.**

46. The Bill of Sale that accompanied the transaction acknowledged receipt of these funds as *"good and valuable consideration, the receipt and adequacy and legal sufficiency of which are hereby acknowledged."* **Exhibit C.**

47. At the time that the Acquisition Agreement was drafted and executed Plaintiff was informed that the transfer included the tangible assets and intangible rights associated with the Macomb Interceptor as more particularly described in the Bill of Sale at **Exhibit C** hereto, which was expressly incorporated into and made a part of the Acquisition Agreement.

48. It was the intention of the parties that these clauses encompass both contractual remedies and any other remedies that would arise from MID's ownership after the execution of the agreement. **Exhibit D – Affidavit of Hupp.** Indeed, preceding its execution, the Defendant expressly represented in a letter of intent that all tangible assets and intangible rights associated with the Macomb Interceptor were included within the assets being transferred pursuant to the Acquisition Agreement.

49. Consequently, Plaintiff assumed all potential liability *after* the date of acquisition of the Macomb Interceptor system, regardless of originating fault.[3] **See Exhibit A**

50. Plaintiff financed the acquisition of DWSD assets through the sale of drain bonds.

51. Detroit expressly stated in paragraph 3.7 of the Acquisition Agreement that "there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or

---

[3] Acquisition Agreement 2.6(b) "at and as of the Closing, MID shall assume, and Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities. MID shall pay, discharge, perform and satisfy all of the Assumed Liabilities when due." Acquisition Agreement 1.3 "'Assumed Liabilities' shall mean any and all Liabilities excluding: (i) the retained liabilities, and (ii) Claims by and among any or all of Detroit, Macomb County and the MID."

11

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement" and, further, in paragraph 3.9 that Detroit would "promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement."

52.    The scheme involving Defendant's officials was fraudulently concealed from Plaintiff by Defendant and its representatives and agents despite affirmative duties to disclose such material information.

53.    On or about December 15, 2010, Plaintiff learned of the scheme, including the bribery, criminal RICO conspiracy, extortion, fraud, obstruction of justice, tax evasion, overcharges for personal gain and violation of Antitrust law being spearheaded by Detroit's designated officials, when the Project was specifically described in the *First Superseding Indictment* issued in Criminal Case No. 10-20403.

**Plaintiff Files Suit Against Detroit Officials and Contractors on the 15 Mile Project**

54.    On July 18, 2011, Plaintiff initiated United States Eastern District Court Case 2:11-cv-13101, captioned *Macomb Interceptor Drain Drainage District v. Kilpatrick, et. al.* asserting claims for Civil RICO violations, Anti-Trust violations, Breach of Contract, fraudulent misrepresentation, and tortious interference against Kilpatrick, Mercado, Miller, Ferguson and multiple contractors and sub-contractors involved in the Project (hereinafter "Case 11-13101") based on the rights transferred to it via the Macomb Acquisition Agreement.

12

55.     On January 10, 2012, Defendant herein moved to intervene as a plaintiff in Case 11-13101 to assert contract and tort claims arising out of the Project and also from work that was the subject of CS-1368, CS-1368-1, CS-1368-4 and CS-1368-5, DWS-864 and DWS-865.

56.     It was unclear from the face of this pleading whether or not Detroit's claims were *in addition to* or *in place of* MIDDD's asserted claims.  However, in this pleading Detroit acknowledged that the scheme advanced by its own officials resulted in the submission of invalid and inaccurate invoices from Inland and other contractors/subcontractors for "(a) work not performed and material and equipment not used; (b) excessive and unlawful markups for work performed and material and equipment used; and/or (c) excessive consulting and other fees, expenses, and costs ...[and from] the pattern of amending (rather than competitively bidding) contracts, which provided to these Defendants opportunities for more unlawful profits and excessive consulting and other fees, expenses, and costs."

57.     At the this time of this filing, Detroit expressly acknowledged the terms of the Macomb Acquisition Agreement and represented to Plaintiff that the relief sought by Detroit was *in addition to* the relief sought by Plaintiff and for damages unique to Detroit which were *above and beyond* those sustained by Plaintiff who paid in full for the Project under the terms of the Acquisition Agreement.

58.     Detroit further represented that Detroit's intervention in Case 11-13101 was merely because the Project was central in time to other claims that it wished to assert under the ongoing conspiracy standard of civil RICO (18 U.S.C. §§1961-68).

59.     Hearing was held on April 4, 2012, at which time the presiding Judge made it clear that if Detroit were granted leave to intervene in Case 11-13101, its intervention would likely be limited to only those claims it had related to the Project.

13

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

60. In response, Detroit's counsel suggested, *for the first time*, that the Macomb Acquisition Agreement might not have assigned to MIDDD *all* of the intangible rights associated with the Macomb Interceptor Sewer system.

61. By Order dated May 7, 2012, Defendant was granted leave to intervene in Case 11-13101 but only as to those claims it had related to the Project.

62. On May 21, 2012, Detroit's Intervening Complaint was filed asserting tort, federal statutory and state claims against Kilpatrick, Mercado, Miller, Ferguson and multiple contractors and subcontractors involved in the Project. It sought, among other things, trebled damages for overcharges on the Project in excess of $75 Million.

63. Having been present at the hearing on April 4, 2012, the named-contractor defendants in Case 11-13101 moved for an order on standing, seeking a ruling on whether MIDDD or Detroit had the right to assert the claims related to the Project.

64. On September 17, 2012, the Hon. Robert Cleland granted the 'Amended Joint Motion for Summary Judgment' in Case 11-13101, holding that Detroit had exclusive standing to pursue the tort and federal statutory claims given the language in the Macomb Acquisition Agreement.

**Detroit Quickly Settles Its Tort and Federal Statutory Claims in Case 11-13101**

65. As provided for *infra*, overcharges on the Project were estimated to be in excess of $26 Million. In line with this, Detroit's Intervening Complaint in Case 11-13101 sought trebled damages in excess of $75 Million.

66. However, a mere two (2) months after the Order dated 9/17/12 in Case 11-13101 held that Detroit had the exclusive right to pursue the $75 Million of asserted tort and federal

14

statutory claims related to the Project, Detroit quickly reached nominal settlements with the contractors and subcontractors who had been named as defendants.

67. More specifically, on or about November 28, 2012 Detroit dismissed Inland and Anthony Soave from Case 11-13101 pursuant to a "Letter Agreement" in exchange for installment payments totaling $4.5 Million.

68. In or about February 2013, Detroit dismissed Lakeshore Engineering Services, Inc., a subcontractor against whom MIDDD had asserted claims in Case 11-13101, via a Mutual Release and Settlement Agreement in exchange for $2,575,000.00 plus real property purportedly valued at $2,500,000.00.

69. On information, Detroit dismissed L. D'Agostini & Sons, Inc., another contractor/subcontractor against whom MIDDD had asserted claims in Case 11-13101, in exchange for no monetary consideration.

70. Only Detroit's claims against Kilpatrick, Mercado, Miller and Ferguson remain.

**Detroit's Usage Overcharges to MIDDD**

71. At all times preceding the execution of the Macomb Acquisition Agreement, MIDDD paid usage charges to Detroit in relation to its use of the Macomb Interceptor Sewer system.

72. The grossly inflated Project total became the Plaintiff's direct responsibility of Plaintiff by Order of Judge Feikens dated December 18, 2008.

73. At the time of this ruling, the scheme and its production of grossly inflated overcharges was concealed from Judge Feikens and MIDDD.

15

74. Even so, Detroit amortized the grossly inflated costs for the Project into the usage charges assessed to MIDDD for the Macomb Interceptor Sewer system in the rate years 2005-2006 through 2009-2010, together with Seven and a Half Percent (7.5%) interest annually.

75. Detroit benefitted by receipt of these usage overcharges and the interest thereupon though its highest ranking officials had actual knowledge and were participating in the scheme.

**The Scheme and Overcharges to MIDDD Are Confirmed**

76. On August 19, 2011, Derrick Miller entered a guilty plea in Criminal Case #10-20403. As part of this plea, Miller admitted that at the behest of Kilpatrick and with assistance from Mercado and others in Detroit's administration, he steered millions of dollars of Detroit business to Ferguson, pressured contractors to add Ferguson-controlled companies to DWSD contracts they had been awarded, influenced the awarding of contracts to teams that included Ferguson-controlled companies, 'reevaluated' or fixed bids if the contractor was unwilling to participate in the scheme and gave willing bidders inside information so that they would have an edge over competing bidders.

77. On or about September 20, 2012, a jury trial began in Criminal Case #10-20403.

78. On or about November 5, 2012, Mercado entered a guilty plea to Count I of the Fifth Superseding Indictment - Violation of the Hobbs Act 18 U.S.C. 371, which was substantively a criminal conspiracy relating to Mercado's role in the RICO claims relating to the Kilpatrick Enterprise.

79. In the criminal Trial, several contractors, including Inland, testified that they were voluntarily complicit in the Kilpatrick Enterprise and provided monetary gifts, hotel accommodations and access to private jets to Kilpatrick and his family in an attempt to keep the Mayor happy and prevent Inland work from being held.

16

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

80. On or about March 11, 2013, the jury returned a verdict of guilt against Kilpatrick and Ferguson, and others, of 24 of the 30 charges including:

> **Count 1: Racketeering conspiracy** From 2000-2009, Kilpatrick and Ferguson were part of a criminal enterprise that ran through City Hall in Detroit, called "the Kilpatrick Enterprise" by prosecutors. Contractors who sought work in the city had to include Ferguson or rig bids to make sure Ferguson got a portion of the work and the money.
>
> **Count 2: Extortion, sewer lining contract** From 2002-2006, Kilpatrick and Ferguson received payments of more than $23.7 million in contract revenues from Inland Water Solutions, Inc. A $50 million contract that was already approved by Detroit's Water and Sewerage Department was held up between 2002 and 2006 until Inland Water Solutions replaced their minority contractor with Ferguson, on Ferguson's terms.
>
> **Count 3: Extortion, amendment to sewer lining contract** From 2004-2005, Kilpatrick and Ferguson received payments from Inland of about $175,000 in connection with an amendment to the contract. **Exhibit E.**

81. Though the existence of this scheme has been confirmed by jury verdict in Criminal Case #10-20403, and though Detroit has recouped funds from the participating contractors, Detroit has made no offer to reimburse MIDDD for the overcharges it paid on the Project via the Macomb Acquisition Agreement or the usage overcharges assessed to MIDDD during the rate-years 2005-2006 through 2009-2010.

## COUNT I – FRAUD, FRAUD IN THE INDUCEMENT AND SILENT FRAUD

82. Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

83. Defendant knowingly and intentionally made misrepresentations leading up to and in the Macomb Acquisition Agreement with respect to whether "all" of Detroit's tangible *and intangible* rights, including the right to assert "any and all" claims regarding the Project were being acquired by Plaintiff.

17

84. Defendant knowingly and intentionally misrepresented that its public officials had abided by all state, federal and local laws and regulations in the performance of their job duties and, in particular, with respect to their involvement with the Macomb Interceptor Sewer system and the Project. In fact, Defendant made affirmative promises in the Macomb Acquisition Agreement that there was no known possible or pending litigation relating to the Macomb Interceptor Sewer System including:

    a. Paragraph 3.7 "Litigation. Except as set forth in Schedule 3.7 hereto, there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement."

    b. Paragraph 5.3 "Litigation and Claims. Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement."

85. Even apart from these express misrepresentation and the promise to disclose, Defendant had a legal duty to disclose this material and relevant information regarding the Macomb Interceptor Sewer system and the Project, especially given that the costs for the Project is an express line item in the calculated total consideration due to acquire the sewer system.

86. In reliance on the misrepresentations, Plaintiff entered into the Macomb Acquisition Agreement and paid in full the costs associated with the Project as identified in the Schedules attached thereto.

87. Also in reliance on these misrepresentations, Plaintiff also assumed certain liabilities with respect to the Macomb Interceptor Sewer system.

18

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

88. Defendant intended and Plaintiff did rely on the representations made by Defendant to justify the consideration being demanded and the risk being assumed with regard to the Macomb Acquisition Agreement.

89. Given the involvement of its own Mayor, Director of the DWSD and various department heads and their assistants and employees, Defendant certainly knew that these representations were false when made and in reality its Mayor, Director of the DWSD and others employed by it had grossly inflated, or assisted with the gross inflation of, the charges being passed on to Plaintiff regarding the Project and were otherwise engaged in a large-scale illegal conspiracy with regard to bidding, awarding and approving construction contracts for Detroit.

90. Plaintiff would not have entered into the Macomb Acquisition Agreement on its current terms if not for the misrepresentations and is entitled to reformation and/or rescission thereof plus damages resulting from the fraud including, but not limited to, the payment of inflated usage charges, the payment in full for the grossly inflated Project charges and the loss of a possible civil remedy.

91. Further, Plaintiff is entitled to recoupment of any and all amounts that Defendant recovered from participants in the illegal conspiracy and/or involved with the alleged overcharges on the Project via various settlement agreements by way of a constructive trust on all such funds wrongfully in Defendant's possession at this time as a result of settlement of the Claims asserted by Detroit in Case 11-13101.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter an Order (a) Declaring the reformation and/or rescission of the Macomb Acquisition Agreement; (b) Awarding Plaintiffs the damages sustained as determined by the trier of fact including, but not limited to, the $26 Million in overcharges paid to Defendant in connection with the Project plus

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

costs and reasonable attorney fees; (b) Imposing a constructive trust over all property that Defendant obtained as a result of its fraud, the illegal scheme and in settlement of its claims regarding the Project in Case 11-13101 and otherwise; and (c) Awarding such other relief as may be appropriate.

## COUNT II – INNOCENT MISREPRESENTATION

92.    Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

93.    Plaintiff and Defendant were and are currently in privity of contract via the Macomb Acquisition Agreement.

94.    Defendant represented that no claims existed regarding the Macomb System at the time of negotiations when, in fact, Defendant had actual knowledge of the Kilpatrick Enterprise and the corruption and bid rigging scheme occurring with DWSD and its Directors as was evidenced by the criminal convictions in Criminal Case #10-20403.

95.    Defendant represented that it had abided by all laws with respect to the Macomb System when, in fact, Defendant knew or should have known that its Mayor, Director of DWSD and others employed by Detroit, the DWSD and/or the Water Board had grossly inflated, or assisted with the gross inflation, of the charges being passed on to Plaintiff regard to the Project and were otherwise engaged in a large-scale illegal conspiracy with regard to bidding, awarding and approving construction contracts for Detroit.

96.    Plaintiff would not have entered into the Macomb Acquisition Agreement on its current terms if not for non-disclosure and is entitled to reformation and/or rescission thereof plus damages resulting from the fraud including, but not limited to, the payment of inflated usage

20

charges, the payment in full for the grossly inflated Project charges and the possible loss of a possible civil remedy.

97.     Further, Plaintiff is entitled to recoupment of any and all amounts that Defendant recovered from participants in the illegal conspiracy and/or involved with the alleged overcharges on the Project via various settlement agreements by way of a constructive trust on all such funds wrongfully in Defendant's possession at this time as a result of settlement of the Claims asserted by Detroit in Case 11- 13101.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter an Order (a) Declaring the reformation and/or rescission of the Macomb Acquisition Agreement; (b) Awarding Plaintiffs the damages sustained as determined by the trier of fact including, but not limited to, the $26 Million in overcharges paid to Defendant in connection with the Project plus costs and reasonable attorney fees; (b) Imposing a constructive trust over all property that Defendant obtained as a result of its fraud, the illegal scheme and in settlement of its claims regarding the Project in Case 11-13101 and otherwise; and (c) Awarding such other relief as may be appropriate.

## COUNT III – BREACH OF CONTRACT

98.     Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

99.     A contract existed between the parties and is attached as **Exhibit A**.

100.     Plaintiff breached certain terms and provisions of the Macomb Acquisition Agreement including but not limited to:

   a. Paragraph 2.4 "Assignment of Warranty and Guarantee Rights. Detroit shall
      assign to the MID all of its rights under all contracts, warranties and guarantees
      that apply to service or good related to the Macomb System"

21

b. Paragraph 2.6(b) "Retained and Assumed Liabilities." (b) "At and as of the Closing, MID shall assume, and Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities."

c. Paragraph 2.9(b)(4) "Deliveries." (b) "Detroit shall deliver to MID: (4) An executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to MID and its counsel executed by Detroit.

d. Paragraph 2.9(b)(8) "Deliveries." (b) "Detroit shall deliver to MID: (8) An assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System...."

e. Paragraph 2.9(b)(9) "Deliveries." (b) "Detroit shall deliver to MID: (9) A certificate executed by Detroit as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing"

f. Paragraph 3.3 "No Conflict. The execution, delivery and performance by Detroit of this Agreement, the compliance by Detroit with any of the provisions hereof, and the consummation by Detroit of the transactions contemplated hereby: ... (iii) do not conflict with or violate any Applicable Law or any order, judgment, award or decree of any court of other Governmental Entity to which Detroit or the Macomb System is subject, ...."

g. Paragraph 3.7 "Litigation. Except as set forth in Schedule 3.7 hereto, there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement."

h. Paragraph 3.8 "Disclosure of System Debt. Schedule 3.8 sets forth all System Debt ..., including for each facility or improvement in the Macomb System, and the allocated outstanding principle as of June 30, 2009, together with such charges and adjustments on which the Parties have agreed to resolve all outstanding issues related to debt and rates associated with the Macomb System. None of the written data or information furnished or made available to Macomb County by Detroit as part of the due diligence process with regard to System Debt or other debt or rate-related matters contains an untrue statement of a Material fact or omits to state a Material fact required to be stated therein or necessary to make the statements made, in the contest in which made, not false or misleading."

i. Paragraph 5.3 "Litigation and Claims. Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware

22

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement."

j.  Paragraph 5.4 "Notice of Changes. Detroit shall inform Macomb County and MID in writing if it becomes aware that any representation or warranty made by Detroit in this Agreement has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by the Agreement to be performed or complied with by Detroit."

k.  Paragraph 8.1 "Accuracy of Representations and Warranties. Except as set forth in the Schedules, the representations and warranties of Detroit set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing."

101.  Defendant breached these provisions by initiating a claim in Case 11-13101 directly adverse to Plaintiff, by failing to disclose the existence of the Kilpatrick Enterprise and corruption within the DWSD, charging improper usage rates, participating in and/or benefitting from a criminal scheme and enterprise, failing to investigate and manage the gross overcharges on the Project, failing to notify Plaintiff of the ongoing criminal investigation in which its employees and officials were involved at the time of the Macomb Acquisition Agreement and thereafter, charging Plaintiff a grossly inflated purchase price and affirmatively misrepresenting the accuracy and appropriateness of the "system debt" as represented in negotiating the terms of the Macomb Acquisition Agreement.

102.  Defendant's remedies are enumerated in the Macomb Acquisition Agreement including but not limited to ¶10.1, 10.2, and 10.3.

103.  Plaintiff was damaged by the breach of contract in that it (a) paid the grossly inflated $26 Million Project charge to Detroit in connection with the Macomb Acquisition Agreement, (b) has been prevented from recovering the overcharges from the contractors and subcontractors involved in the Project; (c) paid Detroit egregiously inflated usage charges for the

23

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

Macomb Interceptor Sewer system in the rate years 2005-2006 through 2009-2010, together with Seven and a Half Percent (7.5%) interest annually.

104.    Moreover, the Plaintiff continues to be damaged in that Defendant Detroit, without notice, settled its claims on the Project and retained the proceeds therefrom.

105.    Plaintiff paid Defendant in full the grossly inflated Project costs. Nonetheless, Detroit asserted its right to pursue the $75 Million in claims against the contractors and subcontractors.

106.    After testimony, plea agreements and a jury verdict in the Federal Prosecution confirmed the existence of the scheme on the Project, Detroit surprisingly rushed to settle the $75 Million in claims asserted in Case 11-13101 for grossly disproportionate and nominal sums.

107.    A constructive trust should be imposed on such settlement funds given that Defendant was already paid in full by Plaintiff for all costs related to the Project. Defendant cannot recover these amounts twice.

108.    Said funds are in the unlawful possession of Detroit and should be immediately held and protected for Plaintiff's benefit upon final disposition of this matter.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter an Order (a) Declaring the reformation and/or rescission of the Macomb Acquisition Agreement; (b) Awarding Plaintiffs the damages sustained as determined by the trier of fact including, but not limited to, the $26 Million in overcharges paid to Defendant in connection with the Project plus costs and reasonable attorney fees; (b) Imposing a constructive trust over all property that Defendant obtained as a result of its fraud, the illegal scheme and in settlement of its claims regarding the Project in Case 11-13101 and otherwise; and (c) Awarding such other relief as may be appropriate.

24

## COUNT IV – QUANTUM MERUIT/UNJUST ENRICHMENT

109.     Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

110.     Defendant Detroit was paid by Plaintiff the sum of $54,467,200.00 for the costs it represented were lawfully and necessarily incurred in connection with the Project.

111.     As set forth in the foregoing sections, at least $26 Million of this sum total was actually the product of an illegal scheme that Defendant fraudulently concealed from Plaintiff when demanding payment in full thereof.

112.     The illegal scheme was subsequently confirmed by trial testimony, plea agreements and the jury verdict in Criminal Case #10-20403.

113.     Nonetheless, the Defendant has retained all of the $54,467,200.00 paid to it.

114.     Defendant further has asserted and settled civil claims against contractors and subcontractors involved in the Project overcharges and retained the funds therefrom despite having been paid in full for the Project costs already by the Plaintiff.

115.     It would be inequitable to allow Defendant to retain such significant benefits as a result of its fraud and otherwise inequitable conduct.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter an Order (a) Declaring the reformation and/or rescission of the Macomb Acquisition Agreement; (b) Awarding Plaintiffs the damages sustained as determined by the trier of fact including, but not limited to, the $26 Million in overcharges paid to Defendant in connection with the Project plus costs and reasonable attorney fees; (b) Imposing a constructive trust over all property that Defendant obtained as a result of its fraud, the illegal scheme and in settlement of its claims

25

regarding the Project in Case 11-13101 and otherwise; and (c) Awarding such other relief as may be appropriate.

Respectfully submitted,

By:    s/Raechel M. Badalamenti
        KIRK, HUTH, LANGE & BADALAMENTI, PLC
        ROBERT W. KIRK (P35627)
        RAECHEL M. BADALAMENTI (P64361)
        Email: rbadalamenti@khlblaw.com
        19500 Hall Road, Suite 100
        Clinton Township, MI 48038
Dated: June 25, 2013    (586) 412-4900

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

# *Exhibit A*

**MACOMB INTERCEPTOR**

**ACQUISITION AGREEMENT**

**BY AND BETWEEN**

**CITY OF DETROIT**

**MACOMB INTERCEPTOR DRAIN DRAINANGE DISTRICT**

**AND THE**

**COUNTY OF MACOMB**

**DATED SEPTEMBER 2, 2010**

i

**Bodman 9/2/2010**

Doc 946709v12

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT ("**Agreement**") is made this 2nd day of September, 2010, by and between the City of Detroit, Michigan ("**Detroit**"), the Macomb Interceptor Drain Drainage District ("**MID**")and the County of Macomb ("**Macomb County**") (each individually a "Party" and collectively, the "Parties").

### RECITALS:

A.     Detroit and Macomb County have determined that it is in their respective best interests for Macomb County to acquire, upon the terms and subject to the conditions set forth herein, the Macomb System (as defined herein).

B.     In furtherance thereof, the Macomb Interceptor Drain Drainage District has been established under Chapter 20 of the Drain Code of 1956 to acquire the Macomb System property described in Schedule 1.20 hereto for the mutual consideration set forth in the Agreement below.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties and agreements herein contained, Detroit and Macomb County and MID hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings given to them in this Article I, unless defined elsewhere in this Agreement.

1.1     "**Agreement**" shall have the meaning such term is given in the introductory paragraph hereof.

1.2     "**Applicable Law**" shall mean shall mean any applicable federal, state or local law, statute, ordinance, rule, regulation and any other executive or legislative proclamation of any Governmental Entity.

1.3     "**Assumed Liabilities**" shall mean any and all Liabilities excluding:   (I) the Retained Liabilities, and (ii) Claims by and among any or all of Detroit, Macomb County and the MID.

1.4     "**Business Day**" shall mean any day other than Saturday, Sunday or any day municipalities in the State of Michigan are authorized or obligated by law, executive order or regulation to close.

1/25

9/2/2010
Doc 946709v12

1.5    "**Macomb County's Knowledge**" shall mean the actual knowledge of the Macomb County Public Works Commissioner and legal counsel assigned or retained to represent the offices of the Commissioner.

1.6    "**Claims**" shall mean any Order, any investigation announced or performed by a Governmental Entity, or any actual or alleged complaints, claims or charges, demands for relief or damages, suits, hearings, causes of action, proceedings or litigation which the parties hereto may become legally and/or contractually obligated to pay or defend against, whether direct, indirect or consequential, whether based upon any alleged violation of the federal or the state constitution, any federal or state statute, rule, regulation, or any alleged violation of federal or state common law, whether any such claims are brought in law or equity, tort, contract, or otherwise, and/or whether commenced or threatened, which are related in any way to the Macomb System.

1.7    "**Closing**" shall have the meaning such term is given in Section 2.7 hereof.

1.8    "**Closing Date**" shall have the meaning given such term in Section 2.7 hereof.

1.9    "**Default**" shall mean, as to any party to this Agreement, (a) a default by such party in the performance of any of its Material obligations hereunder and the continuation of such default for a period of thirty (30) Business Days after written notice is delivered by the non-defaulting party to the defaulting party that a default has occurred, or (b) the breach of any representation or warranty hereunder.

1.10   "**Detroit's Knowledge**" shall mean the actual knowledge of its Director, its Assistant Corporation Counsel assigned to DWSD matters, its Assistant Chief of Engineering or its Engineering Support Manager Craig Stanley.

1.11   "**Encumbrance**" shall mean any security interest, mortgage, pledge, claim, lien, charge, option, defect, encumbrance, lease, tenancy, license, covenant, condition, restriction, right of way, easement, judgment, or other right or interest of any nature.

1.12   "**Environmental Requirements**" shall mean all federal, state and local statutes, regulations, and ordinances concerning pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, as such requirements are enacted and in effect on or prior to the Closing Date.

1.13   "**Global Settlement Agreement**" means the settlement agreement between Detroit and Macomb, Oakland and Wayne Counties executed by the parties to that agreement effective May 12, 2009, and approved by the U.S. District Court on that date.

2/25

9/2/2010
Doc 946709v12

1.14    **"Governmental Entity"** shall mean the United States of America, any state, county, city, municipality and any subdivision thereof, any court, administrative or regulatory agency, commission, department or body or other governmental authority or instrumentality or any entity or person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.15    **"Indemnified Party"** shall have the meaning such term is given in Section 11.1.

1.16    **"Indemnifying Party"** shall have the meaning such term is given in Section 11.1.

1.17    **"Liability"** means any responsibility, liability, obligation, expense, Claim, Loss, damage, indebtedness (other than System Debt), principal, interest, penalty, guaranty or endorsement of or by any Person, asserted, absolute or contingent, known or unknown, accrued or unaccrued, due or to become due, liquidated or unliquidated, which is related to or arising out of the ownership, condition, operation, maintenance and repair of the Macomb System.

1.18    **"Loss"** or **"Losses"** means any damages (excluding consequential), deficiencies, dues, principal, interest, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses, related to or arising out of the condition, operation, maintenance and repair of the Macomb System (other than the System Debt) or out of the breach of any representation, warranty or covenant of this Agreement or expense under Section 10.4.

1.19    **"Macomb County"** means the County of Macomb, Michigan.

1.20    **"Macomb System"** means the Macomb Interceptor System, to-wit, all of the interceptor sewers, meters, pump station and appurtenant facilities and associated tangible and intangible personal property commonly known as the Clintondale Pump Station and the Romeo Arm, Garfield, 15 Mile, Macomb, and Lakeshore and Lakeshore Extension Interceptors, and commencing in several branches northwards and eastwards from the intersection of the Edison Corridor Interceptor and 15 Mile Road, Macomb County, Michigan, as specifically described in Schedule 1.20, excluding such property as specifically identified in Schedule 1.20. Meters shall be deemed to include the lead-in sewer beginning at the downstream site of the manhole immediately upstream from the meter.

1.21    **"MID"** means the Macomb Interceptor Drain Drainage District, created pursuant to Chapter 20 of the Drain Code of 1956.

1.22    **"Material"** or "materially" means, depending on the context, any condition, change or effect that, individually or when taken together with all other such conditions, i) is or is reasonably likely to be significantly adverse to the condition of the Macomb System, ii) will or is reasonably likely to prevent the consummation of the transactions contemplated hereby or

3/25

9/2/2010
Doc 946709v12

the validity of this Agreement or defeat the purpose of this Agreement, or iii) if such change or condition had occurred before the execution of this Agreement is of such a nature that it would have induced a Party not to enter into this Agreement

1.23 **"MDNRE"** means the Michigan Department of Natural Resources and the Environment.

1.24 **"NPDES"** means the National Pollutant Discharge Elimination System.

1.25 **"Oakland County"** means the County of Oakland, Michigan.

1.26 **"Macomb System Real Property Agreements"** shall mean the easement agreements, rights of way, licenses, deeds and/or other agreements, instruments or grants evidencing Detroit's rights and obligations with respect to the use and operation of the Macomb System at the properties described on  3.5(a)(1).

1.27 **"Macomb System Real Property Rights"** shall mean the easements, rights of way, licenses and other interests in real property necessary for the use and routine operation of Macomb System

1.28 **"OMI System"** means the Oakland-Macomb Interceptor System transferred from the City of Detroit to the Oakland-Macomb Interceptor Drain Drainage District effective October 22, 2009, to-wit, all of the interceptor sewers, meters and appurtenant facilities and associated tangible and intangible personal property commonly known as the Edison Corridor Interceptor, the Oakland Arm Interceptor and the Avon Arm Interceptor and commencing northwards from the north city line of the City of Detroit. The Northeast Sewerage Pump Station and that part of the Edison Corridor Interceptor located within the city limits of Detroit are not part of the OMI System and were not transferred to the District.

1.29 **"Order"** shall mean any decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any Governmental Entity.

1.30 **"Ordinary Course of Business"** shall mean shall an action taken by a Person with respect to the Macomb System which is consistent in nature, scope and magnitude with the past practices of such Person with respect to the Macomb System and is taken in the ordinary course of the normal, day-to-day operations of such Person with respect to the Macomb System.

1.31 **"Person"** shall mean any individual, corporation, association, partnership, joint venture, trust, estate, unincorporated organization or Governmental Entity.

1.32 **"Purchase Price"** shall have the meaning set forth in Section 2.3 hereof.

4/25

9/2/2010
Doc 946709v12

1.33 **"Representative"** with respect to a particular Person means any officer, employee, agent, consultant, engineer, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

1.34 **"Requisite Regulatory Approvals"** shall have the meaning such term is given in Section 5.1 hereof.

1.35 **"Retained Liabilities"** shall mean only those Liabilities which arise out of or are otherwise related to Claims asserted by a third party which accrue prior to the Closing Date or arise out of contracts for services provided to DWSD by third parties prior to the Closing, excluding any and all Claims by and among Detroit, Macomb County and MID. Notwithstanding the foregoing, for the purposes of this Agreement, any Claim, whether in trespass or other cause of action, whenever (whether before or after Closing), against whomever asserted, and arising out of any allegation that a) Detroit, Macomb County or MID did or does not have an easement, right of way or other interest in real property sufficient to entitle Detroit, Macomb County or MID to use, maintain and operate the Macomb System or b) Detroit, Macomb County or MID is otherwise in violation of or has any unsatisfied obligations arising under any Macomb Real Property Agreement, shall be deemed to have accrued on or before the Closing and be deemed a Retained Liability.

1.36 **"Schedules"** shall mean each schedule specifically referenced in this Agreement.

1.37 **"System Debt"** means the outstanding pro rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to facilities comprising the Macomb System and charged to Macomb County in the DWSD Sewer Rate Model for FY 2009-10 on other than a "common to all" basis, as adjusted to reflect resolution of certain outstanding rate issues, with the exception of debt and debt service for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs. The calculation of System Debt as of 6/30/2009 is set forth in Schedule 3.8. The FY 2009-10 sewer rates and charges will remain in place for the entire fiscal year, even if Closing occurs prior to the end of the fiscal year. In order to determine the "System Debt" on the Closing Date, the District will be credited with i) the difference between debt service on the relevant facilities billed through the rates and the interest on the associated debt for such facilities paid through the Closing Date, assuming interest calculated at a simple interest rate of 5.17% (which the Parties agree fairly approximates the system weighted interest rate for FY 2009-10), and ii) debt service paid in the rates between the Closing and the end of the fiscal year. That calculation, assuming a Closing Date of 6/30/2010, is shown on Schedule 3.8. The Parties agree that this Schedule will be updated to the Closing Date as part of the closing documents.

1.38 **"Third Party Claim"** shall have the meaning such term is given in Section 11.2 hereof.

9/2/2010
Doc 946709v12

1.39 **"Wastewater Disposal Services Contract"** shall mean that certain Wastewater Disposal Services Contract by and between Detroit and the Oakland Macomb Interceptor Drain Drainage District dated October 22, 2009.

## ARTICLE II
## THE PURCHASE AND SALE

2.1 <u>Transfer to the MID</u>. In accordance with the provisions of this Agreement, in consideration for the payment of the Purchase Price and other good and valuable consideration, and subject to the contingencies set forth in ARTICLE VII and ARTICLE VIII, Detroit shall transfer and convey the Macomb System to MID free and clear of all liens and encumbrances pursuant to an Assignment of Rights of Way and Easements, <u>Exhibit A,</u> and other instruments of transfer to be delivered at the Closing in accordance with the provisions relating to the Closing.

2.2 <u>Acquisition by the MID</u>. MID, in reliance upon the covenants, representations, and warranties of Detroit contained herein, hereby agrees to acquire the Macomb System from Detroit.

2.3 <u>Payment of the Purchase Price</u>. As part of the consideration for the transfer and conveyance of the Macomb System to the MID from Detroit, the MID shall make a payment to Detroit in a sum equal to the System Debt (the **"Purchase Price"**).

2.4 <u>Assignment of Warranty and Guarantee Rights</u>. Detroit shall assign to the MID all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System. Upon written request by the MID, Detroit shall use its best efforts to cause its engineering and other contractors to provide their work product created before the Closing related to the Macomb System to the MID and MID agrees to bear the costs, if any, incurred by the engineers and contractors in providing such work product.

2.5 <u>MACOMB SYSTEM</u>. THE MACOMB SYSTEM SHALL BE CONVEYED BY SELLER TO PURCHASER IN "AS IS" PHYSICAL CONDITION, WITH NO ADDITIONAL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PHYSICAL CONDITION OF THE MACOMB SYSTEM THAT EXTEND BEYOND THE WARRANTIES EXPRESSLY STATED IN THIS AGREEMENT. EXCEPT FOR ANY EXPRESS WARRANTIES STATED IN THIS AGREEMENT, THE MACOMB SYSTEM SHALL BE CONVEYED WITH NO EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE.

2.6 <u>Retained and Assumed Liabilities</u>.

(a) At and as of the Closing, Detroit shall retain, and Macomb County or MID shall in no way assume, the obligation to pay, discharge, perform or defend, as applicable and

9/2/2010
Doc 946709v12

when due, any and all of the Retained Liabilities. Detroit shall pay, discharge, perform and satisfy all of the Retained Liabilities when due.

  (b) At and as of the Closing, MID shall assume, and Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities. MID shall pay, discharge, perform and satisfy all of the Assumed Liabilities when due.

  2.7 <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Bodman LLP at 1901 St. Antoine, Detroit, Michigan, on such date as shall be mutually acceptable to the parties on or before June 30, 2010, or such other date as mutually acceptable to the Parties (the **"Closing Date"**).

  2.8 <u>Account Number</u>. No later than three Business Days prior to the Closing Date, Detroit shall deliver to MID in writing the account number of the account into which the Purchase Price is to be transferred at Closing.

  2.9 <u>Deliveries</u>. At the Closing, the transactions listed below shall occur.

  (a) MID shall deliver to Detroit:

    (1) An original certified resolution of the MID authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

    (2) An opinion of counsel to MID covering such matters and in form and substance satisfactory to Detroit and its counsel;

    (3) A certificate executed by MID as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing; and

    (4) The Purchase Price by wire transfer.

  (b) Detroit shall deliver to MID:

    (1) A certified resolution of the Board of Water Commissioners of Detroit authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

9/2/2010
Doc 946709v12

(2)    A certified resolution of Detroit City Council authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

(3)    An executed bill of sale for all of the Macomb System that is tangible personal property in form and substance satisfactory to MID and its counsel and executed by Detroit;

(4)    An executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to MID and its counsel and executed by Detroit;

(5)    An assignment of the Macomb System Real Property Agreements by a quitclaim deed, an Assignment of Rights of Way and Easements, or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to MID and its counsel and executed by Detroit;

(6)    Such additional certificates, affidavits, undertakings and other evidence as may be required to induce MID's title company ("Title Company") to issue such title insurance policies, in form and substance satisfactory to MID, as MID may elect to purchase with respect to the real property identified in Schedule 3.5(a)(1);

(7)    Such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by MID, each in form and substance satisfactory to MID and its counsel and executed by Detroit;

(8)    An assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System except NTH Contract CS-1372, the METCO Services Contract CS-1241, and the Martin Controls contract which shall not be assigned;

(9)    A certificate executed by Detroit as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing;

9/2/2010
Doc 946709v12

(10) An opinion of bond counsel to Detroit providing, in substance, that the transactions contemplated by this Agreement do not violate covenants made by Detroit to its bondholders; and

(11) An opinion of the legal department of Detroit, reasonably satisfactory to MID, providing that the transactions contemplated by this Agreement do not violate the City Charter of Detroit and such additional matters and in such form satisfactory to MID and its counsel.

(c) Each of Detroit and MID shall deliver to the other Party hereto an executed original counterpart of the following documents:

(1) Clintondale Pump Station Transition Services Agreement.

2.10 <u>Transfer of Operation.</u> Effective as of 11:59 p.m. on the Closing Date, MID shall take over from the City all of the operation, maintenance and administration of the Macomb System, except as provided by the Clintondale Pump Station Transition Services Agreement executed on even date herewith.

2.11 <u>Termination of Wastewater Contracts.</u> Effective as of 11:59 p.m. on the Closing Date, the existing Wastewater Disposal Services Contract between Detroit and the Macomb County Wastewater Disposal District shall be terminated, subject to the survival of the following rights and obligations:

(a) The rights and obligations to credits or for additional assessments, respectively, arising under the Look Back process for rate years and rates paid prior to the termination of the existing contracts; and

(b) The payment for wastewater services provided by Detroit to the Macomb County Wastewater Disposal District through the date of termination of the existing contract but not billed or paid until after its termination.

2.12 <u>Expenses.</u> Detroit, Macomb County and MID shall each bear their own expenses incurred by them in connection with the transactions contemplated by this Agreement, including without limitation, consultants' fees, legal fees and accounting fees, whether or not such transaction is consummated, except as may otherwise be provided in Section 5.5 and ARTICLES X and XI.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF DETROIT

Detroit makes the following representations and warranties to Macomb County and MID, except as otherwise set forth in the written disclosure schedules (the "**Schedules**")

9/25

9/2/2010
Doc 946709v12

delivered to Macomb County and MID on or prior to the date hereof, a copy of which is attached hereto:

3.1     Corporate Organization.  Detroit is a municipal corporation duly organized, validly existing and in good standing under the laws of the State of Michigan.

3.2     Authorization.  Detroit has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and thereby. Assuming due and valid authorization, this Agreement will constitute a legal, valid and binding obligation of Detroit, enforceable against Detroit in accordance with its terms, except as the enforcement thereof may be limited by applicable principles of bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors and subject to general principles of equity.

3.3     No Conflict.  The execution, delivery and performance by Detroit of this Agreement, the compliance by Detroit with any of the provisions hereof, and the consummation by Detroit of the transactions contemplated hereby: (i) do not violate any provision of the City Charter of Detroit, ordinances of Detroit or any bond covenants associated with the System Debt; (ii) do not require the consent, approval, clearance, waiver, order or authorization of any Person other than the Board of Water Commissioners and the Detroit City Council; (iii) do not conflict with or violate any Applicable Law or any order, judgment, award or decree of any court or other Governmental Entity to which Detroit or the Macomb System is subject; and (iv) do not conflict with, or result in any breach of, or default or loss of any right under (or an event or circumstance that, with notice or the lapse of time, or both, would result in a default), or the creation of any encumbrance pursuant to, or cause or permit the acceleration prior to maturity of any amounts owing under any indenture, mortgage, deed of trust, lease or other agreement to which Detroit is a party or to which any of the Macomb System is subject, in each case, which failure, violation, conflict or breach would, in the aggregate, materially hinder or impair the consummation of the transactions contemplated by this Agreement.

3.4     No Material Transactions.  Except for the execution of this Agreement, Detroit has not engaged in any Material transactions related to the Macomb System since January 1, 2009 except contracts or contract amendments for the design of the Clintondale pump station improvements under Contract CS-1241, or associated with NTH Contract CS-1372.

3.5     Easements and Rights of Way.

(a)     Schedule 3.5(a) (1) identifies all of the real property occupied by the Macomb System.  Schedule 3.5 (a) (2) sets forth all Macomb System Real Property Agreements in Detroit's possession and control.

(b)     To Detroit's knowledge, except as disclosed on Schedule 3.5(b), Detroit possesses all necessary, permanent, perpetual and transferable Macomb System Real Property

9/2/2010
Doc 946709v12

Rights (not including easements, licenses or rights of way by prescription, necessity, implication or acquiescence) necessary for the use and routine operation of Macomb System.

(c)     Except as disclosed on <u>Schedule 3.5(c)</u>, Detroit has good and marketable title to the Macomb System and to the rights arising under the Macomb System Real Property Rights, free and clear of all Encumbrances

(d)     To Detroit's Knowledge, except as disclosed in <u>Schedule 3.5(d)</u>, Detroit has not breached any provision of and is not in default (and no event or circumstance exists that with notice or the lapse of time, or both, would constitute such default) under the terms of any Macomb System Real Property Agreement and all of such Macomb System Real Property Agreements are in full force and effect.

(e)     There are no pending or, to Detroit's Knowledge, threatened disputes or pending or threatened litigation with respect to any Macomb System Real Property Rights.

3.6     <u>Environmental Requirements</u>.  Detroit has complied in all material respects with all Environmental Requirements in connection with the ownership, operation and administration of the Macomb System, including, without limitation, NPDES permits and MDNRE requirements, and has not received notice of any violation of any of the foregoing.

3.7     <u>Litigation</u>.  Except as set forth in <u>Schedule 3.7</u> hereto, there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement.

3.8     <u>Disclosure of System Debt</u>.  Schedule 3.8 sets forth all System Debt (with the exception of debt for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs), including for each facility or improvement in the Macomb System, and the allocated outstanding principal as of June 30, 2009, together with such charges and adjustments on which the Parties have agreed to resolve all outstanding issues related to debt and rates associated with the Macomb System.  None of the written data or information furnished or made available to Macomb County by Detroit as part of the due diligence process with regard to System Debt or other debt or rate-related matters contains an untrue statement of a Material fact or omits to state a Material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading.

3.9     <u>Disclosure of Pending Contracts</u>.  To Detroit's Knowledge, <u>Schedule 3.9</u> sets forth all pending contracts associated with the operation, maintenance and repair of any facility within the Macomb System.

9/2/2010
Doc 946709v12

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF MACOMB COUNTY AND MID

MID and Macomb County make the following representations and warranties to Detroit, except as otherwise set forth in the Schedule delivered to Detroit on or prior to the date hereof, a copy of which is attached hereto:

4.1     Corporate Organization.  MID is a Chapter 20 drainage district duly organized and validly existing under the laws of the State of Michigan and has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.

4.2     Authorization.  MID has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and thereby.  This Agreement will constitute a legal, valid and binding obligation of MID, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable principles of bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors and subject to general principles of equity.

4.3     No Conflict.  Except as set forth in Schedule 4.3 hereto, the execution, delivery and performance by MID of this Agreement, the compliance by MID with any of the provisions hereof and thereof, and the consummation by MID of the transactions contemplated hereby and thereby: (i) do not violate any Applicable Law; (ii) do not require the consent, approval, clearance, waiver, order or authorization of any Person; and (iii) do not conflict with, or result in any breach of, or default or loss of any right under (or an event or circumstance that, with notice or the lapse of time, or both, would result in a default), or the creation of any encumbrance pursuant to, or cause or permit the acceleration prior to maturity of any amounts owing under any indenture, mortgage, deed of trust, lease or other agreement to which MID is a party, which failure, violation, conflict or breach would, in the aggregate, materially hinder or impair the consummation of the transactions contemplated by this Agreement.

4.4     Litigation.  Except as set forth in Schedule 4.4 hereto, there is no action, suit or proceeding pending or, to the Macomb County's Knowledge, threatened against or affecting Macomb County or MID  before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of MID to perform its  obligations under this Agreement or which in any manner questions the validity of this Agreement.

4.5     Due Diligence.  MID acknowledges that it is being afforded the opportunity to conduct due diligence and investigation with respect to the transactions contemplated by this Agreement.  MID further acknowledges that, to the extent that Macomb County, MID or their advisors, agents, consultants or representatives, by reason of such due diligence and investigation actually knew that any representation and warranty made herein by Detroit is

12/25

9/2/2010
Doc 946709v12

inaccurate or untrue, this constitutes a release and waiver of any and all actions, claims, suits, damages or rights to indemnity, at law or in equity, against Detroit by MID or Macomb County arising out of breach of that representation and warranty. Nothing herein shall be deemed to limit or waive Macomb County's of MID's rights against Detroit arising out of any other representation and warranty made herein by Detroit.

## ARTICLE V
## COVENANTS OF DETROIT

Detroit covenants and agrees with Macomb County and MID as follows:

5.1     Governmental Approvals; Consents.     Detroit shall use reasonable efforts and shall cooperate with Macomb County or MID (including, to the extent necessary, after the Closing), to obtain all permits, approvals and consents, and to make all filings, necessary or required to be obtained or made for MID to have full use and enjoyment of the Macomb System subsequent to the Closing and for the consummation of the transactions contemplated by this Agreement under Applicable Law (all such permits, approvals, filings and consents being referred to as the **"Requisite Regulatory Approvals"**).

5.2     Operation and Maintenance of the Macomb System until Closing.     Between the date of this Agreement and the Closing, Detroit shall:

(a)     Operate the Macomb System in the Ordinary Course of Business;

(b)     Obtain the consent of Macomb County or MID prior to implementing operational decisions of a Material nature;

(c)     Maintain the Macomb System in a state of repair and condition consistent with Detroit's conduct of the operation of the Macomb System prior to Closing;

(d)     Comply in all material respects with Applicable Law and contractual obligations applicable to the operation of the Macomb System;

(e)     Maintain all books and records relating to the operation of the Macomb System in the Ordinary Course of Business.

(f)     Provide to Macomb County and MID reasonable notice prior to making any capital expenditures or implementing any maintenance, repair or operational decisions of a material nature relating to the Macomb System and reasonably consider any objections of the Macomb County thereto;

(g)     Refrain from entering into any sale, assignment, or other transfer of all or any part of Detroit's right, title or interest in and to any portion of the Macomb System without first obtaining the consent of Macomb County and MID;

13/25

9/2/2010
Doc 946709v12

(h)     Refrain from entering into any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the Macomb System without first obtaining the consent of Macomb County and MID; and

(i)     Promptly notify the Macomb County of any emergency or other change in the normal course relating to the Macomb System (or communications indicating that the same may be contemplated) if such emergency or change would be Material.

5.3     <u>Litigation and Claims</u>.  Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

5.4     <u>Notice of Changes</u>.  Detroit shall inform Macomb County and MID in writing if it becomes aware that any representation or warranty made by Detroit in this Agreement has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by this Agreement to be performed or complied with by Detroit.

5.5     <u>Post-Closing Covenants.</u>  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, Detroit will take such further action (including the execution and delivery of such further instruments and documents) as Macomb County or MID may reasonably request, all at the sole cost and expense of MID, unless such action is a result of any Default or breach of any representation, warranty or covenant by Detroit under this Agreement or is covered by Section 10.4, in which cases it will be at the sole cost and expense of Detroit.

5.6     <u>Adjustment of Sewer Disposal Rates After Acquisition</u>  Detroit will adjust its sewer rate model such that no debt service associated with System Debt is charged directly or indirectly to Macomb County, MID, or the Oakland-Macomb Interceptor Drain Drainage District after the Closing Date nor any costs formerly included in the sewer rate model associated with the operation and maintenance of the Macomb System, with the exception of debt service for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs.  <u>Schedule 5.6</u> shows in detail the manner in which the post Closing sewer rates for Oakland-Macomb Interceptor Drain Drainage District will be calculated if the transfers of the Macomb System and the OMI System were effectuated on June 30, 2010.  The Parties agree that before November 30, 2010, they will mutually agree on how the FY2009-10 Look Back calculations should conducted in light of the System Debt adjustments set forth in Section 1.37.

9/2/2010
Doc 946709v12

## ARTICLE VI
## COVENANTS OF MID AND MACOMB COUNTY

The MID and Macomb County hereby covenant and agree with Detroit as follows:

6.1     Cooperation.  Subject to the terms and conditions of this Agreement, Macomb County and MID shall cooperate with Detroit to use its best efforts to secure all necessary consents, approvals, authorizations, exemptions and waivers from all Persons and Governmental Entities as shall be requested by Detroit or required to be obtained in order to consummate the transactions contemplated hereby.

6.2     Litigation and Claims.  MID shall promptly inform Detroit in writing of any Claims (or communications indicating that the same may be contemplated) of which MID is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

6.3     Notice of Changes.  MID shall inform Detroit in writing if it becomes aware that any representation or warranty made by Macomb County or MID in this Agreement has ceased to be accurate or if MID becomes aware of the occurrence of any breach of any covenant or other agreement required by this Agreement to be performed or complied with by the Macomb County.

6.4     New Service Contracts.  Prior to Closing, Macomb County shall enter into a wastewater disposal services contract with the Oakland-Macomb Interceptor Drain Drainage District.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF DETROIT

The obligations of Detroit to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Detroit) on or prior to the Closing of all of the following conditions:

7.1     Accuracy of Representations and Warranties.  Except as set forth in the Schedules, the representations and warranties of Macomb County and MID set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing.

7.2     Performance of Covenants and Agreements.  Macomb County or MID, as their respective liabilities lie, shall have duly performed and complied in all Material respects with the covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing. None of the events or conditions entitling Detroit to terminate this Agreement under ARTICLE IX hereof shall have occurred and be continuing.

9/2/2010
Doc 946709v12

7.3     Consents.  Any consent required for the consummation of this purchase and sale under any agreement, contract, license or other instrument described in any exhibit hereto or referred to herein, or for the continued enjoyment by Detroit of any benefits of such agreement, contract, license or other instrument after the Closing, which consent Macomb County or MID is specifically obligated to obtain pursuant to this Agreement shall have been obtained and be effective.

7.4     Governmental Approvals.  All Requisite Regulatory Approvals shall have been obtained or made and shall be in full force and effect.  There shall be no injunction, restraining order or decree of any nature that restrains or prohibits the transactions contemplated by this Agreement.

7.5     No Proceedings.  Since the date of this Agreement, there shall not have been commenced or threatened against Detroit, Macomb County or MID or their constituent counties or municipalities any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

7.6     Resolutions.  Detroit shall have received certified copies of the resolutions identified in Sections   2.10(a)(1), 2.10(b)(1) and 2.10(b)(2).

### ARTICLE VIII
### CONDITIONS TO OBLIGATIONS OF MACOMB COUNTY AND MID

The obligations of Macomb County and MID to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Macomb County or MID) on or prior to the Closing, of all of the following conditions:

8.1     Accuracy of Representations and Warranties.   Except as set forth in the Schedules, the representations and warranties of Detroit set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing.

8.2     Performance of Covenants and Agreements.  Detroit shall have duly performed and complied in all Material respects with the covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing. None of the events or conditions entitling MID or Macomb County to terminate this Agreement under ARTICLE IX hereof shall have occurred and be continuing.

8.3     Resolutions.  MID and Macomb County shall have received certified copies of the resolutions identified in Sections 2.10(a)(1), 2.10(b)(1) and 2.10(b)(2).

8.4     Consent.  Any consent required for the consummation of the transactions contemplated by this Agreement under any agreement, contract, license or other instrument

16/25

9/2/2010
Doc 946709v12

described in any schedule or exhibit hereto or referred to herein, which consent Detroit is specifically obligated to obtain pursuant to this Agreement shall have been obtained and shall be effective.

8.5    Governmental Approvals.  All Requisite Regulatory Approvals shall have been obtained or made and shall be in full force and effect.  There shall be no injunction, restraining order or decree of any nature that restrains or prohibits the transactions contemplated by this Agreement.

8.6    No Proceedings.  Since the date of this Agreement, there shall not have been commenced or threatened against Detroit, Macomb County of MID or their constituent counties or municipalities any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

8.7    Financing Contingency.  MID shall have obtained financing on terms and conditions reasonably satisfactory to MID in an amount equal to System Debt plus associated financing costs.

8.8    New Service Contracts  Macomb County shall have entered into a new wastewater disposal services contract with the Oakland-Macomb Interceptor Drain Drainage District.

8.9    Resolution of all Certain Disputes.  Macomb County and Detroit shall have executed an agreement acknowledging that all pending disputes between such parties with respect to rates and all other matters have been resolved.

8.10    Title Insurance and Surveys.  MID shall have obtained title commitments and searches and, if MID elects, also title insurance policies and surveys with respect to Macomb System Real Property Rights, from title companies, surveyors and engineering firms, as applicable, and in form and substance, satisfactory to MID.

## ARTICLE IX
## TERMINATION PRIOR TO CLOSING

9.1    Termination.

(a)    This Agreement may be terminated at any time prior to the Closing:

(1)    By the mutual written consent of Detroit, MID and Macomb County;

17/25

9/2/2010
Doc 946709v12

(2)    By Detroit in writing if Macomb County or MID shall be in Default;

(3)    By Macomb County or MID in writing if Detroit shall be in Default;

(4)    By written notice of either Party hereto to the other Party hereto if, after the date of this Agreement but prior to the Closing, defects within and necessary repairs to the Macomb System have become Materially greater or different than those disclosed in the following reports prepared by NTH Consultants, Ltd.:

    (A)    Report on Sewer Condition Investigation & Evaluation Romeo Arm, Oakland-Macomb Interceptor, PCI-12A, DWSD Contract CS-1368 ER_B Task 37-1 (June 5, 2006);and

    (B)    Report of Sewer Condition Assessment Inspection DWSD Construction Contracts PCI 13, 14, 15B, 15C, 24, 25, 42A, and 45, Project No. 15-060131-00 (June 7, 2006).

(5)    By Macomb County, MID or Detroit if the transaction is not approved by all their respective governing bodies; and

(6)    By any Party hereto if the other Party hereto shall fail to timely satisfy those conditions set forth in ARTICLE VII or ARTICLE VIII hereto, as appropriate.

(b)    This Agreement may be terminated by Macomb County in writing on or before January 1, 2010 if it shall not have been satisfied in its sole discretion with the results of Macomb County's continuing due diligence investigations of the Macomb System, including, without limitation, with respect to all operational, financial, environmental, legal and accounting matters.

9.2    <u>Effect on Obligations</u>.    Termination of this Agreement pursuant to this ARTICLE IX shall terminate all obligations of the Parties hereto; provided, however, that termination pursuant to Sections 9.1(a)(2) or 9.1(a)(3) hereof shall not relieve any defaulting party from any liability to the other party hereto resulting from such Default. Notwithstanding the foregoing, any and all existing agreements (other than this Agreement) between Detroit and Macomb County and/or any constituent entity thereof which are related to the Macomb System shall remain in full force and effect following any termination of this Agreement unless and until such existing agreements are otherwise terminated pursuant to the terms thereof.

9/2/2010
Doc 946709v12

## ARTICLE X
## REMEDIES FOR BREACHES OF THIS AGREEMENT

10.1 <u>Survival of Representations and Warranties.</u> All of the representations, warranties and covenants of Macomb County and MID and Detroit contained in this Agreement and the schedules and exhibits hereto shall survive the Closing and continue in full force and effect forever thereafter (subject only to any applicable statutes of limitations applicable to their breach).

10.2 <u>Remedies Generally</u> Unless expressly limited by this Agreement, in addition to any remedies provided in Sections 10.3, 10.4 and 10.5, the Parties shall have all remedies available at law and equity for a breach of contract for any breaches of any terms of this Agreement.

10.3 <u>Remedies for Breach of Representations, Warranties and Covenants.</u> If a Party sustains any Losses because the representations or warranties provided by the other Party are incorrect or untrue or because the other Party has breached its covenants given herein, the other Party shall be liable for all Losses incurred by the Party to cure such representations, warranties or covenants. In addition or in the alternative, the Party may require the other Party to take such actions as required to cure such misrepresentations, warranties or breached covenants.

10.4 <u>Remedies to Cure Title Issues.</u> In the event that Detroit does not possess all necessary, permanent, perpetual and transferable Macomb System Real Property Rights, or if any of those Macomb Real Property Rights are in the form of easements, rights of way or licenses arising by prescription, necessity, acquiescence or implication, MID may obtain by purchase, condemnation or otherwise such easements, rights of way, licenses or other agreements on terms reasonably acceptable to MID and in any case sufficient to entitle MID to use and operate the Macomb System in the same manner as used and operated by Detroit prior to Closing. MID shall use good faith efforts to minimize the cost of obtaining such easements, rights of way, licenses or other agreements. MID shall consult with Detroit before extending offers to purchase, finalizing any appraisals, or extending any settlement offers, and shall reasonably consider any comments or objections made by Detroit with regard to same. In the event that condemnation proceedings are commenced or other litigation related to Macomb System Real Property Rights occurs, MID shall inform Detroit of the commencement of such proceedings and provide advance notice of hearings and settlement conferences scheduled in such proceedings. Detroit, at its sole cost and expense, shall cooperate in taking all actions requested by MID to assist MID in obtaining such easements and other interests in property. Within 60 days of demand, as may be made from time to time by MID, Detroit shall reimburse the Macomb County or MID in an amount equal to any and all costs incurred by Macomb County or MID to obtain such easements and other interests in property including, but not limited to, costs of acquisition or condemnation awards (including the condemnation defendant's attorneys fees and costs) and all legal, expert and professional fees and costs incurred by Macomb County or MID and any Losses actually incurred by the Macomb County

9/2/2010
Doc 946709v12

or MID arising out of Claims asserted against Macomb County or MID by third parties based on the failure to have an easement, right of way, license or other agreement for real property necessary for the use and routine operation of Macomb System. These reimbursable costs include the cost incurred by the Macomb County before Closing to ascertain the location of any improvements constituting any part of the Macomb System or to compare the location of the Macomb easements to the "as-built" designs of the Macomb System. Further, within 60 days of demand, as may be made from time to time by Macomb County or MID, Detroit shall reimburse Macomb County or MID for all Losses actually incurred by Macomb County or MID arising out of Claims asserted against Macomb County or MID arising out of any obligation occurring under the OMI Real Property Agreements before Closing.

    10.5   Limitations on Certain Remedies.

    (a)   Notwithstanding anything in Sections 10.2, 10.3 and 10.4 to the contrary, any right to damages arising under those Sections shall be net of the dollar amount of any insurance proceeds actually received by the Party from any third party insurer with respect to the Claim.

    (b)   The injured Party will take reasonable steps to mitigate all Losses relating to the Claim, including availing itself of any defenses, limitations, and will provide such evidence and documentation of the nature and extent of the Claim as may be reasonably requested by the other Party. The injured Party's reasonable steps include the reasonable expenditure of money to mitigate or otherwise reduce or eliminate any loss or expense for which a remedy would otherwise be due under this ARTICLE X, and the reimbursing Party will reimburse the injured Party for the injured Party's reasonable expenditures in undertaking the mitigation.

    (c)   Notwithstanding anything contained to the contrary in any other provision of this Agreement, except in cases of a Party's gross negligence, willful misconduct or fraud, the obligations of each Party under Sections 10.2, 10.3 and 10.4, and the recovery by any injured Party of any liabilities suffered or incurred by it as a result of any breach or non-fulfillment by a Party or any of its representations, warranties, covenants, agreements or other obligations under this Agreement, shall be limited to actual damages (but excluding consequential damages).

    (d)   Survival of Remedies  The rights and obligations to remedies given in Article X shall survive the Closing indefinitely.

## ARTICLE XI

## PROCEDURES IN THE EVENT OF CLAIMS BY THIRD PARTIES

    11.1   Remedies For Third Party Claims Asserted Against One Party Arising out of or Related to Liabilities Assumed or Retained by the Other Party. In the event that a Third Party

9/2/2010
Doc 946709v12

Claim, as defined below, is asserted against one Party (**"Indemnified Party"**) arising out of or related to matters for which the other Party (**"Indemnifying Party"** (which includes the City of Detroit, Macomb County and MID)) has assumed liability under this Agreement, the Indemnifying Party shall defend the Indemnified Party from such Third Party Claims and shall reimburse the Indemnified Party for any Loss incurred by the Indemnified Party resulting from such Third Party Claims.

11.2    Defense and Settlement of Third Party Claims

(a)    If any third party shall notify an Indemnified Party with respect to any matter (a **"Third Party Claim"**) which arises out of a matter for which liability was expressly assumed or retained by the Indemnifying Party under this Agreement or arises out of the breach of a representation, warranty or covenant given in this Agreement, the Indemnified Party shall promptly (and in any event within 30 days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing. Third Party Claim does not include any Claim covered by Section 10.4. Failure to give the required notice shall not bar the rights of the Indemnified Party under this Agreement except to the extent that such failure prejudices the Indemnifying Party's ability to defend and settle the Third Party Claim.

(b)    To the extent permitted by Applicable Law, the Indemnifying Party will have the right at any time to assume and thereafter conduct the Indemnified Party's defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party provided that within 30 days after receipt of the notice of the claim the Indemnifying Party confirms in writing its responsibility therefore; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party and includes a full and complete release of the Indemnified Party as an unconditional term thereof.

(c)    Unless and until the Indemnifying Party timely assumes the defense of the Third Party Claim as provided in Section 11.2(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d)    In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without seeking the prior written consent of the Indemnifying Party (not to be withheld unreasonably).

(e)    The Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense) and the Indemnified Party shall be entitled to have sole entire control over the defense or settlement of the Claim or portion of a Claim to the extent the Claim or portion of a Claim seeks an order, injunction, non-monetary or other equitable relief

9/2/2010
Doc 946709v12

against the Indemnified Party which if successful, could materially interfere with the business, operations assets, condition (financial or otherwise) or prospects of the Indemnified Party.

11.3    Release and Covenant Not To Sue. Each Party releases and covenants not to sue the other for Liabilities expressly assumed or retained by the Party under this Agreement except to enforce the terms of this Agreement.

11.4    Survival of Remedies. The rights and remedies given in Article XI shall survive the Closing indefinitely.

## ARTICLE XII
## MISCELLANEOUS

12.1    Continued Support. In the event and for so long as any party hereto actively is contesting or defending against any Claim in connection with (a) any transaction contemplated under this Agreement, (b) the resolution of any encroachments or trespasses by MID or Macomb County, encroaching easements, Encumbrances or rights-of-way, (c) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Macomb System, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending party is entitled to reimbursement therefor under ARTICLE X and XI above). The rights and obligations in this Section 12.1 shall survive the Closing indefinitely.

12.2    Cooperation on Repairs After the Closing, Detroit shall cooperate with the MID in taking actions to facilitate the ongoing repairs to the Macomb System.

12.3    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

12.4    Incorporation of Schedules. The Schedules and exhibits identified in this Agreement are incorporated herein by reference and made a part hereof

12.5    Entire Agreement. This Agreement constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous

9/2/2010
Doc 946709v12

agreements and understandings between the Parties with respect to the subject matter hereof. No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by Detroit and MID and in compliance with Section12.12.

12.6  <u>Successors and Assigns</u>.  This Agreement will inure to the benefit of and be binding upon Detroit, Macomb County and MID and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either Party hereto without the prior written consent of the other Party hereto.

12.7  <u>Taking of Necessary Action</u>.  Subject to the terms and conditions of this Agreement, each of the parties hereto agrees, subject to Applicable Law, to use all reasonable best efforts promptly to take or cause to betaken all action and to promptly do or cause to be done all things necessary, proper or advisable under Applicable Laws and regulations to consummate and make effective the transactions contemplated by this Agreement.  Without limiting the foregoing and subject to the terms and conditions of this Agreement, the parties shall use their commercially reasonable efforts to obtain and make all Required Regulatory Approvals.  Each party hereto shall cooperate with the other in good faith to help the other satisfy its obligations hereunder.

12.8  <u>Invalidity</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the practical, economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible. Invalid provisions shall be severed from this Agreement.

12.9  <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.  This Agreement may be executed by facsimile signatures which shall be considered originals.

12.10  <u>Headings</u>.  The headings of the articles, sections and paragraphs of this Agreement and of the exhibits hereto are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof or thereof.

12.11  <u>Construction and References</u>.  Words used in this Agreement, regardless of the number or gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context shall require. Unless otherwise specified, all references in this Agreement to articles, sections,

9/2/2010
Doc 946709v12

paragraphs or clauses are deemed references to the corresponding articles, sections, paragraphs or clauses in this Agreement, and all references in this Agreement to exhibits are references to the corresponding exhibits attached to this Agreement.

12.12 <u>Modification and Waiver</u>. Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provisions hereof (whether or not similar). Oral modifications of this Agreement are not permitted. Modification or amendment of this Agreement shall require the approval of MID's Board, the Board of Water Commissioners and the Detroit City Council.

12.13 <u>Dispute Resolution</u>. Any and all claims alleging a breach of this Agreement shall be submitted to the alternative dispute resolution process set forth in <u>Exhibit B</u> hereto

12.14 <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party shall be in writing and delivered personally, via telecopy (with receipt confirmed) or by registered or certified mail, postage prepaid:

    (a)    if to the MID or Macomb County, to:

        Anthony V. Marrocco
        Macomb County Public Works Commissioner
        21777 Dunham Road
        Clinton Township, MI 48036

        if to Detroit, to:

        Director
        Detroit Water and Sewerage Department
        735 Randolph
        Detroit, Michigan 48226

12.15 <u>Governing Law; Interpretation</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Michigan. The parties hereto (a) consent to the personal jurisdiction of the state and federal courts located in Detroit, Michigan in connection with any controversy related to this Agreement including, but not limited to, counterclaims or third party demands raised as a result of third party counterclaims initiated in any other jurisdiction; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Macomb County or Detroit in connection with this Agreement may be brought in either the state or federal courts located in Detroit, Michigan; and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

<div align="center">24/25</div>

9/2/2010
Doc 946709v12

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY OF DETROIT**, a Michigan municipal corporation

By: _____
Name: Darryl Latimer
Title: Deputy Director
Detroit Water and Sewerage
Department

**MACOMB COUNTY**

By: _____
Name: William Misterovich
Title: Chief Deputy
Macomb County Public Works
Commissioner and County Agency
pursuant to 1939 P.A. 342.

**MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT**

By: _____
Name William Misterovich
Title Acting Chairperson, Macomb
Interceptor Drain Drainage District

25/25

9/2/2010
Doc 946709v12

# Exhibit B

KWAME M. KILPATRICK, MAYOR

CITY OF DETROIT

AND SPECIAL ADMINISTRATOR FOR THE
DETROIT WATER AND SEWERAGE DEPARTMENT

AMENDMENT NO. 2
CONTRACT NO. CS-1368
CONTRACT PURCHASE ORDER NO. 2570872

FOR

CONSULTING SERVICES

BETWEEN

CITY OF DETROIT, MICHIGAN
BOARD OF WATER COMMISSIONERS

AND

INLAND WATERS POLLUTION CONTROL, INC.

"INSPECTION AND IN-PLACE REHABILITATION OF
EXISTING CIRCULAR AND NON-CIRCULAR SEWERS"

# SPECIAL ADMINISTRATOR

## OF

## THE DETROIT WATER AND SEWERAGE DEPARTMENT

### *ORDER NUMBER 2004-5*

TO:        Honorable City Council
Honorable Board of Water Commissioners
Department Heads and Deputies
Executive Staff Boards and Commissions

SUBJECT:    Award of Emergency Amendment (Amendment 2) to Dismiss Contract No. CS-1368 With Inland Waters Pollution Control, Inc.

---

On February 7, 2000, the Federal District Court issued an Order and Supplement to Order Appointing Special Administrator for the Detroit Wastewater Treatment Plant of the Detroit Water and Sewerage Department ("DWSD") in the matter of *U.S. EPA v City of Detroit, et al,* Case No. 77-71100 ("Orders"). The Orders created the position of Special Administrator of the Detroit Wastewater Treatment Plant for the purpose of correcting the causes of noncompliance by DWSD with its NPDES permit and for the purpose of achieving long term, sustained compliance with the permit. On December 3, 2001, by Order Continuing Special Administratorship for the Detroit Water and Sewerage Department, effective at 12:01 a.m. on January 1, 2002, I was appointed Special Administrator of the Detroit Water and Sewerage Department, and the purposes of the Orders were continued. The February 7, 2000 Order directs me to address and correct the various problems with the management and operation of the Detroit Water and Sewerage Department that were identified in the January 17, 2000 Report of the Committee of Investigation, by carrying out the provisions of the July 12, 1999 Plan for Compliance of the Detroit Water and Sewerage Department and by carrying out the recommendations of the Organizational and Operational Review ("OOR") Report of March 1995. These documents form the foundation of the responsibilities to be undertaken by me.

The Orders, as continued by the December 3, 2001 Order, further provides that as Special Administrator, I shall have full power and authority to control, manage and operate the DWSD, including all functions and powers of the Detroit City Council, the Detroit Board of Water Commissioners, the DWSD and any other departments, boards or divisions of the City of Detroit to the extent that they affect my ability to meet the requirements of sustained compliance with the NPDES permit, the Second Amended Consent Judgment ("SACJ"), and other specific responsibilities outlined in those Orders. They also provide me the power to enter into and perform all contractual obligations of the system, and to hire such contractors which I deem necessary or appropriate.

KWAME M. KILPATRICK, MAYOR

CITY OF DETROIT

AND SPECIAL ADMINISTRATOR FOR THE
DETROIT WATER AND SEWERAGE DEPARTMENT

AMENDMENT NO. 2
CONTRACT NO. CS-1368
CONTRACT PURCHASE ORDER NO. 2570872

FOR

CONSULTING SERVICES

BETWEEN

CITY OF DETROIT, MICHIGAN BOARD OF WATER COMMISSIONERS

AND

INLAND WATERS POLLUTION CONTROL, INC.

"INSPECTION AND IN-PLACE REHABILITATION OF
EXISTING CIRCULAR AND NON-CIRCULAR SEWERS"

RECITATIONS

This Amendment Agreement No. 2 (hereinafter called the "AMENDMENT")
dated the _____ day of _____ 20___ between the City of Detroit, a
Municipal Corporation of the State of Michigan, its Board of Water Commissioners of
the Water and Sewerage Department, hereinafter referred to as the "CITY" or "DWSD",
party of the first part, acting by and through Kwame M. Kilpatrick, Mayor of the City of
Detroit and Special Administrator for the Detroit Water and Sewerage Department, and
Inland Waters Pollution Control, Inc., with offices located at 2021 South Schaefer
Highway, Detroit, Michigan 48217, hereinafter referred to as the "CONSULTANT", party
of the second part, made relative and pertaining to Contract No. CS-1368 dated June
26, 2002, by and between the CITY and the CONSULTANT, as previously amended;
and

November 2004

WHEREAS, by Order in a civil action now pending before the United States District Court for the Eastern District of Michigan ("Court"), known and numbered as United States of America v. City of Detroit and Detroit Water and Sewerage Department, No. 77-71100, the Court appointed Kwame M. Kilpatrick, Mayor of the City of Detroit, Special Administrator of the DWSD for the purposes and with the powers set forth in such Order; and

WHEREAS, the Special Administrator wishes to exercise the powers of the Detroit City Council, the Detroit Board of Water Commissioners, and the DWSD (collectively, the "City Bodies"), as authorized by the Order, to the extent necessary to enter into and bind the City and the City Bodies to the terms of this Contract as set forth herein; and

WHEREAS, the CITY desires to engage the CONSULTANT to render certain technical and/or professional services (herein called the "Services"), in connection with inspection and in-place rehabilitation of selected existing sewers using the procedures, methods and equipment of the cured-in-place pipe process; and

WHEREAS, it is of vital importance to DWSD to protect the health, safety and welfare of citizens in sewer rehabilitation areas by maintaining the flow in the existing sewers, at all times maintaining satisfactory conditions for the control and/or proper disposal of storm waters, domestic and sanitary waste waters; and

WHEREAS, the CONSULTANT represents that it is authorized and able to provide professional personnel that are qualified to perform the Services in a manner which is responsive to the CITY'S needs in all respects; and

November 2004

WHEREAS, other related services may be provided in support of the Services; and

WHEREAS, Article 16 "AMENDMENTS" of the Contract provides that the Contract can be amended; and

WHEREAS, the objectives of this Amendment are to address emergency conditions resulting from the apparent collapse of a section of a large DWSD sanitary interceptor located in Macomb County; and

WHEREAS, it is the mutual desire of the parties hereto to amend the Contract to increase compensation by $35,000,000.00 setting a new Total Contract Amount of $95,000,000.00; and

WHEREAS, it is the desire to amend the Contract to increase insurance coverage; and

WHEREAS, to perform these additional services it is necessary that contract time be extended by 365 days, setting a new date for completion of all contract services at July 19, 2006;

NOW THEREFORE, in consideration of the promises, the mutual undertakings and benefits to accrue to the parties and to the public, the parties hereto agree as follows:

November 2004

I.   ADJUST TIME

Delete entirely Section 4.03 of Article 4 "TIME OF PERFORMANCE AND LIQUIDATED DAMAGES" and use the new section as hereinafter follows:


4.03   Contract duration is four (4) years. In no event shall the time period stated herein be extended, except in accordance with the provisions of Article 16 "AMENDMENTS."


II.   ADJUST SCOPE OF WORK

Delete entirely Section 2.01 of Article 2 "SCOPE OF SERVICES" and use the new section as hereinafter follows:


2.01   The CONSULTANT shall perform in a satisfactory and proper manner, as determined within the sole and reasonable discretion of the DWSD, the Services as described below and in Exhibit A "WORK PLAN and DESIGN SPECIFICATIONS" and in Exhibit A-1 "THE SANITARY INTERCEPTOR EMERGENCY REHABILITATION." The Services are understood to include investigation and in-place rehabilitation of existing sewers by using the cured-in-place pipe method, as identified by Task Order. In the event that there shall be any dispute between the parties with regard to the extent and character of the Services to be performed, or the quality of performance under the Contract, the interpretation and determination of the DWSD shall govern.


III.   ADJUST COMPENSATION

Delete entirely Section 7.01a of Article 7 "COMPENSATION" and use the new section as hereinafter follows:

7.01a    The Total Contract Amount shall not exceed $95,000,000.00 except by amendment to this Contract.

Amend Article 7 "COMPENSATION" and use the new section as hereinafter follows:

7.03    The CITY agrees to pay the CONSULTANT on a cost fee basis in accordance with the summary shown as Exhibit B-2 "COSTING SUMMARY FOR EXHIBIT A-1". The DWSD's determination of the completion of this Task Order shall control the amount of payment.

IV.    AMEND EXHIBITS

Amend Exhibits to include Exhibit A-1 "THE SANITARY INTERCEPTOR EMERGENCY REHABILITATION" and Exhibit B-2 "COSTING SUMMARY FOR EXHIBIT A-1" attached hereto.

V.    ADJUST CONTRACT LANGUAGE

Amend Article 2 "SCOPE OF SERVICES" and use the new sections as hereinafter follow:

2.01h    The Consultant shall provide a Performance Bond and a Payment Bond in an amount equal to $35,000,000.00. These bonds shall apply only to the Scope of Work contained in Exhibit A-1, Sanitary Interceptor Emergency Rehabilitation.

2.01I    The Consultant expressly warrants and guarantees to the Owner and Engineer that the labor and materials on completed work performed pursuant to Exhibit A-1 will conform to the Contract

November 2004

Documents and will not be defective for a period of three (3) years, commencing with the date that the owner takes use of the constructed facility.

Amend Article 10 "INSURANCE" and use the new section as hereinafter follows:

10.07   The CONSULTANT shall maintain at its expense during the term of this Contract the following types and amounts of insurance.  With the exception of Worker's Compensation, Employers' Liability, Professional Liability, and Comprehensive Automobile Liability such insurances shall name as an Additional Insured the City of Detroit, a municipal corporation of the State of Michigan, and all other associated, affiliated, allied and subsidiary entities now existing or hereafter created as their respective interests may appear. The insurance policies described in this Amended Section 10.07 shall apply to the work done pursuant to Exhibit A-1 The Sanitary Interceptor Emergency Rehabilitation.

| TYPE OF INSURANCE | MINIMUM AMOUNT |
|---|---|
| **WORKER'S COMPENSATION** | Statutory |
| EMPLOYER'S LIABILITY | |
| Each Accident | $          500,000 |
| Each Disease | $          500,000 |
| Each Person | $          500,000 |
| PROFESSIONAL LIABILITY | |
| (Errors and Omissions) | $        1,000,000 |
| COMMERCIAL GENERAL LIABILITY  (Broad Form) | |
| Bodily Injury – Each Occurrence | $        1,000,000 |
| Body Injury – Aggregate | $        2,000,000 |
| (Completed Operations) | |
| Property Damage – Each Occurrence | $        1,000,000 |
| Property Damage – Aggregate | $        2,000,000 |
| or | |

November 2004

| | | |
|---|---|---|
| Combined Single Limit | $ | 2,000,000 |
| COMPREHENSIVE AUTOMOBILE LIABILITY | | |
| Bodily Injury | $ | 500,000 |
| Property Damage | $ | 250,000 |
| or | | |
| Combined Single Limit | $ | 1,000,000 |
| | | |
| **EXCESS LIABILITY** | $ | 20,000,000 |
| **OWNER'S PROTECTIVE INSURANCE** | $ | 1,000,000 |
| | | |
| **BUILDER'S RISK LIABILITY** | $ | 35,000,000 |

Delete entirely Section 20.03 of Article 20 "MISCELLANEOUS" and use the new section as hereinafter follows:

20.03   This instrument (including Exhibits A, A-1, B-1, B-2, C, D, E and F) contains the entire agreement between the parties and all prior negotiations and agreements are merged herein. Neither the CITY nor the CITY'S Agents have made any representations except those expressly set forth herein, and no rights or remedies are or shall be acquired by the CONSULTANT by implication or otherwise unless expressly set forth herein.

In the event that the language, terms and/or conditions as stated in the Contract itself differs from that in any of the exhibits, the language terms and conditions of the Contract shall govern: all such determinations will be made by the DWSD.

VI.   EFFECT OF AMENDED TERMS ON THE REMAINING PROVISIONS OF THE CONTRACT

Except as herein amended, the terms and conditions of the Contract, dated July 26, 2002, and as previously amended, shall remain the same and govern the relationship of the parties.

November 2004

IN WITNESS WHEREOF, the City and the Consultant by and through their duly authorized officers and representatives have executed this Contract as of the day and year first above written.

WITNESS: (Consultant)

(Signature) *Rene Procopio*

Rene Procopio
(Print or Type)

(Signature) *Kathryn Dickey*

KATHRYN DICKEY
(Print or Type)

WITNESS: (Director)

(Signature)

*Rechanda Cespedes*
(Print or Type) RECHANDA CESPEDES

(Signature)

*Debra L. Ragland*
(Print or Type) DEBRA L. RAGLAND

THIS CONTRACT WAS APPROVED BY THE CITY COUNCIL ON _____

                                    Date
*signature* for    12/30/04
Purchasing Director          Date

---

Inland Waters Pollution Control, Inc
CONSULTANT

BY *Robert DiVello*
(Authorized Signature)

TITLE *President*

2021 South Schaefer Highway
ADDRESS    Detroit, Michigan 48217

TELEPHONE No.    (313) 841-5800

Social Security Number or Federal
Identification No.    38-2024780    .

CITY OF DETROIT
BY
SPECIAL ADMINISTRATOR FOR THE
DETROIT WATER AND SEWERAGE
DEPARTMENT

BY *signature* for

TITLE Victor M. Mercado, Director

APPROVED BY LAW DEPARTMENT PURSUANT TO §6-406 OF THE CHARTER OF THE CITY OF DETROIT

*signature*    12-10-2004
Corporation Counsel          Date

November 2004

## CITY ACKNOWLEDGEMENT

STATE OF MICHIGAN )
) SS.
COUNTY OF WAYNE )

The foregoing instrument was acknowledged before me this _16_ day of
_November_ , 20_04_, by _GARY FUJITA_ ,
the _DEPUTY DIRECTOR_ , of the Water and Sewerage Department of the
City of Detroit, Michigan a municipal corporation.

Notary Public, Wayne County, Michigan
My Commission Expires:

DEBRA L RAGLAND
NOTARY PUBLIC STATE OF MICHIGAN
WAYNE COUNTY
ACTING IN:

MY COMMISSION EXP. MAR. 2,2006

November 2004

If a corporation, please complete the following:

## RESOLUTION OF CORPORATE AUTHORITY

I, _Susan L. Johnson_____, Corporate Officer of _Inland Waters Pollution Control, Inc._
    (Print or Type)

_Michigan_____ Corporation (the "Company" DO HEREBY CERTIFY
that the following is a true and correct excerpt from the minutes of the meeting of the
Board of Directors duly called and held on _November 10, 2004_____ and that the
same is now in full force and effect:

"RESOLVED, that the Chairman, the President, each Vice President, the
Treasurer and the Secretary and each of them, hereby is authorized to
execute and deliver, in the name and on behalf of the Company and under its
corporate seal or otherwise, any agreement or other instrument or document
in connection with any matter or transaction that shall have been duly
approved; the execution and delivery of any agreement; document, or other
instrument, or document in connection with any matter or transaction that
shall have been duly approved; the execution and delivery of any agreement,
document or other instrument by any of such officers to be conclusive
evidence of such approval."

I FURTHER CERTIFY that _____ is Chairman of the Board,
and _Robert L. Williams_____ is President, _David Dixon._____ is
Treasurer, _Bryant M. Frank_____ is Secretary.

I FURTHER CERTIFY that any of the aforementioned officers of the Company
are authorized to execute or guarantee and commit the Company to the conditions,
obligations, stipulations and undertakings contained in Contract No. CS-1368 and that
all necessary corporate approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this _10th_ day of
_November_____, 200_4_.

CORPORATE SEAL

 

           _Susan L. Johnson (signature)_
           Corporate Officer's Signature

           Vice President & General Counsel
           Title

\*     This Signatory must be a DIFFERENT CORPORATE OFFICER than the
signatory on Page S-1.

November 2004

# RESOLUTION OF CORPORATE AUTHORITY

I, Bryant M. Frank, Secretary of Inland Waters Pollution Control, Inc., a Michigan corporation (the "Company") DO HEREBY CERTIFY that the following is a true and correct copy of a resolution of the Board of Directors duly adopted by written consent and that the same is now in full force and effect:

"RESOLVED that Dennis Oszust, as Vice President and General Manager, Pipe Rehabilitation Group of the Company, is hereby authorized to execute and deliver, in the name and on behalf of the Company and under its corporate seal or otherwise, any agreement or other instrument or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement; document, or other instrument, or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement, document or other instrument by Dennis Oszust to be conclusive evidence of such approval."

I FURTHER CERTIFY that Dennis Oszust is authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the proposal and/or contract documents relative to **DWSD CS-1368, ANY AMENDMENTS THERETO, INCLUDING COSTING SUPPLEMENT FOR AMENDMENT NO. 2 TO DWSD CONTRACT NO. CS-1368, TASK ER-37, 15 MILE ROAD & HAYES SEWER REPAIR "INSPECTION AND IN-PLACE REHABILITATION OF EXISTING CIRCULAR AND NON-CIRCULAR SEWERS UP TO 15 INCHES AND LARGER THAN 15 INCHES IN SIZE"** project and that all necessary corporate approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this 13th day of April 2005.

CORPORATE SEAL

_____
Corporate Officer's Signature, Secretary

STATE OF MICHIGAN }
                   } ss.
COUNTY OF WAYNE    }

The foregoing instrument was acknowledged before me this 13th day of April 2005 by Bryant M. Frank, Secretary of Inland Waters Pollution Control, Inc., a Michigan corporation.

_____
Notary Public,
County, Michigan

My Commission expires : 08/26/06

KIMBERLY L STUBBS
NOTARY PUBLIC STATE OF MICHIGAN
WAYNE COUNTY
MY COMMISSION EXP. AUG. 26 2006
acting in Wayne County

## CORPORATE ACKNOWLEDGMENT

STATE OF MICHIGAN )
)
COUNTY OF WAYNE )

The foregoing instrument was acknowledged before me this *10th* day of *November*, 200*4*, by *Robert L. Williams* the *President* of *Inland Waters Pollution Control*, a *Michigan* Corporation on behalf of the Corporation.

*Sheba L. Stephens*

Notary Public, Wayne County, Michigan
My Commission Expires:

SHEBA L. STEPHENS
NOTARY PUBLIC MACOMB CO., MI
MY COMMISSION EXPIRES Sep 8, 2007

November 2004

City of Detroit
Water and Sewerage Department
Contract No. CS-1368

**EXHIBIT A-1**

**THE SANITARY INTERCEPTOR EMERGENCY REHABILITATION**

- **Project Tasks:**

    Funding provided under the Amendment No. 2 will include, but not necessarily be limited to, the following tasks:

- Fabrication and installation of temporary emergency by pass in case 11-foot diameter existing sewer collapses in the sinkhole area. This consists of installation temporary by pass pumps and four 12-inch diameter lines between existing manholes on 11-foot diameter sewer upstream and downstream of the sinkhole area.

- Implementation of temporary permanent bypass pumping to convey sewage around the collapsed section of Interceptor and to prevent upstream flow backups. This includes the installation of two ten foot diameter suction shafts upstream and one eight foot diameter discharge shaft downstream of the damaged suction, pumps with electrical hook-up and diesel generators as backup and two thirty-six inch diameter HDPE (High-Density Polyethylene) pipes, 2,700 feet long each, with all necessary valves and appurtenances.

- Perform an investigation to determine the total extent of damages. This would include surveys, video inspections and a physical walk-through of the interceptor.
- Installation of sheeting to prevent the settlement of houses on the south side of 15 Mile Road
- Stabilization of the existing Interceptor to prevent further damage. This will involve the placement of steel bracing (ribs) within the sewer to support the concrete lining.
- Dewatering of groundwater that includes the installation of eleven dewatering wells along the sewer alignment to prevent groundwater from carrying soil into the Interceptor and keep the ground dry during excavation and repairs.
- Stabilization of the soil envelope around the Interceptor that includes injection of cementious grout to fill voids around the damaged portion of the eleven foot diameter pipe and jet grouting to prevent further collapse of the soil around the sinkhole.
- Develop and implement plan to discharge sewage flow into an existing 60-inch diameter storm sewer belonging to the City of Sterling Heights, in case the damaged section of sewer plugs up and the bypass pumping system is not sufficient.
- Install two bulk heads, one each upstream and downstream side of the sinkhole to isolate the damaged portion of the sewer before excavation of the area for permanent repair.
- Develop design documents for the permanent repair
- Prepare final drawings for the repair
- Obtain all permits from jurisdictional authorities
- Implementation of repair including Road reconstruction and restoration of site, including but not limited to private property restorations as necessary.

# BACKGROUND

The purpose of contract No. CS-1368 is to provide as-needed inspection and in-place rehabilitation of existing sewers at a cost of $50,000,000.00 for the duration of three years on a task-order basis. Amendment No. 1 increased the contract price by $10,000,000.00 with no change in the contract completion time. These services are needed to repair plugged sewers, repairs of major defects (collapses, breaks and investigating lateral connections) to maintain the flows within the wastewater collection system.

This proposed Amendment No. 2 is needed due to emergency conditions resulting from the apparent collapse of a section of a large DWSD sanitary interceptor located in Macomb County. On the morning of August 22, 2004, a massive sinkhole was discovered in 15-Mile Road between Hayes Road and Moravian drive in the City of Sterling Heights. The sinkhole was found increasing in size and posed an immediate threat to existing utilities and adjacent homes.

DWSD has taken the following steps to determine the extent of damage, stabilize the interceptor and adjacent soil envelope to prevent any further damage and prevent flow backups and potential basement flooding and repair of the damaged section:

1. Vactors were used to transport the flow from upstream of damaged section to downstream of the damaged section, while temporary emergency by-pass pumping was being installed in the upstream manhole and 8-inch and 12-inch diameter pipes were installed to carry the flow into existing 60-inch storm sewer, if the 11-foot diameter sewer collapses.

2. Started grouting around the perimeter of the sinkhole to stabilize the ground, using angle and jet grouting.

3. Started installing eleven (11) deep wells for dewatering purposes.

4. Steel sheeting was installed between south side of the interceptor sewer and houses to prevent any further settlement of houses.

5. Started the design work of building a temporary permanent bypass sewer line along 15 Mile Road which would handle a capacity of one hundred cubic feet per second wet weather flow. The bypass will be in use until the repair to the damaged section is complete.

6. Construction of a temporary permanent bypass pumping system is in progress, consisting of two ten foot diameter suction shafts and one 8 foot diameter shaft with pumps, electrical hook up and diesel generators as stand-by, two 2,700 foot long 36-inch diameter High Density Polyethylene (HDPE) discharge lines with all valves and appurtenances.

7. Implemented plan to discharge sewage flow into the existing 60-inch storm sewer belonging to the City of Sterling Heights, in case the 11-foot diameter sewer collapses fully and by-pass pumping does not keep up with the flow during a storm. A 4,800 gallon chlorine tanker is on-site with a chemist on

duty 24-hours a day to dose chlorine into the storm sewer and perform chlorine residual sampling, if the discharge into the 60-inch became necessary.

While the permanent bypass pumping system is being installed, the following actions are being taken:

1. Design and install earth retention system around the damaged section. This consists of soldier piles and auger cast piles and the necessary bracing for a length of 250 lineal feet, a width of 60 lineal feet and a depth of 92 feet.

2. Excavate the sink hole area up to an approximate depth of 70 feet, expose the existing damaged sewer, inspect for damage and cause of failure and remove the existing, damaged pipe.

3. Install new 11-foot diameter Class V reinforced concrete pipe.

4. Build a new access gate structure on the downstream side of the damaged pipe.

5. Backfill the sinkhole per DWSD and City of Sterling Heights and Macomb County Road Commission Standards.

6. Restore 15 Mile Road in the construction area as per City of Sterling Heights and Macomb County Road Commission Standards.

7. Restore the site equal to or better than the condition that existed prior to the sewer break and to the satisfaction of the jurisdictional authorities.

In order to provide DWSD with the means necessary to complete the work described above, the budget for the Contract CS-1368 needs to be increased by an amount of thirty-five million dollars ($35,000,000.00) with a three hundred sixty-five day extension to the contract time.

City of Detroit
Water and Sewerage Department
Contract No. CS-1368


**EXHIBIT B-2**

**COSTING SUMMARY FOR EXHIBIT A-1**


**The terms of this Exhibit B-2 shall apply only to the work done pursuant to the Scope of Work in Exhibit A-1**

CITY OF DETROIT
WATER & SEWER DEPARTMENT
GENERAL ADMINISTRATION

735 RANDOLPH STREET
DETROIT, MICHIGAN 48226-2830
PHONE 313•224•4800/224•4801
FAX 313•224•6067

September 20, 2004

Inland Water Pollution Control, Inc.
2021 South Schaefer Highway
Detroit, Michigan 48217

Attention:    Mr. Dennis Oszust

Gentlemen:

Regarding:    DWSD Contract Number CS-1368, Task Number ER-37
              **Repair of Eleven Foot Sewer at Hayes and Fifteen Mile**

The Detroit Water and Sewerage Department confirms that the following rates will be used for monthly invoices for this task:

I-    Consultants Invoices per Contract No. CS-1372:
    i-    Regular time will based on:
- Direct Labor
- Allowed overhead on direct labor
- Allowed profit on direct labor
- Allowed profit on over head

    ii-    Overtime
- 1.5 times the direct labor for hours worked over 40 in a week or 2 times direct labor for Sundays and Holidays
- 15% on overtime direct labor for overhead
- Allowed profit on 1.5 times the direct labor or 2 times direct labor
- Allowed profit on overhead

    iii-    Straight Time (Personnel)
The rate will be the same as regular time under item (i) for actual number of hours worked.
Attached is representative table for consultant's use to calculate the invoice amount.

II-    Contractor invoices:
    i-    Mobilization and demobilization will be a maximum of 5% of total invoice for the task assigned to a contractor or subcontractor. Documentary proof will be provided to DWSD for the amount charged on this account.
    ii-    Field overhead will be charged for monthly invoices based on documentary proof for the amount charged.

Please be advised accordingly.  If you have any questions, please call.

Very truly yours,

R. C. Shukla, P.E.
Field Engineer

RCS/Gr
Cc: NTH Consultants
    L. D'Agostini & Sons

CITY OF DETROIT
WATER & SEWER DEPARTMENT
GENERAL ADMINISTRATION

735 RANDOLPH STREET
DETROIT, MICHIGAN 48226-283
PHONE 313•224•4800/224-4801
FAX 313•224•6067

April 4, 2005

Mr. Robert L. Williams, President
Inland Waters Pollution Control, Inc.
2021 South Schaefer Highway
Detroit, Michigan 48217

Dear Mr. Williams:

Regarding:    Costing Supplement for Amendment No. 2 to DWSD Contract No. CS-1368
              Task ER-37 – 15 Mile Road and Hayes Sewer Repair
              "Inspection and In-Place Rehabilitation of Existing Circular and
              Non-Circular Sewers up to 15 Inches and Larger than 15 Inches in Size"

The Detroit Water and Sewerage Department (DWSD) has established guidelines for payment of contracts paid on an actual costs plus fee basis. These guidelines govern allowable cost, mark-up percentages and the type of documentation required to substantiate charges. Please be advised that all invoices submitted must contain the required documentation. The mark-up rates included in the supplement were established through negotiations with DWSD and will be effective on work performed beginning December 3, 2004. The other cost guidelines contained in the attached "Costing Supplement" will govern all work performed on the contract from its inception until final completion. This supplement has been added to Amendment No. 2 of Contract No. CS-1368, Contract Costing, Exhibit B-2.

DWSD has retained $597,945.95 of invoiced cost. The retained amount will be released when the project is 95% complete, as determined by the Department.

Thank you for your immediate attention to this matter. Please indicate your acceptance of these terms by signing below. If you have any questions, please contact Darryl Latimer at (313) 964-9486.

Sincerely,

Victor M. Mercado
Director

Accepted Inland Waters Pollution Control Inc.

By: _____

Name: Dennis Oszust

Title: Vice President/General Manager, Pipe Rehabilitation Group

Date: April 11, 2005

VMM/DAL/ER

KWAME M. KILPATRICK, MAYOR



3/17/05
RCS 3/17/05

## CS-1368 Amendment No. 2 Costing Supplement
### (Effective December 3, 2004)

I. **Payment Method**

   A. Payment shall be made on an actual costs basis, with or without a guaranteed maximum, based on an itemized breakdown of the actual Cost of the Work involved, as specified in this Supplement, and a Fee for the Work involved, as specified in paragraph VII, below.

   B. Costs shall include those items for labor, material, equipment and other costs as approved by the DWSD Contracting Officer.

II. **Labor, Subcontract and Material/Equipment Costs:**

   A. The Cost of the Work involved includes the Contractor's payroll costs for craft labor resident at the site (through crew foremen) assigned to furnish and incorporating materials and equipment into the Work involved. Payroll costs shall include wages and those labor burdens certified in advance by an authorized financial representative of the Contractor. For actual payroll costs, daily Contractor-certified time sheets verified by the Engineer and certified payroll records shall be the only valid Records.

   B. The Cost of the Work involved includes the Contractor's costs for labor, (lower tier) Subcontract, material/equipment and supplemental costs of Subcontractors nominated for the Work involved. The methods for calculating Subcontractors' costs shall be the same as those for Contractor costs, except that the term "Subcontractor" shall replace the term "the Contractor," context permitting. If required by the Engineer, the Contractor shall obtain detailed competitive quotations and shall nominate two (2) Subcontractors, acceptable to the Contractor and Engineer, for selection by the Engineer.

   C. The Cost of the Work involved includes the Contractor's costs for materials and equipment, including transportation, storage and necessary Suppliers' field services. All trade discounts, rebates and refunds and returns from surplus sales shall accrue to the Owner, and the Contractor shall make arrangements so that they may be obtained. If required by the Engineer, the Contractor shall obtain competitive quotations for materials and equipment and shall nominate two (2) Suppliers, acceptable to the Engineer, for selection by the Engineer. Invoices segregating items associated with the Work involved shall be the record upon which to base actual Supplier costs.

III. **Construction Equipment Costs:**

   A. The Cost of the Work involved includes costs for individual construction equipment with replacement value in excess of $1,000.00. Transportation, loading and unloading, installation, dismantling and removal costs shall be allowed only if prior consent is obtained from the Engineer, and if the equipment is, or was, transported to the site solely for the Work involved. Shipping costs will be allowed if the equipment requires use of a carrier, and provided the travel distance does not exceed that for similar equipment available in the Detroit metropolitan area. Multiple attachments shall be recoverable if prior consent is obtained from the Engineer. Equipment costs shall cease when the equipment is no longer needed for the Work involved. Payroll costs for labor operating the equipment are as specified in paragraph II.A. above. Equipment costs shall be computed using the same accounting and estimating rules and prices, whether related to added or deleted Work.

   B. When determining actual construction equipment costs, daily logs of the equipment, operators and actual usage, verified by the Engineer, shall be the valid records.

   C. Rented (or owned) equipment, idled solely by actions of the Owner or Engineer, shall be paid at the rate for rented equipment, (or at one-half (50%) of the rates for owned equipment), provided the idle period exceeds what is normal for the equipment and occurs during normal working hours.

IV. **Rented or Leased Construction Equipment:**

   A. For equipment rented or leased from lessors not associated with or owned by the Contractor, the Contractor shall be entitled to negotiated rental rates, but in no event shall the rates exceed those listed in the Rental Rate "Blue Book" published by Dataquest, Inc. for the Detroit metropolitan area applicable to the equipment (model number and year). The equipment rate for second or third shift Work shall not exceed fifty percent (50%) of the base rate. Operating costs shall not exceed the hourly operation rate in the Blue Book. Hourly rates for equipment previously in use on the Work for at least a month shall be based

on the monthly rate divided by 176 hours. Equipment previously in use for only one week or not previously in use at the site shall not be invoiced to the Owner at rates higher than the following schedule of equipment use:

| | |
|---|---|
| Less than 8 hours | Hourly Rate |
| 1 day but less than 7 days | Daily Rate |
| 1 week but less than 30 days | Weekly Rate |
| 30 days or more (when in use) | Monthly Rate |

## V.  Owned Construction Equipment:

A.  For equipment owned by the **Contractor**, or rented or leased from lessors associated with or owned by the **Contractor**, the **Contractor** shall be entitled to costs based on billings established by the **Contractor's** normal accounting practices, but in no event shall equipment ownership costs exceed the hourly rates listed in the "Contractor's Equipment Cost Guide," published by Data quest, for the Detroit Metropolitan area applicable to the equipment. Operating costs shall not exceed the hourly operation rate in the Blue Book. For multiple shifts, the equipment rate shall not exceed the shift Work adjustments recommended in the referenced Cost Guide.

## VI.  Costs Covered by the Fee for the Work Involved (and not Allowable as Cost of the Work Involved):

A. The Cost of the Work involved shall not include any of the following expenses (considered non-reimbursable costs, or administrative costs, or field or home office overhead covered by the Fee for the Work involved):

1. Payroll costs and other compensation of (a) executives, general and administrative managers, estimators, claim consultants, attorneys, accountants, labor relation coordinators, contract and subcontract administrators, purchasers, expeditors and other administrative staff, whether resident at the site or in the **Contractor's** principal or branch offices; and (b) project managers, construction managers, superintendents, engineers, architects, schedulers, detailers, safety personnel, clerks and other administrative staff not resident at the site;

2. Costs in the preparation of Change Orders or Change Authorizations (whether or not ultimately authorized by the Owner), or the preparation or filing of claims;

3. Costs of engineers, architects, accountants, consultants, attorneys and others, in the direct employ of the **Contractor** or otherwise, utilized for services related to a controversy or claim about the acceptability of the Work;

4. Any interest on the Work involved, charges for delinquent payments, lost interest on unpaid retainage, and lost profits and lost opportunities; or

5. Any other expenses of the **Contractor's** principal and branch offices, including storage and yard facilities; and any costs not specifically and expressly allowed in this Article.

## VII.  Limits on Fee for the Work Involved:

A. Any adjustment in Contract Price for Work involved shall include a negotiated Fee to cover (a) those costs described under paragraph VI above, and (b) negotiated profit. Any such Fee shall not exceed the following percentages:

1. <u>Contractor</u> - For Work involved performed or to be performed by (a) the **Contractor**, the Contractor's Fee shall not exceed ten percent (10%) of the **Contractor's** Cost of the Work involved, excluding supplemental costs, (b) any nominated Subcontractor, the Contractor's Fee shall be five percent (5%) of that Subcontractor(s)' Cost of the Work involved, excluding that Subcontractor's Fees.

2. <u>Subcontractors Nominated for the Work Involved</u> - For Work involved performed or to be performed by: (a) any first tier Subcontractor, that first tier Subcontractor's Fee shall not exceed ten percent (10%) of that Subcontractor's Cost of the Work involved, excluding supplemental costs; (b) a lower tier Subcontractor, that lower tier Subcontractor's Fee shall not exceed ten percent (10%) of that Subcontractor's Cost of the Work involved, excluding supplemental costs, and any corresponding higher tier Subcontractors shall share equally a Fee of five percent (5%) of the performing lower tier Subcontractor's Cost of the Work involved, excluding the performing Subcontractor's fees.

3. **Consultant and Professional Engineers' Cost** will remain as per the attached table.

**BILLING RATE SHEETS**
**DWSD CONTRACT NO. CS-1368 TASK ER-37**
**15 MILE/HAYES SINK HOLE PROJECT**

| Column No. | A | B | C | D | E | F | | |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | NAME | TIME | HOURLY RATE (Direct Labor) | OVERHEAD RATE (For Indirect Costs) | PROFIT MARK UP (For Direct Labor)-15% | PROFIT MARK UP (For Indirect Costs)-9% | TOTAL MULTIPLIER | |
| | | STANDARD | 1 | 1.6 | 0.15 | 0.144 | 2.894 | S.T. |
| 1 | NTH CONSULTANTS | OVERTIME | 0.5 | 0.075 | 0.075 | 0.00675 | 0.657 | O.T. |
| | | DOUBLE TIME | 1 | 0.15 | 0.15 | 0.0135 | 1.314 | D.T. |
| | | STANDARD | 1 | 1.6 | 0.15 | 0.144 | 2.894 | S.T. |
| 2 | SPALDING DEDECKER | OVERTIME | 0.5 | 0.075 | 0.075 | 0.00675 | 0.657 | O.T. |
| | | DOUBLE TIME | 1 | 0.15 | 0.15 | 0.0135 | 1.314 | D.T. |
| | | STANDARD | 1 | 1.6 | 0.15 | 0.144 | 2.894 | S.T. |
| 3 | SUPERIOR ENGINEERING | OVERTIME | 0.5 | 0.075 | 0.075 | 0.00675 | 0.657 | O.T. |
| | | DOUBLE TIME | 1 | 0.15 | 0.15 | 0.0135 | 1.314 | D.T. |
| | | STANDARD | 1 | 1.49 | 0.15 | 0.1341 | 2.774 | S.T. |
| 4 | LAKESHORE ENG | OVERTIME | 0.5 | 0.075 | 0.075 | 0.00675 | 0.657 | O.T. |
| | | DOUBLE TIME | 1 | 0.15 | 0.15 | 0.0135 | 1.314 | D.T. |

NOTE: OVERHEAD RATE FOR OVERTIME AND DOUBLE TIME PREMIUM IS 15%
BILLING RATE IS CALCULATED BY MULTIPLYING DIRECT LABOR BY TOTAL MULTIPLIER

# *Exhibit C*

## BILL OF SALE
### (Macomb Interceptor Acquisition Agreement)

THIS BILL OF SALE ("Bill of Sale") is dated as of September 2, 2010 by the City of Detroit, a Michigan municipal ("Detroit") to Macomb Interceptor Drain Drainage District, established pursuant to 1956 P.A. 40 (the "District"). Capitalized terms used in this Bill of Sale and not otherwise defined in this Bill of Sale will have the meaning given those terms in the Macomb Interceptor Acquisition Agreement between Detroit and the District dated September 2, 2010 (the "Acquisition Agreement").

Detroit and the District entered into the Acquisition Agreement whereby Detroit agreed to sell, convey, transfer, assign and deliver to the District, all of Detroit's right, title and interest in and to all of the assets owned by or leased or licensed to Detroit and that comprise the MID System or are otherwise used or held for use by Detroit in the operation of the MID System, whether real, personal or mixed, tangible or intangible, and wheresoever situated, whether or not reflected on Detroit's books and records or its financial statements (collectively, the "Transferred Assets"). Without limiting the generality of the foregoing, the Transferred Assets shall include all of Detroit's right, title and interest in, to and under:

    (a) the physical facilities including associated fixtures described in Schedule 1.20 to the Acquisition Agreement;

    (b) all of the MID System that is tangible personal property;

    (c) all of the MID System that is intangible personal property; and

    (d) all contracts, warranties and guarantees that apply to services or goods related to the facilities comprising the MID System, including without limitation, those contracts listed on Schedule 3.9 to the Acquisition Agreement; provided, however, that the NTH Contract #CS-1372, METCO Contract CS-1421, and the Martin Controls contract shall not be assigned or otherwise deemed to be a Transferred Asset.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by the Acquisition Agreement, Detroit hereby sells, transfers, assigns, conveys, grants and delivers to the District, effective as of 11:59 p.m. on September 2, 2010 (the "Effective Time"), all of Detroit's right, title and interest in and to all of the Transferred Assets.

Detroit agrees with the District that Detroit will take all such further actions, execute and deliver all such further documents and do all other acts and things as the District may reasonably request for the purpose of carrying out the intent of this Bill of Sale.

Without limiting the prior paragraph, Detroit hereby constitutes and appoints the District the true and lawful agent and attorney-in-fact of Detroit, with full power of substitution and

Detroit_1003596_3

resubstitution, in whole or in part, in the name and stead of Detroit but on behalf and for the benefit of the District and its successors and assigns, from time to time:

(a) to demand, receive and collect any and all of the Transferred Assets and to give receipts and releases for and with respect to the same, or any part thereof;

(b) to institute and prosecute, in the name of Detroit or otherwise, any and all proceedings at law, in equity or otherwise, that the District or its successors and assigns may deem proper in order to collect or reduce to possession any of the Transferred Assets and in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be; and

(c) to do all things legally permissible, required or reasonably deemed by the District to be required to recover and collect the Transferred Assets and to use Detroit's name in such manner as the District may reasonably deem necessary for the collection and recovery of same,

Detroit hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by Detroit.

Notwithstanding any other provision of this Bill of Sale, nothing contained in this instrument shall in any way supersede, modify, replace, amend, change, rescind, waive or otherwise affect any of the provisions, including the representations, warranties, covenants and agreements of Detroit or the District, set forth in the Acquisition Agreement, this instrument being intended only to effect the transfer of the Transferred Assets sold or otherwise transferred by Detroit to the District pursuant to the Acquisition Agreement.

This Bill of Sale shall be binding upon, inure to the benefit of and be enforceable by Detroit and the District and their respective successors and assigns. This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Michigan without regard to conflicts-of-law principles that would require the application of any other law.

*[Signature page follows.]*

2

Detroit_1003596_3

IN WITNESS WHEREOF, the undersigned has caused this Bill of Sale to be duly executed as of the day and year first above written.

**CITY OF DETROIT**, a Michigan municipal corporation

**Macomb Interceptor Drain Drainage District** established pursuant to Chapter 20 of 1956 P.A. 40, as amended.

By: _Darryl A. Latimer_
Name: Darryl Latimer
Title: Deputy Director of the Detroit Water and Sewerage Department, authorized representative of the City of Detroit and its Board of Water Commissioners

By: _William Misterovich_
Name: William Misterovich
Its: Acting Chairperson

Detroit_1003596_3

# Exhibit D

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Macomb Interceptor Drain Drainage District,

               Plaintiff,

vs.

Kwame Kilpatrick, et. al.

               Defendants.

Case No. 2:11-cv-13101
Honorable Robert H. Cleland
Magistrate Judge Mona K. Majzoub

---

## AFFIDAVIT OF R. CRAIG HUPP

R. Craig Hupp, being duly sworn, states as follows:

1.    Neither I nor my firm are counsel in this litigation to any party.

2.    This affidavit has been prepared at the request of counsel for Macomb County to provide my recollection of Macomb County's intention at the time of the transaction discussed below as to the scope of assets being transferred to it in a sewer transaction with Detroit. I have been informed that that intention has become an issue in litigation brought by Macomb County. *Macomb Interceptor Drain Drainage District v. Kilpatrick*, 11 cv 13101.

3.    I represented Macomb County in the transfer of certain Detroit-owned sewers in Macomb County to the Macomb Interceptor Drain Drainage District. I consulted with Macomb County throughout.

4.    Those transactions grew out of the settlement of a variety of lawsuits and other disputes between the City of Detroit and Macomb and Oakland Counties as sewer customers.

5.    The "global" settlement of those disputes was reached in the fall of 2008 and was lodged as a proposed settlement in *United States v. Detroit*, Case No. 77-71100 in December 2008. The global settlement agreement was approved and entered by the Court in the spring of 2009.

6.    Under that settlement, the Detroit-owned sewer facilities in Macomb County serving Oakland and Macomb County were to be transferred to the Counties or to entities created by the Counties. The global settlement agreement included as an attachment a Letter of Intent that set forth the parameters of the transfer of the Detroit sewers to Macomb and Oakland Counties.

7.    In October 2009 sewers known as the Edison Corridor and the Oakland Arm were transferred to a newly created drainage district named the Oakland-Macomb Interceptor Drain Drainage District. In September 2010 the sewers east of the Edison Corridor were transferred to the newly created Macomb Interceptor Drain Drainage District. A portion

Detroit_1188449_3

of one of these latter sewers had collapsed in 2004 and is the subject of litigation between Macomb County and a number of parties in the *MIDD v. Kilpatrick* case.

8. The terms of both transactions were essentially the same except for the assets transferred and the acquisition payment.

9. An acquisition agreement was negotiated in 2009 that became the basic agreement for both transactions.

10. What became the acquisition agreement began as a draft that originated with Robert Walter, Assistant Corporation Counsel for the City of Detroit, in late 2008. The agreement went through numerous iterations before being executed at the closing of the OMI transaction in October 2009. Attorneys involved in the drafting process included Mr. Walter and Mr. Mark Jacobs and other lawyers at the Dykema law firm for the City and the Detroit Water and Sewer Department, and myself and other lawyers at Bodman for the Counties. Drafts of the agreement as it evolved were provided to inside counsel at Oakland and Macomb Counties for review and comment. The same teams of lawyers drafted the other documents that were executed at closing to effectuate the transfers.

11. Because Macomb County was taking on all risk and obligations (except accrued tort and a few other expressly defined liabilities), it intended to obtain all of Detroit's rights and interests of whatever kind associated with the facilities and real estate-related rights being transferred so that the County would stand in Detroit's shoes after the transaction for anything related to the facilities being transferred. For that reason, the assets being transferred were defined in the acquisition agreement as "all of the interceptor sewers ... and associated tangible and intangible personal property...." Likewise, Macomb County obtained an assignment of <u>all</u> of Detroit's rights under contracts associated with the facilities.

12. Thus, because the Macomb County acquired the sewers in their "as is" condition, the County took on the risk of tort claims that might accrue after the closing that were attributable to the conditions of the sewers on the date of closing. This tort risk was recognized before closing because the principal dispute underlying the global settlement was a major collapse in one of the sewers being transferred to Macomb County, which collapse had led to a lawsuit against Detroit. Macomb County understood and accepted that this incipient risk of tort liability was part and parcel of what was being acquired.

13. To my knowledge, at the time the acquisition agreement was negotiated and at the time the Macomb transaction closed, Macomb County was completely unaware of the alleged fraudulent and tortious acts set forth in the Kilpatrick indictment or any other tort or other claims Detroit might have had associated with the facilities being transferred. Accordingly, no reference to such claims was made in the acquisition agreement nor was the possibility of such claims expressly considered when the terms of the transaction were negotiated. However, any rights Detroit might have had to assert a tort or other claim associated with the facilities being transferred would likewise have been regarded by Macomb County as being part and parcel of what it was acquiring from Detroit. I have no doubt that had possible tort or other claims against third parties related to a

2

Detroit_1188449_3

.Macomb County sewer been known at the time of the transaction, they would have been specifically listed among the assets transferred to Macomb County,

Executed on May 16, 2012

R. Craig Hupp

Subscribed and sworn to before me on
May 16, 2012

Notary Public, _Wayne_ County, MI
My Commission Expires: 7-6-14

TABITHA M. VASSER
Notary Public, Wayne County, Michigan
Acting in _____ County
My Commission Expires: 07/06/2014

3

Detroit_1188449_3

# Exhibit E

# Kilpatrick trial: Full list of criminal charges and verdicts

*Jun. 23*                                                                                        freep.com

## Kwame Kilpatrick: Guilty, 24 of 30 counts

### Guilty

**Count 1: Racketeering conspiracy** From 2000-2009, Kilpatrick and Ferguson were part of a criminal enterprise that ran through City Hall in Detroit, called "the Kilpatrick Enterprise" by prosecutors. Contractors who sought work in the city had to include Ferguson or rig bids to make sure Ferguson got a cut of the work and the money.**Count 2: Extortion, sewer lining contract** From 2002-2006, Kilpatrick and Ferguson received payments of more than $23.7 million in contract revenues from Inland Water Solutions, Inc. A $50 million contract that was already approved by Detroit's Water and Sewerage Department was held up between 2002 and 2006 until Inland Water Solutions replaced their minority contractor with Ferguson, on Ferguson's terms.**Count 3: Extortion, amendment to sewer lining contract** From 2004-2005, Kilpatrick and Ferguson received payments from Inland of about $175,000 in connection with an amendment to the contract.**Count 4: Extortion, Baby Creek/Patton Park** From 2003-2008, Walbridge Aldinger Co. paid Kilpatrick, Ferguson and his companies more than $5 million for work at Baby Creek and Patton Park out of fear of economic consequences.**Count 5: Attempted extortion, Oakwood pump station** In 2007, Kilpatrick and Ferguson pressured Walbridge to partner with Ferguson in a $140 million construction project at the Oakwood pump station.**Count 9: Extortion, east side water mains** From 2006-2008, Kilpatrick, Ferguson and Ferguson's company, Xcel Construction Services, obtained payments and subcontracts from Lakeshore and A&H Contractor worth more than $12.9 million from a contract to repair mains on Detroit's east side.**Count 17: Bribery, $75,000 bribe** In March 2008, Ferguson gave Kilpatrick $75,000 for the Kilpatrick Civic Fund in exchange for having contracts steered to his company or for having contracts to hire or pay Ferguson.**Counts 18-26: Mail fraud involving civic fund** Kilpatrick used monies donated to the civic fund for personal and campaign expenses.**Count 28: Wire fraud involving civic fund** Kilpatrick used monies donated to the civic fund for personal and campaign expenses.**Count 30: Wire fraud involving civic fund** Kilpatrick used monies donated to the civic fund for personal and campaign expenses.**Counts 31-35: Filing false taxes** Kilpatrick filed false tax returns from 2004-2008.**Count 36: Tax evasion** In 2008, Kilpatrick received unreported taxable income of at least $261,751 in the form of cash, private jet flights and personal expenses paid for by the civic fund, and he owed $85,397 in income tax. He concealed income from the Internal Revenue Service.

### Not guilty

**Count 10: Extortion, east side sewer repair** From 2006-2008, Ferguson and Kilpatrick were accused of extorting $5 million from Lakeshore Engineering Services and A&H Contractor for work related to a sewer repair contract on the east side of Detroit.**Count 27: Mail fraud involving civic fund****Count 29: Wire fraud involving civic fund**

### No verdict

**Count 7: Extortion, Outfalls contract** From 2005-2007, Ferguson and Kilpatrick were accused of

13-53846-tjt   Doc 4954-2   Filed 05/20/14   Entered 05/20/14 14:29:25   Page 92 of 117

extorting more than $1.7 million from Lakeshore Engineering Services and A&H Contractor related to a sewer outfalls contract for no services rendered.**Count 8: Extortion, asbestos abatement** From 2005-2007, Ferguson and Kilpatrick were accused of forcing Lakeshore Engineering Services to pay $75,000 in relation to an asbestos contract in which no work was performed.**Count 16: Bribery, $90,000 bribe** In 2008, Ferguson was accused of giving Kilpatrick $90,000 in two installments in exchange for having contracts steered to his company or for having contracts to hire or pay Ferguson.

## Bobby Ferguson: Guilty, 9 of 11 counts

### Guilty

**Count 1: Racketeering conspiracy** From 2000-2009, Kilpatrick and Ferguson were part of a criminal enterprise that ran through City Hall in Detroit, called "the Kilpatrick Enterprise" by prosecutors. Contractors who sought work in the city had to include Ferguson or rig their bids to make sure Ferguson got a cut of the work and the money.**Count 2: Extortion, sewer lining contract** From 2002-2006, Kilpatrick and Ferguson received payments of more than $23.7 million in contract revenues from Inland Water Solutions, Inc. A $50 million contract that was already approved by Detroit's Water and Sewerage Department was held up between 2002 and 2006 until Inland Water Solutions replaced their minority contractor with Ferguson, on Ferguson's terms.**Count 3: Extortion, amendment to sewer lining contract** From 2004-2005, Kilpatrick and Ferguson received payments from Inland of about $175,000 in connection with an amendment to the sewer lining contract.**Count 4: Extortion, Baby Creek/Patton Park** From 2003-2008, Walbridge Aldinger Co. paid Kilpatrick, Ferguson and his companies more than $5 million for work at Baby Creek and Patton Park out of fear of economic consequences.**Count 5: Attempted extortion, Oakwood pump station** In 2007, Kilpatrick and Ferguson pressured Walbridge to partner with Ferguson in a $140 million construction project at the Oakwood pump station.**Count 7: Extortion, Outfalls contract** From 2005-2007, Ferguson and Kilpatrick extorted more than $1.7 million from Lakeshore Engineering Services and A&H Contractor related to a sewer outfalls contract for no services rendered.**Count 8: Extortion, asbestos abatement** From 2005-2007, Ferguson and Kilpatrick forced Lakeshore Engineering Services to pay him $75,000 in relation to an asbestos contract in which no work was performed.**Count 9: Extortion, east side water mains** From 2006-2008, Kilpatrick, Ferguson and Ferguson's company, Xcel Construction Services, obtained payments and subcontracts from Lakeshore and A&H Contractor worth more than $12.9 million from a contract to repair water mains on Detroit's east side.**Count 17: Bribery, $75,000 bribe** In March 2008, Ferguson gave Kilpatrick $75,000 for the Kilpatrick Civic Fund in exchange for having contracts steered to his company or for having contracts to hire or pay Ferguson.

### Not guilty

**Count 10: Extortion, east side sewer repair** Ferguson and Kilpatrick were accused of extorting $5 million from Lakeshore Engineering Services and A&H Contractor for work related to a sewer repair contract on the east side of Detroit.

### No verdict

**Count 16: Bribery, $90,000 bribe** In 2008, Ferguson was accused of giving Kilpatrick $90,000 in two installments in exchange for having contracts steered to his company or for having contracts to hire or pay

Ferguson.

## Bernard Kilpatrick: Guilty, 1 of 4 counts

### Guilty

**Count 38: filing false taxes** Kilpatrick failed to disclose some $150,000 in income on his 2005 tax return, and understated his income as being $220,259.

### Not guilty

**Count 15: Attempted Extortion, sludge contract** Kilpatrick was accused of demanding a $5,000 payment from Synagro's James Rosendall for Kilpatrick's assistance in landing a sludge contract with the city.**Count 37: Filing false taxes** Kilpatrick was accused of failing to disclose some $35,000 in income on his 2004 tax return and understated his income as being $336,625.

### No verdict

**Count 1: racketeering conspiracy.** The elder Kilpatrick was accused of being part of a criminal enterprise between 2000 and 2009 that steered city contracts to Bobby Ferguson in exchange for bribes.

- Database: Search Michigan Merit Exam, ACT results by district or school
- Drew Sharp: A bizarre day vs. Red Sox; and what's with Verlander?
- McDonald's drops halal items from U.S. menu after problems in Dearborn

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                    Case No. CR-10-20403-NGE

                    Plaintiff,               HON. NANCY G. EDMUNDS

v.

D-1   KWAME M. KILPATRICK,
D-2   BOBBY W. FERGUSON,
D-3   BERNARD N. KILPATRICK,

                    Defendants.
_____/

## VERDICT FORM

We, the Jury, after due deliberation, find the following unanimous verdict on the

charges in the fourth superseding indictment:

### Count One: Racketeering Conspiracy

**Defendant Kwame M. Kilpatrick**

         Not Guilty _____   Guilty  X

**Defendant Bobby W. Ferguson**

         Not Guilty _____   Guilty  X

**Defendant Bernard N. Kilpatrick**

         Not Guilty _____   Guilty _____

*no Consensus for B. Kilpatrick*

### Count Two: Extortion - Sewer Lining Contract (CS 1368)

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____   Guilty __X__

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right __X__

    Induced by wrongful fear of economic harm __X__

**Defendant Bobby W. Ferguson**

    Not Guilty _____   Guilty __X__

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm __X__

2

**Count Three: Extortion - Amendment to Sewer Lining Contract (CS 1368)**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X__

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _X__

Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

Not Guilty _____ Guilty _X__

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _X__

Induced by wrongful fear of economic harm _X__

3

**Count Four: Extortion – Baby Creek/Patton Park (PC 748)**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____   Guilty   X

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right   X

Induced by wrongful fear of economic harm   X

**Defendant Bobby W. Ferguson**

Not Guilty _____   Guilty   X

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right   X

Induced by wrongful fear of economic harm   X

4

**Count Five: Attempted Extortion – Oakwood Pump Station (PC 755)**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty __X__

If you find the defendant guilty of attempted extortion, you must indicate which method(s) you determined, beyond a reasonable doubt, were used to commit the attempted extortion:

Induced under color of official right __X__

Induced by wrongful fear of economic harm __X__

**Defendant Bobby W. Ferguson**

Not Guilty _____ Guilty __X__

If you find the defendant guilty of attempted extortion, you must indicate which method(s) you determined, beyond a reasonable doubt, were used to commit the attempted extortion:

Induced under color of official right __X__

Induced by wrongful fear of economic harm __X__

5

**Count Seven: Extortion - Outfalls Contract** (DWS 849)

**Defendant Kwame M. Kilpatrick**

    Not Guilty \_\_\_\_\_   Guilty \_\_\_\_\_

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

    Not Guilty \_\_\_\_\_   Guilty _X_

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _X_

*No concasus on K. Kilpatrick*

*07-58*

6

**Count Eight: Extortion – Asbestos Abatement**

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____   Guilty _____

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

    Not Guilty _____   Guilty _X_

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _X_

7

**Count Nine: Extortion - Repair of Eastside Water Mains (CM 2014)**

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____ Guilty _X_

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _X_

    Induced by wrongful fear of economic harm _X_

**Defendant Bobby W. Ferguson**

    Not Guilty _____ Guilty _X_

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _X_

    Induced by wrongful fear of economic harm _X_

8

## Count Ten: Extortion – Eastside Sewer Repair (DWS 865)

**Defendant Kwame M. Kilpatrick**

Not Guilty __X__ Guilty _____

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

Not Guilty __X__ Guilty _____

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _____

9

**Count Fifteen: Attempted Extortion - Sludge Contract**

**Defendant Bernard N. Kilpatrick**

Not Guilty __X__ Guilty _____

If you find the defendant guilty of attempted extortion, you must indicate which method(s) you determined, beyond a reasonable doubt, were used to commit the attempted extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _____

10

**Count Sixteen: Bribery - $90,000 Bribe**

*NO Conpensus on #16*

**Defendant Kwame M. Kilpatrick**

　　Not Guilty _____ Guilty _____

**Defendant Bobby W. Ferguson**

　　Not Guilty _____ Guilty _____


**Count Seventeen: Bribery - $75,000 Bribe**

**Defendant Kwame M. Kilpatrick**

　　Not Guilty _____ Guilty _X_

**Defendant Bobby W. Ferguson**

　　Not Guilty _____ Guilty _X_

11

## Count Eighteen: Mail Fraud

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X_

## Count Nineteen: Mail Fraud

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X_

**12**

**Count Twenty: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

   Not Guilty _____   Guilty  X

**Count Twenty-One: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

   Not Guilty _____   Guilty  X

13

**Count Twenty-Two: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X_

**Count Twenty-Three: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X_

14

**Count Twenty-Four: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X__

**Count Twenty-Five: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X__

15

**Count Twenty-Six: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty  $X$ 

**Count Twenty-Seven: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty  $X$  Guilty _____

16

## Count Twenty-Eight: Wire Fraud

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty __X__

## Count Twenty-Nine: Wire Fraud

**Defendant Kwame M. Kilpatrick**

Not Guilty __X__ Guilty _____

17

**Count Thirty: Wire Fraud**

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____   Guilty _X_

**Count Thirty-One: Subscribing False Tax Return**

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____   Guilty _X_

18

**Count Thirty-Two: Subscribing False Tax Return**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____   Guilty  X

**Count Thirty-Three: Subscribing False Tax Return**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____   Guilty  X

*19*

**Count Thirty-Four: Subscribing False Tax Return**

**Defendant Kwame M. Kilpatrick**

   Not Guilty _____   Guilty _X_

**Count Thirty-Five: Subscribing False Tax Return**

**Defendant Kwame M. Kilpatrick**

   Not Guilty _____   Guilty _X_

20

**Count Thirty-Six: Income Tax Evasion**

**Defendant Kwame M. Kilpatrick**

      Not Guilty _____ Guilty ✗

**Count Thirty-Seven: Subscribing False Tax Return**

**Defendant Bernard N. Kilpatrick**

      Not Guilty ✗ Guilty _____

21

## Count Thirty-Eight: Subscribing False Tax Return

**Defendant Bernard N. Kilpatrick**

Not Guilty _____ Guilty  X

<u>s/Jury Foreperson</u>

**In compliance with the Privacy Policy adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal.**

Dated: 3/8/13

22



Job : 16
Date: 5/2/2014
Time: 2:10:38 PM