This Auction Rate Mode Supplement (the *Supplement*) supplements the Composite Sale Order of the Finance Director of the City of Detroit (the *Sale Order*) dated October 18, 2001 entered into pursuant to the Bond Resolution described in the Sale Order (the *Bond Resolution*) relating to the issuance by the City of Detroit (the *City*) of its Sewage Disposal System Revenue and Revenue Refunding Bonds, Series 2001 (the *Series 2001 Securities*) under Ordinance No. 27-86, as amended (the *Bond Ordinance*).

## ARTICLE I
## DEFINITIONS; GENERAL PROVISIONS

Section 1.1    Certain Definitions.    In addition to the terms defined elsewhere in the Bond Ordinance, the Bond Resolution, the Sale Order, the preamble to this Supplement, the General Terms of Series 2001 Securities Supplement described in the Sale Order (the *General Supplement*) and the Variable Rate Mode Supplement and Agreement described in the Sale Order (the *VRM Supplement*), the following terms shall have the following meanings with respect to the Series 2001 Securities issued as (or converted to) Auction Rate Securities:

*"AA" Financial Commercial Paper Rate*, on any date of determination, shall mean (a) for Auction Periods of 35 days or less, the interest equivalent of commercial paper having a maturity of 30 days, (b) for Auction Periods greater than 35 days and less than 75 days, the interest equivalent of commercial paper having a maturity of 60 days, (c) for Auction Periods greater than 75 days and less than 105 days, the interest equivalent of commercial paper having a maturity of 90 days; as each such rate is published on the Business Day prior to such date by the Board of Governors of the Federal Reserve System on its World Wide Web site *http://www.federalreserve.gov/releases/cp/histrates.txt*, or any successor publication ("H.15(519)") under the caption "AA financial." In the event that such publication has not been published in a timely manner, the "AA" Financial Commercial Paper Rate shall be calculated by the Market Agent, and shall be the bond equivalent yield of the arithmetic mean of the offered rates as of 11:00 a.m., New York City time, on the determination date of three leading dealers of U.S. dollar commercial paper in the City of New York (which may include UBS PaineWebber Inc.) selected by the Market Agent, for U.S. dollar commercial paper having a maturity of 30, 60 or 90 days, as applicable, placed for financial issuers whose bond rating is "AA" or the equivalent, from a nationally recognized securities rating agency; provided, however, that if the dealers selected as aforesaid by the Market Agent are not quoting as mentioned in this sentence (and if the Market Agent, in its discretion, determines that such quotations can not be obtained from any three leading dealers of U.S. dollar commercial paper in the City of New York) such rate shall be the same rate as in effect for the immediately preceding Interest Payment Period. For purposes of this definition, the "interest equivalent" of a rate stated on a discount basis (a "discount rate") for commercial paper of a given day's maturity shall be equal to the product of (A) 100 times (B) the discount rate times (C) the quotient (rounded upwards to the next higher one-thousandth (.001) of 1%) of (x) the applicable number of days in a year (365 or 366) divided by (y) the difference between (1) 360 and (2) the product of the discount rate (expressed in decimals) times the applicable number of days in which such commercial paper matures.

1

**After-Tax Equivalent Rate**, on any date of determination, shall mean the interest rate per annum equal to the product of:

    i.     the "AA" Financial Commercial Paper Rate on such date; and

    ii.    1.00 minus the Statutory Corporate Tax Rate on such date.

**All Hold Rate** on any date of determination shall mean the interest rate per annum equal to 90% (as such percentage may be adjusted pursuant to Section 1.12 of this Supplement) of the lesser on such date of:

    i.     the After-Tax Equivalent Rate on such date; and

    ii.    the Kenny Index on such date;

rounded to the nearest one thousandth (.001) of 1%; provided that in no event shall the All Hold Rate be more than the Maximum ARC Rate or less than zero.

**Applicable ARCs Rate** shall have the meaning set forth in Section 1.4(b) of this Supplement.

**Applicable Number of Business Days** means the greater of two Business Days or one Business Day plus the number of Business Days by which the Auction Date precedes the first day of the next succeeding Interest Period.

**Applicable Percentage**, on any date of determination, shall mean the percentage determined (as such percentage may be adjusted pursuant to Section 1.12 of this Supplement) based on the lower of the prevailing credit ratings on the ARCs in effect at the close of business on the Business Day immediately preceding such date, as set forth below:

Credit Ratings

| Moody's Investors Service | Standard & Poor's Corporation | Applicable Percentage |
|---|---|---|
| "Aaa" | "AAA" | 175% |
| "Aa3" to "Aa1" | "AA-" to "AA+" | 175% |
| "A3" to "A1" | "A-" to "A+" | 175% |
| "Baa3" to "Baa1" | "BBB-" to "BBB+" | 200% |
| Below "Baa3" | Below "BBB-" | 265% |

provided, that, in the event that the ARCs are not rated by any nationally recognized rating agency, the Applicable Percentage shall be 265%, and, provided further, that if a Payment Default shall have occurred and be continuing, the Applicable Percentage shall be 265%. For purposes of this definition, Standard & Poor's Corporation's rating categories of "AAA," "AA," "A" and "BBB," and Moody's Investors Service's rating categories of "Aaa," "Aa," "A" and

2

"Baa," refer to and include the respective rating categories correlative thereto if either or both of such rating agencies have changed or modified their generic rating categories or if Moody's Investors Service or Standard & Poor's Corporation no longer rates the ARCs and have been replaced.

*ARCs* shall mean the Series 2001 Securities outstanding as Auction Rate Securities under the Sale Order and this Supplement (including Series 2001 Securities converted to ARCs pursuant to the VRM Supplement).

*Auction* shall mean each periodic implementation of the Auction Procedures.

*Auction Agency Agreement* shall mean the Auction Agency Agreement relating to the ARCs between the Transfer Agent and the Auction Agent and any similar agreement with a successor Auction Agent or successor Transfer Agent, in each case as from time to time amended or supplemented.

*Auction Agent* shall mean any Person appointed as such pursuant to Section 1.14 of this Supplement.

*Auction Agent Fee* shall mean the fee to be paid to the Auction Agent for the services rendered by it under the Auction Agency Agreement and the Broker-Dealer Agreement.

*Auction Date* shall mean, for each Tranche of ARCs, the Initial Auction Date and thereafter, in each instance, the Business Day immediately preceding the first day of each Interest Period, other than:

     i.     each Interest Period commencing after the ownership of the ARCs is no longer maintained in book-entry form by the Depository;

     ii.    each Interest Period commencing after the occurrence and during the continuance of a Payment Default; or

     iii.   any Interest Period commencing less than the Applicable Number of Business Days after the cure or waiver of a Payment Default.

Notwithstanding the foregoing, the Auction Date for one or more Auction Periods may be changed pursuant to Section 1.17 of this Supplement.

*Auction Period* means, for each Tranche of ARCs, each Initial Auction Period and thereafter the Interest Period applicable thereto as the same may be changed pursuant to Section 1.17 of this Supplement.

*Auction Procedures* shall mean the procedures set forth in Section 1.6 of this Supplement.

*Auction Rate* shall mean the rate of interest per annum on any Auction Date that results from the implementation of the Auction Procedures, and determined as described in Section 1.6(c)(ii) of this Supplement.

3

*Authorized Denominations* shall mean $25,000 and any integral multiple thereof.

*Available ARCs* shall have the meaning set forth in Section 1.6(c)(i)(A) of this Supplement.

*Bid* shall have the meaning set forth in Section 1.6(a)(i) of this Supplement.

*Bidder* shall have the meaning set forth in Section 1.6(a)(i) of this Supplement.

*Bond Counsel* shall mean Lewis & Munday, A Professional Corporation, and Howard and Howard Attorneys, P.C., Bond Counsel to the City with respect to the Series 2001 Securities, or such other firm or firms of national recognized standing in the field of tax-exempt municipal bonds as may be appointed by the City (with the prior written consent of the Bond Insurer, which consent shall not be unreasonably withheld) in lieu thereof.

*Bond Insurance* shall mean, with respect to each Tranche of ARCs, the municipal bond insurance policy of the Bond Insurer issuing the same.

*Bond Insurer* shall mean MBIA with respect to Tranche D-1 and Tranche D-2, shall mean FSA with respect to any future Tranche of Variable Rate Securities Series C-1 converted to the Auction Rate Mode under the VRM Supplement and shall mean FGIC with respect to any future Tranche of Variable Rate Securities Series C-2 converted to the Auction Rate Mode under the VRM Supplement.

*Broker-Dealer* shall mean UBS PaineWebber Inc. or any other broker or dealer (each as defined in the Securities Exchange Act), commercial bank or other entity permitted by law to perform the functions required of a Broker-Dealer set forth in the Auction Procedures that (i) is a Participant (or an affiliate of a Participant), (ii) has a capital surplus of at least $50,000,000, (iii) has been selected by the City with the approval of the Market Agent and the Bond Insurer (which approvals shall not be unreasonably withheld) and (iv) has entered into a Broker-Dealer Agreement that remains effective.

*Broker-Dealer Agreement* shall mean the Broker-Dealer Agreement relating to the ARCs between the Auction Agent and the Broker-Dealer and each other agreement between the Auction Agent and a Broker-Dealer pursuant to which the Broker-Dealer agrees to participate in Auctions as set forth in the Auction Procedures, as from time to time amended or supplemented.

*Broker-Dealer Fee* shall mean the fee to be paid to the Broker-Dealers for the services rendered by them under the Broker-Dealer Agreement.

*Business Day* shall mean, for purposes of any Auction, any day other than (i) April 14, April 15, December 30, December 31, and such other dates as may be agreed to in writing by the Market Agent, the Auction Agent, the Broker-Dealer, the Bond Insurer and the City, or (ii) a Saturday, Sunday, holiday or day on which banks located in the city of New York, New York, or the New York Stock Exchange, the Transfer Agent or the Auction Agent, are authorized or permitted by law or executive order to close.

4

*Change of Preference Law* shall mean, with respect to any Holder of ARCs, any amendment to the Code or other statute enacted by the Congress of the United States or any temporary, proposed or final regulation promulgated by the United States Treasury after the date hereof which (i) changes or would change any deduction, credit or other allowance allowable in computing liability for any federal tax with respect to, or (ii) imposes or would impose or reduces or would reduce or increases or would increase any federal tax (including, but not limited to, preference or excise taxes) upon, any interest earned by any holder of bonds the interest on which is excluded from federal gross income under section 103 of the Code.

*Commercial Paper Dealers* means UBS PaineWebber Inc. or its successor or any other commercial paper dealer appointed by the City.

*Default Rate*, on any date of determination, shall mean the interest rate per annum equal to the lesser of (i) the Applicable Percentage of the Kenny Index and (ii) the Maximum ARC Rate.

*Existing Holder* means (a) with respect to and for the purpose of dealing with the Auction Agent in connection with an Auction, a Person who is a Broker-Dealer listed in the Existing Holder registry at the close of business on the Business Day immediately preceding the Auction Date for such Auction and (b) with respect to and for the purpose of dealing with the Broker-Dealer in connection with an Auction, a Person who is a beneficial owner of ARCs.

*Favorable Bond Counsel's Opinion* shall mean, with respect to any action the occurrence of which requires such an opinion of Bond Counsel, an opinion of Bond Counsel to the effect that (i) such action is authorized or permitted by this Supplement, the Sale Order and the Authorizing Documents, and (ii) such action will not adversely affect the exemption of the interest on the Series 2001 Securities from federal and state income taxation (subject to customary exceptions).

*FGIC* shall mean Financial Guaranty Insurance Company as the insurer of the Variable Rate Securities Series C-2 initially issued pursuant to the VRM Supplement.

*FSA* shall mean Financial Security Assurance Inc. as the insurer of the Variable Rate Securities Series C-1 initially issued pursuant to the VRM Supplement.

*Holder* as used in this Supplement shall mean the beneficial owner of any ARCs.

*Hold Order* shall have the meaning set forth in Section 1.6(a)(i) of this Supplement.

*Initial Auction Date* shall mean (i) June 25, 2008, for Tranche D-1, (ii) December 28, 2011, for Tranche D-2 and (iii) the date specified by the Finance Director in the applicable Mode Change Notice for any future Tranche of Variable Rate Securities converted to the Auction Rate Mode under the VRM Supplement.

*Initial Auction Period* shall mean the period from and including (i) July 1, 2008, to and including August 6, 2008, for Tranche D-1, (ii) January 1, 2012, to and including February 1, 2012, for Tranche D-2 and (ii) the dates specified by the Finance Director in the

5

applicable Mode Change Notice for any future Tranche of Variable Rate Securities converted to the Auction Rate Mode under the VRM Supplement.

*Initial Interest Payment Date* shall mean (i) January 1, 2002, for Tranche D-1 and D-2 and (ii) the date specified by the Finance Director in the applicable Mode Change Notice for any future Tranche of Variable Rate Securities converted to the Auction Rate Mode under the VRM Supplement.

*Initial Interest Period* shall mean the period commencing on the date of delivery of the Series 2001 Securities and ending on (and including) (i) June 30, 2008, for Tranche D-1, (ii) December 31, 2011, for Tranche D-2 and (iii) the period specified by the Finance Director in the applicable Mode Change Notice for any future Tranche of Variable Rate Securities converted to the Auction Rate Mode under the VRM Supplement.

*Interest Amount* shall mean the amount of interest distributable in respect of each $25,000 in principal amount (taken, without rounding, to .0001 of one cent) of ARCs for any Interest Period or part thereof, as calculated in accordance with Section 1.10 of this Supplement.

*Interest Payment Date* means the Initial Interest Payment Date and thereafter each July 1 and January 1 during (and the July 1 or January 1, as applicable, immediately following) an Initial Interest Period, and thereafter the Business Day following the last day of each Auction Period, except as changed as described in Section 1.17(a) of this Supplement, and in all cases on the maturity of the Series 2001 Securities, whether at stated maturity, a Redemption Date, or otherwise.

*Interest Period* means with respect to each Tranche of Series 2001 Securities issued as ARCs, unless otherwise changed as described in Section 1.17(a) of this Supplement, the Initial Interest Period for such Tranche, the Initial Auction Period for such Tranche and each successive period of generally 35 days thereafter, respectively, commencing on a Thursday (or the Business Day following the last day of the prior Interest Period, if the prior Interest Period does not end on a Wednesday) and ending on (and including) a Wednesday (unless such Wednesday is not followed by a Business Day, in which case such Interest Period will end on the next succeeding day after such Wednesday that is followed by a Business Day).

*Kenny Index* shall mean the index most recently made available by Kenny S&P Evaluation Services (*Kenny*) or any successor thereto (the *Indexing Agent*) based upon 30-day yield evaluations at par of securities, the interest on which is excluded from gross income for federal income tax purposes under the Code, of not less than five "Intermediate Grade" component issuers selected by the Indexing Agent which shall include, without limitation, issuers of general obligation bonds. The specific issuers included among the component issuers may be changed from time to time by the Indexing Agent in its discretion. The securities on which the Kenny Index is based shall not include any securities the interest on which is subject to a "minimum tax" or similar tax under the Code, unless all such securities are subject to such tax. In the event that Kenny no longer publishes an index satisfying the above definition of the Kenny Index or the Market Agent reasonably concludes that the Kenny Index will not be announced in a timely manner, then the Market Agent shall announce a rate based upon the same criteria used by Kenny to determine the Kenny Index and the rate announced by the Market

Agent for each Auction Date thereafter shall be used in lieu of the Kenny Index for each Auction Date.

*Market Agent* shall mean the market agent or market agents appointed pursuant to Section 1.13 of this Supplement, and its or their successors or assigns.

*Market Agent Agreement* shall mean the Market Agent Agreement relating to the ARCs, between the Transfer Agent and the Market Agent, and any similar agreement with a successor Market Agent, in each case as from time to time amended or supplemented.

*Maximum Interest Rate* shall mean the lesser of (a) 12% per annum or (b) the maximum interest rate permitted by the laws of the State of Michigan.

*Maximum ARC Rate*, on any date of determination, shall mean the interest rate per annum equal to the lesser of:

        i.     the Applicable Percentage of the higher of (i) the After-Tax Equivalent Rate on such date and (ii) the Kenny Index on such date; and

        ii.    the Maximum Interest Rate;

rounded to the nearest one thousandth (.001) of 1%.

*MBIA* shall mean MBIA Insurance Corporation as the insurer of Tranche D-1 and Tranche D-2 of Series 2001 Securities initially issued as ARCs pursuant to this Supplement.

*Order* shall have the meaning set forth in Section 1.6(a) of this Supplement.

*Participant* shall mean a member of or participant in, the Depository.

*Payment Default* shall mean failure of both the City and the Bond Insurer to make payment of interest on, premium, if any, and principal of the ARCs when due.

*Person* means and includes, unless otherwise specified, an individual, corporation, company, trust, estate, partnership or association.

*Potential Holder* means any Person (including an Existing Holder that is (i) a Broker-Dealer when dealing with the Auction Agent and (ii) a potential beneficial owner when dealing with a Broker-Dealer) who may be interested in acquiring ARCs (or, in the case of an Existing Holder thereof, an additional principal amount of ARCs).

*Qualified Surety Bond* means a debt service reserve surety bond, other than the Reserve Policy, satisfying the Reserve Requirement for the Second Lien Bond Reserve Account (i) issued by MBIA or by an insurance company other than MBIA which is rated in the highest category by Standard & Poor's Corporation and Moody's Investors Service, Inc. and, if rated by A.M. Best & Company, is also rated in the highest rating category by A.M. Best & Company or (ii) otherwise approved in writing by MBIA.

7

*Rating Agency* shall mean, on any date, each nationally recognized statistical rating organization (as such term is used in Rule 15c3-1 of the Securities and Exchange Commission) that has a rating in effect on the Securities on such date.

*Rating Confirmation* shall mean a writing from each Rating Agency stating that the rating on the Securities (without giving effect to Bond Insurance) will not be reduced or withdrawn as a result of the action proposed to be taken.

*Record Date* shall mean, during the Initial Interest Period for each Tranche of ARCs, each December 15 and June 15 and thereafter, so long as Interest Payment Dates are specified to occur at the end of each Auction Period as provided in this Supplement, the Applicable Number of Business Days immediately preceding each Interest Payment Date.

*Redemption Date,* when used with respect to any ARCs to be redeemed, shall mean the date fixed for such redemption.

*Registrar* shall mean the Transfer Agent or any separate registrar appointed under the Sales Order with respect to the Series 2001 Securities.

*Reserve Policy* means the $7,379,761.42 Debt Service Reserve Surety Bond dated October 23, 2001 and expiring on July 1, 2032 issued by MBIA in satisfaction of the Reserve Requirement for Second Lien Bonds created by the issuance of Tranches D-1 and D-2 of ARCs pursuant to this Supplement.

*SEC* shall mean the Securities and Exchange Commission.

*Securities Exchange Act* shall mean the Securities Exchange Act of 1934, as amended.

*Securityholder* shall mean the registered owner of an ARC or, as applicable, any other Series 2001 Security.

*Sell Order* shall have the meaning set forth in Section 1.6(a) of this Supplement.

*Statutory Corporate Tax Rate* shall mean, as of any date of determination, the highest tax rate bracket (expressed in decimals) now or hereafter applicable in each taxable year on the taxable income of every corporation as set forth in section 11 of the Code or any successor section without regard to any minimum additional tax provision or provisions regarding changes in rates during a taxable year.

*Submission Deadline* shall mean 1:00 p.m., New York City time, on any Auction Date or such other time on any Auction Date by which Broker-Dealers are required to submit Orders to the Auction Agent as specified by the Auction Agent from time to time.

*Submitted Bid* shall have the meaning set forth in Section 1.6(c)(i) of this Supplement.

**Submitted Hold Order** shall have the meaning set forth in Section 1.6(c)(i) of this Supplement.

**Submitted Order** shall have the meaning set forth in Section 1.6(c)(i) of this Supplement.

**Submitted Sell Order** shall have the meaning set forth in Section 1.6(c)(i) of this Supplement.

**Sufficient Clearing Bids** shall have the meaning set forth in Section 1.6(c)(i)(B) of this Supplement.

**Tranche** shall mean (i) each of the subseries of ARCs designated Series 2001 (D-1) in the aggregate principal amount of $20,000,000 and Series 2001 (D-2) in the aggregate principal amount of $72,450,000 and initially issued under this Supplement and (ii) each subsequent subseries of ARCs, separately designated, converted to ARCs pursuant to the VRM Supplement.

**Transfer Agent** shall mean U.S. Bank Trust National Association in such capacity under the Bond Ordinance, the Bond Resolution, the Sale Order and this Supplement.

**Winning Bid Rate** shall have the meaning set forth in Section 1.6(c)(i)(C) of this Supplement.

Section 1.2    Description of ARCs; Global Form; Depository.

(a)    As provided in the Sale Order, $92,450,000 of the Series 2001 Securities shall initially be issued as ARCs in two Tranches and shall be designated "City of Detroit Sewage Disposal System Second Lien Revenue Bonds (ARCs), Series 2001 (D-1) and Series 2001 (D-2)." Variable Rate Securities may, from time to time, be converted to additional Tranches of ARCs pursuant to the VRM Supplement with such designations as may be provided by the Finance Director in the Mode Change Notice related thereto.

(b)    Except as otherwise provided in this Section 1.2, the ARCs, in the form of one or more securities, shall be registered in the name of the Depository, and ownership thereof shall be maintained in book-entry form by the Depository for the account of the Participants thereof. Initially, the ARCs shall be registered in the name of Cede & Co., as the nominee of DTC. Except as provided in subsection (c) of this Section 1.2, the ARCs of each Tranche may be transferred, in whole but not in part, only to the Depository, or to a successor to DTC selected or approved by the City (with the prior written consent of the Bond Insurer, which consent shall not be unreasonably withheld) or to a nominee of such successor Depository.

(i)    None of the City, the Registrar, the Bond Insurer nor any of their respective affiliates shall have any responsibility or obligation with respect to:

(A)    the accuracy of the records of the Depository or any Participant with respect to any beneficial ownership interest in the ARCs;

9

(B)     the delivery to any Participant, any beneficial owner of the ARCs or any other person, other than the Depository, of any notice with respect to the ARCs; or

(C)     the payment to any Participant, any beneficial owner of the ARCs or any other person, other than the Depository, of any amount with respect to the principal, premium, if any, or interest on the ARCs.

So long as the certificates for the ARCs are not issued pursuant to subsection (c) of this Section 1.2, the City, and the Registrar may treat the Depository as, and deem the Depository to be, the absolute owner of the ARCs for all purposes whatsoever, including without limitation:

(1)     the payment of principal, premium, if any, and interest on the ARCs;

(2)     giving notices of redemption and other matters with respect to the ARCs;

(3)     registering transfer with respect to the ARCs; and

(4)     the selection of ARCs for redemption.

(c)     If at any time the Market Agent (with the prior written consent of the Bond Insurer) has notified the City that the ARCs (or any Tranche of ARCs) should not be maintained in book-entry form or the Depository notifies the City that it is unwilling or unable to continue as Depository with respect to the ARCs, or if at any time the Depository shall no longer be registered or in good standing under the Securities Exchange Act or other applicable statute or regulation and a successor Depository is not appointed by the City within 90 days after the City receives notice or becomes aware of such condition, as the case may be, then this Section 1.2 shall no longer be applicable and the City shall execute and the Registrar shall authenticate and deliver certificates representing the ARCs as provided below. Certificates for the ARCs issued in exchange for a global certificate pursuant to this subsection (c) shall be registered in such names and Authorized Denominations as the Depository, pursuant to instructions from the Participants or otherwise, shall instruct the City and the Registrar. The Registrar shall deliver such certificates representing the ARCs to the persons in whose names such ARCs are so registered on the Business Day immediately preceding the first day of an Interest Period.

Section 1.3     Limitations on Transfer. So long as the ownership of the ARCs is maintained in book-entry form by the Depository, an Existing Holder may sell, transfer or otherwise dispose of its beneficial interest in ARCs only pursuant to a Bid or Sell Order placed in any Auction or to or through a Broker-Dealer; provided that, in the case of all transfers other than pursuant to Auctions, such Existing Holder, its Broker-Dealer or its Participant advises the Auction Agent of such transfer.

Section 1.4    Interest on ARCs.

(a)    Interest on each Tranche of ARCs shall accrue during the Interest Period related thereto and shall be payable in arrears on each Interest Payment Date related thereto. Interest shall be calculated as provided in Section 1.10 hereof.

(b)    During the Initial Interest Period applicable thereto the ARCs of Tranche D-1 shall bear interest at the per annum rate of 5.50%, the ARCs of Tranche D-2 shall bear interest at the per annum rate of 5.50% and the ARCs of any future Tranche of Variable Rate Securities converted to the Auction Rate Mode under the VRM Supplement shall be the rate specified in (or determined pursuant to procedures specified in) the applicable Mode Change Notice for such Tranche. After the Initial Interest Period, the rate of interest on the related Tranche of ARCs for each Interest Period shall be the Auction Rate; provided that if, on any Auction Date, an Auction is not held for any reason, then the rate of interest for the next succeeding Interest Period for such ARCs shall equal the Maximum ARC Rate on such Auction Date. Notwithstanding the foregoing, if:

(i)    the ownership of a Tranche of ARCs is no longer maintained in book-entry form by the Depository, the rate of interest on such Tranche of ARCs for any Interest Period commencing after the delivery of certificates representing ARCs pursuant to Section 1.2(c) of this Supplement shall equal the Maximum ARC Rate on the Business Day immediately preceding the first day of such Interest Period; or

(ii)    if a Payment Default occurs, Auctions will be suspended and the Applicable ARCs Rate (as defined below) for the Interest Period commencing on or after such Payment Default and for each Interest Period thereafter to and including the Interest Period, if any, during which, or commencing less than two Business Days after, such Payment Default is cured will equal the Default Rate.

The rate per annum at which interest is payable on a Tranche of ARCs for any Interest Period is herein referred to as the *Applicable ARCs Rate*. Notwithstanding anything herein to the contrary, the Applicable ARCs Rate cannot exceed the Maximum ARC Rate.

(c)    Notwithstanding anything herein to the contrary, if any ARC or portion thereof has been selected for redemption during the next succeeding Interest Period, such ARC or portion thereof, will not be included in the Auction preceding such Redemption Date, and such ARC or portion thereof, will continue to bear interest until the Redemption Date at the rate established for the Interest Period prior to such Auction.

Section 1.5    Payments. So long as the ARCs are registered in the name of the Depository or the nominee thereof, payment of interest (other than at maturity) and premium, if any, on, and of principal at redemption of, the ARCs shall be made to the Depository by wire transfer provided proper wire instructions are received. Each Holder of ARCs, by such Holder's purchase of ARCs, appoints the Transfer Agent as its agent in connection with the payment by such Holder of its share, if any, of the amounts payable to the Auction Agent and the Broker-Dealers pursuant to Section 1.8(a) of this Supplement.

11

Section 1.6    Auction Procedures.    With respect to each Tranche of ARCs, Auctions shall be conducted on each Auction Date (other than the Auction Date immediately preceding (i) each Interest Period commencing after the ownership of such Tranche of ARCs is no longer maintained in book-entry form by the Depository; (ii) each Interest Period commencing after the occurrence and during the continuance of a Payment Default; or (iii) any Interest Period commencing less than the Applicable Number of Business Days after the cure or waiver of a Payment Default). If there is an Auction Agent on such Auction Date, Auctions shall be conducted (for the related Tranche of ARCs and only for such Tranche) in the following manner:

(a)    Orders by Existing Holders and Potential Holders.

(i)    Except as provided in clause (C) below, prior to the Submission Deadline on each Auction Date:

(A)    each Existing Holder of ARCs may submit to a Broker-Dealer information as to:

(1)    the principal amount of Outstanding ARCs, if any, held by such Existing Holder which such Existing Holder desires to continue to hold without regard to the Auction Rate for the next succeeding Interest Period;

(2)    the principal amount of Outstanding ARCs, if any, which such Existing Holder offers to sell if the Auction Rate for the next succeeding Interest Period shall be less than the rate per annum specified by such Existing Holder; and/or

(3)    the principal amount of Outstanding ARCs, if any, held by such Existing Holder which such Existing Holder offers to sell without regard to the Auction Rate for the next succeeding Interest Period; and

(B)    one or more Broker-Dealers may contact Potential Holders to determine the principal amount of ARCs which each such Potential Holder offers to purchase if the Auction Rate for the next succeeding Interest Period shall not be less than the rate per annum specified by such Potential Holder.

(C)    Notwithstanding the foregoing, prior to the Submission Deadline on the Initial Auction Date, (1) each Existing Holder of ARCs will be deemed to have submitted to a Broker-Dealer information as to the principal amount of Outstanding ARCs held by such Existing Holder and that such Existing Holder offers to sell all of such Outstanding ARCs without regard to Auction Rate for the Initial Auction Period, *unless,* (2) prior to the Submission Deadline, such Existing Holder shall have submitted to

12

a Broker-Dealer the information described in (Y) paragraph (A)(1) above or (Z) paragraph (A)(2) above.

For the purposes hereof, the communication to a Broker-Dealer of information referred to in clause (A)(1), (A)(2), (A)(3), (B) or (C) of this paragraph (a) is hereinafter referred to as an *Order* and collectively as *Orders* and each Existing Holder and each Potential Holder placing an Order is hereinafter referred to as a *Bidder* and collectively as *Bidders*; an Order containing the information referred to in (x) clause (A)(1) or (C)(2)(Y) of this paragraph (a) is hereinafter referred to as a *Hold Order* and collectively as *Hold Orders*, (y) clause (A)(2), (B) or (C)(2)(Z) of this paragraph (a) is hereinafter referred to as a *Bid* and collectively as *Bids* and (z) clause (A)(3) or (C)(1) of this paragraph (i) is hereinafter referred to as a *Sell Order* and collectively as *Sell Orders*.

(ii)    (A)    Subject to the provisions of Section 1.6(b) of this Supplement, a Bid by an Existing Holder shall constitute an irrevocable offer to sell:

(1)    the principal amount of Outstanding ARCs specified in such Bid if the Auction Rate determined as provided in this Section 1.6 of this Supplement shall be less than the rate specified in such Bid; or

(2)    such principal amount or a lesser principal amount of Outstanding ARCs to be determined as set forth in Section 1.6(d)(i)(D) of this Supplement, if the Auction Rate determined as provided in this Section 1.6 shall be equal to the rate specified in such Bid; or

(3)    such principal amount or a lesser principal amount of Outstanding ARCs to be determined as set forth in Section 1.6(d)(ii)(C) of this Supplement if the rate specified shall be higher than the Maximum ARC Rate and Sufficient Clearing Bids have not been made.

(B)    Subject to the provisions of Section 1.6(b) of this Supplement, a Sell Order by an Existing Holder shall constitute an irrevocable offer to sell:

(1)    the principal amount of Outstanding ARCs specified in such Sell Order; or

(2)    such principal amount or a lesser principal amount of Outstanding ARCs as set forth in Section 1.6(d)(ii)(C) of this Supplement if Sufficient Clearing Bids have not been made.

(C)    Subject to the provisions of Section 1.6(b) of this Supplement, a Bid by a Potential Holder shall constitute an irrevocable offer to purchase:

13-53846-tjt   Doc 5029-3   Filed 05/23/14   Entered 05/23/14 19:55:08   Page 13 of 97

(1) the principal amount of Outstanding ARCs specified in such Bid if the Auction Rate determined as provided in this Section 1.6 of this Supplement shall be higher than the rate specified in such Bid; or

(2) such principal amount or a lesser principal amount of Outstanding ARCs as set forth in Section 1.6(d)(i)(E) of this Supplement if the Auction Rate determined as provided in this Section 1.6 of this Supplement shall be equal to the rate specified in such Bid.

(b) <u>Submission by Broker-Dealer to Auction Agent</u>.

(i) Each Broker-Dealer shall submit in writing to the Auction Agent prior to the Submission Deadline on each Auction Date all Orders obtained by such Broker-Dealer and shall specify with respect to each such Order:

(A) the name of the Bidder placing such Order;

(B) the aggregate principal amount of ARCs that are the subject of such Order;

(C) to the extent that such Bidder is an Existing Holder:

(1) the principal amount of ARCs, if any, subject to any Hold Order placed by such Existing Holder;

(2) the principal amount of ARCs, if any, subject to any Bid placed by such Existing Holder and the rate specified in such Bid; and

(3) the principal amount of ARCs, if any, subject to any Sell Order placed by such Existing Holder; and

(D) to the extent such Bidder is a Potential Holder, the rate and amount specified in such Potential Holder's Bid.

(ii) If any rate specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent shall round such rate up to the next highest one thousandth (.001) of 1%.

(iii) If an Order or Orders covering all Outstanding ARCs held by any Existing Holder is not submitted to the Auction Agent prior to the Submission Deadline, the Auction Agent shall deem a Hold Order to have been submitted on behalf of such Existing Holder covering the principal amount of Outstanding ARCs held by such Existing Holder and not subject to an Order submitted to the Auction Agent except that the Auction Agent shall deem an offer to sell to have been submitted on behalf of such Existing Holder for the Initial Auction Period (as described in Section 1.6(a)(i)(C) of this Supplement).

14

(iv)    None of the City, the Transfer Agent nor the Auction Agent shall be responsible for any failure of a Broker-Dealer to submit an Order to the Auction Agent on behalf of any Existing Holder or Potential Holder.

(v)    If any Existing Holder submits through a Broker-Dealer to the Auction Agent one or more Orders covering in the aggregate more than the principal amount of Outstanding ARCs held by such Existing Holder, such Orders shall be considered valid as follows and in the following order of priority:

(A)    all Hold Orders shall be considered valid, but only up to and including in the aggregate the principal amount of ARCs held by such Existing Holder, and if the aggregate principal amount of ARCs subject to such Hold Orders exceeds the aggregate principal amount of ARCs held by such Existing Holder, the aggregate principal amount of ARCs subject to each such Hold Order shall be reduced pro rata to cover the aggregate principal amount of Outstanding ARCs held by such Existing Holder;

(B)    (1)    any Bid shall be considered valid up to and including the excess of the principal amount of Outstanding ARCs held by such Existing Holder over the aggregate principal amount of ARCs subject to any Hold Orders referred to in clause (A) of this paragraph (v);

(2)    subject to subclause (1) of this clause (B), if more than one Bid with the same rate is submitted on behalf of such Existing Holder and the aggregate principal amount of Outstanding ARCs subject to such Bids is greater than such excess, such Bids shall be considered valid up to and including the amount of such excess and the stated amount of ARCs subject to each Bid with the same rate shall be reduced pro rata to cover the stated amount of ARCs equal to such excess;

(3)    subject to subclauses (1) and (2) of this clause (B), if more than one Bid with different rates is submitted on behalf of such Existing Holder, such Bids shall be considered valid first in the ascending order of their respective rates until the highest rate is reached at which such excess exists and then at such rate up to and including the amount of such excess; and

(4)    in any such event, the aggregate principal amount of Outstanding ARCs, if any, subject to Bids not valid under this clause (B) shall be treated as the subject of a Bid by a Potential Holder at the rate therein specified; and

(C)    all Sell Orders shall be considered valid up to and including the excess of the principal amount of Outstanding ARCs held by such Existing Holder over the aggregate principal amount of ARCs subject to valid Hold Orders referred to in clause (A) of this paragraph (v) and valid Bids referred to in clause (B) of this paragraph (v).

(vi)     If more than one Bid for ARCs is submitted on behalf of any Potential Holder, each Bid submitted shall be a separate Bid with the rate and principal amount therein specified.

(vii)     Any Bid or Sell Order submitted by an Existing Holder covering an aggregate principal amount of ARCs not equal to an Authorized Denomination therefor shall be rejected and shall be deemed a Hold Order. Any Bid submitted by a Potential Holder covering an aggregate principal amount of ARCs not equal to an Authorized Denomination therefor shall be rejected.

(viii)     Any Bid submitted by an Existing Holder or a Potential Holder specifying a rate lower than the All Hold Rate shall be treated as a Bid specifying the All Hold Rate and any such Bid shall be considered as valid and shall be selected in the ascending order of the respective rates in the Submitted Bids.

(ix)     An Existing Holder that offers to purchase additional ARCs is, for purposes of such offer, treated as a Potential Holder.

(x)     Any Bid specifying a rate higher than the Maximum Interest Rate will (i) be treated as a Sell Order if submitted by an Existing Holder and (ii) not be accepted if submitted by a Potential Holder.

(c)     <u>Determination of Sufficient Clearing Bids, Auction Rate and Winning Bid Rate.</u>

(i)     Not earlier than the Submission Deadline on each Auction Date, the Auction Agent shall assemble all valid Orders submitted or deemed submitted to it by the Broker-Dealers (each such Order as submitted or deemed submitted by a Broker-Dealer being hereinafter referred to individually as a *Submitted Hold Order*, a *Submitted Bid* or a *Submitted Sell Order*, as the case may be, or as a *Submitted Order* and collectively as *Submitted Hold Orders*, *Submitted Bids* or *Submitted Sell Orders*, as the case may be, or as *Submitted Orders*) and shall determine:

(A)     the excess of the total principal amount of Outstanding ARCs over the sum of the aggregate principal amount of Outstanding ARCs subject to Submitted Hold Orders (such excess being hereinafter referred to as the *Available ARCs*); and

(B)     from such Submitted Orders whether:

(1)     the aggregate principal amount of Outstanding ARCs subject to Submitted Bids by Potential Holders specifying one or more rates equal to or lower than the Maximum ARC Rate, exceeds or is equal to the sum of:

(2)     the aggregate principal amount of Outstanding ARCs subject to Submitted Bids by Existing Holders specifying one or more rates higher than the Maximum ARC Rate; and

16

(3)    the aggregate principal amount of Outstanding ARCs subject to Submitted Sell Orders;

(in the event such excess or such equality exists, other than because the sum of the principal amounts of ARCs in subclauses (1) and (3) above is zero because all of the Outstanding ARCs are subject to Submitted Hold Orders, such Submitted Bids in subclause (1) above being hereinafter referred to collectively as *Sufficient Clearing Bids*); and

(C)    if Sufficient Clearing Bids have been made, the lowest rate specified in such Submitted Bids (which shall be the *Winning Bid Rate*) such that if:

(1)    (aa) each such Submitted Bid from Existing Holders specifying such lowest rate and (bb) all other Submitted Bids from Existing Holders specifying lower rates were rejected, thus entitling such Existing Holders to continue to hold the principal amount of ARCs subject to such Submitted Bids; and

(2)    (aa) each such Submitted Bid from Potential Holders specifying such lowest rate and (bb) all other Submitted Bids from Potential Holders specifying lower rates were accepted;

the result would be that such Existing Holders described in subclause (1) above would continue to hold an aggregate principal amount of Outstanding ARCs which, when added to the aggregate principal amount of Outstanding ARCs to be purchased by such Potential Holders described in subclause (2) above, would equal not less than the Available ARCs.

(ii)    Promptly after the Auction Agent has made the determinations pursuant to paragraph (i) of this subsection (c), the Auction Agent shall advise the Transfer Agent in writing by facsimile of the Maximum ARC Rate and the All Hold Rate and the components thereof on the Auction Date and, based on such determinations, the Auction Rate for the next succeeding Interest Period (the *Auction Rate*) as follows:

(A)    if Sufficient Clearing Bids have been made, that the Auction Rate for the next succeeding Interest Period shall be equal to the Winning Bid Rate so determined;

(B)    if Sufficient Clearing Bids have not been made (other than because all of the Outstanding ARCs are subject to Submitted Hold Orders), that the Auction Rate for the next succeeding Interest Period shall be equal to the Maximum ARC Rate; or

(C)    if all outstanding ARCs are subject to Submitted Hold Orders, that the Auction Rate for the next succeeding Interest Period shall be equal to the All Hold Rate.

(d)    Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of ARCs. Existing Holders shall continue to hold the principal amount of ARCs

17

that are subject to Submitted Hold Orders, and, based on the determinations made pursuant to Section 1.6(c)(i) of this Supplement, Submitted Bids and Submitted Sell Orders shall be accepted or rejected and the Auction Agent shall take such other action as set forth below:

(i) If Sufficient Clearing Bids have been made, all Submitted Sell Orders shall be accepted and, subject to the provisions of paragraph (iv) of this subsection (d), Submitted Bids shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(A) Existing Holders' Submitted Bids specifying any rate that is higher than the Winning Bid Rate shall be accepted, thus requiring each such Existing Holder to sell the aggregate principal amount of ARCs subject to such Submitted Bids;

(B) Existing Holders' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be rejected, thus entitling each such Existing Holder to continue to hold the aggregate principal amount of ARCs subject to such Submitted Bids;

(C) Potential Holders' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring such Potential Holder to purchase the aggregate principal amount of ARCs subject to such Submitted Bids;

(D) each Existing Holders' Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be rejected, thus entitling such Existing Holder to continue to hold the aggregate principal amount of ARCs subject to such Submitted Bid, unless the aggregate principal amount of Outstanding ARCs subject to all such Submitted Bids shall be greater than the principal amount of ARCs (the *remaining principal amount*) equal to the excess of the Available ARCs over the aggregate principal amount of ARCs subject to Submitted Bids described in clauses (B) and (C) of this paragraph (i), in which event such Submitted Bid of such Existing Holder shall be rejected in part, and such Existing Holder shall be entitled to continue to hold the principal amount of ARCs subject to such Submitted Bid, but only in an amount equal to the aggregate principal amount of ARCs obtained by multiplying the remaining principal amount by a fraction the numerator of which shall be the principal amount of Outstanding ARCs held by such Existing Holder subject to such Submitted Bid and the denominator of which shall be the sum of the principal amount of Outstanding ARCs subject to such Submitted Bids made by all such Existing Holders that specified a rate equal to the Winning Bid Rate; and

(E) each Potential Holder's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be accepted but only in an amount equal to the principal amount of ARCs obtained by multiplying the excess of the aggregate principal amount of Available ARCs over the aggregate principal amount of ARCs subject to Submitted Bids described in clauses (B), (C) and (D) of this paragraph

18

(i) by a fraction the numerator of which shall be the aggregate principal amount of Outstanding ARCs subject to such Submitted Bid and the denominator of which shall be the sum of the principal amounts of Outstanding ARCs subject to Submitted Bids made by all such Potential Holders that specified a rate equal to the Winning Bid Rate.

(ii)    If Sufficient Clearing Bids have not been made (other than because all of the Outstanding ARCs are subject to Submitted Hold Orders), subject to the provisions of paragraph (iv) of this subsection (d), Submitted Orders shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(A)    Existing Holders' Submitted Bids specifying any rate that is equal to or lower than the Maximum ARC Rate shall be rejected, thus entitling such Existing Holders to continue to hold the aggregate principal amount of ARCs subject to such Submitted Bids;

(B)    Potential Holders' Submitted Bids specifying any rate that is equal to or lower than the Maximum ARC Rate shall be accepted, thus requiring each Potential Holder to purchase the aggregate principal amount of ARCs subject to such Submitted Bids; and

(C)    each Existing Holder's Submitted Bid specifying any rate that is higher than the Maximum ARC Rate and the Submitted Sell Order of each Existing Holder shall be accepted, thus entitling each Existing Holder that submitted any such Submitted Bid or Submitted Sell Order to sell the ARCs subject to such Submitted Bid or Submitted Sell Order, but in both cases only in an amount equal to the aggregate principal amount of ARCs obtained by multiplying the aggregate principal amount of ARCs subject to Submitted Bids described in clause (B) of this paragraph (ii) by a fraction the numerator of which shall be the aggregate principal amount of Outstanding ARCs held by such Existing Holder subject to such Submitted Bid or Submitted Sell Order and the denominator of which shall be the aggregate principal amount of Outstanding ARCs subject to all such Submitted Bids and Submitted Sell Orders.

(iii)    If all Outstanding ARCs are subject to Submitted Hold Orders, all Submitted Bids shall be rejected.

(iv)    If, as a result of the procedures described in paragraph (i) or (ii) of this subsection (d), any Existing Holder would be entitled or required to sell, or any Potential Holder would be entitled or required to purchase, a principal amount of ARCs that is not equal to an Authorized Denomination therefor the Auction Agent shall, in such manner as it shall, in its sole discretion, determine, round up or down the principal amount of ARCs to be purchased or sold by any Existing Holder or Potential Holder so that the principal amount of ARCs purchased or sold by each Existing Holder or Potential Holder shall be equal to an Authorized Denomination, even if such allocation results in one or more of such Potential Owners not purchasing any ARCs.

19

(e)     Based on the results of each Auction, the Auction Agent shall determine the aggregate principal amount of ARCs to be purchased and the aggregate principal amount of ARCs to be sold by Potential Holders and Existing Holders on whose behalf each Broker-Dealer submitted Bids or Sell Orders and, with respect to each Broker-Dealer, to the extent that such aggregate principal amount of ARCs to be sold differs from such aggregate principal amount of ARCs to be purchased, determine to which other Broker-Dealer or Broker-Dealers acting for one or more purchasers such Broker-Dealer shall deliver, or from which other Broker-Dealer or Broker-Dealers acting for one or more sellers such Broker-Dealer shall receive, as the case may be, ARCs.

Section 1.7     Certain Orders Not Permitted.  The City may not submit an Order in any Auction.  The Auction Agent shall have no duty or liability in monitoring or enforcing compliance with this Section 1.7.

Section 1.8     Notice of Payment Defaults and Cures; Payment of Service Charges.

(a)     The City shall, from time to time and upon receipt of invoices provided therefor, pay to the Auction Agent an amount equal to the Auction Agent Fee as calculated in the Auction Agency Agreement and an amount equal to the Broker-Dealer Fee as calculated in the Broker-Dealer Agreement.

(b)     By 12:30 p.m. New York City time on the Business Day immediately succeeding each Interest Payment Date, the Transfer Agent will determine if a Payment Default has occurred.  If a Payment Default has occurred, the Transfer Agent shall notify the Auction Agent and Broker-Dealer by 1:00 p.m. New York City time of such Payment Default.  If a Payment Default has been cured, the Transfer Agent shall so notify the Auction Agent and the Broker-Dealer by 5:00 p.m. New York City time on the day such Payment Default is cured or waived.

Section 1.9     Calculation of Maximum ARC Rate, All Hold Rate and Default Rate.  The Auction Agent shall calculate the Maximum ARC Rate and the All Hold Rate on each Auction Date.  If the ownership of the ARCs is no longer maintained in book-entry form by the Depository, the Transfer Agent shall calculate the Maximum ARC Rate on the Business Day immediately preceding the first day of each Interest Period commencing after the delivery of certificates representing the ARCs pursuant to Subsection 1.2(c) of this Supplement.  If a Payment Default shall have occurred, the Transfer Agent shall calculate the Default Rate on the first day of (i) each Interest Period commencing after the occurrence and during the continuance of such Payment Default and (ii) any Interest Period commencing less than the Applicable Number of Business Days after the cure or waiver of any Payment Default.  The Auction Agent shall determine the "AA" Financial Commercial Paper Rate for each Interest Period other than the first Interest Period; provided, that if the ownership of the ARCs is no longer maintained in book-entry form, or if a Payment Default has occurred, then the Transfer Agent shall determine the "AA" Financial Commercial Paper Rate for each such Interest Period.  The determination by the Transfer Agent or the Auction Agent, as the case may be, of the "AA" Financial Commercial Paper Rate shall (in the absence of manifest error) be final and binding upon all parties.  If

calculated or determined by the Auction Agent, the Auction Agent shall promptly advise the Transfer Agent of the "AA" Financial Commercial Paper Rate.

Section 1.10   Computation of Interest. The amount of interest distributable to Holders of ARCs in respect of each $25,000 in principal amount thereof for any Interest Period or part thereof shall be calculated as follows:

(a)      During the Initial Interest Period for Tranche D-1 and Tranche D-2, and for any Tranche of ARCs with an Auction Period equal to one year or more, interest shall be calculated on the basis of a 360 day year comprised of 12 30-day months.

(b)      During the Initial Interest Period for any future Tranche of Variable Rate Securities converted to the Auction Rate Mode, interest shall be calculated as set forth in the Mode Change Notice applicable thereto.

(c)      With respect to any Tranche of ARCs with an Auction Period of less than one year, interest on such ARCs for any Interest Period shall be calculated by applying the respective Applicable ARCs Rate for such Interest Period or part thereof to the principal amount of $25,000, multiplying such product by the actual number of days in the Interest Period or part thereof concerned divided by 365 or 366, as applicable, and truncating the resultant figure to the nearest one cent. Interest on such ARCs shall be computed by the Transfer Agent on the basis of a 365-day year for the number of days actually elapsed; except that for any such calculation with respect to an Interest Payment Date occurring after January 1 of any leap year through December 31 of such leap year, such interest (for any day occurring during such period) shall be computed on the basis of a 366-day year period. The Transfer Agent shall make the calculation required in this Section 1.10(c) not later than the close of business on each Auction Date.

Section 1.11   Notification of Rates, Amounts and Payment Dates.

(a)      The Transfer Agent shall determine the aggregate amount of interest distributable on the next succeeding Interest Payment Date to the Holders of the ARCs. So long as the ownership of the ARCs is maintained in book-entry form by the Depository, the Transfer Agent shall advise the Depository of each Record Date for the ARCs at least two Business Days prior thereto.

(b)      Promptly after each Interest Payment Date for the ARCs, and in any event at least 10 days prior to each Interest Payment Date following the Initial Interest Payment Date, the Transfer Agent shall:

(i)      so long as no Payment Default has occurred and is continuing and the ownership of the ARCs is maintained in book-entry form by the Depository, confirm the Auction Agent's determination of (A) the date of such next Interest Payment Date and (B) the amount payable to the Auction Agent pursuant to Section 1.8 hereof and notify the Auction Agent of any discrepancy therein; and

(ii)     advise the Depository, so long as the ownership of the ARCs is maintained in book-entry form by the Depository, of the respective Applicable

21

ARCs Rate and the Interest Amount in respect of the next succeeding Interest Period.

In the event that any day that is scheduled to be an Interest Payment Date shall be changed after the Transfer Agent shall have given the notice referred to in clause (i) of the preceding sentence, not later than 9:15 a.m., New York City time, on the Business Day next preceding the earlier of the new Interest Payment Date or the old Interest Payment Date, the Transfer Agent shall, by such means as the Transfer Agent deems practicable, give notice of such change to the Auction Agent, so long as no Payment Default has occurred and is continuing and the ownership of the ARCs is maintained in book-entry form by the Depository.

Section 1.12    Adjustment in Percentages.

(a)    The Market Agent shall adjust the percentage used in determining the All Hold Rate, the Applicable Percentage used in determining the Maximum ARC Rate and the percentage of the Kenny Index used in determining the Default Rate, if any such adjustment is necessary, in the judgment of the Market Agent, to reflect any Change of Preference Law such that ARCs paying the Maximum ARC Rate, ARCs paying the All Hold Rate and ARCs paying the Default Rate shall have equal market values before and after such Change of Preference Law. Prior to any such adjustment, the City shall give notice thereof to the Rating Agency and no such adjustment shall be made unless such adjustment will not adversely affect the rating on any of the Series 2001 Securities. In making any such adjustment, the Market Agent shall take the following factors, as in existence both before and after such Change of Preference Law, into account:

(i)    short-term taxable and tax-exempt market rates and indices of such short-term rates;

(ii)    the market supply and demand for short-term tax-exempt securities;

(iii)    yield curves for short-term and long-term tax-exempt securities or obligations having a credit rating that is comparable to the ARCs;

(iv)    general economic conditions; and

(v)    economic and financial factors present in the securities industry that may affect or that may be relevant to the ARCs.

(b)    The Market Agent shall effectuate an adjustment in the percentage used in determining the All Hold Rate, the Applicable Percentage used in determining the Maximum ARC Rate and the Applicable Percentage of the Kenny Index used to determine the Default Rate pursuant to Subsection (a) of this Section by delivering to the City, the Bond Insurer, the Transfer Agent and the Auction Agent at least 10 days prior to the Auction Date on which the Market Agent desires to effect such change a Favorable Bond Counsel's Opinion and a certificate in substantially the form attached hereto as Annex I to this Supplement, authorizing the adjustment of the percentage used in determining the All Hold Rate, the Applicable Percentage

22

used in determining the Maximum ARC Rate and the Applicable Percentage of the Kenny Index used to determine the Default Rate, which shall be specified in such certificate.

Section 1.13 Market Agent. The Transfer Agent shall enter into a Market Agent Agreement with UBS PaineWebber Inc., as the initial Market Agent. The Market Agent shall serve as such under the terms and provisions hereof and of the Market Agent Agreement. The Market Agent, including any successor appointed pursuant hereto, shall be a member of the National Association of Securities Dealers, Inc. having capitalization of at least $50,000,000, and be authorized by law to perform all the duties imposed upon it by the Sale Order and the Market Agent Agreement. The Market Agent may be removed at any time by the Transfer Agent, acting at the direction of (a) the City or (b) the Securityholders of 66-2/3% of the aggregate principal amount of the ARCs; provided, that such removal shall not take effect until the appointment of a successor Market Agent. The Market Agent may resign upon 30 days' written notice delivered to the City, the Bond Insurer and the Transfer Agent. The City shall use its best efforts to appoint a successor Market Agent that is a qualified institution, effective as of the effectiveness of any such resignation or removal. Notwithstanding that the Market Agent is the agent of the Transfer Agent under the Market Agent Agreement, the Transfer Agent shall not be liable in any way for any action taken, suffered, or omitted, or for any error of judgment made by the Market Agent, whether in the performance of its duties under the Market Agent Agreement or otherwise.

Section 1.14 Auction Agent.

(a) The Bank of New York shall serve as the initial Auction Agent for the ARCs. The Transfer Agent is hereby directed to enter into an agreement with the Auction Agent which shall provide as follows: The Auction Agent shall be (i) a bank or trust company duly organized under the laws of the United States of America or any state or territory thereof having its principal place of business in the Borough of Manhattan, The City of New York, and having a combined capital stock, surplus and undivided profits of at least $15,000,000 or (ii) a member of the National Association of Securities Dealers, Inc., having a capitalization of at least $15,000,000 and, in either case, authorized by law to perform all the duties imposed upon it hereunder and under the Auction Agency Agreement. The Auction Agent may resign and be discharged of the duties and obligations created by the Sale Order by giving at least 90 days' written notice to the City, the Bond Insurer, the Transfer Agent and the Market Agent (30 days' written notice if the Auction Agent has not been paid its fee for more than 30 days). The Auction Agent may be removed at any time by the Transfer Agent if the Auction Agent is an entity other than the Transfer Agent, acting at the direction of (i) the City, or (ii) the Securityholders of 66-2/3% of the aggregate principal amount of the ARCs; provided that, if required by the Market Agent, an agreement in substantially the form of the Auction Agency Agreement shall be entered into with a successor Auction Agent. If the Auction Agent and the Transfer Agent are the same entity, the Auction Agent may be removed as described above, with the City acting in lieu of the Transfer Agent.

(b) In the event that the Auction Agent shall resign or be removed or dissolved, or if the property or affairs of the Auction Agent shall be taken under the control of any state or federal court or administrative body because of bankruptcy or insolvency, or for any other reason, the City shall use its best efforts to appoint a successor as Auction Agent (which successor must be approved by the Bond Insurer, providing that the Bond Insurer is not then in

23

default on its obligations under the Bond Insurance Policy) and the Transfer Agent shall thereupon enter into an Auction Agency Agreement with such successor.

(c)     The Auction Agent shall be acting as agent for the Transfer Agent in connection with Auctions. In the absence of willful misconduct or negligence on its part, the Auction Agent, whether acting directly or through its agents or attorneys, shall not be liable for any action taken, suffered or omitted or for any error of judgment made by it in the performance of its duties under the Auction Agency Agreement and shall not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining the pertinent facts necessary to make such judgment.

(d)     Notwithstanding that the Auction Agent is the agent of the Transfer Agent hereunder and under the Auction Agency Agreement, the Transfer Agent shall not be liable in any way for any action taken, suffered or omitted, or for any error of judgment made by the Auction Agent, whether in the performance of its duties under the Auction Agency Agreement or otherwise, subject to Section 3.4(b) of the Auction Agency Agreement.

Section 1.15   Broker-Dealers.

(a)     The Auction Agent shall enter into a Broker Dealer Agreement with UBS PaineWebber Inc., as the initial Broker-Dealer. The Market Agent may from time to time approve one or more additional persons to serve as Broker-Dealer under Broker-Dealer Agreements.

(b)     Any Broker-Dealer may be removed at any time, at the request of the City, but there shall, at all times, be at least one Broker-Dealer appointed and acting as such.

Section 1.16   Redemption of ARCs.

(a)     Optional Redemption. The ARCs of each Tranche shall be subject to redemption at the option of the City, in whole or in part in Authorized Denominations, at a redemption price of par plus accrued interest to the date of redemption on

(i)      the final Interest Payment Date of the Initial Interest Period; and

(ii)     the Business Day following the last day of each Auction Period.

In the event the Auction Period for the ARCs of any Tranche is changed pursuant to Section 1.17 of this Supplement, the Market Agent may, with the consent of the City and upon receipt of a Favorable Bond Counsel's Opinion in connection therewith, add additional optional redemption provisions allowing for the optional redemption of ARCs during any Auction Period at prices not exceeding 102% of the principal amount of ARCs redeemed. In connection with the conversion of any Tranche of Variable Rate Securities to a Tranche of ARCs hereunder, the Finance Director may specify optional redemption provisions in addition to the provisions specified above with the prior written consent of the Market Agent.

(b)     Sinking Fund Redemption. The ARCs that are Term Securities are subject to mandatory redemption at par in Sinking Fund Installments as provided in the Sale Order and

24

the General Supplement. In connection with the conversion of Variable Rate Securities to the Auction Rate Mode, the Finance Director may change the Sinking Fund Installments with respect to any such Tranche in compliance with and subject to the limitations set forth in the Variable Rate Supplement.

Section 1.17    Changes in Auction Periods or Auction Date.

(a)    Changes in Auction Period or Periods.

(i)    While any of the Series 2001 Securities are outstanding as ARCs, the Market Agent with the written consent of the City may change, for any Tranche of ARCs, from time to time, the length of one or more Auction Periods and, in connection therewith, add additional optional redemption provisions as provided in Section 1.16 hereof and/or change Interest Payment Dates to or from Interest Payment Dates specified in the notice described below corresponding to the end of each Interest Period and Auction Period; any such change shall be considered a "change in the length of one or more Auction Periods" for the purposes of this Supplement. The Market Agent shall initiate the change in the length of one or more Auction Periods by written notice to the Transfer Agent, the Auction Agent, the City and the Depository in substantially the form of, or contain substantially the information set forth in Annex II to this Supplement at least 10 days prior to the Auction Date for such Auction Period.

(ii)    Any such changed Auction Period shall not be less than seven days. No change in an Auction Period from an Auction Period of one year or less to an Auction Period of more than one year shall occur unless there shall have been delivered to the Transfer Agent a Favorable Bond Counsel's Opinion; and no change in Auction Period from an Auction Period of more than one year to an Auction Period of one year or less shall occur unless there shall have been delivered to the Transfer Agent a Favorable Bond Counsel's Opinion.

(iii)    The change in the length of one or more Auction Periods shall not be allowed unless Sufficient Clearing Bids existed at both the Auction before the date on which the notice of the proposed change was given as provided in this Section 1.17(a) and the Auction immediately preceding the proposed change.

(iv)    The change in length of one or more Auction Periods shall take effect only if (A) the Transfer Agent and the Auction Agent receive, by 11:00 a.m. New York City time, on the Business Day before the Auction Date for the first such Auction Period, a certificate from the Market Agent in substantially the form attached as, or containing substantially the same information contained in, Annex II to this Supplement, authorizing the change in the length of one or more Auction Periods specified in such certificate and (B) Sufficient Clearing Bids exist at the Auction on the Auction Date for such first Auction Period. If the condition referred to in (A) above is not met, the Applicable ARCs Rate for the next Auction Period shall be determined pursuant to the Auction Procedures and the Auction Period shall be the Auction Period determined without reference to

25

the proposed change. If the condition referred to in (A) is met but the condition referred to in (B) above is not met, the Applicable ARCs Rate for the next Auction Period shall be the Maximum ARC Rate and the Auction Period shall be the Auction Period determined without reference to the proposed change.

(b)  Changes in the Auction Date. While any of the Series 2001 Securities are outstanding as ARCs, the Market Agent (with the consent of the City):

(i)  in order to conform with then current market practice with respect to similar securities, shall; or

(ii)  in order to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date and the interest rate borne on the ARCs and upon receipt of a Favorable Bond Counsel's Opinion, may (with respect to any Tranche of ARCs)

specify an earlier Auction Date (but in no event more than five Business Days earlier) than the Auction Date that would otherwise be determined in accordance with the definition of "Auction Date" in Section 1.1 of this Supplement with respect to one or more specified Auction Periods. The Market Agent shall provide notice of any determination to specify an earlier Auction Date for one or more Auction Periods by means of a written notice delivered at least 10 days prior to the proposed changed Auction Date to the Transfer Agent, the Auction Agent, the City and the Depository. Such notice shall be substantially in the form of, or contain substantially the information contained in, Annex III to this Supplement.

(c)  In connection with any change described in this Section 1.17, the Auction Agent shall provide such further notice to such parties as is specified in the Auction Agency Agreement.

(d)  No change shall be made to the Auction Period or Auction Date unless the City shall have received confirmation from the Rating Agency that the rating on any of the Series 2001 Securities will not be adversely affected.

Section 1.18  Credit Ratings. The City shall take all reasonable action necessary to enable at least one nationally recognized statistical rating organization (as that term is used in the rules and regulations of the SEC under the Securities Exchange Act) to provide credit ratings for the ARCs.

Section 1.19  Certain Notices.

(a)  The Market Agent shall provide the Transfer Agent, the Bond Insurer and, so long as no default under the Sale Order and/or this Supplement have occurred and are continuing and the ownership of the ARCs is maintained in book-entry form by the Depository, the Auction Agent with notice of any change in the Statutory Corporate Tax Rate.

(b)  The City shall use its best efforts to provide the Transfer Agent, the Bond Insurer and, so long as no Payment Default has occurred and is continuing and the ownership of

26

the ARCs is maintained in book-entry form by the Depository, the Auction Agent with notice of any change in the maximum rate permitted by law on the ARCs.

Section 1.20 <u>Purchases of ARCs</u>. The City shall not purchase or otherwise acquire ARCs unless the City redeems or otherwise cancels such ARCs on the day of any purchase.

Section 1.21 <u>Notice of Payment Default</u>.

(a) If the City determines that a Payment Default has occurred the City shall promptly notify the Transfer Agent thereof.

(b) So long as the ownership of the ARCs is maintained in book-entry form by the Depository, upon the occurrence of a Payment Default, the Transfer Agent shall immediately send a notice thereof to the Auction Agent and Market Agent by telecopy or similar means.

(c) So long as the ownership of the ARCs is maintained in book-entry form by the Depository, the Transfer Agent shall immediately send notice to the Auction Agent by telecopy or similar means if a Payment Default is cured.

Section 1.22 <u>Conversions from Variable Rate Securities to ARCs</u>. In connection with the conversion of any Variable Rate Securities to a Tranche of ARCs the Finance Director shall include in the Mode Change Notice with respect thereto:

(a) the Initial Auction Date, Initial Auction Period, Initial Interest Payment Date and Initial Interest Period for such Tranche;

(b) the interest rate applicable to the ARCs of such Tranche during the Initial Interest Period;

(c) additional optional redemption dates and redemption prices applicable to the ARCs of such Tranche as provided in Section 1.16(a) hereof;

(d) the designation of the ARCs of such Tranche for purposes of Section 1.2(a) hereof; and

(e) such other matters as the Finance Director deems necessary or appropriate and not inconsistent with the Bond Ordinance, Bond Resolution, Sale Order, General Supplement or VRM Supplement.

Section 1.23 <u>Termination or Suspension of Auction Procedures</u>. With respect to a Tranche of ARCs, Auction Procedures may be terminated or suspended only if

(a) the Auction Period with respect to such Tranche has been changed pursuant to Section 1.17 hereof so that the then current Auction Period extends to the final maturity date of the ARCs of such Tranche; or

27

(b)     as provided in the first paragraph of Section 1.6 hereof.

If the City has failed to pay any fees owing to the Auction Agent or the Broker-Dealer with respect to the ARCs of such Tranche, the Broker-Dealer or Auction Agent shall give written notice thereof to the Bond Insurer and allow the Bond Insurer 45 days after delivery of such notice to cure such failure, during which time Auction Procedures shall not be suspended or terminated.

## ARTICLE II
## BOND INSURANCE

Section 2.1.   Certain Rights of the Bond Insurer.  With respect to the ARCs that it insures the Bond Insurer shall have the following rights.

(a)     The Bond Insurer has the right to approve or disapprove the following matters (its approval to be indicated solely by written consent delivered prior to the applicable action):

(i)     any change in percentages by the Market Agent pursuant to Section 1.12 hereof;

(ii)    the removal of and/or the appointment of a successor to the Market Agent pursuant to Section 1.13 hereof;

(iii)   the removal of and/or appointment of a successor to the Auction Agent pursuant to Section 1.14 hereof;

(iv)    a change in one or more Auction Periods or Auction Dates as provided in Section 1.17 hereof;

(v)     any change in the Maximum Interest Rate or the method of calculating interest hereunder;

(vi)    any amendment to this Supplement permitted by Section 3.2 hereof whether requiring the consent of Securityholders; and

(vii)   any amendment to the Auction Agency Agreement or a Broker-Dealer Agreement.

(b)     In addition to notice rights specifically stated elsewhere, the Bond Insurer shall have the right to receive copies of all notices required to be delivered to a Rating Agency, the City, the Auction Agent, the Market Agent or a Broker Dealer hereunder (except for notices given pursuant to the normal and regular operation of Auction Procedures hereunder).

(c)     The City shall promptly provide the Bond Insurer with a copy of every filing made to a NRMSIR or the MSRB under its Continuing Disclosure Agreement (including the filing of financial information and notices of material events).

28

(d)     The City shall promptly provide the Bond Insurer with a copy of the official statement or other disclosure documents relating to the issuance of Additional Bonds or Securities under the Bond Ordinance.

(e)     The Bond Insurer, acting alone, shall have the right to direct all remedies upon the occurrence of an Event of Default with respect to the ARCs it insures hereunder. The Bond Insurer shall be recognized as the registered owner of each ARC which it insures for the purposes of exercising all rights and privileges available to Securityholders. For ARCs which it insures, the Bond Insurer shall have the right to institute any suit, action, or proceeding at law or in equity under the same terms as a Securityholder in accordance with applicable provisions (and subject to applicable limitations) of the Bond Ordinance and Act 94. Any acceleration of principal payments of the ARCs it insures in connection with an Event of Default must be subject to the Bond Insurer's prior written consent. The rights given to the Bond Insurer pursuant to this Section 2.1(e) are subject to the condition that the Bond Insurer is not in default of its obligations under its Bond Insurance.

Section 2.2.    Payment Procedures for MBIA Bond Insurance. As long as the Bond Insurance issued by MBIA shall be in full force and effect, the City, the Transfer Agent and any paying agent appointed with respect to the ARCs insured by MBIA (for purposes of this Section, *MBIA Insured ARCs*) shall comply with the following provisions:

(a)     In the event that, on the Business Day prior to the payment date on the MBIA Insured ARCs, the Transfer Agent has not received sufficient moneys to pay all principal of and interest on the MBIA Insured ARCs due on the following Business Day, the Transfer Agent shall immediately notify MBIA or its designee on the same Business Day by telephone or telegraph, confirmed in writing by registered or certified mail, of the amount of the deficiency.

(b)     If the deficiency is made up in whole or in part prior to or on the payment date, the Transfer Agent shall so notify MBIA or its designee.

(c)     In addition, if the Transfer Agent has notice that any Securityholder has been required to disgorge payments of principal or interest on the obligation to a trustee in bankruptcy or creditors or others pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Securityholder within the meaning of any applicable bankruptcy laws, then the Transfer Agent shall notify MBIA or its designee of such fact by telephone or telegraphic notice, confirmed in writing by registered or certified mail.

(d)     The Transfer Agent is hereby irrevocably designed, appointed, directed and authorized to act as attorney-in-fact for Securityholders of the MBIA Insured ARCs as follows:

(i)     If and to the extent there is a deficiency in amounts required to pay interest on the MBIA Insured ARCs, the Transfer Agent shall (a) execute and deliver to State Street Bank and Trust Company, N.A., or its successors under the Bond Insurance (the "Insurance Paying Agent"), in form satisfactory to the Insurance Paying Agent, an

29

instrument appointing MBIA as agent for such Securityholders in any legal proceeding related to the payment of such interest and an assignment to MBIA of the claims for interest to which such deficiency relates and which are paid by MBIA, (b) receive as designee of the respective Securityholders (and not as Transfer Agent) in accordance with the tenor of the Bond Insurance payment from the Insurance Paying Agent with respect to the claims for interest so assigned, and (c) disburse the same to such respective Securityholders; and

(ii)     If and to the extent of a deficiency in amounts required to pay principal of the MBIA Insured ARCs, the Transfer Agent shall (a) execute and deliver to the Insurance Payment Agent in form satisfactory to the Insurance Paying Agent an instrument appointing MBIA as agent for such Securityholder in any legal proceeding relating to the payment of such principal and an assignment to MBIA of any of the MBIA Insured ARCs surrendered to the Insurance Paying Agent of so much of the principal amount thereof as has not previously been paid or for which moneys are not held by the Transfer Agent and available for such payment (but such assignment shall be delivered only if payment from the Insurance Paying Agent is received), (b) receive as designee of the respective Securityholders (and not as Transfer Agent) in accordance with the tenor of the Bond Insurance payment therefor from the Insurance Paying Agent, and (c) disburse the same to such Securityholders.

(e)     Payments with respect to claims for interest on and principal of MBIA Insured ARCs disbursed by the Transfer Agent from proceeds of the Bond Insurance shall not be considered to discharge the obligation of the City with respect to such MBIA Insured ARCs, and MBIA shall become the owner of such unpaid MBIA Insured ARCs and claims for the interest in accordance with the tenor of the assignment made to it under the provisions of this subsection or otherwise.

(f)     Irrespective of whether any such assignment is executed and delivered, the City and the Transfer Agent hereby agree for the benefit of MBIA that:

(i)     They recognize that to the extent MBIA makes payments, directly or indirectly (as by paying through the Transfer Agent), on account of principal of or interest on the MBIA Insured ARCs, MBIA will be subrogated to the rights of such Securityholders to receive the amount of such principal and interest from the City, with interest thereon as provided and solely from the sources stated in the Bond Ordinance and the MBIA Insured ARCs, and

(ii)     They will accordingly pay to MBIA the amount of such principal and interest (including principal and interest recovered under

30

subparagraph (ii) of the first paragraph of the Bond Insurance, which principal and interest shall be deemed past due and not to have been paid), with interest thereon as provided in the Bond Ordinance and the MBIA Insured ARCs, but only from the sources and in the manner provided herein for the payment of principal of and interest on the MBIA Insured ARCs to Securityholders, and will otherwise treat MBIA as the owner of such rights to the amount of such principal and interest.

Section 2.3.    MBIA Reserve Policy Provisions.

(a)    Coordination of Draws.  If, in addition to the Reserve Policy for the Second Lien Reserve Account, any other Qualified Surety Bond (an *Additional Reserve Policy*) is provided for the Second Lien Reserve Account, drawings under the Reserve Policy and any such Additional Reserve Policy, and repayment of Policy Costs and reimbursement of amounts due under the Additional Reserve Policy, shall be made on a pro rata basis (calculated by reference to the maximum amounts available thereunder) after applying all available cash in such Second Lien Reserve Account and prior to replenishment of any such cash draws, respectively. "*Additional Reserve Policy*" does not include any reserve fund substitute instrument obtained for any reserve account created under or pursuant to the Bond Ordinance other than the Second Lien Reserve Account.

(b)    Repayment.

(i)    The City shall repay MBIA from Net Revenues the principal amount of any draws under each Reserve Policy and related reasonable expenses incurred by MBIA (together with interest thereon at a rate equal to the lower of (A) the prime rate of Citibank, N.A., New York, New York in effect from time to time plus 3% per annum and (B) the highest rate permitted by law) and shall have the same priority as the obligation to maintain and refill the related Reserve Account.

(ii)    Repayment of draws, expenses and accrued interest (collectively, *Policy Costs*) shall commence in the first month following each draw, and each such monthly payment shall be in an amount at least equal to 1/12 of the aggregate of Policy Costs related to such draw.  If and to the extent that cash has also been deposited in a Reserve Fund, all such cash shall be used (or investments purchased with such cash shall be liquidated and the proceeds applied as required) prior to any drawing under the related Reserve Policy, and repayment of any related Policy Costs shall be made prior to replenishment of any such cash amounts.

(iii)    To secure payment of Policy Costs, statutory liens upon the whole of the Net Revenues is hereby created pursuant to Section 7a of Act 94.  The lien securing Policy Costs related to the Second Lien

31

Bond Reserve Account is of equal priority to the statutory lien on Net Revenues securing Second Lien Bonds *but* subordinate to such lien as between Second Lien Bonds and such Policy Costs. The statutory liens granted by this subsection shall remain in full force and effect until all Policy Costs are paid in full.

(c)     Remedies. If the City shall fail to repay any Policy Costs in accordance with the requirements hereof, MBIA shall be entitled to exercise any and all remedies available at law or under the authorizing document other than (i) acceleration of the maturity of the MBIA Insured ARCs or (ii) remedies which would adversely affect Securityholders.

(d)     Coverage Requirements. The amount of Policy Costs due and owing in any Fiscal Year shall be included in any calculation with respect to such Fiscal Year required by the Bond Ordinance to issue additional Securities or to set rates as obligations required to be covered 100%.

(e)     Additional Securities.

(i)      No additional Second Lien Securities may be issued without MBIA's prior written consent if any Policy Costs are past due and owing to MBIA with respect to the Reserve Account for Securities of that Priority.

(ii)     Upon the issuance of additional Second Lien Bonds, the Second Lien Reserve Account shall be fully funded (at its Reserve Requirement) upon the issuance of such Securities, either with cash or permitted investments or by a Qualified Surety Bond.

Section 2.4.     FSA and/or FGIC Provisions. In the event any of the Variable Rate Securities are converted to a Tranche of ARCs pursuant to the terms of the VRM Supplement, this Supplement may be amended and supplemented (without the approval of Securityholders but with the prior approval of MBIA) to conform or clarify this Supplement with respect to the rights of FSA (if the Variable Rate Securities are Variable Rate Securities Series C-1) or FGIC (if the Variable Rate Securities are Variable Rate Securities Series C-2) pursuant to its Bond Insurance securing such converted Variable Rate Securities, provided, however, that any such amendment and supplement shall be subject to the limits established by, and shall be subject to the provisions of, the Bond Ordinance and the Bond Resolution.

## ARTICLE III
## MISCELLANEOUS

Section 3.1.     Limitation on Defeasance. The City shall not defease the lien of the Bond Ordinance securing any ARCs by the deposit of funds in escrow (commonly known as a "legal defeasance") without obtaining a Rating Confirmation from each Rating Agency of ARCs so defeased.

32

Section 3.2.     Amendments.

(a)     This Supplement cannot be amended or supplemented *except* in accordance with the provisions of the Bond Ordinance and this Section.

(b)     The Finance Director shall provide each Rating Agency with a copy of each amendment or supplement at least 15 days in advance of the same becoming effective.

(c)     For the purpose of acquiring consent for the purposes of the Bond Ordinances or otherwise, the consent of a Securityholder acquiring a Series 2001 Security in a conversion from Variable Rate Securities to ARCs which the remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under the Bond Ordinance or otherwise, but no actual consent shall be required and no more than one such disclosure shall be required.

(d)     This Supplement may be amended as provided and for the purposes set forth in Section 2.4 hereof.

Section 3.3.     Notices to Rating Agencies.     The Finance Director shall give notice to each Rating Agency of any of the following promptly on the occurrence thereof: (i) any optional redemption or defeasance of ARCs, (ii) any conversion of Variable Rate Securities to ARCs, (iii) any change in the Market Agent or Auction Agent and (iv) any change in the Auction Period pursuant to Section 1.17 hereof.

Section 3.4.     Notices.

(a)     Each notice, request or other communication given hereunder to be given to any party named below shall be in writing or otherwise given by Electronic Means (except as provided below) and given to it at its address appearing below or to such other address as it may hereafter specify for such purpose by notice to the others named below.

**City of Detroit**

>   Coleman A. Young Municipal Center
>   Room 1200
>   2 Woodward Avenue
>   Detroit, Michigan 48226
>   Attention: Finance Director

**U.S. Bank Trust National Association**, as Transfer Agent

>   535 Griswold, Suite 550
>   Detroit, Michigan 48226
>   Attention: Corporate Trust Department

33

**FGIC**

> 115 Broadway
> New York, New York 10006
> Attention: Risk Management

**FSA**

> 350 Park Avenue
> New York, New York
> Attention: Managing Director-Surveillance

**MBIA**

> 113 King Street
> Armonk, New York 10504
> Attention: Surveillance

**Standard & Poor's Ratings Services**

> 55 Water Street, 38th Floor
> New York, New York 10041

**Moody's Investors Services**

> 99 Church Street
> New York, New York 10007
> Attention: Fully Supported Group

**Fitch, Inc.**

> One State Street Plaza
> New York, New York 10004
> Attention: Municipal Structure Group

(b)     Each notice, request or other communication given hereunder shall be effective, (i) if given by mail, 72 hours after it is deposited in the United States Mail with first class postage prepaid, addressed to the recipient at its Notice Address and (ii) if given by another means, when delivered at its Notice Address.

(c)     Notices required to be given to the Bond Insurer hereunder shall be given only to the Bond Insurer for the Tranche or Tranches to which such notice relates.

Section 3.5.     Severability.  In the event that any provision of this Supplement is held to be invalid in any circumstance, such invalidity shall not affect any other provision or circumstance.

Section 3.6.     Payments Due and Acts to be Performed on Non-Business Days. If a date of maturity of interest on or principal of ARCs or any redemption date, or a date fixed for the performance of any other act under this Supplement, shall not be a Business Day,

payment of such interest or principal or redemption price need not be made, and any such other act need not be performed, on such date but may be made or performed on the next succeeding Business Day with the same force and effect as if made on the date of maturity or the date fixed for redemption, and, *except* as otherwise herein provided, no interest on any amount so paid shall accrue for the period after such date.

Section 3.7.    Captions; Table of Contents.  The captions or headings in, and the table of contents for, this Supplement are for convenience only and in no way define, limit or describe the scope or content of any provision hereof.

Section 3.8.    Governing Law.  This Supplement shall be governed by the law of the State of Michigan exclusive of its conflicts of law.

35

## [FORM OF NOTICE OF CHANGE IN PERCENTAGES]

## CITY OF DETROIT
## SEWER DISPOSAL SYSTEM REVENUE SECOND LIEN BONDS (ARCs),
## SERIES 2001 (D-__)

(Used in Determination of the Maximum ARC Rate, the All Hold Rate and the Index for Default Rate)

NOTICE IS HEREBY GIVEN that UBS PaineWebber Inc. as Market Agent for the above-identified Series 2001 Securities, hereby authorizes the adjustment in the percentages used to determine the Maximum ARC Rate, the All Hold Rate and the Index for the Default Rate to reflect a Change in Preference Law as set forth in its notice dated _____.

Notice is also hereby given that the Market Agent has obtained confirmation that Bond Counsel expects to be able to give its opinion to the effect that the adjustment in the percentages is authorized by *Section 1.12* of the Auction Rate Mode Supplement to the Sale Order relating to the Series 2001 Securities and will not have an adverse effect on the exclusion of interest on the Series 2001 Securities from gross income for federal income tax purposes.

Dated: _____

UBS PAINEWEBBER INC.

By:_____

Its:_____

I - 1

**[FORM OF NOTICE ESTABLISHING CHANGE IN LENGTH OF ONE OR MORE AUCTION PERIODS]**

### CITY OF DETROIT
### SEWER DISPOSAL SYSTEM REVENUE SECOND LIEN BONDS (ARCs), SERIES 2001 (D-___)

### NOTICE ESTABLISHING CHANGE IN LENGTH OF ONE OR MORE AUCTION PERIODS

Notice is hereby given that UBS PaineWebber Inc., as Market Agent for the above-captioned Series 2001 Securities, hereby establishes new lengths for one or more Auction Periods pursuant to the Auction Rate Mode Supplement to the Sale Order therefor as follows:

1.      The change shall take effect on _____, _____, the date of commencement of the next Auction Period for Tranche D-__ of the Series 2001 Securities outstanding as ARCs (the *Effective Date*).

2.      Interest Payment Dates shall be (or, if applicable, remain) each _____ and _____ after the date of this Notice. For the Auction Period commencing on the Effective Date, the Interest Period (and Auction Period) shall be the period commencing on the Effective Date through and including _____, _____ (date). For Auction Periods occurring after the Auction Period commencing on the Effective Date, the Interest Period (and Auction Period) shall be the period commencing on _____, _____ (date) through and including _____, _____ (date) and each _____ (number of days) day period thereafter commencing on a _____ (day of week) and ending on (and including) a _____ (day of week); provided, however, that the length of subsequent Auction Periods shall be subject to further change hereafter as provided in **Section 1.17** of the Supplement described above.

3.      [Describe any special optional redemption provisions added in connection with the change.]

4.      The changes described above shall take place only upon delivery of this Notice and the satisfaction of other conditions set forth in the Supplement described above and our prior notice dated _____ regarding the proposed change.

5.      Terms not defined in this Notice shall have the meanings as set forth in the Supplement described above.

Dated:_____          UBS PAINEWEBBER INC., as Market Agent

                                                    By:_____

                                                    Its:_____

**[FORM OF NOTICE OF CHANGE
IN AUCTION DATE]**

**CITY OF DETROIT
SEWER DISPOSAL SYSTEM REVENUE SECOND LIEN BONDS (ARCs),
SERIES 2001 (D-__)**

**NOTICE OF CHANGE IN AUCTION DATE**

Notice is hereby given that _____, as Market Agent for Tranche D-__ of the Series 2001 Securities outstanding as ARCs, that the Auction Date is hereby changed as follows:

1.      The definition of "Auction Date" shall be deemed amended by substituting "_____ (number) Business Day" in the second line thereof and by substituting "_____ (number) Business Days" for "two Business Days" in the first line of the definition of "Applicable Number of Business Days."

2.      This change shall take effect on _____ which shall be the Auction Date for the Auction Period commencing on _____ .

3.      The Auction Date for the Series 2001 Securities outstanding as ARCs shall be subject to further change hereafter as provided in the Auction Rate Mode Supplement to the Sale Order relating to the Series 2001 Securities.

4.      Terms not defined in this Notice shall have the meanings as set forth in the Supplement described above.

Dated:      _____

UBS PAINEWEBBER INC., *as* Market Agent

By:_____

Its:_____

G:\D\Detroit\2001 Sewer\Docs\auctionratesupplement-f.doc

## Financial Guaranty Insurance Company Supplement

This **Financial Guaranty Insurance Company Supplement** is a supplement to the **Composite Sales Order with respect to Series 2001 Securities** executed by the Director of Finance of the City of Detroit and together therewith and with all other supplements and all exhibits constitutes the *Sale Order*.

## Article I
## Definitions and Applicability

### Section 1.01. Definitions.

In addition to the terms defined in or pursuant to the Sale Order, the following terms shall have the following respective meanings for all purposes of the Sale Order *unless* the context clearly otherwise requires:

*FGIC Bond Insurer* means Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto.

*FGIC Bond Insurance Policy* means the municipal bond new issue insurance policy issued by the FGIC Bond Insurer that guarantees payment of principal of and interest on the FGIC Insured Securities.

*FGIC Insured Second Lien Bonds* means the $110,550,000 City of Detroit Sewage Disposal System Second Lien Revenue Bonds (Fixed Rate), Series 2001(B) and the $139,080,000 City of Detroit Sewage Disposal System Second Lien Revenue (Variable Rate Demand) Bonds, Series 2001(E).

*FGIC Insured Securities* means the FGIC Insured Senior Lien Bonds and the FGIC Insured Second Lien Bonds.

*FGIC Insured Senior Lien Bonds* means the $76,375,000 City of Detroit Sewage Disposal System Revenue Senior Lien Bonds (Fixed Rate), Series 2001(A) and the $127,165,000 City of Detroit Sewage Disposal System Senior Lien Revenue Refunding (Variable Rate Demand) Bonds, Series 2001(C-2).

*Financial Guaranty* means Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto as the issuer of the Reserve Policy.

*Policy Costs* has the meaning given that term in *Section 2-1.02* hereof.

*Payment Default* means the occurrence and continuance of the failure to pay principal (and premium, if any) or interest on any FGIC Insured Securities without giving any effect to payments made under the FGIC Bond Insurance Policy.

*Reserve Policy* means the Municipal Bond Debt Service Reserve Policy issued in respect of the Bond Reserve Account in connection with the issuance of the FGIC Insured Senior Lien Bonds.

*Reserve Account* means the Bond Reserve Account.

**Section 1.02. Applicability.**

(a)    This Supplement consists of two parts, Part 1, concerning the Bond Insurance, and Part 2, concerning the Reserve Policy.

(1)    Part 1 shall be in effect for only so long as Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto, is the FGIC Bond Insurer of the FGIC Insured Securities and has not failed to comply with its payment obligations under the FGIC Bond Insurance Policy. For so long as Part 2 is in effect, it shall be applicable in respect of the Outstanding FGIC Insured Securities *notwithstanding* anything to the contrary elsewhere contained in the Sale Order.

(2)    Part 2 shall be in effect for only so long as it has not failed to comply with its payment obligations under the Reserve Policy. For so long as Part 2 is in effect, it shall be applicable in respect of the Reserve Account *notwithstanding* anything to the contrary elsewhere contained in the Sale Order.

**Part 1**
**Bond Insurance**

**Article 1-I**
**Default Related Provisions**

**Section 1-1.01.    Acceleration and Annulment.**

Any acceleration of the FGIC Insured Securities or any annulment thereof is *subject* to the prior written consent of the FGIC Bond Insurer.

E-2

**Section 1-1.02.    Notice of Payment Default.**

The FGIC Bond Insurer shall receive immediate notice of any Payment Default and notice of any other Event of Default known to the Transfer Agent or the City within 30 days of the Transfer Agent's or the City's knowledge thereof.

**Section 1-1.03.    Notices Related to Events of Default and Remedies.**

For all purposes of the Bond Ordinance *except* the giving of notice of default to Holders of FGIC Insured Securities, the FGIC Bond Insurer shall be deemed to be the sole holder of the FGIC Insured Securities.

**Section 1-1.04.    Party in Interest.**

The FGIC Bond Insurer is a party in interest and is a party entitled to (i) notify the City and the Transfer Agent of the occurrence of an Event of Default and (ii) request the Transfer Agent to intervene in judicial proceedings that affect the FGIC Insured Securities or the security therefor. The Transfer Agent is required to accept notice of default from the FGIC Bond Insurer.

## Article 1-II
## Miscellaneous

**Section 1-2.01.    Reserve Fund Requirements.**

Any credit instrument hereafter provided in lieu of a cash deposit into the Bond Reserve Account or the Second Lien Bond Reserve Account, other than one provided by the FGIC Bond Insurer, shall conform to the requirements set forth in *Exhibit 1-2.01* hereto, "Reserve Fund Surety Guidelines".

**Section 1-2.02.    Amendments to Bond Ordinance.**

(a)    The FGIC Bond Insurer hereby consents to the amendments to the Bond Ordinance contained in Ordinance No. __ 01.

(b)    Any other amendment or supplement to the Bond Ordinance requiring consent of Holders of FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds is also subject to written consent of the FGIC Bond Insurer before it shall become effective as to FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds, as the case may be.

(c)    Any Rating Agency having a rating in effect with respect to the FGIC Insured Securities must receive notice of each amendment supplement to the Bond Ordinance requiring consent of Holders of FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds and

E-3

a copy thereof at least 15 days in advance of its becoming effective as to FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds, as the case may be.

(d) The FGIC Bond Insurer shall be provided with a full transcript of all proceedings relating to the execution of any such amendment or supplement.

**Section 1-2.03.  Resignations of Fiduciaries.**

(a) Any successor Trustee for FGIC Insured Securities or co-trustee must have combined capital, surplus and undivided profits of at least $50 million, unless the FGIC Bond Insurer shall otherwise approve.

(b) No resignation or removal of any of the following with respect to the FGIC Insured Securities shall become effective until a successor has been appointed and has accepted the duties of the respective office: Trustee, Paying Agent or Registrar.

(c) The FGIC Bond Insurer shall be furnished with written notice of the resignation or removal of any Paying Agent or Trustee and the appointment of any successor thereto.

**Section 1-2.04.  Defeasance.**

(a) Only cash, direct, non-callable obligations of the United States of America and securities fully and unconditionally guaranteed as to the timely payment of principal and interest by the United States of America, to which direct obligation or guarantee the full faith and credit of the United States of America has been pledged, Resolution Funding Corporation interest strips, Certificates of Accrual on Treasury Securities (commonly known as "CATS"), Treasury Investment Growth Receipts (commonly known as "TIGRS") and Separate Trading of Registered Interest and Principal of Securities (commonly known as "STRIPS"), and defeased municipal Securities rated "AAA" by S&P or "Aaa" by Moody's and such other securities as the FGIC Bond Insurer may approve (or any combination of the foregoing) shall be used to effect the defeasance of FGIC Insured Securities *unless* the FGIC Bond Insurer otherwise approves.

(b) In the event of an advance refunding of FGIC Insured Securities, the Finance Director shall cause to be delivered a verification report of an independent nationally recognized certified public accountant. If a forward supply contract is employed in connection with the refunding, (i) such verification report shall expressly state that the adequacy of the escrow to accomplish the refunding relies solely on the initial escrowed investments and the maturing principal thereof and interest income thereon and does not assume performance under or compliance with the forward supply contract, and (ii) the applicable escrow agreement shall provide that in the event of any discrepancy or difference between the terms of the forward supply contract and the escrow agreement (or the authorizing document, if no separate escrow agreement is utilized), the terms of the escrow agreement or authorizing document, if applicable, shall be controlling.

E-4

**Section 1-2.05.**        **Reporting Requirements.**

The FGIC Bond Insurer shall be provided with the following information:

(1)     Notice of any drawing upon or deficiency due to market fluctuation in the amount credited to the Bond Reserve Account or the Second Lien Bond Reserve Account;

(2)     Notice of redemption, other than redemption from Sinking Fund Installments, of any FGIC Insured Securities, or of any advance refunding of FGIC Insured Securities, and identifying the principal amount, maturities and CUSIP numbers thereof;

(3)     Notice of any material events pursuant to Rule 15c2-12 of the Securities and Exchange Act of 1934, as amended.

(4)     Such additional information as the FGIC Bond Insurer may reasonably request from time to time.

**Section 1-2.06.**        **Notice Addresses.**

*FGIC Bond Insurer*
   Financial Guaranty Insurance Company
   115 Broadway
   New York, New York 10006
   Attention:  Risk Management

*Fiscal Agent*
   State Street Bank and Trust Company, N.A.
   61 Broadway
   New York, New York 10006
   Attention: Corporate Trust Department

E-5

## Part 2
## Reserve Policy

## Article 2-I
## Coordination of Draws; Repayment and Security for Repayment

**Section 2-1.01.**     **Coordination of Draws.**

(a)     · If, in addition to the Reserve Policy for the particular Reserve Account, any other reserve fund substitute instrument (*Additional Reserve Policy*) is provided for the same Reserve Fund, drawings under such Reserve Policy and any such Additional Reserve Policy, and repayment of Policy Costs and reimbursement of amounts due under the Additional Reserve Policy, shall be made on a pro rata basis (calculated by reference to the maximum amounts available thereunder) after applying all available cash in such Reserve Account and prior to replenishment of any such cash draws, respectively.

(b)     *Additional Reserve Policy* does not include any reserve fund substitute instrument obtained for any reserve account created under or pursuant to the Bond Ordinance other than the Reserve Account.

**Section 2-1.02.**     **Repayment.**

(a)     The City shall repay Financial Guaranty from Net Revenues the principal amount of any draws under each Reserve Policy and related reasonable expenses incurred by Financial Guaranty (together with interest thereon at a rate equal to the lower of (i) the prime rate of Morgan Guaranty Trust Company of New York in effect from time to time plus 2% per annum and (ii) the highest rate permitted by law and shall have the same priority as the obligation to maintain and refill the Reserve Account.

(b)     Repayment of draws, expenses and accrued interest (collectively, *Policy Costs*) shall commence in the first month following each draw, and each such monthly payment shall be in an amount at least equal to 1/12 of the aggregate of Policy Costs related to such draw.  If and to the extent that cash has also been deposited in a Reserve Fund, all such cash shall be used (or investments purchased with such cash shall be liquidated and the proceeds applied as required) prior to any drawing under the Reserve Policy, and repayment of any related Policy Costs shall be made prior to replenishment of any such cash amounts.

(c)     To secure payment of Policy Costs, statutory liens upon the whole of the Net Revenues is hereby created pursuant to Section 7a of Act 94, and is of equal priority to the statutory lien on Net Revenues securing Senior Lien Bonds *but* subordinate to such lien as between Senior Lien Bonds and such Policy Costs.

E-6

(d)    The statutory lien granted by this subsection shall remain in full force and effect until all Policy Costs are paid in full.

### Article 2-II
### Miscellaneous

**Section 2-2.01.**     **Remedies**

If the City shall fail to repay any Policy Costs in accordance with the requirements of *Section 2-1.02* hereof, Financial Guaranty shall be entitled to exercise any and all remedies available at law or under the authorizing document other than (i) acceleration of the maturity of the FGIC Insured Securities or (ii) remedies which would adversely affect Securityholders.

**Section 2-2.02.**     **Coverage Requirements.**

The amount of Policy Costs due and owing in any Fiscal Year shall be included in any calculation with respect to such Fiscal Year required by the Bond Ordinance to issue additional Securities or to set rates as obligations required to be covered 100%.

**Section 2-2.03.**     **Additional Securities.**

(a)    No additional Securities of a Priority may be issued without Financial Guaranty's prior written consent if any Policy Costs are past due and owing to Financial Guaranty with respect to the Reserve Account for Securities of that Priority.

(b)    Upon the issuance of additional Senior Lien Bonds or Second Lien Bonds, the respective Reserve Account shall be fully funded (at its Reserve Requirement) upon the issuance of such Securities, either with cash or permitted investments or by a reserve fund credit instrument conforming to the requirement set forth in *Exhibit 1-2.01* hereto or otherwise acceptable to Financial Guaranty.

**Section 2-2.04.**     **Reporting.**

The City shall provide Financial Guaranty with the following information:

(a)    The budget for each Fiscal Year promptly after adoption and the Audited Sewage Disposal Fund Financial Statements (as defined in the Master Continuing Disclosure Agreement with respect to the Insured Securities) concurrently with the filing thereof with each NRMSIR and the SID pursuant to such Master Continuing Disclosure Agreement.

(b)    The official statement or similar disclosure document, if any, prepared in connection with the issuance of any Senior Lien Bonds or Second Lien Bonds.

E-7

(c)     Notice of the redemption, other than from Sinking Fund Installments, of any of the Insured Securities.

(d)     Such addition information as Financial Guaranty may reasonably request from time to time.

**Section 2-2.05.     Notice of Potential Claims.**

The City shall ascertain the necessity for a claim upon the Reserve Policy and to provide notice to Financial Guaranty in accordance with the terms of the Reserve Policy at least two business days prior to each interest payment date.

**Section 2-2.06.     Amendments to Bond Ordinance.**

(a)     The Financial Guaranty hereby consents to the amendments to the Bond Ordinance contained in Ordinance No.18-01.

(b)     Any other amendment or supplement to the Bond Ordinance requiring consent of Holders of FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds is also subject to written consent of Financial Guaranty before it shall become effective as to FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds, as the case may be.

**Section 2-2.07.     Removal of Trustee.**

Financial Guaranty shall be provided with written notice of the resignation or removal of the Trustee for FGIC Insured Senior Lien Bonds or FGIC Insured Second Lien Bonds and the appointment of a successor thereto and of the issuance of additional Senior Lien Bonds or Second Lien Bonds.

**Section 2-2.08.     No Conflicts.**

To the extent of any conflict between the provisions of this Part 2 and either Reserve Fund Policy Agreement, the provisions of this Part 2 shall prevail.

**Section 2-2.09.     Notice Address.**

Financial Guaranty Insurance Company
115 Broadway
New York, New York 10006
Attention: Risk Management

*[End of Financial Guaranty Insurance Company Supplement]*

E-8

Exhibit 1-2.01

## Reserve Fund Surety Guidelines

The City may satisfy the requirement (the *Reserve Fund Requirement*) to deposit a specified amount in a Reserve Account (the *Reserve Fund*) by the deposit of a surety bond, insurance policy or letter of credit as set forth below.

1.  A surety bond or insurance policy issued to the City in respect of the Reserve Fund by a company licensed to issue an insurance policy guaranteeing the timely payment of debt service on the Bonds (a "municipal bond insurer") may be deposited in the Reserve Fund to meet the Reserve Fund Requirement if the claims paying ability of the issuer thereof shall be rated "AAA" or "Aaa" by S&P or Moody's, respectively.

2.  A surety bond or insurance policy issued to the City in respect of the Reserve Fund by an entity other than a municipal bond insurer may be deposited in the Reserve Fund to meet the Reserve Fund Requirement if the form and substance of such instrument and the issuer thereof shall be approved by the FGIC Bond Insurer.

3.  An unconditional irrevocable letter of credit issued to the City in respect of the Reserve Fund by a bank may be deposited in the Reserve Fund to meet the Reserve Fund Requirement if the issuer thereof is rated at least "AA" by S&P. The letter of credit shall be payable in one or more draws upon presentation by the beneficiary of a sight draft accompanied by its certificate that it then holds insufficient funds to make a required payment of principal or interest on the bonds. The draws shall be payable within two days of presentation of the sight draft. The letter of credit shall be for a term of not less than three years. The issuer of the letter of credit shall be required to notify the City not later than 30 months prior to the stated expiration date of the letter of credit, as to whether such expiration date shall be extended, and if so, shall indicate the new expiration date.

4.  If such notice indicates that the expiration date shall not be extended, the City shall deposit in the Reserve Fund an amount sufficient to cause the cash or permitted investments on deposit in the Reserve Fund together with any other qualifying credit instruments, to equal the Reserve Fund Requirement on all outstanding related Securities, such deposit to be paid in equal installments on at least a semi-annual basis over the remaining term of the letter of credit, unless the Reserve Fund credit instrument is replaced by a Reserve Fund credit instrument meeting the requirements in any of 1-3 above. The letter of credit shall permit a draw in full not less than two weeks prior to the expiration or termination of such letter of credit if the letter of credit has not been replaced or renewed. The City shall draw upon the letter of credit prior to its expiration or termination unless an acceptable replacement is in place or the Reserve Fund is fully funded in its required amount.

E-9

5.   The use of any Reserve Fund credit instrument pursuant to this Paragraph shall be subject to receipt of an opinion of counsel acceptable to the FGIC Bond Insurer and in form and substance satisfactory to the FGIC Bond Insurer as to the due authorization, execution, delivery and enforceability of such instrument in accordance with its terms, subject to applicable laws affecting creditors' rights generally, and, in the event the issuer of such credit instrument is not a domestic entity, an opinion of foreign counsel in form and substance satisfactory to FGIC Bond Insurer. In addition, the use of an irrevocable letter of credit shall be subject to receipt of an opinion of counsel acceptable to FGIC Bond Insurer and in form and substance satisfactory to FGIC Bond Insurer to the effect that payments under such letter of credit would not constitute avoidable preferences under Section 547 of the U.S. Bankruptcy Code or similar state laws with avoidable preference provisions in the event of the filing of a petition for relief under the U.S. Bankruptcy Code or similar state laws by or against the issuer of the bonds (or any other account party under the letter of credit).

6.   The obligation to reimburse the issuer of a Reserve Fund credit instrument for any fees, expenses, claims or draws upon such Reserve Fund credit instrument shall be subordinate to the payment of debt service on the related Securities. The right of the issuer of a Reserve Fund credit instrument to payment or reimbursement of its fees and expenses shall be subordinated to cash replenishment of the Reserve Fund, and, subject to the second succeeding sentence, its right to reimbursement for claims or draws shall be on a parity with the cash replenishment of the Reserve Fund. The Reserve Fund credit instrument shall provide for a revolving feature under which the amount available thereunder will be reinstated to the extent of any reimbursement of draws or claims paid. If the revolving feature is suspended or terminated for any reason, the right of the issuer of the Reserve Fund credit instrument to reimbursement will be further subordinated to cash replenishment of the Reserve Fund to an amount equal to the difference between the full original amount available under the Reserve Fund credit instrument and the amount then available for further draws or claims. If (a) the issuer of a Reserve Fund credit instrument becomes insolvent or (b) the issuer of a Reserve Fund credit instrument defaults in its payment obligations thereunder or (c) the claims-paying ability of the issuer of the insurance policy or surety bond falls below a S&P "AAA" or a Moody's "Aaa" or (d) the rating of the issuer of the letter of credit falls below a S&P "AA", the obligation to reimburse the issuer of the Reserve Fund credit instrument shall be subordinate to the cash replenishment of the Reserve Fund.

7.   If (a) the revolving reinstatement feature described in the preceding paragraph is suspended or terminated or (b) the rating of the claims paying ability of the issuer of the surety bond or insurance policy falls below a S&P "AAA" or a Moody's "Aaa" or (c) the rating of the issuer of the letter of credit falls below a S&P "AA", the City shall either (i) deposit into the Reserve Fund an amount sufficient to cause the cash or permitted investments on deposit in the Reserve Fund to equal the Reserve Fund Requirement on all outstanding Bonds, such amount to be paid over the ensuing five years in equal

E-10

installments deposited at least semi-annually or (ii) replace such instrument with a surety bond, insurance policy or letter of credit meeting the requirements in any of 1-3 above within six months of such occurrence. In the event (a) the rating of the claims-paying ability of the issuer of the surety bond or insurance policy falls below "A" or (b) the rating of the issuer of the letter of credit falls below "A" or (c) the issuer of the Reserve Fund credit instrument defaults in its payment obligations or (d) the issuer of the Reserve Fund credit instrument becomes insolvent, the City shall either (i) deposit into the Reserve Fund an amount sufficient to cause the cash or permitted investments on deposit in the Reserve Fund to equal to Reserve Fund Requirement on all outstanding Bonds, such amount to be paid over the ensuing year in equal installments on at least a monthly basis or (ii) replace such instrument with a surety bond, insurance policy or letter of credit meeting the requirements in any of 1-3 above within six months of such occurrence.

8.  Where applicable, the amount available for draws or claims under the Reserve Fund credit instrument may be reduced by the amount of cash or permitted investments deposited in the Reserve Fund pursuant to clause (i) of the preceding subparagraph 6.

9.  If the City chooses the above described alternatives to a cash-funded Reserve Fund, any amounts due and owing by the City in any Fiscal Year to the issuer of such credit instrument as a result of a draw thereon or a claim thereunder, as appropriate, shall be included in any calculation with respect to such Fiscal Year required by the Bond Ordinance to issue additional Securities or to set rates as obligations required to be covered 100%.

10. The City shall ascertain the necessity for a claim or draw upon the Reserve Fund credit instrument and to provide notice to the issuer of the Reserve Fund credit instrument in accordance with its terms not later than three days (or such longer period as may be necessary depending on the permitted time period for honoring a draw under the Reserve Fund credit instrument) prior to each interest payment date.

11. Cash on deposit in the Reserve Fund shall be used (or investments purchased with such cash shall be liquidated and the proceeds applied as required) prior to any drawing on any Reserve Fund credit instrument. If and to the extent that more than one Reserve Fund credit instrument is deposited in the Reserve Fund, drawings thereunder and repayments of costs associated therewith shall be made on a pro rata basis, calculated by reference to the maximum amounts available thereunder.

E-11

# Exhibit 4

# Variable Rate Mode Supplement and Agreement

among

## City of Detroit,
as Issuer

## U. S Bank Trust National Association,
as Transfer Agent,

and

## U. S Bank Trust National Association,
as Tender Agent

---

**Dated as of September 1, 2001**

---

with respect to

## City of Detroit
### Sewer Disposal System Senior Lien Revenue Refunding Bonds, Series 2001(C-1) and Series 2001(C-2)
and
### Sewer Disposal System Second Lien Revenue Bonds, Series 2001(E)

# Table of Contents

## Article I
## Definitions

Section 1.01.    Definitions and Provisions of General Application .................... C-1
Section 1.02.    Other Definitions ............................................. C-12
Section 1.03.    Interpretation ................................................ C-13
Section 1.04.    Time ......................................................... C-13

## Article II
## Modal Securities

Section 2.01.    Title Change on Certain Mode Changes ........................... C-14
Section 2.02.    [Reserved]
Section 2.03.    Changes to in Connection with Mode Change ...................... C-14
Section 2.04    Interest ...................................................... C-15
Section 2.05.    [Reserved]
Section 2.06.    Payment of Interest ........................................... C-15

## Article III
## Interest Rate Determinations

Section 3.01.    Manner of Determining Interest Rates; Maximum Interest Rate ......... C-16
Section 3.02.    Interest Rate Determinations for Flexible Mode ..................... C-17
Section 3.03.    Interest Rate Determinations for All Other Modes ................... C-17
Section 3.04.    Failure of Interest Rate Determination ............................ C-18

## Article IV
## Modes and Periods

Section 4.01.    Modes ........................................................ C-19
Section 4.02.    Duration of Modes ............................................ C-20
Section 4.03.    Length of Flexible Rate Periods ................................. C-20
Section 4.04.    Limitations on Length of Flexible Rate Periods ..................... C-21
Section 4.05.    Length of Term Rate Periods .................................... C-21
Section 4.06.    Limitations on Length of a Term Rate Period ...................... C-22
Section 4.07.    Finance Director Fails to Elect a New Term Rate Period .............. C-23
Section 4.08.    [Reserved]
Section 4.09.    Effectiveness of Modes ........................................ C-23
Section 4.10.    Conditions Precedent to Mode Change .......................... C-24
Section 4.11.    Election of Mode Change; How Effected; Irrevocability .............. C-25
Section 4.12.    Selection of Variable Rate Securities ............................ C-26

Section 4.13.   Mode Change Notice ...........................................C-27
Section 4.14.   Notice to Variable Rate Securityholders
                and Liquidity Facility Providers ...............................C-28

## Article V
## Redemption of Securities

Section 5.01.   Optional Redemption – Short-Term Securities .....................C-28
Section 5.02.   Optional Redemption – Modal Fixed Rate Securities .................C-29
Section 5.03.   Limitation on Optional Redemption ...............................C-30

## Article VI
## Right of Optional Tender
## and
## Mandatory Tender Events

Section 6.01.   Tender at Option of Modal Holder ...............................C-30
Section 6.02.   Mandatory Tender Events .......................................C-31
Section 6.03.   Mandatory Tender on Expiry Date ...............................C-32
Section 6.04.   Suspension of Optional Tender Rights ...........................C-32

## Article VII
## Tender and Purchase

Section 7.01.   Notice of Mandatory Tender ....................................C-33
Section 7.02.   Interest to No Longer Accrue ...................................C-34
Section 7.03.   Remarketing of Provider Securities .............................C-34
Section 7.04.   Remarketing Agent; Priority to Provider-Owned Securities ............C-34
Section 7.05.   Draw Information to be Provided by Remarketing Agent;
                Transfer of Amounts .........................................C-35
Section 7.06.   Draws on Liquidity Facility ....................................C-35
Section 7.07.   City Not Obligated to Pay Purchase Price ..........................C-35
Section 7.08.   Payment of Purchase Price .....................................C-35
Section 7.09.   Tender of Less than All of Security ..............................C-36
Section 7.10.   Notification and Delivery of Remarketed Tender Securities ............C-36
Section 7.11.   Actions on Purchase Date ......................................C-37

## Article VIII
## Funds and Accounts

Section 8.01.   Creation of Funds and Accounts ..................................C-38
Section 8.02.   "Sufficient Time" for Payments under Credit Facilities ...............C-39

C-ii

Section 8.03.  Credit Facility Draws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-39
Section 8.04.  Liquidity Facility Draws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-39
Section 8.05.  Application of the Credit Facility Fund . . . . . . . . . . . . . . . . . . . . . . . . . C-40
Section 8.06.  Application of the Remarketing Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . C-40
Section 8.07.  Subrogation Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-41
Section 8.08.  Provider Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-41
Section 8.09.  Investment of Moneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-42
Section 8.10.  No Lien or Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-42
Section 8.11.  Money Held for Particular Modal Securities . . . . . . . . . . . . . . . . . . . . . . C-43

## Article IX
## Bond Insurance and Financial Facilities

Section 9.01.  When Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-43
Section 9.02.  Financial Facility Principal and Interest Requirements . . . . . . . . . . . . . . . C-43
Section 9.03.  Terms of Conforming Financial Facilities . . . . . . . . . . . . . . . . . . . . . . . . C-44
Section 9.04.  Substitution of Financial Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-45
Section 9.05.  Excluded Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-46
Section 9.06.  Reduction and Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-46
Section 9.07.  Termination by Provider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-47

## Article X
## Bond Insurance

Section 10.01.  Location of Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-48

## Article XI
## Concerning the Tender Agent and the Remarketing Agent

Section 11.01.  Tender Agent; Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-48
Section 11.02.  Responsibilities of Tender Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-48
Section 11.03.  Remarketing Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-49

## Article XII
## Miscellaneous

Section 12.01.  Limitation on Defeasance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-50
Section 12.02.  Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-50
Section 12.03.  Notices to Rating Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-50
Section 12.04.  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-51
Section 12.05.  Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-52

C-iii

Section 12.06.    Payments Due and Acts to be Performed on Non-Business Days ........ C-52
Section 12.07.    Captions; Table of Contents .................................... C-52
Section 12.08.    Counterparts ............................................... C-52
Section 12.09.    Governing Law ............................................ C-52

**Signatures** ........................................................ S-1

**Exhibits**
Sec 10.01 – FSA Insured Securities Provisions

C-iv

This **Variable Rate Mode Supplement and Agreement** (the *Agreement*), dated as of September 1, 2001, among the **City of Detroit, Michigan,** (the *City*), **U. S. Bank Trust National Association,** a national banking association with its designated corporate trust office located in Detroit, Michigan, (the *Transfer Agent*), as Transfer Agent under the under the Bond Resolution with respect to the Series 2001 Securities, adopted on August 1, 2001, and amended on October ____, 2001 (the *Bond Resolution*), and **U. S. Bank Trust National Association,** a national banking association with its designated office located in New York, New York, as Tender Agent hereunder (the *Tender Agent*), is a supplement to the **Composite Sales Order with respect to Series 2001 Securities** executed by the Director of Finance of the City of Detroit and together therewith and with all other supplements and all exhibits constitutes the *Sale Order*.

Intending to be legally bound hereby, the parties hereto agree as follows:

## Article I
## Definitions and Provisions of General Application

**Section 1.01. Definitions.**

(a)     Unless the context clearly otherwise requires, (i) capitalized terms not defined herein and defined in the Bond Resolution or elsewhere in the Sale Order are used herein as therein defined and (ii) the following terms have the following respective meanings:

*Account* means any account established by *Section 8.01.*

*Alternative Term Rate* means, for any Term Rate Determination Date, the index published or provided by Kenny Information Systems that is based on yield evaluations at par of Securities, the interest on which is excluded from gross income for purposes of federal income taxation and are not subject to a "minimum tax" or similar tax under the Internal Revenue Code of 1986, as amended (unless all tax-exempt Securities are subject to such tax). The Securities upon which the index is based shall include not less than five "high grade" component issuers selected by Kenny Information Systems, which shall include, without limitation, issuers of general obligation bonds. The specific issuers included among the component issuers may be changed from time-to-time by Kenny Information Systems in its discretion. The yield evaluation period for the index shall be a one year evaluation.

*Alternative Weekly Rate* means the BMA Municipal Swap Index; *and if* the BMA Municipal Swap Index ceases to be published, *then* a new third-party index shall be selected in good faith by the City that has the described composition and methodology of the BMA Municipal Swap Index to the extent there is such an index that is readily available to the Remarketing Agent.

*Auction Rate Mode* means the method by which interest is determined pursuant to the Auction Rate Mode Supplement.

*Auction Rate Mode Supplement* means the document so captioned annexed to the Sale Order as *Annex D.*

*Auction Rate Security* means a Series 2001 Security in the Auction Rate Mode.

*Authorized Denominations* means,

      (i)      for Variable Rate Securities, $100,000 and any multiple of $5,000 in excess thereof;

      (ii)      for Modal Fixed Rate Securities, $5,000 and any multiple thereof.

*Authorizing Documents* means the Bond Ordinance, the Bond Resolution and the Sale Order.

*BMA Municipal Swap Index* means the index based upon the weekly interest rates of tax-exempt variable rate issues included in a database maintained by the Municipal Market Data, Boston, Massachusetts, a Thompson Financial Services Company (or its successor), which meet specific criteria established by The Bond Market Association.

*Bond Counsel* means Lewis & Munday, A Professional Corporation, and Howard and Howard Attorneys, P.C., Bond Counsel to the City with respect to the Series 2001 Securities, or such other firm or firms of national recognized standing in the field of tax-exempt municipal bonds as may be appointed by the City in lieu thereof.

*Bond Insurance Policy*: The Bond Insurance in effect on the Closing Date:

      (i)      for the FSA Insured Securities is the FSA Bond Insurance Policy and

      (ii)      for the FGIC Insured Securities is the FGIC Bond Insurance Policy

*Bond Insurer* means, for

      (i)      the FSA Insured Securities, the FSA Bond Insurer and

      (ii)      the FGIC Insured Securities, the FSA Bond Insurer.

*Bond Resolution* has the meaning given that term in the first paragraph of this instrument.

*City* has the meaning given that term in the first paragraph of this instrument.

C-2

*Closing* means, with respect to a Series of Modal Securities, the delivery of such Series of Modal Securities to, and payment for such Series of Modal Securities by, the purchasers identified in the Sale Order and the other actions in connection therewith.

*Closing Date* means the date on which the Closing occurs.

*Conforming Financial Facility* means a Financial Facility conforming to the requirements of *Section 9.03*.

*Credit Enhancement* means, as of any date, any Credit Facility or the Bond Insurance Policy then in effect.

*Credit Enhancement Provider* means any Bond Insurer and any Credit Facility Provider.

*Credit Facility Provider* means the obligor under a Credit Facility.

*Daily Mode* means the Mode that has all of the attributes provided by this Agreement for Variable Rate Securities bearing interest at a Daily Rate.

*Daily Rate* when used as a noun means a rate of interest determined as provided herein for the Daily Mode.

*Daily Rate Security* means any Variable Rate Security in the Daily Mode.

*Day Count Convention* means:

(i)     for any Short-Term Security, the actual number of days elapsed in the then current calendar year; and

(ii)    for any Long-Term Security, 30-day months in a 360-day year.

*Dexia* means Dexia Credit Local, acting through its New York Agency.

*drawn* means the making of funds available to the Tender Agent under a Financial Facility, whether as a purchase of Securities under a standby bond purchase agreement, a drawing under a letter of credit or otherwise. Correlatives of *drawn* have correlative meanings.

*Electronic Means* means (i) any means of electronically communicating by written word, such as, without limitation, telecopier or other facsimile transmission and e-mail transmission and (ii) any means of electronically communicating by spoken word, such as, without limitation, telephone; *so long as*, the mode of the

Electronic Means is acceptable to the recipient and the communication by Electronic Means is promptly confirmed by a manually signed writing or otherwise authenticated to the satisfaction of the recipient.

*Excluded Security* means a Modal Security that is both an Excluded Credit Enhancement Security and an Excluded Liquidity Facility Security.

*Excluded Credit Enhancement Security* means any Modal Security for which the Credit Enhancement was terminated pursuant to *Section 9.05.*

*Excluded Credit Facility Security* means any Modal Security for which the Credit Facility was terminated pursuant to *Section 9.05.*

*Excluded Liquidity Facility Security* means any Variable Rate Security for which the Liquidity Facility was terminated pursuant to *Section 9.05.*

*Expiry Date* means the date on which a Financial Facility expires by its terms *and not* by reason of any Termination Event.

*Favorable Bond Counsel's Opinion* means, with respect to any action the occurrence of which requires such an opinion of Bond Counsel, an opinion of Bond Counsel to the effect that (i) such action is authorized or permitted by this Agreement, the Sale Order and the Authorizing Documents, and (ii) such action will not adversely affect the exemption of the interest on the Series 2001 Securities from federal and state income taxation (subject to customary exceptions).

*FGIC Bond Insurer* means Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto.

*FGIC Bond Insurance Policy* means the municipal bond new issue insurance policy issued by the FGIC Bond Insurer that guarantees payment of principal of and interest on the FGIC Insured Securities.

*FGIC Insured Securities* means the Series C-2 Securities and the Series E Securities.

*FGIC-SPI* means FGIC Securities Purchase, Inc., a Delaware corporation.

*Flexible Rate* means a rate of interest determined as provided herein for the Flexible Rate Mode.

*Flexible Rate Mode* means the Mode that has all of the attributes provided by this Agreement for Variable Rate Securities bearing interest at a Flexible Rate.

C-4

*Flexible Rate Security* means any Variable Rate Security in the Flexible Rate Mode.

*FSA Bond Insurer* means Financial Security Assurance Inc., a New York stock insurance company, or any successor thereto.

*FSA Bond Insurance Policy* means the municipal bond new issue insurance policy issued by the FSA Bond Insurer that guarantees payment of principal of and interest on the FSA Insured Securities.

*FSA Insured Securities* means the Series C-1 Securities.

*Fund* means any fund established by *Section 8.01.*

*Immediate Termination Event* means a Termination Event occurring under a Financial Facility that *does not* provide for a period after such occurrence during which the affected Modal Securities may be called for tender.

*Initial Mode* means the Mode identified in the Schedule of Terms for Modal Securities appended to the Sale Order as the Mode in which Modal Securities will be initially issued. It is not required that the Initial Mode be the same for all Modal Securities.

*Interest Account* means the account by that name established by *Section 8.01.*

*Interest Adjustment Date* means, for any date after the Closing Date:

    (i)     for a Daily Rate Security, each Rate Determination Date for such Daily Rate Security;

    (ii)    for a Weekly Rate Security, the Mode Change Date for such Weekly Rate Security and thereafter each Thursday;

    (iii)   for a Term Rate Security, the Mode Change Date for such Term Rate Security and thereafter the first day of each Term Rate Period; .

    (iv)   for a Flexible Rate Security, each Rate Determination Date for such Flexible Rate Security; and

    (v)    for a Modal Fixed Rate Security, the Mode Change Date for such Modal Fixed Rate Security.

*Interest Payment Date* means each date on which interest is to be paid and is:

(i)      for a <u>Daily Rate Security</u>, the first Modal Business Day of each calendar month;

(ii)      for a <u>Weekly Rate Security</u>, the first Modal Business Day of each calendar month;

(iii)      for a <u>Flexible Rate Security</u>, the last day of the Flexible Rate Period for the particular Flexible Rate Security;

(iv)      for a <u>Term Rate Security</u>, each Stated Interest Payment Date occurring after the Mode Change Date for such Term Rate Security; and

(v)      for a <u>Modal Fixed Rate Security</u>, each Stated Interest Payment Date occurring after the Mode Change Date for such Modal Fixed Rate Security.

*Last Put Termination Date* means the date on which a Financial Facility terminates by reason of a Last Put Termination Event.

*Last Put Termination Event* means a Termination Event occurring under a Financial Facility *that* provides for a period after such occurrence during which the affected Modal Securities may be called for tender.

*Last Put Termination Notice* means a notice from a Provider stating that it is terminating its Financial Facility by reason of a Last Put Termination Event.

*Legal Maximum Rate* means the maximum interest rate per annum permitted by law.

*Liquidity Facility* means any letter of credit, line of credit, purchase agreement, or other financial arrangement intended to provide funds for the purchase of certain Variable Rate Securities in the event of a failure of the remarketing thereof *but* does not include any protection provided by a Credit Facility. The Liquidity Facility in effect on the Closing Date:

(i)      for the FSA Insured Securities is the Standby Security Purchase Agreement between the City and Dexia, and

(ii)      for the FGIC Insured Securities is the respective Standby Bond Purchase Agreement between the Tender Agent and FGIC-SPI for the particular Series of FGIC Insured Securities.

C-6



*Liquidity Facility Provider* means the obligor under a Liquidity Facility. The Provider of Liquidity Facility Provider in effect on the Closing Date:

      (i)        for the FSA Insured Securities is Dexia and

      (ii)      for the FGIC Insured Securities is FGIC-SPI.

*Long-Term Security* means a Modal Security in a Long-Term Mode.

*Long-Term Mode* means a Term Rate Mode and a Modal Fixed Rate Mode.

*Maximum Provider Rate* means 18 % per annum.

*Modal Business Day* means a day on which the Transfer Agent, the Tender Agent, the Remarketing Agent, each Provider and banks or trust companies in New York, New York, are not authorized or required to remain closed and on which the New York Stock Exchange is not closed.

*Modal Fixed Rate* means a rate of interest determined as provided herein for the Modal Fixed Rate Mode.

*Modal Fixed Rate Security* means any Variable Rate Security in the Modal Fixed Rate Mode.

*Modal Fixed Rate Mode* means the Mode that has all of the attributes provided by this Agreement for Variable Rate Securities bearing interest at a Modal Fixed Rate.

*Modal Holder* and *Modal Securityholder* means the Person in whose name a Modal Security is registered in the Registry.

*Modal Maximum Rate* means, as to any Modal Security, the lesser of the Stated Maximum Rate and the Legal Maximum Rate. The Modal Maximum Rate is not applicable to any Provider Security.

*Modal Securities* means, as of any particular date, such of the Series 2001 Securities described on the Signature Pages for Modal Securities, including the addendum thereto, that are:

      (i)        Variable Rate Securities or Modal Fixed Rate Securities; and

      (ii)      for purposes of Credit Enhancement, Credit Facility draws and in respect of the Credit Facility Fund,

            (A)    Provider Securities and

C-7

(B)     Variable Rate Securities that have become an Auction Rate Securities *unless and until* such Auction Securities become Excluded Credit Enhancement Securities.

*Mode* means any of the methods of determining an interest rate for the Series 2001 Securities permitted by this Agreement.

*Mode Change Date* means the date on which a Mode change becomes or is intended to become effective.

*Mode Change Notice* means the notice from the Finance Director to the other Notice Parties of the Finance Director's intention to change a Mode.

*Notice Address* means the address that a Person specifies to the Notice Parties (other than itself if a Notice Party) as the address to which notices hereunder shall be addressed.

*Notice Parties* means the City, the Tender Agent, the Remarketing Agent, any Credit Enhancement Provider and any Liquidity Facility Provider.

*Outstanding*, as used in the Bond Ordinance, whether or not capitalized, *excludes* Variable Rate Securities that have been duly called for mandatory tender or as to which the Modal Holder thereof gave notice of optional tender and, in either case, for the purchase of which the Purchase Price is held by the Tender Agent for the payment thereof;

*Period* means a period of time determined in accordance with this Agreement during which the Mode is not permitted to be changed for Variable Rate Securities in that Mode.

*Predecessor Financial Facility* means the Financial Facility for which another Financial Facility is substituted or is to be substituted.

*Principal Account* means the account by that name established by *Section 8.01*.

*Provider* means a Credit Facility Provider and a Liquidity Facility Provider

*Provider Securities* has the meaning given such term in *Section 8.08*.

*Provider-Owned Variable Rate Security* has the meaning given that term in *Section 7.03*.

*Provider Rate* means the rate of interest borne by a Provider Security as specified in the particular Financial Facility Agreement and includes any default rate

C-8

or other rate increased by reason of the occurrence of an event or the passage of time, or both.

*Purchase Date* means the date on which Tender Securities or Provider-Owned Modal Securities are to be purchased pursuant to, respectively, the terms hereof or the terms of the Financial Facility Agreement for the Liquidity Facility.

*Purchase Price* means an amount equal to the principal amount of the Tender Securities to be purchased on a Purchase Date *plus* interest accrued to such Purchase Date.

*Rate Determination Date* means:

    (i)    for a <u>Daily Rate Security</u>, each Modal Business Day;

    (ii)    for a <u>Weekly Rate Security</u>,

        (A)    for the first Rate Determination Date,

            (I)    after the Closing, October 31, 2001; otherwise

            (II)    the Modal Business Day before the Mode change to a Weekly Mode;

        (B)    *thereafter*, each Wednesday *but if* such Wednesday is not a Modal Business Day *then* the Thursday immediately following such Wednesday.

    (iii)    for a <u>Flexible Rate Security</u>, the first day of each Flexible Rate Period for such Flexible Rate Security;

    (iv)    for a <u>Term Rate Security</u>, a Modal Business Day selected by the Finance Director no sooner than 30 days before and no later than the Modal Business Day immediately before the Mode Change Date; *thereafter*, the Modal Business Day immediately before the last day of each Term Rate Period for such Term Rate Security; and

    (v)    for a <u>Modal Fixed Rate Security</u>, a Modal Business Day selected by the Finance Director no sooner than 30 days before and no later than the Modal Business Day immediately before the Mode Change Date.

*Rating Agency* means, on any date, each nationally recognized statistical rating organization (as such term is used in Rule 15c3-1 of the Securities and Exchange Commission) that has a rating in effect on the Securities on such date.

*Rating Confirmation* means a writing from each Rating Agency stating that the rating on the Securities will not be reduced or withdrawn (*other* than a withdrawal of a short term rating upon a change to a Long-Term Mode or the Auction Rate Mode) as a result of the action proposed to be taken.

*Record Date* means:

(i)        for a Short-Term Security, the day (whether or not a Modal Business Day) immediately before each Interest Payment.Date for such Security; and

(ii)       for a Long-Term Security, the 15th day (whether or not a Modal Business Day) of the month immediately before each Interest Payment Date for such Security.

*Registrar* means the Transfer Agent in the case of Modal Fixed Rate Securities and the Tender Agent in the case of Variable Rate Securities.

*Remarketing Agent* means the Person appointed as Remarketing Agent in the Sale Order upon the acceptance of such office until a successor Remarketing Agent becomes such and thereafter, such successor Remarketing Agent.

*Remarketing Agreement* means, as of any date, an agreement then in effect between the City and the Remarketing Agent providing for the remarketing of Securities. The Remarketing Agreement in effect on the Closing Date is between the City and UBS PaineWebber Inc..

*Remarketing Fund* means the fund by that name created in *Section 8.01*.

*Sale Order* has the meaning give that term in the first paragraph of this instrument.

*Security* means any Modal Security *unless* the context clearly requires *Security* to mean any Series 2001 Security.

*Series* means the Modal Securities bearing the same series designation. When used as an adjective, the term is limited to Modal Securities of the Type that the term modifies.

*Series C Securities* means Series C-1 Securities and Series C-2 Securities.

*Series C-1 Securities* means the Modal Securities designated as "Series 2001 (C-1)" in the Signature Pages for Modal Securities to the Sale Order.

C-10

*Series C-2 Securities* means the Modal Securities designated as "Series 2001 (C-2)" in the Signature Pages for Modal Securities to the Sale Order.

*Series E Securities* means the Modal Securities designated as "Series 2001 (E)" in the Addendum to the Signature Pages for Modal Securities to the Sale Order.

*Short-Term Security* means a Variable Rate Security in a Short-Term Mode.

*Short-Term Mode* means the Daily Mode, Weekly Mode and Flexible Rate Mode.

*Stated Interest Payment Date* means each January 1 and July 1.

*Stated Maximum Rate* means 12 percent per annum, subject to change as provided in *Section 2.03*.

*Suspension Date* has the meaning given that term in *Section 9.08*.

*Tender Agent* means the Person identified as *Tender Agent* in the first paragraph of this instrument until a successor Tender Agent becomes such and thereafter, such successor Tender Agent.

*Tender Securities* means, as of any Purchase Date, all Modal Securities:

(i)     subject to tender on such Purchase Date by reason of the Modal Holders thereof having given notice as provided in *Section 6.01* and

(ii)     subject to mandatory tender on such Purchase Date pursuant to *Section 6.02*.

*Term Securities* means any Modal Securities identified in as "Term Securities" in the Signature Pages for Modal Securities to the Sale Order.

*Term Rate Security* means any Variable Rate Security in the Term Rate Mode.

*Term Rate* means a rate of interest determined as provided herein for the Term Rate Mode.

*Term Rate Mode* means the Mode that has all of the attributes provided by this Agreement for Variable Rate Securities bearing interest at a Term Rate.

*Termination Date* means the date on which a Financial Facility terminates by reason of a Termination Event.

C-11

*Termination Event* means any event that permits a Provider to terminate its Financial Facility and includes any non-reinstatement of interest drawn under such Financial Facility.

*Termination Notice* means a notice from a Provider stating that it is terminating its Financial Facility by reason of a Termination Event or that it is not reinstating interest drawn under such Financial Facility.

*Tranche* means all Modal Securities in a particular Mode that have the same Rate Determination Date.

*Transfer Agent* means the Person identified as *Transfer Agent* in the first paragraph of this instrument until a successor Transfer Agent becomes such and thereafter, such successor Tender Agent.

*Variable Rate Mode* means any Short-Term Mode or Term Rate Mode.

*Variable Rate Security* means a Modal Security in a Variable Rate Mode.

*Weekly Mode* means the Mode that has all of the attributes provided by this Agreement for Variable Rate Securities bearing interest at a Weekly Rate.

*Weekly Rate* means a rate of interest determined as provided herein for the Weekly Mode.

*Weekly Rate Security* means any Variable Rate Security in the Weekly Mode.

**Section 1.02. Other Definitions.**

Below are certain of the terms used herein and defined in the Bond Resolution in the Sale Order and the location of such defined terms.

| Term | Location |
| --- | --- |
| Bond Ordinance . . . . . . . . . | Bond Resolution, Preamble |
| Credit Facility . . . . . . : . . . . | Bond Resolution, § 1 |
| Financial Facility . . . . . . . . | Bond Resolution, § 1 |
| Financial Facility Agreement . . . . . . . . . . . . . | Bond Resolution, § 1 |
| Person . . . . . . . . . . . . . . . . | Bond Resolution, § 1 |
| Registry . . . . . . . . . . . . . . | GT Supplement, § 1.01 |
| Securities Depository . . . . . | Bond Resolution, § 1 |

C-12

| Term | Location |
|------|----------|
| Series 2001 Security . . . . . . | Bond Resolution, § 1 |
| Type . . . . . . . . . . . . . . . . . . | Composite Sale Order*, ¶ 2 |

\* References to the *Composite Sale Order* are to the Sale Order exclusive of all supplements

## Section 1.03.  Interpretation.

(a)    The word *a* does not necessarily mean "only one" of the noun modified by *a* and, depending on the context, can mean "any particular one, without distinction, of two or more" of the noun modified by *a*.

(b)    The word *and*, primarily when used in definitions, does not necessarily mean that all of the conjoined words must exist either independently or in conjunction with each other. Depending on the context, *and* can mean "as well as" as in the definition of "Provider" where "a Credit Facility and a Liquidity Provider" means a Credit Facility *or* a Liquidity Provider *or both* a Credit Facility and a Liquidity Provider, as required by the context.

(c)    The period *before* a specific date excludes the specific date; i.e., "five Modal Business Day before the last day of the current Term Rate Period" excludes the "last day".

(d)    Words of the masculine gender include correlative words of the feminine and neuter genders.

(e)    Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

(f)    Articles, Sections and Exhibits referred to by number mean the corresponding Articles, Sections and Exhibits of this Agreement.

(g)    The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in this Agreement refer to this Agreement as a whole, including the exhibits and appendices hereto.

## Section 1.04.  Time.

All time expressed in this Agreement is the time in New York City on the date the particular action is to be taken *unless* otherwise provided.

C-13

# Article II
## Modal Securities

**Section 2.01. Title Change on Certain Mode Changes.**

Whenever the Mode of a Variable Rate Security is changed to the Modal Fixed Rate Mode or the Auction Rate Mode, the title of the resulting Series 2001 Security shall include "(Modal Fixed Rate)" or "(ARCs)", as the case may be, in substitution for "(Variable Rate Demand)".

**Section 2.02. [Reserved].**

**Section 2.03. Changes in Connection with Mode Change.**

(a)     Any Mode Change Notice delivered to change the Mode of some or all Variable Rate Securities of a Series also may provide for:

(1)     adding, deleting or otherwise modifying maturity dates of such Securities so long as any additional maturity date is a July 1 occurring no later than the first to occur of (A) a July 1 occurring no more than 35 years after the Closing Date and (B) the maximum maturity date permitted by the Bond Resolution.

(2)     adding, deleting or otherwise modifying the principal of such Securities maturing on any maturity date *so long as* the entire principal amount authorized hereunder is amortized no later than the last maturity date;

(3)     adding or deleting any of such Securities as Term Securities and adding, deleting or otherwise modifying Sinking Fund Installments for any such Term Securities;

(4)     adding or deleting or otherwise modifying the terms hereof for optional redemption of such Securities as Modal Fixed Rate Securities and the Redemption Prices thereof; and

(5)     increasing or decreasing the Maximum Stated Rate of any of such Securities.

(b)     The change described in such notice shall be effective *when, but only when*, the change to the Mode change contemplated by such notice becomes effective *and only if*:

(1)     any change in maturity does not exceed any limitation on maturity contained in the Act;

(2)     any increase in interest rate does not exceed the Legal Maximum Rate;

(3)     such Variable Rate Securities could be issued as Series 2001 Securities of the corresponding Parity and for the corresponding purpose under the Bond Ordinance (treating,

C-14

for such purpose, the Securities with the amortization to be adjusted as no longer outstanding to the extent of the adjustment) and

(4)     the Provider of the Credit Enhancement for the particular Series of Modal Securities has consented to the changes contained in such Mode Change Notice.

**Section 2.04.  Interest.**

(a)     Interest on each Modal Security shall be:

(1)     payable at the rate determined on each Rate Determination Date for such Mode as provided in *Article III* and effective as of the Interest Adjustment Date for which such rate was determined and effective until (and excluding) the next Interest Adjustment Date *or if* such Mode includes only one Interest Adjustment Date *then* the day before such Mode is changed;

(2)     calculated at the Day Count Convention for such Mode; and

(3)     payable on the Interest Payment Date for such Mode to the Modal Holder of such Variable Rate Security as of the Record Date for such Mode *provided that*:

(i)     *if* any such Interest Payment Date occurs after the stated maturity of the related Modal Security *then* interest shall be paid on such stated maturity; and

(ii)     *if* interest on any Modal Security shall be in default, *then* such interest shall be payable on the Special Interest Payment Date, if any, established for such Security.

**Section 2.05.  [Reserved].**

**Section 2.06.  Payment of Interest.**

(a)     *Modal Fixed Rate Securities*.  Interest on Modal Fixed Rate Securities shall be paid by the Transfer Agent as if such Securities were Fixed Rate Securities.

(b)     *Variable Rate Securities*.  Interest due on Variable Rate Securities on an Interest Payment Date shall be paid by the Tender Agent as follows:

(1)     Modal Holders, as of the applicable Record Date, of Short-Term Securities shall be paid by wire transfer of immediately available funds to the account specified by each such Modal Holder in a writing delivered to the Tender Agent.  Such writing shall remain in effect until revoked or revised by such Modal Holder in a writing delivered to the Tender Agent.

C-15

(2)     Modal Holders, as of the applicable Record Date, of Term Rate Securities shall be paid by check mailed by the Tender Agent to each such Modal Holder at its address appearing in the Registry as of such Record Date *except* that any Modal Holder of $1,000,000 or more in aggregate principal amount of Modal Fixed Rate Securities shall be paid in the same manner as Modal Holders of Short-Term Securities upon such Modal Holder delivering the writing required by *paragraph (1)*, above.

(c)     ***Defaulted Interest.***

(1)     *If* interest on any Variable Rate Security payable on an Interest Payment Date is not duly paid or provided for *then* such interest (*Defaulted Interest*) shall cease to be payable to the Person in whose name such Variable Rate Security (or a Predecessor Variable Rate Security) was registered on the Record Date for such Interest Payment Date.

(2)     Defaulted Interest shall be payable by the Transfer Agent to the Person in whose name such Variable Rate Security is registered on a Special Record Date established by the Transfer Agent.

(3)     The Transfer Agent shall establish a Special Record Date of approximately the same number of days before the day on which the Transfer Agent proposes to pay such Defaulted Interest as the number of day by which the Record Date preceded the Interest Payment Date on which such Defaulted Interest would have been payable had not the default occurred.

(4)     *Predecessor Variable Rate Security* means, with respect to any Variable Rate Security, every previous Variable Rate Security evidencing all or a portion of the same as that evidenced by such Variable Rate Security; and, for this purpose, every Variable Rate Security authenticated and delivered pursuant to Section 5 of the Bond Ordinance (or any successor section to such section) in lieu of any lost, destroyed or stolen Variable Rate Security shall be deemed to evidence the same debt as such lost, destroyed or stolen Variable Rate Security.

## Article III
## Interest Rate Determinations

**Section 3.01.  Manner of Determining Interest Rates.**

(a)     The interest rate for all Modal Securities in each Tranche, commencing with the first Rate Determination Date after the Closing Date, shall be determined by the Remarketing Agent on each Rate Determination Date as provided in this Article.

(b)     *If* any interest rate determined as provided in this Article for any Tranche exceeds the Modal Maximum Rate, *then* the interest rate for such Tranche shall be the Modal Maximum Rate.

(c)     The determination of any interest rate pursuant to this Article shall be conclusive.

**Section 3.02.   Interest Rate Determinations for Flexible Rate Mode.**

(a)     Flexible Rate Securities shall bear interest at rates derived by determining the Period that, in the judgment of the Remarketing Agent, would result in the lowest interest cost for such Flexible Rate Securities as provided in this Section.

(b)     On each Rate Determination Date for Flexible Rate Securities, the Remarketing Agent shall determine the Period that results in selling such Flexible Rate Securities at par in the secondary market at such rate for such Period that in the judgment of the Remarketing Agent would result in the lowest interest cost for the City under prevailing market conditions on such Rate Determination Date, *subject* to the following conditions and limitations.

(1)     *If* the Remarketing Agent determines that current or anticipated future market conditions or anticipated future events are such that a different Period would result in a lower interest cost on such Flexible Rate Securities, *then* the Remarketing Agent shall select such Period that in the judgment of the Remarketing Agent would result in such lowest interest cost for the City.

(2)     The Remarketing Agent is subject to the limitations contained in *Section 4.04* in establishing any Flexible Rate Period.

(c)     On or after 4:00 p.m. on the Business Day immediately before each Rate Determination Date for a Flexible Rate Security, any Holder of such Security may telephone the Remarketing Agent and receive notice of the anticipated next Period or Periods and the anticipated Flexible Rate for each such Period.

(d)     By 12:30 p.m. on each Rate Determination Date for each Flexible Rate Security, the Remarketing Agent shall determine the Flexible Rate for the Period then selected for such Security and shall give notice by Electronic Means to the Tender Agent of the name of the new Holder, the Period, the Purchase Date and the Flexible Rate.

(e)     The Remarketing Agent shall promptly notify the Financial Officer and the Trustee of each interest rate determination made under this Section.

**Section 3.03.   Interest Rate Determinations for All Other Modes.**

(a)     The interest rate for each Tranche of Modal Securities other than Flexible Rate Securities shall be determined by the Remarketing Agent on the Rate Determination Date for such

C-17

Mode as the interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at par plus interest accrued to the purchase date, under prevailing market conditions on such Rate Determination Date.

(1)     During the Daily Mode, the Remarketing Agent shall establish the Daily Rate by 9:30 a.m. on each Rate Determination Date. The Daily Rate for any day during the Daily Mode which is not a Modal Business Day shall be the Daily Rate established on the immediately preceding Rate Determination Date.

(2)     During the Weekly Mode, the Remarketing Agent shall establish the Weekly Rate by 5:00 p.m. on each Rate Determination Date.

(3)     The Term Rate for any Term Rate Security shall be determined by the Remarketing Agent not later than 4:00 p.m. on the Rate Determination Date for such Term Rate Security.

(4)     The Remarketing Agent shall determine the Modal Fixed Rate for each Modal Fixed Rate Security not later than 4:00 p.m on the Rate Determination Date for such Modal Fixed Rate Security.

(b)     Upon making each interest rate determination pursuant to this Section, the Remarketing Agent shall give immediate notice by Electronic Means to the Finance Director, the Transfer Agent and the Tender Agent of such interest rate determination.

### Section 3.04. Failure of Interest Rate Determination.

(a)     Each of the following constitutes a *Rate Suspension Event*:

(1)     the Remarketing Agent fails or is unable to determine the interest rate or Period for any Modal Security; or

(2)     a court of law of competent jurisdiction shall hold either of the following to be unenforceable or shall stay either:

(i)     the method by which the Remarketing Agent determines the interest rate with respect to a Modal Security or

(ii)     the selection by the Finance Director of the Term Rate Periods.

(b)     The Remarketing Agent shall notify every other Notice Party of the occurrence of any Rate Suspension Event.

(c)     A Rate Suspension Event shall continue until the Remarketing Agent (or the Finance Director if applicable) again makes such determinations. In the case of clause (ii) above, the Remarketing Agent (or the Finance Director, if applicable) shall again make such determination at

C-18

such time as there is delivered to the Remarketing Agent and the Finance Director an opinion of Bond Counsel to the effect that there are no longer any legal prohibitions against such determinations.

(d)     The following rates are applicable upon the occurrence and during the continuance of a Rate Suspension Event:

(1)     for a Daily Rate Security, the Alternative Weekly Rate as of each Weekly Rate Determination Date;     •

(2)     for a Weekly Rate Security, the Alternative Weekly Rate as of each Weekly Rate Determination Date; and

(3)     for a Flexible Rate Security, the Alternative Weekly Rate in effect on the Business Day that begins each Flexible Rate Period. Each such Flexible Rate Period shall be of the duration specified in *Section 4.03*;

(4)     for a Term Rate Security, the Alternative Term Rate for the Term Rate Period for the Term Rate Period extended as provided in *Section 4.05*.

## Article IV
## Modes and Periods

**Section 4.01. Modes.**

(a)     ***Modes Which Can or Cannot be Changed.***

(1)     The Mode of a Modal Fixed Rate Security cannot be changed.

(2)     The Mode of any Variable Rate Security, including a Variable Rate Security that has been defeased, may be changed *subject* to the following limitations:

(i)     no Mode of a Series C Security may be changed to a Flexible Rate Mode;

(ii)     the Mode of a Variable Rate Security may *not* be changed to the Flexible Rate Mode *unless* the Mode of all outstanding Variable Rate Securities is changed to the Flexible Rate Mode on the same Mode Change Date; and

(iii)     the Mode of a Flexible Rate Security may *not* be changed *unless* the Mode of all outstanding Flexible Rate Securities is changed on the same Mode Change Date.

C-19

(3)     Although the Mode of a Term Rate Security or a Flexible Rate Security may be changed, it may be changed only at the end of a Period.

(b)     **When Change Permitted.**

(1)     The Mode of a Daily Rate Security or a Weekly Rate Security may be changed on any Modal Business Day.

(2)     The Mode of a Flexible Rate Security may be changed only on the last day of the Flexible Rate Period.

(3)     The Mode of a Term Rate Security may be changed only on the last day of the Term Rate Period.

(c)     *How Changed.*

(1)     The Finance Director may change a Variable Rate Security from one Mode to another pursuant to a Mode Change Notice, but such change shall become effective only as provided in *Section 4.09*.

(2)     Once the Mode of a Variable Rate Security is changed to the Modal Fixed Rate or an Auction Rate Security, such Security is no longer a Variable Rate Security.

(d)     *Period Changes Not Mode Changes.* Once a Term Rate Mode or a Flexible Rate becomes effective, giving effect to one or more successive Periods for such Mode is not a Mode change.

**Section 4.02.  Duration of Modes.**

Once a Mode is in effect for a Modal Security, that Mode continues in effect until another Mode takes effect in accordance with in *Section 4.09*.

**Section 4.03.  Length of Flexible Rate Periods.**

(a)     The length of each Flexible Rate Period is determined by the Remarketing Agent in connection with the marketing or remarketing of the respective Flexible Rate Security as provided in *Section 3.02*.

(b)     Unless the Mode is changed, a new Flexible Rate Period shall commence on the last day of the current Flexible Rate Period.

(c)     *If* a Rate Suspension Event prevents the Remarketing Agent from determining a Flexible Rate Period for any Flexible Rate Security, *then* the first Flexible Rate Period shall begin on the day the Remarketing Agent would have otherwise determined such Flexible Rate Period and shall end on the immediately following Interest Adjustment Date for Weekly Rate Securities and

C-20

each Flexible Rate Mode Period thereafter shall begin and end on successive Interest Adjustment Dates for Weekly Rate Securities until the Rate Suspension Event is no longer continuing.

**Section 4.04.  Limitations on Length of Flexible Rate Periods.**

(a)  The Remarketing Agent will comply with the following limitations in establishing the Flexible Rate Period for each Flexible Rate Security.

(1)  The Period shall begin and end on Modal Business Days.

(2)  The Period shall not be longer than the least of:

(i)  Maximum Permitted Period, as defined in *subsection (b)*;

(ii)  365 calendar days;

(iii)  the stated maturity of the Flexible Rate Security; and

(iv)  unless such Flexible Rate Security is to be an Excluded Security, the last Modal Business Day occurring not less than five days before the Expiry Date for the then current Financial Facility or Facilities.

(b)  *Maximum Permitted Period* means the number of days equal to

$$\frac{MMR \times Days}{Rate}$$

Where:

$MMR$  =  The Modal Maximum Rate, which on the date of this Agreement is 12%.

$Days$  =  The number of days on which was based the interest component of the Liquidity Facility for Series E Variable Rate Securities, which for the Liquidity Facility in effect on the Closing Date is 153.

$Rate$  =  The rate for the new Flexible Rate Period.

**Section 4.05.  Length of Term Rate Periods.**

(a)  The length of each Term Rate Period shall be determined by the Finance Director in his/her notice to the Remarketing Agent.

(1)  The length of the initial Term Rate Period shall be set forth in the Mode Change Notice electing a change to the Term Rate Mode.

C-21

(2) The length of each successive Term Rate Period shall be set forth in a notice of the Finance Director delivered to the Remarketing Agent, and such notice shall be delivered not less than five Modal Business Days before the last day of the current Term Rate Period. *Section 4.07* provides for the action to be taken if Finance Director does not give such notice.

(3) The Finance Director shall promptly provide the Transfer Agent and the Tender Agent with a copy of each notice setting the length of a Term Rate Period.

(b) Unless the Mode is changed, a new Term Rate Period shall commence on the last day of the current Term Rate Period.

(c) *If* a Rate Suspension Event prevents the Remarketing Agent from giving effect to a successive Term Rate Period elected by the Finance Director *then* the Finance Director may elect any other Mode not subject to such Rate Suspension Event.

(1) If the Finance Director elects to make a Mode change, notice of the election shall be given in accordance with *Section 4.11* in time to effect the Mode change on the last day of the then current Term Rate Period; *provided* that, any Notice Party may waive any notice requirements with respect to notices to be given to it. The conditions to a Mode change contained in *Section 4.10* are applicable

(2) *If* the Finance Director does *not* elect to make a Mode change or *cannot* meet the requirements of *paragraph (1)*, above, *then* the current Term Rate Period of such affected Variable Rate Security shall be extended for successive Interest Payment Dates until the Rate Suspension Event is no longer continuing.

## Section 4.06. Limitations on Length of a Term Rate Period.

In determining the length of a Term Rate Period the Finance Director is subject to the following limitations. *If* a Term Rate Period of the minimum length cannot meet the limitations set forth below *then* the Finance Director cannot elect a Term Rate Period.

(1) A Term Rate Period must include at least two Interest Payment Dates, the first of which must be at least 30 days after the Mode Change Date.

(2) The length of every Term Rate Period is subject to the following rules regarding Rating Confirmations.

(i) No Term Rate Period may be longer than the immediately preceding Term Rate Period without a Rating Confirmation in respect of the new Term Rate Period.

C-22

(ii)     *If* there is no immediately preceding Term Rate Period *then* a Rating Confirmation shall be obtained and the length of the new Term Rate Period cannot exceed the length permitted by such Rating Confirmation.

(3)     No Term Rate Period for a Series E Variable Rate Security may be less than 366 days.

(4)     A Term Rate Period must begin on a Modal Business Day and must end on an Interest Payment Date that is either a Modal Business Day or the Interest Payment Date that is the stated maturity date of the Modal Security. The second Interest Payment Date in a Term Rate Period may be the Interest Payment Date on which the Term Rate Period ends.

(5)     No Term Rate Period may extend beyond the earlier of:

(i)     the stated maturity of the Term Rate Security and

(ii)     *unless* such Term Rate Security is to be an Excluded Security, the Expiry Date for the required Financial Facility or Facilities.

**Section 4.07.   Finance Director Fails to Elect New Term Rate Period.**

*If* the Finance Director has not provided notice in accordance with *Section 4.05* by the fifth Modal Business Day before the end of the current Term Rate Period, *then* the Term Rate Period and the Term Rate shall be determined as if a Rate Suspension Event had occurred.

**Section 4.08.   [Reserved].**

**Section 4.09.   Effectiveness of Modes.**

(a)     *Conditions to Effectiveness.*

(1)     The Initial Mode of each Series of Modal Securities is effective on and as of the Closing Date for that Series without any further act.

(2)     Other than the Initial Mode, no Mode shall become effective *unless* the conditions precedent to the change to such Mode are met on the Mode Change Date.

(3)     The Mode change from a Variable Rate Mode to an Auction Rate Mode shall not become effective *unless* the conditions established by the applicable section of the Auction Rate Mode Supplement are met.

(4)     Any Mode may become effective for all or some Modal Securities *if,* upon giving effect to the Mode change, the denominations of all Modal Securities are Authorized Denominations for the respective Modes.

C-23

(b)　**When Effective.**　A change in Mode becomes effective only on a Modal Business Day on which a change is permitted under *Section 4.01* for the particular Mode then in effect and takes effect on the Modal Business Day when changed.

## Section 4.10.　Conditions Precedent to Mode Change.

(a)　**All Mode Changes.**　It is a condition precedent to a Mode change that there shall be delivered to the Tender Agent, and the Tender Agent shall hold on the Mode Change Date:

(1)　a Favorable Bond Counsel's Opinion, addressed to the Notice Parties;

(2)　*either* moneys sufficient to pay the Purchase Price of all affected Modal Securities plus interest accrued to the Mode Change Date, so as to be available for such payment *or* a Liquidity Facility with sufficient capacity to permit such amount to be drawn thereunder and under which no condition exists that would prohibit such draw;

(3)　a Rating Confirmation for all Modal Securities not affected by the Mode change *if*:

(i)　the Mode change involves less than all outstanding Modal Securities and

(ii)　the Modal Securities affected by the Mode change will become Excluded Securities.

(b)　**Change to the Auction Rate Mode.**　It is a condition precedent to a Mode change to the Auction Rate Mode that there shall be delivered to the Tender Agent, and the Tender Agent shall hold on the Mode Change Date evidence that:

(i)　the conditions established by the applicable section of the Auction Rate Mode Supplement must be satisfied and

(ii)　the Provider of the Credit Enhancement has consented to the Mode change.

C-24

(c) **_Change Permitted by_ Section 2.03.** It is a condition precedent to a Mode change including any change permitted by _Section 2.03_ that there shall be delivered to the Tender Agent, and the Tender Agent shall hold on the Mode Change Date:

(i)     evidence of the satisfaction of the requirements of _Section 2.03(b)_ and

(ii)    a Favorable Bond Counsel's Opinion with respect to such changes.

(d) **_If Subject of a Financial Facility._** It is a condition precedent to a Mode change of any Variable Rate Security not an Excluded Security, that there shall be delivered to the Tender Agent, and the Tender Agent shall hold on the Mode Change Date:

(1)     every required Conforming Financial Facility for such Variable Rate Securities determined as if the Mode change to be made had become effective; and

(2)     a Rating Confirmation _if_ the amount of interest coverage required by _Section 9.02_ to be provided by any required Financial Facility increases from the amount required for the Mode from which the change is to be made.

(e) **_If Defeased._** It is a condition precedent to a Mode change of any Variable Rate Security that has been defeased that there be delivered to the Tender Agent, and the Tender Agent shall hold on the Mode Change Date:

(1)     a Rating Confirmation with respect to such Modal Securities and

(2)     if required by any Rating Agency providing a Rating Confirmation, a verification report or other evidence of the adequacy of the escrow in respect of such defeasance.

(f) **_Reliance by Tender Agent._** The Tender Agent is entitled to rely on a certificate of the Finance Director that the items delivered to it pursuant to this Section conform to the above requirements.

**Section 4.11.    Election of Mode Change; How Effected; Irrevocability.**

(a) **_Who May Elect._** The Finance Director may elect at any time and from time to time to change the Mode of any Variable Rate Security.

(b) **_How Election Effected._** In order to evidence the election of the Finance Director, and for his/her election to be effective, the Finance Director shall deliver to the Tender Agent, with copies to each of the other Notice Parties, not later than, for the proposed Mode Change Date, the

minimum number of days required by *Section 6.02* for notices given in connection with mandatory tenders *plus* 15 days (or such fewer days in advance of such minimum number as may be acceptable to the other Notice Parties):

      (1)      a Mode Change Notice signed by the Finance Director and

      (2)      the items required by *Section 4.10* to be held by the Tender Agent on the Mode Change Date *except* that:

      (i)      any otherwise required Conforming Financial Facility is not required *if* the current Financial Facility will be a Conforming Financial Facility after giving effect to the Mode change;

      (ii)      *if* any Conforming Financial Facility is required, the Finance Director may satisfy the requirement with a commitment of a bank or other financial institution to provide such Conforming Financial Facility not later than the Mode Change Date, and, in such situation, the Rating Confirmation may be indicative or contingent; and

      (iii)      moneys in respect of the Purchase Price are not required.

      (c)      *Irrevocable.* The election shall be effective upon receipt by the Tender Agent of the foregoing and shall be irrevocable.

**Section 4.12.  Selection of Variable Rate Securities.**

      (a)      Whenever a Mode change is to be effective for less than all outstanding Variable Rate Securities of a Series, the Finance Director may select or direct the Tender Agent to select the Variable Rate Securities of that Series to be affected by whatever means or manner that the Finance Director determines to be in the best interests of the City.

      (b)      *If* the Provider of a Financial Facility has requested the Finance Director to select Provider Securities held by such Provider for a Mode change in order to facilitate the remarketing of such Provider Securities, *then* the Finance Director shall direct that such Provider Securities shall be selected before any Modal Securities are selected for such Mode change.

      (c)      The provisions of this Section are subject to the selection procedures, if any, of the Securities Depository.

C-26

**Section 4.13. Contents of Mode Change Notice.**

The notice of the Finance Director to elect a Mode change shall set forth:

(1)    the new Mode;

(2)    the Mode Change Date, which shall comply with *Section 4.01(b)*;

(3)    *if* the new Mode is to apply to less than all of the outstanding Variable Rate Securities, the means by which such Variable Rate Securities are to be selected in accordance with *Section 4.12*;

(4)    such matters that may be included pursuant to *Section 2.03* as the Finance Director may elect to include;

(5)    *if* the new Mode is a Term Rate Mode, the number of Stated Interest Payment Dates in the related Term Period *subject* to *Section 4.06*;

(6)    *if* the new Mode is an Auction Rate Mode, such matters as are required to be included by the Auction Rate Mode Supplement;

(7)    *if* any of the Modal Securities resulting from the Mode change are to be Excluded Securities (or either Excluded Credit Enhancement Securities or Excluded Liquidity Facility Securities), a statement that the Finance Director will terminate the relevant Financial Facility or Facilities with respect to such Modal Securities on behalf of the City;

(8)    *unless* the Modal Securities resulting from the Mode change will be Excluded Securities, the amount, each separately stated, of principal (and premium, if any) and interest required to be covered pursuant to *Section 9.02*, determined as if the Mode described in such notice were in effect and taking into account any changes contained in such notice pursuant to *Section 2.03*, and calculated in sufficient detail to permit the Tender Agent to verify the arithmetical accuracy thereof;

(9)    a statement that:

(i)    each Financial Facility required by *Section 9.01* and then held by the Tender Agent is a Conforming Financial Facility with respect to the new Mode *or*

(ii)    accompanying the notice is the commitment of a bank or other financial institution to issue a required Financial Facility that will:

(A)    be a Conforming Financial Facility and

C-27

(B) be effective as of the Mode Change Date specified in the notice; and

(10) such matters deemed necessary or appropriate by the Finance Director.

**Section 4.14. Notice to Variable Rate Modal Securityholders and Liquidity Facility Providers.**

(a) Whenever the Tender Agent receives a Mode Change Notice, the Tender Agent shall give the notice of mandatory tender required by *Section 6.02* to the Modal Holders of the Variable Rate Securities to be affected by the Mode change, and if any Provider Securities are Outstanding, to the Liquidity Facility Provider.

(b) Such notice shall be given in advance of the Mode Change Date specified in such Mode Change Notice by at least the minimum number of days required by *Section 6.02*; *provided that*, a Liquidity Facility Provider shall always be given at least five Modal Business Days' notice.

## Article V
## Redemption of Modal Securities

**Section 5.01. Optional Redemption – Short-Term and Term Rate Securities.**

(a) *Short-Term Securities.*

(1) Daily and Weekly Rate Securities. Daily Rate Securities and Weekly Rate Securities are subject to redemption upon notice given as required in the Sale Order in whole or in part on any Modal Business Day at the option of the City at a Redemption Price of 100% of the principal amount thereof to be redeemed plus interest accrued to the Redemption Date.

(2) Flexible Rate Securities. Flexible Rate Securities are subject to redemption upon notice given as required in the Sale Order in whole or in part on any Interest Payment Date at the option of the City at a Redemption Price of 100% of the principal amount thereof to be redeemed plus interest accrued to the Redemption Date.

(b) *Term Rate Securities.* Term Rate Securities are subject to redemption upon notice given as required in the Sale Order in whole or in part on any Interest Payment Date at the option of the City at a Redemption Price of 100% of the principal amount thereof to be redeemed plus interest accrued to the Redemption Date; *provided* that the first such Interest Payment Date on which any Term Rate Securities are subject to redemption shall not be less than 5 calendar months after the calendar month in which occurred the Mode Change Date on which the Mode of such Term Rate Securities was changed to the Term Rate Mode.

C-28

(c)    *Opinion Requirement.* The City shall not exercise its option to redeem any Series C Variable Rate Securities subject to optional redemption *unless* the City has received an opinion of Bond Counsel to the effect that such action will not adversely affect the exemption of the interest on the Series 2001 Securities from federal and state income taxation (subject to customary exceptions).

(d)    *Preference to Provider Securities.* If any Provider Securities of a Series are outstanding, the City shall not exercise its option to redeem Variable Rate Securities of the same Series *unless* the City offers to redeem a corresponding principal amount of such Provider Securities at a price of the principal amount thereof plus interest accrued at the Provider Rate to the date of redemption and if such offer is accepted, so redeems such Provider Securities on or before the redemption date of such Variable Rate Securities.

### Section 5.02.   Optional Redemption – Modal Fixed Rate Securities.

Unless changed pursuant to *Section 2.03*, Modal Fixed Rate Securities are subject to redemption upon notice given as required in the Sale Order in whole on any date or in part on any Interest Payment Date at the option of the City at the Redemption Prices set forth below (expressed as a percentage of the principal amount thereof to be redeemed) for the applicable remaining term and anniversary date of the Mode Change Date, plus interest accrued to the Redemption Date.

| Remaining Term | Interest Payment Date Anniversary after Mode Change Date | Redemption Price |
|---|---|---|
| More than 15 years | 10th | 101% |
| | 11th | 100½ |
| | 12 and thereafter | 100 |

| Remaining Term | Anniversary of Interest Payment Date Following Mode Change Date | Redemption Price |
|---|---|---|
| More than 10 years but not more than 15 years | 7th | 101% |
| | 8th | 100½ |
| | 9th and thereafter | 100 |

C-29

| Remaining Term | Anniversary of Interest Payment Date Following Mode Change Date | Redemption Price |
|---|---|---|
| More than 5 years but not more than 10 years | 3rd | 101% |
| | 4th | 100½ |
| | 5th and thereafter | 100 |

| Remaining Term | Anniversary of Interest Payment Date Following Mode Change Date | Redemption Price |
|---|---|---|
| 5 years or fewer years | 2nd | 100% |

**Section 5.03. Limitation on Optional Redemption.**

The City shall not exercise its option to redeem any Modal Securities *unless* (i) at the time it instructs the Registrar to give notice of such redemption it has sufficient funds available to pay the Redemption Price of such Modal Securities plus interest accrued to the Redemption Date or (ii) it instructs the Registrar to make such redemption conditioned on the availability of such funds on the Redemption Date.

**Article VI**
**Right of Optional Tender**
**and**
**Mandatory Tender Events**

**Section 6.01. Tender at Option of Modal Holder.**

(a)      Subject to *Section 9.08*, Daily Rate Securities and Weekly Rate Securities are subject to tender at the option of the Modal Holder on any Modal Business Day at the Purchase Price of 100% of the principal amount thereof, plus interest accrued to the Purchase Date, upon notice given by the Modal Holder as provided in this Section.

(1)      In order to exercise its option to tender Daily Rate Securities, the Modal Holder shall give an irrevocable tender notice to the Remarketing Agent and the Tender Agent by Electronic Means no later than 11:00 a.m. on the Purchase Date specified in such notice, which may be the same Modal Business Day on which the notice is given.

(2)      In order to exercise its option to tender Weekly Rate Securities, the Modal Holder shall give an irrevocable tender notice to the Remarketing Agent and the Tender

C-30

Agent by Electronic Means no later than 4:00 p.m. not less than seven days before the Purchase Date specified in such notice.

(b)     Tender notices given pursuant to this Section shall specify the CUSIP number of the Security (or portion thereof) to be tendered and otherwise identify such Security to the satisfaction of the Tender Agent, and shall also specify the principal amount of such Security being tendered (which shall be an Authorized Denomination) and shall state in effect that:

(1)     such Security (or portion thereof) shall be purchased on the Purchase Date specified therein at 100% of the principal amount thereof, plus interest accrued to Purchase Date,

(2)     the Securities specified in the tender notice are all the Securities of such Tranche held by Modal Holder *or* if less than all, that after giving effect to such tender, the remaining Securities of such Tranche held by such Modal Holder are in one or more Authorized Denominations for the Mode of such Securities and

(3)     such notice is irrevocable.

### Section 6.02. Mandatory Tender Events.

(a)     Each Variable Rate Security affected by any of the following enumerated events shall be subject to mandatory tender on the Purchase Date set opposite the respective event upon such as notice as is required to be given, all as set forth in the following table, at the Purchase Price of 100% of the principal amount thereof, plus interest accrued to the Purchase Date.

| Event | Purchase Date | Tender Notice Required |
|---|---|---|
| End of Flexible Rate Period | Day on which the Period ends | No |
| End of a Term Rate Period | Day on which the Period ends | Yes, at least 15 days' notice |
| Mode Change | Mode Change Date | Yes, at least 15 days' notice |
| Occurrence of Last Put Termination Event | As provided in *Section 9.07.* | As provided in *Section 9.07* |
| Occurrence of Expiry Date, *if* required by *Section 6.03* | The last Modal Business Day to occur not less than 5 days before the Expiry Date | Yes, at least 15 days' notice |
| New Provider of a Financial Facility | As provided in *subsection (b)* below | Yes, at least 15 days' notice |

C-31

(b)     The Purchase Date in connection with a new Provider of a Financial Facility shall be a Modal Business Day at least 5 days before the sooner to occur of (i) the effective date of such Financial Facility and (ii) the Expiry Date of the Predecessor Financial Facility.

**Section 6.03.  Mandatory Tender on Expiry Date.**

(a)     *Except* as otherwise provided in this Section, *if* the Tender Agent has not accepted a Conforming Financial Facility in accordance with *Section 9.04* to replace an expiring Financial Facility on or before the 20th day before the Expiry Date of such Financial Facility, *then* the Tender Agent shall give notice to the Modal Holders of all Modal Securities subject to such Financial Facility that their Modal Securities are subject to mandatory tender on the Purchase Date specified in such notice.  Such notice shall be given and such Purchase Date shall be specified in such notice as provided in *Section 6.02*.

(b)     *Subsection (a)*, above is not applicable with respect to an expiring Financial Facility *if* the City has given the Tender Agent the commitment of the Provider of such Financial Facility as provided in the below paragraphs.

(1)     The commitment is to provide a Conforming Financial Facility on or before the Expiry Date of such Financial Facility.

(2)     The commitment expressly states that it is unconditional and irrevocable.

(3)     Such commitment is given to the Tender Agent at least 20 days before the Expiry Date of such Financial Facility.

(c)     *Subsection (a)*, above is not applicable with respect to an expiring Financial Facility *if* notice is given in accordance with *Section 4.08* on or before the last day that notice would be otherwise required to be given by *Section 6.02* with respect to such expiring Financial Facility, and such notice states that all the Modal Securities subject to such Financial Facility are intended to become Excluded Securities.

**Section 6.04.  Suspension of Optional Tender Rights.**

(a)     For the purposes of this Section, a *Suspension Period* commences with respect to a Liquidity Facility and the Securities that have the benefit of such Liquidity Facility (the *Affected Securities*) upon (i) the occurrence of an Immediate Termination Event under such Liquidity Facility or (ii) the occurrence of a suspension of such Liquidity Facility by reason of an act, omission or condition affecting the Provider of the correlative Credit Enhancement (either (i) or (ii), a *Credit Enhancement Event*).

(b)     During a Suspension Period, (i) the right of a Modal Securityholder to tender Affected Securities pursuant to *Section 6.01* shall be suspended and (ii) the interest rate or rates for the Affected Securities shall be determined as if the Credit Enhancement Event were a Rate

C-32

Suspension Event *except* that two percent per annum shall be added to the applicable rate for Affected Securities in any Short-Term Mode.

## Article VII
### Tender and Purchase

**Section 7.01. Notice of Mandatory Tender.**

(a)    Whenever notice is required by *Section 6.02* to effect a mandatory tender on a Purchase Date, the Tender Agent shall give such notice at least the required number of days in advance of such Purchase Date.

(b)    The notice of mandatory tender shall:

(1)    in substance specify:

(i)    the event giving rise to the mandatory tender;

(ii)    the Purchase Date; and

(iii)    the Modal Securities subject to mandatory tender identified in such manner as is deemed reasonable by the Tender Agent under the circumstances; and

(2)    state in effect that:

(i)    the identified Modal Securities are subject to mandatory tender on such Purchase Date and in order to receive payment of the Purchase Price on the Purchase Date, such Modal Holder shall transfer its Modal Securities to the Tender Agent with all necessary endorsements on or before 12:00 noon on the Purchase Date;

(ii)    such Modal Securities are deemed tendered on the Purchase Date irrespective of any actual transfer to the Tender Agent and shall cease to bear interest on and after the Purchase Date; and

(iii)    transfers of such Modal Securities may be made after the Purchase Date to the Tender Agent *but* no interest shall be paid for any period on and after the Purchase Date.

(3)    such notice may contain such additional information as the Tender Agent believes to be necessary or appropriate.

C-33

(c)     The failure to properly give notice to any Modal Holder of Securities subject to mandatory tender and entitled hereunder to notice shall not affect the validity of any other mandatory tender as to which notice, if required to be given, was properly given.

### Section 7.02.   Interest to No Longer Accrue.

The Purchase Price of each Tender Security shall become due and payable on its respective Purchase Date, and *if* on such Purchase Date the Tender Agent holds amounts sufficient to pay such Purchase Price, *then* interest on such Tender Security shall cease to accrue; *otherwise*, such Tender Security shall continue to bear interest as if it had not been subject to purchase on such Purchase Date.

### Section 7.03.   Remarketing of Provider Securities.

(a)     *Predecessor Tender Security* means, as to any particular Provider Security, the Tender Security purchased by the Liquidity Facility Provider as a result of the failed remarketing of such Tender Security.

(b)     Provider Securities shall be remarketed by the Remarketing Agent only as Modal Securities (*Provider-Owned Variable Rate Securities*) in the same Mode as the Predecessor Tender Securities *unless* a different Mode has become or will become effective in accordance with *Article IV*.

(c)     The Finance Director shall take such steps as are necessary in sufficient time before the Purchase Date of each Provider-Owned Variable Rate Security so that such Provider-Owned Variable Rate Security will have the benefit of the Liquidity Facility of the Provider owning the correlative Provider Security upon the delivery to the purchasers thereof.

(d)     No Liquidity Provider is under any obligation to transfer its Provider Securities to the Remarketing Agent in connection with a remarketing of the correlative Provider-Owned Variable Rate Securities *except* on a "delivery against payment" basis.

### Section 7.04.   Remarketing by Remarketing Agent; Priority to Provider-Owned Variable Rate Securities.

(a)     The Remarketing Agent shall offer for sale and use its best efforts to sell on each Purchase Date all Tender Securities and all Provider-Owned Variable Rate Securities that will have the benefit of the Liquidity Facility of the Provider owning the correlative Provider Security upon the delivery to the purchasers thereof.

(b)     The Remarketing Agent shall remarket all Provider-Owned Variable Rate Securities before remarketing any Tender Securities.

(c)     The Remarketing Agent shall not sell any Tender Securities or Provider-Owned Variable Rate Securities at a discount from the principal amount thereof.

C-34

**Section 7.05. Draw Information to be Provided by Remarketing Agent; Transfer of Amounts.**

On each Purchase Date for Tender Securities of any particular Series, the Remarketing Agent shall inform the Tender Agent, on or before the time specified by the Tender Agent as the time necessary to permit a timely draw under the related Liquidity Facility, of the amount received by the Remarketing Agent as the purchase price of remarketed Tender Securities as of such time.

**Section 7.06. Draws on Liquidity Facility.**

(a)  On each Purchase Date for Tender Securities of any particular Series, the Tender Agent shall draw on the related Liquidity Facility, in accordance with its terms and to the extent of the availability of amounts thereunder in sufficient time to have amounts available to the credit of the Remarketing Fund established for such Series on the day of the draw. The terms of the Liquidity Facility shall control the time at which the draw is to be made.

(b)  The amount of such draw, to the extent of the availability under the Liquidity Facility, shall equal the Purchase Price of all such Tender Securities *less* the amount received by the Tender Agent as the Purchase Price of such Tender Securities that have been remarketed before the drawing. All Tender Securities for which the Tender Agent has *not* received the purchase price in respect of the remarketing by the time the Tender Agent reasonably believes it must draw to comply with *subsection (a)*, above, shall be deemed to have not been remarketed for the purposes of drawing under the related Liquidity Facility.

(c)  The Tender Agent shall not draw to pay the Purchase Price of any Provider-Owned Variable Rate Securities or any Modal Securities owned by or held for the benefit of the City.

**Section 7.07. City Not Obligated to Pay Purchase Price.**

The Purchase Price is payable solely from amounts made available under the Liquidity Facility and that none of the City, the Transfer Agent, the Tender Agent, the Remarketing Agent or the Bond Insurer is obligated to provide funds for the payment of any Purchase Price.

**Section 7.08. Payment of Purchase Price.**

Upon the transfer of a Tender Security to the Tender Agent with all necessary endorsements, the Tender Agent shall pay the Purchase Price to the Modal Holder of such Tender Security:

(1)  no later than the close of business on the Modal Business Day of transfer (*but* not before the Purchase Date) *if* such Tender Security is transferred at or before 3:00 p.m. and

(2)  no later than the close of business on the Modal Business Day following the Modal Business Day of transfer (*but* not before the Purchase Date) *if* such Tender Security is transferred after 3:00 p.m.

C-35

**Section 7.09. Tender of Less than all of Security.**

*If* less than all of a Modal Holder's Variable Rate Security is subject to mandatory tender or is tendered to the Tender Agent as an optional tender permitted hereunder, *then* upon the transfer of such Variable Rate Security in whole to the Tender Agent, the City shall execute (if not already executed) and the Tender Agent shall authenticate and deliver to such Modal Holder, on the day of transfer, a Variable Rate Security or Modal Securities, registered in the name of such Modal Holder, of the same tenor and in such Authorized Denominations as specified by such Modal Holder as shall equal, in the aggregate, the balance of such Modal Holder's Variable Rate Security.

**Section 7.10. Notification and Delivery of Remarketed Tender Securities.**

(a)     Not later than 12:30 p.m. on the Purchase Date, the Remarketing Agent shall notify the Tender Agent and the Transfer Agent of the principal amount of Tender Securities and Provider-Owned Variable Rate Securities successfully remarketed and such information as is appropriate to comply with current securities industry practices applicable to the transfer of securities of the same character, and owned in the manner, as the Modal Securities to be transferred to the purchasers of such Modal Securities.

(b)     The City shall execute (to the extent not already executed) and the Tender Agent shall authenticate an aggregate principal amount of Modal Securities necessary to comply with the instructions of the Remarketing Agent even though not all Tender Securities or correlative Provider Securities have been tendered on the Purchase Date; *provided* that no Provider-Owned Variable Rate Securities shall be authenticated by the Tender Agent *unless* such Provider-Owned Variable Rate Securities have the benefit of the correlative Liquidity Facility.

(1)     Such Modal Securities shall be in such Authorized Denominations and registered by the Tender Agent as Transfer Agent in such names as shall be instructed by the Remarketing Agent (but not in excess of the aggregate principal amount of Tender Securities and correlative Provider Securities) and shall be authenticated as the appropriate Modal Securities and made available for delivery to the Remarketing Agent no later than 1:30 p.m. on the Purchase Date.

(2)     To the extent that any Modal Securities required to be executed and authenticated by this Section are to be held in the Book-Entry Only System maintained by the Securities Depository, then the Tender Agent shall comply with the procedures of the Securities Depository applicable to tender bonds and the transfer of interests in Securities, and no delivery of such Modal Securities in certificated form is required.

C-36

**Section 7.11. Actions on Purchase Date.**

    (a)    *Definitions.*

        *City's Portion* means, as to a Provider-Owned Variable Rate Security remarketed by the Remarketing Agent on a Purchase Date, an amount equal to the difference between (i) the Provider's Remarketing Portion *and* (ii) the principal amount of the correlative Provider Security *plus* interest accrued thereon at the Provider Rate to such Purchase Date *plus* any fees and expenses required to be paid by the Financial Facility Agreement.

        *Provider's Remarketing Portion* means, as to a Provider-Owned Variable Rate Security remarketed by the Remarketing Agent on a Purchase Date, an amount equal to the principal amount of the correlative Provider Security *plus* an amount equal to the interest accrued to such Purchase Date on such Provider Security as if such bore interest at the rate borne by the Tender Securities then remarketed.

    (b)    *Actions.* The following actions shall be taken on the Purchase Date for a Series of Tender Securities.

        (1)    If any Provider-Owned Variable Rate Securities of the same Series were to be remarketed:

            (i)    The City shall pay the City's Portion to the Tender Agent for payment to the related Liquidity Facility Provider.

            (ii)    From amounts received from purchasers of remarketed Securities, Remarketing Agent shall pay such Provider's Remarketing Portion to the Tender Agent for payment to such Liquidity Facility Provider.

            (iii)    The Tender Agent shall pay the amounts received by it as such Provider's Remarketing Portion and the City's Portion to the Liquidity Facility Provider.

        (2)    From amounts received from purchasers of remarketed Securities the Remarketing Agent shall pay the amounts owed to the tendering Modal Holders of such Tender Securities and then shall pay the balance to the Tender Agent.

        (3)    The Tender Agent next shall deposit to the credit of the Remarketing Fund established for such Series of correlative Variable Rate Securities amounts received from the Remarketing Agent.

        (4)    The Tender Agent shall draw on the Liquidity Facility pursuant to *Section 7.02* and deposit the proceeds of such draw to the credit of such Remarketing Fund.

(5)     The Tender Agent shall notify the Finance Director of any insufficiency in the amount drawn under the Liquidity Facility.

(6)     All amounts not otherwise described in this Section received by the Tender Agent in respect of the remarketing of the Tender Securities shall be deposited to the credit of the Remarketing Fund.

(7)     The Tender Agent shall apply amounts credited to the Remarketing Fund as provided in *Section 8.06*.

(8)     Provider Securities, if any, shall be transferred to the Provider in accordance with *Section 8.08*.

(9)     The Tender Agent shall notify the Finance Director and the Transfer Agent as provided in *Section 8.08*, and such notification shall include the aggregate principal amount of Provider Securities delivered to the Provider of such Liquidity Facility.

## Article VIII
## Funds and Accounts

**Section 8.01.  Creation of Funds and Accounts.**

(a)     Whenever there is a Series of Modal Securities that has the benefit of a Credit Facility, the Tender Agent shall establish and maintain a trust fund for such Series of Modal Securities to be known as the "Credit Facility Fund [adding thereto the Series designation of such Modal Securities] and following trust accounts within it:

(1)     Interest Account
(2)     Principal Account
(3)     Redemption Account

(b)     Whenever there is a Series of Variable Rate Securities that has the benefit of a Liquidity Facility, the Tender Agent shall establish and maintain a trust fund for such Series of Variable Rate Securities to be known as the "Remarketing Fund [adding thereto the Series designation of such Variable Rate Securities]".

(c)     All amounts received by the Tender Agent under a Credit Facility or a Liquidity Facility shall be held by the Tender Agent in trust and applied solely as provided in this Agreement and at all times shall be identified as being held in trust on the books of the Tender Agent for the benefit of the Provider of Credit Facility or Liquidity Facility subject to *Section 8.11*.

C-38

### Section 8.02. "Sufficient Time" for Payments under Credit Facilities.

As used in this Article, *sufficient time* means reasonably sufficient time in which to make the amounts drawn under a Financial Facility available: (i) to the Securities Depository, in accordance with its procedures, for timely payment on the dates in respect of which such amounts are being drawn if the Modal Securities to be paid are then be held in the "Book-Entry Only System" of the Securities Depository or (ii) to the Modal Holders (other than the Securities Depository or its nominee) for timely payment on the dates in respect of which such amounts are being drawn.

### Section 8.03. Credit Facility Draws.

*Except* for Modal Securities that are Excluded Credit Enhancement Securities, the Tender Agent shall draw under each Credit Facility, if any, in sufficient time so as to have available:

(1)     to the credit of the related Interest Account on the date on which interest is due on the Modal Securities (whether on an Interest Payment Date or a Redemption Date or by reason of a purchase of Term Securities in lien of Sinking Fund Redemption), the amount of interest due on outstanding Modal Securities such date;

(2)     to the credit of the related Principal Account on each Principal Installment Date, an amount equal to the Principal Installment due on outstanding Modal Securities on such Principal Installment Date;

(3)     to the credit of the related Redemption Account:

(i)     on each Redemption Date (other than a Redemption Date with respect to Sinking Fund Installments), an amount equal to the Redemption Price of outstanding Modal Securities called for redemption on such Redemption Date other than by reason of Sinking Fund Installments; and

(ii)     on the purchase date of any Term Securities purchased pursuant to the Sale Order, an amount equal to the principal amount of the Term Securities so purchased *less* any discount; and

(4)     immediately upon any acceleration of outstanding Modal Securities pursuant to the Bond Ordinance, an amount that will equal the aggregate principal of such Modal Securities plus interest accrued thereon to the Special Interest Payment Date, such amount to be credited *first* to the Interest Account in an amount equal to interest accrued on such Modal Securities to such Special Interest Payment Date and *second* to the Principal Account, the balance.

### Section 8.04. Liquidity Facility Draws.

The Tender Agent shall draw under each Liquidity Facility as provided in *Section 7.06*.

### Section 8.05. Application of the Credit Facility Fund.

(a)     *Except* for Modal Securities that are Excluded Credit Enhancement Securities, the Tender Agent shall:

(1)     as and when interest is due on outstanding Modal Securities (whether an Interest Payment Date or a Redemption Date or by reason of a purchase of Term Securities in lieu of Sinking Fund Redemption), pay the same to the Modal Holders entitled thereto from amounts credited to the related Interest Account;

(2)     as and when Principal Installments are due on outstanding Modal Securities, pay the same to the Modal Holders entitled thereto from amounts credited to the related Principal Account;

(3)     as and when the Redemption Price is due on outstanding Modal Securities (*other* than by reason of Sinking Fund Installments), pay the same to the Modal Holders entitled thereto from amounts credited to the related Redemption Account; and

(4)     as and when the purchase price is due on any Term Securities purchased pursuant to the Sale Order, pay the same (exclusive of any accrued interest) to the Modal Holders entitled thereto from amounts credited to the related Redemption Account.

(b)     No amount shall be withdrawn from the Credit Facility Fund for the purpose of paying all or any part of any Purchase Price of Tender Securities.

(c)     Such payments shall be made in funds immediately available on the date of payment when required by applicable provisions of this Agreement.

### Section 8.06. Application of the Remarketing Fund.

(a)     As used in this Section, *Necessary Amount* means, with respect to any Purchase Date, the amount, if any, equal to the Purchase Price of Tender Securities to be purchased on such Purchase Date *less* the amount received by the Tender Agent as the purchase price of such remarketed Tender Securities.

(b)     As of the close of business on each Purchase Date, the Tender Agent shall pay to the Liquidity Facility Provider from amounts credited to the related Remarketing Fund, the amount, if any, equal to the amount drawn under such Liquidity Facility *less* the Necessary Amount.

(c)     The Tender Agent shall, as and when the Purchase Price is payable on Tender Securities, pay the same to the Modal Holders entitled thereto in accordance with *Section 7.12.*

(d)     No amount shall be withdrawn from a Remarketing Fund *except* for the purpose of paying all or any part of the Purchase Price of related Tender Securities or to reimburse the Provider of the related Liquidity Facility as provided in *subsection (b),* above.

C-40

**Section 8.07. Subrogation Rights.**

(a)     No payment of any amount to a Modal Holder of a Modal Security made from any amount drawn under a Financial Facility shall discharge the City's obligation to pay such Variable Rate Security in accordance with its terms.

(b)     Whenever an amount is drawn under a Financial Facility to pay an amount due any Modal Holder of a Modal Security, the Provider of such Financial Facility shall be subrogated to the rights of the Modal Holders to receive such amount and to all appurtenant rights under such Variable Rate Security, the Authorizing Documents and this Agreement, including such rights of enforcement and taking other action under the Act as would otherwise have been available to such Modal Holder in respect of such amount.

(c)     The subrogation of any Provider of a Liquidity Facility to the rights of a Holder of a Modal Security is subject to any subrogation in favor of a Provider of Credit Enhancement for such Modal Security *if and to the extent* that such Liquidity Facility Provider has the same benefit of such Credit Enhancement as such Holder.

**Section 8.08. Provider Securities.**

(a)     *If* a Credit Facility or a Liquidity Facility is provided pursuant to a separate Financial Facility Agreement that also provides for reimbursement and related matters (such as a letter of credit and reimbursement agreement), *then* the references in this Section to "Credit Facility" or "Liquidity Facility" refer to such Financial Facility Agreement so far as applicable.

(b)     Immediately upon the receipt of a drawing under a Credit Facility or a Liquidity Facility, the Tender Agent shall notify the Finance Director and the Transfer Agent of the amount thereof, the purpose for the drawing, the numbers or other identifying marks of the Modal Securities for which the drawing was made and the subrogation rights of the Provider of such Credit Facility or a Liquidity Facility to corresponding amounts due Modal Holders of such Modal Securities and (without duplication), amounts payable to such Provider under such Credit Facility or Liquidity Facility and the due dates thereof.

(c)     The following governs the terms of Provider Securities:

(1)     The aggregate principal amount of Provider Securities shall not exceed the unreimbursed amount of the drawing *exclusive* of such portion thereof, if any, as shall represent interest on the related Modal Securities.

(2)     The denomination or denominations shall be as specified by the Provider.

(3)     The interest rate shall be as set forth in such Credit Facility or Liquidity Facility *except* that it shall not exceed the Maximum Provider Rate.

C-41

(4)     The principal amount shall be payable, whether on mandatory redemption or at maturity, in such amounts and on such dates as provided in such Credit Facility or Liquidity Facility.

(5)     Other terms of the Provider Securities shall be as provided in such Credit Facility or Liquidity Facility *subject* only to any limitations contained in the Authorizing Documents and this Agreement.

(6)     Except as otherwise provided above or in the Financial Facility and not in conflict with this subsection, the terms of the Provider Securities shall be the same as the correlative Modal Securities.

(7)     Provider Securities shall convey such appurtenant rights under the Authorizing Document and this Agreement as are conveyed by way of the Provider's right of subrogation plus such additional rights as are provided in respect of payments due under such Credit Facility or Liquidity Facility.

(d)     No Provider Security shall be transferred by the Provider *except* as permitted by the Financial Facility.

**Section 8.09. Investment of Moneys.**

(a)     Amounts credited to the Remarketing Fund or any Account shall be invested by the Tender Agent at the written direction of the Finance Director in only direct obligations of the United States of America maturing within 30 days and then at the times and in the amounts when needed to provide for payments from the Remarketing Fund or any such Account.

(b)     The Remarketing Fund and each Account shall include all investments made with moneys therein and all interest realized thereon and proceeds of the sale or other disposition thereof. Investments shall be valued as provided in the Bond Ordinance for investments made with amounts credited to the Bond Redemption Account.

(c)     The Tender Agent shall have no liability or responsibility for any loss resulting from an investment made in accordance with this Section, including without limitation loss resulting from the disposition of any Investment disposed of to provide moneys needed prior to the date or dates indicated by the City or needed on account of any acceleration or other requirement of early payment hereunder.

**Section 8.10. No Lien or Claims.**

None of the Transfer Agent, Tender Agent, Remarketing Agent, any Provider (*other* than on Provider Securities) nor any other Person *except* for Modal Securityholders shall have any claim against any Fund or Account created pursuant to this Agreement.