(b)     In the event that the Transfer Agent has notice that any payment of principal of or interest on a Series 2005-B Bond has been recovered from a Series 2005-B Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Transfer Agent shall, at the time it provides notice to the Bond Insurer, notify all Series 2005-B Bondholders that in the event that any Series 2005-B Bondholder's payment is so recovered, such Series 2005-B Bondholder will be entitled to payment from the Bond Insurer to the extent of such recovery, and the Transfer Agent shall furnish to the Bond Insurer its records evidencing the payments of principal of and interest on the Series 2005-B Bonds which have been made by the Transfer Agent and subsequently recovered from Series 2005-B Bondholders, and the dates on which such payments were made.

(c)     The Bond Insurer shall, to the extent it makes payment of principal of or interest on the Series 2005-B Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Bond Insurance Policy and, to evidence such subrogation, (i) in the case of subrogation as to claims for past due interest, the Transfer Agent shall note the Bond Insurer's rights as subrogee on the registration books maintained by the Transfer Agent upon receipt from the Bond Insurer of proof of the payment of interest thereon to the Series 2005-B Bondholders of such Series 2005-B Bonds and (ii) in the case of subrogation as to claims for past due principal, the Transfer Agent shall note the Bond Insurer's rights as subrogee on the registration books for the Series 2005-B Bonds maintained by the Transfer Agent upon receipt of proof of the payment of principal thereof to the Series 2005-B Bondholders of such Series 2005-B Bonds. Notwithstanding anything in this authorizing document or the Series 2005-B Bonds to the contrary, the Transfer Agent shall make payment of such past due interest and past due principal directly to the Bond Insurer to the extent that the Bond Insurer is a subrogee with respect thereto.

Section 702.   Credit Facility.     As described in Section 206 hereof, a portion of the Senior Lien Bond Reserve Requirement shall be funded by a Municipal Bond Debt Reserve Fund Policy (the "Reserve Policy") purchased from the Bond Insurer, which shall be applicable to all Senior Lien Bonds. The amount of the Reserve Surety in respect of the 2005 Senior Lien Project Bond Reserve Requirement allocable to the Series 2005-B Bonds is $2,600,000.00. The Finance Director hereby determines that the Reserve Policy is in the best financial interests of the City and the System. The commitment dated February 7, 2005 from the Bond Insurer for the Reserve Policy is hereby accepted. The Finance Director is hereby authorized to execute the Debt Service Reserve Fund Policy Agreement with the Bond Insurer (the "Reserve Policy Agreement"), generally in the form provided in the commitment for the Reserve Policy.

In accordance with the terms of the commitment for the Reserve Policy, the City hereby makes the following covenants and agreements for the benefit of the Bond Insurer, to be applicable so long as the Reserve Policy remains in effect; provided, however, if there is a conflict between the terms of the Reserve Policy Agreement and the provisions of this Sale Order with respect to the following covenants and agreements, the provisions of this Sale Order shall govern:

(a)     The City shall repay the Bond Insurer the principal amount of any draws under the Reserve Policy and related reasonable expenses incurred by the Bond Insurer and shall pay interest thereon at a rate equal to the lower of (i) the prime rate of Morgan Guaranty Trust

- 10 -

Company of New York in effect from time to time plus 2% per annum and (ii) the highest rate permitted by law.

(b)     Repayment of draws, expenses and the interest thereon (collectively, "Policy Costs") shall enjoy the same priority of payment as the City's obligation to make deposits to the Senior Lien Bond Reserve Account.

(c)     Payment of Policy Costs shall commence in the first month following each draw and each such monthly payment shall be in the amount at least equal to $1/12^{th}$ of the aggregate of Policy Costs related to such draw.

(d)     Amounts paid to the Bond Insurer shall be credited first to interest due under the Reserve Policy and under the Reserve Policy Agreement, then to the expenses due under the Reserve Policy Agreement and then to principal due under the Reserve Policy and under the Reserve Policy Agreement. As and to the extent that payments are made to the Bond Insurer on account of principal due under the Reserve Policy and under the Reserve Policy Agreement, the coverage under the Reserve Policy will be increased by a like amount.

(e)     If the City shall fail to repay the Policy Costs in accordance with the requirements of the Bond Resolution and the Reserve Policy Agreement, the Bond Insurer shall be entitled to exercise any and all remedies available at law or under the Bond Resolution other than (i) acceleration of the maturity of the Senior Lien Bonds or (ii) remedies which would adversely affect Holders of Senior Lien Bonds.

(f)     The City shall ascertain the necessity for a claim upon the Reserve Policy and provide notice to the Bond Insurer in accordance with the terms of the Reserve Policy at least two business days prior to each date upon which interest or principal is due on any Senior Lien Bonds.

(g)     All cash and investments in the Senior Lien Bond Reserve Account shall be utilized for making required transfers to the Senior Lien Bond Interest and Redemption Fund for payment of debt service on the Senior Lien Bonds before making any draws under the Reserve Policy. Draws on all alternative credit instruments on which there is available coverage shall be made on a pro rata basis (calculated by reference to coverage then available under each such alternative credit instrument) after applying available cash and investments in the Senior Lien Bond Reserve Account. Repayment of Policy Costs and reimbursement of amounts with respect to alternative credit instruments shall be made on a pro rata basis (calculated by reference to the coverage then available under each such alternative credit instrument) prior to replenishment of any cash draws on the Senior Lien Bond Reserve Account.

(h)     The Bond Insurer shall be given notice of any amendments to the Ordinance not requiring Senior Lien Bondholder consent.

(i)     The Bond Insurer's consent shall be required to any amendments to the Ordinance requiring Senior Lien Bondholder consent.

- 11 -

(j)     The Ordinance shall not be discharged until all Policy Costs owing to the Bond Insurer shall have been paid in full.

(k)     As security for the City's repayment obligations with respect to the Reserve Policy, the City hereby pledges and creates a lien in favor of the Bond Insurer (subordinate only to that of its obligation to make deposits to the Operation and Maintenance Fund and the Senior Lien Bond Interest and Redemption Fund Debt Service Account) in all revenues and collateral pledged as security for the Senior Lien Bonds.

(l)     In addition to the requirements of the rate covenant applicable to Senior Lien Bonds and test for issuance of Additional Senior Lien Bonds set forth in the Ordinance, the City shall also be required to maintain Net Revenues projected to equal at least one times coverage of the City's obligation to repay Policy Costs then due and owing for purposes of such rate covenant and the issuance of Additional Senior Lien Bonds. Furthermore, no Additional Senior Lien Bonds may be issued under the Ordinance without the Bond Insurer's prior written consent if any Policy Costs are past due and owing to the Bond Insurer.

(m)     In the event there has been a draw under the Reserve Policy, the City shall be required to replenish the Senior Lien Bond Reserve Account so that the amount therein equals the Senior Lien Bond Reserve Requirement no later than the end of the twelfth month after such draw.

Section 703.     Other Provisions Applicable to the Bond Insurer.

(A)     Reporting Requirements. The Bond Insurer shall be provided with the following information:

(a)     Notice of any drawing upon or deficiency due to market fluctuation in the amount, if any, on deposit, in the Senior Lien Bond Reserve Account;

(b)     Notice of the redemption, other than mandatory sinking fund redemption, of any of the Series 2005-B Bonds, or of any advance refunding of the Series 2005-B Bonds, including the principal amount, maturities and CUSIP numbers thereof;

(c)     Notice of any material events pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934; and

(d)     Such additional information as the Bond Insurer may reasonably request from time to time.

(B)     Notice Addresses. The notice addresses for the Bond Insurer and the Fiscal Agent is as follows: Financial Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Risk Management; and U.S. Bank Trust National Association, 100 Wall Street, 19th Floor, New York, New York 10005, Attention: Corporate Trust Department.

- 12 -

## ARTICLE VIII
## REMARKETING AGENT AND REMARKETING AGREEMENT

Section 801. Appointment of Remarketing Agent. Lehman Brothers, Inc. is hereby appointed as initial Remarketing Agent for the Series 2005-B Bonds, the acceptance of which appointment shall be conclusively evidenced by the execution by Lehman Brothers, Inc. of the Remarketing Agreement, as hereinafter defined.

Section 802. Approval of Remarketing Agreement. The form of the Remarketing Agreement (the "Remarketing Agreement") between the City and Lehman Brothers, Inc. , as Remarketing Agent on file with the Finance Director is hereby approved with such changes, additions, deletions and modifications as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery thereof. The Finance Director hereby determines that the Remarketing Agreement is in the best interest of the City and the System.

## ARTICLE IX
## OTHER PROVISIONS OF GENERAL APPLICATION
## UPON ISSUANCE OF BONDS

Section 901. Application of Series 2005-B Bond Proceeds. The amount of $565,000.00 shall be deposited in the Construction Fund Series 2005 established under Section 11(e) of the Bond Resolution and shall be used to pay Issuance Costs allocable to the Series 2005-B Bonds, other than the allocable portions of Underwriters' discount in the amount of $428,250.00, the Reserve Policy premium in the amount of $32,500.00, and the Bond Insurance Policy premium of $1,093,792.29, which shall be deemed to be deposited in the Construction Fund Series 2005, but which shall be paid as provided in Section 902 hereof. Capitalized interest in the amount of $16,096,578.34 shall be deposited in the Senior Lien Bond and Interest Redemption Fund and shall be used, together with earnings thereon, to pay interest on the Series 2005-B Bonds through and including January 1, 2007. The balance of the Series 2005-B Bond proceeds shall be deposited in the Construction Fund Series 2005 and shall be used to pay costs of the Project.

Section 902. Payment of Issuance Costs. The Finance Director shall pay Issuance Costs in an aggregate approximate amount of $565,000.00 from the proceeds of the Series 2005-B Bonds deposited in the Construction Fund Series 2005 in accordance with Section 11(b) of the Bond Resolution, or from other legally available funds. In addition, the allocable portion of the Reserve Policy premium and the Bond Insurance Policy premium set forth in Section 901 hereof shall be paid by the Underwriters on behalf of the City to the Bond Insurer. The allocable portion of Underwriters' discount set forth in Section 901 hereof shall be paid to the Underwriters in the form of a discount from the par amount of the Series 2005-B Bonds which the Underwriters shall be required to pay upon closing, thereby reducing the purchase price as provided in Section 203 hereof.

Section 903. Order a Contract. The provisions of this Sale Order shall constitute a contract between the City and any Series 2005-B Bondholder.

- 13 -

<u>Section 904</u>.   <u>Book-Entry-Only Form</u>.      The Series 2005-B Bonds shall be held in book-entry-only form and the appointment of The Depository Trust Company, New York, New York, as depository for the Series 2005-B Bonds pursuant to the terms of the City's Blanket Letter of Representations, dated November 26, 1996, is hereby confirmed.


[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

This Sale Order shall take effect immediately.

Sean K. Werdlow
Finance Director City of Detroit

March 22, 2005

## EXHIBIT A

## REQUIREMENTS OF QUALIFIED
## DERIVATIVE AGREEMENTS

Except as otherwise defined herein the capitalized terms used herein without definitions shall have the meanings ascribed to them in the Sale Order or the Ordinance.

"*Qualified Derivative Agreement*" means (a) a Derivative Agreement, whether it is an Insured Swap or Uninsured Swap, in either case, identified in such Derivative Agreement as being related to a particular series of Securities under the Ordinance (the "Related Securities") if:

(i)  the notional amount for such Derivative Agreement (when taken together with any other Derivative Agreement related to such Related Securities) will not exceed the outstanding principal amount of such Related Securities; provided however that a transaction which reverses, in whole or in part, an existing Qualified Derivative Agreement (with the same provider, the same payment terms and dates, but reversing the obligations of the parties, providing that the two transactions are netted against one another for payment purposes and that one transaction may not be terminated unless either (1) the other transaction is terminated, or (2) the remaining transaction would qualify as a Qualified Derivative Agreement if such determination were made at that point) will be permitted and so long as both remain in effect, will be considered, collectively, to have a zero notional amount for purposes of determining whether the notional amount of such Derivative Agreement will exceed the outstanding principal amount of the Related Securities;

(ii)  the rate to be paid by the City under such Derivative Agreement is not subject to a multiplier;

(iii)  the Derivative Agreement does not include a significant loan component (i.e., an obligation to repay money borrowed, credit extended or the equivalent thereof, including, but not limited to, receipt by the City of any payment (or promise of a payment) which effectively increases the rate on the Derivative Agreement which the City would otherwise pay);

(iv)  such Derivative Agreement is not a currency swap and all payments under such Derivative Agreement are calculated in U.S. Dollars, and any variable or index-based rate used in such swap are from an index for U.S. Dollar denominated obligations;

(v)  any Non-Scheduled Payments (on an Uninsured Swap) or uninsured payments (on an Insured Swap) thereunder are both: (A) Subordinate to all Senior Obligations and (B) payable only if and to the extent that after such payment there are sufficient funds remaining to make all Senior Obligations expected to become due over the next six months;

(vi)  collateral may be required to be delivered by the City in connection with such Derivative Agreement only if and to the extent that after such delivery that there are sufficient funds remaining to make all Senior Obligations expected to become due over the next six months;

- 16 -

(vii) the principal amount of any Security issued to secure a Qualified Derivative Agreement shall be deemed to have a principal amount of zero for purposes of determining any consent or other voting rights under the Ordinance as amended and supplemented; and

(viii) MBIA Insurance Corporation receives notice of, and a copy of, such Derivative Agreement; or

(b) any other Derivative Agreement approved by MBIA Insurance Corporation.

"*Derivative Agreement*" means (i) any contract known as or referred to or which performs the function of an interest rate swap agreement, currency swap agreement, forward payment conversion agreement or futures contract; (ii) any contract providing for payments based on levels of, or changes or differences in, interest rates, currency exchange rates, or stock or other indices; (iii) any contract to exchange cash flows or payments or series of payments; (iv) any type of contract called, or designed to perform the function of, interest rate floors or caps, options, puts or calls or to hedge or minimize any type of financial risk, including, without limitation, payment, currency, rate or other financial risk; and (v) any other type of contract or arrangement that the City entering into such contract or arrangement determines is to be used, or is intended to be used, to manage or reduce the cost of indebtedness, to convert any element of indebtedness from one form to another, to maximize or increase investment return, to minimize investment return risk or to protect against any type of financial risk or uncertainty.

"*Swap Provider*" means, with respect to a Derivative Agreement, the person that is identified in such agreement as the counterparty to, or contracting party with, the City under such agreement.

"*Early Termination Payment*" means, with respect to a Derivative Agreement, any payment obligation of the City thereunder due upon the early termination of any transaction governed by such Derivative Agreement, other than an Insured Early Termination Payment.

"*Insured Early Termination Payment*" means, with respect to a Derivative Agreement, any payment obligation of the City thereunder due upon the early termination of any transaction governed by such Derivative Agreement that is insured under an insurance policy issued by an insurer that has also issued a bond insurance policy with respect to Related Securities.

"*Insured Swap*" means any Derivative Agreement wherein the Regularly Scheduled Payments are insured under a bond insurance policy from an insurer who has also insured the Related Securities, having an outstanding principal amount at least equal to the notional amount of the Derivative Agreement.

"*Non Scheduled Payments*" means any payments under any Derivative Agreement that are not Regularly Scheduled Payments, including but not limited to Early Termination Payments, indemnification payments, tax gross-up payments, expenses and default interest payments.

"*Regularly Scheduled Payments*" means any payments scheduled (at the time such Derivative Agreement is executed) for payment on dates related to interest payment days under the Related Securities and which are intended to be "interest-like" when the interest on the Related Securities and such payments are reviewed together.

"**Senior Obligations**" means the Related Securities, any obligations on a parity with or senior to the Related Securities, any related requirements to replenish debt service reserve funds, any deposits in support of debt service and the obligations of the City to make payments to MBIA Insurance Corporation under the Insurance/Reimbursement Agreement.

"**Subordinate**" means that in the event of: (i) any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization, arrangement or other similar proceedings in connection therewith, relative to the City, (ii) any Subordinated Swap Payment is declared or otherwise becomes due and payable under the applicable Derivative Agreement or, (iii) any Event of Default shall occur and be continuing and (1) written notice of such default shall have been given to the Trustee and (2) judicial proceedings shall be commenced in respect of such Event of Default; then, for so long as any action described in clause (i), (ii) or (iii) hereof shall not have been remedied or cured in the opinion of the Trustee, the Trustee shall pay in full all principal, premium and interest on all Senior Obligations before the Swap Provider is entitled to receive any Subordinated Swap Payment, and to that end the Trustee shall be entitled to receive for application in payment of the Senior Obligations in accordance with the Ordinance any payment or distribution of any kind or character, whether in cash or property or securities, which may be payable or deliverable in any such proceedings in respect of such Subordinated Swap Payment after giving effect to any concurrent payment or distribution in respect to such Senior Obligations.

"**Subordinated Swap Payment**" means any Non-Scheduled Payment on an Uninsured Swap or any uninsured payment on an Insured Swap.

"**Uninsured Swap**" means a Derivative Agreement which is not an Insured Swap.

- 18 -

# Exhibit 8



*In the opinion of Bond Counsel, Lewis Munday, A Professional Corporation, under existing law as presently interpreted (i) interest on the Fixed Rate Bonds is excluded from gross income for federal income tax purposes, (ii) interest on the Fixed Rate Bonds is not an item of tax preference for purposes of the alternative minimum tax on individuals and corporations, and (iii) the Fixed Rate Bonds and the interest thereon are exempt from all taxation imposed by the laws of the State of Michigan except inheritance and estate taxes on gains realized from the sale, payment or other disposition thereof, in each case to the extent and subject to the conditions described under "TAX MATTERS" herein.*

# 382,710,000
# CITY OF DETROIT, MICHIGAN
## Sewage Disposal System

| 122,905,000 | 136,150,000 | 123,655,000 |
|---|---|---|
| **Senior Lien Revenue Refunding Bonds** | **Second Lien Revenue Bonds** | **Revenue Second Lien Bonds** |
| **(Modal Fixed Rate), Series 2001(C-2)** | **(Modal Fixed Rate), Series 2001(E)** | **(Fixed Rate), Series 2006(A)** |

2001 E) and 2006 A) Remarketing Date: May 7, 2008
2001 C-2) Remarketing Date: May 8, 2008

Due: July 1, as shown on inside cover

The purpose of this Remarketing Circular is to provide certain information in connection with the remarketing by UBS Securities LLC (the "Remarketing Agent"), on behalf of itself and as a representative, of the Sewage Disposal System Senior Lien Revenue Refunding Bonds (Modal Fixed Rate), Series 2001 C-2) (the "2001 C-2) Fixed Rate Bonds"), the Sewage Disposal System Second Lien Revenue Bonds (Modal Fixed Rate), Series 2001 E) (the "2001 E) Fixed Rate Bonds") and the Sewage Disposal System Revenue Second Lien Bonds (Fixed Rate), Series 2006 A) (the "2006 A) Fixed Rate Bonds" and, together with the 2001 C-2) Fixed Rate Bonds and the 2001 E) Fixed Rate Bonds, the "Fixed Rate Bonds") issued by the City of Detroit, Michigan (the "City").

The City has elected to convert its Sewage Disposal System Senior Lien Revenue Refunding Bonds (Variable Rate Demand), Series 2001 C-2) (the "2001 C-2) Predecessor Bonds") from the Weekly Mode to the Modal Fixed Rate Mode, its Revenue Second Lien Bonds (Variable Rate Demand), Series 2006 A) the "2006 A) Predecessor Bonds") from the Weekly Mode to the Fixed Rate Mode and a portion of its Second Lien Revenue Bonds (Variable Rate Demand), Series 2001 E) (the "2001 E) Predecessor Bonds") and, together with the 2001 C-2) Predecessor Bonds and the 2006 A) Predecessor Bonds, the "Predecessor Bonds") from the Flexible Rate Mode to the Modal Fixed Rate Mode.

The Predecessor Bonds are being remarketed pursuant to the Remarketing Agreement, dated May 1, 2008, between the Remarketing Agent and the City. The 2001 C-2) Predecessor Bonds were initially issued on October 23, 2001 and the 2006 A) Predecessor Bonds were initially issued on August 10, 2006, each in the Weekly Mode, and currently bear interest at a Weekly Rate. The 2001 E) Predecessor Bonds were initially issued on October 23, 2001 in the Flexible Rate Mode and currently bear interest at a Flexible Rate. The anticipated fixed rate conversion date of the 2001 C-2) Predecessor Bonds is May 8, 2008 and the anticipated fixed rate conversion date of the 2001 E) Predecessor Bonds and 2006 A) Predecessor Bonds is May 7, 2008 (together, the "Conversion Dates"), subject to certain conditions precedent. From and after the Conversion Dates, the Fixed Rate Bonds will bear interest at the rates set forth on the inside cover, payable on each January 1 and July 1, commencing July 1, 2008.

Certain Fixed Rate Bonds are subject to mandatory and optional redemption prior to maturity. See "THE FIXED RATE BONDS – Redemption Provisions" herein.

The principal of and interest on the Fixed Rate Bonds are payable solely from the Pledged Assets under the Bond Ordinance, including the Net Revenues of the City's Sewage Disposal System. **The Fixed Rate Bonds are not general obligations of the City and are not indebtedness of the City for purposes of computing its debt limitations imposed by constitutional, statutory or charter provisions. The Fixed Rate Bonds do not constitute a charge against the general credit or taxing power of the City, and the City is not liable for payment of the Fixed Rate Bonds except from the sources herein described.** See "SECURITY AND SOURCES OF PAYMENT FOR FIXED RATE BONDS" herein. Payment of the principal of and interest on each series of the Fixed Rate Bonds, when due, is insured by a separate financial guaranty insurance policy (collectively, the "FGIC Insurance Policies") issued at the time of the original issuance of the Predecessor Bonds by Financial Guaranty Insurance Company ("FGIC"). In connection with the remarketing, Berkshire Hathaway Assurance Corporation ("BHAC") will issue separate insurance policies (collectively, the "BHAC Insurance Policies") on the Conversion Dates guaranteeing the scheduled payment of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of FGIC to make payments under the FGIC Insurance Policies. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry" and "BOND INSURANCE" herein.



**BERKSHIRE HATHAWAY
ASSURANCE CORPORATION**

THIS COVER PAGE CONTAINS INFORMATION FOR QUICK REFERENCE ONLY. IT IS NOT A SUMMARY OF THE ISSUE. INVESTORS MUST READ THE ENTIRE OFFICIAL STATEMENT TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT DECISION.

It is expected that the 2001 C-2) Fixed Rate Bonds will be delivered to DTC in New York, New York on or about May 8, 2008 and the 2001 E) Fixed Rate Bonds and the 2006 A) Fixed Rate Bonds will be delivered to DTC in New York, New York on or about May 7, 2008.

| | |
|---|---|
| **UBS Investment Bank** | **Loop Capital Markets, LLC** |
| **Fifth Third Securities** | **M.R. Beal & Company** | **Raymond James** |

May 1, 2008

**122,905,000**
**Sewage Disposal System Senior Lien Revenue Refunding Bonds (Modal Fixed Rate), Series 2001(C-2)**

$25,275,000 Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Yield | CUSIP [1] |
|---|---|---|---|---|
| 2008 | 195,000 | 3.50 | 2.00 | 2512374A8 |
| 2009 | 245,000 | 3.50 | 2.25 | 2512374B6 |
| 2010 | 260,000 | 3.50 | 2.55 | 2512374C4 |
| 2011 | 270,000 | 3.50 | 2.85 | 2512374D2 |
| 2012 | 285,000 | 3.50 | 3.08 | 2512374E0 |
| 2013 | 295,000 | 4.00 | 3.21 | 2512374F7 |
| 2014 | 310,000 | 4.00 | 3.34 | 2512374G5 |
| 2015 | 325,000 | 4.00 | 3.48 | 2512374H3 |
| 2016 | 345,000 | 4.00 | 3.62 | 2512374J9 |
| 2017 | 365,000 | 4.00 | 3.76 | 2512374K6 |
| 2018 | 380,000 | 4.00 | 3.89 | 2512374L4 |
| 2019 | 400,000 | 4.00 | 4.00 | 2512374M2 |
| 2028 | 21,600,000 | 5.25 | 4.63 [2] | 2512374P5 |

$4,090,000 4.50% Term Bonds due July 1, 2027 Yield 4.75% CUSIP [1] 2512374N0

$93,540,000 5.25% Term Bond due July 1, 2029 Yield 4.67% [2] CUSIP [1] 2512374Q3

**136,150,000**
**Sewage Disposal System Second Lien Revenue Bonds (Modal Fixed Rate), Series 2001(E)**

$136,150,000 5.75% Term Bonds due July 1, 2031 Yield 4.67% [2] CUSIP [1] 2512374R1

**123,655,000**
**Sewage Disposal System Revenue Second Lien Bonds (Fixed Rate), Series 2006(A)**

$123,655,000 5.50% Term Bonds due July 1, 2036 Yield 4.74% [2] CUSIP [1] 2512373Z4

[1] Copyright 2008, American Bankers Association, CUSIP data herein are provided by Standard & Poor's, CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP numbers listed above are being provided solely for the convenience of Bondholders only at the time of remarketing of the Fixed Rate Bonds and the City and Remarketing Agent do not make any representation with respect to such numbers or undertake any responsibility for their accuracy now or at any time in the future. The CUSIP numbers are subject to being changed after remarketing of the Fixed Rate Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part or as a result of the procurement of secondary market portfolio insurance or other similar enhancement by investors that is applicable to the Fixed Rate Bonds.

[2] Priced to July 1, 2018 optional redemption date.



**CITY OF DETROIT**

---

*MAYOR*
**KWAME M. KILPATRICK**

---

*CITY COUNCIL*
**KENNETH V. COCKREL, JR., PRESIDENT**

| | |
|---|---|
| MONICA CONYERS, President Pro Tem | ALBERTA TINSLEY-TALABI |
| JOANN WATSON | MARTHA REEVES |
| SHEILA M. COCKREL | BRENDA JONES |
| BARBARA-ROSE COLLINS | KWAME KENYATTA |

---

*CITY CLERK*
**JANICE WINFREY**

*FINANCE DIRECTOR*
**NORMAN L. WHITE**

*WATER AND SEWERAGE DEPARTMENT DIRECTOR*
**VICTOR M. MERCADO**

*BOARD OF WATER COMMISSIONERS*
**MARY E. BLACKMON, PRESIDENT**

| | |
|---|---|
| HILLIARD L. HAMPTON | JIMMY L. COOPER |
| CARLA WALKER-MILLER | WILLIAM G. WESTRICK |
| MARILYNN E. GOSLING | KENNETH DANIELS |

---

*SPECIAL SERVICES*

**LEWIS & MUNDAY, A PROFESSIONAL CORPORATION**
**Bond Counsel**

**ROBERT W. BAIRD & CO., INCORPORATED**
**Co-Financial Advisor**

**PHOENIX CAPITAL PARTNERS**
**Co-Financial Advisor and Swap Advisor**

**THE FOSTER GROUP, LLC**
**Feasibility Consultant**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................................ 1
    Authorization.................................................................................................................................... 1
    Security and Sources of Payment for the Fixed Rate Bonds........................................................... 2
    Municipal Bond Insurance.............................................................................................................. 2
    Recent Developments in the Bond Insurance Industry ................................................................... 2
    Miscellaneous ................................................................................................................................. 3

THE FIXED RATE BONDS ..................................................................................................................... 3
    General ........................................................................................................................................... 3
    Redemption Provisions.................................................................................................................... 4

BOOK-ENTRY ONLY SYSTEM ............................................................................................................. 5

PLAN OF REMARKETING ...................................................................................................................... 7
    Remarketing Plan ........................................................................................................................... 7
    Amendments................................................................................................................................... 7
    Related Interest Rate Swaps ........................................................................................................... 9
    Sources and Uses of Funds ............................................................................................................. 9

DEBT SERVICE AND OUTSTANDING INDEBTEDNESS .................................................................. 10

INTEREST RATE SWAP AGREEMENTS............................................................................................... 12
    General ........................................................................................................................................... 12
    Interest Rate Swaps Related to the Remarketed Bonds .................................................................. 12

SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS................................... 15
    Nature of Obligations under the Bond Ordinance............................................................................ 15
    Pledged Assets................................................................................................................................ 15
    Priority of Lien and Payment Status ............................................................................................... 15
    Bond Ordinance Flow of Funds....................................................................................................... 16
    Reverse Flow of Funds ................................................................................................................... 16
    Reserve Accounts and Reserve Requirements................................................................................. 17
    Certain Other Funds ....................................................................................................................... 19
    Rate Covenant ................................................................................................................................ 19
    Enforceability of Rates ................................................................................................................... 20
    Additional Bonds............................................................................................................................. 20
    Amendments Without Consent........................................................................................................ 21
    Trustee............................................................................................................................................ 22
    Remedies ........................................................................................................................................ 22

BOND INSURANCE ................................................................................................................................ 23
    Financial Guaranty Bond Insurance Policies................................................................................... 23
    Berkshire Hathaway Assurance Corporation Bond Insurance Policies ........................................... 25

THE WATER AND SEWERAGE DEPARTMENT................................................................................... 26
    Organization ................................................................................................................................... 26
    The Board........................................................................................................................................ 27
    Management and Personnel.............................................................................................................. 28
    Pension Plan ................................................................................................................................... 29

THE SEWAGE DISPOSAL SYSTEM ..................................................................................................... 29
    Service Area ................................................................................................................................... 29
    Retail and Other Billing; Delinquencies ......................................................................................... 30
    Wholesale Municipal Customers..................................................................................................... 31

Customer and Regional Water Quality Partnering................................................................................32
Wholesale Customer Information......................................................................................................33
The Plant .........................................................................................................................................33
Interceptor System..........................................................................................................................34
Collection System............................................................................................................................34
Environmental Matters ....................................................................................................................34

FEASIBILITY CONSULTANT'S REPORT .........................................................................................35

THE CAPITAL IMPROVEMENT PROGRAM .....................................................................................35

FINANCIAL PROCEDURES ...............................................................................................................37
Budget and Accounting Matters .....................................................................................................37
Management Initiatives ...................................................................................................................37
Collections and Delinquencies ........................................................................................................38
Cash Management ...........................................................................................................................38
Investment Policy ............................................................................................................................39
Rates................................................................................................................................................39
"Look-Back" Adjustments ...............................................................................................................40
Sewage Rate Comparison ..............................................................................................................41

FINANCIAL OPERATIONS ................................................................................................................42
Summary of Historical Revenues and Expenses.............................................................................42
Analysis of Recent Operations .......................................................................................................42
Projected Operations for Fiscal Year 2008 Through 2012 ..............................................................43
Upcoming Reporting Change ..........................................................................................................44
Future Years ...................................................................................................................................45

CONTINUING DISCLOSURE UNDERTAKING ..................................................................................45

LITIGATION .......................................................................................................................................46
Environmental Litigation..................................................................................................................46
Rate Litigation .................................................................................................................................47
Other Litigation ...............................................................................................................................47

TAX MATTERS ..................................................................................................................................48
Federal Tax Matters........................................................................................................................48
State Tax Matters.............................................................................................................................48
Original Issue Discount ...................................................................................................................48
Amortizable Bond Premium .............................................................................................................49
Market Discount ..............................................................................................................................49
Recent Developments ......................................................................................................................50
Future Developments.......................................................................................................................50
Tax Advisors ...................................................................................................................................50

FEASIBILITY CONSULTANT ............................................................................................................50

VERIFICATION OF MATHEMATICAL COMPUTATIONS ..................................................................50

INDEPENDENT AUDITORS................................................................................................................50

CERTAIN LEGAL MATTERS..............................................................................................................51

REMARKETING .................................................................................................................................51

RATINGS ...........................................................................................................................................51

MISCELLANEOUS .............................................................................................................................51

Appendices:

A – Feasibility Report
B – Audited Financial Statements of the Sewage Disposal Fund of the City of Detroit, Michigan as of and for the years ended
    June 30, 2006 and 2005
C – The Bond Ordinance
D – Amendments to Certain Provisions of Authorizing Documents
E – Characteristics of the Sewage Disposal System Service Area
F –  Summary of the Continuing Disclosure Undertaking
G – Specimen of BHAC Bond Insurance Policy

Map of Service Area ........................................................................................................................................Inside Back Cover

This Remarketing Circular has been prepared by the City and provides certain information relating to the City and its Sewage Disposal System in connection with the sale of the Fixed Rate Bonds. This Remarketing Circular is distributed in connection with the sale of the Fixed Rate Bonds and may not be reproduced or used, in whole or in part, for any other purpose. No dealer, broker, salesperson or other person has been authorized by the City or the Remarketing Agent to give any information or to make any representations with respect to the City or its Fixed Rate Bonds other than those contained in this Remarketing Circular and, if given or made, such other information or representations must not be relied upon as having been authorized by the City or the Remarketing Agent. Neither the City nor the Remarketing Agent has undertaken any independent investigation of the operations of FGIC or BHAC, and they make no representation herein as to the accuracy or adequacy of such information or as to the ability of FGIC or BHAC to make payments under their respective bond insurance policies. The Remarketing Agent has provided the following sentence for inclusion in this Remarketing Circular: The Remarketing Agent has reviewed the information in this Remarketing Circular in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Remarketing Agent does not guarantee the accuracy or completeness of such information.

This Remarketing Circular does not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be any sale of the Fixed Rate Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Remarketing Circular nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Sewage Disposal System, the City, FGIC or BHAC since the date hereof.

Upon conversion, the Fixed Rate Bonds will not be registered under the Securities Act of 1933, as amended, and will not be listed on any stock or other securities exchange, and neither the Securities and Exchange Commission nor any other federal, state, municipal or other governmental entity other than the City will have passed upon the accuracy or adequacy of this Remarketing Circular.

IN CONNECTION WITH THIS REMARKETING, THE REMARKETING AGENT MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE FIXED RATE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

The order and placement of materials in this Remarketing Circular, including the Appendices, are not to be deemed to be a determination of relevance, materiality or importance and this Remarketing Circular, including the Appendices, must be considered in its entirety.

Other than with respect to information concerning FGIC and BHAC contained herein under the caption "BOND INSURANCE" and in the appendices to the herein defined Predecessor Official Statements and incorporated herein, none of the information in this Remarketing Circular has been supplied or verified by FGIC or BHAC, and neither FGIC nor BHAC make any representation or warranty, express or implied, as to (i) the accuracy or completeness of such information; (ii) the validity of the Fixed Rate Bonds, or (iii) the tax exempt status of the interest on the Fixed Rate Bonds.

382,710,000
## CITY OF DETROIT, MICHIGAN
Sewage Disposal System

| 122,905,000 | 136,150,000 | 123,655,000 |
|---|---|---|
| **Senior Lien Revenue Refunding Bonds Modal Fixed Rate), Series 2001 C-2)** | **Second Lien Revenue Bonds Modal Fixed Rate), Series 2001 E)** | **Revenue Second Lien Bonds Fixed Rate), Series 2006 A)** |

## INTRODUCTION

This Remarketing Circular provides certain information in connection with the remarketing by UBS Securities LLC (the "Remarketing Agent") of the Sewage Disposal System Senior Lien Revenue Refunding Bonds (Modal Fixed Rate), Series 2001(C-2) (the "2001(C-2) Fixed Rate Bonds"), the Sewage Disposal Second Lien Revenue Bonds (Modal Fixed Rate), Series 2001(E) (the "2001(E) Fixed Rate Bonds") and the Sewage Disposal System Revenue Second Lien Bonds (Fixed Rate), Series 2006(A) (the "2006(A) Fixed Rate Bonds", and together with the 2001(C-2) Fixed Rate Bonds and the 2001(E) Fixed Rate Bonds, the "Fixed Rate Bonds") issued by the City of Detroit, Michigan (the "City").

The 2001(C-2) Fixed Rate Bonds will be converted from 123,625,000 currently outstanding principal amount of Sewage Disposal System Revenue Refunding Bonds (Variable Rate Demand), Series 2001(C-2) (the "2001(C-2) Predecessor Bonds"), a portion of the 2001(E) Fixed Rate Bonds will be converted from the 139,080,000 currently outstanding principal amount of Sewage Disposal System Second Lien Revenue Bonds (Variable Rate Demand), Series 2001(E) (the "2001(E) Predecessor Bonds"), and the 2006(A) Fixed Rate Bonds will be converted from 125,000,000 currently outstanding principal amount of Sewage Disposal System Revenue Second Lien Bonds (Variable Rate Demand), Series 2006(A) (the "2006(A) Predecessor Bonds," and together with the 2001(C-2) Predecessor Bonds and 2001(E) Predecessor Bonds, the "Predecessor Bonds"). The 2001(C-2) Predecessor Bonds and the 2006(A) Predecessor Bonds were each issued in the Weekly Mode and currently bear interest at a Weekly Rate. The 2001(E) Predecessor Bonds were issued in the Flexible Rate Mode and currently bear interest at a Flexible Rate. The Predecessor Bonds will be converted from their respective interest rate modes to the Modal Fixed Rate Mode (in the case of the 2001(C-2) and 2001(E) Predecessor Bonds) or the Fixed Rate Mode (in the case of the 2006(A) Predecessor Bonds) (in either case, referred to herein as the "Fixed Rate Mode"). Upon conversion of any of the Predecessor Bonds to a Fixed Rate Mode, such converted Fixed Rate Bonds may not be converted to any other interest rate mode. The 2001(E) Predecessor Bonds which are not being converted to the Modal Fixed Rate Mode will remain outstanding in the Flexible Rate Mode. This Remarketing Circular is not applicable to such 2001(E) Predecessor Bonds and reference should be made to the Official Statement dated October 18, 2001 with respect thereto.

### Authorization

*Issuance*. The Predecessor Bonds were authorized to be issued pursuant to the Revenue Bond Act of 1933, Act No. 94, Public Acts of Michigan, 1933, as amended (the "Act"). The 2001(C-2) Predecessor Bonds were issued pursuant to Ordinance No. 27-86, as supplemented and amended, which was amended and restated by Ordinance 18-01 (the "Bond Ordinance") and a resolution supplementing the Bond Ordinance adopted by the City Council on August 1, 2001, and as amended on October 10, 2001 (the "2001 Resolution"), a Variable Rate Mode Supplement and Amendment dated as of September 1, 2001 (the "2001 Variable Rate Supplement") and a Sale Order of the Finance Director of the City dated October 1, 2001 (the "2001(C-2) Sale Order", together with the Bond Ordinance, the 2001 Variable Rate Supplement and the 2001 Resolution, the "2001(C-2) Authorizing Documents"). The 2001(E) Predecessor Bonds were issued pursuant to the Bond Ordinance as supplemented by the 2001 Resolution, the 2001 Variable Rate Supplement and a Sale Order of the Finance Director of the City dated October 18, 2001 (the "2001(E) Sale Order" together with the Bond Ordinance, the 2001 Variable Rate Supplement and the 2001 Resolution, the "2001(E) Authorizing Documents"). The 2006(A) Predecessor Bonds were issued pursuant to 2001 Ordinance as supplemented by a resolution adopted by the City Council on February 15, 2006 (the "2006(A) Resolution"), the Variable Rate Mode and Auction Rate Mode Supplement and Agreement dated August 1, 2006 (the "2006(A) Variable Rate Supplement") and a Sale Order of the Interim Finance Director of the City dated as of August 4, 2006 (the "2006(A) Sale Order, together with the Bond Ordinance, 2006(A) Variable Rate Supplement and the 2006(A) Resolution, the "2006(A) Authorizing Documents").

*Remarketing* The Predecessor Bonds to be remarketed are being remarketed pursuant to the Remarketing Agreement, dated May 1, 2008 (the "Remarketing Agreement"), between the Remarketing Agent and the City. The conversion of the 2001(C-2) Predecessor Bonds to Fixed Rate Bonds is expected to occur on or about May 8, 2008, and the conversion of the 2001(E) Predecessor Bonds and the 2006(A) Predecessor Bonds to Fixed Rate Bonds is expected to occur on or about May 7, 2008 (together, the "Conversion Dates"), subject to certain conditions precedent as described in the Remarketing Agreement. **Should the conversion to Fixed Rate Mode fail to occur, the Predecessor Bonds to have been converted will remain outstanding in the Weekly Mode as to the 2001 C-2) Predecessor Bonds and the 2006 A) Predecessor Bonds and in the Flexible Mode as to the 2001 E) Predecessor Bonds. In connection with the remarketing described herein, certain**

**amendments will be made to the 2001(C-2), 2001(E) and 2006(A) Authorizing Documents to shorten certain notice periods in the event the initial Fixed Rate Conversion is not consummated and the City elects to again attempt a fixed rate conversion shortly thereafter. See "PLAN OF REMARKETING – Amendments," and "Appendix D – Amendments to Certain Provisions of the Authorizing Documents" herein.** Until such conversion to a Fixed Rate Mode, the Purchase Price of the 2001(C-2) Predecessor Bonds, 2001(E) Predecessor Bonds and 2006(A) Predecessor Bonds will be paid by separate liquidity facilities provided by DEPFA Bank plc, acting though its New York branch (collectively, the "Liquidity Facilities"). See "PLAN OF REMARKETING" herein for more information.

*Except with respect to the amendments described in the immediately preceding paragraph, this Remarketing Circular only contains information regarding bonds while in the Fixed Rate Mode. Reference is made to the respective Predecessor Official Statements defined below) for information relating to any of the Predecessor Bonds prior to conversion to the Fixed Rate Mode.*

*Underlying Documents.* This Remarketing Circular describes the Fixed Rate Bonds in the Fixed Rate Mode only. It is not intended to be used in connection with any offer to sell or remarket any Predecessor Bonds in any mode other than the Fixed Rate Mode. Should conversion of the Predecessor Bonds to Fixed Rate Mode fail to occur, the Predecessor Bonds will remain in the Weekly Mode. Reference should be made to the Official Statement dated October 1, 2001 with respect to the 2001(C-2) Predecessor Bonds, to the Official Statement dated October 18, 2001 with respect to the 2001(E) Predecessor Bonds and to the Official Statement dated August 4, 2006 with respect to the 2006(A) Predecessor Bonds (together the "Predecessor Official Statements"), on file with the Municipal Securities Rulemaking Board (the "MSRB"), for information concerning the authorization for the Predecessor Bonds, and other information related to the Predecessor Bonds. Reference to the Predecessor Official Statements is made solely for informational purposes, and information in the Predecessor Official Statements is not incorporated herein. Reference should also be made to certain amendments to the 2001 Variable Rate Supplement, the 2001(C-2) Sale Order, the 2006(A) Variable Rate Supplement, and the 2006(A) Sale Order which will be effective in connection with the remarketing, are set forth in Appendix D hereto.

*Interest Rate Swap Agreements.* In connection with the remarketing of the 2001(C-2) and 2006(A) Predecessor Bonds, the City has executed two (2) fixed-to-floating interest rate swaps, the purpose of which is to offset the effect of the floating-to-fixed rate payments of the existing floating-to-fixed interest rate swaps related to the 2001(C-2) and 2006(A) Predecessor Bonds. See "PLAN OF REMARKETING – Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS" herein.

**Security and Sources of Payment for the Fixed Rate Bonds**

Upon conversion, the Fixed Rate Bonds will have the same benefits of the security and sources of payment, covenants and other provisions of the Bond Ordinance as all other Sewage Disposal System Bonds secured by a senior lien, as to the 2001(C-2) Fixed Rate Bonds (sometimes referred to herein along with other senior lien bonds as the "Senior Lien Bonds") and by a subordinate second lien, as to the 2001(E) Fixed Rate Bonds and the 2006(A) Fixed Rate Bonds (together, and along with other second lien bonds, sometimes referred to herein as "Second Lien Bonds"), on the Pledged Assets, as hereinafter described and defined. The Bond Ordinance appears as Appendix C of this Remarketing Circular.

**Municipal Bond Insurance**

Concurrently with the issuance of the Predecessor Bonds, Financial Guaranty Insurance Company ("FGIC"), issued its bond insurance policies for such Predecessor Bonds (the "FGIC Insurance Policies"). The FGIC Insurance Policies remain in effect and unconditionally guarantee the payment of that portion of the principal of and interest on the Fixed Rate Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the City. See "BOND INSURANCE – Financial Guaranty Bond Insurance Policies" herein.

In addition, concurrently with the remarketing of the Predecessor Bonds, Berkshire Hathaway Assurance Corporation ("BHAC") will issue its bond insurance policies for each series of the Fixed Rate Bonds (the "BHAC Insurance Policies") on the respective Conversion Dates. The BHAC Insurance Policies will guarantee the scheduled payment when due of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of FGIC to make payments under the FGIC Insurance Policies. See "BOND INSURANCE – Berkshire Hathaway Bond Insurance Policies."

**Recent Developments in the Bond Insurance Industry**

In recent months, Standard & Poor's, a division of The McGraw-Hill Companies ("S&P"), Moody's Investors Service ("Moody's") and Fitch Ratings ("Fitch" and, collectively, the "Rating Agencies") have expressed growing concern about the potential effects of downturns in the market for structured finance instruments, including collateralized debt

obligations and residential mortgage backed securities, on the claims-paying ability of the bond insurance companies. As a result of exposure to such risks, the Rating Agencies have issued press releases and/or reports addressing their ratings on a number of bond insurance companies. These companies include: (a) FGIC, which provided the FGIC Insurance Policies on the Predecessor Bonds, bond insurance on other Sewage System Bonds, and various surety policies providing Reserve Account credit enhancement; (b) BHAC, which will provide the BHAC Insurance Policies on the Fixed Rate Bonds; (c) MBIA Insurance Corporation ("MBIA"), which provided bond insurance on other Sewage System Bonds and various surety policies providing Reserve Account credit enhancement; and (d) Financial Security Assurance Inc. ("FSA"), which provided bond insurance on other Sewage System Bonds and various surety policies providing Reserve Account credit enhancement. See "BOND INSURANCE" and "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Reserve Accounts and Reserve Requirements" herein. The paragraphs below address recent actions by the Rating Agencies on the bond insurance companies referenced above that have provided bond insurance and/or Reserve Account credit enhancement for outstanding Sewage System Bonds. There could be further deterioration in the financial condition of any of the bond insurance companies, and further credit rating downgrades, which could potentially impact the market price of outstanding Sewage System Bonds and/or the funding of the Sewage System's Reserve Accounts.

*FGIC.* As of March 31, 2008, the financial strength ratings of FGIC were as follows: Fitch – "BBB", Rating Outlook Negative; S&P – "BB", Outlook Negative; and Moody's – "Baa3", under review for possible downgrade. Each rating of FGIC should be evaluated independently. The ratings reflect the respective Rating Agency's current assessment of the insurance financial strength of FGIC, and further explanations of any rating may be obtained only from the applicable Rating Agency. These ratings are not recommendations to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by the Rating Agencies. The further downgrade or withdrawal of any of these ratings may have an adverse effect on the market price of the Fixed Rate Bonds. See "BOND INSURANCE - Financial Guaranty Bond Insurance Policies" for more information.

*BHAC.* In an April 25, 2008 press release, Moody's assigned a "Aaa" rating to BHAC, with a stable outlook. In an April 11, 2008 research update, S&P assigned a "AAA" rating to BHAC, with a stable outlook. See "BOND INSURANCE – Berkshire Hathaway Assurance Corporation Bond Insurance Policies" for more information.

*MBIA.* In a February 26, 2008 press release, Moody's confirmed its "Aaa" rating of MBIA, with a negative outlook. The release is available on the Moody's website at www.moodys.com. In a press release dated February 25, 2008, S&P removed its "AAA" rating of MBIA from CreditWatch and assigned a negative rating outlook. In an April 4, 2008 press release, Fitch downgraded the rating of MBIA from "AAA" to "AA", removed its rating from rating watch negative and assigned a negative rating outlook. The release is available on the Fitch website at www.fitchratings.com. There can be no assurance that the views expressed in those documents represent the current views of the Rating Agencies or that those views will not change in the future.

*FSA.* In a March 11, 2008 press release Moody's affirmed its "Aaa" rating of FSA, with a stable outlook. In a press release dated January 31, 2008, S&P affirmed its "AAA" rating of FSA, with a stable rating outlook. In a January 24, 2008 press release, Fitch affirmed its "AAA" rating of FSA, with a stable rating outlook. There can be no assurance that the views expressed in those documents represent the current views of the rating agencies or that those views will not change in the future.

**Miscellaneous**

There follow in this Remarketing Circular descriptions of the Fixed Rate Bonds and other matters generally relating to the remarketing of the Fixed Rate Bonds. ***Persons considering a purchase of the Fixed Rate Bonds should read this Remarketing Circular in its entirety.***

### THE FIXED RATE BONDS

**General**

The Fixed Rate Bonds are issuable in authorized denominations of $5,000 or integral multiples thereof and will be issued in book-entry form. The Fixed Rate Bonds will be dated as of their original date of issuance and delivery, and will mature on July 1 in the years and principal amounts and bear interest at the rates set forth on the inside cover of this Remarketing Circular. Interest on the Fixed Rate Bonds will accrue from the applicable date of conversion (the "Conversion Dates") and will be payable semiannually on each January 1 and July 1, commencing July 1, 2008 (each an "Interest Payment Date") to the registered owners as of the 15th day of the month immediately preceding the Interest Payment Date (a "Regular Record Date"). Interest on the Fixed Rate Bonds will be computed using a 360-day year and twelve 30-day months.

**Redemption Provisions**

*Optional Redemption.* The Fixed Rate Bonds maturing on or before July 1, 2018, are not subject to redemption prior to maturity. The Fixed Rate Bonds maturing on or after July 1, 2019, are subject to redemption at the option of the City in whole or in part in such order of maturity as the City shall determine and within any maturity by lot, on any date on or after July 1, 2018, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption.

*Mandatory Sinking Fund Redemption.* The 2001(C-2) Fixed Rate Bonds maturing on July 1, 2027 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited b the City in the Sinking Fund established for such purpose under the 2001 Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| Redemption Date (July 1) | Principal Amount |
|---|---|
| 2020 | $420,000 |
| 2021 | 440,000 |
| 2022 | 470,000 |
| 2023 | 495,000 |
| 2024 | 520,000 |
| 2025 | 550,000 |
| 2026 | 580,000 |
| 2027† | 615,000 |

† Final maturity.

The 2001(C-2) Fixed Rate Bonds maturing on July 1, 2029 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the 2001 Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| Redemption Date (July 1) | Principal Amount |
|---|---|
| 2028 | $34,240,000 |
| 2029† | 59,300,000 |

† Final maturity.

The 2001(E) Fixed Rate Bonds maturing on July 1, 2031 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the 2001 Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| Redemption Date (July 1) | Principal Amount |
|---|---|
| 2024 | $1,750,000 |
| 2025 | 1,870,000 |
| 2026 | 1,885,000 |
| 2027 | 1,890,000 |
| 2028 | 1,160,000 |
| 2029 | 1,100,000 |
| 2030 | 62,305,000 |
| 2031† | 64,190,000 |

† Final maturity.

The 2006(A) Fixed Rate Bonds maturing on July 1, 2036 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the 2006(A) Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| Redemption Date (July 1) | Principal Amount |
|---|---|
| 2034 | $7,525,000 |
| 2035 | 7,880,000 |
| 2036† | 108,250,000 |

† Final maturity.

*General Redemption Provisions.* Any Fixed Rate Bonds to be redeemed will be redeemed only in authorized denominations. Fixed Rate Bonds duly called for redemption will cease to bear interest on and after the date fixed for redemption, whether or not presented for payment, provided that funds are on hand with the Transfer Agent to redeem such Fixed Rate Bonds. A registered owner of a Fixed Rate Bond selected for redemption in part, upon surrender of such Fixed Rate Bond for redemption shall receive without cost a new Fixed Rate Bond of the same series and maturity, and in the principal amount of the unredeemed portion of such Fixed Rate Bond that was surrendered.

*Notice of Redemption.* The Transfer Agent will mail notice of redemption to the registered owners of Fixed Rate Bonds not less than 30 days prior to the date fixed for redemption. So long as DTC or its nominee is the registered owner of the Fixed Rate Bonds, the Transfer Agent will send any notice of redemption only to DTC, as described under Book-Entry-Only System."

## BOOK-ENTRY ONLY SYSTEM

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Fixed Rate Bonds (referred to in this section as, the "Bonds"). The Bonds will be remarketed as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and

dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from Issuer or Agent, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of Issuer or Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to Issuer or Agent. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The City may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that Issuer believes to be reliable, but the City takes no responsibility for the accuracy thereof.

**PLAN OF REMARKETING**

**Remarketing Plan**

The City intends to convert the 2001(C-2) Predecessor Bonds from the Weekly Mode to the Modal Fixed Rate Mode, the 2001(E) Predecessor Bonds from the Flexible Rate Mode to the Modal Fixed Rate Mode to the extent bondholder consent is received therefor and the 2006(A) Predecessor Bonds from the Weekly Mode to the Fixed Rate Mode via remarketings pursuant to the Remarketing Agreement. In conjunction with the remarketings, the existing Liquidity Facilities and Remarketing Agreements will be terminated. Each series of the Fixed Rate Bonds will continue to carry the associated FGIC Insurance Policies issued by FGIC. In addition, concurrently with the remarketing of the Predecessor Bonds to Fixed Rate Bonds on the respective Conversion Dates, BHAC, a New York stock insurance corporation, will deliver the BHAC Insurance Policies guaranteeing the scheduled payments when due of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of FGIC to make payments under the FGIC Insurance Policies. See "BOND INSURANCE" herein for more detail.

**Amendments**

Certain amendments to the 2001 Variable Rate Supplement, the 2001(C-2) Sale Order, the 2006(A) Variable Rate Supplement, and the 2006(A) Sale Order (collectively, the "2001 and 2006 Authorizing Documents"), which will be effective in connection with the remarketing, are set forth in Appendix D hereto. The 2001 and 2006 Authorizing Documents are governed by their own amendment provisions but are also subject to the amendment provisions of the Bond Ordinance, which is included as Appendix C to this Remarketing Circular. Section 22(B)(3) of the Bond Ordinance, "Amendments With Consent," states in relevant part as follows:

> [T]he consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

Each of the 2001 Variable Rate Supplement and the 2006(A) Variable Rate Supplement (collectively, the "Supplements") contain substantially the same language. **Accordingly, Holders of the Predecessor Bonds being remarketed hereby which are acquired in the remarketing thereof on or after the date of this Remarketing Circular, whether or not the fixed rate conversion and related optional redemption are consummated in accordance with the initial notice of Mode Change or optional redemption, will be considered to have consented to the amendments set forth in Appendix D without the necessity of receipt of actual formal consent.**

Following is a summary of the amendments. Unless stated otherwise, the amendment applies to all of the Predecessor Bonds being remarketed pursuant to this Remarketing Circular and to only the Predecessor Bonds. It does not apply to any other bonds which are covered by the terms of the 2001 Variable Rate Supplement and related sale orders. Reference should be made to Appendix D for specific amendment provisions and the authority therefor. Capitalized terms used in this section have the same meanings as in Appendix D.

1.  The definition of "Favorable Bond Counsel's Opinion" will be amended to provide that in lieu of the opinion that the remarketing will not adversely affect the exemption of the interest on the Fixed Rate Bonds from federal and state income taxation (subject to customary exceptions), Bond Counsel may provide an opinion to the effect that the interest on the Fixed Rate Bonds is excluded from gross income for federal and state income tax purposes (subject to customary exceptions).

2.  In the event that certain structural changes to debt service are made in the conversion to fixed rate, the Supplements require that the converted Securities meet the requirements for issuance as new bonds of the corresponding parity and for the corresponding purpose under the Bond Ordinance. This requirement will not be required in connection with any remarketing of the Predecessor Bonds that is completed prior to September 30, 2008, but only if the City certifies, in a manner acceptable to Bond Counsel at the time of such remarketing, that such lack of compliance is not materially adverse to the Holders of all outstanding Bonds of the Sewage Disposal System.

3.  The Supplements require that the interest rate in remarketings, other than with respect to Flexible Rate Securities, shall be determined by the Remarketing Agent as the interest rate that in the judgment of the Remarketing Agent would allow such Securities to be sold at par plus accrued interest to the purchase date, under prevailing market conditions. The amendment will allow the Predecessor Bonds to be remarketed at a net premium, provided that the par amount thereof may not increase.

-7-

4. In the event that notice of Mode Change or notice of optional redemption is sent to Holders of the Predecessor Bonds, but the Mode Change or the optional redemption is not consummated on the date specified in the original notices, the amendments shorten the period for giving a subsequent notice of Mode Change or optional redemption. The amendments provide that in such a situation, if the Finance Director again elects to change the Mode for the Predecessor Bonds to the Fixed Rate Mode within 30 days of the initial Mode Change Date, and in connection therewith, optionally redeem a portion of the Predecessor Bonds, his/her election shall be effective if he/she delivers to the Holders of the Predecessor Bonds, the Tender Agent, and each of the other Notice Parties, simultaneously, not later than the 3rd day next preceding the Mode Change and optional redemption date, a subsequent notice of Mode Change and optional redemption stating that such Mode Change Date is the Purchase Date and the redemption date, as applicable.

5. The following amendments relate only to the holders of the 2001(E) Predecessor Bonds consenting to such amendments provided that consent to such amendments is obtained from at least 51% in outstanding principal amount of the Holders of Series E Securities to the amendments[1]:

a. The provision of the 2001 Variable Rate Supplement which requires that all outstanding Flexible Rate Securities be changed on the same Mode Change Date is amended to permit the Mode of Series E Securities (which are currently in the Flexible Rate Mode) to be changed without regard to the Mode of any other Flexible Rate Security.

b. The amendments allow the Mode of a 2001(E) Predecessor Bonds to be changed on any Modal Business Day rather than only on the last day of the Flexible Rate Period.

c. The amendments allow 2001(E) Predecessor Bonds to be subject to redemption on any Modal Business Day rather than only on an Interest Payment Date.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[1] Consent of $137,730,000 in aggregate principal amount (99.03%) was received and, accordingly, those holders will be subject to mandatory tender in the amount of $136,150,000 and optional redemption in the amount of $1,580,000. The amendments apply only to the consenting 2001(E) Predecessor Bondholders. 2001(E) Predecessor Bondholders not consenting will remain outstanding in the Flexible Rate Mode in the aggregate principal amount of $1,350,000. See INTRODUCTION."

**Related Interest Rate Swaps**

In connection with the remarketing of the 2001(C-2) and 2006(A) Predecessor Bonds, the City executed two (2) fixed-to-floating interest rate swaps (the "Mirror Swaps"), which will be effective on the respective Conversion Dates. The purpose of the Mirror Swaps is to offset the floating-to-fixed rate payments of the existing floating-to-fixed rate swaps (the "Existing Swaps") related to the 2001(C-2) and 2006(A) Predecessor Bonds. Additionally, in connection with the execution of the Mirror Swaps, which will be uninsured, the City and the swap providers executed amended and restated ISDA Master Agreements for the Existing Swaps, which will remove the existing FGIC swap insurance, effective on the respective Conversion Dates. The 2001(C-2) Bonds have one (1) related swap which terminates July 1, 2029. The 2006(A) Predecessor Bonds have one (1) related swap which terminates July 1, 2036. The notional amounts and amortization of the Mirror Swaps will match exactly the notional amounts and amortization of the Existing Swaps. Under the Mirror Swaps, the City will receive a fixed rate from the respective swap provider and pay a floating rate based on the SIFMA Index to the swap provider related to the Mirror Swaps. Under the Existing Swaps, the City currently pays a fixed rate to the swap provider and receives a floating rate based on the SIFMA Index to the swap provider. The floating rate receipts of the City under the Existing Swaps and floating rate payments made by the City under the Mirror Swaps will completely offset each other. The City will be left with a net fixed rate payment which equals the difference between the fixed rate payment made by the City on the Existing Swaps and the fixed rate receipt of the City on each Mirror Swap. The net fixed rate payment will be added to and treated as a part of debt service on the applicable Fixed Rate Bonds. See "INTEREST RATE SWAP AGREEMENTS" for more information on the System's outstanding interest rate swap agreements

**Sources and Uses of Funds**

The sources and uses of funds in connection with the remarketing of the Fixed Rate Bonds are as follows:

| | 2001(C-2) Fixed Rate Bonds | 2001(E) Fixed Rate Bonds | 2006(A) Fixed Rate Bonds | Total |
|---|---|---|---|---|
| **SOURCES OF FUNDS:** | | | | |
| Par Amount of Bonds | 122,905,000 | 136,150,000 | 123,655,000 | 382,710,000 |
| Net Reoffering Premium | 5,354,591 | 11,768,806 | 7,493,493 | 24,616,890 |
| **TOTAL SOURCES** | **128,259,591** | **147,918,806** | **131,148,493** | **407,326,890** |
| | | | | |
| **USES OF FUNDS:** | | | | |
| Remarketing Proceeds and Debt Service Accounts | 123,908,730 | 141,952,215 | 125,245,902 | 391,106,846 |
| Costs of Issuance* | 4,350,861 | 5,966,591 | 5,902,591 | 16,220,044 |
| **TOTAL USES** | **128,259,591** | **147,918,806** | **131,148,493** | **407,326,890** |

* Includes underwriting discount, municipal bond insurance premiums, printing costs, rating agency fees, legal fees and other issuance expenses.

## DEBT SERVICE AND OUTSTANDING INDEBTEDNESS[•]

As of the Conversion Dates, there will be $2,983,775,548 aggregate principal amount of Sewage System Bonds outstanding, consisting of $1,539,480,179 Senior Lien Bonds, $1,057,770,000 Second Lien Bonds and $386,525,369[2] State Revolving Fund ("SRF") Junior Lien Bonds. The following tables set forth information with respect to outstanding Sewage System Bonds, including the total outstanding Sewage System Bond debt service.

### Sewage Disposal System Revenue Bonds and Revenue Refunding Bonds

| | Original Principal Amount | Outstanding as of May 8, 2008 | |
|---|---|---|---|
| **Senior Lien Bonds** | | | |
| Sewage Disposal System Revenue Bond, Series 1992-A | $ 4,360,000 | $ 1,260,000 | |
| Sewage Disposal System Revenue Bond, Series 1992-B | 1,915,000 | 655,000 | |
| Sewage Disposal System Revenue Bond, Series 1993-B | 6,603,996 | 2,585,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 1995-B | 125,295,000 | 14,375,000 | |
| Sewage Disposal System Revenue Bond, Series 1997-B | 6,075,000 | 3,250,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 1998-A | 69,000,000 | 65,875,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 1998-B | 68,955,000 | 65,865,000 | |
| Sewage Disposal System Revenue Bond, Series 1999-SRF1 | 21,475,000 | 14,135,000 | |
| Sewage Disposal System Revenue Bond, Series 1999-SRF2 | 46,000,000 | 36,560,000 | |
| Sewage Disposal System Revenue Bond, Series 1999-SRF3 | 31,030,000 | 21,885,000 | |
| Sewage Disposal System Revenue Bond, Series 1999-SRF4 | 40,655,000 | 28,665,000 | |
| Sewage Disposal System Revenue Bonds, Series 1999-A | 302,995,000 | 34,635,179 | |
| Sewage Disposal System Revenue Bonds, Series 2001(C-1) | 159,970,000 | 155,305,000 | |
| Sewage Disposal System Revenue Bonds, Series 2001(C-2) | 127,165,000 | 122,905,000 | [1] |
| Sewage Disposal System Revenue / Revenue Refunding Bonds, Series 2003(A) | 599,380,000 | 335,210,000 | |
| Sewage Disposal System Revenue Bonds, Series 2003(B) | 150,000,000 | 150,000,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 2004(A) | 101,435,000 | 97,890,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 2006(C) | 26,520,000 | 26,560,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 2006(D) | 370,000,000 | 361,865,000 | |
| Total Senior Lien Bonds | 2,258,828,996 | 1,539,480,179 | |
| **Second Lien Bonds** | | | |
| Sewage Disposal System Revenue Bonds, Series 2001(B) | 110,550,000 | 110,550,000 | |
| Sewage Disposal System Revenue Bonds, Series 2001(D-1) | 20,000,000 | 20,000,000 | |
| Sewage Disposal System Revenue Bonds, Series 2001(D-2) | 72,450,000 | 72,450,000 | |
| Sewage Disposal System Revenue Bonds, Series 2001(E) | 139,080,000 | 137,500,000 | [1] |
| Sewage Disposal System Revenue Bonds, Series 2005(A) | 273,355,000 | 240,535,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 2005(B) | 40,215,000 | 40,215,000 | |
| Sewage Disposal System Revenue Refunding Bonds, Series 2005(C) | 63,160,000 | 62,865,000 | |
| Sewage Disposal System Revenue Bonds, Series 2006(A) | 125,000,000 | 123,655,000 | [1] |
| Sewage Disposal System Revenue Bonds, Series 2006(B) | 250,000,000 | 250,000,000 | |
| Total Second Lien Bonds | 1,093,810,000 | 1,057,770,000 | |
| **SRF Junior Lien Bonds** | | | |
| Sewage Disposal System Revenue Bonds, Series 2000-SRF1 | 53,475,000 | 42,500,000 | |
| Sewage Disposal System Revenue Bonds, Series 2000-SRF2 | 65,000,000 | 51,660,000 | |
| Sewage Disposal System Revenue Bonds, Series 2001-SRF1 | 82,200,000 | 72,330,000 | |
| Sewage Disposal System Revenue Bonds, Series 2001-SRF2 | 59,850,000 | 52,665,000 | |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF1 | 18,985,000 | 15,080,000 | |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF2 | 1,970,000 | 1,200,369 | |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF3 | 43,740,000 | 38,490,000 | |
| Sewage Disposal System Revenue Bonds, Series 2003-SRF1 | 48,520,000 | 44,685,000 | |
| Sewage Disposal System Revenue Bonds, Series 2003-SRF2 | 25,800,000 | 22,695,000 | |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF1 | 2,910,000 | 2,545,000 | |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF2 | 18,690,000 | 16,365,000 | |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF3 | 12,920,000 | 11,310,000 | |
| Sewage Disposal System Revenue Bonds, Series 2007-SRF1 | 167,560,000 [2] | 15,000,000 [2] | |
| Total SRF Junior Lien Bonds | 601,620,000 | 386,525,369 | |
| **Total All Bonds** | $3,954,258,996 | $2,983,775,548 | |

SOURCE: The Department.

[1] Reflects partial optional redemption of some of the Predecessor Bonds on the respective Conversion Dates.

[2] Original Principal Amount reflects maximum stated amount of State Revolving Fund Bonds issued as part of the State of Michigan's Revolving Loan Program; outstanding amount reflects principal amount of loan drawn by the Department. As the Department draws additional amounts from time to time hereafter, the outstanding principal amounts of such Bonds will correspondingly increase. It is anticipated that the maximum amounts on all State Revolving Fund Bonds will not be fully drawn until Fiscal Year 2011.

## Debt Service Schedule

| Fiscal Year Ending June 30 [1] | Senior Lien Bonds | | | | Second Lien Bonds | | | | | | SRF Junior Lien Bonds | Total System |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Outstanding Senior Lien Debt Service [2][3] | Series 2001(C-2) Fixed Rate Principal [4] | Series 2001(C-2) Fixed Rate Debt Service [4] | Total Senior Lien Debt Service [3] | Outstanding Second Lien Debt Service [2][3] | Series 2001(E) Fixed Rate Principal [4] | Series 2001(E) Fixed Rate Debt Service [4] | Series 2006(A) Fixed Rate Principal [4] | Series 2006(A) Fixed Rate Debt Service [4] | Total Second Lien Debt Service [4] | Outstanding SRF Junior Lien Debt Service [5] | Total System Debt Service |
| 2008 | 102,834,726 | 195,000 | 1,402,136 | 104,236,862 | 39,700,764 | — | 1,174,294 | — | 3,172,504 | 44,047,562 | 26,964,110 | 175,248,534 |
| 2009 | 100,040,298 | 245,000 | 7,705,526 | 107,745,824 | 35,557,185 | — | 7,828,625 | — | 7,876,275 | 51,262,085 | 27,886,044 | 186,893,953 |
| 2010 | 100,285,816 | 260,000 | 7,709,281 | 107,995,097 | 41,665,423 | — | 7,828,625 | — | 7,876,275 | 57,370,323 | 28,726,659 | 194,092,078 |
| 2011 | 96,365,846 | 270,000 | 7,707,377 | 104,073,224 | 45,244,423 | — | 7,828,625 | — | 7,876,275 | 60,949,323 | 36,862,815 | 201,885,362 |
| 2012 | 93,825,266 | 285,000 | 7,709,990 | 101,535,257 | 48,572,427 | — | 7,828,625 | — | 7,876,275 | 64,277,327 | 37,330,684 | 203,143,268 |
| 2013 | 97,993,108 | 295,000 | 7,706,945 | 105,670,053 | 44,721,132 | — | 7,828,625 | — | 7,876,275 | 60,426,032 | 37,328,678 | 203,424,763 |
| 2014 | 89,549,088 | 310,000 | 7,706,029 | 97,256,029 | 52,534,657 | — | 7,828,625 | — | 7,876,275 | 68,239,557 | 37,331,175 | 203,273,761 |
| 2015 | 90,112,956 | 325,000 | 7,706,203 | 97,819,159 | 52,519,657 | — | 7,828,625 | — | 7,876,275 | 68,224,557 | 37,335,875 | 203,379,591 |
| 2016 | 98,742,771 | 345,000 | 7,709,688 | 106,452,459 | 43,632,527 | — | 7,828,625 | — | 7,876,275 | 59,337,427 | 37,339,497 | 203,129,383 |
| 2017 | 98,494,325 | 365,000 | 7,712,194 | 106,206,519 | 43,648,402 | — | 7,828,625 | — | 7,876,275 | 59,353,302 | 37,332,459 | 202,892,280 |
| 2018 | 98,637,168 | 380,000 | 7,708,723 | 106,345,891 | 43,641,602 | — | 7,828,625 | — | 7,876,275 | 59,346,502 | 37,339,722 | 203,032,114 |
| 2019 | 98,542,836 | 400,000 | 7,709,474 | 106,252,309 | 43,883,402 | — | 7,828,625 | — | 7,876,275 | 59,588,302 | 37,325,719 | 203,166,330 |
| 2020 | 96,929,151 | 420,000 | 7,709,246 | 104,638,397 | 45,646,502 | — | 7,828,625 | — | 7,876,275 | 61,351,402 | 37,335,337 | 203,325,136 |
| 2021 | 85,822,917 | 440,000 | 7,705,940 | 93,528,858 | 56,548,300 | — | 7,828,625 | — | 7,876,275 | 72,253,202 | 37,332,840 | 203,114,900 |
| 2022 | 94,488,922 | 470,000 | 7,711,513 | 102,200,435 | 48,006,297 | — | 7,828,625 | — | 7,876,275 | 63,711,197 | 37,337,853 | 203,249,485 |
| 2023 | 103,704,373 | 495,000 | 7,710,512 | 111,414,885 | 38,817,066 | — | 7,828,625 | — | 7,876,275 | 54,521,966 | 37,325,419 | 203,262,270 |
| 2024 | 97,193,545 | 520,000 | 7,708,164 | 104,901,709 | 51,613,103 | 1,750,000 | 9,578,625 | — | 7,876,275 | 69,068,003 | 28,489,447 | 202,459,160 |
| 2025 | 90,902,507 | 550,000 | 7,709,469 | 98,611,976 | 58,011,466 | 1,870,000 | 9,598,000 | — | 7,876,275 | 75,485,741 | 28,495,656 | 202,593,373 |
| 2026 | 109,725,312 | 580,000 | 7,709,156 | 117,434,468 | 54,633,591 | 1,885,000 | 9,505,475 | — | 7,876,275 | 72,015,341 | 12,894,663 | 202,344,471 |
| 2027 | 110,040,157 | 615,000 | 7,712,226 | 117,752,383 | 57,621,441 | 1,890,000 | 9,402,088 | — | 7,876,275 | 74,899,803 | 9,812,181 | 202,464,368 |
| 2028 | 55,545,167 | 55,840,000 | 62,903,455 | 118,448,622 | 57,526,716 | 1,160,000 | 8,501,413 | — | 7,876,275 | 73,966,403 | 9,810,325 | 202,225,350 |
| 2029 | 63,869,882 | 59,300,000 | 62,934,256 | 126,804,138 | 49,342,416 | 1,100,000 | 8,436,713 | — | 7,876,275 | 65,655,403 | 9,810,991 | 202,270,532 |
| 2030 | 84,943,746 | | | 84,943,746 | 28,064,316 | 62,305,000 | 69,578,463 | — | 7,876,275 | 105,519,053 | 9,814,097 | 200,276,896 |
| 2031 | 82,871,872 | | | 82,871,872 | 30,298,816 | 64,190,000 | 67,880,925 | — | 7,876,275 | 106,056,016 | | 188,927,887 |
| 2032 | 56,972,844 | | | 56,972,844 | 121,343,785 | | | — | 7,876,275 | 129,220,060 | | 186,192,904 |
| 2033 | 130,321,710 | | | 130,321,710 | 49,275,775 | | | 7,525,000 | 7,876,275 | 57,152,050 | | 187,473,760 |
| 2034 | | | | | 171,917,250 | | | | 15,401,275 | 187,308,525 | | 187,308,525 |
| 2035 | | | | | 172,043,000 | | | 7,880,000 | 15,272,550 | 187,296,896 | | 187,296,896 |
| 2036 | | | | | 72,140,250 | | | 108,250,000 | 115,137,841 | 187,278,091 | | 187,278,091 |
| Totals | 2,428,726,309 | 122,905,000 | 273,708,417 | 2,702,434,726 | 1,698,542,690 | 136,150,000 | 311,147,369 | 123,655,000 | 345,891,391 | 2,355,581,450 | 677,546,246 | 5,735,579,421 |

(1) Amounts due July 1 are shown as debt service for the preceding Fiscal Year ending June 30 (the amounts actually required to be set aside in that Fiscal Year). For example, debt service payments due July 1, 2008 are shown in the Fiscal Year ending June 30, 2008.

(2) Includes debt service on the Predecessor Bonds prior to the Conversion Dates. Debt service on the Predecessor Bonds with related Existing Swaps (Series 2001(C-2) and Series 2006(A)) is calculated as per the Bond Ordinance at the fixed interest rate payable by the City under the Existing Swaps until March 1, 2008, due to the recent developments in the bond insurance industry discussed herein, from March 1, 2008 until the Conversion Dates, debt service on such Predecessor Bonds was calculated assuming the fixed swap rate plus an approximated additional payment due to variable rate bond payments in excess of variable swap receipts. Includes debt service on the $1,150,000 uncommitted Series 2001(E) Bonds, which remain in the Flexible Rate Mode, assuming an average rate equal to 125% of the 12-month variable rate average (calculated as per the Bond Ordinance).

(3) Debt service on variable rate bonds with related interest rate swaps is included at the fixed rate to be paid under the related swap agreement as per the Bond Ordinance.

(4) Debt service on the Fixed Rate Bonds after the Conversion Dates includes the net fixed payment by the City under the Mirror Swaps; see "PLAN OF REMARKETING – Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS – Interest Rate Swaps Related to the Remarketed Bonds" for more information.

(5) Net of capitalized interest.

(6) Based on projected drawdown and expenditure of SRF-funded projects.

NOTE: Totals may not add due to rounding.
SOURCE: The Department.

# INTEREST RATE SWAP AGREEMENTS

**General**

   In accordance with its Swap Management Plan adopted November 26, 2002, the City uses interest rate swaps as part of prudent fiscal management to limit its interest rate exposure and to lower its overall cost of borrowing. The City is currently a party to a number of separate interest rate swap agreements that were entered into in conjunction with the issuance of certain variable rate Sewage System Bonds, or in anticipation of Sewage System Bonds expected to be issued prior to the effective date of the swap. Arrangements between the City and the swap counterparty do not alter the City's obligation to pay the principal of and interest on such Sewage System Bonds.

   Net payments received by the City from the swap counterparty under each swap agreement constitute Revenues under the Ordinance. The periodic net interest payments made by the City to the counterparty under each swap agreement, and any termination payment that may be payable by the City to the counterparty upon early termination of the swap agreement, constitute Ancillary Obligations of the City under the Ordinance. The Ordinance permits the City to secure Ancillary Obligations by a lien on Pledged Assets having the same or a lower priority as the lien securing the related Sewage System Bonds. The City has secured its Ancillary Obligations under all current swap agreements listed below by a lien on Pledged Assets of the same priority as the lien securing the related Sewage System Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Priority of Lien and Payment Status."

   The chart set forth on the following page provides a brief description of the principal features of each current interest rate swap agreement related to outstanding or anticipated Sewage System bonds to which the City is a party. See also notes (8) and (10) in Appendix B – "Audited Financial Statement of the Sewage Disposal Fund of the City of Detroit, Michigan".

**Interest Rate Swaps Related to the Remarketed Bonds**

   Until recent market events, the floating rate received by the City under the Existing Swaps generally approximated the floating rate owed by the City on the related Predecessor Bonds, so that the swaps successfully hedged the City's interest rate exposure. As a result of recent market events, however, the Existing Swaps have not provided the City with a nearly complete hedge against interest rate volatility.

   In connection with the remarketing of the 2001(C-2) and 2006(A) Predecessor Bonds, the City has executed two (2) fixed-to-floating interest rate Mirror Swaps which will be effective on the respective Conversion Dates, the purpose of which is to offset the effects of the floating-to-fixed rate payments of the Existing Swaps related to the 2001(C-2) and 2006(A) Predecessor Bonds. Additionally, in connection with the execution of the Mirror Swaps, which will be uninsured, the City and the swap providers have executed amended and restated ISDA Master Agreements for the Existing Swaps, which will remove the existing FGIC swap insurance, effective on the respective Conversion Dates. See "PLAN OF REMARKETING – Related Interest Rate Swaps" herein for more information.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

-12-

13-53846-tjt  Doc 5029-5  Filed 05/23/14  Entered 05/23/14 19:55:08  Page 30 of 174

City of Detroit – Summary of Outstanding Sewage Swaps

| Related Bond Series | Series 1998A[1] | Series 1998B[1] | Series 2001C-1 | Series 2001C-2 | Series 2001C-2[5] | Series 2001D-1[2] | Series 2001D-2[2] | Series 2003B | Series 2006A | Series 2006A[6] | Series 2006D[6] | Sewer Forward Starting SIFMA[6] | Sewer Forward Starting SIFMA[6] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Notional Amount | $69,000,000 | $68,955,000 | $159,970,000 | $127,165,000 | $123,625,000 | $20,000,000 | $72,450,000 | $150,000,000 | $125,000,000 | $125,000,000 | $370,000,000 | $168,750,000 | $56,250,000 |
| Current Notional Amount | $67,500,000 | $67,500,000 | $155,305,000 | $123,625,000 | $123,625,000 | $20,000,000 | $72,450,000 | $150,000,000 | $125,000,000 | $125,000,000 | $361,865,000 | $168,750,000 | $56,250,000 |
| Termination Date(s) | July 1, 2023 | July 1, 2023 | July 1, 2027 | July 1, 2029 | July 1, 2029 | July 1, 2002 | July 1, 2002 | July 1, 2033 | July 1, 2026 | July 1, 2026 | July 1, 2032 | July 1, 2039 | July 1, 2039 |
| Termination/ Exercise Provisions | Counterparty can exercise on or after July 1, 2008 if SIFMA averages 7.00% or higher for a consecutive 90 day period | Counterparty can exercise on or after July 1, 2008 if SIFMA averages 7.00% or higher for a consecutive 90 day period | Counterparty can terminate at par after January 1, 2010 if SIFMA averages 7.00% or higher for a consecutive 180 day period | Counterparty can terminate at par after January 1, 2010 if SIFMA averages 7.00% or higher for a consecutive 180 day period | The City can terminate with five day written notice | The City can terminate with five day written notice | The City can terminate with five day written notice | Counterparty can terminate at par after July 1, 2013 if SIFMA averages 7.00% or higher for a consecutive 180 day period. | The City can terminate with five day written notice | The City can terminate with five day written notice | The City can terminate with five day written notice | The City can terminate with five day written notice. | The City can terminate with five day written notice. |
| Type of Swap | Fixed to Floating Swaption | Fixed to Floating Swaption | Floating to Fixed | Floating to Fixed | Fixed to Floating | Floating to Fixed | Floating to Fixed | Floating to Fixed | Floating to Fixed | Fixed to Floating | Floating to Fixed | Floating to Fixed | Floating to Fixed |
| Rate Paid By Counterparty | 4.512% | 4.512% | SIFMA | SIFMA | 3.578% | SIFMA | SIFMA | SIFMA minus 10 basis points | SIFMA | 3.6908% | 67% of LIBOR + 60 basis points | SIFMA | SIFMA |
| Rate Paid By City | SIFMA | SIFMA | 4.428% | 4.468% | SIFMA | 4.656% | 4.831% | 4.137% from effective date thru 9/30/04 and 3.842% from 10/1/04 thru Termination Date | 4.551% | SIFMA | 4.105% | 4.927% | 4.927% |
| Counterparty | JPMorgan Chase Bank | JPMorgan Chase Bank | UBS AG | UBS AG | UBS AG | Loop Financial Products (Deutsche Bank as Credit Support Provider) | Loop Financial Products (Deutsche Bank as Credit Support Provider) | UBS AG | Loop Financial Products (Deutsche Bank as Credit Support Provider) | Loop Financial Products (Deutsche Bank as Credit Support Provider) | UBS AG | Morgan Stanley Capital Services Inc. | SBS Financial Products (Merrill Lynch as Credit Support Provider) |
| Counterparty Rating | Aaa/AA/AA- | Aaa/AA/AA- | Aa1/AA+/AA- | Aa1/AA+/AA- | Aa1/AA+/AA- | Aa1/AA/AA- | Aa1/AA/AA- | Aa1/AA/AA- | Aa1/AA/AA- | Aa1/AA/AA- | Aa1/AA/AA- | Aa3/AA-/AA- | A1/A+/A+ |
| Swap Insurer | MBIA | MBIA | FSA | None | None | None | None | FSA | None | None | FSA | TBD | TBD |

| Related Bond Series | Series 1998A[1] | Series 1998I[1] | Series 2001C-1 | Series 2001C-2 | Series 2001C-2[b] | Series 2001D-1[2] | Series 2001D-2[a][3] | Series 2003B | Series 2006A | Series 2006A[6] | Series 2006D | Sewer Forward Starting SIFMA[5] | Sewer Forward Starting SIFMA[6] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Counterparty Bond Rating Downgrade Event | Counterparty Senior unsecured < A1/A+ (1 of 2) and Collateral Agreement not executed in 30 days or senior unsecured withdrawn, suspended or < Baa1/BBB+ (1 of 2). | Counterparty Senior unsecured < A1/A+ (1 of 2) and Collateral Agreement not executed in 30 days or senior unsecured withdrawn, suspended or < Baa1/BBB+ (1 of 2). | Counterparty Senior unsecured < A1/A+ (1 of 2) and Collateral Agreement not executed in 30 days or senior unsecured withdrawn, suspended or < Baa1/BBB+ (1 of 2). | Counterparty Senior unsecured withdrawn, suspended or < BBB/Baa2/BBB (1 of 3) and Collateral Agreement not executed in 30 days | Counterparty Senior unsecured withdrawn, suspended or < BBB/Baa2/BBB (1 of 3) and Collateral Agreement not executed in 30 days | Deutsche Bank senior unsecured < A2/A/A (2 of 3) or fails to have any rating on senior debt. | Deutsche Bank senior unsecured < A2/A/A (2 of 3) or fails to have any rating on senior debt. | Counterparty senior unsecured < A2/A (1 of 2) and Collateral Agreement not executed in 30 days | Deutsche Bank senior unsecured < A2/A/A (2 of 3) or fails to have any rating senior debt and within 15 days has not been substituted by acceptable credit support provider | Deutsche Bank senior unsecured < A2/A/A (2 of 3) or fails to have any rating on senior debt and Collateral Agreement not executed in 30 days, Deutsche Bank senior unsecured < Baa3/BBB-(1 of23) or fails to have any rating senior debt and within 15 days has not been substituted by acceptable credit support provider | Counterparty senior unsecured < A2/A (1 of 2) and Collateral Agreement not executed in 30 days | Morgan Stanley senior unsecured < Baa3/BBB- (1 of 2) or fails to have any rating on senior debt. | Merrill Lynch senior unsecured < Baa3/BBB- (1 of 2) or fails to have any rating on senior debt. |
| Bond Rating Downgrade Event | MBIA < (Aa3/AA-) (1 of 2) or fail to maintain ratings from S&P and Moody's or MBIA < (Aaa/AAA) (1 of 2) and fails to pay a claim $20,000,000. | MBIA < (Aa3/AA-) (1 of 2) or fail to maintain ratings from S&P and Moody's or MBIA < (Aaa/AAA) (1 of 2) and fails to pay more than $20,000,000. | FSA < (A1/A+) (1 of 2)or fail to maintain ratings from S&P and Moody's | City's senior unsecured withdrawn, suspended or < BBB/Baa2/BBB (1 of 3) and Collateral Agreement not executed in 30 days. | City's senior unsecured withdrawn, suspended or < BBB/Baa2/BBB (1 of 3) and Collateral Agreement not executed in 30 days | City's senior unsecured < Baa3/BBB-(1 of 2) or fails to have any rating on senior debt. City's second lien unsecured < Baa3/BBB-(1 of 2), or fails to have any rating on second lien debt. | City's senior unsecured < Baa2/BBB (1 of 2), or fails to have any rating on senior debt. City's second lien unsecured < Baa3/BBB-(1 of 2), or fails to have any rating on second lien debt. | City's senior unsecured, suspended or < Baa2/BBB (1 of 2), or fails to have any rating on senior debt. City's second lien unsecured, suspended or < Baa3/BBB-(1 of 2), or fails to have any rating on second lien debt. | City's senior unsecured, suspended or < Baa2/BBB (1 of 2), or fails to have any rating on senior debt. City's second lien unsecured, suspended or < Baa3/BBB-(1 of 2), or fails to have any rating on second lien debt. | City's senior unsecured, suspended or < Baa2/BBB (1 of 2), or fails to have any rating on senior debt. City's second lien unsecured, suspended or < Baa3/BBB-(1 of 2), or fails to have any rating on second lien debt. | City's senior unsecured < Baa3/BBB- (1 of 2), or fails to have any rating on senior debt. | City's senior unsecured < Baa3/BBB-(1 of 2) or fails to have any rating on senior debt. | City's senior unsecured < Baa3/BBB- (1 of 2) or fails to have any rating on senior debt. |
| Bond Rating Downgrade Remedies | The City must provide third-party guarantee rated AAA by Moody's or S&P, post acceptable collateral, or provide S&P or Moody ratings of at least AA- or Aa3 for senior debt | The City must provide third-party guarantee rated AAA by Moody's or S&P, post acceptable collateral, or provide S&P or Moody ratings of at least AA- or Aa3 for senior debt | The City must provide third-party guarantee rated AAA by Moody's or S&P, post acceptable collateral, or provide S&P or Moody ratings of at least A or A2 for senior debt | The City must post acceptable collateral, according to Credit Support Annex | The City must post acceptable collateral, according to Credit Support Annex | None | None | FSA < (A2/A) (1 of 2) to maintain ratings from S&P and Moody's. The City must provide third-party guarantee rated AAA by Moody's or S&P, post acceptable collateral, or provide S&P or Moody ratings of at least A or A2 for senior debt | None | FSA < (A2/A) (1 of 2) or fails to maintain ratings from S&P and Moody's. The City must provide third-party guarantee rated AAA by Moody's or S&P, post acceptable collateral or provide S&P or Moody ratings of at Least A or A2 for senior debt | FSA < (A2/A) (1 of 2) or fails to maintain ratings from S&P and Moody's. The City must provide third-party guarantee rated AAA by Moody's or S&P, post acceptable collateral or provide S&P or Moody ratings of at Least A or A2 for senior debt | None | None |
| Lien Status of Swap Payments | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Second Lien | Second Lien | Senior Lien | Second Lien | Second Lien | Senior Lien | None | None |
| Termination Payments | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Second Lien | Second Lien | Senior Lien | Second Lien | Second Lien | Senior Lien | TBD | TBD |

[1] This swap became effective December 1, 2006.
[2] This swap becomes effective July 1, 2008.
[3] This swap becomes effective January 1, 2012.
[4] This swap becomes effective March 1, 2010.
[5] This swap becomes effective May 8, 2008.
[6] This swap becomes effective May 7, 2008.

## SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS

**Nature of Obligations under the Bond Ordinance**

Sewage System Bonds and Ancillary Obligations are self-liquidating obligations of the City, payable solely from the Pledged Assets under the Bond Ordinance. "Ancillary Obligations" are obligations incurred by the City with respect to particular Sewage System Bonds and consist of Hedge Obligations and Reimbursement Obligations. Hedge Obligations are payment obligations under a hedge agreement, such as an interest rate swap, other than the fees and expenses to be paid in the ordinary course of the transaction. Reimbursement Obligations are repayment obligations under a credit enhancement or liquidity facility, other than the fees and expenses to be paid in the ordinary course of the transaction. The fees and expenses payable by the City in connection with any hedge agreement, credit enhancement or liquidity facility in the ordinary course of the transaction (the "Ancillary Obligation Fees and Expenses") are treated separately under the Bond Ordinance from payments on Sewage System Bonds and Ancillary Obligations and have a different payment priority, as described under "Priority of Lien and Payment Status" below.

**Pledged Assets**

"Pledged Assets" under the Bond Ordinance consist of:

Net Revenues (defined below);

the funds and accounts established by or pursuant to the Bond Ordinance except for the Operation and Maintenance Fund and the Construction Fund and any account thereof;

investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and

any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue.

"Revenues" are defined in the Bond Ordinance as the revenues of the City from the System (construed in accordance with the Act) and include amounts received by the City under its hedge agreements with respect to Sewage System Bonds, including any termination payments, and income earned and gains realized from the investment of amounts in the various funds, accounts and sub-accounts established by the Bond Ordinance other than the Construction Fund for any Fiscal Year earnings on the Construction Fund not transferred to the Receiving Fund by the Board. The Board's current policy is to transfer Construction Fund earnings to the Receiving Fund, and therefore such earnings are included in Revenues. "Net Revenues" are defined in the Bond Ordinance as Revenues except for those transferred to the Operation and Maintenance Fund.

**Priority of Lien and Payment Status**

Sewage System Bonds are secured under the Bond Ordinance in accordance with their relative priorities by a statutory lien on Pledged Assets, as described below. The Bond Ordinance permits the City to secure Ancillary Obligations by a lien on Pledged Assets having the same or a lower priority than the lien securing the particular Sewage System Bonds to which the Ancillary Obligations relate. Ancillary Obligation Fees and Expenses have a higher payment status than Sewage System Bonds and Ancillary Obligations, as described below.

All Ancillary Obligation Fees and Expenses are paid from Revenues in the Operation and Maintenance Fund on the same basis as operating and administrative fees and expenses of the System, with the result being that they are paid before debt service on the Sewage System Bonds and before Ancillary Obligations.

Senior Lien Bonds and related Ancillary Obligations are secured by a first lien on Pledged Assets and rank first in the order of payment from Net Revenues.

Junior Lien Bonds include all Sewage System Bonds issued under the Bond Ordinance other than Senior Lien Bonds. To date, the City has issued two priorities of Junior Lien Bonds:

Second Lien Bonds and related Ancillary Obligations are secured by a lien on Pledged Assets that is senior to the liens securing all other Junior Lien Bonds and second only to the Senior Lien Bonds and their related Ancillary Obligations, and rank second in order of payment from Net Revenues.

15

SRF Junior Lien Bonds and related Ancillary Obligations have the lowest priority lien on Pledged Assets, junior to the liens securing all other Sewage System Bonds and their related Ancillary Obligations, and rank last in order of payment from Net Revenues.

**Bond Ordinance Flow of Funds**

In accordance with the requirements of the Act and the City Charter, the Bond Ordinance establishes certain funds and accounts for the System and permits the establishment of additional funds for additional priorities of Sewage System Bonds. All funds and accounts are held and managed by the City. All Revenues are set aside as collected and credited to the Receiving Fund. As of the first day of each month, amounts credited to the Receiving Fund are transferred seriatim into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been credited to the preceding fund or account:

First: to the Operation and Maintenance Fund, a sum sufficient to provide for the payment of the next month's expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second: to the Senior Lien Bond Debt Service Account, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Senior Lien Bonds and related Ancillary Obligations of the same priority as of the first day of such month;

Third: to the Senior Lien Bond Reserve Account, an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for Senior Lien Bonds;

Fourth: to the Interest and Redemption Fund established for each priority of Junior Lien Bonds, beginning with the Second Lien Bonds and continuing in descending order of priority to, and including, the SRF Junior Lien Bonds:

First: to the Debt Service Account established for such priority, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Lien Bonds and related Ancillary Obligations of the same priority as of the first day of such month; and

Second: to the Reserve Account, if any, established for such priority an amount that, when added to all other amounts then on deposit therein, shall equal the Reserve Requirement for such priority of Junior Lien Bonds;

Fifth: to the Extraordinary Repair and Replacement Reserve Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement so long as the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement, except that an amount withdrawn from such Fund and transferred to the Improvement and Extension Fund as provided in the Bond Ordinance, shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal; and

Sixth: to the Improvement and Extension Fund, such amount, if any, that the Board may deem advisable; provided that no amount shall be deposited therein or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid.

Amounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be credited to the Surplus Fund to be used for any purposes related to the System. The use and application of amounts in the funds and accounts established by the Bond Ordinance are set forth in Appendix C — "The Bond Ordinance."

**Reverse Flow of Funds**

If amounts in the Receiving Fund are insufficient to provide for current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including the Reserve Account, if any, therein), then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and Maintenance Fund and second, to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

If any principal (and redemption premium, if any) of or interest on Sewage System Bonds of a priority or any related Ancillary Obligations become due (whether on a stated or scheduled date, by reason of call for redemption or otherwise),

16

and there are insufficient amounts for the payment thereof in the Interest and Redemption Fund established for such priority of Sewage System Bonds and Ancillary Obligations after applying payments in the Reserve Account, if any, established for such priority of Sewage System Bonds, then there shall be applied to such payment amounts in each Interest and Redemption Fund established for each lower priority of Sewage System Bonds, beginning with the lowest priority and proceeding seriatim in ascending order of priority, until such payments are made in full.

**Reserve Accounts and Reserve Requirements**

The Bond Ordinance establishes a Senior Lien Bond Reserve Account and a Second Lien Bond Reserve Account and authorizes a Reserve Account to be established for other priorities of Junior Lien Bonds, but no such other Junior Lien Bond Reserve Account has been established to date. Accordingly, SRF Junior Lien Bonds are not secured by any Reserve Account. Amounts in a Reserve Account may be used solely for the payment of the principal (and premium, if any) of and interest on the Sewage System Bonds and Ancillary Obligations of the priority for which such Reserve Account was established, as to which there would otherwise be a default.

The Reserve Requirement for Senior Lien Bonds is the maximum Annual Debt Service on all Senior Lien Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Internal Revenue Code of 1986, as amended (the "Code"). The Reserve Requirement for Second Lien Bonds is the average Annual Debt Service on all Second Lien Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code. If a Reserve Account is established for any other priority of Junior Lien Bonds, the Reserve Requirement for such other Junior Lien Bonds shall be the amount set forth in the supplemental action establishing such Reserve Account, and if no amount is set forth, shall be the average Annual Debt Service on all Junior Lien Bonds of such priority then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code.

Concurrently with the issuance of Sewage System Bonds of a priority for which a Reserve Account has been or is being established, the Bond Ordinance requires there be credited to such Reserve Account the amount that, added to the amount on deposit in such account or credited thereto, equals the Reserve Requirement for the Bonds then to be issued and all Bonds of the same priority then outstanding. In connection with the remarketings contemplated herein, the Senior Lien Bond Reserve Account and the Second Lien Bond Reserve Account will be revalued, and any deposits necessary to satisfy the respective Reserve Requirement of each Reserve Account will be made at the time of the remarketing. The Bond Ordinance permits the use of Credit Enhancement to fund any Reserve Account or to substitute for amounts on deposit in a Reserve Account, if the provider is rated in the highest rating category of each Rating Agency then rating the Bonds having the benefit of such Reserve Account, and the City receives an opinion of nationally recognized bond counsel to the effect that such Credit Enhancement will not adversely affect the tax-exempt status of interest on any Bonds. There is no Bond Ordinance requirement that the rating of Credit Enhancement which has been properly been credited to a Reserve Account be maintained.

In accordance with the Ordinance, the Senior Lien Bond Reserve Account and the Second Lien Bond Reserve Account are funded as required with a combination of cash and investments, and Credit Enhancement as set forth in the paragraphs below.

As of the Conversion Dates, the Reserve Requirement for the Senior Lien Bond Reserve Account will be $130,321,710, and available funding includes the following:

1.      Cash and Investments: $51,551,174

2.      Credit Enhancement in the form of surety policies provided by the following Credit Enhancement providers in the amounts noted:

(a)      MBIA surety policy unconditionally guaranteeing the payment of principal of and interest on the Series 1999-SRF2, Series 1999-SRF3 and Series 1999-SRF4 Bonds up to a maximum aggregate available amount of $7,482,000 and with a termination date equal to the earlier of October 1, 2022 or the date on which the City has made all payments required to be made on the three series of related bonds.

(b)      FGIC surety policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $17,301,095 and with a termination date of July 1, 2029.

(c)      FSA surety policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $3,618,077 and with a termination date of July 1, 2031.

17

(d)     FSA surety policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $51,800,000 and with a termination date equal to the earlier of July 1, 2033 or the date on which the Series 2003(A) and 2003(B) Bonds are no longer outstanding.

As of the Conversion Dates, the Reserve Requirement for the Second Lien Bond Reserve Account will be $83,285,401, and available funding includes the following:

1.     Cash and Investments: $28,587,721

2.     Credit Enhancement in the form of surety policies provided by the following Credit Enhancement providers in the amounts noted:

(a)     MBIA surety policy unconditionally guaranteeing the payment of the principal of and interest on the Series 2001(D) Bonds up to a maximum aggregate available amount of $7,379,761 and with a termination date equal to the earlier of July 1, 2032 or the date on which the City has made all payments required to be made on the Series 2001(D) Bonds (includes any bonds that are issued to refund the 2001(D) Bonds).

(b)     FGIC surety policy unconditionally guaranteeing the payment of the principal of and interest on the Series 2001(E) Bonds up to a maximum aggregate available amount of $10,605,321 and with a termination date equal to July 1, 2031.

(c)     MBIA surety policy unconditionally guaranteeing the payment of the principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $22,000,000 and with a termination date equal to the earlier of July 1, 2035 or the date on which the City has made all payments required to be made on the Series 2005(A), Series 2005(B) and Series 2005(C) Bonds.

(d)     FGIC surety policy unconditionally guaranteeing the payment of the principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $17,000,000 and with a termination date of July 1, 2036.

The table below summarizes the funding of the Reserve Requirements for the Senior Lien Reserve Account and Second Lien Reserve Account as of the Conversion Dates.

| | Senior Lien Bonds | Second Lien Bonds | Aggregate System |
|---|---|---|---|
| Reserve Requirement | 130,321,710 | 83,285,401 | 213,607,111 |
| Funding Amounts: | | | |
| Cash and Investments[1] | 51,551,174 | 28,587,721 | 80,138,895 |
| Surety Policies | | | |
| -FSA | 55,418,077 | --- | 55,418,077 |
| -FGIC | 17,301,095 | 27,589,896[2] | 44,890,991 |
| -MBIA | 6,789,762[2] | 29,039,372[2] | 35,829,134 |
| - Total Sureties | 79,508,934 | 56,629,267 | 136,138,201 |
| Total Funding Amounts | 131,060,108 | 85,216,988 | 216,277,096 |

[1]   Represents amounts in cash and cash equivalents and Permitted Investments with Westdeutsche Landesbank Girozentrale, Bank of America (formerly by Nationsbank, N.A.), Morgan Stanley Capital Services Inc. and First Independence Bank.
[2]   For series-specific surety policies represents the lesser of (a) the maximum amount of the policy or (b) the amount of Reserve Requirement allocated to the specific series covered by such policy.

As noted, certain Reserve Account requirements currently are satisfied through surety policies issued by MBIA, FGIC and FSA.  The ratings of MBIA and FGIC recently have been downgraded.  See "INTRODUCTION – Recent Developments in the Bond Insurance Industry" herein.  Although the Bond Ordinance requires that Credit Enhancement used to fund a Reserve Account be rated in the highest rating category of each rating agency at the time of its acquisition, there is no requirement that such rating be maintained.  Accordingly, all Credit Enhancements are valued at their full face value for purposes of determining satisfaction of the applicable Reserve Account Requirement, regardless of the provider's rating.  If the Credit Enhancement were determined to have no value, as for example, if a court made such a determination in connection with the dissolution of the provider, then the City would be required to replenish the applicable Reserve Account over time or through a replacement Credit Enhancement Policy, as described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Bond Ordinance Flow of Funds" and in Appendix C – "The Bond Ordinance."

18

**Certain Other Funds**

As described in "Reverse Flow of Funds" above, amounts held in certain other funds established under the Bond Ordinance may be transferred to the Operation and Maintenance Fund and the Interest and Redemption Fund in the event of a shortfall of Revenues.

Extraordinary Repair and Replacement Fund. The Extraordinary Repair and Replacement Fund is funded by monthly transfers of Revenues in minimum amounts equal to 1/12 of 3% of the budgeted operation and maintenance expense of the System for the Fiscal Year, until the balance in such fund equals no greater than 15% of the budgeted operation and maintenance expense of the System for such Fiscal Year, minus the amount of any transfer described in the two immediately succeeding sentences. Amounts in the Extraordinary Repair and Replacement Fund may be used to pay costs of making major unanticipated repairs and replacements to the System which individually cost or are reasonably expected to cost in excess of $1 million. The Bond Ordinance authorizes the Finance Director, on and after the first day of each Fiscal Year, to transfer not more than 50% of the balance in the Extraordinary Repair and Replacement Fund to the Improvement and Extension Fund, but only if in the month of such transfer the full amount of the minimum monthly transfer has been credited to the fund, and the amounts of all prior transfers from the fund to the Improvement and Extension Fund have been restored in full.

Improvement and Extension Fund. The Improvement and Extension Fund is to be used for improvements, enlargements, extensions or betterment to the System.

Rate Stabilization Fund. The Bond Ordinance permits the Board of Water Commissioners of the Department (the "Board") to create a Rate Stabilization Fund, the purpose of which is to enable the City to set aside Prior Revenues to augment Revenues in future years in order to satisfy the requirements of the Bond Ordinance with respect to rate covenants related to Sewage System Bonds. See "Rate Covenant" below for a description of the restriction on use of transfers from the Rate Stabilization Fund in meeting the rate covenant's coverage requirements. Any funding of the Rate Stabilization Fund is at the sole discretion of the Board. To date, the City has not transferred any funds into the Rate Stabilization Fund.

Only Prior Revenues may be deposited in the Rate Stabilization Fund. "Prior Revenues" are Revenues or Net Revenues only to the extent they may be applied to any lawful purpose of the System, in effect limiting Prior Revenues to Net Revenues that, in the Fiscal Year of receipt, exceed the required deposits described above under "Bond Ordinance Flow of Funds" and the amounts needed to meet the coverage requirements described below under "Rate Covenant." The deposit of Prior Revenues into the Rate Stabilization Fund is limited in any Fiscal Year as described in Appendix C - "The Bond Ordinance - Rate Stabilization Fund." Except as taken into account in connection with a coverage determination, amounts on deposit in the Rate Stabilization Fund may be applied for any lawful purpose of the System.

**Rate Covenant**

The Bond Ordinance requires that the Board fix and revise rates for sewage disposal service from time to time as may be expected to be necessary to produce the greater of:

1. The amounts required to provide for:

   a. the payment of the expenses for maintenance of the System as are necessary to preserve the same in good repair and working order;

   b. the payment of Indebtedness coming due for the Fiscal Year of calculation;

   c. the creation and maintenance of reserves therefor as required by the Bond Ordinance or any ordinance or resolution adopted in accordance with the terms thereof; and

   d. such other expenditures and funds for the System as the Bond Ordinance may require; and

2. The Required Combined Coverage (i.e., with respect to the rate covenant, projected Net Revenues for the fiscal year of calculation, divided by the Indebtedness coming due for such fiscal year).

For purposes of the rate covenant, the coverage requirements for determining the Required Combined Coverage are the following percentages:

| Priority of Indebtedness: | Percentage: |
|---|---|
| Senior Lien Indebtedness | 120% |
| Second Lien Indebtedness (together with Senior Lien Indebtedness) | 110% |
| SRF Junior Lien Bonds (together with Senior and Second Lien Indebtedness) | 100% |

The Bond Ordinance defines "Indebtedness" as (i) principal of and interest on Sewage System Bonds outstanding in the Fiscal Year of calculation, (ii) Reimbursement Obligations, and (iii) amounts payable by the City under a Hedge by reason of the early termination thereof. The City may take into account transfers from the Rate Stabilization Fund in calculating compliance with the rate covenant, but the City shall also comply with the rate covenant by maintaining rate coverage percentages of at least 100% without taking into account any transfers from the Rate Stabilization Fund. Net fixed swap payments payable by the City under the Mirror Swaps will be treated as interest on the Sewage System Bonds and will therefore be included in Indebtedness for purposes of the Bond Ordinance.

The Bond Ordinance provides that the interest rate on the Sewage System Bonds that are Variable Rate Securities (as defined in the Bond Ordinance) shall be calculated as 125% of the annualized average daily rate borne by such Variable Rate Securities for the 12 calendar month period ending immediately before the month of calculation, or if such Variable Rate Securities have been outstanding for less than a full fiscal year on the date of calculation, the interest rate shall be calculated as 125% of the average of the BMA (now SIFMA) Municipal Index, for the five-year period ending not more than one week before the date of calculation. For purposes of determining if Sewage System Bonds are Fixed Rate Securities (as defined in the Bond Ordinance), a rate is "fixed" if the economic effect of the Sewage System Bond bearing interest at a fixed rate is produced by a Qualified Hedge or by Counterpart Securities (as defined in the Bond Ordinance), and a rate is "variable" if the economic effect of the Sewage System Bond bearing interest at a variable rate is produced by a Qualified Hedge.

## Enforceability of Rates

The charges for sewage disposal service are a lien on the respective premises, and the Bond Ordinance provides for certain means of enforcement including the right to shut off and discontinue the supply of water to any premises for the nonpayment of sewage disposal rates when due. The Act provides that the rates charged for services furnished by any public improvement constructed under the Act shall not be subject to supervision or regulation by any State bureau, board, commissioner or other like instrumentality or agency thereof.

## Additional Bonds

The City may not incur any obligations payable from Pledged Assets except for Sewage System Bonds, Ancillary Obligations and Ancillary Obligation Fees and Expenses, and no obligations of the City may be secured by a lien on Pledged Assets except as provided in the Bond Ordinance.

Coverage Requirements. The coverage requirements for determining the Required Combined Coverage (i.e., with respect to the Additional Bonds test, projected Net Revenues for the current or next succeeding fiscal year or historical Net Revenues for the immediately preceding audited fiscal year divided by the maximum Annual Debt Service) for the issuance of additional Sewage System Bonds are as follows:

| Priority of Sewage System Bonds: | Percentage: |
|---|---|
| Senior Lien Bonds | 120% |
| Second Lien Bonds (together with Senior Lien Bonds) | 110% |
| SRF Junior Lien Bonds (together with Senior Lien and Second Lien Bonds) | 100% |

The Sections of the Supplements that require the above coverage requirements to be met for conversion of the Predecessor Bonds from the Weekly Mode or the Flexible Rate Mode, as applicable, to the Fixed Rate Mode under certain circumstances will be amended prior to the remarketing of the Fixed Rate Bonds. See "PLAN OF REMARKETING – Amendments" herein.

General Authority. The City may issue Sewage System Bonds of any Priority (herein, "Additional Bonds") for repairs, extensions, enlargements, and improvements to the System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund), refunding all or a part of any Outstanding Sewage System Bonds and paying the costs of issuing such Additional Bonds, including deposits, if any, to be made to any Reserve Account established or to be established for such Additional Bonds or any other Sewage System Bonds, if, but only if, there is Required Combined Coverage under either the Projected Net Revenues Test or the Historical Net Revenues Test.

20

<u>Projected Net Revenues Test</u>. For purposes of the Projected Net Revenues Test, the Required Combined Coverage means the result produced by dividing the Net Revenues for the current or next succeeding Fiscal Year, by the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Sewage System Bonds and the Additional Bonds to be issued.

Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of the Additional Bonds. In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of sewage disposal systems.

"Annual Debt Service" is a defined term in the Bond Ordinance, and reference should be made to Appendix C — "The Bond Ordinance" for the definition and the rules for determining Annual Debt Service. If any Additional Bonds are to be issued to refund Outstanding Sewage System Bonds, the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the Additional Bonds to be issued and not the Annual Debt Service on the Sewage System Bonds to be refunded.

<u>Historical Net Revenues Test</u>. For purposes of the Historical Net Revenues Test, the Required Combined Coverage means the result produced by dividing the actual Net Revenues for the immediately preceding audited Fiscal Year, by the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Sewage System Bonds and the Additional Bonds to be issued.

Instead of the immediately preceding audited Fiscal Year, the City may use any audited Fiscal Year ending not more than sixteen months prior to the date of delivery of such Additional Bonds. If any change in the rates, fees and charges of the System has been authorized at or prior to the date of sale of such Additional Bonds, the Net Revenues for the particular preceding Fiscal Year shall be augmented by an amount reflecting the effect of such change had the System's billings during such Fiscal Year been at the increased rates.

Net Revenues for the particular preceding audited Fiscal Year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of such Additional Sewage System Bonds and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited Fiscal Year. With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of sewage disposal systems regarding the existence of such conditions.

<u>Alternate Test for Refundings</u>. The City may issue Sewage System Bonds of any Priority without regard to the above tests for the purpose of refunding all or part of Sewage System Bonds then Outstanding and paying costs of issuing such additional Sewage System Bonds, including deposits which may be made to any Reserve Account established or to be established for such additional Sewage System Bonds or any other Sewage System Bonds if, but only if: (i) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the additional Sewage System Bonds to be issued and (B) giving effect to the refunding, all Outstanding unrefunded Sewage System Bonds of equal and higher Priority, is less than (ii) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all Sewage System Bonds of equal and higher Priority, without giving effect to the refunding.

**Amendments Without Consent**

The Bond Ordinance may be amended or supplemented from time to time by a resolution or ordinance of City Council, as required or permitted by law, or by a sale order or other document signed by the Finance Director pursuant to a resolution or ordinance of City Council authorizing such action, without the consent of the Holders of Sewage System Bonds:

To issue Sewage System Bonds of any Priority;

To add to the covenants and agreements of the City in the Bond Ordinance contained, other covenants and agreements thereafter to be observed or to surrender, restrict or limit any right or power reserved to or conferred upon the City (including but not limited to the right to issue Sewage System Bonds or incur other Secured Obligations of, in either case, any Priority);

21

To make such provisions for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions contained in the Bond Ordinance, or in regard to matters or questions arising under the Bond Ordinance, as the City may deem necessary or desirable;

To increase the size or scope of the System; and

To amend or supplement the Bond Ordinance in any respect with regard to one or more Priorities of Sewage System Bonds so long as such amendment does not materially adversely affect the Holders of Outstanding Sewage System Bonds.

The Bond Ordinance provides that no Holders of a Priority of Sewage System Bonds shall be "materially adversely affected" for the purposes of the Bond Ordinance by the change of any coverage percentage established for any other Priority of Sewage System Bonds, and no amendment of or supplement to the Bond Ordinance that provides for or facilitates the issuance of Sewage System Bonds or incurs Ancillary Obligations or Ancillary Obligations Fees and Expenses, in either case, of any Priority shall "materially adversely affect" the Holders of Sewage System Bonds of any other Priority for the purposes of the Bond Ordinance so long as such amendment does not change any coverage percentage established for such Priority of Sewage System Bonds or is not an amendment that requires the consent of the Holder of such Sewage System Bonds because it (i) reduces the aforesaid percentage of Holders of Sewage System Bonds required to consent to an amendment to the Bond Ordinance, (ii) extends the fixed maturity of such Holder's Sewage System Bonds or reduces the rate of interest thereon or extends the time of payment of interest, or reduces the amount of the principal or redemption premium thereof, or reduces or extends the time for payment of any premium payable on the redemption thereof or (iii) changes the Priority of such Holder's Sewage System Bonds or deprives such Holder of the right to payment from Pledged Assets.

The Bond Ordinance provides that the consent of a Holder acquiring a Sewage System Bond in an offering or remarketing in which the offering or remarketing circular or other disclosure documents fully discloses the terms of any amendment or supplement shall be considered obtained as if such consent were being solicited as provided above, but no actual consent shall be required, and no more than one such disclosure in any disclosure document shall be required. See "PLAN OF REMARKETING – Amendments" and Appendix D – "Amendments to Certain Provisions of the Authorizing Documents" herein.

The Bond Ordinance further provides that a confirmation of the rating of the Sewage System Bonds held by Holders affected by any amendment of or supplement to the Bond Ordinance shall be conclusive evidence that such Holders were not materially adversely affected by such amendment or supplement.

So long as FGIC's policies are in effect, any amendment to the Bond Ordinance requiring bondholder consent also requires the consent of FGIC. FGIC also has certain consent rights in its capacity as bond insurer. So long as BHAC's policies are in effect, any amendment to the Bond Ordinance requiring bondholder consent also requires the consent of BHAC. BHAC also has certain consent rights in its capacity as bond insurer.

**Trustee**

The City has appointed U.S. Bank National Association, Detroit, Michigan as trustee (the "Trustee"). The Trustee does not have an active role under the Bond Ordinance, and funds and accounts established under the Bond Ordinance are not held by the Trustee, and the Trustee is not responsible for the administration, investment or disbursement of the moneys allocated to such funds and accounts.

**Remedies**

The Holder or Holders of Sewage System Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the System and the proper application thereof. So long as FGIC's policy is in effect, FGIC shall be deemed to be the sole holder of the Fixed Rate Bonds for purposes of this provision. If FGIC's policy is not in effect, BHAC shall be deemed to be the sole holder of the Fixed Rate Bonds for purposes of this provision, so long as BHAC's policy is in effect. The statutory lien upon Pledged Assets, however, shall not be construed to compel the sale of the System or any part thereof.

If there is a default in the payment of the principal (and premium, if any) of and interest on any Sewage System Bonds, any court having jurisdiction in any proper action may appoint a receiver to administer and operate the System on

behalf of the City and, under the direction of the court, perform all of the duties of the officers of the City more particularly set forth herein and in Act 94.

A Holder of Sewage System Bonds shall have all other rights and remedies given by Act 94 and by law for the payment and enforcement of the Sewage System Bonds and the security therefor.

## BOND INSURANCE

Payment of the principal of and interest on each series of the Fixed Rate Bonds, when due, is insured by the FGIC Insurance Policies, which were issued at the time of the original issuance of the Predecessor Bonds by FGIC. In connection with the remarketing, BHAC will issue the BHAC Insurance Policies on the respective Conversion Dates guaranteeing the scheduled payment of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of FGIC to make payments under the FGIC Insurance Policies.

### Financial Guaranty Bond Insurance Policies

Financial Guaranty Insurance Company (referred to herein as "Financial Guaranty") has supplied the following information for inclusion in this Remarketing Circular. No representation is made by the City or the Remarketing Agent as to the accuracy or completeness of this information.

The policies issued by Financial Guaranty for the Predecessor Bonds will remain in effect upon conversion of the Predecessor Bonds to the Fixed Rate Mode.

Recently, S&P, Moody's and Fitch have downgraded their ratings on Financial Guaranty. See "INTRODUCTION - Recent Developments in the Bond Insurance Industry" herein.

Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Remarketing Circular or any information or disclosure that is provided to potential purchasers of the Fixed Rate Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the policies under the heading "BOND INSURANCE – Financial Guaranty Bond Insurance Policies." In addition, Financial Guaranty makes no representation regarding the Fixed Rate Bonds or the advisability of investing in the Fixed Rate Bonds.

*Financial Guaranty's Ratings.* As of March 31, 2008, the financial strength ratings of Financial Guaranty were as follows: Fitch Ratings – 'BBB', Rating Outlook Negative; Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. – 'BB', Outlook Negative; and Moody's Investors Service, Inc. – 'Baa3', under review for possible downgrade. Each rating of Financial Guaranty should be evaluated independently. The ratings reflect the respective rating agencies' current assessments of the insurance financial strength of Financial Guaranty, and further explanations of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by the rating agencies. The further downgrade or withdrawal of any of these ratings may have an adverse effect on the market price of the Fixed Rate Bonds. Financial Guaranty does not guarantee the market price of the Fixed Rate Bonds, nor does it guarantee that the ratings on the Fixed Rate Bonds will not be reduced, withdrawn or put on review for possible downgrade.

Financial Guaranty's financial strength ratings have been an integral part of its business, since the value of the financial guaranty and insurance products sold by Financial Guaranty has generally been a function of the rating applied to obligations insured by Financial Guaranty. **Recent ratings downgrades, reflected above, and the watches referred to above have adversely impacted the market price of the Fixed Rate Bonds, Financial Guaranty's ability to compete and otherwise to engage in its business, and its results of operations and financial condition, and will continue to have such adverse effects unless Financial Guaranty's ratings are restored (as to which Financial Guaranty can give no assurance).**

*Payments Under the Policies.* Concurrently with the issuance of the Predecessor Bonds, Financial Guaranty issued its bond insurance policies for such Predecessor Bonds (the "Policies"). The Policies unconditionally guarantee the payment of that portion of the principal or accreted value (if applicable) of and interest on the Fixed Rate Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the issuer of the Fixed Rate Bonds (the "Issuer"). Financial Guaranty will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the Policies) from an owner of Fixed Rate Bonds or the trustee or paying agent (if any) of the nonpayment of such amount by the Issuer. The

Fiscal Agent will disburse such amount due on any Fixed Rate Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in Financial Guaranty. The term "nonpayment" in respect of a Fixed Rate Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a Fixed Rate Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

The Policies are non-cancellable by Financial Guaranty. The Policies cover failure to pay principal (or accreted value, if applicable) of the Fixed Rate Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the Fixed Rate Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The Policies also cover the failure to pay interest on the stated date for its payment. In the event that payment of the Fixed Rate Bonds is accelerated, Financial Guaranty will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, Financial Guaranty will become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and will be fully subrogated to all of the Bondholder's rights thereunder.

The Policies do not insure any risk other than Nonpayment by the Issuer, as defined in the Policies. Specifically, the Policies do not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure Fixed Rate Bonds, Financial Guaranty was granted certain rights under the Bond documentation. The specific rights granted to Financial Guaranty in connection with its insurance of the Fixed Rate Bonds may be set forth in the description of the principal legal documents appearing elsewhere in the Official Statement for the applicable Predecessor Bonds, and reference should be made thereto.

The Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*Financial Guaranty Insurance Company*. Financial Guaranty is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. Financial Guaranty is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

Financial Guaranty is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At December 31, 2007, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each was as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of the Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of Financial Guaranty or any claims under any insurance policy, including the Policy, issued by Financial Guaranty.

Financial Guaranty is subject to the insurance laws and regulations of the State of New York, where Financial Guaranty is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, Financial Guaranty is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At December 31, 2007, Financial Guaranty had net admitted assets of approximately $4.298 billion, total liabilities of approximately $4.038 billion, and total capital and policyholders' surplus of approximately $260 million, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The audited consolidated financial statements of Financial Guaranty and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of December 31, 2007 and December 31, 2006, which will be filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Remarketing Circular. Any statement contained herein under the heading "BOND INSURANCE – Financial

Guaranty Bond Insurance Policies" or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by Financial Guaranty with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Remarketing Circular. All financial statements of Financial Guaranty (if any) included in documents filed by Financial Guaranty with the NRMSIRs subsequent to the date of this Remarketing Circular and prior to the termination of the offering of the Bonds shall be deemed to be included by specific reference into this Remarketing Circular and to be a part hereof from the respective dates of filing of such documents.

**The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although Financial Guaranty prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to Financial Guaranty's audited SAP financial statements.**

Financial Guaranty's most recently published GAAP and SAP financial statements are available on Financial Guaranty's website at http://www.fgic.com/investorrelations/financialreports/ or upon request to Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. Financial Guaranty's telephone number is 212.312.3000. Reference is made to those financial statements, including the notes thereto (in particular, Notes 2, 8, 11 and 23 to the GAAP financial statements for the year ended December 31, 2007), for important information concerning Financial Guaranty.

Specimens of the bond insurance policies issued by Financial Guaranty in connection with the issuance of the Predecessor Bonds and as set forth in the applicable Official Statement for the respective Predecessor Bonds are hereby incorporated herein by reference: the "Appendix D-Specimen Bond New Insurance Policies" as to the 2001(C-2) Bonds, the "Appendix D-Specimen Bonds of Municipal Bonds new insurance policy and Municipal Bond Debt Service Reserve Policy" as to the 2001(E) bonds and the "Appendix E-Specimen Bonds Insurance Policy and Reserve Policy" as to the 2006(A) Bonds.

**Berkshire Hathaway Assurance Corporation Bond Insurance Policies**

Berkshire Hathaway Assurance Corporation (referred to herein as "BHAC") has supplied the following information for inclusion in this Remarketing Circular. No representation is made by the City or the Remarketing Agent as to the accuracy or completeness of this information.

*BHAC Bond Insurance Policies.* Concurrently with the issuance of the Fixed Rate Bonds, BHAC will issue its financial guaranty insurance policy for the Fixed Rate Bonds (collectively, the "Policy"). The Policy guarantees the scheduled payment of principal and interest on the Fixed Rate Bonds when due as set forth in the form of Policy included as Appendix G to this Remarketing Circular. BHAC's obligation to make any payment under the Policy is subject to the condition precedent contained in the Policy that a proper claim for payment has been made on the FGIC Insurance Policy and FGIC has failed to pay such claim in the period permitted by the FGIC Insurance Policy for reasons other than a failure to provide proper documentation required by FGIC to pay such claim.

The Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Laws.

*Berkshire Hathaway Assurance Corporation.* BHAC is a New York stock insurance corporation that writes financial guaranty insurance. BHAC was organized on December 21, 2007, and received its New York Certificate of Authority on December 28, 2007. BHAC is licensed in New York to write financial guaranty insurance, surety insurance and credit insurance. As of April 11, 2008, BHAC was licensed to write financial guaranty insurance in 47 additional states and the District of Columbia.

BHAC's shareholders and their respective percentage of outstanding common stock are as follows: Columbia Insurance Company ("Columbia"), a Nebraska corporation – 51%, and National Indemnity Company, a Nebraska corporation – 49%. Columbia and National Indemnity Company are each indirect, wholly owned subsidiaries of Berkshire Hathaway Inc.

BHAC is subject to the insurance laws and regulations of the State of New York, BHAC's state of domicile. Pursuant to New York's financial guaranty insurance law, financial guaranty insurers are limited to writing financial guaranty insurance and related lines, including surety and credit insurance. In addition, New York's financial guaranty insurance law (i) requires such insurers to maintain a minimum surplus as regards policyholders, (ii) establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as a percentage of surplus as regards policyholders; and (iii) establishes

25

contingency, loss and unearned premium reserve requirements. BHAC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations vary by jurisdiction.

At March 31, 2008, BHAC had surplus as regards policyholders of slightly less than $1,000,000,000, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by the New York Department of Insurance.

Copies of BHAC's most recently published SAP Annual Statement is available upon request to: Berkshire Hathaway Assurance Corporation, 100 First Stamford Place, Stamford, CT 06902, Attention: General Counsel. BHAC's telephone number is (203) 363-5200.

*BHAC's Credit Rating.* Standard & Poor's Rating Services ("S&P"), a Division of the McGraw Hill Companies, Inc., has assigned its "AAA" financial strength and financial enhancement ratings to BHAC. S&P has assigned its "AAA" financial strength and financial enhancement ratings to Columbia. The ratings on BHAC are based on a guaranty from Columbia in favor of BHAC. The guaranty issued by Columbia applies to BHAC's policy issued with respect to the Fixed Rate Bonds. Any explanation of these ratings may only be obtained from S&P. The ratings are not a recommendation to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by S&P. Any downward revision or withdrawal of a rating may have an adverse effect on the market price of the Fixed Rate Bonds. BHAC does not guarantee the market price or investment value of the Fixed Rate Bonds nor does it guarantee that the ratings on the Fixed Rate Bonds will not be revised or withdrawn.

In addition, Moody's Investors Service ("Moody's") has assigned its "Aaa" insurance financial strength ratings to BHAC and Columbia. Any explanation of these ratings may only be obtained from Moody's. The ratings are not a recommendation to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by Moody's. Any downward revision or withdrawal of a rating may have an adverse effect on the market price of the Fixed Rate Bonds. On April 25, 2008, the date that Moody's assigned its rating to BHAC, BHAC's ultimate parent company, Berkshire Hathaway Inc., maintained an investment in Moody's parent company of approximately 19.6% of the common shares then outstanding.

BHAC does not guarantee the market price or investment value of the Fixed Rate Bonds nor does it guarantee that the ratings on the Fixed Rate Bonds will not be revised or withdrawn.

Neither BHAC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Remarketing Circular or any information or disclosure that is provided to potential purchasers of the Fixed Rate Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to BHAC or the Policy under the heading "BOND INSURANCE – Berkshire Hathaway Assurance Corporation Bond Insurance Policies." In addition, BHAC makes no representation regarding the Fixed Rate Bonds or the advisability of investing in the Fixed Rate Bonds.

# THE WATER AND SEWERAGE DEPARTMENT

**Organization**

The Sewage Disposal System is owned by the City and is operated, managed and accounted for by the City as a separate enterprise fund (the "Sewage Fund") through the Department. The Department was established under the City Charter and is empowered to supply sewage disposal services within and outside the City. The Department is governed by a seven-member Board of Water Commissioners (the "Board") appointed by the Mayor and operates out of its own 20-story office building in downtown Detroit.

The City Charter provides that the Board shall periodically establish equitable rates for retail and wholesale sewage disposal services. Such rates are established with the concurrence of the City Council. See "FINANCIAL PROCEDURES - Rates." The Board authorizes and executes all service and construction contracts. Certain contracting and other policy-making powers of the Board are subject to the approval or rejection of the City Council and the approval or veto of the Mayor.

Sewage disposal service to the residents of the City and to a substantial portion of the Sewage Disposal System service area outside the City is also provided by the City through the Department. However, the Sewage Disposal System is operated, managed and accounted for as a separate enterprise fund of the City apart from the Sewage Fund.

**The Board**

The members of the Board are appointed by and serve at the pleasure of the Mayor. The members serve four-year terms and the terms are staggered so that not more than two members' terms expire each year. Board members must be citizens of the United States and residents of Michigan. The City Charter provides that at least four members of the Board must be residents of the City. At present the Board consists of four City residents plus one member each from Oakland County, western Wayne County (not including the City) and Macomb County.

The current members of the Board are as follows (dates in parentheses are dates of original appointment to the Board):

*Mary E. Blackmon, President (1989)*. Mrs. Blackmon was elected President in January 2003. She is a retiree of Ameritech, where she served as a Director of Public Relations and Associate Director of Urban and Civic Affairs. She is a current member of the Wayne County Regional Educational Service Agency Board of Education, where she has served since 1982. Mrs. Blackmon also served for 10 years as a member of the Detroit Board of Education. She has served on several committees for the Southeast Michigan Council of Governments (SEMCOG), where she is a Vice President. A graduate of Leadership Detroit, Mrs. Blackmon remains active in a number of civic and community organizations.

*Marilynn E. Gosling (1995)*. Ms. Gosling was elected Vice President in January 2003. She was a member of the Oakland County Board of Commissioners for 14 years before retiring in January 1995. She currently serves on the Board of Directors of the Dispute Resolution Settlement Center and is active as a community mediator. She is also a board member of Camp Oakland Youth Programs, Inc. and the Local Development Company. Ms. Gosling has served as a member of the Community Mental Health Board and the Southeast Michigan Council of Governments (SEMCOG).

*Hilliard L. Hampton (1994)*. Mr. Hampton is the Mayor of the City of Inkster. He also has twenty-eight years with Wayne County government. He currently serves as Sergeant with the Wayne County Sheriff's Department, where he is Supervisor of Community Justice. He has a Bachelor of Arts degree from Wayne State University in Mass Communications and has also received extensive training and certification in law enforcement.

*Jimmy L. Cooper (2007)*. Mr. Cooper is Business Manager for Laborers' Local 1191 – a 3,500 member organization – and had held that position since 1997. A member of Local 1191 for 30 years and a co-founder of the Michigan Labor Alliance, Mr. Cooper is vice president of the executive board of the Michigan Laborers' District Council and secretary of the Laborers' International Union African American Caucus. He is also a member of the Michigan transportation Team, a group that lobbies Congress for funding state highway projects, and is a past president of Detroit Works , a pre-apprenticeship and union training program established by the skilled trade unions.

*Carla Walker-Miller* (2000). Ms. Walker-Miller is the President of Walker-Miller Energy Services, a distributor of power transmission and distribution equipment manufactured for use by electric utilities. She holds a Bachelor of Science Degree in Civil Engineering from Tennessee State University.

*William G. Westrick* (2000). Mr. Westrick was President of the engineering firm of Anderson, Eckstein and Westrick, Inc., and served as a member of the Board of Directors. He is a member of the Southern Michigan Water and Sewer Utilities Association. He serves on the Board of Directors of the Macomb County Traffic Association and the Northeast Water and Sewer Superintendent Association. Previously he was employed by the Macomb County Road Commission for nearly 10 years, first as a Project Engineer in charge of design and construction of individual projects, and finally as the Design and Construction Engineer, coordinating road and bridge projects. Mr. Westrick has a Bachelor of Science Degree in Civil Engineering from the University of Detroit and a Master of Science Degree in Civil Engineering from Wayne State University. He is a Registered Professional Engineer in the State of Michigan.

*Kenneth Daniels (2006)*. Mr. Daniels has been employed by the Michigan Economic Development Corporation since 2005 and served as a community champion for the Governor Granholm's Cool Cities Initiative. Mr. Daniels is a former Michigan State Representative, having served in the Michigan Legislature from 1999 through 2004. He also served for three years on the Detroit Board of Education. Mr. Daniels has served as a member on the Mohican Regent Residents Association, National Association of School Boards and the advisory boards of St. John's Hospital and the Holden Center Boys and Girls Cub.

The Board appoints, with the approval of the Mayor, a Director and Deputy Director who serve at the pleasure of the Board and are responsible for day to day operations of the Department.

**Management and Personnel**

The Department's budget for Fiscal Year 2008 provides funding for 3,104 positions, of which 1,025 positions are classified as strictly Sewage System and 206 positions are classified as strictly Sewage Disposal System. The remaining 1,873 positions are budgeted in the administrative and support divisions, which provide service to both the Water Supply and Sewage Disposal Systems. The cost associated with these positions is allocated to the two systems either on the basis of actual time spent on projects or on estimates developed by the Department. The Department estimates that approximately 40% to 50% of the time allocation of the work force in these areas is attributable to the Sewage Disposal System.

The Department is organized into six operating groups: Engineering, Asset Maintenance, Financial Services, Wastewater Operations, Water Supply Operations, and Information Technology, Systems Integration and Operations. Each of the operating groups is headed by an Assistant Director. In addition, the head of the Public Affairs Division serves as an Assistant Director. Together with the Director and Deputy Director, as discussed below, this group services as the Executive Management Team. The Department's key personnel and their qualifications are summarized below.

*Victor M. Mercado, Director.* Mr. Mercado was named Director of the Detroit Water and Sewerage Department on June 12, 2002. Mr. Mercado brings with him more than 25 years of experience in both the public and private sectors. He previously served as Vice President of Thames Water North America, and President and General Manager of Thames Water Puerto Rico (1999-2002); Vice President and General Manager of United Water Delaware and President of United Water Bethel and United Water Virginia (1997-1999); Chief of Emergency Construction for the Department of Environmental Protection in New York City (1996-1997); and Director of Operations for the Jamaica Sewage Disposal Company in Jamaica, New York (1989-1996). Mr. Mercado has considerable experience in distribution and transportation, construction, and the electric and gas industries. He holds a Bachelor of Science degree in Economics and Industrial Management from the City University of New York.

*Gary Fujita, P.E., Deputy Director.* Appointed Deputy Director in November 2002, Mr. Fujita had served as Interim Deputy Director since January 2002 and as Assistant Director of Wastewater since 1993. He has a Bachelor of Science degree in Civil Engineering from Wayne State University. He is a Registered Professional Engineer and holds a Class "A" Wastewater Treatment Operator's license. Mr. Fujita has been with the Department since 1972 and has also served as Chief Sewerage Plant Engineer. Mr. Fujita has considerable experience in engineering design, construction of major pipelines and related facilities, planning, wastewater treatment, industrial pretreatment, and combined sewer overflow control planning.

*Sam Smalley, Assistant Director- Asset Maintenance.* Mr. Smalley was appointed to his current position in February 2008. He joined the Department in June of 2007 after having spent two years participating in the Department's customer outreach program as a customer representative. He brings considerable experience in engineering design, construction management, and utility management. He is a registered professional engineer in California and Michigan, and has over 20 years of experience in the water and wastewater industry. He obtained a Bachelor of Science in Civil Engineering from San Diego State University, and holds both an F-1 Water Treatment Plant Operator license and an S-1 Water Distribution System Operator license.

*Woodrow McCarty, Assistant Director - Financial Services Group.* Mr. McCarty was assigned to his current position in May 2005. Mr. McCarty holds a Bachelor in Accounting from Wayne State University. He has experience with the City of Detroit in areas of Accounting, Budget, and Cash Management. Mr. McCarty has been with the Department since 1976. Prior to his current assignment he served as Manager of the Financial Reporting Section.

*Stephen Kuplicki, Assistant Director – Wastewater Operations.* Mr. Kuplicki was named the Assistant Director of Wastewater Operations in January 2008, and is responsible for the operation of the Wastewater Treatment Plant and Combined Sewage Overflow Facilities, and the Industrial Waste Control Division. Mr. Kuplicki previously served as the Manager of the Industrial Waste Control Division, where he developed, administered and enforced regulatory control programs on behalf of the City of Detroit. Prior to joining the Department in 1983, Mr. Kuplicki worked as a hydrologist and filtration consultant supporting projects in the chemical, power and petroleum industries throughout the United States, Canada and Mexico. Mr. Kuplicki is a licensed Professional Engineer in the State of Michigan, and a member of the Michigan State Bar. He holds a B.S. degree in Chemical Engineering from Wayne State University, a Master of Engineering degree with a Chemical Engineering major from the University of Detroit, and a Juris Doctor degree from the University of Detroit-Mercy.

*Pamela Turner, Assistant Director – Water Supply Operations.* Ms. Turner was named Assistant Director in April 2003. Prior to her selection Ms. Turner served as Water Quality Division Manager. She has worked in the Department since 1977. Ms. Turner holds a Bachelor of Science degree in Environmental Science and a Masters in Public Administration from the University of Michigan. Ms. Turner has served on the Michigan Department of Environmental Quality Technical Advisory Committee for the Source Water Assessment Program. She is currently serving her second three-year term on the American Water Works Research Foundation, Research Advisory Council.

*Ramesh Shukla, Assistant Director – Engineering*. Mr. Shukla is a Registered Professional Engineer and was appointed to the current position in February 2006. Prior to his appointment, he had served as Interim General Superintendent of Engineering and has been with the Department for more than 17 years. Prior to joining the Department in 1988, Mr. Shukla worked with consulting firms and governmental agencies in the U.S. and abroad in India. Mr. Shukla has over 34 years of experience in planning, design, construction, and management of water and wastewater systems. Mr. Shukla received a B.S. degree in Mechanical Engineering and a Masters degree in Business Administration in India.

*PJ Dada, Assistant Director of Information Technology*. Ms. Dada was named Assistant Director in July 2007. Prior to her position, she served as General Manager of the Process Networks and SCADA Systems Division. Prior to joining the department in September 2006, Ms. Dada worked with consulting firms and the automotive industries. Ms. Dada has over 15 years experience in process controls and instrumentation. Ms. Dada holds a B.S. degree in Electrical Engineering and a minor in Computer Science. She holds a Level III ISA certification.

*George Ellenwood, Assistant Director Public Affairs*. Mr. Ellenwood was named Assistant Director in September 2006. Previously, he served as General Manager of the Department's Public Affairs Group, consisting of the Commercial Operations, Meter Operations and Public Affairs Divisions. Mr. Ellenwood holds a B.A. in English and Modern Languages from Oakland University and an M.A. in Spanish from Wayne State University. He serves on the National Public Affairs Council of the American Water Works Association (AWWA) and the Project Advisory Committee of the AWWA Research Foundation.

Most of the Department's key personnel have considerable managerial experience either with the Department or with other municipal agencies or large utility systems. The Deputy Director and most of the Assistant Directors have significant experience with the Department, each having advanced through the ranks of the Department to his or her present position. The Assistant Director of Asset Maintenance was recruited from outside the Department to facilitate the performance improvements targeted for that operation. The experience and qualifications of the Department's executive staff are commensurate with their duties and responsibilities.

The collective bargaining agreements for the American Federation of State, County and Municipal Employees ("AFSCME") and the other non-uniform unions and nearly all other City bargaining units expire on June 30, 2008. The City currently is in labor negotiations and has no reason to believe that its outstanding labor negotiations will result in any interruption of service from the unionized work force.

**Pension Plan**

Department employees are members of the City's General Retirement System. Payments to the pension fund are made as a percentage of payroll, based on annual actuarial studies. These studies determine the amount necessary to fund the financial benefits as earned as well as an amount necessary to amortize unfunded accrued liabilities. For employees budgeted strictly as Sewage System employees, contributions are made directly to the retirement fund. For employees common to both the Water and Sewage Systems, payments are generally made by the Water System, which is then periodically reimbursed from Sewage System revenues. Although the actuarially computed pension contribution rates are different for the two systems, "common" employees are considered as Water System employees and accordingly, the Sewage System is billed at the Water System's rate. See Appendix B – "Audited Financial Statements of the Sewage Disposal Fund of the City of Detroit, Michigan" as of and for the years ended June 30, 2006 and 2005. The City's Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2006 is available at www.ci.detroit.mi.us/finance/Default.htm.

THE SEWAGE DISPOSAL SYSTEM

The major components of the System include the Plant, a collection system within the City (including approximately 3,000 miles of trunk and lateral sewers), 11 pump stations, 3 interceptors in the City and a 35-mile interceptor outside the City. The City believes that the System is adequate to meet the current needs of its retail and wholesale customers and to meet the current federal requirements of the U.S. Environmental Protection Agency under the Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987. The flow of wastewater is monitored and remotely controlled by the Systems Control Center in the Water Board Building. Some repairs, replacements and major improvements are necessary to improve operations and ensure continued compliance with environmental standards. These repairs, replacements and improvements are part of the System's Capital Improvement Program. See "THE CAPITAL IMPROVEMENT PROGRAM."

**Service Area**

The System presently provides wholesale service through 23 contracts to 76 municipalities in the surrounding metropolitan area and retail service to the customers in the City. Of the total service area of approximately 850 square miles, 138

29

square miles are in the City. See "Map of Service Area" on the inside back cover. The System currently serves approximately 3.0 million people, or one-third of the population of the State of Michigan, including approximately 1.0 million customers in the City and 2.0 million customers in surrounding communities. See Appendix A - "Characteristics of the Sewage Disposal System Service Area." As a matter of general policy, the City does not contract with individual or corporate customers outside the City, but only with municipal entities and public sewage disposal districts or authorities.

The overall population served by the System has been essentially stable since 1990. Within the service area, the percentage of population served on a wholesale basis has increased. This pattern of increases in population and service to wholesale customers is expected to continue in the future. Over 55% of the System's operating revenues for the Fiscal Year ended June 30, 2007, were derived from wholesale customers and the balance from retail customers and miscellaneous other income sources. The following table shows the estimated historical population of the service area as a whole and on a retail and wholesale basis, and the sewage flow in millions of gallons. Annual flow to the Plant during the past three years has been lower than in recent preceding years. This is in part due to drier than normal weather conditions, resulting in less storm flow entering the System.

**Wholesale and Retail Population and Flows[1]**

| | Estimated Population Served | | | |
|---|---|---|---|---|
| Fiscal | Suburban | Detroit | | Annual Wastewater |
| Year | Municipal | Retail | Total | Treated(mg) |
| 2003 | 2,128,800 | 951,300 | 3,080,100 | 224,200 |
| 2004 | 2,128,800 | 951,300 | 3,080,100 | 240,800 |
| 2005 | 2,128,800 | 951,300 | 3,080,100 | 242,700 |
| 2006 | 2,128,800 | 951,300 | 3,080,100 | 248,600 |
| 2007 | 2,128,800 | 951,300 | 3,080,100 | 244,700 |

Mg = Millions of gallons.
SOURCE: The Department.

Generally, the System has expanded with the population increase in the municipalities surrounding the City. It is expected that any additional revenue growth will result from requests by existing wholesale customers to serve major, new manufacturing facilities or from ordinary development within the service area. No expansion of the System's service area is expected in the near future.

**Retail and Other Billing; Delinquencies**

The Department has been the sole provider of all sewage interception, treatment and disposal services in the City since 1940 and all sewage collection since 1964. The Board has full responsibility for rate setting, billing and collection of charges from retail and wholesale customer accounts, subject to review and concurrence by the City Council. There are approximately 280,000 retail customer accounts. These customers are billed on a monthly or quarterly basis and water and sewage charges are included on the same bill. The Department is required to notify three large industrial retail users 90 days prior to the effective date of any rate change. The Department also bills various governmental agencies, including the City, for service. Rate changes, once established, become effective the following July 1.

Pursuant to the Act, the charges for water and sewage service furnished to a premises become a lien on such premises when the service is provided. If the charges on an account are delinquent, such charges may be collected by placing such lien on the property tax roll. The lien may then be enforced in the same manner as the collection of property taxes and enforcement of a lien for property taxes (assuming proper statutory notice to the party responsible for the payment of the charges). The Board may also enforce the payment of charges by discontinuing service to the premises. The Department has a policy of transmitting delinquent accounts to the City's Assessor for placement on the property tax roll. Other more active measures adopted by the Department with respect to enforcement of delinquent bills include termination of service to delinquent accounts, a bad debt write-off policy and common protocols for pursuit of delinquent customers. In addition, in 2006 the Department converted all retail customer accounts to a monthly billing cycle. Residential accounts had previously been billed quarterly. This conversion is intended to produce a beneficial impact to both the Department and its customers. Customers will receive more regular bills and the bills will be lower. The Department will receive a more uniform revenue stream and will be able to monitor and react to anomalies in bills to individual customers. See "FINANCIAL PROCEDURES - Collections and Delinquencies."

**Wholesale Municipal Customers**

The System has provided wholesale service to an increasing number of surrounding municipalities since the construction of the Plant in 1940. The System receives wastewater from a wholesale service community at sewers owned by the City. The quantity of wastewater discharged is measured with a sewage meter or estimated on the basis of water consumption. In all cases, the municipalities are responsible for the construction and maintenance of their own internal sewerage systems for collecting the wastewater and delivering it to the System. Prior to 1968, the municipalities were required to construct their interceptors for connection to a Detroit combined sewer or for connection directly to the System interceptor sewer. Since 1968, the Department has constructed interceptors which it owns and operates in selected areas outside the City.

Wholesale Contracts. Each wholesale district or municipality has executed a sewage disposal agreement with the City which is generally for either an original period of at least 35 years, terminable on one year's notice thereafter unless renewed, or of indefinite duration. The agreements have notice requirements for termination prior to the maximum term of the contract, of from zero to three years. Under the typical contract, the City, subject to certain terms and conditions, is obligated to receive and provide treatment for the wastewater from the municipalities at designated metered points or at mutually agreed locations. The municipality is required to pay for treatment of all wastewater delivered to the System at rates related to the cost incurred in providing the service.

The agreements generally include other provisions required for orderly operation of the System such as: (1) restrictions on the collection of wastewater from outside the limits of the particular municipality or district without the consent of the City; (2) metering for all new customers and for most other customers; and (3) acceptance by wholesale municipal customers of the State's water quality standards and of appropriate City ordinances for meeting the pollution control standards imposed by the State and federal government. Wholesale customers are billed on either a monthly or quarterly basis.

With respect to the wholesale contracts, user classes can be determined based upon use of different facilities or differences in the degree of use but not differences in location. Specifically, each contract requires the establishment of rates based upon a methodology under which the same rate of return on capital asset rate base is charged to customers in and outside the City. The City is permitted to charge the wholesale customers an aggregate of $1,000,000 compounded at 5% annually commencing in Fiscal Year 1980 for costs of indirect service to the System provided by the City. Provision for surcharges for those discharging pollutants in excess of normal domestic sewage is also permitted. In all cases, the municipalities are responsible for the construction and financing of sewer mains in such municipalities required to connect with the interceptor or collection System of the City (except the Oakland-Macomb interceptor which the Department financed and owns).

Settlement Agreements. At various times since 1975, several wholesale municipal customers and industrial users have challenged rates established by the Board. The City and certain municipal entities entered into settlement agreements in 1978, 1980, 1982, 1995 and 1999 (collectively, the "Settlement Agreements"). The Settlement Agreements generally set forth rate schedules to be effective during a specified period of time and established principles by which rates are to be developed. Pursuant to the Settlement Agreements and the Amended Consent Judgment (hereafter defined), all existing wholesale contracts were amended to incorporate certain rate schedules and rate making principles and to provide for observance of environmental controls. Contractual provisions regarding rate making methodology are also subject to EPA regulations prescribing the rate making principles which must be followed as a condition to participation in federal grant programs by the City. See "FINANCIAL OPERATIONS - Rates."

Pursuant to the Settlement Agreements and the wholesale contracts, the Board is responsible for providing treatment and disposal service as may be necessary to conform with all federal, State and local laws and regulations. The customer is required to pay for such service at the rates established by the Board, subject to certain principles including (i) annual review and adjustment, if necessary, to maintain proportionate distribution of all costs among user classes and to generate sufficient revenue to pay the total costs of the System and (ii) revenue requirements based on experience and estimates of operating and maintenance expenses, the local share of capital costs, debt coverage and any obligations imposed by law, and a working capital allowance to cover lags in payments by the customers and by federal and State grant agencies. The Settlement Agreements require the Board to finance, to the maximum extent possible, the local share of capital costs of the System from bond proceeds.

As part of the collective process, the Department recently worked with its customers to develop new model contracts with standardized contract language. These standardized contracts will ensure that all wholesale customers are treated equitably and will also provide the Department with the same rights and controls across all agreements. The standardized contract language will address items such as contract term lengths, contract renewal, flow limitations, flow enforcement provisions, flow measurement, regulatory compliance, connection points, and contract enforcement. The general terms of the new model contract have been approved by all existing contract customers. The Department plans to use the new model contract, with appropriate modifications, as it negotiates new and renewed individual contracts with its customers.

Currently, the long-term contract with Macomb County, a large wholesale customer, has expired. The Department and Macomb are operating under a one-year renewable contract. The Department has initiated discussions with Macomb to renew its long-term contractual arrangement, using the new model contract form. This renegotiation may result in a portion of Macomb County's flow being diverted to a different treatment facility, to accommodate the sanitary sewer overflow challenges facing several communities in Macomb County. The Department has also initiated negotiations for a new contract with Grosse Pointe Farms, using the model contract as a basis.

The Department believes that wholesale customers will continue to utilize the System because (i) the Plant has the capacity required to provide service to those under contract and is currently in compliance with federal and State environmental regulations, (ii) federal and State grant agencies have encouraged regional sewage treatment systems and wholesale customers desiring to leave the System may not have the benefit of federal grant funds covering a portion of the capital cost of eligible facilities, making such a move economically unfeasible, and (iii) long standing contractual relationships exist between the System and its wholesale customers. Moreover, the Department believes that the Settlement Agreements, which contain principles pertaining to the establishment of rates and provisions for advance notice and public hearings thereon, and the mandates of the Amended Consent Judgment relating to capital improvements and operating procedures, should serve to eliminate certain of the factors which precipitated controversy and litigation in the past. In addition, it is expected that certain bases of past controversy may be resolved as a result of implementing EPA regulations which require periodic review of actual operating results with appropriate credit or surcharge adjustments to the various users of the System. However, because of the complex nature of rate setting and cost allocation there can be no assurance that various assumptions which are used in the formulation of future rate increases will not be the subject of controversy and possibly future litigation.

Over the past several years there has been a continuing dispute between the City and certain wholesale municipal customers over control of the System. Various legislative bills and resolutions have been introduced in the State legislature from time to time that have provided for, or suggested studying, changes in the composition of the Board, or have attempted to legislate changes in the management and control of the System. Among these have been proposals to create a regional water and sewerage authority and transfer to this authority the ownership of the City's Sewage Disposal and Sewage Disposal Systems, excluding certain retail facilities. On March 31, 2006, Governor Granholm vetoed Senate Bill 372, which would have given control of the Department to a new regional authority dominated by the suburbs. The bill did not receive enough votes in either house to override the veto. The City will continue to oppose any efforts to transfer control of the City's Sewage Disposal and Sewage Disposal Systems. Currently, no legislation is pending which contemplates the transfer of control of the City's Sewage Disposal and Sewage Disposal Systems.

**Customer and Regional Water Quality Partnering**

Since 1995 the Department has entered into several "partnering" agreements with representatives of its suburban customer communities, establishing a framework for discussion of major issues among Detroit and all of its suburban wholesale customers. The partnering groups have established teams to explore a variety of topics, including flows in the System, operating plans and efficiencies, billing protocol, service contracts, sewer rates, and communication strategies. The Sewer Rates Work Group reviews issues impacting rates and rate levels and attempts to reach consensus on these issues. Through the Sewer Contracts Work Group the Department has created a new model contract with standardized contract language.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## Wholesale Customer Information

The following table lists the wholesale municipal customers, the date of initiation of service with the System and various details of the contracts. For Fiscal Year 2007, these customers provided approximately 55% of the gross operating revenues of the System.

### Summary of Wholesale Sewerage Treatment Contracts

| | Total Billed Flow Mcf FY 2007 | Total Billed Revenue FY 2007 [1] | Contract Date | Term of Contract | Years Remaining in Contract |
|---|---|---|---|---|---|
| Wayne County - Rouge Valley | 3,477,254 | 36,389,754 | 1961 | 50 Years | 6 |
| Macomb County [3] | 2,121,170 | 32,897,289 | 1967 | 35 Years | |
| S. O. C. S. D. D. [2] | 2,952,352 | 29,656,043 | 1962 | 50 Years | 7 |
| Evergreen – Farmington | 2,316,838 | 25,084,922 | 1958 | 50 Years | 3 |
| Clinton - Oakland [3] | 1,515,812 | 17,317,664 | 1968 | 50 Years | 13 |
| Wayne County – Northeast | 1,518,356 | 15,477,575 | 1961 | [6] | |
| Dearborn – West | 594,472 | 5,848,583 | 1961 | 50 Years | 6 |
| Dearborn – East [4] | 506,640 | 5,728,476 | 1957 | [6] | |
| Highland Park [4] | 177,542 | 3,666,450 | 1949 | [8] | |
| Hamtramck [4, 5] | 76,157 | 2,257,075 | 1941 | [8] | |
| Grosse Pointe Farms [4] | 79,187 | 1,623,185 | 1941 | [8] | |
| Grosse Pointe Park | 115,930 | 1,204,722 | 1940 | [8] | |
| Dearborn – Northeast [4] | 38,126 | 929,871 | 1955 | [8] | |
| Melvindale | 86,166 | 887,532 | 1977 | 35 Years | 7 |
| Grosse Pointe [4] | 36,369 | 734,650 | 1940 | [6] | |
| Farmington | 72,612 | 753,013 | 1956 | [6] | |
| Center Line | 64,842 | 763,064 | 1960 | [6] | |
| Allen Park | 44,130 | 454,163 | 1974 | 35 Years | 4 |
| Harper Woods | 6,210 | 156,655 | 1958 | [8] | |
| Wayne County #6 [4] | 3,456 | 100,607 | 1950 | 10 Years | |
| Redford Township [4] | 1,557 | 78,078 | 1940 | [8] | |
| Wayne County #3 [4] | 198 | 26,687 | 1950 | 10 Years | |

Mcf = Thousand cubic feet.

[1] Billed revenue does not include surcharges to wholesale area industrial users for pollutant discharges in excess of Bond Ordinance limits or Industrial Waste Control charges.

[2] Southeastern Oakland County Sewage Disposal District.

[3] Billings include transportation charges for the use of system interceptors specially constructed for those areas.

[4] Billed flow does not include estimated storm drainage and infiltration.

[5] Account currently showing delinquent balances.

[6] Minimum term expired; automatic renewal may be canceled with one year's notice.

[7] Original contract for period of 6 years to be renewed annually.

[8] Duration is indefinite with no initial term. Contracts with indefinite term are generally terminable either by mutual consent or within a specified term of years after notice of termination has been given.

Source: The Department

## The Plant

The Plant, which is among the largest in the world, was originally constructed in 1940 to provide primary treatment of sewage emanating from the City and surrounding communities, and was improved in the mid 1960s with construction of sludge incinerators and filters, and dry ash handling facilities. The Plant was further improved starting in 1970 when construction commenced on secondary treatment processes, including aerated activated sludge units, final clarifiers and additional primary treatment capacity.

Primary treatment of sewage at the Plant is provided by 16 clarifiers or settling basins. Secondary treatment is provided in one air aeration basin, three oxygen aeration basins and 25 final clarifiers. Removal of phosphorus is accomplished with ferrous chloride (pickle liquor) and polymer feeding mechanisms which operate in conjunction with the primary treatment processes.

Chlorine gas is used for disinfection of effluent prior to discharge into the Detroit River. Incineration of dewatered sludge occurs in 14 multiple hearth incinerators. The Department engages contractors for disposal of the ash produced

by incineration of sludge cake, for screenings from preliminary treatment, and for disposal of excess sludge cake which is not incinerated.

## Interceptor System

All of the major trunk sewers in the City are connected in some manner to either the Detroit River Interceptor, the Oakwood-Northwest Interceptor, or the North Interceptor - East Arm, which transport the flow to the Plant. See "Map of the Service Area" on the inside back cover of this Official Statement. The North Interceptor-East Arm was placed in service in 1995. This interceptor provides non-overflowing conveyance of separated suburban flows from northern areas. The Evergreen-Farmington permanent connection, which was completed in fiscal 1994, serves Oakland County and transfers flows from Oakland County which are currently transported by the Oakwood-Northwest Interceptor to the Detroit River Interceptor.

In addition to the collection systems and the interceptors within the City, the Department owns, operates and maintains the 35 mile Oakland-Macomb Interceptor system in Macomb County. The Oakland-Macomb Interceptor feeds into the North Interceptor-East Arm at the City limits. At the request of Macomb County, the Department continues to construct and own expansions to the Oakland-Macomb Interceptor System. The latest addition to this system is the Garfield Arm, which was placed in service in 2004.

## Collection System

Wastewater is transported via the lateral system into the public sewers and then through the interceptor sewers to the Plant. Wholesale customers own and operate their collection systems and discharge their flow into the System interceptor sewers. Approximately 60% of the System is drained by gravity with the remainder requiring pumping at least once.

Approximately 98% of the collection system located within the City consists of combined sewers, which transport both sanitary sewage and storm water drainage. Approximately 80% of the wholesale flow comes from combined sewers, with the remaining 20% being from sanitary sewers. Overflows from combined sewers are diminished to a degree by the use of remote controlled regulators, fabridams and control gates, providing controlled and uncontrolled storage of overflows. Plans are being developed to optimize the existing operation to provide additional in-System storage in order to better control combined sewer overflows ("CSO").

## Environmental Matters

The operation of the Plant is subject to extensive regulation pursuant to the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 (collectively, the "Clean Water Act"). Included in the regulatory framework established by the Clean Water Act is the NPDES permit program, which requires operation of wastewater treatment facilities according to discharge limitations set forth in permits issued to each facility. The NPDES permit program is administered by the United States Environmental Protection Agency (the "EPA") through the MDEQ.

The Department operates the Plant pursuant to an NPDES permit that took effect on January 1, 2008 (the "Permit"). The Permit sets forth requirements in four general classifications: (1) plant operation and discharge of pollutants, (2) management of the wastewater collection system, including various improvements to control CSO, (3) elements of the Industrial Pretreatment Program ("IPP"), and (4) residuals management to dispose of solids generated as byproducts of the treatment process.

The Department is also subject to a number of enforcement related administrative orders and consent judgments, most notably the Second Amended Consent Judgment (SACJ) entered by the US District Court on August 3, 2000, for Clean Water Act violations dating back to the 1970s. The SACJ and related orders set forth remedial measures required of the Department, including several capital improvements at the Plant, increased monitoring and reporting, penalties totaling $1,500,000 for past violations, and payment to MDEQ for oversight activities of $75,000. Most of the ACO capital improvement projects were already contained in the Department's Capital Improvement Program. In addition, three new "supplemental environmental projects" were requested by the MDEQ and agreed to by the Department: (1) a project that will consist of dredging and disposal of approximately 114,000 cubic yards of sediment from Connor Creek; (2) a study of reuse alternatives for biosolids disposal and implementation of the preferred technology; and (3) a triennial asset audit of the wastewater treatment plant focusing on the processes and equipment at the Plant and the transportation and pumping facilities throughout the System. See "LITIGATION--Environmental Litigation."

In compliance with the Permit, the Department is implementing its Long-term CSO Control Plan (the "CSO Plan"). The CSO Plan is generally acceptable to MDEQ, with minor revisions, and appropriate provisions of the CSO Plan were incorporated into the Permit. The Permit establishes a compliance schedule, including design and construction of major capital

34

improvements, to reduce overflows and provide for treatment and disinfection of CSO prior to discharge to the Detroit and Rouge Rivers. The permit requires an operational plan to manage the wastewater collection system so as to maximize transport and treatment of wet weather flows.

Because the Plant is not designed to remove cadmium, copper, lead, PCBs, mercury, or other toxic materials to the levels required by MDEQ, the Department controls these substances primarily through the Industrial Pretreatment Program ("IPP"). The IPP was the culmination of litigation filed by the EPA in 1989 against the City and the State in federal court, alleging that the City failed to fully implement and enforce industrial pretreatment. Although the lawsuit was dismissed in 1997, the Department revised the IPP in 1997, and the revised IPP has been subsequently approved by the MDEQ and the EPA. The Permit incorporates requirements that the Department administer the revised IPP to control and regulate wastewater discharge to the System, including the adoption of local limits for various pollutants.

The IPP includes procedures to identify and locate all industrial users who may be subject to the IPP, identify the character and volume of the pollutants contributed by these users, notify users of programs or standards, receive and analyze self-monitoring reports, investigate instances of non-compliance, fine non-compliers, return noncompliant users to compliance and meet public participation requirements. The IPP currently includes about 364 significant users in the service area of the System. Each significant user is assigned pollutant levels based on its industry classification and is routinely sampled to verify compliance. There was a notice of Non-Compliance issued by the MDEQ in November 2000 for failure to achieve adequate enforcement authority (i.e., the ability to assess significant fines and penalties against industrial violators of the IPP). Current Michigan law may preclude the Department from levying fines on industrial customers located outside the City of Detroit. The Department and the MDEQ have established an agreement delegating a portion of the State of Michigan's enforcement authority to the Department and establishing alternative means of enforcing the goals of the IPP Program. This agreement was executed in December 2002 in full satisfaction of the outstanding issues.

In 1995, the Final Water Quality Guidance for the Great Lakes System (the "Guidance"), developed by the Great Lakes States, EPA and other Federal agencies, established a mechanism for consistent, long term protection for Great Lakes fish, as well as the people and wildlife who consume them. The Guidance contains maximum acceptable contamination levels for 29 pollutants (bioaccumulative chemicals of concern and other pollutants) considered long-term threats due to toxicity. The State of Michigan subsequently adopted new Water Quality Standards in July 1997 to comply with the Great Lakes Initiative (GLI), and the 2004 Permit includes changes as a result of the GLI requirements. These include minor modifications to effluent limits for various toxic pollutants including metals and organic parameters, adjustment to the industrial discharge limits as set forth in permits issued under the IPP to regulate industrial wastewater discharges to the system, and continued updates to the PCB/Mercury Minimization Program to satisfy GLI requirements relating to minimization and pollution prevention activities.

The Department has exceeded certain emission limitations applicable to its incinerator operations. Implementation of several existing and impending air quality regulations may affect the Department's future incinerator operations. The 1990 Clean Air Act Amendments require EPA to establish performance standards for sludge incinerator systems. These standards which have been proposed include numerical emission limitations, which may require stack testing, procurement of additional monitoring equipment and control devices, and enhanced recordkeeping. The Department may need to achieve higher levels of pollution control technology to control incinerator releases of particulates and ozone precursors if the proposed EPA standards are promulgated. The Plant's air emission operating permit requires a significant increased in monitoring, record keeping and operating parameters.

The Department continually monitors the various pending air regulations and will assess the potential impact after the regulations are finalized. While the Department believes that compliance with the pending regulations may be achieved with additional staff and monitoring equipment, the Capital Improvement Program contains several projects to continue to improve incinerator operations and air quality control, including continued renovations of the incinerators.

## FEASIBILITY CONSULTANT'S REPORT

The Department has engaged The Foster Group, LLC (the "Feasibility Consultant") to conduct an evaluation of the System, including information about the financial feasibility of completing the System's Capital Improvement Program. A copy of the report summarizing the findings of The Foster Group LLC's evaluation is included as Appendix A.

## THE CAPITAL IMPROVEMENT PROGRAM

The Department has financed its ongoing Capital Improvement Program from Sewage System Bonds, federal and State grants, and revenues of the System. Over the past ten years, approximately $2.27 billion has been spent for capital improvements to the System.

The Capital Improvement Program, which is subject to at least annual review and revision, is divided into the following major categories: Plant, Sewer Interceptor System, Combined Sewer System, Lateral Sewer Replacement, and Planning/Administration. The Plant category is further divided into sub-categories: Primary Treatment, Secondary Treatment, Solids Handling, Disinfection Facilities and General Purpose. As noted earlier, the System has experienced excursions of regulatory requirements. Since then a variety of capital and operational improvements have been made and, with the exception of opacity violations, the System is presently in substantial compliance with all regulatory requirements for water quality, air quality and sludge disposal. The Capital Improvement Program is therefore primarily intended to improve the reliability of the System to meet those standards as well as to make reasonable efforts to achieve greater operating and maintenance efficiency. A minor portion of the program is dedicated towards very limited growth of the service area.

The following tables detail the planned Capital Improvement Program expenditures for the five Fiscal Years ending June 30, 2012, and the projected funding sources for the Capital Improvement Program. The five year program is estimated to cost $1,519,746,000. Of this amount, it is anticipated that $824,547,700 (approximate net amount) will be raised through the issuance of bonds during and after fiscal year 2010 with the balance of the System's share to be generated out of System revenues, additional SRF Loans and funds currently available.

### Capital Improvement Program Projected Expenditure Schedule

*Fiscal Year Ended June 30,*

|  | 2008 $ | 2009 $ | 2010 $ | 2011 $ | 2012 $ | Total $ |
|---|---|---|---|---|---|---|
| Plant |  |  |  |  |  |  |
| Primary Treatment | 1,202,000 | 4,433,000 | 16,814,000 | 22,837,000 | 8,284,000 | 53,570,000 |
| Secondary Treatment | 3,765,000 | 2,550,000 | 6,057,000 | 19,226,000 | 10,473,000 | 42,071,000 |
| Solids Handling | 415,000 | 2,315,000 | 18,201,000 | 8,594,000 |  | 29,525,000 |
| Disinfection Facilities | 6,250,000 | 33,126,000 | 83,000,000 | 38,000,000 | 29,006,000 | 189,382,000 |
| General Purpose | 33,835,000 | 27,080,000 | 27,464,000 | 19,549,000 | 12,713,000 | 120,641,000 |
| Subtotal Plant | 45,467,000 | 69,504,000 | 151,536,000 | 108,206,000 | 60,476,000 | 435,189,000 |
|  |  |  |  |  |  |  |
| Sewer Interceptor System | 915,000 | 1,551,000 | 6,432,000 | 0 | 0 | 8,898,000 |
| Combined Sewer System | 65,894,000 | 192,875,000 | 222,998,000 | 264,294,000 | 145,106,000 | 891,167,000 |
| Lateral Sewer Replacement | 29,394,000 | 53,840,000 | 12,877,000 | 5,000,000 | 5,000,000 | 106,111,000 |
| Planning & Administration | 22,746,000 | 24,570,000 | 23,140,000 | 4,925,000 | 3,000,000 | 78,381,000 |
| Subtotal | 118,949,000 | 272,836,000 | 265,447,000 | 274,219,000 | 153,106,000 | 1,084,557,000 |
| Total Capital Program | 164,416,000 | 342,340,000 | 416,983,000 | 382,425,000 | 213,582,000 | 1,519,746,000 |

### Sewage Disposal System Capital Improvement Program Projected Funding Sources

*Fiscal Year Ending June 30,*

|  | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|
| Existing Improvement and Extension Funds[1] | 69,821,500 | 0 | 0 | 0 | 0 | 69,821,500 |
| Existing Construction Funds[1] | 471,566,700 | 0 | 0 | 0 | 0 | 471,566,700 |
| Current Revenues | 26,915,200 | 17,511,700 | 34,503,800 | 41,677,300 | 49,724,400 | 170,332,400 |
|  |  |  |  |  |  |  |
| Bond Proceeds | 0 | 0 | 250,000,000 | 400,000,000 | 250,000,000 | 900,000,000 |
| Less: Capitalized Interest | 0 | 0 | (13,125,000) | (21,000,000) | (13,125,000) | (47,250,000) |
| Issuance Expenses[2] | 0 | 0 | (7,700,000) | (12,200,000) | (7,700,000) | (27,600,000) |
| Bond Reserve[3] | 0 | 0 | (167,300) | (267,700) | (167,300) | (602,300) |
| Net Bond Proceeds Available | 0 | 0 | 229,007,700 | 366,532,300 | 229,007,700 | 824,547,700 |
| State Revolving Fund Loans | 33,757,000 | 63,200,000 | 58,200,000 | 12,190,000 | 0 | 167,347,000 |
| Total Funding Sources[4] | 602,060,400 | 80,711,700 | 321,711,500 | 420,399,600 | 278,732,100 | 1,703,615,300 |

(1) Balance available June 30, 2007. (Applies only to Fiscal Year 2008).

(2) Assumes issuance expenses totaling 3 percent of the bond issue amount plus $200,000.

(3) Amount required to purchase surety to fund reserve requirement.

(4) The difference between the total amount available to finance the capital program and the cost of the program represents funds available to finance the capital program after 2012.

SOURCE: The Department.

36

## FINANCIAL PROCEDURES

**Budget and Accounting Matters**

The Department prepares an annual budget in conformity with the City's requirements and procedures, and this budget sets forth estimated revenues and appropriations. No expenditures may be made without an authorized appropriation approved by the Board and City Council. Appropriations are made in lump sum by major program and such amounts cannot be exceeded without Board and City Council approval. Appropriation increases must be funded either by transfer from other appropriations within the funds of the System or by excess revenues generated within the System. The annual budget is reviewed and may be revised by the Mayor prior to submission to the City Council. The City Council conducts hearings and reviews and may alter the budget prior to adoption. Any revisions by the City Council are subject to veto by the Mayor and subsequent override of veto by the City Council. The entire preparation and review process encompasses approximately 6 months and the final budget is approved approximately June 1 of each year, to be effective July 1. The expenditure level of the proposed budget is taken into account as a revenue requirement for establishing Sewage Disposal System rates.

Certain differences should be noted between budget presentation and the audited financial statements for a given period. The budget encumbers amounts which might be spent in future periods and it records equipment and other long-term purchases against the current period. The audited financial statements include accrual of expenditures and revenues and depreciation of plant and equipment over the useful life of such capital items.

Generally, the Department pays for various employees, supplies and equipment, which are shared between the water and sewage systems, from water operations. The Sewage Disposal System is then billed periodically (currently monthly) based on actual operations and an estimate of certain personnel and equipment usage.

Because the System is generally self-insured, the Department includes in its annual budget amounts estimated to be sufficient to pay various liability and workers' compensation claims. The audited financial statements record the expense for such claims in the period when the occurrence of the liability is probable and the amount can be reasonably estimated. In addition, the budget includes amounts necessary to establish and maintain an account designated the "Extraordinary Repair and Replacement Reserve Fund" which has been created for the purpose of providing funds for paying the costs of major unanticipated repairs and replacements to the System.

The Department uses an Oracle financial management system which includes general ledger, purchasing, accounts payable, accounts receivables, project accounting and fixed asset applications. These Oracle core financial applications are integrated with third party Oracle-approved software providers for budget preparation, work order and inventory applications to provide an almost complete financial reporting system.

The Department uses a legacy human resources/payroll application for employee compensation. Preliminary funding has been approved to begin planning the replacement of the legacy system with the human resources/payroll modules. The complete integration of the human resources/payroll application with the core financial applications is expected to take about three years.

The City of Detroit's audited financial statements for the fiscal year ended June 30, 2006, available on the City's website at: www.ci.detroit.mi.us/Portals/0/docs/finance/CAFR/CAFR2006.pdf, includes an unqualified independent auditors' report with exception to a reference to the unaudited financial statements of the Detroit Public Library. The auditors provided the City with a second document, which highlights certain recommended improvements to the City's internal control environment. In its report, the City's auditors noted certain Reportable Conditions involving the City's internal control over financial reporting and operations including 22 it considered material. With respect to each Reportable Condition, the auditors described the criteria, condition, cause, effect and recommended solution. The City takes such recommendations seriously. Accordingly, the City has developed plans and has begun executing such planned action steps to address each concern identified by the auditors. The City is confident that each issue will be addressed, with substantially all issues being addressed prior to the conclusion of the audit of its financial statements for the fiscal year ended June 30, 2007. However, the City may be unable to remediate these matters in a complete and timely manner. If the City is unable to improve its financial and management controls, in a timely and effective manner, its ability to comply with the accounting and financial reporting requirements and other rules that apply to it would be impaired. The audited financial statements of the Sewage Disposal System for the fiscal year ended June 30, 2006, which are included as Appendix B, also includes the unqualified opinion of the City's auditors. See also TAX MATTERS-Recent Developments" herein.

**Management Initiatives**

The Department continues to employ several cost-saving measures instituted in recent years. These programs were designed to streamline operations and make them more efficient, and included: limiting outsourcing of work to contractors;

37

an overtime management plan; elimination of almost all unfilled budgeted positions; voluntary reductions in force through attrition; a work force reduction program; liquidation of surplus vehicles; installation of new work practices and performance targets to improve efficiency and productivity of field crews; and implementation of a performance management tool which provides real-time reporting for performance metrics and supports the overall performance improvement initiative.

These efforts have produced significant results. Department-wide operating expenses for 2005 were actually lower than those experienced in 2002. While recent increases in utility costs have lead to slightly higher expenses in the last two years, the 2007 (unaudited) department-wide operating expenses represent an average annual increase of less than 2% from 2002 levels.

The Department has also initiated an energy management plan for water and sewer system operations. Finally, the Department has launched a program to replace all retail billing meters in the System and install automatic meter reading devices. This program is designed to provide more accurate, timely water use information in an efficient manner.

## Collections and Delinquencies

The Department operates a computerized billing system for its approximately 280,000 retail customers. All retail customers are billed monthly. All retail customers are allowed 20 days to pay, after which a one-time 5% late payment charge is applied. Wholesale municipal customers maintain their own retail billing systems and pay the Department monthly or quarterly in accordance with contractual agreements. The charge for late payment of wholesale customers' bills is also 5%.

Retail water and sewer charges constitute a lien on the premises served, enforceable upon entry on the tax roll as described herein, unless notice is given that a tenant is responsible for such charges. Over the past year, the Department has implemented a program of enforcing these liens and has a policy of transmitting delinquent accounts to the City's Assessor for placement on the property tax roll. To date the City's Treasurer's Office has collected $8.1 million on the Department's behalf. However, the Department continues to believe that discontinuance of service is the most effective method of collection. If water or sewer charges are delinquent, the City official in charge of the collection of such charges may certify to the tax assessing officer of the City the fact of such delinquency, whereupon such charge will be entered upon the next tax roll as a charge (lien) against the premises and the lien will be enforced in the same manner as general taxes of the City are collected; provided, that where notice is given that a tenant is responsible for such charges and service, no further service shall be rendered to such premises until a cash deposit equal to the estimated amount of the next ensuing bill is made. In addition to other remedies provided, the City has a right to shut off and discontinue the supply of water to any premises for the non-payment of bills for water or sewer when due. The termination of any services by the City to any residents may be subject to constitutional safeguards regarding due process, including notice and hearing requirements.

In order to enforce payment of retail billings, the Department pursues an aggressive collection program. Retail customers may have service shut off for non-payment after six months in arrears. During Fiscal Year 2008 (through February 2008), shutoffs totaled approximately 13,200. Historically, the number of shutoffs decline for the quarters ending in December and March due to weather conditions making shutoffs difficult.

The Board of Commissioners currently practices a "Bad Debt" write off policy common in many other large utilities, establishing a common protocol to aid determination of financial feasibility with regard to pursuit of delinquent customers.

The Department's computerized billing system produces data on aged accounts receivable and breaks delinquencies into four aged categories. The February 2008 report indicates total retail delinquencies in excess of six months of $92.8 million. Approximately $86.6 million of this total delinquent balance had been reserved for within the allowance for doubtful accounts as of June 30, 2007. The amount of delinquencies has not caused cash flow problems as sufficient operating capital has been available to the System. The System has not experienced significant problems relating to wholesale municipal delinquencies. Normally, wholesale delinquencies have arisen from disputed billings which can be resolved through negotiation. With respect to wholesale municipal receivables, as of June 30, 2007 the System did not report any significant wholesale municipal delinquencies.

## Cash Management

In accordance with the City Charter, all funds and accounts of the System are separate and distinct from all other City funds. Except as described below, no System moneys are commingled with general fund or other moneys of the City.

All revenues of the System are initially deposited to the Water Receiving Fund because one payment is received from retail customers billed on a combined basis for water and sewerage services. Periodic (generally bi-weekly)

38

transfers are made from the Water Receiving Fund to the Sewage Receiving Fund, based on the proper allocation between funds. Next, transfers are made from the Sewage Receiving Fund to the Operation and Maintenance Fund, Bond Interest and Redemption Funds and other System funds and, until needed, balances are invested in accordance with the provisions of the Bond Ordinance. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Bond Ordinance Flow of Funds."

With the exception of direct payments made for debt service and special "manual" payments, expenditures are made through the City's Central Clearing Account. The City maintains a central account which disburses all vendor payments. Once an invoice has been processed for payment, a wire transfer from the appropriate fund of the City is made to the Central Clearing Account. Moneys from the particular fund must be received before a check is released. Accordingly, no System moneys may be used to "cover" payments to be made from any other fund of the City. While all City payroll checks are drawn upon a special payroll account, funds are cleared through the Central Clearing Account in the same manner as vendor payments.

Debt service payments for Sewage System Bonds (as well as other City debt obligations) are not cleared through the Central Clearing Account. Such payments are made directly from the appropriate debt service account to the paying agent for the particular debt obligation.

The System maintains a budget system that monitors and controls funding in accordance with actual funds available. While the budget includes appropriations for specific projects to be funded out of the Improvement and Extension Fund at the beginning of each Fiscal Year, the Department re-authorizes such appropriations and approves the award of a contract for specific projects only when cash is on hand in such fund, which is then fully encumbered in an amount equal to the amount of the award.

## Investment Policy

Funds in excess of current System requirements are invested by the City for the Department in accordance with State law. The City may invest in direct obligations of the United States, obligations of an agency or instrumentality of the United States, repurchase agreements, mutual funds that invest solely in such government obligations and repurchase agreements, certain grades of commercial paper, bankers acceptances of United States banks, and certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation.

The City's investment policy is to provide for effective cash management. The City's investment policy attempts to maintain and protect investment principal while striving to maximize total return on the portfolio consistent with risk limitations pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended. The City has not experienced material investment-related losses in any City managed funds. As of March 1, 2008, the Sewage Disposal Fund held investments with a total market value of approximately $599,554,865 and the investment with the longest maturity had a date of November 17, 2010.

## Rates

Under the City Charter, the Board has the authority to establish rates for sewage disposal service. In accordance with the Act, rates are subject to review by and concurrence of City Council. Certain of the wholesale contracts require certain notice requirements relating to rate changes, generally 90 or 120 days. Public hearings are required to be held prior to action on rate changes. No other statutory procedures are required as a condition precedent to a change in rates. Rates, once established, become effective the following July 1.

Under the Bond Ordinance, the City covenants that with respect to each Fiscal Year the rates shall be fixed and revised from time to time as may be necessary to produce the greater of (1) the sum of (a) administrative and operating expenses of the System, (b) debt service on Senior Lien Bonds, (c) creation and maintenance of a debt service reserve for Senior Lien Bonds, (d) debt service on Junior Lien Bonds, if any, including maintenance of a reserve therefor to the extent required by the Bond Ordinance, (e) creation and maintenance of an extraordinary repair and replacement reserve fund; and (f) to provide for such other expenditures and funds for the System as the Bond Ordinance and the Act require, and (2) an amount equal to the Required Combined Coverage where the numerator is the Net Revenues projected for the Fiscal Year of calculation and the denominator is the Indebtedness coming for such Fiscal Year. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS—Rate Covenant." The City has covenanted at all times to fix and maintain such rates for services furnished by the System as shall be sufficient to provide for the foregoing. As a matter of operating policy, the Department has established a goal of fixing rates so that net revenues exceed the debt service coverage requirements of the Bond Ordinance. This policy may be changed from time to time by the Board without approval by Bondowners or any other party.

39

Under the Act, rates must be fixed and revised as necessary to comply with the Bond Ordinance. The contracts with wholesale municipal customers typically provide that rates be reasonable in relation to the costs incurred. The Department maintains a small staff to review and make recommendations on rates for water and sewage service. The Department routinely retains outside consultants to supplement the efforts of its staff. The current sewage rates became effective July 11, 2007. A new schedule of sewer rates has been approved by the Board, is currently being reviewed by the City Council, and is expected to take effect in September 2008. See "FINANCIAL OPERATIONS - Analysis of Recent Operations." The Act provides that the rates charged by the System should not be subject to supervision or regulation by any State bureau, board, commission or like agency or instrumentality of the State.

The following table presents a summary of the rates charged by the Department per 1,000 cubic feet for sewage disposal for the last ten years.

### Historic Sewage Disposal Rates*

| Date of Implementation | | City | Average Suburban Wholesale |
|---|---|---|---|
| 7/01/1999 | | 9.86 | 7.08 |
| 7/01/2000 | | 10.93 | 7.40 |
| 7/01/2001 | | 12.22 | 7.27 |
| 7/01/2002 | | 14.28 | 8.23 |
| 7/01/2003 | | 15.79 | 8.93 |
| 7/01/2004 | | 18.99 | 9.27 |
| 7/01/2005 | | 19.68 | 9.28 |
| 7/01/2006 | | 21.11 | 9.65 |
| 7/11/2007 | | 22.62 | 9.78 |
| 9/01/2008 | pending | 24.71 | 10.18 |

* Charge per thousand cubic feet of sewage; includes sewage and storm drainage treatment charges.

SOURCE: The Department.

**"Look-Back" Adjustments**

Because rates are set prospectively, the costs and wastewater volumes must be estimated and therefore actual performance may not coincide with the estimates. Therefore, the EPA, in attempting to ensure that user charges are proportional in effect as well as in their design, adopted regulations which require grantees to review the wastewater contributions and revenues of users and user classes, making appropriate rate adjustments in the next Fiscal Year. While the EPA requires a review not less often than every two years, the Department is following an annual review policy with actual "look-back" adjustments to System users.

In determining the "look-back" adjustment, the Department evaluates the System's actual revenue requirement for the Fiscal Year and each customer class's proportionate share of those requirements based on the actual wastewater volumes. A comparison of these requirements with the billed revenues provides the amount of the "look-back" adjustment. In addition to cash requirements, the Department takes into consideration the financial covenants of the Bond Ordinance and will make no net adjustment which would result in a violation of the rate covenant and the Additional Bonds test. The maximum net adjustment is constrained by the requirements of the Bond Ordinance. Any look-back adjustments appear on the Department's billings in the second succeeding Fiscal Year (e.g., Fiscal Year 2006 adjustments on Fiscal Year 2008 billings, etc.). From an accounting perspective, such adjustments are reflected in the audited financial statements for the applicable Fiscal Year (e.g., Fiscal Year 2006 adjustments were reflected in the audited financial statements for Fiscal Year 2004).

For Fiscal Year 2006, the look-back analysis resulted in an overall System look-back charge of approximately $28.4 million. This is a "net" amount, which means that the Department had under-recovered revenue from some customers and over-recovered revenue from others. The appropriate credit or debit adjustments were made to Fiscal Year 2006 audited financial statements and such credit or debit adjustments, as applicable, are being reflected in customers' bills during Fiscal Year 2008. The look-back adjustment process gives the Department some degree of control over the actual financial performance of the System as adjustments are implemented and limited to ensure compliance with bond covenants and management policies.

40

**Sewage Rate Comparison**

        As shown in the following table, as of 2005 charges for sewage disposal in Detroit are generally below the average rates in effect in comparably sized cities. While sewer rates have increased subsequent to the publishing of this survey, the Department believes that such increases have not been materially different from those experienced by other survey participants. Also, the Department anticipates increasing rates as necessary to continue the funding of the Capital Improvement Program, and believes that the increases projected through 2012 are expected to be comparable to what will be experienced in other large metropolitan areas having wastewater systems of similar size and addressing infrastructure and regulatory challenges similar to those of the System.

**Comparison of Annual Retail Sewage Charges in the 20 Largest**
**U.S. Cities, Ranked from Lowest Cost to Highest Cost**

| City | Small [1] Amount | Rank | Medium [2] Amount | Rank | Large [3] Amount | Rank |
|------|--------|------|--------|------|--------|------|
| Memphis | 79 | 1 | 1,050 | 1 | 105,000 | 1 |
| Chicago | 97 | 2 | 1,296 | 2 | 129,594 | 2 |
| Indianapolis | 149 | 3 | 1,631 | 3 | 167,933 | 3 |
| Phoenix | 192 | 4 | 2,268 | 4 | 233,664 | 6 |
| San Antonio | 228 | 5 | 2,385 | 5 | 233,313 | 5 |
| San Jose | 248 | 6 | 5,403 | 16 | 333,923 | 10 |
| Milwaukee | 262 | 7 | 3,074 | 8 | 293,421 | 8 |
| Dallas | 270 | 8 | 2,402 | 6 | 217,549 | 4 |
| Philadelphia | 273 | 9 | 2,755 | 7 | 258,095 | 7 |
| **Detroit** | **288** | **10** | **3,815** | **10** | **333,640** | **9** |
| Columbus | 288 | 11 | 3,489 | 9 | 401,548 | 13 |
| Los Angeles | 290 | 12 | 3,882 | 11 | 388,189 | 11 |
| Baltimore | 296 | 13 | 3,962 | 12 | 396,211 | 12 |
| Houston | 314 | 14 | 5,385 | 15 | 535,233 | 16 |
| New York | 315 | 15 | 4,219 | 13 | 421,859 | 14 |
| Jacksonville | 373 | 16 | 4,984 | 14 | 467,645 | 15 |
| Boston | 476 | 17 | 6,785 | 19 | 737,246 | 19 |
| Austin | 483 | 18 | 6,168 | 18 | 548,448 | 17 |
| San Diego | 522 | 19 | 6,028 | 17 | 589,328 | 18 |
| San Francisco | 563 | 20 | 10,579 | 20 | 1,057,935 | 20 |
| *Average* [4] | *303* | | *4,092* | | *395,581* | |

(1) Based on water use of 90,000 gallons (12 Mcf) per year and 5/8" meter.
(2) Based on water use of 1.2 million gallons (160 Mcf) per year and 2" meter.
(3) Based on water use of 1.2 million gallons (160 Mcf) per year and 2" meter.
(4) Excluding Detroit

SOURCE: Black & Veatch Corporation, 2005 Survey.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# FINANCIAL OPERATIONS

## Summary of Historical Revenues and Expenses

The table below shows historical revenue and expenses of the Sewage Disposal System for each of the five Fiscal Years ended June 30, 2003 through June 30, 2007. This information is derived from audited financial statements of the Sewage Disposal Fund (except as to fiscal year 2007 which has not yet been audited). Financial statements and notes thereto for the Fiscal Year ended 2006 and 2005, together with the auditors' report thereon, are in Appendix B - "Audited Financial Statements of the Sewage Disposal Fund of the City of Detroit, Michigan."

### Summary of Historical Revenues and Expenses

### For Fiscal Years 2003-2007

| | | | Fiscal Year Ending June 30, | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 (unaudited) |
| Operating Revenues: | | | | | |
| Retail | $124,492,166 | $137,397,451 | $146,894,621 | $155,630,255 | $145,822,109 |
| Wholesale | 147,863,307 | 170,688,966 | 158,120,913 | 188,762,961 | 191,834,525 |
| Other | 7,243,499 | 6,485,913 | 8,572,741 | 7,300,106 | 6,536,907 |
| Total Operating Revenues | 279,598,972 | 314,572,330 | 313,588,275 | 351,693,322 | 344,193,542 |
| Operation and Maintenance Expenses | | | | | |
| Sewage Treatment Plant | 102,795,411 | 108,834,440 | 103,536,939 | 120,630,600 | 128,702,227 |
| Sewage Maintenance and Engineering | 12,319,582 | 15,566,222 | 12,348,657 | 15,775,123 | 10,086,025 |
| Sewer Pump Stations | 2,816,201 | 5,076,606 | 3,122,298 | 2,963,775 | 3,193,023 |
| Interceptors and Regulators | 52,145 | 182,574 | 740,870 | 1,237,752 | 4,378,862 |
| Combined Sewage Overflow Control Basins | 1,606,591 | 1,141,192 | 511,252 | 1,697,068 | 692,041 |
| Commercial | 5,664,080 | 6,321,194 | 5,698,630 | 5,870,839 | 5,878,512 |
| Administrative and General | 33,980,622 | 40,624,344 | 37,441,707 | 46,666,956 | 47,212,866 |
| Total Operating Expenses | 159,234,632 | 177,746,572 | 163,400,354 | 194,842,114 | 200,143,557 |
| Net Operating Revenues[1] | 120,364,340 | 136,825,758 | 150,187,921 | 156,851,208 | 144,049,985 |
| Non-Operating Income[2] | 11,594,449 | 8,017,586 | 14,930,952 | 18,920,649 | 33,362,548 |
| Net Revenues | 131,958,789 | 144,843,344 | 165,118,873 | 175,771,857 | 177,412,533 |
| Debt Service[3] | | | | | |
| Senior Lien Bonds | 86,084,712 | 92,135,474 | 108,403,917 | 105,353,514 | 106,225,011 |
| Senior and Second Lien Bonds | 96,502,214 | 105,389,547 | 123,739,213 | 127,189,369 | 129,757,571 |
| All Bonds, Including SRF Junior Lien | 102,472,833 | 115,969,942 | 136,635,131 | 151,245,544 | 156,427,936 |
| Debt Service Coverage[4] | | | | | |
| Senior Lien Bonds | 1.53 | 1.57 | 1.52 | 1.67 | 1.67 |
| Senior and Second Lien Bonds | 1.37 | 1.37 | 1.33 | 1.38 | 1.37 |
| All Bonds, Including SRF Junior Lien | 1.29 | 1.25 | 1.21 | 1.16 | 1.13 |

(1) Net Revenues that are not required to flow into the Bond Interest and Redemption Funds, the Junior Lien Bond and Interest Redemption Fund or the Extraordinary Repair and Replacement Reserve Fund are available for capital expenditures. It should be noted that the table reflects accounting on an accrual basis in accordance with accounting principles generally accepted in the United States of America and does not necessarily reflect cash available since revenues include accounts receivable and expenditures include a number of "non-cash" items.

(2) Does not include "Miscellaneous Non-Operating Income (Expense)," which amounts are reflected on the Statement of Operations as a net adjustment to Non-Operating Income (Expense). Historically, miscellaneous non-operating income has been actual cash receipts not derived from operations and has not been material.

(3) Includes liquidity fees, as these have traditionally been treated as interest payments for accounting purposes. Projections of debt service in this Remarketing Circular do not include such fees, in accordance with Bond Ordinance treatment of such fees as Ancillary Obligation Fees and Expenses.

(4) "Coverage" calculations include all Net Revenues available for payment of debt service, and include Construction Fund investment earnings. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Pledged Assets" regarding treatment of Construction Fund investment earnings.

SOURCE: The Department

## Analysis of Recent Operations

The following information summarizes the financial operations of the System for the last five fiscal years. Audited financial statements are available for fiscal years 2003 through 2006, and additional detailed information related to the financial statements for the fiscal years ended June 30, 2006 and June 30, 2005 can be found in Appendix B - "Audited Financial Statements of the Sewer Fund of the City of Detroit, Michigan."

Operating Revenues  As indicated in the above table, System operating revenues (primarily generated from water sales) have increased approximately $64.6 million, or 23%, since fiscal 2003. This increase is primarily attributable to sewer rate increases during that period, as billable wastewater volumes have been relatively stable during that time. However, the variance from year to year is also partially attributable to varying levels of bad debt expense throughout the period. Operating revenues in this schedule are expressed net of bad debt expense, which was recorded as an operating expense prior to 2005. Bad debt expense is recognized on the Department's financial statements based on an analysis of the size and age of accounts receivable and the expected ability to collect those receivables. Revenues in the table are net of bad debt expense figures totaling $8.5 million in 2003, $5.3 million in 2004, $32.4 million in 2005, $22.4 million in 2006, and $4.1 million in 2007.

In addition, the revenues shown in the preceding schedule are net of "look-back" adjustments; for example, 2006 retail revenues reflect a $23.2 million customer charge, or increase, in revenues associated with look-back adjustments. Similarly, the 2006 figure for wholesale customers reflects a $5.4 million customer charge (increase) in revenues. The look-back calculations affect all other revenue figures shown in the schedule to varying degrees. A look-back analysis is currently underway for 2007.  The results of such analysis will be incorporated into the financial statements when complete.

Operating Expenses.  Total operating expenses in 2007 were approximately almost $2.5 million (or 1.3 percent) higher than those experienced in 2006.  Operating expenses increased in 2006, primarily at the Plant. These increases were primarily attributable to higher natural gas and electricity prices, as well as increased costs associated with sludge hauling. In addition, the 2006 and 2007 figures in this category include costs from prior years associated with projects that were originally capitalized and were determined to be operating expenses during the close out process of the projects.

The relatively stable cost levels in other areas are primarily attributable to the cost efficiency measures implemented by Department management over the last three fiscal years. See "FINANCIAL PROCEDURES – Management Initiatives." A portion of the annual variation in operating expenses is associated with the allocation of costs for functions that provide service to both the water and sewer systems. These costs are assigned to the two utilities based on detailed labor distribution systems and overall management policy, and will naturally fluctuate based on where maintenance and related activities are focused. The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate this issue and that its financial accounting systems accurately report activity for this matter.

Non-Operating Income.  As indicated in footnote (2) to the above table, the category "Miscellaneous Non-Operating Income (Expense)" reflected in the financial statements is a "net" amount and has historically represented relatively small amounts of non-operating income or certain non-cash write offs. These amounts are not included in the analysis of current revenues and expenses (particularly for purposes of calculating coverage levels) as they generally do not have an effect on the amount of cash available for System operations or debt service. The presentation in the preceding table does not reflect any Miscellaneous Non-Operating Income (Expense) elements.

The indicated debt service coverage levels for all years in the schedule have been remarkably stable, and have been in excess of the figures required by the Bond Ordinance and the Board's policy goal. The stability in debt service coverage is largely attributable to the existence of the "look-back" process noted above, accounting for which results in after the fact adjustments to net revenues.  The 2007 coverage levels indicated in the table are likely to increase once the look-back process has been completed for that year.

The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate each of these issues and that its financial accounting systems accurately report activity for each of these matters.

**Projected Operations for Fiscal Year 2008 Through 2012**

The projected financial operations of the Sewage Disposal System shown in the table on the following page include assumptions relating to inflation and to costs associated with the continuing Capital Improvement Program, including debt service on additional bonds and additional operating costs associated with operating new facilities, all assuming application of current federal pollution control standards and compliance schedules and requirements under the Clean Water Act and the Clean Air Act.  The projected revenues shown in the table do not anticipate any substantial growth in usage by existing customers or extension of service to a substantial number of new customers.  Accordingly, the Department anticipates that increases in revenue requirements will be obtained through rate increases as indicated in the following table.

The projected additional revenue required reflects the minimum additional amounts which will be required to meet the requirements of the Ordinance and the policies enacted by the Board, given the various assumptions.  The operation and maintenance projections are based on actual operating data and budget information. The operation and maintenance expense projection for fiscal year 2008 is based on review of the 2008 budget and actual expenses for the first 6 months of the fiscal year. The 2009 projection is based on this information and the Department's budget and serves as a base for the remaining years. The total debt service includes the amount due on all currently outstanding Sewage System Bonds and all projected additional Sewage

43

System Bond issues required to fund the Capital Improvement Program. The projected Net Revenues are divided by the applicable debt service to show estimated coverage. The balance available is applied to renewals and replacements, the Extraordinary Repair and Replacement Reserve Fund, and the local share of the Capital Improvement Program funded with revenue financed capital.

The projections set forth below are intended as "forward-looking statements." The City cautions that these projections may and often do differ materially from actual results. Some of the factors that could cause actual results to differ materially from those projected are the Department's ability to execute the Capital Improvement Program as scheduled and within budget, regional climate and weather conditions, and adverse legislative, regulatory or legal decisions (including environmental laws and regulations) affecting the Department's ability to manage the System.

### Summary of Projected Revenues and Additional Revenue Requirements

#### For Fiscal Years 2008-2012

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| Operating Revenue Under Existing Rates (a) | 377,220,300 | 399,217,300 | 407,587,500 | 408,449,300 | 409,311,100 |
| Projected Revenue from Rate Increases (b) | | | | | |
| FY 2010: 5.6% | | | 22,702,500 | 22,750,500 | 22,798,500 |
| FY 2011: 6.0% | | | | 26,013,700 | 26,068,700 |
| FY 2012: 5.0% | | | | | 22,881,400 |
| Total Projected Revenue from Sewer Rates | 377,220,300 | 399,217,300 | 430,290,000 | 457,213,500 | 481,059,700 |
| Miscellaneous Operating Revenue | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 |
| Projected Non-Operating Revenue | 22,614,500 | 12,298,500 | 10,794,000 | 10,849,500 | 12,062,200 |
| Total Projected Operating Revenue | 403,584,800 | 415,265,800 | 444,834,000 | 471,813,000 | 496,871,900 |
| | | | | | |
| Operation and Maintenance Expense (c) | 193,421,000 | 201,073,900 | 206,100,700 | 211,253,200 | 216,534,500 |
| Projected Net Operating Revenues | 210,163,800 | 214,191,900 | 238,733,300 | 260,559,800 | 280,337,400 |
| | | | | | |
| Senior Lien Debt Service (d) (e) | 104,236,900 | 107,745,800 | 107,995,100 | 110,635,700 | 118,264,500 |
| Second Lien Debt Service (d) | 44,047,600 | 51,262,100 | 57,370,300 | 60,949,300 | 64,277,300 |
| SRF Debt Service (d) | 26,964,100 | 27,886,000 | 28,726,700 | 36,862,800 | 37,330,700 |
| Total Debt Service | 175,248,600 | 186,893,900 | 194,092,100 | 208,447,800 | 219,872,500 |
| | | | | | |
| Projected Senior Lien Debt Service Coverage | 202% | 199% | 221% | 236% | 237% |
| Projected Senior and Second Lien Debt Service Coverage | 142% | 135% | 144% | 152% | 154% |
| Projected Total Debt Service Coverage | 120% | 115% | 123% | 125% | 127% |
| | | | | | |
| Balance for CIP and Other Purposes | 34,915,200 | 27,298,000 | 44,641,200 | 52,112,000 | 60,464,900 |

(a) Revenues for 2008 assume rates in effect during 2008. Revenues for 2009 - 2012 reflect rates expected to take effect in September 2008. These rates reflect an increase of approximately 8.0 percent.

(b) Projected additional revenue is developed based upon both projected increases in operation and maintenance expense and debt service coverage and certain other requirements which must be met in order to issue bonds to finance the CIP.

(c) Assumes general inflation rate of 2.5% annually after Fiscal Year 2009. Operating expense projected to also include certain fees to remarketing and liquidity providers.

(d) Reflects debt service (principal and interest) on all existing indebtedness, the Predecessor Bonds and the Fixed Rate as provided in the immediately succeeding sentence, and future bonds. Reflects debt service on the Predecessor Bonds at a fixed interest rate payable by the City under the Existing Swaps until March 1, 2008 for Predecessor Bonds (Series 2001(C-2) and Series 2006(A)) subject to Existing Swaps. As a result of recent developments in the bond insurance industry discussed herein, from March 1, 2008, until the conversion to a Fixed Rate, debt service on such Predecessor Bonds was the approximate average variable rate borne by such Predecessor Bonds. Prior to conversion, fiscal year 2008 debt service on the 2001(E) Predecessor Bonds is 125% of the twelve (12) month variable rate average. Debt Service on the Fixed Rate Bonds after the Conversion Dates includes the net fixed payment by the City under the Mirror Swaps; see "INTRODUCTION – Recent Developments in the Bond Insurance Industry", PLAN OF REMARKETING - Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS - Interest Rate Swaps Related to the Remarketed Bonds" for more information.

(e) Assumes bond sales in subsequent years at an annual interest rate of 5.25%. Although the Department may issue Additional Sewage System Bonds as Second Lien or Senior Lien Bonds, for purposes of this table future debt is assumed to be issued as Senior Lien Bonds.

(f) Because 2008 has 366 days, the Total Debt Service for 2008 includes one extra day of interest.

Source: The Foster Group, LLC.

### Upcoming Reporting Change

The Government Accounting Standards Board has recently released Statement No. 45, *Accounting and Reporting by Employers for Postemployment Benefits Other Than Pensions*. The new pronouncement provides guidance for local units of government in recognizing the cost of retiree health care, as well as any "other" postemployment benefits (other than pensions). This change will cause the financial statements of the City to recognize the cost and related liability of providing

44

retiree health coverage over the working life of the employee, rather than at the time the health care premiums are paid.  For the City, this will result in increased expenses and a related liability, which will likely be significant.  The City is currently evaluating the effect that GASB Statement No. 45 will have on its financial statements.  The City commissioned an actuarial valuation as of December 31, 2004.  The present value of all benefits expected to be paid to current plan members as of December 31, 2004 is $8,033 million ($3,931 million for current retirees and $4,102 million for active employees).  The actuarial accrued liability, which is the portion of the $8,033 million attributable to the service accrued by the plan members as of December 31, 2004 is $6,244 million.  The City has not yet determined the Department's share of this liability.  As of December 31, 2004, there were no plan assets available to offset the liabilities of the plan.  GASB Statement No. 45 is effective for the year ending June 30, 2008.

**Future Years**

The Department projects that $900,000,000 principal amount of additional Sewage System Bonds will be issued after January 1, 2010 to finance the Sewage Disposal System's Capital Improvement Program through fiscal 2012.  Additional financings can be expected beyond 2012 to provide for future capital needs of the System.  See "THE CAPITAL IMPROVEMENT PROGRAM." The Department intends to adjust rates, as appropriate and consistent with the Ordinance and the Board rate covenant policy

### CONTINUING DISCLOSURE UNDERTAKING

The City has covenanted for the benefit of the Bondowners and the Beneficial Owners of the Fixed Rate Bonds (as such terms are defined in the Master Continuing Disclosure Agreement dated November 21, 1995 (the "Continuing Disclosure Undertaking")) to provide certain financial information and operating data relating to the Sewage Disposal System and the City's Sewage Disposal Fund by not later than 180 days following the end of each of the City's Fiscal Years (the "Annual Financial Information"), and to provide notices of the occurrence of certain enumerated events, if material.  A summary of the Continuing Disclosure Undertaking is contained in Appendix F.  The Continuing Disclosure Undertaking requires that the Annual Financial Information be filed by the City with each Nationally Recognized Municipal Securities Information Repository (each a "NRMSIR") and the state information depository (the "SID").  The Continuing Disclosure Undertaking also requires that notices of material events be filed by the City with the SID and with either each NRMSIR or the Municipal Securities Rulemaking Board.  Any filing with each NRMSIR and the SID may be made by transmitting such filing to Disclosure USA as provided at www.disclosureusa.org unless the Securities and Exchange Commission withdraws the interpretive advice contained in its letter to the Municipal Advisory Council of Texas, dated September 7, 2004.  These covenants have been made in order to assist the Remarketing Agent named on the cover page of this Official Statement to comply with paragraph (b)(5) of Rule 15c2-12 promulgated by the Securities and Exchange Commission.  As of the date of this Official Statement, the City and the Sewage Disposal Fund are the only "obligated persons" required to provide such annual financial information under Rule 15c2-12.  Reference is made to the respective Predecessor Official Statements for a discussion of the specific nature of the information to be contained in the Annual Financial Information or the notices of material events.

A failure by the City to comply with the Continuing Disclosure Undertaking must be reported by the City in accordance with Rule 15c2-12 and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Fixed Rate Bonds in the secondary market.  Consequently, such failure may adversely affect the marketability and liquidity of the Fixed Rate Bonds and the market price therefor.

The City has entered into a Disclosure Dissemination Agent Agreement (the "Disclosure Dissemination Agreement") with Digital Assurance Certification, L.L.C. ("DAC") for the benefit of the Beneficial Owners of the Fixed Rate Bonds, under which the City has designated DAC as Disclosure Dissemination Agent. The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement.  The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent the City has provided such information to the Disclosure Dissemination Agent as required by this Disclosure Dissemination Agreement.  The Disclosure Dissemination Agent has no duty with respect to the content of any disclosures or notice made pursuant to the terms of the Disclosure Dissemination Agreement.  The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Report, audited financial statements, notice of Notice Event or Voluntary Report, or any other information, disclosures or notices provided to it by the City and shall not be deemed to be acting in any fiduciary capacity for the City, the Bondholders of the Fixed Rate Bonds or any other party.  The Disclosure Dissemination Agent has no responsibility for the City's failure to report to the Disclosure Dissemination Agent a Notice Event or a duty to determine the materiality thereof.  The Disclosure Dissemination Agent will have no duty to determine or liability for failing to determine whether the City has complied with the Disclosure Dissemination Agreement.  The Disclosure Dissemination Agent may conclusively rely upon certifications of the City at all times.

In recent years, the City has been unable to meet its obligation under the continuing disclosure agreements related to prior bond issues, to provide annual financial information within the periods specified in the applicable agreements.

Annual financial information for the Fiscal Years ended June 30, 1999 through 2002 was filed on May 10, 2000, May 28, 2001, May 31, 2002 and March 10, 2003, respectively. Annual financial information for Fiscal Year ended June 30, 2003 was filed on February 9, 2004 (for water supply system bonds and sewage disposal system bonds) and on March 1, 2004 (for other bonds), and for Fiscal Year ended June 30, 2004 was filed on February 16, 2005 (for water supply system bonds and sewage disposal system bonds) and on May 5, 2005 (for other bonds). Annual financial information for Fiscal Year ended June 30, 2005 was filed on June 1, 2006. Annual financial information for Fiscal Year ended June 30, 2006 was filed on September 26, 2007. Annual financial information for the Fiscal Year ended June 30, 2007 will be filed upon completion of an audit of such financial information. A failure by the City to comply with the Disclosure Undertaking must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Bonds in the secondary market. Consequently, such failure may adversely affect the marketability and liquidity of and the market price for the Bonds.

## LITIGATION

### Environmental Litigation

In 1977, the EPA filed suit against the City in the U.S. District Court (the "Court") to compel the Department to comply with the requirements of the Clean Water Act. The City, the State and the EPA entered into a Consent Judgment in September 1977 which contained specific effluent requirements and specific dates to bring the City into compliance. In 1978, as a result of the City's failure to comply with certain provisions of the Consent Judgment, the Court appointed then Mayor of the City, Coleman A. Young, as Administrator of Operations to exercise control, management and operation of the System. As the result of a full scale Plant evaluation, the Amended Consent Judgment was entered by the Court in April 1980. Subsequently, the City demonstrated its compliance with the wastewater quality requirements of the Amended Consent Judgment and the City and the State of Michigan negotiated a new NPDES permit that was issued in August 1983. In December 1984, the Court found that the operations of the Plant were in substantial compliance with the Amended Consent Judgment, terminated the Administratorship and relieved the City from a number of requirements of the Amended Consent Judgment. The Court retained jurisdiction under the remaining provisions of the Amended Consent Judgment in order to ensure the City's continued compliance.

In 1991, Wayne County petitioned the Court to take jurisdiction over certain permit related issues between the County and the communities for which the County provides wastewater service, and also to take jurisdiction over potential contract disputes between the County and the City. The Court granted the County's petition to take jurisdiction over issues relating to these Wayne County communities but deferred taking any action concerning potential contract disputes. After lengthy proceedings, in 1992 the Court ordered MDEQ to make these Wayne County communities co permittees for Wayne County. In the course of conferences related to resolution of non CSO permit issues, the Court had also advocated the creation of a regional or watershed authority to address issues relating to point source and non point source pollution of the Rouge River. The Court had encouraged the parties to agree to the creation of such an agency and to apply to the MDEQ for a regional storm water discharge permit. Detroit and Wayne County have indicated to the Court that they believe that a voluntary approach is the most appropriate means of addressing both point and non point wet weather pollution issues on a watershed basis.

Beginning in August 1997 and continuing through March 1999, the City experienced violations of the requirements of the 1997 Permit related to solids handling at the Plant. In October 1998, the MDEQ issued a Notice of Violation for total suspended solids and total phosphorous permit limit violations and for failure to meet deadlines for implementing specific design and construction projects required by the 1997 Permit. The City has maintained compliance with the effluent requirements of the 1997 Permit since June 1999.

The City and MDEQ negotiated the ACO to resolve this Notice of Violation. This proposed ACO contained a schedule to bring the City back into compliance and contained a schedule of projects to achieve that goal. In the ACO, the City agreed to reimburse MDEQ for its costs of investigation and oversight in connection with the ACO in the amount of $75,000 and to pay a civil penalty of $1,500,000.

The Court advised the parties that the Amended Consent Judgment covered completely the issues in the proposed ACO, and that the ACO should be replaced by a Supplemental Consent Judgment ("SCJ"). The Court also appointed a committee to determine the causes of the permit violations. The committee has submitted its final report to the Court. The City has submitted its response to the committee's report. The Court accepted the committee's report and the City's response on February 7, 2000. On that date the Court entered an Order Appointing Special Administrator For the Detroit Wastewater Treatment Plant of the Detroit Water And Sewerage Department ("the Order").

The Order named then-Mayor Dennis Archer as Special Administrator of the Department for the purpose of correcting the causes of noncompliance discovered by the committee. The appointment was to be for one year or until further order of the Court. On December 3, 2001 the Court entered an Order Continuing Special Administratorship For the Detroit

Water And Sewerage Department.  That Order named Mayor Kwame Kilpatrick as Special Administrator, effective on the date that he took office as Mayor of Detroit.

Under the two Orders, the Special Administrator was given full power to manage the Wastewater Treatment Plant and was given sweeping powers to improve the operation of the Wastewater Treatment Plant.  The City and the MDEQ negotiated the Second Amended Consent Judgment (SACJ), which was entered by the Court on August 3, 2000.  The SACJ establishes a compliance schedule for certain improvements to be made at the Wastewater Treatment Plant.

On January 5, 2006 the Court entered an order terminating the Special Administratorship over the Department.  The court noted that the Department ha d not violated the terms of its NPDES Permit since a new director was hired for the Department in 2002 and that the Department had completed several important projects to ensure compliance with the permit.  The Court determined that the Special Administratorship was no longer needed.

**Rate Litigation**

During August 2004 a portion of the Oakland Macomb Interceptor collapsed.  The interceptor has been repaired.  The Department has implemented sewer rates which allocate the cost of the repair to the interceptor ($53 million) to Macomb County, the only community served by the interceptor.  Macomb County objected to this and has  sued the Department to force a re-allocation of the cost of repair.   On March 23, 2007 the Court rejected Macomb County's claims and ruled that the Department properly allocated the cost of repairing the interceptor to Macomb County.  Macomb County has appealed that ruling to the Sixth Circuit Court of Appeals.

The City of Detroit recently constructed a new 800 Megahertz (MHz) radio communications system that provides communication capabilities to all City departments for both day to day operations and emergency situations.  The total cost of the 800 MHz was approximately $138 million.

In May 2003, the City of Detroit Budget Department, on behalf of all of the general fund departments, and the Detroit Water and Sewerage Department (DWSD), an enterprise fund department entered into a Memorandum of Understanding pursuant to which DWSD took the lead in contracting for and overseeing the construction of the 800 MHz radio project.  Pursuant the MOU, DWSD agreed that it would pay 60% of the capital (i.e. infrastructure) cost of the project and the general fund departments would pay 40% of those costs.  That allocation was based on the larger footprint of DWSD's service area (1,000 square miles in eight counties in southeast Michigan) as compared to the approximately 100 square mile area of the City served by the general fund departments.  This allocation was also based on the understanding that 15 of the 25 radio communication towers (60%) needed to support the system would be constructed outside the City of Detroit and utilized only by DWSD.  Thus, of the total infrastructure costs of $64.4 million, DWSD paid $38.6 million and the general fund departments paid the balance.  The City subsequently succeeded in negotiations with the State of Michigan for the use of its Michigan Public Safety Communications System (MPSCS) radio towers for communications support outside the City of Detroit, in exchange for various payments and the improvements both to the MPSCS towers an the towers planned to be constructed inside the City of Detroit for use of those towers by the State.

In late 2005 Wayne, Oakland and Macomb Counties challenged the 60:40 infrastructure cost allocation in litigation pending in U.S. District Court.  Those counties are wholesale sewerage customers of DWSD.  They argued that the allocations of the costs of the system passed on, in part, to those Counties through DWSD's rates was improper.  They argued that DWSD's allocated share of the infrastructure costs should have been closer to 8%, based on DWSD's actual air time use of the radio system.

On March 23, 2007 the Court issued an opinion in which the Court determined that DWSD's share of the infrastructure cost was too high.   A final order implementing that opinion has not yet been entered.  The Court has ordered the parties to engage in negotiations supervised by the Court to determine the exact amount of the overpayment by DWSD that must be reimbursed by the general fund departments.  The negotiations are ongoing.

**Other Litigation**

On March 24, 2008 the Wayne County Prosecutor filed charges of obstruction of justice and perjury against the Mayor of Detroit.  The charges relate to his testimony in a wrongful discharge lawsuit filed by two former police officers.  That underlying litigation, which has been settled, had no connection to the Detroit Water and Sewerage Department.  The Mayor has asserted his innocence and announced that he will fight the charges.  The Department believes that the charges against the Mayor should not have any effect on the revenues of the Department or the security for the Fixed Rate Bonds.

Additionally, the Department is involved in numerous other lawsuits related to the System. These lawsuits arise primarily out of personal injuries or property damage or assert breach of contract claims on construction projects for the System. The Department and its legal counsel have determined an estimated contingent reserve against the potential outcome of such claims or the amount of potential damages.

## TAX MATTERS

### Federal Tax Matters

In the opinion of Lewis & Munday, A Professional Corporation, Bond Counsel, based on their examination of the documents described in their opinions, under existing law, as presently interpreted, the interest on the Fixed Rate Bonds (a) is excludable from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. It should be noted, however, that with respect to corporations (as defined for federal income tax purposes) such interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations. The opinion is subject to the condition that the City comply with all requirements of the Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder (the "Code"), that must be satisfied subsequent to the issuance of the Fixed Rate Bonds in order that interest thereon be (or continue to be) excluded from gross income for federal income tax purposes. These requirements may include rebating certain earnings to the United States. Failure to comply with any of such requirements could cause the interest on the Fixed Rate Bonds to be so included in gross income retroactive to the applicable date of issuance of the Fixed Rate Bonds. The City has covenanted to comply with all such requirements. Bond Counsel will express no opinion regarding other federal tax consequences arising with respect to the Fixed Rate Bonds and interest thereon.

Additional federal tax consequences relative to the Fixed Rate Bonds and interest thereon include the following matters. The following is a general description of some of these consequences, but is not intended to be complete or exhaustive, and investors should consult their tax advisors with respect to these matters. For federal income tax purposes: (a) tax-exempt interest, including interest on the Fixed Rate Bonds, is included in the calculation of modified adjusted gross income required to determine the taxability of social security or railroad retirement benefits; (b) the receipt of tax-exempt interest, including interest on the Fixed Rate Bonds, by life insurance companies may affect the federal income tax liabilities of such companies; (c) the amount of certain loss deductions otherwise allowable to property and casualty insurance companies will be reduced (in certain instanced below zero) by 15% of, among other things, tax-exempt interest, including interest on the Fixed Rate Bonds; (d) interest incurred or continued to purchase or carry the Fixed Rate Bonds may not be deducted in determining federal income tax; (e) commercial banks, thrift institutions and other financial institutions may not deduct their costs of carrying certain obligations such as the Fixed Rate Bonds; (f) interest on tax-exempt bonds, such as the Fixed Rate Bonds, will be included in effectively connected earnings and profits for purposes of computing the branch profits tax on certain foreign corporations doing business in the United States; and (g) passive investment income, including interest on tax-exempt bonds such as the Fixed Rate Bonds, may be subject to federal income taxation for Subchapter S corporations that have Subchapter C earnings and profits at the close of the taxable year if greater than 25% of the gross receipts of such Subchapter S corporation is passive investment income.

### State Tax Matters

Bond Counsel is further of the opinion that, under existing law, as presently interpreted, the Fixed Rate Bonds and the interest thereon are exempt from all taxation provided by the laws of the State of Michigan, except inheritance and estate taxes, and taxes on gains realized from the sale, payment or other disposition of the Fixed Rate Bonds.

### Original Issue Discount

For federal income tax purposes, if the remarking price of the Fixed Rate Bonds as shown on the cover of this Official Statement is less than the stated redemption price at maturity, then such Fixed Rate Bond is considered to have an "original issue discount" equal to the difference between such remarketing price and the amount payable at maturity (such Fixed Rate Bonds are referred to as "Original Issue Discount Bonds"). The remarketing price of each Original Issue Discount Bond will be the remarketing price to the public at which a substantial amount of the Original Issue Discount Bonds are sold, and the issue date will be the date on which an Original Issue Discount Bond is first issued to the public.

In the opinion of Bond Counsel, under existing law as presently interpreted, the original issue discount on an Original Issue Discount Bond accrued in the hands of a registered owner is treated for federal income tax purposes as tax exempt interest as described below. The registered owner's basis for determining gain or loss on a sale, maturity or other disposition of an Original Issue Discount Bond generally will equal the registered owner's cost, increased by any original issue discount that accrued while the owner held the Original Issue Discount Bond as described below. Generally, any gain or loss incurred by a U.S. registered owner on the sale, exchange or payment at maturity of an Original Issue Discount Bond (based on the registered

owner's basis) would be taxable as capital gain or loss (assuming the Original Issue Discount Bond is held as a capital asset), which would be long term or short term depending on whether the Original Issue Discount Bond was held for more than the applicable period for treatment of long term capital gain.

Subject to the modification in the next paragraph for certain subsequent registered owners, the original issue discount accrued in each "accrual period" will equal the remarketing price of the Original Issue Discount Bond (increased by the amount of the original issue discount accrued in all prior accrual periods without regard to the modifications discussed in the next paragraph) multiplied by the yield to maturity of the Original Issue Discount Bond (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) less the interest payable on such Original Issue Discount Bond during such accrual period.  For purposes of this paragraph, "accrual period" means a six month period (or shorter period from the date of remarketing of the Original Issue Discount Bond) which ends on a day in the calendar year corresponding to the maturity date of the Original Issue Discount Bond or the date six months before such maturity date. The original issue discount so accrued in a particular accrual period will then be considered to accrue ratably on each day of the accrual period.

A modification of the foregoing rules will generally apply to a registered owner who acquired an Original Issue Discount bond by "purchase" if the cost of the Original Issue Discount Bond to that purchaser exceeds the sum of (a) the remarketing price of the Original Issue Discount Bond and (b) the total original issue discount accrued under the rules of the preceding paragraph during the entire period prior to the registered owner's purchase of the Original Issue Discount Bond.  In that case, the amount of the original issue discount considered to accrue in an accrual period will equal (i) the amount determined under the rules of the preceding paragraph reduced by (ii) the portion of such excess purchase price allocable to the days beginning on the date of such purchase and ending on the stated maturity date of the Original Issue Discount Bond.  Such excess would be allocated so as to equal a constant percentage of the original issue discount accrued on each such day in the remaining period to maturity as described above.  For this purpose, a "purchase" is any acquisition of an Original Issue Discount Bond other than one in which the registered owner's basis in such Original Issue Discount Bond is determined be reference to the basis of the Original Issue Discount Bond in the hands of the person from whom acquired (such as a gift).

**Amortizable Bond Premium**

For federal income tax purposes, under existing law, as presently interpreted, if the remarketing price of the Fixed Rate Bonds is greater than the stated redemption price at maturity (such bonds are hereafter referred to as "Premium Bonds"), then the difference between a purchaser's cost basis of the Premium Bonds and the amounts payable on the Premium Bonds (other than the payment of the stated interest thereon) constitutes an amortizable bond premium.  Such amortizable bond premium is not deductible from gross income, but is treated for federal income tax purposes as an offset to the amount of stated tax-exempt interest paid on the Premium Bonds and is taken into account by certain corporations in determining adjusted current earnings for the purpose of computing the alternative minimum tax, which may also affect liability for the branch profits tax imposed by Section 884 of the Code.

In general, the amount of amortizable bond premium allocated to each "accrual period" is the excess of the stated interest on a Premium Bond allocable to such accrual period over the product of the bond purchaser's adjusted acquisition price at the beginning of the accrual period multiplied by the discount rate that, when used in computing the present value of all remaining payments to be made on such Premium Bond (including stated interest) produces an amount equal to the holder's basis in the Premium Bonds.  For purposes of this calculation, the adjusted acquisition price at the beginning of any accrual period is equal to the purchaser's original basis in the Premium Bond decreased by (i) the amount of bond premium amortized in prior accrual periods and (ii) the amount of any payments previously made on the Premium Bond other than payments of stated interest on such Premium Bond.

The amount of amortizable bond premium allocable to each taxable year is deducted from the bond purchaser's adjusted basis on such Premium Bonds to determine taxable gain upon disposition (including sale, redemption or payment at maturity) of such Fixed Rate Bonds.

**Market Discount**

Pursuant to amendments made to the Code by the Omnibus Budget Reconciliation Act of 1993, the "market discount rules" of the Code apply to the Fixed Rate Bonds.  Accordingly, holders acquiring their Fixed Rate Bonds subsequent to the remarketing of the Fixed Rate Bonds will generally be required to treat market discount recognized under the provisions of the Code as ordinary taxable income (as opposed to capital gain income).  Bondholders should consult their own tax advisors regarding the application of the market discount provisions of the Code and the advisability of making any of the elections relating to market discount allowed by the Code.

49

**Recent Developments**

The City has determined that it has not implemented the necessary procedures to ensure compliance with the arbitrage rebate rules of Section 148(f) of the Internal Revenue Code of 1986 applicable to the City's outstanding tax-exempt obligations. The City is engaged in discussions with the Internal Revenue Service with a view to establishing such procedures. The potential impact to the City is indeterminable at this time

The opinion of Bond Counsel is based on existing law as of the date of the opinion and the opinion does not cover future changes in law. Michigan tax law could be affected by a decision of the United States Supreme Court in the case of *Kentucky Department of Revenue Services v. Davis*. The case was argued before the Court on November 5, 2007. The Kentucky Court of Appeals ruled that taxing interest income on out-of-state bonds while exempting interest on bonds issued by the Commonwealth of Kentucky and its political subdivisions violated the Commerce Clause of the United States Constitution. Like Kentucky and a number of other states, the State of Michigan taxes interest on bonds of out-of-state issuers but exempts the interest on bonds issued by the State of Michigan and its political subdivisions. In the event the United States Supreme Court upholds the Kentucky decision and rules that it is unconstitutional to exempt the interest on in-state bonds while taxing the interest on out-of-state bonds, the State of Michigan and other states may modify their tax laws as to the treatment of interest on in-state and out-of-state bonds. No assurances can be given as to the outcome of the *Davis* case or as to the nature of any legislative response by the State of Michigan or any other state if the decision in *Davis* is upheld. Owners of Fixed Rate Bonds should consult their tax advisors with respect to the potential impact on ownership, disposition and market value of the Fixed Rate Bonds as a result of the *Davis* case.

**Future Developments**

No assurance can be given that any future legislation or clarifications or amendments to the Code, is enacted into law, will not contain proposals which could cause the interest in the Fixed Rate Bonds to be subject directly or indirectly to federal income taxation, or which could cause the interest on the Fixed Rate Bonds to be subject directly or indirectly to the State of Michigan income taxation, adversely affect the market price or marketability of the Fixed Rate Bonds, or otherwise prevent the holders from realizing the full current benefit of the status of the interest thereon. Further, no assurance can be given that any such future legislation, or any actions of the Internal Revenue Service, including, but not limited to, selection of the Fixed Rate Bonds for audit examination, or the course or result of any examination of the Fixed Rate Bonds, or other bonds which present similar tax issues, will not affect the market price of the Fixed Rate Bonds.

**Tax Advisors**

INVESTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THEIR ACQUISITION, HOLDING OR DISPOSITION OF THE FIXED RATE BONDS.

## FEASIBILITY CONSULTANT

The Department retains The Foster Group, LLC as a Feasibility Consultant to develop reports and studies relating to the Sewage Disposal System and certain financial matters.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Grant Thornton LLP, independent certified public accountants and consultants, will deliver a report dated as of the Conversion Dates of the interest mode on the Predecessor Bonds from the Weekly Mode to the Modal Fixed Rate Mode with respect to the Series 2001(C-2) Bonds, from the Weekly Mode to the Fixed Rate Mode with respect to the Series 2006(A) Bonds and, to the extent bondholder consent is received therefor, from the Flexible Rate Mode to the Modal Fixed Rate Mode with respect to the Series 2001(E) Bonds verifying the accuracy of the yield of the Fixed Rate Bonds. Such verification will be used by Bond Counsel in its determination that the interest on the Fixed Rate Bonds is not included in gross income for federal income tax purposes as a condition to the conversion and remarketing of the Fixed Rate Bonds. Such verifications will be based upon certain information supplied to Grant Thornton LLP by the Remarketing Agent.

## INDEPENDENT AUDITORS

The audited financial statements of the Sewage Disposal Fund for the years ended June 30, 2006 and 2005, included in Appendix B - "Audited Financial Statements of the Sewage Disposal Fund of the City of Detroit," have been audited by KPMG LLP, independent auditors, as indicated in their report with respect thereto, which report also appears in Appendix B.

## CERTAIN LEGAL MATTERS

Legal matters incident to the conversion of the Fixed Rate Bonds will be passed upon by Lewis & Munday, A Professional Corporation, Detroit, Michigan, and for the Remarketing Agent by its counsel, Pepper Hamilton LLP, Detroit, Michigan.

## REMARKETING

Pursuant to the Remarketing Agreement, UBS Securities LLC, as Remarketing Agent, agreed, subject to certain conditions, to purchase the Fixed Rate Bonds from the City at a purchase price of $405,061,927.61 (being the principal amount of the Fixed Rate Bonds plus net original issue premium of $24,616,890.00 less an underwriting discount of $2,264,962.39). The Remarketing Agent is obligated to purchase all the Fixed Rate Bonds if any are purchased. The Fixed Rate Bonds may be offered and sold by the Remarketing Agent to certain dealers at prices lower than the initial public offering prices for the Fixed Rate Bonds, and the public offering prices may be changed from time to time. In connection with this offering, the Remarketing Agent may overallot or effect transactions which stabilize or maintain the market price of the Fixed Rate Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

Should the conversion of the Predecessor Bonds to the Fixed Rate Mode fail to occur, the Predecessor Bonds to have been converted will remain outstanding and UBS Securities LLC will remarket the Predecessor Bonds as Variable Rate Bonds in their current mode. This Remarketing Circular describes the Fixed Rate Bonds in the Fixed Rate Mode only. It is not intended to be used in connection with any offer to sell or remarket any Predecessor Bonds in any Mode other than the Fixed Rate Mode. Reference should be made to the Predecessor Official Statements on file with the MSRB for information concerning the remarketing of the Predecessor Bonds in the Weekly Mode in the event of conversion to the Fixed Rate Mode or the Flexible Rate Mode, as applicable, is not successful. See Appendix D – "Amendments to Certain Provisions of the Authorizing Documents" herein.

## RATINGS

S&P and Moody's are expected to assign their long-term municipal bond ratings of "AAA" and "Aaa", respectively, to the Fixed Rate Bonds, based upon the issuance by BHAC of the BHAC Insurance Policies for the Fixed Rate Bonds. In addition, S&P, Moody's, and Fitch have assigned their underlying long-term municipal bond ratings of "A+", "A2" and "A+," respectively, to the 2001(C-2) Fixed Rate Bonds and "A", "A3" and "A," respectively, to the Second Lien Series 2001(E) Fixed Rate Bonds and the Second Lien Series 2006(A) Fixed Rate Bonds. An explanation of the significance of such ratings may only be obtained from S&P, Moody's and Fitch. There is no assurance that such ratings will continue for any given period of time or that they will not be revised or withdrawn entirely, if in the sole judgment of S&P, Moody's or Fitch, circumstances so warrant. Any such downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the Fixed Rate Bonds. The City makes no representations as to the appropriateness of the ratings.

The above ratings are not recommendations to buy, sell or hold the Fixed Rate Bonds, and such ratings may be subject to revision or withdrawal at any time by the Rating Agencies. Each of the Rating Agencies has recently issued press releases or reports stating that they are examining the potential effects of downturns in the market for structured finance instruments, including collateralized debt obligations and residential mortgage backed securities, on the claims-paying ability of the bond insurance companies, including FGIC. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry". Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Fixed Rate Bonds.

An explanation of the significance of such ratings may only be obtained from S&P, Moody's and Fitch. There is no assurance that such ratings will continue for any given period of time or that they will not be revised or withdrawn entirely, if in the sole judgment of S&P, Moody's or Fitch, circumstances so warrant. Any such downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the Fixed Rate Bonds. The City makes no representations as to the appropriateness of the ratings.

## MISCELLANEOUS

This Remarketing Circular is not to be construed as a contract or agreement between the City and the purchasers or holders of any of the Fixed Rate Bonds. Any statements made in this Remarketing Circular involving matters of opinion, whether or not expressly so stated, are intended merely as an opinion and not as a representation of fact.

The information, estimates and expressions of opinion herein or incorporated by reference herein are subject to change without notice and neither the delivery of this Remarketing Circular nor any sale made hereunder shall under any circumstances create any implication or permit any inference that there has been no change in the affairs of the City or the System since the date hereof. Certain projections incorporated by reference herein are based upon assumptions as to future events and facts, including projections as to future Sewage Disposal needs, and such projections may not be realized. While assumptions of facts appeared reasonable when made, no warranty is expressed or implied that they will be realized in fact. The information set forth herein or incorporated by reference herein has been obtained from the City and other sources believed to be reliable but the accuracy or completeness is not guaranteed by, and should not be construed as a representation by the Remarketing Agent. Estimates and opinions are included and should not be interpreted as statements of fact. Summaries of documents incorporated by reference herein do not purport to be complete statements of their provisions and such summaries are qualified by references to the entire texts of the documents. Under no circumstances shall this Remarketing Circular constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Fixed Rate Bonds, in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

Additional information may be obtained upon request from the Office of Debt Management, Attention: Donita Crumpler, Assistant Debt Manager, whose address is 1210 Coleman A. Young Municipal Center, Detroit, Michigan 48226 (telephone: 313-224-7244) or from the Director of the Department, Victor M. Mercado, whose address is Water Board Building, 735 Randolph, Detroit, Michigan 48226 (telephone: 313-224-4701).

The Finance Director has approved this Remarketing Circular pursuant to the Remarketing Agreement.

CITY OF DETROIT, MICHIGAN


By: _____ /s Norman L. White _____
                Finance Director

**APPENDIX – A**

**FEASIBILITY REPORT**

[THIS PAGE INTENTIONALLY LEFT BLANK]

T G

## TH FOST R GROUP

P.O. BOX 26282
LEAWOOD, KS 66225
TEL: 913) 345-1410
FAX: 913) 345-1640

THE FOSTER GROUP, LLC
BART FOSTER, PRESIDENT
CELL: 913) 530-6240
BFOSTER@FOSTERGROUPLLC.COM

May 1, 2008

Mr. Victor Mercado, Director
Detroit Water and Sewerage Department
Water Board Building
735 Randolph Street
Detroit, Michigan 48226

Dear Mr. Mercado:

In accordance with our agreement with the City of Detroit (the City ), we submit herewith our Financial Feasibility report to be included as an appendix to the remarketing circular (the Remarketing Circular ) prepared by the City in connection with its remarketing of $382,710,000 Sewage Disposal System Senior Lien Revenue Refunding Bonds, Series 2001(C-2), Sewage Disposal System Second Lien Revenue Bonds, Series 2001(E), and Sewage Disposal System Second Lien Revenue Bonds, Series 2006(A) (collectively, the 2008 Remarketing Bonds ). The purpose of this report is to set forth information concerning financial factors relating to the 2008 Remarketing Bonds.

The report contains the financial feasibility information including analyses of sewerage rates and rate methodology, projections of revenues under existing rates, projection of operation and maintenance expenses, Capital Improvement Program ("CIP") financing, and the impact of projected revenue requirements on future revenues and sewerage rates.

In addition, during the course of our review we have updated our overview of the sewage collection and treatment system (the System ) owned by the City and operated by the Detroit Water and Sewerage Department (the Department ). Our overview, traditionally contained in feasibility reports related to issuance of new money bonds, has instead been incorporated into the main body of the Remarketing Circular. In connection with the remarketing, compliance with the Additional Bonds Test set forth in the City's ordinance under which the 2008 Remarketing Bonds were issued (the "Bond Ordinance") will not be required and, accordingly, is not included herein.

It has been a pleasure to have been of service to the Department on this matter.

Very truly yours,

TH FOST R GROUP

Bart Foster
President

# Contents

Page

INTRODUCTION ........................................................................................................................... 1

Financial Feasibility for the 2008 Remarketing Bonds .............................................................. 2

  Rate Methodology and Existing Rates.......................................................................................... 2

  Projections of Revenue ................................................................................................................ 4

  Operation and Maintenance Expense Projections...................................................................... 5

  Capital Improvement Program..................................................................................................... 6

  Capital Improvement Program Financing.................................................................................... 7

  Impact of Projected Revenue Requirements on Rates for Wastewater Service....................... 9

# INTRODUCTION

This report is based on our analysis of the records and capital improvement programs of the Department, discussions with key Department personnel, and such other investigations as we have found necessary.

In this report, where standards or requirements are indicated as being applicable, being fulfilled, or to be attained, such standards or requirements are those promulgated by the United States Environmental Protection Agency (the EPA) and the Michigan Department of Environmental Quality (the MDEQ) in accordance with the provisions of Federal environmental laws governing the discharge of pollutants to the nation's air and waters. Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Official Statement. References made herein to specific years are for the fiscal years ending June 30, unless otherwise noted.

The proceeds from the 2008 Remarketing Bonds are not intended to finance capital improvement program expenditures – but rather to fix rates of interest on several currently outstanding variable rate bonds in order to achieve anticipated interest savings. Capital improvement expenditures in the Department's CIP through a portion of 2010 will be financed by a combination of available fund balances, loans from the Michigan State Revolving Fund (SRF), and internally generated funds. Capital improvement expenditures scheduled for 2010 and beyond are expected to be financed, in part, with future bond issues. *See Capital Improvement Program Financing.*

In conducting our studies and formulating our projections and opinions contained herein, we reviewed the books, records, agreements, capital improvement programs and other information produced by the Department as we deemed necessary. While we consider such books, records, and other documents to be reliable, we have not verified the accuracy of these documents.

The projections set forth in this report below are intended as "forward-looking statements". In formulating these projections, we have made certain assumptions with respect to conditions, events, and circumstances that may occur in the future. The methodology we utilized in performing these analyses follows generally accepted practices for such projections. Such assumptions and methodologies are summarized in this report and are reasonable and appropriate for the purpose for which they are used. While we believe the assumptions are reasonable and the projection methodology valid, actual results may differ materially from those projected, as influenced by conditions, events, and circumstances that may actually occur. Such factors may include the Department's ability to execute the CIP as scheduled and within budget, regional climate and weather conditions affecting the demand for water, and adverse legislative, regulatory or legal decisions (including environmental laws and regulations) affecting the Department's ability to manage the System and maintain water quality.

# Financial Feasibility for the 2    8 Remarketing Bonds

The financial data used in the analyses presented herein were obtained from the financial records of the Department. The Department's financial records are audited annually and maintained in conformity with generally accepted accounting principles for water and wastewater utilities.

## Rate Methodology and Existing Rates

The methodology by which the revenue requirements for the current wastewater rates have been determined is the cash basis. The cash basis allocates directly all revenue requirements to the appropriate customer classes. The current user charge system of rates has been approved by the EPA and is based on the principle that each customer pays its proportionate share of the costs of the System's operation and maintenance, including replacements. This philosophy is extended to also apply to capital costs, including debt service on revenue bonds, revenue financed capital improvements, and deposits to reserve funds. Allocations of costs to customer classes are determined by the actual usage of facilities by specific customer classes. In general, all customer classes are allocated a portion of administrative and general costs and costs incurred at the Plant based on their annual wastewater volume. Costs associated with the collection system located inside the City and the retail metering facilities and billing system are directly assigned to retail customers inside the City. Costs associated with major interceptors and pump stations are allocated to customer classes based on the geography and use of the collection system. Wholesale customers are not charged a rate differential based on rate of return on investment.

Sewage treatment rates are developed for retail, wholesale, and surcharge customers by determining the total cost of service and units of service. The rate for retail customers having domestic strength sewage is based on sewage flow as estimated by metered water sales. The rates for wholesale customers vary based on whether the customer's sewage is metered or unmetered and the amount of service that is provided to them by the System. The surcharge rates are applicable to each commercial, governmental, and industrial user of the System whose wastewater discharge exceeds the domestic equivalency of certain pollutant parameters.

Stormwater treatment charges are billed to all retail and unmetered wholesale customers. In addition, the State of Michigan and Wayne County are billed for the stormwater runoff from roads under their jurisdiction within the City. Stormwater from metered wholesale customers is recorded by meters and is included in the basic wastewater volume charge. Stormwater treatment charges for unmetered wholesale customers and retail customers are based on the total stormwater revenue requirement and the estimated quantities of stormwater treated in the System. Estimates of stormwater runoff have been developed for the Department utilizing empirical data for the area within the City and each unmetered wholesale community and are used to determine stormwater charges.

Table 1 presents the current sewage treatment rates, which became effective July 11, 2007, and the proposed rates, which have been approved by the Board of Water Commissioners, are under review by the City Council, and are expected to take effect in September 2008. The proposed rates (the "2009 Rates") were designed to generate an overall revenue increase of approximately 8.0 percent over those generated by the current rates.

The Department's sewage rates to its suburban wholesale customer communities are governed by various rate settlement agreements negotiated by the parties to resolve rate challenges filed by various customer communities. Five settlement agreements effectively establish rules the Department must follow in determining sewage rates for its wholesale customers. These agreements were negotiated in 1978, 1980, 1982,

1995, and 1999 and are referred to by the year in which they were established (the "1978 Rate Settlement Agreement", etc.)

## Table 1
## Sewage Treatment Rates

| | Effective July-07 | | Effective September-08 | |
|---|---|---|---|---|
| | **Commodity /Mcf** | **Fixed /month** | **Commodity /Mcf** | **Fixed /month** |
| Retail Customers | | | | |
|   Detroit | 22.62 | Varies | 24.71 | Varies |
|   Other | 24.98 | Varies | 27.29 | Varies |
| Wholesale Customers | | | | |
|   Average Commodity | 9.78 | | 9.95 | |
|   Total Fixed | | 2,764,684 | | 2,945,245 |
| | | | | |
| Surcharge - $/lb. | | | | |
|   Biochemical Oxygen Demand | 0.268 | | 0.254 | |
|     (for each pound (lb) in exceess 275 mg/l) | | | | |
|   Total Suspended Solids | 0.290 | | 0.324 | |
|     (for each lb in exceess 350 mg/l) | | | | |
|   Phosphorus | 3.703 | | 3.729 | |
|     (for each lb in exceess 12 mg/l) | | | | |
|   Fats, Oils, & Grease | 0.201 | | 0.221 | |
|     (for each lb in exceess 100 mg/l) | | | | |
|   Non-Residential Industrial Waste Charge | Based on Meter Size | | Based on Meter Size | |

In recent years, in order to reduce controversy concerning sewage rates, the Department has taken a number of steps to improve communication with the wholesale customers including the scheduling of individual meetings with the wholesale customers to discuss the basis for proposed rate adjustments. These efforts are embodied in the Department's partnering agreements with representatives of the customer communities. The Sewer Rates Work Group has met on a regular basis over the past several years to explore issues impacting overall rate levels, cost allocation techniques, and how information regarding flows in the System should impact cost responsibility amongst customers. Recently, the partnering effort developed a formalized schedule for disseminating information during the development of proposed sewage rates. The intent of this initiative was to accelerate the availability of information used in rate development, allowing for a greater understanding and review opportunity for the Department and customers alike. This schedule included a series of customer meetings, where information regarding sewer rates was formally distributed. Efforts such as these have created greater understanding of the sewage rate development process and have successfully resulted in regional consensus on sewage rate issues.

Since 1983, at the end of each fiscal year, the Department has calculated a look-back adjustment for the rates to determine if all classes of customers paid their proportionate share of costs incurred during the rate period based on actual operating results. For 2006, the calculation of the adjustment indicated that the Department had under recovered revenue from some customers and over recovered revenue from others. The net result was that revenue requirements were approximately $28.4 million in excess of billed revenues. In other words, the customers owed the System $28.4 million - approximately 8.3 percent of originally billed revenue. The appropriate credit and debit adjustments were made to the fiscal year 2006 financial statements

and are being included with the customer's bills during fiscal year 2008. A similar analysis is in the final stages for fiscal year 2007. The "look-back adjustment" process gives the Department some degree of control over the actual financial performance of the System as adjustments are implemented and limited to ensure that compliance with bond covenants and management policies are met.

## Projections of Revenue

Table 2 presents the projected operating revenues for 2008 through 2012. Projections are based on an analysis of historical trends of ten years of actual data, and year to date data for 2008. Projected revenues for 2008 reflect the sewer rate schedule currently in effect. Projected revenues for 2009 through 2012 reflect the new sewer rate schedule, which is expected to become effective in September 2008.

Sales of sewage disposal service in recent years have reflected a decline from those experienced in the early part of the decade. This decline is attributed in part to a series of drier than average conditions (and therefore less metered storm flow) but also to more efficient uses of water for sanitary purposes and conservation measures implemented to address economic issues. The estimates and projections contained herein reflect more conservative assumptions than those utilized in prior evaluations, but continue to be based on normalized conditions beyond 2008. Billable sewage volumes for wholesale customers are projected by each individual customer. In total, they are expected to remain relatively level over the five year period, as are billable volumes for retail customers. Industrial surcharge and industrial waste control revenues are also expected to remain level.

**Table 2**
**Summary of Projected Operating Revenue Under Existing Rates**

| | Fiscal Year Ending June 30 | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| | $ | $ | $ | $ | $ |
| Operating Revenue (a) | | | | | |
| Wholesale Customers | 186,780,300 | 197,055,000 | 197,916,800 | 198,778,600 | 199,640,400 |
| Retail Customers | 173,558,800 | 191,352,200 | 191,352,200 | 191,352,200 | 191,352,200 |
| Industrial Surcharges | 2,406,700 | 2,394,000 | 2,394,000 | 2,394,000 | 2,394,000 |
| Industrial Waste Control | 14,474,500 | 15,924,500 | 15,924,500 | 15,924,500 | 15,924,500 |
| Total Operating Revenue | 377,220,300 | 406,725,700 | 407,587,500 | 408,449,300 | 409,311,100 |
| Miscellaneous Revenue | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 |
| **Total Operating Revenue** | **380,970,300** | **410,475,700** | **411,337,500** | **412,199,300** | **413,061,100** |
| Revenues are based on projected | | | | | |
| billable volumes of: | | | | | |
| Wholesale (Mcf) | 15,707,900 | 15,663,600 | 15,743,600 | 15,823,600 | 15,903,600 |
| Retail (Mcf) | 4,800,000 | 4,800,000 | 4,800,000 | 4,800,000 | 4,800,000 |
| **Total Billable Volume (Mcf)** | **20,507,900** | **20,463,600** | **20,543,600** | **20,623,600** | **20,703,600** |

(a) Based on application of FY 2008 rates for 2008 and FY 2009 rates for 2009 through 2012.

A-4

Miscellaneous Operating Revenue includes revenues generated through the sale of equipment, penalty charges, disposal of septic tanks, and sewer tap inspections among others. Miscellaneous revenues for the study period are estimated based on historical and budgeted information.

## Operation and Maintenance Expense Projections

Table 3 presents the projected operation and maintenance expense for 2008 through 2012. These projections have been developed based on a detailed review of actual expenses for 2006 and 2007 as well as budgeted and year-to-date actual expenses for 2008, and budgeted expenditures for 2009.

The Department has been remarkably successful at holding operating expenses at current levels over the past several years. We are confident that the Department's recent efforts to control costs and ensure that all costs are accurately reported to the accounting system will continue to yield positive results. The cost-conscious environment established by management continues to be successful and performance could continue to improve as the programs are further implemented. However, new programs and the impacts of inflation will most likely not allow for the recent "no increases" in operating expense to continue.

**Table 3**
**Projected Operation and Maintenance Expense**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| | $ | $ | $ | $ | $ |
| Plant Expenses: | | | | | |
| Personal Services | 49,901,200 | 51,875,600 | 53,172,500 | 54,501,800 | 55,864,300 |
| Utilities | 29,252,600 | 30,410,000 | 31,170,200 | 31,949,500 | 32,748,200 |
| Chemicals | 9,045,700 | 9,403,600 | 9,638,700 | 9,879,700 | 10,126,600 |
| Other | 32,406,400 | 33,688,500 | 34,530,800 | 35,394,000 | 36,278,800 |
| Total Plant | 120,605,900 | 125,377,700 | 128,512,200 | 131,725,000 | 135,017,900 |
| | | | | | |
| Non Plant Expenses: | | | | | |
| Pumping Stations | 4,968,500 | 5,165,100 | 5,294,200 | 5,426,600 | 5,562,200 |
| Sewer & Interceptor Maintenance | 9,209,300 | 9,573,700 | 9,813,100 | 10,058,400 | 10,309,800 |
| Commercial & Meter Operations | 10,412,600 | 10,824,600 | 11,095,200 | 11,372,600 | 11,656,900 |
| Industrial Waste Control | 14,987,900 | 15,581,000 | 15,970,500 | 16,369,700 | 16,779,000 |
| Engineering | 2,770,600 | 2,880,200 | 2,952,200 | 3,026,000 | 3,101,700 |
| Administrative & General | 27,936,700 | 29,042,000 | 29,768,000 | 30,512,200 | 31,275,000 |
| Combined Sewer Overflow Facilities | 2,529,500 | 2,629,600 | 2,695,300 | 2,762,700 | 2,831,800 |
| Total Non Plant | 72,815,100 | 75,696,200 | 77,588,500 | 79,528,200 | 81,516,400 |
| Total Operation and Maintenance | 193,421,000 | 201,073,900 | 206,100,700 | 211,253,200 | 216,534,300 |

The projections shown in Table 3 include recognition of the potential impact of anticipated escalation of costs due to inflation during the five-year planning period. While a detailed analysis of variable inflationary rates was conducted, in the final analysis all costs have been increased 2.5 percent annually,

starting in 2010. Utilities, chemicals, contractual services and miscellaneous expenses for 2008 have generally been estimated at budgeted levels or at levels indicated by 2007 expenditures.

## Capital Improvement Program

The Department's Capital Management Group is responsible for coordinating the evaluation of capital needs and developing programs to meet those needs. This capital planning committee formally reviews the Capital Improvement Program and incorporates revisions into the five-year capital agenda on an annual basis. The CIP is dynamic and requires continual review and modification during the course of each year. The current CIP is based on estimates of future capital costs as of June 30, 2007. The estimates for the 2008 ongoing projects are based on remaining costs as of June 30, 2007. As additional cost information is developed from design work being performed on the various projects, cost estimates are adjusted accordingly.

A summary of the CIP for fiscal years 2008 through 2012 is presented in Table 4. For each year, the CIP is divided into major categories of the Plant, Sewer Interceptor System, Combined Sewer System, Lateral Sewer Replacement, and Planning and Administration. In addition, projects at the Plant are further separated into the categories of Primary Treatment, Secondary Treatment, Solids Handling, Disinfection Facilities, and General Purpose.

**Table 4**
**Sewage Disposal System Capital Improvement Program**
**Projected Expenditure Schedule – Fiscal Years 2008 through 2012**

|  | *Fiscal Year Ended June 30,* | | | | | |
|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|  | $ | $ | $ | $ | $ | $ |
| **Plant** |  |  |  |  |  |  |
| Primary Treatment | 1,202,000 | 4,433,000 | 16,814,000 | 22,837,000 | 8,284,000 | 53,570,000 |
| Secondary Treatment | 3,765,000 | 2,550,000 | 6,057,000 | 19,226,000 | 10,473,000 | 42,071,000 |
| Solids Handling | 415,000 | 2,315,000 | 18,201,000 | 8,594,000 | 0 | 29,525,000 |
| Disinfection Facilities | 6,250,000 | 33,126,000 | 83,000,000 | 38,000,000 | 29,006,000 | 189,382,000 |
| General Purpose | 33,835,000 | 27,080,000 | 27,464,000 | 19,549,000 | 12,713,000 | 120,641,000 |
| Subtotal Plant | 45,467,000 | 69,504,000 | 151,536,000 | 108,206,000 | 60,476,000 | 435,189,000 |
|  |  |  |  |  |  |  |
| Sewer Interceptor System | 915,000 | 1,551,000 | 6,432,000 | 0 | 0 | 8,898,000 |
| Combined Sewer System | 65,894,000 | 192,875,000 | 222,998,000 | 264,294,000 | 145,106,000 | 891,167,000 |
| Lateral Sewer Replacement | 29,394,000 | 53,840,000 | 12,877,000 | 5,000,000 | 5,000,000 | 106,111,000 |
| Planning & Administration | 22,746,000 | 24,570,000 | 23,140,000 | 4,925,000 | 3,000,000 | 78,381,000 |
| Subtotal | 118,949,000 | 272,836,000 | 265,447,000 | 274,219,000 | 153,106,000 | 1,084,557,000 |
| Total Capital Program | 164,416,000 | 342,340,000 | 416,983,000 | 382,425,000 | 213,582,000 | 1,519,746,000 |

# Capital Improvement Program Financing

Table 5 presents a plan for financing the CIP (Line 1) for the five-year period ending June 30, 2012 utilizing the provision of maximum debt financing as set forth in the 1980 Settlement Agreement. Within the constraints of the additional securities test and the Department's debt service coverage policies, the amount of bonds to be issued is designed to maximize the capital requirements financed with bond proceeds. Lines 2 through 13 outline the sources available to meet the CIP financing requirements. Line 2 shows the net balance in the Improvement and Extension Fund as of June 30, 2007, available to fund the CIP. Line 3 shows the amount projected to be transferred to the Improvement and Extension Fund each year from current operating revenues. Total funds available from the Improvement and Extension Fund are indicated on Line 4.

The capital financing sources available from the Construction Fund are indicated on Lines 5 through 12. Line 5 shows the net balance in the Construction Fund as of June 30, 2007. As the 2008 Remarketing Bonds do not provide any capital financing, they are not referenced in this table. The anticipated sizes of future bond issues are shown on Line 6. It is assumed that the projected bond issues in 2010, 2011, and 2012 will be sold at the mid-point of the fiscal year and will include capitalized interest for a period of one year. Issuance expenses are estimated at three percent of the issue size plus $200,000 per issue for future issues and are shown on Line 8. In addition, it is assumed that an amount equal to the maximum future principal and interest payment will be funded by Debt Service Reserve Surety Bonds and will be deducted from the proceeds of each issue, as shown on Line 9.

Line 11 presents the proceeds from State Revolving Fund Loans. Unlike other bond issues, funds from SRF loans are not fully received upon loan closing but are "drawn down" over time as dictated for associated projects costs. As the Department incurs expenditures for SRF funded projects, the invoices are transmitted to the state administrators of the SRF for remittance. As such, the amounts shown on Line 11 reflect the projected expenditure schedule of SRF funded projects. The figures on this line apply to existing loan commitments. The Department remains an active participant in the SRF program, and is planning on issuing additional SRF junior lien debt to obtain this low-cost financing during the study period. However, for purposes of the financial planning, this low cost financing is not reflected until the loan is approved. The projections contained herein are also based on this conservative assumption.

Lines 14 through 16 illustrate the projected application of financing sources to meet the CIP financing requirements stated on Line 1. The balances of funds available for subsequent years are shown on Lines 17 through 19 and are carried forward to Lines 2 and 5 in the next year.

## Table 5
## Capital Improvement Program Financing

| Line No. | Item | 2008 $ | 2009 $ | 2010 $ | 2011 $ | 2012 $ | Total $ |
|---|---|---|---|---|---|---|---|
| | | | | *Fiscal Year Ending June 30,* | | | |
| | **Financing Requirements** | | | | | | |
| 1 | Capital Improvement Program (a) | 164,416,000 | 342,340,000 | 416,983,000 | 382,425,000 | 213,582,000 | 1,519,746,000 |
| | **Financing Sources** | | | | | | |
| | _Improvement and Extension Fund_ | | | | | | |
| 2 | Beginning Balance (b) | 69,821,500 | 26,915,200 | 17,511,700 | 34,503,800 | 41,677,300 | _69,821,500_ |
| 3 | Revenue Financed Capital | 26,915,200 | 17,511,700 | 34,503,800 | 41,677,300 | 49,724,400 | 170,332,400 |
| 4 | Subtotal - Improvement & Extension Fund | 96,736,700 | 44,426,900 | 52,015,500 | 76,181,100 | 91,401,700 | 240,153,900 |
| | _Construction Bond Funds_ | | | | | | |
| 5 | Beginning Balance (b) | 471,566,700 | 410,729,200 | 158,504,400 | 46,240,800 | 77,041,900 | 471,566,700 |
| | Bond Proceeds | | | | | | |
| 6 | Sewer System Revenue Bonds (c) | 0 | 0 | 250,000,000 | 400,000,000 | 250,000,000 | 900,000,000 |
| 7 | Less: Capitalized Interest (d) | 0 | 0 | (13,125,000) | (21,000,000) | (13,125,000) | (47,250,000) |
| 8 | Less: Issuance Expenses (e) | 0 | 0 | (7,700,000) | (12,200,000) | (7,700,000) | (27,600,000) |
| 9 | Less: Bond Reserve Account (f) | 0 | 0 | (167,300) | (267,700) | (167,300) | (602,300) |
| 10 | Net Bond Proceeds Available | 0 | 0 | 229,007,700 | 366,532,300 | 229,007,700 | 824,547,700 |
| 11 | State Revolving Fund Loans | 33,757,000 | 63,200,000 | 58,200,000 | 12,190,000 | 0 | 167,347,000 |
| 12 | Subtotal - Construction Bond Funds | 505,323,700 | 473,929,200 | 445,712,100 | 424,963,100 | 306,049,600 | 1,463,461,400 |
| 13 | Total Financing Sources Available | 570,665,900 | 518,356,100 | 497,727,600 | 501,144,200 | 397,451,300 | 1,703,615,300 |
| | **Application of Financing Sources** | | | | | | |
| 14 | Projects Funded with | | | | | | |
| | Improvement and Extension Funds | 69,821,500 | 26,915,200 | 17,511,700 | 34,503,800 | 41,677,300 | 190,429,500 |
| 15 | Projects Funded with Const. Bond Funds | 94,594,500 | 315,424,800 | 399,471,300 | 347,921,200 | 171,904,700 | 1,329,316,500 |
| 16 | Total Financing Sources Applied | 164,416,000 | 342,340,000 | 416,983,000 | 382,425,000 | 213,582,000 | 1,519,746,000 |
| | **Financing Sources Available for Future Requirements** | | | | | | |
| 17 | Improvement & Extension Fund (g) | 26,915,200 | 17,511,700 | 34,503,800 | 41,677,300 | 49,724,400 | _49,724,400_ |
| 18 | Construction Bond Funds (h) | 410,729,200 | 158,504,400 | 46,240,800 | 77,041,900 | 134,144,900 | _134,144,900_ |
| 19 | Total Financing Sources Available for Future | 437,644,400 | 176,016,100 | 80,744,600 | 118,719,200 | 183,869,300 | 183,869,300 |

(a) From Table 4.

(b) Balance available June 30, 2007 (applies only to fiscal year 2008).

(c) Does not include the 2008 Remarketing Bonds, as they do not generate net proceeds for capital financing.

(d) Includes approximately 18 months of capitalized interest on future issues.

(e) Includes 3 percent of bond size and $200,000 for issuance expenses for future issues.

(f) Amount required to purchase surety to fund bond reserve requirement for future issues.

(g) Line 4 minus Line 14.

(h) Line 12 minus Line 15.

## Impact of Projected Revenue Requirements on Rates for Wastewater Service

Table 6 presents a pro forma operations statement, which develops projections for the fiscal years 2008 through 2012. The table provides an indication of the adequacy of the Department's revenues and the feasibility of the currently proposed and future anticipated revenue bond sales. The approximate annual percent increase required shown in the table provides an estimate of the magnitude of increases in operating revenues needed to finance the remaining years of the current CIP.

Operating revenue projections, presented earlier in Table 2, have been based on the Department's prior sewer rate schedule for 2008 and on the new schedule of sewer rates for 2009 through 2012. Lines 2 through 4 indicate additional increases in sewer rates projected to be required to meet projected total revenue requirements in fiscal years 2010 through 2012. The approximate annual percentage increases in operating revenues of 5.6 percent in 2010, 6.0 percent in 2011, and 5.0 percent in 2012.

Projected non-operating revenues of the System include interest earnings from the various funds of the System. The interest earnings have been projected based on an analysis of funds on hand, construction schedules, and average fund balances. Annual interest rates of 2.75 percent and 4.0 percent have been assumed in projecting interest income for funds investing in short-term and long-term investments, respectively.

The projected operation and maintenance expenses shown on Line 10 reflect the impact of the anticipated escalation of costs and changes in operation as presented earlier in Table 3. The Department's debt service is depicted on Lines 11 through 19, separated by priorities of lien. These debt service figures include the new debt service on the 2008 Remarketing Bonds, and are net of the debt service for the predecessor variable rate bonds that were remarketed. The annual principal and interest due on future bond issues anticipated to finance the remaining total cost of the CIP is shown on Line 12. For purposes of these projections, it is assumed that future bonds will be senior lien bonds. A scale that produces an interest cost of approximately 5.25 percent and a 30-year term has been used to calculate debt service on future bond issues. Projected repayments of State Revolving Fund Loans are stated on Lines 16 through 18. These figures only reflect existing loans as no new loans are anticipated for purposes of these projections.

Renewals and Replacements shown on Line 20 represent capitalized expenditures budgeted by the Department, which are not included in the CIP. Line 21 presents the projected level of revenue financed major capital improvements presented earlier on Line 3 of Table 5. These amounts are targeted to finance short lived assets in concert with the Department's capitalization and debt service coverage policies.

In accordance with the requirements of the Bond Ordinance, an annual deposit (Line 22) is made to the Extraordinary Repair and Replacement Fund in an amount equal to the lesser of three percent of that year's budgeted operation and maintenance expense or that which is necessary to enable the aggregate value of the fund to equal 15 percent of that year's budgeted operation and maintenance expense. Annual deposits shown for 2008 through 2012 will be required to establish and maintain the required level due to increased expenses.

**Table 6**
**Revenue Requirements Projections**

| Line No. | Item | 2008 $ | 2009 $ | 2010 $ | 2011 $ | 2012 $ |
|---|---|---|---|---|---|---|
| | **Revenue (a)** | | | | | |
| 1 | Operating Revenue Under Existing Rates | 377,220,300 | 399,217,300 | 407,587,500 | 408,449,300 | 409,311,100 |
| | Projected Revenue from Rate Increases | | | | | |
| 2 | FY 2010:   5.6% | | | 22,702,500 | 22,750,500 | 22,798,500 |
| 3 | FY 2011:   6.0% | | | | 26,013,700 | 26,068,700 |
| 4 | FY 2012:   5.0% | | | | | 22,881,400 |
| 5 | Total Projected Revenue from Sewer Rates | 377,220,300 | 399,217,300 | 430,290,000 | 457,213,500 | 481,059,700 |
| 6 | Miscellaneous Operating Revenue | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 |
| 7 | Total Operating Revenue | 380,970,300 | 402,967,300 | 434,040,000 | 460,963,500 | 484,809,700 |
| 8 | Non-Operating Revenue | 22,614,500 | 12,298,500 | 10,794,000 | 10,849,500 | 12,062,200 |
| 9 | Total Revenue Available | 403,584,800 | 415,265,800 | 444,834,000 | 471,813,000 | 496,871,900 |
| | **Revenue Requirements** | | | | | |
| 10 | Operation and Maintenance Expense (b) | 193,421,000 | 201,073,900 | 206,100,700 | 211,253,200 | 216,534,500 |
| | Debt Service | | | | | |
| | **Senior Lien Bonds** | | | | | |
| 11 | Outstanding Bonds | 94,265,100 | 97,766,200 | 98,027,100 | 94,111,100 | 91,573,600 |
| 12 | Future Bonds (Lien Unspecified) | 0 | 0 | 0 | 6,562,500 | 16,729,200 |
| 13 | Total Senior Debt Service | 94,265,100 | 97,766,200 | 98,027,100 | 100,673,600 | 108,302,800 |
| | **Second Lien Bonds** | | | | | |
| 14 | Outstanding Bonds | 44,047,600 | 51,262,100 | 57,370,300 | 60,949,300 | 64,277,300 |
| 15 | Subtotal Debt Service | 138,312,700 | 149,028,300 | 155,397,400 | 161,622,900 | 172,580,100 |
| | **State Revolving Loan Repayments** | | | | | |
| 16 | Senior Lien Bonds | 9,971,800 | 9,979,600 | 9,968,000 | 9,962,100 | 9,961,700 |
| 17 | Junior Lien Bonds | 26,964,100 | 27,886,000 | 28,726,700 | 36,862,800 | 37,330,700 |
| 18 | Subtotal SRF Loan Repayments | 36,935,900 | 37,865,600 | 38,694,700 | 46,824,900 | 47,292,400 |
| 19 | Total Debt Service | 175,248,600 | 186,893,900 | 194,092,100 | 208,447,800 | 219,872,500 |
| 20 | Renewals and Replacements | 8,000,000 | 8,500,000 | 8,755,000 | 9,017,700 | 9,288,200 |
| 21 | Revenue Financed Major Capital Improvements | 26,915,200 | 17,511,700 | 34,503,800 | 41,677,300 | 49,724,400 |
| 22 | Extraordinary Repair and Replacement Fund | 0 | 329,700 | 754,000 | 772,900 | 792,200 |
| 23 | Operating Reserve Requirement | 0 | 956,600 | 628,400 | 644,100 | 660,100 |
| 24 | Total Revenue Requirements | 403,584,800 | 415,265,800 | 444,834,000 | 471,813,000 | 496,871,900 |
| 25 | Indicated Balance (Deficiency) | 0 | 0 | 0 | 0 | 0 |
| | Debt Service Coverages Under Required Rates | | | | | |
| 26 | Senior Lien for Rate Covenant Purposes (c ) | 202% | 199% | 221% | 236% | 237% |
| 27 | Second Lien for Rate Covenant Purposes (c ) | 142% | 135% | 144% | 152% | 154% |
| 28 | SRF Junior Lien for Rate Covenant Purposes (c ) | 120% | 115% | 123% | 125% | 127% |
| | Operating Reserve  (d) | | | | | |
| 29 | Beginning Balance | 24,177,600 | 24,177,600 | 25,134,200 | 25,762,600 | 26,406,700 |
| 30 | Deposit from Operations | 0 | 956,600 | 628,400 | 644,100 | 660,100 |
| 31 | Ending Balance | 24,177,600 | 25,134,200 | 25,762,600 | 26,406,700 | 27,066,800 |

(a) From Table 2.  Based on application of FY 2009 rates for 2009 through 2012.
(b) From Table 3.
(c) Includes SRF Senior Lien Debt Service on Line 16.
(d) Balance available June 30, 2007 (applies only to fiscal year 2008).

Line 23 of Table 6 presents a revenue requirement established to ensure adequate balances of operating reserves, or working capital. This reserve is established in a similar manner to the Extraordinary Repair and Replacement Reserve Fund and is summarized on Lines 29 through 31 of the table. Annual deposits are targeted at five days of annual operation and maintenance expense or that amount which will result in an annual fund value equal to 45 days of budgeted operation and maintenance expense. The June 30, 2007 balance of this reserve is at the targeted level. As operating expenses increase, additional annual deposits are projected to be necessary through 2012 to maintain the targeted level.

The indicated annual balance or deficiency under existing rates, Line 25 of Table 6, is calculated by subtracting total revenue requirement from the total revenue available. As indicated in the table, the projected rate increases on Lines 2 through 4 are projected to be sufficient to meet projected revenue requirements throughout the study period.

The preceding projections of rate increases are intended to produce annual debt service coverage figures in accordance with the Board of Water Commissioners' policy on debt service coverage, which establishes a target range for debt service coverage for each lien of debt. It requires that sewage rates be set to generate projected debt service coverage ratios that are at least 15 percentage points higher than the rate covenants of the Bond Ordinance. Under this policy (and the current rate covenant coverage figures of the Bond Ordinance), the minimum policy coverage targets are 135 percent for Senior Lien debt, 125 percent for Second Lien debt, and 115 percent for SRF Junior Lien debt. The policy also requires that rates be set so that projected debt service coverage on the lowest lien of debt will not exceed 150 percent.

Projections of annual debt service coverage levels are summarized on Lines 26 through 28. These coverage levels are calculated on the same basis as required by the rate covenant. As indicated, annual coverage levels for 2010 through 2012, assuming the revenue increases shown, are projected to be in excess of the amounts required by the Bond Ordinance and within the debt service coverage target range established by the Board of Water Commissioners. Due to a delay in implementing the 2009 Rates, the SRF Junior Lien debt service coverage level for 2009 is projected to be slightly lower than the minimum policy coverage target. However, all coverage levels for 2009 are projected to be in excess of the amounts required by the Bond Ordinance.

As is common with wastewater utilities throughout the nation, increases in wastewater charges will be necessary to finance construction, operations, and maintenance of additional treatment facilities necessary to ensure continued compliance with existing Federal and state of Michigan environmental regulations and to enable compliance with potentially more stringent regulations as they become effective. This is especially applicable considering the potential capital financing requirements during the study period to comply with the limitations on CSO in the Permit. The projected increases shown in Table 6 are believed to be comparable to those that should be experienced in other areas of the United States having wastewater systems of similar size, and addressing similar infrastructure and regulatory challenges, to the System. It is expected that sewage rate increases, alone, will not result in industry leaving the Detroit area nor is it contemplated that any existing wholesale customers will seek other providers of wastewater treatment service because, at this time, there are no practicable alternative wastewater treatment facilities available, because of the historic Federal funding of the System, and because of the absence of future Federal grants due to the change over to the State Revolving Loan Program, all of which may render new and competing wholesale customer facilities economically unfeasible.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX – B**

**AUDITED FINANCIAL STATEMENTS OF THE SEWAGE DISPOSAL FUND
OF THE CITY OF DETROIT, MICHIGAN AS OF AND FOR THE
YEARS ENDED JUNE 30, 2006 AND 2005**

[THIS PAGE INTENTIONALLY LEFT BLANK]



**CITY OF DETROIT**
**SEWAGE DISPOSAL FUND**

Basic Financial Statements
and Required Supplementary Information

June 30, 2006 and 2005

(With Independent Auditors' Report Thereon)

**CITY OF DETROIT**
**SEWAGE DISPOSAL FUND**

**Table of Contents**

|  | **Page(s)** |
|---|---|
| Independent Auditors' Report | 1 – 2 |
| Basic Financial Statements: | |
| Statements of Net Assets | 3 – 4 |
| Statements of Revenues, Expenses, and Changes in Fund Net Assets | 5 |
| Statements of Cash Flows | 6 |
| Notes to Basic Financial Statements | 7 – 29 |
| Required Supplementary Information (Unaudited) | 30 |



**KPMG LLP**
Suite 1200
150 West Jefferson
Detroit  MI  48226-4429

**Independent Auditors' Report**

The Board of Water Commissioners,
the Honorable Mayor, and
Members of the City Council
City of Detroit, Michigan:

We have audited the accompanying basic financial statements of the Sewage Disposal Fund (the Fund), an enterprise fund of the City of Detroit, Michigan (the City), as of and for the years ended June 30, 2006 and 2005, as listed in the table of contents. These basic financial statements are the responsibility of the Fund's management. Our responsibility is to express an opinion on these basic financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the basic financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the City's internal control over financial reporting of the Fund. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the basic financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 1, the financial statements referred to above present only the Sewage Disposal Fund of the City and are not intended to present fairly the financial position of the City as of June 30, 2006 and 2005, and the changes in its financial position, and, where applicable, cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

In our opinion, the basic financial statements referred to above present fairly, in all material respects, the financial position of the Sewage Disposal Fund of the City as of June 30, 2006 and 2005, and the changes in its net assets and its cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

In accordance with *Government Auditing Standards,* we also audited the financial statements of the City, as described above in this report on the Fund's financial statements. This report does not include the results of our testing of internal control over financial reporting and on our tests of the City's compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters that are reported on separately by us for the City. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an

KPMG LLP  a U.S. limited liability partnership  is the U.S.
member firm of KPMG International, a Swiss cooperative.



opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

The Fund has not presented Management's Discussion and Analysis, which U.S. generally accepted accounting principles have determined is necessary to supplement, although not required to be part of, the basic financial statements.

The schedule of funding progress on page 30 is not a required part of the basic financial statements but is supplementary information required by U.S. generally accepted accounting principles. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

KPMG LLP

Detroit, Michigan
August 20, 2007

# CITY OF DETROIT
## SEWAGE DISPOSAL FUND

Statements of Net Assets

June 30, 2006 and 2005

| Assets | | 2006 | 2005 |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $ | 5,418,283 | — |
| Investments | | 47,205,044 | 47,948,538 |
| Due from other funds | | 52,798,669 | 66,388,078 |
| Accounts receivable (including $50,156,538 and $41,695,332 for unbilled sewage services and net of allowance for doubtful accounts of $85,033,590 and $64,482,340 for June 30, 2006 and 2005, respectively) | | 101,428,204 | 88,501,230 |
| Rate adjustments receivable from customers | | 46,062,009 | 12,174,737 |
| Prepaid expenses | | 5,423,804 | 381,847 |
| Inventories | | 10,456,963 | 11,173,380 |
| Restricted cash and cash equivalents | | 39,168,566 | 21,666,661 |
| Restricted investments | | 312,884,409 | 266,046,651 |
| Restricted due from other funds | | 5,541,786 | 37,638,549 |
| Total current assets | | 626,387,737 | 551,919,671 |
| Noncurrent assets: | | | |
| Restricted long-term investments | | 111,020,313 | 308,770,507 |
| Net pension asset | | 8,371,380 | 7,850,281 |
| Noncurrent rate adjustments receivable from customers | | 30,820,615 | 44,946,430 |
| Issuance costs – pension obligation certificates of participation | | 509,674 | 286,646 |
| Unamortized bond issuance costs | | 33,720,782 | 35,433,200 |
| Capital assets: | | | |
| Land | | 13,834,957 | 13,876,751 |
| Structures | | 1,703,001,142 | 1,143,914,922 |
| Interceptors, regulators, and improvements | | 474,689,271 | 542,769,689 |
| Equipment | | 1,385,071,312 | 708,031,859 |
| Construction work in progress | | 310,502,398 | 1,219,986,063 |
| Total capital assets | | 3,887,099,080 | 3,628,579,284 |
| Less accumulated depreciation | | (750,972,844) | (681,127,715) |
| Net capital assets | | 3,136,126,236 | 2,947,451,569 |
| Total noncurrent assets | | 3,320,569,000 | 3,344,738,633 |
| Total assets | $ | 3,946,956,737 | 3,896,658,304 |

**CITY OF DETROIT**
**SEWAGE DISPOSAL FUND**

Statements of Net Assets

June 30, 2006 and 2005

| Liabilities and Net Assets | | 2006 | 2005 |
|---|---|---:|---:|
| Current liabilities: | | | |
| Current liabilities payable from current assets: | | | |
| Book cash overdraft | $ | — | 758,762 |
| Accounts and contracts payable | | 13,303,914 | 7,683,870 |
| Due to other funds | | 57,747,466 | 53,133,721 |
| Accrued salaries and wages | | 1,246,496 | 1,629,152 |
| Rate adjustments payable to customers | | 7,054,465 | 4,938,657 |
| Accrued workers' compensation | | 811,538 | 895,155 |
| Accrued compensated absences | | 2,281,068 | 5,556,011 |
| Other current accrued liabilities | | 958,353 | 754,691 |
| Total current liabilities payable from current assets | | 83,403,300 | 75,350,019 |
| Current liabilities payable from restricted assets: | | | |
| Revenue bonds and revolving loan payable within one year | | 53,205,000 | 50,035,000 |
| Accrued bond interest payable | | 41,115,497 | 38,654,433 |
| Other liabilities | | — | 89,017 |
| Accounts and contracts payable | | 35,307,217 | 62,465,874 |
| Due to other funds | | 10,262,102 | 11,074,002 |
| Total current liabilities payable from restricted assets | | 139,889,816 | 162,318,326 |
| Total current liabilities | | 223,293,116 | 237,668,345 |
| Long-term liabilities: | | | |
| Revenue bonds and revolving loan payable | | 2,611,323,633 | 2,609,004,255 |
| Pension obligation certificates of participation payable | | 9,031,280 | 8,760,811 |
| Deferred swap termination fees | | 2,504,243 | 2,286,256 |
| Rate adjustments payable to customers | | 2,610,365 | 7,054,465 |
| Accrued workers' compensation | | 4,321,980 | 3,832,814 |
| Accrued compensated absences | | 11,618,703 | 8,361,795 |
| Total long-term liabilities | | 2,641,410,204 | 2,639,300,396 |
| Total liabilities | | 2,864,703,320 | 2,876,968,741 |
| Net assets: | | | |
| Invested in capital assets, net of related debt | | 532,734,469 | 646,808,681 |
| Restricted | | 303,465,827 | 166,369,102 |
| Unrestricted | | 246,053,121 | 206,511,780 |
| Total net assets | | 1,082,253,417 | 1,019,689,563 |
| Total liabilities and net assets | $ | 3,946,956,737 | 3,896,658,304 |

See accompanying notes to basic financial statements.

**CITY OF DETROIT**
**SEWAGE DISPOSAL FUND**

Statements of Revenues, Expenses, and Changes in Fund Net Assets

Years ended June 30, 2006 and 2005

|  | | 2006 | 2005 |
|---|---|---|---|
| Operating revenues: | | | |
| General customers | $ | 160,510,586 | 146,456,155 |
| Suburban customers | | 188,762,961 | 158,120,913 |
| City departments | | 530,845 | 281,062 |
| Sewage surcharge | | 774,798 | 5,914,639 |
| Miscellaneous | | 3,876,014 | 2,815,506 |
| Total operating revenues, net | | 354,455,204 | 313,588,275 |
| Operating expenses before depreciation: | | | |
| Sewage treatment plant | | 123,392,482 | 103,536,940 |
| Interceptors and regulators | | 1,237,752 | 740,870 |
| Sewer pumping stations | | 2,963,775 | 3,122,298 |
| Sewer maintenance and engineering | | 15,775,123 | 12,348,658 |
| Combined sewage overflow control basins | | 1,697,068 | 511,252 |
| Commercial | | 5,870,839 | 5,698,629 |
| Administrative and general | | 46,666,958 | 37,441,707 |
| Total operating expenses before depreciation | | 197,603,997 | 163,400,354 |
| Operating income before depreciation | | 156,851,207 | 150,187,921 |
| Depreciation | | 69,951,016 | 44,053,316 |
| Total operating income | | 86,900,191 | 106,134,605 |
| Nonoperating revenues (expenses): | | | |
| Earnings on investments | | 18,920,649 | 14,930,952 |
| Interest expense, net of capitalized interest | | (43,912,587) | (44,205,957) |
| Miscellaneous | | 655,601 | (7,038) |
| Total nonoperating expenses | | (24,336,337) | (29,282,043) |
| Increase in net assets | | 62,563,854 | 76,852,562 |
| Net assets – beginning of year | | 1,019,689,563 | 942,837,001 |
| Net assets – end of year | $ | 1,082,253,417 | 1,019,689,563 |

See accompanying notes to basic financial statements.

**CITY OF DETROIT**
**SEWAGE DISPOSAL FUND**

Statements of Cash Flows

Years ended June 30, 2006 and 2005

| | | 2006 | 2005 |
|---|---|---|---|
| Cash flows from operationing activities: | | | |
| Receipts from customers | $ | 320,864,453 | 326,617,651 |
| Internal activity – Payments to other funds | | 49,488,016 | (18,598,461) |
| Payments to suppliers | | (156,302,328) | (124,774,098) |
| Payments to the General Retirement System in excess of annual required contributions | | — | (7,850,281) |
| Payments to employees | | (69,072,910) | (68,354,091) |
| Net cash provided by operating activities | | 144,977,231 | 107,040,720 |
| Cash flows from non–capital and related financing activities: | | | |
| Proceeds from issuance of personal obligation certificates of participation | | — | 8,760,811 |
| Issuance costs–pension obligation certificates of participation | | 170,460 | (286,646) |
| Bank overdraft | | — | 758,762 |
| Net cash provided by non–capital and related financing activities | | 170,460 | 9,232,927 |
| Cash provided by capital and related financing activities: | | | |
| Contributions received from customers | | 655,600 | — |
| Acquisition and construction of capital assets, net | | (204,612,868) | (364,680,084) |
| Principal paid on revenue bond maturities and revolving loan | | (27,840,000) | (32,590,000) |
| Interest paid on revenue bonds | | (95,464,337) | (82,010,501) |
| Principal paid on refunded debt | | — | (108,765,000) |
| Proceeds from bond issuance and increase in revolving note payable, ne | | 31,459,549 | 426,848,891 |
| Swap termination fee | | — | (11,750,000) |
| Unamortized discount and bond issuance cost | | 3,756,736 | 2,542,333 |
| Net cash used in capital and related financing activities | | (292,045,320) | (170,404,361) |
| Cash flows from investing activities: | | | |
| Proceeds from sales and maturities of investments | | 622,765,697 | 651,726,904 |
| Purchase of investments | | (471,109,766) | (623,524,459) |
| Interest received on investments | | 18,920,649 | 14,930,952 |
| Net cash provided by investing activities | | 170,576,580 | 43,133,397 |
| Net increase in cash | | 23,678,951 | (10,997,317) |
| Cash at beginning of year | | 20,907,898 | 31,905,215 |
| Cash at end of year | $ | 44,586,849 | 20,907,898 |
| Reconciliation of operating income to net cash provided by operating activities: | | | |
| Operating income | $ | 86,900,191 | 106,134,605 |
| Adjustments to reconcile operating income to net cash provided by operating activities: | | | |
| Depreciation | | 69,951,016 | 44,053,316 |
| Provision for uncollectible accounts | | 20,551,250 | 21,580,685 |
| Changes in certain assets and liabilities: | | | |
| (Increase) decrease in accounts receivable | | (33,478,223) | 2,510,949 |
| (Increase) in rate refund receivable from customers | | (19,761,457) | (21,982,296) |
| (Increase) in prepaid expenses | | (5,041,957) | (375,967) |
| (Increase) decrease in inventories | | 716,417 | (282,877) |
| (Increase) in Net Pension Asset | | (521,099) | (7,850,281) |
| (Decrease) in accounts and contracts payable | | (21,538,613) | (22,701,285) |
| Increase (decrease) in accrued salaries and wages | | (382,656) | 173,323 |
| Increase (decrease) in rate refund payable to customers | | (2,328,292) | 2,615,338 |
| Increase in other accrued liabilities and accrued compensated absences and accrued workers' compensation | | 422,638 | 1,763,672 |
| Net change in due from (to) other funds | | 49,488,016 | (18,598,462) |
| Net cash provided by operating activities | $ | 144,977,231 | 107,040,720 |

See accompanying notes to basic financial statements.

6

**(1)    Summary of Significant Accounting Policies**

The City of Detroit (the City) Charter established the Water and Sewerage Department (the Department) in the year 1836 to supply water, drainage, and sewage service within and outside the City under the administration of the Board of Water Commissioners. The Sewage Disposal Fund (the Fund), an enterprise fund, separately accounts for the Sewage Disposal System (the System), as is required by bond ordinances of the City. The following is a summary of the more significant accounting policies followed in the preparation of the Fund's basic financial statements. These policies conform to U.S. generally accepted accounting principles.

The basic financial statements of the Fund have been included in the City of Detroit's Comprehensive Annual Financial Report and reported as an Enterprise fund. Copies of these reports, along with other financial information, can be obtained at the Fund's administrative office located at 735 Randolph, Detroit, Michigan, 48226.

*a)    Basis of Accounting*

The accounting policies of the Fund conform to U.S. generally accepted accounting principles (GAAP) as applicable to governmental entities. The accounts of the Fund, which are organized as an enterprise fund, are used to account for the Fund's activities, which are financed and operated in a manner similar to a private business enterprise. Accordingly, the Fund maintains its records on the accrual basis of accounting. Revenues from operations, investments, and other sources are recorded when earned. Expenses (including depreciation and amortization) of providing services to the public are accrued when incurred.

In accordance with Governmental Accounting Standards Board (GASB) Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities That Use Proprietary Fund Accounting*, the Fund applies all applicable GASB pronouncements, as well as all Financial Accounting Standards Board (FASB) Statements and Interpretations, Accounting Principles Board (APB) Opinions, and Accounting Research Bulletins (ARBs) issued on or before November 30, 1989, unless those pronouncements conflict with or contradict GASB pronouncements. The Fund also has the option of following FASB guidance issued after November 30, 1989, but has elected not to do so.

*b)    Cash and Cash Equivalents*

Cash and cash equivalents include cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition.

*c)    Investments*

Investments are stated at fair value based on quoted market price.

*d)    Inventories*

Inventories consist of operating and maintenance and repair parts for sewage lines and are valued at the lower of cost or market, with cost being determined on an average cost method.

13-53846-tjt    Doc 5029-5    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 97 of 174

### e) *Capital Assets*

Capital assets are recorded at historical cost, together with interest capitalized during construction. Depreciation is computed using the straight-line method over the estimated useful lives of the related assets as follows:

| | |
|---|---|
| Improvements to land | 67 years |
| Structures | 40 years |
| Interceptors and regulators | 100 years |
| Equipment | 3 – 20 years |

### f) *Workers' Compensation*

The Fund has no insurance coverage for workers' compensation claims. Workers' compensation expenses are recorded when the occurrence of the liability is probable and the amount is reasonably estimable. The amounts recorded as of June 30, 2006 and 2005 are based on compensation expected to be paid, along with estimated medical costs, for all claims known as of the balance sheet date, and historical data are used in computing the liability for estimated incurred but unknown claims as of the balance sheet date.

| | | June 30 | | |
|---|---|---|---|---|
| | | **2006** | **2005** | **2004** |
| Balance at beginning of year | $ | 4,727,969 | 5,206,684 | 4,844,529 |
| Current year claims and changes in estimates | | 964,548 | 475,827 | 1,543,501 |
| Claims payments | | (558,999) | (954,542) | (1,181,346) |
| Balance at end of year | $ | 5,133,518 | 4,727,969 | 5,206,684 |

### g) *Capitalized Interest*

The Fund capitalizes qualifying net interest costs of the System on bonds issued for capital construction in accordance with Statement of Financial Accounting Standards Statement No. 34 *Capitalization of Interest Cost* and Statement No. 62 *Capitalization of Interest Cost in situations Involving Certain Tax-Exempt Borrowings and Certain Gifts and Grants an Amendment of FASB Statement No. 34.* Accordingly, capitalized interest for the years ended June 30, 2006 and 2005 was $54,012,814 and $50,767,951, respectively.

### h) *Taxes and City Services*

The Fund pays no direct federal, state, or local taxes, except local taxes on excess property and federal Social Security taxes. The Fund reimburses the City for most of the direct services furnished by other City departments, including general staff services. Charges are billed for all sewage services provided to City departments.

*i)*     ***Shared Costs***

Costs related to shared facilities and personnel are allocated to the Fund on a basis that relates costs incurred to the Fund benefited.

*j)*     ***Compensated Absences***

The Fund records as a liability estimated vested vacation, sick pay, and banked overtime in accordance with GASB Statement No. 16, *Accounting for Compensated Absences*. Unused vacation pay accumulates until termination of employment, while there is no vesting of sick pay until an employee reaches age 60 or completes 25 years of service.

*k)*     ***Accrued Revenue***

The Fund records unbilled revenues for services provided prior to year-end by accruing actual revenues billed in the subsequent month.

*l)*     ***Net Assets***

Net assets are categorized as follows:

**Invested in capital assets:** This consists of capital assets, net of accumulated depreciation and related debt.

**Restricted:** This consists of net assets that are legally restricted by outside parties or by law through constitutional provisions or enabling legislation. When both restricted and unrestricted resources are available for use, generally it is the Fund's policy to use restricted resources first, and then unrestricted resources when they are needed.

**Unrestricted:** This consists of net assets that do not meet the definition of "restricted" or "invested in capital assets."

*m)*     ***Classification of Revenues***

The Fund has classified its revenues as either operating or nonoperating revenues according to the following criteria:

**Operating revenues**: Operating revenues include activities that have the characteristics of exchange transactions, such as revenue from charges for sewage service.

**Nonoperating revenues**: Nonoperating revenues include activities that have the characteristics of nonexchange transactions, which are defined as nonoperating revenues by GASB Statement No. 9, *Reporting Cash Flows of Proprietary and Nonexpendable Trust Funds and Government Entities That Use Proprietary Fund Accounting*, and GASB Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis for State and Local Governments,* such as investment income and interest expense.

### n)   Use of Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### o)   New Accounting Pronouncements

The Fund adopted GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries.* This Statement establishes accounting and financial reporting standards for impairment of capital assets. The Fund implemented Statement No. 42 with the year ended June 30, 2006.

The Fund adopted GASB Statement No. 46, *Net Assets Restricted by Enabling Legislation – an amendment of GASB Statement No. 34.* This Statement clarifies that a legally enforceable enabling legislation restriction is one that a party external to a government – such as citizens, public interest groups, or the judiciary – can compel a government to honor. This statement also specifies the accounting and financial reporting requirements if new enabling legislation replaces existing legislation or if legal enforceability is reevaluated. The Fund implemented Statement No. 46 with the year ended June 30, 2006.

In July 2004, the GASB issued Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions.* This Statement establishes accounting and financial reporting standards for employers that participate in a defined-benefit "other postemployment benefit" (OPEB) plan. The Fund will implement Statement No. 45 beginning with the year ended June 30, 2007. The Fund is currently evaluating the impact of adopting Statement No. 45.

## (2)   Deposits and Investments

The following is a complete listing of deposits and investments held by the Fund at June 30, 2006:

| | | |
|---|---|---|
| Deposits | $ | 8,833,849 |
| Investments | | 506,862,766 |
| Total deposits and investments | $ | 515,696,615 |

13-53846-tjt    Doc 5029-5    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 100 of 174

The deposits and investments of the Fund at June 30, 2006 are reflected in the basic financial statements as follows:

| | | |
|---|---|---:|
| Unrestricted: | | |
| Deposits | $ | 1,418,283 |
| Investments | | 51,205,044 |
| Restricted: | | |
| Deposits | | 7,415,566 |
| Investments – current | | 344,637,409 |
| Investments – noncurrent | | 111,020,313 |
| Total cash and investments | $ | 515,696,615 |

State law authorizes the Fund to make deposits in the accounts of federally insured financial institutions. Cash held by fiscal agents or by trustees is secured in accordance with the requirements of the agency or trust agreement.

The Fund is authorized to invest in obligations of the U.S. government or its agencies, certificates of deposit, savings and depository accounts of insured institutions, commercial paper of certain investment quality, repurchase agreements, banker's acceptances, mutual funds of certain investment quality, and investment pools as authorized by state law.

### *Custodial Credit Risk of Bank Deposits*

Custodial credit risk is the risk that in the event of bank failure, the Fund's deposits may not be returned by the bank. The Fund does not have a deposit policy for custodial credit risk. At June 30, 2006 and 2005, the Fund had deposits of $8,436,281 and $12,918,713, respectively, that were exposed to custodial credit risk, as they were uninsured and uncollateralized.

### *Custodial Credit Risk of Investments*

Custodial credit risk is the risk that in the event of failure of the counterparty, the Fund will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party. The Fund does not have a policy for custodial credit risk. As of June 30, 2006 and 2005, the Fund had no investments subject to custodial credit risk.

*Interest Rate Risk*

Interest rate risk is the risk that, over time, the value of investments will decrease as a result of a rise in interest rates. The Fund's investment policy does not specifically restrict investment maturities other than commercial paper, which can only be purchased with a 270-day maturity. The Fund's policy minimizes interest rate risk by requiring that the Fund attempt to match its investments with anticipated cash flow requirements. Unless related to a specific cash flow, the Fund is generally not permitted to directly invest in securities maturing more than 10 years from the original date of purchase.

| | | Investment maturities in years | |
| | Fair value | Less than one year | one to five years |
| --- | --- | --- | --- |
| Investment | | | |
| U.S. government agency securities | $ 257,920,511 | 161,876,955 | 96,043,556 |
| Certificate of deposit | 23,421,649 | 23,421,649 | — |
| Commercial paper | 34,981,735 | 34,981,735 | — |
| Repurchase agreements | 19,985,604 | 5,008,847 | 14,976,757 |
| Money market | 170,553,267 | 170,553,267 | — |
| Total investments | $ 506,862,766 | 395,842,453 | 111,020,313 |

*Credit Risk*

The Fund's investment policy complies with state law. The Fund limits its investments in commercial paper, mutual funds, and external investment pools that purchase commercial paper to the top two rating classifications issued by two nationally recognized statistical rating organizations (NRSROs).

As of June 30, 2006, the Fund had the following investments, maturities, and credit quality ratings of debt securities:

| Investment | Fair value | Rating | Rating organization |
| --- | --- | --- | --- |
| U.S. government agency securities | $ 161,876,955 | AAA, Aaa | S & P and Moody's |
| U.S. government agency securities | 96,043,556 | AAA, Aaa | S & P and Moody's |
| Repurchase agreements | 14,976,757 | AAA, Aaa | S & P and Moody's |
| Repurchase agreements | 5,008,847 | AAA, Aaa | S & P and Moody's |
| Money market | 60,160,500 | Aaa | Moody's |
| Money market | 21,834,727 | Not rated | N/A |
| Money market | 88,558,040 | AAAm, Aaa | S & P and Moody's |
| Certificates of Deposit | 23,421,649 | Not rated | N/A |
| Commercial paper | 34,981,735 | Not rated | N/A |
| Total investments | $ 506,862,766 | | |

13-53846-tjt    Doc 5029-5    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 102 of 174

*Concentration of Credit Risk*

Concentration of credit risk is the risk of loss attributed to the magnitude of the Fund's investment in a single issuer. The Fund's policy specifies a number of limitations to minimize concentration of credit risk, including prohibiting investing more than 5% of the portfolio in securities (other than U.S. government, mutual funds, external investment pools, and other pooled investments) of any one issuer.

More than 5% of the Fund's investments are in Federal Home Loan Bank and Federal National Mortgage Association securities. These investments are 28% and 22%, respectively, of the Fund's total investments.

**(3)    Restricted Assets**

Restricted assets, principally cash and investments, are available for debt service on revenue bonds and to provide funds for improvements, enlargements, extensions, and construction. In certain instances, minimum levels of assets are required by bond ordinance provisions or by Board of Water Commissioners' decree. These assets are maintained as follows: (1) With respect to the Bond and Interest Redemption Fund, after provision has been made for expenses of operation and maintenance of the System, a sum proportionately sufficient to provide for payment, when due, of the current principal and interest is set aside. The Bond Reserve Account is part of the Bond and Interest Redemption Fund, and the amounts credited to this account are to be used only to pay principal and interest on the bonds when current revenues are not sufficient. (2) With respect to the Extraordinary Repair and Replacement Reserve Fund, after meeting the requirements of the foregoing funds, monthly deposits in an amount equal to one twelfth of 3% of the budgeted operation and maintenance expense of the System for the fiscal year must be set aside until the aggregate amount funded totals at least 15% of that year's budgeted operating and maintenance costs. These deposits are to be used for major unanticipated repairs and replacement to the System with actual or anticipated cost exceeding $1 million. Once this fund is fully funded, deposits required are amounts needed to maintain fully funded status. Borrowings of up to 50% of the balance in this fund on the first day of the related fiscal year are allowed for transfer to and use from the Improvement and Extension Fund. Any such borrowings must be repaid prior to any deposits being made to the Improvement and Extension Fund. (3) After the aforementioned deposits have been made, excess amounts may be deposited in the Improvement and Extension Fund, established for the payment of improvements, enlargements, repairs, extensions, or betterment to the System. (4) With respect to the Construction Fund, the portion of the proceeds of the sale of bonds for building or improving the System is deposited in this fund. A separate depository account is required for each series of bonds. Proceeds for construction purposes received from federal and state grants and other sources that restrict the use of such proceeds are also deposited into this account.

When both restricted and unrestricted resources are available for use, generally it is the Fund's policy to use restricted resources first, and then unrestricted resources when they are needed.

The Fund's statement of net assets reports $303,996,408 of restricted net assets, of which $299,071,259 is restricted by enabling legislation.

**(4)  Capital Assets**

Capital asset activity for the fiscal years ended June 30, 2006 and 2005 is as follows:

| | Balance, June 30, 2005 | Additions | Disposals | Balance, June 30, 2006 |
|---|---|---|---|---|
| Nondepreciable assets: | | | | |
| Land | $  13,876,751 | — | (41,794) | 13,834,957 |
| Construction in progress | 1,219,986,063 | 284,368,969 | (1,193,852,634) | 310,502,398 |
| | 1,233,862,814 | 284,368,969 | (1,193,894,428) | 324,337,355 |
| Depreciable assets: | | | | |
| Interceptors, regulators, and land improvements | 542,769,689 | 106,574,102 | (174,654,520) | 474,689,271 |
| Structures | 1,143,914,922 | 964,622,796 | (405,536,576) | 1,703,001,142 |
| Equipment | 708,031,859 | 910,940,701 | (233,901,249) | 1,385,071,311 |
| Accumulated depreciation | (681,127,715) | (69,951,016) | 105,887 | (750,972,844) |
| | 1,713,588,755 | 1,912,186,583 | (813,986,458) | 2,811,788,880 |
| Total | $  2,947,451,569 | 2,196,555,552 | (2,007,880,886) | 3,136,126,235 |

| | Balance, June 30, 2004 | Additions | Disposals | Balance, June 30, 2005 |
|---|---|---|---|---|
| Nondepreciable assets: | | | | |
| Land | $  13,876,751 | — | — | 13,876,751 |
| Construction in progress | 1,203,738,078 | 439,665,001 | (423,417,016) | 1,219,986,063 |
| | 1,217,614,829 | 439,665,001 | (423,417,016) | 1,233,862,814 |
| Depreciable assets: | | | | |
| Interceptors, regulators, and land improvements | 532,455,750 | 10,313,939 | | 542,769,689 |
| Structures | 891,488,855 | 252,665,492 | (239,425) | 1,143,914,922 |
| Equipment | 572,095,371 | 136,220,745 | (284,257) | 708,031,859 |
| Accumulated depreciation | (637,571,035) | (44,053,316) | 496,636 | (681,127,715) |
| | 1,358,468,941 | 355,146,860 | (27,046) | 1,713,588,755 |
| Total | $  2,576,083,770 | 794,811,861 | (423,444,062) | 2,947,451,569 |

(5)  **Impaired Capital Assets**

Beginning fiscal year ended June 30, 2006, the Fund implemented GASB Statement No. 42–*Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries.* As of June 30 2006, the Fund did not have any impaired assets reportable under Statement No. 42.

(6)  **Revenue Bonds**

The outstanding indebtedness of the Fund was $2,657,446,122 and $2,653,826,572 at June 30, 2006 and 2005, respectively. The interest rates on the outstanding bonds range from 4.2% to 6.5%. Net revenues of the Fund are pledged to repayment of bonds.

Future debt service requirements at June 30, 2006 are as follows:

|  | Principal | Bond interest | Swap interest | Total requirements |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2007 | $   53,205,000 | 98,382,197 | 32,993,250 | 184,580,447 |
| 2008 | 53,704,128 | 100,782,453 | 33,554,365 | 188,040,946 |
| 2009 | 56,925,000 | 107,542,236 | 32,780,631 | 197,247,867 |
| 2010 | 59,795,000 | 105,879,518 | 33,307,497 | 198,982,015 |
| 2011 | 62,270,000 | 102,905,996 | 32,646,118 | 197,822,114 |
| 2012 – 2016 | 330,454,096 | 515,844,103 | 178,428,909 | 1,024,727,108 |
| 2017 – 2021 | 375,230,225 | 490,294,825 | 198,035,091 | 1,063,560,141 |
| 2022 – 2026 | 431,147,673 | 417,634,980 | 205,211,098 | 1,053,993,751 |
| 2027 – 2031 | 614,335,000 | 222,394,897 | 97,112,842 | 933,842,739 |
| 2032 – 2036 | 620,380,000 | 68,643,718 | 19,553,665 | 708,577,383 |
| | $ 2,657,446,122 | 2,230,304,923 | 863,623,466 | 5,751,374,511 |

In fiscal 2005, the Fund issued $273,355,000 of City of Detroit, Michigan, Sewage Disposal System Revenue Second Lien Bonds, Series 2005-A; $40,215,000 of City of Detroit, Michigan Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-B; and $63,160,000 of City of Detroit, Michigan Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-C. The net proceeds were used to refund a portion of the City's outstanding Sewage Disposal System Revenue Bonds and Revenue Refunding Bonds and to pay costs of issuance associated with the 2005 bonds.

The net proceeds of the Sewage Disposal System Revenue Second Lien Bonds, Series 2005-A, will be used (a) to deposit into the Construction Fund and (b) for the payment of the related costs of issuance, including the premium for the municipal bond insurance.

The net proceeds of the Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-B, will be used (a) to advance-refund the $22,355,000 principal amount of the City's Sewage Disposal System Senior Lien Bonds, Series 1997-A, comprising serial bonds maturing in the year 2022 (the Advance Refunded 1997-A Bonds), with an average interest rate of 5%, (b) to advance-refund $115,000 of 1999-A Sewage Disposal System Senior Lien Bonds, maturing in 2011, and $3,425,000 1999-B Sewage Disposal System Senior Lien Bonds, maturing in 2012 (the Advance Refunded 1999-A Bonds), with an average interest rate of 5.20% and 5.25%, respectively, (c) to advance-refund $8,215,000 of 2003-A Sewage Disposal System Senior Lien Bonds, maturing in 2014, and $8,470,000 Sewage Disposal System Senior Lien Bonds, maturing in 2015 (the Advance Refunded 2003-A Bonds), with an average interest rate of 5.0%, and (d) the payment of the related costs of issuance, including the premium for the municipal bond insurance.

The proceeds of the Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-C, will be used (a) to currently refund $6,770,000 principal amount of the City's Sewage Disposal System Senior Lien Bonds, Series 1995-A bonds, maturing in the year 2025, with an average interest rate of 5%, (b) to currently refund the following amounts of the City's Sewage Disposal System Senior Lien Bonds, Series 1995-B bonds, $2,400,000 principal amount maturing in the year 2008, with an average interest rate of 5.25%, $20,410,000 principal amount of term bonds maturing in the year 2015, with an average interest rate of 5.25%, and $36,605,000 principal amount of term bonds, maturing in the year 2021, with an average interest rate of 5.25% (together with the "Currently Refunded 1995-A/B Bonds"), and (c) for the payment of the related costs of issuance, including the premium for the municipal bond insurance.

Proceeds of the Refunding Bonds were deposited into an irrevocable trust with an escrow agent to provide for all future principal and interest payments on the Currently Refunded 1995-A/B Bonds when due to and including July 1, 2005 at 100% and 101%; the Advance Refunded 1997-A Bonds when due to and including July 1, 2007 at 101%; the Advance Refunded 1999-A Bonds when due to and including July 1, 2010 at 101%; and the Advance Refunded 2003-A Bonds when due to and including July 1, 2013 at 100%.

The advance refunding resulted in a difference between the reacquisition price and net carrying amount of the old debt of $8,987,394. This difference, reported in the basic financial statements as a deduction from bonds payable, is being charged to operations through the year 2024 using the straight-line method. The fund completed the advance refunding to reduce its total debt service payments over the next 20 years and to obtain an economic gain (difference between the present values of the old and new debt service payments) of $6,143,299.

In prior years, the Fund defeased certain bonds by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old bonds. Accordingly, the trust account assets and liabilities for the defeased bonds are not included in the Fund's financial statements. Similarly, the interest expense related to the defeased bonds and the related interest income earned on the escrow fund investments have not been recognized in the statements of revenues, expenses, and changes in fund net assets. As of June 30, 2006 and 2005, approximately $400,800,000 and $593,330,000 of bonds outstanding are considered defeased.

Bonds outstanding at June 30, 2006 include $2,439,587,743 of bonds callable at various dates after June 30, 2006. These bonds are callable at varying premiums, depending on the issue and length of time to maturity.

**(7)** **Pension Obligation Certificates of Participation (POC's)**

*2005 Issuance*

In June 2005, the Detroit Retirement Systems Funding Trust issued $1,440,000,000 ($640 million of fixed rate, Series A, and $800 million of floating rate, Series B) of taxable Pension Obligation Certificates of Participation (COPs). The Trust was created by the General Retirement System Service Corporation (GRSSC) and the Police and Fire Retirement System Service Corporation (PFRSSC), both blended component units of the City. The City entered into service contracts with the GRSSC and PFRSSC to facilitate the transaction.

The POC's were issued for the purpose of funding certain unfunded accrued actuarial liabilities (UAAL) of the two retirement systems of the City, which include the General Retirement System (GRS) and the Police & Fire Retirement System (PFRS), and a portion of the then current year normal contribution. The GRS includes employees and retirees of certain governmental funds, proprietary funds (Transportation Fund, Sewage Disposal Fund and Water Fund) and the Detroit Public Library, a discretely presented component unit.

A proportionate amount of the liability was recorded on the books of the City's Governmental Activities, Transportation Fund, Sewage Disposal Fund and Water Fund, based on each fund's portion of the overall UAAL liquidated by the use of the 2005 POC net proceeds. In connection with the 2005 transactions, the Service Corporations entered into interest rate exchange agreements (swap agreements) to hedge the variable rate interest exposure associated with the issuance of the 2005 Series-B Certificates.

The original Series A and Series B certificates were not specifically related to either of the Service Corporations. The amount of proceeds from the 2005 issuance recorded on each Service Corporation's books was based on the respective proportion of UAAL funding required for the corresponding Pension System.

*Fiscal Year 2006 Events*

Michigan law entitles each Retirement System to have its UAAL funded over a specified period (Amortization Period), which may be duly changed up to a 30-year maximum. Each 2005 Service Contract required the City to make 2005 COP service payments over a period that was limited to the PFRS or GRS Amortization Period (13 years for PFRS and 20 years for the GRS). The funding Ordinance anticipated the possible future extension of the PFRS and GRS Amortization Periods and authorized the Service Corporations, in that event, to assist the City in gaining the financial benefits of making its 2005 COP Service payments over a similarly lengthened period.

On February 8, 2006, the governing board of the GRS extended the Amortization Period for GRS UAAL from 20 to 30 years. On March 30, 2006, the governing board of the PFRS UAAL extended the amortization period for PFRS UAAL from 13 to 30 years. Accordingly, the Detroit Retirement Systems Funding Trust 2006 issued $948,540,000 of taxable Certificates of Participation Series 2006. The City also terminated the Swap agreements entered into in the 2005 transaction and received $48,932,455 as a result of the swap termination.

The Taxable Certificates of Participation Series 2006 were issued to enable the City to replace certain scheduled payment obligations that it incurred to provide funding for the 2005 Subject UAAL with new scheduled payment obligations payable over the extended 30-year periods under the 2006 Service Contracts. This will enable the City to achieve financial benefits from the lengthened payment periods compared to the payment period included within the 2005 Series A and B payment schedules.

The 2006 Certificates were issued to fund the optional redemption $104,055,000 aggregate principal amount of Series 2005-A COPs of certain maturities and the purchase and cancellation of $800,000,000 aggregate principal amount of Series 2005-B COPs of certain maturities.

The City did not pay off the $104,055,000 of optionally redeemed Series A 2005 COPs until July 13, 2006. At June 30, 2006 the portion of the 2006 COP proceeds to pay the $104,055,000 COPs were in irrevocable trust investment accounts and on July 13, 2006 were disbursed to pay the COP service obligation and accrued interest from June 15, 2006 (the last interest payment date) to July 13, 2006. For financial reporting purposes, this disbursement was treated as if it had occurred on June 30, 2006.

In economic substance, the City paid off $904,055,000 of 2005 Series Certificates with the net proceeds from the $948,540,000 received from the issuance of Certificates of Participation Series 2006. The net effect of this on the City's balance sheet is to add on additional $44,485,000 of Certificates of Participation obligations to the government-wide balance sheet. The refunding resulted in an increase of approximately $992 million in required aggregate future cash outflows for debt service. This resulted in an economic loss (difference between the present values of the old and new debt service requirements) of $89,265,111.

Certain maturities of the Series 2005-A COPs still remain outstanding concurrently with the 2006 Certificates. The 2005 COPs and the 2006 Certificates are wholly independent of each other.

The redemption dates and a summary of the aggregate principal and interest amounts for the remaining 2005 POC's are as follows:

| | | Primary Government Principal Business-type Activities | | | |
|---|---|---|---|---|---|
| Maturity (June 15) | Governmental Activities | Sewer Disposal Fund | Transportation Fund | Water Fund | Totals |
| 2007 | - | - | - | - | - |
| 2008 | - | - | - | - | - |
| 2009 | - | - | - | - | - |
| 2010 | 3,861,370 | 28,880 | 340,053 | 519,698 | 4,750,000 |
| 2011 | 8,905,539 | 66,606 | 784,268 | 1,198,587 | 10,955,000 |
| 2012-2016 | 113,686,862 | 850,288 | 10,011,862 | 15,300,989 | 139,850,000 |
| 2017-2021 | 153,857,304 | 1,150,731 | 13,549,481 | 20,707,484 | 189,265,000 |
| 2022-2025 | 155,369,335 | 1,162,040 | 13,682,639 | 20,910,986 | 191,125,000 |
| Total | $ 435,680,409 | $ 3,258,546 | $ 38,368,303 | $ 58,637,742 | $ 535,945,000 |

# CITY OF DETROIT
# SEWAGE DISPOSAL FUND

Notes to Basic Financial Statements

June 30, 2006 and 2005

| Maturity (June 15) | Governmental Activities | Primary Government Interest Business Type Activities | | | Totals |
| | | Sewer Disposal Fund | Transportation Fund | Water Fund | |
|---|---|---|---|---|---|
| 2007 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | $ 25,762,441 |
| 2008 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,441 |
| 2009 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,441 |
| 2010 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,441 |
| 2011 | 20,776,224 | 155,390 | 1,829,663 | 2,796,249 | 25,557,526 |
| 2012-2016 | 93,492,246 | 699,248 | 8,233,418 | 12,583,018 | 115,007,929 |
| 2017-2021 | 60,177,138 | 450,077 | 5,299,514 | 8,099,174 | 74,025,904 |
| 2022-2025 | 20,083,887 | 150,212 | 1,768,692 | 2,703,068 | 24,705,859 |
| Total | $ 278,300,709 | $ 2,081,470 | $ 24,508,620 | $ 37,456,183 | $ 342,346,982 |

The redemption dates and a summary of the aggregate principal and interest amounts for Series 2006 Pension Obligation Certificates are as follows:

| Maturity (June 15) | Governmental Activities | Primary Government Principal Business-type Activities | | | Totals |
| | | Sewer Disposal Fund | Transportation Fund | Water Fund | |
|---|---|---|---|---|---|
| 2007 | $ - | $ - | $ - | $ - | $ - |
| 2008 | - | - | - | - | - |
| 2009 | - | - | - | - | - |
| 2010 | - | - | - | - | - |
| 2011 | - | - | - | - | - |
| 2012-2016 | - | - | - | - | - |
| 2017-2021 | 33,557,338 | 250,982 | 2,955,235 | 4,516,445 | 41,280,000 |
| 2022-2026 | 84,689,193 | 633,408 | 7,458,175 | 11,398,224 | 104,179,000 |
| 2027-2031 | 318,531,321 | 2,382,363 | 28,051,539 | 42,870,777 | 391,836,000 |
| 2032-2035 | 334,309,285 | 2,500,370 | 29,441,030 | 44,994,315 | 411,245,000 |
| Total | $ 771,087,137 | $ 5,767,123 | $ 67,905,979 | $ 103,779,761 | $ 948,540,000 |

|  |  | Primary Government Interest Business Type Activities | | | |
|---|---|---|---|---|---|
| Maturity (June 15) | Governmental Activities | Sewer Disposal Fund | Transportation Fund | Water Fund | Totals |
| 2007 | $ 40,020,806 | $ 299,324 | $ 3,524,442 | $ 5,386,356 | $ 49,230,928 |
| 2008 | 44,079,824 | 329,682 | 3,881,901 | 5,932,655 | 54,224,061 |
| 2009 | 47,826,551 | 357,705 | 4,211,857 | 6,436,922 | 58,833,035 |
| 2010 | 47,826,551 | 357,705 | 4,211,857 | 6,436,922 | 58,833,035 |
| 2011 | 47,826,551 | 357,705 | 4,211,857 | 6,436,922 | 58,833,035 |
| 2012-2016 | 239,132,754 | 1,788,524 | 21,059,285 | 32,184,612 | 294,165,175 |
| 2017-2021 | 236,954,334 | 1,772,231 | 20,867,442 | 31,891,421 | 291,485,428 |
| 2022-2026 | 223,400,997 | 1,670,863 | 19,673,864 | 30,067,292 | 274,813,016 |
| 2027-2031 | 165,038,717 | 1,234,359 | 14,534,175 | 22,212,378 | 203,019,629 |
| 2032-2035 | 52,643,635 | 393,733 | 4,636,075 | 7,085,248 | 64,758,691 |
| Total | $ 1,144,750,722 | $ 8,561,832 | $ 100,812,754 | $ 154,070,728 | $ 1,408,196,036 |

**(8) Deferred Swap Termination Proceeds and Payments**

During the year ended June 30, 2004, the Fund and its counterparty terminated a forward starting swap agreement related to the future issuance of debt in fiscal year 2005. The Fund received a termination payment in the amount of $14,056,137 that has been deferred to offset future debt service. The proceeds will be recognized over the life of the debt using the straight –line method.

During the year ended June 30, 2005, the Fund and its counterparty terminated a forward starting swap agreement related to the issuance of debt in fiscal year 2005. The Fund paid a termination payment in the amount of $11.75 million that has been reserved to offset future debt service. The expense will be recognized over the life of the debt that was issued in fiscal year 2005 using straight-line method.

During the year ended June 30, 2006, The City terminated the Swap agreements entered into in the 2005 transaction and received $48,932,455. The Fund's allocated share is $297,509. The proceeds will be recognized over the life of the debt using the straight-line method.

During fiscal year ended June 30, 2006, the amount of amortization expense was $79,522. The remaining balance of the Sewer Swap Termination Fee as of June 30, 2006 and 2005 is $2,504,243 and 2,286,256, respectively.

**(9)   Long-Term Liabilities**

Long-term liability activity for the years ended June 30, 2006 and 2005 is as follows:

| | Balance, June 30, 2005 | Increase | Decrease | Balance, June 30, 2006 | Amount due within one year |
|---|---|---|---|---|---|
| Revenue bonds payable | $ 2,653,826,572 | 53,654,550 | (50,035,000) | 2,657,446,122 | 53,205,000 |
| Total revenue bond payable | 2,653,826,572 | 53,654,550 | (50,035,000) | 2,657,446,122 | 53,205,000 |
| Add: | | | | | |
| Unamortized premium | 83,676,956 | — | (5,128,099) | 78,548,857 | — |
| Less: | | | | | |
| Deferred charges on refunding | 63,094,656 | 10,013,373 | (3,707,707) | 69,400,322 | — |
| Discount | 15,369,617 | — | (13,303,593) | 2,066,024 | — |
| Net revenue bonds payable | 2,659,039,255 | 43,641,177 | (38,151,799) | 2,664,528,633 | 53,205,000 |
| Pension obligation certificates payable | 8,760,811 | 270,469 | — | 9,031,280 | — |
| Other liabilities: | | | | | |
| Accrued workers' compensation | 4,727,969 | 964,548 | (558,999) | 5,133,518 | 811,538 |
| Accrued compensated absences | 13,917,806 | 3,256,908 | (3,274,943) | 13,899,771 | 2,281,068 |
| Deferred swap termination | 2,286,256 | 297,509 | (79,522) | 2,504,243 | — |
| Total other liabilities | 20,932,031 | 4,518,965 | (3,913,464) | 21,537,532 | 3,092,606 |
| Total | $ 2,688,732,097 | 48,430,611 | (42,065,263) | 2,695,097,445 | 56,297,606 |

| | Balance, June 30, 2004 | Increase | Decrease | Balance, June 30, 2005 | Amount due within one year |
|---|---|---|---|---|---|
| Revenue bonds payable | $ 2,375,152,600 | 420,028,972 | (141,355,000) | 2,653,826,572 | 50,035,000 |
| Add: | | | | | |
| Unamortized premium | 70,051,130 | 17,150,459 | (3,524,633) | 83,676,956 | — |
| Less: | | | | | |
| Deferred charges on refunding | 62,230,146 | 4,456,953 | (3,592,443) | 63,094,656 | — |
| Discount | 16,297,959 | — | (928,342) | 15,369,617 | — |
| Net revenue bonds payable | 2,366,675,625 | 432,722,478 | (140,358,848) | 2,659,039,255 | 50,035,000 |
| Pension obligation certificates payable | — | 8,760,811 | — | 8,760,811 | |
| Other liabilities: | | | | | |
| Accrued workers' compensation | 5,206,684 | 475,827 | (954,542) | 4,727,969 | 895,155 |
| Accrued compensated absences | 12,158,263 | 2,255,075 | (495,532) | 13,917,806 | 5,556,011 |
| Deferred swap termination | 14,056,137 | — | (11,769,881) | 2,286,256 | — |
| Total other liabilities | 31,421,084 | 2,730,902 | (13,219,955) | 20,932,031 | 6,451,166 |
| Total | $ 2,398,096,709 | 444,214,191 | (153,578,803) | 2,688,732,097 | 56,486,166 |

**(10) Derivatives Not Reported at Fair Value**

The Fund is party to derivative financial instruments consisting of interest rate swaps that are intended to effectively convert variable-rate financings to fixed-rate financings. These are not reported at fair value on the statement of net assets at June 30, 2006.

*Objective of the swaps.* In order to better manage its interest rate exposure and to reduce the overall costs of its financings, the Fund has entered into nine separate fixed-payor interest rate swaps. The Fund is also a party in the City's POC's related to the GRS. The City has entered into two separate fixed-payor interest rate swaps related to the POC's and the GRS.

*Market access risk.* The City is exposed to market access risk on its hedge swaps or forward starting swaps in the event that it will not be able to enter credit markets or in the event that credit will become more costly.

*Terms, fair values, and credit risk.* Certain key terms, fair market values, and counterparty credit ratings relating to the outstanding swaps as of June 30, 2006 are presented below. The notional amounts of the swaps, except those with effective dates of September 1, 2006 and March 1, 2007, match the principal amounts of the outstanding financings. The swaps with effective dates of September 1, 2006 and March 1, 2007, were entered into to hedge future interest rate risk and will be associated with financings expected to be issued prior to the effective dates. Except as discussed under rollover risk, the Fund's swap agreements

contain scheduled reductions to outstanding notional amounts that match scheduled or anticipated amortization of associated financings.

| Associated financing issue | Notional amounts (1) | Effective date | Fixed rate paid | Variable rate received | Fair values | Sweep termination date | Final maturity of bonds | Counterparty credit rating |
|---|---|---|---|---|---|---|---|---|
| Sewage 1998-A | $ 68,000,000 | 12/10/1998 | 4.51% | BMA (2) | $ (3,258,018) | 7/1/2023 | 7/1/2023 | Aa2/AA-/NR |
| Sewage 1998-B | 67,900,000 | 12/10/1998 | 4.51 | BMA | (3,260,270) | 7/1/2023 | 7/1/2023 | Aa2/AA-/NR |
| Sewage 1999-A | 27,900,000 | 10/22/1999 | 7.48 | IMT+.28% | (9,227,590) | 7/1/2029 | 7/1/2029 | Aa1/AA-/AA+ |
| Sewage 2001 C-1 | 156,500,000 | 10/23/2001 | 4.43 | BMA | (7,116,931) | 7/1/2027 | 7/1/2027 | Aa2/AA+/AAA |
| Sewage 2001 C-2 | 124,500,000 | 10/23/2001 | 4.47 | BMA | (6,565,848) | 7/1/2029 | 7/1/2029 | Aa2/AA+/AAA |
| Sewage 2003-B | 150,000,000 | 5/22/2003 | 4.14 | BMA | 1,924,401 | 7/1/2033 | 7/1/2033 | Aa2/AA+/AAA |
| Sewage Hedge Swap | 125,000,000 | 9/1/2006 | 4.96 | BMA | 7,867,616 | 7/1/2036 | N/A | Aa2/AA+/AAA |
| Sewage Hedge Swap | 56,250,000 | 3/1/2010 | 4.93 | BMA | 1,320,373 | 7/2/2039 | N/A | Aa3/A+/AA- |
| Sewage Hedge Swap | 168,750,000 | 3/1/2010 | 4.93 | BMA | (4,141,786) | 7/3/2039 | N/A | Aa3/A+/AA- |
| Pension Obligation Certificates - GRS | 99,621,000 | 6/7/2006 | 4.99 | 3 MTH LIBOR + .34% | (183,936) | 6/15/2034 | 6/15/2034 | Aa3/A+/AA- |
| Pension Obligation Certificates - GRS | 42,252,000 | 6/7/2006 | 4.99 | 3 MTH LIBOR + .30% | (84,084) | 6/15/2029 | 6/15/2029 | Aa3/A+/AA- |

(1) Notional amount balance as of July 1, 2006

(2) The Bond Market Association Municipal Swap Index™

(3) Denotes the the swap termination date does not match the final maturity of the financings

***Fair value.*** Because interest rates have generally declined since the time the swaps were negotiated, most of the Fund's swaps have a negative fair value as of June 30, 2006. The negative fair values may be countered by lower total interest payments required under the variable-rate financings, creating lower synthetic interest rates.

***Credit risk.*** As of June 30, 2006, the Fund was not significantly exposed to net credit risk, as the majority of the swaps had net negative fair values. However, should interest rates change and fair values of the swaps become positive, the Fund would be exposed to credit risk in the amount of the derivatives' positive fair value.

The swap agreements contain varying collateral agreements with the counterparties. The swaps require full collateralization of the fair value of the swap should the counterparty's credit rating fall below certain rating levels by Fitch Ratings, Standard & Poor's, and/or Moody's Investors Service. Collateral on all swaps is to be in the form of U.S. government securities held by a third-party custodian.

***Basis risk.*** The Fund is not exposed to significant basis risk on its swaps because most of the variable payments received are based on the Bond Market Association (BMA) index. The Consumer Price Index (CPI) indexed swaps are associated with CPI indexed financings and thus create no basis risk. The London Interbank Offered Rate (LIBOR)-based swap has basis risk on $28.3 million of swaps.

***Termination risk.*** The Fund or counterparty may terminate any of the swaps if the other party fails to perform under the terms of the contract. In such cases, the Fund may owe or be due a termination payment, depending on the value of the swap at that time. In addition, the Fund is exposed to termination risk, but not termination payments, on certain of the Fund's swaps related to Sewer Series 1998-A, Sewer Series 1998-B, Sewer Series 1999-A, Sewer Series 2001-C-1, Sewer Series 2001-C-2, and Sewer Series 2003-B. These

swaps provide the counterparty with the option to terminate the swap agreement beginning on January 1, 2010, July 2, 2011, July 1, 2008, July 1, 2008, January 1, 2010, January 1, 2010, and July 1, 2013, respectively, upon the passing of certain BMA thresholds. If any of these swaps were terminated, the associated variable-rate financings would no longer carry synthetic interest rates, but there would be no termination payment.

*Rollover risk.* The Fund is exposed to rollover risk on swaps that mature or may be terminated prior to the maturity of the associated financings. When these swaps terminate or, in the case of the termination option, if the counterparty exercises its option, the Fund will not realize the synthetic rate offered by the swaps on the underlying issues.

**(11) Employee Benefit Plan**

Substantially all City employees, including the Sewage Disposal Fund employees, are covered by a single-employer plan composed of a defined benefit with an optional employee-contributed annuity through the General Retirement System (GRS). The GRS pays a monthly pension to qualified individuals upon retirement. The amount is based upon a combination of years of service and annual salary.

*Plan Description*

The GRS is administered in accordance with the City of Detroit Charter and union contracts, which assign the authority to establish and amend contributions and benefit provisions to the Retirement System's board of trustees. The GRS issues separate, stand-alone financial statements annually. Copies of these financial statements can be obtained at the Coleman A. Young Municipal Center, 2 Woodward Ave., Rm. 908, Detroit, Michigan 48226.

*Funding Policy*

The GRS funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are sufficient to accumulate sufficient assets to pay benefits when due. The contribution requirements are established and may be amended by the GRS's board of trustees based on information provided by the GRS's consulting actuary. The City's contribution is set by the City Council in conjunction with its approval of the City's annual budget based on information provided by the GRS's consulting actuary.

The recommended contribution rate is determined by the GRS's consulting actuary using the entry age normal actuarial cost funding method. Significant actuarial assumptions used to compute contribution requirements are the same as those used to compute the actuarial accrued liability.

Based upon the June 30, 2005 actuarial valuation, which was the most recent actuarial data available when the budget was developed for the year ended June 30, 2006, the actuary recommended the Sewage Disposal Fund contribution rate of 2.04% Contributions for the Sewage Fund totaled $4,185,887.

Employees may elect to contribute 3%, 5%, or 7% of the first $87,900 of annual compensation and 5% or 7% of any excess over $87,900 for annuity savings. Contributions are voluntary for all union and nonunion

employees. Contributions received from Sewer Fund employees during the year ended June 30, 2006 amounted to $2,638,158.

The contribution requirements of plan members and the City are established and may be amended by the Board of Trustees in accordance with the City Charter, union contracts, and plan provisions. Members may retire with full benefits after attaining 30 years of service; age 55 with 30 years of service if hired after January 1, 1996; age 60 with 10 years of service; or age 65 with 8 years of service. Employees may retire after 25 years of service and collect an actuarially reduced retirement benefit. Monthly pension benefits, which are subject to certain minimum and maximum amounts, are determined according to fixed rates per year of credited service. Members of the General Retirement System who separated prior to July 1, 1981, met the age and service requirements, and who did not withdraw their accumulated annuity contributions are generally eligible for a pension at the time they would have been eligible had they continued in City employment. Members who separate after July 1, 1981 are not required to leave their accumulated annuity contributions in the System. Pension benefits for all members of the GRS are increased annually by 2.25% of the original pension.

*a)* *Administrative Expenses*

Actuarial investment management and bank trustee fees and expenses are included in the GRS plan's administrative expenses when incurred. In addition, the GRS plan's administrative salary, rent, accounting services, duplicating, telecommunications, and travel expenses are included in the GRS plan's administrative expenses when incurred.

| | Fiscal year ended | Annual pension cost (APC) | Percentage of APC contributed | Net pension asset |
|---|---|---|---|---|
| General Retirement System | June 30, 2004 $ | 2,559,591 | 100% $ | — |
| | June 30, 2005 | 6,359,722 | 223% | 7,850,281 |
| | June 30, 2006 | 3,795,979 | — | 8,240,189 |

The annual pension cost and net pension asset as of June 30, 2006 are as follows:

| | | |
|---|---|---|
| Annual required contributions | $ | 3,975,424 |
| Interest on net pension asset | | (620,172) |
| Adjustment to annual required contribution | | 440,727 |
| Annual pension cost | | 3,795,979 |
| Contributions made—employer | | 4,185,887 |
| Changes in net pension asset | | 389,908 |
| Net pension asset, beginning of year | | 7,850,281 |
| Net pension asset, end of year | $ | 8,240,189 |

13-53846-tjt    Doc 5029-5    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 115 of 174

The actuarial methods and significant assumptions used to determine the annual required contributions for June 30, 2006 were as follows:

| | |
|---|---|
| Valuation date | June 30, 2005 |
| Actuarial cost method | Entry age |
| Amortization method | Level percent |
| Remaining amortization period for unfunded accrued liabilities | 30 years |
| Asset valuation method | 3-year smoothed market |
| Actuarial assumptions: | |
| Investment rate of return | 7.9% |
| Projected salary increases* | 4% – 9.5% |
| Cost-of-living adjustments* | 2.25% |

*Includes inflation rate of 4%

## (12) Other Post-employment Benefits

In addition to the pension benefits described above, the City provides post-retirement benefits to its retires, which include hospitalization, dental care, eye care, and life insurance, The umber of City retries at June 30, 2006 is 22451. Costs are accounted for in accordance with GASB Statement No. 12, Disclosure of Information on Post-retirement Benefits Other Than Pension Benefits by State and Local Governmental Employers. The benefits are provided in accordance with the City Charter and union contracts. The costs of benefits, which are financed on a pay-as-you-go basis, for the year ended June 30, 2006, are as follows:

| Benefits | City cost | Retiree cost | Total cost |
|---|---|---|---|
| Hospitalization | $ 139,306,757 | 14,933,508 | 154,240,265 |
| Dental | 6,160,524 | — | 6,160,524 |
| Eye care | 1,969,690 | — | 1,969,690 |
| Life insurance | 143,579 | 26,740 | 170,319 |
| | $ 147,580,550 | 14,960,248 | 162,540,798 |

# CITY OF DETROIT
# SEWAGE DISPOSAL FUND

Notes to Basic Financial Statements

June 30, 2006 and 2005

**(13)  Due from (to)Other Funds**

During the course of operations, numerous transactions occur between individual funds and other City of Detroit funds for goods provided or services rendered. Related receivables and payables are classified as "due from other funds" or "due to other funds" on the balance sheets and are summarized as follows:

|  | | 2006 | 2005 |
|---|---|---:|---:|
| Due from other funds (unrestricted): | | | |
| General | $ | 30,513 | 11,887,394 |
| Water | | 52,768,156 | 54,500,684 |
| Total due from other funds (unrestricted) | $ | 52,798,669 | 66,388,078 |
| Due from other funds (restricted): | | | |
| General | $ | 33,067 | 37,355,552 |
| Water | | 5,508,719 | 282,997 |
| Total due from other funds (restricted) | $ | 5,541,786 | 37,638,549 |
| Due to other funds (unrestricted): | | | |
| General | $ | 5,824,511 | 4,921,074 |
| General Fiduciary | | 411,500 | |
| Water | | 51,511,455 | 48,212,647 |
| Total due to other funds (unrestricted) | $ | 57,747,466 | 53,133,721 |
| Due to other funds (restricted): | | | |
| General | $ | 30,605 | 48,509 |
| Water | | 10,231,497 | 11,025,493 |
| Total due to other funds (restricted) | $ | 10,262,102 | 11,074,002 |

**(14) Capital Improvement Programs**

The Fund is engaged in a variety of projects that are a part of its five-year Capital Improvement Program (the Program). The total cost of this Program is anticipated to be approximately $1.81 billion through fiscal year 2011. The Program is being financed primarily from revenues of the Fund and proceeds from the issuance of revenue bonds.

The total amount of construction contract commitments outstanding at June 30, 2006 and 2005 was approximately $356 million and $453 million, respectively.

**(15) Rate Adjustments**

The U.S. Environmental Protection Agency (EPA), in attempting to ensure that user charges are proportional in effect as well as in their design, requires grantees to compare budgeted wastewater contributions, revenues from users, and user classes to actual results and make appropriate rate adjustments in the second succeeding year. The accompanying financial statements reflect management's estimates of the current and noncurrent amounts receivable from and refundable to customers in accordance with the regulations. Although subsequent adjustments to these amounts may occur, management does not believe the impact would be material to the Fund's financial position or results of operations.

**(16) Contingencies**

The operation of the Fund's Waste Water Treatment Plant (WWTP) is subject to extensive regulation pursuant to the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 (collectively, the Clean Water Act). Included in the regulatory framework established by the Clean Water Act is the National Pollutant Discharge Elimination System (NPDES) permit program, which requires operation of wastewater treatment facilities according to discharge limitations and other requirements as set forth in permits issued to each facility. The U.S. EPA has authorized the State of Michigan Department of Environmental Quality (MDEQ) to implement and enforce the federal NPDES permit program.

The Fund and the City's Legal Department operate the WWTP pursuant to an NPDES permit that took effect on January 1, 2004 and which is due to expire on October 1, 2007.

The Fund is also a defendant in numerous other alleged claims and lawsuits. The Fund and its legal counsel have estimated a reserve for the potential outcome of such claims or the amount of potential damages in the event of an unfavorable outcome for each of the above contingencies, which is included in the accompanying financial statements. The Fund's management and the City's Legal Department estimate that any differences in reserved amounts, and other potential claims against the Fund not covered by the Fund's insurance, resulting from such litigation will not materially impact the Fund's financial position or results of operations.

The City holds various commercial insurance policies to cover potential loss exposures.

**(17) Subsequent Events**

On August 4, 2006, the Fund issued $401,560,000 of bonds that comprised: (1) Sewage Disposal System Revenue Second Lien Bond Series 2006-A (Variable Rate Demand) of $125,000,000, (2) Sewage Disposal System Revenue Second Lien Bond Series 2006-B for $250,000,000 and, (3) Sewage Disposal System Refunding Senior Lien Bonds, Series 2006-C for $26,560,000. The bonds begin to mature July 1, 2009 and will be fully matured in the year 2036.

The proceeds (includes offering premium less cost of issued) of the Sewage Disposal System Refunding Senior Lien Bonds, Series 2006-C is used to refund Sewage Disposal System Senior Lien Bond, Series 2003-A of various maturities with aggregate principal of $27,470,000 plus defeasement cost.

In September 2005, several customers of the Fund challenged the method of allocating costs associated with the 800 MHz project. In early 2007, the court issued a preliminary ruling acknowledging that the Fund had been overcharged, but is yet to issued a final ruling. In management's opinion, the final resolution will not have a material effect on the Fund's financial statements.

**REQUIRED SUPPLEMENTARY INFORMATION**

# CITY OF DETROIT
## SEWAGE DISPOSAL FUND

Required Supplementary Information (Unaudited)

June 30, 2006

Schedule of Funding Progress (in thousands) for the General Retirement System (unaudited):

| Actuarial valuation date, June 30 | Actuarial value of assets | Actuarial accrued liability (AAL) | Funded ratio | Unfunded AAL (UAAL) | Covered payroll | UAAL as a percentage of payroll |
|---|---|---|---|---|---|---|
| 2004 | $ 190,985 | 174,546 | 109.42% | $ (16,442) | — | — |
| 2005 | 220,900 | 167,291 | 132.05% | (53,609) | — | — |
| 2006 | 239,972 | 181,684 | 132.08 | (58,288) | — | — |

See accompanying independent auditors' report.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX – C**

**THE BOND ORDINANCE**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## Ordinance No. 18-01

**An Ordinance to Amend Ordinance No. 27-86 as Amended and Supplemented by Ordinance No. 7-87 Ordinance No. 38-92  Ordinance No. 3-93  Ordinance No. 31-95  Ordinance No. 16-97  Ordinance No. 24-97 and Ordinance No. 36-99 of the City of Detroit to Provide for a Means of Determining if Certain Junior Lien Bonds Bear Interest at a Fixed Rate or a Variable Rate   Change the Reserve Account Requirement for Second Lien Bonds  Facilitate the Use of Debt Service Reserve Fund Surety Bonds by Amending Section 8   and to Amend and Restate Ordinance No. 27-86.**

**Whereas**, the City Council (the Council) of the City of Detroit, Michigan, adopted Ordinance No. 27-86 (the Ordinance) on December 9, 1986, to provide for the financing and refinancing of capital improvements to the Sewage Disposal System by the issuance of Sewage Disposal System Revenue Bonds and Revenue Refunding Bonds and Junior Lien Bonds, and has extensively amended the Ordinance seven times since its adoption in 1986; and

**Whereas**, the Council has determined that it is in the best interest of the City to amend the Ordinance so as to provide a means of determining if certain Junior Lien Bonds bear interest at a fixed or variable rate and to change the Reserve Account Requirement for Second Lien Bonds, such amendment to take effect upon this amendatory ordinance becoming effective; and

**Whereas**, the Council has determined that it is in the best interest of the City to further amend the Ordinance and to restate the Ordinance so as provide for more efficient financings that reflect current capital market practices, eliminate obsolete provisions and integrate this amendment and all prior amendments into one ordinance, such amendment to take effect upon receiving consent of the requisite percent of holders of outstanding Bonds and Junior Lien Bonds; and

**Whereas**, Section 8 of the Ordinance (Section 8) provides for the use of surety bonds (Reserve Account Surety Bonds) to meet the City's obligations, from time to time, to fund Bond Reserve Accounts and Second Lien Bond Reserve Accounts; and

**Whereas**, Section 8 contains certain ambiguous and defective provisions regarding the payment obligations of the City in certain instances; and

**Whereas**, funding Reserve Accounts with Bond proceeds increases the aggregate principal amount of bonds issued to finance capital improvements to the System and can increase the cost of capital and thereby diminish limited capital resources to be directly used for System purposes; and

**Whereas**, the necessity of investing Reserve Accounts funded with Bond proceeds can result in market and credit volatility and can result in an insufficiency of funds if and when the Reserve Account is needed to provide debt service payments; and

**Whereas**, Reserve Account Surety Bonds can result in debt service savings and other economic efficiencies; and

**Whereas**, it is in the best interest of the City and Bondholders that the most efficient use be made of the ability to borrow under the Ordinance and otherwise use capital resources; and

**Whereas**, there can be a material adverse effect on the City and Bondholders if the ability to borrow and capital resources are not used efficiently; and

**Whereas**, the Council determines that it is in the best interests of the City and the Bondholders to amend Section 8 so as to assure the availability of Reserve Account Surety Bonds and that Bondholders may be materially adversely affected if Reserve Account Surety Bonds are not freely available in connection with financing the System; and

**Whereas**, in light of the foregoing, the Council further determines that amendments herein contained do not have a material adverse effect on the interests of Bondholders but rather enhance the ability of the City to obtain Reserve Account Surety Bonds.

**The City of Detroit Ordains**:

<u>Part I</u>

**Section 1.**        **Immediate Amendment of Ordinance No. 27-86.**

(a) ***Amendment.***  Ordinance No. 27-86 as amended to the date hereof is hereby amended by adding three new sections thereto as "Section 1A," "Section 1B" and Section 8 to respectively read as follows:

**Section 1A.**        **Determination of Fixed Rate and Variable Rate Junior Lien Bonds.**

(a) **Applicability**.  This Section is applicable to all Junior Lien Bonds other than SRF Junior Lien Bonds (the "Subject Junior Lien Bonds").

(b) **Generally**.  Notwithstanding any provision of this Ordinance to the contrary, this Section shall govern the following determinations:

(1) Whether a Subject Junior Lien Bond is a Variable Rate Junior Lien Bond (a "Variable Rate Security") or a Fixed Rate Junior Lien Bond (a "Fixed Rate Security") for all purposes of this Ordinance.

(2) How interest is to be calculated on such Variable Rate Securities and Fixed Rate Securities for the purpose of determining Maximum Annual Debt Service, and all definitions and determination of this Ordinance based on or derived from Maximum Annual Debt Service.

(c) ***Definitions of*** **Fixed Rate Securities and Variable Rate Securities**.

"Fixed Rate Security" means a Subject Junior Lien Bond that bears interest at a rate that has been fixed for at least a five-year period that includes all of the Fiscal Year for which a calculation of Annual Debt Service is made.

(1) If the Fiscal Year for which a calculation of Annual Debt Service is made includes only a portion of such five year period, a Security is also a "Fixed Rate Security" but only for such portion.

(2) A rate is fixed for purposes of determining whether a Security is a "Fixed Rate Security" if the economic effect of a Security bearing interest at a fixed rate is produced by a Qualified Hedge or by Counterpart Securities.

(3) A rate is not fixed for purposes of determining whether a Security is a "Fixed Rate Security" if the economic effect of a Security bearing interest at a variable rate is produced by a Qualified Hedge.

"Variable Rate Security" means a Subject Junior Lien Bond that is not a Fixed Rate Security.

(d) *Interest Calculations – Variable Rate Securities*.

(1) If a Variable Rate Security has been Outstanding for less than a full Fiscal Year on the date of calculation, then the interest rate on such Variable Rate Security shall be calculated as 125% of the average of the Bond Market Association (BMA) Municipal Index for the five-year period ending not more than one week before the date of such calculation.

(2) If Variable Rate Securities have been Outstanding for one or more full Fiscal Years on the date of calculation, then the interest rate on such Variable Rate Securities shall be calculated as 125% of the annualized average daily rate borne by such Variable Rate Securities for the 12 calendar month period ending immediately before the month of calculation.

(e) **Interest Calculations – Fixed Rate Securities Convertible to Variable Rate Securities.**

If Subject Junior Lien Bonds are issued as Fixed Rate Securities but are intended to convert by their terms to Variable Rate Securities during a future Fiscal Year and a calculation is made for such future Fiscal Year or any Fiscal Year thereafter, then the Fiscal Year of conversion shall be the first Fiscal Year that such Securities are Outstanding for the purposes of calculating interest at a variable rate.

(f) **Other Definitions.**

"BMA Municipal Index" means the index based upon the weekly interest rates of tax-exempt variable rate issues included in a database maintained by Municipal Market Data, Boston, Massachusetts, a Thompson Financial Services Company (or its successor), which meet specific criteria established by The Bond Market Association.

"Bond Insurance" means any policy of insurance, contract of suretyship, guaranty or other agreement intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal (and premium, if any) of and interest on such Securities and pursuant to which the provider thereof is repaid solely as subrogee without creating any additional payment obligations (other than the payment of a premium or annual fee).

"Counterpart Securities" means Securities that bear interest at rates which vary inversely to each other and that were issued contemporaneously with each other in order to produce a single fixed rate. In order to constitute "Counterpart Securities", both counterparts must be Outstanding at the same time.

"Credit Enhancement" means any Credit Facility and any Bond Insurance.

"Credit Facility" means any letter of credit, line of credit, purchase agreement, or other financial arrangement intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal of and interest on such Securities other than Bond Insurance.

"Hedge" means any agreement by which the City is authorized or permitted by law to manage its debt service, either in connection with the issuance of Securities or in connection with its then Outstanding Securities, including, but not limited to, interest rate exchanges or swaps, hedges and similar agreements.

"Qualified Hedge" means a Hedge with a counterparty that is rated directly or indirectly by a Rating Agency in a rating category at least equal to the category in which the subject Securities are rated without benefit of Credit Enhancement and without reference to qualifications such as "plus" or "minus". If the subject Securities are not rated without the benefit of Credit Enhancement, then the rating category of such Securities shall be the rating category with the benefit of Credit Enhancement.

"Securities" means any Subject Junior Lien Bonds.

### Section 1B.      Second Lien Bond Reserve Requirement.

Notwithstanding any provision of this Ordinance to the contrary, whenever this Ordinance provides for a determination of Maximum Annual Debt Service for purposes of determining the Second Lien Bond Reserve Requirement, a determination of average Annual Debt Service as of the date of issuance shall be made instead, and such determination shall be sufficient for all purposes of this Ordinance with respect to the Second Lien Bond Reserve Requirement as it relates to Maximum Annual Debt Service.

### Section 8.      Municipal Bond Insurance or other Credit Enhancement.

The Finance Director may obtain municipal bond insurance or other credit enhancement in respect of all or part of the Series 1986 Bonds or any Additional Bonds which, if obtained, shall be provided for in the resolution authorizing the sale of the Series 1986 Bonds or any Additional Bonds. Such municipal bond insurance or other credit enhancement may only insure or secure certain Bonds and may or may not insure or secure any other series of Bonds or any part thereof. Such municipal bond insurer or other credit enhancement provider may be afforded certain rights and remedies to direct the proceedings with respect to the enforcement of payment of the Bonds as shall be provided in the resolution authorizing the sale of the Series 1986 Bonds or Additional Bonds.

The City may at any time fulfill its obligation to fund all or a portion of the Bond Reserve Account by acquiring for the benefit of the Bond Reserve Account an irrevocable surety bond payable on any interest or interest and principal payment date in an amount which, when added to any other funds in the Bond Reserve Account, equals the Bond Reserve Requirement. Before any such surety bond is substituted for moneys or applied in lieu of moneys within the Bond Reserve Account, there shall be filed with the Commissioners (i) an opinion of nationally recognized bond counsel to the effect that such substitution will not adversely affect the tax-exempt status of interest on any Bonds; (ii) evidence that such surety bond is provided

by an insurance company rated by each Rating Agency then rating the Bonds to the effect that if the issuers of the surety bond were insuring payment of principal and interest of the Bonds to which the Bond Reserve Account relates, such Bonds would receive the highest rating available from each such Rating Agency; (iii) a copy of the surety bond; and (iv) an opinion of counsel satisfactory to such nationally recognized bond counsel to the effect that the surety bond is valid and enforceable in accordance with its terms. Each such surety bond shall be unconditional and irrevocable and shall provide debt service reserve security for the Bonds with respect to which the surety bond is purchased and, if the surety bond is purchased with respect to more than one issue of Bonds, then for the term of all the then outstanding Bonds for which such surety bond is purchased. Any agreement of the City with or for the benefit of the issuer of any such surety bond may provide that the City will be obligated to repay such issuer on amount equal to any draw-down on the surety bond plus the issuer's expenses and interest, but not in excess of the maximum rate permitted by law (collectively, "Policy Costs"), from Net Revenues subordinated only to debt service payments on the Bonds.

   The City reserves the right, if it deems it necessary in order to acquire such a surety bond, to amend this Ordinance without the consent of any of the Bondholders in the following respects:

   (ii)  to provide that Policy Costs shall be secured by a lien on Net Revenues equal in priority to the statutory lien securing Bonds but subordinate to such statutory lien as between Bonds and Policy Costs; and

   (iii)  to grant to the issuer of such surety bond such additional rights as it may request, provided that such amendment shall not, in the written opinion of nationally recognized bond counsel filed with the Commissioners, materially impair or reduce the security or rights hereby granted to the owners of the 517-E Bonds or the Bonds or any of them.

   (b)  Inconsistent Amendments.

   The amendments contained in this Part I shall prevail to the extent of any inconsistency between these amendments and the amendments identified in Ordinance 36-99 as the "Bondholder Approval Amendments" upon the Bondholder Approval Amendments becoming effective by obtaining the requisite consent.

## Part II

**Amendment to Amend and Restate Ordinance No. 27-86**

Ordinance No. 27-86, as amended to the date hereof (including provisions to take effect upon consent of the owners of Senior Lien Bonds and Junior Lien Bonds outstanding on the effective date of Ordinance No. 36-99), is hereby amended to read as follows, such amendment to take effect as provided in Part III:

Section 1.          **Definitions**.

Whenever used in this Ordinance, except when otherwise indicated by the context, the following terms shall have the following meanings:

"Act 94" means Act 94, Public Acts of Michigan, 1933, as amended.

"Act of Council" means a resolution or ordinance of the Council, as required or permitted by law to authorize or otherwise give effect to the subject matter thereof.

"Ancillary Obligation" means any Reimbursement Obligation and any Hedge Obligation.

"Ancillary Obligation Fees and Expenses" means any fees and expenses in connection with any Hedge or Financial Facility in the ordinary course of the transaction.

"Bond Insurance" means any policy of insurance, contract of suretyship, guaranty or other agreement intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal (and premium, if any) of and interest on such Securities and pursuant to which the provider thereof is repaid solely as subrogee without creating any additional payment obligations (other than the payment of a premium or annual fee).

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Code" means the Internal Revenue Code of 1986, as it may be amended.

"Commissioners" means the Board of Water Commissioners of the City created by Article 7, Section 7-1501, of the Charter of the City or any successor body.

"Construction Fund" means the fund established pursuant to Section 14.

"Council" means the City Council of the City.

"Credit Enhancement" means any Credit Facility and any Bond Insurance.

"Credit Facility" means any letter of credit, line of credit, purchase agreement, or other financial arrangement intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal of and interest on such Securities other than Bond Insurance.

"Debt Service Installment Requirement" means, as of the first day of each month with respect to a Priority of Outstanding Securities and Ancillary Obligations, if any, the total for such month of the (i) Interest Installment Requirement, (ii) Principal Installment Requirement and (iii) Sinking Fund Installment Requirement, if any.

"Extraordinary Repair and Replacement Maximum Requirement" means, for any Fiscal Year, 15% of the budgeted operation and maintenance expense of the System for such Fiscal Year less in the Fiscal Year any amount that is withdrawn from the Extraordinary Repair and Replacement Reserve Fund for paying a major unanticipated repair or replacement to the System pursuant to Section 13D, but only in the Fiscal Year that such amount is withdrawn.

"Extraordinary Repair and Replacement Minimum Requirement" means, for any Fiscal Year, 1/12 of 3% of the budgeted operation and maintenance expense of the System for such Fiscal Year plus such amount as is necessary to restore to the Extraordinary Repair and Replacement Reserve Fund any amount credited to the Improvement and Extension Fund.

"Finance Director" means the Finance Director of the City.

"Financial Facility" means any Credit Enhancement, Liquidity Facility or combined Credit and Liquidity Facility.

"Fiscal Year" means the fiscal year and operation year of the City which begins on July 1 and ends on the following June 30 as it may be modified.

"Hedge" means any agreement by which the City is authorized or permitted by law to manage its debt service, either in connection with the issuance of Securities or in connection with its then Outstanding Securities, including, but not limited to, interest rate exchanges or swaps, hedges and similar agreements.

"Hedge Obligations" means the City's payment obligations under a Hedge other than the obligation to pay fees and expenses in the ordinary course of the transaction.

"Hedge Termination Payment" means an amount payable by the City under a Hedge by reason of the early termination thereof.

"Hedge Receivable" means any amount receivable by the City under a Hedge including any amount by reason of the early termination thereof.

"Holder" means the Person in whose name a Security is registered in the Registry.

"Indebtedness" has the meaning given that term in Section 2.

"Interest and Redemption Fund" means any Interest and Redemption Fund established for a Priority of Securities.

"Interest Installment Requirement" means, as of the first day of each month in a Fiscal Year, with respect to a Priority of Securities and Ancillary Obligations, the amount of interest accrued and unpaid and to accrue to and including the last day of such month, on Outstanding Securities of such Priority and related Ancillary Obligations that constitute interest, if any, next coming due in such Fiscal Year.

"Junior Lien Bonds" means all Securities issued pursuant to this Ordinance other than Senior Lien Bonds.

"Junior Obligations" means all Junior Lien Bonds and all Ancillary Obligations that are not Senior Obligations.

"Legal Investment" means, with respect to any particular amounts, an investment that is authorized or permitted by law as an investment of such amounts.

"Liquidity Facility" means any letter of credit, line of credit, purchase agreement, or other financial arrangement intended to provide funds for the purchase of certain Securities in the event of a failure of the remarketing thereof but does not include any protection provided by a Credit Facility.

"Mandatory Redemption Date" means a date on which Term Securities in the principal amount of the applicable Mandatory Redemption Requirement are required to be redeemed under the Supplemental Action authorizing the sale of such Securities.

"Mandatory Redemption Requirements" means, with respect to any Term Securities, the principal amount of such Securities required to be called for redemption prior to their stated maturity as provided in the ordinance authorizing the issuance or in the resolution providing for the sale of such Term Securities.

"Net Revenues" means Revenues except for those Revenues credited to the Operation and Maintenance Fund.

"Outstanding", unless otherwise provided in a Supplemental Action for particular Securities, means, as of any date and with respect to Securities of a particular Priority, all Securities of such Priority delivered under this Ordinance except:

> (i)     Securities of such Priority theretofore paid or redeemed or acquired by the City and surrendered to the Transfer Agent for cancellation

> (ii)     Securities of such Priority that have matured or have been duly called for redemption and for the payment or redemption of which amounts, together with any unpaid interest, are held by the Trustee or the Paying Agent for the payment thereof;

> (iii)     Securities of such Priority that have been defeased in accordance with this Ordinance or a Supplemental Action; and

> (iv)     Securities of such Priority in exchange for or replacement of which other Securities of such Priority have been authenticated and delivered pursuant to this Ordinance or a Supplemental Action.

"Permitted Investment" means, with respect to any particular amounts, a Legal Investment subject to such limitations as may be imposed by this Ordinance or a Supplemental Action for the investment of such amounts.

"Person" means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

"Pledged Assets" means:

> (i)     Net Revenues;

(ii)      the funds and accounts established by or pursuant to this Ordinance except for the Operation and Maintenance Fund and the Construction Fund and any account thereof;

(iii)     investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and

(iv)     any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue.

"Principal Installment" means, with respect to Securities of a Priority and related Ancillary Obligations, if any, the principal amount of such Securities that are not Term Securities and such of the Ancillary Obligations related to such Securities, if any, that constitute principal or other return of capital.

"Principal Installment Requirement" means, as of the first day of each month in a Fiscal Year, with respect to a Priority of Obligations, the amount of Principal Installments accrued and unpaid and to accrue to, and including, the last day of such month (assuming that principal accrues on the basis of 30-day months in a year of 360 days) on Outstanding Securities of such Priority and related Ancillary Obligations, if any, next coming due in such Fiscal Year.

"Priority" means, with respect to any particular Secured Obligation, all other Secured Obligations having a lien on Pledged Assets on a parity with such Obligation.

"Rating Agency" means any nationally recognized statistical rating organization as defined in Rule 15c3-1 of the United States Securities and Exchange Commission.

"Reimbursement Obligation" means the City's repayment obligations under a Financial Facility, and does not include the obligation to pay fees and expenses in the ordinary course of the transaction.

"Registry" has the meaning given that term in Section 3.

"Required Combined Coverage" means, for two or more Priorities for which a determination is to be made, that (i) the result produced by dividing the prescribed inflows by the prescribed outflows for the highest Priority required for such determination and performing the same calculation for each successively lower Priority and expanding the divisor in each instance by the sum of the outflows for such Priority and each higher Priority equals or exceeds (ii) the coverage requirement for the lowest Priority in each calculation, such that

| Where | $I=$ | Inflows required by the particular determination |
| | $O=$ | Outflows required by the particular determination for the Priority indicated by the subscript |
| | $=$ | Coverage requirement for the particular determination for the Priority indicated by the subscript |

and assuming three Priorities, [1] Senior, [2] Second and [3] SRF, <u>Required Combined Coverage</u> is:

$$[1] \quad \frac{I}{O} \quad {}_1 \text{ and } \quad \frac{I}{[2] (O_1 + O_2)} \quad {}_2 \text{ and }$$

$$[3] \quad \frac{I}{(O_1 + O_2 + O_3)} \quad {}_3$$

"Reserve Account" means a Reserve Account established in an Interest and Redemption Fund and may be restricted in meaning by referring to a Priority of Securities for which such Reserve Account was established.

"Reserve Requirement" means, for a Priority of Securities for which a Reserve Account has been established, the amount of Annual Debt Service on all Securities of such Priority then Outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code as provided below:

(v)     for Senior Lien Bonds, the "amount of Annual Debt Service" shall be maximum Annual Debt Service;

(vi)     for Second Lien Bonds, the "amount of Annual Debt Service" shall be average Annual Debt Service; and

(vii)     for all other Junior Lien Bonds for which a Reserve Account is established, the "amount of Annual Debt Service" shall be the amount set forth in the Supplemental Action establishing such Reserve Account, and if no amount is set forth, the "amount of Annual Debt Service" shall be average Annual Debt Service.

"Revenues" means the revenues of the City from the System, shall be construed as defined in Section 3 of Act 94, and shall also include:

(i)          Hedge Receivables; and

(ii)     income earned and gain realized from the investment of amounts in the various funds, accounts and subaccounts established by this Ordinance other than the Construction Fund for any Fiscal Year earnings on the Construction Fund are not credited to the Receiving Fund.

"Secured Obligations" means all Securities, Ancillary Obligations and Ancillary Obligation Fees and Expenses.

"Securities" means all Senior Lien Bonds and all Junior Lien Bonds.

"Senior Lien Bonds" means all Securities issued under this Ordinance that have a senior lien on Pledged Assets.

"Senior Obligations" means all Senior Lien Bonds and Ancillary Obligations in respect of Senior Lien Bonds and secured on parity therewith.

"Sinking Fund Installment Requirement" means, with respect to a Priority of Term Securities and as of the first day of each month in a Fiscal Year, the amount of any Mandatory Redemption Requirements next coming due in such Fiscal Year, including any Mandatory Redemption Requirement due at the maturity of such Term Security less the

amounts credited to such Mandatory Redemption Requirements as the result of partial redemptions or purchase of such Term Securities.

"SRF Junior Lien Bonds" means all Junior Lien Bonds issued for the purpose of providing improvements to the System under the State's Revolving Fund.

"Supplemental Action" means an Act of Council or a sale order or other document signed by the Finance Director pursuant to an Act of Council, which shall be this Ordinance if the action of the Finance Director is herein authorized.

"System" means the Sewage Disposal System of the City including all plants, works, instrumentalities and properties, used or useful, in whole or in part, in connection with the collection, interception, treatment and disposal of sewage, or the administration or management thereof, all as the same now exist or are hereafter provided for, together with all additions, extensions, repairs and improvements thereto hereafter acquired.

"Term Securities" means, with respect to Securities of a Priority, any maturity of such Securities that has Mandatory Redemption Requirements.

"Transfer Agent" means, as to any particular Securities, the bank or banks selected by the Finance Director to perform the duties provided for the Transfer Agent with respect to such Securities.

**Section 2.** **Definition of *Annual Debt Service*.**

(a) Definitions.

(1) Annual Debt Service" means, for any Fiscal Year and with respect to Indebtedness of any particular Priority, the amount of such Indebtedness due in such Fiscal Year in accordance with their respective terms.

(2) Unless limited by another Section of this Ordinance, "Indebtedness" means (without duplication):

(i) Principal of and interest on Securities Outstanding in any Fiscal Year for which the calculation is made;

(ii) Reimbursement Obligations; and

(iii) Hedge Termination Payments.

(3) Other terms are defined in the last subsection of this Section.

(b) ***Rules for Calculating Principal and Interest*.**

(1) First Day of Fiscal Year. Principal of and interest on Securities coming due on the first day of a Fiscal Year shall be calculated as being due on the last day of the immediately preceding Fiscal Year.

(2) Assumed Paid. Principal of and interest on any Securities due in a Fiscal Year prior to the Fiscal Year for which the calculation is made shall be assumed to have been paid when due.

(3) Due Dates. The due dates for any principal, interest or Redemption Requirements are the stated dates for the payment thereof and not in advance of such stated dates by reason of acceleration.

(4) Term Securities.

(i)     Mandatory Redemption Requirements shall be treated as principal maturing on the respective dates that such Mandatory Redemption Requirements are due.

(ii)     The principal amount of a Term Security maturing in a Fiscal Year shall be reduced by the total of the Mandatory Redemption Requirements due in each Fiscal Year before the Fiscal Year of such maturity.

(5) Tender Securities. Except for Excluded Tender Securities, each date on which Holders of such Tender Securities may tender or may be mandated to tender such Tender Securities shall constitute a maturity of the principal amount of such Tender Securities that could be tendered on such date with the giving of notice or the passage of time, or both.

(6) Interest.

(i)     Interest due in any Fiscal Year shall be offset by the amount of capitalized interest or interest received by the City as "accrued interest" available for the payment thereof.

(ii)     Separate provision is made in this Section for determining the interest rate on:

(A)     Variable Rate Securities,

(B)     Fixed Rate Securities converting to Variable Rate Securities

(c) *Variable Rate Securities*.

(1) If Variable Rate Securities have been Outstanding for less than a full Fiscal Year on the date of calculation, then the interest rate on such Variable Rate Securities shall be calculated as 125% of the average of the Bond Market Association (BMA) Municipal Index for the five year period ending not more than one week before the date of such calculation.

(2) If Variable Rate Securities have been Outstanding for one or more full Fiscal Years on the date of calculation, then the interest rate on such Variable Rate Securities shall be calculated as 125% of the annualized average daily rate borne by such Variable Rate Securities for the 12 calendar month period ending immediately before the month of calculation.

(3) Notwithstanding paragraphs (1) and (2), for the purpose of determining the Reserve Requirement for a Priority of Securities, the interest rate on Variable Rate Securities shall be not adjusted after the date of initial issuance.

(d) *Fixed Rate Securities Convertible to Variable Rate Securities*.

If Securities are issued as Fixed Rate Securities but are intended to convert by their terms to Variable Rate Securities during a future Fiscal Year and a calculation is made for such future Fiscal Year or any Fiscal Year thereafter, then the Fiscal Year of conversion shall be the first Fiscal Year that such Securities are Outstanding for the purpose of calculating interest at a variable rate.

(e) *Other Definitions*.

"BMA Municipal Index" means the index based upon the weekly interest rates of tax-exempt variable rate issues included in a database maintained by Municipal Market Data, Boston, Massachusetts, a Thompson Financial Services Company (or its successor), which meet specific criteria established by The Bond Market Association.

"Counterpart Securities" means Securities that bear interest at rates which vary inversely to each other and that were issued contemporaneously with each other in order to produce a single fixed rate. In order to constitute "Counterpart Securities" both counterparts must be Outstanding at the same time.

"Excluded Tender Securities" means:

> (i)      Tender Securities that the City is not obligated to purchase under any circumstances upon the failure of the remarketing thereof and for which the City has not provided a Liquidity Facility; and

> (ii)     Tender Securities for which the City has provided a Liquidity Facility.

"Fixed Rate Security" means a Security that bears interest at a rate that has been fixed for at least a five-year period that includes all of the Fiscal Year for which a calculation of Annual Debt Service is made.

> (i)      If the Fiscal Year for which a calculation of Annual Debt Service is made includes only a portion of such five year period, a Security is also a "Fixed Rate Security" but only for such portion.

> (ii)     A rate is fixed for purposes of determining whether a Security is a "Fixed Rate Security" if the economic effect of a Security bearing interest at a fixed rate is produced by a Qualified Hedge or by Counterpart Securities.

> (iii)    A rate is not fixed for purposes of determining whether a Security is a "Fixed Rate Security" if the economic effect of a Security bearing interest at a variable rate is produced by a Qualified Hedge.

"Qualified Hedge" means a Hedge with a counterparty that is rated directly or indirectly by a Rating Agency in a rating category at least equal to the category in which the subject Securities are rated without benefit of Credit Enhancement and without reference to qualifications such as "plus" or "minus". If the subject Securities are not rated without the benefit of Credit Enhancement, then the rating category of such Securities shall be the rating category with the benefit of Credit Enhancement.

"Tender Securities" means Securities that are subject to optional or mandatory tender for purchase.

"Variable Rate Security" means any Security that is not a Fixed Rate Security.

**Section 3.** **Authorization and Issuance of Securities; Related Matters**.

(a) *Authorization of Securities*. Securities shall be authorized from time to time by Acts of Council and Supplemental Actions.

(b) *Issuing Securities*. The Finance Director may, by Supplemental Action, take such actions as are necessary or appropriate to give effect to the transactions contemplated by an Act of Council authorizing the issuance of Securities or as are incidental thereto.

(c) *Liability Limited*. All covenants, agreements and obligations of the City contained in this Ordinance or in any Secured Obligations are those of the City and not of any member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of any Secured Obligations or for any claims based thereon or hereunder against any member, officer or employee of the City or any natural Person executing or attesting any Secured Obligations.

(d) *Execution Authentication and Delivery of Securities*.

(1) Securities shall be executed in the name of the City by the facsimile signatures of the Mayor and the Finance Director and shall have a facsimile of the City's seal impressed, imprinted or otherwise reproduced thereon.

(2) No Security shall be valid until authenticated by an authorized representative of the Transfer Agent. Securities shall be delivered by the City to the Transfer Agent for authentication and be delivered to the Transfer Agent by the Finance Director or designee for delivery to the purchaser(s) in accordance with instructions from the Finance Director upon payment of the purchase price therefor in accordance with the bid or purchase contract. Executed blank Securities for registration and issuance to transferees shall, from time to time as necessary, be delivered to the Transfer Agent for safekeeping.

(e) *Reserve Account Requirement*. Concurrently with the issuance of Securities of a Priority for which a Reserve Account has been or is being established, there shall be credited to such Reserve Account the amount that, added to the amount on deposit therein or credited thereto, equals the Reserve Requirement for Securities then to be issued and all Securities of such Priority then Outstanding. Such amount may be provided from any source or may be provided by a Financial Facility meeting the requirements of Section 4.

(f) *Disposition of Proceeds*. The proceeds of the sale of an issue of Securities shall be applied as follows:

(1) An amount equal to the accrued interest, if any, shall be credited to the Interest and Redemption Fund for such Securities to be applied to next maturing interest thereon.

(2) If a Reserve Account has been or is being established for same Priority of Securities as such Securities, the amount necessary to comply with subsection (e) unless such compliance will be obtained with amounts from a different source.

(3) The balance of the proceeds shall be applied as provided in the Supplemental Action providing for the issuance of such Securities.

(g) *Transfer of Registration of Securities*.

(1) <u>Maintenance of Books</u>.  Each Transfer Agent shall keep or cause to be kept, at its principal office, sufficient books for the registration and transfer of registration of Securities for which it is Transfer Agent (the "Registry"), which shall at all times be open to inspection by the City.

(2) <u>Privilege of Transfer</u>.  Under such reasonable regulations as the Transfer Agent may prescribe, the registration of Securities for which it is the Transfer Agent may be transferred upon its Registry by the Person in whose name such Securities are registered, in person or by his or her duly authorized attorney, upon surrender of such Securities for cancellation, accompanied by delivery of a duly executed written instrument of transfer in a form approved by the Transfer Agent for such Securities.

(3) <u>Surrender for Transfer; Receipt of New Securities</u>.  Whenever any Security is surrendered for transfer, the City shall execute and the Transfer Agent for such Security shall authenticate and deliver a new Security or Securities, in the same aggregate principal amount, of the same maturity, and bearing the same rate or rates of interest and otherwise of the same tenor as the Security surrendered for transfer.

(4) <u>Transfer Taxes and Governmental Charges</u>.  The Transfer Agent shall require payment by the Holder requesting the transfer of any Security for which it is the Transfer Agent, any tax or other governmental charge required to be paid with respect to such transfer.

(5) <u>Limitations</u>.  Except as otherwise provided by Supplemental Action, a Transfer Agent shall not be required (i) to issue, register the transfer of or exchange Securities for which it is the Transfer Agent during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption or mandatory tender of such Securities selected for redemption or mandatory tender and ending at the close of business on the day of giving of that notice, or (ii) to register the transfer of or exchange of any such Security so selected for redemption or tender in whole or in part, except the unredeemed or untendered portion of such Security being redeemed or tendered in part.

(h) *Mutilated  Lost or Stolen Securities*.

(1) If any Security is mutilated, the City, at the expense of the Holder of the Security, shall execute, and the Transfer Agent for such Security shall authenticate and deliver, a new Security of like tenor in exchange and substitution for the mutilated Security, upon surrender to such Transfer Agent of the mutilated Security.

(2) If any Security is lost, destroyed or stolen, evidence of ownership of the Security and of the loss, destruction or theft may be submitted to the Transfer Agent for such Security and, if this evidence is satisfactory to the City and the Transfer Agent, and, indemnity satisfactory to such Transfer Agent and the City shall be given, and if all requirements of any applicable law, including Act 354, Public Acts of Michigan, 1972, as amended, have been met, then, at the expense of the Holder requesting the substitute Security, the City shall execute, and such Transfer Agent

shall thereupon authenticate and deliver, a new Security of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Security so lost, destroyed or stolen.  If any such Security shall have matured or shall be about to mature, the Transfer Agent may pay the same without surrender thereof as authorized by Act 354 instead of issuing a substitute Security.

**Section 4.**        **Financial Facilities; Hedges.**

(c)  The Finance Director may, from time to time and at any time, obtain a Financial Facility in respect of all or some Securities if the Finance Director determines such to be in the best financial interests of the City.

(d)  The Finance Director may at any time acquire Credit Enhancement to fulfill the City's obligation to fund any Reserve Account or substitute a Credit Enhancement for amounts in a Reserve Account. Before or concurrently with the acquisition of such Credit Enhancement, the Finance Director shall receive:

(1)  an opinion of nationally recognized bond counsel to the effect that such substitution will not adversely affect the tax-exempt status of interest on any Securities;

(2)  evidence that such Credit Enhancement is provided by a provider  rated in the highest rating category of each Rating Agency then rating the Securities having the benefit of such Reserve Account;

(3)  a copy of the Credit Enhancement; and

(4)  an opinion of counsel satisfactory to said nationally recognized bond counsel to the effect that the Credit Enhancement is valid and enforceable in accordance with its terms.

(e)  The Finance Director may, in accordance with law, from time to time enter into such Hedges as the Finance Director determines to be in the best financial interests of the City.

(f)  The Finance Director may grant to the provider of any Financial Facility, or to any counterparty to any Hedge authorized by this Section, such rights as may be necessary or appropriate that are not inconsistent with this Ordinance.

**Section 5.**        **Security for Payment**.

(a)  The payment of Secured Obligations is secured by a statutory lien, which is hereby created, upon the whole of the Pledged Assets subject to the use and application thereof in accordance with this Ordinance.

(b)  The lien securing Hedge Obligations is valid only to the extent permitted by law.

(c)  Except for Bond Insurance, a statement of the Priority of an Ancillary Obligation shall be contained in the instrument evidencing or providing for such Ancillary Obligation.

(1)  An Ancillary Obligation  in respect of a particular Priority of Securities:

(i)        may be secured at a lower Priority, but

<span style="padding-left:6em;">(ii)</span> may not be secured at a higher Priority.

(2) Ancillary Obligations are "related" to Securities of the same Priority for purposes of determining priority of security and payment even though such Ancillary Obligations may have been entered into in respect of a higher Priority of Securities.

(d) The lien securing the payment of a Secured Obligation is subject to the following Priorities:

(1) The lien securing Senior Obligations shall be a first lien, senior to all other liens created hereunder except the lien securing Ancillary Obligations Fees and Expenses.

(2) The lien securing Junior Obligations shall be junior only to the lien securing Senior Obligations whenever issued. Among Junior Obligations:

(i) the lien securing Second Lien Bonds and related Ancillary Obligations shall be senior to the liens securing all other Junior Obligations;

(ii) the lien of each other Priority of Junior Obligations shall be senior to the lien of all lower Priorities of Junior Obligations; and

(iii) the SRF Junior Lien Bonds shall be the lowest Priority of Junior Lien Bonds, and the lien securing SRF Junior Lien Bonds and related Ancillary Secured Obligations shall be junior to the liens securing all other Junior Obligations, whenever issued.

(e) Each lien securing a Secured Obligation shall continue until either payment in full of such Secured Obligation or, in the case of Securities, is defeased as provided in this Ordinance.

**Section 6. Payment of Secured Obligation; Subordination**.

(a) ***Generally.*** Secured Obligations are not general obligations of the City and shall be payable solely from Pledged Assets as provided in this Section:

(1) Ancillary Obligation Fees and Expenses are payable from Revenues and, to the extent of any insufficiency, Pledged Assets.

(2) All Securities and Ancillary Obligations are payable from Pledged Assets.

(b) **Subordination**.

(1) Whenever any principal (and premium, if any) of and interest on Securities of a Priority or any payment on the Ancillary Obligations related to such Securities (any of the foregoing a "Payment") is due and is not made when due, then until such Payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities and the obligees of such Ancillary Obligations, no Payment shall be made directly or indirectly on or in respect of any Securities of lower Priority or any Ancillary Obligations related to such Securities of lower Priorities (such Securities and Ancillary Obligations collectively, the

"Subordinated Obligations" and the Holders and obligees thereof, the "Subordinated Obligees"), except as provided below with respect to defeased Securities.

(2) Subject to the payment in full of all Securities and Ancillary Obligations of every higher Priority (collectively, the "Superior Obligations" and the Holders and obligees thereof, the "Superior Obligees"), the Subordinated Obligees shall be subrogated to the rights of the Superior Obligees to receive payment in full of the respective Obligations until all amounts owing on the Subordinated Obligations shall be paid in full, and as between the City and its creditors, other than Superior Obligees and Subordinated Obligees, no payment made on Superior Obligations which would otherwise have been made to Subordinated Obligees shall be deemed to be a payment by the City on account of Superior Obligations, it being understood that the Priorities are solely for the purpose of defining the relative rights of Superior Obligees on the one hand and the Subordinated Obligees on the other hand.

(3) Except as otherwise provided in a Supplemental Action, the City may agree with the Holders of Securities of any Priority and the obligee of any related Ancillary Obligations to extend, renew, modify or amend the terms of such Securities or such related Ancillary Obligations or any security therefor, and any such Holders or obligees may release, sell, exchange such security and otherwise deal freely with the City, and the City with any of them, all without notice to or consent of the Holders of any Securities of any lower Priority or the obligees under any related Ancillary Obligations without affecting the liabilities of the City to such Holders or obligees.

(4) Nothing in this subsection shall impair the right of the Holders of any defeased Securities to be paid from the escrow effecting such defeasance.

(c) *Financial Facilities*. Except as otherwise provided in a Supplemental Action:

(1) Nothing in this Section shall affect the payment of Securities from any Financial Facility obtained for the benefit of such Securities.

(2) No payment of an amount made by a drawing or disbursement under a Financial Facility to Holders of Securities which would otherwise have been made by the City shall be deemed to be a payment by the City on account of such Securities for the purpose of discharging the City's obligation on such Securities.

**Section 7.        Securityholders' Rights; Receiver**.

(a)  The Holder or Holders of the Securities representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the System and the proper application thereof. The statutory lien upon Pledged Assets, however, shall not be construed to compel the sale of the System or any part thereof.

(b)  If there is a default in the payment of the principal (and premium, if any) of and interest on any Securities, any court having jurisdiction in any proper action may appoint a receiver to administer and operate the System on behalf of the City and, under the direction of the court, perform all of the duties of the officers of the City more particularly set forth herein and in Act 94.

(c) The Holder or Holders of the Securities shall have all other rights and remedies given by Act 94 and by law for the payment and enforcement of the Securities and the security therefor.

### Section 8.        Management.

The operation, repair and management of the System, including all projects financed by the issuance of Securities, shall remain under the supervision and control of the Commissioners in the manner provided in Article 7, Chapter 15 of the Charter of the City subject to the rights, powers and duties in respect thereto which are reserved by law and the City Charter to the Council.

### Section 9.        Fixing and Revising Rates; Rate Covenants.

(a) The coverage requirements for determining the Required Combined Coverage under this Section are the following percentages:

| Priority of Indebtedness | Percentage |
|---|---|
| Senior Lien Indebtedness | 120 |
| Second Lien Indebtedness | 110 |
| SRF Junior Lien Bonds | 100 |

Prior to or concurrently with the issuance of a Priority of Securities not enumerated above, this subsection shall be amended to provide for the coverage percentage for Indebtedness in respect of such Priority of Securities, but in no case shall the coverage percentage be less than 100. Such amendment shall not require the consent of Holders of any Securities.

(b) The rates for sewage disposal service and the regulations shall be the rates and regulations required to be established by Act 94. Such rates shall be fixed and revised from time to time as may be expected to be necessary to produce the greater of:

(1) the amounts required:

(i) to provide for the payment of the expenses for maintenance of the System as are necessary to preserve the same in good repair and working order; and

(ii) to provide for the payment of Indebtedness coming due for the Fiscal Year of calculation; and

(iii) to provide for the creation and maintenance of reserves therefor as required by the Ordinance or any ordinance or resolution adopted in accordance with the terms thereof and hereof; and

(iv) to provide for such other expenditures and funds for the System as this Ordinance may require; and

(2) The Required Combined Coverage where the Inflows are the Net Revenues projected for the Fiscal Year of calculation and the Outflows are the Indebtedness coming for such Fiscal Year.

(c) The City hereby covenants and agrees at all times to fix and maintain such rates for services furnished by the System as shall be sufficient to provide for the foregoing and to repay any borrowing from the Extraordinary Repair and Replacement Reserve Fund.

(d)  Without taking into account any transfers from the Rate Stabilization Fund, the City shall at all times observe and comply with the covenant contained in subsection (b)(2) above as if the Rate Coverage Percentage were 100.

(e)  The charges for sewage disposal service which are under the provisions of Section 21 of Act 94, Public Acts of Michigan, 1933, as amended, are made a lien on all premises served thereby, unless notice is given that a tenant is responsible, are hereby recognized to constitute such lien and whenever any such charge against any piece of property shall be delinquent for six months, the City official or officials in charge of the collection thereof may certify to the tax assessing officer of the City not later than April 1 of each year the fact of such delinquency, whereupon such charge shall be entered upon the next tax roll as a charge against such premises and the lien thereof enforced in the same manner as general City taxes against such premises are collected and the lien thereof enforced; provided, however, where notice is given that a tenant is responsible for such charges and service as provided by said Section 21, no further service shall be rendered to such premises until a cash deposit equal to the estimated amount of the next ensuing bill shall have been made as security for payment of such charges and services.

(f)  In addition to other remedies provided, the City shall have the right to shut off and discontinue the supply of water to any premises for the nonpayment of sewage disposal rates when due.

**Section 10.  No Free Service or Use; Metered Service.**

No free service or use of the System, or service or use of the System at less than cost, shall be furnished by the System to any person, firm or corporation, public or private, or to any public agency or instrumentality, including the City and any other municipality.  All service provided to customers of the System, with the exception of temporary connections and certain public service uses of the City which are billed on an estimated basis, shall be metered.

**Section 11.  Operating and Fiscal Year.**

The System shall be operated on the basis of the Fiscal Year.

**Section 12.  Funds and Accounts; Flow of Funds.**

**A.  Establishment of Funds and Accounts.**

(a)  The following funds and accounts are hereby established:

- Sewage Disposal System Receiving Fund (the "Receiving Fund")
- Operation and Maintenance Fund

- Senior Lien Bond Interest and Redemption Fund
  - Senior Lien Debt Service Account
  - Senior Lien Bond Reserve Account

- Second Lien Bond Interest and Redemption Fund
  - Second Lien Debt Service Account
  - Second Lien Bond Reserve Account

- Such Interest and Redemption Funds as are established by Supplemental Action for other Priorities of Junior Lien Bonds

- SRF Junior Lien Bond Interest and Redemption Fund
  - SRF Junior Lien Debt Service Account

• No SRF Junior Lien Bond Reserve Account is established

• Extraordinary Repair and Replacement Reserve Fund

• Improvement and Extension Fund

• Surplus Fund

(b) Additional funds may be established for other Priorities of Securities by Supplemental Action of the Finance Director.

## B.    Flow of Funds.

All Revenues shall be set aside as collected and credited to the Receiving Fund.  As of the first day of each month, amounts credited to the Receiving Fund shall be transferred seriatim into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been credited to the preceding fund or account:

First:  to the Operation and Maintenance Fund, a sum sufficient to provide for the payment of the next month's expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second:  to the Senior Lien Bond Debt Service Account, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Senior Lien Obligations as of the first day of such month;

Third:  to the Senior Lien Bond Reserve Account, an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for Senior Lien Bonds;

Fourth:  to the Interest and Redemption Fund established for each Priority of Junior Lien Bonds, beginning with the Second Lien Bonds and continuing in descending order of Priority to, and including, the SRF Junior Lien Bonds:

First:  to the Debt Service Account established for such Priority, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Obligations of such Priority as of the first day of such month;

Second:  to the Reserve Account, if any, established for such Priority an amount that when added to all other amounts then on deposit therein shall equal  the Reserve Requirement for such Priority of Junior Lien Bonds;

Fifth:  to the Extraordinary Repair and Replacement Reserve Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement so long as the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement except that an amount withdrawn from such Fund pursuant to Section 13D shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal; and

Sixth:  to the Improvement and Extension Fund, such amount, if any, that the Commissioners may deem advisable; provided that no amount shall be deposited therein or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid.

**Section 13.       Use and Application of Amounts in Funds**.

**A.       Receiving Fund.**

(a)  Amounts in the Receiving Fund shall be monthly applied as provided in Section 12.

(b)  Amounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be credited to the Surplus Fund.

**B.       Operation and Maintenance Fund**.

Amount in the Operation and Maintenance Fund shall be used to pay the expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses and any rebates to the United States government that may be required by the Code) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order.

**C.       Interest and Redemption Funds**.

(a)  *Generally*.  Amounts in the Interest and Redemption Fund established for a Priority of Securities and Ancillary Obligations shall be applied to pay principal (and redemption premium, if any) of and interest on such Priority of Securities and amounts due on such Priority of Ancillary Obligations.

(b)  *Mandatory Redemption Requirements*.

(1) A Mandatory Redemption Requirement for a maturity of Term Securities may be satisfied in whole or in part by the redemption of Term Securities of such maturity or by the purchase and surrender to the Transfer Agent of such Term Securities from amounts credited to the Interest and Redemption Fund established for such Priority of Securities or purchased with other funds legally available therefor.  The Finance Director shall elect the manner in which he/she intends to satisfy all or a portion of a Mandatory Redemption Requirement for particular Term Securities not less than 40 days prior to the due date of such Mandatory Redemption Requirement unless otherwise provided in the Supplemental Action providing for the issuance of such Term Securities.

(2) Unless otherwise provided in a Supplemental Action providing for the issuance of Term Securities, the City will receive a credit against the Mandatory Redemption Requirement for Term Securities for which such Mandatory Redemption Requirement was established that have been redeemed (other than by application of Mandatory Redemption Requirements) or otherwise acquired by the City prior to the giving of the notice of redemption and that have not been applied as a credit against any other Mandatory Redemption Requirements.

(i)       Not less than 40 days prior to any mandatory redemption date for Term Securities, the Finance Director shall give notice to the Transfer Agent that such Term Securities are to be so credited.

(ii)     Each such Term Security shall be credited by the Transfer Agent at 100% of the principal amount thereof against the Mandatory Redemption Requirement, and the principal amount of Term Securities to be redeemed on such mandatory redemption date shall be reduced accordingly and any excess over such amount shall be credited to future Mandatory Redemption Requirements in such order as the Finance Director shall direct; provided, however, that any excess resulting from the purchase, at less than par, of such Term Securities shall be credited to the Receiving Fund.

(c)  **Reserve Accounts**.

(1) Except as otherwise provided herein, amounts in a Reserve Account shall be used solely for the payment of the principal (and premium, if any) of and interest on Securities and Ancillary Obligations of the Priority for which such Reserve Account was established, as to which there would otherwise be default.

(2) If at any time the amount on deposit in or credited to a Reserve Account exceeds the Reserve Requirement for such Reserve Account, the amount of such excess may be transferred therefrom and credited to the Receiving Fund.

(3) No further payments need be made into an Interest and Redemption Fund in respect of principal and interest after enough of the Securities for which such Fund was established have been retired so that the amount then held in such Fund, including the Reserve Account therein, if any, is equal to the entire amount of principal and interest which will be payable at the time of maturity of all the then Outstanding Securities of such Priority.

(4) A separate Reserve Account may be established for an issue of Securities by the Supplemental Action providing for the issuance of such Securities.

(i)     Securities having the benefit of such Reserve Account may be issued but only if such separate Reserve Account is fully equal to the Reserve Requirement for such Securities concurrently with the issuance of such Securities.

(ii)     The amounts to be paid into any separate Reserve Account to restore it to its Reserve Requirement shall be made on a parity with payments into all other Reserve Accounts established for the same Priority of Securities and shall not exceed, in any Fiscal Year, its proportionate deficit payment.  "Proportionate Deficit Payment" means for a separate Reserve Account the same proportion that the amount available to remedy deficits in each Reserve Account for such Priority bears to the aggregate deficit in all Reserve Accounts for such Priority.

D.     **Extraordinary Repair and Replacement Reserve Fund**.

(a) Amounts may be used to pay the costs of making major unanticipated repairs and replacements to the System which individually have cost or are reasonably expected to cost in excess of 1,000,000 as determined by the Commissioners.

(b) On and after the first day of each Fiscal Year, the Finance Director may, by Supplemental Action, transfer to the Improvement and Extension Fund not more than 50% in aggregate of the balance in this Fund on the first day of such Fiscal Year if, but only if (i) in the month of such transfer the full amount of the Extraordinary Repair and Replacement Minimum Requirement for each prior month in the current Fiscal Year has been credited to this Fund and (ii) the amounts of all prior transfers from this Fund to the Improvement and Extension Fund have been restored in full.

### E.  Improvement and Extension Fund.

The Improvement and Extension Fund shall be used for improvements, enlargements, extensions or betterment to the System.

### F.  Surplus Fund.

Amounts from time to time on hand in the Surplus Fund may, at the option of the Commissioners, be used and applied for any purposes related to the System; provided, however, that if and whenever there should be any deficit in the Operation and Maintenance Fund or in any Interest and Redemption Fund (including any Reserve Account therein) then transfers shall be made from the Surplus Fund to such funds in the priority and order named in Section 12 to the extent of any such deficit.

### Section 14.  Construction Fund.

(a) There shall be established and maintained a separate depository fund designated the Construction Fund.  The City may designate separate accounts in the Construction Fund for different series of Securities for administrative purposes and to better enable the City to comply with its tax covenants in Supplemental Actions or resolutions regarding the exclusion from federal income taxation of interest on Securities.

(b) Amounts in the Construction Fund shall be applied solely in payment of the cost of repairs, extensions, enlargements, and improvements to the System ("construction costs") and any costs of engineering, legal, bond insurance premiums, if any, and other expenses incident thereto, to the financing thereof.

(1) Payments of construction costs, either on account or otherwise, shall not be made unless the registered engineer in charge of such work shall file with the Commissioners a signed statement to the effect that the work has been completed in accordance with the plans and specifications therefor; that it was done pursuant to and in accordance with the contract therefor; that such work is satisfactory; and that such work has not been previously paid for.

(2) Payment of the cost of engineering, legal, financial, bond insurance premium, etc., as provided in this section shall be made upon submission of appropriate documentation to the Finance Director.

(c) Any unexpended balance remaining in the Construction Fund may in the discretion of the Commissioners be used for meeting any Reserve Requirement or for further improvements, enlargements and extensions to the System if, at the time of such expenditure, such use is approved by the Michigan Department of Treasury Municipal Finance Division, if such permission is then required by law.  Any remaining balance after such expenditure shall be paid into the Interest and Redemption Fund established for the Priority of Securities giving rise to such balance for the purpose of purchasing Securities of such Priority at not more than the fair market value thereof but not more than the price at which such Securities may next be called for redemption or used for the purpose of calling such Securities for redemption.  The City may provide additional

or different lawful uses for such unexpended balance or remaining balance by Supplemental Action of the Finance Director which shall, nonetheless, be subject to the City's relevant tax covenants.

### Section 15. Rate Stabilization Fund.

(a) As used in this Section, "Prior Revenue" means any amounts that constitute Revenues or Net Revenues and held under this Ordinance but only to the extent that such amounts may by applied to any lawful purpose of the System. "Prior Revenue" does not include any amounts held under this Ordinance that at the time are restricted in application to a specific purpose, such as, by way of illustration, the application of amounts in the Surplus Fund in the event of a deficit as provided in the proviso to Section 13(F).

(b) The Commissioners may create a fund designated Sewage Disposal System Rate Stabilization Fund (the "Rate Stabilization Fund"). No amounts shall be deposited therein or credited thereto except Prior Revenues and then only if:

(1) such Prior Revenue is credited to the Rate Stabilization Fund in the Fiscal Year in which it was recognized by the City as Net Revenue or within 90 days after the end of such Fiscal Year;

(2) the amount of such Prior Revenue is deducted from the amount of Net Revenue recognized in such Fiscal Year for all purposes of this Ordinance; and

(3) the amount of Net Revenue recognized in such Fiscal Year at least meets the minimum applicable coverage requirements of this Ordinance for such Fiscal Year after (i) such deduction and (ii) all prior deductions in respect of such Fiscal Year pursuant to this clause.

(c) Amounts on deposit in the Rate Stabilization Fund may be taken into account for purposes of fixing and revising rates and rate covenants with respect to Securities (any such purpose, a "Coverage Determination").

(d) Whenever any amount on deposit in the Rate Stabilization Fund is taken into account for any Coverage Determination (a "Reserved Amount"), then such Reserved Amount shall be credited to the Receiving Fund for the Fiscal Year for which such Coverage Determination is made.

(e) Prior to the transfer of any Reserved Amount to the Receiving Fund, such Reserved Amount shall not be used or applied to any purpose except pursuant to Section 17 and then only after all other amounts then in the Rate Stabilization Fund have been applied pursuant to Section 17.

(f) Amounts on deposit in the Rate Stabilization Fund other than Reserved Amounts may be applied to any lawful purpose of the System.

### Section 16. Depositaries.

(g) Amounts in the several funds, accounts and subaccounts established pursuant to this Ordinance shall be kept in one or more accounts separate and apart from all other accounts of the City, and if kept in only one account shall be allocated on the books and records of the City in the manner and at the times provided in this Ordinance.

(h) Amounts in the Interest and Redemption Fund for a Priority of Securities shall be kept on deposit with one of the banks or trust companies where the principal of and interest on such Priority of Securities are payable.

(i)  The depositary of all funds and accounts, except as otherwise specifically provided for herein, shall be those banks or trust companies designated from time to time as such by the Finance Director.

**Section 17.       Priority of Funds.**

(a)  If amounts in the Receiving Fund are insufficient to provide for the current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including the Reserve Account, if any, therein), then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and Maintenance Fund and second, to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

(b)  If any principal (and redemption premium, if any) of or interest on Securities of a Priority or any related Ancillary Obligations become due (whether on a stated or scheduled date, by reason of call for redemption or otherwise), and there are insufficient amounts for the payment thereof in the Interest and Redemption Fund established for such Priority of Securities and Ancillary Obligations after applying payments in the Reserve Account, if any, established for such Priority of Securities, then there shall be applied to such payment amounts in each Interest and Redemption Account established for each lower Priority of Securities, beginning with the lowest Priority and proceeding seriatim in ascending order of Priority, until such payments are made in full.

**Section 18.       Investments.**

(a)  ***Permitted Investments.***   The Permitted Investments for amounts held under this Ordinance are the Legal Investments for such amounts subject to the following:

(1) Investment of amounts in any Reserve Account shall be limited to obligations bearing maturity dates or subject to redemption, at the option of the Holder thereof, not later than ten years from the date of the investment.

(2) Except as otherwise herein provided, investments shall mature at such times as it is estimated the funds therefrom will be required, but shall be limited to obligations bearing maturity dates or subject to redemption, at the option of the Holder thereof, not later than five years from the date of investments.

(3) A Supplemental Action may provide for limitations in addition to or in lieu of the above limitations on Legal Investments or may eliminate any of such limitations.

(4) Notwithstanding paragraph (3), no Permitted Investments for the defeasance of particular Securities may be changed without confirmation from each Rating Agency that such change will not reduce the rating of such Securities.

(b)  **Where Held**.  To the extent required by Act 94, securities representing investments made under this Ordinance shall be kept on deposit with the bank or trust company having on deposit the fund or funds or accounts from which the purchase was made.

(c)  **Disposition of Profit and Gain.**

(1) Profit realized or interest income earned on investment of amounts in the Receiving Fund, Operation and Maintenance Fund, any Interest and Redemption Fund (including the Reserve Account, if any, therein), the Extraordinary Repair and

Replacement Reserve Fund, and Improvement and Extension Fund shall be credited to the Receiving Fund.

(2) Profit realized or interest earned on investments of funds in the Construction Fund relating to any series of Securities and any Redemption Account (including any Reserve Account or Subaccount established for any Securities) shall be credited as received to the funds from which such investments were made; provided, however, that profit realized or interest earned on the Construction Fund relating to any series of Securities may, if permitted by law, be credited to the Receiving Fund at the option of the Commissioners.

(d) *Valuation*.

(1) Investments credited to any Reserve Account shall be valued at least annually on each January 1, unless otherwise specified in the Supplemental Action providing for the issuance of such Securities, at the market value thereof, and the City shall withdraw any excess immediately and, in the event of a deficit, budget such additional deposits at the beginning of the next succeeding Fiscal Year in an amount necessary to maintain each Reserve Account at its Reserve Requirement.

(2) Investments in the Extraordinary Repair and Replacement Reserve Fund shall be valued at least annually on each July 1 at the cost thereof.

**Section 19.        Covenants**.

The City covenants and represents with the Holders of all Securities from time to time Outstanding as follows.

(a) ***Ownership and Authority***.  The City is the lawful owner of the System; the System is free from any and all liens and encumbrances; and the City has good right and lawful authority to encumber and pledge the Pledged Assets as herein encumbered and pledged.

(b) ***Maintenance and Operation of System***.

(1) The City will, through its Commissioners, or such successor board or body as may hereafter be legally charged with the duty of the operation of the System, maintain the System in good repair and working order.

(2) The City will from time to time make all needful and proper repairs, replacements, additions, and betterments to the System so that the System may at all times be operated properly and advantageously, and whenever any portion of the System shall have been worn out, destroyed or become obsolete, inefficient or otherwise unfit for use, the City will procure and install substitutes of at least equal utility and efficiency so that the value and efficiency of the System shall at all times be fully maintained.

(c) ***Books and Records***.  The City will maintain and keep proper books of record and account separate from all other records and accounts in which shall be made full and correct entries of all transactions relating to the System, and the City will also cause an annual audit of such books and records for the preceding Fiscal Year.  The City will make such audit available to the Holder of any Security upon request.

(d) **Disposition of System**.  The City will not sell, lease or dispose of the System or any substantial part thereof until all Outstanding Securities have been paid in full as to both principal and interest.

(1) This covenant shall not be construed to prohibit the disposition or lease of any property comprising part of the System which is no longer necessary, appropriate, required for the use of, or profitable to the System, or which is no longer necessary to the proper operation and maintenance thereof, or which may be sold and leased back to the extent such arrangement is permitted by law.

(2) Paragraph (1) shall not be construed to authorize or permit the sale, lease or disposition of any substantial part of the System.

(3) The City may at all times in its discretion alter, repair or replace any buildings or structures or any part of the System and appurtenances thereto as the Commissioners determine necessary for the System.

(e) **No Competition**.  The City will not, and will not to the extent permitted by law, permit others to, operate a sewage disposal system that will compete with the System.

(f) **Tax Exemption of Securities**.  The City will take all action and refrain from any action as is necessary, including paying any rebates to the United States government that may be required by the Code so as not to impair the tax exemption of the interest on Securities issued as tax-exempt Securities from general federal and State of Michigan income taxation.

### Section 20.    Trustee.

(a) The City shall at all times maintain a Trustee in order to further assure prompt compliance with all of the requirements, duties and obligations of the City with respect to the System and the Securities and to perform such other duties as may be provided in a Supplemental Action; provided that no such additional duties shall be imposed on an existing Trustee without its consent.

(b) All fees, costs, and expenses of any legal proceedings that may be brought by the Trustee to enforce the duties and obligations of the City hereunder or under any Securities and any amounts advanced by Securityholders to the Trustee for such costs and expenses shall be paid by the City to the Trustee or such Securityholders, or both, as the case may be, in the first instance from the Net Revenues remaining, in the month of payment, after making the transfers and deposits required by Section 12 to all Interest and Redemption Funds (including the Reserve Account, if any, therein), and, to the extent that sufficient amounts are not available from the Revenues therefor, from general funds of the City.

(c) In the event that general funds of the City are used to pay any such costs and expense, the City shall be reimbursed therefor with interest at the rate of 7% per annum from the first Net Revenues remaining, in the month of reimbursement, after (i) making the transfers and deposits required by Section 12 to all Interest and Redemption Funds (including the Reserve Account, if any, therein) and (ii) paying the Trustee or Securityholders as provided in subsection (b).

(d) The Trustee is authorized to act in reliance upon the sufficiencies, correctness, genuineness or validity of any instrument or document or other writing submitted to it hereunder and shall have no liability with respect to said matters.  The Trustee shall not be liable for any error in judgment or any act done or omitted by it in good faith.  In the event of any dispute or question arising hereunder the Trustee shall not be liable if it acts or takes no action in accordance with the opinion of its legal counsel.

(e) In the event the required percentage of Securityholders shall direct the Trustee in writing to exercise one or more of the remedies specified in this Ordinance or in Act 94, the Trustee shall be under no obligation to proceed to enforce or compel the performance of the duties and obligations of the City under this Ordinance unless and until the Holders shall have reasonably indemnified the Trustee for all estimated costs and expenses in the exercise of said remedies, including necessary attorneys' fees.

### Section 21.    Additional Securities.

**A.    Limitations on Indebtedness**.

The City shall not incur any obligations payable from Pledged Assets except for Secured Obligations, and no obligations of the City shall be secured by a lien on Pledged Assets except as provided in this Ordinance.

**B.    Issuance of Securities**

(f)  Limitations on Issuance.

(1) The City shall not issue any Securities except in accordance with Section 21. Ancillary Obligations and related Ancillary Obligation Fees and Expenses may be incurred in respect of such Securities and shall be secured and payable as elsewhere provided in this Ordinance.

(2) Other limitations on the issuance of Securities may be added by Supplemental Action of the Finance Director.

(g) Coverage Requirements. The coverage requirements for determining the Required Combined Coverage under this Section are the following percentages:

| Priority of Securities | Percentage |
|---|---|
| Senior Lien Bonds…………………………….…..120 | |
| Second Lien Bonds………………………………110 | |
| SRF Junior Lien Bonds…………….……………100 | |

Prior to or concurrently with the issuance of a Priority of Securities not enumerated above, this subsection shall be amended to provide for the coverage percentage for such Priority of Securities, but in no case shall such coverage percentage be less than 100. Such amendment shall not require the consent of Holders of any Securities.

(h) Refunding Securities. If any Additional Securities (any of such, the "Refunding Securities") are to be issued to refund Outstanding Securities (the "Securities to be Refunded"), the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the Refunding Securities and not the Annual Debt Service on the Securities to be Refunded.

**C.    "New Money" and Refunding.**

(a) *General Authority*. The City may issue Securities of any Priority (herein, "Additional Securities") for repairs, extensions, enlargements, and improvements to the System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund ), refunding all or a part of any Outstanding Securities and paying the costs of issuing such Additional Securities, including deposits, if any, to be made to any Reserve Account established or to be established for such Additional Securities or any other Securities, if, but only if, there is Required Combined Coverage under either the Projected Net Revenues

Test contained in subsection (b) or the Historical Net Revenues Test contained in subsection (c). The determination in a Supplemental Action that there will be Required Combined Coverage upon the issuance of such Additional Securities shall be conclusive.

(b) Projected Net Revenues Test. For purposes of determining the Required Coverage Requirement, the Inflows are the projected Net Revenues of the System for the then current or the next succeeding Fiscal Year and the Outflows are the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Securities and the Additional Securities to be issued.

(1) Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of the Additional Securities.

(2) In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of sewage disposal systems.

(c) **_Historical Net Revenues Test_**. For purposes of determining the Required Coverage Requirement, the Inflows are the actual Net Revenues of the System for the immediately preceding audited Fiscal Year and the Outflows are the maximum composite Annual Debt Service in any future Fiscal Year on Outstanding Securities and the Additional Securities to be issued.

(1) Instead of the immediately preceding audited Fiscal Year, the City may use any audited Fiscal Year ending not more than sixteen months prior to the date of delivery of such Additional Securities.

(2) If any change in the rates, fees and charges of the System has been authorized at or prior to the date of sale of such Additional Securities, the Net Revenues for the particular preceding Fiscal Year shall be augmented by an amount reflecting the effect of such change had the System's billings during such Fiscal Year been at the increased rates.

(3) Net Revenues for the particular preceding audited Fiscal Year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of such Additional Securities and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited Fiscal Year.

(4) With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of sewage disposal systems regarding the existence of such conditions.

(5) Audited financial statements may be relied upon if no augmentation of Net Revenues is required.

**D. Debt Service Reduction – An Additional Means of Refunding.**

The City may issue Securities of any Priority (herein, "Additional Securities") without regard to Section 21C for refunding all or part of Securities then Outstanding and paying costs of issuing the

Refunding Securities, including deposits which may be made to any Reserve Account established or to be established for such Additional Securities or any other Securities if, but only if:

> (1) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the Additional Securities and (B) giving effect to the refunding, all Outstanding unrefunded Securities of equal and higher Priority is less than

> (2) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all equal and higher Priority Securities, without giving effect to the refunding.

**Section 22.      Defeasance.**

(a)  A Security is "defeased" for purposes of this Ordinance if:

> (1) there has been deposited in trust sufficient cash and Permitted Investments, not callable by the issuer, the principal of and interest on which mature at the times and in the amounts, without the reinvestment thereof, necessary to pay principal of and interest on such Security to its maturity, or, if called for redemption, to the date fixed for redemption, together with the amount of the redemption premium, if any; and

> (2) if such Security is to be redeemed prior to maturity, irrevocable instructions have been given to the Transfer Agent to call such Security for redemption.

(b)  A Supplemental Action providing for the issuance of Securities may:

> (1) provide different means of defeasing such Securities, and such means may be in addition to or in lieu of the means set forth in subsection (a);

> (2) provide for the Legal Investments that are Permitted Investments for the defeasance of such Securities, but no such Permitted Investments may thereafter be changed except as provided in Section 18; and

> (3) provide for the consequences of such Securities being defeased.

(c)  Except as otherwise provided in a Supplemental Action:

> (1) the Legal Investments for the defeasance of such Securities are the Permitted Investments therefor; and

> (2) the statutory lien herein referred to in Section 4 shall be terminated with respect to defeased Securities, the Holders of such defeased Securities shall have no further rights under this Ordinance except for payment from the deposited funds and registration and replacement of such Securities, and such Securities shall no longer be considered to be Outstanding under this Ordinance.

**Section 23.        Amendments; Consent of Securityholders.**

**A.        Amendment without Consent.**

(a)  This Ordinance may be amended or supplemented from time to time by Act of Council or Supplemental Action without consent of the Holders of Securities:

(1)  To issue Securities of any Priority;

(2)  To add to the covenants and agreements of the City in this Ordinance contained, other covenants and agreements thereafter to be observed or to surrender, restrict or limit any right or power reserved to or conferred upon the City (including but not limited to the right to issue Securities or incur other Secured Obligations of, in either case, any Priority);

(3)  To make such provisions for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions contained in this Ordinance, or in regard to matters or questions arising under this Ordinance, as the City may deem necessary or desirable;

(4)  To increase the size or scope of the System; and

(5)  To amend or supplement this Ordinance in any respect with regard to one or more Priorities of Securities so long as such amendment does not materially adversely affect the Holders of Outstanding Securities.

(b)  No Holders of a Priority of Securities shall be "materially adversely affected" for the purposes of this Ordinance by the change of any coverage percentage established for any other Priority of Securities, and no amendment of or supplement to this Ordinance that provides for or facilitates the issuance of Securities or incurs other Secured Obligations of, in either case, any Priority shall "materially adversely affect" the Holders of Securities of any other Priority for the purposes of this Ordinance so long as such amendment does not change any coverage percentage established for such Priority of Securities or is not an amendment that requires the consent of the Holder of such Security under Section 23B(a)(1) or (2).

(c)  A confirmation of the rating of the Securities held by Holders affected by any amendment of or supplement to this Ordinance shall be conclusive evidence that such Holders were not materially adversely affected by such amendment or supplement.

**B.        Amendments With Consent.**

(a)  With the consent of the Holders of not less than 51% in principal amount of Securities then Outstanding, the City may from time to time and at any time amend this Ordinance in any manner by Act of Council; provided, that no such amendment shall:

(1)  reduce the aforesaid percentage of Holders of Securities required to consent to an amendment to this Ordinance without the consent of the Holders of all Securities then Outstanding, or

(2)  without the consent of the Holder of each Security affected thereby:

(i)        extend the fixed maturity of such Security or reduce the rate of interest thereon or extend the time of payment of interest, or

reduce the amount of the principal or redemption premium thereof, or reduce or extend the time for payment of any premium payable on the redemption thereof, or

(ii)     change the Priority of such Security or deprive such Holder of the right to payment of such Security from Pledged Assets.

(b) It shall not be necessary for the consent of the Securityholders under this Section to approve the particular form of any proposed Act of Council but it shall be sufficient if such consent shall approve the substance thereof.  The consent of the Holder of a Security shall bind all Holders of any Security for which such Security was the predecessor.

(c) For the purpose of acquiring consent for the purposes of this Section, the consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

(d) Promptly after an Act of Council amending this Ordinance pursuant to this Section has obtained the requisite consent, the Finance Director shall cause the Transfer Agent to notify, by mail at their addresses shown in the Registry, or by publication, Holders of all Outstanding Securities affected by such amendment, of the general terms of the substance of such Act of Council.  Filing notice pursuant to the continuing disclosure agreement in respect of such Securities shall constitute sufficient notice for the purposes of this subsection.

### Section 24.        Severability and Captions.

(a) If any section, paragraph, clause or provision of this Ordinance shall be held invalid, the invalidity of such section, paragraph, clause or provision shall not affect any other provision of this Ordinance.

(b) Captions of sections and paragraphs of this Ordinance are furnished for the convenience of reference only and are not part of this Ordinance.

## PART III

### Section 1.        Consent of Bondholders and Junior Lien Bondholders.

(a) The registered owner or beneficial owner of each series of Bonds and Junior Lien Bonds issued after the effective date of this Ordinance by its acceptance thereof expressly consents to the amendments contained in Part II (the "Part II Amendments").

(b) At, but not until, such time as the owners of not less than 51% in principal amount of the Bonds then outstanding and the owners of not less than 51% in principal amount of the Junior Lien Bonds then outstanding (including without limitation each series of Bonds and Junior Lien Bonds issued after the effective date of this Ordinance upon the issuance thereof) shall have consented to the Part II Amendments, Ordinance No. 27-86 shall be amended and restated as herein provided.  Promptly thereafter, the City shall cause the Transfer Agent to provide notice setting forth in general terms the substance of the Senior Lien Bondholder and Second Lien Bondholder Approval Amendments, in accordance with Section 26(B) of Ordinance No. 27-86 as in effect on the date of adoption of this Ordinance.

**Section 2.**     **Severability; Paragraph Headings; and Conflict**.

If any section, paragraph, clause or provision of this Ordinance shall be held invalid, the invalidity of such section, paragraph, clause or provision shall not affect any other provision of this Ordinance. The paragraph headings in this Ordinance are furnished for convenience of reference only and shall not be considered to be part of this Ordinance.

**Section 3.**     **Publication and Recordation**.

This Ordinance shall be published in full in the Detroit Legal News, a newspaper of general circulation in the City qualified under State Law to publish legal notices, promptly after its adoption.

**Section 4.**     **Effective Date.**

This Ordinance shall be effective immediately.

**Approved as to Form**

_____
Ruth Carter
Corporation Counsel

## APPENDIX – D

### AMENDMENTS TO CERTAIN PROVISIONS OF AUTHORIZING DOCUMENTS

Following are the amendments to the 2001 Variable Rate Supplement, the 2001(C-2) Sale Order, the 2006(A) Variable Rate Supplement, and the 2006(A) Sale Order (collectively, the "2001 and 2006 Authorizing Documents"), which will be effective in connection with the remarketing of the Predecessor Bonds. The 2001 and 2006 Authorizing Documents are governed by their own amendment provisions but are also subject to the amendment provisions of the Bond Ordinance, which is included as Appendix C to this Remarketing Circular. Section 23(B)(c) of the Bond Ordinance, "Amendments With Consent," states in relevant part as follows:

> [T]he consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

Each of the 2001 Variable Rate Supplement and the 2006(A) Variable Rate Supplement contain substantially the same language. Accordingly, Holders of the Predecessor Bonds being remarketed hereby which are acquired in the remarketing thereof on or after the date of this Remarketing Circular, whether or not the fixed rate conversion is consummated in accordance with the initial notice of Mode Change or optional redemption, will be considered to have consented to the amendments set forth in this Appendix D.

In accordance with the provisions of each of the 2001 Variable Rate Supplement and the 2006(A) Variable Rate Supplement, consent of the Transfer Agent and Tender Agent, each Provider, each Bond Insurer and the Remarketing Agent (as defined in the 2001 Variable Rate Supplement or the 2006(A) Variable Rate Supplement, as applicable), will be obtained or waived and notice will be provided to each Rating Agency. Consent of at least 51% in outstanding principal amount of the Holders of Series 2001(E) Predecessor Bonds will be obtained in order for the amendments specifically referencing such consent to be effective.

To the extent certain of the amendments set forth in this Appendix D affect Holders of Sewage System Securities beyond those who have consented to such changes, as described above, the City has determined that such amendments can be made without Bondholder consent, as described in the Bond Ordinance. The amendment to Section 1.01 of each of the 2001 Variable Rate Supplement and the 2006(A) Variable Rate Supplement is pursuant to the authority of Section 23(A)(a)(3) of the Bond Ordinance, which permits amendments without consent of Securityholders for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions. The form of legal opinion regarding tax exemption set forth in Section 1.01 does not encompass the situation where a remarketing is deemed to be a reissuance for federal tax purposes. The amendment allows the opinion to be in the appropriate form for a reissuance but does not change the substance of the opinion. The amendments to Sections 2.03 and 3.03 of each of the 2001 Variable Rate Supplement and the 2006(A) Variable Rate Supplement are pursuant to the authority of Section 23(A)(5), which allows amendment without Securityholder consent so long as such amendment does not materially adversely affect the Holders of Outstanding Securities (as such terms are defined in the Bond Ordinance). In connection with these amendments, the City's Finance Director will make a determination that, based upon market conditions, the effect on overall Sewage System debt service of the implementation of these amendments in connection with the fixed rate remarketings described in this Remarketing Circular, and certain other factors, such amendments are not materially adverse to Holders of Outstanding Sewage System Securities.

### SERIES 2001 (C-2) and (E) AMENDMENTS

**Amendments to the Supplement.**

**Amendment of Section 1.01 – Definitions.** The definition of Favorable Bond Counsel's Opinion is hereby amended to read as follows *(added language is in italics)*:

Favorable Bond Counsel's Opinion means, with respect to any action the occurrence of which requires such an opinion of Bond Counsel, an opinion of Bond Counsel to the effect that (i) such action is authorized or permitted by this Agreement, the Sale Order and the Authorizing Documents, and (ii) such action will not adversely affect the exemption of the interest on the Series 2001 Securities from federal and state income taxation (subject to customary exceptions), *provided, however, that if Bond Counsel believes it necessary or appropriate, in lieu of the opinion described in (ii) above, Bond Counsel may provide an opinion to the effect that the interest on such Series C-2 Securities or Series E Securities is excluded from gross income for federal and state income tax purposes (subject to customary exceptions).*

D-1

**Amendment to Section 2.03 - Changes in Connection with Mode Change**. Section 2.03(b)(3) is hereby amended to read as follows *(added language is in italics)*:

(b)(3)    such Variable Rate Securities could be issued as Series 2001 Securities of the corresponding Parity and for the corresponding purpose under the Bond Ordinance (treating, for such purpose, the Securities with the amortization to be adjusted as no longer outstanding to the extent of the adjustment), *provided, however, that in connection with the remarketing of any Series C-2 Securities or Series E Securities that is completed prior to September 30, 2008, compliance with this Section 2.03(b)(3) shall not be required, but only if the City certifies, in a manner acceptable to Bond Counsel at the time of such remarketing, that such lack of compliance with this Section 2.03(b)(3) is not materially adverse to the Holders of all outstanding Bonds of the Sewage Disposal System*; and

**Amendment to Section 3.03 - Interest Rate Determinations for All Other Modes.** Section 3.03(a) is hereby amended to read as follows *(added language is in italics)*:

(a)    The interest rate for each Tranche of Modal Securities other than Flexible Rate Securities shall be determined by the Remarketing Agent on the Rate Determination Date for such Mode as the interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at par plus accrued interest to the purchase date, under prevailing market conditions on such Rate Determination Date; *provided, however, that for Series C-2 Securities in the Weekly Mode, and for Series E Flexible Rate Securities being converted to the Modal Fixed Rate Mode, if required by prevailing market conditions in the judgment of the Remarketing Agent, the Remarketing Agent on the Rate Determination Date for such Mode may determine an interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at a net premium, i.e. coupons exceed yields on a net basis, provided, further, that in the event of a premium remarketing permitted by the preceding clause, the total par amount of the Series C-2 Securities and the total par amount of the Series E Securities so remarketed shall not increase by reason of such premium, it being understood that circumstances permitting the exercise of the discretion authorized to be exercised by the Remarketing Agent by this Section shall **not** constitute a Rate Suspension Event under Section 3.04 hereof.*

**Amendment of Section 4.01 – Modes.** Section 4.01 is hereby amended to read as follows *(added language is in italics)*:

(a)(2)(iii) the mode of a Flexible Rate Security may not be changed unless the Mode of all outstanding Flexible Rate Securities is changed on the same Mode Change Date, *provided, however, that the mode of a Series E Security may be changed without regard to the Mode of any other Flexible Rate Security, if (i) the Modal Holder of such Flexible Rate Security has consented to this amendment of this Section of the Supplement, and (ii) Modal Holders of 51    of the outstanding principal amount of Series E Securities have consented to such amendment of the Supplement.*

(a)(3)    Although the Mode of a Term Rate Security or a Flexible Rate Security may be changed, it may be changed only at the end of a Period, *provided, however, that the Mode of a Series E Security may be changed on any Modal Business Day, if (i) the Modal Holder of such Series E Security has consented to this amendment of this Section of the Supplement, and (ii) Modal Holders of 51    of the outstanding principal amount of Series E Securities have consented to such amendment of the Supplement.*

(b)(2)    The Mode of a Flexible Rate Security may be changed only on the last day of the Flexible Period, provided, however, that the Mode of a Series E Security may be changed on any Modal Business Day, if (i) the Modal Holder of such Series E Security has consented to this amendment of this Section of the Supplement, and (ii) Modal Holders of 51% of the outstanding principal amount of Series E Securities have consented to such amendment of the Supplement.

**Amendment of Section 4.11 – Election of Mode Change; How Effected; Irrevocability.** Section 4.11(b) is hereby amended to read as follows *(added language is in italics)*:

(b)    In order to evidence the election of the Finance Director, and for his/her election to be effective, the Finance Director shall deliver to the Tender Agent, with copies to each of the other Notice Parties, not later than, for the proposed Mode Change Date, the minimum number of days required by *Section 6.02* for notices given in connection with mandatory tenders *plus* 15 days (or such fewer days in advance of such minimum number as may be acceptable to the other Notice Parties), *provided, however, that, for a Mode Change of Series C-2 Securities from the Weekly Rate Mode or Series E Securities from the Flexible Rate Mode to the Modal Fixed Rate Mode, if on such Mode Change Date (herein the* **"First Mode Change Date"**) *all of the conditions to conversion to the Modal Fixed Rate Mode are not met, if the Finance Director again elects to change the Mode for such Series C-2 Securities or Series E Securities to the Modal Fixed Rate Mode within 30 days of the First Mode Change Date, his/her election shall be effective if he/she delivers to the Tender Agent, with copies concurrently to each of the other Notice Parties, not later than the minimum number of days required by Section 6.02(c) for notices given in connection with a Mode Change in such situation:*

**Amendment of Section 4.14 – Notice to Variable Rate Modal Securityholders and Liquidity Facility Providers**. Section 4.14 is hereby amended to add additional language at the end of subsection (b) to read as follows (*added language is in italics*):

(b)        Such notice shall be given in advance of the Mode Change Date specified in such Mode Change Notice by at least the minimum number of days required by Section 6.02; provided that, a Liquidity Facility Provider shall always be given at least five Modal Business Days' notice*, except in the circumstances set forth in the proviso to Section 4.11(b) hereof.*

**Amendment of Section 5.01 – Optional Redemption – Short-Term and Term Rate Securities.** Section 5.01(a)(2) is hereby amended to read as follows (added language is in italics):

(a)(2)        Flexible Rate Securities are subject to redemption upon notice given as required in the Sale Order in whole or in part on any Interest Payment Date at the option of the City at a Redemption Price of 100% of the principal amount thereof to be redeemed plus interest accrued to the Redemption Date, *provided, however, that Series E Securities are subject to redemption upon notice given as required in the Sale Order in whole or in part on any Modal Business Day, if (i) the Modal Holder of such Series E Security has consented to this amendment of this Section of the Supplement, and (ii) Modal Holders of 51 of the outstanding principal amount of Series E Securities have consented to such amendment of the Supplement.*

**Amendment of Section 6.02 – Mandatory Tender Events.** Section 6.02 is hereby amended to add a new subsection (c) to read as follows (*added language is in italics*):

(c)        If a Mode Change with respect to Series C-2 Securities or Series E Securities to the Modal Fixed Rate Mode from the Weekly Rate Mode or the Flexible Rate Mode, as applicable, has been properly noticed in accordance with Section 6.02(a) above (herein the **"First Mode Change Date"**) and all of the conditions precedent to the conversion to the Modal Fixed Rate Mode are not met, if the Finance Director again elects to change the Mode for such Securities to the Modal Fixed Rate Mode within 30 days of the First Mode Change Date, notice of a subsequent Mode Change shall be given to Modal Holders of Series C-2 Securities or Series E Securities, as applicable, not later than the 3rd day next preceding the Mode Change Date, stating that such Mode Change Date is the Purchase Date.

**Amendment to the General Terms of the 2001 Securities Supplement to the Composite Sale Order.**

Section 4.02(a) is hereby amended to read as follows (*added language is in italics*):

(a)        When Series 2001 Securities, or portions thereof, are to be for redeemed, the Registrar for such Series 2001 Securities shall in its own name or in the name of the City, give notice by first class mail not less than 30 days prior to the date fixed for redemption to the registered owners of the Series 2001 Securities or portions thereof to be redeemed at their addresses set forth in the Registry, *provided, however, that where notice of optional redemption has been delivered to registered owners of Series C-2 Securities or Series E Securities in the manner required by this Section (the date fixed in such notice for redemption is herein referred to as the "First Redemption Date"), and all of the conditions precedent to the conversion of such Series C-2 Securities or Series E Securities to the Modal Fixed Rate Mode are not met, if the City again elects to effect a conversion to the Fixed Rate Mode and, in connection therewith, optionally redeem Series C-2 Securities, a subsequent notice to such registered owners in the manner required by this Section shall be given to such registered owners not later than the 3rd day next preceding the date fixed for redemption, if such date is within 30 days of the First Redemption Date.*

## SERIES 2006(A) AMENDMENTS

**Amendments to the Supplement.**

**Amendment of Section 1.01 – Definitions.** The definition of Favorable Bond Counsel's Opinion is hereby amended to read as follows *(added language is in italics)*:

Favorable Bond Counsel's Opinion means, with respect to any action the occurrence of which requires such an opinion of Bond Counsel, an opinion of Bond Counsel to the effect that (i) such action is authorized or permitted by this Agreement and the Authorizing Documents, and (ii) such action will not adversely affect the exemption of the interest on the Modal Securities from federal and state income taxation (subject to customary exceptions), *provided, however, that if Bond Counsel believes it necessary or appropriate, in lieu of the opinion described in (ii) above, Bond Counsel may provide an opinion to the effect that the interest on such Modal Securities is excluded from gross income for federal and state income tax purposes (subject to customary exceptions).*

**Amendment to Section 2.03 - Changes in Connection with Mode Change**.  Section 2.03(b)(3) is hereby amended to read as follows *(added language is in italics)*:

(b)(3)  such Variable Rate Securities could be issued as Modal Securities of the corresponding Parity and for the corresponding purpose under the Bond Ordinance (treating, for such purpose, the Securities with the amortization to be adjusted as no longer outstanding to the extent of the adjustment), *provided, however, that in connection with the remarketing of any Modal Securities that is completed prior to September 30, 2008, compliance with this Section 2.03(b)(3) shall not be required, but only if the City certifies, in a manner acceptable to Bond Counsel at the time of such remarketing, that such lack of compliance with this Section 2.03(b)(3) is not materially adverse to the Holders of all outstanding Bonds of the Sewage Disposal System*; and

**Amendment to Section 3.03 - Interest Rate Determinations for Other Modes.**  Section 3.03(a) is hereby amended to read as follows (*added language is in italics*):

(a)  The interest rate for each of the Modal Securities other than Commercial Paper Rate Securities and Auction Rate Securities shall be determined by the Remarketing Agent on the Rate Determination Date for such Mode as the interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at par plus accrued interest to the purchase date, under prevailing market conditions on such Rate Determination Date; *provided, however, that for Securities in the Weekly Mode, if required by prevailing market conditions in the judgment of the Remarketing Agent, the Remarketing Agent on the Rate Determination Date for such Mode may determine an interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at a net premium, i.e. coupons exceed yields on a net basis, provided, further, that in the event of a premium remarketing permitted by the preceding clause, the total par amount of the Securities so remarketed shall not increase by reason of such premium, it being understood that circumstances permitting the exercise of the discretion authorized to be exercised by the Remarketing Agent by this Section shall **not** constitute a Rate Suspension Event under Section 3.04 hereof.*

**Amendment of Section 4.12 – Election of Mode Change; How Effected; Irrevocability.**  Section 4.12(b) is hereby amended to read as follows (*added language is in italics*):

(b)  In order to evidence the election of the Finance Director, and for his/her election to be effective, the Finance Director shall deliver to the Tender Agent, with copies to each of the other Notice Parties, not later than, for the proposed Mode Change Date, the minimum number of days required by **Section 6.02** for notices given in connection with mandatory tenders *plus* 15 days (or such fewer days in advance of such minimum number as may be acceptable to the other Notice Parties), *provided, however, that, for a Mode change from the Weekly Rate Mode to the Fixed Rate Mode, if on such Mode Change Date (herein the "First Mode Change Date") all of the conditions to conversion to the Fixed Rate Mode are not met, if the Finance Director again elects to change the Mode for such Securities to the Fixed Rate Mode within 30 days of the First Mode Change Date, his/her election shall be effective if he/she delivers to the Tender Agent, with copies concurrently to each of the other Notice Parties, not later than the minimum number of days required in Section 6.02(c) for notices given in connection with a Mode Change in such situation:*

**Amendment of Section 4.15 – Notice to Variable Rate Security and Auction Rate Security Holders and Liquidity Facility Providers**.  Section 4.15 is hereby amended to add additional language at the end of subsection (b) to read as follows (*added language is in italics*):

(b)  Such notice shall be given in advance of the Mode Change Date specified in such Mode Change Notice by at least the minimum number of days required by **Section 6.02**; provided that, a Liquidity Facility Provider shall always be given at least five Modal Business Days' notice*, except in the circumstances set forth in the proviso to Section 4.12(b) hereof.*

**Amendment of Section 6.02 – Mandatory Tender Events.**  Section 6.02 is hereby amended to add a new subsection (c) to read as follows (*added language is in italics*):

(c)  If a Mode Change from the Weekly Rate Mode to the Fixed Rate Mode has been properly noticed in accordance with Section 6.02(a) above (herein the **"First Mode Change Date"**) and all of the conditions precedent to the conversion to the  Fixed Rate Mode are not met, notice of a subsequent Mode Change to the Fixed Rate Mode shall be given to Modal Holders not later than the 3rd day next preceding the Mode Change Date, if such Mode Change Date is within 30 days of the First Mode Change Date, stating that such Mode Change Date is the Purchase Date.

D-4

**AMENDMENTS TO THE SALE ORDER.**

Section 2.05(b) is hereby amended by adding a paragraph at the end of the Section to read as follows (*added language is in italics*):

(b)     *In a situation where notice of optional redemption has been delivered to registered owners of Series 2006(A) Securities in the manner required by this Section (the **"First Redemption Date"**), and all of the conditions precedent to the conversion to the Fixed Rate Mode are not met, if the City again elects to effect a conversion to the Fixed Rate Mode and, in connection therewith, optionally redeem Securities, a subsequent notice to such registered owners in the manner required by this Section shall be given to such registered owners not later than the 3rd day next preceding the date fixed for redemption, if such date is within 30 days of the First Redemption Date.*

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX – E**

CHARACTERISTICS OF THE SEWAGE
DISPOSAL SYSTEM SERVICE AREA

[THIS PAGE INTENTIONALLY LEFT BLANK]

# CHARACTERISTICS OF THE SEWAGE DISPOSAL SYSTEM SERVICE AREA

The Department operates a regional Sewage Disposal System which serves approximately 3.0 million people living in the City and 76 other southeastern Michigan communities. Sewage Disposal System customers may be classified into three categories: the City, surrounding communities, and local authorities. All of the Sewage Disposal System service area is within the Detroit Primary Metropolitan Statistical Area ("PMSA").

Although the City is the single largest entity served by the Department, its relative importance has declined as nearby communities have increased in population and joined the Sewage Disposal System. As a percentage of total population served by the Department, the City has declined from 73% in 1950 to 24% in 2005.

The following sections provide summary information about the major components of the Sewage Disposal System service area: the City, the largest municipal entities (listed by population served) and various statistics relating to Detroit and the Detroit PMSA.

## DETROIT

The City of Detroit is located in southeastern Michigan in Wayne County and has a land area of approximately 138 square miles. The City is the nation's 11th largest city and the center of the nation's tenth largest PMSA. The City is internationally known for its automobile manufacturing and trade. The southeastern border of the City lies on the Detroit River, an international waterway, which is linked by the St. Lawrence Seaway to seaports around the world. The City is the commercial capital of Michigan and a major economic and industrial center of the nation. There are nine diverse industrial parks, and more than 50 firms have world headquarters within the confines of the City.

The City is a home rule city with significant independent powers under the City Charter. The City provides the following services: public protection, public works, cultural and recreational, civic center, health, physical and economic development, public lighting, transportation, water supply and sewage disposal, human services (including housing), airport and parking. In accordance with the Charter, the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the legislative branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years. The last regular election for these positions was on November 8, 2005, in which the Mayor and five incumbent members and four new members of the City Council were elected. In January 2006, the Mayor and the newly constituted City Council commenced their new terms. There are no limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the judicial branch of State government.

The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify ordinances enacted by the City by referendum, However, these powers do not extend to the budget or any ordinance for the appropriation of money, and the referendum power does not extend to emergency ordinances.

Since 2003, unemployment has increased, with an estimated employed civilian labor force of 375,076 and a 2007 yearly unemployment rate average of 14.3%, compared to a 7.2% state-wide average and a 4.6% national unemployment rate.

Historically, the City's economy has been closely tied to the manufacturing sector, especially the automotive industry. The two major U.S. automobile companies and DaimlerChrysler AG are principal employers and taxpayers in the Detroit metropolitan area. While the City's economy is linked to automobile and automobile related manufacturing, recent developments are allowing the City to be more diversified by increasing its activities in other manufacturing sectors, trade, commerce, and tourism.

There currently are three casino licensees operating casinos in the City. As permitted by Act 69, Public Acts of Michigan, 1997, in November 1997 the City's voters approved the imposition of a local tax of 9.9% on adjusted gross receipts from casino operations ("AGR") in the City. Also pursuant to Act 69, the City has imposed a municipal service fee of 1.25% of AGR, or 4 million per licensee, whichever is greater, to pay for the provision of municipal services. Act 306, Public Acts of Michigan, 2004, effective September 2, 2004, imposed an additional wagering tax of 6% of AGR, which is allocated one-third to the City and two-thirds to the State. Thus, the City currently collects a total of 11.9% on AGR as the wagering taxes in addition to such municipal service fee.

As a result of the taxes and fees described above, the City collected revenues from gaming facilities of 85.8 million in fiscal 2001, 109.4 million in fiscal 2002, 111.3 million in fiscal 2003, 116.1 million in fiscal 2004, and 138.0 million in fiscal 2005. Effective January 1, 2006, pursuant to an agreement with the three casinos in the City, an additional payment to the City of 1% of each casino's AGR was imposed on the casinos. Also pursuant to the same agreement and effective January 1, 2006, an additional payment to the City of 1% of AGR was imposed on casinos that achieved at least 400 million in annual AGR. The City's Amended Fiscal Year 2006 Budget anticipated the total revenues of 153 million from gaming facilities, which is expected to be realized.

The City's educational and medical institutions continue to grow in size and recognition, Wayne State University, one of the nation's largest urban educational institutions, as well as the University of Detroit-Mercy, the largest independent university in the State, are located in the City.

## LARGEST MUNICIPAL ENTITIES SERVED BY THE DEPARTMENT

Set forth below are descriptions of the largest municipal entities receiving sewage disposal service from the Department based on 2000 Census figures and, where available, 2006 population estimates.

### Sterling Heights

The City of Sterling Heights is located in southwestern Macomb County, about six miles north of Detroit's city limits. Sterling Heights was incorporated in 1968 and has an area of approximately 36.8 square miles. The 2006 estimated population was 127,991. Industrial development in Sterling Heights is a continuation of that which has taken place in the City of

Warren, immediately to the south. The first major industry to locate in Sterling Heights was Ford Motor Company in 1956, followed later by DaimlerChrysler AG. General Dynamics, another major employer, has located its headquarters in Sterling Heights for the engineering and design of all its products except tanks. The Detroit News maintains its principal printing plant in Sterling Heights. Lakeside Associates, owners of the area's largest shopping mall, is one of the ten largest taxpayers.

## Livonia

The City of Livonia is located in Wayne County, about 2 miles west of Detroit's western limit. Incorporated in 1950, Livonia is a residential, commercial and industrial city which encompasses some 38 square miles. Livonia's major population growth occurred in the 1950s and 1960s. The 2006 estimated population was 96,736. Livonia's tax base is well diversified. General Motors Corporation and Ford Motor Company comprise approximately 16% of its tax base. Three large shopping centers attract shoppers from surrounding communities.

## Clinton Township

Clinton Township is located in the central portion of Macomb County, approximately 14 miles north of downtown Detroit. It is primarily a residential community with a land area of 38 square miles. Population has grown from 95,648 in 2000, to 96,278 in 2006.

## Dearborn

The City of Dearborn adjoins Detroit on the southwest; its eastern boundary is approximately eight miles from the center of Detroit. Dearborn was incorporated in 1928 and today covers some 25.5 square miles. The location of Ford Motor Company's headquarters in Dearborn in the early 1930s shaped the economy and growth of Dearborn. The 2006 estimated population is 92,382. Ford Motor Company is by far the largest employer and taxpayer in Dearborn.

## Westland

The City of Westland, with an area of 20.42 square miles, is located three miles west of the Detroit city limits. Land use is primarily residential and commercial in character. Conveniently located near an interstate freeway, industrial development continues with auto suppliers, injection molders and tool and die shops. The 2006 estimated population was 84,504.

## Troy

The City of Troy is served through both the Southeast Oakland County Sewage Disposal District and the Evergreen-Farmington District. It covers 34.8 square miles and is located 14 miles north of Detroit. Troy is principally a residential community with the primary non-residential taxpayers being light industrial, research and office centers. The Troy office market is second only to Southfield in suburban office space available. The 2006 population was 81,118.

## Southfield

The City of Southfield is served by both the Southeast Oakland County Sewage Disposal District and the Evergreen-Farmington District, is located adjacent to and northwest of the City of Detroit and covers 26.6 square miles. In addition to being a residential community, Southfield is a major office center with total office footage surpassing the central business district of Detroit. The 2006 population was 76,090.

## St. Clair Shores

The City of St. Clair Shores, served through the Southeast Macomb District, is a residential community of 11.6 square miles extending along Lake St. Clair. St. Clair Shores is located in southeastern Macomb County, one mile northeast of the Detroit city limits and adjacent to and north of Grosse Pointe Shores. St. Clair Shores has undergone substantial growth since its incorporation in 1950 when its population totaled 19,823. The 2006 population was 61,162.  St. Clair Shores is predominantly a residential community with limited manufacturing and commercial development.

## Royal Oak

The City of Royal Oak, served through the Southeast Oakland County Sewage Disposal District, encompasses an area of 11.9 square miles. It is primarily a residential and commercial community located in the southeastern part of Oakland County, two miles north of the Detroit city limits. The 2006 population was 57,984.

## Dearborn Heights

The City of Dearborn Heights, served through the Middle Rouge Valley District, is located in Central Wayne County. It is contiguous with the City of Dearborn on three sides and its northeast boundary adjoins Detroit. Incorporated as a city in 1963, Dearborn Heights encompasses an area of approximately 12.1 square miles which is essentially fully developed. There are no major industrial taxpayers in Dearborn Heights. Employed residents work in and around Detroit. A substantial portion of its population is employed by Ford Motor Company in Dearborn Heights.  The 2006 population was 55,278.

## DETROIT PMSA

The Detroit PMSA is comprised of seven counties: Wayne, Oakland, Macomb, Livingston, Lapeer, St. Clair and Monroe. Monroe County was added to the census definition for the Detroit PMSA as a result of the 1980 census.  All of the Sewage Disposal System service area is located in the Detroit PMSA.  In terms of population, the Detroit PMSA is ranked the sixth largest PMSA in the country.

## Population

The Detroit PMSA experienced a growth in population from 3,170,315 in 1950 to 4,441,551 in 2000. The following table presents population trends of the Detroit PMSA and the United States since 1950.

**Table 1**
**Population Trends**

|  | **Detroit PMSA** |  | **U.S.** |
|---|---|---|---|
| Year | Population | % Change | % Change |
| 1950………. | 3,169,649 | -- | -- |
| 1960………. | 4,050,840 | 27.80% | 18.50% |
| 1970………. | 4,549,869 | 12.32% | 13.40% |
| 1980………. | 4,488,072 | (1.36%) | 11.40% |
| 1990………. | 4,382,299 | (2.36%) | 10.20% |
| 2000………. | 4,441,551 | 1.35% | 13.20% |

SOURCE: US. Department of Commerce, Bureau of the Census.

## Employment

The Detroit PMSA is located in a regional economy which is highly susceptible to swings in the national economy due to its high concentration of employment in the durable goods industries, particularly the automotive industry.

**Table 2**
**Annual Average Wage and Salary Employment by Place of Work (Non-Agricultural)**

| | **Detroit PMSA** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2002** | | **2003** | | **2004** | | **2005** | |
| Industry Group: | **(000's)** | | **(000's)** | | **(000's)** | | **(000's)** | |
| Natural Resources & Mining…....... | 90 | 4.3 | 85 | 4.1 | 86 | 4.2 | 85 | 4.1 |
| Construction…….....…...…....... | 12 | 0.6 | 11 | 0.5 | 11 | 0.5 | 11 | 0.5 |
| Manufacturing…………………..... | 329 | 15.6 | 309 | 14.9 | 298 | 14.4 | 285 | 13.9 |
| Trade, Transportation & Utilities.... | 396 | 18.8 | 388 | 18.6 | 383 | 18.6 | 380 | 18.5 |
| Information…....………………..... | 38 | 1.8 | 37 | 1.8 | 36 | 1.8 | 35 | 1.7 |
| Financial Activities………….….... | 117 | 5.6 | 119 | 5.7 | 117 | 5.7 | 118 | 5.7 |
| Professional and Business Services | 368 | 17.5 | 364 | 17.5 | 358 | 17.3 | 372 | 18.1 |
| Education and Health Services....... | 250 | 11.9 | 253 | 12.1 | 256 | 12.4 | 264 | 12.8 |
| Leisure & Hospitality….................. | 178 | 8.4 | 181 | 8.7 | 182 | 8.8 | 182 | 8.8 |
| Other Services.................................. | 96 | 4.6 | 97 | 4.6 | 99 | 4.8 | 91 | 4.4 |
| Government.................................... | 232 | 11.0 | 238 | 11.4 | 237 | 11.5 | 234 | 11.4 |
| Total…………………..... | 2,104 | 100.0 | 2,083 | 100.0 | 2,062 | 100.0 | 2,057 | 100.0 |

|  | U.S. | | | | | | | |
| Industry Group: | **2002** **(000's)** |  | **2003** **(000's)** |  | **2004** **(000's)** |  | **2005** **(000's)** |  |
|---|---|---|---|---|---|---|---|---|
| Natural Resources & Mining…….. | 583 | 0.4 | 572 | 0.4 | 591 | 0.4 | 625 | 0.5 |
| Construction……...……...…….... | 6,716 | 5.2 | 6,735 | 5.2 | 6,976 | 5.3 | 7,277 | 5.5 |
| Manufacturing…………………... | 15,259 | 11.7 | 14,510 | 11.2 | 14,315 | 10.9 | 14,232 | 10.7 |
| Trade, Transportation & Utilities.... | 25,497 | 19.6 | 25,287 | 19.5 | 25,533 | 19.4 | 25,909 | 19.4 |
| Information…....………………... | 3,395 | 2.6 | 3,188 | 2.5 | 3,118 | 2.4 | 3,066 | 2.3 |
| Financial Activities…………….... | 7,847 | 6.0 | 7,977 | 6.1 | 8031 | 6.1 | 8,141 | 6.1 |
| Professional and Business Services | 15,997 | 12.3 | 15,985 | 12.3 | 16,395 | 12.5 | 16,882 | 12.6 |
| Education and Health Services....... | 16,199 | 12.4 | 16,588 | 12.8 | 16,953 | 12.9 | 17,342 | 13.0 |
| Leisure & Hospitality..................... | 11,986 | 9.2 | 12,173 | 9.4 | 12,493 | 9.5 | 12,802 | 9.6 |
| Other Services................................ | 5,372 | 4.1 | 5,401 | 4.2 | 5,309 | 4.0 | 5,386 | 4.0 |
| Government.................................... | 21,513 | 16.5 | 21,583 | 16.6 | 21,621 | 16.5 | 21,803 | 16.3 |
| Total………………….... | 130,364 | 100.0 | 129,999 | 100.0 | 131,355 | 100.00 | 133,465 | 100.00 |

NOTE:      Totals may not add due to rounding.
SOURCE: Michigan Department of Labor & Economic Growth, Office of Labor Market Information for Detroit-Warren-Livonia CBSA; U.S. Department of Labor, Bureau of Labor Statistics for U.S.

Unemployment in the Detroit PMSA in comparison to the City of Detroit, the State and the United States is illustrated in the following table:

**Table 3**
**Civilian Unemployment Rates**

|  | **Detroit** | **Detroit PMSA** | **State of Michigan** | **U.S.** |
|---|---|---|---|---|
| 2003 | 14.6% | 7.2% | 7.1% | 6.0% |
| 2004 | 14.0% | 7.1% | 7.1% | 5.5% |
| 2005 | 14.2% | 7.2% | 6.7% | 4.9% |
| 2006 | 13.7% | 7.2% | 6.9% | 4.6% |
| 2007 | 14.3% | 7.7% | 7.2% | 4.6% |

SOURCE:   Michigan Department of Labor & Economic Growth; U.S. Department of Labor, Bureau of Labor Statistics.

## Housing Characteristics

**Table 4**
**City of Detroit Housing Inventory**
**(in thousands)**

| Occupancy Status | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|
| Owner-occupied.............. | 298.6 | 250.9 | 197.9 | 184.6 |
| Renter-occupied.............. | 199.1 | 182.6 | 176.1 | 151.8 |
| Vacant .......................... | 31.3 | 37.7 | 36.0 | 38.7 |
| Total Housing Units....... | 529.0 | 471.2 | 410.0 | 375.1 |

Note:   Data may not add due to independent recording. Excludes seasonal housing.
SOURCE: U.S. Department of Commerce, Bureau of the Census.

**Table 5**
**Housing Characteristics-2000**

| | City of Detroit | Detroit PMSA | United States |
|---|---|---|---|
| Percent owner-occupied ........................... | 54.9% | 72.4% | 66.2% |
| Rental vacancy .......................................... | 8.3% | 6.4% | 6.8% |
| Median Value of owner-occupied units ..... | 63,600 | 127,800 | 119,600 |
| Median contract rent ................................ | 486 | 502 | 602 |
| Persons per household.............................. | 2.77 | 2.58 | 2.59 |

NOTE:   Value of Owner-Occupied Units is a self-reported estimate of the then-current market
value, and therefore is not directly comparable to the State Equalized Value.
SOURCE: U.S. Department of Commerce, Bureau of Census.

## Manufacturing

The following table shows a breakdown of manufacturing wage and salary employment by type for the Detroit PMSA from 2001 through 2005.

**Table 6**
**Manufacturing Wage and Salary Employment**
**(in thousands)**

| Industry Group: | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Total durable goods industries ................................. | 262.6 | 253.0 | 244.6 | 225.1 | 215.9 |
| Total nondurable goods industries .......................... | 46.8 | 44.7 | 44.2 | 43.7 | 43.6 |
| Total manufacturing employment .......................... | 309.4 | 297.7 | 288.8 | 268.8 | 259.4 |

SOURCE: Michigan Department of Labor and Economic Growth, Office of Labor Market Information.

## Family Income

Of the 20 largest CBSA's, Detroit ranks thirteen in terms of Effective Buying Income (EBI) in 2005 as shown in the following table:

**Table 8**
**Ranking of 20 Largest CBSA's by**
**Median Household Effective Buying Income – 2005**

| Rank | | EBI | Population (000) |
|---|---|---|---|
| 1 | Washington-Arlington-Alexandria, DC-VA-MD-WV........ | 54,693 | 5,239.1 |
| 2 | San Francisco-Oakland-Freemont, CA ............................... | 54,541 | 4,215.4 |
| 3 | Boston-Cambridge-Quincy, MA-NH ................................. | 49,011 | 4,450.5 |
| 4 | Minneapolis-St. Paul-Bloomington, MN-WI ..................... | 48,419 | 3,138.3 |
| 5 | Seattle-Tacoma-Bellevue, WA........................................... | 46,789 | 3,200.9 |
| 6 | Atlanta-Sandy Springs-Marietta, GA ............................... | 46,249 | 4,765.8 |
| 7 | Chicago-Naperville-Joliet, IL-IN-WI................................ | 45,876 | 9,433.6 |
| 8 | Dallas-Fort Worth-Arlington, TX ..................................... | 45,468 | 5,786.9 |
| 9 | Baltimore-Towson, MD .................................................... | 44,629 | 2,644.9 |
| 10 | San Diego-Carlsbad-San Marcos, CA................................ | 44,506 | 2,998.6 |
| 11 | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD.......... | 44,060 | 5,816.3 |
| 12 | New York-Newark-Edison, NY-NJ-PA ............................. | 43,978 | 18,768.2 |
| **13** | **Detroit-Warren-Livonia, MI .............................................** | **43,666** | **4,496.1** |
| 14 | Houston-Baytown-Sugar Land, TX.................................... | 43,055 | 5,239.5 |
| 15 | Phoenix-Mesa-Scottsdale, AZ........................................... | 42,458 | 3,730.6 |
| 16 | Los Angeles-Long Beach-Santa Ana, CA.......................... | 42,269 | 13,104.0 |
| 17 | St. Louis, MO-IL.............................................................. | 40,830 | 2,755.7 |
| 18 | Riverside-San Bernardino-Ontario, CA ............................ | 39,869 | 3,753.4 |
| 19 | Miami-Fort Lauderdale-Miami Beach, FL......................... | 38,816 | 5,379.5 |
| 20 | Tampa-St. Petersburg-Clearwater. FL............................... | 36,968 | 2,92.8 |

SOURCE: Sales & Marketing Management Magazine, Annual Survey of Buying Power, 2005.

## Largest Employers

Below is a listing of the largest private sector employers by company and by number of employees actually or estimated to be employed within the City as of June 30, 2005.

**Table 9**
**Largest Private Employers**

| Company | Detroit Employment |
|---|---|
| The Detroit Medical Center…………………….….. | 10,617 |
| DaimlerChrysler AG…………………………………… | 9,900 |
| Henry Ford Health System……………………….…… | 7,404 |
| General Motors Corporation…………………….…… | 6,311 |
| St. John Health System…………………………….... | 4,821 |
| American Axle & Manufacturing Holdings Inc………. | 4,309 |
| DTE Energy Co……………………………………….. | 3,987 |
| Compuware Corp……………………………………… | 3,946 |
| Motor City Casino……………………………..……… | 2,800 |
| Blue Cross/Blue Shield of Michigan………….……… | 2,694 |

SOURCE: Crain's *Book of Lists 2006* Edition, December 2005.