## Construction

The following table shows residential construction (public and private) by number of units for the Detroit PMSA and the U.S. The number of units constructed in the Detroit PMSA has increased substantially since 1995, after several years of decline.

**Table 10**
**Residential Construction**
**(Number of Units)**

| YEAR | DETROIT PMSA | U.S. |
|------|------------|------|
| 1995…………….. | 18,037 | 1,332,500 |
| 1996…………….. | 19,925 | 1,425,600 |
| 1997…………….. | 18,098 | 1,441,100 |
| 1998…………….. | 20,926 | 1,612,300 |
| 1999…………….. | 19,370 | 1,663,500 |
| 2000…………….. | 18,348 | 1,592,300 |
| 2001…………….. | 16,218 | 1,636,700 |
| 2002…………….. | 17,779 | 1,747,700 |

| YEAR | DETROIT- WARREN-LIVONIA CBSA | U.S. |
|------|------------|------|
| 2003 (1)..………. | 19,900 | 1,889,200 |
| 2004…………….. | 21,808 | 2,052,100 |
| 2005…………….. | 16,392 | 2,155,300 |

_____
(1) Beginning January 2003, building permit data reflect an increase in the universe of permits issuing places from 19,000 to 20,000 places.
SOURCE: US. Department of Commerce, Bureau of the Census.

## Port of Detroit

The Detroit/Wayne County Port Authority is a public agency responsible for promoting trade and freight transportation through the Port of Detroit, which provides direct water service to world markets via the Great Lakes/St. Lawrence Seaway. The Port has five privately-owned and operated full-service terminals, a liquid bulk terminal and bulk facility, and a single dock facility with capacity for 14 oceangoing vessels. In addition, more than 30 industries located on the Detroit and Rouge Rivers have their own port facilities. A variety of ship repair services are available. The Detroit area, which is the largest foreign trade zone in the United States, provides financial advantages related to federal taxes and customs duties at subzones throughout the City and region. The Port is a principal port of entry for trade with Canada by means of bridge, vehicular tunnel, rail tunnel and barge service. Steel and scrap steel are the principal export products of the Port, handled for the three local steel mills. General cargo constitutes a minor portion of total tonnage due to the lack of regularly scheduled shipping service.

**Table 11**
**Waterborne Commerce of the Port of Detroit**
**(million tons – computed as short tons of 2,000 pounds)**

|  | Foreign | | | Domestic | Grand |
|  | Canadian | Overseas | Total | Total | Total |
|---|---|---|---|---|---|
| 1991…….. | 1.5 | 0.9 | 2.4 | 11.9 | 14.3 |
| 1992…….. | 2.0 | 1.4 | 3.4 | 13.0 | 16.4 |
| 1993…….. | 2.4 | 0.9 | 3.3 | 13.9 | 17.2 |
| 1994…….. | 4.5 | 1.5 | 6.0 | 12.7 | 18.7 |
| 1995…….. | 2.6 | 1.0 | 3.7 | 15.2 | 18.9 |
| 1996…….. | 4.6 | 1.7 | 6.3 | 12.3 | 18.6 |
| 1997…….. | 4.8 | 1.3 | 6.1 | 12.0 | 18.1 |
| 1998…….. | 5.0 | 1.9 | 6.9 | 12.5 | 19.4 |
| 1999…….. | 3.5 | 1.1 | 4.6 | 12.3 | 16.9 |
| 2000…….. | 4.1 | 1.1 | 5.2 | 12.0 | 17.2 |
| 2001…….. | 4.3 | 0.4 | 4.7 | 12.3 | 17.0 |
| 2002…….. | 3.7 | 0.7 | 4.4 | 12.9 | 17.3 |
| 2003…….. | 3.5 | 0.4 | 3.9 | 10.4 | 14.3 |

SOURCE: Detroit/Wayne County Port Authority.

## Transportation Network

Five major rail lines provide direct service to the Detroit area by such railroad companies as Conrail, Norfolk Southern, Grand Trunk Western, Canadian Pacific and CSX Transportation. Major cargoes handled by the rail lines in the Detroit area include automobiles, auto parts, steel, chemicals and food products.

Air transportation service is provided to the City at the Detroit City Airport, with general aviation, cargo and scheduled passenger services, and at the Detroit Metropolitan Wayne County Airport, the nation's 10th largest international airport and the largest hub for Northwest Airlines. More than 30 other scheduled airlines provided domestic and international service with more than 1 million annual passenger enplanements and 137,000 tons of annual enplaned cargo.

This area's extensive toll-free highway system, which includes the 1-94, 1-75, 1-96 and 1-696 interstate highways and Canadian Highway 401, provides one-day access, based on a 500-mile day, to 48% (by population) of the U.S. market and to the Province of Ontario, Canada.

**APPENDIX – F**

**SUMMARY OF THE CONTINUING DISCLOSURE UNDERTAKING**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# SUMMARY OF THE CONTINUING DISCLOSURE UNDERTAKING

*Certain provisions of the Master Continuing Disclosure Agreement executed by the City (the "Disclosure Agreement") are summarized below. This summary does not purport to be complete or definitive and is qualified in its entirety by reference of full terms of the Disclosure Agreement.*

The Disclosure Agreement was executed and delivered by the City for the benefit of the Holders and the Beneficial Owners, as defined in this Appendix F, and in order to assist the Remarketing Agent in complying with SEC Rule 15c2-12(b)(5). The Fixed Rate Bonds are subject to the Disclosure Agreement.

## Certain Definitions

Defined terms used in the Disclosure Agreement and not otherwise defined therein have the meanings set forth in the Bond Ordinance.

"Audited General Purpose Financial Statements" means annual general purpose financial statements (currently prepared as the City's Comprehensive Annual Financial Report), if any, of the City, audited by such independent public accountants as shall then be required or permitted by state law or the Bond Ordinance. The Disclosure Agreement requires that Audited Financial Statements be prepared in accordance with GAAP, applied on a consistent basis, *provided however*, that the City may from time to time, in accordance with GAAP and subject to applicable federal or state legal requirements, modify the basis upon which its financial statements are prepared. The Disclosure Agreement requires that notice of any such modification be provided to (i) either to each NRMSIR or the MSRB and (ii) the SID.

"Audited Sewage Disposal Fund Financial Statements" means annual financial statements, if any, of the City's Sewage Disposal Fund audited by such independent public accountants as shall then be required or permitted by City ordinance or the Bond Ordinance. The Disclosure Agreement requires that Audited Sewage Disposal Fund Financial Statements be prepared in accordance with GAAP, applied on a consistent basis; *provided, however,* that the City may from time to time, in accordance with the GAAP and subject to applicable federal or state legal requirements, modify the basis upon which financial statements are prepared. The Disclosure Agreement requires that notice of any such modification be provided to (i) either to each NRMSIR or the MSRB and (ii) the SID.

"Beneficial Owner, " for the purpose of this Appendix F, means a beneficial owner of Subject Bonds, as determined pursuant to the Rule.

"Fiscal Year" means that period established by the City with respect to which its Audited Sewage Disposal Fund Financial Statements or Unaudited Sewage Disposal Fund Financial Statements, as applicable, are prepared. The City's Fiscal Year begins on July 1 and ends on June 30 of the next calendar year.

"Fixed Rate Bonds" means the Sewage Disposal System Senior Lien Revenue Refunding Bonds (Modal Fixed Rate), Series 2001(C-2), the Sewage Disposal Second Lien Revenue Bonds

(Modal Fixed Rate), Series 2001(E) and the Sewage Disposal System Revenue Second Lien Bonds (Fixed Rate), Series 2006(A).

"GAAP" means generally accepted accounting principles, as such principles are prescribed, in part, by the Government Accounting Standards Board, supplemented by pronouncements of the American Institute of Certified Public Accountants and by the Financial Accounting Standards Board, made applicable to state and local governmental entities, and in effect from time to time.

"Holders" means the registered owners of the Subject Bonds.

"Listed Event" means any of the events listed below under the heading "Reporting Certain Events."

"MSRB" mans the Municipal Securities Rulemaking Board established pursuant to Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended.

"NRMSIR" means, at any time, a then existing nationally recognized municipal securities information repository as recognized by the SEC from time to time for the purposes referred to in the Rule. The NRMSIRs currently approved by the SEC are set forth in Exhibit A hereto.

"Remarketing Agent" means the remarketing agent in connection with the offering of Subject Bonds.

"Remarketing Circular" means the City's Remarketing Circular related to the Fixed Rate Bonds.

"Rule" means the applicable provision of Rule 15c2-12 adopted by the SEC under the Securities Exchange Act of 1934, as amended (17 CFR Part 240, §240.15c2-12), as in effect on the date of the Disclosure Agreement, including any official interpretations thereof.

"SEC" means the United States Securities and Exchange Commission.

"Securities Counsel" means legal counsel expert in federal securities laws.

"SID" mans the Municipal Advisory Council of Michigan or such other appropriate state information depository for the State of Michigan, if any, as recognized by the SEC for the purposes referred to in the Rule.

"Subject Bonds" means those bonds issued pursuant to the Bond Ordinance, including the Fixed Rate Bonds, which are made subject to the terms of the Disclosure Agreement in any resolution of the City Council authorizing the issuance of such bonds.

"Trustee" means U.S. Bank National Association, Detroit, Michigan, as the Trustee under the Bond Ordinance or any successor thereto.

"Unaudited General Purpose Financial Statements" means the same as Audited General Purpose Financial Statements, except that they shall not have been audited by independent public accountants.

"Unaudited Sewage Disposal Fund Financial Statements" means the same as Audited Sewage Disposal Fund Financial Statements, except that they shall not have been audited by independent public accountants.

**Provision of Annual Financial Information**

The City will, not later than 180 days after the end of each Fiscal Year, provide to the SID and each NRMSIR the annual financial information described below for such Fiscal Year (the "Annual Financial Information") which is consistent with the requirements of the Disclosure Agreement. The Audited Sewage Disposal Fund Financial Statements, or Audited General Fund Financial Statements, as applicable, may be submitted separately from the balance of the Annual Financial Information, and later than the date required for the filing of the Annual Financial Information if not available by the date.

The Disclosure Agreement requires the City to provide, in a timely manner, notice of any failure by it to provide Annual Financial Information to each NRMSIR and the SID on or before the date described in the first paragraph under this heading, to the SID and either (i) each NRMSIR, or (ii) the MSRB, with a copy to the Trustee.

**Content of Annual Financial Information**

The City's Annual Information shall contain or include by reference the following:

> a. the Audited Sewage Disposal Fund Financial Statements, if available;

> b. if the Audited Sewage Disposal Fund Financial Statements are not available, the Unaudited Sewage Disposal Fund Financial Statements and the Audited General Purpose Financial Statements (or the Unaudited General Purpose Financial Statements if the Audited General Purpose Financial Statements are not available); and

> c. financial information or operating data of the types included in tabular form in the Remarketing Circular under the headings "The Sewage Disposal System," "Financial Operations," "Financial Procedures" (excluding the Sewage Rate Comparison information) and "The Department of Water and Sewerage"; actual data comparable to the projections contained under the heading "The Capital Improvement Program;" and actual operating data comparable to the projections contained under the following section headings of Appendix A -- "Feasibility Report:" "Rate Methodology and Existing Rates, "Projections of Revenues," and "Operation and Maintenance Expense Projections."

If not provided as part of the Annual Financial Information by the date required (as described above under "Provision of Annual Financial Information"), the City shall provide Audited Sewage Disposal Fund Financial Statements or Audited General Purpose Financial Statements, as applicable, when and if available, to each NRMSIR and the SID.

Any and all of the items above may be included by specific reference to other documents, including official statements or debt issues of the City or related public entities, which have been submitted to each NRMSIR and the SID or the SEC. If such document is an official statement, it must also be available from the MSRB. Annual Financial Information may be provided in one document or multiple documents, and at one time or in part from time to time.

**Other Obligated Persons**

With respect to any wholesale customer of the System that an obligated person for whom financial information or operating data is presented in the Remarketing Circular, as determined pursuant to the Rule, the City shall provide or cause to be provided:

(a)     to each NRMSIR and the SID, annual financial information of such obligated person of the type included in the Remarketing Circular with respect to such obligated person within 180 days after the end of the obligated person's fiscal year;

(b)     to each NRMSIR and SID, financial statements of such obligated person, audited in accordance with GAAP, within 180 days after the end of the obligated person's fiscal year or, if not then available, when and if available; and

(c)     in a timely manner either to the MSRB or each NRMSIR, and also the SID, with a copy to the Trustee, notice of any failure to provide the above-referenced information.

**Reporting of Certain Events**

The City will give timely notice to the SID, the Trustee, and to either each NRMSIR or the MSRB of the occurrence of any of the following events with respect to the Subject Bonds, if material:

(a)     principal and interest payment delinquencies;

(b)     non-payment related defaults;

(c)     modification to rights of Holders;

(d)     Subject Bond calls;

(e)     unscheduled draws on credit enhancements reflecting financial difficulties;

(f)     substitution of credit or liquidity providers, or their failure to perform;

(g)     defeasances;

(h)     rating changes;

(i)     adverse tax opinions, or events adversely affecting the tax-exempt status (if applicable), of any Subject Bonds;

(j)     unscheduled draws on the debt service reserves reflecting financial difficulties; and

(k)     release, substitution or sale of property securing repayment of the Subject Bonds.

**Additional Information**

Nothing in the Disclosure Agreement will be deemed to prevent the City from disseminating any other information, or including any other information in any Annual Financial Information or notice of occurrence of a Listed Event, in addition to that which is required by the Disclosure Agreement. If the City chooses to include any information in any Annual Financial Information or notice of occurrence of a Listed Event in addition to that which is specifically required by the Disclosure Agreement, the City will have no obligation under the Disclosure Agreement to update such information or include it in any future Annual Financial Information or notice of occurrence of a Listed Event.

**Amendment of Disclosure Agreement**

The Disclosure Agreement may be amended by the City, and any provisions of the Disclosure Agreement may be waived, without the consent of the Holders or Beneficial Owners, except as required pursuant to clause 4(ii) below, under the following conditions: (1) such amendment or waiver is made in connection with a change in circumstances that arises from a change in legal (including regulatory) requirements, a change in law (including rules or regulations) or in interpretations thereof, or a change in the identity, nature or status of the City or Sewage Disposal System or the type of business conducted thereby, (2) the Disclosure Agreement as so amended or waived could have complied with the requirements of the Rule as of the date of each primary offering of Subject Bonds affected by such amendment or waiver, after taking into account any amendments, or interpretations of the Rule, as well as any change in circumstances, (3) the City shall have delivered to the Trustee an opinion of Securities Counsel, addressed to the City and the Trustee, to the same effect as set forth in clause (2) above, (4) either (i) a party unaffiliated with the City (such as the Trustee or bond counsel), acceptable to the City and the Trustee, has determined that the amendment does not materially impair the interests of the Beneficial Owners, or (ii) the Holders consent to the amendment or waiver to the Disclosure Agreement pursuant to the same procedures as are required for amendments to the Bond Ordinance with consent of Holders, and (5) the City shall have delivered copies of such waiver or amendment to the SID and to either each NRMSIR or the MSRB.

In addition to the foregoing, the City may amend the Disclosure Agreement, and any provision of the Disclosure Agreement may be waived, if the Trustee shall have received an opinion of Securities Counsel, addressed to the City and the Trustee, to the effect that the adoption and the terms of such amendment or waiver would not, in and of themselves, cause the undertakings in the Disclosure Agreement to violate the Rule, taking into account any subsequent changes in or official interpretation of the Rule.

To the extent any amendment to the Disclosure Agreement results in a change in the type of financial information or operating data provided pursuant thereto, and first Annual Financial Information provided thereafter shall include a narrative explanation of the reasons for the

change and the impact of the change. If a change is made to the basis on which financial statements are prepared, the Annual Financial Information for the year in which the change is made shall present a comparison between the financial statements or information prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles. Such comparison shall include a qualitative and, to the extent reasonably feasible, quantitative discussion of the differences in the accounting principles and the impact of the change in the accounting principles on the presentation of the financial information.

## Benefit; Enforcement

The provisions of the Disclosure Agreement will inure solely to the benefit of the Holders and the Beneficial Owners from time to time. Except as described in this paragraph, the provisions of the Disclosure Agreement will create no rights in any other person or entity. The obligation of the City to comply with the provisions of the Disclosure Agreement are enforceable by any Beneficial Owner of outstanding Subject Bonds and, in addition, by the Trustee on behalf of the Holders of outstanding Subject Bonds. The right to enforce the provisions of the Disclosure Agreement are limited to a right, by action or mandamus or for specific performance, to compel performance of the City's obligations under the Disclosure Agreement. Any failure by the City to perform in accordance with the Disclosure Agreement will not constitute a default or an event of default under the Bond Ordinance, and the rights and remedies provided by the Bond Ordinance upon the occurrence of a default or an event of default will not apply to any such failure.

## Termination of Reporting Obligation

The City's obligations under the Disclosure Agreement with respect to the Subject Bonds will terminate upon (i) the legal defeasance under the Bond Ordinance, (ii) prior redemption, or (iii) payment in full of all of the Subject Bonds. The City shall give notice of any such termination to the SID and to either each NRMSIR or the MSRB.

The Disclosure Agreement, or any provision thereof, will be null and void in the event the City (1) delivers to the Trustee an opinion of Securities Counsel, addressed to the City and the Trustee, to the effect that those portions of the Rule which require the provisions of the Disclosure Agreement, or any of such provisions, do not or no longer apply to the Subject Bonds, whether because such portions of the Rule are invalid, have been repealed, or otherwise, as will be specified in such opinion, and (2) delivers notice to such effect to the SID and to either each NRMSIR or the MSRB.

## Governing Law

The Disclosure Agreement provides that it be construed and interpreted in accordance with the laws of the State, and that any suits and actions arising out of the Disclosure Agreement be instituted in a court of competent jurisdiction in the State, provided that, to the extent the Disclosure Agreement addresses matters of federal securities laws, including the Rule, the Disclosure Agreement is to be construed in accordance with such federal securities laws and official interpretations thereof.

F-6

# EXHIBIT A

The nationally recognized municipal securities information repositories approved by the Securities and Exchange Commission as of July 12, 2006, are set forth below:

Bloomberg Municipal Repository

100 Business Park Drive
Skillman, NJ 08558
Phone: (609) 279-3225
Fax: (609) 279-5962
http://www.bloomberg.com/markets/rates/municontacts.html
Email: Munis@Bloomberg.com

DPC Data Inc.

One Executive Drive
Fort Lee, NJ 07024
Phone: (201) 346-0701
Fax: (201) 947-0107
http://www.MuniFILINGS.com
Email: nrmsir@dpcdata.com

Interactive Data Pricing and Reference Data, Inc.

Attn: NRMSIR
100 William Street, 15th Floor
New York, NY 10038
Phone: 212-771-6999; 800-689-8466
Fax: 212-771-7390
http://www.interactivedata-prd.com
Email: NRMSIR@interactivedata.com

Standard & Poor's Securities Evaluations, Inc.

55 Water Street
45th Floor
New York, NY 10041
Phone: (212) 438-4595
Fax: (212) 438-3975
http://www.disclosuredirectory.standardandpoors.com/
Email: nrmsir_repository@sandp.com

F-7

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX – G**

**SPECIMEN OF BHAC BOND INSURANCE POLICY**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# BERKSHIRE HATHAWAY ASSURANCE CORPORATION
## *NEW YORK, NEW YORK*

## FINANCIAL GUARANTY INSURANCE POLICY

### DECLARATIONS

Policy No.:

Issuer:  City of Detroit, Michigan

Description of Obligations:

Fiscal Agent:  U.S. Bank National Association

Premium:

Effective Date:

Endorsements:

Prior Insurer:  Financial Guaranty Insurance Company

G-1

**INSURANCE POLICY TERMS AND CONDITIONS (Primary)**

Berkshire Hathaway Assurance Corporation ("BHAC"), a New York corporation, in consideration of the payment of the Premium and subject to the terms and conditions of this Policy (which includes any endorsement hereto), hereby agrees unconditionally and irrevocably to pay U.S. Bank National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of the Holders of the Obligations (as set forth in the Bond Ordinance, bond resolution and other applicable authorizing documents providing for the issuance of and securing the Obligations), that portion of the Insured Payments which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

BHAC will pay an amount equal to such Insured Payments to the Fiscal Agent on the later to occur of (i) the Business Day following the day on which BHAC shall have Received a completed Notice of Nonpayment, or (ii) the date applicable principal or interest becomes Due for Payment. If a Notice of Nonpayment to BHAC is incomplete or does not in any instance conform to the terms and conditions of this Policy, it shall be deemed not Received, and BHAC shall promptly give notice to the Fiscal Agent that the purported Notice of Nonpayment is not deemed Received. Upon receipt of such notice, the Fiscal Agent may submit an amended Notice of Nonpayment. The Fiscal Agent will disburse the amounts paid to it by BHAC in respect of such Insured Payments to the Holders only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it of (i) evidence of the Holder's right to receive such payments, and (ii) evidence, including, without limitation, any appropriate instruments of assignment, that all of the Holder's rights to payment of such Insured Payments shall thereupon vest in BHAC. Upon such disbursement, BHAC shall become the owner of the Obligation, appurtenant coupon (if any) or right to payment of such Insured Payments and any interest thereon, and shall be fully subrogated to all of the Holder's right, title and interest thereunder, including the Holder's right to payment thereof. Payment by BHAC to the Fiscal Agent for the benefit of the Holders shall discharge the obligation of BHAC under this Policy to the extent of such payment.

This Policy is non-cancelable by BHAC for any reason. The Premium on this Policy is not refundable for any reason, including the payment prior to maturity of the Obligations. This Policy does not insure against any acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of BHAC, nor does this Policy insure against any risk other than Nonpayment.

Except to the extent expressly modified by the Declarations to this Policy or any endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy.

"Avoided Payment" means any amount previously distributed to a Holder in respect of any Insured Payment by or on behalf of the Issuer, which amount has been recovered from such Holder pursuant to any applicable bankruptcy law in accordance with a final, nonappealable order of a court having competent jurisdiction that such payment constitutes an avoidable preference with respect to such Holder.

"Business Day" means any day other than (i) a Saturday or Sunday, or (ii) any day on which the offices of the Fiscal Agent are authorized or required by law, executive order or governmental decree to be closed.

"Due for Payment" means (i) when referring to the principal of an Obligation, the stated maturity date thereof, or the date on which such Obligation shall have been duly called for mandatory

sinking fund redemption, and does not refer to any earlier date on which payment is due by reason of a call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity (unless BHAC in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date) and (ii) when referring to interest on an Obligation, the stated date for payment of such interest.

"Holder" means, in respect of any Obligation, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Obligation to payment of principal or interest thereunder, except that Holder shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Obligations.

"Insured Payments" means the principal of and interest on the Obligations that shall become Due for Payment. Insured Payments shall not include any additional amounts owing by the Issuer solely as a result of the failure by the Issuer to pay such amount when due and payable, including without limitation any such additional amounts as may be attributable to penalties or to interest accruing at a default rate, to amounts payable in respect of indemnification, or to any other additional amounts payable by the Issuer by reason of such failure.

"Nonpayment" means, in respect of an Obligation, the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest Due for Payment on such Obligation. It is further understood that the term "Nonpayment" in respect of an Obligation includes any Avoided Payment.

"Notice" means telephonic or telegraphic notice subsequently confirmed in writing, or written notice given by overnight or other delivery service, or by certified or registered United States mail, from a Holder or a paying agent for the Obligations to BHAC. Notices to BHAC may be mailed by certified mail or may be delivered by telecopier to facsimile number (203) 363 5221, attn: Bond Insurance Claims, or to such other address as shall be specified by BHAC to the Fiscal Agent in writing.

"Obligation" means the bonds stated in the Declarations.

"Receipt" or "Received" means actual receipt of Notice of or, if Notice is given by overnight or other delivery service, or by certified or registered United States mail, by a delivery receipt signed by a person authorized to accept delivery on behalf of BHAC.


THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAWS. Payments under this Policy may not be accelerated except at the sole option of BHAC.

Premium is due not later than the Effective Date.

This Policy will be governed by, and shall be construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, BHAC has caused this Policy to be executed on its behalf by its duly authorized officer, and to become effective and binding upon BHAC by virtue of such signature.

BERKSHIRE HATHAWAY ASSURANCE CORPORATION

By._____

Name:_____

Title:_____

ATTEST:

By._____

Name:_____

Title:_____

SPECIMEN

G-4

# BERKSHIRE HATHAWAY
# ASSURANCE CORPORATION
## NEW YORK, NEW YORK

PRIOR BOND INSURER ENDORSEMENT (Primary)
ATTACHED TO POLICY NUMBER

In consideration of the premium paid by Premium Obligor, the Policy is amended as follows:

The following definitions are added to the Policy:

"Condition Precedent" means a proper claim for payment has been made on the Prior Insurance and the Prior Insurer has failed to pay such claim in the period permitted by the Prior Insurance for reasons other than failure to provide proper documentation required by the Prior Insurer to pay such claim.

"Paid in Full" For purposes of this Endorsement, any Obligation shall be "paid in full" upon the first to occur of (a) the date when the Prior Insurer has paid all amounts which may become due under the Prior Insurance and (b) the date when all Insured Payments (as defined in this Endorsement, except that, for purposes of this sentence, without giving any effect to the words "during the Term of this Policy" in such definition) required to be paid by the Issuer, including all principal and accrued interest, have been paid or deemed to be paid (but for purposes of this Endorsement, "deemed to be paid" shall not include defeasance of the Obligation) in accordance with the terms of the Obligations, and any period during which any such payment could have been avoided in whole or in part as a preference payment under applicable law shall have expired before any proceeding requisite to such avoidance shall have been commenced and any Insured Payment shall be "paid in full" when such payment has been made by the Issuer, and any period during which any such payment could have been avoided in whole or in part as a preference payment under applicable law shall have expired before any proceeding requisite to such avoidance shall have been commenced.

"Prior Insurance" means the financial guaranty insurance policy delivered by the Prior Insurer with respect to each of the Obligations.

"Prior Insurer" means the entity identified as such in the Declarations, its successors and assigns.

The following definitions replace the definitions provided for in the Policy:

"Holder" means, in respect of any Obligation, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Obligation to payment of principal or interest thereunder but shall not include the Prior Insurer, the Issuer or any affiliate or successor thereof.

"Insured Payments" means payments which are scheduled to be made during the Term of this Policy in accordance with the original terms of the Obligations (including when amended in accordance with such original terms) when issued and without regard to any amendment or modification of such Obligations thereafter (other than an amendment in accordance with such terms); provided that no such amount shall constitute an "Insured Payment" unless and until the Condition Precedent has been fulfilled, in which event the Insured Payment insured under the Policy shall be the principal and interest scheduled to be made as aforesaid on the Obligations less any amount paid by the Prior Insurer in respect thereof. Payments which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) an election by the Issuer to pay principal on an accelerated basis or (c) any other cause, shall not constitute "Insured Payments" unless BHAC shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration. Insured Payments shall not include any amounts due in respect of the Obligations attributable to any increase in interest rate, penalty or other sums, if any, payable by the Issuer by reason of any default or event of default in respect of the Obligations. Insured Payments shall, subject to the Condition Precedent, include principal and interest due in respect of the Obligations payable in connection with the maturity thereof as well as mandatory sinking fund redemption. In the absence of written consent by BHAC, any (i) action by the Holder of an Obligation which releases, or diminishes the liability of, the Prior Insurance; or (ii) failure by the Holder to take such action(s) as BHAC may reasonably require in order to preserve BHAC's rights, if any, against the Prior Insruance, shall result in such Obligation ceasing to be insured under this Policy.

The following Terms and Conditions are added to the Policy:

1.    In addition to all other requirements set forth in this Policy, with respect to an Avoided Payment only, BHAC shall have no obligation to make any payment to any Holder under this Policy until the fourth Business Day following receipt by BHAC from the Fiscal Agent of (i) a certified copy of the order of the court which exercised jurisdiction to the effect that the Holder is required to return a payment of principal or interest constituting a Insured Payment and paid on the Obligation during the Term of this Policy because such payment was an avoidable preference under applicable law (the "Order"), (ii) a certificate of the Holder that the Order has been entered and is not subject to any stay.  With respect to an Avoided Payment, BHAC may disburse payment due under the Policy to the receiver, conservator, debtor-in-possession, trustee in bankruptcy

or other person named in the Order and not to the Fiscal Agent or Holder directly; unless such Holder has been required previously to disgorge all or part of such payment, as demonstrated to the satisfaction of BHAC.

In addition to all other requirements set forth in this Policy, with respect to all claims under this Policy BHAC shall have no obligation to make any payment to any Holder under this Policy until it has received (i) a certificate stating that the Condition Precedent has been fulfilled accompanied by a certified copy of the claim filed with the Prior Insurer; and (ii) an assignment duly executed and delivered by the Holder, in such form as is reasonably required by BHAC and provided to the Holder by BHAC or the Fiscal Agent, irrevocably assigning to BHAC all rights and claims of the Holder relating to or arising under the Obligation and the Prior Insurance against the Issuer and the Prior Insurer, as appropriate, upon disbursement of any payments by BHAC hereunder.

2.      BHAC's obligation to make any payment under this Policy is subject to the Condition Precedent.

3.      In addition to BHAC being subrogated to the rights of each Holder to receive payment under the Obligations to the extent of any payment by BHAC hereunder, BHAC shall be subrogated to the rights of each Holder to receive payment under the Prior Insurance to the extent of any payment by BHAC hereunder and shall be subrogated to the rights of the Prior Insurer to the extent of any payment by BHAC hereunder.

4.     This Policy shall expire with respect to each Obligation on the date on which that Obligation is Paid in Full.

IN WITNESS WHEREOF, BHAC has caused this Policy to be executed on its behalf by its duly authorized officer, and to become effective and binding upon BHAC by virtue of such signature.

BERKSHIRE HATHAWAY ASSURANCE CORPORATION

By:_____

Name:  Kara Raiguel

Title:  Vice President

ATTEST:

By._____

Name:  Brian Snover

Title:  Vice President



# DETROIT WATER AND SEWERAGE DEPARTMENT
## POLLUTION CONTROL SYSTEM
### FOR THE
### SOUTHEASTERN MICHIGAN METROPOLITAN AREA
### 2005

Printed on Recycled Paper
(800) 342-5578 · (800) 462-2732

# Exhibit 9

DTC Bond

**Book-Entry-Only**                                                    RATINGS: (See "RATINGS" herein)

*In the opinion of Bond Counsel, Lewis & Munday, A Professional Corporation, under existing law, as presently interpreted (i) interest on the Fixed Rate Bonds is excluded from gross income for federal income tax purposes, (ii) interest on the Fixed Rate Bonds is not an item of tax preference for purposes of the alternative minimum tax on individuals and corporations and (iii) the Fixed Rate Bonds and the interest thereon are exempt from all taxation imposed by the laws of the State of Michigan except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof, in each case to the extent and subject to the conditions described under "TAX MATTERS" herein and Appendix H hereto.*

**$385,305,000**

# CITY OF DETROIT, MICHIGAN
## Water Supply System

| $190,405,000 | $194,900,000 |
|:---:|:---:|
| **Revenue Refunding Second Lien Bonds** | **Revenue Senior Lien Bonds** |
| **(Fixed Rate), Series 2001-C** | **(Fixed Rate), Series 2005-B** |

**Remarketing Date: May 14, 2008**                    **Due: July 1, as shown on inside cover**

The purpose of this Remarketing Circular is to provide certain information in connection with the remarketing by Siebert Brandford Shank & Co., LLC (the "Remarketing Agent") and the broker-dealers listed below of the Water Supply System Revenue Refunding Second Lien Bonds (Fixed Rate), Series 2001-C (the "2001C Fixed Rate Bonds"), and the Water Supply System Revenue Senior Lien Bonds (Fixed Rate), Series 2005-B (the "2005B Fixed Rate Bonds," and together with the 2001C Fixed Rate Bonds, the "Fixed Rate Bonds"), issued by the City of Detroit, Michigan (the "City").

Pursuant to the Variable Rate Demand Bonds Supplement and Agreement, dated as of May 31, 2001, between the City and U.S. Bank Trust National Association (now U.S. Bank National Association), in its capacities as Trustee, Transfer Agent and Tender Agent, with respect to the City's Water Supply System Revenue Refunding Second Lien Bonds (Variable Rate Demand), Series 2001-C (the "2001 Predecessor Bonds"), and the Variable Rate Mode and Auction Rate Mode Supplement and Agreement, dated as of March 22, 2005, between the City and U.S. Bank National Association in its capacity as Tender Agent with respect to the City's Water Supply System Revenue Senior Lien Bonds (Variable Rate Demand), Series 2005-B (the "2005 Predecessor Bonds," and together with the 2001 Predecessor Bonds, the "Predecessor Bonds"), the City has elected to convert the Predecessor Bonds from the Weekly Mode to the Fixed Rate Mode.

The Predecessor Bonds are being remarketed pursuant to a Remarketing Agreement, dated as of May 6, 2008, between the Remarketing Agent and the City. The 2001 Predecessor Bonds were initially issued on June 7, 2001 in the Weekly Mode and currently bear interest in the Weekly Mode. The 2005 Predecessor Bonds were initially issued on March 23, 2005 in the Weekly Mode and currently bear interest in the Weekly Mode. The anticipated conversion date of the Predecessor Bonds is May 14, 2008 (the "Conversion Date"), subject to certain conditions precedent. From and after the Conversion Date, the Fixed Rate Bonds will bear interest at the rates set forth on the inside cover, payable on each January 1 and July 1, commencing July 1, 2008.

Certain Fixed Rate Bonds are subject to mandatory or optional redemption prior to maturity. See "THE FIXED RATE BONDS –Redemption Provisions."

The principal of and interest on the Fixed Rate Bonds are payable solely from the Pledged Assets under the Bond Ordinance (as defined herein), including the Net Revenues of the City's Water Supply System. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS." **The Fixed Rate Bonds are not general obligations of the City and do not constitute indebtedness of the City for purposes of computing its debt limitations imposed by constitutional, statutory or charter provisions. The Fixed Rate Bonds do not constitute a charge against the general credit or taxing power of the City, and the City is not liable for the payment of the Fixed Rate Bonds except from the sources herein described.** Concurrently with the remarketing of the Predecessor Bonds, Berkshire Hathaway Assurance Corporation ("BHAC") will issue separate bond insurance policies for the 2001C Fixed Rate Bonds and the 2005B Fixed Rate Bonds (the "BHAC Insurance Policies") on the Conversion Date, guaranteeing the scheduled payment when due of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of Financial Guaranty Insurance Company ("FGIC") to make payments under separate financial guarantee insurance policies issued by FGIC (the "FGIC Policies") concurrently with the issuance of the Predecessor Bonds, for such Predecessor Bonds. The FGIC Policies remain in effect and unconditionally guarantee the payment of that portion of the principal of and interest on the Fixed Rate Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the City. See "BOND INSURANCE" and "INTRODUCTION –Recent Developments in the Bond Insurance Industry" herein.

BERKSHIRE HATHAWAY                                        FGIC
ASSURANCE CORPORATION

**THIS COVER PAGE CONTAINS INFORMATION FOR QUICK REFERENCE ONLY. IT IS NOT A SUMMARY OF THE FIXED RATE BONDS. INVESTORS MUST READ THE ENTIRE REMARKETING CIRCULAR TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT DECISION.**

It is expected that the Fixed Rate Bonds will be delivered to DTC in New York, New York, on or about May 14, 2008.

# Siebert Brandford Shank & Co., LLC

| **DEPFA First Albany Securities LLC** | **JPMorgan** | **KeyBanc** |
|:---:|:---:|:---:|
| **Cabrera Capital Markets, LLC** | | **Comerica Securities** |
| **Melvin & Co.** | **Wachovia Securities** | |

Dated: May 6, 2008

# MATURITY SCHEDULE

## $ 190,405,000
## Water Supply System Revenue Refunding Second Lien Bonds
## (Fixed Rate), Series 2001-C

### $151,500,000 Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price/ Yield | CUSIP[1] | Maturity (July 1) | Principal Amount | Interest Rate | Price/ Yield | CUSIP[1] |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 480,000 | 3.00% | 2.08% | 2512556P5 | 2019 | $ 12,510,000 | 5.75% | 4.04%[2] | 2512556Z3 |
| 2010 | 495,000 | 3.00% | 2.55% | 2512556Q3 | 2020 | 13,235,000 | 5.75% | 4.15%[2] | 2512557A7 |
| 2011 | 515,000 | 3.00% | 2.88% | 2512556R1 | 2021 | 14,025,000 | 5.75% | 4.25%[2] | 2512557B5 |
| 2012 | 325,000 | 3.50% | 3.12% | 2512556S9 | 2022 | 14,865,000 | 5.75% | 4.32%[2] | 2512557C3 |
| 2013 | 340,000 | 3.50% | 3.25% | 2512556T7 | 2023 | 15,750,000 | 5.75% | 4.39%[2] | 2512557D1 |
| 2014 | 350,000 | 3.50% | 3.37% | 2512556U4 | 2024 | 16,690,000 | 5.75% | 4.43%[2] | 2512557E9 |
| 2015 | 365,000 | 4.25% | 3.51% | 2512556V2 | 2025 | 17,690,000 | 5.75% | 4.47%[2] | 2512557F6 |
| 2016 | 380,000 | 4.25% | 3.65% | 2512556W0 | 2026 | 18,735,000 | 5.75% | 4.50%[2] | 2512557G4 |
| 2017 | 390,000 | 4.25% | 3.79% | 2512556X8 | 2027 | 19,945,000 | 5.75% | 4.55%[2] | 2512557H2 |
| 2018 | 415,000 | 4.25% | 3.92% | 2512556Y6 | 2028 | 4,000,000 | 5.75% | 4.60%[2] | 2512557J8 |

$18,815,000 4.75% Term Bonds due July 1, 2029 --- Priced to yield 4.90%; CUSIP[1] 2512557K5

$20,090,000 4.50% Term Bonds due July 1, 2029 --- Priced to yield 4.90%; CUSIP[1] 2512557L3


## $ 194,900,000
## Water Supply System Revenue Senior Lien Bonds
## (Fixed Rate), Series 2005-B

### $51,620,000 Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price/ Yield | CUSIP[1] | Maturity (July 1) | Principal Amount | Interest Rate | Price/ Yield | CUSIP[1] |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | $ 1,750,000 | 5.00% | 2.55% | 2512557M1 | 2020 | $ 2,690,000 | 5.50% | 4.15%[2] | 2512557X7 |
| 2011 | 1,855,000 | 4.00% | 2.88% | 2512557N9 | 2021 | 2,905,000 | 5.50% | 4.25%[2] | 2512557Y5 |
| 2012 | 1,940,000 | 4.00% | 3.12% | 2512557P4 | 2022 | 3,025,000 | 5.50% | 4.32%[2] | 2512557Z2 |
| 2013 | 2,020,000 | 5.00% | 3.25% | 2512557Q2 | 2023 | 3,145,000 | 5.50% | 4.39%[2] | 2512558A6 |
| 2014 | 2,125,000 | 5.00% | 3.37% | 2512557R0 | 2024 | 3,270,000 | 5.50% | 4.43%[2] | 2512558B4 |
| 2015 | 2,225,000 | 4.00% | 3.51% | 2512557S8 | 2025 | 3,490,000 | 5.50% | 4.47%[2] | 2512558C2 |
| 2016 | 2,305,000 | 4.00% | 3.65% | 2512557T6 | 2026 | 3,620,000 | 5.50% | 4.50%[2] | 2512558D0 |
| 2017 | 2,385,000 | 4.00% | 3.79% | 2512557U3 | 2027 | 3,850,000 | 5.50% | 4.55%[2] | 2512558E8 |
| 2018 | 2,465,000 | 5.50% | 3.92% | 2512557V1 | 2028 | 3,980,000 | 5.50% | 4.60%[2] | 2512558F5 |
| 2019 | 2,575,000 | 5.50%[2] | 4.04% | 2512557W9 | | | | | |

$28,415,000 4.75% Term Bonds due July 1, 2034 --- Priced to yield 4.94%; CUSIP[1] 2512558G3

$57,365,000 5.50% Term Bonds due July 1, 2035 --- Priced to yield 4.74%[2], CUSIP[1] 2512558H1

$57,500,000 5.25% Term Bonds due July 1, 2035 --- Priced to yield 4.83%[2], CUSIP[1] 2512558J7

---

[1] Copyright 2008, American Bankers Association, CUSIP data herein are provided by Standard & Poor's, CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP numbers listed above are being provided solely for the convenience of Bondholders only at the time of remarketing of the Fixed Rate Bonds and the City and Remarketing Agent do not make any representation with respect to such numbers or undertake any responsibility for their accuracy now or at any time in the future. The CUSIP numbers are subject to being changed after remarketing of the Fixed Rate Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part as a result of the procurement of secondary market portfolio insurance or other similar enhancement by investors that is applicable to the Fixed Rate Bonds.

[2] Priced to July 1, 2018 optional redemption date.



**CITY OF DETROIT**

---

*MAYOR*
KWAME M. KILPATRICK

---

*CITY COUNCIL*
KENNETH V. COCKREL, JR., PRESIDENT

MONICA CONYERS, President Pro Tem
JOANN WATSON
SHEILA M. COCKREL
BARBARA-ROSE COLLINS

ALBERTA TINSLEY-TALABI
MARTHA REEVES
BRENDA JONES
KWAME KENYATTA

---

*CITY CLERK*
JANICE WINFREY

*FINANCE DIRECTOR*
NORMAN L. WHITE

*WATER AND SEWERAGE DEPARTMENT DIRECTOR*
VICTOR M. MERCADO

*BOARD OF WATER COMMISSIONERS*
MARY E. BLACKMON, PRESIDENT

HILLIARD L. HAMPTON
CARLA WALKER-MILLER
MARILYNN E. GOSLING

JIMMY L. COOPER
WILLIAM G. WESTRICK
KENNETH DANIELS

---

*SPECIAL SERVICES*

LEWIS & MUNDAY, A PROFESSIONAL CORPORATION
Bond Counsel

ROBERT W. BAIRD & CO., INCORPORATED
Co-Financial Advisor

PHOENIX CAPITAL PARTNERS
Co-Financial Advisor and Swap Advisor

THE FOSTER GROUP, LLC
Feasibility Consultant

[THIS PAGE INTENTIONALLY LEFT BLANK]

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................1
    Authorization ...........................................................................................................................1
    Senior Lien Bonds, Second Lien Bonds, SRF Junior Lien Bonds ......................................2
    Municipal Bond Insurance .....................................................................................................3
    Recent Developments in the Bond Insurance Industry .........................................................3
    Water Supply System .............................................................................................................3
    Miscellaneous ........................................................................................................................4

THE FIXED RATE BONDS .............................................................................................................4
    General ....................................................................................................................................4
    Redemption Provisions ...........................................................................................................4

BOOK ENTRY ONLY SYSTEM .....................................................................................................5

PLAN OF REMARKETING ..............................................................................................................7
    Remarketing Plan ...................................................................................................................7
    Amendments ...........................................................................................................................7
    Related Interest Rate Swaps ..................................................................................................8
    Sources and Uses of Funds ....................................................................................................9

DEBT SERVICE AND OUTSTANDING INDEBTEDNESS .........................................................10

INTEREST RATE SWAP AGREEMENTS .....................................................................................12
    Interest Rate Swaps Related to the Remarketed Bonds ......................................................12

SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS .......................14
    Nature of Obligations ...........................................................................................................14
    Revenues, Net Revenues and Pledged Assets .....................................................................14
    Priority of Lien and Payment Status ....................................................................................14
    Bond Ordinance Flow of Funds ...........................................................................................15
    Reverse Flow of Funds .........................................................................................................16
    Reserve Accounts and Reserve Requirements ....................................................................16
    Rate Stabilization Fund ........................................................................................................18
    Operating and Rate Covenants .............................................................................................18
    Additional Bonds ..................................................................................................................19
    Enforceability of Rates .........................................................................................................19
    Amendments Without Consent .............................................................................................20
    Trustee's Responsibilities .....................................................................................................21
    Bondholder Rights and Remedies ........................................................................................21

BOND INSURANCE ........................................................................................................................22
    Berkshire Hathaway Assurance Corporation Bond Insurance Policies ...............................22
    Financial Guaranty Insurance Policies ................................................................................23

THE WATER AND SEWERAGE DEPARTMENT .........................................................................26
    Organization ..........................................................................................................................26
    The Board ..............................................................................................................................26
    Management and Personnel ..................................................................................................27
    Employee Bargaining Units .................................................................................................28
    Pension Plan ..........................................................................................................................29

THE WATER SUPPLY SYSTEM ............................................................................................29
    Service Area ............................................................................................................29
    Master Plan ..............................................................................................................30
    Wholesale Municipal Service ...................................................................................31
    Partnering Efforts .....................................................................................................33
    Retail Service ...........................................................................................................33
    Physical Facilities .....................................................................................................33
    Environmental Matters .............................................................................................35
    Security Improvements .............................................................................................35

FEASIBILITY CONSULTANTS REPORT .....................................................................................35

THE CAPITAL IMPROVEMENT PROGRAM ...............................................................................35

FINANCIAL PROCEDURES .........................................................................................................37
    Budget and Accounting Matters ...............................................................................37
    Management Initiatives .............................................................................................38
    Collections and Delinquencies .................................................................................38
    Cash Management .....................................................................................................39
    Investment Policy .....................................................................................................40
    Rates .........................................................................................................................40
    Water Rate Comparison ...........................................................................................41

FINANCIAL OPERATIONS ..........................................................................................................42
    Summary of Historical Revenues and Expenses .......................................................43
    Analysis of Recent Operations .................................................................................44
    Projected Revenues and Revenue Requirements for Fiscal Years 2008 to 2012 ..........45
    Upcoming Reporting Change ...................................................................................46

LITIGATION ...............................................................................................................................46
    Detroit Water and Sewerage Department Litigation .................................................46
    Other Litigation .......................................................................................................47

CONTINUING DISCLOSURE UNDERTAKING ...........................................................................47
    The Continuing Disclosure Undertaking ..................................................................47
    The Disclosure Dissemination Agent – DAC ...........................................................48

TAX MATTERS ...........................................................................................................................48
    Federal Tax Matters .................................................................................................48
    State Tax Matters .....................................................................................................49
    Original Issue Discount ............................................................................................49
    Amortizable Bond Premium .....................................................................................50
    Market Discount .......................................................................................................50
    Recent Developments ...............................................................................................50
    Future Developments ...............................................................................................51
    Tax Advisors ............................................................................................................51

FEASIBILITY CONSULTANT .....................................................................................................51

VERIFICATION OF MATHEMATICAL COMPUTATIONS ...........................................................51

INDEPENDENT AUDITORS .................................................................................................................51

CERTAIN LEGAL MATTERS .............................................................................................................51

REMARKETING ...................................................................................................................................52

RATINGS ...............................................................................................................................................52

MISCELLANEOUS ...............................................................................................................................52

**APPENDICES:**

| | |
|---|---|
| A | Financial Feasibility Report |
| B | Audited Financial Statements of the Water Fund of the City of Detroit, Michigan as of and for the years ended June 30, 2006 and June 30, 2005 |
| C | Bond Ordinance |
| D | Amendments to Certain Provisions of the Authorizing Documents |
| E | Characteristics of the Water Supply System Service Area |
| F | Summary of the Continuing Disclosure Undertaking |
| G | Specimen of BHAC Bond Insurance Policy |
| H | Form of Favorable Bond Counsel's Opinion |

Map of Service Area ................................................................................................ Inside Back Cover

This Remarketing Circular has been prepared by the City and provides certain information relating to the City and its Water Supply System in connection with the remarketing of the Fixed Rate Bonds. This Remarketing Circular is distributed in connection with the remarketing of the Fixed Rate Bonds and may not be reproduced or used, in whole or in part, for any other purpose. No dealer, broker, salesman or other person has been authorized by the City or the Remarketing Agent to give any information or to make any representations with respect to the City or its Fixed Rate Bonds other than those contained in this Remarketing Circular and, if given or made, such other information or representations must not be relied upon as having been authorized by the City or the Remarketing Agent. Neither the City nor the Remarketing Agent has undertaken any independent investigation of the operations of Berkshire Hathaway Assurance Corporation ("BHAC"), or Financial Guaranty Insurance Company ("FGIC") and they make no representation herein as to the accuracy or adequacy of such information or as to the ability of BHAC or FGIC to make payments under the separate policies to be issued by BHAC (the "BHAC Policies") or the separate policies issued by FGIC (the "FGIC Policies"). The Remarketing Agent has provided the following sentence for inclusion in this Remarketing Circular. The Remarketing Agent has reviewed the information in this Remarketing Circular in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Remarketing Agent does not guarantee the accuracy or completeness of such information.

This Remarketing Circular does not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be any sale of the Fixed Rate Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Remarketing Circular nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Water Supply System, the City or BHAC or FGIC since the date hereof.

Upon conversion to the Fixed Rate Mode, the Fixed Rate Bonds will not be registered under the Securities Act of 1933, as amended, and will not be listed on any stock or other securities exchange, and neither the Securities and Exchange Commission nor any other federal, state, municipal or other governmental entity other than the City will have passed upon the accuracy or adequacy of this Remarketing Circular.

IN CONNECTION WITH THIS REMARKETING, THE REMARKETING AGENT MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE FIXED RATE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Other than with respect to information concerning BHAC and FGIC contained under the caption "BOND INSURANCE" and in the appendices to the herein defined Predecessor Official Statements which are incorporated herein, none of the information in this Remarketing Circular has been supplied or verified by BHAC or FGIC and neither BHAC nor FGIC makes any representation or warranty, express or implied, as to (i) the accuracy or completeness of such information; (ii) the validity of the Fixed Rate Bonds, or (iii) the tax exempt status of the interest on the Fixed Rate Bonds.

The order and placement of materials in this Remarketing Circular, including the Appendices, are not to be deemed to be a determination of relevance, materiality or importance and this Remarketing Circular, including the Appendices, must be considered in its entirety.

**$385,305,000**
**CITY OF DETROIT, MICHIGAN**
**Water Supply System**

| $190,405,000 | $194,900,000 |
|:---:|:---:|
| Revenue Refunding Second Lien Bonds | Revenue Senior Lien Bonds |
| (Fixed Rate), Series 2001-C | (Fixed Rate), Series 2005-B |

## INTRODUCTION

This Remarketing Circular provides certain information in connection with the remarketing by Siebert Brandford Shank & Co., LLC (the "Remarketing Agent") of the Water Supply System Revenue Refunding Second Lien Bonds (Fixed Rate), Series 2001-C (the "2001C Fixed Rate Bonds") and the Water Supply System Revenue Senior Lien Bonds (Fixed Rate), Series 2005-B (the "2005B Fixed Rate Bonds", and together with the 2001C Fixed Rate Bonds, the "Fixed Rate Bonds"), issued by the the City of Detroit, Michigan (the "City"). For definitions of certain capitalized terms used but not otherwise defined in this Remarketing Circular, see Appendix C – "Bond Ordinance."

The 2001C Fixed Rate Bonds will be converted from $190,630,000 outstanding principal amount of Water Supply System Revenue Refunding Second Lien Bonds (Variable Rate Demand), Series 2001-C (the "2001 Predecessor Bonds") initially issued by the City on June 7, 2001, and the 2005-B Fixed Rate Bonds will be converted from $195,000,000 outstanding principal amount of Water Supply System Revenue Senior Lien Bonds (Variable Rate Demand), Series 2005-B (the "2005 Predecessor Bonds") originally issued by the City on March 23, 2005 (collectively, the "Predecessor Bonds"). The Predecessor Bonds were issued in the Weekly Mode and currently bear interest at a Weekly Rate. Pursuant to the Variable Rate Demand Bonds Supplement and Agreement, dated as of May 31, 2001, between the City and U.S. Bank Trust National Association (now U.S. Bank National Association) in its capacities as Trustee, Tender Agent and Transfer Agent, with respect to the 2001 Predecessor Bonds (the "2001 Supplement") and a Variable Rate Mode and Auction Rate Mode Supplement and Agreement, dated March 22, 2005, between the City and U.S. Bank National Association, as Tender Agent, with respect to the 2005 Predecessor Bonds (the "2005 Supplement" and, together with the 2001 Supplement, the "Supplements"), the Predecessor Bonds will be converted from the Weekly Mode to the Fixed Rate Mode. Under each of the Supplements, no further Mode changes are permitted after conversion to the Fixed Rate Mode.

### Authorization

*Issuance.* The Predecessor Bonds were authorized under the Revenue Bond Act of 1933, Act No. 94, Public Acts of Michigan, 1933, as amended (the "Act"). The 2001 Predecessor Bonds were issued pursuant to Ordinance No. 32-85, as supplemented and amended (the "Predecessor Ordinance"), as supplemented by a Resolution adopted by the City Council on January 31, 2001 as amended and restated April 25, 2001 (the "2001 Resolution") and a Sale Order of the Finance Director of the City dated May 31, 2001 (the "2001 Sale Order") as supplemented by the 2001 Supplement (collectively, the "2001 Sale Order"). The Predecessor Ordinance was subsequently amended and restated by the Bond Ordinance (hereinafter defined). The Bond Ordinance, the 2001 Resolution, the 2001 Sale Order and the 2001 Supplement are collectively referred to herein as the "2001 Authorizing Documents."

The 2005 Predecessor Bonds were issued pursuant to Amended and Restated Bond Ordinance No. 01-05, adopted on January 26, 2005, which amended and restated the Predecessor Ordinance (the "Bond Ordinance"), as supplemented by an Amended and Restated Resolution adopted by the City Council on January 26, 2005 (the "2005 Resolution"), a Sale Order of the Finance Director of the City dated March 22, 2005 (the "2005 Sale Order", as supplemented by the 2005 Supplement. The 2005 Ordinance, the 2005 Resolution, the 2005 Sale Order and the 2005 Supplement are collectively referred to herein as the "2005 Authorizing Documents," and together with the 2001 Authorizing Documents, the "Authorizing Documents".

*Remarketing.* The Predecessor Bonds to be remarketed are being remarketed pursuant to the Remarketing Agreement, dated May 6, 2008 (the "Remarketing Agreement"), between the Remarketing Agent and the City. The conversion of the Predecessor Bonds to Fixed Rate Bonds is expected to occur on or about May 14, 2008, (the "Conversion Date"), subject to certain conditions precedent as described in the Remarketing Agreement. **Should the conversion to Fixed Rate Mode fail to occur, the Predecessor Bonds to have been converted will remain**

1

outstanding in the Weekly Mode. **In connection with the remarketing described herein, certain amendments have been made to the Authorizing Documents to shorten certain notice periods in the event the initial Fixed Rate Conversion is not consummated and the City elects to again attempt a fixed rate conversion shortly thereafter. See "PLAN OF REMARKETING – Amendments", and "Appendix D – Amendments to Certain Provisions of the Authorizing Documents" herein.** Until such conversion to a Fixed Rate Mode, the respective Liquidity Facility (described below) will be available to pay the Purchase Price of Predecessor Bonds that have not been remarketed. The purchase price of 2001 Predecessor Bonds that have not been remarketed will be paid pursuant to a Liquidity Facility provided by DEPFA Bank plc, acting through its New York branch, the liquidity facility provider for the 2001 Predecessor Bonds, and the Purchase Price of the 2005 Predecessor Bonds that have not been remarketed will be paid pursuant to a Liquidity Facility provided by Dexia Credit Local, acting through its New York branch, the liquidity facility provider for the 2005 Predecessor Bonds. See "PLAN OF REMARKETING," herein for more information.

Except with respect to the amendments described in the immediately preceding paragraph, this Remarketing Circular only contains information regarding bonds while in the Fixed Rate Mode. Reference is made to the respective Predecessor Official Statements (defined below) for information relating to any of the Predecessor Bonds prior to the conversion to the Fixed Rate Mode.

*Underlying Documents.* Except with respect to the amendments referenced herein, this Remarketing Circular describes the Fixed Rate Bonds in the Fixed Rate Mode only. It is not intended to be used in connection with any offer to sell or remarket any Predecessor Bonds in any mode other than the Fixed Rate Mode. Should conversion of the Predecessor Bonds to Fixed Rate Mode fail to occur, the Predecessor Bonds will remain in the Weekly Mode. Reference should be made to the Official Statement dated May 31, 2001, with respect to the 2001 Predecessor Bonds (the "2001 Official Statement") and the Official Statement dated March 11, 2005, with respect to the 2005 Predecessor Bonds (the "2005 Official Statement") (collectively, the " Predecessor Official Statements"), on file with the Municipal Securities Rulemaking Board (the "MSRB"), for information concerning the authorization for the Predecessor Bonds, and other information related to the Predecessor Bonds. Reference to the Predecessor Official Statements is made solely for informational purposes, and, except as otherwise provided herein, information in the Predecessor Official Statements is not incorporated herein. Reference should also be made to certain amendments to the 2001 Supplement, the 2005 Supplement and the 2005 Sale Order which are effective and will be employed in connection with the remarketing, which are set forth in Appendix D hereto.

*Interest Rate Swap Agreements.* In connection with the remarketing of the Fixed Rate Bonds, the City has executed, effective as of the Conversion Date, three (3) fixed-to-floating interest rate swaps, the purpose of which is to offset the effect of the floating-to-fixed rate payments of the existing floating-to-fixed rate swaps relating to the Predecessor Bonds. See, "PLAN OF REMARKETING - Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS" herein.

## Senior Lien Bonds, Second Lien Bonds, SRF Junior Lien Bonds

The Bond Ordinance constitutes a contract between the City and the holders of all bonds issued thereunder. All bonds issued and to be issued under the Bond Ordinance are payable solely from the Pledged Assets, which include the Net Revenues of the Water Supply System and amounts available in certain funds and accounts established under the Bond Ordinance. Water Supply System Bonds secured by a senior lien on Pledged Assets constitute and are sometimes referred to in this Remarketing Circular as "Senior Lien Bonds." All Water Supply System Bonds issued under the Bond Ordinance that are not Senior Lien Bonds constitute "Junior Lien Bonds," and are secured by a lien on Pledged Assets that is junior to the lien securing all Senior Lien Bonds. Among Junior Lien Bonds, Water Supply System Bonds issued as "Second Lien Bonds" are secured by a lien on Pledged Assets that is superior to the liens securing all other Junior Lien Bonds, and Water Supply System Bonds issued as State Revolving Fund ("SRF") Junior Lien Bonds are secured by a lien on Pledged Assets that is junior to the liens securing all other Junior Lien Bonds. In addition to being subordinate in lien to all other Water System Bonds, SRF Junior Lien Bonds do not have a debt service reserve fund. There are currently no Junior Lien Bonds other than Second Lien Bonds and SRF Junior Lien Bonds.

Upon conversion, the Fixed Rate Bonds will have the same benefits of the security and sources of payment, covenants and other provisions of the Bond Ordinance as did the related Predecessor Bonds. The 2001C Fixed Rate Bonds will be on a parity with all Water Supply System Bonds heretofore or hereafter issued as Second Lien Bonds. The 2005B Fixed Rate Bonds will be on a parity with all other Water Supply System Bonds heretofore or hereafter issued as Senior Lien Bonds.

See "DEBT SERVICE AND OUTSTANDING INDEBTEDNESS" and "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS".

2

**Municipal Bond Insurance**

Concurrently with the remarketing of the Predecessor Bonds, Berkshire Hathaway Assurance Corporation ("BHAC") will issue separate bond insurance policies for the 2001-C Fixed Rate Bonds and the 2005-B Fixed Rate Bonds (the "BHAC Insurance Policies") on the respective Conversion Dates. The BHAC Insurance Policies will guarantee the scheduled payment when due of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of FGIC to make payments under the FGIC Insurance Policies that were issued concurrently with the issuance of the Predecessor Bonds for such Predecessor Bonds. See "BOND INSURANCE – Berkshire Hathaway Assurance Corporation Bond Insurance Policies" herein. The FGIC Insurance Policies remain in effect and unconditionally guarantee the payment of that portion of the principal of and interest on the Fixed Rate Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the City. See "BOND INSURANCE – Financial Guaranty Bond Insurance Policies."

**Recent Developments in the Bond Insurance Industry**

In recent months, Standard & Poor's, a division of The McGraw-Hill Companies ("S&P"), Moody's Investors Service ("Moody's") and Fitch Ratings ("Fitch" and, collectively, the "Rating Agencies"), have expressed growing concern about the potential effects of downturns in the market for structured finance instruments, including collateralized debt obligations and residential mortgage backed securities, on the claims-paying ability of the bond insurance companies. As a result of exposure to such risks, the Rating Agencies have issued press releases and/or reports addressing their ratings on a number of bond insurance companies. These companies include: (a) FGIC, which provided the policies on the Predecessor Bonds, bond insurance on other Water Supply System Bonds, and various surety policies providing Reserve Account credit enhancement; (b) MBIA Insurance Corporation ("MBIA"), which provided bond insurance on other Water Supply System Bonds and various surety policies providing Reserve Account credit enhancement; and (c) Financial Security Assurance Inc. ("FSA"), which provided bond insurance on other Water Supply System Bonds and various surety policies providing Reserve Account credit enhancement. See "BOND INSURANCE" and "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Reserve Accounts and Reserve Requirements" herein. The paragraphs below address recent actions by the Rating Agencies on the bond insurance companies referenced above that have provided bond insurance and/or Reserve Account credit enhancement for outstanding Water Supply System Bonds. There could be further deterioration in the financial condition of any of the bond insurance companies, and further credit rating downgrades, which could potentially impact the market price of outstanding Water Supply System Bonds and/or the funding of the Water Supply System's Reserve Accounts.

*FGIC.* As of March 31, 2008, the financial strength ratings of FGIC were as follows: Fitch – "BBB", Rating Outlook Negative; S&P – "BB", Outlook Negative; and Moody's – "Baa3", under review for possible downgrade. Each rating of FGIC should be evaluated independently. The ratings reflect the respective Rating Agency's current assessment of the insurance financial strength of FGIC, and further explanations of any rating may be obtained only from the applicable Rating Agency. These ratings are not recommendations to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by the Rating Agencies. The further downgrade or withdrawal of any of these ratings may have an adverse effect on the market price of the Fixed Rate Bonds. See "BOND INSURANCE" herein for more information.

*MBIA.* In a February 26, 2008 press release, Moody's confirmed its "Aaa" rating of MBIA, with a negative outlook. The release is available on the Moody's website at www.moodys.com. In a press release dated February 25, 2008, S&P removed its "AAA" rating of MBIA from CreditWatch and assigned a negative rating outlook. In an April 4, 2008 press release, Fitch downgraded the rating of MBIA from "AAA" to "AA", removed its rating from rating watch negative an assigned a negative rating outlook. The release is available on the Fitch website at www.fitchratings.com. There can be no assurance that the views expressed in those documents represent the current views of the Rating Agencies or that those views will not change in the future.

*FSA.* In a March 11, 2008 press release Moody's affirmed its "Aaa" rating of FSA, with a stable outlook. In a press release dated January 31, 2008, S&P affirmed its "AAA" rating of FSA, with a stable rating outlook. In a January 24, 2008 press release, Fitch affirmed its "AAA" rating of FSA, with a stable outlook. There can be no assurance that the views expressed in those documents represent the current views of the Rating Agencies or that those views will not change in the future.

**Water Supply System**

The Water Supply System (sometimes referred to herein as the "System") is owned by the City and is operated, managed and accounted for by the City as a separate enterprise fund through the Water and Sewerage

3

Department (the "Department"), which is established under the City Charter. All funds and accounts of the Water Supply System are maintained separate from other City funds, including those of the City's Sewage Disposal System. See "FINANCIAL PROCEDURES – Cash Management." The Department is headed by a seven-member board appointed by the Mayor, known as the Board of Water Commissioners (the "Board of Commissioners" or the "Board"), which meets monthly. The Department and the Board oversee both the Water Supply System and the Sewage Disposal System. See "THE WATER AND SEWERAGE DEPARTMENT"

The Water Supply System is one of the largest in the nation in terms of water produced and population served. The System provides retail service within the City and wholesale service to 124 surrounding communities through 86 contracts with public entity customers. The System's service area covers 981 square miles and an estimated population of 3.9 million, representing approximately 43% of the population of the State of Michigan. See "THE WATER SUPPLY SYSTEM" and Appendix A – "Financial Feasibility Report."

## Miscellaneous

There follow in this Remarketing Circular descriptions of the Fixed Rate Bonds, the BHAC Insurance Policies and the FGIC Insurance Policies and BHAC, FGIC, the Department, the Water Supply System, its service area and financial position, and other matters generally relating to the issuance of the Fixed Rate Bonds, including Appendices relating to demographic, financial and legal matters. ***Persons considering a purchase of the Fixed Rate Bonds should read this Remarketing Circular in its entirety.*** All capitalized terms used in this Remarketing Circular, unless otherwise defined herein or the context otherwise indicates, have the same meanings as in the Bond Ordinance.

## THE FIXED RATE BONDS

### General

The Fixed Rate Bonds, are issuable in authorized denominations of $5,000 or integral multiples thereof and will be issued in book-entry form. The Fixed Rate Bonds will be dated their respective original dates of issuance and delivery and will mature on July 1 in the years and principal amounts and bear interest at the rates set forth on the inside cover of this Remarketing Circular. Interest on the Fixed Rate Bonds will accrue from the applicable date of conversion (collectively, "Conversion Dates"), and will be payable semiannually on each January 1 and July 1, commencing July 1, 2008 (each an "Interest Payment Date") to the registered owners as of the 15th day of the month immediately preceding the Interest Payment Date (a "Regular Record Date"). Interest on the Fixed Rate Bonds will be computed using a 360-day year and twelve 30-day months, and will be payable when due by check drawn on U.S. Bank National Association, Detroit, Michigan, as Transfer Agent (the "Transfer Agent").

### Redemption Provisions

*Optional Redemption.* The Fixed Rate Bonds maturing on or before July 1, 2018 are not subject to redemption prior to maturity. The Fixed Rate Bonds maturing on or after July 1, 2019 are subject to redemption at the option of the City in whole or in part in such order of maturity as the City shall determine and within any maturity by lot, on any date on or after July 1, 2018 at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption.

*Mandatory Sinking Fund Redemption.* The 2001C Fixed Rate Bonds, bearing interest at the rate of 4.50% and maturing on July 1, 2029 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the 2001 Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| July 1 | Principal Amount |
|--------|------------------|
| 2028 | $ 7,090,000 |
| 2029* | 13,000,000 |

*Final Maturity

The 2001C Fixed Rate Bonds, bearing interest at the rate of 4.75% and maturing on July 1, 2029 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the

4

Sinking Fund established for such purpose under the 2001 Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| July 1 | Principal Amount |
|---|---|
| 2028 | $ 10,115,000 |
| 2029* | 8,700,000 |

*Final Maturity

The 2005B Fixed Rate Bonds bearing interest at the rate of 4.75% and maturing on July 1, 2034 are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the 2005 Resolution in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth below.

| July 1 | Principal Amount | July 1 | Principal Amount |
|---|---|---|---|
| 2029 | $ 4,215,000 | 2032 | $ 4,840,000 |
| 2030 | 4,425,000 | 2033 | 5,050,000 |
| 2031 | 4,630,000 | 2034* | 5,255,000 |

*Final Maturity

The principal amount of the above-described bonds (the "Term Bonds") of a series, interest rate and maturity to be redeemed on the dates set forth above shall be reduced by the principal amount of Term Bonds of the same series, interest rate and maturity that have been redeemed (other than by application of Mandatory Redemption Requirements) or otherwise acquired by the City and delivered to the Transfer Agent prior to giving the notice of redemption described below. The City may satisfy any Mandatory Redemption Requirement by the purchase and surrender of Term Bonds of the same series, interest rate and maturity in lieu of calling such Term Bonds for mandatory redemption.

*General Redemption Provisions.* Any Fixed Rate Bonds to be redeemed will be redeemed only in authorized denominations. Fixed Rate Bonds duly called for redemption will cease to bear interest on and after the date fixed for redemption, whether or not presented for payment, provided that funds are on hand with the Transfer Agent to redeem such Fixed Rate Bonds. A registered owner of a Fixed Rate Bond selected for redemption in part, upon surrender of such Fixed Rate Bond for redemption shall receive without cost a new Fixed Rate Bond of the same series, interest rate and maturity, and in the principal amount of the unredeemed portion of such Fixed Rate Bond that was surrendered.

*Notice of Redemption.* The Transfer Agent will mail notice of redemption to the registered owners of Fixed Rate Bonds not less than 30 days prior to the date fixed for redemption. *So long as DTC or its nominee is the registered owner of the Fixed Rate Bonds, the Transfer Agent will send any notice of redemption only to DTC, as described under* "GENERAL FIXED RATE BOND PROVISIONS - Book-Entry-Only System" below.

## BOOK-ENTRY ONLY SYSTEM

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Fixed Rate Bonds (referred to in this section as, the "Bonds"). The Bonds will be remarketed as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and

pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com. and www.dtc.org.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Fixed Rate Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the issuer of the Bonds as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds and principal and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the City or the Transfer Agent, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the City or the Transfer Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, principal and interest and redemption premiums, if any, to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the City or the Transfer Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The requirement for physical delivery of the Fixed Rate Bonds in connection with a mandatory tender will be deemed satisfied when the ownership rights in the Fixed Rate Bonds are transferred by Direct Participants on DTC's records and followed by a book-entry credit of tendered Fixed Rate Bonds to the Transfer Agent's DTC account.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the City or the Transfer Agent. Under such circumstances, in the event that a successor securities depository is not obtained, Bond certificates are required to be printed and delivered.

The City may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, bond certificates will be printed and delivered to DTC.

The foregoing information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the City believes to be reliable, but the City takes no responsibility for the accuracy thereof.

## Disclaimer of Liability for Failures of DTC

The City and the Remarketing Agent cannot and do not give any assurances that DTC, the Direct and Indirect Participants or others will distribute payments of principal, interest or redemption proceeds with respect to the Fixed Rate Bonds paid to Cede & Co. or another DTC nominee as the Owner, or will distribute any redemption or other notices to the Beneficial Owners, or that they will do so on a timely basis or will serve and act in the manner described in this Remarketing Circular. The City and the Remarketing Agent are not responsible or liable for the failure of DTC or any Participant to make any payment or give any notice to a Beneficial Owner with respect to the Fixed Rate Bonds or an error or delay relating thereto.

# PLAN OF REMARKETING

## Remarketing Plan

The City intends to convert the 2001 Predecessor Bonds and the 2005 Predecessor Bonds from the Weekly Mode to the Fixed Rate Mode, via remarketing pursuant to the Remarketing Agreement and as provided for in the respective underlying 2001 Authorizing Documents and the 2005 Authorizing Documents. In conjunction with the remarketing, the existing Liquidity Facilities and Remarketing Agreements will be terminated. Each series of the Fixed Rate Bonds will continue to carry the associated Bond Insurance policy. See "BOND INSURANCE" herein for more detail.

## Amendments

Certain amendments to the 2001 Supplement, the 2005 Supplement, and the 2005 Sale Order (collectively, the "2001 and 2005 Authorizing Documents"), which will be effective in connection with the remarketing, are set forth in Appendix D hereto. The 2001 and 2005 Authorizing Documents are governed by their own amendment provisions but are also subject to the amendment provisions of the Bond Ordinance, which is included as Appendix C to this Remarketing Circular. Section 22(B)(3) of the Bond Ordinance, "Amendments With Consent," states in relevant part as follows:

> [T]he consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

Each of the Supplements contain substantially the same language. **Accordingly, Holders of the Predecessor Bonds being remarketed hereby which are acquired in the remarketing thereof on or after the date of this Remarketing Circular, whether or not the fixed rate conversion and related optional redemption are consummated in accordance with the initial notice of Mode Change or optional redemption, will be considered to have consented to the amendments set forth in Appendix D without the necessity of receipt of actual formal consent.**

Following is a summary of the amendments. The amendments apply to all of the Predecessor Bonds being remarketed pursuant to this Remarketing Circular and to only the Predecessor Bonds. Reference should be made to Appendix D for specific amendment provisions and the authority therefor.

1.     The definition of "Favorable Bond Counsel's Opinion" will be amended to provide that in lieu of the opinion that the remarketing will not adversely affect the exemption of the interest on the Fixed Rate Bonds from federal and state income taxation (subject to customary exceptions), Bond Counsel may provide an opinion to the

7

effect that the interest on the Fixed Rate Bonds is excluded from gross income for federal and state income tax purposes (subject to customary exceptions).

2. In the event that certain structural changes to debt service are made in the conversion to fixed rate, the Supplements require that the converted Securities meet the requirements for issuance as new bonds of the corresponding parity and for the corresponding purpose under the Bond Ordinance. This requirement will not be required in connection with any remarketing of the Predecessor Bonds that is completed prior to September 30, 2008, but only if the City certifies, in a manner acceptable to Bond Counsel at the time of such remarketing, that such lack of compliance is not materially adverse to the Holders of all outstanding Bonds of the Water Supply System.

3. The Supplements require that the interest rate in remarketings, subject to certain exceptions not applicable to a Fixed Rate remarketing, shall be determined by the Remarketing Agent as the interest rate that in the judgment of the Remarketing Agent would allow such Securities to be sold at par plus accrued interest to the purchase date, under prevailing market conditions. The amendment will allow the Predecessor Bonds to be remarketed at a net premium, provided that the par amount thereof may not increase.

4. In the event that notice of Mode Change or notice of optional redemption is sent to Holders of the Predecessor Bonds, but the Mode Change or the optional redemption is not consummated on the date specified in the original notices, the amendments shorten the period for giving a subsequent notice of Mode Change or optional redemption. The amendments provide that in such a situation, if the Finance Director again elects to change the Mode for the Predecessor Bonds to the Fixed Rate Mode within 30 days of the initial Mode Change Date and, in connection therewith, optionally redeem a portion of the Predecessor Bonds, his/her election shall be effective if he/she delivers to the Holders of the Predecessor Bonds, the Tender Agent, and each of the other Notice Parties, simultaneously, not later than the 3rd day next preceding the new Mode Change and optional redemption date, a subsequent notice of Mode Change and optional redemption stating that such Mode Change Date is the Purchase Date and the redemption date, as applicable. In such circumstances the new Mode Change Date and optional redemption date for the 2001 Predecessor Bonds may be any Business Day, rather than an Interest Payment Date.

**Related Interest Rate Swaps**

In connection with the remarketing of the Predecessor Bonds, the City has executed three (3) fixed-to floating interest rate swaps (the "Mirror Swaps"), which will be effective on the Conversion Date. The purpose of the Mirror Swaps is to offset three (3) floating-to-fixed rate swaps related to the Predecessor Bonds. Two swaps related to the 2001 Predecessor Bonds will be terminated upon conversion of the 2001 Predecessor Bonds to the Fixed Rate Mode. The 2001 Predecessor Bonds will have two (2) remaining swaps which terminate July 1, 2026 and July 1, 2029 (the "2001 Existing Swaps"). The 2005 Predecessor Bonds have one (1) remaining related swap which terminates July 1, 2035 (the "2005 Existing Swap" and together with the 2001 Existing Swaps the "Existing Swaps"). The Mirror Swaps have been executed with the same counterparty as on the Existing Swaps and the notional amounts and amortization of the Mirror Swaps exactly match the notional amounts and amortization of the Existing Swaps. Under the Mirror Swaps, the City will receive a fixed rate from the respective swap provider and pay a floating rate based on the SIFMA Index to the swap provider related to the Mirrors Swaps. Under the Existing Swaps, the City currently pays a fixed rate to the swap provider and receives a floating rate based on the SIFMA Index from the swap provider. The floating rate receipts of the City under the Existing Swaps and floating rate payments made by the City under the Mirror Swaps are expected to completely offset each other. The Mirror Swap related to the 2001 Existing Swap which terminates July 1, 2026 will not embed an optional termination provision to offset the existing counterparty owned optional termination provision on the Existing Swap which terminates July 1, 2026. The City will be left with a net fixed rate payment to the respective swap provider which equals the difference between the fixed rate payment made by the City on the Existing Swaps and the fixed rate receipts of the City on each Mirror Swap. The net fixed rate payment will be added to and treated as a part of debt service on the applicable Fixed Rate Bonds. See "INTEREST RATE SWAP AGREEMENTS" for more information on the System's outstanding interest rate swap agreements.

## Sources and Uses of Funds

The sources and uses of funds in connection with the remarketing of the Fixed Rate Bonds are as follows:

| | 2001C Fixed Rate Bonds | | 2005B Fixed Rate Bonds | | Total | |
|---|---|---|---|---|---|---|
| **SOURCES OF FUNDS** | | | | | | |
| Par Amount of Bonds | $ | 190,405,000.00 | $ | 194,900,000.00 | $ | 385,305,000.00 |
| Net Reoffering Premium | | 15,127,438.05 | | 8,575,327.25 | | 23,702,765.30 |
| **TOTAL SOURCES** | $ | 205,532,438.05 | $ | 203,475,327.25 | $ | 409,007,765.30 |
| | | | | | | |
| **USES OF FUNDS** | | | | | | |
| Remarketing Account | $ | 191,942,534.43 | $ | 195,895,081.97 | $ | 387,837,616.40 |
| Termination Payment[1] | | 6,216,000.00 | | - | | 6,216,000.00 |
| Costs of Issuance[2] | | 7,373,903.62 | | 7,580,245.28 | | 14,954,148.90 |
| **TOTAL USES** | $ | 205,532,438.05 | $ | 203,475,327.25 | $ | 409,007,765.30 |

_____

(1) Represents termination payment made by the City to the Swap Counterparty in consideration of the City's termination of two swap agreements with Goldman Sachs, Mitsui Marine Derivative Products, L.P. with respect to the 2001 Predecessor Bonds.

(2) Includes underwriting discount, printing costs, rating agency fees, bond insurance premiums, legal and financial advisory fees and other costs of issuance.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## DEBT SERVICE AND OUTSTANDING INDEBTEDNESS

As of the Conversion Date, there will be $2,307,995,131 aggregate principal amount of Water Supply System Bonds outstanding, consisting of $1,618,370,000 Senior Lien Bonds, $677,365,000 Second Lien Bonds, and $12,260,131 SRF Junior Lien Bonds. The following schedules set forth information with respect to outstanding Water Supply System Bonds, including total outstanding Water Supply System Bonds debt service.

### Water Supply System Revenue Bonds and Revenue Refunding Bonds

| Senior Lien Bonds | Original Principal Amount | Outstanding as of May 14, 2008 |
|---|---|---|
| Water Supply System Revenue & Revenue Refunding Bonds, Series 1993 | $ 193,805,000 | $ 24,725,000 |
| Water Supply System Revenue Refunding Bonds, Series 1995-B | 60,485,000 | 45,480,000 |
| Water Supply System Revenue (Senior Lien) Bonds, Series 1997-A | 215,300,000 | 112,270,000 |
| Water Supply System Revenue (Senior Lien) Bonds, Series 1999-A | 256,340,000 | 6,000,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2001-A | 302,485,000 | 75,110,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2003-A | 234,805,000 | 181,835,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2003-C | 46,355,000 | 30,015,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2003-D | 151,370,000 | 142,300,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2004-B | 163,590,000 | 149,845,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2005-A | 105,000,000 | 105,000,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2005-B | 195,000,000 | 194,900,000[1] |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2005-C | 126,605,000 | 125,185,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2006(A) | 280,000,000 | 280,000,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2006(D) | 146,590,000 | 145,705,000 |
| Total Senior Lien Bonds | $ 2,508,285,000 | $ 1,618,370,000 |
| **Second Lien Bonds** | | |
| Water Supply System Revenue Second Lien Bonds, Series 1995-A | $ 112,445,000 | $ 16,570,000 |
| Water Supply System Revenue Second Lien Bonds, Series 2001-C | 192,290,000 | 190,405,000[1] |
| Water Supply System Revenue Second Lien Bonds, Series 2003-B | 172,945,000 | 58,425,000 |
| Water Supply System Revenue Refunding Second Lien Bonds, Series 2004-A | 77,010,000 | 72,745,000 |
| Water Supply System Revenue Second Lien Bonds, Series 2006(B) | 120,000,000 | 120,000,000 |
| Water Supply System Revenue Refunding Second Lien Bonds, Series 2006(C ) | 220,645,000 | 219,220,000 |
| Total Second Lien Bonds | $ 1,004,320,000 | $ 677,365,000 |
| **SRF Junior Lien Bonds** | | |
| Water Supply System Revenue Bonds, Series 2005-SRF-1 | $ 15,265,000 | $ 6,085,450 |
| Water Supply System Revenue Bonds, Series 2005-SRF-2 | 10,710,000 | 4,607,115 |
| Water Supply System Revenue Bonds, Series 2006-SRF-1 | $6,035,000 | $1,567,566 |
| Total SRF Junior Lien Bonds | $ 32,010,000 | $ 12,260,131[2] |
| **Total Water Supply System Bonds** | $ 3,544,615,000 | $ 2,307,995,131 |

SOURCE: The Department

---

[1]  Reflects redemption of $225,000 of the 2001 Predecessor Bonds and $100,000 of the 2005 Predecessor Bonds on the Conversion Date.

[2]  Original Principal Amount reflects maximum stated amount of State Revolving Fund Bonds issued as part of the State of Michigan's Revolving Loan Program; outstanding amount reflects principal amount of loan by Department.  As the Department draws additional amounts from time to time hereafter, the outstanding principal amounts of such Bonds will correspondingly increase.

# Debt Service Schedule

| Fiscal Year Ending [1] | Outstanding Senior Lien Debt Service [2],[3] | 2005-B Principal | 2005-B Interest [4],[5] | Total Senior Lien Debt Service [4] | Outstanding Second Lien Debt Service [2],[3],[5] | 2001-C Principal | 2001-C Interest [4],[5] | Total Second Lien Debt Service | Total SRF Junior Lien Debt Service [6] | Total System Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | $86,893,297 | $0 | $10,638,228 | $97,531,526 | $25,159,159 | $0 | $10,925,484 | $36,084,643 | $1,540,341 | $135,156,510 |
| 2009 | 97,901,620 | 0 | 12,235,613 | 110,137,232 | 29,162,249 | 480,000 | 12,007,191 | 41,649,440 | 1,731,660 | 153,518,275 |
| 2010 | 95,858,055 | 1,750,000 | 12,235,613 | 109,843,667 | 29,416,298 | 495,000 | 11,988,515 | 41,899,813 | 1,919,847 | 153,663,328 |
| 2011 | 102,191,175 | 1,855,000 | 12,129,069 | 116,175,243 | 29,646,828 | 515,000 | 11,969,179 | 42,131,008 | 1,965,922 | 160,272,173 |
| 2012 | 101,901,600 | 1,940,000 | 12,034,766 | 115,876,366 | 30,144,759 | 325,000 | 12,615,173 | 43,084,932 | 1,961,225 | 160,922,523 |
| 2013 | 101,234,755 | 2,020,000 | 11,936,007 | 115,190,761 | 30,832,679 | 340,000 | 12,596,949 | 43,769,627 | 1,965,891 | 160,926,279 |
| 2014 | 101,610,361 | 2,125,000 | 11,812,789 | 115,548,150 | 30,444,413 | 350,000 | 12,577,832 | 43,372,245 | 1,969,813 | 160,890,207 |
| 2015 | 101,637,861 | 2,225,000 | 11,683,262 | 115,546,124 | 30,417,088 | 365,000 | 12,557,998 | 43,340,085 | 1,968,044 | 160,854,253 |
| 2016 | 101,766,289 | 2,305,000 | 11,569,929 | 115,641,217 | 30,295,900 | 380,000 | 12,534,490 | 43,210,390 | 1,965,638 | 160,817,245 |
| 2017 | 101,762,041 | 2,385,000 | 11,452,337 | 115,599,378 | 30,313,875 | 390,000 | 12,509,978 | 43,213,853 | 1,962,594 | 160,775,824 |
| 2018 | 101,219,129 | 2,465,000 | 11,330,486 | 115,014,615 | 30,863,238 | 415,000 | 12,484,672 | 43,762,910 | 1,963,859 | 160,741,385 |
| 2019 | 92,807,423 | 2,575,000 | 11,167,404 | 106,549,822 | 27,216,200 | 12,510,000 | 12,457,824 | 52,184,024 | 1,964,381 | 160,698,227 |
| 2020 | 92,819,694 | 2,690,000 | 10,997,213 | 106,506,906 | 27,209,975 | 13,235,000 | 11,623,663 | 52,068,638 | 1,964,159 | 160,539,704 |
| 2021 | 92,737,031 | 2,905,000 | 10,819,638 | 106,461,670 | 27,210,275 | 14,025,000 | 10,674,313 | 51,909,588 | 1,963,194 | 160,334,451 |
| 2022 | 92,759,781 | 3,025,000 | 10,628,123 | 106,412,905 | 27,200,813 | 14,865,000 | 9,669,916 | 51,735,729 | 1,966,431 | 160,115,065 |
| 2023 | 93,117,656 | 3,145,000 | 10,428,951 | 106,691,607 | 27,191,063 | 15,750,000 | 8,607,039 | 51,548,101 | 1,958,925 | 160,198,633 |
| 2024 | 92,866,406 | 3,270,000 | 10,222,119 | 106,358,526 | 27,184,975 | 16,690,000 | 7,482,628 | 51,357,603 | 1,965,622 | 159,681,750 |
| 2025 | 92,807,906 | 3,490,000 | 10,007,355 | 106,305,262 | 27,189,425 | 17,690,000 | 6,293,004 | 51,172,429 | 1,966,416 | 159,444,106 |
| 2026 | 92,951,656 | 3,620,000 | 9,778,376 | 106,350,032 | 27,204,750 | 18,735,000 | 5,034,043 | 50,973,793 | 1,961,413 | 159,285,237 |
| 2027 | 92,816,056 | 3,850,000 | 9,541,188 | 106,207,244 | 27,200,750 | 19,945,000 | 3,702,710 | 50,848,460 | 1,960,613 | 159,016,316 |
| 2028 | 92,882,456 | 3,980,000 | 9,289,234 | 106,151,690 | 27,197,500 | 21,205,000 | 2,392,912 | 50,795,412 | 0 | 156,947,101 |
| 2029 | 92,818,606 | 4,215,000 | 9,029,072 | 106,062,678 | 27,188,750 | 21,700,000 | 1,182,805 | 50,071,555 | 0 | 156,134,233 |
| 2030 | 92,852,475 | 4,425,000 | 8,785,481 | 106,062,956 | 49,408,500 | 0 | 0 | 49,408,500 | 0 | 155,471,456 |
| 2031 | 92,809,119 | 4,630,000 | 8,529,800 | 105,968,918 | 49,404,000 | 0 | 0 | 49,404,000 | 0 | 155,372,918 |
| 2032 | 92,884,750 | 4,840,000 | 8,262,265 | 105,987,015 | 49,399,500 | 0 | 0 | 49,399,500 | 0 | 155,386,515 |
| 2033 | 93,257,625 | 5,050,000 | 7,982,638 | 106,290,263 | 49,390,750 | 0 | 0 | 49,390,750 | 0 | 155,681,013 |
| 2034 | 92,934,100 | 5,255,000 | 7,690,922 | 105,880,022 | 49,843,500 | 0 | 0 | 49,843,500 | 0 | 155,723,522 |
| 2035 | 7,189,600 | 114,865,000 | 7,387,351 | 129,441,951 | 5,980,000 | 0 | 0 | 5,980,000 | 0 | 135,421,951 |
| 2036 | 0 | 0 | 0 | 0 | 123,375,000 | 0 | 0 | 123,375,000 | 0 | 123,375,000 |
| Total | $2,587,288,520 | $194,900,000 | $289,605,225 | $3,071,793,744 | $1,002,692,209 | $190,405,000 | $213,888,318 | $1,406,985,527 | $38,585,928 | $4,517,365,200 |

(1)  Amounts due July 1 are shown as debt service for the preceding Fiscal Year ending June 30 (the amounts actually required to be set aside in that Fiscal Year). For example, debt service payments due July 1, 2008 are shown in the Fiscal Year ending June 30, 2008. All figures are net of capitalized interest.

(2)  Net of interest on the Predecessor Bonds, including for Fiscal Year 2008. See footnote (5) below.

(3)  Debt service on variable rate bonds with interest rate swap agreements is included at the fixed rate to be paid under the related swap agreement. There is no unhedged variable rate debt outstanding. Does not include liquidity fees.

(4)  All interest figures include the estimated impact of net swap payments. See "PLAN OF REMARKETING – Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS – Interest Rate Swaps Related to the Remarketed Bonds" for more information.

(5)  Reflects interest on the Predecessor Bonds at a fixed interest rate payable by the City under the Existing Swaps until March 1, 2008. As a result of recent developments in the bond insurance industry discussed herein, from March 1, 2008, until the conversion to a Fixed Rate, interest on such Predecessor Bonds was the approximate average variable rate borne by such Predecessor Bonds. Debt Service on the Fixed Rate Bonds after the Conversion Dates includes the net fixed payment by the City under the Mirror Swaps; see "INTRODUCTION - Recent Developments in the Bonds Insurance Industry," "PLAN OF REMARKETING - Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS - Interest Rate Swaps Related to the Remarketed Bonds" for more information.

(6)  Based on projected drawdown and expenditure of SRF-funded projects.

NOTE: Totals may not add due to rounding.

SOURCE: The Department

# INTEREST RATE SWAP AGREEMENTS

In accordance with its Swap Management Plan adopted November 26, 2002, the City uses interest rate swaps as part of prudent fiscal management to limit its interest rate exposure and to lower its overall cost of borrowing. The City is currently a party to a number of separate interest rate swap agreements that were entered into in conjunction with the issuance of certain variable rate Water Supply System Bonds, or in anticipation of Water Supply System Bonds expected to be issued prior to the effective date of the swap. Arrangements between the City and its swap counterparties do not alter the City's obligation to pay the principal of and interest on such Water Supply System Bonds.

Net payments received by the City from the swap counterparty under each swap agreement constitute Revenues under the Bond Ordinance. The periodic net interest payments made by the City to the counterparty under each swap agreement, and any termination payment that may be payable by the City to the counterparty upon early termination of the swap agreement, constitute Ancillary Obligations of the City under the Bond Ordinance. The Bond Ordinance permits the City to secure Ancillary Obligations by a lien on Pledged Assets having the same or a lower priority as the lien securing the related Water Supply System Bonds; provided, however, that any lien securing Ancillary Obligations in respect of Senior Lien Bonds is subject to the rights of the holders of the City's outstanding Water Supply System Revenue Second Lien Bonds, Series 1995-A, except to the extent that such Ancillary Obligations arise in connection with a Financial Facility acquired to fund any portion of the Reserve Account or to be substituted for cash therein. The City has secured its Ancillary Obligations under all current swap agreements listed in the following chart by a lien on Pledged Assets of the same priority as the lien securing the related Water Supply System Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Priority of Lien and Payment Status."

The chart set forth on the following page provides a brief description of the principal features of each current interest rate swap agreement related to outstanding or anticipated Water Supply System Bonds to which the City is a party. See also Note 10 in Appendix B – "Audited Financial Statements of the Water Fund of the City of Detroit, Michigan."

## Interest Rate Swaps Related to the Remarketed Bonds

Until recent market credit events occurred, the floating rate received by the City under the Existing Swaps generally approximated the floating rate owed by the City on the related Predecessor Bonds, so that the swaps successfully hedged the City's interest rate exposure. As a result of recent market events, however, the Existing Swaps have not provided the City with a nearly complete hedge against interest rate volatility.

In connection with the remarketing of the 2001 Predecessor Bonds and the 2005 Predecessor Bonds, the City has executed three (3) fixed-to-floating interest rate Mirror Swaps, which will be effective on the Conversion Date, the purpose of which is to offset the effects of the floating-to-fixed rate payments of the Existing Swaps related to the 2001 Predecessor Bonds and the 2005 Predecessor Bonds. The Mirror Swap related to the 2001 Existing Swap which terminates July 1, 2026 will not embed an optional termination provision to offset the existing counterparty owned optional termination provision on the Existing Swap which terminates July 1, 2026. Additionally, the City has terminated two swaps with Goldman Sachs, Mitsui Marine Derivative Products, L.P., related to the 2001 Predecessor Bonds, effective on the Conversion Date. See "PLAN OF REMARKETING – Related Interest Rate Swaps" herein for more information.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

# CITY OF DETROIT MICHIGAN – Water Supply System Bonds
## Summary of Outstanding Interest Rate Swap Agreements

| Related Bond Series | Water Forward Starting SIFMA Series 2001C (2) | Water Forward Starting 2001C (Merrill Swap) (2) | *Series 2001C (1) | *Series 2001C Mirror Swap | Series 2001C | Series 2003C | Series 2005D | Series 2006A | Series 2006B | *Series 2005B | *Series 2005B Mirror Swap | Water Forward Starting SIFMA (1) | Water Forward Starting SIFMA (1) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Notional Amount | $76,510,000 | $76,510,000 | $114,390,000 | $113,360,000 | $113,360,000 | $4,335,000 | $151,370,000 | $77,010,000 | $163,590,000 | $195,000,000 | $195,000,000 | $150,000,000 | $50,000,000 |
| Current Notional Amount | $76,510,000 | $76,510,000 | $113,360,000 | $113,360,000 | $113,360,000 | $4,335,000 | $149,655,000 | $77,000,000 | $158,490,000 | $195,000,000 | $195,000,000 | $150,000,000 | $50,000,000 |
| Termination Date(s) | 1-Jul-29 | 1-Jul-29 | 1-Jul-26 | 1-Jul-26 | 1-Jul-26 | July 1, 2013 and July 1, 2014 | 1-Jul-33 | 1-Jul-25 | 1-Jul-23 | 1-Jul-35 | 1-Jul-35 | 1-Jul-39 | 1-Jul-39 |
| Termination Exercise Provisions | The City can terminate with five days written notice. | Counterparty can terminate at par after January 1, 2010 if SIFMA averages 7.00% or higher for a consecutive 180 day period | The City can terminate with five days written notice. Termination of this Mirror Swap requires simultaneous termination of original swap | None | None | None | Counterparty can exercise after July 2, 2011 if SIFMA averages 7.00% or higher for a consecutive 180 day period | Counterparty can exercise after July 1, 2005 if SIFMA averages 7.00% or higher for a consecutive 180 day period | Counterparty can exercise after July 1, 2005 if SIFMA averages 7.00% or higher for a consecutive 180 day period | The City can terminate with five days written notice | The City can terminate with five days written notice. Termination of this Swap requires simultaneous termination of original swap | The City can terminate with five days written notice | The City can terminate with five days written notice |
| Type of Swap | Floating to Fixed | Fixed to Floating | Fixed to Floating | Floating to Fixed | Fixed to Floating | Floating to Fixed | Fixed to Floating Swaption | Fixed to Floating Swaption | Fixed to Floating Swaption | Floating to Fixed | Fixed to Floating | Floating to Fixed | Floating to Fixed |
| Rate Paid By Counterparty | SIFMA | 3.998% | 3.498% | SIFMA | 4.90% | CPI plus constant rate (between 1.14% and 1.16%) | 4.06% | 3.94% | 3.845% | SIFMA | 3.652% | SIFMA | SIFMA |
| Rate Paid by City | 4.8687% | SIFMA | SIFMA | 4.71% | SIFMA | Between 3.87% and 4.00% | SIFMA | SIFMA | SIFMA | 3.652% | SIFMA | 4.932% | 4.932% |
| Counterparty | SBS Financial Products Company, LLC (Merrill Lynch as Credit Support Provider) | Merrill Lynch | Morgan Stanley Capital Services Inc | Morgan Stanley Capital Services Inc | Morgan Stanley Capital Services Inc | Morgan Stanley Capital Services Inc | JPMorgan Chase Bank | JPMorgan Chase Bank | JPMorgan Chase Bank | Morgan Stanley Capital Services Inc | Morgan Stanley Capital Services Inc | Morgan Stanley Capital Services Inc | SBS Financial Products Company, LLC (Merrill Lynch as Credit Support Provider) |
| Counterparty Rating | A1/A+/A+ (CSP Rating) | A1/A+/A+ | Aa3/AA-/AA- | Aa3/AA-/AA- | Aa3/AA-/AA- | Aa3/AA-/AA- | Aaa/AAA/AA- | Aaa/AAA/AA- | Aaa/AAA/AA- | Aa3/AA-/AA- | Aa3/AA-/AA- | Aa3/AA-/AA- | A1/A+/A+ (CSP Rating) |
| Swap Insurer | None | None | None | None | None | MBIA | MBIA | MBIA | MBIA | None | None | None | None |
| Counterparty Bond Rating Downgrade Event | Merrill Lynch senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Merrill Lynch senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Counterparty's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Counterparty's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Counterparty's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Counterparty's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Counterparty's senior unsecured withdrawn, suspended or < A1/A+ (1 of 2) and collateral agreement not executed in 30 days. | Counterparty's senior unsecured withdrawn, suspended or < A1/A+ (1 of 2) and collateral agreement not executed in 30 days. | Counterparty's senior unsecured withdrawn, suspended or < A1/A+ (1 of 2) and collateral agreement not executed in 30 days. | Counterparty's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Counterparty's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Morgan Stanley's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | Merrill Lynch senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. |
| Bond Rating Downgrade Event | The City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt | City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | City's second lien withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on second lien debt. | City's second lien withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on second lien debt. | City's second lien withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on second lien debt. | City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | MBIA withdrawn, suspended or < Aa3/AA-(1 of 2) or MBIA < Aaa/AAA (1 of 2) and fails to pay claim greater than $20,000,000. | MBIA withdrawn, suspended or < Aa3/AA-(1 of 2) or MBIA < Aaa/AAA (1 of 2) and fails to pay claim greater than $20,000,000. | MBIA withdrawn, suspended or < Aa3/AA-(1 of 2) or MBIA < Aaa/AAA (1 of 2) and fails to pay claim greater than $20,000,000. | City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. | City's senior unsecured withdrawn, suspended or < Baa3/BBB-(1 of 2) or fails to have any rating on senior unsecured debt. |
| Bond Rating Downgrade Remedies | None | None | None | None | None | The City must provide third party guarantee rated Aa3/AA- by Moody's or S&P, post acceptable collateral, or provide S&P-Moody ratings of at least A or A1 for senior debt. | The City must provide third party guarantee rated Aa3/AA- by Moody's or S&P, post acceptable collateral, or provide S&P-Moody ratings of at least A or A1 for senior debt. | The City must provide third party guarantee rated Aa3/AA- by Moody's or S&P, post acceptable collateral, or provide S&P-Moody ratings of at least A or A1 for senior debt. | The City must provide third party guarantee rated Aa3/AA- by Moody's or S&P, post acceptable collateral, or provide S&P-Moody ratings of at least A or A1 for senior debt. | None | None | None | None |
| **Lien Status of:** | | | | | | | | | | | | | |
| Swap Payments | Second Lien | Second Lien | Second Lien | Second Lien | Second Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien |
| Termination Payments | Second Lien | Second Lien | Second Lien | Second Lien | Second Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | Senior Lien | TBD | TBD |

(1) These Swaps became effective July 1, 2011.

(2) These Swaps become effective March 1, 2010.

* See "INTEREST RATE SWAP AGREEMENTS" – Interest Rate Swaps Related to the Remarketed Bonds" herein. Floating-to-fixed rate payments of the Existing Swaps will be offset by Mirror Swaps that have been executed in connection with the remarketing of the Remarketed Bonds. (The Mirror Swaps related to the Series 2001C (Existing Swap) and Morgan Stanley will not embed an optional termination provision to effect the existing counterparty-owned optional termination provision on the Existing Swap.)

# SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS

## Nature of Obligations

Water Supply System Bonds and Ancillary Obligations are self-liquidating obligations of the City, payable solely from the Pledged Assets under the Bond Ordinance. "Ancillary Obligations" are obligations incurred by the City with respect to particular Water Supply System Bonds and consist of Hedge Obligations and Reimbursement Obligations. Hedge Obligations are payment obligations under any hedge agreements, such as the periodic net payments and any termination payments that the City is required to make under interest rate swap agreements. Reimbursement Obligations are repayment obligations under any credit enhancement and liquidity facilities, such as bond insurance, letters of credit, interest rate swap insurance and standby bond purchase agreements. The fees and expenses payable by the City in connection with such hedge agreements, credit enhancement and liquidity facilities ("Ancillary Obligation Fees and Expenses") are treated separately from payments on Water Supply System Bonds and Ancillary Obligations under the Bond Ordinance and have a different payment priority, as described under "Priority Lien and Payment Status" below.

## Revenues, Net Revenues and Pledged Assets

The Bond Ordinance defines "Revenues" as the revenues of the City from the Water Supply System construed in accordance with the Act, and includes amounts receivable by the City under any interest rate swaps and hedge agreements in connection with Water Supply System Bonds, including any net payments and termination payments payable to the City, and income earned and gain realized from investment of amounts in the various funds and accounts established under the Bond Ordinance, other than the Construction Fund for any fiscal year earnings on the Construction Fund are not credited to the Receiving Fund by the Board. "Net Revenues" are defined as all Revenues except those transferred to the Operation and Maintenance Fund.

"Pledged Assets" under the Bond Ordinance consist of:

- Net Revenues;

- Funds and accounts established by the Bond Ordinance (except the Operation and Maintenance Fund and the Construction Fund) and investments of amounts credited to such funds and accounts; and

- Any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not Net Revenue.

## Priority of Lien and Payment Status

Water Supply System Bonds are secured under the Bond Ordinance in accordance with their relative priorities by a statutory lien on Pledged Assets, as described below. The Bond Ordinance permits the City to secure Ancillary Obligations by a lien on Pledged Assets having the same or a lower priority than the lien securing the particular Water Supply System Bonds to which the Ancillary Obligations relate. Ancillary Obligation Fees and Expenses have a higher payment status than Water System Bonds and Ancillary Obligations, as described below.

- All Ancillary Obligation Fees and Expenses are paid from Revenues in the Operation and Maintenance Fund on the same basis as operating and administrative fees and expenses of the System, with the result being that they are paid before debt service on the Water Supply System Bonds and before Ancillary Obligations.

- Senior Lien Bonds and Ancillary Obligations secured on a parity (including regularly scheduled net payments and any termination payments by the City under interest rate swap agreements related to Senior Lien Bonds, and reimbursement payments under liquidity facilities, bond insurance and swap insurance policies related to Senior Lien Bonds) are secured by a first lien on Pledged Assets and rank first in the order of payment from Net Revenues; provided, that any lien securing Ancillary Obligations in respect of Senior Lien Bonds shall be subject to the rights of the holders of the City's outstanding Water Supply System Revenue Second Lien Bonds, Series 1995-A, except to the extent that such Ancillary Obligations arise in connection with a Financial Facility acquired to fund any portion of the Reserve Account or to be substituted for cash therein.

14

- Junior Lien Bonds include all Water Supply System Bonds issued under the Bond Ordinance other than Senior Lien Bonds. To date, the City has issued two priorities of Junior Lien Bonds:

  Second Lien Bonds and Ancillary Obligations secured on a parity therewith are secured by a lien on Pledged Assets that is senior to the liens securing all other Junior Lien Bonds and second only to the Senior Lien Bonds and their parity secured Ancillary Obligations, and rank second in order of payment from Net Revenues.

  SRF Junior Lien Bonds have the lowest priority of lien on Pledged Assets, junior to the liens securing the Senior Lien Bonds and the Second Lien Bonds and their respective parity secured Ancillary Obligations and rank last in order of payment from Net Revenues.

**Bond Ordinance Flow of Funds**

In accordance with the requirements of the Act and the City Charter, the Bond Ordinance establishes certain funds for the System, separate from all other funds of the City. All Revenues are set aside as collected and credited to the Receiving Fund. As received, amounts credited to the Receiving Fund shall be transferred *seriatim* into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been transferred to the preceding fund or account:

*First: To the Operation and Maintenance Fund,* a sum sufficient to provide for the payment of the next succeeding month's expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order.

*Second: To the Senior Lien Debt Service Account,* an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for all Senior Lien Bonds and parity secured Ancillary Obligations as of the first day of such month.

*Third: To the Senior Lien Bond Reserve Account,* an amount that, when added to all other amounts then on deposit therein, shall equal the Reserve Requirement of Senior Lien Bonds.

*Fourth: To the Interest and Redemption Fund* established for each priority of Junior Lien Bonds, beginning with the Second Lien Bonds and continuing in descending order of Priority of Lien to, and including, the SRF Junior Lien Bonds:

- To the Debt Service Account established for such Priority of Lien, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Lien Bonds and parity secured Ancillary Obligations of such Priority of Lien, as of the first day of such month; and

- To the Reserve Account, if any, established for such Priority of Lien, an amount that, when added to all other amounts then on deposit therein, shall equal the Reserve Requirement for such Priority of Lien of Junior Lien Bonds.

*Fifth: To the Extraordinary Repair and Replacement Reserve Fund,* the amount of the Extraordinary Repair and Replacement Minimum Requirement so long as the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement, except that an amount withdrawn from such Fund pursuant to the Bond Ordinance shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal; and

*Sixth: To the Improvement and Extension Fund,* such amount, if any, that the Board of Commissioners may deem advisable; provided that no amount shall be deposited therein or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid.

The use and application of amounts in the Funds and Accounts established by the Bond Ordinance is set forth in Appendix C – "Bond Ordinance."

15

**Reverse Flow of Funds**

If amounts in the Receiving Fund are insufficient to provide for the current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including the Reserve Accounts, if any, therein) then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund, and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and Maintenance Fund, and second to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

**Reserve Accounts and Reserve Requirements**

The Bond Ordinance establishes a Senior Lien Bond Reserve Account and a Second Lien Bond Reserve Account, and provides that no Reserve Account is established for SRF Junior Lien Bonds. Under the Bond Ordinance, Reserve Accounts may be established by supplemental action of the Finance Director for other Junior Lien Bonds, but no Junior Lien Bonds other than Second Lien Bonds and SRF Junior Lien Bonds have been issued to date. Amounts in a Reserve Account may be used solely for the payment of the principal (and premium, if any) of and interest on the Water Supply System Bonds and Ancillary Obligations of the same Priority of Lien for which such Reserve Account was established, as to which there would otherwise be a default.

The Reserve Requirement for Senior Lien Bonds is the maximum Annual Debt Service on all Senior Lien Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Internal Revenue Code of 1986, as amended (the "Code"). The Reserve Requirement for Second Lien Bonds is the maximum Annual Debt Service on all Second Lien Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code. If a Reserve Account is established for any other priority of Junior Lien Bonds, the Reserve Requirement for such other Junior Lien Bonds shall be the amount set forth in the supplemental action establishing such Reserve Account, and if no amount is set forth, shall be the average Annual Debt Service on all Junior Lien Bonds of the same Priority of Lien then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code.

Concurrently with the issuance of Water Supply System Bonds of a priority for which a Reserve Account has been or is being established, the Bond Ordinance requires there be credited to such Reserve Account the amount that, added to the amount on deposit in such account or credited thereto, equals the Reserve Requirement for the Bonds then to be issued and all Bonds of the same priority then outstanding. In connection with remarketings contemplated herein, the Senior Lien Bond Reserve Account and the Second Lien Bond Reserve Account will be revalued, and any deposits necessary to satisfy the respective Reserve Requirement will be made at the time of the remarketing. The Bond Ordinance permits the use of Credit Enhancement to fund any Reserve Account or to substitute for amounts on deposit in a Reserve Account, if the provider is rated in the highest rating category of each Rating Agency then rating the Bonds having the benefit of such Reserve Account, and the City receives an opinion of nationally recognized bond counsel to the effect that such Credit Enhancement will not adversely affect the tax-exempt status of interest on any Bonds. There is no Bond Ordinance requirement that the rating of the Credit Enhancement which has been properly credited to a reserve Account be maintained. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry" herein.

As of the Conversion Date the Reserve Requirement for the Senior Lien Bond Reserve Account will be $129,441,951 and available funding includes:

1. Cash: $10,086,822

2. Forward Supply Agreements in the form of commercial paper as follows:

(a) Morgan Stanley Forward Supply Agreement dated November 1, 2001 that is earning 6.012%, has a value of $22,769,343.35 and matures on July 1, 2023.

(b) Bank of America Forward Supply Agreement dated March 8, 1999 that is earning 5.862%, has a value of $28,304,247.14 and matures on July 1, 2023.

3. Credit Enhancement in the form of surety policies provided by the following surety bond providers in the amounts noted:

(a) Financial Guaranty Insurance Company ("FGIC") surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $16,729,163 and with a termination date of July 1, 2029.

16

(b) FGIC surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $15,954,125 and with a termination date of July 1, 2033.

(c) MBIA Insurance Corporation ("MBIA") surety policy unconditionally guarantying the payment of the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $24,970,000 and with a termination date equal to the earlier of July 1, 2034 or the date on which the Series 2003(A) Bonds are no longer outstanding.

(d) FGIC surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $4,000,000 and with a termination date of July 1, 2035.

(e) Financial Security Assurance Inc. ("FSA") surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $3,000,000 and with a termination date equal to the earlier of July 1, 2034 or the date on which the Series 2006(A) and Series 2006(D) Bonds are no longer outstanding.

(f) MBIA surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $29,000,000 and with a termination date equal to the earlier of July 1, 2027 or the date on which the City has made all payments required on senior lien water revenue bonds.

As of the Conversion Date the Reserve Requirement for the Second Lien Bond Reserve Account will be $49,414,278 and available funding includes:

1. Cash: $3,600,000

2. Credit Enhancement in the form of surety policies provided by the following surety bond providers in the amounts noted:

(a) FGIC surety policy unconditionally guarantying the payment of principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $6,815,645 and with a termination date of July 1, 2033.

(b) MBIA surety policy unconditionally guarantying the payment of the payment of principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $29,000,000 and with a termination date equal to the earlier of July 1, 2032 or the date on which the Series 2003(B) Bonds are no longer outstanding.

(c) FSA surety policy unconditionally guarantying the payment of principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $10,000,000 and with a termination date equal to the earlier of July 1, 2036 or the date on which the Series 2006(B) and Series 2006(C) Bonds are no longer outstanding.

The table below summarizes the funding of the Reserve Requirements for the Senior Lien Reserve Account and Second Lien Reserve Account as of the Conversion Date.[1]

|  | Senior Lien Bonds | Second Lien Bonds | Aggregate System |
|---|---|---|---|
| Reserve Requirement | $129,441,951 | $49,414,278 | $178,856,229 |
| Funding Amounts: |  |  |  |
| Cash | 10,086,822 | 3,600,000 | 13,686,822 |
| Forward Supply Agreements | 51,073,590 | 0 | 51,073,590 |
| Credit Enhancement | 93,653,288 | 45,815,645 | 139,468,933 |
| Total Funding Amounts | $154,813,700 | $49,415,645 | $204,229,345 |

(1) Represents funding requirements and amounts as of the Conversion Date (as of May 14, 2008).

As noted, certain Reserve Account requirements currently are satisfied through surety policies issued by MBIA, FGIC and FSA. The ratings of MBIA and FGIC have recently been downgraded. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry" herein. Although the Bond Ordinance requires that Credit Enhancement used to fund a Reserve Account be held in the highest rating category of each rating agency at the time of its acquisition, there is no requirement that such rating be maintained. Accordingly, all Credit Enhancements are valued at their full face value for purposes of determining satisfaction of the applicable Reserve Account Requirement, regardless of their rating. If the Credit Enhancement were determined to have no value, as for example, if a court made such a determination in connection with the dissolution of the provider, then the City would be required to replenish the applicable Reserve Account as described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Bond Ordinance Flow of Funds" and in Appendix C – "Bond Ordinance."

**Rate Stabilization Fund**

       The Bond Ordinance authorizes the City to establish a Rate Stabilization Fund, the purpose of which is to enable the City to set aside Prior Revenues to augment Revenues in future years in order to satisfy the requirements of the Bond Ordinance with respect to rate covenants and the Additional Bonds Tests (as hereinafter defined); provided, however, that rates still must be set so as to produce Net Revenues, exclusive of any transfer from the Rate Stabilization Fund, in an amount at least equal to the principal of and interest on all Senior Lien and Second Lien Bonds coming due during any fiscal year in which monies are transferred from the Rate Stabilization Fund.

       "Prior Revenues" are Revenues of the System that, in the fiscal year of receipt, remain in the Receiving Fund after all required deposits described above under "Flow of Funds," and are otherwise available to be applied to any lawful purpose of the Water Supply System, and may be deposited into the Rate Stabilization Fund only if (a) such Prior Revenues are deposited in the fiscal year in which they are received or within 90 days after the end of the fiscal year in which they are received, (b) the amount of Prior Revenues deposited into the Rate Stabilization Fund is deducted from the amount of Net Revenue recognized in such fiscal year, and (c) after making such deposit, the amount of Net Revenues recognized in such fiscal year continues to meet the applicable rate coverage requirements of the Bond Ordinance (see "Operating and Rate Covenants" below). Amounts on deposit in the Rate Stabilization Fund are part of the Pledged Assets on which the Bond Ordinance creates a statutory lien to secure payment of all bonds issued on behalf of the System under the Bond Ordinance, in the order of their respective priorities. In addition, amounts on deposit in the Rate Stabilization Fund may be applied for any lawful purpose of the System. Any funding of the Rate Stabilization Fund is at the sole discretion of the Board of Commissioners. To date, the City has not transferred any funds into the Rate Stabilization Fund.

**Operating and Rate Covenants**

       Pursuant to the Act, the City has covenanted under the Bond Ordinance to maintain the System in good repair and working order and to make all needed and proper repairs, replacements, additions and betterments so that the System may at all times be operated properly and advantageously and so that the value and efficiency of the System shall at all times be maintained.

       The Bond Ordinance requires that rates be fixed and revised from time to time as may be necessary to produce the greater of:

    1.   The amounts required to provide for:

        a.   payment of operating and maintenance expenses of the System;

        b.   payment of Indebtedness coming due for the fiscal year;

        c.   creation and maintenance of reserves required by the Bond Ordinance; and

        d.   such other expenditures and funds for the System as the Bond Ordinance may require; and

    2.   The Required Combined Coverage.

       The City has covenanted at all times to fix and maintain rates for services furnished by the System as shall be sufficient to provide for the foregoing and to repay any transfer from the Extraordinary Repair and Replacement Reserve Fund.

       For purposes of the rate covenant, "Required Combined Coverage" is determined by dividing the projected Net Revenues for the fiscal year of calculation by the prescribed Indebtedness coming due during such fiscal year: The coverage requirements for determining Required Combined Coverage for the rate covenant are as follows:

| Priority of Indebtedness: | Percentage: |
|---|---|
| Senior Lien Indebtedness | 120% |
| Second Lien Indebtedness (together with Senior Lien Indebtedness) | 110% |
| SRF Junior Lien Bonds (together with Senior Lien and Second Lien Indebtedness) | 100% |

       The Bond Ordinance defines "Indebtedness" as (i) principal of and interest on Water Supply System Bonds outstanding in the Fiscal Year of calculation, (ii) Reimbursement Obligations, and (iii) amounts payable by the City under a Hedge by reason of the early termination thereof. The City may take into account transfers from the Rate Stabilization Fund in calculating compliance with the rate covenant, but the City shall also comply with the rate covenant by maintaining rate coverage percentages of at least 100% without taking into account any transfers from

the Rate Stabilization Fund. Net fixed swap payments payable by the City under the Mirror Swaps will be treated as interest on the Water Supply System Bonds and will therefore be included in indebtedness for the purposes of the Bond Ordinance.

The Bond Ordinance provides that the interest rate on Water Supply System Bonds that are Variable Rate Securities shall be calculated as 125% of the annualized average daily rate borne by such Variable Rate Securities for the 12 calendar month period ending immediately before the month of calculation, or if such Variable Rate Securities have been outstanding for less than a full fiscal year on the date of calculation, the interest rate shall be calculated as 125% of the average of the BMA Municipal Index (now known as the SIFMA Municipal Index), for the five-year period ending not more than one week before the date of calculation. For purposes of determining if Water Supply System Bonds are Fixed Rate Securities, a rate is "fixed" if the economic effect of the Water Supply System Bond bearing interest at a fixed rate is produced by a Qualified Hedge or by Counterpart Securities (as defined in the Bond Ordinance), and a rate is "variable" if the economic effect of the Water Supply System Bond bearing interest at a variable rate is produced by a Qualified Hedge.

**Additional Bonds**

The City may not incur any obligations payable from Pledged Assets except for Water Supply System Bonds, Ancillary Obligations and Ancillary Obligation Fees and Expenses, and no obligations of the City may be secured by a lien on Pledged Assets except as provided in the Bond Ordinance.

*Coverage Requirements.* The coverage requirements for determining the Required Combined Coverage for the issuance of additional Water Supply System Bonds are as follows:

| Priority of Water Supply System Bonds: | Percentage: |
|---|---|
| Senior Lien Bonds | 120% |
| Second Lien Bonds (together with Senior Lien Bonds) | 110% |
| SRF Junior Lien Bonds (together with Senior Lien and Second Lien Bonds) | 100% |

The Sections of the Supplements that require the above coverage requirements to be met for conversion of the Predecessor Bonds from the Weekly Mode to the Fixed Rate Mode under certain circumstances, will be amended prior to the Remarketing of the Fixed Rate Bonds. See "PLAN OF REMARKETING – Amendments" herein.

The Bond Ordinance provides that a coverage percentage shall be established in connection with the issuance of a new priority of Water Supply System Bonds and that such percentage shall not be less than 100. If any additional Water Supply System Bonds are to be issued to refund Outstanding Water Supply System Bonds, the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the refunding Water Supply System Bonds and not the Annual Debt Service on the Water Supply System Bonds to be refunded. "Annual Debt Service" is a defined term in the Bond Ordinance, and reference is be made to Appendix C — "Bond Ordinance" for the definition and the rules for determining Annual Debt Service.

**Enforceability of Rates**

The charges for sewage disposal service are a lien on the respective premises, and the Bond Ordinance provides for certain means of enforcement including the right to shut off and discontinue the supply of water to any premises for the nonpayment of sewage disposal rates when due. The Act provides that the rates charged for services furnished by any public improvement constructed under the Act shall not be subject to supervision or regulation by any State bureau, board, commissioner or other like instrumentality or agency thereof.

*General Authority.* The City may issue additional Water Supply System Bonds of any Priority of Lien for repairs, extensions, enlargements, and improvements to the System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund), refunding all or a part of any Outstanding Water Supply System Bonds and paying the costs of issuing such additional Water Supply System Bonds, including deposits, if any, to be made to any Reserve Account established or to be established for such additional Water Supply System Bonds or any other Water Supply System Bonds if, but only if, there is Required Combined Coverage under either the Projected Net Revenues Test or the Historical Net Revenues Test.

*Projected Net Revenues Test.* For purposes of determining the Required Coverage Requirement, the numerator is the projected Net Revenues of the System for the then current or the next succeeding fiscal year, and the denominator is the maximum composite Annual Debt Service in any fiscal year on Outstanding Water Supply System Bonds and the additional Water Supply System Bonds to be issued.

- Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of the additional Water Supply System Bonds.

- In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of water supply systems.

*Historical Net Revenues Test.* For purposes of determining the Required Coverage Requirement, the numerator is the actual Net Revenues of the System for the immediately preceding audited fiscal year and the denominator is the maximum composite Annual Debt Service in any future fiscal year on Outstanding Water Supply System Bonds and the additional Water Supply System Bonds to be issued.

- Instead of the immediately preceding audited fiscal year, the City may use any audited fiscal year ending not more than sixteen months prior to the date of delivery of such additional Water Supply System Bonds.

- If any change in the rates, fees and charges of the System has been authorized at or prior to the date of sale of such additional Water System Bonds, the Net Revenues for the particular preceding fiscal year shall be augmented by an amount reflecting the effect of such change had the System's billings during such fiscal year been at the increased rates.

- Net Revenues for the particular preceding audited fiscal year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of such additional Water Supply System Bonds and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited fiscal year.

- With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of water supply systems regarding the existence of such conditions.

- Audited financial statements may be relied upon if no augmentation of Net Revenues is required.

*Debt Service Reduction – An Additional Means of Refunding.* The City may issue additional Water Supply System Bonds of any Priority of Lien without regard to the above tests for the purpose of refunding all or part of Water Supply System Bonds then Outstanding and paying costs of issuing such additional Water Supply System Bonds, including deposits which may be made to any Reserve Account established or to be established for such additional Water Supply System Bonds or any other Water Supply System Bonds if, but only if: (i) the combined Annual Debt Service coming due in the current fiscal year and each fiscal year thereafter until maturity on (A) the additional Water Supply System Bonds and (B) giving effect to the refunding, all Outstanding unrefunded Water Supply System Bonds of equal and higher Priority of Lien, is less than (ii) the combined Annual Debt Service coming due in the current fiscal year and each fiscal year thereafter until maturity on all Water Supply System Bonds of an equal and higher Priority of Lien, without giving effect to the refunding.

For a detailed discussion relating to the terms and conditions upon which additional Water Supply System Bonds may be issued, see Appendix C – "Bond Ordinance." The City intends to issue additional Water Supply System Bonds for financing the System's current Capital Improvement Program. Such Water Supply System Bonds may be issued either as Senior Lien Bonds, Second Lien Bonds or SRF Junior Lien Bonds. See "THE CAPITAL IMPROVEMENT PROGRAM."

## Amendments Without Consent

The Bond Ordinance may be amended or supplemented from time to time by a resolution or ordinance of City Council, as required or permitted by law, or by a sale order or other document signed by the Finance Director pursuant to a resolution or ordinance of City Council authorizing such action, without the consent of the Holders of Water Supply System Bonds:

- To issue Water Supply System Bonds of any priority;

20

• To add to the covenants and agreements of the City in the Bond Ordinance contained, other covenants and agreements thereafter to be observed or to surrender, restrict or limit any right or power reserved to or conferred upon the City (including but not limited to the right to issue Water Supply System Bonds or incur other Secured Obligations of, in either case, any priority);

• To make such provisions for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions contained in the Ordinance, or in regard to matters or questions arising under the Ordinance, as the City may deem necessary or desirable;

• To increase the size or scope of the System; and

• To amend or supplement the Bond Ordinance in any respect with regard to Water Supply System Bonds of one or more Priorities of Lien so long as such amendment does not materially adversely affect the Holders of Outstanding Water Supply System Bonds.

The Bond Ordinance provides that no Holders of Water Supply System Bonds of a Priority of Lien shall be "materially adversely affected" for the purposes of the Bond Ordinance by the change of any coverage percentage established for Water Supply System Bonds of any other Priority of Lien, and no amendment of or supplement to the Bond Ordinance that provides for or facilitates the issuance of Water Supply System Bonds or incurs Ancillary Obligations or Ancillary Obligations Fees and Expenses, in either case, of any Priority of Lien shall "materially adversely affect" the Holders of Water Supply System Bonds of any other Priority of Lien for the purposes of the Bond Ordinance so long as such amendment does not change any coverage percentage established for such Priority of Lien or is not an amendment that requires the consent of the Holder of such Water Supply System Bonds because it (i) reduces the aforesaid percentage of Holders of Water Supply System Bonds required to consent to an amendment to the Bond Ordinance, (ii) extends the fixed maturity of such Holder's Water Supply System Bonds or reduces the rate of interest thereon or extends the time of payment of interest, or reduces the amount of the principal or redemption premium thereof, or reduces or extends the time for payment of any premium payable on the redemption thereof or (iii) changes the Priority of Lien of such Water Supply System Bonds or deprives such Holder of the right to payment of such Water Supply System Bonds from Pledged Assets.

**The Bond Ordinance also provides that where bondholder consent to amendment of the Ordinance or Supplement is required in an offering remarketing, such consents shall be considered obtained as if such consents were being solicited under the Ordinance if the offering or remarketing circular or other disclosure document fully discloses the terms of such amendment or supplement, and no actual consent shall be required, and no more than one such disclosure shall be required. See, "PLAN OF REMARKETING – Amendments" and Appendix D – "Amendments to Certain Provisions of the Authorizing Documents" herein.**

So long as the FGIC policies are in effect, any amendment to the Bond Ordinance requiring bondholder consent also requires the consent of FGIC. FGIC also has certain consent rights in its capacity as insurer. So long as BHAC's policies are in effect, any amendment to the Bond Ordinance requiring bondholder consent also requires the consent of BHAC. BHAC also has certain consent rights in its capacity as bond insurer.

**Trustee's Responsibilities**

The City has appointed U.S. Bank National Association, Detroit, Michigan as trustee (the "Trustee") for the purpose of monitoring and enforcing compliance with the provisions of the Act and the Bond Ordinance. The funds and accounts established under the Bond Ordinance are not held by the Trustee, and the Trustee is not responsible for the administration, investment or disbursement of the monies allocated to such funds and accounts.

**Bondholder Rights and Remedies**

The Holder or Holders of Water Supply System Bonds representing in the aggregate not less than 20% of the entire principal amount there of then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the Water Supply System and the proper application thereof. The statutory lien upon Pledged Assets, however, shall not be construed to give the Holders of the Water Supply System Bonds the authority to compel the sale of the Water Supply System or any part thereof. So long as FGIC's policies are in effect, FGIC shall be deemed to be the sole holder of the Fixed Rate Bonds for purposes of this provision. If FGIC's policy is not in effect, BHAC shall be deemed to be the sole holder of the Fixed Rate Bonds for purposes of this provision, so long as BHAC's policy is in effect. See Appendix C – "Bond Ordinance" for additional rights and remedies of Water Supply System Bondholders.

Concurrently with the remarketing of the Predecessor Bonds, Berkshire Hathaway Assurance Corporation ("BHAC") will issue separate bond insurance policies for the 2001-C Fixed Rate Bonds and the 2005-B Fixed Rate Bonds (the "BHAC Insurance Policies") on the respective Conversion Dates, guaranteeing the scheduled payment when due of the principal of and interest on the Fixed Rate Bonds. BHAC's obligation to make payments under the BHAC Insurance Policies is subject to the failure of Financial Guaranty Insurance Corporation to make payments under separate financial guarantee insurance policies issued by FGIC (the "FGIC Policies") concurrently with the issuance of the Predecessor Bonds, for such Predecessor Bonds. See "BOND INSURANCE – Berkshire Hathaway Assurance Corporation Bond Insurance Policies" herein. The FGIC Insurance Policies remain in effect and unconditionally guarantee the payment of that portion of the principal of and interest on the Fixed Rate Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the City. See "BOND INSURANCE – Financial Guaranty Bond Insurance Policies."

## Berkshire Hathaway Assurance Corporation Bond Insurance Policies

Berkshire Hathaway Assurance Corporation (referred to herein as "BHAC") has supplied the following information for inclusion in this Remarketing Circular. No representation is made by the City or the Remarketing Agent as to the accuracy or completeness of this information.

*BHAC Bond Insurance Policies.* Concurrently with the issuance of the Fixed Rate Bonds, BHAC will issue its financial guaranty insurance policy for the Fixed Rate Bonds (collectively, the "BHAC Policy"). The BHAC Policy guarantees the scheduled payment of principal and interest on the Fixed Rate Bonds when due as set forth in the form of BHAC Policy included as Appendix G to this Remarketing Circular. BHAC's obligation to make any payment under the BHAC Policy is subject to the condition precedent contained in the BHAC Policy that a proper claim for payment has been made on the FGIC Insurance Policy and FGIC has failed to pay such claim in the period permitted by the FGIC Insurance Policy for reasons other than a failure to provide proper documentation required by FGIC to pay such claim.

The BHAC Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Laws.

*Berkshire Hathaway Assurance Corporation.* BHAC is a New York stock insurance corporation that writes financial guaranty insurance. BHAC was organized on December 21, 2007, and received its New York Certificate of Authority on December 28, 2007. BHAC is licensed in New York to write financial guaranty insurance, surety insurance and credit insurance. As of April 11, 2008, BHAC was licensed to write financial guaranty insurance in 47 additional states and the District of Columbia.

BHAC's shareholders and their respective percentage of outstanding common stock are as follows: Columbia Insurance Company ("Columbia"), a Nebraska corporation – 51%, and National Indemnity Company, a Nebraska corporation – 49%. Columbia and National Indemnity Company are each indirect, wholly owned subsidiaries of Berkshire Hathaway Inc.

BHAC is subject to the insurance laws and regulations of the State of New York, BHAC's state of domicile. Pursuant to New York's financial guaranty insurance law, financial guaranty insurers are limited to writing financial guaranty insurance and related lines, including surety and credit insurance. In addition, New York's financial guaranty insurance law (i) requires such insurers to maintain a minimum surplus as regards policyholders, (ii) establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as a percentage of surplus as regards policyholders; and (iii) establishes contingency, loss and unearned premium reserve requirements. BHAC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations vary by jurisdiction.

At March 31, 2008, BHAC had surplus as regards policyholders of slightly less than $1,000,000,000, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by the New York Department of Insurance.

Copies of BHAC's most recently published SAP Annual Statement is available upon request to: Berkshire Hathaway Assurance Corporation, 100 First Stamford Place, Stamford, CT 06902, Attention: General Counsel. BHAC's telephone number is (203) 363-5200.

22

*BHAC's Credit Rating.* Standard & Poor's Rating Services ("S&P"), a Division of the McGraw Hill Companies, Inc., has assigned its "AAA" financial strength and financial enhancement ratings to BHAC. S&P has assigned its "AAA" financial enhancement rating to Columbia. The ratings on BHAC are based on a guaranty from Columbia in favor of BHAC. The guaranty issued by Columbia applies to BHAC's policy issued with respect to the Fixed Rate Bonds. Any explanation of these ratings may only be obtained from S&P. The ratings are not a recommendation to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by S&P. Any downward revision or withdrawal of a rating may have an adverse effect on the market price of the Fixed Rate Bonds. BHAC does not guarantee the market price or investment value of the Fixed Rate Bonds nor does it guarantee that the ratings on the Fixed Rate Bonds will not be revised or withdrawn.

In addition, Moody's Investors Service ("Moody's") has assigned its "Aaa" insurance financial strength ratings to BHAC and Columbia. Any explanation of these ratings may only be obtained from Moody's. On April 25, 2008, the date that Moody's assigned its rating to BHAC, BHAC's parent company, Berkshire Hathaway, Inc., maintained an investment in Moody's parent company of approximately 19.6% of the common shares then outstanding. The ratings are not a recommendation to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by Moody's. Any downward revision or withdrawal of a rating may have an adverse effect on the market price of the Fixed Rate Bonds. BHAC does not guarantee the market price or investment value of the Fixed Rate Bonds nor does it guarantee that the ratings on the Fixed Rate Bonds will not be revised or withdrawn.

Neither BHAC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Remarketing Circular or any information or disclosure that is provided to potential purchasers of the Fixed Rate Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to BHAC or the Policy under the heading "BOND INSURANCE – Berkshire Hathaway Assurance Corporation Bond Insurance Policies." In addition, BHAC makes no representation regarding the Fixed Rate Bonds or the advisability of investing in the Fixed Rate Bonds.

## Financial Guaranty Insurance Policies

The financial guaranty insurance policies for the Predecessor Bonds will remain in effect upon their conversion to Fixed Rate Bonds. Recently, S&P, Moody's and Fitch have downgraded their ratings on FGIC. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry" herein.

Financial Guaranty Insurance Company (referred to herein as "Financial Guaranty") has supplied the following information for inclusion in this Official Statement. No representation is made by the City or the Remarketing Agent as to the accuracy or completeness of this information.

The policies issued by Financial Guaranty for the Predecessor Bonds will remain in effect upon conversion of the Predecessor Bonds to the Fixed Rate Mode.

Recently, S&P, Moody's and Fitch have downgraded their ratings on Financial Guaranty. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry" herein.

Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Remarketing Circular or any information or disclosure that is provided to potential purchasers of the Fixed Rate Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the Policies (hereinafter defined) under the heading "BOND INSURANCE" – Financial Guaranty Insurance Policies." In addition, Financial Guaranty makes no representation regarding the Fixed Rate Bonds or the advisability of investing in the Fixed Rate Bonds.

*Financial Guaranty's Ratings.* As of March 31, 2008, the financial strength ratings of Financial Guaranty were as follows: Fitch Ratings - 'BBB', Rating Outlook Negative; Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.-'BB', Outlook Negative; and Moody's Investors Service, Inc. – 'Baa3', under review for possible downgrade. Each rating of Financial Guaranty should be evaluated independently. The ratings reflect the respective rating agencies' current assessments of the insurance financial strength of Financial Guaranty, and further explanations of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the Fixed Rate Bonds, and are subject to revision or withdrawal at any time by the rating agencies. The further downgrade or withdrawal of any of these ratings may have an adverse effect on the market price of the Fixed Rate Bonds. Financial Guaranty does not guarantee the market price or investment value of the Fixed Rate Bonds, nor does it guarantee that the ratings on the Bonds will not be reduced, withdrawn or put on review for possible downgrade.

23

Financial Guaranty's financial strength ratings have been an integral part of its business, since the value of the financial guaranty and insurance products sold by Financial Guaranty has generally been a function of the rating applied to obligations insured by Financial Guaranty. **Recent ratings downgrades, reflected above, and the watches referred to above have adversely impacted the market price of the Fixed Rate Bonds, Financial Guaranty's ability to compete and otherwise to engage in its business, and its results of operations and financial condition, and will continue to have such adverse effects unless FGIC's ratings are restored (as to which Financial Guaranty can give no assurance).**

*Payments Under the Policies.* Concurrently with the issuance of the Predecessor Bonds, Financial Guaranty issued its bond insurance policies for such Predecessor Bonds (the "FGIC Policies"). The FGIC Policies unconditionally guarantee the payment of that portion of the principal or accreted value (if applicable) of and interest on the Fixed Rate Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the issuer of the Fixed Rate Bonds (the "Issuer"). Financial Guaranty will make such payments to U.S. Bank Trust Association, or its successor as agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the FGIC Policies) from an owner of Fixed Rate Bonds or the trustee or paying agent (if any) of the nonpayment of such amount by the Issuer. The Fiscal Agent will disburse such amount due on any Fixed Rate Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in Financial Guaranty. The term "nonpayment" in respect of a Fixed Rate Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a Fixed Rate Bond which has been recovered from such owner pursuant to the United States bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

The FGIC Policies are non-cancelable by Financial Guaranty. The FGIC Policies cover failure to pay principal (or accreted value, if applicable) of the Fixed Rate Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the Fixed Rate Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The FGIC Policies also cover the failure to pay interest on the stated date for its payment. In the event that payment of the Fixed Rate Bonds is accelerated, Financial Guaranty will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, Financial Guaranty will become the owner of the Bond, appurtenant coupon or right to payment of principal of and interest on such Bond and will be fully subrogated to all of the Bondholder's rights thereunder.

The FGIC Policies do not insure any risk other than Nonpayment by the Issuer, as defined in the FGIC Policies. Specifically, the FGIC Policies do not cover: (1) payment or acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure Fixed Rate Bonds, Financial Guaranty was granted certain rights under the Bond Documentation. The specific rights granted to Financial Guaranty in connection with its insurance of the Fixed Rate Bonds may be set forth in the description of the principal legal documents appearing elsewhere in the Remarketing Circular for the applicable Predecessor Bonds, and reference should be made thereto.

The FGIC Policies are not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*Financial Guaranty Insurance Company.* Financial Guaranty is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. Financial Guaranty is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

Financial Guaranty is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At December 31, 2007, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each was as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or

24

affiliates is obligated to pay any debts of Financial Guaranty or any claims under any insurance policy, including the Policy, issued by Financial Guaranty.

Financial Guaranty is subject to the insurance laws and regulations of the State of New York, where Financial Guaranty is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, Financial Guaranty is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At December 31, 2007, Financial Guaranty had net admitted assets of approximately $4,298 billion, total liabilities of approximately $4,038 billion, and total capital and policyholders' surplus of approximately $260 million, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The audited consolidated financial statements of Financial Guaranty and subsidiaries, on the basis of U.S. generally accepted accounting principals ("GAAP"), as of December 31, 2007 and December 31, 2006, which will be filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRS"), are hereby included by specific reference in this Remarketing Circular. Any statement contained herein under the heading "BOND INSURANCE – Financial Guaranty Insurance Policies", or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by Financial Guaranty with such NRMSIRS, and shall not be deemed, except as so modified or superseded, to constitute a part of this Remarketing Circular. All financial statements of Financial Guaranty (if any) included in documents filed by Financial Guaranty with the NRMSIRs subsequent to the date of this Remarketing Circular and prior to the termination of the remarketing of the Fixed Rate Bonds shall be deemed to be included by specific reference into this Remarketing Circular and to be a part hereof from the respective dates of filing of such documents.

**The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although Financial Guaranty prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to Financial Guaranty's audited SAP financial statements.**

Financial Guaranty's most recently published GAAP and SAP financial statements are available on Financial Guaranty's website at http://www.fgic.com/investorrelations/financialreports/or upon request to Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. Financial Guaranty's telephone number is 212.312.3000. Reference is made to those financial statements, including the notes thereto (in particular, Notes 2,8,11 and 23 to the GAAP financial statements for the year ended December 31, 2007) for important information concerning Financial Guaranty.

Specimens of the bond insurance policies issued by Financial Guaranty in connection with the issuance of the Predecessor Bonds and as set forth in the applicable Official Statement for the respective Predecessor Bonds are hereby incorporated herein by reference: the "Appendix D – Specimen Bond New Issue Insurance Policy and Municipal Bond Debt Service Reserve Fund Policy" as to the 2001 Bonds and the "Appendix E – Specimens of Financial Guaranty Insurance Policy and the Debt Service Reserve Policy" as to the 2005 Bonds.

# THE WATER AND SEWERAGE DEPARTMENT

## Organization

The Water Supply System is owned by the City and is operated, managed and accounted for by the City as a separate enterprise fund (the "Water Fund") through the Department. The Department was established under the City Charter and is empowered to supply water within and outside the City. The Department is governed by a seven-member Board of Water Commissioners (the "Board") appointed by the Mayor and operates out of its own 20-story office building in downtown Detroit.

The City Charter provides that the Board shall periodically establish equitable rates for retail and wholesale water supply services to be paid by occupants of homes or buildings using water and by any person, municipality or public or private agency making a wholesale purchase of water. Such rates are established with the concurrence of the City Council. See "FINANCIAL PROCEDURES - Rates". The Board authorizes and executes all service and construction contracts. Certain contracting and other policy-making powers of the Board are subject to the approval or rejection of the City Council and the approval or veto of the Mayor.

Sewage disposal service to the residents of the City and to a substantial portion of the Water Supply System service area outside the City is also provided by the City through the Department. However, the sewage system is operated, managed and accounted for as a separate enterprise fund of the City apart from the Water Fund.

## The Board

The members of the Board are appointed by and serve at the pleasure of the Mayor. The members serve four-year terms and the terms are staggered so that not more than two members' terms expire each year. Board members must be citizens of the United States and residents of Michigan. The City Charter provides that at least four members of the Board are residents of the City. At present the Board consists of four City residents plus one member each from Oakland County, western Wayne County (not including the City) and Macomb County.

The current members of the Board are as follows (dates in parentheses are dates of original appointment to the Board):

*Mary E. Blackmon, President (1989).* Mrs. Blackmon was elected President in January 2003. She is a retiree of Ameritech, where she served as a Director of Public Relations and Associate Director of Urban and Civic Affairs. She is a current member of the Wayne County Regional Educational Service Agency Board of Education, where she has served since 1982. Mrs. Blackmon also served for 10 years as a member of the Detroit Board of Education. She has served on several committees for the Southeast Michigan Council of Governments (SEMCOG), where she is a Vice President. A graduate of Leadership Detroit, Mrs. Blackmon remains active in a number of civic and community organizations

*Marilynn E. Gosling (1995).* Ms. Gosling was elected Vice President in January 2003. She was a member of the Oakland County Board of Commissioners for 14 years before retiring in January 1995. She currently serves on the Board of Directors of the Dispute Resolution Settlement Center and is active as a community mediator. She is also a board member of Camp Oakland Youth Programs, Inc. and the Local Development Company. Ms. Gosling has served as a member of the Community Mental Health Board and the Southeast Michigan Council of Governments (SEMCOG).

*Hilliard L. Hampton (1994).* Mr. Hampton is the Mayor of the City of Inkster. He also has twenty-eight years with Wayne County government. He currently serves as Sergeant with the Wayne County Sheriff's Department, where he is Supervisor of Community Justice. He has a Bachelor of Arts degree from Wayne State University in Mass Communications and has also received extensive training and certification in law enforcement.

*Jimmy L. Cooper (2007).* Mr. Cooper is Business Manager for Laborers' Local 1191 – a 3,500 member organization – and has held that position since 1997. A member of Local 1191 for 30 years and a co-founder of the Michigan Labor Alliance, Mr. Cooper is vice president of the executive board of the Michigan Laborers' District Council and secretary of the Laborers' International Union African American Caucus. He is also a member of the Michigan Transportation Team, a group that lobbies Congress for funding state highway projects; and his is a past president of Detroit Works!, a pre-apprenticeship and union training program established by the skilled trade unions.

*Carla Walker-Miller (2000).* Ms. Walker-Miller is the President of Walker Miller Energy Services, a distributor of power transmission and distribution equipment manufactured for use by electric utilities. She holds a Bachelor of Science Degree in Civil Engineering from Tennessee State University.

*William G. Westrick (2000).* Mr. Westrick was President of the engineering firm of Anderson, Eckstein and Westrick, Inc., and served as a member of the Board of Directors. He is a member of the Southern Michigan Water and Sewer Utilities Association. He serves on the Board of Directors of the Macomb County Traffic Association and the Northeast Water and Sewer Superintendent Association. Previously, he was employed by the Macomb County Road Commission for nearly 10 years, first as a Project Engineer in charge of design and construction of individual projects, and finally as the Design and Construction Engineer, coordinating road and bridge projects. Mr. Westrick has a Bachelor of Science Degree in Civil Engineering from the University of Detroit and a Master of Science Degree in Civil Engineering from Wayne State University. He is a Registered Professional Engineer in the State of Michigan.

*Kenneth Daniels (2006).* Mr. Daniels has been employed by the Michigan Economic Development Corporations since 2005 and served as a community champion for the Governor Granholm's Cool Cities Initiative. Mr. Daniels is a former Michigan State Representative, having served in the Michigan Legislature from 1999 through 2004. He also served for three years on the Detroit Board of Education. Mr. Daniels has served as a member on the Mohican Regent Residents Association, National Association of School Boards and the advisory boards of St. John's Hospital and the Holden Center Boys and Girls Cub.

The Board appoints, with the approval of the Mayor, a Director and Deputy Director who serve at the pleasure of the Board and are responsible for day to day operations of the Department.

**Management and Personnel**

The Department's budget for Fiscal Year 2008 provides funding for 3,104 positions, of which 1,025 positions are classified as strictly Sewage System and 206 positions are classified as strictly Water Supply System. The remaining 1,873 positions are budgeted in the administrative and support divisions, which provide service to both the Sewage and Water Supply Systems. The cost associated with these positions is allocated to the two systems either on the basis of actual time spent on projects or on estimates developed by the Department. The Department estimates that approximately 50% to 60% of the time allocation of the work force in these areas is attributable to the Water Supply System.

The Department is organized into five operating groups: Engineering, Asset Maintenance, Financial Services, Wastewater Operations and Water Supply Operations. Each of the operating groups is headed by an Assistant Director. The Department's key personnel and their qualifications are summarized below.

*Victor M. Mercado, Director.* Mr. Mercado was named Director of the Detroit Water and Sewerage Department on June 12, 2002. Mr. Mercado brings with him more than 25 years of experience in both the public and private sectors. He previously served as Vice President of Thames Water North America, and President and General Manager of Thames Water Puerto Rico (1999-2002); Vice President and General Manager of United Water Delaware and President of United Water Bethel and United Water Virginia (1997-1999); Chief of Emergency Construction for the Department of Environmental Protection in New York City (1996-1997); and Director of Operations for the Jamaica Water Supply Company in Jamaica, New York (1989-1996). Mr. Mercado has considerable experience in distribution and transportation, construction, and the electric and gas industries. He holds a Bachelor of Science degree in Economics and Industrial Management from the City University of New York.

The Director of the Department of Water and Sewerage, announced his resignation May 6, 2008, effective August, 2008, to accept another position. Mr. Mercado will be on leave from the Department beginning June 20, 2008. In accordance with the City Charter, the Deputy Director will exercise the powers and duties of the Director during Mr. Mercado's absence and after the position of Director becomes vacant.

*Gary Fujita, P.E., Deputy Director* Appointed Deputy Director in November 2002, Mr. Fujita had served as Interim Deputy Director since January 2002 and as Assistant Director of Wastewater since 1993. He has a Bachelor of Science degree in Civil Engineering from Wayne State University. He is a Registered Professional Engineer and holds a Class "A" Wastewater Treatment Operator's license. Mr. Fujita has been with the Department since 1972 and has also served as Chief Sewerage Plant Engineer. Mr. Fujita has considerable experience in engineering design, construction of major pipelines and related facilities, planning, wastewater treatment, industrial pretreatment, and combined sewer overflow control planning.

*Sam Smalley, Assistant Director - Asset Maintenance.* Mr. Smalley was appointed to his current position in February 2008. He joined the Department in June of 2007 after having spent two years participating in the Department's customer outreach program as a customer representative. He brings considerable experience in engineering design, construction management, and utility management. He is a registered professional engineer in California and Michigan, and has over 20 years of experience in the water and wastewater industry. He obtained a

27

Bachelor of Science in Civil Engineering from San Diego State University, and holds both an F-1 Water Treatment Plant Operator license and an S-1 Water Distribution System Operator license.

*Woodrow McCarty, Interim Assistant Director - Financial Services.* Mr. McCarty was assigned to his current position in May 2005. Mr. McCarty holds a Bachelor in Accounting from Wayne State University. He has experience with the City of Detroit in areas of Accounting, Budget, and Cash Management. Mr. McCarty has been with the Department since 1976. Prior to his current assignment he served as Manager of the Financial Reporting Section.

*Stephen Kuplicki, Interim Assistant Director-Wastewater Operations.* Mr. Kuplicki was named the Assistant Director of Wastewater Operations in January 2008, and is responsible for the operation of the Wastewater Treatment Plant and Combined Sewerage Overflow Facilities, and the Industrial Waste Control Division. Mr. Kuplicki previously served as the Manager of the Industrial Waste Control Division, where he developed, administered and enforced regulatory control programs on behalf of the City of Detroit. Prior to joining the Department in 1983, Mr. Kuplicki worked as a hydrologist and filtration consultant supporting projects in the chemical, power and petroleum industries throughout the United States, Canada and Mexico. He is a licensed Professional Engineer in the State of Michigan, and a member of the State Bar of Michigan. He holds a B.S. degree in Chemical Engineering from Wayne State University, a Master of Engineering degree with a Chemical Engineering major from the University of Detroit, and a Juris Doctor degree from the University of Detroit Mercy.

*Pamela Turner, Assistant Director – Water Supply Operations.* Ms. Turner was named Assistant Director in April 2003. Prior to her selection Ms. Turner served as Water Quality Division Manager. She has worked in the Department since 1977. Ms. Turner holds a Bachelor of Science degree in Environmental Science and a Masters in Public Administration from the University of Michigan. Ms. Turner has served on the Michigan Department of Environmental Quality Technical Advisory Committee for the Source Water Assessment Program. She is currently serving her second three-year term on the American Water Works Research Foundation, Research Advisory Council.

*Ramesh Shukla, Interim Assistant Director – Engineering.* Mr. Shukla is a Registered Professional Engineer and was appointed to the current position in February 2006. Prior to his appointment, he had served as Interim General Superintendent of Engineering and has been with the Department for more than 17 years. Prior to joining the Department in 1988, Mr. Shukla worked with consulting firms and governmental agencies in the U.S. and abroad in India. Mr. Shukla has over 34 years of experience in planning, design, construction, and management of water and wastewater systems. Mr. Shukla received a B.S. degree in Mechanical Engineering and a Masters degree in Business Administration in India.

*PJ Dada, Assistant Director for Information Technology.* Ms. Dada was named Assistant Director in July 2007. Prior to her position, she served as General Manager of the Process Networks and SCADA Systems Division. Prior to joining the department in September 2006, Ms. Dada worked with consulting firms and the automotive industries. Ms. Dada has over 15 years experience in process controls and instrumentation. Ms. Dada holds a B.S. degree in Electrical Engineering and a minor in Computer Science. She holds a Level III ISA certification.

*George Ellenwood, Assistant Director for Public Affairs.* Mr. Ellenwood was named Assistant Director of Public Affairs in September 2006. Previously, he served as General Manager of the DWSD Public Affairs Group consisting of the Commercial Operations, Meter Operations and Public Affairs Divisions. He holds a B.A. in English and Modern Languages from Oakland University and an M.A. in Spanish from Wayne State University. Mr. Ellenwood serves on the National Public Affairs Council of the American Water Works Association (AWWA) and the Project Advisory Committee of the Michigan Section of AWWA and is a member of the Public Relations Society of America and the Water Environment Federation.

Most of the Department's key personnel have considerable managerial experience, either with the Department or with other municipal agencies or large utility systems. The Deputy Director and most of the Assistant Directors have significant experience with the Department, each having advanced through the ranks of the Department to his or her present position. The Assistant Director of Asset Maintenance was recruited from outside the Department to facilitate the performance improvements targeted for that operation. The experience and qualifications of the Department's executive staff are commensurate with their duties and responsibilities.

**Employee Bargaining Units**

The City budgeted 15,04 employees (including part-time and seasonal employees) for fiscal 2007. Approximately 10% of these employees are non-union, and the remaining 90% are represented by one of the City's 50 bargaining units. The largest bargaining units are: the American Federation of State, County and Municipal

Employees ("AFSCME"); the Detroit Police Officers Association ("DPOA"); the Detroit Fire Fighters Association ("DFFA"); the Teamsters; and the Amalgamated Transit Union ("ATU"). There are current collective bargaining agreements in place for AFSCME and the majority of the non-uniformed bargaining units, covering approximately 93% of our civilian unionized employees. These agreements expire on June 30, 2009, and include employee concessions in both wages and health care.

The City recently received a binding arbitration award (Michigan Public Act 312) with the DPOA covering the period July 1, 2005 through June 30, 2009. The award included health care concessions similar to those negotiated with the non-uniformed employees. The City is just beginning Act 312 proceedings with the Detroit Police Lieutenant and Sergeant's Association (DPLSA), and expect hearings to conclude in the early fall of 2007.

Historically, the DFFA agreements provide for automatic parity of DFFA with DPOA and the DPLSA with respect to wages and benefits. Accordingly, although there has been no effective DFFA agreement since June 30, 2001, DFFA members continue to receive the same wage and health care and pension benefits as in the DPOA and the DPLSA. The City and DFFA also are in an Act 312 mandatory binding arbitration proceeding for a successor agreement.

The City has no reason to believe it will face any interruption of service from the unionized work force.

## Pension Plan

Department employees are members of the City's General Retirement System. Payments to the pension fund are made as a percentage of payroll, based on annual actuarial studies. These studies determine the amount necessary to fund the financial benefits as earned as well as an amount necessary to amortize unfunded accrued liabilities. For employees budgeted strictly as Water Supply System employees, contributions are made directly to the retirement fund. For employees common to both the Water Supply and Sewage Systems, payments are generally made by the Water Supply System, which is then periodically reimbursed from Sewage System revenues. Although the actuarially computed pension contribution rates are different for the two systems, "common" employees are considered as Water Supply System employees and accordingly, the Sewage System is billed at the Water Supply System's rate. See Appendix B – "Audited Financial Statements of the Water Fund of the City of Detroit, Michigan." The City's Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2006, the last fiscal year for which Comprehensive Annual Financial Reports are available), is available at www.ci.detroit.mi.us/finance/Default.htm.

## THE WATER SUPPLY SYSTEM

The Water Supply System is one of the largest in the nation in terms of water produced and population served. The Water Supply System has been the sole provider of all water service in the City since commencement of water supply as a public service in the mid-nineteenth century. In addition, the System began providing wholesale service to surrounding municipalities in about 1900. The Water Supply System draws its fresh water from the Great Lakes System which is naturally available, with Lake Huron to the north, the Detroit River to the south and Lake St. Clair to the east.

The Department believes the System is adequate to meet the needs of its current retail and wholesale customers and to meet the current requirements of the U.S. Environmental Protection Agency under the Safe Drinking Water Act. The major components of the System include three intake facilities, five treatment plants and an extensive conveyance system consisting of over 3,400 miles of transmission and distribution mains throughout the service area (complemented by 8,982 miles of connected transmission and distribution mains owned by wholesale municipal customers), 22 booster pumping stations and 22 water storage reservoirs located throughout the Water Supply System. Water flow and pressure throughout the System are monitored and controlled by a Systems Control Center housed in the Department's Central Services Facility.

## Service Area

The Water Supply System provides retail service to customers in the City and wholesale service to 124 communities in the surrounding metropolitan area through contracts with 86 public entities. As a matter of policy, the City does not generally contract with individual or corporate consumers outside the City, but only with public entities including cities, villages, townships and public water and utility authorities. For the fiscal year ended June 30, 2007, wholesale consumption and sales were estimated to account for approximately 80% of total water usage and 75% of billed operating revenues.

The service area covers 981 square miles and includes a population of approximately 3.9 million, representing approximately 43% of the population of the State of Michigan. Over 87% of the population served by the System resides in the Detroit Primary Metropolitan Statistical Area (the "PMSA"). A more detailed description of the service area is set forth in Appendix E – "Characteristics of the Water Supply System Service Area." Additionally, a map of the service area is printed on the inside back cover of this Remarketing Circular.

The overall population served by the System has been essentially stable during the past 20 years. Generally, the System has expanded to correspond with population increases and movements in the municipalities surrounding the City. Within the service area, the percentage of population served on a wholesale basis has increased. The Department anticipates continued expansion of the service area as well as moderate growth in water consumption as a result of projected increases in the population of the wholesale service area and continued business expansion throughout the entire service area. The Department has a "growth pays for growth" policy regarding funding the costs of extending service to new contract communities, which is designed to ensure that existing customers are not adversely impacted by the extension of service to new service areas. This policy was enacted for extension of service to the City of Wixom in the late 1990s. Specific details regarding the further implementation of this policy are being discussed and finalized in several technical workgroups made up of Department personnel and wholesale customer representatives.

The following table shows certain historical estimates of the population of the service area and water sales in thousands of cubic feet ("Mcf") for suburban wholesale customers, for City of Detroit (retail) customers and for the Water Supply System as a whole, together with total water production and unaccounted for water. As is common for all large water systems, the System experiences a differential between the quantity of water produced and the quantity of water billed to customers, and the difference is referred to as "unaccounted for water." Unaccounted for water results from a variety of factors such as the range of accuracy of production and retail meters, losses due to leaks or major breaks in the transmission and distribution systems, and the accuracy of estimates for unmetered use. The Department believes that improvements in the accuracy of the reported production figures may reduce the level of unaccounted for water, since studies conducted as part of the master planning process revealed that production at two of the five water treatment plants may be over-reported by as much as 20 percent. Considering the age of the System, the Department believes the average level of unaccounted for water is not uncommon.

**Wholesale and Retail Population, Water Sales and Unaccounted for Water**

| | Water Sales (a) | | | | | | Unaccounted for Water | |
| | Suburban Wholesale | | Detroit Retail | | | | | |
| | Population | Water Sales (Mcf) | Population | Water Sales (Mcf) | Total Water Sales (Mcf) | Total Water Produced (Mcf) | Volume Unaccounted (Mcf) | As a %age of Production |
|---|---|---|---|---|---|---|---|---|
| 2003 | 3,008,300 | 20,197,000 | 951,300 | 5,305,000 | 25,502,000 | 31,902,900 | 6,400,900 | 20.1% |
| 2004 | 3,024,800 | 19,262,800 | 951,300 | 5,405,000 | 24,667,800 | 29,643,700 | 4,975,900 | 16.8% |
| 2005 | 3,024,800 | 19,381,900 | 951,300 | 4,850,800 | 24,232,700 | 28,367,300 | 4,134,600 | 14.6% |
| 2006 | 3,024,800 | 19,156,300 | 951,300 | 4,927,000 | 24,083,300 | 29,266,700 | 5,183,400 | 17.7% |
| 2007 | 3,024,800 | 18,417,900 | 951,300 | 4,672,800 | 23,090,700 | 28,063,000 | 4,972,300 | 17.7% |

Mcf = 1,000 cubic feet per day
Source: The Department

**Master Plan**

The Department recently completed a master planning study that evaluated the physical System needs over the next 50 years. That study included participation from community leaders and other representatives of all customer communities served by the System, in order to determine potential demands that would be placed on the System. The master plan concluded that the demand for water within the region will most likely grow significantly over the next 50 years, but that this demand could generally be met from the existing treatment facilities (with upgrades) and that no new water treatment plants would be necessary. The master plan primarily focused on necessary investments in transmission and distribution facilities that will be necessary to ensure reliability of service to all customers.

30

One of the major transmission main projects in the Master Plan consists of a series of mains in northern Oakland and Macomb Counties designed to increase the reliability in the service area that is being supplied by the Orion, Adams and Franklin pump stations. This connection will also enable the Department to provide water to potential new customer communities, including Wolverine Lake, Oakland Township, Oxford Township, Oxford, Brandon, Addison, Milford and Bruce Township. The Department (through the Technical Advisory Committee – see "Partnering Efforts" below) has formed a work group to provide interested parties with vital information on potential routes and implementation plans for this connection, and to solicit input from those parties. Implementation of this aspect of the master plan, including the construction of this proposed connection, is based upon a number of factors including: addressing System and customer needs as they develop and the development, implementation and execution of new long term water service contracts.

**Wholesale Municipal Service**

The Water Supply System has provided wholesale service to an increasing number of surrounding municipalities since the 1940s. The growth period for wholesale municipal customers began in 1957 with the construction of a major transmission main to serve the area north of the City, and increased beginning in 1975 with the construction of a major transmission main to serve the area west of the City. In all cases, the municipalities being served are responsible for the construction and maintenance of distribution and lateral water mains within their respective geographical boundaries to connect the customers of such municipalities to the transmission mains of the Water Supply System. In some cases, the municipal entities being served also own and maintain their own transmission mains.

The System serves 124 municipalities through 86 contracts with municipal and other public entity customers. Each water service agreement generally provides for (i) delivery of water by the Department to the best of its ability to the municipality or other public entity at designated metered points at rates of flow and pressure adequate to meet the reasonable requirements of the customers of the municipality or other public entity and (ii) payment by the municipal or other public entity for all water supplied at reasonable rates established by the Department, subject to review by and concurrence of the City Council, including an annual minimum charge. The municipal entity is solely responsible for distributing water from the points of delivery to its customers. The agreements are typically for periods of at least 35 years and, unless renewed, are continued on a year to year basis. Most agreements also include other provisions required for orderly operation of an integrated water supply and distribution system such as the following: (i) restrictions on redistribution outside the limits of the particular municipality or other public entity without consent of the Department; (ii) measurement of water furnished by meters; (iii) the metered flow of water furnished is the basis for billing; (iv) method of computing the annual minimum charge, generally based on applying the prevailing rate to a contractually specified minimum level of consumption (based on population estimates at the time the contract was signed); (v) municipal acceptance of the Department's standards for construction of distribution mains and Department approval of construction plans therefor to ensure a uniform standard throughout the area; and (vi) prohibition against combining of System supplied water with water from any other source without prior written approval of the Department to ensure a uniform quality of water throughout the area.

The Department is paid monthly by each municipality and other public entity, and payment is not contractually dependent upon collections by the municipality or other public entity from its respective retail consumers. The Department assesses a 5% late payment charge on bills not paid when due. While the Department has the legal right to discontinue water service to wholesale users if not paid within 60 days, such a measure would not be practical, and wholesale collection problems have been resolved through negotiation or litigation. See "FINANCIAL PROCEDURES -Collections and Delinquencies."

The following table provides information about the contracts of the ten largest wholesale water supply customers. For fiscal year ended June 30, 2006, (the last fiscal year for which audited financial statements are available), these customers provided approximately 30% of the gross operating revenues of the Water Supply System, and accounted for 40% of billed revenue to wholesale water supply customers.

31

## Summary of Wholesale Water Supply Contracts

| | Total Billed Flow (Mcf) FY 2007 | Total Billed Revenue FY 2007 | Contract Date |
|---|---|---|---|
| Flint | 1,449,578 | $16,075,816 | 1967 |
| Southeast Oakland County Water Authority | 1,275,236 | 10,469,683 | 1960[a] |
| Warren | 939,949 | 7,510,193 | 1940 |
| Sterling Heights | 811,686 | 8,993,479 | 1953 |
| Dearborn | 729,019 | 5,409,324 | 1931 |
| Ypsilanti Community Utility Authority | 637,748 | 6,288,197 | 1931 |
| Livonia | 618,521 | 6,840,847 | 1972 |
| Troy | 613,675 | 9,156,027 | 1964 |
| Clinton Township | 525,302 | 4,233,932 | 1973 |
| Farmington Hills | 517,495 | 7,767,606 | 1963 |

Mcf = thousands of cubic feet.
[a] Date of incorporation of the Authority. Constituent municipalities initiated service in different years between 1929 and 1980.

SOURCE: The Department

No municipality or other public entity having once contracted for water service with the Water Supply System has thereafter terminated its contract with the System. In general, because (i) the geology of the area surrounding the City does not support a substantial water supply by subsurface wells, (ii) there is a natural supply of raw water coupled with the capital facilities of the Water Supply System in place, and (iii) there are longstanding municipal relationships extending contractually in most cases for many years, the Board believes that the wholesale customers will continue to be an integral part of the System. In 2004, however, the cities of Centerline, Fraser, Grosse Pointe Shores, Troy, Warren and St. Clair Shores and the Southeast Oakland County Water Authority commissioned a study to begin exploring potential alternative water supply options. The findings of that study indicated an estimated cost of construction of $1.4 billion. Several community leaders who sponsored the study have indicated that proceeding with an independent system at this time does not seem feasible. In addition, most regional leaders and the media have opined that separation does not appear to be in the best interest of the region.

Even if the communities decided to proceed, separation from the System would not be possible for at least 7 years. Many of the communities involved would still be under contract with the System at that time. The Department believes that all communities currently under contract will conclude that remaining with the System is the most economic, responsible, and correct decision for their constituents and that service will continue as currently provided in the service agreements. The Department intends to protect its contractual rights in this matter and to pursue renegotiation of all service agreements to ensure long-term stability to the service area.

Over the past several years there has been a continuing dispute between the City and certain wholesale municipal customers over control of the System. Various legislative bills and resolutions have been introduced in the State legislature from time to time that have provided for, or suggested studying, changes in the composition of the Board, or have attempted to legislate changes in the management and control of the System. Among these have been proposals to create a regional water and sewerage authority and transfer to this authority the ownership of the City's Water Supply and Sewerage Disposal Systems, excluding certain retail facilities. On March 31, 2006, Governor Granholm vetoed Senate Bill 372, which would have given control of the Department to a new regional authority dominated by the suburbs. The bill did not receive enough votes in either house to override the veto. The City will continue to oppose any efforts to transfer control of the City's Water Supply and Sewerage Disposal Systems.

32

House Bill 6105 was introduced in the legislature on May 24, 2006. The bill would have made the Department's rates subject to review and approval by the Michigan Public Service Commission. The City opposed the bill and it was not adopted in the 2005 2006 legislative session. As of the date of this Remarketing Circular, the Michigan legislature has not introduced any new legislation seeking control of the City's System or review of its rates.

## Partnering Efforts

The Department has entered into a series of "partnering" agreements with representatives of its suburban customer communities. These agreements, which have established a Technical Advisory Committee ("TAC") have established a framework for discussion of major issues between the Department and its suburban wholesale customers. The TAC has established multi-faceted teams to explore several issues on a variety of topics, including emergency preparedness, service contracts, water rates, and communication strategies.

The TAC Water Rates Work Group has made progress in creating greater understanding of the Department's water rate methodology and of issues impacting rates and rate levels. It has proved to be an excellent forum for communicating rate methodologies, exploring alternative approaches to allocating costs to customers, and building consensus regarding the development of water rates. This work group is currently developing potential modifications to the water rate model that would be designed to utilize the best available technical information to improve the understanding of water rates, and the perceived equitability.

The TAC Contracts Work Group has developed a new model contract with standardized contract language. This document will ensure that all wholesale customers are treated equitably and similarly. This will also provide the Department with the same rights and controls across all agreements. Standardized model contract language has been developed to address items such as contract term lengths, contract renewal, flow limitations, flow enforcement provisions, flow measurement, regulatory compliance, connection points, and contract enforcement. Many of the communities served by the Department have expressed interest in negotiating new service agreements with the Department, utilizing the model contract as the basis. The Department is in various stages of negotiations with 33 of these communities and believes that several new contracts will be put in place during 2008. Representatives of customer communities have expressed appreciation of the Department's willingness to sponsor these partnering programs and the opportunity to be involved in the process.

## Retail Service

The Water Supply System is the sole provider of all water service in the City. The System also provides retail services on a very limited basis to certain customers outside the City. The Water Supply System in the City includes lateral mains, meters and reading devices directly connecting customers to the System. The Department has full responsibility for retail service, rate setting, billing and collection of charges from customers in the City, subject to review and concurrence by the City Council.

Pursuant to the Act, the charges for water and sewerage service furnished to a premises become a lien on such premises when the service is provided. If an account becomes delinquent the lien may be enforced in the same manner as the collection and enforcement of a lien for property taxes (assuming proper statutory notice to the party responsible for the payment of the charges). The Board may also enforce the payment of charges by discontinuing water service to the premises. Historically, the Department has not pursued enforcement of liens, believing discontinuance of service to be the most timely method of collection. However, the Department has a policy of transmitting delinquent accounts to the City Assessor for placement on the property tax roll. Other active measures adopted by the Department with respect to enforcement of delinquent bills include a bad debt write-off policy and common protocols for pursuit of delinquent customers. In addition, in 2006, the Department converted all retail customer accounts to a monthly billing cycle. Residential accounts had previously been billed quarterly. This conversion is intended to produce a beneficial impact to both the Department and its customers. Customers will receive more regular bills and they will be lower. The Department will receive a more uniform revenue stream and will be able to monitor and react to anomalies in bills to individual customers. In recent years, the aggregate balance of delinquent accounts has increased somewhat, reflecting recent rate increases and a moderate decline in collection rates. See "FINANCIAL PROCEDURES - Collections and Delinquencies."

## Physical Facilities

*Intake Facilities.* The Water Supply System's three intake facilities are listed below and, in the opinion of the Department, are generally in good working order and repair.

33

- The Lake Huron intake, located in Lake Huron, approximately 5 miles north of Port Huron and 5 miles into the lake, was placed in operation in 1974. This intake supplies raw water through a tunnel to the Lake Huron water treatment plant.

- The Belle Isle intake, located at the eastern end of Belle Isle where Lake St. Clair flows into the Detroit River, was placed in operation in 1931. This intake supplies raw water to the Water Works Park, Springwells and Northeast water treatment plants.

- The Fighting Island intake and tunnel, located under the Detroit River on the Canadian side just west of the northern end of Fighting Island, was placed in operation in 1964. This intake supplies raw water to the Southwest water treatment plant.

*Water Treatment Plants.* Raw water from the intake facilities is treated at the System's water treatment plants, which includes screening, filtering, bacteria control, and taste and odor control. Each of the five water treatment plants in the Water Supply System was constructed with the capability to treat the water in accordance with federal requirements under the Safe Drinking Water Act. In the opinion of the Department, based upon physical evaluations conducted by its consultants no significant improvements to the treatment plants are presently required to meet such requirements. See "Environmental Matters" below. In addition, each treatment plant is equipped with its own laboratory facilities for the examination of drinking water which are recertified periodically (every three years) by the Michigan Department of Public Health. The treatment plants are more particularly described in the following table. For capital improvements planned for each plant, see "THE CAPITAL IMPROVEMENT PROGRAM."

### Water Treatment Plants

| Plant | Placed in Operation | Rated Capacity (Mgd) |
|---|---|---|
| Lake Huron | 1974 | 400 |
| Southwest | 1964 | 240 |
| Northeast | 1956 | 360 |
| Springwells[a] | 1931/1959 | 540 |
| Water Works Park | 2003 | 240 |

[a] A major addition was completed in 1959, doubling the capacity of such water treatment plant by adding a new reservoir, sedimentation basin and filtration facility.

SOURCE: The Department

The Water System is physically inspected approximately every 18 to 24 months (in conjunction with issuance of new money revenue bonds) for purposes of assessing its condition and the appropriateness of the capital improvement programs. The most recent evaluation was completed in May 2006. At that time the evaluation concluded that overall the treatment facilities are in good operating condition and, while the condition of the distribution facilities, the facilities generally are in adequate to good condition. The Department is unaware of any materially adverse changes to the general physical condition of the facilities of the Water System Plant and the Collection System since the date of that inspection. Some repairs, replacements and major improvements are necessary to improve operations and ensure continued compliance with environmental standards. These repairs, replacements and improvements are part of the CIP.

*Transmission and Distribution System.* The Department owns and maintains all distribution mains (less than 24 inches in diameter) and transmission mains (24 inches to 120 inches in diameter) within the City limits and certain transmission mains throughout the wholesale service area. See the map, inside rear cover, for the siting of such transmission mains. The Water Supply System connects throughout the wholesale service area with the transmission and distribution mains owned and operated by the wholesale municipal customers.

The transmission system is laid out in an organized grid pattern to provide adequate pressures that are reinforced by use of booster stations and reservoirs as necessary. The transmission system is interconnected and flow of water can be controlled, particularly in emergency conditions, to flow in either direction by opening or closing valves. Water pressures can be boosted to overcome any losses due to an emergency situation.

There is an ongoing program of replacement of distribution mains in the City, especially with respect to certain mains installed during the period 1923 to 1929. Because of certain pipe design and manufacturing deficiencies, these mains are coming to the end of their useful lives. This program of renovation and replacement was started in 1972 and is an ongoing, annual improvement program. In certain other areas within the City,

distribution mains are being replaced with larger mains. With respect to the transmission system that serves the wholesale customers, the Capital Improvement Program includes a number of projects designed to improve service and reliability in areas outside the City.

*Monitoring Facilities.* The Water Supply System Control Center located in the Department's Central Services Facility controls and monitors the transmission and distribution of water throughout the System. Operators in the Control Center can remotely control the pump stations at the treatment plants and the 22 booster stations to adjust flow and pressure requirements to meet the changing demands of customers. Recent improvements to the Control Center have been undertaken by the Department as part of a Department-wide instrumentation and computerization project included in the Capital Improvement Program.

## Environmental Matters

The Water Supply System is subject to rules, regulations and standards established and enforced by federal and State agencies. In the opinion of the Department, based on the continual monitoring of the treatment, supply and distribution facilities by the Department's Water Supply Operations Group, the System is currently operating well within all applicable water quality standards. Further rules or regulations which may be promulgated pursuant to the 1986 and 1996 amendments to the Safe Drinking Water Act could require the Department to modify operations and/or construct facilities beyond those currently contemplated by the Capital Improvement Program.

## Security Improvements

The Department has a project under contract that will improve and upgrade security at all of its facilities. On March 17, 2003 the Department completed its vulnerability assessment ("VA"). The risk assessment methodology used by the Department is a performance based methodology developed by Sandia National Laboratories in conjunction with the American Water Works Association and the U.S. Environmental Protection Agency. Certain vulnerabilities that were identified in the assessment are being addressed by a project that is under contract. The remaining vulnerabilities will be addressed within the Department's Capital Improvement Program.

Currently, each fresh water treatment facility is equipped with twenty-four hour security personnel, an intrusion detection system, video surveillance or assessment, and an access control system. The fence lines of these facilities are patrolled and checked each shift by the Department's internal security staff. The VA conducted by the Department recognized security measures that can mitigate the vulnerabilities that were identified. A Capital Improvement Program project is anticipated that will implement these security measures as upgrades to the physical security at these facilities.

The booster stations and system reservoirs are equipped with an intrusion detection system, a fence line detection system, and mechanical security gates. The fence lines of these facilities are patrolled and checked by contract security service personnel. The security systems at these facilities were tested in 2003 and a project is currently under contract to improve electronic security systems at these facilities. The improvements will include video assessment, access control, and upgrades to the existing intrusion detection system.

The Department has initiated internal security-related activities in addition to the security contracts currently being implemented. All internal physical security improvements relative to specific facility upgrades were completed in November 2002 with the last of the reservoir tank hatchways and external access appurtenances secured with custom-made locking devices. Minor perimeter fence repairs, vegetation removal and reduction, and temporary electronic surveillance improvements have been made until such time as the new security renovations contract is fully deployed.

## FEASIBILITY CONSULTANT'S REPORT

The Department has engaged The Foster Group, LLC (the "Feasibility Consultant") to prepare a Financial Feasibility Report. A copy of the report summarizing the findings of the Foster Group LLC's evaluation is included as Appendix A.

## THE CAPITAL IMPROVEMENT PROGRAM

The Department has financed its ongoing Capital Improvement Program (the "CIP") for the System from the issuance of Water Supply System Bonds and from revenues of the System. From 1988 through 2007,

approximately $1.4 billion has been spent for capital improvements to the System. The Department's Capital Management Group coordinates all capital planning activities and is responsible for evaluating capital needs and developing programs to meet those needs. This committee formally reviews the Capital Improvement Program and incorporates revisions on an annual basis. The current CIP for the five fiscal years ending June 30, 2012 is estimated to cost approximately $1.4 billion and is based on estimates of future capital costs as of June 30, 2007. The Capital Improvement Program is a dynamic one, and requires continual review and modification as conditions warrant.

In fiscal year 2006, the Department began to finance some of the capital improvements to the System with loans by the Michigan Municipal Bond Authority from the Drinking Water Revolving Fund. The City's obligation to repay such loans is evidenced by SRF Water System Bonds issued as Junior Lien Bonds on a subordinated basis to any Second Lien Bonds.

The following tables detail the planned Capital Improvement Program expenditures for the five Fiscal Years ending June 30, 2012, and the projected funding sources for the Capital Improvement Program. The five year program is estimated to cost $1,374,910,000. Of this amount, it is anticipated that $1,026,945,100 (approximately net amount) will be raised through the issuance of bonds during and after fiscal year 2010 with the balance of the System's share to be generated out of System revenues, additional SRF Loans and funds currently available.

## Capital Improvement Program Projected Expenditure Schedule

| | Fiscal Year Ending June 30. | | | | | |
|---|---|---|---|---|---|---|
| Category | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
| Plant Replacement and Renovation | | | | | | |
| General Plant | $ 23,263,000 | $ 22,335,000 | $ 13,024,000 | $ 5,128,000 | $ 1,995,000 | $ 65,745,000 |
| Water Works Park | 845,000 | 3,100,000 | 4,000,000 | 3,100,000 | 20,500,000 | 31,545,000 |
| Springwells | 4,130,000 | 14,350,000 | 28,950,000 | 40,275,000 | 103,525,000 | 191,230,000 |
| Northeast | 4,674,000 | 10,870,000 | 14,950,000 | 22,093,000 | 38,248,000 | 90,835,000 |
| Southwest | 5,885,000 | 24,493,000 | 23,480,000 | 20,958,000 | 38,340,000 | 113,156,000 |
| Lake Huron | 1,824,000 | 7,850,000 | 2,300,000 | 1,150,000 | 0 | 13,124,000 |
| Pumping Stations & Reservoirs | 9,491,000 | 25,775,000 | 38,916,000 | 17,125,000 | 13,700,000 | 105,007,000 |
| Subtotal - Plant | 50,112,000 | 108,773,000 | 125,620,000 | 109,829,000 | 216,308,000 | 610,642,000 |
| | | | | | | |
| Metro Area Construction | 60,631,000 | 148,321,000 | 183,856,000 | 169,449,000 | 141,250,000 | 703,507,000 |
| Urban System Improvements | 58,884,000 | 49,206,000 | 23,302,000 | 21,200,000 | 20,600,000 | 173,192,000 |
| Mechanical Maintenance | 21,746,000 | 22,775,000 | 22,050,000 | 3,700,000 | 0 | 70,271,000 |
| Computer Systems | 4,163,000 | 3,450,000 | 3,500,000 | 3,525,000 | 3,000,000 | 17,638,000 |
| Subtotal | 145,424,000 | 223,752,000 | 232,708,000 | 197,874,000 | 164,850,000 | 964,608,000 |
| Total System | $ 195,536,000 | $ 332,525,000 | $ 358,328,000 | $ 307,703,000 | $ 381,158,000 | $ 1,575,250,000 |

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## Water Supply Disposal System Capital Improvement Program
## Projected Funding Sources

| | Fiscal Year Ending June 30, | | | | | Total |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | |
| Existing Improvement and Extension Funds(a) | $ 28,408,700 | $ - | $ - | $ - | $ - | $ 28,408,700 |
| Existing Construction Funds(a) | 528,868,400 | - | | | | 528,868,400 |
| Current Revenues | 22,289,200 | 13,304,600 | 33,982,700 | 38,692,000 | 43,326,900 | 151,595,400 |
| Bond Proceeds | - | - | 450,000,000 | 275,000,000 | 375,000,000 | 1,100,000,000 |
| Less: Capitalized Interest | - | - | (21,656,300) | (7,218,800) | (9,843,800) | (38,718,900) |
| Issuance Expenses(b) | - | - | (13,700,000) | (8,450,000) | (11,450,000) | (33,600,000) |
| Bond Reserve Account(c) | - | - | (301,100) | (184,000) | (250,900) | (736,000) |
| Net Bond Proceeds Available | | | 414,342,600 | 259,147,200 | 353,455,300 | 1,026,945,100 |
| State Drinking Water Revolving Fund Loans | 2,180,000 | 5,000,000 | - | - | - | 7,180,000 |
| Total Funding Sources(d) | $ 581,746,300 | $ 18,304,600 | $ 448,325,300 | $ 297,839,200 | $ 396,782,200 | $ 1,742,997,600 |

(a) Balance available June 30, 2007 (Applies only to Fiscal Year 2008).
(b) Reflects underwriting discount, original issue discount and issuance expenses for the remarketing of the Fixed Rate Bonds in 2008 and, in subsequent years assumes issuance expenses totaling 3 percent of the bond issue amount plus $200,000. Net of estimated premium for Fixed Rate Bonds.
(c) Amount required to purchase surety or fund reserve requirement.
(d) The difference between the total amount available to finance the capital program and the cost of the program represents funds available to finance the capital program after 2012.

SOURCE: The Department

# FINANCIAL PROCEDURES

## Budget and Accounting Matters

The Department prepares an annual budget in conformity with the City's requirements and procedures, and this budget sets forth estimated revenues and appropriations. No expenditures may be made without an authorized appropriation approved by the Board and City Council. Appropriations are made in lump sum by major program and such amounts cannot be exceeded without Board and City Council approval. Appropriation increases must be funded either by transfer from other appropriations within the funds of the System or by excess revenues generated within the System. The annual budget is reviewed and may be revised by the Mayor prior to submission to the City Council. The City Council conducts hearings and reviews and may alter the budget prior to adoption. Any revisions by the City Council are subject to veto by the Mayor and subsequent override of veto by the City Council. The entire preparation and review process encompasses approximately six months and the final budget is approved approximately June 1 of each year, to be effective July 1. The expenditure level of the proposed budget is taken into account as a revenue requirement for establishing Water Supply System rates.

Certain differences should be noted between budget presentation and the financial statements for a given period. The annual budget represents amounts which might be spent in the fiscal year and it records equipment and other long-term purchases against the current period. The financial statements include accrual of expenditures and revenues and depreciation of plant and equipment over the useful life of such capital items.

Generally, the Department pays for various employees, supplies and equipment that are shared between the Water Supply and Sewage Systems from water operations. The Sewage System is then billed periodically (currently monthly) based on actual operations and an estimate of certain personnel and equipment usage.

Because the System is generally self-insured, the Department includes in its annual budget amounts estimated to be sufficient to pay various liability and workers' compensation claims. The financial statements record the expense for such claims in the period when the occurrence of the liability is probable and the amount can be reasonably estimated. In addition, the budget includes amounts necessary to establish and maintain an account designated the "Extraordinary Repair and Replacement Reserve Fund," which has been created for the purpose of providing funds for paying the costs of major unanticipated repairs and replacements to the System. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Bond Ordinance Flow of Funds."

The Department uses an Oracle financial management system which includes general ledger, purchasing, accounts payable, accounts receivables, project accounting and fixed asset applications. These Oracle core financial applications are integrated with third party Oracle-approved software providers for budget preparation, work order and inventory applications to provide a nearly complete financial reporting system.

The Department uses a Legacy human resources/payroll application for employee compensation. Preliminary funding has been approved to begin planning the replacement of the Legacy system with the human resources/payroll modules. The complete integration of the human resources/payroll application with the core financial applications is expected to take about 3 years.

The City of Detroit's audited financial statements for the fiscal year ended June 30, 2006, available on the City's website, at http://www.ci.detroit.mi.us/Portals/)/docs/finance/CAFR/CAFR2006.pdf, includes an unqualified independent auditors' report with exception to a reference to the unaudited financial statements of the Detroit Public Library. The auditors provided the City with a second document, which highlights certain recommended improvements to the City's internal control environment. In its report, the City's auditors noted certain "Reportable Conditions" involving the City's internal control over financial reporting and operations including 22 it considered material. With respect to each Reportable Condition, the auditors described the criteria, condition, cause, effect and recommended solution. The City takes such recommendations seriously. Accordingly, the City has developed plans and has begun executing such planned action steps to address each concern identified by the auditors. The City is confident that each issue will be addressed, with substantially all issues being addressed prior to the conclusion of the audit of financial statements for the fiscal year ended June 30, 2007. However, the City may be unable to remediate these matters in a complete and timely manner. If the City is unable to improve its financial and management controls, in a timely and effective manner, its ability to comply with the financial and reporting requirements and other rules that apply to it would be impaired. The audited financial statements of the Water Supply System for the fiscal year ended June 30, 2006, which are included as Appendix B, also includes the unqualified opinion of the City's auditors. See also "TAX MATTERS - Recent Developments" herein.

**Management Initiatives**

The Department continues to employ several cost-saving measures instituted in recent years. These programs were streamline operations and make them more efficient, and included; limiting outsourcing of work to contractors; an overtime management plan; elimination of almost all unfilled budgeted positions; voluntary reductions in force through attrition; a work force reduction program; liquidation of surplus vehicles installation of new work practices and performance targets to improve efficiency and productivity of field crews; and implementation of a performance management tool which provides real-time reporting for performance metrics and supports the overall performance improvement initiative.

These efforts have produced significant results. Department-wide operating expenses for 2005 were actually lower than those experienced in 2002. While recent increases in utility costs have lead to slightly higher expenses in the last two years, the (unaudited) 2007 department-wide operating expenses represent an average annual increase of less than 2 percent from 2002 levels.

The Department has also initiated an energy management plan for water and sewer system operations. Finally, the Department has launched a program to replace all retail billing meters in the System and install automatic meter reading devises. This program is designed to provide more accurate, timely water use information in an efficient manner.

**Collections and Delinquencies**

The Department operates a computerized billing system for its approximately 280,000 retail customers. All retail customers are billed monthly. All retail customers are allowed 20 days to pay, after which a one-time 5% late payment charge is applied. Wholesale municipal customers maintain their own retail billing systems and also pay the Department monthly in accordance with contractual agreements. The charge for late payment of wholesale customers' bills varies by individual contract, but generally is also 5%.

Retail water and sewer charges constitute a lien on the premises served, enforceable upon entry on the tax roll as described herein, unless notice is given that a tenant is responsible for such charges. In 2007 the Department implemented a program of enforcing these liens and began transmitting accounts to the City's Law Department for processing in this manner. To date the City's Treasurer's Office has collected $8.1 million on the Department's behalf. However, the Department continues to believe that discontinuance of service is the most timely method of collection. If water or sewer charges are delinquent, the City official in charge of the collection of such charges may certify to the tax assessing officer of the City the fact of such delinquency, whereupon such charge will be entered

38

upon the next tax roll as a charge (lien) against the premises and the lien will be enforced in the same manner as general taxes of the City are collected; provided, that where notice is given that a tenant is responsible for such charges and service, no further service shall be rendered to such premise until a cash deposit equal to the estimated amount of the next ensuing bill is made. In addition to other remedies provided, the City has a right to shut off and discontinue the supply of water to any premises for the non-payment of bills for water or sewer when due. The termination of any services by the City to any residents may be subject to constitutional safeguards regarding due process, including notice and hearing requirements.

In order to enforce payment of retail billings, the Department pursues an aggressive collection program. Retail customers may have service shut off for non-payment after 6 months in arrears. During fiscal year 2008 (through February), shutoffs totaled approximately 13,200. Historically, the number of shutoffs decline from November through March due to weather conditions making shutoffs difficult.

The Board of Commissioners currently practices a "Bad Debt" write off policy common in many other large utilities, whereby establishing common protocol in aid determination of financial feasibility with regard to the pursuit of delinquent customers.

The Department's computerized billing system produces data on aged accounts receivable and breaks delinquencies into several aged categories. The February 2008 report indicated total retail delinquencies (in excess of 6 months) of approximately $37.3 million. The amount of delinquencies has not caused cash flow problems as sufficient operating capital has been available to the System. The System has not experienced significant problems relating to wholesale municipal delinquencies. Normally, wholesale delinquencies have arisen from disputed billings which can often be resolved through negotiation. As of December 31 , 2007 no wholesale municipal customer carried a delinquent balance in excess of one year. The allowance for doubtful accounts reflected in the financial statements represents the Department's estimate of the amount of potential uncollectible accounts receivable. Increases in the reserve are netted against revenues reported on the financial statements. The amount reserved is determined based on a formula that takes into account the total amount of accounts receivable as well as specific items within the category, including reserves for disputed billings. Approximately $44.5 million was reserved as an allowance for doubtful accounts at June 30, 2007. To the extent that the Department includes a projected increase in the allowance for doubtful accounts in developing prospective water rates, this revenue requirement is allocated to retail customers only.

## Cash Management

In accordance with the City Charter, all funds and accounts of the System are separate and distinct from all other City funds. Except as described below, no System monies are commingled with general fund or other monies of the City.

All revenues of the System are deposited to the Water Receiving Fund. Because one payment is received from retail customers billed on a combined basis for water and sewerage service, the full amount of payment is initially deposited in the Water Receiving Fund. Periodic (generally bi-weekly) transfers are made from the Water Receiving Fund to the Sewage Receiving Fund, based on the proper allocation between funds. Next, transfers are made from the Water Receiving Fund to the Operation and Maintenance Fund, Senior Lien Bond Interest and Redemption Fund, Junior Lien Bond Interest and Redemption Fund and other System funds and, until needed, balances are invested in accordance with the provisions of the Bond Ordinance. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Bond Ordinance Flow of Funds."

With the exception of direct payments made for debt service and special "manual" payments, expenditures are made through the City's Central Clearing Account. The City maintains a central account which disburses all vendor payments. Once an invoice has been processed for payment, a wire transfer from the appropriate fund of the City is made to the Central Clearing Account. Monies from the particular fund must be received before a check is released. Accordingly, no System monies may be used to "cover" payments to be made from any other fund of the City. While all City payroll checks are drawn upon a special payroll account, funds are cleared through the Central Clearing Account in the same manner as vendor payments.

Debt service payments for Water Supply System Bonds (as well as other City debt obligations) are not cleared through the Central Clearing Account. Such payments are made directly from the appropriate debt service account to the paying agent for the particular debt obligation.

The Department maintains a budget system that monitors and controls funding in accordance with actual funds available. While the budget includes appropriations for specific projects to be funded out of the Improvement and Extension Fund at the beginning of each fiscal year, the Department re-authorizes such appropriations and

approves the award of a contract for specific projects only when cash is on hand in such fund, which is then fully encumbered in an amount equal to the amount of the award.

**Investment Policy**

Funds in excess of current System requirements are invested by the City for the Department in accordance with State law. The City may invest in direct obligations of the United States, obligations of an agency or instrumentality of the United States, repurchase agreements, mutual funds that invest solely in such government obligations and repurchase agreements, certain grades of commercial paper, bankers acceptances of United States banks, and certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation.

The City's investment policy is to provide for effective cash management. The City's investment policy attempts to maintain and protect investment principal while striving to maximize total return on the portfolio consistent with risk limitations, pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended. The City has not experienced material investment-related losses in any City managed funds. As of April 1, 2008, the Water Fund held investments with a total market value of approximately $633,550,004 and the longest investment had a maturity date of March 20, 2013.

**Rates**

Under the City Charter, the Board has the authority to establish rates for water service. In accordance with the Act, rates are subject to the review by and concurrence of the City Council. Certain of the wholesale contracts require certain notice requirements relating to rate changes, generally 90 or 120 days. Public hearings are required by statute under the Michigan Home Rule Act to be held prior to action on rate changes. No other statutory procedures are required as a condition precedent to a change in rates. Rates, once established, become effective the following July 1.

Under the Bond Ordinance, the City covenants that, with respect to each Fiscal Year, the rates shall be fixed and revised from time to time as may be necessary to produce the greater of: (1) the sum of (a) administrative and operating expenses of the System, (b) debt service on Senior Lien Bonds, (c) creation and maintenance of a debt service reserve for Senior Lien Bonds, (d) debt service on Junior Lien Bonds, if any, including maintenance of a reserve therefor to the extent required by the Bond Ordinance, (e) creation and maintenance of an extraordinary repair and replacement reserve fund, and (f) to provide for such other expenditures and funds for the System as the Bond Ordinance and the Act require; and (2) an amount equal to the Required Combined Coverage where the numerator is the Net Revenues projected for the Fiscal Year of calculation, and the denominator is the Indebtedness coming for such Fiscal Year. See "SECURITY AND SOURCES FOR PAYMENT OF THE FIXED RATE BONDS – Operating and Rate Covenants." The City has covenanted at all times to fix and maintain such rates for services furnished by the System as shall be sufficient to provide for the foregoing. As a matter of operating policy, the Department has established a goal of fixing rates so that net revenues exceed the debt service coverage requirements of the Bond Ordinance. This policy may be changed from time to time by the Board without approval by Bondowners or any other party.

Under the Act, rates must be fixed and revised as necessary to comply with the Bond Ordinance. The contracts with wholesale municipal customers typically provide that rates be reasonable in relation to the costs incurred for the supply of water. The Department maintains a small staff to review and make recommendations on rates for water and sewer service. The Department has routinely retained outside consultants to supplement the efforts of its staff. The current water rate schedule became effective July 14, 2007. The Act provides that the rates charged by the System should not be subject to supervision or regulation by any State bureau, board, commission, or like agency or instrumentality of the State.

Currently, rates are adjusted annually and are determined by the "utility basis" method, which is recommended by the American Water Works Association for municipally-owned utilities providing services to metropolitan areas and which the System is required to use by Michigan law. Under this method, the revenue requirement is comprised of three elements of cost: operation and maintenance expenses, depreciation expense and a return on the rate base. The rate base reflects the value of property on which the Department is entitled to earn a return. In formulating rates, the Department recognizes the distinctions between retail customers and the various wholesale municipal customers based on the differences in the cost of serving each class of customer. The "utility basis" method has been upheld in litigation involving the Department's water rates.

The following table indicates a summary of retail and wholesale water rates in effect over the past ten years. The fiscal year 2008 rates for wholesale customers per Mcf range from a low of $5.63 to a high of $274.94.

40

A new schedule of water rates developed to generate an overall revenue increase of approximately 8.0 percent over those produced by the existing water rates has been approved by the Board, was approved by the City Council May 6, 2008, and will become effective on all bills issued on or after September 3, 2008.

SOURCE: The Department

**Water Rate Comparison**

As shown in the following table, current charges for consumption of a like amount of water are generally less in Detroit than in most other major cities. The Department anticipates increasing rates as is necessary to continue the funding of the Capital Improvement Program that such increases are not anticipated to differ significantly from what will be experienced in other areas of the country having water systems of comparable age and facing infrastructure challenges similar to the System, and that the price and availability of water in the area should continue to be a positive factor in the attraction of industry to the area.

| City | Small (a) Amount | Small (a) Rank | Medium (b) Amount | Medium (b) Rank | Large (c) Amount | Large (c) Rank |
|------|------|------|------|------|------|------|
| Chicago | $ 117 | 1 | $ 1,561 | 2 | $ 156,137 | 7 |
| Phoenix | 132 | 2 | 2,970 | 12 | 301,157 | 14 |
| Memphis | 137 | 3 | 1,946 | 3 | 99,303 | 1 |
| Jacksonville | 172 | 4 | 1,484 | 1 | 103,522 | 2 |
| Dallas | 181 | 5 | 2,155 | 6 | 164,935 | 8 |
| **Detroit** | **184** | **6** | **2,152** | **5** | **169,174** | **9** |
| New York | 198 | 7 | 2,653 | 10 | 265,320 | 11 |
| Milwaukee | 199 | 8 | 2,317 | 8 | 116,996 | 4 |
| Baltimore | 220 | 9 | 1,953 | 4 | 125,306 | 5 |
| Austin | 220 | 9 | 4,106 | 18 | 349,183 | 19 |
| Columbus | 222 | 11 | 2,219 | 7 | 149,885 | 6 |
| Indianapolis | 247 | 12 | 2,336 | 9 | 114,761 | 3 |
| San Francisco | 260 | 13 | 3,161 | 14 | 277,421 | 13 |
| San Jose | 263 | 14 | 3,129 | 13 | 270,216 | 12 |
| San Antonio | 271 | 15 | 3,588 | 17 | 305,353 | 15 |
| Houston | 277 | 16 | 3,287 | 15 | 310,830 | 16 |
| Los Angeles | 284 | 17 | 3,361 | 16 | 336,072 | 18 |
| Philadelphia | 288 | 18 | 2,753 | 11 | 228,427 | 10 |
| Boston | 353 | 19 | 4,947 | 20 | 511,514 | 20 |
| San Diego | 380 | 20 | 4,271 | 19 | 317,585 | 17 |
| Average (d) | $ 233 | | $ 2,852 | | $ 237,049 | |

(a) Based on water use of 90,000 gallons (12 Mcf) per year and 5/8" meter.
(b) Based on water use of 1.2 million gallons (160 Mcf) per year and 2" meter.
(c) Based on water use of 1.2 million gallons (160 Mcf) per year and 2" meter.
(d) Excluding Detroit.

*SOURCE: Black & Veatch Corporation 2005 Survey.*

41

**Summary of Historical Revenues and Expenses**

The table below shows historical revenues and expenses of the Water Supply System for each of the past five fiscal years ended June 30, 2007. Information is derived from the audited financial statements of the Water Fund for fiscal years ended June 30, 2003 through and included the fiscal year ended June 30, 2006. The financial statement of the Water Fund for fiscal year ended June 30, 2007 has not been audited. Financial statements and notes thereto as of and for the fiscal years ended June 30, 2006 and June 30, 2005 are included in Appendix B – "Audited Financial Statements of the Water Fund of the City of Detroit, Michigan."

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## Summary of Historical Revenues and Expenses
## For Fiscal Years 2003-2007

| | Fiscal Year Ending June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2003** | **2004** | **2005** | **2006** | **2007** *(Unaudited)* |
| Operating Revenues: | | | | | |
| Water Sales - Detroit | $ 61,814,702 | $ 70,881,142 | $ 58,921,494 | $ 68,736,614 | $ 66,383,095 |
| Water Sales - Suburban | 175,537,813 | 180,816,227 | 200,050,339 | 205,581,302 | 208,028,964 |
| Other | 3,678,190 | 3,719,815 | 1,641,252 | 1,912,850 | 2,322,380 |
| Total Operating Revenues | $ 241,030,705 | $ 255,417,184 | $ 260,613,085 | $ 276,230,767 | $ 276,734,438 |
| Operation and Maintenance Expenses | | | | | |
| Source of Supply | $ 1,400,820 | $ 2,599,262 | $ 2,244,535 | $ 2,856,385 | $ 1,570,104 |
| Low Lift Pumping | 5,402,838 | 5,628,218 | 6,081,177 | 8,258,270 | 6,411,189 |
| Purification | 15,967,195 | 17,406,399 | 18,983,784 | 18,441,764 | 15,436,846 |
| High Lift Pumping | 26,208,834 | 18,614,963 | 19,338,389 | 15,306,817 | 20,602,556 |
| Water Quality Operations | 3,044,338 | 3,447,504 | 1,876,012 | 1,705,680 | 1,407,394 |
| Transmission and Distribution | 56,294,653 | 56,548,520 | 52,449,347 | 42,241,472 | 41,899,632 |
| Commercial | 5,578,007 | 6,244,587 | 7,227,323 | 5,084,493 | 6,219,119 |
| Administrative and General | 43,716,332 | 42,072,318 | 48,753,131 | 52,320,068 | 58,059,479 |
| Total Operating Expenses | $ 157,613,017 | $ 152,561,771 | $ 156,953,698 | $ 146,214,949 | $ 151,606,319 |
| Net Operating Revenues (a) | 83,417,688 | 102,855,413 | 103,659,386 | 130,015,817 | 125,128,120 |
| Non-Operating Income (b) | 6,453,901 | 4,223,627 | 7,175,672 | 18,843,877 | 34,065,168 |
| Net Revenues | $ 89,871,589 | $ 107,079,040 | $ 110,835,058 | $ 148,859,694 | $ 159,193,288 |
| | | | | | |
| Debt Service Requirements (c) | | | | | |
| Senior Lien Bonds | $ 61,450,538 | $ 63,808,400 | $ 71,795,200 | $ 73,404,900 | $ 82,262,200 |
| Senior Lien and Second Lien Bonds | $ 82,912,996 | $ 95,330,500 | $ 105,575,100 | $ 107,287,800 | $ 115,174,700 |
| All Bonds including SRF Junior Lien Bonds | | | | $ 107,305,000 | $ 115,449,700 |
| Debt Service Coverage (d) | | | | | |
| Senior Lien Bonds | 1.46 | 1.68 | 1.54 | 2.03 | 1.94 |
| Senior Lien and Second Lien Bonds | 1.08 | 1.12 | 1.05 | 1.39 | 1.38 |
| All Bonds including SRF Junior Lien Bonds | | | | 1.39 | 1.38 |

(a) Net Revenues not required to flow into the Interest and Redemption Funds or the Extraordinary Repair and Replacement Reserve Fund are available for capital expenditures. It should be noted that the table reflects accounting on an accrual basis in accordance with generally accepted accounting principles and does not necessarily reflect cash available since revenues include accounts receivable and expenditures include a number of "non-cash" items such as increases in the amounts reserved for doubtful accounts.

(b) Does not include "Miscellaneous Non-Operating Income (Expense)," which amounts are reflected on the Statement of Operations as a net adjustment to Non-Operating Income (Expense). Historically, miscellaneous non-operating income has been actual cash receipts not derived from operations and has not been material.

(c) Includes liquidity fees, as these have traditionally been treated as interest payments for accounting purposes. Projections of debt service in this Remarketing Circular do not include such fees, in accordance with the Bond Ordinance treatment of such fees as Ancillary Obligation Fees and Expenses.

(d) "Coverage" calculations include all Net Revenues available for payment of debt service, and include Construction Fund investment earnings. See "SECURITY AND SOURCES OF PAYMENT FOR THE FIXED RATE BONDS – Pledged Assets" regarding treatment of Construction Fund investment earnings.

SOURCE: The Department

43

**Analysis of Recent Operations**

The following information summarizes the financial operations of the System for the last five fiscal years. Audited financial statements are available for fiscal years 2003 through 2006, and additional detailed information related to the financial statements for the fiscal years ended June 30, 2006 and June 30, 2005 can be found in Appendix B – "Audited Financial Statements of the Water Fund of the City of Detroit, Michigan." The fiscal year 2007 figures contained herein are unaudited.

*Operating Revenues.* As indicated in the above table, System operating revenues (primarily generated from water sales) have increased approximately $36 million, or 15%, since fiscal 2003. This increase is primarily attributable to water rate increases during that period, as water sales have experienced a moderate decline during that time. However, the variance from year to year is also partially attributable to varying levels of bad debt expense throughout the period. In order to align with the presentation of financial results in a manner consistent with the 2005 audited financial statements, operating revenues in this schedule are expressed net of bad debt expense, which was recorded as an operating expense prior to 2005. Bad debt expense is recognized on the Department's financial statements based on an analysis of the size and age of accounts receivable and the expected ability to collect those receivables. During 2004, the Department did not record any bad debt expense, as existing reserves were deemed adequate based on the analysis conducted at the time. The corresponding bad debt expense figures for 2005, 2006 and 2007 were approximately $11.0 million, $4.4 million and $6.3 million, respectively. Miscellaneous operating revenue, which refers to other operating revenue not directly generated from the sale of water, remained fairly consistent over the past three years.

*Operating Expenses.* Total operating expenses in 2007 were actually approximately $6 million (or 4 percent) lower than those experienced in 2003.

The relatively stable cost levels are primarily attributable to the cost efficiency measures implemented by Department management over the last three fiscal years. See "FINANCIAL PROCEDURES – Management Initiatives." A portion of the annual variation in operating expenses is associated with the allocation of costs for functions that provide service to both the water and sewer systems. These costs are assigned to the two utilities based on detailed labor distribution systems and overall management policy, and will naturally fluctuate, based on where maintenance and related activities are focused.. The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate this issue and that its financial accounting systems accurately report activity for this matter.

*Nonoperating Income.* As indicated in footnote (b) to the above table, the category "Miscellaneous Nonoperating Income (Expense)" reflected in the financial statements is a "net" amount and has historically represented relatively small amounts of nonoperating income or certain non-cash write offs. Recently this category also includes "contributions" of assets and other non-monetary amounts. These amounts are not included in the analysis of current revenues and expenses (particularly for purposes of calculating coverage levels) as they generally do not have an effect on the amount of cash available for System operations or debt service. The presentation in the preceding table does not reflect any elements of Miscellaneous Nonoperating Income (Expense).

The indicated debt service coverage levels for all liens of debt have experienced a significant increase during the last two years. These coverage levels have been in excess of the prospective figures required by the Bond Ordinance and the Board's policy goal. These improved levels are a product of several elements, including the ongoing implementation of the Departments efficiency initiatives, more conservative planning for regarding water sales levels, bad debt expense and other "non-cash" operating expenses, and a moderate reduction in the occurrence of such "non-cash" expenses during the last two years. The Department continues to take steps to ensure improved fiscal performance.

The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate each of these issues and that its financial accounting systems accurately report activity for each of these matters.

# Summary of Projected Revenues and Additional Revenue Requirements
## For Fiscal Years 2008-2012

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| Operating Revenue Under Existing Rates(a) | $304,259,800 | $317,142,400 | $326,905,000 | $329,365,500 | $331,846,800 |
| Projected Revenue from Rate Increases(b) | | | | | |
| FY 2010:  6.2% | | | 20,112,000 | 20,263,400 | 20,416,000 |
| FY 2011:  6.8% | | | | 23,724,600 | 23,903,300 |
| FY 2012:  6.6% | | | | | 24,951,600 |
| | ------------------ | ------------------ | ------------------ | ------------------ | ------------------ |
| Total Projected Revenue from Water Rates | 304,259,800 | 317,142,400 | 347,017,000 | 373,353,500 | 401,117,700 |
| Miscellaneous Operating Revenue | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Projected Non-Operating Revenue | 15,765,400 | 12,275,900 | 7,911,900 | 9,075,300 | 9,586,000 |
| Total Projected Operating Revenue | $321,525,200 | $330,918,300 | $356,428,900 | $383,928,800 | $412,203,700 |
| Operation and Maintenance Expense(c) | 156,579,600 | 156,593,400 | 160,508,200 | 164,520,900 | 168,633,900 |
| Projected Net Operating Revenues | 164,945,600 | 174,324,900 | 195,920,700 | 219,407,900 | 243,569,800 |
| Senior Lien Debt Service | 97,531,500 | 110,137,200 | 109,843,700 | 127,987,700 | 145,989,000 |
| Junior Lien Debt Service | 36,084,600 | 41,649,400 | 41,899,800 | 42,131,000 | 43,084,900 |
| DWRF Junior Lien Debt Service | 1,540,300 | 1,731,600 | 1,919,800 | 1,965,900 | 1,961,200 |
| Total Debt Service(d)(e) | $135,156,400 | $153,518,200 | $153,663,300 | $172,084,600 | $191,035,100 |
| Projected Senior Lien Debt Service Coverage | 169% | 158% | 178% | 171% | 167% |
| Projected Senior and Second Lien Debt Service Coverage | 123% | 115% | 129% | 129% | 129% |
| Projected Total Debt Service Coverage | 122% | 114% | 127% | 128% | 128% |
| Balance for CIP and Other Purposes | $ 29,789,200 | $ 20,806,700 | $ 42,257,400 | $ 47,323,300 | $ 52,534,700 |

---

(a) Revenues for 2008 assume rates currently in effect. Revenues for 2009 – 2012 reflect rates scheduled to take effect in September 2008.

(b) Projected additional revenue is developed based upon both projected increases in operation and maintenance expense and debt service coverage and certain other requirements which must be met in order to issue bonds to finance the CIP.

(c) Assumes general inflation rate of 2.5% annually after Fiscal Year 2009. Operating expense projected to also include certain fees to remarketing providers.

(d) Reflects debt service (principal and interest) on all existing indebtedness, the Predecessor Bonds, and the Fixed Rate Bonds as provided in the immediately succeeding sentence, and future bonds. Reflects debt service on the Predecessor Bonds at a fixed interest rate payable by the City under the Existing Swaps until March 1, 2008. As a result of recent developments in the bond insurance industry discussed herein, from March 1, 2008, until the conversion to a Fixed Rate, debt service on the Predecessor Bonds was the approximate average variable rate borne by such Predecessor Bonds. Debt Service on the Fixed Rate Bonds after the Conversion Date included the net fixed payment by the City under the Mirror Swaps; see "INTRODUCTION - recent Developments in the Bond Insurance Industry", "PLAN OF REMARKETING - Related Interest Rate Swaps" and "INTEREST RATE SWAP AGREEMENTS – Interest Rate Swaps Related to the Remarketed Bonds" for more information.

(e) Assumes bond sales in subsequent years at an annual interest rate of 5.25%. Although the Department may issue Additional Water System Bonds as Second Lien or Senior Lien Bonds, for purposes of this table future debt is assumed to be issued as Senior Lien Bonds.

**Upcoming Reporting Change**

The Governmental Accounting Standards Board has recently released Statement No. 45, *Accounting and Reporting by Employers for Postemployment Benefits Other Than Pensions*. The new pronouncement provides guidance for local units of government in recognizing the cost of retiree health care, as well as any "other" postemployment benefits (other than pensions). This change will cause the financial statements of the City to recognize the cost and related liability of providing retiree health care coverage over the working life of the employee, rather than at the time the health care premiums are paid. For the City, this will result in increased expenses and a related liability, which will likely be significant. The City is currently evaluating the effect that GASB No. 45 will have on its financial statements. The City commissioned an actuarial valuation as of December 31, 2004. The present value of all benefits expected to be paid to current plan members as of December 31, 2004 is $8,033 million ($3,931 million for current retirees and $4,102 million for active employees). The actuarial accrued liability, which is the portion of the $8,033 million attributable to the service accrued by plan members as of December 31, 2004, is $6,244 million. The City has not yet determined the Department's share of this liability. As of December 31, 2004, there were no plan assets available to offset the liabilities of the plan. Statement No. 45 is effective for the year ending June 30, 2008.


# LITIGATION

**Detroit Water and Sewerage Department Litigation**

The City of Detroit recently constructed a new 800 Megahertz (MHz) radio communications system that provides communication capabilities to all City departments for both day to day operations and emergency situations. The total cost of the 800 MHz was approximately $138 million.

In May 2003 the City of Detroit Budget Department, on behalf of all the general fund departments, and the Detroit Water and Sewerage Department (the "DWSD"), an enterprise fund department) entered into a Memorandum of Understanding (the "MOU"), pursuant to which DWSD took the lead in contracting for and overseeing the construction of the 800 MHz radio project. Pursuant to the MOU, DWSD agreed that it would pay 60% of the capital (i.e. infrastructure) cost of the project and the general fund departments would pay 40% of those costs. That allocation was based on the larger footprint of DWSD's service area (1,000 square miles in eight counties in southeast Michigan) as compared to the approximately 100 square mile area of the City served by the general fund departments. This allocation was also based on the understanding that 15 of the 25 radio communication towers (60%) needed to support the system would be constructed outside the City of Detroit and utilized only by DWSD. Thus, of the total infrastructure costs of $64.4 million, DWSD paid $38.6 million and the general fund departments paid the balance. The City subsequently succeeded in negotiations with the State of Michigan for the use of its Michigan Public Safety Communications System (MPSCS) radio towers for communications support outside the City of Detroit, in exchange for various payments and the improvements both to the MPSCS towers and the towers planned to be constructed inside the City of Detroit for use of those towers by the State.

In late 2005 Wayne, Oakland and Macomb Counties challenged the 60:40 infrastructure cost allocation in litigation pending in U.S. District Court. Those counties are wholesale sewerage customers of DWSD. They argued that the allocation of the costs of the system passed on, in part, to those Counties through DWSD's rates was improper. They argued that DWSD's allocated share of the infrastructure costs should have been closer to 8%, based on DWSD's actual air time use of the radio system.

On March 23, 2007 the Court issued an opinion in which the Court determined that DWSD's share of the infrastructure cost was too high. A final order implementing that opinion has not yet been entered. The Court has ordered the parties to engage in negotiations supervised by the Court to determine the exact amount of the overpayment by DWSD that must be reimbursed by the general fund departments. The negotiations are ongoing.

On October 9, 2002 the City of Warren filed a lawsuit in Macomb County Circuit Court challenging the water rate increases for the City of Warren that took effect on July 1, 2001 and July 1, 2002. The Department is defending the lawsuit with retained counsel. The Department removed the case to the United States District Court for the Eastern District of Michigan. The Department did so because the plaintiff challenged the allocation of certain costs between the water and sewage funds. The challenge implicated the terms of settlement agreements and

46

consent judgments entered by the District Court. On February 13, 2006 the U.S. District Court granted the Department's motion to dismiss the lawsuit. The plaintiff filed an appeal of that ruling with the Sixth Circuit Court of Appeals. On July 23, 2007 the Court of Appeals reversed the District Court's decision to take jurisdiction over the case and ordered that it be remanded to Macomb County Circuit Court. The Department filed a motion for change of venue to a neutral county, which was granted. The case was recently transferred to Saginaw County Circuit Court.

On April 18, 2007 EBI-Detroit Inc. filed suit against the Department in a lawsuit over a construction project at the Lake Huron Water Treatment Plant. EBI was the general contractor. The lawsuit seeks compensation for alleged delay damages and breach of contract. The lawsuit was originally filed in St. Clair County Circuit Court. That court has granted the Department's motion for a change of venue to Wayne County. The Department will contest the lawsuit.

## Other Litigation

The Department is involved in numerous other lawsuits related to the System. These lawsuits arise primarily out of personal injuries or property damage, or assert breach of contract claims on construction projects for the System. The Department and its legal counsel have determined an estimated contingent reserve against the potential outcome of such claims or the amount of potential damages.

On March 24, 2008 the Wayne County Prosecutor filed charges of obstruction of justice and perjury against the Mayor of Detroit. The charges relate to his testimony in a wrongful discharge lawsuit filed by two former police officers. That underlying litigation, which had been settled, had no connection to the Detroit Water and Sewerage Department. The Mayor has asserted his innocence and announced that he will fight the charges. The Department believes that the charges against the Mayor should not have any effect on the revenues of the Department or the security for the bonds.

## CONTINUING DISCLOSURE UNDERTAKING

### The Continuing Disclosure Undertaking

The City has covenanted for the benefit of the Beneficial Owners (as hereinafter defined) of the Fixed Rate Bonds pursuant to the Continuing Disclosure Undertaking heretofore delivered by the City (the "Disclosure Undertaking") (a summary of which is set forth in Appendix F, hereto), to provide or cause to be provided: (i) each year, audited financial statements (unaudited if audited are unavailable) and certain financial information and operating data pertaining to the System (collectively, the "Annual Report") by not later than the date 210 days after the last day of the fiscal year for the City, commencing with the Annual Report for the City's fiscal year ending June 30, 2007, and (ii) timely notices of the occurrence of certain enumerated events, if material. Currently, the City's fiscal year commences on July 1. "Beneficial Owners" means, under this caption only, the registered owner of any Fixed Rate Bond, or any person with the power, directly or indirectly, to vote or consent with respect to, or to dispose of Fixed Rate Bond (including any person holding a Fixed Rate Bond through a nominee, depository or other intermediary) or who is treated as the owner of any Fixed Rate Bond for federal income tax purposes.

An Annual Report will be filed by the City with each nationally recognized municipal securities information repository (each a "NRMSIR") and with Michigan's state information depository (the "SID"), in each case as then recognized as such by the Securities and Exchange Commission (the "SEC"). If the City is unable to provide to each NRMSIR and the SID an Annual Report by the date required, the City shall send, in a timely manner, to each NRMSIR or the Municipal Securities Rulemaking Board (the "MSRB"), and to the SID, a notice of the failure to file the Annual Report by such date. The notices of material events will be filed by the City with the MSRB or each NRMSIR, and with the SID. Any filing with each NRMSIR and the SID may be made by transmitting such filing to Disclosure USA as provided at www.disclosureusa.org unless the SEC withdraws the interpretive advice contained in its letter to the Municipal Advisory Council of Texas, dated September 7, 2004. These covenants have been made in order to assist the Remarketing Agent and registered brokers, dealers and municipal securities dealers in complying with the requirements of subsection (b)(5) of Rule 15c2-12 promulgated by the SEC pursuant to the Securities and Exchange Act of 1934, as amended (the "Rule").

In recent years, the City has been unable to meet its obligation under continuing disclosure agreements related to prior bond issues, to provide annual financial information within the periods specified in the applicable

agreements. Annual financial information for the City for Fiscal Years ended June 30, 1999 through 2002 was filed on May 10, 2000, May 28, 2001, May 31, 2002 and March 10, 2003, respectively. Annual financial information for Fiscal Year ended June 30, 2003 was filed on March 1, 2004 (for other bonds), and for Fiscal Year ended June 30, 2004 was filed on February 16, 2005 (for water supply system bonds and sewage disposal system bonds) and on May 5, 2005 (for other bonds). Annual financial information for Fiscal Year ended June 30, 2005 was filed on June 1, 2006. Annual financial information for Fiscal Year ended June 30, 2006 was filed by the City on February 29, 2008. Annual financial information for the Fiscal Year ended June 30, 2007 will be filed after completion of an audit of such financial information    A failure by the City to comply with the Disclosure Undertaking must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Fixed Rate Bonds in the secondary market. Consequently, such failure may adversely affect the marketability and liquidity of and the market price for the Fixed Rate Bonds.

**The Disclosure Dissemination Agent – DAC**

In order to provide continuing disclosure with respect to the Fixed Rate Bonds in accordance with the Rule, in connection with the issuance of the Fixed Rate Bonds the City will enter into a Disclosure Dissemination Agent Agreement ("Disclosure Dissemination Agreement") for the benefit of the Beneficial Owners with Digital Assurance Certification, L.L.C. ("DAC"), under which the City has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent the City has provided such information to the Disclosure Dissemination Agent as required by this Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the content of any disclosures or notice made pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Report, Audited Financial Statements, notice of Notice Event or Voluntary Report, or any other information, disclosures or notices provided to it by the City and shall not be deemed to be acting in any fiduciary capacity for the City, the Beneficial Owners or any other party. The Disclosure Dissemination Agent has no responsibility for the City's failure to report to the Disclosure Dissemination Agent a Notice Event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the City has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the City at all times.

## TAX MATTERS

**Federal Tax Matters**

In the opinion of Lewis & Munday, A Professional Corporation, Bond Counsel, based on their examination of the documents described in their opinion, under existing law, as presently interpreted, the interest on the Fixed Rate Bonds (a) is excluded from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. It should be noted, however, that with respect to corporations (as defined for federal income tax purposes) such interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations.  The opinion is subject to the condition that the City comply with all requirements of the Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder (the "Code") that must be satisfied subsequent to the remarketing of the Fixed Rate Bonds in order that interest thereon be (or continue to be) excluded from gross income for federal income tax purposes. These requirements may include rebating certain earnings to the United States. Failure to comply with any of such requirements could cause the interest on the Fixed Rate Bonds to be included in gross income retroactive to the date of issuance of the Fixed Rate Bonds. The City has covenanted to comply with all such requirements.

Additional federal tax consequences relative to the Fixed Rate Bonds and interest thereon include the following matters. The following is a general description of some of these consequences, but is not intended to be

48

complete or exhaustive, and investors should consult their tax advisors with respect to these matters. For federal income tax purposes: (a) tax-exempt interest, including interest on the Fixed Rate Bonds, is included in the calculation of modified adjusted gross income required to determine the taxability of social security or railroad retirement benefits; (b) the receipt of tax-exempt interest, including interest on the Fixed Rate Bonds, by life insurance companies may affect the federal income tax liabilities of such companies; (c) the amount of certain loss deductions otherwise allowable to property and casualty insurance companies will be reduced (in certain instances below zero) by 15% of, among other things, tax-exempt interest, including interest on the Fixed Rate Bonds; (d) interest incurred or continued to purchase or carry the Fixed Rate Bonds may not be deducted in determining federal income tax; (e) commercial banks, thrift institutions and other financial institutions may not deduct their costs of carrying certain obligations such as the Fixed Rate Bonds; (f) interest on tax-exempt bonds, such as the Fixed Rate Bonds, will be included in effectively connected earnings and profits for purposes of computing the branch profits tax on certain foreign corporations doing business in the United States; and (g) passive investment income, including interest on tax-exempt bonds such as the Fixed Rate Bonds, may be subject to federal income taxation for Subchapter S Corporations that have Subchapter C earnings and profits at the close of the taxable year if greater than 25% of the gross receipts of such Subchapter S Corporation is passive investment income.

**State Tax Matters**

Bond Counsel is further of the opinion that, under existing law, as presently interpreted, the Fixed Rate Bonds and the interest thereon are exempt from all taxation provided by the laws of the State of Michigan, except inheritance and estates taxes, and taxes on gains realized from the sale, payment or other disposition of the Fixed Rate Bonds.

**Original Issue Discount**

For federal income tax purposes, if the remarketing price of a Fixed Rate Bond as shown on the cover of this Official Statement is less than the stated redemption price at maturity, then such Fixed Rate Bond is considered to have an "original issue discount" equal to the difference between such remarketing price and the amount payable at maturity (such Fixed Rate Bonds are referred to as "Original Issue Discount Bonds"). The remarketing price of each Original Issue Discount Bond will be the remarketing price to the public at which a substantial amount of such Original Issue Discount Bonds are sold, and the issue date will be the date on which an Original Issue Discount Bond is first issued to the public.

In the opinion of Bond Counsel, under existing law as presently interpreted, the original issue discount on an Original Issue Discount Bond accrued in the hands of a registered owner is treated for federal income tax purposes as tax-exempt interest as described below. The registered owner's basis for determining gain or loss on a sale, maturity or other disposition of an Original Discount Bond generally will equal the registered owner's cost, increased by any original issue discount that accrued while the owner held the Original Discount Bond as described below. Generally, any gain or loss incurred by a U.S. registered owner on the sale, exchange or payment at maturity of an Original Discount Bond (based on the registered owner's basis) would be taxable as capital gain or loss (assuming the Original Discount Bond is held as a capital asset), which would be long term or short term depending on whether the Original Discount Bond was held for more than the applicable treatment of long term capital gain.

Subject to the modification in the next paragraph for certain subsequent registered owners, the original issue discount accrued in each "accrual period" will equal the remarketing price of the Original Issue Discount Bond (increased by the amount of the original issue discount accrued in all prior accrual periods without regard to the modifications discussed in the next paragraph) multiplied by the yield to maturity of the Original Issue Discount Bond (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) less the interest payable on such Original Issue Discount Bond during such accrual period. For purposes of this paragraph, "accrual period" means a six month period (or shorter period from the date of remarketing of the Original Issue Discount Bond) which ends on a day in the calendar year corresponding to the maturity date of the Original Issue Discount Bond or the date six months before such maturity date. The original issue discount so accrued in a particular accrual period will then be considered to accrue ratably on each day of the accrual period.

A modification of the foregoing rules will generally apply to a registered owner who acquired an Original Issue Discount bond by "purchase" if the cost of the Original Issue Discount Bond to that purchaser exceeds the sum of (a) the remarketing price of the Original Issue Discount Bond and (b) the total original issue discount

accrued under the rules of the preceding paragraph during the entire period prior to the registered owner's purchase of the Original Issue Discount Bond. In that case, the amount of the original issue discount considered to accrue in an accrual period will equal (i) the amount determined under the rules of the preceding paragraph reduced by (ii) the portion of such excess purchase price allocable to the days beginning on the date of such purchase and ending on the stated maturity date of the Original Issue Discount Bond. Such excess would be allocated so as to equal a constant percentage of the original issue discount accrued on each such day in the remaining period to maturity as described above. For this purpose, a "purchase" is any acquisition of an Original Issue Discount Bond other than one in which the registered owner's basis in such Original Issue Discount Bond is determined be reference to the basis of the Original Issue Discount Bond in the hands of the person from whom acquired (such as a gift).

**Amortizable Bond Premium**

For federal income tax purposes, under existing law, as presently interpreted, if the remarketing price of a Fixed Rate Bond is greater than the stated redemption price at maturity (such bonds are hereafter referred to as "Premium Bonds"), then the difference between a purchaser's cost basis of the Premium Bonds and the amounts payable on the Premium Bonds (other than the payment of the stated interest thereon) constitutes an amortizable bond premium. Such amortizable bond premium is not deductible from gross income, but is treated for federal income tax purposes as an offset to the amount of stated tax-exempt interest paid on the Premium Bonds and is taken into account by certain corporations in determining adjusted current earnings for the purpose of computing the alternative minimum tax, which may also affect liability for the branch profits tax imposed by Section 884 of the Code.

In general, the amount of amortizable bond premium allocated to each "accrual period" is the excess of the stated interest on a Premium Bond allocable to such accrual period over the product of the bond purchaser's adjusted acquisition price at the beginning of such accrual period multiplied by the discount rate that, when used in computing the present value of all remaining payments to be made on such Premium Bond (including stated interest) produces an amount equal to the holder's basis in the Premium Bonds. For purposes of this calculation, the adjusted acquisition price at the beginning of any accrual period is equal to the purchaser's original basis in the Premium Bond decreased by (i) the amount of bond premium amortized in prior accrual periods and (ii) the amount of any payments previously made on the Premium Bond other than payments of stated interest on such Premium Bond.

The amount of amortizable bond premium allocable to each taxable year is deducted from the bond purchaser's adjusted basis on such Premium Bonds to determine taxable gain upon disposition (including sale, redemption or payment at maturity) of such Fixed Rate Bonds.

**Market Discount**

Pursuant to amendments made to the Code by the Omnibus Budget Reconciliation Act of 1993, the "market discount rules" of the code apply to the Fixed Rate Bonds. Accordingly, holders acquiring their Fixed Rate Bonds subsequent to the remarketing of the Fixed Rate Bonds will generally be required to treat market discount recognized under the provisions of the Code as ordinary taxable income (as opposed to capital gain income). Holders should consult their own tax advisors regarding the application of the market discount provisions of the Code and the advisability of making any of the elections relating to market discount allowed by the Code.

**Recent Developments**

The City has determined that it has not implemented the necessary procedures to ensure compliance with the arbitrage rebate rules of Section 148(f) of the Internal Revenue Code of 1986 applicable to the City's outstanding tax-exempt obligations. The City is engaged in discussions with the Internal Revenue Service with a view to establishing such procedures. The potential impact to the City is indeterminable at this time.

The opinion of Bond Counsel is based on existing law as of the date of the opinion and the opinion does not cover future changes in law. Michigan tax law could be affected by a decision of the United States Supreme Court in the case of Kentucky Department of Revenue Services v. Davis. The case was argued before the Court on November 5, 2007. The Kentucky Court of Appeals ruled that taxing interest income on out-of-state bonds while exempting interest on bonds issued by the Commonwealth of Kentucky and its political subdivisions violates the Commerce Clause of the United States Constitution. Like Kentucky and a number of other states, the State of Michigan taxes interest on bonds of out-of-state issuers but exempts the interest on bonds issued by the State of

Michigan and its political subdivisions. In the event that the United States Supreme Court upholds the Kentucky decision and rules that it is unconstitutional to exempt the interest on in-state bonds while taxing the interest on out-of-state bonds, the State of Michigan and other states may modify their tax laws as to the treatment of interest on in-state and out-of-state bonds. No assurances can be given as to the outcome of the Davis case or as to the nature of any legislative response by the State of Michigan or any other state if the decision in Davis is upheld. Owners of the Fixed Rate Bonds should consult their tax advisors with respect to the potential impact on ownership, disposition and market value of the Fixed Rate Bonds as a result of the Davis case at the Supreme Court.

**Future Developments**

No assurance can be given that any future legislation or clarifications or amendments to the Code, if enacted into law, will not contain proposals which could cause the interest on the Fixed Rate Bonds to be subject directly or indirectly to federal income taxation, or which could cause the interest on the Fixed Rate Bonds to be subject directly or indirectly to State of Michigan income taxation, adversely affect the market price or marketability of the Fixed Rate Bonds, or otherwise prevent the holders from realizing the full current benefit of the status of the interest thereon. Further, no assurance can be given that any such future legislation, or any actions of the Internal Revenue Service, including, but not limited to, selection of the Fixed Rate Bonds for audit examination, or the course or result of any examination of the Fixed Rate Bonds, or other bonds which present similar tax issues, will not affect the market price of the Fixed Rate Bonds.

**Tax Advisors**

INVESTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE TAX CONSE-QUENCES OF THEIR ACQUISITION, HOLDING OR DISPOSITION OF THE FIXED RATE BONDS.

## FEASIBILITY CONSULTANT

The Department retains The Foster Group, LLC as a Feasibility Consultant to develop reports and studies relating to the Water Supply System and certain financial matters. The Financial Feasibility Report appears in Appendix A.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Grant Thornton, LLP, independent certified public accountants and consultants, will deliver a report dated as of the applicable Conversion Date of the interest mode on the Predecessor Bonds from the Weekly Mode to the Fixed Rate Mode verifying the accuracy of the yield of the Fixed Rate Bonds. Such verification will be used by Bond Counsel in its determination that the interest on the Fixed Rate Bonds is not included in gross income for federal income tax purposes as a condition to the conversion and remarketing of the Fixed Rate Bonds. Such verifications will be based upon certain information supplied to Grant Thornton, LLP by the Remarketing Agent.

## INDEPENDENT AUDITORS

The financial statements of the Water Fund as of and for the years ended June 30, 2006 and 2005, included in Appendix B – "Audited Financial Statements of the Water Fund of the City of Detroit, Michigan," have been audited by KPMG LLP, independent auditors, as indicated in their report with respect thereto, which report also appears in Appendix B.

## CERTAIN LEGAL MATTERS

Legal matters incident to the conversion of the Fixed Rate Bonds will be passed upon by Lewis & Munday, A Professional Corporation, Detroit, Michigan, and for the Remarketing Agent by its counsel, Allen Brothers, PLLC, Detroit, Michigan.

51

# REMARKETING

Pursuant to the Remarketing Agreement, Siebert Brandford Shank & Co., LLC, as Remarketing Agent, agrees subject to certain conditions to purchase the 2001C Fixed Rate Bonds from the City at a purchase price of $204,334,981.00 (being the principal amount of the 2001C Fixed Rate Bonds, plus a net reoffering premium of $15,127,438.05 less an underwriter's discount of $1,197,457.05) and to purchase the 2005B Fixed Rate Bonds from the City at a purchase price of $202,249,601.15 (being the principal amount of the 2005B Fixed Rate Bonds, plus a net reoffering premium of $8,575,327.25, less an underwriter's discount of $1,225,726.10). The Remarketing Agent will be obligated to purchase all the Fixed Rate Bonds if any are purchased. The Fixed Rate Bonds may be offered and sold by the Remarketing Agent to certain dealers at prices lower than the initial public offering prices for the Fixed Rate Bonds, and the public offering prices may be changed from time to time. In connection with this offering, the Remarketing Agent may overallot or effect transactions which stabilize or maintain the market price of the Fixed Rate Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

Should the conversion of the Predecessor Bonds to the Fixed Rate Mode fail to occur, the Predecessor Bonds to have been converted will remain outstanding and Siebert Brandford Shank & Co., LLC will remarket the Bonds as Variable Rate Bonds in the Weekly Mode. This Remarketing Circular describes the Fixed Rate Bonds in the Fixed Rate Mode only. It is not intended to be used in connection with any offer to sell or remarket any Predecessor Bonds in any Mode other than the Fixed Rate Mode. Reference should be made to the Official Statements for the Predecessor Bonds on file with the MSRB for information concerning the remarketing of the Predecessor Bonds in the Weekly Mode in the event the conversion to the Fixed Rate Mode is not successful. See Appendix D – "Amendments to Certain Provisions of the Authorizing Documents."

# RATINGS

S&P and Moody's are expected to assign their long-term municipal bond ratings of "AAA" and "Aaa" respectively to the Fixed Rate Bonds based upon the issuance by BHAC of the BHAC Insurance Policies for the Fixed Rate Bonds. In addition S&P, Moody's and Fitch have assigned their underlying long-term municipal bond ratings of "A+" "A2" and "A+" respectively, to the 2005B Fixed Rate Bonds based upon the underlying rating of Senior Lien Bonds of the City of Detroit, Water Supply System. and underlying long-term municipal bond ratings of "A" "A3" and "A" to the 2001C Fixed Rate Bonds based upon the underlying rating of Second Lien Bonds of the City of Detroit, Water Supply System.

An explanation of the significance of such ratings may only be obtained from S&P, Moody's and Fitch. There is no assurance that such ratings will continue for any given period of time or that they will not be revised or withdrawn entirely, if in the sole judgment of S&P, Moody's or Fitch, circumstances so warrant. Any such downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the Fixed Rate Bonds. The City makes no representations as to the appropriateness of the ratings. The City makes no representations as to the appropriateness of the ratings.

The above ratings are not recommendations to buy, sell or hold the Fixed Rate Bonds, and such ratings may be subject to revision or withdrawn at any time by the Rating Agencies. Each of the Rating Agencies has recently issued press releases or reports stating that they are examining the potential effects of downturns in the market for structured finance instruments, including collateralized debt obligations and residential mortgage backed securities, on the claims-paying ability of the bond insurance companies, including FGIC. See "INTRODUCTION – Recent Developments in the Bond Insurance Industry." Any downward revision or withdrawal of any of the abov ratings may have an adverse effect on the market price of the Fixed Rate Bonds.

# MISCELLANEOUS

This Remarketing Circular is not to be construed as a contract or agreement between the City and the purchasers or holders of any of the Fixed Rate Bonds. Any statements made in this Remarketing Circular involving matters of opinion, whether or not expressly so stated, are intended merely as an opinion and not as a representation of fact.

The information, estimates and expressions of opinion herein are subject to change without notice and neither the delivery of this Remarketing Circular nor any sale made hereunder shall under any circumstances create any implication or permit any inference that there has been no change in the affairs of the City or the System since the date hereof. Certain projections contained herein are based upon assumptions as to future events and facts, including projections as to future water supply needs, and such projections may not be realized. While assumptions of facts appeared reasonable when made, no warranty is expressed or implied that they will be realized in fact. The information set forth herein has been obtained from the City and other sources believed to be reliable but the accuracy or completeness is not guaranteed by, and should not be construed as a representation by the Remarketing Agent. Estimates and opinions are included and should not be interpreted as statements of fact. Summaries of documents do not purport to be complete statements of their provisions and such summaries are qualified by references to the entire texts of the documents. Under no circumstances shall this Remarketing Circular constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Fixed Rate Bonds, in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

Additional information may be obtained upon request from the Office of Debt Management, Attention: Donita Crumpler, Assistant Debt Manager, whose address is 1210 Coleman A. Young Municipal Center, Detroit, Michigan 48226 (telephone: 313-224-7244) or from the Director of the Department, Victor M. Mercado, whose address is Water Board Building, 735 Randolph, Detroit, Michigan 48226 (telephone: 313-224-4701).

The Finance Director has approved this Remarketing Circular pursuant to the Remarketing Agreement.

**CITY OF DETROIT, MICHIGAN**

By: /s/ Norman L. White _____
       Finance Director

[THIS PAGE INTENTIONALLY LEFT BLANK]

# APPENDIX A

## Feasibility Report

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TFG

# THE FOSTER GROUP

P.O. BOX 26282
LEAWOOD, KS 66225
TEL: (913) 345-1410
FAX: (913) 345-1640

THE FOSTER GROUP, LLC
BART FOSTER, PRESIDENT
CELL: (913) 530-6240
BFOSTER@FOSTERGROUPLLC.COM

May 6, 2008

Mr. Victor Mercado, Director
Detroit Water and Sewerage Department
Water Board Building
735 Randolph Street
Detroit, Michigan 48226

Dear Mr. Mercado:

In accordance with our agreement with the City of Detroit (the "City"), we submit herewith our Financial Feasibility Report to be included as an appendix to the remarketing circular (the "Remarketing Circular") prepared by the City in connection with its remarketing of $385,305,000 Water Supply System Revenue Refunding Second Lien Bonds (Fixed Rate), Series 2001-C and Water Supply System Revenue Senior Lien Bonds (Fixed Rate), Series 2005-B (collectively, the "2008 Remarketing Bonds"). The purpose of this report is to set forth information concerning financial factors relating to the 2008 Remarketing Bonds.

The report contains the financial feasibility information including analyses of water rates and rate methodology, projections of revenues under existing rates, projection of future operation and maintenance expenses, CIP financing, and the impact of projected revenue requirements on future revenues and water rates.

In addition, during the course of our review we have updated our overview of the water treatment and distribution system (the "System") owned by the City and operated by the Detroit Water and Sewerage Department (the "Department"). Our overview, traditionally contained in feasibility reports related to issuance of new money bonds, has instead been incorporated into the main body of the Remarketing Circular. In connection with the remarketing, compliance with the Additional Bonds Test set forth in the City's ordinance under which the 2008 Remarketing Bonds were issued (the "Bond Ordinance") will not be required and, accordingly, is not included herein.

It has been a pleasure to have been of service to the Department on this matter.

Very truly yours,

THE FOSTER GROUP

Bart Foster
President

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Contents

Page

Introduction ...................................................................................................................... 1

Financial Feasibility for the 2008 Remarketing Bonds ................................................. 2

    Rate Methodology and Existing Rates ...................................................................... 2

    Projection of Revenues ............................................................................................. 4

    Operation and Maintenance Expense Projections .................................................... 5

    Capital Improvement Program ................................................................................. 6

    Capital Improvement Program Financing .................................................................. 7

    Impact of Projected Revenue Requirements on Water Service Rates ...................... 9

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Introduction

This report is based on our analysis of the records and capital improvement programs of the Department, discussions with key Department personnel, and such other investigations as we have found necessary.

In this report, where standards or requirements are indicated as being applicable, being fulfilled, or to be attained, such standards or requirements are those promulgated by the United States Environmental Protection Agency (the "EPA") and the Michigan Department of Environmental Quality (the "MDEQ") in accordance with the provisions of Federal laws and the laws of the State of Michigan governing the supply of drinking water. Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Official Statement. References made herein to specific years are for the fiscal years ending June 30, unless otherwise noted.

The proceeds from the 2008 Remarketing Bonds are not intended to finance capital improvement program expenditures – but rather to fix rates of interest on several currently outstanding variable rate bonds in order to achieve anticipated interest savings. Capital improvement expenditures in the Department's CIP through a portion of 2010 will be financed by a combination of available fund balances, loans from the Michigan State Revolving Fund ("SRF"), and internally generated funds. Capital improvement expenditures scheduled for 2010 and beyond are expected to be financed, in part, with future bond issues. *See "Capital Improvement Program Financing."*

In conducting our studies and formulating our projections and opinions contained herein, we reviewed the books, records, agreements, capital improvement programs and other information produced by the Department as we deemed necessary. While we consider such books, records, and other documents to be reliable, we have not verified the accuracy of these documents.

The projections set forth in this report below are intended as "forward-looking statements". In formulating these projections, we have made certain assumptions with respect to conditions, events, and circumstances that may occur in the future. The methodology we utilized in performing these analyses follows generally accepted practices for such projections. Such assumptions and methodologies are summarized in this report and are reasonable and appropriate for the purpose for which they are used. While we believe the assumptions are reasonable and the projection methodology valid, actual results may differ materially from those projected, as influenced by conditions, events, and circumstances that may actually occur. Such factors may include the Department's ability to execute the CIP as scheduled and within budget, regional climate and weather conditions affecting the demand for water, and adverse legislative, regulatory or legal decisions (including environmental laws and regulations) affecting the Department's ability to manage the System and maintain water quality.

A-1

# Financial Feasibility for the 2008 Remarketing Bonds

The financial data used in the analyses presented herein was obtained from the financial records of the Department. The Department's financial records are audited annually and maintained in conformity with generally accepted accounting principles for water and wastewater utilities.

## Rate Methodology and Existing Rates

The Department's water rates are developed to provide sufficient levels of revenue to meet all operation and maintenance expenses of the System, debt service requirements on obligations issued for the System, capital improvement expenditures to be funded from current revenues, and other specific Bond Ordinance and revenue requirements. Water rates are developed for retail and wholesale customers by determining the total costs of service and individual customer water service requirements. Water rates for wholesale customers are developed on the "utility" basis, in conformance with State of Michigan statutes. Under the "utility" basis, wholesale customers are charged rates developed to recover cost of service as represented by operation and maintenance expense, depreciation expense, and a return on the investment the City has made in wholesale service facilities. The rate of return charged to wholesale customers has averaged between six and seven percent in recent years. Water rates for retail customers within the City of Detroit are determined in the same manner, except that the rate of return is calculated to meet the System's cash requirements. The rate of return charged to City of Detroit customers is generally lower than that charged to wholesale customers, reflecting the City's ownership of the System and the associated risks, rights, and responsibilities of investing in water service facilities. The rates charged to retail customers also include costs associated with the distribution system within the City of Detroit and bad debt expense for all customers of the System.

The current water rates for retail customers within the City, which became effective July 11, 2007, include three block rates ranging from $13.56 per thousand cubic feet for the first block to $11.15 per thousand cubic feet for the last block and a fixed service charge which varies by the size of the customer's water meter. The average rate charged to wholesale customers is $11.81 per thousand cubic feet. A new schedule of water rates (the "2009 Rates"), has been approved by the Board of Water Commissioners and the City Council and is scheduled expected to take effect in August 2008. These rates represent an overall revenue increase of approximately 8.0 percent over the current rates.

Service to customers outside the City is on a wholesale basis through contracts with various municipalities and governmental entities. Separate rates are developed for each wholesale customer recognizing the total revenue requirement of the System, and each customer's water usage, demands on the System, and the distance and elevation relative to the water treatment plants.

The Department's water rate methodology is sound and strives to utilize the best available, verifiable information to allocate costs to individual customer communities in the most equitable fashion possible. Few challenges to the Department's water rates have been filed over the years, and the Department has prevailed in every instance. Because of the many variables used in the Department's water rate model to define use of the System by each customer community, it is quite complex. That complexity has occasionally contributed to perceptions of inequity among certain customer community representatives. In order to address these perceptions and achieve a greater understanding of the water rate development process, the Department has taken a number of steps to improve communication with the wholesale customers including the scheduling of individual meetings with the wholesale customers to discuss the basis for proposed rate adjustments. These efforts are embodied in the Department's partnering agreements with representatives of the customer communities. The TAC Water Rates Work Group has met on a regular basis over the past year to explore

A-2

issues impacting overall rate levels, cost allocation techniques, and how information regarding use of the System should impact cost responsibility amongst customers.

In addition, the 2009 Rates are the first that have been computed utilizing a new "Contract Method" water rate methodology that implements the terms of the model contract. This method, developed in concert with suburban customer representatives through the TAC process, allocates certain costs of service to customers based on their contracted maximum daily and hourly demands. In this manner, the planning between DWSD as the service provider and each customer community is tied to the new model contracts, capital investment decisions are made based on such planning, and cost recovery through water rates reflects the level of service stipulated in the contracts. While contracts are being negotiated, customer communities are assigned contract demand "proxies" based on a uniform process established by the TAC.

Recently, the partnering effort developed a formalized schedule for disseminating information regarding the development of proposed water rates. The intent of this initiative was to accelerate the availability of information used in rate development, allowing for a greater understanding and review opportunity for the Department and customers alike. This schedule included a series of customer meetings where information regarding water rates was formally distributed. Efforts such as these are creating a greater understanding of the water rate development process and have developing regional consensus on water rate issues.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# Projection of Revenues

Table 1 presents the projected operating revenues for 2008 through 2012. The Department's financial records account for revenue based on all volume billed at the appropriate fiscal year rate and as such approximately reflect treated water pumped during the fiscal year. The projections shown in Table 1 are developed on the same basis. The total operating revenues of the System consist of several components that are individually derived from various elements of the rate structure. For instance, volume charge revenue refers to water sales revenue from individual customers. Meter charge revenue refers to "readiness to serve" charges to individual customers that are not a product of the amount of water consumed.

**Table 1**
**Projected Water System Sales and Revenues Under Existing Rates**

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| | $ | $ | $ | $ | $ |
| Operating Revenue (a) | | | | | |
| Wholesale Customers | 228,555,000 | 243,624,300 | 246,069,800 | 248,530,300 | 251,011,600 |
| Retail Customers | | | | | |
| Volume Charge Revenue | 57,632,300 | 61,526,900 | 61,526,900 | 61,526,900 | 61,526,900 |
| Meter Charge Revenue | 18,072,500 | 19,308,300 | 19,308,300 | 19,308,300 | 19,308,300 |
| Total Retail Customers | 75,704,800 | 80,835,200 | 80,835,200 | 80,835,200 | 80,835,200 |
| | | | | | |
| Miscellaneous Revenue | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| **Total Operating Revenue** | **305,759,800** | **325,959,500** | **328,405,000** | **330,865,500** | **333,346,800** |
| | | | | | |
| Revenues are based on projected water sales of: | | | | | |
| Wholesale (Mcf) | 19,230,900 | 18,937,000 | 19,127,600 | 19,319,400 | 19,512,800 |
| Retail (Mcf) | 4,800,000 | 4,800,000 | 4,800,000 | 4,800,000 | 4,800,000 |
| Total Sales (Mcf) | 24,030,900 | 23,737,000 | 23,927,600 | 24,119,400 | 24,312,800 |

(a) Based on application of FY 2009 rates for 2009 through 2012.

The projected water sales to wholesale customers were based on analyses of historical trends, discussion with the Department personnel, and analyses of specific information relating to individual customers. Water volume projections for 2008 through 2012 anticipate normal weather conditions and are based on an analysis of historical trends of ten years of actual data. Water sales for the wholesale customers are projected to increase moderately over the five-year period. The projected operating revenues are determined by applying the appropriate rates to the projected water sales for each wholesale customer and the City of Detroit retail customers. Projected revenues for 2008 reflect the water rate schedule currently in effect. Projected revenues for 2009 through 2012 reflect the new water rate schedule, which is scheduled to become effective in August 2008. Based on historical trends, retail water sales are projected to remain at current levels during the next five years.

Miscellaneous Operating Revenue includes revenues generated through the sale of equipment, penalty charges, turn-on and shut-off fees, fire hydrant maintenance, and other operations.

## Operation and Maintenance Expense Projections

Table 2 presents the projected operation and maintenance expense for 2008 through 2012. These projections have been developed based on a detailed review of actual expenses for 2006 and 2007 as well as budgeted and year-to-date actual expenses for 2008, and budgeted expenditures for 2009.

The Department has been remarkably successful at holding operating expenses at current levels over the past several years. We are confident that the Department's recent efforts to control costs and ensure that all costs are accurately reported to the accounting system will continue to yield positive results. The cost-conscious environment established by management continues to be successful and performance could continue to improve as the programs are further implemented. However, new programs and the impacts of inflation will most likely not allow for the recent "no increases" in operating expense to continue.

The projections shown in Table 2 include recognition of the potential impact of anticipated escalation of costs due to inflation during the five-year planning period. While a detailed analysis of variable inflationary rates was conducted, in the final analysis all costs have been increased 2.5 percent annually beginning in 2010. Utilities, chemicals, contractual services and miscellaneous expenses for 2009 have generally been estimated at budgeted levels or at levels indicated by 2007 and 2008 expenditures.

**Table 2**
**Projection of Operation and Maintenance Expense**

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| | $ | $ | $ | $ | $ |
| Plant Expenses | | | | | |
| Personnel Costs | 16,858,400 | 16,859,900 | 17,281,400 | 17,713,400 | 18,156,300 |
| Contractual Services | 2,965,800 | 2,966,100 | 3,040,300 | 3,116,300 | 3,194,200 |
| Utilities | | | | | |
| Electricity | 22,789,300 | 22,791,300 | 23,361,100 | 23,945,100 | 24,543,700 |
| Other | 4,939,900 | 4,940,300 | 5,063,800 | 5,190,400 | 5,320,200 |
| Chemicals | 5,909,600 | 5,910,100 | 6,057,900 | 6,209,300 | 6,364,500 |
| Other | 1,803,400 | 1,803,600 | 1,848,700 | 1,894,900 | 1,942,300 |
| **Total Plant** | **55,266,400** | **55,271,300** | **56,653,200** | **58,069,400** | **59,521,200** |
| Non-Plant Expenses | | | | | |
| Water Distribution | 17,162,900 | 17,164,400 | 17,593,500 | 18,033,300 | 18,484,200 |
| Maintenance | 39,491,900 | 39,495,400 | 40,482,800 | 41,494,800 | 42,532,200 |
| Commercial & Meter Operations | 10,823,500 | 10,824,500 | 11,095,100 | 11,372,500 | 11,656,800 |
| Engineering | 3,821,600 | 3,821,900 | 3,917,400 | 4,015,400 | 4,115,800 |
| Administrative & General | 30,013,300 | 30,015,900 | 30,766,200 | 31,535,500 | 32,323,700 |
| **Total Non-Plant** | **101,313,200** | **101,322,100** | **103,855,000** | **106,451,500** | **109,112,700** |
| **Total Operation and Maintenance** | **156,579,600** | **156,593,400** | **160,508,200** | **164,520,900** | **168,633,900** |

A-5

# Capital Improvement Program

The Department's Capital Management Group is responsible for coordinating the evaluation of capital needs and developing programs to meet those needs. This capital planning committee formally reviews the Capital Improvement Program and incorporates revisions into the five-year capital agenda on an annual basis. The CIP is dynamic and requires continual review and modification during the course of each year. The current CIP is based on estimates of future capital costs as of June 30, 2007. The estimates for the 2008 ongoing projects are based on remaining costs as of June 30, 2007. As additional cost information is developed from design work being performed on the various projects, cost estimates are adjusted accordingly.

A summary of the CIP for 2008 through 2012 is presented in Table 3. For each year, the CIP is divided into the major categories of Plant Replacement and Renovation, Metro Area Construction, Urban System Improvements, Maintenance and Repair, Mechanical Maintenance, and Computer Systems. In addition, the Plant Replacement and Renovation category is further identified by specific plant and by pumping stations and reservoirs.

## Table 3
### Water Supply System Capital Improvement Program
### Projected Expenditure Schedule - Fiscal Years 2008 through 2012

| Category | Fiscal Year Ending June 30, | | | | | Total |
| | 2008 $ | 2009 $ | 2010 $ | 2011 $ | 2012 $ | $ |
|---|---|---|---|---|---|---|
| **Plant Replacement and Renovation** | | | | | | |
| General Plant | 23,263,000 | 22,335,000 | 13,024,000 | 5,128,000 | 1,995,000 | 65,745,000 |
| Water Works Park | 845,000 | 3,100,000 | 4,000,000 | 3,100,000 | 20,500,000 | 31,545,000 |
| Springwells | 4,130,000 | 14,350,000 | 28,950,000 | 40,275,000 | 103,525,000 | 191,230,000 |
| Northeast | 4,674,000 | 10,870,000 | 14,950,000 | 22,093,000 | 38,248,000 | 90,835,000 |
| Southwest | 5,885,000 | 24,493,000 | 23,480,000 | 20,958,000 | 38,340,000 | 113,156,000 |
| Lake Huron | 1,824,000 | 7,850,000 | 2,300,000 | 1,150,000 | 0 | 13,124,000 |
| Pumping Stations & Reservoirs | 9,491,000 | 25,775,000 | 38,916,000 | 17,125,000 | 13,700,000 | 105,007,000 |
| **Subtotal - Plant** | **50,112,000** | **108,773,000** | **125,620,000** | **109,829,000** | **216,308,000** | **610,642,000** |
| Metro Area Construction | 60,631,000 | 148,321,000 | 183,856,000 | 169,449,000 | 141,250,000 | 703,507,000 |
| Urban System Improvements | 58,884,000 | 49,206,000 | 23,302,000 | 21,200,000 | 20,600,000 | 173,192,000 |
| Mechanical Maintenance | 21,746,000 | 22,775,000 | 22,050,000 | 3,700,000 | 0 | 70,271,000 |
| Computer Systems | 4,163,000 | 3,450,000 | 3,500,000 | 3,525,000 | 3,000,000 | 17,638,000 |
| **Subtotal** | **145,424,000** | **223,752,000** | **232,708,000** | **197,874,000** | **164,850,000** | **964,608,000** |
| **Total System** | **195,536,000** | **332,525,000** | **358,328,000** | **307,703,000** | **381,158,000** | **1,575,250,000** |

# Capital Improvement Program Financing

Table 4 presents a plan for financing the System share of the CIP (Line 1) for the five-year period ending June 30, 2012. Within the constraints of the additional securities test and the Department's debt service coverage policies, the amount of bonds to be issued is designed to maximize the capital requirements financed with bond proceeds. Lines 2 through 15 outline the sources available to meet the CIP financing requirements. Line 2 shows the net balance in the Improvement and Extension Fund as of June 30, 2007, available to fund the CIP. Line 3 shows the amount projected to be transferred to the Improvement and Extension Fund each year from current operating revenues. Total funds available from the Improvement and Extension Fund are indicated on Line 4.

The capital financing sources available from the Construction Fund are indicated on Lines 5 through 13. Line 5 shows the net balance in the Construction Fund as of June 30, 2007. The 2008 Remarketing Bonds do not provide any capital financing, and are therefore not reflected in this table. The anticipated sizes of future bond issues are shown on Line 6. It is assumed that all future bond issues will be sold at the mid-point of the fiscal year and will include capitalized interest for a period of one year. Issuance expenses are estimated at three percent of the issue size plus $200,000 per issue for future issues and are shown on Line 8. In addition, it is assumed that an amount equal to the maximum future principal and interest payment will be funded by Debt Service Reserve Surety Bonds and will be deducted from the proceeds of each issue, as shown on Line 9.

Line 11 presents the proceeds from State Drinking Water Revolving Fund Loans. Unlike other bond issues, funds from these loans are not fully received upon loan closing but are "drawn down" over time as dictated for associated projects costs. As the Department incurs expenditures for SRF funded projects, the invoices are transmitted to the state administrators of the SRF for remittance. As such, the amounts shown on Line 11 reflect the projected expenditure schedule of SRF funded projects. The figures on this line apply to existing loan commitments. The Department remains an active participant in the SRF program, and is planning on issuing additional SRF junior lien debt to obtain this low-cost financing during the study period. However, for purposes of the financial planning, this low cost financing is not reflected until the loan is approved. The projections contained herein are also based on this conservative assumption.

Lines 14 through 16 illustrate the projected application of financing sources to meet the CIP financing requirements stated on Line 1. The balance of funds available for subsequent years is shown on Lines 17 through 19 and is carried forward to Lines 2 and 5 in the next year.

## Table 4
## Capital Improvement Program Financing

| Line No. | Item | Fiscal Year Ending June 30, 2008 $ | 2009 $ | 2010 $ | 2011 $ | 2012 $ | Total $ |
|---|---|---|---|---|---|---|---|
| | **Financing Requirements** | | | | | | |
| 1 | Capital Improvement Program (a) | 195,536,000 | 332,525,000 | 358,328,000 | 307,703,000 | 381,158,000 | 1,575,250,000 |
| | **Financing Sources** | | | | | | |
| | Improvement and Extension Fund | | | | | | |
| 2 | Beginning Balance (b) | 28,408,700 | 22,289,200 | 13,304,600 | 33,982,700 | 38,692,000 | 28,408,700 |
| 3 | Revenue Financed Capital | 22,289,200 | 13,304,600 | 33,982,700 | 38,692,000 | 43,326,900 | 151,595,400 |
| 4 | Subtotal - Improvement & Extension Fund | 50,697,900 | 35,593,800 | 47,287,300 | 72,674,700 | 82,018,900 | 180,004,100 |
| | Construction Bond Funds | | | | | | |
| 5 | Beginning Balance (b) | 528,868,400 | 307,103,700 | 1,867,900 | 71,187,100 | 56,614,000 | 528,868,400 |
| | Bond Proceeds | | | | | | |
| 6 | Water System Revenue Bonds (c) | 0 | 0 | 450,000,000 | 275,000,000 | 375,000,000 | 1,100,000,000 |
| 7 | Less: Capitalized Interest | 0 | 0 | (21,656,300) | (7,218,800) | (9,843,800) | (38,718,900) |
| 8 | Less: Issuance Expenses (d) | 0 | 0 | (13,700,000) | (8,450,000) | (11,450,000) | (33,600,000) |
| 9 | Less: Bond Reserve Account (e) | 0 | 0 | (301,100) | (184,000) | (250,900) | (736,000) |
| 10 | Net Bond Proceeds Available | 0 | 0 | 414,342,600 | 259,147,200 | 353,455,300 | 1,026,945,100 |
| 11 | State Drinking Water Revolving Fund Loans | 2,180,000 | 5,000,000 | 0 | 0 | 0 | 7,180,000 |
| 12 | Subtotal - Construction Bond Funds | 531,048,400 | 312,103,700 | 416,210,500 | 330,334,300 | 410,069,300 | 1,562,993,500 |
| 13 | **Total Financing Sources Available** | 581,746,300 | 347,697,500 | 463,497,800 | 403,009,000 | 492,088,200 | 1,742,997,600 |
| | **Application of Financing Sources** | | | | | | |
| 14 | Projects Funded with Improvement and Extension Funds | 28,408,700 | 22,289,200 | 13,304,600 | 33,982,700 | 38,692,000 | 136,677,200 |
| 15 | Projects Funded with Construction Bond Funds | 223,944,700 | 310,235,800 | 345,023,400 | 273,720,300 | 342,466,000 | 1,495,390,200 |
| 16 | **Total Financing Sources Applied** | 252,353,400 | 332,525,000 | 358,328,000 | 307,703,000 | 381,158,000 | 1,632,067,400 |
| | **Financing Sources Available for Future Requirements** | | | | | | |
| 17 | Improvement & Extension Fund (f) | 22,289,200 | 13,304,600 | 33,982,700 | 38,692,000 | 43,326,900 | 43,326,900 |
| 18 | Construction Bond Funds (g) | 307,103,700 | 1,867,900 | 71,187,100 | 56,614,000 | 67,603,300 | 67,603,300 |
| 19 | **Total Financing Sources Available for Future Requirements** | 329,392,900 | 15,172,500 | 105,169,800 | 95,306,000 | 110,930,200 | 110,930,200 |

(a) From Table 3.

(b) Balance available June 30, 2007 (applies only to fiscal year 2008).

(c) Does not include the 2008 Remarketing Bonds, as they do not generate net proceeds for capital financing.

(d) Includes 3 percent of bond size and $200,000 for issuance expenses for future issues.

(e) Amount required from bond proceeds to purchase Debt Service Reserve Account Surety Bonds for future issues.

(f) Line 4 minus Line 14.

(g) Line 12 minus Line 15.

# Impact of Projected Revenue Requirements on Water Service Rates

Table 5 presents a pro forma statement developed from revenue and revenue requirement projections for 2008 through 2012. The table provides an indication of the adequacy of the Department's revenues and the feasibility of the currently proposed and future anticipated revenue bond sales. The approximate magnitude of annual operating revenues shown in the table is projected to be needed to finance the remaining years of the current CIP.

Operating revenue projections, presented earlier in Table 1, are based on the Department's prior water rate schedule for 2008 and on the new schedule of water rates for 2009 through 2012. Lines 2 through 4 indicate additional increases in water rates projected to be required to meet projected total revenue requirements in fiscal years 2010 through 2012. The approximate annual percentage increases are 6.2 percent in 2010, 6.8 percent in 2011, and 6.6 percent in 2012, and are considered to be quite reasonable given the magnitude of the CIP. These projected increases are believed to be comparable with those that should be experienced in other areas of the country having water systems of comparable age, and facing similar infrastructure challenges, to the System.

Projected non-operating revenues of the System include investment earnings from all System funds and have been projected based on an analysis of funds on hand, construction schedules, and average fund balances. Annual interest rates of 2.75 percent and 4.0 percent have been assumed in projecting interest income for funds investing in short-term and long-term investments, respectively.

The projected operation and maintenance expenses shown on Line 10 reflect the impact of the anticipated escalation of costs and changes in operation as presented earlier in Table 2. The Department's debt service is depicted on Lines 11 through 18, separated by priorities of lien. These debt service figures include the new debt service on the 2008 Remarketing Bonds, and are net of the debt service for the predecessor variable rate bonds that were remarketed. The annual principal and interest due on future bond issues anticipated to finance the remaining total cost of the CIP is shown on Line 12. For purposes of these projections, it is assumed that future bonds will be senior lien bonds. A scale that produces an interest cost of approximately 5.25 percent and a 30-year term has been used to calculate debt service on future bond issues. A similar presentation of debt service on second lien bonds is presented on Lines 14 and 15. Projected repayments of SRF Loans are stated on Line 17. These figures only reflect existing loans as no new loans are anticipated for purposes of these projections.

Renewals and Replacements shown on Line 19 represent capitalized expenditures budgeted by the Department, which are not included in the CIP. Line 20 presents the projected level of revenue financed major capital improvements presented earlier in Line 3 of Table 4. These amounts are targeted to finance short lived assets in concert with the Department's capitalization and debt service coverage policies.

In accordance with the requirements of the Ordinance, an annual deposit (Line 21) is made to the Extraordinary Repair and Replacement Fund in an amount equal to the lesser of three percent of that year's budgeted operation and maintenance expense or that which is necessary to enable the aggregate value of the fund to equal 15 percent of that year's budgeted operation and maintenance expense. Annual deposits shown for 2008 through 2012 will be required to establish and maintain the required level due to increased expenses.

# Table 5
## Revenue Requirements Projections

| Line No. | Item | *Fiscal Year Ending June 30,* | | | | |
|---|---|---|---|---|---|---|
| | | 2008 $ | 2009 $ | 2010 $ | 2011 $ | 2012 $ |
| | **Revenue (a)** | | | | | |
| 1 | Operating Revenue Under Existing Rates | 304,259,800 | 317,142,400 | 326,905,000 | 329,365,500 | 331,846,800 |
| | Projected Revenue from Rate Increases | | | | | |
| 2 | FY 2010: 6.2% | | | 20,112,000 | 20,263,400 | 20,416,000 |
| 3 | FY 2011: 6.8% | | | | 23,724,600 | 23,903,300 |
| 4 | FY 2012: 6.6% | | | | | 24,951,600 |
| 5 | Total Projected Revenue from Water Rates | 304,259,800 | 317,142,400 | 347,017,000 | 373,353,500 | 401,117,700 |
| 6 | Miscellaneous Operating Revenue | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| 7 | Total Operating Revenue | 305,759,800 | 318,642,400 | 348,517,000 | 374,853,500 | 402,617,700 |
| 8 | Non-Operating Revenue | 15,765,400 | 12,275,900 | 7,911,900 | 9,075,300 | 9,586,000 |
| 9 | **Total Revenue Available** | 321,525,200 | 330,918,300 | 356,428,900 | 383,928,800 | 412,203,700 |
| | **Revenue Requirements** | | | | | |
| 10 | Operation and Maintenance Expense (b) | 156,579,600 | 156,593,400 | 160,508,200 | 164,520,900 | 168,633,900 |
| | Debt Service | | | | | |
| | Senior Lien Bonds | | | | | |
| 11 | Outstanding Bonds | 97,531,500 | 110,137,200 | 109,843,700 | 116,175,200 | 115,876,400 |
| 12 | Future Bonds (lien unspecified) | 0 | 0 | 0 | 11,812,500 | 30,112,600 |
| 13 | Total Senior Debt Service | 97,531,500 | 110,137,200 | 109,843,700 | 127,987,700 | 145,989,000 |
| | Second Lien Bonds | | | | | |
| 14 | Outstanding Bonds | 36,084,600 | 41,649,400 | 41,899,800 | 42,131,000 | 43,084,900 |
| 15 | Total Second Lien Bonds | 36,084,600 | 41,649,400 | 41,899,800 | 42,131,000 | 43,084,900 |
| 16 | Subtotal Debt Service | 133,616,100 | 151,786,600 | 151,743,500 | 170,118,700 | 189,073,900 |
| 17 | SRF Junior Lien Bonds | 1,540,300 | 1,731,600 | 1,919,800 | 1,965,900 | 1,961,200 |
| 18 | Total Debt Service | 135,156,400 | 153,518,200 | 153,663,300 | 172,084,600 | 191,035,100 |
| 19 | Renewals and Replacements | 7,500,000 | 7,500,000 | 7,687,500 | 7,879,700 | 8,076,700 |
| 20 | Revenue Financed Major Capital Improvements | 22,289,200 | 13,304,600 | 33,982,700 | 38,692,000 | 43,326,900 |
| 21 | Extraordinary Repair and Replacement Fund | 0 | 2,100 | 587,200 | 601,900 | 617,000 |
| 22 | Operating Reserve Requirement | 0 | 0 | 0 | 149,700 | 514,100 |
| 23 | **Total Revenue Requirements** | 321,525,200 | 330,918,300 | 356,428,900 | 383,928,800 | 412,203,700 |
| 24 | Indicated Balance (Deficiency) | 0 | 0 | 0 | 0 | 0 |
| | **Debt Service Coverages Under Required Rates** | | | | | |
| 25 | Senior Lien for Rate Covenant Purposes | 169% | 158% | 178% | 171% | 167% |
| 26 | Second Lien for Rate Covenant Purposes | 123% | 115% | 129% | 129% | 129% |
| 27 | SRF Junior Lien for Rate Covenant Purposes | 122% | 114% | 127% | 128% | 128% |
| | **Operating Reserve (c)** | | | | | |
| 28 | Beginning Balance | 20,415,400 | 20,415,400 | 20,415,400 | 20,415,400 | 20,565,100 |
| 29 | Deposit from Operations | 0 | 0 | 0 | 149,700 | 514,100 |
| 30 | Ending Balance | 20,415,400 | 20,415,400 | 20,415,400 | 20,565,100 | 21,079,200 |

(a) From Table 1. Based on application of FY 2009 rates for 2009 through 2012.

(b) From Table 2.

(c) Balance available June 30, 2007 (applies only to fiscal year 2008).

Line 22 of Table 5 presents a revenue requirement established to ensure adequate balances of operating reserves, or working capital. This reserve is established in a similar manner to the Extraordinary Repair and Replacement Reserve Fund and is summarized on Lines 28 through 30 of the table. Annual deposits are targeted at five days of annual operation and maintenance expense or that amount that will result in an annual fund value equal to 45 days of budgeted operation and maintenance expense. The June 30, 2007 balance of this reserve has been established at the targeted level and additional annual deposits are projected through 2012 to maintain the required level due to increased expenses.

The indicated annual balance or deficiency under existing rates, Line 24 of Table 5, is calculated by subtracting total revenue requirement from the total revenue available. As indicated in the table, the projected rate increases on Lines 2 through 4 are projected to be sufficient to meet projected revenue requirements throughout the study period.

The preceding projections of rate increases are intended to produce annual debt service coverage figures in accordance with the Board of Water Commissioners' policy on debt service coverage, which establishes a target range for debt service coverage for each lien of debt. It requires that water rates be set to generate projected debt service coverage ratios that are at least 15 percentage points higher than the rate covenants of the Bond Ordinance. Under this policy (and the current rate covenant coverage figures of the Bond Ordinance), the minimum policy coverage targets are 135 percent for Senior Lien debt, 125 percent for Second Lien debt, and 115 percent for SRF Junior Lien debt. The policy also requires that rates be set so that projected debt service coverage on the lowest lien of debt will not exceed 150 percent.

Projections of annual debt service coverage levels are summarized on Lines 25 through 27. These coverage levels are calculated on the same basis as required by the rate covenant. As indicated, annual coverage levels for 2010 through 2012, assuming the revenue increases shown, are projected to be in excess of the amounts required by the Bond Ordinance and within the debt service coverage target range established by the Board of Water Commissioners. Due to a delay in implementing the 2009 Rates, the Second Lien and SRF Junior Lien debt service coverage levels for 2009 are projected to be slightly lower than the minimum policy coverage targets. However, all coverage levels for 2009 are projected to be in excess of the amounts required by the Bond Ordinance.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# APPENDIX B

## AUDITED FINANCIAL STATEMENTS OF THE WATER FUND

## OF THE CITY OF DETROIT

[THIS PAGE INTENTIONALLY LEFT BLANK]



# CITY OF DETROIT
# WATER FUND

Basic Financial Statements
and Required Supplementary Information

June 30, 2006 and 2005

(With Independent Auditors' Report Thereon)

**CITY OF DETROIT**
**WATER FUND**

**Table of Contents**

| | Page(s) |
|---|---|
| Independent Auditors' Report | 1 – 2 |
| Basic Financial Statements: | |
| Statements of Net Assets | 3 – 4 |
| Statements of Revenues, Expenses, and Changes in Fund Net Assets | 5 |
| Statements of Cash Flows | 6 |
| Notes to Basic Financial Statements | 7 – 30 |
| Required Supplementary Information (Unaudited) | 31 |



**KPMG LLP**
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

**Independent Auditors' Report**

The Board of Water Commissioners,
  the Honorable Mayor, and
  Members of the City Council
City of Detroit, Michigan:

We have audited the accompanying basic financial statements of the Water Fund (the Fund), an enterprise fund of the City of Detroit, Michigan (the City), as of and for the years ended June 30, 2006 and 2005, as listed in the table of contents. These basic financial statements are the responsibility of the Fund's management. Our responsibility is to express an opinion on these basic financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the basic financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the City's internal control over financial reporting of the Fund. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the basic financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in note 1, the financial statements referred to above present only the Water Fund of the City and are not intended to present fairly the financial position of the City as of June 30, 2006 and 2005, and the changes in its financial position, and, where applicable, cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

In our opinion, the basic financial statements referred to above present fairly, in all material respects, the financial position of the Water Fund of the City as of June 30, 2006 and 2005, and the changes in its net assets and its cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

In accordance with *Government Auditing Standards*, we also audited the financial statements of the City, as described above in this report on the Fund's financial statements. This report does not include the results of our testing of internal control over financial reporting and on our tests of the City's compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters that are reported on separately by us for the City. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.



opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

The Fund has not presented Management's Discussion and Analysis, which U.S. generally accepted accounting principles have determined is necessary to supplement, although not required to be part of, the basic financial statements.

The schedule of funding progress on page 31 is not a required part of the basic financial statements but is supplementary information required by U.S. generally accepted accounting principles. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

KPMG LLP

Detroit, Michigan
March 20, 2008

2

**CITY OF DETROIT
WATER FUND**

Statements of Net Assets

June 30, 2006 and 2005

| Assets | 2006 | 2005 |
|---|---:|---:|
| **Current assets:** | | |
| Cash and cash equivalents | $ 3,997,111 | 870,259 |
| Investments | 22,345,923 | 7,520,716 |
| Due from other funds | 56,884,330 | 53,149,298 |
| Accounts receivable (including $28,558,437 and $29,934,243, respectively, for unbilled water services and net of allowance for doubtful accounts of $39,119,680 and $36,887,901 for June 30, 2006 and 2005, respectively) | 63,789,759 | 68,971,401 |
| Inventories | 8,967,419 | 6,330,165 |
| Prepaid expenses | 5,930,718 | 568,211 |
| Restricted cash and cash equivalents | 34,465,603 | 25,052,140 |
| Restricted investments | 362,605,066 | 412,158,969 |
| Restricted due from other funds | 6,021,460 | 40,475,299 |
| Total current assets | 565,007,389 | 615,096,458 |
| **Noncurrent assets:** | | |
| Restricted long-term investments | 10,717,537 | 30,072,332 |
| Net pension asset | 148,590,274 | 150,452,508 |
| Issuance costs – pension obligation certificates of participation | 8,910,507 | 5,154,834 |
| Unamortized bond issuance costs | 30,603,648 | 32,088,822 |
| **Capital assets:** | | |
| Land and land rights | 6,529,308 | 6,527,438 |
| Structures | 825,649,528 | 707,846,651 |
| Mains | 763,588,390 | 714,856,603 |
| Services, meters, and improvements to land | 106,085,312 | 103,323,777 |
| Equipment | 864,457,966 | 630,635,010 |
| Construction work in progress | 140,815,156 | 418,027,160 |
| Total capital assets | 2,707,125,660 | 2,581,216,639 |
| Less accumulated depreciation | (743,068,280) | (688,863,364) |
| Net capital assets | 1,964,057,380 | 1,892,353,275 |
| Total noncurrent assets | 2,162,879,346 | 2,110,121,771 |
| Total assets | $ 2,727,886,735 | 2,725,218,229 |

# CITY OF DETROIT
# WATER FUND

Statements of Net Assets

June 30, 2006 and 2005

| Liabilities and Net Assets | 2006 | 2005 |
|---|---|---|
| Current liabilities: | | |
| Accounts and contracts payable | $ 22,718,139 | 16,543,893 |
| Accrued salaries and wages | 1,706,286 | 2,171,724 |
| Accrued workers' compensation | 2,913,177 | 3,470,751 |
| Accrued compensated absences | 3,715,980 | 8,604,763 |
| Due to other funds | 53,873,011 | 65,882,639 |
| Other current accrued liabilities | 8,142,609 | 3,053,509 |
| Total current liabilities payable from current assets | 93,069,202 | 99,727,279 |
| Current liabilities payable from restricted assets: | | |
| Revenue bonds payable within one year | 25,535,000 | 24,595,000 |
| Accrued bond interest payable | 38,626,382 | 38,521,332 |
| Accounts and contracts payable | 20,501,071 | 20,117,305 |
| Other current accrued liabilities | 459,722 | 629,346 |
| Due to other funds | 10,982,590 | 6,515,574 |
| Total current liabilities payable from restricted assets | 96,104,765 | 90,378,557 |
| Total current liabilities | 189,173,967 | 190,105,836 |
| Long-term liabilities: | | |
| Revenue bonds payable, net | 1,900,402,692 | 1,915,294,379 |
| Pension obligation certificates of participation payable, net | 159,017,458 | 157,548,214 |
| Accrued workers' compensation | 15,198,239 | 15,240,595 |
| Accrued compensated absences | 14,912,321 | 9,808,909 |
| Deferred swap termination fees | 16,213,524 | 16,797,795 |
| Total long-term liabilities | 2,105,744,234 | 2,114,689,892 |
| Total liabilities | 2,294,918,201 | 2,304,795,728 |
| Net assets: | | |
| Invested in capital assets, net of related debt | 217,225,377 | 204,520,234 |
| Restricted for capital acquisitions and bond payments | 81,914,130 | 121,409,825 |
| Unrestricted | 133,829,027 | 94,492,442 |
| Total net assets | 432,968,534 | 420,422,501 |
| Total net assets and liabilities | $ 2,727,886,735 | 2,725,218,229 |

See accompanying notes to basic financial statements.

4

# CITY OF DETROIT
# WATER FUND

Statements of Revenues, Expenses, and Changes in Fund Net Assets

Years ended June 30, 2006 and 2005

|  | 2006 | 2005 |
|---|---|---|
| Operating revenues: | | |
| Water sales – Detroit | $ 68,736,614 | 58,921,494 |
| Water sales – suburban | 205,581,302 | 200,050,339 |
| Miscellaneous | 1,912,850 | 1,641,252 |
| Total operating revenues, net | 276,230,766 | 260,613,085 |
| Operating expenses before depreciation: | | |
| Source of supply | 2,856,385 | 2,244,535 |
| Low-lift pumping | 8,258,270 | 6,081,177 |
| Purification | 18,441,764 | 18,983,784 |
| High-lift pumping | 15,306,817 | 19,338,389 |
| Water quality operations | 1,705,680 | 1,876,012 |
| Transmission and distribution | 35,101,901 | 45,417,478 |
| Services and meters | 5,939,668 | 5,645,086 |
| Hydrant division | 1,199,902 | 1,386,783 |
| Commercial | 5,084,493 | 7,227,323 |
| Administrative and general | 52,320,068 | 48,753,131 |
| Total operating expenses before depreciation | 146,214,948 | 156,953,698 |
| Operating income before depreciation | 130,015,818 | 103,659,387 |
| Depreciation | 54,628,100 | 41,529,608 |
| Operating income | 75,387,718 | 62,129,779 |
| Nonoperating revenue (expense): | | |
| Earnings on investments | 18,843,877 | 7,175,672 |
| Interest expense, net of capitalized interest | (83,963,811) | (63,260,449) |
| Miscellaneous | 2,278,249 | (62,246) |
| Total nonoperating expense | (62,841,685) | (56,147,023) |
| Contributed capital | — | 6,938,882 |
| Increase in net assets | 12,546,033 | 12,921,638 |
| Net assets – beginning of year | 420,422,501 | 407,500,863 |
| Net assets – end of year | $ 432,968,534 | 420,422,501 |

See accompanying notes to basic financial statements.

5

**CITY OF DETROIT**
**WATER FUND**

Statements of Cash Flows

Years ended June 30, 2006 and 2005

|  | 2006 | 2005 |
|---|---|---|
| Cash flows from operating activities: | | |
| Receipts from customers | $ 283,573,844 | 260,740,367 |
| Loans to other funds | 23,176,195 | (28,698,398) |
| Payments to suppliers | (86,907,411) | (115,305,031) |
| Payments to the General Retirement System in excess of annual required contribution | — | (150,452,508) |
| Payments to employees | (57,564,022) | (53,688,328) |
| Net cash provided by (used in) operating activities | 162,278,606 | (87,403,898) |
| Cash flow from noncapital and related financing activities: | | |
| Proceeds from issuance of Personal Obligation Certificates of Participation | — | 157,548,214 |
| Issuance costs – Pension Obligation Certificates of Participation | (2,286,429) | (5,154,834) |
| Net cash (used in) provided by noncapital and related financing activities | (2,286,429) | 152,393,380 |
| Cash flows from capital and related financing activities: | | |
| Contributions received from customers | 2,278,249 | 6,938,882 |
| Acquisition and construction of capital assets, net | (107,519,457) | (134,448,175) |
| Principal paid on revenue bond maturities | (24,595,000) | (22,440,000) |
| Interest paid on revenue bonds | (102,671,509) | (85,928,089) |
| Principal paid on refunded debt | — | (125,985,000) |
| Proceeds from bond issuance and increase in revolving note payable, net | 4,723,954 | 424,791,474 |
| Unamortized discount and bond issuance cost | 7,404,533 | 5,175,110 |
| Net cash (used in) provided by capital and related financing activities | (220,379,230) | 68,104,202 |
| Cash flows from investing activities: | | |
| Proceeds from sales and maturities of investments | 449,752,017 | 309,876,577 |
| Purchase of investments | (395,668,526) | (449,752,017) |
| Interest received on investments | 18,843,877 | 7,175,672 |
| Net cash provided by (used in) investing activities | 72,927,368 | (132,699,768) |
| Net increase in cash | 12,540,315 | 393,916 |
| Cash at beginning of year | 25,922,399 | 25,528,483 |
| Cash at end of year | $ 38,462,714 | 25,922,399 |
| Reconciliation of operating income to net cash provided by operating activities: | | |
| Operating income | $ 75,387,718 | 62,129,779 |
| Adjustments to reconcile operating income to net cash provided by operating activities: | | |
| Depreciation | 54,628,100 | 41,529,608 |
| Provision for uncollectible accounts | 2,231,779 | 6,650,637 |
| Changes in certain assets and liabilities: | | |
| (Increase) decrease in accounts receivable | 2,949,862 | (10,919,185) |
| (Increase) decrease in inventories | (2,637,254) | 501,841 |
| (Increase) in prepaid expenses | (5,362,507) | (461,392) |
| Increase (decrease) in accounts and contracts payable | 6,558,012 | (13,787,881) |
| Increase (decrease) in accrued salaries and wages | (465,438) | 354,027 |
| Increase (decrease) in Issuance cost POC | 1,862,234 | (150,452,508) |
| Increase in other accrued liabilities, compensated absences, and workers' compensation | 3,949,904 | 5,749,574 |
| Net change in due to (from) other funds | 23,176,196 | (28,698,398) |
| Net cash provided by (used in) operating activities | $ 162,278,606 | (87,403,898) |

Noncash capital financing activities:
  Capital assets of $2,278,249 were acquired through contributions from developers.

See accompanying notes to financial statements.

6

**(1)** **Summary of Significant Accounting Policies**

The City of Detroit (the City) Charter established the Water Department (the Department) in the year 1836 to supply water within and outside the City under the administration of the Board of Water Commissioners. The Water Fund (the Fund), an Enterprise fund, separately accounts for the Water Supply System (the System), as is required by bond ordinances of the City. The following is a summary of the more significant accounting policies followed in the preparation of the Fund's financial statements. These policies conform to U.S. generally accepted accounting principles.

The financial statements of the Water Fund have been included in the City of Detroit's Comprehensive Annual Financial Report (CAFR) and reported as an Enterprise fund. Copies of these reports, along with other financial information, can be obtained at the Fund's administrative office, located at 735 Randolph, Detroit, Michigan, 48226.

**(a)** *Basis of Accounting*

The accounting policies of the Fund conform to U.S. generally accepted accounting principles (GAAP) as applicable to governmental entities. The accounts of the Fund, which are organized as an Enterprise fund, are used to account for the Fund's activities, which are financed and operated in a manner similar to a private business enterprise. Accordingly, the Fund maintains its records on the accrual basis of accounting. Revenues from operations, investments, and other sources are recorded when earned. Expenses (including depreciation and amortization) of providing services to the public are accrued when incurred.

In accordance with Governmental Accounting Standards Board (GASB) Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities That Use Proprietary Fund Accounting,* the Fund applies all applicable GASB pronouncements, as well as all Financial Accounting Standards Board (FASB) Statements and Interpretations, Accounting Principles Board (APB) Opinions, and Accounting Research Bulletins (ARBs) issued on or before November 30, 1989, unless those pronouncements conflict with or contradict GASB pronouncements. The Fund also has the option of following FASB guidance issued after November 30, 1989, but has elected not to do so.

**(b)** *Cash and Cash Equivalents*

Cash and cash equivalents include cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition.

**(c)** *Investments*

Investments are reported at fair value based on quoted market price.

**(d)** *Inventories*

Inventories consist of operating and maintenance and repair parts for water lines and are valued at the lower of cost or market, with cost being determined on an average cost method.

7 (Continued)

**(e)    Capital Assets**

Capital assets are recorded at historical cost, together with interest capitalized during construction. Depreciation is computed using the straight-line method over the estimated useful lives of the related assets as follows:

| | |
|---|---|
| Improvements to land | 67 years |
| Structures | 40 years |
| Mains | 67 years |
| Services | 67 years |
| Meters and equipment | 3 – 20 years |

**(f)    Workers' Compensation**

The Fund has no insurance coverage for workers' compensation claims. Workers' compensation expenses are recorded when the occurrence of the liability is probable and the amount is reasonably estimable. The amounts recorded as of June 30, 2006 and 2005 are based on compensation expected to be paid, along with estimated medical costs, for all claims known as of the balance sheet date, and historical data are used in computing the liability for estimated incurred but unknown claims as of the balance sheet date.

| | | June 30 | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| Balance at beginning of year | $    18,711,345 | 15,778,254 | 13,778,575 |
| Current year claims and changes in estimates | 4,356,803 | 7,345,178 | 6,756,198 |
| Claims payments | (4,956,732) | (4,412,087) | (4,756,519) |
| Balance at end of year | $    18,111,416 | 18,711,345 | 15,778,254 |

**(g)    Capitalized Interest**

The Fund capitalizes qualifying net interest costs of the System on bonds issued for capital construction in accordance with Statement of Financial Accounting Standards (SFAS) No. 34 *Capitalization of Interest Cost* and Statement No. 62 *Capitalization of Interest Cost in situations Involving Certain Tax-Exempt Borrowings and Certain Gifts and Grants an Amendment of FASB Statement No. 34.* Accordingly, capitalized interest for the years ended June 30, 2006 and 2005 was $18,812,748 and $28,942,595, respectively.

**(h)    Taxes and City Services**

The Fund pays no direct federal, state, or local taxes, except local taxes on excess property and federal Social Security taxes. The Fund reimburses the City for most of the direct services furnished by other City departments, including general staff services. Charges are billed for all water services provided to City departments.

8

(Continued)

*(i)* **Shared Costs**

Costs related to shared facilities and personnel are allocated to the Fund on a basis that relates costs incurred to the fund benefited.

*(j)* **Compensated Absences**

The Fund records as a liability estimated vested vacation, sick pay, and banked overtime in accordance with GASB Statement No. 16, *Accounting for Compensated Absences*. Unused vacation pay accumulates until termination of employment, while there is no vesting of sick pay until an employee reaches age 60 or completes 25 years of service.

*(k)* **Accrued Revenue**

The Fund records unbilled revenues for services provided prior to year-end by accruing actual revenues billed in the subsequent month.

*(l)* **Net Assets**

Net assets are categorized as follows:

**Invested in Capital Assets**: This consists of capital assets, net of accumulated depreciation and related debt.

**Restricted**: This consists of net assets that are legally restricted by outside parties or by law through constitutional provisions or enabling legislation. When both restricted and unrestricted resources are available for use, generally it is the City's policy to use restricted resources first, and then unrestricted resources when they are needed.

**Unrestricted**: This consists of net assets that do not meet the definition of "restricted" or "invested in capital assets."

*(m)* **Classification of Revenues**

The Fund has classified its revenues as either operating or nonoperating revenues according to the following criteria:

**Operating Revenues**: Operating revenues include activities that have the characteristics of exchange transactions, such as revenue from charges for water service.

**Nonoperating Revenues**: Nonoperating revenues include activities that have the characteristics of nonexchange transactions, which are defined as nonoperating revenues by GASB Statement No. 9, *Reporting Cash Flows of Proprietary and Nonexpendable Trust Funds and Governmental Entities That Use Proprietary Fund Accounting*, and GASB Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis for State and Local Governments*, such as investment income and interest expense.

13-53846-tjt    Doc 5029-6    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 118 of 120

**(n)   Use of Estimates**

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**(o)   New Accounting Pronouncements**

The Fund adopted GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. This Statement establishes accounting and financial reporting standards for impairment of capital assets. The Fund implemented GASB Statement No. 42 with the year ended June 30, 2006.

The Fund adopted GASB Statement No. 46, *Net Assets Restricted by Enabling Legislation—an amendment of GASB Statement No. 34*. This Statement clarifies that a legally enforceable enabling legislation restriction is one that a party external to a government – such as citizens, public interest groups, or the judiciary – can compel a government to honor. This Statement also specifies the accounting and financial reporting requirements if new enabling legislation replaces existing legislation or if legal enforceability is reevaluated. The Fund implemented GASB Statement No. 46 with the year ended June 30, 2006.

In July 2004, the GASB issued Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. This Statement establishes accounting and financial reporting standards for employers that participate in a defined-benefit "other postemployment benefit" (OPEB) plan. The Fund will implement GASB Statement No. 45 beginning with the year ended June 30, 2008. The Fund is currently evaluating the impact of adopting Statement No. 45.

**(2)   Deposits and Investments**

The following is a complete listing of deposits and investments held by the Fund at June 30, 2006:

| | | |
|---|---|---:|
| Deposits | $ | 12,237,801 |
| Investments | | 421,893,439 |
| Total deposits and investments | $ | 434,131,240 |

The deposits and investments of the Fund at June 30, 2006 are reflected in the financial statements as follows:

| | | |
|---|---|---:|
| Unrestricted: | | |
| Cash and cash equivalents | $ | 3,997,111 |
| Investments | | 22,345,923 |
| Restricted: | | |
| Cash and cash equivalents | | 34,465,603 |
| Investments – current | | 362,605,066 |
| Investments – noncurrent | | 10,717,537 |
| Total cash and investments | $ | 434,131,240 |

State law authorizes the Fund to make deposits in the accounts of federally insured financial institutions. Cash held by fiscal agents or by trustees is secured in accordance with the requirements of the agency or trust agreement.

The Fund is authorized to invest in obligations of the U.S. government or its agencies, certificates of deposit, savings and depository accounts of insured institutions, commercial paper of certain investment quality, repurchase agreements, banker's acceptances, mutual funds of certain investment quality, and investment pools as authorized by state law.

### *Custodial Credit Risk of Bank Deposits*

Custodial credit risk is the risk that in the event of bank failure, the Fund's deposits may not be returned by the bank. The Fund does not have a deposit policy for custodial credit risk. At June 30, 2006 and 2005, the Fund had deposits of $6,739,465 and $27,464,345, respectively, which were exposed to custodial credit risk, as they were uninsured and uncollateralized.

### *Custodial Credit Risk of Investments*

Custodial credit risk is the risk that in the event of failure of the counterparty, the Fund will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party. The Fund does not have a policy for custodial credit risk. As of June 30, 2006 and 2005, the Fund had no investments subject to custodial credit risk.