### Interest Rate Risk

Interest rate risk is the risk that, over time, the value of investments will decrease as a result of a rise in interest rates. The Fund's investment policy does not specifically restrict investment maturities other than commercial paper, which can only be purchased with a 270-day maturity. The Fund's policy minimizes interest rate risk by requiring that the Fund attempt to match its investments with anticipated cash flow requirements. Unless related to a specific cash flow, the Fund is generally not permitted to directly invest in securities maturing more than 10 years from the original date of purchase.

| | | | Investment maturities in years | |
| | Fair value | | Less than one year | one to five years |
|---|---|---|---|---|
| Investment: | | | | |
| U.S. government agency securities | $ | 118,632,147 | 107,914,610 | 10,717,537 |
| Certificate of deposit | | 8,860,656 | 8,860,656 | — |
| Commercial paper | | 52,283,902 | 52,283,902 | — |
| Money market | | 242,116,734 | 242,116,734 | — |
| Total investments | $ | 421,893,439 | 411,175,902 | 10,717,537 |

### Credit Risk

The Fund's investment policy complies with state law. The Fund limits its investments in commercial paper, mutual funds, and external investment pools that purchase commercial paper to the top two rating classifications issued by two nationally recognized statistical rating organizations (NRSROs).

As of June 30, 2006, the Fund had the following investments, maturities, and credit quality ratings of debt securities:

| | Fair value | | Rating | Rating organization |
|---|---|---|---|---|
| Investment: | | | | |
| U.S. government agency securities | $ | 46,790,138 | AAA, Aaa | S & P and Moody's |
| U.S. government agency securities | | 61,124,472 | A-1+ | S & P |
| U.S. government agency securities | | 10,717,537 | AAA, Aaa | S & P and Moody's |
| Money market | | 14,058,155 | Aaa | Moody's |
| Money market | | 97,792,234 | AAAm, Aaa | S & P and Moody's |
| Money market | | 130,266,345 | N/A | N/A |
| Certificate of deposit | | 8,860,656 | N/A | N/A |
| Commercial paper | | 52,283,902 | N/A | N/A |
| Total investments | $ | 421,893,439 | | |

(Continued)

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 1 of 121

*Concentration of Credit Risk*

Concentration of credit risk is the risk of loss attributed to the magnitude of the Fund's investment in a single issuer. The Fund's policy specifies a number of limitations to minimize concentration of credit risk, including prohibiting investing more than 5% of the portfolio in securities (other than U.S. government, mutual funds, external investment pools, and other pooled investments) of any one issuer.

More than 5% of the Fund's investments are in Federal Home Loan Bank, Federal Home Loan Mortgage, and Federal National Mortgage Association securities. These investments are 7%, 13%, and 7%, respectively, of the Fund's total investments.

**(3)  Restricted Assets**

Restricted assets, principally cash and investments, are available for debt service on revenue bonds and to provide funds for improvements, enlargements, extensions, and construction. In certain instances, minimum levels of assets are required by bond ordinance provisions or by Board of Water Commissioners' decree. These assets are maintained as follows: (1) With respect to the Bond and Interest Redemption Fund, after provision has been made for expenses of operation and maintenance of the System, a sum proportionately sufficient to provide for payment, when due, of the current principal and interest is set aside. The Bond Reserve Account is part of the Bond and Interest Redemption Fund, and the amounts credited to this account are to be used only to pay principal and interest on the bonds when current revenues are not sufficient. (2) With respect to the Extraordinary Repair and Replacement Reserve Fund, after meeting the requirements of the foregoing funds, monthly deposits in an amount equal to one twelfth of 3% of the budgeted operation and maintenance expense of the System for the fiscal year must be set aside until the aggregate amount funded totals at least 15% of that year's budgeted operating and maintenance costs. These deposits are to be used for major unanticipated repairs and replacement to the System with actual or anticipated cost exceeding $1 million. Once this fund is fully funded, deposits required are amounts needed to maintain fully funded status. Borrowings of up to 50% of the balance in this fund on the first day of the related fiscal year are allowed for transfer to and use from the Improvement and Extension Fund. Any such borrowings must be repaid prior to any deposits being made to the Improvement and Extension Fund. (3) After the above deposits have been made, excess amounts may be deposited in the Improvement and Extension Fund, established for the payment of improvements, enlargements, repairs, extensions, or betterment to the System. (4) With respect to the Construction Fund, the portion of the proceeds of the sale of bonds for building or improving the System is deposited in this fund. A separate depository account is required for each series of bonds. Proceeds for construction purposes received from federal and state grants and other sources that restrict the use of such proceeds are also deposited into this account.

When both restricted and unrestricted resources are available for use, generally it is the Fund's policy to use restricted resources first, and then unrestricted resources when they are needed.

The Fund's statement of net assets reports $81,914,130 of restricted net assets, of which $71,543,172 is restricted by enabling legislation.

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 2 of 121

**(4)   Capital Assets**

Capital asset activity for the fiscal years ended June 30, 2006 and 2005 is as follows:

|  | Balance, June 30, 2005 | Additions | Disposals | Balance, June 30, 2006 |
|---|---|---|---|---|
| Nondepreciated capital assets: |  |  |  |  |
| Land and land rights | $   6,527,438 | 1,870 | — | 6,529,308 |
| Construction in progress | 418,027,160 | 132,675,454 | (409,887,458) | 140,815,156 |
|  | 424,554,598 | 132,677,324 | (409,887,458) | 147,344,464 |
| Depreciated capital assets: |  |  |  |  |
| Services, meters, and improvements to land | 103,323,777 | 2,823,010 | (61,475) | 106,085,312 |
| Structures | 707,846,651 | 477,053,519 | (359,250,642) | 825,649,528 |
| Mains | 714,856,603 | 151,730,672 | (102,998,885) | 763,588,390 |
| Equipment | 630,635,010 | 446,020,895 | (212,197,939) | 864,457,966 |
| Accumulated depreciation | (688,863,364) | (54,628,100) | 423,184 | (743,068,280) |
|  | 1,467,798,677 | 1,022,999,996 | (674,085,757) | 1,816,712,916 |
| Total | $ 1,892,353,275 | 1,155,677,320 | (1,083,973,215) | 1,964,057,380 |

|  | Balance, June 30, 2004 | Additions | Disposals | Balance, June 30, 2005 |
|---|---|---|---|---|
| Nondepreciated capital assets: |  |  |  |  |
| Land and land rights | $   6,527,438 | — | — | 6,527,438 |
| Construction in progress | 679,745,387 | 171,715,631 | (433,433,858) | 418,027,160 |
|  | 686,272,825 | 171,715,631 | (433,433,858) | 424,554,598 |
| Depreciated capital assets: |  |  |  |  |
| Services, meters, and improvements to land | 96,834,157 | 6,489,620 | — | 103,323,777 |
| Structures | 453,406,152 | 254,440,499 | — | 707,846,651 |
| Mains | 689,057,547 | 25,799,056 | — | 714,856,603 |
| Equipment | 492,782,490 | 138,004,268 | (151,748) | 630,635,010 |
| Accumulated depreciation | (647,652,745) | (41,529,608) | 318,989 | (688,863,364) |
|  | 1,084,427,601 | 383,203,835 | 167,241 | 1,467,798,677 |
| Total | $ 1,770,700,426 | 554,919,466 | (433,266,617) | 1,892,353,275 |

13-53846-tjt   Doc 5029-7   Filed 05/23/14   Entered 05/23/14 19:55:08   Page 3 of 121

**(5) Impaired Capital Assets**

Beginning fiscal year ended June 30, 2006, the Fund implemented GASB Statement No. 42. As of June 30, 2006, the Fund did not have impaired assets reportable under GASB Statement No. 42.

**(6) Long-Term Obligations**

The outstanding indebtedness of the Fund for revenue bonds was approximately $1,971,743,954 and $1,991,615.00 at June 30, 2006 and 2005, respectively. The interest rates on the outstanding fixed-rate revenue bonds range from 4.30% to 6.38%. Net revenues of the Fund are pledged to repayment of bonds.

Future debt service requirements as of June 30, 2006 are as follows:

| Year ending June 30: | Principal | Bond interest | Swap interest | Total requirements |
|---|---|---|---|---|
| 2007 | $ 25,535,000 | 93,995,842 | 25,260,767 | 144,791,609 |
| 2008 | 27,025,000 | 93,168,039 | 25,540,372 | 145,733,411 |
| 2009 | 36,145,000 | 91,782,661 | 25,499,099 | 153,426,760 |
| 2010 | 35,755,000 | 90,148,553 | 25,453,115 | 151,356,668 |
| 2011 | 37,625,000 | 88,720,191 | 25,364,700 | 151,709,891 |
| 2012 – 2016 | 222,743,954 | 413,440,268 | 123,130,238 | 759,314,460 |
| 2017 – 2021 | 275,225,000 | 358,333,894 | 118,104,233 | 751,663,127 |
| 2022 – 2026 | 325,090,000 | 288,434,928 | 100,020,618 | 713,545,546 |
| 2027 – 2031 | 456,620,000 | 193,380,804 | 66,156,762 | 716,157,566 |
| 2032 – 2036 | 529,980,000 | 69,464,886 | 35,724,841 | 635,169,727 |
| | $ 1,971,743,954 | 1,780,870,066 | 570,254,745 | 4,322,868,765 |

In fiscal 2005, the Fund issued $105,000,000 of City of Detroit, Michigan Water Supply System Revenue Senior Lien Bonds, Series 2005-A, $195,000,000 of City of Detroit, Michigan, Water Supply System Revenue refunding Second Lien Bonds (Variable Rate Demand), and Series 2005-B, $126,605,000 of City of Detroit, Michigan, Water Supply System Revenue Refunding Senior Lien Bonds, Series 2005-C. The net proceeds were used to refund a portion of the City's outstanding Water Supply Systems Revenue Bonds and Revenue Refunding Bonds and to pay cost of issuance associated with the 2005 Bonds.

The proceeds of the Revenue Refunding Senior Lien Bonds, Series 2005-C will be used to (a) to advance-refund $69,285,000 principal amount of the City's Water Supply Revenue Senior Lien Bonds, Series 1997-A comprised of serial bonds maturing in the years 2010, 2016 and 2017: the 2018 through 2021 mandatory redemption payment for serial 1997-A term bonds maturing July 1, 2027 (Refunded 1997-A Bonds) with an average interest rate of 5.5% (b) to refund $56,700,000 principal amount of the City's Water Supply System Revenue Senior Lien Bonds, Series 1999-A bonds maturing in the years 2011 through 2018 with interest rate of 7.48% (Refunded 1999-A bonds and collectively with the Refunded 1997-A Bonds, and the Refunded bonds) and (c) for payment of the related costs of issuance, including the premium for the municipal bond insurance.

Those refunded securities were deposited in an irrevocable trust with an escrow agent to provide for all future debt service payments on the Refunded 1999-A Bonds when due to including July 1, 2010 and redeem the Refunded 1997-A Bonds on July 1, 2007 at 101%.

The advance refunding resulted in a difference between the reacquisition price and the net carrying amount of the old debt of $4,938,589. This difference, reported in the financial statements as a deduction from bonds payable, is being charged to operations through the year 2024 using the straight-line method. The Fund completed the advance refunding to reduce its total debt service payments over the next 20 years and to obtain an economic gain (difference between the present values of the old and new debt service payments) of $4,567,184.

In prior years, the Fund defeased certain bonds by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old bonds. Accordingly, the trust account assets and the liability for the defeased bonds are not included in the Fund's financial statements. Similarly, the interest expenses related to the defeased bonds and the related interest income earned on the escrow fund investments have not been recognized in the statements of revenues, expenses, and changes in fund net assets. As of June 30, 2006 and 2005, approximately $666,845,000 and $511,265,000 respectively, of bonds outstanding are considered defeased.

Bonds outstanding at June 30, 2006 include $1,718,013,954 of bonds callable at various dates after June 30, 2006. These bonds are callable at varying premiums, depending on the issue and length of time to maturity.

## (7) Pension Obligation Certificates (POC's)

### 2005 Issuance

In June 2005, the Detroit Retirement Systems Funding Trust issued $1,440,000,000 ($640 million of fixed rate, Series A, and $800 million of floating rate, Series B) of taxable Pension Obligation Certificates of Participation (POCs). The Trust was created by the General Retirement System Service Corporation (GRSSC) and the Police and Fire Retirement System Service Corporation (PFRSSC), both blended component units of the City. The City entered into service contracts with the GRSSC and PFRSSC to facilitate the transaction.

The POC's were issued for the purpose of funding certain unfunded accrued actuarial liabilities (UAAL) of the two retirement systems of the City, which include the General Retirement System (GRS) and the Police & Fire Retirement System (PFRS), and a portion of the then current year normal contribution. The GRS includes employees and retirees of certain governmental funds, proprietary funds (Transportation Fund, Sewage Disposal Fund and Water Fund) and the Detroit Public Library, a discretely presented component unit.

A proportionate amount of the liability was recorded on the books of the City's Governmental Activities, Transportation Fund, Sewage Disposal Fund and Water Fund, based on each fund's portion of the overall UAAL liquidated by the use of the 2005 POC net proceeds. In connection with the 2005 transactions, the Service Corporations entered into interest rate exchange agreements (swap agreements) to hedge the variable rate interest exposure associated with the issuance of the 2005 Series-B Certificates.

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 5 of 121

The original Series A and Series B certificates were not specifically related to either of the Service Corporations. The amount of proceeds from the 2005 issuance recorded on each Service Corporation's books was based on the respective proportion of UAAL funding required for the corresponding Pension System.

*Fiscal Year 2006 Events*

Michigan law entitles each Retirement System to have its UAAL funded over a specified period (Amortization Period), which may be duly changed up to a 30-year maximum. Each 2005 Service Contract required the City to make 2005 POC service payments over a period that was limited to the PFRS or GRS Amortization Period (13 years for PFRS and 20 years for the GRS). The funding Ordinance anticipated the possible future extension of the PFRS and GRS Amortization Periods and authorized the Service Corporations, in that event, to assist the City in gaining the financial benefits of making its 2005 POC Service payments over a similarly lengthened period.

On February 8, 2006, the governing board of the GRS extended the Amortization Period for GRS UAAL from 20 to 30 years. On March 30, 2006, the governing board of the PFRS UAAL extended the amortization period for PFRS UAAL from 13 to 30 years. The Taxable Certificates of Participation Series 2006 were issued to enable the City to replace certain scheduled payment obligations that it incurred to provide funding for the 2005 Subject UAAL with new scheduled payment obligations payable over the extended 30-year periods under the 2006 Service Contracts. This will enable the City to achieve financial benefits from the lengthened payment periods compared to the payment period included within the 2005 Series A and B payment schedules.

Accordingly, the Detroit Retirement Systems Funding Trust 2006 issued $948,540,000 ($148,540,000 of fixed rate Series A, and $800 million of floating rate Series B) of taxable Series 2006. The City also terminated the Swap agreements entered into in the 2005 transaction and received $48,932,455 as a result of the swap termination.

The City did not pay off the $104,055,000 of optionally redeemed Series A 2005 POC's until July 13, 2006. At June 30, 2006 the portion of the 2006 POC's proceeds to pay the $104,055,000 POC's were in irrevocable trust investment accounts.

Retirement Trust 2006 account statements reflect that, on July 13, 2006 approximately $104,404,000 of funds were disbursed to pay the POC's service obligation and accrued interest from June 15, 2006 (the last interest payment date) to July 13, 2006.

In economic substance, the City paid off $904,055,000 of 2005 Series Certificates with the net proceeds from the $948,540,000 received from the issuance of the 2006 POC. The net effect of this on the City's balance sheet is to add on additional $44,485,000 of POC obligations to the governmentwide balance sheet.

The present value of the net economic loss from refunding of the COP's Series 2005 by the COP's Series 2006 is $89,265,111.

|  | Certificates of Participation Series 2006 $948,540,000 |
|---|---|
| Cash flow requirements to service Series 2005 COP's | $ 2,267,195,204 |
| Less cash flow requirements for new COP's | 2,356,736,036 |
| Net loss from refunding actually realized in years 2026 to 2035 | $ (89,540,832) |
| Economic loss (annually) | $ (89,265,111) |

Certain maturities of the Series 2005-A POCs still remain outstanding concurrently with the 2006 Certificates. The 2005 POCs and the 2006 Certificates are wholly independent of each other.

The redemption dates and a summary of the aggregate principal and interest amounts for the remaining 2005 POC's are as follows:

| | Primary Government Principal | | | | |
|---|---|---|---|---|---|
| | | Business-type activities | | | |
| Maturity (June 15) | Governmental activities | Sewer Disposal Fund | Transportation Fund | Water Fund | Totals |
| 2007 | $ — | — | — | — | — |
| 2008 | — | — | — | — | — |
| 2009 | — | — | — | — | — |
| 2010 | 3,861,370 | 28,880 | 340,053 | 519,698 | 4,750,001 |
| 2011 | 8,905,539 | 66,606 | 784,268 | 1,198,587 | 10,955,000 |
| 2012 – 2016 | 113,686,862 | 850,288 | 10,011,862 | 15,300,989 | 139,850,001 |
| 2017 – 2021 | 153,857,304 | 1,150,731 | 13,549,481 | 20,707,484 | 189,265,000 |
| 2022 – 2025 | 155,369,335 | 1,162,040 | 13,682,639 | 20,910,986 | 191,125,000 |
| Total | $ 435,680,410 | 3,258,545 | 38,368,303 | 58,637,744 | 535,945,002 |

(Continued)

**Primary Government Interest**

| Maturity (June 15) | Governmental activities | Business-type activities | | | Totals |
| | | Sewer Disposal Fund | Transportation Fund | Water Fund | |
|---|---|---|---|---|---|
| 2007 | $ 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,442 |
| 2008 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,442 |
| 2009 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,442 |
| 2010 | 20,942,804 | 156,636 | 1,844,333 | 2,818,669 | 25,762,442 |
| 2011 | 20,776,224 | 155,390 | 1,829,663 | 2,796,249 | 25,557,526 |
| 2012 – 2016 | 93,492,246 | 699,248 | 8,233,418 | 12,583,018 | 115,007,930 |
| 2017 – 2021 | 60,177,138 | 450,077 | 5,299,514 | 8,099,174 | 74,025,903 |
| 2022 – 2025 | 20,083,887 | 150,212 | 1,768,692 | 2,703,068 | 24,705,859 |
| Total | $ 278,300,711 | 2,081,471 | 24,508,619 | 37,456,185 | 342,346,986 |

The redemption dates and a summary of the aggregate principal and interest amounts for Series 2006 Pension Obligation Certificates are as follows:

**Primary Government Principal**

| Maturity (June 15) | Governmental activities | Business-type activities | | | Totals |
| | | Sewer Disposal Fund | Transportation Fund | Water Fund | |
|---|---|---|---|---|---|
| 2007 | $ — | — | — | — | — |
| 2008 | — | — | — | — | — |
| 2009 | — | — | — | — | — |
| 2010 | — | — | — | — | — |
| 2011 | — | — | — | — | — |
| 2012 – 2016 | — | — | — | — | — |
| 2017 – 2021 | 33,557,338 | 250,982 | 2,955,235 | 4,516,445 | 41,280,000 |
| 2022 – 2026 | 84,689,193 | 633,408 | 7,458,175 | 11,398,224 | 104,179,000 |
| 2027 – 2031 | 318,531,321 | 2,382,363 | 28,051,539 | 42,870,777 | 391,836,000 |
| 2031 – 2035 | 334,309,285 | 2,500,370 | 29,441,030 | 44,994,315 | 411,245,000 |
| Total | $ 771,087,137 | 5,767,123 | 67,905,979 | 103,779,761 | 948,540,000 |

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 8 of 121

| Maturity (June 15) | Governmental activities | Sewer Disposal Fund | Transportation Fund | Water Fund | Totals |
|---|---|---|---|---|---|
| | | **Primary Government Interest** | | | |
| | | **Business-type activities** | | | |
| 2007 | $ 40,020,806 | 299,324 | 3,524,442 | 5,386,356 | 49,230,928 |
| 2008 | 44,079,824 | 329,682 | 3,881,901 | 5,932,655 | 54,224,062 |
| 2009 | 47,826,551 | 357,705 | 4,211,857 | 6,436,922 | 58,833,035 |
| 2010 | 47,826,551 | 357,705 | 4,211,857 | 6,436,922 | 58,833,035 |
| 2011 | 47,826,551 | 357,705 | 4,211,857 | 6,436,922 | 58,833,035 |
| 2012 – 2016 | 239,132,754 | 1,788,524 | 21,059,285 | 32,184,612 | 294,165,175 |
| 2017 – 2021 | 236,954,334 | 1,772,231 | 20,867,442 | 31,891,421 | 291,485,428 |
| 2022 – 2026 | 223,400,997 | 1,670,863 | 19,673,864 | 30,067,292 | 274,813,016 |
| 2027 – 2031 | 165,038,717 | 1,234,359 | 14,534,175 | 22,212,378 | 203,019,629 |
| 2031 – 2035 | 52,643,635 | 393,733 | 4,636,075 | 7,085,248 | 64,758,691 |
| Total | $ 1,144,750,720 | 8,561,831 | 100,812,755 | 154,070,728 | 1,408,196,034 |

## (8) Deferred Amount on Refunding

The following shows the calculation of the total deferred amount on refunding and the effect on the Pension Obligation Payable by each fund. The total Deferred Amount on Refunding is comprised of the amount transferred from Series 2005 issuance costs of $27,651,925 plus tender and redemption premiums paid of $3,404,274, or a total of $31,056,197. It will be amortized over the remaining life of the old POC's Series 2005 (19 years), which is shorter than the life of the new POC's Series 2006 (29 years).

| | Governmental activities | Transportation Fund | Water Fund | Sewage Disposal Fund | Library |
|---|---|---|---|---|---|
| POC payable – 2005 Series | $ 435,683,032 | 38,362,255 | 58,635,556 | 3,264,157 | — |
| POC payable – 2006 Series | 771,087,136 | 67,905,979 | 103,779,761 | 5,767,123 | — |
| Advance payable Primary Government | | | | — | 24,554,826 |
| Deferred amount on refunding | (24,733,155) | (2,223,313) | (3,397,859) | (188,822) | (513,048) |
| Net POC Payable | $ 1,182,037,013 | 104,044,921 | 159,017,458 | 8,842,458 | 24,041,778 |
| Net advance payable to Primary Government | $ — | — | — | — | 20,041,778 |

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 9 of 121

**(9) Long-Term Liabilities**

Long-term activity for the years ended June 30, 2006 and 2005 is as follows:

| | Balance, June 30, 2005 | Increase | Decrease | Balance, June 30, 2006 | Amount due within one year |
|---|---|---|---|---|---|
| Revenue bonds payable | $ 1,991,615,000 | — | (24,595,000) | 1,967,020,000 | 25,535,000 |
| State revolving loan | — | 4,723,954 | — | 4,723,954 | — |
| Total revenue bonds payable | 1,991,615,000 | 4,723,954 | (24,595,000) | 1,971,743,954 | 25,535,000 |
| Add unamortized premium | 17,976,690 | — | (1,078,078) | 16,898,612 | — |
| Less: | | | | | |
| Deferred charges on refunding | 49,223,977 | 6,221,498 | — | 55,445,475 | — |
| Discount | 20,478,334 | — | (13,218,935) | 7,259,399 | — |
| Net revenue bonds | 1,939,889,379 | (1,497,544) | (12,454,143) | 1,925,937,692 | 25,535,000 |
| Pension obligation certificates payable 2005 series | 157,548,214 | — | (98,912,658) | 58,635,556 | — |
| Pension obligation certificates payable 2006 series | — | 103,779,761 | — | 103,779,761 | — |
| Less deferred defeasance cost | — | 3,397,859 | — | 3,397,859 | — |
| Net pension obligation certificate payable | 157,548,214 | 100,381,902 | (98,912,658) | 159,017,458 | — |
| Other liabilities: | | | | | |
| Accrued workers' compensation | 18,711,346 | 4,356,803 | (4,956,733) | 18,111,416 | 2,913,177 |
| Accrued compensated absences | 18,413,672 | 5,103,411 | (4,888,782) | 18,628,301 | 3,715,980 |
| Deferred swap termination | 16,797,795 | — | (584,271) | 16,213,524 | — |
| Total other liabilities | 53,922,813 | 9,460,214 | (10,429,786) | 52,953,241 | 6,629,157 |
| Total | $ 2,151,360,406 | 108,344,572 | (121,796,587) | 2,137,908,391 | 32,164,157 |

21

(Continued)

| | Balance, June 30, 2004 | Increase | Decrease | Balance, June 30, 2005 | Amount due within one year |
|---|---|---|---|---|---|
| Revenue bonds payable | $ 1,713,435,000 | 426,605,000 | (148,425,000) | 1,991,615,000 | 24,595,000 |
| Add unamortized premium | 6,257,305 | 12,302,729 | (583,344) | 17,976,690 | — |
| Less: | | | | | |
| Deferred charges on refunding | 44,223,565 | 8,298,346 | (3,297,934) | 49,223,977 | — |
| Discount | 21,604,144 | — | (1,125,810) | 20,478,334 | — |
| Net revenue bonds | 1,653,864,596 | 430,609,383 | (144,584,600) | 1,939,889,379 | 24,595,000 |
| Pension obligation certificates payable | — | 157,548,214 | — | 157,548,214 | — |
| Other liabilities: | | | | | |
| Accrued workers' compensation | 15,778,254 | 7,345,178 | (4,412,086) | 18,711,346 | 3,470,751 |
| Accrued compensated absences | 15,589,521 | 4,203,964 | (1,379,813) | 18,413,672 | 8,604,763 |
| Deferred swap termination | 16,943,863 | — | (146,068) | 16,797,795 | — |
| Total other liabilities | 48,311,638 | 11,549,142 | (5,937,967) | 53,922,813 | 12,075,514 |
| Total | $ 1,702,176,234 | 599,706,739 | (150,522,567) | 2,151,360,406 | 36,670,514 |

## (10) Derivatives Not Reported at Fair Value

The Fund is party to derivative financial instruments consisting of interest rate swaps that are intended to effectively convert variable-rate financings to fixed-rate financings. These are not reported at fair value on the statement of net assets at June 30, 2006.

*Objective of the Swaps*. In order to better manage its interest rate exposure and to reduce the overall costs of its financings, the Fund has entered into 15 separate fixed-payor interest rate swaps. The Fund is also a party in the City's POC's related to the GRS. The City has entered into two separate fixed-payor interest rate swaps related to the POC's and the GRS.

*Market Access Risk*. The Fund is exposed to market access risk on its hedge swaps or forward starting swaps in the event that it will not be able to enter credit markets or in the event that credit will become more costly.

(Continued)

*Terms, Fair Values, and Credit Risk*. Certain key terms, fair market values, and counterparty credit ratings relating to the outstanding swaps as of June 30, 2006 are presented below. The notional amounts of the swaps, except those with effective dates of September 1, 2006 and March 1, 2007, match the principal amounts of the outstanding financings. The swaps with effective dates of September 1, 2006 and March 1, 2007, were entered into to hedge future interest rate risk and will be associated with financings expected to be issued prior to the effective dates. Except as discussed under rollover risk, the Fund's swap agreements contain scheduled reductions to outstanding notional amounts that match scheduled or anticipated amortization of associated financings.

| Associated financing issue | Notional amounts (1) | Effective date | Fixed rate paid | Variable rate received | Fair values | Sweep termination date | Final maturity of bonds | Counterparty credit rating |
|---|---|---|---|---|---|---|---|---|
| Water 2001-C (3) | $ 47,723,000 | 6/7/2001 | 4.07% | BMA | $ — | 1/1/2006 | 7/1/2029 (3) | Aaa/AA+/NR |
| Water 2001-C (3) | 29,972,000 | 6/7/2001 | 4.70 | BMA | (1,214,171) | 7/1/2011 | 7/1/2029 (3) | Aaa/AA+/NR |
| Water 2001-C (3) | 47,628,000 | 1/1/2006 | 5.42 | BMA | (3,490,184) | 7/1/2011 | 7/1/2029 (3) | Aaa/AA+/NR |
| Water 2001-C | 114,150,000 | 6/7/2001 | 4.90 | BMA | (10,802,162) | 7/1/2026 | 7/1/2026 | Aa3/A+/AA |
| Water 2003-B | 1,980,000 | 1/30/2003 | 3.02 | CPI + 1.01% | 57,777 | 7/1/2009 | 7/1/2009 | Aa3/A+/AA |
| Water 2003-B | 2,290,000 | 1/30/2003 | 3.31 | CPI + 1.12% | 67,167 | 7/1/2010 | 7/1/2010 | Aa3/A+/AA |
| Water 2003-B | 2,500,000 | 1/30/2003 | 3.55 | CPI + 1.25% | 74,359 | 7/1/2011 | 7/1/2011 | Aa3/A+/AA |
| Water 2003-B | 2,175,000 | 1/30/2003 | 3.74 | CPI + 1.33% | 59,662 | 7/1/2012 | 7/1/2012 | Aa3/A+/AA |
| Water 2003-B | 2,800,000 | 1/30/2003 | 3.87 | CPI + 1.34% | 66,848 | 7/1/2013 | 7/1/2013 | Aa3/A+/AA |
| Water 2003-B | 2,505,000 | 1/30/2003 | 4.00 | CPI + 1.36% | 47,560 | 7/1/2014 | 7/1/2014 | Aa3/A+/AA |
| Water 2003-C | 2,005,000 | 1/30/2003 | 3.87 | CPI + 1.34% | 47,885 | 7/1/2013 | 7/1/2013 | Aa3/A+/AA |
| Water 2003-C | 2,330,000 | 1/30/2003 | 4.00 | CPI + 1.36% | 44,237 | 7/1/2014 | 7/1/2014 | Aa3/A+/AA |
| Water 2003-D | 150,545,000 | 2/6/2003 | 4.06 | BMA | (3,674,234) | 7/1/2033 | 7/1/2033 | Aa2/AA-/NR |
| Water 2004-A | 77,010,000 | 5/13/2004 | 3.94 | BMA | (903,397) | 7/1/2025 | 7/1/2025 | Aa2/AA-/NR |
| Water 2004-B | 163,590,000 | 5/13/2004 | 3.85 | BMA | (856,979) | 7/1/2023 | 7/1/2023 | Aa2/AA-/NR |
| Water 2005-B | 195,000,000 | 4/1/2005 | 4.71 | BMA | (6,703,870) | 7/2/2035 | 7/2/2035 | Aa3/A+/AA- |
| Water Forward Starting Swap | 120,000,000 | 3/1/2007 | 5.00 | BMA | (7,616,810) | 7/3/2036 | 7/3/2036 | Aa3/A+/AA- |
| Pension Obligation Certificates-GRS | 99,621,000 | 6/7/2006 | 4.99 | 3 MTH LIBOR +.34% | (183,936) | 6/15/2034 | 6/15/2034 | Aa3/A+/AA- |
| Pension Obligation Certificates-GRS | 42,252,000 | 6/7/2006 | 4.99 | 3 MTH LIBOR +.30% | (84,084) | 6/15/2029 | 6/15/2029 | Aa3/A+/AA- |

(1) Notional amount balance as of June 30, 2006
(2) The Bond Market Association Municipal Swap Index™
(3) Denotes the the swap termination date does not match the final maturity of the financings

*Fair Value*. Because interest rates have generally declined since the time the swaps were negotiated, most of the Fund's swaps have a negative fair value as of June 30, 2006. The negative fair values may be countered by lower total interest payments required under the variable-rate financings, creating lower synthetic interest rates.

*Credit Risk*. As of June 30, 2006, the Fund was not significantly exposed to net credit risk, as the majority of the swaps had net negative fair values. However, should interest rates change and fair values of the swaps become positive, the Fund would be exposed to credit risk in the amount of the derivatives' positive fair value.

The swap agreements contain varying collateral agreements with the counterparties. The swaps require full collateralization of the fair value of the swap should the counterparty's credit rating fall below certain rating levels by Fitch Ratings, Standard & Poor's, and/or Moody's Investors Service. Collateral on all swaps is to be in the form of U.S. government securities held by a third-party custodian.

23 (Continued)

*Basis Risk*. The Fund is not exposed to significant basis risk on its swaps because most of the variable payments received are based on the Bond Market Association (BMA) index. The Consumer Price Index (CPI) indexed swaps are associated with CPI indexed financings and thus create no basis risk.

*Termination Risk*. The Fund or counterparty may terminate any of the swaps if the other party fails to perform under the terms of the contract. In such cases, the Fund may owe or be due a termination payment, depending on the value of the swap at that time. In addition, the Fund is exposed to termination risk, but not termination payments, on certain of the Fund's swaps related to Water Series 2001-C, Water Series 2003-D, Water Series 2004-A, and Water Series 2004-B. These swaps provide the counterparty with the option to terminate the swap agreement beginning on January 1, 2010, July 2, 2011, July 1, 2008, and July 1, 2008, respectively, upon the passing of certain BMA thresholds. If any of these swaps were terminated, the associated variable-rate financings would no longer carry synthetic interest rates, but there would be no termination payment.

*Rollover Risk*. The Fund is exposed to rollover risk on swaps that mature or may be terminated prior to the maturity of the associated financings. When these swaps terminate or, in the case of the termination option, if the counterparty exercises its option, the Fund will not realize the synthetic rate offered by the swaps on the underlying issues. The Fund has this risk for the three (3) Water Series 2001-C financing issues.

**(11) Employee Benefit Plan**

Substantially all City employees, including the Water Fund employees, are covered by a single-employer plan composed of a defined benefit with an optional employee-contributed annuity through the GRS. The GRS pays a monthly pension to qualified individuals upon retirement. The amount is based upon a combination of years of service and annual salary.

*Plan Description*

The GRS is administered in accordance with the City of Detroit Charter and union contracts, which assign the authority to establish and amend contributions and benefit provisions to the Retirement System's board of trustees. The GRS issues separate, stand-alone financial statements annually. Copies of these financial statements can be obtained at the Coleman A. Young Municipal Center, 2 Woodward Ave., Rm. 908, Detroit, Michigan, 48226.

*Funding Policy*

The GRS funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are sufficient to accumulate sufficient assets to pay benefits when due. The contribution requirements are established and may be amended by the GRS's board of trustees based on information provided by the GRS's consulting actuary. The City's contribution is set by the City Council in conjunction with its approval of the City's annual budget based on information provided by the GRS's consulting actuary.

The recommended contribution rate is determined by the GRS's consulting actuary using the entry age normal actuarial cost funding method. Significant actuarial assumptions used to compute contribution requirements are the same as those used to compute the actuarial accrued liability.

Based upon the June 30, 2005 actuarial valuation, which was the most recent actuarial data available when the budget was developed for the year ended June 30, 2006, the actuary recommended a Water Fund contribution rate of 20.84%. Contributions for the Water Fund totaled $5,156,381.

Employees may elect to contribute 3%, 5%, or 7% of the first $90,000 of annual compensation and 5% or 7% of any excess over $90,000 for annuity savings. Contributions are voluntary for all union and nonunion employees. Contributions received from Water Fund employees during the year ended June 30, 2006 amounted to $3,032,044.

The contribution requirements of plan members and the City are established and may be amended by the board of trustees in accordance with the City Charter, union contracts, and plan provisions. Members may retire with full benefits after attaining 30 years of service; age 55 with 30 years of service if hired after January 1, 1996; age 60 with 10 years of service; or age 65 with 8 years of service. Employees may retire after 25 years of service and collect an actuarially reduced retirement benefit. Monthly pension benefits, which are subject to certain minimum and maximum amounts, are determined according to fixed rates per year of credited service. Members of the GRS who separated prior to July 1, 1981, met the age and service requirements, and who did not withdraw their accumulated annuity contributions would have been eligible for a pension at the time they would have been eligible had they continued in City employment. Members who separate after July 1, 1981 are not required to leave their accumulated annuity contributions in the System. Pension benefits for all members of the GRS are increased annually by 2.25% of the original pension.

*Administrative Expenses*

Actuarial investment management and bank trustee fees and expenses are included in the GRS plan's administrative expenses when incurred. In addition, the GRS plan's administrative salary, rent, accounting services, duplicating, telecommunications, and travel expenses are included in the GRS plan's administrative expenses when incurred.

|  | Fiscal year ended | Annual pension cost (APC) | Percentage of APC contributed | Net pension asset |
|---|---|---|---|---|
| General Retirement System | June 30, 2004 | $ 16,814,426 | 100 | $ — |
| | June 30, 2005 | 17,571,543 | 956 | 150,452,508 |
| | June 30, 2006 | 7,018,615 | 100 | 148,590,274 |

(Continued)

The annual pension cost and net pension asset as of June 30, 2006 is as follows:

| | |
|---|---:|
| Annual required contributions | $ 10,457,713 |
| Interest on net pension asset | (11,885,748) |
| Adjustment to annual required contribution | 8,446,650 |
| Annual pension cost | 7,018,615 |
| Contributions made (employer) | 5,156,381 |
| Changes in net pension asset | (1,862,234) |
| Net pension asset, beginning of year | 150,452,508 |
| Net pension asset, end of year | $ 148,590,274 |

The actuarial methods and significant assumptions used to determine the annual required contributions for June 30, 2006 were as follows:

| | |
|---|---:|
| Actuarial cost method | Entry age |
| Amortization method | Level percent |
| Remaining amortization period for unfunded accrued liabilities** | 30 years |
| Asset valuation method | 3-year smoothed market |
| Actuarial assumptions: | |
| Investment rate of return | 7.9% |
| Projected salary increases* | 4% – 9.5% |
| Cost-of-living adjustments* | 2.25% |

*Includes inflation rate of 4%

**Amortization period was changed in FY 2006, see note 7.

**(12) Other Post-Employment Benefits**

In addition to the pension benefits described above, the City provides postretirement benefits to its retirees, which include hospitalization, dental care, eye care, and life insurance, The number of City retirees at June 30, 2006 is 22,451. Costs are accounted for in accordance with GASB Statement No. 12, *Disclosure of Information on Postemployment Benefits Other Than Pension Benefits by State and Local Governmental Employers*. The benefits are provided in accordance with the City Charter and union contracts. The costs of benefits, which are financed on a pay-as-you-go basis, for the year ended June 30, 2006, are as follows:

| Benefits | City cost | Retiree cost | Total cost |
|---|---|---|---|
| Hospitalization | $ 139,306,757 | 14,933,508 | 154,240,265 |
| Dental | 6,160,524 | — | 6,160,524 |
| Eye care | 1,969,690 | — | 1,969,690 |
| Life insurance | 143,579 | 26,740 | 170,319 |
| | $ 147,580,550 | 14,960,248 | 162,540,798 |

27

(Continued)

### (13) Due to (from) Other Funds

During the course of operations, numerous transactions occur between individual funds and other City of Detroit funds for goods provided or services rendered. Related receivables and payables are classified as "due from other funds" or "due to other funds" on the balance sheets and are summarized as follows:

|  | 2006 | 2005 |
|---|---|---|
| Due from other funds (unrestricted): | | |
| General Fund | $ 804,919 | 757,819 |
| Sewage Disposal Fund | 56,079,411 | 52,391,479 |
| Total due from other funds | $ 56,884,330 | 53,149,298 |
| Due from other funds (restricted): | | |
| General Fund | $ 357,919 | 33,628,639 |
| Sewage Disposal Fund | 5,663,541 | 6,846,660 |
| Total due from other funds | $ 6,021,460 | 40,475,299 |
| Due to other funds (unrestricted): | | |
| General Fund | $ 6,038,572 | 17,324,357 |
| General Fiduciary | 506,181 | |
| Sewage Disposal Fund | 47,328,259 | 48,558,282 |
| Total due to other funds | $ 53,873,012 | 65,882,639 |
| Due to other funds (restricted): | | |
| General Fund | $ 33,963 | 290,175 |
| Sewage Disposal Fund | 10,948,627 | 6,225,399 |
| Total due to other funds | $ 10,982,590 | 6,515,574 |

### (14) Capital Improvement Programs

The Fund is engaged in a variety of projects that are a part of its five-year Capital Improvement Program (the Program). The total cost of this program is anticipated to be approximately $1.68 billion through fiscal year 2010. The Program is being primarily financed from revenues of the Fund and proceeds from the issuance of revenue bonds.

The total amount of construction contract commitments outstanding at June 30, 2006 and June 30, 2005 was approximately $156 million and $101 million, respectively.

**(15) Rate Adjustments**

The U.S. Environmental Protection Agency (EPA), in attempting to ensure that user charges are proportional in effect as well as in their design, requires grantees to compare budgeted wastewater contributions, revenues from users, and user classes to actual results and make appropriate rate adjustments in the second succeeding year. The accompanying financial statements reflect management's estimates of the current and noncurrent amounts receivable from and refundable to customers in accordance with the regulations. Although subsequent adjustments to these amounts may occur, management does not believe the impact would be material to the Fund's financial position or results of operations.

**(16) Contingencies**

The Fund is also a defendant in numerous alleged claims, lawsuits, billing disputes, and other stated and pending demands. The Fund and the City's Legal Department have estimated a reserve, which is included in the accompanying financial statements, for the potential outcome of such claims or the amount of potential damages in the event of an unfavorable outcome for each of the above contingencies. The Fund's management and the City's Legal Department believe that any differences in reserved amounts and final settlement, after consideration of claims covered by insurance, resulting from such litigation will not materially impact the Fund's financial position or results of operations.

The City holds various commercial insurance policies to cover potential loss exposures.

**(17) Subsequent Events**

On August 14, 2006 the Water Supply System issued $1,136,585,000 of Series 2006 bonds to finance a portion of the costs of the Water Supply System capital improvement program, refund certain prior outstanding bonds, fund reserve requirements and pay cost of issuance of the 2006 Bonds. These were comprised of: (1.) $767,235,000 of new issued bonds ($280,000,000 Revenue Senior Lien Bonds-Series 2006(A), $120,000,000 System Revenue Second Lien Bonds (Variable Rate Demand), Series 2006 (B), $220,645,000 Revenue Refunding Second Lien Bonds, Series 2006 (C), and, $146,590,000 Revenue Refunding Senior Lien Bonds, Series 2006 (D)). The Series (A) bonds begin to mature July 1, 2007 and will fully mature in the year 2018. The Series (B) bonds mature July 1, 2036. The Series 2006 (C) and (D) both begin to mature July 1, 2007 and will fully mature in the years 2012 and 2013, respectively. (2.) $142,755,000 of refunded fixed rate Revenue Senior Lien Bonds Series 2003(D). These were remarketed/converted on September 1, 2006 and begin maturing January 1, 2007. (3.) $226,595,000 of Refunded Revenue Senior Lien Bonds, Series 2004(A) and (B). ($72,765,000 Refunding Second Lien Bonds fixed rate Series 2004(A) and $153,830,000 Refunding Senior Lien Bonds fixed rate Series 2004(B)). Both of the Series 2004 Bonds have a remarketing date of August 16, 2006.

In September 2005, several customers of the Fund challenged the method of allocating costs associated with the 800 MHz project. In early 2007, the court issued a preliminary ruling acknowledging that the Fund had been overcharged, but is yet to issue a final ruling. In management's opinion, the final resolution will not have a material effect on the Fund's financial statements.

The Fund issued Revenue Refunding bonds that are insured with bond insurance coverage purchased through rated bond insurers. The bond insurance helps the Fund to obtain a lower cost of borrowing. As of February 20, 2008 the major rating agencies downgraded one of the Fund's bond insurers. The rating of the Fund's bonds that are insured by the downgraded bond insurer has not been affected.

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 19 of 121

**REQUIRED SUPPLEMENTARY INFORMATION**

# CITY OF DETROIT
# WATER FUND

Required Supplementary Information (Unaudited)

June 30, 2006

Schedule of Funding Progress (in millions) for the General Retirement System (unaudited):

| Actuarial valuation date, June 30 | Actuarial value of assets | Actuarial accrued liability (AAL) | Funded ratio | Unfunded AAL (UAAL) | Covered payroll |
|---|---|---|---|---|---|
| 2001 (a) (b) | $  2,912.1 | 3,179.6 | 91.6% | $  267.5 | 439.6 |
| 2002 | 2,761.2 | 3,276.6 | 84.3 | 515.4 | 440.7 |
| 2003 | 2,537.7 | 3,270.6 | 77.6 | 733.0 | 448.6 |
| 2004 | 2,470.2 | 3,383.9 | 73.0 | 913.7 | 444.6 |
| 2005 | 3,222.4 | 3,347.4 | 96.3 | 125.0 | 390.6 |

(a) After changes in actuarial assumptions.

(b) Plan amended.

See accompanying independent auditors' report.

# APPENDIX C

## BOND ORDINANCE

[THIS PAGE INTENTIONALLY LEFT BLANK]

Ordinance No. _____

**An Ordinance to Amend and Restate Ordinance No. 30-02 of the City of Detroit to Provide for the Issuance of SRF Junior Lien Bonds to Evidence Loans from the State Drinking Water Revolving Fund.**

**Whereas**, Ordinance No. 30-02 provides for the financing and refinancing of capital improvements to the Water Supply System (the "System")of the City of Detroit, Michigan (the "City"), by the issuance from time to time of Water Supply System Revenue Bonds and Revenue Refunding Bonds;

**Whereas**, the City Council of the City desires to amend and restate Ordinance No. 30-02 to provide for the issuance of SRF Junior Lien Bonds to enable the City to finance eligible improvements to the System with low-cost loans from the State Drinking Water Revolving Fund established pursuant to the federal Safe Drinking Water Act of 1974, as amended;

**The City of Detroit Ordains:**

**Amendment to Amend and Restate Ordinance No. 30-02**

Ordinance No. 30-02, as amended to the date hereof is hereby amended and restated in its entirety to read as set forth below. Such amendment and restatement to take effect as provided in Section 25 hereof.

## SECTION 1. DEFINITIONS - GENERAL.

Whenever used in this Ordinance, except when otherwise indicated by the context, capitalized terms not defined herein and defined in the preamble hereto are used herein as defined in the preamble, and the following terms shall have the following meanings:

> "Act 34" means Act 34, Public Acts of Michigan, 2001, as amended.

> "Act 94" means Act 94, Public Acts of Michigan, 1933, as amended.

> "Act of Council" means a resolution or ordinance of the Council, as required or permitted by law to authorize or otherwise give effect to the subject matter thereof.

> "Additional Securities" has the meaning given that term in Section 20(C)(1).

> "Ancillary Obligation" means any Reimbursement Obligation and any Hedge Obligation.

> "Ancillary Obligation Fees and Expenses" means any fees and expenses in connection with any Hedge or Financial Facility in the ordinary course of the transaction.

"BMA Municipal Index" means the index based upon the weekly interest rates of tax-exempt variable rate issues included in a database maintained by Municipal Market Data, Boston, Massachusetts, a Thompson Financial Services Company (or its successor), which meet specific criteria established by The Bond Market Association.

"Bond Counsel's Opinion" means an opinion signed by an attorney or firm of attorneys of nationally recognized standing in the field of law relating to municipal, state and public agency financing, selected by the City.

"Bond Insurance" means any policy of insurance, contract of suretyship, guaranty or other agreement intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal (and premium, if any) of and interest on such Securities and pursuant to which the provider thereof is repaid solely as subrogee without creating any additional payment obligations (other than the payment of a premium or annual fee).

"Capital Appreciation Securities" means Securities that pay interest only at maturity.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Code" means the Internal Revenue Code of 1986, as it may be amended and the rules and regulations promulgated thereunder or applicable thereto.

"Commissioners" means the Board of Water Commissioners of the City created by Article 7, Section 7-1501, of the Charter of the City or any successor body.

"Construction Fund" means the fund established pursuant to Section 14.

"Council" means the City Council of the City.

"Counterpart Securities" means Securities that bear interest at rates which vary inversely to each other and that were issued contemporaneously with each other in order to produce a single fixed rate. In order to constitute "Counterpart Securities" both counterparts must be Outstanding at the same time and in such amounts and with such amortizations schedules as to maintain the fixed rate so utilized.

"Coverage Determination" means a determination of the ratio of Net Revenues to Indebtedness with respect to Securities for purposes of fixing or revising rates or issuing Additional Securities or incurring additional Secured Obligations.

2

"Credit Enhancement" means any Credit Facility and any Bond Insurance.

"Credit Facility" means any letter of credit, line of credit, purchase agreement, surety bond or other financial arrangement, other than Bond Insurance, intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal of and interest on such Securities or intended to secure an obligation to fund an account or fund, such as a Reserve Account.

"Debt Service Installment Requirement" means, as of the first day of each month with respect to a Priority of Outstanding Securities and Ancillary Obligations, if any, the total for such month of the (i) Interest Installment Requirement, (ii) Principal Installment Requirement and (iii) Sinking Fund Installment Requirement, if any.

"Excluded Tender Securities" means:

      (i)     Tender Securities that the City is not obligated to purchase under any circumstances upon the failure of the remarketing thereof and for which the City has not provided a Liquidity Facility; and

      (ii)     Tender Securities for which the City has provided a Liquidity Facility.

"Extraordinary Repair and Replacement Maximum Requirement" means, for any Fiscal Year, 15% of the budgeted operation and maintenance expense of the System for such Fiscal Year less in the Fiscal Year any amount that is withdrawn from the Extraordinary Repair and Replacement Reserve Fund for paying a major unanticipated repair or replacement to the System pursuant to Section 13D, but only in the Fiscal Year that such amount is withdrawn.

"Extraordinary Repair and Replacement Minimum Requirement" means, for any Fiscal Year, 1/12 of 3% of the budgeted operation and maintenance expense of the System for such Fiscal Year plus such amount as is necessary to restore to the Extraordinary Repair and Replacement Reserve Fund any amount credited to the Improvement and Extension Fund.

"Finance Director" means the Finance Director of the City or any successor officer of the City responsible for performing the duties of the Finance Director pursuant to the Charter of the City.

"Financial Facility" means any Credit Enhancement, Liquidity Facility or combined Credit and Liquidity Facility.

"Fiscal Year" means the fiscal year and operation year of the City which begins on July 1 and ends on the following June 30 as it may be modified.

3

"Fixed Rate Security" means a Security that bears interest at a rate that has been fixed for at least a five-year period that includes all of the Fiscal Year for which a calculation of Annual Debt Service is made or to its scheduled maturity, whichever is shorter; provided, however that:

> (i)      If the Fiscal Year for which a calculation of Annual Debt Service is made includes only a portion of such five year period, a Security is also a "Fixed Rate Security" but only for such portion;

> (ii)     A rate is fixed for purposes of determining whether a Security is a "Fixed Rate Security" if the economic effect of a Security bearing interest at a fixed rate is produced by a Qualified Hedge or by Counterpart Securities; and

> (iii)    A rate is variable for purposes of determining whether a Security is a "Fixed Rate Security" if the economic effect of a Security bearing interest at a variable rate is produced by a Qualified Hedge.

"Government Obligations" means direct obligations of the United States of America or obligations the principal of and interest on which is fully guaranteed by the United States of America, including U.S. Treasury Trust Receipts.

"Hedge" means any agreement by which the City is authorized or permitted by law to manage its debt service, either in connection with the proposed issuance or issuance of Securities or in connection with its then Outstanding Securities, including, but not limited to, interest rate exchanges or swaps, hedges and similar agreements.

"Hedge Obligations" means the City's payment obligations under a Hedge other than the obligation to pay fees and expenses in the ordinary course of the transaction.

"Hedge Termination Payment" means an amount payable by the City under a Hedge by reason of the early termination thereof.

"Hedge Receivable" means any amount receivable by the City under a Hedge including any amount by reason of the early termination thereof.

"Holder" or "Securityholder" means the Person in whose name a Security is registered in the Registry.

"Indebtedness" has the meaning given that term in Section 2.

"Interest and Redemption Fund" means any Interest and Redemption Fund established for a Priority of Securities.

"Interest Installment Requirement" means, as of the first day of each month in a Fiscal Year, with respect to Securities and Ancillary Obligations of the same Priority of Lien, the amount of interest accrued and unpaid and to accrue to and including the last day of such month, on Outstanding Securities of such Priority of Lien and Parity Ancillary Obligations that constitute interest, if any, next coming due in such Fiscal Year.

"Junior Lien Bonds" means all Securities issued pursuant to this Ordinance other than Senior Lien Bonds.

"Junior Obligations" means all Junior Lien Bonds and all Ancillary Obligations that are not Senior Obligations.

"Legal Investment" means, with respect to any particular amounts, an investment that is authorized or permitted by law as an investment of such amounts, including Government Obligations.

"Liquidity Facility" means any letter of credit, line of credit, purchase agreement, or other financial arrangement intended to provide funds for the purchase of certain Securities in the event of a failure of the remarketing thereof but does not include any protection provided by a Credit Facility.

"Mandatory Redemption Date" means a date on which Term Securities in the principal amount of the applicable Mandatory Redemption Requirement are required to be redeemed under the Supplemental Action authorizing the sale of such Securities.

"Mandatory Redemption Requirements" means, with respect to any Term Securities, the principal amount of such Securities required to be called for redemption prior to their stated maturity as provided in the Supplemental Action authorizing the sale of such Term Securities.

"Net Revenues" means, for any period of time, all Revenues received during such period of time, except for those Revenues transferred to the Operation and Maintenance Fund.

"Operation and Maintenance Fund" means the fund established pursuant to Section 12(A)(1).

"Outstanding", unless otherwise provided in a Supplemental Action for particular Securities, means, as of any date and with respect to Securities of a particular Priority of Lien, all Securities of such Priority of Lien delivered under this Ordinance except:

(i) Securities of such Priority of Lien theretofore paid or redeemed or acquired by the City and surrendered to the Transfer Agent for cancellation;

(ii) Securities of such Priority of Lien that have matured or have been duly called for redemption and for the payment or redemption of which amounts, together with any unpaid interest, are held by the Trustee or the Paying Agent for the payment thereof;

(iii) Securities of such Priority of Lien that have been defeased in accordance with this Ordinance or a Supplemental Action; and

(iv) Securities of such Priority of Lien in exchange for or replacement of which other Securities of such Priority of Lien have been authenticated and delivered pursuant to this Ordinance or a Supplemental Action.

"Parity Ancillary Obligations" means, as to Securities, those Ancillary Obligations which have the same Priority of Lien, regardless of whether the Ancillary Obligations were entered into with respect to those Securities or Securities with a different Priority of Lien.

"Permitted Investment" means, with respect to any particular amounts, a Legal Investment subject to such limitations as may be imposed by this Ordinance or a Supplemental Action for the investment of such amounts.

"Person" means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

"Pledged Assets" means:

(i) Net Revenues;

(ii) the funds and accounts established by or pursuant to this Ordinance except for the Operation and Maintenance Fund and the Construction Fund and any account thereof;

(iii) investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and

(iv) any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue.

6

"Principal Installment" means, with respect to Securities of the same Priority of Lien and related Ancillary Obligations, if any, the principal amount of such Securities that are not Term Securities and such of the Ancillary Obligations related to such Securities, if any, that constitute principal or other return of capital.

"Principal Installment Requirement" means, as of the first day of each month in a Fiscal Year, with respect to a Priority of Obligations, the amount of Principal Installments accrued and unpaid and to accrue to, and including, the last day of such month (assuming that principal accrues on the basis of 30-day months in a year of 360 days) on Outstanding Securities of such Priority of Lien and related Ancillary Obligations, if any, next coming due in such Fiscal Year.

"Priority of Lien" means, with respect to any particular Secured Obligation, all other Secured Obligations having a lien on Pledged Assets on a parity with such Obligation.

"Qualified Hedge" means a Hedge with a counterparty that is rated directly or indirectly by a Rating Agency in a rating category at least equal to the category in which the subject Securities are rated without benefit of Credit Enhancement and without reference to qualifications such as "plus" or "minus". If the subject Securities are not rated without the benefit of Credit Enhancement, then the rating category of such Securities shall be the rating category with the benefit of Credit Enhancement.

"Rate Stabilization Fund" means the fund created under Section 13(G)(2).

"Rating Agency" means any nationally recognized statistical rating organization as defined in Rule 15c3-1 of the United States Securities and Exchange Commission.

"Receiving Fund" means the Water Supply Receiving Fund established under Section 12(A)(1).

"Refunding Securities" means Additional Securities issued for the purpose of refunding Outstanding Securities.

"Reimbursement Obligation" means the City's repayment obligations under a Financial Facility, and does not include the obligation to pay fees and expenses in the ordinary course of the transaction.

"Registry" means the books for the registration and transfer of registration of securities as provided in Section 3G(1).

"Required Combined Coverage" means, for two or more Securities of a different Priority of Lien for which a Coverage Determi-

nation is to be made, the result produced by dividing the Net Revenues projected for the Fiscal Year of calculation by the prescribed related Indebtedness coming due during such Fiscal Year.

"Reserve Account" means a Reserve Account established in an Interest and Redemption Fund and may be restricted in meaning by referring to Securities of the same Priority of Lien for which such Reserve Account was established.

"Reserved Amount" means any amount on deposit in the Rate Stabilization Fund which is taken into account in connection with any Coverage Determination.

"Reserve Requirement" means, for Securities of the same Priority of Lien for which a Reserve Account has been established, the lesser of the amount of Annual Debt Service on all Securities of the same Priority of Lien then Outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code as provided below:

> (i)     for Senior Lien Bonds, the "amount of Annual Debt Service" shall be maximum Annual Debt Service;

> (ii)     for Second Lien Bonds, the "amount of Annual Debt Service" shall be maximum Annual Debt Service; and

> (iii)     for all other Junior Lien Bonds for which a Reserve Account is established, the "amount of Annual Debt Service" shall be the amount set forth in the Supplemental Action establishing such Reserve Account, and if no amount is set forth, the "amount of Annual Debt Service" shall be average Annual Debt Service.

"Revenues" means the revenues of the City from the System, which shall be construed as defined in Section 3 of Act 94, and shall also include:

> (i)     Hedge Receivables; and

> (ii)     income earned and gain realized from the investment of amounts in the various funds, accounts and subaccounts established by this Ordinance other than the Construction Fund for any Fiscal Year earnings on the Construction Fund are not credited to the Receiving Fund.

"Second Lien Bonds" means the City's outstanding Water Supply System Revenue Second Lien Bonds, Series 1995-A and any Additional Securities of equal Priority of Lien.

8

"Secured Obligations" means all Securities, Ancillary Obligations and Ancillary Obligation Fees and Expenses.

"Securities" means all Senior Lien Bonds and all Junior Lien Bonds.

"Securities to be Refunded" means the Particular Outstanding Securities to be refunded by Refunding Securities issued for such purpose.

"Senior Lien Bonds" means all Securities issued under this Ordinance that have a senior lien on Pledged Assets.

"Senior Obligations" means all Senior Lien Bonds and Ancillary Obligations in respect of Senior Lien Bonds and secured on parity therewith, and including all Junior Lien Bonds that have acceded to a parity status with Senior Lien Bonds pursuant to Section 5(F) hereof and Ancillary Obligations in respect thereof, secured on a parity therewith, if any.

"Sinking Fund Installment Requirement" means, with respect to Term Securities of the same Priority of Lien and as of the first day of each month in a Fiscal Year, the amount of any Mandatory Redemption Requirements next coming due in such Fiscal Year, including any Mandatory Redemption Requirement due at the maturity of such Term Security less the amounts credited to such Mandatory Redemption Requirements as the result of partial redemptions or purchase of such Term Securities, if any.

"State" means the State of Michigan.

"SRF Junior Lien Bonds" means all Junior Lien Bonds issued for the purpose of providing improvements to the System under the State's Revolving Fund.

"Supplemental Action" means an Act of Council or a sale order or other document signed by the Finance Director pursuant to an Act of Council, which shall be this Ordinance if the action of the Finance Director is herein authorized.

"System" means the Water Supply System of the City including all plants, works, instrumentalities and properties, used or useful, in connection with obtaining a water supply, the treatment of water or the distribution of water, as the same now exists, together with all additions, extensions, repairs and improvements thereto hereafter acquired.

"Tender Securities" means Securities that are subject to optional or mandatory tender for purchase.

"Term Securities" means, with respect to Securities of the same Priority of Lien, any maturity of such Securities that has Mandatory Redemption Requirements.

"Transfer Agent" means, as to any particular Securities, the bank or banks selected by the Finance Director to perform the duties provided for the Transfer Agent with respect to such Securities.

"Trustee" means U.S. Bank National Association or any successor Trustee selected by the Finance Director to perform the duties of trustee under Section 19 hereof.

"Variable Rate Security" means any Security that is not a Capital Appreciation Security or a Fixed Rate Security.

## SECTION 2.  DEFINITION OF ANNUAL DEBT SERVICE.

(A)  *Definitions*.

(1)    "Annual Debt Service" means, for any Fiscal Year and with respect to Indebtedness of any particular Priority, the amount of such Indebtedness due in such Fiscal Year in accordance with their respective terms.

(2)    Unless limited by another Section of this Ordinance, "Indebtedness" means (without duplication):

      (i)    Principal of and interest on Securities Outstanding in any Fiscal Year for which the calculation is made;

      (ii)    Reimbursement Obligations; and

      (iii)    Hedge Termination Payments.

(B)  *Rules for Calculating Principal and Interest*.

(1)    First Day of Fiscal Year. Principal of and interest on Securities coming due on the first day of a Fiscal Year shall be calculated as being due on the last day of the immediately preceding Fiscal Year.

(2)    Assumed Paid. Principal of and interest on any Securities due in a Fiscal Year prior to the Fiscal Year for which the calculation is made shall be assumed to have been paid when due.

(3)    Due Dates. The due dates for any principal, interest or Redemption Requirements are the stated dates for the payment thereof and not in advance of such stated dates by reason of acceleration.

(4)    Term Securities.

      (i)    Mandatory Redemption Requirements shall be treated as principal maturing on the respective dates that such Mandatory Redemption Requirements are due.

10

(ii)     The principal amount of a Term Security maturing in a Fiscal Year shall be reduced by the total of the Mandatory Redemption Requirements due in each Fiscal Year before the Fiscal Year of such maturity.

(5)     Tender Securities. Except for Excluded Tender Securities, each date on which Holders of such Tender Securities may tender or may be mandated to tender such Tender Securities shall constitute a maturity of the principal amount of such Tender Securities that could be tendered on such date with the giving of notice or the passage of time, or both.

(6)     Interest.

(i)     Interest due in any Fiscal Year shall be offset by the amount of capitalized interest or interest received by the City as "accrued interest" available for the payment thereof.

(ii)     Separate provision is made in this Section for determining the interest rate on:

(a)  Variable Rate Securities as provided in subsection (C) below; and

(b)  Fixed Rate Securities converting to Variable Rate Securities as provided in subsection (D) below.

(C)     *Variable Rate Securities*.

(1)     If Variable Rate Securities have been Outstanding for less than a full Fiscal Year on the date of calculation, then the interest rate on such Variable Rate Securities shall be calculated as 125% of the average of the BMA Municipal Index (as hereinafter defined) for the five year period ending not more than one week before the date of such calculation.

(2)     If Variable Rate Securities have been Outstanding for one or more full Fiscal Years on the date of calculation, then the interest rate on such Variable Rate Securities shall be calculated as 125% of the annualized average daily rate borne by such Variable Rate Securities for the 12 calendar month period ending immediately before the month of calculation.

(3)     Notwithstanding paragraphs (1) and (2), for the purpose of determining the Reserve Requirement for Securities of the same Priority of Lien, the interest rate on Variable Rate Securities shall be not adjusted after the date of initial issuance.

(D)     *Fixed Rate Securities Convertible to Variable Rate Securities.*

If Securities are issued as Fixed Rate Securities but are intended to convert by their terms to Variable Rate Securities during a future Fiscal Year and a calculation is made for such future Fiscal Year or any Fiscal Year thereafter, then the Fiscal

Year of conversion shall be the first Fiscal Year that such Securities are Outstanding for the purpose of calculating interest at a variable rate.

(E)     *Capital Appreciation Securities.*

For the Capital Appreciation Securities, the Accreted Value per $5,000 due at maturity shall be as determined semiannually to maturity on such dates as specified in a Supplemental Action. For purposes of the rate covenants in Section 9, the Additional Securities requirements of Section 20, and for all other purposes of this Ordinance, the Accreted Value of Capital Appreciation Securities shall be deemed to be due and payable in the Fiscal Years in which such Accreted Value shall actually be due and payable by the City into the Senior Lien Bond and Interest Redemption Fund or the Second Lien Bond Interest and Redemption Fund, as applicable, or assumed paid under (B)(2) above, as applicable.

**SECTION 3. AUTHORIZATION AND ISSUANCE OF SECURITIES; RELATED MATTERS.**

(A)     *Authorization of Securities.* Securities shall be authorized from time to time by Acts of Council and Supplemental Actions.

(B)     *Issuing Securities.* The Finance Director may, by Supplemental Action, take such actions as are necessary or appropriate to give effect to the transactions contemplated by an Act of Council authorizing the issuance of Securities or as are incidental thereto.

(C)     *Liability Limited.* All covenants, agreements and obligations of the City contained in this Ordinance or in any Secured Obligations are those of the City and not of any member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of any Secured Obligations or for any claims based thereon or hereunder against any member, officer or employee of the City or any natural Person executing or attesting any Secured Obligations.

(D)     *Execution, Authentication and Delivery of Securities.*

(1)     Securities shall be executed in the name of the City by the facsimile signatures of the Mayor and the Finance Director and shall have a facsimile of the City's seal impressed, imprinted or otherwise reproduced thereon.

(2)     No Security shall be valid until authenticated by an authorized representative of the Transfer Agent. Securities shall be delivered by the City to the Transfer Agent for authentication and be delivered to the Transfer Agent by the Finance Director or designee for delivery to the purchaser(s) in accordance with instructions from the Finance Director upon payment of the purchase price therefor in accordance with the bid or purchase contract. Executed blank Securities for registration and issuance to transferees shall, from time to time as necessary, be delivered to the Transfer Agent for safekeeping.

(E)     *Reserve Account Requirement.* Concurrently with the issuance of Securities of a Priority for which a Reserve Account has been or is being established, there shall be credited to such Reserve Account the amount that, added to the amount on deposit therein or credited thereto, equals the Reserve Requirement for Securities then to be issued and all Securities of such Priority then Out-

standing. Such amount may be provided from any source or may be provided by a Financial Facility meeting the requirements of Section 4.

(F) **Disposition of Proceeds**. The proceeds of the sale of an issue of Securities shall be applied as follows:

(1) An amount equal to the accrued interest shall be credited to the Interest and Redemption Fund for such Securities to be applied to next maturing interest thereon.

(2) If a Reserve Account has been or is being established for Securities of the same Priority of Lien as such Securities, the amount necessary to comply with subsection (E), above, unless such compliance will be obtained with amounts from a different source, or by the deposit of a Financial Facility meeting the requirements of Section 4.

(3) The balance of the proceeds, including premium, if any, shall be applied as provided in the Supplemental Action providing for the issuance of such Securities.

(G) **Transfer of Registration of Securities**.

(1) <u>Maintenance of Books</u>. Each Transfer Agent shall keep or cause to be kept, at its principal office, sufficient books for the registration and transfer of registration of Securities for which it is Transfer Agent, which shall at all times be open to inspection by the City.

(2) <u>Privilege of Transfer</u>. Under such reasonable regulations as the Transfer Agent may prescribe, the registration of Securities for which it is the Transfer Agent may be transferred upon its Registry by the Person in whose name such Securities are registered, in person or by his or her duly authorized attorney, upon surrender of such Securities for cancellation, accompanied by delivery of a duly executed written instrument of transfer in a form approved by the Transfer Agent for such Securities.

(3) <u>Surrender for Transfer; Receipt of New Securities</u>. Whenever any Security is surrendered for transfer, the City shall execute and the Transfer Agent for such Security shall authenticate and deliver a new Security or Securities, in the same aggregate principal amount, of the same maturity, and bearing the same rate or rates of interest and otherwise of the same tenor as the Security surrendered for transfer.

(4) <u>Transfer Taxes and Governmental Charges</u>. The Transfer Agent shall require payment by the Holder requesting the transfer of any Security for which it is the Transfer Agent, any tax or other governmental charge required to be paid with respect to such transfer.

(5) <u>Limitations</u>. Except as otherwise provided by Supplemental Action, a Transfer Agent shall not be required (i) to issue, register the transfer of or exchange Securities for which it is the Transfer Agent during a period beginning at the opening of business fifteen (15) days before the day of the giving of a notice of redemption or mandatory tender of such Securities selected for redemption or mandatory tender and

ending at the close of business on the day of giving of that notice, or (ii) to register the transfer of or exchange of any such Security so selected for redemption or tender in whole or in part, except the unredeemed or untendered portion of such Security being redeemed or tendered in part.

(H)     *Mutilated, Lost or Stolen Securities*.

(1)     If any Security is mutilated, the City, at the expense of the Holder of the Security, shall execute, and the Transfer Agent for such Security shall authenticate and deliver, a new Security of like tenor in exchange and substitution for the mutilated Security, upon surrender to such Transfer Agent of the mutilated Security.

(2)     If any Security is lost, destroyed or stolen, evidence of ownership of the Security and of the loss, destruction or theft may be submitted to the Transfer Agent for such Security and, if this evidence is satisfactory to the City and the Transfer Agent, and, indemnity satisfactory to such Transfer Agent and the City shall be given, and if all requirements of any applicable law, including Act 354, Public Acts of Michigan, 1972, as amended, have been met, then, at the expense of the Holder requesting the substitute Security, the City shall execute, and such Transfer Agent shall thereupon authenticate and deliver, a new Security of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Security so lost, destroyed or stolen. If any such Security shall have matured or shall be about to mature, the Transfer Agent may pay the same without surrender thereof as authorized by Act 354 instead of issuing a substitute Security.

## SECTION 4. FINANCIAL FACILITIES; HEDGES.

(A)     The Finance Director may, from time to time and at any time, obtain a Financial Facility in respect of all or some Securities if the Finance Director determines such to be in the best financial interests of the City.

(B)     The Finance Director may at any time acquire a Credit Enhancement to fulfill the City's obligation to fund any Reserve Account or substitute a Credit Enhancement for amounts in a Reserve Account. The Credit Enhancement shall be deposited with and payable to the Transfer Agent in its capacity as paying agent for the related Securities. Before or concurrently with the acquisition of such Credit Enhancement, the Finance Director shall receive:

(1)     an opinion of nationally recognized bond counsel to the effect that such substitution will not adversely affect the tax-exempt status of interest on any Securities;

(2)     evidence that such Credit Enhancement is provided by a provider rated in the highest rating category of each Rating Agency then rating the Securities having the benefit of such Reserve Account;

(3)     a copy of the Credit Enhancement; and

(4)     an opinion of counsel satisfactory to said nationally recognized bond counsel to the effect that the Credit Enhancement is valid and enforceable in accordance with its terms.

14

(C)    The Finance Director may, subject to the requirements of Act 34 or in accordance with any other applicable law, from time to time enter into such Hedges as the Finance Director determines to be in the best financial interests of the City.

(D)    The Finance Director may grant to the provider of any Financial Facility, or to any counterparty to any Hedge authorized by this Section, such rights as may be necessary or appropriate that are not inconsistent with this Ordinance, Act 34 or any other applicable law.

## SECTION 5. SECURITY FOR PAYMENT.

(A)    The payment of Secured Obligations is secured by a statutory lien, which is hereby created, upon the whole of the Pledged Assets <u>subject</u> to the use and application thereof in accordance with this Ordinance.

(B)    The lien securing Hedge Obligations is valid only to the extent permitted by law.

(C)    Except for Bond Insurance, a statement of the Priority of Lien of an Ancillary Obligation shall be contained in the instrument evidencing or providing for such Ancillary Obligation.

    (1)    An Ancillary Obligation in respect of Securities of the same Priority of Lien:

        (i)    may be secured at a lower Priority of Lien, but

        (ii)    may <u>not</u> be secured at a higher Priority of Lien.

    (2)    Ancillary Obligations may have a Priority of Lien lower than that of the Securities in respect of which such Ancillary Obligations have been entered into and may be Parity Ancillary Obligations to Securities to which they are otherwise unrelated; provided, that any lien securing Ancillary Obligations in respect of Senior Lien Bonds shall be subject to the rights of the holders of the City's outstanding Water Supply System Revenue Second Lien Bonds, Series 1995-A, except to the extent that such Ancillary Obligations arise in connection with a Financial Facility acquired to fund any portion of the Reserve Account or to be substituted for cash therein.

(D)    The lien securing the payment of a Secured Obligation is subject to the following Priorities:

    (1)    The lien securing Senior Obligations shall be a first lien, senior to all other liens created hereunder except the lien securing Ancillary Obligations Fees and Expenses which are further subject to the qualification of subsection (C)(2) above.

    (2)    The lien securing Junior Obligations shall be junior only to the lien securing Senior Obligations whenever issued.  Among Junior Obligations:

        (i)    the lien securing Second Lien Bonds and Parity Ancillary Obligations thereto shall be senior to the liens securing all other Junior Obligations;

(ii)    the lien of each other Priority of Junior Obligations of the same Priority of Lien shall be senior to the lien of all lower Priorities of Junior Obligations; and

(iii)    the SRF Junior Lien Bonds shall be the lowest Priority of Junior Lien Bonds, and the lien securing SRF Junior Lien Bonds and related Ancillary Secured Obligations shall be junior to the liens securing all other Junior Obligations, whenever issued.

(E)    Each lien securing a Secured Obligation shall continue until either payment in full of such Secured Obligation or, in the case of Securities, is defeased as provided in Section 21 of this Ordinance. Ancillary Obligations shall be defeased in the manner provided in the agreement with the obligee of such Ancillary Obligations.

(F)    In accordance with this subsection, the City may provide for the accession of Junior Lien Bonds to the status of complete parity with Senior Obligations when there shall have been filed with the Commissioners a certificate satisfying the requirements of Section 20(C) from a national consulting firm or a national firm of certified public accountants, and further reciting the opinion:

(1)    that the Reserve Account contains an amount equal to the Reserve Requirement computed on a basis which includes all Securities then outstanding and such Junior Lien Bonds;

(2)    that all payments into the various funds and accounts hereinabove required to be held under this Ordinance are current as of the date of accession; and

(3)    that the Interest and Redemption Fund contains the amounts which would have been required to be accumulated therein on the date of accession if such Junior Lien Bonds had originally been issued as Senior Lien Bonds; such amounts shall be shown in said certificate.

The accession of such Junior Lien Bonds shall be conclusively evidenced by notice from the City to the Trustee and each Holder of such Junior Lien Bonds.

## SECTION 6. PAYMENT OF SECURED OBLIGATION; SUBORDINATION.

(A)    *Generally*. Secured Obligations are not general obligations of the City and shall be payable solely from Pledged Assets as provided in this Section:

(1)    Ancillary Obligation Fees and Expenses are payable from Revenues and, to the extent of any insufficiency, Pledged Assets.

(2)    All Securities and Ancillary Obligations are payable from Pledged Assets.

16

(B)   **Subordination**.

(1)    Whenever any principal (and premium, if any) of and interest on Securities of the same Priority of Lien or any payment on the Parity Ancillary Obligations thereto is due and is not made when due, then until such payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities and the obligees of such Parity Ancillary Obligations, no such payment shall be made directly or indirectly on or in respect of any Securities of a lower Priority of Lien or any Ancillary Obligations which are Parity Ancillary Obligations to such Securities of lower Priorities of Lien (such Securities and Ancillary Obligations collectively, the "Subordinated Obligations" and the Holders and obligees thereof, the "Subordinated Obligees"), except as provided below with respect to defeased Securities.

(2)    Subject to the payment in full of all Securities and Ancillary Obligations of every higher Priority of Lien (collectively, the "Superior Obligations" and the Holders and obligees thereof, the "Superior Obligees"), the Subordinated Obligees shall be subrogated to the rights of the Superior Obligees to receive payment in full of the respective Obligations until all amounts owing on the Subordinated Obligations shall be paid in full.

(3)    Except as otherwise provided in a Supplemental Action, the City may agree with the Holders of Securities of any Priority of Lien and the obligee of any Parity Ancillary Obligations thereto to extend, renew, modify or amend the terms of such Securities or such Parity Ancillary Obligations thereto or any security therefor, and any such Holders or obligees may release, sell, exchange such security and otherwise deal freely with the City, and the City with any of them, all without notice to or consent of the Holders of any Securities of any lower Priority or the obligees under any Parity Ancillary Obligations thereto without affecting the liabilities of the City to such Holders or obligees.

(4)    Nothing in this subsection shall impair the right of the Holders of any defeased Securities to be paid from the escrow effecting such defeasance.

(C)   **Financial Facilities**.  Except as otherwise provided in a Supplemental Action:

(1)    Nothing in this Section shall affect the payment of Securities from any Financial Facility obtained for the benefit of such Securities.

(2)    No payment of an amount made by a drawing or disbursement under a Financial Facility to Holders of Securities which would otherwise have been made by the City shall be deemed to be a payment by the City on account of such Securities for the purpose of discharging the City's obligation on such Securities.

## SECTION 7. SECURITYHOLDERS' RIGHTS; RECEIVER.

(A)    The Holder or Holders of the Securities representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all

duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the System and the proper application thereof. The statutory lien upon Pledged Assets, however, shall not be construed to give the Holders of the Securities the authority to compel the sale of the System or any part thereof.

(B)     If there is a default in the payment of the principal (and premium, if any) of and interest on any Securities, any court having jurisdiction in any proper action may appoint a receiver to administer and operate the System on behalf of the City and, under the direction of the court, perform all of the duties of the officers of the City more particularly set forth herein, in Act 94 and in such orders of the court.

(C)     The Holder or Holders of the Securities shall have all other rights and remedies given by Act 94 and by law for the payment and enforcement of the Securities and the security therefor.

## SECTION 8.  MANAGEMENT.

The operation, repair and management of the System, including all projects financed by the issuance of Securities, shall remain under the supervision and control of the Commissioners in the manner provided in Article 7, Chapter 15 of the Charter of the City subject to the rights, powers and duties in respect thereto which are reserved by law and the City Charter to the Council.

## SECTION 9.  FIXING AND REVISING RATES; RATE COVENANTS.

(A)     The coverage requirements for determining the Required Combined Coverage under this Section are the following percentages:

| Priority of Indebtedness | Percentage |
| --- | --- |
| Senior Lien Indebtedness | 120% |
| Second Lien Indebtedness | 110% |
| SRF Junior Lien Bonds | 100% |

Prior to or concurrently with the issuance of Securities of a Priority of Lien not enumerated above, this subsection shall be amended to provide for the coverage percentage for Indebtedness in respect of such Securities, but in no case shall the coverage percentage be less than 100. Such amendment shall not require the consent of Holders of any Securities.

(B)     The rates for water service and the regulations shall be the rates and regulations required to be established by Act 94. Such rates shall be fixed and revised from time to time as may be expected to be necessary to produce the greater of:

(1)     the amounts required:

(i)     to provide for the payment of the expenses for maintenance of the System as are necessary to preserve the same in good repair and working order; and

(ii)     to provide for the payment of Indebtedness coming due for the Fiscal Year of calculation; and

(iii)    to provide for the creation and maintenance of reserves therefor as required by the Ordinance or any ordinance or resolution adopted in accordance with the terms thereof and hereof; and

(iv)    to provide for such other expenditures and funds for the System as this Ordinance may require; and

(2)    The Required Combined Coverage where the numerator is the Net Revenues projected for the Fiscal Year of calculation and the denominator is the Indebtedness coming due for such Fiscal Year.

(C)    The City hereby covenants and agrees at all times to maintain such rates for services furnished by the System as shall be sufficient to provide for the foregoing and to repay any transfer from the Extraordinary Repair and Replacement Reserve Fund.

(D)    Without taking into account any transfers from the Rate Stabilization Fund, the City shall at all times observe and comply with the covenant contained in subsection (B)(2) above as if the Rate Coverage Percentage were 100%.

(E)    The charges for water service which are under the provisions of Section 21 of Act 94 are made a lien on all premises served thereby, unless notice (accompanied by a copy of the lease of the affected premises, if any,) is given to the Council that a tenant is responsible, are hereby recognized to constitute such lien and whenever any such charge against any piece of property shall be delinquent for six months, the City official or officials in charge of the collection thereof may certify to the tax assessing officer of the City not later than April 1 of each year the fact of such delinquency, whereupon such charge shall be entered upon the next tax roll as a charge against such premises and the lien thereof enforced in the same manner as general City taxes against such premises are collected and the lien thereof enforced; provided, however, where notice is given that a tenant is responsible for such charges and service as provided by said Section 21, no further service shall be rendered to such premises until a cash deposit equal to the estimated amount of the next ensuing bill shall have been made as security for payment of such charges and services.

(F)    In addition to other remedies provided, the City shall have the right to shut off and discontinue the supply of water to any premises for the nonpayment of water rates when due.

**SECTION 10. NO FREE SERVICE OR USE; METERED SERVICE.**

No free service or use of the System, or service or use of the System at less than cost, shall be furnished by the System to any person, firm or corporation, public or private, or to any public agency or instrumentality, including the City and any other municipality. All service provided to customers of the System, with the exception of temporary connections and certain public service uses of the City which are billed on an estimated basis, shall be metered.

**SECTION 11. OPERATING AND FISCAL YEAR.**

The System shall be operated on the basis of the Fiscal Year.

## SECTION 12. FUNDS AND ACCOUNTS; FLOW OF FUNDS.

(A) **Establishment of Funds and Accounts.**

(1)    The following funds and accounts are hereby established:

- Water Supply System Receiving Fund
- Operation and Maintenance Fund
- Senior Lien Bond Interest and Redemption Fund
  - Senior Lien Debt Service Account
  - Senior Lien Bond Reserve Account
- Second Lien Bond Interest and Redemption Fund
  - Second Lien Debt Service Account
  - Second Lien Bond Reserve Account
  - SRF Junior Lien Bond Interest and Redemption Fund
  - SRF Junior Lien Debt Service Account
  - No SRF Junior Lien Bond Reserve Account is established
- Such Interest and Redemption Funds as are established by Supplemental Action for other Junior Lien Bonds of the same Priority of Lien
- Extraordinary Repair and Replacement Reserve Fund
- Improvement and Extension Fund
- Surplus Fund

(2)    Additional funds and accounts may be established for other Securities of the same Priority of Lien by Supplemental Action of the Finance Director.

(B) **Flow of Funds.**

All Revenues shall be set aside as collected and credited to the Receiving Fund. As received, amounts credited to the Receiving Fund shall be transferred *seriatim* into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been transferred to the preceding fund or account:

First: to the Operation and Maintenance Fund, a sum sufficient to provide for the payment of the next month's expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second: to the Senior Lien Debt Service Account, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Senior Lien Obligations as of the first day of such month;

Third: to the Senior Lien Bond Reserve Account, an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for Senior Lien Bonds;

Fourth: to the Interest and Redemption Fund established for each Priority of Junior Lien Bonds, beginning with the Second Lien Bonds and continuing in descending order of Priority of Lien to, and including, each Priority of Lien of Junior Lien Bonds:

first: to the Debt Service Account established for such Priority of Lien, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Obligations of such Priority of Lien as of the first day of such month;

second: to the Reserve Account, if any, established for such Priority of Lien an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for such Priority of Lien of Junior Lien Bonds;

Fifth: to the Extraordinary Repair and Replacement Reserve Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement so long as the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement except that an amount withdrawn from such Fund pursuant to Section 13D shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal; and

Sixth: to the Improvement and Extension Fund, such amount, if any, that the Commissioners may deem advisable; provided that no amount shall be deposited therein or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid.

## SECTION 13. USE AND APPLICATION OF AMOUNTS IN FUNDS.

(A) **Receiving Fund**.

(1) Amounts in the Receiving Fund shall be applied as received as provided in Section 12. Amounts not transferred to any other fund or account shall remain in the Receiving Fund until the last day of each Fiscal Year.

(2) Amounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be transferred to the Surplus Fund.

(B) **Operation and Maintenance Fund**.

Amounts in the Operation and Maintenance Fund shall be used to pay the expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses and any rebates to the United States government that may be required by the Code) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order.

(C) **Interest and Redemption Funds**.

(1) Generally. Amounts in the Interest and Redemption Fund established for Securities and for Ancillary Obligations of the same Priority of Lien shall be ap-

plied to pay principal (and redemption premium, if any) of and interest on such Securities and amounts due on such Ancillary Obligations.

(2)  Mandatory Redemption Requirements.

(i)  A Mandatory Redemption Requirement for a maturity of Term Securities may be satisfied in whole or in part by the redemption of Term Securities of such maturity or by the purchase and surrender to the Transfer Agent of such Term Securities from amounts credited to the Interest and Redemption Fund established for such Securities of Priority of Lien or purchased with other funds legally available therefor. The Finance Director shall elect the manner in which he/she intends to satisfy all or a portion of a Mandatory Redemption Requirement for particular Term Securities not less than 40 days prior to the due date of such Mandatory Redemption Requirement unless otherwise provided in the Supplemental Action providing for the issuance of such Term Securities.

(ii)  Unless otherwise provided in a Supplemental Action providing for the issuance of Term Securities, the City will receive a credit against the Mandatory Redemption Requirement for Term Securities for which such Mandatory Redemption Requirement was established that have been redeemed (other than by application of Mandatory Redemption Requirements) or otherwise acquired by the City prior to the giving of the notice of redemption and that have not been applied as a credit against any other Mandatory Redemption Requirements.

(a)  Not less than 40 days prior to any mandatory redemption date for Term Securities, the Finance Director shall give notice to the Transfer Agent that such Term Securities are to be so credited.

(b)  Each such Term Security shall be credited by the Transfer Agent at 100% of the principal amount thereof against the Mandatory Redemption Requirement, and the principal amount of Term Securities to be redeemed on such mandatory redemption date shall be reduced accordingly and any excess over such amount shall be credited to future Mandatory Redemption Requirements in such order as the Finance Director shall direct; provided, however, that any excess resulting from the purchase, at less than par, of such Term Securities shall be credited to the Receiving Fund.

(3)  Reserve Accounts.

(i)  Except as otherwise provided herein, amounts in a Reserve Account shall be used solely for the payment of the principal (and premium, if any) of and interest on Securities and Ancillary Obligations of the same Priority of Lien for which such Reserve Account was established, as to which there would otherwise be default.

(ii)  If at any time the amount on deposit in or credited to a Reserve Account exceeds the Reserve Requirement for such Reserve Account, the amount of such excess may be transferred therefrom and credited to the Receiving Fund.

(iii)  No further payments need be made into an Interest and Redemption Fund in respect of principal and interest after enough of the Securities for which such Fund was established have been retired so that the amount then held in such Fund, including the Reserve

Account therein, if any, is equal to the entire amount of principal and interest which will be payable at the time of maturity of all the then Outstanding Securities of such Priority of Lien.

(iv)    A separate Reserve Account may be established for an issue of Securities by the Supplemental Action providing for the issuance of such Securities.

(a)    Securities having the benefit of such Reserve Account may be issued but only if such separate Reserve Account is fully equal to the Reserve Requirement for such Securities concurrently with the issuance of such Securities.

(b)    The amounts to be paid into any separate Reserve Account to restore it to its Reserve Requirement shall be made on a parity with payments into all other Reserve Accounts established for Securities of the same Priority of Lien and shall not exceed, in any Fiscal Year, its proportionate deficit payment. "Proportionate Deficit Payment" means for a separate Reserve Account the same proportion that the amount available to remedy deficits in each Reserve Account for such Priority bears to the aggregate deficit in all Reserve Accounts for such Priority.

(D)    ***Extraordinary Repair and Replacement Reserve Fund***.

(1)    Amounts in the Extraordinary Repair and Replacement Reserve Fund may be used to pay the costs of making major unanticipated repairs and replacements to the System which individually have cost or are reasonably expected to cost in excess of $1,000,000 as determined by the Commissioners.

(2)    On and after the first day of each Fiscal Year, the Finance Director may, by Supplemental Action, transfer to the Improvement and Extension Fund not more than 50% in aggregate of the balance in this Fund on the first day of such Fiscal Year if, but only if (i) in the month of such transfer the full amount of the Extraordinary Repair and Replacement Minimum Requirement for each prior month in the current Fiscal Year has been credited to this Fund and (ii) the amounts of all prior transfers from this Fund to the Improvement and Extension Fund have been restored in full.

(3)    The City shall fix rates and charges for the services supplied by the System sufficient to permit it to meet its obligations under Section 13D.

(E)    ***Improvement and Extension Fund***.

The Improvement and Extension Fund shall be used for improvements, enlargements, extensions or betterment to the System.

(F)    ***Surplus Fund***.

Amounts from time to time on hand in the Surplus Fund may, at the option of the Commissioners, be used and applied for any purposes related to the System for which the funds and accounts were established hereunder or for any other lawful purpose of the System; provided, however, that if and whenever there should be any deficit in the Operation and Maintenance Fund or in any Interest and Redemption Fund (including any Reserve Account therein) then transfers shall be made from the Surplus Fund to such funds in the priority and order named in Section 12 to the extent of any such deficit.

23

(G)    *Rate Stabilization Fund*

(1)    As used in this Section, "Prior Revenue" means any amounts that constitute Revenues or Net Revenues and held under this Ordinance but only to the extent that such amounts may be applied to any lawful purpose of the System. "Prior Revenue" does not include any amounts held under this Ordinance that at the time are restricted in application to a specific purpose, such as, by way of illustration, the application of amounts in the Surplus Fund in the event of a deficit as provided in the proviso to Section 13(F).

(2)    The Commissioners may create a fund designated Water Supply System Rate Stabilization Fund (the "Rate Stabilization Fund"). No amounts shall be deposited therein or credited thereto except Prior Revenues and then only if:

(i)    such Prior Revenue is credited to the Rate Stabilization Fund in the Fiscal Year in which it was recognized by the City as Net Revenue or within 90 days after the end of such Fiscal Year;

(ii)    the amount of such Prior Revenue is deducted from the amount of Net Revenue recognized in such Fiscal Year for all purposes of this Ordinance; and

(iii)    the amount of Net Revenue recognized in such Fiscal Year at least meets the minimum applicable coverage requirements of this Ordinance for such Fiscal Year after (i) such deduction and (ii) all prior deductions in respect of such Fiscal Year pursuant to this clause.

(3)    Amounts on deposit in the Rate Stabilization Fund may be taken into account with respect to any Coverage Determination.

(4)    Whenever any Reserved Amount is taken into account for any Coverage Determination, then such Reserved Amount shall be credited to the Receiving Fund for the Fiscal Year for which such Coverage Determination is made.

(5)    Prior to the transfer of any Reserved Amount to the Receiving Fund, such Reserved Amount shall not be used or applied to any purpose except pursuant to Section 16 and then only after all other amounts then in the Rate Stabilization Fund have been applied pursuant to Section 16.

(6)    Amounts on deposit in the Rate Stabilization Fund other than Reserved Amounts may be applied to any lawful purpose of the System.

## SECTION 14. CONSTRUCTION FUND.

(A)    There shall be established and maintained a separate depository fund designated the Construction Fund. The City may designate separate accounts in the Construction Fund for different series of Securities for administrative purposes and to better enable the City to comply with its tax covenants in Supplemental Actions regarding the exclusion from federal income taxation of interest on Securities.

(B)    Amounts in the Construction Fund shall be applied solely in payment of the cost of repairs, extensions, enlargements, and improvements to the System and any costs of engineering, legal, bond insurance premiums, if any, and other expenses incident thereto, to the financing thereof.

(1)    Payments of the cost of repairs, extensions, enlargements and improvements to the System, either on account or otherwise, shall not be made unless the registered engineer in charge of such work shall file with the Commissioners a signed statement to the effect that the work has been completed in accordance with the plans and specifications therefor; that it was done pursuant to and in accordance with the contract therefor; that such work is satisfactory; and that such work has not been previously paid for.

(2)    Payment of the cost of engineering, legal, financial, bond insurance premium, etc., as provided in this Section shall be made under such procedures as established by and upon submission of appropriate documentation to the Finance Director.

(C)    Any unexpended balance remaining in the Construction Fund may in the discretion of the Commissioners be used for meeting any Reserve Requirement or for further improvements, enlargements and extensions to the System if, at the time of such expenditure, such use is approved by the Michigan Department of Treasury, if such permission is then required by law. Any remaining balance after such expenditure shall be paid into the Interest and Redemption Fund established for the Securities of the Priority of Lien giving rise to such balance for the purpose of purchasing Securities of such Priority at not more than the fair market value thereof but not more than the price at which such Securities may next be called for redemption or used for the purpose of calling such Securities for redemption. The City may provide additional or different lawful uses for such unexpended balance or remaining balance by Supplemental Action of the Finance Director which shall, nonetheless, be subject to receipt of a Bond Counsel's Opinion that such use is permitted by applicable law and will not adversely affect the tax exempt status of Outstanding Securities.

## SECTION 15. DEPOSITARIES.

(A)    Amounts in the several funds, accounts and subaccounts established pursuant to this Ordinance shall be kept in one or more accounts separate and apart from all other accounts of the City, and if kept in only one account shall be allocated on the books and records of the City in the manner and at the times provided in this Ordinance.

(B)    Amounts in the Interest and Redemption Fund for Securities of the same Priority of Lien shall be kept on deposit with one of the banks or trust companies where the principal of and interest on such Securities are payable.

(C)    The depositary of all funds and accounts, except as otherwise specifically provided for herein, shall be those banks or trust companies designated from time to time as such by the Finance Director.

## SECTION 16. PRIORITY OF FUNDS.

(A)    If amounts in the Receiving Fund are insufficient to provide for the current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including

the Reserve Account, if any, therein), then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and Maintenance Fund and second, to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

(B)     If any principal (and redemption premium, if any) of or interest on Securities of the same Priority of Lien or any related Ancillary Obligations become due (whether on a stated or scheduled date, by reason of call for redemption or otherwise), and there are insufficient amounts for the payment thereof in the Interest and Redemption Fund established for such Securities and Ancillary Obligations after applying payments in the Reserve Account, if any, established for such Securities, then there shall be applied to such payment amounts in each Interest and Redemption Account established for Securities of each lower Priority of Lien, beginning with the lowest Priority of Lien and proceeding *seriatim* in ascending order of Priority of Lien, until such payments are made in full.

## SECTION 17.INVESTMENTS.

(A)     *Permitted Investments*.  The Permitted Investments for amounts held under this Ordinance are the Legal Investments for such amounts subject to the following:

(1)     Investment of amounts in any Reserve Account shall be limited to obligations bearing maturity dates or subject to redemption, at the option of the Holder thereof, not later than ten years from the date of the investment.

(2)     Except as otherwise herein provided, investments shall mature at such times as it is estimated the funds therefrom will be required, but shall be limited to obligations bearing maturity dates or subject to redemption, at the option of the Holder thereof, not later than five years from the date of investments.

(3)     A Supplemental Action may provide for limitations in addition to or in lieu of the above limitations on Legal Investments or may eliminate any of such limitations.

(4)     Notwithstanding paragraph (3), no Permitted Investments for the defeasance of particular Securities may be changed without confirmation from each Rating Agency that such change will not reduce the rating of such Securities.

(B)     *Where Held*.  To the extent required by Act 94, securities representing investments made under this Ordinance shall be kept on deposit with the bank or trust company having on deposit the fund or funds or accounts from which the purchase was made.

(C)     *Disposition of Profit and Gain*.

(1)     Profit realized or interest income earned on investment of amounts in the Receiving Fund, Operation and Maintenance Fund, any Interest and Redemption Fund (including the Reserve Account, if any, therein), the Extraordinary Repair and Replacement Reserve Fund, and Improvement and Extension Fund shall be credited to the Receiving Fund.

(2)     Profit realized or interest earned on investments of funds in the Construction Fund relating to any series of Securities and any Redemption Account (including any Re-

serve Account or Subaccount established for any Securities) shall be credited as received to the funds from which such investments were made; provided, however, that profit realized or interest earned on the Construction Fund relating to any series of Securities may, if permitted by law, be credited to the Receiving Fund at the option of the Commissioners.

(D)    *Valuation.*

(1)    Investments credited to any Reserve Account shall be valued at least annually on each January 1, unless otherwise specified in the Supplemental Action providing for the issuance of such Securities, at the market value thereof, and the City shall withdraw any excess immediately and, in the event of a deficit, budget such additional deposits at the beginning of the next succeeding Fiscal Year in an amount necessary to maintain each Reserve Account at its Reserve Requirement.

(2)    Investments in the Extraordinary Repair and Replacement Reserve Fund shall be valued at least annually on each July 1 at the cost thereof.

## SECTION 18.COVENANTS.

The City covenants and represents with the Holders of all Securities from time to time Outstanding that so long as any Securities remain Outstanding, as follows.

(A)    *Ownership and Authority.* The City is the lawful owner of the System; the System is free from any and all liens and encumbrances; and the City has good right and lawful authority to encumber and pledge the Pledged Assets as herein encumbered and pledged.

(B)    *Maintenance and Operation of System.*

(1)    The City will, through its Commissioners, or such successor board or body as may hereafter be legally charged with the duty of the operation of the System, maintain the System in good repair and working order and will operate it efficiently and will faithfully and punctually perform all duties with reference to the System required by the Constitution and laws of the State, including the making and collecting of sufficient rates for services rendered by the System and the segregation and application of the revenues of the System in the manner provided in this Ordinance.

(2)    The City will from time to time make all needed and proper repairs, replacements, additions, and betterments to the System so that the System may at all times be operated properly and advantageously, and whenever any portion of the System shall have been worn out, destroyed or become obsolete, inefficient or otherwise unfit for use, the City will procure and install substitutes of at least equal utility and efficiency so that the value and efficiency of the System shall at all times be fully maintained.

(C)    *Books and Records.* The City will maintain and keep proper books of record and account separate from all other records and accounts in which shall be made full and correct entries of all transactions relating to the System, and the City will also cause an annual audit of such books and records for the preceding Fiscal Year to be made by an accountant who shall comment on the man-

27

ner in which the City has complied with the requirements of this Ordinance. The City will make such audit available to the Holder of any Security upon request.

(D)  *Disposition of System*.  The City will not sell, lease or dispose of the System or any substantial part thereof until all Outstanding Securities have been paid in full as to both principal and interest.

(1)  This covenant shall not be construed to prohibit the disposition or lease of any property comprising part of the System which is no longer necessary, appropriate, required for the use of, or profitable to the System, or which is no longer necessary to the proper operation and maintenance thereof, or which may be sold and leased back to the extent such arrangement is permitted by law.

(2)  Paragraph (1) shall not be construed to authorize or permit the sale, lease or disposition of any substantial part of the System.

(3)  The City may at all times in its discretion alter, repair or replace any buildings or structures, make any change in the location of its water mains, pipes, water supply tunnels, aqueducts, pumping stations, and appurtenances thereto, and any buildings or structures therefor as the Commissioners determine necessary for the System.

(4)  The City will acquire and construct all extensions, enlargements, and improvements to the System promptly in accordance with the plans therefor.

(E)  *No Competition*.  The City will not, and will not to the extent permitted by law, permit others to operate a water supply system that will compete with the System.

(F)  *Tax Exemption of Securities*.  The City will take all action and refrain from any action as is necessary, including paying any rebates to the United States government that may be required by the Code so as not to impair the tax exemption of the interest on Securities issued as tax-exempt Securities from general federal and State of Michigan income taxation.

## SECTION 19. TRUSTEE.

(A)  *Requirement to Maintain*.  The City shall at all times maintain a Trustee in order to further assure prompt compliance with all of the requirements, duties and obligations of the City with respect to the System and the Securities and to perform such other duties as may be provided in a Supplemental Action; <u>provided that</u> no such additional duties shall be imposed on an existing Trustee without its consent. U.S. Bank National Association is hereby appointed as Trustee. The Financial Director is authorized to select and appoint any successor bank or trust company to perform the duties of the Trustee.

(B)  *Resignation of Trustee*.  The Trustee may resign by giving not less than 60 days' written notice to the City specifying the date when such resignation shall take effect, and such resignation shall take effect upon the date specified in such notice provided a successor trustee has been appointed, unless previously a successor shall have been appointed, as provided in subsection (D) below, in which event such resignation shall take effect immediately on the appointment and accep-

tance of such successor, provided further that if a successor trustee shall not have been appointed the Trustee may petition a court of competent jurisdiction to appoint a successor trustee.

(C) *Removal of Trustee*. The Trustee shall be removed at any time by an instrument or concurrent instruments in writing, filed with the Trustee and the City, and signed by the Holders of a majority in principal amount of the outstanding Securities. In addition, as long as no event of default exists under the Ordinance, the City, upon 60 days notice to the Trustee, shall have the right to remove the Trustee by an instrument in writing filed with the Trustee.

(D) *Appointment of and Transfer to Successor Trustee*. If the Trustee shall resign or shall be removed, or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the holders of a majority of aggregate principal amount of Securities then outstanding, in the case of removal by the Holders, or by the City, in the case of removal by the City, by an instrument or concurrent instruments in writing of such Holders; provided, however, that in case of such vacancy the Finance Director shall forthwith appoint a Trustee, provided no event of default exists under the Ordinance, to fill such vacancy unless and until a successor Trustee shall be appointed by the Bondholders. At any time, the Trustee may substitute any affiliate, subsidiary, or successor in interest after a merger or consolidation in any and all capacities to which it is appointed hereunder as long as the entity so substituted is qualified to accept such appointment pursuant to all applicable statutory and regulatory requirements, and any requirements contained in this Ordinance. The rights, duties and substitution of the Trustee shall be governed by and construed in accordance with the laws of the State. If the Trustee substitutes an affiliate or subsidiary as Trustee or consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation or other entity entitled to conduct said trustee business under applicable law, the successor without any further act shall be the successor of the Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything to the contrary contained herein notwithstanding.

Any successor Trustee shall be a trust company or bank in good standing, within the State, acceptable to the Finance Director, provided no event of default exists, and having total reported capital funds of not less than $40,000,000 if there be such an institution willing, qualified and able to accept the trust upon reasonable and customary terms.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under this Ordinance. The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under this Ordinance and any property held by it under this Ordinance, and shall, after all amounts owing to the Trustee have been paid in full, pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

(E) *Fees, Costs and Expenses*. All fees, costs, and expenses of any legal proceedings that may be brought by the Trustee to enforce the duties and obligations of the City hereunder or under

any Securities and any amounts advanced by Securityholders to the Trustee for such costs and expenses shall be paid by the City to the Trustee or such Securityholders, or both, as the case may be, in the first instance from the Net Revenues remaining, in the month of payment, after making the transfers and deposits required by Section 12 to all Interest and Redemption Funds (including the Reserve Account, if any, therein), and, to the extent that sufficient amounts are not available from the Revenues therefor, from general funds of the City.

(F) *Advancement of Costs and Expenses.* In the event that general funds of the City are used to pay any such costs and expense, the City shall be reimbursed therefor with interest at the rate of 7% per annum from the first Net Revenues remaining, in the month of reimbursement, after (i) making the transfers and deposits required by Section 12 to all Interest and Redemption Funds (including the Reserve Account, if any, therein) and (ii) paying the Trustee or Securityholders as provided in subsection (b).

(G) *Reliance of Trustee; Standard of Care.* The Trustee is authorized to act in reliance upon the sufficiencies, correctness, genuineness or validity of any instrument or document or other writing submitted to it hereunder and shall have no liability with respect to said matters. The Trustee shall not be liable for any error in judgment or any act done or omitted by it in good faith. In the event of any dispute or question arising hereunder the Trustee shall not be liable if it acts or takes no action in accordance with the opinion of its legal counsel.

(H) *Indemnification of Trustee.* In the event the required percentage of Securityholders shall direct the Trustee in writing to exercise one or more of the remedies specified in this Ordinance or in Act 94, the Trustee shall be under no obligation to proceed to enforce or compel the performance of the duties and obligations of the City under this Ordinance unless and until the Holders shall have reasonably indemnified the Trustee for all estimated costs and expenses in the exercise of said remedies, including necessary attorneys' fees.

## SECTION 20.ADDITIONAL SECURITIES.

(A) *Limitations on Indebtedness.*

The City shall not incur any obligations payable from Pledged Assets except for Secured Obligations, and no obligations of the City shall be secured by a lien on Pledged Assets except as provided in this Ordinance.

(B) *Issuance of Securities.*

(1) Limitations on Issuance.

(a) The City shall not issue any Securities except in accordance with Section 20. Ancillary Obligations and related Ancillary Obligation Fees and Expenses may be incurred in respect of such Securities and shall be secured and payable as elsewhere provided in this Ordinance.

(b) Other limitations on the issuance of Securities may be added by Supplemental Action.

(2) **_Coverage Requirements._** The coverage requirements for determining the Required Combined Coverage under this Section are the following percentages:

| Priority of Securities | Percentage |
|---|---|
| Senior Lien Bonds ....................................... | 120% |
| Second Lien Bonds....................................... | 110% |
| SRF Junior Lien Bonds................................. | 100% |

Prior to or concurrently with the issuance of a Priority of Securities not enumerated above, this subsection shall be amended to provide for the coverage percentage for such Priority of Securities, but in no case shall such coverage percentage be less than 100. Such amendment shall not require the consent of Holders of any Securities.

(3) **_Refunding Securities._** If any Refunding Securities are to be issued to refund Securities to be Refunded, the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the Refunding Securities and not the Annual Debt Service on the Securities to be Refunded.

(C) **_"New Money" and Refunding._**

(1) <u>General Authority</u>. The City may issue Additional Securities of any Priority of Lien for repairs, extensions, enlargements, and improvements to the System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund ), refunding all or a part of any Outstanding Securities and paying the costs of issuing such Additional Securities, including deposits, if any, to be made to any Reserve Account established or to be established for such Additional Securities or any other Securities, <u>if, but only if</u>, there is Required Combined Coverage under either the Projected Net Revenues Test contained in subsection C(2) below or the Historical Net Revenues Test contained in subsection C(3) below. The determination in a Supplemental Action that there will be Required Combined Coverage upon the issuance of such Additional Securities shall be conclusive.

(2) <u>Projected Net Revenues Test</u>. For purposes of determining the Required Coverage Requirement, the numerator is the projected Net Revenues of the System for the then current or the next succeeding Fiscal Year and the denominator is the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Securities and the Additional Securities to be issued.

(i) Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of the Additional Securities.

(ii) In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of water supply systems.

(3)     Historical Net Revenues Test.  For purposes of determining the Required Coverage Requirement, the numerator is the actual Net Revenues of the System for the immediately preceding audited Fiscal Year and the denominator is the maximum composite Annual Debt Service in any future Fiscal Year on Outstanding Securities and the Additional Securities to be issued.

(i)     Instead of the immediately preceding audited Fiscal Year, the City may use any audited Fiscal Year ending not more than sixteen months prior to the date of delivery of such Additional Securities.

(ii)     If any change in the rates, fees and charges of the System has been authorized at or prior to the date of sale of such Additional Securities, the Net Revenues for the particular preceding Fiscal Year shall be augmented by an amount reflecting the effect of such change had the System's billings during such Fiscal Year been at the increased rates.

(iii)     Net Revenues for the particular preceding audited Fiscal Year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the System to be paid for in whole or in part from the proceeds of such Additional Securities and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited Fiscal Year.

(iv)     With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of water supply systems regarding the existence of such conditions.

(v)     Audited financial statements may be relied upon if no augmentation of Net Revenues is required.

(D)     ***Debt Service Reduction – An Additional Means of Refunding.***

The City may issue Additional Securities of any Priority of Lien without regard to Section 20C for refunding all or part of Securities then Outstanding and paying costs of issuing the Refunding Securities, including deposits which may be made to any Reserve Account established or to be established for such Additional Securities or any other Securities if, but only if:

(1)     the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the Additional Securities and (B) giving effect to the refunding, all Outstanding unrefunded Securities of equal and higher Priority of Lien is less than

(2)     the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all securities of an equal and higher Priority of Lien, without giving effect to the refunding.

## SECTION 21. DEFEASANCE.

(A)     A Security is "defeased" for purposes of this Ordinance if:

(1)     there has been deposited in trust sufficient cash and Permitted Investments constituting Government Obligations, not callable by the issuer, the principal of and interest on which mature at the times and in the amounts, without the reinvestment thereof, necessary to pay principal of and interest on such Security to its maturity, or, if called for redemption, to the date fixed for redemption, together with the amount of the redemption premium, if any; provided, however, that the sufficiency of the deposit to effectuate the defeasance of a Security shall have been verified by a nationally recognized accounting firm.

(2)     if such Security is to be redeemed prior to maturity, irrevocable instructions have been given to the Transfer Agent to call such Security for redemption; and

(3)     Nothing in this subsection (A) shall affect any lien securing Ancillary Obligations except as provided in the agreement with the obligee of such Ancillary Obligations.

(B)     A Supplemental Action providing for the issuance of Securities may:

(1)     provide different means of defeasing such Securities, and such means may be in addition to or in lieu of the means set forth in subsection (A);

(2)     provide for the Legal Investments that are Permitted Investments for the defeasance of such Securities, but no such Permitted Investments may thereafter be changed except as provided in Section 18; and

(3)     provide for the consequences of such Securities being defeased.

(C)     Except as otherwise provided in a Supplemental Action:

(1)     the Legal Investments for the defeasance of such Securities are the Permitted Investments therefor; and

(2)     the statutory lien herein referred to in Section 5 shall be terminated with respect to defeased Securities, the Holders of such defeased Securities shall have no further rights under this Ordinance except for payment from the deposited funds and registration and replacement of such Securities, and such Securities shall no longer be considered to be Outstanding under this Ordinance.

## SECTION 22. AMENDMENTS; CONSENT OF SECURITYHOLDERS.

(A)     *Amendment without Consent.*

(1)    This Ordinance may be amended or supplemented from time to time by Act of Council or Supplemental Action without consent of the Holders of Securities:

(a)    To issue Securities of any Priority;

(b)    To add to the covenants and agreements of the City in this Ordinance contained, other covenants and agreements thereafter to be observed or to surrender, restrict or limit any right or power reserved to or conferred upon the City (including but not limited to the right to issue Securities or incur other Secured Obligations of, in either case, any Priority);

(c)    To make such provisions for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions contained in this Ordinance, or in regard to matters or questions arising under this Ordinance, as the City may deem necessary or desirable;

(d)    To increase the size or scope of the System; and

(e)    To amend or supplement this Ordinance in any respect with regard to Securities of one or more Priorities of Lien so long as such amendment does not materially adversely affect the Holders of Outstanding Securities.

(2)    No Holders of Securities of a Priority of Lien shall be "materially adversely affected" for the purposes of this Ordinance by the change of any coverage percentage established for Securities of any other Priority of Lien, and no amendment of or supplement to this Ordinance that provides for or facilitates the issuance of Securities or incurs other Secured Obligations of, in either case, of any Priority of Lien shall "materially adversely affect" the Holders of Securities of any other Priority of Lien for the purposes of this Ordinance so long as such amendment does not change any coverage percentage established for such Priority of Lien or is not an amendment that requires the consent of the Holder of such Security under Section 22B(i) or (ii).

(B)    *Amendments With Consent.*

(1)    With the consent of the Holders of not less than 51% in principal amount of Securities then Outstanding affected thereby, the City may from time to time and at any time amend this Ordinance in any manner by Act of Council; <u>provided</u>, that no such amendment shall:

(i)    reduce the aforesaid percentage of Holders of Securities required to consent to an amendment to this Ordinance without the consent of the Holders of all Securities then Outstanding, or

(ii)    without the consent of the Holder of each Security affected thereby:

(a)    extend the fixed maturity of such Security or reduce the rate of interest thereon or extend the time of payment of interest, or reduce the

amount of the principal or redemption premium thereof, or reduce or extend the time for payment of any premium payable on the redemption thereof, or

(b) change the Priority of Lien of such Security or deprive such Holder of the right to payment of such Security from Pledged Assets.

(2) It shall not be necessary for the consent of the Securityholders under this Section to approve the particular form of any proposed Act of Council but it shall be sufficient if such consent shall approve the substance thereof. The consent of the Holder of a Security shall bind all Holders of any Security for which such Security was the predecessor.

(3) For the purpose of acquiring consent for the purposes of this Section, the consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

(4) Promptly after an Act of Council amending this Ordinance pursuant to this Section has obtained the requisite consent, the Finance Director shall cause the Transfer Agent to notify, by mail at their addresses shown in the Registry, or by publication, Holders of all Outstanding Securities affected by such amendment, of the general terms of the substance of such Act of Council. Filing notice pursuant to the continuing disclosure agreement in respect of such Securities shall constitute sufficient notice for the purposes of this subsection.

(5) No amendment may be made under this Section 22(B) which affects the rights of the insurer or obligee of a Financial Facility or counterparty to a Hedge without its consent.

## SECTION 23. SEVERABILITY AND CAPTIONS.

(A) If any section, paragraph, clause or provision of this Ordinance shall be held invalid, the invalidity of such section, paragraph, clause or provision shall not affect any other provision of this Ordinance.

(B) Captions of sections and paragraphs of this Ordinance are furnished for the convenience of reference only and are not part of this Ordinance.

## SECTION 24. PUBLICATION AND RECORDATION.

This Ordinance shall be published in full in the "Detroit Legal News", a newspaper of general circulation in the City qualified under State law to publish legal notices, promptly after its adoption.

## SECTION 25. EFFECTIVE DATE.

This Ordinance shall be effective immediately.

**Approved as to Form**

_____

Corporation Counsel

35

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX D**

**AMENDMENTS TO CERTAIN PROVISIONS OF THE AUTHORIZING DOCUMENTS**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# AMENDMENTS TO CERTAIN PROVISIONS OF AUTHORIZING DOCUMENTS

Following are the amendments to the 2001 Supplement, the 2005 Supplement, and the 2005 Sale Order (collectively, the "2001 and 2005 Authorizing Documents"), which will be effective in connection with the remarketing of the Predecessor Bonds. The 2001 and 2005 Authorizing Documents are governed by their own amendment provisions but are also subject to the amendment provisions of the Bond Ordinance, which is included as Appendix C to this Remarketing Circular. Section 22(B)(3) of the Bond Ordinance, "Amendments With Consent," states in relevant part as follows:

> [T]he consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

Each of the 2001 Supplement and the 2005 Supplement contain substantially the same language. Accordingly, Holders of the Predecessor Bonds being remarketed hereby which are acquired in the remarketing thereof on or after the date of this Remarketing Circular, whether or not the fixed rate conversion is consummated in accordance with the initial notice of Mode Change or optional redemption, will be considered to have consented to the amendments set forth in this Appendix D.

In accordance with the provisions of each of the 2001 Supplement and the 2005 Supplement, consent of the Trustee, Transfer Agent and Tender Agent, each Provider, each Bond Insurer and the Remarketing Agent (as defined in the 2001 Supplement or the 2005 Supplement, as applicable), will be obtained or waived and notice will be provided to each Rating Agency.

To the extent certain of the amendments set forth in this Appendix D affect Holders of Water System Securities beyond those who have consented to such changes, as described above, the City has determined that such amendments can be made without Bondholder consent, as described in the Bond Ordinance. The amendment to Section 1.01 of each of the 2001 Supplement and the 2005 Supplement is pursuant to the authority of Section 22(A)(1)(c) of the Bond Ordinance, which permits amendments without consent of Securityholders for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions. The form of legal opinion regarding tax exemption set forth in Section 1.01 does not encompass the situation where a remarketing is deemed to be a reissuance for federal tax purposes. The amendment allows the opinion to be in the appropriate form for a reissuance but does not change the substance of the opinion. The amendments to Sections 2.03 and 3.02 of the 2001 Supplement and 2.03 and 3.03 of the 2005 Variable Rate Supplement are pursuant to the authority of Section 22(A)(1)(e) of the Bond Ordinance, which allows amendment without Securityholder consent so long as such amendment does not materially adversely

affect the Holders of Outstanding Securities (as such terms are defined in the Bond Ordinance). In connection with these amendments, the City's Finance Director will make a determination that, based upon market conditions, the effect on overall Water Supply System debt service of the implementation of these amendments in connection with the fixed rate remarketings described in this Remarketing Circular, and certain other factors, such amendments are not materially adverse to Holders of Outstanding Water Supply System Securities.

## SERIES 2001-C AMENDMENTS

### AMENDMENTS TO THE SUPPLEMENT.

A.    Amendment of Section 1.01 – Definitions. The definition of Favorable Bond Counsel's Opinion is hereby amended to read as follows *(added language is in italics)*:

Favorable Bond Counsel's Opinion means, with respect to any action the occurrence of which requires such an opinion of Bond Counsel, an opinion of Bond Counsel to the effect that (i) such action is authorized or permitted by this Agreement, the Bond Authorizing Resolution, the Ordinances and the Acts, and (ii) such action will not adversely affect the exemption of the interest on the Bonds from federal and state income taxation (subject to customary exceptions), *provided, however, that if Bond Counsel believes it necessary or appropriate, in lieu of the opinion described in (ii) above, Bond Counsel may provide an opinion to the effect that the interest on the Bonds is excluded from gross income for federal and state income tax purposes (subject to customary exceptions).*

B.    Amendment to Section 2.03 - Changes in Connection with Mode Change. Section 2.03(b)(2) is hereby amended to read as follows *(added language is in italics)*:

(b)(2)  Such Modal Bonds could be issued as Parity Obligations under the Bond Authorizing Resolution (treating, for such purpose, the Modal Bonds with the amortization to be adjusted as no longer outstanding to the extent of the adjustment), *provided, however, that in connection with the remarketing of any Modal Bonds that is completed prior to September 30, 2008, compliance with this Section 2.03(b)(2) shall not be required, but only if the City certifies, in a manner acceptable to Bond Counsel at the time of such remarketing, that such lack of compliance with this Section 2.03(b)(2) is not materially adverse to the Holders of all outstanding bonds of the Water Supply System;* and

C.    Amendment to Section 3.02 - Interest Rate Determinations. Section 3.02(a) is hereby amended to read as follows *(added language is in italics)*:

(a)    The interest rate for all Bonds in each Mode shall be determined by the Remarketing Agent on the Rate Determination Date for such Mode as the interest rate that in the judgment of the Remarketing Agent would allow such Modal Bonds to be sold at par plus accrued interest, under prevailing market conditions on such Rate

Determination Date; *provided, however, that for Bonds in the Weekly Mode, if required by prevailing market conditions in the judgment of the Remarketing Agent, the Remarketing Agent on the Rate Determination Date for such Mode may determine an interest rate that in the judgment of the Remarketing Agent would allow such Modal Bonds to be sold at a net premium, i.e. coupons exceed yields on a net basis, provided, further, that in the event of a premium remarketing permitted by the preceding clause, the total par amount of the Bonds so remarketed shall not increase by reason of such premium.*

D. <u>Amendment of Section 4.06 – Election of Mode Change; How Effected; Irrevocability</u>. Section 4.06(b) is hereby amended to read as follows (*added language is in italics*):

(b) In order to evidence the election of the Finance Director, and for his/her election to be effective, the Finance Director shall deliver to the Tender Agent, with copies to each of the other Notice Parties, not later than fifteen (15) days prior to the Mode Change Date, the minimum number of days required by Section 6.02 for notices given in connection with mandatory tenders plus 15 days (or such fewer days in advance of such minimum number as may be acceptable to the other Notice Parties), *provided, however, that, for a Mode change from the Weekly Rate Mode to the Fixed Rate Mode, if on such Mode Change Date (herein the "First Mode Change Date") all of the conditions to conversion to the Fixed Rate Mode are not met, if the Finance Director again elects to change the Mode for such Bonds to the Fixed Rate Mode within 30 days of the First Mode Change Date, his/her election shall be effective if he/she delivers to the Tender Agent, with copies concurrently to each of the other Notice Parties, not later than the minimum number of days required by the proviso to the second paragraph of Section 6.02(a) for notices given in connection with mandatory tenders in such situation:*

E. <u>Amendment of Section 4.08 – Notice to Modal Bondholders</u>. Section 4.08 is hereby amended to add Subsection (d) to read as follows (*added language is in italics*):

(d) *Notwithstanding the prior notice periods required by (a) and (c) of this Section 4.08, if the City is permitted to give the notice of Mode Change Date to Fixed Rate Mode described in the proviso to the second paragraph of Section 6.02(a), the Tender Agent shall give the notices required by this Section 4.08 not later than the 3rd day next preceding the Mode Change Date.*

F. <u>Amendment of Section 5.01 – Optional Redemption-Short-Term Bonds</u>. Section 5.01 is hereby amended to read as follows (*added language is in italics*):

Bonds in a Daily Mode or a Weekly Mode will be subject to redemption prior to their maturity date at the option of the Issuer, in whole on any Business Day or in part (and, if in part, in an Authorized Denomination) on any Interest Payment Date during such Daily Mode or Weekly Mode at a Redemption Price equal to 100 percent of the principal amount of such Bonds, plus accrued interest, if any, to the redemption date, *provided, however, that if on a Redemption Date (herein the "First Redemption Date")*

*the attempt to redeem the Bonds is not successful, then Bonds in a Weekly Mode shall be subject to redemption prior to their maturity date at the option of the Issuer, in whole or in part, on any Business Day within 30 days of the First Redemption Date.*

G. Amendment of Section 5.04 – General Provisions Regarding Redemption of Bonds. The first sentence of Section 5.04(a)(ii) is hereby amended to read as follows (*added language is in italics*):

Notice of the redemption of Bonds will be given by first class mail, postage prepaid, not less than 30 days or more than 60 days prior to the Redemption Date, to the registered owners of the Bonds to be redeemed, provided, however, that *if on a Redemption Date (herein the "First Redemption Date") the attempt to redeem the Bonds is not successful, notice of a subsequent redemption of Bonds within 30 days of the First Redemption Date shall be given by electronic means and by first class mail, postage prepaid, not less than three (3) days nor more than 60 days prior to such Redemption Date and shall be deemed to have been given when sent.*

H. Amendment of Section 6.02 – Mandatory Tender. Section 6.02(a) is hereby amended to read as follows (*added language is in italics*):

(a) …

**A Holder of a Bond subject to mandatory tender may not elect to retain its Bonds.**

With respect to a mandatory tender described in clause (i) above of Bonds bearing interest at a Daily Rate or a Weekly Rate, the Tender Agent is required to give notice to the Holders of such Bonds not later than the 15th day next preceding the Mode Change Date to Daily Rate or Weekly Rate and not later than the 30th day next preceding the Mode Change Date to Fixed Rate Mode stating the Mode Change Date and that such Bonds are required to be purchased on such Mode Change Date; *provided, however, that if a Mode Change Date to Fixed Rate Mode has been properly noticed as provided for in Section 6.02(a) above (herein the "First Mode Change Date") and all of the conditions precedent to the conversion to the Fixed Rate Mode are not met, the Tender Agent shall be required to give notice to the Holders of such Bonds of a subsequent Mode Change Date to Fixed Rate Mode not later than the 3rd day next preceding such Mode Change Date, if such Mode Change Date is within 30 days of the First Mode Change Date, stating such Mode Change Date and that such Bonds are required to be purchased on such Mode Change Date. In these circumstances, the Mode Change Date for Bonds bearing interest at a Weekly Rate may be any Business Day, notwithstanding the requirement of Section 4.04(2) that the Mode Change of Weekly Rate Bonds may be changed only on an Interest Payment Date.*

D-4

# SERIES 2005-B AMENDMENTS

**AMENDMENTS TO THE SUPPLEMENT.**

A.     Amendment of Section 1.01 – Definitions. The definition of Favorable Bond Counsel's Opinion is hereby amended to read as follows *(added language is in italics)*:

Favorable Bond Counsel's Opinion means, with respect to any action the occurrence of which requires such an opinion of Bond Counsel, an opinion of Bond Counsel to the effect that (i) such action is authorized or permitted by this Agreement and the Authorizing Documents, and (ii) such action will not adversely affect the exemption of the interest on the Series 2005 Securities from federal and state income taxation (subject to customary exceptions), *provided, however, that if Bond Counsel believes it necessary or appropriate, in lieu of the opinion described in (ii) above, Bond Counsel may provide an opinion to the effect that the interest on such Series 2005 Securities is excluded from gross income for federal and state income tax purposes (subject to customary exceptions).*

B.     Amendment to Section 2.03 - Changes in Connection with Mode Change. Section 2.03(b)(3) is hereby amended to read as follows *(added language is in italics)*:

(b)(3)  such Variable Rate Securities could be issued as Series 2005 Securities of the corresponding Parity and for the corresponding purpose under the Bond Ordinance (treating, for such purpose, the Securities with the amortization to be adjusted as no longer outstanding to the extent of the adjustment), *provided, however, that in connection with the remarketing of any Series 2005 Securities that is completed prior to September 30, 2008, compliance with this Section 2.03(b)(3) shall not be required, but only if the City certifies, in a manner acceptable to Bond Counsel at the time of such remarketing, that such lack of compliance with this Section 2.03(b)(3) is not materially adverse to the Holders of all outstanding bonds of the Water Supply System;* and

C.     Amendment to Section 3.03 - Interest Rate Determinations for Other Modes. Section 3.03(a) is hereby amended to read as follows *(added language is in italics)*:

(a)     The interest rate for each the Series 2005 Securities other than Commercial Paper Rate Securities and Auction Rate Securities shall be determined by the Remarketing Agent on the Rate Determination Date for such Mode as the interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at par plus accrued interest to the purchase date, under prevailing market conditions on such Rate Determination Date; *provided, however, that for Securities in the Weekly Mode, if required by prevailing market conditions in the judgment of the Remarketing Agent, the Remarketing Agent on the Rate Determination Date for such Mode may determine an interest rate that in the judgment of the Remarketing Agent would allow such Modal Securities to be sold at a net premium, i.e. coupons exceed yields on a net*

D-5

*basis, provided, further, that in the event of a premium remarketing permitted by the preceding clause, the total par amount of the Securities so remarketed shall not increase by reason of such premium, it being understood that circumstances permitting the exercise of the discretion authorized to be exercised by the Remarketing Agent by this Section shall **not** constitute a Rate Suspension Event under Section 3.04 hereof.*

D. Amendment of Section 4.12 – Election of Mode Change; How Effected; Irrevocability. Section 4.12(b) is hereby amended to read as follows (*added language is in italics*):

(b) In order to evidence the election of the Finance Director, and for his/her election to be effective, the Finance Director shall deliver to the Tender Agent, with copies to each of the other Notice Parties, not later than, for the proposed Mode Change Date, the minimum number of days required by **Section 6.02** for notices given in connection with mandatory tenders *plus* 15 days (or such fewer days in advance of such minimum number as may be acceptable to the other Notice Parties), *provided, however, that, for a Mode change from the Weekly Rate Mode to the Fixed Rate Mode, if on such Mode Change Date (herein the "First Mode Change Date") all of the conditions to conversion to the Fixed Rate Mode are not met, if the Finance Director again elects to change the Mode for such Securities to the Fixed Rate Mode within 30 days of the First Mode Change Date, his/her election shall be effective if he/she delivers to the Tender Agent, with copies concurrently to each of the other Notice Parties, not later than the minimum number of days required in Section 6.02(d) for notices given in connection with a Mode Change in such situation:*

E. Amendment of Section 4.15 – Notice to Variable Rate Security and Auction Rate Security Holders and Liquidity Facility Providers. Section 4.15 is hereby amended to add additional language at the end of subsection (b) to read as follows (*added language is in italics*):

(b) Such notice shall be given in advance of the Mode Change Date specified in such Mode Change Notice by at least the minimum number of days required by **Section 6.02**; provided that, a Liquidity Facility Provider shall always be given at least five Modal Business Days' notice, *except in the circumstances set forth in the proviso to Section 4.12(b) hereof.*

F. Amendment of Section 6.02 – Mandatory Tender Events. Section 6.02 is hereby amended to add a new subsection (c) to read as follows (*added language is in italics*):

(c) *If a Mode Change from the Weekly Rate Mode to the Fixed Rate Mode has been properly noticed in accordance with Section 6.02(a) above (herein the "First Mode Change Date") and all of the conditions precedent to the conversion to the Fixed Rate Mode are not met, notice of a subsequent Mode Change to the Fixed Rate Mode shall be given to Modal Holders not later than the 3rd day next preceding the Mode Change Date,*

D-6

*if such Mode Change Date is within 30 days of the First Mode Change Date, stating that such Mode Change Date is the Purchase Date.*

## AMENDMENTS TO THE SALE ORDER.

Section 2.05(b) is hereby amended by adding a paragraph at the end of the Section to read as follows (*added language is in italics*):

(b)    …

*In a situation where notice of optional redemption has been delivered to registered owners of Series 2005-B Securities in the manner required by this Section (the* **"First Redemption Date"**), *and all of the conditions precedent to the conversion to the Fixed Rate Mode are not met, if the City again elects to effect a conversion to the Fixed Rate Mode and, in connection therewith, optionally redeem Securities, a subsequent notice to such registered owners in the manner required by this Section shall be given to such registered owners not later than the 3rd day next preceding the date fixed for redemption, if such date is within 30 days of the First Redemption Date.*

[THIS PAGE INTENTIONALLY LEFT BLANK]

# APPENDIX E

## CHARACTERISTICS OF THE WATER SUPPLY SYSTEM SERVICE AREA

[THIS PAGE INTENTIONALLY LEFT BLANK]

# CHARACTERISTICS OF THE WATER SYSTEM SERVICE AREA

The Department operates a regional Water System that serves approximately 3.9 million people living in the City and 124 other southeastern Michigan communities. Water System customers may be classified into three categories: the City, surrounding communities, and local water authorities. Although the City is the single largest entity served by the Department, its relative importance has declined as nearby communities have increased in population and joined the Water System. As a percentage of total population served by the Department, the City has declined from 73% in 1950 to 24% in 2007.

The following sections provide summary information about the major components of the Water System service area: the City, the eight largest municipal entities (listed by population served) and various statistics relating to Detroit and the Detroit-Warren-Livonia MSA.

## DETROIT

The City of Detroit is located in southeastern Michigan in Wayne County and has a land area of approximately 138 square miles. According to the U.S. Department of Commerce's 2000 National Data Book, the City is the nation's 10th largest city and the center of the nation's seventh largest MSA. The City is internationally known for its automobile manufacturing and trade. The southeastern border of the City lies on the Detroit River, an international waterway, which is linked by the St. Lawrence Seaway to seaports around the world. The City is the commercial capital of Michigan and a major economic and industrial center of the nation. There are eight diverse industrial parks, and more than 50 firms have world headquarters within the confines of the City.

The City is a home rule city with significant independent powers under the City Charter. The City provides the following services: public protection, public works, cultural and recreational, civic center, health, physical and economic development, public lighting, transportation, water supply and sewage disposal, human services (including housing), airport and parking. In accordance with the Charter, the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the legislative branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years. The last regular election for these positions was on November 8, 2005, in which the Mayor and five incumbent members and four new members of the City Council were elected. In January 2006, the Mayor and the newly constituted City Council commenced their new terms. There are no limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the judicial branch of State government.

The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify ordinances enacted by the City by referendum, however, these powers do not extend to the budget or any ordinance for the appropriation of money, and the referendum power does not extend to emergency ordinances.

Since 2000, unemployment has increased, with an estimated employed civilian labor force of 311,302 and a 2007 yearly unemployment rate average of 14.3%, compared to a 7.7% state-wide average and a 4.6% national unemployment rate.

E-1

Historically, the City's economy has been closely tied to the manufacturing sector, especially the automotive industry. The two major U.S. automobile companies and DaimlerChrysler AG are principal employers and taxpayers in the Detroit metropolitan area. While the City's economy is linked to automobile and automobile related manufacturing, recent developments are allowing the City to be more diversified by increasing its activities in other manufacturing sectors, trade, commerce, and tourism.

In the November 1996 election, the qualified electors of the State passed a statewide gaming initiative allowing three casino gaming establishments to be licensed in the City. The Michigan legislature amended the gaming initiative in July 1997 by the passage of Act 69 Public Acts of Michigan, 1997 ("Act 69"), which requires, among other things, that an applicant for licensure submit along with its application to the Michigan Gaming Control Board, a certified development agreement between itself and the City. Three casino developers were selected by the Mayor and approved by City Council. Until the permanent casinos open, each of the three casino developers is operating a temporary facility in and around the downtown area. The City has entered Development Agreements with each casino developer.

The City's educational and medical institutions continue to grow in size and recognition, Wayne State University, one of the nation's largest urban educational institutions, as well as the University of Detroit-Mercy, the largest independent university in the State, are located in the City.

## LARGEST MUNICIPAL ENTITIES SERVED BY THE DEPARTMENT

Sets forth below are descriptions of the eight largest municipal entities receiving water supply service from the Department based on 2000 Census figures and, where available, 2006 population estimates.

### Southeastern Oakland County Water Authority

The Authority is a municipal corporation created to distribute water to its ten constituent members which include the following municipalities: City of Berkley, Village of Beverly Hills, City of Birmingham, City of Clawson, City of Huntington Woods, City of Lathrup Village, City of Pleasant Ridge, City of Royal Oak, City of Southfield, and the Village of Bingham Farms. The Authority was established in 1956, and in terms of population is the largest wholesale customer served by the Department. The area comprising the Authority covers approximately 58 square miles and is located north of and adjacent to Detroit. The 2006 estimated population served by the Authority was 191,556. Two cities account for roughly two-thirds of the land area and population served by the Authority: Royal Oak and Southfield. The City of Royal Oak encompasses approximately 11.5 square miles and has an estimated 2006 population of 60,720. It is primarily a residential and commercial community. The City of Southfield covers approximately 25.9 square miles and has an estimated 2006 population of 90,104. Southfield is a residential community with substantial commercial development.

### Warren

The City of Warren became an incorporated city in 1957 and was one of the first large suburban communities to develop in the Detroit metropolitan area. The City of Warren encompasses approximately 34.5 miles of the southwestern section of Macomb County and it is

E-2

adjacent to Detroit. The 2006 estimated population of Warren was 136,589. Warren's economy is closely linked with the automobile industry, much of it being research and development rather than manufacturing. General Motors Corporation and DaimlerChrysler AG have major facilities in Warren.

## Sterling Heights

The City of Sterling Heights is located in southwestern Macomb County, about six miles north of Detroit's city limits. Sterling Heights was incorporated in 1968 and has an area of approximately 36.8 square miles. The 2006 estimated population was 127,991. Industrial development in Sterling Heights is a continuation of that which has taken place in the City of Warren, immediately to the south. The first major industry to locate in Sterling Heights was Ford Motor Company in 1956, followed later by Daimler Chrysler AG. General Dynamics, another major employer, has located its headquarters in Sterling Heights for the engineering and design of all its products except tanks. The Detroit News maintains its principal printing plant in Sterling Heights. Lakeside Associates, owners of the area's largest shopping mall, is one of the ten largest taxpayers.

## Flint

The City of Flint is the county seat of Genesee County and the principal city of the Flint MSA. Incorporated in 1855, the City now covers approximately 33.1 square miles and has a 2006 estimated was 117,068. Flint is located about 60 miles northwest of Detroit It is one of the principal automotive manufacturing centers in the country. The General Motors Corporation represents a significant portion of Flint's tax base.

## Livonia

The City of Livonia is located in Wayne County, about 2 miles west of Detroit's western limit. Incorporated in 1950, Livonia is a residential, commercial and industrial city that encompasses some 38 square miles. Livonia's major population growth occurred in the 1950s and 1960s. The 2006 estimated population was 96,736. Livonia's tax base is well diversified. General Motors Corporation and Ford Motor Company comprise approximately 16% of its tax base. Three large shopping centers attract shoppers from surrounding communities.

## Clinton Township

Clinton Township is located in the central portion of Macomb County, approximately 14 miles north of downtown Detroit. It is primarily a residential community with a land area of 38 square miles. Population has grown from 48,865 in 1970 to 96,781 in 2006.

## Dearborn

The City of Dearborn adjoins Detroit on the southwest; its eastern boundary is approximately eight miles from the center of Detroit. Dearborn was incorporated in 1928 and today covers some 25.5 square miles. The location of Ford Motor Company's headquarters in Dearborn in the early 1930s shaped the economy and growth of Dearborn. The 2006 estimated population is 92,382. Ford Motor Company is by far the largest employer and taxpayer in Dearborn.

E-3

## Westland

The City of Westland, with an area of 20.42 square miles, is located three miles west of the Detroit city limits. Land use is primarily residential and commercial in character. Conveniently located near an interstate freeway, industrial development continues with auto suppliers, injection molders and tool and die shops. The 2006 estimated population was 84,504.

## DETROIT-WARREN-LIVONIA MSA

The Detroit-Warren-Livonia MSA is comprised of seven counties: Wayne, Oakland, Macomb, Livingston, Lapeer, St. Clair and Monroe. Except for Flint, which is located outside the Detroit-Warren-Livonia MSA, all of the Water Supply System service area is located in the Detroit-Warren-Livonia MSA. In terms of population, the Detroit-Warren-Livonia MSA is ranked the sixth largest MSA in the country.

### Population

The Detroit-Warren-Livonia MSA experienced a growth in population from 3,170,315 in 1950 to 4,441,551 in 2000. The following table presents population trends of the Detroit-Warren-Livonia MSA and the United States since 1950.

### Table 1
### Population Trends

| Year | Detroit-Warren-Livonia MSA Population | % Change | U.S. % Change |
|------|------------|----------|----------|
| 1950.......... | 3,169,649 | -- | -- |
| 1960.......... | 4,050,840 | 27.8% | 13.4% |
| 1970.......... | 4,549,869 | 12.3% | 13.4% |
| 1980.......... | 4,488,072 | (1.4%) | 11.4% |
| 1990.......... | 4,382,299 | (2.3%) | 10.2% |
| 2000.......... | 4,441,551 | 1.35% | 13.20% |

SOURCE: US. Department of Commerce, Bureau of the Census.

### Employment

The Detroit-Warren-Livonia MSA is located in a regional economy that is highly susceptible to swings in the national economy due to its high concentration of employment in the durable goods industries, particularly the automotive industry.

E-4

**Table 2**
**Annual Average Wage and Salary Employment by Place of Work (Non-Agricultural)**

**Detroit-Warren-Livonia MSA**

| Industry Group: | 2003 (000's) | % | 2004 (000's) | % | 2005 (000's) | % | 2006 (000's) | % |
|---|---|---|---|---|---|---|---|---|
| Natural Resources & Mining......... | 85 | 4.1 | 86 | 4.2 | 85 | 4.1 | 85 | 3.8 |
| Construction............................ | 11 | 0.5 | 11 | 0.5 | 11 | 0.5 | 11 | 0.5 |
| Manufacturing........................ | 309 | 14.9 | 298 | 14.4 | 285 | 13.9 | 285 | 13.3 |
| Trade, Transportation & Utilities.... | 388 | 18.6 | 383 | 18.6 | 380 | 18.5 | 380 | 18.4 |
| Information............................ | 37 | 1.8 | 36 | 1.8 | 35 | 1.7 | 35 | 1.7 |
| Financial Activities................... | 119 | 5.7 | 117 | 5.7 | 118 | 5.7 | 118 | 5.7 |
| Professional and Business Services | 364 | 17.5 | 358 | 17.3 | 372 | 18.1 | 372 | 17.9 |
| Education and Health Services....... | 253 | 12.1 | 256 | 12.4 | 264 | 12.8 | 264 | 13.6 |
| Leisure & Hospitality.................. | 181 | 8.7 | 182 | 8.8 | 182 | 8.8 | 182 | 9.1 |
| Other Services.......................... | 97 | 4.6 | 99 | 4.8 | 91 | 4.4 | 91 | 4.5 |
| Government............................. | 238 | 11.4 | 237 | 11.5 | 234 | 11.4 | 234 | 11.4 |
| Total............................... | 2,083 | 100.0 | 2,062 | 100.0 | 2,057 | 100.0 | 2,018 | 100.0 |

**U.S.**

| Industry Group: | 2003 (000's) | % | 2004 (000's) | % | 2005 (000's) | % | 2006 (000's) | % |
|---|---|---|---|---|---|---|---|---|
| Natural Resources & Mining......... | 572 | 0.4 | 591 | 0.4 | 625 | 0.5 | | |
| Construction............................ | 6,735 | 5.2 | 6,976 | 5.3 | 7,277 | 5.5 | | |
| Manufacturing........................ | 14,510 | 11.2 | 14,315 | 10.9 | 14,232 | 10.7 | | |
| Trade, Transportation & Utilities.... | 25,287 | 19.5 | 25,533 | 19.4 | 25,909 | 19.4 | | |
| Information............................ | 3,188 | 2.5 | 3,118 | 2.4 | 3,066 | 2.3 | | |
| Financial Activities................... | 7,977 | 6.1 | 8031 | 6.1 | 8,141 | 6.1 | | |
| Professional and Business Services | 15,985 | 12.3 | 16,395 | 12.5 | 16,882 | 12.6 | | |
| Education and Health Services....... | 16,588 | 12.8 | 16,953 | 12.9 | 17,342 | 13.0 | | |
| Leisure & Hospitality.................. | 12,173 | 9.4 | 12,493 | 9.5 | 12,802 | 9.6 | | |
| Other Services.......................... | 5,401 | 4.2 | 5,309 | 4.0 | 5,386 | 4.0 | | |
| Government............................. | 21,583 | 16.6 | 21,621 | 16.5 | 21,803 | 16.3 | | |
| Total............................... | 129,999 | 100.0 | 131,355 | 100.00 | 133,465 | 100.00 | | 100.00 |

NOTE:     Totals may not add due to rounding.
SOURCE: Michigan Department of Labor & Economic Growth, Office of Labor Market Information for Detroit-
Warren-Livonia CBSA; U.S. Department of Labor, Bureau of Labor Statistics for U.S.

Unemployment in the Detroit-Warren-Livonia MSA in comparison to the City of Detroit, the State and the United States is illustrated in the following table:

**Table 3**
**Civilian Unemployment Rates**

|      | Detroit | Detroit-Warren-Livonia MSA | State of Michigan | U.S. |
|------|---------|----------------------------|-------------------|------|
| 2003 | 14.6%   | 7.2%                       | 7.1%              | 6.0% |
| 2004 | 14.0%   | 7.1%                       | 7.1%              | 5.5% |
| 2005 | 14.2%   | 7.2%                       | 6.7%              | 4.9% |
| 2006 | 13.7%   | 7.2%                       | 6.9%              | 4.6% |
| 2007 | 14.3%   | 7.7%                       | 7.2%              | 4.6% |

SOURCE: Michigan Department of Labor & Economic Growth ("DL&EG"); U.S. Department of Labor, Bureau of Labor Statistics.

## Housing Characteristics

**Table 4**
**City of Detroit Housing Inventory**
**(in thousands)**

| Occupancy Status    | 1970  | 1980  | 1990  | 2000  |
|---------------------|-------|-------|-------|-------|
| Owner-occupied....... | 298.6 | 250.9 | 197.9 | 184.6 |
| Renter-occupied....... | 199.1 | 182.6 | 176.1 | 151.8 |
| Vacant ................. | 31.3  | 37.7  | 36.0  | 38.7  |
| Total Housing Units... | 529.0 | 471.2 | 410.0 | 375.1 |

SOURCE: U.S. Department of Commerce, Bureau of the Census.
NOTE:     Data may not add due to independent recording. Excludes seasonal housing.

**Table 5**
**Housing Characteristics-2002**

|                                  | City of Detroit | Detroit MSA | United States |
|----------------------------------|-----------------|-------------|---------------|
| Percent owner-occupied ........... | 54.9%           | 72.4%       | 66.2%         |
| Rental vacancy .................... | 8.3%            | 6.4%        | 6.8%          |
| Median Value of owner-occupied units ..... | $63,000 | $127,800 | $119,600 |
| Median contract rent ............... | $486            | $502        | $602          |
| Persons per household............... | 2.77            | 2.58        | 2.59          |

SOURCE: U.S. Department of Commerce, Bureau of Census.
NOTE:     Value of Owner-Occupied Units is a self-reported estimate of the then-current market value, and therefore is not directly comparable to the State Equalized Value.

E-6

## Manufacturing

The following table shows a breakdown of manufacturing wage and salary employment by type for the Detroit-Warren-Livonia MSA from 2003 through 2007.

**Table 6**
**Manufacturing Wage and Salary Employment**

| Industry Group: | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| | | (In Thousands) | | | |
| Total durable goods industries | 262.6 | 253.0 | 244.6 | 225.1 | 215.9 |
| Total nondurable goods industries | 46.8 | 44.7 | 44.2 | 43.7 | 43.6 |
| Total manufacturing employment | 309.4 | 297.7 | 288.8 | 268.8 | 259.4 |

SOURCE: Michigan Department of Labor and Economic Growth, Office of Labor Market Information.

## Family Income

The following table sets forth certain information concerning personal income in the Detroit-Warren-Livonia CBSA, the State of Michigan and the United States.

### Table 7
### Effective Household Buying Income – 2005

|  | Detroit-Warren-Livonia CBSA | State of Michigan | U.S. |
|---|---|---|---|
| Under $20,000 | 18.7% | 20.6% | 21.5% |
| $20,000-34,999 | 20.1% | 22.7% | 22.5% |
| $35,000-49,000 | 18.0% | 19.1% | 19.3% |
| $50,000 and over | 43.2% | 37.6% | 36.7% |
|  | 100.0% | 100.0% | 100.0% |
| Median effective buying income | $43,666 | $39,668 | $39,324 |

SOURCE: Sales Management & Marketing Magazine, Annual Survey of Buying Power, 2005. Effective Buying Income is a widely used, copyrighted marketing statistic equivalent to disposable personal income.

Of the 20 largest CBSA's, Detroit ranks thirteen in terms of Effective Buying Income (EBI) in 2005 as shown in the following table:

### Table 8
### Ranking of 20 Largest CBSA's by
### Median Household Effective Buying Income – 2005

| Rank |  | EBI | Population (000) |
|---|---|---|---|
| 1 | Washington-Arlington-Alexandria, DC-VA-MD-WV | 54,693 | 5,239.1 |
| 2 | San Francisco-Oakland-Freemont, CA | 54,541 | 4,215.4 |
| 3 | Boston-Cambridge-Quincy, MA-NH | 49,011 | 4,450.5 |
| 4 | Minneapolis-St. Paul-Bloomington, MN-WI | 48,419 | 3,138.3 |
| 5 | Seattle-Tacoma-Bellevue, WA | 46,789 | 3,200.9 |
| 6 | Atlanta-Sandy Springs-Marietta, GA | 46,249 | 4,765.8 |
| 7 | Chicago-Naperville-Joliet, IL-IN-WI | 45,876 | 9,433.6 |
| 8 | Dallas-Fort Worth-Arlington, TX | 45,468 | 5,786.9 |
| 9 | Baltimore-Towson, MD | 44,629 | 2,644.9 |
| 10 | San Diego-Carlsbad-San Marcos, CA | 44,506 | 2,998.6 |
| 11 | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 44,060 | 5,816.3 |
| 12 | New York-Newark-Edison, NY-NJ-PA | 43,978 | 18,768.2 |
| **13** | **Detroit-Warren-Livonia, MI** | **43,666** | **4,496.1** |
| 14 | Houston-Baytown-Sugar Land, TX | 43,055 | 5,239.5 |
| 15 | Phoenix-Mesa-Scottsdale, AZ | 42,458 | 3,730.6 |
| 16 | Los Angeles-Long Beach-Santa Ana, CA | 42,269 | 13,104.0 |
| 17 | St. Louis, MO-IL | 40,830 | 2,755.7 |
| 18 | Riverside-San Bernardino-Ontario, CA | 39,869 | 3,753.4 |
| 19 | Miami-Fort Lauderdale-Miami Beach, FL | 38,816 | 5,379.5 |
| 20 | Tampa-St. Petersburg-Clearwater. FL | 36,968 | 2,92.8 |

SOURCE: Sales & Marketing Management Magazine, Annual Survey of Buying Power, 2005.

## Largest Employers

Below is a listing of the largest private sector employers by company and by number of employees actually or estimated to be employed within the metro Detroit area at the end of 2006.

**Table 9**
**Largest Employers**

| Company | Employment |
|---------|-----------:|
| Ford Motor Company | 55,342 |
| General Motors Corp | 41,861 |
| University of Michigan | 33,374 |
| Chrysler L.L.C. | 32,597 |
| Detroit Public Schools | 17,329 |
| U.S. Postal Service | 15,385 |
| U.S. Government | 15,328 |
| Henry Ford Health System | 15,139 |
| St. John Health | 14,286 |
| City of Detroit | 13,762 |

SOURCE: Crain's *Book of Lists, 2008* Edition, December 2007.

## Construction

The following table shows residential construction (public and private) by number of units for the Detroit-Warren-Livonia MSA and the U.S. The number of units constructed in the Detroit-Warren-Livonia MSA has increased substantially since 1995, after several years of decline.

**Table 10**
**Residential Construction**
**(Number of Units)**

| YEAR | DETROIT- PMSA | U.S. |
|------|:-------------:|:----:|
| 2001 | 16,218 | 1,636,700 |
| 2002 | 17,779 | 1,747,700 |

| YEAR | DETROIT- WARREN-LIVONIA PMSA | U.S. |
|------|:----------------------------:|:----:|
| 2003 (1) | 19,900 | 1,889,200 |
| 2004 | 21,808 | 2,052,100 |
| 2005 | 16,442 | 2,147,600 |

SOURCE: US. Department of Commerce, Bureau of the Census.
(1) Beginning January 2003, building permit data reflect an increase in the universe of permits issuing places from 19,000 to 20,000 places.

## Port of Detroit

The Detroit/Wayne County Port Authority is a public agency responsible for promoting trade and freight transportation through the Port of Detroit, which provides direct water service

13-53846-tjt    Doc 5029-7    Filed 05/23/14    Entered 05/23/14 19:55:08    Page 80 of 121

to world markets via the Great Lakes/St. Lawrence Seaway. The Port has five privately-owned and operated full-service terminals, a liquid bulk terminal and bulk facility, and a single dock facility with capacity for 14 oceangoing vessels. In addition, more than 30 industries located on the Detroit and Rouge Rivers have their own port facilities. A variety of ship repair services are available. The Detroit area, which is the largest foreign trade zone in the United States, provides financial advantages related to federal taxes and customs duties at subzones throughout the City and region. The Port is a principal port of entry for trade with Canada by means of bridge, vehicular tunnel, rail tunnel and barge service. Steel and scrap steel are the principal export products of the Port, handled for the three local steel mills. General cargo constitutes a minor portion of total tonnage due to the lack of regularly scheduled shipping service.

### Table 11
### Waterborne Commerce of the Port of Detroit
### (million tons – computed as short tons of 2,000 pounds)

| | Foreign | | | Domestic | Grand |
|---|---|---|---|---|---|
| | Canadian | Overseas | Total | Total | Total |
| 2001…….. | 4.3 | 0.4 | 4.7 | 12.3 | 17.0 |
| 2002…….. | 3.7 | 0.7 | 4.4 | 12.9 | 17.3 |
| 2003…….. | 3.5 | 0.4 | 3.9 | 10.4 | 14.3 |
| 2004…….. | 3.6 | 0.6 | 4.2 | 12.6 | 16.8 |
| 2005…….. | 4.0 | 0.4 | 4.4 | 13.0 | 17.4 |

SOURCE: Detroit/Wayne County Port Authority.

## Transportation Network

Five major rail lines provide direct service to the Detroit area by such railroad companies as Conrail, Norfolk Southern, Grand Trunk Western, Canadian Pacific and CSX Transportation. Major cargoes handled by the rail lines in the Detroit area include automobiles, auto parts, steel, chemicals and food products.

Air transportation service is provided to the City at the Detroit City Airport, with general aviation, cargo and scheduled passenger services, and at the Detroit Metropolitan Wayne County Airport, the nation's 13th largest international airport and the largest hub for Northwest Airlines. More than 27 other scheduled airlines provided domestic and international service with more than 34 million annual passenger deplanements and enplanements, and 107,643 tons of annual enplaned cargo.

This area's extensive toll-free highway system, which includes the 1-94, 1-75, 1-96 and 1-696 interstate highways and Canadian Highway 401, provides one-day access, based on a 500-mile day, to 48% (by population) of the U.S. market and to the Province of Ontario, Canada.

**APPENDIX F**

**SUMMARY OF THE CONTINUING DISCLOSURE UNDERTAKING**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# SUMMARY OF THE CONTINUING DISCLOSURE UNDERTAKING

*Certain provisions of the Master Continuing Disclosure Agreement executed by the City (the "Disclosure Agreement") are summarized below. This summary does not purport to be complete or definitive and is qualified in its entirety by reference of full terms of the Disclosure Agreement.*

The Disclosure Agreement was executed and delivered by the City for the benefit of the Holders and the Beneficial Owners, as defined in this Appendix F, and in order to assist the Remarketing Agent in complying with SEC Rule 15c2-12(b)(5). The Fixed Rate Bonds are subject to the Disclosure Agreement.

## Certain Definitions

Defined terms used in the Disclosure Agreement and not otherwise defined therein have the meanings set forth in the Bond Ordinance.

"Audited General Purpose Financial Statements" means annual general purpose financial statements (currently prepared as the City's Comprehensive Annual Financial Report), if any, of the City, audited by such independent public accountants as shall then be required or permitted by state law or the Bond Ordinance. The Disclosure Agreement requires that Audited Financial Statements be prepared in accordance with GAAP, applied on a consistent basis, *provided however*, that the City may from time to time, in accordance with GAAP and subject to applicable federal or state legal requirements, modify the basis upon which its financial statements are prepared. The Disclosure Agreement requires that notice of any such modification be provided to (i) either to each NRMSIR or the MSRB and (ii) the SID.

"Audited Water Fund Financial Statements" means annual financial statements, if any, of the City's Water Fund audited by such independent public accountants as shall then be required or permitted by City ordinance or the Bond Ordinance. The Disclosure Agreement requires that Audited Water Fund Financial Statements be prepared in accordance with GAAP, applied on a consistent basis; *provided, however,* that the City may from time to time, in accordance with the GAAP and subject to applicable federal or state legal requirements, modify the basis upon which financial statements are prepared. The Disclosure Agreement requires that notice of any such modification be provided to (i) either to each NRMSIR or the MSRB and (ii) the SID.

"Beneficial Owner, " for the purpose of this Appendix F, means a beneficial owner of Subject Bonds, as determined pursuant to the Rule.

"Fiscal Year" means that period established by the City with respect to which its Audited Water Fund Financial Statements or Unaudited Water Fund Financial Statements, as applicable, are prepared. The City's Fiscal Year begins on July 1 and ends on June 30 of the next calendar year.

"Fixed Rate Bonds" means, collectively, the City's Water Supply System Revenue Refunding Second Lien Bonds (Fixed Rate), Series 2001-C and Revenue Senior Lien Bonds (Fixed Rate), Series 2005-B.

"GAAP" means generally accepted accounting principles, as such principles are prescribed, in part, by the Government Accounting Standards Board, supplemented by pronouncements of the American Institute of Certified Public Accountants and by the Financial Accounting Standards Board, made applicable to state and local governmental entities, and in effect from time to time.

"Holders" means the registered owners of the Subject Bonds.

"Listed Event" means any of the events listed below under the heading "Reporting Certain Events."

"MSRB" mans the Municipal Securities Rulemaking Board established pursuant to Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended.

"NRMSIR" means, at any time, a then existing nationally recognized municipal securities information repository as recognized by the SEC from time to time for the purposes referred to in the Rule. The NRMSIRs currently approved by the SEC are set forth in Exhibit A hereto.

"Remarketing Agent" means the remarketing agent in connection with the offering of Subject Bonds.

"Remarketing Circular" means the City's offering document related to the Fixed Rate Bonds.

"Rule" means the applicable provision of Rule 15c2-12 adopted by the SEC under the Securities Exchange Act of 1934, as amended (17 CFR Part 240, §240.15c2-12), as in effect on the date of the Disclosure Agreement, including any official interpretations thereof.

"SEC" means the United States Securities and Exchange Commission.

"Securities Counsel" means legal counsel expert in federal securities laws.

"SID" mans the Municipal Advisory Council of Michigan or such other appropriate state information depository for the State of Michigan, if any, as recognized by the SEC for the purposes referred to in the Rule.

"Subject Bonds" means those bonds issued pursuant to the Bond Ordinance, including the Fixed Rate Bonds, which are made subject to the terms of the Disclosure Agreement in any resolution of the City Council authorizing the issuance of such bonds.

"Trustee" means U.S. Bank National Association, Detroit, Michigan, as the Trustee under the Bond Ordinance or any successor thereto.

"Unaudited General Purpose Financial Statements" means the same as Audited General Purpose Financial Statements, except that they shall not have been audited by independent public accountants.

"Unaudited Water Fund Financial Statements" means the same as Audited Water Fund Financial Statements, except that they shall not have been audited by independent public accountants.

## Provision of Annual Financial Information

The City will, not later than 180 days after the end of each Fiscal Year, provide to the SID and each NRMSIR the annual financial information described below for such Fiscal Year (the "Annual Financial Information") which is consistent with the requirements of the Disclosure Agreement. The Audited Water Fund Financial Statements, or Audited General Fund Financial Statements, as applicable, may be submitted separately from the balance of the Annual Financial Information, and later than the date required for the filing of the Annual Financial Information if not available by the date.

The Disclosure Agreement requires the City to provide, in a timely manner, notice of any failure by it to provide Annual Financial Information to each NRMSIR and the SID on or before the date described in the first paragraph under this heading, to the SID and either (i) each NRMSIR, or (ii) the MSRB, with a copy to the Trustee.

## Content of Annual Financial Information

The City's Annual Information shall contain or include by reference the following:

    a.    the Audited Water Fund Financial Statements, if available;

    b.    if the Audited Water Fund Financial Statements are not available, the Unaudited Water Fund Financial Statements and the Audited General Purpose Financial Statements (or the Unaudited General Purpose Financial Statements if the Audited General Purpose Financial Statements are not available); and

    c.    financial information or operating data of the types included in tabular form in the Remarketing Circular under the headings "The Water Supply System," "Financial Operations," "Financial Procedures" (excluding the Water Rate Comparison information), and "The Department of Water and Sewerage"; actual data comparable to the projections contained under the heading "The Capital Improvement Program;" and actual operating data comparable to the projections contained under the following section headings of Appendix A -- "Feasibility Report:" "Rate Methodology and Existing Rates," "Projections of Revenues," and "Operation and Maintenance Expense Projections."

If not provided as part of the Annual Financial Information by the date required (as described above under "Provision of Annual Financial Information"), the City shall provide Audited Water Fund Financial Statements or Audited General Purpose Financial Statements, as applicable, when and if available, to each NRMSIR and the SID.

Any and all of the items above may be included by specific reference to other documents, including official statements or debt issues of the City or related public entities, which have been submitted to each NRMSIR and the SID or the SEC. If such document is an official statement, it must also be available from the MSRB. Annual Financial Information may be provided in one document or multiple documents, and at one time or in part from time to time.

**Other Obligated Persons**

With respect to any wholesale customer of the System that an obligated person for whom financial information or operating data is presented in the Remarketing Circular, as determined pursuant to the Rule, the City shall provide or cause to be provided:

(a)     to each NRMSIR and the SID, annual financial information of such obligated person of the type included in the Remarketing Circular with respect to such obligated person within 180 days after the end of the obligated person's fiscal year;

(b)     to each NRMSIR and SID, financial statements of such obligated person, audited in accordance with GAAP, within 180 days after the end of the obligated person's fiscal year or, if not then available, when and if available; and

(c)     in a timely manner either to the MSRB or each NRMSIR, and also the SID, with a copy to the Trustee, notice of any failure to provide the above-referenced information.

**Reporting of Certain Events**

The City will give timely notice to the SID, the Trustee, and to either each NRMSIR or the MSRB of the occurrence of any of the following events with respect to the Subject Bonds, if material:

(a)     principal and interest payment delinquencies;

(b)     non-payment related defaults;

(c)     modification to rights of Holders;

(d)     Subject Bond calls;

(e)     unscheduled draws on credit enhancements reflecting financial difficulties;

(f)     substitution of credit or liquidity providers, or their failure to perform;

(g)     defeasances;

(h)     rating changes;

(i)     adverse tax opinions, or events adversely affecting the tax-exempt status (if applicable), of any Subject Bonds;

F-4

(j)     unscheduled draws on the debt service reserves reflecting financial difficulties; and

(k)     release, substitution or sale of property securing repayment of the Subject Bonds.

## Additional Information

Nothing in the Disclosure Agreement will be deemed to prevent the City from disseminating any other information, or including any other information in any Annual Financial Information or notice of occurrence of a Listed Event, in addition to that which is required by the Disclosure Agreement. If the City chooses to include any information in any Annual Financial Information or notice of occurrence of a Listed Event in addition to that which is specifically required by the Disclosure Agreement, the City will have no obligation under the Disclosure Agreement to update such information or include it in any future Annual Financial Information or notice of occurrence of a Listed Event.

## Amendment of Disclosure Agreement

The Disclosure Agreement may be amended by the City, and any provisions of the Disclosure Agreement may be waived, without the consent of the Holders or Beneficial Owners, except as required pursuant to clause 4(ii) below, under the following conditions: (1) such amendment or waiver is made in connection with a change in circumstances that arises from a change in legal (including regulatory) requirements, a change in law (including rules or regulations) or in interpretations thereof, or a change in the identity, nature or status of the City or Water Supply System or the type of business conducted thereby, (2) the Disclosure Agreement as so amended or waived could have complied with the requirements of the Rule as of the date of each primary offering of Subject Bonds affected by such amendment or waiver, after taking into account any amendments, or interpretations of the Rule, as well as any change in circumstances, (3) the City shall have delivered to the Trustee an opinion of Securities Counsel, addressed to the City and the Trustee, to the same effect as set forth in clause (2) above, (4) either (i) a party unaffiliated with the City (such as the Trustee or bond counsel), acceptable to the City and the Trustee, has determined that the amendment does not materially impair the interests of the Beneficial Owners, or (ii) the Holders consent to the amendment or waiver to the Disclosure Agreement pursuant to the same procedures as are required for amendments to the Bond Ordinance with consent of Holders, and (5) the City shall have delivered copies of such waiver or amendment to the SID and to either each NRMSIR or the MSRB.

In addition to the foregoing, the City may amend the Disclosure Agreement, and any provision of the Disclosure Agreement may be waived, if the Trustee shall have received an opinion of Securities Counsel, addressed to the City and the Trustee, to the effect that the adoption and the terms of such amendment or waiver would not, in and of themselves, cause the undertakings in the Disclosure Agreement to violate the Rule, taking into account any subsequent changes in or official interpretation of the Rule.

To the extent any amendment to the Disclosure Agreement results in a change in the type of financial information or operating data provided pursuant thereto, and first Annual Financial Information provided thereafter shall include a narrative explanation of the reasons for the

F-5

change and the impact of the change. If a change is made to the basis on which financial statements are prepared, the Annual Financial Information for the year in which the change is made shall present a comparison between the financial statements or information prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles. Such comparison shall include a qualitative and, to the extent reasonably feasible, quantitative discussion of the differences in the accounting principles and the impact of the change in the accounting principles on the presentation of the financial information.

**Benefit; Enforcement**

The provisions of the Disclosure Agreement will inure solely to the benefit of the Holders and the Beneficial Owners from time to time. Except as described in this paragraph, the provisions of the Disclosure Agreement will create no rights in any other person or entity. The obligation of the City to comply with the provisions of the Disclosure Agreement are enforceable by any Beneficial Owner of outstanding Subject Bonds and, in addition, by the Trustee on behalf of the Holders of outstanding Subject Bonds. The right to enforce the provisions of the Disclosure Agreement are limited to a right, by action or mandamus or for specific performance, to compel performance of the City's obligations under the Disclosure Agreement. Any failure by the City to perform in accordance with the Disclosure Agreement will not constitute a default or an event of default under the Bond Ordinance, and the rights and remedies provided by the Bond Ordinance upon the occurrence of a default or an event of default will not apply to any such failure.

**Termination of Reporting Obligation**

The City's obligations under the Disclosure Agreement with respect to the Subject Bonds will terminate upon (i) the legal defeasance under the Bond Ordinance, (ii) prior redemption, or (iii) payment in full of all of the Subject Bonds. The City shall give notice of any such termination to the SID and to either each NRMSIR or the MSRB.

The Disclosure Agreement, or any provision thereof, will be null and void in the event the City (1) delivers to the Trustee an opinion of Securities Counsel, addressed to the City and the Trustee, to the effect that those portions of the Rule which require the provisions of the Disclosure Agreement, or any of such provisions, do not or no longer apply to the Subject Bonds, whether because such portions of the Rule are invalid, have been repealed, or otherwise, as will be specified in such opinion, and (2) delivers notice to such effect to the SID and to either each NRMSIR or the MSRB.

**Governing Law**

The Disclosure Agreement provides that it be construed and interpreted in accordance with the laws of the State, and that any suits and actions arising out of the Disclosure Agreement be instituted in a court of competent jurisdiction in the State, provided that, to the extent the Disclosure Agreement addresses matters of federal securities laws, including the Rule, the Disclosure Agreement is to be construed in accordance with such federal securities laws and official interpretations thereof.

F-6

# EXHIBIT A

The nationally recognized municipal securities information repositories approved by the Securities and Exchange Commission as of April 29, 2008, are set forth below:

Bloomberg Municipal Repository
100 Business Park Drive
Skillman, New Jersey 08558
Phone: (609) 279-3225
Fax: (609) 279-5962
E-mail: Munis@Bloomberg.com

DPC Data Inc.
One Executive Drive
Fort Lee, New Jersey 07024
Phone: (201) 346-0701
Fax: (201) 947-0107
E-mail: nrmsir@dpcdata.com

Standard & Poor's Securities Evaluations, Inc.
55 Water Street, 45th Floor
New York, New York 10041
Phone: (212) 438-4595
Fax: (212) 438-3975
E-mail: nrmsir_repository@sandp.com

Interactive Data Pricing and Reference Data, Inc.
Attn: NRMSIR
100 William Street, 15th Floor
New York. New York 10038
Phone: (212) 771-6999
Fax: (212) 771-7390
E-mail: NRMSIR@interactivedata.com

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX G**

**SPECIMEN OF BHAC BOND INSURANCE POLICY**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# BERKSHIRE HATHAWAY ASSURANCE CORPORATION
## *NEW YORK, NEW YORK*

## FINANCIAL GUARANTY INSURANCE POLICY

### DECLARATIONS

Policy No.:

Issuer:  City of Detroit, Michigan

Description of Obligations:

Fiscal Agent:  U.S. Bank National Association

Premium:

Effective Date:

Endorsements:

Prior Insurer:  Financial Guaranty Insurance Company

## INSURANCE POLICY TERMS AND CONDITIONS (Primary)

Berkshire Hathaway Assurance Corporation ("BHAC"), a New York corporation, in consideration of the payment of the Premium and subject to the terms and conditions of this Policy (which includes any endorsement hereto), hereby agrees unconditionally and irrevocably to pay U.S. Bank National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of the Holders of the Obligations (as set forth in the Bond Ordinance, bond resolution and other applicable authorizing documents providing for the issuance of and securing the Obligations), that portion of the Insured Payments which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

BHAC will pay an amount equal to such Insured Payments to the Fiscal Agent on the later to occur of (i) the Business Day following the day on which BHAC shall have Received a completed Notice of Nonpayment, or (ii) the date applicable principal or interest becomes Due for Payment. If a Notice of Nonpayment to BHAC is incomplete or does not in any instance conform to the terms and conditions of this Policy, it shall be deemed not Received, and BHAC shall promptly give notice to the Fiscal Agent that the purported Notice of Nonpayment is not deemed Received. Upon receipt of such notice, the Fiscal Agent may submit an amended Notice of Nonpayment. The Fiscal Agent will disburse the amounts paid to it by BHAC in respect of such Insured Payments to the Holders only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it of (i) evidence of the Holder's right to receive such payments, and (ii) evidence, including, without limitation, any appropriate instruments of assignment, that all of the Holder's rights to payment of such Insured Payments shall thereupon vest in BHAC. Upon such disbursement, BHAC shall become the owner of the Obligation, appurtenant coupon (if any) or right to payment of such Insured Payments and any interest thereon, and shall be fully subrogated to all of the Holder's right, title and interest thereunder, including the Holder's right to payment thereof. Payment by BHAC to the Fiscal Agent for the benefit of the Holders shall discharge the obligation of BHAC under this Policy to the extent of such payment.

This Policy is non-cancelable by BHAC for any reason. The Premium on this Policy is not refundable for any reason, including the payment prior to maturity of the Obligations. This Policy does not insure against any acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of BHAC, nor does this Policy insure against any risk other than Nonpayment.

Except to the extent expressly modified by the Declarations to this Policy or any endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy.

"Avoided Payment" means any amount previously distributed to a Holder in respect of any Insured Payment by or on behalf of the Issuer, which amount has been recovered from such Holder pursuant to any applicable bankruptcy law in accordance with a final, nonappealable order of a court having competent jurisdiction that such payment constitutes an avoidable preference with respect to such Holder.

"Business Day" means any day other than (i) a Saturday or Sunday, or (ii) any day on which the offices of the Fiscal Agent are authorized or required by law, executive order or governmental decree to be closed.

"Due for Payment" means (i) when referring to the principal of an Obligation, the stated maturity date thereof, or the date on which such Obligation shall have been duly called for mandatory

sinking fund redemption, and does not refer to any earlier date on which payment is due by reason of a call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity (unless BHAC in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date) and (ii) when referring to interest on an Obligation, the stated date for payment of such interest.

"Holder" means, in respect of any Obligation, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Obligation to payment of principal or interest thereunder, except that Holder shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Obligations.

"Insured Payments" means the principal of and interest on the Obligations that shall become Due for Payment. Insured Payments shall not include any additional amounts owing by the Issuer solely as a result of the failure by the Issuer to pay such amount when due and payable, including without limitation any such additional amounts as may be attributable to penalties or to interest accruing at a default rate, to amounts payable in respect of indemnification, or to any other additional amounts payable by the Issuer by reason of such failure.

"Nonpayment" means, in respect of an Obligation, the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest Due for Payment on such Obligation. It is further understood that the term "Nonpayment" in respect of an Obligation includes any Avoided Payment.

"Notice" means telephonic or telegraphic notice subsequently confirmed in writing, or written notice given by overnight or other delivery service, or by certified or registered United States mail, from a Holder or a paying agent for the Obligations to BHAC. Notices to BHAC may be mailed by certified mail or may be delivered by telecopier to facsimile number (203) 363 5221, attn: Bond Insurance Claims, or to such other address as shall be specified by BHAC to the Fiscal Agent in writing.

"Obligation" means the bonds stated in the Declarations.

"Receipt" or "Received" means actual receipt of Notice of or, if Notice is given by overnight or other delivery service, or by certified or registered United States mail, by a delivery receipt signed by a person authorized to accept delivery on behalf of BHAC.

THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAWS. Payments under this Policy may not be accelerated except at the sole option of BHAC.

Premium is due not later than the Effective Date.

This Policy will be governed by, and shall be construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, BHAC has caused this Policy to be executed on its behalf by its duly authorized officer, and to become effective and binding upon BHAC by virtue of such signature.

BERKSHIRE HATHAWAY ASSURANCE CORPORATION

By._____

Name:_____

Title:_____

ATTEST:

By._____

Name:_____

Title:_____

# BERKSHIRE HATHAWAY
# ASSURANCE CORPORATION
## *NEW YORK, NEW YORK*

PRIOR BOND INSURER ENDORSEMENT (Primary)
ATTACHED TO POLICY NUMBER

In consideration of the premium paid by Premium Obligor, the Policy is amended as follows:

The following definitions are added to the Policy:

"Condition Precedent" means a proper claim for payment has been made on the Prior Insurance and the Prior Insurer has failed to pay such claim in the period permitted by the Prior Insurance for reasons other than failure to provide proper documentation required by the Prior Insurer to pay such claim.

"Paid in Full" For purposes of this Endorsement, any Obligation shall be "paid in full" upon the first to occur of (a) the date when the Prior Insurer has paid all amounts which may become due under the Prior Insurance and (b) the date when all Insured Payments (as defined in this Endorsement, except that, for purposes of this sentence, without giving any effect to the words "during the Term of this Policy" in such definition) required to be paid by the Issuer, including all principal and accrued interest, have been paid or deemed to be paid (but for purposes of this Endorsement, "deemed to be paid" shall not include defeasance of the Obligation) in accordance with the terms of the Obligations, and any period during which any such payment could have been avoided in whole or in part as a preference payment under applicable law shall have expired before any proceeding requisite to such avoidance shall have been commenced and any Insured Payment shall be "paid in full" when such payment has been made by the Issuer, and any period during which any such payment could have been avoided in whole or in part as a preference payment under applicable law shall have expired before any proceeding requisite to such avoidance shall have been commenced.

"Prior Insurance" means the financial guaranty insurance policy delivered by the Prior Insurer with respect to each of the Obligations.

BH-116 (05/08)

G-5

"Prior Insurer" means the entity identified as such in the Declarations, its successors and assigns.

The following definitions replace the definitions provided for in the Policy:

"Holder" means, in respect of any Obligation, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Obligation to payment of principal or interest thereunder but shall not include the Prior Insurer, the Issuer or any affiliate or successor thereof.

"Insured Payments" means payments which are scheduled to be made during the Term of this Policy in accordance with the original terms of the Obligations (including when amended in accordance with such original terms) when issued and without regard to any amendment or modification of such Obligations thereafter (other than an amendment in accordance with such terms); provided that no such amount shall constitute an "Insured Payment" unless and until the Condition Precedent has been fulfilled, in which event the Insured Payment insured under the Policy shall be the principal and interest scheduled to be made as aforesaid on the Obligations less any amount paid by the Prior Insurer in respect thereof. Payments which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) an election by the Issuer to pay principal on an accelerated basis or (c) any other cause, shall not constitute "Insured Payments" unless BHAC shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration. Insured Payments shall not include any amounts due in respect of the Obligations attributable to any increase in interest rate, penalty or other sums, if any, payable by the Issuer by reason of any default or event of default in respect of the Obligations. Insured Payments shall, subject to the Condition Precedent, include principal and interest due in respect of the Obligations payable in connection with the maturity thereof as well as mandatory sinking fund redemption. In the absence of written consent by BHAC, any (i) action by the Holder of an Obligation which releases, or diminishes the liability of, the Prior Insurance; or (ii) failure by the Holder to take such action(s) as BHAC may reasonably require in order to preserve BHAC's rights, if any, against the Prior Insruance, shall result in such Obligation ceasing to be insured under this Policy.

The following Terms and Conditions are added to the Policy:

1. In addition to all other requirements set forth in this Policy, with respect to an Avoided Payment only, BHAC shall have no obligation to make any payment to any Holder under this Policy until the fourth Business Day following receipt by BHAC from the Fiscal Agent of (i) a certified copy of the order of the court which exercised jurisdiction to the effect that the Holder is required to return a payment of principal or interest constituting a Insured Payment and paid on the Obligation during the Term of this Policy because such payment was an avoidable preference under applicable law (the "Order"), (ii) a certificate of the Holder that the Order has been entered and is not subject to any stay. With respect to an Avoided Payment, BHAC may disburse payment due under the Policy to the receiver, conservator, debtor-in-possession, trustee in bankruptcy

or other person named in the Order and not to the Fiscal Agent or Holder directly; unless such Holder has been required previously to disgorge all or part of such payment, as demonstrated to the satisfaction of BHAC.

In addition to all other requirements set forth in this Policy, with respect to all claims under this Policy BHAC shall have no obligation to make any payment to any Holder under this Policy until it has received (i) a certificate stating that the Condition Precedent has been fulfilled accompanied by a certified copy of the claim filed with the Prior Insurer; and (ii) an assignment duly executed and delivered by the Holder, in such form as is reasonably required by BHAC and provided to the Holder by BHAC or the Fiscal Agent, irrevocably assigning to BHAC all rights and claims of the Holder relating to or arising under the Obligation and the Prior Insurance against the Issuer and the Prior Insurer, as appropriate, upon disbursement of any payments by BHAC hereunder.

2.    BHAC's obligation to make any payment under this Policy is subject to the Condition Precedent.

3.    In addition to BHAC being subrogated to the rights of each Holder to receive payment under the Obligations to the extent of any payment by BHAC hereunder, BHAC shall be subrogated to the rights of each Holder to receive payment under the Prior Insurance to the extent of any payment by BHAC hereunder and shall be subrogated to the rights of the Prior Insurer to the extent of any payment by BHAC hereunder.

4.    This Policy shall expire with respect to each Obligation on the date on which that Obligation is Paid in Full.

IN WITNESS WHEREOF, BHAC has caused this Policy to be executed on its behalf by its duly authorized officer, and to become effective and binding upon BHAC by virtue of such signature.

BERKSHIRE HATHAWAY ASSURANCE CORPORATION

By:_____

Name:  Kara Raiguel

Title:  Vice President

ATTEST:

By._____

Name:  Brian Snover

Title:  Vice President

**APPENDIX H**

**FORM OF FAVORABLE BOND COUNSEL'S OPINION**

[THIS PAGE INTENTIONALLY LEFT BLANK]

Upon the delivery of the Bonds, Bond Counsel proposes to issue its Favorable Bond Counsel's Opinion in substantially the following form:

LAW OFFICES

**LEWIS & MUNDAY**

A PROFESSIONAL CORPORATION

2490 FIRST NATIONAL BUILDING

660 WOODWARD AVENUE

DETROIT, MICHIGAN 48226

TELEPHONE (313) 961-2550

TELECOPIER (313) 961-1270

[Closing Date]

City of Detroit
Detroit, Michigan

Dear Sir or Madam:

We have acted as Bond Counsel in connection with the remarketing of the City of Detroit Water Supply System Revenue Refunding Second Lien Bonds (Fixed Rate) Series 2001-C (the *2001-C Bonds*) and the City of Detroit Water Supply System Revenue Senior Lien Bonds (Fixed Rate) Series 2005-B (the *2005-B Bonds* and together with the 2001-C Bonds, the *Bonds*).

Reference is made to the following documents with respect to the 2001-C Bonds (the *2001-C Documents*): (i) the Variable Rate Demand Bonds Supplement and Agreement (a *Supplement*), dated May 31, 2001, between the City of Detroit, Michigan (the *City*), and U.S. Bank National Association acting in its separate capacities as Trustee, Transfer Agent and Tender Agent, as last amended on April 23, 2008; and (ii) the Sale Order of the Finance Director of the City dated as of May 31, 2001, as supplemented on May 6, 2008 (a *Sale Order*).

Reference is made to the following documents with respect to the 2005-B Bonds (the *2005-B Documents*): (i) the Variable Rate Mode and Auction Rate Mode Supplement and Agreement (a *Supplement*), dated March, 22, 2005, between the City and U.S. Bank, as Transfer Agent, as amended on April 23, 2008, and (ii) the Sale Order of the Finance Director of the City dated as of March 22, 2005, as amended on April 23, 2008 and as supplemented on May 6, 2008 (a *Sale Order*).

In connection with the remarketing, the mode of the Bonds was changed (the *Mode Change*) pursuant to the 2001-C Documents in the case of the 2001-C Bonds and the 2005-B Documents in the case of the 2005-B Bonds and the Supplements were amended. In addition, certain changes were made in the debt service structure and the redemption provisions as set forth in the Remarketing Agreement, dated May 6, 2008 (the *Remarketing Agreement*), between the City and Siebert Bradford Shank & Co., LLC.

Capitalized terms not defined herein and defined in either Supplement are used herein as therein defined.

As to questions of fact material to our opinion, we have relied upon representations of the City contained in the authorizing City ordinance (the *Ordinance*) and in the documents delivered by the City in connection with the initial issuance of the 2001-C Bonds and the 2005-B Bonds.

H-1

We have not, however, undertaken to verify the same by independent investigation. We have assumed, but have not independently verified, that the signatures on all documents and certificates we have examined are genuine, and that the Bonds conform to the specimen Bonds that we have examined.

Based on the foregoing, we are of the opinion, as of the date hereof and under existing law as presently interpreted, as follows:

1. The Mode Change and the changes to the debt service structure and redemption provisions set forth in the Remarketing Agreement are authorized or permitted by the Ordinance and the respective Supplements and Sale Orders.

2. The interest on the Bonds (a) is excluded from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the alternative minimum tax imposed upon individuals and corporations under the Internal Revenue Code of 1986, as amended (the **Code**). It should be noted, however, that with respect to certain corporations (as defined for federal income tax purposes), such interest is taken into account in determining adjusted current earnings for the purpose of computing income subject to the alternative minimum tax imposed on such corporations. The opinion set forth in clause (a) above is subject to the condition that the City comply with all requirements of the Code that must be satisfied subsequent to the issuance of the Bonds in order that interest thereon be (or continue to be) excluded from gross income for federal income tax purposes. These requirements include rebating certain earnings to the United States. Failure to comply with certain of these requirements could cause interest on the Bonds to be included in gross income retroactive to the date of issuance of the Bonds. The City has covenanted to comply with all such requirements. We express no opinion regarding other federal tax consequences arising with respect to the Bonds.

3. The Bonds and the interest thereon are exempt from all taxation imposed by the laws of the State of Michigan, except inheritance, gift and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof.

Very truly yours,

H-2

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]



# DETROIT WATER AND SEWERAGE DEPARTMENT
## WATER TRANSMISSION SYSTEM
### FOR THE
#### SOUTHEASTERN MICHIGAN METROPOLITAN AREA
#### 2005

Printed on Recycled Paper
IMAGEMASTER 800.452.5152

# Exhibit 10



Financial Guaranty Insurance
Company
115 Broadway
New York, NY 10006
(212) 312-3000
(800) 352-0001

*A GE Capital Company*

# Municipal Bond
# New Issue Insurance Policy

**Issuer:** City of Detroit, Michigan

**Policy Number:** 01010573

**Control Number:** 0010001

**Bonds:** $192,290,000 in aggregate principal amount of Water Supply System Revenue Refunding Second Lien Bonds (Variable Rate Demand), Series 2001-C

**Premium:** $749,053.01

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to State Street Bank and Trust Company, N.A., or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                                                    Page 1 of 2

13-53846-tjt   Doc 5029-7   Filed 05/23/14   Entered 05/23/14 19:55:08   Page 111 of 121



Financial Guaranty Insurance
Company
115 Broadway
New York, NY 10006
(212) 312-3000
(800) 352-0001

*A GE Capital Company*

# Municipal Bond
# New Issue Insurance Policy

agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

*Deborah M. Reif*

**President**

*Judith J. Hart*

**Authorized Representative**

**Effective Date: June 7, 2001**

State Street Bank and Trust Company, N.A., acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)



Financial Guaranty Insurance
Company
115 Broadway
New York, NY 10006
(212) 312-3000
(800) 352-0001

*A GE Capital Company*

# Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

**Policy Number: 01010573**                     **Control Number:  0010001**

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY.  IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

*Deborah M. Reif*

**President**

**Effective Date:  June 7, 2001**

*Judith g. Starr*

**Authorized Representative**

Acknowledged as of the Effective Date written above:

**Authorized Officer**
**State Street Bank and Trust Company, N.A., as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form E-0002 (10/93)                                                                                          Page 1 of 1

# Exhibit 11



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

| | | | | |
|---|---|---|---|---|
| **Issuer:** | City of Detroit, Michigan | | **Policy Number:** | 05010189 |
| | | | **Control Number:** | 0010001 |
| **Bonds:** | $195,000,000.00 in aggregate principal amount of Water Supply System Revenue Senior Lien Bonds (Variable Rate Demand), Series 2005-B | | **Premium:** | $1,093,792.29 |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date: March 23, 2005**

**Authorized Representative**

U.S. Bank Trust National Association acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                 Page 2 of 2



**FGIC**

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

Policy Number: 05010189          Control Number:  0010001

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:  March 23, 2005                 Authorized Representative

Acknowledged as of the Effective Date written above:

Authorized Officer
U.S. Bank Trust National Association, as Fiscal Agent

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0002 (10/93)                                                      Page 1 of 1

# Exhibit 12

Financial Guaranty Insurance
Company
115 Broadway
New York, NY 10006
(212) 312-3000
(800) 352-0001

A GE Capital Company



# Municipal Bond
# New Issue Insurance Policy

**Issuer:** City of Detroit, Michigan

**Policy Number:** 01012198

**Control Number:** 0010001

**Bonds:** $139,080,000 in aggregate principal amount of Sewage Disposal System Second Lien Revenue Bonds (Variable Rate Demand), Series 2001(E)

**Premium:** $707,577.33

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to State Street Bank and Trust Company, N.A., or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a

Financial Guaranty Insurance
Company
115 Broadway
New York, NY 10006
(212) 312-3000
(800) 352-0001

A GE Capital Company



## Municipal Bond
## New Issue Insurance Policy

Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:  October 23, 2001**

**Authorized Representative**

State Street Bank and Trust Company, N.A., acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                                                     Page 2 of 2

Financial Guaranty Insurance
Company
115 Broadway
New York, NY 10006
(212) 312-3000
(800) 352-0001

A GE Capital Company



# Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

**Policy Number: 01012198**                    **Control Number: 0010001**

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

*Deborah M. Reif*

**President**

**Effective Date: October 23, 2001**

*[signature]*

**Authorized Representative**

Acknowledged as of the Effective Date written above:

*[signature]*

**Authorized Officer**
**State Street Bank and Trust Company, N.A., as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form E-0002 (10/93)                                                                Page 1 of 1