_____
                                    )
In re                               )          Case No. 13-53846
                                    )
CITY OF DETROIT, MICHIGAN,          )          In Proceedings Under
                                    )          Chapter 9
                Debtor.             )
                                    )          Hon. Steven W. Rhodes
_____)

**AMBAC ASSURANCE CORPORATION'S**
**NOTICE OF ASSERTED RIGHT TO VOTE A CLAIM**

Ambac Assurance Corporation ("Ambac"), by and through its undersigned

attorneys, and pursuant to ¶ 9(a) of the Order (I) Establishing Procedures For

Solicitation And Tabulation Of Votes To Accept Or Reject Plan Of Adjustment

And (II) Approving Notice Procedures Related To Confirmation Of The Plan Of

Adjustment [ECF No. 2984] (the "Solicitation Order") and the Fourth Amended

Order Establishing Procedures, Deadlines and Hearing Dates Relating to the

Debtor's Plan of Adjustment [ECF No. 4202] (the "Fourth Amended Scheduling

Order," and together with the Solicitation Order, the "Orders"), respectfully

submits this Notice of Right to Vote a Claim (the "Voting Notice"), and in support

hereof, states as follows:[1]

Ambac hereby asserts the exclusive right to vote on the Fourth Amended

Plan for the Adjustment of Debtors of the City of Detroit [ECF No. 4392] (the

_____

[1] All capitalized terms not defined herein have the meaning defined in the Orders.

"Plan") on certain claims in Classes 7 and 8 of the Plan (the "Ambac Bond Claims") relating to Ambac-insured bonds that are identified on the attached Exhibit 6A (the "Bonds").

Ambac files this Voting Notice and asserts the right to vote on the Plan because, among other things, it is obligated to pay for the benefit of the holders of the Bonds that portion of the scheduled principal of, and interest on, the Bonds that the City fails to pay, subject to and in accordance with the terms of Ambac's financial guaranty insurance policies covering the Bonds.

As set forth more fully in the brief in support of this Voting Notice, attached hereto as Exhibit 3, Ambac has the right to vote on the Ambac Bond Claims under the bond documents pursuant to which the City issued and holders purchased the Bonds as well as under applicable common law principles.

Therefore, Ambac seeks an order, substantially in the form attached hereto as Exhibit 1, (i) ruling that Ambac is the sole party authorized to vote the Ambac Bond Claims, and (ii) directing the City to disregard any votes submitted on the Ambac Bond Claims by any party other than Ambac.

Dated: May 23, 2014

Respectfully Submitted,
**ARENT FOX LLP**

By: /s/ Carol Connor Cohen
Carol Connor Cohen
Caroline Turner English
Randall Brater
1717 K Street, NW
Washington, DC 20036-5342
(202) 857-6054
Email: Carol.Cohen@arentfox.com

David L. Dubrow
Mark A. Angelov
1675 Broadway
New York, NY 10019
(212) 484-3900

**-**and-

**SCHAFER AND WEINER, PLLC**
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
Email: bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

## EXHIBITS

**Exhibit 1**        Proposed Order

**Exhibit 2**        Notice

**Exhibit 3**        Brief in Support

**Exhibit 4**        Certificate of Service

**Exhibit 5**        Affidavits [None]

**Exhibit 6**        Exhibits

- Exhibit 6A – Schedule of Ambac Insured Bonds

- Exhibit 6B – Sale Orders

- Exhibit 6C – Ambac Financial Guaranty Insurance Policies

**Exhibit 1**

**Proposed Order**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

In re                  )        Case No. 13-53846

                     )

CITY OF DETROIT, MICHIGAN,    )        In Proceedings Under

                     )        Chapter 9

         Debtor.         )

_____ )        Hon. Steven W. Rhodes

## ORDER AUTHORIZING AMBAC ASSURANCE CORPORATION TO VOTE CERTAIN CLASS 7 LIMITED TAX GENERAL OBLIGATION BOND CLAIMS AND CERTAIN CLASS 8 UNLIMITED TAX GENERAL <u>OBLIGATION BOND CLAIMS</u>

This matter coming before the Court on Ambac Assurance Corporation's

Notice of Asserted Right to Vote a Claim (the "Voting Notice"), filed by Ambac

Assurance Corporation ("Ambac"); and the Court being fully advised in the

premises;

IT IS HEREBY ORDERED THAT:

1.     Ambac is the sole party authorized to vote the Ambac Bond Claims,[1] as set

forth in the Voting Notice.

2.     The City shall disregard any votes submitted on the Ambac Bond Claims by

any party other than Ambac.

_____

[1] Capitalized terms used herein but not otherwise defined shall have the meanings
ascribed to them in the Voting Notice.

**Exhibit 2**

**Notice**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

———————————————————————  )
                                                      )
In re                                              )          Case No. 13-53846
                                                      )
CITY OF DETROIT, MICHIGAN,         )          In Proceedings Under
                                                      )          Chapter 9
                        Debtor.                   )
———————————————————————  )          Hon. Steven W. Rhodes

## <u>NOTICE AND OPPORTUNITY TO OBJECT</u>

Ambac Assurance Corporation ("Ambac"), by and through its respective

undersigned attorneys, has filed its Notice of Right to Vote Claim (the "Voting

Notice") and pursuant to ¶ 9(a) of the Order (I) Establishing Procedures For

Solicitation And Tabulation Of Votes To Accept Or Reject Plan Of Adjustment

And (II) Approving Notice Procedures Related To Confirmation Of The Plan Of

Adjustment [ECF No. 2984] (the "Solicitation Order") and the Fourth Amended

Order Establishing Procedures, Deadlines and Hearing Dates Relating to the

Debtor's Plan of Adjustment [ECF No. 4202] (the "Fourth Amended Scheduling

Order," and together with the Solicitation Order, the "Orders").

**<u>Your rights may be affected.</u>  You should read these papers carefully**

**and discuss them with your attorney, if you have one in this bankruptcy case.**

**(If you do not have an attorney, you may wish to consult one.)**

Pursuant to ¶ 9(c) of the Solicitation Procedures Order, any holder affected by the Voting Notice, or any representative thereof, are permitted to file and serve on the ECF noticing list a brief in response ("Response") to the Voting Notice.

All Responses must be filed with the Court on or before **June 24, 2014** at:

United States Bankruptcy Court
Eastern District of Michigan
211 W. Fort Street, Suite 2100
Detroit, MI 48226

If you mail your Response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

If a Response is timely filed and served, a hearing on the Voting Notice will be held on **July 14, 2014** at which the Court shall hear and determine any disputes arising in connection with the Voting Notice.

**If you or your attorney do not take these steps, the Court will grant the relief sought in the Voting Notice.**

Dated: May 23, 2014

Respectfully Submitted,
**ARENT FOX LLP**

By: /s/ Carol Connor Cohen
Carol Connor Cohen
Caroline Turner English
Randall Brater
1717 K Street, NW
Washington, DC 20036-5342
(202) 857-6054
Email: Carol.Cohen@arentfox.com

Exhibit 2-2

David L. Dubrow
Mark A. Angelov
1675 Broadway
New York, NY 10019
(212) 484-3900

**-**and-

**SCHAFER AND WEINER, PLLC**
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
Email:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

**Exhibit 3**

**Brief**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re | ) | Case No. 13-53846 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | In Proceedings Under |
| | ) | Chapter 9 |
| Debtor. | ) | |
| _____ | ) | Hon. Steven W. Rhodes |

## AMBAC ASSURANCE CORPORATION'S BRIEF IN SUPPORT OF ITS NOTICE OF ASSERTED RIGHT TO VOTE A CLAIM

Ambac Assurance Corporation ("Ambac"), a creditor and party in interest

that insures Unlimited Tax General Obligation ("UTGO") bonds and Limited Tax

General Obligation ("LTGO") bonds issued by the City of Detroit (the "City"),

files this brief in support of its Notice of Asserted Right to Vote a Claim ("Voting

Notice") pursuant to the Court's Order (I) Establishing Procedures for Solicitation

and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II)

Approving Notice Procedures Related to Confirmation of the Plan of Adjustment

[ECF No. 2984] (the "Solicitation Order") and Fourth Amended Order

Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's

Plan of Adjustment [ECF No. 4202].

## PRELIMINARY STATEMENT

On March 11, 2014, this Court issued the Solicitation Order. Under the Solicitation Order, parties who wish to assert their right to vote on the Plan of Adjustment (the "Plan") must file a Notice of Asserted Right to Vote and a brief in support.

Pursuant to the Solicitation Order, Ambac asserts that it has the exclusive right to vote on the claims in Classes 7 and 8 of the Plan relating to Ambac-insured bonds that are identified on the attached Exhibit 6A. No election is available for Classes 7 and 8, and accordingly, Ambac makes no assertion regarding an election. The legal and factual support for Ambac's right to vote is detailed below.

Ambac has the sole right to vote on the Plan with respect to the Ambac-insured bonds. The bond documents pursuant to which the City issued and holders purchased the Ambac-insured bonds explicitly provide that Ambac has the exclusive right to vote, control all remedies, and exercise consent rights on behalf of every Ambac-insured bondholder. In addition, as the insurer of the bonds, Ambac is entitled to take all reasonable actions to mitigate its losses, and that necessarily includes exercising voting rights with respect to the Plan by which its recovery – and its corresponding losses – will be determined. For these reasons, Ambac, rather than the holders of bonds that Ambac insures, has the right to vote on the Plan with respect to the Ambac-insured bonds.

## STATEMENT OF FACTS

Ambac insures certain UTGO and LTGO bonds issued by the City. The bond documents pursuant to which the bonds were issued and sold to public include the 2004 Unlimited Tax Sale Order (the 2004 UTGO Sale Order), the 2004 Limited Tax Sale Order (the 2004 LTGO Sale Order), and the 2005 Limited Tax Sale Order (the "2005 LTGO Sale Order," and collectively, the "Sale Orders") (attached hereto as Exhibit 6B).[1]

Ambac issued Financial Guaranty Insurance Policy numbers 22980BE and 22981BE, each effective September 9, 2004, insuring the City's payment obligations under the 2004 UTGO Bonds and the 2004 LTGO Bonds, respectively. It issued Financial Guaranty Insurance Policy number 24218BE, effective June 29, 2005, insuring the City's payment obligations under the 2005 LTGO Bonds (together with Policy numbers 22980BE and 22981BE, the "Ambac Policies" or the "Policies," attached hereto as Exhibit 6C). Pursuant to the terms of the Policies, in the event and to the extent the City does not pay, Ambac is obligated to

---

[1] Pursuant to the 2004 UTGO Sale Order, Ambac insures General Obligation Bonds (Unlimited Tax) Series 2004-A(1), General Obligation Bonds (Unlimited Tax) Series 2004-B(1), and General Obligation Bonds (Unlimited Tax) Series 2004-B(2) (collectively, the "2004 UGTO Bonds"); pursuant to the 2004 LTGO Sale Order, Ambac insures General Obligation Bonds (Limited Tax) Series 2004 (the "2004 LTGO Bonds"); and pursuant to the 2005 LTGO Sale Order, Ambac insures General Obligation Bonds (Limited Tax) Series 2005-A(1); General Obligation Bonds (Limited Tax) Series 2005-A(2); and General Obligation Bonds (Limited Tax) Series 2005-B (collectively the "2005 LTGO Bonds").

pay the holders of Ambac-insured UTGO and LTGO bonds the full scheduled principal of and interest on the Ambac-insured bonds.

On October 1, 2013, the City defaulted on its obligation to make interest payments on the UTGO bonds insured by Ambac in the amount of $1,994,281. On that same date, the City also defaulted on its obligation to make interest payments on the LTGO bonds insured by Ambac in the amount of $2,266,586. On April 1, 2014, the City defaulted on its obligation to make principal and interest payments on the UTGO bonds insured by Ambac in the amount of $10,419,281. Also on April 1, 2014, the City defaulted on its obligation to make principal and interest payments on the LTGO bonds insured by Ambac in the amount of $20,686,586. Thus, Ambac has to date made payments to holders of the UTGO bonds in the total amount of $12,413,563, and to the LTGO bonds in the total amount of $22,953,172, all as a result of the City's defaults.

The Sale Orders vest Ambac with the right to vote on a plan on behalf of *all* of the bondholders who hold Ambac-insured bonds, the right to control and direct the enforcement of *all* of the UTGO and LTGO bondholders' rights and remedies in the event of a default, and the right to consent on behalf of all of the bondholders without regard to the existence of a default. *See* 2004 UTGO Sale Order, Ex. B § II(B)-(D), at B-1–2; 2004 LTGO Sale Order, Ex. A § II(B)-(D), at A-1–2; 2005 LTGO Sale Order, Ex. B § II(B)-(D), at B-1–2.

In furtherance of Ambac's rights under the Sale Orders and related documents, Ambac timely filed fourteen (14) proofs of claim [Claim Nos. 1050, 1060, 1076, 1083, 1089, 1106, 1110, 1118, 1119, 1121, 1122, 1134, 1147 and 1149] asserting claims against the City for the full amount of principal and interest due under the applicable bond documents.

## ARGUMENT

**I.    The Sale Orders Vest Ambac with the Right to Vote and Control Remedies on Behalf of All of the Holders of Ambac-Insured Bonds.**

The Sale Orders plainly and unequivocally provide Ambac with the right to vote on the Plan to the exclusion of the holders of Ambac-insured bonds.  Each Sale Order provides:

> *Any reorganization or liquidation plan with respect to the City must be acceptable to Ambac Assurance.  In the event of any reorganization or liquidation, Ambac Assurance shall have the right to vote **on behalf of all Bondholders who hold Ambac Assurance-insured Bonds** absent a default by Ambac Assurance under the applicable Financial Guaranty Insurance Policy insuring such bonds.*

2004 UTGO Sale Order, Ex. B § II(C), at B-2 (emphasis added); 2004 LTGO Sale Order, Ex. A § II(C), at A-2 (same); 2005 LTGO Sale Order, Ex. B § II(C), at B-2 (same).  This language makes clear that Ambac has the right to vote on the Plan on behalf of all of the bonds it insures.

Moreover, where the City has defaulted and continues to be in default on its obligations to pay debt service on the UTGO and LTGO bonds as it comes due,

Ambac has the exclusive right to enforce all remedies on behalf of the bondholders:

> [U]pon the occurrence and continuance of an event of default, Ambac Assurance shall be entitled to **control and direct the enforcement of all rights and remedies granted to the Bondholders** for the benefit of the Bondholders under the Financing Document pursuant to state law.

2004 UTGO Sale Order, Ex. B § II(D), at B-2 (emphasis added); 2004 LTGO Sale Order, Ex. A § II(D), at A-2 (same); 2005 LTGO Sale Order, Ex. B § II(D), at B-2 (same). And even absent a default by the City, the Sale Orders vest Ambac with the right to consent in lieu of bondholders whenever bondholder consent is required. *See* 2004 UTGO Sale Order, Ex. B § II(B) at B-1; 2004 LTGO Sale Order, Ex. A § II(B), at A-1; 2005 LTGO Sale Order, Ex. B § II(B), at B-1.

Taken together, these provisions vest in Ambac the exclusive right to (1) vote on the Plan on behalf of all holders of Ambac-insured bonds; (2) control and direct the enforcement of all rights and remedies granted to the bondholders while the City remains in default of its obligations to pay the bonds; and (3) provide consent in lieu of bondholder consent.

All of these provisions are applicable here and vest Ambac with the exclusive right to vote on the Plan. The City filed for bankruptcy on July 18, 2013 and remains a debtor, and the City defaulted on the bonds by failing to make payments in October 2013 and again in April 2014. Ambac has not defaulted under the applicable insurance policies. As such, Ambac, and not individual

bondholders, is entitled to vote on the Plan under the express terms of the Sale

Orders.

## II. Ambac Has the Common Law Right to Exercise All Remedies with Respect to the Insured Bonds.

In addition to the unequivocal language from the Sale Orders vesting in

Ambac the right to vote on the Plan in lieu of the bondholders, common law

principles mandate the same result.[2]  As an insurer, Ambac is entitled to take all

reasonable measures to protect itself against losses, and this necessarily includes

voting on the Plan by which these losses will be determined.

The bondholders have a duty to mitigate their insured losses.  *See, e.g.*, *Bak*

*v. Citizens Ins. Co. of Am.*, 503 N.W.2d 94, 96 (Mich. 1993) (plaintiff insured is

responsible for minimizing losses); *see also* 11 Couch on Ins. § 168:9 ("[I]t is the

duty of insureds to do all that they reasonably can to minimize the loss; in essence,

mitigation is a duty the insured performs for the insurer's benefit.").  By the same

token, any subrogee such as an insurer or a surety has the right to take all

_____

[2] It should be noted that while the Ambac Policies were written in New York and delivered in Michigan, the laws of New York and Michigan do not differ as to the relevant legal principles, and therefore, the court need not perform a choice of law analysis.  *See, e.g.*, *Carbonic Prod. Co. v. Welding & Cutting Supply Co., Subsidiary of Union Carbide*, 823 F.2d 553, *2 (6th Cir. 1987) ("[C]onflict-of-laws rules 'are appealed to only when a difference in law will make a difference to the outcome.'"); *French v. Essentially Ours Indus., Inc.*, No. 07-817, 2008 WL 2788511, at *6 (W.D. Mich. July 16, 2008) ("A choice of law analysis is unnecessary where there is no actual conflict because 'there can be no injury' in applying a particular state's law absent a true conflict." (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985)).

reasonable actions that may help mitigate its losses. *See In re Air Crash Disaster*, 86 F.3d 498, 449-51(6th Cir. 1996) (applying Michigan law to hold that subrogee properly mitigated its damages by settling with tort plaintiffs without subrogor's approval and for amounts higher than subrogor claimed to be appropriate); *Fid. & Deposit Co. of Maryland v. Westra Const., Inc.,* No. 08-1219, 2010 WL 1904524, at *4 (M.D. Pa. May 10, 2010) , 2010 WL 1904524, at *4 (M.D. Pa. May 10, 2010) (noting that a surety that assumes responsibility for the debt of its principal, "may extinguish a financial demand in order to protect [its] own rights and to avoid costly litigation"); *see also WBP Cent. Assoc., LLC v. DeCola*, 937 N.Y.S.2d 306, 309 (2d Dep't 2012) (surety performing its duties under performance bond deemed to have acted reasonably in settling lawsuit against principal for an amount less than the total claimed damages); *In re Dow Corning*, 250 B.R. 298, 329 (Bankr. E.D. Mich. 2000) (subrogee is the "real party in interest with an *independent* right to pursue the claim").

The necessary corollary to the foregoing principles is that an insured may not prejudice the insurer's rights by exercising or electing its own remedies to the insurer's detriment. *See, e.g.*, *Howarth v. Druggists Mut. Ins. Co.*, 485 F.2d 34, 37 (8th Cir. 1973) (insured could not prejudice insurer's subrogation rights by settling the underlying suit before insurer was subrogated); *Stolaruk Corp. v. Central Nat. Ins. Co. of Omaha*, 522 N.W.2d 670, 671 (Mich. Ct. App. 1994) (same); *Poynter v.*

*Aetna Cas. & Sur. Co.*, 163 N.W.2d 716, 718 (Mich. Ct. App. 1968) (same).

Taken together, these principles vest in Ambac the exclusive right to vote to the full extent it insures the UTGO and LTGO bonds. The bondholders have a duty to mitigate their losses insured by Ambac by deferring to Ambac's vote on the Plan. *Bak*, 503 N.W.2d at 97 (insured "must make every reasonable effort to minimize damages"). Since Ambac is or will be the real party in interest, it has the corresponding right to vote on the Plan in a manner that reasonably mitigates its losses. *See Dow Corning*, 250 B.R. at 328-29 (subrogor cannot defeat the subrogation claim of the subrogee). Finally, the holders of Ambac-insured Bonds may not take any action to prejudice Ambac's rights, *see Howarth* , 485 F.2d at 37 (by settling with third party tortfeasor, insured lost right to proceed against insurer); *Stolaruk Corp.*, 522 N.W.2d at 671-72 (insured barred from seeking insurance coverage after agreeing to consent judgment to which insurer was not a party); *Poynter*, 163 N.W.2d at 718 (insurer not liable under policy where insured independently accepted settlement from tortfeasor without reserving insurer's subrogation rights), and accordingly, may not interfere with Ambac's right to vote on the Plan.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should hold that Ambac has the exclusive right to vote all claims relating to the Bonds and direct the City to accept

Ambac's votes on the Plan on account of claims listed in Exhibit 6A to the Voting

Notice, to the exclusion of all other creditors, if any, asserting or voting the same

claims.

Dated:  May 23, 2014              Respectfully Submitted,

**ARENT FOX LLP**

By:  /s/ Carol Connor Cohen
Carol Connor Cohen
Caroline Turner English
Randall Brater
1717 K Street, NW
Washington, DC  20036-5342
(202) 857-6054
Email:  Carol.Cohen@arentfox.com

David L. Dubrow
Mark A. Angelov
1675 Broadway
New York, NY 10019
(212) 484-3900

**-**and-

**SCHAFER AND WEINER, PLLC**
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
Email:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

**Exhibit 4**

**Certificate of Service**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| In re | ) | Case No. 13-53846 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | In Proceedings Under |
| | ) | Chapter 9 |
| Debtor. | ) | |
| _____ | ) | Hon. Steven W. Rhodes |

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2014, Ambac Assurance Corporation's Notice of Asserted Right to Vote a Claim and Brief in Support were filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

Respectfully Submitted,

**ARENT FOX LLP**

Dated: May 23, 2014          By: /s/ Carol Connor Cohen
                                          CAROL CONNOR COHEN
                                          CAROLINE TURNER ENGLISH
                                          RANDALL BRATER
                                          1717 K Street, NW
                                          Washington, DC 20036-5342
                                          (202) 857-6054
                                          Carol.Cohen@arentfox.com

                                          DAVID L. DUBROW
                                          MARK A. ANGELOV
                                          1675 Broadway
                                          New York, NY 10019
                                          (212) 484-3900

and

**SCHAFER AND WEINER, PLLC**

DANIEL J. WEINER (P32010)
BRENDAN G. BEST (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
bbest@schaferandweiner.com

*Counsel for Ambac Assurance Corporation*

**Exhibit 5**

**Affidavits [None]**

**Exhibit 6**

**Exhibits**

## Exhibit 6A

## Ambac-Insured Unlimited Tax General Obligation Bonds

| Policy No. | Claim Nos. | CUSIPs | Description | Amount of Principal Being Voted | Amount of Interest Being Voted | Total Amount Being Voted |
|---|---|---|---|---|---|---|
| 22980BE | 1060 | 251093YX2<br>251093YY0<br>251093YZ7<br>251093ZA1<br>251093ZB9<br>251093ZC7<br>251093ZD5<br>251093ZE3<br>251093ZF0 | DETROIT-SER A | $39,872,258 | $17,801,000 | $57,673,258 |
| 22980BE | 1083 | 251093ZM5<br>251093ZN3<br>251093ZP8<br>251093ZQ6<br>251093ZR4<br>251093ZS2<br>251093ZT0 | DETROIT-REF-B1 | $38,206,678 | $5,223,000 | $43,429,678 |
| 22980BE | 1106 | 251093ZX1 | DETROIT-REF-TXB-B2 | $736,241 | $108,000 | $844,241 |
| | | | **Total:** | $78,815,177 | $23,240,000 | $102,055,177 |

## Ambac-Insured Limited Tax General Obligation Bonds

| Policy No. | Claim Nos. | CUSIPs | Description | Amount of Principal Being Voted | Amount of Interest Being Voted | Total Amount Being Voted |
|---|---|---|---|---|---|---|
| 22981BE | 1149 | 251093A59 | DETROIT-TXB-SELF INS | $13,186,559 | $631,000 | $13,817,559 |
| 24218BE | 1118 | 251093B25'<br>251093B33<br>251093B41<br>251093B58<br>251093B66 | DETROIT TXB-IMPT-A-1 | $60,766,168 | $21,518,000 | $82,284,168 |
| 24218BE | 1121 | 251093C32<br>251093C40<br>251093C57<br>251093C65<br>251093C73<br>251093C81<br>251093C99<br>251093D23<br>251093D31<br>251093D49<br>251093D56<br>251093D64 | DETROIT IMPT-A-2 | $11,080,060 | $3,601,000 | $14,681,060 |
| 24218BE | 1134 | 251093E71<br>251093E89<br>251093E97<br>251093F21<br>251093F39<br>251093F47<br>251093F54<br>251093F62 | DETROIT REF-IMPT-B | $9,003,535 | $2,095,000 | $11,098,535 |
| | | | Total: | $94,036,322 | $27,845,000 | $121,881,322 |

# 6B

6-B

CITY OF DETROIT
FINANCE DIRECTOR'S ORDER APPROVING SALE OF
GENERAL OBLIGATION BONDS (UNLIMITED TAX),
SERIES 2004-A(1)

GENERAL OBLIGATION BONDS (UNLIMITED TAX),
SERIES 2004-A(2)

GENERAL OBLIGATION REFUNDING BONDS (UNLIMITED TAX),
SERIES 2004-B(1)

AND

GENERAL OBLIGATION REFUNDING BONDS (UNLIMITED TAX),
SERIES 2004-B(2)

August 27, 2004

WHEREAS, pursuant to a resolution adopted by the City Council of the City of Detroit, Michigan (the "City") on June 14, 2004 (the "Bond Resolution"), the City authorized the issuance of its General Obligation Bonds (Unlimited Tax), Series 2004-A in the aggregate principal amount of not to exceed $45,000,000, for the purpose of financing all or portions of the costs of certain capital public improvement projects as more particularly described in the Bond Resolution (collectively, the "Projects"), and paying the costs of issuance of the Series 2004-A Bonds, and its General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B in the aggregate principal amount of not to exceed $75,000,000 for the purpose of refunding certain of the City's outstanding General Obligation Bonds (Unlimited Tax); and

WHEREAS, in accordance with the Bond Resolution, the Finance Director of the City (the "Finance Director") filed an application with the Michigan Department of Treasury for an Order of Approval to issue the General Obligation Bonds (Unlimited Tax), Series 2004-A in the aggregate principal amount of not to exceed $45,000,000 and the General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B in the aggregate principal amount of not to exceed $75,000,000 (the "Order of Approval"), and on August 11, 2004, the Order of Approval was issued by the Michigan Department of Treasury; and

WHEREAS, the Bond Resolution provides, among other things, that the Bonds shall be sold to the underwriter or underwriters (the "Underwriters"), who shall be represented by such Underwriter or Underwriters selected by the Finance Director of the City (the "Representative") as confirmed in an order of the Finance Director executed at the time of sale of the Bonds and pursuant to a bond purchase agreement (the "Bond Purchase Agreement") to be entered into by the Representative on behalf of the Underwriters and the City, and to be approved and executed by the Finance Director; and authorizes the Finance Director (i) to determine the principal amounts of the Bonds to be issued on a fixed or variable interest rate

basis and tax exempt or taxable basis; (ii) to determine the interest rate provisions, tender and other requirements for Bonds issued on a variable rate basis; (iii) to determine and allocate the amount of proceeds of the Bonds to the various Projects; (iv) to negotiate the terms for the sale of the Bonds with the Representative; (v) to cause the Preliminary Official Statement and the final Official Statement for the Bonds to be prepared and circulated; (vi) to negotiate the terms for a letter of credit or other credit enhancement to secure payment of all or a portion of the Bonds; (vii) to negotiate the terms of a remarketing agreement, auction agent agreement, broker-dealer agreement or such other agreements as may be necessary to accomplish the sale and delivery of the Bonds as determined by the Finance Director within the parameters of the Resolution, (viii) to negotiate Interest Rate Exchange Agreements with the provider or providers thereof, if economically desirable, in connection with any Bonds issued on a variable or fixed rate basis or the Other Outstanding Bonds; and (ix) to take such other actions and make such other determinations not inconsistent with the Bond Resolution as the Finance Director determines to be necessary or appropriate in connection with the sale of the Bonds as shall be set forth in an order of the Finance Director executed at the time of sale of the Bonds; and

WHEREAS, the Finance Director has determined that the Series 2004-A Bonds authorized to be issued to finance all or a portion of the costs of the Projects, be issued as both taxable and tax-exempt Bonds in two separate sub-series: (a) the tax-exempt sub-series to be designated General Obligation Bonds (Unlimited Tax), Series 2004-A(1) and (b) the taxable sub-series to be designated General Obligation Bonds (Unlimited Tax), Series 2004-A(2) in an aggregate principal amount of not to exceed $45,000,000; and that the Series 2003-B Bonds authorized to be issued to refund all or a portion of the Outstanding Prior Bonds, be issued as both taxable and tax-exempt Bonds in two separate sub-series: (a) the tax-exempt sub-series to be designated General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B(1) and (b) the taxable sub-series to be designated General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B(2) in an aggregate principal amount of not to exceed $75,000,000, all as authorized by Section 302 of the Bond Resolution; and

WHEREAS, the City has received an offer for the purchase of the Bonds from the Underwriters designated herein, in the amounts, and with the prices to the City, interest rates and other terms, all as more particularly set forth herein and in the Bond Purchase Agreement.

WHEREAS, pursuant to the terms of the Bond Resolution the City intends to obtain a policy of municipal bond insurance to insure payment of the principal of and interest on the Bonds when due; and

WHEREAS, pursuant to the Bond Resolution, the City Council authorized the preparation of a Preliminary Official Statement (the "Preliminary Official Statement") for distribution to prospective purchasers of the Bonds and authorized the Finance Director of the City to ratify the prior distribution of the Preliminary Official Statement and execute and deliver a final Official Statement in connection with the sale of the Bonds.

NOW, THEREFORE, BE IT ORDERED ON BEHALF OF THE CITY OF DETROIT, MICHIGAN, AS FOLLOWS:

# ARTICLE I
## AUTHORITY AND DEFINITIONS

Section 101. <u>Authority</u>. This Finance Director's Order Approving Sale of General Obligation Bonds (Unlimited Tax), Series 2004-A(1), General Obligation Bonds (Unlimited Tax), Series 2004-A(2), General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B(1) and General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B(2) (hereinafter referred to as the "Sale Order" or the "Order") is issued in accordance with the provisions of the Bond Resolution.

Section 102. <u>Definitions</u>. All terms which are defined in the Bond Resolution shall have the same meanings in this Sale Order and Exhibit A hereto, except as otherwise specifically provided herein.

# ARTICLE II
## TERMS OF THE BONDS

Section 201. <u>Designation of Series and Principal Amounts</u>. A. The Series 2004-A Bonds shall be issuable in two sub-series designated the "GENERAL OBLIGATION BONDS (UNLIMITED TAX), SERIES 2004-A(1)" (hereinafter referred to as the "General Obligation Bonds (Unlimited Tax), Series 2004-A(1)" or the "Series 2004-A(1) Bonds") and the "GENERAL OBLIGATION BONDS (UNLIMITED TAX) SERIES 2004-A(2)" (hereinafter referred to as the "General Obligation Bonds (Unlimited Tax), Series 2004-A(2)" or the "Series 2004-A(2) Bonds"), as authorized by Sections 301 and 302 of the Bond Resolution. The Series 2004-A(1) Bonds shall be issued in the aggregate principal amount of $39,270,000.00 and are intended at the time of issuance to be tax-exempt obligations described in Section 103(a) of the Code. The Series 2004-A(2) Bonds shall be issued in the aggregate principal amount of $2,055,000.00 and are intended at the time of issuance to be taxable obligations.

B. The Series 2004-B Bonds shall be issuable in two sub-series designated the "GENERAL OBLIGATION REFUNDING BONDS (UNLIMITED TAX), SERIES 2004-B(1)" (hereinafter referred to as the "General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B(1)" or the "Series 2004-B(1) Bonds") and the "GENERAL OBLIGATION REFUNDING BONDS (UNLIMITED TAX) SERIES 2004-B(2)" (hereinafter referred to as the "General Obligation Refunding Bonds (Unlimited Tax), Series 2004-B(2)" or the "Series 2004-B(2) Bonds"), as authorized by Sections 301 and 302 of the Bond Resolution. The Series 2004-B(1) Bonds shall be issued in the aggregate principal amount of $53,085,000.00 and are intended at the time of issuance to be tax-exempt obligations described in Section 103(a) of the Code. The Series 2004-B(2) Bonds shall be issued in the aggregate principal amount of $17,270,000.00 and are intended at the time of issuance to be taxable obligations.

The Series 2004-A(1) Bonds and the Series 2004-B(1) Bonds are collectively referred to hereinafter as the "Tax-Exempt Bonds." The Series 2004-A(2) Bonds and the Series 2004-B(2) Bonds are collectively referred to hereinafter as the "Taxable Bonds." The Tax-Exempt Bonds and the Taxable Bonds are collectively referred to hereinafter as the "Bonds."

Section 202. Interest Rates, Principal Amounts and Maturity Dates. The Bonds shall be dated as of their date of delivery. The Bonds shall be issued as serial bonds and term bonds which shall mature on the following dates and in the principal amounts and shall initially be sold at the prices or yields as set forth below and shall bear interest at the rates set forth below from their date of delivery to maturity, such interest to be payable semi-annually on April 1, and October 1 of each year, commencing on April 1, 2005. Interest with respect to the Bonds shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. Certain Bonds shall be subject to redemption prior to maturity as set forth in Section 203 hereof.

## Series 2004-A(1) Bonds

The Series 2004-A(1) Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2019 | $4,500,000 | 5.250 | 4.160 | 108.523 |
| 2020 | 185,000 | 4.250 | 4.300 | 99.434 |
| 2020 | 6,085,000 | 5.250 | 4.240 | 107.868 |
| 2021 | 6,600,000 | 5.000 | 4.440 | 104.321 |
| 2022 | 6,930,000 | 5.250 | 4.400 | 106.572 |
| 2023 | 375,000 | 4.500 | 4.560 | 99.251 |
| 2023 | 6,920,000 | 5.250 | 4.460 | 106.091 |
| 2024 | 785,000 | 4.600 | 4.640 | 99.486 |
| 2024 | 6,890,000 | 5.250 | 4.530 | 105.533 |

## Series 2004-A(2) Bonds

The Series 2004-A(2) Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2012 | $2,055,000 | 4.570 | 4.570 | 100.000 |

## Series 2004-B(1) Bonds

The Series 2004-B(1) Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2012 | $1,900,000 | 3.750 | 3.510 | 101.579 |
| 2012 | 5,645,000 | 5.000 | 3.510 | 109.817 |
| 2013 | 1,595,000 | 3.750 | 3.670 | 100.581 |
| 2013 | 6,305,000 | 5.000 | 3.670 | 109.693 |
| 2014 | 1,475,000 | 4.000 | 3.780 | 101.749 |
| 2014 | 6,800,000 | 5.000 | 3.780 | 109.710 |
| 2015 | 8,675,000 | 5.000 | 3.890 | 108.789 |
| 2016 | 9,105,000 | 5.250 | 3.970 | 110.098 |
| 2017 | 305,000 | 4.000 | 4.050 | 99.509 |
| 2017 | 9,280,000 | 5.250 | 4.030 | 109.598 |
| 2018 | 2,000,000 | 5.250 | 4.100 | 109.018 |

## Series 2004-B(2) Bonds

The Series 2004-B(2) Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2009 | $2,000,000 | 3.920 | 3.920 | 100.000 |
| 2010 | 4,520,000 | 4.160 | 4.160 | 100.000 |
| 2011 | 9,750,000 | 4.390 | 4.390 | 100.000 |
| 2018* | 1,000,000 | 5.240 | 5.240 | 100.000 |

*Term Bond

Section 203.   Redemption of Bonds.

    (a)    Optional Redemption of Bonds.

The Series 2004-A(1) Bonds and the Series 2004-B(1) Bonds or portions thereof in multiples of $5,000, maturing on or after April 1, 2015, may be redeemed prior to their stated maturity, at the option of the City, in whole, or in part in any order of maturity determined by the City (and by lot within a single maturity) on any date permitted by law on or after April 1, 2014 at a redemption price of par plus accrued interest to the date fixed for redemption.

The Series 2004-A(2) Bonds and the Series 2004-B(2) Bonds are not subject to optional redemption prior to maturity.

(b)    Mandatory Sinking Fund Redemption of the Series 2004-B(2) Bonds. The Series 2004-B(2) Bonds designated term bonds shall be subject to mandatory redemption in part by the City, by lot, prior to their scheduled maturity from monies on deposit in the Sinking Fund accounts established under the Bond Resolution, on April 1 of each of the years and in the principal amounts set forth below, at the redemption price of 100% of the principal amount of Series 2004-B(2) Bonds to be so redeemed plus accrued interest to the date fixed for redemption:

$1,000,000 Series 2004-B(2) Bonds
Maturing April 1, 2018

| Redemption Date April 1 | Principal Amount |
|---|---|
| 2012 | $ 135,000 |
| 2013 | 140,000 |
| 2014 | 150,000 |
| 2015 | 155,000 |
| 2016 | 165,000 |
| 2017 | 170,000 |
| 2018 (final maturity) | 85,000 |

(c)    Notice of Redemption and Manner of Selection of Bonds.

Notice of redemption of any Bond will be given at least 30 days prior to the date fixed for redemption by mail to the registered owner or owners at the registered addresses shown on the registration books kept by the Bond Registrar and Paying Agent. The failure to receive any such mailed notice, if mailed, or any defect in such mailed notice, will not affect the validity of the redemption. So long as Cede & Co., as nominee of DTC, is the registered owner of the Bonds, all notices of redemption will be sent only to Cede & Co. Bonds will be called for redemption in multiples of $5,000 and Bonds of denominations of more than $5,000 will be treated as representing the number of Bonds obtained by dividing the denomination of the Bond by $5,000 and such Bonds may be redeemed in part. The notice of redemption for Bonds redeemed in part will state that upon surrender of the Bond to be redeemed a new Bond or Bonds in aggregate principal amount equal to the unredeemed portion of the Bond surrendered will be issued to the registered owner thereof. No further interest on the Bonds or portions of the Bonds called for redemption will accrue after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Bond Registrar and Paying Agent to redeem the same.

In case less than the full amount of an outstanding Bond is called for redemption, the Bond Registrar and Paying Agent upon presentation of the Bonds called in part for redemption will register, authenticate and deliver to the registered owners a new Bond in the principal amount of the portion of the original Bond not called for redemption.

## ARTICLE III
## APPROVAL OF AGREEMENTS

Section 301.    Approval of Underwriters and the Bond Purchase Agreement.    The Bonds shall be sold to J.P. Morgan Securities Inc. and Oppenheimer & Co. Inc., as representatives of the Underwriters including J.P. Morgan Securities Inc., Oppenheimer & Co. Inc., A.G. Edwards & Sons, Inc., Loop Capital Markets, LLC, Comerica Securities, Merrill Lynch & Co., Siebert Brandford Shank & Co., LLC.  The Bond Purchase Agreement between the City and the Underwriters, dated August 27, 2004, relating to the Bonds, in substantially the form presented on this date to the Finance Director and the purchase prices, discounts and premiums for the Bonds, as set forth therein are hereby approved, with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of such Bond Purchase Agreement.

Section 302.    Approval of Preliminary Official Statement and Official Statement. The Preliminary Official Statement relating to the Bonds dated August 18, 2004, and its use by the Underwriters is hereby approved and confirmed.  The form of the Official Statement dated August 27, 2004, relating to the Bonds is hereby approved with such further changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Official Statement.

Section 303.    Approval of Escrow Agreement. The Escrow Agreement relating to the Series 2004-B(1) Bonds and the Escrow Agreement relating to the Series 2004-B(2) Bonds, each between the City and the Escrow Agent (as defined below) and dated the date of delivery, are hereby authorized and approved with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Escrow Agreement.

Section 304.    Approval of Disclosure Dissemination Agent Agreement.    The appointment of Digital Assurance Certification, L.L.C as Disclosure Dissemination Agent (the "DDA") of the City in order to provide certain continuing disclosure with respect to the Bonds in accordance with Rule 15c2-12 of the United States Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time (the "Rule") is hereby authorized and approved.  The Disclosure Dissemination Agent Agreement (the "Disclosure Agreement"), dated as of September 9, 2004, between the City and the DDA is hereby authorized and approved with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Disclosure Agreement.

## ARTICLE IV
## BOND REGISTRAR, PAYING AGENT AND ESCROW AGENT

Section 401. <u>Bond Registrar and Paying Agent</u>. U.S. Bank National Association, Detroit, Michigan, is hereby appointed as bond registrar, transfer agent and paying agent for the Bonds (the "Bond Registrar," "Transfer Agent" and "Paying Agent"). The Bond Registrar, Transfer Agent and Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereunder and under the Bond Resolution by a written instrument of acceptance delivered to the City on the date of delivery of the Bonds.

Section 402. <u>Escrow Agent</u>. U.S. Bank National Association, Detroit, Michigan, is hereby appointed as Escrow Agent (the "Escrow Agent") in connection with the Bonds to Be Refunded.

## ARTICLE V
## BOND INSURANCE

Section 501. <u>Acceptance of Commitment</u>. The Commitment of Ambac Assurance Corporation (the "Insurer") to provide a municipal bond insurance policy (the "Policy") to secure payment of all of the Bonds, on the terms and conditions specified in the Commitment, is hereby accepted.

Section 502. <u>Additional Terms Under the Policy</u>. The additional terms and requirements of the Insurer as set forth in Exhibit B hereto, are hereby accepted and incorporated by reference in this Sale Order. Capitalized terms used in Exhibit B and not defined in the Bond Resolution shall have the meanings assigned thereto in the Policy.

## ARTICLE VI
## OTHER PROVISIONS OF GENERAL APPLICATION
## UPON ISSUANCE OF BONDS

Section 601. <u>Establishment of Sub Accounts and Funds</u>. Pursuant to Section 501 of the Bond Resolution, there are hereby designated and established with the Paying Agent the following separate and segregated subaccounts and funds:

(a)     For the Series 2004-A(1) Bonds:

1.      The "SERIES 2004-A CONSTRUCTION FUND A(1) SUBACCOUNT" in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2004-A(1) Bonds required by Sections 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2004-A(1) Bonds to pay the costs of the Projects set forth in Section 603 below. Upon the payment of all costs of the Projects, any balance in the Series 2004-A Construction Fund A(1) Subaccount shall be transferred to the Debt Retirement Fund or used in any manner permitted by law and which will not cause the interest on the Series 2004-A(1) Bonds to become includible in gross income for federal income tax purposes.

(b)     For the Series 2004-A(2) Bonds:

1.     The "SERIES 2004-A CONSTRUCTION FUND A(2) SUBACCOUNT," in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2004-A(2) Bonds required by Sections 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2004-A(2) Bonds to pay the costs of the Projects categorized as Neighborhood/Economic Development Project in Section 603 hereof (the "Brush Park Project"). Upon the payment of all costs of the Brush Park Project, any balance in the Series 2004 Construction Fund A(2) Subaccount shall be transferred to the Debt Retirement Fund or used in any manner permitted by law.

(c)     For the Series 2004-B(1) Bonds:

1.     The "SERIES 2004-B(1) ESCROW FUND," in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2004-B(1) Bonds required by Section 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2004-B(1) Bonds and any moneys transferred by the City from the debt retirement fund of the bonds to be refunded by the Series 2004-B(1) Bonds, an amount sufficient, together with investment earnings, to pay the principal of and interest on the Bonds to Be Refunded as they become due pursuant to the terms of the Series 2004-B(1) Escrow Agreement authorized in Section 303 herein. Any balance remaining in the Series 2004-B(1) Escrow Fund after payment in full of principal and interest on the Bonds to Be Refunded by the Series 2004-B(1) Bonds shall be applied as provided in the Series 2004-B(1) Escrow Agreement.

(d)     For the Series 2004-B(2) Bonds:

1.     The "SERIES 2004-B(2) ESCROW FUND," in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2004-B(2) Bonds required by Section 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2004-B(2) Bonds and any moneys transferred by the City from the debt retirement fund of the bonds to be refunded by the Series 2004-B(2) Bonds, an amount sufficient, together with investment earnings, to pay the principal of and interest on the Bonds to Be Refunded as they become due pursuant to the terms of the Series 2004-B(2) Escrow Agreement authorized in Section 303 herein. Any balance remaining in the Series 2004-B(2) Escrow Fund after payment in full of principal and interest on the Bonds to Be Refunded by the Series 2004-B(2) Bonds shall be applied as provided in the Series 2004-B(2) Escrow Agreement.

Section 602. Application of Series 2004-A(1) Bond Proceeds. The purchase price for the Series 2004-A(1) Bonds is $41,065,459.37 consisting of the par amount ($39,270,000.00) less underwriters' discount of $602,299.18, less an original issue discount of $7,890.75, plus original issue premium of $2,405,649.30. Of this amount, $665,459.37 (which includes $489,442.05 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be deposited in the Bond Issuance Fund for the payment of the costs of issuance on the Series 2004-A(1) Bonds in accordance with Section 503 of the Bond Resolution. The amount of $2,405,649.30 constituting the net original issue premium of the Series 2004-A(1)

Bonds shall be deposited in the Debt Retirement Fund and shall be immediately transferred to the Series 2004 Construction Fund A(1) Subaccount. The remainder of the proceeds of the Series 2004-A Bonds in the estimated amount of $40,400,000.00 shall be deposited in the Series 2004-A Construction Fund (A)(1) Subaccount established in Section 601 herein, and used, together with other amounts in the Series 2004-A(1) Construction Fund, to finance the costs of the following Projects in the not to exceed amounts indicated: (i) $1,000,000 for Neighborhood/Economic Development; (ii) $10,600,000 for Recreation, Zoo and Cultural Facilities Improvements; (iii) $10,000,000 for Public Lighting System Betterments, Improvements and Extensions; (iv) $5,000,000 for the Detroit Institute of Arts Improvements; (v) $1,500,000 for the Charles H. Wright Museum of African-American History Improvements; (vi) $3,000,000 for Municipal Facilities Improvements; (vii) $1,650,000 for the Historical Museum and related facilities; and (viii) $7,650,000 for Public Safety Facilities, in accordance with the restrictions set forth in the Bond Resolution.

Section 603. Application of Series 2004-A(2) Bond Proceeds. The purchase price for the Series 2004-A(2) Bonds is $2,029,187.18 consisting of the par amount ($2,055,000.00) less underwriters' discount of $25,812.82. Of this amount, $29,187.18 (which includes $18,166.64 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be deposited in the Bond Issuance Fund for the payment of the costs of issuance on the Series 2004-A(2) Bonds in accordance with Section 503 of the Bond Resolution. The remainder of the proceeds of the Series 2004-A(2) Bonds in the estimated amount of $2,000,000.00 shall be deposited in the Series 2004-A Construction Fund A(2) Subaccount established in Section 601 herein, and used, together with other amounts in the Series 2004-A Construction Fund, to finance the costs of the Brush Park Project in accordance with the restrictions set forth in the Bond Resolution.

Section 604. Application of Series 2004-B(1) Bond Proceeds. The purchase price for the Series 2004-B(1) Bonds is $57,554,999.02 consisting of the par amount ($53,085,000.00) less underwriters' discount of $172,085.48, less original issue discount of $1,497.55 and plus a premium of $4,643,582.05. Of this amount, $582,195.65 (which includes $529,462.25 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be immediately transferred to the Bond Issuance Fund for the payment of costs of issuance on the Series 2004-B(1) Bonds in accordance with Section 503 of the Bond Resolution. The amount of $4,643,582.05 constituting the net original issue premium of the Series 2004-B(1) Bonds shall be deposited in the Series 2004-B(1) Debt Retirement Fund. The remaining portion of the proceeds of the Series 2004-B(1) Bonds of $56,972,803.37, plus the City's funds on hand of $1,367,996.88 from the Debt Retirement Funds of the bonds to be refunded by the Series 2004-B(1) Bonds shall be deposited in the Series 2004-B(1) Escrow Fund.

Section 605. <u>Application of Series 2004-B(2) Bond Proceeds</u>. The purchase price for the Series 2004-B(2) Bonds is $17,209,770.09 consisting of the par amount ($17,270,000.00) less underwriters' discount of $60,229.91. Of this amount, $162,548.81 (which includes $144,744.00 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be immediately transferred to the Bond Issuance Fund for the payment of costs of issuance on the Series 2004-B(2) Bonds in accordance with Section 503 of the Bond Resolution. The remaining portion of the proceeds of the Series 2004-B(2) Bonds of $17,047,221.28, plus the City's funds on hand of $423,553.13 from the Debt Retirement Funds of the bonds to be refunded by the Series 2004-B(2) Bonds shall be deposited in the Series 2004-B(2) Escrow Fund.

Section 606. <u>Payment of Issuance Expenses</u>. The Finance Director may pay the costs of issuance in an aggregate amount estimated at $1,439,391.01 (net of Underwriters' discount), including but not limited to, fees of bond counsel, fees of underwriters' counsel, rating agency fees, accounting and auditing fees, financial advisory fees, printing fees, municipal bond insurance and other out-of-pocket expenses, from portions of the proceeds of the Bonds deposited in the Bond Issuance Fund established in Section 503 of the Bond Resolution or from other legally available funds.

Section 607. <u>Bonds to Be Refunded</u>. The Prior Bonds listed on Schedule A attached hereto and made a part hereof shall constitute the Bonds to Be Refunded by the Series 2004-B(1) Bonds and the Series 2004-B(2) Bonds.

Section 608. <u>Appointment of Verification Agent</u>. Grant Thornton L.L.P., Certified Public Accountants, is hereby appointed as verification agent for the funds deposited and on hand in the Escrow Funds under the Escrow Agreements to perform the duties described in the Official Statement under the heading "Verification of Certain Mathematical Calculations."

Section 609. <u>Sale Order a Contract</u>. The provisions of this Sales Order shall constitute a contract between the City and any Bondholder.

Section 610. <u>Effective Date</u>. This Sale Order shall take effect immediately upon its execution by the undersigned Finance Director of the City.

SO ORDERED this 27th day of August, 2004.

Sean K. Werdlow
Finance Director
City of Detroit

## EXHIBIT A

## SUMMARY OF BONDS TO BE REFUNDED

### FROM THE PROCEEDS OF THE SERIES 2004-B(1) BONDS:

### GENERAL OBLIGATION BONDS (UNLIMITED TAX), SERIES 1996A

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2009 | $1,925,000 | 5.300% | 101% |
| 2012 | 2,250,000 | 5.500 | 101 |
| 2013 | 2,375,000 | 5.500 | 101 |
| 2014 | 2,505,000 | 5.500 | 101 |
| 2015 | 2,640,000 | 5.500 | 101 |
| 2016 | 2,785,000 | 5.500 | 101 |

### GENERAL OBLIGATION BONDS (UNLIMITED TAX), SERIES 1999B

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2014 | $1,990,000 | 5.875% | 101% |
| 2015 | 2,705,000 | 6.000 | 101 |
| 2016 | 2,865,000 | 6.000 | 101 |
| 2017 | 3,035,000 | 6.000 | 101 |
| 2018 | 3,220,000 | 5.500 | 101 |
| 2019 | 3,395,000 | 5.750 | 101 |
| 2020 | 3,590,000 | 5.750 | 101 |

## GENERAL OBLIGATION BONDS (UNLIMITED TAX), SERIES 2001A

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2006 | $1,100,000 | 4.000% | 100% |
| 2007 | 1,240,000 | 4.000 | 100 |
| 2008 | 1,400,000 | 5.000 | 100 |
| 2009 | 1,135,000 | 5.500 | 100 |
| 2006 | 765,000 | 3.625 | 100 |
| 2007 | 630,000 | 3.800 | 100 |
| 2008 | 465,000 | 4.000 | 100 |
| 2009 | 735,000 | 4.100 | 100 |

## GENERAL OBLIGATION REFUNDING BONDS (UNLIMITED TAX), SERIES 2001B

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2009 | $3,340,000 | 5.500% | 100% |

## GENERAL OBLIGATION BONDS (UNLIMITED TAX), SERIES 2002

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2006 | $1,655,000 | 3.000% | 100% |
| 2007 | 1,705,000 | 3.000 | 100 |
| 2008 | 1,755,000 | 3.250 | 100 |
| 2009 | 1,815,000 | 3.500 | 100 |

**FROM THE PROCEEDS OF THE SERIES 2004-B(2) BONDS:**

**GENERAL OBLIGATION REFUNDING BONDS (UNLIMITED TAX), SERIES 1997B**

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2006 | $4,205,000 | 5.000% | 100% |
| 2007 | 3,900,000 | 5.500 | 100 |
| 2008 | 3,700,000 | 5.500 | 100 |

**GENERAL OBLIGATION BONDS, SERIES 2000A (AMT)**

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2006 | $1,075,000 | 5.250% | 100% |
| 2007 | 1,130,000 | 5.375 | 100 |
| 2008 | 1,195,000 | 5.500 | 100 |

**GENERAL OBLIGATION BONDS (UNLIMITED TAX), SERIES 2001A**

| PRINCIPAL MATURITY DUE APRIL 1 | PRINCIPAL AMOUNT | INTEREST RATE | REDEMPTION PRICE |
|---|---|---|---|
| 2006 | $550,000 | 4.000% | 100% |
| 2006 | 385,000 | 3.625 | 100 |

## EXHIBIT B

## MUNICIPAL BOND INSURANCE
## (FINANCIAL GUARANTY INSURANCE)

### Section I
### DEFINITIONS

Except as otherwise provided in this Exhibit B, the following terms have the definitions set forth below:

"Ambac Assurance" shall mean Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company.

"Financial Guaranty Insurance Policy" shall mean the financial guaranty insurance policy issued by Ambac Assurance insuring the payment when due of the principal of and interest on the Bonds as provided therein.

### Section II
### AMBAC ASSURANCE CONSENT LANGUAGE

**A.** **Consent of Ambac Assurance.**

Any provision of the Bond Resolution and the Sale Order (together, the "Financing Document") expressly recognizing or granting rights in or to Ambac Assurance may not be amended in any manner which affects the rights of Ambac Assurance hereunder without the prior written consent of Ambac Assurance. Ambac Assurance reserves the right to charge the City a fee for any consent or amendment to the Financing Document while the Financial Guaranty Insurance Policy is outstanding.

**B.** **Consent of Ambac Assurance in lieu of Bondholder Consent.**

Unless otherwise provided in this Section, Ambac Assurance's consent shall be required in lieu of Bondholder consent, when required, for the following purposes: (i) execution and delivery of any supplemental Financing Document or any amendment, supplement or change to or modification of the Financing Document, (ii) removal of the Paying Agent and selection and appointment of any successor paying agent; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires Bondholder consent.

**C.    Consent of Ambac Assurance in the Event of Insolvency.**

Any reorganization or liquidation plan with respect to the City must be acceptable to Ambac Assurance. In the event of any reorganization or liquidation, Ambac Assurance shall have the right to vote on behalf of all Bondholders who hold Ambac Assurance-insured Bonds absent a default by Ambac Assurance under the applicable Financial Guaranty Insurance Policy insuring such Bonds.

**D.    Consent of Ambac Assurance Upon Default.**

Anything in the Financing Document to the contrary notwithstanding, upon the occurrence and continuance of an event of default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Bondholders for the benefit of the Bondholders under the Financing Document pursuant to state law.

## Section III
## NOTICES/INFORMATION TO BE GIVEN TO AMBAC ASSURANCE

**Notices to be sent to the attention of the SURVEILLANCE DEPARTMENT:**

A.    While the Financial Guaranty Insurance Policy is in effect, the City shall furnish to Ambac Assurance, upon request, the following:

     (a)    a copy of any financial statement, audit and/or annual report of the City

     (b)    such additional information it may reasonably request.

Upon request, such information shall be delivered at the City's expense to the attention of the Surveillance Department, unless otherwise indicated.

B.    A copy of any notice to be given to the registered owners of the Bonds, including, without limitation, notice of any redemption of or defeasance of Bonds, and any certificate rendered pursuant to the Financing Document relating to the security for the Bonds, at no cost to Ambac Assurance.

C.    To the extent that the City has entered into a continuing disclosure agreement with respect to the Bonds, Ambac Assurance shall be included as party to be notified.

**Notices to be sent to the attention of the GENERAL COUNSEL OFFICE:**

A.    The City, as appropriate, shall notify Ambac Assurance of any failure of the City to provide relevant notices, certificates, etc.

B.    Notwithstanding any other provision of the Financing Document, the City shall immediately notify Ambac Assurance if at any time there are insufficient moneys to make any payments of principal and/or interest as required and immediately upon the occurrence of any event of default under the Financing Document.

**Other Information to be given to Ambac Assurance:**

The City will permit Ambac Assurance to discuss the affairs, finances and accounts of the City or any information Ambac Assurance may reasonably request regarding the security for the Bonds with appropriate officers of the City. The City will permit Ambac Assurance to have access to and to make copies of all books and records relating to the Bonds at any reasonable time.

**Section IV**
**PAYMENT PROCEDURE PURSUANT TO THE**
**FINANCIAL GUARANTY INSURANCE POLICY**

The following language sets out the applicable procedure for payments under the Financial Guaranty Insurance Policy:

As long as the Bond insurance shall be in full force and effect, the City and the Paying Agent agree to comply with the following provisions:

(a)    At least one (1) business day prior to all Interest Payment Dates the Paying Agent will determine whether there will be sufficient funds in the Funds and Accounts to pay the principal of or interest on the Bonds on such Interest Payment Date. If the Paying Agent determines that there will be insufficient funds in such Funds or Accounts, the Paying Agent shall so notify Ambac Assurance. Such notice shall specify the amount of the anticipated deficiency, the Bonds to which such deficiency is applicable and whether such Bonds will be deficient as to principal or interest, or both. If the Paying Agent has not so notified Ambac Assurance at least one (1) business day prior to an Interest Payment Date, Ambac Assurance will make payments of principal or interest due on the Bonds on or before the first (1st) business day next following the date on which Ambac Assurance shall have received notice of nonpayment from the Paying Agent.

(b)    the Paying Agent after giving notice to Ambac Assurance as provided in (a) above, make available to Ambac Assurance and, at Ambac Assurance's direction, to The Bank of New York, as insurance trustee for Ambac Assurance or any successor insurance trustee (the "Insurance Trustee"), the registration books of the City maintained by the Trustee or Paying Agent, if any, and all records relating to the Funds and Accounts maintained under the Financing Document.

(c) the Paying Agent shall provide Ambac Assurance and the Insurance Trustee with a list of registered owners of Bonds entitled to receive principal or interest payments from Ambac Assurance under the terms of the Financial Guaranty Insurance Policy, and shall make arrangements with the Insurance Trustee (i) to mail checks or drafts to the registered owners of Bonds entitled to receive full or partial interest payments from Ambac Assurance and (ii) to pay principal upon Bonds surrendered to the Insurance Trustee by the registered owners of Bonds entitled to receive full or partial principal payments from Ambac Assurance.

(d) the Paying Agent shall, at the time it provides notice to Ambac Assurance pursuant to (a) above, notify registered owners of Bonds entitled to receive the payment of principal or interest thereon from Ambac Assurance (i) as to the fact of such entitlement, (ii) that Ambac Assurance will remit to them all or a part of the interest payments next coming due upon proof of Bondholder entitlement to interest payments and delivery to the Insurance Trustee, in form satisfactory to the Insurance Trustee, of an appropriate assignment of the registered owner' s right to payment, (iii) that should they be entitled to receive full payment of principal from Ambac Assurance, they must surrender their Bonds (along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee to permit ownership of such Bonds to be registered in the name of Ambac Assurance) for payment to the Insurance Trustee, and not the Paying Agent, and (iv) that should they be entitled to receive partial payment of principal from Ambac Assurance, they must surrender their Bonds for payment thereon first to the Paying Agent who shall note on such Bonds the portion of the principal paid by the Paying Agent and then, along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee, to the Insurance Trustee, which will then pay the unpaid portion of principal.

(e) in the event that the Paying Agent has notice that any payment of principal of or interest on a Bond which has become Due for Payment and which is made to a Bondholder by or on behalf of the City has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Paying Agent shall, at the time Ambac Assurance is notified pursuant to (a) above, notify all registered owners that in the event that any registered owner's payment is so recovered, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available, and the Paying Agent shall furnish to Ambac Assurance its records evidencing the payments of principal of and interest on the Bonds which have been made by the Paying Agent and subsequently recovered from registered owners and the dates on which such payments were made.

(f) in addition to those rights granted Ambac Assurance under the Sale Order, Ambac Assurance shall, to the extent it makes payment of principal of or interest on Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Financial Guaranty Insurance Policy, and to evidence such subrogation (i) in the case of subrogation as to claims for past due interest, the Paying Agent shall note Ambac Assurance's rights as subrogee on the registration books of the City maintained by the Paying Agent upon receipt from Ambac Assurance of proof of the payment of interest thereon to the registered owners of the Bonds, and

(ii) in the case of subrogation as to claims for past due principal, Paying Agent shall note Ambac Assurance's rights as subrogee on the registration books of the City maintained by the Paying Agent upon surrender of the Bonds by the registered owners thereof together with proof of the payment of principal thereof.

DELIB:2542169.3\022765-00171

CITY OF DETROIT
FINANCE DIRECTOR'S ORDER APPROVING SALE OF
GENERAL OBLIGATION SELF-INSURANCE BONDS
(LIMITED TAX), SERIES 2004

August 27, 2004

WHEREAS, pursuant to a resolution adopted by the City Council of the City of Detroit, Michigan (the "City") on May 26, 2004 (the "Bond Resolution"), the City authorized the issuance of its General Obligation Self-Insurance Bonds (Limited Tax), Series 2004 in the aggregate principal amount of not to exceed $65,000,000, for the purpose of funding the Risk Management Fund previously established by the City for the purpose of defraying losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure, to establish a reserve fund to secure payment of principal of and interest on the Bonds in an amount not exceeding the maximum amount of principal and interest coming due on the bonds in any fiscal year, if necessary, to provide for a discount of not to exceed 10% of the principal amount of the Bonds and to pay legal, financial, accounting, printing and other expenses related to the issuance of the Bonds; and

WHEREAS, in accordance with the Bond Resolution, the Finance Director of the City (the "Finance Director") filed an application with the Michigan Department of Treasury for an Order of Approval to issue the Bonds (the "Order of Approval") in an aggregate amount not to exceed $65,000,000 and on August 11, 2004, the Order of Approval was issued by the Michigan Department of Treasury; and

WHEREAS, the Bond Resolution provides, among other things, that the Bonds shall be sold to the underwriter or underwriters (the "Underwriters"), who shall be represented by such Underwriter or Underwriters selected by the Finance Director of the City (the "Representative") as confirmed in an order of the Finance Director executed at the time of sale of the Bonds and pursuant to a bond purchase agreement (the "Bond Purchase Agreement") to be entered into by the Representative on behalf of the Underwriters and the City, and to be approved and executed by the Finance Director; and authorizes the Finance Director (i) to determine the principal amounts of the Bonds to be issued on a fixed or variable interest rate basis and tax exempt or taxable basis; (ii) to determine the interest rate provisions, tender and other requirements for Bonds issued on a variable rate basis; (iii) to negotiate the terms for the sale of the Bonds with the Representative; (iv) to cause the Preliminary Official Statement and the final Official Statement for the Bonds to be prepared and circulated; (v) to negotiate the terms for a letter of credit or other credit enhancement to secure payment of all or a portion of the Bonds; (vi) to negotiate the terms of a remarketing agreement, auction agent agreement, broker-dealer agreement or such other agreements as may be necessary to accomplish the sale and delivery of the Bonds as determined by the Finance Director within the parameters of this Resolution, (vii) to negotiate Interest Rate Exchange Agreements with the provider or providers thereof, if economically desirable, in connection with any Bonds issued on a variable or fixed rate basis; and (viii) to take such other actions and make such other determinations not inconsistent with the Bond Resolution as the Finance Director determines to be necessary or

appropriate in connection with the sale of the Bonds as shall be set forth in an order of the Finance Director executed at the time of sale of the Bonds; and

WHEREAS, the City has received an offer for the purchase of the Bonds from the Underwriters designated herein, in the amounts, and with the prices to the City, interest rates and other terms, all as more particularly set forth herein and in the Bond Purchase Agreement.

WHEREAS, pursuant to the terms of the Bond Resolution the City intends to obtain a policy of municipal bond insurance to insure payment of the principal of and interest on the Bonds when due; and

WHEREAS, pursuant to the Bond Resolution, the City Council authorized the preparation of a Preliminary Official Statement (the "Preliminary Official Statement") for distribution to prospective purchasers of the Bonds and authorized the Finance Director of the City to ratify the prior distribution of the Preliminary Official Statement and execute and deliver a final Official Statement in connection with the sale of the Bonds.

NOW, THEREFORE, BE IT ORDERED ON BEHALF OF THE CITY OF DETROIT, MICHIGAN, AS FOLLOWS:

## ARTICLE I
## AUTHORITY AND DEFINITIONS

Section 101. <u>Authority.</u> This Finance Director's Order Approving Sale of the General Obligation Self-Insurance Bonds (Limited Tax), Series 2004 (hereinafter referred to as the "Sale Order" or the "Order") is issued in accordance with the provisions of the Bond Resolution.

Section 102. <u>Definitions.</u> All terms which are defined in the Bond Resolution shall have the same meanings in this Sale Order, except as otherwise specifically provided herein.

## ARTICLE II
## TERMS OF THE BONDS

Section 201. <u>Designation of Series and Principal Amounts.</u> (a) The Bonds shall be designated "GENERAL OBLIGATION SELF-INSURANCE BONDS (LIMITED TAX), SERIES 2004" as provided in Section 302 of the Bond Resolution The Bonds shall be issued in the aggregate principal amount of $62,285,000.00. The Bonds are intended at the time of issuance to be taxable obligations.

Section 202. <u>Interest Rates, Principal Amounts and Maturity Dates.</u> The Bonds shall be issued in book-entry form and will be fully registered as to principal and interest in the name of Cede & Co., as nominee for The Depository Trust Company ("DTC"), in denominations of $5,000 or an integral multiple thereof and will be dated from their date of delivery. The Bonds shall be issued as serial bonds which shall mature on the following dates and in the principal amounts and shall initially be sold at the prices or yields as set forth

below and shall bear interest at the rates set forth below from their date of delivery to maturity, such interest to be payable semi-annually on April 1 and October 1 of each year, commencing on April 1, 2005. Interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

The Bonds shall mature on April 1 in the years and principal amounts, bear interest and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2009 | $ 2,750,000 | 3.920 | 3.920 | 100.000 |
| 2010 | 10,910,000 | 4.160 | 4.160 | 100.000 |
| 2011 | 11,360,000 | 4.390 | 4.390 | 100.000 |
| 2012 | 11,860,000 | 4.570 | 4.570 | 100.000 |
| 2013 | 12,405,000 | 4.700 | 4.700 | 100.000 |
| 2014 | 13,000,000 | 4.850 | 4.850 | 100.000 |

Section 203. <u>Redemption of Bonds</u>. The Bonds are not subject to mandatory or optional redemption prior to maturity.

## ARTICLE III
## APPROVAL OF AGREEMENTS

Section 301. <u>Approval of Underwriters and the Bond Purchase Agreement</u>. The Bonds shall be sold to J.P. Morgan Securities Inc. and Oppenheimer & Co. Inc., as representatives of the Underwriters including J.P. Morgan Securities Inc., Oppenheimer & Co. Inc., A.G. Edwards & Sons, Inc., Loop Capital Markets, LLC, Comerica Securities, Merrill Lynch & Co., Siebert Brandford Shank & Co., LLC. The Bond Purchase Agreement between the City and the Underwriters, dated August 27, 2004, relating to the Bonds, in substantially the form presented on this date to the Finance Director and the purchase prices, discounts and premiums for the Bonds, as set forth therein are hereby approved, with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of such Bond Purchase Agreement.

Section 302. <u>Approval of Preliminary Official Statement and Official Statement</u>. The Preliminary Official Statement relating to the Bonds dated August 18, 2004, and its use by the Underwriters is hereby approved and confirmed. The form of the Official Statement dated August 27, 2004, relating to the Bonds is hereby approved with such further changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Official Statement.

Section 303. <u>Approval of Disclosure Dissemination Agent Agreement</u>. The appointment of Digital Assurance Certification, L.L.C as Disclosure Dissemination Agent

(the "DDA") of the City in order to provide certain continuing disclosure with respect to the Bonds in accordance with Rule 15c2-12 of the United States Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time (the "Rule") is hereby authorized and approved. The Disclosure Dissemination Agent Agreement (the "Disclosure Agreement"), dated as of September 9, 2004, between the City and the DDA is hereby authorized and approved with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Disclosure Agreement.

## ARTICLE IV
## BOND INSURANCE

Section 401. <u>Acceptance of Commitment</u>. The Commitment of Ambac Assurance Corporation (the "Insurer") to provide a municipal bond insurance policy (the "Policy") to secure payment of all of the Bonds, on the terms and conditions specified in the Commitment, is hereby accepted. Capitalized terms used in this Article V and not defined in the Bond Resolution shall have the meanings assigned thereto in the Policy.

Section 402. <u>Additional Terms Under the Policy</u>. The additional terms and requirements of the Insurer as set forth in Exhibit A hereto, are hereby accepted and incorporated by reference in this Sale Order.

## ARTICLE V
## BOND REGISTRAR AND PAYING AGENT

Section 501. <u>Bond Registrar and Paying Agent</u>. U.S. Bank National Association, Detroit, Michigan, is hereby appointed as bond registrar, transfer agent and paying agent for the Bonds (the "Bond Registrar," "Transfer Agent" and "Paying Agent"). The Bond Registrar, Transfer Agent and Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereunder and under the Bond Resolution by a written instrument of acceptance delivered to the City on the date of delivery of the Bonds.

## ARTICLE VI
## OTHER PROVISIONS OF GENERAL APPLICATION
## UPON ISSUANCE OF BONDS

Section 601. <u>Application of Bond Proceeds</u>. The purchase price for the Bonds is $61,805.131.44 consisting of the par amount ($62,285,000.00) less underwriters' discount of $479,868.56. Of this amount, $705,131.44 shall be immediately transferred to the Bond Issuance Fund (including the cost of municipal bond insurance, which shall be deemed deposited in the Bond Issuance Fund, but which shall be wired directly to the Insurer at closing) for payment of costs of issuance of the Bonds in accordance with Section 503 of the Bond Resolution. The remainder of the proceeds of the Bonds in the amount of $61,100,000.00 shall be deposited in the Risk Management Fund previously created by the City pursuant to Ordinance No. 16-95 (the "Ordinance") and used solely for the purpose of

funding and maintaining (together with the current Risk Management Fund balance) a reserve not less than the Minimum Required Balance (as defined in the Ordinance) to pay for any losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure.

Section 602. <u>Payment of Issuance Expenses</u>. The Finance Director may pay the costs of issuance in an aggregate amount estimated at $705,131.44 (net of Underwriters' discount), including but not limited to, fees of bond counsel, fees of underwriters' counsel, rating agency fees, accounting and auditing fees, financial advisory fees, printing fees, municipal bond insurance and other out-of-pocket expenses, from portions of the proceeds of the Bonds deposited in the Bond Issuance Fund established in Section 503 of the Bond Resolution or from other legally available funds.

Section 603. <u>Sale Order a Contract</u>. The provisions of this Sales Order shall constitute a contract between the City and any Bondholder.

Section 604. <u>Effective Date</u>. This Sale Order shall take effect immediately upon its execution by the undersigned Finance Director of the City.

SO ORDERED this 27th day of August, 2004.

Sean K. Werdlow
Finance Director
City of Detroit, Michigan

## EXHIBIT A
## MUNICIPAL BOND INSURANCE
## (FINANCIAL GUARANTY INSURANCE)

### Section I
### DEFINITIONS

Except as otherwise provided in this Exhibit B, the following terms have the definitions set forth below:

"Ambac Assurance" shall mean Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company.

"Financial Guaranty Insurance Policy" shall mean the financial guaranty insurance policy issued by Ambac Assurance insuring the payment when due of the principal of and interest on the Bonds as provided therein.

### Section II
### AMBAC ASSURANCE CONSENT LANGUAGE

**A.    Consent of Ambac Assurance.**

Any provision of the Bond Resolution and the Sale Order (together, the "Financing Document") expressly recognizing or granting rights in or to Ambac Assurance may not be amended in any manner which affects the rights of Ambac Assurance hereunder without the prior written consent of Ambac Assurance. Ambac Assurance reserves the right to charge the City a fee for any consent or amendment to the Financing Document while the Financial Guaranty Insurance Policy is outstanding.

**B.    Consent of Ambac Assurance in lieu of Bondholder Consent.**

Unless otherwise provided in this Section, Ambac Assurance's consent shall be required in lieu of Bondholder consent, when required, for the following purposes: (i) execution and delivery of any supplemental Financing Document or any amendment, supplement or change to or modification of the Financing Document, (ii) removal of the Paying Agent and selection and appointment of any successor paying agent; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires Bondholder consent.

**C.      Consent of Ambac Assurance in the Event of Insolvency.**

Any reorganization or liquidation plan with respect to the City must be acceptable to Ambac Assurance. In the event of any reorganization or liquidation, Ambac Assurance shall have the right to vote on behalf of all Bondholders who hold Ambac Assurance-insured Bonds absent a default by Ambac Assurance under the applicable Financial Guaranty Insurance Policy insuring such Bonds.

**D.      Consent of Ambac Assurance Upon Default.**

Anything in the Financing Document to the contrary notwithstanding, upon the occurrence and continuance of an event of default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Bondholders for the benefit of the Bondholders under the Financing Document pursuant to state law.

**Section III**
**NOTICES/INFORMATION TO BE GIVEN TO AMBAC ASSURANCE**

<u>Notices to be sent to the attention of the SURVEILLANCE DEPARTMENT</u>:

A.      While the Financial Guaranty Insurance Policy is in effect, the City shall furnish to Ambac Assurance, upon request, the following:

      (a)      a copy of any financial statement, audit and/or annual report of the City

      (b)      such additional information it may reasonably request.

Upon request, such information shall be delivered at the City's expense to the attention of the Surveillance Department, unless otherwise indicated.

B.      A copy of any notice to be given to the registered owners of the Bonds, including, without limitation, notice of any redemption of or defeasance of Bonds, and any certificate rendered pursuant to the Financing Document relating to the security for the Bonds, at no cost to Ambac Assurance.

C.      To the extent that the City has entered into a continuing disclosure agreement with respect to the Bonds, Ambac Assurance shall be included as party to be notified.

**Notices to be sent to the attention of the GENERAL COUNSEL OFFICE:**

A.      The City, as appropriate, shall notify Ambac Assurance of any failure of the City to provide relevant notices, certificates, etc.

B.      Notwithstanding any other provision of the Financing Document, the City shall immediately notify Ambac Assurance if at any time there are insufficient moneys to make any payments of principal and/or interest as required and immediately upon the occurrence of any event of default under the Financing Document.

**Other Information to be given to Ambac Assurance:**

The City will permit Ambac Assurance to discuss the affairs, finances and accounts of the City or any information Ambac Assurance may reasonably request regarding the security for the Bonds with appropriate officers of the City. The City will permit Ambac Assurance to have access to and to make copies of all books and records relating to the Bonds at any reasonable time.

**Section IV**
**PAYMENT PROCEDURE PURSUANT TO THE**
**FINANCIAL GUARANTY INSURANCE POLICY**

The following language sets out the applicable procedure for payments under the Financial Guaranty Insurance Policy:

As long as the Bond insurance shall be in full force and effect, the City and the Paying Agent agree to comply with the following provisions:

(a)      At least one (1) business day prior to all Interest Payment Dates the Paying Agent will determine whether there will be sufficient funds in the Funds and Accounts to pay the principal of or interest on the Bonds on such Interest Payment Date. If the Paying Agent determines that there will be insufficient funds in such Funds or Accounts, the Paying Agent shall so notify Ambac Assurance. Such notice shall specify the amount of the anticipated deficiency, the Bonds to which such deficiency is applicable and whether such Bonds will be deficient as to principal or interest, or both. If the Paying Agent has not so notified Ambac Assurance at least one (1) business day prior to an Interest Payment Date, Ambac Assurance will make payments of principal or interest due on the Bonds on or before the first (1st) business day next following the date on which Ambac Assurance shall have received notice of nonpayment from the Paying Agent.

(b)      the Paying Agent after giving notice to Ambac Assurance as provided in (a) above, make available to Ambac Assurance and, at Ambac Assurance's direction, to The Bank of New York, as insurance trustee for Ambac Assurance or any successor insurance trustee (the "Insurance Trustee"), the registration books of the City

maintained by the Trustee or Paying Agent, if any, and all records relating to the Funds and Accounts maintained under the Financing Document.

(c)     the Paying Agent shall provide Ambac Assurance and the Insurance Trustee with a list of registered owners of Bonds entitled to receive principal or interest payments from Ambac Assurance under the terms of the Financial Guaranty Insurance Policy, and shall make arrangements with the Insurance Trustee (i) to mail checks or drafts to the registered owners of Bonds entitled to receive full or partial interest payments from Ambac Assurance and (ii) to pay principal upon Bonds surrendered to the Insurance Trustee by the registered owners of Bonds entitled to receive full or partial principal payments from Ambac Assurance.

(d)     the Paying Agent shall, at the time it provides notice to Ambac Assurance pursuant to (a) above, notify registered owners of Bonds entitled to receive the payment of principal or interest thereon from Ambac Assurance (i) as to the fact of such entitlement, (ii) that Ambac Assurance will remit to them all or a part of the interest payments next coming due upon proof of Bondholder entitlement to interest payments and delivery to the Insurance Trustee, in form satisfactory to the Insurance Trustee, of an appropriate assignment of the registered owner' s right to payment, (iii) that should they be entitled to receive full payment of principal from Ambac Assurance, they must surrender their Bonds (along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee to permit ownership of such Bonds to be registered in the name of Ambac Assurance) for payment to the Insurance Trustee, and not the Paying Agent, and (iv) that should they be entitled to receive partial payment of principal from Ambac Assurance, they must surrender their Bonds for payment thereon first to the Paying Agent who shall note on such Bonds the portion of the principal paid by the Paying Agent and then, along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee, to the Insurance Trustee, which will then pay the unpaid portion of principal.

(e)     in the event that the Paying Agent has notice that any payment of principal of or interest on a Bond which has become Due for Payment and which is made to a Bondholder by or on behalf of the City has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Paying Agent shall, at the time Ambac Assurance is notified pursuant to (a) above, notify all registered owners that in the event that any registered owner's payment is so recovered, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available, and the Paying Agent shall furnish to Ambac Assurance its records evidencing the payments of principal of and interest on the Bonds which have been made by the Paying Agent and subsequently recovered from registered owners and the dates on which such payments were made.

(f)     in addition to those rights granted Ambac Assurance under the Sale Order, Ambac Assurance shall, to the extent it makes payment of principal of or interest on

Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Financial Guaranty Insurance Policy, and to evidence such subrogation (i) in the case of subrogation as to claims for past due interest, the Paying Agent shall note Ambac Assurance's rights as subrogee on the registration books of the City maintained by the Paying Agent upon receipt from Ambac Assurance of proof of the payment of interest thereon to the registered owners of the Bonds, and (ii) in the case of subrogation as to claims for past due principal, Paying Agent shall note Ambac Assurance's rights as subrogee on the registration books of the City maintained by the Paying Agent upon surrender of the Bonds by the registered owners thereof together with proof of the payment of principal thereof.

DELIB:2543607.2\022765-00172



*Sean Werdlow*

STATE OF MICHIGAN
## DEPARTMENT OF TREASURY
LANSING

JENNIFER M. GRANHOLM
GOVERNOR

JAY B. RISING
STATE TREASURER

August 11, 2004

***APPROVAL***
Municipality Code 82-2050
Application ID Number 256

The Honorable Kwame M. Kilpatrick, Mayor
City of Detroit
1200 Coleman A. Young Municipal Center
2 Woodward Avenue
Detroit, Michigan 48226

Dear Chief Administrative Officer:

Thank you for submitting the *Application for State Treasurer's Approval to Issue Long-Term Securities* to the Michigan Department of Treasury requesting Approval under section 303(7) of Public Act 34 of 2001 for the purpose of establishing funds, reserves, or accounts in amounts determined by the city to defray losses for which insurance coverage could be provided by an insurer but for which the city has determined to self-insure.

Based upon the information provided, the Department of Treasury has determined that the city has
a) indicated the authority to issue the municipal security requested;
b) projected the ability to repay the municipal security when due; and
c) adequately addressed any non-compliance with subsection 303(3) of Act 34.

This approval is for the Self-Insurance Bonds (Limited Tax General Obligation), Series 2004, in the amount of not to exceed $65,000,000.00, with a final maturity of April 1, 2014. No material changes, amendments or addenda may be made to the information provided without further approval of the Department.

Within 15 days after the issuance of a municipal security, you will need to file with the Department the enclosed Security Report and the documents required in section 141.2319, Public Act 34 of 2001. Please mail them to the Local Audit and Finance Division at P.O. Box 30728, Lansing, Michigan 48909-8228.

If you have any questions, please contact the Local Audit and Finance Division at (517) 373-0660.

Sincerely,

*Frederick Headen for*

Jay B. Rising
State Treasurer

Enclosure

CITY OF DETROIT
FINANCE DIRECTOR'S ORDER APPROVING SALE OF
GENERAL OBLIGATION CAPITAL IMPROVEMENT BONDS
(LIMITED TAX), SERIES 2005-A(1)

GENERAL OBLIGATION CAPITAL IMPROVEMENT BONDS
(LIMITED TAX), SERIES 2005-A(2)

AND

GENERAL OBLIGATION CAPITAL IMPROVEMENT REFUNDING
BONDS (LIMITED TAX), SERIES 2005-B

June 24, 2005

WHEREAS, pursuant to Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), Act 34, Public Acts of Michigan, 2001, as amended ("Act 34"), the Charter of the City (the "City Charter") and a resolution adopted by the City Council of the City of Detroit, Michigan (the "City") on May 6, 2005, (the "Bond Resolution"), the City authorized the issuance of one or more series of its (i) General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A in an aggregate principal amount of not to exceed $87,500,000 (the "Series 2005-A Bonds") for the purpose of financing all or a portion of the costs of the City relating to the 800 MHz Radio Project, including capitalized interest, if necessary (the "Project"), and paying the costs of issuance of such Bonds, and its (ii) General Obligation Capital Improvement Refunding Bonds (Limited Tax), Series 2005-B in an aggregate principal amount of not to exceed $13,500,000 (the "Series 2005-B Bonds," together with the Series 2005-A Bonds, referred to herein as the "Bonds") for the purpose of refunding all or a portion of the Outstanding Prior Bonds (as defined in the Bond Resolution) and paying the costs of issuance of such Bonds, all as particularly described in the Bond Resolution; and

WHEREAS, the Bond Resolution provides, among other things, that the Bonds shall be sold to the underwriter or underwriters to be determined by the Finance Director of the City in the Bond Purchase Agreement (as defined in the Bond Resolution) to be dated the date hereof, for the Bonds to be entered into by the underwriters and the City, and to be approved and executed by the Finance Director, and authorizes the Finance Director to determine and establish (i) the Bonds to be issued on a tax exempt or taxable basis, the series designation, the aggregate principal amount, purchase price, principal maturities and dates, interest rates and/or the method for determining interest rates, interest payment dates, redemption and/or tender for purchase provisions and purchase price for the Bonds, costs of issuance to be paid from Bond proceeds, the approval of the Bond Purchase Agreement and any credit enhancement or other agreement authorized in the Bond Resolution; (ii) the Outstanding Prior Bonds to be refunded; and (iii) such other terms and provisions not inconsistent with the Bond Resolution as the Finance Director determines to be necessary or appropriate in connection with the sale of the Bonds, all as shall be set forth in this order of the Finance Director; and

WHEREAS, the Finance Director has determined that the Series 2005-A Bonds authorized to be issued to finance all or a portion of the costs of the Projects, be issued as both taxable and tax-exempt Bonds in two separate sub-series: (a) the taxable sub-series to be designated General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(1) and (b) the tax-exempt sub-series to be designated General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(2) in an aggregate principal amount of not to exceed $87,500,000 all as authorized by Section 302 of the Bond Resolution; and

WHEREAS, pursuant to the Bond Resolution, the City Council authorized the preparation of a Preliminary Official Statement (the "Preliminary Official Statement") for distribution to prospective purchasers of the Bonds and authorized the Finance Director of the City to ratify the prior distribution of the Preliminary Official Statement and execute and deliver a final Official Statement in connection with the sale of the Bonds; and

WHEREAS, the Finance Director pursuant to the Bond Purchase Agreement has received an offer for the purchase of the Bonds from J.P. Morgan Securities Inc., as representative of the underwriters set forth in Schedule 1 to the Bond Purchase Agreement and itself (collectively, the "Underwriter"), and desires to sell the Bonds to the Underwriter in the amounts, and with the prices to the City, interest rates and other terms, all as more particularly set forth herein; and

WHEREAS, pursuant to the terms of the Bond Resolution the City intends to obtain a policy of municipal bond insurance to insure payment of the principal of and interest on the Bonds when due.

NOW, THEREFORE, BE IT ORDERED ON BEHALF OF THE CITY OF DETROIT, MICHIGAN, AS FOLLOWS:

## ARTICLE I
## AUTHORITY AND DEFINITIONS

Section 101. <u>Authority</u>. This Finance Director's Order Approving Sale of General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(1), General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(2) and General Obligation Capital Improvement Refunding Bonds (Limited Tax), Series 2005-B (hereinafter referred to as the "Order") is issued in accordance with the provisions of the Bond Resolution.

Section 102. <u>Definitions</u>. All terms which are defined in the Bond Resolution shall have the same meanings in this Order, except as otherwise specifically provided herein.

## ARTICLE II
## TERMS OF BONDS

Section 201. <u>Designation of Series and Principal Amounts</u>. A. The Series 2005-A Bonds shall be issuable in two sub-series designated the "GENERAL OBLIGATION CAPITAL IMPROVEMENT BONDS (LIMITED TAX), SERIES 2005-A(1)" (hereinafter referred to as the "Series 2005-A(1) Bonds") and the "GENERAL OBLIGATION CAPITAL IMPROVEMENT BONDS (LIMITED TAX), SERIES 2005-A(2)" (hereinafter referred to as the "Series 2005-A(2)

Bonds"), as authorized by Sections 301 and 302 of the Bond Resolution. The Series 2005-A(1) Bonds shall be issued in the aggregate principal amount of $73,500,000 and are intended at the time of issuance to be taxable obligations. The Series 2005-A(2) Bonds shall be issued in the aggregate principal amount of $13,530,000 and are intended at the time of issuance to be tax-exempt obligations as described in Section 103(a) of the Code.

B.     The Series 2005-B Bonds shall be designated "GENERAL OBLIGATION CAPITAL IMPROVEMENT REFUNDING BONDS (LIMITED TAX), SERIES 2005-B" as provided in Section 301 of the Bond Resolution. The Series 2005-B Bonds shall be issued in the aggregate principal amount of $11,785,000. The Series 2005-B Bonds are intended at the time of issuance to be tax-exempt obligations as described in Section 103(a) of the Code.

The Series 2005-A(2) Bonds and the Series 2005-B Bonds are collectively referred to hereinafter as the "Tax-Exempt Bonds." The Series 2005-A(1) Bonds are referred to hereinafter as the "Taxable Bonds." The Tax-Exempt Bonds and the Taxable Bonds are collectively referred to hereinafter as the "Bonds."

Section 202.   Interest Rates, Principal Amounts and Maturity Dates. The Bonds shall be dated as of their date of delivery. The Bonds shall be issued as serial bonds and term bonds which shall mature on the following dates and in the principal amounts and shall initially be sold at the prices or yields as set forth below and shall bear interest at the rates set forth below from their date of delivery to maturity, such interest to be payable semi-annually on April 1, and October 1 of each year, commencing on October 1, 2005. Interest with respect to the Bonds shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. Certain Bonds shall be subject to redemption prior to maturity as set forth in Section 203 hereof.

### Series 2005-A(1) Bonds

The Series 2005-A(1) Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2010 | $ 3,190,000 | 4.270 | 4.270 | 100.000 |
| 2011 | 3,315,000 | 4.300 | 4.300 | 100.000 |
| 2012 | 3,500,000 | 4.360 | 4.360 | 100.000 |
| 2013 | 3,600,000 | 4.390 | 4.390 | 100.000 |
| 2014 | 3,770,000 | 4.500 | 4.500 | 100.000 |
| 2015 | 3,950,000 | 4.530 | 4.530 | 100.000 |
| 2016 | 4,130,000 | 4.610 | 4.610 | 100.000 |
| 2020* | 18,565,000 | 4.960 | 4.960 | 100.000 |
| 2025* | 29,480,000 | 5.150 | 5.150 | 100.000 |

* Term Bonds

## Series 2005-A(2) Bonds

The Series 2005-A(2) Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date April 1 | Principal Amount | Interest Rate % | Yield % | Price |
|---|---|---|---|---|
| 2010 | $ 615,000 | 3.50 | 3.110 | 101.708 |
| 2011 | 635,000 | 3.50 | 3.260 | 101.246 |
| 2012 | 660,000 | 4.50 | 3.390 | 106.647 |
| 2013 | 685,000 | 4.00 | 3.520 | 103.228 |
| 2014 | 715,000 | 4.00 | 3.630 | 102.749 |
| 2015 | 745,000 | 4.00 | 3.730 | 102.186 |
| 2016 | 775,000 | 4.00 | 3.830 | 101.425 |
| 2017 | 805,000 | 4.00 | 3.930 | 100.581 |
| 2018 | 835,000 | 4.00 | 4.020 | 99.796 |
| 2019 | 870,000 | 4.00 | 4.110 | 98.847 |
| 2020 | 905,000 | 4.00 | 4.170 | 98.135 |
| 2021 | 1,000,000 | 5.00 | 4.090 | 107.554 |
| 2022 | 1,000,000 | 5.00 | 4.130 | 107.207 |
| 2023 | 1,040,000 | 5.00 | 4.180 | 106.776 |
| 2024 | 1,095,000 | 5.00 | 4.210 | 106.518 |
| 2025 | 1,150,000 | 5.00 | 4.250 | 106.175 |

[remainder of page intentionally left blank]

<u>Series 2005-B Bonds</u>

The Series 2005-B Bonds shall mature on April 1 in the years and principal amounts, bear interest at the rates and be initially sold at the prices and yields as follows:

| Maturity Date<br>April 1 | Principal<br>Amount | Interest<br>Rate % | Yield % | Price |
|---|---|---|---|---|
| 2006 | $ 200,000 | 3.250 | 2.660 | 100.435 |
| 2007 | 100,000 | 3.250 | 2.730 | 100.882 |
| 2008 | 100,000 | 3.250 | 2.850 | 101.049 |
| 2009 | 740,000 | 3.500 | 2.970 | 101.867 |
| 2010 | 770,000 | 3.500 | 3.110 | 101.708 |
| 2011 | 50,000 | 3.500 | 3.260 | 101.246 |
| 2012 | 50,000 | 3.625 | 3.390 | 101.404 |
| 2013 | 900,000 | 4.000 | 3.520 | 103.228 |
| 2014 | 935,000 | 4.000 | 3.630 | 102.749 |
| 2015 | 1,000,000 | 5.000 | 3.730 | 110.300 |
| 2016 | 1,020,000 | 5.000 | 3.790 | 110.197 |
| 2017 | 1,075,000 | 5.000 | 3.860 | 109.573 |
| 2018 | 1,125,000 | 5.000 | 3.930 | 108.954 |
| 2019 | 1,180,000 | 5.000 | 3.990 | 108.426 |
| 2020 | 1,240,000 | 5.000 | 4.040 | 107.989 |
| 2021 | 1,300,000 | 5.000 | 4.090 | 107.554 |

Section 203.     <u>Redemption of Bonds</u>.

(a)     *Optional Redemption of the Bonds*.

The Bonds or portions thereof in multiples of $5,000, maturing on or after April 1, 2016, may be redeemed prior to their stated maturity, at the option of the City, in whole, or in part in any order of maturity determined by the City (and by lot within a single maturity) on any date permitted by law on or after October 1, 2015 at a redemption price of par plus accrued interest to the date fixed for redemption.

(b)     *Mandatory Sinking Fund Redemption of the Bonds*.

The Series 2005-A(1) Bonds maturing April 1, 2020 and April 1, 2025 are hereby designated term bonds (the "Term Bonds") and shall be subject to mandatory redemption in part by the City, by lot, prior to their scheduled maturity on April 1 of each of the years and in the principal amounts set forth below, at the redemption price of 100% of the principal amount of the Bonds to be so redeemed plus accrued interest to the date fixed for redemption:

| $18,565,000 Series 2005-A(1) Bonds Maturing April 1, 2020 | | $29,480,000 Series 2005-A(1) Bonds Maturing April 1, 2025 | |
|---|---|---|---|
| Redemption Date April 1 | Principal Amounts | Redemption Date April 1 | Principal Amounts |
| 2017 | $ 4,315,000 | 2021 | $ 5,565,000 |
| 2018 | 4,515,000 | 2022 | 5,570,000 |
| 2019 | 4,750,000 | 2023 | 5,800,000 |
| 2020 | 4,985,000 | 2024 | 6,115,000 |
| | | 2025 | 6,430,000 |

The principal amount of Term Bonds of a maturity to be redeemed on the dates set forth above shall be reduced by the principal amount of Term Bonds of the same maturity and interest rate that have been redeemed (other than by mandatory sinking fund redemption) or otherwise acquired by the City and delivered to the Transfer Agent prior to giving the notice of redemption described below. The City may satisfy any mandatory redemption requirement by the purchase and surrender of Term Bonds of the same maturity and interest rate in lieu of calling such Term Bonds for mandatory redemption.

(c)     Notice of Redemption and Manner of Selection of Bonds.

Notice of redemption of any Bond will be given at least 30 days prior to the date fixed for redemption by mail to the registered owner or owners at the registered addresses shown on the registration books kept by the Bond Registrar and Paying Agent. The failure to receive any such mailed notice, if mailed, or any defect in such mailed notice, will not affect the validity of the redemption. So long as Cede & Co., as nominee of DTC, is the registered owner of the Bonds, all notices of redemption will be sent only to Cede & Co. Bonds will be called for redemption in multiples of $5,000 and Bonds of denominations of more than $5,000 will be treated as representing the number of Bonds obtained by dividing the denomination of the Bond by $5,000 and such Bonds may be redeemed in part. The notice of redemption for Bonds redeemed in part will state that upon surrender of the Bond to be redeemed a new Bond or Bonds in aggregate principal amount equal to the unredeemed portion of the Bond surrendered will be issued to the registered owner thereof. No further interest on the Bonds or portions of the Bonds called for redemption will accrue after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Bond Registrar and Paying Agent to redeem the same.

In case less than the full amount of an outstanding Bond is called for redemption, the Bond Registrar and Paying Agent upon presentation of the Bonds called in part for redemption will register, authenticate and deliver to the registered owners a new Bond in the principal amount of the portion of the original Bond not called for redemption.

### ARTICLE III
### APPROVAL OF AGREEMENTS

Section 301.     Approval of Underwriters and the Bond Purchase Agreement. The Bonds shall be sold to J.P. Morgan Securities Inc., as representative of the Underwriters. The Bond Purchase Agreement between the City and the Underwriters, dated June 24, 2005, relating to the Bonds, in substantially the form presented on this date to the Finance Director and the purchase prices, discounts and premiums for the Bonds, as set forth therein are hereby approved, with such

changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of such Bond Purchase Agreement.

Section 302.    Approval of Preliminary Official Statement and Official Statement.  The Preliminary Official Statement relating to the Bonds dated June 17, 2005, as supplemented on June 23, 2005, and its use by the Underwriters is hereby approved and confirmed.  The form of the Official Statement dated June 24, 2005, relating to the Bonds is hereby approved with such further changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Official Statement.

Section 303.    Approval of Escrow Agreement. The Escrow Agreement relating to the Series 2005-B Bonds between the City and the Escrow Agent (as defined below) and dated the date of delivery, is hereby authorized and approved with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Escrow Agreement.

Section 304.    Approval of Disclosure Dissemination Agent Agreement.    The appointment of Digital Assurance Certification, L.L.C as Disclosure Dissemination Agent (the "DDA") of the City in order to provide certain continuing disclosure with respect to the Bonds in accordance with Rule 15c2-12 of the United States Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time (the "Rule") is hereby authorized and approved.  The Disclosure Dissemination Agent Agreement (the "Disclosure Agreement") between the City and the DDA is hereby authorized and approved with such changes as are subsequently approved by the Finance Director, such subsequent approval to be conclusively evidenced by his execution and delivery of the Disclosure Agreement.

## ARTICLE IV

## BOND REGISTRAR, PAYING AGENT AND ESCROW AGENT

Section 401.    Bond Registrar and Paying Agent.    U.S. Bank National Association, Detroit, Michigan, is hereby appointed as bond registrar, transfer agent and paying agent for the Bonds (the "Bond Registrar," "Transfer Agent" and "Paying Agent").  The Bond Registrar, Transfer Agent and Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereunder and under the Bond Resolution by a written instrument of acceptance delivered to the City on the date of delivery of the Bonds.

Section 402.    Escrow Agent.    U.S. Bank National Association, Detroit, Michigan, is hereby appointed as Escrow Agent (the "Escrow Agent") in connection with the Refunded Bonds.

## ARTICLE V
## BOND INSURANCE

Section 501. <u>Acceptance of Commitment</u>. The Commitment of Ambac Assurance Corporation (the "Insurer") to provide a municipal bond insurance policy (the "Policy") to secure payment of all of the Bonds, on the terms and conditions specified in the Commitment, is hereby accepted.

Section 502. <u>Additional Terms Under the Policy</u>. The additional terms and requirements of the Insurer as set forth in Exhibit B hereto, are hereby accepted and incorporated by reference in this Sale Order. Capitalized terms used in Exhibit B and not defined in the Bond Resolution shall have the meanings assigned thereto in the Policy.

## ARTICLE VI
## OTHER PROVISIONS OF GENERAL APPLICATION
## UPON ISSUANCE OF BONDS

Section 601. <u>Establishment of Sub Accounts and Funds</u>. Pursuant to Section 501 of the Bond Resolution, there are hereby designated and established with the Paying Agent the following separate and segregated subaccounts and funds:

(a)     For the Series 2005-A(1) Bonds:

1.     The "SERIES 2005-A ACQUISITION FUND A(1) SUBACCOUNT" in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2005-A(1) Bonds required by Sections 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2005-A(1) Bonds to pay the costs of the Project, including legal and consulting fees and expenses for reimbursement to the City for moneys previously expended in anticipation of issuance of the Bonds. Upon the payment of all costs of the Project, any balance in the Series 2005-A Acquisition Fund A(1) Subaccount shall be transferred to the Debt Retirement Fund or used in any manner permitted by law.

(b)     For the Series 2005-A(2) Bonds:

1.     The "SERIES 2005-A ACQUISITION FUND A(2) SUBACCOUNT," in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2005-A(2) Bonds required by Sections 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2005-A(2) Bonds to pay the costs of the Project as such costs become due and payable. Upon the payment of all costs of the Project, any balance in the Series 2005 Acquisition Fund A(2) Subaccount shall be transferred to the Debt Retirement Fund or used in any manner permitted by law and which will not cause the interest on the Series 2005-A(2) Bonds to become not excludable from gross income for federal income tax purposes.

(c)     For the Series 2005-B Bonds:

        1.     The "SERIES 2005 ESCROW FUND," in which shall be deposited, after making the deposits from the proceeds of the sale of the Series 2005-B Bonds required by Section 502 and 503 of the Bond Resolution, the remainder of the proceeds of the sale of the Series 2005-B Bonds and any moneys transferred by the City from the debt retirement fund of the bonds to be refunded by the Series 2005-B Bonds, an amount sufficient, together with investment earnings, to pay the principal of and interest on the Refunded Bonds as they become due pursuant to the terms of the Escrow Agreement authorized in Section 303 herein.    Any balance remaining in the Series 2005 Escrow Fund after payment in full of principal and interest on the Refunded Bonds by the Series 2005-B Bonds shall be applied as provided in the Escrow Agreement.

        Section 602. Application of Series 2005-A(1) Bond Proceeds.  The purchase price for the Series 2005-A(1) Bonds is $72,930,375.00 consisting of the par amount ($73,500,000.00) less underwriters' discount of $569,625.00.     Of this amount, $1,544,333.04 (which includes $1,340,231.91 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be deposited in the Bond Issuance Fund for the payment of the costs of issuance on the Series 2005-A(1) Bonds in accordance with Section 503 of the Bond Resolution.    The amount of $2,616,430.04 shall be deposited shall be deposited in the Debt Retirement Fund to pay capitalized interest on the Series 2005-A(1) Bonds.   The remainder of the proceeds of the Series 2005-A(1) Bonds in the estimated amount of $68,769,611.92 shall be deposited in the Series 2005-A Acquisition Fund (A)(1) Subaccount established in Section 601 herein, and used to pay the costs of the Project, including legal and consulting fees and expenses for reimbursement to the City for moneys previously expended in anticipation of issuance of the Bonds, subject to the restrictions set forth in the Bond Resolution.

        Section 603.    Application of Series 2005-A(2) Bond Proceeds.  The purchase price for the Series 2005-A(2) Bonds is $13,893,054.90 consisting of the par amount ($13,530,000.00) less underwriters' discount of $104,857.50, plus net original issue premium of $467,912.40. Of this amount, $274,918.64 (which includes $237,347.37 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be deposited in the Bond Issuance Fund for the payment of the costs of issuance on the Series 2005-A(2) Bonds in accordance with Section 503 of the Bond Resolution.    The amount of $436,069.32 shall be deposited in the Debt Retirement Fund to pay capitalized interest on the Series 2005-A(2) Bonds.   The remainder of the proceeds of the Series 2005-A(2) Bonds in the estimated amount of $13,182,066.94 (including the amount of $467,912.40 constituting the net original issue premium of the Series 2005-A(2) Bonds) shall be deposited in the Series 2005-A Acquisition Fund A(2) Subaccount established in Section 601 herein, and used to finance the costs of the Project in accordance with the restrictions set forth in the Bond Resolution.

        Section 604.    Application of Series 2005-B Bond Proceeds.  The purchase price for the Series 2005-B Bonds is $12,486,858.85 consisting of the par amount ($11,785,000.00) less

B-9

underwriters' discount of $91,333.75, plus original issue premium of $793,192.60. Of this amount, $238,747.76 (which includes $195,747.02 for the payment of municipal bond insurance premium to the Insurer, which shall be deemed part of the costs of issuance, but which shall be wired directly to the Insurer at closing) shall be immediately transferred to the Bond Issuance Fund for the payment of costs of issuance on the Series 2005-B Bonds in accordance with Section 503 of the Bond Resolution. The remaining portion of the proceeds of the Series 2005-B Bonds of $12,248,111.09 shall be deposited in the Series 2005 Escrow Fund.

Section 606. <u>Payment of Issuance Expenses</u>. The Finance Director may pay the costs of issuance in an aggregate amount estimated at $2,053,224.30 (net of Underwriters' discount), including but not limited to, fees of bond counsel, fees of underwriters' counsel, rating agency fees, accounting and auditing fees, financial advisory fees, printing fees, municipal bond insurance and other out-of-pocket expenses, from portions of the proceeds of the Bonds deposited in the Bond Issuance Fund established in Section 503 of the Bond Resolution or from other legally available funds.

Section 607. <u>Designation of Refunded Bonds</u>. The Prior Bonds listed on Appendix A attached hereto and made a part hereof shall constitute the Refunded Bonds by the Series 2005-B Bonds.

Section 608. <u>Appointment of Verification Agent</u>. Grant Thornton L.L.P., Certified Public Accountants, is hereby appointed as verification agent for the funds deposited and on hand in the Escrow Fund under the Escrow Agreements to perform the duties described in the Official Statement under the heading "Verification of Certain Mathematical Calculations."

Section 609. <u>Sale Order a Contract</u>. The provisions of this Sale Order shall constitute a contract between the City and any Bondholder.

[remainder of page intentionally left blank]

Section 610.  <u>Effective Date</u>.  This Sale Order shall take effect immediately upon its execution by the undersigned Finance Director of the City.

SO ORDERED this 24th day of June, 2005.

_____
Sean K. Werdlow
Finance Director
City of Detroit

11

## APPENDIX A

The proceeds from the Series 2005-B Bonds shall be used to refund the following Outstanding Prior Bonds of the City:

1.      Downtown Development Limited Tax General Obligation Bonds, Series 1997, maturing July 15, 2008, 2009, 2015 and 2020.

## EXHIBIT B

## MUNICIPAL BOND INSURANCE
## (FINANCIAL GUARANTY INSURANCE)

### Section I
### DEFINITIONS

Except as otherwise provided in this Exhibit B, the following terms have the definitions set forth below:

"Ambac Assurance" shall mean Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company.

"Financial Guaranty Insurance Policy" shall mean the financial guaranty insurance policy issued by Ambac Assurance insuring the payment when due of the principal of and interest on the Bonds as provided therein.

### Section II
### AMBAC ASSURANCE CONSENT LANGUAGE

**A.      Consent of Ambac Assurance.**

Any provision of the Bond Resolution and the Sale Order (together, the "Financing Document") expressly recognizing or granting rights in or to Ambac Assurance may not be amended in any manner which affects the rights of Ambac Assurance hereunder without the prior written consent of Ambac Assurance. Ambac Assurance reserves the right to charge the City a fee for any consent or amendment to the Financing Document while the Financial Guaranty Insurance Policy is outstanding.

**B.      Consent of Ambac Assurance in lieu of Bondholder Consent.**

Unless otherwise provided in this Section, Ambac Assurance's consent shall be required in lieu of Bondholder consent, when required, for the following purposes: (i) execution and delivery of any supplemental Financing Document or any amendment, supplement or change to or modification of the Financing Document, (ii) removal of the Paying Agent and selection and appointment of any successor paying agent; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires Bondholder consent.

C.      **Consent of Ambac Assurance in the Event of Insolvency.**

Any reorganization or liquidation plan with respect to the City must be acceptable to Ambac Assurance. In the event of any reorganization or liquidation, Ambac Assurance shall have the right to vote on behalf of all Bondholders who hold Ambac Assurance-insured Bonds absent a default by Ambac Assurance under the applicable Financial Guaranty Insurance Policy insuring such Bonds.

D.      **Consent of Ambac Assurance Upon Default.**

Anything in the Financing Document to the contrary notwithstanding, upon the occurrence and continuance of an event of default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Bondholders for the benefit of the Bondholders under the Financing Document pursuant to state law.

## Section III
## NOTICES/INFORMATION TO BE GIVEN TO AMBAC ASSURANCE

**Notices to be sent to the attention of the <u>SURVEILLANCE DEPARTMENT</u>:**

A.      While the Financial Guaranty Insurance Policy is in effect, the City shall furnish to Ambac Assurance, upon request, the following:

(a)      a copy of any financial statement, audit and/or annual report of the City

(b)      such additional information it may reasonably request.

Upon request, such information shall be delivered at the City's expense to the attention of the Surveillance Department, unless otherwise indicated.

B.      A copy of any notice to be given to the registered owners of the Bonds, including, without limitation, notice of any redemption of or defeasance of Bonds, and any certificate rendered pursuant to the Financing Document relating to the security for the Bonds, at no cost to Ambac Assurance.

C.      To the extent that the City has entered into a continuing disclosure agreement with respect to the Bonds, Ambac Assurance shall be included as party to be notified.

B-2

**<u>Notices to be sent to the attention of the GENERAL COUNSEL OFFICE</u>:**

A.     The City, as appropriate, shall notify Ambac Assurance of any failure of the City to provide relevant notices, certificates, etc.

B.     Notwithstanding any other provision of the Financing Document, the City shall immediately notify Ambac Assurance if at any time there are insufficient moneys to make any payments of principal and/or interest as required and immediately upon the occurrence of any event of default under the Financing Document.

**<u>Other Information to be given to Ambac Assurance</u>:**

The City will permit Ambac Assurance to discuss the affairs, finances and accounts of the City or any information Ambac Assurance may reasonably request regarding the security for the Bonds with appropriate officers of the City.  The City will permit Ambac Assurance to have access to and to make copies of all books and records relating to the Bonds at any reasonable time.

**Section IV**
**PAYMENT PROCEDURE PURSUANT TO THE**
**FINANCIAL GUARANTY INSURANCE POLICY**

The following language sets out the applicable procedure for payments under the Financial Guaranty Insurance Policy:

As long as the Bond insurance shall be in full force and effect, the City and the Paying Agent agree to comply with the following provisions:

(a)     At least one (1) business day prior to all Interest Payment Dates the Paying Agent will determine whether there will be sufficient funds in the Funds and Accounts to pay the principal of or interest on the Bonds on such Interest Payment Date.  If the Paying Agent determines that there will be insufficient funds in such Funds or Accounts, the Paying Agent shall so notify Ambac Assurance.  Such notice shall specify the amount of the anticipated deficiency, the Bonds to which such deficiency is applicable and whether such Bonds will be deficient as to principal or interest, or both.  If the Paying Agent has not so notified Ambac Assurance at least one (1) business day prior to an Interest Payment Date, Ambac Assurance will make payments of principal or interest due on the Bonds on or before the first (1st) business day next following the date on which Ambac Assurance shall have received notice of nonpayment from the Paying Agent.

(b)     the Paying Agent after giving notice to Ambac Assurance as provided in (a) above, make available to Ambac Assurance and, at Ambac Assurance's direction, to The Bank of New York, as insurance trustee for Ambac Assurance or any successor insurance trustee (the "Insurance Trustee"), the registration books of the City maintained by the

Trustee or Paying Agent, if any, and all records relating to the Funds and Accounts maintained under the Financing Document.

(c)     the Paying Agent shall provide Ambac Assurance and the Insurance Trustee with a list of registered owners of Bonds entitled to receive principal or interest payments from Ambac Assurance under the terms of the Financial Guaranty Insurance Policy, and shall make arrangements with the Insurance Trustee (i) to mail checks or drafts to the registered owners of Bonds entitled to receive full or partial interest payments from Ambac Assurance and (ii) to pay principal upon Bonds surrendered to the Insurance Trustee by the registered owners of Bonds entitled to receive full or partial principal payments from Ambac Assurance.

(d)     the Paying Agent shall, at the time it provides notice to Ambac Assurance pursuant to (a) above, notify registered owners of Bonds entitled to receive the payment of principal or interest thereon from Ambac Assurance (i) as to the fact of such entitlement, (ii) that Ambac Assurance will remit to them all or a part of the interest payments next coming due upon proof of Bondholder entitlement to interest payments and delivery to the Insurance Trustee, in form satisfactory to the Insurance Trustee, of an appropriate assignment of the registered owner' s right to payment, (iii) that should they be entitled to receive full payment of principal from Ambac Assurance, they must surrender their Bonds (along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee to permit ownership of such Bonds to be registered in the name of Ambac Assurance) for payment to the Insurance Trustee, and not the Paying Agent, and (iv) that should they be entitled to receive partial payment of principal from Ambac Assurance, they must surrender their Bonds for payment thereon first to the Paying Agent who shall note on such Bonds the portion of the principal paid by the Paying Agent and then, along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee, to the Insurance Trustee, which will then pay the unpaid portion of principal.

(e)     in the event that the Paying Agent has notice that any payment of principal of or interest on a Bond which has become Due for Payment and which is made to a Bondholder by or on behalf of the City has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Paying Agent shall, at the time Ambac Assurance is notified pursuant to (a) above, notify all registered owners that in the event that any registered owner's payment is so recovered, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available, and the Paying Agent shall furnish to Ambac Assurance its records evidencing the payments of principal of and interest on the Bonds which have been made by the Paying Agent and subsequently recovered from registered owners and the dates on which such payments were made.

(f)     in addition to those rights granted Ambac Assurance under the Sale Order, Ambac Assurance shall, to the extent it makes payment of principal of or interest on Bonds,

become subrogated to the rights of the recipients of such payments in accordance with the terms of the Financial Guaranty Insurance Policy, and to evidence such subrogation (i) in the case of subrogation as to claims for past due interest, the Paying Agent shall note Ambac Assurance's rights as subrogee on the registration books of the City maintained by the Paying Agent upon receipt from Ambac Assurance of proof of the payment of interest thereon to the registered owners of the Bonds, and (ii) in the case of subrogation as to claims for past due principal, Paying Agent shall note Ambac Assurance's rights as subrogee on the registration books of the City maintained by the Paying Agent upon surrender of the Bonds by the registered owners thereof together with proof of the payment of principal thereof.

DELIB:2635310.3\022765-00177

6C

6-C



# **Ambac**

### Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor: **CITY OF DETROIT, MICHIGAN**

Policy Number:

22980BE

Obligations: Consisting of:
$39,270,000 General Obligation Bonds (Unlimited Tax), Series
2004-A(1), dated their date of delivery and maturing on April 1 in
the years 2019 through 2024, both inclusive;
(AS FURTHER DESCRIBED ON THE REVERSE HEREOF)

Premium: **$1,181,814.94**

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

**SEAL**

Secretary

Authorized Representative

Effective Date:
September 9, 2004

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Authorized Officer of Insurance Trustee

Form No.: 2B-0012 (1/01)

**Ambac Assurance Corporation**
One State Street Plaza
New York, NY 10004
212.668.0340

*A member of the Ambac Financial Group, Inc.*

September 9, 2004

City of Detroit, Michigan
Finance Department
2 Woodward Avenue
Detroit, MI 48226

Robert W. Baird & Co.
300 East Fifth Avenue
Naperville, IL 60563

J.P. Morgan, as Representative of
  the Underwriters
1 Bank One Plaza
Chicago, IL 60670

Miller, Canfield, Paddock and
  Stone, P.L.C.
150 West Jefferson Avenue
Detroit, MI 48226

**Ambac**

Ladies and Gentlemen:

This opinion has been requested of the undersigned, a Vice President and an Assistant General Counsel of Ambac Assurance Corporation, a Wisconsin stock insurance corporation ("Ambac Assurance"), in connection with the issuance by Ambac Assurance of a certain Financial Guaranty Insurance Policy, effective as of the date hereof (the "Policy"), insuring $111,680,000 in aggregate principal amount of City of Detroit, Michigan (the "Obligor"), General Obligation Bonds (Unlimited Tax), consisting of $39,270,000 Series 2004-A(1) and $2,055,000 Series 2004-A(2) (Federally Taxable) and General Obligation Refunding Bonds consisting of $53,085,000 Series 2004-B(1) and $17,270,000 Series 2004-B(2) (Federally Taxable), each series dated their date of delivery (collectively, the "Obligations").

In connection with my opinion herein, I have examined the Policy, such statutes, documents and proceedings as I have considered necessary or appropriate under the circumstances to render the following opinion, including, without limiting the generality of the foregoing, certain statements contained in the Official Statement of the Obligor dated August 27, 2004 relating to the Obligations (the "Official Statement") under the headings "BOND INSURANCE" and "APPENDIX C – SPECIMEN MUNICIPAL BOND INSURANCE POLICY".

Based upon the foregoing and having regard to legal considerations I deem relevant, I am of the opinion that:

1.    Ambac Assurance is a stock insurance corporation duly organized and validly existing under the laws of the State of Wisconsin and duly qualified to conduct an insurance business in the State of Michigan.

2.    Ambac Assurance has full corporate power and authority to execute and deliver the Policy and the Policy has been duly authorized, executed and delivered by Ambac Assurance and constitutes a legal, valid and binding obligation of Ambac Assurance enforceable in accordance with its terms except to the extent that the enforceability (but not the validity) of such obligation may be limited by any applicable bankruptcy, insolvency, liquidation, rehabilitation or other similar law or enactment now or hereafter enacted affecting the enforcement of creditors' rights.

3.    The execution and delivery by Ambac Assurance of the Policy will not, and the consummation of the transactions contemplated thereby and the satisfaction of the terms thereof will not, conflict with or result in a breach of any of the terms, conditions or provisions of the Certificate of Authority, Articles of Incorporation or By-Laws of Ambac Assurance, or any restriction contained in any contract, agreement or instrument to which Ambac Assurance is a party or by which it is bound or constitute a default under any of the foregoing.

4.    Proceedings legally required for the issuance of the Policy have been taken by Ambac Assurance and licenses, orders, consents or other authorizations or approvals of any governmental boards or bodies legally required for the enforceability of the Policy have been obtained; any proceedings not taken and any licenses, authorizations or approvals not obtained are not material to the enforceability of the Policy.

5.    The statements contained in the Official Statement under the heading "BOND INSURANCE", insofar as such statements constitute summaries of the matters referred to therein, accurately reflect and fairly present the information purported to be shown and, insofar as such statements describe Ambac Financial Group, Inc. and Ambac Assurance, fairly and accurately describe Ambac Financial Group, Inc. and Ambac Assurance.

6.    The form of Policy contained in the Official Statement under the heading "APPENDIX C – SPECIMEN MUNICIPAL BOND INSURANCE POLICY" is a true and complete copy of the form of Policy.

The opinions expressed herein are solely for your benefit, and may not be relied upon by any other person.

Very truly yours,

*Dwight Kwa*

Dwight Kwa
Vice President and
Assistant General Counsel

**Ambac**

/kd
22980be

**CERTIFICATE OF BOND INSURER**

In connection with the issuance of $111,680,000 in aggregate principal amount of City of Detroit, Michigan (the "Obligor"), General Obligation Bonds (Unlimited Tax), consisting of $39,270,000 Series 2004-A(1) and $2,055,000 Series 2004-A(2) (Federally Taxable) and General Obligation Refunding Bonds consisting of $53,085,000 Series 2004-B(1) and $17,270,000 Series 2004-B(2) (Federally Taxable), each series dated their date of delivery (collectively, the "Obligations"), Ambac Assurance Corporation ("Ambac") is issuing a financial guaranty insurance policy (the "Insurance Policy") guaranteeing the payment of principal and interest when due on the Obligations, all as more fully set out in the Insurance Policy.

*Ambac*

On behalf of Ambac, the undersigned hereby certifies that:

(i)    the Insurance Policy is an unconditional and recourse obligation of Ambac (enforceable by or on behalf of the holders of the Obligations) to pay the scheduled payments of interest and principal on the Obligations in the event of a Nonpayment as defined in the Insurance Policy;

(ii)    the insurance premium of $1,181,814.94 was determined in arm's length negotiations in accordance with our standard procedures, is required to be paid as a condition to the issuance of the Insurance Policy and represents a reasonable charge for the transfer of credit risk;

(iii)    no portion of such premium represents a payment for any direct or indirect services other than the transfer of credit risk, including costs of underwriting or remarketing the Obligations or the cost of insurance for casualty of Obligation financed property;

(iv)    we are not co-obligors on the Obligations and do not reasonably expect that we will be called upon to make any payment under the Insurance Policy; and

(v)    the Obligor is not entitled to a refund of any portion of premium for the Insurance Policy in the event that the Obligations are retired prior to their stated maturity.

IN WITNESS WHEREOF, Ambac Assurance Corporation has caused this certificate to be executed in its name on this 9th day of September, 2004, by one of its officers duly authorized as of such date.

AMBAC ASSURANCE CORPORATION

By _____
Dwight Kwa
Vice President and
Assistant General Counsel

## AMBAC ASSURANCE CORPORATION'S
## CERTIFICATE AS TO NO DEFAULT

**Ambac**

      The undersigned officer of Ambac Assurance Corporation (the "Insurer"), as insurer of $111,680,000 in aggregate principal amount of City of Detroit, Michigan (the "Obligor"), General Obligation Bonds (Unlimited Tax), consisting of $39,270,000 Series 2004-A(1) and $2,055,000 Series 2004-A(2) (Federally Taxable) and General Obligation Refunding Bonds consisting of $53,085,000 Series 2004-B(1) and $17,270,000 Series 2004-B(2) (Federally Taxable), each series dated their date of delivery (collectively, the "Obligations"), HEREBY CERTIFIES that the Insurer is not currently in default nor has the Insurer been in default at any time with respect to the payment of the principal of or interest on any obligation guaranteed by the Insurer.

Dated: September 9, 2004        AMBAC ASSURANCE CORPORATION

                                     _____
                                     Dwight Kwa
                                     Vice President and
                                     Assistant General Counsel



# Ambac

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor: **CITY OF DETROIT, MICHIGAN**

Policy Number: **22981BE**

Obligations: $62,285,000 General Obligation Self-Insurance Bonds (Limited Tax), Series 2004 (Federally Taxable), dated their date of delivery and maturing on April 1 in the years 2009 through 2014, both inclusive. The Paying Agent is U.S. Bank National Association, Detroit, Michigan.

Premium: $549,846.78

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

**SEAL**

Secretary

Authorized Representative

Effective Date:
**September 9 , 2004**

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Authorized Officer of Insurance Trustee

Form No.: 2B-0012 (1/01)

A-6657



# Ambac

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor: **CITY OF DETROIT, MICHIGAN**

Policy Number:
**24218BE**

Obligations: **$73,500,000 in aggregate principal amount of General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(1)(Taxable), dated their Date of Delivery and consisting of: (AS FURTHER DESCRIBED ON THE REVERSE HEREOF)**

Premium: **$1,773,326.30**

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

**SEAL**

Secretary/

Authorized Representative

Effective Date:
**June 29, 2005**

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

A-**8217**

**Ambac Assurance Corporation**
One State Street Plaza
New York, NY 10004
212.668.0340

*A member of the Ambac Financial Group, Inc.*

June 29, 2005

City of Detroit, Michigan
1200 Coleman A. Young Municipal Center
2 Woodward Avenue
Detroit, MI 48226

Robert W. Baird & Co.
300 East Fifth Avenue
Naperville, IL 60563

JP Morgan Securities, Inc.
131 S. Dearborn Street
Chicago, IL 60670

Pepper Hamilton LLP
100 Renaissance Center
Detroit, MI 48243



Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson Avenue
Detroit, MI 48226

U.S. Bank National Association
535 Griswold
Detroit, MI 48226

Ladies and Gentlemen:

This opinion has been requested of the undersigned, a First Vice President and an Assistant General Counsel of Ambac Assurance Corporation, a Wisconsin stock insurance corporation ("Ambac Assurance"), in connection with the issuance by Ambac Assurance of a certain Financial Guaranty Insurance Policy, effective as of the date hereof (the "Policy"), insuring certain obligations of the City of Detroit, Michigan (the "Obligor"), consisting of: $73,500,000 in aggregate principal amount of General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(1)(Taxable); $13,530,000 in aggregate principal amount of General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(2); and $11,785,000 in aggregate principal amount of General Obligation Capital Improvement Refunding Bonds (Limited Tax), Series 2005-B, dated their date of delivery (the "Obligations").

In connection with my opinion herein, I have examined the Policy, such statutes, documents and proceedings as I have considered necessary or appropriate under the circumstances to render the following opinion, including, without limiting the generality of the foregoing, certain statements contained in the Official Statement of the Obligor dated June 24, 2005 relating to the Obligations (the "Official Statement") under the headings "BOND INSURANCE" and "APPENDIX C – SPECIMEN FINANCIAL GUARANTY INSURANCE POLICY".

Based upon the foregoing and having regard to legal considerations I deem relevant, I am of the opinion that:

1.    Ambac Assurance is a stock insurance corporation duly organized and validly existing under the laws of the State of Wisconsin and duly qualified to conduct an insurance business in the State of Michigan.

2.    Ambac Assurance has full corporate power and authority to execute and deliver the Policy and the Policy has been duly authorized, executed and delivered by Ambac Assurance and constitutes a legal, valid and binding obligation of Ambac Assurance enforceable in accordance with its terms except to the extent that the enforceability (but not the validity) of such obligation may be limited by any applicable bankruptcy, insolvency, liquidation, rehabilitation or other similar law

or enactment now or hereafter enacted affecting the enforcement of creditors' rights.

3.    The execution and delivery by Ambac Assurance of the Policy will not, and the consummation of the transactions contemplated thereby and the satisfaction of the terms thereof will not, conflict with or result in a breach of any of the terms, conditions or provisions of the Certificate of Authority, Articles of Incorporation or By-Laws of Ambac Assurance, or any restriction contained in any contract, agreement or instrument to which Ambac Assurance is a party or by which it is bound or constitute a default under any of the foregoing.

**Ambac**

4.    Proceedings legally required for the issuance of the Policy have been taken by Ambac Assurance and licenses, orders, consents or other authorizations or approvals of any governmental boards or bodies legally required for the enforceability of the Policy have been obtained; any proceedings not taken and any licenses, authorizations or approvals not obtained are not material to the enforceability of the Policy.

5.    The statements contained in the Official Statement under the heading "BOND INSURANCE", insofar as such statements constitute summaries of the matters referred to therein, accurately reflect and fairly present the information purported to be shown and, insofar as such statements describe Ambac Financial Group, Inc. and Ambac Assurance, fairly and accurately describe Ambac Financial Group, Inc. and Ambac Assurance.

6.    The form of Policy contained in the Official Statement under the heading "APPENDIX C – SPECIMEN FINANCIAL GUARANTY INSURANCE POLICY" is a true and complete copy of the form of Policy.

The opinions expressed herein are solely for your benefit, and may not be relied upon by any other person.

Very truly yours,

Eileen L. Kirchoff
First Vice President and
Assistant General Counsel

## CERTIFICATE OF BOND INSURER

In connection with the issuance of certain obligations of the City of Detroit, Michigan (the "Obligor"), consisting of: $73,500,000 in aggregate principal amount of General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(1)(Taxable); $13,530,000 in aggregate principal amount of General Obligation Capital Improvement Bonds (Limited Tax), Series 2005-A(2); and $11,785,000 in aggregate principal amount of General Obligation Capital Improvement Refunding Bonds (Limited Tax), Series 2005-B, dated their date of delivery (the "Obligations"), Ambac Assurance Corporation ("Ambac") is issuing a financial guaranty insurance policy (the "Insurance Policy") guaranteeing the payment of principal and interest when due on the Obligations, all as more fully set out in the Insurance Policy.

On behalf of Ambac, the undersigned hereby certifies that:

(i) the Insurance Policy is an unconditional and recourse obligation of Ambac (enforceable by or on behalf of the holders of the Obligations) to pay the scheduled payments of interest and principal on the Obligations in the event of a Nonpayment as defined in the Insurance Policy;

(ii) the insurance premium of $1,773,326.30 was determined in arm's length negotiations in accordance with our standard procedures, is required to be paid as a condition to the issuance of the Insurance Policy and represents a reasonable charge for the transfer of credit risk;

(iii) no portion of such premium represents a payment for any direct or indirect services other than the transfer of credit risk, including costs of underwriting or remarketing the Obligations or the cost of insurance for casualty of Obligation financed property;

(iv) we are not co-obligors on the Obligations and do not reasonably expect that we will be called upon to make any payment under the Insurance Policy; and

(v) the Obligor is not entitled to a refund of any portion of premium for the Insurance Policy in the event that the Obligations are retired prior to their stated maturity.

IN WITNESS WHEREOF, Ambac Assurance Corporation has caused this certificate to be executed in its name on this 29th day of June, 2005, by one of its officers duly authorized as of such date.

AMBAC ASSURANCE CORPORATION

By _Eileen L. Kirchoff_
Eileen L. Kirchoff
First Vice President and
Assistant General Counsel