UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re ) | | Chapter 9 |
| ) | | |
| CITY OF DETROIT, MICHIGAN, ) | | Case No. 13-53846 |
| ) | | |
| Debtor. ) | | Hon. Steven W. Rhodes |

-------------------------------------------------------

**CREDITOR'S JAMIE S. FIELDS MEMORANDUM IDENTIFYING ISSUES OF LAW RELATING TO THE CONFIRMATION OF THE FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF DETROIT, MICHIGAN (MAY 5, 2014)**

Creditor, JAMIE S. FIELDS, attorney acting *in pro per*, Detroit Police uniformed retiree and City of Detroit resident, respectfully submits this memorandum of points and authorities regarding questions of law to facilitate and expedite the Court's consideration of the City's Plan of Adjustment pursuant to the Court's Order dated May 23, 2014. The following questions of law related to the City's proposed Plan of Adjustment are presented to the Court for its consideration.

**1. Does the City's Plan Comply with the Provisions of 1122 (Classification of Claims) and 1129(a) (3) (good faith)?**

Section 1122, which prescribes the rules for classifying claims, unequivocally states that substantially dissimilar claims may not be placed in the same class. The Code is silent, however, on what constitutes "substantially dissimilar" claims. In trying to answer this question the circuits are split. Courts have used various tests to determine whether separate classification and disparate treatment of legally similar claims is permissible, and, as a corollary, does not constitute unfair discrimination. See, *e.g.*, *In re 11,111 Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (considering whether there is reasonable and fair basis for different treatment; whether discrimination is proposed in good faith; and whether degree of discrimination is proportional to its rationale).

It appears a logical extension of Section 1122 that the City by separating dissimilar claims into different classes (Class 10 and 11) and then linking those classes for voting purposes violates the spirit of the Code. In addition, the City's treatment of many pension claims as impaired, when they will be paid in full is somewhat odd even in a system that employs a liberal notion of impairment. Creditors that will be paid in full are unlikely to have strong impetus to be highly involved in the case. Classifying pension claims that will not be reduced as impaired goes beyond even the broad notion of impairment that underlies the Chapter 9 negotiation process and dilutes the power of pension claim holders that are being asked to accept significantly adverse treatment under the City's Plan (GRS pension claim holders especially those subject to ASF recoupment).

The informational meetings conducted by the Official Committees of Retirees have been attended by thousands of retirees, the vast majority of which are civilian (GRS) pension claim holders. The reason there are so few PFRS pension claim holders at these meetings is simple, unimpaired creditors are unlikely to have a strong interest in the case. The overwhelming majority of individual retirees that have file objections to either the City's Disclosure Statement or Plan of Adjustment are civilians.

The City apparently found the Claims in Class 10 and 11 to be dissimilar enough to warrant separate classification. But paradoxically by linking the classes together for voting purposes, the City appears to be hedging by saying that the "nature of the claims" while not similar enough to be in the same class should have their votes conditioned on both classes accepting the Plan.

The City of Central Falls, Rhode Island's (11-13105) did not impair pension claims under $10,000 and did not give those unimpaired pension claims voting rights. The City of Detroit also did not impair pensions below the poverty level. But the City is lumping those pensions claim holders with no impairment with those pension claim holders with a de minimis impairment with those pension claim holders that are substantially impaired in the same voting bloc and treating all pension claim holders as impaired. Central Falls also further divided pension claims into classes based on level of impairment. Detroit has combined dissimilar claims, ranging from no impairment to over 50% impairment (including the elimination of COLA), into the same voting class.

The RDPFFA reached a mediated settlement (Class 10) with the City. The DRCEA reached a mediated settlement (Class 11) with the City. These settlements were based on arm's length negotiations and were substantially different from each in part due to the financial health of the respective pension funds. The City's subsequent action, combining both classes for voting purposes - renders the settlements illusory and negates yeomanlike efforts of Judge Rosen.

The settlements are illusory because the City is treating approximately 40% of uniformed retirees (3,587) whose pensions are not being reduced and who never have received COLA as "impaired" creditors. The City would undoubtedly argue that since these retirees, also referred to as "pre-69 plan" retirees, are impaired because they receive escalators based on the raises active employees receive. Active employees have not had a wage increase since 2004. The City, as part of their forward financial projections, have forecasted future raises for active employees. Any projections of future pension increases for retirees based on nebulous and uncertain raises for active employees that can't be enforced and is lacking consideration is an illusory promise.

Additionally, the City in another of many contradictions, while classifying pension claim holders as unsecured creditors have provided individual retirees pension claims amounts on their ballots based on their *pro rata* share of the pensions system's purported unfunded actuarial liabilities (UAL). It appears, that the City has admitted that to the extent the pension systems are funded, that is collateral for pensions, and to the extent pensions are funded, pensioners are secured creditors and to the extent the pension system is unfunded, pensioners are unsecured creditors. Therefore, retirees based on the monies they are receiving for the unsecured portions of their pension claims, are receiving a far less recovery than other unsecured creditor (e.g., bond holders).

There are approximately 8,000 PFRS retirees. Almost 40% (3,587) are what are called "pre-69 plan" retirees who do not receive any escalator or COLA and are not subject to any reduction of pension benefits regardless of how they vote. Another approximately 2,000 police/fire retirees receive simple (non-compounded COLA) and the remainder receive compounded COLA. Almost half of Class 10 are unimpaired and the remainder only have a *de minimis* impairment. There are approximately 12,000 retirees (Class 11) who will be substantially impaired under the plan (e.g. 4.5% reduction + elimination of COLA + ASF recoupment).

A class is deemed to have accepted a plan if two-thirds in dollar amount and one-half in number of creditors that have voted have cast affirmative votes. To the extent that all pension claims are linked together for voting purposes, a single disgruntled group with a large claim can dominate the plan process and may force their will on other unsecured creditors. The opposite is also true, a single contented group that is minimally impaired can dominate the plan process and may force their will on pension claim holders that are not as large but are more impaired.

PFRS retirees generally retire at a younger age and their pension claims are on average greater than GRS retirees. Therefore, the likelihood is increased that the plan will be accepted by over 2/3 of the dollar amount of the claims thereby imposing the will of unimpaired creditors on substantially impaired GRS claims. The City's classification does not satisfy Section 1129(a) (10)

The leading case adopting this view is the Eighth Circuit's decision in *Windsor on the River Associates, Ltd. v. Balcor Real Estate Finance, Inc*. (*In re Windsor on the River Associates, Ltd.*), 7 F.3d 127, 132 (8th Cir. 1993). The court acknowledged that any alteration of a creditor's rights could make a claim impaired; in *Windsor*, the challenged class of claims would be paid in full in 60 days. See *Id*. at 130. However, the court reasoned that allowing a debtor to engineer an impaired class solely for purposes of securing plan confirmation would nullify the protection that truly impaired creditors otherwise receive through Section 1129(a)(10). See *Id.* at 131. The Third Circuit Court of Appeals has followed the *Windsor* approach, at least in the context of asbestos-related bankruptcies, calling artificial impairment "troubling" and observing that "[t]he chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors." See *In re Combustion Engineering, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004).

A majority of courts have followed *Windsor's* approach in barring debtors from unfairly manipulating impairment of a class to satisfy Section 1129(a) (10). See *In re RYYZ, LLC,* 490, B.R. 29, 43 (Bankr. E.D.N.Y. Apr. 4, 2013) (observing that majority view is that artificial impairment is not permitted). In a case concerning the Chapter 11 filing of a company with pending asbestos claims, the court held that although the plan may meet the technical classification requirements of Sections 1122 and 1129(b), it is "fundamentally unfair that one claimant…will be paid in full, while [another]… risk[s] receiving nothing…. The court is informed that other judges have confirmed plans with such discriminatory classifications. This judge cannot do so in good conscience." *In re ACandS, Inc.* 311 B.R. 36, 43, 2004 Bankr. LEXIS 81 (Bankr. D. Del. 2004).

The Jones Day Newsletter (July/August 2007) outlined the very dangers of gerrymandering that on which the City is relying:

> Voting in chapter 11 is conducted by classes, rather than individual creditors or shareholders. This means that a dissenting individual creditor or shareholder can be outvoted if the remaining class members hold enough of the claims or interests in the class to achieve the voting majorities specified in the Bankruptcy Code for class acceptance. As such, how a claim or interest is classified can have a significant impact on the debtor's prospects for confirming a chapter 11 plan — a creditor, for example, whose claim is substantial enough to give it voting control of a class may be able to block confirmation.

Although, the forgoing illustrative example was of the possibility of a large creditor (or group) being able to block confirmation the opposite is also true. For, as the old adage goes, that which can be used as a shield, may also be applied as a sword, and such malleability and changeability can both protect, as well as be used against one. Therefore, courts must assure that debtors have a legitimate purpose or rationalization for classification of claims so as not to unfairly manufacture an artificial impairment or manipulate class voting.

The Supreme Court in *Avon Park*, 311 U.S. 138 (1940) a municipal restructuring case decided before the Bankruptcy Code made the "same treatment" requirement explicit in section 1123(a)(4). In *Avon Park,* the Court reversed an order confirming a plan of adjustment in which the debtor classified all bond claims into a single class, which was to receive refunding bonds. The City's fiscal agent held bonds classified into that class. Under the plan, the City proposed to pay additional amounts, apparently for its assistance in facilitating the refunding. *Id* at 141. The Supreme Court held that this additional consideration, which was not available to other bondholders classified within the same class, violated basic principles of municipal restructuring:

> Compositions under Ch. IX . . . envisage equality of treatment of creditors. Under that section and its antecedents, a composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others, whether that consideration moved from the debtor or from another. . . .

Congress codified this aspect of *Avon Park* in Section 1123(a)(4), and courts have continued to apply the reasoning of *Avon Park* in situations analogous to those here. For example, in *Adelphia* the district court held that there was a substantial possibility that the bankruptcy court had erred in confirming a plan providing for a class of bondholders to receive specified pro rata distributions but also for certain bondholders who had voted to approve the plan to receive other consideration, including releases and exculpation:

> There is no doubt here that in return for approving the Plan, some claimants will receive a more valuable settlement than others. While such an outcome may be permissible where the added benefit is given for truly collateral reasons (i.e., independent from their status as claimants), here the benefit is given in exchange for the claimant's affirmative vote for the Plan – an added benefit that is tied directly to the Plan itself and given to some claimants in a class, but not all. Such an inducement may well lead some claimants to approve the Plan when they otherwise may have rejected it. As a result, creditors opposing the Plan may have been prejudiced by a quid pro quo exchange of Plan approval for valuable releases and exculpations.

Section 1123(a) (4) guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan. Where the receipt of valuable benefits in a plan is conditioned on a vote to accept that plan, there is a very real possibility of dissuading or silencing opposition to the plan. In this context, the Bankruptcy Court's semantic distinction between the treatment of claims and claimants goes against the spirit of section 1123(a) (4) and what it seeks to protect.

To treat retirees differently – **one entitled to 100% payment or a *de minimis* reduction (PFRS Claims) and another (GRS Claims) to a substantially less payment –** but to mandate that the classes vote together elevates form over substance and violates the equal treatment mandate of section 1123(a) (4).

2. **Is the City Prohibited by Law from Taking Action Necessary to carry out the Plan because prospectively it violates Michigan Law requiring that City fund employee pension benefits in the year that they were earned?**

Michigan has chosen to control its political subdivisions by making it unconstitutional to diminish or impair accrued pension benefits and by requiring that those benefits be annually funded. See *Mich. Const. Art. 9, Section 24* ("Pension Clause"). The fact that a municipality is in bankruptcy does not alter the State's control over the municipality.

The City prospectively plans to violate State law by forbearing on their required annual pension contributions until 2023. Congress did not intend to provide municipal debtors with dispensation to ignore State laws governing their conduct simply because those laws may make it harder for them to adjust their debts. Such adjustment cannot be done at the expense of State law. Section 903 of the Code makes this clear. Sections 109 (c) (2), 903 and 904 all reflect a healthy respect for State sovereignty. The final safeguard of State sovereignty is 943(b) (4), which requires, as a condition of confirmation of a Plan, that "the debtor is not prohibited by law from taking any action necessary to carry out the plan."

From the outset, Congress was aware that municipal bankruptcy laws created significant potential for interference in State affairs; thus, the first such law contained a provision similar to Section 903. Legislative history from the 1934 Act explains that this language was put into the law "as a further limitation upon Federal power and in respect for the rights and responsibilities of the States," S. COMM. ON THE JUDICIARY, REP. No. 407, at 2 (1934). Under the plain terms of Section 903 and its legislative history (dating back to its inception), the States retain control over their political subdivisions even during a Chapter 9 case. State control is so absolute that the legislative history indicates that "withdrawal of State consent at any time will terminate the case."

Section 109(c)(2) specifically addresses State consent to authorize a filing, but does not address the interplay between State law and control reflected in Section 903 after a petition is filed. If Congress only sought to limit State control at the incipient stage of its grant of authority to file a bankruptcy petition, it would not have included Section 903 in the Code. These provisions must be read in conjunction with one another.

Congress did not envision or intend that Chapter 9 become a haven for municipalities that seek to ignore and break State laws and constitutional provisions to adjust their debts. Without the control that Section 903 provides for through State law, a municipal debtor would be free to violate any and every State law once it filed a Chapter 9 petition. If construed otherwise, the whole rationale of Section 903, a healthy respect for State control over their subdivisions and a State's fiscal affairs, is lost and the constitutionality of Chapter 9 as a whole is thrown into doubt. Assuming arguendo, that 943(b)(4) does not prohibit the impairment of pensions in bankruptcy, the logical interpretation of the purpose of 943(b)(4) is that it applies after an obligation is restructured in Chapter 9, not necessarily to the restructuring itself.

In *Sanitary & Improvement Dist. #7*, 90 B.R. at 974-75, bondholders challenged a proposed Plan that would have restructured their bonds, and replaced them with bonds that provided for a buy-back by the municipality at less than the full nominal value of the bonds. The court concluded that 943(b) (4) did not prevent a restructuring of the bonds. "To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debt is not," the court concluded, "a logical or necessary result." *Id*. at 974. The court ruled that the restriction applied to the bonds as restructured, not to the restructuring itself. *Id*. at 975.

In *Sanitary*, the Court allowed the restructuring of the bonds in bankruptcy but rejected the Plan, which allowed the redemption of the bonds during the first six months following confirmation at a value which was approximately ten percent less than their actual present value, which was prohibited by state law, and therefore was prohibited by Section 943(b) (4) of the Code. The City of Detroit's proposal, to not fund its pension contributions as required, until 2023[1] is prohibited by Michigan law and, therefore also by Sections 903 and 943(b) (4) of the Code.

Reading both clauses of the *Michigan Const. Art. 9, Section 24*, as having no independent force or meaning and as being merely co-extensive with each other, violates the rules of statutory construction. It would render the second paragraph of *Mich. Const. Art. 9, Section 24* meaningless surplusage. See, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). See also, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 668–69 (2007).

---

[1] Even in the event that the State pledge is forthcoming those monies would not fully fund the City's required normal annual retirement system contribution. The City proposes making no contribution until 2023 and less than the required contribution until 2033.

It does not follow, nor has it been argued, that this Court's ruling that pensions can be impaired in bankruptcy, has any effect on the second paragraph of *Mich, Const. Art. 9, Section 24* post-bankruptcy on the requirement that accrued pension benefits must "be annually funded" in the year they were earned. *Sanitary* was not allowed to redeem bonds in violation of state law post-bankruptcy and the City of Detroit - post-bankruptcy – should not be able to ignore Michigan law by not fully funding their annual pension obligations in the year that they are earned.

The Michigan Supreme Court in addressing the annual funding requirement stated "In the years prior to the 1963 Mich. Constitution, the Legislature did not always make adequate appropriations to maintain (the state pension system) …on an actuarially sound basis…the practical effect of this underfunding was that many pensioners had accumulated years of service for which insufficient money had been set aside in the pension reserve fund to pay the benefits their years of service entitled." *Kosa v Treasury State of Michigan*, 408 Mich. 356, 365, (1980).

The *Kosa* Court analyzed the history of the legislation by looking to the constitutional debates. It noted that a "clear distinction must be drawn between the right to receive pension benefits and the funding method adopted by the Legislature to assure that the monies are available for the payments of such benefits." *Id* at 371. *Art. 9, Section 24* "expressly mandates (municipalities) to fund all public employee pension systems to a level **which includes unfunded accrued liabilities**" which are "the estimated amounts which will be needed according to actuarial projections to fulfill presently existing pension obligations…." *Shelby Twp Police & Fire Retirement Bd. V Shelby Twp*, 438 Mich 247, 255-256 (1991) (emphasis added) quoting *Kosa* at 364. See also, *Musselman v. Governor of Mich.*, 533 N.W.2d 237, 243 (Mich. 1995). (School district's failure to fully fund its pension obligations violated the Michigan Constitution).

An examination of the constitutional debates, reveals the framers' intent was to create a clear obligation of municipalities to annually fully fund their pension and retirement systems. This is illustrated by the following:

"[This] section is an attempt to rectify, in part, policies which have permitted sizeable deficiencies to pile up in retirement systems in this state. Under this section, accruing liability in each fiscal year must be funded during that year, thus keeping any of these systems from getting farther behind than they are now." [2 Official Record, Constitutional Convention 1961, p 3402].

## CONCLUSION

The Court by addressing the forgoing substantive legal questions prior to the confirmation trial would facilitate the fair, equitable and expedient adjudication of this matter.

/s/ Jamie S. Fields
Jamie S. Fields (P-52808)
555 Brush
Detroit, Mich. 48226
(313) 570-3906

Date: May 25, 2014