**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

CITY OF DETROIT, MICHIGAN,

                 Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

**RESPONSE OF THE DETROIT INSTITUTE OF ARTS TO**
**OBJECTIONS TO THE CITY'S AMENDED PLAN OF CONFIRMATION**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................3

        A.      The Museum Was Established For The Sole Charitable Purpose Of
                Making Art Available To The Public. ....................................................3

                1.      The Museum Begins With The Incorporation Of The DIA Corp.
                        As A Public Art Institute.............................................................. 3

                2.      The Museum Is Continued With The Formation Of The Arts
                        Commission Of The City Of Detroit With The City Acting As Co-
                        Trustee With The DIA Corp. ....................................................... 4

                3.      The Museum Continues Under The 1997 Operating Agreement
                        With The DIA Corp. Assuming All Responsibilities For Operating
                        The Museum For The Benefit Of The Public. ........................... 8

        B.      The Museum Is The Product Of More Than A Century Of Public And
                Private Charitable Acts. .........................................................................9

        C.      A Century Of Public-Private Contributions Has Resulted In A Museum
                That Benefits The People Of Detroit And The State Of Michigan.......................10

III.    ARGUMENT .................................................................................................11

        A.      The Museum Art Collection Is Not A City Asset That May Be Liquidated
                To Satisfy The City's Obligations. .....................................................12

                1.      The Museum Art Collection Is Held In Charitable Trust. ........ 12

                2.      The Museum Art Collection Is Protected By An Implied Trust............. 18

                3.      The Museum Art Collection Is Protected By The Public-Trust
                        Doctrine............................................................................ 19

                4.      The City is Bound by Promises, Representations and Restrictions
                        relating to Gifts to the Museum and the Museum Art Collection............. 19

        B.      Any Attempted Sale Of The Museum Art Collection By The City Would
                Result In Protracted, Expensive Litigation. .........................................21

        C.      The DIA Settlement As Part Of The Plan Is In The Best Interests Of The
                City And The Creditors..........................................................................22

                1.      The Plan's Treatment Of The Museum Art Collection Is Better
                        Than The Alternatives.......................................................... 22

                2.      The DIA Settlement Promotes Plan Feasibility. ..................... 24

IV.     CONCLUSION.................................................................................................26

The Detroit Institute of Arts, a Michigan non-profit corporation founded in 1885 ("DIA Corp."), has served continuously for over 125 years as the steward of the museum now known as the Detroit Institute of Arts ("Museum") and as a trustee of a charitable trust protecting the Museum. It currently manages the Museum under a 1997 Operating Agreement with the City of Detroit ("City"). The DIA Corp. is a party to a proposed settlement ("Grand Bargain" or "DIA Settlement"), which has been made part of the City's Fourth Amended Plan of Adjustment [Docket No. 4392] ("Plan"). The DIA Corp. submits this Response in support of the Plan and in response to the objections filed by certain bondholders, creditors, and the insurers of City obligations ("Financial Creditors").

## I. <u>INTRODUCTION</u>

For more than 125 years, the people of the City of Detroit and the State of Michigan (the "Public") have contributed their funds, family treasures, time, and goodwill to the Museum. These contributions were given in charitable trust, by the people, for the people. As a result, the Public has access to one of the world's most important encyclopedic public collections of artwork (the "Museum Art Collection") housed in a building (the "Museum Building") specifically dedicated "to the Knowledge and Enjoyment of Art."

As the City's chapter 9 case and creditor demands posed an existential threat to the Museum and the Museum Art Collection, the Court-appointed mediators broached the possibility of a "Grand Bargain"—unprecedented in its scope and ambition, benefiting the City, the Public, creditors, and other interested parties in the bankruptcy case. After months of negotiations, the parties agreed to a proposed DIA Settlement that would make $466 million available to satisfy City obligations to certain creditors, preserve approximately $250 million of county millage

support, and safeguard the Museum Art Collection, and also serves as a condition of the State contribution at a discounted present value of $195 million. The City included the terms of the DIA Settlement in its Plan.

The Financial Creditors have filed Plan objections ("Objections") arguing that the City must instead sell, transfer, or convey some or all the Museum Art Collection. The Objections contend the Museum Art Collection is a "non-core" asset whose value can be used to satisfy City obligations and the Plan is not in the best interests of creditors because the DIA Settlement does not derive sufficient value from the Museum Art Collection.

The Financial Creditors are mistaken. In determining whether to approve the DIA Settlement, the Court normally considers the likelihood that the Museum or the Museum Art Collection can be sold to satisfy the City's obligations; the potential amount at stake in litigating any such claim; the inherent difficulty in realizing value from a sale; and the best interest of the City and its creditors. Each of these factors points to approval of the DIA Settlement as part of the Plan. The law of trusts, contract, and equity, backed by over a century of history, belie any suggestion that the City may sell or pledge the Museum Art Collection to satisfy City obligations. Any such attempt would be fraught with litigation, delay, and legal and market risk, jeopardizing the City's ability to receive sale proceeds based on the aggregate estimated values of individual objects. The DIA Settlement is in the best interest of the City and its creditors, as it will preserve one of the City's most important cultural institutions, an anchor of the Midtown community, and an essential component of the City's revitalization.

For these reasons, the Court should approve the DIA Settlement as part of the Plan.

2

## II. BACKGROUND

### A. THE MUSEUM WAS ESTABLISHED FOR THE SOLE CHARITABLE PURPOSE OF MAKING ART AVAILABLE TO THE PUBLIC.

#### 1. THE MUSEUM BEGINS WITH THE INCORPORATION OF THE DIA CORP. AS A PUBLIC ART INSTITUTE.

The DIA Corp. was organized in 1885 as the Detroit Museum of Art (the "DMA") through the efforts of public-spirited Detroit residents who donated funds, land and artwork and who erected the Museum's first building on Jefferson Avenue. The DMA was founded as a "public art institute" pursuant to Public Act 3 of 1885 (the "1885 Act"), which obligated the DMA to faithfully use its property for "art purposes" and prohibited the DMA from selling, encumbering, or disposing of its general art collection:

> Section 15. All gifts, devises, or bequests made to any such corporation, and all of its income, shall be faithfully used for the purposes for which such corporation was organized; and no dividend in money or property shall ever be made by such corporation among its members.

> Section 16. The character and purposes of such corporation shall not be changed, nor its general art collection be sold, incumbered, or disposed of, unless authorized by the legislature of this state . . . .

(Exhibit 1 (P.A. 3 (1885)); *see also* MICH. COMP. LAWS § 10759-10776 (1915); *see also* MICH. COMP. LAWS § 10777-10787 (1915).

Mirroring this legislative mandate, the DIA Corp's initial articles of incorporation ("1885 Articles") state that the DIA Corp. was established for the purpose of the:

> founding of a public art institute in the City of Detroit, which may acquire and hold such real estate as may be suitable for the site of such art buildings as it may erect or maintain thereon; receive and use such gifts, contributions, devises and bequests, as may be made it, for art purposes; receive, acquire, collect and own paintings, sculpture, engraving, drawings, pictures, coins and other works of art, and may institute, maintain or assist schools for the teaching of

3

art, and may do all other things authorized by [the 1885 Act], and have and enjoy all the privileges and franchises given thereby.

(Exhibit 2 (1885 Articles)). The DIA Corp. was initially funded with, among other things, cash gifts totaling $40,000 from 40 private individuals. (*Id*.).

In the ensuing years, it became clear that a combination of public and private support would better serve the Public's interests. In 1899, legislation was passed to allow the City to make appropriations to support the Museum. P.A. 429 (1899) (as further amended by P.A. 489 (1903)). Thereafter, the City supported the Museum, which helped ensure the art collection would be freely available to the Public.

After several years of private/public cooperation, the Michigan Supreme Court held the DIA Corp. was not a municipal agency and, thus, the City could not constitutionally commit its credit to the private corporation even though it served a public purpose and provided a public benefit. *Detroit Museum of Art v. Engel*, 153 N.W. 700, 703 (Mich. 1915).

> **2.      THE MUSEUM IS CONTINUED WITH THE FORMATION OF THE ARTS COMMISSION OF THE CITY OF DETROIT WITH THE CITY ACTING AS CO-TRUSTEE WITH THE DIA CORP.**

To resolve the constitutional problem *Engel* created, the DIA Corp. agreed to place title to some (but not all) of its assets in the City, including the existing Museum building, lands, and Museum Art Collection, with the understanding that the City would assume the responsibility to properly care for, maintain, and exhibit the Museum Art Collection for the Public's benefit. But the DIA Corp. did not have the authority to transfer its assets. Under the DIA Corp.'s enabling legislation and Articles, the Museum's assets could be used only for "art purposes" and could only be disposed of in a way that best promoted and perpetuated "the purposes for which such corporation was originally organized." P.A. 3, §§ 3, 15, 16 (1885). The Legislature enacted Public Act 67 in 1919 ("1919 Act") to allow the DIA Corp. to convey its property, including real

4

estate and the art collection, to the City, subject to the express limitation that "said property so conveyed shall in the hands of said city be faithfully used for the purposes for which [the DIA Corp.] was organized." (Exhibit 3 (P.A. 67 § 20 (1919)).[1]

Although the Legislature had previously authorized cities to receive gifts of real and personal property for public purposes, P.A. 380, § 1 (1913) (the "1913 Act"), the City lacked the mechanism to undertake responsibility for the Museum. To permit the City to do so, the City amended its Charter in 1918 (the "1918 Charter") to create a new municipal department, known as the "Arts Commission," to receive the DIA Corp. property, continue the Museum's activities, receive charitable gifts, and establish the "Detroit Institute of Arts" for the Public's benefit.

The 1918 Charter amendment creating the Arts Commission gave the City the authority to "take and hold" charitable gifts for art purposes and the obligations to "acquire, collect, own and exhibit" Museum quality objects and works and to build and operate a museum for the Public's benefit.[2] In June 1919, the DIA Corp. agreed to convey title to land on Woodward

---

[1] The 1919 Act was repealed in 1921 as part of the consolidation of the corporations law but contained a savings provision that continued the effect of the act on corporations existing at the time. 1921 P.A. 84; *see also* MICH. COMP. LAWS § 9053 (1921).

[2] The 1918 Charter provided in relevant part:

(a) The commission shall hold, in the name of the City, such real estate as may be necessary for the accomplishment of its objects;

(b) Shall build, operate and maintain suitable buildings to be used for the exhibition of paintings and works of art and auditorium purposes, to be known as the Detroit Institute of Arts, and to which, under proper rules and regulations, the public may have access free of charge . . . .

(c) Shall acquire, collect, own and exhibit, in the name of the City, works of art, books and other objects such as are usually incorporated in Museums of Art.

\*          \*          \*

5

Avenue, its art collection, and certain other assets to the City so that both public and private support could continue to be used to care for, maintain, and grow an art collection for the Public. (Exhibit 4 (Excerpts of the January 27, 1920 Board Minutes of the Trustees of the Detroit Museum of Art)).[3]

The parties understood that the Museum's charitable purpose would continue and that the City would be bound by the obligations created by law, statute, and agreement. The DIA Corp.'s contemporaneous board minutes reflect that the DIA Corp.'s leaders expressly relied on the 1919 Act to prevent the City from utilizing the transferred property for any purpose other than the public exhibition of the Museum Art Collection for the Public's benefit. (*Id.*) The DIA Corp.'s president, Ralph H. Booth, noted in the year preceding this transaction that "the city in its new charter has provided for an arts commission, contemplating that you will convey the property and trusts you hold to the city, as the basis for the Detroit Institute of Arts." (Exhibit 5 (Excerpts of DMA's 1918 Annual Report at 7)).[4] Similarly, at the time of the conveyance, Mr. Booth reiterated:

> [S]teps have been taken looking to the conveyance of our property and collections to the City of Detroit with due regard for the trust we hold and of the obligations attached thereto. . . . Under such conveyance the property can only be used for such purposes as we have received it or for some kindred purpose so indicated by the Circuit Court. . . . *If you should convey the real estate and the collections to the city in conformity with the amended legislation it*

---

(e) May, with the approval of the common council, in the name of the City, take and hold, by purchase, gift, devise, bequest or otherwise, such real and personal property as may be proper for carrying out the intents and purposes for which it is established.

(Exhibit 6 (Charter of the City of Detroit, Ch. XIX, Arts Commission § 7 (1918))). The 1918 Detroit City Charter is available online.

[3] To avoid filing excessively voluminous exhibits with the Court, certain exhibits have been filed in excerpted form. Full copies of these exhibits can be provided on request.

[4] The DMA Annual Reports and DIA Annual Bulletins are available online.

6

> *should be noted that the property can be used only for such*
> *purposes as this permits, and further the conveyance would be*
> *made to the Arts Commission, who would hold the property in*
> *behalf of the city for its uses in accord with the provision of the city*
> *charter . . . .*

(Exhibit 7 (Excerpts of DMA's 1919 Annual Report at 11-13)) (emphasis added).

With the DIA Corp. and the City acting together on behalf of the Museum, a historic period of private-public collaboration for the Public's benefit began. As announced in the first Bulletin of the Detroit Institute of Arts issued in October 1919:

> This change marks the beginning of an epoch in the history of
> Detroit when it shall become a civic function of the municipality to
> foster art, by operating and maintaining a museum for the people
> of the city. It is an era when art shall become in its broadest sense
> democratic, with the museum and its valuable collections actually
> belonging to the people.

(Exhibit 8 (Excerpts of October 1919 Bulletin of the Detroit Institute of Arts at 1)).

The City and the DIA Corp. collaborated on the construction of a new Museum Building to house the growing Museum Art Collection. Completed in 1927, the building's charitable purpose was affixed to its façade: "*Dedicated by the People of Detroit to the Knowledge and Enjoyment of Art.*" At the dedication of the Museum Building, Mr. Booth acknowledged the charitable objects and purposes implicit in this statement of dedication:

> [T]he beauty of art and the spiritual and moral beauties which lie
> beyond and above the beauty of art alone, are as essential in the
> life of a community as are the material comforts and modern
> facilities and improvements which it is the pride of every
> prosperous, enlightened community of today to furnish its citizens.
> . . . And in this spirit today, in behalf of the people of Detroit, let
> us dedicate this building to the lofty purpose for which it was
> conceived: "The Knowledge and Enjoyment of Art," believing that
> we have seen the completion of a building that will stand for
> centuries to come, because of the enduring character of art; and
> that if we cling to our spiritual ideals we shall best advance the
> high destiny of generations to come.

7

Detroit News, "Monument to Detroit, Speakers Call New Art Institute," Oct. 8, 1927.

This collaboration continued through the City's prosperous years. But as the City's fortunes declined, the City ceased providing funds for art acquisitions and experienced difficulty meeting its obligations to care for the Museum Art Collection and Museum Building. As a result, the DIA Corp. rededicated itself to the continued support of the Museum. This resulted in a new partnership of the private and public sectors.

### 3. THE MUSEUM CONTINUES UNDER THE 1997 OPERATING AGREEMENT WITH THE DIA CORP. ASSUMING ALL RESPONSIBILITIES FOR OPERATING THE MUSEUM FOR THE BENEFIT OF THE PUBLIC.

After decades of (sometimes tempestuous) joint management and inadequate City financial support, the City materially decreased its appropriation to Museum operations. Private and state support helped maintain Museum operations, but as the State began to experience its own financial difficulties, the State withdrew its support as well.

To address these threats to the Museum, the DIA Corp. and the City changed their roles once again. The City understood that to obtain private support for the Museum and to build an endowment, it was crucial that the DIA Corp., a non-profit entity, take over management of the Museum. To address these and other issues, the City entered into an Operating Agreement with the DIA Corp. in 1997 ("Operating Agreement"). Among other things, the Operating Agreement confirmed that the Museum Art Collection was held in trust and could only be used for art purposes. The Operating Agreement approved the Museum's Collections Management Policy (Exhibit 9 (Operating Agreement, § F2(a))), which states that, in deaccessioning works from the Museum Art Collection, "the Museum must be ever aware of its role as trustee of the collection for the benefit of the public." (Exhibit 10 (Collections Management Policy, § V.A.)). The Operating Agreement affirms the Collections Management Policy on deaccessioning, which

8

prohibits using deaccessioning proceeds as operating funds. (Operating Agreement, § F2(b); Collections Management Policy, § V.F.).

### B.    THE MUSEUM IS THE PRODUCT OF MORE THAN A CENTURY OF PUBLIC AND PRIVATE CHARITABLE ACTS.

Over the course of more than 125 years, property, funds, and services have been given to cultivate and preserve the Museum Art Collection, maintain the Museum Building, and keep the Museum open to the Public for the Public's benefit.

The DIA Corp. has contributed artwork, funds and services to the Museum for the Public's benefit. Private individuals, institutions and foundations have contributed property for the Public's benefit, including works of art. Funds have been contributed to care for, maintain and exhibit the Museum Art Collection, as well as to maintain and expand the Museum Building. These donors have gone to great lengths to grow an endowment that will help ensure that the Museum and its collection and services will be available to the Public in perpetuity. In most if not all cases, donors gave their personal treasures or funds to the DIA Corp. with the express or implied restriction or understanding that those objects and funds would be used solely to benefit the "Detroit Institute of Arts" and the Public the Museum serves.

The State of Michigan has contributed significantly and generously as well—over $180 million just since 1989—including an "equity grant," purportedly to reimburse Detroit for services provided to non-Detroit residents, because the City could not fully support Museum operations. Wayne, Macomb, and Oakland Counties have also contributed. Under the Art Institute Authorities Act, MICH. COMP. LAWS § 123.1201 *et seq*., the counties' electors approved a millage to support the Museum through "Art Institute Services Agreements" with the DIA Corp. They will remit approximately $23 - 25 million in each year over the ten-year period of the millage to help support the Museum.

9

The City also has contributed to the Museum and to its public and charitable purpose. On and off over the years, as its financial circumstances permitted, it has supported Museum operations. It helped finance and construct the Museum Building, dedicating it to the "knowledge and enjoyment of art," and later provided funds to help maintain and renovate the Museum Building. The City also has appropriated specific funds to acquire works of art for the Museum Art Collection, which (unlike other municipal artwork) were accessioned into the Museum's permanent collection. The City does not treat or account for these objects as assets that are subject to sale. (Exhibit 11 (Excerpts of the City of Detroit 2012 Comprehensive Audited Financial Report at 74, 95) (listing $29 million in City-owned works of art)).

C. **A CENTURY OF PUBLIC-PRIVATE CONTRIBUTIONS HAS RESULTED IN A MUSEUM THAT BENEFITS THE PEOPLE OF DETROIT AND THE STATE OF MICHIGAN.**

As a result of this century of public-private collaboration, the Museum has become a world-class art institute—one of the top six encyclopedic fine arts museums in the United States—that is a source of civic pride and an irreplaceable Public institution. The Museum Art Collection comprises a multicultural and multinational survey of human creativity from prehistory through the 21st century. The Museum's iconic *Detroit Industry* murals by Diego Rivera have been described as "one of America's most significant monuments to itself" and "a summons to renewed greatness" of the City.

The Museum is a center of arts and culture in Michigan and the anchor of the City's Cultural Center Historic District, helping to drive businesses, residents, and talented recruits to Detroit. The Museum provides the premier venue for arts education in the Detroit area. Visitors and students of all ages benefit from access to the unique and irreplaceable collection and services provided by the Museum, including innovative educational and interpretive

10

programming and critical social services. The DIA's education programs reach approximately 150,000 participants annually. The Museum is home to the Mosaic Youth Theater and provides programming to veterans at the Dingell Veterans Hospital, clients of Mariner's Inn, and patients at Children's Hospital of Detroit.

The Museum is an economic and social engine in Detroit and southeast Michigan. In the past year, the Museum drew more than 600,000 visitors, with more than 300,000 residents from Macomb, Oakland, and Wayne counties taking advantage of the free admission policy adopted following millage approval. These visitors spend millions of dollars in Detroit each year as a result of their visits. The Museum has more than 28,000 members, 700 volunteers, and 300 employees, many of whom are City residents who pay property and other taxes in addition to City income taxes. The DIA Corp. has an operating budget of approximately $32 million with a large percentage of that total budget spent in the City.

### III.   ARGUMENT

In determining whether to approve the DIA Settlement as part of the Plan, the Court normally considers the likelihood of success on the merits of any claim that the Museum or the Museum Art Collection can be sold to satisfy the City's obligations; the difficulty inherent in realizing value from a hypothetical sale; and the best interests of the City and its creditors. *See Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); 11 U.S.C. §§ 901(a), 943(b)(6), 1129(b); *see generally Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988). As the DIA Corp. is prepared to show at the Plan confirmation hearing, the City would be unlikely to prevail on any claim that it could sell the Museum or the Museum Art Collection; the litigation associated with resolving these issues

would be complex and expensive and provide only speculative benefits; and the DIA Settlement is in the best interest of the City and its creditors, because it is better than the alternatives.

### A. THE MUSEUM ART COLLECTION IS NOT A CITY ASSET THAT MAY BE LIQUIDATED TO SATISFY THE CITY'S OBLIGATIONS.

#### 1. THE MUSEUM ART COLLECTION IS HELD IN CHARITABLE TRUST.

Under the Michigan Estates and Protected Individuals Code, a trust "includes, but is not limited to, an express trust, private or charitable, with additions to the trust, wherever and however created." MICH. COMP. LAWS § 700.1107(n). A "charitable trust" is defined as a "relationship where the trustee holds property for a charitable purpose." MICH. COMP. LAWS § 14.252(b). Michigan law further provides that a charitable trust "may be created for the relief of poverty, the advancement of education or religion, the promotion of health, scientific, literary, benevolent, governmental, or municipal purposes . . . or other purposes the achievement of which is beneficial to the community." MICH. COMP. LAWS § 700.7405(1). "'It is the purpose to which the property is to be devoted which determines whether the trust is charitable" and it is "'sufficient if [the settlor] shows an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable.'" *Knights of Equity Mem'l Scholarships Commission v. University of Detroit*, 102 N.W.2d 463, 467 (Mich. 1960) (citation omitted).

"'There is no prescribed form for the declaration of a trust; whatever evinces the intention of the party that the property of which he is the legal owner shall beneficially be another's is sufficient.'" *Faulds v. Dillon*, 204 N.W. 733, 735 (Mich. 1925) (citation omitted); *see Frost v Frost*, 131 N.W. 60, 61 (Mich. 1911) ("The creation of a trust does not depend upon the use of a particular form of words, but it may be inferred from the facts and circumstances of the case."). A trust may be established through the formation or organization documents of a charitable entity:

The only document of record which could establish that an express trust was created is the articles of incorporation of the Americana Foundation. The articles of incorporation contain no explicit declaration of a trust. However, the articles of incorporation do show beyond reasonable doubt that a trust was intended to be created.

*In re Americana Foundation*, 378 N.W.2d 586, 588-89 (Mich. Ct. App. 1985).

"'Charitable gifts and trusts are favorites of the law and of the courts, and the courts will declare valid, and give effect to, such gifts and trusts where it is possible to do so consistently with established principles or rules of law.'" *In re Rood's Estate,* 200 N.W.2d 728, 738 (Mich. Ct. App. 1972) (quoting 14 C.J.S. *Charities* § 6, p. 427). "A determination that a charitable trust is created needs only a finding that 'some charitable purpose' exists." *Id.* at 733.

Under these standards, the DIA Corp.'s initial Articles of Incorporation established a charitable trust for the benefit of the Public (the "DIA Charitable Trust") with the DIA Corp as the trustee. Under the 1885 Act and the DIA Corp.'s Articles, the DIA Corp. was established as a public art institute, whose purpose was the "founding of a public art institute in the City of Detroit" which may "receive and use such gifts, contributions, devises and bequests, as may be made to it, for art purposes" (1885 Articles); whose "duty" was "the public exhibition of [the corporation's] collection of works of art" (1885 Act § 4); who was required to "faithfully" use "[a]ll gifts, devises, or bequests . . . for the purposes for which such corporation was organized" (1885 Act § 15); and whose "character and purposes" could "not be changed, nor its general art collection [] sold, incumbered or disposed of . . . ." (1885 Act § 16) The 1885 Act, which provided the DMA with special statutory authority to incorporate for the purpose of "founding a public art institute" and required that the DMA's trustees publicly exhibit the art and use all of the DMA's income and resources to advance its charitable purposes, had the effect of establishing a charitable trust with the DIA Corp. as trustee.

13

The transfer of the DIA Corp.'s assets to the City, the creation of the Arts Commission, and the 1918 City charter confirmed and continued the DIA Charitable Trust, and established the City as a co-trustee. When the City accepted the transfer of the DIA Corp.'s land on Woodward Avenue, its art collection, and certain other assets, it did so subject to the 1919 Act's limitation that "said property so conveyed shall in the hands of said city be faithfully used for the purposes for which [the DIA Corp.] was organized." P.A. 67 § 20 (1919). Under the 1913 Act and Chapter XIX of the 1918 Charter, the Arts Commission had the same charitable duties and obligations of the DIA Corp., including: the duty to build and operate a building "for the exhibition of paintings and works of art . . . to be known as the Detroit Institute of Arts, and to which, under proper rules and regulations, the public may have access free of charge"; the duty to "acquire, collect, own and exhibit, in the name of the city, works of art, books and other objects such as are usually incorporated in Museums of Art"; and the right "with the approval of the common council, in the name of the city, [to] take and hold, by purchase, gift, devise, bequest or otherwise, such real and personal property as may be proper for carrying out the intents and purposes for which it is established." (1918 Charter § 7). Like the DIA Corp.'s Articles, the Charter did not give the Arts Commission the power to sell artwork for municipal purposes but, instead, required the Arts Commission to "take and hold" such property "as may be proper [to] carr[y] out the intents and purposes for which it [was] established." (*Id.*).

The Operating Agreement also confirms and continues the DIA Charitable Trust. The Operating Agreement recognized and affirmed that the Arts Commission and the DIA Corp. had worked together for the benefit of the Museum and that the Operating Agreement was necessary for the Museum to continue to advance its charitable purposes, including by increasing the "opportunity to secure federal, state, regional, county, City and other financial support," the

14

"gifts of works of art to the [Museum]" and the "contributions to the [DIA Corp.'s] endowment funds held on behalf of the [Museum]." (Operating Agreement, Recitals, ¶ 6). The Operating Agreement likewise recognized through the Collection Management Policy that the Museum Art Collection was held in trust, that such artwork could not be encumbered, and that the policy of the Museum required that any proceeds from deaccessions be used solely to acquire additional artwork for the Museum Art Collection.

The acts of donors, who made contributions to advance the Museum's charitable objects and purposes, with the expectation that such contributions would be held for charitable purposes, also confirm the existence of the DIA Charitable Trust. More than 100 years of deeds of gifts, conveyance documents, and other records establish donors' intentions to convey property to the Museum to advance its charitable object and purpose, not to benefit the municipality generally; for example, one of the museum's largest early benefactors, Ralph H. Booth, required that all of his gifts be permanently exhibited in the Museum at least eight months of the year. (*See, e.g.*, Exhibit 12 (January 17, 1933 Letter from Arts Commission to Mayor Frank Murphy)). When he served as the DIA Corp.'s president, Mr. Booth remarked in the year preceding the 1919 transaction, "the city in its new charter has provided for an arts commission, contemplating that you will convey the property and trusts you hold to the city, as the basis for the Detroit Institute of Arts." (DMA Annual Report 1918 at 7; *see also* DMA Annual Report 1919 at 11).

The City cannot now deny the existence of the DIA Charitable Trust. Under the doctrine of election, a party cannot avail itself of the benefits of a trust relationship and then later reject it. *See Holzbaugh v. Detroit Bank & Trust Co.*, 124 N.W.2d 267, 268 (Mich. 1963). Likewise, equitable estoppel applies where: "(1) a party by representations, admissions, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably

15

relies and acts on this belief; and (3) the other party will be prejudiced if the first party is allowed to deny the existence of the facts." *In re Beglinger Trust*, 561 N.W.2d 130, 131-32 (Mich. Ct. App. 1997); *see also Wiersma v. Mich. Bell Tel. Co.*, 401 N.W.2d 265, 269 (Mich. Ct. App. 1986) (state may be estopped by its acts, conduct, silence, and acquiescence).

The City has acknowledged that it holds the Museum Art Collection in trust for the Public's benefit. (*See, e.g.*, Exhibit 13 (Letter from Mayor David Bing to Macomb, Wayne, and Oakland Commissioners) (stating that the City "hold[s] [the Museum Art Collection] in trust for the public"); Exhibit 14 (Excerpts of City of Detroit Proposed Capital Agenda FY 2013-14 Through FY 2017-18 at 63) (stating that the DIA "collects and holds in trust for the people of Detroit, Michigan, and the world, examples of the highest quality of fine arts from all times and cultures throughout the world")). It has solicited and accepted funds and property for the Museum; the DIA Corp., the State, the Counties, the taxpayers, foundations, institutions, and others gave gifts of art and funds in reliance on the City's representations and conduct; and the Public would be harmed if the City were to sell, transfer, or convey any portion of the Museum Art Collection to satisfy municipal debts and obligations. Indeed, the City has taken affirmative steps over the years to convince the Public that charitable assets would not be sold because it wished to ensure continued gifts to the Museum. (Letter from Mayor David Bing to Macomb, Wayne, and Oakland Commissioners; Excerpts of City of Detroit Proposed Capital Agenda FY 2013-14 Through FY 2017-18 at 63). Whether by election or estoppel, the City cannot deny that it holds Museum assets solely in trust.

Similarly, the City cannot avoid the effect of its dedication of property to charitable purposes. "[I]f a dedication is made for a specific or defined purpose, neither the legislature, a municipality or its successor, nor the general public has any power to use the property for any

16

other purpose than the one designated, whether such use be public or private . . . ." *2000 Baum Family Trust v. Babel*, 793 N.W.2d 633, 640 (Mich. 2010) (quoting *Baldwin Manor, Inc. v. City of Birmingham*, 67 N.W.2d 812, 815 (Mich. 1954)). As the Michigan Supreme Court has stated when describing the doctrine of dedication:

> [I]t would be dishonest, immoral, or indecent, and in some instances even sacrilegious, to reclaim at pleasure property which has been solemnly devoted to the use of the public, or in furtherance of some charitable or pious object. The law therefore will not permit any one thus to break his own plighted faith; to disappoint honest expectations thus excited, and upon which reliance has been placed. The principle is one of sound morals and of most obvious equity, and is in the strictest sense a part of the law of the land. It is known in all courts, and may as well be enforced at law as in equity.

*Id.* at 641 (quoting *Patrick v. Young Men's Christian Ass'n of Kalamazoo*, 79 N.W. 208, 211 (Mich. 1899)).

The City dedicated the Museum to art purposes. Although Michigan courts have not yet applied this doctrine to personal property, it would be dishonest, immoral, and indecent for the City to attempt to claim the right to sell any property for its own benefit that the City represented the Museum would hold for the Public's benefit.

Nor can the City ignore the Michigan Attorney General's formal Opinion issued on June 13, 2013 (Opinion No. 7272, the "AG Opinion"):

> [T]he art collection of the Detroit Institute of Arts is held by the City of Detroit in charitable trust for the people of Michigan, and no piece in the collection may thus be sold, conveyed, or transferred to satisfy City debts or obligations.

(AG Opinion at 22). Empowered by the Michigan Legislature to enforce charitable trusts under MICH. COMP. LAWS § 14.251, the AG Opinion confirms that the Museum Art Collection cannot be used by the City to address municipal debts and obligations.

17

More compelling than any formal trust agreement, the Museum itself is the evidence of the DIA Charitable Trust. It has served for more than a century as a vessel into which thousands of donors, both public and private, have poured their goods and goodwill to advance the "knowledge and enjoyment of art." To borrow a maxim usually employed in tort law, "the thing speaks for itself."

## 2. THE MUSEUM ART COLLECTION IS PROTECTED BY AN IMPLIED TRUST.

"'Implied trusts arise by operation of law as contradistinguished from those that arise from agreements of the parties, and are raised by law for the purpose of carrying out the presumed intent of the parties, or without regard to such intention for the purpose of asserting equitable rights or frustrating fraud.'" *Digby v. Thorson*, 30 N.W.2d 266, 272 (Mich. 1948) (citation omitted). A resulting trust is an implied trust that arises from presumed intent, "where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein . . . ." *Potter v. Lindsay*, 60 N.W.2d 133, 135 (Mich. 1953). Moreover, "[a] gift [to a city] shall not be invalid because of an informality in the instrument evidencing the gift, if the intent can be determined from the instrument . . . ." MICH. COMP. LAWS § 123.871.

Here, the City and the DIA Corp., acting separately and together from time to time for the benefit of the Museum, (1) constructed a building "dedicated to the knowledge and enjoyment of art" to house the Museum Art Collection; (2) solicited charitable donations for the Museum as a separate entity for the benefit of the Public; (3) represented that works would be held in the permanent collection for use and display at the Museum for the Public; (4) adopted policies that strictly limited deaccessioning; and (5) represented to the Public that the City held the Museum Art Collection in trust, leading to the conclusion that the donors' and the City's presumed intent

18

was that the City held the Museum Art Collection in trust and does not have a beneficial interest therein that it may use for its sole benefit.

### 3. THE MUSEUM ART COLLECTION IS PROTECTED BY THE PUBLIC-TRUST DOCTRINE.

Under the public-trust doctrine, governmental entities have a duty to preserve and protect resources held in trust for the public. *See Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387, 452 (1892) (noting certain navigable waters were not held for sale but "in trust for the people of the State"). In declaring that "the public trust doctrine is alive and well in Michigan, the Michigan Supreme Court has stated:

> The State may not, by grant, surrender such public rights any more than it can adjudicate the police power or other essential power of government. . . . The State of Michigan has an undoubted right to make use of its proprietary ownership of the [land] in question [subject only to the paramount right of] the public [to] enjoy the benefit of the trust.

*Glass v. Goeckel*, 703 N.W.2d 58, 65 (Mich. 2005) (quoting *Nedtweg v. Wallace*, 208 N.W. 51, 53 (Mich. 1926)). Although the AG Opinion notes that no Michigan court has addressed whether the public-trust doctrine applies to cultural property such as art held for public exhibition, strong consideration should be given to expanding the scope of the doctrine to other public resources. The City retains legal title to the Museum Art Collection, but consistent with the public-trust doctrine, the Museum Art Collection is subject "to the paramount right of the public to enjoy the benefit of the trust." *Glass*, 703 N.W.2d at 65.

### 4. THE CITY IS BOUND BY PROMISES, REPRESENTATIONS AND RESTRICTIONS RELATING TO GIFTS TO THE MUSEUM AND THE MUSEUM ART COLLECTION.

A promise that the promisor should reasonably have expected to induce action of a definite and substantial character that is relied on is enforceable to prevent injustice. *Novak v.*

*Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). Evidence of such a promise may be taken from all the facts and circumstances. *State Bank of Standish v. Curry,* 500 N.W.2d 104, 109 (Mich. 1993). Policies and procedures may form the basis for an enforceable contract or promise. *See Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 606 (Mich. 1993); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880, 885 (Mich. 1980). Similarly, under the 1913 Act, which permits cities to receive gifts for public purposes, conditions, limitations, and requirements imposed on gifts to the City are enforceable, and no provision in the 1913 Act allows a recipient city to sell or transfer a gift of real or personal property given for such public purposes. MICH. COMP. LAWS § 123.871.

Here, the City has described the Museum as a cultural resource of the State to solicit and obtain hundreds of millions of dollars in funds and objects. (Exhibit 15 (June 25, 1975 Letter from Mayor Coleman Young to Frederick Cummings) (stating that the City would seek State funding in order to "[open] the doors of the Detroit Art Institute to the people"); Letter from Mayor David Bing to Macomb, Wayne, and Oakland Commissioners). The City has approved policies, both formal and informal, that prohibit the sale of objects accessioned into the permanent collection to fund operations. (*See, e.g.*, Exhibit 16 (Journal of the City Council, City of Detroit May 22 – Dec. 6, 1989 at 2551-52) (unanimously approving the Museum's deaccessioning policy)). The City has kept those objects off the City's books and declared in its annual financial reports that those works are held in trust. (*See, e.g.*, Excerpts of the City of Detroit 2012 Comprehensive Audited Financial Report at 74, 95; Excerpts of City of Detroit Proposed Capital Agenda FY 2013-14 Through FY 2017-18 at 63). Donors to the Museum, including the DIA Corp., had a reasonable and legitimate expectation that those policies would be followed and that the City would not treat the promise contained therein as illusory, and

20

provided gifts to the Museum with express or implied "conditions, limitations, and requirements" that objects be displayed at the Museum or be used to support the Museum. In addition, some important gifts had express detailed restrictions on their use and transferability. (*See, e.g.*, January 17, 1933 Letter from Arts Commission to Mayor Frank Murphy). Others that did not have express restrictions still were made under deeds of gift and other documents to the "Detroit Institute of Arts" for inclusion in the permanent collection, subject to policies that prohibit using deaccession proceeds to pay even the Museum's operating expenses or debts (Operating Agreement, § F2; Collections Management Policy, § V.F.), or otherwise limited in the use to which they could be put. These restrictions and conditions, both categorical and on an object-by-object basis, are binding on the City, both under the common law and the 1913 Act. Any attempt by the City to sell or transfer the Museum Art Collection or other property to satisfy municipal debts and obligations would break the City's promises and commitments or violate gifts' conditions, limitations and requirements.

**B. ANY ATTEMPTED SALE OF THE MUSEUM ART COLLECTION BY THE CITY WOULD RESULT IN PROTRACTED, EXPENSIVE LITIGATION.**

Until recently, there has been little reason for the DIA Corp. or the City to define their ownership interest in the Museum Art Collection or to address transferability restrictions. If the City attempts to transfer its interest in the Museum Art Collection to satisfy creditors, the DIA Corp. (and likely the Attorney General) would institute proceedings to prevent the City from doing so. Based on the fact-intensive nature of the dispute and the need to address more than a century of information regarding the Museum, the litigation would likely take years to resolve. Donors and heirs also would challenge any purchaser's right to continue to retain transferred objects. The City would have to spend substantial time and resources in litigation whose likely outcome is uncertain at best.

### C. THE DIA SETTLEMENT AS PART OF THE PLAN IS IN THE BEST INTERESTS OF THE CITY AND THE CREDITORS.

To determine whether a settlement is in the best interest of the City and its creditors, the bankruptcy court must "form an educated estimate of . . . all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Comm.*, 390 U.S. at 424. In this case, two factors stand out: The City's and the creditors' alternatives to the Plan's treatment of the Museum Art Collection, and how the Plan's treatment of the Museum Art Collection enhances the City's ability to rehabilitate itself and perform its obligations under the Plan. These factors support approval of the DIA Settlement as part of the Plan.

### 1. THE PLAN'S TREATMENT OF THE MUSEUM ART COLLECTION IS BETTER THAN THE ALTERNATIVES.

Outside funders, which have no obligation to the City or its pensioners, will provide at least $466 million to address the City's obligations to the pensioners, but only on the condition that the City transfer any interest it might have in the Museum and the Museum Art Collection to the DIA Corp., which must keep them in the City in perpetuity. The Financial Creditors argue that the funders' largesse is not better than the creditors' alternatives, because the City may and must sell the "non-core" Museum and Museum Art Collection to satisfy the City's obligations. But Michigan law does not permit a court or creditor to force a sale of municipal assets outside of bankruptcy. *See* MICH. COMP. LAWS § 600.6021(1) ("No execution may issue upon a judgment against [any city]."). Chapter 9's policies as well as state law protecting municipal assets from levy militate against including a city's property in a chapter 9 case as a source of repayment. *See Newhouse v. Corcoran Irr. Dist.*, 114 F.2d 690 (9th Cir. 1940) (municipality's assets and property cannot be liquidated to pay creditors); *cf. Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942) (city has only its taxing power).

22

These limitations are even more pronounced when the subject property is imbued with a charitable purpose and with charitable restrictions. *See generally* MᴄQᴜɪʟʟɪɴ Tʜᴇ Lᴀᴡ ᴏꜰ Mᴜɴɪᴄɪᴘᴀʟ Cᴏʀᴘᴏʀᴀᴛɪᴏɴꜱ § 47.21 (3rd ed. 2014) ("A gift to a municipal corporation for a charitable purpose cannot, after the municipality accepts it, be renounced or conveyed away so as to defeat the charity."). Indeed, given the evident restrictions on its interest in the Museum Art Collection, the City would be confronted outside of chapter 9 with the same inability to derive value from the Museum Art Collection that it faces in this chapter 9 case. *Cf.* 11 U.S.C. § 541(c)(2) ("[A] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is applicable in a case under this title'"); 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."). Thus, the Financial Creditors' suggestion that, outside of bankruptcy, the City "acting rationally and with due care" likely would seek to monetize the Museum Art Collection or other purportedly non-core assets and that this would "result[] in higher recoveries for unsecured creditors" is incorrect. (Docket No. 4660 at 12).

In addition, any attempt by the City to place any object of the Museum Art Collection in jeopardy would likely result in complex, lengthy litigation in which the City is unlikely to be able to show that it can monetize any portion of the Museum Art Collection. Even if a court of competent jurisdiction did not conclude that the entire Museum and Museum Art Collection were held in charitable trust, the litigation that would be generated by any attempt to sell works

23

could take years as the donative intent and restrictions associated with each significant object would be subject to separate examination.

The value the City derives from the DIA Settlement is not unreasonably low compared to the alternatives; the City is not "squandering" an asset. (*See* Docket No. 4643 at 20). The $466 million that would be obtained from the DIA Settlement is well within the range of values that properly reflect the risk of litigation and difficulty of collection. Moreover, the DIA Settlement is a condition to the funding of the State Contribution. And the DIA Settlement amount reflects a material percentage of the nominal value of the entire collection under any estimation.

Finally, the transfer of Museum assets as part of the DIA Settlement does not constitute a fraudulent transfer. A fraudulent transfer is a transfer of an interest of the debtor in property with actual intent to hinder, delay or defraud creditors or for less than reasonably equivalent value. 11 U.S.C. § 548(a)(1). In this case, the transfer would occur only upon Court approval of the transfer, after full disclosure of its purpose and effect, as a reasonable settlement of disputed claims. Such approval would rule out any later attack on the transaction as a fraudulent transfer by an implicit, if not explicit, determination that the transfer was made in good faith, not for any fraudulent purpose, and for reasonably equivalent value in settlement of disputed claims. Any such determination would be binding on the debtor and all creditors. *See* 11 U.S.C. § 944(a).

## 2.  THE DIA SETTLEMENT PROMOTES PLAN FEASIBILITY.

The continued operation of a vibrant Museum would maintain a significant positive economic impact on the fiscal stability and prospects of the City. The Museum generates at least $32 million a year (its annual budget) of direct economic activity at no cost to the City. Museum operations pump money directly into Detroit's economy and result in indirect economic activity from tourism and other spending, with a multiplying effect on City economic activity generally.

24

The City directly benefits from property and payroll taxes and the taxes associated with visitor spending, which would be lost if the Museum were shuttered.

These direct economic and fiscal consequences are obvious but only touch the Museum's true benefit to the City. The Museum is a core feature of the City's future. It is the cultural cornerstone of Midtown Detroit, providing a stable anchor for the cultural district and for the surrounding neighborhoods. The Museum draws economic investment to Midtown Detroit, is a selling point for businesses attempting to attract and recruit talent to the City, and is an important factor in decisions by businesses that are seeking to locate in the City. The current City Charter declares that "[t]he people have a right to expect city government to provide for its residents . . . cultural enrichment, including libraries and art and historical museums . . . ." *See* Charter of the City of Detroit, Declaration of Rights at ¶ 1. With formal art educational programs being cut, the need for the Museum is even more pronounced. A cultural institution is not a luxury; the Museum is as important to the City's future as it has been to its past.

The Financial Creditors' consultants have told potential purchasers that the Museum is "a legacy City asset with no direct linkage to the City's financial recovery and a tenuous cultural relevance to Detroit's current citizens," suggesting they believe that the Museum Art Collection can be monetized without harming the City's rehabilitation and viability. (*See Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts* [Docket No. 3925] at Exhibit 5B, p.5). But as the Financial Creditors seem to concede, any sale or transfer of the Museum Art Collection would devastate the Museum (and result in a loss of the proceeds from the DIA Settlement). The monetization of artwork to pay the City's obligations would "negatively impact the [Museum]"

25

(*Id*. at Exhibit 5B, p.9), and the Museum likely would lose its accreditation and any reasonable possibility of receiving funds and artwork from donors who saw prior gifts spent on City obligations. The counties have said they would cancel the $250 million millage, and they effectively control the flow of funds. With no other funding prospects, the Museum almost certainly would close. If the Museum were forced to close, the City would be required to spend millions of dollars to mothball the Museum Building, protect the sensitive, valuable Museum Art Collection until it could be properly disposed of, and engage in other liquidation activities. The Museum's closure would have a significant adverse impact on the welfare of the City and its citizenry, especially on the newly vibrant and growing Midtown area and the arts community that the Museum anchors, impairing the City's revitalization and the Plan's feasibility.

## IV.   CONCLUSION

One of the attorneys for the Financial Creditors stated their position succinctly when he said the Museum Art Collection is a "glittering link to the glory days of Detroit" that must yield to "grubby" creditor losses. (5/15/14 Hr. Tr. at 26-27). He misses the point. The Museum is as important to Detroit's future as it has been to its past. The creditors never had any rights to the Museum Art Collection or any expectation that such charitable property would be available to satisfy their debts. This is the "grubby" reality to which the Financial Creditors must yield.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: /s/Arthur T. O'Reilly
Arthur T. O'Reilly (P70406)
Scott B. Kitei (P78064)
Daniel N. Adams (P72328)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7628
Email: aoreilly@honigman.com

May 27, 2014                            and

CRAVATH, SWAINE & MOORE LLP

Richard Levin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Attorneys for The Detroit Institute of Arts

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the ECF system, and will send notification of such filing to all ECF participants registered in this matter.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: /s/Arthur T. O'Reilly
Arthur T. O'Reilly (P70406)
Scott B. Kitei (P78064)
Daniel N. Adams (P72328)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7628
Facsimile: (313) 465-7629
Email: aoreilly@honigman.com

May 27, 2014                and

CRAVATH, SWAINE & MOORE LLP
Richard Levin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Attorneys for The Detroit Institute of Arts

28