UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .       Docket No. 13-53846
        MICHIGAN,              .
                              .       Detroit, Michigan
                              .       May 22, 2014
              Debtor.         .       10:00 a.m.
. . . . . . . . . . . . . . . .

       HEARING RE. (#4202) STATUS CONFERENCE RE. PLAN
         CONFIRMATION PROCESS - FOURTH AMENDED ORDER
     ESTABLISHING PROCEDURES, DEADLINES AND HEARING DATES
         RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
          BEFORE THE HONORABLE STEVEN W. RHODES
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                      By:  BRUCE BENNETT
                      555 South Flower Street, Fiftieth Floor
                      Los Angeles, CA  90071
                      (213) 243-2382

                      Jones Day
                      By:  HEATHER LENNOX
                      222 East 41st Street
                      New York, NY  10017
                      (212) 326-3837

                      Jones Day
                      By:  GEOFFREY IRWIN
                           GREGORY SHUMAKER
                      51 Louisiana Avenue, N.W.
                      Washington, D.C.  20001-2113
                      (202) 879-3768

For Erste             Ballard Spahr, LLP
Europaische           By:  VINCENT J. MARRIOTT, III
Pfandbrief-und        1735 Market Street, 51st Floor
Kommunalkreditbank    Philadelphia, PA  19103-7599
Aktiengesellschaft    (215) 864-8236
in Luxemburg, S.A.:

For National Public   Sidley Austin, LLP
Finance Guarantee     By:  GUY NEAL
Corp.:                1501 K Street, NW
                      Washington, D.C.  20005
                      (202) 736-8041

APPEARANCES (continued):

```
For Assured           Chadbourne & Parke, LLP
Guaranty Municipal    By:  SAMUEL KOHN
Corp.:                     ROBERT SCHWINGER
                      30 Rockefeller Plaza
                      New York, NY  10112
                      (212) 408-1060

For County of         Dechert, LLP
Macomb, Michigan:     By:  ALLAN S. BRILLIANT
                      1095 Avenue of the Americas
                      New York, NY  10036
                      (212) 698-3600

For County of         Young and Associates
Oakland, Michigan:    By:  JAYE QUADROZZI
                      27725 Stansbury Blvd., Suite 125
                      Farmington Hills, MI  48334
                      (248) 353-8620

For Detroit           Clark Hill, PLC
Retirement Systems:   By:  JENNIFER GREEN
                      500 Woodward Avenue, Suite 3500
                      Detroit, MI  48226
                      (313) 965-8274

For Ad Hoc Water      Kramer Levin Naftalis & Frankel, LLP
and Sewer             By:  CRAIG SIEGEL
Bondholders:          1177 Avenue of the Americas
                      New York, NY  10036
                      (212) 715-9432

For Dexia Holdings,   Allard & Fish
Inc., and Dexia       By:  DEBORAH FISH
Credit Local:         2600 Buhl Building
                      535 Griswold
                      Detroit, MI  48226
                      (313) 961-6141

For Deutsche Bank     Katten Muchin Rosenman, LLP
AG, London:           By:  JOHN RAMIREZ
                      575 Madison Avenue
                      New York, NY  10022-2585
                      (212) 940-6435

For Syncora           Kirkland & Ellis, LLP
Holdings, Ltd.,       By:  STEPHEN C. HACKNEY
Syncora Guarantee          MARC KIESELSTEIN
Inc., and Syncora     300 North LaSalle
Capital Assurance,    Chicago, IL  60654
Inc.:                 (312) 862-2157
```

APPEARANCES (continued):

| | |
|---|---|
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By:  RANDALL BRATER<br>1717 K Street, NW<br>Washington, DC  20036-5342<br>(202) 715-8472 |
| For the Detroit Fire Fighters Association and the Detroit Police Officers Association: | Erman, Teicher, Zucker & Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For U.S. Bank: | Waller Lansden Dortch & Davis, LLP<br>By:  PAUL DAVIDSON<br>511 Union Street, Suite 2700<br>Nashville, TN  37219<br>(615) 850-8942 |
| For the Official Committee of Retirees: | Dentons US, LLP<br>By:  SAM J. ALBERTS<br>1301 K Street, NW, Suite 600, East Tower<br>Washington, DC  20005-3364<br>(202) 408-7004 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, 3rd Floor<br>Birmingham, MI  48009<br>(248) 723-6263 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By:  DANA M. KAUFMAN<br>767 Fifth Avenue<br>New York, NY  10153<br>(212) 310-8257 |
| For FMS Wertmanagement: | Schiff Hardin, LLP<br>By:  PAUL GREENWALT<br>6600 Sears Tower<br>Chicago, IL  60606<br>(312) 258-5702 |

APPEARANCES (continued):

| | |
|---|---|
| For David Sole: | Jerome D. Goldberg, PLLC |
| | By:  JEROME D. GOLDBERG |
| | 2921 East Jefferson, Suite 205 |
| | Detroit, MI  48207 |
| | (313) 393-6001 |

For Three Bond-        Mintz, Levin, Cohn, Ferris, Glovsky and
Holders of DWSD           Popeo, PC
Ad Hoc Water and       By:  WILLIAM KANNEL
Sewer Bondholder       One Financial Center
Committee:             Boston, MA  02111
                       (617) 348-1665

For Wilmington         Drinker Biddle & Reath, LLP
Trust Company,         By:  HEATH ROSENBLAT
N.A.:                  1177 Avenue of the Americas, 41st Floor
                       New York, NY  10036-2714
                       (212) 248-3248

For UAW:               Cohen, Weiss & Simon, LLP
                       By:  JOSHUA J. ELLISON
                       330 West 42nd Street
                       New York, NY  10036-6976
                       (212) 356-0229

For Detroit            Legghio & Israel, PC
Fire Fighters:         By:  CHRISTOPHER LEGGHIO
                       306 South Washington Ave., Suite 600
                       Royal Oak, MI  48067
                       (248) 398-5900

For AFSCME Local       Miller Cohen, PLC
917 and 3308:          By:  ROBERT FETTER
                       600 West Lafayette Blvd., #4
                       Detroit, MI  48226
                       (313) 566-5900

Court Recorder:        Kristel Trionfi
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Court is in session.  Please be seated.

2    Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Let me ask counsel to put your

4    appearances on the record here this morning, please.

5          MR. NEAL:  Good morning, your Honor.  Guy Neal,

6    Sidley Austin, for National Public Finance Guarantee.

7          MR. HACKNEY:  Your Honor, good morning.  Stephen

8    Hackney and Marc Kieselstein on behalf of Syncora.

9          THE COURT:  Thank you.

10          MR. MARRIOTT:  Good morning, your Honor.  Vince

11    Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

12          MR. SCHWINGER:  Good morning, your Honor.  Robert

13    Schwinger from Chadbourne & Parke for Assured Financial

14    Guaranty.

15          MR. BRATER:  Good morning, your Honor.  Randy Brater

16    from Arent Fox on behalf of Ambac.

17          MS. PATEK:  Good morning, your Honor.  Barbara Patek

18    on behalf of the Detroit Fire Fighters Association and the

19    Detroit Police Officers Association, and with me this morning

20    are Christopher Legghio and Alidz Oshagan, who are co-counsel

21    for the Detroit Fire Fighters.

22          THE COURT:  Thank you.

23          MR. DAVIDSON:  Good morning, your Honor.  Paul

24    Davidson from Waller for the U.S. Bank along with Courtney

25    Rogers.

```
1              THE COURT:  Thank you.

2              MS. QUADROZZI:  Good morning, your Honor.  Jaye

3    Quadrozzi from Young & Associates.  I also have Joe Fischer

4    and Bob Weisberg on behalf of Oakland County.

5              THE COURT:  Thank you.

6              MS. GREEN:  Good morning, your Honor.  Jennifer

7    Green on behalf of the Retirement Systems for the City of

8    Detroit, and I have my colleague, Robert Gordon, and also

9    Shannon Deeby with me today.

10             MR. ALBERTS:  Good morning, your Honor.  Sam J.

11   Alberts from Dentons on behalf of the Official Committee of

12   Retirees.

13             MR. PLECHA:  Good morning, your Honor.  Ryan Plecha,

14   Lippitt O'Keefe Gornbein, on behalf of the retiree

15   association parties.

16             MS. KAUFMAN:  Good morning, your Honor.  Dana

17   Kaufman from Weil, Gotshal & Manges on behalf of Financial

18   Guaranty Insurance Company.

19             MS. FISH:  Good morning, your Honor.  Deborah Fish,

20   Allard & Fish, on behalf of Dexia Holdings, Inc., and Dexia

21   Credit Local.

22             MR. KOHN:  Good morning, your Honor.  Samuel Kohn of

23   Chadbourne & Parke on behalf of Assured Guaranty Municipal

24   Corp.

25             MR. GREENWALT:  Good morning, your Honor.  Paul
```

1   Greenwalt from Schiff Hardin on behalf of FMS Wertmanagement.

2        MR. GOLDBERG:  Good morning, your Honor.  Jerome

3   Goldberg on behalf of interested party, David Sole.

4        MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

5   Jones Day, on behalf of the City of Detroit along with Greg

6   Shumaker, Heather Lennox, David Heiman, and Bruce Bennett on

7   behalf of the city as well.

8        THE COURT:  Okay.  Thank you.  First let me express

9   my appreciation and gratitude for the work of the committee,

10  the discovery and trial efficiency committee or something

11  like that.  I read the papers that were filed both on behalf

12  of the objecting creditors and on behalf of the city.  My

13  first interest is in hearing what ideas you can have to make

14  our discovery and trial more efficient that don't involve

15  adjourning the trial because I think that is an absolute last

16  resort, so I will open the podium to anyone who'd like to

17  address that.  Oh, excuse me one second.  I forgot to ask.

18  Are there people on the telephone who'd like to place an

19  appearance on the record?

20       MR. BRILLIANT:  Yes, your Honor.  Allan Brilliant on

21  behalf of Macomb County by and through the Macomb County

22  public works commissioner.

23       THE COURT:  Thank you, sir.  Who else?

24       MR. KANNEL:  Good morning, your Honor.  William

25  Kannel on behalf of members of the ad hoc sewer and water

 1   bondholders committee, Fidelity, Franklin, and Eaton Vance.

 2         MR. SIEGEL:  Good morning, your Honor.  This is

 3   Craig Siegel of Kramer Levin on behalf of the members of the

 4   ad hoc committee of the DWSD bondholders, Nuveen and

 5   BlackRock.

 6         MR. RAMIREZ:  Good morning, your Honor.  This is

 7   John Ramirez, Katten Muchin, on behalf of Deutsche Bank.

 8         MR. ROSENBLAT:  Good morning, your Honor.  Heath

 9   Rosenblat of Drinker Biddle & Reath on behalf of Wilmington

10   Trust National Association.

11         MR. ELLISON:  Good morning, your Honor.  Josh

12   Ellison of Cohen, Weiss & Simon on behalf of the UAW.

13         THE COURT:  Any others on the telephone?  You may

14   proceed, sir.

15         MR. SHUMAKER:  Good morning, your Honor.  Greg

16   Shumaker of Jones Day for the City of Detroit.  It's nice to

17   be in front of you again.  Your Honor, as the papers that

18   you've reviewed reflect, the discovery and trial efficiency

19   committee has met a couple of times this week or had

20   conversations, which I think were quite productive.  And

21   you've asked about how to, if you will, streamline the

22   pretrial discovery keeping the confirmation hearing date of

23   July 25th.  I have some ideas to share with your Honor that

24   we have posited to the objectors, but I will say that I think

25   it's fair to say that the objectors are still focused, if you

1 will, on the issue of document production, so there has not

2 been a significant amount of attention paid to how do we make

3 this more efficient because in their views, as their papers

4 reflect, all documents must be produced prior to the

5 commencement of depositions of fact witnesses, and all fact

6 witness depositions must be concluded before expert

7 depositions are taken.

8          We do think it's critical to keep the confirmation

9 hearing date of July 25th.  What we have -- what we have

10 suggested to the objectors is this.  The objectors are

11 currently putting together a deposition proposal that I

12 believe they plan on sharing with the city early next week.

13 We've talked, and there was some discussion last -- at the

14 last status conference in front of you, your Honor, about

15 ways of moving forward, and one of the things that the

16 committee has agreed on is that it would be a good thing to

17 pare down the witness lists significantly and -- because

18 previously we were at about almost 200.  Since last status

19 conference two parties have filed amended witness lists.  One

20 is Oakland County, which has trimmed its list from 48 or 49

21 to 20, which still puts it in second place behind Syncora in

22 the number of witnesses.  Syncora, I believe, has 37.  And

23 Ms. Patek has filed a reduction for DPOA and DFFA from 12 to

24 6, but we have a significant number of fact witnesses.  There

25 are 166 still remaining.  We've proposed last time Mr.

1    Hertzberg shared with you that we think perhaps some sort of
2    limit like a three witness per objector limit would make
3    sense, perhaps if the objectors are able to make a case as to
4    why they need a fourth, that that would be part of the --
5    part of the dynamic.  We think, in looking at the witness
6    lists, that would really only affect six parties who have
7    identified witnesses -- more than three witnesses.  Those
8    parties are, again, Oakland County and DPOA, DFFA, the
9    Carlton Carter objectors, which relates to claims that, I
10   believe, three individuals have against the 36th District
11   Court.  Those individuals have identified 15 witnesses.
12   David Sole --
13            THE COURT:  Excuse me one second.  Is there an
14   attorney for those parties here in court today?  Would you
15   step forward, please, sir?  Let me just ask you did you put
16   your appearance on the record?
17            MR. FETTER:  Today?
18            THE COURT:  Yes.
19            MR. FETTER:  Not today.
20            THE COURT:  Okay.  Please go ahead and do that for
21   me.
22            MR. FETTER:  Robert Fetter, Miller Cohen, on behalf
23   of AFSCME Local 917 and 3308.
24            THE COURT:  All right.  Thank you, sir.
25            MR. SHUMAKER:  So we have Oakland County at 20,

1  DPOA, DFFA at 12, and what I'll refer to as the 36th District

2  Court objectors as at 15.  David Sole has identified 14

3  witnesses plus any retiree who has filed an objection to the

4  plan, which, if you count that, would put us into I think

5  over 200, but 14 other than that category.  Macomb County has

6  18.  Wayne County has 15.  So the three counties combined

7  have 55 witnesses identified.  And FGIC has seven identified.

8  Again, we think this is very much an excessive number.  What

9  we've agreed with the objectors is to put forth pared down

10  witness lists, which would be somewhat of will call, the

11  witnesses that each party absolutely thinks they have to

12  have, and, therefore, I think depositions can be scheduled

13  and proceed with them with the understanding that given

14  developments in discovery and how things progress that

15  someone is not going to say they weren't on your list that we

16  got at the end of May.  And that was sort of the

17  understanding that the committee was thinking of.

18          THE COURT:  I have to ask to what extent is the city

19  considering paring down its witnesses?

20          MR. SHUMAKER:  Oh, it is, your Honor, and I think

21  right now we are thinking about that, and I'm thinking

22  right -- we have 37, I believe.  Right now I think 20 to 24,

23  25 max, and that's subject to -- but absolutely it's

24  incumbent upon the city to do that as well.  Of course, we

25  have that burden of proof thing, but that's what we're -- we

1 are trying to pare down as well, and we think that that would

2 be necessary.

3      We've proposed -- and, again, this is in terms of

4 streamlining -- that with regard to the depositions that

5 perhaps your Honor consider placing a day limit on the

6 parties, if you will, that each side -- and the number that

7 we came up with is 30 days -- that each side would get 30

8 total days of deposition.  When I say "sides," I mean the

9 city and the objectors collectively would have 30 and 30.

10 You'd obviously have to have double tracking to make the

11 current June 27th deposition deadline, but that's what we've

12 proposed.  Again, the objectors are considering that and have

13 not heard that.  Also, I think we propose that depositions

14 should be seven hours in length, that there be a lead

15 questioner.  I don't think that anyone on the objectors' side

16 has said that the lead questioner approach that was used

17 during the eligibility and the swaps hearings was anything

18 other than the best way of proceeding.

19      We also believe except for some limited exceptions

20 that -- the only 30(b)(6) deposition notices have gone out to

21 the city -- that when a witness sits, that they sit both as a

22 fact witness and as a 30(b)(6) witness.  We have not

23 designated that yet, and, your Honor, we have a few hundred

24 of those to designate to, but we believe that that's more

25 workable for the witnesses.  When I say "limited exceptions,"

1    I think it's probably fair to say that Mr. Orr, maybe

2    Mr. Buckfire, perhaps Mr. Malhotra, they might be where you

3    would have a full day of 30(b)(6) deposition topics.  We're

4    in the midst of putting that together, but, you know, you'd

5    have a day where they were talking about their activities as

6    a fact witnesses, and then you would have a 30(b)(6)

7    deposition topic day.  So that was our proposal, and that was

8    kind of what we've talked about on the deposition side of

9    things at least in terms of streamlining that, but I think

10   the objectors are still developing their position on that.

11          You saw in the papers that the objectors have

12   proposed somehow using a Section 11 conference such as is

13   specified in the manual of complex litigation.  The city is

14   more than willing to participate in that obviously if your

15   Honor thinks that that would be helpful.  We just have not --

16   it's been a concept that the committee has discussed, and I

17   believe that Mr. Hackney is putting together a proposal that

18   we would get next week on that as well if your Honor believes

19   that that is a good idea.

20          In terms of maintaining the trial schedule as it is,

21   the city firmly believes that the July 25th should be the

22   start date for the confirmation hearing.  I mean the simple

23   reason why is that every day the City of Detroit is in

24   bankruptcy is a bad day, so, as your Honor knows, we've been

25   pushing to get to this confirmation hearing as quickly as

1    possible.  But when we look out, we've also --

2              THE COURT:  It's scheduled to start on the 24th.

3              MR. SHUMAKER:  Is it the 24th?  I'm sorry.  I'm

4    sorry.  The 24th, your Honor, so -- but what we've -- the

5    reason we've kind of tried to develop a concept for your

6    Honor, what you raised at the end of the conference last time

7    about the possibility of time limits for both sides such as

8    was done in eligibility and the swaps hearings is working

9    backwards from the end of September.  And I'm certain your

10   Honor is going to need some time to assimilate all the

11   testimony and make his decision, so what the city is thinking

12   is that would probably take four weeks.  I mean I'm not --

13   I'm sure you could do it faster than that, your Honor, but it

14   would seem like a fairly reasonable amount of time.

15   Obviously your Honor will tell us whether that is, but if

16   that is the case and the confirmation hearing starts on July

17   24th and goes until the Friday before Labor Day -- and, your

18   Honor, that's presumptuous of me because you have not set

19   aside that many, but if that were the case and you followed

20   the approach that you did with eligibility and swaps in terms

21   of time so that that's roughly six hours of court time a day

22   if you go nine, have an hour and a half break, 15-minute --

23   two 15-minute breaks, and get to -- that you roughly get into

24   the 169 to 180 time frame if you were to let us go an extra

25   hour or two on some days with some certain witnesses.  I have

1   raised this with the objectors, but the city's initial

2   approach would be to say of the 180 that we should split

3   that, that the city would present its case, including

4   argument time, in 90 days -- I mean -- I'm sorry -- 90

5   hours -- 90 days -- good gracious -- and that the objectors

6   would also have 90 hours to present their case.

7        THE COURT:  Well, let me ask you to pause there.

8   First, what's the magic of a confirmation order or any order,

9   not to presume the outcome, by the end of September?

10       MR. SHUMAKER:  Well, I don't know if there's any

11  magic in that, your Honor, but the city has always, again,

12  tried to move this along as expeditiously as possible with

13  the understanding that the emergency manager is in place

14  until the end of September.  I think that's the 28th.

15       THE COURT:  Whatever the date is, what's the status

16  of Jones Day's representation of the city after Mr. Orr is no

17  longer in office?

18       MR. SHUMAKER:  I believe, your Honor, that we would

19  continue to be retained, but if, say, the emergency manager

20  leaves office and no one is replaced -- not to get into the

21  possibilities, but say that that's the assumption --

22  presumably we will be representing the city through the end,

23  although then I believe City Council has the ability to vote

24  out the emergency manager, and then it would be, I believe,

25  the decision of City Council and/or the mayor.  And I look

1  back to make sure I'm right, but I think that's the state of

2  play, so it would be up to them whether Jones Day would

3  continue its representation of the city. We have not had, to

4  my knowledge, discussions about going beyond that.

5          THE COURT: Okay. Anything further?

6          MR. SHUMAKER: No. There's a lot of this back and

7  forth about the documents, your Honor. I think perhaps Mr.

8  Irwin is in the thick of that. It might be best for him to

9  address that. But in terms of possibilities for

10  streamlining, those are the ideas that we had. Thank you,

11  your Honor.

12          THE COURT: Thank you. Mr. Irwin, may I hear from

13  you?

14          MR. IRWIN: Yes. May I begin with a few reports

15  that I believe I owe the Court just to tidy up some issues

16  from a week or so ago? We did, in fact, reproduce the hard

17  drives on the Court's schedule Friday of last week, and we

18  filed the attendant certification with that. We have, I

19  believe, all hard drives accounted for in terms of the return

20  to Jones Day or our vendor with two exceptions. I believe

21  one of the COP holders, FMS, who just filed their

22  certification yesterday, represented to us because we

23  contacted them that it was on its way to us. I think we even

24  have a FedEx tracking number, so I'm not --

25          THE COURT: Okay.

1          MR. IRWIN:  -- worried about that.  We also

2    contacted Mr. Goldberg because he had not returned his drive

3    yet to us, but he assured us that he had not even opened it

4    and that it would be coming back to us very shortly, so I'm

5    not concerned about that.

6          We also, as the Court hopefully saw, filed the

7    affidavit of Ms. Hale on Monday, which had the attendant

8    attachments to it.  As we discussed in court last week, it

9    also had the index of the document production along the lines

10   of what we agreed to with objectors off and on the record, so

11   I think we're compliant with what the expectations were of us

12   from last week.

13         On documents, on the city's document production, the

14   city believes that it is in substantial compliance with the

15   requests now and at a minimum on Friday -- well, tomorrow, at

16   this point when we will make a supplemental production, which

17   is something that I've discussed with a number of objectors

18   in my many, many meet and confers that I've been having over

19   the last week or so, but I thought I would just highlight for

20   the Court the categories of the documents that would be

21   produced.  Some of these we've talked about.  Three very

22   important substantial categories of documents that relate to

23   and, in our view, is a preview and an advance production on

24   expert issues that really go to the core of the case, the

25   Ernst & Young ten- and forty-year projections that, again,

1 are at the core of the -- the objections at the core of the
2 plan, that has taken some time because these are very large
3 spreadsheets, and as the Court may be aware, Ernst & Young is
4 being asked for the same information from the Phoenix Group
5 and Ms. Kopacz. We're trying to do all of this together and
6 trying to prioritize these things. Ernst & Young has worked
7 with counsel very closely in connection with a number of
8 mediations and has run sensitivities and has baked certain
9 analyses into these projections, and they stay with this very
10 large document over time, and it requires someone with a
11 great deal of care to go through these tables and pull out
12 and remove and expunge any mediation-related information or
13 projections that are baked into these tables. We believe
14 that we will be in receipt of those in native format because
15 I've talked to certain objectors about how to get this
16 information to them sooner. Could we paste values in the
17 Excel spreadsheet that doesn't require links that could be
18 broken and disrupt the performance of the -- the mechanics of
19 the schedule? We think we're at a point today where with a
20 very quick turnaround and folding into the production we're
21 planning for tomorrow native versions stripped of mediation
22 information that will get objectors a very, very large amount
23 of information that they really want because, again, everyone
24 is asking for it. It's what the expert testimony is going to
25 be all about. And, again, it will allow them to see how all

1   of these things came together.  And by the way, your Honor, a

2   lot of the work that's done by other city advisors,

3   restructuring work from the Conway MacKenzie folks, actuarial

4   analysis from the Milliman house, those all roll up into this

5   model, so maybe not at the Nth level of detail, but they're

6   all baked into this so you can see how the whole thing works,

7   and that's part of what we're providing tomorrow.

8           We are also providing the Milliman and Conway

9   MacKenzie separate components of that.  If you want to see it

10  to the Nth level, they'll be getting that separately.  That

11  also be going out tomorrow on the Conway MacKenzie side on

12  the restructuring projections and analyses that are in the

13  plan we'll be producing, and there's an attachment in the

14  plan.  It's a 70-page attachment with all the department

15  heads and how all this reinvestment is going to work, but

16  they're only two-page summaries right now, and what we will

17  be providing is all of the support behind those two-page

18  summaries.  And, again, it's our view that this is an

19  acceleration of what is truly expert discovery, but it's in

20  the plan.  We want them to have it.  We want to take our time

21  with it and make sure it's done correctly, and that will be

22  produced tomorrow.  There are a number of other categories of

23  documents or cats and dogs, if you will, that -- some of

24  which have come up in connection with my meet and confers

25  with people.  I've made this commitment, and I can assure you

1  many, many people have taken me up on it, to contact me and
2  ask me to help them where we have somehow identified a range
3  where the responsive documents exist, but they're having
4  trouble finding something, and we've been directing them to
5  in some cases pinpoint sites in our production where those
6  documents are.  Where those conversations have resulted in a,
7  gee, we're just not sure it's in there, we think we did, but
8  we can't know for sure, or if we just missed something, if
9  there's a document -- an update document or a document that
10  they want us to go further back in time, we've done that, and
11  so we folded those documents in some categories into this
12  production that we're making tomorrow.  I've discussed some
13  of these with counsel.  A couple of them I wanted to also
14  just bring to your attention.  We have been providing
15  documents to Phoenix at their request.  We've been sharing
16  those documents with them.  We've been logging those -- the
17  documents that have been shared, and to date so that we're
18  current with what we've provided, that will be a part of
19  tomorrow's production as well.  That's included so that the
20  creditors have that information as well.
21          The one I specifically wanted to bring to the
22  Court's attention is an issue that came up late last week.
23  We learned for the first time -- we counsel learned for the
24  first time that the mayor has actually asked his department
25  heads to provide certain reports to him assessing the plan.

1 I haven't seen the written request myself.  If we have it,

2 we've included it in there.  One of the -- one of the

3 responding department heads included it in the preview of the

4 answer, which we have.  The request was essentially to

5 provide a report regarding the ability to meet revenue and

6 expense projections in the plan of adjustment; number two, an

7 evaluation of financial projections for restructuring

8 initiatives; and, number three, the feasibility of

9 restructuring initiatives timeline.  So they were asked to

10 report to him on all these subjects.  We learned of it on

11 Friday.  It was confirmed for us on Monday of this week.  We

12 actually had a previously scheduled discovery committee call

13 on Tuesday morning.  We alerted the objectors of the

14 existence of these reports.  They were literally just being

15 created.  We've collected them now, and that will also be a

16 part of tomorrow's production.  And to the extent more are

17 generated or created, we will, of course, produce those.

18    So that, your Honor, takes us through where the city

19 stands as of tomorrow, and, again, the city's view is -- and

20 I remain committed to work with anyone who needs additional

21 assistance to locate documents within the city's production

22 or to go back if there's a -- if there's an earlier in time

23 document or a more current version of a document that they

24 need, we've been doing just that.

25    So the question really is from the city's

1   perspective what is left, what is remaining after that.  And
2   as I see it, it really comes down to a couple of buckets.  I
3   have reported to objectors -- and I know I saw it in their
4   report to the Court yesterday -- that we did get a late batch
5   of documents from Ernst & Young, from their collection.  It
6   just didn't come to us in time to fold into the original
7   production.  It's about 2,000 documents.  I don't know how
8   many of those will be responsive, but we have put them in the
9   queue, and they are being reviewed right now.  And, in fact,
10  we have a document review team that is going to be working
11  through this holiday weekend to get everything done so that
12  we get it out to them as quickly as possible.  It seems like
13  a next week -- seems like next week is perfectly manageable
14  in that regard.
15          The only other thing that is definitely coming next
16  week -- well, there's one other bucket we sort of need to
17  talk about, but Ernst & Young is also preparing -- and this
18  is something I think I previewed with the Court and I've
19  certainly talked to objectors about -- something more
20  ambitious than simply the native version of the ten- and
21  forty-year projections that they're working on.  They refer
22  to it as the binder.  I think it's going to be a lot more --
23  it's going to have a lot more data in it.  It's going to have
24  a lot more -- there are going to be documents that also go to
25  some of the assumptions that they used in connection with

1   this, and that will be produced.  It's supposed to come to us

2   today or tomorrow.  We need to review it for privilege and

3   other reasons, and then we'll get it out to objectors next

4   week, so that will be even more fulsome than what we're

5   providing in connection with tomorrow's native version of the

6   Excel spreadsheets themselves.

7           Where that then leaves us primarily is the impasse

8   that we seem to be having with the DWSD objectors and the

9   impact it's having on our ability to produce documents and

10  whether this is going to be something that derails the

11  process.  We provided to the Court last night in our

12  submission an exchange that we've been having as we try to

13  work through issues with the DWSD objectors, but their --

14  both their indications of their witness lists and what they

15  are asking the city to do as a further cooperation or

16  compliance with their discovery requests is becoming

17  incredibly burdensome and unmanageable on the city.  We laid

18  out in our -- I think if your Honor hasn't read, we've

19  certainly laid out in our e-mail that we provided to them

20  earlier this week where I had requested that they tell us

21  what they really need.  Give me the categories of what you

22  really need in this case, and we will help you find it or

23  we'll go get it.  That exercise yielded two e-mails from --

24  one from the counties, one from the DWSD parties, where they

25  laid it out, and we responded by doing just that, in many

1 cases showing them exactly where the information in our

2 existing production is with very precise pinpoint sites.

3 Yes, when we were responding to these requests, we went to

4 the DWSD. We went to the chief operating officer and relied

5 on him and his staff to go out and get us the responsive

6 information to these requests, and that's in the Hale

7 declaration. It's laid out pretty clearly. And it worked.

8 We produced almost all of the financial information that

9 they're asking for that seems to us relevant to their

10 objections, which is odd because the objections seem almost

11 entirely legal in nature, we have provided, and we laid that

12 out for them. And I stand ready to continue to help identify

13 documents in the production that would be relevant to their

14 issues or that they're simply having difficulty finding. The

15 real issue is they are insisting that we search multiple

16 custodians in a drain your computer, full-scale, ESI document

17 sweep that will cost the city potentially, if you think about

18 who they're asking us to do -- they're actually asking us to

19 search 20 custodians at the DWSD, again, drain their

20 computers, run these search terms, and produce the documents.

21 That would be incredibly costly and burdensome to the city

22 and could be an excuse to disrupt the schedule, quite

23 frankly, and we have real questions about what the relevance

24 of this is. We have made what we feel is an appropriate

25 offer to this group, which is to take the top three

1   individuals at the DWSD, which includes the director, the
2   COO, and the CFO, through which all of these underlying -- to
3   which all of these underlying people report or through which
4   any relevant information would roll up and search those on
5   their search terms, and we've reported to them -- we've
6   reported to them, your Honor, that just to take those three
7   individuals, those three individuals and run their search
8   terms yields about 35,000 documents, and that will take time
9   and money to review.  Now, we did not -- we are not waiting
10  for them to agree to that.  Based on the tone and the tenor
11  of our meet and confers, it doesn't seem like there's going
12  to be agreement to this, but that will take us into next
13  week.  And at the end of next week, we could produce those
14  documents, but that's going to be 35,000 documents.  It's
15  going to cost the city between 40 and $50,000 to do that,
16  just to look for e-mails that might relate to some of their
17  issues when we have pointed them to the core financial
18  information that we think is relevant here.  But if we need
19  to do that, we will do that.  They are insisting that we take
20  three to twenty, so instead of 35,000 documents, it's, you
21  know, six or seven times that many documents.  We could be
22  talking about a quarter of a million dollars to search e-
23  mails, and there's limited bandwidth in our -- we have
24  limited ability to process this information with very limited
25  returns at issue here, so, again, we are not waiting.  We did

1    not limit our initial search and production to DWSD proper.

2    In fact, we hear this on calls all the time. We see it in

3    these papers. Well, there's only 1,200 documents from DWSD

4    proper. That is from the DWSD custodians, but we searched

5    DWSD across all of our city custodians. I ran a very simple

6    search the other day. I searched for DWSD, you know, in our

7    document production, and that returned 2,200 hits, which are

8    associated with 3,700 documents. And if you search water

9    within three of sewer, that returns 2,500 hits and almost

10    5,000 documents. So we feel like we have done a very robust

11    DWSD-related search in connection -- and that are responsive

12    to these requests. If we need to search these additional

13    custodians, again, at the very top of DWSD, we can do that.

14    It'll be expensive, but we can do it by the end of next week,

15    but there has been no negotiation in this regard, and there

16    is no relenting in terms of how much further we need to go.

17    And we are concerned that the DWSD group is getting out front

18    in an effort to disrupt the schedule.

19         THE COURT: All right. On the objectors' side, I

20    guess we should deal with this issue of documents first, and

21    then we'll deal with the issue of how to make discovery and

22    trial more efficient. So who'd like to address the issue of

23    documents, especially DWSD documents?

24         MR. NEAL: Good morning again. Guy Neal, Sidley

25    Austin, for National Public Finance Guarantee. National

1  itself insures about $1.8 billion of water and sewer bonds,

2  but I don't rise for National.  I rise for the committee.

3  And just by way of two-minute background, as your Honor may

4  recall, the committee formed in the midst of the fire drill

5  last Thursday, metaphor intended, but to give you -- just to

6  give you a sense of who we are, I've broken it down to six

7  groups, although you probably could expand it, but group one

8  is the DWSD bondholders, bond insurers, and indenture

9  trustee.  Group two would be Oakland, Macomb, and Wayne

10 Counties.  Group three, COPs holders, FGIC, and Syncora.

11 Group four, LTGOs insured largely by Ambac Assurance

12 Corporation.  Group five, the Retirement Systems and the

13 Official Committee.  And group six would be labor.  I'm

14 calling them labor.  Maybe they're also called union, but

15 that's the Detroit Police Officers Association and the

16 Detroit Fire Fighters Association.  Six groups, within them

17 close to about two dozen objectors, two dozen law firms, many

18 more lawyers than two dozen law firms.  If you exclude the

19 retirees and you exclude labor, these are the holders and

20 insurers of roughly $8.4 billion worth of debt, 6 billion

21 water-sewer special revenue debt, about 1.4 billion in

22 general fund debt.

23        Now, what have we done in the past five days?  This

24 group of objectors, we've met, we've conferred, we've

25 coordinated.  And as Mr Shumaker accurately described, we had

1  two conference calls with the city in an effort to address
2  the five issues we laid out in our statement. And I know you
3  read the statement. I'm not going to go through each one.
4  And we filed in that statement -- excluding exhibits, it's 11
5  pages, which in and of itself is a feat to have this
6  committee with a dozen law firms do 11 pages, and we'll take
7  our victories where we can.

8          Document production. It's all driven by document
9  production. You have heard, you will hear two things, one
10 from the city we've substantially completed, and from the
11 objectors, while you've made arguably a substantial
12 production, you have not substantially completed. The city
13 said that -- said to us in meet and confers that by next week
14 we'll get the Milliman, E&Y and Conway MacKenzie documents.
15 It's encouraging to hear that it accelerated that process and
16 that we're going to get the hard drives of those materials
17 tomorrow. That's encouraging. There's still additional
18 documents that are going to roll in next week, and other
19 colleagues on the committee that are not part of the DWSD can
20 address the issues relating to this production, which would
21 be on the -- excuse me, your Honor -- it would be on the 23rd
22 of May. Remember, the production deadline was May 6th. And
23 remember when some of us were baby lawyers, you tended to get
24 Bankers Boxes of real documents that you go through. These
25 are electronic information on hard drives. It'll take the

1  holiday weekend to process.  It'll take all next week to go
2  through the documents.

3          Let me turn to DWSD because that's an interest in
4  particular of my client and my constituency, again, $6
5  billion worth of debt as to which they are trying to impair
6  in a variety of ways, lower the interest rate to what they
7  deem to be a market rate.  That raises intensive fact
8  determinations of credit quality, credit rating, CAPEX
9  expenditure, governance, rate payer ability, all of those
10 that the ratings agencies such as Moody's, Standard & Poor's,
11 Fitch Ratings, all evaluate based on a published set of
12 criteria, fact-intensive inquiries.  They're not legal.
13 There's also the desire of the city to pull out from the
14 systems a closed loop system of special revenue debt, pull
15 out about $430 million.  If that money comes out, that's a
16 violation of state law, federal law, we maintain, as well as
17 our bond documents, but even if they're allowed to do it as a
18 matter of law, question is can they take it out senior to our
19 debt.  Is it part of operations and maintenance?  Fact-
20 intensive inquiry.  Does it come out of the bottom of the
21 waterfall?

22          THE COURT:  How is that fact-intensive?

23          MR. NEAL:  Well, it's fact-intensive in a variety of
24 ways.  First, is the number correct.  Is the 428 million that
25 they maintain largely consists of unfunded actuarial

 1    liability of the water and sewerage system, is that number
 2    correctly calculated?  And that's based on census data of
 3    DWSD employees, many of whom we maintain are on the DWSD
 4    payroll, but they're not DWSD employees, so that number
 5    becomes fact-intensive.  I'm going to keep this at a high
 6    level.  I have colleagues here that can get as granular and
 7    as into the weeds of water, sewer production as this Court
 8    would like.  I sense from your smile we'll keep it at a high
 9    level.  There is -- as you know, your Honor, there's a
10    hearing next Wednesday.  You set next Wednesday as a hearing
11    to address document review issues because even though we all
12    got a hard drive -- and this is the -- excuse the
13    pejorative -- this is the cookie cutter hard drive.  The same
14    production everyone got on May 7th or May 6th they got again
15    last week on May 16th.  As to DWSD, these documents are not
16    responsive.  We established that at the May 12th hearing and
17    the May 15th hearing, not responsive to the DWSD parties'
18    discovery requests.
19            Here's what we know from the production, and Mr.
20    Irwin confirmed as much when he stood up here, that of the
21    DWSD custodian, 1,142 pages, not documents, pages, and no ESI
22    search of anybody to date -- they're still working through
23    that -- and an estimated 35 to 40,000 documents to the extent
24    they do an ESI search of the top three management, the
25    director, the CFO, chief operating officer.  So when they

1  filed last night a statement, paragraph 5, page 3 of their

2  statement, that they've substantially completed the DWSD

3  document production -- try to do this professionally and

4  delicately -- that's not an accurate representation.  They've

5  produced 1,142 pages.  There may be -- there are 40,000 pages

6  that are coming to us next week, 40,000 coming to us that

7  would be responsive to our prioritized requests, simple math.

8  We have standing here today, May 23rd, two percent of what

9  the city maintains to be -- city maintains and we dispute --

10 we can get into that next week -- two percent of what the

11 city maintains is responsive to the DWSD document requests,

12 which, again, 6 billion of the 7.48 billion at issue.  So we

13 have worked with the city, and we intend to -- Mr. Irwin has

14 been great.  He's been available at every time.  We have had

15 dialogues.  We have had disagreements.  But from last Monday,

16 May 12th's, hearing when they were ordered to produce

17 documents going back to 2009, when they were ordered to

18 produce additional documents as they relate to the GLWA

19 transaction or any transaction that they're considering, and

20 when we -- when he, when Mr. Irwin called me on May 14th,

21 last Wednesday, one week ago, and said, "Let me help you.

22 Please prioritize your requests.  You've served many.  The

23 county has served an equal number.  Work together.

24 Prioritize your request.  Give us a list of custodians," we

25 did so within five hours, got an e-mail from me identifying

1  the information we need.  You can read through it, but I'm

2  not going to take the Court's time today.  To date here we

3  are, May 22nd.  I don't have the documents that I

4  prioritized.  I don't have the searches of the custodians who

5  have information.

6         Now, we hear from the city that they've asked for

7  documents and they searched for documents of, in addition to

8  one DWSD custodian, other city witnesses, Conway MacKenzie,

9  Miller Buckfire, people who don't work at DWSD nor would they

10  have the documents we're looking for, and they've produced

11  3,000 documents.  Well, be it 1,400 or be it 3,000, take the

12  city at its word on every representation.  We're still

13  talking two to ten percent at most of the production that we

14  have to date.  And, again, to the extent you want, we can go

15  deeper, deeper, deeper, deeper.  Your Honor, we're here all

16  day, and I don't want to take up the broader issues that

17  concern more than just DWSD.  People have been very patient

18  with me on this committee because I've been very, of course,

19  DWSD-centric.

20         So what does this mean to me?  And really it's not

21  just to DWSD.  It's to Mr. Hackney.  It's to Mr. Marriott,

22  Mr. Perez.  What does this all mean?  This means that if you

23  assume -- and it's aggressive.  It's very aggressive.  If you

24  assume that by Monday, June 2nd, we will have substantial

25  completion of a document production, if you assume that date

1  just ten days away, less than ten days away, that leaves you,

2  your Honor -- that leaves you with 25 days at which to -- I'm

3  merging into scheduling if that's okay, your Honor.  That

4  leaves you with 25 days total, 19 workdays, to set out to

5  accomplish a deposition of the city's 37 witnesses, which may

6  be reduced.  There are additional witnesses outside the

7  city's witness lists that we need to depose, director of

8  DWSD, the CFO, people who have information on capital

9  expenditure and capital improvement.  That determines the

10 interest rate, market interest rate, in 19 workdays let alone

11 the city's desire to take our depositions, which, if it's

12 three per objector, I'm going to assume 12 objectors just for

13 sake of argument.  That's an additional 36.  Your Honor,

14 you're at about the 75 witness number for depositions in a

15 19-day window.

16        Your Honor, I'd like to think that I am good, that I

17 can do that, but I'm not that good.  Maybe Mr. Hackney could

18 do that.  I can't do that.  And I'm being asked at the same

19 time not just to take, defend -- well, lets back up.

20        THE COURT:  Don't shake your head.  It was a

21 compliment.

22        MR. NEAL:  So let me back up because I'd have to

23 finish review of documents, prepare for depositions, take

24 depositions, defend depositions, and under the city's

25 proposal put together three to four -- myself three to four

1    expert witnesses.  Everyone else has one to three, let's just
2    assume as a starting point, of expert witnesses while all of
3    this is ongoing.  I would submit to you, your Honor, that if
4    we had sodium pentothal, that even the Jones Day lawyers
5    could not accomplish that end.  If they found themselves in a
6    similar position -- and they are -- they're the lone objector
7    as a law firm for a client in <u>Stockton</u>.  They are prosecuting
8    right now.  That case is in the process of confirmation,
9    closing argument on June 4th.  They've had a longer period of
10   time representing one client, the last remaining objector,
11   holding a $35 million claim in that case, had a longer period
12   of time to conduct fact discovery and to conduct expert
13   discovery and to prepare for trial.  One objector, $35
14   million claim.  Doesn't equate to the two dozen here with
15   $7.4 billion.

16          So, your Honor, and I say this not for purposes of
17   show, not for purposes of spite or sport, no desire on my
18   part to continue this any longer than it needs to be
19   continued.  I think everyone in this courtroom agrees on
20   that, but to be frank, I cannot adequately represent my
21   client under the schedule as currently constructed given
22   where we are with the document production.  Going back to the
23   name of this committee, discovery and trial efficiency
24   committee, Mr. Shumaker is right.  We're stuck on discovery
25   but not even deposition discovery.  We're working out a

1   protocol.  We're stuck on document discovery.  And we told

2   Mr. Shumaker and Mr. Irwin, in all honesty, that we haven't

3   gotten to the trial part.  We are more than happy to discuss

4   an efficient way to proceed with trial and to divide up time

5   appropriately.  We think the objectors can better divide up

6   their allocated time better than the city can for us or,

7   frankly, your Honor, even you can for us, but we understand

8   the limitations.  We're at document discovery.  We're not at

9   fact depositions.

10      So what we submitted to your Honor really didn't

11  have much secret sauce or special formula to it last night in

12  the schedule.  We simply presumed that document production

13  would be substantially complete.  That remains an assumption.

14  That remains aggressive, that it would be substantially

15  complete by June 2nd, and we rolled out the dates

16  accordingly.  I'm going to give you just one example of what

17  we did.  We didn't try to get too creative.  Under the

18  existing order, the fourth amended scheduling order today, it

19  provides 52 days between May 6th, production deadline, and

20  the June 27 fact deposition cutoff, 52 days, itself

21  aggressive.  Under the proposed order, from June 2nd to July

22  18th, which is the date that we plugged in -- let me pause.

23  We arrived at July 18th because last week Mr. Hertzberg said

24  July 15th would be an appropriate extension.  We added three

25  days.  If you twist our arms, we could go back to July 15th.

1  So June 2nd to July 18th, that's 46 days already.  Already we

2  end up losing six days of a time period at which no time can

3  be squandered, no time can be lost, so, hence, it was a three

4  and a half bump-out of each of the deadlines, and why not

5  just move one date?  Well, every iteration of the scheduling

6  order had the same progression, had the same sequencing of

7  events, written discovery followed by fact depositions

8  followed by expert depositions followed by supplemental

9  objections and pretrial briefing and then followed by the

10  trial.  Jones Day is saying we're being a little too rigid in

11  trying to adhere to that progression, although, in my own

12  experience of 20 years, that's how every trial is staged.  If

13  you remember, you know, the Trident commercial that four out

14  of five dentists agree, I think you would -- if you asked any

15  litigator if that's how -- how would you stage a trial, they

16  would say that's how you would stage a trial, at least four

17  out of five, and the fifth one you wouldn't want as your

18  lawyer.  That's how you -- that's how you have to do it.  I

19  understand Mr. Hertzberg's comments and his instincts -- I

20  mean he has more experience than I do -- of trying to move

21  out the fact date to July 15th, but we can't have expert

22  reports without having the documents, without having the

23  depositions, and then providing a short window of time for

24  the experts to complete.

25          THE COURT:  I need you to rewind a bit.

1      MR. NEAL:  Yes.

2      THE COURT:  Mr. Irwin suggested that you can get

3  substantially the documents you need from his searches of the

4  three top employees of the DSWD.  What is your position on

5  that as opposed to the other 17 or however many other

6  employees there are?

7      MR. NEAL:  Yes, very good.  The e-mail I sent him

8  had --

9      THE COURT:  Excuse me for one second.

10      MR. NEAL:  Yes.

11      THE COURT:  Go ahead, sir.

12      MR. NEAL:  Yes.  The e-mail that I sent Mr. Irwin at

13  his request last week identified 14 custodians, not --

14      THE COURT:  Feel free to pause if you need to.

15      MR. NEAL:  I will continue.

16      THE COURT:  Okay.

17      MR. NEAL:  The e-mail I sent last week had 14

18  custodians.  Maybe the counties sent an additional request

19  that added -- was additive and made it 20.  I don't know.  My

20  list had 14, three of which they've agreed to search.  Let me

21  tell you how we arrived at the number and why we think it's

22  appropriate.  In the first instance, Ms. Hale filed an

23  affidavit describing how they went about trying to collect

24  DWSD documents, and I want to give the short form version of

25  that.  They went to their chief operating and compliance

1  officer and general counsel, a gentleman by the name of

2  William Wolfson, and they asked him, "Please, Mr. Wolfson,

3  will you endeavor to collect documents that relate to DWSD

4  issues?"  And I'm not saying he did so in response to our

5  discovery requests -- I think there's an ambiguity -- but

6  just DWSD issues.  Those are in the plan.  Again, not

7  directly responsive to our discovery.  He turned around and

8  collected from 11 custodians.  Those 11 custodians sent back

9  to Mr. Wolfson 1,142 pages.  To put that in perspective, Ms.

10  Hale's affidavit that she filed earlier this week is about

11  900 pages, just her affidavit alone.  So on issues relating

12  to $6 billion worth of debt where substantial impairment is

13  being imposed by the plan, we have to date 1,142 pages, which

14  comprise 61 documents.  We've looked at them.  They're not

15  meaningful.  They're not material.  So we asked that there be

16  ESI searches as to additional custodians, those as to whom he

17  collected from but only got back -- I don't know -- I can't

18  do the math in my head -- a hundred pages per person if that.

19  We are asking for a search based with search terms.  If you

20  give me a moment, your Honor, I want to go back to Mr.

21  Irwin's estimate of the cost, which, regrettably, I don't

22  have in my notes, but, again, if you put -- everything

23  becomes relative, of course.  The burden on them to produce

24  is relative to the issue before the Court.  What's before the

25  Court, as I explained, substantial impairment of $6 billion

1  worth of debt.  The cost to search those documents is de

2  minimis relative to the amounts that are at issue, and I

3  would submit to your Honor if this were a case in federal

4  court in which $6 billion --

5          THE COURT:  Well, hold on.  Hold on.

6          MR. NEAL:  Yes.

7          THE COURT:  Does the city propose not to pay any of

8  that $6 billion?

9          MR. NEAL:  No.

10          THE COURT:  All right.  So it's not like $6 billion

11  is at stake here.  You're talking about --

12          MR. NEAL:  Well, let me --

13          THE COURT:  You're talking about the interest rate

14  and --

15          MR. NEAL:  Two issue -- two main -- well, three main

16  economic issues, yes.

17          THE COURT:  And call protection.

18          MR. NEAL:  Right.  Interest rate, call protection,

19  and the pension allocation.

20          THE COURT:  Oh, okay, but I wouldn't want it

21  reported that the city is going to impair $6 billion worth of

22  your debt.  It's not.

23          MR. NEAL:  It's not a $6 billion loss.  You are

24  absolutely correct.  I don't have the --

25          THE COURT:  What is the dollar value you contend is

1    at stake with the city's plan vis-a-vis your clients?

2        MR. NEAL:  I would ask your Honor not to hold me to

3    it, but by rough math --

4        THE COURT:  It's an estimate.

5        MR. NEAL:  Rough math, it's about $800 million.

6        THE COURT:  Okay.

7        MR. NEAL:  It's real money.

8        THE COURT:  It's still a big number, but --

9        MR. NEAL:  Nonetheless, it's a very big number.

10       THE COURT:  -- it's not six billion.  Okay.

11       MR. NEAL:  Six billion just sounds larger, your

12   Honor, but I understand.  Fair enough.

13       THE COURT:  Well, so would 60, but --

14       MR. NEAL:  Fair enough.  The cost.  Again, I don't

15   know how I missed this in Mr. Irwin's presentation.  It is de

16   minimis.  If it takes some additional time beyond -- here's a

17   legitimate concern by the city.  If it takes some additional

18   time to do the ESI search of more than three custodians, I

19   can't speak for everybody, but National won't come back and

20   say, "Wow, we lost another week.  Let's go back to your

21   Honor, and let's ask for an additional week extension."  I

22   understand some documents come in later than others.  That's

23   why we have rolling productions.  But these documents are

24   essential, and why are they essential?  Because as a general

25   policy matter, the city wants to put forward the usual

1  suspects of Kevyn Orr, of Charles Moore, of Gaurav Malhotra,

2  of Ken Buckfire.

3          THE COURT:  Okay.  Let's not call them suspects.

4          MR. NEAL:  I'm sorry.  That's a colloquial term.  I

5  don't mean to use it in its -- apologies.  I'll strike that,

6  take that back.

7          THE COURT:  Thank you.

8          MR. NEAL:  But they want to put forward consultants

9  of the city both in response to Rule 30(b)(6) designations

10  where you ask give me the person most knowledgeable on CAPEX

11  needs of the water and sewerage systems.  We anticipate they

12  will put forward Ken Buckfire or Charles Moore, not someone

13  who is, we submit, the person most knowledgeable.  So we ask

14  that the people who are most knowledgeable -- we have their

15  titles -- we can go over them -- have their documents

16  searched.

17          THE COURT:  And that's how many?

18          MR. NEAL:  On my list -- and I defer to Jaye

19  Quadrozzi, counsel for Oakland, or Allan Brilliant, who's on

20  the phone, counsel for Macomb -- that would be 14 total.

21  We'd be happy to work with the city to try to narrow that

22  list down to ten, but I'm speaking solely for National.  I

23  don't have the authority of Ms. Quadrozzi or Mr. Brilliant or

24  others on the team.  So that is the basis -- and Mr. Hackney

25  will speak after me, I'm sure, on non-DWSD document issues,

1    but that is the basis for the proposed fifth amended

2    scheduling order, to keep it in line with the fourth amended

3    scheduling order, to allow for a reasonable time for parties

4    to challenge the city's case in chief and to present their

5    own case.

6              I'm going to close with just two comments, your

7    Honor.  One, we call -- and I think we used the terminology

8    in our submission -- the witness list rationalization, and

9    then there's the discovery -- I give credit to Mr. Hackney or

10   I -- that's Mr. Hackney -- and then the deposition protocol,

11   which is my term of art, so I can be prejudiced with that.

12   That process is ongoing.  Again, I described the six groups

13   at the outset.  These are daily conference calls.  These are

14   daily e-mails with members of the group to bring the number

15   down.  We've made substantial progress, DWSD working across

16   with Syncora and the COPs, to get to a rational number.

17   There may only be five to ten core witnesses that people

18   really care about.  I'm not saying there's only going to be

19   five to ten depositions that we -- five to ten are the core

20   that both COPs, Syncora, DWSD, county, that they'll all want,

21   hence the need for no artificial seven-hour limitation.  But

22   we are working on that, and Mr. Shumaker stated it

23   accurately.  We promise to get them something early next

24   week.  It will allow this to get done in a period, but not in

25   a period between June 2nd and June 27th.  That is not

1  workable from our perspective.  So unless your Honor has

2  anything else for me, I know Mr. Hackney wants to address one

3  issue that I've not addressed, and that's the effective use

4  of pretrial conferences going forward, but I know he has

5  other issues that he wants to address as they relate in

6  specific to the general fund creditors, so thank you.

7         THE COURT:  Thank you, sir.

8         MR. HACKNEY:  Your Honor, good morning.  Stephen

9  Hackney on behalf of Syncora.  I think this is a big hearing.

10 We're kind of at a crossroads, and I was wondering if I could

11 give you my thoughts on why I do believe we are at the last

12 resort of having to move the trial date.  I'll tell you

13 reasons why we don't want to move the trial date either, you

14 know.  When you're opposing a plan that you don't think is

15 confirmable, you want to get it unconfirmed as fast as you

16 can so that we can set about the work of building a plan that

17 works, so we want to get there fast as well, but it has to be

18 in a fair fashion, so I do want to address that.  I'd like to

19 give you some insight into the document issues that may hit

20 your desk on Wednesday.  We're still reviewing things.  I'd

21 like to close with some thoughts about how we can move

22 forward in a way that is efficient and will hopefully serve

23 your aims of even if the trial date does have to move, if you

24 ever reach that conclusion, we can make sure that that's the

25 last move or get there in the most efficient way possible.

1    I will tell you, your Honor, I don't know if you

2  know I missed some of the end of the swap trial because my

3  wife and I had a little girl.  We actually have three girls,

4  and they are four and a half and two and a half and four

5  months, and the irony of it is that when you have three small

6  children, the things that happen at nighttime are like out of

7  "A Midsummer Night's Dream," like you end up sleeping in

8  different beds and people kick you in the head all night

9  until you wake up and ask why is someone kicking me in the

10  head, and so the -- one of the ironies of the Detroit case is

11  that when I come here, even though the hearings are stressful

12  and they involve a lot of prep, it's often typically a place

13  where I catch up on my sleep.  Last night I did not catch up

14  on my sleep.  I will tell you I woke up at three o'clock this

15  morning.  I was wide awake.  I could not go back to sleep,

16  and it's because I was really upset about the way this last

17  week went down with this committee we formed.  It was a

18  missed opportunity this last week, I think, and I'm

19  frustrated about it because if we work together, we can put

20  on a good trial for you that will elicit the truth for you so

21  that you can decide what the best answer is, but if we don't

22  do that, we're going to make hash of it, and I feel like the

23  city thinks that this is all over but for the shoutin', so

24  they're saying this trial is a formality.  Judge Rhodes has

25  his thing on feasibility, and we've got to satisfy him about

1   feasibility, but all the rest of it is done.  I do not

2   believe that we're having a show trial in this case.  I don't

3   believe after three decades on the bench in the largest

4   Chapter 9 case that this trial isn't what it purports to be,

5   which is a real trial.  And if we are going to have a real

6   trial in the largest Chapter 9 case in American history with

7   some of the most complicated issues, not Stockton where they

8   got it down to like one creditor who wasn't happy with the

9   way they were being treated and, by the way, raised many of

10  the objections that we're raising, but many different

11  creditors and many different issues, any one of which, in my

12  world as a commercial litigator, could in and of itself be a

13  multi-year litigation, no lie, it can't come as a surprise to

14  us that there are complicated issues to work through and

15  complex issues to work through on discovery.  Now, the city

16  was the one -- when you put out there, "Here's what I think

17  about the schedule.  What do you all think about the

18  schedule?  Give me your comments," the city more or less put

19  their hand up and said, "We like your schedule."  They

20  advocated for an extremely compressed discovery and trial

21  schedule.  And remember those are my words, but they're also

22  the words from Ms. Hale's affidavit where she describes the

23  extraordinary measures she had to go through to address the

24  extreme nature of the schedule, so this is something where

25  the lawyers on both sides will tell you this is a -- this is

 1  a very accelerated schedule.  And I've given you my views

 2  before about why we didn't think it wouldn't work, and I'm

 3  not going to go into them again, but what I can tell you for

 4  sure is that if it was going to work, the city needed to be

 5  perfect in complying with its obligations under that

 6  schedule, and, unfortunately -- and that's because they are

 7  the gatekeeper for the information.  We need the information

 8  to take the depositions.  Our experts need the information.

 9  I will get into what information it is that we need and why

10  we need it in a moment.

11         The city, as you know, has been far from perfect in

12  complying with its discovery obligations.  It granted an

13  extension to itself of the initial date in late April.  Its

14  May 6 production of documents was inefficient, improper, and

15  unfair.  It was plagued by the clawback problem.  Even as we

16  sit here today 16 days past the date the city was to be

17  completed with their production, and Mr. Irwin says, "You

18  know, these creditors are of the view that you got to

19  complete the document production before we get into

20  depositions," that's what your order says, and we aren't even

21  demanding that.  We're looking for substantial completeness.

22  These are real lawyers in the room that are practical and

23  understand complete, okay, but substantially complete, yes.

24  Even as we sit here today 16 days past the date to be

25  complete, we do not have documents supporting the city's

1  forecasts, absolutely essential information relating to best

2  interest, relating to feasibility, relating to what's in the

3  plan.  We do not have documents supporting the city's

4  calculation of the OPEB claims.  We're still waiting to

5  understand, okay, we have the DIA documents, but, city, what

6  art documents were in your possession that led you to make

7  the decision around the grand bargain.  We are waiting on

8  other documents that relate to things, for example, the

9  city's historical experience with the Revised Judicature Act,

10  which is critical for claimants like the COP holders and the

11  retirees because that is the basis for their remedy outside

12  of bankruptcy.  Even Ms. Hale concedes in the affidavit that

13  she filed last night that her work is ongoing even with what

14  they filed this week, ongoing.  Those are her words.  These

15  documents go to the most important issues in the case, unfair

16  discrimination, fair and equitable, best interest of

17  creditors.

18       Now, from the Hale affidavit we learned the

19  following additional facts that I will not front-run our

20  hearing next Wednesday, but I want to say that they are of

21  concern to me.  The city, Jones Day proper, the city, the

22  Jones Day law firm, only searched five city custodians, five,

23  Kevyn Orr; Ms. Fox, who's his assistant, who I believe came

24  on the scene in the fourth quarter of 2013; the CFO, who I

25  think only came on the scene in the first quarter of 2014;

1    Ms. Mays, the assistant to Mr. Orr; and Mayor Duggan.  I am

2    going to maintain an open mind.  We have people reviewing the

3    documents right now.  I wonder whether they even got the

4    documents back to January 1, 2013, relating to things like

5    what are the asset valuations of many of the city's assets

6    over $2 million.  That's clearly relevant to plan

7    confirmation.  What are the delinquent taxes and the city's

8    ability to collect taxes on a historical basis, on a go

9    forward basis?  What does the assessor's office say about

10   that?  Why isn't it collecting documents -- taxes?  How much

11   has it not collected?  What does it think it can do?  There

12   will be relevant evidence in there that will matter to you,

13   things like feasibility and best interests.  What does the

14   planning department think about the long-term vision of the

15   city?  How does it fit into the restructuring and

16   reinvestment initiatives?  These aren't reaches.  This isn't

17   us torturing the city just for the fun of it.  These are

18   material documents that not only do I want, but I will bet

19   you that Ms. Kopacz is going to want them as well.  These are

20   real documents or real effort to grasp this.

21          We learned that the extreme nature of the schedule

22   led the city to make its collection of documents from city

23   employees prior to receiving our document requests and even

24   to begin reviewing the documents prior to receiving our

25   requests without going back to rereview them based on our

1   requests.  And by the way, our requests were served early.

2   Many of the people -- of the folks in this room, their

3   document requests came in even after mine.  We served ours

4   earlier to give the city extra time.

5        We learned that the city did apply that January 1,

6   2013, limitation across all document categories.  I would say

7   that's not necessarily consistent with what I had previously

8   understood.  And we understand now that the city made this

9   critical decision to look at categories of information and

10  say, well, that relates -- that also relates to expert

11  discovery, so we'll just hold it back until then, for

12  example, on the forecasts or on Milliman.  This is in Ms.

13  Hale's report.

14       Now, these documents are clearly discoverable now

15  because they relate to things that are in the plan that we

16  are going to be fighting about at confirmation.  The moment

17  they made that decision, your Honor, to say, well, that can

18  wait for expert discovery, they crippled the schedule because

19  our experts under the schedule have to produce if it's an

20  affirmative report -- and I think we should try and get some

21  clarity around this -- on June 24th.  If it's a rebuttal

22  report, they have to do it on July 1st.  The moment the city

23  made the decision to hold back the underlying substantive

24  documents that were going into things that were in the plan

25  but that the city deemed would be the subject of expert

testimony, they crippled our expert's ability to make the
type of simultaneous production of expert reports that your
order envisioned.  Now, I don't think Ms. Hale did that on
purpose like -- I just met her today.  I think -- I'm not
saying she was with evil intent, but I am saying the effect
of it was you hamstrung our ability to have our experts make
even the expedited production.  Your Honor, the city's
actions are crippling our ability to get this case ready for
you.

Now, the city's experts are working away.  They have
full and unfettered access to this information.  Many of mine
are waiting anxiously on the document production and seeing
the sand run out of the clock in terms of when their reports
are due.  And when the city says that, you know -- you know,
there is an acknowledgement by Mr. Hertzberg that the
deadline for fact discovery needs to cut off, needs to be
moved back, that's just the reality of what's going on, and
there is a reality of the implications of that for the
remainder of the schedule.  And part of my frustration of why
I woke up so early this morning was that the DTEC, which is
what we call the committee that you made up -- I think that
you have a knack for acronyms because that's a good acronym
there, but Mr. Neal I would say has spearheaded much of that.
All of the people in this room have been working hard on it,
and I will tell you that I'm actually -- I'm impressed over

1  and over again.  On the swap trial we did a lot of

2  coordination, and I'm always impressed to see the way that

3  creditors work together on things.  You know, we're always

4  portrayed as this bag of cats, you know, that are just

5  fighting each other, and you take one out and settle with

6  them, and then you put the bag back wherever you hold bags of

7  cats.  And what happened here is these creditors -- it's

8  impressive to watch them work together.  There are

9  intelligent people on the phone.  There are strong

10 personalities on the phone.  They have views.  They want to

11 do it this way.  They want to do it this way.  People trim

12 their sales to try and do things like put a document in front

13 of you where we say here are things that we think could be

14 helpful, and it's kind of a vision sometimes of what the

15 bankruptcy could be if we were able to achieve a consensual

16 plan.  What was frustrating was as we were doing conference

17 calls and working together, all of a sudden the city was

18 backing off the position even that Mr. Hertzberg had taken a

19 week ago.  Now they were saying, "What are you talking about?

20 We have already substantially produced the documents.  Is

21 there some confusion about that?  And, no, we don't need to

22 delay the fact discovery cutoff.  It should just stay the

23 same.  I don't know what good old Mr. Hertzberg was talking

24 about.  Let's just keep it the same.  And we cannot move that

25 trial."  And so not only have we lost all the time up until

1   that point, I feel like we lost the last week because I
2   thought that we were going to get together and rationalize
3   the schedule and make it work, and instead the city just
4   pivoted on us, and that was frustrating to me given all the
5   time I spent on the phone with people like Mr. Neal and
6   others trying to begin the difficult process of getting
7   everyone together to work together in the practical way that
8   you need us to.  If we are going to craft a schedule that
9   will deliver to you a trial that is worthy of this
10  proceeding, I believe it needs to be substance based, your
11  Honor, and what I mean by that is we should drive the city
12  and, to the extent it will benefit the Court, drive the
13  creditors, too, to engage in the types of practical back and
14  forth that takes the pleadings down to the reality of
15  painting a picture of what the trial will look like, painting
16  a picture of what the evidence will look like.  I'm talking
17  about questions like how does the city propose to justify the
18  discrimination between pensioners and COP holders?  Is the
19  city assuming that the Court will rule in its favor on
20  invalidity?  That's not consistent with the plan, but is that
21  part of its strategy?  If the Court finds that there are fact
22  issues that preclude the Court from finding COP invalidity as
23  a matter of law, are we going to try the fact issues of COP
24  invalidity in connection with the plan?  That is not what the
25  plan currently says, but that's actually a real question to

1   ask the city in light of recent events.  If the city's

2   rationale is not that the COPs are invalid but that there are

3   other bases to treat the two classes differently, what are

4   the bases, and what is the evidence that will go into

5   supporting that rationale?  How does the city propose to

6   prove the merits of the grand bargain?  I could go on and on.

7   These are real questions.  I think sometimes you say things

8   that are true at the right level of generality, so you'll

9   say, "Come on, Mr. Hackney, we know what this case is about,"

10  and we do at a certain level of generality, but when you're

11  taking it down to the level of how much time should those

12  guys get, how many depositions do they need, how should we

13  structure this, you have to go from the level of generality

14  of generally understanding unfair discrimination is in play,

15  best interest is in play, feasibility is in play, to the

16  practical evidence-based conversation that we have about how

17  are you going to put this together, what are you seeing, what

18  parts of it are expert testimony, what parts are not.  You

19  know, that is very consistent with what the manual on complex

20  litigation says, and I have never been part of a more

21  complicated litigation than this one.  This is the -- this is

22  what they wrote the manual for.  And so even if you engage in

23  this type of substantive-based interaction, cards on the

24  table, it's not like you get done with that status conference

25  and say, "Oh, okay, we solved how deps will happen and how

1  much time and who will sit and what trial is going to be

2  like." I'm not saying that it will. What it does is it

3  forces the lawyers to engage. It forces the lawyers to

4  engage with each other and with the Court. And what I think

5  will grow from that are things that we can use to rationalize

6  discovery, and I will give you an example of one idea that I

7  have not had the chance to talk about with my DTEC

8  colleagues, and my strong preference is not to ad lib from

9  the podium over much, but this is one idea I will give. If

10 you have a conversation with the people -- with the different

11 attorneys, especially the city, how are you going to prove

12 this, lets understand what the key disputed issues are going

13 to be, and let's understand how the city intends to prove it

14 up, what I could see doing is something that's kind of novel

15 and I've never seen done. I don't even know if it's within

16 the rules, but I could see the Court saying, "I, the Court,

17 am going to actually drive the 30(b)(6) topics onto these key

18 issues." And to the extent the party has a unique issue

19 that, you know, they want a separate 30(b)(6) on, I'll get --

20 under good cause I'll give that to them, but instead of

21 having the chaos of everyone crafting their 30(b)(6) topics

22 and the city having to rationalize it and figure it out,

23 there could be a better way to get there in terms of making

24 sure that there's a good linkage between where we take the

25 30(b)(6) deps, how much of it we take, and how it fits onto

1  what we're going to be litigating at trial.  That's an
2  example of the way the substantive exchange that I'm talking
3  about can facilitate that, which, in turn, I believe can
4  facilitate other depositions because I think that there's a
5  little bit of a steam valve effect, which is if you've gotten
6  a good 30(b)(6) dep on unfair discrimination, I think it
7  reduces the pressure somewhat on you to put it into all of
8  your dep outlines and take a bunch of depositions outside of
9  the 30(b)(6).  It won't eliminate the other depositions.  I'm
10  not saying it's a panacea.  I'm saying it's the type of
11  practical-based solution that we could do to get a handle on
12  things.

13          A second idea is one that Mr. Neal alluded to, which
14  is after we rationalize the witness list, which I think we
15  should do just to paint the targets better of who will likely
16  need to be deposed or who could be deposed, what we should do
17  then is I think we should tell people file something that
18  says who you want to depose because this may be like one of
19  those false conflict-type problems that you learn about in
20  law school where it's -- you know, there's a choice of law
21  problem in two states.  You don't know which one applies, and
22  it turns out the states don't really have a substantive
23  conflict.  You may see a sorting effect that goes on like Mr.
24  Neal alluded to, which is DWSD has got a focus over here,
25  COPs and COPs insurers have a focus over here, maybe LTGO

 1   nearer to them, and the Venn diagram of what's problematic in
 2   the middle where they overlap, we both want Orr, we both want
 3   Moore, we both want Malhotra, et cetera.  Well, then we
 4   simplify the problem of, okay, good, so it turns out there's
 5   about five to seven of these guys that are in the middle of
 6   the Venn diagram.  What if we -- and I, as the Court, have a
 7   better sense of how these guys fit into -- men and women fit
 8   into the issues that are going to be litigated, and then it
 9   can be, okay, we'll have a DWSD day and a non-DWSD day, or
10   it's going to be 12 hours total, six and six, or whatever,
11   but what we can't do is we can't keep having these
12   conversations where, you know, Mr. Shumaker gets up and says,
13   "I think Syncora should get three witnesses."  What's the
14   basis for that?  We don't have the type of substantive level
15   exchanges yet.  They have a lot about my case because we
16   filed an objection.  We don't even have their replies yet,
17   and we're already talking about limiting witnesses, limiting
18   time.  I don't think we're at the point, your Honor, where we
19   can start to do that and have it be anything other than
20   arbitrary because we just -- we haven't engaged enough on the
21   substance, and this is the view that we expressed with
22   respect to the Manual for Complex Litigation.
23          The last thing that I wanted to say, your Honor,
24   is -- and I also want to echo what Mr. Neal said about Mr.
25   Irwin.  I spent time with Mr. Irwin.  The information that

1 we're getting tomorrow, that facilitates discovery. That was

2 very helpful, like I appreciate that. I spoke with Ms. Hale

3 today on an issue that we got the static out of the line,

4 didn't have to come in here and bother you with it. I

5 appreciate that. I don't want to just dun the city

6 immercilessly for no point whatsoever, and I've told both

7 of -- or Mr. Irwin on several occasions that I don't hold

8 what's happening against him. I know that he's doing the

9 best that he can. It's just no one could perform under this

10 schedule. It's not something that you can do.

11          But I will say going forward is if we're going to

12 get there where we are going to work through this complexity

13 both in terms of the scale of the issues that are in play but

14 also in terms of getting these parties to all work together

15 so that we minimize the number of depositions, which is also

16 an ask of the city, so they want to go fast, but they want it

17 to be super orderly as well -- if we are going to do that,

18 there's going to have to be compromise, and the compromise

19 isn't just from the creditors. It is also from the city.

20 And that's, candidly, what bankruptcy is about. And you know

21 this better than I do. It is about compromise. But

22 discovery is often about important compromises as well.

23 Schedules are about compromise. And if you think about what

24 the city is saying today, the city is coming in and saying we

25 can have what everybody concedes was a false start to our

1  document production, not produce the documents that support
2  the forecasts that are in the plan, not search for documents
3  that go back prior to Jan. 1, 2013, not provide actuarial
4  information relating to the central valuations in the case of
5  pension and OPEB, and produce a ton of mediation material
6  inadvertently that requires everybody to send the hard drives
7  back and injects delay on its own.  And, your Honor, we, the
8  city, think that the result of all that is that you should
9  punish the creditors by shrinking the amount of time their
10 experts have with the information and holding the schedule.
11 That's not compromise.  You asked Mr. Irwin, "What's magical
12 about the September 30 date?  And he said, "Well, there isn't
13 really anything magical about it.  It's part of the state
14 settlement with the city, sure."  But you and I have been
15 here before where I feel like we have these guns that are
16 being pointed at our head or the city is pointing a gun to
17 its own head and saying, "Stop me or I'll shoot."  And they
18 can't create a back-end deadline and then say, "Okay.  Well,
19 we'll give Judge Rhodes a month to write the opinion, and
20 that means that we can only have this many trial days, and
21 that's if we start on this day, so we have to jam it all in
22 before -- between now and then because we have to get done by
23 September 30 and have September 30 not be a magical day."
24 You said earlier that you wanted the just and speedy and
25 efficient resolution of this case.  Your Honor, in my

1  considered opinion, I say this -- I say this with great

2  respect -- right now all we have is the speed.  We're not

3  tracking on justice.  I cannot prepare for this trial under

4  this schedule and fairly represent my clients, but I don't

5  think we're actually tracking on efficiency.  If we want to

6  go fast going forward, maybe not as fast as what the city

7  says, but fast by your standard, I think we need to go slow

8  at the beginning to get it organized, and that's a substance-

9  based exchange about what we're litigating and then a lot of

10 interaction between the lawyers to figure out how to try that

11 case up to you.  Thank you very much, your Honor.

12          THE COURT:  Thank you.

13          MR. SCHWINGER:  Good morning, your Honor.  Robert

14 Schwinger from Chadbourne & Parke for Assured Guaranty.  I

15 just want to amplify a few points from Mr. Neal's excellent

16 presentation about some of the document issues.  I don't want

17 to get in front of what we're going to do next week, but I

18 think it's very important for the Court to have a real

19 appreciation of the reality of what the production was

20 because the affidavit that we received from the city

21 essentially tried to paint in a tone that sounded very

22 reasonable a production that was unreasonable and

23 nonresponsive in larger measure in terms of what we have

24 gotten to date, and it's very clear that much more material

25 is going to be coming.  With luck we'll have it by June 2nd,

1 but, in any event, we're talking three and a half weeks off
2 the original schedule, which assumes the city would be
3 producing in full on May 6th.
4        As Mr. Neal mentioned, the city collected documents
5 from within the DWSD. They went to the chief operating
6 officer, told him what they wanted to collect, and then he
7 went to, they said, 11 other individuals, so 12 individuals
8 in total. And according to the index that the city provided
9 at your Honor's request, we have a total of 1,142 pages from
10 the -- within DWSD from 12 custodians. That's 95 pages per
11 person. I measured it in my office yesterday. It's a half
12 an inch. They did a document production from -- in a case of
13 the dimension of this size involving potentially hundreds of
14 millions of dollars of impairment of DWSD-related bonds of an
15 organization of the both financial and physical size and
16 complexity of the DWSD, they went to 12 people, got a half-
17 inch of paper from each one of them and said, "Hey, look at
18 that. My job is done." I would submit to you if one of my
19 associates said that for document production --
20        THE COURT: How many inches do you need?
21        MR. SCHWINGER: It would be helpful if the inches
22 were responsive, and that will take me to my next point
23 because I don't measure it in terms --
24        THE COURT: All right. Let's talk about that rather
25 than inches.

 1          MR. SCHWINGER:  Sure.  But our point is as a rule of

 2     thumb from the practical experience of litigators, to get a

 3     production of that dimension in a case of this dimension,

 4     that's a red flag that something is off.

 5               In terms of what we have and what we need, there was

 6     this mention of this exchange.  We had the prioritization of

 7     various document requests, and on the request that we

 8     prioritize from the DWSD group, there were 38 that were

 9     prioritized.  There were 26 of them that the city has said,

10     "We're still working on them."  That's just on the priority

11     list.  That's a lot of production that we don't have at the

12     moment.  The city sent us an e-mail purporting to show

13     various documents in the production where we could find some

14     of this material.  The original 1142 pages amounted to 61

15     documents.  What they pointed us to in their e-mail was

16     another 40 documents, none of which, by the way, came out of

17     the DWSD production, so essentially apparently nothing that

18     we asked for apparently, according to the city, was in the

19     files of the DWSD.

20               THE COURT:  Okay.  I need you to focus on what you

21     need that you don't have.

22               MR. SCHWINGER:  Sure.  Well, basically what we need

23     that we don't have is our prioritization list.  To give you

24     an example --

25               THE COURT:  Okay.

1          MR. SCHWINGER:  -- of the things that we are -- we

2     have prioritized, what the city has said, "We're still

3     working on it.  We're going to get you more material."  These

4     are DWSD historical financial information, pension allocation

5     information.

6          THE COURT:  Okay.  I'm going to amend my request.

7     If the city has said they're going to give it to you, let's

8     trust that for the moment.

9          MR. SCHWINGER:  Okay.  And I'm not denying that they

10    will.

11         THE COURT:  What I need you to focus on is -- excuse

12    me -- what you need that you don't have that the city has

13    refused or is unwilling to provide.

14         MR. SCHWINGER:  Okay.  That is not -- I'm not saying

15    that the city is refusing, although they've made some general

16    comments in their filing last night that many of our requests

17    are unreasonable, but ultimately --

18         THE COURT:  Is the answer to my question there's

19    nothing?

20         MR. SCHWINGER:  The answer to it -- the answer to

21    your request is given what the city said in their written

22    responses and objections, they purport to be willing to give

23    us this material.  The question is when.

24         THE COURT:  Right.

25         MR. SCHWINGER:  The question here is timing.  We had

1    our hearing on May 12th about objections, and essentially

2    nothing was really -- we dealt with those issues.  There are

3    materials that the Court ordered the city to provide on May

4    12th.  We've yet to get any of them.  And there are

5    additional -- and there are materials --

6            THE COURT:  So your issue is timing?

7            MR. SCHWINGER:  The issue here is timing.  That's

8    correct.  I don't think there is a substantive roadblock, the

9    city saying, "We refuse to give you material on certain

10   topics."  The answer is that we haven't gotten it to date,

11   and also there's an issue of timing.  And while the city may

12   be, in theory, willing to give us documents on the subject,

13   whether their actions are, in fact, the kind of robust --

14           THE COURT:  Right.  Well, we'll have to wait and

15   test that; right?

16           MR. SCHWINGER:  Excuse me.

17           THE COURT:  We'll have to wait and test that when it

18   comes in.

19           MR. SCHWINGER:  Well, that's true to some extent,

20   your Honor, but there are certain things that we see.  For

21   example, I go back to the size of the production is at least

22   one indication.  Another one is with the number of

23   custodians.

24           THE COURT:  It won't do -- I forewarn you it won't

25   do for you to come back in and say they only gave us "X"

1  number of inches of documents.

2        MR. SCHWINGER:  I understand that, your Honor.  The

3  point is we've -- they sent back, for example, to say what --

4  you know, here's a document on this subject, and they've

5  given us more -- in total, your Honor, they've pointed us to

6  40 documents in their entire -- in their production thus far.

7  And this is simply -- and we can go through, you know,

8  particular topics, but this is not going to be -- the fact

9  that you have one or two documents you can point to in a

10 production that's on a certain subject doesn't mean you've

11 given a full production of the information of the sort that,

12 for example, the experts need to look at.  They've mentioned

13 that, for example, one of the things that are forthcoming is

14 these binders from Ernst & Young and Milliman which will

15 contain all their detailed forecasts and so on.  Well, what

16 about the back-up against which those forecasts can be

17 tested?  That's not going to be in those expert reports.

18 That's going to be in the raw documents that you get from the

19 document production.  They've said that they will -- they've

20 agreed that they're going to do an ESI search for three

21 custodians, who are the three top individuals, the director,

22 the CFO, and the COO.  Now, what you're not going to find in

23 their e-mail is some low-level person, for example, running a

24 set of projections and then one of his colleagues say --

25        THE COURT:  You're anticipating issues.

1          MR. SCHWINGER:  I am anticipating --

2          THE COURT:  It's premature for that.

3          MR. SCHWINGER:  I agree, your Honor, it's going to

4    be premature till May 28th.  The point is, your Honor, is

5    that I don't want the Court to be taking it at face value

6    that everything is going fine with the city's production.  We

7    have a lot of grave concerns.  There are a lot of red flags

8    flying at the moment, and we certainly -- from what we've

9    seen from the city to date in terms of particularization

10   where they point us to, "Oh, here's two or three documents on

11   a subject," that doesn't come -- there's no way that that

12   represents the responsive universe.  It just simply defies

13   all common litigation experience, and that's the concern that

14   we are raising here.  I mean at a minimum, for example, your

15   Honor, if they want to collect paper documents from within

16   DWSD and the chief operating officer said, "I need to go to

17   12 people," why wouldn't you think you need to go to those 12

18   people to get e-mail?  I mean logic says that if you have --

19   if those people have relevant documents for one set of

20   purposes, they're going to have it for another.  That's just

21   a big gap that's staring us in the face.

22          So right now we have -- and just in terms of the

23   volume, as I said, you know, we've talked about the number of

24   pages.  The city is saying that they're going to give us

25   35,000 more documents plus the Milliman binders, the Ernst &

1   Young binders, the Conway MacKenzie binders.  We obviously

2   right now have a very, very small fraction of what the

3   ultimate total will be, and that's -- once again, goes to the

4   issue of the timing.  When are we really going to have enough

5   of the responsive universe that is practical to proceed in

6   discovery according to the current schedule versus having to

7   adjust to the reality of getting the vast majority of what

8   the city is going to produce on DWSD by June 2nd, three and a

9   half weeks later than what the schedule contemplated, and

10   where the city's reaction is that, "Well, you know, you'll

11   just have to squeeze your discovery to fit that because we're

12   not going to budge on our end?"

13         Just to wrap up on this point, we were here last --

14   we were here last week, your Honor.  The city has been

15   ordered to produce additional material.  We're still waiting

16   for it.  We haven't seen it to date.  They didn't produce on

17   time.  Under these circumstances, I mean the city has to

18   grapple with the consequences of its own actions, and we're

19   not faulting them or saying it's intentional, but the

20   realties here have to be dealt with, and that's the concern

21   we have, and that's what motivates the request here about the

22   schedule adjustment that we've been talking about.  Thank

23   you.

24         THE COURT:  All right.  Anybody else want to add to

25   instead of repeat what's already been said?

1          MS. QUADROZZI:  Your Honor, I have a couple of
2    specific points with respect to the DWSD production, and I
3    will certainly not repeat any of the comments or arguments,
4    although I share in it with the fellow members of the
5    committee, but in terms of specifics -- and this may be a
6    little more granular than your Honor wants, so you stop me if
7    this is.  There are two groups of documents that Oakland
8    requested as to which we are very concerned that they are not
9    producing them, and they are not of the group that we believe
10   that they are going to produce, the 35,000 or the 40,000
11   additional, and they are these.  Oakland sought documents
12   relating to the condition of the DWSD system, needed repairs,
13   capital expenditures.  These were, among others, Oakland
14   document requests ten and twelve.  To both of these, the city
15   responded that they would produce documents in their document
16   requests.  They objected on the general objections, but they
17   said they'll produce existing responsive documents.  In the
18   materials with Ms. Hale's affidavit, they identified in
19   response to those that they searched from Sanjay Marken,
20   Conway MacKenzie, and some unidentified person that says
21   Department of Water.  With the exception of the ten-year
22   plan, there are no documents in anything that we have seen
23   that is responsive to these requests.  There's a really
24   significant question here from Oakland as to whether or not
25   the CIP needs of DWSD on which the city's plan is relying are

1    sufficient to allow for the continued operation of DWSD in

2    terms of its ability to meet its contracts with its

3    customers, Oakland being one of them.  We've seen

4    documents -- and Macomb references one in its objections --

5    that suggest that the numbers relied on by the city may be as

6    low as by a third, so we're entitled to look at DWSD

7    documents that talk about that issue.  What the city has said

8    in response is what they are now doing is they will look at

9    the director, the CFO, and the COO.  I will note that the COO

10   is also the general counsel, so those are the three files

11   that they've said that they will search.  What we would like

12   is for there to be a more fulsome search of people who are

13   likely to have these documents.  I don't believe that we

14   should just be forced to look at the cleaned up documents

15   that may make their way into the director's or the general

16   counsel's files.  Rather, we're interested in the documents

17   that the plant manager at the wastewater treatment plant

18   might have or the people who are in charge of ensuring that

19   the pipes that service the system are replaced on a regular

20   annual basis and what guidelines that they're using to do

21   that.  Those are the types of documents that we want.  When

22   Mr. Irwin reached out -- and he actually reached out to

23   Macomb, and then Macomb reached out to me, and said, "Listen,

24   we want to get you guys what you want, and we recognize we

25   haven't done a full search.  Can you identify some custodians

 1    for us, maybe help us with some search terms?"  So we did
 2    that, and we provided a list, and I'm sorry.  I don't have
 3    the e-mail here, so I don't remember the number that I
 4    listed.  It might -- maybe it was 12.  Maybe it was 14.  But
 5    I did so with an eye to the people that would have those
 6    particular types of documents, manager of the wastewater
 7    treatment plant, wanted to get somebody on the water side.
 8    When I hear the city now saying, "Oh, my God, they've given
 9    this ridiculous number," when I look at the materials that
10    Ms. Hale provided, 11 of the custodians that I identified as
11    might be having meaningfully these documents, the city had Mr
12    Wolfson go and talk to anyway, so it's clear that both of us
13    recognize these are the people with knowledge.  It's simply
14    not sufficient for there to be just the search of those high-
15    level documents.  We think that we're entitled to something
16    deeper than that.

17           The second issue that relates to this, your Honor,
18    is one having to do with rates, and Oakland sought documents
19    relating to customer rates, rate classes, historical and
20    future projections about rates.  There are a whole list of
21    them, and I won't go through them all, but they are roughly
22    Oakland requests 4, 5, 6, 8, 28, and 49.  And they sought
23    these documents, your Honor, because rates and their
24    historical relation to revenues of DWSD is important in the
25    analysis of whether or not a DWSD that is stripped of

1    hundreds of millions of dollars over the next ten years can

2    continue to provide the services that it needs.  For all of

3    these requests, again, the city in the responses that they

4    filed said, "We will produce them."  In response to the

5    requests, again, the city searched a VP at Miller Buckfire,

6    Conway MacKenzie, and this unidentified Department of Water

7    files.  Well, respectively, the consultants don't have these

8    documents.  These documents reside at DWSD.  They haven't

9    provided any of these documents.  In response to Request

10   Numbers 28 and 49, which seek documents about the rates and

11   the agreements with municipalities about the rates, the city

12   said it doesn't have any responsive documents.  Well, that

13   doesn't make any sense.  Of course they have responsive

14   documents.  I have those documents or my client does from

15   Oakland.  It doesn't -- maybe the consultants don't have the

16   documents, but certainly DWSD has them.  They're relevant to

17   the future viability of DWSD.  We know, for example, that the

18   city in its projections, we believe, has failed to account

19   for the loss of revenue to the system that will be coming in

20   the future because of what we know is happening with Flint

21   and Genesee County.  We're certainly entitled to take a look

22   at the documents to see if during the course of the

23   discussions with respect to that there are different

24   predictions about how they will account for losses of rates.

25   Those are just two specific categories that I intended to go

1   through just to help illustrate the particular reasons that

2   we don't believe that it is appropriate to limit those

3   custodians and the searches to just those three, your Honor.

4          THE COURT:  I want to thank you for cutting your

5   witness list in half.  I'm going to ask you to do it again,

6   and I may ask you to do it again.

7          MS. QUADROZZI:  May I ask a question on that, your

8   Honor?  One of the things -- and I think I've seen it in

9   materials, but I will say that it is possible -- there has

10  been so many e-mails -- that I might have missed this.  If

11  the city has listed on its list a witness that we would like

12  to have a chance to question, are we free to not include it

13  on ours but yet not be prejudiced if in the future they take

14  it off theirs?

15         THE COURT:  You should list the witnesses you want

16  to call.

17         MS. QUADROZZI:  Fair enough, your Honor.

18         THE COURT:  All right.  Who else?

19         MR. BRILLIANT:  Your Honor, this is Allan Brilliant

20  on behalf of, you know, Macomb County by and through its --

21         THE COURT:  Mr. Brilliant, I'm going to ask you not

22  to go through the same kind of complaints about the city that

23  I just heard from Oakland County.  There is a time and a

24  place to do that, but it's not today.  All right?

25         MR. BRILLIANT:  Yes, your Honor.  I just want to

1  do -- just talk briefly.  We join in in all of the -- you

2  know, the common --

3          THE COURT:  Okay.  And there's no need for the "me,

4  too" either.

5          MR. BRILLIANT:  Okay, your Honor, you know.  Thank

6  you.  And I think the -- your Honor, I guess the one thing I

7  would say is, you know, in connection with the city's

8  presentation dealing with the -- you know, the issue of, you

9  know, the number of witnesses, you know, they mentioned, you

10  know, a list of all the various parties and how many

11  witnesses are on their list, and they mentioned, for

12  instance, you know, that Macomb had 18.  Of the 18 witnesses

13  we had on our list, you know, nine of them are witnesses that

14  are on the city's list, and the reason we put them on our

15  list is there were topics that we would want to ask them

16  about that were not on the city's list of topics for those

17  witnesses, you know, the DWSD, you know, type issues.  I

18  suspect, your Honor, that, you know, if someone takes out all

19  the duplicate numbers, you know, of witnesses, you know --

20  and we have not, you know, calculated it exactly, but it's,

21  you know, much fewer than the total amount of witnesses that,

22  you know, have been, you know -- you know, discussed today.

23  It's in the nature of around 70 total witnesses, of which 37,

24  you know, are the witnesses of the -- you know, of the city.

25  You know, we were --

1            THE COURT:  Actually, sir --

2            MR. BRILLIANT:  -- working very hard with the --

3            THE COURT:  Actually, sir, you're mistaken about

4    that.

5            MR. BRILLIANT:  Okay.

6            THE COURT:  Taking into account the fact that some

7    witnesses are listed on multiple lists, just counting the

8    number of witnesses, it's still between 160 and 200.

9            MR. BRILLIANT:  I apologize if I'm wrong about that,

10   your Honor.  That's not how we calculated it, but obviously

11   we must have missed some.

12           THE COURT:  All right.  Thank you, sir.

13           MR. BRILLIANT:  Thank you, your Honor.

14           MR. DAVIDSON:  Your Honor, Paul Davidson for U.S.

15   Bank.  I just wanted to give you a preview of what we're

16   going to do for Wednesday in order to answer some of the

17   questions that you've asked today.  What we have done is take

18   those document requests that we carefully prepared and have

19   since prioritized, and we've put those on a chart.  We've

20   then put the city's response in terms of what they have told

21   us and identified that they have produced responsive to those

22   requests.  We will then have on the chart where our experts

23   have told us they must have these documents and why they must

24   have these documents, and we will show the gaps in the city's

25   production, and the gaps will be visually available for you

1    to see, and we will explain why we need those documents.

2         And the last point on the trial schedule I would

3    make is that the experts have made it clear to us that they

4    will need at least two weeks after they receive the documents

5    that they have requested in order to help us prepare for the

6    depositions.

7         THE COURT:  Okay.  Thank you for that, sir.

8         MR. MARRIOTT:  Good morning, your Honor.  Vince

9    Marriott, Ballard Spahr, EEPK.  I want to take it back out of

10   the weeds for a minute because --

11        THE COURT:  Without repeating anything that anyone

12   has already said twice.

13        MR. MARRIOTT:  That is precisely my objective is to

14   repeat none of this.  I just want to go back to a point that

15   Mr. Hackney admittedly nodded to but I want to emphasize

16   because it focuses on the big picture, which I think gets

17   lost if we start arguing about whether this particular

18   document was responsive to this particular request.  I mean

19   we'll have hearings for that purpose.  This schedule is being

20   driven by a date which I think is entirely artificial, and

21   that's September 30.  And the reason given for that date is

22   it's bad for the city to be in bankruptcy.  It's not bad for

23   the city in the way, for example, it would be bad for a

24   corporation in Chapter 11.  I mean 904 gives the city the

25   ability to operate normally.  The Court has already approved

1   a DIP loan and a lighting loan so that the city can proceed
2   with the reinvestment initiatives before it gets out of the
3   case, so it's not as though the city is sitting in limbo
4   unable to do anything to better itself while the case is
5   pending.

6           What would be bad for the city is for this Court to
7   approve a plan that doesn't work.  The plan confirmation
8   process is the only process by which this Court can be
9   educated about whether the plan works.  The way that this
10  plan is structured, the city has one shot.  Chapter 18 is not
11  going to really work if this plan is confirmed in part
12  because many of the largest assets of the case will have been
13  sold or otherwise dealt with and won't be available the next
14  time around, so there is a lot at stake in the approval of
15  this plan.  And a process that does not allow a confirmation
16  hearing where issues are properly addressed is not simply
17  unfair to creditors, as has already been said by many, it's
18  unfair to the city because if you are forced to approve or
19  disapprove a plan without having it been properly litigated,
20  you may say "yes" to a plan that doesn't work.  You might say
21  "no" to a plan that does.  Neither makes sense.  And so to
22  build the schedule around a date that really, really doesn't
23  matter is, in my view, not only a mistake for creditors, it
24  is a mistake for the city.  Let's set this up in a way that
25  works, not in a way that is beholden to a date that is almost

1  entirely arbitrary.  Thank you.

2            THE COURT:  Thank you, sir.

3            MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

4  on behalf of the official committee.  Just two very quick

5  points.  The first is we had not joined the pleading.  We

6  were not a signatory to it.  We feel that we are -- we have a

7  stipulation with the city which governs our discovery

8  concerns as well as other retirees, so we didn't feel the

9  need to join in this.  The one thing I would like to add,

10  though, is that whatever the Court decides, particularly in

11  terms of document production, that it be done with the

12  thought of the last production which, unfortunately,

13  disclosed some settlement mediation communications, which was

14  very unfortunate because, in fact, the day after this Court

15  ruled that it be pulled back, there was a report in one of

16  the Detroit papers about sensitive mediation between the

17  committee and the city, which appears to have been planted

18  for either political gain or some sort of strategic gain, and

19  so we would caution that whatever is produced there be a

20  double-check if not triple-check on those documents that they

21  are not released in the future.

22            THE COURT:  Who did that?

23            MR. ALBERTS:  We don't know, your Honor.  We have

24  not conducted discovery.  We could surmise.  We could guess.

25  I think the only way maybe the Court could ever find out is

1   ask people to verify that they did not release any documents

2   to the press, and if they did, what did they produce, but we

3   don't want to have it happen again.  Thank you.

4           MR. GOLDBERG:  Jerome Goldberg on behalf of

5   interested party, David Sole.  I just wanted to assure the

6   Court that we have no intention of burdening the trial with

7   hundreds of witnesses, that we could easily pare our list

8   down to two or three.  And, in fact, I will speak to Mr.

9   Shumaker.  I mean Mr. Sole's interest -- if the retirees vote

10  in support of the plan, he will not really be calling any

11  witnesses, and I'll be glad to talk to him.  I've read the

12  other stipulations, and we'll be glad to talk to Mr. Shumaker

13  about that to facilitate so there is no burden on our party's

14  case at all.

15          I just want to raise one brief question, and I hope

16  I'm not out of line.  I know in the eligibility hearing the

17  Court gave many individual objectors who were not represented

18  a chance for a hearing, and I'm just wondering if the Court

19  is considering a similar process with regard to this.  I know

20  many individuals have filed because they --

21          THE COURT:  Yes.

22          MR. GOLDBERG:  -- have tremendous concern.

23          THE COURT:  The answer is yes.

24          MR. GOLDBERG:  Okay.

25          THE COURT:  We have received, I've been advised,

1   over 600 such objections.

2           MR. GOLDBERG:  That's amazing, yeah.

3           THE COURT:  And I can't accommodate the process that

4   would result from inviting 600 people, so we are engaged in a

5   process in our office to determine who to invite and to fix a

6   number and to set that up fairly soon.

7           MR. GOLDBERG:  Okay.  Thank you, your Honor.  And

8   I'll be speaking to Mr. Shumaker to work out, you know, the

9   question that was raised.

10          THE COURT:  Thank you.

11          MR. LEGGHIO:  Good morning, your Honor.  Christopher

12  Legghio.  This is a non-DWSDS issue, so this is changing

13  gears.  And I won't repeat anything that's been said.  The

14  fire fighters filed some objections to the PA, and this

15  doesn't involve discovery.  Our objections, we think, are

16  purely legal issues, and we think they lend themselves to

17  consideration of the Court before the POA trial, and we would

18  urge the Court that we have that opportunity.

19          THE COURT:  So that would involve setting up, what,

20  a hearing date where you would argue your objections, and

21  then I would take the city's responses to that and then take

22  it under advisement?

23          MR. LEGGHIO:  No, your Honor.  I wouldn't -- I'm not

24  going to choreograph how the Court would handle that.  You

25  could tell us that you want us to brief it and no oral

1  argument, any way the Court wants to do it, but we think it's
2  a purely legal issue. It's not an issue for trial.
3          THE COURT: So the objections that were filed were
4  not in the nature of a brief with legal argument in support
5  of them --
6          MR. LEGGHIO: There was --
7          THE COURT: -- or were they? You tell me.
8          MR. LEGGHIO: There was legal argument attached, not
9  a fulsome brief that you might get in a motion for summary
10 judgment, but there were other arguments attached. And I
11 think it is a purely legal --
12         THE COURT: All right. Well, let's hear what the
13 city has to say about that, and, you know, if --
14         MR. LEGGHIO: It's a --
15         THE COURT: I'm willing to accommodate, you know,
16 any kind of an efficiency that a party is interested in. It
17 doesn't make sense for you to have to sit through a trial,
18 however long it might be, if all you have are legal issues.
19         MR. LEGGHIO: Yes, your Honor. And let me be more
20 precise. The legal issue -- the discrete objection that I'm
21 speaking to that the fire fighters filed was a challenge to
22 the ten-year injunction on the future applicable pension plan
23 for police and fire. It's that issue we think lends itself
24 to a pure legal review.
25         THE COURT: Okay.

1          MR. LEGGHIO:  Thank you, your Honor.

2          THE COURT:  Thank you, sir.  Ms. Patek, you've been

3     trying to speak.

4          MS. PATEK:  Good morning, your Honor.  Barbara Patek

5     again on behalf of the DPOA and the DFFA.  Mr. Legghio

6     essentially covered the issue that I wanted to raise,

7     which --

8          THE COURT:  Okay.

9          MS. PATEK:  -- is a scheduling issue.  We did raise

10    it with the city last night, and I just wanted to make the

11    Court aware of that.

12         THE COURT:  Okay.

13         MR. FETTER:  Your Honor, Robert Fetter of Miller

14    Cohen on behalf of AFSCME Locals 917 and 3308, who are the

15    representatives of the 36th District Court employees.  We

16    have filed objections, and some of the individual members

17    have also filed objections regarding the inclusion of 36th

18    District Court in this bankruptcy.  Frankly, to add an

19    independent third party into the bankruptcy, we had

20    anticipated some sort of motion to do that and that this

21    issue would be dealt on motion practice.  Again, as the last

22    two attorneys had indicated, this issue is largely a legal

23    issue.

24         THE COURT:  Um-hmm.

25         MR. FETTER:  And it should be dealt with in the

1 | motion practice.

2 |       THE COURT:  Well, if that was so, I wondered why you

3 | proposed to call so many witnesses, let alone any witnesses.

4 |       MR. FETTER:  I did not propose to call any

5 | witnesses.  That was one of the individual's attorneys.

6 |       THE COURT:  Then I apologize to you.

7 |       MR. FETTER:  And I think that -- not to speak for

8 | the --

9 |       THE COURT:  All right.  Well, have you discussed

10 | with the city how most efficiently to process your issue

11 | apart from the trial process?

12 |       MR. FETTER:  Frankly, it's been very difficult to

13 | get the attorneys representing the debtor to pay much

14 | attention to this issue.

15 |       THE COURT:  Okay.

16 |       MR. FETTER:  There's been very little follow-through

17 | on their part.  Every time I try to contact them, they say

18 | they'll get back to me, and --

19 |       THE COURT:  And they haven't yet.  All right.

20 |       MR. FETTER:  Yes.

21 |       THE COURT:  Well, now is the time.

22 |       MR. FETTER:  I would agree.  So we would ask for,

23 | you know --

24 |       THE COURT:  Yeah.  What would you propose?

25 |       MR. FETTER:  I would propose -- we did fully brief

1  the legal issues in the objections.  Obviously we haven't
2  seen their response yet.  There may be some documents,
3  exhibits, things like that, that we did not attach to the
4  objections that we would want to submit to the Court for
5  their review, so whether I need to brief it fully, I think it
6  would be repetitive to the objections, and I don't want to do
7  that.
8            THE COURT:  No.
9            MR. FETTER:  However, there would be -- there may be
10  some other things I would want to submit prior to oral
11  argument in documents, and one thing I can think of, we did
12  send out some interrogatories regarding the standards under
13  the Dow Corning case that they must meet to --
14            THE COURT:  Right.
15            MR. FETTER:  -- be able to join, and they've
16  admitted in the response to that interrogatory that many of
17  those they can't meet.  And there may be some other smaller
18  documents that we did not attach to the objections because I
19  don't believe we attached any documents to the objections.
20            THE COURT:  Um-hmm.
21            MR. FETTER:  But outside of having some opportunity
22  to present those documents, I don't feel a need to brief it
23  further.
24            THE COURT:  Okay.
25            MR. FETTER:  Thank you, your Honor.

1       THE COURT:  Well, let me just ask generally, not of

2   you, of the group, is there anyone else here who thinks that

3   your objections can be handled on purely a legal basis

4   outside of the fact-finding trial process?  No response.  All

5   right.  Thank you, sir.

6       MR. FETTER:  Thank you.

7       THE COURT:  Would the city like a further

8   opportunity to be heard?  Actually, I would appreciate it

9   because I have some questions for you.

10       MS. LENNOX:  Good morning, your Honor.  Heather

11  Lennox on behalf of the city.  Some of the questions I may

12  have to defer to Mr. Shumaker and Mr. Irwin.  I rise only to

13  deal with a couple of specific things that are perhaps a

14  little more bankruptcy related than litigation related,

15  although they kind of overlap.  And perhaps it might be

16  easiest to take the last issues raised by Ms. Patek, Mr.

17  Legghio, and Mr. Fetter first.

18       First -- and I am not going to get into this on the

19  record, but I disagree with a lot of the representations that

20  Mr. Fetter made to you, but with respect to the pertinent

21  issue, which is should we have a separate hearing on legal

22  issues only to sort of get those out of the way or whatever,

23  that is, as your Honor recalls, certainly something that your

24  Honor proposed originally in the original scheduling order,

25  and the city did not have opposition to it.  The city

1 continues not to have opposition to it with these

2 reservations. If we're going to do that kind of process, I

3 really think we need to do that kind of process for

4 everybody. The city -- given everything that the city has to

5 do, it would be difficult for us or perhaps prejudicial to us

6 to have to prepare for legal issues here and then a legal

7 issue here, and then we have more legal issues down the road,

8 particularly because some of these objectors raised the same

9 issues. For example, if Mr. Fetter wants to talk about

10 third-party releases, I got third-party release objections

11 from everyone, so are we going to argue that for everybody

12 that day?

13          THE COURT: Um-hmm.

14          MS. LENNOX: So as long as -- again, we don't have

15 an objection to the concept, but the concept has to be one

16 day for everyone, all issues, however your Honor wants to

17 decide that, so we can reasonably prepare to deal with that

18 bundle of issues.

19          THE COURT: So then in your proposal, would you

20 let -- how would it be determined which of the objectors'

21 objections are legal and not?

22          MS. LENNOX: Well, it would seem to me that if your

23 Honor wants to have a hearing early on legal issues, perhaps

24 those issues, those topics, can be described. For example,

25 if we're going to have an argument --

1        THE COURT:  By whom, though?  Who would make that

2   decision?

3        MS. LENNOX:  I think that would be up to the Court.

4   You have two issues in front of you that people have

5   specifically requested, nobody else has requested.  If your

6   Honor would like to do that, there are certain things that

7   probably do lead to pure legal discussion, third-party

8   releases, perhaps Mr. Legghio's and Ms. Patek's issue,

9   although they did suggest they were going to call witnesses,

10  but if they're not, we'll be happy to not have witnesses on

11  that.  So we do -- we have gone through and summarized

12  obviously all of the objections.  There are certain things

13  that certainly do lead themselves to legal argument.  And if

14  your Honor is inclined to have those kinds of things done

15  early, I think it should be up to the Court.  If your Honor

16  wants to invite people to submit issues to be decided in that

17  way so that people have --

18        THE COURT:  I actually like that idea.

19        MS. LENNOX:  -- um-hmm -- a fair opportunity to

20  present that to your Honor, the city is not opposed to that.

21        THE COURT:  All right.

22        MS. LENNOX:  We just want some kind of order.  Okay.

23  The next thing that I rise to address -- and I am not going

24  repeat this stuff, but I've asked to simply because I've been

25  a little more in the weeds as things have gone on with

1   respect to the DWSD discovery, and I'm going to be very brief

2   in responding to what your Honor heard.  And I'm very glad

3   that Mr. Neal -- I thought perhaps I was reading the

4   objections wrong when I kept seeing the difficulty we've been

5   having moving this process forward, but Mr. Neal agreed with

6   me.  There are three issues that the bondholders have that

7   they're concerned about, the interest rate, the call

8   protection, and the payment of the DWSD UAL, and generally,

9   although this is really more the county's issue, the

10  feasibility of the -- not the city's business plan, the huge

11  business plan, the DWSD business plan, so let's talk about

12  those.

13          First, on the interest rate, the legal issue is are

14  we allowed to impose a market rate of interest?  In large

15  measure, that's a legal issue that can be argued in cramdown

16  if we have to go to cramdown.  We don't know if we have to go

17  to cramdown yet.  And we have produced to them already the

18  interest rate reset charts and the documents supporting it

19  that we have from our expert witness.  The call protection is

20  largely a legal issue.  The DWSD payment of its own UAAL,

21  again, very minimal documents.  We have established at a

22  hearing before your Honor before we were here that the actual

23  valuation reports where they allocate what DWSD and all that

24  stuff are produced by the systems.  If we had them, we gave

25  them to them.  They can get them from the system.  Most of

1   them are online. So what they're looking for are the

2   documents that we've said they're going to be getting

3   tomorrow and next week, which are a minimal number of

4   documents from E&Y and Milliman to support the rest of that.

5           What's at stake on the bond side of it? And I'll

6   address the county separately. What's at stake on the bond

7   side of it when you deal with this is, first of all, of the

8   $6 billion of debt, over half of that is unimpaired under the

9   plan, so the debt --

10          THE COURT: Define "unimpaired."

11          MS. LENNOX: Meaning we're reinstating the debt as

12  it stands today.

13          THE COURT: With no interest rate adjustment and

14  no --

15          MS. LENNOX: No.

16          THE COURT: -- call protection changes?

17          MS. LENNOX: Exactly. So less than half of it is

18  what we're talking about. When we apply what we think might

19  be the interest rate modifications to this, we think the

20  actual impact to the DWSD bondholders is less than half of

21  what Mr. Neal estimated.

22          THE COURT: 400 million instead of 800 million?

23          MS. LENNOX: Or less.

24          THE COURT: Or less.

25          MS. LENNOX: Yes. So not that that's not a big

1    number, but in the grand scheme of things and what we're

2    talking about, particularly when we're still talking about a

3    hundred percent payment of principal, were limited to -- were

4    very limited issues here, your Honor.  We have already

5    committed to and are in the process of doing the three ESI

6    searches.

7            THE COURT:  Mr. Neal says that the interest rate

8    adjustment is a complex issue because it involves a wide

9    range of considerations that the market would look at.

10           MS. LENNOX:  And that would all be the purview of

11   expert testimony.  I mean I'm not sure, frankly, your Honor,

12   what the -- you know, the head of the water -- the head of

13   the water operations is going to have on this issue.

14           THE COURT:  Well, he would argue and did argue that

15   what that particular witness might have, for example, would

16   include information about the condition of the system, the

17   capital expenditures required for the system, which arguably

18   would impact, in the market's view, what an appropriate

19   market rate of interest is for the outstanding debt.

20           MS. LENNOX:  What I think the market would look at

21   is the ability to generate revenue and cash flow when they're

22   looking at a pure financial analysis, and I will get to that

23   in a minute because that was really more the county's issue.

24           THE COURT:  I'm not sure that was more the county's

25   issue.

1    MS. LENNOX:  Well, regardless, your Honor --

2    THE COURT:  I heard Mr. Neal say it's an issue that

3  he will argue goes to interest rate.  Am I right, Mr. Neal?

4    MR. NEAL:  You're doing a very good job, your Honor,

5  so I'll let you continue.

6    MS. LENNOX:  So, again, your Honor, we have not said

7  to them we've given you everything we're --

8    THE COURT:  Hold on.

9    MS. LENNOX:  -- going to give you, and I'm not

10  giving you any more.

11    THE COURT:  Hold on.  I'm not conceding you

12  anything, sir.

13    MR. NEAL:  No.  I recognize as much, but you flagged

14  the issues that I raised in my opening presentation.

15    THE COURT:  All right.  That's as far as -- that's

16  as far as that went.

17    MR. NEAL:  Can I just make one -- this will help, I

18  think, Ms. Lennox's point if I can just make one additional

19  point.  I recognize the 400 million calculation of

20  Ms. Lennox.  I was adding on top of it the 430 million that

21  they're trying to subordinate us to.  That's how I arrived at

22  my rough justice 800 million.  Thank you.

23    MS. LENNOX:  Well, we'll take issue with that, but

24  that's for another day.  That's not today.  So, again, with

25  respect to the production, while we've given them 5,000

1   documents from all city custodians, we haven't said, "But
2   that's all you're getting."  I mean Mr. Irwin and Mr.
3   Shumaker went through chapter and verse.  I'm not going to
4   repeat what they're getting and when they're getting it, but
5   basically by the end of next week, they're pretty much going
6   to have everything that's relevant.
7           With respect to feasibility and a lot of the things
8   that you say may go into interest rates, in the -- no, no,
9   no -- that Mr. Neal said might go into interest rates --
10          THE COURT:  Thank you.
11          MS. LENNOX:  Let me correct that.  Let me explain
12  what they have.  They have historical financials back to
13  2008.  They have operating expenditures back to 2009.  They
14  have the DWSD business plan, and they have the Conway
15  MacKenzie model underlying the business plan.  I mean that's
16  pretty extensive financial documentation that they can start
17  working with right now when it comes to that kind of stuff,
18  and to go to the condition of the system, they have the ten-
19  year capital improvement plan.  You can't put together a
20  capital improvement plan for the next ten years without first
21  doing an assessment of the system as it exists today.
22          THE COURT:  And do they have the documents --
23          MS. LENNOX:  Yes, they do.
24          THE COURT:  -- that --
25          MS. LENNOX:  They have that document.

1          THE COURT:  They have that document, but my question

2    was do they have the documents on which the authors of that

3    report or that assessment relied when they made that

4    assessment?

5          MS. LENNOX:  Yeah.  Your Honor, I do not know that

6    standing here, but, again, we have conceded we are doing full

7    ESI searches of all the big dogs at DWSD, and we will search

8    that database.

9          So when we're talking about the three issues -- and

10   feasibility, of course, what does the business plan do and

11   what does it say, that is clearly the most fact-intensive

12   issue.  Interest rates, arguably not.  Call protections,

13   legal.  DWSD, UAL, limited set of documents.  By next week,

14   they'll have everything.  What else is there?  Your Honor,

15   Mr. Neal works for a really big firm, Sidley Austin.  The

16   other objectors have really big firms, Chadbourne & Parke,

17   Kramer Levin, Mintz Levin, Waller Dortch, Mr. Brilliant's

18   firm, Dechert.  They have one opponent, the city. They have

19   three, maybe four, discrete issues, all of which are largely

20   legal.  I think these firms are up to the task of dealing

21   with it in the time that your Honor has allotted.

22          Again, I would also say, your Honor, that no matter

23   how you look at what we're trying to do here in streamlining

24   everything, there are clearly going to be a lot of witnesses

25   at trial.  There's no reason that the non-DWSD witnesses

1  can't go first and the DWSD witnesses come toward the back of

2  that deposition pack so people will have more time if they

3  feel they need it to digest whatever it is that they're

4  getting that they don't have.

5          With the two -- with respect to the two things that

6  Ms. Quadrozzi raised, again, I think we've talked about the

7  condition of the system.  We've talked about the fact that

8  we're still searching the top people.  But with respect to

9  some of the -- and I will get back to where Mr. Irwin was

10 going with how many people do we have to search and how

11 long -- and how far down the food chain are you going here in

12 terms of cost-benefit analysis.  I'm not sure how the head of

13 security or the IT officer or two people who are identified

14 to us that didn't even have titles are going to help that

15 process, so if there are one or two more that people think

16 are particularly relevant, we're happy to -- again, we're

17 happy to do it.  We're certainly happy to do whatever the

18 Court tells us we have to do, but we need to be reasonable

19 about this in light of what's at stake here.

20         Now, let me tell you what's at stake with the

21 counties.  The counties have contracts with us for us to

22 provide sewerage and water services to them.  We've already

23 told them we're assuming their contracts.  I'm not sure

24 really --

25         THE COURT:  Well, but they're entitled to your proof

1    of the city's ability to perform under the contract under

2    Section 365.

3            MS. LENNOX:  Absolutely.  And they are getting that

4    in terms of all of the feasibility documents that we've

5    already provided and in terms of the business plan, the

6    model, the capital improvement program, and in light of what

7    are the alternatives.  The system is what it is.  The system

8    is an old system.  The system is in need of a lot of

9    upgrading.  There's a plan to do it, a reasonable plan to do

10   it over time that won't cause the rates for people to

11   skyrocket, and your Honor will be hearing all about that in a

12   few months.

13           THE COURT:  I appreciate your advocacy on that, but

14   they're entitled to see the evidence that you have of the

15   reasonableness of the plan and --

16           MS. LENNOX:  No question.

17           THE COURT:  -- to test it.

18           MS. LENNOX:  No question, your Honor.  All we're

19   saying is they have a really lot of stuff that they can and

20   should start working with.  We've already told them they're

21   going to be getting more stuff, and all we're asking is to

22   say, look, in light of all of that and in light of what your

23   issues really are, let's be reasonable about limiting what

24   more we're going to do here in light of the cost-benefit to

25   people, the process, and the city, so I am --

1          THE COURT:  All right.  Well, at a minimum, today is

2     not the day to decide issues of document production, but I

3     would encourage you to provide the underlying and backup

4     documents that went into the longer range capital improvement

5     program for the water system.

6          MS. LENNOX:  Certainly, your Honor.  And with that,

7     I'm going to turn the podium back over to my --

8          THE COURT:  And I would encourage you between now

9     and next Wednesday to continue the process you've been

10    engaged in vigorously, your meet and confers with the

11    counties, to -- the other parties, for that matter, to narrow

12    your differences.

13         MS. LENNOX:  Absolutely, your Honor.  We commit

14    to -- we commit to do that.

15         THE COURT:  All right.

16         MS. LENNOX:  And I will turn this back over to Mr.

17    Irwin and Mr. Shumaker.  If there's anything further you

18    need --

19         THE COURT:  Okay.  Thank you.

20         MS. LENNOX:  Thank you.

21         THE COURT:  Mr. Hackney argues with much vigor and

22    some force that we should have a more in-depth discussion

23    among all counsel as to what the issues are in an effort to

24    focus and limit discovery and witnesses.  What do you think

25    of that idea?

1    MR. SHUMAKER:  Well, I certainly think it would be a

2  good idea, to the extent it's going to limit discovery and

3  witnesses, and the city is open to that, your Honor, if

4  that's what you think is appropriate.  I mean we do have a

5  plan which we're litigating and we're going to be proving

6  that that's --

7    THE COURT:  I don't want to put you to having to

8  make an opening statement, but it does strike me that

9  Mr. Hackney's approach has some merit.  Would you be prepared

10  to do that by next Wednesday?

11    MR. SHUMAKER:  I guess my question would be what is

12  "that"?  Certainly, we'd be happy to have a discussion with

13  your --

14    THE COURT:  Well, it's a fair question.  Let me try

15  to answer it at least at the level I think would be helpful

16  and appropriate.

17    MR. SHUMAKER:  Certainly.

18    THE COURT:  It would involve your reviewing more

19  than superficially, although not at the opening statement

20  level, the kinds of evidence you intend to put forward on the

21  elements of confirmation that have been objected to one by

22  one.

23    MR. SHUMAKER:  So it would be a breakdown of the

24  city's affirmative case?  Is that what we're thinking about?

25    THE COURT:  You could phrase it generally that way.

1        MR. SHUMAKER:  Yeah.  In terms of which witnesses

2   and which --

3        THE COURT:  I wouldn't do it witness by witness.  I

4   would do it issue or element by issue or element, so, for

5   example, on the issue of unfair discrimination, here's who we

6   intend to call, and here's what we expect them to testify.

7   And I would expect that what follows would be more than just

8   the plan isn't -- doesn't unfairly discriminate or is fair

9   and equitable, not much more but some more.

10       MR. SHUMAKER:  Yeah.  Certainly, your Honor, I mean

11  in terms of fleshing --

12       THE COURT:  With the understanding that you're going

13  to be as complete as you can be, but it's not for the purpose

14  of limiting you in any sense.

15       MR. SHUMAKER:  Right.  Just having an open

16  discussion about different aspects of the city's case.  You

17  know, I think that that might well be helpful to your Honor

18  and to the parties.  I just am a little bit concerned as to

19  whether we could do that by Wednesday.  I mean we're going to

20  have to make some --

21       THE COURT:  I only suggested Wednesday because you

22  want to start trial on July 24th.

23       MR. SHUMAKER:  I understand that, your Honor, and

24  I'm not trying to --

25       THE COURT:  There's still an open question here;

1  right?

2          MR. SHUMAKER:  I'm not trying to slow it down, but

3  perhaps, you know --

4          THE COURT:  At the same time, Mr. Hackney, let me

5  ask you to rise in response to this question now.

6          MR. HACKNEY:  Yes.

7          THE COURT:  If we're doing this for the city,

8  doesn't it snow, as we say here in Michigan, on both sides of

9  the fence?

10          MR. HACKNEY:  I think it does.  I think sauce for

11  the goose is sauce for the gander, which I think they say in

12  Michigan as well.

13          THE COURT:  Well, I don't know about that because

14  I'm a vegetarian.

15          MR. HACKNEY:  Oh, I've stuck my foot in my mouth

16  again, but I'm also from Michigan, so -- but the only thing I

17  was thinking -- I actually had thought about that, but I

18  think it's fair to ask creditors to start to articulate their

19  view.  There is a bit of a staging concept perhaps maybe

20  because you might want to first get a picture of the city and

21  then think about it, but I will represent to the Court for

22  what it's worth that I would be willing to try and do that

23  real time if we're together next Wednesday, so if you'd give

24  me an hour and a half or something to go collect myself after

25  the city has given us some clarity, I would come back in the

1    afternoon and tell you here's how I see that setting up.

2              MR. SHUMAKER:  That's fine, your Honor.  Wednesday

3    would be fine.

4              THE COURT:  All right.  Well, let me see if I can

5    put together an order that will more specifically articulate

6    what everyone's obligations would be in this process.

7              MR. SHUMAKER:  Terrific.

8              THE COURT:  What else did you want to address?

9              MR. SHUMAKER:  I just -- you know, I don't want to

10   duplicate anything, and one thing that I've learned in

11   representing the debtor in this case is that you've got to

12   have a real thick skin, so I'm not even going to respond to

13   the --

14             THE COURT:  Okay.

15             MR. SHUMAKER:  -- suggestion that the city's counsel

16   is --

17             THE COURT:  All right.  But you have to -- you have

18   to address this because it has been challenged here today,

19   and it's what more is there to the urgency of starting on

20   July 24th and concluding by September 30th than it's not good

21   for the city to be in bankruptcy?

22             MR. SHUMAKER:  Well, it's, you know, the uncertainty

23   of what your Honor has intimated at, you know.  When the

24   emergency manager steps aside, the uncertainty that that will

25   provoke for the city could be dramatic.  We have not, as I

1  said, talked to the mayor about that issue or to City Council

2  about that issue, but if --

3         THE COURT:  I'm a little surprised at that.

4         MR. SHUMAKER:  Well, your Honor, we haven't, and we

5  can, but -- and I hear what you're saying, your Honor, but

6  that's -- that is a -- one of the -- obviously the biggest

7  issue, and we certainly don't want to get in a situation

8  where the city is prejudiced because this --

9         THE COURT:  But let me ask this question of you.  Is

10  that circumstance that state law set up cause to set up a

11  schedule more expedited than might otherwise be justified?

12         MR. SHUMAKER:  Again, your Honor, for the reasons

13  that I said, the answer, I think, to that is yes.  I think

14  that from the city's standpoint getting this done by the end

15  of September is important.

16         THE COURT:  Okay.  Anything else you want to

17  address?

18         MR. SHUMAKER:  Everything else -- some of the cracks

19  about Mr. Hertzberg I think we should just let lie.  He was

20  trying to be cooperative, but that's for another time.  Thank

21  you, your Honor.

22         THE COURT:  Mr. Irwin, is there anything you wanted

23  to say?

24         MR. IRWIN:  No, your Honor.

25         THE COURT:  Ms. Patek has something she'd like to

1    add here.

2           MS. PATEK:  Your Honor, I just want to respond to

3    Ms. Lennox's comments with respect to our issue in the

4    bankruptcy context because unlike some of the other

5    creditors, you know, taking on Mr. Hackney's theme of getting

6    an unconfirmable plan unconfirmed as soon as possible, we'd

7    like to see the city go into confirmation with a confirmable

8    plan, and the issue that's raised by Mr. Legghio and that

9    he's taking the lead on is a discrete legal issue.  Their

10   response, the city, will be filed on Tuesday, and so we just

11   don't want that to get lost in the weeds.

12          THE COURT:  Right.  I got that.

13          MR. ALBERTS:  Your Honor, just very quickly, Sam

14   Alberts on behalf of the Retiree Committee.  Whatever the

15   Court decides, obviously for next Wednesday we will live

16   with.  We just want to remind the Court that we are still

17   somewhat schizophrenic in that your --

18          THE COURT:  Right.  I know.

19          MR. ALBERTS:  Yeah.

20          THE COURT:  It's complex.

21          MR. ALBERTS:  So we would not like to be in a

22   position where we would have to put forward our case because,

23   quite frankly, we don't know what our case is going to be on

24   confirmation.  We're hoping we're in support.

25          THE COURT:  Right; right.

1          MR. ALBERTS:  Thank you.

2          THE COURT:  Thank you for reminding me of that.  All

3     right.  I'm going to take a recess in our status conference

4     here right now and ask your patience for 15 or 20 minutes

5     while I contemplate whether there's any further guidance I

6     want to give you here today or simply adjourn this matter and

7     whatever else is set for next Wednesday, so it's 12:20 or so.

8     We'll reconvene at 12 -- excuse me -- 12:40.

9          THE CLERK:  All rise.  Court is in recess.

10        (Recess at 12:22 p.m., until 12:41 p.m.)

11         THE CLERK:  All rise.  Court is in session.  Please

12    be seated.  Recalling Case Number 13-53846, City of Detroit,

13    Michigan.

14         THE COURT:  Thank you again, counsel, for your

15    efforts in articulating ways to streamline this process.  I

16    appreciate it very much.  At this point in our process, I'm

17    going to do two things.  I'm going to articulate in a filing

18    a procedure for attempting to carve out legal issues with

19    your input, and I'm going to articulate a process through

20    which we can get a disclosure not only from the city but from

21    objecting parties, a disclosure of the evidence, witnesses

22    and documents, on each of the contested elements of

23    confirmation.  I'll try to articulate as best I can the

24    extent of the disclosure that I want or that I think would be

25    helpful in our process.  It has to be more than superficial,

 1  but, as I said before, I don't want opening statements, so

 2  something in between.  I'll see if I can articulate that.

 3          That's as much as I want to do in regard to this

 4  portion of the status conference now.  I do want to take a

 5  lunch break now and reconvene after lunch to go through with

 6  the city and anyone else who's interested the list that I

 7  mentioned the last time and perhaps even the time before that

 8  of my questions or points of ambiguity regarding the plan,

 9  and I'd like to do that after lunch today at two o'clock, so

10  obviously I need someone from the city to work with me on

11  that.  Others of you are welcome to stay and listen, but I

12  certainly would not require it of you.  I don't expect

13  anything from you in regard to this process, so it's really

14  up to you whether you stay and listen in or not, so I will

15  see you back at two o'clock, please.

16          THE CLERK:  All rise.  Court is in recess.

17      (Recess at 12:44 p.m., until 2:00 p.m.)

18          THE CLERK:  All rise.  Court is in session.  Please

19  be seated.  Recalling Case 13-53846, City of Detroit,

20  Michigan.

21          THE COURT:  Okay.  Give me a moment to get organized

22  here, please.  Okay.  Do you have a copy of the most recent

23  plan there with you?

24          MS. LENNOX:  Yes, your Honor.

25          MR. BENNETT:  Yes, your Honor.

1          THE COURT:  Okay.  Okay.  So I will be referring to

2     the actual page numbers on the plan, not the ECF page number.

3     So, again, just to reiterate our ground rules, these are

4     areas that I perceive of as being ambiguous or about which I

5     have questions.  These are not Judge Rhodes' objections.  I

6     don't expect or even want an answer to any of these questions

7     now.  This is for you to consider, please, and decide if you

8     want to insert in your next version of the plan language to

9     address the question or to make it clearer.  Okay.

10          So we'll begin on page 2 with the definition of

11     "administrative claim."  I think we may have had a brief

12     colloquy about this before.  The language is broad enough to

13     include or arguably broad enough to include every debt that

14     the city has incurred while the case was pending.  It may, on

15     the other hand, be your intent that administrative claims

16     only cover those claims that arise in connection with the

17     prosecution of the case or you may have some other definition

18     in mind, so think about what you want to do with that.

19          Oh, I mentioned this before, but I'm going to

20     mention it again.  It would be my request and suggestion that

21     you remove the phrase "and/or" in all of the numerous,

22     numerous places that it appears.  It strikes me that every

23     time you use it, you mean "or."  If you want to clarify in

24     your list of definitions that "or" includes "and," you can do

25     that, but "and/or" has, in my view, no place in the English

1    language.  Okay.

2         Next one is on page 5, please.  Paragraph 47

3    suggests a year to object to claims.  My question would be

4    why you need a year, and if that period isn't shorter at

5    confirmation, we may need to have a conversation about that.

6         I was, frankly -- well, okay.  Page 14, please.  My

7    apologies.  Page 10, paragraph 123, effective date, business

8    day as determined by the city on which each applicable

9    condition contained in Section 3-A has been satisfied or

10   waived.  It might be good to think about putting in some

11   provision to give notice of the effective date, notice that

12   the effective date has been determined or something like

13   that.

14        MR. BENNETT:  Your Honor, would that be a

15   prospective notice or a notice after it has occurred?  Is

16   it --

17        THE COURT:  Well, think about whatever makes sense

18   to you.

19        MR. BENNETT:  Okay.

20        THE COURT:  I have no more thought than that people

21   should be advised that the city is taking the position that

22   the plan is effective --

23        MR. BENNETT:  Okay.

24        THE COURT:  -- or is going to be effective or was

25   effective at some point in time, but --

1          MR. BENNETT:  Okay.

2          THE COURT:  -- it feels like people should know

3    that.  Okay.  Now page 14, paragraph 166.  I was confused by

4    the definition of "indirect 36th District Court claim."  Now,

5    likely this will all get thrashed out in connection with your

6    legal arguments on that issue, so let me not say anything

7    more about it.

8          Page 14, definition of "liquidity event."  Oh, yes.

9    This was a doozy.  I could not figure this out at all,

10   especially the language that began "and failing that, comma,

11   as soon thereafter as possible, comma, but notwithstanding

12   such compliance, comma."  You need to unpack that for me,

13   please.

14         MR. BENNETT:  Okay.  Your Honor, because this

15   language was -- I'm sure looks this way because it was

16   negotiated heavily, I think I'll do that after consultation

17   with the different parties.

18         THE COURT:  Whatever you need to do.  I just need to

19   be able to understand it, and I've tried.  Okay.  Page 18,

20   paragraph 219, definition of "post-petition purchaser

21   claims," I couldn't understand what the word "purchaser" in

22   that defined term was intended to signify, so you'll have to

23   explain that to me at some point.

24         MR. BENNETT:  I think it's just a post-petition

25   financing claim, and --

1          MS. LENNOX:  It's a lender claim.

2          MR. BENNETT:  Yeah.

3          MS. LENNOX:  They call themselves purchasers.

4          THE COURT:  Okay.

5          MS. LENNOX:  We can clarify that, your Honor.

6          THE COURT:  Please.  If all it needs to have added

7   to it is we call them purchaser claims because that's how

8   they call themselves, that's fine.

9          Page 19, paragraph 230, definition of "restoration

10  trust."  I may have missed it, but normally a trust has a

11  trustee and somebody who appoints the trustee, and there are

12  terms of a trust.  And I didn't see any of that in the plan

13  or any of the attachments to the plan.  Like I say, I may

14  have missed it, but if it's not in the package somewhere,

15  some definition of all of that needs to be included.

16         Page 23, please.  One second.  I don't have it.  I

17  don't have the page right.  Okay.  It's not 23.  It's 25

18  talking about bar dates for administrative claims, so it's

19  (a)(2)(A), general bar date provisions.  This suggests

20  procedures will be specified in the confirmation order.  It

21  would be nice to give notice to the Court and to the parties

22  of what procedures you have in mind before you actually

23  submit a confirmation order if it ever comes to that.

24         MR. BENNETT:  Your Honor, it's here that I would

25  contemplate carving out ordinary course claims so that there

 1  won't be a bar date requirement for them, and that would also

 2  have the effect of curing the issue with respect to the

 3  definition.

 4      THE COURT:  Okay.  But we've got to tell people that

 5  ordinary course claims are not included here.  Otherwise

 6  you're going to get a flood of them or at least you might.

 7      MR. BENNETT:  Right.

 8      THE COURT:  And we don't want that.

 9      MR. BENNETT:  We'll figure out a way to get that

10  into the record early.

11      THE COURT:  It also strikes me that within 30 days

12  after the effective date may be a little bit short,

13  especially if it takes several days after the effective date

14  to give people notice that there was an effective date, and I

15  have to ask if you were planning on giving people who might

16  be subject to this paragraph notice of the bar date other

17  than what appears in the plan.

18      MS. LENNOX:  Normally what we do, your Honor, is

19  file and publish and serve on all the creditors a notice of

20  effective date, which would include this bar date.

21      THE COURT:  If that's included in your procedures,

22  okay.

23      MS. LENNOX:  Okay.

24      THE COURT:  Okay.  Now page 30, please.  One second.

25  One more second, please.  Okay.  In the last paragraph under

1  assignment on page 30, try as I might, I could not understand
2  how that was supposed to work, so I will have to ask you to
3  clarify that for me at some point in time or amend it so that
4  it's clear as to what it's intended to accomplish.

5         Page 31, under subparagraph 2, distributions from
6  the disputed COPs claims reserve, there's a reference in the
7  middle of the paragraph to the costs, fees, and expenses
8  related to the COP litigation incurred from and after the
9  effective date, and so it just needs to specify costs, fees,
10  and expenses incurred by whom.

11        Page 32, first paragraph, contribution to PFRS, in
12  the middle there it says, "The city will contribute
13  sufficient funds required to pay each holder," et cetera.  It
14  leaves open, however, who will determine what this sufficient
15  contribution is and what will happen if there is a dispute
16  about that amount, and then the same question on page 33 in
17  regard to the contribution to the GRS.

18        Page 33, under "contributions to GRS," about two-
19  thirds of the way down the page under "treatment" the
20  language states, "The exclusive sources for such
21  contributions shall be certain city sources."  That's pretty
22  open.  Do you want to specify it any more particularly?

23        Page 34, ASF current participants under D-1, at the
24  beginning it says, "The annuity savings fund excess amount
25  will be calculated."  Again, because it's in the passive

1   voice, we don't know who's going to do that calculation and
2   who will do the deductions or how that will be accomplished.
3   Under paragraph 2 right below that, there is the phrase --
4   well, in the middle there it says, "Based on each ASF
5   distribution recipient's life expectancy and other factors."
6   Again, that's broad and vague, and you might want to clarify
7   more specifically what those factors are.

8          Page 37, please.  Again, there's a contemplation
9   here that at a later date the procedures for providing notice
10  to each party whose executory contract or unexpired lease is
11  being assumed pursuant to the plan will be established.  I
12  would suggest that the sooner you can suggest those
13  procedures the better.

14         Page 38 at the bottom, rejection, damages, bar date,
15  there's a deadline there of 30 days after the effective date,
16  which, of course, if that's what you want to stick to, we
17  have to give creditors notice of the effective date and
18  notice of the bar date.

19         Page 39, I actually was not sure what that very
20  first sentence means, "Rejection of any executory contract or
21  unexpired lease pursuant to the plan or otherwise shall not
22  constitute a termination of a preexisting obligation owed to
23  the city under such contract or lease," so I would have to
24  ask you to explain to me at some point or give me an example
25  of how that might work in a real world situation.

1        Page 39 again talks about the city determining that
2    the conditions have been satisfied or waived regarding
3    effective date.  My question there is what if there is a
4    dispute about whether any of the conditions have been met or
5    not?  Do we want to establish a procedure for the prompt
6    resolution of that dispute?

7        Next, page 40, if I'm reading this correctly, it has
8    the following impact.  If the city determines that the
9    effective date -- if the conditions for the effective date
10   are not satisfied, the Court is required to vacate the
11   confirmation order.  I guess I would say that doesn't quite
12   feel right to me, especially if there's a dispute about
13   whether the conditions have been met and the Court determines
14   that they have.  In the next paragraph relating to
15   dissolution of the Retiree Committee, at the end it says,
16   "All disputes relating to the approval of fees and expenses
17   shall be determined by the Bankruptcy Court," and the next
18   sentence says no appeal.  That doesn't feel right to me
19   either.  I'm not sure a plan of confirmation can -- a plan of
20   adjustment and an order confirming a plan of adjustment can
21   foreclose appellate rights like that.

22       Okay.  Page 40.  Well, wait.  That's not right.
23   Hold on one second.  It's page 41, discharge of claims.  My
24   question there would be is there anything about this language
25   that's different from, broader than or less broad than the

1  discharge provided in the Bankruptcy Code or even more
2  fundamentally whether the plan shouldn't just say that the
3  claims that the Bankruptcy Code says discharged are
4  discharged?
5        Page 41, which is where we are, I'm confused about
6  this concept of indirect employee indemnity claims.  The
7  subject is dealt with here and then again later, and I
8  couldn't figure out how they work together.
9        Page 46, conditions to state's participation, it
10  might be worthwhile to have the plan require either the city
11  or the state or somebody to again give notice that these
12  conditions have been met when they have.  Beyond that, I
13  would have the following comments on the individual
14  paragraphs, and I hope this doesn't create too much of an
15  issue in your negotiations with the parties, let alone the
16  state, because I know the Michigan House is now considering
17  the bills.  Let me just break my earlier rule and ask you if
18  "F" is intended to require the cessation of litigation in
19  which the City of Detroit or its emergency manager is not at
20  issue.
21        MS. LENNOX:  It is not, your Honor.
22        THE COURT:  Beyond that, paragraphs I, J, K, and L
23  use the word "assurances," and I think it should be
24  clarified.  Assurances by whom?
25        Page 47, paragraph 3, conditions to the foundations'

 1   participation, "E," the existence of appropriate governance

 2   and oversight structures.  What does "appropriate" mean?  Who

 3   decides whether the governance and oversight structures are

 4   appropriate?  Same in "F."  And in "H" the affirmation by

 5   county authorities of certain existing funding obligations

 6   with respect to DIA Corp., what certain existing funding

 7   obligations do those refer to?

 8        Page 49, professional fee reserve.  My only question

 9   there is what about fees incurred after the effective date?

10   Maybe they'll just be paid in the ordinary course, but you

11   should deal with that one way or the other.  And who is going

12   to calculate the amount of the reserve and how will it be

13   calculated?  On that same page in paragraph "M" in the fifth

14   line there's the parenthetical "consistent with the

15   injunction provisions of Section 3(d)(5)."  I wasn't sure

16   what that meant or how that worked in relation to that other

17   paragraph.

18        Page 51, "U" at the top, post-effective date

19   governance.  I know this is covered in the state legislation

20   in great detail, and so I'm wondering if the plan shouldn't

21   just say the city will be subject to post-effective date

22   governance as established by the state.  The way this reads,

23   it says, "A financial oversight board shall be established."

24   If this plan is confirmed, of course, that becomes the

25   federal court telling the city it's got to establish this

1     financial oversight board, and it's really the state that's

2     doing it, and I think, as a matter of comity between the

3     federal government and the state government, this should

4     be -- this should be clarified.

5           Page 55 -- excuse me -- fifth line under "tort

6     claims," it says -- well, beginning on the fourth line --

7     well, the fifth line, "In an administrative or judicial

8     tribunal of appropriate jurisdiction selected by the city."

9     That feels a little odd to me because normally the selection

10    of the appropriate jurisdiction in the first instance is made

11    by the claimant themselves subject to venue and jurisdiction,

12    of course.  This sort of reverses that.  At the end of that

13    same paragraph, it says, "If the city does not serve such

14    notice upon the holder of a tort claim by the claims

15    objection bar date, such holder may file a motion," et

16    cetera.  Two things about that.  The first is I wonder if we

17    should give these kinds of claimants notice at the

18    appropriate time of their right to file this kind of motion,

19    and, second, I wonder if we should set a deadline for the

20    filing of these kinds of motions so it isn't held open like

21    forever.

22          Page 56, application of bankruptcy rules, this

23    sentence would suspend a bankruptcy rule, and I'm not sure I

24    have the authority to do that.

25          Page 57, retention of jurisdiction, "B,"

1  jurisdiction to enforce the term, paren, maturity, close

2  paren, of the collective bargaining agreements.  I think I

3  have an idea what that means, but I would ask you to spell it

4  out much more clearly and spell it out in a way that doesn't

5  infringe on whatever jurisdiction exists in -- under state

6  law in any court or administrative tribunal over interpreting

7  collective bargaining agreements.

8         Page 58, this is Article VIII, paragraph C,

9  disclosure of amounts to be paid for Chapter 9 case services.

10  "The city shall file a statement of all amounts to be paid,"

11  so the question is is this just the outstanding fee

12  obligations, or is it all of the fees that have been paid in

13  the case?  It's a little bit vague because Section 943, when

14  it gives the Court the authority to determine the

15  reasonableness of fees to be paid, it's a little bit vague

16  there, too, so I'd ask you to clarify what your intent is

17  here.

18         Okay.  So that's it in the plan itself, but I had a

19  very few questions regarding the attachments, and here we

20  will have to refer to the ECF page, so I'll do the best I can

21  to describe it to you.  Okay.  It's ECF page 131, but it's

22  page 14 of the DIA settlement terms.  Page 14 of the DIA

23  settlement terms.  Do you have that with you?

24         MS. LENNOX:  Yes, sir.

25         THE COURT:  Okay.  At the top there, Bankruptcy

1  Court approval process, basically says, the settlement
2  between the city and the DIA is subject to Bankruptcy Court
3  approval in a manner acceptable to the parties, which the
4  city shall seek promptly after the signing of the definitive
5  documentation for the settlement, so it would be good if that
6  paragraph or someplace it described more particularly what
7  form that request for approval will take.  Will it be in the
8  plan?  Will it be by separate motion and when?

9        Now, ECF page 256, which is page 6 of the form of
10  state contribution agreement, paragraph 6 talks about default
11  by GRS and PFRS and remedies, and I couldn't quite figure out
12  what would constitute a default by GRS or PFRS.  It talks
13  about they'll be in default if the system hasn't complied
14  with any of the conditions set forth in the plan, but, you
15  know, at some point perhaps you could explain to me one or
16  two examples of what that might constitute.  And then,
17  frankly, I couldn't understand if there was a default and it
18  was determined exactly what the effect of the default would
19  be.

20        ECF page 260, which is Exhibit A to the state
21  contribution agreement -- one second.  Actually, the piece I
22  want to ask about is on the next page, 261.  This language
23  suggests circumstances in which the initial members of the
24  investment committee would be appointed by the Bankruptcy
25  Court in the first full paragraph there.  The language of the

1  second full paragraph seems to suggest that the Bankruptcy

2  Court would then also appoint the successor independent

3  members or it could be read that way, so, again, I would ask

4  you to clarify what your intent is there.  I would hope you

5  could figure out a way to establish these appointment

6  processes such that the Bankruptcy Court doesn't have to be

7  involved in this after some point in time.

8          MS. LENNOX:  That's been further discussion on that

9  already, your Honor.

10          THE COURT:  Good.  Okay.  That was all I had about

11  the language itself.  There is the other open issue which

12  I've asked you to think about, which is I think it would be

13  appropriate, perhaps even simply in the order confirming the

14  plan rather than in the plan, to have an independent person

15  whose responsibility it is to report to the Court regarding

16  the city's compliance with the plan.  That's it.

17          MS. LENNOX:  Your Honor --

18          THE COURT:  Yes.

19          MS. LENNOX:  -- may I ask a question as to that last

20  issue?  That is something that we have given quite a bit of

21  thought to, and we've developed very specific ideas with

22  respect to that.  Would your Honor prefer to see that in a

23  new version or the next version of the plan, or is that

24  something that you would prefer to see in a proposed

25  confirmation order?

1          THE COURT:  Well, since we're all likely to see the
2     next version of the plan before we see a confirmation order,
3     I think, you know, the sooner we can start to deal with it,
4     the better.  Other than that, I don't really have any strong
5     views about it.

6          MS. LENNOX:  Thank you, your Honor.

7          THE COURT:  Would anyone else like to bring up
8     anything here today?  No?  All right.  We are in recess, and
9     I will see you all next Wednesday.

10         THE CLERK:  All rise.  Court is adjourned.

11       (Proceedings concluded at 2:43 p.m.)

INDEX

WITNESSES:

    None

EXHIBITS:

    None

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    May 27, 2014
_____             _____
Lois Garrett