UNITED STATES BANKRUPTCY COURT
EASTERN DIVISION OF MICHIGAN

IN RE:
CITY OF DETROIT, MICHIGAN
*Debtor.*

CHAPTER 9
CASE NO. 13-53846
HON. STEVEN W. RHODES

_____/

## MOTION FOR RELIEF FROM AUTOMATIC STAY AND RULING THAT CLAIM IS NOT SUBJECT TO REDUCTION OR COMPROMISE IN BANKRUPTCY

HRT Enterprises ("HRT"), a Michigan partnership, by and through its counsel, Demorest Law Firm, PLLC, states as follows for its Motion For Relief from Automatic Stay and Ruling that Claim is not Subject to Reduction or Compromise in Bankruptcy (the "Motion"):

### Prior and Pending Litigation

1.      HRT owns property in the City of Detroit (the "City") that is the subject of pending, bankruptcy-stayed litigation (U.S. District Court for the Eastern District of Michigan Case No. 12-13710). The HRT property is located at 11111 French Road, Detroit, MI 48234 (the "Property").

2.      The Property is located near Detroit City Airport, in an area designated for taking by the City of Detroit. HRT first sued the City for inverse condemnation in Wayne County Circuit Court in 2002. In September 2005, a jury found that the City had not inversely condemned HRT's Property based on the facts then in existence. This ruling was upheld on appeal.

3.      In 2009, based on events since 2005, HRT filed an inverse condemnation claim against the City in U.S. District Court. At that time, the Hon. Avern Cohn

dismissed the case, ordering HRT to exhaust its state remedies before pursuing its claims in federal court.

4.      HRT filed its second state court lawsuit against the City in Wayne County Circuit Court in July 2009. In 2011, the Circuit Court ruled that HRT's claims were barred by *res judicata* and dismissed the case. This ruling was upheld on appeal.

5.      In August 2012, HRT filed its second federal lawsuit in U.S. District Court for the Eastern District of Michigan (Case No. 12-13710), including claims for inverse condemnation taking without just compensation and substantive due process (**Exhibit 1**).

6.      On March 26, 2013, Judge Cohn denied the City's Motion to Dismiss and/ or Summary Judgment (**Exhibit 2**). Judge Cohn found: (1) that HRT's claim is ripe; (2) that neither res judicata nor collateral estoppel apply; and (3) that HRT's claim is not barred by a statute of limitations.

7.      As a result of the City of Detroit's bankruptcy filing, the pending litigation in federal court has been automatically stayed.

8.      At the time the stay was entered, discovery had nearly been completed, and the parties were preparing for trial.

9.      HRT's claims against the City are disputed and need to be quantified and liquidated. This can be accomplished by lifting the stay and allowing the case to proceed before Judge Cohn in U.S. District Court. The litigation needs to come to a conclusion in order to determine whether the City is liable to HRT, and, if so, the amount of damages or just compensation that HRT is entitled to receive.

2

## Lifting of Automatic Stay

10. Currently, claims against the City of Detroit are stayed pursuant to 11 U.S.C. § 362(a)(2), during which time the City of Detroit has proposed its plan of adjustment to modify its obligations to creditors whose claims are subject to reduction or compromise.[1]

11. Pursuant to 11 U.S.C. § 362(d)(1), upon the request of a party in interest, the Court shall grant relief from the Stay enforced pursuant to 11 U.S.C. § 362(a)(2) for cause.

## Relief Sought

12. HRT hereby requests that this Court enter an Order lifting the automatic stay to allow HRT to continue to litigate its claims through Judgment in the U.S. District Court for the Eastern District of Michigan. If the judgment is in favor of HRT, enforcement of that judgment will be subject to the order of this Court.

13. Pursuant to L.B.R. 9014-1(b)(4) (E.D. MI), a copy of the proposed Order is attached as **Exhibit 3**.

---

[1] HRT filed timely Objections to the City's Chapter 9 Plan (Docket No. 3412) and the City's Disclosure Statement (Docket No. 3854). HRT's claims are not subject to reduction or compromise because they are based on a Constitutional claim for the taking of property without just compensation. Congress may not pass laws under its Bankruptcy power that would effect a taking of private property without just compensation. *U.S. v. Security Industrial Bank*, 459 U.S. 70 (US 1982), citing *Louisville Joint Stock Land Bank v. Radford*, 295 US 555 (1935). Although Congress may authorize the City to impair obligation of contracts in Chapter 9 bankruptcy, it may not authorize the taking of private property without just compensation in violation of the Fifth Amendment. Therefore, HRT must be permitted to fully litigate its inverse condemnation and other claims against the City in U.S. District Court.

3

**WHEREFORE**, HRT respectfully requests that this Court enter an order lifting the automatic stay to permit HRT to proceed with its stayed lawsuit against the City of Detroit. If the judgment is in favor of HRT, enforcement of that judgment will be subject to the order of this Court.

Respectfully submitted,

/s/ Melissa Demorest LeDuc
Mark S. Demorest (P35912)
Melissa Demorest LeDuc (P68867)
Demorest Law Firm, PLLC
Attorneys for creditor
HRT Enterprises
322 West Lincoln Ave.
Royal Oak, MI 48067
248-723-5500
mark@demolaw.com
melissa@demolaw.com

Dated: May 27, 2014

City of Detroit bankruptcy:HRT:Motion for Relief from Stay 2014 05 15.docx

4

UNITED STATES BANKRUPTCY COURT
EASTERN DIVISION OF MICHIGAN

IN RE:                                          CHAPTER 9
CITY OF DETROIT, MICHIGAN                        CASE NO. 13-53846
    *Debtor.*                                HON. STEVEN W. RHODES

_____/

## **INDEX OF EXHIBITS**

**Exhibit**                     **Description**

1.    Complaint and Jury Demand, *HRT Enterprises v. City of Detroit*, E.D. Mich.
    Docket No. 2:12-cv-13710-AC-RSW, August 21, 2012

2.    Decision and Order Denying Defendant's Motion to Dismiss, or, In the
    Alternative, For Summary Judgment, *HRT Enterprises v. City of Detroit*, E.D.
    Mich. Docket No. 2:12-cv-13710-AC-RSW, March 26, 2013

City of Detroit bankruptcy:HRT:Index of Exhibits (Motion for Relief).docx

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HRT ENTERPRISES, a Michigan
partnership,

       Plaintiff,

v                             Case No. _____

CITY OF DETROIT, a Michigan municipal   Hon. _____
corporation,

       Defendant.

Demorest Law Firm, PLLC
MARK S. DEMOREST (P35912)
MELISSA L. DEMOREST (P68867)
MICHAEL K. HAYES (P75419)
Attorneys for Plaintiff
322 W. Lincoln
Royal Oak, Michigan 48067
248-723-5500

## COMPLAINT AND JURY DEMAND

       Plaintiff, HRT Enterprises, a Michigan partnership, ("HRT"), through its attorneys,

Demorest Law Firm, PLLC, states as follows for its Complaint against Defendant, City of

Detroit:

## STATEMENT OF THE CASE

      1.    The City of Detroit owns and operates an airport on the east side of

Detroit.   The City of Detroit must acquire all of the neighboring privately-owned

properties located within 750 feet of the centerline of Runway 15/33, in order

to comply with FAA safety regulations, and to comply with the City's obligations under its various grant agreements with the FAA and the State of Michigan. The City must purchase these properties located off the west side of the airport, regardless whether the City ever expands Detroit City Airport to construct a new runway.

2.     HRT owns 11 acres of land adjacent to the City's Airport, including an existing factory building and office building.

3.     The City designated HRT's property for acquisition years ago, because it is located in the 750-foot safety area, but the City has never purchased the property.

4.     HRT filed an inverse condemnation lawsuit against the City in state court in 2002, because HRT believed that the City's actions had at that point interfered with HRT's property rights to the extent that HRT's commercial property was no longer viable.

5.     Based on the facts then in existence, the jury determined that the City had not inversely condemned HRT's property as of the trial in September 2005. At that point, the building was mostly vacant. However, one tenant still occupied part of the property, and provided some rental income to HRT.

6.     To HRT, the "death" of its Property was inevitable as of the time of the trial in September 2005, but the jury concluded that the Property was still "alive" in 2005.

7.     Since the 2005 trial, the City has taken additional actions to restrict the use and value of HRT's property, and to implement its plan to acquire HRT's property and other property in the area.   These actions are discussed below.

8.     Now, seven years after that trial, the City has still not purchased HRT's property.   The property is entirely vacant and the building has been vandalized.   The

2

property is no longer usable, rentable or salesable. If the Property was still "alive" in 2005, it is clearly deceased now.

9. Even if the inverse condemnation of HRT's property had not occurred as of September 2005, the City's actions since then, and its continuing unreasonable delay in acquiring HRT's property, have ripened into inverse condemnation of the property. HRT is entitled to just compensation for its Property under the Fifth Amendment and 42 USC § 1983.

10. In 2009, HRT filed a second lawsuit against the City of Detroit, this time in U.S. District Court. HRT's Complaint alleged that, based on new events since the trial in 2005, inverse condemnation of HRT's property had now occurred.

11. The case was assigned to Hon. Avern Cohn, who ruled that HRT's case must first go to state court, based on the Supreme Court's *Williamson* decision, which requires exhaustion of state court inverse condemnation remedies before filing of a federal court lawsuit under 42 USC § 1983.

12. The City of Detroit argued that HRT's claims were barred by *res judicata*. Judge Cohn rejected the City's *res judicata*, recognizing that the facts regarding HRT's property had changed since 2005. Judge Cohn wrote that, "clearly the operative facts have changed from those presented to the 2005 state jury."

13. Based on Judge Cohn's ruling, HRT promptly filed its second state court lawsuit against the City of Detroit. Ignoring applicable law and the new events that had occurred since the 2005 trial, the Wayne County Circuit Court dismissed HRT's lawsuit based on *res judicata*. This ruling was affirmed by the Michigan Court of Appeals in July 2012.

3

14.     Additional relevant events occurred even during the pendency of HRT's appeal, but the Michigan Court of Appeals refused to allow HRT to supplement the record to reflect these new events.

15.     The *res judicata* rulings of the Michigan courts are inconsistent with federal law on inverse condemnation under the Fifth Amendment and 42 USC § 1983. HRT's property has now been taken by the City of Detroit through inverse condemnation.

16.     HRT is entitled to pursue this lawsuit seeking just compensation for its Property under the Fifth Amendment and 42 USC § 1983, regardless of the improper decisions of the state courts.

## PARTIES

17.     Plaintiff HRT Enterprises ("HRT") is a Michigan partnership.

18.     Defendant City of Detroit is a municipal corporation organized and existing under the Constitution and laws of the State of Michigan. The City of Detroit has its principal place of business at 2 Woodward Avenue, Detroit, Michigan.

## JURISDICTION

19.     HRT's claims against the City of Detroit are based on the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.

20.     Under the Fifth Amendment, private property may not be taken for public use without just compensation.

4

21.     HRT's Property was taken by the City through inverse condemnation, but HRT has not received just compensation from the City.

22.     The Fifth and Fourteenth Amendments also provide that a person may not be deprived of property without due process of law.

23.     HRT was deprived of its property by the City of Detroit, a political sub-division of the State of Michigan, without due process of law.

24.     HRT was damaged by the denial of its due process rights.

25.     The Court has jurisdiction of this matter under 28 U.S.C. §1331.

## FACTUAL ALLEGATIONS

### HRT'S Property is No Longer Viable Due to the City's Actions

26.     HRT owns 11 acres of land located at 11111 and 11181 French Road, Detroit, Michigan (the "Property").

27.     There is a large industrial building on the Property. The building is now vacant, and has been severely vandalized over approximately the past two years.

28.     The City of Detroit owns and operates an airport adjacent to the HRT Property, traditionally known as Detroit City Airport, and now known as Coleman A. Young International Airport (the "Airport").

29.     HRT's Property is located directly across French Road from the western boundary of the Airport property.

30.     Because of the actions of the City of Detroit, HRT's tenants and sub-tenants have all been driven out of business.

5

31.    Because of the actions of the City of Detroit, HRT is no longer able to use, lease or sell the Property.

### The City Must Acquire HRT's Property Due to its Proximity to the Airport

32.    No buildings are permitted within 750 feet of the centerline of Runway 15/33 without a waiver from the Federal Aviation Administration ("FAA").

33.    The front part of the HRT Property along French Road, including much of the existing building, is located within this 750-foot zone.

34.    The City of Detroit must acquire HRT's Property (and all the other properties located within 750 feet of the centerline of Runway 15-33) in order to comply with FAA safety regulations.

35.    The City of Detroit is also required to purchase HRT's Property (and all the other properties located within 750 feet of the centerline of Runway 15-33) in order to comply with the terms of the City's grant agreements with the FAA and the State of Michigan.

36.    The City of Detroit has already acquired most of the properties located within 750 feet of the centerline of Runway 15-33, but has never acquired HRT's Property.

37.    Because of its grant agreements with the FAA and the State of Michigan, the City of Detroit may not close the Airport. In July 2005, the FAA's District Office wrote to Delbert Brown, then Manager of the City's Airport, stating:

> In accepting Airport Improvement Program funds, the City of Detroit has agreed to certain specific terms and conditions. Federal statute requires these grant assurances as a condition for receiving such Federal aid and the City has

6

obligated itself in binding grant agreements to comply with these assurances. .... **Thus, the City may not close the airport without FAA's consent and a formal release from the terms of the grant agreements.** ... The prospects for **FAA concurrence in closing Coleman A. Young Airport are highly unlikely** under the justification we believe the City would present.

(Exhibit 1, emphasis added).

### The Merkur Steel Lawsuit

38.    In 1999, Merkur Steel, HRT's tenant, sued the City of Detroit for inverse condemnation of its leasehold rights. *Merkur Steel Supply, Inc. v. City of Detroit* (Wayne County Circuit Court Case No. 99-928001-CC (the "Merkur Steel Lawsuit").

39.    A jury trial was held in the Merkur Steel Lawsuit in Wayne County Circuit Court in 2002.

40.    The jury unanimously found that the City of Detroit partially inversely condemned Merkur Steel's property rights as a tenant of the Property.

41.    The Circuit Court entered a Final Judgment against the City in the Merkur Steel Lawsuit on March 29, 2002. The City of Detroit filed an appeal to the Michigan Court of Appeals. The Court of Appeals affirmed the verdict in favor of Merkur Steel in a unanimous published opinion. The City of Detroit then filed an Application for Leave to Appeal with the Michigan Supreme Court, which was denied.

42.    HRT was not a party to the Merkur Steel lawsuit.

43.    HRT received no compensation or damages as a result of the Merkur Steel lawsuit.

44.    The partners of HRT are not identical to the shareholders of Merkur Steel.

7

## The City Steel Lawsuit

45. In 2002, City Steel, a sub-tenant of Merkur Steel, also sued the City of Detroit for inverse condemnation. *Steel Associates, Inc. v. City of Detroit* (Wayne County Circuit Court Case No. 02-223249-CC), (the "City Steel Lawsuit").

46. City Steel sought compensation for the diminution in value of its property rights as a sub-tenant at the Property.

47. A jury trial was held in the City Steel Lawsuit in Wayne County Circuit Court in November 2003. The jury in the City Steel Lawsuit unanimously found that the City of Detroit inversely condemned City Steel's property rights as a sub-tenant of the Property.

48. The Circuit Court entered a Final Judgment against the City in the City Steel Lawsuit in December 2003. The City of Detroit filed an appeal to the Michigan Court of Appeals. The Court of Appeals affirmed the verdict in favor of City Steel. The City of Detroit then filed an Application for Leave to Appeal with the Michigan Supreme Court, which was denied.

49. HRT was not a party to the City Steel Lawsuit.

50. HRT received no compensation of damages as a result of that lawsuit.

51. The partners of HRT are not identical to the shareholders of City Steel.

## HRT's First Lawsuit in Wayne County Circuit Court

52. In 2002, HRT sued the City of Detroit for inverse condemnation. *HRT Enterprises, et al. v. City of Detroit* (Wayne County Circuit Court Case No. 02-240493-CC). The City of Detroit was driving most of HRT's tenants out of business, and HRT

8

believed that the City's actions had progressed to the point that HRT's property rights as the owner of the property had been taken by the City.

53.     A jury trial was held in the HRT Lawsuit in Wayne County Circuit Court in September 2005.

54.     The September 2005 trial involved only issues of Michigan law.   HRT reserved any claims under the U.S. Constitution.

55.     The jury in the HRT Lawsuit found that the City of Detroit had not inversely condemned the Property as of September 2005, based on the facts then in existence.

56.     HRT filed an appeal to the Michigan Court of Appeals.  The Michigan Court of Appeals affirmed the verdict in favor of the City of Detroit.  HRT then filed an Application for Leave to Appeal with the Michigan Supreme Court, which was denied on March 24, 2008.

### Events Since September 2005 Jury Verdict

57.     About ten years have elapsed since HRT filed its first inverse condemnation lawsuit, and nearly seven years have elapsed since the 2005 trial. The City of Detroit still has not acquired the Property from HRT.

58.     The City cannot close the Airport, and is still required to purchase HRT's Property.

59.     The existing building on HRT's property is now totally vacant, due to the City of Detroit's interference with the use of the Property by HRT's tenants and sub-tenants.

9

60.    The last remaining operating company in the Property, Merkur Technical Services, Inc., went out of business at the end of 2008, about three years after the trial.

61.    HRT then attempted to lease all or part of the Property to other tenants, without success.

62.    HRT has also been unable to sell the Property.

### The City Still Plans to Acquire HRT's Property

63.    The City of Detroit's plan is to acquire the Property, both for the safety of the existing Runway 15-33, and also for the construction of a new replacement runway which would run through HRT's Property.

64.    On December 13, 2006, Delbert Brown, then Manager of the Airport, wrote to the FAA's Detroit Airports District Office about a meeting between representatives of the City, the FAA, and the State of Michigan to discuss the future of the Airport.   Airport Manager Brown confirmed the City's plan to construct the replacement runway, stating:

> Everyone at the meeting expressed agreement that the proposed relocated runway project appears to be the only sensible long-term solution for the Airport.   The City appreciates the support of all towards: 1) meeting minimum FAA airport facility standards, 2) positioning the airport to accommodate future demand, and 3) making the airport economically viable.

(Exhibit 2, underlining in original).

65.    In his October 17, 2008 letter to the City Council's Public Health and Safety Standing Committee, Airport Manager Delbert Brown reaffirmed the City's plan to acquire the Property.  Airport Manager Brown wrote:

10

An issue facing the Coleman A. Young Airport Department is to have standard runway safety areas in place. We are adversely affected by this FAA requirement because the Coleman A. Young Airport may end up with an even shorter runway than currently exists. If this happens, we will be unable to meet the aviation needs of our present customers and eliminate the possibility of airline service at our airport. The projects included in the Master Plan/ Gateway Plan will help to alleviate this issue this:

a) A 5,000 to 6,500 foot replacement runway. [This is the proposed runway that would run through the Property.] ...

e) **Airport will continue the land acquisition program to facilitate safety areas, clear zones and ultimately the replacement of the existing runway.**

(Exhibit 3, emphasis added).

66.     Over seven years after the 2005 trial, the FAA and the State of Michigan are currently reviewing the City of Detroit's new proposed Airport Layout Plan. Like the City's existing plan, the new proposed Airport Layout Plan still shows the City's plan for taking of HRT's Property.

## Public Announcements of the City's Plan to Purchase HRT's Property

67.     Public announcement of the City's plan to acquire property is one of the facts that can be used to prove an inverse condemnation claim.

68.     Since the 2005 trial, the City has publicly announced and reaffirmed its plan to purchase the Property. In his March 11, 2008 State of the City address, former Mayor Kwame Kilpatrick stated that the City would finally complete the acquisition of land near the Airport. He said:

11

> We will complete the acquisition of land, started by Coleman
> Young, along French Road next to City Airport to finish the
> improvements needed to make it a viable commercial or
> general aviation airport. When completed, 90 percent of the
> funds used for this purpose would be reimbursed by the
> FAA.

69.     In March 2010, the City of Detroit's Purchasing Division published a
"Request for Proposals for Management and Development Services at the Coleman A.
Young Airport." In this Request for Proposal, the City asked private companies that
were interested in taking over management of the Airport to respond with their
proposals by April 21, 2010. It also told the public that the City intends to acquire the
property necessary to building a replacement runway, which would necessarily include
the acquisition of HRT's Property.

70.     The City is also attempting to reach an agreement with an airline to
resume scheduled passenger service at the Airport.

### Piecemeal Acquisition of Other Properties in the Acquisition Area

71.     The City's piecemeal acquisition of other properties in the area of the
project is another one of the facts that can be used to prove an inverse condemnation
claim.

72.     During the years since the jury verdict in the prior HRT lawsuit, the City
has not purchased HRT's Property, but has acquired many other commercial and
residential properties in the area through purchase agreements, non-payment of
property taxes, or formal condemnation proceedings.

12

73.   During the seven years since the jury verdict in the prior HRT lawsuit, the City has refused to purchase the Property from HRT, while the City has purchased other commercial and residential properties in the 750-foot acquisition area.   **Exhibit 4 is a** map prepared by the City of Detroit showing all of the City-owned properties located in the expansion area covered by the Airport Layout Plan, as of September 2006.   The City-owned properties are highlighted in yellow.   The City has acquired additional parcels of property in this area since Exhibit 6 was prepared.

74.   Last year, in response to an inverse condemnation lawsuit, the City purchased a commercial property on Van Dyke Avenue, which is located more than 750 feet from the centerline of Runway 15-33, rather than purchase HRT's Property.[1]

75.   The properties in the 750-foot zone have become increasingly isolated from each other as other buildings acquired by the City have been demolished.   Some blocks have no remaining structures, or only one or two occupied houses.

### The City is Preparing to Acquire HRT's Property

76.   In 2009, in preparation for its acquisition of the Property, the City of Detroit constructed a left turn lane into HRT's vacant property. (Photographs attached as **Exhibit 6**).   Since there is little traffic on French Road any more, with the City having purchased most of the other properties in the area already, there is no other plausible explanation for the City's construction of the "left turn lane to nowhere."

---

[1] *WPLC, LLC v City of Detroit*, Wayne County Circuit Court, Case No. 09-020214-CZ).

13

## The City's Unreasonable Delay in Acquiring HRT's Property

77.    The City's unreasonbale delay in acquiring property is another one of the facts that can be used to prove an inverse condemnation claim. Unreasonable delay in the purchase of property may itself also constitute a cognizable claim.

78.    Seven years have elapsed since the 2005 trial, but the City still has not acquired HRT's Property. Even if there had not been an unreasonable delay in 2005, another seven years certainly constitutes unreasonable delay, particularly when HRT's Property has become completely unusable in that time.

79.    The City began purchasing property in the mini-take area many years ago.

80.    The City has purchased the vast majority of the property in the mini-take area.

81.    By refusing to purchase HRT's Property, the City has aggravated the deterioration of property values, causing blight.

## The City's Failure to Maintain its Own Properties in the Area

82.    The City is now the major property owner in the area designated for airport acquisition (French Road to Van Dyke, and Lynch Road to McNichols). However, the City is not properly maintaining those properties. To the contrary, the City has once again allowed the adjacent properties that it owns to become dumping grounds. (See photographs attached as Exhibit 6).

83.    The vandals who damaged HRT's Property often gained access to the Property through a path from the City's adjoining property. (See photographs attached

14

as **Exhibit 7**). The vandals have even claimed that they are acting on behalf of the City of Detroit in removing materials from the Property.

## The City's Efforts to Limit Access to the Property

84.      McNichols Road (Six Mile Road) has been closed between French Road (the west side of the Airport) and Connor Road (the east side of the Airport) since 1987. The road was closed to allow larger aircraft to use the Airport for scheduled airliner service.

85.      The closure of McNichols Road limits access to the Property.

86.      Even though there is not currently any scheduled airliner service at the Airport, the City has opposed all efforts to reopen McNichols Road.

87.      In an October 6, 2008 letter to the City Council, Delbert Brown, Director of the Airport Department stated:

> The proposed reopening of McNichols Rd. at the northern boundary of the Airport's main runway (15/33) will begin a domino effect at the airport and the national aviation system and as the Airport Department Director, I can only recommend against taking such action as reopening said road. ...
>
> **In brief, the result of reopening McNichols Rd. will be lost jobs, lost revenue and a reduction in the Coleman A. Young Airport's operating classification. The proposed reopening will result in the reduction in the length of the current runway and limit the size and types of aircraft that can land and takeoff at our facility. The loss will not only be felt at the Airport but also in the economic impact estimated at $25 Million dollars in southeast Michigan.**

**(Exhibit 8, emphasis added)**

15

88.   In January 2008, the City submitted to the FAA a proposal for funding to completely close French Road — the road on which HRT's Property is located— between Lynch Road and McNichols. In this proposal, Delbert Brown, then Director of the Airport, stated:

> French Road corridor includes the removal of all pavement including curb and gutter. Restoration to this area will include the placement of 3" of top soil, seeding and mulching. French Road will be terminated at Lynch Rd and Six Mile Road [McNichols] with fencing and barricades.

(Exhibit 9).

## The City has Accepted Additional Federal and State Grants Since the 2005— With Strings Attached

89.   Since the 2005 trial, the City has accepted additional state and federal grants for land acquisition near the Airport. The terms and conditions of these grants affect HRT's Property.

90.   In February 2007, for example, the City entered into a grant agreement for another airport project. The grant agreement required the City to put up $15,000. The State provided $105,000 and the FAA provided $480,000, to complete the funding of $600,000 for land acquisition. The City agreed to keep the airport in operation for at least another twenty years. The City also agreed to the following condition, among others:

> 6. The SPONSOR [City of Detroit] will, either by the acquisition and retention of easements or other interests in or rights for the use of land or airspace, or by the adoption and enforcement of zoning regulations, prevent the construction, erection, alteration or growth of any structure, tree or other object in the approach areas of the runways of the Airport, which would constitute an obstruction to air navigation according to the criteria or standards prescribed in FAA Advisory Circulars.

16

(Exhibit 10, Attachment 3).

91.    In 2008, the City requested the FAA to provide $85 Million in funding to expand the Airport (**Exhibit 11**).

## The City Has Provided Limited Services for the HRT Property

92.    The vandals who are damaging HRT's Property often gain access to the Property through a path from the City of Detroit's adjoining property, which was a vacant lot purchased by the City from Chrysler Corporation.

93.    HRT notified the City of this problem, but the City took no action to stop it.

94.    The only way that HRT could obtain any police protection for its Property was to agree to pay a police officer for "protection."

## The City Has Interfered with HRT's Efforts to Protect its Property

95.    In 2011, HRT hired Gilbert's Trucking to construct an earthen berm on HRT's property, to attempt to block vandals from using vehicles to enter HRT's property from the City's adjoining property.

96.    Gilbert's Trucking was working on the HRT property on July 21, 2011. The City of Detroit's Airport Department called the Detroit Police Department, claiming that Gilbert's Trucking was trespassing on property owned by the City of Detroit, even though Gilbert's Trucking was working only on HRT's property.

97.    The Detroit Police Department responded to the scene and arrested the employees of Gilbert's Trucking who were working on HRT's property. They were subsequently prosecuted by the City of Detroit.

17

98.   On July 21, 2011, HRT partner Karl Thomas spoke on the telephone with Jason Watt, the City's current Airport Manager.   Thomas explained to Watt that his company, HRT, owned the property at 11111 French Road.

99.   Airport Director Watt claimed that the City of Detroit had already purchased the 11111 French Road property from HRT for $1.5 million. Karl Thomas informed him that was not true.

100.   Airport Director Watt then complained to Karl Thomas about HRT doing work to preserve and protect its own property. He said that HRT was only making it more expensive for the City to later utilize the property.

### HRT's Prior Lawsuit in U.S. District Court

101.   Because the City of Detroit had still not acquired the Property, and its tenants had been driven out of business by the City of Detroit, HRT filed a lawsuit against the City of Detroit in the U.S. District Court for the Eastern District of Michigan in 2009 (Case No. 2:09-CV-14460).

102.   HRT alleged that while a takings claim may not have been ripe in September 2005, a takings claim was now ripe due to new events and the continued passage of time.

103.   The City of Detroit sought dismissal of the case, on a variety of grounds, including *res judicata* (claims barred by HRT's prior lawsuit against the City of Detroit) and the Statute of Limitations.

104.   Judge Avern Cohn dismissed the U.S. District Court lawsuit, but on different grounds than requested by the City.

18

105.   Judge Cohn agreed with HRT that HRT's claims against the City of Detroit are not barred by *res judicata*, because of the passage of time and new events that have occurred since the 2005 jury verdict in the prior state court lawsuit.

106.   Judge Cohn ruled that, "Clearly the operative facts have changed from those presented to the 2005 state jury."

107.   Judge Cohn dismissed the U.S. District Court lawsuit.   Judge Cohn ruled that because of the U.S. Supreme Court's ruling in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), HRT must pursue its current claims in Wayne County Circuit Court before coming to federal court.

### HRT's Second Lawsuit in Wayne County Circuit Court

108.   Based on Judge Cohn's *Williamson* ruling, HRT filed its second inverse condemnation lawsuit against the City of Detroit in Wayne County Circuit Court on July 6, 2009.   (*HRT Enterprises v. City of Detroit, Wayne County Circuit Court*, Case No. 09-016475-CC).

109.   On March 29, 2011, the Wayne County Circuit Court granted summary disposition to the City of Detroit, ruling that HRT's claims were barred by *res judicata*. HRT's Motion for Reconsideration was denied in an order entered on April 21, 2011.

110.   HRT timely appealed to the Michigan Court of Appeals.

111.   During the pendency of the appeal, HRT filed a motion to supplement the record on appeal, in order to bring to the Court of Appeals' attention events that had occurred after the Circuit Court granted summary disposition in favor of the City of Detroit. The Court of Appeals denied that Motion.

19

112.   On July 26, 2012, the Court of Appeals affirmed the Circuit Court, also ruling that HRT's Complaint was barred by *res judicata*. The Court of Appeals stated that HRT presented "no new operative facts" since the prior trial.

113.   The rulings of the Circuit Court and Court of Appeals were contrary to the ruling of Judge Cohn that "the operative facts have changed from those presented to the 2005 state jury."

### COUNT I

### INVERSE CONDEMNATION – *DE FACTO TAKING*

114.   HRT incorporates by reference the allegations of paragraphs 1 through 113 inclusive, as though fully set forth herein.

115.   The City of Detroit, under color of law, has interfered with HRT's use of the Property in order to further and promote the City's own plans to acquire the Property.

116.   The City of Detroit's interference with the use of the Property has interfered with HRT's property rights to such an extent that the City of Detroit has *de facto* taken the Property.

117.   The City's actions have denied HRT all economically viable uses of its land.

118.   As a result of the City of Detroit's actions in interfering with the use of the Property, the City has inversely condemned the Property.

119.   The City of Detroit may not take HRT's property without just compensation, pursuant to the Fifth Amendment.

20

120.    HRT is entitled to recover compensation from the City of Detroit for the City's taking of the Property, under 42 USC §1983.

**WHEREFORE**, HRT respectfully requests this Court to:

a.      Enter a Judgment determining that the City of Detroit has inversely condemned the Property;

b.      Award HRT just compensation for the taking of its property rights by the City of Detroit, in an amount in excess of $75,000; and

c.      Award HRT its costs, interest and attorney's fees as allowed by law.

## COUNT II

### INVERSE CONDEMNATION – CITY OF DETROIT'S
### UNREASONABLE DELAY IN ACQUIRING PROPERTY

121.    HRT incorporates by reference the allegations of paragraphs 1 through 120 inclusive, as though fully set forth herein.

122.    The City of Detroit intends to acquire the Property for public use.

123.    The City has prohibited, and intends to continue to prohibit, the full use of the Property in order to facilitate the City of Detroit's plans for Detroit City Airport to the point of denying HRT all economically viable use of its property.

124.    The City of Detroit has engaged in deliberate actions toward the Mini-Take Area, in general, and the Property in particular, that in fact interfered with HRT's property rights.

125.    The City of Detroit's unreasonable delay in proceeding with its plans to acquire the Property has interfered with HRT's property rights to the extent that the City of Detroit has taken the Property without compensation to Plaintiffs.

21

126.   The City's unreasonable delay in purchasing the property for the purpose of bringing down the property's value does not advance a legitimate government interest.

127.   The City of Detroit may not take HRT's Property without just compensation, pursuant to the Fifth Amendment.

128.   HRT is entitled to recover compensation from the City of Detroit for the City's interference with HRT's property rights, under 42 USC §1983.

**WHEREFORE,** HRT respectfully requests this Court to:

a.      Enter a Judgment determining that the City of Detroit has inversely condemned the Property;

b.      Award HRT just compensation for the taking of its property rights by the City of Detroit, in an amount in excess of $75,000; and

c.      Award HRT its costs, interest and attorney's fees as allowed by law.


## COUNT III

## INVERSE CONDEMNATION – REGULATORY TAKING

129.   HRT incorporates by reference the allegations of paragraphs 1 through 128 inclusive, as though fully set forth herein.

130.   A government agency may be liable for taking private property by overburdening the property with regulations.

131.   The City of Detroit has taken the Property through its regulations because those regulations do not further a legitimate government interest.  The City of Detroit

has improperly used its regulations to freeze or drive down the value of the Property in anticipation of the City of Detroit's acquisition of the Property.

132.   The City of Detroit's regulations deprive Plaintiffs of economically viable use of the Property, considering: (a) the character of the City of Detroit's actions; (b) the economic effect of the City of Detroit's regulation on the Property; and (c) the extent by which the regulation has interfered with distinct economic-backed expectations.

133.   The effect of the City's regulations has been to burden Plaintiffs with a disproportionate share of the City of Detroit's costs of owning and operating Detroit City Airport.  The City's actions have forced HRT to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.

134.   The City of Detroit may not take HRT's Property without just compensation, pursuant to the Fifth Amendment.

135.   HRT is entitled to recover compensation from the City of Detroit for the City's interference with HRT's property rights, under 42 USC §1983.

**WHEREFORE,** HRT respectfully requests this Court to:

a.      Enter a Judgment determining that the City of Detroit has inversely condemned the Property;

b.      Award HRT just compensation for the taking of its property rights by the City of Detroit, in an amount in excess of $75,000; and

c.      Award HRT its costs, interest and attorney's fees as allowed by law.

23

## COUNT IV

### SUBSTANTIVE DUE PROCESS

136. HRT incorporates by reference the allegations of paragraphs 1 through 135 inclusive, as though fully set forth herein.

137. The Fifth and Fourteenth Amendments of the U.S. Constitution provide that no person shall be deprived of property without due process of law.

138. The Fifth Amendment prohibits the deliberate and arbitrary use of government power.

139. The City of Detroit's actions toward the Property and the Mini-Take Area were taken pursuant to a policy and practice of the City of Detroit.

140. The actions of the City of Detroit were taken under color of state law.

141. The City of Detroit's actions toward Plaintiffs were arbitrary and unreasonable, and either failed to advance a legitimate government interest or were an unreasonable means of advancing a legitimate government interest.

142. The acts or omissions of the City of Detroit were intentional.

143. The acts of omissions of the City of Detroit were the proximate cause of the deprivation of HRT's substantive due process rights protected by the Michigan Constitution.

144. HRT has been damaged by the City of Detroit's actions.

145. HRT is entitled to recover damages from the City of Detroit pursuant to the Fifth Amendment and 42 USC §1983.

WHEREFORE, HRT respectfully requests this Court to:

24

a.     Enter a Judgment determining that the City of Detroit has deprived HRT of its Property without due process of law;

b.     Award HRT damages for the taking of its property by the City of Detroit without due process of law, in an amount in excess of $75,000; and

c.     Award HRT its costs, interest and attorney's fees as allowed by law.

### JURY DEMAND

Plaintiff, HRT Enterprises, hereby demands a trial by jury as to all issues in this case.

Respectfully submitted,

s/ Mark S. Demorest (P35912)
Demorest Law Firm, PLLC
Attorneys for Plaintiff
322 W. Lincoln
Royal Oak, Michigan 48067
248-723-5500
mark@demolaw.com

Dated: August 21, 2012

Thomas, Karl:HRT Enterprises:U.S. Dist. Court - 2nd Case:Pleadings:Complaint and Jury Demand.docx

25

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HRT ENTERPRISES,

     Plaintiff,

vs.

CITY OF DETROIT,

     Defendants.

_____/

Case No. 12-13710

HON. AVERN COHN

## DECISION AND ORDER DENYING DEFENDANT'S
## MOTION TO DISMISS, OR, IN THE ALTERNATIVE,
## FOR SUMMARY JUDGMENT (Doc. 9)

### I. INTRODUCTION

    This is a Fifth Amendment takings case. Plaintiff HRT Enterprises (HRT) owns an 11-acre parcel of land with a commercial building having a footprint of approximately four acres (the property) directly across French Road from the Coleman A. Young International Airport, formerly the Detroit City Airport (Airport), in the City of Detroit. HRT's property is configured, and has been operated, as a steel service center. According to HRT, a "filed and approved" Airport Layout Plan shows that the parcel is at the center of the Airport and is designated for a taking by the City along with other properties in a "Mini-Take Area."

    HRT complains that defendant City of Detroit (the City) has engaged in an inverse condemnation by delaying acquisition of the property and taking certain actions in an attempt to drive down the amount of compensation it will have to pay HRT. The actions include passing resolutions that declare the necessity of acquiring the properties by condemnation; isolating the Mini-Take Area by closing McNichols Road between Conner

and French; and systematically publishing plans to acquire the properties leading to "blight by announcement."

The complaint is in four counts:

(I)     Inverse Condemnation - De Facto Taking;
(II)    Inverse Condemnation - City of Detroit's Unreasonable Delay in Acquiring Property;
(III)   Inverse Condemnation - Regulatory Taking; and
(IV)    Substantive Due Process.

Now before the Court is the City's motion to dismiss, or, in the alternative, motion for summary judgment (Doc. 9). For the reasons that follow, the motion is DENIED.

## II. BACKGROUND[1]

### A.

Due to the City's acquisition efforts in the Mini-Take Area, on September 3, 1999, Merkur Steel Supply, Inc. (Merkur Steel), one of HRT's tenants, filed a takings claim against the City in Wayne County Circuit Court (Doc. 11, p. 4). In 2002, a jury entered a verdict in favor of Merkur Steel, finding that the City's acquisition efforts amounted to a de facto taking of Merkur Steel's leasehold interest in the property (Id. at 4-5). Merkur Steel's sub-tenant Steel Associates, Inc. (Steel Associates) filed a separate action in Wayne County Circuit Court against the City claiming a de facto taking of its leasehold interest (Id. at 5). In 2003, a jury verdict was entered in favor of Steel Associates (Id.).

Subsequently Merkur Steel, Steel Associates and HRT collectively filed suit against the City in Wayne County Circuit Court claiming inverse condemnation of the property (Id.

---

[1] The parties did not submit a joint statement of undisputed material facts. Defendant filed a statement of material facts not in dispute; plaintiff responded; defendant filed a response to plaintiff's counter-statement of facts.

2

at 6). In addition to the claims raised in this case, HRT stated a procedural due process claim and an equal protection claim under the Michigan Constitution. In 2005, a jury returned a verdict of no cause of action, rejecting HRT's claim of inverse condemnation (Id. at 6-7). In 2007, the Michigan Court of Appeals affirmed the jury verdict, and, in 2008, the Michigan Supreme Court denied leave to appeal (Id. at 6-7).

In 2008, HRT filed a four-count complaint in this Court, similar to the current complaint. See HRT Enters. v. City of Detroit, No. 08-14460 (E.D. Mich. 2008). The Court found that the operative facts had changed from those presented to the 2005 state jury. In 2005, part of the property was still occupied and generating enough revenue from rent to pay taxes and perform repairs to the property. By 2008, according to HRT, the property was vacant and there was no longer enough rental income to pay taxes or maintain the property. However, the Court held that HRT had not sought just compensation through state procedures based on the new facts, and, therefore, the case was not ripe for federal court review under Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195-97 (1985).

In 2009, HRT filed another complaint in state court claiming inverse condemnation of its property (Doc. 11, p. 8). The trial court dismissed HRT's claims based on res judicata; in 2012, the Michigan Court of Appeals affirmed the trial court's decision. See HRT Enters. v. City of Detroit, No. 09-016475-CC, 2012 WL 3055221 (Mich. Ct. App. 2012). The court of appeals reasoned that HRT did not raise any new facts from the time of the 2005 jury trial. Id. HRT did not seek leave to appeal the Michigan Supreme Court.

**B.**

On August 21, 2012, HRT filed this action (Doc. 1). HRT says the facts have

3

changed since 2005 and the City's subsequent actions have amounted to a total taking of the property. HRT says the following events have occurred since 2005:

1. The last remaining tenant on the property went out of business in late 2008 and the property is now vacant;

2. The property has been looted by vandals who used adjacent City owned land to gain access to the property. Further, the City is not maintaining the land it owns in the area, and it is being used as a dumping ground;

3. HRT has been unable to lease or sell the property. The City, however, says that it technically leases the property because it is paying rent to HRT;

4. In December of 2006, Delbert Brown (Brown), manager of the Airport, confirmed the City's plan to construct a replacement runway, which requires meeting FAA airport facility standards;

5. In March of 2008, former City Mayor Kwame Kilpatrick stated that the City would complete the acquisition of land near the Airport along French Road;

6. In October of 2008, Brown, in a letter to the City Council's Public Health and Safety Standing Committee, stated that the Airport "will continue the land acquisition program to facilitate safety areas, clear zones and ultimately the replacement of the existing runway";

7. In March of 2010, the City's Purchasing Division informed the public that it intended to acquire all of the property necessary for building a replacement runway;

8. In October of 2008, Brown recommended to City Council against the reopening of McNichols Road, which was approved to be closed for five years in 1987;

9. The City has continued to purchase both residential and commercial properties

4

within, and outside of, the Mini-Take Area since 2005;

10. In February of 2007, the City entered into a grant agreement for another airport project and accepted state and federal funds for land acquisition;

11. In January of 2008, the City submitted to the FAA a proposal for funding to completely close French Road, the road on which HRT's property is located, between Lynch and McNichols;

12. In 2008, the City requested $85 million in funding from the FAA to expand the airport;

13. In 2009, the City constructed a left turn lane off of French Road, which leads to HRT's vacant property; and

14. In July of 2011, HRT hired Gilbert's Trucking to construct an earthen berm on the property to prevent trespassing. The City arrested and prosecuted employees of Gilbert's Trucking for trespassing on City owned property. Thus, the City has held itself out to the public as owner of HRT's land.

See (Doc. 11, pp. 18-27).

Since the 2005 jury trial, the City has also received a number of federal grants through the "Michigan Department of Transportation City of Detroit Contract for a Federal/State/Local Airport Project Under the Block Grant Program." The grants were awarded as follows:

1. On December 1, 2005, the City received a grant to "Conduct an Economic Impact Study, as Further Defined in Contract No. FM 82-02-MP."

2. On February 9, 2007, the City received a grant for "Land Reimbursement Costs for Parcels 392, 488, 491, 511, 626, 710, 711, 715, 731, 732, 939, 940, 943, 956, 958, 959,

5

960, and 961, as Further Defined in Contract No. FM 82-02-LAND."

3. On December 3, 2007, the City received a grant for "Airport Crack Sealing and Paint Marking, as Further Defined in Contract No. FM 82-02-C84."

4. On March 3, 2008, the City received a grant for "Land Acquisition Costs for Parcels 1613, 1618, 1630, 1640, 1539, 1540, 1541, 1542, 1290, 1292, 1293, 1294, 1416, 1417, 1418, 1419, 1425, 1430, 1433, 1434, 1505, 1508, 1513, 1514, 1515, 1516, 1517, 139, 245, 246, 252, 355, 486, 487, 937 and 938 as Further Defined in Contract No. FM 82-02-LAND."

5. On June 10, 2008, the City received a grant for "Reconfiguration of the Taxiway at Runway 25 (End) and Update of the Airport Layout Plan, as Further Defined in Contract Nos. FM 82-02-C85 and FM 82-02-MP."

6. On February 1, 2010, the City received a grant for"Design and construction of a hanger to house a Michigan State Police (MSP) helicopter, as further defined in Contract No. M 82-02-C86."

7. On April 28, 2011, the City received a grant for "Design for the Rehabilitation of Parallel Taxiway A. Design and Construction for the Reconfiguration of the Taxiway Connectors at Runway 25 End. This Work is Further Defined in Contract Nos. FM 82-02-C85 and FM 82-02-C87.

8. On August 12, 2011, the City received a grant to "Rehabilitate Parallel Taxiway A for Runway 15/33."

9. On March 2, 2012 the grant for the rehabilitation of parallel taxiway A for runway 15/33 was amended.

Further, following the 2005 jury trial, the City has systematically continued to

6

purchase property in the Mini-Take Area. The City submitted to the Court a document that shows that it has purchased fifty-eight parcels from January of 2005 until the present time.

Although HRT has not sought to obtain a permit to rehabilitate or expand its building, at a hearing on January 16, 2013, the City admitted that a portion of the property is not suitable for building because it would be in violation of the "building restriction line," which restricts buildings from being too close to the runway. Further, the City admitted that certain changes would not be permitted because they would interfere with the (1) "runway visibility zone," or (2) "transitional zone." The airport has two runways that are perpendicular to each other. The runway visibility zone is the area where a pilot on one runway needs to be able to see a plane on the other runway. The transitional zone is the area around the runway, which must be clear in case a plane deviates from the flight path or the runway. Further, transforming the building from a steel service center to another use would require compliance with FAA regulations, Michigan's Tall Structure Permit Act and likely face Detroit Building Department opposition.

The City's Airport Layout Plan[2] (the Plan) shows that the building restriction line for existing runways 15-33 and 7-25 runs directly through a portion of the property. See Pl's. Ex. 18. Further, the Plan proposes a new runway which runs through the property. See Pl's. Ex. 19. A new preliminary plan, submitted to the FAA and the State of Michigan in January of 2009, also shows a new runway going through the property. See Pl's. Ex. 20.

More recently, on January 9, 2013, the City released its "Detroit Future City Report"

---

[2] The current approved Airport Layout Plan is the City's 1996 plan.

7

(DFC Report) (Doc. 15, p. 1)[3]. The DFC Report contains recommendations for different areas and neighborhoods in the City (Doc. 17, p. 7). In the DFC Report, the property is located in the designated "Mt. Elliott Industrial" neighborhood (Doc. 15, p. 1). The DFC Report states, in pertinent part:

> The vision is to upgrade Mt. Elliott as an intense and attractive industrial area designed to accommodate modern, large-format industrial development; provide ample employment opportunities for Detroiters; and reinforce the region's role as a global hub for manufacturing. Expansion of the Coleman A. Young Airport will serve to support the local auto and metals industries but also provide additional opportunities in aerospace activities that align with many skills already in place to serve auto production. A new ring-road will connect this district directly with Chrysler to the south along with logistics activities, the Port, and the international crossing in Southwest Detroit.

(Doc. 15-2).

### III. STANDARD OF REVIEW

#### A. Fed. R. Civ. P. 12(b)(6)

A Fed. R. Civ. P. 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted. In reviewing a motion to dismiss, "the court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001). The court is not required to accept as true legal conclusions, conclusory statements, or mere recitations of the elements of a cause of action. Ashcroft

---

[3] The DFC Report was created by a Mayor-appointed Steering Committee and the Detroit Economic Growth Corporation (Doc. 17, p. 7).

8

v. Iqbal, 556 U.S. 662, 677 (2009).  Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678 (citation omitted).

"To survive a motion to dismiss under Rule 12(b)(6), a 'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'"  Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n., 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)).  The plaintiff must "state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief."  Fabian v. Fuller Helmets, Inc., 628 F.3d 278, 280 (6th Cir. 2010) (citing Iqbal, 556 U.S. at 677).  The Court must "draw on its judicial experience and common sense" in determining whether a claim is plausible.  Iqbal, 556 U.S. at 679.

### B. Fed. R. Civ. P. 56

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set out specific facts showing a genuine issue for trial.  Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009).  The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  Hawkins

9

v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). Determining credibility,

weighing evidence, and drawing reasonable inferences are left to the trier of fact. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## IV. DISCUSSION

The City says it is entitled to dismissal, or, in the alternative, summary judgment, for

four reasons:

> First, HRT has failed to exhaust state court remedies. Despite
> this Court's admonitions, HRT did not file an Application for
> Leave to appeal with the Michigan Supreme Court following the
> Michigan Court of Appeals' July 2012 decision. Second, under
> Michigan law, res judicata and collateral estoppel law bar this
> case because prior courts actually decided the inverse
> condemnation claims and issues as the Michigan Court of
> Appeals held. Third, under 28 U.S.C. § 1738, the prior
> Michigan court decisions preclude this current action. As
> illustrated in San Remo Hotel, L.P. v. City of San Francisco,
> 545 U.S. 323 (2005) a federal court is precluded from
> relitigating claims that would be precluded under the relevant
> state's law. Finally, HRT's claims are barred by the applicable
> statute of limitations. Indeed, HRT's takings claims accrued in
> 1991.

(Doc. 9, p. 1-2). The City's arguments fail to persuade. The reasons follow.

### A. Ripeness

The City first claims that this case is not ripe for federal court review because HRT

did not file an application for leave to appeal with the Michigan Supreme Court following the

2012 decision of the Michigan Court of Appeals described at page 3, supra. HRT did not

claim that an application for leave to appeal to the Michigan Supreme Court would be futile.

Therefore, the City says that HRT did not exhaust state court remedies. The City is

mistaken.

In Williamson County, the Supreme Court held that a takings claim is not ripe until

10

a two-prong test is satisfied: (1) an administrative body has rendered a final decision, i.e.
the "finality" requirement; and (2) the property owner resorted to state remedies for just
compensation, i.e. pursued an inverse condemnation action.  473 U.S. 172.  The second
prong is at issue here.

As it relates to the second prong, the Supreme Court stated, "[I]f a State provides
an adequate procedure for seeking just compensation, the property owner cannot claim a
violation of the Just Compensation Clause until it has used the procedure and been denied
just compensation." Id. at 195.  The Michigan Constitution provides that a property owner
can seek compensation by filing an action for inverse condemnation when property is taken
for public use.  Mich. Const. Art. 10, § 2.

Here, HRT's claim is ripe.  HRT pursued an inverse condemnation claim to an
unsuccessful conclusion in state court.  HRT argued its case in the state trial court and in
the Michigan Court of Appeals.  It exhausted its appeal by right.  The time for applying for
review by the Michigan Supreme Court has expired.  The City does not provide any
authority for its position that HRT's failure to file for review by the Michigan Supreme Court
precludes it forever from asserting a takings claim in federal court.  To the contrary,
Williamson County precluded a plaintiff from bringing a takings claim until it has been
denied just compensation.  Here, after the court of appeals' decision became final, HRT
was denied just compensation through adequate state procedure, and its claim immediately
became ripe for review by this Court.  See, e.g., Brown v. Metro. Gov't of Nashville, No.11-
5339, 2012 WL 2861593, at *3 (6th Cir. Jan. 9, 2012) (reasoning that takings claim was
ripe for review after plaintiff had pursued an inverse condemnation action in state court,
receiving final decision by state court of appeals, but not appealing that decision to the

11

state supreme court).

## B. Res Judicata/Collateral Estoppel

Next, the City says that HRT has already had its bite at the apple in state court, and the case must be dismissed either on res judicata grounds, or under 28 U.S.C. § 1738. The Court disagrees. The 2008 case was not decided on the merits. The trial court ruled on the 2005 adjudication. Indeed, the trial court explicitly stated that "this case has already been litigated once. The jury entered a no-cause of action in HRT versus City of Detroit, in the 2005 case. This issue has already been decided." The trial court did not consider what occurred since 2005.

Under the full faith and credit statute, 28 U.S.C. § 1738, a federal court must give preclusive effect to prior state court actions according to the preclusion law of the state. San Remo Hotel, L.P. v. City and Cnty. Of San Fran., Cal., 545 U.S. 323, 336 (2005) ("This statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'"); DLX, Inc. v. Kentucky, 381 F.3d 511, 520 (6th Cir. 2004) ("[P]reclusive effect must be given to ... prior state-court action[s] under 28 U.S.C. [§] 1738 according to res judicata law of the state.").

The Michigan Supreme Court has recognized that "[t]he doctrine of res judicata bars a subsequent action when '(1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." Estes v. Titus, 481 Mich. 573, 585 (2008). Michigan takes a broad approach to the doctrine of res judicata, "holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." Adair v. State, 470

12

Mich. 105, 121 (2004) (citing Dart v. Dart., 460 Mich. 573, 586 (1999)). Relatedly, the doctrine of collateral estoppel bars subsequent claims where "(1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there was mutuality of estoppel." Id. (citation omitted).

Here, the Michigan state courts held that HRT's claim was barred by res judicata. That was not a decision on the merits entitled to preclusive effect. Further, because of the many events that occurred after the 2005 trial, as detailed above, HRT did not have an opportunity to resolve its claim in the first case. It could not have presented facts not yet in existence at the time of the 2005 case. These additional facts might lead a jury to conclude that today, in 2013, a taking of HRT's property has occurred. The Michigan Court of Appeals, with little explanation, decided that HRT did not present new facts since the 2005 jury verdict. The Michigan Court of Appeals categorized the "new facts" as being of the same nature as the facts presented to the 2005 jury. The evidence belies this assertion, and the Court is not bound by the Michigan Court of Appeals' decision. Res judicata and collateral estoppel do not bar HRT's suit.

### C. Statute of Limitations

Next, the City says that the statute of limitations bars HRT's claims. The parties agree that a fifteen-year statute of limitations applies where, as here, HRT holds a present ownership in the property at the time the lawsuit was filed. Mich. Comp. Laws § 600.5801(4). The City says that HRT's claim is barred because it accrued in 1991, when the City first discussed its expansion plans. The City is mistaken.

This case is based on the events that occurred subsequent to the 2005 trial.

13

Although HRT's underlying claim is based on the City's expansion plans, the statute of limitations began to run when HRT's claim accrued. In 2005, a jury determined that HRT did not have a claim. Based on the City's continuing actions subsequent to the 2005 trial, however, it is possible that a jury will find that a taking has now occurred eight years later. HRT's claim is based on the City's actions since 2005, which are continuing to date. At the earliest, the statute of limitations began to run in 2005. This action is timely.

## V. CONCLUSION

For the reasons stated above, the City's motion to dismiss and/or for summary judgment (Doc. 9) is DENIED. The overwhelming additional events that have occurred since 2005, when a state court jury determined that HRT did not have a takings claim, present a question of fact as to whether a taking has now occurred. The City has continued its acquisition efforts in the Mini-Take Area for eight years since the 2005 jury trial. There is an abundance of facts of which a jury may now find amount to a taking of HRT's property.

SO ORDERED.

S/Avern Cohn
UNITED STATES DISTRICT JUDGE

Dated: March 26, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 26, 2013, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160

14

IN RE:  
CITY OF DETROIT, MICHIGAN  
    *Debtor.*

CHAPTER 9  
CASE NO. 13-53846  
HON. STEVEN W. RHODES

_____/

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2014, I served the following:

1.)     Motion for Relief From Automatic Stay and Ruling That Claim Is Not Subject To Reduction Or Compromise In Bankruptcy,

2.)     Notice of Motion of HRT Enterprise for Entry of An Order Granting Relief From Automatic Stay and Opportunity to Object, and

3.)     this Certificate of Service,

upon all parties registered to receive electronic notices in this matter via the Court's electronic case filing system.

Respectfully submitted,

/s/ Melissa Demorest LeDuc  
Mark S. Demorest (P35912)  
Melissa Demorest LeDuc (P68867)  
Demorest Law Firm, PLLC  
Attorneys for creditor  
HRT Enterprises  
322 West Lincoln Ave.  
Royal Oak, MI 48067  
248-723-5500  
mark@demolaw.com  
melissa@demolaw.com

Dated: May 27, 2014

City of Detroit bankruptcy:HRT:COS Motion for Relief from Stay 2014 05 15.docx