UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re ) | | Chapter 9 |
| ) | | |
| CITY OF DETROIT, MICHIGAN, ) | | Case No. 13-53846 |
| ) | | |
| Debtor. ) | | Hon. Steven W. Rhodes |

-------------------------------------------------------

*SUPPLEMENTAL* OBJECTION OF CREDITOR JAMIE S. FIELDS TO THE CONFIRMATION OF THE FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF DETROIT, MICHIGAN (MAY 5, 2014)

# PRELIMINARY STATEMENT

COMES NOW creditor and Detroit Police retiree, JAMIE S. FIELDS, attorney acting *in pro per,* hereby files a *supplemental* objection to the City's Fourth Amended Plan of Adjustment (Plan) (Doc. 4392). This objection incorporates by reference his previous Objection to the Plan (Doc. 3485) and is limited to the following objections: 1) The "Grand Bargain" provides an illusory recovery and is prohibited under State Law; 2) Bankruptcy does not provide the City with dispensation from complying with State Law post-bankruptcy; 3) The Plan is not feasible and relies on fiscal gimmickry rather than sound fiscal management, and; 4) The City by releasing the on-going vote counts of Class 10 and 11 prior to the close of voting renders the vote nugatory.

1. **The Detroit Institute of Art (DIA) and Foundation Agreement to partially fund the City's required annual contribution to PFRS is an illusory promise and is prohibited under State Law and Section 943 (b) of the Bankruptcy Code.**

    It is axiomatic that proposed recoveries cannot be "illusory." They are illusory if there is no real enforceable obligation between the parties. If one party can breach the agreement and walk away without any consequences, then that is no agreement at all. The "Grand Bargain," as it is colloquially referred, is no bargain, rather a "Grand Illusion" and would be more appropriate in a David Copperfield show in Las Vegas than in a Chapter 9 Plan of Adjustment. The Plan states:

    > "During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default ……"

    The Plan precludes retirees from being able to enforce the "Grand Bargain." In the case of a default by the DIA and/or foundations the City has legal redress against the DIA and/or foundations. But the City is not required by the Plan or by law to pursue any actions against the DIA or foundations to enforce the agreement nor can retirees compel the City to take such actions.

If the City decided to litigate a default by the DIA or foundations it would have to overcome language in the Plan that entitles:

> "All Funders (including The DIA, both as to any DIA Deficiency and with respect to the Guaranty) (to) have the right to rely upon the determination of the Board of Directors of the Supporting Organization as to whether the conditions to a scheduled payment have been satisfied and, if not initially satisfied, whether they have been timely cured."

The forgoing Plan provision creates a "remedy" unlike that for the breach of any other contract, the party that defaults (e.g., DIA or foundations) has the exclusive right to determine if the breach was justified. While the agreements memorialized in the Plan were the result of hard fought negotiations between the City and certain parties in mediation, and the yeomanlike efforts of Judge Rosen, when illusory promises are all that support a purported bilateral agreement, there is no mutuality of obligation and, thus, there is no agreement. A promise is illusory when it fails to bind the promisor, who retains the option of discontinuing performance. "Words of promise which by their terms make performance entirely optional with the "promisor" do not constitute a promise," *Hess v Cannon Twp*, 265 Mich App 582, 592 (2005). Although such words are often referred to as forming an illusory promise, they do not fall within the legal definition or meaning of a promise.

Such a promise may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance, (CORBIN on Contracts, 1993). The "Grand Bargain," is indefinite, conditional and allows the promisor to retain an unlimited right to decide later the nature or extent of its performance. This unlimited choice in effect destroys the promise and makes it illusory. WILLISTON on Contracts, 2007, pp. 804–805.

In addition, retirees are third-party beneficiaries to the "Grand Bargain" between the City, State, DIA and foundations. The ability of third-party beneficiaries to enforce an agreement or contract entered into for their benefit is provided for under Michigan Law, MCL 600.1405, which provides that "Any person for whose benefit a promise is made by way of contract...has the same right to enforce said promise that he would have had is the said promise had been made directly to him as the promisee." However, the Plan has chosen to violate Michigan Law by providing:

> "(there) will be no third-party beneficiaries to the rights of the City or the Supporting Organization, and no party other than the City or the Supporting Organization (or The DIA in respect of the Guaranty), as applicable, shall have the right to assert any claim against any Funder in respect of the obligations arising under the (agreement)."

2. **The City is prohibited by Law from Taking Action Necessary to carry out the Plan because prospectively it violates Michigan Law requiring that City fund employee pension benefits in the year that they were earned?**

Michigan has chosen to control its political subdivisions by making it unconstitutional to diminish or impair accrued pension benefits and by requiring that those benefits be annually funded. See *Mich. Const. Art. 9, Section 24* ("Pension Clause"). The fact that a municipality is in bankruptcy does not alter the State's control over the municipality.

The City proposes post-bankruptcy to violate State law by forbearing on their required annual pension contributions until 2023. Congress did not intend to provide municipal debtors with dispensation to ignore State laws governing their conduct simply because those laws may make it harder for them to adjust their debts. Such adjustment cannot be done at the expense of State law. Section 903 of the Bankruptcy Code makes this clear. While this objection has been previously made, the City response was non-sequitor and provided no authorities to support the City's position. The City addressed this issue more substantively, if not accurately, in its response brief on appeal to PFRS to the U.S. Court of Appeals (14-1208, et. al., May 27, 2014, pages 65-66).

The City relies on its' misreading of *Musselman v Governor*, 353 N.W. 2d 237 (1995) to support its position and incorrectly assert that "the drafters of art. 9, § 24 … did not contemplate that the prefunding requirement could be enforced by a court. They expected that the decision to comply rested ultimately with the Legislature, whom the people would have to trust…" *Musselman* involved state employee's healthcare benefits. It is sophistic to believe that the framers of the Constitution would enact a law with the expectation that it could not be enforced.

If this Court adopts the City's position it would render the requirement in the Michigan Constitution that pensions be funded in the year they were earned as meaningless surplusage. **T**he Fifth Circuit expressed the most common statutory interpretation stating: **"**We, of course, will not interpret a statute in a manner to render a provision meaningless." 2 *Clear Channel*, 209 Ariz. at 552, 125 P.3d at 1171. The City argues that *Musselman* stands for the premise "(that) there is no way… to compel a city council to raise more money." *Id*. The City is right – no court can compel a city council to raise money – but a court can enforce a city to pay its bills and obligations such as funding earned accrued pension benefits. The City argument fails for four primary reasons:

First, the objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, *People v Nutt*, 469 Mich 565, 573 (2004). This rule of "common understanding" has been described by Michigan Justice Cooley in this way:

> "The interpretation that (the constitution) should be given it is that which reasonable minds, the great mass of the people themselves, would give it. For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed," *Traverse City School District v Attorney General*, 384 Mich 390, 405 (1971).

An examination of the constitutional debates, reveals the framers' intent was to create a clear obligation of municipalities to annually fully fund their pension and retirement systems:

> "[This] section is an attempt to rectify, in part, policies which have permitted sizeable deficiencies to pile up in retirement systems in this state. Under this section, accruing liability in each fiscal year must be funded during that year, thus keeping any of these systems from getting farther behind than they are now." (2 Official Record, Constitutional Convention 1961, p 3402).

Secondly, *Musselman* found the funding clause to "unambiguously (require) the state and its political subdivisions to fund accrued financial benefits during the fiscal year for which corresponding services are rendered." In order to reach the objective of discerning the intent of the people when ratifying a constitutional provision, courts apply the plain meaning of each term used therein at the time of ratification unless technical, legal terms were employed. *Id*. See also, *Phillips v Miracle Inc*., 470 Mich 415, 422 (2004). Because these adjectives are not technical, legal terms that would have been ascribed a particular meaning by those learned in the law at the time the Constitution was ratified, we discern the intent of the people in ratifying art 9, Section 24 by according the adjectives their plain and ordinary meanings at the time of ratification." *Id*. At 425

Thirdly, *Musselman* involved contractual health care benefits and the court was called upon to determine whether healthcare benefits were an "accrued financial benefit" under the Michigan Constitution and were "earned compensation" that had to be annually funded. *Id*

Fourth, one of the reasons why the City's retirement system is relatively well-funded is precisely because PFRS and GRS instituted legal action on numerous occasions, and succeeded in Wayne County Circuit Court enforcing the Michigan Constitutional provision requiring the City to annually fund its retirement system. The City should now be barred from raising these issues at this late date by *res judicata* (claim preclusion) and *collateral estoppel* (issue preclusion) having previously litigated identical claims and forgoing their appellate rights.

3. **The Plan is not feasible and relies on fiscal gimmickry rather than fiscally sound management.**

The City's EM's response to the prior administration's mismanagement is somewhat a hair-of-the-dog remedy in that, in order to cure Detroit's reliance on fiscal gimmickry, the City has resorted to a bit of gimmickry itself – employing tactics to conform to the letter of a restriction governing the management of budgets or debt while violating the spirit of that restriction.

One reason why the City's Plan brings legacy costs down from a projected 70% of general fund revenues in 2020 to close to 10% is because it includes a "pension holiday." Up through fiscal year 2023, the only funds going towards retiree pensions will be funding from the so-called "Grand Bargain," and possibly sewer and water system ratepayers. No tax revenues will be going towards the unfunded pension liability.

Putting off pension payments, violates Michigan Law and is irresponsible considering that the City's reluctance to fund pensions fully and straightforwardly contributed significantly to Detroit's bankruptcy. It deferred payments and entered into a pension obligation borrowing scheme that backfired epically. Even if the old plan is frozen not paying off the remaining unfunded liability as soon as possible carries an opportunity cost to taxpayers of lost investment return.

The practice of topping off pension benefits with short term investment gains has proven to be one of the City's bankruptcy most contentious issues. The GRS did so through the "Annuity Savings Fund" (ASF). The City's proposed "pension restoration" plan in the City's Plan of Adjustment, includes restoring GRS pension holders ASF recoupment. Recovery which would be based on the GRS reaching certain funding levels is irreconcilable, standing in stark contradiction, to the City's vexatious assertions regarding the legality of the ASF disbursements, which they have variously characterized as improper and a breach of the GRS trustee's fiduciary duty.

4. **The City's release to the media on the on-going voting results of Class 10 and 11 prior to the conclusion of Class voting renders those votes nugatory, regardless of the voting outcome, because of the probability of skewing the votes and confusing an already complicated voting process.**

City employees and retirees are understandably cynical of the City's motives and this inherent cynicism has been compounded by the City's admitted balloting "mistake." The process and errors, no matter how unintentional or well-meaning any of the actors may be, has provided no comfort to retirees who are facing one of the most important decisions of their lives.

On May 28, 2014 the City released information, to the media, that 15% of the ballots have been counted and the Plan is winning acceptance by a two to one margin. This is not only highly inappropriate but creates substantive and procedural questions. Studies of national elections conducted on the effect of the media reporting election results prior to all polling places closing has shown showed a substantial impact on election participation when the access to the information allowed the participants to gain new information (e.g., like in this instance) and the potential voters are hearing new information indicating election results. See, "*An experimental Test of the Release of Early Election Results*," Geoffrey Peterson, University of Wisconsin Eau Claire (1994).

## CONCLUSION

The City has not been forthcoming with retirees on the condition of its finances or its benchmarks of what improved City services look like. The City has constantly failed to provide information on the nature and value of City assets or the health of the retirement systems funding level when compared to other similar cities in the country. The City has failed to discuss less onerous healthcare options that the parties have presented. The City has caused its creditors to spend an inordinate amount of time attempting to get necessary information that they are legally entitled to or requiring creditors to compel discovery, including unnecessarily wasting the Court's time and that of the Court's expert possibly delaying the start of the confirmation hearing.

Rather than spending time to ensure acceptance of the Plan by alleviating retirees concerns and fixing easy to remedy Plan deficiencies, the EM spends his time continuing to belittle retirees, many of whom would vote to accept the plan if not for being deeply troubled by the illusory nature of some of the agreements. The EM has continued demonizing retirees to the press and scaring retirees by discussing the "draconian" cuts should the plan be rejected by Classes 10 and 11. And now the EM is being hoisted by his own petard when he complains that the financial creditors are spreading "misinformation" to the media. The City's summarily dismissive and cavalier attitude toward retiree's legitimate concerns is reminiscent of Groucho Marx who said "Who are you going to believe me or your lying eyes."

/s/ Jamie S. Fields_____
Jamie S. Fields (P-52808)
555 Brush
Detroit, Mich. 48226
(313) 570-3906

Date: June 1, 2014