UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          May 28, 2014
                  Debtor.         .          10:01 a.m.
. . . . . . . . . . . . . . . . .

         HEARING RE. (#4508) ORDER REGARDING HEARING ON
       OUTSTANDING OBJECTIONS TO WRITTEN DISCOVERY (RE:
           RELATED DOCUMENT(S) 4202 ORDER ESTABLISHING
        PROCEDURES, DEADLINES AND HEARING DATES RELATING TO
      THE DEBTOR'S PLAN OF ADJUSTMENT); (#3929) MOTION OF THE
         CITY OF DETROIT WATER & SEWERAGE DEPARTMENT FOR AN
       ORDER AMENDING AND CLARIFYING FEE REVIEW ORDER FILED
         BY INTERESTED PARTY CITY OF DETROIT WATER AND
      SEWERAGE DEPARTMENT; (#5011) LETTER FILED BY STEPHEN D.
      LERNER, COUNSEL TO THE COURT-APPOINTED EXPERT; (#4202)
          STATUS CONFERENCE REGARDING CONFIRMATION PROCESS
           BEFORE THE HONORABLE STEVEN W. RHODES
             UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street, Fiftieth Floor
                       Los Angeles, CA  90071
                       (213) 243-2382

                       Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  GEOFFREY IRWIN
                            GREGORY SHUMAKER
                            GEOFFREY STEWART
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

APPEARANCES (continued):

```
For Erste             Ballard Spahr, LLP
Europaische           By:  VINCENT J. MARRIOTT, III
Pfandbrief-und        1735 Market Street, 51st Floor
Kommunalkreditbank    Philadelphia, PA  19103-7599
Aktiengesellschaft    (215) 864-8236
in Luxemburg, S.A.:

For National Public   Sidley Austin, LLP
Finance Guarantee     By:  GUY NEAL
Corp.:                1501 K Street, NW
                      Washington, D.C.  20005
                      (202) 736-8041

                      Sidley Austin, LLP
                      By:  JEFFREY BJORK
                      555 West Fifth Street, Suite 4000
                      Los Angeles, CA  90013
                      (213) 896-6037

For Assured           Chadbourne & Parke, LLP
Guaranty Municipal    By:  SAMUEL KOHN
Corp.:                     ROBERT SCHWINGER
                      30 Rockefeller Plaza
                      New York, NY  10112
                      (212) 408-1060

For County of         Dechert, LLP
Macomb, Michigan:     By:  ALLAN S. BRILLIANT
                      1095 Avenue of the Americas
                      New York, NY  10036
                      (212) 698-3600

For County of         Young and Associates
Oakland, Michigan:    By:  JAYE QUADROZZI
                      27725 Stansbury Blvd., Suite 125
                      Farmington Hills, MI  48334
                      (248) 353-8620

For Detroit           Clark Hill, PLC
Retirement Systems:   By:  ROBERT GORDON
                      151 Old Woodward Avenue, Suite 3500
                      Birmingham, MI  48009
                      (248) 988-5882

For UAW:              Cohen, Weiss & Simon, LLP
                      By:  BABETTE CECCOTTI
                      330 West 42nd Street
                      New York, NY  10036-6976
                      (212) 356-0227
```

APPEARANCES (continued):

|  | International Union, UAW<br>By:  MICHAEL NICHOLSON<br>8000 East Jefferson Avenue<br>Detroit, MI  48214<br>(313) 926-5216 |
|---|---|
| For Syncora<br>Holdings, Ltd.,<br>Syncora Guarantee<br>Inc., and Syncora<br>Capital Assurance,<br>Inc.: | Kirkland & Ellis, LLP<br>By:  STEPHEN C. HACKNEY<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-2157 |
| For Detroit Retired<br>City Employees<br>Association,<br>Retired Detroit<br>Police and Fire<br>Fighters Associa-<br>tion, Shirley V.<br>Lightsey, and<br>Donald Taylor: | Silverman & Morris, PLLC<br>By:  KARIN F. AVERY<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330 |
| For Civil Division,<br>U.S. Department of<br>Justice: | United States Department of Justice<br>By:  MATTHEW TROY<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, D.C.  20044<br>(202) 307-0958 |
| For Ambac<br>Assurance<br>Corporation: | Arent Fox, LLP<br>By:  CAROL CONNOR COHEN<br>1717 K Street, NW<br>Washington, D.C.  20036-5342<br>(202) 857-6054 |
| For the Detroit<br>Fire Fighters<br>Association and<br>the Detroit Police<br>Officers Associa-<br>tion: | Erman, Teicher, Zucker &<br>  Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For the Official<br>Committee of<br>Retirees: | Dentons US, LLP<br>By:  SAM J. ALBERTS<br>1301 K Street, NW, Suite 600, East Tower<br>Washington, D.C.  20005-3364<br>(202) 408-7004 |

APPEARANCES (continued):

|  | Dentons US, LLP<br>By:  CAROLE NEVILLE<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY  10020-1089<br>(212) 768-6889 |
|---|---|
| For Three Bond-<br>Holders of DWSD<br>Ad Hoc Water and<br>Sewer Bondholder<br>Committee: | Mintz, Levin, Cohn, Ferris, Glovsky and<br>   Popeo, PC<br>By:  WILLIAM KANNEL<br>One Financial Center<br>Boston, MA  02111<br>(617) 348-1665 |
| For City of<br>Detroit Water and<br>Sewerage Depart-<br>ment: | Kilpatrick & Associates, PC<br>By:  RICHARDO KILPATRICK<br>903 North Opdyke Road, Suite C<br>Auburn Hills, MI  48326<br>(248) 377-0700 |
| For U.S. Bank: | Waller Lansden Dortch & Davis, LLP<br>By:  DAVID E. LEMKE<br>        HEATHER HUBBARD<br>511 Union Street, Suite 2700<br>Nashville, TN  37219<br>(615) 850-8655 |
| For Martha E.M.<br>Kopacz: | Squire Sanders, LLP<br>By:  STEPHEN LERNER<br>221 East Fourth Street, Suite 2900<br>Cincinnati, OH  45202<br>(513) 361-1220 |
| For County of<br>Wayne, Michigan: | Butzel Long, PC<br>By:  MAX J. NEWMAN<br>Stoneridge West<br>41000 Woodward Avenue<br>Bloomfield Hills, MI  48304<br>(248) 258-2907 |
| For BNY Mellon: | Reed Smith, LLP<br>By:  AMY TONTI<br>Reed Smith Centre<br>225 Fifth Avenue<br>Pittsburgh, PA  15222<br>(412) 288-3274 |

APPEARANCES (continued):

```
For AFSCME Local     Miller Cohen, PLC
917 and 3308:        By:  ROBERT FETTER
                     600 West Lafayette Blvd., #4
                     Detroit, MI  48226
                     (313) 566-5900

For Carlton Carter,  Resnick Law, PC
Bobby Jones,         By:  MARK BREDOW
Roderick Holley,     719 Griswold Street, #620
Richard T.           Detroit, MI  48226
Weatherly:           (313) 423-8320

For the Fee          Shaw Fishman Glantz & Towbin, LLC
Examiner:            By:  ROBERT FISHMAN
                     321 North Clark Street, Suite 800
                     Chicago, IL  60654
                     (312) 541-0151




Court Recorder:      Kristel Trionfi
                     United States Bankruptcy Court
                     211 West Fort Street, 21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  Court is in session.  Please be seated.

2    Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  I understand that some of you were

4    already admonished about making noise in the hallway.  For

5    those of you who weren't here for that, I urge you -- I

6    instruct you to be absolutely quiet in our hallways because

7    Judge Cleland, our neighbor, is conducting a trial.  You can

8    have your conversations here or downstairs, just not in the

9    hallways.  Okay.  And I'll try to remind you before we take

10   our breaks.

11         I'd like to begin with the motion regarding the DWSD

12   trustee fee issue and then turn to the letter from Ms. Kopacz

13   and her attorney and then address any further issues

14   regarding document production or interrogatories and then the

15   status conference.  Is that okay with everybody?

16         MR. BENNETT:  Your Honor, if I might suggest that I

17   think the discussion concerning the factual contentions may

18   well inform the discovery issues, so it might make sense to

19   cover that first.

20         THE COURT:  Okay.  Let me contemplate that.  So

21   let's begin with the motion regarding the trustee's fees.

22         MR. KILPATRICK:  Good morning, your Honor.  May it

23   please the Court, Richardo Kilpatrick appearing on behalf of

24   the Detroit Water and Sewage Department referred to around

25   here as DWSD.  For those who aren't aware, I'm not related to

1  Kwame.  I'm not going to repeat -- the Detroit Water and
2  Sewage Department is an autonomous department of the city.
3  It has independence in legal, financial, and management
4  matters.  I'm not going to repeat what's in the motion
5  because I've practiced before this Court for more than 20
6  years, but I wanted to highlight why the motion was filed and
7  summarize some important points contained therein.  Let me
8  begin --

9           THE COURT:  Okay.  Before you do that, I need you to
10  fill in a step in the analysis that your motion assumes but I
11  didn't quite get, which is why are we paying -- or why is the
12  city paying these fees at all?

13           MR. KILPATRICK:  Under the indenture agreement,
14  there is a requirement that the city pay reasonable fees and
15  expenses of the indenture trustee and the professionals in
16  certain instances.

17           THE COURT:  So does the department or the city agree
18  that this creditor is oversecured and, therefore, entitled to
19  fees under Section 509(b) -- 506(b)?

20           MR. KILPATRICK:  No.  What we -- no.  We don't make
21  that concession.  What the --

22           THE COURT:  Well, then why are we paying the fees?

23           MR. KILPATRICK:  Well --

24           THE COURT:  I mean lots of secured creditors have
25  agreements for their fees to be paid, but under the

1    Bankruptcy Code they're only paid if they're oversecured;

2    right?

3             MR. KILPATRICK:  That's correct, your Honor.

4             THE COURT:  So why are we paying the fees at all?

5             MR. KILPATRICK:  This is not -- this is not

6    analogous to a secured creditor.  This is an indenture

7    trustee who has certain responsibilities under the indenture

8    to the bondholders.

9             THE COURT:  Okay.  Well, let me just ask more

10   generally what in the Bankruptcy Code obligates a debtor like

11   the city to pay an opposing party's fees?

12            MR. KILPATRICK:  Nothing in the Bankruptcy Code

13   requires that.  It is included within the contract -- within

14   the indenture itself.

15            THE COURT:  Well, but in bankruptcy we don't care

16   much about contracts.

17            MR. KILPATRICK:  Your Honor --

18            THE COURT:  I'm serious.  Do we?

19            MR. KILPATRICK:  Your Honor --

20            THE COURT:  Why do we?

21            MR. KILPATRICK:  -- the reason we're here -- the

22   reason --

23            THE COURT:  Why are we paying these fees at all?

24            MR. KILPATRICK:  We may have to address that issue

25   at some time in the future, but it is our position that

1  they're entitled to reasonable fees to do the things that are

2  required under the indenture.  We do disagree that they have

3  done what's required under the indenture, and we think

4  they've exceeded that.  And we're not paying them.  They're

5  paying themselves.  I mean the Court -- let me explain how --

6  let me explain how this mechanism works, with the Court's

7  indulgence.

8         THE COURT:  I promise you that indulgence --

9         MR. KILPATRICK:  Okay.

10         THE COURT:  -- but I can't --

11         MR. KILPATRICK:  All the money comes --

12         THE COURT:  I'm having trouble getting past why

13  we're paying these fees.

14         MR. KILPATRICK:  Your Honor, under the indenture --

15         THE COURT:  If we're not obligated to as a matter of

16  law, then it's a gift.

17         MR. KILPATRICK:  That is --

18         THE COURT:  Every dollar that pays this gift is one

19  less dollar for a police officer, an analogy I've made --

20         MR. KILPATRICK:  Or one less dollar to fund the

21  water system.  Your Honor, the way this works, the money

22  comes into a lockbox.  The lockbox is controlled by the

23  trustee.  The trustee takes the money out of the lockbox to

24  pay the bondholders, then pays himself and his professionals.

25  That's part of our problem.  That's one of the reasons we're

1  here.

2              THE COURT:  Yeah.

3              MR. KILPATRICK:  I think that the better way to look

4  at this is that the fee examiner will be required to look at

5  a number of aspects, number one, whether they should be paid

6  at all, and then the appropriate -- then the appropriate

7  mechanism for them to be paid, and then determine that

8  they're reasonable.

9              THE COURT:  Well, whether they should be paid at all

10 is a question of law.  That's outside the scope of the fee

11 examiner's mandate, isn't it?

12             MR. KILPATRICK:  Yes, your Honor, but we -- again,

13 we --

14             THE COURT:  The fee examiner can deal with the issue

15 of reasonableness, but whether --

16             MR. KILPATRICK:  He can --

17             THE COURT:  -- whether they should be paid or not is

18 a question of law for the Court, isn't it?

19             MR. KILPATRICK:  That's correct.  Would you prefer

20 that I bring --

21             THE COURT:  I want to put you to it.  I want to put

22 you to it here.  I have to.  Is the city obligated by the

23 Bankruptcy Code to pay these fees?  If so, where is it in the

24 Bankruptcy Code?

25             MR. KILPATRICK:  Your Honor --

1    THE COURT:  Okay.  If you're not prepared to deal

2 with that question --

3    MR. KILPATRICK:  I'm not prepared to deal with that

4 question.

5    THE COURT:  -- then we can put it off for another

6 day.  That's fine.  But it is out there, and I'm concerned

7 about it.  I think we all have to be concerned about that.

8    MR. KILPATRICK:  Okay.  And we will address it.  I

9 mean, you know, at -- in the appropriate time -- I try to

10 keep -- I try to keep this very --

11    THE COURT:  All right.  So today we're just going to

12 deal with the issue of assuming it is payable --

13    MR. KILPATRICK:  Right.

14    THE COURT:  -- how do we get it paid.

15    MR. KILPATRICK:  That's correct.

16    THE COURT:  All right.  Fair enough.

17    MR. KILPATRICK:  Payment mechanism.  Since a

18 substantial portion of the response is devoted to what you

19 just asked about, whether they should be paid at all, I will

20 address that at a future time.  This motion was brought for

21 three primary reasons.  Number one, to ensure that there's

22 some transparency and integrity in the payment of the fees

23 and determination of what's reasonable.  The trustee's duties

24 are set forth under the indenture, and we have to determine

25 when those duties arose and provide a mechanism for the

1 independent review of the fees and expenses of the trustee

2 and its retained professionals.

3 THE COURT: Well, let me ask you this question.

4 Outside of bankruptcy or before bankruptcy, what was the

5 mechanism by which the reasonableness of the trustee's fees

6 were determined either before or after the trustee grabbed

7 them from the lockbox?

8 MR. KILPATRICK: It wasn't an issue. Under the

9 pre- -- the pre-petition arrangement between U.S. Bank and

10 the -- and DWSD was for payment of $20,000 per year per

11 system as a fee to the indenture trustee. There were no

12 professionals retained or employed by the trustee, so --

13 THE COURT: Okay. So the issue only arises because

14 of --

15 MR. KILPATRICK: The filing of the bankruptcy case.

16 THE COURT: -- what's happening in the bankruptcy.

17 Okay.

18 MR. KILPATRICK: That's correct.

19 THE COURT: All right.

20 MR. KILPATRICK: As I was just indicating, your

21 Honor, the trustee independently chooses counsel or other

22 professionals, employs those professionals, receives their

23 bills and then makes the decision whether to pay them or not.

24 This is totally unsupervised by anybody at this moment. The

25 second reason that we brought the motion was because we do

1   need something --

2          THE COURT:  So the trustee has a blank check.

3          MR. KILPATRICK:  Basically, yes.  They have the

4   ability to take any of the revenue that's received in the

5   lockbox, pay the bonds --

6          THE COURT:  Is this another bad deal that the city

7   made?

8          MR. KILPATRICK:  Pay the lockbox first, pay the

9   bondholders first and then proceed to pay the professionals

10  and itself, by the way.

11         THE COURT:  You think I'm going to let you get away

12  with not answering my question?

13         MR. KILPATRICK:  Are you asking if I would have

14  written the contract -- or the deal this way?  No, I would

15  not have.

16         THE COURT:  You could interpret it that way.

17         MR. KILPATRICK:  Yeah.  No, I wouldn't have written

18  the deal this way.

19         THE COURT:  All right.

20         MR. KILPATRICK:  So short of litigation, this is an

21  attempt to create a mechanism to potentially resolve any

22  issues that exist with the reasonableness and the propriety

23  of the fees, and also Mr. Fishman, if the Court rules in our

24  favor, is a very experienced mediator with a lot of -- he's

25  seasoned, and he's been a mediator, and he has a lot of

1   experience with dealing with these types of issues and will
2   be well-suited to address this.
3           THE COURT:  Why not just require the trustee to file
4   a fee application with the Court that complies with Section
5   330 of the Bankruptcy Code --
6           MR. KILPATRICK:  I think that that's part of the
7   plan itself.
8           THE COURT:  -- and our local rules?
9           MR. KILPATRICK:  I think that that's part of the
10  plan itself.  It sort of contemplates that as is currently
11  composed because they have to have an allowable claim to be
12  paid at confirmation, so at some point this Court is going to
13  end up addressing this issue.  Efficiency is the third
14  reason.
15          THE COURT:  So you interpret the plan to require
16  review of fees, even those fees that have already been paid,
17  not just those that will be paid after?
18          MR. KILPATRICK:  Absolutely.  Absolutely, your
19  Honor.  The restraints imposed by the Code on this Court are
20  imposed for the benefit of the city.  The city is requesting
21  your intervention in this matter.  We're not -- you're not
22  imposing it on us.  We're asking that this matter be ruled on
23  by this particular Court.
24          Efficiency.  This is the least expensive alternative
25  to avoid continual disputes before this Court because, as

1  you're indicating, there are multiple motions that I could

2  have brought.  I've been silent.  I've assisted where

3  necessary with the city's professionals to move this case

4  forward looking towards confirmation, but --

5            THE COURT:  Why did the department wait so long to

6  bring this issue before the Court?

7            MR. KILPATRICK:  Because we were --

8            THE COURT:  I mean you're already over $2 million

9  in; right?

10           MR. KILPATRICK:  No.  We were $900,000 in when we

11 broke off negotiations.  When we became aware that it was

12 $2.7 million in accrued fees, that's when we -- that's when I

13 met with my clients, and they decide -- they felt compelled

14 to bring this motion before this Court.

15           THE COURT:  Okay.  Again, this is a less expensive

16 alternative to bring these -- to review the fees and

17 expenses, and in the event that the Court is forced to

18 address these fees, I think -- and I think you will at some

19 point have to do so -- you will probably want the input from

20 your fee examiner.  In DWSD's views, the fees and expenses of

21 the trustee and his professionals should be proportionate to

22 the responsibilities under the indenture and proportionate to

23 the treatment contemplated under the plan for these

24 particular claims.  They should be appropriate given the

25 facts and circumstances of this case factoring in the ad hoc

1    committee, the insurers and the sophisticated investors with

2    experience and sophisticated counsel who are represented here

3    in this Court.  And above all, they have to be reasonable.

4    As I've indicated previously, these funds are deducted from

5    the system's revenues.  They're an unbudgeted item.  They are

6    $2.7 million.  We were informed that they were 2.7 million as

7    of February.  We don't know what they are now.  I'm sure

8    they're well in excess of that.  The trustee currently hires

9    whoever it decides to employ, then reviews and pays its bills

10   with the fees that it withdraws from the revenues that are

11   all ratepayers' monies.  These are exactly --

12             THE COURT:  How much do you think the fees should

13   have been instead of 2.7 million?  Don't have a number for

14   me?

15             MR. KILPATRICK:  I do.

16             THE COURT:  What is it?

17             MR. KILPATRICK:  About a third of that, I mean, you

18   know, if you want my honest opinion.  These are exactly the

19   types of fees and expenses that should be at least vetted

20   with the fee examiner as an initial phase before they're

21   addressed by this Court.

22             THE COURT:  Um-hmm.

23             MR. KILPATRICK:  And I think that was envisioned in

24   this order.

25             THE COURT:  If I read the trustee's paper correctly,

1    they agree to it prospectively, so the --

2            MR. KILPATRICK:  That's correct.

3            THE COURT:  So the issue is whether to run the fees

4    to date through the examiner process.

5            MR. KILPATRICK:  There are two issues.  They've

6    agreed to the professionals' fees being reviewed

7    prospectively.  We're asking that all fees -- currently the

8    bank, which was being paid $20,000 per year per system, which

9    was 40,000 total, is charging at the rate of in excess of

10   $500 per hour for the services of Lawrence Bell.  We feel

11   that those fees are --

12           THE COURT:  Lawrence?

13           MR. KILPATRICK:  Lawrence Bell.  He's an employee of

14   the bank.

15           THE COURT:  What does he do?

16           MR. KILPATRICK:  I have no idea.

17           THE COURT:  I'll ask him.

18           MR. KILPATRICK:  I have no idea, but he's -- we feel

19   that those fees --

20           THE COURT:  Is that more than $20,000 a year per --

21           MR. KILPATRICK:  It would be speculation, but --

22   because no information has been shared with us other than

23   what was disclosed back in October.

24           THE COURT:  So you don't even get an accounting of

25   the fees?

1     MR. KILPATRICK:  No, we don't.

2     THE COURT:  Oh, my.

3     MR. KILPATRICK:  We get a withdrawal.  We get a

4  self-help withdrawal out of the revenues that are ratepayers'

5  money from the systems.

6     THE COURT:  Well, that's a blank check without an

7  invoice.

8     MR. KILPATRICK:  That's exactly true, which is why

9  we're here today.  So, your Honor, there are two issues.

10  One, they did agree prospectively that the -- three issues.

11  They did agree prospectively that the fees would be subject

12  to review for its professionals.  We're asking that all fees,

13  anything that's charged hourly, be submitted to Mr. Fishman

14  for his initial review.

15     THE COURT:  Okay.

16     MR. KILPATRICK:  Okay.

17     THE COURT:  Thank you.

18     MR. KILPATRICK:  You're welcome.

19     MR. LEMKE:  Just a second, your Honor.  Good

20  morning, your Honor.  David Lemke on behalf of the U.S. Bank,

21  which is the trustee for the water and sewer bonds.  And,

22  your Honor, I heard your questions, so I am certainly

23  prepared to address the ones you've asked.

24     THE COURT:  All right.  Well, let's start with the

25  first one.  What in the Bankruptcy Code justifies the city

1  paying your client's fees?

2      MR. LEMKE:  Your Honor, I think there are two bases

3  for the city -- or it's actually the department having to pay

4  the fees and expenses out of system revenues.  If you look at

5  the -- if you look at the indenture and the ordinances and

6  the statute, the Bond Revenue Act, the city is mandated to

7  pay out of system revenues the operating expenses of the

8  systems.  The trustee's fees and expenses are operating

9  expenses of the system, so they have a statutory --

10      THE COURT:  What says that?

11      MR. LEMKE:  I'm sorry.

12      THE COURT:  What says that?

13      MR. LEMKE:  Well, I guess I wasn't prepared to have

14  that contested today because the city had not --

15      THE COURT:  Okay.  That's fine.  We'll reserve --

16      MR. LEMKE:  The city had not contested that.

17      THE COURT:  We'll reserve that for another day.

18      MR. LEMKE:  Okay.

19      THE COURT:  Fair enough.  Move on.

20      MR. LEMKE:  Okay.  And also I do think that if you

21  look at the bonds, the water sewer bonds as a secured claim,

22  they are clearly oversecured, and certainly the debtor's plan

23  treats them as oversecured.  The debtor's plan --

24      THE COURT:  I didn't quite hear Mr. Kilpatrick admit

25  to that.

1    MR. LEMKE:  I didn't hear Mr. Kilpatrick admit to it

2    either, but I would -- and your Honor can certainly ask

3    debtor's counsel, Jones Day --

4        THE COURT:  Assuming they're oversecured, does the

5    trustee or the bondholders, for that matter, have a security

6    interest in the cash that's used to pay the fees?

7        MR. LEMKE:  Let me explain it this way.  They do

8    under certain circumstances, but under other circumstances

9    they are actually an operating expense that gets paid before

10   the lien attaches, so if can explain that, so the ordinary

11   expenses, which are the ones that Mr. Kilpatrick was

12   referencing, the $20,000 a year, those were the ordinary

13   administrative expenses that got charged per each system

14   under the indentures prior to any sort of extraordinary

15   events occurring.  Once there was an extraordinary event,

16   which was -- really it began with the meeting in -- here in

17   Detroit in June with the emergency manager, then the trustee

18   had to start engaging in extraordinary measures rendering

19   extraordinary services, which is a term under the documents,

20   and had to engage counsel, which engaged us and our local

21   counsel, the Bodman firm.  So at that point the trustee then

22   was entitled in other documents and the indenture to pay the

23   extraordinary fees and expenses that it was incurring, which

24   is what led to counsel charging, and then eventually the

25   trustee, as we put forth in our papers, concluded it needed

1   to have a financial advisor because of the involvement -- its

2   involvement in the mediation and the other negotiations that

3   went on.  I certainly won't get into all of that with your

4   Honor, but the point is that's how this all came about.  So,

5   yes, the fees and expenses did go up or changed dramatically

6   from $40,000 a year, but that's because there was a lot more

7   that needed to be done.  As we laid out in our papers, the

8   minute this hit the press with the emergency manager's

9   proposed plan back in June of 2013 --

10          THE COURT:  Okay.  But I want you to circle back to

11  my question.

12          MR. LEMKE:  Okay.  I'm sorry.  I got off track.  Can

13  you repeat your question, your Honor?

14          THE COURT:  Does the trustee or the bondholders --

15          MR. LEMKE:  Oh, I'm sorry.

16          THE COURT:  -- have a security interest in the cash

17  that's used to pay the fees?

18          MR. LEMKE:  Okay.  So here's how the indenture

19  works.  I got to really explain it rather than just give you

20  a yes/no answer on that.  So the money comes into the

21  lockbox, as Mr. Kilpatrick explained.  Then those funds are

22  split up because the lockbox includes water and sewer

23  revenue, so then they get split into receiving funds, one for

24  the water system, one for the sewer system.  From the

25  receiving fund, the city tells the trustee how much it needs

1  in operating and maintenance -- for operating and maintenance

2  expenses.  The trustee transfers that money to the city.

3  Then the city makes the payment of operating and maintenance

4  expenses, which includes -- has been including to date the

5  monthly payments that it has been making to the trustee, so

6  the city, by agreement that was entered into back last year

7  early -- or in the fall of last year, was initially paying

8  $100,000 a month to the trustee out of each system, and then

9  it went to $150,000 a month.  Those amounts were coming out

10  of the operating and maintenance fund as operating expenses.

11  The trustee then used those funds to offset its fees and

12  expenses, including the professionals.

13          THE COURT:  Let's pin this down.

14          MR. LEMKE:  So it's not --

15          THE COURT:  Are you telling me that the city wrote a

16  check or that the trustee just took the funds out of the

17  lockbox?

18          MR. LEMKE:  The trustee can't take the funds out of

19  the lockbox, no.  The city -- I don't know if it wrote a

20  check.  I think it wired it or there was some internal bank

21  movement, but the city has to do that.  We cannot self-help

22  despite what Mr. Kilpatrick said, so the city made the

23  payments to the trustee and has been, and it continues to,

24  which it is obligated to do.

25          THE COURT:  How does the city know how much to pay?

1      MR. LEMKE:  It agreed to pay $100,000 a month, and
2  we agreed --
3      THE COURT:  100,000 a month is not $2.7 million.
4      MR. LEMKE:  It's not.
5      THE COURT:  How does the city know how much to pay?
6      MR. LEMKE:  We agreed that periodically the trustee
7  would advise the city, and up through November we did provide
8  invoices with -- or redacted invoices, I should say.  We
9  provided that up through November.  At that point, my
10  understanding was the city wasn't really reviewing those, and
11  it may have been an error on our part not to continue
12  providing those, which we are happy to continue providing,
13  but the point is there was going to be -- always going to be
14  some sort of a, quote, true-up, which is after a certain
15  period of time, we committed to revisit with the city -- or
16  with the department really, with the department, what the
17  trustee's actual fees and expenses were up through a certain
18  period of time and whether or not those payments that were
19  coming out of the systems was covering all of them, and they
20  did cover all of them until fairly recently.  And when we
21  recognized that those funds that were being paid monthly were
22  not going to cover all of the trustee's fees and expenses,
23  especially those going forward, we notified Jones Day and
24  said there is going to be a shortfall.  The city --
25  department will continue making the -- what is a total of

1   $300,000 a month.  We will continue doing what we've been

2   doing, but we will then expect that at some point in the

3   future, whether it's at the confirmation, the effective date,

4   or a distribution date, the true-up would occur, and to the

5   extent we had a delta, that would need to simply be paid as

6   the claim, part of the allowed claim of the trustee and the

7   bondholders.

8         THE COURT:  How much do you contend you should have

9   been paid by now?

10        MR. LEMKE:  I don't have a definitive amount.  Hold

11  on just a second.

12        THE COURT:  Okay.

13        MR. LEMKE:  Oh, shoot.  This is not the right chart.

14  I'm sorry, your Honor.  I don't have a definitive amount, but

15  it is in excess -- I believe it would be in excess, if we

16  just stopped the clock today, the amounts that the trustee

17  has incurred for itself and professionals would be in excess

18  of the amounts the city has paid by a couple hundred thousand

19  dollars, in the hundred -- you know, the multiple hundred

20  thousand dollar range, but not -- I don't think it's a half

21  million, and I certainly don't think it's above that, but

22  given what is going on in the case and given the role that

23  the trustee needs to play, it's its obligation to play in

24  connection with this case as the trustee, we do anticipate

25  that that delta may continue to increase because we know what

1  is involved in terms of getting ready for the confirmation

2  hearing, you know, between now and mid-July or whenever -- if

3  it gets reset, whenever it gets reset to, so we're -- that

4  was the reason we tried to bring it to the city's attention

5  was there's going to be this issue.  And we did not want

6  there to be a big "got you" at the end of the case and say,

7  "Well, here's the delta."

8          THE COURT:  Well, but what's the mechanism you

9  foresee by which the issue of whether the fees you are

10 requesting or have been paid is reasonable or have been

11 reasonable will be determined?

12         MR. LEMKE:  Well, here's what we had proposed was

13 that we would submit the redacted invoices to the department,

14 all of the professionals and the trustee's redacted invoices,

15 and we would not redact them heavily.  We would do it at a

16 bare minimum to keep privilege and work product safe, but,

17 you know, if there was an issue with the level of the

18 redaction, then we would try to work with them, but the point

19 was we would submit those.  If they had an issue, we would

20 try to work it out, and if we couldn't, then ultimately they

21 do have the right to go to court, whether it's to come to you

22 or some other court with jurisdiction, and contest the

23 reasonableness of the fees.  We didn't believe it would get,

24 frankly, to this point, but it has.  And when we submitted --

25 like I said, when we submitted the invoices back in late

1  November, early December, where we had gone through and
2  gathered up what we had done to date and submitted the
3  redacted, we got nothing back from them, no response, no --
4  and I believe, if I'm not mistaken, the fact is they didn't
5  really look at them because the idea was they really wanted
6  us to cap our fees and expenses, which the trustee simply
7  cannot do, your Honor.  It has a fiduciary duty to these
8  holders to make sure it exercises the duties and the powers
9  that have been put upon it by the ordinances and by the
10 indenture.  You also asked me about the lien.
11      THE COURT:  Holders are holders who are perfectly
12 capable of defending their own interest in this case.
13      MR. LEMKE:  Well, you know, your Honor, that may be
14 true of the ad hoc committee, which consists of five holders
15 that comprise about a billion dollars of bonds, and that's
16 not an insignificant amount, but they're not a majority, and
17 there's certainly another 4.7 billion of bondholders out
18 there who are not otherwise in court represented.
19      THE COURT:  But they could be?
20      MR. LEMKE:  Well, some of them probably could.  As a
21 practical matter, some of them probably could not.  But the
22 fact is when the city entered into these transactions and
23 issued these bonds, the statute requires that a trustee be
24 appointed.  The ordinances require that a trustee be
25 appointed to make sure the city complies with its obligations

1  under the indenture, so it's part of the deal, as you alluded

2  to earlier.  It is not a bad deal for the city.  It is the

3  deal the city entered into, and the trustee has that role.

4  It has the job to make sure that the --

5         THE COURT:  It wasn't a bad deal to enter into an

6  agreement which gave the trustee a blank check?

7         MR. LEMKE:  See, and I would respectfully disagree

8  with your characterization of it being a blank check.  It is

9  not.  They have to be reasonable.  If the --

10         THE COURT:  All right.  Let's pause there.  Wouldn't

11  the law impose on you and your client the burden of

12  establishing the reasonableness of the fees?

13         MR. LEMKE:  I would disagree with that, your Honor.

14  I think the presumption -- and I'm not going to point to a

15  place on the document that says that, but I think the

16  presumption should be if the trustee is exercising the duties

17  given to it under the indenture -- and we laid out for your

18  Honor in our pleadings some of -- on a summary basis some of

19  the things we have had to do on behalf of the holders, I

20  don't think any of those things could be argued as were

21  unnecessary.

22         THE COURT:  That's a different question.

23         MR. LEMKE:  Okay, but -- so we're doing that.  If

24  we're doing those --

25         THE COURT:  The question is not whether you've met

1    that burden.  The question is whether you have that burden.

2    Is there any case law anywhere that says that when a contract

3    obligates a party -- one party to pay the reasonable fees of

4    the other party, the party who wants the fees doesn't have

5    the burden to show the reasonableness of those fees?

6              MR. LEMKE:  Your Honor, I am not prepared to respond

7    to that today, and I apologize, but I certainly --

8              THE COURT:  All right.

9              MR. LEMKE:  -- can and will at a later date.

10             THE COURT:  No apology needed.

11             MR. LEMKE:  So the point is they are not without

12   recourse, so if, in fact, the fees and expenses were

13   unreasonable, yes, we did see it as it would be incumbent

14   upon the department if they felt like the fees were

15   unreasonable for whatever reason, they would come to us first

16   obviously and then come to your Honor if necessary, and we

17   have tried to --

18             THE COURT:  Why not require your fees and the fees

19   of the employee of the bank to be subject to the fee examiner

20   process even retroactively?

21             MR. LEMKE:  Well, as we've conceded, this is an

22   issue that we think should go away with simply allowing us to

23   go ahead and present to the fee examiner.  We did take the

24   position that we shouldn't be required to do that, but we're

25   agreeing to do it.  And I don't necessarily -- and I don't

1   necessarily want to argue that point, but here's why we
2   didn't think it was reasonable for us to go back
3   retroactively, and that is the department has sat on this for
4   11 months.  Now, granted, they raised the issue in November.
5   We exchanged communication.  We set out in very clear
6   language that we were -- what our position was and that we
7   were not subject to the fee examiner.  I don't think anybody
8   argues that we are unless and until your Honor amends the
9   order and says that we are, and we proceeded along the course
10  of action we thought we had agreed upon.  They submitted the
11  funds every month.  We paid our fees and expenses.  We
12  notified them that that wasn't going to be sufficient.  And
13  without even having the conversation with counsel for the
14  department about it, the motion got filed, and we've
15  responded to it.  So it's going to be a fair amount of burden
16  on our part to go back and look at all the invoices.  We've
17  tried to do our invoices the same way that we suspected
18  debtor's counsel has been doing and all the others subject to
19  the fee examiner, but we'll have to make sure.  We've tried
20  to do that.  We tried to be careful about that.  That's going
21  to take some time and effort.  The fee examiner -- I don't
22  know how long it will take him to examine 11 months of fees
23  and expenses, but that will be an additional expense to the
24  city.  What we thought was a better approach would be we will
25  submit the redacted invoices for those months prior to the

1   time we start submitting to the fee examiner, to the

2   department.  If they legitimately have an issue with any of

3   the work that was done, again, we will try to address it with

4   them without the need for either your Honor or the fee

5   examiner, or maybe at that point those issues alone that

6   they've identified will go to the fee --

7           THE COURT:  Mr. Kilpatrick has already told the

8   Court he wants to cut your fee by two-thirds.

9           MR. LEMKE:  I know.  Made me break out in a sweat

10  back there.

11          THE COURT:  Good.

12          MR. LEMKE:  Well, your Honor, I'm not trying to be

13  flippant.  I'm not making light of the fact that it's 2.7 or

14  whatever the number is now and that it's going to go up.  It

15  is, and it is a fair amount of money, and it's, you know --

16          THE COURT:  It's $3 million.

17          MR. LEMKE:  It is three million and probably

18  climbing.  I'll be -- you know, to be honest, it will

19  probably go above that if we go through the full-blown

20  litigation of the confirmation hearing, and I'm not taking

21  that lightly, but I want to put it into some context.  What

22  the trustee has had to do on behalf of the holders -- again,

23  we don't think anything we have done has been something that

24  was not required, certainly not something that the ad hoc

25  committee has wanted us to do, the insurers have wanted us to

1  do.  We have tried to coordinate with them.  And then we get

2  calls, inquiries, whatever, from the other holders who are

3  not in the courtroom asking us what we're doing, what we're

4  going to do about this.  We've tried to provide them with

5  notice, communication.  Your Honor knows we've filed

6  pleadings occasionally in court taking positions on certain

7  issues, tried to be judicious in when we appeared in court

8  and when we took positions.

9          THE COURT:  You're arguing the reasonableness of

10  your fees.

11          MR. LEMKE:  Yes.

12          THE COURT:  That's not before me today.

13          MR. LEMKE:  Okay.

14          THE COURT:  What does the fellow who works for the

15  bank do for $500 an hour?

16          MR. LEMKE:  I'm going to introduce your Honor --

17  your Honor, Larry Bell -- so this is Larry Bell.

18          THE COURT:  Mr. Bell, would you step forward,

19  please?  Can you describe for the Court what you do for $500

20  an hour?

21          MR. BELL:  For one thing, I -- my name is Lawrence

22  J. Bell.  I'm a vice president with the bank.  And one of the

23  first things I would do is try to understand what the problem

24  is.  I work on troubled transactions on a full-time basis for

25  the bank.  And among my early duties would be the retention

1   of counsel and reviewing whatever the situation is to

2   determine what kind of role the bank should play and spent

3   quite a bit of time on that and also spoke with a number of

4   bondholders, and it's not just institutional holders.  I

5   think the Court may have a -- not a full view of who the

6   bondholders are.

7           THE COURT:  No.  I get that there are individuals

8   and institutions.  I get that.

9           MR. BELL:  There are many --

10          THE COURT:  Probably many more individuals than

11  institutions.

12          MR. BELL:  That is the case.

13          THE COURT:  But there's nothing about our process

14  that prevents any of them from having their interest

15  represented here --

16          MR. BELL:  That is true.

17          THE COURT:  -- on their own.

18          MR. BELL:  But it's too costly for them to do so.

19  At least that is what they tell me.

20          THE COURT:  Okay.  And at some point I suppose we

21  could have an argument about whether that by itself justifies

22  transferring the cost to the city, which is what you and your

23  lawyer are arguing here.

24          MR. BELL:  Well, I believe under the indenture, your

25  Honor, that that's our job.

1     THE COURT:  Yeah; right.

2     MR. BELL:  We do this on many bond issues.

3     THE COURT:  Your lawyer is arguing that for you.

4     MR. BELL:  Got that.

5     THE COURT:  All right.  How did you arrive at $500

6 an hour?

7     MR. BELL:  That is something I have probably 20

8 peers that do the same kind of work around the country, and

9 we all charge the same amount.  It's a blended rate that we

10 charge.

11     THE COURT:  Peers.  You mean at the bank or among

12 competitors?  What are you talking about?

13     MR. BELL:  I'm talking about at the bank.

14     THE COURT:  At the bank.  Okay.  Thank you, sir.

15     MR. BELL:  And our competitors also charge in a

16 similar fashion.

17     THE COURT:  Thank you, sir.  You're all set.  Thank

18 you for that introduction.

19     MR. LEMKE:  You're welcome, your Honor, so -- and I

20 think what Mr. Bell alluded to is it's not unusual.  In fact,

21 it is common in the industry for indenture trustees like U.S.

22 Bank to charge -- for their extraordinary fees and expenses

23 to charge an hourly rate, and I suspect that the bank's fees

24 and expenses -- the rate is --

25     THE COURT:  So your position is that his $500-an-

1  hour fee is included within the definition of extraordinary

2  expense?

3          MR. LEMKE:  It is.  It's an extraordinary fee of the

4  trustee.

5          THE COURT:  Extraordinary fee.

6          MR. LEMKE:  And then expenses that he would now be

7  incurring would be --

8          THE COURT:  The bank would incur his salary even if

9  this case had never been filed?

10          MR. LEMKE:  Well, they would, your Honor, but the

11  bank is compensated for acting as the trustee, which the

12  department not only chose --

13          THE COURT:  So there's no out-of-pocket expense

14  resulting from Mr. Bell's work on this case, is there?

15          MR. LEMKE:  There shouldn't be honestly, your Honor.

16  He is -- he and the bank are entitled to be compensated.

17  That is how they make their money as trustee.  They do not

18  have a financial stake.  They don't invest in these bonds.

19  They don't get a rate of return on these bonds.  This is not

20  a bank loan where they're receiving interest.  They are a

21  trustee.  They perform a service.  Prior to an event of

22  default or some extraordinary event, the service is for the

23  city or the department, and they are compensated for that.

24  Once there's an extraordinary event, the trustee's duties

25  shift a little, and they're looking out for the interest of

1   the bondholders, but under the documents, under the statute,

2   the department is obligated to continue paying the trustee's

3   extraordinary fees and expenses as an operating and

4   maintenance expense.  If it's not an operating and

5   maintenance expense, there is a provision in the indenture

6   that says they -- the trustee has a lien on the net revenues

7   for payment of fees and expenses after payment of debt

8   service on the bonds and some of the other funds in the

9   bonds, so either way -- excuse me -- either way the trustee

10  would be paid, but I think the city -- or the department has

11  said, and we agree, that really the fees and expenses we're

12  talking about here today are the type that would be paid as

13  extraordinary fees and expenses above the waterfall, if you

14  will, to use a colloquialism.

15          THE COURT:  All right.  Thank you.

16          MR. LEMKE:  Thank you, your Honor.

17          THE COURT:  Does anyone else want to be heard on

18  this matter?

19          MR. NEAL:  Good morning, your Honor.  Guy Neal,

20  Sidley Austin, National Public Finance Guarantee.  National

21  is one of the bond insurers for DWSD bonds.  They are subject

22  to the same indenture, same bond ordinance, and do have a

23  right to recover their fees, but -- and we reserve our right

24  in that regard.

25          I rise to make two brief points.  First, in the

1   city's joinder, the city says that professional fees that
2   DWSD should be required to pay should be subject to the fee
3   examiner process.  As your Honor noted, there's the
4   reasonableness of fees as well as the entitlement under law
5   of the fees.  One of the central issues in our plan objection
6   is whether or not the city's professional fees and the fees
7   of their lawyers and their advisors can be charged to the
8   system, number one, and the amount of those fees.  That
9   number may be about $20 million, hasn't been established yet,
10  but that's what we are hearing, that the city is trying to
11  transfer $20 million worth of fees to DWSD.  We reserve our
12  right to challenge that number and the appropriateness of the
13  allocation in general.  I rise to make that point because
14  Mr. Kilpatrick's proposed form of order has a reservation
15  baked into it that the DWSD can challenge the reasonableness
16  of fees charged to DWSD, and, your Honor, I would submit it
17  would be more appropriate to broaden that for all parties
18  with an economic stake in the DWSD reserve the right to
19  challenge fees that are allocated to DWSD, again, using that
20  $20 million number as but one example.  Thank you.
21          THE COURT:  Thank you.
22          MR. KOHN:  Good morning, your Honor.  Samuel Kohn of
23  Chadbourne & Parke on behalf of Assured Guaranty.  We are
24  also similarly situated as National where we insure close to
25  $2 billion of the water and sewer bonds.  There are documents

1 in insurer protection documents that provide for fees. Your

2 Honor asked, for instance, what could be the Bankruptcy Code

3 basis for paying fees. You know, if there are a lien, if

4 there are pledged revenues, then 922(d) protects those

5 pledged special revenues in bankruptcy, but that could be for

6 another day. As far as the insurer fees, we had worked out

7 with the city that there is a provision in the plan that, to

8 the extent that they are allowed, fees and expenses, pursuant

9 to the documents and to the extent that they're allowed in

10 some process that is not determined yet in the context of

11 confirmation, that's how we expect that we would get

12 reimbursed at the end of the day. So to the extent that the

13 order has such important language, which we'd like to take a

14 look at that order before it is entered so that it could

15 comply with the provisions of the plan as it exists today.

16 Thanks.

17          THE COURT:  All right.

18          MR. FISHMAN:  Good morning, your Honor.  Robert

19 Fishman.  I'm the fee examiner appearing on my own behalf.  I

20 do not have any position whatsoever with respect to whether

21 your Honor should require the trustee to submit any of its

22 fees and expenses to me for my review.  I merely wanted to

23 appear this morning to make sure that if your Honor had any

24 questions about my aspect of how that might work, I would be

25 here to answer it.  And to the extent that your Honor does

1   ultimately decide, if you do, to have them submitted, then I
2   wanted to participate in the line drawing of just how and
3   when this would happen because it's not a simple task.  It's
4   something we certainly can handle, but I would want to
5   participate in figuring out how best to accomplish that task,
6   so I wanted to be available to answer any questions you might
7   have in the event that you had any.
8          THE COURT:  Well, I'm inclined to grant the relief
9   that the department seeks here.  Let me ask your guidance on
10  what you think the most efficient process would be to do this
11  catch-up work.
12         MR. FISHMAN:  Well, your Honor, we've had a couple
13  of professionals added to the process as we've gone along,
14  and so we confronted the catch-up aspect of this a couple
15  times, although I don't think any of the additions have been
16  quite of this magnitude.  $3 million of fees is a pretty good
17  stack of paper, and it would take more than a few minutes to
18  go through and review it.  What I would try to accomplish,
19  your Honor, is to get the current fees into the process on a
20  current basis as quickly as possible to try to not wait to
21  get all of the past due fees at once but, rather, to ask them
22  to sort of make a rolling production starting back in July
23  because it makes the most sense to read them sequentially,
24  and I would certainly work with them in helping them to
25  understand what I might ask them to do to the physical

1  presentation of their invoice, so I might ask them to send me
2  one or two, go over it with them, make some suggestions,
3  which I mean, as we all understand, I have no remedial power,
4  so people can take my suggestions or ignore my suggestions,
5  and all I'm able to do is file a report and share my views on
6  what was reasonable and what wasn't reasonable.  I don't
7  think it's at all an insurmountable task.  It will take a
8  little bit of coordination and a little bit of time, but
9  we'll certainly be able to catch up to the current period of
10 time, depending on how long it takes them to get us the
11 invoices, but certainly within 30 or 45 days after receiving
12 the invoices, we should --
13          THE COURT:  Okay.
14          MR. FISHMAN:  -- we should be able to turn our work
15 product around.
16          THE COURT:  Of course, you'd be willing to work with
17 counsel in fashioning an appropriate process.
18          MR. FISHMAN:  Yes, your Honor.  I mean we have a
19 process.  It may not be exactly what would be required for
20 this context, and so to the extent that it needs to be fine-
21 tuned in some respect to address the idiosyncracies of this
22 particular relationship, I'm sure that we can do that.  I'm
23 not wedded to any particular result, and, therefore, if we
24 sit around a table and talk about it, I'm sure we'll be able
25 to come up with the right criteria to make the process work

1  as efficiently as possible.

2          THE COURT:  All right.  Thank you.

3          MR. FISHMAN:  Thank you.

4          THE COURT:  Well, I can start with this observation.

5  It was certainly the Court's intent when it entered the

6  original fee examiner order that all fees for which the city

7  is responsible would be subject to the fee examiner process,

8  and the Court certainly had in mind any such fees for which

9  the city was responsible to pay to the professionals of

10 creditors.  It appears to the Court, therefore, that the

11 issue is before the Court -- before it only because the

12 Court's intention in this regard wasn't clear enough in the

13 order that it entered, which is unfortunate.

14          In this regard, the Court will note that there's

15 even more cause for some kind of independent review of the

16 fees of a creditor or the fees that a creditor incurs because

17 unlike a professional for the city who the city can fire if

18 they don't like their fees, the city can't fire the

19 professionals of a creditor, so there isn't that built-in

20 incentive on the professional's part to control fees when a

21 professional's fees are paid by an opposing party.  So in the

22 circumstances, the Court concludes that this fee examiner

23 order should be clarified to make it clear that this

24 trustee's professional fees and the fees of the trustee also

25 are subject to the fee examiner process.

1         Now, having said that, the Court reserves for

2 another day whether the city is liable for these fees at all,

3 and when I say "the city," of course, I mean the department

4 or the city. This is a matter of concern to the Court, as my

5 questions reflected, but which understandably counsel was not

6 prepared to deal with today. So it also should be clear that

7 to the extent the fee examiner process results in a fee that

8 the city or the department still concludes is not a

9 reasonable fee, this Court retains the ultimate authority to

10 determine that issue as well. And I think that either party

11 who would seek a Court determination on the issue of

12 reasonableness can file the motion, and as part of that

13 process, we can decide who has the burden on the issue of

14 reasonableness. So the Court will prepare an appropriate

15 order and at the same time encourage and instruct counsel for

16 the city and for the trustee to meet and confer with the fee

17 examiner for the purposes of fashioning an appropriate

18 process or fine-tuning the process that exists for the review

19 of other fees by the fee examiner. Anything further on this?

20         MR. KILPATRICK: Thank you, your Honor.

21         THE COURT: All right. That's all on that one then.

22 One more second, please. Let's turn our attention to the

23 letter that the Court received from Mr. Lerner on

24 Ms. Kopacz's behalf.

25         MR. LERNER: Good morning, your Honor. Stephen

1  Lerner of Squire Sanders on behalf of Marti Kopacz, the
2  court-appointed expert.  Your Honor, thank you for the
3  opportunity to appear today.  Ms. Kopacz, as the court-
4  appointed expert, felt that it was prudent to inform the
5  Court of certain concerns regarding her ability to fulfill
6  her duties by the current deadline of June 24th, which is the
7  date for her to submit her expert report.  As we outlined in
8  the letter to your Honor last Friday, among the materials
9  that she had not received included a fully functioning
10  model -- in fact, two models, one, the base case model and,
11  second, the model that underlies the plan of adjustment --
12  which she needs in a fully functioning format in order to do
13  the relevant analyses to render her expert opinion.
14          In addition, it is her view that there are a variety
15  of items that as of yet are unreconcilable among the various
16  models, and it may help to explain that.  As we understand
17  it, there's a base case model, which E&Y prepared.  There are
18  restructuring and reinvestment initiatives which the city
19  will include in its plan of adjustment from which you then
20  have the model that underlies the plan.  Those do not
21  reconcile with one another, and that reconciliation is
22  critical to Ms. Kopacz's ability to fulfill her duties.
23          We have received the models.  We got those on
24  Friday.  We've discussed with Jones Day the need for further
25  follow-up.  I believe, as we are sitting here today, there is

1  a call going on between Ms. Kopacz's team and folks at E&Y to

2  begin that process, but there are other pieces of

3  information, including this reconciliation, which was not

4  part of the response that counsel for the city included to

5  our letter.  That is still outstanding.  So as we sit here

6  today, there are certain material pieces of information

7  without which Ms. Kopacz is concerned that she cannot fulfill

8  her duties by June 24th, and that's the reason we wanted to

9  bring this to your attention so that there's no surprise.

10        THE COURT:  Okay.  So what else besides this

11  reconciliation, please?

12        MR. LERNER:  There are a variety of pieces of

13  information which have been provided to the city.  I would

14  categorize some of these as more material than others.  They

15  include information regarding the negotiations on the

16  collective bargaining agreements, a variety of revenue and

17  expense information regarding prior years in order to

18  understand whether future years are reasonable, information

19  regarding the status of sale of certain assets that are

20  contemplated by the plan, a number of personnel-related

21  items, for example, the head count of various departments --

22  one can't determine feasibility of a plan unless one knows

23  exactly who is to be retained -- and certain other

24  department-level pieces of information.  Some of these

25  requests are recent.  I don't -- I mean we're not here to

1    cast aspersions on the city or the professionals.  It's
2    simply that there is information that needs to be
3    forthcoming.  We're sure that the city is working on that,
4    but the point is that --
5              THE COURT:  Well, let me just ask you then what
6    specifically would you like me to do or say to the city about
7    the situation other than to encourage the city to provide the
8    information requested as promptly as possible because that's
9    in their best interest?
10             MR. LERNER:  Right.  I doubt the city needs
11   encouragement to provide the information, and, as I say, I'm
12   not aware of any piece of information that the city has been
13   requested to provide that they've refused to provide.  It's
14   more informing the Court.  We understood also that last week
15   there was a status conference we didn't participate in where
16   the Court is being asked to push out certain dates in the
17   schedule, and part of the reason for sending the letter when
18   we did was part of that process includes the expert's report.
19   We didn't want the Court to contemplate the broader schedule
20   without understanding that there are concerns regarding
21   Ms. Kopacz's report.
22             THE COURT:  All right.
23             MR. LERNER:  So I don't think there's a need for
24   encouragement.  I think the Court -- it's important for the
25   Court to know, for example, if all the information were

 1    obtained today, which it won't be, Ms. Kopacz estimates that
 2    she probably needs another week or two in order to complete
 3    her report.  It's hard for her to estimate exactly how much
 4    potential additional time she needs without knowing
 5    exactly --
 6              THE COURT:  You mean beyond the 24th?
 7              MR. LERNER:  Yes.  So it's really more to assist the
 8    Court in fashioning whatever relief your Honor decides with
 9    respect to the schedule.  We will continue to work with the
10    city and its professionals to try to get the information we
11    need and resolve any further issues.  Thank you.
12              MR. STEWART:  Good morning, your Honor.  Geoffrey
13    Stewart, Jones Day, for the city.  I don't disagree with
14    anything Mr. Lerner has said.  Ernst & Young has been trying
15    to get as much as it can to Ms. Kopacz and others.  It has
16    many pressures on it.  The reason I'm standing up is, first
17    of all, to simply apprise the Court of what has been done
18    very recently and, second, to make a proposal to extend to
19    all financial advisors, not just Phoenix, the informal
20    cooperation E&Y has been giving because the materials E&Y
21    have produced are quite large and are very complicated, as
22    you would expect.
23              THE COURT:  Um-hmm.
24              MR. STEWART:  And so, first of all, let me inform
25    you what's happened.  The fully functional model was produced

1  to everyone on Friday, and that is a set of spreadsheets that

2  are interlocked with a formula to connect them, and the

3  reason it wasn't done sooner was that there were certain

4  worksheets in there that had mediation materials, and we

5  needed to pull those out for the reasons the Court is all too

6  familiar with.

7       THE COURT:  Yes.

8       MR. STEWART:  And that disrupted the formulas.  They

9  had to be reprogrammed into the spreadsheets so the one we

10 turned over actually worked, so that's why that was Friday.

11      Last night we produced the so-called binder, which

12 is a very large set of electronic files that contains the

13 supporting information for the model.  And if one were to

14 think of this as a pyramid, the apex are the forecast, the

15 model is the middle level, and the binder is the lower level.

16 It goes without saying anything we are asked of that E&Y has

17 that Ms. Kopacz wants she will get, and that's not an issue.

18 Some of the things Mr. Lerner referred to really come from

19 other parts of the city and not E&Y, but that doesn't change

20 our response.

21      What I would like to propose, though is this.  I

22 know that in the status conference one of the things that

23 would be discussed is the deposition of E&Y representatives,

24 which is fine.  I think, though, we'll move the process along

25 if we can come up with a means of informally having meetings

1   between E&Y and the financial advisors for the objectors,

2   which we could start tomorrow or do later in the week or as

3   soon as we could organize it.  I'd like for them to be off

4   the record in the sense the mediations were off the record so

5   that there can be a free exchange of ideas.  This will allow

6   the financial advisors for the objectors to come up the

7   learning curve more steeply.  It will avoid delay, and,

8   frankly, this is something they should know anyway.  So I

9   think all I would ask for from the Court is some indication

10  that such meetings would be -- whatever was said in them

11  would not be subject to any collateral use so that everybody

12  could speak freely, and thereafter I would encourage the

13  objectors' counsel to contact me, and I will set up meetings,

14  and there can be more than one.  I think they ought to be

15  face to face, and the advisors can show up and ask E&Y and

16  work through the model so they don't have to guess how it was

17  put together.

18          THE COURT:  Well, that's a generous offer.  I thank

19  you, but the question remains what do I do about the

20  representation that Ms. Kopacz is going to need an additional

21  week or more beyond the deadline that I set assuming even

22  that all the information she requests but doesn't have is

23  provided today, which probably won't happen?

24          MR. STEWART:  Right.  I can't be inside of, you

25  know, what her work is looking like.  I think that really

1 | becomes an issue --

2 | THE COURT:  Well, I have to take that representation
3 | at face value.

4 | MR. STEWART:  Right.  Well, your Honor, this is
5 | complex.  There's no two ways about it.  I don't disagree
6 | with that at all.  I've looked at this model.  I've listened
7 | in on the meetings between Phoenix and E&Y.  I'm not trying
8 | to minimize at all Ms. Kopacz's concern about the complexity
9 | because it is complex.  I do think, though, that if her work
10 | is confined to testing the reasonableness of the city's
11 | assumptions and the manner it went about doing things, that
12 | is not quite the same as having to create a competing model
13 | or model of her own.  I can't say whether she should or
14 | should not have more time.

15 | THE COURT:  Well, but, again, I have to defer to her
16 | professional judgment on how she's going to answer the
17 | question of whether the city's plan is feasible or not.

18 | MR. STEWART:  And, your Honor, I have to as well.

19 | THE COURT:  It's not for me to tell her how to do
20 | that.

21 | MR. STEWART:  Nor can I.  If that is her
22 | representation, I have no means of gainsaying it, nor do I
23 | wish to.

24 | THE COURT:  All right.  All right.  Thank you.  Can
25 | you make any representation to the Court and Ms. Kopacz as to

1    when she will get the material, the balance of the material

2    she says she needs?

3              MR. STEWART:  I got the list from Mr. Lerner only

4    last night and have not even been able to open it because

5    I've been traveling.  I think the binder may well have much

6    of the information, but I will look at it today, and we will

7    get it to her as quickly as we can, which usually has been a

8    turnaround time of less than a few hours.

9              THE COURT:  All right.  Then I'm going to propose --

10   Mr. Lerner, I'm going to propose that you and your client and

11   Mr. Stewart and I get on the telephone on Monday and see

12   where we are.  Any objection to that?

13             MR. STEWART:  No.  That's fine, your Honor.

14             MR. LERNER:  Thank you, your Honor.

15             THE COURT:  All right.  We'll set up a time and a

16   call-in number and advise you.  All right.  Give me one more

17   second, please.  Mr. Bennett, I am intrigued by your

18   suggestion that we go through our discussion of the factual

19   issues in the case before we have our discussion about where

20   we stand and what we still need regarding documents and then

21   move to witnesses, et cetera.  It makes sense to me, so let's

22   do that.

23             MR. BENNETT:  Thank you, your Honor.

24             MR. SCHWINGER:  Your Honor, may we be heard on this?

25   Others do not share Mr. Bennett's view.

1      THE COURT:  So we're going to have an argument about
2  what the order of proceeding is going to be?
3      MR. SCHWINGER:  It's up to your Honor, obviously.
4      THE COURT:  All right.  I'll give you one minute.
5  Go ahead.
6      MR. SCHWINGER:  Robert Schwinger from Chadbourne &
7  Parke for Assured Guaranty.  Very simply, your Honor, the
8  Court set out a procedure here to make the discovery run in
9  an orderly fashion.  Requests were propounded.  The city put
10  forth their written objections.  We had a hearing on May 11th
11  and then on May 12th and then on May 15th to discuss those
12  objections.  Now that the city's production or deficiencies
13  in production are being put under a microscope, which is what
14  this hearing and last week's hearing were about, the city now
15  wants to come in with new legal arguments to explain why,
16  well, maybe the matters that were asked for really aren't
17  needed after all.  That's what we should have been dealing
18  with weeks ago, and it seems to me that it seems to be a
19  back-door attempt to avoid having to deal with troublesome
20  areas of deficient discovery production by essentially
21  reopening and giving the city a second bite to start
22  rethinking what's relevant and what's not to its case.
23      MR. BENNETT:  Your Honor, may I respond briefly?
24      THE COURT:  One second.  Look, the thrust of my
25  efforts at each of these conferences, of which we've now had

1   a series, is to try to make the discovery process and also

2   the trial process as efficient as possible, and I think that

3   Mr. Bennett's suggestion is more in line with that ultimate

4   goal, so let's proceed that way.

5           MR. BENNETT:  Thank you, your Honor.  We prepared

6   and transmitted to the members of the discovery committee --

7   it's got a fancy name -- I forgot it already -- but to the

8   discovery committee our effort at a list of factual issues.

9   I tried to give hard copies -- there was some slight

10  formatting adjustments -- to the people I recognized this

11  morning.  I have a few extra copies, and I don't know -- does

12  your Honor have enough for your staff, or do I need --

13          THE COURT:  Did we just get the one copy?

14          MR. BENNETT:  I don't know what was delivered to

15  you, so --

16          THE COURT:  Do we have -- do you all have copies of

17  this?

18          MR. BENNETT:  Okay.

19          THE COURT:  It would help us if you could --

20          MR. BENNETT:  May I approach, your Honor?

21          THE COURT:  Yes.  Thank you.

22          MR. BENNETT:  And I have a few extras if there's

23  anybody here --

24          THE COURT:  Anybody else in the courtroom want a

25  copy?  I see a few hands.

1          MR. BENNETT:  So here's a couple of extras.

2          THE COURT:  Anybody else?  All right.

3          ATTORNEY:  Your Honor, I have a couple extras as

4     well if anybody else needs them.

5          THE COURT:  And you've got a customer just to your

6     left there.  Thank you for that offer, sir.

7          MR. BENNETT:  Okay.  So I want to just make a few

8     introductory comments about the whole document.  First of

9     all, this does not contain all issues.  I tried to extract

10    all the purely legal issues.  Some stayed in.  We'll go by

11    them and cross them out where we need to.  In addition, there

12    are a number of factual issues that I don't expect to be

13    controverted, and so I didn't include them.  For example,

14    there will be -- we will probably hopefully wholly through

15    declarations establish voting, what the results of the voting

16    is, and matters such as that.  And there are a series of

17    other confirmation elements that we will deal with I hope in

18    the form of declarations without the need for testimony.  I

19    think, based upon the pleadings that have been produced to

20    date and what I've been hearing in the courtroom, that each

21    of the issues on this presentation, which, unfortunately,

22    runs -- there's some space that people can take notes, but

23    runs roughly 11 pages, every single issue is controverted,

24    and so if I'm wrong about that -- and I hope that I am --

25    then obviously this will shrink, and the number of witnesses

 1  will shrink, but as things stand right now, I think that

 2  someone controverts something all over the place.

 3          The other request that I would make of everyone

 4  while they're here today is that if we've missed an issue

 5  that is controverted that should be on this list, people

 6  should let me know.  I didn't intend to leave anything off.

 7  I want it at the end of the day --

 8          THE COURT:  Okay.

 9          MR. BENNETT:  -- to be complete, and I suspect that

10  the order of things may well change to have an appropriate

11  development.  So with that, let me take a quick run through

12  it and explain some things about some points.  I think a lot

13  of it is self-explanatory.  So page 1 is focusing on the

14  revenue side, and it's about revenue streams and revenue

15  assumptions and where they came from.  And I think obviously

16  it feeds into lots of legal issues, which is why it's

17  separate and in front, and we think that, for better or for

18  worse, there is controversy over this.  There's arguments

19  that the numbers are too high or too low in lots of different

20  directions.

21          Then the next issue is feasibility, and really this

22  takes the revenue part and moves on to the expense side, and

23  the expense side includes city operations, reinvestment

24  obligations continuing under the plan, sustainability of

25  operations -- and I'm going over to page 3 -- access to the

1  capital markets.  Again, I think each and every one of these

2  issues is to one degree or another controverted, and that,

3  again, hopefully will change over time because I think it

4  ought to personally, but I think right now it seems that this

5  entire page is controverted by one party or another.  Then we

6  turn to --

7          THE COURT:  Well, pause there.  One second.  It

8  seems to me that an important element of feasibility is the

9  support and willingness of the city government that will be

10  in place after the emergency manager leaves office to

11  implement the plan.

12          MR. BENNETT:  And I include that, your Honor, in

13  2(b) on the bottom of page 2.

14          THE COURT:  I don't quite read it in here.  Where

15  should I read it into?

16          MR. BENNETT:  I did not try to put in all of the

17  elements that will be proved, but I think the -- in B --

18  little b. 1 point i is intended to cover -- would be covered

19  within the ambit of that phrase.  I can add -- I could add

20  more language to every single page, your Honor.

21          THE COURT:  Okay.

22          MR. BENNETT:  We tried to be in as kind of summary

23  as we possibly could be.

24          THE COURT:  Okay.

25          MR. BENNETT:  All right.  The next part I want to

1   pause on, which is the issue of reasonableness of
2   settlements -- and that starts on page 4. It's topic number
3   three. It starts on page 4. I think it fits entirely on
4   page 4. And the reason I want to pause here is that I detect
5   very significant disagreement between the parties about what
6   has to be proved relative to the settlements. I draw your
7   attention, your Honor, to a.ii., which is a point that I
8   think is really crucial here, that all of the agreements --
9   all the settlements that are being brought to your Honor were
10  reached in mediation supervised by judicial officers, so
11  unlike the situation that we may have had with respect to
12  prefiling settlements relating to the swap transaction where
13  there was much discovery about and much interest in the who
14  said what to who when of the developing of a settlement, in
15  this instance, first, all of that is privileged, whether it
16  took place actually in mediation or connected to it on the
17  side, and confidential, and, frankly, I think your Honor
18  heard in the context of the production issues that everyone
19  seems to think that the confidentiality of what happened in
20  mediation is really important whether or not settlements
21  ultimately were reached. And, secondly, I think the cases
22  support that there is a presumption that what comes out of
23  mediation has been bargained in good faith and at arm's
24  length, so we think it's both unnecessary and I think, your
25  Honor, impossible for the city to prove up the ins and outs

1  of the negotiations, what positions were taken when and why

2  you came out at exactly the spot that you did other than

3  there was a mediation, and people came to a point, and that

4  was where the agreement was reached.  I don't think that

5  creates a problem for your Honor in terms of applying the

6  standards, of course, because what your Honor has to do is

7  find that a particular settlement is within a range of

8  reasonableness, and I've taken pains to point out with

9  respect to each and every proposed settlement that the city

10  will prove what the range of reasonableness is.  And other

11  people, of course, can disagree about the range of

12  reasonableness.  But we don't need to be detained, and,

13  frankly, this will bear on some of the discovery disputes

14  you'll hear later but I'm not going to argue, we don't have

15  to devote chunks of the confirmation hearing, the city

16  doesn't believe, to going through what was your first

17  proposal, what was your second proposal, what was the other

18  side's first proposal, what was their second proposal, and

19  why is it you came to Point A as opposed to Point B a little

20  bit to the left of Point C, a little bit to the right?  And,

21  frankly, we think that a signal from your Honor as to whether

22  our view of the world is correct or as to whether the

23  opposing party's view of the world is correct concerning how

24  to prove up settlements in the context of the confirmation

25  hearing would very clearly simplify the structure of the

1    confirmation hearing itself and, frankly, also inform the

2    proper scope of discovery in some important areas.

3         Turning to the next page, which is the best interest

4    section, and there is overlap in many places, your Honor, and

5    so I'll point out by saying that I regard 4.f., which deals

6    with the restructuring initiatives -- this is both a

7    feasibility point, and it's also a best interest point

8    because it takes resources away from creditors.  It also --

9    obviously the projections don't work unless this all works,

10   so that's a big chunk of best interest, and we've laid it out

11   there.  The first topic, 4.a., is, in all likelihood, one of

12   those topics that is purely legal.  It does show up on our

13   list of purely legal questions, and arguably it doesn't

14   belong here, but I think that every other topic does.  I will

15   also say that reading this last night, I think Item E belongs

16   after Item B from an organizational perspective, but they all

17   belong under this general topic of best interests.  And,

18   again, unless -- and unless the objectors advise me

19   otherwise -- and I'm hoping they will -- each and every one

20   of these elements are controverted and, therefore, are

21   properly going to have to be the subject of evidence at the

22   hearing.

23        Page 6 deals specifically with the interest rate

24   reset provisions of the plan as applied to DWSD debt, which,

25   by the way, is City of Detroit debt.

1          THE COURT:  Just one second, please.

2          MR. BENNETT:  Sure.

3          THE COURT:  In 4.b., you have bracketed for

4    Romanette i and Romanette ii just plain DIA.  What are you

5    intending to signify there?

6          MR. BENNETT:  The DIA is identifying a witness or

7    two to cover part of these topics as well.

8          THE COURT:  So this will be a witness you call or a

9    witness they call?

10          MR. BENNETT:  We haven't worked out between the DIA

11    and ourselves who would be the person calling the witness.

12    It would be part of the city's side of the case.

13          THE COURT:  When would you foresee that witness or

14    those witnesses being identified?

15          MR. BENNETT:  I think the DIA has already submitted

16    a witness list.  I will confess personally that I just didn't

17    have the time to go match them up and consult with DIA

18    counsel to get the right name into the right paragraph.

19          THE COURT:  Okay.  One more thing.  Under 4.d., no

20    creditor will do better outside Chapter 9, how would you

21    foresee these two witnesses being qualified to answer that

22    question?

23          MR. BENNETT:  Your Honor, this is actually -- that's

24    a very good question.  This isn't --

25          THE COURT:  Well, thank you.

1    MR. BENNETT:  This is actually a multi -- in my

2    view, it's a multi-part inquiry, and it is vastly more legal

3    than it is -- than it is as a matter of testimony.  If your

4    Honor has had any time to read the papers that were filed

5    recently relative to the confirmation, especially that

6    particularly concise 215-page effort by the city --

7         THE COURT:  I started.

8         MR. BENNETT:  We explain that the -- that this is --

9    I'll use a term I use for this all the time.  This is kind of

10   a thought experiment.  What we have to do is to think about

11   what the circumstances will be like after a dismissal and

12   think about what creditors will do confronted with a

13   dismissal, the fact that the city doesn't have enough money

14   to pay all of them, and the steps that they will take and the

15   consequences of those steps.  I don't think that that -- that

16   we have to call witnesses for the purposes of doing the --

17   spelling out the steps because I think we find the steps from

18   the law books, and we can -- and we can figure out what

19   clients will do, and --

20        THE COURT:  Right.

21        MR. BENNETT:  -- I don't think -- and we tried to do

22   that, by the way, in at least summary fashion in the

23   pleadings that we filed.  Then what we see the financial

24   witnesses testifying to is when we give them the environment

25   that the law provides, what happens economically?  And so I

1  think the -- that the witness testimony I contemplate for

2  Item D is a very small slice of the presentation, and I would

3  think that it is more the subject of briefing, opening and

4  closing arguments to build the platform.  And the witnesses,

5  I suspect, will be -- part of their testimony will be

6  establishing that they understand the legal platform; that

7  they've learned what the legal platform is.

8          THE COURT:  Might do this by, for example,

9  hypothetical questions.  If A, B, and C, then what can

10  creditors do?

11          MR. BENNETT:  What will happen; right.  Based upon

12  their expert advice, they're going to have to make

13  projections about the future.  How will businesses react to

14  certain -- to a certain state of affairs?  How will a person

15  receiving a tax bill -- that will go on many more pages than

16  the example your Honor saw at the adversary hearing -- how

17  will a resident react to that?  What is going to happen to

18  that tax bill when it comes back to the assessor's office or

19  the tax collector's office not paid in full --

20          THE COURT:  Okay.

21          MR. BENNETT:  -- and all those -- those are the --

22  so some of it will be established because the law books tell

23  us what happens, and other parts will have to be established

24  by expert witnesses, who say, okay.  Assuming the law turns

25  out to be a certain way -- and if there's fights over what

1  the law will be in this area, then on cross-examination I

2  suspect the questioner will say, "Well, assume a different

3  set of results than the law generates. What do you think

4  then?" But it most certainly is a forward looking question.

5  All the cases, of course, recognize that it's a forward

6  looking question. Hopefully we don't have to establish all

7  of the details of the enforcement mechanisms through witness

8  testimony. I, frankly, think it's much more efficient to

9  view those all as they are, as legal questions.

10      THE COURT: On 4.a., you say you have the impression

11  that everything in here is contested. Is 4.a. contested?

12  Does anyone in your reading of what you've seen so far

13  suggest that the city can be compelled to sell assets?

14      MR. BENNETT: I think the words that are used is is

15  that the plan -- that a plan can't be confirmed unless the

16  city does sell noncore assets, so I think those are the words

17  they use as opposed to --

18      THE COURT: Okay.

19      MR. BENNETT: But I think it's the same question,

20  and -- but once again, if at anything that happens after I

21  sit down any one of these get crossed off the pages, we're

22  thrilled, and I suspect your Honor would be as well.

23      If your Honor is with me, turning to page 6, this

24  turns out to be a very short page, and there's a message in

25  this. There aren't really a lot of factual questions that

 1  relate to the treatment of DWSD debt under the plan.  There

 2  are other legal questions to be sure.  They have been

 3  briefed.  Taking them in turn because so much of discovery is

 4  focused on this -- and, again, I'm not going to argue the

 5  discovery points that are from other people.  I just want to

 6  make a few points about -- for purposes of trial.  For

 7  purposes of determining interest rates, we all know that the

 8  way the market interest determines interest rates for debt is

 9  they get something called an offering circular or official

10  statement in the municipal world, and that's the information

11  they use.  They don't then go and visit water and sewer

12  facilities and pore through all of their contracts and get

13  nine different -- search the e-mails of fifteen or however

14  many witnesses and what have you.  This is the deck that the

15  market uses, and whether it's perfect or not perfect, it's

16  the reality.

17          THE COURT:  Well, do we all know that, or is that

18  something you're going to prove?

19          MR. BENNETT:  I believe that's something we could

20  easily prove, but the -- I make it only for the point that on

21  this question there -- your Honor has certainly heard the

22  argument that everything matters, and the answer is of course

23  it might, but the world doesn't look at everything, and a

24  line has to be drawn someplace.  But this is the one,

25  frankly, that is the wide open -- this 5.a. question is the

1  question that is causing the angst, and, frankly, I would

2  submit it's the only question that is causing the angst with

3  respect to the DWSD production questions.  That's the only

4  point I wanted to make here.

5          With respect to point B, which also is controverted

6  as to whether or not the payments to be made to the GRS

7  system by DWSD after the plan effective date are operating

8  and maintenance expenses, I think that's a purely legal

9  question at the end of the day.  The amounts -- if there's

10 fights over the amounts, that is probably a factual question,

11 and we have a place in here for the amounts where the

12 witnesses are identified.  But I will -- I think we all

13 should remember a few things.  We just sat here and heard the

14 trustee say that the costs and expenses that the trustee

15 incurs in a Chapter 9 case are operating and maintenance

16 expenses of the system, but those same people are saying that

17 the pension obligations accrued by workers who performed

18 services in that system, well, they're not, so we have a

19 controverted question that in light of what happened this

20 morning to me, I don't understand how it can be fairly

21 controverted, but apparently it is.

22          THE COURT:  Well, let me probe that and pin you down

23 a little bit on that.  If I understand the city's plan

24 correctly, and I may not, the city proposes to have 40-some

25 million dollars a year for nine or ten years taken out of the

1    stream of revenue from the water department --

2            MR. BENNETT:  Um-hmm.

3            THE COURT:  -- and paid into the pension plans.  Am

4    I right at least approximately so far?

5            MR. BENNETT:  That is approximately correct.

6            THE COURT:  Okay.  Well, instead of guessing at an

7    answer, let me just ask you the direct question.  How was

8    that number calculated?  What does that number represent?

9            MR. BENNETT:  Okay.  It represents the underfunded

10   portion of the GRS pension plan attributed to the employees

11   of the DWSD that are in the GRS system.  Those are the

12   benefits accrued to date and the expected growth of those

13   benefits going forward.

14           THE COURT:  Okay.  So it's both the --

15           MR. BENNETT:  Pardon?

16           THE COURT:  It's both the deficit as of now and on a

17   going-forward basis?

18           MR. BENNETT:  Just as of today?  I'll defer to

19   Ms. Lennox, who's closer to the numbers than I am.

20           MS. LENNOX:  Thank you, your Honor.  For the record,

21   Heather Lennox.  How this number was devised was we obviously

22   reached a negotiated settlement with most of our union and

23   retirees about what the modifications to the current GRS

24   benefits will be.  That plan will be frozen as of June 30th,

25   2014, so benefits under the current plan as it exists now

1    stop accruing as of that date.  For current employees there

2    will be a new plan put forth that we --

3            THE COURT:  Right.

4            MS. LENNOX:  -- talk about in the plan, but this is

5    the number that talks about the currently accrued benefits

6    under the frozen plan after the cuts are given effect, so

7    what this number is intended to say is if you look at it

8    today with the frozen plan, with the cut benefits, how much

9    of that UAAL that you come out with is GRS or is attributable

10   to DWSD and its retirees?

11           THE COURT:  So is it appropriate, in your view, for

12   parties to be talking about the obligation that the plan

13   would impose to bring that money in as an acceleration of an

14   obligation?

15           MS. LENNOX:  No.

16           THE COURT:  It feels more like a catch-up.

17           MS. LENNOX:  It is a catch-up.  That's exactly

18   right, your Honor.  And the way that we have phrased it in

19   our papers is that you figure out what that number is today,

20   and we could either go -- we could go to DWSD today and say,

21   "You owe, you know, several hundred million dollars of a UAAL

22   today.  Please pay it," or we could say to them, "Well, that

23   might impose a cash flow hit on you, so let's pay it over a

24   period of years," and we can pick the period of years, and

25   that's all we're doing.

1          THE COURT:  Um-hmm.

2          MS. LENNOX:  There is -- as Mr. Neal indicated,

3   there is also a $20 million component of that number that is

4   related to overall case restructuring cost because obviously

5   DWSD has been part of this overall case restructuring, so

6   there is a portion of that that is being allocated to DWSD.

7          THE COURT:  And you'll prove the basis of that

8   somehow.

9          MS. LENNOX:  Yes.

10         THE COURT:  So is it fair, in your view, for the

11  counties or the bondholders or whoever to assert that this

12  40-some million dollars a year -- how much is it?  43?

13         MS. LENNOX:  The first year because it's got the

14  restructuring expenses in it is a little higher.  I think

15  it's -- I forget if it's 50-some or 60-some million, and then

16  it's -- I believe its 44-1/2 for the remaining eight years.

17         THE COURT:  So is it fair for anyone to assert that

18  this provision of the plan means that the counties or the

19  ratepayers or the bondholders are paying for the grand

20  bargain?

21         MS. LENNOX:  Absolutely not, your Honor, not in the

22  city's view.  They're paying --

23         THE COURT:  It doesn't feel like it.

24         MS. LENNOX:  We agree.  We think they're paying what

25  they currently owe today after receiving the benefit of the

 1   negotiated reductions.  That's it.

 2          THE COURT:  And how much in negotiated reductions?

 3          MS. LENNOX:  Well, for GRS it's ASF recoupment plus

 4   four and a half percent across the board, so ultimately it's

 5   about 14-1/2 percent.

 6          THE COURT:  Well, but have you calculated how much

 7   money that saves the counties and the ratepayers?

 8          MS. LENNOX:  Actually, we do.  We think it reduces

 9   their payments, their UAAL portion, by around 250, $260

10   million overall.

11          THE COURT:  Wow.  That's a big number.

12          MS. LENNOX:  We think so.

13          THE COURT:  And is it fair to say that if the

14   department had been paying all along enough money to the

15   water -- to GRS -- to the city for GRS that there'd be no

16   unfunded or underfunded liability at this point in time, the

17   water rates that the city's water department's customers

18   would have been charged would have been higher?

19          MS. LENNOX:  I think that's a logical conclusion,

20   your Honor.

21          THE COURT:  Somewhat higher.

22          MS. LENNOX:  Yes.

23          THE COURT:  So they were in that sense undercharged

24   all these years.

25          MS. LENNOX:  I believe arguably everybody at the

1  city, including DWSD, was undercharged all these years.  I

2  agree.

3        THE COURT:  Well, how did it happen that the

4  department didn't get enough money to pay GRS so that we are

5  now in a position where there is this underfunded liability?

6        MS. LENNOX:  Um-hmm.  I think that the answer to

7  that, your Honor, goes to pension accounting and actuarial

8  estimates that have occurred over decades.  I mean

9  certainly -- I think we lay this out very broadly speaking in

10  the disclosure statement -- we've said this publicly

11  before -- that we think that the estimates that were used by

12  the pension funds for what amounts the city and its

13  departments needed to pay to provide for adequately funded

14  plans were insufficient in large measure over the last

15  several decades, which is why we believe the funding -- and

16  we've set it forth in our papers -- the funding of the two

17  pension plans, GRS in particular, is dangerously low, and

18  that didn't happen overnight.  That happens over a long

19  period of time, your Honor.

20        THE COURT:  And so this 50 or $40 million a year is

21  a catch-up of that --

22        MS. LENNOX:  Yes.

23        THE COURT:  -- in your view?

24        MS. LENNOX:  It's what's currently owed today based

25  on all the things we discussed earlier.

1    THE COURT:  And how do you -- how do you deal with

2  what I perceive to be the argument of especially the

3  bondholders, although possibly the counties as well, that

4  this yearly amount, 50 or $40 million a year, is not a

5  current operating expense that they should be charged with?

6    MS. LENNOX:  We go through over several pages

7  in great detail in the reply that we filed this weekend, but

8  I'll try to boil it down into a quick nutshell, and it has

9  several components to it.  First, historically, as has been

10  the practice -- well, first of all, let's start with the

11  Michigan Constitution, which requires these amounts to be

12  paid.  So does the city charter.  But, secondly, as

13  historical practice --

14    THE COURT:  You're talking about Article IX, Section

15  24?

16    MS. LENNOX:  Yes, sir.  But as a part of historical

17  practice, the pension amounts, the -- when the plan was

18  ongoing, there's an amount in pension accounting called a

19  normal cost, which is what are the benefits accrued for this

20  particular year, and then there's the UAAL, which is the

21  underfunding that we have to catch up.  And as a matter of

22  historical practice, DWSD has always paid -- in the payments

23  that it makes to GRS, a portion of it is normal cost, and a

24  portion of it is underfunding.  The fact that these expenses

25  were paid out of operating and maintenance expenses were

1  disclosed in the offering circulars that the bondholders knew
2  about when they purchased the bonds.  It has always been
3  accounted for this way.  And under the terms of the bonds,
4  those operating and maintenance expenses, as they are
5  determined monthly -- so if there's a payment due next month,
6  the pension amount will go right into it -- those are not
7  subject to the bondholder liens, so we have this all laid out
8  in our papers.
9        THE COURT:  Okay.  All right.
10       MS. LENNOX:  And we believe that's the appropriate
11  legal way to look at it.
12       THE COURT:  Thank you.
13       MS. LENNOX:  Thank you, your Honor.
14       MR. BENNETT:  No unfair discrimination on page 7.
15       THE COURT:  Okay.
16       MR. BENNETT:  This area as well, there are legal
17  issues that are not on this page, but these are the factual
18  issues that we think are controverted and will have to be
19  dealt with.  I want to -- I want to highlight Point C because
20  I think it's not obvious from the way the deal has evolved
21  and the way the deal is described, which is that when
22  everyone opens the disclosure statement and they see the
23  recovery percentage that's been calculated for purposes of
24  the disclosure statement really looking toward the pensioner
25  universe, that, first of all, it lumps together parts of

1 their distribution that are not coming from the city,

2 including, in particular, the state contribution and the

3 foundations' and DIA contribution.  But more importantly and

4 slightly more subtlety, because that percentage was

5 calculated kind of looking at benefits matched up over time

6 in the future, it's not necessarily the same calculation that

7 you would make if you were trying to determine distribution

8 on account of the claim today.  The pension convention, of

9 course, is that the investment return and the discount of

10 future benefits back to present value is the same number.

11          THE COURT:  Um-hmm.

12          MR. BENNETT:  But, in fact, your Honor may be

13 familiar with this from your Chapter 11 cases.  When the PBGC

14 looks at discounting benefits to present value in Chapter 11

15 cases, they use an annuity based rate --

16          THE COURT:  Right.

17          MR. BENNETT:  -- to kind of look at the market, and

18 that's on the order of roughly half or a little more than

19 half of the rate that was implicit, so we will show that

20 math, which we think is the more relevant math for purposes

21 of determining the discrimination question to try to put

22 things into an apples and apples framework with the creditor.

23 It also, by the way, had an obligation that went out into the

24 future but is matured on the bankruptcy date, and so that

25 will be a part of the proof in this area.

1          Moving on to proposed in good faith, paragraph 7 on

2   page 8 --

3          THE COURT:  Before we go there, I have another

4   question relating to the water department, so maybe I should

5   call Ms. Lennox back --

6          MR. BENNETT:  Which question?

7          THE COURT:  -- to the lectern.

8          MR. BENNETT:  We kind of divide this one up.

9          THE COURT:  Well, all right.  The question relates

10  to OPEB and OPEB savings.

11         MR. BENNETT:  Okay.

12         THE COURT:  So the plan -- well, not the plan.  The

13  city has already terminated OPEB, per se, and you're going to

14  replace it with --

15         MS. LENNOX:  Modify it.

16         THE COURT:  -- VEBAs; right?

17         MS. LENNOX:  Correct.  That will happen in the plan.

18  We have modified the --

19         THE COURT:  Modified on an interim basis.

20         MS. LENNOX:  Correct.

21         THE COURT:  Okay.  My question then is that

22  obviously results in savings, substantial savings to the city

23  and to the water department.  Yes?

24         MS. LENNOX:  Yes, sir.

25         THE COURT:  How does that savings get reflected in

1   the positions of either the customers, the counties, on the
2   one hand, or the bonds, on the other hand?
3              MS. LENNOX:  So, again, OPEB -- and there's another
4   savings as well in addition to OPEB, but OPEB is -- was
5   always paid, again, as an operating and maintenance expense.
6   DWSD's portion of that obviously was dependent on healthcare
7   inflation, but obviously it's been going up.  I think last
8   year they paid about $22 million for OPEB.  In the plan I
9   think they'll pay about two, two and a half million going
10  forward, so that, again, is reflected in -- at a line item in
11  the budget going forward for what they would have to pay for
12  that, and it's a substantial savings, hundreds of millions of
13  dollars in savings to DWSD over the time frame we're talking
14  about.  And then there's another savings that the general --
15             THE COURT:  Well, before you go on to the other
16  savings, would -- is it the city's position that this OPEB
17  savings will --
18             MS. LENNOX:  Should have the effect of lowering
19  rates.
20             THE COURT:  -- have the effect of lowering rates?
21  There may be other factors that set --
22             MS. LENNOX:  Yeah.  They may --
23             THE COURT:  -- that off, but --
24             MS. LENNOX:  Correct.
25             THE COURT:  -- the rates will be lower than they

1  otherwise would have if OPEB had continued?

2          MS. LENNOX:  Correct.  I don't want to leave the

3  misimpression that rates are going to go down because

4  obviously there's a lot of capital improvements that need to

5  be had to the system, and so rates will probably go up

6  modestly.  In fact, we are predicting modest rate increases,

7  but it has nothing to do with this.  As a result --

8          THE COURT:  But if OPEB were continued, the rates

9  would --

10          MS. LENNOX:  Be higher.

11          THE COURT:  -- be higher.

12          MS. LENNOX:  Yes.

13          THE COURT:  What was the other savings?

14          MS. LENNOX:  The other savings is the DWSD portion

15  of the COPs because COPs funded pensions, so part of the COPs

16  amortization was paid by DWSD.  It was about $10 million a

17  year annually, and I think that is going down by about 90-

18  plus percent per year.

19          THE COURT:  All right.  Thank you.  Mr. Bennett.

20          MR. BENNETT:  Again, to page 7, plan proposed in

21  good faith.  Again, I pause here only to focus on --

22          THE COURT:  Page --

23          MR. BENNETT:  Page 8.  Sorry.

24          THE COURT:  Paragraph 7, yeah.

25          MR. BENNETT:  Item 7, page 8.  I really just wanted

1   to highlight again the Romanette iv, which is, again, an

2   effort to streamline the trial and figure out exactly what we

3   do have to prove.  The to and fro of mediated settlements

4   would be evidence of good faith, but we think that that's not

5   necessary, and, in fact, impossible to prove in light of the

6   confidentiality and privilege nature of mediated discussions,

7   and that's a discovery issue for later.

8             With respect to page 8 is kind of DWSD-related

9   issues that were really both bond and county, so you've just

10   been discussing part of 8.a. is -- there's the issue raised

11   by the bondholders as to whether the pension funding going

12   forward is within the O&M clause.  There is also the issue

13   raised by the counties as to whether there is any form of

14   legal violation.  This covers that second part of the same

15   question.  There is the -- 8.b. is a topic that is very

16   contingent.  It's in the -- it's in the happy event that

17   there is a DWSD transaction and certain kinds of proceeds are

18   generated thereby.  There is a provision to what is dealt

19   with, so there's a -- we think this is mostly a legal

20   question because the agreement was that all that was going to

21   be shared was general fund proceeds that would be generated,

22   and, of course, the transaction may or may not generate

23   general fund proceeds, and so there will be a factual

24   question over whether -- if there is a transaction, whether

25   funds generated are, in fact, general fund proceeds or not,

1    so I think there's a little bit of a mixed question there.

2    Some of it is very much legal, and it's contingent.

3            There are a few extra things on the following pages.

4    Again, page 10, this is the ASF recoupment, which is a

5    significant part of the GRS restructuring.  There have been

6    objections to this.  Paragraph 10 on page 11, there is an

7    objection to the --

8            THE COURT:  Well, hold on.

9            MR. BENNETT:  Sure.

10           THE COURT:  All right.  In one paragraph, what is

11   the ASF recoupment?

12           MR. BENNETT:  Inside of the -- as Ms. Lennox

13   mentioned, part of the change to GRS which reduces the

14   reduction in pensions that have to be suffered by pension

15   holders generally is something called the ASF recoupment.

16   What the ASF recoupment is, the annuity savings plan made

17   distributions in excess of earnings, and a portion of that is

18   recaptured and redistributed to other -- you know, to all

19   pension holders.

20           THE COURT:  So this is recoupment from retired

21   people who were paid more than the investment return that the

22   pension plan realized?

23           MR. BENNETT:  This one applies to actives as well.

24   That's correct.

25           THE COURT:  And the plan is not to recoup all of

1   that.

2           MR. BENNETT:  Not nearly.

3           THE COURT:  How much would all of it be?

4           MR. BENNETT:  Ms. Lennox will give you the numbers

5   if she's got them.  I don't even know if she has those today.

6           THE COURT:  Okay.  Ms. Lennox, how much would all of

7   that be?

8           MS. LENNOX:  Well, your Honor, this has been going

9   on, again, for decades.  We are focusing on a ten-year period

10  between July 1, 2003, and June 30th, 2013, because, as you

11  mentioned, we're not taking back nearly all of it.  And so we

12  believe that the gross number, if I'm recalling this

13  correctly, if you calculated all of that for that period of

14  time -- and I'm just talking returns in excess of what was

15  actually realized -- I believe it's something on the order of

16  $386 million.  However, we are not seeking to take back even

17  all of that.  We've capped it at 20 percent of somebody's

18  highest balance, and so if you take that cap into effect --

19  and we've also further capped it for people who are currently

20  retired so that it can be no more than 20 percent of their

21  current pension check.  So when you apply dual caps, I think

22  it takes it down to somewhere about 275 to $280 million that

23  otherwise we would have to spread across in global pension

24  cuts across the board for everyone.

25          THE COURT:  So the $370 million is or is not for

1  that ten-year period the amount of the excess distributions

2  over the investment returns?

3          MS. LENNOX:  That is the full amount of the excess

4  distributions.

5          THE COURT:  It is.  Okay.

6          MS. LENNOX:  But we are not seeking to take all of

7  that back.

8          THE COURT:  That's the 200 and what million?

9          MS. LENNOX:  I believe it's somewhere between 275,

10  $280 million.

11          THE COURT:  And why has the city decided not to seek

12  recoupment of all of it?

13          MS. LENNOX:  That was -- that is a very -- ASF

14  recoupment is kind of a controversial concept just because of

15  people's perceptions of what these accounts were and what

16  they should have been and what in actuality legally they

17  were.  It was a very hotly -- and I don't want to get into

18  mediation discussions, but it was a very heavily negotiated

19  point.

20          THE COURT:  Oh, this was a negotiated --

21          MS. LENNOX:  Yes, sir.

22          THE COURT:  -- settlement.

23          MS. LENNOX:  Yes, sir.

24          THE COURT:  Okay.  So proving the reasonableness of

25  this recoupment as opposed to more or as opposed to less will

1  be part of --

2         MS. LENNOX:  The range of reasonableness.

3         THE COURT:  -- the whole process of approving

4  settlements.

5         MS. LENNOX:  Correct, your Honor.

6         THE COURT:  Got it.  Okay.  All right.  Thank you.

7         MS. LENNOX:  Thank you.

8         MR. BENNETT:  Okay.  Page 11, item 10.  This is the

9  release that the state has insisted on as a condition of the

10 state contribution.  There have been objections from a number

11 of parties to that.  And lastly but I'm sure -- I don't want

12 to say least, at page 12, Item Number 11 --

13        THE COURT:  Well, but hold on.  Still on Item 10

14 here, you know, without pinning you down to details, can you

15 summarize for us the nature of the claims that are and are

16 not being released here if the plan is confirmed?

17        MR. BENNETT:  Your Honor, it is a comprehensive

18 general release by the retirees in terms of their claims

19 against the state.

20        THE COURT:  So it's claims by retirees?

21        MR. BENNETT:  It is claims by -- well, by retirees

22 or actives to the extent they have accrued benefits.

23        THE COURT:  Okay.

24        MR. BENNETT:  Ms. Lennox correctly points out that

25 it's related to Detroit and pensions, but it's a general

1    release with respect to the -- you know, the pension claims,

2    the actions of the emergency manager, this case --

3            THE COURT:  Okay.

4            MR. BENNETT:  -- but it is not --

5            THE COURT:  So if any other creditors have, for

6    example, independent claims against the State of Michigan,

7    they're not covered here?

8            MR. BENNETT:  That's not part of this.

9            THE COURT:  Does the city release any monetary

10   claims it might have against the state on any grounds?

11           MR. BENNETT:  The city is releasing any claims it

12   has in respect to the pensions as well.

13           THE COURT:  What about, for example, in respect to

14   revenue sharing?

15           MR. BENNETT:  I don't think there's any release that

16   extends beyond pensions even as to the city.

17           THE COURT:  Okay.  You may continue.  Thank you.

18           MR. BENNETT:  But your Honor understands that the

19   city's release is not in this category.  That would be part

20   of the state settlement --

21           THE COURT:  Okay.

22           MR. BENNETT:  -- because it's not a nonconsensual

23   third-party release.

24           THE COURT:  All right.  Thank you for clarifying it.

25           MR. BENNETT:  Okay.  Last but certainly important to

1  the 36th District claimants or objectors, there's been a --

2  there's been a continuing controversy over exactly how the

3  36th District claims are dealt with under the plan --

4          THE COURT:  Right.

5          MR. BENNETT:  -- and so that's the last issue.

6  Okay.

7          THE COURT:  But, again, I want to -- I want to probe

8  a little bit here.  Are you the right person?

9          MR. BENNETT:  I think so.  If I'm not, I'll --

10          THE COURT:  I have the impression from prior

11  hearings or maybe from what I've read that the relationship

12  between the city and the District Court is set forth in

13  statute, in decisions of the Michigan courts, and as a matter

14  of practice and procedure.  Is that fair to say?

15          MR. BENNETT:  Fair to say.

16          THE COURT:  I also have the impression that the

17  third aspect of the relationship, practice and procedure, may

18  or may not be entirely consistent with the first two.

19          MR. BENNETT:  Okay.  I am the wrong person --

20          THE COURT:  Am I right about that, and --

21          MR. BENNETT:  I am the wrong person to delve into

22  that level of detail with respect to the 36th District Court.

23  I don't know.  Is that yours, too, but --

24          MS. LENNOX:  Your Honor, in answer to your question,

25  I believe that practice and procedure may or may not be

1  consistent with what the laws say, and I think -- based on
2  prior hearings, I think one of the conclusions we all came to
3  was the law is not particularly clear in some aspects on some
4  of this, so what the plan does is it basically says, look, if
5  there's a claim against the city somehow, not against the
6  state -- if there's a claim against the city somehow, that
7  the city would have to pay it either directly to the court or
8  through the court to a court creditor.  It's a city
9  obligation to pay it.  Then the plan will relieve the city of
10  having to do that.  It doesn't affect other issues.  And I
11  don't think the plan as drafted did that, but we will
12  certainly make it clear -- and we say this in our reply --
13  that if there is any -- if a creditor of the court wants to
14  allege that the state somehow has the obligation to provide
15  funding for its claim, they're perfectly free to do that.
16  They can go to state court and do that, and we thought the
17  plan tried to make that clear.  We will make that explicit.
18          THE COURT:  Okay.  But what's the legal or factual
19  basis for discharging whatever claim a creditor of the Court
20  might have that the city is obligated to pay that claim?
21          MS. LENNOX:  Well, again, we think that that is a
22  claim, whether it comes from the creditor directly or through
23  the court, that the city would have to pay, and so the city
24  can certainly discharge it against the court as their
25  immediate creditor, as you will.

1          THE COURT:  Well, but doesn't the law require the

2    city to fund at least some portion of the operations of the

3    court?

4          MS. LENNOX:  Exactly.  What the law requires the

5    city to fund are the reasonable and necessary operating

6    expenses of the court.  That doesn't necessarily include

7    frivolous litigation may not be a reasonable and necessary

8    expense of the court and things like that.  In fact --

9          THE COURT:  Some of those creditors have judgments

10   or arbitration awards.

11         MS. LENNOX:  Um-hmm.

12         THE COURT:  Is it the city's position that it is not

13   responsible for those?

14         MS. LENNOX:  I think if they're pre-petition claims

15   against the city, they can be treated -- the city may have

16   responsibility, but they can be treated as pre-petition

17   claims against the city, which is how the plan proposes to

18   treat them.

19         THE COURT:  It is.

20         MS. LENNOX:  Yes.

21         THE COURT:  Keeping open at the same time whatever

22   claims these creditors may have against others --

23         MS. LENNOX:  Yes.

24         THE COURT:  -- to pay those claims?

25         MS. LENNOX:  Yes, sir.

1          THE COURT:  Thank you.

2          MS. LENNOX:  Thank you.

3          MR. BENNETT:  Okay.  So I think that will give your

4    Honor a sense of what we think the confirmation hearing has

5    to address.  You will note for convenience on page 13 the

6    witness list has been rejuggled as a result of the exercise

7    of trying to put all this down in an organized fashion, and

8    our witness count, I think, has been reduced some more.

9          THE COURT:  Okay.

10         MS. LENNOX:  And we hope that this exercise will

11   allow other people to do likewise.  There's something else

12   about this process that does touch on discovery that I'll

13   just leave with you, and that is this.  If I'm right about

14   the fact that the process of negotiating settlements, since

15   they all or substantially all happen in the context of the

16   mediation, of the supervised mediation, are not going to be

17   the subject of the confirmation hearing, as you work your way

18   through the different topics, this hearing is going to be a

19   lot about numbers, and it's going to be about experts'

20   interpretations about numbers, and it's going to be a lot

21   less about who said what to who when.  I know that we started

22   out with a vision that we were going to complete our factual

23   discovery first and then -- including all fact-based

24   depositions, and then we were going to go and do expert

25   testimony afterwards, and it strikes me in light of what

1  these questions are really about, I'm not sure that's as

2  necessary as it might be in an auto accident case or in

3  another case where the percipient witness deposition

4  testimony, in fact, sets the stage for what the experts have

5  to do.  In reality, in this case, it's the numbers and the

6  documents that are going to set what experts have to do, and

7  I'm sure it's possible a hypothetical could come up where

8  something that happens in the deposition testimony of the

9  expert witnesses will have some impact on some opinion of

10  some expert to be sure that's true, but I think, frankly,

11  that's a very small part of the universe as opposed to a big

12  part of the universe.  And so the observation that I'm going

13  to offer to your Honor is is that if we need to find time

14  because we think that the -- that we have factual witness

15  overload -- and I think that is the problem that everybody

16  has been focusing on -- the city would not have a problem

17  with allowing fact witness discovery to keep going all the

18  way through expert witness discovery.  And if that means that

19  particular experts have to change their opinions at the

20  margin or even centrally because some witness breaks down and

21  disavows their numbers, which is hard to imagine happening,

22  we'd live with it.  It would be inconvenient, but we would

23  live with it.  But we just do not think that the fact witness

24  deposition testimony as distinguished from all of the

25  numbers, many of which have been in the data room from day

1   one or as the case has progressed but have also been produced

2   as a matter of written discovery, that's really where the

3   action is, and we're prepared certainly to live with any

4   inconvenience that would arise by double-tracking that time.

5   Thank you, your Honor.

6          THE COURT:  I have a bit more for you.

7          MR. BENNETT:  Okay.

8          THE COURT:  This is procedural.  Is it fair to say

9   that, again, just sort of generally speaking, your major

10  creditor groups with whom you haven't settled are the DWSD

11  bondholders, the counties, the LTGO bonds, and the COPs and

12  their insurers?

13         MR. BENNETT:  That's correct, your Honor.

14         THE COURT:  Is it also fair to say and would it be

15  appropriate to say without breaching the confidentiality of

16  mediation that you are still in negotiations with one or more

17  of those groups?

18         MR. BENNETT:  That's correct, your Honor.

19         THE COURT:  With the hope of reaching an agreement

20  sometime before confirmation?

21         MR. BENNETT:  Yes, your Honor.

22         THE COURT:  All right.  So my question is

23  procedurally how does the city plan to work a new settlement

24  that may come up into the process going forward, or is that

25  question impossible to answer until we see exactly what the

1    settlement is and when it occurs?

2           MR. BENNETT:  Okay.  There's two kinds of

3    settlements, I think, that we would have to be thinking about

4    to answer that question.  One kind of settlement is a

5    settlement that fits within current economic parameters and

6    places that have been left for settlements to occur, which

7    would not have any impact on any other distribution or any

8    other creditor claim.  And in that circumstance, your Honor,

9    if there -- number one, settling parties can make an

10   agreement without additional solicitation and disclosure, but

11   if solicitation and disclosure is required to gain acceptance

12   of a particular class whose representatives are settling, we

13   would send some form of supplemental disclosure just to that

14   universe, figure out how much time we really needed for

15   balloting or for an opportunity to change votes -- it could

16   go either way depending on the settlement -- and then

17   ultimately get back the results, and it turns out that this

18   issue is something that a number of people in negotiation

19   have focused on, and there has been information exchanged

20   about what the last time is that we could do this without

21   changing --

22          THE COURT:  Well, that was going to be my next

23   question.

24          MR. BENNETT:  Yeah.

25          THE COURT:  If it's the city's --

1          MR. BENNETT:  It depends on the class.

2          THE COURT:  If it's the city's position that we

3     should stick with our confirmation date, does it make sense

4     to set a deadline by which settlements will occur or not?

5          MR. BENNETT:  Your Honor, I would not say that

6     because we did build into the plan in a lot of places room

7     for settlements that could be achieved without changing very

8     many other things, and so I would not want to put an

9     arbitrary deadline on it because I want there to be

10    settlements whenever settlements can be had.  I will -- I

11    don't think, by the way, again, because of the --

12         THE COURT:  Well --

13         MR. BENNETT:  The problem is --

14         THE COURT:  -- I've got a witness -- my own witness

15    who's telling me that in the present existing universe, not

16    some alternative universe that may exist after a settlement,

17    she's going to have a hard time meeting my deadline.

18         MR. BENNETT:  I understand that, your Honor, and I

19    think that's -- the reason I'm reluctant to put a deadline on

20    settlements is that the deadline would be different depending

21    upon which group we're talking about.  Some of the groups are

22    very concentrated, and you could have your effective

23    solicitation and change a day before the balloting deadline,

24    and you'd be done or practically done.  Others there's -- you

25    heard --

1          THE COURT:  Yeah.  All right.

2          MR. BENNETT:  -- the extended colloquy about DTC,

3    and it turns out that we actually deal with ClearStream,

4    which few of us knew, which is the European equivalent, and

5    they managed to actually make a mistake, but I think it's

6    been rectified.  And so if it was one of those classes, we

7    would wind up in a -- with a much more difficult time to fit

8    everything together, so I really am reluctant only for that

9    purpose.

10          THE COURT:  I don't bring this up, anybody, to

11   discourage settlements.

12          MR. BENNETT:  No.

13          THE COURT:  I continue to encourage them as strongly

14   as possible.

15          MR. BENNETT:  Right.  But we would also, I think,

16   your Honor, to -- not to say that you wouldn't extend

17   balloting if there were certain circumstances where you

18   needed to get a settlement done and you did not have enough

19   time.  I would not do anything to change the current ballot

20   deadline because it would be a notice nightmare, and I

21   suspect if you ever changed balloting, it would be -- the

22   deadline, it would be targeted only to those classes where

23   there were changes and where we thought we needed additional

24   time.

25          THE COURT:  All right.  Thank you.  All right.

1    Well, we're going to take our lunch break now.  I think I had
2    suggested to Mr. Hackney when he proposed this process that
3    it would be a good idea for him and his colleagues to take a
4    lunch break or a lunch -- time for a lunch break to figure
5    out how to most efficiently respond to the city's proffer
6    here, so it has worked out well for that purpose.  And we
7    will reconvene -- one second -- at 1:30, please.
8              MR. HACKNEY:  Your Honor --
9              THE COURT:  Sir.
10             MR. HACKNEY:  -- may I ask a question?  Stephen
11   Hackney on behalf of Syncora.  It seems -- first of all, this
12   was very helpful, and we appreciate them filing that.  It was
13   certainly useful to hear your questions.  I don't want this
14   to devolve into a massive cross-examination nor an argument,
15   and I know you don't either.  I can see some areas where the
16   creditors may also be able to play a role of asking some
17   questions of the city to refine certain areas of proof going
18   forward.  Is that also an appropriate use of our lunchtime to
19   come up with a set of questions that we would like to ask in
20   addition to thinking about how we'll present our anticipated
21   proffer to you?
22             THE COURT:  I certainly would be amenable to you
23   suggesting what further questions you think I should ask of
24   the city.
25             MR. HACKNEY:  Appreciate it, your Honor.  Thank you

1    very much.

2         THE COURT:  All right.  Let me remind you, please,

3    again that our neighbor is conducting a trial, so you can

4    have your conversations here in the courtroom during the

5    lunch hour if you like or down on the first floor, but

6    please, again, absolute silence in the hallway.

7         THE CLERK:  All rise.  Court is in recess.

8         (Recess at 12:04 p.m., until 1:32 p.m.)

9         THE CLERK:  All rise.  Court is in session.  Please

10   be seated.  Recalling Case Number 13-53846, City of Detroit,

11   Michigan.

12        THE COURT:  We'll give everyone a couple minutes to

13   get settled.  Okay.  Who'd like to proceed?

14        MR. HACKNEY:  Good afternoon, your Honor.  Stephen

15   Hackney on behalf of Syncora.  And let me compliment you on

16   the record chambers to gown -- or to robe timing there.  That

17   was impressive and scary.  Your Honor, so this is how we

18   propose to organize the first part of the afternoon for you.

19   I had mentioned to you the notion of asking questions of you

20   that you might ask of the city to the extent that you found

21   that useful.  At the Court's suggestion, I previewed those

22   questions with Mr. Bennett to give him an opportunity to

23   think about them.  I will not attempt to describe his -- he

24   gave us some preliminary answers.  I'll leave that to

25   Mr. Bennett to provide the answers himself.  At that point, I

1  think the Court had anticipated that creditors might make a

2  similar description of their case, so to speak, even though

3  obviously we don't have the burden, but what we anticipate

4  putting on, and I believe the folks at the DWSD portion of

5  the case had wanted to go first and then COPs and LTGO after

6  that, and Ms. Patek on behalf of some of the labor unions I

7  think is going to go at the end.

8          THE COURT:  Okay.

9          MR. HACKNEY:  Your Honor, these are the questions

10  that I posed to Mr. Bennett.  They're ones that I thought

11  might be useful in terms of advancing discovery.  The first

12  one relates to the COPs.  As you know, in the COPs litigation

13  that's before you, the city had recently signaled that it

14  would -- that it had a pending motion to dismiss that it

15  thought could be a vehicle for finally determining the

16  validity of the COPs, and my question to Mr. Bennett was if

17  that motion is either not resolved or it's resolved in a way

18  that suggests that there are questions of fact that preclude

19  it from being resolved as a motion to dismiss, is it the

20  city's intention to try the validity of the COPs either in

21  the plan or by coordinating the adversary with the trial of

22  the plan because that would have a big impact on the types of

23  evidence that might be required if that were the case.  That

24  was the first question I asked.

25          The second question I asked, your Honor, was what

1    evidence will the city introduce at a more granular level

2    regarding the proposition that, quote, "providing better

3    treatment to pensioners will promote relationships with those

4    whose ongoing cooperation is vital to the city's recovery."

5    That's a phrase from page 7 of the factual prove-up document

6    the city submitted.  If you look on page 7, you'll see that

7    there are witnesses anticipated to testify on that subject.

8    I believe Mr. Orr is one, and I can't remember who the other

9    is.  My question was more granular on the nature of the

10   evidence that's going to be offered there.  Is it going to be

11   expert testimony, survey testimony, or is it going to be, you

12   know, I've got my finger on the pulse of the city, and I can

13   just tell you this is really important?

14        The third area of questions, your Honor, related to

15   the notion of the grand bargain.  I asked if the city intends

16   to prove up specific bequest limitations with respect to

17   specific pieces of art as opposed to broader what can be

18   described as legal doctrines like the attorney general's

19   opinion or the public trust doctrine that might apply to all

20   of the art.  I asked whether the city intends to introduce

21   evidence regarding the value of the collection above and

22   beyond the Christie's valuation that was done on a small

23   portion of the collection.  I asked how will the city prove

24   up the importance of the art collection to the city's

25   revitalization.  You will see that that is a call-out in

1     their factual presentation as well, your Honor, and I believe

2     it calls for Mr. Orr and Mr. Rapson and maybe some others to

3     speak to that subject, but I wanted to understand more

4     precisely how they're going to speak to that subject.  Are

5     they going to be qualified as experts, or are they going to

6     just say, "I'm someone who's familiar with the city, and I

7     can tell you that it's very important"?

8          And then I last asked what evidence will the city

9     introduce regarding alternative steps taken to monetize the

10    art.  I asked that question because if the city is in a

11    position to stipulate that it took none, that may narrow the

12    need for discovery on the issues of alternative pathways to

13    monetization.

14         Your Honor, those are the questions that I posed to

15    Mr. Bennett before the break, and we can proceed as you want

16    us to from here on out, your Honor.

17         THE COURT:  Thank you, sir.  Mr. Bennett, I'm just

18    going to turn the lectern over to you and ask you to address

19    those questions to the extent you are comfortable.

20         MR. BENNETT:  Okay, your Honor.  As to the first

21    question, which relates to proof relating to factual issues

22    on COPs validity, we do not think that's part of the

23    confirmation hearing.  We view the confirmation hearing

24    insofar as it relates to the COPs as dealing with the

25    adequacy of the reserves that are in the plan for the payment

1  of the COPs in the event that they turn out to be valid, and

2  that's why there are no fact issues in our statement relating

3  to the COPs.  There clearly is an adversary proceeding.  We

4  expect that to go forward.

5        Second, evidence on employee relations and the

6  impact of pension reductions, again, I can't imagine that

7  this is controverted at least to half of it, but it sounds

8  like it is.  Actives, of course, have rights to the extent of

9  their existing vested portions.  They have rights under the

10  pension plans, and they also are looking at what happens to

11  retirees understanding that they someday will be retirees,

12  but we do have witnesses that are going to testify to this as

13  a matter of their experience with this work force.  They are

14  listed.  If there are any additional ones, we will make sure

15  we advise the objectors.  I do not off the top of my head

16  think that we have an expert that is going to address this,

17  and I can assure Mr. Hackney that there is no survey coming

18  on that question.  At least we don't plan one.

19        With respect to the restrictions in donation-related

20  documents as to the art, I think I heard a statistic that the

21  production of that material -- and I can't remember exactly

22  what the parameters are on it -- was at least 90,000 pages.

23  We don't expect to introduce the 90,000 pages.  What I think

24  we would propose to do, the city's side, would be to

25  introduce a collection of documents that give the Court some

1    sense of the kinds of restrictions that the city sees in

2    documents affecting certain donations probably focusing on

3    major ones as opposed to smaller ones with personal

4    identification redacted.  I hope there's no issue as to that,

5    but that's the way we would do it.  And certainly the

6    objectors would have the opportunity to introduce others if

7    they think it would better inform the Court to see a broader

8    sample than the city would be providing.

9            I was asked whether I would be able to represent

10   that our proposed collection would be representative, and I

11   said, frankly, I would not because I don't think we intend to

12   read all of them to be able to decide that.  We will give the

13   Court enough information to canvass the issue, which is, of

14   course, the standard for dealing with a settlement, and

15   that's what we propose to do there.

16           As to valuation of the collection, clearly the

17   Christie's valuation will go into evidence, and a witness for

18   Christie's has been identified.  The city is in the process

19   of obtaining -- of trying to obtain a value of the entire

20   collection on a, I guess, less granular and, therefore, much

21   less expensive basis than a Christie's type evaluation would

22   be.  We don't have the results of that work yet, but we think

23   we're going to complete that process and have a report for a

24   collection on the whole on a little bit different basis, and,

25   of course, it will be provided in accordance with the

1    expert -- on the calendar for the expert deadlines.  It will

2    say that we know that the -- that some objectors are pursuing

3    exactly the same approach because some of the people that we

4    tried to interview to make that kind of a valuation turned

5    out to have been engaged already by someone in the case.

6           Museum's contribution to the city, I seem to

7    remember that the DIA -- one of the DIA witnesses -- and I

8    don't know if it's on their list or not because it would be

9    an expert -- is an expert on that subject.  We will have

10   other testimony about the importance of the museum to that

11   part of the city and the city as a whole by people who will

12   establish why they are in a position to know, so I think

13   there may be both kinds of evidence.  I'm not exactly

14   positive as to whether or not there's expert testimony.

15          There were other efforts to evaluate, not so much

16   that the city went out and got bids or things like that, but

17   there were other efforts that were undertaken by the city to

18   investigate what other possibilities might be for dealing

19   with the DIA collection and the related assets.  We haven't

20   yet figured out what approach we want to take in informing

21   the Court about those activities if we're going to do so at

22   all, and we certainly don't want to start a major discovery

23   endeavor with respect to all of the blind alleys that the

24   city investigated and didn't go down, so we're going to take

25   some time and think about the last question about -- I don't

1  think we're prepared to stipulate there were no efforts.  How

2  much evidence we introduce on that and how we go about doing

3  it in a way that doesn't create, again, a whole major subset

4  of discovery directed to everyone the city talked to about

5  the subject, we'll have to figure that out, and we will let

6  the objectors know as promptly as possible.

7            THE COURT:  Thank you.

8            MR. BENNETT:  I think I covered them.  There was one

9  other question that Mr. Hackney didn't ask on this list that

10  came up when we were standing, and that was -- and there does

11  seem to be a significant controversy, which is the -- back to

12  the issue that I raised concerning what it is that the city

13  has to prove to establish that a settlement is reasonable and

14  the question of whether or not it's enough to prove up the

15  range of reasonableness as the city sees it as opposed to

16  replay for the Court steps, proposals, and counterproposals

17  that led in that direction and a point assessment by the city

18  as to why a particular point was a good point.  And I do

19  think -- and we disagree.  I mean they -- I'll let the

20  objectors speak about their own position, but I do think it

21  will substantially enlighten the preparation for the trial

22  and the scope of discovery if on some basis we could get your

23  Honor's views about that because it's a big area if it's the

24  area of -- how did the parties reach a particular point as

25  opposed to any other point in the range of reasonableness is

1    an area that could bog everybody down in a lot of work that

2    the city, quite frankly, thinks is not an appropriate topic

3    for the trial.  Thank you, your Honor.

4            MR. LEMKE:  Good afternoon, your Honor.  David Lemke

5    again on behalf of U.S. Bank as trustee for the water and

6    sewer bonds.  Your Honor, the trustee has been asked to make

7    a presentation on the issues related to the DWSD parties, at

8    least those issues that are common to the trustee, the ad hoc

9    committee, and the insurers of the bonds, and so I will make

10   that presentation.  To the extent there are separate issues

11   raised by some of the other DWSD parties, then they'll be

12   addressed separately, your Honor, by other counsel.

13           Your Honor, I want to start by really kind of a

14   little bit of a windup, if you will, into the factual issues

15   that we think will be presented to the Court.  You know, this

16   is a very complicated case, as your Honor knows.  The city, I

17   think, says as much in its pleadings, that it is the largest

18   and the most complicated Chapter 9 ever filed.  I don't think

19   anybody in the courtroom would disagree with that notion.  In

20   addition to it being complicated because of its size and the

21   complexity and the various tentacles, if you will, of what

22   has to be done here in order to try to get a plan confirmed,

23   the plan also raises a number of issues that are issues of

24   first impression, your Honor, that may have to be decided by

25   you as part of a contested confirmation hearing, and so we

1  start our presentation with the notion that -- and I think it

2  was -- it's supported by the presentation that the city made

3  wherein they indicated that pretty much every point was

4  contested, and I think that's a fair assumption at the

5  moment, that the parties will need a full opportunity, your

6  Honor, to make their cases to you on all of the issues and to

7  create a full record for your Honor.

8       THE COURT:  Define "full opportunity."

9       MR. LEMKE:  I'm sorry.

10      THE COURT:  Define "full opportunity."

11      MR. LEMKE:  It is an opportunity to present evidence

12  on each of the issues, certainly on each of the objections.

13  I guess to back up, it's to hear the evidence first that the

14  city will propose with respect to confirmation of its plan on

15  all the requirements that it has to establish for your Honor

16  in connection with having a plan confirmed.  And then it's to

17  hear the evidence in rebuttal that the objecting parties will

18  put on, and in this case the DWSD parties will put on with

19  respect to those items in the plan --

20      THE COURT:  Well, I wonder why you think you need to

21  remind the Court of this.

22      MR. LEMKE:  Your Honor, I will move on.  Thank you.

23  Your Honor, we do think that all the issues raised in the

24  plan and certainly those raised by the DWSD parties are mixed

25  issues of law and fact, and, again, I think that is somewhat

1  supported by the statement of debtor's counsel.  Now, I'm

2  going to provide you a summary of what we think the evidence

3  may be that the objecting parties would put on, but I guess I

4  do feel a need to caveat unless -- that we are -- we have not

5  conducted discovery yet, as you know.  In fact, we really

6  haven't even started it in any meaningful manner.  Documents

7  are coming in.  They're being reviewed, but no depositions

8  have been taken, so at some level the city was able, as they

9  should have been, able to put on a little bit more of a

10 detailed presentation for your Honor, and we're going to have

11 to be a little bit higher level because we're still waiting

12 to develop some of our --

13          THE COURT:  That's fine.

14          MR. LEMKE:  Okay.  Thank you, your Honor.

15 Appreciate that.  And so we're basically -- the DWSD parties,

16 the common issues is we are objecting on basically four --

17 there are four main issues, and that is that the interest

18 rates being proposed on those bonds that would receive the

19 cramdown interest rates are below market, and they're based

20 upon a yield curve that bears really we don't think any

21 relation to the system's actual credit quality or what the

22 market would dictate.  They're stripping the call protections

23 from the DWSD bonds, which has its own effects.

24          THE COURT:  Let's back up to interest for a second.

25          MR. LEMKE:  Okay.

1          THE COURT:  To the extent you are able to answer

2     these questions, more specifically, to the extent you can,

3     from an evidentiary perspective, what will your evidence show

4     as to why the city's proposed interest rate is below market?

5          MR. LEMKE:  Your Honor, the -- first of all, we

6     think you'll hear both fact and expert witnesses on this

7     issue.  We believe that we will be able to elicit factually

8     through the city the -- we'll need to first know what they

9     are, but we'll elicit the facts that they relied on, the

10    underlying assumptions that went into whatever their experts

11    used to create the interest curve that they've put in the

12    plan, so we will know whether -- and that will -- we assume

13    they're on --

14         THE COURT:  Well, that might help you to undermine

15    their case, but it won't help you to prove your case.  I'm

16    asking you about your case.

17         MR. LEMKE:  Projections of the city, how it will

18    fare going forward, whether the projections that they're

19    making on revenues, operating expenses, capital expenditures,

20    are reasonable and achievable.  The capital --

21         THE COURT:  Is it your position that water rates

22    should go higher than the city contends they should or that

23    the city should spend more on capital improvements than the

24    city says it should spend?

25         MR. LEMKE:  I guess I have to answer that by saying

1  that is an open question, your Honor.  That is clearly one of
2  the factual issues that we need to get to the bottom of is
3  all we've seen are their projections in very summary fashion.
4  We've had a little bit of opportunity to look at some of the
5  underlying data but not a lot, so I don't have a good answer
6  for you.
7        THE COURT:  Well, but what's the impact of higher
8  water rates or greater capital improvement needs on interest?
9        MR. LEMKE:  On interest.  A lot of it relates -- or
10  intertwines, and, of course, we'll have expert testimony that
11  hopefully will do a better job of explaining this than I'm
12  going to do for your Honor, so --
13        THE COURT:  Well, I just need to know.  Does higher
14  water rates mean higher interest rates or lower interest
15  rates?
16        MR. LEMKE:  I think you have to --
17        THE COURT:  Does more capital improvement mean
18  higher interest rates or lower interest rates?
19        MR. LEMKE:  The interest rates are going to be
20  driven in large part, right, by risk of nonpayment, so to the
21  extent there are higher capital requirements than have been
22  anticipated, that could be a factor in the interest rates.
23        THE COURT:  Which way?
24        MR. LEMKE:  Up.  That would, you know -- the city
25  says, you know, we have "X" dollars of capital expenditures.

1    If the evidence were to come in that the capital expenditures

2    are much higher, then at least based on the current revenues,

3    there may be an increased risk they can't cover all their

4    capital expenditures.

5              THE COURT:  Okay.

6              MR. LEMKE:  Right.  The same would be true of the

7    operating expenses, however they -- whether they're --

8    they've projected too high or too low.  That will, of course,

9    be based on projections, will be tested against past

10   performance, which we don't have an insight into yet, but we

11   hopefully will.

12             THE COURT:  How about water rates or water --

13             MR. LEMKE:  On the revenues.

14             THE COURT:  -- water bill collection rates or --

15   that's revenues, yes.

16             MR. LEMKE:  Right.

17             THE COURT:  Thank you.

18             MR. LEMKE:  You're welcome, your Honor.  So the

19   revenues are a function of probably more than these two

20   things, but they're basically the rates that are charged and

21   the volumetric usage, so the city has taken into -- or has

22   projected that they will be charging certain rates and that

23   they may -- they've built into their plan some rate

24   increases.  I think it's on average four percent a year.  So

25   that'll have to be tested as to whether or not that will

1　generate sufficient revenues to pay the cost of services, and

2　the cost of services include the operating expenses, the debt

3　service, and the capital expenditures.  If their projections

4　are wrong or if the evidence suggests that they have under --

5　sorry -- overestimated the revenue projections --

6　　　　　　THE COURT:  Okay.  Got it.

7　　　　　　MR. LEMKE:  -- it could have a -- it could have an

8　adverse impact on the interest rates in the market.  And all

9　of these are just facts we do not have all the evidence on or

10　sufficient information on and we're trying to get to the

11　bottom of, but we need to understand the systems and how the

12　systems will perform.

13　　　　　　Now, our working assumption right now is based on at

14　least conduct to date or abilities to date, capabilities to

15　date, is that the systems are not unhealthy.  I don't know

16　what better word to use, but that they do generate sufficient

17　revenues to pay the current operating expenses, to pay the

18　current debt service, to pay the capital expenditures that

19　are at least currently in place under their capital

20　improvement plan, but we haven't had a chance to really test

21　those numbers.  Now, when you add onto, though, the

22　possibility that this payment into the pension plan -- what

23　we call the UAAL surcharge -- I don't know what word you want

24　to use for it, but it's that $428 million that will be paid

25　in over nine years -- that has not been paid to date, so that

1   is a new element, and that will have to be tested against

2   their assumptions and their projections on whether or not

3   that is going to create any increased risk of nonpayment,

4   which will, again, have an impact on the market -- on the

5   market rates.

6           The other thing that impacts it -- and I'm not going

7   to get all of these, I'm afraid, but -- is the call

8   protections.  As your Honor may know, when a public debt like

9   this is issued, if there are call protections in place that

10  prevent an issuer from calling the debt for a certain period

11  of time, that generates or usually results in the interest

12  rate that the issuer has to pay and the lender is willing to

13  receive, the holder is willing to -- is a lower rate because

14  they've -- they have protected their yield for a certain

15  period of time.  By eliminating those call protections, which

16  they're contemplating doing, that will have an impact on the

17  current bondholders, but it will also -- without any call

18  protections, it will have -- going forward, it will have an

19  impact on the market rates for the new bonds that they want

20  to issue if there's no call protections in place for those.

21          And then lastly is the issue of insurance, and

22  insurance certainly -- bond insurance certainly bears on what

23  the interest rates may be for a particular issue of bonds, so

24  I hope that answers your question --

25          THE COURT:  Yes.  Thank you.

1      MR. LEMKE:  -- the best I can.  So I talked about

2  the call protection.  That's one of the problems we have with

3  the plan.  The other problem is the payment of the 428

4  million that is going to go into the GRS from the DWSD.

5      THE COURT:  Of course, your experts will also take

6  into account the reduced expenditures resulting from the OPEB

7  and pension plan modifications; right?

8      MR. LEMKE:  I think it's fair to say the experts

9  will take into account, yes, all relevant factors, and so you

10  would assume that they will look at those issues, but if I

11  can respond to that a little bit, at least based on the

12  historical information we have, which is mainly just what's

13  ever publicly available right now on the websites in terms of

14  operating performance, the -- and what the city has advised

15  us is that the amount that's going to be paid every year

16  under the plan for the 428 million -- I think the number was

17  some average of 45 million, whatever adds up to 48-1/2

18  million -- or 428-1/2 million, that actually is going to be

19  more than what the systems were historically paying for their

20  pension, the full OPEB, and then the COPs payments, which

21  were actually being paid below the line.  They were not being

22  paid as operating expenses.  They were being paid as -- by

23  the city's own admission, they were being paid below debt

24  service.  Now, we don't know for a fact either whether or not

25  the pension -- the full pension payments or the full OPEB

1  payments were being paid as operating expenses.  It's what

2  the city says.  But it's still part of the discovery that we

3  are trying to engage in as to determine that.

4          THE COURT:  Right.  Yep.

5          MR. LEMKE:  And so those are some of the issues, and

6  whether or not the -- the other part of that is that the

7  $428-1/2 million, as your Honor pointed out, is the -- and

8  debtor's counsel acknowledges it's the -- as of the date they

9  freeze the plan, which will be in June, sort of fixes an

10  amount of unfunded liabilities, and that then gets amortized

11  under the city's plan over nine years.  And you ask whether

12  it's an acceleration or is it a catch-up, and it's a little

13  bit of both, but it has an acceleration component to it.

14  Those payments of that unfunded liability could be amortized

15  over as long as 30 years.  They would be permitted to do that

16  under the law.  They are choosing to pay them in nine years,

17  so they are accelerating what the DWSD might have to pay or

18  the time frame during which it might have to make those

19  payments, and they're --

20          THE COURT:  You call a quicker catch-up than the law

21  requires an acceleration.

22          MR. LEMKE:  Well, I don't know what else to call it.

23  We can -- if there's a better term, but it is being paid

24  faster than is certainly required.  There's no obligation.

25  They are choosing to do that.  The reason they're choosing to

1  do that is that they do want to get the money that they've
2  apparently promised to the GRS pension holders, and that's --
3  we understand that issue.  But it also allows the rest of the
4  city to have a nine-year holiday on catching up their share
5  of the unfunded actuarial liability.  None of the other city
6  departments are paying into the GRS for the first nine years.
7  It's the DWSD, and it's the funds coming out of the grand
8  bargain.  And so it is having an adverse impact on the
9  bondholders.  It is not only accelerating the payment, it is
10  causing their -- the funds coming out of the DWSD for a past
11  due liability to be paid into the GRS --
12         THE COURT:  Well, hold on.
13         MR. LEMKE:  -- which will be paid to all GRS
14  employees.
15         THE COURT:  Hold on.  Hold on.
16         MR. LEMKE:  Okay.
17         THE COURT:  Does any single bondholder get even one
18  dollar less on account of this?
19         MR. LEMKE:  It's an impairment of their rights under
20  the document -- of their lien, your Honor, if they are
21  taking --
22         THE COURT:  I'll take that as a no.
23         MR. LEMKE:  Okay.  Not under the plan, but it
24  increases the risk of nonpayment.
25         THE COURT:  Okay.  So it may impact the interest

1   rate.

2          MR. LEMKE:  It may impact the interest rate, but

3   five years from now it could actually result in a true

4   payment default on the bonds because they are front-loading

5   the DWSD's UAAL, and now they're also trying to pay --

6          THE COURT:  So that becomes a question of the

7   reasonableness of their feasibility projections.

8          MR. LEMKE:  It becomes a question of whether or not

9   that is fair as well or discriminatory.

10          THE COURT:  In any event, there's security; right?

11          MR. LEMKE:  I'm sorry.  Which are secured?  The

12   bonds?

13          THE COURT:  Aren't the bonds secured?

14          MR. LEMKE:  They are, but, remember, they want to

15   pay these before they pay debt service.  They want to pay

16   this payment as an operating expense so that if -- so they're

17   stripping the lien to pay it.

18          THE COURT:  But are they oversecured or not?  We had

19   that conversation this morning.

20          MR. LEMKE:  Well, I guess the answer I'll give you

21   is we are fully secured if you look at us as special revenue

22   bonds as a secured creditor, but we would argue, your

23   Honor --

24          THE COURT:  Doesn't get you attorney fees.

25   Oversecured gets you attorney fees.  We had that conversation

1  this morning.

2          MR. LEMKE:  We did, your Honor.  We are -- let me

3  put it this way.  We are certainly secured to the level that

4  it would be sufficient to pay our attorneys' fees.  How about

5  that?  And with that I might sit down.  No.  I'm just

6  kidding.  I have much more to say, your Honor.

7          THE COURT:  Okay.

8          MR. LEMKE:  Yeah.  And if I need to be the expert on

9  that, I'm happy to do it.

10          THE COURT:  That's why we have Daubert.

11          MR. LEMKE:  Yeah.  Is it Dilbert or Daubert, your

12  Honor?

13          THE COURT:  Yeah.

14          MR. LEMKE:  So all right.  Then the fourth area of

15  sort of general concern for the DWSD holders in addition to

16  the 428 is that they have seemed to create a placeholder for

17  this possible transaction, a qualified DWSD transaction,

18  which may or may not occur, as counsel indicated, as part of

19  sort of a private partnership, but it's unclear whether or

20  not as part of that they would be basically eliminating the

21  due on sale clause, if you will.  There is a provision right

22  now in the ordinance that says they cannot sell those assets

23  unless, among other things -- there are other requirements,

24  but among other things, they pay the bonds off in full.  The

25  plan doesn't speak to that, so there's sort of this

1  placeholder we're concerned about.  We need to conduct some
2  discovery and determine whether that is a live issue or not
3  for the Court, I believe.  So, your Honor --
4          THE COURT:  Is a due on sale clause in a contract
5  enforceable in bankruptcy?
6          MR. LEMKE:  It is an ordinance, first of all.  It's
7  not just a contractual obligation.  It is in the ordinance,
8  so I would say it is --
9          THE COURT:  So that might make a difference.  Okay.
10         MR. LEMKE:  It might make a difference.  And
11 secondly, your Honor, remember, they have said they are
12 unimpairing three point something billion dollars of the
13 bonds.  That is one of the rights of the bondholders.  They
14 cannot unimpair them and then strip that right at the same
15 time.  So, your Honor, the objectors -- the DWSD objectors
16 raise a number of the issues under 943 that they say that the
17 plan does not comply with.  Basically it is Sections 2, 4, 6,
18 7.  In other words, they don't -- it doesn't meet the best
19 interest of creditors.  It's not fair and equitable.  It is
20 not -- it does not comply with all of the provisions of
21 Chapter 9 which are incorporated under 901 and which 943(2)
22 requires.  It also -- if you got to the point of
23 determining -- and that doesn't even let them get to cramdown
24 then if they -- if you conclude that they can't comply with
25 those --

1          THE COURT:  Right.

2          MR. LEMKE:  -- you don't get to 1129, but even if

3  you conclude 1129 is applicable, our position is they cannot

4  satisfy the cramdown requirements either, so that was my long

5  windup, I guess, if you will, your Honor, to get into some of

6  the evidence that we think we'll be presenting.

7          THE COURT:  Okay.  Go ahead.

8          MR. LEMKE:  And, again, I want to be -- you know, to

9  say that we don't -- we're not saying that we have the burden

10  of proof on any of this, but we understand we have to come

11  forward with a case.  So, your Honor, we will present

12  evidence addressing the structure of the department, the fact

13  that the department and the systems operate, in essence,

14  separate and apart from the city.  They are enterprise funds.

15  Now, they're a department of the city, but they are a closed

16  system.  The systems are closed systems.  None of the

17  revenues are supposed to leak out of the systems.  Those

18  revenues are for one purpose and one purpose only.  They are

19  to pay the cost of services of providing sewer services and

20  water services.  Likewise, only on a rare occasion would

21  money actually come into those systems from outside the

22  systems.  They do, if you will, self-sustain, and they self-

23  sustain through proper rates generating the proper level of

24  revenues that will cover the cost of services.  It's actually

25  statutorily mandated, but it's also what's mandated in the

1  ordinances and it's what's mandated in the indentures, and so

2  we'll present evidence explaining how the systems work and

3  how the funds work, how the cash flow and the waterfall works

4  and why it works like that, why these bonds -- these are

5  not -- I mean these types of bonds are issued in every state

6  of the union, but why these special revenue bonds are issued

7  the way they are and why some of the -- some of the

8  protections in the covenants are in place to protect the

9  holders' interest in the net revenues, which is their primary

10 if not in some instances sole source of payment of the bonds.

11 They don't get to look to the general fund for payment of the

12 principal and interest or any other damages they may suffer.

13         We also want to lay out for you, your Honor, the

14 nature of the bargain that underlies the bonds, and so we

15 will present evidence on the bond structure itself, which

16 ties into what I just said.  We will try to present evidence

17 on the indenture, on how the indenture was structured, how it

18 was intended to structure, how the waterfall works, why it

19 works the way it does and, again, why that is all part of the

20 benefit of the bargain that the DWSD bondholders contracted

21 for and are still entitled to as special revenue holders

22 under Chapter 9.

23         We think that we can -- through all that, we will

24 hopefully be able to show your Honor and convince you that,

25 in fact, this is what the holders expect, and it's what the

1   market expects is that in a Chapter 9, at least under the

2   facts and circumstances as we have here, which is a system

3   that is perfectly capable of paying every penny, full

4   interest at -- through any call period, that it is the

5   expectation and it is a requirement of the city to, in

6   essence, pay that, that the impairment of the bonds that they

7   are proposing, especially --

8            THE COURT:  Well, hold on.  In a reorganization,

9   doesn't the debtor have a fiduciary obligation to cram down

10  on secured creditors where appropriate for the benefit of

11  unsecured creditors?

12           MR. LEMKE:  I guess the answer to that is where

13  appropriate, and we would argue that in this instance --

14           THE COURT:  Well, the fact that the city is capable

15  of paying the full interest, as you just asserted, is

16  irrelevant to whether that's what they should be doing in a

17  reorganization like this.

18           MR. LEMKE:  I understand your point, but it is -- I

19  would argue respectfully it's not irrelevant, and the reason

20  is not only are they capable of doing it, but the impairments

21  that they are proposing, the reductions in the interest rates

22  and the elimination of the call protections -- let's take the

23  428 aside for a second -- those two -- those two things are

24  not necessary under their own plan for them to achieve the

25  results they want to achieve with respect to any other

1  creditors in the plan.  Remember, at the end of the day, this
2  is a closed system.  None of the money leaks out of the
3  system.  You mentioned earlier today about the police and
4  firemen.  It doesn't leak out to them.  You know, for better
5  or for worse, that's not how it works.

6        THE COURT:  Well, but if it saves -- if it saves
7  money on interest, that means the water rates don't have to
8  go up so high.

9        MR. LEMKE:  It could have an impact.  You're right.
10  It could certainly have an impact on water rates, but with
11  all due respect, they're not one of the unsecured creditors
12  in the case; right?  They're the ratepayers.  They are the
13  essence -- almost seen as the equity owners of the systems.
14  The ratepayers pay the rates for services rendered.  The
15  interest rates reductions -- the reduction or the elimination
16  of the call protections may -- and there will be evidence
17  presented on this.  It actually won't result in any savings
18  to the city at all.  Now, we will certainly intend to present
19  some evidence that at the end of the day because of what
20  they're doing to the special revenue bonds, the market
21  reaction is going to be that the interest rates are going to
22  be higher.

23        THE COURT:  Well, hold on.  How can it not result in
24  savings to the city when just the other day you told me -- or
25  maybe it was Mr. Neal told me that it's going to cost the

1  bondholders -- well, first he said 800 million, and then it
2  was really 400 million.
3           MR. LEMKE:  That was Mr. Neal, your Honor.  I deny
4  all -- no.  Your Honor, here I think you got to sort of
5  unpack it a little bit, if you will.
6           THE COURT:  Okay.
7           MR. LEMKE:  Okay.  So under the city's plan, they
8  say that they'll realize somewhere between zero and 300 and I
9  think it's $20 million in interest savings if they cram down,
10  and that assumes every impaired class of DWSD bonds gets the
11  cramdown rate all across the board, but their plan works at
12  zero.  They don't need those savings to make their plan work.
13  They say that in their plan.  They also say -- I don't know
14  if they said it expressly in the plan, but they certainly
15  said it in their objection that they don't need access to the
16  capital markets either for their plan to work.  So they don't
17  need to strip the call protections because they don't need to
18  go into the capital markets, according to their own
19  admissions, to realize any savings.  And we also think what
20  the evidence will show is they won't be able to go into the
21  capital markets and refinance any of these bonds for lower
22  interest rates than they're currently paying, so that will be
23  a damage to the holders by stripping them of their call
24  protection.  That will devalue their holdings, but there will
25  be no resulting benefit to the city from doing that.

1          THE COURT:  Okay.

2          MR. LEMKE:  Okay.  So, your Honor, I think I covered

3    the interest rate and the evidence we'll put on there, and I

4    think I've -- I believe I have covered the call protection,

5    although if I have not, I hope counsel will -- who gets up

6    behind me will help me address that.  And I guess I want to

7    talk a little bit more about the evidence that we think your

8    Honor will need to consider regarding this pension allocation

9    and the -- or what we call the UAAL surcharge, and so we

10   think the evidence that you're going to have to hear, your

11   Honor, is, first of all, we need to establish what the actual

12   total amount of the total of UAAL is.  We've been given

13   numbers, and for now we can only accept them at face value,

14   but we are, we believe, entitled and need to understand how

15   that gross number got calculated.  As your Honor may recall

16   there's been two different numbers bandied about.  There's

17   the Milliman number, which is the city's current consultant,

18   and then there was what our GRS number -- Gabriel, Roeder

19   number, which was different, so we need to figure out what

20   the differences are.  Then from there you got to figure out

21   what the right allocation of that number is to the DWSD, so

22   that'll be factual, intensive.  We need to know what -- we

23   need to present evidence to your Honor on what the impact

24   will actually be on the systems, which will, we believe,

25   potentially increase the risk of nonpayment, of this

1    acceleration.  I know you don't like that word.

2         THE COURT:  When you say "the systems," you mean the

3    water systems, not the Retirement Systems?

4         MR. LEMKE:  Water system, water and sewer systems,

5    yes, your Honor.  Yes.  That's right.  So we need to know the

6    impact on those and their projections so that we can

7    determine whether or not there is a -- the impact of that,

8    quote, impairment on the holders.  There's certainly some

9    costs that are now -- we understand are now being added to

10   this 428 million.

11        THE COURT:  Why is there any reason to believe that

12   there will be any impact on the holders, the bondholders?

13   Yeah.

14        MR. LEMKE:  Well, it just all goes, again, to

15   whether the projections on revenues, expenses are accurate

16   and if you're going to add additional amounts -- and it is --

17   it's probably -- I think it's about twice as much annually

18   for the first nine years that will be going out the door

19   ahead of debt service that is -- that was going out the door

20   historically ahead of debt services, as best we can tell, for

21   pensions and OPEB.  COPs are always being paid after debt

22   service.  So if you're now paying out twice as much annually

23   because you're paying it in nine years and you're not making

24   any of the other departments pay their share yet, then that

25   could have an adverse impact on the ability of the systems to

1    actually generate those funds sufficient to pay those

2    expenses, all the other operating expenses, and, thus, debt

3    service, which then would be at risk of nonpayment.

4          THE COURT:  So the city would have to show, in your

5    view, that the water rate increases that they project would

6    be sufficient to cover this additional expense taking into

7    account all the other expenses, whether they go up or down?

8          MR. LEMKE:  That would certainly be one of the

9    things, your Honor, yes, that they're going to -- they're

10    going to have to show.  I think the other thing is that --

11    and it kind of relates to this -- is at least the trustee and

12    the ad hoc committee have not taken the position that

13    whatever that number is, whether -- let's just say it's 428

14    million, that that's the right number, whatever that number

15    is.  They're not taking the position it cannot be paid into

16    the GRS.  We've only taken the position that it cannot be

17    paid as an operating expense.  It is not an operating

18    expense.  It is not a current --

19          THE COURT:  How can it not be?

20          MR. LEMKE:  Pardon me?

21          THE COURT:  How can it not be?

22          MR. LEMKE:  You have to look at the definition of

23    the operating expenses under the statute, the ordinance --

24          THE COURT:  Which is?

25          MR. LEMKE:  -- and the indenture.

1        THE COURT:  This month's and last month's expenses?

2        MR. LEMKE:  Its current.  Its current expenses for

3 the next month's operations.  This liability --

4        THE COURT:  Suppose the city proves that this 400

5 and whatever the number is million dollars is an expense that

6 should have been paid beginning -- I don't know -- 30 years

7 ago and until last month.

8        MR. LEMKE:  Okay.

9        THE COURT:  Doesn't that make it still a current

10 operating expense?

11        MR. LEMKE:  No, I don't think that it does.  I think

12 that if the plan were still in place -- and it's not.  It's

13 going to be frozen, but if it were still in place, the

14 current benefits being earned -- and I can't remember what

15 the terminology was that was used, but there's current

16 benefits being earned, and they get paid, sort of a pay as

17 you go basis.  Those are operating expenses.  This accrued

18 liability is a long-term liability, and it gets paid, but it

19 gets accrued.  It gets amortized.  So it is a -- it is an

20 extraordinary expense.  It is a capital expense.  It is

21 something other than an operating expense.

22        THE COURT:  How does it ever get paid then?

23        MR. LEMKE:  It gets paid at the bottom of the

24 waterfall, your Honor, and it doesn't matter whether it's

25 paid at the top of the waterfall or the bottom of the

1  waterfall.  If their projections are right on revenues and

2  expenses and debt service, it'll be paid wherever it is.

3          THE COURT:  Okay.

4          MR. LEMKE:  But it does, in practice --

5          THE COURT:  And that's true whether the amortization

6  is 30 years or 10 years?

7          MR. LEMKE:  Yes, but by front-loading it, it does

8  create that -- it puts a harder -- or a heavier load on cash

9  flow in the first nine years, and cash flow -- as we say in

10  Bankruptcy Court, cash is king, and cash flow is king for

11  these systems.  They basically do operate very much on a cash

12  basis.

13         THE COURT:  Right.  So you agree with the

14  proposition that if the systems' revenues are sufficient to

15  cover operating expenses as you define them, bond payments,

16  whatever they are, cramdown or not, and this catch-up on the

17  pension obligation --

18         MR. LEMKE:  The acceleration.

19         THE COURT:  -- the catch-up --

20         MR. LEMKE:  Okay.

21         THE COURT:  And it's not a surcharge either.

22         MR. LEMKE:  Okay.

23         THE COURT:  Then you're all set because from an

24  accounting standpoint, it doesn't matter which check is

25  written first.  There's got to be money to pay all of it.

1      MR. LEMKE:  But we're not all set, and here's why.

2      THE COURT:  I said "if."

3      MR. LEMKE:  But even if I would say we're not all

4  set because if it's not an operating expense, then it is

5  stripping the lien in the net revenues that is the collateral

6  for the bonds, and so it would be -- it would be no different

7  than them coming up with something else like --

8      THE COURT:  Well, but you said the money has to be

9  paid.

10      MR. LEMKE:  And it can be paid at the bottom of the

11 waterfall after the debt service so that the lien is not

12 stripped, so debt service gets paid every month.  The reserve

13 funds get trued up, whatever.  There should be funds then

14 available at the bottom of the waterfall to make this

15 payment.

16      THE COURT:  And you don't have any objection to the

17 use of that money to pay this debt?

18      MR. LEMKE:  Trustee does not, and the ad hoc

19 committee did not raise that objection.  I will defer to

20 others if they have objection to not being paid at all.

21      THE COURT:  So as long as your debt service is paid,

22 you don't care how fast or slow this unfunded pension

23 liability is paid?

24      MR. LEMKE:  You know, I wouldn't go that far, your

25 Honor, because you still got to put some stress tests on

1    whether or not the accelerated -- I'm sorry -- the catch-up

2    payment being paid faster than it should be paid is putting

3    an additional stress on the system --

4              THE COURT:  Absolutely.

5              MR. LEMKE:  -- that could still result in a default.

6              THE COURT:  It has to be feasible.  I've said that.

7              MR. LEMKE:  Right.  So I don't want to -- you know,

8    they couldn't come up with any number, and --

9              THE COURT:  Right.

10             MR. LEMKE:  -- we'd say that's fine and pay what you

11   want to pay.

12             THE COURT:  Right.  Absolutely.

13             MR. LEMKE:  It has to be the right number.

14             THE COURT:  The assumptions have to be reasonable.

15             MR. LEMKE:  That's right.  So the other thing, your

16   Honor, that we need to find out is we now understand and

17   honestly didn't until fairly recently, but we now understand

18   that the 428 million may not be the end of it either; that at

19   the end of the nine years if the city determines that that --

20   their actuarial assumptions and investment assumptions were

21   wrong, we might owe more.  If they've shifted employees

22   because what we understand is wherever the employee retires

23   from, that department bears the full retirement burden, so

24   the last month of their employment they could get shifted to

25   DWSD.  It has to pay the full amount.  I'm not saying that

1   will happen, but, in other words, it could, and so we have to

2   understand what risk factors, what factors are in place that

3   might cause us to actually have to pay more than the 428 when

4   we thought we would otherwise be done at the end of nine

5   years.

6           On the other hand, if it turns out at the end of

7   nine years we've paid too much -- in other words, the

8   actuarial assumptions and investment assumptions were wrong

9   but they were wrong to the benefit of the systems; they

10  earned more -- we don't get any money back, that once into

11  the systems, it's in, so it's important for us, again, to

12  understand what this number is, how it's arrived at, and

13  exactly whether it is fair in amount.

14          And I think, finally, I guess -- and I have

15  mentioned this, but there is a -- I don't know.  It goes to a

16  number of the issues.  Probably it goes to good faith, best

17  interest, others, but this notion that the rest of the city

18  departments, in essence, get a nine-year holiday on having to

19  catch up their underfunded liabilities to the GRS when the

20  department does not, it pays its full share faster than it

21  might otherwise have to -- for example, if the other city

22  departments would pay their share in, that nine years could

23  be stretched out and the city still receives the same amount

24  of money.

25          THE COURT:  Which of the other -- which of the other

1   departments have income?

2         MR. LEMKE:  Well, they all have income from whatever

3   sources of revenues that the city has, whether it's taxes --

4   and I don't know whether there are departments that have

5   specific fees or whatever that they generate.

6         THE COURT:  None of them are self-sufficient like

7   the water, huh?

8         MR. LEMKE:  Not to my knowledge.  Now, there may be

9   one of the other departments that has -- that generates

10   independent revenues, and I just don't have the answer to

11   that.  I don't want to say that they're not because I may be

12   wrong about that, but for purposes of this conversation, I

13   can't point you to one where they have an independent source

14   of revenues, but that doesn't change the fact that the burden

15   for funding the GRS is being put disproportionately on the

16   DWSD, which has a disproportionate impact on the holders.

17         THE COURT:  Why is it disproportionate if the number

18   is calculated based on the employee actuarial projections for

19   the DWSD employees?

20         MR. LEMKE:  Well, among other reasons, again, it

21   increases the amount that the DWSD has to pay annually, and

22   if it comes above debt service, that's a bigger issue than

23   below, but it also --

24         THE COURT:  Well, but only because the DWSD didn't

25   pay enough over the years.

1          MR. LEMKE:  Well, none of the departments did.  In

2   fact, the DWSD was the only one that --

3          THE COURT:  Well, but that's the reason why the DWSD

4   has to pay more now.

5          MR. LEMKE:  All right.  We will -- for purposes of

6   today, we will accept that, in fact, the DWSD has a UAAL of

7   some dollar amount -- all right -- due to actuarial

8   assumptions --

9          THE COURT:  If it doesn't, it solves a lot of

10  problems for us.

11         MR. LEMKE:  We'll be back in here as soon as we find

12  out that it doesn't, your Honor.

13         THE COURT:  As soon as you find that out, you'll

14  settle.

15         MR. LEMKE:  Yeah.  That's right.  I lost my train of

16  thought now, and it wasn't a very long train.  I can't

17  remember where I was.  I apologize.  I wish there was

18  something in here that would help -- oh, it's the holiday.

19  I'm sorry.  It's the holiday.  Yes.  So it is creating -- it

20  may be the DWSD's liability, but the whole city has the

21  liability to the GRS.  The DWSD doesn't have its own

22  liability necessarily.  It has its --

23         THE COURT:  Well, but isn't the grand bargain paying

24  the other -- the balance of the city's liability?

25         MR. LEMKE:  Sure, for the first nine years it is,

1    but so one city department, because it does have these

2    revenues, because it is a, you know --

3              THE COURT:  A closed system, as you described it?

4              MR. LEMKE:  A closed system, which it is, is being

5    required to pay more of its share because in addition, as

6    those monies get paid in by the DWSD and by the grand

7    bargain, the DWSD's money doesn't just go to DWSD employees

8    who are entitled to retirement benefits.  It goes to all city

9    employees who are retired under the GRS, so the DWSD is

10   paying in faster than it needs to.  It is the only department

11   paying in, and its funds are being used to pay all employees,

12   so there is a disproportionate impact on the department,

13   which means it's a potentially disproportionate impact on the

14   holders because of risk of nonpayment.

15             THE COURT:  Okay.

16             MR. LEMKE:  You know, I think we've covered this a

17   little bit, but just to make sure, you know, we think the

18   evidence will actually also show that given what the city is

19   proposing with respect to the interest, the call protections,

20   the payment into the GRS, that it will actually increase the

21   future financing costs, and so it goes back to they won't

22   realize any of the savings that they are contemplating that

23   they will realize and that it will -- it may even exceed --

24   the future financing cost, depending on how the market reacts

25   to the plan, could actually exceed any of the savings that

1   they are garnering from reducing the OPEB and the pension

2   liabilities.  Remains to be seen obviously.  That's part of

3   the evidence that we may be presenting to your Honor.

4        We do think your Honor will hear evidence on the

5   feasibility of the overall plan, and I don't know -- can't

6   stand up here and say that as the trustee or ad hoc committee

7   we would be addressing the overall feasibility of the plan.

8   That will be something I think others will address, but

9   certainly it has -- it does have an impact on us.  Now, our

10  view is that at least with respect to the DWSD treatment,

11  that what they are proposing in terms of paying into the

12  pension fund is doable, if you will, again, without any of

13  the other impairments that they're trying to impose on the

14  holders.

15       You know, we will certainly want to see how, though,

16  the rest of their plan and the treatment that they're

17  proposing to the bonds -- you know, what sort of impact that

18  will have on the credit quality of the systems and the other

19  ability of the systems to go out back into the capital

20  markets and raise capital to make the capital expenditures

21  that they have projected, so in terms of -- oh, I'm sorry.

22       And then there is the last issue.  The trustee did

23  not raise this, but I think the insurers did, and we

24  certainly raised it in our objection to say that we think all

25  the bonds are impaired; right?  The city has said that three

1  billion are unimpaired, but if we're correct on the $428-1/2

2  million that paying it above debt service is an impairment

3  because it strips our lien, then they're all impaired, but

4  the city has not provided all of the holders an opportunity

5  to vote.  It may be an issue the city simply has to address,

6  your Honor.

7          THE COURT:  Okay.

8          MR. LEMKE:  So here's some of the evidence that

9  we -- types of evidence, and we do have to just do it in

10  fairly broad categories for the reasons I stated earlier, so

11  we'll present bond documentation, historical and projected

12  financials regarding the DWSD, most importantly, though, the

13  underlying support for those reports, which we don't have.

14  We will look at budgets, all materials and components of

15  revenues and expenses, you know, look at rates, wholesale

16  contracts, their CAPEX plan, all the things you might

17  consider, your Honor, in terms of looking at the systems and

18  determining their economic health, viability, both now and in

19  the long run.  Certainly want to look at management and

20  consultant reports and statements that the city has had

21  prepared for them over the years, including a cost of service

22  study or a rate study, although we were told yesterday they

23  don't have one, which -- and that'll get addressed, I guess,

24  later on in the discovery.  It seems a little odd that a

25  system would not have a rate study that would tell it what

1  its cost of services were so it knew what rates to charge,

2  but that is a critical -- we think a critical factor in your

3  Honor being able to determine whether the city's projections

4  with respect to the DWSD have any basis in fact as some sort

5  of analysis of that.

6          We will be introducing rating agency reports, bond

7  market materials to show you the impact on the market and the

8  rates and the value of the bonds based on the interest rates

9  and the changes in the call protections.  We will certainly

10  be looking at the GRS records, the Retirement Systems

11  records, audits, documents related to the UAAL all going into

12  determining if the amount and allocation of the UAAL is

13  correct, whether or not -- and included in that whether or

14  not there were employees that were attributed to the DWSD for

15  coming up with the UAAL that really were not employees of the

16  DWSD.  They really were employees of other departments, but

17  now the DWSD is burdened with their retirement obligations.

18          In terms of witness categories, your Honor,

19  certainly DWSD officials and consultants will be on our

20  witness list, actuarial consultants such as Milliman and

21  Gabriel, Roeder, city and emergency manager officials and

22  consultants, county officials and consultants potentially,

23  city and DWSD 30(b)(6) designees.  We don't know who those

24  are yet or at least a definitive list of who those will be,

25  but whoever those are will almost certainly be part of the

1  witnesses that your Honor will hear from.  Bondholder insurer

2  representatives may also be taking the stand, your Honor, to

3  explain again the structure of the bonds and the whole -- how

4  the -- how it was put together, why it was put together, and

5  the impact that some of the changes being proposed will have

6  on the value of those bonds.  Expert witnesses on credit

7  ratings, interest rates, pension, and water and sewer

8  operations, and then in addition to the actuarial

9  consultants, there may be additional witnesses on the GRS

10  UAAL --

11        THE COURT:  In this list of witness or witness

12  categories, are you speaking for yourself or for a group?

13        MR. LEMKE:  I am speaking for the group, the greater

14  DWSD objecting group, so the parties.

15        THE COURT:  And who does that consist of?

16        MR. LEMKE:  It consists of the trustee, the ad hoc

17  committee, and the insurers of the DWSD bonds, so that's

18  Assured, National, FGIC, and Berkshire.  Did I get that

19  right?

20        THE COURT:  Thank you.

21        MR. LEMKE:  And that, I think, your Honor, is all I

22  have, but some of my other counsel colleagues may have some

23  additional --

24        THE COURT:  Okay.

25        MR. LEMKE:  -- items.  Thank you.

1          MR. BJORK:  Your Honor, Jeff Bjork from Sidley

2   Austin on behalf of National.  I just wanted to follow up on

3   a couple things, a couple questions you had --

4          THE COURT:  Okay.

5          MR. BJORK:  -- asked along the way.

6          THE COURT:  Sure.  Go ahead.

7          MR. BJORK:  And also I wanted to address what really

8   is the city's contention that by and large this impairment is

9   kind of legal in nature; that there really aren't facts in

10  dispute.  Mr. Lemke went through a litany of facts that are

11  in dispute both in terms of interest rate impairment and the

12  like, but beyond that, just in terms of what call protection

13  is, what's the appropriate interest rate coming out, you

14  asked him a question about what is your case going to be,

15  objectors, in terms of the interest rate, and our response to

16  that is the city has proposed an A rating utility curve in

17  terms of its interest rate.  That's its chart.

18         THE COURT:  Um-hmm.

19         MR. BJORK:  And it's kind of a modified chart in the

20  sense of there are different factors they've taken into

21  account, but essentially it's A rating.  Currently the system

22  is junk rated.  The system will continue to be operated by

23  the city as presently stands in the plan coming out, and so

24  we will be putting on expert testimony that really goes to, I

25  think, what you were asking, which is what is the credit

1  quality of the system day one post-effective date, how do the

2  markets look at it, and that gets into -- you'll hear a lot

3  about _Till_.  You'll hear about efficient markets, prime plus.

4  You're going to get a lot of expert testimony on that, which

5  will be guided by the factual testimony as well, so that was

6  one point I wanted to raise.

7          THE COURT:  Um-hmm.

8          MR. BJORK:  The other thing you've asked now three

9  or four times is are we oversecured, undersecured, perfectly

10  secured, fully secured.  I think the answer to that is pretty

11  simple, which is the rates are set in an amount sufficient to

12  cover O&M per the documents plus the debt service, and on top

13  of that there's a coverage reserve.  So what you will hear in

14  terms of --

15          THE COURT:  There's a what?

16          MR. BJORK:  A coverage reserve, so they collect

17  enough so that essentially at the end of the day there is

18  some amount left over at the bottom of the waterfall.  It's

19  not a lot.  And it is a closed system.  That money doesn't go

20  out to the general fund.  It stays in the system.  So for

21  purposes of whether we're oversecured, the answer is, yes,

22  we're oversecured.  The rates are set, and the rates are

23  sufficient to cover the debt, and that's one of the

24  fundamental points that you're going to hear a lot of

25  testimony on, something that today -- until today the city

1  had I thought made pretty clear that they agreed with the

2  fact that there are sufficient revenues to cover the debt

3  service, and I thought I heard counsel for the DWSD entity

4  saying he wasn't quite sure.  You'll hear testimony about

5  that.

6       You asked about the impact to holders, you know,

7  what difference does it make if you're putting 428 ahead of

8  the holders?  They're going to get paid whether it's under

9  cramdown rate or it's under their contract rate.  If they get

10  paid, what difference does it make?  Well, to the extent

11  we're going through a cramdown analysis -- and you'll hear

12  testimony about this -- there's plenty of case law that says

13  that you can't subordinate a lien to an exit facility and

14  then satisfy the retention of lien requirement under 1129.

15  You'll also hear a lot of evidence -- and this is purely

16  factual -- that goes to -- and something unique to Chapter 9,

17  which is the best interest of creditors test and the fair and

18  equitable test.  As you know, your Honor, those tests are

19  different in the context of Chapter 9 than they are in the

20  context of Chapter 11.  And, in fact, when you're talking

21  about fair and equitable, which is something you'll hear a

22  lot about at confirmation, you're really talking about what

23  is the amount that the objecting creditors could reasonably

24  expect to receive under the circumstances?  That's a fact-

25  based analysis.  All the Courts look at it from the fact-

1    based analysis.  Best interest as well.  So, again, your

2    Honor, these are mixed questions of law and fact.  We

3    appreciate the fact that the Court wants to have an efficient

4    trial.  We appreciate that.  We have done our best to

5    coordinate amongst the DWSD objectors to that end, but at the

6    end of the day you can't take out one legal issue or one

7    legal proposition and issue some blanket ruling ahead of

8    confirmation.  We will be -- we will be as tight and

9    efficient as possible in presenting the evidence, and by July

10   18th, per your calendar, so long as it holds, you're going to

11   have supplemental objections that tie off our objections

12   element by element to the facts as educed by the city or as

13   that we discover through evidence along with expert reports,

14   and so I would just ask that your Honor take all of this into

15   consideration as you think about other legal issues on DWSD

16   that are susceptible for one-off determinations.  Thank you.

17            THE COURT:  Thank you.

18            MR. KOHN:  Good afternoon, your Honor.  Samuel Kohn

19   of Chadbourne & Parke on behalf of Assured Guaranty.

20            THE COURT:  Would you keep your voice up for me?

21            MR. KOHN:  Sure, your Honor.  Samuel Kohn of

22   Chadbourne & Parke on behalf of Assured Guaranty.  Your

23   Honor, one of the benefits of going last is that

24   everything -- almost everything has been said, so I'm going

25   to be really, really brief and only address one or two issues

1  that may not have been fully addressed, and the first one

2  actually goes to the chart, and it is really helpful that the

3  city presented the chart that everybody got this morning.

4          THE COURT:  Um-hmm.

5          MR. KOHN:  But your Honor asked a question to

6  Mr. Bennett about 4.d., and that's best interest, 943(b)(7),

7  how will Mr. Malhotra and Mr. Buckfire give testimony to no

8  creditor will do better outside of Chapter 9.  Now, as it

9  relates to DWSD, that -- and Mr. Bennett responded that

10  there's some principles of law, and they'll apply some

11  principles of law, and they'll apply it and come up with an

12  answer.  And then he said that this was going to be the

13  smallest part of his presentation or small-scale production.

14  I'm not sure exactly the words he said.  But from the DWSD

15  side, it's going to be a large -- a very large presentation,

16  and maybe Mr. Lemke and Mr. Bjork didn't focus on it, but

17  what I think is going to have to happen is what are the

18  rights of holders outside of bankruptcy.  That's going to be

19  an inquiry on whether the system is solvent, on whether

20  there's a capacity to increase rates, whether there is a

21  reasonable expectation of creditors to be reinstated in full

22  without impairment in bankruptcy, totally without impairment.

23  They call it 428.  I'm a previous accountant.  I'll call it

24  429 because it's 428.5, so it's really 429, and that there

25  would be no coupon impairment at all and no call protection

 1    stripping at all, and it's based on historical perspectives,

 2    and projections, so there's going to be a very, very large

 3    emphasis on discovery and on the evidentiary presentation and

 4    in the expert presentation from our side what the reasonable

 5    expectation of creditors of a fully secured system outside of

 6    bankruptcy.  That includes the remedies, the remedies of a

 7    receiver, the remedies of mandamus, whatever that mandamus

 8    means.  Does it mean to make sure that there's a fully

 9    scrubbed audit of the DWSD employees that -- we only know

10    this anecdotally, but the city's blacksmith is on the DWSD

11    payroll, and, you know -- and the question is, you know, when

12    they calculate it, this gets into the UAAL and your Honor's

13    question about why the non-DWSD -- the DWSD employees would

14    have to have paid anyway instead of the non-DWSD GRS --

15             THE COURT:  Right.

16             MR. KOHN:  -- but the answer is let's assume for

17    purposes of this exercise that the DWSD employees paid 90

18    percent of their liability until the bankruptcy.  Let's

19    assume that the non-DWSD employees paid ten percent of their

20    unfunded liability.  So their calculation would be skewed the

21    other way, and they make it a calculation of the total UAAL

22    funded and, say, historically -- which we don't know, by the

23    way, because they're living with the case for a year and a

24    half.  We didn't get the documents of historical -- my

25    understanding is there's some Milliman documents in last

 1  night's production that we couldn't look at yet, but we don't
 2  know yet whether the calculation of UAAL is accurate, whether
 3  they included the blacksmith or whether they included non-
 4  DWSD employees and whether historically we paid 90 percent
 5  and they paid 10 percent either which way it's going to --
 6  it's going to benefit the non-DWSD GRS employees because it's
 7  one system; right?  So there's going to be a lot of evidence
 8  that's going to be required to be shown notwithstanding
 9  Mr. Bennett's minimization of DWSD issues.

10         Now, your Honor asked -- there was mention of the
11  call protection, and right now it's a very easy -- the call
12  protection -- and there's some language in their brief, and
13  we're going to talk about this at the confirmation hearing.
14  They even say in their statement they're going to talk --
15  discuss about the -- that they're going to present evidence
16  about the value of the call protection.  That is going to be
17  educed through factual evidence and expert evidence about
18  what the value is.

19         And your Honor asked Mr. Lemke about the interest
20  rates and just wanted to talk to you, just tell you that it's
21  sort of an easy roadmap to look a little bit on why
22  bondholders will be impaired through the plan.  I would
23  encourage you, your Honor, if you have a chance, to look at
24  the Fitch reports and the rating reports of how they rate the
25  bonds today as a result of the plan's proposed impairment of

1  the bonds.  Then you'll see how bondholders can get impaired.

2  Thank you, your Honor.

3          THE COURT:  Well, I'll accept your invitation when

4  and if they are admitted into evidence.

5          MR. KANNEL:  Sam always likes to forget about me.

6  I'm William Kannel for the ad hoc bondholders.  Unless FGIC

7  or Berkshire have something to say, I'm actually going to be

8  last, and I'm actually going to be brief.  I'm going to try

9  not to duplicate --

10          MR. KOHN:  We are on the same side.

11          MR. KANNEL:  In this case, your Honor.  I'm going to

12  try not to duplicate any of the arguments made by Mr. Lemke,

13  Mr. Bjork, or Mr. Kohn.  We actually joined in the trustee's

14  objection, and we're going to be relying principally, if not

15  exclusively, on all of their evidence.  There is one specific

16  issue that we called out that I think and hope was taken care

17  of today, but maybe not entirely.  There are three classes of

18  DWSD bonds under the plan.  There's the ones that are insured

19  or held by clients like mine or insured by clients -- by Mr.

20  Bjork and Mr. Kohn's clients as well as FGIC and BHAC, and

21  then there are two classes of subordinate bonds held by the

22  state, the state revolving bonds.  Those are in Class 1-B and

23  1-C, and those are, apart from the 428 million, unimpaired

24  under the plan.  Those bonds are subordinate to the bonds my

25  clients hold and the other parties' clients insure.

1  Mr. Bennett was clear.  The reply is clear that the

2  nonconsensual releases only apply to pension claimants.  I am

3  a little worried about the exculpation provision, which

4  exculpates the state from any -- with respect to any

5  distributions it receives under the plan which could

6  conceivably include distributions on these junior bonds, and

7  I'd like to make sure for the record we're maintaining our

8  claims, whatever they may be, against the state for receiving

9  interest.  If the plan is confirmed as it stands, that should

10  have gone to our clients because that is an intercreditor

11  third-party matter, and I don't think it's subject to a

12  nonconsensual release.  And if they're trying to make it so,

13  we're going to have to have our day in court on that.  Thank

14  you.

15         THE COURT:  All right.

16         MR. BRILLIANT:  Your Honor, Allan Brilliant on

17  behalf of Macomb County by and through the public -- Macomb

18  County public works commissioner as well as the Macomb

19  Interceptor Drain, you know, District.  Your Honor, I'm going

20  to -- I'm going to speak on behalf of Macomb.  The other

21  counties are going to speak after me.  You know, a lot of the

22  issues that we have are common with the issues of the DWSD,

23  you know, bondholders, though we have a different spin on

24  them and a different perspective given that we have different

25  economic interests than, you know, the bondholders do, so,

1    you know, I'm going to just touch --

2           THE COURT:  What is the county's economic interest?

3           MR. BRILLIANT:  You know, the counties, your Honor,

4    are -- you know, I have two clients.  One is a creditor here.

5    The Macomb interconnector, you know, drainage district, you

6    know, purchased some assets from the city that were subject

7    of, you know, criminal conspiracy by the former mayor and the

8    head of the DWSD.  We were overcharged for those assets based

9    upon, you know, false misrepresentations, and we have a --

10   you know, a claim for about $26 million -- well, at least $26

11   million -- related to that.  With respect to Macomb County,

12   Macomb County is what is called a first-tier customer of the

13   DWSD, effectively through another entity purchases sewage

14   services from the city, so --

15          THE COURT:  So your interest is in whether or not

16   that client's executory contract with the city will be

17   assumed and whether you -- whether they can show adequate

18   assurance of future performance?

19          MR. BRILLIANT:  We have more issues than that, your

20   Honor.  I mean we are a large customer.  We are a contingent

21   creditor pursuant to the contract.  We then wholesale out the

22   sewage to the municipalities in Macomb County, you know, who

23   then, you know, sell sewage to the individual residents

24   there, and then all the money eventually gets back to DWSD.

25   We have -- we are a party in interest here, and we have an

1   interest in making sure that the plan complies with law and
2   that the interests of Macomb County as a first-tier, you
3   know, customer are not adversely affected.

4         THE COURT:  Well, I'm trying to identify if it's
5   anything more than adequate assurance of future performance.

6         MR. BRILLIANT:  It is, your Honor.  I mean, as I
7   said, we believe that the plan, you know, does violate law by
8   taking -- potentially by taking assets out of the DWSD in
9   violation of -- you know, of state law, which affects the --

10        THE COURT:  What assets?

11        MR. BRILLIANT:  You know, the pension prepayments,
12  your Honor, and potentially the -- you know, under the
13  contingent, you know, value rights to the extent any of the
14  assets of DWSD are sold --

15        THE COURT:  Were you here when I suggested that it's
16  not a prepayment at all?  If anything, it's a --

17        MR. BRILLIANT:  Well, your Honor --

18        THE COURT:  -- post-payment catch-up?

19        MR. BRILLIANT:  Okay.  Your Honor, I don't believe
20  it's a catch-up.  I think your Honor should hear all the
21  testimony.

22        THE COURT:  What evidence is there to suggest it's a
23  prepayment of anything?

24        MR. BRILLIANT:  Okay.  Well, your Honor, you know,
25  the UAAL -- it is an accrual.  It is not monies that are due

1   to the employees.  Employee, you know, works for DWSD, hasn't

2   even retired yet.  There is an accrual with respect to what

3   his pension will be in the future, so that's the first thing.

4   It's not necessarily that the monies are past due; that DWSD

5   hasn't been paying --

6           THE COURT:  Oh, I think that's a gross

7   misrepresentation of the accounting that goes on with

8   pensions.

9           MR. BRILLIANT:  It's accounting, your Honor.  I mean

10  it's clearly an accounting issue, and it is an accrual.  I'm

11  not disagreeing with your Honor.

12          THE COURT:  I mean by that definition, the city

13  wouldn't have to pay into the pension fund for a particular

14  employee until that employee retires.

15          MR. BRILLIANT:  Well, your Honor, I'm not

16  suggesting -- I'm not suggesting that they shouldn't make

17  payments into the pension fund.

18          THE COURT:  Have you got an accountant who's going

19  to testify to what you just told me?

20          MR. BRILLIANT:  What?  That it's an -- that it's an

21  accrual and that all the monies aren't currently due, your

22  Honor?

23          THE COURT:  Yeah.

24          MR. BRILLIANT:  You know -- you know, I believe

25  there will be testimony at the hearing.

1          THE COURT:  Who?  I want a name.

2          MR. BRILLIANT:  You know -- you know, I don't know

3     specifically, your Honor, but --

4          THE COURT:  Get it to me on Monday.

5          MR. BRILLIANT:  The name of a witness who will

6     testify that the monies aren't currently all due?  I just

7     want to make sure we're communicating, your Honor, because

8     I -- I mean that's all I'm saying is it's an accrual.

9          THE COURT:  You have said to me --

10         MR. BRILLIANT:  Right.

11         THE COURT:  -- that the money that the city asserts

12    as the unfunded pension liability is not money that's

13    presently due by the water department to the general service

14    general retirement systems.

15         MR. BRILLIANT:  But, your Honor, and I guess --

16         THE COURT:  Is that what you said?

17         MR. BRILLIANT:  Your Honor, what I'm talking about

18    is --

19         THE COURT:  Is that what you said?

20         MR. BRILLIANT:  Due and payable, that it's not

21    something that under law -- I don't think anyone disputes

22    that they could pay it over ten years or twenty years or

23    thirty years.  What I was saying --

24         THE COURT:  Oh, so you agree it's due?

25         MR. BRILLIANT:  You know, I don't know what you mean

1    by "due," your Honor.

2            THE COURT:  In the legal sense.  It's an obligation.

3            MR. BRILLIANT:  But if I have a mortgage --

4            THE COURT:  We can separate payable if you like.

5            MR. BRILLIANT:  No, no.  But if I have a mortgage

6    obligation, your Honor, and --

7            THE COURT:  We can separate payable if you like.

8    That's fine, but it's an obligation.  It's a liability.

9            MR. BRILLIANT:  It's an accrued -- I mean we have

10   disagreements about how it's calculated, but there is an

11   accrued liability.

12           THE COURT:  And I don't want to argue about the

13   amount either.

14           MR. BRILLIANT:  No one disputes that there is an

15   accrued liability in that the pension plan is underfunded and

16   that ultimately DWSD will have to pay additional dollars in

17   order to make sure that --

18           THE COURT:  And that's going to come from the

19   customers; right?

20           MR. BRILLIANT:  Ultimately, it'll come from the

21   customers, your Honor, yes.

22           THE COURT:  So it's just a question of how quick.

23           MR. BRILLIANT:  In part, yes.

24           THE COURT:  But why do you call that an acceleration

25   or -- it's a catch-up.

1    MR. BRILLIANT:  Well, you know, your Honor, the

2 reality is DWSD was paying what it was being asked by the GRS

3 to fund, so it's not as if, you know, the GRS was saying, you

4 know, pay "X" and they were paying half of "X" and now they

5 need to catch it up, but I -- look, your Honor --

6    THE COURT:  And I've said before in this bankruptcy

7 we're done making bad deals.  Your client should have been

8 paying much more all these years, and now it's time to pay.

9 Am I wrong?

10    MR. BRILLIANT:  You know, your Honor, you know, I

11 think you should, you know, listen to the testimony and the

12 evidence and then determine --

13    THE COURT:  Well, I'm asking you what that evidence

14 will be, and --

15    MR. BRILLIANT:  Well, your Honor, we haven't, you

16 know, had the opportunity.  We just reviewed -- got the

17 Milliman documents in the last couple of days.  We have not

18 had an opportunity to take their depositions, the depositions

19 of anybody at the GRS.  We do have publicly available pension

20 information, which reflects that they were, you know, paying

21 the amounts that -- you know, that -- you know, that they

22 were asked to pay by the GRS.  I mean you're right, your

23 Honor.  You could say using 20-20 hindsight that since

24 there's an unfunded portion for DWSD, that somehow, you know,

25 they should have been paying more in the past, but, you know,

1    that's -- you know, that assumes that the amounts that they

2    were paying were inappropriate at the time that they were

3    billed by GRS for it.

4              THE COURT:  It does.

5              MR. BRILLIANT:  So, your Honor, in any event,

6    regardless of how you characterize it, I think there's two

7    areas of evidence that we're going to put on with respect to

8    this.  One is with respect to the amount and whether that's

9    appropriate, and the documents we've received and from the

10   reply brief that was filed by the city on Sunday, the -- it's

11   $45.4 million for, I guess years, you know -- you know, two

12   through nine, and it's $65.4 million in year one, which is

13   many multiples of what DWSD has been paying historically, but

14   in any event, we're told that that includes $20 million, you

15   know, pro rata share for the bankruptcy costs, and then in

16   addition to that there's an administrative fee.  From looking

17   at the -- you know, the Milliman documents, that may be as

18   much as $2-1/2 million per year that's being charged to DWSD.

19   No explanation for that.  In addition, the amount, you know,

20   is calculated based upon certain assumptions, how much money

21   the funds will yield in interest as it's invested and also

22   based upon assumptions as to how many people retire or when

23   they'll retire and what types of benefits they get.  And as

24   earlier -- counsel earlier pointed out, you know, the -- you

25   know, if we pay too much rather than, you know, paying an

1  amount, you know, through an iterative process where it's

2  readjusted, you know, every year, now it's just being fixed,

3  you know, over the next nine years as to what DWSD was going

4  to pay, not going to get any money back if they overpay, and

5  on the other hand potentially be liable for additional

6  amounts if it turns out they underpay.  And then one of the

7  things that we point out in our papers is if the city, you

8  know, defaults in ten or twelve years, even though DWSD would

9  have put the money into the GRS for the benefit of its

10  employees, you know, they may end up having to, you know --

11  you know -- you know -- you know, pay again, so it's not as

12  if --

13        THE COURT:  I can't get this process question out of

14  my head, Mr. Brilliant, which relates to what is Macomb

15  County's interest in this bankruptcy case.

16        MR. BRILLIANT:  You know, again, your Honor --

17        THE COURT:  You're a customer.

18        MR. BRILLIANT:  We're a customer.  We have a

19  contract that requires them to charge us rates based on --

20        THE COURT:  Yeah.  And help me out here to

21  understand what's the process by which the water department

22  sets its water rates.  What is that?

23        MR. BRILLIANT:  Well, your Honor, they're supposed

24  to be set, you know -- as your Honor knows, historically

25  there's big disputes about it.  It was litigated every year.

1    THE COURT:  My question is a process question.  What

2  does the law say as to how the Detroit water department sets

3  its water rates?

4    MR. BRILLIANT:  It's supposed to be based upon its

5  costs.  Basically, they charge their costs.

6    THE COURT:  How physically or conceptually is it

7  done?  What happens?

8    MR. BRILLIANT:  There's a -- I said there's been

9  litigation for years because there's a process that was

10  established by the -- you know, the District Court with

11  respect to it, but they put together a budget of what their

12  expenses are going to be, and then they figure out what the

13  rates would have to be to pay the interest on the bonds and

14  to cover their operating expenses.

15    THE COURT:  And so if a customer like Macomb County

16  thinks that the rate has been improperly calculated for

17  whatever reason, what relief does -- or what process does

18  Macomb County have to seek relief?

19    MR. BRILLIANT:  They can complain to DWSD and seek

20  to get them to agree to it, and if they don't agree to it,

21  they can go to court.

22    THE COURT:  What court?

23    MR. BRILLIANT:  I believe it's been the United

24  States District Court here.  You know, there was a case that

25  was pending for, you know --

1    THE COURT:  Well, but that case has been closed;

2 right?

3    MR. BRILLIANT:  It has been closed, and as part of

4 closing that case there was a process that was set up, you

5 know, to -- you know, where DWSD -- well, you know, there

6 were two -- you know, there were non-city people put on the

7 board.  There's a process put in place where information is

8 given to the board members and representatives of the

9 counties in advance of the negotiations on --

10    THE COURT:  All right.  Well, let me ask you to

11 pause for one second.  Mr. Bennett, when the city sets water

12 rates post-bankruptcy, post-confirmation, will it be engaging

13 that process that Mr. Brilliant has described or what's the

14 interplay?

15    MR. BENNETT:  Your Honor, the law requires that --

16 and I can't remember the section number, but it's someplace

17 in 943 -- the exact number is --

18    THE COURT:  Yeah.

19    MR. BENNETT:  -- eluding me -- requires that this

20 Court not interfere with the normal process for setting

21 rates, and it is contemplated by the city and I'm sure by

22 DWSD that whatever process applied to the setting of rates

23 applies the same rates under applicable law in Michigan,

24 until it's changed will continue to apply.

25    THE COURT:  So if that's true -- and I recognize

1  it's a question, but if it's true, what standing would Macomb
2  County have in this court in the context of the plan of
3  adjustment to complain about factors that roll into the
4  setting of the water rates?
5          MR. BRILLIANT:  Right.  Your Honor, again, you
6  know -- you know, and -- you know, the -- you know, the MIDDD
7  for a second, which is a creditor, you know, is in a
8  different situation, but with respect to just Macomb for the
9  moment, Macomb is a party in interest in the case as a
10  customer and as a contracting party, you know, which has a
11  contingent contract pursuant to the contract and the right to
12  make sure that if the contract is going to be assumed that
13  it's properly assumed under the Bankruptcy Code and as part
14  of adequate assurance that requires that the contract, you
15  know, and the -- you know, and the rate process and the
16  appropriate rates, you know, be charged pursuant to the
17  contract.  Your Honor, the definition of party in interest
18  for purposes of a Chapter 11 or Chapter 9 case and the
19  objection of a confirmation of a -- you know, of a plan as it
20  relates to whether the plan, you know -- you know, violates
21  law, you know, whether it's, you know, not feasible and,
22  therefore, adversely affects the, you know, contracting
23  counterparties, you know -- you know, I think is very clear.
24          THE COURT:  Okay.
25          MR. BRILLIANT:  Your Honor, I'm not going to repeat

1  too much of what the DWSD parties have raised, but our

2  expectation is that we would, you know, put on, you know,

3  evidence which would include live testimony, documents, you

4  know, deposition transcripts, that we would -- you know,

5  would designate in connection with the history of the DWSD,

6  how it works, how it sells its water and sewage services, how

7  it's organized, its recent operating losses, the lawsuit that

8  was brought here in District Court regarding the

9  environmental issues and the court orders.

10          THE COURT:  Recent operating losses?

11          MR. BRILLIANT:  Yes, your Honor.

12          THE COURT:  You're going to take the position that

13  the rates are too low and should be higher?

14          MR. BRILLIANT:  No, your Honor.  You know --

15          THE COURT:  What's the purpose of that evidence

16  then?

17          MR. BRILLIANT:  Yes.  Your Honor, we believe that

18  the projections that are put together by the -- you know, by

19  the city underestimate the amount of capital expenditures

20  that need to occur here at the city.  I mean --

21          THE COURT:  So the need -- the city needs to spend

22  more on capital expenditures?

23          MR. BRILLIANT:  DWSD needs to spend a lot more on

24  capital expenditures.  It's in their budget.

25          THE COURT:  So the water rates will go up even

1    higher than the city estimates?

2            MR. BRILLIANT:  Correct, but, your Honor --

3            THE COURT:  And your client is willing to pay that?

4            MR. BRILLIANT:  Your Honor, what -- your Honor, the

5    premise --

6            THE COURT:  Yes or no?

7            MR. BRILLIANT:  No, your Honor.

8            THE COURT:  Well, how can rates go up unless your

9    client is willing to pay it --

10            MR. BRILLIANT:  Your Honor -- okay.

11            THE COURT:  -- or without your client being willing

12    to pay it?

13            MR. BRILLIANT:  Let me -- your Honor, you know, if I

14    may, we believe that they underestimate capital expenditures.

15    They overestimate cost savings and -- you know, in connection

16    with the plan.  They also, we believe, overestimate to some

17    extent --

18            THE COURT:  Why is it -- why doesn't that mean

19    higher water rates?

20            MR. BRILLIANT:  Your Honor, if you combine all of

21    that, you know, with having to pay over nine years instead of

22    over twenty or thirty -- fifteen or twenty or thirty years,

23    the -- you know, the pension obligations, it will invariably

24    require higher water and sewage rates, absolutely, your

25    Honor, and --

1          THE COURT:  Okay.

2          MR. BRILLIANT:  And so, you know, our ability --

3          THE COURT:  The rates are going to go up whether the

4    unfunded pension liability is paid over ten years, twenty

5    years, or thirty years; right?

6          MR. BRILLIANT:  Under the --

7          THE COURT:  It's a question of how much and for how

8    long.

9          MR. BRILLIANT:  We believe to some extent that

10   that's right, your Honor.  They historically have gone up,

11   you know, every year, you know, recently, but there --

12         THE COURT:  Do you have an estimate on what you

13   think the capital expenditures should be or what your client

14   has estimated them should be?

15         MR. BRILLIANT:  In our objection, your Honor, not

16   taking into account the Detroit, you know, retail network,

17   what needs to be --

18         THE COURT:  Right.

19         MR. BRILLIANT:  -- you know, fixed, we believe that

20   on the sewage side that there's probably a -- it's a third

21   more, at least a third more and more than a billion dollars

22   more than they have estimated over ten years.

23         THE COURT:  How much of an increase in the water

24   rate would that by itself result in?

25         MR. BRILLIANT:  I don't have that, you know,

1    information, your Honor.

2            THE COURT:  Will your witnesses testify to that?

3            MR. BRILLIANT:  That on a standalone?  We have

4    not -- you know, we have not contemplated that, your Honor.

5    You know, as your Honor knows, this is -- we are very early

6    into -- you know, into discovery here.  We have not -- you

7    know, DWSD documents by and large just came to us yesterday,

8    so we have general areas that we can discuss as to --

9            THE COURT:  Okay.

10           MR. BRILLIANT:  -- what our testimony is, but in

11   terms of, you know, for a trial that's, you know --

12           THE COURT:  Fair enough.  If you don't have it, you

13   don't have it.

14           MR. BRILLIANT:  We have not talked to the particular

15   witnesses.

16           THE COURT:  I don't fault you for not having it.

17           MR. BRILLIANT:  Yeah.  And the other thing is, your

18   Honor, we had put on our witness list, you know, the rate

19   consultant, you know, for the -- you know, for the city, who

20   is really the person who would know that or could easily

21   estimate that.

22           THE COURT:  Who is that?

23           MR. BRILLIANT:  I believe his name is Bart Foster --

24           THE COURT:  Okay.

25           MR. BRILLIANT:  -- your Honor.  Let me just double-

 1    check that.  Yes.  Bart Foster.  Your Honor, we will put on

 2    testimony that 65 percent of the revenues for DWSD comes from

 3    customers outside of the city and that it's expected, you

 4    know, over the projection period that that will continue to

 5    grow.  As I said earlier, we put on testimony that DWSD is

 6    being asked because of the incremental amounts and because of

 7    inappropriate accounting calculations that the amount of, you

 8    know, the -- of the, you know -- the pension payments over

 9    the next nine years would be, you know -- you know, more than

10    the UAAL.

11              THE COURT:  Macomb County doesn't think that the

12    population of the City of Detroit will turn around and go

13    back up?

14              MR. BRILLIANT:  You know, I don't have a specific

15    answer for you, your Honor, but over the short period of

16    time, you know, the -- you know, the suburbs are growing

17    faster than the -- you know, the city's population, and

18    there's, you know -- you know, more, you know --

19              THE COURT:  Okay.

20              MR. BRILLIANT:  -- industry and other, you know,

21    demand for, you know, water and sewage in the suburbs, you

22    know, over the foreseeable future from our perspective.

23              THE COURT:  Um-hmm.

24              MR. BRILLIANT:  Your Honor --

25              THE COURT:  What are the projected economic activity

1   increases in Macomb County?

2          MR. BRILLIANT:  I'm not following you, your Honor.

3   You're saying from the plan or are you saying just more --

4          THE COURT:  No.  In Macomb County.  You said that

5   population and business activity goes up in Macomb County

6   faster than you foresee in Detroit?

7          MR. BRILLIANT:  I said all the non-city -- I was not

8   necessarily referring to --

9          THE COURT:  Right, but I thought you --

10         MR. BRILLIANT:  I wasn't necessarily saying Macomb

11  versus --

12         THE COURT:  I thought you'd know what Macomb County

13  was expecting in terms of increases in economic activity.

14         MR. BRILLIANT:  You know, no, I do not, your Honor.

15         THE COURT:  No?  All right.

16         MR. BRILLIANT:  I was referring -- and if I said

17  Macomb County versus the city --

18         THE COURT:  You didn't say Macomb.  You didn't.  You

19  said all the suburbs.

20         MR. BRILLIANT:  Right.

21         THE COURT:  I didn't think you'd know that answer to

22  all the suburbs.

23         MR. BRILLIANT:  No.

24         THE COURT:  I thought maybe you'd know it for

25  Macomb.

1          MR. BRILLIANT:  No.  And, your Honor, regardless of

2     whether the amount that is proposed under the plan is

3     appropriate, again, we believe that, you know, it's being,

4     you know, utilized to pay non-DWSD employees and, therefore,

5     you know -- you know, violates, you know -- you know, state

6     law.  As we said, your Honor, you know --

7          THE COURT:  So what evidence will you have on

8     whether and to what extent Macomb County's ability to provide

9     water and sewer services to its residents will be better off

10    if this case is dismissed?

11         MR. BRILLIANT:  You know, we're not -- you know, we

12    have not contemplated that, your Honor.  We are not asking

13    that the case be dismissed.  You know, I think, you know,

14    our --

15         THE COURT:  All right.  So you're not arguing that

16    this plan is not in the best interests of your client.

17         MR. BRILLIANT:  Your Honor, we have, you know -- we

18    have a lot of smaller issues, but we have, like I said, three

19    principal issues.  One is that the plan violates state law by

20    taking monies out of the DWSD, putting it into GRS and paying

21    the pensions of non-DWSD employees.  That creates risk for

22    DWSD, as we've talked about earlier, in that --

23         THE COURT:  Okay.

24         MR. BRILLIANT:  -- it violates the law.  That's

25    number one.  The second issue is that the financial

1   projections with respect to DWSD aren't reliable and that

2   because of the CAPEX, the payment of, you know, the -- I'm

3   trying not to use the word "accelerated," your Honor --

4           THE COURT:  Thank you.

5           MR. BRILLIANT:  -- the nine-year -- the nine-year

6   payment of the -- you know, rather than a longer period, you

7   know -- you know, payment will create, you know, financial

8   burdens, the combination of the two.

9           THE COURT:  What length of time do you think it

10  should be?

11          MR. BRILLIANT:  You know, I don't have an answer for

12  that, your Honor.

13          THE COURT:  Okay.

14          MR. BRILLIANT:  I'd have to talk to my clients

15  and --

16          THE COURT:  Okay.

17          MR. BRILLIANT:  Okay.  But I don't have -- you know,

18  I don't have an answer for that.  And then the -- and then,

19  your Honor, you know -- you know, the MIDDD is an unsecured

20  creditor, and we have a -- you know, we believe that the plan

21  unfairly discriminates against, you know, MIDDD by paying

22  general unsecured creditors significantly less than, you

23  know -- you know, pension and other -- you know, other

24  payments.  Those are -- we have some -- you know, we have,

25  you know, some smaller issues.

1      THE COURT:  And that client filed a proof of claim?

2      MR. BRILLIANT:  Yes, your Honor.  We filed a proof

3  of claim.  The city objected to it on the 15th.  They were

4  kind enough to give us an extension until Friday to file our

5  3018 motion for temporary allowance to vote, and we will do

6  that --

7      THE COURT:  Okay.

8      MR. BRILLIANT:  -- on or before Friday and schedule

9  a hearing with your Honor to determine whether it can be

10  temporarily allowed.

11      THE COURT:  Okay.

12      MR. BRILLIANT:  Okay.  Your Honor, the -- would your

13  Honor want me to, you know, proffer whatever other areas of

14  testimony would be or --

15      THE COURT:  Well, I want you to make your record

16  here as complete as you would like to, so it's up to you.

17      MR. BRILLIANT:  Okay.  Well, I didn't think that

18  this is like oral argument, try to persuade you --

19      THE COURT:  It's not oral argument.

20      MR. BRILLIANT:  -- so I don't know what's in the

21  record I need, but --

22      THE COURT:  It's not an opening statement.

23      MR. BRILLIANT:  Yeah, yeah, yeah.

24      THE COURT:  You know, I --

25      MR. BRILLIANT:  Yeah.

1          THE COURT:  I've been a little --

2          MR. BRILLIANT:  I'm just complying with --

3          THE COURT:  I've been a little bit loose or lax

4     about some of that, but --

5          MR. BRILLIANT:  Right.

6          THE COURT:  -- if there's more you'd like to say,

7     you should go for it.

8          MR. BRILLIANT:  Yeah.  Okay.  Your Honor, you know,

9     obviously we're not going to talk about all our issues or all

10    the facts, you know -- you know, just as Mr. Bennett said,

11    we're just going to talk about some of the bigger things, you

12    know.  You know, your Honor, we dispute the -- you know, the

13    city's view that the plan itself, you know, doesn't, you

14    know, effectively, you know, require, you know, the -- you

15    know, the setting of rates.  Once you set the budget, the

16    setting of rates are just the arithmetic, you know,

17    determination that's necessary, you know, to make everything,

18    you know, balance, so, you know, our -- and also, you know,

19    the -- you know, the bylaws of the DWSD, you know, require

20    that the -- you know, the DWSD, you know, board approve

21    the -- you know, the budgets, you know, not the emergency

22    manager, you know, or the city, and to the best of our

23    knowledge at this point, you know, that has not, you know,

24    yet -- you know, yet occurred.  You know, your Honor, we --

25    you know, we will, you know, contest a number of the -- you

1  know, the issues that -- you know, that Mr. Bennett set forth

2  in their proffer as well, but I don't see any, you know --

3  you know, benefit to putting them on the record. I mean your

4  Honor doesn't view like if we don't raise something here,

5  that we can't raise it at the hearing.

6       THE COURT: No, no, no. I want that crystal clear

7  on the record. Nobody waives anything by not bringing

8  something up at this point in time.

9       MR. BRILLIANT: Okay.

10      THE COURT: This is not that kind of a hearing.

11      MR. BRILLIANT: All right. So my sense is, your

12  Honor, I've given you, you know, a general view as to, you

13  know, what it is that, you know, we intend to do. I think

14  our main, you know -- you know, issues and what we've been

15  trying to do in discovery really rely on the pension issues,

16  you know -- you know, how they calculated, you know, this --

17  you know, the 45.4 million, what does the -- you know, what

18  are the three components, what is the basis of those, what

19  are the actuarial assumptions under those, whether or not

20  it's -- you know, whether or not it's appropriate, how the

21  money, you know, is going to be spent, you know, once it's in

22  the GRS and what effect does that have on DWSD and then on

23  the feasibility issues. Then we have, like I said, a lot

24  of -- some smaller issues from an evidentiary perspective in

25  connection with the unfair discrimination and, you know, some

1    of the other smaller issues that we have in our objection.

2          THE COURT:  Thank you, sir.  All right.  We're going

3    to take a recess at this point and reconvene at 3:25, please.

4          THE CLERK:  All rise.  Court is in recess.

5       (Recess at 3:09 p.m., until 3:24 p.m.)

6          THE CLERK:  All rise.  Court is in session.  Please

7    be seated.  Recalling Case Number 13-53846, City of Detroit,

8    Michigan.

9          MR. NEWMAN:  Thank you, your Honor.  Max Newman on

10   behalf of Wayne County.  I will attempt to be brief as well.

11   Our interest in the plan is one of feasibility, which is

12   related to the issue that the Court raised with Mr. Brilliant

13   with respect to adequate assurance of future performance

14   under the executory contract we have with the city, but I

15   think it's a little bit broader than that in the sense that

16   confirmation requires the city being able to show that it is

17   going to be able to provide services under the plan.  And so

18   I think that the issue of feasibility and the issue of

19   adequate assurance of future performance is really

20   inextricably linked and that I would leave it to something

21   broader than merely our contract but to the whole services

22   from the DWSD.  Our interest is in maintaining the closed

23   system, maintaining proper management of the system, and

24   maintaining that funds are not leaving the system.  Our

25   concern is that with the front-loaded catch-up payment, which

1   is a mouthful admittedly, but with the front-loaded catch-up
2   payment, a lot of risk is being put on the system, and in the
3   event that the plan is not successful -- and obviously for
4   the region we hope that the plan is successful, but if the
5   plan is not successful, we are concerned about that leaving
6   an undue cost on the counties.  The rates are not a remedy
7   for any misdeeds or any mistakes that are made in
8   calculations or anything else.  The rates are supposed to
9   reflect the soundness of the system and the appropriateness
10  of the expenses that are paid out in the system.  And if
11  rates go up to cover for things other than that, then,
12  frankly, the counties aren't doing their job for their
13  constituencies, and the plan is inappropriately not complying
14  with our executory contracts.
15          The Court asked Mr. Brilliant some questions about
16  what remedies we might have in those situations, but I think
17  that is to some extent begging the question because the horse
18  will have already gotten out of the barn by the time we get
19  to the point of those remedies, and going in front of the
20  District Court and spending a lot of legal fees from the
21  counties, legal fees from the DWSD that all have to be paid
22  for somewhere after expenses have been paid that are
23  inappropriate is a -- at best a pyrrhic victory and at worst
24  making a bad situation --
25          THE COURT:  All right.  But does your client agree

1    that whatever the number of the unfunded pension liability

2    is, the water department has to pay it somehow?

3         MR. NEWMAN:  The unfunded pension liability that is

4    related to DWSD has to get paid somehow, yes, your Honor.

5    It's a question of how quickly and what the numbers are and

6    all --

7         THE COURT:  Okay.

8         MR. NEWMAN:  -- that sort of thing, but the idea

9    that it can vanish into thin air, obviously we would like the

10   market to adjust in such a way that it would do that, but I

11   don't think anybody is anticipating that.

12        With that, if the Court has no more questions, I

13   won't add anything more to --

14        THE COURT:  Thank you, sir.

15        MR. NEWMAN:  -- what Mr. Brilliant said.

16        MS. QUADROZZI:  Your Honor, Jaye Quadrozzi on behalf

17   of Oakland County.  I am going to be the briefest so far.

18   Our positions have been laid out clearly.  I did want to let

19   the Court know that at your suggestion we did go back and

20   reduce our witness list one more time.

21        THE COURT:  I saw that.  Thank you very much.

22        MS. QUADROZZI:  We still are in the process --

23        THE COURT:  I won't make you cut it in half again.

24        MS. QUADROZZI:  Actually, that was fortuitous

25   although correct.  It actually did go directly in half.  We

1  are still in the process, as everyone has said, of -- early

2  on in the process of documents and discovery.  We haven't

3  started depositions.  I did have a really productive

4  conversation with a group of people, including Jones Day,

5  yesterday morning about some additional documents, and I

6  think that as we move forward and actually get those

7  documents and review it, it may, in fact, be possible for us

8  to reduce the number of DWSD personnel on the witness list,

9  but I can't do that until I've had a chance to see the

10  documents.  Thank you, your Honor.

11          THE COURT:  Thank you.

12          MR. HACKNEY:  Good afternoon, your Honor.  Stephen

13  Hackney on behalf of Syncora.  I will confess that I may not

14  have fully understood what I was agreeing to when I said

15  "yes" to the question of can DWSD go first, but fool me once.

16  So, your Honor, it's not my intention to engage in oral

17  argument today or to present an opening statement.  I don't

18  want to advocate really over much or at all with the Court.

19  I want to paint a picture of the evidence that I think the

20  COPs holders -- and we've coordinated amongst ourselves --

21  that we anticipate that we will be presenting with the --

22  with a couple caveats at the outset so you understand the

23  parameters of my presentation.  Point one is that it will

24  come as no surprise to the Court that much of the evidence

25  that we introduced before you will come in the form of

1    adverse examinations or cross-examinations of city witnesses

2    or introduction of city source documents.  They underlie, as

3    you might imagine, virtually everything from the forecasts,

4    tax policy, on and on.

5              THE COURT:  Sure.

6              MR. HACKNEY:  I hope not to repeat that over much.

7    What you'll then hear from me is the focus on where I think

8    much of our testimony will be expert testimony.  I intend to

9    note a couple places where there will -- where there will or

10   may be fact witnesses that aren't city affiliated fact

11   witnesses.  The goal here is to paint a picture of what our

12   defensive case will look like in response to the city's case

13   in chief.

14             I also wanted to note a couple things at the outset,

15   your Honor.  One is that there are certain experts that are

16   just sufficiently in process that I don't know what's going

17   to happen with them, and it's not -- it is not my intention

18   to describe testimony other than testimony at this point in

19   time I think it's likely that you'll hear, so that's how I'm

20   governing myself.

21             THE COURT:  That's fine.  Thank you.

22             MR. HACKNEY:  I have divided my presentation into

23   what I consider sort of the three core areas of highly

24   factual debate between the city and its COP creditors, and

25   those are the best interest of creditors test, the unfair

1 discrimination test, and the fair and equitable test.  With

2 respect to the fact witnesses that will go into the best

3 interest of creditors, it won't come as a surprise that the

4 city's witnesses and the city's documents will be the source

5 documents relating both to what it is anticipated creditors

6 will get under the plan versus what they might receive if the

7 case were dismissed and they were left to their remedies.

8          With respect to the expert testimony, on this front

9 the COPs are likely to call expert witnesses to assess the

10 accuracy of the city's forecasts and the potential for

11 increasing the city's tax revenues.  It is also possible or

12 likely that we will call expert witnesses to testify to the

13 appropriate amount of debt that a city similarly situated to

14 the City of Detroit would or should bear, which I believe

15 goes not only to feasibility but also to the best interest

16 test.  They are always the flip side of one another.  As part

17 of these forms of expert testimony, you can expect expert

18 testimony to establish the appropriate amounts likely to be

19 owed to pensioners and other general unsecured creditors if

20 the case were dismissed.  That's how we see best interest of

21 creditors setting up.

22          THE COURT:  Well, but what about the next step?

23 What do recoveries look like in the alternative universe?

24          MR. HACKNEY:  In the alternative universe, you

25 would -- Mr. Bennett was correct, which one of the unique

1   things about the Bankruptcy Code and the prove-up of a plan

2   is that there are at least two areas that I see that actually

3   force the city and the defending creditor to imagine an

4   alternative world and prove it up.  One is best interest

5   where you imagine the dismissal of the petition.  The other

6   is unfair discrimination where you imagine the remedies that

7   the favored and unfavored classes would have had in the

8   absence of a bankruptcy filing.  The prove-up that I would

9   expect -- there's always that reminder that is their burden

10  to show that you wouldn't do better, so we'll actually be

11  looking to see what they say about this alternative universe.

12  What I expect the evidence to show on our side will be that

13  if forecasts are higher, if there is incremental revenue from

14  taxes that are raised in the event of a dismissal of the

15  bankruptcy petition, that the COPs holders will receive more

16  in that world than they would under the plan, and that will

17  involve a number -- a mixture of expert testimony on

18  different subjects as well as assumptions that that person

19  might make about the legal framework that will exist in the

20  event of a dismissal.

21          THE COURT:  Okay.

22          MR. HACKNEY:  Bit of a hybrid.  Your Honor, on

23  unfair discrimination, again, the city's fact witnesses and

24  documents will establish the terms of the settlements with

25  the pensioners, the source data relating to what they are

1   likely to receive under their settlements with the city, and

2   obviously there will be governing legal statutes and other

3   source documents indicating what remedies would likely be

4   outside of bankruptcy.

5           With respect to the expert testimony on this

6   subject, this is the one where it's perhaps the most

7   detailed.  The COPs holders are likely to call expert

8   witnesses to address the so-called numerator and denominator

9   issues associated with the pension claims.  What this

10  means -- and you saw this treated in -- well, if you've had

11  an opportunity to read our objection, you would have seen

12  this treated in detail.  It means both what is the true

13  amount of what they are getting, what is the true amount of

14  what their claim is.  Those turn out to be surprisingly

15  complicated questions involving the expertise of actuaries

16  and analysis of what is embodied in these UAAL numbers that

17  have been bandied about quite a bit.

18          The COPs holders are also likely to call expert

19  witnesses to address the so-called numerator issues

20  associated with the COPs recovery, and what that means is

21  what is the true value of the B notes that COPs holders are

22  being awarded with "awarded" used loosely.

23          Syncora will also call expert -- or the COPs holders

24  are likely to call expert testimony to establish that the

25  city can bear either additional taxes or additional debt or

1   both such that the city will not be able to establish that

2   the discrimination is, quote, unquote, necessary to its

3   reorganization.

4           Last, your Honor, on the notion of what is fair and

5   equitable under the Bankruptcy Code, this is where you may

6   see some additional witnesses beyond what I call city

7   controlled witnesses, and by -- when I say this, I mean that

8   we will, at a minimum, cross-examine them, and if the city

9   narrows its scope, we will adversely examine them.  And can I

10  mention one of the things that we might address down the road

11  when we have time is my suspicion that the Court will want

12  all witnesses to just testify once.  That will affect

13  preparation because it affects whether or not you can put

14  your testimony in at the time -- for example, Kevyn Orr

15  testifies -- or whether you have to wait and call him in your

16  own case.

17          Either way you will hear testimony from the city

18  witnesses with respect to the art, the grand bargain.  DIA

19  witnesses will be called with respect to efforts to monetize

20  alleged limitations on the art and the likely value.  I

21  should put Christie's witnesses under potential experts

22  depending on how Christie's is handled, but the Christie's

23  witnesses will likely be called to test their assessment of

24  the portion of the art collection that they valued.  You'll

25  also see city documents relating to the alleged limitations

1  on the city's ability to sell the art.  And then you will

2  also --

3        THE COURT:  Well, will it be the COPs holders'

4  position that Chapter 9 requires the city to monetize its art

5  in some reasonable way or in any way?

6        MR. HACKNEY:  I believe it will.  It is.  And there

7  has been much back and forth on that today with Mr. Bennett,

8  I noted, and I also noted that as a potential legal issue

9  that could be phrased.  The devil is sort of in the details

10 in terms of how you set that legal issue up.  I have seen

11 it -- I've seen it arranged as nothing in Chapter 9 requires

12 a municipality to sell assets.  I've also seen it arranged as

13 nothing under state law allows a creditor to compel a

14 municipality to sell assets.  But I think that those tend to

15 bury the lead a little bit.  I think the fairer way to

16 characterize it is where a city has the extent of the debts

17 that this one does as well as the extent of the needs that

18 this one does, is it fair and equitable for it to retain a

19 multi-billion dollar art collection where the sale of that

20 collection would both address creditor needs and the needs of

21 the citizenry?  Our argument is that it is not fair and

22 equitable or in the best interest of creditors to retain a

23 lavish art collection when you have both the debts and the

24 needs of the city.  So I'm not trying to dodge the

25 hypothetical too much, but I also want to frame it in the

1   fairest way possible to what I think the question gets at.  A

2   fact witness that I think is likely to testify and maybe will

3   come as no surprise to the Court is Steve Spencer, who is the

4   Houlihan Lokey employee who ran the process to solicit

5   indications of interest for the art.  We will likely call him

6   at the trial to have him talk about what went into that and

7   the indications that he got.  And Mr. Bennett alluded to this

8   earlier, which is that he's correct that we anticipate

9   calling a valuation expert to provide valuation testimony

10  akin to what Christie's did but on a different portion of the

11  collection than what Christie's valued.

12          Now, one thing I -- that hits the three main areas

13  that I had divided my presentation, your Honor.  One thing

14  that is somewhat up for debate but that we're considering is

15  that we appreciate the idea -- we're very mindful of the idea

16  that we're not going to litigate the validity of the COPs at

17  plan confirmation, and it's not my intention to secure that

18  admission from Mr. Bennett and then whipsaw him by putting on

19  an inordinate amount of testimony about the COPs.  What we

20  are considering is the idea that the COPs have gotten such a

21  bad rap over the course of the case.  In fact, I think that

22  in the <u>Free Press</u> the word "disastrous" is automatically put

23  next to the word "COPs" every time you read the article.

24  There is actually a lot of nuance to that question of why

25  that transaction was done, the economic logic behind it, and

1    it is possible that we will call a COPs -- what I call a COPs

2    witness, one of the individuals who lived that transaction,

3    to describe the economic rationale for it and how it relates

4    to the pensions and specifically the unfunded pension

5    liability that is not today because of the COPs transaction.

6    It would not be --

7         THE COURT:  What would be the relevance of that to

8    confirmation issues?

9         MR. HACKNEY:  The relevance would certainly be to

10   fair and equitable because I think it is -- and that's a

11   broad standard for the Court to consider, but you can

12   certainly see there's a -- there's certainly kind of a

13   bitterness almost to the COPs because the COPs are used to

14   plug this billion four hole and minimize the position that

15   the pensioners were in in terms of their unfunded liability,

16   and then years pass.  We come into this proceeding.  By our

17   estimations, the pensioners -- you saw the numbers in our

18   objection if you had a chance to read it -- are receiving

19   very fulsome recoveries.  The COPs are not.

20        THE COURT:  That opens up a really big door.

21        MR. HACKNEY:  On validity, because it would be my

22   intention to structure it so that it was not an attempt to

23   submarine them.  And I will tell you this is part of the

24   debate.

25        THE COURT:  Well, but --

1    MR. HACKNEY:  This is part of the debate.

2    THE COURT:  Okay.  Okay.

3    MR. HACKNEY:  Yeah.

4    THE COURT:  Let's assume for the minute that you can

5    do that, you can structure this in a way that doesn't really

6    focus on validity.  What you're really focusing is on the

7    point that for fair and equitable you want to try to prove

8    that that transaction was actually beneficial to the city,

9    not disastrous to the city, and that weighs in the matrix of

10   fair and equitable.  Is that where you're going?

11   MR. HACKNEY:  That's a very fair way to say one part

12   of it, and the other part would be that it's logical to treat

13   the COPs holders similar to the pensioners because of the way

14   they are so --

15   THE COURT:  Okay.  Okay.

16   MR. HACKNEY:  -- interconnected or equitable.

17   THE COURT:  But the door that gets opened, again,

18   not having to deal with validity, per se, is what a disaster

19   it was for the city.

20   MR. HACKNEY:  Yeah.  It's interesting.  I mean to a

21   certain extent you have to be careful, in my opinion, to

22   separate the COPs from the swaps.  This is one of the --

23   THE COURT:  Okay.  But even assuming you can do

24   that, you know, we're not talking about swaps, we're talking

25   about COPs.

1          MR. HACKNEY:  Agreed.

2          THE COURT:  Okay.  Still it's a big door, and when I

3     say "disastrous" in this context, I don't mean legally.  I

4     mean economically in the same sense that you mean beneficial.

5          MR. HACKNEY:  Let me see if I can respond to that

6     appropriately.  What COPs will be debating and what it is

7     fundamentally not my intention to do is to open the door on

8     validity at trial, and so I would structure the direct

9     examination so that it did not happen, and -- but, on the

10    other side of it, I sort of feel like in your mind, at least,

11    or in the press and certainly that we read, the door of the

12    disastrousness has been opened, and that is the type of thing

13    that makes me want to be able to not just give you documents

14    that show, your Honor, here's the interest spread, this is

15    the amount of money that was saved year-in and year-out,

16    these are the number of police officers that were funded with

17    that money, this was helpful to the city over all these

18    years, but actually have a person bring it alive for you so

19    that you see the logic of it.  That will be the calculus.

20         THE COURT:  Okay.  I'm not raising this question for

21    any other purpose than to suggest to you that the evidence

22    that you bring in on that point may well not be the only

23    evidence on that point.

24         MR. HACKNEY:  Fair enough, and I appreciate that

25    cautionary note, your Honor.  Point is well-taken.  If I

1  could say a couple -- just a couple additions, your Honor,

2  which is Mr. Bennett made a point about the fact that it may

3  be useful to have a colloquy on the mediation privilege.  I

4  share that interest.  I don't know if this is an appropriate

5  time to do it.  I know the LTGOs would like to have an

6  opportunity to do the same thing that I've just done, but I

7  wanted to mention that as a concept for something that might

8  benefit us all today.  The other thing I want to say, your

9  Honor, is there is significant creditor interest/agida about

10 making sure that --

11          THE COURT:  Slash what?

12          MR. HACKNEY:  Agida, which is a word that I copied

13 from Italian people, so I hope that I'm using it correctly.

14          THE COURT:  I was going to say it didn't sound

15 Yiddish.

16          MR. HACKNEY:  No.  That is not Yiddish.  There is

17 significant concern about addressing the document issues that

18 were scheduled for today and I also I think addressing the

19 schedule.  I am only mentioning those today because I'm

20 noticing the hour.  I'm going to pass the podium to the LTGOs

21 unless you want me to address the mediation privilege at this

22 point.

23          THE COURT:  Well, yeah, I do.  We should address

24 that.  If I heard Mr. Bennett correctly, his issue was only

25 sort of peripherally the mediation issue.  It's when it comes

1  time to considering the issue of whether to approve the
2  settlements that are in the plan, is the back and forth that
3  led to the settlement relevant to the Court's consideration
4  of the settlement, and I think that issue would arise whether
5  or not the back and forth was in the context of mediation,
6  frankly, or not.  I mean mediation is a second issue there,
7  but, you know, I think his point is the law sets forth -- the
8  case law sets forth these factors, and none of them have
9  anything to do with what the conversation was that led up to
10 the deal.  That's what I need you to address.
11         MR. HACKNEY:  Yes.  So this is a -- this is in some
12 respect -- I would describe this as kind of a trapdoor
13 question, although I'm not accusing you of trying to trap me,
14 and I'll tell you what I mean.  When I read the city's reply,
15 what I see them saying is we can address these settlements
16 under Rule 9019 and the Bard factors, and then once we do
17 that -- and we can do it by showing you the merits of the
18 claims back and forth and the defenses, and you can do a
19 probing analysis of the record in that respect and determine
20 if it falls within the range of reasonableness.  Once we do
21 that, we're done with that settlement.  I think the problem
22 is that the fact that there is a settlement in the plan does
23 not absolve the Court or the city from proving that the
24 settlement also complies with the other elements of
25 confirmation such as unfair discrimination and best interest

1    and so forth, and I'll get to the practical realities of why
2    that matters, but let me actually take a step back to the
3    swap trial that we both lived through, which was the swap
4    trial played out exactly the opposite of what the city is now
5    implying, which is the city really I would say did not
6    introduce the evidence of the underlying transaction.  It
7    didn't bring in the representations that were made by UBS
8    Bank to the city that could have arguably been fraudulent,
9    showed you the reliance value of them, gave you a sense of
10   the damages so that you could assess whether they're
11   settling.  What they did was they put Mr. Orr up on the
12   stand, and he did two things.  The first one is he said
13   effectively, "My lawyers have told me all of the issues are
14   50-50, and if you balance 50-50 legal issues against this
15   magnitude of dollar issue, you end up in this range," and
16   more to the point that we're talking about now, which is the
17   mediation privilege, which is after they were referred to
18   mediation, Mr. Moore -- Mr. Orr testified at length about
19   what happened in that mediation.  We came in.  The mediators
20   were saying we -- you know, we kind of thought we'd start
21   here.  The mediator said, no, that was never going to happen,
22   and so it's --
23             THE COURT:  Well, but answer this question for me.
24             MR. HACKNEY:  Sure.
25             THE COURT:  When, depending on what time period

1  we're talking about, I either rejected the settlement and

2  then later accepted the settlement, did I --

3         MR. HACKNEY:  I remember both of those moments.

4  Thank you.

5         THE COURT:  -- yeah -- did I take into account any

6  of that?  No.

7         MR. HACKNEY:  Probably not.

8         THE COURT:  What I looked at when I was evaluating

9  the reasonableness of the settlement was the relative merits

10  and strengths of the claims and defenses which mostly came

11  through Ms. Ball and Ms. English and you as you laid out what

12  the claims and defenses would be.  It was great.  It was very

13  helpful to me.

14         MR. HACKNEY:  Fair enough.

15         THE COURT:  Mr. Orr, not so much.

16         MR. HACKNEY:  Let me take that forward to my

17  original point, which is the notion that Rule 9019 can't pull

18  the settlement out of the plan.

19         THE COURT:  And I agree with that a hundred percent,

20  but that only leads to the question, which is even assuming

21  it's relevant to best interest and fair and equitable and

22  unfair discrimination, what is the back and forth of the

23  conversation relevant to any of that even?

24         MR. HACKNEY:  So I'll have to reserve on the

25  question of whether all of the back and forth is relevant,

1    but let me tell you how portions of the negotiation are

2    absolutely relevant, and let me show you how the city is

3    already using them because if you take a look at the document

4    that Mr. Bennett used today, which is what's called, I think,

5    the factual plan confirmation factual proposition --

6              THE COURT:  Okay.  I have it here.

7              MR. HACKNEY:  Take a look at page 7 of that

8    document.

9              THE COURT:  Okay.

10             MR. HACKNEY:  And if you would, your Honor, look at

11   what is denominated 6.b.i. and 6.b.ii.  So this is a key

12   argument for them because they're saying two things that are

13   important here, your Honor.  One of them is they're saying

14   the state contribution funds and the foundation and DIA funds

15   are not city funds, but then they make a second key

16   statement.  It's an example of how subtle this is, which is

17   they say state contribution funds in 6.b.i. are not the

18   city's funds and would not otherwise be available to the

19   city.  In 6.b.ii. they say foundations' and DIA funds are not

20   the city's funds and would not otherwise be available to the

21   city.  Now, you can see already what's happening here, right,

22   which is it is a soft implication with momentous importance,

23   which is that, well, they told us in the mediation that they

24   weren't going to do our deal unless we structured it such

25   that the art institute was taken out of this debatable realm

1   forever and if all of our money went to the pensioners, and

2   you can imagine the interest to that -- of that fact to

3   creditors like me who aren't seeing any of the funds that are

4   going to the pensioners because we are saying, as you know,

5   from the rooftops, "Wait.  There are alternative means to

6   monetize the art," but what we will also say is, "Wait a

7   second.  We want to test the proposition.  Did that deal have

8   to be structured that way?"  Our reading of some of these

9   foundations was that they were most interested in protecting

10   the art.  And were they really --

11         THE COURT:  Well, all right.  I'll leave it to you

12   this way.  If the city breaches the confidentiality of

13   mediation in attempting to prove the second part of that or

14   really any part of it, then you're in, but I can't assume

15   that.  I have to assume the city in discovery and, most

16   importantly, at trial will respect the confidentiality of

17   mediation in all of its proofs.  And I think --

18         THE COURT:  I'll offer -- if I can offer a brief

19   rejoinder, your Honor, the first is that, in my opinion,

20   they're already not doing it.  They're giving you enough

21   here.  They're saying, "Your Honor, we wouldn't have it but

22   for this," and that's all they want to say.  And when I want

23   to test that -- but, your Honor, second -- I'm sorry.  Just

24   one more point.  Remember that the concept of the city

25   attributing things to the foundations has already happened

1  because I don't know if you remember, but the city was going

2  around saying, "Hey, you know, pensioners, we're sorry.

3  Pension reform has just got to be part of the deal.

4  Foundations are insisting on it."  And what do we get?

5      THE COURT:  Well, the city may have -- the city may

6  have done that, but my decision on confirmation is going to

7  be based on the evidence at the hearing on confirmation.

8      MR. HACKNEY:  But that is why I believe we are on a

9  collision course because I believe if you strictly construe

10 the mediation privilege such that the city just has to say

11 there's a settlement, how do you get to the point where

12 the --

13      THE COURT:  Well, just by way of example, to look at

14 two or one.  It doesn't matter.  We'll look at two, and would

15 otherwise -- and would not otherwise be available to the

16 city.  The city could well prove that by calling someone from

17 the foundations and the DIA to testify to that without

18 breaching confidentiality of what was said in mediation.

19      MR. HACKNEY:  Well, they could, but the question is

20 can we fairly test that proposition where the person is

21 saying, "Here was my state of mind in the mediation."

22      THE COURT:  Well --

23      MR. HACKNEY:  And so, you know, "Here's my state of

24 mind in the mediation.  Here's what I was thinking about.

25 Here's my negotiating strategy," but then we can't go the

1   extra step to say, "Well, what did you say back and forth?"

2   Let me tie this into a legal rule, your Honor, and I'll sit

3   down.  When I read your mediation order -- and, you know, you

4   wrote it, so you know what you meant by it, and I'm not

5   trying to put words in your mouth.  I'll just tell you what I

6   thought, and I thought that you were enshrining Rule 408 in

7   the mediation order.  The reason that's important is because

8   Rule 408 is commonly thought of -- is commonly held out by

9   folks to say that settlement, you can't inquire into it at

10  all, end of story.

11          THE COURT:  It's not that broad.

12          MR. HACKNEY:  That's right, and what's so important

13  about it is it I think maps well here, which is it would be a

14  violation of the mediation order, I think, if the city were

15  to use the retirees' statements to the city in the mediation

16  in a litigation against them if this plan fails or if

17  something were not to have come of their mediation efforts

18  because then they'd be taking the spirit of compromise

19  between one another and using it back at the other person

20  frustrating the environment of compromise that mediation is

21  suppose to create.  When they come together as one and are

22  now satisfied and happy with each other -- and in the case of

23  the pensioners, I'm sure very happy -- then you have to think

24  about it from the perspective of the third party who is

25  looking at the transaction saying, "I don't want to introduce

1    evidence for the purpose of establishing that the retirees
2    knew that they couldn't recover or the city knew that its
3    UAAL was inflated."  I am trying to introduce it for the
4    purpose of showing this was not the only way that the
5    transaction had to be structured.  There were alternative
6    structures that were acceptable to them that would have
7    allowed for sharing of proceeds with other creditors.  And it
8    permeates their case because it --

9         THE COURT:  Well, but why can't you show that
10   without asking who said what at the mediation?

11        MR. HACKNEY:  Because the transaction itself is one
12   that has the structural elements, for example, that the DIA
13   has to be conveyed, but all the money can only go to
14   pensioners or that -- take DWSD that we heard a lot about
15   today, I'll say.  It's interesting on DWSD that the city is
16   going to DWSD and saying, "Hey, you owe money on the
17   pensions, and we're going to take it out."  Well, the DWSD
18   had to pay money on the COPs to help service the COPs as
19   well, but there's no effort by the city to go, "And by the
20   way, like we got to get some recovery for those COPs guys."
21   No.  Again, it's, "Oh, well, this is the way -- this is the
22   only way that the structure could work, and, once again, it
23   had to go to the pensioners," or with the UTGO like Mr. Neal
24   who's always sitting so smugly next to me.

25        THE COURT:  You're not inviting a lawsuit here, are

1    you?  No.

2          MR. HACKNEY:  I hope not, but I'm not sure -- am I

3    straying, your Honor?

4          THE COURT:  I remain unpersuaded.  I have said

5    before and I'll say it again, the best way to resolve this

6    bankruptcy is through mediation and settlement, and any crack

7    in the wall of confidentiality undermines that goal.  And

8    beyond that I remain unpersuaded that you can't do everything

9    you need to do very effectively potentially without that

10   breach, so those are my -- those are my thoughts to the

11   extent they help you at this stage in your process.

12         MR. HACKNEY:  Understood, your Honor.  I wanted to

13   just leave you with one thought briefly before I sat down and

14   handed the podium to my friends, the LTGO.  One of the things

15   Mr. Bennett said is that the evidence will mainly be about

16   numbers and so we should really focus when it comes to

17   discovery -- we can get into this later, but let's focus on

18   the numbers, got to give them the numbers, got to give them

19   the numbers.  I wanted to add to that, though, just as you're

20   thinking about this case in terms of discovery and trial,

21   it's not just about the numbers.  The numbers are the

22   conclusion.  It's about the method.  It is about the

23   methodology by which you reach the numbers.

24         THE COURT:  The method and the assumptions.

25         MR. HACKNEY:  Absolutely.  And that's why we're

1   pushing so hard on the discovery with respect to whether it's

2   ESI collection or --

3           THE COURT:  Yeah.

4           MR. HACKNEY:  -- whatever is because --

5           THE COURT:  I get that.

6           MR. HACKNEY:  Yes.

7           THE COURT:  I'm with you on that.

8           MR. HACKNEY:  I was sensitive to that point, so I

9   didn't want this to just boil down to a, "Hey, you know,

10   here's the accounting system.  You can worry about how we got

11   there later," and I wanted to make that point.  Thank you

12   very much.

13           MS. COHEN:  Good afternoon, your Honor.  Carol

14   Connor Cohen from Arent Fox on behalf of Class 7, the LTGO

15   debt.  I'm going to try to be really brief, your Honor,

16   because we have a great deal of interest as well in the

17   discovery and schedule matters that Mr. Hackney wants to talk

18   about, so I'm going to get up and then get down.

19           Broadly speaking, Ambac's objection on behalf of the

20   LTGO debt raised four issues:  that the plan doesn't satisfy

21   the best interest of creditors because the LTGO debt would do

22   better outside of bankruptcy if the case were dismissed; that

23   the plan does not satisfy the fair and equitable test because

24   it fails to treat the LTGO debt as senior unsecured -- I

25   believe both we and the city have agreed that's a pure legal

1    issue that could be handled without the necessity of proof --
2    third, that the plan unfairly discriminates against the LTGOs
3    by providing for recoveries of the pension claims that are
4    several orders of magnitude larger; and, fourth, that the
5    plan does not satisfy the fair and equitable test because it
6    fails to maximize return to creditors.  And in this regard,
7    in particular, because the city's revitalization spending is
8    being done on the backs of creditors, we believe that it's
9    incumbent upon the city to provide for a potential upside to
10   the extent that that revitalization spending results in some
11   upside to replace the losses that have paid for the spending
12   in the first place.
13              THE COURT:  How would you structure that?
14              MS. COHEN:  Excuse me?
15              THE COURT:  How would you structure that?
16              MS. COHEN:  Well, I think there's -- we actually, I
17   think, hope to present some expert testimony on that subject,
18   your Honor.
19              THE COURT:  All right.
20              MS. COHEN:  Because the city bears the burden, I'm
21   going to echo what Mr. Hackney said here, which is that from
22   a factual perspective, we expect all of our factual evidence
23   to be by way of cross-examination of the city's witnesses or
24   by documents, and many of the same things that Mr. Hackney
25   talked about we would expect to educe, and so I'm not going

1   to repeat that in the interest of time. We also anticipate

2   presenting two expert witnesses. One is an actuarial expert

3   who will testify about both the pension and OPEB liabilities

4   in the context of unfair discrimination. He'll testify

5   regarding the true measure of those liabilities on the

6   pension side, in particular, to show what the actual recovery

7   appears to be. And if we ever get documents on the

8   calculation of the OPEB, which we haven't yet, we would

9   expect that he might also be testifying about that, which

10   goes to how the B notes are shared on a pro rata basis with

11   the OPEB.

12         The other expert is an expert on municipal budget

13   and finance, including specifically municipal securities. He

14   has considerable expertise in dealing with distressed

15   municipalities from prior positions he's held, and he'll

16   provide testimony in support of the objections that the plan

17   isn't in the best interest of creditors and not fair and

18   equitable. He will also provide evidence supporting our

19   contention that it would be feasible for the city to provide

20   greater creditor recoveries under the plan. Specifically,

21   he'll testify about how states create statutory frameworks in

22   order to maximize the access of municipalities throughout the

23   state to the capital markets and how the importance -- and

24   how important it is for the city to have this access to the

25   capital markets going forward and to their revitalization

1   efforts.  He will also testify that the LTGO debt will do

2   better outside of bankruptcy based on its very small size

3   relative to the other liabilities that the city has.  I think

4   we are probably the smallest of all.  The elevated status,

5   the LT -- LT -- I can't say the word -- the limited tax bonds

6   have in the hierarchy of municipal debt and, most

7   importantly, on this expert's experience in out-of-court

8   restructuring of other municipalities and how it worked there

9   with their debt.  And then finally he's going to talk about

10   his opinion regarding the city's projections and budget and

11   specifically that the city would have adequate resources to

12   pay the LTGOs in full over the next five to ten years if they

13   were stretched out and that the city has sufficient potential

14   upside to share a portion of that upside with creditors.

15   Thank you, your Honor.

16        THE COURT:  Thank you.  We need to take a bit of a

17   pause here, please.  Ms. Patek, you had an issue that you

18   wanted to bring to my attention.  Chris, who was it?  Ms.

19   Neville.

20        MS. NEVILLE:  I did, your Honor.  This has -- it's

21   Carole Neville for the Retiree Committee -- has absolutely

22   nothing to do with discovery.

23        THE COURT:  Right.

24        MS. NEVILLE:  We have a ballot issue, and we

25   discovered an error on the GRS ballots that affects several

1   thousand people, and so the city and the Retiree Committee

2   have been working to send out a new ballot.  We wanted to

3   bring it to the Court's attention.  I'm not quite sure how

4   we're going to do this because the votes have already started

5   to come in, and people are voting in the GRS who are

6   affected.  We have already decided to have a new color.  The

7   ballots are color-coded, so this will be a different color,

8   but it's not clear yet whether we have to solicit all of the

9   GRS who are affected by ASF or a section of them, and --

10          THE COURT:  What was the nature of the error?

11          MS. NEVILLE:  The ASF was calculated from 2002 to

12  2013 instead of 2003 to 2013, and at least a thousand people

13  will no longer have an ASF recoupment, and some will have a

14  smaller, and it also affects the actives, so --

15          THE COURT:  Um-hmm.

16          MS. NEVILLE:  -- we need to send out new ballots to

17  those people.

18          THE COURT:  Excuse me.

19          MS. NEVILLE:  The question we have really is --

20          THE COURT:  Telephone?  Is it off, sir?

21          UNIDENTIFIED SPEAKER:  Yes, it is.  Sorry, Judge.

22          MS. NEVILLE:  We're not really sure whether we need

23  to send out ballots to all of the GRS people.  Excuse me.

24  The process has been very confusing for retirees.  I've

25  answered hundreds of calls.  My staff has.  We had two town

1  hall meetings with several thousand people.  People don't
2  know how to vote, and this is going to be an additional
3  confusion.  So I think what we need to do is figure out what
4  our strategy is with the city and come back and tell your
5  Honor and send out a new notice.
6          THE COURT:  Who are you working with?
7          MS. NEVILLE:  Ms. Lennox.
8          THE COURT:  When do you expect the two of you to
9  come to an agreement on how to handle this?
10         MS. NEVILLE:  We're not in disagreement.  What we
11 have -- what we first had to do is figure out how many people
12 were affected by this.  Milliman recalculated its numbers,
13 and I believe Conway MacKenzie redid its numbers.  Now Segal
14 has to redo their numbers.  It will also change the amount of
15 each person's claim since AFS was included in it.
16         THE COURT:  Right.
17         MS. NEVILLE:  So there are a number of issues there,
18 and we have to figure out how to deal with it, but I wanted
19 your Honor to know about that as soon as we had discovered
20 it.
21         THE COURT:  Can we agree to have a conference call
22 with you and me and Ms. Lennox on this Monday?
23         MS. NEVILLE:  Your Honor, I'd like to do it sooner
24 if we can possibly do that.  If we could do it Friday --
25         THE COURT:  Friday?

1            MS. NEVILLE:  If that works for you.

2            THE COURT:  Yes.  I'll have my staff get in touch

3     with you on the time and the mechanics of it.

4            MS. NEVILLE:  Because I think the sooner we send the

5     ballots out, the better it will be, and --

6            THE COURT:  Absolutely.

7            MS. NEVILLE:  -- we'd like you to see at least what

8     it is we propose to send out.

9            THE COURT:  Thank you.

10           MS. NEVILLE:  Thank you.

11           MR. NICHOLSON:  Your Honor, can I be heard on this?

12    Michael Nicholson for UAW.  This is not just an issue for

13    retirees.  It's also an issue for active employees.  I

14    attended a Retiree Committee presentation where people were

15    asking -- seeing the logic of the description of the ASF

16    recoupment and seeing that it didn't match up with what they

17    were seeing on their ballots were saying, "What's the

18    explanation?"  We don't have an explanation.  And their next

19    statements were, "If we can't trust this, what else is

20    wrong?"  And we're very concerned about the effect on the

21    voting.

22           THE COURT:  And why are you telling me this?

23           MR. NICHOLSON:  So you know.  We thought it was

24    important.  We were among the voices that thought it was

25    important to bring this to the Court's attention because it

1  has an impact on the voting on the plan that's now going on,

2  and I thought it was incumbent upon --

3          THE COURT:  Yeah.  I agree with you.  This is very,

4  very unfortunate --

5          MR. NICHOLSON:  Yes.  I agree.

6          THE COURT:  -- because it will undoubtedly result in

7  "no" votes that might have otherwise been "yes" votes --

8          MR. NICHOLSON:  Exactly.

9          THE COURT:  -- just because of the confusion and the

10  questions about the reliability of the data that's being

11  provided.

12          MR. NICHOLSON:  Because of that, your Honor, I'd ask

13  that at least -- I wanted to bring to your attention this was

14  not just a retiree issue.  I also want the Court -- I think

15  the Court at least ought to consider and the parties ought to

16  consider and Jones Day ought to consider, the city, whether

17  it's appropriate to disclose the error and then resolicit the

18  entire class.  And, you know, I think -- I agree --

19          THE COURT:  I assume that would be part of the

20  process.

21          MR. NICHOLSON:  Yeah.  I would assume so.  And,

22  frankly, your Honor, even people sitting at a meeting who

23  aren't subject to ASF recoupment, if there's other folks --

24          THE COURT:  Right.

25          MR. NICHOLSON:  -- are displaying a lack of

1  confidence in --

2         THE COURT:  Absolutely.

3         MR. NICHOLSON:  -- the process, it's a problem.

4         THE COURT:  It is, absolutely.

5         MR. NICHOLSON:  Yeah.

6         THE COURT:  I agree with you.

7         MR. NICHOLSON:  And we wanted to make sure this was

8  brought to your attention.  That's why --

9         THE COURT:  Thank you, sir.

10        MR. NICHOLSON:  -- we're here, your Honor.

11        THE COURT:  Thank you.

12        MR. NICHOLSON:  Thank you.

13        MR. BENNETT:  Briefly as to this, when the city was

14  informed of it, it immediately started work to figure out

15  exactly what the problem is.  I don't personally know what

16  the number of the ballots are affected are, but the best

17  estimates that the city currently has is that it's 2,000 or

18  less, so it's a very significantly small subset of the entire

19  retiree and active universe.  The other thing I want to

20  emphasize to your Honor is that in every --

21        THE COURT:  Well, but that ignores the ripple effect

22  it has on everybody.

23        MR. BENNETT:  I understand.  In every event the

24  recovery gets better, so there's a reason of having a shorter

25  ASF recovery period.

1          THE COURT:  Right.

2          MR. BENNETT:  In every event, the news to an

3     individual gets better.  There is no event where the news to

4     an individual gets worse, and the estimate -- the aggregate

5     estimate numbers that Ms. Lennox gave you this morning are

6     the estimates for the correct duration for the period.

7          THE COURT:  Okay.  Thank you.

8          MR. BENNETT:  So I don't want anyone to be --

9          THE COURT:  Who do we hold responsible for this?

10         MR. BENNETT:  Your Honor, I don't know where this

11    happened.

12         THE COURT:  All right.  Tell Ms. Lennox I want an

13    answer to that question when I talk to her on Friday.

14         MR. BENNETT:  Okay.  We will do that, your Honor.

15    Your Honor, I want -- there's only very few points that rise

16    to --

17         THE COURT:  One second before you go on.  Is there

18    anyone else who wants to be heard about their case?  I saw a

19    couple of hands, maybe a third or a fourth, so let's proceed

20    with those.  Ms. Patek, since you're standing, why don't you

21    step forward?  And then I'll get back to you, Mr. Bennett.

22         MS. PATEK:  Your Honor, Barbara Patek on behalf of

23    the Detroit Fire Fighters Association and the Detroit Police

24    Officers Association, and I'm here today to strictly address

25    the factual issues and proofs.  Mr. Legghio is here to

1    address the legal issue.  All of our factual issues, because

2    we are the 3,300 men and women active employees who provide

3    police and fire protection to the City of Detroit, fit one

4    way or the other under the umbrella of the feasibility

5    determination, and in part it's going to come under the

6    umbrella of human capital.  And we have -- they're broken

7    into two issues, one of whom -- one of which the city has

8    identified as a legal issue, and that's the 1123(a)(4) issue

9    regarding the different and less favorable treatment for the

10   actives on the going forward pension.  And we believe that

11   there are some factual predicates that the Court needs to

12   understand to resolve those issues.  It may turn out that

13   those are not in any serious dispute, and if that turns out

14   to be the case, we would be more than happy to have that

15   issue moved forward and dealt with expeditiously because we

16   want the city to get it right at the time of confirmation.

17          The second piece of our feasibility argument deals

18   really with these --

19          THE COURT:  I'm sorry.  Before you go to number two,

20   can you be a little more specific about number one?

21          MS. PATEK:  Yes.

22          THE COURT:  I'm not quite sure I followed it.

23          MS. PATEK:  And I can actually -- we have objected.

24   Under the plan there is an accrued pension benefit --

25          THE COURT:  Um-hmm.

1          MS. PATEK:  -- that each active employee is entitled

2     to as part of his or her claim.

3          THE COURT:  Right.

4          MS. PATEK:  And then there is a going forward

5     formula for the pension, and that going forward formula in

6     some ways, because of the fact that the hard freeze impacts

7     the amount of the pension claim, and in the case of the DPOA

8     and the DFFA there -- the evidence will show that the pension

9     that they will receive from the city under the plan as

10    proposed will include a lower contribution amount from the

11    city as a percentage of their base pay, a significantly less

12    generous final average compensation -- that is, the look-back

13    is five years from the two settling public safety unions, and

14    it's ten years for the DPOA and the DFFA.  And since people's

15    earning capacity is usually greater at the end of their

16    career, that means a less generous pension for these

17    individuals who don't have Social Security to fall back on

18    for either disability or retirement.  They need to be older

19    and have more years of service to receive full retirement

20    benefits, and it also includes the elimination of the

21    deferred retirement option plan for some of these employees,

22    which I think is a -- also a serious human capital issue from

23    the standpoint of there are ways in which that pension

24    formula is going to change on July 1st that may encourage

25    people who might otherwise have been eligible to DROP to

1  perhaps leave their employment with the city.  We view these

2  as facts the Court has to understand.  The city may not

3  dispute them.  The effect of the hard freeze is that whatever

4  that accrued benefit is now, it's frozen in time, and so

5  instead of being based on the employees' compensation at the

6  time of retirement, it's based upon their employment now, and

7  that imposes a more severe cut on these actives, so that's

8  basically what the proofs will be.  We propose to provide

9  those proofs through either a 30(b)(6) designee of the city

10 or the Retirement Systems that can address and explain those

11 issues to the Court, and we would also offer the testimony of

12 the --

13            THE COURT:  This is a feasibility, in your view, you

14 say the evidence will -- well, let me just ask.  How does

15 that amount to a feasibility issue?

16            MS. PATEK:  Well, in the first instance, it's an

17 illegal treatment issue, and in the second --

18            THE COURT:  Illegal in what sense?

19            MS. PATEK:  In the sense that they are getting a

20 less generous benefit than others in the same class.

21            THE COURT:  So like unfair discrimination?

22            MS. PATEK:  It's not exactly unfair discrimination

23 because it's 1123(a)(4).  It is that they are being treated

24 less favorably than members of the two settling public safety

25 unions, and they have not consented to that treatment.  It's

1  as simple as that.

2          THE COURT:  Well, but why does that make it illegal?

3          MS. PATEK:  Because I don't believe that under the

4  Code the Court can treat them -- they need to be -- have the

5  opportunity to be treated the same unless they agree, and

6  they haven't agreed.

7          THE COURT:  Are they in the same class?

8          MS. PATEK:  They are in the same class.

9          THE COURT:  Oh, that's the issue.

10         MS. PATEK:  Yes, your Honor, and I apologize.

11         THE COURT:  Okay.

12         MS. PATEK:  I should have said that at the

13  beginning.  They are all Class 10 active employees, and

14  they --

15         THE COURT:  Okay.  Yeah.  So the rule you're

16  concerned about is the rule that requires all creditors in a

17  class to be treated similarly.

18         MS. PATEK:  Exactly.

19         THE COURT:  Got it.

20         MS. PATEK:  Exactly.  So, as I indicated, those

21  facts may, in fact, turn out to be not disputed, and it may

22  be something that can be resolved as a pure legal matter, but

23  there's that piece of it and the fact that, you know, the

24  other feasibility issue -- and I think the pension treatment

25  is part of it -- is the inability of the DPOA in particular

1  but both the DPOA and DFFA to resolve their issues and get to

2  a labor contract with the city.  And I think the -- you know,

3  first of all, we are in this case, and it's a little odd to

4  be talking about these specific economic labor issues, but,

5  as I sat in the courtroom this morning and hearing a banker

6  indicate it's $500 an hour to review the certain complicated

7  documents, I think this issue -- and the Court heard a lot of

8  this evidence at the eligibility trial both from Chief Craig,

9  who would be one of the witnesses we would expect to examine,

10  as well as the presidents of the two public safety unions,

11  Jeff Pegg and Mark Diaz.  You know, yesterday the governor

12  signed into law a new minimum wage act, and I think $9.75 is

13  the new minimum wage in Michigan.  And you can check it

14  out --

15          THE COURT:  In several years.

16          MS. PATEK:  Yes.  But you can check it out on the

17  city's website.  The starting pay for a Detroit police

18  officer is $14 an hour.  And as the Court is aware from the

19  evidence that was heard at the eligibility hearing, that is

20  significantly less than -- and we realize that there is --

21  you know, there are huge financial considerations, but there

22  are reinvestment initiatives that the city is doing, and we

23  think this human capital is an important one.  And we think

24  the ability of the city to -- you know, to retain these

25  officers and to be able to hire and attract professional

1  police officers in the future is one that I think needs to be

2  addressed.

3        THE COURT:  Okay.  But which element of confirmation

4  does that argument sort of shoehorn into?

5        MS. PATEK:  I think it shoehorns into feasibility

6  from the standpoint of it's not just do we have the money to

7  pay, but do we have the ability to execute and provide

8  adequate public safety.  And if as things are now there's a

9  huge exodus before July 1st, which hopefully won't happen,

10 but the potential is there, that could be a very bad thing

11 for the city.  If their ability to hire and retain these

12 officers, who, as the Court well knows, have been working

13 under extremely difficult situations over the --

14       THE COURT:  Well, do you have a witness who will

15 testify as to how much it would cost the city to do what you

16 think the Code requires to be done here?

17       MS. PATEK:  Do I have a witness that will -- we

18 could provide the Court with that information one way or the

19 other.  I don't think it's a huge difference between -- I

20 guess the short answer is yes.  We will find a witness that

21 can provide that testimony, and I think it could come in

22 through -- as simply as through cross-examination of some of

23 the city's witnesses --

24       THE COURT:  All right.

25       MS. PATEK:  -- either Mr. Moore or Mr. Malhotra.

1          THE COURT:  All right.  Thank you.

2          MS. PATEK:  I think that's all I have.

3          THE COURT:  Thank you.

4          MS. AVERY:  Good afternoon, Judge.  Karin Avery on

5    behalf of the retiree association parties, which consists of

6    the Retired Detroit Police and Fire Fighters Association,

7    Donald Taylor individually and as president of the RDPFFA,

8    the Detroit Retired City Employees Association, and Shirley

9    V. Lightsey as its president.  We aren't prepared to provide

10   a factual or legal analysis of our objections because, as the

11   Court knows, we've entered into a settlement with the debtor,

12   and we, in conjunction with the committee, filed a response

13   to just make the Court aware that we weren't sure whether we

14   needed to file anything, but we wanted to preserve whatever

15   rights we have because we won't know until sometime after

16   June 20th whether or not we're going to object to the plan.

17         THE COURT:  Right.

18         MS. AVERY:  So we just wanted to make that clear.

19         THE COURT:  Okay.  Anyone else?  Sir.

20         MR. TROY:  Good afternoon, your Honor.  Matthew Troy

21   from the United States Department of Justice, Civil Division,

22   on behalf of the Department of Housing and Urban Development,

23   otherwise known as HUD.  Your Honor, HUD has, through a

24   series of agreements, guaranteed a series of notes that the

25   city has issued under HUD's Section 108 loan program.  To

1   date the debtor has not defaulted in payment on those notes,

2   so HUD's claim under its guarantee remains a pre-petition

3   contingent claim.  In the plan the debtor has proposed to

4   reinstate the notes and the related HUD agreements.  The rub,

5   your Honor, is the amount that the debtor claims is due under

6   those notes.  We filed an objection raising as one objection

7   that HUD disputed that amount.  The debtor believes it's "X."

8   HUD believes it's "Y," a higher amount.  We have provided

9   that number to the city, offered an explanation to the city

10  for the basis for that claim.  We haven't received a response

11  back, so I rise today simply to comply with your judge's --

12  your Honor's order and to tell you that we are prepared to

13  call a witness, a HUD employee with the Section 108 loan

14  program, to testify as to the amounts that could come due

15  under the notes if the city fails to perform post-petition.

16          THE COURT:  Okay.  What's the EPA issue?

17          MR. TROY:  The EPA issue, your Honor, we would

18  submit is purely a legal one, and it relates to the scope of

19  the discharge and injunction provisions.  We also filed a

20  statement in compliance with your Honor's other order from

21  Friday.

22          THE COURT:  Right.  Okay.  Thank you.  Anyone else?

23  Mr. Gordon.

24          MR. GORDON:  Thank you, your Honor.  Robert Gordon

25  on behalf of the Detroit Retirement Systems.  Your Honor, I

1    rise to raise one issue in particular with respect to
2    feasibility, and I know the Court is considering the proofs
3    that need to be put on in that regard, but my issue with
4    respect to feasibility has more to do with your -- perhaps
5    your scheduling order, and that was an issue that was raised
6    earlier today by counsel for the court-appointed expert.  And
7    this hearkens back -- and I want to be a little delicate
8    about it because it's still something before the Court, but I
9    think it was two weeks ago the Court heard argument about
10   certain parties' desire to intervene in the COPs litigation.
11   And in that context, it was made quite clear -- of course, it
12   was made clear in their papers as well that they filed before
13   the Court that if intervention was granted, that they would
14   also seek to institute an adversary to seek disgorgement of
15   $1.4 billion or something in that range from the Retirement
16   Systems.  Now, while we and I believe the city as well
17   believes that that cause of action is fatally flawed in a
18   number of respects, the fact is that there has been no
19   determination of that.  And I rise simply to raise the issue
20   for the Court to think about, I guess.  I don't know how that
21   plays into the timing of this trial on confirmation because I
22   don't know how the Court can consider whether the plan is
23   feasible if this issue hasn't been resolved.  If the Court
24   grants intervention and allows the lawsuit to go forward and
25   sometime post-confirmation somehow there is a determination

1    that 1.4 billion needs to be disgorged, the plan requires the

2    city to just fill that hole, but how it does it no one knows.

3    And at that point, of course, lots of things will have been

4    set in motion by a confirmed plan possibly, so I'm very

5    concerned about that and raise the issue at this time.

6              THE COURT:  Can you come up with any creative ideas

7    short of adjourning the trial for two years?

8              MR. GORDON:  I don't know, your Honor.  That's

9    exactly my concern is I don't know exactly what the answer is

10   to that, but I thought I would be remiss if I didn't raise

11   the issue at this time.

12             THE COURT:  All right.  Well, we should think about

13   it.

14             MR. GORDON:  Thank you, your Honor.

15             THE COURT:  Okay.

16             MR. BREDOW:  Good afternoon, your Honor.  Mark

17   Bredow, Resnick & Moss, who appear on behalf of individual

18   court officers Carlton Carter, Bobby Jones, Roderick Holley,

19   and Richard T. Weatherly.  These are court officers with the

20   36th District Court.  These are the indirect 36th District

21   Court claims the court imposes -- that the plan imposes a --

22   or seeks to impose an injunction preventing them from

23   pressing their claims against the city, 36th District Court,

24   and particularly against the state.  They wish to treat those

25   third-party claims against the nondebtor 36th District Court

1  and provide the sole source of revenue for them or sole

2  source of opportunity for them to collect.

3          THE COURT:  I didn't hear that today.

4          MR. BREDOW:  Well, she did -- Ms. Lennox did

5  indicate that they were intending to amend to allow the

6  claims against the state to proceed, and I did hear that.

7          THE COURT:  Well, all right.  We can debate about

8  whether it was an amendment or an interpretation of her

9  language, but okay.

10          MR. BREDOW:  So with respect to our objection on

11  that issue, we believe that the facts regarding the ability

12  of the city to treat these -- the claims of the creditors of

13  the 36th District Court under the Dow Corning factors -- we

14  believe that the facts --

15          THE COURT:  Well, but why does that even apply?

16          MR. BREDOW:  Pardon me, your Honor?

17          THE COURT:  Why does that even apply?

18          MR. BREDOW:  Well, we think that the -- well, the

19  Dow Corning factors were used in the context of Chapter 11

20  cases, but we --

21          THE COURT:  Well, but who's going to be released?

22          MR. BREDOW:  I'm sorry, your Honor.

23          THE COURT:  Who is going to be released that this

24  Dow factors would apply to?

25          MR. BREDOW:  Well, we interpret that as providing a

1  release to the city and the 36th District Court against the
2  claims of our clients, the court officers, that they would no
3  longer be able to press those claims if --
4       THE COURT:  Well, but the 36th District Court gets
5  its money one way or the other from the city or the state;
6  right?
7       MR. BREDOW:  From the revenues that they generate
8  internally and to some extent from the city.  That is
9  correct.  I believe --
10      THE COURT:  So if the plan proposes to treat the
11  claim, to the extent it's a claim against the city,
12  consistent with other unsecured claims, Dow wouldn't apply to
13  that; right?
14      MR. BREDOW:  Not as a direct claim against the city
15  directly, no.  And my clients do not claim that they have the
16  right to bring suit directly against the City of Detroit
17  for --
18      THE COURT:  Who do they want to sue or who --
19      MR. BREDOW:  The 36th District Court.  They wish to
20  obtain a judgment.
21      THE COURT:  Is the court a suable entity?  That
22  feels wrong to me.
23      MR. BREDOW:  Well, your Honor, they are a legal
24  entity.  They are separate and distinct from the city.  They
25  are a subset of the state, and there are legal proceedings

1  in --

2       THE COURT:  Right, so why wouldn't you just sue the

3  state for whatever wrong your clients committed -- or your

4  clients were -- seek compensation for?

5       MR. BREDOW:  Well, the case -- well, apart from the

6  comments that were stated today with respect to the ability

7  to do so, before that we objected because we felt that the

8  plan prevented us from doing so.

9       THE COURT:  Right.  Okay.  But that's now been

10  amended or clarified.

11       MR. BREDOW:  And the AFSCME -- the union is --

12       THE COURT:  Yeah.

13       MR. BREDOW:  -- addressing those claims directly,

14  your Honor.

15       THE COURT:  Right.

16       MR. BREDOW:  And I bring those up today because --

17       THE COURT:  Okay.

18       MR. BREDOW:  -- we represent an individual --

19       THE COURT:  Well, I agree with you that in the plan

20  confirmation process we've got to -- we've got to get this

21  straightened out, and we've got to make crystal clear what

22  exactly the city is proposing here.  It seems to me clear

23  enough that there's not to be a release of the state.  It

24  seems to be clear enough that there is to be a discharge of

25  the claim against the city, but in substitution for that you

1   get to file a claim against the city, and that's bankruptcy.

2   What's less clear is this third alternative of what happens

3   with a claim against the court itself, so --

4           MR. BREDOW:  Yes.

5           THE COURT:  -- I think we do have to work that out.

6           MR. BREDOW:  And we think that the -- again, I think

7   these are mostly -- these are legal issues.  The factual

8   issues that we would produce are essentially the witnesses of

9   the Court to establish those particular factors that we think

10  would be appropriate if the Court --

11          THE COURT:  Well, you were here when I asked either

12  Mr. Bennett or Ms. Lennox about the extent to which the

13  actual practice surrounding how the Court functions vis-a-vis

14  the city and the state may be somewhat inconsistent with what

15  the Supreme Court case law says and what the statutory --

16          MR. BREDOW:  I was here.

17          THE COURT:  -- law is, so to the extent of that, it

18  seemed to me there were factual issues.

19          MR. BREDOW:  Yes.

20          THE COURT:  So --

21          MR. BREDOW:  Our other objections, your Honor,

22  with -- assuming -- in the event that the Court feels as

23  though that's an appropriate exercise of the Court's powers

24  and appropriate -- and that the city may appropriately

25  provide for such claims in the plan that it meets under the

1  title, we would object to -- well, we filed objections to the

2  breadth of the injunction, which I believe Ms. Lennox

3  addressed, so we think that there are no factual issues

4  there. They're most legally -- they're legal issues.

5        THE COURT: All right.

6        MR. BREDOW: Most importantly, at that point, are

7  the incorrect classification of the claims of the 36th

8  District Court, our four clients, and I think that the --

9  those claims -- they're employees with wage and -- I'm sorry,

10  your Honor. They are employees with claims for accrued back

11  wages. It sounds very similar to the very claims -- the

12  Workers' Compensation claims that the city has proposed to

13  pay 100 percent. They're both employees. They've both lost

14  wages through no fault of their own, and they both are either

15  in the dispute process --

16        THE COURT: So this is an unfair discrimination --

17        MR. BREDOW: It is an unfair discrimination --

18        THE COURT: -- objection.

19        MR. BREDOW: -- particularly where there has been an

20  arbitration award and a decision of the Michigan Supreme

21  Court that the --

22        THE COURT: Okay.

23        MR. BREDOW: -- that the award is proper.

24        THE COURT: All right.

25        MR. BREDOW: We wanted to bring witnesses to assess

1 the nature of their employment, the similarity to the other

2 employees, and perhaps even to the pensions, the pension

3 employees, because those are in a nature of compensation, but

4 I think that the -- they're more similar -- substantially

5 similar to the Workers' Compensation claims than they would

6 be to the pension claims, although they are --

7        THE COURT: Well, the burden would be on the city to

8 justify the distinct treatment.

9        MR. BREDOW: Exactly.

10        THE COURT: Okay.

11        MR. BREDOW: So I believe that our witness -- we can

12 present the four -- our four clients.

13        THE COURT: What's the total amount of the claim or

14 the four claims?

15        MR. BREDOW: Rounded or exact, your Honor?

16        THE COURT: No, no, no. Approximately.

17        MR. BREDOW: $5,650,000 for four court officers.

18        THE COURT: All right. Thank you.

19        MR. BREDOW: We think that there might be --

20 segueing a little bit into the unfair discrimination, might

21 be a bit of bad faith. It's interesting that the only claims

22 of the 36th District Court that are attempted to be treated

23 in this claim are these disputes, legal disputes, arbitration

24 disputes. Vendors, accounts payable, other creditors of the

25 court are allowed to proceed whether they're pre-petition or

1  post-petition.

2          THE COURT:  And that might fit in the unfair

3  discrimination --

4          MR. BREDOW:  So we wanted to elicit testimony --

5          THE COURT:  -- category.

6          MR. BREDOW:  -- probably through cross-examination

7  of the city's witnesses in that, your Honor.  And with

8  respect to that, unless the Court has any other questions,

9  that's my presentation.

10         THE COURT:  Thank you, sir.  I would encourage you

11  to try to work as much of this out with Ms. Lennox in advance

12  as you can.

13         MR. BREDOW:  I will do so.

14         THE COURT:  One more, Mr. Bennett.  Right,

15  everybody?  One more.  All right.

16         MR. FETTER:  Robert Fetter of Miller Cohen on behalf

17  of AFSCME Local 3308 and 917.  I stand on the same issues as

18  Mr. Bredow as the 36th District Court.  Of course, he

19  represents some of the individuals that are members of Local

20  917.

21         The factual issues that may be present, it's

22  AFSCME's position that they're either not in dispute or

23  they're not truly factual issues and that this is prime for

24  something that could be resolved without the confirmation

25  process.  And if there are factual issues, they're so narrow

1   and they're so small that we propose in the memorandum that

2   we submitted to the Court that there be a separate small

3   evidentiary hearing to these narrow issues rather than going

4   through the --

5        THE COURT:  Clarify for me what interest you

6   represent beyond these four individuals that Mr. Bredow

7   represents.

8        MR. FETTER:  There's several, and there are many

9   arbitration cases --

10       THE COURT:  There are.

11       MR. FETTER:  -- some grievances.  There are -- I

12  don't believe there are any court cases that did not come out

13  of an arbitration, so there are some court cases, but I

14  believe they're all subsequent litigation over arbitrations.

15       THE COURT:  Okay.

16       MR. FETTER:  And then there's unfair labor practices

17  that are pending or have been resolved before the Michigan

18  Employment Relations Commission, which is our state public

19  sector labor board.

20       THE COURT:  Right.

21       MR. FETTER:  Just to clarify a few issues where I

22  think there may be some factual issues and why I don't think

23  they're factual issues, one is the process of how they

24  operate the payment, how the city provides funds to 36th

25  District Court, and they treat them largely like a

1  department.  If they get a bill, they send the bill over to
2  the city, and the city pays it.  Unfortunately, our state
3  courts have said that that's unconstitutional, that the
4  funding units have to provide the courts a lump sum of money.
5  They have to figure out what their budget is, and the funding
6  unit gets to decide what that amount is within some reason
7  for it being able to operate, and they get that lump sum of
8  money, and the court has got that money to deal with.

9       Now, if they had been operating in that way that our
10 courts say is constitutional, we wouldn't be here because
11 once that money was transferred, it would be 36th District
12 Court's money, and we wouldn't have this intermingling of
13 city money versus -- you know, where did this money come.
14 The money would just come, and it would be the assets of 36th
15 District Court.

16      THE COURT:  So the money to pay these awards would
17 be included in the lump sum that the court requests from the
18 city.  The city would pay it, and that would be that.

19      MR. FETTER:  That's right.  And if that money came
20 up short, then the court would have to cut somewhere else if
21 they had a large judgment as they did with the court
22 officers, so although there are --

23      THE COURT:  Who enforces the city's obligation to
24 write the check that the court requests?

25      MR. FETTER:  They have the ability under their

1    inherent constitutional power to sue the city.

2         THE COURT:  So it would be District Court against

3    City of Detroit --

4         MR. FETTER:  It would be 36th District Court --

5         THE COURT:  -- in the Court of Claims or in the

6    Circuit Court or whatever?

7         MR. FETTER:  It would be in Circuit Court, and a

8    good example of that is Wayne County Circuit Court sued Wayne

9    County I think two years ago claiming they didn't have enough

10   money to operate.

11        THE COURT:  Who won that one?

12        MR. FETTER:  The court.

13        THE COURT:  All right.  But how does that play out

14   when the defendant is in bankruptcy?

15        MR. FETTER:  Well, that's an interesting question

16   because obviously that's never happened in Michigan before,

17   so that's the open question I think the wonk in me and the

18   legal scholar in me -- I enjoy that issue.  It's a very

19   interesting issue because what happens -- and really when you

20   strip this away of all the issues, that's really the issue is

21   what happens to the funding of a state court when the -- who

22   the legislature had appointed to pay is in bankruptcy?  Now,

23   we assert that that obligation to fund a branch of

24   government, the judicial branch of government, comes from the

25   state.  It's another branch of the state government.  Now, to

1   be able to fund that court, what we've decided to do, as a

2   matter of public policy here in the State of Michigan, is to

3   have the local municipalities, counties, townships, cities,

4   fund the local courts, be it the District Courts or the

5   Circuit Courts.  But what happens --

6           THE COURT:  Right.

7           MR. FETTER:  -- when that falls apart?  Well, we

8   assert that it reverts back to the state.  The state still

9   has that obligation to fund the court.

10          THE COURT:  All right.  So in this case the city has

11  denied any intent to foreclose that.

12          MR. FETTER:  Yeah.  So here's the issue as to what

13  Ms. Lennox had talked about earlier today about allowing

14  us -- allowing the individual judgment creditors of 36th

15  District Court to go after the state.  I don't believe and

16  they don't believe because they said it in their reply that

17  there is a mechanism for that to happen because the judgments

18  that we have are against 36th District Court, which is its

19  own legal entity.  And the function of a lot of that as to

20  the grievances is that we have a contract.  AFSCME had a

21  contract between 36th District Court and AFSCME, and we

22  enforce that contract as 36th District Court as a legal

23  entity.  And we should be able to enforce that, but can we

24  enforce that against the state?  I don't think we can enforce

25  it against the city either.  We can only enforce it against

1  36th District Court.

2          THE COURT:  How?

3          MR. FETTER:  Well, you would either -- well,

4  normally when everybody is solvent --

5          THE COURT:  They're not now.

6          MR. FETTER:  They're not.  So your question is how

7  do you do it when they're in bankruptcy?  Well, 36th District

8  Court --

9          THE COURT:  Well, the court isn't in bankruptcy,

10  but --

11          MR. FETTER:  I'm sorry.   When the city is in

12  bankruptcy, their funding unit, their statutory funding unit.

13          THE COURT:  Exactly.

14          MR. FETTER:  Then you would have to execute against

15  36th District Court, and there are --

16          THE COURT:  You mean like computers and --

17          MR. FETTER:  Their office furniture.

18          THE COURT:  The judges' --

19          MR. FETTER:  They have bank accounts.  They have

20  money coming in from other sources.

21          THE COURT:  That's disastrous.

22          MR. FETTER:  It's a disaster, but that's -- this

23  City of Detroit bankruptcy is a disaster for lots of people,

24  and the state has stepped in in the last year or so with the

25  reorganization of 36th District Court and has provided some

1  funding because of the disaster that 36th District Court is

2  in as well.  And I believe the position of the state for this

3  is --

4          THE COURT:  So you believe that -- who would issue

5  this execution?

6          MR. FETTER:  We're not the first one to execute

7  against 36th District Court.  It would be a Circuit Court who

8  issued the judgment.

9          THE COURT:  So the Wayne County Circuit Court would

10 enter an order, whatever it's called, that gives your clients

11 the authority to go take the computers out of the 36th

12 District Court?

13         MR. FETTER:  Yeah.  Fortunately, I know a few good

14 court officers, but, yes, that's what happened.

15         THE COURT:  Doesn't sound very fortunate to me.

16         MR. FETTER:  That's happened against 36th District

17 Court -- that's happened against 36th District Court in the

18 past.  Now, there's separate statutes and court rules against

19 executing against municipalities and counties and things of

20 that nature, which it happens differently.  It goes on the

21 tax rolls.  But 36th District Court doesn't have a tax roll,

22 so, unfortunately, that's how it happens.  My intent is to

23 avoid that disaster in any way possible, but --

24         THE COURT:  So an individual creditor of the court

25 can shut the court down?

1          MR. FETTER:  I don't believe constitutionally a

2     court can be shut down.  The state --

3          THE COURT:  Well, but how can it function if its

4     computers are subject to auction by the sheriff to pay a

5     creditor?

6          MR. FETTER:  According to Michigan case law, a state

7     court cannot be shut down, that the state has to provide

8     sufficient funding for it to operate.  And if the state

9     refuses to do that, then 36th District Court would have a

10    claim or could take an action against the state when the city

11    is in bankruptcy to provide that funding.  As a creditor --

12         THE COURT:  In the same court that issued the

13    judgment that took all its property way.

14         MR. FETTER:  It would be a different court.  That

15    would be the Court of Claims, which is now the Court of

16    Appeals.

17         THE COURT:  You understand my confusion.

18         MR. FETTER:  Yes, I do.  I do.  Your Honor, I've

19    been dealing with these issues with 36th District Court for a

20    very long time.

21         THE COURT:  Okay.  So what is your -- let me just

22    get right to the bottom line here.

23         MR. FETTER:  Yes.

24         THE COURT:  What is your position then on what this

25    plan should say or do to preserve your clients' rights --

1           MR. FETTER:  I have --

2           THE COURT:  -- consistent with the Bankruptcy Code?

3           MR. FETTER:  I have no dispute that my clients have

4    no ability to collect directly from the city or city

5    property.  I have no dispute over that.  The city is in

6    bankruptcy.  We have no access to that.  But we wouldn't have

7    any access to that in the beginning.  But the injunction

8    should not reach to 36th District Court itself, which is what

9    it does currently.  And even if they amend or clarify or

10   whatever they're going to do, it'll still do that, so it

11   should not attach to 36th District Court.  Now, I agree with

12   Ms. Lennox that there may be issues between 36th District

13   Court and the city regarding funding, but to be frank,

14   although that is a concern of my clients, that's not -- we're

15   a creditor of 36th District Court.

16          THE COURT:  If the 36th District Court is its own

17   entity and not a department of the city, is it anything more

18   than a creditor of the city?

19          MR. FETTER:  I believe it is a creditor of the city,

20   and it's filed a proof of claim, as a matter of fact.

21          THE COURT:  So the relief you seek is elimination of

22   the injunction that would otherwise prohibit your client from

23   pursuing its remedies against the court itself.

24          MR. FETTER:  That's right.

25          THE COURT:  Thank you, sir.

1      MR. FETTER:  And if you may, if you want, your

2   Honor, there are two other factual issues that I wanted to

3   raise that could be possibilities of issues and perhaps a

4   short explanation of why they're not.  We also raise the

5   issue of the unfairness of targeting only AFSCME members.  If

6   you look at the proof of claim of 36th District Court, which

7   is the best evidence that we have of what claims are affected

8   because no other proofs of claim -- nothing else is included

9   in the proofs of claim except for AFSCME member claims.

10  That's it, only employment claims from AFSCME members,

11  nothing more.  And as Mr. Bredow said, we believe that is,

12  but we don't think that that issue is in dispute.  We think

13  that the proof of claim is what it is, and if we're

14  incorrect, we'll stand corrected.  But as far as we know, the

15  best evidence we have is that's all that's included.  And the

16  issue that was raised in the document that was submitted and

17  distributed today as a factual issue is that there is some

18  property of the City of Detroit at 36th District Court, and I

19  don't believe that's an issue either.  If we got to the

20  disastrous situation where we were attempting to execute

21  against 36th District Court and we grabbed a desk that

22  belonged to the city, obviously we couldn't grab that because

23  that is property of the city, not of 36th District Court.  So

24  really I don't think that that's an issue nor is it in

25  dispute.  If there's something that is property of the city,

1  it's property of the city, and I don't see a dispute there.

2         THE COURT:  Well, as with Mr. Bredow, I would urge

3  you to try to work all of this out with Ms. Lennox as

4  promptly as possible.

5         MR. FETTER:  Yes.  I agree, your Honor, and I've had

6  some discussions with -- I'd reached out to Ms. Lennox, and I

7  got a return phone call from somebody else from her office --

8         THE COURT:  All right.  Well --

9         MR. FETTER:  -- and I haven't heard in several weeks

10  about proposals to try to work this out.  If we can, I would

11  like to go to mediation to try to work these out, and if I

12  can't get any movement on that from the city, then perhaps

13  I'll file a motion --

14         THE COURT:  All right.  Then let's make a deal.  If

15  by, say, two weeks from today you still feel you need

16  mediation, write me a letter.

17         MR. FETTER:  Okay.  Thank you, your Honor.

18         THE COURT:  Mr. Bennett.

19         MS. TONTI:  Your Honor --

20         THE COURT:  Another "your Honor."

21         MS. TONTI:  Yes.

22         THE COURT:  Oh, on the phone.

23         MS. TONTI:  Sorry.  On the phone, your Honor.  I

24  didn't know how many people were left in the courtroom, but I

25  heard you say "the last one."  My name is Amy Tonti, and I

1    have a short statement on behalf of BNY Mellon as custodian

2    for the Retirement System funds.  May I?

3              THE COURT:  Yes.  Go ahead.

4              MS. TONTI:  Thank you, your Honor.  A similar issue

5    for BNY Mellon has to go -- as custodian and solely as

6    custodian has to go with respect to the injunction and the

7    breadth of the injunction.  BNY Mellon's contracts are not

8    with the city, and they are with the Retirement Systems, and

9    BNY Mellon did not file a proof of claim in this case because

10   its contracts are with the Retirement Systems.  Those

11   contracts, the custody agreements contain indemnity

12   provisions in favor of the custodian.  And when you look at

13   the plan of adjustment, it has terms like "Retirement Systems

14   indemnity obligations," "indirect employee indemnity

15   obligations," "state-related entities," and "related entities

16   of each of those," and then you get to the scope of the

17   injunction, and it appears to be very broad.  And what BNY

18   Mellon, as custodian, does not want the plan to do is to

19   modify its rights as custodian under the custodian

20   agreements, not release claims of BNY Mellon as custodian

21   against parties other than the city arising from the custody

22   agreements and not enjoin BNY Mellon as custodian from

23   pursuing claims arising from the custody agreements against

24   parties other than the city.  And this is particularly

25   important because the plan also states that the city

1  preserves all of its right of action against any party

2  relating to the practices of the Retirement Systems.  So the

3  scope of the injunction appears to be extremely broad,

4  affects parties like BNY Mellon as custodian that's not a

5  creditor of the city, and we have asked for clarification on

6  that and have not yet received it, so we filed an objection

7  to the plan for those reasons and filed a list of issues with

8  respect to the same.

9          THE COURT:  I saw that.

10         MS. TONTI:  Thank you, your Honor.

11         THE COURT:  I saw that.  Thank you very much.

12         MS. TONTI:  Thank you.

13         MR. ALBERTS:  Your Honor, Sam Alberts on behalf of

14  the Retiree Committee.  I just stand to rise to point out one

15  thing that we are currently discussing with the city some of

16  our concerns we have as to the scope of exculpation.  Even

17  though we are in support of the treatment and have advised

18  our constituents of our support of the treatment under

19  Classes 10, 11, and 12 -- and my response to Mr. Hackney, who

20  thinks that retirees are overwhelmingly happy about this, I

21  would just invite him to one of my town hall meetings to hear

22  how happy they are.  We are concerned, though, with the scope

23  of the exculpation.  We're looking into some issues on it,

24  and we just didn't want that issue to be perceived as being

25  waived.  The city is aware of our concern, and for now that's

1   where we're leaving it.  Thank you.

2          THE COURT:  Thank you.  Mr. Bennett.

3          MR. BENNETT:  Your Honor, I want to -- I have very

4   few reactions that I feel compelled to make at this time.

5   Clearly I'm not going to respond to the legal arguments that

6   were raised here.  This idea, of course, originates with

7   Mr. Hackney, and as long as it went, I still think it's a

8   good one, which is that we do have to start sorting out

9   what's really controverted as opposed to what's not

10  controverted, and we have to figure out how to manage this

11  ultimately at trial.  And while I know that it is the

12  objectors' position that we shouldn't be even talking about

13  trial until we go through a series of steps, the reality is

14  is the trial is going to dictate everything else, and so I

15  think it's entirely appropriate what happens here today and

16  to think about what the implications are of what we heard

17  today on trial.

18         I really walked away with two fundamental

19  observations.  One is there was discussion about putting

20  up -- have witnesses testify about what indentures say and

21  what the market understanding of what provisions like that

22  mean, and there were other issue -- people talking about

23  bringing testimony about market expectations and reasonable

24  market expectations and, frankly, I think a more general

25  statement.  There shouldn't be any at this trial reading of

1   documents from the witness stand.  Exhibits will be
2   important.  Documents will be important.  The trial brief
3   should lay out each and every document that is important, and
4   we all ought to read them.  And it would -- I think it would
5   expedite things quite a bit if, number one, documents, until
6   it's established that parol evidence is -- should be
7   introduced for any purpose, are going to speak for
8   themselves, and they're going to be part of the record, and
9   we're going to deal with them as documents.  Otherwise, this
10  will get genuinely out of hand.
11          THE COURT:  I agree with that a hundred percent.
12          MR. BENNETT:  I think second -- my second reaction
13  sitting here today was that time limits are absolutely
14  essential because what -- at least what happens from my
15  perspective is that I try to be exceptionally concise with
16  respect to all the business the city needs to get done, and
17  then a huge amount of time gets consumed by a whole bunch of
18  other people, some of it's duplicative, and then I've got to
19  respond to all of it, but we're all tired, and it's kind of
20  at the end.  And I think the trial is going to work the same
21  way unless people have to be disciplined.
22          I also think that with respect to time limits, it
23  will force all of us to focus on our important and good
24  arguments and important factual disputes and force, because I
25  think it's essential, editing down some of the more

1 peripheral "while we're at it" type arguments, which,

2 frankly, I sense there's a lot of it there. There were a few

3 and fortunately only --

4 THE COURT: How much time do you need?

5 MR. BENNETT: Well, we proposed, I think, the -- I

6 think it was 90 hours, 90 hours per side total podium time,

7 so between cross-examination, arguments, and --

8 THE COURT: That was before you cut down your

9 witness list.

10 MR. BENNETT: I would go shorter, your Honor. I

11 will be very easy. I will take any number under 90, and if

12 it's the same on both sides, it would be fine. I worry about

13 it being too long.

14 THE COURT: Any number.

15 MR. BENNETT: If each side is the same --

16 THE COURT: I won't hold you to that. You don't

17 mean any number.

18 MR. BENNETT: -- we'll fit. If each side is the

19 same, we'll find a way to fit because I do think at the end

20 of the day the issues could be and would be more discrete if

21 people understood they were going to have limits. And I also

22 think the testimony would be more focused if people

23 understood they were going to have very substantial limits.

24 And, your Honor, our track record is really good. And every

25 time we've had -- the time when I've been involved, I've

1   always had time left over, always had time left over.

2           Okay.  A couple of very discrete things that I do

3   think are important that we just have to talk about today.

4   Number one, the rating agency reports.  I think your Honor's

5   reaction --

6           THE COURT:  Number one, what?

7           MR. BENNETT:  The rating agency reports.  Your

8   Honor's reaction to the offer that "Why don't you read those

9   reports?" was exactly right.  I'll take it one step further.

10  Those reports are a hundred percent hearsay or expert reports

11  without the requisite ability to examine.  I also checked

12  with my colleagues.  There's not a single rating agency

13  witness on anyone's lists, so I think it's behind us, but if

14  it's not, if there's going to be rating agency testimony, it

15  should come in by people who are prepared to withstand cross-

16  examination with respect to their views and also their prior

17  views and their general track record.  We do not believe that

18  the rating agencies are anything close to authoritative with

19  respect to matters relating to this case.  Their ratings on

20  the city's securities before this proceeding are partly

21  evidence of that as well as their rating --

22          THE COURT:  Well, at this stage in the proceeding, I

23  will say to you that when that came out, I had the same

24  questions in my mind, although I can't say at this point it's

25  the time to actually rule on that.

1        MR. BENNETT:  That's fine, your Honor.  I just

2    wanted to make sure that the city's --

3        THE COURT:  Yeah.

4        MR. BENNETT:  -- position on it was clear.  With

5    respect to the COPs proposal to effectively bring to court a

6    character witness for the COPs, we have said -- first of all,

7    that's the kind of thing that real time limits will eliminate

8    because it isn't germane to anything -- any of the business

9    that we actually have to conduct at the confirmation hearing,

10   and we have said in an effort to be constructive, in an

11   effort to narrow issues, that we regard the issue as the

12   adequacy of the claims reserve, which assumes that at the end

13   of the day the COPs claims are allowed in full, so we believe

14   that's the way --

15       THE COURT:  Well, but Mr. Hackney is concerned that

16   the reputation of the COPs deal, not the swaps deal, the COPs

17   deal, will infect the city's argument or the Court's

18   consideration of the fair and equitable issue because of the

19   substantial discrimination in the treatment of COPs compared

20   to other claims, for example, pension claims.

21       MR. BENNETT:  Okay.  Once again, I think your Honor

22   previously, in response to some of the dialogue, indicated

23   that the city has to be careful not to put certain things in

24   issue.  Otherwise all kinds of other things will be in issue.

25   I think that it would be also fair to instruct the city that

1  for purposes of confirmation the COPs are assumed to be an
2  allowed claim and that any evidence put in to the contrary
3  would open a door to something different.  The treatment of
4  the COPs claim is the same as other unsecureds.  It is the
5  same as LTGOs.  It is the same as OPEBs.  It is the same as
6  lots of other unsecured creditors.  And they all have the
7  same -- they can raise different arguments, but they all have
8  the same discrimination position vis-a-vis pension treatment.
9           THE COURT:  Why doesn't time limits solve this
10 problem?
11          MR. BENNETT:  Time limits may -- I said time limits
12 I think will solve this problem because I do think it's got
13 nothing to do with the essence of the case to be sure.  The
14 other point I heard was Mr. Hackney again, but I also don't
15 think this is unique to him -- I think this came out in a
16 couple of the other presentations as well -- is that with
17 respect to issues that we think can be fairly described as
18 legal issues, the assertion is, well, maybe there is a legal
19 issue, but the city is not stating it correctly.  Stated
20 correctly is in the unique circumstances of Detroit, does the
21 legal issue still come out the same way.  This was with
22 respect to asset sales, requiring asset sales.  It also came
23 up, I think, with one of the UTGO questions.  A number of
24 people want to say this case is so different, it's not really
25 a legal issue.  Again, you can say that about every legal

1  issue whether it's been decided before or not decided before,
2  that it's either an issue of law or it's an issue of law
3  except in this extraordinary case in which case it becomes a
4  mixed issue of law and fact.  The willingness of the Court to
5  entertain these arguments or unless the Court limits the
6  extent to which it's willing to entertain these arguments,
7  again, the trial is going to be expanded from where it needs
8  to be, and --

9         THE COURT:  Well, but give me an example -- a
10  specific example where you're concerned about this.

11         MR. BENNETT:  The issue which I think we identified
12  as a legal issue, which is whether or not the -- whether or
13  not there is an obligation in order to get a plan confirmed
14  that the city sell assets that people characterize as noncore
15  or even we say assets as core or noncore.  It was one of the
16  ten or so legal issues that were identified.  There's another
17  one that we think is a pure legal issue that the DWSD holders
18  would characterize as having factual content, which relates
19  to whether or not 1129(b) is applicable to special revenue
20  secured indebtedness.  I think that was treated as a legal
21  issue, frankly, in the Jefferson County case and was ruled
22  on.  I know that they didn't ultimately -- that opinion
23  didn't ultimately result in a judgment on that point, so I
24  think the DWSD holders want to relegate it to the status of
25  dicta, but I think this is a purely legal issue and can be

1    resolved by this Court and, quite frankly, would simplify the

2    trial if it was behind us before we even got to the trial.

3    That's what summary judgments and --

4         THE COURT:  Well, but going back to number one, I'm

5    wondering in my mind if there aren't two different things

6    going on there.  Number one, your assertion that -- well, let

7    me just state it more neutrally.  Whether a debtor in Chapter

8    9 is required to sell noncore assets, however that's defined,

9    in order to meet the best interest of creditors test versus,

10   number two, if the answer to question number one is no, as a

11   general matter, can a city be required in Chapter 9 to sell

12   noncore assets to meet other tests like fair and equitable or

13   to reduce unfair discrimination?

14        MR. BENNETT:  First of all, with respect to the

15   first issue, which was the fair and equitable test, I think

16   the parties more or less agree that --

17        THE COURT:  First test was best interest of

18   creditors.

19        MR. BENNETT:  Right, but then you said in the second

20   question if you needed it for fair and equitable, and I think

21   those two collapse.  So I think most people in their briefs

22   effectively conceded that for --

23        THE COURT:  Yeah.

24        MR. BENNETT:  -- all practical purposes they

25   collapse in a Chapter 9, and so I don't think that would add

1  anything, and, frankly, I would --

2          THE COURT:  Okay.

3          MR. BENNETT:  -- might state the first question to

4  include both.  I think with respect to the second question,

5  if there's unfair discrimination, there's unfair

6  discrimination, and if there isn't, there isn't.  If there

7  isn't -- if the Court says there's unfair discrimination and

8  we have to fix it, I think then it becomes the city's

9  obligation to find a way to fix it and that if the city could

10 decide if it thought it was prudent under all the

11 circumstances to treat an asset in a different way to do so,

12 but I don't think it changes -- there's two legal questions

13 here.  Legal question number one, does the city have, as a

14 prerequisite -- to get past the best interest and fair and

15 equitable rule, does the city have to exhaust assets on some

16 basis that are characterized as noncore.  Your Honor knows

17 that I don't think that distinction is real, but --

18         THE COURT:  Right.

19         MR. BENNETT:  In any event, that's that.  And I

20 think that's a decision that can be resolved on the law.  And

21 then the second issue, which is factually intensive, is

22 whether or not there is unfair discrimination.  And if we

23 suffer an adverse ruling on unfair discrimination, we got to

24 do something about it.  What it is is different.

25         THE COURT:  Well, then remind me which element of

1  confirmation was all of the evidence about the importance of

2  art to the city that you described earlier today relevant to.

3      MR. BENNETT:  All best interests.  The only time art

4  comes up in the context of discrimination is because part of

5  the grand bargain involved contributions that were earmarked.

6  Do those earmarks stick or not?

7      THE COURT:  Well, but now I'm a little confused.  If

8  all of that evidence is relevant to best interest, how can

9  the Court decide the best interest test -- whether the best

10  interest test requires sale before trial?

11     MR. BENNETT:  Your Honor, I, frankly, think that

12  case gets collapsed and becomes incredibly smaller if your

13  Honor resolves the legal question one way or the other.

14     THE COURT:  So you would only put that in if the

15  Court concluded that it was not just a matter of law?

16     MR. BENNETT:  That's correct, your Honor.

17     THE COURT:  Okay.

18     MR. BENNETT:  That's why I said an advance ruling on

19  that and some other issues would have a great tendency to

20  shorten and focus the trial.

21     THE COURT:  So the legal issue isn't really just

22  art.  It's any asset.

23     MR. BENNETT:  That's correct.  It's any asset.  And

24  that's why it is a -- kind of a legal issue because it's

25  going to come up in -- it comes up in all kinds of different

1    cases and different -- arguably different assets that are

2    described as noncore.  And I think in our brief we talked

3    about the two cases decided on the same day by the Ninth

4    Circuit, <u>Fano</u> and the other case whose name I can't call up

5    this minute, which made pretty clear that the Court was not

6    going to instruct a municipality to sell an asset.  There

7    might be other reasons why the plan is not confirmable, but

8    that's --

9         THE COURT:  All right.  Well, let's not argue the

10   point now.

11        MR. BENNETT:  Okay.  All right.  I'll move on.  I

12   only have two more technical things.  First of all, on the --

13   I think your Honor ruled that we could work with testimony

14   that doesn't have anything to do with mediation to fill in

15   some gaps where they need to be filled in.  I just wanted to

16   point out to everyone that there's actually a mistake on page

17   7 of our outline.  We'll update this over time, but with b.i.

18   we identified a Kresge witness.  He should be identified

19   under b.ii., and that it is a foundation person.  We

20   contemplated a foundation person would testify about what the

21   foundations were all about in participating and, again, not

22   invading the mediation privilege.

23        And last very technical point, but it's important,

24   is that the basic plan treatment, not the plan treatment that

25   people can voluntarily elect, but the basic plan treatment

1  for DWSD holders includes call protection.  It doesn't

2  necessarily include as much call protection as they already

3  have, but it is not completely stripped.  It's a maximum of

4  five years, and it's less if the issue matures earlier.  So

5  it was said several times that the plan strips call

6  protection.  The only circumstances in which there is no call

7  protection is if there wasn't to begin with or in the

8  circumstances where a creditor elects to be treated to get

9  the existing rate notes, and it was just said several times.

10  I wanted to --

11          THE COURT:  All right.  Thank you.

12          MR. BENNETT:  I do think -- again, I do think that

13  defining what is important for your Honor to hear at a trial,

14  what your Honor wants to hear at a trial, what your Honor

15  doesn't need to hear at a trial as early as possible is the

16  best way to organize the rest of the case, and we are

17  prepared to cooperate in any way to see all that to happen.

18  Thank you, your Honor.

19          THE COURT:  All right.  Thank you.  All right.  I

20  want to -- I want to turn attention before we get to the

21  issue of documents here to the issue of how to parse out

22  which are the legal issues to be decided in advance and which

23  not.  I appreciated very much the submissions that I received

24  from you all.  We have reviewed them and are prepared to

25  create and file a list very soon here.  Much of the

1  discussion of which issues can be considered legal issues

2  came out in the course of today's discussion, and that was

3  very helpful also.  So if it's okay with everyone here, I'd

4  like to just rely on your written submissions and make my own

5  judgment as to which issues I think can be resolved short

6  of -- or in advance of the trial.

7         MR. KOHN:  Your Honor --

8         MS. CECCOTTI:  Your Honor --

9         THE COURT:  Yeah.  Let's go ahead with the woman on

10  the phone.  Go ahead, ma'am.

11         MS. CECCOTTI:  Yes.  I'm sorry.  Your Honor, it's

12  Babette Ceccotti for the Auto Workers.  And you may have been

13  about to get to this, and, if so, I apologize, but a few of

14  us that are operating under stipulations filed a request

15  similar in nature regarding the nature of our scheduling vis-

16  a-vis the Court's interest in identifying the legal issues,

17  and I wonder if you were going to address that request that

18  we be afforded an opportunity to weigh in on the legal issues

19  before any determination is made by the Court on them.

20         THE COURT:  If the question is am I going to consult

21  with you about the schedule, the answer is absolutely.

22         MS. CECCOTTI:  Okay.  Thank you very much.

23         THE COURT:  Yeah.  That was going to be the next

24  item on our agenda actually.

25         MS. CECCOTTI:  Yeah.  I was afraid that I might have

1  jumped the gun.  Thank you, your Honor.

2        THE COURT:  Okay.  So, yeah, just hang on, and we

3  will turn to that momentarily.  Sir.

4        MS. CECCOTTI:  Okay.

5        MR. KOHN:  Thank you, your Honor.  Samuel Kohn of

6  Chadbourne & Parke on behalf of Assured Guaranty.  Your

7  Honor, the DWSD discovery parties filed a submission saying

8  that many of these issues are issues of mixed law and fact,

9  and they don't lend themselves to separate issues such as 8,

10  9, and 10 on the city's list, but this is the first time --

11  we haven't seen the city's list.  We respectfully request

12  that we can respond to you in a very, very short time in

13  writing why issues -- some of these issues, 8, 9, and 10,

14  should not be purely legal issues.

15        THE COURT:  The problem with doing that, of course,

16  is that we extend the process.  I'm just going to have to ask

17  you to rely on me to use my best judgment on that.

18        MR. KOHN:  Okay.  Your Honor, then let me address

19  Points 9 and 10 of the city's list of legal issues.

20        THE COURT:  All right.  I'll give you 30 seconds on

21  each.

22        MR. KOHN:  Okay.  Well, they're actually both

23  because they both --

24        THE COURT:  All right.  Then I'll give you a minute

25  for both.

1       MR. KOHN:  Okay.  They actually relate to no call

2   provisions contained in debt secured by special revenues may

3   be modified by a plan of adjustment and that no claims arise

4   from that modifications of the no call provision contained in

5   the debt secured by special revenues in the plan of

6   adjustment.  Those two --

7       THE COURT:  I agree with you.

8       MR. KOHN:  Thank you, your Honor.

9       MR. MARRIOTT:  Good afternoon, your Honor.  Vince

10  Marriott, EEPK and affiliates.  When you issued your order

11  regarding identification of purely legal matters, it was our

12  understanding that what you were looking for were objections

13  that raised only legal issues.  What it sounds as though this

14  has evolved into, certainly based on what the city filed, is

15  something different, more a sort of motion in limine type

16  practice where we are not simply identifying objections that

17  raise purely legal issues, which is one thing, and something

18  entirely different, which is to extract from objections that

19  are demonstrably objections that raise issues of both law and

20  fact and to decide the legal issues in advance of the

21  evidence that bears upon the fact issues.

22      THE COURT:  I am going to be very studious about not

23  doing that.

24      MR. MARRIOTT:  Because I think that's different and

25  not really efficient.

1          THE COURT:  No.  I agree with you a hundred percent.

2    If an identified issue in any of the papers -- and I have to

3    say probably a majority of them fit that very description --

4    involve any questions of fact at all, I'm not going to deal

5    with it in advance of trial.

6          MR. MARRIOTT:  Okay.  I just wanted to make sure

7    that we weren't turning this into something it didn't start

8    out as.

9          THE COURT:  No, no, no.

10         MR. MARRIOTT:  And the other quick thing is --

11         THE COURT:  I make that -- I make that commitment to

12    you, and I also have to say that the fact that an issue on

13    the list is on the list doesn't mean that after argument I'm

14    not going to find, oh, it shouldn't be on the list, there's a

15    fact issue here.

16         MR. MARRIOTT:  And just as sort of a process point,

17    I gather what you will do after you identify these issues is

18    would be to set a briefing schedule.  I mean --

19         THE COURT:  Yeah, yeah.  We'll have a briefing

20    schedule.  We'll have an argument schedule, the --

21         MR. MARRIOTT:  And we could raise in the brief --

22         THE COURT:  -- usual thing we do.

23         MR. MARRIOTT:  And we could raise in the brief the

24    point you've just made is here's our view of the law, but we

25    also think that facts bleed into this in a way that --

 1          THE COURT:  Oh, absolutely.  Absolutely.  You should
 2    do that.  If you think that an issue that I've identified is
 3    not one that can be resolved on purely legal grounds, say
 4    that.
 5          MR. MARRIOTT:  Okay.  Thank you.
 6          THE COURT:  Absolutely.  And if I agree with you
 7    after my preliminary review of your papers, I'll pull it off
 8    the list.
 9          MR. MARRIOTT:  Thank you, your Honor.
10          THE COURT:  All right.  Let's talk about schedule
11    here.  My sense is that it would help you to do this briefing
12    and have this hearing sooner than later, so let me ask any of
13    you who are willing to take a stab at suggesting a schedule,
14    and then we'll see how it plays out with the rest of you.
15    Nobody is willing.  Do you want me just to order a schedule?
16    That's what you pay me the big bucks for.  Yes.  Okay.
17    That's what I'll do.  It does strike me --
18          MS. CECCOTTI:  Your Honor, Babette Ceccotti again.
19    Would you do it on the basis of -- that you've done in the
20    past, which is to propose a schedule and then provide a
21    particular number of days for comments?
22          THE COURT:  Yes.  That's a good idea.  Thank you.  I
23    will do that and then, subject to your comments, will enter a
24    final order.  That's a good idea.  I like that.  Thank you.
25    So, Ms. Ceccotti on the phone, was there anything further you

1  wanted to say about the schedule?

2      MS. CECCOTTI:  Other than -- nothing except to just

3  remind you that we'd filed the statements and asked for the

4  deferral.

5      THE COURT:  Okay.

6      MS. CECCOTTI:  But I'll assume that our written

7  statement speaks for itself unless you had a question.

8      THE COURT:  All right.  Thank you.  All right.  It's

9  now 5:15, but I am prepared to plow on ahead and deal with

10  the issue of whether or not we still have document production

11  issues, and I'd actually like to begin with Mr. Irwin.

12  What's new?

13      MR. IRWIN:  Your Honor, I was getting a little

14  worried that we were going to get through a hearing without

15  giving people an opportunity to complain about the city's

16  document production, so I'm quite relieved that we're at this

17  point.

18      THE COURT:  Nope.  It's on the agenda --

19      MR. IRWIN:  I am --

20      THE COURT:  -- under "old business."

21      MR. IRWIN:  I can certainly report to the Court

22  where we -- what we've accomplished over the last week or so

23  and where we expect to be.  I'm not sure if the Court would

24  like me to engage or anticipate some of the filings we've

25  seen in the last 24 hours or if you'd like me to allow

1  objectors to present that.

2         THE COURT:  I would like you to cover as little or

3  as much as you think will make the rest of our day as

4  efficient as possible.

5         MR. IRWIN:  Great.  Okay.  Let me start just by

6  saying, you know, what we've done and where we hope to be in

7  very short order.  On Friday of this last week, we produced a

8  large volume of documents that was consistent with what I

9  represented to the Court we would be doing on Wednesday or

10  Thursday.  I think it was Thursday.  We said the next day

11  we'd be doing some things.  It included several significant

12  documents or data collections, if you will.  It included the

13  Ernst & Young projections, the working models that have been

14  referenced today.  Those went out in Friday's production.

15  Last night, as you will have also heard from Mr. Stewart, we

16  produced the binder.  Again, these are related but different

17  exercises.  The models that we produced on Friday were the

18  native versions of big spreadsheets that allowed people to

19  see and touch and work the core projections and spreadsheets

20  that Ernst & Young has been developing that are the center of

21  the plan.  The binder is more.  It has more documents in it.

22  It's got narrative.  It's got other resources and source

23  materials and data summaries that complete this exercise from

24  Ernst & Young.  It also included, because I think this will

25  come up in connection with some of the discussions we'll

1   have, a number of actuarial reports, these Milliman reports
2   that we talked about last week, which, again, take the form
3   of letters from the Milliman actuaries indicating what their
4   answers are and their methodology is for arriving at these
5   answers in connection with OPEB and pension-related questions
6   that the city has put to them in various scenarios.  There
7   was some talk at one point about whether we should provide to
8   the objectors at their request the documents that related to
9   instances where these calculations appeared in the plan.  We
10  did not limit it to that.  We gave them every Milliman mini
11  report that we have.  I was told that these on the OPEB
12  side -- if I mix up the numbers, I apologize -- I think on
13  the OPEB side there were over 120 or so mini reports on OPEB-
14  related calculations.  I think there were a little over 50 on
15  the pension side.  And I think someone said earlier that they
16  hadn't received OPEB reports, so there must -- I can provide
17  them if they didn't recognize that they were part of Friday's
18  production, but those were delivered on Friday.  And, again,
19  you know, one of the things Mr. Hackney said earlier, which
20  resonates entirely with me in terms of, you know, what do we
21  really need in the form of additional discovery from the
22  city, it's not just math, it's not just data, but it's
23  methodology and analysis behind the data, these letters or
24  these little mini reports on their face contain the analysis
25  and the assumptions and the modeling and the methodology

1  behind arriving at these figures.  These aren't just letters

2  that say, "Dear City:  You asked me to calculate this result

3  based on Y assumption.  Here it is.  Here's the number."

4  These are ten, twenty, sometimes thirty-plus-page documents

5  that lay this out pretty clearly and pretty precisely.  So we

6  delivered that production on Friday.  It had other materials

7  in it as well.  We are in the -- and then last night we made

8  another production.  It included a large number of DWSD-

9  related documents.  We've been engaged with the DWSD parties

10  in a dialogue to try to get to them, again, really fast-

11  tracking these analyses or reports or data collections or

12  consulting agreements, things that are easy for us to grab

13  because they're either on someone's shelf or on their virtual

14  shelf and we can get them to them as quickly as possible.  We

15  did that starting last night.  I expect that we'll have much

16  more of that later this week in a production that we'll be

17  making on Friday of this week, which will include five things

18  that I think will largely bring the city up to date in many

19  respects, and I'll explain that, but it will include the last

20  batch of Ernst & Young documents that I had mentioned before

21  that came to us late in the process that we folded into our

22  review.  It will contain the ESI and electronic records from

23  Mr. Cline, who is one of the custodians in the Syncora

24  submission from last night, so those records are in our

25  process right now.  They're going to be produced on Friday.

1   There are going to be some COPs-related documents. I

2   indicated to Mr. Marriott and Mr. Hackney that we were

3   producing some of those historical documents for them going

4   back to 2005. We got through, I think, 60 percent or so for

5   Friday, and the balance will be produced on Friday of next

6   week. We will also be producing the documents relating to

7   the once proposed, now defunct DWSD transaction, the GLWA

8   transaction documents that were the subject of our discovery

9   hearing several weeks ago at this point. We collected those,

10   and we've got them ready to go as well in connection with

11   this production. It also includes as much of the ESI

12   collection from the top three custodians at DWSD that we

13   discussed with the DWSD parties and that we indicated we'd be

14   willing to sweep and produce last week, and so we'll get

15   through as much of that as possible. It is possible that we

16   wouldn't get through all of it, but we think we'd get through

17   most of it by Friday of this week. So that's where the --

18   that's where the city stands at the moment.

19        I want to report something else which is going on

20   between the DWSD parties and the city. Ms. Quadrozzi

21   referenced it earlier. I was approached after our last

22   hearing with what I thought was a very good idea, and it did

23   result in a productive meeting that took place yesterday

24   morning where the DWSD parties essentially said, you know,

25   we'd still like you to do ESI searches on a number of

 1   custodians, and that's sort of a separate issue for the
 2   moment, but what we really think makes sense is let's get
 3   some principal-to-principal conversations going here.  Let's
 4   not do this lawyer to lawyer.  Can you get a couple of DWSD
 5   representatives on the phone with us?  We'll put a list out
 6   to you, again, with these core reports or data collections
 7   or, you know, something that is not going to be picked up by
 8   any search of someone's e-mails, but you just ask someone,
 9   and they will know, and we said, yes, of course, we'll do
10   that.  We had it yesterday.  The parties provided us with a
11   list of questions.  They were fair.  They were directed to
12   our employees in a way that we could answer, and I thought
13   the call went very, very well.  And I think for the vast
14   majority of items on that list the response -- if it wasn't,
15   "We believe you have it already," or, "We believe you have
16   access to it by way of a customer portal that's available
17   to" -- excuse me -- "some of the DWSD parties," "We can get
18   it to you pretty quickly," and that's how we left things.
19   And I think we're in a good place in terms of getting them
20   those core reports and data collections as soon as possible.
21          So what remains on the DWSD side is the ESI search,
22   the computer drain and full searching across e-mails of a
23   number of custodians.  The city, if you recall, your Honor,
24   was in a position where we wanted to do the top three people.
25   The DWSD parties as a group had many, many more.  I don't

1    remember the number.  It was 17 or 18, I think.  Mr. Neal
2    came back to me late last week and said collectively we think
3    we could work through this if you would agree to do your top
4    three people and four additional custodians.  And the city
5    said we would agree to do that.  We would agree to collect
6    those records, run those searches as quickly as we could, and
7    return those results.  So we are in the process of doing just
8    that.  We've got our top three custodians.  We think we'll be
9    finished with that on -- you know, on Friday of this week or
10   not -- very close to that, and hopefully not far behind that
11   we will be providing the returns on the ESI searches for
12   those four additional custodians.  There are a lot of
13   records.  This is not an easy exercise.  It's not something
14   that the city takes on lightly and is not without expense.  I
15   think the projections were -- as I reported, for the top
16   three custodians, the returns on the searches were, I think,
17   35,000 documents which still needed to be reviewed, and that
18   review took place through the holiday weekend and puts us in
19   a position to do what I think we're going to be able to do
20   for Friday.  Just to put that in perspective, our entire
21   production in the main case was a little over 30,000
22   documents, and that production was so large that it required
23   us to create an index because it was so unwieldy for so many
24   people, so we're talking about a very large volume of
25   additional documents that the DWSD parties are requesting.

1  We're going to deliver it as soon as we can.  35,000

2  documents that return on search terms does not necessarily

3  mean 35,000 documents will be produced because they're not

4  all responsive when you run these sorts of searches.  The

5  best estimate that I have at the moment for the additional

6  four custodians -- and I spoke with Mr. Neal briefly about

7  this early this morning in the hallway around the corner so

8  that we weren't having it behind bars.  I told him that those

9  numbers were coming back to us --

10        THE COURT:  You had a conversation around the

11  corner?

12        MR. IRWIN:  Yes, around the corner of the hallway so

13  that we were not --

14        THE COURT:  Okay.  But my injunction was no

15  conversation on this floor.

16        MR. IRWIN:  Oh, I meant on the other floor, on the

17  next floor down, your Honor.

18        THE COURT:  That is what I thought you meant.

19        MR. IRWIN:  I did.

20        THE COURT:  Yeah.

21        MR. IRWIN:  I was concerned because the numbers that

22  were coming back to me from our vendor were suggesting that

23  they were much larger than I now understand them to be.

24        THE COURT:  Let me pause here.  We should not joke

25  about this.  Our neighbor is extremely upset with us, and,

1  frankly, if he has his way, we're out of this building.  He
2  is extremely upset.

3          MR. IRWIN:  I will not be the person who causes us
4  to be evicted.

5          THE COURT:  All right.  Go ahead.

6          MR. IRWIN:  The net, net, your Honor, is that the
7  numbers I think are still large but manageable.  I think two
8  of the additional four custodians are still like 22,000
9  documents for us to review, so they got to be put in the
10  funnel.  We have resources, but they are not unlimited, and
11  it's going to take a little bit more time to get through
12  those custodians.  Again, I think the delivery of the
13  prioritized material that fits in line with the sorts of
14  things that you heard from Mr. Lemke and other people today
15  in terms of what their proofs are going to need to be in
16  terms of the economic health of the DWSD and rate setting
17  agreements and projections and consultant reports, those are
18  the sorts of things that were the subject of our conversation
19  yesterday, and those are the sorts of things that we feel
20  like if the DWSD parties do not have them already, we can get
21  them to them quickly and is not going to be held up by what
22  is also going on with regard to the ESI searches that we were
23  talking about.

24          So that said, that's where we are, your Honor.
25  That's what we're looking forward to completing in the

1   next -- the rest of this week and, if necessary, into the
2   following week.

3           THE COURT:  Well, the question you didn't answer in
4   your presentation is how does all of this impact the city's
5   position that the trial date should not be adjourned?

6           MR. IRWIN:  I'm not trying to be cowardly, your
7   Honor.  I think Mr. Shumaker is going to take broader
8   questions of scheduling and coordination and things like
9   that.  I think he's been involved with the discovery
10  committee, and I know they had a meeting yesterday afternoon
11  to talk about witnesses and depositions and things just like
12  that.  I was not a party to it.

13          THE COURT:  All right.  Let me hear from Mr.
14  Shumaker, and then I will hear from creditors.

15          MR. SHUMAKER:  Greg Shumaker, Jones Day, for the
16  City of Detroit.  Good afternoon, your Honor.

17          THE COURT:  No cowardice inferred, sir.

18          MR. SHUMAKER:  In terms of how -- what Mr. Irwin
19  just laid out, how it should affect the schedule, I have to
20  return to where I was last time given what I indicated about
21  your Honor's ability to generate a decision on the plan prior
22  to the end of September.  We think it continues to be doable.
23  The documents that Mr. Irwin was talking about about some of
24  the DWSD witnesses we think means necessarily that the DWSD
25  witness depositions would be at the end of next month.  That

1   seems fair certainly to give them appropriate time to go

2   through that.  And what Mr. Bennett said about being able to

3   work into the beginning of July, I continue to believe that

4   that's a workable solution.  In fact, you'll recall that Mr.

5   Hertzberg raised that a couple of status conferences ago, but

6   we got sort of waylaid because the objectors believe that

7   there must be absolute cessation of activity on the fact

8   witness side before expert depositions should begin, but I

9   would think that the discovery and trial efficiency

10  committee, as Mr. Irwin suggested, has had a couple of very

11  productive conversations.  I would think that what we would

12  want to be doing is developing a deposition schedule that

13  would place the fact witnesses whose testimony the experts

14  required -- or require up at the front of the schedule, and

15  then witnesses who don't such as, you know, Mr. Gilbert or

16  Mr. Rapson or some of the charitable foundation witnesses

17  that the objectors have identified would be in the beginning

18  of July.  I don't see how they -- those witnesses would

19  affect what the experts are doing.  So, you know, we have had

20  discussions with the -- about the depositions.  The parties

21  yesterday -- we've had two conversations.  Yesterday we

22  exchanged deposition protocols.  Frankly, I think that -- I

23  haven't heard back from the objectors' side on our proposal,

24  but we have identified a general banding approach where there

25  would be an initial band of depositions of fact witnesses who

1   are --

2        THE COURT:  When are you talking about starting

3   depositions?

4        MR. SHUMAKER:  Well, that's -- we want to get going,

5   your Honor, and we've been trying to get the deposition

6   protocol set up, and, you know, next week would be fine to

7   get started, but we haven't had a lot of -- we keep hearing

8   "We need the documents.  We need the documents before we can

9   schedule depositions," so we're -- you know, it is somewhat

10   difficult under that circumstance to engage on the deposition

11   schedule in setting one up.

12        THE COURT:  All right.

13        MR. SHUMAKER:  As part of that, just as to

14   deposition protocol, we have -- what we're going back and

15   forth is the time limits on the depositions and the number of

16   witnesses and whatnot, but that's still in flux.

17        THE COURT:  All right.  Thank you.  Who wants to be

18   heard on schedules and documents?

19        MR. HACKNEY:  May I?

20        THE COURT:  Yes.

21        MR. HACKNEY:  I'm not letting the DWSD go first

22   again.

23        THE COURT:  The last time you make that mistake.

24        MR. HACKNEY:  That's right.  There's a lot to

25   respond to.  I'm mindful of the hour.  I want to get to the

 1   point and give you the current status of the issues with
 2   discovery, and then I'd like to make a pitch to you on the
 3   schedule and sum it up, and I'll sit down.  So I do want to
 4   say our appreciation to Mr. Irwin.  He is somebody that we're
 5   working with.  We talk to him a lot.  He's been handed a
 6   somewhat thankless task.  I think he's trying to work through
 7   it as adroitly as he can.  I will say, though, that when you
 8   read the Hale affidavit, which is part of what's driving our
 9   conversation now because remember that this hearing was set
10   up around the idea that we would review the Hale affidavit
11   and try and make headway through the production in order to
12   speak meaningfully with you today -- the Hale affidavit
13   contains a kind of remarkable statement up front that betrays
14   where all the document problems came from, which is -- and
15   I'll describe them for you.  She says we engaged in a number
16   of extraordinary measures that are not uncommon in temporary
17   restraining order and preliminary injunction level
18   proceedings, and I can tell you as someone that's tried a lot
19   of those that those are a complete hair-on-fire mess to try
20   to get through, and it's because the bulldozer is going to
21   knock down the historic building tomorrow if you don't try it
22   today.  There has been a question in our mind as to why we're
23   trying one of the largest most complicated Chapter 9 cases as
24   if it were on that type of schedule that led Ms. Hale to say
25   this is how we've been handling this, this isn't uncommon for

1　those types of cases.  So here are the types of issues that
2　we're confronting from the Hale affidavit, and then you
3　can -- I'll give you our ask, your Honor, which is the city
4　did not collect documents up through the time of what is
5　fairly described as the actual plan of adjustment that we're
6　litigating.  I think everyone would admit that the first plan
7　of adjustment was in the way of a placeholder.  There were no
8　agreements that had been struck.  I asked my guys to go back
9　and tell me from the bankruptcy side when would you say that,
10　you know, the fairest -- you know, what is the plan of
11　adjustment that we would want them to go through, and the
12　consensus was, well, they had the UTGO and the retirees by
13　the second plan of adjustment, but this is a good example.
14　So if you search through the production, all of the documents
15　end in mid-March.  The real plan hadn't been proposed yet.
16　It's a logical one to go through what I consider the real
17　plan.

18　　　　　THE COURT:  When was that?

19　　　　　MR. HACKNEY:  I knew you were going to ask me that
20　question.  I do not have the date of the second amended plan
21　of adjustment.

22　　　　　THE COURT:  Okay.

23　　　　　MR. HACKNEY:  I apologize.  I can get it to you
24　easily enough.  Second, your Honor, the city did not do ESI
25　collection from people who clearly have relevant information.

1  These are, for example, Dave Bing, the mayor of the city for
2  six months of the first part of the case, a person who
3  himself had reduced full-time employees in number and wages
4  as recently as two years ago and felt he could do so
5  consistent with his duties to the public trust, and who, by
6  the way, had been reported as saying that he had questions
7  about the consultants and the proposals that they were making
8  for how the city would be run.  That's a relevant person.
9  Mr. Cline, I'm happy to hear today, they have now run that,
10 but they had not run that as of the time we filed our
11 statement or at least that was my understanding.  Mr. Craig,
12 the fire -- the police chief; the fire commissioner; and Beth
13 Niblock, the IT director, who is now one of their will call
14 witnesses; Caroline Sallee at Ernst & Young, who is now one
15 of their will call witnesses; and Brenda Jones, who I believe
16 is a City Council member and is now one of their will call
17 witnesses.  So rather than say there are other people I'm
18 concerned about, the city planning commissioner, the
19 comptroller, the assessor, people who you would think you'd
20 run an ESI search for the assessor of the City of Detroit in
21 a case that's as much about taxes as this one, be that as it
22 may, we've tried to identify the ones where we point to that
23 and say that I don't get.  Your Honor, to Ms. Hale's
24 affidavit --
25           THE COURT:  You don't get in the sense you don't

1  understand why it wasn't done?

2          MR. HACKNEY:  Why it wasn't done.  And it's one

3  where I can't say, well, you know, they didn't get the --

4  they didn't do an ESI search for the person that reports to

5  the city planning commissioner.  There is a materiality

6  threshold at some point where they can -- where you can kind

7  of come out.  When it's the police chief, the mayor, you

8  know, I can't in good stead to my client say, "Well, I kind

9  of gave them a pass on Mayor Bing.  He probably didn't really

10 have anything that was relevant."  Your Honor, you'll notice

11 it's extraordinary.  The city began to collect documents in

12 advance of receiving creditor requests.  They began to review

13 documents in advance of receiving our requests.

14         THE COURT:  Well, but let me just be a hundred

15 percent clear about this.  For the mayor, for Ms. Jones, for

16 these other people that you've identified --

17         MR. HACKNEY:  Yes.

18         THE COURT:  -- here today, are you going to get

19 those documents or the city is not going to give you those

20 documents as of now?

21         MR. HACKNEY:  Well, to facilitate today, I had had

22 my associate, who's running point on this, put the question

23 to Mr. Irwin so that he could have a response by today, and I

24 don't know what the answer is.

25         THE COURT:  What's the answer?

1    MR. IRWIN:  The question came to me in the form
2    of -- I didn't -- some of the names that you just listed were
3    not part of my conversation.
4        MR. HACKNEY:  That is a fair point.  Some of
5    these -- I apologize, Mr. Irwin.  Your Honor, I apologize to
6    you as well.  I didn't say that right.  Some of the names
7    that I gave you, Ms. Niblock, Ms. Sallee, and Ms. Jones, were
8    people that I added last night after I saw the city's prove-
9    up and new will call witness list.  I did not say that
10   correctly.  Mr. Arnault and Mr. Irwin had a meet and confer
11   on the subject of Mayor Bing, Mr. Cline, Mr. Craig, and the
12   Detroit fire commissioner.  I apologize.
13       THE COURT:  Okay.  So what's the status of that?
14       MR. IRWIN:  On Mayor Bing, who is -- and the fire
15   commissioner, I sort of group them in two groups.  There's
16   the expert side -- that's Mr. Cline and the Milliman
17   witnesses -- and there are the mayor and the fire
18   commissioner and the police chief.  The mayor is not anywhere
19   on our will call list.  He never was.  The fire commissioner
20   is no longer on our will call list.  We think that the search
21   for e-mail with respect to those individuals is not likely to
22   return relevant plan-related information.  If there are --
23   for example, searching the police chief's e-mails is not
24   likely to return anything more than a lot of operational e-
25   mails that he will send in his capacity as police chief, and

1  in light of everything else that we're doing, we would think

2  that the more appropriate approach here would be to identify

3  real topics like a limited group of topics that we could go

4  to this individual and say, "Do you have documents relating

5  to this topic?" that we might be able to either produce or

6  not produce, but the resources associated with, again, taking

7  the -- having a vendor come in, take the entire set of

8  electronic records off --

9         THE COURT:  Well, let's pause there.  Are there

10  specific documents or types of documents or classes of

11  documents or subjects that, for example, you want to get or

12  try to get from the police chief?

13         MR. HACKNEY:  Yes.  So the -- yes, and the answer is

14  that the restructuring and reinvestment initiatives, as

15  you'll note, a significant component that relates to the

16  police chief, so I'm not interested in seeing him tell Car

17  Number 54 go over there, but you usually skin the cat on

18  this, your Honor, with search terms.

19         THE COURT:  Car 54 --

20         MR. HACKNEY:  Car 54.

21         THE COURT:  -- where are you?  You have to be a

22  certain age to get that one; right?

23         MR. HACKNEY:  I know, yeah.

24         ATTORNEY:  I wouldn't know.

25         THE COURT:  Right.  Well, is this in that category

1  where maybe you and Mr. Irwin and the police chief should get

2  on the phone and work out what you want?

3          MR. HACKNEY:  Well, I would like to try to work it

4  out with Mr. Irwin if he thinks it could be -- I mean are we

5  at the draw the line in the sand point or --

6          THE COURT:  I mean the fact that they're not on your

7  will call list seems to me to be irrelevant to whether or not

8  they might have documents that Mr. Hackney is entitled to.  I

9  mean it's just --

10          MR. IRWIN:  And that's fair, your Honor.  I would

11  say that if there is some way short of doing the exercise

12  that I think Mr. Hackney knows all too well -- Mr. Hackney

13  was describing this problem that Syncora would have if, in

14  fact, certain discovery -- this had taken a different path.

15  The same is true for the city.  If Mr. Hackney could work

16  with me and identify for me a discrete set of records or a

17  very narrow search that we could do there, we could

18  accomplish that.

19          MR. HACKNEY:  We can talk.  I mean I'm always here

20  to facilitate.

21          THE COURT:  I want you to do that, and, you know,

22  we'll get on the phone to the extent you can't agree on

23  production of something specific or a specific class or

24  target of things.

25          MR. HACKNEY:  Understood.  I don't want to negotiate

1   this in front of you.  It's not an efficient use of your

2   time.  I will say that I will -- we've been trying to do

3   this.  I think sometimes, in Mr. Irwin's defense, you know,

4   he's dealing with so many different people, but they have

5   kind of a chain of command there, so we kind of need Mr.

6   Irwin authorized to cut deals with us so that we don't always

7   have to say here's a bunch of things for you to consider, and

8   then it kind of gets -- you know, then we're standing here.

9          Your Honor, a couple other important points that you

10  need to understand so you understand our perspective on the

11  schedule.  Point two, we do not yet have amended

12  interrogatory responses, and I went back to the city on this

13  one and said --

14         THE COURT:  Amended in the sense of -- remind me.

15         MR. HACKNEY:  So our interrogatory responses that I

16  got back from the city, candidly, were not compliant with the

17  rules and not responsive to the interrogatories.  I went back

18  to Mr. Irwin, and I said I'll narrow this one, clarify this

19  one, on and on, but I need you to give me real responses to

20  my interrogatories.  Very important tool in a case like this.

21  He said okay.  We're still waiting on them.  That's not --

22         THE COURT:  What's the schedule for that?

23         MR. IRWIN:  I'm working on them right now.  That's

24  going to be a this week item.

25         THE COURT:  All right.

1          MR. HACKNEY:  Again, not here to beat up Mr. Irwin,

2     here to make a record of where we're at.  Third, your Honor,

3     I wanted to note for the record that we do not yet have the

4     information supporting the E&Y forecasts.  It sounds like the

5     binder is going to be coming at the end of this week.  That

6     is what I --

7          THE COURT:  Okay.

8          MR. IRWIN:  The binder was produced last night.

9          MR. HACKNEY:  Understood.  And then last an issue I

10    mentioned to Mr. Irwin today relating to the Hill forecasts

11    that he and I have worked out.  So I think that we would have

12    been within our rights to say to the city, "No.  Go back and

13    do the document production the right way.  Wait for our

14    document requests.  Consider them.  Then do the collection.

15    Then do the review," on and on.  This is a massive case.  My

16    clients collectively with the other COPs holders have a

17    billion four at stake, and it's an existential threat, which

18    is that they seek to eradicate almost all of it, but we have

19    not done that.  We have made a practical ask.  It has four

20    parts, your Honor, and this is, in part, based on the new

21    witnesses I saw on the will call list last night.  We'd like

22    them to add Cline, Sallee, Craig, the fire chief, Niblock,

23    and Brenda Jones to the list of people for whom ESI searches

24    should be conducted.  I know Mr. Irwin and I will talk about

25    this.

1      THE COURT:  Okay.

2      MR. HACKNEY:  For those people and the other people

3   that they ran ESI searches for, though, you got to run the

4   search through the date of that second amended plan.  That's

5   the plan that we're all litigating.  It just makes no sense

6   to stop in mid-March.  Third --

7      THE COURT:  Excuse me.  What do you think about

8   that?

9      MR. IRWIN:  I think it would put a lot more in our

10  funnel to have to go back and rerun for those periods when I

11  think -- I think it is true that the documents look

12  different, the first plan and the second amended plan.

13  They're separated by a matter of weeks, not months.  I think

14  what I saw -- what I heard from Mr. Arnault yesterday -- what

15  I saw in the papers and what I think I'm hearing from Mr.

16  Hackney now is that the settlements, the occurrence of these

17  settlements in this particular time period seems to be what's

18  driving that, but I think we've had a candid discussion today

19  about what it is that's actually discoverable about those

20  settlements that took place in mediation, so the question is

21  what is it that we're really returning in connection with

22  restarting this machine and putting all of this information

23  into the review pile again for a period of just several

24  weeks?  I mean the document review in any case has to stop at

25  some point.  There are always going to be developments after

1  the fact, and I think that at our last hearing on this

2  somebody raised the issue of whether the city would be

3  willing to supplement its production, and I stood and said of

4  course we would, and I think the Court liked the idea of

5  getting targeted requests for supplementation as opposed to

6  having to rerun the searches every time, you know, a period

7  has passed during which there have been developments on

8  multiple fronts.

9        MR. HACKNEY:  Your Honor, they're creating a reality

10 on the ground, and then they're shifting the onus to me to

11 say, "Well, what do you really need?"  I mean they imposed a

12 date limitation that was before, I believe, they even got my

13 document requests.  I didn't ask them to do that.  That's

14 something they just did, and now they're coming through later

15 and saying, "Well, because I did it this way, it's really

16 complicated and difficult for you to make me go do it the

17 right way, so I'm going to shift the burden back to you and

18 say what do you think is really in there that's important."

19 And my response is, "I don't know.  You didn't give it to

20 me."  It relates to people that have relevant information.

21 It relates to Kevyn Orr.  You know, I'm not just talking

22 about some plan.  I'm talking about the plan that had the

23 UTGO and retiree settlements in it.  There could have been a

24 host of things that went into that in terms of analysis of

25 different types of OPEB or R&R initiatives, how they'd be

1   impacted, and the extent to which they could sustain the

2   changes to them because of the fact that they're cutting

3   deals.  I don't know.  But it puts us in an impossible

4   position when they use their prior decisions to say, "Well,

5   we really shouldn't have to do anything more because we got

6   to keep the trial date, and we don't want to move the

7   schedule."

8           THE COURT:  Well, it's a close question, but I must

9   side with Mr. Hackney here that the additional production

10  through the second plan should have been provided here, and

11  the Court will request that and order that.

12          MR. HACKNEY:  Your Honor, points three and four I'll

13  be very brief.  I think point four was that we'd actually ask

14  there to be an order that they get us our interrogatories by

15  Friday so that we can have a date certain.  It sounds like

16  Mr. Irwin is going to do that anyway.  Point three is an

17  important one for --

18          THE COURT:  I'll agree with that.  You may submit an

19  order.

20          MR. HACKNEY:  Your Honor, point three is an

21  important one given our colloquy earlier.  I'd like you to

22  consider it.  The Hale affidavit says that they are

23  construing the mediation privilege broadly.  You can also

24  imagine nuanced questions about who is covered by the

25  mediation privilege, the most obvious of which being that the

1    charitable foundations weren't actually creditors in the case

2    at the time they were invoked, so there are questions about

3    the scope of the privilege, questions about the application

4    of it by the city.  It is my view that the city should log

5    documents that they're withholding on the basis of this

6    mediation privilege for two reasons.  Number one, it may be

7    something -- this is definitely a log where you can see

8    looking at it and saying, wait a second, that's from a time

9    period before the mediation order, wait a second, that's not

10   a person involved the mediation, point one, but point two, I

11   think that you're going to want to have this log whether it's

12   for in camera review or for issues that come up down the road

13   at trial.  And so my suggestion is one that I'm sure the city

14   is gritting its teeth over, but this is one of those things

15   that I think if they start doing now we're all going to be

16   very glad that it exists when the trial comes along because

17   if we hit one of these issues and it's not all prepared, that

18   could be a real delay.

19           MR. IRWIN:  Your Honor, the issue of privilege logs

20   I think was one that we discussed with multiple parties at

21   the outset of discovery.  I don't understand what purpose is

22   served to see if the city executed on its understanding of

23   the mediation order.  It is yet another potentially --

24           THE COURT:  Yeah.  I agree that the burden involved

25   in this is much greater than any potential value of it, so I

1   will not order this.

2         MR. HACKNEY: Your Honor, if I could briefly speak

3   to the schedule and then sit down, I think that our argument

4   is pretty simple, which is we have proposed in the fifth

5   amended scheduling order -- the proposed fifth amended

6   scheduling order something that I think is unremarkable and

7   also fair and sort of charitable to the situation that we, as

8   creditors, find ourselves in, which is we've proposed to move

9   fact discovery cutoff and all the associated dates back three

10   weeks from June 27 to July 18. Okay. That is 22 days, I

11   should say, to be precise.

12         Now, I woke up at four in the morning again today.

13   I always know that you want to know what time I wake up. But

14   I think part of the reason that I was -- I don't understand

15   why it's so controversial where the city is four weeks, five

16   weeks behind in its written discovery, you know, obligations.

17   The order said comply with written discovery by May 6. Here

18   we are almost into early June. I don't have interrogatory

19   responses. We're talking about important people that have

20   not been searched. We're talking about date limitations that

21   don't make sense. For me to come back and for the DTEC and

22   the other members of the creditors to come back and say,

23   "We're going to take the city's efforts to remedy this in

24   good faith. We see what Mr. Irwin is trying to do here.

25   We'll only move the schedule three weeks," to me seems like

1  the height of reasonableness, point one.  Point two, your

2  Honor, it still allows for a trial schedule that I think gets

3  the trial done before September 30.  So to the extent that

4  Mayor Duggan is going to fire Kevyn Orr and fire Jones Day as

5  soon as he possibly can, which I think was reported in the

6  press and in some respects I think raised sort of larger and

7  more troubling questions about why that would be the case --

8       THE COURT:  Well, let's pause here.  Has that issue

9  been resolved?

10       MR. SHUMAKER:  It has not, your Honor.  There's been

11  no final answer in that regard.

12       MR. HACKNEY:  Respectfully, your Honor, I don't

13  think that Mayor Duggan gets to -- he has his powers, but I'm

14  not sure that he gets to effectively dictate to you when you

15  have to have a trial by.  And I also want to note that you

16  see a number of warning signs blinking.

17       THE COURT:  Well, I just want to say for the record

18  that it would be a really bad idea for the city, the mayor,

19  to terminate Jones Day's services at such a critical phase in

20  this process.  I don't exactly know where we will be on

21  September 30th or in the few days before or after that, but

22  whatever phase it is, it will be a critical phase because

23  we'll either be in the process of negotiating and drafting a

24  confirmation order or an order of dismissal and dealing with

25  the consequences of that, or we'll be dealing with how to get

1   from confirmation to effective date, or we'll be dealing with

2   the requirements of the plan that take effect on the

3   effective date, and to terminate Jones Day at that point is

4   just an incredibly bad idea.  Okay.

5         MR. HACKNEY:  I don't know --

6         THE COURT:  I hope the mayor hears me.  Feel free to

7   communicate my view of this to him.  I mean when I heard last

8   week that this issue was still open, I actually went through

9   the plan for the purpose of sort of cataloging in my mind all

10   of the tasks that the city has to accomplish upon the moment

11   of confirmation, again, assuming there is confirmation, and

12   it is an incredibly long and complex list and over -- and

13   staggered over a period of time.  And to expect a new firm to

14   come in or the city's own lawyers to come in and pick that up

15   is just -- it's inefficient and unrealistic, and I can't

16   imagine how that would be in the city's best interest.

17         MR. HACKNEY:  I agree with you.  I don't know any

18   creditor who disagrees with you.  I think it also betrays a

19   certain artificial view of the nature of whether it's the end

20   of the plan.  I mean we're talking about a plan that relates

21   to how the city is going to be conducted for years, and the

22   COPs holders will be people that will be living with that as

23   well.

24         Let me tie this up.  You're hearing noises from

25   Brooks Patterson and Mayor Duggan that if it weren't for the

1  bankruptcy schedule, they might have a prospect of being able

2  to cut a deal.  You're hearing from the court-appointed

3  expert, Ms. Kopacz, that she's not sure she can make this

4  June 24 time frame.  You're hearing from the retirees that

5  there is this really delicate, you know, kind of potential

6  pivot that they may have to do three days before the trial,

7  and we're --

8         THE COURT:  And now we have a new ballot that has to

9  go out, too.

10        MR. HACKNEY:  And now we have a new ballot, so the

11  question really becomes why are -- you know, the system is

12  kind of blinking red a little bit.  You have lawyers like me

13  saying there are problems with discovery that impact our

14  ability to represent our clients, you know, not just I want

15  to sleep at night, but also I need to do a good job for my

16  client.  You have lawyers saying, "I'm not sure that I can."

17  You got a lot of red lights on the panel going off, and so

18  the question becomes and the one that gets me up at four in

19  the morning is what in the world are we doing trying to hold

20  onto getting this done in advance of this September 30 date

21  by a month?  Is that a magical date?  And the answer we know

22  from Mr. Shumaker is it is not.  So I'm here to plead, your

23  Honor, my case, which is let's please allow us the sensible

24  adjustment, which is that because of the different what I'll

25  describe as a -- somewhat of a stumbling start to written

discovery that has caused delay, that takes time to
synthesize, let us move fact discovery back three weeks.
Yes, it has implications for expert discovery and on and on,
but I think our proposal is one that's borne of common sense
and experience, and it's one we proposed in good faith.
Thank you, your Honor.

THE COURT:  Thank you.  Let me see a show of hands.
How many of you want to be heard at this point?  Two?  Okay.

MR. SCHWINGER:  Thank you, your Honor.  Robert
Schwinger from Chadbourne & Parke for Assured Guaranty.  I
think Mr. Irwin did a good job of summarizing our current
status, and I think when we were here last time, I think your
Honor really hit the nail on the head in terms of the issue
for the DWSD parties in discovery.  The city is not -- we
don't really have fights over are you going to give us this
category of documents.  The question is -- they've said,
"We'll give you this.  We'll give you that."  The question is
when are we going to get it, and when the city says that its
production has been completed, have they really done an
adequate job of collecting.  As you heard from Mr. Irwin, on
Friday we got another installment of documents, and then we
got another installment ten o'clock last night in the sense
that we got a computer link saying you can download the
documents from here.  After we got the documents on Friday,
we did an intensive review of the documents that we had

1  received to date for anything that could possibly be DWSD-
2  related either because it was marked that way by the city in
3  their index, that it was listed in an e-mail we got, or that
4  it contained -- it came up in any of the search terms that
5  the city suggested we ran, and we still found that the
6  production was remarkably deficient in many key areas, and
7  that's why we made the filing last night which had this very
8  gory 24-page chart in small type for which we apologize, but
9  the point is that there were lots of key areas that still had
10 lots of holes in them, and they were many of the areas we've
11 been talking about all day today, the methodology and
12 assumptions and background behind the interest reset chart,
13 all sorts of background about the pension and OPEB
14 calculations, et cetera, the issues of DWSD restructuring,
15 and I could go on and on, but the details aren't really
16 important at this point.  The fact is that sitting here today
17 we have more documents from the city.  We've heard from Mr.
18 Irwin that, you know, we -- excuse me.  We have more
19 documents in from the city.  We have no chance yet to assess
20 them.  We have more documents coming in on Friday.  As he
21 mentioned, he's -- an addition on that, the city is doing ESI
22 searches for the top three people, and now they're adding in
23 four more at our request, for which we appreciate, which
24 maybe, if we're lucky, we'll get early next week.  We are
25 very, very far at this point, your Honor, off the schedule

1    that originally contemplated that documents would be all
2    produced on May 6th, and, you know, when we get those
3    documents, then we have to, you know, review them and see if
4    there's still any more gaps.  And I'm hopeful at that point
5    with all those materials in that maybe some point in the
6    middle of next week we'll actually have something approaching
7    reasonable completion from the city, which each time before
8    this they've said, "Oh, we're substantially complete," but
9    more installments with many, many more documents keep coming
10   in.
11           The suggestion was raised that, well, we can start
12   depositions anyway, going to the issue of the schedule, but
13   the contemplation currently that's being talked about with
14   the committee is that the first thing we'd start with is a
15   band of 30(b)(6) depositions from core city representatives,
16   and obviously it's very hard to start with 30(b)(6)
17   depositions on a series of topics when you don't -- you're
18   still waiting for the documents to come in to even start the
19   process, so I think the -- as Mr. Hackney said -- I agree
20   with him -- the schedule issues have really gotten very, very
21   bogged down because of what's going on with the document
22   production.  We're not in the position to go ahead today
23   with -- certainly with what we have, and we have to assess
24   what's going to come in.  But I think that also -- that plays
25   into the schedule issues, which I won't repeat what

1  Mr. Hackney said, but that's where we are in terms of the

2  DWSD parties here on discovery.

3        THE COURT:  Thank you, sir.

4        MR. SCHWINGER:  Thank you.

5        MR. NEAL:  I just have 15 seconds, your Honor.  I

6  just want to make a note that -- Guy Neal, Sidley Austin.

7  Join with Mr. Hackney's request.  The fifth amended

8  scheduling order that he referenced that was in our filing,

9  Docket Number 4980.

10       THE COURT:  Right.

11       MR. NEAL:  Thank you.

12       THE COURT:  Yes, yes.  Thank you.

13       MS. HUBBARD:  Good afternoon, your Honor.  Heather

14  Hubbard at Waller for the U.S. Bank, the trustee for the

15  water and sewer bonds.  We filed last night a chart, and I'm

16  just going to point to two things, so I actually have a copy

17  if that would be helpful.

18       THE COURT:  If you can just give me the docket

19  number, I can look at it right here.

20       MS. HUBBARD:  I do not have the docket number.

21       THE COURT:  Oh, all right.  Then I'll take your

22  copy.

23       MS. HUBBARD:  So the trustee and ad hoc committee

24  had 56 document requests.  In working with the city, we've

25  really tried to narrow our highest priorities, and we picked

1    15.  That didn't mean that we were waiving the documents for

2    the other requests, but we really did try to focus in on what

3    do we need most in order to start the depositions.  And this

4    document, it reflects the previous productions, including

5    Friday.  It does not include the production that was made at

6    10 p.m. last night.  We've not had time to digest that.

7           THE COURT:  Okay.

8           MS. HUBBARD:  But I do think that it shows that in

9    the past when representations have been made that the

10    documents have been produced, in fact, they have not.  So,

11    for example, if you look at Requests 20, 23, and 24 related

12    to OPEB and COPs, Ms. Lennox was discussing earlier this

13    morning the historical treatment, and we said we've not

14    received those documents.  They've provided Bates labels for

15    those documents, but when you go to them, they actually don't

16    have any of the historical backup information.  We have to

17    have that to be able to move forward with our experts and

18    with the depositions.  And then with regard to the interest

19    rate reset chart --

20           THE COURT:  So what did Ms. Lennox say when you went

21    back to her on that?

22           MS. HUBBARD:  Well, that was this morning.

23           THE COURT:  Oh, that was this morning.

24           MS. HUBBARD:  I didn't have time to talk to her --

25           THE COURT:  All right.

1          MS. HUBBARD:  -- about that today.

2          THE COURT:  I missed that.  I'm sorry.

3          MS. HUBBARD:  With regard to the interest rate reset

4    chart, they provided -- I believe it was the hearing last

5    week, Ms. Lennox said, "Well, the backup data for that has

6    already been produced."  Well, we weren't aware of what that

7    was, so we reached out to Ms. Lennox and said, "Can you

8    provide us Bates labels?"  She provided us with two.  We

9    pulled those.  The problem is those were just previous

10   iterations of the reset chart.  It provided no backup data.

11   We were able to take from the production last night at 10

12   p.m. -- they had one more Bates label they provided, and it

13   was actually a summary dated May 1 of 2014, which really just

14   said, you know, here's the savings we think that the city

15   will get by resetting the interest rates.  We still don't

16   have, even based on last night's production, any backup data

17   related to those charts, and that really just -- it

18   implicates the schedule, so if the suggestion is, well, let's

19   start depositions next week and we can start with the folks

20   that you think your experts need to rely upon, well, that's

21   really putting, you know, the cart before the horse because

22   we have to have these documents.  Our experts have to have

23   these documents.  We have to be able to review them, and then

24   we can take the depositions that -- of the fact witnesses

25   that the experts are going to rely upon.  So it's really

1    difficult to say that we're going to start depositions next
2    week.  We agree with Mr. Hackney that the schedule is going
3    to have to be put off.
4         We would also point out that in Ms. Hale's affidavit
5    she had said that, you know, she spoke with Mr. Wolfson at
6    DWSD to pull these documents, and he talked to 11 different
7    custodians, but if you look at the index as to the
8    custodians, not a single one of those individuals has
9    produced anything.  It's just from their experts.  And I
10   think that's part of the problem.  The city has not said, "We
11   refuse to produce it," but we've not received it yet, and
12   it's May 26th, and so we just don't see how we could actually
13   get started with depositions at this point before we get the
14   production complete.  Thank you.
15        THE COURT:  Mr. Irwin, anything further?
16        MR. IRWIN:  Very quickly.  As an administrative
17   matter, when we collected from Mr. Wolfson and we went to
18   DWSD, he talked to a number of people.  Those people provided
19   documents to him.  He then provided them to the city.  For
20   purposes of the production, we sourced those documents to Mr.
21   Wolfson, so it may appear as if Mr. Wolfson were the only one
22   who responded with documents.  That was not the case.  That
23   was just for coding purposes.
24        MS. HUBBARD:  I would just add that in the Hale
25   affidavit Mr. Wolfson was not a custodian that produced any

1  documents responsive to DWSD.

2       THE COURT:  All right.  Mr. Irwin, is it -- was

3  there something more you wanted to say?

4       MR. IRWIN:  No.  I'm sorry.

5       THE COURT:  Is it realistic for me to have yet one

6  more status conference on the issue of document production

7  next Wednesday and to insist that you tell me and everyone

8  else tell me at that hearing that we're done with issues of

9  document production?

10      MR. IRWIN:  I can certainly -- I can certainly

11  provide the update that is allowed under the circumstances.

12  There are issues that have come up today in terms of adding

13  custodians or adding time periods that would not permit me to

14  stand up and say we are done as of right now.  I don't know

15  how that's going to play out over the next week.  Some of it

16  is subject to the meet and confer I'll have to have with

17  Mr. Hackney.

18      THE COURT:  Well, I want a date by which you commit

19  to say to the Court, "Your Honor, we have provided everything

20  we have been asked for, and all of the document production

21  issues have been resolved."

22      MR. IRWIN:  And I'm not --

23      THE COURT:  Next Friday?

24      MR. IRWIN:  Next Friday.  Yeah.

25      THE COURT:  Not two days.  That would be the 6th.

1           MR. NEAL: While Mr. Irwin is conferring --

2           THE COURT: One second. No, no. I want to hear --

3 I want to -- I want to let him confer.

4           MR. IRWIN: The fundamental problem we're having is

5 that we haven't retrieved the electronic records yet, and so

6 we don't know what the volume that we're dealing with yet is.

7 It's not just sort of a flip the switch and download data to

8 get documents. An option, your Honor, would be to run the

9 searches and just produce the documents without making any

10 kind of review for privilege or otherwise.

11           THE COURT: I'm not asking you to do something that,

12 in your judgment, is not in your client's best interest. I'm

13 just asking for a date because I'm going to hold you to it.

14           MR. IRWIN: I think we need time to understand the

15 volume of the information that we have before I commit to a

16 date that I can't sit here and say that we would meet. I

17 need to know what the volume of the information is.

18           THE COURT: All right. So you're asking me to give

19 you a date by which you can give me a date.

20           MR. IRWIN: Which would allow me to meet and confer

21 with Mr. Hackney and understand the universe of the requests

22 and what the scope of the exercise is, retrieve the

23 information, and then make a judgment.

24           THE COURT: What's the date?

25           MR. IRWIN: Probably, say, Monday.

1    THE COURT:  I just caution you that the longer this
2  takes, the harder and harder it is for me to say no to
3  Mr. Hackney about moving the trial.  Sir.

4    MR. SHUMAKER:  Your Honor, would it be possible to
5  give you a date on Friday after we meet and confer with
6  Mr. Hackney and get some understanding of what we're dealing
7  with?

8    THE COURT:  Absolutely.  So by Friday I want you to
9  file a paper in which you set forth the date by which you
10  commit to produce all remaining unproduced documents.

11    MR. SHUMAKER:  We will do that, your Honor.  Your
12  Honor, can I make one --

13    THE COURT:  All right.  And I'm going to defer
14  making a decision about the trial date and the rest of the
15  schedule till I see what date you're committing to.

16    MR. SHUMAKER:  Understood, your Honor.

17    THE COURT:  Is there something else you wanted to
18  add?

19    MR. SHUMAKER:  Yes, your Honor.  I was just going to
20  suggest this exercise today I think has been very helpful for
21  everyone.  The city has, you know, cut down its witness list
22  substantially.  There are a couple of people like Ms. Jones
23  and Ms. Niblock who have come up in the process of putting
24  this together.  Could I suggest that there be a date that
25  everyone submits an amended witness list so that we --

1  everyone knows what they're dealing with moving forward with
2  the deposition schedule?

3       THE COURT:  Okay.  I'll put such a deadline in the
4  final scheduling order.  I want to impose another deadline
5  sometime next week.  This would be a deadline for the
6  committee, whatever we're calling it today, to submit a
7  report of what agreements have been reached and what the open
8  issues are on deposition protocols, ordering of depositions,
9  and if you can reach an agreement on how much time each side
10 should get for the trial, that would be great --

11      MR. SHUMAKER:  Your Honor, one other issue that --

12      THE COURT:  -- and anything else you'd like me to
13 decide, and then I'm just going to make decisions.

14      MR. SHUMAKER:  There's one other issue that we've
15 raised with the objectors is the site visit that we've talked
16 about, the so-called bus tour, and I think we've got some --
17 we've made some progress in that regard, and that might be
18 something for this as well.

19      THE COURT:  Yeah.  That's also a good thing to
20 include in this, you know, with as much detail about the
21 parameters as you can think of.

22      MR. SHUMAKER:  Understood.

23      THE COURT:  That may be something we want to speak
24 about at a subsequent status conference, but go ahead and
25 make as much progress on that as you can.

1          MR. SHUMAKER:  Will do.

2          THE COURT:  All right.  Can we conclude now?

3          MR. HACKNEY:  Can I ask -- sorry.  I just had one.

4     I think the DTEC, the committee, our view on the bus tour had

5     been we wanted to get an initial signal from you as to

6     whether it was something you want us to go through the brain

7     dam of trying to work out.  If you do, we will --

8          THE COURT:  I do think it would be valuable.

9          MR. HACKNEY:  Okay.  We will try to work it out.

10    Thank you.

11         THE COURT:  But, you know, there are a whole range

12    of parameters like who else is on the bus, who gets to speak,

13    is it going to be recorded?  We have to have room for the

14    marshals.  Where are we going to go?  I mean all of those

15    details I'm going to, you know, ask you all to work out

16    subject to my final approval, so what's a realistic deadline

17    for me to set for a report from the committee?  A week from

18    Friday?

19         MR. NEAL:  Yes, your Honor, a week from Friday.  We

20    could certainly do that.

21         THE COURT:  You agree?

22         MR. SHUMAKER:  Certainly, your Honor.

23         THE COURT:  All right.  So that's -- what's that

24    date?  June 6th.  All right.  Before we conclude, I want to

25    thank all of the attorneys for the work and effort that went

1  into your presentations today.  I do agree with the sentiment

2  that has been expressed here that it was an extremely

3  valuable effort for all of us to undertake, and I especially

4  want to thank Mr. Hackney for suggesting it and really,

5  again, to all of you for executing it so well, so with that

6  we will be in recess.

7            THE CLERK:  All rise.

8        (Proceedings concluded at 6:19 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            June 3, 2014
_____    _____
Lois Garrett