# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| | : |
| In re: | : Chapter 9 |
| | : |
| CITY OF DETROIT, MICHIGAN, | : Case No. 13-53846 |
| | : |
| Debtor. | : Hon. Steven W. Rhodes |
| | : |

## OBJECTION OF ASSURED GUARANTY MUNICIPAL CORP., BERKSHIRE HATHAWAY ASSURANCE CORPORATION AND FINANCIAL GUARANTY INSURANCE COMPANY TO MOTION OF THE CITY OF DETROIT FOR SITE VISIT BY COURT IN CONNECTION WITH THE HEARING ON CONFIRMATION OF THE CITY'S PLAN OF ADJUSTMENT

Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"), Berkshire Hathaway Assurance Corporation ("BHAC") and Financial Guaranty Insurance Company ("FGIC") respond as follows in opposition to the *Motion of the City of Detroit for Site Visit by Court in Connection with the Hearing on Confirmation of the City's Plan of Adjustment* filed June 6, 2014 [Docket No. 5250] (the "Motion").

## INTRODUCTION

1. Debtor the City of Detroit, Michigan (the "City") seeks to take the Court on a "bus tour" at the start of the hearing on confirmation of the City's proposed Plan of Adjustment ("Confirmation Hearing"), during which the Court

would view various as-yet-undisclosed locations which the City asserts would be "relevant to the Court's consideration of the City's Plan" (Motion at 1), and would provide "context" (*id.* at 3-4) about the issues in this case. In fact, the "evidence" that the proposed bus tour purportedly would provide is not relevant to the substantive bankruptcy issues that need to be addressed at the Confirmation Hearing and could in fact unnecessarily cloud the record in this very contentious case. In addition, for a case such as this, the City's bus tour proposal would be improper and impractical for a variety of procedural reasons, as well as unnecessary in light of other alternatives for providing such evidence to the Court. Furthermore, the City's proposed protocol for the bus tour is itself procedurally improper and unworkable in a number of respects. For all these reasons, the Motion should be denied.

## ARGUMENT

2. While the Sixth Circuit treats the decision whether to permit a visit to a location outside the courtroom by the trier of fact as a matter of the trial court's discretion, *see United States v. Moonda*, 347 F. App'x 192, 201 (6th Cir. 2009), there are substantial reasons why this Court should not approve the City's proposal to take the Court on a bus tour of various locations around Detroit guided by the City as part of the Confirmation Hearing.

2

# I. THE PROPOSED BUS TOUR IS NOT RELEVANT TO THE TESTS FOR PLAN CONFIRMATION THAT ARE THE FOCUS OF THE PLAN CONFIRMATION HEARING

3.      On a purely substantive level, the most basic reason why the City's bus tour proposal should not be approved is because the "evidence" that the City seeks to place before the Court through the bus tour is not relevant to the tests for plan confirmation that the Court will be called upon to apply.  The City in its Motion does not even cite or reference any of those tests or any Chapter 9 precedent in arguing for its proposal.  The bus tour "evidence" the City seeks to present thus has no place at the Confirmation Hearing.

4.      The City repeatedly insists in the Motion that the Court needs to appreciate the "context" and importance of the monies that the City seeks spend to rebuild Detroit.  (*See* Motion at 3-4.)  But the simple fact is that the issue at the Confirmation Hearing is not whether the City's objectives are well-intentioned or laudable, or for this Court to pass upon their desirability or wisdom as a policy matter.  *See* 11 U.S.C. § 904.  Rather, the question in regard to those objectives is primarily one of accurately projecting the costs of what the City seeks to do, and determining whether the Plan feasibly can meet those costs given the legal rights that Chapter 9 provides to other parties and the restrictions placed upon the City in this context by the applicable tests for plan confirmation.

3

5.     At the Confirmation Hearing, the Court will be asked to determine whether the Plan meets a number of specific tests, including: (a) whether the Plan is in the best interests of creditors, *see* 11 U.S.C. § 943(b)(7); (b) whether the Plan is fair and equitable, *see id.* § 1129(b)(1); and (c) whether the Plan is feasible *see id.* § 943(b)(7). Each of these tests has a precise legal standard that will require the Court to evaluate and rely on competent evidence regarding the City's finances and other matters presented in accordance with the Federal Rules of Evidence, not impressions from taking views of venues selected and moderated by one party that the City offers by way of its proposed bus tour.

6.     First, for a plan to be in the best interests of creditors, the chapter 9 debtor must prove that its plan provides each creditor with at least what it reasonably could expect to receive outside of bankruptcy. *See In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999); *Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*, 191 B.R. 1005, 1020 (Bankr. C. D. Cal. 1996 (quoting 4 Collier on Bankruptcy ¶ 943.03[7] (15th ed. 1995)) (courts "must apply the [best interest of creditors] test to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case."). This test will require the Court to examine competent evidence regarding the financial data, projections, and the parties' legal rights to determine what they would receive

outside of bankruptcy, and compare those recoveries to the recoveries offered by the Plan. To expect that any of such evidence could be obtained through a bus tour is simply implausible.

7.     Second, there have been numerous objections raised on the grounds that the proposed Plan is not "fair and equitable."  For example, Assured has objected to the City's attempt to "cram down" impairment of interest rates and call protections of DWSD bondholders. *See Objection of Assured Guaranty Municipal Corp. to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)*, filed May 12, 2014 [Docket No. 4674] at 37-59. Among other things, Assured argues that this treatment is impermissible in this case under the applicable legal tests. *See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 680 (6th Cir. 2006); *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005); *General Electric Credit Equities, Inc. v. Brice Road Devs., L.L.C. (In re Brice Road Devs., L.L.C.)*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008); *see also Till v. SCS Credit Corp.*, 541 U.S. 465, 478-79 (2004).  Resolution of these objections will require detailed factual and expert testimony regarding the financial condition of the DWSD as well as the municipal finance markets, none of which could plausibly be argued will be obtainable through the bus tour.

8.     Third, for a plan to be feasible, a chapter 9 debtor must prove that, under its plan, "it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality." *In re Mount Carbon Metro. Dist.*, 242 B.R. at 35 (quoting 4 Collier on Bankruptcy ¶ 943.03[7] (15th ed. 1999)).  Proof of plan feasibility turns on, among other things, "reasonable income and expense projections" rather than "mere hopes, desires and speculation." *Id.* (citing *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 419-420 (8th Cir. 1985); *In re Grandfather Mountain Ltd. Partnership*, 207 B.R. 475, 485-86 (Bankr. M.D. N.C. 1996); *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1003-04 (E.D. Va. 1994); *Affiliated Nat'l Bank - Englewood v. TMA Assoc. Ltd. (In re TMA Assoc. Ltd.)*, 160 B.R. 172, 177 (D. Colo. 1993)).  Once again, this test will require the Court to consider competent and likely conflicting evidence regarding the City's finances presented by the parties pursuant to the Federal Rules of Evidence.  Impressions gleaned from a bus tour of selective locations guided by one side will not meaningfully inform that analysis.

9.     The City's conclusory assertion that its proposed three-hour bus tour will meaningfully assist the Court in providing "context" for evaluating the evidence to be presented at the Confirmation Hearing is unsupported and does not stand up to scrutiny.  To cite an obvious example, with respect to the issue of

blight, it bears noting that just very recently, on May 27, 2014, the Detroit Blight Removal Task Force issued a highly-publicized 331-page report (*see http://report.timetoendblight.org/*) that, in order to evaluate the issue of blight in Detroit, found it necessary to conduct a **building-by-building** physical survey of property conditions data for all 380,000 parcels in Detroit, using approximately 150 paid surveyors and volunteers working over a 10-week period. (*See http://report.timetoendblight.org/intro/*). The Task Force explained in its report that this massive effort was necessary because "there was no comprehensive, single database that accurately defined the current scope of blight in Detroit." *Id.* Yet just ten days after the results of this massive undertaking were released, the City in its motion suggests that a three-hour bus tour of a handful of locations cherry-picked by the City's counsel (which three-hour period must also allow time for a museum walkthrough and visits to proposed rail lines and downtown redevelopment areas) will somehow enable the Court "to put into context the evidence that it will hear" about blight. (Motion at 3.)

10. Such a suggestion defies common sense. Whatever "context" might be helpful when addressing plan confirmation issues, that "context" for a city of Detroit's dimensions and complexity will not come from the brief series of

7

scattered stops that the City proposes to conduct. Rather, the City should be held

to the same standards as other parties in this case.[1]

## II.    A LONE BANKRUPTCY PRECEDENT PERMITTING A SITE VISIT THAT WAS CONDUCTED ON MUTUAL CONSENT HARDLY ENDORSES ORDERING SUCH VISITS HERE OVER CREDITOR OBJECTIONS

11.    The City attempts to rely upon a judicial site visit order from a lone

unpublished Chapter 11 case in another district — *In re Charles Street African*

*Methodist Episcopal Church of Boston*, Case No. 12-12292 (FJB) (Bankr. D.

Mass.), [Docket No. 420] (Oct. 16, 2012) (Motion Exhibit 6A). That case provides

no support for ordering the proposed bus tour in this case here over creditor

objections. Notably, the City fails to disclose in its Motion that the site visit in

*Charles Street* was *not objected to*. The order in *Charles Street* made clear on its

face that the site visit order was issued *on consent* as part of an *agreed resolution*

of a motion *in limine* that principally dealt with other issues. (*See* Motion Exhibit

6A at 1.)

---

[1]    *Compare* Transcript of 5/28/14 Hearing [Docket No. 5183] at 139:19-140:1 (responding to counsel's invitation that the Court "look at the Fitch reports and the ratings reports of how they rate the bonds today as a result of the plan's proposed impairment of the bonds" by stating "Well, I'll accept your invitation when and if they are admitted into evidence."). Equally, the Court can consider the report of the Detroit Blight Removal Task Force if and when it is offered by the City and admitted into evidence at trial.

12. Specifically, the circumstances giving rise to the order in *Charles Street* involved a debtor who had filed a motion *in limine* against an eve-of-trial production by a creditor bank of certain appraisal reports that contradicted other appraisal reports that the bank previously had produced. (*See Charles Street* Docket No. 312 (Exhibit A), ¶ 11.) The parties resolved the motion by stipulating that all the appraisal reports could be admitted and agreeing on the record that the court would also conduct a site visit of the specific properties whose value was the subject of the conflicting and belatedly-produced appraisal reports. (*See Charles Street* 9/28/12 Tr. Docket No. 411 (Exhibit B.) In other words, the site visit in *Charles Street*, unlike here, was *uncontested* at the time it was ordered.

13. Indeed, before approving the order, the court in *Charles Street* specifically asked on the record "Is it, without question, that the parties collectively want to schedule a court site visit?" (*see* Exhibit B at 12:12-13), to which the debtor's counsel responded, "I believe that's where we did come out." (*id.* at 12:14) and the creditor bank's attorney stated, "We had no objection to a site visit." (*id.* at 12:24). While the City's Motion confusingly refers to *Charles Street* as involving "an objecting bank" (Motion at 2), what that bank actually was objecting to was *the debtor's overall plan of reorganization* that was about to be tried at the confirmation hearing, not the site visit itself. *Charles Street* thus provides no authority for ordering over creditor objections the City's proposed bus

tour of various locations — particularly locations of properties that are not themselves the central focus of the upcoming Confirmation Hearing, as was the case in *Charles Street*, where the value of improvements being made to the debtor's real estate to be visited was a key issue in whether or not the debtor's Chapter 11 plan could be confirmed.

## III.   IN THIS CASE THERE IS NO "SITE" TO VISIT

14.    Not only is this case easily distinguished from *Charles Street*, the only bankruptcy case cited by the City, it is also dramatically different from the kinds of cases where site visits by a trier of fact typically occur.  Here, unlike in those cases, there is no one location of direct and obvious relevance to any central issue in the case.  Rather, what the City proposes is having the Court view one party's cherry-picked selection of a mere handful of locations, with those locations being of no more inherent relevance to this case than thousands of potential alternative locations within Detroit that could just as easily have been selected for viewing.

15.    This is not the kind of situation where finder-of-fact visits to key sites outside the courthouse have been approved.  Indeed, even in single-site cases within the Sixth Circuit, including criminal cases with their heightened constitutional requirements, view requests are not uncommonly rejected, as the cases the City cites in its own Motion show.  *See United States v. Moonda*, 347 F. App'x 192, 201-02 (6th Cir. 2009) (denying motion for view of the scene of the

crime due to logistical and safety concerns and availability of expert testimony and aerial photographs); *United States v. Simmons*, 174 F. App'x 913, 917-18 (6th Cir. 2006) (denying motion for view of the location of arrest in light of availability of "ample evidence of the scene" in the form of photographs, maps, testimony and judicial notice). But even in those cases cited by the City where views were permitted, the sites in question were the locations of central relevance to those cases. *See Moore v. United States*, 54 Fed. Cl. 747, 748 (Fed. Cl. 2002) (in class action seeking compensation for imposition of easement, Court viewed parcels subject to the easement); *United States v. Sargent Cnty. Water Res. Dist.*, 876 F. Supp. 1090, 1097 (D.N.D. 1994) (Clean Water Act case in which Court viewed a drain and parts of "three sloughs" that Court identified as being "in question" in the litigation); *Northwestern Nat'l Cas. Co. v. Global Moving & Storage Co.*, 533 F.2d 320, 322-23 (6th Cir. 1976) (upholding site visit to burned warehouse that was the subject of insurance claims relating to the underlying warehouse fire).

16. In short, the City's characterization of its Motion as being one for a "site" visit is fundamentally misleading given what is being proposed on this Motion. Unlike the cases that the City has cited in support of its Motion, this case is not about any particular "site." It is about a sprawling metropolis covering more than 138 square miles that is home to more than 700,000 people. No "site visit" could possibly encompass even a meaningful fraction of what this case is about or

the people, places, businesses and institutions that this case will affect in any reasonably even-handed or fair manner. Notably, there is no suggestion in the City's motion that the locations it proposes to visit (which it still has yet to disclose) would constitute even a representative cross-section of the City as a whole. The City has not identified any precedent for conducting a wide-ranging judicial bus tour to view one party's selectively-chosen tiny fraction of underlying locations that are not directly relevant to central issues in the case.[2]

---

[2] It is no answer for the City to say that objecting creditors are free to propose their own additional locations for a viewing. The City has the ability to propose locations for a viewing at this time because it has full knowledge of its own territory, properties, infrastructure and institutions. But many of the creditors in this case are in no position to do likewise. Discovery is still at the outset while these parties wait for the City to complete its document production by June 20 (six weeks late), for witnesses to be produced for depositions, and for experts to issue reports in July. There will not be time for additional locations to be added once the parties can finally determine which other locations might be appropriate because, as the City pointed out in *Debtor's Ex Parte Motion for an Order Shortening Notice and Scheduling an Expedited Hearing, if Necessary, with Respect to Debtor's Motion for Site Visit by Court in Connection with the Hearing on Confirmation of the City's Plan of Adjustment*, filed June 6, 2014 [Docket No. 5251], the need for "adequate time to make all arrangements for the Site Visit, including coordinating security arrangements with the Court," makes it "necessary" for the request for approval of the proposed visit "to [be brought] before the Court "expeditiously." (*Id.* ¶ 7.) That cannot be done under the circumstances here.

## IV. THE AVAILABILITY OF OTHER EVIDENCE OBVIATES THE NEED FOR JUDICIAL VISITS OUTSIDE THE COURTROOM

17.     Another threshold question that needs to be addressed is whether the time, complication and procedural risks associated with a judicial visit to various locations serves any real purpose here, given the availability of evidence in the form of photographs, videos, testimony and so on, that could be introduced on the record at trial subject to the rights of all parties under the Federal Rules of Evidence. Absent a meaningful showing by the City that evidence in these forms would be insufficient, a request for a judicial visit is properly declined.

18.     Courts regularly exercise their discretion to deny motions for a view outside the courthouse when the availability of alternative evidence makes such a site visit unnecessary. *See United States v. Simmons*, 174 F. App'x at 918 (Sixth Circuit stating that for view to be appropriate it must be "necessary to an understanding of the litigation and the requisite information cannot be introduced in any other way."). "A court generally acts within [its] discretion in denying a motion for a view when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs." *Id.* (quoting *United States v. Crochiere*, 129 F.3d 233, 236 (1st Cir. 1997)); *see United States v. Moonda*, 347 F. App'x at 202 (Sixth Circuit upheld denial of view where, *inter alia*, "the aerial photographs of the scene" provided "an adequate picture of the surroundings").

19.     Here, despite conceding that at the Confirmation Hearing the Court will "hear ample testimony" (Motion at 4), and receive other evidence about blight and other conditions (Motion at 3), the City nonetheless presses the Court to take a bus tour outside the courthouse to observe such matters firsthand.  It is precisely in such circumstances — where other available evidence that is subject to the protections of all parties provided by the Federal Rules of Evidence describes the scene — that courts deny motions to view.  *See United States v. Triplett*, 195 F.3d 990, 999 (8th Cir. 1999) (no abuse of discretion in denying motion for view where "the evidence presented at trial included photographs and diagrams of the sites of [Defendant's] arrests, as well as witness testimony regarding the circumstances and conditions at those locations at the relevant times."); *Skyway Aviation Corp. v. Minneapolis, N. & S. Ry. Co.*, 326 F.2d 701, 708 (8th Cir. 1964) (affirming denial of view motion where "[t]he trial court felt that nothing could be gained by a view and inspection" and where "the evidence sought by this excursion was adduced by testimony of two witnesses", concluding that "[t]he inspection would have had only a cumulative effect and served no additional purpose.").

20.     In denying a motion for a view, the District Court stated that "[t]his Court does not need to visit the scene to understand the lightning conditions on Lake St. Clair.  Rather, such conditions will be deduced from the evidence presented to the Court during trial."  *In re M/V MIELKE WAVE*, No. 10-13519,

2011 WL 4063274, at *2 (E.D. Mich. Sept. 13, 2011). This Court is no less capable in this case.

## V. THE CITY IGNORES THE OBVIOUS ALTERNATIVE OF MAKING A PRESENTATION TO THE COURT'S EXPERT

21. What the City now proposes as a bus tour is in fact the kind of presentation that, if the City wishes to make it, could and logically should be done as part of the City's meetings and information-sharing with the Court's expert witness, Martha E. M. Kopacz. Ms. Kopacz has been directed by the Court to "investigate and reach a conclusion on (a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and (b) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable." (*Order Appointing Expert Witness*, dated April 22, 2014 [Docket No. 4215] ¶¶ 1-2.) The City's stated reasons for wishing to conduct its bus tour directly relate to Ms. Kopacz's inquiries.

22. Indeed, providing such a presentation in the context of meetings and information-sharing with the Court's expert is consistent with all parties' rights and the promotion of justice and fairness in this case, since Ms. Kopacz will be subject to cross-examination by parties and the Court and the admissibility of her report will be subject to the Federal Rules of Evidence. *See United States v. Moonda*, 347 F. App'x at 202 (Sixth Circuit, in upholding denial of crime scene view, cited, *inter alia*, fact that defendant's expert "went to the emergency berm area under

15

traffic conditions similar to those existing at the time of the shooting" and testified at trial about various auditory readings he conducted there).[3]

## VI. THE CITY'S PROPOSED BUS TOUR PROTOCOL IS IMPROPER IN A NUMBER OF RESPECTS

23.    In addition to the foregoing substantive and procedural reasons why the City's proposed bus tour is improper and should not be approved here, there are

_____

[3] Making this presentation to Ms. Kopacz could provide substantial other benefits. It would remove artificial limitations on the time available for any viewings. It would not impose upon the time available for the Confirmation Hearing. It would permit freer interactive dialogue with the City's representatives. Perhaps most significantly, making this presentation to Ms. Kopacz it would eliminate the logistical headaches of arranging visits involving judicial and security personnel in a case that is already under intense scrutiny by the media — who by virtue of the City's Motion have now been placed on high alert about tracking down a possible judicial bus tour. The risk that details of the bus tour could leak in advance, or be discovered by the media while the tour is in progress — or indeed could be revealed through live reporting on social media — creates not only security risks but also the possibility that interested persons or groups could seek to alter conditions or stage incidents or confrontations at the proposed viewing locations. These risks argue in favor of the simpler and less publicly visible alternative of presenting to Ms. Kopacz. *See United States v. Moonda*, 347 F. App'x at 202 (Sixth Circuit held no abuse of discretion in denying a view where "[w]ithout question, there would be inherent dangers in conducting a jury view next to a heavily trafficked turnpike" and where conducting view presents "logistical difficulties and safety hazards"); *Kelley v. Wegman's Food Markets, Inc.*, 98 F. App'x 102, 105 (3d Cir. 2004) (denial of jury view upheld where District Court noted concern that a "view would be . . . difficult to control"); *United States v. Passos-Paternina*, 918 F.2d 979, 986 (1st Cir. 1990) (affirming denial of view due to the "dangerousness" of the site and the "availability of sufficient testimonial evidence").

numerous improper features in the City's "Proposed Protocol for Site Visit" (Motion Exhibit 6B) ("Protocol") that provide further grounds for not approving the City's proposal.

24.     The City proposes in the final paragraph of its Protocol that "Time spent on the Site Visit shall not count against any party's allocated time at the Confirmation Hearing." (Protocol at 2.)  But the City's own Motion makes clear that this bus tour is being sought solely on the City's behalf in support of the case that the City seeks to make at the Confirmation Hearing.  In a case where the Court has decreed finite trial time with an equal division between the two sides at the Confirmation Hearing (*see Fifth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment*, dated June 9, 2014 [Docket No. 5259] at 4), the City should not be given an extra three hours to make a presentation over creditor objections which the City alone created to serve its side of the case.

25.     The Protocol also proposes to limit which counsel for objecting parties can and cannot view and be part of the bus tour (Protocol at 1 & n.3), even though the bus tour is intended to serve as evidence for the trier of fact.  (*See* Protocol at 2.)  This is wholly improper.  Counsel for objecting parties cannot be excluded from the presentation of evidence to the trier of fact in their own case, as they may need or wish to object, or to respond, or to adjust their presentations at

17

the Confirmation Hearing in light of what was presented to the Court during the tour. Such exclusion could result in reversible error in this Circuit. *See United States v. Walls*, 443 F.2d 1220, 1223 (6th Cir. 1971) (finding "reversible error for the court to deny appellant and his attorney the opportunity to attend the view to insure against the intrusion of prejudicial error."); *see also Lillie v. United States*, 953 F.2d 1188, 1191 (10th Cir. 1992) (reversing and remanding over concerns about premises view where counsel was absent, noting the potential impact on counsel's "opportunity to cross-examine, to object to the introduction of the evidence, or to rebut the evidence."); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1267 (9th Cir. 2001) (noting that where counsel are not present during a judicial view, absent counsel "had no way of knowing exactly what the court looked at, or how the judge went about his visit").

26. Any suggestion by the City that the video of the tour called for by the Protocol (Protocol at 2) would be an adequate substitute for the absent counsel only provides a further basis for denying the City's Motion. Such an assertion completely undercuts the core premise asserted by the City in support of its Motion — its contention that such alternative forms of evidence are insufficient to capture what an in-person visit would communicate. (*See* Motion at 4.) Moreover, the Protocol is entirely silent about how the video will be prepared and edited, leaving unanswered such fundamental questions as who will serve as the videographer;

what oaths, certifications, training or qualifications will be required of the videographer; whether the video should show the videographer's view of the locations, and/or the videographer's attempt to capture what the videographer believes the Court is viewing, and/or the act of the Court viewing it, and/or any of the scenery that the Court will inevitably view while traveling from one location to another. The possibilities for selective editing of the video, either while it is being recorded or in post-production, boggle the mind.

27.     The Protocol also provides that during the bus tour the City's counsel will be providing the Court with "statements" identifying "the purpose for which the Debtor included such location as part of the Site Visit" (Protocol at 2), and that the Court may be posing "questions" to counsel, with counsel then providing "answers" on the spot that will be part of the record. (Protocol at 2.) Fundamental principles of trial fairness bar such proceedings that will be part of the record from taking place when not all Confirmation Hearing counsel are permitted to be present. Fundamental fairness and constitutional guarantees of due process also bar any such statements in the absence of any effective means for opposing counsel to cross-examine "witnesses" or challenge "evidence." *Cf. United States v. Cronic*, 466 U.S. 648, 653 & n.8, 656, 659 & n.25 (1984) (noting "due process" and "fairness" concerns when stating in criminal case that "[t]he Court has uniformly found constitutional error without any showing of prejudice when counsel was

either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.").[4]

## <u>CONCLUSION</u>

For the foregoing reasons, Assured, BHAC and FGIC respectfully request that the Court issue an order denying the City's Motion.

Dated: June 17, 2014

By: _/s/ Lawrence A. Larose_

Lawrence A. Larose
Samuel S. Kohn
Robert A. Schwinger
30 Rockefeller Plaza
New York, NY 10012
Telephone: (212) 408-5100
llarose@chadbourne.com
skohn@chadbourne.com
rschwinger@chadbourne.com

*Counsel for Assured Guaranty*
*Municipal Corp.*

_s/ Alfredo R. Pérez_

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
alfredo.perez@weil.com

– and –

---

[4] There is one final point that bears mentioning. There was a prior occasion when City representatives sought to take creditor representatives on a bus tour of certain locations, which effort collapsed when the City demanded that the attendees sign a Detroit Police Department "Release, Waiver and Covenant Not to Sue Agreement" before being permitted to participate. While neither the Protocol nor the Motion makes any mention of the possibility of such requests being repeated in connection with the current proposed bus tour, it would be improper to make agreeing to any such requests a condition of counsel's being able to attend a proceeding that is part of the Confirmation Hearing in this case. Such requests or requirements should be expressly prohibited by the Court if any bus tour were to proceed. But the better course of action would simply be for the City's Motion for approval of the bus tour to be denied altogether.

/s/ My Chi To
My Chi To
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-7435
Fax: (212) 909-6836
mcto@debevoise.com

*Counsel for Berkshire Hathaway*
*Assurance Corporation*

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER
& PLUNKETT, P.C.
280 North Old Woodward Avenue,
Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
EJEssad@wwrplaw.com
mrjames@wwrplaw.com

*Attorneys for Financial Guaranty*
*Insurance Company*