# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---------------------------------------------------------------------  x:
In re                                                                 :       Chapter 9
                                                                      :
CITY OF DETROIT, MICHIGAN,                                            :       Case No. 13-53846
                                                                      :
                              Debtor.                                 :       Hon. Steven W. Rhodes
                                                                      :
---------------------------------------------------------------------  x

## MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S RESPONSE TO THE CITY OF DETROIT'S OBJECTION TO PROOF OF CLAIM NUMBER 3683 FILED BY MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT BY AND THROUGH THE MACOMB COUNTY PUBLIC WORKS COMMISSIONER

The Macomb Interceptor Drain Drainage District's ("MIDDD") hereby submits this response (the "Response") to the *Corrected Objection of the City of Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 3683 Filed by Macomb Interceptor Drain Drainage District by and through the Macomb County Public Works Commissioner* [Docket No. 4954] (the "Objection"). In support thereof, MIDDD respectfully states as follows:

## PRELIMINARY STATEMENT

The basis for MIDDD's claim is set forth in a complaint (the "Complaint") filed by MIDDD against the City of Detroit (the "City," "Detroit," or the "Debtor") in the Macomb County Circuit Court, which Complaint is attached to MIDDD's proof of claim. The Complaint alleges several causes of action upon which relief may be granted, including fraud, fraud in the inducement, silent fraud, innocent misrepresentation, breach of contract, and quantum meruit/unjust enrichment. Although the City states in it Objection that it "expects to vigorously contest the lawsuit once the matter proceeds," it has not yet answered the Complaint and, in the

19525881

Objection, takes no issue with any of the facts alleged in therein. MIDDD believes—based on, among other things, the record of the criminal case brought against former City officials for the same conduct underlying MIDDD's claim—that the factual predicates for the MIDDD claim are not in dispute. If, however, the City were to dispute any of the alleged facts, MIDDD stands ready, willing and able to prove its case.

The only substantive basis for opposition to allowance of the MIDDD claim that the City actually raises in the Objection is that the claim may be barred by res judicata. The City provides no legal analysis to support that assertion and, as explained below, res judicata is inapplicable. Accordingly, MIDDD requests that the Court overrule the Objection, and allow the claim in the amount of not less than $26 million.

## BACKGROUND

### I.    The MIDDD Claim

1.    As part of a global settlement of certain disputes and lawsuits between the City of Detroit and Oakland and Macomb Counties, as sewer customers, the parties agreed that the City-owned sewer systems located in Macomb County (the "Macomb Interceptor System") would be transferred by the City to MIDDD in exchange for a payment from MIDDD calculated in part based on the City's costs of building and repairing a portion of that system (the "15 Mile Project"). In early 2009, the global settlement was approved by the United States District Court for the Eastern District of Michigan (the "District Court") in United States v. Detroit, Case No. 77-71100 (E.D. Mich.).

2.    In September of 2010, pursuant to the global settlement, the MIDDD acquired the Macomb Interceptor System from the City of Detroit for $89,996,704 (the "Purchase Price") pursuant to an Acquisition Agreement, dated as of September 6, 2010 by and between MIDD, Macomb County and the City (the "Agreement"). The Purchase Price was calculated in part

based upon the City of Detroit's cost in building and repairing the 15 Mile Project. During the negotiations leading up to the agreement, the City represented that the cost of the 15 Mile Project in the amount of $54,467,200.00 was based on arms-length charges. In fact, these total project costs included significant overcharges for work that was not performed, equipment that was not used, and excess markups and double billings that were imposed as part of a criminal conspiracy involving, among others, the then-Mayor of Detroit, Kwame Kilpatrick, and the then-director of the Detroit Water and Sewer Department ("DWSD"), Victor Mercado.

3.     Although the City knew or should have known that the project costs being passed on to MIDDD via the Agreement were not legitimate or based on arms-length charges, the City did not disclose this to MIDDD. MIDDD relied upon the City's representations in entering into the Agreement and paying the Purchase Price.

4.     On June 26, 2013, MIDDD filed the Complaint commencing a lawsuit (the "MC Case") against the City in the Macomb County Circuit Court.[1] A true and correct copy of the Complaint is attached to MIDDD's proof of claim (the "MIDDD Proof of Claim"), which is attached as Exhibit 1 to the Objection.

5.     In the MC Case, MIDDD seeks to recover not less than $26 million in damages from the City on several grounds, including, but not limited to, that the City knowingly and intentionally concealed and misrepresented that its public officials had abided by all state, federal and local laws in the performance of their duties, and that there was no known possible or pending litigation relating to the Macomb Interceptor System.[2] These representations turned out

---

[1]     On December 19, 2013 the MC Case was administratively stayed by the Macomb County Circuit Court due to the ongoing bankruptcy proceedings.

[2]     Specifically, MIDDD seeks, in the MC Case, an order (a) declaring the reformation and/or rescission of the Agreement, (b) awarding MIDDD damages in the amount of not less than $26 million in overcharges paid to the City in connection with the 15 Mile Project plus costs and reasonable attorney fees, (c) imposing a constructive trust over all property that the City obtained as a result of its fraud, the illegal scheme, in settlement of its claims in

3

to be false, as the City representatives that negotiated the Agreement, in fact, knew or should have known of extensive fraud and extortion relating to the 15 Mile Project because either (i) they were involved in the criminal conduct or (ii) they had actively assisted in a federal investigation of these criminal activities prior to and during the course of negotiations with MIDDD relating to the Agreement.[3]  That federal investigation ultimately led to a criminal case (the "Criminal Case") commenced in the District Court.[4]  See Case No. 10-20403 (E.D. Mich.)

6.       As a result of these fraudulent representations and concealments, MIDDD agreed to pay the Purchase Price, including $54,467,200.00 in costs associated with the 15 Mile Project that the City specifically identified in the schedules to the Agreement.  Those costs were vastly inflated due to the extensive racketeering scheme perpetrated by, among others, City officials.

## II.    Prior Litigation Against Non-City Defendants

7.       On July 18, 2011, prior to the commencement of the MC Case against the City, MIDDD filed a civil lawsuit against the defendants in the Criminal Case and the contractor and sub-contractor defendants who worked on the 15 Mile Project (collectively, the "Non-City Defendants") in the District Court (Case No. 11-13101 (the "USDC Case")), alleging fraud, anti-trust and breach of contract claims.

8.       During the course of this litigation, the City moved to intervene as a  plaintiff to assert claims against the Non-City Defendants stemming from the extensive fraud and extortion that led to overcharges on several DWSD projects, including the 15 Mile Project.  In its pleadings, the City acknowledged that the scheme advanced by its own officials resulted in the

---

USDC Case (defined below) and otherwise, resulting in unjust enrichment; and (d) awarding such other relief as may be appropriate.

[3]    A true and correct copy of the Agreement is attached to the MIDDD Proof of Claim.

[4]    Evidence at the trial against certain of the criminal conspirators in the Criminal Case revealed that representatives of the City and the DWSD had knowledge of the corruption and over-billing schemes.

4

submission of invalid and inaccurate invoices from contractors and subcontractors for (a) work not performed and material and equipment not used; (b) excessive and unlawful markups for work performed and material and equipment used; and (c) excessive consulting and other fees, expenses, and costs resulting from the pattern of amending (rather than competitively bidding) contracts, which provided to the Non-City Defendants opportunities for more unlawful profits and excessive consulting and other fees, expenses, and costs. See *Intervening Complaint of the Plaintiff City of Detroit Through the Detroit Water and Sewerage Department* (the "Intervening Complaint"), USDC Case, Docket No. 205. In the Intervening Complaint, the City expressly adopted the MIDD's claim that, "as a result of inflated invoices submitted on the [15 Mile Project], the cost of repairs of the [15 Mile Project] was increased by at least $23 million." See Intervening Complaint ¶ 101.

9.     Upon the City's request for intervention in the case, certain of the Non-City Defendants challenged MIDD's standing to assert tort and antitrust claims as assignee under the Agreement. On September 17, 2012, the court issued an opinion and order (the "USDC Opinion and Order") holding that MIDD did not have standing to assert tort and antitrust claims against the Non-City Defendants based on the language of the Agreement and limiting MIDD's claims to those which arose from the Non-City Defendants' breach of contract CS-1368 as it pertained to the 15 Mile Project. USDC Case, Docket No. 237.[5] The District Court was not presented with and did not rule on any claims between MIDD and the City.

10.     The City subsequently pursued the tort and antitrust claims against the Non-City Defendants previously asserted by MIDD, eventually settling those claims. Although the City represented throughout negotiations of the Agreement that for the substantial consideration being

---

[5]     This Opinion and Order is attached the Objection at Exhibit 2.

paid by MIDDD, the City would assign any and all future claims it may have relating to the Macomb Interceptor System including the 15 Mile Project, the City did not remit any monies received from its settlements with the Non-City Defendants to MIDDD.

### III.    The Bankruptcy Proceedings

11.    On July 18, 2013, the City filed a petition for relief under Chapter 9 of Title 11 of the United States Code (the "Bankruptcy Code"), triggering the application of the automatic stay pursuant to sections 362 and 922 of the Bankruptcy Code.  Thus, proceedings in the MC Case were stayed.

12.    On November 21, 2013, the Court entered the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 1782] (the "Bar Date Order").  Pursuant to the Bar Date Order, MIDDD timely filed the MIDDD Proof of Claim prior to the bar date set for governmental claims, which was received by the Debtor's claims agent on May 5, 2014.  In the MIDDD Proof of Claim, MIDDD asserts the claims brought in the MC Case, comprised of $26 million in liquidated, unsecured claims plus additional unliquidated claims (collectively, the "MIDDD Claim").

13.    On May 15, 2014, the City filed the Objection.

### ARGUMENT

14.    The only alleged substantive basis for disallowance of the MIDDD Claim that the City asserts in the Objection is that the MIDDD Claim may be barred by res judicata.  The Objection implies that there may be other grounds upon which the Court may disallow the MIDDD Claim, but contains no explanation of the basis upon which the City "expects to vigorously contest the lawsuit once the matter proceeds."  Objection at 4.  The Objection is unfounded for several reasons.

6

15.     First, MIDDD has a valid, enforceable claim against the City arising out of the fraud perpetrated upon it by the City as alleged in the Complaint.[6]  The operative facts relating to the MIDDD Claim were established in the Criminal Case and thus cannot reasonably be disputed.  To the extent the MIDDD Claim cannot be decided on summary judgment, however, MIDDD stands ready, willing, and able to prove the allegations through the claims adjudication process.  Second, for the reasons set forth herein, there is no basis to find that the MIDDD Claim is barred by res judicata.

## I.     The MIDDD Claim is Not Barred By Res Judicata.

16.     The City states that it will argue that the MIDDD Claim is barred by res judicata based on the USDC Opinion and Order, which held, in relevant part, that MIDDD did not have standing to assert non-contractual claims against the Non-City Defendants given the terms of the Agreement which reserved these claims for DWSD and/or the City of Detroit.  See USDC Case at Docket No. 237.  The Objection contains no citation to case law, and no analysis explaining how or why the MIDDD Claim against the City should be barred by res judicata.  This is with good reason, because the doctrine of res judicata is clearly inapplicable.

17.     The elements of the doctrine of res judicata[7] are "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies;' (3) an issue in the subsequent action which was litigated or which should have been

---

[6]     MIDDD incorporates the Complaint by reference as if fully set forth herein.

[7]     Although res judicata encompasses both issue preclusion and claim preclusion, the City did not even specify under which theory it is proceeding. The elements of the doctrine of issue preclusion or collateral estoppel, which are narrower than claim preclusion, are as follows: (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.  Hamilton's Bogarts, Inc. v. Michigan, 501 F.3d 644, 650 (6th Cir. 2007). The analysis herein would apply equally to any assertion pursuant to the narrower doctrine of collateral estoppel.

7

litigated in the prior action; and (4) an identity of the causes of action." Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 529 (6th Cir. 2006). Notably, the City bears the burden of proving that all of these elements exist. See In re Lebbos, 455 B.R. 607, 612 (Bankr. E.D. Mich. 2011) ("A party asserting res judicata as a defense bears the burden of proving each element").

18.     The doctrine of res judicata is inapplicable here because, in the USDC Case, the District Court neither heard nor decided the merits of the MIDDD Claim brought against the City in the MC Case. In fact, MIDDD's only claims in the USDC Case were asserted against the Non-City Defendants—contractors and subcontractors who overbilled for the 15 Mile Road Project contract. The circumstances related to the MIDDD's entry into the Agreement with the City and acquisition of the Macomb Interceptor System were not at issue in the USDC Case. Thus, the City's misrepresentation and/or concealment of the criminal enterprise to induce MIDDD to enter into the Agreement was not the subject of the USDC Case or any opinion therein issued.

### A.     There Is No Final Decision On The Merits.

19.     The City claims that the USDC Opinion and Order acts as a bar to MIDDD's fraud claims against the City in the MC Case, and that the City's subsequent settlement with the Non-City Defendants in the USDC Case regarding the alleged statutory anti-trust and state law tort claims constitutes a final decision on the merits. The City does not further explain how this applies to the MIDDD Claim against the City in the MC Case.

20.     Although the facts and circumstances surrounding the USDC Case relate to the facts and circumstances alleged in the MC Case, the operative facts giving rise to MIDDD's claims for relief are markedly different. Specifically, in the MC Case, MIDDD asserts that the City fraudulently induced the execution of the Agreement by, in part, misrepresenting the status and substance of open DWSD contracts that had been procured as part of an illegal scheme, in

8

addition to knowingly failing to disclose the scope and nature of the gross fraud then being investigated by the U.S. Department of Justice and Federal Bureau of Investigation relating to the assets the City sought to sell to MIDDD. On the other hand, in the USDC Case, MIDDD asserted claims against Non-City Defendants only based on excess billings submitted in connection with DWSD Contract CS-1368. MIDDD asserted its claims in the USDC Case as an assignee under the Agreement. When one of the Non-City Defendants therein challenged whether MIDDD had standing to assert state law tort and/or federal statutory claims against the Non-City Defendants based on the terms of the Agreement, the District Court held:

> Concurring Defendants and the City of Detroit concede that these clauses assign to [MIDDD] state-law contract claims arising out of the [15 Mile Project], but maintain that the clauses do not assign claims sounding in tort or federal statutory law. The court agrees with Concurring Defendants and the City of Detroit. The incorporation of the clause "under all contracts, warranties and guarantees" expressly limits the preceding assignment of "all of its rights." Accordingly, the City of Detroit assigned to [MIDDD] the City's rights to contracts related to the [15 Mile Project], including the right to recover for damages caused by breaches of those contracts, but not the *City's rights* to then-unknown causes of action sounding in state tort law or federal statutory law.

Opinion and Order at 7, USDC Case No. 11-13101, Docket No. 237 (emphasis added).

21.     The USDC was not asked to and did not rule on any question pertaining to the execution of the Agreement containing this clause or any non-contractual claims between MIDDD and the City. In fact, the District Court summarized the history of the USDC Case as follows:

> This claim arises from [Inland Waters Pollution Control's] involvement in the repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan. Prior to this collapse, on June 22, 2002, Inland and the City of Detroit Water and Sewerage Department entered into CS-1368, a contract for sewer repair, cleaning, and restoration (the "Contract"). The Contract was amended five times over the next four years, ostensibly to take into consideration the ever-increasing cost of repairs to the interceptor sewer line. Detroit later assigned Macomb its rights under the Contract, including the right to recover damages caused by a

breach of the Contract, but did not assign Macomb the rights to any of Detroit's then-unknown causes of action sounding in state tort or federal statutory law. On July 18, 2011, Macomb sued forty Defendants, alleging that Kwame Kilpatrick, then the Mayor of Detroit, along with a variety of Detroit officials, conspired with Inland to overcharge the Detroit Water and Sewerage Department for the costs of repairs to the sewer interceptor. Kilpatrick stood trial and was convicted of most charges from. (sic) Macomb's action has since been narrowed via motion practice to a single breach of contract count against a single defendant, Inland.

*Opinion and Order Denying Defendant's Motion to Dismiss Plaintiff's First Amended*

*Complaint* at 1-2, USDC Case No. 11-13101, Docket No. 314.

     22.    Confirming this history, the City's Motion to Intervene pled:

[MIDDD's] claims in this lawsuit include not only a breach of DWSD's sewer-repair contract, but also various statutory and common-law torts based upon the unlawful activities committed against DWSD. In motions to dismiss, contrary to [MIDDD's] allegations, certain of the Defendants argue that the tort claims belong to DWSD and that [MIDDD] lacks standing to bring these claims. (*See, e.g.*, Defs.' Mots. to Dismiss, ECF Nos. 33, 40, 58.) DWSD seeks to intervene because the Defendants have placed its entitlement to the tort claims squarely at issue. Without attempting to resolve the issue at this point, it is clear that DWSD has an interest in this lawsuit.

*Intervening-Plaintiff City of Detroit and its Detroit Water and Sewerage Department's*

*Brief in Support of its Motion to Intervene as a Matter of Right Under Fed. R. Civ. P. 24(A)*

(the "Motion to Intervene") at 1, USDC Case No. 11-13101, Docket No. 145.

     23.    In its opposition to a Non-City Defendant's Motion to Dismiss the tort and federal statutory claims, the City further acknowledged that the District Court, in the USDC Case, did not adjudicate the merits of the MIDDD Claim brought in MC Case, stating:

On May 7, 2012, the Court granted DWSD's motion to intervene. Due partly to a key issue about who had standing to assert the statutory and tort claims (i.e., DWSD or MIDDD), the Court adopted a practical step-by-step approach and limited the scope of DWSD's intervention to the project that MIDDD raised in its original Complaint – namely, the sewer project on which [L. D'Agostini & Sons, Inc. d/b/a LD&S] worked. (ECF No. 202.) That approach allowed for the identification of who holds the claims before further considering the potential extent or limits of those claims.

*Intervening Plaintiff City of Detroit through the Detroit Water and Sewerage Department's*
*Response to Defendant L. D'Agostini & Sons, Inc.'s Motion to Dismiss Counts III And VIII*
*of the Complaint-In-Intervention* at 3-4, USDC Case No. 11-13101, Docket No. 267.

24.     There has clearly been no adjudication and certainly no final judgment on the merits of the claims asserted by MIDDD in the MC Case.[8]  See e.g., Artie Fields Prods., Inc. v. Channel Seven of Detroit, Inc., 97 F.3d 1451 (6th Cir. 1996) (Res judicata does not apply where the district court issued a ruling regarding a separate claim, but not as to the claim that movant sought to bar by the doctrine).  Accordingly, the MIDDD Claim is not barred by res judicata.

**B.      The MC Case Is Not A Subsequent Action Between The Same Parties.**

25.     It is undisputed that the City and MIDDD were parties to the USDC Case, along with numerous Non-City Defendants.  Specifically, MIDDD is the original plaintiff and the City subsequently moved to be added as an intervening plaintiff to also assert claims against the Non-City Defendants.  No litigation, however, was commenced in the USDC Case between the City and MIDDD at any point; no cross or third-party claims were alleged.

26.     In the context of res judicata, "the claim [precluded] includes all rights of the plaintiff to remedies *against the defendant* with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."  In re Fordu, 201 F.3d 693, 703 (6th Cir. 1999) (quoting Restatement (Second) of Judgments, § 24(1) (1982)) (emphasis added). MIDDD, however, asserted no claims against the City, as a defendant, in that USDC Case.  The MIDDD Claim is based on, among other things, the *City's* (as opposed to the Non-City Defendants') knowing failure to disclose its knowledge of the ongoing criminal activities relating to the 15 Mile Project, which has never been litigated and was only first asserted in the MC Case

---

[8]     Notably, the City settled claims between itself and the CS-1368 contractors.  Had MIDDD prevailed on the September 7, 2012 declaratory order, MIDDD would have replaced the City in the settlement negotiations.

as a separate action against the City.  As the MC Case is not a subsequent action between the same adverse parties to a prior lawsuit, the City cannot rely upon the doctrine of res judicata to object to the MIDDD Proof of Claim.

        **C.**     **The Issues In The MC Case Were Not Litigated In The USDC Case.**

        27.     The MIDDD Claim alleges, among other things, tort and breach of contract claims against the City stemming from, among other things, the City's fraudulent misrepresentations that induced MIDDD to enter into the Agreement on its terms.  MIDDD's entry into that Agreement and its acquisition of the Macomb Interceptor system pursuant to it are entirely different transactions from those that gave rise to the claims against the Non-City Defendants in the USDC Case.  Accordingly, the issues relevant to the MIDDD Claim brought in the MC Case—*i.e.* the City's knowledge of the fraudulent activities of the Non-City Defendants, and whether the City concealed or misrepresented certain material facts related to the negotiation of the Agreement—were never litigated in the USDC Case.

        28.     Moreover, the MIDDD Claim brought in the MC Case includes a claim for unjust enrichment against the City for failure to turn over the proceeds the City received from its settlement of claims in the USDC Case, even though MIDDD had paid the City in full for the 15 Mile Project.  By definition, this cause of action could not have arisen until after the filing and disposition of the City's claims in the USDC Case and thus could not have been litigated previously.  See Rawe, 462 F.3d at 529-530.

        **D.**     **There Is No Identity Of Causes of Action.**

        29.     The final element examined by Courts analyzing a defense of res judicata is the "identity of causes of action."   This element is met when a suit and a subsequent suit contain rights of action that are created by the same facts and must be sustained by the same evidence. See In re Lebbos, 455 B.R. at 616 (quoting Sanders Confectionary Products, Inc. v. Heller

Financial Services, Inc., 973 F.2d 474, 483-84 (6th Cir. 1992) ("Identity of causes of action means an identity of the facts creating the right of action and of the evidence necessary to sustain each action.")).

30.     The proofs in the MC Case will turn upon the *City's* conduct, including in negotiations surrounding the execution of the Agreement, the City's actual knowledge of and involvement in a criminal enterprise headed by its then-Mayor, the amount paid by MIDDD for the acquisition of the Macomb Interceptor System including full reimbursement for the costs charged in connection with the 15 Mile Project, and the amounts recovered by City as a result of the terms of the Agreement.  This is drastically different from the proofs required for MIDDD to sustain its claims in the USDC Case, which depend upon the fraudulent conduct of the Non-City Defendants, and the nature and amounts of those defendants' overcharges.

31.     Thus, "the evidence necessary to sustain" the MIDDD Claim is different from the evidence needed to prove the claims asserted in the USDC Case.  There is no identity of causes of action and the City cannot rely upon the doctrine of res judicata to bar the MIDDD Proof of Claim.

## II.     Evidence of Misrepresentation and Fraud is Established by Criminal Indictment and Conviction.

32.     The Debtor has offered no evidence that the amount of the MIDDD Claim is less than the amount asserted in the MIDDD Proof of Claim, or that there is any probability that the MIDDD Claim is invalid.

33.     As explained above, the Debtor's only basis for its assertion of invalidity—that the MIDDD Claim is barred by res judicata—is unfounded.  Thus, the Debtor's objection does nothing to overcome the *prima facie* showing of the validity or amount of the MIDDD Claim in

the MIDDD Proof of Claim. In any event, MIDDD is ready, willing and able to prove its claim

at an evidentiary hearing before this Court or the Macomb County Circuit Court.

34.     Evidence from the Criminal Case, including, but not limited to the conviction of

several City officials on the following of the 30 charges, establishes that representatives of the

City and DWSD had knowledge of the criminal enterprise:

> **Count 1: Racketeering conspiracy** From 2000-2009, Kilpatrick and Ferguson
> were part of a criminal enterprise that ran through City Hall in Detroit, called "the
> Kilpatrick Enterprise" by prosecutors. Contractors who sought work in the city had
> to include Bobby Ferguson or rig bids to make sure Ferguson got a portion of the
> work and the money, including DWSD contract CS-1368;
>
> **Count 2: Extortion, sewer lining contract** From 2002-2006, Kilpatrick and
> Ferguson received payments of more than $23.7 million in contract revenues from
> Inland Water Solutions, Inc related in large part to work done on the Macomb
> Interceptor System. A $50 million contract that was already approved by Detroit's
> Water and Sewerage Department was held up between 2002 and 2006 until Inland
> Water Solutions replaced their minority contractor with Ferguson, on Ferguson's
> terms; and
>
> **Count 3: Extortion, amendment to sewer lining contract** From 2004-2005,
> Kilpatrick and Ferguson received payments from Inland of about $175,000 in
> connection with an amendment to DWSD CS-1368.

35.     Further, with respect to damages, the City itself actually acknowledged that "the

$58 million amount that was allocated to the [15 Mile Project] was $27 million more than

NTH's[9] estimate of $31 million" if not for the criminal enterprise. Intervening Complaint ¶ 123.

The City even *adopted* MIDDD's claim that "as a result of inflated invoices submitted on the [15

Mile Project], the cost of repairs of the [15 Mile Project] was increased by at least $23 million"

in the USDC Case. Intervening Complaint ¶ 128. Having done so, the City cannot now deny

that the overcharges on which the MIDDD's principal claims in the MC Case are based at least

fall within the range of the $26 million set forth in the MIDDD Proof of Claim. Moreover, it is

---

[9]     NTH Consultants, Ltd. was hired to evaluate and design the repair of the 15 Mile Project. See Intervening
Complaint ¶ 85.

clear from the schedules to the Agreement that the Purchase Price paid by MIDDD included the costs of repairs of the 15 Mile Project. Thus, the City cannot reasonably dispute that MIDDD paid fraudulent overcharges and suffered substantial damages.

[*Remainder of Page Left Intentionally Blank*]

WHEREFORE the Macomb Interceptor Drain Drainage District respectfully requests the Court (i) enter an order overruling the Objection and allowing the MIDDD Claim in the amount of not less than $26 million, and (ii) grant any further relief in favor of the MIDDD that the Court deems proper.

Dated: June 18, 2014

DECHERT LLP

By:  /s/ Allan S. Brilliant
Allan S. Brilliant
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

*Attorneys for Macomb Interceptor Drain Drainage District*

Respectfully submitted,

KIRK, HUTH, LANGE & BADALAMENTI

By:  /s/ Raechel M. Badalamenti (P64361)
Raechel M. Badalamenti
Robert T. Carollo Jr.
19500 Hall Road, Suite 100
Clinton Township, MI 48038
Telephone: (586) 412-4900
Facsimile: (586) 412-4949
rbadalamenti@KHLBlaw.com

*Attorneys for Macomb Interceptor Drain Drainage District*