# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

## SYNCORA'S RESPONSE IN OPPOSITION TO ATTORNEY GENERAL'S MOTION TO QUASH SUBPOENA TO DEPOSE ATTORNEY GENERAL BILL SCHUETTE

Pursuant to the DIA Settlement,[1] the City proposes to transfer its multi-billion dollar art collection for a small fraction of its value. The City claims that this transaction — the so-called "cornerstone of the Plan" — is reasonable because it accurately reflects the uncertainty surrounding the City's ability to sell the art. As evidence of this uncertainty, the City relies on an opinion from the Attorney General (the "AG Opinion") concluding that the DIA Assets cannot be sold because they are held in a "charitable trust" for the people of Michigan. And, because the view of the Attorney General could ultimately prevail in any ensuing litigation, the City argues that its decision to enter into the DIA Settlement falls within the range of reasonableness.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Doc. No. 4392].

Thus, the AG Opinion played a critical role in the City's 9019 analysis and its decision to enter into the DIA Settlement. Yet, despite the City's reliance on the AG Opinion, the City is not offering the Attorney General as a witness. Accordingly, Syncora served a deposition subpoena on the Attorney General aimed at exploring the process underlying the AG Opinion. Though the City appears content to accept the AG Opinion at face value, it appears that the AG Opinion may have been the product of a hasty and flawed process influenced by input from the DIA and its attorneys from the beginning. If that is the case, then there may be compelling grounds to question the merits of the AG Opinion — and its attendant impact on the City's analysis of the DIA Settlement.

Despite the importance of the AG Opinion to the City's 9019 analysis, the Attorney General subsequently moved to quash Syncora's subpoena on relevance, burden, and privilege grounds. Each of these arguments is unavailing.

*First*, the weight to be accorded the AG Opinion by the City in deciding to enter into the DIA Settlement turns not just on the merits of the legal conclusions reached, but also the process undertaken in reaching it. Here, the City is <u>not</u> arguing that the AG Opinion bars it from selling the DIA Assets. Nor can it, given that the City does not concede the correctness of the AG Opinion. Instead, the City is pointing to the <u>existence</u> of the AG Opinion and contending that the AG Opinion, much like an expert opinion, portends a prediction of future outcomes

2

should it pursue a sale. But, much like an expert opinion, the weight that should be accorded to the AG Opinion depends on the Attorney General's methodology and sources. In fact, the Attorney General has an "Opinion Policy" intended to ensure a "thoroughly-researched" and "legally-sound" opinion. It is therefore necessary — and relevant — to explore the following topics as part of the Attorney General's deposition:

- The facts and information that the Attorney General did and did not consider;

- The source of those facts — *i.e.,* did the Attorney General rely solely on information that the DIA provided prior to the official opinion request;

- The Attorney General's compliance with its own internal Opinion Policy; and

- The initial impetus behind the Attorney General's decision to issue his opinion — *i.e.*, was it a response to a legitimate opinion request or initiated by the Attorney General's office for some other reason.

*Second*, though depositions of government officials are discouraged, they are nevertheless permitted under "extraordinary circumstances." This case, the largest chapter 9 case in history, presents just such a situation. In fact, the Court and the State already recognized the unique nature of this case when they allowed Governor Snyder to be deposed in connection with the eligibility trial. Given that the City cites the AG Opinion as one of the primary reasons it did not pursue a sale of its multi-billion dollar art collection — a sale that could increase creditor

3

recoveries and improve essential City services — extraordinary circumstances exist to justify deposing the Attorney General.

*Third*, the Attorney General has no legal basis to assert the deliberative process privilege, the work product doctrine, or the attorney-client privilege. To begin, the deliberative process privilege and the attorney-client privilege apply only to communications. Here, however, Syncora seeks to discover only what the Attorney General did and the facts he considered. Furthermore, this Court has already ruled that there is no common interest between the Attorney General and the DIA and thus all of the Attorney General's communications with the DIA are discoverable. Finally, the publication of the AG Opinion operates as a waiver of any applicable privileges.

Accordingly, Syncora respectfully requests that the Court deny the Attorney General's Motion to Quash.

## BACKGROUND

Michigan law, MCL 14.32, provides that "[i]t shall be the duty of the attorney general, when required, to give his opinion upon all questions of law submitted to him by the legislature, or by either branch thereof, or by the governor, auditor general, treasurer, or any other state officer . . . ." Typically, however, the Attorney General declines a request for an opinion when (a) the requestor is not a

person authorized to request an opinion under the applicable law or (b) the question is likely to be the subject of litigation in the near term.[2]

When the Attorney General receives a proper opinion request, the Attorney General and his team have a process in place to ensure that the resulting opinion is thoroughly-researched and legally-sound. That process is as follows:

> If [an] opinion request is granted, it is assigned to an assistant attorney general having recognized expertise in the relevant area of the law. This attorney is expected to prepare a thoroughly researched and well-written draft. The Assistant Attorney General for Law then reviews the draft to assure it is legally sound and performs any editing that may be needed before sending the draft to the Chief Legal Counsel. The draft also may be circulated to other attorneys within the Department of Attorney General for additional substantive review. Drafts of most formal opinions and some letter opinions are first submitted for consideration and approval by the Attorney General's Opinion Review Board (ORB), before submission to the Attorney General for his review. Given the time and attention accorded these matters, the opinions process may take several months to complete depending upon the complexity of the question presented.[3]

On June 11, 2013, Senate Majority Leader Randall Richardville requested an opinion from the Attorney General regarding the ability of the City to sell the DIA Assets to satisfy its debts and obligations. (Exhibit 6-A at attachment (b).) Just two days after receiving this request, the Attorney General issued his opinion

---

[2] *Opinions Policy,* State of Michigan Attorney General B. Schuette, http://www.michigan.gov/ag/0,1607,7-164-20988_20991-252325--,00.html (emphasis added) (last visited May 6, 2014).

[3] *See supra,* n.2.

concluding that the DIA Assets are held in a charitable trust and cannot be sold. (Ex. 6-A at attachment (a).)

On April 7, 2014, Syncora requested all documents from the Attorney General relating to the AG Opinion. In response, the Attorney General produced three documents and asserted the common interest privilege, the deliberative process privilege, the work product doctrine, and the attorney-client privilege over all other responsive documents. (Ex. 6-A, Responses to Syncora's Subpoena.) In connection with that production, the Attorney General produced a privilege log indicating that it had withheld numerous communications with the DIA. (Ex. 6-B, Privilege Log.)

On April 25, 2014, Syncora moved to compel the production of communications between the DIA and the Attorney General on the grounds that those documents were not protected by the common interest privilege. The Court found that there was no common interest between the Attorney General and the DIA and ordered the Attorney General to produce its communications with the DIA.[4]

A review of the communications between the Attorney General and the DIA reveals that they began communicating in early April 2013 — more than four

---

[4] Contrary to the statements in the Attorney General's Motion to Quash, the Court did not agree with the Attorney General's objections regarding his internal communications. Those communications were not at issue in Syncora's Motion to Compel.

6

months <u>before</u> Senator Richardville's official request that the Attorney General issue an opinion relating to the sale of the DIA Assets. (Ex. 6-C). That first communication reveals that the Attorney General had contacted counsel for the DIA and asked whether the DIA Assets could be sold to satisfy the debts of the City. In response, counsel for the DIA prepared a legal memorandum articulating several reasons why the DIA Assets could not be sold.

Over the next few months, counsel for the DIA and the Attorney General communicated more than 15 times. At the request of the Attorney General's staff, the DIA provided a number of documents, including the following:

- A legal memorandum authored by the DIA entitled "Selling the Detroit Institute of Arts Collection to Satisfy the City's Creditors: Legal and Practical Considerations";
- Legal research regarding the public trust doctrine;
- Codes of ethics for museums;
- The Association of Art Museum Directors' Policy on Deaccessioning;
- Historical information and documents relating to the DIA;
- A memorandum describing the impact of the DIA on the Detroit Economy and Residents; and
- A DIA Timeline of Events.

(Exhibits 6-D–6-J)

The communications further reveal that the Attorney General's office had a very short timeline to release the AG Opinion. And, because of this short timeline,

the Attorney General's office did not have sufficient time to incorporate or thoroughly review all of the materials the DIA provided. For example, on June 12, 2013, counsel for the DIA provided the Attorney General's office with 12 additional documents on the history of the DIA, including some that described the purpose of the DIA and individual restrictions on some of the gifts. While these documents provided important information regarding the DIA, the Attorney General's office lamented that, "[g]iven that our timeline shrunk yet again (possibly issuing tomorrow morning), I'm not sure we will have time to incorporate much. But its [sic] good to have nonetheless." (Ex. 6-K.)

Although much of the information from the DIA appears to have been utilized to draft the AG Opinion, nowhere in the opinion does the Attorney General mention that his office had frequently consulted with the DIA. Nor does the AG Opinion disclose that the Attorney General's office began researching the ability of the City to sell the DIA Assets well before Senator Richardville actually submitted his request.

After the Court ordered the production of the communications between the Attorney General's office and the DIA, the Attorney General issued a press release attempting to justify those communications. According to the Attorney General, he "watched the financial situation in Detroit carefully and anticipated this matter

would come down the pike. That's why he took action on to prepare for it . . . He feels very strongly that no great city sells its art."[5]

## ARGUMENT

The Attorney General seeks to quash Syncora's deposition subpoena on the grounds that (a) the process underlying the AG's Opinion is not relevant; (b) "extraordinary circumstances" do not justify the undue burden that a one-day deposition would impose on the Attorney General; and (c) the process underlying the AG Opinion is protected by the deliberative process privilege, the work product doctrine, and the attorney-client privilege. As discussed below, each of these arguments fail.

*First*, the process underlying the AG Opinion goes to the merit and persuasiveness of that opinion. While the Attorney General claims that the opinion speaks for itself, the conclusion cannot be divorced from the process.

*Second*, depositions of high-ranking officials are permitted where extraordinary circumstances exist and the official has first-hand knowledge about the relevant facts. Where, as here, the AG Opinion is being utilized in the largest Chapter 9 case in history to protect a multi-billion dollar asset from sale, extraordinary circumstances exist. Furthermore, as the Attorney General concedes,

---

[5] *See, e.g.,* Nathan Bomey and Mark Stryker, *Documents Reveal DIA, Schuette talked months before Detroit bankruptcy*, Detroit Free Press, May 1, 2014.

he "studied the factual information at issue in the DIA matter," and thus he alone can testify about the facts he relied upon and the process he undertook.

*Third*, the variety of privileges asserted by the Attorney General do not apply where, as here, Syncora seeks to depose him regarding (a) his communications with the DIA and (b) the process that led to the issuance of the AG Opinion. Moreover, with the publication of the AG Opinion, the Attorney General waived any privileges that may apply to the Attorney General's internal processes.

### A. Information Relating to the Process Underlying the Attorney General Opinion is Relevant to the Merit of that Opinion and the Reasonableness of the DIA Settlement.

In support of his Motion to Quash, the Attorney General claims that his "opinion speaks for itself and stands on its own." (Mot. at 15.) As a result, any inquiry into the process by which the AG opinion was reached is, according to the Attorney General, "both intrusive and legally irrelevant." (*Id*. at 12 (emphasis in original).)

As with any opinion, however, the process that leads to the conclusion is as important — and often more important — than the conclusion itself. Indeed, even the Attorney General mandates that his office follow certain procedures intended to ensure the issuance of opinions that are "thoroughly-researched" and "legally-

10

sound."[6] Given the intimate connection between a sound process and a defensible opinion, the process underlying the AG Opinion is highly relevant to the merit of that opinion.

To test the AG Opinion, Syncora intends to depose the Attorney General on the general process that led to the issuance of the opinion and, in particular, his compliance with the Attorney General's Opinion Policy. In fact, based on Attorney General's own document production, it appears as though the Attorney General's office failed to comply with its own internal policies. For example, there is no evidence that (a) the initial drafting of the opinion was performed by an assistant attorney general with expertise in the relevant area of law; (b) the draft was circulated to other attorneys within the Department of the Attorney General for review; or (c) the opinion was submitted to the Attorney General's Opinion Review Board. In addition, the AG Opinion addresses an issue that is likely to be, and currently is, the subject of litigation — in further contravention of the Opinion Policy. Indeed, the Attorney General concedes as much by invoking the protections of the work-product doctrine.

Finally, the documents produced by the Attorney General reveal that the AG Opinion may have been written in a compressed time frame that did not allow for a thorough review of all relevant materials. Though the Opinion Policy notes that

---

[6] *See supra*, n. 2.

the "opinion process may take several months to complete depending on the complexity of the question presented," the AG Opinion was issued just two days after the Attorney General received Senator Richardville's request.

In addition, Syncora also intends to ask the Attorney General about the information and research that he relied upon. In particular, it appears as though much of the information that the Attorney General utilized to draft the AG Opinion was provided by the DIA. Indeed, the DIA provided numerous legal memorandum concluding that the DIA Assets could not be sold. The DIA, of course, had a vested interest in the Attorney General's ultimate opinion. If, however, the Attorney General relied solely on the DIA for its information — without any independent research or analysis — then there may be reason to doubt the merit of the AG Opinion.

Syncora also intends to question the Attorney General regarding his motivation for issuing the AG Opinion. As Michigan law makes clear, the Attorney General may provide an opinion only when a question is submitted by the state legislature or another government official. Here, however, the Attorney General appears to have initiated the drafting process months before receiving Senator Richardville's request. If that is true, then the Attorney General may have violated Michigan law governing the issuance of opinions. Moreover, it calls into question the impetus behind the Attorney General's decision to issue the AG

Opinion (*i.e.*, was it a political decision rather than a response to a legitimate opinion request).

Finally, just yesterday, the Attorney General filed a declaration and letter formally approving the DIA Settlement [Doc. 5338]. Exploring the reasons for his approval is yet another reason that his deposition is relevant.

In light of the above, it is critical that Syncora have the opportunity to explore the process underlying the AG Opinion. If, as Syncora suspects, the AG Opinion resulted from a flawed process, then the weight to be accorded to the conclusions reached therein is subject to additional attack. And, if Syncora can demonstrate that the view of the Attorney General is lacking in merit, then the City's reliance on that decision — and its attendant effect on the decision to convey the DIA Assets for significantly less than their market value — will be further undercut.

### B. Extraordinary Circumstances Justify the Deposition of the Attorney General.

The Attorney General claims that Syncora's subpoena should be quashed because it will pose an undue burden on the Attorney General. (Mot. at 9.) In most of the cases cited by the Attorney General, the courts refused to allow the depositions of high-ranking government officials. As these courts held, such depositions were not warranted because the party seeking the deposition was not able to demonstrate the requisite "extraordinary circumstances" because they could

13

not identify with particularity the information they needed or establish that the information was not available from other sources. *See, e.g., Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013). In this case, however, each of those prerequisites is satisfied.

*First*, as discussed above, Syncora is able to identify with particularity the exact information it seeks from the Attorney General. Specifically, Syncora seeks further clarity surrounding the process that led to the issuance of the AG Opinion.

*Second*, the Attorney General alone has first-knowledge regarding (a) the facts and information that he relied upon to issue the AG Opinion; and (b) the exact process that he undertook when drafting and issuing that opinion. Though the Attorney General claims that he "has no first-hand knowledge of the facts underlying the legal status of the DIA's art collection," that argument misses the mark. The relevant inquiry here relates to the facts relating to the issuance of the AG Opinion. And, as the Attorney General concedes, he "studied the factual information at issue in the DIA Matter." (*Id.* at 16.) The purpose of the deposition, at least in part, is to explore exactly what factual information he studied.

*Third*, this case is readily distinguishable from the other cases cited by the Attorney General. As noted both here and elsewhere, this case involves the largest chapter 9 bankruptcy in history. Indeed, both the Court and the State already

14

recognized the unique nature of this case when they allowed Governor Snyder to sit for a deposition during the eligibility trial. In addition, the Attorney General's testimony relates to the City's decision to transfer billions dollars of the City's assets — in apparent <u>contravention</u> of his opinion. Last, the Attorney General's approval of the DIA Settlement is a necessary condition of the DIA Funding Parties' participation.

### C. Syncora's Subpoena Does Not Require the Disclosure of Privileged Information.

#### 1. Syncora's Subpoena Does Not Violate the Deliberative Process Privilege.

The Attorney General argues that Syncora's subpoena is an improper attempt to invade the deliberative process privilege. (Mot. at 13-17.) According to the Attorney General, the deliberative process privilege protects all information relating to the process surrounding the drafting and issuance of the AG Opinion and Syncora's subpoena should therefore be quashed. (*Id.* at 17.) However, this expansive and absolute reading of the deliberative process privilege is not supported by the applicable case law.

To begin, the deliberative process privilege applies only to "*communications* during the deliberative process that are part of the decision-making process of a government agency."[7] (*Id.* at 13.) Here, however, Syncora does not seek internal

---

[7] The scope of the deliberative process privilege cited by the Attorney General is similar to the deliberative process privilege exemption codified at MCL 15.243(1). MCL 15.243 provides

communications. Instead, as detailed above, Syncora will depose the Attorney General regarding what he personally did. Moreover, the communications sought do not relate to the "decision" by the Attorney General to issue the opinion, but rather to the opinion itself.

In addition, "[t]he deliberative process privilege does not protect material that is purely factual." *Truel v. City of Dearborn*, 291 Mich. 125, 136 (Mich. App. Ct. 2010). And, as the City concedes, the "Attorney General studied the factual information at issue in the DIA Matter." (Mot. at 16.) Thus, to the extent Syncora questions the Attorney General about the factual information he considered, that information is not protected by the deliberative process privilege.

Finally, even if the deliberative process privilege applies, "it can be overcome by a sufficient showing of need." *Truel*, 291 Mich. at 136. "This need determination is to be made flexibly on a case-by-case, ad hoc basis. The court must balance the evidentiary need against the harm that could result from disclosure, taking into account such factors as the relevance of the evidence, the availability of other evidence, the seriousness of the case, the role of the government, and the chilling effect on future government action." *Id*. As discussed above, many of these factors — including the relevance of the evidence,

---

that a public body may exempt from disclosure "[c]ommunications and notes within a public body or between public bodies of an advisory nature to the extent that they cover other than purely factual materials and are preliminary to a final agency determination of policy or action."

16

the need for it, and the seriousness of the case — weigh in favor of disclosure. Thus, even if the Court decides that the deliberative process applies to the testimony-at-issue, the Attorney General should not be able to assert it in this instance.

### 2. Syncora's Subpoena Does Not Violate the Work Product Doctrine.

The Attorney General also seeks to quash the subpoena on the grounds that it violates the work product doctrine. (Mot. at 17.) According to the Attorney General, the work product doctrine applies here because Syncora's subpoena seeks the Attorney General's thoughts, strategy, and opinions. While the work-product doctrine may have applied at one point to certain information, the Attorney General's subsequent publication of his opinion constitutes a waiver of that privilege.

Under the work product doctrine, discovery documents and other tangible things prepared by a party or his representative in anticipation of litigation are typically protected from disclosure. FED. R. CIV. P. 26(b)(3). Work product protection may, however, be implicitly waived by affirmative use of the work product to advance a party's interests. *United States v. Nobles*, 422 U.S. 225, 239-40 (1975); *see also* 6 Moore's Federal Practice § 26.70[6][c] at 26 (3d ed. 1997) ("A party also impliedly waives work product protection if it places the substance of the documents for which the protection is claimed at issue.").

In *Harding v. Dana Transport, Inc.*, for example, the court found that the company impliedly waived work-product protection when it placed an internal investigation into issue by asserting a Title VII defense based in part upon the company's reasonable investigation into the plaintiff's claims. 914 F.Supp. 1084, 1096 (D. N.J. 1996). In that situation, the court held that justice demanded that the plaintiffs be permitted to respond to the allegation of reasonable investigation "with a full spectrum of information." *Id.*

Here, as in *Harding*, the Attorney General waived work product protection when it published the AG Opinion. As a result of that opinion, the Attorney General put into issue the process underlying the opinion. Moreover, fairness demands that Syncora and the other creditors have the opportunity to fully and fairly respond to the City's arguments regarding the <u>weight</u> to be accorded the AG Opinion — an opportunity that they will not have without some insight into the process underlying the drafting of the AG Opinion.

### 3. Syncora's Subpoena Does Not Violate the Attorney-Client Privilege.

Finally, the Attorney General argues that its communications are protected by the attorney-client privilege. (Reply at 18-19.) However, as with each of the above privileges, this too fails.

First, like the Attorney General's claims of work product protection, the attorney-client privilege is also subject to waiver. *See In re Columbia/HCA Corp.,*

18

293 F.3d 289, 306 (6th Cir. 2002) ("there is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege."). And here, because the Attorney General has put at issue his opinion, he cannot now shield the communications that resulted in it.

Second, as noted above, Syncora intends to question the Attorney General regarding his communications with the DIA. As this Court has already found, however, there is no common interest between the Attorney General and the DIA. Therefore, those communications are subject to discovery.

*[Remainder of this page intentionally left blank]*

Dated: June 18, 2014                    Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*