<u>**Exhibit 6-A**</u>

**Response and Objections to Subpoena to Produce Documents**



**BILL SCHUETTE**
ATTORNEY GENERAL

P.O. BOX 30754
LANSING, MICHIGAN 48909

April 21, 2014

*Via First-Class Mail*

McDonald Hopkins PLC
39533 Woodward Avenue, Suite 318
Bloomfield Hills, MI 48304

      Re:    *In re: City of Detroit, Michigan*
             Docket No. 13-53846

Dear Sirs:

      Enclosed herewith and served upon you please find the *Attorney General's Response and Objections to Subpoena to Produce or Permit Inspection,* with *Proof of Service* thereof.

      If you have any questions or concerns with regard to the enclosures, please do not hesitate to contact my office.

                          Very truly yours

                          Michael R. Bell
                          Assistant Attorney General
                          Revenue & Collection Division
                          517.373.3203

MRB:tjm
Enclosures

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

CITY OF DETROIT MICHIGAN,

Debtor.

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

---

## PROOF OF SERVICE

I hereby certify that I have mailed by United States Postal Service the *Attorney*

*General's Response and Objections to Subpoena to Produce or Permit Inspection* to

the following:

McDonald Hopkins PLC
39533 Woodward Avenue, Suite 318
Bloomfield Hills, MI 48304

/s Michael R. Bell (P47890)
Assistant Attorney General

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN,

Debtor.

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

## ATTORNEY GENERAL'S RESPONSE AND OBJECTIONS TO SUBPOENA TO PRODUCE OR PERMIT INSPECTION

Attorney General Bill Schuette hereby responds and objects, in part, to Syncora's March 28, 2014 subpoena (Dkt. #3315).

### RESPONSE

1. On April 7, 2014, Syncora served the Attorney General with a subpoena dated March 28, 2014. Exhibit A of the subpoena included six document requests. Both the Attorney General and the State of Michigan have separately appeared in this Chapter 9 case through their respective counsel, and an ethical wall has been erected between these parties. Because of this wall, this pleading responds only to document request No. 1, requesting

"[a]ll documents and communications relating to Attorney

General's Opinion No. 7272." It is the Attorney General's

understanding that counsel for the State will respond to document

request Nos. 2 – 6.

2. Enclosed are three responsive documents, which the Attorney

General now produces:

    a. Attorney General Opinion No. 7272;

    b. Request for Attorney General Opinion from Senate Majority
       Leader Randy Richardville; and

    c. Common Interest Agreement between Attorney General and
       the Detroit Institute of Arts.

3. Any other responsive documents are privileged.

## OBJECTIONS

4. Under Fed. R. Civ. P. 45(d)(2)(B), the Attorney General objects to

document request No. 1 as it requests documents and

communications that are protected by the attorney-client, work-

product, deliberative process, common-interest, and other

privileges.

5. The Attorney General objects to producing the following categories
   of documents, which are privileged materials subject to the
   attorney-client, work-product, and deliberative-process privileges:

   a. Ten internal communications between assistant Attorneys
      General regarding Attorney General Opinion No. 7272.

   b. Eighteen drafts of Attorney General Opinion No. 7272.

6. The Attorney General also objects to producing eleven
   communications (some of which include attached documents)
   between the Attorney General and counsel for the Detroit
   Institute of Arts, which are protected by a Common Interest
   Agreement between the Attorney General and the Detroit
   Institute of Arts and are privileged under to the following
   privileges: attorney-client, work-product, common-interest, and
   deliberative-process.

   a. The Common Interest Agreement between the Attorney
      General and the Detroit Institute of Arts covers all materials
      exchanged "in connection with, relating to, or arising from
      potential litigation involving protecting the art collection of
      the Detroit Institute of Arts." (Agreement preamble, p. 1.)

   b. Paragraph C defines the term "Covered Communications
      and Information" expansively "to include, but not be limited
      to, oral and written communications between counsel,
      clients, witnesses, and other persons employed or retained
      by the Parties and their counsel, memoranda of law, factual

summaries, documents, and any other information in any form . . . ." (Agreement, p. 2.)

c. Paragraph F of the Agreement requires the parties to take all necessary steps to protect the covered materials, including the appropriate invocation of any applicable privilege available under governing law. (Agreement, p. 3.)

d. Paragraph K applies to materials exchanged "prior to the execution of this Agreement and is intended as the written embodiment of any prior understanding and agreement reached by and among the Parties." (Agreement, p. 3.)

e. Paragraph U acknowledges that the Agreement is "to be broadly construed so as to fully protect and preserve, to the fullest extent permitted by law, the confidentiality and secrecy of Covered Communications and Information." (Agreement, p. 5.)

Respectfully submitted,

Bill Schuette
Attorney General

/s B. Eric Restuccia (P49550)
Deputy Solicitor General
Counsel of Record

Michael Bell (P47890)
William R. Bloomfield (P68515)
Assistant Attorneys General

The following opinion is presented on-line for informational use only and does not replace the official version.

# STATE OF MICHIGAN

## BILL SCHUETTE, ATTORNEY GENERAL

DETROIT INSTITUTE OF ARTS:          Conveyance or transfer of Detroit
                                            Institute of Arts collection.

CITY OF DETROIT:
CHARITABLE TRUSTS:

NONPROFIT CORPORATIONS ACT:

The art collection of the Detroit Institute of Arts is held by the City of Detroit in charitable trust for the people of Michigan, and no piece in the collection may thus be sold, conveyed, or transferred to satisfy City debts or obligations.

Opinion No. 7272                         June 13, 2013

Honorable Randy Richardville
State Senator
The Capitol
Lansing, MI 48909

You have asked whether the art collected and displayed at the Detroit Institute of Arts may be sold, transferred, or otherwise disposed for the purpose of satisfying debts or obligations of the City of Detroit (City) unrelated to the operation or purpose of the Detroit Institute of Arts.

The Detroit Institute of Arts (museum) is an encyclopedic museum with an expansive collection of art. "The [museum's] collection is among the top six in the United States, comprising a multicultural and multinational survey of human creativity from prehistory through the 21st century."[1][1] The museum is located in the City's Cultural Center Historic District, which is listed in the National Register of Historic Places.[2][2] The museum is operated by a nonprofit corporation, the Detroit Institute of Arts Founders Society (Founders Society).

The City itself is presently under the administration of an emergency manager as provided for in the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 *et seq.* That act allows the emergency manager to sell, convey, or otherwise

transfer assets of the City, if such is provided for in the manager's financial and operating plan,[3][3] or otherwise with the prior written approval of the Governor. MCL 141.1552(r).[4][4] As your request notes, some have suggested that the museum's art collection, to which the City has legal title, could be sold under this act in order to satisfy debts or obligations owed by the City, but unrelated to the art collection or the museum.[5][5]

Before addressing your question, it is helpful to provide an overview of the museum's creation and present operations.

## I.    Historical Overview of the Detroit Institute of Arts.

The museum was incorporated by its founding members as a nonprofit charitable corporation 128 years ago pursuant to legislation enacted in 1885. In that year, the Michigan Legislature enacted 1885 PA 3, an "[a]ct for the formation of corporations for the cultivation of art." The act provided that a group of individuals could "become a body corporate" for "the purpose of founding a public art institute" "in the manner and for the purposes . . . set forth" in the act. Section 1, CL 1915, § 10759. The act stated that the corporation must have articles of incorporation setting forth its purpose, Section 2, CL 1915, § 10760, and further provided that:

> Such corporations shall have power . . . to receive, acquire, collect, and own paintings, sculpture, engravings, drawings, pictures, coins, and other works of art, and to institute, maintain, or assist schools for the teaching of art.

> *The public exhibition of its collection of works of art shall be the duty of every such corporation,* and, as soon as it shall be prepared to do so, it shall, under reasonable regulations, and without any improper discriminations, *open its buildings and art collection to the general public.* [1885 PA 3, Sections 3 and 4, CL 1915, §§ 10761, 10762; emphasis added.]

The property of the corporation would be tax exempt, Section 18, CL 1915, § 10776, and the corporation would be managed by a board of trustees who served without compensation. Sections 6 through 11, CL 1915, §§ 10764 - 10769. The act required that "all gifts, devises, or requests" be "faithfully used for the purposes" of the corporation, and "no dividend in money or property" could be made among the corporation's members. Section 15, CL 1915, § 10773. The corporation was prohibited from changing

its "character and purposes," and from selling "its general art collection." Section 16, CL 1915, § 10774. And the corporation could only wind up its affairs if provided for by law. *Id.*

The museum, then known as the Detroit Museum of Art, was incorporated on April 16, 1885, pursuant to these requirements, and set forth its purpose in its articles of incorporation as "for the founding of a public art institute in the City of Detroit, which may . . . receive and use such gifts, contributions, devises and bequests as may be made for art purposes: receive, acquire, collect and own paintings, sculpture, engravings, drawings, pictures, coins and other works of art, and may do all things authorized by said Act . . . ." 1885 Articles of Incorporation, Detroit Museum of Art.[6][6] The museum immediately thereafter began acquiring pieces of art for its collection through purchases, gifts, donations, and bequests.

Not long after the museum's incorporation, the Legislature passed various acts empowering the City to appropriate money to support the museum, and to issue bonds for the construction of buildings. This expenditure of public money on behalf of the museum, a private nonprofit corporation, raised concerns and a lawsuit was filed. See *Detroit Museum of Art v Engel*, 187 Mich 432, 434-435; 153 NW 700 (1915). During this time period, the museum had conveyed its buildings and real estate to the City. (No art was conveyed to the City given the express prohibition in the incorporating legislation). However, the museum retained control of its collection and operation. *Detroit Museum of Art*, 187 Mich at 435.

The Michigan Supreme Court ultimately concluded that these appropriations violated the 1908 Constitution's restrictions on a city's lending of credit to an entity other than a public or "municipal agency." *Id.* at 439-443. The Court agreed that the museum served a "public purpose," but did not find that fact or the fact that the museum had conveyed its buildings and real property to the City dispositive since it did "not change the museum's character as a private corporation." *Id.* at 440. Presumably, after this decision, the museum no longer received appropriations from the City, and the museum apparently began to struggle financially. In response, in 1919 the Legislature amended 1885 PA 3, as amended by 1913 PA 245, to allow corporations formed under that act to convey their property. 1919 PA 67 provided that a "corporation organized under [1885 PA 3] situated in a city empowered to maintain a public art institute . . . may convey all or any of its property to said city. . .and said property so conveyed shall . . . be faithfully used for the purposes for which such corporation was organized . . . ." Section 20. 1885 PA 3, 1913 PA 245, and 1919 PA 67 were subsequently repealed by 1921 PA 84, as part of the consolidation of corporations law, but were subject to the savings provision in that act.

Pursuant to this statutory authorization and the City's 1918 Charter, which authorized the City to operate an art institute and to acquire art for the institute, Charter XIX, Sections 1, 7, the museum, in its corporate capacity as the Detroit Museum of Art, conveyed its buildings and art collection to the City in 1919. With the legal transfer of the properties and art collection to the City, the City was now free to support the museum; and it did so by funding both museum operations and by purchasing new art for the collection. The nonprofit corporation, however, did not wind up its affairs but rather continued to exist to assist the museum with gifts of art and with support of museum operations and their costs. That nonprofit corporation exists today as the Founders Society, as noted above.

Over the ensuing years, the museum's structure and funding sources changed as needed based on changing circumstances. By 1955, the City began to encounter financial problems, and its acquisitions for the museum collection largely ceased. In 1973, the museum temporarily closed due to lack of funding. Shortly thereafter, in 1977, the State began granting money to the City so that the museum could continue operating. In 1983, the City claimed greater control over the museum's operations: museum employees became employees of the City. These events led to the issuance of an opinion by Attorney General Frank Kelley, which confirmed the validity of State appropriations or grants to the City for the benefit of the museum.

In confirming State support for the museum, Attorney General Kelley recognized the museum's state or "public purpose" and status as a unique, cultural treasure of the people of Michigan:

> Unquestionably, and uniquely in Michigan, the Detroit Institute of Arts, as a widely acclaimed cultural facility, is utilized by the citizens of this state without regard to residency in the city. The facility is an outstanding tourist attraction utilized by tourists and their families. Its vast displays and cultural facilities are readily and regularly available to Michigan students. Both the Governor in his Executive Budget, and the Legislature in the enactment of appropriations for the support of the Detroit Institute of Arts, have recognized its place in the cultural life of this state. [OAG, 1983-1984, No 6225, pp 303, 308 (May 7, 1984).]

Following the Attorney General's opinion, state grants for the museum continued; though by the 1990s, these grants began decreasing. From 1977 through 2011, state funding for the museum totaled roughly $300 million.

In 1997, the structure and operation of the museum changed again. Under a 1997 Operating Agreement, the City maintained its legal title to the art collection, but transferred operations – and their entire cost – back to the Founders Society. From 1997 to the present, the museum has operated under this Agreement. And despite the Founders Society's best efforts to support the museum with charitable dollars, it continued to face financial difficulties. In 2010, the Legislature enacted the Art Institute Authorities Act, 2010 PA 296, MCL 123.1201 *et seq*. This act authorized the establishment of an art institute authority for the levying of property taxes to support "art institute[s]" like the museum. MCL 123.1205.[7][7] In November 2012, voters of Oakland, Macomb, and Wayne Counties passed the millage to help support the museum. This millage supplements the museum's charitable endowment and regular charitable contributions.

## II.    Present Operations.

To address your question, a closer examination of the 1997 Operating Agreement is also required. Other helpful documents include the Museum's Collections Management Policy, which is referenced in the Operating Agreement; the ethical policies governing both American and international museums; and the accounting practices that apply to museum art collections.

### A.    1997 Operating Agreement.

The 1997 Operating Agreement, which expires in 2018, currently governs the relationship between the Founders Society and the City. The Operating Agreement is referenced explicitly in the City's charter: "The Arts Department shall maintain and operate the Detroit Institute of Arts directly or pursuant to an operating agreement." 2012 Charter for the City of Detroit, § 7-301.

Several sections of the Operating Agreement are relevant to the ownership and disposition of the art collection.

Section E. of the Operating Agreement specifies that the City retains ownership of the art collection, the museum properties, and any newly acquired art. And Section F.12. requires the Founders Society to use best efforts to solicit gifts and donations of works of art for the benefit of the museum.

Section F.2.(a) of the Operating Agreement cedes responsibility for managing the City's art collection to the Founders Society in accord with the museum's Collections Management Policy, which is discussed below. In addition, Section F.2.(b) cedes the right to acquire and dispose of the museum's works of art to the Founders Society; providing that any funds it receives from any sale must be used solely to purchase other works of art for the art collection. In consideration for exclusive right to manage the museum and control the artwork, subject to the terms of the agreement, the Founders Society assumed full responsibility for all operating expenses of the museum, as well as other obligations that had previously been the responsibility of the City, including "management of the art collections; presentation of exhibitions and other events; maintenance of the museum building, the Frederick lot . . . and the employee parking lot; collection and expenditure of income; fundraising; marketing; acquisition/disposition of works of art; and all other financial operations . . . ." Section D.3. Although the City retains legal title to the museum and its artwork, the sale of the artwork by the City is not permitted under the Operating Agreement and would seriously undermine the ability of the Founders Society to fulfill its contractual responsibilities.

## B. Collections Management Policy.

The museum's Collections Management Policy, to which Section F.2.(a) of the Operating Agreement requires the Founders Society to adhere, includes language restricting the disposition of the art collection.

Section V.A. states: "In considering objects or groups of objects, the Museum must be ever aware of its role as trustee of the collection for the benefit of the public." Section V.E. similarly states: "The manner of disposition should be in the best interest of the Museum, the public it serves, the public trust it represents, and the scholarly and cultural communities it serves." Section V.F. limits the use of the disposition proceeds: "Net proceeds derived from the sale of a deaccessioned object (i.e., the proceeds of the disposition less all related expenses) shall not be used as operating funds. Such net proceeds shall be placed in the selling curatorial department's Art Acquisition Fund . . . ."

## C. Professional Codes of Ethics.

The museum's Collections Management Policy, which views museum assets as being held in "public trust"[8][8] and which strictly limits deacquisition of art, is in accord with the professional codes of ethics adopted by the American Alliance of Museums and the International Council of Museums.[9][9] Relevant sections from these ethical codes follow.

The American Alliance of Museum's Code of Ethics (adopted 1991, amended 2000) states:

> Taken as a whole, museum collections and exhibition materials represent the world's natural and cultural common wealth. As stewards of that wealth, museums are compelled to advance an understanding of all natural forms and of the human experience. It is incumbent on museums to be resources for humankind and in all their activities to foster an informed appreciation of the rich and diverse world we have inherited. It is also incumbent upon them to preserve that inheritance for posterity.
>
> Museums in the United States are grounded in the tradition of public service. They are organized as public trusts, holding their collections and information as a benefit for those they were established to serve. . . .
>
> ***
>
> [D]isposal of collections through sale, trade or research activities is solely for the advancement of the museum's mission. Proceeds from the sale of nonliving collections are to be used consistent with the established standards of the museum's discipline, but in no event shall they be used for anything other than acquisition or direct care of collections.[10][10]

The International Council of Museums' Code of Ethics (adopted 1986, amended 2001, and revised 2004) gives similar principles:

> Principle 2: Museums that maintain collections hold them in trust for the benefit of society and its development.
>
> * * *
>
> Principle 2.16: Museum collections are held in public trust and may not be treated as a realizable asset. Money or compensation received from the deaccessioning and disposal of objects and specimens from a museum collection should be used solely for the benefit of the collection and usually for acquisitions to that same collection.[11][11]

### D. **Accounting Practices.**

In accord with the view that museum art collections are held in trust for the public and are not financial assets of the museum, neither the City nor the Founders Society

have capitalized the art collection. In other words, the art collection is not considered on either the City's or the Founders Society's books as an asset with a monetary value because, though these assets have substantial monetary value, they are not assets that can simply be sold; rather, they are subject to the strict deaccessioning policies discussed above.

The decision not to capitalize the art collection accords with the American Association for State and Local History's policy against capitalization of museum collections. It also accords with the accounting principles of both the Financial Accounting Standards Board and the Governmental Accounting Standards Board, which each allow the non-capitalization of museum collections. See FASB, No. 116, ¶¶ 11-13; GASB No. 34. By contrast, the City has capitalized other City works of art that are outside the museum's collection; the City's 2012 Comprehensive Annual Financial Report lists these works of art as capital assets valued at $29.8 million.[12][12] It is understood that such works of art include the City's "Spirit of Detroit" statue, the Joe Louis "fist," and other works of art in City buildings.

## III. The art collection is held in charitable trust and may not be sold to satisfy City debts.

Against this backdrop, you ask whether the art collected and displayed at the museum may be sold or transferred for purposes of satisfying debts or obligations of the City unrelated to the collection or the museum. The answer to this question is no. As explained below, this question is governed by the law of charitable trusts.

### A. Michigan law favors the creation of charitable trusts.

Michigan charitable trust law is rooted in the common law. Much of that law is now codified in various statutes, such as the Supervision of Trustees for Charitable Purposes Act, 1961 PA 101, MCL 14.251 *et seq.*, the Charitable Gifts Act, 1915 PA 280, MCL 554.351 *et seq.*, the Nonprofit Corporation Act, 1982 PA 162, MCL 450.2101 *et seq.*, and the Estates and Protected Individuals Code (EPIC), 1998 PA 386, MCL 700.1101 *et seq.* Though the museum was incorporated before many of these statutes were enacted, the basic principles of charitable trust law are uniform and longstanding.

A Michigan court observed decades ago that "'[c]haritable gifts and trusts are favorites of the law and of the courts, and the courts will declare valid, and give effect to, such gifts and trusts where it is possible to do so . . . .'" *In re Rood's Estate*, 41 Mich

App 405, 422; 200 NW2d 728 (1972), quoting 14 CJS, Charities, § 6, p 427. The Supervision of Trustees for Charitable Purposes Act echoes this sentiment, providing that "[i]t is hereby declared to be the policy of the state that the people of the state are interested in the administration, operation and disposition of the assets of all charitable trusts in the state." MCL 14.251. That act further provides that the "act, in all of its provisions, in the interests of society and in conformity with public policy is intended to protect the rights and interest of the people of the state and the uncertain and indefinite beneficiaries of all charitable trusts . . . ." MCL 14.265.[13][13]

The EPIC defines the word "trust" in the following way:

"Trust" includes, but is not limited to, an express trust, private or *charitable*, with additions to the trust, wherever and however created. Trust includes, but is not limited to, a trust created or determined by judgment or decree under which the trust is to be administered in the manner of an express trust. [MCL 700.1107(n); emphasis added.]

Case law confirms this, concluding that the term "trust" is not limited to express trusts and extends to corporations created to administer trusts. See *In re Americana Foundation*, 145 Mich App 735; 378 NW2d 586 (1985).

The EPIC defines a "charitable trust" as "a trust . . . created for a charitable purpose described in section 7405(1)." MCL 700.7103(c). Section 7405(1), MCL 700.7405(1), in turn, provides that a charitable trust "may be created for the relief of poverty, the advancement of education or religion, the promotion of health, scientific, literary, benevolent, governmental, or municipal purposes, . . . or other purposes the achievement of which is beneficial to the community." See also Restatement (Third) of Trusts §§ 27-28 (2003); 15 Am Jur 2d, Charities, §§ 5 and 32. Section 2(b), MCL 14.252 (b), of the Supervision of Trustees for Charitable Purposes Act similarly defines "charitable trust" as "the relationship where a trustee holds property for a charitable purpose." While neither of these Acts expressly mention art museums, the public exhibition of art is generally considered a charitable purpose. See 15 Am Jur 2d, Charities, § 49. See also *Hardman v Feinstein*, 240 Cal Rptr 483, 486 (Cal Ct App 1987) ("Art museums advance education and therefore serve a charitable purpose."). In fact, charitable trusts and nonprofit corporations "are the organizational structures generally available to private museums." Sara Tam, Note, In Museums We Trust: Analyzing the Mission of Museums, Deaccessioning Policies, and the Public Trust, 39 Fordham Urb L J 849, 855-856 (2012).

These more recent statutory iterations of the term "charitable trust" are consistent with the Michigan Supreme Court's past descriptions. In *Scarney v Clarke*, 282 Mich 56, 63-64; 275 NW 765 (1937), the Court observed:

In 2 Restatement of the Law of Trusts, p 1096, § 349, it is said:

"A charitable trust may be created by (a) a declaration by the owner of property that he holds it upon a charitable trust; or (b) a transfer inter vivos by the owner of property to another person to hold it upon a charitable trust."

\* \* \*

In charitable trusts, the public is the beneficiary. A distinguishing characteristic of such a trust is that the prospective beneficiary is undetermined and unknown, and while such a trust need not be for the benefit of the entire public, yet it must be public in nature and for unascertained beneficiaries. [See also *Scudder v Security Trust Co*, 238 Mich 318; 213 NW 131 (1927) (discussing requirements for creation of charitable trust).]

Historically, to create a charitable trust, no specific words needed to be used, rather "'[i]t [was] sufficient . . . to show[ ] an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable.'" *Knights of Equity Memorial Scholarships Comm v University of Detroit*, 359 Mich 235, 242-243; 102 NW2d 463 (1960) (affirming that agreement between voluntary association and university created a charitable trust), quoting 4 Scott, Trusts (2d ed.) § 351, at 2574. See also *In re Rood's Estate*, 41 Mich App at 413 ("A determination that a charitable trust is created needs only a finding that 'some charitable purpose' exists.") and *In re Americana Foundation*, 145 Mich App at 738-739. The EPIC similarly does not require any particular words be used to create a trust, MCL 700.7401(1) and MCL 700.7402, and a trust may even be created through oral statements, MCL 700.7407.

In general, any legal entity, including a municipality, may serve as trustee of a charitable trust. Restatement (Third) of Trusts, § 33; 15 Am Jur 2d, Charities § 83. The Supervision of Trustees for Charitable Purposes Act defines "[t]rustee" to "mean [ ] any individual, group of individuals, association, foundation, trustee corporation, or *other legal entity* holding property for any charitable purpose." MCL 14.252(a) (emphasis added). See also *Hardman*, 240 Cal Rptr at 485-486 (Fine Arts Museums

of San Francisco is charitable trust administered by City of San Francisco as trustee).
A city may thus act as trustee of a charitable trust established for the purpose of
maintaining and operating an art museum.

A "trustee shall administer the trust in good faith, [ ] in accordance with its terms
and purposes, for the benefit of the trust beneficiaries." MCL 700.7801. See also MCL
700.7802. With a trust, whether charitable or otherwise, the trustee holds the
legal interest – or legal title – in the assets, but the beneficiary holds the equitable
interest. *Apollinari v Johnson*, 104 Mich App 673, 675, 305 NW2d 565 (1981) ("The
separation of legal and equitable title is one of the distinctive features of the trust
relationship. Legal title vests in the trustee to be held for the benefit of the
beneficiary."). See also *In re Americana Foundation*, 145 Mich App at 740 (Trustee
foundation "held the legal estate whereas the public received the benefit and
enjoyment."); Restatement (Third) of Trusts, § 2, comment d, see also *id.*, § 42. Thus,
while a trustee has legal title to the trust assets, a trustee may not dispose of trust
assets as the trustee wishes; instead, a trustee is limited to using the assets for the
designated purposes of the trust. MCL 700.7801. See also *In re Friends for Long
Island's Heritage*, 911 NYS2d 412 (NY App Div 2010) (nonprofit corporation could not
sell assets donated for purpose of public exhibition and display to pay off corporate
debts upon dissolution.).

>           B.    **The art collection is held in charitable trust for the people of
>                 Michigan and cannot be sold for purposes other than the
>                 acquisition of art.**

With its incorporation in 1885, the museum was created as a nonprofit corporation
with a specific charitable purpose: "the public exhibition of its collection of works of
art." 1885 PA 3, Section 4, CL 1915, § 10762. The museum's 1885 Articles of
Incorporation reflect this purpose. The museum was authorized to acquire art for that
specific purpose, 1885 PA 3, Section 3, CL 1915, § 10761, and was required to "faithfully
use[ ]" "[a]ll gifts, devises, or bequests made to" the museum for that purpose. *Id.*,
Section 15, CL 1915, § 10773. The museum could not change its "character and
purposes" or sell "its general art collection" unless authorized by the Legislature. *Id.*,
Section 16, CL 1915, § 10774.

Thus, as a legal entity holding assets for a charitable purpose, the museum was
founded as a charitable trust. The museum's charitable purpose was the exhibition of
art for the public; the art collection thereafter acquired by the museum became the res
or assets of the trust. And as a charitable trustee, the Founders Society was limited to
using its assets – the art collection – for its dedicated charitable purpose.

Moreover, the Legislature's intent was plain: once an art institution like the museum incorporated and began collecting art and dutifully exhibiting its collection for the public, it was do so in perpetuity if possible. Hence, the Legislature created restrictions on a change to the character or purpose of the art institution, and the disposition of its general collection; and it required that any winding up be provided for by law so as to "best promote and perpetuate" "the purposes" of the institution. 1885 PA 3, Section 10774, CL 1915, § 10774.

In 1919, in the wake of the Michigan Supreme Court's ruling in *Detroit Museum of Art v Engel,* the Legislature determined that the best method to "promote and perpetuate" "the purposes" of the museum was to authorize the conveyance of all property to a "city empowered to maintain a public art institute." 1919 PA 67, Section 20. This conveyance would allow the City directly to support the museum consistent with the Supreme Court's ruling. The law also required the City to "faithfully[ ] use [ ]" the art conveyed "for the purposes for which" the institution was organized, which was to operate a "public art institute" and exhibit art to the "general public." No provision was included for a city to change or modify the purpose, sell the art conveyed, or wind up or dissolve its public art institute.

Pursuant to these express statutory authorizations, the Founders Society transferred its art collection to the City in 1919. When the City accepted the transfer, it was bound by the language of 1919 PA 67 to perpetuate and "maintain a public art institute" that would exhibit art to the general public, and to "faithfully[ ] use[ ]" the art conveyed for that purpose. Under charitable trust law, this transfer was a transfer of the Founders Society's legal interest or legal title in its charitable assets to a new charitable trustee – the City. Under those circumstances, the equitable interest in the art collection remained with the people of Michigan, the ultimate beneficiaries of the museum's or Founders Society's charitable purpose. Appollinari, 104 Mich App at 675. See also *Hardman,* 240 Cal Rptr at 486 ("[A]lthough the Fine Arts Musuems [ ] is administered by City officials [as trustee], the trust assets do not constitute public assets but rather the res of a charitable trust.").[14][14]

In accepting the trust, consistent with the statute, the City agreed at its own cost and expense to maintain and operate the trust, which by City Charter included the mandate that the City "[s]hall acquire, collect, own and exhibit, in the name of the city, works of art, books and other objects such as are usually incorporated in Museums of Art." 1918 City Charter, Chapter XIX, Section 7(c).[15][15]  Over the years, the museum's art collection grew through charitable donations of art and direct purchases by the City. As new pieces were added to the collection, the entire collection continued to be dedicated towards the museum's initial charitable purpose: the public display of its art collection.

See MCL 700.1107(n) (term "trust" "includes . . . an express trust, private or charitable, *with additions to the trust, wherever and however created*.") (Emphasis added). Thus, the entire collection – to this day – continues to be held in charitable trust for this same charitable purpose, including the pieces acquired by the City with City money that were purchased and added to the museum collection.[16][16]

This conclusion is consistent with Michigan trust law, and restrictions found in the Nonprofit Corporation Act, the statute under which charitable, nonprofit corporations incorporate today. See MCL 450.2301(5) ("This act shall not be deemed to permit assets held by a corporation for charitable purposes to be used, conveyed or distributed for noncharitable purposes.") Moreover, the museum's current operations and policies under the 1997 Operating Agreement, the museum's Collections Management policies, the ethical policies of the various museum associations, and the Founders Society's and the City's accounting practices, confirm this result. Rather, these documents, discussed above, expressly state that the entire collection is held in trust for the public and strictly limit the use of the art to its public exhibition, and any disposition of art or proceeds from the disposition of art can only be used to acquire additional art for the museum's collection. Based on these facts and charitable trust law, the City, as charitable trustee, cannot sell art from the trust for the purpose of satisfying debts owed to its creditors.

## Conclusion

It is my opinion, therefore, that the art collection of the Detroit Institute of Arts is held by the City of Detroit in charitable trust for the people of Michigan, and no piece in the collection may thus be sold, conveyed, or transferred to satisfy City debts or obligations. In issuing this opinion, I recognize the serious financial hardships that face the City, the difficulties that the people who live and work in the City have endured for decades, and the many challenges facing the citizens of the City of Detroit and the State in the future. Yet, in the 128 years since the creation of the Detroit Institute of Arts, at no time have the people demanded that their most precious cultural resources be sold in order to satisfy financial obligations. To the contrary, the citizens of this State recognize that abandoning or selling the public's artwork would damage not only the City's but the State's cultural commonwealth. In Michigan, we not only appreciate our cultural treasures, we guard them zealously in charitable trust for all state residents, present and future.

---

[1][1] See www.dia.org/about/history.aspx.

[2][2] See http://nrhp.focus.nps.gov/natregsearchresult.do?fullresult=true&recordid=55.

[3][3] MCL 141.1551 requires an emergency manager to develop a written financial and operating plan addressing various issues, and to submit the plan to the State Treasurer.

[4][4] An emergency manager must first submit any proposed sale of assets to the local government unit's governing body for approval. MCL 141.1559(1). If the governing body disapproves the proposed sale, the governing body must present an alternative plan that yields a similar financial result. The local emergency financial assistance loan board then chooses between the options. MCL 141.1559(2).

[5][5] Because this opinion concludes that the art collection is held in charitable trust, it is unnecessary to address whether the collection is the type of asset that could be sold for purposes of MCL 141.1552(r). But arguably, the Legislature, in enacting the Local Financial Stability and Choice Act, did not intend that unique cultural assets of a local unit of government be sold since such a sale would not be in the best interests of the health, safety, and welfare of the citizens of this State. MCL 141.1543.

[6][6] The museum's corporate documents are available at www.dleg.state.mi.us/bcs_corp/sr_corp.asp.

[7][7] The act defines "art institute" as "an encyclopedic art museum whose primary art collection and facility, at the date an authority is established, are owned by a municipality located in this state." MCL 123.1203(a).

[8][8] The term "public trust" as used by museums and their associations should not be equated with the "public trust doctrine" that Michigan and other courts have applied to navigable waterways. See, e.g., *Glass v Goeckel*, 473 Mich 667, 694; 703 NW2d 58 (2005) (finding that the shores of the Great Lakes below the ordinary high water mark were held in public trust.). See also *Netweg v Wallace*, 237 Mich 14, 17; 208 NW 51 (1926) and *State v Venice of America Land Co*, 160 Mich 680, 702; 125 NW 770 (1910). While there has been debate in other states for extending this doctrine to apply to cultural resources, like museums, see Sara Tam, Note, 39 Fordham Urb L J 849, 861-863 (2012), In Museums We Trust: Analyzing the Mission of Museums, Deaccessioning Policies, and the Public Trust, research discloses no Michigan cases that have applied the public trust doctrine outside of the natural resources context.

[9][9] Museums and professional organizations began promulgating ethical codes regarding deaccessioning and museum practices, after the Metropolitan Museum of Art in New York planned to sell several significant pieces in 1972. Tam, In Museums We Trust, 39 Fordham Urb L J at 864-865.

[10][10] Available at www.aam-us.org/resources/ethics-standards-and-best-practices/code-of-ethics-for-museums.

[11][11] Available at http://icom.museum/the-vision/code-of-ethics/.

[12][12] See City of Detroit's 2012 Comprehensive Annual Financial Report, pp 29, 95, *available at* http://www.detroitmi.gov/DepartmentsandAgencies/Finance/AccountsDivision.aspx.

[13][13] The Supervision of Trustees for Charitable Purposes Act provides that "[t]he attorney general . . . shall represent the people of the state and the uncertain or indefinite beneficiaries in all charitable trusts in this state, and may enforce such trusts by proper proceedings in the courts of this state." MCL 14.254(a). See also MCL 554.352 and MCL 700.7405(3).

[14][14] While the entire art collection is held in charitable trust, the plain language of 1919 PA 67 further protects any piece of art acquired from 1885 through the 1919 transfer from sale for a non-museum related purpose because the City of Detroit can only "use[ ]" that art "for the purposes for which" the museum was organized, which was to operate a "public art institute" and display art to the "general public." 1919 PA 67, Section 20; 1885 PA 3, Sections 1, 3, and 4, CL 1915, §§ 10759, 10761, and 10762. This language precludes a sale of artwork obtained through this transfer for the purpose of satisfying City debts unrelated to the art collection or the museum. And other Michigan laws add protection to those works of art that were gifts from charitable donors. See, e.g., MCL 554.352 (gifts for charitable purposes create a charitable trust that "shall be liberally construed by the court so that the intentions of the creator thereof shall be carried out whenever possible.").

[15][15] Notably, while the 1918 City Charter empowered the Arts Commission, subject to the approval of the city council, to sell, convey, and lease any real property, *Id.*, Section 7(g), no express provision was made for the sale or disposal of the art work.

[16][16] A contrary conclusion that some of the art collection is held in charitable trust and other art is not – for instance, the art purchased by the City – is neither consistent with trust law nor reasonable. If this were the case, assets held in charitable trust would necessarily reside in the same collection as non-charitable assets, despite the fact that the *whole collection* exists for the singular charitable purpose of the public exhibition of art. See MCL 700.7811(2) (A trustee shall keep trust property separate from the trustee's own property.") Moreover, under that view, as substantial charitable contributions continued to be made over the years both directly to the collection and in support of the collection, the commingling of charitable assets with non-charitable assets could be viewed as a breach of charitable trust. See MCL 700.7901. That untenable result further supports the conclusion that the entire collection existed – and continues to exist – in charitable trust.

---

[1] See www.dia.org/about/history.aspx.

[2] See http://nrhp.focus.nps.gov/natregsearchresult.do?fullresult=true&recordid=55.

[3] MCL 141.1551 requires an emergency manager to develop a written financial and operating plan addressing various issues, and to submit the plan to the State Treasurer.

[4] An emergency manager must first submit any proposed sale of assets to the local government unit's governing body for approval. MCL 141.1559(1). If the governing body disapproves the proposed sale, the governing body must present an alternative plan that yields a similar financial result. The local emergency financial assistance loan board then chooses between the options. MCL 141.1559(2).

[5] Because this opinion concludes that the art collection is held in charitable trust, it is unnecessary to address whether the collection is the type of asset that could be sold for purposes of MCL 141.1552(r). But arguably, the Legislature, in enacting the Local Financial Stability and Choice Act, did not intend that unique cultural assets of a local unit of government be sold since such a sale would not be in the best interests of the health, safety, and welfare of the citizens of this State. MCL 141.1543.

[6] The museum's corporate documents are available at www.dleg.state.mi.us/bcs_corp/sr_corp.asp.

[7] The act defines "art institute" as "an encyclopedic art museum whose primary art collection and facility, at the date an authority is established, are owned by a municipality located in this state." MCL 123.1203(a).

[8] The term "public trust" as used by museums and their associations should not be equated with the "public trust doctrine" that Michigan and other courts have applied to navigable waterways. See, e.g., *Glass v Goeckel*, 473 Mich 667, 694; 703 NW2d 58 (2005) (finding that the shores of the Great Lakes below the ordinary high water mark were held in public trust.). See also *Netweg v Wallace*, 237 Mich 14, 17; 208 NW 51 (1926) and *State v Venice of America Land Co*, 160 Mich 680, 702; 125 NW 770 (1910). While there has been debate in other states for extending this doctrine to apply to cultural resources, like museums, see Sara Tam, Note, 39 Fordham Urb L J 849, 861-863 (2012), In Museums We Trust: Analyzing the Mission of Museums, Deaccessioning Policies, and the Public Trust, research discloses no Michigan cases that have applied the public trust doctrine outside of the natural resources context.

[9] Museums and professional organizations began promulgating ethical codes regarding deaccessioning and museum practices, after the Metropolitan Museum of Art in New York planned to sell several significant pieces in 1972. Tam, In Museums We Trust, 39 Fordham Urb L J at 864-865.

[10] Available at www.aam-us.org/resources/ethics-standards-and-best-practices/code-of-ethics-for-museums.

[11] Available at http://icom.museum/the-vision/code-of-ethics/.

[12] See City of Detroit's 2012 Comprehensive Annual Financial Report, pp 29, 95, *available at* http://www.detroitmi.gov/DepartmentsandAgencies/Finance/AccountsDivision.aspx.

[13] The Supervision of Trustees for Charitable Purposes Act provides that "[t]he attorney general . . . shall represent the people of the state and the uncertain or indefinite beneficiaries in all charitable trusts in this state, and may enforce such trusts by proper proceedings in the courts of this state." MCL 14.254 (a). See also MCL 554.352 and MCL 700.7405(3).

[14] While the entire art collection is held in charitable trust, the plain language of 1919 PA 67 further protects any piece of art acquired from 1885 through the 1919 transfer from sale for a non-museum related purpose because the City of Detroit can only "use[ ]" that art "for the purposes for which" the museum was organized, which was to operate a "public art institute" and display art to the "general public." 1919 PA 67, Section 20; 1885 PA 3, Sections 1, 3, and 4, CL 1915, §§ 10759, 10761, and 10762. This language precludes a sale of artwork obtained through this transfer for the purpose of satisfying City debts unrelated to the art collection or the museum. And other Michigan laws add protection to those works of art that were gifts from charitable donors. See, e.g., MCL 554.352 (gifts for charitable purposes create a charitable trust that "shall be liberally construed by the court so that the intentions of the creator thereof shall be carried out whenever possible.").

[15] Notably, while the 1918 City Charter empowered the Arts Commission, subject to the approval of the city council, to sell, convey, and lease any real property, *Id.*, Section 7(g), no express provision was made for the sale or disposal of the art work.

[16] A contrary conclusion that some of the art collection is held in charitable trust and other art is not – for instance, the art purchased by the City – is neither consistent with trust law nor reasonable. If this were the case, assets held in charitable trust would necessarily reside in the same collection as non-charitable assets, despite the fact that the *whole collection* exists for the singular charitable purpose of the public exhibition of art. See MCL 700.7811(2) (A trustee shall keep trust property separate from the trustee's own property.") Moreover, under that view, as substantial charitable contributions continued to be made over the years both directly to the collection and in support of the collection, the commingling of charitable assets with non-charitable assets could be viewed as a breach of charitable trust. See MCL 700.7901. That untenable result further supports the conclusion that the entire collection existed – and continues to exist – in charitable trust.


BILL SCHUETTE
Attorney General

---

17TH DISTRICT
S-106 CAPITOL BUILDING
P.O. BOX 30036
LANSING, MI 48909-7636
PHONE: (517) 373-3543
TOLL-FREE: (866) 650-7917
FAX: (517) 373-0927
E-MAIL: senrichardville
        @senate.michigan.gov

# RANDY RICHARDVILLE

## SENATE MAJORITY LEADER

### THE MICHIGAN SENATE

June 11, 2013

DEPT OF [   ]
ATTORNEY GENERAL

JUN 1 1 2013

Igned to ____

Attorney General Bill Schuette
G. Mennen Williams State Office Building
P.O. Box 30212
Lansing, Michigan 48909

Dear Attorney General Schuette:

As you may be aware from recent media reports, there has been much discussion regarding whether the Detroit Institute of Art's (DIA) collection is an asset of the City of Detroit that could be sold in order to satisfy City debts or other obligations. It is my understanding that the DIA's buildings and collection are owned by the City, but that the City contracts with the Detroit Institute of Arts, Inc., a non-profit organization, to operate the museum and manage the collection. Further, it is my understanding that various creditors or other individuals have suggested that pieces of the collection could be sold pursuant to the authority set forth in the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 et seq.

Accordingly, I respectfully request a formal Attorney General opinion regarding whether the art collected and displayed at the DIA may be sold, transferred, or otherwise disposed for the purpose of satisfying debts or obligations of the City of Detroit unrelated to the operation or purpose of the DIA? Given the urgency of the matter, I also ask that this request be expedited.

Thank you in advance for your time and attention to this matter.

Sincerely,

Randy Richardville
Senate Majority Leader
The 17th District

www.SenatorRandyRichardville.com

## COMMON INTEREST AGREEMENT
## IN ANTICIPATION OF LITIGATION

This Common Interest Agreement (the "Agreement") is entered into by the Attorney General for the State of Michigan in his individual, official capacity as an interested party in the *In re City of Detroit*, bankruptcy proceeding, case number 13-53846, and by the Detroit Institute of Arts, f/k/a the Detroit Museum of Arts, Detroit Museum of Arts Founders' Society, and Founders Society Detroit Museum of Art (hereinafter, the "Society") (each individually a "Party" and collectively the "Parties"), in connection with, relating to, or arising from potential litigation involving protecting the art collection of the Detroit Institute of Arts (the "Matter").

WHEREAS, the Parties have a mutual interest in the Matter; and

WHEREAS, that mutuality of interest includes, but is not limited to, sharing points of view or defenses on some or all of the issues, facilitating fact-gathering and legal analysis, and preserving to the fullest extent permitted by law the protection against disclosure afforded under the work product doctrine, the attorney-client and deliberative process privileges, and other applicable rules of law; and

WHEREAS, the City of Detroit ("City) is a Michigan municipal corporation, previously governed by the Mayor of Detroit and the Detroit City Counsel and currently governed by Kevyn Orr, the Emergency Manager of the City of Detroit ("EM"), pursuant to the provisions of the Local Financial Stability and Choice Act, MCL 141.1541 et seq.;

WHEREAS, the Society manages the public art institute that is now commonly known as the Detroit Institute of Arts (the "Museum") pursuant to an operating agreement with the City;

WHEREAS, for the purpose of preventing any attempt to sell, encumber, or transfer and consult with each other and/or exchange certain information from time to time as part of the same; and

WHEREAS, in the course of their mutual interests in the Matter, and to further those mutual interests, the Parties intend that all their communications between them, in any form whatsoever, both before the execution of this agreement and thereafter, shall pursuant to this agreement be confidential and privileged information legally protected from disclosure by any means employed whatsoever; and

WHEREAS, execution of this Agreement is not intended to waive or diminish the effect of any privilege or protection; and

WHEREAS, this Agreement does not require any disclosure of information by any party to it; and

WHEREAS, the exchange of information contemplated by this Agreement is essential to the effective representation of the Parties by their respective counsel;

NOW, THEREFORE, in order to memorialize in writing the understanding and agreement under which the Parties have engaged in prior discussions and intend to engage in

future discussions, and to set forth the rights and obligations of the Parties under that understanding and agreement, the Parties hereby agree as follows:

A. Each of the undersigned represents and warrants that he or she is fully authorized to enter into the terms and conditions of this Agreement, and execute this Agreement on his or her own behalf and on behalf of the Party or Parties he or she represents and further represents that he or she has explained this Agreement to the Party or Parties he or she represents and has obtained the agreement of each such Party to abide by the terms and conditions of this Agreement.

B. The Parties may share documents, factual material, attorney-client communications, and any other information that the Parties may from time to time deem appropriate to share, subject to the terms set forth below.

C. "Covered Communications and Information" is defined to include, but not be limited to, oral and written communications between counsel, clients, witnesses, and other persons employed or retained by the Parties and their counsel, memoranda of law, factual summaries, documents, and any other information in any form, including information generated by or disclosed to any person covered by Paragraph J, below, that would be protected from disclosure to third parties by one or more of the Rules of Nondisclosure, as defined below, and which are designated by the disclosing counsel as "Privileged Common Interest Material." Covered Communications and Information under this Agreement shall not include information that is received from any person or entity not a signatory to this Agreement, or information that is now, or hereafter becomes, public knowledge without violation of this Agreement, or that is sought or obtained by the Parties to the Agreement in accordance with applicable discovery procedures, formal or informal, as may be agreed to by counsel for the Parties. Further, Covered Communications and Information shall not include any information that is subject to disclosure pursuant to the Freedom of Information Act, 5 United States Code section 552 *et seq.*, or the Michigan Freedom of Information Act, Michigan Compiled Laws 24.201 *et seq.*, subject to the obligations of Paragraph F, below.

D. "Rules of Nondisclosure" include but are not limited to the work product doctrine, the attorney-client and deliberative process privileges, and all other applicable rules of law and evidence regarding the confidentiality of information, including Covered Communications and Information.

E. Unless disclosure is required despite taking the steps contemplated in Paragraph F, or unless the Party that creates or originally conveys the Covered Communication and Information consents in writing, Covered Communications and Information that have been exchanged between or among any of the Parties shall be disclosed only to the Parties to this Agreement, their counsel, and any person covered by Paragraph J, below. Use of Covered Communications and Information by the recipients thereof shall be limited to common interest in the Matters and subject to the limitations of Paragraph J. Exchange of any Covered Communications and Information among or between the Parties, and persons covered by Paragraph J, shall not be deemed to be a waiver of any of the Rules of Nondisclosure.

F. Should any person who is not bound by this Agreement request or demand, whether by subpoena, discovery request, or otherwise, that any Party provide the requesting person with

access to any communication or information that has been exchanged between or among any of the Parties and that may constitute a Covered Communication or Information under this Agreement, the Party receiving the request or demand shall immediately notify all the other Parties and shall inform the requesting person that the communication or information sought is subject to this Agreement and that a request should be made of the Party that originally created or conveyed the communication or information. The Party receiving the request or demand shall take all steps necessary to avoid any waiver of any Rule of Nondisclosure that may protect the confidentiality of the communications or information to which access is sought, including the appropriate invocation of any applicable privilege available under governing law, consistent with and subject to the requirements of applicable law.

G. The Parties shall mark documents subject to this Agreement as "Privileged Common Interest Material." However, the failure to so mark any such material does not waive any otherwise applicable protections allowed by law or by this Agreement. The Parties shall take all reasonable steps to safeguard and protect from disclosure all Covered Communications and Information.

H. The obligations provided in this Agreement shall be continuing obligations and shall survive the withdrawal of any Party hereto pursuant to Paragraphs L and M, below, the termination of this Agreement pursuant to Paragraph N and O, below, and the termination of the Matter, whether terminated by settlement or by final judgment after any rights of appeal have been exercised or waived.

I. Notwithstanding any other provisions of this Agreement, unless the Party that creates or originally conveys the Covered Communication or Information expressly consents, no Covered Communication or Information shall be offered in evidence or disclosed for any purpose in any trial, hearing, deposition, or other legal proceeding, unless the disclosure is required by law.

J. The obligations undertaken by the Parties in this Agreement shall be binding upon the Parties, their legal counsel, employees, agents, experts, consultants, successors, and assigns, and any other persons employed or retained by the Parties to perform any work or provide any service in connection with the Matter.

K. This Agreement shall apply to all Covered Communications and Information exchanged in connection with the Matter between or among the Parties prior to the execution of this Agreement and is intended as the written embodiment of any prior understanding and agreement reached by and among the Parties.

L. Any Party may withdraw from this Agreement with prior written notice to all other Parties. In the event of such a withdrawal, this Agreement shall continue to protect all Covered Communications and Information that have been exchanged between and among any of the Parties as of the date such withdrawal becomes effective. The withdrawing Party shall continue to be bound by the obligations provided in this Agreement as of the date of the withdrawal.

M. If allowed by governing law, within ten (10) business days following the date of withdrawal from this Agreement and upon the request of any non-withdrawing Party, the withdrawing Party shall return all written Covered Communications or Information that it has

3

received, and all copies thereof, excepting any Covered Communications or Information that the Party created or originally conveyed. If the Parties remaining as parties to this Agreement consent and the law so allows, the withdrawing Party may destroy all copies of such communications and information instead of returning them.

N. This Agreement may be terminated by the withdrawal of all but one remaining Party, or by written consent of all remaining Parties. Termination shall be effective upon the date of execution of the written notice of withdrawal of the last but one remaining Party, or the date of execution of the written consent of all remaining Parties. Termination shall operate prospectively only. Termination shall in no way affect the continued protected nature of the Covered Communications and Information exchanged prior to termination, nor shall termination affect the continuing obligations of restricted disclosure provided in this Agreement as to such Covered Communications and Information exchanged prior to termination.

O. If allowed by governing law, within ten (10) business days following the termination of this Agreement and upon the request of any Party, the Parties shall return all written Covered Communications or Information they received, and all copies thereof, excepting any Covered Communications or Information that the Parties created or originally conveyed. If the Parties consent and the law so allows, the Parties may destroy all copies of such communications and information instead of returning them.

P. Except as provided herein, any amendments or modifications to this Agreement must be agreed to by all Parties in writing. No other party may join this Agreement unless all parties to this Agreement agree in writing.

Q. Nothing in this Agreement shall be deemed to create an attorney-client relationship between counsel and anyone other than the client or clients of that counsel, or to modify in any way each Party's existing attorney-client relationships. The fact that the Parties, through counsel, have entered into this Agreement shall not in any way preclude counsel from meeting all professional and ethical obligations to represent the interests of their respective clients, including representing or advocating any interest, any legal theory, any factual matters of their respective clients that may be adverse to any of the interests, legal theories, and factual matters of any other Party to this Agreement, except that no Party may use any Covered Communications or Information received from another Party against that Party in this Matter. Nothing in this Agreement shall be used to seek the disqualification in this Matter or any subsequent matter of any counsel for any Party.

R. This Agreement does not cover any aspect of the relationship among the Parties other than what is explicitly addressed herein. This Agreement shall not constitute a waiver of any Party's claims, defenses, rights, or remedies with regard to any matter not specifically addressed herein. Neither the execution of this Agreement nor anything contained herein shall be deemed or construed as an admission by any Party of any wrongdoing or liability on the part of any Party or of the existence of facts upon which liability could be based.

S. This Agreement may be signed in copies and counterparts, and it shall be binding upon those Parties that have signed copies and sent a signed copy to every other Party.

T. Any notices to be made under this Agreement shall be made by facsimile or electronic mail to counsel of record for a Party, followed by postal service delivery with proof of receipt.

U. The Parties agree and acknowledge that this Agreement is to be broadly construed so as to fully protect and preserve, to the fullest extent permitted by law, the confidentiality and secrecy of Covered Communications and Information. This Agreement shall be construed as if it were drafted by all Parties. If any provision of this Agreement shall be deemed invalid, unenforceable or illegal, then notwithstanding such invalidity, unenforceability or illegality, the remainder of this Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the Parties, by and through their undersigned duly authorized signers, agree to be bound by the terms of this Agreement and, in order to signify such agreement, have executed this Agreement on the dates indicated below.

Dated: 12-4-13

Interested Party, the Michigan Attorney General

Bill Schuette, Attorney General
or His Designee

Dated: 12.2.13

The Detroit Institute of Arts

By: John D. Pirich (P23204
Attorney) for the Detroit Institute of Arts