# Exhibit 6-D

## DIA Memo Regarding Sale Constraints



**Selling the Detroit Institute of Arts Collection to Satisfy the City's Creditors:
<u>Legal and Practical Constraints</u>**

The City of Detroit's Emergency Manager has suggested that the City's creditors may demand that some or all of the valuable art collection held at the Detroit Institute of Arts ("Museum") be sold and the proceeds devoted to satisfaction of the City's obligations. Although he has not taken a position publicly on whether creditors would be able to reach the collection to satisfy obligations, he has suggested that to resolve any such claim without the risk of litigation, the Detroit Institute of Arts ("DIA"), an independent not-for-profit entity that administers the Museum, raise and devote substantial funds to creditors over up to 20 years. The suggestion's premise—that creditors might reach the collection or effectively require the Emergency Manager to sell it—and its conclusion—that the DIA could raise sufficient funds to settle any dispute over the premise—are both mistaken.

**1. Creditors May Not Compel a Sale of the Art Collection.**

*1.1. A Bankruptcy Court May Not Order a Sale.*

The Bankruptcy Code substantially limits a bankruptcy court's authority in a case under chapter 9. Section 904 provides:

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
> (1) any of the political or governmental powers of the debtor;
> (2) any of the property or revenues of the debtor; or
> (3) the debtor's use or enjoyment of any income-producing property.

In short, the court may not order a municipal debtor to sell "any property … of the debtor". *See* 6 COLLIER ON BANKRUPTCY ¶ 904.01[2] (16th ed. 2012, Alan N. Resnick & Henry J. Sommers eds.).

A bankruptcy court may deny confirmation of a chapter 9 plan of adjustment if it is not in the "best interests of creditors". 11 U.S.C. § 943(b)(7). A plan is in the best interests of creditors if it is better than the alternative. In a chapter 9 case, the alternative to plan confirmation is dismissal of the case, allowing creditors to seek remedies under applicable nonbankruptcy law. *Id.* ¶ 943.03[7][a]. Therefore, a plan need not provide for distribution to creditors of some or all of the collection's value to meet the best interests test unless creditors can force a sale of the collection outside of bankruptcy under applicable state law. As shown below, they cannot.

1

*1.2. A Michigan Court May Not Order a Sale to Satisfy Creditor Claims.*

    1.2.1 <u>An Order Requiring Tax Assessments Is the Sole Remedy to Enforce a Judgment.</u>

Under Michigan law, MCL 600.6093(1), the procedure a city's creditor must use to recover a judgment against the city is:

(1) the clerk of the court certifies the judgment;

(2) the judgment certificate is filed with the assessing officer of the city;

(3) the assessing officer proceeds to assess the amount of the judgment upon the taxable property of the city upon the next tax roll of the city, referred to as a warrant;

(4) this warrant is collected and returned in the same manner as other taxes.

The remedy of assessing taxes to collect a judgment can be enforced by the courts. When the assessing officer of a city refuses to assess taxes to pay the judgment, the officer or city can be compelled to assess the taxes. *Morley Bros. v. Supervisor of Carrolton Tp., Saginaw County*, 312 Mich. 607, 20 N.W.2d 743 (1945) (employing mandamus to require assessment of taxes); *Zelenka v. Wayne County Corporate Counsel*, 143 Mich. App. 567, 372 N.W.2d 356 (1985) (ordering county board of commissioners to satisfy the judgment).

The assessment of a tax to pay a judgment under MCL 600.6093 is not subject to the Headlee Amendment, which amended the Michigan constitution, Const. 1963, at 9, §§6 *et seq.* to limit the amount by which taxes can be increased without voter ratification. *Am. Axle & Mfg. Inc. v City of Hamtramck*, 461 Mich. 352, 604 N.W.2d 330 (2000). The Michigan Supreme Court reasoned that MCL 600.6093 was a permitted exception to the Headlee Amendment.

MCL 600.6093(1) also states, "Nothing herein contained shall be construed to exclude other remedies given by law for the enforcement of the judgment." But in the absence of another authorized remedy, this procedure is "the sole remedy for the collection of a judgment" against a city. *City of Roosevelt Park v Norton Twp.*, 330 Mich. 270, 273; 47 N.W.2d 605 (1951) (construing predecessor to MCL 600.6093, judgment creditor could not garnish township funds or debtors to collect judgment); *Payton v. City of Highland Park*, 211 Mich. App. 510, 512-513, 536 N.W.2d 285 (1995) (judgment creditor could not use garnishment under MCL 600.4011 to collect judgment against city, interpreting MCL 600.6093). MCL 600.6097 permits a city to fund a judgment by the issuance of bonds, but it does not require it. Our research did not find any other remedies at law to enforce a judgment but did find a prohibition on execution to enforce a judgment.

A municipal creditor may not seize city property or compel a city to sell property to satisfy the judgment. "No execution may issue upon a judgment against [any city]." MCL 600.6021(1). The rationale for foreclosing collection of a judgment by the seizure of property:

> " ... is that municipal funds constitute a trust fund for the accomplishment of certain municipal functions; that to subject municipal funds to levy of execution and garnishment would restrict,

2

> thwart and interfere with proper and orderly functioning of the
> municipal governmental machinery; and that to allow an individual
> municipal creditor to reach municipal funds for the satisfaction of his
> claim would effect a preference in favor of such creditor to the
> prejudice of other creditors and to the ultimate prejudice of the credit
> of the municipality.

*Payton*, 211 Mich. App. at 511, quoting *Roosevelt Park*, 330 Mich. at 273.

### 1.2.2 A Writ Of Mandamus Is Not Available To Force A Sale.

Similarly, a creditor may not obtain a writ of mandamus to force a municipal officer to sell an asset to satisfy a debt absent a specific, preexisting legal duty to sell the asset, such as an existing contract to sell the asset or a valid order by an authorized official to sell the asset. In Michigan, "[m]andamus will only issue against a public official in such cases to compel the performance of a clear legal duty." *Hoad v. Van Wagoner*, 278 Mich. 600, 608; 270 N.W. 802 (1937). This is consistent with jurisdictions outside of Michigan, where mandamus relief will lie only where (1) the petitioner has a clear right to relief, (2) the respondent has a clear duty to act, (3) there is no other adequate remedy available to the petitioner, and (4) properly invoked jurisdiction of the court. Mandamus, AM. JUR. 2D § 19. Moreover, "[m]andamus compels the performance of ministerial acts or duties only." If the sought-after act requires discretion by the official, mandamus will not lie. *Id*. §§ 51, 90, 122.

The Michigan Supreme Court long ago explained, "It has been held by us that mandamus proceedings do not adjudicate rights, but are a mode of enforcing existing rights." *Detroit Trust Co v. Van Wagoner*, 295 Mich. 449, 453; 295 N.W. 222, 223 (1940) (internal quotes and citations omitted) (issuing mandamus against the Attorney General to enforce a condemnation award that the Attorney General failed to timely contest, despite questions as to the holder of title to condemned property). Michigan law expressly limits the execution of a judgment against a municipality to the assessment of taxes or issuance of bonds. A court could grant a writ of mandamus to compel a municipal official to assess a tax, levy a bond, or make a payment out of existing tax funds. *See*, *e.g.*, *Goodenough v. Ticknor*, 265 Mich. 355, 357; 251 N.W. 593 (1933). But there is no reported decision by a Michigan court granting a writ to force the sale of municipal property to satisfy a judgment.

Because the exclusive method to enforce a Michigan court judgment is an order requiring the assessment of a tax and no execution may issue against property of the municipality, MCL 600.6021(1), a Michigan court may not order a sale of municipal property to satisfy a judgment.

**2. The City May Not Sell The Collection.**

Even if creditors could not compel a sale of the Museum's collection, the Emergency Manager, acting on behalf of the City, might consider a sale to raise funds to address the City's non-Museum-related obligations. However, such a sale would violate the Operating Agreement between the City and the DIA, would violate donation and other restrictions on items in the collection and would violate the public trust.

3

*2.1. A Sale Would Violate The Operating Agreement Between The City And The DIA.*

The City entered into an Operating Agreement with the DIA dated December 12, 1997, under which the City engaged the DIA as manager and operator of the Museum, including giving the DIA the responsibility and the right to acquire and dispose of art. *See*, *e.g.*, Operating Agreement §§ D.1, D.3 and F.2. The Operating Agreement prohibits the City from selling the art without the DIA's consent and, consistent with the understanding that the art is held in public trust, makes clear that funds received from the disposition of art may be used only in furtherance of the public trust: "Any funds received from disposition of works of art in the City art collection shall be used *solely* to purchase other works of art for the City art collection." (*Id.* § F.2 (emphasis in original)).

The Emergency Manager could terminate the Operating Agreement. MCL 141.1552(1)(j). However, termination might create more problems than it would solve. As explained in more detail below, the City would not have a means to operate the Museum, and the City would lose the benefit of the annual $20 million or more millage that supports Museum operations, likely requiring the Museum's closure and the loss of the economic activity, tax revenues, and numerous other benefits that the Museum brings to the City.

*2.2. A Sale Would Violate Donation and Other Restrictions.*

The City, as donee of a gift that is restricted to a particular charitable purpose, whether it is a contribution of an art object or cash, will be treated under Michigan law as having received the gift in a charitable trust. A trust may exist even in the absence of a trust agreement or other writing. *See* MCL 700.1107(n) (broadly defining a "trust" as, among other things, "an express trust, private or charitable, with additions to the trust, wherever and however created"); *see also In re Americana Foundation*, 145 Mich App 735, 737-38; 378 N.W.2d 586 (1985). A trust arises "from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee." Restatement (Third) of Trusts § 2 (2001); *see also* MCL 700.701 cmt (referencing Restatement); MCL 700.7407; *Osius v Dingell*, 375 Mich 605, 613; 134 NW2d 657 (1965) ("Part of the law pertaining to express trusts is the rule that a valid trust in personalty may be created by parol."). A court may not modify a charitable trust unless specific requirements are satisfied, including that the particular charitable purpose has become "unlawful, impracticable, or impossible to achieve." MCL 700.7413.

The original grant of the Museum collection and real property to the City was authorized under a statute that restricted the use of such property. Public Act 67 of the Laws of 1919 authorized the Detroit Museum of Art to convey its collection to the City of Detroit, "and said property so conveyed shall in the hands of the city be faithfully used for the purposes for which such corporation was organized." 1919 PA 67, § 1 (later repealed as part of the consolidation of corporations law subject to a savings provision, 1921 PA 84 (MCL [1921] § 9053)). Such corporations could be formed "for the purpose of the cultivation of art or the founding of a public art institute or both" with restrictions on their ability to sell, encumber, or dispose of art collections. 1913 PA 245.

Since that initial conveyance, donors have contributed innumerable works of art and millions of dollars with the intention and understanding that the art be accessioned into the Museum's permanent collection. This intention is often manifested in written gift agreements, some of which impose additional restrictions on the gift. Other times, the gift of art is made by the donor with the

4

clear understanding that the contributed work will be held for display or educational purposes, even if the donor's intention is not evidenced in writing. In addition, donors have contributed funds earmarked or used for the purchase of art, to maintain, expand, and improve the Museum building to better display and accommodate the art, or to care for and maintain the art. By way of example, in 1919, Mr. George G. Booth donated a collection of artistic handicrafts based on the assurance "that in due time adequate provision will be made for their permanent care and exhibition." (DMA Annual Report (1919).) In and around 1924, Mr. Ralph H. Booth donated $200,000 to be invested and "the income used to purchase works of art to be permanently given to and exhibited in the museum of the Detroit Institute of Arts," or otherwise returned to the heirs of Mr. Booth. The Edsel B. Ford Foundation financially supported Diego Rivera during the time when Mr. Rivera was creating his masterpiece, Detroit Industry, or Man and Machine, for the Museum. And various funds, including the Robert H. Tannahill Foundation Fund, have likewise provided for the development of this collection by donating funds with restrictions and conditions on their usage.

The generosity of these contributors was premised, both implicitly and explicitly, upon the DIA's continuing provision of cultural enrichment to the public. By virtue of these donations, there are restrictions on the City's authority to sell or encumber any piece of art in the collection. At a minimum, each and every piece must be examined to determine whether it is placed in a charitable trust.

   2.3.   *The Collection Is Held In Public Trust.*

Under the public-trust doctrine, the State and its subdivisions, including the City, have a duty, owed to the people of the State, to preserve and protect resources held in trust for the public. Government has limited power when it comes to property held in trust for the public, subject only to the paramount right of the public to enjoy the benefit of the public trust. The City holds the Museum's art collection in public trust. It may not be sold, even for a fair cash equivalent, except to maintain and enhance the collection, and must be maintained for the purpose of public exhibition and assistance in the teaching of art.

The seminal public trust case is *Illinois Central Railroad Company v. Illinois*, 146 U.S. 387 (1892). The State of Illinois had granted to the railroad in perpetuity land lying under navigable waters. Later, the State revoked the grant. The Supreme Court upheld the revocation. The State holds title to lands under navigable waters that is different from the title that it holds in lands that may be held for sale. "It is a title held in trust for the people of the State." *Id*. at 452. The State cannot divest itself of authority over property held in trust for the people of the State but must maintain the property for the people to enjoy "freed from the obstruction or interferences of private parties." *Id*.

The public trust doctrine has been expanding since *Illinois Central* to apply to other public resources. *See Wade v. Kramer*, 121 Ill. App. 3d 377, 380; 459 N.E.2d 1025 (1984) (accepting the application of public trust doctrine to archaeological objects); Derek Fincham, *Deaccession of Art from the Public Trust*, 16 ART ANTIQUITY & L. 1, 27 (2011) (describing the often-stated view that museums hold their collections in public trust); Patrick S. Ryan, *Application of the Public-Trust Doctrine and Principles of Natural Resource Management to Electromagnetic Spectrum*, 10 MICH. TELECOMM. TECH. L. REV. 285 (2004) (ultra-wideband and software-defined radio as resources held in public trust); Patty Gerstenblith, *Identity and Cultural Property; The Protection of Cultural Property in the United States*, 75 B. U. L. REV. 559 (May 1995) (Native American cultural artifacts held in public trust); Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law; Effective Judicial Intervention*, 68 MICH. L. REV. 471 (1969

5

– 1970) (resource management assets held in public trust). Once property is dedicated for public use, and taxpayers and other parties have relied on that dedication, a municipality cannot revoke the dedication "for private purposes." *Board of Trustees of Philadelphia Museums v. Trustees of University of Pennsylvania*, 96 A. 123 (Pa. 1915).

In declaring that "the public trust doctrine is alive and well in Michigan," *Glass v. Goeckel*, 473 Mich. 667, 681; 703 N.W.2d 58, 66 (2005) (land lying lakeward up to ordinary high water mark held in public trust), the Michigan Supreme Court said:

> "The State may not, by grant, surrender such public rights any more than it can adjudicate the police power or other essential power of government …. The State of Michigan has an undoubted right to make use of its proprietary ownership of the [property] in question subject only to the paramount right of the public to enjoy the benefit of the trust."

*Id*. 473 Mich. at 679, 703 N.W. 2d at 65 (quoting *Nedtweg v. Wallace*, 237 Mich. 14, 17, 208 N.W. 51 (1926) (land previously submerged under lake which became suitable for human occupation by reliction held in public trust, could be leased to private parties but not sold to curtail public use)); *see also Curry v. City of Highland Park*, 242 Mich. 614, 618; 219 N.W. 745 (1928) (waste disposal site is property held in public trust which cannot be disposed of by city to private owners).

The Michigan Legislature recognized the public trust in art work maintained by art institutes or museums as early as 1885, in 1885 PA 3, MCL 10759 *et seq.*, providing for the formation of a corporation to finance a public art institute to acquire and hold real estate and art for art purposes and teaching art. MCL 10761.

The Detroit Museum of Art, the predecessor to the Museum, was formed pursuant to 1885 PA 3. "The public exhibition of its collection of works of art" is the duty of a public art institute. MCL 10762. If the public art institute is unable to serve its purpose, the legislature is to provide for:

> "the conservation and disposition of its property in such a way as may best promote and perpetuate, in the city in which it is situated, the purposes for which such corporation was originally organized."

MCL 10774. When the public art institute act was amended in 1919 to provide for the conveyance of art work to the City of Detroit, the art work was required "in the hands of said city be faithfully used for the purposes for which such corporation was organized", that is, *to perpetuate the public exhibition of the art*. (Emphasis supplied.) 1919 PA 67. The Museum is a crown jewel in the public culture of the City and State of Michigan and a main cultural draw for both. In addition to the services at the Museum's Woodward Avenue location in the City, the Museum provides curatorial consultants, conservation services and traveling exhibits to art institutes and community cultural centers throughout Michigan and the country, underscoring its public trust character.

The City has always recognized that the Museum collection is held in public trust. Charter of the City of Detroit, Ch. XIX, Arts Commission, §7(b), (c) (1918). In announcing the transaction, it was stated:

> "This change marks the beginnings of an epoch in the history of
> Detroit when it shall become a civic function of the municipality to
> foster art, by operating and maintaining a museum for the people of
> the City. It is an era when art shall become in its broadest sense
> democratic, with the museum and its valuable collections actually
> belong to the people."

DIA, Bulletin of the Detroit Institute of Arts of the City of Detroit (Oct. 1919). "[T]he Detroit Institute of Arts is an institution which, with all of its collection and resources, belongs to [the people]" Art. Comn'n Rep. at 3 (1920). Indeed, the City has repeatedly stated at various points that the collection is held in trust.

Consistent with the public trust in the art work, the City has not capitalized the Museum's collection in its annual financial reports, but capitalizes only the City art works not held by the Museum—such as the "Spirit of Detroit" statue, the Joe Louis "fist" and other works of art in and around city buildings throughout Detroit at $29 million, excluding the art owned by the DIA. *See* Governmental Accounting Standards Board ("GASB") No. 34 (art held by a governmental entity for public service is not capitalized); Financial Accounting Standards Board ("FASB") No. 116, ¶ 12 (art held for public service rather than financial gain is not capitalized).

The recent enactment of an art institute authority and public approval of a tax levy in Macomb, Oakland and Wayne counties to support the Museum under the Art Institute Act Authorities, 2010 PA 296, are contemporary legislative and electoral expressions of the public trust in the Museum collection.

It is recognized in the code of virtually every museum association that the art collections held by public museums are held in the public trust and cannot be sold except to acquire other art work. *See* codes of the Association of Museums, the International Council of Museums, the American Association for State and Local History, the Association of Art Museum Directors, the American Alliance of Museums. The Museum's Collection Management Policy and Curator's Guidelines for Managing the Deaccession Process similarly both mandate that if Museum art work is sold or "deaccessioned", the proceeds must be used exclusively to acquire other art work.

Michigan's established public policy, therefore, is that the Museum collection is held in public trust for exhibition and art education purposes for the benefit of the City and State public.

**3. Sale Of Art Would Cause Substantial Harm To The Museum, The City, And The Public.**

The Museum is among the top six comprehensive fine arts museums in the United States. Established in 1885, the Museum is the cultural anchor of Midtown Detroit, occupying a full city block on Woodward Avenue. It offers groundbreaking educational and interpretive programming to more than 500,000 visitors each year, and provides crucial social services to the surrounding areas, including the Children's Hospital bedside program. The Museum is a major contributor to the State's and, particularly, the City's, menu of tourist attractions and significantly enhances the quality of life in the City and southeastern Michigan. It serves as the cornerstone of the museum and arts districts, which are core features in the plan to revitalize Detroit and which would not be viable without the draw that the Museum provides to artists, students, and other visitors. The

7

Museum brings people to the City, contributing greatly to the critical mass that is necessary for real economic change and the economic revitalization underway in the City.

The sale of art from the DIA collection to satisfy the obligations of the City would have catastrophic and irreparable consequences for the Museum. The Museum would almost certainly be sanctioned by and possibly expelled from the Museum accrediting bodies to which it belongs, resulting in an inability to participate in loan programs and special exhibits that attract visitors and an inability to attract curators and other personnel to the Museum. Donors would quickly flee, halting the flow of cash and artwork that the Museum desperately needs to operate. Such a sale would likely result in a loss of millage proceeds pursuant to the terms of the service agreements with the counties of Wayne, Oakland, and Macomb. The loss and eventual elimination of support would leave 100% of the costs of operating, maintaining and improving the museum and the maintenance of its collection to the City which could not afford to do so. Without accreditation, curators, donors, millage funds, and the DIA, the Museum would close.

The closure or crippling of the Museum would have similar irreparable adverse consequences for the City itself. The Museum is a critical element to the healthy, vibrant, and prosperous community that exists and that is taking shape in the City. Art is increasingly recognized as a key driver in the economic development of Detroit, prompting significant investment in the City, particularly from the foundation community. The Museum is used by businesses, educational institutions, health care facilities and others in recruiting senior executives and other personnel to work and live in Detroit. The DIA has commissioned an economic study to show the effect on Detroit's economy, its tax revenue and other financial measures and intends to make the study public upon its completion. But there can be little dispute that attempting to sell the collection in an effort to place the City on a path to fiscal solvency would have serious adverse consequences. A closure of the Museum would remove from the City one of the principal draws for potential businesses, residents, and visitors, irreparably damage regional quality of life so critical to economic development, and trigger a new barrage of national and international negative publicity about Detroit and Michigan.

And, of course, the public would be harmed and forever denied access to artistic works that are held in public trust. The DIA is charged with protecting and preserving art consistent with professional standards. The Museum has an experienced and skilled Conservation Department, which repairs and restores objects. It carefully and responsibly displays and protects these works to ensure that the people of the City, the State, and the world can view them for generations to come. A sale would place these pieces of art out of reach, potentially depriving the public forever of their right to view and share in these cultural treasures. Worse, without the assurance of professional care that a museum provides, such artwork may be damaged and lost.

**4. The Museum Cannot Raise Funds To Settle Any Claims Against The Collection.**

The EFM has also suggested that the DIA could raise funds for the City to avoid selling its collection. Such an effort would also likely negate the millage, because the county art authorities are unlikely to fund an operation that would be raising funds for the City. In addition, such an effort would be highly impractical, because the same DIA donor base, which the City presumably wants to access, has in the past provided, and currently provides, generous support to the museum. Strong-arming this same donor base to save the collection by funding the City's obligations will damage long-standing donor relationships. This option simply represents another path into the death spiral.

8

The EFM's final suggestion, partnering with another museum to "share" significant portions of the collection for a fee that would be turned over to the City, is also highly unlikely. Few museums could afford such an arrangement, and those that could already possess substantial collections and have no need of the Museum's collection beyond occasional loans. Most museums have limited space and staff, making such an arrangement impractical, and traveling large groups of art for extended periods of time could place fragile art works at significant risk. Under the best circumstances, these arrangements are complex and are planned for years in advance. A forced partnership to fund City debt places the Museum at a tremendous disadvantage in any negotiation.