# Exhibit 6

## Addendum to Proofs of Claim

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | ) | |
|---|---|---|
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**ADDENDUM TO SYNCORA PROOF OF CLAIM**

**TABLE OF CONTENTS**

**Page**

**CONTENTS**

**I.** **Introduction** .......................................................................................................... **1**

**II.** **General Obligation Bond Claims** ...................................................................... **1**

    A. Satisfied Insurance Obligations ................................................................. 2

    B. Future Interest and Principal Payments ..................................................... 3

**III.** **Overview of COPs and Swaps Transactions** .................................................... **3**

    A. COPs, Swaps, and Service Corporations. ................................................. 3

    B. Relevant Agreements ................................................................................. 4

        1. The Service Contracts, Contract Administration Agreement, and Swap Master Agreements ........................................... 4

        2. The 2009 Amendments and the Collateral Agreement ............................ 5

    C. The City's Bankruptcy and the Forbearance Agreement ........................... 6

    D. The COP Litigation .................................................................................... 7

**IV.** **COP Claims** ......................................................................................................... **8**

    A. Direct COP Holdings and COP Insurance ................................................. 8

    B. Breach of Contract ..................................................................................... 9

    C. Fraud and Fraudulent Inducement ............................................................. 9

    D. Unjust Enrichment ................................................................................... 10

    E. Restitution ................................................................................................ 10

    F. Abuse of Process ..................................................................................... 10

    G. Fees and Expenses ................................................................................... 11

i

## TABLE OF CONTENTS (CONT'D)

|  |  |  | Page |
|---|---|---|---|
| **V.** | **Swap Claims** | | 12 |
| | A. | Future Swap Payments | 12 |
| | B. | Fraud and Fraudulent Inducement | 12 |
| | C. | Breach of Contract | 12 |
| | D. | Fees and Expenses | 13 |
| **VI.** | **Reservation of Rights** | | 13 |

[*Remainder of Page Intentionally Left Blank*]

## SUMMARY OF EXHIBITS

| | |
|---|---|
| Exhibit A: | GO Bond Sale Order |
| Exhibit B: | GO Bond Resolution |
| Exhibit C: | GO Bond Notice of Nonpayment and Assignment of Rights |
| Exhibit D: | GO Bond Insurance Policy |
| Exhibit E: | Service Corporations' Articles of Incorporation |
| Exhibit E1: | Detroit General Retirement System Articles of Incorporation and Bylaws |
| Exhibit E2: | Detroit Police and Fire Retirement System Articles of Incorporation and Bylaws |
| Exhibit F: | Service Contracts |
| Exhibit F1: | 2005 GRS Service Contract |
| Exhibit F2: | 2005 PFRS Service Contract |
| Exhibit F3: | 2006 GRS Service Contract |
| Exhibit F4: | 2006 PFRS Service Contract |
| Exhibit G: | Trust Agreements |
| Exhibit G1: | 2005 Trust Agreement |
| Exhibit G2: | 2006 Trust Agreement |
| Exhibit H: | Insurance Policies |
| Exhibit H1: | 2005 COP Policy |
| Exhibit H2: | 2006 COP Policy |
| Exhibit H3: | 2006 UBS Swap Policy for PFRS |
| Exhibit H4: | 2006 UBS Swap Policy for GRS |
| Exhibit H5: | 2006 SBS Swap Policy for PFRS |
| Exhibit H6: | 2006 SBS Swap Policy for GRS |
| Exhibit I: | Summary of the Integrated Agreements |

| | |
|---|---|
| Exhibit J1: | UBS Swap Master Agreement |
| Exhibit J2: | UBS Swap Master Agreement Schedule |
| Exhibit J3: | SBS Swap Master Agreement |
| Exhibit J4: | SBS Swap Master Agreement Schedule |
| Exhibit K: | Contract Administration Agreements |
| Exhibit K1 | 2005 Contract Administration Agreement |
| Exhibit K2 | 2006 Contract Administration Agreement |
| Exhibit L: | Collateral Agreement |
| Exhibit M: | Amended and Restated Swap Agreement Schedules |
| Exhibit M1: | UBS Amended and Restated Schedule |
| Exhibit M2: | SBS Amended and Restated Schedule - GRS |
| Exhibit M3: | SBS Amended and Restated Schedule - PFRS |
| Exhibit N: | Forbearance Agreement |
| Exhibit O: | Sixth Amendment to Forbearance Agreement |
| Exhibit P: | COP Notices of Nonpayment and Assignment of Rights |
| Exhibit P1: | Series 2005-A (June 17, 2013) |
| Exhibit P2: | Series 2006-B (June 17, 2013) |
| Exhibit P3: | Series 2006-B (Sept. 12, 2013) |
| Exhibit P4: | Series 2006-B (Dec. 13, 2013) |
| Exhibit P5: | Series 2005-B (Dec. 13, 2013) |

[*Remainder of Page Intentionally Left Blank*]

## I. Introduction

1. This addendum is part of and is incorporated by reference into the proofs of claim to which it is attached (each, a "*Proof of Claim*") filed by Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "*Syncora*") against the City of Detroit, Michigan (the "*City*") in its above-captioned chapter 9 bankruptcy case. The Court established by an order dated November 21, 2013 (the "*Bar Date Order*") February 21, 2014 as the date by which creditors must file prepetition claims against the City (the "*Bar Date*"). Syncora expressly reserves the right to amend and/or supplement its timely filed Proof of Claim at any time, including after the Bar Date, in any manner, and/or to file additional proofs of claim to, *inter alia*, (a) assert any additional claims of whatever kind or nature that Syncora has, or that it may have at any time under any applicable law, and (b) adjust the amount of any claim asserted in the Proof of Claim.

2. Syncora's presently asserted claims are set forth below and described more fully herein:

| Claim | Amount | Nature of Claim |
|---|---|---|
| GO Bonds: Satisfied Insurance Obligations | $892,475 | Secured |
| GO Bonds: Future Insurance Obligations | $44,012,763 | Secured |
| COPs: Direct Holdings / Insurance | $484,943,168 | Unsecured |
| COPs: Breach of Contract | $484,943,168 | Unsecured |
| COPs: Fraud / Fraudulent Inducement | Unliquidated | Unsecured |
| COPs: Unjust Enrichment | $484,943,168 | Unsecured |
| COPs: Restitution | $484,943,168 | Unsecured |
| COPs: Abuse of Process | Unliquidated | Unsecured |
| COPs: Fees and Expenses* | $8,614,883 | Unsecured |
|  | $5,828,481 | Administrative Expense |
| Swaps: Insurance Obligations | $89,310,264 | Secured |
| Swaps: Fraud / Fraudulent Inducement | $89,310,264 | Secured |
| Swaps: Breach of Contract | $89,310,264 | Secured |
| Swaps: Fees and Expenses* | $8,614,883 | Secured |
|  | $5,828,481 | Administrative Expense |

## II. General Obligation Bond Claims

3. On October 21, 2003, the City issued $44,020,000 in General Obligation Bonds (Unlimited Tax), Series 2003-A (the "*GO Bonds*"). The City had authority to issue the GO Bonds under state law, the Charter of the City of Detroit, the resolution adopted by the City Council of Detroit on July 23, 2003 (the "*GO Bond Resolution*"), and the Sale Order (as defined below). Detroit voters authorized the issuance of the GO Bonds to fund certain specified projects of the City.[1] Interest on the GO Bonds is payable semi-annually on April 1 and

---

\* Amount of fees and expenses include Swap- and COP-related fees and expenses.

1 Ex. B, GO Bond Resolution at 2 ("Whereas . . . the qualified electors of the City of Detroit, County of Wayne, State of Michigan (the "City") authorized the Issuance and sale of general obligation unlimited tax bonds of the City to finance certain public capital improvement projects of the City as more particularly described herein."); Mich. Const. Art II § 1 ("Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution.").

October 1 of each year. (Ex. A, Order Approving Sale of General Obligation Bonds (Unlimited Tax), Series 2003-A § 202 (October 9, 2003) (the "*Sale Order*").) Principal on the GO Bonds is payable annually on April 1 of each year. (*Id.*)

4. Syncora insures the GO Bonds and has various claims, described below, as a GO Bond insurer and as subrogee. These claims are secured.[2] Moreover, the liens securing payment of the GO Bonds constitute liens "on special revenues" within the meaning of section 922(d) of the Bankruptcy Code.[3]

### A. Satisfied Insurance Obligations

5. The City failed to make the GO Bond October 1, 2013 interest payment of $892,475.00. (*See* Ex. C, GO Bond Notice of Nonpayment (Sept. 25, 2013).) Syncora remitted this amount to U.S. Bank National Association ("*U.S. Bank*"), as Paying Agent for the GO Bonds, for the benefit of GO Bond holders. Syncora is therefore subrogated to the rights of the GO Bond holders to payment from the City. (*See* Ex. D, GO Bond Insurance Policy at 1 (providing that upon making an insurance payment, Syncora "shall become the owner of the Bond, any appurtenant coupon to the Bond or the right to receipt of payment of principal and interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by [Syncora] hereunder"); Ex. C, Assignment of Rights (Sept. 24, 2013) (providing, among other things, that the Paying Agent "assigns to Syncora all rights to the payment of the Amount Due for Payment" and acknowledging that "Syncora shall be subrogated to all rights to payment under the Bonds to the extent of such payment by Syncora").) Therefore, Syncora has a claim in the amount of $892,475.00 plus interest on account of satisfied GO Bond insurance obligations.

---

[2] First, the GO Bond Resolution provides that "the unlimited tax, full faith, credit and resources of the City *are hereby irrevocably pledged* for the prompt payment of the principal and interest on the Bonds." (Ex. B, GO Bond Resolution § 301(a) (emphasis added).) Second, the GO Bonds were issued only after authorizing resolutions by the City Council and approval by a majority of the voters in a City-wide election establishing a pledge of ad valorem taxes as security to repay these obligations exclusively. The GO Bond Resolution provides that "[t]he City pledges to pay the principal of and interest on the Bonds from the proceeds of an annual levy of ad valorem taxes on all taxable property in the City without limitation as to rate or amount for the payment thereof." (*Id.*) And, to the extent of Syncora's payments to GO Bond holders on account of insurance, "the assignment *and pledge of the security* and all covenants, agreements and other obligations of the City to the bondholders shall continue to exist and shall run to the benefit of [Syncora], and [Syncora] shall be subrogated to the rights of such bondholders." (Ex. A, Sale Order (emphasis added).)

[3] The GO Bonds were issued to finance the costs of certain voter-approved capital projects, including approximately: (a) $14.5 million for neighborhood/economic development and housing rehabilitation programs; (b) $11 million for recreation, zoo, and cultural facilities improvements; (c) $7.8 million for public lighting system betterments, improvements, and extensions; (d) $5 million for the Detroit Institute of Arts improvements; (e) $4.3 million for the Charles H. Wright Museum of African-American History improvements; (f) $1.1 million for Municipal Facilities improvements; (g) $10,000 for fire buildings and sites; and (h) $83,000 for public safety facilities. (Resolution § 301(b).)

### B. Future Interest and Principal Payments

6. Over the next ten years, the remaining $34,380,000 in outstanding GO Bond principal will mature, and interest on that principal will become due and owing. (*See* Ex. A, Sale Order at 3-4.) Syncora estimates that its total future exposure on account of interest on the GO Bonds is $9,632,763. Therefore, Syncora has a contingent claim for $44,012,763.

## III. Overview of COPs and Swaps Transactions

### A. COPs, Swaps, and Service Corporations.

7. The City has historically failed to keep current on its accrued pension obligations. By 2005, two of the City's pension funds — the General Retirement System ("*GRS*") and the Police and Fire Retirement System ("*PFRS*") — were underfunded by approximately $1.4 billion. (Detroit, MI, Code § 18-15-120(g) (2005).) To fund this shortfall, the City issued instruments known as certificates of participation ("*COPs*"). (*Id.*)

8. In connection with the COP issuance, the City entered into a series of related financing transactions and contracts (the "*Integrated Agreements*").[4] Specifically, the City created two non-profit entities (the "*Service Corporations*") to serve as intermediaries in the financing. (*Id.* § 18-15-125 (2005).) Service contracts between the City and each of the Service Corporations, together with an agreement regarding the administration of the Service Contracts (discussed below), govern the relationship between the parties. (*Id*. § 18-15-140.) The Service Corporations' boards of directors are each comprised of three City officers and two City Council members. (Ex. E1, GRS Articles of Incorporation art. VIII (providing that the Service Corporation's directors shall consist of two City Council Members and the City's Finance Director, Budget Director, and Corporation Counsel); Ex. E2, PFRS Articles of Incorporation art. VIII (same) (together with the GRS Articles of Incorporation, the "*Articles of Incorporation*").) The City's Finance Director serves as the president of each Service Corporation. (*Id.*)

9. The Service Corporations created two funding trusts (each a "*Funding Trust*") to issue and sell the COPs pursuant to separate trust agreements.[5] (Detroit, MI, Code § 18-5-129.) In 2005, the 2005 Funding Trust issued a series of fixed-rate COPs (the "*2005 Fixed-Rate COPs*") and floating-rate COPs. (Ex. F1, 2005 GRS Service Contract; Ex. F2, 2005 PFRS Service Contract (together with the 2005 GRS Service Contract, the "*2005 Service Contracts*").) In 2006, the City refinanced the floating-rate COPs by exchanging them for two new series of

---

[4] For purposes of this Proof of Claim, the COPs are assumed to be valid. Nothing contained herein shall be deemed an admission by Syncora as to the validity of the COPs or that it continues to have insurance obligations in connection with the COPs. Syncora preserves all of its rights and arguments regarding the validity of the COPs and the extent of its COPs-related insurance obligations, including that any part of the COPs transaction structure is illegal or void.

[5] The Detroit Retirement Systems Funding Trust 2005 was established to provide for the issuance of the 2005 COPs. (Ex. G1, 2005 Trust Agreement (June 2, 2005).) Subsequently, the Detroit Retirement Systems Funding Trust 2006 was established to provide for the issuance of the 2006 COPs. (Ex. G2, 2006 Trust Agreement (June 12, 2006) [hereinafter, with the 2005 Trust Agreement, the "*Trust Agreements*"].)

3

COPs — one with a fixed interest rate (the "*2006 Fixed-Rate COPs*") and one with a floating interest rate (the "*2006 Floating-Rate COPs*" and, together with the 2006 Fixed-Rate COPs, the "*2006 COPs*"). (Ex. F3, 2006 GRS Service Contract; Ex. F4, 2006 PFRS Service Contract (together with the 2006 GRS Service Contract, the "*2006 Service Contracts*" and together with the 2005 Service Contracts, the "*Service Contracts*").)

10. To fix the interest rate on the 2006 Floating-Rate COPs, the Service Corporations entered into the Swaps (payments on account thereof, the "*Swap Payments*") with UBS A.G. and SBS Financial Products Company, LLC (together, and with Merrill Lynch Capital Services, Inc., as credit support provider to SBS, the "*Swap Counterparties*"). (Detroit, MI, Code § 18-5-140 (2005); Ex. L, Collateral Agreement at 1 (June 15, 2009).)

11. The City arranged for insurance on both the COPs and the Swaps in the event of the City's nonpayment. Syncora is one of several insurers that agreed to provide insurance on the COPs and the Swaps. (*See* Ex. H1, 2005 COP Policy (June 2, 2005); Ex. H2, 2006 COP Policy (June 12, 2006); Ex. H3, 2006 UBS Swap Policy for PFRS (June 12, 2006); Ex. H4, 2006 UBS Swap Policy for GRS (June 12, 2006); Ex. H5, 2006 SBS Swap Policy for PFRS (June 12, 2006); Ex. H6, 2006 SBS Swap Policy for GRS (June 12, 2006).)

12. Ultimately, the proceeds of the COP issuance flowed through the Service Corporations to the City in exchange for the City's agreement to fund future payments of principal and interest to the Service Corporations (the "*Service Payments*"). (Detroit, MI, Code § 18-5-120 (2005).) The Service Corporations in turn promised to pay forward the Service Payments to the Funding Trusts via a Contract Administrator (as defined herein). (Ex. G, Trust Agreements § 201(b).) The Service Corporations' ability to pay the Service Payments and the Swap Payments therefore depends on the City's performance under the Service Contracts.

13. Payment under the Service Contracts is made according to a priority hierarchy (the "*Waterfall*"). The Waterfall provides, in part, for payments in the following order: interest on COPs and periodic Swap Payments; payments of COP principal; and finally, Swap termination payments. (*See* Ex. F, Service Contracts § 8.03.)

### B. Relevant Agreements

#### 1. The Service Contracts, Contract Administration Agreement, and Swap Master Agreements

14. The COPs and the Swaps transactions are, or were, governed by a series of interrelated and interconnected agreements that set out the parties' respective rights. The Integrated Agreements include the Service Contracts, the Swaps, the Trust Agreements, and the Contract Administration Agreement.[6]

15. The Service Contracts established and governed the City's obligation to provide the Service Corporations with the funds necessary to pay the amounts due under the COPs and the Swaps. Syncora has multiple rights under the Service Contracts, including third party

---

[6] A summary of the Integrated Agreements is attached hereto as Exhibit I.

beneficiary status and consent rights. (*See, e.g.*, Ex. F, Service Contracts § 9.07 (providing that the Service Contracts are binding obligations that Syncora has the right to enforce as third-party beneficiary).) Additionally, Syncora had the right to consent to any termination of the Swaps by the Service Corporations (Service Contracts § 9.02) and amendment of the Service Contracts (*id.* § 9.05).[7]

16. Syncora also has broad control and amendment rights under the Integrated Agreements. For example, the Contract Administration Agreement cannot be amended without Syncora's consent pursuant to section 10.3. Further, Syncora is treated as a COP holder for the COPs it insures under section 6.9.2(1) and had the right to control all actions taken by any Swap Counterparty, including directions, consents, and waivers under section 6.9.2(2). Under the Trust Agreement, established to appoint U.S. Bank as Trustee and provide for issuance of the COPs, COP holders (including Syncora) have various rights, including the right to consent to (a) changes to the payments or amounts of payments, (b) a reduction in the principal amount of certificates, and (c) modifications of the Service Corporations' grant of a security interest to the Funding Trust in the Funding Trust Receivables (*i.e.*, payments by the Service Corporations for the benefit of the COP holders). (Ex. G, Trust Agreements §§ 702, 802.)

17. Thus, Syncora has broad rights — both as a third-party beneficiary and as a party-in-interest — to, *inter alia*, (a) enforce the terms of the agreements; (b) direct the actions of the COP-holders; and (c) consent to any waivers, amendments, or modifications of the agreements.

### 2. The 2009 Amendments and the Collateral Agreement

18. In 2009, a potential Termination Event (as defined in the Master Agreements) under the Swaps occurred.[8] To avoid a significant termination payment, the City, the Service Corporations, the Swap Counterparties, and Syncora[9] entered into a series of interrelated agreements that restructured the Swaps, one of which was a collateral pledge (the "*Collateral Agreement*"). (Ex. L, Collateral Agreement at 1 (June 15, 2009).) Under the Collateral Agreement, the City agreed to fund the Service Corporations' Swap Payments through a "lockbox" arrangement and to pledge certain casino tax revenues (the "*Casino Revenues*") as collateral to certain of its obligations under the Service Contracts. (*See id.* § 4.1.) The Service

---

[7] For purposes of this Proof of Claim, the Swaps are assumed to be valid. Nothing contained herein shall be deemed an admission by Syncora as to the validity of the Swaps or that it continues to have insurance obligations in connection with the Swaps. Syncora preserves all of its rights and arguments regarding the validity of the Swaps and the extent of its Swaps-related insurance obligations, including that its insurance obligations were discharged by, among other things, the Swap Counterparties' material alteration of the underlying agreements as a result of the Forbearance Agreement.

[8] A Termination Event, in practical terms, allows the Swap Counterparties to "fix" the interest rate at current rates and demand immediate payment of the net present value of all future payments, calculated at the fixed interest rate.

[9] Though Syncora is not a signatory to the Collateral Agreement, its consent was required before the Collateral Agreement could be executed, it is referenced in the Collateral Agreement, and has rights under the Collateral Agreement.

5

Corporations in turn granted a security interest in the Casino Revenues to the Swap Counterparties. (*Id*. § 4.2.)

19. In addition, the Collateral Agreement also stated that it could not be amended in a fashion that affects any of Syncora's rights, remedies, or obligations without Syncora's consent. (*Id*. § 14.5.) Further, the Collateral Agreement provided that the City cannot divert or redirect the payment of the Casino Revenues. (*Id*. § 5.1) The Collateral Agreement also integrated the provisions of the Swaps, the Service Contracts, and the Contract Administration Agreement. (*Id*. § 14.14.) As an insurer, Syncora could exercise any right granted to it in the Collateral Agreement — and obviously retained the significant rights granted to it in the other agreements comprising the structure. (*Id*. § 14.6.)

20. Prior to the petition date, several events that trigger the automatic trapping of funds in the General Receipts Subaccount under section 5.4 of the Collateral Agreement had already occurred. These events include the Governor's declaration of a financial emergency in Detroit, the appointment of an Emergency Manager, and a credit rating downgrade in March 2012. (Ex. M, A&R Part 1(i); Ex. J1, J3, Master Agreements § 5; Ex. L, Collateral Agreement § 11.6.) Then, on June 14, 2013, the City failed to fund a Service Payment. The Service Corporations in turn failed to make their regularly scheduled payments to the Funding Trust. Under section 5.4, the Service Corporations' payment default constituted an Event of Default under the Swaps, which in turn triggered the automatic trapping of the funds in the General Receipts Subaccount. (Ex. L, Collateral Agreement § 5.4(a)(iii); Ex. J2, J4, Master Agreement Schedules § 5(vi).)

21. In connection with the Collateral Agreement, the parties also amended the Swaps. In particular, the Swaps were modified to incorporate the Collateral Agreement and expand Syncora's consent rights to include a right of consent to any waiver, modification, and amendment of the Swaps or the Collateral Agreement. (Ex. M, A&R,[10] Part 5(d).) The amended Swaps preserved Syncora's right to prevent designation of an early Swap termination so long as a Termination Event or Event of Default was outstanding. Put another way, after the Termination Events and Events of Default described above took place, a Swap Counterparty had to obtain Syncora's consent before terminating the Swaps.

### C. The City's Bankruptcy and the Forbearance Agreement

22. In June 2013, the City entered into negotiations with the Swap Counterparties to amend the Swaps. On July 15, 2013, the City, the Service Corporations, and the Swap Counterparties executed that certain Forbearance and Optional Termination Agreement dated July 15, 2013 (as amended, the "*Forbearance Agreement*").[11] (Ex. N, Forbearance Agreement (July 15, 2013).) On July 18, 2013, the City filed for bankruptcy under chapter 9 of the

---

[10] The term "A&R" means those certain amendments to the schedules to the Master Agreements attached hereto as Exhibit M1, Exhibit M2, and Exhibit M3.

[11] The City amended the Forbearance Agreement six times since its execution, most recently on December 27, 2013. (*See* Ex. O, Sixth Amendment to Forbearance Agreement [Docket No. 2341].)

Bankruptcy Code. That same day, the City filed a motion to assume the Forbearance Agreement [Docket No. 17] (the "*Assumption Motion*").

23. Syncora maintained that the Forbearance Agreement violated the Integrated Agreements, including with respect to Syncora's consent rights.[12] Additionally, the City and the Swap Counterparties altered the obligations of the Swaps by, among other things, impermissibly permitting the release of cash collateral. At its core, the Forbearance Agreement purported to do three things: (a) grant the City the right to direct the Swap Counterparties to terminate the Swaps; (b) obligate the Swap Counterparties to waive their right to enforce the cash trap under the Collateral Agreement; and (c) provide for a Swap termination payment to be made directly to the Swap Counterparties. (Ex. N, Forbearance Agreement §§ 1, 3.1, 3.5.) By entering into, and acting under, the Forbearance Agreement, the Swap Counterparties waived, modified, or amended their rights under the Swaps and the Collateral Agreement and materially altered the Swaps transaction. On January 16, 2014, the Court denied the Assumption Motion.

### D. The COP Litigation

24. On January 31, 2014, the City filed a lawsuit seeking a declaratory judgment that the COPs are invalid, that all COP-related claims should be disallowed, and for related injunctive relief (the "*COP Litigation*"). Specifically, the City seeks a declaratory judgment that "[t]he 2005 and 2006 Service Contracts are illegal under Michigan law, and the Service Contracts and all other contractual or other obligations incurred by the City in connection with the COPs transactions are unenforceable and void *ab initio*." (*See* Complaint for Declaratory and Injunctive Relief ¶ 41, *City of Detroit v. Detroit General Retirement System Serv. Corp.*, No. 14-04112 [Docket No. 1].) Additionally, the City seeks a declaratory judgment that any claims based on the City's obligations to payments under the Service Contracts on account of the COPs should be disallowed pursuant to 11 U.S.C. § 502(b)(1) "because the agreements creating those obligations are unenforceable, void, and of no effect whatsoever." (*Id.* ¶ 49.) Finally, the City requests "preliminary, temporary and permanent injunctive relief enjoining defendants . . . from taking any act that (a) would require, or purport to require, the City to make City Payments or provide distributions under a plan of adjustment to either of the Service Corporations or either of the Funding Trusts or (b) deprive the City of any benefit it is due." (*Id.* ¶ 51.)

25. In short, the City argues that "the economic reality of the COPs transactions was that they were municipal bond offerings by the City, with the Service Corporations and the Service Contracts serving as the instrumentalities by which the City hoped to evade the requirements of state law for the issuance of that debt." (*Id.* ¶ 31.) The City alleges that the 2005 and 2006 COPs transactions violate Michigan law requirements for the issuance of funded debt, and that the transactions resulted in the City incurring net indebtedness that exceeded the City's debt ceiling established by Michigan law. Therefore the City asserts that its obligations relating thereto were void *ab initio* and seeks disallowance of COP-related claims.

---

[12] For further discussion regarding Syncora's various objections to the Forbearance Agreement, see the *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366].

## IV. COP Claims

26. Interest and principal payments on account of the 2005 Fixed-Rate COPS are due annually on June 15 of each year until repayment in full in 2025.[13] (2005 Service Contracts, Schedule 2.) Interest payments on account of the 2006 Fixed-Rate COPs are due semi-annually on June 15 and December 15 (2006 Service Contracts ST § 4(e)) and interest payments on account of the 2006 Floating-Rate COPs are due on the fifteenth day of each quarter (2006 Service Contracts, Index Rate Funding Cost Supplement § 2 (defining "Index Rate Service Charge Payment Dates").) Principal payments on account of the 2006 COPs are due on June 15 of each year beginning in 2026 and ending in 2035. (2006 Service Contracts, Schedule 3.)

27. Pursuant to Section 201 of the June 12, 2006 Trust Agreement, the Service Corporations assigned to the Funding Trust the rights to receive Scheduled Payments and Service Charges on the COPs. Trust T&C, Section 201 ("Effective as of the Closing Date, each Corporation hereby transfers, assigns and otherwise conveys to the Funding Trust all of its right, title and interest in, to and under the Funding Trust Receivables now or hereafter created under its respective Service Contract, and all monies due or to become due with respect thereto and all proceeds (as defined in Section 9-315 of the Uniform Commercial Code as in effect in the State of Michigan) of such Funding Trust Receivables.").

### A. Direct COP Holdings and COP Insurance

28. Syncora directly owns approximately $179,155,000 of 2006 Floating-Rate COPs and approximately $27,345,000 of 2005 Fixed-Rate COPs. Prior to the petition date, the City failed to make its June 2013 COP-related Service Payment, and has also missed additional payments since the petition date. The chart below describes the various Service Payments owed to Syncora on account of its direct COP holdings that the City has not paid to date.

| Payment Date | 2006 Floating-Rate COPs | | 2005 Fixed-Rate COPs | |
|---|---|---|---|---|
| | Principal | Interest | Principal | Interest |
| 6/15/2013 | — | 189,338.00 | — | — |
| 9/15/2013 | — | 181,131.00 | — | — |
| 12/15/2013 | — | 175,175.00 | — | 623,876.00 |

29. Syncora also insures the 2005 and 2006 COPs. (*See* Ex. H1, 2005 COP Policy (June 2, 2005); Ex. H2, 2006 COP Policy (June 12, 2006).) As discussed above, the City failed to make the June 2013 COP-related Service Payment, and also has missed additional payments since the petition date.[14] The chart below describes the various Service Payments that the City has not paid to date, and on account of which Syncora has remitted payment to the Trustee for the benefit of COP holders.

---

[13] No principal amounts are due on the 2005 Fixed-Rate COPs in the years 2016 through 2019 or 2021 through 2024. (2005 Service Contracts, Schedule 2.)

[14] *See* Ex. P, COP Notices of Nonpayment and Assignments of Rights.

8

| Payment Date | 2006 Floating-Rate COPs | | 2005 Fixed-Rate COPs[15] | | 2005 Fixed-Rate COPs[16] | |
|---|---|---|---|---|---|---|
| | Principal | Interest | Principal | Interest | Principal | Interest |
| 6/15/2013 | — | 453,131.74 | 23,105,000.00 | 520,209.07 | — | 676,350.68 |
| 9/15/2013 | — | 433,490.14 | — | — | — | — |
| 12/15/2013 | — | 419,235.82 | — | — | — | 676,350.68 |

30. As insurer of the COPs, Syncora is subrogated to the rights of the COP holders. (Ex. H1, 2005 COP Policy at 1 (providing that upon disbursement, "[Syncora] shall become the owner of the Bond, any appurtenant coupon to the Bond or the right to receipt of payment of principal and interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payment under the Bond, to the extent of any payment by [Syncora] hereunder"); Ex. H2, 2006 COP Policy at 1 (same); Ex. F, Service Contracts § 7.03 (providing that insurers making insurance payments "are subrogated to the rights" of COP holders and "shall be entitled to exercise all rights and remedies that the Person to which it is subrogee would have otherwise been entitled to exercise."); Ex. P, COP Notices of Nonpayment and Assignment of Rights (providing, among other things, that the Trustee "assigns to Syncora all rights to the payment of the Amount Due for Payment" and acknowledging that "Syncora shall be subrogated to all rights to payment under the Bonds to the extent of such payment by Syncora").)

31. Moreover, pursuant to section 9.01 of the Service Contracts, the commencement of the City's bankruptcy case resulted in the automatic acceleration of all payments due under each Service Contract. Therefore, Syncora has claims on account of its direct COP holdings and COP insurance in the amount of approximately $484,943,168.

### B. Breach of Contract

32. Syncora has a claim for breach of contract. In section 3.02 of the Service Contracts the City represented and warranted, among other things: (a) execution of the Service Contracts was within the City's authority; (b) the City's payment obligations under the Service Contracts do not constitute indebtedness of the City; and (c) the Service Contracts are valid and binding obligations of the City. If any of the foregoing are found to be inaccurate or untrue in any way, including in connection with the COP Litigation, the City will have breached the Service Contracts. Therefore, Syncora has contingent claims on account of its direct COP holdings and COP insurance in the amount of approximately $484,943,168.

### C. Fraud and Fraudulent Inducement

33. In connection with its efforts to market the COPs and to obtain insurance on the COPs, the City made various representations to would-be COP holders and insurers (including Syncora) regarding the City's economic characteristics, fiscal outlook, and financial controls and auditing. Certain of these representations were false, and the City made such false

---

[15] Policy number: SCA02078A; CUSIP number: 25113PAX3.

[16] Policy number: SCA02078A; CUSIP number: 25113PAY1.

9

representations knowingly or recklessly without any knowledge of their truth. By making these statements in connection with the COPs and Swaps transactions, the City intended for Syncora and other parties to rely on this information. Such representations were material to Syncora's decision whether to purchase COPs and to serve as insurer of the COPs, and Syncora relied on these representations when determining whether to purchase and insure the COPs. These misrepresentations resulted in significant injury to Syncora. Therefore, Syncora has a claim for compensatory and punitive damages in an amount to be determined, plus interest.

### D. Unjust Enrichment

34. Syncora has a claim for unjust enrichment in the event the City's obligations under the Service Contracts are invalidated as a result of the COP Litigation. The City or its instrumentalities received over $1.4 billion in connection with the 2005 and 2006 COPs transactions as a result of the City's promises under the Service Contracts. The City or its instrumentalities have retained the entirety of such funds since the consummation of the 2005 and 2006 COPs transactions, and the City has earned substantial interest on such funds. It would be inequitable, unjust, and unconscionable for the City or its instrumentalities to retain such funds if the COPs are invalidated or otherwise declared void *ab initio*. Otherwise, the City would receive a huge windfall as a result of its own decision to enter into transactions that turned out to be beyond the scope of its authority, all at the expense of COP holders. Syncora directly owns $206.5 million in current face value of COPs. Therefore, Syncora has claims for unjust enrichment on account of its direct COP holdings and COP insurance in the amount of approximately $484,943,168.

### E. Restitution

35. Syncora has a claim for restitution in the event the COPs are invalidated as a result of the COP Litigation. As discussed in Section IV.D, the City of Detroit or its instrumentalities benefitted from the over $1.4 billion received in connection with the 2005 and 2006 COPs transactions. Invalidation of the City's obligations with respect to the COPs would effectively terminate the parties' relationship. In such instance restitution is available to return the parties to their status prior to entering into the contracts. Syncora directly owns $206.5 million in current face value of COPs. Therefore, Syncora has claims for restitution on account of its direct COP holdings and COP insurance in the amount of approximately $484,943,168.

### F. Abuse of Process

36. Syncora has a claim against the City for abuse of process. Following the City's June 14, 2013 COP-related default, Syncora sent a letter on June 17, 2013 to U.S. Bank, as custodian under the Collateral Agreement, notifying it of the City's default. U.S. Bank then trapped the Casino Revenues, and the City began to negotiate with U.S. Bank, Syncora, and others in order to release the Casino Revenues. Then, on July 5, 2013, the City filed a state court lawsuit seeking injunctive relief and a temporary restraining order ("*TRO*") prohibiting U.S. Bank from trapping the Casino Revenues. Although the City and Syncora had been in regular communications during the negotiations, the City did not immediately notify Syncora of the filing of its complaint or of the TRO hearing. As a result, the TRO was granted on July 5, 2013 on an *ex parte* basis. The City had an ulterior purpose in bringing the state court action and in

failing to notify Syncora of the TRO hearing, and its actions in use of judicial process were improper. In addition, the City claimed that Syncora's actions resulted in damages to the City, but the City's Emergency Manager later testified that Syncora's actions did not interfere in the negotiations at all. Therefore, Syncora has a claim for abuse of process in an amount to be determined.

### G. Fees and Expenses

37. Syncora is entitled to payment of its reasonable fees and expenses incurred in connection with its role as COP insurer. *See* Ex. K, CAA §§ 9.6, 10.5. Specifically, 10.5.1 of the Contract Administration Agreement provides that the Service Corporations "shall pay or reimburse each Insurer for any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur" in connection with the following:

- the administration, enforcement, defense or preservation of any rights or security hereunder or under any document contemplated hereby;

- the pursuit of any remedies hereunder or under any document contemplated hereby or otherwise afforded by law or equity;

- any amendment, waiver or other action with respect to or related to this Agreement or any document contemplated hereby whether or not executed or completed;

- the violation by either Corporation of any law, rule or regulation or any judgment, order or decree applicable to it;

- any advances or payments made by an Insurer to cure defaults of the Corporation hereunder or any document contemplated hereby; or

- any litigation or other dispute in connection with this Agreement, any document contemplated hereby or the transactions contemplated hereby or thereby, other than amounts resulting from the failure of an insurer to honor its payment obligations under its respective Credit Insurance.

(Ex. K, CAA § 10.5.1.)

38. Further, section 9.6 of the Contract Administration Agreement provides that "In the event of any dispute between or among any of the parties hereto arising out of this Agreement, the prevailing party or parties shall be entitled to recover from the losing party or parties, all fees, costs and expenses, including, without limitation, attorneys' fees, incurred by such prevailing party or parties in connection with such dispute."

39. Syncora's disputes with the City relating to the COPs, including but not limited to disputes relating to the Forbearance Agreement, are well known, and Syncora has incurred substantial attorneys' fees in connection therewith. Syncora is entitled to repayment on account of such fees and expenses as described above. Moreover, Syncora's involvement substantially contributed to the City's chapter 9 case and has served to enhance the reorganization process for

all creditors by, among other things, resulting in the denial of the Assumption Motion. Syncora has a claim in the amount of $8,614,883 plus interest on account of fees and expenses discussed in this Section and Section V.C, *infra*. Approximately $5,828,481 of this amount is an administrative expense claim on account of postpetition fees and expenses. Syncora also has a contingent claim for future fees and expenses in an amount to be determined.

## V. Swap Claims

40. As discussed in Section III.B.1 *supra*, to fix the interest rate on the 2006 Floating-Rate COPs, the Service Corporations entered into the Swaps with the Swap Counterparties. (Detroit, MI, Code § 18-5-140 (2005); Ex. L, Collateral Agreement at 1 (June 15, 2009).) Under the Swaps, if interest rates fall below a certain fixed rate, the Service Corporations pay the Swap Counterparties the difference between the lower rate and the higher rate. Conversely, if interest rates exceed the fixed rate, the Swap Counterparties pay the Service Corporations the difference between the higher rate and the lower fixed rate. Swap Payments are payable to the Swap Counterparties on the 15th day of each quarter.

41. Syncora has various claims relating to the Swaps, which are described in detail below. These claims are secured by the pledge of Casino Revenues.

### A. Future Swap Payments

42. The City is liable to the Swap Counterparties to make timely Swap Payments. In the event the City fails to do so, Syncora may be obligated to provide payment to the Swap Counterparties. Accordingly, Syncora has a contingent claim in the amount of at least $89,310,264 plus interest for future Swap Payments.

### B. Fraud and Fraudulent Inducement

43. In connection with its efforts to obtain insurance on the Swaps, the City made various representations to would-be Swap insurers (including Syncora) regarding the City's economic characteristics, fiscal outlook, and financial controls and auditing. Certain of these representations were false, and the City made such false representations knowingly or recklessly without any knowledge of their truth. By making these statements in connection with the COPs and Swaps transactions, the City intended for Syncora and other parties to rely on this information. Such representations were material to Syncora's decision whether to serve as insurer of the Swaps, and Syncora relied on these representations when determining whether to insure the Swaps. These misrepresentations resulted in significant injury to Syncora. Therefore, Syncora has a claim for compensatory and punitive damages in an amount to be determined, plus interest.

### C. Breach of Contract

44. Syncora has a claim for breach of contract on account of the City's breach of the Collateral Agreement. First, section 14.5 of the Collateral Agreement provides that it may not be amended except with Syncora's consent. The City breached this agreement by entering into the Forbearance Agreement without Syncora's consent. Second, the City represented and warranted that, among other things: (a) the Collateral Agreement constitutes a "valid and binding

12
13-53846-tjt    Doc 5444-7    Filed 06/18/14    Entered 06/18/14 22:00:00    Page 17 of 19

agreement of the City"; (b) the pledge of the Casino Revenues to secure the Swaps was valid; and (c) the application of the Casino Revenues under the Collateral Agreement was in compliance with applicable state law. (*See* Ex. L Collateral Agreement art. VI). If any of the representations or warranties are found to be inaccurate or untrue in any way, including in connection with the COP Litigation, the City will have breached the Collateral Agreement. Therefore, Syncora has a claim in the amount of approximately $89,310,264.

### D. Fees and Expenses

45. Syncora is entitled to payment of its fees and expenses, including attorneys' fees, in connection with its Swap claims. Section 5(xi) of the Amended and Restated Schedule provides that Syncora is an express third-party beneficiary of the Swap agreement and shall be afforded "all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred . . . including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder." (Ex. M, A&R § 5(xi).) Syncora's disputes with the City relating to the Swaps, including but not limited to the Forbearance Agreement, are well known, and Syncora has incurred substantial fees in connection therewith. Moreover, Syncora's involvement substantially contributed to the City's chapter 9 case, and has served to enhance the reorganization process for all creditors by, among other things, resulting in the denial of the Assumption Motion. Syncora has a claim in the amount of $8,614,883 plus interest on account of fees and expenses discussed in this Section and Section IV.F, *supra*. Approximately $5,828,481 of this amount represents postpetition fees and expenses entitled to administrative priority.

## VI. Reservation of Rights

46. The filing of this Proof of Claim (including any documents or attachments submitted in connection therewith) does not constitute a concession or admission by Syncora of liability, of any facts, or as to whether all or a portion of the claims are prepetition or postpetition in connection with any claim that has been or may be asserted against Syncora or against the City. Nothing in this Proof of Claim shall be construed as a waiver of Syncora's right to treat any claim set forth herein as an administrative claim, to the extent such claim is in fact an administrative claim pursuant to section 503 of the Bankruptcy Code.

47. Syncora has filed this Proof of Claim (including any documents and attachments submitted in connection therewith) under compulsion of the Bar Date Order entered in the City's chapter 9 case. Syncora reserves the right to amend and/or supplement this Proof of Claim at any time, including after the Bar Date, in any manner, and/or to file additional proofs of claim to, *inter alia*, (a) assert any additional claims of whatever kind or nature Syncora has, or that it may have at any time under any applicable law, whether legal or equitable, including such claims that are entitled to rights and priorities afforded under section 365, 503 or 507 of the Bankruptcy Code, and (b) adjust the amount of any claim asserted against the City in this Proof of Claim.

48. The filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver or release of Syncora's rights against any person, entity, or property, or a waiver of the right to compel the City to return property of Syncora currently in the possession of the City;

(b) a consent by Syncora to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Syncora; (c) a waiver or release of Syncora's right to trial by jury in this Court or any other court in any proceeding as to any and all matters described in the Proof of Claim, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by Syncora to a jury trial in the Court or any other court in any proceeding as to any and all matters described in the Proof of Claim or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Syncora's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this case against or otherwise involving Syncora; (g) an election of remedies; or (h) a waiver of any arguments that its insurance obligations were discharged or are null and void for any reason, including because the Swap Counterparties' entry into the Forbearance Agreement constituted a material alteration of the underlying agreement and because the Swap Counterparties cannot assign "all rights and claims" to Syncora as required by the Swap Policy because the Swap Counterparties modified their rights under the Forbearance Agreement or otherwise.

49. Syncora reserves its rights, and nothing herein shall prejudice Syncora's rights, under any order of the Court, including the Bar Date Order.

50. All notices and pleadings relating to this Proof of Claim should be addressed to:

> Syncora Guarantee Inc. and Syncora Capital Assurance Inc.
> Attn: Claude LeBlanc
> Attn: James Lundy
> 135 West 50th Street, 20th Floor
> New York, New York 10020
> Telephone: (212) 478-3400
>
> -with a copy to-
>
> Kirkland & Ellis LLP
> Attn: Ryan Bennett
> Attn: Stephen Hackney
> 300 North LaSalle Street
> Chicago, Illinois 60654
> Telephone: (312) 862-2000

[*Remainder of Page Intentionally Left Blank*]