UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------x
:
In re : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No. 13-53846
:
Debtor. : Hon. Steven W. Rhodes
:
:
---------------------------------------------------x

# RESPONSE OF THE CITY OF DETROIT TO THE MOTION OF THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT TO DESIGNATE AND DETERMINE ADDITIONAL LEGAL ISSUE REGARDING METHODOLOGY FOR ASF RECOUPMENT FROM RETIREES

1. Through its *Motion of the General Retirement System of the City of Detroit to Designate and Determine Additional Legal Issue Regarding Methodology for ASF Recoupment from Retirees* (Docket No. 5478) (the "Motion"),[1] the General Retirement System of the City of Detroit (the "GRS")[2] seeks to enlist the Court in its attempt to alter settlement terms that it previously

---

[1] The Retiree Committee filed the *Official Committee of Retirees' Concurrence in Motion of the General Retirement System of the City of Detroit to Designate and Determine Additional Legal Issue Regarding Methodology for ASF Recoupment from Retirees* (Docket No. 5509).

[2] Capitalized terms not otherwise defined in this Response shall have the meaning given to them in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* (Docket No. 4392) (the "Plan").

negotiated and formally approved by action of its Board of Trustees. The Court should deny the GRS a second bite at the apple.

2. As the Court is aware, the adjustment of the City's debts pursuant to the Plan has been the subject of intensive and prolonged mediation and negotiation among essentially all interested parties in this chapter 9 case. Perhaps the most important subject of these negotiations has been the treatment of the City's staggering, multi-billion dollar legacy obligations (including the treatment of GRS Pension Claims). The successful negotiation of a comprehensive settlement regarding these legacy obligations — which settlement served the dual purposes of (a) establishing recoveries upon existing claims and (b) allocating risk related to pension legacy obligations among the parties going forward — was a crucial milestone in the City's efforts to confirm the Plan.

3. The GRS was hardly a spectator to these discussions. The GRS participated extensively in Court-ordered mediation proceedings and related negotiations with the City regarding the treatment of GRS Pension Claims and the prospective allocation of pension-related risk. As a result of the parties' negotiations, the GRS agreed to settle these issues on the terms set forth in the Plan, including <u>the precise topic of the GRS' Motion</u>. Indeed, prior to the filing of the Motion, the GRS had publicly endorsed the treatment of GRS Pension Claims provided in the Plan and just as publicly declared that it believes that the Plan is in

the best interests of GRS participants. It is thus disingenuous, at best, and quite a surprise to the City, for the GRS to ask the Court, six weeks after the commencement of solicitation of the Plan, to undo the parties' agreement and rewrite the terms of that agreement.

4. Although the GRS seeks to cast this as a legal issue, it is not. It is an attempt to have the Court rewrite the settlement. As demonstrated below, there is no legal or equitable basis for requiring the City to amend its Plan to provide the GRS with the relief it seeks in the Motion. The GRS should honor its commitment to support the Plan as written and should not be permitted to use the Motion to renegotiate the compromises it has reached with the City through judicial mediation.

## Response

### A. The treatment of GRS Pension Claims under the Plan was negotiated by the GRS.

5. The Motion — which was filed without any advance notice to the City — surprised the City not only because the GRS has explicitly endorsed the Plan and recommended that its members vote in favor of the Plan, but because the GRS negotiated with the City regarding the very terms that it now seeks to modify.

6. Early in this case, the Court appointed Chief Judge Gerald Rosen as judicial mediator and ordered various parties in interest, including the City and the GRS, to appear before Judge Rosen to discuss and negotiate, among

other things, "the treatment of the claims of the various creditor classes in a plan of adjustment." *See* Docket No. 322 (Aug. 13, 2013) (Mediation Order appointing Judge Rosen); Docket No. 333 (identifying treatment of claims as an issue for mediation); Docket No. 334 (ordering the City and the GRS to appear before Judge Rosen for mediation).

7.  Through mediation, and independently, the City has remained in constant contact with representatives of the GRS. The City's communications with the GRS have involved extensive discussions regarding the treatment of GRS Pension Claims. In April 2014, after many months of negotiations, the City and the GRS agreed on an acceptable treatment of GRS Pension Claims, which is embodied in the Plan. Counsel to the GRS declared that the Plan embodied "the best deal that we've been able to put together through the mediation process that represents the best scenario for retirees." *See* Detroit Pension Board Endorses Deal to Cut Benefits, Eliminate COLA, The Detroit Free Press (Apr. 16, 2014), *available at* http://www.freep.com/article/20140416/NEWS01/304160130/ Detroit-pension-board-general-cut (quoting Michael VanOverbeke, general counsel to the GRS).

8.  More recently, the GRS board held a public meeting and passed a resolution formally supporting the Plan and urging the members of the GRS to vote in favor of the Plan. *See* General Retirement System Board Urges Support for

Detroit Bankruptcy Plan (June 11, 2014), *available at* http://www.crainsdetroit.com/article/20140611/NEWS/140619950/general-retirement-system-board-urges-support-for-detroit-bankruptcy (stating that the GRS board "passed a resolution recommending that retirees accept the city's fourth amended plan of adjustment" and that the GRS board "expects to issue a letter to nonuniform retirees next week, with its reasons for supporting the plan"). In a public statement, the GRS board said: "The board of trustees believes that the proposed (plan of adjustment) represents the best interests of GRS members, retirees and beneficiaries and further represents the best and most prudent option for maximizing the preservation of retirement benefits." *See* Pension Board Agrees to Urge "Yes" Vote on Detroit Bankruptcy Plan (June 11, 2014), *available at* http://www.reuters.com/article/2014/06/11/usa-detroit-bankruptcy-pensions-idUSL2N0OS1SK20140611.

9. The Motion represents an about-face of the GRS' support for the terms of the Plan that the GRS itself negotiated, and it is contrary to the GRS' stated public support for the Plan. If the Court were to grant the Motion, it would set a dangerous precedent in this case that parties may disregard mediated compromises and selectively litigate issues that were resolved through the mediation process. The Court should deny the Motion and deny the GRS the right to renegotiate deal points that have already been resolved.

### B. The lump sum payment option shifts investment risk onto the City to fund additional pension liabilities that the City negotiated not to assume.

10. Under the Plan, a retiree who previously received a full distribution from his or her ASF account will have his or her monthly pension payments reduced by an amount that represents the annuity value of the excess portion of such distribution. This monthly pension reduction is intended to allow the GRS to recoup, over the projected remaining life of the retiree, the value of that excess distribution. Thus, for example, if a pensioner received an excess ASF distribution of $50,000, his or her monthly pension might be reduced by $400 per month (it would vary based on age) so that over his or her expected lifetime, the GRS would recover the value of that $50,000. The interest rate for purposes of paying off this excess amount over a pensioner's remaining expected life is 6.75%, which is the investment return that the GRS is expected to earn on its assets under the Plan. This element of the pension settlement, and particularly the 6.75% rate, was negotiated by the City, the GRS and other parties in the mediation before Judge Rosen and represents the City's and pensioners' shared risk going forward in funding the GRS pension fund.

11. The Motion seeks to allow the retirees to buy back in a single payment the amount of this monthly pension reduction for ASF Recoupment. Using the example above, the retiree would be allowed to buy-back and avoid the

$400 reduction in his or her monthly pension check by making an up-front $50,000 payment into the GRS trust. If allowed, the City would thereafter assume the obligation — through funding of GRS — to make the $400 monthly pension payments that the Plan otherwise avoids. In other words, what the GRS proposes is to allow retirees to increase their pensions beyond the deal that was negotiated, and in doing so add to the pension liabilities of GRS that the City would be required to fund.

12. To be sure, the GRS argues that the retirees would be paying for the privilege of having their pensions restored. But the funding risk would thereafter lie with the City. More specifically, if, in the example above, the retiree pays $50,000 to buy back the $400 per month pension, the City would bear the funding risk that the $50,000 earns 6.75% over the expected lifetime of the retiree. If it falls short, the City has to increase its contributions. The City would be saddled with increased pension liabilities and saddled with the risk that the payment it received for assuming those liabilities falls short of paying for them.

13. This is not what the City bargained for in mediation with the GRS. The Plan represents a finely-calibrated compromise between the City and the GRS regarding the appropriate amount of risk that each of the City and the GRS pensioners should bear going forward. The City agreed to the use of a 6.75% investment return assumption respecting the assets and future contributions to fund

pensions, in part, based on the expected amount of pension liabilities it would be assuming. The GRS now asks the Court to require the City to assume **greater** pension liabilities, and to require the City to continue to bear risk at the negotiated 6.75% return assumption on assets it receives as consideration for such additional liabilities.

14. Perhaps in the mediations the City might have been willing to assume the greater pension liabilities attendant upon the requested buy-out option in return for a lower investment return rate. Or perhaps it might have been willing to assume the greater liabilities attendant to the buy-out option at 6.75% if it had received from retirees in return a reduction in some other element of the pension funding risk assumed by the City. But the mediation on this issue has now passed and the deal was struck. It would be, consequently, unfair for the Court to impose on the City greater economic risk than it bargained for, without any consideration. At bottom, this is precisely what the movants are seeking.[3]

### C. The lump sum option disproportionately benefits those retirees that benefitted most from the improper ASF interest payments.

15. Furthermore, the Motion, if granted, may disproportionately benefit those retirees who are least in need of financial assistance, namely, those

---

[3] It matters not that under the GRS' request, the City would have the opportunity to make more than 6.75% on the amounts it receives to fund the additional pensions. It would be assuming funding risk on unexpected liabilities that the City did not bargain for, with nothing in return.

retirees who have large amounts of cash on hand or who have access to low-interest financing. In particular, the retirees that are most likely to avail themselves of the lump sum payment option are the very retirees who received the most significant increases to their ASF account balances as a result of mismanagement of the ASF prior to the City's bankruptcy case.

16. ASF Recoupment under the Plan is designed to recover some of the excess interest that was improperly credited into employees' ASF accounts between 2003 and 2013. In that time period, ASF accounts were treated as a guaranteed investment program, where, each year, ASF account holders were credited with interest of at least 7.9%, regardless of the actual rate of return realized by the GRS. As a result, individuals' ASF account balances were, in many instances, significantly higher than they should have been had the actual, and proper, rate of return been credited to those accounts. The negotiated settlement under the Plan does not seek to obtain recoupment of the entire excess; to the contrary, it seeks recoupment of only a _portion_ of such excess. Thus, those retirees whose ASF distributions were largest and, in particular, those who benefitted most from the improper accrual of interest, are likely to be the parties that are in a financial position (due to such net ASF distribution) to make lump sum payments to restore a portion of their pensions. Those who are least well off, and do not have the ability to borrow at rates significantly lower than 6.75%, would not be

able to take advantage of the one-time buy-out offer. Thus, the option that the GRS seeks, although ostensibly available to all pensioners subject to ASF Recoupment, may end up being a viable option merely for the wealthiest pensioners. It would be inequitable to permit the relatively wealthier pensioners who received the most significant improper ASF benefits to to shift the burdens of their future pension payments on the City while others are prohibited.

     **D.    Neither Michigan law nor the Bankruptcy Code requires the City to permit retirees to repay ASF Recoupment in a lump sum.**

    17.    The GRS has identified reasons that some of its members might want to repay their ASF Recoupment in a lump sum, but it has not established any legal basis for <u>requiring</u> the City to provide for a lump sum payment option in the Plan.

    18.    The GRS' first argument is that "if retirees happen to outlive their life expectancy, the retirees would ultimately pay more than the Recoupment Amount under the Plan." *See* Motion ¶ 6. The GRS merely states this fact, which the City does not deny, and does not explain how or why it should require the Plan to permit retirees to make a lump sum payment of their ASF Recoupment. Furthermore, while some retirees may outlive their life expectancies, others may not reach theirs. Those retirees will ultimately pay back <u>less</u> than the Recoupment Amount under the Plan. On average, the extra amounts paid back by retirees who outlive their life expectancy should be offset by the shortage in payments from

those retirees that do not reach their life expectancy. Thus, the affected retirees in the aggregate share this risk evenly.

19. Second, the GRS argues that by failing to permit retirees to make a lump sum payment, they are being "forced" into financing the Plan at a "fairly burdensome interest rate of 6.75%." *See* Motion ¶ 7. The GRS, however, provides no evidence that the interest rate is burdensome and states, without any support, that retirees might be able to borrow money at a lower rate and use the loan proceeds to make a lump sum payment of the Recoupment Amount. *Id.* The Court cannot use the GRS' bald speculation that retirees might get a better rate than 6.75% to conclude that a 6.75% rate is unfair, especially given that the 6.75% rate was arrived at through negotiations between the City and the GRS. In addition, the use of a 6.75% discount rate for ASF Recoupment is necessitated by the use of a 6.75% discount rate for calculation of the present value of future pension benefits. While the City could have held out for a lower discount rate in its negotiations, it compromised with the GRS on the 6.75% rate to avoid bigger cuts to accrued benefits.

20. Next, the GRS asserts that Michigan law does not support the recoupment of ASF funds from retirees over time because, if the City were to pursue a restitution theory and obtain a money judgment against the retirees, the retirees would be permitted to pay the judgment in a lump sum. *Id.* ¶ 10. Even if

true, this is irrelevant, because the Plan does not contemplate such a lawsuit. The Plan embodies an agreement with the GRS as to how to resolve the ASF Recoupment issue.

21. The GRS' assertion that applying a 6.75% discount rate is effectively a "penalty" that is disfavored under Michigan law is similarly unavailing. The use of a 6.75% discount rate is not a penalty. It merely accounts for the time-value of money for purposes of calculating the future reduction in pension payments, and it is the rate negotiated with all the parties and embodied in the Plan with respect to pension liabilities. As stated earlier, the use of 6.75% for ASF Recoupment is necessitated by its use in calculating the present value of future pension benefits.

## Conclusion

22. For the reasons set forth herein, the City requests that the Court deny the Motion.

LAI- 3217573v3

12

13-53846-tjt    Doc 5578    Filed 06/24/14    Entered 06/24/14 23:29:09    Page 12 of 14

Dated: June 24, 2014   Respectfully submitted,

    /s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

# CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing *Response of the City of Detroit to the Motion of the General Retirement System of the City of Detroit to Designate and Determine Additional Legal Issue Regarding Methodology for ASF Recoupment from Retirees* was filed and served via the Court's electronic case filing and noticing system on this 24th day of June, 2014.

/s/ Heather Lennox