UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

---------------------------------------------- )
In re:                                        )   Case No. 13-53846
                                              )
CITY OF DETROIT, MICHIGAN,                    )   In Proceedings Under
                                              )   Chapter 9
           Debtor.                            )
                                              )   Hon. Steven W. Rhodes
                                              )
---------------------------------------------- )

**WAYNE COUNTY'S BRIEF REGARDING ITS STANDING TO RAISE OBJECTIONS TO THE DEBTOR'S FOURTH AMENDED PLAN OF ADJUSTMENT**

Wayne County, Michigan, a Michigan Constitutional corporation, a party-in-interest in this case, by and through its County Executive, Robert A. Ficano ("Wayne County"), states:

**Issue Presented:** On June 5, 2014, the Court issued its Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures (the "Legal Issues Order"). Question 10 of the Legal Issues Order asked "Whether Macomb, Oakland and Wayne Counties have standing to object to the Plan."

**Factual Background:**

Wayne County, Michigan is a Michigan Constitutional Corporation, organized under Article VII, Section 1 of the Michigan Constitution of 1963. The City of Detroit ("Detroit") is entirely located within Wayne County, and is within its jurisdiction. By area, the City of Detroit constitutes nearly

1

22% of Wayne County. By population (as of 2010), Detroit has nearly 40% of the residents of Wayne County. Wayne County's government provides substantial services for Detroit that Detroit would otherwise have to provide for itself, including, but not limited to, the Prosecutor's Office, the Circuit Court, the Register of Deeds and Sheriff's Office. The results of Detroit's bankruptcy will have a material impact on all of Wayne County's residents and governmental services.

This is especially true with respect to the Detroit Water and Sewerage Department ("DWSD"). Wayne County and Detroit are parties to a January 13, 1944 Agreement for Use of Certain Detroit Sewers, amended by a February 28, 1961 Amendatory Agreement and a June 13, 1982 Amendment No. 2, as well as other agreements by which DWSD provides Wayne County and its residents with water and sewage services (together, the "DWSD Contracts"). Through the DWSD Contracts, Wayne County provides residents with a core function of government, supplying the most basic and essential human needs to County residents. DWSD maintains an extensive infrastructure designed to meet Wayne County and regional needs.

Under Detroit's Fourth Amended Plan of Adjustment (the "Plan"), the DWSD Contracts are assumed. The Plan provides for the continuation of DWSD as a department of Detroit's government, but also contains provisions suggesting that DWSD could be sold to a private entity under terms that are, at present, unknown (and unknowable).

Wayne County has objected to the Plan primarily on "feasibility" grounds. Wayne County's objective, through its objection, is to ensure that water and sewerage services will be provided to its residents without interruption, excessive cost or illegal subsidization of other City departments.

At present, the Plan calls for payments by DWSD of pension liabilities over 9 years, even though existing law would allow those payments to be amortized over as many as 30 years. In addition, the Plan calls for DWSD to pay a portion of the administrative costs of this bankruptcy. Because the DWSD's pension payments will be held by the General Retirement System to the benefit of all pensioners, the Plan shifts the risk of failure on to DWSD, for the benefit of other City departments.

At the same time, DWSD will have to expend significant sums to repair its aging infrastructure and overcome a long history of mismanagement and corruption. Further, the cost of water and sewer services for Wayne County residents – including those residing in the City of Detroit – already substantially exceed federal and industrial guidelines. Therefore, cost is an issue with a direct impact on feasibility-- it is not only bad policy to attempt to increase rates to pay past-due obligations, but it also may be impossible to generate additional revenue through rate increases that impose excessive burdens on residents and businesses (the success of the Plan depends on enhancing regional competitiveness for businesses and residents). Wayne County therefore questions the feasibility of the Plan under a full examination of the circumstances of this Case.

**Argument:**

A. **Standing, Generally**:

In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, (1992), the Supreme Court set forth the general standard that allows a party standing in Federal Court. Specifically, the Court outlined three elements to establish standing under Article III as follows:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized…and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations removed).

B. **Standing In Chapter 9:**

There are relatively few cases addressing standing in the context of Chapter 9 Cases. In *In re Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. 610, 615-16 (D. Colo. 1992), the Court found that the party requesting standing "must either be a creditor of a debtor… or be able to assert an equitable claim against the estate." *Id.* Where the party-in-interest had a 'vital interest' and a 'sufficient stake' in the Chapter 9 proceeding, even a non-creditor would have standing. *Id. at 616*.

The only Courts to have squarely addressed the issue found that a party to an executory contract has standing in Chapter 9. In *In re Suffolk Reg'l Off-Track Betting Corp.*, 462 B.R. 397, 413 (Bankr. E.D. N.Y. 2011), the Court held that:

4

> "If an order for relief is entered, the Amended Term Sheet, as an executory contract, is subject to Suffolk OTB's assumption or rejection pursuant to §§ 365 and 901, and Churchill Downs, as a party to the Amended Term Sheet, would have standing to be heard in connection with any motion to assume or reject that contract. If Churchill Downs has standing to be heard on the issue of assumption or rejection of the Amended Term Sheet in this bankruptcy case, it has standing to be heard on the threshold issue of Suffolk OTB's entitlement to commence this bankruptcy case. *In re Suffolk Reg'l Off-Track Betting Corp.,* 462 B.R. 397, 413 (Bankr. E.D.N.Y. 2011)

*Id.*

Similarly, in *In Mount Carbon Metropolitan District*, 1999 Bankr. LEXIS 1643 (Bankr. Col. 1999), the Court held that even though parties to executory contracts being assumed under a Chapter 9 plan did not have rights to vote on the plan, they still had standing to object to it. The *Mount Carbon* Court found that executory contract parties had standing because the Plan may alter the Debtor's ability to perform under the contract. *Id.* at pg. 8. Further, preservation of the right to object because a plan does not satisfy the requirements of §943 "is vital to the credibility of the bankruptcy system... To allow a debtor to short circuit such fundamental objections by structuring plans which neutralize troublesome or well-funded creditors would foster great mischief." *Id.*

C. **Wayne County Has Standing Because Detroit Is Within Its Jurisdiction:**

In *Lujan*, the Supreme Court held that a party has standing if there is an invasion of a legally protected interest that is concrete and particularized and actual or imminent. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). In this case, residents of Detroit are residents of Wayne County, and Wayne County already provides substantial services to those residents. While no one is certain what may happen if Detroit's Plan is not confirmed, if Detroit defaults under a confirmed Plan, or if the case is dismissed, it is not conjectural to suggest that, under those circumstances, Wayne County may have to provide additional services to Detroit residents. As such, Wayne County has a

5

concrete, direct and particularized interest in ensuring that any Plan that is confirmed is likely to succeed, and is likely to maintain services to Detroit (and Wayne County) residents.

Further, the relationship between services provided by the City and County is such that any adjustment of services may significantly impact the County. For example, Detroit Police Officers work with Wayne County Prosecutors to charge and prosecute criminal offenders. Pending trial, offenders arrested by the Detroit Police are held in custody by the Wayne County Sheriff. At trial, the offenders are tried before the Wayne County Circuit Court. The system depends on the interplay between Detroit and the County.

Similarly, no significant construction can occur in Detroit without the review and approval of the County's Department of Public Services. Wayne County works with the City's Detroit Economic Growth Corporation to promote business investment. The Wayne County Health & Human Services Public Health Department works with the City's Department of Health and Wellness Promotion on public health initiatives. In many other ways, the County's jurisdiction and services overlap with those of the City.

Another example is Homeland Security and Emergency Management ("HSEM"). Under Public Act 390, the State of Michigan requires Wayne County to have an Emergency Management Coordinator, and permits Detroit to have an Emergency Management Coordinator or to appoint the County as its coordinator. As of now, Detroit does have an Emergency Management Coordinator, and the County and City work together on numerous cross-over projects, such as the Local Emergency Planning Committee, School Safety, the Freedom Festival Fire Works, the Bell Isle Race, the Free Press Marathon and others. Detroit has already (pre-bankruptcy) partially restructured its HSEM

Department. If Detroit were to eliminate their HSEM, or if it were unable to fund it, it would significantly impact the Wayne County HSEM Department as presently constituted.

A final example relates to Land Resources and Management. Wayne County's Land Resources and Management Department collaborates with Detroit through Wayne County's CLEAN program for pickup of illegally dumped waste and tires. Solid Waste facilities in the City must be included in Wayne County's Solid Waste Management Plan, requiring regular coordination between the City and County. The City and County also collaborate on other waste and disposal matters, including inspection of City-owned waste Transfer Stations and disposal of household hazardous waste.

Finally, as mentioned before, the City's population is nearly 40% of the County residents. The success or failure of the City as a viable economic entity – and, hopefully, an engine for investment and development – has spillover effects for all of the County's residents (and, indeed, for the region). This is not a mere speculative injury – it has a direct impact on substantially all of Wayne County's residents.

As a result, the ultimate feasibility of the Plan is critical to Wayne County in ways that extend beyond DWSD. If Detroit's Plan is not feasible, the costs to Wayne County are concrete and substantial. Accordingly, under *Lujan*, Wayne County would have broad standing to address the feasibility of the Plan even notwithstanding its relationship with DWSD.

D. **Wayne County Has Standing Because Of The DWSD Contracts:**

In order to confirm the Plan, the Court must find that the plan is feasible. See, 11 U.S.C. §943(b)(7). One of the provisions of the Plan is that the DWSD Contracts are assumed. Under Section 365 of the Code, in order to assume the contracts, Detroit must show that they will be able to proved adequate assurance of future performance under the DWSD Contracts. Because the contracts are assumed as part of the Plan, adequate assurance is a confirmation issue under 11 U.S.C. 943(b)(2)(the Plan must comply with all provisions of Chapter 9)(see also Section 901(a), which incorporates Section 365 into Chapter 9).

In order to determine whether the City is able to comply with the terms of the DWSD Contracts while operating under its Plan, the Court must conduct a broad examination of the Plan as a whole. The DWSD is not a side issue – its success, and the success of the City are inextricably linked.

For example, it is critical that the DWSD maintain its labor force throughout the Plan period. The DWSD's employees are covered by Detroit's General Retirement Systems ("GRS") Plan, the same Plan that covers all City employees. In order to maintain the DWSD's staff, the Plan will have to fund specifically the pensions of DWSD workers, and not just require DWSD to pay an amount that – if dedicated to DWSD workers – would be sufficient to address the present under-funding deficit. Instead, the Plan requires that the DWSD provide a significant portion of the early plan payments to the GRS Plan – benefitting all employees – while "kicking the can" down the road 9 years to see if Detroit can fund pension obligations related to DWSD employees.

DWSD also needs a balanced budget sufficient to address the large-scale capital improvements needed to the water and sewerage systems. In order to find the Plan --- and the assumption of the DWSD Contracts – feasible, the Court must determine that DWSD will be able to fund these payments, continue to provide services and maintain the cost requirements required by law and the DWSD Contracts. Again, this is a major issue involving more than a billion dollars and requires a broad overview of the finances of DWSD and the City as a whole.

Whether Detroit will be able to perform under the DWSD Contracts depends on the success of the Plan. The complexity and scope of the issues related to the Plan, DWSD and the DWSD Contracts is sufficient to provide Wayne County with an invasion of a legally protected interest (its rights under the DWSD Contracts) and a concrete potential injury – the possible breach of the DWSD Contracts after assumption. Although it is not the only basis for standing, or direct and concrete injury for the Plan, the Bankruptcy Code contemplates that counter-parties to executory contracts will have standing, as it puts the burden on the debtor to provide adequate assurance of future performance under an assumed contract. 11 U.S.C. §365(b)(1)(C). Finally, the only cases that have squarely addressed this issue granted broad standing to a counter-party to an executory contract. *In re Suffolk Reg'l Off-Track Betting Corp.,* 462 B.R. 397, 413 (Bankr. E.D.N.Y. 2011); *In re Mount Carbon Metro Dist.*, 1999 Bankr. LEXIS 1643 (Bankr. Col. 1999). Accordingly, Wayne County's interest in the DWSD Contracts suffices to justify broad standing to explore the viability of the Plan.

**Conclusion:**

The future of the DWSD is a critical component of Detroit's bankruptcy. In examining that future, the Court should consider the input of the DWSD's customers – including the Counties (and

9

Wayne County believes that the Counties are best organized to present this input). Further, Wayne County is in a unique situation, as Detroit is within its jurisdiction, and the impact of Detroit's reorganization on Wayne County is direct and particularized. Accordingly, the Court should find that Wayne County has broad standing to raise its objections to Detroit's Plan.

Respectfully Submitted,

BUTZEL LONG, a professional Corporation

/s/ Max J. Newman
By: Max J. Newman (P51483)
By: Beth Gotthelf (P38951)
Attorneys for Wayne County
Stoneridge West
41000 Woodward Ave
Bloomfield Hills, MI 48304
(248) 258-2907
newman@butzel.com

Dated: June 27, 2014