|  |  |
|---|---|
| In re: | ) Case No. 13-53846 |
|  | ) |
| CITY OF DETROIT, MICHIGAN | ) Chapter 9 |
|  | ) |
| Debtor | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) |

**BRIEF IN SUPPORT OF STANDING OF COUNTY OF MACOMB,**
**MICHIGAN, BY AND THROUGH ITS COUNTY AGENCY, THE**
**MACOMB COUNTY PUBLIC WORKS COMMISSIONER, TO OBJECT**
**TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT**
**OF DEBTS OF THE CITY OF DETROIT**

Pursuant to the *Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures* [Docket No. 5235] (the "Legal Issues Order"), County of Macomb, Michigan, a Michigan Constitutional corporation ("Macomb"), by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner, hereby submits this brief in support of Macomb's standing[1] to object to confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 4392] (the "Plan").[2] Macomb respectfully states as follows:

## PRELIMINARY STATEMENT

Macomb unquestionably has standing to object to the Plan. In its Plan, the City of Detroit (the "City" or the "Debtor") intends to take various steps that, contrary to applicable law,

---

[1] This brief addresses only Macomb's standing to object to the Plan. In addition to Macomb, the Macomb Interceptor Drain Drainage District ("MIDDD") has filed objections to the Plan. MIDDD is a creditor that has filed a timely proof of claim asserting a general unsecured claim. Thus, as a creditor and party in interest, MIDDD has standing. MIDDD believes its standing to object to the Plan is not disputed. Moreover, the Court has not requested briefing regarding MIDDD's standing. To the extent MIDDD's standing becomes disputed, MIDDD reserves the right to submit a brief in support of its standing to object to the Plan.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Macomb Objection (defined below).

will adversely affect Macomb's interests. The Debtor's contention that Macomb lacks standing is simply an effort to silence Macomb's arguments. The doctrine of standing, however, is not available to sweep objections under the rug where, as here, the party in interest asserting them (Macomb) has a real stake in the outcome. Macomb's objections should be addressed on the merits, and cannot be avoided through a misplaced reliance on the standing doctrine.

The Detroit Water and Sewerage Department (the "DWSD") is a non-profit municipal monopoly subject to various State and City laws and federal court orders that regulate its operation. Its water and sewer systems exist for the benefit of the citizens of southeastern Michigan who use them. Most of those citizens live outside of the City in Macomb, Oakland, and Wayne Counties, and the ratio of suburban users to City users continues to grow. Because the City has long since recouped its initial investment in the DWSD wastewater disposal systems,[3] and the operation and maintenance of the assets of those systems are funded entirely by ratepayers, the actual economic interest in those systems lies not with the City, but with ratepayers.

Macomb itself is a wholesale customer of DWSD sewer services. Macomb pays for certain sewer services and resells such services to individual municipalities within Macomb County. As a major sewer ratepayer, Macomb has a vital interest in any action that may affect the sewer systems. Water service in Macomb, however, is provided directly to the municipalities, which pay DWSD for those services and, in turn, resell such services to their residents (all of whom, of course, are Macomb residents).

First and foremost, Macomb has an obligation to protect the health and well-being of its citizens. Ensuring the uninterrupted access of citizens to functioning wastewater removal

---

[3]     Although the City may have also recouped its entire investment in the DWSD water system as well, discovery is ongoing and thus Macomb is uncertain whether that is the case at this time.

services is critical to public health, and thus Macomb's interests. Further, to protect public health, sewer services must be not only available, but also affordable. Although Macomb is a "suburban" county, in the sense that it is outside the City of Detroit, it is largely populated by working-class citizens for whom the ability to afford increases in monthly bills is a critical concern. The Plan, however, threatens both the availability and affordability of vital services.

Through the Plan, the City intends to use the DWSD as a profit-generating asset, taking cash flow from the system and using it to pay City obligations that are unrelated to the DWSD, including unfunded pension liabilities to non-DWSD employees. Moreover, the City intends to contribute the proceeds of potential dispositions of DWSD assets to pension funds and the City's General Fund. These intended actions not only violate Michigan and Detroit laws and relevant contract provisions requiring that all DWSD proceeds be used for solely DWSD obligations, but they also threaten the viability of the system by diverting funds from desperately needed capital improvement projects. Necessarily, the diversion of DWSD revenues to purposes other than the provision of wastewater disposal services will cause the rates for these services to increase. Thus, this attempt by the City to use revenues from suburban ratepayers to subsidize its obligations necessarily affects the pecuniary interests of those ratepayers, including Macomb. Although Macomb believes that this effect will be substantial, Macomb's right to be heard in these proceedings is not dependent on the magnitude of its injury. To the contrary, as discussed below, the legal standard for determining standing under both Article III of the Constitution and the Bankruptcy Code is unexacting. Accordingly, if the Plan threatens to cause even one dollar to be diverted from the DWSD system, or if the Plan has any conceivable effect on the ability to meet capital improvement needs, that is enough to establish Macomb's standing to object to the Plan.

The City's suggestion, in its reply to objections to the Plan, that Macomb's standing is questionable because Oakland-Macomb Interceptor Drain Drainage District ("OMI"), rather than Macomb, is the executing counterparty to the OMI-Detroit Agreement (defined below)—the relevant wastewater disposal agreement with the City—is misplaced. OMI was created in 2009 pursuant to settlement agreements reached in a 42-year-old District Court case to acquire, maintain, and operate certain equipment and facilities located in Macomb used to transport wastewater from both Oakland and Macomb for treatment by the DWSD. OMI's creation was necessary solely because of the intercounty use and purpose of the equipment and facilities. OMI is a mere intermediary, not a user of wastewater services. Indeed, as the OMI-Detroit Agreement itself makes clear, Macomb and Oakland Counties remain the true "First Tier" wholesale customers of the DWSD. Consistent with that economic reality, Macomb and Oakland Counties are specifically identified as the beneficiaries of that agreement. The rates charged by DWSD are merely passed through OMI to Macomb and Oakland. Moreover, Macomb and Oakland, not OMI, have representatives on the steering committee created by the OMI-Detroit Agreement and nominees on the DWSD Board of Water Commissioners. For all practical intents and purposes, Macomb and Oakland, not OMI, are the parties with an actual stake in the DWSD operation, and the City has treated them accordingly. Macomb's interest is not remote or tangential. For the City to argue otherwise would be disingenuous.

Moreover, under Michigan law, intended third party beneficiaries directly referred to in a contract have the same rights to enforce the contract as the counterparty that executes the agreement. The OMI-Detroit Agreement (defined below) specifically identifies Macomb as a third-party beneficiary, and therefore Macomb has the same rights as OMI, the executing counterparty, to enforce that agreement. Thus, Macomb holds a contingent claim against the

City, and therefore is a "creditor" and party in interest within the meaning of the Bankruptcy Code. Thus, the Court should find that Macomb has standing to object to the Plan, which affects its rights as a third party beneficiary of the OMI-Agreement, and thus as a creditor and party in interest.

## BACKGROUND

### I.     The DWSD

1.      The DWSD is a branch of the City government. It provides the water supply and wastewater control and treatment services for residential, commercial, governmental, institutional and industrial customers both in the City and neighboring communities in, among others, Macomb, Wayne, and Oakland Counties. DWSD services are used by approximately 40% of the state's population. Revenues from rates charged to customers outside the City for water and sewer services account for approximately 65% of total DWSD revenue.

2.      According to its website, "[b]y Michigan statute, DWSD is a not-for-profit entity. Water and sewer rates are based on cost of service only …" and "[b]y law, DWSD can only recover the cost for provision of service — it cannot make a profit." See http://www.dwsd.org/downloads_n/about_dwsd/fact_sheet/dwsd_fact_sheet.pdf

3.      As documents filed in the District Court Case (defined below) reveal, in 1974, the City asserted that its initial investment from its General Fund, and thus its "equity," in the DWSD sewer system, was $15,278,135,[4] and demanded that the Board of Water Commissioners reimburse the General Fund for that equity. See District Court Case, Case No. 77-71100, Docket

---

[4]     According to a 1975 internal DWSD memo, the remaining funds for the initial construction of the sewage system came from the sale of bonds ($5.075 million), and federal grants ($9 million). See District Court Case, Case No. 77-71100, Docket No. 2376-1.

No. 2376-1.[5]  The DWSD (then called the Detroit Metro Water Department) made a series of payments from sewer rate revenues aggregating to that amount.  See id.

4.      The repayment of the City's "equity" in the system was determined as a matter of fact as part of a Special Master Report commissioned by Judge Feikens in the District Court Case.  See Report and Recommendations of the Masters, at 74-78, District Court Case, Case No. 77-71100, Docket No. 2376-2.[6]

5.      Since that time, General Fund revenues have not been used for DWSD's operations and any services that other City departments have provided to DWSD have been billed to DWSD at full cost.  Likewise, water and sewerage services supplied by DWSD to the City have been billed to the City.  Thus, the City has not had a General Fund investment in the DWSD sewer system since 1975.

## II.      Macomb's Relationship With the Debtor

6.      Macomb is a party to the Wastewater Disposal Services Contract (the "Macomb-OMI Agreement"), dated as of September 30, 2009, between Macomb and OMI.[7]  OMI, in turn, is a party to the Wastewater Disposal Services Contract (the "OMI-Detroit Agreement"), dated October 22, 2009, between OMI and the City, by its Board of Water Commissioners.[8]

7.      OMI, an intercounty drainage district, was created in connection with a global settlement agreement reached in May 2009 in United States v. City of Detroit, Case No. 77-77100 (E.D. Mich) (the "District Court Case").  Pursuant to that global settlement, as well as a purchase agreement dated October 22, 2009, the Debtor transferred to OMI ownership of the

---

[5]      The Documents Filed in the District Court Case at Docket No. 2376-1 are attached hereto as Exhibit A.

[6]      The Report and Recommendations of the Masters is attached hereto as Exhibit B.

[7]      The Macomb-OMI Agreement is attached hereto as Exhibit C.

[8]      The OMI-Detroit Agreement is attached hereto as Exhibit D.

interceptors, pump stations, meters, and appurtenant facilities owned by the Debtor in Macomb, commonly known as the ITC Corridor Interceptor, the Oakland Arm Interceptor, and the Avon Arm Interceptor. See Macomb-OMI Agreement, at 1-2. OMI operates and maintains those facilities to provide wastewater transportation services to Macomb and Oakland Counties. OMI is run by a three-member board made up of representatives of Macomb and Oakland Counties, and the State of Michigan.

8.      Pursuant to the Macomb-OMI Agreement, OMI transports wastewater from the Macomb County Wastewater Disposal District in Macomb to Detroit for treatment and disposal by the DWSD. See Macomb-OMI Agreement § 1. The Macomb County Wastewater Disposal District services some 500,000 county residents, which is about 60% of Macomb's population. The other 40% live in communities that either have their own treatment plants, contract with the City directly or through Wayne County, or have no public sewer systems.

9.      Macomb pays OMI at rates based upon the rates DWSD charges OMI, plus costs and charges incurred by OMI. See Macomb-OMI Agreement, § 10. The DWSD charges OMI for wastewater flow delivered to the DWSD system at rates established by the Debtor through its cost allocation and rate design processes. See OMI-Detroit Agreement, § 20.01. Accordingly, the rates charged by DWSD under the OMI-Detroit Agreement are passed through OMI to Macomb and Oakland.[9] Macomb itself pays a wholesale rate, and recovers that payment through charges to the municipalities with whom it has wastewater service contracts.

10.     Pursuant to the OMI-Detroit Agreement, OMI is a wholesale "First Tier Customer" of the DWSD. See OMI-Detroit Agreement § 1.01 (definition of "Customer"). The

---

[9]     The Macomb-OMI Agreement confirms that this arrangement is intended "to serve the public health and welfare of the people of the State of Michigan, especially in the area affected [thereby], and to enhance the water quality of the Great Lakes and its tributaries." Macomb-OMI Agreement, § 3.

phrase "First Tier Customer" is defined in the OMI-Detroit Agreement as "all directly contracted Services customers of the [wastewater disposal system owned, operated and maintained by the City acting through its Board]."  OMI-Detroit Agreement § 1.01.  The OMI-Detroit Agreement also provides that: (i) "Oakland and Macomb County … shall have the status and rights of Tier 1 Customers,[10] including but not limited to participation on the Sewer Steering Committee and all of its subcommittees and work groups," OMI-Detroit Agreement, § 19.08, and (ii) "Oakland County and Macomb County are intended third party beneficiaries of this Contract."  OMI-Detroit Agreement, § 19.07.

11.     In addition to these contractual arrangements, Macomb has a role in the governance of DWSD.  Pursuant to orders entered in the District Court Case, the DWSD Board of Water Commissioners must include a nominee of the Macomb County Public Works Commissioner.  See Bylaws for the Detroit Water and Sewerage Department Board of Water Commissioners.

## III.     Procedural Background

12.     After filing several prior iterations of its plan of adjustment and accompanying disclosure statement, the Debtor filed the Plan and Fourth Amended Disclosure Statement with respect to the Plan [Docket No. 4391] (the "Disclosure Statement") on May 5, 2014.  Also on that date, the Court entered an order approving the Disclosure Statement [Docket No. 4401].

---

[10]    The use of the term "Tier 1 Customer" in Section 19.08 of the OMI-Detroit Agreement, instead of the defined term "First Tier Customer," is a drafting error.  "Tier 1 Customer" is not defined in the agreement, but a review of other provisions of the agreement confirm that "Tier 1 Customer" was intended to have the same meaning as "First Tier Customer."  For example, Section 14.01 of the OMI-Detroit Agreement establishes the Steering Committee, "formed to facilitate a cooperative working partnership between the City, DWSD and First Tier Customers …"  OMI-Detroit Agreement § 14.01 (emphasis added).  Macomb and Oakland, but not OMI, have representatives on the Steering Committee, thus evidencing Macomb and Oakland's status a "First Tier Customers."See http://www.dwsoutreach.org/Home/AboutUs/SteeringCommitteeWastewater/tabid/61/Default.aspx.

13.     On May 12, 2014, various parties, including Macomb, filed objections to the Plan. See *Objection of County of Macomb, Michigan, by and Through its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and the Assumption of Sewer Contracts* [Docket No. 4636] (the "Macomb Objection").

14.     On May 23, 2014, the Court entered the *Order Regarding Identifying Legal Issues Relating to Confirmation* [Docket No. 5021] (the "Legal Issues Request Order"), requesting that "objecting creditors file a paper identifying any issues of law relating to confirmation that the party believes can be determined without the necessity of proof at the confirmation hearing."

15.     On May 26, 2014, the Debtor filed the Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 5034] (the "Debtor Reply").  In the Debtor Reply, the Debtor questioned whether Macomb has standing to object to the Plan.

16.     In response to the Legal Issues Request Order, Macomb filed the Statement of County of Macomb, Michigan, by and through its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District in Response to Court's Order Regarding Identifying Legal Issues Relating to Confirmation [Docket No. 5076], which identified Macomb's standing to object to the Plan as a legal issue that could be determined in advance of the confirmation hearing.

17.     On June 5, 2014, the Court entered the Legal Issues Order, requesting briefing by June 30, 2014 on, among other things, "[w]hether Macomb, Oakland and Wayne Counties have standing to object to the Plan."

## IV.    The Plan.

18.    The Plan affects the pecuniary interests of Macomb in various ways.  It proposes to implement the Debtor's settlement (the "<u>GRS Settlement</u>") with the General Retirement System for the City of Detroit (the "<u>GRS</u>").  DWSD employees and retirees participate in the GRS along with employees and retirees of other City departments, other than police and firefighters.  The City alleges that the unfunded actuarial accrued liabilities ("<u>UAAL</u>") in the GRS pension fund are $2.037 billion.  Disclosure Statement at 12.  The Plan requires payment by the DWSD of the GRS UAAL attributed to it by the City over 9 years, rather than over a much longer period of time (the "<u>UAAL Funding</u>"), plus, as learned through discovery, (i) $2.5 million per year in administrative expenses over that 9-year period and (ii) $20 million of restructuring charges in 2015 (collectively, the "<u>Administrative and Restructuring Charges</u>," and together with the UAAL Funding, the "<u>DWSD 9-Year Funding</u>").  <u>See</u> Disclosure Statement at 22.  The payments required of DWSD pursuant to the DWSD 9-Year Funding total $428.5 million (the "<u>DWSD Aggregate Amount</u>").[11]  <u>See</u> Disclosure Statement at 38.  The Debtor proposes that that amount be paid by the DWSD in installments of $65.4 million in 2015, and $45.4 million in each of the years 2016 through 2023.  <u>See</u> Plan Exhibit II.B.3.r.ii.A.  Those payments would be vastly greater than the DWSD's recent total pension contributions of:  $11.6 million in 2009, $11.4 million in 2010, $19.7 million in 2011, $10.9 million in 2012, and $24.3 million in 2013.  <u>See</u> Disclosure Statement at 92.

19.    The funding for such payments would be derived from rates charged by the DWSD to its customers, including Macomb, through June 20, 2023.  <u>See</u> Disclosure Statement at

---

[11]    Among other things, Macomb disputes (i) that DWSD Aggregate Amount reflects an accurate allocation of GRS UAAL to DWSD, and (ii) the propriety of the requirement that DWSD pay the Administrative and Restructuring Charges.  Macomb reserves all rights to dispute these factual issues, including to present evidence and argument at the confirmation hearing with respect to them.

22. For the first ten years following the bankruptcy, the DWSD would be the sole City department contributing to the GRS system for *all* Detroit retirees and employees.

20. The Plan also provides for the establishment of a "Restoration Trust" for the acknowledged purpose of potentially restoring certain pension benefits otherwise compromised pursuant to the Plan for both the GRS and the Police and Fire Retirement System for the City of Detroit (the "PFRS"). See Plan at 47-48. The Restoration Trust would hold the "DWSD CVR," a "single series of contingent value right certificates representing the right to receive 50% of the net proceeds resulting from a 'Qualifying DWSD Transaction.'" Plan at 9. A "Qualifying DWSD Transaction" is "a potential transaction involving the transfer to a third party of a majority of the assets of, or the operation and management of, the City's water and/or sewage disposal systems currently operated by the DWSD." Plan at 19. In other words, not only would the DWSD be required, at the expense of the Counties, to fund shortfalls in the GRS pension, but the Plan expressly contemplates transactions involving the DWSD's assets or operation and management of its systems that would restore ostensibly compromised benefits of the GRS and the PRFS, *i.e.* benefits that cannot be funded due to the funding shortfalls of both pension systems. The restoration of those benefits could only come at the expense of ratepayers, including Macomb.

21. Although the potential creation of a regional water and sewer authority (a "Regional Authority") to take over water and sewer service from the DWSD was included in prior iterations of the Plan and Disclosure Statement, the Debtor removed the concept after concluding that negotiations had run their course. See Disclosure Statement at 145. On April 17, 2014, however, the Court entered an order [Docket No. 4156] requiring the Debtor and the Counties to mediate the issue of whether to create a Regional Authority and all other issues

related to the DWSD.  Thus, a Regional Authority may return as a component of the Plan, and, although unclear, may be considered a "third party" for purposes of the definition of "Qualifying DWSD Transaction."  If so, 50% of any sale proceeds, lease payments, or payments pursuant to a management contract received by the DWSD under either a Regional Authority structure or a public-private partnership would be paid into the City's General Fund, and 50% would be allocated to the GRS pension fund and PFRS pension fund (even though no DWSD employee is a PFRS employee).  Not a cent would be retained by the DWSD for use in its water and sewer systems or for needed capital improvements.

22.     In addition, the Plan provides for the impairment of bonds secured by the DWSD water and sewer revenues, which is likely to significantly increase the cost of future borrowings.

## ARGUMENT

23.     A party has standing to object to confirmation of a Chapter 9 plan if the party (i) meets the requirements for standing under Article III of the Constitution, and (ii) is a party in interest as defined in section 1109(b) of the Bankruptcy Code.  See, e.g., In re Global Indus. Techs., Inc., 645 F.3d 201, 210 (3d Cir. 2011).

24.     To establish Article III standing, a party must show an "injury in fact" that is fairly traceable to the challenged action and can be redressed by a favorable decision.  Id. (citing Whitmore v. Arkansas, 495 U.S. 149 (1990)).  The injury in fact standard is "very generous," and a party meets this standard if it alleges a "specific, 'identifiable trifle' of injury" or a "personal stake in the outcome of the litigation."  Id. (citing United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686-90, 690 n.14 (1973); Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982); The Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir. 2000)).

12

25.     Pursuant to section 1109(b) of the Bankruptcy Code, made applicable in Chapter 9 cases through section 901(a), "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. §§ 1109(b), 901(a).  The list of potential parties in interest in section 1109(b) is not exclusive, and it has been widely construed to "create a broad right of participation" to "anyone who has a legally protected interest that could be affected by the bankruptcy proceeding."  In re Global Indus. Techs., Inc., 645 F.3d at 210 (citing In re Combustion Eng'g, Inc., 391 F.3d 190, 214 n.21 (3d Cir. 2004)); In re James Wilson Assocs., 965 F.2d 160, 169 (7th Cir. 1992)).  As the Sixth Circuit Bankruptcy Appellate Panel has observed, "[i]n various contexts 'party in interest' has been held to be one who has an actual pecuniary interest in the case … anyone who has a practical stake in the outcome of a case … and those who will be impacted in a significant way in the case."  In re Morton, 298 B.R. 301, 307 (6th Cir. B.A.P. 2003) (quoting In re Cowan, 235 B.R. 912 (Bankr. W.D. Mo. 1999) (internal citations omitted)).  "[A] bankruptcy court must look at the facts and circumstances in each case to determine if a person or entity is a party in interest."  In re Player Wire Wheels, Ltd., 421 B.R. 851, 855 (Bankr. N.D. Ohio 2009).  "Article III standing and standing under the Bankruptcy Code are effectively co-extensive."  In re Global Indus. Techs., Inc., 645 F.3d at 211.  Moreover, pursuant to section 1128(b) of the Bankruptcy Code, also made applicable in Chapter 9 through section 901(a), "[a] party in interest may object to confirmation of a plan."  11 U.S.C. §§ 1128(b), 901(a).

26.     Macomb easily meets these unexacting standards, and the Court should find it has standing to object to confirmation of the Plan.

## I. The Plan Harms Macomb's Pecuniary Interests.

27. As asserted in the Macomb Objection, the Plan's requirement that DWSD pay the DWSD Aggregate Amount over 9 years rather than over a much longer period, while all other GRS-participating City departments will cease contributions to the GRS for at least ten years, results in a substantial overpayment by the DWSD of its pension obligations. <u>See</u> Macomb Objection at 11-12. This overpayment will be used to fund the City's obligations to non-DWSD employees in violation of not only the MCL and the Detroit City Charter—which require all monies collected by the DWSD to be used to fund the costs of its systems—but also the City's wastewater disposal contracts. <u>See</u> <u>id</u>. at 12-13. The City's planned contribution of the proceeds of any "Qualifying DWSD Transaction"—50% to the City's General Fund, and 50% to fund the "DWSD CVR" to be used to restore pension benefits of both the GRS and PFRS—also violates those laws and contracts. <u>See</u> <u>id</u>. at 14-15. These legal and contractual requirements are clearly intended to protect ratepayers from the diversion of funds paid into the DWSD system to other purposes for which ratepayers receive no benefit.

28. As Macomb has alleged, the costs of the overpayment of UAAL, and the cost of any payments made by a third party to the City pursuant to a Qualifying DWSD Transaction, will be passed on to ratepayers such as Macomb through artificially inflated rates. <u>See</u> <u>id</u>. at 13. Thus, Macomb, a captive customer of a municipal monopoly, will be forced to subsidize City obligations that are unrelated to DWSD, even though it derives no benefit from the payment of non-DWSD costs. Although, in form, the City charges OMI for services, the indisputable economic substance is that any increase in rates affects Macomb County directly. After all, OMI is merely an intermediary through which DWSD charges are passed through to, and paid by, Macomb. Moreover, the diversion of funds will result in the DWSD's inability to cover necessary capital improvements, detrimentally affecting Macomb. <u>See</u> <u>id</u>. 19-20. Thus,

14

Macomb has alleged much more than the "trifle of an injury" required for Article III standing and, in fact, has a concrete, identifiable, personal stake in the outcome of Plan confirmation.

29.     The Ninth Circuit considered similar circumstances in Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 733 F.3d 939 (9th Cir. 2013). There the BPA, a federal agency, provided power from federally owned dams to, among others, "consumer-owned utilities" ("COUs"), its direct customers that, in turn, provided power to their own customers. Id. at 944. The APAC, an ad hoc group of customers of the COUs, brought an action challenging a BPA order adopting a settlement agreement that, among other things, set terms for refunding overcharges resulting from an unlawful program. The Ninth Circuit found that, by alleging that the settlement would cause BPA to set higher rates for the COUs, who would in turn set higher rates for members of the APAC, the APAC members had alleged an economic injury, which it found to be a legally protected interest necessary for Article III standing. See id. at 950-51. In doing so, the Ninth Circuit rejected arguments that the APAC members did not have a legally protected interest in non-inflated rates. Id. The Ninth Circuit also found that the alleged injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" because the costs of any rates and charges incurred by the COUs were recovered from customers such as the APAC members. Id. at 952-53. Thus, due to the pass-through nature of the contracts, APAC established sufficiently concrete harm. Id. at 953.

30.     Here, Macomb has alleged that the Plan, like the settlement in Ass'n of Pub. Agency Customers, will cause Macomb to bear the economic injury of artificial sewer rate increases. Thus, it has alleged an injury to a legally protected interest. In addition, like in Ass'n of Pub. Agency Customers, that injury is sufficiently concrete and particularized because,

although an intermediary, OMI pays the DWSD charges, those charges are directly passed through to Macomb pursuant to contractual arrangements.

31.     The Ninth Circuit further found that the alleged economic injury to the APAC members was "fairly traceable to the challenged action of the defendant," finding that the APAC members did not need to show that the BPA's actions were "the very last step in the chain of causation," but that "there are no independent actions of third parties that break the chain between the alleged unlawful act—i.e., its adoption of the settlement—and [the APAC member's] economic harm." Id. at 953.  Again, because the BPA charges were passed on from the COUs directly to its customers, the Ninth Circuit found it "difficult to imagine a causal chain in which the defendant's actions are more 'determinative' of the actions of a third party—and, in turn, of the alleged harm done to [the APAC member]." Id.  For the same reasons, it found that the alleged injury could be redressed because if the settlement were invalidated, it could not be a cause of economic harm to the APAC members. Id. at 954.  Similarly, because rate increases under the Debtor's Plan will be passed on directly to Macomb, the Debtor's proposal of the Plan is "fairly traceable" to Macomb's alleged injury, and the Court's refusal to confirm that Plan would redress that injury.  Thus, the Court should find that Macomb easily meets the standard for Article III standing.

32.     Moreover, looking at the facts and circumstances of this case, Macomb has a legally protected pecuniary interest that may be affected by the bankruptcy proceeding, and it is a party in interest within the meaning of section 1109(b).  As noted above, Macomb has an interest in paying rates that are based on DWSD's costs of service, and that interest is legally protected by State statute and the City Charter.  Moreover, as discussed in Section II, infra, Macomb's interest is protected by its right to enforce the OMI-Detroit Agreement.  If confirmed, the Plan

would allow the City to boldly bypass rate setting protocols prescribed under DWSD governance

(in which Macomb has a voice), and relevant agreements, to cause artificial rate increases at the

expense of Macomb.[12]  See Macomb Objection at 16-18.  Thus, Macomb's legally protected

interests can and will be affected by the Plan, if confirmed, and Macomb has standing to raise

objections as a party in interest.

## II.    Macomb Is A Contingent Creditor Under Michigan Law.

33.    In the Debtor Reply, the City has suggested that Macomb's "standing to object is

not immediately apparent" because it "apparently is not party to a contract with the City

directly."  Debtor Reply at 140 n.84.  However, pursuant to section 600.1405 of the Michigan

Compiled Laws:

> Any person for whose benefit a promise is made by way of
> contract … **has the same right to enforce said promise that he**
> **would have had if the said promise had been made directly to**
> **him as the promisee**.  (1) A promise shall be construed to have
> been made for the benefit of a person whenever the promisor of
> said promise has undertaken to give or to do or refrain from doing
> something directly to or for said person.

MCL § 600.1405.  In determining whether a party is a third party beneficiary with standing to

enforce a contract pursuant to Michigan law, courts look to the form and meaning of the written

agreement to determine if the parties are clearly aware that the promisor's obligation

encompasses third parties.  See Brunsell v. City of Zeeland, 651 N.W.2d 388, 390 (Mich. 2002)

(quoting Koenig v. City of S. Haven, 597 N.W.2d 99, 104-05 (Mich. 1999)).  Here the OMI-

---

[12]    Macomb submits that its objections are well-pled, and all that is needed to establish standing is that it "**alleges** a specific, 'identifiable trifle' of injury," and that it has a "legally protected interest that **could** be affected by the bankruptcy proceeding."  In re Global Indus. Techs., Inc., 645 F.3d at 210 (emphasis added).  Macomb acknowledges that the Court has expressed skepticism at hearings regarding whether the proposed funding of UAAL is a pre-funding resulting in an overpayment.  However, Macomb has not had the opportunity to present evidence regarding the merits of its objections, and requests that the Court reserve judgment until Macomb is able to do so.  As courts such as the First Circuit Court of Appeals have recognized, the issue of standing should not be collapsed with the merits of a claim.  See U.S. v. $8,440,190.00 in U.S. Currency, 719 F.3d 49, 62 (1st Cir. 2013).

Detroit Agreement specifically states that Oakland and Macomb Counties "are intended third party beneficiaries of this Contract" and that the "Contract shall not be construed to benefit any persons other than the City, [OMI], **and the two Counties**." OMI-Detroit Agreement, § 19.07 (emphasis added). Further, the OMI-Detroit Agreement confirms that, notwithstanding the use of OMI as an intermediary, Macomb and Oakland Counties remain "First Tier Customers," OMI-Detroit Agreement, § 19.08. Thus, Macomb and Oakland Counties have the status of "**directly contracted Services customers** of the [wastewater disposal system owned, operated and maintained by the City acting through its Board]." OMI-Detroit Agreement, § 1.01 (definition of "First Tier Customer") (emphasis added). The form and meaning of the contract leaves no doubt that Macomb is a third party beneficiary with standing to enforce the OMI-Agreement pursuant to MCL § 600.145.[13]

34.      Macomb's status as a third party beneficiary with state law rights to enforce the OMI-Detroit Agreement provides it with the same rights as the executing counterparty to that agreement. See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.), 239 F.3d 365, 2000 WL 1741550, at *7 (5th Cir. 2000) (intended third party beneficiary to settlement had allowable claim against the estate); Osprey-Troy Officentre L.L.C. v. World Alliance Fin. Corp., 822 F.Supp.2d 700, 707 (E.D. Mich. 2011) (finding intended third party beneficiary is "entitled to assert claims under the contract as if it were standing in the shoes of the parties"). Moreover, "[i]t is within the fair contemplation of parties entering into a contract that the other party may breach it, or have made misrepresentations to induce the making of the contract. Thus, a contingent claim arises at [the point in time of entry into the contract], although it may never

---

[13]      The makeweight character of the City's suggestion that its relationship with Macomb is "attenuated" is apparent from the parties' course of dealing over many years. The City has always dealt with Macomb as a "First-Tier Customer," and has been in regular contact with Macomb's representatives on the sewer Steering Committee and its nominee on the DWSD Board of Water Commissioners.

mature." <u>In re Russell</u>, 193 B.R. 568, 571 (Bankr. S.D. Cal. 1996); <u>see also</u> <u>In re Mount Carbon</u>

<u>Metro. Dist.</u>, Case No. 97-20215 (MSK), 1999 Bankr. LEXIS 1643, at *19–20 (Bankr. D. Colo.

July 20, 1999) (finding contract counterparties are creditors with contingent unmatured claims).

Thus, as an effective counterparty to the OMI-Detroit Agreement,[14] Macomb holds a contingent

claim, is a "creditor" pursuant to section 101(10), and, as a creditor, has an automatic statutory

right to be heard on any issue in this case as a party in interest pursuant to section 1109(b),

including whether the Plan should be confirmed.[15] <u>See</u> <u>In re Addison Cnty. Hosp. Auth.</u>, 175

B.R. 646, 650 (Bankr. E.D. Mich. 1994).[16]

### III.  Macomb Has Standing To Object To The Legality And Feasibility Of The Plan Regardless Of Its Treatment Of The OMI-Detroit Agreement.

35.     The City may argue that even if Macomb is a creditor, it nonetheless lacks

standing to object to the Plan because the Plan contemplates assumption of the OMI-Detroit

Agreement, and therefore the Plan allegedly leaves Macomb's interests in that Plan unimpaired.

Any such argument, however, is at odds with relevant authorities that hold that, although

unimpaired creditors may not object to their treatment under the Plan, they maintain standing to

"raise objections to a plan on the basis of good faith, feasibility, and other generalized

---

[14]     Macomb's status as third-party beneficiary also gives it the right to stand in OMI's shoes to object to the assumption of the OMI-Detroit Agreement.  In any event, Macomb expects that, if necessary, OMI would submit its own objection to that assumption.

[15]     Moreover, both Macomb and Oakland, the true economic counterparties to the OMI-Detroit Agreement, filed objections to the Plan raising similar concerns.  It would make no sense to find that Macomb and Oakland, acting individually, do not have standing but that, if they had acted together through OMI—a mere pass-through to them individually—they would have had standing.

[16]     In <u>In re Addison</u>, this Court held that the members of Concerned Citizens, an unicorporated group of citizens from the area served by an inter-municipal hospital, had a right to be heard in a Chapter 9 case to the extent they were creditors, but that the members that were not creditors were not parties in interest with a right to be heard. <u>See</u> <u>In re Addison</u>, 175 B.R. at 650.  The Court reasoned that to allow those non-creditors standing would "overburden the debt adjustment process" by "granting a blanket invitation to all parties in the area serviced by [the hospital]." <u>Id</u>.  Here, Macomb is a contingent creditor due to its status as a third-party beneficiary of the OMI-Detroit Agreement.  Macomb, as a wholesale "First Tier Customer" of the DWSD, has particularized interests that give rise to standing.  Allowing Macomb to be heard would not invite individual citizens who are not wholesale customers, and may be "merely interested in the outcome of the matter" to seek to be heard in the case, and therefore would not open the floodgates to objectors that would overburden the process.  <u>See id</u>.

confirmation requirements, as well as to contest the categorization as being unimpaired." See, e.g., In re Farmland Indus., Inc., 294 B.R. 855, 891 (Bankr. W.D. Mo. 2003) (citing 7 Collier on Bankruptcy ¶ 1129.02[3], 1129–21–22 (15th ed. Rev.)).

36.     For example, in In re Mount Carbon, two municipal corporations whose boundaries bordered or overlapped with a chapter 9 municipal debtor objected to confirmation of the debtor's plan of adjustment.  See In re Mount Carbon, 1999 Bankr. LEXIS 1643 at *2–3. The objectors were counterparties to a number of executory contracts with the debtor that governed the development of certain infrastructure in the debtor's district.  Id. at *3.  The success of the debtor's plan of adjustment depended on extensive repair and installation of new infrastructure in the debtor's district, the cost of which was to be paid by landowners in the district.  Id. at *5.

37.     The debtor argued that the objectors lacked standing to object to the debtor's plan of adjustment.  Specifically, they maintained that because the debtor intended to assume the objectors' executory contracts, the objectors' rights were unimpaired and they were deemed to accept the plan.  Id. at *6–7.  The court rejected this argument, holding that the objectors had standing to object to the legal sufficiency or confirmability of the debtor's plan of adjustment. Id. at 21.  The court reasoned that the objectors should be given "an opportunity to oppose confirmation of a plan which may affect [their] pecuniary interests, even though [their] legal rights remain the same …" and that doing so "protects the regularity and credibility of the confirmation process."  Id. at *19.  Regarding potential harm to the objectors' pecuniary interests, the court explained:

> Because the [debtor] proposes to assume its executory contracts
> through the [p]lan, [the objectors] hold pre-petition unmatured
> contingent claims. They are entitled to object to assumption under
> § 365 just as if assumption had been sought by separate motion
> rather than tied to confirmation of the [p]lan. If their executory
> contract is rejected, they will have standing as pre-petition creditors
> to object to confirmation. If the contracts are assumed, the
> [debtor's] ability to perform may be altered due to the [p]lan's
> terms. For example, to the extent that the [debtor's] performance
> under the [executory contacts] depends upon landowners
> shouldering the infrastructure costs, the [p]lan's feasibility and the
> degree it binds landowners is critical to [the objectors'] pecuniary
> interests.

Id. at *19–20.

38.     Finally, the Court held that "preservation of a creditor's right to object to

confirmation of a plan because it does not satisfy the requirements of § 943 is vital to the

credibility to the bankruptcy system," that the "bankruptcy court must determine whether these

requirements are satisfied to confirm [a chapter 9 plan]," and that the "adversary process best

elicits the evidence necessary for such determinations." Id. at *20-21.

39.     As in In re Mount Carbon, the Debtor has expressed an intention to assume the

OMI-Detroit Agreement, and has not provided Macomb an opportunity to vote any claims under

that agreement. Macomb disputes that its interests under the OMI-Detroit Agreement are

unimpaired, but even if they were, the Plan's violation of applicable law[17] and infeasibility will

affect the City's ability to perform under that agreement, which is critical to Macomb's

pecuniary interests thereunder. In particular, Macomb alleges that the illegal overpayment of

GRS UAAL under the Plan will cause rates to become disproportionate to DWSD costs,

---

[17]     The Debtor has suggested that Macomb does not have standing to raise the Plan's violation of MCL §
123.141(2), because that section governs the sale of water, and Macomb County's relationship with the City
relates to sewer services. See Debtor Reply at 140 n.84. The Plan, however, also will cause monies collected
from the sale of water to be diverted from the DWSD system, violating applicable law and affecting the City's
ability to meet the standards of section 943 of the Bankruptcy Code and to perform its obligations under the
Plan. Thus, under the reasoning of Mount Carbon, Macomb has standing to raise this barrier to confirmability
of the Plan.

resulting in an immediate breach of the OMI-Detroit Agreement. Moreover, the Plan is rendered infeasible by the diversion of cash from the system for non-DWSD costs, which will affect the City's ability to meet capital improvement needs, negatively affecting the systems' viability and thus DWSD's ability to continue to provide essential public services pursuant to the OMI-Detroit Agreement.

40. Accordingly, Macomb has standing to object to the legality and feasibility of the Plan because the Plan will have an effect on Macomb's pecuniary interests as a DWSD ratepayer and intended third party beneficiary of the OMI-Detroit Agreement.[18]

*[Remainder of Page Left Intentionally Blank]*

---

[18] Thus, the circumstances here are different from situations where, courts, for example, have held that an unimpaired creditor may not have standing to object to a plan on the grounds that it violates the absolute priority rule, because creditors only have standing to object to the parts of a reorganization plan that affect their interests. See, e.g., In re G-I Holdings Inc., 420 B.R. 216, 255 (D.N.J. 2009). Here, Macomb is only objecting to matters that affect its pecuniary interests.

WHEREFORE, Macomb requests that the Court find that Macomb has standing to object to the Plan.

Dated: June 30, 2014

Respectfully submitted,

DECHERT LLP

By:_____/s/ Allan S. Brilliant_____
Allan S. Brilliant
G. Eric Brunstad
James M. McGuire
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

*Attorneys for County of Macomb, Michigan by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner*

# EXHIBIT A



*Detroit Metro Water Department*
*Water Board Building*
*Detroit, Michigan 48226*
*(313) 224-4800*

*Coleman A. Young, Mayor*
*City of Detroit*

August 18, 1975

The Honorable
Board of Water Commissioners
City of Detroit, Michigan

Madam President and Commissioners:

Re:  Detroit Sewage System Equity

In accordance with your recent requests for a report and legal opinions
relative to the takeover of the Detroit Sewage Disposal System, submitted
is:

                  (Exhibit 4 "B")
1)  A report/dated August 11, 1975 from the Accounting
      Manager containing a brief history and breakdown of
      the transaction.
                  (Exhibit 4 "C")
2)  A report/to the Board from the General Manager dated
      December 16, 1974, wherein he recommended payment
      of $2,540,698.11 for the Sewage Disposal System equity
      in accordance with opinion from the Corporation Counsel.

Respectfully submitted,

Charles R. Scales, Jr.
Deputy Director

Att.

Form C of L-27-ME

# City of Detroit

## DETROIT METRO WATER DEPARTMENT

### INTER - DEPARTMENTAL MEMO

TO: Mr. Cedroni

DATE: August 11, 1975

COPY TO:

FROM: J. Fehner

### Re:  City Equity in the Sewage Plant

The Sewage Plant was originally constructed during the years 1938, '39 and '40, and the costs were financed as follows:

| | |
|---|---|
| Sale of Bonds | $  5,075,000.00 |
| Federal Grant | 9,000,000.00 |
| City of Detroit Contributions: | |
| (1) Depreciated value of Interceptors and Pumping Stations at 5/1/40 | 4,475,885.27 |
| (2) Value of City Cash Contributions for Sewage Plant | 7,593,024.23 |
| (3) Depreciated value of Southfield Interceptor | 668,527.71 |
| Total Sanitary Sewage City Contribution | $ 12,737,437.21 |
| Total Sewage Disposal Assets | $ 26,812,437.21 |

This amount ($12,737,437.21) appeared on the Sewage records up to June 30, 1964, as "Contributions from City of Detroit".

On July 1, 1964, this department took over the "Operation and Maintenance of Storm Sewers and lateral sewers," formerly operated by the DPW Sewer Division.  In order to offset these costs, rates to city users were raised by 9½¢ per 1000 cu. ft. of water used.  We set up on our books as contributions the estimated value of Storm Sewer pumping Station that we were to operate, maintain, repair and replace ($2,540,698.11.)

In our 1969-70 budget preparation, we requested Council approval for an across-the-board rate increase of 32½¢ per 1000 cu. ft. of water to cover the additional treatment costs to be incurred at the Sewage Plant.  Council, at this time, recommended that we raise rates to city users a total of $1.06, and 32½¢ to Suburbs, 1000 cu.ft. of water used (JCC 10-14-69).  However, the Board refused to implement this increase. (BWC Meetings of 8/4/69, for example).

During ensuing months numerous attempts at a settlement of this impasse were made. Mr. A. Pelham was called upon to make his analyses.  He suggested that the Board repay to the General Fund the above-mentioned City Equity in the Sewage Plant. This compromise was accepted by all parties.  As can be seen from the above explanation, the City Equity is comprised of $12,737,437.21 of original Sewage Disposal

Mr. E. Cedroni                                                              August 11, 1975
                              Page 2

System assets as of 5/1/40, and $2,540,698.11 of estimated costs of Storm Sewer
pumping stations.

Payments to the General City of the $12,737,437.21 were made as follows:

| Date of Payment | Journal Voucher # | Bank Transfer # | Amount |
|---|---|---|---|
| July 22, 1970 | 1-237 | 7 | $ 2,500,000.00 |
| Sept. 9, 1970 | 3-141 | 331 | 2,500,000.00 |
| April 28, 1971 | 10-380 | 1320 | 800,000.00 |
| May 13, 1971 | 11-194 | 1386 & 1387 | 1,500,000.00 |
| June, 1971 | 12-277 | 1519 - 1520 | 1,350,000.00 |
| Oct. 11, 1971 | 4-168 | 546 | 500,000.00 |
| Nov. 9, 1971 | 5-159 | 662 | 500,000.00 |
| Nov. 30, 1971 | 5-357 | 733 | 350,000.00 |
| May 8, 1972 | 11-185 | 1432 | 2,737,437.21 |
| | | | $12,737,437.21 |

In the acceptance of the compromise, the Board said that the final amount of the
City's equity in the Sewage Plant would have to be determined.  In a letter from the
Board to the Controller and Corporation Counsel, dated 4/11/72, the total equity was
established at $12,737,437.21.
                                            (Exhibit 4 "D")

In a legal opinion from the Corporation Counsel, dated 5/7/74, the amount determined
on the basis of this opinion as City Equity in the Sewage Plant was $12,737,437.21.
Therefore, no additional amounts were due the General City.
                     (Exhibit 4 "E")
However, on December 11, 1974, the prior decision was superseded and Corporation
Counsel said that total should be $15,278,135.00.  In accordance with Board action
of December 16, 1974, payment of $2,540,698.11 was made by Journal Voucher #8-326,
on February 26, 1975.

As can be seen, this is a very involved transaction dating back to at least May of
1940.  There were no actual deeds or transfers of title made since all properties
are the City of Detroit.

                         EXHIBIT 4 "B"
                         Page 2



**METRO WATER DEPT.**

Water Board Building
Detroit, MI 48226
(313) 224-4800

ERNEST CEDRONI
General Manager

December 16, 1974

The Honorable
Board of Water Commissioners
City of Detroit, Michigan

Madam President and Commissioners:

Regarding:  Detroit Sewage System Equity

In 1970 the Common Council determined the equity of the Detroit Sewage Disposal System should be reimbursed to the City by this department.  The amount of the equity was determined to be $15,279,000.

Although this department agreed to the principal of the payment, the amount claimed by the City could not be substantiated and payment was made to the City in the total amount of $12,737,437.21.  The City insisted upon receiving the additional amount claimed and this department continued to deny the claim.  On May 7, 1974, the Corporation Counsel issued guidelines which should be used in determining the amount of the equity.  The guidelines substantiated our position.  On December 11, 1974 Mr. Elliott Hall, Corporation Counsel, gave an opinion which contradicts the previous one and declares that the amount of $15,278,135 is the legal obligation of the Board.

Inasmuch as the Corporation Counsel is the official legal officer of the City, there appears to be no recourse except to abide by the legal opinion.  It is recommended, therefore, that the Board of Water Commissioners approve the payment of $2,540,698.11 for the Sewage Disposal Equity.

Respectfully submitted,

E. Cedroni

E. Cedroni
General Manager



*Law Department*
*City-County Building*
*Detroit, Michigan 48226*
*(313) 224-4550*

December 11, 1974

*Coleman A. Young, Mayor*
*City of Detroit*

RECEIVED
1974 DEC 12 PM 1 18
D.W.S.S
GENERAL MANAGER'S OFFICE

Dennis O. Green, Director
Finance Department
11th Floor, City-County Bldg.
Detroit, Michigan 48226

Re: Detroit Sewage System Equity

Dear Mr. Green:

You have asked our opinion as to the legality of the
agreement approved by the City Council on February 24, 1970,
(J.C.C. 363-364), under which the Detroit Sewage System
would pay to the General Fund of the City an amount equal
to the City's equity in the Sewage DRsposal System.

After an exhaustive review of the problem which lead
to the City Council's actions, this office is of the
opinion that there was a meeting of the minds between the
representatives of the executive branch and the Water
Department as to: (1) The Detroit Sewage System purchasing
from the City its equity in the Sewage Disposal System;
(2) the amount of the City's equity in the Sewage Disposal
System; i.e., $15,278,135. Further, that this meeting of
the minds was communicated to the City Council and that the
City Council approved this matter by resolution relying
upon the executive branch's recommendation.

EXHIBIT 4 "E"



*Law Department*
*City-County Building*
*Detroit, Michigan 48226*
*(313) 224-4550*

*Coleman A. Young, Mayor*
*City of Detroit*

Dennis O. Green, Director
Finance Department                    -2-           December 11, 1974

Therefore, it is this Department's opinion that this
constitutes a legal obligation of the Detroit Sewage System.

Very truly yours,

ELLIOTT S. HALL
Corporation Counsel

ESH:lgb



CITY OF DETROIT

COLEMAN A. YOUNG, Mayor

OFFICE OF THE CORPORATION COUNSEL
DETROIT, MICHIGAN 48226
(313) 224-4550

May 7, 1974

Mr. Walter Stecher
Budget Director
1110 City-County Bldg.
Detroit, Mich.  48226

Re:  Detroit Sewage System Equity

Dear Sir:

You have requested our opinion on the legality and
collectibility of the $2,542,000 credit in the General
Fund budget for 1973-74.

The amount represents the disputed unpaid balance
of the City's equity in the Sewage Disposal System which
was estimated in 1970 to have been $15,279,000.

In a letter dated March 2, 1970, the General Manager
of the Water Department acknowledged that the City's equity
amounted to "approximately $15,000,000", but further in-
dicated that "the total exact sum has not yet been determined"
(Copy attached).

Except for a copy of the above-mentioned letter, we
have seen no documentation of an unconditional agreement
for the payment of the specific sum of $15,279,000.

There appears to have been no meeting of the minds
at any time as to the total City equity.  Indeed, after
the Water Department had paid ten million dollars, and had
tendered $2,737,437.21 as final payment, there was in 1972,
an uncertainty as to the balance due.  (See correspondence
between David Boston and R. P. Roselle, attached).  If any
mutuality existed at all, it was the mutual realization that
there was a difference of opinion as to the amount of the
balance of the equity.

The Water Commissioners claim that the book value of the sewage system was $12,737,437.21 in 1940, and maintain that said value was established in Detroit v. Highland Park, 326 Mich 78, decided in 1949.

In the course of those proceedings, the trial court found that the total capital costs of the (Record pg. 271) system as of May 3, 1940 were $27,098,918.96, comprised of $9,000,000 from a PWA grant, $5,075,000 from revenue bond proceeds and $13,023,918.96 from the City. And although not essential to its decision, the Supreme Court referred to total capital costs of $26,842,349.45, and, by implication, net capital costs of $12,767,349.45. Furthermore, reports of the Auditor General indicate that as of May, 1940, city contributions amounted to $12,767,499.45. Querie: To what may these variances be attributed?

It appears that the present dispute involves the propriety of including certain pumping stations among capital items transferred to the Sewage Disposal System, for which the General Fund seeks reimbursement.

Our examination of the records and briefs in the Highland Park cases disclosed that as of 1940 there were established City policies with respect to the composition of the sewage disposal system and the allocation of costs thereto. Those policies were affirmed by the court decision, and accordingly, should govern the disposition of the present dispute.

Both the trial court and the Supreme Court recognized the fact that some facilities served dual functions, ie., the handling of both sanitary sewages and storm water drainage. The City clearly established that certain costs allocable to storm water drainage had been deducted from total construction costs to arrive at the total of $27,098,918.96 as the cost of the sewage disposal system. Exhibits received in evidence conclusively show such allocations to have been made for (a) River Rouge Interceptor, (b) Oakwood pumping station, and (c) Baby Creek sewer.

The trial court ruled that the net costs assigned to the sewage disposal system were for facilities required for the treatment and disposal of sanitary sewage and therefore proper capital costs of the system. The Supreme Court affirmed.

We therefore advise that the instant dispute be resolved in accordance with the following guidelines:

-2-

a) Pumping stations and structures utilized solely for the handling and transportation of storm waters, and performing no function peculiar to the disposal system nor constituting a necessary part thereof, may not be charged to City equity in the sewage disposal system.

b) The City's equity in the sewage disposal system must include the capital costs of those pumping stations or structures which are required or used for diverting sanitary flow into the intercepting system, or which are required or necessary to keep sanitary sewage out of the River Rouge or the Detroit River.

c) In the case of pumping stations or structures handling both sanitary sewage and storm waters, only that part of the capital costs allocable to sanitary sewage may be charged to City equity in the sewage disposal system.

There is little doubt that the Water Department had obligated itself to reimburse the General Fund for the City's equity in the sewage system. Whether there is an additional balance due is contingent upon a final determination whether all properly chargeable items, as set forth in the aforementioned guidelines, have been considered. We suggest that such final determination will, of necessity, require both engineering and accounting expertise.

Very truly yours,

ARTHUR YIM,
Asst. Corporation Counsel

AY:svr

APPROVED:

CORPORATION COUNSEL

cc: Victor McCormick, Auditor General

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

> Plaintiff and
> Counter-Defendant

> Civil Action No.
> 771100

-vs-

STATE OF MICHIGAN,

> Defendant and
> Counter-Plaintiff
> and Cross-Plaintiff,

-vs-

THE CITY OF DETROIT, a municipal
corporation, THE DETROIT WATER &
SEWERAGE DEPARTMENT,

> Defendant and
> Cross-Defendants

-vs-

All Communities and Agencies Under
Contract With the City of Detroit
For Sewage Treatment Services.

_____/

REPORT AND RECOMMENDATIONS
OF THE MASTERS

DATE: MAY 1, 1978

## TABLE OF CONTENTS

| | | | | Pages |
|---|---|---|---|---:|
| Introduction | | | | 1 |
| I. | Ratemaking Principles | | | |
| | A. | General Background | | |
| | | 1. | Historic Setting | 3 |
| | | 2. | Detroit Investment | 7 |
| | | 3. | Contract Rate Provision | 9 |
| | | 4. | Increased Treatment Requirements | 13 |
| | | 5. | The 1974 Rate Study and 1975 Rate Increase | 15 |
| | | 6. | The 1977 Rate Study | 19 |
| | B. | Revenue Requirements | | |
| | | 1. | General Methodology | 23 |
| | | 2. | Total Revenue Requirements: 1977 Rate Study | 25 |
| | | 3. | Operating and Maintenance Expense | 27 |
| | | 4. | Capital Expenditures | 31 |
| | | 5. | Working Capital: Grant Anticipation Financing | 33 |
| | | 6. | Revenue Surplus | 37 |
| | | 7. | Detroit's Changed Assumptions | 39 |
| | | 8. | Two and One-Half Year Rate Period | 45 |
| | | 9. | Surplus Revenue Corrections | 48 |
| | C. | Rate Allocation | | 55 |
| | | 1. | General Methodology | 56 |
| | | 2. | Depreciation of Grant-Funded Plant | 63 |
| | | 3. | Differential Rate of Return | 72 |
| II. | Application of Michigan Law | | | 88 |
| | A. | Jurisdiction and Applicable Law | | 91 |
| | B. | Surplus Revenues | | 101 |
| | C. | Rate Allocation | | |
| | | 1. | Utility Basis of Ratemaking | 104 |
| | | 2. | Depreciation of Grant-Funded Investment | 106 |
| | | 3. | Differential Rate of Return | 109 |
| | D. | Remedy | | 118 |
| III. | Other Issues | | | 119 |
| | A. | Res Judicata: Oakland County | | 120 |
| | B. | Reporting Practices | | 127 |
| | C. | Personnel and Purchasing Practices | | 130 |
| | D. | Disposition of Motions | | 132 |
| | E. | Storm Water Volume Objections | | 134 |
| | F. | Supplemental Objections: Wayne County (Redford Township) | | 136 |
| | G. | 90-Day Written Notice Objection: Melvindale | | 139 |
| | H. | Representation on Board of Water Commissioners | | 141 |

## TABLE OF CONTENTS

III.   Other Issues (cont'd)

    I.  Hearing Requirement   143

    J.  Ratemaking Power   145

    K.  Bond Revenue Coverage Requirements   146

    L.  Abandoned Objections   147

INTRODUCTION

This report constitutes the recommendation of the
Masters appointed in this case to hear the objections
of several suburban customers to the sewage treatment
rate schedule adopted by the City of Detroit on August
3, 1977, to take effect on bills rendered on and after
September 1, 1977.  The objections have all been framed
as contract claims governed by Michigan law.  The
Report is divided into three major sections.  The first
section sets out recommended findings on all the major
issues of the case.  These findings go both to matters
of fact and to an evaluation of the facts by stating
conclusions as to the propriety of the challenged rates
as a matter of fair ratemaking practices.  Remedies
have been recommended in conjunction with the findings
that indicate the need to correct present rates.  The
second section weighs the fair ratemaking conclusions
against the standards of Michigan law, to determine
the extent to which the contracts between Detroit and
its suburban customers oblige Detroit to conform to
fair ratemaking standards.  The final section sets out
recommendations for the disposition of a large variety
of other issues that have not seemed to require any
further action.

The separation between the discussion of fair rate-
making principles and legal conclusions has resulted
from the special nature of the issues presented.  The
major issues may be grouped into two distinct cate-
gories.  The issues in the first category turn on

-1-

claims that the sewage treatment rates were based on
grossly inflated projections of actual revenue require-
ments. The issues in the second category turn on claims
that the method of apportioning rates between Detroit
customers and suburban customers is unreasonable, what-
ever the level of revenue requirements may be. As to
the revenue requirements, it is clear that the expenditure
projections made in the 1977 rate study that led to the
new rates have proved sharply greater than the actual
expenditures. Detroit has sought to justify the rates
in light of this change only by advancing ratemaking
assumptions drastically different from those applied in
the 1977 rate study. As to the method of apportioning
rates, there is a strong general claim that it does
not conform to the requirements of the specific suburban
contracts involved in this case. In addition, it is
clear that in the special situation confronting the
Detroit sewage treatment operation, the present method
of apportioning rates could in some circumstances lead
to untoward and even bizarre results. Detroit has
sought to justify its methods of apportionment both by
reliance on general ratemaking principles and by heavy
reliance on several decisions of Michigan state courts.
In these circumstances, clear exposition of the issues
and suggested conclusions has suggested a division be-
tween general ratemaking conclusions and specific appli-
cation of Michigan law.

Two recommendations are made for correction of the
present rate structure. It is recommended in Part I-B
that a self-adjusting mechanism be adopted to correct the
large anticipated revenue surpluses. It is recommended

-2-

in Part I-C that the rates to suburban customers for 1978-
1979 and for the period from July 1, 1979 through December
31, 1979 be reduced by reducing the rate of return charged
to them to the level of the rate of return charged to
Detroit customers in the 1977 rate study for the same
rate periods.  Although it is also concluded in Part I-C
that it was wrong to calculate depreciation charges on
investment that has been funded by federal and state
grants, it is further concluded that there is no need
to adopt any remedy on this account.

I.  RATEMAKING PRINCIPLES
    A.  GENERAL BACKGROUND

(1)  Historic Setting

1 .  The present Detroit sewage treatment plant went in-
to operation in 1940.  From the beginning, it has provided
treatment services for customers outside the City.  Over
the years, additional suburban customers were added to
the system.  Detroit now provides wastewater treatment
service to some 78 suburban communities.  (Exhibit 40,
P. 3-24.)  All of the objectors in the present proceedings
are suburban customers.

2 .  The basic service of sewage treatment is provided
to all customers of the system.  Actual treatment of
all sewage is provided at a single central plant.  In
addition to this central plant, the system includes the
large "interceptor" sewers that bring combined sewage
flows to the central plant.  Many portions of the central
plant and the interceptor system are devoted to the common
use of all customers, both within and outside the City of
Detroit.  All parties agree that some method must be
used to allocate the costs of these components among all
customers.

3 .  Customers in the City of Detroit are provided "retail"
sewage service.  This service extends beyond the basic
treatment function to include individual sewage gathering
facilities and individual billing.  All parties agree
that Detroit customers should bear the costs of the "lateral"
sewer system that collects Detroit sewage, and the costs
of individual metering and billing.

4 .  A few suburban customers are provided retail service.

-3-

None of the objections advanced in the present proceeding are based directly on service provided to such customers.

  5 .  The overwhelming bulk of service to suburban customers is provided as "wholesale" service under contracts with governmental units.  Some of these suburban customers are provided service through facilities that are clearly identifiable to the needs of those customers. All parties agree that these suburban customers are properly chargeable with the costs of these identifiable facilities.  None of the objections that have been pressed through the hearings and argument of the present case are addressed to calculation of the separate portions of the charges based on these separately identified facilities.

  6 .  The early rate relationships between Detroit customers and suburban customers are set out, at least in part, in the 1966 Pollution Control Program for the Detroit Regional Watershed that was introduced as Exhibit 27. The several rates are set out at Pages 6 to 8 of that exhibit as follows, expressed as dollars per thousand cubic feet (mcf):

|      | Detroit customers | Suburban customers |
|------|-------------------|--------------------|
| 1940 | $ 0.11 /mcf       | $ 0.2161 /mcf      |
| 1949 | 0.13 /mcf         | 0.225 /mcf         |
| 1959 | 0.23 /mcf         | 0.325 /mcf         |
| 1964 | 0.325/mcf         | 0.325 /mcf         |

None of the evidence adduced in this case shows the methods by which these rates were developed.

  7 .  A more complicated pattern of rate relationships is shown by the record for later periods.  Exhibit 14, the rate study that led to the 1975 rate increases described in Paragraphs 24-35 below, shows that the rates were

-4-

increased in 1970 (P. 4) to the following levels (Pages

A and B):

| | |
|---|---|
| Detroit customers | $ 0.65 /mcf |
| Metered suburbs | 0.65 /mcf |
| Unmetered suburbs | 0.65 /mcf |
| Macomb County District | 1.585/mcf |
| Clinton-Oakland District | 1.665/mcf |
| Suburban individual | 0.72 /mcf |

None of the evidence adduced in this case shows the methods

by which these rates were developed.  In the 1966 Pollution

Control Program, however, it is stated that rates for sub-

urban service

> will consist of factors for the construction
> cost, financing, operation, renovation, and
> maintenance of the regional interceptor
> system, pumping stations and wastewater treat-
> ment plant or plants, plus a reasonable rate
> of return on the investment to provide for
> the improvement and growth of the system.
> Rates for service within the City will include
> separate factors for the maintenance, operation,
> renovation, and improvement of the internal
> collection system.

(Exhibit 27, P. 30.)  The lack of evidence on the methods

of developing the 1970 rates makes it impossible to deter-

mine, on the present record, whether the suburban rates

that went into effect in 1970 included any "rate of return

on the investment."

8 .  All funds derived by the City of Detroit from sewage

charges must be devoted to sewage treatment uses.  The

Michigan Home Rule Act provides in part that:

> Each city may in its charter provide: * * *
> (4) for the acquiring, establishment, opera-
> tion, extension, and maintenance of sewage
> disposal systems, sewers, and plants, either
> within or without the corporate limits of
> the city, as a utility, * * * including the
> fixing and collecting of charges for service
> covering the cost of such service, the pro-
> ceeds whereof shall be exclusively used for
> the purposes of the sewage disposal system * * *.
> M.C.L.A. S. 117.4f(4), M.S.A. S. 5.2079(4).

The Charter of the City of Detroit provides that:

-5-

> All monies paid into the City Treasury from fees collected for water, drainage, or sewerage services shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest or principal of any obligations issued to finance the water supply and sewage disposal facilities of the city, and shall be kept in separate funds. (Section 7-1503, as set out in proposed findings of Wayne, Oakland, and Macomb Counties, P. 7.)

Separate accounts are maintained for the Sewage Disposal Fund. Exhibit 13 is the Auditors' Report prepared by Peat, Marwick, Mitchell & Co. for the Sewage Disposal Fund for the fiscal year ended June 30, 1977. Paragraph XIII of the consent decree entered in this action on September 14, 1977, requires that an annual audit of the Detroit Water and Sewerage Department be conducted by a major private sector accounting firm not less than once every twelve months.

-6-

### (2)  Detroit Investment

9 .  The original sewer treatment facilities that Detroit
put into operation in 1940 cost more than $26,000,000.
The principal sources of these funds were roughly
$9,000,000 in federal grants, $5,000,000 from proceeds
of revenue bonds, and $12,700,000 from the general
funds of Detroit.  See City of Detroit v. City of
Highland Park, 1949, 326 Mich. 78, 39 N.W.2d 325.

10.  Between 1964 and 1974, payments were made to the
City of Detroit from funds generated by sewage user
charges.  After these payments were completed, it was
believed that all of the contributions from the general
funds of the City had been repaid.  (Tr. 271; 625-626.)
As a result of later audit procedures, however, adjust-
ments were made to reflect accumulated depreciation with
the result that as of June 30, 1977, the balance sheet
of the Sewage Disposal Fund showed contributions from the
City of Detroit of $2,570,471.  Neither Note F to the
Fiscal 1977 Audit, Exhibit 13, nor the testimony of the
accountant who prepared the audit, Mr. Jaslowski
(Tr. 247-249), explains the nature or purpose of this
restatement.

11.  Apart from the contribution that resulted from the
auditing adjustment described in Paragraph 10, the
Detroit sewage treatment facilities have been financed
by three sources of funds.  One has been grants from
the United States and the State of Michigan.  Another
has been borrowing.  The third has been charges imposed
on users of the system.

-7-

12. None of the evidence adduced in the hearings permits any calculation of the relative amounts of capital that have been generated by user charges imposed on various classes of users in Detroit and in the suburbs. It is clear, however, that suburban customers have been tied into the Detroit system for long but varying periods of time, and that suburban customers have provided sub-stantial portions of the capital invested in the system through user charges.

13. All of the bonds that have been issued to generate funds for the sewage system have been revenue bonds. The ordinances authorizing these revenue bonds were admitted in evidence as Exhibits 45, 46, 47, and 48. These bonds are not general obligations of the City of Detroit, but are payable only out of revenues of the sewage system. All future bond issues are expected to be revenue bonds.

-8-

### (3)  Contract Rate Provisions

14.  Several sewage treatment contracts between Detroit and suburban customers have been introduced into evidence. The ratemaking provisions of the several contracts employ substantially different language. Each of the several provisions is set out below.

15.  Three contracts between the County of Oakland and the City of Detroit have been formed to provide sewage disposal to three distinct districts in Oakland County. The agreement of December 30, 1958, captioned the Evergreen-Farmington Sewage Disposal Agreement, Exhibit 17, contains two rate provisions.  Paragraph 2 provides that:

> The County shall pay the City * * * at such rates as now are or may hereafter be established by the City for such disposal services.

Paragraph 11 provides that:

> The sewage disposal charges herein provided for to be made by the City shall be reasonable and comparable to the rates charged to the public agencies served by the City under like conditions.  Any disagreement between the parties hereto as to such charges shall be determined in the courts of the State, and the parties agree to consent that any such action may be heard by a judge other than of the Wayne or Oakland County Circuit Court.

16.  The agreement of November 1, 1962, between Oakland County and the City of Detroit (the Southeastern Oakland County contract), Exhibit 15, provides in Paragraph 2 that:

> The County shall pay the [Detroit] Board [of Water Commissioners] * * * at such rates as now are or may hereafter be established by the Board for such services.

Paragraph 12 of this agreement provides that:

> The sewage disposal charges herein provided for to be made by the Board shall be reasonable and comparable to the rates charged to

the public agencies served by the Board under
like conditions. Any disagreement between the
parties hereto as to such charges shall be
determined in the courts of the State, and the
parties agree to consent that any such action
may be heard by a Judge other than of the Wayne
or Oakland County Circuit Court.

17. The agreement of February 5, 1968, between Oakland

County and the City of Detroit (the Clinton-Oakland con-

tract), Exhibit 16, provides in Paragraph 9 that:

The County shall pay the Board for wastewater
disposal service at such rates as the Board
may establish from time to time, it being
mutually understood that the portion of said
rates for treatment shall be uniform through-
out the entire Detroit System and that such
rates shall always be reasonable in relation
to the costs incurred by the Board for pro-
viding this service. The Board shall give 90
days written notice of any change in rates
to the Board of Public Works of the County.
All money collected by the Board from the
County for providing this service under the
terms of this agreement, shall be used for
the construction, financing, operating, main-
tenance, renovation, repair, replacement,
and improvements of the Detroit System.

18. The agreement of March, 1967, between Macomb County

and the City of Detroit, Exhibit 23, provides in Para-

graph 9 that:

The County shall pay the Board for wastewater
disposal service at such rates as the Board
may establish from time to time, it being
mutually understood that such rates for
treatment shall be uniform throughout the
entire Detroit Wastewater Disposal System
and such rates shall always be reasonable
in relation to the costs incurred by the
Board for providing this service. The
Board shall give 90 days written notice
of any change in rates to the Treasurer of
the County. All money collected by the
Board from the County for providing this
service under the terms of this agreement,
shall be used for the construction, finan-
cing, operation, maintenance, renovation,
repair, replacement, and improvements of
the Detroit Regional Wastewater Disposal
System. See Exhibit "D" hereto attached
and made a part hereof.

Exhibit "D," referred to in Paragraph 9 as just quoted,

provides that:

-10-

It is further agreed and understood that the hereinbefore stated treatment charge will be increased or decreased as costs therefore increase or decrease and standards relative thereto are raised, provided, however, such charge shall be uniform throughout the entire Detroit Wastewater System.

19.  The Sewage Disposal Agreement of August 15, 1961, between Wayne County and the City of Detroit (the Rouge Valley Contract), Exhibit 24, provides in Paragraph 2 that:

> The County shall pay the Board for any and all sewage accepted by the Board for disposal hereunder, at such rates as now are or may hereafter be established by the Board for such services.  The charge for such sewage disposal services shall be on the basis of:  1) the aggregate quantity of water consumed within the District, and 2) the quantity of sewage indicated by sewage flow meters to the extent hereinafter set forth.

It further provides in Paragraph 12 that:

> The sewage disposal charges herein provided for to be made by the Board shall be comparable to the rates charged to the public agencies served by the Board under like conditions.  Any disagreement between the parties hereto as to such charges shall be determined in the courts of the State.

20.  The Sewage Disposal Agreement of January 13, 1944, between Wayne County and the City of Detroit (the Northeast contract), Exhibit 52, provided in Paragraph 4 that the County would pay at the rate of $0.2161 per thousand cubic feet.  Paragraph 12 provides that:

> The charge herein provided for shall be subject to adjustment from time to time so as to be fair and equitable, taking into consideration the various cost factors.  Any disagreement between the parties hereto as to such a rate shall be determined in the courts of the State.

The amendatory agreement of February 28, 1961, between Wayne County and the City of Detroit, Exhibit 53, amended Paragraph 4 of the original agreement to provide that:

-11-

The County shall pay the City for any and all
sewage accepted by the City for disposal here-
under at such rates as now are or may here-
after be established by the City for such
disposal services.

-12-

### (4)   Increased Treatment Requirements

21. Statutory requirements for the treatment of waste-water have been increased drastically in relatively recent years. The costs of providing such treatment have required sharp increases in the sewage rates charged by Detroit to all its customers, within and outside the city.

22. The present lawsuit began as an action by the United States against the City of Detroit, the Detroit Water and Sewerage Department, and the State of Michigan, alleging violations of the Federal Water Pollution Control Act, 33 U.S.C. SS.1251 et seq., and of the provisions of a National Pollutant Discharge Elimination System permit issued pursuant to the Act. The underlying claims of violation have been disposed of by entry of a consent judgment on September 14, 1977. Compliance with the terms of the consent judgment will require expenditure of hundreds of millions of dollars over a period of several years. It is anticipated that large portions of the construction costs will be paid by grants from the United States and the State of Michigan. Within a few years, however, the Detroit sewage disposal system must finance more than one hundred million dollars of capital improvements through some combination of borrowing and user charges. In addition, vast increases in operation, maintenance, and repair and replacement costs will be required to operate a much larger and more complicated plant according to acceptable standards of quality.

23. The rate disputes that have emerged from the

-13-

setting of greatly increased expenditure requirements are
set against a background of common agreement that sub-
stantial rate increases are unavoidable.  The disputes go
primarily to the size and timing of the increases and
the apportionment between Detroit and suburban customers.

-14-

### (5)  The 1974 Rate Study and 1975 Rate Increase

24.  Exhibit 14 is the December, 1974 Report on Sewage
Rates Detroit Metro Water Department.  This Report was
prepared primarily by Mr. William Carney, a Principal
Governmental Analyst, who testified extensively at
the hearings.  (Tr. 558-681.)

25.  Exhibit "A" to the 1974 Report indicated that
current rates had resulted in a deficit of nearly $700,000
for the sewage treatment operation for the twelve months
ended June 30, 1974, on an unaudited basis.  Substantial
rate increases were recommended.

26.  In determining the rates to be recommended, Mr.
Carney sought to establish rates that would last for a
five-year period.  In this process, the fiscal year from
July 1, 1977 to June 30, 1978 was selected as a "test
year."  The test year is used to justify the rates by pro-
jecting the income needs that are expected for the test
year and comparing them to projections of the revenues
that would be generated by applying the proposed rates
to anticipated sewage flows.

27.  The first step in preparing the rates recommended in
the 1974 report was to estimate the revenue needs of the
system on a "cash basis."  Under this method of esti-
mating revenue needs, account is taken only of antici-
pated real expenditures.  Operating and maintenance expendi-
tures and like items are treated as current expenses.
Capital costs are accounted for by considering only the
amounts needed to service interest and principal obli-
gations on outstanding indebtedness and any new indebted-
ness that is scheduled to be incurred, together with

-15-

amounts required by "coverage" requirements. (Coverage requirements are discussed in Paragraph 69 below.) Depreciation accounting does not form any part of revenue requirements on this basis of planning.

28. After revenue requirements were estimated on a cash basis, the next planning step was to set rates that would generate revenues sufficient to cover the revenue requirements. In setting the rates, Mr. Carney turned to a "utility basis." Under the utility basis of rate setting, rates are established by considering both depreciation and return on capital.

29. In setting new rates, the 1974 Report began by apportioning the operating and maintenance expenditures that had been used in projecting revenue requirements. Customers were divided into various classes, but for purposes of this case it is important to focus only on the division between Detroit customers and suburban customers. Operating and maintenance expenditures that were directly attributable to either class of customers were allocated to the appropriate class. Operating and maintenance expenditures for common plant used for both classes of customers were apportioned among the classes according to relative volumes of sewage flow.

30. The second step in setting the rates recommended by the 1974 Report was to charge depreciation. Depreciation charges were based on the book value of sewage treatment facilities, based on purchase cost less accrued depreciation. No adjustment was made to take account of the fact that some of the facilities had been purchased with funds contributed by grants from federal or state govern-

-16-

ments.  Depreciation charges were allocated among the
classes of customers in the same way as operating and
maintenance costs.  Revenues generated by this portion
of the rates were not segregated into any kind of
depreciation account, and were available to the Detroit
Water and Sewerage Department for any purpose.

31.  The final step remaining in determining the rates
recommended by the 1974 study was to apply a rate of
return figure to a rate base.  The total rate base for
the plant facilities used in common for Detroit and
suburban customers was set by deducting from book value
both contributions from federal and state government
grants and depreciation.  This rate base was then allo-
cated to the two classes of customers according to the
relative volumes of flow.  The next step was to deter-
mine, as a matter of judgment, a figure that would con-
stitute a fair rate of return to charge suburban customers
on the rate base allocated to them.  Mr. Carney deter-
mined that a 7% rate of return would be a fair charge
after considering the rate Detroit could earn by invest-
ing money, the cost of money to Detroit, and elements
of risk.  After applying this rate of return to the sub-
urban rate base, sufficient revenues were generated to
permit the rate of return for Detroit customers to be
set at zero.  Suburban customers thus paid a 7% rate of
return while Detroit customers paid none.

32.  The rates recommended in the 1974 study were:

-17-

| | |
|---|---|
| Detroit | $0.75 /mcf, plus a fixed storm water service charge |
| Metered Suburbs | .94 /mcf |
| Unmetered Suburbs | .89 /mcf, plus a fixed storm water service charge |
| Macomb County | 2.03 /mcf |
| Clinton-Oakland | 2.26 /mcf |
| Suburban Individual | .89 /mcf, plus a fixed storm water service charge |

33. Mr. Carney testified that in determining the appro-
priate method of allocating charges between Detroit and
suburban customers he relied upon the decision in City of
Detroit v. City of Highland Park, 1949, 326 Mich. 78, 39
N.W.2d 325.

34. The rates recommended by the 1974 study were adopted
by Detroit, to become effective on bills rendered on September
1, 1975 and thereafter.

35. Oakland County brought suit in Michigan state courts
to challenge the rates adopted by Detroit in 1975 on the
basis of the 1974 rate study.  Pleadings and opinions in
the Michigan state litigation are set out in Exhibit 43.
The impact of this litigation on the present proceeding will
be discussed in Part II.

-18-

## (6)  1977 Rate Study

36.  The rates that are challenged in the present pro-
ceedings were recommended by a rate study performed in 1977
by Black and Veatch, consulting engineers.  The study has
been admitted in evidence as Exhibit 9.  The general
setting of the study is described in the following para-
graphs.  Detailed findings as to the methods and results
of the study are set out in dealing with the specific
challenges that have been addressed to the study.

37.  The methods adopted in the 1977 rate study were the
same as the methods that had been employed in the 1974
rate study described above.  Revenue requirements were
estimated on a "cash" basis.  Rates were developed to
satisfy the resulting projected revenue requirements on a
"utility" basis.  Operating and maintenance costs were
taken directly from the revenue requirement calculation.
Costs that could be identified to specific classes of
customers were charged to them, and common costs were
allocated according to relative volume of flow.  The
balance of the revenue requirements needed to meet capi-
tal costs was generated through charges for depreciation
and a rate of return.  Depreciation charges were calcu-
lated for the common plant without reducing its book
value to reflect amounts contributed by grants from the
United States or the State of Michigan.  The rate base
was determined by deducting the amount of such contri-
butions and accrued depreciation from book value.  A
judgment was then made that it was again proper to charge
a 7% rate of return to suburban customers.  Suburban rates
were then set by adding together components for operating

-19-

and maintenance costs, depreciation, and a 7% rate of return applied to the rate base allocated to suburban customers. Unlike the expectation of the 1974 study, it was determined that Detroit rates would not generate sufficient revenue if they were calculated without charging Detroit customers any rate of return on the rate base allocated to Detroit customers. The specific rate of return charged to Detroit customers was set by determining the total revenue deficit that remained after calculating the rates to suburban customers and rates to Detroit customers without any rate of return. The result was that the rate of return charged to Detroit customers was slightly more than 7% for the first year of the study, slightly more than 2% for the second year, and approximately 4 1/2% for the final half-year. (Exhibit 51.)

38. The rates proposed by the 1977 study were approved by the Board of Water Commissioners on July 8, 1977, and adopted by the Detroit City Council on August 3, 1977. (Exhibit 44.)

39. The rates adopted on August 3, 1977, became effective with bills rendered on and after September 1, 1977. The increased rates for the first period, 1977-1978, were applied to all customers for services received in all months beginning with August 1, 1977. (Tr. 1093.) The rates described as rates for July 1, 1978 to June 30, 1979 will be charged to all customers for services received in the months beginning with June 1, 1978. (Tr. 1181.) Although there is no record testimony on the subject, the testimony as to billing practices indicates that the rates described as rates for July 1, 1979 through December 31, 1979 will be charged to all customers for services

-20-

received in the months beginning with June 1, 1979.

40. The schedule of rates recommended by the 1977 study
and adopted by the City of Detroit sets rates for three
periods. The first period is the portion of the July 1, 1977
to June 30, 1978 fiscal year covered by bills rendered
on and after September 1, 1977; the second period is the
fiscal year from July 1, 1978 to June 30, 1979. The
final period is the first half of the following fiscal
year, running from July 1, 1979 to December 31, 1979.
It is anticipated that the new rate structure contem-
plated by the consent decree entered in this action on
September 14, 1977 will take effect on January 1, 1980.
The respective rates for these three periods are:

|                  | 1977-1978   | 1978-1979   | Last half of 1979 |
|------------------|-------------|-------------|-------------------|
| Detroit          | $ 2.35 /mcf | $ 2.64 /mcf | $3.29 /mcf        |
| Macomb County    | 3.62 /mcf   | 3.72 /mcf   | 4.07 /mcf         |
| Clinton-Oakland  | 4.60 /mcf   | 4.43 /mcf   | 4.56 /mcf         |
| All other suburbs| 1.72 /mcf   | 2.08 /mcf   | 2.52 /mcf         |

(Exhibit 9, Tables 14, 15, Pages 41, 43.)

-21-

## B.   REVENUE REQUIREMENTS

41 .  A great portion of the record in this case has been
made in efforts to show that the revenue requirements as-
sumed in establishing the user charges recommended by the
1977 rate study have proved false.  The objectors have in
fact shown, with the agreement of Detroit, that expendi-
tures both for operating and maintenance, and for long-
term capital improvements, will fall far short of the
levels projected in the 1977 rate study.  Detroit has sought
to justify adherence to the rates recommended by the 1977
study by offering grounds that are a drastic departure
from the ratemaking principles adopted in the 1977 rate
study.  The Masters have concluded, for the reasons set
forth in detail below, that the attempted justifications
offered by Detroit are inadequate.  Recommendations for
a specific remedy are set out at the close of this section.

(1)  General Methodology

42 .  The first step in determining the rates that should
be charged by a utility involves a calculation of the reve-
nues required.  So far as the record reveals, the City of
Detroit has always determined its sewage rates by pro-
jecting revenue requirements on what is called a "Cash"
basis.  This term does not reflect the principles on
which the actual books of account are kept--in fact, the
sewage accounts are kept on an accrual basis rather than
a cash flow basis.  Instead, the term "cash basis" is
one of ratemaking art.  It means that revenue require-
ments are determined by forecasting operation and main-
tenance expense, annual debt service payments for princi-
pal and interest plus any required reserve fund payments,
and all other expenditures during the ratemaking period.
As compared to the "utility" basis for calculating revenue
requirements, the cash basis does not treat depreciation
on existing plant as a revenue requirement.  The cash
basis of determining revenue requirements is commonly
regarded as an appropriate method for publicly owned utili-
ties that are not operated for profit, but that are organ-
ized to serve the public on a self-supporting basis.
(Exhibit 11, P. 29.)  No objection has been made to the
application of the cash basis method of determining the
revenue requirements of the Detroit sewage department; and
the Masters find that it is appropriate to adhere to it
in appraising the objections that have been advanced to
the rates involved in this proceeding.
43 .  The cash basis method of projecting revenue require-
ments does not of itself determine the extent to which long-

-23-

term capital improvements should be financed by long-term
borrowing as compared to payment out of current user
charges.  Long-term borrowing simply provides a source
of revenues that can be applied to actual revenue needs.
The greater the amount of long-term borrowing in any given
rate period, the lower the amount of revenues that must
be raised by current user charges.  Long-term borrowing,
however, does not reduce revenue needs by the full amount
of the borrowing.  Once long-term indebtedness is incurred,
it becomes necessary to generate revenue to cover the costs
of paying interest and repaying principal, and also to esta-
blish any bond reserve funds required by the terms of
borrowing.

44 .  The cash basis method of projecting revenue require-
ments also does not determine the extent to which reliance
may be placed on government grants to finance capital improve-
ments.  Government grants simply reduce the portion of the
revenue requirements that must be generated by user charges
or long-term borrowing.

45 .  Determination of the amount of revenues to be derived
by user charges under the cash basis method of calculating
revenue requirements is thus a result of subtracting from
total expenditures projected for the ratemaking period
the net amounts that are expected to be generated by govern-
ment grants and long-term borrowing.

-24-

(2)  Total Revenue Requirements:  1977 Rate Study

46 .  The total revenue requirements originally estimated
by Black & Veatch for the period covered by the 1977 rate
study were as follows:

| | |
|---|---|
| 1977 - 1978 | $ 60,032,600 |
| 1978 - 1979 | 75,418,000 |
| July 1 - Dec. 31, 1979 | 46,380,700 |

(Exhibit 9, Table 17, P. 45.)

47 .  The rates recommended by the 1977 rate study were cal-
culated to meet the projected revenue requirements without
generating any significant surplus or deficit.  The antici-
pated surpluses from the rates were as follows:

| | |
|---|---|
| 1977 - 1978 | $ 139,000 |
| 1978 - 1979 | 33,900 |
| July 1 - Dec. 31, 1979 | 2,100 |

(Ibid.)

Mr. Lobb, who prepared the 1977 rate study, testified that
the rates were established on the principle of meeting anti-
cipated needs without generating any reserve.  (Lobb, tr. 888.)
The 1977 rate study stated:  "The proposed charges are in-
tended to derive revenues from the customers in a manner
commensurate with the cost  of providing service to the
customer and to recover the annual revenue requirements of
the wastewater system for the period July 1, 1977 through
December 31, 1979."  (Exhibit 9, P. 2.)

48 .  Several objections have been advanced to the total
revenue requirements assumed in setting the rates recom-
mended by the 1977 rate study.  The greatest sums of money
are involved in the objections that operating and maintenance
expenditures were greatly overstated, and that capital

-25-

expenditures were projected at a rate that could not be met. Smaller sums are involved in challenges to the decision to treat the cost of paying for construction before receipt of governmental grant reimbursement as a current expense rather than a long-term capital cost to be met out of long-term borrowing. Each of these objections will be dealt with separately.

-26-

### (3)  Operating and Maintenance Expense

49 .  In the 1977 rate study, estimates for operating and
maintenance expenditures were made as follows:

| | |
|---|---|
| 1977 - 1978 | $ 43,456,200 |
| 1978 - 1979 | 57,876,700 |
| July 1, 1979 to Dec. 31, 1979 | 35,027,700 |

(Exhibit 9, Table 5, Line 8, P. 23.)

50 .  There is no dispute that the estimates of opera-
ting and maintenance expenditures underlying the 1977
rate study were greatly overstated with respect to the
1977-1978 year.  Part of the shortfall has resulted
from the failure of Detroit to attain the rate of capi-
tal expenditure anticipated at the time the rate study
was made.  Since anticipated capital improvements have
not been made as scheduled, operating and maintenance
expenditures have not been made to operate and maintain
as much plant as had been expected.  As of the time
of the hearings in this case, Black & Veatch had reduced
its projected operating and maintenance expenditures
to the following figures:

| | |
|---|---|
| 1977 - 1978 | $ 35,888,800 |
| 1978 - 1979 | 54,607,700 |
| July 1, 1979 to Dec. 31, 1979 | 32,794,000 |

(Exhibit 36.)

51 .  The difference between the operating and main-
tenance expenditures originally forecast in the 1977 rate
study and the operating and maintenance expenditures now
forecast is a reduction for each of the three rate periods
of the following amounts:

| | |
|---|---|
| 1977 - 1978 | $  7,567,400 |
| 1978 - 1979 | 3,269,000 |
| July 1, 1979 to Dec. 31, 1979 | 2,233,700 |
| Total | $ 13,070,100 |

-27-

52 .  The effect of the revised projections of operating
and maintenance expenditures is easily summarized in
tabular form:

|  | 1977-1978 | 1978-1979 | July 1, 1979-Dec. 31, 1979 |
|---|---|---|---|
| 1977 Study | $ 43,456,200 | $ 57,876,700 | $ 35,027,700 |
| Revised | 35,888,800 | 54,607,700 | 32,794,000 |
| Reduction | $ 7,567,400 | $ 3,269,000 | $ 2,233,700 |

53 .  It is not possible on the present record to make any
determination whether the operating and maintenance expendi-
tures now forecast by the City of Detroit will again prove
to be greater than actual experience.  The objectors have
argued, relying on the actual expenditures incurred
during the first seven months from July 1, 1977 through
January 31, 1978, that it is unlikely that operating and
maintenance expenses will actually reach the levels cur-
rently predicted by Detroit.  Cross-examination of Detroit's
expert, Mr. Lobb, lends support to this argument.  (Tr.
978-988.)  Although it may very well prove true that expen-
ditures will fall short of the current projection, no evi-
dence has been offered that would support any specific
dollar finding.

54 .  Just as it is impossible to make any findings that
would justify rejecting the operating and maintenance
expense projections currently offered by Detroit for the
1977-1978 rate period, so it is impossible to make any
findings that would justify rejecting the projections for
later rate periods.  It is possible that the capital
improvement program may again fall short of schedule, and
that operating and maintenance expenditures will be re-
duced correspondingly.  It is also possible that the pro-

-28-

gram will proceed ahead of schedule, with concomitant
increases in operating and maintenance expenditures.
Nothing but speculation is possible at this point.

55 .  The expert witness for the objectors, Mr. Gillett,
sought to challenge the method by which operating and
maintenance expenditures were originally estimated by
the 1977 rate study.  In that study, operating and main-
tenance expenditures for the 1977-1978 period were taken
from budgets prepared for that period by the operating
officials of the sewage department.  The expenditures
thus assumed for that period were apparently made the
basis for projecting expenditures in later periods.
Mr. Gillett expressed the view that the next year's
budget figures should not have been used, in light of
the fact that actual expenditure figures for several
months of the 1976-1977 period must have been available
and would have revealed that actual expenditures were
far short of that year's budget levels.  (Tr. 69.)
He prepared his own estimates of future operating and
maintenance expense, beginning with actual expenditure
information that was available to Black & Veatch at
the time of the 1977 rate study.  The summary of his pro-
jections was introduced into evidence through his testi-
mony (Tr. 78-87.) and in the form of Exhibit 4.  The
result was a projection somewhat higher than the revised
Detroit projection for the 1977-1978 period, and somewhat
lower than the revised Detroit projection for the subse-
quent periods.  Although the Masters believe that Mr.
Gillett's computations are reasonable, they cannot con-
clude that they have demonstrated that the alternative
projections offered by Detroit are unreasonable as to the

-29-

periods beginning with July 1, 1978.  It is a closer question
whether it was appropriate for Black & Veatch to ignore actual
expenditures during the 1976-1977 period by accepting the
budget figures for the 1977-1978 period.  Mr. Lobb testified,
however, that the budget figures had been accepted for
several reasons.  First, the shortfall in expenditures for
the 1976-1977 period had resulted from a "revenue shortfall."
Second, actual expenditures had come very close to budget
figures during the 1974-1975 and 1975-1976 years.  Third,
it was anticipated that Detroit would soon be required to
comply with a consent decree that would greatly increase
all of its expenditures.  (Tr. 858-859.)  In this setting,
the Masters cannot find that it was unreasonable to pro-
ject operating and maintenance expenditures over the period
of the 1977 rate study by relying on the budget figures
for the 1977-1978 year.

-30-

### (4)   Capital Expenditures

56 .  At the time of the 1977 rate study, it was projected
that total capital improvement expenditures during the
full fiscal years from 1977 to 1978, 1978 to 1979, and 1979
to 1980 would be as follows:

| | |
|---|---|
| 1977 - 1978 | $ 103,800,000 |
| 1978 - 1979 | 156,394,000 |
| 1979 - 1980 | 307,147,000 |
| | $ 567,341,000 |

It was further projected that $430,408,000 of this total
would be financed by grants from the federal and state
governments, leaving a balance of $136,933,000 to be
financed by the sale of revenue bonds and current user
charges.  (Exhibit 9, Table 4, P. 19-20.)

57 .  At the time of the hearings, revisions in the capital
improvement program had led Detroit to revise substantially
its projected capital improvement expenditures.  The revised
forecast provided separate figures for the first half of
the fiscal year running from 1979 to 1980, which is the
last rate period involved in the 1977 study, and the second
half of that fiscal year, which is the first portion of the
period to be covered by the rate system mandated by the
consent decree.  The figures in the revised forecast of
total capital improvement expenditures are:

| | |
|---|---|
| 1977 - 1978 | $  29,875,000 |
| 1978 - 1979 | 177,263,000 |
| July 1, 1979 to Dec. 31, 1979 | 74,167,000 |
| January 1, 1980 to June 30, 1980 | 155,010,000 |
| | $ 436,315,000 |

(Exhibit 28.)

-31-

58 .   The reductions in projected total capital improvement
expenditures have led to concomitant reductions in the pro-
jected local share of capital improvement expenditures to
be raised by sale of revenue bonds, nonoperating revenues,
and user charges.   The comparative figures follow:

|                              | 1977 study    | Current       |
|------------------------------|---------------|---------------|
| 1977 - 1978                  | $ 28,640,000  | $ 9,219,000   |
| 1978 - 1979                  | 39,018,000    | 49,095,000    |
| July 1, 1979 to Dec. 31, 1979 | 34,638,000   | 17,012,000    |
|                              | $102,296,000  | $ 75,326,000  |

(Exhibit 9, Table 5, Line 14, P. 23; Exhibits 28 and 36.)
During the period covered by the 1977 rate study, Detroit
is now projecting a reduction in the local share of capi-
tal improvement expenditures of $26,970,000.

59 .   No evidence has been adduced by the objectors that
would warrant any finding on the probability that the
current Detroit projections of total capital improvement
expenditures and of the local share of capital improve-
ment expenditures are excessive.   It remains possible
that expenditures will fall short of even the new pro-
jections, and it may even be possible that expenditures will
outpace the new projections.

-32-

### (5)  Working Capital:  Grant Anticipation Financing

60 .  The 1977 rate structure included for each rate period
a revenue requirement of $4,000,000 a year to finance capi-
tal improvement expenditures incurred before receipt of the
federal or state grant funds that would reimburse the expen-
ditures.  (Exhibit 9, Table 5, Line 15, P. 23.)  Over the two
and a half year period covered by the rate study, the total
revenue need thus projected was $10,000,000.  Mr. Lobb, who
prepared the 1977 rate study, testified that these revenue
requirements did not represent interest to be paid on short-
term borrowing to finance construction expenditures paid
prior to receipt of government grants.  Instead, it was
anticipated that as the construction program continued over
time, Detroit itself would have to generate funds from
sources other than short-term borrowing to finance ever-
increasing levels of expenditures made prior to receipt of
grant funds.  (Lobb, Tr. 1071-1075.)  Thus the original
hypothesis appears to have been that during the 1977-1978
period, Detroit would generate a total level of expenditures
$4,000,000 in excess of grant receipts; that by the end
of the 1978-1979 period, the total would have climbed to
$8,000,000; and that by the end of 1979, the total would
have reached $10,000,000.  Upon completion of the construc-
tion program, grant receipts would cover the anticipatory
outlays, leaving Detroit with $10,000,000 of money on hand.

61 .  The revised revenue requirements projected by Detroit
change the amount needed for grant anticipation financing
only for the year 1977-1978.  No grant anticipation finan-
cing is shown as a revenue requirement for that year, on
the ground that the capital program has fallen so far behind

-33-

the original schedule that there is no need for separate
revenues to finance expenditures in advance of grant
receipts. (Exhibit 36; Lobb, Tr. 996.)

62 . The major dispute with respect to the grant antici-
pation financing element of the revenue requirements relates
to the method chosen to satisfy this revenue requirement.
Expert witnesses both for the objectors (Gillett, Tr. 70.)
and Detroit (Lobb, Tr. 1073.) agreed that this requirement
represents working capital. The objectors' witness, how-
ever, expressed the view that since the requirement is a
cost of financing long-term capital improvements, the money
required should be raised by long-term revenue bonds.
(Gillett, Tr. 1253-1255; cf. Tr. 151-152.) This technique
would reduce the burden on current rate payers that
results from the alternative technique of generating the
entire revenue requirement from current user charges.
The long-term debt technique, however, suffers from the
disadvantage that if grant receipts actually catch up
with capital improvement expenditures, the system is
left with surplus funds. On the figures used in the
revised projection, for example, the system would borrow
$6,000,000 by long-term revenue bonds repayable over a
period of many years, and would in a short time be left
with $6,000,000 in funds. The objectors' witness res-
ponded to this difficulty by suggesting that the funds
could be devoted to other long-term capital improvements,
or to recalling older long-term debt. (Gillett, Tr. 1253.)
A third alternative might be to finance expenditures in
anticipation of grant receipts by short-term borrowing,
but witnesses for all parties assumed that this alternative
is not in fact open to Detroit. (Lobb, Tr. 1075; Kanters,
Tr. 1176; Gillett, Tr. 1253.)

-34-

63 .  The Masters have not found it necessary to determine
whether it is reasonable to employ user charges to finance
long-term capital improvement expenditures in anticipation
of grant receipts.  The most satisfactory method of
financing appears to be short-term borrowing, so that
current users are charged only with the current cost of
adding capacity that is devoted in part to current use,
and so that there is no surplus left at the end of the
period to be devoted to other uses.  Given the assumed
unavailability of short-term borrowing, the alternative
of long-term borrowing has much to commend it.  So long
as any surplus funds generated by the eventual receipt
of grant payments are devoted to other long-term uses
such as constructing long-term improvements or retiring
other long-term debt, user charges would coincide
reasonably well with actual use.  Nonetheless, the inade-
quate levels of working capital described below make it
unnecessary to determine whether the comparative benefits
of long-term financing are so great as to make current
user charge financing unreasonable.

64 .  Viewing the revenue requirement for financing capi-
tal improvement expenditures in advance of government
grant receipts as a working capital requirement provides
a sufficient alternative basis for rejecting the ob-
jectors' claim that revenue requirements have been over-
stated on this account.  Mr. Kelly, an expert witness
for Detroit, testified that sound financing of the
sewage operation would require a minimum working capital
level equal to about one-fourth of annual operating and
maintenance expenses.  (Kelly, Tr. 1201.)  Detroit
entered the 1977-1978 year with working capital of

-35-

$7,837,536 (Exhibit 13, at "Exhibit 4.")  Current pro-
jected levels of operating and maintenance expense for
1977-1978 are $35,888,800; for 1978-1979, $54,607,700;
and for 1979-1980, $65,588,000.  (Exhibit 36.)  Working
capital for 1978-1979 should thus rise to nearly
$14,000,000, and for 1979-1980 to approximately
$16,000,000.  The Masters find this level of working
capital fully reasonable.  Treating the projected sums
needed for financing long-term capital improvement ex-
penditures in anticipation of grants as working capital,
the sums are reasonable and indeed modest.  As working
capital requirements, there is no reason to refund them
at the time when grant receipts catch up with capital
spending, and thus no need to worry about the possibility
that capital improvements will be required over a much
longer period than the period assumed in reckoning with
the need to devote the funds to other purposes.  And as
working capital requirements, they constitute a reasonable
charge against current users. The remedy recommended
below, paragraph 81(3), (5), is designed to delete the
charges for grant anticipation financing and to provide
instead for scheduled increases in working capital.

-36-

(6)   Revenue Surplus

65 .  The figures set out above show that Detroit itself
now admits that the revenue requirements projected by the
1977 rate study were far higher than the revenue require-
ments now projected.  Looking only to projected opera-
ting and maintenance expenses and the local share of capi-
tal improvement expenditures, the total of the amounts
that Detroit must raise has been reduced by $40,040,100
($13,070,100 reduction in operating and maintenance
expenditures, plus $26,970,000 reduction in the local
share of capital improvement expenditures).

66 .  Although Detroit has argued that it may encounter
temporary problems with cash flows, a problem discussed
below, it has not advanced any serious argument that
its projections of the revenues that will result from
the rates recommended by the 1977 rate study were high.
Instead, it has attempted to eliminate the surplus
revenues generated by the present rate structure by
offering drastic changes in the assumptions on which
the rates were initially set.  The changed assumptions
are dealt with in section (7) below.  The major means
of spending the revenue surpluses, however, may be
noted briefly.  For 1977-1978, the total level of long-
term capital improvements to be financed from current
rates has been increased from $5,640,000 (Exhibit 9,
Table 5, Line 19, P. 23) to $8,219,000 (Exhibit 36.)
Even after this increase, a surplus of $10,798,500 is
projected.  This surplus is now projected as an amount
to be carried over to finance long-term capital improve-
ments during the 1978-1979 period.  For 1978-1979, ad-

-37-

herence to the rates recommended by the 1977 rate study is now expected to generate a surplus of $11,189,400. This surplus is now projected as an amount to be carried over to finance long-term capital improvements during the final six months of the rate period, July 1, 1979 to December 31, 1979. For the final six months, adherence to the rates recommended in the 1977 study is now expected to generate a surplus of $8,438,700. This surplus is now projected as an amount to be carried over to finance long-term capital improvements during the next six months following the close of the period covered by the rate study. (Exhibit 36.)

-38-

## (7)  Detroit's Changed Assumptions

67 .  The major method by which Detroit has sought to justify
the need to retain the millions of dollars of excess revenues
generated by present rates as compared to original and revised
projections of revenue needs has been to increase the capital
costs to be financed out of current user charges rather than
long-term borrowing.

68 .  In the 1977 rate study, it was projected that the local
share of major capital expenditures during the rate period
would total $102,296,000.  It was further projected that
$91,000,000 of this amount would be raised by the sale of
revenue bonds.  Only $11,296,000 was to be raised by "revenue
financing." (Exhibit 9, P. 21.)  The 1977 rate study further
projected that over the entire rate period, $2,500,000 would
be available from "non-operating revenues" to apply against
the local share of capital expenditures, leaving $8,796,000
to be raised by current user charges.  (Exhibit 9, Table 5,
P. 23.  This $8,796,000 figure represents the $18,796,000
total of the items entered on Line 19, less the financing
in anticipation of grant receipts total of $10,000,000
entered on Line 15.)  This determination to raise revenues
primarily by long-term bonding rather than imposing current
user charges was based on a deliberate choice to resort to
"maximum debt financing of the major improvements."  This
choice rested on a conclusion that the expense of such
major improvements should be spread out over the users
who would benefit from the improvements over future years.
(Lobb, Tr. 862-863.)

69 .  Some small level of revenues for long-term capital
improvements must be generated from current user charges

because of bond coverage requirements imposed by Detroit
ordinances.  The terms of bond ordinance 517-E (Exhibit 47)
have been carried forward into the most recent bond or-
dinance in evidence, Ordinance 527-G (Exhibit 46.)  Under
the terms of these ordinances, new revenue bonds may be
issued only if the estimated new revenues derived by the
sewage system shall be equal to at least one and one-half
times the largest amount of combined principal and interest
to fall due in any future operating year on any bonds then
payable out of the net revenues of the system, including
such additional bonds then being issued.  (Exhibit 46, P. 2.)
The funds generated by setting rates sufficient to meet
this coverage requirement as new long-term bonds are issued
exceed the amounts that must be used for current debt
service and bond reserve fund payments.  The balance is
available for long-term capital expenditure, and is appro-
priately so used.  (Lobb, Tr. 863.)

70 .  In seeking to justify continued adherence to the
rates recommended by the 1977 rate study, Detroit has now
sought to rely on a drastic departure from the original
assumption that it should resort to maximum debt financing.
The projected local share of long-term capital investment
has dropped substantially; the projected portion of the
local share to be raised by long-term borrowing has dropped
far more.  Thus it is now projected that the local share of
long-term capital investment during the rate period will be
$75,326,000 rather than the $102,296,000 originally pro-
jected.  The total level of bonds to be issued during the
period, however, has fallen from the original projection
of $91,000,000 to $48,000,000.  (Exhibit 36.)  This
reduction in bond sales has been made possible by applying

-40-

the surplus revenues generated by current rates entirely
to expenditures for long-term capital improvements.
Mr. Lobb, who authored the 1977 rate study, testified
that the current proposed use of these surplus revenues
generated by user charges does not represent maximum bond
financing.  (Lobb, Tr. 1028.)

71 .   The Masters find it is reasonable to cover the
actual local share of long-term capital expenditures out
of current user-charge revenues to the extent shown by
Exhibit 36 for the 1977-1978 rate period.  The pendency
of these rate proceedings has prevented the issuance of
revenue bonds.  The total amount shown, $8,219,000,is
clearly reasonable in the circumstances.

72 .   The Masters find that it is not reasonable for
Detroit to depart from the assumptions on which the 1977
rate study was based and to seek to justify current user
charges by shifting to substantial financing of long-term
capital expenditures out of current user charges.  The
most fundamental basis for this conclusion is that it is
unreasonable to impose very large proportional increases
in current user charges over a brief period of time for
the purpose of financing long-term capital improvements
that will benefit future generations of users over a
period of many years.  The fact that Detroit founded its
rates on this very assumption is highly cogent evidence
in support of this conclusion.  Slight additional
support may be found in the fact that in the 1966 Pollution
Control Program admitted in evidence as Exhibit 27,
it was stated that the cost of capital improvements not
covered by government grants would be met by sales of
revenue bonds.  (Exhibit 27, P. 5, 27.)  Further support

-41-

is provided by the opinion testimony of the objectors'
expert that it is not reasonable to carry the excess
revenues over from one rate period to finance long-term
capital construction in the next period. (Gillett,
Tr. 306-308.) The tersely stated opinion of Detroit's
experts that the currently proposed use of these user-
charge revenues is reasonable is not persuasive enough
to warrant a contrary conclusion. (Lobb, Tr. 939; Kelly,
Tr. 1202-1203.) Detroit should be held to the reasonable
assumptions on which it based the 1977 rate study, and
should not be allowed to depart from those assumptions
in a retrospective litigating effort to justify the
rates by whatever assumptions may be created.

73 . The conclusion that Detroit should be required to
adhere to the principle of maximum debt financing for its
long-term capital improvement expenditures must take into
account the fact that issuance of long-term bonds will
impose coverage and debt service requirements that off-
set to some extent the revenues generated by selling the
bonds. (Lobb, Tr. 990-992.) Under the remedy proposed
to correct the revenue surpluses generated by the 1977
rate structure, these requirements will be satisfied out
of current revenues from user charges.

74 . Detroit has attempted to justify adherence to the
rates recommended by the 1977 study by offering an analysis
of the cash flow experience of the sewage receiving fund
during the 1977-1978 period. This study was offered
through the testimony of Mr. Fahner (Tr. 1088, ff.)
and Exhibits 39 and 39a. The Masters are unable to find
in this testimony any persuasive reason to disregard
the surpluses shown by Detroit's own expert testimony as

-42-

summarized in Exhibit 36. The sewage fund has always
operated on an accrual basis; this fact was known when the
1977 rate study was performed. The accounts of the sewage
department for the first seven months of the 1977-1978 rate
period suggest that on an accrual basis, the revenues pro-
jected on the basis of the 1977-1978 rates are almost
exactly on target. (Exhibit 41.) The sewage department
does not ordinarily prepare cash flow analyses of the
type represented by Exhibits 39 and 39a for any purpose.
(Fahner, Tr. 1151-1152.) The cash flow analysis, more-
over, does not show the cash flow of the entire sewage
department, but relates instead only to the sewage
receiving fund. (Fahner, Tr. 1105-1106.) One major
item that is thus omitted from the analysis is receipts
from amounts due from federal and state governments as
grants for construction payments already made by the
sewage department. (Fahner, Tr. 1120.) The potential
significance of this omission is shown by the fact that
as of June 30, 1977, the balance sheet of the Sewage
Disposal Fund showed grants receivable of $29,161,849.
(Exhibit 13, "Exhibit 1.") The objectors's expert wit-
ness, moreover, offered persuasive testimony that the
method of preparing Exhibit 39 resulted in apparent
double counting of some expenditures, and drew from
assumptions as to the probable increased level of monthly
expenditures for the final five months of the 1977-1978
period that are open to serious question. (Gillett, Tr.
1274-1276.) Cumulating all of these weaknesses, the cash
flow testimony is not entitled to any serious consideration
in evaluating the reasonableness of the current user charge
rate structure.

-43-

75 .  Various testimony and arguments advanced by Detroit
suggest that it is attempting to justify adherence to the
rates recommended by the 1977 rate study by raising the
spectre that it will be obliged to comply with the capital
improvement program mandated by the consent decree even
if federal and state grant funds are not received according
to the assumptions made in the rate study.  (Suhre, Tr.
426, 452; Kanters, Tr. 1165; Exhibits 29, 42.)  The
Masters do not believe it is necessary to resolve any of
the issues that might be raised by such arguments.  The
1977 rate study was founded on the premise that grant
funds would be received as scheduled, and no evidence
whatever has been advanced to suggest any reason for depart-
ing from that premise.  Although it is entirely clear that
vast sums would have to be raised by user charges if Detroit
were compelled to comply with the capital expenditure pro-
gram mandated by the consent decree and at the same time
failed to receive anticipated grant revenue (Gillett,
Tr. 299), retention of the surpluses generated by the
current rate structure cannot be justified on any such
speculative basis.

76 .  Mr. Kanters, the Director of the Detroit Water and
Sewerage Department, testified that if actual developments
should indicate that it is not necessary to put into effect
the rate increase now scheduled for the period from July
1, 1979 to December 31, 1979, he would consider recommending
that the rate increase not be put into effect.  (Kanters,
Tr. 1167-1168.)  The possibility that Detroit might be
willing to avoid some part of the surpluses that it now
expects  to generate out of the current rate structure is
not a sufficient basis to forego more definite corrections.

-44-

(8)  Two and One-Half Year Rate Period

77 .  The objectors have urged that in the circumstances
confronting the Detroit sewage treatment plant, it was
not reasonable for the 1977 rate study to attempt to
set rates for a period running nearly two and one-
half years into the future.  Their expert witness re-
peatedly testified that although in other settings it
is common practice to set rates for substantially longer
periods of time, such as five years, it was not reason-
able to follow the common practice in the unique cir-
cumstances confronting Detroit.  Given the need to
undertake and finance a vast program of long-term capi-
tal improvements, subject to great possible difficulties
in implementation, he believed that rates should not be
set for more than one year at a time.  (Gillett, Tr.
59-60, 112, 175-178, 196-205, 1268-1269.)  The ob-
jectors seek to bolster this testimony by pointing out
that the 1974 rate study, designed to generate rates
that would prove adequate for five years, required dras-
tic revision within a year after its recommendations
were put into effect.  (Carney, Tr. 562, 652-653; Exhibit
14.)  Detroit has responded by offering testimony of
its expert witness that if he had not been instructed to
employ a two and one-half year rate period by Detroit,
he would have preferred to use a longer period, and that
use of a long rate period is particularly important for
a system that is confronted with a need to finance a
very large capital improvement program.  (Lobb, Tr. 848,
941.)  He further testified that it is not prudent to
be forced into reliance on annual approval of rate increases

-45-

by the City Council. (Lobb, Tr. 941, 1032-1034.) His
testimony was supported by a long list of rate studies
that have been conducted for lengthy periods, (Exhibit 34),
and by the recommendations of generally accepted
utility ratemaking manuals. (Exhibits 10 and 11.) Finally,
Detroit's second expert witness testified that it is
important to set rates well in advance, so as to be
assured that revenues will match needs, and so as to
reassure the financial community that revenue bond
issues will prove sound investments. (Kelly, Tr. 1189-
1190.) At the same time, he testified that such long-
range planning does not prohibit "mid-course corrections."
(Kelly, Tr. 1189.)

78. Given this conflicting expert opinion testimony,
and given the clear fact that it is common practice to
plan municipal utility rates for lengthy periods into
the future, the Masters cannot find that it was unreason-
able to undertake to establish a rate structure for the
two and one-half year period covered by the 1977 rate
study. Neither can the Masters find that it was unreason-
able, in the Spring of 1977, to adopt the rate structure
without incorporating an automatic self-adjusting pro-
cess into the rate structure.

79. Although it was reasonable to undertake to establish
rates for the period covered by the 1977 rate study at
the outset, events have proved that the rates which were
reasonable as a matter of projection when established have
become clearly unreasonable in practice. The surplus
revenues generated by the rates established pursuant to
for the uses and purposes advanced in these proceedings.

-46-

In order to make the rates reasonable, it is important
that a self-correcting mechanism now be incorporated
into the rate structure.  Such a mechanism is recom-
mended below.

-47-

(9)  Surplus Revenue Corrections

80 .  Several factors enter into a determination of the
method that should be selected to correct the rates estab-
lished pursuant to the 1977 rate study.  The overriding
concern is that Detroit not be impeded in any way in
complying with the requirements of the consent decree as
a result of revenue shortages.  In addition, it is im-
portant that a method of correction be found that will
not require continuing litigation.  Beyond these con-
cerns, it must be recognized that a return to a policy
of maximum debt financing will increase the amounts
that must be generated by current user charges to sup-
port bond service and coverage requirements.  Finally,
account must be taken of the reasonable needs to in-
crease the level of working capital available to the
system.  By good fortune, all of these concerns can be
served by a relatively simple order.  The amounts  of
surplus revenue generated during 1977-1978, and the
amounts projected to be generated during the remainder
of the rate study period, are so spectacular that nothing
in the present record would support speculation that
some catastrophic turn of events, undescribed and un-
defined, may increase the levels of the revenue require-
ments that must be met from current user charges.
Detroit may safely be held to the figures that it has
itself offered.

81 .  Applying these considerations, the Masters recom-
mend the following procedure to correct the revenue sur-
pluses resulting from the current rate structure:

-48-

(1)   The rates scheduled to go into effect for the
period from July 1, 1978 to June 30, 1979 shall go into
effect as now scheduled, or as they may be amended pur-
suant to the recommendations advanced in Part C below.

(2)   The surplus revenues generated during the 1977-
1978 rate period shall be determined according to the
accrual accounting techniques ordinarily employed in
maintaining the accounts of the Sewage Disposal Fund.
This determination shall be made on an unaudited basis
as soon as possible after July 1, 1978, but in no event
later than July 31, 1978.   In determining the level of
surplus revenues, Detroit may charge against current
user charges amounts for long-term capital improvement
up to the limit of $8,219,000; no greater amount may be
charged unless it can be shown that it was reasonably
incurred prior to June 30, 1978, according to capital
improvement spending programs in effect as of May 1, 1978.
Further deductions may be made to reflect bond coverage
or reserve fund requirements on account of bonds issued
before June 30, 1978 only upon a satisfactory showing
that such deductions are required to comply with the
terms of prior bond ordinances.   If adjustments in the
surplus calculation are required upon audit of the Sewage
Disposal Fund, corresponding adjustments shall be made
in the customer credits ordered by recommendation (3)
over the remainder of the adjustment period specified
in recommendation (3).

(3)   Six million dollars may be deducted from the
total surplus calculated pursuant to recommendation (2),
and added to the working capital accounts of the Sewage
Disposal Fund.   The balance of the surplus shall be

returned to all customers, in Detroit and in the suburbs, in proportion to the ratio between the sewage flow charged to each customer and the total sewage flow charged to all customers during the 1977-1978 period. This balance of surplus shall be returned to the customers by crediting it in equal amounts to bills rendered from September 1, 1978 through July 1, 1979.

(4) The surplus revenues generated during the 1978-1979 rate period shall be determined according to the accrual accounting techniques ordinarily employed in maintaining the accounts of the Sewage Disposal Fund. This determination shall be made on an unaudited basis as soon as possible after July 1, 1979, but in no event later than July 31, 1979. In determining the level of surplus revenues, Detroit may charge amounts for long-term capital improvements only to the extent that they are covered by nonoperating revenues or by amounts generated to satisfy bond coverage requirements but not required for bond reserve fund payments. Further deductions may be made to reflect bond coverage and reserve fund requirements on account of bonds issued before June 30, 1979 only upon a satisfactory showing that such deductions are required to comply with the terms of prior bond ordinances. Adjustments required by the audit for 1978-1979 shall be reflected in the manner provided in recommendation (2).

(5) Two million dollars may be deducted from the total surplus calculated pursuant to recommendation (4), and added to the working capital accounts of the Sewage Disposal Fund. The balance of the surplus shall be returned to all customers, in Detroit and in the suburbs, in proportion to the ratio between the sewage flow charged to each customer and the total sewage flow charged

-50-

to all customers during the 1978-1979 period.  This balance
of surplus shall be returned to the customers by crediting
it in equal amounts to bills rendered from September 1, 1979
through July 1, 1980.

(6)  After Detroit has prepared its Sewage Disposal
Fund budget for the period from July 1, 1979 through June 30,
1980, it shall make a good faith projection of the revenues
to be generated under the rates scheduled to go into effect
on July 1, 1979, as they may be amended pursuant to the
recommendations advanced in Part C below, and the rates to
go into effect pursuant to the various charge systems
mandated by the consent decree to take effect as of January
1, 1980.  If this projection shows a surplus of more than
$2,000,000 for the rate period from July 1, 1979 through
December 31, 1979 the rate increase now scheduled to go
into effect on July 1, 1979 shall not go into effect and
the rates established for the period from July 1, 1978
through June 30, 1979 shall remain in effect through
December 31, 1979.  If this projection shows a surplus of
$2,000,000 or less, the rate increase scheduled to go into
effect on July 1, 1979 may go into effect as it may be
amended pursuant to the recommendations advanced in Part C
below.

(7)  The surplus revenues generated during the rate
period from July 1, 1979 through December 31, 1979 shall
be determined according to the accrual accounting techniques
ordinarily employed in maintaining the annual accounts of
the Sewage Disposal Fund.  This determination shall be
made on an unaudited basis as soon as possible after
January 1, 1980, but in no event later than January 31, 1980.
In determining the level of surplus revenues, Detroit may
charge amounts for long-term capital improvements only to the

-51-

extent that they are covered by nonoperating revenues or by
amounts generated to satisfy bond coverage requirements but
not required for bond reserve fund payments.  Further deduc-
tions may be made to reflect bond coverage and reserve fund
requirements on account of bonds issued before December 31,
1979, but only upon a satisfactory showing that such deduc-
tions are required to comply with the terms of prior bond
ordinances.

(8)  The surplus calculated pursuant to recommendation
(7) shall be returned to all customers, in Detroit and in
the suburbs, in proportion to the ratio between the sewage
flow charged to each customer and the total sewage flow
charged to all customers during the rate period from July
1, 1979 through December 31, 1979.  This surplus shall be
returned to the customers by crediting it in equal amounts
to bills rendered from March 1, 1980 through December 1, 1980.

82 .  In making these recommendations, the Masters are aware
that they have not had the benefit of specific suggestions
from the parties.  The objectors have requested that the
surplus generated by the 1977-1978 rates simply be refunded.
The Masters reject that request because of the many un-
certainties involved on this record.  An immediate refund
would not take account of the need for increased working
capital, and it would leave the Sewage Fund exposed to
possible difficulties in implementing its capital improve-
ments program on schedule.  These difficulties would be
exacerbated if for some reason sewage flows do not meet
the levels on which revenue forecasts for the 1978-1979
period are based.  The objectors have not made any speci-
fic recommendations at all for the 1978-1979 rate period,
and have simply recommended that the parties be directed to

-52-

negotiate on the rates to take effect on July 1, 1979.
Detroit, on the other hand, has taken the position that
no relief whatever is warranted, and that an immediate
refund would threaten to bankrupt the system. On the
present record, the fear of bankruptcy is chimerical.
The formula suggested by the Masters, when set against the
vast surpluses that Detroit itself expects to generate
by the current rate schedule, will provide Detroit with a
large continuing cash balance to protect against unfore-
seeable irregularities in the receipt of revenues and the
expenditure of funds. It is highly important, however,
that the parties respond to this formula in specific terms,
so as to enable the Court to determine whether the
recommended remedy will work as it is expected to work.
It is particularly important that any objections founded
on bond coverage requirements be made in specific detail,
to ensure that the decree will not interfere with orderly
marketing of the bonds that must be sold if Detroit is
to be held to its original assumption that its long-term
capital improvement program should be financed to the
maximum extent feasible by long-term borrowing. It is
likewise important that full information be provided to
support any objections made on account of the need to
protect the sewage system against the possibility that
a rate refund may be ordered in the litigation brought by
Oakland County and still pending in the state courts.
In this connection, it is important to note that the
1977 rate study included $4,000,000 in the revenue require-
ments for 1977-1978 to cover this pending litigation.
(Exhibit 9, Table 5, Line 20, P. 23.) Mr. Lobb testified
that this sum represented the total return element that

-53-

had been charged and that is being contested.  Bond
counsel required this coverage.  (Lobb, Tr. 869.)
Mr. Lobb has deleted this coverage requirement in his
revised projection of revenue requirements on the
ground that the surplus generated by current rates is
more than adequate to provide the necessary coverage.
(Lobb, Tr. 996.)  The remedy recommended above is framed
in such a way that the sewage system should continue
to enjoy ample surpluses to provide the required cover-
age.

-54-

C.   RATE ALLOCATION

83.  Once it has been determined what portion of the
revenue requirements of the Detroit sewage disposal
system is to be generated by user charges, it remains
necessary to translate the total sum to be raised by
user charges into specific rates.  Detroit has accom-
plished this task by shifting from the "cash" method
of determining revenue requirements to a "utility"
method of setting the rates charged to different
classes of customers.  As detailed below, the utility
method of setting rates involves reliance on charges
for depreciation and for a rate of return on net
investment in the system.  Although none of the parties
have challenged use of the utility method of establishing
rates, vigorous disputes have emerged as to the methods
of setting depreciation charges and charging rates of
return that distinguish between Detroit customers and
suburban customers.  These particular disputes demon-
strate the inherent fragility of relying on a utility
method of rate determination for a sewage system that
uses a cash method of determining revenue requirements
and that is experiencing a great growth in capital
improvement expenditures.  The recommendations of the
Masters are that the method of setting depreciation
charges has been wrong but that no remedy is required
on this account in the present proceeding, and that
the differential rates of return should be eliminated
by the remedy proposed in section (3) below.

-55-

## (1)  General Methodology

84.  The "cash" basis of determining the revenue require-
ments of the Detroit sewage disposal system has been de-
scribed in Part B.  After total revenue requirements are
determined by this method, deductions are taken for
amounts to be raised by federal and state grants and by
bond sales.  The remainder of the revenue requirements
must be raised by user charges.  Development of a system
of user charges to generate these revenue requirements
could follow either a "cash" basis or a "utility" basis.
Detroit has used a "utility" basis of developing user
charges in the 1974 and 1977 rate studies, and apparently
has always used this method.  The expert witness for the
objectors testified that this method of developing rates
is "perfectly applicable to the Detroit situation."
(Gillett, Tr. 189.)

85.  The first step in developing user charges under
either a cash basis or a utility basis is to determine
whether distinguishable customer classifications should
be developed to reflect the fact that distinguishable
costs are incurred in serving different classes of
customers.  Detroit has developed several different
classes of customers.  No challenge has been addressed
to the propriety of the classes it has developed.  Thus,
as a matter of illustration, all parties agree that it
is proper for Detroit to set rates on the assumption
that Detroit customers should pay the costs of the local
sewer system that provides individual service to individual
customers in Detroit, and that suburban customers should
not pay any part of those costs.  So too, it is agreed

-56-

that individual Detroit customers should not bear any por-
tion of the costs of the Oakland-Macomb interceptor, a
large interceptor sewer constructed by Detroit to gather
sewage flow from points in Oakland and Macomb County.

86. After specific customer classes have been identified,
and the costs that are peculiar to each class have been
isolated, there remain many costs for facilities that are
used to serve all of the various customer classes in
common. Thus major interceptor sewers in Detroit, and
the sewage treatment plant itself, provide service in
common to all of the separate customer classes. Some
method of allocating these common plant costs among the
different customer classes must be found. Although
it would be possible to take account of such matters as
the relative strength of sewage flows or delivery flow
rate characteristics in allocating common plant costs,
Detroit has chosen to allocate these costs solely on
the basis of relative volumes of flow. In the 1977
rate study, it was projected that of total sewage flow
volume, Detroit would account for 53.7% in 1977-1978,
53.3% in 1978-1979, and 52.9% in 1979-1980. The
suburbs, correspondingly, were projected to account for
46.3% in 1977-1978, 46.7% in 1978-1979, and 47.1% in
1979-1980. (Exhibit 9, Table 1, P. 12.) As noted in
Part III-D, none of the objections that remain in this
proceeding challenge the projections of relative flow,
and none of the objectors have asserted that common costs
should be allocated on any basis other than relative flow.

87. If rates were set on a cash basis, no further compli-
cations would remain. Common plant costs would be allocated

-57-

among all classes of customers in direct proportion to relative volumes of sewage flow. Rates to each class of customers would then be determined by adding to this common plant charge the additional charges developed from the costs identifiable to each class of customers separately.

88. The utility basis for generating specific rates for each customer class is more complicated. As Detroit has applied this method, charges for operating and maintenance expenditures are treated just as they would be treated on a cash basis. The rates for each customer class include a charge for the operating and maintenance costs of common plant calculated according to relative volumes of flow, and separate charges for any operating and maintenance costs that can be separately identified for each customer class. None of the objections in this case have challenged this portion of the 1977 rate study.

89. The sharp distinction between the cash and utility methods of setting rates for each class of customers appears in determining the charges to account for capital costs. Under the cash basis, the revenue requirements established by determining debt service and coverage costs would be allocated among customer classes in the same way as operating and maintenance expenditures were allocated. Debt costs attributable to identifiable classes would be charged to those classes, and common costs would be apportioned among all classes on the basis of relative volume of flow. Under the utility basis of setting rates the revenue requirements of debt coverage and service determined on a cash basis become relevant only as a final step rather than the starting point, as described in Paragraphs 93 and 94 below.

-58-

90. On a utility basis, the starting point in allocating capital costs is a charge for depreciation.  Capital assets are allocated among customer classes according to distinctive or common patterns of use.  Depreciation charges for the capital assets are then assessed against the various customer classes.  Depreciation charges begin with the historic book cost of the capital assets.  Periods of estimated useful life are then determined according to the type of capital asset involved.  The periods of useful life estimated by Detroit range from twenty years to one hundred years.  (Exhibit 13, Note A.)  Detroit has always determined depreciation charges by this method, adopting a straight-line method of allocating cost uniformly over the total period of estimated useful life, without further adjustment.  The objectors assert that the result is to impose artificially inflated depreciation charges, since Detroit has never subtracted from historic book cost the portion of the otherwise depreciable capital assets purchased with funds received as grants from the federal or state governments.  (Gillett, Tr. 67-68.)

91. Although Detroit has determined its sewage rates by a method that includes charges for depreciation, the depreciation charges have no other function.  Depreciation charges do not constitute a revenue requirement, since revenue requirements are determined on a cash basis.  Depreciation charges do not provide any direct means of replacing plant as it needs replacement, since the Sewage Disposal Fund does not include any separate depreciation fund.  (Jaslowski, Tr. 264; Carney, Tr. 641.)  The revenues generated by the depreciation charge simply flow into the general accounts of the Sewage

-59-

Disposal Fund for whatever use seems most appropriate.

92. After depreciation charge components have been deter-
mined for the rates to be charged to each customer class,
the next step of developing complete rates under the utility
method is to consider charges for a "rate of return" on
the investment in the sewage facilities.

93. In the 1974 study, a seven percent rate of return was
charged to suburban customers on a rate base made up of the
separate facilities allocable to the different classes of
suburban customers plus a portion of the rate base in the
common plant determined by allocating the total rate base
of the common plant according to relative Detroit and
suburban rates of flow.  In determining the value of the
rate base, the starting point was historic book value of
the capital assets involved in each portion of the rate
base.  Two deductions were taken from this initial book
value.  Accumulated depreciation was deducted, and amounts
contributed by grants from the federal and state govern-
ments were deducted.  Application of the seven percent
rate of return to the rate base determined in this fashion
completed the calculation of the total rates to be
charged to each class of suburban customers.  Estimates of
the revenues that would be generated by these charges led
to the conclusion that the total user charge revenue require-
ments of the system as projected by the 1974 study could
be satisfied by setting Detroit rates that did not include
any rate of return charge on the portion of the rate base
allocable to Detroit customers.  Under the 1974 study, then,
suburban customers were charged a seven percent rate of
return, and Detroit customers were charged no rate of return.

-60-

(Carney, Tr. 589-590.)

94. In the 1977 rate study, a seven percent rate of return was again applied to each of the suburban customer classes on a rate base calculated according to the method that was used in the 1974 rate study. Estimates of the total revenues to be raised from the suburban customer rates established by this method, however, showed that Detroit customers would have to be charged a rate of return if total user charges were to generate sufficient revenues to satisfy the estimated revenue requirements of the system. As a result, Detroit rates were set on a basis that charged varying rates of return according to the estimated revenue requirements for each rate period. For 1977-1978, the rate of return charged to Detroit customers was 7.16%; for 1978-1979, it was 2.25%; for the period from July 1, 1979 through December 31, 1979, it was 4.53%. (Exhibit 51.) The objectors charge that Detroit was not entitled to discriminate against suburban customers in the rates of return charged in 1978-1979 and in the final six months of 1979. No apparent objection has been made to the modest discrimination in favor of suburban customers during the 1977-1978 period.

95. The depreciation and differential rate of return objections will be discussed separately. It must be kept in mind from the outset, however, that they are interdependent. If depreciation is not allowed on capital assets purchased with government grant funds, the revenues raised by depreciation charges will fall short of meeting the revenue requirements determined on a cash basis. The deficit could be made up only by charging rates of return that would seem very high if they were

-61-

considered apart from the actual cash basis revenue require-
ments of the system.

### (2) Depreciation on Grant-Funded Plant

96.   The sewage rates charged to all customers by Detroit
have been calculated by including charges for depreciation
on the historic book value of the sewage plant assets,
including assets paid for with federal and state grant
funds.  This practice was approved in City of Detroit v.
City of Highland Park, 1949, 326 Mich. 78, 39 N.W.2d 325.
Mr. Carney, the author of the 1974 rate study, tesitifed
that in adhering to this practice he relied on the approval
given to the practice in the Highland Park case, and on
the fact that the practice had withstood numerous audits.
(Carney, Tr. 578-579.)  Mr. Lobb, who prepared the 1977
rate study, testified that he adhered to this practice
because it was the practice that Detroit had built into
its rate structure and because of the court approval.
(Lobb, Tr. 876.)

97.   Because of the large portions of the Detroit sewage
treatment facilities that have been grant-funded, the
practice of taking depreciation on grant-funded assets
greatly increases the charges that are made on account
of depreciation.  The following figures from Exhibit 1
illustrate this point in rough terms, although there
may be room to dispute specific portions of the figures
employed:

|  | 6/30/78 | 6/30/79 | 12/31/79 |
|---|---|---|---|
| Depreciation expense (including grant-funded assets) | $ 9,054,000 | $11,791,000 | $ 7,102,000 |
| Depreciation expense (excluding grant-funded assets) | $ 3,639,000 | $ 4,660,000 | $ 3,155,000 |
| Increased depreciation charges as a result of including grant-funded assets | +$ 5,415,000 | +$ 7,131,000 | +$ 3,947,000 |

-62-

The total increased depreciation charges as a result of
including grant-funded assets for the 2 1/2 year period
July 1, 1977 to December 31, 1979 is $16,493,000.

98.  Although the determination to charge depreciation
on grant-funded facilities has a great effect on the amount
of user charges determined according to depreciation, it
has no other effect.  It is clear that the depreciation
items reflected on the balance sheet of the Sewage Disposal
Fund are mere accounting entries.  (Jaslowski, Tr. 264.)
Depreciation charges are not considered at all in deter-
mining revenue requirements (Carney, Tr. 668-669), and
there is no attempt to isolate into a separate fund any
portion of the user charges corresponding to the depreciation
component of the user charges.  Instead, revenues from this
portion of the charges are available for whatever current
use the system may choose.  (Carney, Tr. 641; Gillett, Tr.
1247.)  Under present conditions and the assumptions of the
1977 rate study, deduction of the depreciation component
of the user charge calculation would merely require that
some other label be used in describing the components
of the user charge designed to cover the user charge
revenue requirements determined on the cash basis.

99.  It was generally agreed  that depreciation
charges are designed to recover original investment in
an asset over the period of its estimated useful life.
(Gillett, Tr. 67-68; Carney, Tr. 610-611.)  This was
the explanation advanced in the 1974 rate study.  (Exhibit
14, P. 9.)  So too, this is the explanation offered in
the ratemaking manuals that were offered in evidence.
(Exhibit 10, P. 3; Exhibit 11, P. 31.)

-64-

100. The expert witness for the objectors testified that
it was unreasonable to determine rates by including a
charge for depreciation on grant-funded plant, since the
sewage disposal system has not incurred any "cost" with
respect to grant expenditures.  (Gillett, Tr. 67-69.)
Witnesses for Detroit testified variously that the Detroit
method is a departure from the general philosophy of
depreciation (Carney, Tr. 681); that if a rate system were
being started free from the effects of the prior Detroit
practices, it would be better practice not to charge
depreciation on grant-funded plant (Lobb, Tr. 1044-1045);
and that in the case of investor-owned utilities, most
regulatory commissions would not permit depreciation
charges on grant-funded facilities because that would
simply enrich the owners on account of something they
had got for free.  (Kelly, Tr. 1197.)

101. Despite their uneasiness with the grant depreciation
technique, Detroit's experts sought to justify the tech-
nique on the ground that it is necessary to generate suf-
ficient revenues to maintain the sewage treatment system.
(Carney, Tr. 681; Lobb, Tr. 941-942; Kelly, Tr. 1196-1198.)
This attempted justification is not persuasive in light
of the facts that revenue requirements are determined on
a cash basis without regard to depreciation charges,
and that no special treatment is accorded to any portion
of the revenues generated by user charges to take account
of the depreciation calculation that entered into the
rate calculation.

102. Two other justifications were offered by one of
Detroit's expert witnesses for adhering to the grant
depreciation technique.  (Lobb, Tr. 942-943.)

-65-

Apparently the first justification arises from the fact
that depreciation is charged both on common plant and on
facilities that are separately allocated to distinct
customer classes.  It is possible that some customer
classes are enjoying the use of facilities that have
been depreciated to zero.  In some sense, these
customers have "paid" for these facilities, and should
be able to rely on payments charged to other customers
by the same method to generate large portions of current
revenue requirements.  This effect is not persuasive.
Since depreciation charges do not enter into the cal-
culation of current revenue requirements, no class of
customers should be found to have a vested interest in
perpetuating an otherwise undesirable method of rate-
setting.  No depreciation should be charged to customers
on account of assets that have been depreciated to zero,
no matter whether the grant-funded portion of facilities
is depreciated.  To the extent that assets retain depre-
ciable life, the depreciation charge should be set on the
most reasonable basis available.

103.  A second dimension of unfairness may be claimed in
the results that arise from combining depreciation on
grant-funded portions of the sewage treatment facilities
with a rate base that excludes grant contributions.  This
potential unfairness arises from the method of deducting
both accumulated depreciation and grant contributions
in arriving at the rate base.  Mr. Lobb testified very
clearly that in his study the rate base for a $100
investment with a 100-year estimated life and a $80
contribution from grants would begin at $20, and would
be reduced by the full amount of depreciation--$1--

-66-

each year.  As a result, the rate base would be reduced to
zero in twenty years.  (Lobb, Tr. 1034-1040.)  Under this
system, some classes of customers may have reduced to
zero the rate base in facilities allocated to that class
and still serving it.  Apparently Mr. Lobb was concerned
that somehow a change in the method of calculating depre-
ciation would extend the rate base over additional years
or would result in charging a higher rate of return on
the rate base.  When the Masters queried counsel for
Detroit as final argument as to the means by which this
unfair impact would be realized, he expressed an inability
to clarify the testimony.  The Masters are equally at
a loss to clarify the testimony.  The rate base has
been calculated by eliminating grant-contributed assets.
Eliminating grant-contributed assets from the method
of determining the depreciation charge component of
user charges would not affect the rate base unless a
retroactive change were made to adjust for the shortcomings
of the original method of computing the rate base.  On
the figures used above, it would make excellent sense
to apportion the annual $1 charge for depreciation be-
tween grant-contributed portions of the $100 investment
and the balance of the investment, so that the initial
$20 rate base is reduced at a rate of only $ .20 a year
on account of depreciation.  After twenty years, the
rate base would stand at $16, rather than zero.  Even
if this retroactive correction were performed, however,
it would simply mean that customers who had enjoyed the
benefit of an artificially reduced rate base would be
made to pay any appropriate rate of return in the future.
The fact that a particular class of customers should have

-67-

been paying a rate of return on a slowly declining rate
base ($20, $19.80, $19.60 . . . $16.00) over the first
twenty years, instead of on a rapidly declining rate base
($20, $19, $18 . . . $0), does not establish any vested
interest in continued artificial low rates. The Masters
cannot find in this testimony any justification for
continuing a practice that the witness himself believed
to be undesirable as an initial matter.

104. Apart from the theoretical difficulties expressed
by the witnesses with the concept of charging depreciation
on grant-contributed facilities, it is evident that this
practice could easily lead to apparently strange results
with only small changes in the circumstances confronting
the Detroit sewage treatment operations. Since revenue
requirements are determined on a cash basis without
regard to depreciation, and operating and maintenance
expenses are passed through to users in direct proportion
to relative rates of flow, depreciation charges based on
grant-contributed facilities could generate revenues
in excess of actual requirements. The objectors' wit-
ness illustrated this possibility by showing that in a
year in which no new bonds were issued, so that there were
no new "coverage" requirements, the funds resulting from
depreciating grant-contributed facilities could easily
exceed the amounts needed to service outstanding debt.
(Gillett, Tr. 1237-1246; Exhibits 49, 50.) This result
could be expressed in terms of a "negative rate of return,"
but that characterization does not further the analysis
of the result. Instead, the question is whether the
system should be allowed to generate a profit in this fashion,

-68-

so as to have funds available for further investment.

105. Just as depreciation charges based on full original cost including grant-funded facilities could yield revenues in excess of cash basis revenue requirements, so depreciation charges based on original cost minus grant funding could yield revenues far short of cash basis revenue requirements. In such circumstances, the remaining revenue requirements could be made up by calculating user charges through some combination of return on a rate base if that is permitted and direct allocation among users of any remaining revenue requirement.

106. One further objection to the grant depreciation technique remains to be dealt with. The objectors' expert testified that it is unfair to current rate payers to charge depreciation on the full original cost of current facilities because the result is that they are both paying for the plant they are using and for the cost of replacing that plant for future generations of users. (Gillett, Tr. 1247.) This testimony is simply one way of avoiding the question. No one has questioned the proposition that if the full original cost of current facilities were funded by the sale of revenue bonds, current users would properly be chargeable with the cost of paying for the facility. No one would question the same conclusion if the full original cost of current facilities had been paid for out of general funds of the City of Detroit. The only question is whether current users are entitled to avoid paying the cost of the facilities they are currently using. And the only argument is that they are entitled to avoid paying the cost of those facilities because it is the intention of the granting governments

-69-

that they not pay for those facilities.  The government
grants are treated as a gift of free use of the grant-
funded plant to all users over its useful life.

107.  The arguments outlined above identify the considera-
tions that bear on a choice between setting user charges
on the basis of depreciating the full original cost of
grant-funded facilities or setting user charges by
depreciating full original cost minus grant funding.  In
the circumstances of this case, the Masters believe that
it is unnecessary to choose between these alternatives
for purposes of evaluating the propriety of the rate
structure established pursuant to the 1977 rate study.
Once the revenue requirements have been established on
the cash basis, it is clear that those requirements must
be satisfied by user charges.  To the extent that the
depreciation component of user charges is reduced by
a reduction in the base on which depreciation is calculated,
offsetting increases must be made in some other fashion.
As an abstract proposition, the proper method of developing
the offsetting increases would be to allocate the cash
basis revenue requirements into categories identifiable
to each separate class of customers and a common plant
category that is not identifiable to any separate class
of customers.  Each class would be charged with the require-
ments allocable to it, and a share of the common require-
ments allocated according to relative flow.  In the con-
crete terms of the present case, however, the objectors
have not offered any evidence that would justify a finding
that the results of this process of allocation would be
significantly different than the results reached by charging
depreciation on the grant-funded portion of individually

-70-

allocable and common-plant facilities. In this state of the record, the Masters do not believe that there is any justification for holding further proceedings to deter- mine a proper allocation of current cash-basis revenue requirements among various classes of users. No adjustment should be made to the present rate structure on account of the underlying premise that depreciation should be charged on the full original cost of grant-funded facilities.

108. For the reasons described in Part II, the Masters believe that although no relief from the present rate structure is warranted on account of the method of cal- culating charges for depreciation, the method is improper. If it should be decided that relief is required if the method is improper, the method of measuring the relief should be that suggested in the preceding paragraph.

-71-

## (3)  Differential Rate of Return

109.  As described in paragraphs 31 and 37 above, both the 1974 rate study
and the 1977 rate study determined the rates charged to suburban customers
by allocating a rate base to each class of suburban customers and charging
a seven percent rate of return on that rate base.  The rate base was de-
termined by subtracting both grant contributions and accumulated deprecia-
tion from historic cost, in the manner described in paragraph 31 above.
The 1974 study concluded that the revenues generated by the suburban rates
determined in this manner would be sufficient to permit Detroit rates
to be set without charging Detroit users any rate of return on the rate
base allocated to Detroit customers.  The 1977 study concluded that the
revenues generated by the suburban rates determined in this manner would
not be sufficient to permit Detroit rates to be set without charging
Detroit users any rate of return.  The result of the 1977 study was to
charge Detroit users different rates of return for each rate period,
according to the level of revenue requirements that needed to be met.
The resulting rates of return charged to Detroit customers were 7.16%
for the 1977-1978 rate period, 2.25% for    1978-1979, and 4.53% for
the period from July 1, 1979 through December 31, 1979. (Exhibit 51.)
The objectors assert that their contracts with Detroit preclude Detroit
from charging a higher rate of return to suburban users than is charged
to Detroit users.

110.  The total amounts projected to be realized by the user charge
component representing the rate of return calculation in the 1977 rate
study were $7,522,500 for 1977-1978, $5,750,300 for 1978-1979, and
$4,253,000 for the period from July 1, 1979 through December 31, 1979.
It these total sums were applied to the total rate base, they would
result in overall rates of return of 7.08%, 4.62% and  5.72% during those
three rate periods.  (Exhibit 51.)

111.  The dollar values of the rate base allocated to Detroit and to
the suburbs as a group were nearly equal for each rate period:

| Rate Base | 1977-1978 | 1978-1979 | July 1, 1979 to December, 1979 |
|---|---|---|---|
| Detroit | $50,734,000 | $62,582,000 | $76,747,000 |
| All Suburbs | 55,554,000 | 61,993,000 | 71,895,000 |

(Exhibit 51.)  Applying the differential rates of return to these
allocated rate bases resulted in the following total projected revenues
from the rate of return charges:

-72-

| Revenues | 1977-1978 | 1978-1979 | July, 1979 to December, 1979 |
|---|---|---|---|
| Detroit | $3,633,700 | $1,410,800 | $1,736,700 |
| All suburbs | 3,888,800 | 4,339,500 | 2,516,300 |

(Exhibit 51; the figures for the final six month period are also
shown in Exhibit 9, Table 11, p. 37.)

112. Application of the overall rates of return to the rate base
allocated to Detroit and to all the suburban customers collectively
for 1978-1979 and for the final six months of 1979 would result in the
following changes in the revenues derived from the rate of return charges
to each class:

| Revenues | 1978-1979 | July, 1979 to Dec. 1979 |
|---|---|---|
| Detroit | $2,888,723: + $1,477,923. | $2,195,885;+ 459,185. |
| All suburbs | 2,861,535: - $1,477,965. | $2,861,535:- 459,214. |

113. The figures set out above demonstrate that only modest changes
would result in the total rate allocation between Detroit and all sub-
urban customers if identical rates of return were applied to all classes
during the periods covered by the 1977 rate study, so long as all of
the other assumptions of the 1977 rate study were held unchanged. Similar
results would follow if, after deducting depreciation according to the
grant depreciation techniques employed in the study, the balance of the
revenue requirements calculated on the cash basis were allocated between
Detroit and the suburbs as a simple residual revenue requirement without
performing any rate base calculation at all. Although the total number
of dollars involved seems small in comparison to the total revenues that
must be generated by user charges, it remains important to establish the
correct principle. If the objectors are right, they are entitled to
whatever modest adjustments may follow. In addition, it remains necessary
to establish a new system of user charges pursuant to the consent decree:
the principle established now will have a substantial cumulative impact
in future years. The argument of Detroit that the objectors have admitted,
through their own expert witness, that different methods of computing rates
cannot be found to be unreasonable so long as the resulting rate variations
are not greater than ten percent (Gillett, Tr. 1269-1271) is not persuasive.
The objectors have the right to demand compliance with contract commit-
ments. The fact that a million or two dollars a year does not represent
a substantial portion of the staggering sums required by the Detroit sewage
treatment operation does not make it reasonable to charge such sums in
violation of the contracts.

114. The arguments addressed to the rate of return question all proceed
from the premise that it would be proper for Detroit to charge a rate
of return on the capital investment used to provide service to suburban
customers if Detroit had provided the investment out of its general funds
or out of user charges imposed on customers inside the City of Detroit.
In such circumstances, at least, a charge on account of capital invest-
ment appears to be well recognized. (Gillett, Tr. 88; Exhibit 10, p. 6.)
If Detroit should elect in such circumstances to forego imposing a com-
parable charge on its own residents, there would be no cause to object.
The suburban customers, however, rely on the fact that the initial
investment by Detroit in the system has been repaid.  (Gillett, Tr. 88;
Carney Tr. 624-625.) The only investment that Detroit retains in the
system arises from an auditing restatement of its original contribution.
(Exhibit 13, Note F.)  No explanation has been offered of the
reasons for redetermining that Detroit has not been repaid to the extent
of $2,570,471 of its original investment, and this contribution was not
relied upon in the 1977 rate study. Without further information, the
Masters cannot determine whether this figure represents an investment on
which Detroit should be permitted a rate of return under the general
principle.  Since Detroit has not chosen to offer any further information
on this matter, it seems appropriate to decide the case on the assumption
used in the 1977 rate study, which is that Detroit should be treated as
if all of its initial investment in the system has been repaid.
115.  Beginning from the premise that all of the investment by Detroit
out of general funds has been repaid, the "equity" in the sewage treat-
ment system that represents the difference between total assets and total
liabilities has been generated by government grants and by charges imposed
on users of the system.  Detroit agrees that it is not entitled to claim
a rate of return on the investment generated by government grants, even
though Detroit is the owner of the system that has resulted in large
part from those grants.  Detroit does claim, however, that it is entitled
to charge suburban customers a distinctive rate of return on the invest-
ment generated out of user chargs.  There has not been any showing what-
ever as to the proportions of the investment attributable to user charges
that have been imposed on suburban customers.  Since it is clear that very
substantial portions of this investment have resulted from user charges
imposed on suburban customers, it seems appropriate to resolve the
resulting uncertainty against Detroit.  Accordingly, it should be assumed
that suburban customers have contributed through user charges the full
portion of the rate base that Detrit has sought to allocate to them.

-74-

This assumption will clearly hold true for the future, and is the foundation
of the objectors' repeated protests that the practice of charging differential
rates of return means that Detroit is first investing suburban money, and
then charging suburban customers a rate of return on that suburban money.
The objectors admit that the suburban customers have not become owners of
the system by virtue of these user charges (Gillett, Tr. 206-207), but
argue that the bare fact that Detroit owns the system does not entitle
Detroit to charge a differential rate of return.

116. One of the basic justifications offered by Detroit for charging
differential rates of return is that Detroit owns the sewage treatment
system, and that it is irrelevant who has paid for the portions not
funded by government grants. (Carney, Tr. 631; Lobb, Tr. 884.) One
of its expert witnesses testified that allowing the owner a return on
the investment is in accord both with the "American system" and sound
ratemaking principles. (Kelly, Tr. 1199-1200.)

117. A second and closely related justification offered by Detroit
for charging differential rates of return is that the practice has
been clearly permitted by Michigan decisions. These decisions will
be discussed fully in Part II below. The most important of these
decisions is the as yet unreported decision by the Michigan Court of
Appeals in an action brought by Oakland County to challenge the rate
structure that resulted from the 1974 rate study. The Court of Appeals
decision basically determined that some level of difference in the
rates of return does not violate the contractual requirement that rates
be reasonable in relation to costs, unless evidence that had been
improperly excluded by the trial court should show that the Oakland
County contracts had been drafted in circumstances that show the parties
understood the contract provisons to have some other meaning. The
decision spoke of justification for differential charges in the costs
incurred by Detroit in providing police and fire protection for the
sewage treatment facilities, in running risks of tort liability, and
by suffering a loss of its tax base by precluding taxable uses of the
sewage treatment plant site. The decision approved the basic ruling
of the trial court without discussing the trial court's observation
that the actual amount of the rate differential between a seven percent
charge and no charge must be upheld only because some differential was
appropriate, and no evidence had been introduced to show that the
amount of that differential was improper. As far as appears, neither
court was asked to consider separately the provision of the Clinton-Oakland
contract that the portion of the rates "for treatment shall be uniform
throughout the entire Detroit System." (Exhibit 16, p. 3.)

-75-

118. The arguments advanced by the objectors have clearly
been framed as a response to the opinion of the Michigan Court
of Appeals in the Oakland County litigation.  Their major
effort has been directed to a two-pronged demonstration that
there is no rational basis for the differential charged by
Detroit, and that it is possible to develop a rational dif-
ferential that lowers the extra costs charged to the suburban
customers.  Although it has not been as prominently focused,
they have also advanced an argument that the uniformity
provisions of some of the contracts require that suburban
customers be charged no more than a fair estimate of the
costs for police and fire protection and the like that are
fairly attributable to the suburban customers.

119. It is clear that the determination to charge a seven
percent rate of return on the rate base allocated to suburban
customers was made without any consideration at all of the
actual costs of providing police and fire protection, the
value of the risk of tort liability, or the possible loss
of tax revenues resulting from tax-free use of the sewage
treatment site.  (E.g., Carney Tr. 665-666.)

120. The determination to charge a seven percent rate of
return on the rate base allocated to suburban customers was
arrived at as a matter of judgment.  Both Mr. Carney and
Mr. Lobb, in developing the 1974 and 1977 rate studies,
considered a variety of factors in determining that seven
percent represented a fair rate of return.  (Carney, Tr.
582-590; Lobb, Tr. 880-886.)  One of the prominent factors
considered in setting the rate of return was the "imbedded"
interest rate on outstanding sewage treatment revenue bonds.
Consideration of this factor by itself, along with the esti-
mated current costs of issuing new revenue bonds, persuades

-76-

the Masters that a seven percent rate of return would be a
reasonable rate if Detroit had financed the sewage treatment
facility out of general funds.

121. The basic argument that the differential in the rate of
return is arbitrary proceeds from the method by which
Mr. Carney and Mr. Lobb determined the rate of return charged
on the rate base allocated to Detroit customers. Neither of
them made any effort to determine a fair or reasonable rate of
return. Instead, each determined the amount of revenue that
would be generated by suburban customer rates that included a
seven percent rate of return charge, the amount of revenue
that would be generated by Detroit customer rates that did
not include any rate of return charge, and the total revenue
needs of the system. (Carney, Tr. 582-590; Lobb, Tr. 880-886.)
In the 1974 rate study, it was concluded that this comparison
showed no need to charge any rate of return to Detroit customers.
In the 1977 rate study, it was concluded that additional
revenues must be raised by imposing a rate of return charge
on Detroit customers. The result was the rates of return
previously described: 7.16% for 1977-1978, 2.25% for 1978-1979,
and 4.53% for the period from July 1, 1979 through December 1979.
(Exhibit 51.) Mr. Lobb testified that after charging suburban
customers a reasonable rate of return, Detroit customers
should bear the risk of ownership that they must be charged
higher rates if needed to satisfy revenue requirements.
(Lobb, Tr. 886.)

122. Once again, if Detroit had financed the sewage treat-
ment system out of general funds, the Masters would not be
persuaded that either the amount of the differential or the
method of determing it were unreasonable. Indeed, the con-
clusion that in such circumstances Detroit should be entitled
to a seven percent rate of return on its investment allocable

-77-

to suburban customers would justify charging no rate of
return to Detroit customers, and requiring both suburban and
Detroit customers to share any remaining requirements
according to the portions of the total facility investment
allocable to them. This method would avoid the bizarre results
that might follow from the method used in the 1977 rate study
with only slight changes in the circumstances. If, for
example, depreciation were calculated on a basis that excluded
grant-funded facilities, the amount of the revenues that would
have to be raised by the rate of return charged to Detroit
customers after charging suburban customers a flat seven per-
cent rate of return would increase greatly. It would easily
be possible for the imputed rate of return charged to Detroit
customers to reach a rate of fifteen percent or more. Alter-
natively, the coverage requirements associated with a particular-
ly large bond offering in a single rate year might likewise
result in markedly higher charges to Detroit customers than
to suburban customers. If Detroit is entitled to treat the
sewage treatment system investment as if it had been made out
of the general funds of Detroit, the method used in the 1977
rate study does not discriminate unfairly against suburban
customers and if anything carries a danger of unreasonable
discrimination against Detroit customers.

123. For the reasons that will be stated in detail below, the
Masters are persuaded that Detroit should not be permitted to
set sewage treatment rates according to the principles that
would apply if Detroit had financed the system out of its own
general funds. Suburban customers should be treated in the
same fashion as Detroit customers except to the extent that a
reasonable basis can be found for identifying costs attributable
to suburban customers or to Detroit customers. The methods

-78-

applied in the 1974 and 1977 rate studies do not represent
a rational basis of identifying or measuring the distinctive
costs attributable to suburban customers with respect to
police and fire protection, the risk of tort liability, the
risk that investment will be made in excess facilities (Lobb,
TR. 882), the loss of tax revenues, or anything else. If
these methods are not rational, however, it remains to be
seen whether any rational method can be found.

124.   The objectors sought to develop a rational method of
accounting for the fact that suburban customers do not bear
any share of the costs borne by Detroit taxpayers by admitting
that under the decision of the Michigan Court of Appeals there
is a differential in costs that should be taken into account,
and by seeking to account for this difference by charging
suburban customers with a contribution in lieu of taxes.
(Gillett, Tr. 93, 126, 185-186; Exhibit 2.)   The basic method
adopted was to determine the portion of the sewage treatment
plant in Detroit that serves suburban customers, and then to
calculate the tax that would be imposed on that portion of
the plant.   The tax calculation was performed by beginning
with book value of the plant minus contributions, and by
applying the general City of Detroit tax rate but not the
school tax rate.   (Gillett, Tr. 93-110.)   The result of
this calculation would be to charge suburban customers as a
group amounts significantly lower than the amount of the
total rate differential resulting from the 1977 rate study.

125.   Detroit has challenged the method of calculating a
contribution in lieu of taxes in many ways.   The most funda-
mental attack is that under Michigan tax law,
utility plants are assessed real estate taxes on values
determined by "trending" original investment up to the

-79-

present cost of replacing the plant, and then subtracting estimates of actual depreciation. Mr. Scott, one of Detroit's expert witnesses, testified at length in an effort to show that if the Detroit sewage treatment plant were owned by a private utility, Detroit would collect real estate taxes at the expense of suburban customers far greater than the amounts realized by its differential rate of return calculations. (Scott, Tr. 760-834; Exhibits 30, 31, and 32.) Mr. Scott testified that this calculation should be performed by assessing the hypothetical taxes on the whole plant without deducting the amounts contributed by federal and state grants, but he offered alternative calculations that deducted federal and state grants in the amount of original dollars and in the amount of original dollars as "trended" into current dollars. (Exhibits 31, 32.)

126. The objectors' witness sought to justify his method of calculating a contribution in lieu of taxes on the ground that the calculation should undertake to determine the amount of tax revenues lost because the sewage treatment plant site is devoted to a nontaxable public use rather than some alternative private use. On this approach, he expressed the view that no private utility would have invested comparable sums in a private sewage treatment facility on this site, and that no other private industry would have located a taxable enterprise on this site having a value equal to the assessable value of the present sewage treatment plant. (Gillett, Tr. 128-129, 222-223.) The objectors also point to the fact that Detroit's expert admitted that he did not know of any privately owned sewage treatment facility as large as the Detroit facility. (Scott, Tr. 785.)

127. The Masters are not persuaded that the calculation of
a contribution in lieu of taxes affords a reasonable method
of determining a fair charge against the suburbs.  Several
reasons lead to this conclusion.  First, the calculation
proceeds on completely speculative assumptions.  There has
not been any showing that Detroit has in fact lost any taxes
because of the fact that its sewage treatment plant treats
suburban sewage.  No showing has been made that the treatment
facility might have been located elsewhere in Detroit, or even
outside of Detroit, if it had been constructed to treat only
Detroit sewage.  Neither has any showing been made that the
treatment facility would have occupied a smaller portion of the
present site if suburban sewage were not treated.  Second, it
is fruitless and probably impossible to speculate as to the
value of alternative private investments that might have been
made on this site, much less to compare that value to the
value of the taxable private investments that now occupy
whatever alternative site might have been found for the
facility.  Third, the most reasonable method of determining
actual lost taxes appears to be to determine the tax that
would be levied if the present sewage plant were in fact
taxable.  Although it is not entirely clear that the method
used by Mr. Scott corresponds perfectly with the methods
used by Michigan tax authorities, in light of testimony by
Mr. Gillett that indicates a different method of deducting
depreciation from trended value (Gillett, Tr. 1264-1265), Mr.
Scott's methods come far closer to this determination than
do Mr. Gillett's.  Yet the result reached by Mr. Scott's
methods would be to impose a charge on suburban customers
that seems completely out of proportion to the speculative
possibility that Detroit may have lost some measure of tax

-81-

revenues. This charge might be reduced by applying a fractional
tax rate designed to reflect the portion of Detroit tax dollars
devoted to police and fire protection, but at that point it
would be better to undertake a direct calculation of police
and fire costs. In addition, the method proposed by Mr. Scott
would complicate every new rate determination by interjecting
a complex factor requiring much effort to calculate and inviting
serious dispute and litigation.

128. The Masters do not believe that it is appropriate to seek
to apply some method of calculating the costs borne by Detroit
that has not been advanced by any of the parties. None of
the contracts afford any clear justification for one method or
another. If some other method were undertaken, however, a
wide variety of alternatives might be considered. The most
obviously rational method would be to undertake to determine
a fair value for the police and fire protection furnished by
Detroit, and for any risks of ownership that are subject to
plausible evaluation. This value could then be charged by
Detroit to the sewage treatment operation in the same manner
as Detroit now charges for the benefit of administrative
services. (Gillett, Tr. 127.) This charge would be appor-
tioned among all customers of the system, so that Detroit
users would pay a proper share directly, and suburban cus-
tomers would do likewise. The difficulty with this method
is that it would impose a very complex calculation requiring
a great many judgments that could fairly be disputed by the
suburbs. A second possible method would be simply to arrive
at a lump sum annual charge to the suburban customers.
Although this method would probably be as rational as the
efforts to compute a contribute in lieu of taxes, it suffers

-82-

from the disadvantage that is patently arbitrary unless
agreed to by the parties, and that it would have to be
adjusted if inflation continues to prevail at current rates.
A third possible method would be to find an index that would
respond to increasing costs and to differences in relative
use of the system by Detroit and suburban customers.  One
such index would be to charge suburban customers a set per-
centage of the operating and maintenance expenses allocated
to them--in the period covered by the 1977 rate study, for
example, a two percent charge levied on the operating and
maintenance expense allocated to suburban customers for the
period from July 1, 1979 through December 31, 1979 (Exhibit
9, Table B, p. 7) would yield an annual contribution in the
apparently reasonable amount of approximately $600,000.
Once again, it is difficult to justify any such calculation
as a matter of interpreting the present contracts.

129.  Interpretation of the contracts between Detroit and
its suburban customers should be set against the difficulties
just examined.  However reasonable it may seem in the abstract
to permit Detroit to charge the suburban customers some
reasonable amount to compensate for the fact that Detroit
taxpayers provide police, fire, and risk protection for the
system, the method Detroit has chosen to reflect this fact
is unsatisfactory.  The method the objectors have proposed
in response to the perceived needs of Michigan law as inter-
preted by the Court of Appeals in the pending litigation
challenging the 1974 rate study, the contribution in lieu
of taxes, is equally unsatisfactory.  The general language
of the contracts cannot reasonably be stretched to establish
some other system that would have the desirable characteristics

-83-

of easy application, automatic growth as costs increase, and automatic adjustment as relative suburban use of the system changes.

130. If the contracts are approached from this perspective, attention is immediately directed to the uniform rates provisions in two of the contracts. The Clinton-Oakland contract, executed in 1968, provides that "the portion of said rates for treatment shall be uniform throughout the entire Detroit System." (Exhibit 16, p. 3, paragraph 9.) The Macomb contract, executed in 1967, provides that "such rates for treatment shall be uniform throughout the entire Detroit Wastewater Disposal system." (Exhibit 23, p. 3, paragraph 9.) On their face, these provisions seem to provide an explicit answer to the dilemma suggested above. Detroit has agreed with at least these customers that it will not charge any differential rate of return. This agreement would make excellent sense in dealing with a system financed by user charges imposed on suburban customers and Detroit customers alike. It makes even greater sense in light of the manifest difficulties of calculating any rational contribution from the suburbs to offset the protections provided by Detroit. Beyond these arguments from the face of contracts and the difficulties shown by this record, yet other arguments support this interpretation.

131. One strong argument in favor of the conclusion that the uniform rates provisions preclude a differential rate of return is that these two contracts were formed at a time when the prevailing rate structure, adopted in 1964, apparently imposed equal charges on both Detroit and suburban customers. See paragraph 6 above.

-84-

132. Added arguments may also be found. There are many ways in which Detroit might benefit from persuading suburban customers to commit themselves to a long-range alliance in a central sewage treatment facility. In its 1966 pollution control plan, Detroit suggested that common facilities would realize efficiencies of scale that would redound to the benefit of all customers. (Exhibit 27, p. 3) During that period, regional treatment facilities were given preferential priorities in obtaining federal and state grant funds. (Carney, Tr. 632-633.) In addition to these concrete benefits to Detroit customers and rate payers, the city as a whole might benefit from staffing an expanded facility with city residents, and might benefit from the assurance that sewage from its northerly and westerly customers would be piped to the central plant rather than treated and discharged upstream from Detroit. In face of all these possible advantages, it would make excellent sense for Detroit to give up any claim to a charge for the costs of protecting the system by adding the precise uniform rate language that had not appeared in earlier contracts executed at a time when Detroit was in fact charging higher rates to suburban customers than to Detroit customers. In light of these factors, the contrary evidence arising from the statement in the 1966 plan that suburban rates would include a reasonable rate of return on investment does not warrant a different interpretation of the subsequent contracts. (Exhibit 27, p. 30.)

133. In all the circumstances, the Masters conclude that the uniform rates provision of the Clinton-Oakland and Macomb contracts preclude any differential rate of return. These

-85-

provisions were not discussed by the Michigan courts in the
Oakland County suit challenging the rate structure recommended
by the 1974 rate study, and nothing in the Michigan decisions
stands in the way of reaching this conclusion. In addition,
there is every indication that the record developed by the
parties in this case is a fuller and more comprehensive
record. This precise question should not be found controlled
by the Michigan cases.

134. If the uniform rates provisions preclude a differential
rate of return charge under the Clinton-Oakland and the Macomb
contracts, there remains the problem of the other contracts.
All but one of the contracts admitted in evidence contains a
provision that the charges made to the suburban customers
involved shall be comparable to the rates charged to the
public agencies served by Detroit under like circumstances.
(Evergreen-Farmington Agreement, Exhibit 17, paragraph 11;
Southeastern Oakland contract, Exhibit 15, paragraph 12;
Rouge Valley contract, Exhibit 24, paragraph 12.) As to
these contracts, it seems clear that the suburban customers
are entitled to the benefit of the uniform rates provisions
negotiated in the later contracts. The same conclusion
should follow as to the oldest contract, the Northeast
contract (Exhibit 52). Although that contract simply pro-
vides in general terms that the rates shall be "fair and
equitable," it cannot be found fair or equitable to insist
on a differential rate of return as to one contract cus-
tomer when different treatment is required by the subsequently
negotiated contracts with other customers.

-86-

<u>135</u>.  The remedy for the unjustified discrimination in setting
the charges for rate of return should be shaped in recognition
of the large surpluses that are expected to be generated by
the current rate structure.  As described in part B above,
Detroit's own projections show that the rates scheduled to take
effect on July 1, 1978 and July 1, 1979 are now expected to
generate revenues far in excess of revenue requirements.  Even
taking account of the desirability of providing a comfortable
cash surplus according to the crediting formula recommended
in the remedy portion of part B, there is a wide margin for
adjustment.  Accordingly, there is no reason to increase the
rates charged to Detroit customers.  Instead, the rates charged
to suburban customers should be reduced by calculating the
rate of return on the rate base allocated to them in the 1977
rate study at 2.25% for 1978-1979, and 4.53% for the period
from July 1, 1979 through December 31, 1979.

<u>136</u>.  Although the Masters believe that the conclusion and
remedy recommended above are the best resolution of the
dilemma presented by the current contracts, they believe it
is appropriate to commend to the suburban customers the
desirability of recognizing that this resolution is a second-
best alternative.  It would be highly desirable for the suburbs
to agree with Detroit on an index formula that would recognize
the propriety of charging the suburbs a reasonable amount for
the protections Detroit furnishes the sewage treatment operation.
Failing such agreement, the court should consider the possibility
of determining that such a charge might appropriately be imposed
under the rate structure to be developed pursuant to the consent
decree, as a matter of implementing the fair implications of
federal grant statutes.

-87-

## II.  APPLICATION OF MICHIGAN LAW

The recommendations made in Part I were designed to
separate as far as possible questions of sound ratemaking
under the suburban contracts from questions of law.  Detroit
has sought to rest much of its case on the proposition that
Michigan law permits Detroit great latitude in determining
for itself what ratemaking procedures should be applied under
the suburban contracts.  This portion of the recommendations
sets out the reasons for the conclusion that Michigan law
does not allow Detroit the freedom it claims.

It will be seen that the Michigan decisions do appear
to allow Detroit substantial freedom in establishing suburban
user charges.  At the same time, it is clear that this freedom
is not unlimited.  The opinions, indeed, specifically support
the conclusion that reasonable rates can be measured only
against the radical changes that have transformed the require-
ments for sewage treatment and the costs of providing such
treatment.  There is every reason to suppose that the Michigan
courts would apply Michigan law so as to achieve a harmonious
and effective integration with federal treatment requirements
and with the federal user charge requirements that are to take
hold in the near future.  In addition, Michigan law is suffi-
ciently flexible to take account of the fact that the suburban
customers have no realistic alternative to participation in
the regional treatment facility provided by Detroit.  Thus
in one of the major cases relied upon by Detroit, City of
Detroit v. City of Highland Park, 1949, 326 Mich. 78, 100,
39 N.W.2d 325, 334, the Supreme Court recognized that it
was especially true that Detroit should be limited to a

-88-

reasonable rate, since "it would be impracticable if not impossible for [Highland Park] to refuse to accept the services of [Detroit] as to sewage treatment because of the integration of the sewer systems of the two cities."

In more specific terms, Michigan law should be found to embrace several propositions that are important to the surplus revenue projections found in this case. First, sewage treatment rates to the suburbs, as well as to Detroit customers, should be set so as to achieve a fair distribution of capital improvement costs over time. Present users should not be charged with sudden and drastic rate increases designed not only to cover the current operating and maintenance costs of complying with ever more expensive treatment requirements, but also to cover the cost of constructing facilities that will be used by succeeding generations of future users. Second, it is not necessary to permit rates to be set for two and a half years in advance, according to anticipation of optimum progress with the requirements of the consent decree, without any provision for adjustment if Detroit is unable to spend money as fast as it is generated by the schedule of user charges. Third, there is no need to delay adjustment of excessive rates until a new system of user charges and industrial user charges is implemented on January 1, 1980, pursuant to the requirements of the consent decree. To the contrary, the prospect that a new system of user charges in compliance with 33 U.S.C. S. 1284(b) will require a far more elaborate scheme of cost apportionment than has been attempted in the present system counsels that a serious effort be made to balance revenues for the period from September 1, 1977 to December 31, 1979 against costs for the same period. Finally,

-89-

it is proper to place greater reliance on the principles used in the process of generating the rates initially than on the substitute principles that may be advanced in an effort to justify the rates as events fail to correspond to the assumptions made in setting the rates.  Litigating rationalizations offered to support rates that cannot be justified on the original premises adopted by Detroit's own experts to not command great deference.

Michigan law presents greater difficulty with respect to the questions raised by ratemaking that charges depreciation on grant-contributed capital and that charges suburban customers a greater rate of return on their rate base than is charged to Detroit customers on their rate base.  The best conclusion, however, appears to be that each of these practices lacks sufficient support in Michigan law to be accepted.

## A.  JURISDICTION AND APPLICABLE LAW

This action was brought by the United States against the City of Detroit, the Detroit Water and Sewage Department, and the State of Michigan, alleging violations of the Federal Water Pollution Control Act, 33 U.S.C. S.S. 1251 et seq., and the provisions of a National Pollutant Discharge Elimination System permit issued pursuant to the Act.  Jurisdiction was founded on 33 U.S.C. S. 1319(b) and 28 U.S.C. S. 1345. Prior to entering the consent judgment of September 14, 1977, the Court on September 9, 1977 entered an order asserting ancillary jurisdiction over all challenges to the rate structure adopted by the Detroit City Council on August 3, 1977, covering the period from September 1, 1977 through December 31, 1979. The proceedings before the Masters grow out of the order of September 9, 1977.

The parties have agreed that the issues in this case are governed by Michigan law.  (Pretrial conference March 20, 1978, transcript 24-30.)  Although agreement by the parties does not preclude the court from reaching a different conclusion, the Masters have found it appropriate to recommend decision under Michigan law.  This recommendation rests in large part on the conclusion that Michigan law supports the results that should be reached even if federal law were to be applied either of its own force or as a limit on the reach of Michigan law. In light of this recommendation, the possible arguments for applying federal law will be sketched in no more than minimum detail.

Two alternative sources might be found for preemption by federal law.  The first springs from the specific user charge

-91-

requirements of the Water Pollution Control Act, 33 U.S.C.
S. 1284(b).  The second springs from a more general view
that state law should not be permitted to prevent a regional
sewage disposal system from generating the revenues required
to comply with the sewage treatment requirements imposed by
federal law.  Neither potential source of federal law seems
to warrant departure in this case from the results that would
be achieved independently under Michigan law.

Turning first to the user charge requirements, 33 U.S.C.
S. 1284(b)(1) provides that the Administrator shall not approve
any grant for any treatment works "unless he shall first have
determined that the applicant (A) has adopted or will adopt a
system of charges to assure that each recipient of waste
treatment services within the applicant's jurisdiction * * *
will pay its proportionate share of the costs of operation and
maintenance (including replacement) of any waste treatment
services provided by the applicant * * *."  Section 1284(b)(2)
provides that the Administrator shall issue guidelines appli-
cable to payment of waste treatment costs by industrial and
nonindustrial recipients of services.  The guidelines are
required to establish classes of users of such services; to
develop criteria against which to determine the adequacy of
charges imposed on classes and categories of users "reflecting
all factors that influence the cost of waste treatment, in-
cluding strength, volume, and delivery flow rate characteristics
of waste;" and to suggest model systems of user charges.  The
applicable guidelines are published in 40 C.F.R. Part 35,
Subpart E.  The most directly relevant guidelines include
S.S. 35.905-26 (definition of "user charge"); 35.925-11
(requirement that user charges be adopted); 35.935-13 (criteria
for user charge systems, including requirements that strength,

-92-

volume, and delivery flow rate characteristics be considered, and that the grantee review user charges annually and revise them periodically to reflect actual costs); Appendix B (subdivision (g) of which requires that costs be distri-buted "in approximate proportion" to each user's contri-bution to total wastewater load).

It is apparent that the present Detroit rate structure does not comply with all of the user charge requirements established by these regulations.  Costs have been allocated

-93-

solely in relation to relative volume of wastewater flow,
without considering the relative strength or delivery flow
rate characteristics of the waste.  The rate schedule adopted
for the period from September 1, 1977 through December 31, 1979
does not include any provision for annual review of the rela-
tionship between charges and costs, nor any provision for
periodic revision of rates.  Several considerations, however,
support the conclusion that noncompliance with these regulations
has no bearing on the present proceedings.

Perhaps the most important consideration is that in nego-
tiating the consent decree, the Environmental Protection Agency
itself was satisfied to agree to provisions for developing a
system of user charges and industrial cost recovery to take
effect on January 1, 1980.  This practical administrative
construction supports the implication that might otherwise be
drawn from the face of the statute and regulations in any
event--a federal grant recipient is required to adhere to
federal user charge requirements only after very substantial
progress has been made in constructing the grant-supported
facilities.  Added support for this conclusion is provided
by 40 C.F.R. S. 35.935-13, which provides that the Regional
Administrator shall not pay more than fifty percent of the
federal share of any Step 3 (construction) project until
evidence has been submitted that a user charge system is
being developed, nor more than eighty percent until the
system has been approved.  The federal requirements, in short,
have not yet attached.

The conclusion that the specific federal requirements
have not yet attached to the user charges imposed by Detroit
precludes any need to explore the further question whether

-94-

suburban customers would have any direct judicial remedy against Detroit for noncompliance with such federal requirements.

Turning to the possible need to prevent state law from interfering with compliance with federal sewage treatment requirements, the facts of the present case do not demand determination of the circumstances that might justify federal preemption. Nothing in Michigan law threatens to prevent Detroit from establishing charges sufficient to comply with federal requirements. Quite the contrary, state law recognizes full authority to recover all costs necessary to comply with federal law. To the extent that federal law may be concerned with establishing equitable relationships between the charges to different user classes, moreover, state law seems fully consistent with any standards that might be found in federal law.

Under Michigan law, the issues raised by the suburban customers are primarily questions of contract interpretation. The contract questions, however, must be set against the background of general ratemaking authority. Michigan law recognizes a very broad freedom to set user charges that has been taken into account in construing contract provisions designed to control such charges. Although the details of the Michigan decisions are better addressed in relation to the specific issues of this case, a general description of the three most important cases may prove helpful in setting the stage.

In City of Detroit v. City of Highland Park, 1949, 326 Mich. 78, 39 N.W.2d 325, Detroit sued to recover from Highland Park reasonable rates for sewage treatment, as established by

-95-

Detroit ordinances.  The Detroit ordinances imposed a charge
of eleven cents per thousand cubic feet on Detroit residents,
and more than twenty-one cents on suburban customers.  Highland
Park filed a cross-bill requesting that the courts determine
a reasonable charge.  Judgment was given for Detroit, and
the cross-bill was dismissed.  The general standard stated by
the court was that:

> The court will not set a formula in accordance with
> which Highland Park is to pay for the services of
> Detroit's sewage disposal system.  This is a legis-
> lative matter and unless the rate is arbitrary,
> capricious or unreasonable, the courts will not
> interfere.  326 Mich. at 92, 39 N.W.2d at 330.

There was no express contract involved in the suit brought by
Detroit against Highland Park.

The next case, Township of Meridian v. City of East
Lansing, 1955, 342 Mich. 734, 71 N.W.2d 234, arose out of a
contract that required East Lansing to supply water to the
Township at rates that would be " 'reasonable in relation to
the costs incurred by the city for the supply of water.' "
Although the opinions do not provide a simple statement of
the events involved, it appears that Township rates had
originally been set equal to the rates charged East Lansing
customers, but without allowing the Township to take advantage
of the twenty percent discount for prompt payment allowed to
East Lansing customers.  Thereafter the rate to the Township
was increased to 150% of the rate charged East Lansing cus-
tomers, still without allowance of the prompt payment discount.
As a result, the Township was paying nearly twice the rate
paid by prompt-paying local customers (150% of the base rate
compared to 80% of the base rate).  The Court upheld the
new rate against a claim that it was not reasonable in
relation to cost.  The most important general passages of

the opinion establish the Court's general approach to this

contract phrase, which is also involved in the present case:

> It will be noted that the clause under examination does not equate rates to costs. Identity is not required. Obviously there is elbowroom for adjust-ment. The requirement merely is that they shall be "reasonable" in relation to costs. The word "reasonable" with respect to rates charged by utilities is a word of the most universal employment. * * * The determination of its meaning, in any case, is not subject to mathematical computation with scientific exactitude but depends upon a compre-hensive examination of all factors involved, having in mind the objective sought to be attained in its use. 342 Mich. at 749, 71 N.W.2d at 237.

> After all, we are not setting a rate. We are deciding merely whether a rate charged goes beyond a contract which requires that it be "reasonable in relation to the costs incurred by the city for the supply of water." As we noted, identity of rates with costs is not required. As a practical matter this would impose an impossible accounting task. The relation-ship need only be a reasonable one. * * *

> The burden of proof was on the plaintiff to show that the rates charged were, in fact, unreasonable with relation to cost. * * * 342 Mich. at 752-753, 71 N.W.2d at 238-239.

The third important Michigan case is County of Oakland

v. City of Detroit, 1978 __ Mich.App. ___, ___ NW.2d ___,

an as yet unreported opinion that is annexed to Exhibit 43.

The Court of Appeals there affirmed a Circuit Court decision

that rejected challenges by Oakland County to a sewage

treatment rate increase adopted by Detroit in 1975. It

will be necessary to discuss this litigation in some detail

in addressing the claim that Detroit is not entitled to

charge suburban customers a "rate of return" on its sewage

treatment investment that departs from any comparable charge

imposed on Detroit residents. For general purposes, it is

sufficient to note that the Court approached the contract

claim that the 1975 rate was not reasonable in relation to

cost by beginning with the presumption that the rate is

reasonable, and adhering to the presumption "in the absence
of a showing that it is capricious, arbitrary, or unreasonable."
Despite the express contract prevision, the court appears to
have approached the matter from the same general perspective
as had been adopted in Detroit v. Highland Park.  Oakland
County has determined to seek review of this decision in the
Michigan Supreme Court.

Before turning to a detailed discussion of the ways in
which Michigan law applies to the facts of this case, finally,
it may be useful to state the fundamental policies that should
guide the inquiry into the meaning of the Michigan decisions.

There can be no doubt as to the most important single
goal to be achieved by the present rate structure.  Current
user charges must generate sufficient revenues, in conjunction
with bond sales, to ensure that the pace of compliance with
the consent decree is not retarded for want of local financial
resources.  Pursuit of this goal, moreover, must be confided
in large measure to good faith planning by Detroit.  Detroit
is ultimately responsible for complying with the decree, and
with the underlying treatment standards imposed by federal
statute.  In addition, Michigan law recognizes that primary
responsibility for developing rates to cover costs lies with
Detroit, subject to relatively limited judicial review.

Perhaps the next most important goal is to minimize or
eliminate future judicial review of the present rate structure.
To this end, all parties have agreed that the present pro-
ceeding must embrace the complete rate structure for the
period from September 1, 1977 to December 31, 1979.  Not
only would later litigation impose substantial costs of its

-98-

own, but it would create potentially insurmountable obstacles
to orderly bond financing of the vast improvements required
by the consent decree.  Future claims of excessive rates could
well have the perverse effect of making the rates inadequate
by increasing the need to finance long-term capital improve-
ments out of current charges rather than bond sales.  It is
accordingly important that the present rate structure either
be approved with finality, or that any provisions for adjust-
ment be cast in a form that will not thwart orderly bond
marketing.

Beyond these immediate goals lies a deeper long-range need
to establish principles that accommodate fairly the divergent
interests involved in a regional sewage treatment facility.
It is far too late to inquire whether an ideal program for
achieving compliance with modern sewage treatment standards
would provide for a single regional treatment facility operated
by Detroit.  Whatever the ideal system would be, Detroit and
its suburban customers have no reasonable alternative to
intensive and very expensive development of the present
Detroit facility.  The suburban customers must be willing
to pay a fair share of the costs of this facility, and
Detroit must be content to demand no more than a fair share.
If the regional facility achieves economies for all users,
all users should share them; if it entails inefficiencies
for all users, all users should share them.  Recognition of
these principles is important not only for the present case,
but also for other communities faced with the choice between
smaller local facilities and larger regional facilities.

Finally, the fact that the present proceeding is limited
to the rate structure in effect from September 1, 1977 to

-99-

December 31, 1979 should not foreclose concern with the goal
of providing a smooth transition into the rate system man-
dated by the consent decree for the period beginning with
January 1, 1980.  Although it is not possible to forecast
any of the details of the new rate structure, care should be
taken to avoid burdening the new structure with charges
unfairly carried over from inadequate present rates and to
avoid blessing the new structure with substantial surpluses
carried over from excessive present rates.

### B.   SURPLUS REVENUES

None of the Michigan cases affords any specific guidance
in resolving the questions raised by the surplus revenues
generated by the 1977 rate structure, as described in part
I-B.  The decision in Township of Meridian v. City of East
Lansing, 1955, 342 Mich. 734, 71 N.W.2d 234, quoted above,
makes it clear that the objectors have the burden of proving
that as a result of these surpluses the rates are not reasonable
in relation to costs.  It is likewise clear that a determina-
tion of reasonableness does not require or justify precise
matching of revenues and expenditures.  The situation con-
fronting the court in that case, however, was far removed
from the situation presented by the present case.  The rate
to the complaining customer was set at $0.361 to $0.3615.
The defendant city produced three different methods of com-
puting its costs, showing cost figures that ranged as low
as $0.35, but that generally ranged higher than the rate and
up to $0.4334.  It was specifically found that the defendant
city had been losing money in providing the water.  342 Mich.
at 752, 71 N.W.2d at 328.  The conclusion that rates were
reasonable in relation to the reasonable cost figures shown
in those circumstances cannot afford any guidance to decision
in the completely different circumstances of the present case.
Even less help is provided by the decision in City of Detroit
v. City of Highland Park, 1949, 326 Mich. 78, 39 N.W.2d 325,
since it did not involve any contract requirements.  The rates
challenged by the suburban customer in that case, moreover,
were set at a level that would have returned 5.97% to Detroit

-101-

on its own investment in the system if those rates had been charged to all customers. 326 Mich. at 101-103, 39 N.W.2d at 334-335. Once again, there is no parallel to the large surpluses generated in this case by a system that is financed entirely by government grants, revenue bonds, and user charges.

In the action brought by Oakland County to challenge the 1975 rate structure adopted by Detroit, one of the objections raised was that it was unreasonable to adopt a "test year" three years in the future to verify the reasonableness of the rates. This claim was abandoned prior to judgment, however, and the determination of the circuit court that the rate study was not shown to be unreasonable rested on this abandonment. (Exhibit 43, Opinion p. 6.) In light of this fact, and the fundamental fact that the circumstances surrounding the 1974 rate study were not open to the dramatic upheavals that were contemplated at the time of the 1977 rate study, the circuit court decision is of no relevance to the present case.

With no more guidance than this from the Michigan cases, it is appropriate to conclude that the objectors have carried the burden of showing that the rates set by the 1977 rate study are not reasonable in relation to the costs actually incurred in the 1977-1978 period or the costs now projected by Detroit to be incurred in the later periods of the rate study. Two sure guides lead inexorably to this conclusion. The first is the simple size of the revenue surpluses that even Detroit now admits will result from the present rate structure. The second lies in the fact that Detroit has sought to justify the rates only by resorting to principles far different than the principles relied upon in the 1977

-102-

rate study.  Some slight added support may be found in the
testimony of the objectors' expert that the reduction of
revenue requirements has rendered the rates unreasonable in
relation to cost.(Gillett, Tr. 167-168.)  Since this testi-
mony does not purport to rest on any common industry under-
standing of the terms used in the suburban contracts, however,
the Masters have not relied upon it in reaching their recom-
mendations.

The conclusion that the present rates are unreasonable
in relation to cost does not command any particular form of
remedy.  For the reasons expressed in Part I-B, the Masters
believe that the remedy should be tailored to the many
uncertainties that surround the revenue requirements of
the Detroit sewage treatment operation.  Rather than attempt
to recalculate specific rates for any of the periods involved,
a self-adjusting mechanism should be adopted that will both
bring actual charges into reasonable relation to actual costs
and also provide a secure margin of cash flows to protect
against unforeseen imbalances between revenues and expendi-
tures.  The remedy proposed in Part I-B is calculated to
achieve these ends.

C.  RATE ALLOCATION

(1)  Utility Basis of Ratemaking

In the abstract, it would be possible to urge that once revenue requirements are calculated on a cash basis it is not reasonable to calculate rates on a utility basis.  If depreciation is not calculated as a cost in determining revenue requirements, it is not readily apparent that rates based upon depreciation charges are reasonable in relation to costs as required by the suburban contracts.  Nonetheless, none of the objectors have challenged the combination of the cash basis in projecting revenue requirements and the utility basis in setting rates for the different customer classes.  The explanation for this position may well be found in Michigan statutes and decisions, and provide a useful framework for addressing the specific depreciation and rate of return questions that have been raised.

The Michigan Constitution specifically authorizes any city or village to provide sewage disposal services outside of its corporate limits. Article 7, S. 24.  The Home Rule Act provides that a city may establish a sewage disposal system both within and without its corporate limits, and may operate it "as a utility," with the right to collect charges "covering the cost of such service, the proceeds whereof shall be exclusively used for the purposes of the sewage disposal system, and which may include a return on the fair value of the property devoted to the service." M.C.L.A. S. 117.4f(4), M.S.A. S. 5.2079(4).  The Revenue Bond Act provides that rates for services furnished by a public improvement financed by revenue bonds shall be sufficient to provide for maintaining the improvement in

-104-

good repair and working order, and that the rates shall be fixed and revised from time to time by the governing body of the borrower. M.C.L.A. S. 141.121, M.S.A. S. 5.2751.

Against the background of these statutes, a claim was made in City of Detroit v. City of Highland Park, 1949, 326 Mich. 78, 90, 39 N.W.2d 327, 329, that Detroit could not set rates to suburban customers "on a utility basis." The court rejected this claim. In several passages it made it clear that charges could be determined by treating the sewage system as a public utility, and concluded that it was proper "to charge rates on the basis of operating a public utility." 326 Mich. at 96-99, 39 N.W.2d at 331-333.

Without further argument by the objectors, it is appropriate to conclude that Michigan law supports an interpretation of the suburban contracts to permit ratesetting on a utility basis, at least to the extent that it is appropriate to include some charge for depreciation in establishing rates for the different classes of customers.

-105-

## (2)  Depreciation of Grant-Funded Investment

Part I-C(2) describes the Detroit practice of setting
rates by charging depreciation on original plant investment,
including investment that has been funded by federal and
state grants.  The general ratemaking objections to that
practice were explored, and it was concluded that the practice
is undesirable.  Considerable care is required in reaching
the conclusion that Michigan law should not be found to permit
this practice.

The starting point of the inquiry into Michigan law must
be City of Detroit v. City of Highland Park, 1949, 326 Mich.
78, 98, 39 N.W.2d 325, 333.  Highland Park specifically
objected to the Detroit practice of charging depreciation on
the portion of the plant investment provided by federal grants.
The court specifically approved the practice.  At least three
considerations warrant the conclusion, however, that Michigan
courts would reach a different result on the facts of the
present case.

First, and most ambiguously, the decision in the Highland
Park case was apparently written on the assumption that Detroit
had actually created a depreciation fund out of the deprecia-
tion charges.  The court spoke repeatedly of the need to
generate a fund that would support repairs and replacements,
that would help to rebuild and restore the system over its
years of service, and that would help protect against the
dangers of explosion, collapse, or obsolescence.  326 Mich.
at 95-99, 39 N.W.2d at 331-333.  In addition, the court
was writing of a situation in which Detroit had provided
nearly half of the investment in the system out of its own
general funds.  In rough terms, the system at that point

-106-

had been financed by $12,700,000 from Detroit general funds,
$5,000,000 from revenue bonds, and $9,000,000 from federal
grants.  In such circumstances there is an obvious attraction
to permitting rates that would recover the city's investment
out of user charges.  In the present case, on the other hand,
it is clear that Detroit has recovered its initial investment,
and has not undertaken to create any fund to hold sums re-
covered by the depreciation component of user charges for any
of the purposes contemplated by the court in the Highland Park
litigation.

Second, although the court recognized that the federal
grants had been given to Detroit on the basis of a plan to
provide service to suburban customers, it stressed that the
grant was given to Detroit, and prophesied--quite inaccurately--
that "this is not a recurring grant."  In the present case it
is clear that for a long time, Detroit explicitly relied on
its status as a regional treatment facility in seeking and
receiving preferential access to federal and state grants.
(Carney, Tr. 632-633.)  Even more important, federal law
requires that user charges be sufficient to cover the cost
of "replacement," but defines replacement to include expendi-
tures "during the useful life of the treatment works necessary
to maintain the capacity and performance for which such works
are designed and constructed."  33 U.S.C. S.S. 1284(b)(1),
1292(3).  This definition strongly suggests a federal policy
that current users should not be compelled to pay depreciation
charges designed to permit reconstruction of grant-funded
facilities after their useful life has passed.  Even without
finding that this federal policy precludes state law from
permitting greater depreciation charges, it is clear that

-107-

state law should take this federal policy into account in
determining the reasonableness of greater depreciation charges.
This conclusion is particularly appropriate in the circum-
stances of the present case, in which a system of user charges
complying with the requirements of federal law is due to take
effect on January 1, 1980.

Finally, the Highland Park case did not involve any
contract provisions limiting the general ratemaking freedom
of Detroit.  The critical question in the present case is whether
investment funded by federal and state grants represents a
"cost" to be considered in determining whether rates are reason-
able in relation to cost.  The Highland Park case simply does
not speak to this question.  Whatever general meaning it might
have in reading the contract provisions against the background
of general ratemaking principles is lost by the drastic change
in the role of federal financing in the ongoing operation
of the Detroit system.

For these reasons, the Masters have concluded that the
Highland Park case does not preclude the contract interpre-
tation recommended in Part I-C(2).  At the same time, this
conclusion has not been made the basis of any independent
recommendation that the present rate structure be modified.
The reasons for the determination that no further relief is
required are set out in Part I-C(2).

-108-

### (3)   Differential Rate of Return

In Part I-C(3) it is recommended that the suburban
contracts be interpreted to preclude the differential
rate of return charged against suburban customers for the
rate periods of 1978-1979 and July 1, 1979 through
December 31, 1979.  Reliance was placed on the uniform
rate provisions of two of the contracts, and the pro-
visions in other contracts requiring rates to be the
same for all municipal customers.  The meaning of these
provisions was drawn from the special circumstances sur-
rounding the present case.  The most important of these
circumstances is that apart from a relatively inconsequen-
tial and unexplained bookkeeping adjustment, all of
Detroit's direct investment in the system has been paid
back out of user charges.  Detroit's arguments have
resisted this recommendation on grounds that may con-
veniently be grouped around three headings.  First, it
relies on general statutory provisions.  Second, it
relies on general ratemaking decisions in Michigan and
other states.  Third, it relies most heavily on the
circuit court and court of appeals decisions in the state
litigation brought by Oakland County to challenge the
1975 rate structure.  Each of these sets of arguments
will be examined in order.

Michigan statues provide that a city may render
sewage disposal services outside of its corporate limits,
and may set charges that "may include a return on the
fair value of the property devoted to the service, ex-
cluding from such valuations the portions of the system
as may have been paid for by special assessment * * *."

-109-

M.C.L.A. S. 117.4f(4), M.S.A. S. 5.2079(4).  It is not at
all clear that this statute would automatically authorize
rates that charge a fair value rate of return to some
customers and not to others.  The provision that excludes
portions of the system paid for by special assessment,
indeed, may suggest that at least customers who have paid
for a share of the system through user charges may not
be assessed a discriminatory rate of return that is not
charged to other customers who have paid for no greater
proportional share of the system through user charges.
However that may be, the question in the present case is
whether the contracts with the suburban customers have
surrendered whatever rights Detroit may have had to
charge a differential rate of return even on a system
financed by user charges, revenue bonds, and federal
and state grants.  The general terms of this statute
do not provide significant aid in determining the proper
interpretation of the contracts in circumstances as
special as those involved in this case.

General ratemaking decisions provide even less
support for Detroit's position.  The decision in City
of Detroit v. City of Highland Park, 1949, 326 Mich.
78, 39 N.W.2d 325, to be sure, did permit Detroit to
charge higher rates to suburban customers in order to
realize a return on its investment.  That case, however,
did not involve a contract, and was decided at a time
when Detroit in fact had a very large investment in the
sewage treatment facilities derived from its own general
funds.  Township of Meridian v. City of East Lansing,
1955, 342 Mich. 734, 750-751, 71 N.W.2d 234, 237-238,

-110-

involved a contract that required rates to be reasonable in
relation to costs.  Three different methods of calculating
costs were proposed.  One of them included a four percent
return on the depreciated capital investment of the system.
The result of this method of calculating costs was to
show costs that were substantially higher than the con-
tested rate, and that were substantially lower than costs
computed by an alternative method that did not include
any return on investment but instead covered the principal
and interest requirements of outstanding bonds.  The Court
relied on the Highland Park case for the proposition that
a fair return on the city's investment was a proper charge.
This statement, however, was set in the context of approving
all of the alternative methods of computing costs.  The
decision, moreover, rests on the manifest assumption that
the City of East Lansing had financed much of the system
with general obligation bonds, 342 Mich. at 751, 71 N.W.2d
at 238.  It thus does not speak even to the question
whether differential rates of return on property financed
by revenue bonds and user fees are permissible under a
contract that requires that rates be reasonable in relation
to cost.  It offers even less guidance in interpreting
contract clauses that require uniform rates.

General ratemaking decisions from other states
provide even less support to Detroit's position.  It is
distinction enough that none of the cases cited involved
problems of contract interpretation.  Other fundamental
distinctions exist as well.  Louisville & Jefferson
County Metropolitan Sewer Dist. v. Joseph E. Seagram &
Sons, 1948, 307 Ky. 413, 211 S.W.2d 122, involved a
system built by the city out of general funds.

-111-

Borough of Ambridge v. Pennsylvania Public Utility
Commission, 1939, 137 Pa.Super. 50, 8 A.2d 429, involved
a municipal utility that was subject to regulation by a
state public utility commission, and that had apparently
paid for its system by means that did not involve any-
thing like the circumstances of the Detroit system.
In Faxe v. Grandview, 1956, 48 Wash.2d 342, 294 P.2d
402, a portion of the water system had been financed by
special tax levies on property within the city, and no
evidence was offered either as to the value of the service
provided nonresidents or the rate of return realized from
the contested rates.  Messenheimer v. Windt, 1955, 211
Ga. 575, 87 S.E.2d 402, involved water charges cal-
culated to raise funds for uses that were specifically
authorized by the state constitution.  Town of Terrell
Hills v. City of San Antonio, Tex.Civ.App.1958, 318 S.W.2d
85, is apparently the only case in which the system was
financed entirely out of revenue bonds.  The opinion does
state that it was not in itself "unlawful" to set rates
on a basis that included a seven percent rate of return
charge to nonresident customers, and a three percent charge
to resident customers.  The court also found that the
entire amount of the rate differential was justified by
other factors, however, 318 S.W.2d at 88, and in any
event was not confronted with any contract claim.  None of
these cases provides material guidance in answering the
contract questions presented by the present case.

Finally, Detroit places its greatest reliance on the
opinions of the Michigan state courts in County of Oakland
v. City of Detroit, offered in evidence as Exhibit 43.

-112-

The two opinions should be treated in order.

Judge Miller's opinion in the Circuit Court speaks plainly to major portions of the issues raised in the present case. He clearly addressed the claim that Detroit should not be allowed to conform to the general practice of charging a rate of return to suburban customers in light of the fact that all of Detroit's investment in the system had been repaid. The claim was clearly rejected, basically on the ground that reasonable grounds existed for classifying suburban customers separate from Detroit customers. The reasonableness of the classification was found in the facts that Detroit remains the owner of the system; that Detroit loses tax revenues because the system is present in Detroit; that Detroit provides police and fire protection; and that Detroit is subject to the risks of ownership and management, including potential tort liability. The specific conclusion was that Oakland County had not carried the burden of showing that "no reasonable basis exists for the differential rate between suburban and Detroit customers." (Opinion, P. 29.)

Two critical distinctions prevent the circuit court from settling the differential rate of return question presented by the 1977 rate structure. First, Judge Miller carefully noted at two different points that no evidence had been presented that would warrant any conclusion on the question whether the amount of the rate differential was reasonable. Initially, he stated that: "The rate of return is a recognized item chargeable for the responsibility of management and ownership, even though under the peculiar facts of this case the amount is questionable, but not herein questioned." (Opinion,

-113-

P. 22.)  Later, he concluded that:

> a return of 7% * * * has not been challenged
> as to amount of charge, only as to the right
> to charge it at all.  Since it is found
> proper to make some charge, plaintiff has not
> carried its burden of proof and the entire
> 7% must be considered fair and reasonable
> for the purposes of this suit.  (Opinion,
> P. 28, Par. 11.)

By themselves, these portions of the opinion leave the
way open for the proof offered in the present case that
the amount of the differentials involved in the 1977 rate
study does not bear any reasonable relation, or indeed
any relation at all, to the burdens of ownership and
protection that Judge Miller concluded were sufficient
to justify some differential in rates.

Second, and even more important, no portion of
Judge Miller's opinion deals with the contract requirements
for uniform rates.  The only contract provision addressed
was the provision that rates must be reasonable in rela-
tion to cost.  Given a showing that Detroit was incurring
some costs related to the sewage system that were not other-
wise recovered through rates, and absent any showing as to
the amount of those costs, it was not difficult to conclude
that the objectors had failed to carry their burden.  That
conclusion, however, does not help at all in addressing the
questions raised by the uniform rates requirements.  It is
interesting but probably fruitless to speculate as to
the reasons for overlooking the uniform rates require-
ment of the Clinton-Oakland contract, which was clearly
before the circuit court.  (Opinion, P. 4.)  The
requirement may have been overlooked or ignored because
it was found in only one of the three Oakland contracts.
It may have been put aside because of a fear that

-114-

arguments based on that clause would interfere with arguments based on the "8 percent discount" provision and addressed to other issues. Whatever the explanation may be, the circuit court opinion does not help reveal the proper interpretation of the uniform rates provisions under Michigan law.

The Court of Appeals decision offers no more guidance than the circuit court opinion that it largely affirms. The sole issue discussed is whether it is reasonable to establish distinctive rate classifications for Detroit and suburban customers in relation to the contract requirement that rates be reasonable in relation to cost. The classifications were found reasonable, as a general proposition, in light of the concern that Detroit taxpayers are providing police and fire protection, are running the risks of tort liability, and pay higher taxes because of the tax exempt status of the sewage treatment site. The case was remanded for further proceedings, however, because of a ruling that the circuit court had improperly excluded evidence bearing on the question whether the parties intended to permit such classifications in setting rates reasonable in relation to costs. (That evidence has not been offered in the present case.) In light of the circuit court opinion, the appellate opinion cannot be read to address the question raised by the clear showing on the present record that the differential rates of return bear no relationship to any costs incurred by Detroit. Neither is any account taken of the uniform rates provisions or the provisions in other contracts that extend the benefit of the uniform rates provisions to other customers.

-115-

In light of these distinctions, it must be concluded that the opinions in the suit brought to challenge the 1975 rate structure do not afford any help in understanding the decision that would be reached by a Michigan court on the record made in the present case. Although federal courts must be careful to avoid undue disregard of state court opinions, equal care must be taken to ensure that uncritical adherence to distinguishable decisions does not distort state law. The present record presents a compelling picture of the haphazard operation of the differential rate of return method used in the 1977 rate study. Given this showing, and the failure of the state court opinions to address the uniform rates provision, it cannot be concluded that Michigan law would uphold the differential rate of return method as used in the 1977 rate study.

In reaching this conclusion as to Michigan law, no reliance has been placed on the opinion of the objectors' expert that the differential rate of return method resulted in charges that were not founded in cost and were not uniform. (Gillett, Tr. 168-178.) This testimony offers a persuasive interpretation of the contract provisions, but it does not purport to rest on any expert knowledge of common or accepted meaning for the phrases used in the suburban contracts. The testimony has been treated as no more than argument. Neither has any reliance been placed on the argument of the objectors that the differential rate of return has resulted in devoting sewage system funds to general City uses. There is no showing that in fact funds have been taken out of the sewage system. To the contrary, revenues generated

-116-

by the differential rate of return have been devoted to
the needs of the system.  The objectors themselves, indeed,
have repeatedly protested that it is unfair to charge them
a rate of return charge that is then reinvested so as to
augment the rate base on which future rate of return
charges are calculated.

-117-

## D.   REMEDY

Remedies have been proposed in Parts I-B and I-C
to correct the revenue surpluses projected to arise from
the 1977 rate structure, and to eliminate the differential
rate of return built into the 1977 rate structure.   The
remedies follow directly from the nature of the contract
violations found, and do not require further elaboration.

The objectors have requested that they be awarded
the expenses of litigation, on the ground that the remedies
requested and recommended result in benefit to all users
of the sewage system, including Detroit customers.   They
have deliberately withheld detailed arguments of law, in
the belief that the question may be better addressed by
the court.   The Masters do not understand that the order
to consider objections to the 1977 rate structure
embraces a charge that they pass on the request for counsel
fees.   Accordingly no recommendation is made on this request.
It may be recorded, however, that counsel for all parties
have presented their adversary positions in the finest
traditions of cooperative but vigorous and highly competent
professional advocacy.

-118-

## III OTHER ISSUES

The recommended findings and conclusions set out in Parts I and II above reach the major issues presented at the hearings and advanced by the parties in their arguments and requests for relief. A large number of other issues have also been raised during the course of the proceedings before the Masters. As to each of them, it is recommended that no affirmative relief be given. The reasons for these recommendations are set out below. The first three issues involve matters that have been separately briefed and argued between Oakland County and the City of Detroit. The remaining issues involve disposition of motions that were filed before the Masters and a wide variety of objections that can be described in rather summary fashion.

-119-

### A. Res Judicata:  Oakland County

The litigation between Oakland County and the City of Detroit still pending in the state courts of Michigan is described at length in Part II above.  In its Answer and its Motion for Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment , the City of Detroit asserted that the state court proceedings are binding on Oakland County in the present proceeding by way of res judicata or collateral estoppel.  This defense has been carried through the hearings, and remains in the case.  Although the issue remains in the case, the parties have not provided extensive briefs on the troubling questions of law that it presents.  On the basis of sketchy preliminary research into Michigan law, the Masters recommend that the defense be denied and that the issues as to Oakland County be decided on the same grounds that are applied to the other objectors.

The matter as to which the res judicata defense is advanced is the right of Detroit to charge a rate of return to suburban customers higher than the rate of return charged to Detroit customers.  Under the 1975 rates challenged in the state court proceedings, rates to suburban customers, including Oakland County, included a charge representing a 7% return on the rate base allocated to the suburban customers.  The circuit court ruled that a differential rate of return was proper, and that since no question had been raised as to the amount of the differential the challenged rates must stand.  The Court of Appeals reversed for a new trial on the ground that the circuit court had improperly excluded evidence bearing on the intent of the parties to the contracts involved.  Its opinion,

however, made it clear that apart from the question of con-
tract interpretation, Michigan law would permit a differen-
tial rate of return as a matter of general ratemaking prac-
tice.  The parties are agreed that renewed trial proceedings
have not yet been had in the state circuit court, and that
an application for leave to appeal to the Michigan Supreme
Court has been filed and is now pending.  (E.g., Detroit pro-
posed opinion, P. 12-13.)

The first question raised by the res judicata defense is
whether it goes to matters of claim preclusion or issue pre-
clusion.  The Masters are inclined to the view that the claim
or cause of action advanced in the present proceedings is not
the same as the claim or cause of action advanced in the state
court proceedings.  The present proceedings challenge a 1977
rate structure that could not possibly have been challenged
in the state court proceedings when initiated in 1975, or
when tried in 1976.  (Exhibit 43)  Michigan courts appear to
adhere to the general view that two suits involve the same
cause of action only if "'the facts or the evidence essential
to the maintenance of the two actions are identical.'"
American Mutual Liability Insurance Co. vs. Michigan Mutual
Liability Co., 1975, 64 Mich. App. 315, 325, 235 N.W.2d 769.
The facts and evidence essential to challenge the 1977 rate
structure are in many ways very different from those that
might have been advanced in a challenge to the 1975 rate
structure.

More difficult questions are presented by the assertion
that the state court proceedings are binding on Oakland County
as a matter of issue preclusion.  At first impression, it
appears that there are issues common to both the state court
litigation and the present litigation.  The state court liti-

-121-

gation specifically involved claims that Detroit is not en-
titled to charge any rate of return on facilities that have
been paid for out of revenue bonds and, ultimately, user
charges; and that Detroit is not entitled to impose a greater
rate of return charge on suburban customers than on Detroit
customers.  The same basic claims are advanced again in the
present proceeding.  It has been concluded in Part II that
the precedential impact of the Michigan decision is limited
by the fact that the Michigan courts did not consider the
contract requirement that rates be uniform, but considered
only the requirement that rates be reasonable in relation to
cost.  It would be very difficult to determine whether for
purposes of collateral estoppel the issue that would be pre-
cluded is the specific issue presented by the contract pro-
vision that rates must be reasonable in relation to cost, or
is instead the broader issue presented by the assertion that
the contracts prohibit differential rates of return.  In
light of the other reasons for concluding that collateral
estoppel does not apply, there is no need to decide this
question.

Despite the possible identity of issues, the Masters
believe that issue preclusion should not apply.  Several
grounds underlie this conclusion.  All of them draw from
Michigan law, in the belief that the preclusive effect to
be accorded a Michigan judgment should clearly be governed
by Michigan law in these pendent jurisdiction proceedings.

First, it is far from clear whether Michigan courts
would attach preclusive effect to a judgment pending
appellate review.  In City of Troy vs. Hershberger, 1970,
27 Mich. App. 123, 127-128, 183 N.W.2d 430, appeal dis-
missed for want of a substantial federal question 1971,

-122-

404 U.S. 804, the court stated that a judgment pending on
appeal "is deemed res judicata." The only authorities re-
lied upon for this statement, however, fail to provide
support. McHugh vs. Trinity Building Co., 1931, 254 Mich.
202, 236 N.W. 232, ruled that res judicata effect should
not be given to a judgment in proceedings that were sub-
sequently enjoined by another court. 14 Michigan Law &
Practice, Judgments Sec. 176, P. 620, does indeed state
that a judgment pending on appeal is ordinarily deemed
res judicata. No Michigan authorities are cited for this
proposition. The same work, however, states in a later
section--not cited by the court in the Hershberger case--
that in Michigan the pendency of an appeal suspends the opera-
tion of a judgment and prevents it from being pleaded or used
in evidence as a conclusive estoppel. Id., Judgments Sec. 234,
P. 653. The later statement is supported by a citation to Day
vs. DeJonge, 1887, 66 Mich. 550, 33 N.W. 527. The Day case
indeed ruled that res judicata effect cannot be given to a
judgment pending appeal. It is far from clear, however,
whether the opinion meant to announce a general rule or
whether it instead relied upon the broad scope of review that
formerly applied in Michigan to appeals in equity. In other
states, the prevailing rule is that a judgment is accorded
res judicata effect pending appeal, but there is a strong
minority rule that agrees with the apparent ruling of the Day
case. See Overseas Motors, Inc. vs. Import Motors Ltd., Inc.,
E.D. Mich. 1974, 375 F.Supp. 499, 517-518, affirmed on other
grounds 6th Cir. 1975, 519 F.2d 119, certiorari denied 423
U.S. 987; Restatement of the Law, Second, Judgments
Sec. 41, P. 5-6, 11 (Tent. Dr. No. 1, 1973). In this
muddled state of affairs, it seems better not to reach a con-

-123-

clusion as to the rule that would be followed by Michigan courts
if there are other reasons for denying issue preclusion effect
to the state litigation.

Second, the present status of the Michigan proceedings
is that there is no determination whether the Oakland County
contracts permit Detroit to charge a higher rate of return to
Oakland County customers than to Detroit customers.  The
Court of Appeals ruled that evidence bearing on the interpre-
tation of all the Oakland County contracts had been excluded
improperly, and that the evidence "went to the heart of the
issue before the court."  It thereupon remanded for considera-
tion of the excluded evidence.  The result of this disposition
is that there has not been a final determination by any
Michigan court as to the effect of the contracts.  Michigan
decisions have ruled that no preclusive effect should be
given to a decision that has been restrained by proceedings
in another court, McHugh vs. Trinity Building Co., 1931,
254 Mich. 202, 235 N.W. 232, nor to a decision that has
been vacated by the court that entered it, Lowrie & Robinson
Lumber Co. vs. Campbell Ave. Methodist Episcopal Church,
1912, 170 Mich. 341, 136 N.W. 364.  It seems clear that
there should be no preclusion resulting from a circuit court
decision that has been vacated on appeal, and remanded for
further proceedings on the very issue that is asserted to
be estopped by the earlier decision.

Finally, attributing preclusive effect to the state
court proceedings involving Oakland County could lead to
the result that the 1977 rate structure might be applied
differently to Oakland County than to other suburban custo-
mers.  This disparate result would be particularly unfor-
tunate as to matters of such great public concern as the

-124-

proper distribution of the costs resulting from the massive
pollution control program now in progress.  On an issue of
comparable public moment, the Michigan Supreme Court appears
to have ruled that principles of res judicata should not pre-
clude reexamination in later proceedings of even a final and
unappealed judgment.  See Gregory Marina, Inc. vs. City
of Detroit, 1966, 378 Mich. 364, 377 (opinion of Justice
Kelly, joined by Justice Souris), 403 (opinion of Chief
Justice Kavanagh, joined by Justices Black & Smith), 144
N.W.2d 503.  As a general principle, it has been stated that
a prior judgment should not be controlling on a question
of law when a new determination is warranted to avoid
inequitable administration of the laws, or when there is a
clear and convincing need for a new determination because
of the potential adverse impact of the prior determination
on the public interest.  Restatement of the Law, Second,
Judgments Sec. 68.1 (Tent. Dr. 1, 1973).

Beyond these general principles, there is a very strong
argument that the Oakland County contracts preclude reliance
on the estoppel effect of the state court litigation if the
result would be determination of rates to Oakland County on
principles different than the principles applied in deter-
mining rates to other suburban customers.  The Evergreen-
Farmington and the Southeastern Oakland contracts both pro-
vide that the rates charged shall be "comparable to the rates
charged to the public agencies served by [Detroit] under like
conditions."  (Exhibit 17, Para. 11; Exhibit 15, Para. 12.)
The Clinton-Oakland contract provides that the portion of the
rates for treatment "shall be uniform throughout the entire
Detroit system."  (Exhibit 16, Para. 9.)

-125-

Because there appears to be no final judgment in the state court proceedings, and because of the great public interest in uniform treatment of all the suburban customers, the Masters recommend that the defense of res judicata and collateral estoppel as to Oakland County be denied.

### B.  Reporting Practices

Count III of the objections filed by Oakland County charges that the current accounting and auditing system used by the Detroit Water and Sewerage Department is inadequate. The objection rests in part on a claim that annual and monthly reports are not received in timely fashion.  In addition, it is asserted that the monthly statements are inadequate because they are based only on estimates.  The result of these claimed reporting deficiencies is alleged to be that Oakland County lacks sufficient information to determine whether sewage rates comply with the requirements of the contracts between it and the City of Detroit.

The allegations of the objection were explored at the hearings through the testimony of Mr. Robert H. Fredericks, Chief Deputy Drain Commissioner of Oakland County.  On direct examination, Mr. Fredericks testified that monthly and annual reports come late, and are based on accrual accounting rather than actual cost figures.  He further testified that as a result of the delays in receiving information, it is difficult for Oakland County to respond to questions raised by the customers to whom Oakland County passes on the increased rates charged by Detroit. (Tr. 357-362.)  On cross-examination, he testified that some of the information useful to assessing operation of the sewage system is available in the annual summary of operating statistics, a public document; that he has attended public meetings of the Board of Water Commissioners; and that he has obtained information about sewage operations from a member of the Board of Water Commissioners who is a resident of Oakland County and chief officer of the Southeastern Oakland County Water Authority.

-127-

He further testified that some of his requests for informa-
tion have not been satisfied because the Board simply does
not keep the information in the form he would like.
(Tr. 380-387.)

No specific provision of any of the contracts between
Oakland County and the City of Detroit has been offered
to support the claim that Detroit has a contractual duty
to provide information more promptly or in greater detail.
No testimony has been offered to show whether Detroit has
delayed in making information public after it has been com-
piled by Detroit.  Nothing has been offered to suggest that
if suburban customers had been supplied with greater infor-
mation more promptly, any of the rates involved in the pre-
sent proceeding would have been changed.

The sole claim advanced, then, is that the contractual
requirements for rates that are reasonable in relation to
cost and that are uniform imply an obligation of better
reporting than has been provided in the past.  The relief
sought goes directly to securing better information, and
would not at all affect the present rate structure as such.

The Masters recommend that this objection and the
corresponding request for relief be denied.

If the recommendations for relief advanced above are
adopted by the court, implementation of that relief will
automatically provide the information required to verify
the resulting rates and charges.

If no relief is awarded on the present objections, the
showing made in support of the objection is insufficient to
warrant direct relief.  No showing has been made that
Oakland County has been denied access to information con-
cerning the premises on which each new rate structure has

-128-

been developed.  No showing has been made that such delays
as have occurred in reporting the results of current opera-
tions are at all important when measured against the time
periods that must be involved in challenging the impact of
established rates on the ground that in actual operation
they have departed from contract requirements.  Nor has any
showing been made that reporting on an accrual basis of
accounting instead of a cash basis is inaccurate or mis-
leading.  So far as appears from the record, the accounts
have always been kept on an accrual basis, and the accrual
basis has been used in the rate studies of 1974 and 1977.
Although good faith performance of the contracts between
Oakland County and the City of Detroit doubtless requires
a reasonable sharing of information, no sufficient showing
has been made that Detroit has unreasonably withheld
information.

## C. Personnel and Purchasing Practices

Count IV of the Complaint of Oakland County asserted that the present rate structure is excessive because it "perpetuates an inefficient and uneconomical Detroit Water and Sewerage Department." More specific allegations were that the Department suffers from the purchasing policies imposed by the City of Detroit, that its personnel practices have been deficient, and that it has suffered as a result of the Detroit residency requirement applied to engineering staff and other professionals.

Objections based on the residency requirement appear to have been withdrawn by Mr. Hampton at the final pretrial conference on March 20, 1978. (Tr. P. 57.) No live testimony was presented as to the effects of the purchasing practices. The only argument addressed to purchasing practices has been the argument of Detroit that the vague general statements about Department complaints as to city purchasing policies set out in the Giffels/Black & Veatch report, Exhibit 40, are insufficient to justify any findings. (Detroit proposed opinion, P. 40.) The Masters agree that no evidence has been presented that would warrant any findings even as to the nature of the purchasing policies employed, much less as to the relative merits of those policies. Neither has there been any evidence that would begin to establish any dollar value that might be attached to losses resulting from any inefficiencies that might be proved on more detailed evidence.

Some very slender evidence was adduced as to claims that Detroit Water and Sewerage Department employees have not always conformed to the highest standards of diligence.

-130-

(Exhibit 21; Exhibit 40, P. 1-11.)  This evidence is not
sufficient to support findings as to any specific inef-
ficiency.  Even more important, this evidence does not
support any conclusion whatever as to the amount--if
any--by which Department revenue needs have increased
as a result of lax personnel policies.  On this record,
the Masters must conclude that this objection has failed
for total want of proof.

Perhaps in recognition of the lack of proof connecting
the claimed inefficiencies to the rate structure, the pro-
posed findings offered by Oakland County have presented
these objections solely in terms of a claim that the
Detroit Water and Sewerage Department has failed to improve
its personnel practices in compliance with the requirements
of the consent decree entered in this action on September
14, 1977.  The proceedings before the Masters have not
been conducted to determine whether Detroit is in compliance
with any aspect of the consent decree provisions.  Detroit
has not had any notice that such issues would be raised.
The Masters believe that in any event, questions of com-
pliance with the consent decree are not properly before
them.  The scope of the proceedings before the Masters has
been confined to challenges to the rate structure, and
nothing in the order of September 9, 1977, indicates that
the proceedings should be expanded to consider questions
of compliance with the consent decree.

The Masters accordingly recommend dismissal of all
objections raised in Count IV of the Complaint of Oakland
County for want of proof.

-131-

### D.  Disposition of Motions

The Masters recommend confirmation of three separate orders entered by them with respect to several motions.

On March 20, 1978, the Masters entered an order on a Motion by the City of Detroit for Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment. The order of the Masters was that all of the issues raised by the motion be carried with the case for disposition following the conclusion of hearings.  Although this disposition had the practical effect of denying the motion, and no further consequences appear to flow from formal grant or denial of the motion, the Masters recommend that the issues raised by the motion be disposed of according to the recommendations made above, and that their order of March 20 be confirmed.

On March 31, 1978, the City of Detroit moved at the close of the objectors' initial presentation for dismissal on the ground that upon the facts and the law the objectors had shown no right to relief with respect to specified objections.  The objectors responded by withdrawing their objections that the audit of the Sewage Disposal Fund for the fiscal year ended June 30, 1977, conducted by Peat, Marwick, Mitchell & Co. was not sufficient to constitute compliance with the requirements of Paragraph XIII of the consent judgment entered in this case on September 14, 1977 as to that year.  The Masters ordered that the sufficiency of the audit be withdrawn from adjudication in the proceedings, and that all of the other issues raised by the motion be carried with the case.  This order was confirmed by a written order entered on April 3, 1978.  It is now recommended

that the order permitting withdrawal of the objection be confirmed, and that the other issues raised by the motion be disposed of according to the recommendations made herein.

At the final pretrial conference on March 20, 1978, the objectors withdrew the portions of their objections based upon the methods by which Detroit computed the relative volume of sewage flows between suburban customers and Detroit customers as a basis for allocating common costs between the two classes of customers. (Prehearing transcript, P. 63-68.) At the hearing on March 31, 1978, the matter was framed in a formal motion to dismiss without prejudice. (Tr. P. 492-495.) The Masters granted the motion at the hearing, and confirmed the order by written order entered on April 3, 1978. It is recommended that the court confirm the order of the Masters. The Masters understand the effect of the motion and their order to be that these objections cannot be renewed in any subsequent attack on the Detroit rate structure adopted August 3, 1977 for the period from September 1, 1977 to December 31, 1979, but that there has not been any adjudication on these issues that should have any preclusive effect if the issues should be raised again in some other context.

-133-

### E.  Storm Water Volume Objections

The Masters recommend adoption of their order entered
at the hearings on April 7, 1978, dismissing without pre-
judice issues concerning the calculation of storm water
flow volume from the City of Grosse Pointe and the City of
Grosse Pointe Farms.  (Tr. 949-952.)

The objections filed by the City of Grosse Pointe com-
plained of the methods used to calculate the volume of its
storm water drainage.  (Paragraphs 7 through 17.)  The City
of Grosse Pointe Farms, on the other hand, expressly sought
to withhold from the present proceedings its own dispute
with Detroit over the methods of computing the volume of
its storm water drainage.  (Complaint Paragraph 10.)  It was
recognized by all parties from the outset that the issues
raised by these disputes do not affect the level of the rates
adopted by Detroit, but go only to the method of applying
the rates to the volume of drainage encountered in these
specific settings.  It has further recognized that proof
of the actual drainage volumes will be both complicated,
and entirely unrelated to the rate structure involved in
these proceedings.  At the hearing on April 7, counsel for
the City of Grosse Pointe sought leave to withdraw this
portion of its objections without prejudice.  The Masters
agreed that the issues should be withdrawn from the hearing
before them, and to recommend that the motion to dismiss
without prejudice be granted by the Court.  At the same time,
the Masters recommended that the Court confirm the right of the
City of Grosse Pointe Farms to withhold its objections to
the volume of flow determination without prejudice to pursuit
in other proceedings.

It is now recommended that the Court permit these
issues to be withheld from the present proceedings with-
out prejudice to renewal in other proceedings.  The
questions presented do not affect the rate structure.
There is no apparent need to assert pendent jurisdiction
to resolve them.  Resolution of these questions between
the parties by negotiation or in subsequent litigation
should have no bearing on the validity of the rate
structure or the ability of Detroit to market its bonds.
The present proceedings would be delayed significantly
if these issues were to be adjudicated.  Pretermission
of these issues will not affect implementation of the
consent decree in this action.  They should be left for
resolution by other means.

-135-

F. Supplemental Objections: Wayne County (Redford Township)

At the start of the hearing on April 7, 1978, counsel appeared on behalf of Redford Township to request leave to file supplemental objections. The Masters granted leave to file a copy of the supplemental objections with the clerk. It was further ruled that the questions raised by the supplemental objections would not be considered during the course of the hearings then being conducted. The Masters reserved determination of the final recommendation to be made as to disposition of the motion. (Tr. 954-957.) It is now recommended that leave to file the objections be denied.

The major issue raised by the proposed supplemental objections is addressed to the fact that the sewage treatment rates apply equally to sanitary flow and surface water runoff. The supplemental objections assert that lower rates should be charged for surface water runoff. This assertion rests on a claim that the actual cost of treating surface water runoff is in a range from one third to one half the cost of treating sanitary flow. In addition, it rests on a claim that some further reduction should be made to account for the fact that during periods of heavy storm runoff, some sewage overloads are diverted directly into the Rouge River or the Detroit River without any treatment.

None of the other objections addressed in these proceedings have raised the issue presented by the supplemental objections. It is manifest that disposition of the questions thus raised would require extensive trial preparation, and might require extensive hearings as well. Consideration of these objections would entail all of the burdensome consequences of unwarranted delay that the Court's order of

-136-

September 9, 1977, was intended to prevent. The objec-
tions have been filed far beyond the time period permitted
by that order, and should be precluded as untimely filed.
The consequence of this ruling should be that the issues
raised by the supplemental objections should be foreclosed
from consideration in any subsequent proceedings in any
other forum, to the extent that they are addressed to
the rate structure adopted by Detroit on August 3, 1977,
for the period ending December 31, 1979. The only excep-
tion that should be made to this preclusion goes to the
quite separate question of determining the volume of sur-
face water runoff, a question addressed below.

Although the recommendation to foreclose consideration
of the issues raised by the proposed supplemental objec-
tions is fully supported by the order of September 9, 1977,
the Masters believe it is unlikely that any valid objec-
tions have been lost by this procedural forfeiture. No one
has challenged the testimony that it was reasonable, in the
circumstances, to base Detroit's sewage rates soley on the
volume of flow, without distinguishing according to the
relative strength of the flows or the delivery rate charac-
teristics of different flows. (Carney, Tr. 570-572; Kelly,
Tr. 1204-1205.) The user charge system to be developed
pursuant to the requirements of the consent decree and federal
statutues will be required to take account of the relative
strength of different sewage flows and delivery flow rate
characteristics. It seems likely that the matters raised by
the supplemental objections will be considered, and that
conclusions will be reached, almost as quickly as they could
be disposed of in the present proceedings.

One quite distinctive issue has been raised by the

-137-

proposed supplemental objections, however, and deserves
different treatment.  Paragraph 6 complains that Detroit
has adopted arbitrary methods in calculating the actual
volume of surface water flow.  Paragraph B of the request
for relief seeks calculation of the volume on some basis
other than surface area.  To the extent that these objec-
tions do not go to the rate charged by Detroit, but
solely to calculation of the volume of flow to which the
rate is applied, the Masters recommend that the request
for leave to file the objections be denied without
prejudice to the right to pursue the question in other pro-
ceedings.  The objection to the calculation of flow volume
appears to parallel the questions raised by the City of
Grosse Pointe and the City of Grosse Pointe Farms.  Through-
out the course of these proceedings, Mr. Breen, as counsel
for Wayne County, made it clear that Redford Township was
dissatisfied with the methods of calculating the volume of
surface water flow.  The reasons that warrant dismissal
without prejudice of the comparable questions raised by the
City of Grosse Pointe and the City of Grosse Pointe Farms
accordingly apply with equal force to Redford Township.
This portion of the motion for leave to file should accord-
ingly be denied without prejudice.

### G.  90-Day Notice Objection:  Melvindale

Count I of the objections filed by the City of
Melvindale, Paragraphs 3 through 6, asserted that the 1977
rate schedule was adopted in violation of a ninety-day
notice provision in the contract between the City of
Melvindale and the Board of Water Commissioners.  The
rate schedule was adopted by Detroit City Council on
August 3, 1977 to become effective with bills rendered on
September 1, 1977, and thereafter.  Bills have been cal-
culated on the basis of charging for all water consumed
from August 1, 1977, at the rate approved for the 1977-
1978 rate period.  See Paragraph 39, Part I-A above.

The City of Melvindale has failed to present any
evidence or argument on its objection.  The contract
between the City and the Board of Water Commissioners was
not offered in evidence.  In response to the motion of
the City of Detroit to dismiss this claim at the close of
the objectors' initial presentation (Tr. 475), Mr. Breen,
representing the customers in Wayne County, stated that
counsel for the City of Melvindale had instructed him
that Melvindale had elected to rely on its pleadings
(Tr. 487).

On this state of the record, the Masters feel com-
pelled to recommend that the objection be denied.  The
absence of any evidence even as to the contract terms
precludes the objection.

If the ninety-day notice objections should be pursued
beyond the record, the major question appears to be whether
the consent judgment and the order of September 9, 1977,
were intended to preclude the parties from raising the lack

-139-

of notice objection.  Counsel have expressed varying views on the subject, but have failed to produce any argument or evidence.  The Masters are unable to make any recommendation as to the intent of the September 9, 1977 order.

Finally, it may be questioned whether the asserted failure to comply with contract notice requirements would warrant any specific relief.  All users should be required to bear a fair share of the costs incurred by the sewage disposal system, and delay in implementing new rates simply means that the rates must be raised to higher levels to recoup the losses resulting from delay.

### H.  Representation on Board of Water Commissioners

Paragraph 6(A) of the objections filed by the City of
Grosse Pointe challenges the composition of the Detroit
Board of Water Commissioners.  The allegation is that
sixty-five percent of the Board budget is derived from
"suburban dollars," and that the composition of the
Board thus violates a right of "equal representation."

Under the Charter of the City of Detroit, the water
and Sewerage Department is headed by a seven-member
board known as the Board of Water Commissioners.  The
members of the board are appointed by the Mayor of
Detroit.  It is required that at least four members of
the board be residents of Detroit.  (Section 7-1501, as
quoted in the proposed opinion of the City of Detroit,
P. 87.)  Under current practice, three members of the
Board are appointed from suburban communities.  (E.g., Tr.
384.)

The Detroit Charter provides that the Board of Water
Commissioners shall establish equitable rates for sewerage
services.  (Section 7-1502, as quoted in the proposed opinion
of the City of Detroit, P. 73-74.)

Under the provisions of the Michigan Revenue Bond
Act of 1933, as amended, M.C.L.A. Sec. 141.121, M.S.A.
Sec. 5.2751, ultimate responsibility for setting the rates
for sewage services rests in the City Council of Detroit.
The rate structure now challenged by the City of Grosse
Pointe was in fact adopted by the City Council (recom-
mended finding 38, Part I-A above).

No evidence or argument have been offered by the City
of Grosse Pointe in support of this objection.  Mr. Breen,

-141-

representing the customers in Wayne County, stated that counsel for Grosse Pointe had determined "to let the record speak for itself." (Tr. 491)

The Masters recommend that this objection be denied to the extent that it constitutes a challenge to the validity of the rate structure adopted by the City of Detroit on August 3, 1977, for the period beginning with bills rendered on September 1, 1977 and ending with December 31, 1979. There is no showing whatever that the rate structure violates any contractual requirements because of the method of structuring the Board of Water Commissioners. To the extent that the rate structure otherwise complies with contractual requirements, there is no possible reason to invalidate the rate structure even on the assumption that the Board of Water Commissioners is not properly structured. This conclusion would follow even if the rates had been finally adopted by the Board of Water Commissioners. Retroactive invalidation of governmental acts is not an acceptable remedy for malapportionment. The conclusion follows even more clearly as to the present rate structure, which was actually adopted by the Detroit City Council. No claim has been made that suburban customers are entitled to representation on the City Council, nor does it seem likely that any such claim could be made.

The Masters recommend further that the merits of this objection not be addressed beyond the point of concluding that it does not warrant relief from the present rate structure. The present proceedings are concerned only with the current rate structure. Even if some colorable claim to representation can be made, it should be advanced in other proceedings seeking other forms of relief.

-142-

## I.  Hearing Requirement

Paragraph 6(C) of the objections filed by the City of
Grosse Pointe challenges the current rate structure on the
ground that the Board of Water Commissioners is not required
to hold public hearings prior to proposing rate changes.
It is further objected that there is no "appeal" from rate
changes once they have been made.  It is asserted that this
situation is inconsistent with regulations imposed on other
utilities.

No argument has been made in support of this objection.
No evidence has been offered to describe the actual prac-
tices of the Board of Water Commissioners in giving prior
notice of proposed rate changes and allowing opportunity,
by way of public hearing or otherwise, to become involved
in the ratemaking decision.  Neither has any evidence
been offered to suggest that had full-scale adversary
hearings been held, the rates proposed by the Board of
Water Commissioners and adopted by the Detroit City Council
would have been altered in any way.  Mr. Breen, representing
Wayne County customers, stated that counsel for Grosse
Pointe had determined to "rely on their pleadings" on this
issue.  (Tr. 513.)

In this state of the record and argument, the Masters
recommend that this objection be denied to the extent that
it constitutes a challenge to the validity of the rate
structure adopted by the City of Detroit on August 3, 1977,
for the period beginning with bills rendered on September
1, 1977 and ending with December 31, 1979.  Whether or not
a showing could be made in some other proceeding that
would justify prospective relief as to future rate periods,

-143-

the purposes of the order of September 9, 1977 require that
this objection be rejected for want of proof as to the
present rate structure.

## J.  Ratemaking Power

Paragraph 12 of the objections filed by the City of
Grosse Pointe Farms asserts that the rates established
by Detroit on August 3, 1977 "were not established in
accordance with the rate making powers conferred upon the
City."  This objection has not been supported by any
evidence, argument, or brief.  The Masters are uncertain
whether this objection is meant to assert any independent
theory, or whether it is simply a residual objection
designed to support the more specific theories advanced
in earlier paragraphs of the objections.  The City of
Detroit has chosen to respond to this objection as if it
is intended to assert that the Board of Water Commissioners
and the City Council did not comply with established pro-
cedural rules governing their actions.  Treating the ob-
jection in this fashion, the City of Detroit relies on the
presumption of regularity established by the evidence
of Exhibit 44, in the form of certified copies of the
resolutions adopted by the Board and City Council.

The Masters recommend that this objection be denied
for want of supporting evidence.  This conclusion follows
whether this objection is intended to claim that the
Board of Water Commissioners and City Council did not com-
ply with their own established procedures in recommending
and adopting the present rate structure, or whether it is
intended to assert some other claim.

-145-

## K.  Bond Revenue Coverage Requirements

Paragraph 8 of the objections filed by Macomb County charges that the debt service coverage requirements imposed by Detroit ordinances on the issuance of revenue bonds are excessive, and have the effect of rendering sewerage rates unreasonable in relation to cost.  In response to a motion to dismiss made by the City of Detroit at the close of the objectors' initial presentation, counsel for Macomb County indicated that this argument would be pursued.  (Tr. 513-518.)  No testimony was produced on this issue, however, and no arguments have been advanced nor proposed findings suggested by the objectors.  The Masters recommend that it be denied to the extent that it constitutes a challenge to the validity of the rate structure adopted by the City of Detroit on August 3, 1977, for the period beginning with bills rendered on September 1, 1977 and ending with December 31, 1979.

-146-

## L.  Abandoned Objections

Many of the objections advanced by one or more of the objectors have been modified substantially in the course of presenting evidence and argument.  The Masters believe that each of these objections has been covered by the recommendations made above.  A substantial number of other objections have been abandoned by the failure of any of the parties to present evidence, advance argument, or propose findings.  The Masters recommend that each of the objections listed below be denied for want of evidence to the extent that they constitute challenges to the validity of the rate structure adopted by the City of Detroit on August 3, 1977, for the period beginning with bills rendered on September 1, 1977 and ending with December 31, 1979.

(1)  Macomb County objections, Paragraph 1(d), Pages 3 to 4, asserting that Detroit should establish rates on the premise that long-term borrowing should never be paid off, but should be perpetually refinanced.

(2)  Macomb County objections, Paragraph 3, Page 4, objecting to the method of allocating costs between retail customers and wholesale customers on the basis of the methods of estimating unmetered flows.  To the extent that this objection is among the objections that were withdrawn without prejudice, as authorized by the order entered by the Masters on April 3, 1978 and recommended for confirmance above, it should be dismissed without prejudice on that ground.

(3)  Macomb County objections, Paragraph 4, Pages 4 to 5, was withdrawn at the final prehearing conference

on March 20, 1978.  (Tr. 63-64.)

(4)  Macomb County objections, Paragraph 7(f), Page 7 was withdrawn at the final prehearing conference on March 20, 1978 (Tr. 64.)

(5)  Macomb County objections, Paragraph 9, Page 7, to the extent that it asserts that estimates of cost increases were based on excessive inflation rates.  The expert witness called by the objectors expressly refused to quarrel with the inflation factors assumed in the 1977 rate study (Tr. 83.), and the objectors have acquiesced in the assumed inflation factors in their proposed findings. (P. 12.)

(6)  Macomb County objections, Paragraph 11, Page 7, challenging the component of the rates based on transportation and sewage flows.

(7)  Oakland County objections, Paragraphs 12 and 13, Pages 5-6.  These objections relate to the rate of return component of the transportation charges in the Clinton-Oakland Sewage System.  No evidence was offered that would justify the Masters in making any findings as to the methods used in developing this component of the charges, or as to the legitimacy of those methods.  Dismissal of this objection from the present proceedings should not have any bearing on the litigation between Oakland County and the City of Detroit now pending in the state courts of Michigan.

(8)  Grosse Pointe Farms objections, Paragraph 7, and Wayne County objections, Count 7, challenging the late payment charges exacted by the City of Detroit.  No evidence was adduced on these objections.  During prehearing conferences, the parties suggested that this question might be resolved by negotiation rather than litigation.  Although

-148-

the question has not been formally withdrawn, the Masters
recommend that it be dismissed without prejudice on the
ground that it is not a challenge to the rate structure
involved in these proceedings.

David V. Ragone, Chief Master

Jonathan W. Bulkley, Master

Edward H. Cooper, Master

-149-

# EXHIBIT C

# WASTEWATER SERVICES AGREEMENT

## BETWEEN

## OAKLAND-MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT

## AND

## COUNTY OF MACOMB

THIS AGREEMENT, made and entered into this _____ day of September 2009, by and between OAKLAND-MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT ("DRAINAGE DISTRICT"); and the COUNTY OF MACOMB, a Michigan Constitutional corporation in the State of Michigan, by and through its County Agency, the Macomb County Public Works Commissioner, ("COUNTY"). In this Agreement either the DRAINAGE DISTRICT or COUNTY may also be referred to individually as a "Party" or jointly as "Parties."

RECITALS

WHEREAS, in 1966 the Macomb County Board of Supervisors, by majority vote of its members-elect, authorized and directed that there be established a county system of sewage disposal improvements and services to serve municipalities in the County, said system being known as the "Macomb County Wastewater Disposal District ("MCWDD"), and has designated the Macomb County Public Works Commissioner as the county agency for the MCWDD; and

WHEREAS, the COUNTY and certain municipalities in the MCWDD presently have contracts for the provision of wastewater disposal services by the COUNTY to the municipalities; and,

WHEREAS, COUNTY, City of Detroit ("DETROIT") and other parties have entered into a Settlement Agreement dated May 12, 2009 ("Global Settlement Agreement") pursuant to which, among other things, Macomb County has agreed to acquire all interceptors, pump

Detroit_950287_7

stations, meters and appurtenant facilities associated with the provision of wastewater transportation and disposal services owned by DETROIT in Macomb County east of the International Transmission Company ("ITC") Corridor (f/k/a Edison Corridor) (collectively, the "Macomb Interceptor System"); the DRAINAGE DISTRICT has agreed to acquire the interceptors, pump stations, meters and appurtenant facilities associated with the provision of wastewater transportation and disposal services owned by DETROIT in Macomb County commonly known as the ITC Corridor (f/k/a Edison Corridor), Oakland Arm, and Avon Arm interceptors (collectively the "OMI System"); and the DRAINAGE DISTRICT has entered into a wastewater services agreement with the City of DETROIT, whereby DETROIT has agreed to provide wastewater transportation, treatment and disposal services to the DRAINAGE DISTRICT; and,

WHEREAS, since 1977 there has been repeated litigation between wholesale customers and DETROIT over ratemaking and other issues associated with DETROIT's provision of wastewater transportation, treatment and disposal services which govern how DETROIT sets wastewater rates and it is possible that there will be disputes in the future with regard to same;

WHEREAS, the settlement agreements and associated court orders (collectively "Settlements") are as follows:

- Settlement Agreement which was filed in the United States District Court for the Eastern District of Michigan on July 19, 1978, (the "1978 Settlement Agreement")

- An Amended Consent Judgment was entered in United States District Court Civil Action Numbers 77-71100 and 80-17613

- A Settlement Agreement filed with the United States District Court for the Eastern District of Michigan on August 26, 1980 (the "1980 Settlement Agreement")

- Settlement Agreement filed with the United States District Court for the Eastern District of Michigan on July 21, 1982

Detroit_950287_7

- A n Order Re Service Contract Amendments dated April 15, 1982
- 1995 Rate Settlement Agreement (the "1995 Settlement Agreement")
- 1999 Rate Settlement Agreement (September 1, 2000) (the "1999 Settlement Agreement")
- Second Amended Consent Judgment (August 3, 2000
- Settlement Agreement filed with the Untied States District Court for the Eastern District of Michigan on May 12, 2009.

WHEREAS, prior court orders have required that wastewater contracts between DETROIT and its Tier I customers be amended to incorporate the terms of such settlements as they relate to rates, rate making practices and industrial wastewater control and it is expected that settlements in the future will also be subject to such orders; and,

WHEREAS, the wastewater rates charged by DRAINAGE DISTRICT to COUNTY will be governed in significant part by wastewater rates set by DETROIT; and,

WHEREAS, said amended agreements have required the customers with wastewater contracts with DETROIT ("Tier 1 customers") to cause each of the municipalities ("Tier II customers") within the Tier 1 customer's service area to implement: (a) a proportionate user charge system in conformance with applicable federal law and (b) sewer use regulations at least as stringent as those adopted by DETROIT; and,

WHEREAS, it is imperative for the public health and welfare of the present and future residents of COUNTY that adequate and proper wastewater disposal facilities continue to be made available within the COUNTY.

NOW, THEREFORE, in consideration of the promises and the mutual undertakings and covenants of the parties hereto, it is agreed by and between the parties hereto as follows:

1.  <u>Provision of Services.</u>  DRAINAGE DISTRICT agrees to provide wastewater services to COUNTY to transport the sewage from the MCWDD to DETROIT for treatment and

Detroit_950287_7

disposal and agrees to contract for such services with DETROIT, subject to conditions and in the manner as set forth in this Agreement.

2.     Utilization of Services. COUNTY on behalf of the MCWDD, agrees to utilize and pay for such wastewater transportation services furnished by DRAINAGE DISTRICT subject to the conditions and terms hereinafter set forth.

3.     Public Purpose. The Parties enter into this agreement to serve the public health and welfare of the people of the State of Michigan, especially in the area affected hereby, and to enhance the water quality of the Great Lakes and its tributaries.

4.     Interceptor System. DRAINAGE DISTRICT shall collect or intercept wastewater at the point or points designated herein, or to be designated in the future by mutual agreement of the parties hereto, through interceptors of the capacity needed to meet the total Maximum Allowable Flow Limit of the municipalities served by the MCWDD.

5.     Collection System. DRAINAGE DISTRICT will provide for such wastewater intercepting facilities as may be necessary to meet the terms of this Agreement with the understanding that COUNTY shall provide the collection system of interceptors, laterals and trunks required to deliver the wastewater to the points of interception.

6.     Service Area. The service area of COUNTY is shown in Exhibit A. The service area may be amended upon mutual agreement of the parties but shall not extend beyond its corporate limits except by mutual consent of the parties hereto.

7.     Points of Discharge Into System. Wastewater from MCWDD shall be delivered by COUNTY for collection and transportation for treatment by DRAINAGE DISTRICT at the locations shown on Exhibit A and at such other point or points as may, from time to time, be mutually agreed upon by the parties hereto.

Detroit_950287_7

8. <u>Maximum Allowable Flow Limit.</u> COUNTY's Maximum Allowable Flow Limit totaled over all points of discharge into the DISTRICT shall be 283 cfs. This limit shall be expressed in units of cubic feet per second and shall be determined by calculating an average of meter readings over a rolling sixty-minute time frame. "Flow" shall mean wastewater delivered by COUNTY from the MCWDD Service Area to the Drainage DISTRICT's system. It shall include sanitary flow, dry weather infiltration and inflow, and a wet weather flow component. It shall also include wastewater from industrial and/or commercial facilities in compliance with the City of Detroit's Industrial Pretreatment Ordinance, Detroit City Code Section 56-3-56.1 et seq., as amended. "Maximum Allowable Flow Limit" means the maximum allowable Flow that the County may deliver to the OMI System as measured at the Northeast Pump Station. This flow shall also include Common Use Inflow & Infiltration ("I&I"), and because it is measured at the Northeast Pump Station, it may reflect attenuation through the OMI System. Common Use I&I means any inflow or infiltration entering the OMI System between any metered connection and the DRAINAGE DISTRICT's point of metering by DETROIT. The COUNTIES and DRAINAGE DISTRICT shall develop a method to determine and allocate the amounts of Common Use I&I and of attenuation. This method may be changed from time to time by the DRAINAGE DISTRICT in consultation with the COUNTIES.

The DRAINAGE DISTRICT acknowledges that contracts between Macomb County and certain cities, villages and townships (CVTs) located within Macomb County will expire during the term of this Agreement and that the Macomb County CVTs may decide to terminate their relationship with Macomb County, divert flow or seek additional capacity that will result in the necessity of modifying or increasing the Maximum Allowable Flow Limit specified herein. Accordingly, the DRAINAGE DISTRICT agrees that in the event any of the foregoing occurs

Detroit_950287_7

the Maximum Allowable Flow Limit and acceptance of flow specified herein, shall be reopened for renegotiation. COUNTY shall notify DETROIT and DRAINAGE DISTRICT of its intention to commence renegotiations. The DRAINAGE DISTRICT and COUNTY agree to amend this Agreement to reflect the new Maximum Allowable Flow Limit if one is negotiated. If COUNTY does not notify DETROIT and the DRAINAGE DISTRICT of its desire to renegotiate the Maximum Allowable Flow Limit, the Maximum Allowable Flow Limit specified herein shall continue in full force and effect. It is also understood that from time to time the DWSD Wastewater Master Plan may be updated which may also necessitate modifications to the Maximum Allowable Flow Limit for the DRAINAGE DISTRICT and/or its customers. The Parties reserve the right to reopen for negotiation the Maximum Allowable Flow Limit specified herein in the event that the DWSD Wastewater Master Plan or other analysis acceptable to the Parties demonstrates modifications are warranted.

9. <u>Acceptance of Flow.</u> The DRAINAGE DISTRICT agrees to accept and COUNTY agrees to deliver no less than 70% of all Instantaneous Flow generated within COUNTY's Service Area and existing as of the date of this Contract.

10. <u>Ratemaking.</u> COUNTY shall pay DRAINAGE DISTRICT for wastewater services at such rates as DRAINAGE DISTRICT may establish from time to time, it being mutually agreed and understood that such rates shall be based upon rates charged DRAINAGE DISTRICT by DETROIT for wastewater transportation, treatment and disposal, plus costs and charges incurred by DRAINAGE DISTRICT for providing transportation services. Within 30 days after revised wastewater rates are approved by both the City Council of DETROIT and DRAINAGE DISTRICT, DRAINAGE DISTRICT shall notify COUNTY of the revised rates.

Detroit_950287_7

All monies collected by DRAINAGE DISTRICT shall be utilized exclusively for the administration, operation, maintenance, reserves and benefit of the DRAINAGE DISTRICT.

11.     Charges to be Based on Flow.  The charges for such wastewater services, except as hereinafter provided, shall be on the basis of the aggregate quantity of wastewater (including sanitary flow, dry weather infiltration and inflow, and a wet weather component, and the COUNTY'S amount of Common Use I&I allocated by the DISTRICT) entering the OMI System from COUNTY.  Included in the computation of charges for wastewater services are all applicable costs and expenses associated with financing, administration, operation and maintenance, DWSD sewage disposal charges or other applicable expenses as determined by the DRAINAGE DISTRICT and COUNTY.  DRAINAGE DISTRICT acknowledges that COUNTY will be billed directly by DETROIT for DETROIT's charges associated with high strength and industrial wastewater flows and COUNTY will pay the invoiced charges directly to DETROIT.

12.     Interim Administrative, Operating and Maintenance Cost Allocation.  For the first three years of this Contract, the administrative, operating and maintenance costs and charges incurred by the Drainage District (and not including DWSD sewage disposal charges) shall be allocated between the Macomb County and Oakland County on a 51.5%/48.5% basis.  During this three-year period, the DRAINAGE DISTRICT, COUNTY and Oakland County shall develop a long-term intercounty cost allocation methodology, considering actual operating experience.

13.     Meters.  All wastewater flow from COUNTY entering the OMI System shall be measured by those billing meters installed at the time this Agreement is executed unless the Parties mutually agree that additional meters are required.  All required wastewater meters and meter pits shall be owned, furnished, installed and maintained by COUNTY in accordance with

Detroit_950287_7

GDRSS principles and standards. The COUNTY shall be responsible for processing meter data. The DRAINAGE DISTRICT shall be responsible for determining billed volumes. COUNTY agrees to accept DRAINAGE DISTRICT's estimates of quantities of wastewater flow during all periods in which the meters fail to measure the wastewater flow correctly, provided there is reasonable basis for such estimates.

14. <u>Accuracy of Customer Meters.</u> COUNTY shall take such steps as may be required to insure the accuracy of any measuring devices used in computing the charges to be paid by COUNTY under the terms of this Agreement. DRAINAGE DISTRICT shall have the right, at its election, to inspect and check for proper installation and operation of any measuring device owned or operated by COUNTY. For purposes of operating and maintaining Customer Meters, the DRAINAGE DISTRICT, Oakland and Macomb Counties may agree to develop an operational plan and utilize a common contractor and consultant for flow volume and rate determination.

15. <u>OMI Billed Volumes .</u> COUNTY agrees it will be bound by the volumes of wastewater flow (including sanitary flows, dry weather infiltration and inflow, wet weather inflow and the wet weather inflow that does not reach the DETROIT wastewater treatment plant), as invoiced by the DRAINAGE DISTRICT to COUNTY, subject to the COUNTY's right to challenge and appeal such invoices.

16. <u>Incorporation of Rate Settlements.</u> COUNTY agrees that the terms of Settlements between DETROIT and COUNTY as may be in full force on the effective date of this Agreement and as they may apply to services provided by the DRAINAGE DISTRICT to COUNTY or to wastewater operations of DRAINAGE DISTRICT are hereby incorporated into this AGREEMENT and shall be fully enforceable by DRAINAGE DISTRICT. Exhibit B sets

Detroit_950287_7

forth those terms that DETROIT and DRAINAGE DISTRICT agree are operative and applicable to wastewater rates charged by DETROIT as of the effective date of this Agreement.

17.   Future Rate Settlements.   COUNTY agrees that should future rate or other settlements be entered into by DETROIT or should federal, state, DETROIT or DRAINAGE DISTRICT laws, ordinances or regulations be adopted or promulgated that affect the rates, ratemaking practices or wastewater control practices of customers of DETROIT's wastewater transportation, treatment and disposal services, COUNTY will expeditiously amend this Agreement to conform to such new or amended requirements upon written request by DRAINAGE DISTRICT.

18.   Proportional User Charges.   COUNTY agrees that it shall adopt and enforce rules and regulations to implement and maintain a revenue system whereby, at a minimum, the operation, maintenance and replacement portion of DETROIT's charges, DRAINAGE DISTRICT's costs and COUNTY's rates are distributed proportionately to each user or user class that is tributary to DETROIT's treatment works. In particular, such rules and regulations shall provide that surcharges established by DETROIT and DRAINAGE DISTRICT for the recovery of incremental operation, maintenance and replacement costs of treating extraordinary concentrations of sewage, shall be billed to and collected from individual firms as identified by DETROIT in its billings. COUNTY agrees that DETROIT may bill for these services directly to COUNTY and that COUNTY, not DRAINAGE DISTRICT, shall be responsible for obtaining payment of such billings and will remit the payments directly to DETROIT. These rules and regulations shall conform to Section 204(b) (1)(A) of Public Law 92-500, as amended, and regulations of the United States Environmental Protection Agency (hereinafter referred to as the U.S. EPA), being 40 CFR, 35.929 through 35.929-3, and shall achieve a proportionate User

Detroit_950287_7

Charge System which is effective throughout DETROIT's service area. The rules and regulations shall provide for monitoring of commercial, governmental and industrial users and shall be consistent with the monitoring rules and regulations of DETROIT and DRAINAGE DISTRICT. DETROIT and DRAINAGE DISTRICT shall have the right under said rules and regulations to audit all monitoring activities including the right to perform monitoring tests itself to verify the accuracy of monitoring results.

19.   Billing. The wastewater services charges as herein provided for shall be billed on a monthly basis by DRAINAGE DISTRICT to COUNTY. Any portion of the charges related to accuracy that is not paid by the due date shall be subject to a finance charge at a rate of 1.5% per month for each month that they remain unpaid. Any portion of the total bill, plus any finance charges applied to the bill which are not paid by the next billing date, shall be shown on the next bill as arrears. If the accuracy of a bill is in dispute, COUNTY shall place the disputed amount of the bill in an interest bearing escrow account maintained by a bank located in Michigan or a County Treasurer pending resolution of the dispute and the finance charge shall thereupon cease. Accrued interest on the escrow account shall be allocated between the Parties directly proportional with the resolution of the dispute. The cost, if any, of maintaining the escrow account shall be allocated between the Parties inversely proportional with the resolution of the dispute. Disputes related to rates for Services charged by DETROIT are specifically excluded from the application of this paragraph. Claims for interest in any other billing dispute shall be resolved by a court of competent jurisdiction.

20.   Commencement of Service. All wastewater services charges herein provided for shall commence at the time services are made available for the acceptance of wastewater from COUNTY into the OMI System.

Detroit_950287_7

21.     Engineering Standards. COUNTY agrees to conform to generally acceptable standards and specifications established by good engineering practices in the installation of wastewater collection, pumping, and transportation facilities which the COUNTY will cause to have constructed within its corporate limits. COUNTY further agrees to provide DRAINAGE DISTRICT with a copy of the location records of existing wastewater collection facilities, if any, located within its corporate boundaries. COUNTY shall submit plans for new sewers directly to DETROIT with a courtesy copy to the DRAINAGE DISTRICT.

22.     Violations of Flow Standards. In cases where the character of wastewater from COUNTY or any portions thereof or from any commercial manufacturing or industrial plant, building or premises within the corporate limits of the COUNTY is such that it imposes an additional burden upon the facilities of or services to be provided by DRAINAGE DISTRICT above that which would be imposed through adherence to standard limitations for wastewater permitted to enter the DETROIT Interceptor, as established from time to time by DRAINAGE DISTRICT or DETROIT, or agencies of the state or federal governments, any additional costs necessitated thereby shall be an additional charge over the rates herein provided. COUNTY shall refuse any person, firm, or corporation the right to discharge its wastewater into its wastewater system if such wastewater violates the standards or limitations established or to be established.

23.     Compliance with Pollution Laws. COUNTY agrees to comply with all laws, ordinances, rules, regulations, and orders of DRAINAGE DISTRICT, DETROIT, State of Michigan and United States of America applicable to the service area of DETROIT's wastewater disposal system within COUNTY with reference to wastewater characteristics, collection and disposal, and water pollution control. COUNTY further agrees to ascertain the party or parties at fault and require same to pay the reasonable cost for repair of any damage resulting to the

Detroit_950287_7

interceptors serving the DISTRICT whether or not owned by the DISTRICT (including the OMI System and/or to the DETROIT System) for the violation of any of the aforesaid laws, ordinances, orders, rules and regulations.

24. <u>Industrial Wastewater Control.</u> COUNTY agrees that it shall adopt and enforce rules and regulations pertaining to the use, design and construction of sewers, and the discharge of industrial or commercial wastes into sewers, where such sewers are tributary to DETROIT's treatment works. Such rules and regulations shall be consistent with and at least as stringent as all applicable provisions of the pertinent ordinances adopted by DETROIT, these being the 1979 amendments to Chapter 56, Article 1, and Chapter 56, Article 6, of the Municipal code of DETROIT as they may be adopted and amended from time to time. In the event any municipality or other governmental unit shall fail to adopt an ordinance as required herein, or shall fail to diligently enforce the same, DETROIT and/or DRAINAGE DISTRICT shall have authority to take appropriate action which may include suit in an appropriate court of general jurisdiction alleging such municipality's failure to adopt or enforce an ordinance, and following a hearing on the merits, should the court find that the allegations in DETROIT's or DRAINAGE DISTRICT's petition are true, it is agreed that such court may, in such instance, grant appropriate injunctive relief against said municipality or any individual discharger there; terminate the municipality's contractual right to discharge waste waters into DETROIT's or DRAINAGE DISTRICT's system and/or to grant DETROIT or grant DRAINAGE DISTRICT such other relief as may be appropriate under the circumstances. These actions shall enable DETROIT or DRAINAGE DISTRICT to:

(a) Deny or condition new or increased contributions of pollutants or changes in the nature of pollutants, to the waste collection system by Industrial and

Detroit_950287_7

13-53846-tjt    Doc 5692    Filed 06/30/14    Entered 06/30/14 17:40:43    Page 200 of 225

Commercial Users.  The terms "Industrial and Commercial" user shall mean those users defined in Section 56-6-3(11) and (P) of DETROIT Ordinance No. 353-H of Chapter 56 of Article 6 passed on November 7, 1979 and as may be amended from time to time.

(b)     Require compliance with applicable current and future National Pretreatment Standards and other more restrictive requirements as may be imposed by DETROIT or DRAINAGE DISTRICT promulgated by the U.S. EPA under the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq.

(c)     Control, through permit, contract order, or similar means, the contribution to the waste collection system by Industrial and Commercial Users to ensure compliance with subparagraph (b) above.

(d)     Require the development of compliance schedules by Industrial and Commercial Users for the installation and facilities required to meet applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by DETROIT or DRAINAGE DISTRICT.

(e)     Require the submission of notices and self-monitoring reports from Industrial and Commercial Users to assess and assure compliance with National Pretreatment Standards and other more restrictive requirements as may be imposed by DETROIT or DRAINAGE DISTRICT.

Detroit_950287_7

(f) Carry out all inspection, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial and Commercial Users, compliance or noncompliance with applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by DETROIT. It being further understood that DETROIT or DRAINAGE DISTRICT may contract with qualified parties to carry out the inspection, surveillance and monitoring procedures of this paragraph.

(g) Seek injunctive relief for noncompliance with National Pretreatment Standards and other more restrictive requirements as may be imposed by DETROIT or DRAINAGE DISTRICT.

(h) Require Industrial and Commercial Users to install containment facilities to protect the treatment works from accidental spills of critical or hazardous materials.

25. <u>Emergency Situations</u>. No failure or delay in performance of this executed Agreement by either party hereto, shall be deemed to be a breach thereof when such failure or delay is occasioned by or due to any Act of God, strikes, lockouts, wars, riots, epidemics, explosions, sabotage, breakage or accident to machinery or lines of pipe, the binding order of any court or governmental authority, or any other cause, whether of the kind herein enumerated, or otherwise, not within the control of the party claiming suspension; provided that no cause or contingency shall relieve COUNTY of its obligation to make payment for wastewater entering the interceptors system operated by the DISTRICT, and provided further that DRAINAGE

Detroit_950287_7

DISTRICT shall assume full responsibility for maintaining service in the absence of the above Emergency Situations.

26. <u>Temporary Interruption of Service.</u>  In the event proper operation of the system requires DETROIT or DRAINAGE DISTRICT to discontinue temporarily all or part of the service provided directly or indirectly to COUNTY, no claims for damages for such discontinuance shall be made by COUNTY against DETROIT or DRAINAGE DISTRICT.

27. <u>ROW and Easements.</u>  To the extent permitted by law the COUNTY will provide DRAINAGE DISTRICT with the necessary permits and rights-of-way to use streets, highways, alleys and easements under its jurisdiction within the corporate boundaries of COUNTY for the purpose of constructing, maintaining, and operating wastewater transportation facilities to adequately service the DRAINAGE DISTRICT and/or COUNTY.  The above permission is intended to include that provided in Article 7, Section 29, Michigan Constitution of 1963; Public Act 368 of 1925, as amended, being MCLA 247.183; and other applicable state statutes.  It is further agreed as a condition of the foregoing that DRAINAGE DISTRICT shall restore all existing structures and/or improvements lying in the right-of- way of construction to as good a condition as before the construction undertaken by DRAINAGE DISTRICT took place, and to the extent permitted by law shall save COUNTY harmless from all liability, claims, suits, actions, or causes of action for damages for injuries, including death, or otherwise by reason of the construction work herein above provided for, provided that nothing in this section or in this agreement shall be construed to render DRAINAGE DISTRICT liable for acts of negligence by COUNTY or any of its officers, employees or agents.  Any such facilities constructed, maintained and operated under this section shall remain in perpetuity the property of

Detroit_950287_7

DRAINAGE DISTRICT and shall not be operated or maintained by any other than employees of DRAINAGE DISTRICT or their authorized representatives.

28. Term. The term of this Agreement shall be for 30 years from the date of execution. The terms of this Agreement shall become operational upon the termination of the wastewater services contract between DETROIT and COUNTY. This Agreement shall be renewed without further action by the parties hereto for successive terms of 10 years thereafter, unless either party hereto shall elect to terminate the same by written notice to the other party given 5 years prior to the date of termination of the original term or any renewal thereof. In the event of the willful cessation by either of the parties hereto of performance of and/or of compliance with the terms of this agreement, the other party hereto may elect to terminate this Agreement at any time upon 90 days written notice. In the event of termination of this Agreement, DRAINAGE DISTRICT shall have the right by legal or equitable means or self help to prevent continued introduction of wastewater into the DRAINAGE DISTRICT's interceptors from the area contemplated to be served hereby.

29. Notice. Except as otherwise specified in this Agreement, all notices, consents, approvals, requests and other communications (collectively, "Notices") required or permitted under this Agreement shall be given in writing and mailed by first class mail, addressed as follows:

> If to the DRAINAGE DISTRICT:
> Secretary
> Oakland-Macomb Interceptor Drain Drainage District
> One Public Works Drive
> Building 95-West
> Waterford, Michigan 48328
>
> With a copy to:

Detroit_950287_7

Oakland County Water Resources Commissioner
One Public Works Drive
Building 95-West
Waterford, Michigan 48328

If to the COUNTY:
Macomb County Public Works Commissioner
Macomb County Office of Public Works
21777 Dunham Road
Clinton Township, Michigan 48036

30. All Notices shall be deemed given on the day of post-marked mailing. Any Notice given by a party hereunder must be signed by an authorized representative of such party. Notwithstanding the requirement above as to the use of first-class mail, change of address notices, termination notices, and other Notices of a legal nature, shall be sent by certified first-class mail, postage prepaid, return receipt requested.

31. Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the respective parties hereto, their successors and assigns. COUNTY's rights under this Agreement shall not be assigned without DRAINAGE DISTRICT's prior consent, which shall not be unreasonably withheld.

32. Third Party Beneficiaries. DETROIT is an intended third party beneficiary of Paragraphs 22, 23 and 24 of this Agreement.

33. Amendments. The Agreement may be amended only in writing executed by persons with legal authority to bind the respective Parties.

34. Enforceability. If any provision of this Agreement or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

Detroit_950287_7

35.     Integration.  This Agreement contains the entire agreement between the Parties and all prior negotiations and agreements are merged into this Agreement.  Neither Party has made any representations except those expressly set forth in this Agreement, and no rights or remedies are, or shall be, acquired by either Party by implication or otherwise unless expressly set forth in this Agreement.

36.     Headings.  The headings of the paragraphs of this Agreement are for convenience only and shall not be used to construe or interpret the scope or intent of this Agreement or in any way affect the same.

37.     Jurisdiction.  The rights and remedies set forth in this Agreement are not exclusive and are in addition to any of the rights or remedies provided by law or equity.  This Agreement and all actions arising under it shall be governed by, subject to, and construed according to the law of the State of Michigan.  Each Party agrees, consents and submits to the personal jurisdiction of any state or federal court of competent jurisdiction in Michigan, for any action arising out of this Agreement.

38.     Execution of Agreement.  This Agreement may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Agreement.

39.     Effective Date.  This Agreement shall take effect upon its adoption and execution by the respective Parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

Detroit_950287_7

COUNTY OF MACOMB

By its County Agency

By: _____
     ANTHONY V. MARROCCO,
Macomb County Public Works Commissioner

Dated: _____09/30/2009_____


Dated: _10-1-09_


OAKLAND-MACOMB        INTERCEPTOR
DRAIN DRAINAGE DISTRICT

By: _____

     JOHN P. McCULLOCH

Its:: ___Secretary___

Detroit_950287_7

# EXHIBIT D

# WASTEWATER DISPOSAL SERVICES CONTRACT
## BETWEEN
## CITY OF DETROIT
## AND
## OAKLAND-MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT

This **Wastewater Disposal Services Contract** ("Contract") is made this 22ʳᵈ day of October 2009, by and between the City of Detroit, a municipal corporation ("City"), by its Board of Water Commissioners ("Board"), and Oakland-Macomb Interceptor Drain Drainage District, a public corporation ("Customer"). The Board and Customer may be referred to individually as "Party" or collectively as the "Parties."

**Whereas**, the City owns a System which is operated by the Board; and

**Whereas**, the City has contracted to supply Services to numerous governmental entities in southeastern Michigan; and

**Whereas**, Customer desires to obtain Services from the City; and

**Whereas**, the System owned by the City and operated by the Board is currently subject to the jurisdiction of the United States District Court for the Eastern District of Michigan and consent judgments and settlement agreements entered in *United States Environmental Protection Agency* v *City of Detroit*, Civil Action No. 77-77100; and

**Whereas**, the Board implemented a voluntary partnering effort with its First Tier Customers, of which the Steering Committee is a central part, which assists the Board in data gathering, alternative evaluations and recommendations; and

**Whereas**, the various work groups are key components of the Steering Committee;

ACCORDINGLY, THE PARTIES AGREE AS FOLLOWS:

### Article 1. Definitions

1.01    The following words and expressions, or pronouns used in their stead, shall be construed as follows:

"Board" shall mean the Board of Water Commissioners of the City of Detroit.

"CFS" shall mean cubic feet per second.

"City" shall mean the City of Detroit, a municipal corporation, acting by and through its Board of Water Commissioners.

"Contract" shall mean each of the various provisions and parts of this document, including all attached Exhibits and any amendments thereto, as may be executed by the duly authorized representatives of the Parties, and approved by Customer, the Board of Water Commissioners and the Detroit City Council.

"Customer" shall mean the First Tier Customer that is designated herein as a Party to this Contract.

"Customer Overflow Volume" shall mean that volume of wastewater generated in Customer's service area during a wet weather event that exceeds the capacity of the Customer's system and is discharged before entering the Board's System.

"Detroit City Council" shall mean the legislative body of the City of Detroit.

"DWSD" shall mean the Detroit Water and Sewerage Department.

"Exhibit A" shall be a description of the Customer's Service Area from which wastewater may be delivered to the System. It shall depict the corporate limits of Customer, the agreed upon Service Area, the specific location of the points of metered and/or non-metered connection, and Customer's Maximum Allowable Flow Limit at the points of metered and/or non-metered connection.

"Exhibit B" intentionally omitted.

"Exhibit C" shall be a description of the purpose, responsibilities, and membership of the DWSD Design Standards Committee.

"Exhibit D" shall be a description of the terms of the Industrial Waste Control Program that has been adopted by the DWSD and the Customer.

"Exhibit E" shall be a description of the alternative dispute resolution procedure established by Section 9.01.

"Exhibit F" shall be the list of rate settlement agreements cited in Section 20.05, which shall be developed in accordance with the 2009 Settlement Agreement in the case of *U.S. Environmental Protection Agency v City of Detroit, et al,* E.D. Mich. No. 77-77100.

"First Tier Customer(s)" shall mean all directly contracted Services customers of the System.

"Flow" shall mean wastewater delivered by Customer from Customer's Service Area to the System. It shall include sanitary flow, dry weather infiltration and inflow, and a wet weather flow component. It shall also include wastewater from industrial and/or commercial facilities in compliance with the City of Detroit's Industrial Pretreatment Ordinance, Detroit City Code Section 56-3-56.1 et seq., as amended.

"GDRSS" shall mean the Greater Detroit Regional Sewer System.

"GDRSS Technical Work Group" shall mean the committee consisting of representatives of the DWSD, and its First Tier Customers, and its respective sub-work groups, and shall include its successor or replacement if altered or discontinued. Customer shall have the right to attend all meetings of this committee.

"Instantaneous Flow" shall mean Flow that is calculated and registered by a metering device designed to measure wastewater flow at specified intervals over a specified period of time in accordance with GDRSS flow metering standards.

"Maximum Allowable Flow Limit" shall mean the maximum allowable Flow that Customer may deliver to the System. This limit shall be expressed in units of cubic feet per second and shall be determined by calculating an average of meter readings over a rolling sixty minute time frame.

"Meter" shall mean a wastewater billing meter.

"MGD" shall mean million gallons per day.

"Notices" shall mean all notices, consents, approvals, requests and other communications required to be given under the terms of this Contract.

"Service Area" shall mean the service area of Customer designated in Exhibit A to this Contract.

"Steering Committee" shall mean the advisory committee consisting of representatives of DWSD, its First Tier Customers, and the committee's work groups, and shall include its successor or replacement if altered or discontinued. The committee may, in its discretion, agree to add additional members. Customer shall have the right to attend all meetings of this committee.

"Services" shall mean the collection, transportation, and treatment of wastewater by the DWSD.

"System" shall mean the wastewater disposal system owned, operated and maintained by the City acting through its Board.

"WWTP" shall mean the DWSD's Wastewater Treatment Plant.

### Article 2.
### Delivery of Flow; Maximum Allowable Flow Limit; Enforcement

2.01   Maximum Allowable Flow Limit. Customer's Maximum Allowable Flow Limit shall be 423 CFS.

2.02   Delivery of Percentage of Flow. The City agrees to accept and Customer agrees to deliver no less than 70% of all Instantaneous Flow generated within Customer's Service Area and existing as of the date of the Detroit City Council's approval of this Contract.

2.03    Calculation of Charges. Customer shall pay the City for Services for Flow delivered into the System at such rates as the City may establish during its cost allocation and rate design processes, which rates shall be established in accordance with Article 20 of this Contract.

2.04    Enforcement of Maximum Allowable Flow Limit.   The Parties acknowledge that Customer deviations over the Maximum Allowable Flow Limit may occur. If Customer has multiple incidents of Flow exceeding the Maximum Allowable Flow Limit which evidence a pattern of exceedances, as determined in the sole and reasonable discretion of the City, the City shall give written notice of such exceedances to Customer. Thereafter, the City and Customer shall meet and attempt to develop a plan for reducing or eliminating the exceedances. If, in the opinion of the City, the Parties are unable to agree on a plan, the City shall have the right to assert any available remedies for breach of contract.

2.05    Nothing in this Article 2 shall be construed to preclude Customer from constructing or operating wastewater facilities for the purpose of reducing or eliminating Customer Overflow Volumes or improving the operation of Customer's sewage system.

2.06    Reopener.   The City acknowledges that the Clinton-Oakland Sewage Disposal System contract between Oakland County and certain cities, townships and villages (CVTs) located in Oakland County will expire in 2017 and that the CVTs may decide to terminate their relationship with Oakland County, divert flow or seek additional capacity that will result in the necessity of modifying or increasing the Maximum Allowable Flow Limit specified in 2.01 affecting the flow reserved for Oakland County's CVTs (i.e. 140 cfs based on DWSD Wastewater Master Plan). Accordingly, the City agrees that prior to 2017, and at any such later dates requested by Customer, Oakland County and/or Macomb County, the Maximum Allowable Flow Limit specified in Section 2.01 and and delivery of Percentage of Flow specified in Section 2.02   shall be reopened for renegotiation. Customer, Oakland County and/or Macomb County shall notify the City of the desire to commence renegotiations not less than twenty-four (24) months prior to 2017 or twenty-four months (24) prior to any such later dates requested by Customer, Oakland County and/or Macomb County. The City and Customer agree to amend this Agreement to reflect the new Maximum Allowable Flow Limit. If Customer, Oakland County or Macomb County do not notify the City of the desire to renegotiate the Maximum Allowable Flow Limit, the Maximum Allowable Flow Limit specified in Section 2.01 shall continue in full force and effect. It is also understood that from time to time the DWSD Wastewater Master plan may be updated which may necessitate modifications to the Maximum Allowable Flow Limits. The Parties reserve the right to reopen for negotiation at anytime the Maximum Allowable Flow Limit specified in 2.01 in the event that the DWSD Wastewater Master Plan or other analysis acceptable to the Parties demonstrates modifications are warranted.

## Article 3.
## Meter Ownership, Maintenance, and Accuracy; Data Collection

3.01  Ownership and Maintenance Responsibility. Customer's Flow shall be metered by one or more Meters and appurtenant equipment at the Northeast Pump Station (collectively, the "New Meters") which shall be owned and maintained by City. Until the New Meters are installed and operational, the City shall continue to maintain all Meters, data acquisition equipment, and meter pits previously in use (collectively, the "Previoius Meter Facilities") and shall continue to use the same procedures for measuring flow and incorporating flow measurements into the sewer rate model. In the event that Customer or Oakland County or Macomb County come to own one or more of the Previous Meter Facilities before the New Meters are operational, Customer shall provide all necessary access to the City to operate, maintain and read the Previous Meter Facilities and shall require as a condition of transfer of any of the Previous Meter Facilities to Oakland County or Macomb County that they provide all necessary access to the City to operate, maintain and read the Previous Meter Facilitities .

3.02  Meter Maintenance. The City shall maintain its Meters and associated data acquisition equipment in accordance with the GDRSS Phase IV Technical Memoranda 8, or subsequent modifications thereto. The City shall collect data from its Meters in accordance with the Good Metering Practice specified in the GDRSS Phase IV Technical Memoranda 8, or subsequent modifications thereto. The City may contract for any such services.

3.03  Meter Accuracy. The City will ensure the accuracy of its Meters. Customer shall have the right to inspect the Meters and check for proper operation, including inspection of records. The City and the GDRSS Technical Work Group shall review the accuracy of the Meters on a regular basis and compare the findings to the then-best available technology. In the event that the accuracy of a Meter is found to be unsatisfactory, as determined by the GDRSS Technical Work Group and approved by the City, the City shall, as soon as practicable, repair, rehabilitate or replace the Meter.

3.04  The costs of maintaining, repairing or improving the Previous Meter Facilities or New Meters shall be treated in the development of sewer rates consistent with the treatment of costs associated with other meters owned or operated by Detroit for billing Tier 1 Customers.

## Article 4.
## Service Area; Acceptance of Flow

4.01  Service Area. The area for which the City agrees to provide Services shall be as shown in Exhibit A (the "Service Area"). Customer shall not deliver to the System any Flow originating in any area outside of the specified Service Area without the written consent of the City. A temporary delivery of Flow from outside the Service Area may be authorized by a memorandum of understanding between Customer and the City. A permanent change in the Service Area shall require amendment of this Contract.

4.02 <u>Acceptance of Flow</u>. The City will accept Flow from Customer, as limited by the terms of this Contract, at the point at which Interceptor PCI-5 crosses the boundary between the City of Warren and the City of Detroit. The City shall have no responsibility for operating and maintaining any portions of the wastewater collection system upstream of the point of connection. The City owns that part of Interceptor PCI-5 that is between the between the City of Warren/City of Detroit boundary and the Northeast Pump Station. The City and Customer have entered into a long-term operating agreement, set forth in Article 22, under which Customer is responsible for operating and maintaining PCI-5 within the City of Detroit. The City is responsible for operating and maintaining all other parts of its System downstream from Customer's wastewater collection system. Article 22 also sets forth the manner in which the Northeast Pump Station will be operated and maintained to handle Customer's Flow.

4.03 <u>Change in Service Area</u>. The boundaries of the Service Area may be changed only by the express written agreement of the City and Customer and shall be embodied in an amendment to this Contract.

## Article 5. Flow Measurement

5.01 The GDRSS Technical Work Group shall make all reasonable efforts to use the best available information to establish Customer's estimated (1) sanitary flows, (2) dry weather infiltration and inflow, (3) wet weather inflow that reaches the WWTP, and (4) wet weather inflow that does not reach the WWTP.

5.02 <u>Process</u>. The GDRSS Technical Work Group shall decide on the type of analyses, and shall carry out analyses of Flow from Customer using Meter information and other relevant data. The results of such analyses shall be utilized by the City, in its sole and reasonable discretion, in its annual cost allocation and rate design processes and shall form the basis of billings for Customer.

5.03 The GDRSS Technical Work Group shall have the responsibility for reviewing the information it obtains pursuant to this Article 5 for the purpose of verifying that the information is acceptable from a technical basis. The City shall have the authority, in its sole and reasonable discretion, for determining how best to utilize the information analyzed by the GDRSS Technical Work Group.

## Article 6. Flow Re-Allocation

6.01 <u>Flow Re-Allocation</u>. Should Customer terminate or reduce its Flow into the System, whether at the end of this Contract's term, by mutual agreement, or due to a breach of this Contract by Customer, that portion of its Maximum Allowable Flow Limit so terminated or reduced shall be re-allocated at the discretion of the City for the benefit of the System. Flow re-allocation between First Tier Customers may occur only with the prior written approval of the City.

6.02 <u>Responsibility for Capital Cost Recovery</u>. If Customer reduces or terminates its Flow into the System, Customer shall remain responsible for any remaining capital costs for

facilities built to provide Customer its Maximum Allowable Flow Limit. In the event that Customer terminates its participation in the System, Customer shall either (1) pay in full all outstanding capital costs accumulated to the date of its termination of participation in the System, or (2) enter into a contract guaranteeing monthly payments to the City of the remaining capital costs, or (3) assign the responsibility for the remaining capital costs to the First Tier Customer to whom Customer has re-allocated its Flow (the "RAF Customer") provided that Customer shall remain ultimately responsible for the remaining capital costs in the event the RAF Customer fails to timely pay said capital costs.

## Article 7.
## Contract Term; Renewal and Termination

7.01   Term. The City shall provide Services to Customer in accordance with the terms and conditions of this Contract for a period of thirty years from the effective date of this Contract and any ten-year renewal terms (collectively the "Contract Term"). The effective date of this Contract shall be the date that this Contract is approved by the Detroit City Council or Customer's legislative body whichever is later. This Contract replaces and supersedes any prior wastewater disposal services contracts between the Parties.

7.02   Renewal. This Contract shall automatically renew at the conclusion of the thirty-year term for an additional ten-year term, unless a Party provides written notification to the other Party in accordance with Article 16 on or before the conclusion of the twenty-fifth year of the thirty-year term stating its intent not to renew this Contract. Thereafter, this Contract shall automatically renew every ten years for an additional ten-year term, unless a Party provides written notification to the other Party in accordance with Article 16 on or before the conclusion of the fifth year of the then current ten-year term stating its intent not to renew this Contract. The automatic renewals of this Contract shall not preclude a review of its terms and the Parties are encouraged to reaffirm or amend its terms as necessary. The Parties may, in writing, mutually agree upon a longer renewal term.

7.03   Customer's obligations under Article 6, if any, shall survive the expiration or termination of this Contract and continue until such obligations are satisfied.

## Article 8. Construction Standards

8.01   Customer shall abide by the design specifications and construction standards as adopted by the City. DWSD shall form a Design Standards Committee. The Design Standards Committee shall create a set of design standards and shall make a recommendation to the City regarding adoption of the design standards. Customer shall submit plans and specifications for new wastewater collection or transport facilities for review and approval to DWSD prior to the installation of such facilities. DWSD will review the plans and specifications and provide Customer with a determination as to its approval or disapproval of the plans and specifications. If Customer does not agree with the outcome of the DWSD review, Customer may request a review by the Design Standards

Committee. The Design Standards Committee will be governed by the guidelines described in Exhibit C.

## Article 9. Dispute Resolution

9.01  Any and all claims alleging a breach of this Contract shall be submitted to the alternative dispute resolution process set forth in Exhibit E of this Contract

## Article 10. Payment for Services

10.01  Bills for Services shall be rendered to Customer on a monthly basis. All such bills shall be due and payable not more than forty-five calendar days from the date shown on the bill. Any portion of the charges related to accuracy that is not paid by the due date shall be subject to a finance charge at a rate of 1.5% per month for each month that they remain unpaid. Any portion of the total bill, plus any finance charges applied to the bill which are not paid by the next billing date, shall be shown on the next bill as arrears. If the accuracy of a bill is in dispute, Customer shall place the disputed amount of the bill in an interest bearing escrow account maintained by a bank located in Michigan or a County Treasurer pending resolution of the dispute and the finance charge shall thereupon cease. Accrued interest on the escrow account shall be allocated between the Parties directly proportional with the resolution of the dispute. The cost, if any, of maintaining the escrow account shall be allocated between the Parties inversely proportional with the resolution of the dispute. Disputes related to rates for Services charged by the City are specifically excluded from the application of this Article 10. Claims for interest in any other billing dispute shall be resolved by the Director's Council or a court of competent jurisdiction.

## Article 11. Emergency Situations

11.01  No failure or delay in performance of this Contract, by either Party, shall be deemed to be a breach thereof when such failure or delay is caused by a force majeure event, including but not limited to, any Act of God, strikes, lockouts, wars, acts of terrorism, riots, epidemics, explosions, sabotage, breakage or accident to machinery or lines of pipe, the binding order of any court or governmental authority, or any other cause, whether of the kind enumerated in this Article 11 or otherwise, not within the control of a Party, except that no cause or contingency shall relieve Customer of its obligation to make payment for Services provided by the City. .

## Article 12. Default Provisions

12.01  In the event either Party commits a material breach of this Contract, the Party alleging the breach shall give written notice of the breach to the other Party within a reasonable time of discovering the breach. The Party in breach shall be given a reasonable time to cure the breach. If the Party in breach fails to cure the breach, the non-breaching Party may declare this Contract in default and pursue all available legal remedies, including termination of this Contract for cause.

## Article 13. Assignment

13.01 This Contract shall not be assigned, in whole or in part, by either Party without the prior written consent of the other Party. Consent to an assignment by either Party shall not be unreasonably withheld.

## Article 14. Steering Committee

14.01 <u>Establishment</u>. The Steering Committee is formed to facilitate a cooperative working partnership between the City, DWSD and First Tier Customers by facilitating discussion and development of recommendations regarding System operation, maintenance, rates, and best practices to DWSD and the City, and is based on the free flow of information regarding financial and operational functions. The Steering Committee shall maintain bylaws that govern the way it conducts its business. In the event of a conflict between the terms of the bylaws adopted by the Steering Committee and the terms of this Contract, the terms of this Contract shall control.

14.02 <u>General Responsibilities</u>. The Steering Committee shall periodically review and evaluate the rates, rate methodology, operation, and maintenance of the System. The Steering Committee shall have the opportunity each year to review the Capital Improvement Program as prepared by DWSD, prior to its adoption by the City.

14.03 <u>Annual Report by City</u>. The City will present an annual report to the Steering Committee that shall consist of (1) a general report on System operation and maintenance and (2) a report that lists those contracts for Services, if any, that have been entered into by the City and another customer(s) where the terms of the contract(s) invoke the application of Article 21 of this Contract.

14.04 <u>Annual Meeting and Report by Steering Committee</u>. The Steering Committee will meet annually with and report to the Board. The Steering Committee may otherwise meet and communicate with the Board as the Steering Committee deems necessary.

14.05 <u>Work Groups</u>. The Steering Committee may create work groups to address specific issues facing the System. The work groups in existence as of January 1, 2009, are the Best Practices Work Group, the GDRSS Technical Work Group, the Public Information Work Group, the Rates Work Group, and the Wet Weather Work Group. Any reference to a particular work group in this Contract shall include its successor or replacement if altered or discontinued.

## Article 15. Amendment

15.01 The Parties may from time to time consider it in their best interests to change, modify or extend a term, condition or covenant of this Contract. Any such change, addition, deletion, extension or modification, which is mutually agreed upon by the City and Customer shall be incorporated in written amendments to this Contract. Such amendments shall not invalidate this Contract nor relieve or release either Party of any of its respective obligations under this Contract unless so stated in the amendment.

15.02  No amendment to this Contract shall be effective and binding upon the parties unless it expressly makes reference to this Contract, is in writing, is signed and acknowledged by duly authorized representatives of both Parties, is approved by Customer's legislative body, and is approved by the Board and Detroit City Council.

## Article 16. Notices

16.01  Except as otherwise specified in this Contract, all notices, consents, approvals, requests and other communications (collectively, "Notices") required or permitted under this Contract shall be given in writing and mailed by first class mail, addressed as follows:

> If to the Board:
>
>> Director
>> Detroit Water and Sewerage Department
>> 735 Randolph
>> Detroit, Michigan 48226
>
> If to the Customer:
>
>> Commissioner John P. McCulloch, Secretary
>> Oakland-Macomb Interceptor Drain Drainage District &
>> Oakland County Water Resources Commissioner
>> 1 Public Works Drive
>> Waterford, Michigan 48328
>
> with a copy to:
>
>> Commissioner Anthony V. Marrocco,
>> Macomb County Public Works Commissioner
>> P.O. Box 806
>> Mt. Clemens, Michigan  48046-0806

16.02  All Notices shall be deemed given on the day of post-marked mailing. Any Notice given by a Party hereunder must be signed by an authorized representative of such Party.

16.03  Notwithstanding the requirement above as to the use of first-class mail, change of address notices, termination notices, and other Notices of a legal nature, shall be sent by certified first-class mail, postage prepaid, return receipt requested.

## Article 17. Industrial Waste Control Program

17.01  Customer agrees to abide by the requirements of the Industrial Waste Control Program as set forth in Exhibit D. To the extent that Exhibit D obligates Customer in the future to adopt any new or modified ordinance, rule, or regulation based upon a future amendment to the City of Detroit's Industrial Pretreatment Ordinance or any successor or similar ordinance, such amendment shall be consistent with the then-current rules and regulations of the United States Environmental Protection agency (USEPA) and Michigan

Department of Environmental Quality (MDEQ), but may be more stringent than USEPA and MDEQ rules and regulations.

## Article 18. Rights-of-Way

18.01 The Customer shall assist the Board to obtain permission to use streets, highways, alleys, and/or easements in the local governmental units within the Customer's jurisdiction for the purpose of constructing, maintaining, and operating wastewater disposal facilities to adequately service the Customer's jurisdiction and other areas. This assistance shall include assisting with regard to obtaining the consent of the local governmental units, as provided in Article 7, Section 29, Michigan Constitution of 1963. In the event of such construction, the Board shall request the Customer and local governmental units within the Customer's jurisdiction to execute such separate instruments granting rights-of-way in its streets, highways, and alleys as may be reasonably required by the Board. The Board shall restore all existing structures and/or improvements laying in the right-of-way of construction to as good a condition as before the construction took place. Any such facilities constructed, maintained and operated under this section shall remain the property of the Board and shall not be operated or maintained by any entity other than the Board or its authorized representatives.

18.02 Relocation of Facilities. Should future construction by any federal, state or county agency require relocation of a wastewater interceptor, Meter or other City facility, the cost incurred by the City for such relocation, if not reimbursed by the agency requiring the relocation, will be charged in future rates as a common-to-all cost to all System users for the relocation of a common-to-all facility, or as a customer-specific cost to a specific customer or customers for the relocation of a customer-specific facility.

18.03 Easements. Subject to the provisions of Section 18.01 and to the extent that Customer has jurisdiction, the City shall be granted temporary and permanent easements, and shall be permitted to use the streets, alleys and highways within Customer's legal jurisdiction for the purpose of constructing, operating and maintaining the System. This consent by Customer is given in compliance with Article 7, Sec. 29 of the Michigan Constitution of 1963, provided that the City shall provide Customer with a written explanation of the type of easement required and the duration thereof.

## Article 19. Miscellaneous

19.01 Enforceability. If any provision of this Contract or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Contract shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

19.02 Integration. Subject to Section 20.05, this Contract contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Contract. Neither Party has made any representations except those expressly set forth in this Contract, and no rights or remedies are, or shall be, acquired by either Party by implication or otherwise unless expressly set forth in this Contract.

19.03 <u>Headings</u>. The headings of the sections of this Contract are for convenience only and shall not be used to construe or interpret the scope or intent of this Contract or in any way affect the same.

19.04 <u>Jurisdiction</u>. The rights and remedies set forth in this Contract are not exclusive and are in addition to any of the rights or remedies provided by law or equity. This Contract and all actions arising under it shall be governed by, subject to, and construed according to the law of the State of Michigan. Each Party agrees, consents and submits to the exclusive personal jurisdiction of any state or federal court of competent jurisdiction in Michigan, for any action arising out of this Contract.

19.05 <u>Execution of Contract</u>. This Contract may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Contract. Promptly after the execution of this Contract, the City shall provide a copy to the Customer.

19.06 <u>Contract Beneficiaries.</u> The rights and benefits under this Contract shall inure to the benefit of and be binding upon the Parties, their agents, successors, and assigns.

19.07 <u>Third Party Beneficiaries</u>. Oakland County and Macomb County are intended third party beneficiaries of this Contract. Other than the two Counties, there are no third party beneficiaries to this Contract and this Contract shall not be construed to benefit any persons other than the City, Customer and the two Counties.

19.08 Oakland and Macomb County on behalf of the Clinton-Oakland Sewage Disposal System and the Macomb Wastewater Disposal district, respectively, shall have the status and rights of Tier I Customers, including but not limited to participation on the Sewer Steering Committee and all of its subcommittees and work groups.

19.09 Effective Date. This Contract shall become effective on the occurrence of both of the following: the transfer of the Oakland Macomb Interceptor to Customer and the transfer of the Macomb-Only Intereceptors to Macomb County.

## Article 20. Rates

20.01 <u>Rates</u>. Customer agrees to pay for all Services supplied by the City at such rates as the City may establish. Rates shall be reasonable in relation to the costs incurred by the City for the provision of the Services. The City shall give written notice of any changes in the rates. Notice shall be made in accordance with Section 5e of Public Act 279 of 1909, Michigan Compiled Laws, Sec. 117.5e, as amended ("Act 279").

20.02 <u>Notification of Rates</u>. As soon as possible in the ratemaking process, the City shall provide information on proposed rates and the draft data and information used in the calculation of proposed rates in a format that will enable Customer to assist in the ratemaking process. Not less than thirty calendar days prior to the hearing required by Act 279, the City shall provide Customer with written notice of a proposed rate and the underlying data used to calculate the rate. The City shall meet with Customer to review the rate and the data. The City shall provide Customer, upon written request, a copy of

the rate notebook containing the detailed tabulations supporting the establishment of the final rates for the next rate year and the look back adjustments.

20.03    <u>Disclosure of Rate Information by Customer</u>.  Each year, Customer will disclose to its customers information related to its rates and other charges, and information regarding what portion of those costs is related to charges from DWSD and/or other major service providers.

20.04    <u>Estimate of Usage</u>.  In the event meters fail to correctly measure the quantity of wastewater transmitted by Customer for any period of time, the City shall provide a reasonable estimate of the quantity of wastewater generated by Customer for such period provided that there is a reasonable basis for the estimate.  Customer and the City shall, either through their respective technical representatives, the GDRSS Technical Work Group and/or the Steering Committee, seek agreement upon a method to estimate such quantities.  In the event the Parties are unable to agree upon a method to estimate such quantities, the City's determination of a method shall be conclusive and the Customer agrees to accept the estimate established by the City.

20.05    The Parties acknowledge that certain provisions of certain prior rate settlement agreements and consent judgments, as described in Exhibit F, are in effect as of the effective date of this Contract.  It is not the intent of this Contract to contradict or nullify the provisions of any court approved settlements, and court approved settlements shall continue in full force and effect to the extent they have not been otherwise fully performed, amended, or superceded.  Nothing in this Contract shall prohibit a party from requesting that a court modify or terminate the provisions of a settlement agreement or consent judgment and any modification or termination granted by the court shall not require the amendment of this Contract.

20.06    The City recognizes that Customer's allocation of rates and charges to its customers may vary depending upon the nature, location and purpose of the particular project carried out by the City.  Accordingly, when requested by Customer in writing, the City shall provide reasonable information to assist Customer in the accounting of expenses for a specified project.

## Article 21.  Ensuring Equality of Contract Terms

21.01    If the City enters into any contract, and any amendments thereto, with a wastewater disposal services customer other than Customer, and the material terms of such other contract are more favorable than the material terms of Customer's Contract, Customer may elect to adopt all of such other material terms.  However, if Customer exercises the option provided for in this Article 21, Customer must accept all material terms of the other contract in their entirety and may not select among various terms contained in multiple other contracts by, for example, selecting the Contract Term from one contract and the Rates provision of another contract.  The terms and conditions of Exhibit A of this Contract are specifically excluded from the application of this Article 21.

## Article 22.  Operation of Northeast Pump Station and Interceptor PCI-5

22.01   Maintenance of Interceptor PCI-5.   Customer shall operate, maintain, repair and improve Interceptor PCI-5 from a point immediately northward from the screens in the pump station wet well at its own expense.  Customer shall develop a maintenance plan for the section of PCI-5 within the City, subject to City approval.  City shall have the right to approve the design and specifications for repairs and improvements and the qualifications and selection of any contractors to perform that work, which approval shall not be unreasonably withheld.

22.02   Northeast Pump Station Costs and Accounting.   Customer shall be responsible for payment of all costs arising out of or related to the operation, maintenance, improvement and repair the Northeast Pump Station.  City will establish separate accounts for the Northeast Pump Station to which all costs will be charged by employees for in-house labor, parts and equipment and for contractual services.  In the event the City determines that it is more cost effective to allocate certain labor functions or establish a flat monthly charge rather than directly account for them, it may do so with Customer's prior consent, which consent shall not be unreasonably withheld so long as City has provided an acceptable cost allocation justification for the proposed allocation or flat charge.  Any allocation or flat charge will be subject to periodic review and adjustment at intervals not greater than five years.  City will maintain supporting records for all Northeast Pump Station charges for 12 months after the Look Back for the relevant financial year has been completed and the associated detailed rate notebook has been made available to Customer.   Supporting records will be available for Customer review upon written request.  City will invoice Customer directly for the cost of operating, maintaining, improving and repairing the Northeast Pump Station on a quarterly basis.  These costs will not be recovered through the rates.

22.03   Power to the Northeast Pump Station will be separately metered and charged to the pump station, unless the parties agree that it is to their mutual benefit to take power for both the pump station and water plant at a common meter, in which case, power to the pump station will be submetered.  Customer will receive a copy of meter readings and utility invoices upon written request.  There will be no markup by the City on the cost of electricity consumed at the Northeast Pump Station.

22.04   DWSD labor will be charged at established labor contract rates for the employee performing pump station operations, plus DWSD's usual labor overhead costs for benefits and taxes.  All indirect and overhead costs charged to the Northeast Pump Station shall be consistent with indirect and overhead cost procedures applied to the rest of the City's sewerage system.

22.05   Northeast Pump Station Pumping Capacity.   The Northeast Pump Station presently has total pump capacity of 550 CFS and firm capacity (largest pump removed) of 400 CFS.  City agrees to maintain the pump station pumping capacity at a level sufficient to handle Customer's maximum Allowable Flow Limit during the life of this Contract.  In the event Customer determines that additional pumping capacity is required and makes a written request to the City to increase firm pumping capacity, City shall reasonably consider undertaking improvements as needed to increase pumping capacity as requested by Customer or as otherwise agreed upon by the Parties at the sole cost of Customer.

Customer shall have the option, at its sole discretion, to finance such improvements and the City may require that Customer finance such improvements.

22.06 <u>Northeast Pump Station Operating Protocols.</u> The pump station will always be operated to provide instantaneous pumping rates as required to handle flow up to the Customer's Maximum Allowable Flow Limit. DWSD will endeavor to maintain upper wet well levels at or below an elevation of 532.00 Mean Sea Level so that storage capacity on the Edison Corridor beyond that associated with wet well levels at that elevation will not be utilized in wet weather events or other events without advance written authorization from OMI, or unless conditions warrant to protect public health, safety, welfare or the environment or the integrity of the System. Customer shall have the right to receive SCADA data on the Northeast Pump Station via a web application and will bear any costs of obtaining/accessing the SCADA data. Copies of all operating records not available through the web application will be provided to Customer upon written request. Customer shall have reasonable access to all Northeast Pump Station operating records at all reasonable times, subject to reasonable advance written notice.

22.07 Customer and City will develop a communication and coordination procedure for operation of control gates in the Customer's system and for any temporary shutdown of equipment affecting pumping capacity or control at the Northeast Pump Station for repairs, etc. City and Customer will list appropriate contacts from the other on their emergency notification lists.

22.08 <u>Rehabilitation, Repairs and Improvements.</u> In 2010 and at five-year intervals thereafter, the City will undertake an asset condition assessment of the Northeast Pump Station performed by an outside engineering firm acceptable to Customer. The draft and final asset condition assessment report shall be provided to Customer. Based on the findings of that report, City shall develop and provide Customer a copy of a plan for undertaking rehabilitation, repairs and improvements ("Rehabilitation Plan"). City shall reasonably consider any comments Customer may have on the Rehabilitation Plan. Customer shall have the option, in its sole discretion, to finance such rehabilitation, repairs and improvements the City undertakes pursuant to the Remediation Plan. City shall undertake, at a time and schedule satisfactory to the City, in its sole discretion, any additional rehabilitation, repair or improvement work, beyond that provided for in the Rehabilitation Plan, requested by Customer so long as Customer agrees to pay all costs associated therewith. City will undertake no rehabilitation, repairs, or improvements with an expected cost of $250,000 or more without prior Customer consultation, review and opportunity to comment or object, except in the case of an emergency or as required by state or federal regulatory authorities.

22.09 For all repair and improvement work performed on the Northeast Pump Station, City shall confer with Customer and provide Customer the opportunity to comment on and to object, if appropriate, with regard to i) the development of plans and specifications and other bid conditions, ii) the identification of candidate engineers and contractors, and iii) the development and approval of change orders greater than $100,000 or 10% of the bid amount. City shall reasonably consider Customer's comments and objections on any of the foregoing matters

(Signatures appear on next page)

**In Witness Whereof,** the City and Customer, by and through their duly authorized officers and representatives, have executed this Contract.

**Customer:**

By: _____
(Signature)

John P. McCulloch
(Print name)

Its:    Secretary
(Title)


**City of Detroit:**

By: _____
Pamela Turner...............

Its:    Director, Detroit Water & Sewerage Department


APPROVED BY
CUSTOMER'S DRAINAGE BOARD ON:


September 1, 2009
_____
Date


APPROVED BY
BOARD OF WATER COMMISSIONERS ON:

August 26, 2009
_____
Date


APPROVED BY
DETROIT CITY COUNCIL ON:

August 25, 2009
_____
Date

Detroit_946534_5