## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | ) Case No. 13-53846 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) In Proceedings Under |
| | ) Chapter 9 |
| Debtor. | ) |
| | ) Hon. Steven W. Rhodes |
| | ) |

## OAKLAND COUNTY'S BRIEF ON STANDING PURSUANT TO COURT'S JUNE 5, 2014 ORDER IDENTIFYING LEGAL ISSUES, ESTABLISHING SUPPLEMENTAL BRIEFING SCHEDULE AND SETTING HEARING DATES AND PROCEDURES[1]

Oakland County, Michigan ("Oakland County"), a contingent creditor and party in interest in the above-captioned case, by and through its undersigned counsel, hereby files its *Brief On Standing Pursuant To Court's June 5, 2014 Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule And Setting Hearing Dates and Procedures*.

## INTRODUCTION

Oakland County is clearly a party in interest with standing to object to the City of Detroit, Michigan's (the "City") *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4392] (the "Plan"). While the City has challenged the standing of differently situated Macomb County, neither the City nor any other party in

---

[1] While Oakland County is cognizant of the statements made by the Court in its June 5, 2014 *Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule And Setting Hearing Dates and Procedures* [Docket No. 5235] with regard to further briefs being "discouraged", as Oakland County has not previously briefed the legal issues addressed herein, Oakland County believes that the instant brief is necessary and appropriate.

13-53846-tjt   Doc 5694   Filed 06/30/14   Entered 06/30/14 17:43:23   Page 1 of 25

interest has challenged the standing of Oakland County, a party to several executory contracts proposed to be assumed by the City in the Plan. Moreover, applicable case law, of which the City is aware and upon which it relied heavily in its papers filed in support of the Plan, clearly establishes Oakland County's standing to contest the Plan.

## GENERAL BACKGROUND

## I. THE DETROIT WATER AND SEWERAGE DEPARTMENT

The Detroit Water and Sewerage Department ("DWSD") is a department (i.e., Enterprise Fund (as defined in the Plan)) of the City of Detroit government. The DWSD is responsible for the water supply and the control and treatment of wastewater for residential, commercial, governmental, institutional and industrial customers at a retail level within the City. The DWSD also serves over 125 wholesale suburban customers, many of whom, in turn, service their own retail customers.

It is estimated that the DWSD provides water and sewer services to over four (4) million individual residents of southeast Michigan, most of whom reside in Oakland, Macomb, and Wayne Counties. The DWSD is one of the largest municipal water and sewerage departments in the nation.

Notwithstanding its size and importance to the region, the DWSD has posted losses each year for the last seven (7) years, including, on average approximately $200 million a year loss for fiscal years ending 2009 – 2013, evidencing significant and recurring operational and/or fiscal mismanagement. Historically, the DWSD has a demonstrated pattern of ignoring and/or deferring much needed capital improvements. These capital improvements are needed to correct existing deficiencies

and known problems. Failure to confront and resolve these infrastructure needs on a current basis dramatically increases the costs of future repairs. The DWSD has significant critical capital improvement needs over the next 10 years. Most of these needs are on-going in order to maintain the water and wastewater system in good repair for reliable service. These needs are in addition to the capital improvements associated with likely required future initiatives and regulatory changes. Without funding for these critical capital improvement needs, the DWSD is in jeopardy of interrupting, in whole or in part, operations and/or being unable to provide water and sewer services to the public-at-large in much of Southeast Michigan in accordance with regulatory requirements and industry standards. To the extent that the DWSD may fail to provide such services (as contractually required - discussed below) the underlying assumptions relied upon in connection with the Plan will be under-cut, thus precluding the City from confirming the Plan.

## II.  OAKLAND COUNTY'S BUSINESS AND CONTRACTUAL RELATIONSHIP WITH THE DWSD

Oakland County is a party to several contracts with the City pursuant to which the City, through the DWSD, provides water and sewer services for and on behalf of, Oakland County. Such services are, in turn, utilized by residents and business located in the 62 cities, villages and townships located throughout Oakland County. Accordingly, Oakland County (and its municipal customers) relies upon the DWSD to provide vital water and sewer services to a significant portion of the approximately 1

million individual residents and numerous businesses located throughout Oakland County.

## III.   THE CITY'S PROPOSED PLAN OF ADJUSTMENT, AS AMENDED, AND PLEADINGS FILED IN OPPOSITION TO AND SUPPORT OF THE PLAN.

On May 5, 2014, after having filed several prior versions of its proposed plan of adjustment, the City filed the Plan and corresponding disclosure statement [Docket No. 4391] (the "Disclosure Statement").

The Plan proposes, among other things, to implement the City's "settlement" with the General Retirement System for the City of Detroit (the "GRS"). DWSD employees and retirees participate in the GRS along with employees and retirees of numerous other City departments, other than police and firefighters. Pursuant to the proposed "settlement" with the GRS, the City's unfunded actuarial accrued liabilities in the GRS pension fund (the "UAAL") are asserted to be $2.037 billion (See Disclosure Statement at 12). The UAAL would be funded, in part, by the DWSD's payment of a portion of the UAAL (purported to be its allocable share of the UAAL) over a 9 year period. See Disclosure Statement at 21. Such funding would be derived from charges by the DWSD to its customers, including Oakland County, through June 20, 2023. See id.

For the first ten years following the bankruptcy, the DWSD, a public service monopoly which derives approximately 65% of its total revenues from suburban communities outside the City's corporate limits (a substantial portion of which comes from Oakland County), would be the sole City department contributing to the GRS

system for **all** Detroit retirees and employees. The Plan proposes that a portion of UAAL will be funded by proceeds of a "settlement" regarding the Detroit Institute of Arts, pursuant to which the State of Michigan and certain charitable foundations are expected to contribute $258.4 million over the ten-year period.

According to the City, the amount of UAAL allocable to the DWSD would be satisfied by payment of approximately $408.5 million (See Disclosure Statement at 59), which the City proposes to be paid by the DWSD in installments of $45.4 million in each of the years 2015 through 2023. (See Plan Exhibit II.B.3.r.ii.A).[2] Those payments would be **vastly greater** than the DWSD's recent total pension contributions of: $11.6 million in 2009, $11.4 million in 2010, $19.7 million in 2011, $10.9 million in 2012, and $24.3 million in 2013. See Disclosure Statement at 89. In addition, and notwithstanding the critical importance of the DWSD, the Plan fails to make sufficient funding available to the DWSD for operations and desperately needed capital improvements.

If the DWSD does not have sufficient funding or is required to make payments under the Plan that are contrary to law, its ability to provide services and the City's ability to confirm its Plan are precluded, thus rendering the Plan not feasible. Accordingly, on May 12, 2014, Oakland County filed *Oakland County's Objection To Confirmation Of The City Of Detroit, Michigan's Proposed Fourth Amended Plan Of*

---

[2] The payment in year 2015 by the DWSD also includes $20 million for alleged allocation of administrative expenses of the City in connection with its chapter 9 proceeding, charges which Oakland County contends is improper and illegally assessed against the DWSD.

*Adjustment* [Docket No. 4627] raising these and other objections to the Plan. Numerous other parties in interest filed similar and additional objections to the Plan.

On May 26, 2014, the City filed the *Consolidated Reply to Certain Objections To Confirmation of Fourth Amended Plan For The Adjustment Of Debts Of The City Of Detroit* [Docket No. 5034] (the "Omnibus Reply in Support of the Plan"). In a footnote in the Omnibus Reply in Support of the Plan, the City noted that "apparently [Macomb County] is not a party to a contract with the City directly and, thus, its standing to object [to the Plan] is not immediately apparent. See Omnibus Reply in Support of the Plan at FN 84, page 140. In addition, in Exhibit A to the Omnibus Reply in Support of the Plan, the City indicates that it "disputes the standing of the Macomb Parties to assert the Macomb County Objection" to the Plan. See Omnibus Reply in Support of the Plan at Exhibit A thereto, at page 241 of 256. There is no mention of any challenge to the standing of Oakland County in either footnote 84 or Exhibit A to the Omnibus Reply in Support of the Plan. See Omnibus Reply in Support of the Plan at FN 84 and Exhibit A thereto at page 239 of 256. Implicit in the City's challenge to Macomb's standing is the proposition that if Macomb County **were** a party to a contract with the City, it would have standing. Oakland County is clearly such a party, thus supporting why the City failed to object to its standing.

## IV. THE COURT'S INSTANT JUNE 5, 2014 ORDER IDENTIFYING LEGAL ISSUES, ESTABLISHING SUPPLEMENTAL BRIEFING SCHEDULE AND SETTING HEARING DATES AND PROCEDURES

On May 23, 2014, this Honorable Court entered its *Order Regarding Identifying Legal Issues Relating To Confirmation* [Docket No. 5021] (the "Order Requiring

Identification of Legal Issues") pursuant to which the Court ordered that "the City and each objecting creditor shall file a paper identifying any issues of law relating to confirmation that the party believes can be determined without the necessity of proof at the confirmation hearing." <u>See</u> Order Requiring Identification of Legal Issues.

Oakland County, the City, and numerous other parties in interest filed papers in response to the Court's Order Requiring Identification of Legal Issues identifying their respective legal issues. No party, including the City, has challenged, legally or factually, or otherwise questioned, the standing of Oakland County to contest the Plan.[3] Moreover, the City, in *The City's Identification Of Legal Issues Relating To Confirmation* [Docket No. 5077], filed in response to the Order Requiring Identification of Legal Issues, **did not** identify a legal issue with regard to whether Oakland County had standing to object to the Plan. <u>See</u> *The City's Identification Of Legal Issues Relating To Confirmation* [Docket No. 5077].

On June 5, 2014, this Honorable Court entered its *Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule And Setting Hearing Dates And Procedures* [Docket No. 5235] (the "<u>Legal Issues Order</u>") pursuant to which the Court identified several legal "issues that may be determined as a matter of law", including –

---

[3] Macomb County, presumably in response to the City's footnote questioning its standing in the Omnibus Reply in Support of the Plan, did identify the standing issue in its papers. However, Macomb's papers specifically limited the application of the standing issue to Macomb County; it did not include Oakland County (or Wayne County). <u>See</u> *Statement of County of Macomb, Michigan, By And Through Its County Agency, The Macomb County Public Works Commissioner, And The Macomb Interceptor Drain Drainage District In Response To Court's Order Regarding Identifying Legal Issues Relating To Confirmation* [Docket No. 5076] at Section I., page 2 ("Standing Of Macomb to File Objections").

11. Whether Macomb, Oakland and Wayne Counties have standing to object to the Plan.

<u>See</u> Legal Issues Order at Paragraph 11. The Legal Issues Order required that supplemental briefs, if any, be filed by June 30, 2014.

<u>ARGUMENT</u>

## I. OAKLAND COUNTY HAS STANDING TO OBJECT TO THE PLAN PURSUANT TO APPLICABLE LAW.

The participation of parties in interest in Chapter 9 cases is governed by section 1109 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1109 and 901 (incorporating section 1109 into cases pending under chapter 9). Section 1109(b) provides that a "party in interest" has standing to "appear and be heard on **any issue** in a case in this chapter." 11 U.S.C. § 1109(b)(emphasis added). Although the term "party in interest" is not defined by the Bankruptcy Code or the Bankruptcy Rules (other than through the non-exhaustive list of examples provided in § 1109(b)(identifying the debtor, the trustee, a creditors' committee, an equity security holder, or any indenture trustee)), courts construe this term broadly, in order to allow all parties affected by a bankruptcy case to appear and be heard. <u>See</u> <u>e.g.</u> <u>Savage & Assocs., P.C. v. K & L Gates, LLP (In re Teligent, Inc.)</u>, 640 F.3d 53, 60 (2d Cir. 2011); <u>In re Stone Barn Manhattan, LLC</u>, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) (citing <u>In re Johns-Manville Corp.</u>, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984); <u>In re Public Service Co. of New Hampshire</u>, 88 B.R. 546, 550 (Bankr. D.N.H. 1988) (citing cases).

The basic test for "party in interest" standing under § 1109(b) is "whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so

as to require representation." Stone Barn Manhattan, 405 B.R. at 74 (quoting Public Service Co. of New Hampshire, 88 B.R at 550-551). It is generally understood that a "pecuniary interest directly affected by the bankruptcy proceeding" provides standing under § 1109(b). Id. at 74 (citing cases). According to the Second Circuit, the underlying theory behind the "party in interest" requirement is that "anyone holding a direct financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." Teligent, Inc., 640 F.3d at 60. See also In re Wolf Creek Valley Metropolitan District, 138 B.R. 610, 615 (Bankr. D. Col. 1992) (quoting from collected cases) ("Party in interest is an expandable concept depending on the particular factual context in which it is applied. The purpose is to permit the involvement of those persons and interests which will be affected by the reorganization process."). The determination whether a party is a "party in interest" is made on a case-by-case basis. In re Suffolk Regional Off-Track Betting Corp., 462 B.R. 397 (Bankr. E.D.N.Y. 2011) citing Church Mut. Ins. Co. v. Am. Home Assurance Co. (In re Heating Oil Partners, LP), 422 F. App'x 15, 17 (2d Cir. 2011).

The case of In re: Mount Carbon Metropolitan District, 1999 Bankr. LEXIS 1643 (Bankr. D. Colo. 1999) (**Exhibit A**)[4] contains an almost identical fact pattern to that

---

[4] The City has relied heavily upon the Mount Carbon case in support of the Plan. Indeed, the Court's opinion denying confirmation of the debtor's plan in the Mount Carbon Chapter 9 bankruptcy case (In re Mount Carbon Metro. Dist., 242 B.R. 18 (Bankr. D. Colo. Nov. 1, 1999)) is the most frequently cited case decision in the City's *Consolidated Reply to Certain Objections To Confirmation of Fourth Amended Plan For The Adjustment Of Debts Of The City Of Detroit* [Docket No. 5034]. Thus, the City is well

presently before the Court and sets forth an effective and persuasive argument

applicable to objecting parties therein and to Oakland County in this case.  Specifically,

in Mount Carbon, the Court held that a non-debtor party to an executory contract, that

the Debtor proposed to assume under the Plan and that was deemed to accept the Plan

as a matter of law because the Plan did not propose to modify its legal rights under the

executory contracts, **had standing to object to confirmation of the plan**.  Id.  The

Mount Carbon Court went on to explain that -

> Lakewood and Morrison [the non-debtor parties] have a **vital stake in whether the Plan is confirmed**. A confirmed Plan constitutes a new contract between the District and its creditors. Because the District proposes to assume its executory contracts through the Plan, Lakewood and Morrison hold pre-petition unmatured contingent claims. They are entitled to object to assumption under § 365 just as if assumption had been sought by separate motion rather than tied to confirmation of the Plan. If their executory contract is rejected, they will have standing as pre-petition creditors to object to confirmation. **If the contracts are assumed, the District's ability to perform may be altered due to the Plan's terms.** For example, to the extent that the District's performance under the intergovernmental agreements depends upon landowners shouldering the infrastructure cost, **the Plan's feasibility** and the degree it binds landowners **is critical to Lakewood and Morrison's [parties similarly situated to Oakland County] pecuniary interest**.
>
> In addition, preservation of creditors' right object to confirmation of a plan because it does not satisfy the requirements of § 943 is vital to the credibility of the bankruptcy system.  Objections to the confirmability of a proposed plan are of a different nature than those based upon a Plan's treatment of a specific creditor.  **Whether a**

aware of its existence and presumably it formed the basis for the City's failure to challenge Oakland County's standing to contest the Plan.

> plan is feasible, proposed in good faith, or otherwise
> satisfies the requirements of 11 U.S.C. § 943 **address whether**
> **the plan is confirmable as a matter of law**. A bankruptcy
> court must determine whether these requirements are
> satisfied to confirm the Plan. The adversary process best
> elicits the evidence necessary for such determinations. **To**
> **allow a debtor to short circuit such fundamental objections**
> **by structuring plans which neutralize troublesome or well-**
> **funded creditors would foster great mischief**. It would
> upset the carefully calibrated balance between debtors and
> creditors in the reorganization process and jeopardize its
> credibility. The Court therefore concludes that even though
> the claims of Lakewood and Morrison are unimpaired
> thereby barring a vote on the Plan, **they nonetheless retain**
> **standing to object to its confirmability pursuant to 11**
> **U.S.C. § 943**.

Mount Carbon, at *19-21 (emphasis added). In a subsequent **reported** decision denying

confirmation of the municipalities' proposed plan of adjustment, the Mount Carbon

Court cited its un-reported decision with approval. See In re Mount Carbon Metro.

Dist., 242 B.R. 18 (Bankr. D. Colo. Nov. 1, 1999)("Indeed, this Court has previously

denied the District's motion to overrule the objections of the Cities **for lack of standing**.

In re Mount Carbon Metro. Dist., 1999 Bankr. LEXIS 1643, No. 97-20215 MSK (Bankr. D.

Colo. July 20, 1999). **As parties to executory contracts which the District intends to**

**assume, the Cities' interests are affected by confirmation of the Plan.**" (emphasis

added)).

In Suffolk Regional Off-Track Betting, supra, the Bankruptcy Court similarly

held that a non-debtor party (Churchill) to an executory contract with the municipality

Debtor had standing to object to the entry of an order for relief on eligibility. The

municipality Debtor argued that Churchill did not have a pecuniary interest because it

was not a creditor and the municipality Debtor had pre-funded $100,000 to Churchill as

an advance against any amounts that might be payable to Churchill by the municipality

Debtor through the term of the contract (which amount was 2xs the estimated

maximum exposure of Debtor to Churchill based upon historical trends.)  The Court

explained that -

> If an order for relief is entered, the Amended Term Sheet, as
> an executory contract, is subject to Suffolk OTB's[/Debtor's]
> assumption or rejection pursuant to §§ 365 and 901, and
> Churchill Downs, as a party to the Amended Term Sheet
> [executory contract], would have standing to be heard in
> connection with any motion to assume or reject that contract.
> If Churchill Downs has standing to be heard on the issue of
> assumption or rejection of the Amended Term Sheet in this
> bankruptcy case, it has standing to be heard on the threshold
> issue of Suffolk OTB's entitlement to commence this
> bankruptcy case.
>
> * * * *
>
> As of the date of filing, and as of the date of this decision,
> Churchill Downs is a party to an executory contract with the
> [municipal] Debtor, and has standing to object to and the
> entry of an order for relief.  Moreover, Suffolk OTB [the
> municipal Debtor] clearly contemplates an ongoing
> contractual relationship with Churchill Downs throughout
> the duration of this case.

Suffolk Regional Off-Track Betting, at 413-414.

Both the Mount Carbon and the Suffolk Regional Off-Track Betting (both

Chapter 9 cases), clearly and unequivocally support Oakland County's standing (as

party to numerous executory contracts which have not been assumed or rejected) to

appear and be heard on all issues in the City's Chapter 9 case including, but not limited

to, prosecuting objections to the City's proposed plan of adjustment.  Indeed, the Mount

Carbon decision, holding that the non-debtor party to an executory contract with the

municipal debtor had standing to contest the plan, is premised upon facts that are virtually identical to the instant case. Here, just like in Mount Carbon, Oakland County is a direct party to executory contracts with the City. In addition, Oakland County relies exclusively upon the City and the DWSD to provide the water and sewer services to the residents and business in Oakland County pursuant to the City's proposed assumption of such executory contracts. Such reliance clearly and unequivocally establishes Oakland County's pecuniary interest in the survival of the DWSD and the Plan. Moreover, the Plan's provisions seek to unlawfully amend or cause breach of Oakland County's contracts with the City providing an inherent defect in the Plan. Thus, Oakland County has standing to object to the Plan.

## II. NO PARTY HAS CHALLENGED THE STANDING OF OAKLAND COUNTY.

The lack of any objection to the standing of Oakland County is consistent with the authorities cited herein and so heavily relied upon by the City in the Omnibus Reply in Support of the Plan since, unlike Macomb County, Oakland County is a direct party to numerous executory contracts with the City. No other party has challenged the standing of Oakland County. Pursuant to this Court's *Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 4202], the City was required to file all its responses to any objection to the Plan by May 26, 2014. The City did not raise any standing claim with

regard to Oakland County's objection in its Omnibus Reply in Support of the Plan or otherwise and no other party has contested Oakland County's standing.[5]

## III.     RESERVATION OF RIGHTS.

Oakland County hereby reserves and preserves all of its rights, remedies, and arguments in connection with this Brief, and specifically reserves all right(s) to supplement this Brief and to be heard before the Court with regard to the arguments set forth in this Brief, as well as reserves the right to make any other applicable arguments, including those raised in other related briefs and/or other joinders to the briefs raised by other parties with respect to standing to object to the Plan.

Specifically, by way illustration and not limitation, this Brief is based upon the City's representation that it intends to assume its contracts with Oakland County. To the extent the City cannot or decides not to assume such contracts, Oakland County will have additional arguments in support of standing to object to the Plan as well as additional objections to the Plan.

## <u>CONCLUSION</u>

Applicable law clearly demonstrates Oakland County's standing to pursue objections to the Plan. Moreover, no party in interest herein has challenged or otherwise raised any issue with regard to the standing of Oakland County. For all these

---

[5] Since the City has never filed any pleading identifying any issues or objections it may have with regard to Oakland County's standing, Oakland County specifically reserves the right to, among other things, respond to any issue(s) or objection(s) that may be raised by the City now or in the future.

reasons, the Court should determine that Oakland County has standing to object to the City's Plan.

WHEREFORE, Oakland County respectfully requests, for all the reasons contained herein, that this Honorable Court enter an order determining that Oakland County has standing to object to the City's Plan and granting such additional or other relief as is appropriate under the circumstances.

Respectfully Submitted,

Dated: June 30, 2014            **CARSON FISCHER, P.L.C.**

By:    */s/ Joseph M. Fischer*
Joseph M. Fischer (P13452)
Robert A. Weisberg (P26698)
Christopher Grosman (P58693)
4111 Andover Road, West – 2nd Floor
Bloomfield Hills, Michigan 48302
Telephone: (248) 644-4840
Facsimile: (248) 644-1832
JFischer@CarsonFischer.com
RWeisberg@CarsonFischer.com
CGrosman@CarsonFischer.com

*Counsel for Oakland County, Michigan*

# SUMMARY OF EXHIBITS

Exhibit A   -   <u>In re: Mount Carbon Metropolitan District</u>,
1999 Bankr. LEXIS 1643 (Bankr. D. Colo. 1999)

Exhibit B   -   Certificate of Service



In re: MOUNT CARBON METROPOLITAN DISTRICT, a quasi-municipal corporation, EIN 84-0748058, Debtor.

Case No. 97-20215 MSK, Chapter 9

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF COLORADO

*1999 Bankr. LEXIS 1643*

July 20, 1999, Decided
July 20, 1999, Filed

**DISPOSITION:** **[*1]** Objections of Michael Blumenthal and Harvey B. Alpert DENIED for lack of standing. Blumenthal's and Alpert's request to intervene DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Objectors opposed confirmation of the Third Amended Plan for Adjustment of Debts submitted by debtor improvement district in its Chapter 9 bankruptcy proceeding.

**OVERVIEW:** Debtor improvement district filed bankruptcy pursuant to Chapter 9 and submitted a Third Amended Plan (Plan) for Adjustment of Debts. A group of objectors opposed the Plan, and debtor contended none of them had standing. The court found for debtor as to objectors that held a future interest in property within the district area. The court determined those objectors did not have a sufficient stake in the proceedings to object because their interests were speculative. The court denied debtor's contentions concerning the other objectors. The court found that while the municipal objectors were deemed to have accepted the Plan because it did not modify their legal rights under the executory contracts on which they based their objections, the Plan could affect the ability of debtor to implement the executory contracts. Thus, the municipal objectors had a sufficient stake in the proceedings. The court held that the objector owning property in the district had standing because it would be significantly affected by the Plan, which called for extensive infrastructure repair and replacement to be paid for by property owners.

**OUTCOME:** The court found that objectors that a future interest in property within debtor improvement district did not have a sufficient stake in the proceedings to object but that the municipal and property owner objectors would be significantly affected by the proposed plan for adjustment of debts.

**CORE TERMS:** confirmation, landowner, infrastructure, executory contracts, standing to object, property owners, pecuniary interests, installation, repair, confirmability, reorganization, unimpaired, objecting, holder, state law, legal right, pre-petition, credibility, intervene, adversely, partner, vital, intergovernmental, replacement, confirmed, default, sewer, levy, taps, matter of law

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Municipality Bankruptcy > General Overview*
[HN1] Chapter 9 differs from other chapters of the Bankruptcy Code in that it allows a governmental entity created under state law to reorganize its financial affairs through a process governed by federal law.

*Bankruptcy Law > Municipality Bankruptcy > Reservation of State Power*
[HN2] To avoid preemption of state powers, the Chapter 9 process may not limit or impair the power of the state to control the debtor in the exercise of its political or

governmental powers. *11 U.S.C.S. § 903.* As a result, only certain provisions of other chapters of the Bankruptcy Code are applicable to Chapter 9, and these are incorporated by reference in *§ 901(a).*

**Bankruptcy Law > Claims > Allowance**
[HN3] See *11 U.S.C.S. § 1109(b).*

**Bankruptcy Law > Claims > Allowance**
[HN4] The designation of parties in interest in *11 U.S.C.S. § 1109(b)* is not exclusive. The phrase "parties in interest" invites interpretation and is generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings. The determination of whether a party is a party in interest is determined case by case, based upon whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation.

**Bankruptcy Law > Claims > Allowance**
**Tax Law > State & Local Taxes > Real Property Tax > Assessment & Valuation > General Overview**
[HN5] See *11 U.S.C.S. § 902(3).*

**Bankruptcy Law > Claims > Allowance**
[HN6] *11 U.S.C.S. § 1109(b)* generally describes parties in interest, and *§ 943(a)* adds "special taxpayers" as a particular group.

**Bankruptcy Law > Claims > Allowance**
**Civil Procedure > Justiciability > Standing > General Overview**
[HN7] All parties in interest do not necessarily have standing with respect to every issue in a bankruptcy case.

**Bankruptcy Law > Municipality Bankruptcy > General Overview**
**Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites > Feasibility**
**Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites > Good Faith Proposal**
[HN8] Whether a plan for adjustment of debts in a Chapter 9 bankruptcy proceeding is feasible, proposed in good faith, or otherwise satisfies the requirements of *11 U.S.C.S. § 943* address whether the plan is confirmable as a matter of law.

**COUNSEL:** For Mount Carbon Metropolitan District, debtor: Bradley N. Shefrin, Denver, CO.

For Mount Carbon Metropolitan District, debtor: Brian P. Halloran, Louisville, CO.

For Mount Carbon Metropolitan District, debtor: Scott Albertson, Golden, CO.

Todd, Curt, Haligman and Lottner, P.C., Foster, Mark C., Laufer, Joel, McVay, Charles F., Pack, Stuart, Richey, William A., Denver, CO.

Worcester, Mark K., Irvine, CA.

Miller, Richard L., Lakewood, CO.

Ust, Denver, CO.

**JUDGES:** Marcia S. Krieger, United States Bankruptcy Judge.

**OPINION BY:** Marcia S. Krieger

**OPINION**

**ORDER DETERMINING STANDING OF OBJECTORS**

THIS MATTER comes before the Court on the request of Mount Carbon Metropolitan District (the District) for 1) an Order overruling the objections of Westwind LLC, Michael Blumenthal, Harvey B. Alpert, the City of Lakewood and the City of Morrison to the District's proposed Chapter 9 Plan for lack of standing; or, 2) a determination that the City of Lakewood and City of Morrison have standing to be heard only as to whether the District may **[*2]** assume certain executory contracts; and 3) a determination that such executory contracts are not in default. Westwind LLC (Westwind), Michael Blumenthal and Harvey B. Alpert (Blumenthal and Alpert), the City of Lakewood (Lakewood) and the City of Morrison (Morrison) object. All parties have filed briefs. The facts on the standing issues are undisputed. However, the facts material to whether the executory contracts are in default are disputed. Therefore, an evidentiary hearing on this issue is required.

Having reviewed the pleadings submitted, the Third Amended Plan for Adjustment of Debts and the Disclosure Statement, and having heard the representations of counsel, the Court finds and concludes as follows:

**I. FACTUAL BACKGROUND**

1. This is a Chapter 9 case in which the District seeks confirmation of its Third Amended Plan for Adjustment of Debts (the Plan). The District has solicited votes and the Plan has been noticed for confirmation.

Only Westwind, Blumenthal, Alpert, Morrison and Lakewood (Objectors) have objected to confirmation.

2. The District was formed in 1976 as a water and sanitation district then converted to an improvement district in 1982. Property was added [*3] to the District in December, 1984 and removed from the District in December, 1988. It is currently comprised of 963.6 largely undeveloped acres located between Morrison Road and Alameda Parkway along Highway C-470 on the western edge of metropolitan Denver. Westwind is 1 of 19 entities owning property within the District. Blumenthal and Alpert hold purchase and sale agreements to acquire property from Westwind. [1]

> 1    Copies of the purchase and sale contracts have not been submitted to the Court nor has any reference been made to the content of such agreements.

3. Lakewood and Morrison are municipal corporations whose boundaries border or overlap the District. The District has a number of executory contracts referred to as intergovernmental agreements with Lakewood and Morrison. Among other matters, these govern the installation and servicing of streets, sidewalks, bike paths, lighting, parks, easements, rights of way, traffic signs and signals and other infrastructure necessary to development in the District. [*4] The Debtor has also scheduled Morrison as one of its 20 largest unsecured creditors to whom it owes $ 24,890.00 for sewer charges.

4. According to the District's Disclosure Statement, this case was initiated to restructure approximately $ 14 million in bond indebtedness incurred in 1985, proceeds of which were used to make road and sewer improvements in two discrete sub-developments within the District and to retire 1984 bonds. Although in 1985 it was envisioned that the property within the District would be developed, no substantial development occurred thereafter. The infrastructure installed in 1985 now needs repair or replacement. In addition, new development will require extensive new infrastructure.

5. The Plan proposes to retire the 1985 bonds by partial payment and issuance of replacement bonds. Payment of administrative expenses, secured debt and general unsecured debt will be by new financing provided by one of the property owners, CDN Development, L.P. (CDN). In addition to lending funds to the District, CDN will sell the District water rights and taps necessary for the anticipated development.

6. The Plan is to be funded by increased tax revenue and revenue from the [*5] sale of water taps in the course of development. Tax revenue will be increased by increasing the assessed value of property within the District and applying a higher mill levy (to be raised from 21.45 to 37 mills).

7. The success of the Plan is dependent upon aggressive, extensive residential and commercial development. Such development depends upon repair and installation of new infrastructure. The Plan anticipates that the cost of repair, replacement and installation of new infrastructure will be borne by property owners who will "pay as you go". The Disclosure Statement explains that "land owners will have great incentive to pay for such infrastructure, because for landowners to realize any value from their land, it will be necessary to pay for and install such infrastructure and the District believes the cost of the infrastructure will be significantly less than the gains to be realized by landowners from the development and/or sale of land, and that therefore landowners will have the incentives to make the necessary investment in such infrastructure." (Disclosure Statement page 42). Neither the Plan nor the Disclosure Statement proposes any "specific method or plan to raise [*6] funds from the disparate landowners" but the District acknowledges that infrastructure costs must be covered prior to the anticipated development. If the District participates in infrastructure costs, "then its policy shall be to use available Additional Tap Revenues and to have the property owners provide the surety and the means to carry out the agreements. Therefore, not only will landowners be burdened with a mill levy significantly higher than surrounding property, but they will have to pay the costs associated with any future development". (Disclosure Statement page 42).

8. The District proposes to assume its intergovernmental agreements with Lakewood and Morrison. It is unclear whether and to what extent performance under these contracts is dependent upon landowners' payment of infrastructure costs.

## II. ISSUES PRESENTED

The District contends that all of the Objectors lack standing to object to confirmation of the Plan. With regard to Westwind, Blumenthal and Alpert, the District argues that such Objectors are neither creditors of the District nor "special taxpayers" as that term is defined in *11 U.S.C. § 902(3)*. With regard to Lakewood and Morrison, [*7] the District argues that because the District intends to assume its executory contracts, Lakewood and Morrison are deemed to have accepted the Plan and therefore are barred from objecting to confirmation.

All Objectors respond that they are parties in interest entitled to object to confirmation of the proposed Plan pursuant to *11 U.S.C. § 1109(b)*. Westwind, Blumenthal and Alpert argue that they need not be "special taxpayers" pursuant to *11 U.S.C. § 902(3)* in order to object.

They contend that because Westwind owns property within the District and Blumenthal and Alpert hold purchase and sale agreements for property within the District, they have pecuniary interests affected by the Plan. They further request that if they lack standing pursuant to *11 U.S.C. § 1109(b)*, they be permitted to intervene with regard to confirmation issues pursuant to *Fed. R. Bankr. P. 2018*.

Lakewood and Morrison contend that as parties to executory contracts, they are parties in interest pursuant to *11 U.S.C. § 1109(b)*. They dispute the District's contention that if they are deemed to have accepted the plan by **[*8]** assumption of their executory contracts, they are barred from raising general objections to the confirmability of the proposed plan. In addition, they claim standing on behalf of current and future citizens of the District and the State of Colorado. If they lack standing under *11 U.S.C. § 1109(b)* they, too, seek permissive intervention pursuant to *Fed. R. Bankr. P. 2018*.

### III. ANALYSIS

[HN1] Chapter 9 differs from other chapters of the Bankruptcy Code in that it allows a governmental entity created under state law to reorganize its financial affairs through a process governed by federal law. [HN2] To avoid pre-emption of state powers, the Chapter 9 process may not limit or impair the power of the state to control the debtor in the exercise of its political or governmental powers. *11 U.S.C. § 903*. As a result, only certain provisions of other chapters of the Code are applicable to Chapter 9; these are incorporated by reference in *11 U.S.C. § 901(a)*. Among the provisions incorporated by reference, is [HN3] *§ 1109* which provides in subsection (b):

> A party in interest, including the debtor, the trustee, a creditors' committee **[*9]** and equity security holders' committee, a creditor, an equity security holder, or an indentured trustee, may raise and may appear and be heard on any issue in a case under this chapter.

The Tenth Circuit Court of Appeals has twice held that [HN4] the designation of parties in interest in *§ 1109(b)* is not exclusive. *Nintendo Company, Ltd. v. Patten (In re Alpex Computer Corporation), 71 F.3d 353, 356 (10th Cir. 1995)*; *Vermejo Park Corporation v. Kaiser Coal Corporation (In re Kaiser Steel Corporation), 998 F.2d 783, 788 (10th Cir. 1993)*. The Court noted in *Alpex* that the phrase "parties in interest" invites interpretation and is "generally understood to include all persons whose pecuniary interests are directly affected

by the bankruptcy proceedings" *Alpex, at 356 citing to In re Hutchinson, 5 F.3d 750, 756 (4th Cir. 1993)*. The determination of whether a party is a party in interest is determined case by case, based upon whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation. *Kaiser, at 788 citing to In re Amatex Corp., 755 F.2d 1034, 1042 (3rd Cir. 1985)*. **[*10]** Consistent with this instruction, the interests of each Objector must be analyzed independently.

### A. Westwind

The District argues that the broad definition of *§ 1109(b)* is limited by the provisions of *§ 943(a)* which authorizes special taxpayers to object to Chapter 9 plans. The District argues that "*section 943(a)* gives only a 'special taxpayer' the right to object to confirmation." (District Brief, June 3, P 34). Because Westwind, Blumenthal and Alpert are not "special taxpayers," the District contends they cannot object to confirmation of the Plan.

The term "special taxpayer" is defined in [HN5] *11 U.S.C. § 902(3)* as "a record holder of legal or equitable title to real property against which a special assessment or special tax has been levied, proceeds of which are the sole source of payment of an obligation issued by the debtor to defray the cost of an improvement relating to such real property." Westwind, Blumenthal and Alpert admit they are not special taxpayers.

This Court finds the argument of the District unpersuasive in two respects. First, the provisions of *§ 943(a)* appear permissive and inclusive rather than exclusive. There is nothing in **[*11]** 943(a) nor in any other Code provision cited by the District which states or implies that only "special taxpayers" can object to a Chapter 9 plan. Were that the case, the provisions of 1109(b) specifically incorporated by reference in *§ 901(a)* would be rendered meaningless. Creditors, as well as other parties in interest, would be barred from objecting to a Chapter 9 plan. If, as the District suggests, only "special taxpayers" can object to a Chapter 9 plan, then in the absence of "special taxpayers," no one could object to confirmation. Such conclusion is not only inconsistent with the structure of Chapters 9 and 11, it would lead to abridgment of the due process rights of parties whose interests are adversely affected. [2]

> 2  *See Ault v. Emblem Corporation (In re Wolf Creek Valley Metropolitan District No IV), 138 B.R. 610 (D. Colo. 1992)*. In *Wolfcreek Valley* Judge Kane considered whether a landowner in District was entitled to notice of and had standing to object to confirmation of a Chapter 9 plan. He concluded that even though a property owner was

not a "special taxpayer" specifically authorized to object under *§ 943(a)*, the property owner nevertheless had a sufficient pecuniary interest to warrant due process and standing to object.

[*12]  A better reading of *§ 943(a)* is to harmonize it with *§ 1109(b)*. [HN6] *Section 1109(b)* generally describes parties in interest; *section 943(a)* adds a particular group. Courts recognize that some debtors of debtors have sufficient pecuniary or property interests to entitle them to object to a proposed plan. *See Commercial Union Insurance Co. v. Johns-Manville Corp. (In re Johns Manville Corp.), 31 B.R. 965, 971 (S. D. N. Y. 1983)* (consumer union that was a debtor to debtor was a party in interest); *In re Wolfcreek, supra.*, (landowner/taxpayer a debtor of district was party in interest). *Section 943(a)* simply recognizes a specific group of debtors to a district, namely taxpayers upon whom the Plan, as compared to state law, would impose a particularized tax burden.

Second, although the Plan does not technically levy a special assessment or tax on landowners to pay a particular obligation, it implicitly depends upon District property owners paying for all repair and installation of infrastructure. The Plan indirectly imposes the entire financial cost of repair and installation of sewers, street and other infrastructure upon landowners. If the Plan is confirmed and landowners [*13] refuse to pay for such improvements, landowners will be burdened by greater taxation without the ability to realize the value of their investment. This places property owners in essentially the same economic position as if a special tax were imposed. The Plan requires them to pay a special obligation without compliance with state law. Because the landowners' vital interests are affected by the Plan, they have sufficient stake in the Chapter 9 proceeding to object to its confirmation.

## B. Blumenthal and Alpert

Were Blumenthal and Alpert property owners like Westwind, they also would have standing to object to confirmation. However they do not hold title to property within the District. Instead, they hold contract rights to purchase property from Westwind. They state that "their property rights flow from those of Westwind and are in addition to Westwind." It is clear that their rights are derivative from Westwind but they present no facts establishing that their rights differ from those of Westwind. Indeed, they merely join in Westwind's objection.

Although *§ 1109(b)* should be construed broadly, it is designed to encompass only parties significantly affected by a Chapter [*14] 9 proceeding. The critical test is whether the prospective party has a "sufficient stake in the proceedings so as to require representation".

*Wolfcreek, at 615*. Blumenthal and Alpert do not contend that they have a direct relationship with the District, nor have they alleged facts which establish that their interests differ from those of Westwind. To the extent that the Plan only affects Blumenthal and Alpert's future interests to be acquired from Westwind, it is Westwind, only, which has standing to object.

Blumenthal and Alpert alternatively argue that they should be allowed to intervene in accordance with *Fed. R. Bank. P. 2018(a)*. This rule authorizes intervention of "interested parties" on a discretionary basis. The origin and nature of Blumenthal and Alpert's interests pose a problem in this context, too. Blumenthal and Alpert make no showing that participation is necessary to protect their rights and interests. To the extent that their objection is the same as Westwind's and their rights are derivative from Westwind, no separate representation is required.

## C. Morrison

The District has scheduled Morrison as a creditor holding a general unsecured claim of approximately [*15] $ 25,000.00, however, the Disclosure Statement does not list Morrison as a creditor in any of the seven classes under the Plan. To the extent Morrison is a creditor holding a pre-petition claim, it is a party in interest expressly authorized by *§ 1109(b)* to object to confirmation of the Plan. To the extent that it no longer holds an unsecured claim in this case, it nevertheless has standing to object in accordance with the reasoning applicable to Lakewood.

## D. Lakewood

As with Westwind, Blumenthal and Alpert, the question of Lakewood's standing is determined by whether it has a sufficient property or pecuniary stake in the Chapter 9 case. The District contends that because it will assume its executory contracts with Lakewood, Lakewood's interest is unimpaired and it is deemed to have accepted the Plan. Relying upon the reasoning of *In re Wonder Corporation of America, 70 B.R. 1018 (Bankr. D. Conn. 1987)*, it further argues that having accepted the Plan, it is now barred from objecting to confirmation.

In *Wonder Corporation,* the Bankruptcy Court in Connecticut considered the applicability of *§ 1109(b)* to creditors whose rights were deemed unimpaired [*16] under a proposed Chapter 11 Plan. Judge Schiff referred to the *Matter of Johns Manville Corporation, 68 B.R. 618 (Bankr. S. D. N. Y. 1986)*, in which Judge Lifland opined that since parties can appeal only from plan provisions adversely affecting them, no party should be able to prevent the confirmation of a plan by raising rights of

third parties who did not object to confirmation. [3] Judge Schiff went two steps further, holding that claimants who have accepted a plan or who are legally presumed to accept a plan cannot object to its confirmation. Due to its overbreadth, this conclusion has been subsequently narrowed by other courts, including Judge Schiff. Judge Schiff expressly modified his reasoning in *Wonder Corporation in In re Scott Cable Communications, Inc., 232 B.R. 558 (D. Conn. 1999)*:

[HN7] All parties in interest do not necessarily have standing with respect to every issue in a bankruptcy case. For example, an unimpaired creditor may not have standing to object to its treatment under a plan, *see, In re Wonder Corporation of America, 70 B.R. at 1018, 1022 (Bankr. D. Conn. 1987)*, but it would nonetheless have standing [*17] to object to confirmation on other grounds, i.e., feasibility, § 1129(a)(11).

3    Judge Lifland reasoned from several decisions discussing standing on appeal. *In re Evans Products, Co., 65 B.R. 870 (S. D. Fla. 1986)* (appellants had standing only to challenge those parts of a reorganization plan that affects the direct interests); *In re Fondiller, 707 F.2d 441 (9th Cir. 1983)* ("only aggrieved persons" may appeal an order of the Bankruptcy Court); *In re Sweetwater, 57 B.R. 743 (D. Utah 1985)* (this Court interprets the aggrieved person test to mean that an appellant who is appealing from a Bankruptcy Court Order confirming a plan of reorganization may challenge only those parts of the plan that directly adversely and pecuniarily affect the appellant.)

Bankruptcy courts struggle to balance the due process rights of all parties who may be affected by a proposed plan of reorganization against the delay, confusion, and inconvenience which results when parties [*18] having only a tangential interest in the process desire to litigate. *Travelers Ins. Co. v. H.K. Foster Co. Inc., 45 F.3d 737 (3rd Cir. 1995)*. Most courts conclude that parties may not object to confirmation of a plan based upon interests of parties who have accepted it, and that parties who have voted to accept a plan may not object to confirmation based upon unfair treatment. [4] These restrictions are consistent with over-arching doctrines which preclude parties from taking inconsistent positions

in a single controversy and from asserting claims in the absence of a legal right or injury. Within these limitations, Morrison and Lakewood may not object on behalf of current or future citizens of the District of the cities, nor upon behalf of the State of Colorado. The standing of each city is limited to its interest in this case.

4    *See In re Orlando Investors L.P., 103 B.R. 593, 597* (limited partners who retain their limited partner interests in full lack standing to object to confirmation based upon the inequality of treatment of other partners.); *In re Westwood Plaza Apartments, 147 B.R. 692, 699 (Bankr. E. D. Tex. 1992)* (if there has been any unequal treatment of claims, the creditor who has benefited from the treatment does not have standing to object).

[*19]  Fortunately, this case does not require the Court to determine whether a creditor who votes to accept its treatment under a proposed plan waives its right to object to confirmation. Here, Morrison and Lakewood have not voted to accept the Plan. They are deemed to have accepted it as a matter of law because the Plan does not propose to modify their legal rights under executory contracts. None of the cases cited by the District, including *Wonder Corporation* as modified, bar such creditors such as Lakewood and Morrison from objecting to the legal sufficiency (or confirmability) of a plan. This makes good sense both because it guarantees creditors such as Morrison and Lakewood an opportunity to oppose confirmation of a plan which may affect its pecuniary interest, even though its legal rights remain the same, and because it protects the regularity and credibility of the confirmation process.

Lakewood and Morrison have a vital stake in whether the Plan is confirmed. A confirmed Plan constitutes a new contract between the District and its creditors. Because the District proposes to assume its executory contracts through the Plan, Lakewood and Morrison hold pre-petition unmatured contingent [*20]  claims. They are entitled to object to assumption under § 365 just as if assumption had been sought by separate motion rather than tied to confirmation of the Plan. If their executory contract is rejected, they will have standing as pre-petition creditors to object to confirmation. If the contracts are assumed, the District's ability to perform may be altered due to the Plan's terms. For example, to the extent the District's performance under the intergovernmental agreements depends upon landowners shouldering the infrastructure cost, the Plan's feasibility and the degree it binds landowners is critical to Lakewood and Morrison's pecuniary interest.

In addition, preservation of creditors' right object to confirmation of a plan because it does not satisfy the

requirements of *§ 943* is vital to the credibility of the bankruptcy system. Objections to the confirmability of a proposed plan are of a different nature than those based upon a Plan's treatment of a specific creditor. [HN8] Whether a plan is feasible, proposed in good faith, or otherwise satisfies the requirements of *11 U.S.C. § 943* address whether the plan is confirmable as a matter of law. A bankruptcy [*21] court must determine whether these requirements are satisfied to confirm the Plan. The adversary process best elicits the evidence necessary for such determinations. To allow a debtor to short circuit such fundamental objections by structuring plans which neutralize troublesome or well-funded creditors would foster great mischief. It would upset the carefully calibrated balance between debtors and creditors in the re-organization process and jeopardize its credibility. The Court therefore concludes that even though the claims of Lakewood and Morrison are unimpaired thereby barring a vote on the Plan, they nonetheless retain standing to object to its confirmability pursuant to *11 U.S.C. § 943*.

**IT IS THEREFORE ORDERED** that

1. Westwind LLC has standing to bring its objection to confirmation of the proposed Plan.

2. The Cities of Morrison and Lakewood have standing to bring objections to confirmation of the proposed Plan based upon their interests, as a creditor and/or holder of claims arising from executory contracts, but not on behalf of current or future citizens within the District or their respective city limits or on behalf of the State of [*22] Colorado.

3. The Objections of Michael Blumenthal and Harvey B. Alpert are **DENIED** for lack of standing.

4. Blumenthal's and Alpert's request to intervene is **DENIED**.

5. Whether the executory contracts between the District and Cities of Morrison and Lakewood are in default will be tried at the confirmation hearing set for September 7 - 10, 1999.

DATED this 20th day of July, 1999.

BY THE COURT:

Marcia S. Krieger

United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | ) Case No. 13-53846 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) In Proceedings Under |
| | ) Chapter 9 |
| Debtor. | ) |
| | ) Hon. Steven W. Rhodes |
| | ) |

## CERTIFICATE OF SERVICE

I, Joseph M. Fischer, hereby certify that the foregoing *Brief On Standing Pursuant To Court's June 5, 2014 Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule And Setting Hearing Dates and Procedures* was filed and served via the Court's electronic case filing and noticing system on this 30th day of June, 2014.

 */s/ Joseph M. Fischer*
Joseph M. Fischer (P13452)

1