UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,              .
                              .        Detroit, Michigan
                              .        June 26, 2014
            Debtor.          .        9:00 a.m.
. . . . . . . . . . . . . . . . .

        HEARING RE. (#5259) STATUS CONFERENCE ON PLAN
        CONFIRMATION PROCESS (RE. FIFTH AMENDED ORDER
     ESTABLISHING PROCEDURES, DEADLINES AND HEARING DATES
    RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT.  STATUS
    HEARINGS REGARDING PLAN CONFIRMATION PROCESS; (#5285)
        CORRECTED MOTION TO QUASH SYNCORA'S SUBPOENA TO
        DEPOSE ATTORNEY GENERAL BILL SCHUETTE FILED BY
     INTERESTED PARTY BILL SCHUETTE; (#5250) MOTION OF THE
     CITY OF DETROIT FOR SITE VISIT BY COURT IN CONNECTION
    WITH THE HEARING ON CONFIRMATION OF THE CITY'S PLAN OF
      ADJUSTMENT FILED BY DEBTOR IN POSSESSION CITY OF
       DETROIT, MICHIGAN; (#5300) JOINT MOTION TO QUASH
       SUBPOENAS DUCES TECUM FILED BY INTERESTED PARTIES
        A. PAUL AND CAROL C. SCHAAP FOUNDATION, CHARLES
        STEWART MOTT FOUNDATION, COMMUNITY FOUNDATION FOR
      SOUTHEAST MICHIGAN, HUDSON-WEBBER FOUNDATION, MAX M
     AND MARJORIE S. FISHER FOUNDATION, MCGREGOR FUND,
     THE FORD FOUNDATION, THE FRED A. AND BARBARA M. ERB
      FAMILY FOUNDATION, W.K. KELLOGG FOUNDATION, WILLIAM
       DAVIDSON FOUNDATION; (#5478) MOTION OF THE GENERAL
        RETIREMENT SYSTEM OF THE CITY OF DETROIT TO
        DESIGNATE AND DETERMINE ADDITIONAL LEGAL ISSUE
       REGARDING METHODOLOGY FOR ASF RECOUPMENT FROM
       RETIREES FILED BY CREDITOR GENERAL RETIREMENT
     SYSTEM OF THE CITY OF DETROIT; (#5442) MOTION FOR
      PROTECTIVE ORDER CITY OF DETROIT'S MOTION FOR
      ENTRY OF A PROTECTIVE ORDER STRIKING SYNCORA'S
       DEMAND IN ITS RULE 30(b)(6) DEPOSITION NOTICE
     FOR THE PERSONAL FINANCIAL INFORMATION OF ALL CITY
      RETIREES FILED BY DEBTOR IN POSSESSION CITY OF
    DETROIT, MICHIGAN; (#5436) MOTION TO COMPEL FULL AND
    FAIR RESPONSES TO SYNCORA'S INTERROGATORIES FILED BY
    INTERESTED PARTIES SYNCORA CAPITAL ASSURANCE, INC.,
                SYNCORA GUARANTEE, INC.
        BEFORE THE HONORABLE STEVEN W. RHODES
        UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Jones Day
                         By:  HEATHER LENNOX
                         222 East 41st Street
                         New York, NY  10017
                         (212) 326-3837

                         Jones Day
                         By:  GEOFFREY IRWIN
                              GREGORY SHUMAKER
                         51 Louisiana Avenue, N.W.
                         Washington, D.C.  20001-2113
                         (202) 879-3768

                         Pepper Hamilton, LLP
                         By:  ROBERT S. HERTZBERG
                         4000 Town Center, Suite 1800
                         Southfield, MI  48075-1505
                         (248) 359-7333

For the Detroit         Clark Hill, PLC
Retirement              By:  ROBERT D. GORDON
Systems:                151 South Old Woodward Avenue, Suite 200
                        Birmingham, MI  48009
                        (248) 988-5882

For the Official        Dentons US, LLP
Committee of            By:  SAM J. ALBERTS
Retirees:               1301 K Street, NW, Suite 600, East Tower
                        Washington, DC  20005
                        (202) 408-7004

                        Dentons US, LLP
                        By:  CAROLE NEVILLE
                        1221 Avenue of the Americas, 25th Floor
                        New York, NY  10020-1089
                        (212) 632-8390

For the Detroit         Erman, Teicher, Zucker &
Fire Fighters              Freedman, P.C.
Association and         By:  BARBARA A. PATEK
the Detroit Police     400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI 48034
tion:                  (248) 827-4100

APPEARANCES (continued):

For Detroit Retired      Lippitt O'Keefe, PLLC
City Employees           By:  RYAN C. PLECHA
Association,             370 East Maple Road, 3rd Floor
Retired Detroit          Birmingham, MI  48009
Police and Fire          (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For CFSM, The            Plunkett Cooney
Davidson Founda-         By:  DOUGLAS C. BERNSTEIN
tion, The Erb            38505 Woodward Avenue, Suite 2000
Foundation, The          Bloomfield Hills, MI  48304
Fisher Foundation,       (248) 901-4091
Ford Foundation,
Hudson-Webber
Foundation, The
Kellogg Founda-
tion, McGregor
Fund, The Mott
Foundation and
The Schaap Founda-
tion:

For James Knight         Bilzin Sumberg
Foundation:              By:  MICHAEL KREITZER
                         1450 Bricknell Avenue, 23rd Floor
                         Miami, FL  33131-3456
                         (305) 374-7580

For Kresge               Winston & Strawn, LLP
Foundation:              By:  DESIREE M. RIPO
                         200 Park Avenue
                         New York, NY  10166
                         (212) 294-2622

For Syncora              Kirkland & Ellis, LLP
Holdings, Ltd.,          By:  STEPHEN C. HACKNEY
Syncora Guarantee             RYAN BENNETT
Inc., and Syncora        300 North LaSalle
Capital Assurance,       Chicago, IL  60654
Inc.:                    (312) 862-2157

For Erste                Ballard Spahr, LLP
Europaische              By:  VINCENT J. MARRIOTT, III
Pfandbrief-und           1735 Market Street, 51st Floor
Kommunalkreditbank       Philadelphia, PA  19103-7599
Aktiengesellschaft       (215) 864-8236
in Luxemburg, S.A.:

APPEARANCES (continued):

| | |
|---|---|
| For Attorney General of Michigan: | Michigan Department of Attorney General<br>By:  MICHAEL MURPHY<br>          MATTHEW SCHNEIDER<br>525 W. Ottawa Street, Fl. 2<br>Lansing, MI  48933<br>(517) 373-1162 |
| For Assured Guaranty Municipal Corp.: | Chadbourne & Parke, LLP<br>By:  ROBERT SCHWINGER<br>30 Rockefeller Plaza<br>New York, NY  10112<br>(212) 408-5364 |
| For National Public Finance Guarantee Corp.: | Sidley Austin, LLP<br>By:  GUY NEAL<br>1501 K Street, NW<br>Washington, D.C.  20005<br>(202) 736-8041 |
| For County of Wayne, Michigan: | Butzel Long, PC<br>By:  MAX J. NEWMAN<br>Stoneridge West<br>41000 Woodward Avenue<br>Bloomfield Hills, MI  48304<br>(248) 258-2907 |
| For County of Oakland, Michigan: | Young and Associates<br>By:  JAYE QUADROZZI<br>27725 Stansbury Blvd., Suite 125<br>Farmington Hills, MI  48334<br>(248) 353-8620 |
| For County of Macomb, Michigan: | Dechert, LLP<br>By:  ALLAN S. BRILLIANT<br>1095 Avenue of the Americas<br>New York, NY  10036<br>(212) 698-3600 |
| Court Recorder: | Kristel Trionfi<br>United States Bankruptcy Court<br>211 West Fort Street, 21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Case Number 13-53846, City of Detroit,

2     Michigan.

3          THE COURT:  I understand we have attorneys who wish

4     to be sworn in to the bar of the Court.  Step forward,

5     please.

6          MR. WHITE:  Good morning, your Honor.  Matthew

7     White.

8          MR. SCHMIDT:  Benjamin Schmidt.

9          THE COURT:  Okay.  Are you prepared to take the oath

10    of admission to the Bar of the Court?

11         MR. WHITE:  Yes, your Honor.

12         MR. SCHMIDT:  Yes, your Honor.

13         THE COURT:  All right.  Please raise your right

14    hand.  Do you affirm that you will conduct yourselves as

15    attorneys and counselors of this Court with integrity and

16    respect for the law, that you have read and will abide by the

17    civility principles approved by the Court, and that you will

18    support and defend the Constitution and laws of the United

19    States?

20         MR. WHITE:  I do, your Honor.

21         MR. SCHMIDT:  I affirm, your Honor.

22         THE COURT:  All right.  You're all set.  We will

23    take care of your paperwork.

24         MR. WHITE:  Thank you, your Honor.

25         MR. SCHMIDT:  Thank you, your Honor.

1     THE COURT:  One moment, please.  Okay.  For our

2  agenda today, I propose to take the motions in the order that

3  they appear on the docket, so first it's the GRS motion and

4  then the motion to quash filed by the foundations, then the

5  motion to quash filed by the Attorney General and then the

6  motion regarding the site visit, then the city's motion for a

7  protective order regarding the Rule 30(b)(6) deposition

8  notice and then Syncora's motion to compel full and fair

9  responses and then the two status conferences.  It's the

10  Court's intention to hear the arguments on all of the motions

11  and, depending on the timing, take a break for consideration

12  and then give decisions to the extent I can.  Anybody object

13  to that order of proceeding?  Okay.  So let's start with the

14  GRS motion, please.

15     MR. GORDON:  Good morning, your Honor.  Robert

16  Gordon of Clark Hill on behalf of the General Retirement

17  System, the movant in this matter, your Honor.  We had filed

18  our motion on Friday, the 20th, and seeking certain relief as

19  described in the motion.  A concurrence was filed by the

20  Official Retirees' Committee on Monday.  A response to the

21  motion was filed by the city on Tuesday.  And since then in-

22  depth settlement discussions have ensued between the parties.

23  That has also included participation by Mr. Driker as

24  mediator.  That included last night.  And I am pleased to

25  report that it appears that we have -- the parties have

1  agreed to a resolution in concept to this motion.  There is

2  one and perhaps more, but I believe there's only one issue

3  still sort of out there that needs to be resolved and

4  discussed amongst the parties, so our hope is to get that

5  resolved today.  I guess the only thing I would ask in that

6  regard is if there's a need to have a dialogue with the Court

7  tomorrow that maybe there's some way that even by call we

8  could do that because it would be very important, I think, to

9  be able to announce this resolution before the weekend

10  with -- since it does affect -- it could affect voting, and

11  voting is ongoing right now.

12          THE COURT:  Thank you for your news, first of all,

13  and the answer to your question regarding my availability

14  tomorrow is yes.  Let my office know when you might need me,

15  and we will set it up.

16          MR. GORDON:  Thank you, your Honor.

17          THE COURT:  Anyone from --

18          MS. NEVILLE:  Good morning, your Honor.  Carole

19  Neville for the Retiree Committee.  I would like to thank Mr.

20  Driker, who stayed up late with all of us negotiating this.

21  The agreement will make the buyout option available to

22  retirees, which is really important to the Retiree Committee,

23  to the retirees across the state and everywhere else, so

24  we're very happy about the agreement in principle.  And it's

25  subject to this documentation and the committee approval.

1       THE COURT: Thank you. Is there anything anyone

2  from the city would like to say about this matter?

3       MS. LENNOX: Good morning, your Honor. Heather

4  Lennox on behalf of the city. Nothing further to add.

5       THE COURT: Sir.

6       MR. PLECHA: Good morning, your Honor. Ryan Plecha

7  on behalf of the retiree association parties. We were made

8  aware of the agreement in principle this morning. I have no

9  objections to the principle. I'd just ask to be included in

10  the documentation and resolution of ongoing issues. Thank

11  you.

12       THE COURT: All right. I think that's appropriate.

13  Anything from anyone else on this matter? Okay. Thank you

14  again for your work in resolving that. Let's turn our

15  attention to the motion to quash filed by the foundations.

16       MR. BERNSTEIN: Good morning, your Honor. Douglas

17  Bernstein of Plunkett Cooney on behalf of the Community

18  Foundation for Southeast Michigan, the William Davidson

19  Foundation, the Fred A. and Barbara M. Erb Family Foundation,

20  the Max M. and Marjorie S. Fisher Foundation, the Ford

21  Foundation, the Hudson-Webber Foundation, the W.K. Kellogg

22  Foundation, McGregor Fund, the Charles Stewart Mott

23  Foundation, and the A. Paul and Carol C. Schaap Foundation.

24  Joining in the motion today are the Kresge Foundation as well

25  as the John S. and James L. Knight Foundation.

1        Your Honor, this is the foundations' motion to quash

2    pursuant to Rules 26 and 45.  The Court can protect parties

3    and persons from discovery to avoid annoyance, oppression,

4    undue burden, and expense.  The foundations would submit in

5    this instance preventing intimidation is also appropriate.

6    The foundations believe that the subpoenas have been issued

7    for no other reason than to convince the foundations that no

8    good deed goes unpunished and that they should reconsider

9    their agreement to commit funds to aid the city in working

10   its way through its financial issues while preserving the

11   assets of the Detroit Institute of Arts and propping up the

12   recovery for the pensions.

13        There are a series of deposition topics that were

14   listed both in our pleadings and in the subpoenas which the

15   foundations submit are not reasonably designed to lead to

16   admissible evidence on the topic of the confirmability of the

17   plan.  For instance, there are document requests of the

18   foundations which seek production of documents for every

19   grant issued by the 12 foundations from 1990 to present.

20   Now, a cursory review of the websites for the foundations

21   that are available reveals -- in some instances, the websites

22   go back to grant histories to 2006, and I'll use the example

23   of the Ford Foundation.  The Ford Foundation website alone

24   provides grant data from 2006 to 2014, which contains 406

25   pages of grants, 30 to a page; in other words, over 12,000

1    grants. In total, the information available just from the

2    websites reveals grant data of over 20,000 grants issued by

3    these 12 foundations. There is no good reason for the

4    foundations to be put through the time and trouble of

5    producing these documents for the purpose of a determination

6    of whether or not the plan is confirmable or not.

7           If you look at the objections to the plan filed by

8    Syncora, they basically come down to five general topics:

9    that the plan fails the best interest of the creditors test,

10   that the plan unfairly discriminates between classes of

11   creditors, that the plan is not fair and equitable, that the

12   plan is not feasible, and that the plan was not proposed in

13   good faith. Now, the deposition topics which are set forth

14   in the subpoenas for consideration by the 30(b)(6)

15   representatives of the foundations are the negotiations

16   between the foundations, the city, and other parties

17   regarding the DIA settlement, which the foundations believe

18   is expressly subject to the terms of the mediation order

19   issued at Docket Number 322, which says all those

20   negotiations and the documents that were generated in

21   connection therewith are privileged and not to be discovered.

22   The second area of inquiry for the deposition topic are the

23   terms of the DIA settlement, which we would also submit,

24   again, are covered by the mediation order. Number three, the

25   foundations' contribution to the DIA settlement, which we

1  would submit is -- the terms are contained in the plan itself

2  at Exhibit Roman Numeral I.A.91, which sets forth what the

3  foundations have agreed to do and on what terms.  Number

4  four, the foundations' involvement with the DIA, which the

5  foundations submit is completely irrelevant as to whether or

6  not the plan is confirmable or not.  Number five, the

7  foundations' reasons for entering into the DIA settlement,

8  which we would stipulate is to benefit the city and preserve

9  the DIA and help the city through its troubles, and we have

10  no problem stipulating to that fact.  Otherwise it's

11  irrelevant as to whether or not the plan is confirmable or

12  not.  Number six, the purpose or mission of each foundation.

13  Well, the website of virtually each foundation contains the

14  mission right on there, so there's no need for deposition

15  testimony for that.  Number seven, the foundations' prior

16  donations or contributions including those to the arts,

17  which, again, the foundations submit, number one, are

18  irrelevant to the confirmability of the plan and, number two,

19  are available from the foundations' websites.  And, number

20  eight, the importance and the value of the DIA and its

21  collection, again, no bearing on whether or not the plan is

22  confirmable.

23        The documentation requests that have been submitted

24  by Syncora are all documents and communications relating to

25  the DIA settlement, which the foundations submit are subject

1    to the mediation order and not discoverable.  Number two, all

2    documents and communications relating to the negotiations

3    surrounding the DIA settlement, again, we believe to be

4    covered by the mediation order.  Number three, all documents

5    and communications relating to the transfer of the collection

6    to the DIA Corporation pursuant to the DIA settlement, which

7    we would submit are covered by the mediation order and, to

8    the extent not, covered by Exhibit I.A.91 to the plan.

9    Number four, all documents and communications describing the

10    reasons for entering into the DIA settlement, again, which

11    the foundations believe would be irrelevant, but, again, they

12    would stipulate that the reasons are to do good for the city

13    in that the foundations were invited to the proceedings to

14    help out as good samaritans and for no other purpose.  Number

15    five, documents sufficient to show the causes or charities

16    the foundations have previously supported or provided money

17    to from January 1st, 1990, to the present, and, again, we've

18    submitted much of the information is available from the

19    websites themselves as well as from a website called

20    guidestar.com, which contains a database for over one million

21    not for profit charitable foundations, and it contains grant

22    databases, financial information, their Form 990s that are

23    filed with the IRS and so on.  Number six, the foundations'

24    mission statements, again, available from the websites.

25    Number seven, documents sufficient to show the current

1  process for evaluation of potential partners or causes, which

2  the foundations believe to be irrelevant to the

3  confirmability of the plan.  Number eight, all communications

4  between the foundations and the DIA from January 1st, 2001,

5  to the present, again, quite burdensome, also irrelevant in

6  the minds of the foundation.

7          The defenses which Syncora has raised to the motion

8  is, number one, that the discovery sought is relevant to

9  their objections to the plan, which, as I've stated, we

10  believe to be not accurate.  Number two, that the discovery

11  requests are not unduly burdensome.  Well, I would submit

12  going back for documentary evidence of anything for 24-1/2

13  years provides some burden, especially when a lot of it is

14  readily available from the websites.  And, number three, that

15  the mediation privilege does not apply in that in Syncora's

16  view the mediation order only applied to creditors.  Your

17  Honor, the foundations were only invited to this party by the

18  mediator, and, in fact, the settlement, as proposed, was

19  announced by the mediator, so how the foundations are not

20  entitled to that protection is beyond me especially when the

21  foundations through these proceedings have operated under the

22  assumption that that order applied to them, all of the prior

23  negotiations regarding the DIA settlement contained a strict

24  legend on it that it's subject to the mediation order and not

25  subject to discovery and to remain confidential, and we just

1  believe that it's not accurate.  So for the foregoing

2  reasons, the foundations would ask that the Court quash the

3  subpoenas in their entirety.

4           THE COURT:  Thank you, sir.

5           MR. KREITZER:  Your Honor, this is Michael Kreitzer

6  with the Knight Foundation.  May I be heard?

7           THE COURT:  I'm sorry.  Who was that, sir?

8           MR. KREITZER:  I'm sorry.  Your Honor, this is

9  Michael Kreitzer.  I represent the John F. and James L.

10  Knight Center.

11           THE COURT:  Just stand by for me for one moment.  We

12  do have an attorney from the city at the lectern, so let me

13  let him go first, and then I will call upon you, sir.  Okay?

14           MR. KREITZER:  Thank you, Judge.

15           MR. SHUMAKER:  Thank you, your Honor.  Good morning.

16  Greg Shumaker of Jones Day for the City of Detroit.  Your

17  Honor, I rise for two reasons to express two concerns.  As

18  you know, the city filed a statement in support of the

19  foundations' motion to quash, and the two concerns are these

20  that the city has.  One, the city firmly believes that what

21  Syncora seeks by these deposition and document subpoenas is

22  clearly protected by the mediation privilege and that this is

23  a clear effort to intrude on that privilege.  As your Honor

24  knows, you issued the order back in August of last year.  It

25  was very clear, and all the parties have known what it said

1  for a long, long time.  All proceedings, discussions,

2  negotiations, and writings incident to mediation shall be

3  privileged and confidential and shall not be disclosed,

4  filed, or placed in evidence.  Syncora has now issued 12

5  deposition subpoenas asking for, amongst other things, the

6  negotiations of the grand bargain that was done under the

7  auspices of Chief Judge Rosen.  With that set of facts,

8  clearly something is going on.  Syncora knows what the

9  mediation order says.  It says it wants to know, for example,

10 whose idea it was that the foundations' funds go directly to

11 the pensioners and, quote, "what the foundation is expected

12 to receive in exchange for the donations."  your Honor, those

13 are clearly unequivocally the kinds of back and forth in the

14 mediation process that your Honor's order is intended to

15 cover.  In fact, the only reason that the grand bargain could

16 get done, that the DIA settlement could get done in the way

17 it was was because the mediation order was in place.

18       So the second concern is this.  Why does Syncora do

19 it?  Why does Syncora issue 12 subpoenas that not only demand

20 deposition testimony but also documents that so clearly fall

21 within the Court's mediation privilege?  He also wants

22 documents going back to 1990, as Mr. Bernstein says, and on a

23 host of other irrelevant topics such as the foundations' view

24 on the importance and the value of art.  Why would you do

25 that?  It's the city's view that you do that to intimidate.

1  You do that to bully.

2          THE COURT:  Well, what's the relevance of why they

3  do it --

4          MR. SHUMAKER:  Why they do it?  Well, I think it

5  goes into what --

6          THE COURT:  -- assuming it is irrelevant as you

7  argue?

8          MR. SHUMAKER:  Well, your Honor, I think it goes

9  into --

10          THE COURT:  Either the motion should be granted or

11  not.

12          MR. SHUMAKER:  Agree with that, your Honor, but one

13  of -- you know, Rule 26 is designed to -- allows your Honor

14  to protect the parties from embarrassment or oppression.

15  That's why it's relevant because we do think it is

16  harassment.  We think Syncora wants the foundations to think,

17  "Why did we do this?  Do we want to deal with this sort of

18  hassle?  Is this important enough to us?"  We think that's

19  what Syncora's motive is, and we think motive has everything

20  to do with why your Honor should quash the subpoena in its

21  entirety.

22          The other thing, as you saw in our paper, your

23  Honor, we very much think that the subpoena should be

24  quashed, but if your Honor thinks that depositions should go

25  forward for some reason, we would think that they should be

1  on a very limited time frame given the very, very minimal

2  amount of relevant material that the foundations might know.

3  　　　　　THE COURT:  How does the city deal with Syncora's

4  argument that at least some of the information sought is

5  relevant to its unfair discrimination objection to the plan?

6  　　　　　MR. SHUMAKER:  Well, it would be -- that would be a

7  question on a topic-by-topic basis.  We think that the vast

8  majority of the topics in that subpoena are covered by the

9  mediation privilege or ask, as Mr. Bernstein was outlining,

10  for burdensome information going back to 1990.  Is it

11  possible that Syncora could come up with a question that was

12  dealing with relevant topics?  It's possible, but I don't see

13  it in the deposition that they've issued to these 12

14  foundations.

15  　　　　　THE COURT:  All right.  Thank you, sir.

16  　　　　　MR. SHUMAKER:  Thank you, your Honor.

17  　　　　　THE COURT:  All right.  On the telephone, you may

18  proceed, sir.

19  　　　　　MR. KREITZER:  Thank you very much, your Honor.

20  Good morning, and thank you for receiving our argument by

21  telephone this morning.  I greatly appreciate it.  Your

22  Honor, my name is Michael Kreitzer with the law firm of

23  Bilzin Sumberg here in Miami.  We represent the John F. and

24  James L. Knight Foundation.  And as Mr. Bernstein indicated

25  to you, while he does not directly -- or does not represent

1   the Knight Foundation, the Knight Foundation did join in with

2   the motion of the other foundations.  I just wanted to add a

3   few additional comments, if I may, Judge.  I'll be brief.

4           It does strike me that the subpoena that has been

5   served upon all of the foundations is designed in part to

6   oppress the motivation of the foundations to participate in

7   the grand bargain, and it seems to me that the Court has the

8   authority clearly to either quash the subpoenas or to

9   significantly limit the breadth of the subpoenas, the breadth

10  and the scope.  And in that regard, Judge, I would point out

11  that it is completely unnecessary that subpoenas be served

12  upon every single one of the foundations, and it is certainly

13  appropriate for your Honor to consider a structure.  If your

14  Honor were inclined, of course, to not completely quash the

15  subpoenas, your Honor could certainly consider a process by

16  which some of the foundations but not all of the foundations

17  are required to respond to the subpoena in some limited

18  fashion and then perhaps upon a showing of good cause by

19  Syncora that they need additional discovery from additional

20  foundations, that only then should the remainder of the

21  foundations be subject.  And I would suggest, Judge, that

22  perhaps the way to approach that might be to -- if, again,

23  your Honor were inclined to allow some discovery in this

24  regard, to decide that the foundations that were most

25  involved in the grand bargain and perhaps the foundations

1  that are contributing the greatest amount might be the first,
2  but then others only follow along if, in fact, there is some
3  good cause showing.

4        Additionally, Judge, we think that the actual
5  subject matters should be severely limited, significantly
6  limited, and the duces tecum aspect of the subpoena, the
7  breadth of the discovery, be limited significantly as well.
8  There's clearly, Judge, less intrusive ways of allowing this
9  discovery to proceed if your Honor were inclined to allow it
10 at all.

11       Additionally, Judge, certainly with respect to my
12 client, the Knight Foundation, which is based here in Miami,
13 Florida, we think that it would be inappropriate to require
14 the Knight Foundation to travel, you know, into Detroit to
15 have the depositions taken. I understand there may have been
16 discussions by Syncora to travel to Miami, and if that's the
17 case, I would just want them to confirm it on the assumption
18 that your Honor decided not to quash the subpoenas.

19       And then finally, your Honor, I think, you know,
20 both the city and Mr. Bernstein argued, properly so, that the
21 mediation privilege should clearly be considered by the Court
22 here. The intent, the public policy behind this privilege,
23 as your Honor well knows, is to allow for the candid and
24 forthright communications and conversations among parties
25 involved in the potential mediation so that they can reach

 1   conclusions that are beneficial to all of the parties and to

 2   the ultimate goals of this bankruptcy proceeding.  And, of

 3   course, by impinging upon those communications and not

 4   recognizing the privilege, your Honor, it seems to me, once

 5   again, you oppress the parties or the Court inadvertently

 6   oppresses the parties from having further candid and

 7   forthright conversations that might be beneficial to the

 8   ultimate bankruptcy.

 9           So with that, Judge, we would ask on behalf of the

10   Knight Foundation and joining in with the other parties that

11   your Honor quash the subpoena or significantly limit its

12   breadth.  Thank you, Judge.

13           THE COURT:  Thank you.  One more.

14           MS. RIPO:  Good morning, your Honor.  My name is

15   Desiree Ripo with the law firm of Winston & Strawn, and I'm

16   here today on behalf of my clients, the Kresge Foundation and

17   its president, Rip Rapson.  We have joined in the motion

18   submitted by Plunkett Cooney to quash the subpoenas issued by

19   Syncora because we agree with and support the arguments

20   presented to you by Mr. Bernstein today, and we submit that

21   the subpoenas should be quashed in their entirety.  Thank you

22   very much.

23           THE COURT:  Thank you.

24           MR. HACKNEY:  Your Honor, good morning.  Stephen

25   Hackney on behalf of Syncora.  So when Mr. Bernstein called

1   me about the foundations' objections to the subpoenas, I said

2   to him, "I can imagine how your clients feel," and he

3   actually used the phrase that I used.  I said, "I'm sure they

4   feel like no good deed goes unpunished," that they're coming

5   to the bankruptcy and giving money to the city's retirees and

6   trying to do something helpful, and I can understand that

7   from their perspective, but I laid out for him my perspective

8   and why we had issued the subpoenas, and I laid out the

9   substantive issues for him about what it is that the

10   foundations have become involved in.  And I'd like to frame

11   that, if I could, and then lay out the key points that go

12   towards the motion.  But what we're talking about here in the

13   grand bargain is something that the city itself has described

14   as the cornerstone of the plan, so you pull out the

15   cornerstone, the foundation falls.  That's how important the

16   transaction they've involved themselves is.  The assets in

17   question that are being conveyed are multi-billion dollar

18   assets that are going away from the city.  It's currently in

19   the city.  The city has title to the assets.  After the

20   transaction, they will be in public trust forever.  And it

21   is -- the foundation contribution piece for the assets is --

22   dials directly into the unfair discrimination argument

23   because the city has now said that those are not city funds

24   and should not be considered when you do the unfair

25   discrimination analysis, and it has a dramatic impact on the

1   calculation of what the recoveries are under the plan if you
2   include or exclude that. So I explained that to
3   Mr. Bernstein, and we explained that in our motion for the
4   purpose of showing that the foundations are in -- have
5   involved themselves in the centerpiece of the most important
6   part of the plan and that our discovery is aimed at exploring
7   that for multiple reasons that I will go into but, in
8   particular, for testing the assertion that these are, quote,
9   unquote, not city funds, which is the first argument that
10  they make in connection with the unfair discrimination point.
11  So I will respectfully disagree with counsel here today that
12  says we're trying to harass people, we're trying to
13  intimidate people. It's not fair, and it's not a description
14  of how I operate in this case. I will get to the issue of
15  burden in a moment, if I could, but I think with respect to
16  the issue of relevance, these are -- this is relevant
17  information that we believe that the foundations possess.
18  I'll speak to burden and then the privilege, if I could, at
19  the end, your Honor. Whether the foundations would have
20  contributed the money if the city had not agreed to transfer
21  its art collection, that's relevant state of mind evidence
22  that they possess. Whether the foundations were the ones
23  that imposed on the city the requirement that all monies go
24  to the retiree classes or whether the city was the one that
25  proposed that to the foundations. The ability of the

foundations to pay their respective amounts is an important question that we want to explore. The sources of the funds that they are contributing to the grand bargain is also an important one that we want to explore for reasons I'll explain, the importance of the foundations of obtaining the exculpation they receive under the plan because the foundations actually do, I believe, under the plan receive an exculpation in connection with their contribution, so they actually are getting something from the plan. And then we have also sought information regarding the importance of the DIA to the Detroit community because that is something that has separately been raised by the city. Many of these foundations are ones that have contributed to the DIA in the past, and we are, thus, seeking to understand their view on the importance of the DIA to the community as an economic entity. That's a relevant issue to things the city has put at issue.

The two broad categories of information that we are seeking here can be roughly divided into, number one, what went into this deal and how it was structured. Could it have been structured differently in a way that allows either the art collection to be preserved as a city asset or, alternatively, monetized, or part of the art collection and/or whose idea was it that all of your money had to go to the retirees? You can imagine as a creditor who is on the

1  outside looking in that those are very important questions,
2  and the city has already put these at issue because you'll
3  remember in our pretrial conference before you where they
4  described and laid out their arguments, they were saying
5  things like, "It is the foundations that were requiring us to
6  do this.  We are -- you know, we're limited here.  This is
7  what they're insisting upon."  And we want to test that
8  assertion, so this goes to the fairness and equitableness of
9  the grand bargain and the plan.  It goes to the question of
10  whether these are city funds or are not city funds, and it
11  also goes to the business judgment exercised by the city with
12  respect to the way it structured the grand bargain.  There is
13  no question in my mind that the subpoena seeks relevant and
14  discoverable evidence relating to the cornerstone of the
15  plan.  There is no basis to find us as seeking to harass or
16  intimidate these foundations.
17          I'd like to turn to the question of burden, your
18  Honor, and end on the question of privilege because I think
19  the privilege is going to be an important issue to resolve,
20  but on the question of burden, one of the things I want to --
21  I want to point out two things.  Mr. Bernstein and I did not
22  have an opportunity to speak meaningfully about -- it was
23  never on the table that if we narrowed this request this way
24  or if we narrowed this request this way or the sorts of horse
25  trading that go into a recovery that they would then sit for

a deposition.  His objections to the deposition were
sufficiently existential that he communicated he was going to
move to quash.  And our conversation was relatively short as
a result, and it was cordial.  And what I told him at the end
of the conversation was -- I said I understand why you're
moving to quash, but if the motion is denied, I am here to
work through issues that you have with respect to burden.  We
will travel to the foundations.  We've already planned.  We
will travel to Florida.  We will travel to New York.  And
note that we have structured the subpoena so that it uses
different terminology, so it is documents relating to the
grand bargain are things that we request in the first four or
so requests.  When it comes to the historical grant-making
information and the historical activities of the subpoena, we
have said "documents sufficient to show," and "documents
sufficient to show" is a different request that signals to
the receiving party you don't need to go collect all the
documents that relate to everything that you've ever done.
You just need to give us a document, for example, that shows
this.  And my expectation was that the foundations would
produce a report that shows how they typically give money on
a yearly basis -- it's often in their financial reports or
other documents that they prepare; they know what they're
giving -- and that he would point me to that and we would
work through those issues.  And it's still my intention to do

 1   that, but I would -- I will be surprised if Mr. Bernstein

 2   disagrees with me that we were not in a position to engage in

 3   the type of horse trading about burden because of the fact

 4   that the motion to quash was going to go forward anyway.  And

 5   I stand by my statements to him that I'm a phone call away

 6   and that I work through these types of issues all the time.

 7        I also signaled to Mr. Bernstein that we would be

 8   willing to limit the depositions to half-day depositions if

 9   we could work together to schedule the foundations so that we

10   could do two a day.  It would be potentially more convenient

11   for the foundations and more convenient for the lawyers.  So

12   I have signaled to them my willingness to work on whatever

13   the problematic parts of the subpoena are, and I draw the

14   Court's attention to the way we structured the requests for

15   information.

16        So one question might be, well, why are you trying

17   to find out where they've given money to in the past, and why

18   are you trying to figure out where they're going to get the

19   money from to fund the grand bargain in the future, and the

20   answer is that we want to see how this is going to affect the

21   foundations' behavior going forward because virtually all of

22   these foundations are ones that operate in southeast Michigan

23   and have longstanding commitments to the City of Detroit.

24   What we want to explore is is the effect of the grand bargain

25   that it has taken hundreds of millions of dollars in

1   charitable monies that were otherwise going to be devoted to

2   the southeast Michigan region and/or Detroit in particular,

3   redirected them away from things, for example, like blight

4   remediation or other things that can help the city,

5   redirected them to the grand bargain to the pensioners, who,

6   in my -- it is my understanding as many as 70 percent of the

7   pensioners do not live in the City of Detroit, so I've

8   already explained why we think the negotiations related to

9   the DIA settlement are important, but this effort to

10  understand the way the grand bargain is going to alter these

11  foundations' participation in the future of Detroit is a

12  meaningful inquiry that we believe we have the right to

13  develop evidence on, and I will give you an example of how

14  important it could be.

15          The Detroit Future City's plan is an innovative plan

16  that was put together by the Kresge Foundation, and it's

17  interesting because when the city retained Conway MacKenzie

18  and when Kevyn Orr came on the scene and they were going

19  through the city and trying to decide how to fix it, what I

20  would have expected as just a layperson is that the first

21  thing that you would have done is sat down and said, "I need

22  to understand the long-term strategic plan, the long-term

23  urban plan for the City of Detroit because I need to

24  understand that plan so that I can map the spending onto the

25  plan so that the spending we propose to do maps onto the

1  long-term strategy."  And as best I've been able to tell,
2  that was not done.  Instead they did this sprint through the
3  city and basically asked everybody what money they needed to
4  fix themselves, and there was not an attempt to integrate.
5  And what's ironic about that, your Honor, is that the Kresge
6  Foundation for the last three years had been doing exactly
7  that.  They had been developing this Detroit Future City plan
8  and it is a very -- it's a fascinating document for which the
9  Kresge Foundation should be complimented.  It was based on
10 thousands of conversations that they had with the city, and
11 it's just a very creative document.

12          Now, the important part for purposes of this motion,
13 your Honor, is that I believe that the Kresge Foundation has
14 put something like $140 million behind implementing the
15 Detroit Future City plan, so the creation of the seven
16 different focused economic centers, the creation of the green
17 belt, the revitalization of the creation of the parks and all
18 the stuff that goes into that plan, they have put something
19 like $140 million behind that.  We want to understand how the
20 Kresge -- for example, the Kresge Foundation's decision now
21 to devote monies to the grand bargain is going to
22 implement -- implicate the plans they had to give money
23 towards the Detroit area for subjects like blight remediation
24 or other types of implementing grants that relate to the
25 urban future of the city.  That is not a fishing expedition.

1    I think that that is something that's highly relevant to the

2    Court's consideration because consider this.  If we can

3    establish that these foundations are not going to alter their

4    giving levels and that they were direct -- they're going to

5    direct about the same amount towards the Detroit area over

6    the next ten years as part of the grand bargain but that

7    they're redeploying funds that were otherwise going to be

8    used on something like blight over to the grand bargain, it

9    raises a serious question, I think, for the Court to

10   consider, which is is the city really getting something for

11   its Art Institute because in an alternative universe where

12   the city pursued monetizing the Art Institute or at least a

13   portion of it -- you know, leave a $500 million Art

14   Institute, sell the other several billion dollars, use that

15   for creditors and for revitalization, if the foundations are

16   still directing their money, for example, supplementing what

17   the Kresge Foundation has already proposed to give on Detroit

18   Future Cities, you can see net net the city comes out better,

19   the creditors come out better, the citizens of Detroit

20   arguably come out better, so the warping -- the potential

21   warping effect of the grand bargain on the philanthropic

22   efforts of these foundations is a, I believe, relevant issue

23   to feasibility and to the fairness and equitableness of the

24   plan.  And by the way, it isn't just me that thinks this --

25   I'm not just speculating -- because one of the things that

1    you've been seeing in the press as we saw this grand bargain

2    play out in front of us was that other organizations like,

3    for example, the Detroit Symphony Orchestra were putting

4    their hands up and saying, "Whoa, you know, what implication

5    will this have for us?"  There was a time, I think, in recent

6    history where the Detroit Symphony Orchestra, which is also

7    an important cultural asset, I believe, here in the city or a

8    cultural part of the city's fabric, I think it was like on

9    the verge of bankruptcy, and it's had different financial

10   issues itself.  And some of those foundations have been

11   quoted in the press saying, "We're looking a little bit

12   nervously at the grand bargain because we're worrying that

13   it's like a gigantic sun that sort of warps the space-time

14   fabric of the philanthropic community here in the southeast

15   Michigan area, and it sucks all this money over to them and

16   diminishes what they get," so it isn't just me saying we want

17   to understand the impact that this is going to have on the

18   City of Detroit.  It is organizations within the City of

19   Detroit that have expressed that as well.

20          So I do not believe that there can be a serious

21   contention that our subpoena doesn't seek relevant

22   information, and we have structured the subpoena to avoid

23   imposing a burden.  I don't want people reviewing documents

24   back to 1990.  I didn't expect them to.  That's why we put in

25   "documents sufficient to show."  It is basically inviting the

1  lawyer for the foundations to call me and explain to me -- if

2  it's on the website, we'll go to the website.  I don't know

3  these foundations.  He does.  Like if he will show me the

4  ways to limit the burden, we'll limit the burden.  I'm

5  interested in the substance.

6          The challenging issue I think that relates to the

7  motion is the mediation privilege, and we do disagree with

8  the foundations that the mediation privilege should cover

9  their conduct because they are picking out language that says

10  all conversations incident to writings, documents, and

11  negotiations incident to the mediation are strictly

12  confidential and shall not be disclosed, but the mediation

13  order itself says that the Court is ordering the parties into

14  the mediation, and it gives Judge Rosen the flexibility for

15  himself to issue other orders with respect to the conduct of

16  the mediation.  There has never been an order ordering the

17  foundations into the mediation or saying that the foundations

18  are part of the mediation and now are going to be covered by

19  the mediation privilege.  And I don't think the mediation

20  privilege is well-suited to the foundations because what you

21  are talking about when you're talking about settlement

22  privileges -- and you and I have had colloquy on this

23  before -- is you're talking about the freedom for two people

24  to come together and say, "You're alleging this, and I'm

25  alleging this, and I concede this part of your case, and you

1  concede this part of your case."  The foundations have --
2  we'll stipulate that they don't have liability or exposure to
3  Detroit, so if the foundations come and say, "I might be
4  willing to contribute $10 million," that's not an admission
5  against interest by the foundations.  That's not going to be
6  evidentiarily relevant.  There's not going to be some way
7  that's going to be used against them that they only offered
8  ten or I think I can get twenty, so the purposes behind the
9  privilege are not well-suited to the foundations.  We don't
10  believe the foundations are covered by the mediation order,
11  and so we think there's an important threshold question about
12  the application of the mediation privilege to the
13  foundations, but if there is a privilege that applies to
14  them, it has surely been waived by the conduct of the city,
15  the foundations, and even the mediators in connection with
16  the mediation and the grand bargain.
17       Your Honor, consider what we have seen.  On April
18  1st Bill Nowling, who is Mr. Orr's spokesman, gave a quote in
19  a Detroit newspaper in which he said, "The foundations are
20  requiring us to shake up the pension boards and reform the
21  pensions because" -- words to the effect of obviously they're
22  the ones putting the money in.  They want to see the change.
23  That was a quote from Mr. Nowling.  That's a statement about
24  statements or state of mind by the foundations in the
25  mediation.  The foundations then wrote back to the public and

said, "An April 1 story about the role of foundations in
Judge Gerald Rosen's proposal to help revitalize Detroit by
preserving the collection at the Detroit Institute of Arts,"
and it goes on, "included a misstatement from the emergency
manager's office on the role of participating foundations.
The philanthropic community has not demanded specific changes
to the pension funds, such as replacement of the pension
boards.  We have not been involved in any negotiations beyond
what was needed to get this proposal to the table, and at no
time have we discouraged unions or pension representatives
from working to achieve the best possible outcome."  So the
foundations themselves have come forward and said, "We will
tell you things that we did not say in the context of this
negotiation."  That's not consistent with the idea that
everything related to the mediation must be strictly
confidential.

Consider that the -- you know, the United Press
International reported that Judge Rosen had asked
representatives of regional and national foundations to
participate in a proposal which would include raising up to
$500 million to spare the city from having to part with some
of the collection managed by the Detroit Institute of Arts.
By the way, you'll see this repeated over and over, but to
the extent there are negotiations with the foundations,
negotiations that are protected by the mediation privilege,

1    there are statements in the press with respect to what Judge

2    Rosen's apparently opening offer or opening request to them

3    was, and that is that he was seeking $500 million.  That is

4    the type of substantive thing that is supposed to be strictly

5    confidential.  If Judge Rosen or whomever was speaking with

6    the foundations and went to them and said, "Would you all

7    contribute $500 million?" I should not be reading in the

8    press that that's what he said to the foundations, and yet

9    you can read it in multiple articles all over the Internet,

10   "Toward the" -- here's what the U.S. -- here's what the

11   Detroit News reported.  "Toward the end of a recent three-

12   hour meeting, Chief Judge Gerald Rosen offered what one

13   participant called a 'very carefully worded' idea that fell

14   short of asking nine foundations, including the Kresge,

15   Hudson-Webber, Mott, Knight, and Ford foundations, for a

16   commitment to support the plan."  "Under the plan, the nine

17   foundations - facilitated by mediators appointed by Rosen -

18   would create a fund of between 300 million and 500 million to

19   help the city honor its pension commitments and prevent the

20   DIA collection from being liquidated."  "'The bankruptcy is

21   one of the most consequential events in the history of our

22   city and our region,' said Rosen in a recent statement.  The

23   meeting was intended to give them a perspective - not only on

24   some of the challenges raised by the bankruptcy but also some

25   of the very real opportunities that the bankruptcy provides."

1    <u>Crain's</u> reports that Judge Rosen proffered a

2    tantalizing solution to a group of foundations to protect

3    Detroit's art.  "Could they somehow create a fund or

4    financing mechanism to protect the art?"  That's a question.

5    The DIA has then announced that it's joined behind the scenes

6    federally mediated talks -- I mean not so behind the scenes

7    given that I'm reading about them here in the newspaper, but

8    it says the grand bargain "would funnel about $500 million

9    into pensions, thereby buying the DIA -- buying the DIA its

10   independence from city ownership and freeing up more money

11   for city services.  Two sources with detailed knowledge of

12   the talks but not authorized to speak on the record confirmed

13   that museum leaders had joined the negotiations, which began

14   in Rosen's chambers a month ago with a gathering of

15   foundation heads - without the DIA at the table.  One source

16   said there have been at least one meeting and multiple phone

17   calls between DIA representatives and Rosen's."

18       From the <u>Free Press</u> in December, "In a statement

19   issued today, DIA leaders said they had pledged at a Tuesday

20   meeting with mediators, including U.S. Chief Judge Gerald

21   Rosen and Eugene Driker, to help refine the proposal that

22   Rosen has been pushing behind closed doors since November."

23   "Rosen has been lobbying leaders of at least 10 foundations,

24   ranging from giants such as the New York-based Ford

25   Foundation to modest-size organizations such as the McGregor

1  Fund.  But the boards of directors of those participating

2  foundations would still have to agree that supporting

3  municipal pensions is consistent with their missions."

4  January 13th, Alberto Ibarguen from the Knight

5  Foundation states, "The foundations would stipulate that

6  Detroit must put the money into the pension system."  Ms.

7  Noland of the Community Foundation says, "a plan to help

8  pensioners and protect the art began to form last fall when

9  Judge Rosen," whom she calls -- whom she knows, called her.

10  "'His office reached out to me and said:  'We have an idea.

11  What do you think about raising 500 million?'"  This is

12  coming from Rosen to the foundations.  It's the opening offer

13  of what we're going to -- what the Art Institute is -- it's

14  going to take to save it.  "And I said, 'Are you crazy?'

15  Actually, I didn't say that - you don't say that to a federal

16  judge.  I said, 'Let me call some people I know.'"  And it

17  goes on.  Yes.  The Knight Foundation has released a

18  statement on its blog saying, "The funds paid to the city by

19  foundations and other funders will then be directed

20  exclusively to the pensions owed to retired city employees -

21  a down payment on a hard-earned promise from Detroit," "with

22  the explicit understanding from all parties that the funds

23  from this arrangement will be used solely for these

24  purposes," and it goes on.

25  The Internet is not consistent with the notion that

1   this mediation was an entirely confidential very secret thing
2   that nobody could know about.  The mediators have given press
3   releases and public statements.  They have led press
4   conferences describing where the grand bargain came from, the
5   origins of ideas.  The participants in the grand bargain have
6   been quoted in newspapers about their conversations with the
7   mediators, but what is most interesting about the way the
8   comments flow through the stories is that sometimes the
9   comments just say, "They're asking us to give money to
10  preserve the art collection."  Sometimes they say, "They're
11  asking for money for city services in exchange for the art
12  collection being preserved."  And then at the end it becomes,
13  "Oh, no.  It's the foundations that are requiring their money
14  go to the retirees."

15          You can imagine that the concern here is that the
16  proposal was put to them, "Why don't you contribute money,
17  and we'll give it to the retirees, not to the Syncoras of the
18  world?"  And the foundations said, "That sounds great to us,"
19  and that when it all comes out at the end, then it's the city
20  saying, "Oh, the foundations required that of us, Syncora.
21  We are very sorry.  We try to do the best we can for you."
22  These are not mere items of speculation.  These are very
23  important issues with respect to a grand bargain that lies at
24  the heart of the city's plan.  It's the cornerstone of the
25  plan.  And so I think that --

1    THE COURT:  I have to say that after that

2   presentation, I didn't quite hear what the relevance is to

3   any of your objections.  For example, unfair discrimination

4   seems to be the most likely candidate.  Unfair discrimination

5   requires the Court to consider the city's business judgment

6   or the reasons for paying one class more than another class.

7   What's the relevance of any of this to that?

8        MR. HACKNEY:  Okay.  So let's take that one right

9   head-on then.  Okay.  So the standard -- the city will

10  concede and has conceded in its reply that -- I would say the

11  legal standard, less clear than it could be, but here's what

12  the city has said.  The city has said that it can engage in

13  immaterial level of discriminations of less than four

14  percent, I think, almost as of right, and then the city has

15  said that there's this big band where you essentially have to

16  defer to their business judgment and that when you cross over

17  the magic 50 percent -- absolute 50 percent, which is a

18  strange formulation, then there's almost a heightened level

19  of scrutiny under either the Aztec or the Markell test, so

20  for both tests they've said you don't really kind of get

21  under the hood on unfair discrimination until you cross 50

22  percent.  Now, when you look at the plan and you see Syncora

23  and the other COPs holders are proposed to get ten percent,

24  take a guess where the city says that the retiree numbers

25  come in at.  They come in at 59 cents.  And so the argument

1  is, oh, look, it's only four -- it's only, you know, six

2  times as much as you're getting, and so it doesn't trigger

3  that heightened level of scrutiny.  Now, I don't agree with

4  their formulation of the legal test, which is why I'm

5  portraying it this way, but the question --

6      THE COURT:  Assume it's the heightened level of

7  scrutiny, as you phrase it.

8      MR. HACKNEY: Yeah.

9      THE COURT:  Still what's the relevance?

10     MR. HACKNEY:  Well, the relevance is what -- number

11  one, what goes into that calculation of who's getting what

12  because argument 1-A under the city's brief --

13     THE COURT:  Assume for a moment that the pensioners

14  are getting 90-some percent and you're getting 10 percent.

15  Assume that.

16     MR. HACKNEY:  Yes.

17     THE COURT:  And the heightened level, whatever that

18  level is, of scrutiny is triggered.  Still, what's the

19  relevance?

20     MR. HACKNEY:  Well, you've assumed away the

21  relevance because of the way you set up the hypothetical.

22  For example, if the city will stipulate that the funds by the

23  foundations are city funds that are calculated in the unfair

24  discrimination either because they're transferred on

25  account -- they're contributed on account of the transfer of

1  a city asset --

2          THE COURT:  And you've lost me already, and maybe

3  the city has lost me.  I don't know.  But I would have

4  assumed that the issue of unfair discrimination is based upon

5  not where money comes from but where money goes to.

6          MR. HACKNEY:  That is definitely how Syncora views

7  the world.

8          THE COURT:  All right.

9          MR. HACKNEY:  But the city --

10          THE COURT:  Let's view the world that way since

11  you're the one at the lectern.

12          MR. HACKNEY:  Yes.  No.  Well, remember, you were

13  asking me relevance, and I'm describing the city's case.  I'm

14  trying to discover and defend their case.

15          THE COURT:  Okay.  So is this your concession that

16  this has nothing to do with the issue of whether the

17  discrimination is justified or not?  It's only an issue of

18  whether there is discrimination.

19          MR. HACKNEY:  No.  It goes to the amount --

20          THE COURT:  And explain to me how it's relevant to

21  the issue of whether the discrimination, whatever it is,

22  however you characterize it, however the city characterizes

23  it, is justified or not.

24          MR. HACKNEY:  Okay.  So there are two issues going

25  on here that I think are relevant.  The information from the

 1   foundations is definitely relevant to the amount of
 2   discrimination that's going on, which is absolutely something
 3   that the city is attempting to litigate and is absolutely
 4   something that the city says is relevant to your application
 5   of the test.  In fact, the city has, in my judgment, when
 6   they interpret the Markell test, they are basically waving
 7   the white flag on the Markell test, but they have absolutely
 8   said to you, "Oh, you know, the Markell test, that doesn't
 9   really apply until you get to about 85-5."  Okay.  That's the
10   one instance where Mr. Markell proposed it.  Now, ironically,
11   if you include the foundation amounts in the calculation,
12   guess what you find out?  You find out pretty quickly that
13   the recoveries are 95 to 100 versus 4 to 5 cents depending on
14   how you think of it, so it is absolutely relevant to the
15   amount of discrimination, which the city says is absolutely
16   relevant.  Now, it is also relevant to the application of the
17   test putting aside the amount of discrimination.  That's
18   because the Aztec test has been summarized by courts in this
19   district to say however you construe the fact -- the Aztec
20   test, which I would describe as a slightly more amorphus
21   four-factor test, but they say however you apply the four
22   factors, you must show that the discrimination is necessary
23   to confirming a plan.  Now, you can see that the negotiations
24   with the foundations and how they went down in terms of whose
25   idea this all was is critical to whether the grand bargain,

1  as presently structured, is necessary to confirming the plan

2  because if the foundations are shown through discovery to

3  say, "Look, cards on the table, our main focus was protecting

4  the Art Institute.  That's what we've done.  We've never

5  given money to retirees before.  We've given money to the DIA

6  a lot" -- this is something, by the way, that's true of many

7  of the foundations; they were known players for the DIA --

8  then the imposition of that condition starts to go to the

9  question of whether the grand bargain, as structured, was

10  necessary to confirmation of the plan because if it had been

11  structured differently, you might have been able to confirm a

12  different plan with different recoveries for creditors that

13  did not involve discrimination, so I think it plays into both

14  issues.  And I also believe this plays into fairness and

15  equitableness.  I don't want to move away from unfair

16  discrimination if I haven't persuaded you, but it's right

17  down Main Street on what they're saying.

18          THE COURT:  What does the Sixth Circuit case of U.S.

19  Truck say about all this?

20          MR. HACKNEY:  Say that again.

21          THE COURT:  What does the Sixth Circuit case in U.S.

22  Truck say about all of this?

23          MR. HACKNEY:  I don't know.

24          THE COURT:  Well, I invite you to look at it.

25          MR. HACKNEY:  I will.  I apologize, your Honor.  I

1　haven't read all of -- I don't know if that was cited in the

2　briefs, but if it was, I --

3　　　　　　THE COURT:  I actually didn't see it.

4　　　　　　MR. HACKNEY:  Okay.  Sounds like it should have

5　been.  I will read that after court, but I've read Aztec and

6　its progeny, Markell and its progeny.  The legal standard

7　around unfair discrimination is going to be a big issue, but

8　we're just talking about discovery right now, so I'm trying

9　to stay away from arguing who's right and wrong on the law.

10　I actually -- and I'm trying to take the city's case as I

11　find it in their reply and discover it and prepare for it.

12　　　　　　Now, I will say our view is that recoveries under a

13　plan are ones that are considered with respect to the unfair

14　discrimination analysis, and I actually think what the city

15　is trying to do here with the "these are not city funds"

16　argument, I actually don't think it works, and I will caucus

17　with my colleagues, but I think that if we could get

18　agreement on that today that actually you do calculate, as

19　the Court says, the total amount that a party is getting

20　under a plan irrespective of the source -- we're not doing

21　this whole gifting thing by one party to another and so on

22　and so forth -- that would narrow the subpoenas because then

23　we wouldn't have to get into at least the parts of whose idea

24　was this with respect to the stipulation that go to the

25　retirees, but you're still going to see issues about how much

1 could have been raised because the other thing that you --

2 that's going to go to fairness and equitableness is the last

3 thing that -- if you think of this as effectively like the

4 monetization process that happened, for what it's worth --

5 they didn't do a formal market testing and try and do what

6 Houlihan Lokey did and go out and try and sell the art to

7 people and see what they'd pay for it to get a sense of what

8 is this worth.  The only process that they ran that we can

9 see is Judge Rosen going out to people and soliciting their

10 involvement, and when you go out to people and say, "Do you

11 think you could put together 500 million?" well, you're not

12 probably going to get more than that, and so no person would

13 go to market saying, "Hey, do you think you would pay me as

14 much as 500 million?" and think that maybe they'll get six.

15   THE COURT:  Of course, all of that assumes the city

16 was required to do anything to monetize the art.

17   MR. HACKNEY:  Well, they were required to take

18 actions that are fair and equitable that are aimed at giving

19 a reasonable recovery to creditors, and that is a broad

20 standard that looks at a host of things.  And you're right,

21 you know.  We've been over this ground before, I think, and I

22 won't repeat it, but I mean what I've -- what was important

23 to me today was to come and show you certainly the relevance,

24 the way it plugs into the 250-page reply brief.  I mean this

25 is not something that I haven't thought about.  This is

1  actually something that I previewed several -- you know,

2  several weeks back with you, and --

3        THE COURT:  Let's talk about the issue of ability to

4  pay --

5        MR. HACKNEY:  Yes.

6        THE COURT:  -- by the foundations.  Is there any

7  reason to doubt that?

8        MR. HACKNEY:  The short answer is I don't know.  I

9  have to take the discovery to understand it.  There is not --

10  when I look at the -- I don't see an effective remedy in the

11  DIA -- in the grand bargain to a foundation not paying.

12        THE COURT:  Well, they will have entered into a

13  contract, so there would be a breach of contract claim.

14        MR. HACKNEY:  No.  You're right, but as I understand

15  it, the way it works is it's like the DIA -- this is like 90

16  percent.  I've been trying to get this right just so you

17  know.

18        THE COURT:  Okay.

19        MR. HACKNEY:  So it's like -- the way it works is

20  like the DIA is supposed to backstop the foundations, and so

21  if the foundation doesn't give the money, it's like the DIA

22  has to put the money in, and then the DIA gets the claim, and

23  then I guess the DIA pursues the claim against the

24  foundation.  But there's a real issue around that because my

25  understanding from the press is that the DIA is struggling to

1  raise its hundred million, and so I'm a little -- I don't
2  view the DIA as likely an actual creditworthy guarantor of
3  the foundations, so I question whether it's going to put the
4  money in if they don't.  And I also question a little bit
5  whether the DIA is actually going to sue, you know, the Ford
6  Foundation, which has provided millions of dollars to the
7  DIA, so there are qualitative concerns here, so -- and by the
8  way, I think, as I understand it -- and this is the part that
9  I'm asking to be confirmed.  I had hoped it would be
10 confirmed today, but I couldn't get the answer from my team,
11 but I think it matters because if they -- if somebody pulls
12 out and doesn't give the money, I don't believe -- I'm sure
13 Ms. Neville will correct me if I'm wrong, but I don't believe
14 that that immediately ripples through to a cut to pensioners.
15 I think it has whatever impact it has on the Retirement
16 System, and then when the city comes on line in 2023 and
17 starts putting its money in to eradicate any UAAL and make --
18 yeah.  At that point, it's just to eradicate any UAAL that's
19 arisen or -- yes.  The UAAL will be a little bit big -- will
20 be bigger by whatever amount wasn't funded plus the accrued
21 interest over time, and so I believe but am not certain that
22 it could impact the city years from now if they don't pay, so
23 I think it's a relevant line of inquiry.
24        As relevant to us, though, is are they invading
25 their endowments to make the payments and keeping all their

1    other -- well, either way, are they invading their endowments

2    to make the grand bargain contribution, or, again, are they

3    rediverting money?  So does the Kresge Foundation have a

4    document that says, "This is great.  We were going to do 250

5    on Detroit Future Cities because we had another 110 that we

6    were going to put to that after the $140 million

7    implementation fund is exhausted, but we'll just take that

8    110 and put it over towards the grand bargain"?  That would

9    be important to know, I think, not just for me in my case,

10   but I would think that you would want to understand, like I

11   said, the gravitational impact of the grand bargain on

12   spending in the Detroit area by these philanthropic entities.

13   It's not a fishing expedition.

14        THE COURT:  All right.  Let me move on to other

15   counsel, please.

16        MR. HACKNEY:  Thank you very much, your Honor.

17        MR. MARRIOTT:  Good morning, your Honor.  Vince

18   Marriott, EEPK and affiliates.  It sounds as though this may

19   ultimately go in a direction where no resolution of the scope

20   of mediation privilege needs to be reached, but at some point

21   we're going to have to address this mediation privilege

22   because this plan is becoming and may ultimately be

23   exclusively a compilation of settlements reached in

24   mediation.

25        THE COURT:  Let's talk about whether the phrase

1   "mediation privilege" is the appropriate language to use
2   because what we have is a court order, and what we're talking
3   about is enforcing or not enforcing a court order.

4           MR. MARRIOTT: I think that that's a better way of
5   thinking about it because orders can be changed.

6           THE COURT: Orders can be changed. They can't,
7   however, be waived, which privileges can.

8           MR. MARRIOTT: And I'm not rising to talk about
9   waiver. What I'm rising to talk about is process and how the
10  mediation confidentiality, whether order-based or privilege-
11  based, is a threat to the confirmation process given the way
12  that the plan is coming together as a compilation of mediated
13  settlements. I mean when you think about Rule 408 --

14          THE COURT: Is today the day to talk about changing
15  an order?

16          MR. MARRIOTT: Well, I just -- to the extent that
17  you're going to be thinking about mediation privileges in
18  connection with this motion, it seems appropriate --

19          THE COURT: Mediation orders.

20          MR. MARRIOTT: -- mediation orders in connection
21  with this motion, it seems an appropriate time to at least
22  talk about sort of high-level issues raised by this. Let's
23  just start with Rule 408, not an order, not a privilege, a
24  rule. I mean the confidentiality is designed to protect
25  parties who are in the process from using the process against

1   each other if it breaks down.  That works very well in a two-

2   party dispute, and it would work well in the event that

3   mediation failed.  The parties that were participating in it

4   as to their issue could not use what was disclosed in the

5   mediation against each other when litigating that issue.

6   This isn't a two-party process, and we're talking about not

7   mediations that failed.  We're talking about mediations that

8   succeeded and succeeded in reaching a settlement, which, as

9   part of this plan process, you are going to have to find were

10  reasonable and in the best interest of creditors.

11          THE COURT:  Yeah.  We've had this conversation many

12  times before, and my conclusion has always been that who said

13  what to whom during the mediation that led to the successful

14  settlement is irrelevant.  What matters is whether the

15  settlement that was reached is a reasonable settlement given

16  the factors we're all aware of mostly including the relative

17  merits of the parties' legal and factual positions in the

18  case.

19          MR. MARRIOTT:  I think it's -- I don't know that a

20  blanket statement as to who said what to whom, who offered

21  what and when and why is irrelevant.  If you remember in the

22  swap situation when we were litigating the swap settlement,

23  in fact, Mr. Orr, because it was relevant, testified

24  relatively specifically about who offered what to whom when

25  and why, and, for example, as Mr. Hackney indicated -- and it

 1  may go away because we may end up deciding that where the

 2  money comes from is irrelevant.  What matters is where it's

 3  going to, and so who said what to whom about how this money

 4  has to be directed won't be relevant to assessing the grand

 5  bargain, but to the extent that it is, who said what to whom

 6  is highly relevant, in our view, to whether or not the grand

 7  bargain is reasonable, fair and equitable, and ought to be

 8  approved by this Court as part of the plan.  So if the

 9  mediation order becomes this cone of silence with black

10  boxes, everything that went on in the mediation insulates it

11  from inquiry and puts creditors and ultimately the Court in a

12  position where -- and I think the city used this phrase in a

13  hearing a couple weeks ago -- presumption of reasonableness

14  because a settlement was reached in mediation -- how you test

15  that if you can't get into that black box becomes a real

16  problem.

17          THE COURT:  Well, if the city is asserting that

18  presumption of reasonableness means someone else has the

19  burden of proving that a settlement is not reasonable, I've

20  never accepted that.

21          MR. MARRIOTT:  But testing that proposition at all,

22  presumption or not, when the plan becomes a compilation of

23  mediated settlements, which are in a black box, it's hard to

24  see how that doesn't create a presumption in fact if not in

25  law, so, again, when you think about what the purpose behind

1 the confidentiality --

2        THE COURT:  I have a hard time accepting that given

3 my holding once and suggestion a second time that the city

4 didn't meet its burden of proving reasonableness.

5        MR. MARRIOTT:  The swap.  But, Judge, that was a

6 situation where the city did not take the position that the

7 mediation was a black box and did not bar inquiry into the

8 process, and that evidence --

9        THE COURT:  Perhaps so, but the basis of my

10 rejection of the one and suggestion that the other one was

11 not going to be approved was not based on that.  It was based

12 on the merits of the respective claims and defenses.  Yes?  I

13 mean I very carefully went through on the record who was

14 claiming what and what the relative strengths of those were.

15 It wasn't based on who said what to whom.  I hardly cared

16 about that.

17        MR. MARRIOTT:  Who said what to whom I think can, in

18 fact, have substantive meaning with respect to the

19 reasonableness of a settlement or its -- whether it's fair

20 and equitable in the context of the plan or the purpose to

21 which a settlement is being put in the plan.  I'm not

22 suggesting necessarily, Judge, that this gets resolved today.

23 I mean Mr. Hackney has argued that even if there was a right

24 to confidentiality, it was waived or it may be the issue as

25 to which that inquiry as necessary will go away, but I think

1  it is going to be something that's going to affect this
2  process in a way that needs to be thought about.
3          THE COURT:  All right.
4          MR. MARRIOTT:  And I just want to say in closing, I
5  promise, that the purpose behind the confidentiality is to
6  protect the parties against each -- from each other if the
7  settlement fails.  It's really not designed to be a block to
8  full inquiry into whether a settlement is fair and
9  reasonable.  Thank you.
10         THE COURT:  All right.  Would anyone -- sorry.
11  Would anyone else like to be heard before we turn to
12  rebuttal?  All right.  Any rebuttal?  Mr. Bernstein.
13         MR. BERNSTEIN:  Your Honor, I'm not sure that
14  there's anything more that I'd add that wouldn't be
15  repetitive unless the Court has questions, but a couple
16  things.  Number one, this is the first inquiry I've heard
17  about the foundations' ability to pay.  Certainly that may
18  have been a topic of inquiry, but it wasn't listed among the
19  deposition topics.  I concede Mr. Hackney and I did have a
20  cordial conversation rather than just us filing the motion.
21  I think the foundations' position is, with regard to the
22  future deployment of funds, if we're reallocating from one
23  good cause to another with the foundations, I think the
24  foundations would take the position if the city doesn't get
25  by the bankruptcy, you're not going to have a city to put

1   money into, and I think that pretty much is their position,

2   so if the Court has any further questions, I'd be happy to

3   address --

4           THE COURT:  No.  Thank you.

5           MR. BERNSTEIN:  Thank you.

6           THE COURT:  Any rebuttal from the city?

7           MR. SHUMAKER:  Your Honor, very quickly.  One, I

8   think what you've just heard shows that there is an attempt

9   to try to get into the mediation order that your Honor has

10  issued, so there's no question there.  And as your Honor has

11  pointed out, you can't waive that order.   When we talk about

12  the privilege, your order is in place.  The parties acted in

13  reliance upon that order.  The back and forth is not

14  relevant.  The money that's coming in as a part of the grand

15  bargain either is relevant -- I mean is either reasonable, as

16  your Honor says, based upon the parties' relative merits of

17  their positions, or it's not, and we think that's why the

18  subpoena should be quashed.

19          THE COURT:  All right.  The Court will take this

20  under advisement and make a decision at the end of the day's

21  proceedings.  Let's turn our attention then to the next

22  matter, which is the attorney general's motion to quash.

23          MR. MURPHY:  Good morning, your Honor.  Michael

24  Murphy appearing on behalf of the attorney general of

25  Michigan.

1          THE COURT:  Yes, sir.  Go ahead.

2          MR. MURPHY:  This is our motion, your Honor, to

3     quash.  I've reviewed the briefs.  I thought they were

4     adequate for the Court's purposes.  I wanted to point out a

5     couple of things.  One, this involves a subpoena, as the

6     Court is aware, and it involves a published attorney general

7     opinion, Number 7272, which is a formal published opinion.

8     And the position is the opinion says what it says.  How it

9     got to that point is not relevant.  The process is

10    irrelevant.  The motive behind it is irrelevant.  It stands

11    or falls on its own legal merit, which is decided by a Court

12    if it's challenged by a party to a lawsuit where it is being

13    relied upon.  7272 doesn't bind courts as a legal precedent

14    as, say, an appellate decision would bind the lower court.

15    The ground to question the opinion doesn't arise with how it

16    was written or reached or why it was done but its legal basis

17    and its legal reasoning.  That's what an opinion is all

18    about.

19          Now, there's a lot of talk in the response, and

20    that's why I wanted to address that is the cases and the

21    response that indicates you need some type of extraordinary

22    circumstances to allow the deposition of a high-ranking

23    official such as the attorney general, and throughout the

24    response, the extraordinary circumstances cited to this Court

25    is the existence of this Chapter 9.  Now, I'll be the first

1  to admit that this a pretty extraordinary case.  It's the

2  largest municipal bankruptcy in the history of the country.

3  But those aren't the extraordinary circumstances that would

4  justify the deposition of a high-ranking official.  It's the

5  circumstances surrounding that official's involvement.  As an

6  example, perhaps you have a run-of-the-mill civil case in a

7  state circuit court where the attorney general was personally

8  involved in some decision that affected some party.  That

9  could be sufficient extraordinary circumstances.  It doesn't

10 matter what the case is about itself.  It's the circumstances

11 surrounding what we're talking about.  For example, on page 3

12 of their response, the city cites 7272 as one of the primary

13 reasons, in their words, primary reasons that there has been

14 no art sale.  Now, I don't have any knowledge of whether

15 that's correct or not.  I don't have any personal knowledge

16 of whether the city is making that claim, but let's say they

17 are.  Then I think the deposition should be of somebody at

18 the city who made the determination that the opinion is a

19 correct one, not of the person who issued it but the person

20 who followed it, the person who said they accept this

21 opinion.  So extraordinary circumstances is the overall case,

22 but the events need for the factual knowledge of the

23 occurrence at issue, not necessarily because of the case

24 itself.

25         There's no authority for the bald proposition -- and

1  I'm jumping to a privilege argument -- because you publish an
2  opinion that you waive the underlying privileges.  I fail to
3  see any support for that statement.  I fail to see how that
4  even exists.  On page 12 of the response, that language they
5  use there is in and of itself a legal argument and not a
6  search for facts.  For example, we have a published opinion,
7  and because it's published, any privileges associated with
8  its preparation are waived.  If that proposition is true,
9  then every published opinion by the attorney general has
10 waived every privilege it has, and the attorney general can
11 be deposed in any case where he publishes an opinion taken to
12 its logical conclusion.  There's no authority for that.
13        And on page 19 of the response -- I like the
14 sentence because it was important -- is that their claim is
15 the attorney general has put this opinion at issue.  As the
16 Court can easily see from the circumstances of the case, the
17 opinion has been put at issue by the creditors and by the
18 city, not the attorney general.  The attorney general merely
19 issued it.  Whether the opinion is accepted by the Court or
20 not depends on its reasoning.  It depends on its legal merit,
21 not how it got written, not who wrote it, not whether it was
22 written by one person or two persons or three persons.  They
23 need to deal with its content, not on how it arrived on the
24 face of this earth, which is what this seems to be about.
25        They talk about the time involved.  A request was

1   made, two days later an opinion issued.  Now, it's been my

2   experience that some large, large law firms can turn out an

3   opinion in 24 hours, airtight, perfect reasoning, great

4   logic, tremendous legal authority, and somebody else can work

5   on an opinion because of their skill, ability, time

6   constraints six months and turn out something that could be

7   categorized as a legal gobbledygook that doesn't make any

8   sense.  The time involved is immaterial to a written opinion

9   and its purposes.  The process does not lead or establish

10  merit in the opinion.  That has nothing to do with the merit

11  of the opinion.  The merit of the opinion is what is stated

12  in it, what is cited in it.  Is it right or is it wrong?

13  That's for briefing and argument, not for depositions.  The

14  reasoning of the opinion and the legal authority it relies on

15  establishes its merit, and that's what we're here about.

16  It's privileged information.  The process is not relevant to

17  anything the opinion says.  It's what it is, it's what it

18  says, and it's subject to legal argument and briefing, not

19  subject to a deposition.  I don't know why this is being

20  brought here or why this is being subpoenaed.  I don't know

21  what the purpose is behind it, but the opinion says what it

22  says, and it's not going to change by any deposition, and

23  that's why we would ask the Court to quash the subpoena.

24  Thank you.

25          THE COURT:  Thank you, sir.

1          MR. MURPHY:  Any questions, your Honor?

2          THE COURT:  Anyone else want to speak in support of

3    the motion?  All right.  Mr. Hackney.

4          MR. HACKNEY:  Good morning, your Honor.  So let me

5    start by saying that I appreciate the attorney general's

6    concerns that a subpoena to a high-ranking official are not

7    something to be taken lightly, and I understand the

8    seriousness of the issue.  My dad worked for the Attorney

9    General's Office for 40 years under Frank Kelley and Jennifer

10   Granholm and even Mike Cox, and so I'm very familiar with the

11   attorney general's office.  And we did not issue the subpoena

12   lightly, but before I get to the two principal arguments that

13   are raised, undue burden and privilege, I would like to talk

14   about how the attorney general's opinion --

15         THE COURT:  I wouldn't characterize the principal

16   argument as either undue burden or privilege.  It's

17   relevance.

18         MR. HACKNEY:  Ah, yes.  Okay.  Well, let's start

19   then.  I would say the components of the undue burden claim

20   were both relevance and --

21         THE COURT:  Okay.  All right.

22         MR. HACKNEY:  But point well-taken.  So counsel -- I

23   did not catch the gentleman's name, but he made an

24   interesting statement when he was arguing to you because what

25   he said was -- he said whether the opinion is accepted by the

1    Court is what's at issue here, and that should be accepted or
2    not accepted on the merits.  Now, that goes directly to the
3    problem, from my vantage point, because that is not how this
4    proceeding is going to play out, and I'd like to talk about
5    that, if I could, for a moment with you about how the opinion
6    is going to be used from an evidentiary standpoint that
7    shows, in my view, that the legal merits of the opinion alone
8    are not sufficient to debate.  And you'll note, if I could
9    say when you read the -- for example, the Morgan case, which
10   is the centerpiece of where the extraordinary burden standard
11   comes from for high-ranking officials, the Morgan case
12   involved the Secretary of Agriculture, I think, making a --
13   it was a rule-making authority at the time -- it was 19 --
14   late 1930s -- of prices relating to like the meat packing
15   industry.  Now, that litigation actually related to whether
16   or not that decision that he made was the correct one, so
17   they were actually litigating his decision, and this is my
18   point to counsel for the attorney general, which is if we
19   were just litigating the question of can the city sell the
20   art or not, then I would have comfort that we were going to
21   litigate the issue.  It will be addressed on the merits, and
22   I can focus on the facts and the law.  That's the problem.
23   That is not how it will enter into this case.  The way it's
24   going to enter into this case is the city is going to look at
25   the opinion, and it's going to point out the opinion to you,

1  as it has done in its discovery responses to us when we said,

2  "Why can't -- what are the limitations on your ability to

3  sell the art?"  And front and center is attorney general

4  opinion.  They're going to justify the DIA settlement by

5  saying, "You have the opinion of the attorney general.  He's

6  allowed to enforce charitable trust rights.  That raises the

7  specter of litigation.  In order to involve the uncertainty

8  and costs of the attendant litigation, we entered into the

9  grand bargain.  You should defer to our business judgment

10 because it's reasonable based on consideration of all these

11 facts such as that one."  In my estimation, what they are

12 doing is they're using the attorney general's opinion like an

13 expert opinion, and think about this, your Honor.  You can

14 see it from an evidentiary standpoint.  Hear me out.  I know

15 you're about to tell me you don't like this argument, but let

16 me show it to you.

17      THE COURT:  No.  What I'm about to tell you is I

18 don't like the city's argument --

19      MR. HACKNEY:  You don't like the city's argument

20 that it -- I'm sorry.

21      THE COURT:  -- because, once again, I'm more

22 concerned with whether it's a reasonable settlement based on

23 the merits of the legal arguments involved, not who

24 enunciated them.

25      MR. HACKNEY:  I just think -- I'm trying to think

1 for a moment where if we had a stipulation today that the

2 issue of the attorney general's opinion was something that

3 merely could be considered by the city to the extent it was

4 legally meritorious --

5        THE COURT:  How about a ruling?  Would that help

6 you?

7        MR. HACKNEY:  That is something I would like to talk

8 with counsel about because the example I was going to give

9 you plays to the relevance, which is pretend that the city

10 was going to march in -- I'll be extreme here, okay, but a

11 ten-year-old kid who had an oral opinion that you can't sell

12 the art, the lawyer for the DIA that had an opinion that you

13 can't sell the art, and they do, or the attorney general had

14 an opinion that you can't sell the art.  You can see that

15 each of the opinions can be tested on their legal merits, but

16 they are absolutely of differing evidentiary significance,

17 and so that is -- I'm anticipating the way they're going to

18 use the evidence at trial, your Honor.  That's what I'm --

19 I'm not just harassing --

20        THE COURT:  And all I'm -- and all I'm telling you

21 is I don't care the age or experience of who announces what

22 opinion and the basis for it.  I want to know what the basis

23 is, and I will evaluate it independently.

24        MR. HACKNEY:  It would be helpful if I could confer

25 with some of my colleagues.

1          THE COURT:  Well, all right.

2          MR. HACKNEY:  But I guess let me tie this one up a

3    little bit then because -- and let me try and telescope it a

4    little bit.  But I think there is one important distinction

5    that counsel also conceded, which is that the opinion itself

6    is not actually a statement of law -- of the law by the

7    attorney general.  It's just a prediction.  And that

8    distinguishes it from all of the cases that are cited.

9          THE COURT:  I have to say that to me the opinion is

10   really nothing more than a brief that any other party in

11   interest might submit on the merits of the issue framed, and

12   you wouldn't take the deposition of any other attorney in the

13   case to discuss with them why they came to the conclusion

14   they did in their brief.

15         MR. HACKNEY:  It's interesting because, you know, I

16   was thinking about the distinction between a pleading and a

17   freestanding opinion.  I think there are two.  The first one

18   is that you're required to file the pleading, and the second

19   is that this opinion preceded the proceedings.  That's part

20   of the story here, your Honor, is that we want to show the

21   facts around the way the attorney general involved himself.

22   He did something that's atypical under his own opinion

23   policy.  He typically does not issue opinions where something

24   is about to be the subject of litigation I presume because

25   he's concerned about exactly what's happening right now,

1　which is that he gets himself into the middle of it.  And,

2　second, your Honor, they did not --

3　　　　　THE COURT:  And I just have to state again I don't

4　care about any of that.  What I care about is what has he

5　argued and what is the law in support of it.  What are the

6　merits of it?

7　　　　　MR. HACKNEY:  Well, I guess what I would say is I

8　think it would -- if we had a ruling today that the city

9　cannot say -- you know, they cannot point to nonlegal

10　considerations around the opinion and say, "Look, we actually

11　think that it's wrong, but because it comes from the attorney

12　general, we have to defer to it," because that, I think,

13　starts to implicate him as this expert, as this person who's

14　made a statement of the law.  I think that would --

15　　　　　THE COURT:  The city will argue what it wants.  I

16　can't prevent it from arguing, but what I've suggested to you

17　is what weight I think it deserves.

18　　　　　MR. HACKNEY:  Well, and that's helpful, but I

19　also -- I mean if they're going to argue that and

20　introduce -- you know, if two months from now Kevyn Orr is on

21　the stand going, "I know Bill Schuette.  He issues opinions

22　that are, you know, respected by this Court on pensions and

23　same sex marriage, and they probably would have respected

24　this opinion, too," okay, no, those were dustbins; right?  I

25　mean like this is apparently the opinion that we're deferring

1 to, but the other two have been litigated, taken to

2 conclusion and rejected by this Court, so -- but if it's a

3 qualitative element where he's saying the attorney general

4 has a policy where they issue opinions that are thoughtful

5 and well-reasoned --

6        THE COURT:  Well, I would warn --

7        MR. HACKNEY:  -- and that impacted my business

8 judgment --

9        THE COURT:  I would warn the city that if Mr. Orr

10 says that, he will not be helping his case because he should

11 take into account in deciding this issue not who announced

12 the merits of the issues raised but what those merits were.

13 That's what I want him to take into account just like me.

14        MR. HACKNEY:  Well, like I said at the beginning, I

15 mean I do think it poses a different story if the creditors

16 have some comfort that we're going to litigate the issue, but

17 if we're not, I think we have a different evidential problem.

18        THE COURT:  All right.

19        MR. HACKNEY:  Thank you.

20        THE COURT:  Thank you.  Anyone else want to be heard

21 on this, for example, anyone from the city?  Apparently not.

22        MR. MURPHY:  Your Honor, I have nothing further

23 unless you have any questions for me.

24        THE COURT:  Sir, I have to ask you to speak near the

25 microphone, please.

1　　　　MR. MURPHY:  I have nothing further, your Honor,

2　that you might -- unless you have questions for me that I can

3　answer.

4　　　　THE COURT:  No.  I'll take this matter under

5　advisement and issue a decision later.  Okay.  Let's turn our

6　attention to the motion for the site visit.

7　　　　MR. HERTZBERG:  Good morning, your Honor.  Robert

8　Hertzberg, Pepper Hamilton, on behalf of the city.  This is

9　our motion formally submitted at this point asking the Court

10　to authorize a site tour of the city.  We previously brought

11　this up to the Court at a status conference, and it's been

12　part of the discussion with numerous of the objectors.  We

13　thought we had it worked out.  It didn't happen, and we filed

14　the formal motion, which is now before the Court.

15　　　　As we all know, this is the largest Chapter 9 ever

16　filed in the history of the United States and, in my opinion,

17　for what it's worth, one of -- the most important bankruptcy

18　case in the history of bankruptcy because it involves a city

19　of 700,000 residents.  I also happen to think it's probably

20　one of the most important legal cases in the country today.

21　　　　We did a tour -- when I say "we," I mean myself and

22　Mr. Shumaker, my co-counsel in this -- of the city, of the

23　proposed site yesterday to get an idea because I wanted to

24　fully understand the proposed tour site, not just on a map

25　and not just pictures.  I wanted to understand it so that I

1  could explain the importance of it to the Court, so we spent

2  four hours going around the proposed site, which I don't want

3  to go over in court today, but getting an understanding of

4  what it is so that I could explain it to the Court and why

5  it's so important.  And I have for years myself, as like I

6  assume the Court has, driven into the City of Detroit for

7  work, pleasure, and other things, come in through the

8  highways, come up through Detroit or midtown and seen that

9  area but have not experienced what is going on in the city

10  itself.  At least I haven't.  I've seen it through the tunnel

11  of the highways, not through the neighborhoods, not through

12  the police precincts and not through other things, which are

13  part of the living, breathing part of the city, not just the

14  highway system that brings you into downtown or into midtown.

15          I'd suggest to the Court, with all due respect, that

16  you need to see this.  It's important.  It was important for

17  me and Mr. Shumaker to see it yesterday, and it really

18  changed our view of everything to have seen it live and to

19  see the city as it is, and it was -- one of the issues

20  raised -- and we'll get into this a little bit more in a

21  minute -- was the safety issue.  Let me assure the Court it

22  was completely safe, what we did.  There's no issue of safety

23  here.

24          I think both parties -- when I say "both parties,"

25  the city and the objectors -- all agree that the standard is

1   discretion, so I'm not going to sit here and spend 20 minutes

2   going over the case law.  I agree with the objectors.  It's

3   the city's position that it's totally in your discretion, but

4   we think you should exercise this discretion and authorize

5   the bus tour.  And why is it important?  Because it gives you

6   context.  You need to witness this.  You need to see what's

7   going on in the city.  I can come in here with pictures all

8   day long.  Pictures are not going to help you understand it.

9   It didn't.  Especially when I saw it yesterday, it's

10  different than the pictures, and you need to see live what is

11  going on in the city.

12          This case screams out for a site visit.  This is not

13  a normal Chapter 11.  We've all seen -- and you've seen

14  hundreds of them -- retail cases, manufacturing cases,

15  hospital reorganizations, et cetera.  This is not your normal

16  Chapter 11.  This isn't where you go and you see how a widget

17  is made or how a widget is sold at a retail operation.  This

18  is a Chapter 9 of a municipality of 700 residents, and this

19  can be seen through a site visit unlike an industrial

20  facility.

21          One of the most important aspects of the plan of

22  adjustment is the $1.4 billion reinvestment into the city.

23  In order to see how the reinvestment works, the Court needs

24  to see where the money is going to be directed.  If you look

25  at the plan, for example, over 400 million is going into the

1   police and safety.  400 -- over 400 million is going into

2   blight remediation.  I can hold up a picture of a police

3   precinct, but that's going to mean nothing to you, your

4   Honor.  If you walk through a police precinct, you're going

5   to understand does it need work, does it not need work.  And

6   they'll get up and they'll say, "Well, we're just cherry

7   picking things."  No, we're not.  We're showing you what you

8   need to see as part of the reinvestment.  Are you going to

9   see some blight?  Yes, you would see some blight, but a major

10  part of the reinvestment is the blight removal.  And how can

11  you understand what the blight removal is unless you see it?

12  I can hold up a picture, and I have the blight book here to

13  show the Court if it wants to see, but it's going to be

14  meaningless because all it is is a picture of a house.

15  There's no one around it.  It's a photograph.  It's not a

16  living, breathing community.

17          Another major issue is -- and, by the way, I am at a

18  loss, to be real frank with the Court, why the objectors, the

19  ones that have filed objections to the site tour, are

20  objecting.  I understand their motivation, but it really

21  doesn't make sense.  What they want the Court to do is really

22  to look at the financial aspects only.  They want the Court

23  to review balance sheets, financial statements, and other

24  documents but not look at the city itself because they know

25  if the Court understands what's going on in the city, it'll

1  not rely only on the financial aspects.  It will rely on that
2  it's a community of residents, that it needs reinvestment.
3  This all -- the site tour puts everything into context.

4          There's really six major objections that were filed
5  or six categories of objections that were filed to the site
6  tour.  The first one is that the time should be charged
7  against the city.  We'll accept that.  We'll take that
8  against our hours of allotment under the trial, so I think
9  that issue goes away.  And what it indicates by doing that is
10  is this is part of our proofs and that we should be allowed
11  to do it and allowed to request the Court to come on the
12  tour.

13          As I indicated, courts have discretion.  It's a
14  total issue of discretion under the case law.  And just
15  because the Court can look at photos doesn't mean the Court
16  is barred from doing a site tour.  There's some implication
17  in some of the pleadings that the Court could simply look at
18  the photos and that's enough.  I'd suggest to the Court that
19  in its discretion it has the right to look at the actual
20  sites.

21          The objectors were unable to find one case in their
22  pleadings that it would be an abuse of discretion if the
23  Court ordered a site tour, and that's critical because there
24  are no cases dealing with the issue that it could be a
25  possible abuse of discretion if the Court allowed a site

1  tour.

2      The objectors also acknowledge that the ability of

3  the city to provide future public service is a feasibility

4  issue, and unless the Court understands what services are

5  going to be provided and how they're going to be provided

6  such as police, fire, blight removal, it would not be meeting

7  the feasibility requirement.

8      The objectors attempt to claim that the contextual

9  evidence is irrelevant.  I'd suggest to the Court that the

10  contextual evidence is extremely relevant in the Court making

11  its ruling.

12      Next they claim that a three-hour tour is not

13  efficient.  It's our proofs.  If we want to make those our

14  proofs and they believe it's inefficient, that's fine.  They

15  can believe what they want.  We believe it's an efficient use

16  of our time, and it's charged against our time, and we want

17  to do this tour.

18      Next they claim that there's 138 miles to the city,

19  and a normal site visit only covers one location.  Nothing

20  says in the Court discretion that it can't see several sites.

21  They want to say that a normal site visit is one location.

22  If we want to go by ten or twelve sites, that's in your

23  discretion to make that decision whether we can have that

24  tour.

25      As to -- their next argument is that we should just

1  have the court expert do it, the court-appointed expert go

2  through the site tour and report back to the Court.  That's

3  the same problem as what I'm addressing with the Court.  We

4  don't need someone to get up here and testify, "I saw a

5  building which was in bad shape.  I saw a precinct that

6  needed work on it.  I saw this in the city," and report that

7  to you.  You are the finder of facts in this case.  You need

8  to go out and see this with your own eyes is what the city

9  believes.

10       Next argument is is that we are excluding some of

11  the objectors.  That wasn't our intention.  Our belief is

12  that each objector should have a seat on the bus, one of

13  their -- an attorney for each objector should have a seat.

14  So if we somehow didn't include one objector as part of our

15  proposal, I want it a hundred percent clear that was not

16  intentional.  Each objector should have a representative

17  attorney on the bus tour.

18       Some of the specific issues that were raised were

19  such as a -- how are we going to video this because we had

20  suggested --

21       THE COURT:  Attorneys who by settlement now support

22  the plan also want a seat.

23       MR. HERTZBERG:  I was going to get to that later.

24       THE COURT:  Oh, all right.

25       MR. HERTZBERG:  I'll do it now.  That's fine.  I

1    don't think it's necessary.  They're supporting the plan.

2    There's only one party that's come before this Court and

3    said, "I want a seat on the bus even though we're supporting

4    the settlement."  This is not meant -- let me be blunt.  This

5    is not an event.  This is meant for the Court to see

6    something, and if a party is objecting to the plan, they

7    should have the right to see this, too.  When you're

8    supporting the plan, there's no benefit for it.  We shouldn't

9    be taking up a seat with it.  This is not an event to come

10   witness, and there's no upside for that party.  They're

11   supporting the city.  If for some reason that the vote

12   doesn't turn the way that they expect and all of a sudden

13   they become an objector, absolutely, they should be part of

14   the process.

15          Specific issues that have been raised, one is the

16   video.  How are we going to do this?  There are licensed

17   videographers who do depositions.  All the deps are being

18   videoed as proposed right now.  We'll put one on the bus.  We

19   can video it, and that'll cure the problem.  And it'll be a

20   licensed videography.

21          Security.  This is one that they raise, and I kind

22   of -- I don't get it.  One, we're not going to require the

23   attorneys to sign a waiver.  Two, there isn't going to be an

24   issue of security.  I did the tour yesterday with Mr.

25   Shumaker.  There was no issue whatsoever.  We were a hundred

1    percent safe.  We're going to put in place -- and we can

2    discuss how we're going to do it with the Court in camera so

3    that the process will be completely safe for everyone.  We

4    understand the Court needs marshals.  We have a process that

5    will work.  I'm more than willing to discuss it.  I believe

6    the best way to do it would be in camera with the Court and

7    with the objectors present to understand how we're going to

8    set it up.

9          They indicate that their biggest -- one of their

10   biggest fears is that it's going to become a circus, there's

11   going to be parties following the tour, press, et cetera, and

12   it's going to be come unmanageable.  If we can talk with the

13   Court in camera with the objectors present, we can indicate

14   how we can do the process so that it will not become

15   unmanageable so that the press will not be involved following

16   the bus around and that citizens won't be involved in the

17   process.  It can work.  It's just a matter of proper

18   planning, and we have some strong ideas on how it can be

19   done.

20         So, in summary, your Honor, the case law is clear.

21   It's in complete discretion with you on whether to do it.  I

22   suggest to you strongly that you need to do it as the finder

23   of fact.  Does the Court have any questions?

24         THE COURT:  Would you have any objection to

25   including sites on the tour that objecting creditors might

1  request?

2        MR. HERTZBERG:  Absolutely not.

3        THE COURT:  That was it.  Thank you.

4        MR. HERTZBERG:  Thank you.

5        MR. SCHWINGER:  Good morning, your Honor.  Robert

6  Schwinger from Chadbourne & Parke for Assured Guaranty

7  Municipal Corp. objecting to the motion.  I think the first

8  place to start on this motion is with the Bankruptcy Code,

9  Section 904, which makes very clear that there is a line

10 between what local government does and what the Bankruptcy

11 Court does in Chapter 9 proceedings.  One of the overhangs

12 that this brings to the issue of the bus tour is that the

13 Court, under Section 904, is very -- is not to be seen as

14 invading the province of local government, passing value

15 judgments on what local government says they want to do in

16 terms of exercising of their municipal powers.

17        The issue in this case is the city has things they

18 want to do to help rebuild the City of Detroit.  The question

19 is what are those things going to cost?  Can they be done

20 consistent with the strictures under Chapter 9, the various

21 tests under Section 943, under Section 1129, and the legal

22 rights of various parties such as, for example, my clients

23 with respect to bonds.  There are issues with pensions and

24 state law and so on.  Those are the issues that this Court

25 has to address.  The Court is not being asked to make a value

1  judgment on whether conditions of blight or police

2  protection, et cetera, should be given more or less attention

3  by the City of Detroit. And, in fact, there certainly

4  aren't -- there are no parties in this case who are saying to

5  the Court, "Oh, Judge, you don't have to worry about blight.

6  Blight is not all that important." No one is saying that

7  police protection and fire protection aren't important. So

8  it's not as if the Court is being asked to make a value

9  judgment on those issues. The issues that the Court is going

10 to be asked to address really do turn fundamentally on

11 financial issues relating to can the city accomplish its

12 objectives given the strictures that Chapter 9 puts on it for

13 a plan of adjustment.

14      The issue has been raised about context, which is a

15 word which is easy to say, but not a lot of meaning has

16 actually been attached to it. Counsel made the reference to

17 what happens in a Chapter 11 proceeding, and I think it's

18 actually a very instructive analogy because you can envision

19 many Chapter 11 proceedings, for example, say, involving a

20 hospital where one could argue that the Court really must go

21 and see the faces of the patients and the Court must go and

22 see the conditions under which the nurses have to work every

23 day, et cetera, to understand what the bankruptcy means to

24 that institution, and that institution, indeed, may have a

25 meaning to the community, but that's not typically what's

1  done in a Chapter 11 case, and the context issue here really
2  is the same.

3          In addition, in terms of giving the Court context,
4  we refer to the blight removal report, and that really is the
5  point.  When the blight removal task force wanted to
6  understand the true dimensions of blight in the City of
7  Detroit, they had 150 people working for ten weeks to paint a
8  true and rich and complex picture of the reality of the city
9  and all its dimensions, and now the city here comes in and
10  says, "No, no, no.  You really don't need to do that.  What
11  you need to do is take a three-hour whirl through town on a
12  bus, and that'll be enough.  You'll get the whole picture."
13  And I think that's not really realistic and is belied by
14  what, in fact, is likely to be --

15          THE COURT:  I didn't quite hear Mr. Hertzberg say I
16  would get the whole picture.

17          MR. SCHWINGER:  Well, that certainly may be true,
18  but certainly he indicated that the Court would get all the
19  context it needed or at least enough of the context that it
20  needed, and I think even that is a somewhat fanciful notion.
21  The city is -- any city of this dimension is really far too
22  complex, I think, for the limited number of stops and the
23  limited amount of time --

24          THE COURT:  So you don't object to the bus tour.
25  You object to how short it is.

1          MR. SCHWINGER:  I don't think there is -- the City

2     of Detroit has enough time for this Court to take the bus

3     tour that would be needed to give the context that the city

4     thinks that this Court needs to have.  As we mentioned to the

5     Court, it's 700 -- excuse me -- 138 square miles, 700,000

6     people.  There is a lot to the city.  It's not a small town.

7     It's very different.

8          THE COURT:  One of the really interesting ongoing

9     issues that we have all faced throughout this case has been

10    where the 904 line is; right?

11         MR. SCHWINGER:  Yes.

12         THE COURT:  You mentioned that.  And especially

13    where it is in the context of confirmation where other issues

14    that may move that line come up, for example, best interest

15    of creditors, fair and equitable, maybe even unfair

16    discrimination.  In that context, why isn't this entirely

17    relevant?

18         MR. SCHWINGER:  Sorry.  I didn't catch that.  Did

19    you say entirely relevant or entirely irrelevant?

20         THE COURT:  Entirely relevant, yeah.

21         MR. SCHWINGER:  Entirely relevant.  To address that,

22    I need to tie together a few things that are sort of

23    anticipating arguments I was going to get to.

24         THE COURT:  Okay.

25         MR. SCHWINGER:  One of the most critical things here

1   is that whatever this Court ends up doing in this case should

2   not have a Section 904 cloud hanging over it, and one of the

3   factors that I think the Court ought to consider in the

4   exercise of its discretion is if you consider, shall we say,

5   the delta between the live experience of seeing a certain

6   street corner versus seeing one of the photographs, is that

7   difference so valuable to this proceeding that the Court

8   should put a -- you know, a Section 904, you know, cloud over

9   it in order to -- in order to get to it?  I don't think it

10  is.  I think 904 is an area that is -- I think the Court

11  should give a wide berth to if this proceeding is going to go

12  forward and to stand up, especially on appellate review.  We

13  don't need more appellate issues in this case.

14          THE COURT:  Well, but then how do you deal with the

15  argument that Section 904 is explicitly subject to waiver,

16  and this is the city's request?

17          MR. SCHWINGER:  I don't know that that may

18  thoroughly account for all the potential constitutional

19  issues, and I can't say that it's not something that I've

20  given great study to, but it may be a little bit more

21  complicated than that.

22          THE COURT:  A related question is, as we've all

23  agreed, the city bears the burden of proof on each of the

24  elements for confirmation, however they are ultimately

25  legally described, and if this is something that the city's

1  attorneys and advocates think is necessary for it -- them to

2  carry that burden, shouldn't the Court permit it unless there

3  are extraordinary considerations that suggest otherwise?

4      MR. SCHWINGER:  Yeah.  Well, several points.  First

5  of all, certainly there is no extraordinary considerations

6  test in the case law, so that's not something which is a

7  recognized test.  What I can say is, for example, you look at

8  some of the cases that we cite, which are criminal cases, and

9  in criminal cases there is tremendous concern about the

10  constitutional rights of the criminal defendant, due process

11  rights, rights of confrontation and so on, and yet even in

12  cases like that where the defendant says, look, the jury has

13  to see the scene of the crime or the place of the arrest or

14  something like that, there are still occasions such as, for

15  example, the Moonda case from the Sixth Circuit where we --

16  that both sides have referred to in their papers where the

17  Court has said, "No, you know, it's enough.  We have things.

18  There are photographs.  There are experts and so on," and

19  it's -- this is something which the Court, in its discretion,

20  says, "I can live without."  And we see that in many, many

21  cases.  The Simmons case also --

22      THE COURT:  Right, but Mr. Hertzberg argues that the

23  case law isn't particularly helpful because all the Court was

24  saying there was it was not an abuse of discretion to

25  disallow the view.  Nothing in the case suggests that it

1    would have been an abuse of discretion to allow the view.

2             MR. SCHWINGER:  I don't disagree with --

3             THE COURT:  The real issue is not the case law.

4    It's how this Court should exercise its discretion.

5             MR. SCHWINGER:  That's correct, but certainly it is

6    informative and instructive when courts have exercised their

7    discretion not to allow a view to look at what factors they

8    pointed to to explain that decision, and so --

9             THE COURT:  Well, so, for example, there was the one

10   case where the Court exercised its discretion not to when it

11   would have resulted in shutting down a highway.

12            MR. SCHWINGER:  Well, there was more to it than

13   that.  The Court also pointed out there are aerial

14   photographs and that there was an expert who was going to go

15   there and conduct tests and report on those tests, so it was

16   not just safety concerns.  That was the Moonda case.  There

17   was the -- there was the case from this Court in the District

18   Court about, you know, weather conditions on the lake.  Court

19   said, "Look, I don't need to go out on the lake to understand

20   weather conditions," other cases where the courts point to

21   the fact that there are, you know, photographs and so on.

22   It's a factor which courts often point to.  It's not simply

23   something to be brushed aside.  There is a notion --

24            THE COURT:  Would you argue prejudice to your

25   client's positions?

1          MR. SCHWINGER:  We are concerned about, I guess,

2     several things.  I think the city alluded to the idea that

3     there is some sense that this thing could -- despite the best

4     intentions of the parties and the Court, could turn into

5     something of a spectacle.  I mean we're all aware that

6     everything gets incredibly exaggerated attention in this

7     case.  Well, maybe it's not exaggerated.  This case is very

8     important, but it gets a lot of attention.  And I think your

9     Honor has occasionally expressed the view that that's not

10    always helpful to the process and to voting and things like

11    that.  I don't think we need more spectacles in this case.

12    I've also raised the issue, once again, it puts a cloud over

13    the proceedings and the outcome because there is an

14    assumption here that the Court is going to go on the tour and

15    say -- at least an assumption by the city that the Court is

16    going to go on the tour and say, "Oh, my God, this is

17    terrible.  I have to take certain actions."  What if the

18    Court has a different reaction to what it sees?

19          THE COURT:  That's the chance any litigant takes

20    whenever they offer evidence.

21          MR. SCHWINGER:  Exactly, your Honor, but the point

22    is is that if the Court were to take the other view, then we

23    may well, once again, have a significant Section 904 issue

24    because then it's the judge putting his value judgments and

25    assessments of what's important in terms of local priorities

1  versus that of the local government officials, so a process
2  where it's difficult for the judge to view the evidence one
3  way but okay to view it another way is a somewhat fraught
4  procedure in terms of having a record which can stand up.
5  Once again, the thing which really gets -- I think is salient
6  here, your Honor, is that the -- there are a lot of risks
7  here, and the benefit -- the net incremental benefit of
8  taking the Court on a tour I think is very, very small.  I
9  mean counsel has made comments about, you know, his personal
10 awareness of, you know, having seen firsthand things in the
11 city.  I guess none of us really know what the Court's
12 familiarity is nor am I going to ask, but I think it is
13 somewhat naive for anyone to suggest that this Court really
14 has no comprehension of what the human dimensions of blight
15 might be.  I think any sophisticated person living in a major
16 metropolitan city probably already has a fairly decent idea
17 of what that is, so I think the additional extra bit that's
18 going to be gathered from this thing is fairly small.
19      THE COURT:  Still I want to refocus you on the issue
20 of prejudice.
21      MR. SCHWINGER:  Right.  Well, those are -- I think
22 those are the --
23      THE COURT:  We've heard about the possibility of it
24 becoming unmanageable or a spectacle, to use your word.  What
25 else?

1          MR. SCHWINGER:  Okay.  There is also a -- I guess an

2     issue of, for lack of a better term, I'll call it sort of,

3     you know, in -- say like in the nature of impeachment in

4     cross-examination, which is we're going to sort of get hit

5     with this tour.  It will be what it will be.  It's not like

6     there are, you know, photographs that are produced in

7     discovery.  You can deal with them.  You can examine

8     witnesses.  You can do whatever it is.  The tour is just sort

9     of going to happen, and there we are having to somehow deal

10    with it on the spot.  That's a -- that's not the way evidence

11    is --

12         THE COURT:  Is there anything to impeach about it?

13    I mean it is what it is.  Would your clients be interested in

14    designating any sites or spots to add to the tour?

15         MR. SCHWINGER:  One of the concerns, quite frankly,

16    your Honor, is I don't know that my client has enough

17    information to be able to meaningfully do that.  We are not

18    the City of Detroit, and I think a lot of the objecting

19    parties are in that same position.

20         THE COURT:  Well, but the city is an open city.  You

21    could certainly develop your own list in the meantime.

22         MR. SCHWINGER:  Your Honor, all I can say is that I

23    haven't seen any case in which a site visit was authorized

24    over someone's objections on that basis.  You know, this goes

25    back to the issue of sort of the selectivity.  Even in

1    cases -- and there are a few -- where the Court visits more

2    than one site, but in those cases the site was the one

3    central place of importance.  It was the -- it was the church

4    case where they were looking at the church's own properties,

5    and the city in its reply papers cited the King County case

6    where the judge was actually riding the roads, which the

7    question was were those roads proper easements.  And the

8    judge literally rode every inch of every road in that case.

9    He didn't say, "Okay.  I'm just going to stop here and

10   there."  The opportunity of doing that full look, just that

11   it is impossible here, and that's a big difference when it's

12   being done over the parties' objections whereas in those

13   cases it was done on consent.

14        THE COURT:  So you wouldn't object if I saw every

15   square mile, huh?

16        MR. SCHWINGER:  I think I would -- I think the time

17   required to do that would be quite unreasonable, your Honor,

18   for this proceeding.  Just to cover a few other points, as we

19   mentioned, there's the availability of other forms of

20   evidence which, even if they're not 100 percent of what the

21   city is willing to -- is able to offer through the tour, it

22   certainly is -- the difference is quite small, and many

23   courts have recognized that in all sorts of site visit

24   situations.  We mentioned the opportunity of the Court

25   directing its expert, Ms. Kopacz, to take a look at these

1  things and go on the tour that the city suggests, which we

2  suggest would --

3        THE COURT:  Well, but how is that relevant to her

4  limited mandate dealing with feasibility?

5        MR. SCHWINGER:  By my understanding, I believe that

6  the city has suggested that some of this evidence may well be

7  relevant to questions of feasibility, but, in any event, the

8  Court is free to expand Ms. Kopacz's mandate if it so

9  chooses.  And the courts have pointed to the availability of

10  an expert to address such issues as a reason not to go on a

11  site visit.  And I think that's a factor which informs the

12  Court's discretion, and it perhaps avoids, you know, some

13  unfortunate headline along the lines of, "Judge refuses to

14  look."  You know, you have someone that you've appointed in

15  this case to act for you not being party directed, and that

16  really solves a lot of issues, and I think the Court should

17  feel free to take advantage of that in the exercise of its

18  discretion.  It's one of the avenues out there.

19        THE COURT:  Well, Ms. Kopacz has many skills that

20  she has gained from her experience and education.  I'm not

21  sure that comprehending and communicating the state of a

22  major metropolitan city, however, is among them.

23        MR. SCHWINGER:  I can't speak to that, your Honor.

24  I understand your concerns, but --

25        THE COURT:  That feels like a different set of

1   skills than your ordinary accountant would have --

2          MR. SCHWINGER:  Well --

3          THE COURT:  -- or even your extraordinary

4   accountant.

5          MR. SCHWINGER:  Well, except that the city is

6   stressing here that this is not a dry technical exercise.

7   The city said this is a -- to see the human element, and

8   Ms. Kopacz is human, and, you know, I think that from that

9   level she's certainly qualified to observe what it is that

10   the city thinks it's trying to communicate.  I don't think

11   she's inherently unqualified to perform this role if the

12   Court wanted to rely on her for that purpose.

13          With regard to some of the practicalities, we've

14   heard from counsel that some of the issues have been

15   addressed about who gets to go on the bus and whether it

16   counts against the city's time, but I also think that the

17   Court and the parties should not be naive of some of the

18   realities that's going to attend this in today's era of

19   social media.  There is -- this motion has gotten more

20   coverage in the press than I would have ever imagined.  It

21   was in the papers today.  It was in the papers, I think, when

22   we filed our objection.  There is a lot of interest in this,

23   and that raises concerns that I think we would be -- it would

24   be naive for us to not take seriously.  With respect to

25   issues that --

1      THE COURT:  Can I rely on the lawyers to keep
2  confidential the details of the date, time, and route of the
3  tour?
4      MR. SCHWINGER:  I would hope so, your Honor, but,
5  you know, several weeks ago I was here because --
6      THE COURT:  That's not the commitment I was looking
7  for, counsel.
8      MR. SCHWINGER:  Well, your Honor, I can only speak
9  for myself.  You know, several weeks ago I was here in front
10  of you because, you know, we had an issue with the mediation
11  order not being followed.  We had a long discussion just in
12  the last hour about whether or not the mediation order was
13  abided with in the grand bargain situation.
14      THE COURT:  Then let me ask you for your commitment.
15      MR. SCHWINGER:  You certainly have my commitment,
16  your Honor, but there's a lot of other people in this room
17  behind me if they haven't walked out on me, so --
18      THE COURT:  No.  They're still here.
19      MR. SCHWINGER:  Okay.  With regard also to the
20  issues of the -- of going around on the tour, you know, we
21  mentioned in a footnote in our papers a somewhat serious
22  incident that happened previously.  About a year or so ago,
23  the city wanted to take us all on a -- the creditors on some
24  sort of bus tour, I guess, similar to this, and it sort of
25  fell apart because the city wanted everyone to sign a

1  release, I guess, in case they were injured or killed or

2  something during the trip.  Now, maybe they were just worried

3  about, you know, motor vehicle accidents and so on, but, you

4  know, that's all I can say is I'm just pointing to the city's

5  own actions in this regard.  But I think, you know, there is

6  a lot of intense public attention and emotion about this

7  bankruptcy in general, and naturally it'll extend to, you

8  know, this bankruptcy proceeding.  And I think we ought not

9  to live in sort of a lawyers' fantasy world about what is

10  actually going on here, and I think that's a very significant

11  issue for the Court with the marshals, et cetera, to address

12  and to think about in the exercise of its discretion.

13          THE COURT:  All right.  Thank you, sir.  Does anyone

14  else want to be heard on this?

15          MR. MARRIOTT:  Good morning again, your Honor.

16  Vince Marriott, EEPK.  We along with Deutsche Bank, Syncora,

17  and Wilmington Trust filed a limited objection, which, as

18  filed, has been addressed by the city.  We complained about

19  not allocating time to this and not allowing each objector to

20  have counsel present, which has been addressed, although when

21  I was listening to Mr. Hertzberg describe this as a three-

22  hour tour -- I'm going to date myself here, but I immediately

23  flashed --

24          THE COURT:  Oh, no.

25          MR. MARRIOTT:  -- "Gilligan's Island."

1          THE COURT:  No, no, no.

2          MR. MARRIOTT:  And we know how that turned out.  And

3     I may have to file a supplemental "Gilligan's Island"

4     objection, but short of that, we're fine.

5          MR. GORDON:  Good morning again, your Honor.  Robert

6     Gordon on behalf of the Retirement Systems.  Just very

7     briefly, our papers that we filed just simply said that we

8     thought that if there's going to be a tour, if the Court is

9     so inclined to engage in that process, that we should be

10    entitled to participate as well.  Mr. Hertzberg this morning

11    said this is not an event.  We know it's not an event.  It's

12    certainly not an event where he is hosting it and playing the

13    bouncer and deciding who gets invited and who doesn't get

14    invited.  It is a proceeding.  It is a proceeding, and we are

15    entitled to be at that proceeding.  I think it goes without

16    saying that the Retirement Systems have played a central role

17    in this bankruptcy case and are entitled to be at all

18    proceedings.  What our role will be at confirmation is still

19    yet to be determined.  It has been indicated that we will

20    have no role at confirmation.  That is not clear at all.  We

21    don't know what will happen at the confirmation hearing.  If

22    the Court denies the plan, there could be further

23    proceedings.  And, again, to be there and to be able to view

24    the evidence as it's being presented is important for our

25    clients as much as anybody else, so we would ask that we be

1    able to participate.  Thank you, your Honor.

2            MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

3    on behalf of the Official Committee of Retirees.  I just want

4    to echo Mr. Gordon's statement and add just one other point.

5    It should first be stated that even if the vote comes out the

6    way we hope it will and it's in favor of it and we are a

7    supporting party, we are, at this point, supporting the votes

8    of 10 and 11 and 12.  It's not all aspects of the plan, so

9    there are issues there that we are still discussing with the

10   city.  But more importantly than that, we do have a

11   constituency that expects us to understand what is going on

12   in this case, all elements of it, raises questions about it.

13   I think the openness of the proceedings and all has been very

14   important to our constituents.  Our ability to report to our

15   constituents is important as well.  We think one other seat

16   on the bus for a member of the Retiree Committee professional

17   is not going to impose any burden on the city, and we would

18   ask for a spot on the bus.

19           THE COURT:  Well, but if the request is granted for

20   you and for Mr. Gordon, then doesn't that open the door to

21   all the other parties --

22           MR. ALBERTS:  Well, I don't --

23           THE COURT:  -- who have settled?

24           MR. ALBERTS:  Well, there are actually not that many

25   other parties that have settled.  I think the concern would

1   be --

2          THE COURT: So you agree it does open the door for

3   them, too?

4          MR. ALBERTS: I think the Court could limit it. I

5   mean, for example, we have nine members of our -- on our

6   committee who are -- two of whom are the retiree

7   associations. We have three unions, three individuals. I

8   mean we could channel our information to them. I think that

9   would limit the number of seats. The bigger concern is all

10  the objectors out there. You have individual objectors who

11  number in the hundreds. Obviously I don't think the Court

12  has intended to give them seats on the bus, but they could --

13  you know, and they're not before the Court now, so I do think

14  that it is not -- it is not burdensome. You've heard from

15  two of the retiree groups, who have thought that it is

16  important for us to understand what is being shown to the

17  Court and that if it's necessary for us to report after the

18  fact what was seen, obviously not before the fact.

19         THE COURT: Thank you.

20         MR. ALBERTS: Thank you.

21         MS. PATEK: Good morning, your Honor. Barbara Patek

22  on behalf of the Detroit Police Officers Association and the

23  Fire Fighters Association. Right now we have a seat on the

24  bus. We don't went to lose our seat on the bus if we are

25  fortunate enough to reach agreement with the city, and we

1  didn't file anything because we are an objector, but we would

2  join in the comments of Mr. Gordon and Mr. Alberts.

3        MR. HERTZBERG:  I'll be brief, your Honor.  It's a

4  little hard to argue against the points raised by counsel to

5  the Retiree Committee because they didn't file an objection

6  but they got up and decided to object.  Simply stated, the

7  Court sees the issue.  If we open the door, we're going to

8  have thousands here.  I think it should be a bus tour for the

9  objectors, but I'll leave it to the Court's discretion on how

10  to organize it.

11        Second, I have no problem with including the

12  objectors' sites if there's some specific sites they want on

13  the bus tour.  That's fair.  We can include those so that

14  they don't feel like they've been prejudiced by the ones

15  we've picked out, so we'll allow that.  That's not an issue.

16        They try and classify this as a blight tour.  This

17  is not going to be a blight tour.  The Court is going to see

18  many good things that are taking place in the city, many very

19  productive things.  There's going to be some blight that's

20  seen, but this is not a blight tour.  So to characterize

21  that --

22        THE COURT:  Let me ask about the issue of security

23  and confidentiality.  It was pointed out here that despite

24  our best efforts, we did have a breach already, and it had

25  serious consequences.  We can't have that in this context.

1  How do we deal with that?

2          MR. HERTZBERG:  Well, there's two ways, your Honor.

3  One, there's about, I think, ten objectors and the city.

4  It's a small group that will be given, quote, the route and

5  will be given the date and time and the location that the bus

6  leaves from, so we can control it that way.  If one of the

7  counsels decides to breach that that receives that

8  information, I can't do anything about that.  Only you can

9  enforce it.  We're all officers of the Court.  Hopefully we

10  know when we've been told to keep something confidential, we

11  do.  This won't be given out to the parties.  It will be

12  given out to the counsel only.  If for some reason it is

13  breached, which I would hope not, and I can assure you we

14  won't breach it as officers of the Court, there will be

15  adequate security available, and I can explain to the Court

16  in camera how we intend on doing it, that there will be no

17  issue here, absolutely no issue, so I'm not concerned about

18  it.  And I understand that the Court is concerned, but we

19  will address those concerns and make the Court comfortable

20  when we walk the Court through how we'll do it in its

21  chambers.

22          Next, your Honor, the objectors -- one of the major

23  argument was that the benefit is small of doing --

24          THE COURT:  Just to be perfectly up front about this

25  issue of confidentiality and security, we're not talking

1  about the consequence of a breach being a one-month

2  adjournment of the trial.  We're talking about our personal

3  safety here.

4          MR. HERTZBERG:  Your Honor, I'm just as concerned as

5  you are.  I'll be on that bus just like you will when it goes

6  on the tour, and I'm concerned about my safety just as I am

7  about all the objectors.  It will be a safe environment.  We

8  went through the tour, myself and Mr. Shumaker, yesterday.  I

9  am completely confident that it will be a safe tour for

10  everyone on the bus and that there will be adequate security.

11  I wouldn't be going out there putting my life at risk.  Let

12  me assure you of that.

13          THE COURT:  Well, you went on the tour with no

14  advance notice to anybody, to anybody.

15          MR. HERTZBERG:  Even if there's advance notice,

16  there will be adequate security, and we can address that.

17          THE COURT:  All right.  What else did you want to

18  say?

19          MR. HERTZBERG:  They claim it's a small benefit.

20  What do they care then?  It's against our time that it's

21  being charged.  If we believe it's a benefit, that should be

22  enough.  The Court was clear that it can be done at your

23  discretion.  We're asking you to exercise that discretion.

24  Any other questions the Court has?

25          THE COURT:  No.  That's all.

1          MR. HERTZBERG:  Thank you.

2          THE COURT:  All right.  We've been going long enough

3     now that we need a break, so we'll break until 11:30 and pick

4     up with the balance of the motions then.

5          THE CLERK:  All rise.  Court is in recess.

6        (Recess at 11:15 a.m., until 11:30 a.m.)

7          THE CLERK:  All rise.  Court is in session.  Please

8     be seated.  Recalling Case Number 13-53846, City of Detroit,

9     Michigan.

10          THE COURT:  Let's turn our attention to the city's

11     motion for a protective order.

12          MR. SHUMAKER:  Good morning again, your Honor.  Greg

13     Shumaker for the city.  I guess I'll start off on a positive

14     note, and that is the fact that the city has received 123

15     Rule 30(b)(6) deposition topics in the last month or six

16     weeks, and we have, after discussions with the different

17     parties that have issued them, agreed to designate 122, and

18     that doesn't include those that were withdrawn, so that's a

19     good thing, but I rise, your Honor, to discuss the last

20     topic, which we could not agree to, and that is one of

21     Syncora's deposition topic requests, which was Number 29

22     asking for someone to testify from the city on the, quote,

23     identity, location, and financial position of the city's

24     retirees.

25          How all this came about was we received 52

1   deposition topics from Syncora.  Mr. Hackney and I

2   corresponded, and I indicated that we had problems with 11 of

3   their topics.  We consulted.  Syncora withdrew two, and we

4   designated for all but this one.  I would point out that when

5   we had the meet and confer with Oakland County, who had the

6   identical deposition topic, Oakland County withdrew that

7   topic from consideration but not Syncora.  And the back and

8   forth was -- we indicated what is obvious, we think, that

9   there is no relevance.  There's a huge burden here, and we

10   think that there are huge privacy concerns involved with

11   Syncora's effort to get this information.

12        Syncora says that we -- that the city falsely claims

13   that it wants the current assets and income of its retirees,

14   and I would just point your Honor to the e-mail exchange that

15   I had with Mr. Hackney and his colleague, Mr. Arnault, where

16   it's spelled out what Syncora wants, and that is it wants the

17   retirees' current assets and income.  It wants somebody from

18   the city to testify about those.

19        Now, in the meet and confer, Syncora's counsel was

20   willing to say, no, you don't have to identify all of the

21   retirees, and all we want from location is the city and

22   address, but we do want the current assets and income of the

23   retirees.  We simply can't understand why Syncora wants to

24   know what the retirees currently make, what they own.  To us

25   obviously that crosses the line.  It is information -- when

1    Syncora says, "Well, we're looking for what the city knows

2    about that," that information has been produced by the city

3    and by the Retirement Systems in response to Syncora's

4    deposition -- I mean document requests, and it's all sorts of

5    actuarial reports that the Retirement Systems maintains such

6    as, you know, information about the retirees' length of

7    service, how long they've -- how long they've worked for the

8    city and how much their current monthly incomes are.  And

9    when I say "current monthly incomes," I mean current monthly

10   pensions are.  And it also categorizes all that information

11   by age, so to the extent that Syncora's argument is we want

12   to compare the relative harm that would occur if the retirees

13   were to sustain the same kinds of cuts as the plan foresees

14   for Syncora, it can do that with the records that it has.

15   For example, you know, the records that have been provided to

16   Syncora indicate that over 80 percent of GRS retirees are

17   over 60 years old, and it specifies how much their monthly

18   pension is.

19          I'm not sure what all they're getting at, but if

20   they want to know whether those retirees are somehow

21   independently wealthy over and above what they're receiving

22   as a pension so they can make the comparison between the

23   effects on the cuts on retirees as opposed to the effect on

24   the cuts on its client, it has that information available.

25   And requiring the city to educate a witness to the extent

1    that it's supposed to know what the personal financial

2    circumstances are for over 20,000 retirees to us seems

3    ridiculous not only -- not only has that information been

4    produced in discovery, but it's also publicly available on

5    the Retirement Systems' websites.  Every month Gabriel,

6    Roeder puts out actuarial reports on the GRS and the PFRS, so

7    there's plenty of information out there, and -- you know, on

8    what the average GRS retiree's pension is, which is, by the

9    way, your Honor, about $20,500.  You know, if the grand

10   bargain does not go through and the plan continues, that

11   means that the retirees may well have to sustain cuts of up

12   to 20, 30 percent.  You don't need to know much more

13   information than what the average retiree's income is and how

14   much their income is going to go down to make the arguments

15   that Syncora is going to want to make, again, comparing the

16   retirees' harm to Syncora's.

17            So, your Honor, that's really the big reason.  We

18   don't see the relevancy.  We think that the burden in terms

19   of educating somebody from the city to understand all of

20   these circumstances makes no sense, and from -- but most

21   fundamentally from a -- from a privacy perspective, we think

22   this is a classic kind of information that Rule 26(c) looks

23   to protect because we think this is oppressive.  We think

24   it's potentially embarrassing.  This is just not -- this is

25   not reasonably tailored to get legitimate evidence.  We think

1  it's a pointless line of inquiry, and we think that Syncora

2  can make its arguments without this level of intrusion.

3  Thank you, your Honor.

4          THE COURT:  Thank you.

5          MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

6  on behalf of the Official Committee of Retirees.  We filed a

7  very short joinder in support of the city's motion to quash

8  on this issue.  I think the city has laid out the issue

9  fairly well.  Anything I would say right now would just be

10  duplicative, and --

11          THE COURT:  Thank you.

12          MR. ALBERTS:  Thank you.

13          MS. PATEK:  Good morning again, your Honor.  Barbara

14  Patek on behalf of the DFFA and the DPOA, and I have been

15  asked this morning to speak on behalf of both the DPLSA and

16  the DPCOA as well.  And this goes to the issue of given the

17  fact of the DROP program that any information about retirees

18  would, by definition, include information about active public

19  safety officers, my understanding is Syncora has given some

20  assurance, but we would join in the city's request because we

21  would absolutely object to anything that would potentially

22  disclose either personal information about location or

23  financial information given that that is traditionally kept

24  very private for these officers.

25          And the only other thing that we would say about it

1  is in terms of the, quote, discrimination itself, it needs to
2  be, from our perspective -- and the city may not agree with
3  us on this, but from our perspective, at least, part of the
4  quid pro quo here is that the active public safety officers
5  are accepting the risk of any underfunding of the pension
6  liability going forward, and when you talk about the
7  cornerstone of a plan of adjustment, we're not there yet,
8  but -- for the fire fighters and the DPOA, but any deal -- I
9  mean this is, I think, essential to the city's ability to
10  keep and retain its public safety officers.
11         THE COURT:  Thank you.
12         MR. HACKNEY:  Your Honor, Stephen Hackney for the
13  record -- good morning -- for Syncora.  Your Honor, one of
14  the things that I like about arguing in front of you is that
15  you are a very substantive person, and sometimes you are
16  extremely substantive, and that can be -- it makes the
17  arguments productive, and I appreciate that.  I appreciate
18  the time that the Court puts into it.  And so I'd like to
19  start my argument with the substance, but I would like to put
20  at the end of my presentation my expression of frustration
21  and concern about the way that this was handled by the city.
22  I do not believe that this motion has been handled properly
23  by the city, and I would like to address that at the end of
24  my argument, but I would like to start with the substance.
25         Your Honor, there is a threshold issue that I think

1    we should address at the outset of this motion that goes to

2    the -- it's a simple question, and you saw Mr. Shumaker doing

3    this again, which is he keeps saying Syncora wants to try and

4    prove this, Syncora is trying to do this.  I don't have the

5    burden of proof at trial here.  I am discovering the city's

6    case.  On page 45 of its reply, it is the city that has put

7    personal hardship at issue as one of the defenses for unfair

8    discrimination, and I believe that there is a threshold legal

9    issue that we should start with, which is is personal

10   hardship in the case or is it out of the case.  The Official

11   Committee of Retirees, the attorney general, and the city in

12   one part of its brief, although not in the others, they all

13   say this information is wholly irrelevant, and my point is I

14   agree.  There is no support in the 254-page reply brief, not

15   one case that I saw that says that Bankruptcy Courts and

16   debtors can consider the personal hardship that will be

17   suffered by various creditor classes in deciding to pay them

18   differently for better or worse, your Honor.

19        THE COURT:  If I say I agree, are we done?

20        MR. HACKNEY:  We are with respect to personal

21   financial information.  If personal hardship is not in the

22   case, I don't want to know their financial information.  It's

23   not my issue.  It's their issue.  And I don't think that

24   you'll -- they're not giving up anything if you say it's not

25   in the case because there's no law in support of it anyway.

1  I just don't think it is in the case.

2          THE COURT:  Mr. Shumaker, I have to say to you --

3  step to the microphone for me.  I've never seen a case where

4  in deciding whether to confirm a plan, whether we're talking

5  about best interest test or talking about unfair

6  discrimination or fair and equitable, where the hardship or

7  the neediness of creditors was considered.  Have you?

8          MR. SHUMAKER:  I don't know if I have, your Honor,

9  but I guess I would --

10          THE COURT:  Is it an issue in the case?

11          MR. SHUMAKER:  I believe that is one of the

12  judgments that was made in connection with putting together

13  the plan and underlies sort of the DIA settlement.

14          THE COURT:  Why doesn't that open up the door to

15  Mr. Hackney's discovery?

16          MR. SHUMAKER:  Well, as I described, your Honor, I

17  think the first part of that is that there are other ways to

18  get about the information as I described with the actuarial

19  reports.

20          THE COURT:  You mean depose 20,000 employees -- or

21  retirees?

22          MR. SHUMAKER:  I'm sorry, your Honor.

23          THE COURT:  Depose 20,000 retirees?

24          MR. SHUMAKER:  Well, it's -- you know, you can still

25  make the arguments --

1           THE COURT:  What other ways?

2           MR. SHUMAKER:  I mean you can still make those

3    arguments in a nonindividual way.  It's a collective personal

4    hardship.  Your Honor can not believe that the retirees will

5    suffer more than the other creditors, but you can argue that

6    through the kinds of evidence that has already been provided

7    to Syncora, and they would say, well --

8           THE COURT:  Well, but that evidence only goes so

9    far.  It doesn't describe all of the income of all of the

10   retirees.  Some of them may have other jobs or other sources

11   of income, and it says nothing about assets at all.

12          MR. SHUMAKER:  That's true.  That information is not

13   in those actuarial reports, but I do think that, you know --

14   in terms of how I see the case, no, but this is not just any

15   old case.  This is a case, as everyone has talked about --

16          THE COURT:  Well, hold on.  Hold on.  There are lots

17   of Chapter 11 cases where employees are dealt with

18   differently than other creditors.

19          MR. SHUMAKER:  Certainly.

20          THE COURT:  Have any of those cases ever taken into

21   account the greater needs of the employees compared to the

22   needs of, for example, trade creditors --

23          MR. SHUMAKER:  I'm not --

24          THE COURT:  -- or bondholders?

25          MR. SHUMAKER:  I'm not certain as I stand here, your

1  Honor, whether -- excuse me, your Honor, if I may.

2  THE COURT:  Yes.  I mean I have to say that in the

3  case law I'm familiar with where the issue is the business

4  justification for whatever discrimination is in the plan is

5  determined based on the business needs of the debtor, not the

6  business or financial needs of the creditors.  That's the

7  distinction.

8  MR. SHUMAKER:  I understand where you're coming

9  from, your Honor.  I have consulted with Ms. Lennox, as you

10  saw.  I think that the -- I can affirm that the city is not

11  going to be standing on the personal hardship argument, so

12  perhaps this is --

13  THE COURT:  Well, I think that's the appropriate

14  decision.  I'm going to -- I'm going to say here as

15  unequivocally as I can that as a matter of law, creditors'

16  needs is not an issue when it comes to determining unfair

17  discrimination.  It's the business judgment of -- the

18  business rationale of the debtor taking into account the

19  debtor's needs that is critical.

20  MR. SHUMAKER:  Understood, your Honor.  Now, with

21  what I just -- my statement about what the city is not going

22  to be relying on, I still have the concern about the personal

23  and financial information.  I don't know whether Mr. Hackney

24  is willing --

25  THE COURT:  Well, let me ask you to pause, and let

1  me get back to Mr. Hackney because I did interrupt his
2  argument to call on you for this question.  Mr. Hackney, do
3  you still need this?
4          MR. HACKNEY:  No.
5          THE COURT:  All right.  Then we will enter an order
6  that you are withdrawing this request from the city.
7          MR. HACKNEY:  In reliance on the Court's ruling.
8          THE COURT:  In reliance on what I have held here
9  today, absolutely.
10          MR. HACKNEY:  Your Honor, I won't go on and on, but
11  I would like somewhat of a brief opportunity to defend
12  myself, though.
13          THE COURT:  You may have that, sir.
14          MR. HACKNEY:  This motion did not fairly describe to
15  you the efforts that I took in that meet and confer to
16  address the concerns of the city, and, in particular -- and
17  Mr. Shumaker just did it again when he got up here today.  He
18  said they want all the retiree income for all 20,000 of them.
19  That's not true.  What I told them in the meet and confer and
20  what Mr. Arnault's e-mail says, if you read it, at the end
21  the last two sentences were, "I said that I want to know what
22  you know."  And I know that it's -- I know the substance
23  we've resolved, but I wanted -- what I want to tell you is
24  that I took steps on every point, relevance, privacy, burden,
25  to address them.  There was never a substantive response

 1  coming back from me.  I sent them the e-mail, and what I said
 2  in the e-mail was -- when they said, "We're not going to be
 3  able to work it out," I said, "Okay, look, put it in an
 4  objection, and I'll figure it out whether I'm going to move
 5  to compel later."  And my intention was I'll ask Orr about
 6  it.  If it's an unresolved issue, if it's a live issue in the
 7  case, then we'll bring it to the Court's attention later.
 8  And, you know, out of the blue the next day we get this
 9  motion that is filed that generated an absolute firestorm of
10  controversy, and it absolutely put Syncora in the middle.
11  And it described Syncora as if Syncora was putting at issue
12  the personal hardship of the retirees.  It did not disclose
13  the fact that we had aimed to limit our information to what
14  the city knew, and it did not do a good job highlighting the
15  fact that we had said there can be privacy.  You don't have
16  to give us their names.  You don't have to give us their
17  addresses.  I don't think that the way that the city handled
18  this motion was appropriate, your Honor.  It was not fair to
19  me and my client.  And given the public attention to this
20  case, I not only wanted to defend myself as a litigant before
21  you, but I also wanted to remind the city that when they file
22  these pleadings, it has an outsized effect in the newspapers.
23  And, you know, we're a business, too, that's impacted by that
24  type of publicity.  If they're going to -- if they're going
25  to file these motions, they've got to be accurate.   They

1  should not be seemingly calculated to inflame all of this

2  anger outside the courtroom.  This should be a substantive

3  proceeding, not one where the city whips up a motion against

4  certain of its creditors, and I appreciate you hearing me on

5  that.

6       THE COURT:  All right.  Let's turn our -- is there

7  something you wanted to say, sir?

8       MR. SHUMAKER:  Yes, your Honor, if I may.  Just very

9  briefly, your Honor, in the defending my conduct category.

10      THE COURT:  Okay.

11      MR. SHUMAKER:  One is, again, I would direct your

12  Honor to just read Mr. Arnault's e-mail, and, you know, I

13  quote from it, "For the financial position of the city's

14  retirees, we want to know the retirees' current assets and

15  income."  Now, it's unequivocal what they're after.  We asked

16  them to withdraw.  They didn't.  Rule 37(d)(2) requires the

17  city to not just object to a 30(b)(6) topic that it's not

18  going to respond to.  It is required.  A failure is not

19  excused on the ground that the discovery sought was

20  objectionable unless the party failing to act has a pending

21  motion for a protective order under Rule 26(c).  That's why

22  we filed the motion for protective order.  Thank you, your

23  Honor.

24      THE COURT:  All right.  Let's turn our attention to

25  the motion to compel filed by Syncora.

1      MR. HACKNEY:  Good morning, your Honor.  Stephen

2   Hackney on behalf of Syncora.  I would like to just be

3   concise on this.  You've heard a lot of argument today, but

4   this is, I think, a relatively important issue because it

5   does go back to the grand bargain, and I want to give you

6   some history here because part of our motion is aimed at the

7   fact that there was a deal here, but even if you say, "Well,

8   let's address it on the substance," I still think that you

9   should grant the motion to compel even on the substance of

10   their answers, but I want to give you the history so that you

11   understand it.

12      The initial responses to Syncora's interrogatories

13   were bafflegab, so if you pick them up and read them, they

14   are just -- they are not responsive.  And these were the ones

15   that we were provided with on May 6th, and we went -- we

16   filed a motion to compel.  We talked about the improper use

17   of Rule 33(d) and just the general nonresponsiveness, but we

18   quoted some of them.  I mean some of the interrogatories

19   you'll be reading the answer to the interrogatory, and you're

20   into the second page.  You can't even remember what the

21   question was because it's just a bunch of words.

22      I went back to Mr. Irwin, and I said, "You know this

23   doesn't work."  I said, "Let's work this out."  And on May

24   13th, which was the day after the May 12th hearing that we

25   had before you where Mr. Irwin was somewhat under siege by

1  all the people that were frustrated with the document

2  production, Mr. Arnault and I did a call with Mr. Irwin in my

3  office that night to discuss how we could proceed.  And I

4  have endeavored not to repeat the things that were said in

5  these conversations with Mr. Irwin.  Now, they are meets and

6  confer, and meets and confer are often summarized, but I have

7  wanted to not like delve into it too much, but I was very

8  disappointed to see that the city asserted in its response

9  that, no, no, no, you know, good old Mr. Hackney is wrong

10 when he says that there's an agreement, but they did not

11 support it with an affidavit that contradicted mine.  And I

12 think it puts it somewhat at issue, and it compels me to say,

13 no, no, no, this is what was said back and forth by us to one

14 another.  And what I said to them on that night with respect

15 to the interrogatories and the rest of the rogs was I said I

16 can refine and work with some of these rogs to help with your

17 burden, but on the art rogs, I think we have two paths

18 forward.  Either the question of which art pieces are worth

19 more than a million dollars, which are the 300 most valuable,

20 what the specific provenance and other objections there are

21 to selling the 300 most valuable, on and on.  I can either

22 arguably make you go compile this information from what's in

23 your possession and the DIA's possession, make you do the

24 work to answer the question -- that's what interrogatories

25 are for -- they're not document requests; they're requests

1   for answers -- or I'll give you another door, and I'll say
2   you could admit that you don't know.  And Mr. Irwin was very
3   relieved when I said that on the phone.  He said, "That's
4   great because everyone knows we don't know."  And in the
5   ensuing days we had subsequent e-mail communications where I
6   laid it out to them, you can either answer the question or
7   you can say you don't know, and they chose to take door
8   number two, which is that they don't know.  And what's
9   happened since that time is that now Mr. Irwin, who was
10  dealing with the facts and knows they don't know the answers
11  to the interrogatories -- they know parts of the answer.
12  They can say, "Other than as delineated in the Christie's
13  report, we don't know what pieces in the collection are worth
14  more than $1 million.  We don't know.  Live with it."  They
15  don't know.  The problem is I think that he went back from
16  that hearing after he'd gotten all the good stuff from me
17  where I limited my interrogatories and where I subsequently
18  on the basis of this, which I called the small deal, then
19  subsequently did another of -- a number of other agreements
20  with them with respect to documents that they were happy
21  about where I was attempting to work through the burden
22  issues that they had.  During that intervening period, guess
23  what happened, which was I think there was heartburn on
24  the -- on other parts of the house there over the fact that
25  they were going to say they don't know because now they

realized, oh, now this is helping Syncora develop its
argument that we didn't adequately diligence the asset before
we threw it into the grand bargain.  And so time passed and
time passed and time passed, and by June 20th we were
reaching out saying, "Where are we on this?"  And what we got
was we got answers to our interrogatories that are, number
one, not true and are not consistent with our agreement.  If
you pick up their interrogatory responses, the interrogatory
response implies that you can either answer the question from
the documents that have been provided or that the answer
resides at the DIA, and so it implies that there is an answer
to the question and that the city knows the answer to the
question and that so can Syncora if it will only go look at
these document sources.  Point one, the documents cited --
and I brought copies of them if you would like to see them.
There are about 40 of them.  Most of them are truly I would
say, you know, junk like the city charter or, you know, the
city CAFR, you know.  They truly are just not really relevant
to this issue, but I brought some of the ones that look like
kind of DIA documents.  If you want to see what I'm talking
about, it's here.  But I'll represent to you that if you take
the documents they gave you and review them all and then say,
okay, Interrogatory Number 2, what are the 300 most valuable
works in the collection, you're no further on that way than
after you've looked at the documents they gave you.  And the

1  second thing they did is --

2       THE COURT:  Well, but let me ask this direct

3  question of you.  Isn't the only natural inference from the

4  answer that you did get that the city doesn't know?

5       MR. HACKNEY:  From the answer that they did give?

6  No.  I think the inference is the other way.  I think the

7  inference is that they know and you can know, too, because

8  that's what a Rule 33(d) response says.  It says there is an

9  answer to this question.  Look at these documents.  It will

10  answer your question.  And that is not correct.  And by the

11  way, I can tell you the DIA -- it's 50,000 pages of

12  documents.  We're still going through it now.  Not only has

13  the city not looked at those documents -- I mean we are doing

14  what we believe the city should have done to diligence this

15  asset, but I have spoken to the reviewers, and I have said,

16  "Now the city is saying I can get the answers from the DIA

17  documents."  Now, I don't know how they could know that, but

18  just out of curiosity, is that correct?  And the answer has

19  been no.  One of the most surprising parts of the case is

20  that the operating agreement of the DIA requires it to

21  maintain like a registry of all artwork that's worth more

22  than $1 million in the DIA, and they have to update it

23  regularly.  And one of the first things that we did when we

24  were in discovery with the DIA was we were like, "Can we get

25  that registry?" because that's going to be a very useful way

1   to focus on the most valuable art.  And they said, "We don't
2   maintain it."  So this has been a big struggle for us, and
3   I've been on this long jihad now for over six weeks trying to
4   get the city to admit something that we know is true.  They
5   haven't got a comprehensive description of the entire
6   collection.  They don't know for sure which pieces they
7   bought and which they didn't.  They don't know what's worth
8   more than a million, what the 300 most valuable are, on and
9   on.  So whether you've -- I just think the resolution to this
10  motion is simple.  Number one, they agreed to this.  There
11  was a deal cut where they said, "Okay.  We agree.  We're
12  going to take door number two," and they are trying to welsh
13  out of that deal.  But, secondly, they don't know.  And all
14  I'm asking is that their interrogatory responses streamline
15  the case in this respect that to the extent my questions are
16  good ones, they say they don't know the answer to the
17  question.  If they want to say, "With respect to limitations
18  on the ability to sell the art, we are aware of assertions by
19  the attorney general that have been included in his opinion.
20  We are aware of assertions by the Art Institute in their
21  opinions about why we can't sell the art.  Here are the
22  different bases for them like is in their current answer," I
23  get that, but they need to go on and say, however, "With
24  respect to specific bequest limitations with respect to the
25  300 most valuable pieces, we have not, number one, tried to

1  determine what the 300 most valuable are, and, number two, we

2  don't know whether there are specific bequest limitations on

3  them or not."  That's all I want.  Interrogatories and Rule

4  30(b)(6) as discovery tools are tailor made for Chapter 9

5  where you have all this complexity and just sewer issues and,

6  you know, restructuring and reinvestment and art, and it's

7  just like you could spend months and months and months and

8  months chasing people around to get answers, and what's great

9  is that 30(b)(6) requires them to collect the information and

10 put it into one person, and the interrogatories requires them

11 to answer the questions so that they can streamline issues

12 before the Court.  They're frustrating that with these

13 answers to the question, and so I think they should be

14 compelled to answer the question consistently with the way

15 that they agreed to and with what is truthful.  Thank you.

16      MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

17 Jones Day, on behalf of the city.  Mr. Hackney expresses

18 frustration with the way this motion to compel has developed

19 and the answers have been provided.  I share that

20 frustration.  It's been extremely difficult for me to

21 understand why we have arrived at where we are on some of

22 these things.  It is the city's view --

23      THE COURT:  Let me just ask you the question.  Does

24 the city know which of the pieces at the DIA are the 300 most

25 valuable?

1          MR. IRWIN:  The answer is we do know to the extent

2    that we have been provided the information by virtue of

3    something like a Christie's report on which we are permitted

4    to rely on what the values as assessed by Christie's of those

5    pieces are.  Where they fall among the relative values of

6    other pieces that may not have been appraised by Christie's

7    we don't know, but they may very well be there.

8          THE COURT:  Pause there.

9          MR. IRWIN:  Yes.

10          THE COURT:  Was that your answer to the

11   interrogatory?

12          MR. IRWIN:  We provided the Bates range.

13          THE COURT:  Was that your answer to the

14   interrogatory, what you just told me?

15          MR. IRWIN:  Those were not the words that we

16   included in the interrogatory response, but functionally we

17   made that very same response.

18          THE COURT:  In substance?

19          MR. IRWIN:  Yes.

20          THE COURT:  Read me your response.

21          MR. IRWIN:  Response to the interrogatories.  On a

22   question --

23          THE COURT:  On the 300 most valuable question.

24          MR. IRWIN:  The 300 most valuable works of art in

25   the collection.  "Documents relating to the city's knowledge

1   as to the subject matter of this request can be found at,"

2   and we list the Bates range where the Christie's report,

3   among other things, can be found, which speak for themselves.

4   "It is the city's understanding and belief that the

5   information needed to answer this request fully and

6   accurately is in the possession of the DIA, if anyone," and

7   directs the objectors to the documents they've subpoenaed

8   from the DIA, which is the city --

9        THE COURT:  You don't accept the proposition that

10  what you told me a few moments ago is different from what

11  that says?

12       MR. IRWIN:  I believe that as the proposition was

13  explained to me by Mr. Hackney in terms of the purpose of

14  these things, to understand and identify the city's knowledge

15  on these topics, we have met that, and that's exactly what we

16  told Mr. Hackney.

17       THE COURT:  What I hear you say is if you're going

18  to answer the question directly, what are the 300 most

19  valuable pieces at the DIA, you don't know.  The city does

20  not know.

21       MR. IRWIN:  The city does not know.

22       THE COURT:  Then why don't you just say that?

23       MR. IRWIN:  Because here's the problem, your Honor.

24  As Mr. Hackney has explained to me as this -- as, again, this

25  has evolved over time, the purpose of this exercise to some

1  degree is to establish the due diligencing that the city did,

2  the knowledge that the city had, and it's equally applicable

3  to the questions about identifying all of the pieces worth

4  more than a million dollars or more.  And what is going to

5  happen when we respond in the way that Syncora would like to

6  draft the responses for us, which we would submit is not

7  appropriate, is for this piece of paper to be waved around to

8  say the city admits and acknowledges that it knows nothing

9  about these things, and that is fundamentally not true.  If a

10  request is put to us --

11        THE COURT:  Well, but if it's true that you don't --

12  you cannot identify the 300 most valuable or every piece

13  worth more than a million, you're going to have to deal with

14  that.

15        MR. IRWIN:  Yeah.  I don't disagree with that, your

16  Honor, but --

17        THE COURT:  You know, why not just answer the

18  question "I don't know"?  If you don't know, you don't know.

19  And when I say "you," of course, I mean the city.

20        MR. IRWIN:  Yes.  I think that the fundamental

21  concern that the city has, your Honor, is that if it does

22  have partial information -- and, again, I think it's in some

23  respects helpful --

24        THE COURT:  Well, but the way the question is

25  phrased, partial information is virtually an admission that

1  you don't know.

2          MR. IRWIN:  And that's why it's frustrating to be

3  here in many respects, your Honor, because we feel like we

4  are -- if a request says, "Identify all pieces of art worth

5  more than a million dollars," and we have information about

6  some of those pieces, it was the city's view and continues to

7  be the city's view that we should be permitted to say,

8  "Here's what we know.  Here are the -- here are the ones that

9  we do know about, and we don't know the rest," and that's all

10  we tried to accomplish here.

11          THE COURT:  Okay.  But you did not say, "And we

12  don't know the rest."

13          MR. IRWIN:  We said that the information needed to

14  answer this request is in the possession of someone else.

15          THE COURT:  Okay.  But that's not the same as

16  saying, "And we don't know the rest."

17          MR. IRWIN:  It is not those --

18          THE COURT:  All it says is somebody else knows.

19          MR. IRWIN:  That is true, your Honor.  It is not

20  those words.  It is a -- to me it is functionally the same

21  thing to say someone else knows the answer to that question.

22  "Here's what I know.  To get the rest, you need to ask

23  someone else," and that's all we tried to accomplish here.

24          And, your Honor, I would say, you know, the --

25  another part of this that's been frustrating for us is that I

1  personally tried to, again, preview for Mr. Hackney and Mr.
2  Arnault that we would be responding in this manner with the
3  e-mail that we pointed out where I said the city does, in
4  fact, have partial information that is responsive to these
5  requests, but we will state in our answers that to get the
6  full information, you need to go to the DIA.  That e-mail was
7  never responded to, and I was, therefore, very surprised.
8  And, in fact, I picked up the phone and called Mr. Hackney
9  that night the nanosecond after I got his e-mail complaining
10  about the sufficiency of these responses because I really
11  very much wanted to talk to him because I was very confused
12  by why this misunderstanding actually ever took place, and so
13  it was a misunderstanding.  I hear Mr. Hackney now to be
14  saying he expected something different.  I delivered what I
15  thought was a fair and functionally responsive and truthful
16  answers to these interrogatories.  We could change the
17  language, but to me they would say exactly the same thing,
18  and they would be used for exactly the same purpose.  And the
19  only thing that would change would be someone would have to
20  then add in response to a question in a deposition, for
21  example, that is true that the city cannot identify all
22  pieces worth more than a million dollars, but what you're not
23  asking me about is the fact that we did due diligence, and we
24  do know about a lot of them.  And all we're trying to do in
25  our interrogatory responses, which I think we're entitled to

1  do, is establish and identify where that knowledge lies.

2       THE COURT:  But you don't know whether the list you

3  can identify as worth more than a million is ten percent,

4  fifty percent, or ninety percent?

5       MR. IRWIN:  That is true.  That applies specifically

6  to number two, but it wouldn't apply to number one, and

7  for -- I would say most of them -- most of the requests talk

8  about all.  I mean you can't remove -- you can talk about the

9  intent and the desire to figure out what the city did to due

10  diligence these things, but you can't change the language of

11  the actual request.  Identify all restrictions on

12  alienability on the works of art identified in response to

13  interrogatory number two.  It is true we can't identify all

14  restrictions on alienability, but we do know something about

15  that.  And all we did was say, "If you want to know what we

16  knew, if the real purpose here is to figure out what we knew,

17  here's where you can look.  After that, you'd have to ask

18  somebody else.  You'd have to ask the DIA."

19       THE COURT:  All right.  Thank you.

20       MR. HACKNEY:  Two points briefly.  The first point

21  is that the idea that Mr. Irwin and I were not connecting or

22  communicating with each other well is not correct.  I am not

23  somebody who is hard to understand when I'm dealing with my

24  fellow counsel.  I'm a very plain-spoken person.  Mr. Irwin

25  knows what we were trying to do.  And by the way, ironically,

1    the interrogatories were actually not designed for this

2    purpose.  What I was hoping was I could use the

3    interrogatories to narrow the collection down to the 300 most

4    valuable and then feed that information over to the experts

5    to have them start getting ready valuing it.  It was only

6    when we got into discovery and I realized that the city

7    didn't know that it started going the other direction

8    because, as a practical matter, I don't even know how long it

9    would -- I mean if the motion to compel was granted and they

10   had to actually go figure out what the 300 most valuable

11   were, it would have taken forever, so I said, "Okay.  The

12   judge is not going to order them to do something that I

13   should have already -- they should have already done, but I'm

14   at least going to get them to admit that they don't know,"

15   and now I can't even get that because there is a second

16   question.  You asked Mr. Irwin, "Do you know the answer?"

17   But there's a second question, which is, "If Mr. Hackney goes

18   to the DIA, do they have the answer to the question?"  And he

19   is saying to you, "We believe the answer to that is yes."

20   That's what their answer says.  The information needed to

21   respond to this is at the DIA.  And what I'm here to tell you

22   is it's not.  If you go to the DIA and say, "Mr. Irwin told

23   me to come over and talk to you.  Can you give me the list

24   that has the 300 most valuable on it?" I don't believe that

25   information resides at the DIA either.  If they are saying,

1  "There's a ton of art over at the DIA.  Go learn everything
2  you can about it and give it to your experts and then value
3  all of it and then at the end you'll know what the 300 most
4  valuable are," well, that's not exactly responsive to the
5  interrogatory.
6            THE COURT:  Let's pause here.  The rules do require
7  complete answers.
8            MR. HACKNEY:  Yes.
9            THE COURT:  The rules don't require truthful
10 answers.
11           MR. HACKNEY:  The rules don't require truthful
12 answers?
13           THE COURT:  They only require that the person
14 signing them believe they're true.
15           MR. HACKNEY:  Yeah.  I mean that's a little
16 philosophical, but -- I mean I'm not making --
17           THE COURT:  It's a fine line obviously, but I can't
18 enter an order requiring a response different from what was
19 stated on the grounds that it's not a truthful answer.
20 There's nothing in the rules that would justify that --
21           MR. HACKNEY:  Well --
22           THE COURT:  -- if the person believes it's truthful.
23           MR. HACKNEY:  I think that where I get where you're
24 coming from is where you're saying, "I can't tell them what
25 to say," but when counsel gets up and --

1          THE COURT:  Well, I can tell them what to say to the

2  extent that the answer is incomplete.

3          MR. HACKNEY:  Well, then this one is --

4          THE COURT:  That's an overstatement, too.  I mean I

5  can tell them to give a complete answer, but I -- but beyond

6  that --

7          MR. HACKNEY:  Well, so in light of the admissions

8  made by counsel at the podium, I would submit that you have

9  the authority to tell them to answer consistent with the

10  admissions, but let's deal with it -- let's deal with it

11  under the context of completeness.

12          THE COURT:  Well, or I would tell them that there

13  would be consequences from having an answer that's different

14  from what was admitted here on the record here today.

15          MR. HACKNEY:  Right.  Fair point.  But can we talk

16  about it in the rubric of completeness --

17          THE COURT:  Okay.

18          MR. HACKNEY:  -- which is -- let's talk about in the

19  rubric of completeness, which is they're missing the part

20  where we ask where they have agreed to tell us what the city

21  knows or doesn't know.  They're missing the curlicue.  And by

22  the way, what's interesting about this is Mr. Irwin cites the

23  e-mail exchange that he had with Mr. Arnault, and they quoted

24  that twice in their brief.  And the first time they quote it,

25  it's interesting because they cut off the last part of that

1  e-mail exchange because what he said to Mr. Arnault as they
2  were trying to get out of this agreement was he said, "I will
3  make clear that the information resides with the DIA, not
4  with the city." And the information is the answer to the
5  interrogatory. And Mr. Arnault and I were like, well, now
6  he's trying to say it's over at the DIA, and I said he can
7  only say that if he knows it to be true, point one, but,
8  point two, as long as he says that the city doesn't know the
9  answer, then the DIA is the DIA, but when they gave us the
10 responses, your Honor, if you look at the answers to the
11 interrogatories, they don't put the last part on, so the
12 answers are not complete because they don't address the
13 city's knowledge on the question. Your Honor --
14        THE COURT: Mr. Irwin, I have a question for you.
15        MR. IRWIN: Yes.
16        THE COURT: Based on the answers you did submit or
17 the city did submit, do you have any objection if the Court
18 draws the inference from them that the Court -- that the city
19 doesn't know the full answer to the question?
20        MR. IRWIN: No, your Honor, we don't object to that.
21 That's, again, why I am frustrated that we are here. I
22 believe I had functionally delivered that response, that the
23 limits to the city's knowledge is here, and that's all we --
24 whatever else we know, and that's why I say -- and I do have
25 to take issue with something Mr. Hackney said. I am not

1  saying that I have studied the DIA's collection and I know

2  the rest of the information to be there, which is why I

3  said -- because I can read their letter agreements with the

4  DIA in terms of the scope of the subpoenas and the agreement

5  on the production that was going to be made, which track a

6  lot of these issues very closely -- I say the DIA, if anyone,

7  is going to be the person or the entity with knowledge of

8  these matters, so, no, we have never -- we have said to --

9  I've said to Mr. Hackney a number of times the question as

10 it's posed to me, which I was pleased to hear Mr. Hackney

11 agreed because we've talked about this -- the question as

12 originally designed was simply to elicit information about

13 art so that experts could use it, identify all works of art

14 worth more than a million dollars.  The city does not know

15 the answer to that.  It has some information.  It has

16 provided it.  But it does not know the answer to all pieces

17 of art.

18          THE COURT:  All right.  I'm going to take this

19 matter under advisement with the others.  We'll take our

20 lunch break now and reconvene at 1:15, please.  I'll give you

21 my decisions at that time, and then we'll continue with the

22 two status conferences.

23          THE CLERK:  All rise.  Court is in recess.

24     (Recess at 12:17 p.m., until 1:15 p.m.)

25          THE CLERK:  All rise.  Court is in session.  Please

1  be seated.  Recalling Case Number 13-53846, City of Detroit,
2  Michigan.

3          THE COURT:  All right.  It appears that everyone is
4  present.  Addressing first the attorney general's motion to
5  quash the subpoena that was issued to him by Syncora, the
6  Court concludes that this motion should be granted.  The
7  Court concludes that the attorney general's opinion that is
8  the subject of that subpoena is for all functional purposes
9  the equivalent of a brief, and it will be given weight by the
10 Court only to the extent that the facts on which it relies
11 are established in the evidence and the law on which it
12 relies is persuasive.

13         In weighing any settlements in the case, including
14 what's been called the grand bargain here, the Court will
15 weigh the merits of the opposing facts and law and not take
16 into account the position or authority of the people who may
17 have taken positions on one side or the other of the issues.
18 So in these circumstances, there is no basis for questioning
19 the attorney general regarding his legal opinion, so that
20 motion is granted.

21         Addressing next the foundations' motion to quash the
22 subpoenas that were issued to them, the Court again concludes
23 that this motion should be granted.  The Court concludes that
24 none of the 30(b)(6) subjects and none of the documents that
25 are sought from the foundations are relevant to or even

1　arguably relevant to the issues of whether the plan is

2　discriminatory or whether it is unfairly discriminatory, the

3　best interest of creditors or even the extent to which the

4　so-called grand bargain settlement protects the art of the

5　city.  Accordingly, that motion is granted.

6　　　　Now, having said that, it was mentioned during

7　argument that Syncora is interested in information relating

8　to the foundations' ability to pay.  That is a relevant

9　subject on which the Court would allow limited discovery.  It

10　is not, however, as far as the Court could determine, a part

11　of the discovery that was, in fact, served.  The Court hopes

12　that Syncora's counsel and counsel for the several

13　foundations can work out a streamlined and efficient way for

14　Syncora to get the information it needs to evaluate this

15　issue of their ability to pay.

16　　　　In the motion to quash the foundations' requested

17　costs, the Court will ask counsel for those foundations to

18　file a separate motion for costs if they wish to pursue that.

19　　　　Turning now to the motion for a site visit, the

20　Court is inclined to exercise its discretion to grant that

21　motion and to go on a site inspection as requested.  The

22　Court believes it is likely that the value of such an

23　inspection would be outweighed by the effort it would take to

24　organize and execute the tour, so it will take, however,

25　further discussion and planning here in the meantime, so,

1    while I'm not prepared yet to enter an order granting the

2    motion, I do think it is appropriate to move the discussions

3    forward.  And so to that end, I am going to ask the creditors

4    who are objecting to the plan at this point to nominate one

5    or two of them to attend a meeting with one or two

6    representatives of the city, me, and the Marshals Office to

7    discuss and conclude the details necessary to effectuate this

8    site inspection.  And if the creditors are unable to agree

9    upon one or two representatives for that purpose, the Court

10   will identify someone for you.  So I think that's as much on

11   that motion as we can do at this point in time.

12           Turning then to the city's motion for a protective

13   order regarding the retirees' personal information, the Court

14   did state on the record earlier that it would find that

15   Syncora had withdrawn this request based on the Court's

16   ruling that the retirees' hardships was not at all relevant

17   to the issue of either unfair discrimination or fair and

18   equitable.  And just to elaborate on that a bit, as the Court

19   stated earlier, it is unaware of any case law interpreting

20   Section 1129 that holds that it is appropriate to consider

21   the relative hardships of creditors in evaluating the issues

22   under that section of the Bankruptcy Code.  And, indeed, as

23   the Court suggested in the hearing, if that door were opened

24   here and that subject were relevant here, it would literally

25   open up every single retiree as well as Syncora itself to

1   these same inquiries about hardship, assets, income,

2   financial position, and that would be an extraordinarily

3   burdensome and invasive process for all concerned.

4           Turning finally to Syncora's motion to compel

5   complete and truthful answers to the interrogatories, the

6   Court is, likewise, going to deny this motion but with a

7   finding on the record here that to the extent that any answer

8   to any of the interrogatories as to which Syncora seeks a

9   more complete answer is incomplete, it's because the city

10  doesn't know the answer.

11          Let's turn our attention finally then to the two

12  status conferences.

13          MR. HERTZBERG:  Your Honor, could I just --

14          THE COURT:  Sir.

15          MR. HERTZBERG:  -- ask one question?  Will you be

16  notifying us when --

17          THE COURT:  When we're going to have this meeting?

18          MR. HERTZBERG:  Yeah.

19          THE COURT:  Yes.  It'll be sometime in the last two

20  weeks of July, but I don't have a date to give you right now.

21          MR. HERTZBERG:  That's fine.  Thank you.

22          THE COURT:  Okay.  I wanted to see what the status

23  is of Syncora's motion to enforce the solicitation procedures

24  regarding the balloting issue.

25          MR. BENNETT:  Good afternoon, your Honor.  Ryan

1    Bennett on behalf of Syncora.  Your Honor, we have not yet

2    reached an agreement with the city with respect to the

3    ballots.  We've reached some components of an agreement but

4    not all the way through, and we're still trying to work that

5    out.  Right now the city's objection deadline is July 2nd to

6    the motion, and then we're trying to get a hearing with you

7    as well, and we'd filed an ex parte order request to continue

8    the voting deadline to the extent that hearing happens to be

9    passed.

10        THE COURT:  I was a little surprised and

11   disappointed that you didn't ask for an expedited hearing

12   when you filed this motion.

13        MR. BENNETT:  Understood, your Honor.  We filed it

14   with enough time.  We didn't know that we needed it.  We

15   filed it with, you know, the requisite notice period built

16   into it.  We just weren't able to get a hearing before your

17   Honor until after the voting deadline.  We could still do

18   that, your Honor, if you'd like.

19        THE COURT:  All right.  Who for the city is going to

20   deal with this?

21        MS. LENNOX:  Good afternoon, your Honor.  Heather

22   Lennox of Jones Day on behalf of the city on this.  I think

23   Mr. Bennett's characterization of where we are is accurate.

24   I think we're talking -- I will be perfectly frank with your

25   Honor.  I don't think we're going to resolve everything with

1  respect to this motion.  We are prepared to file papers by

2  the 2nd.

3         With respect to the motion that was filed on voting,

4  I might suggest a solution given the timing of the vote

5  deadline similar to what I think your Honor ordered yesterday

6  with respect to Macomb Interceptor, that they send in

7  provisional -- they send in ballots for Class 9.  I'll even

8  give them a provisional ballot for Class 14, which is what

9  they want.  And how those ballots will be counted and in what

10  amount will be determined by your Honor hopefully prior to

11  the July 21st deadline when KCC has to file the report.  I

12  think that would resolve the voting issue, your Honor.

13         THE COURT:  That sounds like a good solution to me

14  on an interim basis.  Is that okay with you, sir?

15         MR. BENNETT:  It is, your Honor.  In fact, I was

16  going to propose it as an alternative as well.  Just to be

17  clear, I mean we are requesting an additional Class 9 ballot

18  as well as a Class 14 ballot understanding that in both

19  circumstances absent a deal they'll be filed on a provisional

20  basis; right?  Great.

21         THE COURT:  Okay.

22         MR. BENNETT:  Thank you.

23         THE COURT:  Okay.  So did we already give a hearing

24  date on Syncora's motion?

25         MS. LENNOX:  I don't believe so, your Honor.

1     THE COURT:  Do we have some hearings already set on

2  July 14th?

3     MS. LENNOX:  I don't believe so, your Honor.  We

4  have status conferences on the 15th.  It's the 14th?

5     THE COURT:  Hold on one second.

6     MS. LENNOX:  I know we have 16th and 17th.

7     MR. NEAL:  Excuse me.  The status conference for the

8  plan is on the 14th. and the hearing on voting rights is also

9  on the 14th if it's going forward, and it's probably not.

10     THE COURT:  All right.  So should we just do it on

11  that day?

12     MS. LENNOX:  Fine, your Honor.

13     MR. NEAL:  That sounds great.  Thank you.

14     THE COURT:  All right.  Ten o'clock on the 14th.

15  Okay, Chris?

16     THE CLERK:  That's fine.

17     THE COURT:  Okay.  Good.  So you can withdraw your

18  motion to extend your balloting deadline.

19     MR. BENNETT:  Correct.  We'll do that, your Honor.

20     THE COURT:  Okay.  All right.  Let's turn our

21  attention then to a more general status conference regarding

22  the plan confirmation process.  The city filed a paper with

23  some issues it wants addressed.  I have a couple of issues.

24  Let me just ask you to go first.

25     MR. SHUMAKER:  Thank you, your Honor.  Good

afternoon.  Greg Shumaker for the record.  Your Honor, you've
read our paper, so I won't belabor that, but to summarize
quickly, the city completed its document production on
Friday, produced over 67,000 documents.  I mentioned earlier
that we have designated our witnesses on 30(b)(6) topics.  I
actually believe that the city owes Syncora a designation on
one topic, which we're working on.  And the city has also
answered over 260 interrogatories when you include subparts,
so a lot of that preliminary written discovery has moved
forward.

On depositions, they are just starting, and the
parties are in the midst of setting up a schedule.  And
you'll recall, your Honor, that the order that you entered on
the deposition protocol envisioned three bands of witnesses.
Band 1 witnesses were common core witnesses who the parties
anticipated would be designated for a number of 30(b)(6)
topics, and that has proven to be the case.  And those Band 1
witnesses were, I think it's fair to say, supposed to go
first.  All the parties agreed on that in the beginning.  I
know the objectors put forth a statement back in early June
to that effect that that was the agreement of the parties.
The city recognized -- I'm not sure -- ten days ago or so
that four of the seven Band 1 witnesses were going to be
identified as expert witnesses who would be producing expert
reports, and so the city reached out with the objectors and

1    indicating it might be most efficient for the parties to have

2    those two-day depositions come after the expert reports were

3    delivered so that -- to minimize burden on the witnesses and

4    counsel, if you will, with the idea that they would be two-

5    day depositions and if we needed to go into a third on the

6    expert testimony, that we would do that, so that removed four

7    of those witnesses, Band 1 witnesses.

8            One of the Band 1 witnesses is Cynthia Thomas, and

9    she is controlled by the Retiree Systems.  Her deposition has

10   also been set, two-day deposition has been set.  That left

11   two Band 1 witnesses.  One, Mr. Bowen from Milliman, the

12   city's actuary, is set for Monday, I believe, Monday and

13   Tuesday.  We got that set right away.  There is disagreement

14   on Mr. Orr's deposition, and the city first offered him up

15   yesterday and believed -- knew that the status conference was

16   today, believed that he was a Band 1 witness, that the

17   objectors, as they had said previously to the Court, they

18   needed to hear what the city's case was, had to hear what the

19   testimony was on the 30(b)(6) topics for which he had been

20   designated, so we proposed the 26th and the 28th.  The

21   objectors, despite what had been said before, didn't like

22   that date and objected and said, no, he's -- now he's -- it's

23   one of the most important depositions in the case, so he must

24   come later, so give us dates from June 30th through August

25   4th, and we'll tell you when he's going to be available.

1   There was back and forth, and, as I indicated, look, he's a
2   Band 1 witness.  We've got to get the show on the road.  It's
3   June 26th, and we've had one deposition.  Your Honor
4   indicated in the order -- the fifth amended scheduling order
5   that depositions should start immediately.  Mr. Orr should
6   go.  So the backup -- you could see where this is backing up
7   on the back end, if you will, as we defer those -- the big
8   four who are also going to be experts, and we've got 64 total
9   fact witnesses, and we've gotten one accomplished.  It's a
10  big concern, and that is why I went back and said, look,
11  Mr. Orr obviously has a lot of things going on, but he is
12  available on the 9th and 10th of July.  Let's do him.  That
13  was again rejected in an e-mail.  I believe it might -- it
14  was yesterday and indicating that the objectors want to take
15  that at the end of July.  And, again, your Honor, the city
16  would submit that we've got to get this show on the road and
17  quickly, so that's the Band 1.
18          The Band 2's we -- when your Honor signed the order
19  with the deposition protocol, there were about -- well, let
20  me put it this way.  It was before the parties filed their
21  amended witness lists on Friday, and at that time -- I will
22  say earlier this week the city, I, proffered deposition dates
23  for 20, I think, of the 22 Band 2 witnesses that are
24  controlled by the city, and we have not heard back from the
25  objectors yet on, you know, moving forward with those.  But I

1  note -- and this was in the report to your Honor -- that

2  the -- at the time that the deposition protocol was set up,

3  there were ten DWSD witnesses that had been identified.  The

4  objectors indicated they wanted to talk to Mr. Doak, who your

5  Honor has heard before, so that increased the total to 11.

6  And the DWSD objectors -- and when I say that, I'm referring

7  both to the insurers and the holders as well as the counties,

8  Oakland, Macomb, and Wayne County.  They've identified 16 new

9  witnesses on the DWSD topics, meaning that of the 64

10 witnesses right now, 27 are devoted to the DWSD issues.  Your

11 Honor, we've proposed previously a limitation on the general

12 number of Band 2 witnesses.  Your Honor did not agree with

13 that.  But, again, the amount that's going on and all that

14 needs to get done between now and August 4th suggests to us

15 that some sort of limitation would be helpful.  You know, the

16 counties have identified 19 unique witnesses that no one else

17 has identified as opposed to the city's 12 unique witnesses.

18 FGIC has eight, Syncora has six, and EEPK has three.  Again,

19 those are unique witnesses that no one else has identified,

20 but it gives you some relative appreciation of how much is

21 now focused on the DWSD issue which candidly we see as

22 somewhat the tail wagging the dog in the overall picture.  I

23 know it's very important to those objectors, but we think a

24 limitation might well be in order.

25         Then the other thing, we also -- just so your Honor

1    knows, the city flagged for the objectors in my e-mail on
2    Monday to them that three of the Band 2 witnesses that are
3    going to be identified, Mr. Cline, Ms. Sallee, and Mr. Hill,
4    are going to be experts as well, and so they are being pushed
5    into the post-July 8th -- actually into the July 14th week,
6    so, again, we've got a lot going on.  And so that, I think,
7    is where we sit generally speaking.
8            I did want to raise one other issue with your Honor,
9    and I'm not saying that now is the time to rule, but I
10   thought I would raise it with you because it's something
11   we've been thinking about, and that is whether your Honor
12   plans on taking judicial notice of the testimony in the prior
13   eligibility proceeding and the swaps proceedings, and that
14   becomes an issue, for example, with certain fact witnesses,
15   say, Chief Craig.  Chief Craig, as you recall well, I'm sure,
16   depicted the current conditions, the deplorable conditions
17   that the city faces on the police front.  We would suggest
18   that since -- the parties are not identical in those
19   proceedings, but -- when I say "those proceedings," I'm kind
20   of talking about the swaps proceedings at the moment -- but
21   they're very similar, and we got similar parties.  We've got
22   the same proceeding.  We've got similar witnesses, for
23   example, Mr. Malhotra or Mr. Buckfire, who are experts and
24   were qualified in the swaps, you know, Mr. Malhotra on the
25   financial analysis used for forecasts and --

1       THE COURT:  All right.  Well, my impression here is

2  that if you want to incorporate any of that testimony into

3  this proceeding, you should file a motion and identify

4  specifically what parts of what transcripts you want.

5       MR. SHUMAKER:  We can do that, your Honor.

6       THE COURT:  Parties will be on notice and can object

7  or agree as they see fit.

8       MR. SHUMAKER:  Thank you, your Honor.  And I think

9  that, unless your Honor has questions, is where things stand

10  at least from the city's standpoint.

11       THE COURT:  Thank you.  Anybody want to be heard?

12       MR. HACKNEY:  Good afternoon, your Honor.  Stephen

13  Hackney on behalf of Syncora.  I just wanted to address two

14  issues with you, if I could.  The first one is that I --

15  we've worked out the scheduling of all the witnesses with the

16  exception of Orr, and I just -- I think it's silly that we're

17  bringing this issue to you.  I leaned over to Mr. Shumaker

18  before the hearing and said, "Look, like we noticed him up

19  for July 21 and 22.  No one said that there's a conflict."  I

20  am the lead questioner on Orr, and I can tell you that I need

21  additional time to adequately prepare for his deposition

22  based on the other depositions that I'm taking and the way

23  the documents are processed and uploaded.  There's an

24  enormous --

25       THE COURT:  Let me cut you off.

1        MR. HACKNEY:  Yeah.

2        THE COURT:  It's fine.

3        MR. HACKNEY:  Okay.  Good.  I'm sorry that you -- I

4   just don't -- so the second issue that I wanted to revisit

5   with you is your favorite subject, and it's the mediation

6   privilege.  I know that you said --

7        THE COURT:  You mean the mediation order.

8        MR. HACKNEY:  The mediation, yeah.  That's right.

9   That's right.  So I know that you've said there's not going

10  to be a mediation privilege log, a mediation -- a log of the

11  documents withheld under the mediation order, and I'm not

12  directly asking to reconsider that, but I wanted to make you

13  aware that I have asked the city to consider whether they

14  will provide us with aggregate information with respect to

15  how many documents are being withheld, the types of certain

16  documents.  I've asked them for categories of information

17  relating to the nature and extent of the assertion because

18  right now we don't have visibility into the way it's being

19  applied.  You had said -- in your fifth amended scheduling

20  order, you said something to the effect of like all

21  additional motions on discovery, you know -- all additional

22  discovery issues will be heard by motion, and so I'm not

23  seeking to argue this to you today, but I, in the way of

24  status, wanted to let you know that it's something I've

25  reached --

1          THE COURT:  Let me ask you to pause again.  I want

2    to offer to everyone the ability to present to me any

3    discovery disputes you have by telephone on an informal basis

4    as you see fit.

5          MR. HACKNEY:  Thank you.

6          THE COURT:  Call my office, and we will set it up as

7    promptly as we can.  And if we can resolve it, we can resolve

8    it.  If we can't and then you have to file a motion, okay,

9    but I think this is the least I can do given our timing.

10          MR. HACKNEY:  Thank you for offering that.

11          THE COURT:  Now, I want to make an additional offer

12    to you specifically, really to everyone but you specifically.

13    I want you to feel free to pre-clear with me any further

14    discovery you want to take.

15          MR. HACKNEY:  In the fashion that you just

16    described?

17          THE COURT:  Yes.

18          MR. HACKNEY:  That would be helpful.

19          THE COURT:  You know, you have been criticized, as

20    you have pointed out here today, sometimes unfairly,

21    sometimes not so unfairly, and I want to -- I want to clear

22    all of that away.  If you think it's in your best interest to

23    pre-clear with me some discovery you want to do or some issue

24    with regard to discovery, I want to -- I want to break

25    through all of that kind of difficulty.

1          MR. HACKNEY:  Absolutely.  I appreciate the offer,

2     and we'll avail ourselves of it if we see a controversy or

3     even if we don't.

4          THE COURT:  All right.

5          MR. HACKNEY:  I think -- I don't know if Mr. Neal

6     wanted to comment on behalf of DWSD, but we're working --

7          THE COURT:  Yeah.  That was going to be my next

8     question.  Yes.

9          MR. NEAL:  Good afternoon, your Honor.  Guy Neal,

10    Sidley Austin, rising for my client, National Public Finance

11    Guarantee.  To the extent I go too far and implicate other

12    DWSD-related parties, they will stand and speak for their

13    respective interests.

14          Very briefly, to comment on Mr. Shumaker's

15    suggestion to the Court in last night's filing that there be

16    a limitation of witnesses, it is fair of him to characterize

17    the Band 2 witnesses for deposition as both county and DWSD

18    parties, but it merits a little bit of unpacking.  The DWSD

19    parties -- and that would include -- and excuse me, your

20    Honor.  I'm getting over a chest cold.  That would include

21    National Public Finance Guarantee, Assured Guaranty, U.S.

22    Bank, and the ad hoc committee.  We'll be taking the lead on

23    about six depositions.  Those are the ones we care about, so

24    six of the twelve.  My math might be a little off.  It could

25    be seven of twelve.  That's the first observation.

1      The second, with respect to the witnesses that the

2  DWSD parties themselves have identified in their respective

3  witness lists, witnesses they control, who they may call

4  affirmatively in their case in chief putting aside rebuttal,

5  will be about the same number, about half a dozen.  So,

6  again, I rise on DWSD insurers and bondholder interests

7  today.  I'm not speaking for the counties.  That's a separate

8  inquiry.  We don't want to have there be any artificial

9  limitation, number one, on the depositions that we can take

10  of the city's witnesses, DWSD personnel in particular and

11  their financial advisors, and then, number two, the number of

12  witnesses we intend to call, which I would be surprised if

13  there'd be greater than half a dozen, so we would encourage

14  your Honor to resist imposing any artificial limitation

15  either on who we depose or who we can call given the

16  relative, and I think relative with respect to the rest of

17  the objectors, small number of witnesses.  Thank you.

18          THE COURT:  Thank you, sir.

19          MR. SCHNEIDER:  Good afternoon, your Honor.  Matthew

20  Schneider from the Office of Attorney General here on behalf

21  of the governor and the State of Michigan.  And as you know,

22  FGIC has subpoenaed the governor and his chief of staff, Mr.

23  Muchmore, as well as a 30(b)(6) witness.  They are seeking

24  both deposition testimony and document production, and they

25  set a July 3rd date for that.  I wanted to update the Court

1  that we are working very cooperatively with FGIC and their

2  counsel, Ed Soto.  He's here, and we thank them.  Our goal is

3  to work cooperatively, and in fact, we've reached an

4  agreement which we want to make sure that the Court is aware

5  of.  The agreement is is that FGIC has agreed to adjourn

6  these depositions without date, and that's also adjourned

7  without prejudice to our right to file a motion to quash at a

8  later date.  FGIC has also agreed to narrow the document

9  requests by removing a couple things, but, nevertheless --

10         THE COURT:  Let me ask you to pause --

11         MR. SCHNEIDER:  Um-hmm.

12         THE COURT:  -- with the same offer I made earlier,

13  which is it would be much more efficient to resolve these

14  kinds of disputes by telephone than by motion and response

15  and hearing, et cetera, et cetera.

16         MR. SCHNEIDER:  We agree, and, in fact, we'd like to

17  go one step further.  We'd like to work out those disputes

18  among ourselves without having to bring them to you, and

19  that's what we would like to try to do.  If we can't do that,

20  we'll reach out to you.  It might not be possible to reach an

21  agreement.  We may file a motion to quash, and I wanted to

22  let you know that.

23         THE COURT:  All right.

24         MR. NEWMAN:  Your Honor, Max Newman on behalf of

25  Wayne County.  Since we have more of these so-called unique

1  witnesses, I decided that I would come up and take the heat

2  before Ms. Quadrozzi came up.  I will say to the Court --

3          THE COURT:  There's plenty of heat for both of you.

4          MR. NEWMAN:  Well, your Honor, I don't think there

5  should be, and let me explain why.  First of all, not all

6  witnesses are created equal.  The witnesses -- the unique

7  witnesses that we have are all parties within our control.

8          THE COURT:  Pause for a minute.  What are your

9  county's three most significant objections to confirmation?

10          MR. NEWMAN:  My county's -- I can narrow that really

11  to one very broad category, which is the adequate assurance

12  of future performance slash feasibility questions related to

13  DWSD.  I don't know exactly --

14          THE COURT:  More specifically what?

15          MR. NEWMAN:  More specifically, are they going to be

16  able to continue to provide services with the plan as it

17  currently stands with the payments on the pension obligations

18  and with respect to capital improvements, the financing of

19  the system, and the maintaining of the funding -- the funding

20  arrangement for the system and fees as they have -- as they

21  are provided under the existing contracts.

22          THE COURT:  And how many witnesses are you going to

23  call in an attempt to convince me of all that?

24          MR. NEWMAN:  Your Honor, it's very difficult for me

25  to answer that question at this time because I don't know the

city's case yet, so let me tell you what I -- I have listed
six county employees.  That's the people we're talking about.
That's the people in addition to the overlap with the DWSD
objectors.  I may not call any of them depending on how the
city's case comes in.  To the extent that there are specific
issues with respect to how the future of the DWSD is laid out
by the city and their obligation to show adequate assurance
of future performance under the contracts impacts my county,
I need certain of my county's employees to be at least on the
ready to say we agree that this is how it will impact us, in
which case I probably wouldn't call the witness, or we
disagree.  We are on a time limit.  We are responding.  We
don't know what yet the city's case will be.  Our witnesses
have different areas of knowledge.  There may be some
overlap, but I will not call overlapping witnesses.
Moreover, I will commit to the Court today that I won't waste
time on cumulative witnesses.  In other words, if the issue
is the same between Wayne and Oakland -- and there may very
well be ones that are the same -- and Oakland calls a witness
to address engineering questions, that sort of thing, capital
improvement costs, I'm not going to call someone to say, "Me,
too."  I didn't want to list -- you know, I didn't want to
hide behind rebuttal witnesses.  I didn't want to hide behind
saying, you know, I could call some of these people to rebut
some of the things that the city may say about the water and

1  sewerage system.  Instead, I wanted to say these are the six

2  people who it is theoretically possible I may call if there

3  are disagreements with your witnesses' testimony over the

4  future of the water system and how it will impact Wayne

5  County.  That's why we have some unique witnesses.  I don't

6  think that these people are going to throw the discovery into

7  disarray, and I do believe that -- you know, I recognize --

8  let me put it differently.  I recognize that we are under a

9  time limit, and I intend to respect that and not waste the

10 Court's time with them, but to the extent that there are

11 finger pointings because we have names on our list we do,

12 this is why, and we will do our best to manage it within an

13 organized and efficient trial.

14          THE COURT:  Thank you.

15          MR. NEWMAN:  Thank you, your Honor.

16          MS. QUADROZZI:  Good afternoon, your Honor.  Jaye

17 Quadrozzi on behalf of Oakland County.  Your Honor, just for

18 clarification, we amended our witness list.  We did not add

19 any witnesses at all.  We eliminated witnesses.  The two fact

20 witnesses, who I guess I will say are Oakland's unique

21 witnesses in the city's terminology, are not new.  Those two

22 witnesses have been on our list all the way along.

23          THE COURT:  Who are they?

24          MS. QUADROZZI:  They are Bob Daddow and Sidney

25 Lockhart.

1          THE COURT:  And who are they?

2          MS. QUADROZZI:  I'm sorry.

3          THE COURT:  Who are they?

4          MS. QUADROZZI:  Sidney Lockhart is an engineer at

5    the Water Resources Department, and Bob Daddow is a deputy

6    executive at Oakland County's executive's office.

7          THE COURT:  And what are Oakland County's objections

8    to the plan?

9          MS. QUADROZZI:  Oakland County shares, as does Wayne

10   County and I expect Macomb County, very similar objections.

11   Our objections go to the feasibility.  We also have

12   objections as they relate to illegality and good faith.  But

13   in terms of the fact witness presentation, I think the

14   feasibility is going to be where those fact witnesses come

15   into play if, in fact, they need to come into play.

16          Second point, in terms of the other -- the Band 2

17   DWSD witnesses, I think that perhaps the city presented a

18   somewhat pessimistic view of where we are.  We have all of

19   the DWSD ten Band 2 depositions scheduled.  I worked with Mr.

20   Hamilton.  We had no problem whatsoever scheduling them.

21   Those are all done.  From the county's perspective, you heard

22   Mr. Neal say that he was taking lead on six or so of them.

23   Oakland County has lead on four of them, so -- and that is

24   it.  It is the witnesses that have already been identified

25   and approved in that Band 2, Category A, in the protocol, and

1    I expect those depositions to go forward.  I will say this
2    because I've said this to other parties.  If as we take those
3    depositions we believe that we don't need some of the
4    depositions that are scheduled further on, I, similar to
5    counsel for Wayne County, do not want to waste anyone's time
6    here, and we will be as efficient as we can and eliminate
7    those that we view we no longer need if we are able to.
8            THE COURT:  Thank you.  Anyone else want to be
9    heard?
10           MR. BRILLIANT:  Your Honor, Allan Brilliant on
11   behalf of Macomb County by and through its, you know, county
12   agency, and, again, your Honor, I thank you for allowing us
13   to, you know, appear by phone.  We only have two witnesses
14   that weren't included on the -- in the Band 2 or Band 1 order
15   regarding deposition protocol.  Those are Jason Matteo, the
16   chief engineer at Macomb County Public Works Office, who was
17   very intimately involved in an intercounty, you know, study
18   as to what the capital improvement needs are for the -- you
19   know, for the system, and then the second witness that we
20   have on our list that's not, you know, covered, you know, in
21   connection with the order was a -- potentially a 30(b)(6)
22   witness to be designated by Plante Moran, the auditor of the
23   GRS pension fund.  Our hope is that after we take the
24   depositions of -- you know, of Mr. Bowen, which is scheduled
25   for Monday and Tuesday, and Ms. Thomas from the GRS that

1  we'll be able to eliminate that person as we're hopeful that

2  we can get the information from the other parties.  You know,

3  your Honor, our expectation is as well -- we understand with

4  the time limits as to what our case can be that we're going

5  to have to coordinate among the other counties as well as the

6  DWSD parties with respect to putting on our case, and we're

7  very much prepared to do that.

8           THE COURT:  Thank you.

9           MR. MARRIOTT:  Good afternoon, your Honor.  Vince

10  Marriott, Ballard Spahr, EEPK and affiliates.  I have a

11  nondiscovery issue.  Is now the appropriate time to --

12           THE COURT:  Yes.  Go ahead.

13           MR. MARRIOTT:  It relates to your order identifying

14  legal issues, establishing supplemental briefing schedule and

15  the like.  One of the issues that was in that order was issue

16  nine, which was whether LTGO's are entitled to priority over

17  unsecured -- other unsecured claims.  That was an issue that

18  we were likely to weigh in on along with Ambac and the city.

19  I know that there was a stipulation agreed to between Ambac

20  and the city removing that issue as to them from the

21  preconfirmation briefing and argument on that issue.  I just

22  want to confirm that it really is removed from the

23  preconfirmation briefing and hearing schedule for everybody

24  that would want to weigh in on it, and to the extent that it

25  is relevant to an objection or supplemental objection that we

1    might file to the plan depending upon what the LTGO

2    settlement is that we can raise the issue in connection with

3    confirmation and don't need to waive it -- to raise it now.

4            THE COURT:  Any objection to that from the city?

5            MS. LENNOX:  No objection, your Honor.

6            THE COURT:  All right.  Thank you for bringing that

7    up.

8            MR. MARRIOTT:  Thank you.

9            THE COURT:  Anyone else want to bring anything up?

10   I have a couple of matters.  One does relate to the LTGO

11   settlement.  Is it the city's intention to seek court

12   approval of that, and, if so, will that request be in the

13   context of a motion or an amended plan?

14           MS. LENNOX:  I believe we're talking right now, your

15   Honor, of doing that in the context of an amended plan, and,

16   yes, it would be -- it would be -- we would be requesting

17   court approval via that mechanism.

18           THE COURT:  And when do you propose filing that?

19           MS. LENNOX:  Well, that's a good question.  We're

20   still working out definitive documentation.  I'm hopeful that

21   we can get this done certainly in the next couple weeks.

22           THE COURT:  And what impact will that have on LTGO

23   balloting?

24           MS. LENNOX:  It will not require resolicitation.

25           THE COURT:  And why do you conclude that?

1    MS. LENNOX:  Because it will not result in a

2  material disadvantage to the LTGO's.

3    THE COURT:  Okay.  While I have you here, I have an

4  issue regarding leaking to the press and public the interim

5  results on balloting.  I think I read somewhere not too long

6  ago that the balloting was coming in at two to one in favor.

7  I would strongly suggest that neither the balloting agent nor

8  the city provide any interim balloting information at all

9  until the final certification.

10    MS. LENNOX:  Publicly, your Honor.

11    THE COURT:  Publicly.

12    MS. LENNOX:  We agree.

13    THE COURT:  If you do provide any public information

14  about it, it should be complete and accurate information so

15  that it discloses not just the count of the votes but the

16  count of the claims or the totals of the claims on each side

17  of the vote because both are obviously important under the

18  Bankruptcy Code, but I don't suggest that.  My suggestion is

19  not to disclose anything until the final balloting.

20    MS. LENNOX:  We agree with your Honor on that.  That

21  was an unfortunate remark to the press.  It was immediately

22  addressed, and we don't expect that to be happening again.

23    THE COURT:  All right.  That's all I have.  On the

24  issue of discovery and depositions and the number of

25  witnesses, I'm, frankly, not inclined to take any action

1   other than I have taken here today, but I do caution everyone

2   involved here that the deadlines that I have set are firm

3   deadlines and, as I indicated in the order, will only be

4   extended upon a showing of extraordinary cause.  I can't help

5   but be disappointed that depositions are only just now

6   beginning because all it means is you all are going to have

7   to work that much harder to meet the deadlines that I did

8   set.  Anything else?  All right.  We're adjourned for today.

9       (Proceedings concluded at 2:03 p.m.)

INDEX


<u>WITNESSES:</u>

　　　None

<u>EXHIBITS:</u>

　　　None


　　　　I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett　　　　　　　　　June 30, 2014
_____　　　_____
Lois Garrett