UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | : | |
|---|---|---|
| In re: | : | Chapter 9 |
| | : | |
| CITY OF DETROIT, MICHIGAN, | : | Case No. 13-53846 |
| | : | |
| Debtor. | : | Hon. Steven W. Rhodes |
| | : | |

# NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION'S SUPPLEMENTAL BRIEF REGARDING LEGAL ISSUE #7

National Public Finance Guarantee Corporation ("National"), by and through its undersigned attorneys, and pursuant to the Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures [Doc. No. 5235] (the "Legal Issues Order"), respectfully submits this Supplemental Brief Regarding Legal Issue #7 (the "Issue #7 Supplement"), and in support thereof, states as follows:[1]

---

[1] This Issue #7 Supplement is offered in support of National's Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Doc. No. 4665] (the "Objection"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Objection.

## PRELIMINARY STATEMENT

1. Issue #7 asks *whether the Bankruptcy Code prohibits the interest rate and call protection modifications of bonds secured by special revenues set forth in § II.B.3.a.ii. of the Plan.*[2] It is National's position that the impairment is absolutely prohibited for the following two reasons.[3]

2. First, the relevant sections of the Bankruptcy Code were drafted to "insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely, they will have *unimpaired rights* to the project revenue pledged to them."[4] Sections 902, 922(d), 927 and 928, read together, clearly reflect Congressional intent that special revenue debt should receive the "benefit of its bargain" in a chapter 9 case—that is, the application of pledged special revenues to the payment of debt secured by such revenues pursuant to its terms. No provision of the Bankruptcy Code permits a municipal debtor to impair special revenue debt in a manner that is inconsistent with those substantive protections; therefore, special revenue debt is not subject to impairment.

---

[2] Legal Issues Order ¶ 7.

[3] National submits this brief to address certain issues that were raised at the May 28, 2014 status conference and in the City's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Doc. No. 5034] (the "City's Reply") which impact upon any determination by the Bankruptcy Court of Issue #7 at this stage of the proceeding, and to summarize its position on Issue #7 in advance of hearing.

[4] S. Rep. No. 100-506 at 12 (1988) (emphasis added) (hereinafter "S. Rep.").

3. Second, even if special revenue debt could, in some circumstances, ever be subject to impairment, the proposed impairment in the Plan is impermissible because it fails the fair and equitable test. This test, as applied in chapter 9 cases, requires a plan to meet the reasonable expectations of creditors in the circumstances. As set forth below, the relevant undisputed circumstances here include (i) that the Systems' revenues are sufficient to pay the DWSD Bonds pursuant to their terms and all other DWSD obligations as and when due, and (ii) that the Systems are closed such that the Systems' revenues must be applied in accordance with the terms of the DWSD Bonds and applicable law, and may not be transferred to the City's general fund or applied to general fund obligations. Because the Plan fails to meet the DWSD Bondholders' reasonable expectation in these circumstances of payment in full of the DWSD Bonds pursuant to their terms, the proposed impairment in the Plan fails the fair and equitable test. Therefore, the Bankruptcy Code prohibits the proposed impairment of the DWSD Bonds.

# ARGUMENT

**I. THE BANKRUPTCY CODE'S PROTECTIONS OF SPECIAL REVENUE DEBT PROHIBIT THE NON-CONSENSUAL IMPAIRMENT OF THE DWSD BONDS AS SET FORTH IN THE PLAN.**

4. Congress enacted the 1988 amendments to ensure that special revenue debt would remain unaffected by a municipality's chapter 9 filing. These amendments had the effect of providing special revenue debt holders with the "benefit of their bargain": (i) pledged special revenues are applied to pay such debt per its contractual and statutory terms without interruption during the bankruptcy case and the holders of such debt are not prevented from enforcing their state law, contractual rights to payment (11 U.S.C. § 922(d)), (ii) special revenue debt holders may only be paid from the pledged revenues and may not assert any deficiency claim against a municipality's general fund (11 U.S.C. § 927), and (iii) liens on special revenue survive in chapter 9 and attach to post-petition revenues (11 U.S.C. § 928). These provisions create substantive protections for debt secured by special revenues that no other provision of the Bankruptcy Code may impair or disregard.

5. The amendments were intended to ensure that special revenue debt is unimpaired in chapter 9.[5] Congress was concerned that "[l]enders may be reluctant to advance funds for projects [of a financially distressed municipality] . . . when the possibility exists that the lien securing repayment could be avoided if the municipality files bankruptcy."[6] Congress also wanted to ensure that distressed municipalities would have continued access to the capital markets for necessary financing. As explained in the Senate Report, "[r]easonable assurance of timely payment is essential to the orderly marketing of municipal bonds and notes and continued municipal financing," and the 1988 amendments were designed to "help to prevent th[e] situation" of an adverse legal ruling that would result in all cities "fac[ing] higher borrowing costs and a city experiencing serious financial difficulties could find it very difficult or impossible to issue revenue bonds."[7] To address these concerns, the 1988 amendments had the effect of isolating special revenue debt, and preserving its pre-bankruptcy status, in a chapter 9 case. *See In re Jefferson Co.*, 474 B.R. 228, 273-74 (Bankr. N.D. Ala. 2012).

---

[5] S. Rep. at 12.

[6] H.R. Rep. No. 100-1011, at 5 (1988) (hereinafter "H.R. Rep.").

[7] S. Rep. at 21, 27.

6. The first such absolute protection is codified in section 922(d), pursuant to which, the automatic stay does not apply to special revenue debt, thereby ensuring that special revenue debt is unaffected by the bankruptcy of a municipality. Faced with the specific question, the court in *Jefferson County* held that the automatic stays of sections 362(a) and 922(a) do not apply to the required payment of special revenues to special revenue debtholders. *In re Jefferson Co.*, 474 B.R. at 271. The uninterrupted and unimpaired payment of special revenues is required, even after commencement of a bankruptcy case, in accordance with the contractual terms and applicable state law. As the *Jefferson County* court found, special revenues "are not protected from further actions by the Indenture Trustee to acquire them from the [municipality]." *Id.* at 272.[8] The *Jefferson County* court based its conclusion in part on the finding that "[t]he structure and intent of what Congress enacted by its 1988 amendments to chapter 9 was to provide a mechanism whereby the pledged special revenues would continue to be paid uninterrupted to those to which/whom payment of the sewer system's indebtedness is secured by a lien on special revenues." *Id.* at 274.

---

[8] Here, Michigan law, as set forth in Act 94, expressly provides the DWSD Bondholders and the DWSD Trustee with the right to "protect and enforce the statutory lien and enforce and compel the performance of all duties of the officials of the borrower, including the fixing of sufficient rates, the collection of revenues, the proper segregation of revenues, and the proper application of revenues." M.C.L. § 141.109. No provision of the Bankruptcy Code or in a plan of adjustment can impair that right.

6

7. In addition, section 927 maintains the non-bankruptcy separation between special revenue and general fund debt by providing that DWSD Bondholders, as special revenue creditors, may not seek recourse against the City's general fund.[9] As applied here, that means that the City's general fund is not liable to pay any deficiency claims of DWSD Bondholders if the pledged revenues are insufficient, even though the City may have issued the DWSD debt. And section 928 ensures that the DWSD Bondholders' liens on special revenues continue in full force even after the City's bankruptcy filing.[10]

8. The City argues that special revenue debt is no different than other secured debt, and that *all* secured debt is subject to non-consensual impairment under the Bankruptcy Code. That argument is based on a mistaken premise. Special revenue debt and other secured debt are not the same. No other municipal debt is afforded the statutory protections of special revenue debt in sections 922(d), 927 and 928. While special revenue debt and other municipal secured debt enjoy liens on assets, the similarities end there. Other municipal secured debt is subject to

---

[9] H.R. Rep. at 4 ("In the event of a default, [special revenue] bondholders cannot look to any other assets of the municipality for repayment. . . . Special revenue bonds are issued so that if the asset financed fails, repayment will not come out of general treasury funds . . .").

[10] H.R. Rep. at 8 (stating that eliminating the risk of avoidance of a lien on special revenues "should make it easier for troubled municipalities to obtain needed financing of public projects").

the automatic stay, is not paid during the course of a chapter 9 case, is subject to potential lien cut-off under section 552(a), is not secured by special revenues as defined in section 902, is subject to having its collateral used to satisfy other creditors, and may have recourse to the general fund for deficiency claims. Special revenue debt is wholly unique, and this is precisely what Congress intended to address and protect (both for lenders and municipalities) in enacting the 1988 amendments.

9. Section 943(b)(2) provides that a plan must comply with the provisions of chapter 9. If a plan of adjustment purports to impair the rights and protections of special revenue debt (which the City's Plan does), such plan violates the Bankruptcy Code. No other Bankruptcy Code section (including section 1129(b)) can be read to permit the impairment of the express, substantive rights granted to special revenue debt under the Bankruptcy Code. Section 1129(b) (and other procedural provisions, such as sections 1123(b)(1) and (5)[11]) must be

---

[11] Sections 1123(b)(1) and (5), which the City relies on in support of the proposed impairment, do not inform the analysis here. City's Reply ¶ 159. Sections 1123(b)(1) and (5) simply state the truism that a plan *may* impair secured claims, subject to the Bankruptcy Code's other requirements, not that a plan can or must impair secured claims in a given circumstance. *See, e.g.*, *In re Fed. Mogul Global, Inc.*, 684 F.3d 355, 371 (3d Cir. 2012); *In re Emerald Forest Const., Inc.*, 226 B.R. 659, 664-65 (Bankr. D. Mont. 1998). Moreover, the City's reliance on *Jefferson County* to support its ability to impair special revenue debt is unavailing. City's Reply ¶ 160. Not only was the issue of impairment not briefed, the *Jefferson County* court was faced with a system that was not generating sufficient revenues to pay special revenue debt. Moreover, the treatment of special revenue debt in

interpreted in a manner consistent with the provisions of chapter 9, and the clear intent of Congress to leave special revenue debt unimpaired. Accordingly, the Bankruptcy Code prohibits impairment of the DWSD Bonds.

## II. APPLICATION OF THE "FAIR AND EQUITABLE" TEST PROHIBITS THE PROPOSED IMPAIRMENT OF THE DWSD BONDS.

10. The City argues that section 1129(b) can be used to impair the DWSD bonds. For the reasons set forth above, National disagrees. But, in any event, application of section 1129(b) compels the conclusion that the proposed non-consensual impairment of the DWSD Bonds violates the Bankruptcy Code. The City cannot overcome the threshold inquiry of the "fair and equitable" test as applied in chapter 9.

11. Sections 1129(b)(1) and (b)(2)(A) are incorporated into chapter 9 pursuant to section 943(b)(1). As applied in chapter 9, the "fair and equitable" test imposes additional requirements beyond those found in chapter 11. *See* 6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][B] (16th ed. 2013) ("[T]he fair and equitable rule has additional content in chapter 9 cases" because courts must take into account the reasonable expectations of affected creditors). A chapter 9 plan is fair and equitable only if "the amount to be received by the bondholders is *all that they can*

---

*Jefferson County* was consensual. Thus, the dicta relied on by the City does not inform the analysis here.

*reasonably expect in the circumstances.*" *Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (emphasis added). As a threshold matter, then, any application of section 1129(b) in the context of chapter 9 requires the Bankruptcy Court to assess (i) the reasonable expectations of the affected debt holders in terms of recovery *and* (ii) the applicable circumstances.

12. The DWSD Bondholders' reasonable expectation is to receive the "benefit of their bargain" which Congress protected through the 1988 amendments: continued and unimpaired payment of the DWSD Bonds from pledged special revenues. As discussed above, these protections expressly distinguish special revenue debt from other types of debt of a municipality—special revenue creditors have different expectations from other secured creditors based on the provisions of chapter 9.

13. In addition, the circumstances here confirm the "reasonableness" of the DWSD Bondholders' expectations to receive payment in full as and when due pursuant to their contractual terms. Two fundamental facts dictate this conclusion and they are undisputed:[12]

---

[12] To the extent the City reverses course and chooses to take issue with either of the undisputed facts, then the entirety of Issue #7 should be determined at confirmation.

- The Systems' revenues are sufficient to pay the DWSD Bonds according to their terms and all other DWSD obligations when due;[13] and

- The Systems are closed in that the Systems' Revenues must remain in the Systems, be used solely for specified purposes of the Systems, and cannot be distributed outside the Systems to the City's general fund.[14]

14. In light of these two undisputed facts, coupled with the special revenue debt protections in the Bankruptcy Code and the legislative history of the 1988 amendments, the DWSD Bondholders reasonably expect to be paid in full under the terms of the DWSD Bonds—it would be unreasonable, unfair, and inequitable to expect otherwise under the circumstances. On its face then, the Plan's treatment of the DWSD Bonds fails the "fair and equitable test."

---

[13] *See* Disclosure Statement at 100 (disclosing that Systems' revenues for FY2013 were substantially higher than debt service requirements); Disclosure Statement Exhibit M at 5 (projecting debt service coverage through 2023 exceeding 100%); Ordinances § 9 (requiring rates to be set at a level sufficient to pay DWSD Bonds).

[14] The City has acknowledged this distinction since the outset of this case. City of Detroit's Pre-Trial Brief In (I) Support Of Entry Of An Order For Relief And (II) Opposition To Objections Requiring The Resolution Of Issues Of Material Fact [Doc. No. 1240] at 40 ("First, contrary to AFSCME's assertion, the City's General Fund does not have access to revenues generated by its water and sewer department, the use of which is governed by the ordinances and indentures governing the special revenue debt issued by such funds.") (citations omitted). Conversely, the DWSD Bondholders may not be repaid from the City's general fund. M.C.L. § 141.107(2); Bond Ordinances § 6(a) ("Secured Obligations are not general obligations of the City and shall be payable solely from Pledged Assets as provided in this Section . . .").

15. Moreover, the proposed impairment is unnecessary and inequitable because it does not benefit the City's general fund or its creditors. At the status conference on May 28, there was some discussion or suggestion that general fund creditors would benefit from savings realized by the Systems.[15] Because the Systems are closed and the Bankruptcy Code prohibits general fund creditors from obtaining payment from pledged special revenues, unsecured creditors of the City will not benefit from any savings resulting from the proposed impairment.[16] Not only is there no benefit to the City's general fund from the proposed impairment, it is unnecessary under the terms of the Plan.[17] The Bankruptcy Court will hear evidence on these issues at trial.

---

[15] *See, e.g.*, Hr. Tr. (May 28, 2014) at 115:8-11 (Court: "In a reorganization, doesn't the debtor have a fiduciary obligation to cram down on secured creditors where appropriate for the benefit of unsecured creditors?").

[16] The Plan concedes as much; none of the payments to be made to any unsecured creditor comes from any savings attributable to the modifications to interest rate and call protection. Specifically, the $428.5 million Revenue Diversion to Class 11 GRS Pension Claims is drawn from the O&M Fund and not from the proposed impairment discussed in this Issue #7 Supplement. National's objections to the Revenue Diversion are set forth in the Objection.

[17] Disclosure Statement at 63 ("[T]he resetting of interest rates on New DWSD Bonds pursuant to the Interest Rate Reset Chart will save the City between $0 and $320 million on a net present value basis."); Disclosure Statement Exhibit M (DWSD projections do not include interest rate impairment).

16. Nor is it relevant, as the City has suggested, that "the City is the issuer of the DWSD debt" and the "Court has determined that the City is insolvent."[18] Although the City issued the DWSD debt, the debt is only payable from the Systems' revenues and the general fund is not liable for any debt payment shortfall if such revenues are insufficient. The pools of resources available to each set of creditors are completely unique and siloed off from each other.

### III. NATIONAL'S REMAINING OBJECTIONS, WHICH WILL BE DECIDED AT CONFIRMATION, PROHIBIT THE PROPOSED IMPAIRMENT.

17. For the reasons set forth above, National respectfully submits that if the Bankruptcy Court is to rule at this juncture, the Bankruptcy Court must answer Issue #7 by concluding that the Bankruptcy Code prohibits the proposed impairment of the DWSD Bonds as set forth in the Plan. However, if the Bankruptcy Court is not inclined to rule now, other more fact-intensive applications of relevant Bankruptcy Code provisions also prohibit the proposed impairment of the DWSD Bonds, in addition to the points raised above. Adjudication of those issues involve facts which the City will likely dispute, and should only be decided after a full evidentiary record is presented at

---

[18] City's Reply ¶ 176 n.70.

confirmation.[19] A full discussion of those provisions is set forth in the Objection, and include:

- *Best Interests of Creditors*: The City agrees that evidence must be presented to assess whether the Plan is better than the reasonable alternative.[20]

- *Interest Rate Modification*: Although National does not believe any modification is allowable, if the Bankruptcy Court rules otherwise, the City agrees that the determination on appropriate interest rates requires assessment of a significant evidentiary record.[21]

---

[19] Moreover, the appropriateness of the $428.5 million Revenue Diversion to fund pension costs (i) is not encompassed in Issue #7's specific wording, and (ii) can only be decided at confirmation after the development of a full evidentiary record.

[20] *See* Plan Confirmation Factual Propositions (circulated at May 28, 2014 status conference) ¶ 4.d; Hr. Tr. (May 28, 2014) at 57:18-22 (Bennett: "[U]nless the objectors advise me otherwise . . . each and every one of these elements [in ¶ 4 of the Plan Confirmation Factual Propositions] are controverted and, therefore, are properly going to have to be the subject of evidence at the hearing.").

[21] *See* City's Reply ¶ 161 ("[T]estimony to be presented by the City during the Confirmation Hearing will show that the proposed interest rates, in fact, will provide holders of DWSD Bond Claims with the full allowed amount of their claims."); *id*. ¶ 164 ("Testimony offered by the City during the Confirmation Hearing will demonstrate that (a) an efficient market will exist for the New DWSD Bonds . . . (b) the rates set forth in the Interest Rate Reset Chart (i) represent the interest rates that would be produced by this efficient market . . . and (ii) will provide holders of New DWSD Bonds with the present value of their allowed amount of their Secured Claims as of the Effective Date."); *id.* ¶ 178 ("[T]he DWSD will realize a total cost savings of over $500 million if the Plan is confirmed . . . consisting of *savings* resulting from . . . the reset of interest rates contemplated in the Plan."); Plan Confirmation Factual Propositions ¶ 5.a ("Proposed interest rates for impaired issues of DWSD-debt give holders payments having a present value equal to the allowed amount of their claims (Kenneth Buckfire (Miller Buckfire)).").

13-53846-tjt    Doc 5703    Filed 06/30/14    Entered 06/30/14 21:14:21    Page 14 of 16

- *Unfair discrimination*: The City admits that it will present evidence on whether the "DWSD-related issues are treated fairly."[22]

- *Call Protection*: The Court has already acknowledged that the permissibility of the City's proposal to provide no value on account of modified or eliminated DWSD call protection is a mixed question of law and fact.[23]

## CONCLUSION

18. We respectfully request that the Court determine that the Bankruptcy Code, as informed by the legislative history of the 1988 amendments, prohibits the impairment set forth in § II.B.3.a.ii. of the Plan. In the alternative, the Court should defer ruling on Issue #7 until all evidence has been presented at trial.

---

[22] Plan Confirmation Factual Propositions ¶ 4.g.

[23] *See* Hr. Tr. at 240:5-241:6 (May 28, 2014) (colloquy between the Court and Samuel Kohn on behalf of Assured).

Dated: June 30, 2014

| SIDLEY AUSTIN LLP | JAFFE RAITT HEUER & WEISS, P.C. |
|---|---|
| */s/ Jeffrey E. Bjork* | */s/ Paul R. Hage* |
| Jeffrey E. Bjork | Louis P. Rochkind (P24121) |
| Gabriel R. MacConaill | Paul R. Hage (P70460) |
| 555 West Fifth Street, Suite 4000 | 27777 Franklin Road, Suite 2500 |
| Los Angeles, CA 90013 | Southfield, MI 48034-8214 |
| Telephone: (213) 896-6000 | Telephone: (248) 351-3000 |
| jbjork@sidley.com | lrochkind@jaffelaw.com |
| gmacconaill@sidley.com | phage@jaffelaw.com |
| | *Counsel for National Public Finance Guarantee Corp.* |
| -and- | |
| James Bendernagel | |
| Guy S. Neal | |
| 1501 K Street, N.W. | |
| Washington, D.C. 20005 | |
| Telephone: (202) 736-8041 | |
| jbendernagel@sidley.com | |
| gneal@sidley.com | |