**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**BRIEF OF ASSURED GUARANTY MUNICIPAL CORP. IN**
**RESPONSE TO ISSUE NUMBER 7 IN ORDER IDENTIFYING**
**LEGAL ISSUES, ESTABLISHING SUPPLEMENTAL BRIEFING**
**SCHEDULE AND SETTING HEARING DATES AND PROCEDURES**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT ........................................................................................................................4

I.     The Unique Protections Afforded to Revenue Bonds Prohibit the Impairment of Existing DWSD Bonds as Proposed in the Plan....................................................4

  A.     Congress Amended the Bankruptcy Code Specifically to Prevent the Impairment of Revenue Bondholders in Bankruptcy .........................................5

  B.     Neither the Bankruptcy Code Nor Case Law Support the Impairment of Existing DWSD Bonds as Proposed in the Plan................................................10

II.    The City has Admitted that its Plan is Not "Fair and Equitable" .........................11

III.   Alternatively, the Court Can Determine that Assured's Objections Can Only be Resolved on a Full Evidentiary Record ...........................................................14

  A.     Assured's "Best Interests of Creditors" Objection Can Only be Determined with the Benefit of a Full Evidentiary Record ...................................................14

  B.     The Proposed Interest Rate Modification May Require a Full Evidentiary Record....................................................................................................................16

  C.     Assured's Unfair Discrimination Objection Can Only be Determined with the Benefit of a Full Evidentiary Record ...................................................18

  D.     Assured's Objection to the Proposed Call Protection Modification Can Only be Determined with the Benefit of a Full Evidentiary Record ................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient Inc.),
420 F.3d 559 (6th Cir. 2005) .................................................................................17

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.),
482 B.R. 404 (Bankr. N.D. Ala. 2012). ...............................................................11

In re City of Detroit,
No. 13-53846, Docket No. 1240 (Bankr. E.D. Mich. Oct. 17, 2013) .....................13

In re Dow Corning,
244 B.R. 678 (Bankr. E.D. Mich. 1999) ...............................................................12

In re Dow Corning Corp.,
244 B.R. 696 (Bankr. E.D. Mich. 1999) ...............................................................19

In re Jefferson Cnty., Ala.,
474 B.R. 228 (Bankr. N.D. Ala. 2012) .................................................................11

Lorber v. Vista Irr. Dist.,
127 F.2d 628 (9th Cir. 1942) ...............................................................................12

Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.),
456 F.3d 668 (6th Cir. 2006) ...............................................................................17

**Statutes**

11 U.S.C. § 552(a) .................................................................................................6

11 U.S.C. § 902(2) .................................................................................................7

11 U.S.C. § 922(d) .................................................................................................7

11 U.S.C. § 927.................................................................................................5, 8, 9

11 U.S.C. § 928.....................................................................................................8

11 U.S.C. § 943(b)(1) .......................................................................................2, 12

11 U.S.C. § 943(b)(7) .........................................................................................14

11 U.S.C. § 1111(b).............................................................................................7

ii

11 U.S.C. § 1123(b) ................................................................................................10

11 U.S.C. § 1129(b) ..............................................................................................2, 12

MCL § 141.107(2) ..................................................................................................13

**Other Authorities**

6 COLLIER ON BANKRUPTCY ¶ 928.02
 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) ....................................6

6 COLLIER ON BANKRUPTCY ¶ 943.03[1][f][i][B]
 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) ...................................12

Hearing Before the S. Subcomm. On Courts and Admin. Practice of the Comm. on the
 Judiciary, 100th Cong. 539-40 (June 10, 1988)........................................................6

Hr'g Tr. (May 28, 2014) ................................................................................14, 19, 20

Hr'g Tr. (Apr. 17, 2014) ........................................................................................15

S. REP. NO. 100-506, 100th Cong., 2d Sess. (1988).....................................5, 6, 7, 8, 9

iii

Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"),[1] a creditor and party in interest in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "City"), hereby files this brief in response to issue number 7 ("Issue #7") identified in the Court's *Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures* [Docket No. 5235] (the "Legal Issues Order")[2] and respectfully states as follows:

## PRELIMINARY STATEMENT

1. Issue #7 asks "[w]hether the Bankruptcy Code prohibits the interest rate and call protection modifications of bonds secured by special revenues as set forth in § II.B.3.a.ii. of the Plan." The answer is unequivocally "***YES***."

2. The unique protections afforded under the Bankruptcy Code to bonds secured by a lien on pledged special revenues ("Revenue Bonds") require that holders of Revenue Bonds ("Revenue Bondholders") retain unimpaired rights to all project revenues pledged to them. In 1988, Congress amended the Bankruptcy Code (the "Municipal Bankruptcy Amendments") to preserve the underlying state

---

[1] Assured is a monoline insurer that provides financial guarantees to the U.S. public finance market. Assured and its affiliates insure or reinsure approximately $2.24 billion in gross aggregate principal amount of outstanding bonds issued by the City, including water supply system bonds, sewage disposal system bonds, and unlimited tax general obligation bonds.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Objection of Assured Guaranty Municipal Corp. to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4674] (the "Assured Objection").

law rights of Revenue Bondholders notwithstanding the commencement of a chapter 9 case.  As the legislative history of those amendments and their operation make clear, Congress intended to ensure that Revenue Bondholders received the "benefit of their bargain"—unimpaired rights to the project revenues pledged to them, to the exclusion of the affiliated municipality's general creditors.  This intent would be completely frustrated if the City could arbitrarily impose its proposed interest rate and call protection modifications on the Existing DWSD Bonds.

3.  Consistent with the Municipal Bankruptcy Amendments, sections 943(b)(1) and 1129(b)(1) and (b)(2)(A) of the Bankruptcy Code require that the Plan must be "fair and equitable" to be confirmed.  Generally, the "fair and equitable" test requires that a debtor honor its contractual commitments when it has the financial wherewithal to do so.  In the chapter 9 context, this test further requires that a plan meet the reasonable expectations of creditors under the applicable circumstances.  Here, the DWSD Bondholders reasonably expect unimpaired payment in full under the terms of the Existing DWSD Bonds.  This reasonable expectation is supported by the undisputed facts that (i) the pledged net revenues are sufficient to timely pay all amounts owed to the DWSD Bondholders; and (ii) the DWSD is a "closed loop" under Michigan law, meaning that the net revenues of the DWSD are unavailable to pay the City's general creditors under any circumstances.  Because the Plan fails to meet the DWSD Bondholders'

reasonable expectations, the interest rate and call protection modifications to the Existing DWSD Bonds as proposed in Section II.B.3.a.ii. of the Plan are prohibited by the Bankruptcy Code and the Plan may not be confirmed as proposed.

4. Alternatively, the Court can determine that it cannot resolve Assured's objections to the Plan's proposed interest rate and call protection modifications of the Existing DWSD Bonds without a complete evidentiary record. Assured has argued, for example, that the proposed interest rate and call protection modifications are prohibited by the Bankruptcy Code because they are not in the best interests of creditors or would result in unfair discrimination. Although Assured and the City appear to be in broad agreement regarding the *legal* standards governing Assured's objections, significant *factual* disputes remain, each of which must be resolved at the confirmation hearing. Indeed, the City has admitted that it will be required to present extensive evidence to address Assured's objections.

## BACKGROUND

5. On May 5, 2014, the City filed the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392] (the "Plan") and the *Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4391] (the "Disclosure Statement").

6. Assured filed the Assured Objection on May 12, 2014. The City filed

3

its *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 5034] (the "City Reply") on May 26, 2014.

7.     On June 2, 2014, the Court issued the *Notice of Proposed Order Identifying Legal Issues, Establishing Briefing Schedule and Setting Hearing Date and Procedures* [Docket No. 5172] (the "Notice of Proposed Order"), identifying issues determinable as a matter of law.  Assured, together with similarly situated parties, filed a comment to the Notice of Proposed Order on June 4, 2014 opposing the identification of issues related to the impairment of DWSD Bondholders in the Notice of Proposed Order.  A hearing was held on the Notice of Proposed Order on May 28, 2014 (the "May 28 Hearing").  During the May 28 Hearing, the City presented the "Plan Confirmation Factual Propositions" (the "Factual Propositions," a true and correct copy of which is attached hereto as Exhibit "A").

8.     The Court issued the Legal Issues Order on June 5, 2014, identifying Issue #7 as an issue that may be determinable as a matter of law.

## ARGUMENT

### I.     The Unique Protections Afforded to Revenue Bonds Prohibit the Impairment of Existing DWSD Bonds as Proposed in the Plan

9.     If the Court decides to immediately rule on Issue #7, it should find that the Bankruptcy Code prohibits the impairment of Existing DWSD Bonds as proposed in Section II.B.3.a.ii. of the Plan.  Congress passed the Municipal

4

Bankruptcy Amendments specifically to ensure that both Revenue Bondholders and municipal issuers of Revenue Bonds receive "the benefit of the[ir] bargain." S. REP. NO. 100-506, 100th Cong., 2d Sess., at 12 (1988). Pursuant to the Municipal Bankruptcy Amendments, Revenue Bondholders must "retain *unimpaired* rights to the project revenues pledged to them" notwithstanding the commencement of a chapter 9 case. Id. (emphasis added). In exchange, Revenue Bondholders are not permitted to seek a deficiency claim against a municipal issuer if it becomes apparent that they struck a bad bargain and pledged revenues are insufficient to satisfy their claims. See 11 U.S.C. § 927. Any modification or impairment of Revenue Bonds in bankruptcy (including pursuant to a plan of adjustment) that deprives Revenue Bondholders from any portion of the project revenues pledged to them (as opposed to by simple insufficiency of collateral) would frustrate Congress's intent by denying Revenue Bondholders the benefit of their bargain while saddling them with its burdens.

A. Congress Amended the Bankruptcy Code Specifically to
   Prevent the Impairment of Revenue Bondholders in Bankruptcy[3]

10. Prior to the adoption of the Municipal Bankruptcy Amendments, a chapter 9 filing threatened to dissolve the barrier between Revenue Bondholders and a municipality's general fund and general creditors, to the potential detriment of all. Congress understood that funds pledged for payment of Revenue Bonds

---

[3] See also Assured Objection, at ¶¶ 58-61.

5

under state law were "often legally unavailable for other enterprises or for general government purposes."[4] Hearing Before the S. Subcomm. On Courts and Admin. Practice of the Comm. on the Judiciary, 100th Cong., at 539-40 (June 10, 1988) (Report of the National Bankruptcy Conference on Proposed Municipal Bankruptcy Amendments). Nevertheless, prior to the adoption of the Municipal Bankruptcy Amendments, the flow of funds pledged for the payment of Revenue Bonds could have been disrupted by the filing of a chapter 9 petition. For example, section 552(a) of the Bankruptcy Code (incorporated into chapter 9 through section 901(a)) could have been read to void consensual liens on the revenues from municipal projects or utility systems generated postpetition.[5] See 11 U.S.C. § 552(a); S. REP. NO. 100-506, at 25 (Views of the U.S. Department of Justice, Office of Legislative and Intergovernmental Affairs, Aug. 23, 1988 [hereinafter "DOJ Views"]); 6 COLLIER ON BANKRUPTCY ¶ 928.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).

11. Similarly, prior to the adoption of the Municipal Bankruptcy

---

[4] As discussed in detail in the Assured Objection, in this case Michigan law creates a "closed loop" under which general creditors cannot access the revenues of the DWSD Systems. See Assured Objection, at ¶¶ 20-25, 116. Thus, this is precisely the type of case that Congress was concerned about when enacting the Municipal Bankruptcy Amendments.

[5] Section 552(a) of the Bankruptcy Code states, with respect to consensual liens, "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

6

Amendments, an undersecured Revenue Bondholder could potentially reach general municipal assets.[6] Congress understood that "[s]tate constitutions or statutes frequently impose limitations on [municipal] general obligations." S. Rep. No. 100-506, at 24-25 (DOJ Views). "Chapter 9 seemingly was not intended to eliminate these limitations but the incorporation of § 1111(b) [in chapter 9] might be construed to effect this result." Id.

12. In response to these problems, Congress passed the Municipal Bankruptcy Amendments to preserve existing state law barriers between Revenue Bondholders and a municipality's general fund and general creditors. The Municipal Bankruptcy Amendments struck the following balance: First, section 902(2) introduced the new term "special revenues," which was defined to include "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used to provide . . . utility, or other services . . . ." 11 U.S.C. § 902(2). Second, section 922(d) excepted pledged special revenues from application of the automatic stay, meaning that Revenue Bondholders can enforce their right to be paid from pledged revenues in the ordinary course during the pendency of a chapter 9 case. See 11 U.S.C. § 922(d). Third, section 927 eliminated the section 1111(b) election for holders of

---

[6] For example, Section 1111 of the Bankruptcy Code states, "A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . ." 11 U.S.C. § 1111(b)(1)(A).

7

liens on pledged special revenues, eliminating the risk that an undersecured Revenue Bondholder could attempt to enforce a deficiency claim against general municipal assets. See 11 U.S.C. § 927. Finally, section 928 provided that special revenues generated postpetition remain subject to a prepetition lien on such revenues, notwithstanding section 552(a). See 11 U.S.C. § 928.

13. In short, Congress recognized a unique type of security interest unlike any other secured claim under the Bankruptcy Code—a lien on pledged special revenues—the enforcement and scope of which is intended to be unaffected by a chapter 9 case, and which does not have recourse against general assets of the municipal debtor in the case of a deficiency. By virtue of the Municipal Bankruptcy Amendments, "the pledge [of special revenues] should be protected against claims which are unrelated to the particular . . . system . . . which generated the revenues," S. REP. NO. 100-506, at 25 (DOJ Views), and Revenue Bondholders "retain *unimpaired* rights to the project revenues pledged to them" notwithstanding the commencement of a chapter 9 case. S. REP. NO. 100-506, at 12 (emphasis added). Equally, the Municipal Bankruptcy Amendments also ensured that Revenue Bondholders have no recourse against a municipality's general fund. See 11 U.S.C. § 927. As a result of section 927's elimination of the section 1111(b) election solely with respect to Revenue Bonds, Revenue Bondholders, unlike all other secured creditors, have no recourse against the

8

general assets of the municipal debtor, even in the event of a deficiency.  See id.

14.    Thus, the Municipal Bankruptcy Amendments carefully protect the arrangements struck by municipalities and Revenue Bondholders prior to bankruptcy.  Revenue Bondholders retain the "benefit of their bargain with the municipal issuer, namely . . . *unimpaired rights* to the project revenues pledged to them."  S. REP. NO. 100-506, at 12 (emphasis added).  In exchange, Revenue Bondholders, unlike all other secured creditors, have no right to assert a deficiency claim if it is ultimately determined that they struck a bad bargain and pledged project revenues are insufficient to satisfy their claims.  Allowing a municipality to impair Revenue Bondholders through a plan of adjustment would upend this careful balance struck by the Municipal Bankruptcy Amendments—giving the municipality all of the benefits of their bargain, while capriciously denying benefits to Revenue Bondholders.

15.    In this case, the City does not dispute that the pledged net revenues of the DWSD Systems are more than sufficient to pay debt service on the Existing DWSD Bonds.  See City Reply, at ¶ 176 n.70 ("the DWSD debt is collateralized by a lien on revenues accounted for in the DWSD funds, *which collateral should be sufficient to pay the DWSD bonds in full* . . . .") (emphasis added).  Thus, given the unique character of the lien of the Existing DWSD Bonds on pledged special revenues under the Bankruptcy Code and the circumstances of this case, the

9

Bankruptcy Code prohibits the impairment of the Existing DWSD Bonds as set forth in Section II.B.3.a.ii. of the Plan.

> B.   Neither the Bankruptcy Code Nor Case Law Support the
>       Impairment of Existing DWSD Bonds as Proposed in the Plan

16.   Neither the Bankruptcy Code nor relevant case law supports the impairment of Existing DWSD Bonds as proposed in the Plan.  Almost incredibly, the City suggests that section 1123(b) of the Bankruptcy Code demonstrates that Revenue Bondholders may be impaired.  See City Reply, at ¶¶ 159, 168.  Section 1123(b) stands for the unremarkable proposition that a plan may, ***subject to satisfaction of all other requirements of the Bankruptcy Code***, impair or leave unimpaired any class of claims, whether secured or unsecured.  See 11 U.S.C. § 1123(b).   Section 1123(b) does not address whether a class of Revenue Bondholders may be impaired consistent with the other requirements of the Bankruptcy Code.  Indeed, if the City's all-encompassing interpretation of section 1123(b) were correct, the Bankruptcy Code's other cramdown requirements would be nullities.

17.   Likewise, and again contrary to the City's assertion, no court has ***ever*** ruled that Revenue Bondholders may be impaired through a chapter 9 plan of adjustment.  The City incorrectly asserts that the bankruptcy court in Jefferson County held that Revenue Bondholders could be impaired.  See City Reply, at ¶ 160.  The Jefferson County court did no such thing.  Rather, the bankruptcy court

10

noted in mere footnotes, in *dicta*, and without the benefit of complete briefing on the issue or even a dispute ripe for adjudication, that the cramdown provisions set forth in section 1129(b)(2)(A) *may* be available to modify the contractual relations of Revenue Bondholders. See Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.), 482 B.R. 404, 434 n.17, 435 n.18 (Bankr. N.D. Ala. 2012).[7] In fact, the Jefferson County court took great pains to articulate and enforce the careful balance struck by the Municipal Bankruptcy Amendments. See In re Jefferson Cnty., Ala., 474 B.R. 228, 272-74 (Bankr. N.D. Ala. 2012) (holding that the Bankruptcy Code does not prevent bondholder enforcement actions to compel payment from pledged special revenues because, in part, "the structure and intent of [the Municipal Bankruptcy Amendments] was to provide a mechanism whereby the pledged special revenues would continue to be paid uninterrupted to those to which/whom payment of the sewer system's indebtedness is secured by a lien on special revenues."). This Court should similarly defer to Congress's unambiguous and repeatedly-stated intent: preserve Revenue Bondholders' unimpaired access to the pledged special revenues of the DWSD Systems.

## II.     The City has Admitted that its Plan is Not "Fair and Equitable"

18.    Consistent with the Municipal Bankruptcy Amendments, sections

---

[7]    The Jefferson County court was presented with a system which was not generating sufficient project revenues to pay debt service. Because the City has admitted in this case that the pledged project revenues are sufficient to pay debt service on the Existing DWSD Bonds, the Jefferson County court's statement is inapposite and does not inform the analysis here.

11

943(b)(1) and 1129(b)(1) and (b)(2)(A) of the Bankruptcy Code require that the Plan be "fair and equitable" in order to be confirmed. The City's Plan is not "fair and equitable" because the City has admitted that pledged net revenues of the DWSD Systems are sufficient to pay debt service on the Existing DWSD Bonds.

19.     As recognized by courts in the Sixth Circuit, where a debtor "has the financial wherewithal to honor its contractual commitments," the "fair and equitable" test set forth by sections 1129(b)(1) and (b)(2)(A) requires that the debtor's plan must provide each creditor with at least the creditor's bargained-for rate of interest. See In re Dow Corning, 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999). Moreover, as applied in chapter 9, the "fair and equitable" test takes into account the reasonable expectations of affected creditors and requires that creditors receive "all that they can reasonably expect in the circumstances." See Lorber v. Vista Irr. Dist., 127 F.2d 628, 639 (9th Cir. 1942); 6 COLLIER ON BANKRUPTCY ¶ 943.03[1][f][i][B] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). Accordingly, here the Court should assess (i) the reasonable expectations of the DWSD Bondholders **and** (ii) the applicable circumstances.

20.     As discussed in detail above, the intent of the Municipal Bankruptcy Amendments was to ensure that Revenue Bondholders receive the benefit of their bargain—unimpaired rights to the project revenues pledged to them to the exclusion of the affiliated municipality's general creditors in exchange for

relinquishing any claim against general municipal assets. In this case, ***the City does not dispute***[8] that (i) the pledged net revenues are sufficient to timely pay all amounts owed on the Existing DWSD Bonds[9] and (ii) the DWSD is a "closed loop" under Michigan law, meaning that the net revenues of the DWSD are unavailable to pay the City's general creditors under any circumstances.[10] In light of the legislative history of the Municipal Bankruptcy Amendments and these undisputed facts, the DWSD Bondholders can and should reasonably expect unimpaired payment in full under the terms of the Existing DWSD Bonds. The Plan cannot be confirmed because it fails to meet these reasonable expectations.

21. It should be noted that, for the reasons discussed above and in the Assured Objection, general fund creditors could not benefit from any of the purported "savings" the City suggests might be generated by Section II.B.3.a.ii. of the Plan because the Bankruptcy Code prohibits the use of pledged special

---

[8] To the extent the City takes issue with either of these undisputed facts, then the entirety of Issue #7 should be determined at confirmation on a full evidentiary record.

[9] See City Reply, at ¶ 176 n.70 ("the DWSD debt is collateralized by a lien on revenues accounted for in the DWSD funds, ***which collateral should be sufficient to pay the DWSD bonds in full*** . . . .") (emphasis added).

[10] See, e.g., City of Detroit's Pre-Trial Brief In (I) Support Of Entry Of An Order For Relief And (II) Opposition To Objections Requiring The Resolution Of Issues Of Material Fact, In re City of Detroit, No. 13-53846, Docket No. 1240, at 40 (Bankr. E.D. Mich. Oct. 17, 2013) ("First, contrary to AFSCME's assertion, the City's General Fund does not have access to revenues generated by its water and sewer department, the use of which is governed by the ordinances and indentures governing the special revenue debt issued by such funds.") (citations omitted). Conversely, the DWSD Bondholders may not be repaid from the City's general fund. MCL § 141.107(2); DWSD Bond Ordinances, at § 6(a) ("Secured Obligations are not general obligations of the City and shall be payable solely from Pledged Assets as provided in this Section . . . .").

13

revenues to pay the City's general fund creditors and the DWSD is a "closed loop." Indeed, none of the payments proposed to be made to any unsecured creditor in the Plan are attributable to the interest rate and call protection modifications set forth in Section II.B.3.a.ii. of the Plan.[11]

## III. Alternatively, the Court Can Determine that Assured's Objections Can Only be Resolved on a Full Evidentiary Record[12]

22.     As an alternative to making any findings or rulings regarding Issue #7, based on the pleadings filed to date the Court can determine that it cannot resolve Assured's objections to the proposed interest rate and call protection modifications of the Existing DWSD Bonds in the Plan without a complete evidentiary record.

### A. Assured's "Best Interests of Creditors" Objection Can Only be Determined with the Benefit of a Full Evidentiary Record

23.     Assured has objected to the Plan because, among other things, under the *specific facts of this case*, the proposed impairment of DWSD Bondholders would run afoul of the requirement that a chapter 9 plan be "in the best interests of creditors."  See Assured Objection, at ¶¶ 62-65; 11 U.S.C. § 943(b)(7).

24.     Assured believes that the Plan cannot comply with the best interests of

---

[11]  During the May 28 Hearing the Court asked "doesn't the debtor have a fiduciary obligation to cram down on secured creditors where appropriate for the benefit of unsecured creditors?" Hr'g Tr. at 115:9-11 (May 28, 2014).  In this case such a cram down is inappropriate under the Bankruptcy Code and, even if it were approved, will not benefit any unsecured creditors of the City.

[12]  This Court instructed parties that, "[i]f you think that an issue that I've identified [in the Legal Issues Order is not one that can be resolved on purely legal grounds, say that" in briefing.  Hr'g Tr. at 243:2-4 (May 28, 2014).

14

creditors requirement because DWSD Bondholders would receive timely payment in full if the case were to be dismissed, which is more than DWSD Bondholders will receive under the Plan. See Assured Objection, at ¶¶ 62-65. Certain of the most important facts supporting this argument are undisputed. For example, the City agrees with Assured "[t]hat the DWSD debt is collateralized by a lien on revenues accounted for in the DWSD funds, *which collateral should be sufficient to pay the DWSD bonds in full* . . . ." City Reply, at ¶ 176 n.70 (emphasis added).[13] Additionally, there is no dispute that, under the applicable statutes, ordinances and indentures, the DWSD is a "closed loop" under Michigan law,[14] meaning that the net revenues of the DWSD are unavailable to pay the City's general creditors under any circumstances even if the City were permitted to reduce the interest rates payable on the DWSD Bonds by way of cramdown (which it is not). See Assured Objection, at ¶¶ 20-25; City Reply, at ¶¶ 222-25.

25. Nevertheless, the City claims that it will present evidence at the

---

[13] The City's financial projections show that the City agrees with Assured that pledged net revenues of the DWSD Systems are more than sufficient to pay debt service on the Existing DWSD Bonds. See Disclosure Statement, Exhibit L; Disclosure Statement Exhibit M; see also Disclosure Statement, at 100 ("During Fiscal Year 2013, the sewage disposal system received net system revenues of approximately $461.8 million versus expected debt service requirements of approximately $200.0 million. . . . During Fiscal Year 2013, the water system received net system revenues of approximately $370.1 million versus expected debt service requirements of approximately $153.4 million."). The City has also acknowledged on the record that the DWSD Bondholders are fully secured. See Hr'g Tr. at 143:3-6 (Apr. 17, 2014) ("The only part of that, part of the plan that we intend to seek cramdown on is with respect to the basic 1129(b) treatment of oversecured debt. . . .").

[14] See supra note 10.

15

confirmation hearing showing that: (i) "[n]o creditor will do better outside chapter 9 (Gaurav Malhotra (EY); Kenneth Buckfire (Miller Buckfire))" and (ii) "[c]reditors are receiving all they can reasonably expect under the circumstances (Kevyn Orr (EM); Gaurav Malhotra (EY))."[15]  In response, Assured is prepared to present evidence, including factual and expert testimony, showing that pledged net revenues are sufficient to timely pay all amounts owed to the DWSD Bondholders in full if the case were to be dismissed.  Moreover, Assured is prepared to demonstrate that, unlike unsecured creditors, Assured and the DWSD Bondholders have viable remedies—including the appointment of a receiver and mandamus proceedings—that would allow DWSD Bondholders to actually realize timely payment in full outside of bankruptcy.  In short, while the City and Assured may disagree on a great deal, they agree that Assured's objection on the grounds that the Plan cannot be confirmed because it is not in the best interests of creditors is a factual dispute that cannot be answered at this juncture of the case.

B.    The Proposed Interest Rate Modification
       May Require a Full Evidentiary Record

26.    Assured and the City again appear to be in broad agreement as to the *legal* standards that must be met to establish that a proposed cramdown interest rate is appropriate.  First, if pledged net revenues are sufficient to pay debt service, a plan must provide creditors with at least their contracted-for rate of interest.  See

---

[15]   Factual Propositions, at ¶¶ 4.c, 4.d

16

Assured Objection, at ¶ 70 (citing Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 680 (6th Cir. 2006)); City Reply, at ¶ 176 n.70 (standard not disputed).  Second, if pledged net revenues are insufficient to pay debt service, "the market rate should be applied . . . where there exists an efficient market."  See Assured Objection, at ¶ 70 (quoting  Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient Inc.), 420 F.3d 559, 568 (6th Cir. 2005)); City Reply, at ¶ 162 (same).  Third, if no efficient market for the new debt would exist, "then the bankruptcy court should employ the formula approach endorsed by the Till plurality."  See Assured Objection, at ¶ 70 (quoting  In re Am. HomePatient Inc., 420 F.3d at 568); City Reply, at ¶ 163 n.65 (same).

27.     Assured believes that the City has conceded the first point of the Dow standard—pledged net revenues of the DWSD Systems are sufficient to pay debt service on the Existing DWSD Bonds in full.  See City Reply, at ¶ 176 n.70; supra n.13.  Thus, no further inquiry is required and interest rates may not be impaired.  However, if the City now disputes this concession or the Court disagrees, the City has explicitly stated that appropriate cramdown interest rates cannot be determined as a matter of law, but must instead be determined based on evidence to be presented at the confirmation hearing.  See City Reply, at ¶ 161. The City has indicated that it will be required to present testimonial evidence that:

17

(a) an efficient market will exist for the New DWSD Bonds offered in exchange for the Objecting Parties' Class 1A Claims and (b) the rates set forth in the Interest Rate Reset Chart (i) represent the interest rates that would be produced by this efficient market for the New DWSD Bonds and (ii) will provide holders of New DWSD Bonds with the present value of the allowed amount of their Secured Claims as of the Effective Date. The yield curve used in calculating the rates set forth in the Interest Rate Reset Chart (a) is based upon the *pro forma* credit profile of a post-Confirmation DWSD, (b) reflects the expected market for improved DWSD credit going forward and (c) provides DWSD Bond Claims with a par recovery based upon existing maturities.

City Reply, at ¶ 164.[16]

28.     Assured is prepared to respond with evidence showing that the interest rates contemplated by the Plan fail to meet any of the applicable tests. Such evidence will include both qualitative and quantitative analysis.

29.     Accordingly, a complete evidentiary record will be required to determine whether the proposed interest rate impairment under Section II.B.3.a.ii. of the Plan violates the Bankruptcy Code under the particular facts of this case.

C.     Assured's Unfair Discrimination Objection Can Only be
       <u>Determined with the Benefit of a Full Evidentiary Record</u>

30.     Determining whether the interest rate and call protection modifications contemplated by the Plan rise to the level of "unfair discrimination" also requires a complete evidentiary record. Both the City and Assured appear to agree that the Plan unfairly discriminates if it provides similarly-situated creditors

---

[16] <u>See</u> <u>also</u> Factual Propositions, at ¶ 5.a (The City will present evidence that "[t]he proposed interest rates for impaired issues of DWSD-debt give holders payments having a present value equal to the allowed amount of their claims (Kenneth Buckfire (Miller Buckfire)).").

with materially different percentage recoveries.  See Assured Objection, at ¶ 111 (citing In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)); City Reply, at ¶ 89 (same).  Moreover, the City has admitted that objections alleging unfair discrimination can only be resolved on a full evidentiary record.  See Hr'g Tr. at 235:21-22 (May 28, 2014) ("the second issue, which is factually intensive, is whether or not there is unfair discrimination.").  Assured is prepared to present evidence, including expert testimony, comparing the relative value of the reinstated DWSD Bonds to be received by purportedly unimpaired DWSD Bondholders and the New DWSD Bonds or New Existing Rate DWSD Bonds to be received by the remaining DWSD Bondholders.  For its part, the City has merely vaguely acknowledged that it will put on testimony to show that "DWSD-related issues are treated fairly . . . ."  Factual Propositions, at ¶ 4.g.  Accordingly, Assured's unfair discrimination objection turns on a factual dispute and cannot be resolved by any ruling made by this Court with respect to Issue #7.

D.     Assured's Objection to the Proposed Call Protection Modification Can Only be Determined with the Benefit of a Full Evidentiary Record

31.     Finally, whether DWSD Bondholders are adequately compensated for any impairment to call protection in the Plan also requires a complete evidentiary record.  During the May 28 Hearing, the Court observed that issues related to call protection—including "whether no-call provisions contained in debts secured by special revenues may be modified in a plan of adjustment"—present questions of

19

mixed law and fact. See Hr'g Tr. at 240:5-241:8 (May 28, 2014) (colloquy between the Court and Samuel Kohn on behalf of Assured). Assured is prepared to present expert testimony that call protection has measurable market value for which DWSD Bondholders would receive no compensation under the Plan.

## CONCLUSION

WHEREFORE, Assured respectfully requests that the Court (i) determine that the Bankruptcy Code, as informed by the legislative history of the Municipal Bankruptcy Amendments, prohibits the interest rate and call protection modifications to the Existing DWSD Bonds proposed in Section II.B.3.a.ii. of the Plan or, in the alternative, (ii) defer ruling on Issue #7 until all evidence has been presented at trial.

Dated: New York, New York
June 30, 2014

**CHADBOURNE & PARKE LLP**

By:  /s/  Lawrence A. Larose
Lawrence A. Larose
Samuel S. Kohn
Eric Daucher
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
llarose@chadbourne.com
skohn@chadbourne.com
edaucher@chadbourne.com

*Attorneys for Assured Guaranty*
*Municipal Corp*

20