# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

## SYNCORA'S FIRST SUPPLEMENTAL OBJECTION REGARDING CERTAIN LEGAL ISSUES RELATING TO CONFIRMATION

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (together, "Syncora")[1] submit this first supplemental objection primarily in response to the following question posed by the Court:[2]

- Whether the UTGO Settlement and the Plan's treatment of Unlimited Tax General Obligation Bond ("UTGO") Claims violate Michigan's Unlimited Tax Election Act, M.C.L. §§ 141.161–168 (the "UTEA").

As explained below, the answer is "yes" because the Plan leaves a tax levy in place after satisfying the associated debt obligation, diverts a tax-levy millage to purposes not approved by Detroit voters, and impermissibly assigns certain claim holders' rights to payment. As such, the Plan cannot be confirmed.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4392] (including all exhibits and attachments thereto, the "Plan") or the *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 5034] (the "City's Reply"), as applicable.

[2] *See Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures* [Docket No. 5235] (the "Legal Issues Order").

Additionally, Syncora briefly addresses an issue implicated by two questions posed by the Court:

- Whether the Plan is a "Specified Plan" as defined in the COP Swap Settlement; and, if the Plan is not, whether certain Plan releases are consensual as related to the COP Swap Counterparties (the "Counterparties") or, if non-consensual, are legally permissible.

To aid the Court, Syncora respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Bankruptcy Code provides that a chapter 9 plan cannot be confirmed if the debtor is legally prohibited from taking any action to carry out the plan.[3]  Here, the UTGO Settlement—a key component of the Plan—violates the UTEA, the Revised Municipal Finance Act (the "RMFA"),[4] and other applicable law.

2.      Specifically, the UTGO Settlement's primary flaws are three-fold. *First*, although the UTGO Bond Claims are *fully and finally* satisfied under the Plan, the UTGO Bond Tax Levy (the "Tax Levy") remains in place.  *Second*, in direct contravention of the UTEA and RMFA, the Plan redirects the Tax Levy millage to recipients and for purposes not approved by Detroit voters.  *Third*, the UTGO Settlement contemplates a forced assignment of UTGO Bond Claim Holders' rights to payment *to the City's designee*—without the UTGO Bond Claim

---

[3]   11 U.S.C. § 943(b)(4).

[4]   M.C.L. §§ 141.2101–2821.

Holders' consent. Accordingly, because the City is legally prohibited from taking the actions contemplated by the UTGO Settlement, the Plan cannot be confirmed.

3. As to the second issue presented above, Syncora takes no position on whether the Plan is a "Specified Plan" or whether the Plan's releases are consensual or non-consensual *vis-à-vis* the Counterparties. But, Syncora does take issue with the Counterparties' proposed resolution related to these questions—namely, the Counterparties' proposed modification to broaden Plan's definition of Exculpated Parties.[5] If the City adopts this proposal, the Plan could impermissibly exculpate the Counterparties from, among other things, Syncora's potential claims and defenses against the Counterparties for their acts and omissions in connection with this case.[6]

4. Syncora acknowledges that this issue may not be ripe under the Court's Legal Issues Order. Nevertheless, Syncora briefly addresses the issue below to apprise the Court that the Counterparties' proposed resolution is unworkable and to preserve its rights.

---

[5] *See Limited Objection of Merrill Lynch Capital Services, Inc. and UBS AG to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [ECF No. 4392] or Request for Clarification with Respect Thereto* 3 [Docket No. 4668] (the "Counterparties' Objection").

[6] Syncora objected to the Plan's definition of Exculpated Parties as it applies to the GRS and PFRS and reserved all rights to object to the release, exculpation, injunction, and discharge provisions of the Plan. *See Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment*, 54–55 n.56 [Docket No. 4679] (the "Plan Objection").

# ARGUMENT

## I. The UTGO Settlement and the Plan Violate Applicable Law

5. The UTGO Settlement runs afoul of state law for three reasons. *First*, based on the UTEA and RMFA, the Tax Levy must end because the UTGO Bond Claims are fully and finally resolved under the Plan—but the UTGO Settlement and Plan seek to leave the Tax Levy in place. *Second*, again based on the UTEA, the Tax Levy millage must be used in accordance with the purposes for which the taxes were levied—but the UTGO Settlement and Plan seek to divert the Tax Levy millage to "a designee or designees of the City,"[7] which diversion has not been approved by Detroit voters. *Third*, the UTGO Settlement violates other applicable law by forcing UTGO Bond Claim Holders to assign their rights to payment without such Holders' consent to the assignment.

### (a) The Tax Levy Must End Because the UTGO Bond Claims Are Resolved Under the Plan.

6. When presented with a question regarding statutory interpretation, a court must first look to the statute's text,[8] which is where the inquiry should end if the text is plain and unambiguous.[9] Precedent in this District teaches that courts

---

[7] Plan Art. IV.D.

[8] *U.S. v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) ("The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.").

[9] *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

should also apply "common sense" to "avoid unreasonable results wherever possible" and give statutes "a practical interpretation which will not produce an absurd result."[10]

7.    Specific provisions of the UTEA and RMFA bear on whether the Tax Levy must end in light of the Plan's treatment of UTGO Bond Claims:

- The UTEA provides that the City's voters "may make 1 or more binding unlimited tax pledges for the payment of 1 or more tax obligations referred to in the ballot . . . [h]owever, the tax which may be levied shall not be [in] excess of a rate or amount sufficient for payment of the obligations."[11]

- The RMFA provides that "[w]hen any municipality completes the retirement of a debt evidenced by a municipal security or accumulates sufficient funds in the debt retirement fund for the retirement [thereof], the governing body of the municipality shall certify that the debt evidenced by a municipal security is retired . . . and the county treasurer shall no longer be required to recognize a levy for the debt . . . ."[12]

- The RMFA also provides that "[i]f there is surplus money on hand for the payment of principal or interest at the time of making an annual tax levy, and provision has not been made in the authorizing resolution for disposition of that money, the annual levy for principal and interest shall be adjusted to reflect available funds."[13]

---

[10]    *In re PHM Credit Corp.*, 110 B.R. 284, 288 (E.D. Mich. 1990).

[11]    M.C.L. § 141.164(3).

[12]    *Id.* § 141.2705(2).

[13]    *Id.* § 141.2701(4).

8.     The import of these statutory provisions is straightforward: Detroit voters may approve unlimited tax levies of *ad valorem* taxes; the City cannot levy more taxes than necessary to pay the obligations approved by the electorate; when sufficient funds have been collected to retire the obligations, no further taxes should be levied; and, if there is a surplus, then Detroit citizens must get the benefit of reduced tax bills. Indeed, this summary should not be controversial—the City itself agrees with it: "The [RMFA] mandates, among other things, that the City use such *ad valorem* taxes solely to pay unlimited tax obligations and further provides that the *ad valorem* taxes must cease when the UTGO is retired."[14]

9.     Here, the Plan provides a structure —in accordance with the UTGO Settlement—that does not comport with the foregoing statutory mandates:

> (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the Municipal Finance Authority, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of Restructured UTGO Bonds; and (4) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible

---

[14]   City's Reply at 165.

Pensioners and to the Retirement Systems, in accordance
with applicable agreements.[15]

10.     Furthermore, the Plan's treatment-of-claims section provides that
"each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, *in full
satisfaction of such Allowed Claim*, shall receive, on or as soon as reasonably
practicable after the Effective Date, a Pro Rata share of Restructured UTGO
Bonds."[16]  In exchange for this treatment, UTGO Bond Claims against the City are
"satisf[ied], discharge[d] and release[d]."[17]  Therefore, the UTGO Bond Claims are
*fully and finally* resolved under the Plan for an Allowed Claim of $388,000,000—
approximately 74 cents on the dollar.

11.     Yet, in a not-so-subtle sleight of hand, the Plan leaves in place the full
Tax Levy.[18]  Thus, notwithstanding the UTEA and RMFA provisions listed above,
and notwithstanding the fact that the UTGO Bond Claims are fully and finally
resolved under the Plan, the citizens of Detroit will be compelled to pay the same

---

[15]   Plan Art. IV.D.

[16]   *Id.* Art. II.B.3.o.ii. (emphasis added).

[17]   *Id.* Art. III.D.4.a.

[18]   Under the UTGO Settlement, "the remaining portion of the UTGOs that are not Reinstated
UTGOs (the "Stub UTGOs") shall remain outstanding," and the Court's confirmation order
shall confirm the "existence of a lien in favor of the Reinstated UTGOs on ad valorem tax
revenues (millage) in the full amount that was pledged to repay the original UTGOs . . . for
so long as either the Reinstated UTGOs or the Stub UTGOs are outstanding."  Plan. Ex.
I.A.285; *see also* Plan Art. I.227. (defining "Reinstated Stub UTGO Bonds" as "Unlimited
Tax General Obligation Bonds in the principal amount of $43,410,000 that, from and after
the Effective Date, will remain outstanding and will be payable from the UTGO Bond Tax
Levy, as more particularly described [in the UTGO Settlement]").

*ad valorem* taxes. The Court should not—indeed, under section 943(b)(4) of the Bankruptcy Code, the Court cannot—countenance the City's disregard for Michigan state law.

12.     The City has argued—and likely will argue in connection with the Court's Legal Issues Order—that it may maintain the Tax Levy, consistent with the UTEA and RMFA, because the Stub UTGOs will remain outstanding.[19] The City's argument, however, suffers two fatal flaws. *First*, as discussed in detail below, Detroit voters did not approve the purpose to which the City intends to divert the Tax Levy millage collected in connection with the Stub UTGOs. *Second*, the City's assertions elevate form over substance in the worst way.

13.     To the latter point, it is well-settled that courts must "look through the form to the substance of any particular transaction."[20] The form of the UTGO Settlement is not complicated—the City explained it quite well: "the Stub UTGOs will remain outstanding after the Effective Date, and the *ad valorem* taxes will

---

[19]   *See* City's Reply at 165–66.

[20]   *Ohio v. Collins* (*In re Madeline Marie Nursing Homes*), 694 F.2d 433, 437 (6th Cir. 1982) (citations omitted); *see also In re Wheeler*, 252 B.R. 420, 429 (W.D. Mich. 2000) (citing *Madeline Marie Nursing Homes*, considering substance over form, and reversing the bankruptcy court's decision as "fundamentally wrong" and outside the "ordinary considerations of fairness").

continue to serve as the source of payment for the Stub UTGOs."[21]  But that is not the full story—it omits the true substance of the transaction.

14.    In substance, "a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds,"[22] which proceeds will be "in an amount equal to the principal and interest payable on the Reinstated Stub UTGO Bonds."[23]  Accordingly, the City's contention that the Tax Levy will continue to serve as a source of payment for the Stub UTGOs is a complete fiction. After all, as shown above, the UTGO Bond Claims are fully and finally resolved under the Plan.  The Court, therefore, must scrutinize the Stub UTGO-Tax Levy structure for what it is:  the City's attempt the side-step the UTEA and RMFA so that it can pay its "designee."  Put another way, the City is robbing Peter—*i.e.*, tax payers—to pay Paul—*i.e.*, pensioners.

**(b)    Tax Levy Proceeds Must Be Used in Accordance with the Purposes for Which the Taxes Were Levied.**

15.    As noted above, the UTEA provides that a city "may make 1 or more binding unlimited tax pledges for the payment of 1 or more *tax obligations referred to in the ballot* [in which the city asks for such approval].  After this vote

---

[21]    City's Reply at 165.

[22]    Plan Art. IV.D.

[23]    *Id.* Art. I.23.

of approval the public corporation may levy, *for payment of these obligations*, ad valorem taxes . . . ."[24]

16.     A plain reading of the quoted text provides that "these obligations" in the second quoted sentence relates back to the "*tax obligations referred to in the ballot*" in the preceding sentence, and thus a city may levy and apply ad valorem taxes to pay the tax obligations referred to in the ballot only.[25] This interpretation should not be controversial, especially in the context of taxes that require specific voter approval.

17.     Under analogous circumstances, in *Niles Bryant School of Piano Tuning v. Bailey*, the Michigan Supreme Court held that taxes levied for a certain purpose must be used for that purpose.[26] In *Bailey*, the Supreme Court found that the Battle Creek city charter granted the city authority to levy taxes for three

---

[24]   M.C.L. § 141.164(3) (emphasis added). "Public corporation" means "a county, city, village, township, charter township, port authority, metropolitan district, or authority of this state, or a combination of these entities when authorized by law to act jointly." M.C.L. § 141.162(b). "Unlimited tax pledge" means "an undertaking by a public corporation to secure and pay a tax obligation from ad valorem taxes to be levied on all taxable property within the boundaries of the public corporation without limitation as to rate or amount and in addition to other taxes which the public corporation may be authorized to levy." M.C.L. § 141.162(d).

[25]   "Tax obligation" means "a bond . . . or other evidence of indebtedness payable . . . from ad valorem taxes as a general or full faith and credit obligation of a public corporation." M.C.L. § 141.162(c).

[26]   *Niles Bryant School of Piano Tuning v. Bailey*, 126 N.W. 116, 118 (Mich. 1910) (tax proceeds were levied for "ordinary municipal expenses" and could not "be diverted . . . to anything other than ordinary municipal expenses").

specific purposes, including "ordinary municipal expenses."[27]  The city sought instead to use the taxes levied for ordinary municipal expenses to fund a new city hall.  The Supreme Court held that the charter limited "the purposes and . . . the manner which [the city] might expend the money of the municipality received from taxes or other sources" and that "[c]ontracting an indebtedness . . . for the purchase of a city hall site is not an ordinary municipal expense."[28]  Also, the Supreme Court considered that construction of a new city hall "was not an appropriation contemplated by the charter . . . as construed by the city authorities when they made up the budget for the general tax levy," nor was it otherwise "at that time taken into consideration, or in any manner provided for."[29]  Therefore, the Supreme Court held that "the monies arising from taxes levied 'for ordinary municipal expenses' [could] not lawfully be used" to fund a new city hall.[30]

18.    Here, the City—like Battle Creek in *Bailey*—must be bound by the purposes and manner for which the Tax Levy was initially created and approved by Detroit voters.  Importantly, each ballot relating to the UTGOs asked voters, on a

---

[27]    *Bailey*, 126 N.W. at 118.

[28]    *Id*. at 118.

[29]    *Id*.

[30]    *Id*.

11

project-by-project basis, for authorization to issue bonds relating *to a tax levy for a specific purpose*.  For instance, voters were presented with the following question:

> Do you favor the authorization and issuance of General Obligation Bonds, payable from taxes the City is allowed to levy in addition to Charter and statutory limits, in an amount necessary to pay the principal and interest thereon in the principal sum of an amount not to exceed [an amount stated in the ballot] for [the purpose(s) described in the ballot]?[31]

19.    Surely, if the Tax Levy was meant to pay pensions or City expenses generally, the ballots approving the Tax Levy would have said so.  Indeed, for example, municipalities in Michigan and elsewhere do levy specific taxes designated to fund pension obligations.[32]

---

[31]  Copies of exemplar ballots are attached hereto at **Exhibit A**.  For example, the Series 2003-A UTGOs were issued for the following "public capital improvements" approved by voters: (a) neighborhood/economic development and housing rehabilitation programs; (b) recreation, zoo, and cultural facilities improvements; (c) public lighting system betterments, improvements, and extensions; (d) Detroit Institute of Arts improvements; (e) Charles H. Wright Museum of African-American History improvements; (f) municipal facilities improvements; (g) fire buildings and sites; and (h) public safety facilities.  *See* Resolution of Detroit City Council dated September 19, 2013 § 301(b).

[32]  *See, e.g.*, Financial Report with Supplemental Information of the City of Dearborn Heights, Michigan 27 (June 30, 2012) (discussing 6.1 mill *ad valorem* property tax assessment on account of police and fire retiree pension benefits provided under Michigan Public Act 345 of 1937), a copy of which is attached hereto at **Exhibit B**; City of Huntington Park, California, Resolution No. 2013-39 (adopting 2.1 mill tax on "all taxable property within the City of Hunting Park" on account of contributions to public employee retirement system), a copy of which is attached hereto at **Exhibit C**.

12

20. Additionally, the City's municipal code states that "[n]o obligations shall be sold to obtain funds for any purpose or purposes other than that for which those obligations were specifically authorized."[33]

21. Contrary to the Plan and UTGO Settlement, Detroit voters did not approve using the Tax Levy for payment of pension obligations or for the City's general use—and the City points to no authority supporting its contention that it is "entirely free to transfer the payments received on account of the Stub UTGOs as set forth under the Plan."[34] This is so because, as shown above, the City cannot achieve its sought-after result and remain faithful to the UTEA.[35]

22. In sum, Detroit citizens approve tax levies for specific purposes.[36] If taxes levied for a certain purpose were not required to be used for that purpose, a

---

[33] Detroit Muni. Code § 8-502.

[34] City's Reply at 166.

[35] Other text in the UTEA supports the view that the specific purpose for which the taxes are levied is key. In particular, section 141.165(3) is instructive. It provides that the "notice of election shall set forth a brief general description of the purpose of each unlimited tax pledge, [and] a statement of the estimated period of time over which each tax obligation is expected to be issued or incurred . . . ." M.C.L. § 141.165(3). Again, here the statute emphasizes the purpose for which taxes are to be levied and applied. Moreover, the "statement of the estimated period of time" is only "for informational purposes and shall not be binding upon the public corporation if the legislative body of the public corporation later determines that changed circumstances have rendered the estimate impossible or impractical to comply with." *Id.* The statute does not, however, provide that the stated *purpose* of the unlimited tax pledge is non-binding under changed circumstances. If the legislature wanted to make statements regarding the purpose of the tax pledge in ballots to be non-binding, it would have done so.

[36] *See* Mich. Const. art. II. § 6 ("Whenever any question is required to be submitted by a political subdivision to the electors for the increase of the ad valorem tax rate limitation . . .

municipality could simply redirect tax proceeds immediately after obtaining voter approval of the tax at issue. That result would be absurd at best, and it would render the UTEA meaningless at worst. In the end, the Court need not take Syncora's word alone on this topic—it could also consider Mr. Orr's:

> [UTGO Bond Claim Holders'] revenue stream is UTGO. That's a dedicated revenue stream, a millage that was created solely for them, and there's an argument to be made by some that if we aren't paying on their bonds, we can't collect the millage.
>
> It's not so much that their percentage has changed from 15 to 74, it's that they've agreed to give us the equivalent of 26 percent of what they're owed from a dedicated revenue stream. That's the equivalent of $100 million.[37]

### (c)   Absent Their Consent or Their Insurers' Consent, UTGO Bond Claim Holders' Rights Cannot Be Assigned

23.   In addition to violating Michigan municipal tax law, the UTGO Settlement infringes the UTGO Bond Claim Holders' and their insurers' property rights.[38] It does so by providing that "the rights to payment on the Stub UTGOs shall be assigned by the Plan (without any consent or action on the part of, or additional consideration payable to, the Bond Insurers or UTGOs bondholders) to

---

or for the issue of bonds, only electors in, and who have property assessed for any ad valorem taxes in, any part of the district or territory to be affected by the result of such election or electors . . . shall be entitled to vote thereon.").

[37]   Brian Chappatta, *Detroit's Orr Explains Bondholders' 74% Recovery: Five Questions*, Bloomberg Businessweek (Apr. 11, 2014), http:// http://www.businessweek.com/news/2014-04-10/detroit-s-orr-explains-bondholders-74-percent-recovery-five-questions.

[38]   Syncora insures approximately $34,380,000 of outstanding UTGOs.

[TBD/City designee]."[39]  Syncora, which is not a party to the UTGO Settlement, has not consented to this assignment.  Thus, to the extent Syncora's rights to payment on the Stub UTGOs are assigned to the City's designee, the UTGO Settlement trespasses upon Syncora's property rights.

24.     As a threshold matter, it is axiomatic that, in the context of a bankruptcy case, the nature and characteristics of a creditor's property rights are defined by reference to state law.[40]  Here, the City does not—and cannot—cite to any authority supporting the proposition that it may assign a creditor's property rights or a creditor's claim "without any consent . . . or additional consideration."[41]  Certainly, if that were the law, then there would be no need for a federal bankruptcy system because a debtor could simply assign its creditors' claims to itself, thereby cancelling its indebtedness.

25.     But that is not the law.  Instead, the law is that "[a]n assignment of a right is a *manifestation of the assignor's intention to transfer it* by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."[42]  Here, the City

---

[39]  Plan Ex. I.A.285. (bracketed text in original).

[40]  *See Butner v. United States*, 440 U.S. 48, 56–57 (1979); *accord In re City of Detroit, Mich.*, No. 13-53846, 2013 WL 6331931, at *44 (Bankr. E.D. Mich. Dec. 5, 2013).

[41]  Plan Ex. I.A.285.

[42]  Restatement (Second) of Contracts § 317 (1981).

cannot show that Syncora manifested its intention to transfer its right to payment on account of the Stub UTGOs. Accordingly, the Court cannot approve the Plan or the UTGO Settlement over Syncora's objection.

26.    Of course, because the City cannot achieve its ends under state law, it likewise cannot do so under the Bankruptcy Code. In an analogous situation, at least one bankruptcy court has expressed strong skepticism that courts may assign creditors' rights.

27.    In *In re MF Global Inc.*, the debtor attempted to assign to itself certain claims held by creditors against third parties in exchange for such creditors' distribution under the plan.[43] Judge Glenn noted on the record that no authority authorized the assignment and that the court could not use section 105 of the Bankruptcy Code to fill the gap.[44]    Similarly, the City can show no legal basis for the assignment here, and the Court may not use Bankruptcy Code section 105 to fill the gap.[45]

---

[43]   2012 WL 1424670, at *3 (Bankr. S.D.N.Y. Apr. 24, 2012).

[44]   *Id.* Hr'g Tr. at 39 (Bankr. S.D.N.Y. Apr. 18, 2012) ("Tell me what the authority is for the Trustee to impose the requirement on commodities customers to assign their claims. . . . [T]here is no authority for the Trustee to insist on the assignment . . . . And I don't find 105 — you've in part relied on Section 105 of the Bankruptcy Code to fill that gap. And that I don't agree with."), a copy of which is attached hereto at **Exhibit D**.

[45]   "[A] court may invoke § 105(a) 'if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code.'" *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 n.1 (6th Cir. 2000); *In re Middleton Arms P'ship*, 934 F.2d 723, 724 (6th Cir. 1991) ("Although section 105(a) grants the Bankruptcy Court equitable power, 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the

28.     Moreover, the Plan's forced assignment of UTGO Bond Claim Holders' property interests in the Stub UTGOs is tantamount to a non-consensual third-party release in favor of the City's designees.   In essence, the forced assignment requires one party (*i.e.*, Syncora) to give up its property for the benefit of a non-debtor third party (*i.e.*, pensioners).   This structure is analogous to the facts underlying the Sixth Circuit's seminal decision in *Dow Corning*.[46]   In that case, the debtors' plan compelled creditors to release their claims—*i.e.*, their rights to payment—against non-debtor third parties.[47]   The City's Plan does the same thing:  it compels Stub UTGO Holders to give up their rights to payment, without such Holders' consent, in favor of non-debtor third parties.  Whether it is termed a "release" or, as here, an "assignment," the structure must survive scrutiny under the seven-factor *Dow Corning* test.

29.     Under *Dow Corning*, a non-consenting creditor's claim against a non-debtor can be enjoined only under "unusual circumstances," which exist only if all of the following seven factors are present:  (a) an identity of interest between the debtor and the non-debtor exists such that a suit against the non-debtor is

---

confines of the Bankruptcy Code.'") (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

[46]   *See Class Five Nevada Claimants, et al. v. Dow Corning Corp., et al.* (*In re Dow Corning Corp.*), 280 F.3d 648 (6th Cir. 2002).

[47]   *Id.* at 658.

functionally a suit against the debtor that will deplete the estate of assets; (b) the non-debtor contributed substantial assets to the estate; (c) the injunction is essential to the reorganization; (d) the impacted class has overwhelmingly voted in favor of the plan; (e) the plan provides a mechanism to pay for all, or substantially all, of the classes affected by the injunction; (f) the plan provides an opportunity for non-settling claimants to recover in full; and (g) the bankruptcy court made specific factual findings to support its approval of the releases.[48]

30.　　Here, the *Dow Corning* factors are not met and "unusual circumstances" do not exist to justify a non-consensual assignment of the UTGO Bond Claim Holders' property rights in the Stub UTGOs.  In detail, suits against pensioners would not deplete the City's assets; pensioners have not contributed substantial assets to the City; the City cannot show that the forced assignment of UTGO Bond Claim Holders' rights is essential to the bankruptcy; certain members of the UTGO Bond Claims class—including Syncora and its insureds—will not vote in favor of the purported assignment; and, among other things, there is no means for such dissenting members to recover in full under the Plan.  As such, the forced assignment of UTGO Bond Claim Holders' rights in the Tax Levy millage violates the *Dow Corning* standard.[49]

---

[48] *Id.*

[49] Additionally, the City's attempted assignment can be analogized to a class gift effectuated without unanimous consent of the gifting class.  In *In re Armstrong World Industries, Inc.*,

31.     Accordingly, the City cannot assign the UTGO Bond Claim Holders' rights to payment on account of the Stub UTGOs without such Holders' consent. Here, Syncora has not provided its consent, and thus the UTGO Settlement cannot be approved and the Plan cannot be confirmed.

## II.     Counterparty Exculpation

32.     The Court asks whether the Plan constitutes a "Specified Plan" and if not, whether the releases set forth in section III.D.7 of the Plan are consensual or non-consensual as related to the Counterparties.  In considering these issues, the Court may hear arguments and may make findings relating to the question of whether exculpating the Counterparties would violate Sixth Circuit law on non-consensual third-party releases.  Syncora writes to highlight its concern and to protect its rights regarding the Plan.

---

the Third Circuit rejected the debtors' attempt to make a distribution to equity holders over the objection of unsecured creditors.  432 F.3d 507 (3d Cir. 2005).  Among other things, the court took issue with the fact that the transfer between classes occurred without the unanimous consent of the gifting class.  *Armstrong*, 432 F.3d at 514 ("In turn, Class 7 automatically waived the warrants in favor of Class 12, *without any means for dissenting members of Class 7 to protest*.") (emphasis added); *cf. In re Journal Register Co.*, 407 B.R. 520, 532 (Bankr. S.D.N.Y. 2009) (approving gifting where "[h]ere, there is no *forced distribution* from one class to a junior class over the objection of an intervening dissenting or objecting class" and "[t]he 'gift' by a small group of Secured Lenders *is wholly consensual on their part*") (emphasis added).  The City's Plan suffers the same flaw that gave the *Armstrong* court pause—the automatic transfer from members of one class (UTGO Bond Claim Holders) to another (PFRS and GRS pensioners) without the transferring class's unanimous consent.

33. To be sure, exculpating the Counterparties under the Plan would violate bankruptcy law. The Plan exculpates the Exculpated Parties[50] "to the fullest extent permitted under applicable law . . . [from] any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including . . . the settlements implemented under the Plan, the Exhibits . . . any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan."[51]

34. Syncora may have various claims and defenses against the Counterparties on account of their acts and omissions "in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case."[52] For example, Syncora may have claims against the Counterparties for reimbursement of fees and expenses under the applicable swap agreements resulting from the Counterparties' negotiation and entry into the Swap Settlement. Also, Syncora may have a claim against the Counterparties for the amounts they have and will

---

[50] Under the Plan, "Exculpated Parties" means "collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors and (g) Gabriel, Roeder, Smith & Company." Plan Art. I.A.132.

[51] *Id.* Art. III.D.6.

[52] *Id.*

receive under the Swap Settlement in violation of the COP Service Contracts. Including the Counterparties in the Plan's definition of Exculpated Parties could shield the Counterparties from liability to third parties like Syncora in connection with, among other things, the Swap Settlement. The Counterparties' acts and omissions regarding the Swap Settlement were "in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 case" and certainly were in contemplation of "consummation of the transactions set forth in the Plan."[53]

35.     But to exculpate the Counterparties, the City would have to satisfy the *Dow Corning* standard for nonconsensual third-party releases, which the City has not done and cannot do. Among other things, Syncora's claims against the Counterparties would not affect the City's property. The Counterparties have not contributed substantial assets to the City's restructuring. The exculpation is non-essential, as evidenced by the Counterparties indicating that they would accept language narrowing the definition of Exculpated Parties in lieu of including the Counterparties in the definition. The affected parties are unlikely to vote to accept the Plan, and Syncora will not. Finally, Syncora is not being paid in full.

---

[53]    *Id.*

36.   Additionally, imposing a non-consensual third-party release would be inconsistent with the Court's, and others', statements on the record during the hearing on the Swap Settlement.[54]

37.   In sum, the Court's consideration of the questions posed in the Legal Issues Order must not impact parties' rights as against the Counterparties.

## **RESERVATION OF RIGHTS**

38.   Syncora reserves all rights to further supplement its Plan Objection, including the rights to:  (a) raise and prosecute legal and factual issues that are outside the scope of the Court's Legal Issues Order; and (b) amend, expand, or otherwise supplement its Plan Objection.

*[Remainder of Page Intentionally Left Blank]*

---

[54]   *See, e.g.*, *In re City of Detroit, Michigan*, Case No. 13-53846, Hr'g. Tr. 7-8, Apr. 11, 2014 ("[T]he Court concludes that nothing in the Settlement Agreement here enjoins or otherwise prevents Syncora from pursuing any rights that it may have.  Further, the bar order provision in this Settlement Agreement is limited to preventing potential defendants in suits brought by the City from asserting claims for contribution or indemnification against the Counterparties."); Orr Dep. 108:15-17 (Q: "What happens to direct claims by third parties against the Counterparties?  Do you know?"  A: "Yes.  Nothing.").

Dated:  June 30, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Ryan Blaine Bennett*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*