**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------x
                                        :
In re                                   :          Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :          Case No. 13-53846
                                        :
                        Debtor.         :          Hon. Steven W. Rhodes
                                        :
                                        :
-------------------------------------------------------x

**DEBTOR'S SUPPLEMENTAL BRIEF ON LEGAL ISSUES**
**RELATING TO CONFIRMATION OF FOURTH AMENDED**
**PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**

# TABLE OF CONTENTS

I. THE PLAN'S TEN YEAR INJUNCTION RELATING TO COLLECTIVE BARGAINING DOES NOT VIOLATE THE PUBLIC EMPLOYMENT RELATIONS ACT ................................................. 2

II. THE PLAN'S TREATMENT OF SECTION 1983 CLAIMS DOES NOT VIOLATE THE FOURTEENTH AMENDMENT ............................. 9

III. THE PLAN'S TREATMENT OF PARTIES WHOSE PROPERTY HAS BEEN TAKEN BY CONDEMNATION OR INVERSE CONDEMNATION DOES NOT VIOLATE THE FIFTH OR FOURTEENTH AMENDMENTS ................................................. 13

IV. THE ABSOLUTE PRIORITY RULE DOES NOT APPLY TO SECURED CLAIMS ....................................................................... 20

V. THE PLAN SATISFIES SECTION 1123(A)(4) OF THE BANKRUPTCY CODE .................................................................. 30

  A. Section II.B.3.a.ii of the Plan Satisfies Section 1123(a)(4) ............... 33

  B. Section II.B.3.q.ii of the Plan Satisfies Section 1123(a)(4) .............. 35

VI. THE UTGO SETTLEMENT DOES NOT VIOLATE THE UNLIMITED TAX ELECTION ACT ......................................... 37

VII. THE PROPOSED INTEREST RATE AND CALL PROTECTION MODIFICATIONS FOR CERTAIN SPECIAL REVENUE DEBT DO NOT VIOLATE THE PROVISIONS OF THE BANKRUPTCY CODE APPLICABLE TO SUCH DEBTS ................................. 39

VIII. MACOMB COUNTY DOES NOT HAVE STANDING TO OBJECT TO THE PLAN, OAKLAND COUNTY DOES NOT HAVE CONSTITUTIONAL STANDING AND WAYNE COUNTY HAS ONLY LIMITED CONSTITUTIONAL STANDING ............................... 44

  A. Macomb is Not a "Party in Interest" for Purposes of Sections 1109(b) and 1128(b) of the Bankruptcy Code ................................. 44

  B. The Counties Have Objected to the Plan on Grounds for Which They Lack Constitutional Standing .................................................. 50

    1. Macomb Does Not Have Standing to Raise Objections Related to the DWSD Because It Does Not Have a Direct Relationship with the DWSD .................................................. 54

|       | 2.  | Macomb Lacks Standing to Object to the City's Assumption of the OMI-Detroit Agreement Because Macomb is Not a Party to That Agreement. | 55 |
|-------|-----|-----|-----|
|       | 3.  | Macomb Lacks Standing to Object to the Plan's Treatment of Non-Pension Unsecured Claims. | 56 |
|       | 4.  | Oakland is Not a Party in Interest. | 57 |
|       | 5.  | Oakland Cannot Object to the Releases in the Plan Because It Is Not a Creditor. | 57 |
|       | 6.  | Oakland's and Wayne's Contract Counterparty Status Does Not Invest Them with Standing to Generally Object to All Aspects of the Plan. | 58 |
|       | 7.  | Wayne Does Not Have Standing Simply Because the City Lies Within its Geographic Parameters. | 62 |
| IX.   | THE PLAN DOES NOT IMPACT POTENTIAL INDEMNITY CLAIMS AGAINST THIRD PARTIES HELD BY BANK OF NEW YORK MELLON | | 64 |
| X.    | THE PLAN IS A SPECIFIED PLAN AS DEFINED IN THE COP SWAP SETTLEMENT | | 68 |
| XI.   | THE PLAN RELEASES AS THEY APPLY TO THE SWAP COUNTERPARTIES ARE LAWFUL AND APPROPRIATE | | 72 |

# TABLE OF AUTHORITIES

**CASES**

Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp.
(In re Dana Corp.), 412 B.R. 53 (S.D.N.Y. 2008)......................................33, 35

Aetna Realty Investors, Inc.v . Monarch Beach Venture, Ltd.
(In re Monarch Beach Venture, Ltd.), 166 B.R. 428
(C.D. Cal. 1993)...................................................................... 26, 27-28

Am. Bonding & Trust Co. v. Baltimore & Ohio Sw. Ry. Co., 124 F. 866
(6th Cir. 1903)......................................................................................38

Americredit Fin. Servs., Inc. v. Nichols (In re Nichols), 440 F.3d 850
(6th Cir. 2006)................................................................................. 15-16

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
526 U.S. 434 (1999)............................................................................30

Bank of N.Y. v. Treco (In re Treco), 240 F.3d 148 (2d Cir. 2001).......................16

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.), 482 B.R. 404
(Bankr. N.D. Ala. 2012) ................................................................. 43-44

Bates v. United States, 522 U.S. 23 (1997) ..............................................25

Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362 (2d Cir. 2006)..................................7

City of Monterey v. Del Monte Dunes at Monterey, Ltd.,
526 U.S. 687 (1999)............................................................................10

Commonwealth Nat'l Bank v. United States (In re Ashe), 712 F.2d 864
(3d Cir. 1983)......................................................................................16

CoreStates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33
(E.D. Pa. 1996)....................................................................21-22, 25, 28-29

Edwards v. Concord Dev. Corp., No. 174487, 1996 WL 33358104
(Mich. Ct. App. Sept. 17, 1996) ..........................................................38

Foster v. Ypsilanti Sav. Bank, 300 N.W. 78 (Mich. 1941) ....................................70

Heck v. Humphrey, 512 U.S. 477 (1994) ..............................................10

Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398 (1934)....................................7

In re A.P.I. Inc., 331 B.R. 828 (Bankr. D. Minn. 2005)..................50-51, 52, 53, 56

In re Addison Community Hospital Authority, 175 B.R. 646
    (Bankr. E.D. Mich. 1994)..........................................................45, 57

In re Albrechts Ohio Inns, Inc., 152 B.R. 496 (Bankr. S.D. Ohio 1993)...............29

In re Arden Props., Inc., 248 B.R. 164 (Bankr. D. Ariz. 2000).............................22

In re Armstrong World Indus., Inc., 432 F.3d 507 (3d Cir. 2005)...................29-30

In re Bashas' Inc., 437 B.R. 874 (Bankr. D. Ariz. 2010).................................22, 26

In re Cent. Med. Ctr., Inc., 122 B.R. 568 (Bankr. E.D. Mo. 1990).............32-33, 35

In re Chrysler LLC, 405 B.R. 84 (Bankr. S.D.N.Y. 2009).....................................17

In re City of Detroit, 504 B.R. 97 (Bankr. E.D. Mich. 2013)..................................19

In re Corcoran Hosp. Dist., 233 B.R. 449 (Bankr. E.D. Cal. 1999).......................19

In re Cypresswood Land Partners, I, 409 B.R. 396 (Bankr. S.D. Tex. 2009).........22

In re Dow Corning Corp., 215 B.R. 346 (Bankr. E.D. Mich. 1997).........................5

In re Dow Corning Corp., 255 B.R. 445 (E.D. Mich. 2000)......................31, 33, 35

In re Elijah, 41 B.R. 348 (Bankr. W.D. Mo. 1984)................................................27

In re Global Indus. Techs., 645 F.3d 201 (3d Cir. 2011).......................................51

In re Harry C. Partridge, Jr. & Sons, Inc., 43 B.R. 669
    (Bankr. S.D.N.Y. 1984).........................................................60-61

In re Indianapolis Downs, LLC, 486 B.R. 286 (Bankr. D. Del. 2013)...................58

In re Jackson, 311 B.R. 195 (Bankr. W.D. Mich. 2004)...................................38-39

In re Lakeside Global II, Ltd., 116 B.R. 499 (Bankr. S.D. Tex. 1989).............27-28

In re Lehman Bros. Holdings Inc., No. 11-CV-3760, 2012 WL 1057952
    (S.D.N.Y. Mar. 26, 2012)........................................................49

*In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937 (Bankr. S.D. Fla. 1992) ............. 26-27

*In re Mount Carbon Metro. Dist.*, 242 B.R. 18 (Bankr. D. Colo. 1999) ...............6, 8

*In re Mount Carbon Metro. Dist.*, No. 97-20215-MSK, 1999 WL 34995477
    (Bankr. D. Colo. July 20, 1999).........................................................49-50, 61-62

*In re New Midland Plaza Assocs.*, 247 B.R. 877
    (Bankr. S.D. Fla. 2000)........................................................................ 22, 24-25

*In re Pac. Gas & Elec. Co.*, 304 B.R. 395 (Bankr. N.D. Cal. 2004).......................47

*In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N.D. Cal. 2012)................... 16-17

*In re Quigley Co.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008)....................52, 53, 57, 59

*In re Rachels Indus., Inc.*, 109 B.R. 797 (Bankr. W.D. Tenn. 1990) .....................60

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990) ................................31

*In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756
    (Bankr. D. Nev. 1998) ........................................................................... 22, 29-30

*In re Simplot*, No. 06-00002, 2007 Bankr. LEXIS 2936
    (Bankr. D. Idaho Aug. 28, 2007) ........................................................... 53-54, 57

*In re Suffolk Reg'l Off-Track Betting Corp.*, 462 B.R. 397
    (Bankr. E.D.N.Y. 2011) ............................................................................. 59-60

*In re Swift*, No. 11-80717, 2012 WL 5381528
    (Bankr. D. Neb. Nov. 1, 2012) ................................................................... 22-23

*In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010) ...........................26

*In re Trenton Ridge Investors, LLC*, 461 B.R. 440
    (Bankr. S.D. Ohio 2011)................................................................... 21, 23, 25-26

*In re U.S. Fidelis, Inc.*, 481 B.R. 503 (Bankr. E.D. Mo. 2012) ..............................54

*In re UNR Indus., Inc.*, 143 B.R. 506 (Bankr. N.D. Ill. 1992) ................... 31-32, 36

*In re Varanasi*, 394 B.R. 430 (Bankr. S.D. Ohio 2008)...........................................17

Interim Investors Comm. v. Pavlico, 1990 U.S. App. LEXIS 16874
(4th Cir. Sept. 24, 1990) ...................................................................48

ISB Sales Co. v. Dave's Cakes, 672 N.W.2d 181 (Mich. Ct. App. 2003).................5

Johnston v. Miller, 40 N.W.2d 770 (Mich. 1950) ............................................ 69-70

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636
(2d Cir. 1988).................................................................................52

Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586 (2013) .................15

Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.),
505 F.3d 109 (2d Cir. 2007) ...............................................................49

Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935)......................14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ..................... 51-52, 55, 62, 63

Michigan Dep't of Transp. v. Tomkins, 749 N.W.2d 716 (Mich. 2008)........... 17-18

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) ....................................... 10-11

Monroe v. Pape, 365 U.S. 167 (1961) .............................................................. 10-11

Official Unsecured Creditors Comm. v. Oak Park Vill. Ltd. P'ship
(In re Long Dev., Inc.), 211 B.R. 232 (Bankr. W.D. Mich. 1994)....................39

Patsy v. Bd. of Regents, 457 U.S. 496 (1982) ...........................................................9

People v. Lowe, 773 N.W.2d 1 (Mich. 2009).............................................................5

Pleasantview Nursing Home, Inc. v. NLRB, 351 F.3d 747 (6th Cir. 2003) ............6

ROK Builders, LLC v. 2010-1 SFG Venture, LLC, 2012 WL 3779669
(D.N.H. Aug. 30, 2012) ...................................................................48

Schroeder v. Terra Energy, Ltd., 565 N.W.2d 887 (Mich. Ct. App. 1997)............71

Seraphin v. Morris Publ'g Grp. LLC (In re Morris Publ'g Grp. LLC),
No. 10-10134, 2010 Bankr. LEXIS 488 (S.D. Ga. Feb. 9, 2010) ......................51

S. Boulevard, Inc. v. Martin Paint Stores (In re Martin Paint Stores),
207 B.R. 57 (S.D.N.Y. 1997) ...............................................................49

Spiek v. Michigan Dep't of Transp., 572 N.W.2d 201 (Mich. 1998) ...................... 18

Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838
   (6th Cir. 2002) ........................................................................................... 52

TDS Metrocom, L.L.C. v. Michigan Bell Tel. Co., No. 5:05-CV-31,
   2005 WL 3535064 (W.D. Mich. Dec. 22, 2005) ........................................ 69, 71

United States v. Sec. Indus. Bank, 459 U.S. 70 (1982) ..................................... 15, 18

Vansen v. City of Pontiac, No. 218520, 2001 WL 879021
   (Mich. Ct. App. Aug. 3, 2001) ........................................................................ 71

Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989) ............................. 11-12

**ADMINISTRATIVE ADJUDICATIONS**

RBE Elecs. of S.D., Inc., 320 N.L.R.B. 80 (1995) ................................................ 6-7

**FEDERAL CONSTITUTION, STATUTES & LEGISLATIVE HISTORY**

U.S. Const. art. I, § 10 ........................................................................................... 19

U.S. Const. amend. V ........................................................................................ 13-20

U.S. Const. amend. XIV ...................................................................................... 9-20

11 U.S.C. § 101 ............................................................................................... 12, 13

11 U.S.C. § 365 ............................................................................................... 60-61

11 U.S.C. § 506 ..................................................................................................... 24

11 U.S.C. § 547 ............................................................................................... 42-43

11 U.S.C. § 552 ........................................................................................ 41, 42, 43

11 U.S.C. § 901 ......................................................................................... 12-13, 45

11 U.S.C. § 922 ..................................................................................................... 41

11 U.S.C. § 926 ..................................................................................................... 41

11 U.S.C. § 927 .................................................................................41

11 U.S.C. § 928 .................................................................................41

11 U.S.C. § 943 .......................................................................2-3, 8-9

11 U.S.C. § 944 .................................................................................12

11 U.S.C. § 1109 ......................................................................... 44-57

11 U.S.C. § 1111 ...............................................................41, 42, 43

11 U.S.C. § 1123 ................................................. 12, 14, 30-37

11 U.S.C. § 1128 ....................................................... 44-50, 57

11 U.S.C. § 1129 ...................................................20-30, 40, 43-44

42 U.S.C. § 1983 ......................................................... 9-13

Act of Feb. 24, 1871, 16 Stat. 431 ...............................................11

H.R. Rep. No. 95-595 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963.........28, 29, 31

H.R. Rep. No. 100-1011 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 4115.................43

S. Rep. No. 100-506 (1988) ..............................................................42, 43

## STATE CONSTITUTION & STATUTES

Mich. Const. art. I, § 10 .........................................................19

Mich. Const. art. IX, § 24 ...................................................... 19-20

Michigan Public Act 4 of 2011, M.C.L. §§ 141.1501 *et seq.* (repealed) .............. 3-4

Michigan Public Act 336 of 1947, M.C.L. §§ 423.201 *et seq.* (as amended) ..........3

Michigan Public Act 436 of 2012, M.C.L. §§ 141.1541 *et seq.*........................... 3-8

M.C.L. § 141.164 ..............................................................37

M.C.L. § 141.1543 ...................................................4, 5, 8

M.C.L. § 141.1549 ...................................................4, 6, 8

M.C.L. § 141.1550 ...............................................................................4

M.C.L. § 141.1552 ...............................................................................4

M.C.L. § 141.1567 ...............................................................................7

M.C.L. § 423.215 ..........................................................................3, 5, 6, 8

M.C.L. § 600.1405 ............................................................................47

**OTHER AUTHORITIES**

7 <u>Collier on Bankruptcy</u> ¶ 1123.01
 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) .........................31, 36

<u>Restatement (Second) of Contracts</u> § 203 (1981)...................................71

<u>Restatement (Second) of Contracts</u> § 317 (1981)...................................38

Pursuant to the Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures (Docket No. 5235) (the "<u>Legal Issues Order</u>"), the City of Detroit (the "<u>City</u>") hereby files this supplemental brief on legal issues relating to confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (the "<u>Plan</u>").[1]

Mindful that the Legal Issues Order discourages further briefing, the City does not submit further argument regarding the following issues identified in the Legal Issues Order: (a) Issue 8 ("Whether § II.B.3.u.i and § III.D.5 of the Plan, relating to the treatment of the claims against the 36th District Court, violate the Bankruptcy Code"), addressed at pages 200-204 of the City's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5034) (the "<u>Consolidated Reply</u>"), filed on May 26, 2014; (b) Issue 9 ("Whether the failure of the Plan to treat LTGO claims as senior unsecured claims violates the Bankruptcy Code, Michigan law, or a contract right that is enforceable in bankruptcy");[2] and (c) Issue 12 ("Whether the

---

[1]     The City filed the Plan and its related disclosure statement (Docket No. 4391) (the "<u>Disclosure Statement</u>") on May 5, 2014.  Except as expressly provided herein, capitalized terms not otherwise defined herein have the meanings given to them in the Plan and, if not defined therein, the Disclosure Statement.

[2]     Pursuant to paragraph 4 of the Order Approving Stipulation Modifying Certain Deadlines Established in the Fifth Amended Order Establishing

scope of the Plan's discharge and injunction provisions should be limited as requested in the objection to confirmation filed by the United States").[3]  Moreover, the City has limited its discussion of the remaining legal issues to only such argument as is necessary to supplement and clarify the legal arguments set forth in the Consolidated Reply and the exhibit thereto.

## ARGUMENT

### I.  THE PLAN'S TEN YEAR INJUNCTION RELATING TO COLLECTIVE BARGAINING DOES NOT VIOLATE THE PUBLIC EMPLOYMENT RELATIONS ACT

    1.    At pages 159 to 162 of its Consolidated Reply, the City demonstrated that the temporary injunction set forth at Section II.B.3.q.ii.G of the Plan against the further modification of pension benefits (the "Benefit Modification Injunction") would not violate section 943(b)(4) of the Bankruptcy Code because, among other things:  (a) the Plan did not require the City to take any affirmative action to implement the Plan that would violate Michigan law

---

(continued…)

        Procedures, Deadlines, and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 5466), entered on June 20, 2014, the Court has ordered that Issue 9 will not be heard at the hearing on legal issues scheduled for July 17, 2014.

[3]    The City and the United States have reached a consensual resolution of the objection to confirmation filed by the United States, which resolution is set forth in a stipulation filed by the City and the United States (Docket No. 5634), was approved by the Court pursuant to an order (Docket No. 5668) entered on June 30, 2014 and will be reflected in the Confirmation Order should the Court confirm the Plan.

(rather, the Plan contemplates only action by the Court); and (b) the Benefit

Modification Injunction does not violate Michigan Public Act 336 of 1947, the

Public Employment Relations Act, M.C.L. §§ 423.201 *et seq.* (as amended)

("PERA") because (i) the City's duty to bargain under PERA is not absolute and

(ii) PERA requires the City to bargain only "at reasonable times".

        2.      The interplay between PA 436 and PERA further confirms the

City's position that PERA does not prohibit the Benefit Modification Injunction

and, thus, that the Plan satisfies section 943(b)(4) of the Bankruptcy Code.  PERA

is clear that the collective bargaining obligations imposed thereby are superseded

by the imperative of addressing financial emergencies as embodied in PA 436 and

its predecessor statutes.  PERA expressly provides that:

> Collective bargaining agreements under this act may be rejected, modified, or terminated pursuant to the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531 [("PA 4")]. *This act does not confer a right to bargain that would infringe on the exercise of powers under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531.*

M.C.L. § 423.215(8) (emphasis added).[4]  This specific prohibition against

infringements upon the Emergency Manager's exercise of his powers under PA 436

---

[4]      Although PA 4 was repealed in 2012, the legislative history of PA 436 states that "a reference to … former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager … shall function and be interpreted to reference to this

(in this case, through the Benefit Modification Injunction) is not limited to the five-year exemption from the obligation to collectively bargain discussed in the Consolidated Reply. It extends to infringements upon the Emergency Manager's "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government." M.C.L. § 141.1549(2). Included among these broad powers that may not be infringed by PERA is the authority to "initiate steps to correct the condition[s]" contributing to the financial emergency, approve or disapprove a plan for paying all outstanding obligations and issue orders "necessary to accomplish the purposes of this act." M.C.L. § 141.1552(1)(a), (d), (g); § 141.1550(1). The Michigan legislature found that these broad powers were necessary because "the health, safety, and welfare of the citizens of this state would be materially and adversely affected by the insolvency of local governments and [ ] the fiscal accountability of local governments is vitally necessary to the interests of the citizens of this state to assure the provision of necessary governmental services…." M.C.L. § 141.1543(a).

3. Accordingly, Michigan law invests the Emergency Manager with the "power" to suspend collective bargaining to the extent such bargaining

_____

(continued…)

act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including … MCL 423.201 to 423.217." PA 436, at Enacting § 2.

would impede his ability to resolve the City's financial emergency and PERA expressly prohibits infringements upon the exercise of that power. Taken in tandem, PA 436 and PERA establish that the Emergency Manager's authority to rectify the City's fiscal emergency trumps the right to collective bargaining in financial emergencies such as Detroit is experiencing. See People v. Lowe, 773 N.W.2d 1, 9 (Mich. 2009) ("Statutes regulating the same subject matter must be read together and, when possible, construed harmoniously."); In re Dow Corning Corp., 215 B.R. 346, 358 (Bankr. E.D. Mich. 1997) (interpreting statutory language to have "consistent meaning from one section to the next"), supplemented by 215 B.R. 526 (Bankr. E.D. Mich. 1997). The very purpose and intent of PA 436 is to give the Emergency Manager the authority and tools to resolve the financial emergency so the City can provide "necessary governmental services essential to public health, safety, and welfare." M.C.L. § 141.1543(a). The Michigan legislature's amendments to PERA make clear that collective bargaining should not get in the way of the exercise of these powers. M.C.L. § 423.215(8); ISB Sales Co. v. Dave's Cakes, 672 N.W.2d 181, 185 (Mich. Ct. App. 2003) ("The primary goal of statutory interpretation is to give effect to the intent of the Legislature…. Statutory language should be reasonably construed, keeping in mind the purpose of the statute.").

4. PERA cannot be construed to invalidate the Benefit Modification Injunction where PERA itself prohibits the assertion of collective bargaining rights that would infringe upon the Emergency Manager's ability "to assure the fiscal accountability" of the City and provide "necessary government services," which objectives are the very purpose of both PA 436 and Chapter 9 generally. M.C.L. § 141.1549(2); see In re Mount Carbon Metro. Dist., 242 B.R. 18, 34-35 (Bankr. D. Colo. 1999) (a plan of adjustment must ensure the municipality can "provide future public services at the level necessary to its viability as a municipality"). As a result, M.C.L. § 423.215(8) and PA 436 together establish that the Emergency Manager may lawfully suspend collective bargaining pursuant to his emergency powers as necessary to correct the City's financial emergency, and the Benefit Modification Injunction is thus proper under Michigan law.

5. In any event, the Emergency Manager's lawful exercise of his powers under PA 436 is entirely consistent with PERA's requirement that the City collectively bargain at "reasonable times". While the phrase "reasonable times" is not defined by PERA, suspending collective bargaining during a fiscal emergency is entirely proper. See Pleasantview Nursing Home, Inc. v. NLRB, 351 F.3d 747, 755-56 (6th Cir. 2003) (recognizing that employers can suspend bargaining "when there are 'compelling economic considerations.'"); RBE Elecs. of S.D., Inc.,

320 N.L.R.B. 80, 81 (1995) (employers may "excus[e] bargaining entirely" where there exists "a dire financial emergency"). Moreover, courts have repeatedly recognized that addressing a fiscal emergency is of the utmost public importance. See, e.g., Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 444-45 (1934) (finding a financial emergency "furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community"); Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 368-69 (2d Cir. 2006) (statute freezing wages of public employees proper because addressing "the City's financial problems … [was] a legitimate public interest"). Accordingly, in the context of a financial emergency, a "reasonable time" to resume collective bargaining under PERA is *after* a municipality has taken the necessary steps to resolve that emergency. Where the Michigan legislature has already mandated an automatic, baseline five-year suspension of collective bargaining following a municipality's placement into receivership (PA 436, § 141.1567) — without first taking into consideration any details, circumstances or the extent of that municipality's financial emergency — it stands to reason that, given the City's extremely dire fiscal crisis and the expansive powers set forth in PA 436, the Emergency Manager has the authority to determine that the "reasonable time" to resume collective bargaining requires an additional five years.

6.     Indeed, that PA 436 does not require bargaining for the first five years following placement into receivership says nothing of the Emergency Manager's "power" to enact a financial plan that requires suspension of bargaining for additional time when necessary "to assure the fiscal accountability" of the City and provide "necessary government services."  M.C.L. § 141.1549(2); see Mount Carbon, 242 B.R. at 34-35 (a plan of adjustment must ensure the municipality can "provide future public services at the level necessary to its viability as a municipality").  That is precisely what the Emergency Manager's Plan has done here.  The purpose of the Plan — indeed, of any plan of adjustment — is to allow the City to adjust its debts while ensuring its ability to provide "governmental services essential to public health, safety, and welfare" going forward.  M.C.L. § 141.1543(a).  PA 436 gives the Emergency Manager authority to determine that ten years (not five) is the amount of time required to do so, M.C.L. § 141.1549(2), and, as set forth above, PERA states that collective bargaining may not stand in the way, M.C.L. § 423.215(8).  Following the ten-year injunction — i.e., after the City has taken the necessary steps to ensure its fiscal viability — is thus a "reasonable time" to resume bargaining under PA 436 and PERA.

7.     Accordingly, because the Benefit Modification Injunction is entirely consistent with PERA, the Plan satisfies section 943(b)(4) of the

Bankruptcy Code and the DPOA Objection and the DFFA Objection on this issue should be overruled.

## II. THE PLAN'S TREATMENT OF SECTION 1983 CLAIMS DOES NOT VIOLATE THE FOURTEENTH AMENDMENT

8.     The Plan's contemplated impairment of tort claims asserted pursuant to 42 U.S.C. § 1983 ("Section 1983") does not violate the Fourteenth Amendment of the United States Constitution.  Congress's inclusion of Section 1983 claims among those liabilities that may be impaired in chapter 9 is an appropriate exercise of the bankruptcy power, and is fully consistent with the discretion that the Fourteenth Amendment confers on Congress to define the scope and limits of judicial remedies available for constitutional violations committed at the state or local level.

9.     The Fourteenth Amendment does not itself provide any right of action for constitutional violations but instead assigns that task to Congress, which has the "power to enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment.  U.S. Const. amend. XIV, § 5.  Congress created Section 1983 as part of the Civil Rights Act of 1871.  See Patsy v. Bd. of Regents, 457 U.S. 496, 502-03 (1982), superseded by statute on other grounds as stated in Cassirer v. Kingdom of Spain, 580 F.3d 1048 (9th Cir. 2009), aff'd in part, rev'd in part on reh'g en banc, 616 F.3d 1019 (9th Cir. 2010) (en banc).  The statute provides in relevant part that "[e]very person who under color of any statute,

ordinance, regulation, custom, or usage, of any State … subjects, or causes to be

subjected, any citizen … to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress …." 42 U.S.C.

§ 1983. Section 1983 thus imposes "a species of tort liability," and creates a right

to money damages for those who are the victims of constitutional violations

perpetrated under color of state law. City of Monterey v. Del Monte Dunes at

Monterey, Ltd., 526 U.S. 687, 709 (1999) (quoting Heck v. Humphrey, 512 U.S.

477, 483 (1994)).

   10. Because Congress created the damages remedy available under

Section 1983 as a matter of legislative grace, it is free to define the limits of —

and the effect of other applicable law on — that remedy. In Monroe v. Pape,

365 U.S. 167, 187-191 (1961), for example, the United States Supreme Court held

that Congress did not authorize constitutional claims for money damages against

municipalities *at all*, because a municipality did not qualify as a "person" under

the statutory language of Section 1983. Although the Court overruled Monroe

seventeen years later in Monell v. New York City Dep't of Social Services,

436 U.S. 658 (1978), it did so solely on statutory grounds. Monell surveyed the

text and legislative history of the Civil Rights Act of 1871 and concluded that

Congress intended the term "'persons' to include municipal corporations,"

id. at 686, based on both "the 'usual' meaning" of the term "person" and its definition in the Dictionary Act. Id. at 688 (quoting Act of Feb. 25, 1871, § 2, 16 Stat. 431). In light of that plain meaning, the Court explained, the statute must be read to authorize suits for damages against municipalities unless the legislative history contained some "clear statement" to the contrary. Id. at 701.

11. The necessary implication of Monell's statutory analysis is that the Section 1983 remedy against municipalities is available only to the extent authorized by Congress as opposed to being *required* by the Constitution. Indeed, if the remedy were somehow constitutionally required, then Monell's statutory analysis would have been unnecessary, and Monroe's prior interpretation of Section 1983 would have been not only wrong but unconstitutional — a radical conclusion that Monell did not remotely suggest.

12. Congress's power to define the limits of any damages remedy under Section 1983 is further confirmed by Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). In Will, the Supreme Court held that states are not subject to constitutional claims for money damages because "a State is not a 'person' within the meaning of § 1983." Id. at 65. The Court further explained that Section 1983 does not authorize a suit for damages against state officers acting in their official capacity, because to do so "would allow [a plaintiff] to circumvent congressional intent by [the] mere pleading device" of naming the official rather than the state

itself as a defendant.  Id. at 71.  The Court thus reaffirmed that "congressional

intent" determines the nature and scope of any judicial remedy that Section 1983

provides to plaintiffs who allege constitutional violations.

13.     The Bankruptcy Code demonstrates clear congressional intent

that tort claims asserted under Section 1983 are subject to impairment and enjoy

no special status in bankruptcy.  Liabilities arising under Section 1983 fall

squarely within the ambit of the expansive definition of "claim" set forth at

section 101(5) of the Bankruptcy Code,[5] and various provisions of the Bankruptcy

Code applicable in chapter 9 provide generally for the impairment of "claims."

See 11 U.S.C. § 1123(a)(3) (providing that a plan shall specify the treatment of

impaired claims); 1123(b)(1) (providing that a plan may impair or leave

unimpaired any class of claims, secured or unsecured); see also 11 U.S.C.

§ 901(a) (making the foregoing provisions applicable in chapter 9).

14.     Nothing in the Bankruptcy Code suggests that Section 1983

claims are not subject to impairment.  While Congress took pains to enumerate

specific types of claims that cannot be discharged in chapter 9, see 11 U.S.C.

§ 944(c), it did not include Section 1983 claims among that list.  See also

11 U.S.C. § 901(a) (excluding the various exceptions to discharge of section 523

---

[5]     The Bankruptcy Code defines "claim" as any "right to payment, whether or
not such right is reduced to judgment, liquidated, unliquidated, fixed,
contingent, matured, unmatured, disputed, undisputed, legal, equitable,
secured, or unsecured." 11 U.S.C. § 101(5).

of the Bankruptcy Code from chapter 9). The decision not to include an exception for Section 1983 claims further evidences Congress's intent not to shield them from impairment in chapter 9.

15. Chapter 9 thus imposes a clear limit on the ability of plaintiffs to collect money damages against a bankrupt municipality under the constitutional-tort remedy of Section 1983. Because the availability of that remedy is purely a matter of legislative grace, the impairment of Section 1983 claims in chapter 9 does not raise any constitutional concerns under the Fourteenth Amendment.

## III. THE PLAN'S TREATMENT OF PARTIES WHOSE PROPERTY HAS BEEN TAKEN BY CONDEMNATION OR INVERSE CONDEMNATION DOES NOT VIOLATE THE FIFTH OR FOURTEENTH AMENDMENTS

16. The impairment of claims arising from the alleged condemnation or inverse condemnation of property does not violate the Fifth or Fourteenth Amendments of the United States Constitution. Just as with respect to Section 1983 claims, under the Bankruptcy Code, any right to payment constitutes a claim that, unless otherwise shielded by other provisions of the Bankruptcy Code, is subject to impairment and discharge in bankruptcy.[6] Liabilities arising from claims for condemnation or inverse condemnation, therefore, fit squarely

---

[6] The Bankruptcy Code's definition of "claim" includes not only any "right to payment" but also any right to an equitable remedy that gives rise to a right to payment. See 11 U.S.C. § 101(5).

within the Bankruptcy Code's definition of "claims" and are subject to impairment in chapter 9 by operation of section 1123 of the Bankruptcy Code, among other provisions.

17.     Although "[t]he Bankruptcy Power, like the other great substantive powers of Congress, is subject to the Fifth Amendment" prohibition against uncompensated takings, see Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935), superseded by statute on other grounds as stated in Magee v. Weller, No. 3:13-CV-249, 2013 WL 5366092 (S.D. Ohio Sept. 24, 2013), any potential limitations that the Fifth Amendment may impose on the bankruptcy power are implicated only where the application of a Bankruptcy Code provision destroys a creditor's rights in specific property of the debtor. In Radford, for example, the Court struck down parts of the Frazier-Lemke Act that stripped mortgagees of their pre-existing property rights by allowing bankrupt homeowners to either purchase their homes at a statutory rate (with the mortgagee's consent) or to delay foreclosure for five years and purchase at an appraised rate (without the mortgagee's consent).  Because these provisions "t[ook] [the] property of individual mortgagees in order to relieve the necessities of individual mortgagors" without just compensation, they were invalid. Id. at 602; see id. at 589-95.  The Court also stressed, however, that "the position of a secured creditor, who has rights in specific property, differs fundamentally

from that of an unsecured creditor, who has none," and it heavily emphasized the creditor's particular rights in the debtor's home. Id. at 588, 589; see also Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2599-2600 (2013) (describing Radford as a case involving "a right to receive money that is secured by a particular piece of property").

18.    Similarly, in United States v. Security Industrial Bank, 459 U.S. 70 (1982), the United States Supreme Court addressed the application of a Bankruptcy Code provision that gave debtors the ability to avoid certain non-possessory, non-purchase-money liens held by pre-existing creditors. In light of the Court's "substantial doubt [as to] whether the retroactive destruction of the appellees' liens in these cases comports with the Fifth Amendment," it gave the new statute prospective effect only. Id. at 78; see id. at 78-82. However, in doing so, the Court emphasized the "traditional property interests" at stake and noted that "the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral." Id. at 75. The Sixth Circuit has also noted this distinction between property rights and payment rights for purposes of the Fifth and Fourteenth Amendments. See Americredit Fin. Servs., Inc. v. Nichols (In re Nichols), 440 F.3d 850, 854 (6th Cir. 2006) (describing the difference between "the [secured creditor's] *contractual* right to obtain repayment" and its

"*property right* … in the collateral that secures the debt" for Takings Clause purposes and noting that "[b]ankruptcy laws have long been construed to authorize the impairment of contractual obligations") (emphasis in original).

19.    In keeping with these principles, courts assessing takings challenges to bankruptcy plans have clearly distinguished between creditors with specific rights in the debtor's property and those with merely a right to receive payment.  In Bank of New York v. Treco (In re Treco), 240 F.3d 148 (2d Cir. 2001), for example, a bank challenged an order requiring it to turn over certain assets for distribution in a Bahamian bankruptcy proceeding.  The court held that it did not need to address the bank's takings argument:  if the claim was secured (a question the lower courts had not addressed), turnover was barred by federal statute, and if it was unsecured, the claim was doomed to fail because "unsecured" claims are "not 'property' for purposes of the Takings Clause." Id. at 161.  Similarly, in Commonwealth National Bank v. United States (In re Ashe), 712 F.2d 864, 869 (3d Cir. 1983), the court held that "nonspecific judgment liens" awarded to the creditor after the debtor's default on commercial loans "did not create a property right in land, but only the opportunity to make a levy."  As a result, they did not qualify as "property interests subject to a taking analysis."  Id.  A host of bankruptcy courts have reached the same conclusion. See, e.g., In re Plant Insulation Co., 469 B.R. 843, 875 (Bankr. N.D. Cal. 2012)

(only "claims that rise to the level of an enforceable interest in specific property [are] protected under the Takings Clause"), aff'd sub nom. Fireman's Fund Ins. Co. v. Plant Insulation Co. (In re Plant Insulation Co.), 485 B.R. 203 (N.D. Cal. 2012), rev'd on other grounds, 734 F.3d 900 (9th Cir. 2013), cert. denied sub nom. OneBeacon Ins. Co. v. Plant Insulation Co., 134 S. Ct. 1901 (2014); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) (rejecting a tort creditor's takings claim because "the objector holds an unsecured claim, rather than a lien in some collateral that is property of the estate, which is a necessary prerequisite to a [takings] claim in the bankruptcy context"); In re Varanasi, 394 B.R. 430, 438 (Bankr. S.D. Ohio 2008) (rejecting takings claim because "[u]nsecured creditors do not have interests in any of a debtor's property prior to the debtor filing bankruptcy," but rather "simply a right to collect payment from the debtor").

20.     Like the other unsecured creditors in the cases discussed above, condemnation and inverse condemnation claimants do not have any "rights in specific property" of the debtor that have been impacted by a Bankruptcy Code provision. Radford, 295 U.S. at 588. In fact, the whole point of condemnation is to *extinguish* the landowner's property interests in exchange for money. See, e.g., Michigan Dep't of Transp. v. Tomkins, 749 N.W.2d 716, 721-22, 728 (Mich. 2008). Similarly, in inverse condemnation cases, the municipality must provide compensation because it "injur[ed] … the property … [by] depriv[ing] the owner

of the ordinary use of it."  Spiek v. Michigan Dep't of Transp., 572 N.W.2d 201, 202 n.3 (Mich. 1998) (internal quotation marks and citation omitted).  Because condemnation and inverse condemnation claimants have the right (or potential right) only to receive payment from the City rather than any particular interest in specific City property, nothing in Radford or Security Industrial Bank speaks to their situation.

21. The Fifth and Fourteenth Amendments also do not prohibit the impairment of condemnation or inverse condemnation claims in chapter 9 as a matter of first principles.[7]  If the "right to payment" possessed by condemnation or inverse condemnation claimants is somehow protected by the Fifth and Fourteenth Amendments, then any number of the City's creditors — whether vendors, trade creditors or other entities that entered into transactions with the City prior to the Petition Date — may possess arguments that they conveyed property to the City for which they did not receive "just compensation."  No one, however, could reasonably argue that all such creditors have valid constitutional objections to the impairment of their right to receive payment in chapter 9 because any such holding would destroy the fundamental purpose of chapter 9 — the adjustment of the municipality's debts.

---

[7]     No court appears to have discussed any Takings Clause challenge to the impairment of condemnation or inverse condemnation claims in chapter 9.

22.     At bottom, the allegations of certain claimants that — prior to

the Petition Date — the City failed to provide just compensation in taking their

property or interfered with their property to the extent that the claimant was

entitled to just compensation do not demonstrate that either the Bankruptcy Code

or the adjustment of debts pursuant thereto gave rise to the alleged interference

with any property right.  Rather, the Bankruptcy Code merely allows for the

money judgment that may arise from such a claim to be compromised and treated

as a prepetition claim along with all others, whether constitutionally rooted or not.

It is not relevant that the Constitution itself provides the right to just

compensation.  Merely uttering the word "constitutional" does not transform an

otherwise unsecured claim into a unimpairable right to payment.  Many of the

City's creditors have a constitutional right to payment from the City outside of

bankruptcy arising from, for example, the federal and state Contracts Clauses,

see U.S. Const. art. I, § 10, cl. 1; Mich. Const. art. I, § 10.  Nonetheless, those

rights may be diminished by this Court in chapter 9 pursuant to the Bankruptcy

Power.  See, e.g., In re City of Detroit, 504 B.R. 97, 115-28 (Bankr. E.D. Mich.

2013) (holding that the Court could impair pension benefits notwithstanding the

Pensions Clause of the Michigan Constitution); In re Corcoran Hosp. Dist.,

233 B.R. 449, 457 (Bankr. E.D. Cal. 1999) (confirming a plan that impaired

general unsecured claims over the class's objection).  Like the Contracts Clauses

and the Pensions Clause, the Takings Clause guarantees former property owners (in condemnation cases) and current property owners (in inverse condemnation cases) a right to just compensation. The Takings Clause does *not*, however, guarantee them full payment on that prepetition right to payment in the exceptional circumstance of municipal bankruptcy.

## IV.     THE ABSOLUTE PRIORITY RULE DOES NOT APPLY TO SECURED CLAIMS

23.     Section 1129(b)(2)(B) of the Bankruptcy Code — the codification of the so-called "absolute priority rule" — provides that, for a plan to be fair and equitable, unsecured creditors may receive less than the value of their claims as of the effective date of a plan only if no class of junior claims or interests receives any distribution on account of the claims therein.[8]

24.     In contrast, section 1129(b)(2)(A) of the Bankruptcy Code sets forth a standard for the "fair and equitable" treatment of *secured* claims and

---

[8]     Specifically, section 1129(b)(2)(B) of the Bankruptcy Code provides that the "fair and equitable" requirement is satisfied, with respect to *unsecured* claims, if:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property ….

11 U.S.C. § 1129(b)(2)(B).

contains no language similar or analogous to section 1129(b)(2)(B)'s formulation of the absolute priority rule.  See 11 U.S.C. § 1129(b)(2)(A).[9] Thus, the Bankruptcy Code expressly applies the absolute priority rule exclusively to unsecured claims and omits any reference to the absolute priority rule in the context of secured claims.

      25.     Most courts agree that section 1129(b)(2)(B) of the Bankruptcy Code means precisely what it says, i.e., that the absolute priority rule applies only to unsecured creditors.  See, e.g., In re Trenton Ridge Investors, LLC, 461 B.R. 440, 502 (Bankr. S.D. Ohio 2011) ("[T]he absolute priority rule simply does not apply with respect to a fully secured creditor ...."); CoreStates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 54 (E.D. Pa. 1996) ("Courts limit their

---

[9]    Section 1129(b)(2)(A) of the Bankruptcy Code provides that the "fair and equitable" requirement is satisfied with respect to *secured* claims if, among other alternatives, the plan provides:

> (i)  (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

11 U.S.C. § 1129(b)(2)(A)(i).

application of the absolute priority rule to unsecured creditors.");

In re Cypresswood Land Partners, I, 409 B.R. 396, 437 (Bankr. S.D. Tex. 2009) (holding that a secured creditor "does not have standing to object on the grounds that the Amended Plan violates the absolute priority rule contained in § 1129(b)(2)(B)(ii) because [such creditor] is the holder of a *secured* claim. The absolute priority rule only applies to a class of *unsecured* claims, not to a class of secured claims or equity interest holders.") (emphasis in original);

In re Arden Props., Inc., 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000) ("[T]he absolute priority rule applies only to unsecured classes, not to secured claims, the requirements for which are separately set forth in § 1129(b)(2)(A)…."); In re New Midland Plaza Assocs., 247 B.R. 877, 893 (Bankr. S.D. Fla. 2000) ("As a fully secured creditor, Coolidge does not have standing to assert the absolute priority rule of § 1129(b)(2)(B)(ii)."); In re Bashas' Inc., 437 B.R. 874, 928 (Bankr. D. Ariz. 2010) ("The only statutory cramdown section that applies to the rights accorded to secured creditors is found in § 1129(b)(2)(A), and an 'absolute priority' protection is nowhere to be located within that statute."); In re Sagewood Manor Assocs. Ltd. P'ship, 223 B.R. 756, 774 (Bankr. D. Nev. 1998) ("The absolute priority rule applies to unsecured creditors and thus, cannot be raised by … a fully secured creditor."); In re Swift, No. 11-80717, 2012 WL 5381528, at *4 (Bankr. D. Neb. Nov. 1, 2012)

("The absolute priority rule is a tool which only unsecured creditors may use to protect their interest in obtaining payment. Secured creditors do not have standing to assert the absolute priority rule.").

26.     Even if the absolute priority rule applied to secured claims (which it does not), it would merely be redundant of the treatment that section 1129(b)(2)(A) of the Bankruptcy Code already requires, i.e., that a plan is "fair and equitable" as to secured creditors if, under such plan, secured creditors will (a) retain their liens and (b) receive distributions of a value equal to the amount of their allowed secured claims as of the effective date of the plan. See 11 U.S.C. § 1129(b)(2)(A)(i); Trenton Ridge, 461 B.R. at 502-03 ("But even if the minority view is correct and the absolute priority rule does apply to secured creditors, all the rule would require with respect to secured claims would be that they receive the specific treatment provided for secured creditors in § 1129(b)(2)(A) before equity holders could receive equity in the reorganized debtor.").

27.     Moreover, secured claims are not susceptible to application of the absolute priority rule because the recovery due under the Bankruptcy Code on any portion of a creditor's claim that constitutes a secured claim is rigidly defined. Distributions on account of allowed secured claims are limited to the lesser of (a) the value of the collateral securing such claims and (b) the allowed amount of

the secured claim.[10]  Thus, to be confirmable, a plan must provide for payment in full of all *allowed* secured claims; the unpaid portion of any such claim either constitutes an unsecured claim, or is disallowed entirely, depending on the circumstances.  Applying the absolute priority rule to secured claims would be inconsistent with the Bankruptcy Code's framework regarding the allowance and payment of secured claims.

28.    A number of courts have determined that the absolute priority rule applies only to unsecured claims simply by applying basic principles of statutory interpretation.  In New Midland Plaza, for example, the court relied upon the plain language of section 1129(b)(2) of the Bankruptcy Code in rejecting the view articulated by a few courts, discussed below, that the absolute priority rule is an "implicit" component of the "fair and equitable" requirement applicable to secured claims, as follows:

> This Court respectfully disagrees with courts that have expanded the definition of "fair and equitable" under § 1129(b)(1) to rewrite the clear, unambiguous, and express requirements of § 1129(b)(2).… [T]he absolute priority rule is *explicit*, not *implicit*, in § 1129(b)(2).  Just as Congress expressly incorporated the absolute priority rule in paragraphs (B) and (C) of § 1129(b)(2), it just as expressly excluded it from paragraph (A) of

---

[10]    See 11 U.S.C. § 506(a)(1) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim.").

§ 1129(b)(2). It is a basic principle of statutory construction that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

New Midland Plaza, 247 B.R. at 894 (emphasis in original) (quoting Bates v. United States, 522 U.S. 23 (1997)). According to the New Midland Plaza court, "an extensive analysis of the legislative history of § 1129(b) … appears inappropriate given that the language of § 1129(b) is by no measure ambiguous." Id. The court further explained that "Congress was obviously aware of the absolute priority rule, as it included the rule in paragraphs (B) (relating to classes of unsecured creditors) and (C) (relating to classes of interest), yet it excluded it from paragraph (A) (relating to classes of secured claims) of the same provision." Id. Accordingly, it concluded that "this Court is not, through an over-expansive reading of the 'fair and equitable' standard, going to rewrite paragraph (A) of § 1129(b)(2) to include a rule purposefully excluded by Congress." Id. at 894-95; see also CoreStates, 202 B.R. at 55 ("The provisions articulated in § 1129(b)(2)(B) apply only to unsecured claims. This Court feels that if Congress wanted the payout of secured claims to satisfy the absolute priority rule for purposes of determining whether a plan is fair and equitable, it would have specifically included that requirement in § 1129(b)(2)(A) as it did in § 1129(b)(2)(B).") (internal citation omitted); Trenton Ridge, 461 B.R. at 502 ("The structure of

§ 1129(b)(2)(A), (B) and (C) supports the proposition that the absolute priority rule … does not apply to secured claims.") (quoting In re TCI 2 Holdings, LLC, 428 B.R. 117, 168-69 (Bankr. D.N.J. 2010)); Bashas', 437 B.R. at 928 ("With respect, this court disagrees with the Monarch decision, if it is intended to apply the absolute priority rule to a *secured* class of creditors. This is because the statute expressly contains the solitary expression of this rule in the section that *only* deals with *unsecured* creditors. § 1129(b)(2)(B)(ii).") (emphasis in original).

29. As noted above, a small minority of courts have held that, notwithstanding the plain language of section 1129(b)(2) of the Bankruptcy Code, the absolute priority rule applies to secured claims as an "implicit" component of the "fair and equitable" requirement. See Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 436 (C.D. Cal. 1993) ("The developing case law and legislative history persuade this court that absolute priority *is* an implicit part of the 'fair and equitable' formula: the dissenting secured creditor must ordinarily be paid in full before any junior class may share under the plan.") (emphasis in original); In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 941-42 (Bankr. S.D. Fla. 1992) ("The absolute priority requirement is implicit in § 1129(b)(1) and (2), imposing a 'fair and equitable' standard on cram down plans. 'The fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans,

placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders.'") (quoting In re Lakeside Global II, Ltd., 116 B.R. 499, 511 (Bankr. S.D. Tex. 1989));[11] In re Elijah, 41 B.R. 348, 352 (Bankr. W.D. Mo. 1984) ("The legislative history states that the test [set forth in section 1129(b)(2)(A)(i), applicable to secured claims] is a codification of the absolute priority rule.").

      30.     The minority view expressed in these earlier-decided cases has been correctly rejected by the majority of courts, however, because (a) it fails to give effect to the clear statutory language of section 1129(b) of the Bankruptcy Code and (b) misinterprets the legislative history underlying this provision. The courts in Monarch Beach, Elijah and Lakeside Global (upon which the Miami Center court relied in part) cited the legislative history of section 1129(b) of the Bankruptcy Code in support of the proposition that the absolute priority rule

---

[11]    The Miami Center court further held that a proposed plan's failure to provide an objecting secured creditor with the "indubitable equivalent" of its claim, combined with the fact that the objecting secured creditor would receive deferred payments while equity holders would retain their interests under such plan — violated the absolute priority rule. See Miami Center, 144 B.R. at 942. Courts have criticized this reasoning. See, e.g., Trenton Ridge, 461 B.R. at 503 ("[I]f Congress wanted to address the risk inherent in receiving payments over time under the rubric of the fair and equitable standard in the manner suggested by the Miami Center Associates court, it could have required — as it did in other sections of the Bankruptcy Code — that the secured creditor receive 'cash on the effective date of the plan equal to the allowed amount of such claim[,]' 11 U.S.C. § 1129(a)(9)(B)(ii) — but it did not do so.").

applies to secured claims by implication.  In particular, the <u>Monarch Beach</u> and

<u>Lakeside Global</u> opinions quote a particular paragraph from the 1977 House

Report discussing the provision that would become section 1129(b)(2)(B) of the

Bankruptcy Code, as follows:

> The general principle of the subsection permits
> confirmation notwithstanding nonacceptance by an
> impaired class if that class and all below it in priority are
> treated according to the absolute priority rule.
> The dissenting class must be paid in full before any
> junior class may share under the plan.  I[f] it is paid in
> full, then junior classes may share.  Treatment of classes
> of secured creditors is slightly different because they do
> not fall in the priority ladder, but the principle is the
> same.

H.R. Rep. No. 95-595, at 413 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6369;

<u>see</u> <u>Monarch Beach</u>, 166 B.R. at 435; <u>Lakeside Global</u>, 116 B.R. at 511 n.37.

    31.    Viewed in isolation, it may be possible to interpret the

language quoted above as suggesting that Congress intended to subject secured

claims to the absolute priority rule.  Any ambiguity, however, is resolved when

the above excerpt is reviewed in context.  As explained by the <u>CoreStates</u> court

and ignored by <u>Monarch Beach</u> and <u>Lakeside Global</u>, the larger passage, in fact,

evidences Congressional intent to *exclude* secured claims from the absolute

priority rule's ambit:

> Immediately below the portion of legislative history
> relied on in <u>Monarch Beach</u>, the following remarks were

made with respect to secured and unsecured claims and § 1129(b)(2)(A):

"Specifically, the Court may confirm a plan over the objection of a class of *secured* claims if the members of that class are unimpaired or if they are to receive under the plan property at a value equal to the allowed amount of their secured claims. * * * * *

The court may confirm over the dissent of a class of *unsecured* claims, including priority claims, only if the members of the class are unimpaired, if they will receive under the plan property of a value equal to the allowed amount of their unsecured claims, or if no class junior may receive anything under the plan. *This codifies the absolute priority rule from the dissenting class on down.*"

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 413 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6369. *Both the statute and its legislative history reveal intentional Congressional inaction with respect to inserting the absolute priority requirement in the portion of § 1129(b)(2)(A) dealing with secured claims. Its specific codification in § 1129(b)(2)(B)(ii) suggests to the Court that application is reserved for unsecured creditors.*

CoreStates, 202 B.R. at 55 (emphasis added);[12] see also Sagewood Manor,

223 B.R. at 773 ("The legislative history makes it clear that Congress intended the

---

[12]     The CoreStates court further noted that its interpretation of section 1129(b)(2)'s legislative history "corresponds with the original justification for the [absolute priority] rule," which was to protect unsecured creditors from the effects of collusive reorganizations devised by secured creditors and equity holders. Id. (quoting In re Albrechts Ohio Inns, Inc., 152 B.R. 496, 501 (Bankr. S.D. Ohio 1993), for the proposition that the "origins of the absolute priority rule lay in the desire to frustrate collusive arrangements between secured creditors and equity holders at the expense of unsecured creditors"); see also In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005) ("The absolute priority rule is a judicial

absolute priority rule to apply only to unsecured creditors, while secured creditors

are to receive the present value of their claims under the plan of reorganization.").

Although resort to legislative history is not necessary because the statutory

language of section 1129(b) of the Bankruptcy Code is unambiguous, the relevant

legislative history — read in context and in its entirety — further supports

Congressional intent to apply the absolute priority rule solely to unsecured claims.

In sum, the plain language of section 1129(b) of the Bankruptcy Code, its

legislative history and the weight of existing case law all support the proposition

that the absolute priority rule does not apply to secured claims.

## V.     THE PLAN SATISFIES
## SECTION 1123(A)(4) OF THE BANKRUPTCY CODE

32.     The Plan, including Sections II.B.3.a.ii and II.B.3.q.ii thereof

(the treatment of Class 1A (DWSD Bond Claims) and Class 10 (PFRS Pension

Claims), respectively), satisfies section 1123(a)(4) of the Bankruptcy Code.

Section 1123(a)(4) of the Bankruptcy Code provides that a plan shall "provide the

same treatment for each claim or interest of a particular class, unless the holder of

a particular claim or interest agrees to a less favorable treatment of such particular

_____

(continued…)

invention that predated the Bankruptcy Code.  It arose from the concern that
because a debtor proposed its own reorganization plan, the plan could be 'too
good a deal' for that debtor's owners.") (quoting <u>Bank of Am. Nat'l Trust &
Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 444 (1999)).

claim or interest." 11 U.S.C. § 1123(a)(4). This provision, which "applies to the treatment of claims within the same class[,] … 'is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure [of equality].'" In re Dow Corning Corp., 255 B.R. 445, 497 (E.D. Mich. 2000) (quoting In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990)), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).

33.     Importantly, and as expressly provided in the statute, section 1123(a)(4) of the Bankruptcy Code "applies to claims, not creditors." H.R. Rep. No. 95-595, at 407 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6363. That is, while the provision requires the same treatment of *claims* in a particular class, it does not require that a plan treat all *creditors* holding such claims the same overall.  See 7 Collier on Bankruptcy ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (explaining that section 1123(a)(4)'s requirement that the plan provide the "same treatment for each claim … of a particular class" does not apply "to the plan's overall treatment of the creditors holding such claims …"); In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992) (noting, in the context of a section 1123(a)(4) objection, that the debtor had confused "equal treatment of *claims* with equal treatment of *claimants*") (emphasis in original), rev'd on other grounds sub nom. UNR-Rohn, Inc. v.

Bloomington Factory Workers (In re UNR Indus., Inc.), 173 B.R. 149 (N.D. Ill. 1994).

34.     In addition, case law interpreting section 1123(a)(4) of the Bankruptcy Code makes clear that, unless the particular holder has agreed to less favorable treatment, the requirement of "same treatment" means that each holder of a particular claim within a class must be afforded the same *opportunity* or *process*.  For example, under the proposed plan in In re Central Medical Center, Inc., 122 B.R. 568, 574 (Bankr. E.D. Mo. 1990), all bondholders were given the opportunity to participate in a lottery system whereby certain bonds would be randomly selected to be redeemed each year, with those chosen first to receive a greater present value of their claims and a different interest rate from those bondholders chosen to be paid later.  Because bondholders were to receive different amounts of money under the mandatory redemption system, the debtor argued that the plan failed to provide the bondholders with equal treatment as required by section 1123(a)(4) of the Bankruptcy Code.  Id.  The court disagreed, finding that:

> [T]he [p]lan affords all bondholders the opportunity to participate in the same random lottery system.  The fact that some may ultimately receive more money than others is merely a consequence of a system that was applied equally to all members of that class.  Thus, by placing all class members within the same system, the [p]lan complies with Section 1123(a)(4)….

Id.; see also In re Dow Corning, 255 B.R. at 501 (finding that there is no requirement that settlement offers be proportional within a class; stating that "[t]he requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the *same process* for claim satisfaction.'") (citation omitted) (emphasis in original); Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").  As set forth below, upon consideration of these principles, it becomes evident that the Plan, and Sections II.B.3.a.ii and II.B.3.q.ii in particular, complies with section 1123(a)(4) of the Bankruptcy Code.

### A.  Section II.B.3.a.ii of the Plan Satisfies Section 1123(a)(4)

35.  Section II.B.3.a.ii of the Plan provides the same treatment for each claim in a particular Class of DWSD Bond Claims and, thus, satisfies section 1123(a)(4) of the Bankruptcy Code.  As set forth in Section II.B.3.a.ii of the Plan, certain Classes of DWSD Bond Claims are Unimpaired and certain Classes of DWSD Bond Claims are Impaired.

36.  All Unimpaired Allowed DWSD Bond Claims will be Reinstated under the Plan.  As such, the Plan treats each claim in an Unimpaired Class of DWSD Bond Claims the same as all other claims in that Class.

37.     Holders of Impaired Allowed DWSD Bond Claims will receive, at the option of the City, either (a) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder (with accrued and unpaid interest being added to the principal amount of the New DWSD Bonds or paid in Cash); or (b) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim.  However, each Holder of an Impaired Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds (again, with accrued and unpaid interest being added to the principal amount of the New Existing Rate DWSD Bonds or paid in Cash).

38.     The New DWSD Bonds and the New Existing Rate DWSD Bond differ in terms of their interest rates and call protections; thus, a Holder of an Impaired Allowed DWSD Bond Claim that receives New Existing Rate DWSD Bonds will not receive precisely the same thing under the Plan as a Holder that receives New DWSD Bonds or Cash.  Nevertheless, section 1123(a)(4) of the Bankruptcy Code is satisfied with respect to the Plan's treatment of Impaired DWSD Bond Claims because all Holders of Impaired Allowed DWSD Bond Claims are *afforded the same opportunity*:  all may choose to vote to accept the

Plan and to elect to receive New Existing Rate DWSD Bonds in lieu of New DWSD Bonds.  See Dow Corning, 255 B.R. at 501; Dana, 412 B.R. at 62; Central Medical Center, 122 B.R. at 574.  The fact that some claimants in a particular Class of DWSD Bond Claims ultimately may receive more money (but less call protection) than others is merely a consequence of an opportunity that is afforded to all members of that Class.[13]  See Central Medical Center, 122 B.R. at 574. The Plan, thus, provides the same treatment for each claim in a particular Class of DWSD Bond Claims and section 1123(a)(4) of the Bankruptcy Code is satisfied with respect to Section II.B.3.a.ii of the Plan.

**B.**　　**Section II.B.3.q.ii of the Plan Satisfies Section 1123(a)(4)**

39.　　Section II.B.3.q.ii of the Plan provides the same treatment for each PFRS Pension Claim in Class 10 and, thus, satisfies section 1123(a)(4) of the Bankruptcy Code.  Class 10 Claims are for the unfunded actuarially accrued liabilities (UAAL) of the PFRS (i.e., the underfunding of the PFRS).  The Plan provides identical treatment for all Class 10 *claims*:  holders of Class 10 Claims will receive, on account of such claims, the PFRS Adjusted Pension Amount, subject to certain adjustments as set forth in the Plan.  See Plan § II.B.3.q.ii.C.

---

[13]　　It is the City's understanding that the insurers of the DWSD Bonds that have objected to the election afforded to Impaired Classes of DWSD Bonds have distributed letters to the bondholders whose DWSD Bonds they insure advocating that such bondholders make the election.

40.     Section II.B.3.q.ii of the Plan also provides that future pension benefits for holders of PFRS Pension Claims in Class 10 who are Active Employees will accrue consistent with the terms and conditions of the New PFRS Active Pension Plan, the principal terms of which are attached to the Plan as Exhibit I.A.191.b.  See Plan § II.B.3.q.ii.A.  That is, Section II.B.3.q.ii.C of the Plan explains the pension benefits that *claimants* who are employees will receive from the City in the future as a result of their future employment.  New benefits that will be accrued by active employees under a new pension plan do not result in *claims* that are compromised in the Plan.  As set forth on Exhibit I.A.191.b to the Plan, different employee associations have agreed to different terms and conditions for future pension benefit accruals for the employees that they represent.  See Plan, Exhibit I.A.191.b.

41.     However, this is not an affront to section 1123(a)(4) of the Bankruptcy Code.  Although contained under the "Treatment" heading for Class 10 Claims, Section II.B.3.q.ii.C of the Plan regarding the accrual of future benefits for *certain claimants* relates to the parties' relationship going forward and is unrelated to the treatment of those claimants' PFRS Pension *Claims* (i.e., claims for the underfunding of the PFRS).  See 7 Collier on Bankruptcy ¶ 1123.01[4][b]; UNR Industries, 143 B.R. at 523; see also Plan § I.B.1(g) ("For purposes of the Plan, unless otherwise provided herein[,] … captions and headings to Articles and

Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.").[14]  Thus, Section II.B.3.q.ii of the Plan provides the same treatment for each Class 10 *claim*, and section 1123(a)(4) of the Bankruptcy Code is satisfied with respect to that provision.

## VI.     THE UTGO SETTLEMENT DOES NOT VIOLATE THE UNLIMITED TAX ELECTION ACT

42.     As set forth in the Consolidated Reply, the UTEA provides that the City may levy certain *ad valorem* taxes in an amount necessary to pay unlimited tax obligations (each, a "UTGO"),[15] and the UTGO Settlement in no way conflicts with or violates this (or any other) statutory requirement.  The City addresses the issue here only to clarify the mechanics of the UTGO Settlement as they relate to the UTEA.

43.     Pursuant to the UTGO Settlement, (a) certain Unlimited Tax General Obligation Bonds will be exchanged for new bonds issued by the Michigan Finance Authority on a *pro rata* basis and (b) the remainder of the outstanding Unlimited Tax General Obligation Bonds (the "Stub UTGOs") will

---

[14]     The City included a discussion of current employees' future pension benefits under a new hybrid plan in this section of the Plan so that a pension participant would be able to find all of the information related to his or her past and future benefits in one place in the document.

[15]     "[The] tax which may be levied shall not be excess of a rate or amount sufficient for payment of the obligations."  M.C.L. § 141.164(3).

continue to be held by the current holders thereof. The UTGO Settlement does not effect a transfer of the Stub UTGOs; it merely effects an assignment of the holders' contractual rights to payment on the debt to the City or its designee. This assignment of rights pursuant to the UTGO Settlement (a) does not violate the UTEA, (b) does not constitute an unlawful "redirect[ion] of UTGO tax levy proceeds … to the pension systems" as asserted by Syncora and (c) is otherwise consistent with Michigan law.

44.     Indeed, under Michigan law and longstanding principles of contract law, contract rights are freely assignable except in certain limited circumstances, such as where assignment is expressly forbidden in the contract itself. See Am. Bonding & Trust Co. v. Baltimore & Ohio Sw. Ry. Co., 124 F. 866, 875 (6th Cir. 1903) (a contract right "is assignable unless there is something in the terms or nature of the contract … that evidences that it was the intention of the parties thereto that it should not be assignable").[16] Courts routinely apply this rule to settlements, holding that absent express settlement language to the contrary, a party to a settlement may freely assign its rights under such settlement. See, e.g., In re Jackson, 311 B.R. 195, 200-02 (Bankr. W.D. Mich. 2004) (holding that, pursuant to a settlement agreement, the debtor validly

---

[16]     See also Edwards v. Concord Dev. Corp., No. 174487, 1996 WL 33358104, at *1 (Mich. Ct. App. Sept. 17, 1996) ("A contractual right can be assigned unless … assignment is validly precluded by contract.") (quoting Restatement (Second) of Contracts § 317(2)) (ellipsis in original).

assigned her right to receive certain annuity funds; stating that "[a]s a general rule, contract rights and duties are assignable," and "Michigan law mandates application of the general rule").[17]  The UTEA thus does not stand as an obstacle to the assignment of payment rights by the holders of the Stub UTGOs to the City or its designee pursuant to the UTGO Settlement.[18]

45.     Thus, the UTGO Settlement — including the City's maintenance of the relevant UTGO tax levy to support the original debt and the debt holders' assignment of their rights to payment on that debt — is consistent with the UTEA.

## VII.     THE PROPOSED INTEREST RATE AND CALL PROTECTION MODIFICATIONS FOR CERTAIN SPECIAL REVENUE DEBT DO NOT VIOLATE THE PROVISIONS OF THE BANKRUPTCY CODE APPLICABLE TO SUCH DEBTS

46.     The City demonstrated in the Consolidated Reply — and will not repeat at length here — that the interest rate and call protection modifications proposed in the Plan are permissible impairments of secured debt.

---

[17]     See also, e.g., Official Unsecured Creditors Comm. v. Oak Park Vill. Ltd. P'ship (In re Long Dev., Inc.), 211 B.R. 232, 239-40 (Bankr. W.D. Mich. 1994) (holding that the debtor validly assigned an ownership interest in certain notes, in exchange for cash payments, as part of settlement agreement), aff'd, 117 F.3d 1420 (6th Cir. 1997).

[18]     It is worth noting that the UTGO Settlement neither (a) prejudices the City's taxpayers, who have already received the benefits financed by the City's issuance of the UTGOs, nor (b) constitutes a tax increase further burdening such taxpayers.

See Consolidated Reply, at ¶¶ 157-72. With respect to interest rate modifications, for example, the City argues that the applicable interest rates proposed in the Plan provide the Holders of DWSD Bond Claims in impaired Classes with the present value of their secured claims as of the Effective Date. See id. at ¶¶ 157-65. This treatment is consistent with, and expressly contemplated by, the Bankruptcy Code, which permits a plan to provide a secured creditor with cash payments totaling the present value of its secured claim as of the effective date of the plan, so long as the secured creditor retains the lien securing its claim. 11 U.S.C. § 1129(b)(2)(A)(i). Certain secured creditors may contend that the interest rates proposed by the City will not provide them with the present value of their claims as of the Effective Date. The propriety of the interest rates proposed by the City is a question of fact, however, that will be subject to further proof at the Confirmation Hearing. As a matter of law, the City's right to provide secured creditors with the present value of their claims as of the Effective Date is not subject to reasonable dispute.

47. In the Consolidated Reply, the City also demonstrates that the limited modifications to call protections proposed under the Plan are permissible impairments of secured debt. See Consolidated Reply, at ¶¶ 166-72. The City explained, for example, that the commencement of a bankruptcy renders all of the debtor's debts mature and payable. See id. at ¶¶ 170-72. Thus, any contractual

call protections became moot and of no further force or effect as of the Petition Date.  See id.  Moreover, the City established that, even if any call protection provisions continued to exist following the Petition Date — which they did not — the modification of call protections is precisely the type of impairment of secured debt that is permissible under the Bankruptcy Code.  See id. at ¶¶ 166-69.

48.     Nothing in the provisions of chapter 9 addressing special revenue debt in particular requires or even permits a different result.  By their plain terms, sections 922(d), 926(b), 927 and 928 of the Bankruptcy Code address, respectively:  (a) the absence of any stay of the application of pledged special revenues in chapter 9; (b) the fact that transfers to or for the benefit of bondholders on account of their bonds are not avoidable as preferences in chapter 9; (c) the inability of a holder of a claim payable solely from special revenues to seek recourse from a chapter 9 debtor's general revenues, pursuant to section 1111(b) of the Bankruptcy Code; and (d) the fact that, notwithstanding section 552(a) of the Bankruptcy Code, special revenues remain subject to prepetition liens following the commencement of a chapter 9 case (subject to necessary operating expenses).  See 11 U.S.C. §§ 922(d), 926(b), 927, 928.  Except for in these limited, enumerated circumstances, nothing in chapter 9 provides or even suggests that special revenue debt should be treated differently than any other secured debt.  Thus, nothing in the plain language of the special

revenue provisions of chapter 9 disturbs the propriety of the proposed interest rate and call protection modifications.

49. Although no ambiguity exists regarding the interpretation of the special revenue provisions of chapter 9 in this context, consultation of the applicable legislative history confirms that congressional purpose in enacting these provisions was limited to addressing certain specific concerns unrelated to the issues at bar.

50. Congress's singular purpose in amending the Bankruptcy Code in 1988 to add the provisions of chapter 9 respecting special revenues was to redress certain unintended consequences of the general incorporation into chapter 9 of sections 547, 552 and 1111(b) of the Bankruptcy Code caused by the unique characteristics of special revenue debt.

> The proposed amendments would dispel the confusion which has resulted from the general statement in Section 901 of the Bankruptcy Code that Sections 547, 552 and 1111(b) are currently applicable to a Chapter 9 case. Those sections were originally drafted with regard to corporate and individual bankruptcies and incorporated by reference in Section 901 of the Bankruptcy Code. Their effect on a municipal bankruptcy due to the unique nature of municipal finance was never considered by the drafters of the Bankruptcy Code.

S. Rep. No. 100-506, at 1-2 (1988).

51.     In particular, Congress was concerned that the application of sections 547, 552 or 1111(b) of the Bankruptcy Code to municipal special revenue obligations could effectively:  (a) deprive the holders of such obligations of the benefit of their liens; (b) transform special revenue obligations into general obligations of the municipality, often in violation of state statutory or constitutional debt limits or other requirements; and (c) as a result, limit municipal access to credit markets.  See S. Rep. No. 100-506, at 5-9; H.R. Rep. No. 100-1011, at 4-9 (1988), reprinted in 1988 U.S.C.C.A.N. 4115, 4118-23. The purpose of the 1988 amendments to the Bankruptcy Code was not, therefore, to generally differentiate special revenue debt from other forms of secured debt in all contexts, but rather to provide debtors and holders of special revenue debt with equivalent protections to that afforded under other chapters of the Bankruptcy Code.  Accordingly, nothing in the plain language of the Bankruptcy Code or the legislative history of the 1988 amendments suggests that the impairment of special revenue debt should be evaluated any differently than the impairment of other forms of secured debt.  See Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.), 482 B.R. 404, 434 n.17, 435 n.18 (Bankr. N.D. Ala. 2012) (explaining that the sections of the Bankruptcy Code not changed by the 1988 amendments (including, for example, section 1129(b)(1)-(b)(2)(B) regarding nonconsensual impairment) remain available to "modify the contractual relations

-43-

between parties to municipal special revenue financing agreements" or to "otherwise alter aspects of pledged special revenue transactions involving municipalities").

## VIII. MACOMB COUNTY DOES NOT HAVE STANDING TO OBJECT TO THE PLAN, OAKLAND COUNTY DOES NOT HAVE CONSTITUTIONAL STANDING AND WAYNE COUNTY HAS ONLY LIMITED CONSTITUTIONAL STANDING

52.     Macomb County ("Macomb"), Oakland County ("Oakland") and Wayne County ("Wayne," and collectively, the "Counties") each filed an objection to the Plan.  See Docket No. 4627 (the "Oakland Objection"), Docket No. 4636 (the "Macomb Objection"), Docket No. 4663 (the "Wayne Objection," and collectively, the "County Objections").  The Court should strike these objections to the extent described below because the Counties do not have standing with respect to the issues raised in their objections.

### A.     Macomb is Not a "Party in Interest" for Purposes of Sections 1109(b) and 1128(b) of the Bankruptcy Code

53.     Macomb does not have standing to object to the Plan on any basis because it is not a "party in interest" for purposes of sections 1109(b) and 1128(b) of the Bankruptcy Code.  Section 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

Section 1128(b) similarly provides that "[a] party in interest may object to confirmation of a plan."[19]

54.    The Bankruptcy Code does not define "party in interest," and the list of parties in interest provided by section 1109(b) is not exhaustive.  At the same time, courts should not interpret section 1109(b) so expansively as to burden the bankruptcy process with participation by entities that have no direct interest in the case.  As this Court recognized in In re Addison Community Hospital Authority, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994):

> The Court concludes that the members of Concerned Citizens who are not creditors do not have standing to be heard under § 1109(b).  This Court should not be so liberal in granting applications to be heard as to overburden the debt adjustment process.  Where a party is merely interested in the outcome of the matter and does not have a direct legal interest in the chapter 9 proceeding, that party is not a "party in interest."  By allowing a large number of non-creditors to be heard in this action, the Court would be granting a blanket invitation to all parties in the area serviced by Addison.  This would hamper, and unduly delay, the debt adjustment process.

Id. at 650 (internal citations omitted).

55.    Macomb is precisely the type of non-creditor that should not be permitted to be heard in this case.  Macomb has failed to establish that it falls within any of the categories of "parties in interest" identified in section 1109(b) or

_____

[19]    Sections 1109(b) and 1128(b) apply in chapter 9 cases.  See 11 U.S.C. § 901(a).

that it is otherwise a party in interest under applicable case law. Although

Macomb asserts that it is a "creditor," it does not identify any claims that is has

against the City, it has not filed a proof of claim in this case and it is not scheduled

on the City's Second Amended List of Creditors and Claims (Docket No. 1059)

(the "List of Creditors").[20] Likewise, Macomb is not a "creditors' committee, an

equity security holders' committee, … an equity security holder, or any indenture

trustee." See 11 U.S.C. § 1109(b).

56.     Moreover, Macomb does not assert that it is a party to any

contracts with the City. In the Macomb Objection, Macomb states only that it is a

party to a Wastewater Disposal Services Contract (the "Macomb-OMI

Agreement"), dated September 30, 2009, with Oakland-Macomb Interceptor Drain

Drainage District ("OMI"). See Macomb Objection, at ¶ 1. As the Macomb

Objection concedes, however, the City is *not* a party to the Macomb-OMI

Agreement. Id. Under the Macomb-OMI Agreement, OMI apparently transports

wastewater from Macomb County to the City for treatment and disposal, and

Macomb pays OMI based on the rates that the DWSD charges OMI pursuant to *a*

---

[20]     Macomb Interceptor Drain Drainage District ("MIDDD"), a legal entity
discrete from Macomb that was also a signatory to the Macomb Objection,
has filed a proof of claim asserting a general unsecured claim against the
City. See Proof of Claim No. 3683. MIDDD's claim against the City is
classified in Class 14 under the Plan.

*discrete agreement to which Macomb is not a party.*[21] Id. at ¶ 2. Accordingly,

contrary to the assertions in the Macomb Objection, Macomb is not a DWSD

ratepayer because, under the Macomb-OMI Agreement, all of Macomb's

payments are made to OMI, not to the DWSD or the City.[22]

57.     Nor does Macomb's assertion of third-party beneficiary status

under the OMI-Detroit Agreement provide it with standing under section 1109(b)

of the Bankruptcy Code. Under Michigan state law, a third-party beneficiary to a

contract has standing to *enforce* the terms of a contract that are designed to benefit

the third party. See M.C.L. § 600.1405. Thus, Macomb's standing is limited to

the enforcement of the terms of the OMI-Detroit Agreement, which does not

include objecting to the City's Plan, particularly where (a) there has been no

default under the OMI-Detroit Agreement, (b) the OMI-Detroit Agreement will be

assumed under the Plan and (c) Macomb has not filed a proof of claim with

respect to the OMI-Detroit Agreement (or otherwise). The few bankruptcy cases

---

[21]     OMI is party to a Wastewater Disposal Services Contract (the "OMI-Detroit Agreement") with the City, dated October 22, 2009. Macomb Objection, at ¶ 1. Macomb also asserts that "the OMI-Detroit Agreement specifically provides that Macomb is an intended third party beneficiary of that OMI-Detroit Agreement and that Macomb, on behalf of the MCWDD, has the status of a 'Tier 1 Customer' of the DWSD." Id. at ¶ 3.

[22]     Regardless, even if Macomb were a DWSD ratepayer, ratepayer status alone is insufficient to confer standing. See In re Pac. Gas & Elec. Co., 304 B.R. 395, 414 (Bankr. N.D. Cal 2004) ("ratepayers as such (as opposed to creditors who happen to be ratepayers) lack standing").

that have addressed the standing of third-party beneficiaries have involved disputes regarding the enforcement or alleged breach of the contract in question. See, e.g., Interim Investors Comm. v. Pavlico, 1990 U.S. App. LEXIS 16874, at **2-4 (4th Cir. Sept. 24, 1990) (debtor had standing to sue for breach of agreement to which it was a third-party beneficiary); ROK Builders, LLC v. 2010-1 SFG Venture, LLC, 2012 WL 3779669, at **6-7 (D.N.H. Aug. 30, 2012) (generally recognizing the right of a third-party beneficiary to enforce a contract but concluding that the party in question was not, in fact, a third-party beneficiary), aff'd sub nom. ROK Builders, LLC v. 2010-1 SFG Venture LLC (In re Moultonborough Hotel Grp., LLC), 726 F.3d 1 (1st Cir. 2013). The Macomb Objection cites to no case law — and the City is aware of none — holding that a third-party beneficiary of another party's contract with a debtor is a "party in interest" for purposes of standing to object to a debtor's plan.

58.     Because (a) Macomb is not a creditor of the City, (b) Macomb is not party to any contract with the City and (c) Macomb is impacted by the operations and financial health of the DWSD solely to the extent that such operations and financial health might impact OMI under OMI's separate contract with the City, Macomb's interests in this case are entirely derivative of OMI's interests under the OMI-Detroit Agreement.  Such derivative interests are insufficient to establish party in interest status, as recognized by the court in

In re Lehman Brothers Holdings Inc., No. 11-CV-3760, 2012 WL 1057952

(S.D.N.Y. Mar. 26, 2012):

> Significantly, party-in-interest standing under § 1109(b)
> does not arise if a party seeks to assert some right that is
> purely derivative of another party's rights in the
> bankruptcy proceedings. Significantly, a creditor once
> removed does not have party-in-interest standing:
> The concept [of party-in-interest standing] does not …
> encompass a creditor of one of the debtor's creditors.
> Such a party may be deeply concerned about the
> bankruptcy proceeding, since the debtor's ability to pay
> its creditor may affect the creditor's ability to pay, in turn,
> its creditor. But the party's legal rights and interests can
> only be asserted against the debtor's creditor, not against
> the debtor, and hence it is not a "party in interest" ….

Id. at **3-4 (internal citations and quotation marks omitted) (quoting Krys v.

Official Comm. of Unsecured Creditors (In re Refco Inc.), 505 F.3d 109, 117 n.10

(2d Cir. 2007), and S. Boulevard, Inc. v. Martin Paint Stores (In re Martin Paint

Stores), 207 B.R. 57, 61 (S.D.N.Y. 1997)).

59.    At least one court has applied the foregoing rule prohibiting

the assertion of "derivative standing" in the chapter 9 context. In In re Mount

Carbon Metropolitan Dist., No. 97-20215-MSK, 1999 WL 34995477 (Bankr. D.

Colo. July 20, 1999), two individuals (Blumenthal and Alpert) objected to the

chapter 9 debtor's plan, and the debtor argued that they lacked standing.

The objectors had no direct relationship with the debtor but instead, were parties

to a contract with a third party (Westwind) pursuant to which the objectors had the

right to purchase property within the debtor's jurisdiction from Westwind. Id. at *3.  The court found that the objectors' interests were derivative of the third party's and, therefore, insufficient to establish standing under section 1109(b) of the Bankruptcy Code.  Id. at *5 ("Blumenthal and Alpert do not contend that they have a direct relationship with the [debtor] ….  To the extent that the Plan only affects Blumenthal and Alpert's future interests to be acquired from Westwind, it is Westwind, only, which has standing to object.").

60.    Macomb asserts only that DWSD rate changes will affect it because payments that Macomb owes to OMI under an agreement to which the City is not a party are based on such rates.  Macomb has failed to establish that this derivative, secondhand relationship to the DWSD renders Macomb a party in interest for purposes of section 1109(b) and 1128(b) of the Bankruptcy Code.  Accordingly, Macomb does not have standing to object to the Plan.

## B.    The Counties Have Objected to the Plan on Grounds for Which They Lack Constitutional Standing

61.    Even a party deemed a "party in interest" within the meaning of sections 1109(b) and 1128(b) of the Bankruptcy Code must establish that it also has constitutional standing in addition to party in interest status.  See In re A.P.I. Inc., 331 B.R. 828, 856-57 (Bankr. D. Minn. 2005) (finding that, to object to confirmation, a party must demonstrate both its statutory and constitutional standing), aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc., No. 06-167,

2006 WL 1473004 (D. Minn. May 25, 2006); <u>Seraphin v. Morris Publ'g Grp. LLC</u>

<u>(In re Morris Publ'g Grp. LLC)</u>, No. 10-10134, 2010 Bankr. LEXIS 488, at *11

(Bankr. S.D. Ga. Feb. 9, 2010) ("[Section] 1109 does not give every party in

interest the right to seek relief on every issue…. To establish standing to object to

confirmation, a party in interest under § 1109(b) must possess a legally protected

interest affected by confirmation."); <u>In re Global Indus. Techs.</u>, 645 F.3d 201, 210

(3d Cir. 2011) (to establish standing for purposes of objecting to a debtor's plan,

"a party must, in the first instance, meet the requirements for standing that

litigants in all federal cases face under Article III of the Constitution").

      62.    The United States Supreme Court set forth three requirements

for Article III standing in <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992):

(a) the party seeking standing "must have suffered an 'injury in fact' — an

invasion of a legally protected interest which is … concrete and particularized and

… actual or imminent, not conjectural or hypothetical," (b) "there must be a

causal connection between the injury and the conduct complained of — the injury

has to be fairly [ ] trace[able] to the challenged action of the defendant, and not [ ]

th[e] result [of] the independent action of some third party not before the court"

and (c) it must be "'likely,' as opposed to merely 'speculative,' that the injury will

be redressed by a favorable decision." <u>Id.</u> at 560-61 (internal citations and

quotation marks omitted). In addition, a party may not be heard if it alleges a

"generalized grievance not particular" to that party or if it asserts "the legal rights and interests of a third party."  See Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838, 853 (6th Cir. 2002).  The party seeking standing bears the burden of proof.  Lujan, 504 U.S. at 561.

       63.    In the context of objecting to a bankruptcy plan, the objecting party must have standing with respect to each specific objection.  See A.P.I., 331 B.R. at 857.  Only those aspects of a plan that directly affect a party's rights are subject to objection.  See In re Quigley Co., 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) ("[T]he objecting party can only challenge the parts of the plan that directly implicate its own rights and interests.").  In other words, parties may not raise objections with respect to issues that affect only the interests of third parties.  See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 644 (2d Cir. 1988) ("The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context.  Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and capable of representing himself.  Third-party standing is of special concern in the bankruptcy context where … one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties ….").

64.     In <u>A.P.I.</u>, certain insurance companies objected to the debtor's plan on several grounds, including the classification of asbestos claims, the treatment of such claims, the prepetition solicitation of plan acceptances, third-party release provisions, the plan's compliance with section 524(g) of the Bankruptcy Code and the plan's exculpation clause.  <u>A.P.I.</u>, 331 B.R. at 861-69. The court conducted discrete standing analyses with respect to each of the insurance companies' objections and ultimately determined that the insurers lacked standing with respect to the majority of the objections.

65.     For example, the court found that the objecting parties could not object to the classification or treatment of asbestos claims because the majority of the objecting parties were not creditors, and those that were had claims only in other classes.  <u>Id.</u> at 861-63.  Thus, the plan's classification and treatment of asbestos claims had no impact on the objectors, and they were not permitted to be heard on that issue.  <u>Id.</u>  The court similarly found that prepetition solicitation, third-party releases and the plan's compliance with section 524(g) did not impact the objectors and, thus, that they lacked standing to object on those grounds. <u>Id.</u> at 863-67.  <u>See</u> <u>also</u> <u>Quigley</u>, 391 B.R. at 702-06 (objecting parties did not have standing to object to classification and treatment of claims or solicitation and voting issues); <u>In re Simplot</u>, No. 06-00002, 2007 Bankr. LEXIS 2936, at *33 (Bankr. D. Idaho Aug. 28, 2007) ("[P]arties may not assert confirmation

objections that relate solely to others, or that go to issues that do not directly and adversely affect them pecuniarily."), aff'd sub nom. DJS Props., L.P. v. Simplot, 397 B.R. 493 (D. Idaho 2008); In re U.S. Fidelis, Inc., 481 B.R. 503, 514-15 (Bankr. E.D. Mo. 2012) (creditor with unimpaired claim did not have standing to object to plan based on plan releases and treatment of other claims).

### 1. Macomb Does Not Have Standing to Raise Objections Related to the DWSD Because It Does Not Have a Direct Relationship with the DWSD

66. The majority of Macomb's objections to the Plan relate to the City's provision of water and sewerage services through the DWSD. Macomb raises six objections to the Plan that relate to the DWSD: (a) the DWSD's funding of unfunded actuarial accrued liabilities violates state and local laws; (b) the Plan provides for a tax on suburban DWSD ratepayers that requires electoral approval; (c) the Plan violates the DWSD bylaws and the OMI Detroit Agreement; (d) DWSD pre-funding is not a sound exercise of business judgment; (e) the Plan is not feasible; and (f) the City cannot assume the OMI-Detroit Agreement because it cannot cure defaults and provide adequate assurance of future performance. See Macomb Objection, at ¶¶ 16-39.

67. As discussed in detail above, Macomb has no direct relationship with the DWSD and is, at best, a third-party beneficiary of a contract between the City and OMI. See supra § VIII.A. Without any direct pecuniary

relationship with the DWSD, Macomb lacks standing to raise Plan objections that

relate exclusively to the Plan's treatment of DWSD-related issues.[23]  Accordingly,

the Court should strike the objections identified in paragraph 66 above.[24]

<blockquote>

**2.       Macomb Lacks Standing to Object to the
City's Assumption of the OMI-Detroit Agreement
Because Macomb is Not a Party to That Agreement.**

</blockquote>

68.     Macomb objects to the Plan on the grounds that the City

cannot assume the OMI-Detroit Agreement because the City would allegedly

default on the agreement upon emergence from bankruptcy as a result of "the use

of DWSD funds for non-DWSD purposes."  See Macomb Objection, at ¶¶ 37-39.

As Macomb concedes, however, it is not a party to the OMI-Detroit Agreement,

and the Macomb Objection does nothing to establish that Macomb, as a mere

---

[23]     Macomb has not identified any particularized pecuniary injury but, instead,
makes only sweeping statements about the potential future failure of the
DWSD.  See Macomb Objection, *passim*; see also Oakland Objection,
*passim* (similarly failing to identify any particularized pecuniary injury).
This is precisely the type of "generalized grievance" that Lujan holds is
insufficient as a basis for standing.

[24]     Moreover, any standing that MIDDD may have to object to the Plan as a
holder of a Class 14 Claim would not invest Macomb with standing to argue
its DWSD-related objections.  MIDDD's Class 14 Claim is a general
unsecured claim that, if allowed, would receive New B Notes from the City's
General Fund.  See Plan § II.B.3.u.  Because Class 14 claimants must look to
the General Fund for their recoveries under the Plan, the operations and
financial health of the DWSD are irrelevant to such recoveries.  Accordingly,
even if the standing of a discrete legal entity (i.e., MIDDD) were somehow
to be imputed to Macomb (which it should not be), that standing would not
suffice to allow Macomb to argue its wide-ranging objections vis-a-vis the
DWSD.

third-party beneficiary to the OMI-Detroit Agreement, has standing to object to the proposed assumption of the OMI-Detroit Agreement (especially where OMI, the actual party to the agreement, has not objected). Accordingly, the Court should strike Macomb's objection to the Plan regarding the assumption of the OMI-Detroit Agreement.[25]

### 3. Macomb Lacks Standing to Object to the Plan's Treatment of Non-Pension Unsecured Claims.

69. Macomb objects to the Plan on the grounds that it unfairly discriminates against non-pension unsecured claims. See Macomb Objection, at ¶¶ 40-42. Macomb, however, is not a creditor in this case, and thus, it does not have any pension or non-pension unsecured claims. See supra ¶ 55 (noting that Macomb has not filed a proof of claim and is not on the List of Creditors).

70. Because Macomb is not a creditor, it has no pecuniary interest in the Plan's treatment of pension and non-pension unsecured claims, and accordingly, it does not have standing to object based on the treatment of such claims. See A.P.I., 331 B.R. at 861-69 (party may not object to plan based on treatment of creditors in classes in which the objecting party is not a claimant);

---

[25] Wayne is not a party to the OMI-Detroit Agreement either, and thus, to the extent the Wayne Objection incorporates this objection by reference, Wayne also lacks standing to object to the assumption of the OMI-Detroit Agreement.

Quigley, 391 B.R. at 702-06 (same); Simplot, 2007 Bankr. LEXIS 2936, at *33

("parties may not assert confirmation objections that relate solely to others").[26]

### 4. Oakland is Not a Party in Interest.

71.     Oakland is not a creditor in this case.  It has not filed a proof of

claim in this case, is not identified on the List of Creditors, is not a party to any

executory contracts that will be rejected and did not receive a ballot to vote on the

Plan.  Although some courts have found that contract counterparties to contracts

in default may have standing, in light of this Court's ruling in Addison, a

compelling argument can be made that Oakland, as a non-creditor, is not a party in

interest and thus has no standing to object to the Plan under section 1109(b) or

1128(b) of the Bankruptcy Code.  See supra § VIII.A.

### 5. Oakland Cannot Object to the Releases in the Plan Because It Is Not a Creditor.

72.     Oakland argues that the Plan should not be confirmed unless,

among other things, the injunction and release provisions of Sections III.D.5 and

III.D.7 of the Plan are removed.  See Oakland Objection, at ¶ 80.  Oakland does

not have standing to bring this objection because it is not a creditor and, therefore,

it is unaffected by such injunction and release provisions.

---

[26]     Macomb also objects to the Plan's exculpation provision.  See Macomb
Objection, at ¶¶ 43-46.  Macomb lacks standing to object to this provision
because Macomb is not a party in interest.  See supra § VIII.A.

73.     Section III.D.5 of the Plan enjoins only those parties that "have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities."  As set forth above, Oakland is not the holder of any such Claim.  Thus, Oakland cannot be harmed by the injunction set forth in Section III.D.5 of the Plan, and it lacks standing to object to that provision.  See In re Indianapolis Downs, LLC, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (party did not have standing to object to third-party releases in plan because the releases had no impact on that party).  Likewise, Section III.D.7 of the Plan does not apply to Oakland because it provides for releases only by "each holder of a Claim that votes in favor of the Plan" and by holders of "Pension Claims."  Oakland neither is nor can be either of these things and, thus, lacks standing to object to these releases.[27]

### 6.     Oakland's and Wayne's Contract Counterparty Status Does Not Invest Them with Standing to Generally Object to All Aspects of the Plan.

74.     Each of Oakland and Wayne objects to the Plan in its alleged capacity as a counterparty to contracts with the City related to the DWSD. See Oakland Objection, at ¶ 12 ("Oakland County is a party to several contracts with the City pursuant to which the City, through the DWSD, provides water and

---

[27]     In addition, even if Oakland is a DWSD ratepayer, a ratepayer that is not also a creditor does not have standing.  See supra footnote 22.

sewer services for and on behalf of, Oakland County."); Wayne Objection, at ¶ 2

("Wayne County and the City are parties to a January 13, 1944 Agreement for Use

of Certain Detroit Sewers … as well as other agreements by which DWSD

provides Wayne County and its residents with water and sewage services.").

More specifically, each County argues that its respective status as a contract

counterparty invests it with standing to object to the Plan on essentially any basis,

including with respect to the feasibility thereof and bad faith.  See, e.g., Wayne

County's Brief Regarding Its Standing to Raise Objections to the Debtor's Fourth

Amended Plan of Adjustment (Docket No. 5627), at 4-5 (citing In re Suffolk Reg'l

Off-Track Betting Corp., 462 B.R. 397, 413 (Bankr. E.D.N.Y. 2011)).

     75.    The Counties' respective standing to object to the Plan,

however, must be limited to those issues that directly impact them — i.e., the

proposed assumption of their contracts.[28]  See Quigley, 391 B.R. at 705 ("the

objecting party can only challenge the parts of the plan that directly implicate its

own rights and interests").  Suffolk is not to the contrary.  In Suffolk, the Court

found that a party's contract counterparty status necessarily implied standing to

object to the municipality's eligibility to be a chapter 9 debtor because the

eligibility determination was a threshold condition to the Court ever reaching the

---

[28]    With respect to Oakland, if the Court concludes that it is not a party in
interest under section 1109(b) or 1128(b) of the Bankruptcy Code, then
Oakland lacks standing even with respect to the proposed assumption of its
contracts with the City.  See supra § VIII.B.4.

question of assumption or rejection of the party's contract.  <u>Suffolk</u>, 462 B.R.

at 413.  This reasoning does not translate to the confirmation context, which is not

similarly a gating issue for the assumption/rejection determination.

Put differently, the Counties do not need to object to confirmation broadly to

preserve any rights with respect to the proposed assumption of their contracts,

which discrete matter is now properly before the Court.  The Counties' standing to

assert their rights within the assumption context is not only sufficient to protect

their interests, it should be properly regarded as the limit of their constitutional

standing (as described above).

      76.    Even allowing that Oakland and Wayne possess standing to

object to the assumption of their respective contracts with the City, the Counties

overstate the breadth of that standing.  Section 365(b)(1) of the Bankruptcy Code

provides that a debtor may only assume an executory contract if it "provides

adequate assurance of future performance under such contract."  <u>See</u> 11 U.S.C.

§ 365(b)(1)(C).  The adequate assurance requirement, however, only applies "[i]f

there has been a default" in the executory contract.  <u>See</u> 11 U.S.C. § 365(b)(1).

<u>See also</u> <u>In re Rachels Indus., Inc.</u>, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990)

("where there has been *no* default, the provision of adequate assurance of future

performance is not necessary") (emphasis in original); <u>In re Harry C. Partridge, Jr.</u>

<u>& Sons, Inc.</u>, 43 B.R. 669, 671 (Bankr. S.D.N.Y. 1984) (section 365(b)(1)(A) of

the Bankruptcy Code "is intended to provide protection for the other party to the contract or unexpired lease and is inapplicable if no default exists, in which case the contract or unexpired lease may be assumed without the debtor having to provide adequate assurances to the creditor").

77.     Oakland's objection to the Plan focuses extensively on the future success of the DWSD.  See Oakland Objection, at ¶¶ 17-49.  Oakland's and Wayne's only particularized pecuniary interests in the future operation of the DWSD are in connection with the City's future performance under any agreements between the City and Oakland or the City and Wayne.  Notably, however, neither Oakland nor Wayne has asserted that the City has defaulted under any agreement with either County, and the City is not aware of any such default.  Thus, section 365(b)(1)(C) of the Bankruptcy Code does not apply, and Oakland and Wayne are not entitled to raise objections to the Plan that, even if couched in terms of feasibility and bad faith, are in substance, attempts to require the City to provide adequate assurance of future performance under section 365(b)(1)(C).[29]

---

[29]     Mount Carbon does not support Oakland's or Wayne's position that it has standing by virtue of its status as a contractual counterparty.  In the present case, the City will assume each of the relevant contracts under the Plan, and there has been no default under any such contracts.  Thus, the section 365(b)(1)(C) requirement of adequate assurance of future performance does not apply.  In contrast, in Mount Carbon, there was a dispute regarding whether there was a default under the contract in question.  See Mount Carbon, 1999 WL 34995477, at *7.  Thus, the contract counterparty in Mount Carbon had standing, in part, because it was arguably

Having suffered no injury in fact as required by <u>Lujan</u> and the Bankruptcy Code, Oakland and Wayne, thus, both overstate the breadth of their standing to object to the Plan, and the Court should strike Oakland's and Wayne's feasibility and bad faith objections because the City is not required to prove adequate assurance of future performance on any agreements with Oakland and Wayne.

78.     Because Oakland lacks standing with respect to each of the three bases for its objection to the Plan (feasibility, bad faith and unlawful third-party releases), Oakland does not have *any* constitutional standing to object to the Plan and should not be heard with respect to any Plan confirmation issues.[30]

### 7. Wayne Does Not Have Standing Simply Because the City Lies Within its Geographic Parameters.

79.     In its most recent papers, Wayne asserts that it has standing under <u>Lujan</u> "because Detroit is within its jurisdiction." <u>See</u> Wayne County's Brief Regarding its Standing to Raise Objections to the Debtor's Fourth Amended Plan of Adjustment (Docket No. 5627), at 5. Wayne proceeds to identify various services that it provides to the City's residents and certain overlaps in administrative tasks between the City and Wayne. For instance, Wayne suggests

_____

(continued…)

entitled to a showing of adequate assurance of future performance, something that cannot be said of Oakland, Wayne or Macomb.

[30]     Furthermore, Oakland's status as a party in interest is questionable, at best, under this Court's ruling in <u>Addison</u> because Oakland is not a creditor in this case. <u>See</u> <u>supra</u> § VIII.A.

that *if* the City defaults under the Plan, "Wayne County *may* have to provide additional services to Detroit residents."  Id. (emphasis added).  Wayne also notes that (a) the City's police force interacts with Wayne County Prosecutors, the Wayne County Sheriff and the Wayne County Circuit Court, (b) construction in the City is subject to review and approval by the Wayne's Department of Public Services, (c) the City and Wayne work together on issues related to homeland security and (d) the City and Wayne collaborate on issues related to land resources and management.  Id. at 6.

80.    Wayne, however, fails to identify how any of these facts relate to the provisions of the Plan, what particularized injury Wayne has suffered as a result of these interactions or how the Plan's future failure or success will have any "concrete and particularized" pecuniary impact on Wayne County, as required by Lujan.  Instead, Wayne provides a laundry list of ways in which the City and Wayne interact (as is inevitable for any city and its respective county) without providing any evidence of the particularized harm that Wayne has suffered or will suffer if the Plan does not succeed.  This is precisely the type of "conjectural or hypothetical" injury that Lujan prohibits as the basis for standing.  Thus, the fact that the City is located in Wayne County does not satisfy the constitutional standing requirements.

81.     As a result of the foregoing, the *only* basis for Wayne's

standing in this case is as a Class 14 creditor, similar to the MIDDD.  See supra

footnote 24.  Thus, Wayne's standing is limited to issues that directly affect

general unsecured creditors only, which does not include any DWSD-related

objections.  Id.

## IX.     THE PLAN DOES NOT IMPACT POTENTIAL INDEMNITY CLAIMS AGAINST THIRD PARTIES HELD BY BANK OF NEW YORK MELLON

82.     In its Limited and Cautionary Objection and Reservation of

Rights of the Bank of New York Mellon, as Custodian (Docket No. 4610)

(the "BNY Mellon Objection"), the Bank of New York Mellon ("BNY Mellon")

objects to:  (a) "any modification, release, discharge, injunction against, or similar

limitations of claims of BNY Mellon against persons or entities other than the

Debtor" (any such release, a "Potential BNY Mellon Release"); and (b) "any

modification or rejection of the Custody Agreements [as such term is defined in

the BNY Mellon Objection], including but not limited to the reimbursement and

indemnification provisions, as the Debtor is not a party to the Custody

Agreements."  BNY Mellon Objection, at ¶ 7.  Because the plain language of the

Plan neither (a) classifies any indemnity claim that BNY Mellon may have against

a third party (any such claim, a "BNY Indemnity Claim") as a Class 14 Claim,

(b) provides for a Potential BNY Mellon Release nor (c) effects the rejection or

modification of the Custody Agreements, the concerns expressed in the BNY Mellon Objection are unfounded.

83. Potential BNY Indemnity Claims are not classified as Class 14 Claims under the Plan. BNY Mellon expresses a concern that, although BNY Indemnity Claims are not direct claims against the City, they nevertheless might be classified in Class 14 if they were deemed encompassed by the definition of "Indirect Employee Indemnity Claims" under the Plan (which Claims are classified in Class 14). BNY Indemnity Claims, however, are not "Indirect Employee Indemnity Claims" under the Plan. "Indirect Employee Indemnity Claim" is defined by the Plan as follows:

> any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification and/or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

Plan § I.A.167.

84. The BNY Mellon Objection does not allege that BNY Mellon believes that it may possess any claims under the Custody Agreements against an employee or former employee of the City that would fall within the definition of "Indirect Employee Indemnity Claim." Regardless, even if BNY Mellon were to possess a claim against an employee or former employee of the City related to the

Retirement Systems, claims for indemnity against the City on account of any such

claims are expressly rejected under the Plan.  Section IV.M of the Plan

("Assumption of Indemnification Obligations") plainly states that "Retirement

System Indemnity Obligations[31] shall not be assumed under the Plan and shall be

discharged."  Accordingly, BNY Indemnity Claims are not "Indirect Employee

Indemnity Claims" under the Plan and, thus, are neither defined as "Other

Unsecured Claims" under the Plan nor classified in Class 14.

   85. Accordingly, because BNY Indemnity Claims are not claims

against the City subject to treatment in any class of claims under the Plan, the

plain language of the Plan reveals that BNY Mellon's concerns regarding

"modification, release, discharge, injunction against, or similar limitations" of

BNY Indemnity Claims are unfounded.  The discharge and injunction provisions

of the Plan, by their express terms, do not apply to BNY Indemnity Claims.

See Plan § III.D.4 (providing that "Claims and other debts and Liabilities against

the City" are discharged); § III.D.5 (enjoining "holders of Claims against the City,

---

[31] The Plan defines "Retirement System Indemnity Obligations" as "any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS and/or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements."  Plan § I.A.238.

Indirect 36th District Court Claims or Indirect Employee Indemnity Claims….").

The release provisions of the Plan apply only to (a) holders of Claims that vote in

favor of the Plan (with respect to the consensual release) and (b) holders of

Pension Claims (with respect to the non-consensual release).  <u>See</u> Plan § III.D.7.

Because BNY Mellon (a) did not file a proof of claim in this chapter 9 case and

has not received a ballot and (b) is not the holder of a Pension Claim, the release

provisions of the Plan do not apply to BNY Mellon.  Neither does the Plan attempt

to enjoin or release any claim of BNY Mellon against the Retirement Systems or

otherwise modify or limit any BNY Indemnity Claim (and BNY Mellon identifies

no language of the Plan that might purport to do so).  Accordingly, the BNY

Mellon Objection should be overruled on this point.

86.     Finally, although the City has not yet filed its Plan Supplement

containing Exhibit II.D.6 to the Plan (Executory Contracts and Unexpired Leases

to Be Rejected), the City represents that the Custody Agreements —

<u>i.e.</u>, agreements to which the City is not a party — will not be included on such

Exhibit.  Accordingly, the BNY Mellon Objection's concerns regarding rejection

or modification of the Custody Agreements pursuant to the Plan are unfounded,

and the BNY Mellon Objection should be overruled.

## X.    THE PLAN IS A SPECIFIED PLAN
##       AS DEFINED IN THE COP SWAP SETTLEMENT

87.    The Plan is a "Specified Plan" as defined in the COP Swap Settlement.  Therefore, the City's prosecution of the Plan does not violate the COP Swap Settlement.  Pursuant to the COP Swap Settlement, a "Specified Plan" has three components.  First, a Specified Plan provides the COP Swap Counterparties with economic treatment equivalent to Section II.B.3.i of the Plan.  Second, a Specified Plan exculpates the COP Swap Counterparties to the extent another creditor is exculpated under the Plan.  Third, except as set forth above, a Specified Plan "treats the rights and claims" of the COP Swap Counterparties "no less favorably than the terms" of the COP Swap Settlement and COP Swap Settlement Approval Order.  See COP Swap Settlement, at § 1.1.

88.    The COP Swap Counterparties filed a limited objection (Docket No. 4668) asserting the Plan may not be a Specified Plan.  They raise two principal concerns:  (a) they should be Exculpated Parties under the Plan, and (b) they do not have to grant the releases in Section III.D.7 of the Plan.  The City believes the first concern is resolved.[32]   With respect to the second, the City submits that the COP Swap Counterparties have agreed to vote in favor of the

---

[32]    While the Plan as filed does not exculpate any creditors that would entitle the COP Swap Counterparties to exculpation, in light of recent settlements, the City contemplates creditors will receive exculpation under the Plan.  As such, the City intends to include the COP Swap Counterparties as Exculpated Parties, which should resolve any dispute on this point.

Plan and, with that vote, to the release provisions. The City understands that the COP Swap Counterparties have a differing interpretation, but that interpretation is not a reasonable one.

89.     The COP Swap Counterparties' basic argument for avoiding the releases is that the Plan may, in their view, not be a Specified Plan because the release provisions that extinguish claims held by the COP Swap Counterparties that are unrelated to the swaps and COPs result in less favorable treatment for such claims than is contemplated by the terms of the settlement. This contention, which is premised on the COP Swap Counterparties' flawed contractual interpretation of the COP Swap Settlement, lacks merit.

90.     Basic interpretive principles dictate that the phrase "rights and claims" in the COP Swap Settlement only refers to rights and claims that fall within the subject matter of that agreement, not unrelated rights and claims against other parties. See TDS Metrocom, L.L.C. v. Michigan Bell Tel. Co., No. 5:05-CV-31, 2005 WL 3535064, at *4 (W.D. Mich. Dec. 22, 2005) (Michigan law; holding the phrase "telecommunication service" was limited to "toll and local exchange service" and not other telecommunication services that were not the subject of the contract); Johnston v. Miller, 40 N.W.2d 770, 772 (Mich. 1950) ("[T]he intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered

together, and so construed as to be consistent with every other part.") (citation and quotation marks omitted); <u>Foster v. Ypsilanti Sav. Bank</u>, 300 N.W. 78, 82 (Mich. 1941) ("The intent of the parties at the time the agreement was made, as gathered from the entire instrument, controls despite literal terms in derogation of the interior sense of the transaction.") (citation and quotation marks omitted).

91.     The COP Swap Settlement addresses the City's and COP Swap Counterparties' disputes with respect to the COPs and COP Swap Documents. <u>See</u>, <u>e.g.</u>, COP Swap Settlement, at 2 (referring to the agreement as "a consensual resolution of their disputes under or in respect of the Certificates of Participation, the Swap Agreements and the Collateral Agreement"). The COP Swap Counterparties appear to acknowledge, as they should, that the phrase "rights and claims" is limited to their swap claims against the City. <u>See</u> Ltd. Obj. of Swap Counterparties (Docket No. 4668), at 1. It makes no sense to suggest that the phrase "rights and claims" refers to claims unrelated to the subject matter of the settlement.

92.     Similarly, the phrase "no less favorabl[e] than the **terms**" of the settlement necessarily contemplates that a term of the COP Swap Settlement addresses the subject matter at issue. Here, no term of the COP Swap Settlement addresses the claims subject to release under Section III.D.7 of the Plan. In the absence of a term in the settlement addressing the claim, the Plan cannot be

treating the COP Swap Counterparties less favorably than the settlement. In other words, the provision in the COP Swap Settlement that is relied upon by the COP Swap Counterparties contemplates an inconsistency between the terms of the settlement and the Plan. Where there is no term on point in the settlement, there can be no inconsistency.

93.    In addition to the plain language, as a matter of common sense, the agreement cannot reasonably be interpreted to mean that the City must unimpair any claims that the COP Swap Counterparties might have that are unrelated to the settlement. The City submits that the COP Swap Counterparties' interpretation should be rejected because it is unreasonable.[33] See Vansen v. City of Pontiac, No. 218520, 2001 WL 879021, at *2 (Mich. Ct. App. Aug. 3, 2001) (reasonable constructions of contracts must be favored over unreasonable ones); Schroeder v. Terra Energy, Ltd., 565 N.W.2d 887, 894 (Mich. Ct. App. 1997) (same); see also TDS Metrocom, 2005 WL 3535064, at *5 (Michigan law; "[I]n construing the contract, the court must adopt the construction that will result in a reasonable, fair, and just contract, as opposed to one that is unusual or extraordinary or produces unfair or unreasonable results.") (citation and quotation marks omitted); accord Restatement (Second) of Contracts § 203 (1981).

---

[33]    Despite the fact that each version of the Plan contained releases, the COP Swap Counterparties did not advance the instant interpretation until after the City filed its fourth amended Plan.

94.     Accordingly, because the Plan (a) provides the Swap Counterparties with the economic treatment contemplated by the COP Swap Settlement, (b) will exculpate the COP Swap Counterparties (and certain related entities), consistent with the terms of the COP Swap Settlement, and (c) does not treat the "rights and claims" of the COP Swap Counterparties addressed in the COP Swap Settlement less favorably than they are treated in such agreement, the Plan is a "Specified Plan".

## XI.     THE PLAN RELEASES AS THEY APPLY TO THE SWAP COUNTERPARTIES ARE LAWFUL AND APPROPRIATE

95.     As set forth above, the Plan is a "Specified Plan" as defined in the COP Swap Settlement.  The COP Swap Counterparties have agreed to vote to accept a Specified Plan and, by so voting, consent to the releases set forth in Section III.D.7.a of the Plan (which, by its terms, applies only to holders of claims that vote to accept the Plan).  To the extent that the Plan is not a Specified Plan, the releases set forth in Section III.D.7.a of the Plan will apply to the COP Swap Counterparties *only* if they nevertheless vote to accept the Plan.  In either case, the releases set forth in Section III.D.7.a of the Plan are consensual as they relate to the COP Swap Counterparties.  Moreover, regardless of whether or not the Plan is a Specified Plan, the releases set forth in Section III.D.7.b of the Plan are neither consensual nor nonconsensual as they relate to the COP Swap Counterparties. Section III.D.7.b of the Plan applies only to holders of Pension Claims and simply

does not, in any event, apply to the COP Swap Counterparties. As such, the releases set forth in Section III.D.7 of the Plan are consensual, lawful and appropriate as they relate to the COP Swap Counterparties.

## **CONCLUSION**

96.     For the reasons set forth herein, the City requests that the Court overrule the Objections and confirm the Plan.

Dated:  June 30, 2014          Respectfully submitted,


   /s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

## <u>CERTIFICATE OF SERVICE</u>

I, Heather Lennox, hereby certify that the foregoing Debtor's Supplemental Brief on Legal Issues Relating to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 30th day of June, 2014.

/s/ Heather Lennox