**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**MEMORANDUM OF OFFICIAL COMMITTEE OF RETIREES OF THE CITY OF DETROIT ADDRESSING ISSUE NOS. 4, 5, 9 & 10 FROM THE JUNE 5, 2014 COURT ORDER IDENTIFYING LEGAL ISSUES (DKT. 5235)**

The Official Committee of Retirees of the City of Detroit (the "Committee") respectfully submits this Memorandum ("Memo") to address Issue Nos. 4, 5, 9 and 10 listed in the Court's Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures, entered June 5, 2014 (Dkt. 5235) (the "Order"). The Committee believes that these four issues most directly affect Committee members, are issues on which the Committee has a unique perspective, and are issues on which the Court may benefit from additional briefing.

## Issue 4. Whether the absolute priority rule of 11 U.S.C. § 1129(b)(2)(A) is applicable to secured claims.

The authorities cited in the City's May 26, 2014 Consolidated Reply[1] represent the majority view, *i.e.* that the absolute priority rule does not apply to secured claims. This view properly reflects the statutory language and the recent trend of decisions on this issue. *See* City 5/26 Reply, ¶ 181 n.72. For the benefit of the Court, the Committee supplements those cases cited by the City with the following cases, which also support the majority position:

- *United States v. Creamer,* 195 B.R. 154, 156 (M.D. Fla. 1996) ("The absolute priority rule does not apply to secured creditors covered by subsection [1129(b)(2)](A) because it was specifically omitted from that subsection.").

- *In re Sparkle Stor-All Eaton Tp., LLC,* No. 11–30382, 2011 WL 4542709, at *5 n.4 (Bankr. N.D. Ohio, Sept. 28, 2011) (court "generally finds" absolute priority rule violation arguments to "be the province of unsecured creditors, not secured creditors").

- *In re Bashas' Inc.,* 437 B.R. 874, 928 (Bankr. D. Ariz. 2010) (rejecting the minority view and holding that the absolute priority rule does not apply to secured claims).

---

[1] Consolidated Reply To Certain Objections To Confirmation of Fourth Amended Plan For The Adjustment Of Debts Of The City Of Detroit, filed May 26, 2014 [Dkt. 5034] (the "City 5/26 Reply").

82420015\V-7

- *In re TCI 2 Holdings, LLC,* 428 B.R. 117, 168-69 (Bankr. D. N.J. 2010) ("The structure of [1129(b)(2)] supports the proposition that the absolute priority rule . . . does not apply to secured claims.").

- *In re Linda Vista Cinemas, L.L.C.,* 442 B.R. 724, 753 (Bankr. D. Ariz. 2010) (rejecting the minority view and holding that the absolute priority rule does not apply to secured claims).

- *In re New Midland Plaza Assocs.,* 247 B.R. 877, 895 (Bankr. S.D. Fla. 2000) (interpreting section 1129 and finding a "fully secured creditor . . . does not have standing to assert the absolute priority rule").

- *In re Sagewood Manor Assocs., L.P.,* 223 B.R. 756, 773 (Bankr. D. Nev. 1998) ("The legislative history makes clear that Congress intended the absolute priority rule to apply only to unsecured creditors . . . .").

- *In re Applied Safety, Inc.,* 200 B.R. 576, 588 (Bankr. E.D. Pa. 1996) ("The absolute priority rule applies to only unsecured claims.").

- *In re Paradise Springs Assocs.,* 165 B.R. 913, 920-21 (Bankr. D. Ariz. 1993) ("With no unsecured claim, MONY's confirmation arguments relative to the new value exception to the absolute priority rule are moot. MONY has no standing to raise those issues.").

**Issue 5.     Whether §§ II.B.3.a.ii. and q.ii. of the Plan[2] relating to classification satisfy 11 U.S.C. § 1123(a)(4).**

The Committee's constituency is directly affected by one aspect (Plan section II.B.3.q.ii)[3] of the above issue. The following points and authorities demonstrate any and all classifications embodied within Class 10 PFRS Pension Claims or related thereto satisfy the requirements of 11 U.S.C. § 1123(a)(4), which provides in relevant part:

> Notwithstanding any otherwise applicable non-bankruptcy law, <u>a plan shall . . . provide the same treatment for each claim</u> or interest <u>of a particular class</u>, unless the holder of a particular claim or

---

[2] "Plan" means the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, dated May 5, 2014. [Dkt. 4392.]

[3] Section II.B.3.a.ii of the Plan addresses the treatment of DWSD Bond Claims, which is not a Retiree Committee issue.

3

interest agrees to a less favorable treatment of such particular claim or interest . . . .  (Emphasis added).

A.    **Plan Treatment of PFRS Pension Claims**

Section II.B.3.q.ii. of the Plan discusses the Treatment of PFRS Pension Claims, and in general provides:

| | |
|---|---|
| **Subpart A**: | (1) contributions from 2014 to 2023 to fund benefits accrued under the Prior PFRS Pension Plan[4] will be from the State or the DIA Proceeds in amounts and years specified in Exhibit II.B.3.q.ii.A; |
| | (2) contributions after 2023 will be either from DIA Proceeds or from the City in amounts sufficient to pay each claimant her PFRS Adjusted Pension Amount; |
| **Subpart B**: | for 2014 - 2023, the assumed investment return and discount rate shall be 6.75%; |
| **Subpart C**: | for 2014 - 2023, benefits will be reduced to the extent of any DIA Proceeds Default Amount, and increased to the extent of PFRS Restoration Payments; |
| **Subpart D**: | the City will issue DWSD CVR[5] to the Restoration Trust; |
| **Subpart E**: | PFRS claimants who are active employees will accrue additional pension benefits after July 2014 as set forth in the New PFRS Active Pension Plan and New PFRS Active Pension Plan Formula; |
| **Subpart F**: | for 2014 - 2034, per the State Contribution Agreement (described in Subpart H; Plan Exhibit I.A. 268), there shall be an Investment Committee; |
| **Subpart G**: | except as required to maintain tax-qualified status, there shall be no changes to operation of the PFRS until June, 2023. |

*See also* Disclosure Statement,[6] pp. 17 - 20, 36 - 37.  [Dkt.  4391 at 32-36, 51-52.]

---

[4] Capitalized terms not defined herein have the meanings set forth in the Plan.

[5] "DWSD CVR" is defined in the Plan as "a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction."  Plan, § I.A.112.

4

The Plan also addresses the treatment of the PFRS Pension Plan and provides as follows for Alternative A of the Plan:

> If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances

*See* Plan, Art. I.A. 209(a). [Dkt. 4391-1 p. 25.]

The terms summarized above for Class 10 claims, set forth in Plan section II.B.3.q.ii, on their face do not reflect any distinctions in treatment to test against 11 U.S.C. § 1123(a)(4). Certain Plan definitions (Plan §§ I.A.162 - 165), and sections of the Disclosure Statement (pp. 25 - 26, 64 - 65), however, describe the Income Stabilization program for which PFRS pensioners are eligible, and which has been the subject of objections based on 11 U.S.C. § 1123(a)(4).

**B.      The Objection Under Section 1123(a)(4) Based on Income Stabilization Payments**

1.      The March 21, 2014 Objection.

To the Committee's knowledge, the first challenge under Code section 1123(a)(4) to the treatment of Class 10 claims was presented last March in the Retirement Systems' Objection and Brief Regarding Classification Of Retiree Pension Claims In The City's Proposed Plan of Adjustment, dated March 21, 2014 [Dkt. 3142] (the "March Systems' Objection"). The plan at issue then was the Plan Of Adjustment Of Debts, dated February 21, 2014 [Dkt. 2708], and was

---

[6] "Disclosure Statement" means the Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan For The Adjustment of Debts of the City of Detroit, dated May 5, 2014. [Dkt. 4391.]

5

still the subject of negotiations and changes. At the time, however, the City had agreed to a conceptual proposal that, going forward after a plan was effective, the majority of PFRS pensioners would lose all cost of living benefits ("COLA") and receive reduced pensions amounting to approximately 90 - 94% of their prior pension payments, which the March Systems Objection referred to as the "Standard Treatment." *See* March Systems Objection, p. 4. Certain PFRS pensioners, however, with "household income less than a threshold amount . . . tied to a percentage of federal poverty levels" could be eligible for higher pension payments going forward, which the Systems referred to as the "Enhanced Treatment." *Id.* The specific figures were still being negotiated, but the Systems argued any differential between the Standard and Enhanced treatments violated Code sections 1122(a) and 1123(a)(4). *Id.*, pp. 6 -12.

2.    The Proposed Income Stabilization Program

The current Plan contains a similar set of provisions to benefit PFRS pensioners (and beneficiaries) who face cuts in their pension payments going forward and whose household income is below or near the poverty level. Specifically, an Eligible Pensioner[7] can receive an Income Stabilization Benefit, which is a

> [B]enefit in the amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

Plan, § I.A.162; *see also* Disclosure Statement, p. 25

---

[7] In relevant part, "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 . . . ; provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future . . . ." Plan, § I.A.124; *see* Disclosure Statement, pp. 25 - 26).)

6

There is also another benefit -- an Income Stabilization Benefit Plus payment -- designed to keep Eligible Pensioners' household income at a minimum equal to 105% of the Federal Poverty Level, or keep the pension payments current with cost-of-living adjustments, whichever amount is lower. *See* Plan, § I.A.163; Disclosure Statement, p. 26.

The monies to be used in this Income Stabilization program are not from the City, but instead are governed by the State Contribution Agreement (Plan Ex.I.A.268), which provides, among other things: (a) that the monies for the program are to come primarily from the State Contribution, (b) that the Contribution is not to exceed $20 million, (c) that the State is to make the decisions on who is eligible and for what amounts of supplemental benefits, and (d) that the programs will be administered by the Systems' Investment Committees and trustees. *See* Plan Ex. I.A.268, § 3. An additional permitted source of funding for the program, stems from the dedicated UGTO Settlement proceeds. *See* Plan Section IV.D. [Dkt. 4391-1, p. 54.]

3.     The Proposed Income Stabilization Program
       Is Not Contrary to Section 1123(a)(4)

There are least four reasons the Income Stabilization Program does not contradict Section 1123(a)(4).

(1)     Income Stabilization Payments Are a Future Benefit - Not a Claim. Section 1123(a)(4) expressly applies only to a "claim" or "interest." Eligibility for Income Stabilization Payments is a proposed future benefit, not a form of distribution on a "claim" as defined in 11 U.S.C. § 101(5).[8] As such, and as noted by the City in the May 26th Consolidated Reply, there

_____

[8] Under 11 U.S.C. § 101(5) the term "claim" means --

    (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

7

is no violation of Section 1123(a)(4) because that Section is concerned with the treatment of *claims*, not *claimants*' future benefits. *See* <u>City 5/26 Reply</u>, ¶¶ 290 - 292, pp. 186 - 188 (citing *In re UNR Indus., Inc.,* 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), *rev'd on other grounds,* 173 B.R. 149 (N.D. Ill. 1994), and 7 COLLIER ON BANKRUPTCY ¶ 1123.01[4][b]).

      (2)    <u>All Holders of Class 10 PFRS Pension Claims Have the Same Opportunity</u>. All of the PFRS pensioners have the same opportunity for eligibility and benefit under the Income Stabilization program. This same opportunity satisfies the equal treatment requirement in Section 1123(a)(4).

> [C]ourts have interpreted the "same treatment" requirement to mean that all claimants in the class must have "the same opportunity" for recovery. … What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.

*In re W.R. Grace & Co.,* 729 F.3d 311, 327 (3d Cir. 2013) (citations omitted)

      Here, all PFRS pensioners "have the same opportunity" to be eligible for the Income Stabilization program, and therefore Section 1123(a)(4) is satisfied. *See In re Dow Corning Corp.,* 255 B.R. 445, 500 (E.D. Mich. 2000) ("the inquiry is whether the claim is subject to the same process in satisfying the claim as the other claims within the class"); *see also In re Dana Corp.*, 412 B.R. 53, 61, 62 (S.D.N.Y. 2008) ("'the same' does not mean identical'"; "The key inquiry under § 1123(a)(4) is . . . whether they have the same opportunity."); *In re Cent. Med. Ctr., Inc.,* 122 B.R. 568, 574-75 (Bankr. E.D. Mo. 1990) ("the Plan subjects all members of the same class to the same means of claim determination.").

---

      (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

82420015\V-7

(3)    <u>Funding From A Non-Debtor Third Party</u>.  Even if hypothetically the program *did* provide higher payments to a subset of actual claims in the same class, when the source of the additional monies is a third party pursuant to a settlement with the debtor, there is no inequality of treatment within the meaning of Section 1123(a)(4).  *In re Quigley Co., Inc.,*  377 B.R. 110, 116 - 17 (Bankr. S.D.N.Y. 2007) ("The . . . payments do not . . . affect the equality of treatment because all similarly situated . . . Claimants will receive the same distribution under the Plan. The . . . settlement is being funded by a non-debtor and is being paid outside of the Plan.")  Here, the existence of the Income Stabilization Program is a mandate of the State under its third party State Contribution Agreement.[9]  Additional partial funding for the program stems from the use of proceeds made available by the disputed secured creditor UGTO Settlement.  Both sources of funding for the Income Stabilization Program result from Mediation.  Neither source of funding stems from the City's general fund or qualifies as a City-controlled distribution of City tax revenue.

(4)    <u>Extraordinary Claims</u>.  Even if hypothetically the additional payments were for claims and exclusively from the City's funds, the courts have recognized that additional payments to a small subset of "extraordinary claims" facing particular hardships distinct from the other claims in that class do not constitute unequal treatment within the meaning of section 1123(a)(4).  *W.R. Grace & Co.,* 729 F.3d at 330 (upholding higher payments to a subset of claims that lacked the class majority's likely recoveries from other non-debtor sources).

---

[9] *See* State Contribution Agreement, Plan, Ex. I.A.268, § 3.

### C. Future Pension Benefits and Vote Combination Objections Under Section 1123(a)(4) to PFRS Pension Claims Treatment.

Two other objections to the Plan, one by the Detroit Police Officers Association (the "DPOA") and the other from an individual, Jamie Fields, cite § 1123(a)(4) as the basis for objections to Plan § II.B.3.q.11. Only brief discussion is needed for each objection.

1. DPOA Objection. [Dkt. 4938, May 19, 2014.] The DPOA argues that the future pension benefits of DPOA members are lower than future pension benefits of other public safety union members, in violation of Section 1123(a)(4), the reason for which (according to the DPOA) is because the DPOA has not settled with the City, while the other unions have settled. *See* DPOA Objection ¶¶ 21 - 37. As noted above, future benefits are not "claims" within 11 U.S.C. §§ 101(5) and 1123(a)(4), and therefore this objection should be rejected. *See* Memo pp. 7 - 8, *supra*; *see also* City 5/26 Reply, ¶¶ 290 - 292, pp. 186 - 188.

2. Jamie Fields Objections. [Dkt. 4404, 5032.] Mr. Fields filed an Objection to the Plan on May 5, 2014 [Dkt. 4404] (the "Fields Objection"), which, among other arguments, objected to the Plan's combination of the votes by Class 10 (PFRS pension) and Class 11 (GRS pension). Mr. Fields alleged the combination improperly manipulates the vote, because the PFRS claims are either unimpaired (PFRS claimants who never had COLA rights) or slightly impaired (claimants losing a portion of COLA rights), some of whom will certainly vote in favor of the Plan, thus overwhelming the GRS vote which could/should oppose the Plan due to deeper cuts and/or ASF clawbacks. *See* Fields Objection, pp. 2-3. Mr. Fields also argues that the PFRS Class 10 is improperly constituted because it includes retirees with differing economic interests, *i.e.* retirees who have no COLA and those who have a standard 2.25% annual escalator. *Id.* In his May 5th Objection, Mr. Fields cites, among other Code sections, Section 1122 (classification) and Section 1129(b) (unfair discrimination), but does not cite Section 1123(a)(4).

82420015/V-7

On May 25, 2014, Mr. Fields filed his Memorandum Identifying Issues of Law [Dkt. 5032] (the "Fields Memo"), where he makes a number of arguments regarding classifications, including the arguments from his Objection that Class 10 improperly combines unimpaired claims (never had COLA) with impaired claims (had COLA), and that the PFRS-vote-will-overwhelm-the-GRS-vote. *See* Fields Memo, pp. 4-6. Mr. Fields then cites to several cases and Section 1123(a)(4), to argue that combining the Class 10 and Class 11 votes violates the equal treatment mandate of Section 1123(a)(4). *Id.*, pp. 7-8.

While the City filed its Consolidated Reply the next day, and did not have the opportunity to address Mr. Fields' Section 1123(a)(4) argument, there are several reasons Section 1123(a)(4) is not violated by his arguments:

First, section 1123(a)(4) requires the "same treatment" for claims "of a particular class," whereas Mr. Fields' argument is based on a perceived dissimilarity between classes:  that Class 11 is prejudiced by having its vote combined with Class 10.

Second, Mr. Fields' argument assumes that the fact of separate classification of Class 10 and Class 11 must be ignored and assumes that the combined voting renders the separate classification functionally irrelevant, thereby violating the same treatment requirement under section 1123(a)(4) ("same treatment" for claims "of a particular class").

Third, Mr. Fields' issue is not a section 1123(a)(4) argument about dissimilar claim treatment within a class, but rather raises the effect of classification on Plan voting.  As such, the issue is not a legal issue that can be divorced from the facts of acceptance or rejection.

In addition, contrary to Mr. Fields' arguments, Class 10's inclusion of all PFRS pension claims despite differing COLA rights is permitted under Section 1122.

> Under § 1122 of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other

82420015\V-7

claims or interests of such class." 11 U.S.C. § 1122(a). To determine whether claims are "substantially similar," the proper focus is on "the legal character of the claim as it relates to the assets of the debtor." . . . The Bankruptcy Court has "broad discretion" to decide if a plan satisfies that requirement, and we will uphold a plan's classification scheme so long as it is "reasonable" and does not "arbitrarily designate classes."

*W.R. Grace,* 729 F.3d at 326 (citations omitted) (personal injury claims properly in same class despite differing rights to payment from third party); *see Quigley,* 377 B.R. at 116 ("Claims are similar if they have 'substantially similar rights *to the debtor's assets*'" (quoting *In re Drexel Burnham Lambert Grp., Inc.,* 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992)). Here, all PFRS pension claims have similar rights to the City's assets, and are properly classified together.

For all the above reasons, the Committee respectfully submits that any distinctions between holders claims in Class 10 are not proscribed differences in treatment or otherwise inconsistent with 11 U.S.C. § 1123(a)(4).

**Issue 9.      Whether the failure of the Plan to treat LTGO claims as senior unsecured claims violates the Bankruptcy Code, Michigan law, or a contract rights that is enforceable in bankruptcy.**

The primary challenges to the Plan's failure to treat LTGO Bond claims as senior unsecured claims have been voiced by Ambac Assurance Corporation ("AMBAC"). (Dkt. 4677). The Committee addresses this issue to advise the Court as to why the Plan's proposed treatment of pension claims, relative to LTGO claims, is proper, and violates neither Michigan law nor the Bankruptcy Code. As an initial matter, the Committee agrees with the City that under Michigan law the LTGOs are "unsecured claims based upon [alleged] contractual obligations of the City." *See* City 5/26 Reply, ¶ 151 (citing the City's Memorandum in Support of Motion to Dismiss, dated January 17, 2014 [Dkt. 83] ("City MTD"), pp. 22-33, *AMBAC Assurance Corp. v. The City of Detroit, et al.*, Adv. Pro. No. 13-05310 (Bankr. E.D.Mich. Nov.

82420015/V-7

8, 2013)). In contrast to bond obligations, which may, notwithstanding the Michigan Contract Clause,[10] be impaired under a balancing test,[11] no Michigan State court decision has *ever* held that pension obligations protected by the Pension Clause of the Michigan Constitution[12] may be impaired, either inside or outside of Chapter 9 proceedings. The Committee invites the Bankruptcy Court to reconsider its prior ruling on the Committee's Tenth Amendment argument made in the Eligibility Determination.[13] However, even if the Court does not, the Plan's

---

[10] Article 1, section 10 of the Michigan Constitution provides in part that "[n]o . . . law impairing the obligation of contract shall be enacted."

[11] *See, e.g.*, *AFT Michigan v. State of Michigan*, Case No. 313960, 2014 Mich. App. LEXIS 69 (Mich. App. Jan. 14, 2014) (explaining three-step analysis to determine whether a state action violates the Michigan Contract Clause, but not identifying any comparable balancing test for violations of the Pension Clause).

[12] Article 9, section 24 of the Michigan Constitution provides in part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."

[13] This Court is aware that the Committee and other creditors have appealed [Dkt. 2268] the Court's Eligibility Determination [Dkt. Nos. 1945, 1946] on this point. As the Committee argued to this Court, the Committee is arguing on appeal to the United States Court of Appeals for the Sixth Circuit that any impairment of pension benefits by the Bankruptcy Court would impermissibly encroach on the rights and functions of Michigan as a sovereign state and is prohibited by the Tenth Amendment. *See* Brief of the Official Committee of Retirees of the City of Detroit, Case No. 14-1209, Dkt. No. 27, pp. 19-48 (6th Cir. 2014) ("App. Br."); *see also* Reply Brief of the Official Committee of Retirees of the City of Detroit, Case No. 14-1209, Dkt. No. 46, at 1-22 (6th Cir. 2014). As the United States Supreme Court has recognized, one core aspect of a state's sovereignty is the right to retain control of its fiscal affairs. *See* App. Br. (citing *United States v. Bekins*, 304 U.S. 27, 51 (1938); *Ashton v. Cameron Cty. Water Imp. Dist. No. 1*, 298 U.S. 513, 528-32 (1936)). The Tenth Amendment protects the sovereign states' rights to control their fiscal affairs in bankruptcy, and the power of a bankruptcy court to impair such rights only extends to matters "normally within [the] province" of the bankruptcy court. *Id.* (*citing Bekins*, 304 U.S. at 51). This power extends to the adjustment of ordinary contractual debt, such as municipal bond debt, which, as noted above, is a contractual obligation that may be impaired consistent with Michigan law. *Id.*, pp. 19-31. However, it does not extend to the impairment of accrued pension benefits protected by the Pension Clause, since such an imposition upon the management and control of Michigan fiscal affairs goes to the core of state sovereignty, is not a matter on which the bankruptcy court is "normally" requested to act, and is impermissible under Michigan law. *Id.*, pp. 40-48.

13

treatment of the LTGO claims, relative to the pension claims, is fully appropriate and in accordance with Michigan law and the Bankruptcy Code.

## A. The RMFA Cannot Be Interpreted, Consistent with the Michigan Constitution, to Give Priority to LTGO Claims with the Effect of Impairing Pension Claims.

The Michigan Constitution prohibits accrued pension benefits from being "diminished or impaired." MICH CONST., ART. IV, § 24. Holders of LTGOs are, under Michigan law, general unsecured creditors who are not entitled to any priority of payment. Memo, pp. 14-15, *infra*. As a matter of Michigan law, the rights of holders of pension claims are clearly superior to holders of LTGO claims.

Assuming, *arguendo*, however that the Revised Municipal Finance Act, Mich. Comp. Laws Ann. § 141.2101 *et seq*. ("RMFA"), pursuant to which the LTGOs were issued, were construed to create a priority in favor of holders of LTGO claims, the RMFA would be unconstitutional as a matter of Michigan law. A priority favoring payment of LTGO claims over pension claims would effectuate an impairment of pension obligations in direct violation of the Pension Clause. It is a hornbook proposition of Michigan law that Courts thus "will presume that all legislation is constitutional and will attempt to construe legislation so as to preserve its constitutionality." *People v. Neumayer*, 275 N.W.2d 230, 237 (Mich. 1979). Therefore, the LTGO statute cannot be interpreted so as to permit the payment of LTGO claims ahead of pension claims.

## B. Under Michigan Law the LTGO Claim Holders are General Unsecured Creditors Who are Not Entitled to Priority Status.

The LTGOs, which were issued pursuant to the RMFA, are, under Michigan law, contractual obligations that are not secured by statutory or contractual liens. *See* City MTD, p. 22-33. The City has noted that LTGOs are general obligations of the City and are payable from

82420015\V-7

the City's General Fund.  *See* City 5/26 Reply, ¶ 143.  There is no segregated account for the benefit of LTGOs.  *Id*.  Also, the RMFA does not provide for any remedies normally appurtenant to liens, such as a cash trapping mechanism or other element of control.  *See* City MTD, p. 30.

AMBAC notably does not cite to any case law supporting the proposition that the RMFA created a lien in favor of LTGO holders.  Further, AMBAC's statement that the RMFA provisions referenced above are "statutory controls" that serve as the "functional equivalent" to a lien, *see* AMBAC Objection, at 10-11, is an acknowledgement that LTGO holders do not in fact hold a lien.  In contrast, the Michigan statute authorizing the issuance of water and sewer bonds, Act 94, MCL 141.101 et seq., contains a specific authorization provision stating that "[t]he governing body in the ordinance authorizing the bonds … may pledge any funds ... and create a statutory first lien in favor of the holders of the bonds or a party subject to the agreement."  MCL §141.107(4) (emphasis added).

In short, under Michigan law, the LTGO claims are not entitled to "senior" or "priority" status.  And, as demonstrated below, the fact that the Plan proposes to provide the pension claimants with a greater relative recovery than the LTGO claims does not in any way violate the Bankruptcy Code.

### C.  The Respective Treatment of the LTGO Claim Holders and the Pension Claim Holders Satisfies 1129(b)(1).

1.  The Plan's Proposed Treatment of Pension Claims Does Not Discriminate Unfairly Against the LTGO Bond Claim Holders.

Section 1129(b)(1) prohibits confirmation of a plan of adjustment that "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan."  11 U.S.C. § 901 (incorporating 11 U.S.C. § 1129(b)(1)).  AMBAC argues, *inter alia*, that the disparity between the projected Plan payments on LTGO Bond claims versus those on pension claims amount to unfair discrimination

15

under the Bankruptcy Code. *See* AMBAC Objection, pp. 19-23, 44-48. Under the commonly applied *Aztec*[14] test, one factor in determining whether disparate treatment constitutes "unfair discrimination" is whether the discrimination is supported by a "reasonable basis." *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989). The Committee writes to demonstrate that there are at least two reasonable bases for the preferential treatment of pension claims over LTGO claims, and that this Court may confirm the Plan if Class 7 rejects the Plan.

One "reasonable basis" to discriminate in favor of the holders of pension claims is the express sovereign will of Michigan legislature and citizenry, enshrined in the Pension Clause, that pension obligations should be provided with preferential treatment over contractual obligations. As noted above, in its challenge to the City's eligibility to be a Chapter 9 debtor, the Committee argued that accrued pension benefits cannot, consistent with the Tenth Amendment, be impaired by this Court as a result of the Pension Clause. However, this Court need not agree with the Committee that the Pension Clause, as a matter of law, prohibits any impairment or diminishment of accrued pension benefits in this Chapter 9 proceeding to conclude that, as reflected in the Pension Clause, accrued pension benefits have, and are entitled to, special status under Michigan law. This alone provides a "reasonable basis" on which to treat accrued pension benefit claims differently. The Court appeared to implicitly recognize this special status in the Eligibility Determination, in which the Court admonished that it would "not necessarily confirm any plan of adjustment that impairs pensions" and "will not lightly or casually exercise the

_____

[14] Under the *Aztec* test, a bankruptcy court considers: "(1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate the plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against." *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989). As the City notes, there do not appear to be any published chapter 9 opinions applying the *Markell* "rebuttable presumption test," *see* City 5/26 Reply, ¶ 86 (citing *In re Dow Corning Corp.*, 244 B.R. 696, 702 (E.D. Mich. 1999)), and therefore the Committee does not address the application of the test here.

82420015\V-7

power under federal bankruptcy law to impair pensions." *In re City of Detroit, Mich.*, 504 B.R. 97, 154 (Bankr. E.D.Mich. 2013). The Court further noted that section 943(b) "demand[s] this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan." *Id.*

A second "reasonable basis" for the treatment is the need for the City to honor its past commitments to its workers to ensure that the City's workforce will be sufficiently motivated and inspired to provide the necessary services that will help the City effectuate its Plan. To this extent, the proposed treatment of pension claims is vitally necessary to ensure the Plan's feasibility. Honoring, to the extent feasible, past pension commitments will motivate existing employees to remain and facilitate the hiring of new employees with the skills necessary to implement the Plan. Treating accrued pension benefits as mere unsecured claims, by contrast, would send the message that the City does not care about the men and women who over time have given of themselves to make it run -- a clear disincentive to anyone even considering employment with Detroit as it begins the revitalization envisioned by the Plan.

Courts have routinely recognized on this basis that differential treatment of claims by municipal workers does not constitute unfair discrimination. *In re U.S. Truck Co.*, 47 B.R. 932, 939 (D. Mich. 1985), *aff'd In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir. 1986); *In re Chateaugay Corp.*, 89 F.3d 942 (2d Cir. 1995); *In re Kliegl Bros. Universal Elec. Stage Lighting*, 149 B.R. 306 (Bankr. E.D.N.Y. 1992). In *Chateaugay*, the court held that the plan's failure to impair holders of unpaid workers compensation claims and its impairment of a surety's subrogation claims on such payments was not discriminatory. 89 F.3d at 950-51. The Court found that the differential was justified in part because employees considered workers compensation benefits to be an entitlement under state law and that the failure to make such

82420015\V-7

payments would cause employees to "react so negatively as to jeopardize peaceful labor relations and thereby cast into doubt LTV's ability to secure sales contracts from customers." *Id*. at 949.

In *Kliegl*, the bankruptcy court found under the four-factor *Aztec* test that the separate classification of trade union claims from general unsecured claims and the plan proposal to pay 75% on behalf of trade union claims and 15% on behalf of general unsecured claims did not discriminate unfairly against holders of general unsecured claims. *Kliegl*, at 309. The court found that "a reasonable basis" for the disparate treatment existed because "the Debtor's ability to continue to operate a union shop [wa]s absolutely critical to its ability to function successfully in its industry" and to "insur[e] its continued ability to compete for and get access to work in its industry." *Id.* Finally, in *In re U.S. Truck*, the District Court upheld the bankruptcy court's approval of the separate classification of a collective bargaining rejection damages claim and stated that "[u]nlike other creditors who will get paid off and go away the employees of U.S. Truck have a continuity of interest in the ongoing business." 47 B.R. at 937. In affirming the District Court, the Sixth Circuit recognized the "virtually unique interest" of union employees. *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 587 (6th Cir. 1986).

The rationale of these precedents applies with full force here. For the Plan to succeed, the City needs to retain and motivate its existing workforce and attract new workers -- in the City's hour of need, it is asking them to make an investment in Detroit. As Detroit's Chief of Police has acknowledged,[15] the prospect of Detroit's treating its pensioners like any other unsecured creditor, without recognizing the special status of pension claims and the sacrifices made by the individual men and women behind them, as was put forth in the City's June 14 Proposal, wreaked havoc with morale. The City has now recognized that its treatment of

---

[15] Testimony of Chief James Craig, Eligibility Trial Transcript, 10/25/13, Final Transcript (Dkt. 1501, pp. 208: 22-24; 215: 13-22).

82420015\V-7

pensioners in the Plan has ramifications beyond the bare payment of the pension claims themselves and speaks to underlying relationship between the City and its workforce both now and in the future. Thus, the fact that, as a percentage of claims, under the Plan the LTGO claimants will recover less than the pensions claimants is fully appropriate under the Bankruptcy Code.

2.  The Proposed Treatment is Fair and Equitable to the LTGO Claim Holders.

AMBAC objects that the Plan fails to satisfy the 1129(b) fair and equitable requirement with respect to LTGO claims because the Plan provides for payment to allegedly junior creditors, before the LTGO claims are paid in full, in violation of the absolute priority rule. *See* AMBAC Objection, at 37-40. AMBAC further objects that at a minimum, the fair and equitable test requires that holders of LTGO claims be treated "materially better" than junior creditors because the Plan fails to take into account the "state law rights and interest" of LTGO claim holders. *Id.* at 40-44. Neither of these arguments withstands scrutiny.

First, as demonstrated above, as a matter of Michigan law, the LTGO claims are general unsecured claims. *See* Memo, pp. 14-15 *supra*. Section 1129(b)(2)(B)(i) of the Bankruptcy Code, which sets forth the absolute priority rule for unsecured claims, provides in relevant part that a plan is fair and equitable with respect a class of such claims if it provides that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." 11 U.S.C. § 1129(b)(2)(B)(i). Even assuming, *arguendo*, that AMBAC's claims were entitled to senior status under Michigan law, which they are not, the absolute priority rule is irrelevant -- it does not apply in Chapter 9 because there is no class of equity interests junior to unsecured creditors. *See In re Corcoran Hosp. Dist.*, 233 B.R. 449, 458 (Bankr. E.D.Ca. 1999) (holding that the proposed

82420015\V-7

chapter 9 plan did not implicate the absolute priority rule because there were no holders of equity interests in the debtor hospital).

AMBAC's second argument that the Plan fails to meet the fair and equitable requirement, because it does not take into account the LTGO holders state law rights, also fails. Assuming, *arguendo*, that any alleged state law "structural seniority" must be recognized in the Plan, AMBAC, which holds general unsecured claims, has failed to demonstrate any such seniority as matter of Michigan law.[16] In any event, as discussed above, outside of Chapter 9 is it likely that LTGO claim holders would be at a distinct *disadvantage* with respect to holders of pension claims. If the Chapter 9 case were dismissed, retirees would seek declaratory and injunctive relief in the state courts to protect their sacrosanct rights under the Pension Clause, which no Michigan state court has ever held can be impaired. Certain plan trustees and retiree representatives have already obtained such relief in the Michigan state courts. *See General Ret. Sys. v. Orr*, No. 13-768-CZ (Ingham Cty. Cir. Ct. July 17, 2013), *Flowers v. Snyder*, No. 13-729-CZ (Ingham Cty. Cir. Ct. July 8, 2013), *Webster v. State*, No. 13-734-CZ (Ingham Cty. Cir. Ct. July 3, 2013).

---

[16] Furthermore, assuming, *arguendo*, to the contrary that section 507 of the Bankruptcy Code preempts Michigan statutory priorities for LTGO claims, *see* City 5/26 Reply, pp. 95-99, no such preemption applies to accrued pension benefits. "When Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute. This principle applies when Congress intends to pre-empt the historic powers of the States or when it legislates in traditionally sensitive areas that affect the federal balance. *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543-44 (2002) (internal citations and quotations omitted). There is no indication, let alone a "clear statement," that, in enacting chapter 9, Congress intended to allow bankruptcy courts to effectively override provisions of state Constitutions that pertain to state fiscal affairs. Quite the contrary. As the *Bekins* Court observed of the current chapter 9's predecessor, "[t]he statute is carefully drawn so as to not impinge upon the sovereignty of the State." 304 U.S. at 51.

82420015/V-7

In short, none of AMBAC's alleged bases for arguing that the Plan violates any provision of the Bankruptcy Code vis-à-vis the holders of pension claims has any merit, and the Plan should be confirmed.

## Issue 10. Whether Macomb, Oakland and Wayne Counties have standing to object to the Plan.

In the December 20, 2013 Opinion Regarding Eligibility, this Court provided the following summary of several principles of standing relevant here:

> As a rule, a party must have a personal stake in the outcome of the controversy to satisfy Article III. . . .
>
> In a bankruptcy case, the standing of a party requesting to be heard turns on whether the party is a party in interest. . . . A party in interest is one who has a sufficient stake in the proceeding so as to require representation. . . .
>
> 11 U.S.C. § 1109(b), provides, [a] party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter. 11 U.S.C. § 901(a) makes this provision applicable in a chapter 9 case.

Opinion Regarding Eligibility at 55, 504 B.R. 191, 233-34 (citations and quotations omitted). In *In re Addison Cty. Hosp. Auth.,* this Court made the following observations for applying the principles on standing in chapter 9 cases:

> This Court should not be so liberal in granting applications to be heard as to overburden the debt adjustment process. . . . Where a party is merely interested in the outcome of the matter and does not have a direct legal interest in the chapter 9 proceeding, that party is not a "party in interest." . . . By allowing a large number of non-creditors to be heard in this action, the Court would be granting a blanket invitation to all parties in the area serviced by [there, the inter-municipal hospital authority]. This would hamper, and unduly delay, the debt adjustment process.

175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) (creditors had standing to be heard, but not taxpayer group members). Finally, "[t]he burden to establish standing remains with the party claiming that standing exists." *In re Than*, 215 B.R. 430, 434 (9th Cir. B.A.P. 1997). "Speculative or

82420015\V-7

hypothetical claims are insufficient to establish standing." *In re Citation Corp.*, 371 B.R. 518, 522 (N.D. Ala. 2007) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–106 (1983)). Even when an entity does have creditor status, that creditor must establish that its objection derives from a direct legal interest of that party as creditor. *In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) ("[A]lthough a party in interest may object to confirmation of a plan …. it cannot challenge portions of the plan that do not affect its direct interests.") (internal quotations and citation omitted). "To have standing to invoke a statute you must be one of the persons whom the statute is intended to protect." *Matter of James Wilson Assocs.*, 965 F.2d 160, 168 (7th Cir. 1992).

While Macomb, Wayne and Oakland Counties are parties in interest with standing to object to the plan for certain purposes,[17] their standing is limited to objections that derive from their respective direct legal interests. Macomb, Oakland and Wayne Counties fail to meet their burden of showing that they have standing to object to numerous issues.

The entire premise of all the Counties' objections based upon future rate increases, which are the bulk of their objections, is speculative--the unsubstantiated notion that DWSD's payment

---

[17] Macomb and Wayne Counties have each filed proofs of claim, and are thus each potential creditors of the City. The City has objected to the Macomb proof of claim, and the Committee has joined in the opposition to the Macomb request to estimate its claim for voting purposes. [Dkt. 5315.]

Moreover, Wayne County also alleges that it is a party with the City of Detroit to a certain wastewater contract with the City of Detroit, last amended June 13, 1982, as well as other agreements by which DWSD provides Wayne County and its residents with water and sewage services. [Dkt. 4663 at ¶ 2.]

Similarly, Oakland County alleges it "is a party to several contracts with the City pursuant to which the City, through the DWSD, provides water and sewer services for and on behalf of, Oakland County." [Dkt. 4627 at ¶ 12.]

Macomb alleges that it is an intended third party beneficiary of a wastewater disposal contract between the Oakland-Macomb Interceptor Drain Drainage District and the City, dated October 22, 2009. However, Macomb County does not allege that it contracts with the City for water supply services. [Dkt. 4636 at ¶¶ 1, 3.]

82420015\V-7

of $428.5 million to satisfy its accrued pension liability will cause injury in the form of an unlawful rate increase. The Counties point to nothing in their objections to substantiate such assumption that any rate increase would be unlawful. Likewise, their assertion of injury from a "Qualifying DWSD Transaction" in connection with the DWSD CVR is total speculation and hence not a basis for standing to attack the Plan provisions relating thereto.

Moreover, none of the Counties show how they might have standing to object on the basis of (i) section 7-1203 of the Charter of the City of Detroit or (ii) the DWSD by-laws, as none allege that either City Charter or By-law provisions are intended for their benefit or protection. [Dkt. 4636, pp. 12, 16-18; Dkt. 4627 at ¶¶ 60-62.] Further, Macomb County does not have standing to object on the basis of MCL 123.141(2) -- which it asserts as the basis for one of its principal objections [Dkt. 4636 at ¶¶ 19, 21, 24] -- since that statute deals only with water rates and Macomb County is not a DWSD water customer.

Finally, the Counties fail to demonstrate their standing to object to third-party releases or the exculpation provisions of the Plan. None of the Counties point to any cause of action in which they have a direct legal interest against a third party that is being released or exculpated by the Plan.

In short, the Counties are limited to standing based on their direct legal interests. At most, the Counties may challenge plan feasibility,[18] contract-assumption issues and electoral approval requirements.[19]

_____

[18] By its own admission, Wayne County "has primarily objected to the Plan on 'feasibility' grounds." [Dkt. 5627, p. 2.]

[19] If Macomb County is part of a dissenting class and its claim, which has been objected to, is not disallowed, they may have standing to pursue its unfair discrimination objection. [Dkt. 4636 at ¶¶ 40-42.]

82420015\V-7

Dated:   June 30, 2014

Respectfully submitted,

By: */s/ Sam Alberts* _____

Claude Montgomery
Carole Neville
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel:     (212) 768-6700
Fax:     (212) 768-6800
claude.montgomery@dentons.com
carole.neville@dentons.com

Sam Alberts
Dan Barnowski
DENTONS US LLP
1301 K Street, NW, Suite 600 East Tower
Washington, DC 20005
Tel: (202) 408-6400
Fax: (202) 408-6399
sam.alberts@dentons.com
dan.barnowski@dentons.com

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct:  (248) 971-1711
Cell:  (248) 882-8496
Fax:  (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

82420015\V-7

**CERTIFICATE OF SERVICE**

I, Sam Alberts, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on June 30, 2014.

By:    _/s/ Sam Alberts_____
          Sam Alberts