UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re                                                  Chapter 9

CITY OF DETROIT, MICHIGAN,            Case No. 13-53846

                 Debtor.                      Hon. Steven W. Rhodes

_____/

## JOHN P. QUINN'S OBJECTIONS TO
## FOURTH AMENDED PLAN OF ADJUSTMENT

1.     I am a General Retirement System ("GRS") retiree, a member of Class 11, affected by the Annuity Savings Fund Recoupment ("ASFR").

2.     I object to the Fourth Amendment Plan of Adjustment (Doc. 4392, 5/5/14) ("Plan") on the grounds that: (a) by attempting to impose the ASFR on claims whose holders do not individually agree to its application to their claims, the Plan imposes non-consensual less favorable treatment on those claims than on other claims in the Class 11 in violation of 11 U.S.C. §1123(a)(4); and (b) the Plan attempts to adjust GRS's liability on the claims of retirees in violation of 11 U.S.C. §941. The grounds for these objections are explained in more detail below.

3.     The Plan should not be confirmed unless it is modified with reference to Class 11 to apply the ASFR only to the particular claims in the class, if any, whose holders agree to permit its application to their claims.

     A.     Applying the ASFR to a claim in Class 11 whose holder does not agree to less favorable treatment of her claim would violate 11 U.S.C. §1123(a)(4).

11 U.S.C. §1123(a)(4) requires that the Plan "provide the same treatment for

each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest".[1] This requirement can be difficult to apply to claims that are unliquidated or when the Plan establishes post-confirmation procedures for determining the amount to be paid to each claimant; so it is not surprising that almost all published cases construing §1123(a)(4) arise in those contexts.[2] However, the claims of Class 11 claimants are easily and precisely liquidated by the application of mortality tables and a discount rate to each claimant's particular circumstances (ages of claimant and beneficiary, if any; amount of pension; *etc.*); and the Plan sets forth rules and algorithms for precise calculation of each claimant's future pension benefits without making use of any post-confirmation procedures.[3] Here the application of §1123(a)(4) is straightforward.

It is a "fundamental and long recognized principle" that members of the same class should receive the same percentage distribution.[4] "Even though neither the Code

---

[1] §1123(a)(4) applies in this case. 11 U.S.C. §901.

[2] See, *e.g., In re W.R. Grace & Co.*, 729 F.3d 311, text accompanying notes 22 to but not including 26 (3rd Cir. 2013), and cases cited therein. It bears noting that, even in these circumstances, the Sixth Circuit appears to give §1123(a)(4)'s requirement of the same treatment a stricter reading than other circuits. *In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002), cited in *Grace*.

[3] Plan at 2 - 3, 8, 12, 13, 22 (PACER pages 9 - 10, 15, 19, 20, 29) (definitions 16 - 22, 89, 154, 156, 268); 33 - 35 (PACER pages 40 - 42). See also the exhibits cited in the cited Plan provisions.

[4] 5 Collier on Bankruptcy p. 1123.01 n. 10 (L.King ed.1985); see also *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941) ("[T]he theme of the Bank-ruptcy Act is equality of distribution") (Douglas, J., for a unanimous Court); *Moore v. Bay*, 284 U.S. 4, 5 (1931) (Holmes, J., for a unanimous Court). I have found one case in which a bankruptcy judge seems to claim that the Second Circuit recognizes a

nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that Sec. 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."[5] That is precisely what the Plan does by applying the ASFR, in varying percentages, to some but not all claims in Class 11. Under the Plan, if it is confirmed and if the Grand Bargain is fully implemented, each claim for monthly pension benefits will reduced by 4.5% and COLA will not apply to the reduced pension. For many (probably most) class claims, those are the only reductions to monthly pension benefits. However, class claims affected by the ASFR will suffer an additional proportional reduction in monthly pension payments. For some claims, including mine, the additional reduction will be as much as 15.5%. Moreover, while the base reduction of 4.5% may, if certain conditions are met, be reduced or eliminated, the ASFR reduction will continue for the lives of the claimant and any beneficiary.[6] If the

---

vague exception to this "fundamental and long recognized principle": "The Second Circuit has approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate consideration. See *In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 918-919, aff'd, 960 F.2d 285 (2d Cir.1992)." *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr.S.D.N.Y.1998). However, a look at the cited district- and circuit-court decisions in *Drexel Burnham Lambert* discloses that the Second Circuit has done no such thing. Moreover, neither *Hibbard Brown* nor *Drexel Burnham Lambert* involved confirmation of a plan or application of §1123(a)(4).

[5] *In re AOV Industries, Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986). The *AOV* majority went on to hold that requiring unequal consideration for the same proportional distribution within a class also necessarily violates §1123(a)(4). That holding has proved controversial. See *In re Dow Corning Corp.*, 255 B.R. 445, 497-98 (E.D.Mich. 2000), aff'd in part and remanded in part, 280 F.3d 648 (6th Cir.2002). However, the underlying principle, that payment of different percentage settlements to co-class members with liquidated claims violates §1123(a)(4), is uncontroversial.

[6] A recent press release indicates that members of Class 11 affected by the

3

Grand Bargain falls through, all claims of Class 11 will incur larger reductions in the pensions, but it will remain true that the reductions imposed on claims affected by the ASFR will be much greater than those imposed on other class claims; indeed, the pensions of some ASFR claimants may be wiped out entirely.[7]

The Plan clearly does not "provide the same treatment for each claim or interest of" Class 11. Instead, it prescribes much less favorable treatment to claims held by class members affected by the ASFR. Under §1123(a)(4), no member of Class 11 who is affected by the ASFR can be required to accept this less favorable treatment. Rather, the ASFR can be applied only to the claims of those particular class members, if any, who agree to accept less favorable treatment.

The City attempts to justify imposition of the ASFR on some claims in Class 11 by recounting an alleged history of excessive interest allocations by GRS to the Annuity Saving Fund that unfairly benefitted the holders of those claims.[8] However, §1123(a)(4) makes no exception allowing differential treatment for which the debtor can articulate, or even prove, some justification: its prohibition of non-consensual less favorable treatment is absolute. If the alleged excessive allocations actually occurred and can

---

ASFR may be offered a limited opportunity to pay off the ASFR in a lump sum. This does not change the analysis. It makes no difference for retirees who cannot raise the funds for the lump-sum payoff. For those who can and do, their agreement to make the payoff will almost certainly constitute agreement to the less favorable treatment, making less favorable treatment permissible in their individual cases.

[7] See the Plan provisions cited in note 3, *supra*.

[8] Fourth Amended Disclosure Statement (Doc. 4391, 5/5/14), at 106 (PACER page 120).

serve as justification for penalizing the affected class members, then presumably someone (Perhaps GRS?) has a claim for unjust enrichment against those favored by the allocations, assuming all the elements[9] of such a claim can be made out and all defenses[10] overcome. If that is the case, then whoever has such a claim is free to prosecute it. But §1123(a)(4) tells us the Plan cannot be used as a shortcut to skip the niceties of pleading and proof and simply take the money from the putative defendants to give it to the presumed victim(s).

Moreover, according to the City the claimants affected by the ASFR are not the only members of Class 11 who have benefitted from GRS's alleged misallocation of funds. The City says the recipients of "thirteenth checks" have been similarly unfairly enriched.[11] Yet the Plan makes no provision for special reduction in the claims of thirteenth-check recipients. Thus, even if §1123(a)(4) permitted discrimination among class claims when it can somehow be justified, imposing extra reductions on the claims of class members affected by the ASFR but not on the claims of recipients of thirteenth checks would still violate the statute because the Plan fails to provide the same treatment for the claims of class members affected by the ASFR and the claims of members who received thirteenth checks.

---

[9] See *Bellevue Ventures, Inc. v. Morang-Kelly Investments, Inc.*, 302 Mich. App. 59, 64 (2013).

[10] As to allocations made more than six years ago, the statute of limitations provides an obvious defense. Mich.C.L. §600.5813.

[11] Fourth Amended Disclosure Statement, *supra*.

B.  Because the Plan prescribes less favorable treatment for the claims of members of Class 11 affected by the ASFR but fails to specify whether a vote by such a class member to accept the Plan constitutes or implies agreement to the less favorable treatment, there is a serious danger that the voting by Class 11 on the Plan will be corrupted by vote-buying, will fail to reflect the true intentions of class members, and may cause an unintended rejection of the Plan.

   (1)  Permitting non-consensual, unequal treatment within Class 11 would enable the City to use money taken from class members affected by the ASFR to buy the votes of class members who are untouched by the ASFR.

Perhaps the greatest evil flowing from unequal treatment of creditors within a class is the opportunity it provides the plan proponent to use funds withheld from the disfavored class members to buy the votes of those who benefit from the discrimination.[12] The resources available to pay Class 11 claims are finite. By redirecting some of those resources from the claims of class members affected by the ASFR to others who are unaffected or minimally affected, the City has provided those who benefit from the unequal treatment a much stronger incentive to accept the plan than it could without the ASFR. Fortunately, by including §1123(a)(4) in the Code, Congress has removed the opportunity for such chicanery. Because of that provision, no class member can be compelled to contribute part of her pension claim to help buy the votes of other class members.

   (2)  A vote to accept the Plan cast by a Class 11 creditor for whom the Plan provides less favorable treatment should not be held to constitute or imply agreement to the less favorable treatment for purposes of §1123(a)(4).

Does a vote to accept a plan of adjustment cast by a creditor, for whose claim

---

[12] See *In re Quigley Co.*, 377 B.R. 110, 119 (Bkrtcy.S.D.N.Y. 2007).

the plan prescribes less favorable treatment than other claims in her class, imply that creditor's agreement to the less favorable treatment for purposes of §1123(a)(4)? So far as my research discloses, this is a question of first impression. At least on the facts of this case, the better rule is that such a vote does not constitute or imply agreement to less favorable treatment.

A very large portion of Class 11 (no doubt including many class members affected by the ASFR) consists of financially vulnerable persons who lack the resources to retain counsel in this matter and also lack the training and experience that would enable them to find out for themselves about §1123(a)(4) and its impact on this case. The City, GRS, the Retiree Committee, the Detroit Retired City Employees Association and a host of pundits and political and civic leaders continue aggressively to solicit class members to vote to accept the Plan. However, so far as I have observed (and I have been watching and listening closely) no one has bothered publicly to inform class members even of the existence of §1123(a)(4), much less of its impact on the claims of many members of Class 11. In these circumstances, treating a vote to accept the Plan as agreement to accept less favorable treatment would be a cruel deceit. It would mean that many members of the class who respond positively and trustingly to the urgings of their leaders to do the right thing and vote to accept the Plan would thereby unknowingly give away an important right each of them has as an individual: the right to withhold agreement to less favorable treatment. Their sense of betrayal can only be heightened by the knowledge that their less cooperative fellows affected by the ASFR will suffer no penalty for their recalcitrance and will indeed enjoy smaller

7

reductions in their pensions than those who will have voted to accept.

> (3) A rational class member affected by the ASFR who knows of her individual right to withhold agreement to less favorable treatment has a strong incentive to vote to reject of the Plan even if she concludes that is should be accepted and that acceptance is in her own interest.

As I write this, the outcome of the voting on the Plan remains uncertain. If it turns out that Class 11 rejects the Plan, that rejection may be the result of a perverse incentive structure that makes it imprudent for a class member affected by the ASFR to vote to accept the Plan even if she believes that the Plan should be accepted by the class and that acceptance of the Plan would be in her interest and in the interest of her beneficiary, if she has one.

My own situation serves as a useful example. I am informed in the materials accompanying my ballot that the total estimated amount of my ASFR will have a present value of $89,894.47 if the Grand Bargain works and $94,426.22 if it does not. Either way, the cost of agreement to less favorable treatment is very high. Nonetheless, I have concluded that Class 11 should accept the Plan, both because acceptance is in my interest and my beneficiary's and because it would be good for the City and the region. Still, it would be imprudent for me to vote to accept. It is extremely unlikely that the vote will be so close that my vote will be determinative. If my vote to accept is interpreted as agreement to less favorable treatment, my beneficiary and I will incur a large financial cost while very probably providing no benefit to anyone, since my vote almost surely will not change the outcome.

The fact that I am thus perversely incentivized not to vote to accept the Plan is of

little consequence since, as noted, my vote is unlikely to determine the outcome. But I am not the only GRS retiree in this position. If enough similarly situated class members vote to reject the Plan, our votes could result in the class rejecting of the Plan even if all of us would prefer that it be accepted. Thus, the possibility that a vote to accept the Plan might be interpreted as agreement to less favorable treatment may result in the class rejecting the Plan even if most class members, with claims valued at more than two-thirds of all class claims, want the class to accept the Plan.

I intend to act prudently and either abstain or vote to reject the Plan. In the unlikely event that my vote or failure to vote tips the balance and results in the class rejecting the Plan, I will not object to my vote or abstention being treated to a vote to accept, provided that vote to accept is held not to constitute, imply or otherwise result in my agreement to less favorable treatment for purposes of §1123(a)(4).

4. The Plan should not be confirmed unless it is modified to adjust only the City's liability on the claims of retirees, not GRS's liability on those claims.

A. The Plan must adjust the City's debts, that is, its liability on claims, not the liabilities of any other party.

The City has filed the Plan pursuant to 11 U.S.C. §941, which requires that "[t]he debtor shall file a plan for the adjustment of the debtor's debts." The debtor is the "... municipality concerning which a case under [Title XI, U.S.C.] has been commenced,"[13] in this case, the City of Detroit. A debt of the City is its liability on a claim.[14] If the City

---

[13] 11 U.S.C. §101(13), made applicable in this case by 11 U.S.C. §103(f).

[14] 11 U.S.C. §101(12), made applicable in this case by 11 U.S.C. §103(f).

13-53846-tjt    Doc 5723    Filed 07/01/14    Entered 07/01/14 15:16:06    Page 9 of 16

and another party are both liable on a claim, only the City's liability, not the other party's, is a debtor's debt for purposes of §941.

Application of the maxim "*Inclusio unius est exclusio alterius*,"[15] to §941 makes its requirement of a plan of adjustment different from the analogous requirement in Chapter 11 in two important respects. First, no one but the debtor may file a Chapter 9 plan of adjustment.[16] Second, and of particular concern here, the plan of adjustment can adjust only the debtor's debts, not anyone else's debts. There is no such explicit limitation on which debts can be adjusted in a Chapter 11 plan of adjustment. Thus, in a Chapter 11 case, the provision in §1123(b)(6) that the plan of adjustment may "include any other appropriate provision not inconsistent with the applicable provisions of this title" can, in unusual circumstances, permit adjustment of the debts of someone other than the debtor, because §941 is not an "applicable provision" in a Chapter 11 case.[17] However, even though §1123(b)(6) applies to a Chapter 9 case,[18] it does not permit adjustment of a debt of someone other than the debtor in such a case because that would be "inconsistent with [an] applicable [provision] of this title," namely §941.

---

[15] Cf. *In re Hyatt*, 479 B.R. 880, 897 (Bkrtcy.D.N.M., 2012), (maxim invoked to interpret 11 U.S.C. §1112(b)(4); 14. *In re Mu'Min*, 374 B.R. 149, 374 B.R. 149, 169, nt. 36 (Bkrtcy.E.D.Pa. 2007) (interpreting 11 U.S.C. §362(k)).

[16] *In re City of Stockton*, 478 B.R. 8, 20 (Bkrtcy.E.D.Cal., 2012). Compare 11 "U.S.C. §1121(c) (In a reorganization under Chapter 11 any party in interest may file a plan if certain conditions are met.);

[17] We will see that adjustment of GRS's liability to retirees would not be permissible in this case even under the criteria used in Chapter 11 cases. See note 29 and accompanying text.

[18] 11 U.S.C. §901.

B.  GRS's liabilities to retirees are not the City's liabilities.

It follows that, unless GRS is identical with or part of the City, the Plan cannot adjust GRS's liabilities to retirees, even if GRS and the City are co-debtors. A brief review of the applicable Michigan law makes it clear that GRS and the City are distinct entities.

The Court is familiar with Mich. Const. Art. 9, §24, which deals with public pensions. To implement §24, Michigan has enacted the Public Employee Retirement System Investment Act ("PERSIA"), codified at Mich.C.L. §38.1132 *et seq.* GRS has been created and established by the City;[19] so for purposes of PERSIA, GRS is a "system," defined as a "public employee retirement system created and established by this state or any political subdivision of this state."[20] GRS therefore is "a separate and distinct trust fund [whose] assets ... shall be for the exclusive benefit of the participants and their beneficiaries and of defraying reasonable expenses of investing the assets of the system."[21] Those assets accordingly are in no sense "property of the debtor"[22] available for use in adjusting the City's debts. Indeed, the corpus of a trust is not

---

[19] Detroit City Code §47-1-2; Detroit Home Rule Charter (Adopted pursuant to the Home Rule City Act, Mich.C.L. §117.1 *et seq.*) §11-101 *et seq.*

[20] Mich.C.L. §38.1132e(5).

[21] Mich.C.L. §38.1133(8).

[22] See 11 U.S.C. §902(1). Except in cases of fraud or improper preferences, the determination of property interests in a bankruptcy case is governed by state law. *Butner v. United States*, 440 U.S. 48, 54-55 (1979).

11

13-53846-tjt   Doc 5723   Filed 07/01/14   Entered 07/01/14 15:16:06   Page 11 of 16

property of the debtor even if the debtor itself is the trustee.[23] *A fortiori*, it is not property of the debtor when the trust is "separate and distinct" from the debtor.

  C. GRS is liable to retirees for monthly pension payments.

The City does not make monthly pension payments to GRS retirees. GRS does. This is consistent with the legal structure created by Mich. Const. Art. 9, §24 and PERSIA. Michigan law does not, at least not clearly and explicitly, impose upon the City a duty to make pension payments to retirees. By its explicit terms, Mich. Const, Art. 9, §24 requires only that the City fully fund employees' accrued pension benefits each fiscal year during the term of each employee's service.[24] Similarly, PERSIA requires that the City make contributions to GRS and governs the calculation of those contributions,[25] but leaves to GRS the task of making disbursements to retirees, since GRS holds the funds contributed by the City and the earnings on those funds "for the exclusive benefit of the participants and their beneficiaries and of defraying reasonable expenses of investing the assets of the system."[26]

  D. The Plan unlawfully attempts to adjust GRS's liability to retirees for monthly pension payments.

Nonetheless, the Plan seems to tell GRS retirees (and the materials

---

[23] *In re Cannon v. J. C. Bradford & Co.*, 277 F.3d 838, 849 (6th Cir. 2002).

[24] The second sentence in §24 requires that "[f]inancial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

[25] Mich.C.L. §38.1140m.

[26] See note 20, *supra*.
12

accompanying our ballots make it clear) that the amount each of us receives from GRS each month as a pension payment will be reduced if the Plan is confirmed. This can only mean that GRS's liability for those monthly payments is adjusted by the Plan. By attempting to adjust GRS's liability for monthly pension payments the Plan violates 11 U.S.C. §941, so 11 U.S.C. §943(b)(2) prevents its confirmation.

It is possible to read Michigan law to impose upon the City and GRS joint liability for the pension payments GRS makes to retirees. Mich. Const, Art. 9, §24 contains two sentences. The second is quoted in note 24. The first sentence provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."[27] It is not obvious from this language who bears the contractual obligation it imposed. The ambiguity arises chiefly from the difficulty of identifying the antecedent(s) of "thereof" and "thereby." It seems likely they both refer back to the same phrase(s); but do they refer to "each pension plan and retirement system," or to "the state and its political subdivisions," or to both?

If "thereof" and "thereby" refer to both antecedent phrases, then the contractual obligation imposed by the sentence is a joint obligation of the City ("the state and its

---

[27] The Court has held that the contractual obligation imposed by the first sentence of §24 must be treated as an ordinary unsecured debt, the prohibition of diminishing or impairing the obligation notwithstanding. Opinion Regarding Eligibility, Document No. 1945, at 75 - 80. I do not challenge that holding here. I agree with Michigan's Attorney General and the Retiree Committee that the holding is erroneous and reserve the right to challenge it if and when the occasion arises. This is not the occasion. So far as I know, the Court has made no determination regarding the nature of the City's duty to fund pension benefits as they accrue. In the Plan, the City seems to assume that this duty also is an ordinary unsecured debt.

political subdivisions") and GRS ("each pension plan and retirement system"). If that obligation is understood to include the payment of pensions to retirees, then the City is jointly liable with GRS to assure that those payments are made. The City's liability for those payments can be adjusted in this case, but GRS's cannot.

> E. Retirees cannot be enjoined from prosecuting claims against GRS for their unadjusted pensions. It follows logically those claims cannot be adjusted.

Even though Plan attempts to reduce GRS's liability for pension payments, it does not suggest that retirees be enjoined from enforcing claims against GRS for the difference between the payments they are to receive under the Plan and what they would be due but for the Plan.[28] A possible explanation for the omission of such an injunction is that its inclusion would violate clearly established law. In *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*[29] the Sixth Circuit held that, even in a Chapter 11 case, a non-consenting creditor's claim against a non-debtor can be enjoined only when seven factors are present: "(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes,

---

[28] Plan at 41 - 42 (PACER pages 48 - 49).

[29] 280 F.3d 648, 658, (6th Cir. 2002).

has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions."[30] At least factors (1), (2), (5) and (6) are absent here, so retirees cannot be enjoined from enforcing their unadjusted claims against GRS.

But that makes the adjustment of the claims meaningless: if a claimant is permitted to enforce a claim as it was before adjustment, then the adjustment is illusory. Thus, a sensible reading of *Dow Corning* leads to the conclusion that retirees' claims against GRS could not be adjusted even if this were a Chapter 11 case.

All this raises a practical question: If the City's duty to fund pensions is adjusted downward, how can GRS pay the pensions in full? The obvious response is that the question is not before the Court: the City seeks bankruptcy protection; GRS does not. A full answer would require an assessment of several factors, including: GRS's current financial state; the likely return on its investments; the life expectancies of retirees and their beneficiaries; additional infusions of cash GRS may receive pursuant to the Plan[31] and the Grand Bargain; and the expectation that the City will, at some future date, resume compliance with its duty fully to fund GRS. All those issues have great importance for retirees, their beneficiaries, GRS and the City. But they need not be

---

[30] *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658, (6th Cir. 2002).

[31] According to the Plan, claims against the City for GRS pensions will be allowed in the amount of $1,879,000,000. Plan at 33 (PACER page 40).

considered in this case because the issue here is the City's financial viability, not GRS's.

*John P. Quinn* (signature)
John P. Quinn
2003 Military Street
Detroit, MI 48209
(313) 673-9548
quinjohn@umich.edu

Dated: July 1, 2014

## CERTIFICATE OF SERVICE

I certify that on July 1, 2014, I am filing a hard copy of the above document with the Clerk of the Court. I understand the Clerk will promptly scan that hard copy and file the resulting pdf version using EDF, thus effecting service on all persons entitled to service in this action.

I further certify that on July 1, 2014, I am emailing pdf copies of the above document as follows:

to Jonathan S. Green, representing the City, at green@millercanfield.com;

to Sam J. Alberts, representing the Retiree Committee at sam.alberts@dentons.com;

to Robert D. Gordon, representing GRS, at rgordon@clarkhill.com; and

to Ryan C. Plecha, representing eDRCEA, at rplecha@lippittokeefe.com.

*John P. Quinn* (signature)
John P. Quinn
2003 Military Street
Detroit, MI 48209
(313) 673-9548
quinjohn@umich.edu

Dated: July 1, 2014