Jamie S. Fields (P-52808)\
Attorney-at-Law
555 Brush #2409
Detroit, Michigan 48226
313-570-3906
jeansartre@msn.com

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In Re | Chapter 9 |
| City of Detroit, Michigan | Case No. 13-5384 |
| Debtor | Hon. Steven W. Rhodes |

**OBJECTIONS AND BRIEF IN SUPPORT OF OBJECTIONS OF CREDITORS
WILLIAM OCHADLEUS, SHELTON HAYES, SHIRLEY BERGER, RAYMOND YEE,
FREDERICK T. McCLURE JR, JOHN CLARK, JIM BENCI, JANICE BUTLER, MORRIS WELLS,
MELVIN F. WILLIAMS SR., KIMBERLY ANN SANDERS, SARAH E. GIDDENS, DEBORAH WARD,
JACKIE FULBRIGHT, CATHERINE TUTTLE, RITA SERRA, MARTIN TREADWELL, ED GAINES,
BARBARA TRIPLETT-DECREASE, JOHN J. O'NEILL,  ROY MCCALISTER, POLLY MCCALISTER,
GAIL WILSON TURNER, LOLETHA PORTER COLEMAN, AFFORD COLEMAN, JESSIE BANKS,
LESTER COLEMAN, DEBORAH LARK, MOSES LARK, SHARON COWLING, MICHAEL COWLING,
ROBERT JACKSON, RASHELLE PETTWAY, MICHAEL A. ADAMS, JOHN HAWKINS,
LAURA ISOM, DUANE MCKISSIC, HERBERT MORELAND, CYNTHIAN DIANE MORELAND,
HENRY ELLIS, KEITH JACKSON SR., DEBORAH ROBINSON, JAMES ALEXANDER JR.,
DEBRA J. FAIR, BRENDA GOSS ANDREWS, JAMIE FIELDS, RICARDO C. JENKINS,
JACQUELINE JACKSON, TOMMIE CARODINE, LAWRENCE V. PORTER, ROBBIN RIVERS,
JAMES R. YOUNGER, ROSCOE MAYFIELD, CHARLES BARBIERI, CRAIG SCHWARTZ,
GLENDA COLE-DIXON, WALTER LONG JR., GEORGE GRAVES, TERRANCE ANDERSON,
DAVID ANDERSON, NANCY FOWLER, GEORGE CHESTER, ANTHONY KLUKOWSKI JR,
TODD KLUKOWSKI,  ROGER KLUKOWSKI, LOIS KLUKOWSKI-HOGEN, PATRICIA E. MCCABE,
DANIEL P. ROOT, JEANNETTA WASHINGTON, MIKE FOLEY
<u>TO THE CONFIRMATION OF THE FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS
OF CITY OF DETROIT, MICHIGAN (MAY 5, 2014)</u>**

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT…………………………………….…….........….…...............…1

II.  ARGUMENT……………………………..……………………...…......…….......…......…2

III. THE PLAN DOES NOT SATISFY THE STATUTORY REQUIREMENTS
     FOR CONFIRMATION...................................................................................................2

   A. The Plan is Not in the Best Interests of Creditors, Section 943(b) (7)…..…..........…...................…2

      1. The "Best Interests" Test Provides Protection to Individual
         Dissenting Creditors...................................................................................3

      2. The "Best Interests" Test Requires the City to Provide Retirees a
         Reasonable Recovery under the Circumstances…..................................................4

         a. PFRS is Well-Funded and the City Lacks Justification to Reduce the
            Pension Benefits of Police Officers and Fire Fighters................................4

         b. Class 10 (PFRS) Claim Holders Could Recover Substantially
            More Outside of Bankruptcy...................................................................6

         c. Class 12 (OPEB) Claim Holders Could Recover Substantially
            More Outside of Bankruptcy.................................................................10

         d. There are Hundreds of Millions of Dollars of Delinquent Tax and Other
            Revenues Available to Pay Retirees.......................................................11

      3. To Meet the "Best Interests" Test the City Must Maximize the Value of its
         Assets to Enhance Creditor Recoveries.......................................................12

   B. The Plan Improperly Classifies and Unfairly Discriminates Against
      PFRS Claim Holders…...............................................................................13

      1. The Plan Improperly Classifies Class 10 Claims…………..…………......…...……......….13

         a. The City's Plan Improperly Combines Impaired and Unimpaired
            Claims to Gerrymander Class 10.............................................................14

      2. The Plan's contains an Improper Voting "Death Trap"...................................15

3. The Retiree Settlement Agreement for 2014 OPEB Violates the
Spirit of Rule 9019 ................................................................................................16

**C. The Plan Violates Section 943(b) (4)  Because it Fails to Comply with
Michigan Law**.................................................................................................................17

1. The Michigan Constitution (*Art. IX, Section 24*) Requires that Pension
Benefits be Annually Funded in the Year they were Earned.........................................20

2. The "Grand Bargain" to Partially Fund the City's Required Annual
Contribution to PFRS is an Illusory Promise and is Prohibited Under
State Law (MCL 600.1405) ........................................................................................18

3. The Governor of the State of Michigan does not
Have the Authority to violate the Michigan Constitution...........................................19

**D. The Plan is Not Feasible**……………………………….………......….………..…….....…........….20

1. The City is Not Capable of Implementing the Plan, therefore, the
Plan is Not Feasible....................................................................................................21

2. The City's Prior Performance and the Inability of its Management
Makes the Plan Not Feasible.......................................................................................21

3. The City's Plan Does Not Define "Adequate Municipal Services." ...........................................23

**E. The Court's *Sua Sponte* Determination of the Constitutional Question Whether
Pensions could be Impaired, Consistent with the Tenth Amendment
Should Have Been Avoided**........................................................................................24

**F. The Court Should Not Grant Third-Party Releases of Non-Debtors**......................................28

**G. The Court's Site "Tour" of the City is more Prejudicial than Probative**..............................28

**H. Other Objections**.................................................................................................30

**IV. RESERVATION OF RIGHTS**……………….……..………...……….....….……..…..........….30

**V. CONCLUSION**………………….……….....….………………..….......…..........….................…30

III

# TABLE OF AUTHORITIES

**CASES**                                                           **Page(s)**

*Adams v. City of Battle Creek,*

    250 F.3d 980,986 (6th Cir. 2001)............................................................................26

*Ashwander v. TVA,*

    297 U.S. 288 (1936)............................................................................................26

*In re ACandS, Inc.*

    311 B.R. 36, (Bankr. D. Del. 2004)…......................................................................14

*In re Adelphia,*

    61 B.R. 337 (S.D.N.Y. 2007)..................................................................................16

*In re Allegheny Intl. Inc.,*

    118 B.R. 282, (Bankr. W.D. Pa. 1990)....................................................................15

*Bank of Am. Nat'l Trust & Savs. Assoc.,*

    526 U.S. 434, 441 (1999)......................................................................................3

*In re Barnwell Cnty. Hosp.,*

    471 B.R. 849, 869 (2012)............................................................................…......4

*In re Belco Vending, Inc.,*

    67 B.R. 234, 236 (B.R. Mass. 1986)...............................................................…....23

*In re Boston Post Rd. Ltd. P'ship,*

    21 F.3d 477 (2d Cir. 1994)...................................................................................14

*Burton v. United States,*

    196 U.S. 283, 295 (1905)....................................................................................27

IV

*In re Connector* 2000 Ass'n, Inc.,

    447 B.R. at 752 (Bankr. D.S.C. 2011)........................................................................4

*In re C&P Gray Farms, Inc.,*

    70 B.R. 704 (Bankr. W.D. Mo. 1987)......................................................................21

*In re Canal Place Ltd. P'ship,*

    921 F.2d at 579 (5th Cir. 1991).............................................................................21

*In re City of Stockton, Cal.*

    493 B.R. 772, (Bankr. E.D. Cal. 2013)...................................................................17

*In re Clarkson,*

    767 F.2d 417 (8th Cir. 1985)..................................................................................21

*Della Rocco v. Schenectady,*

    683 N.Y.S.2d 622 (1998)........................................................................................11

*In re Dow Corning Corp.,*

    280 F.3d 648, 696 (6th Cir. 2002)..........................................................................16

*In re Drexel Burnham Lambert Group, Inc.,*

    138 B.R. 714 (Bankr. S.D.N.Y. 1992).....................................................................15

*Duncan v. Retired Public Employees of Alaska, Inc.,*

    71 P.3d 882 (AK. 2003) .........................................................................................11

See *In re Eastland Partners, L.P;*

    149 B.R. 105, 108 (Bankr. E.D. Mich. 1992)........................................................21

*Fano v. Newport Heights Irrigation Dist.,*

    114 F.2d 563 (9th Cir. 1940)................................................................................3, 4

*In re Greystone III,*

995 F.2d 1274 (5th Cir. 1991)............................................................................................16

*In re Gulph Woods Corp.,*

84 B.R. 961 (Bankr. E.D. Pa. 1988)....................................................................................21

*Hess v Cannon Twp,*

265 Mich App 582 (2005)....................................................................................................19

*Kane v. Johns-Manville Corp.,*

843 F.2d 636 (2d Cir. 1988).................................................................................................23

*Kelley v. Everglades Drainage District,*

319 U.S. 415 (1943)...........................................................................................................3, 4

*Kosa v Treasury State of Michigan,*

408 Mich. 356, 365, (1980).................................................................................................18

*In re Lakeside Global II, Ltd.,*

116 B.R. 499, 506) (Bankr. S.D. Tex. 1989).......................................................................20

*Law Enforcement Labor Services, Inc. v. Mower,*

483 N.W.2d 696, (Minn.1992).............................................................................................11

*Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.,*

792 N.W.2d 686 (Mich. 2010)......................................................................................... 6, 27

*In re Lettick Typographic, Inc.,*

103 B.R. 32, 38 (Bankr. D. Conn. 1989).............................................................................13

*In re Lowenschuss,*

67 F.3d 1394 (9th Cir. 1995)................................................................................................27

VI

*Mascio v. Public Emps. Ret. Sys of Ohio,*

    160 F.3d 310, 313 (6th Cir. 1998)..............................................................................................10

*In re Mount Carbon Metropolitan District,*

    242 BR 18 Colo. 1999)..................................................................................................24

*In re Masters, Inc.,*

    141 B.R. 13 (Bankr. E.D.N.Y. 1992).........................................................................................16

*Muller Optical Co. v. EEOC,*

    743 F.2d 380 (6th Cir.1984).......................................................................................26

*Musselman v. Governor of Mich.,*

    533 N.W.2d 237, 243 (Mich. 1995)..........................................................................................7

*MCorp Financial, Inc.,*

    137 B.R. 219, 236 (Bankr. S.D. Tex. 1992).................................................................................15

*Old chief v United States*

    519 U.S. I72 (1997)..................................................................................................28

*Pan Am Corp. v. Delta Air Lines, Inc.,*

    175 B.R. 438 (S.D.N.Y. 1994)...................................................................................21

*People v Attorney General of Illinois,*

    (Doc. No. 115635, 115645, July 3, 2014)..................................................................................11

*Plaut v. Spendthrift Farm, Inc.,*

    514 U.S. 211,219 (1995).............................................................................................25

*In re Pierce County Housing Auth.,*

    414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) .......................................................................2, 4

VII

*In re Sanitary & Improvement District,*

 90 B.R. at 974 (Neb. 1989) ............................................................................ 2, 3, 18

*In re Sierra-Cal,*

 210 B.R. 168 (Bkrtcy E.D. Cal. 1997) ........................................................................ 3

*Shelby Twp Police & Fire Retirement Bd. V Shelby Twp,*

 438 Mich 247(1991) ......................................................................................... 1, 7

*Siler v. Louisville & Nashville R.R. Co.,*

 213 U.S. 175 (1909) ........................................................................................... 26

*In re Swartville LLC,*

 No. 11-08676, (Bankr. EDNC 2012) ...................................................................... 14

*Taylor v Auditor General,*

 360 Mich 146 (1960) .......................................................................................... 26

*In re Treasure Bay Corp.,*

 12 B.R. 520, 547 (Bankr. S.D. Miss. 1997) ............................................................. 20

*In re U.S. Truck,*

 47 B.R. at 940 (6th Cir. 1986) ............................................................................ 21

*United States v. Burke,*

 504 U.S. 229, 246 (1992)…................................................................................. 25

*United States Trust Co.,*

 431 U.S. at 25, 30 (1977) ..................................................................................... 3

*Weiner v. County of Essex,*

 620 A.2d 1071 (N.J. 1992) ................................................................................. 11

VIII

*Welch v. Brown*,

    935 F.Supp.2d 875 (E.D. Mich. 2013)......................................................................................10

*In re Windsor*,

    7 F.3d 127, 132 (8th Cir. 1993).............................................................................................14

## Statutes

11 U.S.C. § 903................................................................................................................................20

11 U.S.C. § 904................................................................................................................................20

11 U.S.C. § 943(b) (4)..............................................................................................................20, 21

11 U.S.C. § 943(b) (7)......................................................................................................................23

11 U.S.C. § 1122........................................................................................................................14, 17

11 U.S.C. § 1124..............................................................................................................................16

11 U.S.C. § 1129(a) (3)..............................................................................................................13, 14

11 U.S.C. § 1129(a) (10)..................................................................................................................16

11 U.S.C. § 1129(b)..............................................................................................................3, 14, 17

MCL 600.1405.................................................................................................................................. 22

Michigan Constitution, Article IX, Section 24.........................................................................8, 20

## Federal Rules

Federal Rule of Evidence (FRE) 403.................................................................................................28

The forgoing DPD retirees, employees and/or surviving spouses ("Ochadleus Objectors"), hereby object to the *Fourth Amended Plan of Adjustment of Debts* (the "Plan") (Doc. 4392).

### I. PRELIMINARY STATEMENT

United States Supreme Court Justice Felix Frankfurter said "There is no greater inequality than the equal treatment of unequals." Bankruptcy is a zero sum game. And rarely has the balance of equities been any clearer. On one hand are retirees who gave decades of toil, sweat and labor to the City, and who now face the specter of financial ruin and lessened life expectancy.[1] And on the other hand, the interests of bondholders who as a class had the greatest opportunity to reduce the risk of nonpayment by an issuer and expected a return commensurate with risk. If they lose their investments they can absorb losses and go forward as viable entities.

Former boxer Mike Tyson said "Everyone has a plan 'till they get punched in the face." The City's Plan is not feasible, is tenuous, obtuse, misleading and too brittle to accommodate a good punch in the face. While the road to Hell may be paved with good intentions, the road to the City's bankruptcy has been paved by misuse of funds, cronyism and the lack of political will to make the tough choices. Now the City is seeking a "fresh start" without providing a reasonable hope of success or evidence that it will discontinue its reckless spending and perpetual mismanagement. It is difficult to separate the wheat from the abundant chaff because of the City's many conclusory and outrageous public statements, which are troubling attempts to try the case in the media. Yet the City's fiscal incontinence is painfully obvious. But, it is unconscionable for the City to ask for a clean balance sheet without a feasible Plan to fix its structural deficiencies.

---

[1] *Americans without Health Insurance and Life Expectancy*, Smieon Knight, May 10, 2010.

In the novel "*The Sun Also Rises*," Ernest Hemingway asks and answers the question, "How do you go bankrupt? Two ways: Gradually, then suddenly." Detroit makes his point. From 2008-2012 the City annually spent 100 million dollars more than it took in revenues. This is in spite of state law that requires the City to operate under a balanced budget. The City has been operating for decades without fundamental financial controls, and has failed to match its revenues with its expenses, in accordance with its own charter and state law.

## II.  ARGUMENT

*"Municipalities that simply match their revenues with their expenses do not get into trouble," Richard Ravitch*

The City's Plan is not a Plan at all. It's the City's expression of its intent to continue down the path of self-dealing and mismanagement. The panoply of objections the Court has received from retirees is not borne from their greed in seeking a bigger piece of the financial pie, but has its provenance in the City's dismissiveness of retiree's ideas on how to grow the pie.

## III.  THE PLAN DOES NOT SATISFY THE STATUTORY REQUIREMENTS FOR CONFIRMATION

### A.  The Plan Is Not In The Best Interests Of Creditors, Section 943(b) (7).

First and foremost, the Plan is not "in the best interests of creditors" as required by Section 943(b) (7) of the Bankruptcy Code. The burden is on the City to prove by a preponderance of the evidence that it has satisfied the requirements of Section 943(b) of the Code, *In re Pierce Cty. Hous. Authority,* 414 B.R.702 (W.D. Wash. 2009). In applying the best interests test, courts have inquired as to whether the plan is "better than the alternatives." **"Creditors are given guarantees as individual creditors under the best interests test."** *In re Sanitary Improvement Dist. #7,* 90 B.R. 966 (Neb. 1989) (Emphasis in original).

2

1. <u>The "Best Interests" Test Provides Protection to Individual Dissenting Creditors.</u>

The best interests test "applies to all individual dissenting creditors, even those whose claims are classified within a class that has accepted the plan." *Bank of Am. Nat'l Trust & Savs. Assoc.*, 526 U.S. 434, 441 (1999). Thus, "(if) even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial." *In re Adelphia* 361 B.R. 337 (N.Y. 2007), *In re Sierra-Cal,* 210 B.R. 168 (1997) [the "best interests test cannot be finessed by a cram down under 1129(b)]."

As the Supreme Court held long ago, "minorities under the various reorganization sections of the Bankruptcy Act cannot be deprived of the benefits of the statute by reason of a waiver, acquiescence or approval by the other members of the class. The applicability of that rule to proceedings under Chapter 9 is plain. "(The) fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent." *Kelley*, 319 U.S. 415 (1943), see e.g., *Fano v. Newport Heights Irrigation Dist*., 114 F.2d 563 (9th Cir. 1940) (reversing confirmation of proposed plan of adjustment on the grounds that it was not in the "best interests" of a dissenting bondholder despite the fact that 90% of bondholders had accepted the plan); *Sanitary* at 971 (denying confirmation of proposed plan on the grounds that it was not in the "best interests" of creditors despite it "(was) accepted by all classes of creditors").

As shown below, the City's Plan provides retirees a recovery far less than that which can reasonably be expected under the circumstances and that retirees could achieve in the absence of the City's Chapter 9 case. As a result, the Plan is not in the "best interests" of retirees and hence does not satisfy Section 943(b) (7) of the Bankruptcy Code.

3

2. The "Best Interests" Test Requires the City to Provide Retirees a Reasonable Recovery under the Circumstances.

The legislative history suggests that determination of a reasonable recovery in Chapter 9 is to be guided by reference to two cases (citing *Kelley* and *Fano*). The common theme of both *Kelley* and *Fano* is consideration of the municipal debtor's future ability to pay and a plan must not impair and discharge debt based upon a static "snapshot" of the debtor's current assets and liabilities. Rather to achieve confirmation over the objection of a dissenting impaired creditor, the debtor must prove that the plan devotes a "fair" amount of "probable future revenues" for "satisfaction of creditors." *Kelley*, 319 U.S. at 420.

The "best interests" standard is "a floor requiring a reasonable effort at payment of creditors by the municipal debtor." *In re Pierce County*, at 718. Simply stated, the "best interests" test in Chapter 9 requires the debtor to prove that a proposed plan "affords all creditors the potential for the greatest economic return from the debtor's assets." *In re Barnwell County Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012), see also *In re Connector 2000 Assn.*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011).

a. PFRS is Well-Funded and the City Lacks Justification to Reduce Pension Benefits of Police Officers and Fire Fighters.

The fact that PFRS has an unfunded liability does not mean the plan is underfunded. It does not mean that the City has to take drastic and immediate actions to reduce or pay off the unfunded liability. It does not mean that the City has to cut PFRS claim holder's pensions.

> "There is nothing intrinsically wrong with having an unfunded liability. Unfunded liabilities are a natural part of retirement system funding, comparable to a mortgage on a home." Jose Fernandez, Principal and Consulting Actuary, Cavanaugh Macdonald Consulting, LLC

4

A mortgage represents a good analogy. If a person owns a house valued at $200,000 and owes $120,000 on a mortgage, the $120,000 owed represents an "unfunded liability," but like pensions that money is not due all at once. It is due over 30 years. While it is preferable for a pension plan to be "fully funded," it is not unusual for funding gaps to emerge, especially during economic downturns. The health of PFRS is dependent on the City's ability and willingness to make its legally required contributions. Funding gaps are usually closed gradually over time, by making regular payments to the plan. This process is referred to as "amortizing the unfunded liability." This is similar to the process of paying down a mortgage. As long as payments are being made in full and on schedule, the plan will be on a course toward full funding and the existence of a funding gap is not problematic. Funding gaps are also closed by investment returns reverting to projected norms through cyclical business cycle changes (smoothing the ups and downs of capital markets) (typically a 5-7 year period rather than a snapshot of assets) to mitigate the impact of short term fluctuations from long-term cost estimates. The Plan proposes $0 for their annual required "normal cost" contribution to PFRS (until 2023) and a ($0) recovery toward the retirement system's Unfunded Accrued Liability (UAL) which violates Michigan Law and the rules promulgated by the Government Accounting Standards Board (GASB).

The City's response to prior administration's mismanagement is somewhat a hair-of-the-dog remedy in that, in order to cure its reliance on fiscal gimmickry, it has resorted to a bit of gimmickry itself – employing tactics to conform to the letter of a restriction governing the management of debt, while violating the spirit of that restriction. The City deferred its required minimum pension contributions and entered into a pension obligation borrowing scheme that backfired epically.

5

One reason why the Plan reduces legacy costs to a projected 10% of general fund revenues in 2020 is because it includes a "pension holiday." Through 2023, the only funds going toward pensions will be from the "Grand Bargain," and possibly sewer and water system ratepayers. However, it remains unclear where the proceeds of the "Grand Bargain" will be directed. Will funds go to the City who will then make a contribution to PFRS? If to PFRS, what accounts will be credited? Has the City sought a determination if under IRS rules, a pension plan can accept donations and retain their qualified plan status? Will the donors to the "Grand Bargain" seek some form of tax deduction for the funds provided? The answers are unclear.

It would be incumbent on the City to provide clear answers to those questions, because the City's prior reluctance to fund pensions fully and straightforwardly, contributed significantly to its bankruptcy. In a rather unusual argument, since the retirement system has previously successfully has litigated to force compliance, the City appears to concede its requirement to annually fund its retirement system, but inexplicably asserts it cannot be forced to comply.[2]

For years, in essence the City has been robbing Peter (PFRS) to pay Paul (general fund). The City in a striking display of chutzpah, has proposed a Plan, to substantially reduce pension benefits, and to allow it to ignore its obligation to annually fund pension credits in the year they are earned. The Plan would allow it to rob *both* Peter a*nd* Paul. The City wishes to continue its fiscal "sleight of hand."

---

[2] The City in its "Consolidated Reply to Certain Objections" quoted *Shelby,* 438 Mich 247 (1991) acknowledging their responsibility to annually fund GRS (page 154, footnote 90; 5-26-14). The City has the same obligation to PFRS.

6

**b.** <u>Class 10 (PFRS) Claims Could Recover Substantially More Outside of Bankruptcy</u>.

The monies ("collateral") controlled by PFRS are held in trust for retirees. The "collateral" determines the extent of retiree's priority. The significance of the trust is that PFRS assets are not City assets. In the same way that banks do not own the assets of their clients held in trust, the pension trust has a separate legal existence. In the context of a bankruptcy, it means the assets of a trust which are not city assets are not available for claims of creditors. This is why that PFRS, as a separate legal entity, is a creditor of the City. The "collateral" and the long-term reforms the City has taken (e.g., switching to a hybrid pension plan, raising the retirement age, requiring contributions from active employees etc.) ensures that PFRS would be able to fulfill its obligation to provide unreduced lifetime pension benefits to its retirees.

There are two reasons why retirees could recover substantially more outside bankruptcy. First, retirees could exercise their state law remedies. Courts have ruled that Michigan law "expressly mandates cities to fund all public employee pension systems to a level which includes unfunded accrued liabilities" which are "the estimated amounts which will be needed according to actuarial projections to fulfill presently existing pension obligations..." *Shelby Twp Police & Fire Retirement Bd. V Shelby Twp*, 438 Mich 247 (1991). See also, *Musselman v. Governor of Mich,* 533 N.W.2d 237 (1995) (School district's failure to fully fund its pension obligations violated the Michigan Constitution). The Michigan Constitutional debates, reveal the framer's intent to create a clear obligation of municipalities to annually fully fund its pensions:

> "(This) section is an attempt to rectify, in part, policies which have permitted sizeable deficiencies to pile up in retirement systems in this state. Under this section, accruing liability in each fiscal year must be funded during that year, thus keeping any of these systems from getting farther behind than they are now." (*2 Official Record, Constitutional Convention* 1961, p 3402).

7

The Constitutional debates make it unequivocally clear that pension obligations are contracts that must be paid - even to the extent that retirees could force a municipality to sell assets - in the event of non-payment, as evident from the following debate exchange:

MR. SHACKLETON: Mr. Chairman, a question to one of the Committee, if I may. If a new fund were created by a present political subdivision, or should in the future a new political subdivision be created and want to set up a pension fund, would they have to that first year put in funds sufficient to take care of past service? If not how would past service funds be accumulated?

CHAIRMAN MARTIN: Mr. Van Dusen.

MR. VAN DUSEN: The answer, Mr. Chairman to Mr. Shackeltons's first question is no, they would not have to immediately fund past service benefits. They would have to put in enough to currently fund current service benefits......The only constitutional requirement would be the current funding of current service benefits.

MR. SHACKLETON: If they did not properly take care of the past service then, where would your contractual obligation come out?

MR. VAN DUSEN: An employee who continued in service of the public employer in reliance upon the benefits the plan says he would receive would have the contractual right to receive those benefits and, *would have the entire assets of the employer at his disposal from which to realize those benefits.* 1 Official Record, Constitutional Convention 1961, pg. 774. (Emphasis added by Michigan Attorney General, Frank Kelley). Attorney General Opinion Number 5076, August 9, 1976.

In *Butner v United States*, 440 US 48 (1979), the Supreme Court held that state property law determines property rights in the assets of a bankruptcy estate. *Id.* at 55. The doctrine from *Butner* subsequently expanded to represent the principle that in the absence of a specific bankruptcy provision to the contrary, bankruptcy takes non-bankruptcy rights and laws as it finds them. The City cannot point to anything in the Code that would preclude it from being required to monetize its assets or to collect outstanding delinquent revenues for the benefit of retirees.

8

The second reason why retirees could recover substantially more outside bankruptcy, is that since pensions are paid for life, the exact value of a benefit is not known until the pensioner dies. Actuaries project the value of benefits (which are subject to a fixed formula) based on life expectancy. Like all future projections, these are estimates based on scientific data. The actuarial projections for life expectancy are not pure conjecture but are based on known data up to this point in time. As a result, the projected future benefits have a reasonable degree of certainty.

The money owed to a pension trust (PFRS) is for work already performed. Accrued pension benefits represent deferred wages. An employer, such as Detroit, hires employees with the understanding that they will receive over-all compensation of $X. This amount ($X) is divided into salary paid bi-weekly and deferred salary, which is the pension, and are funded bi-weekly according to the projected sum necessary to fund the benefit paid over a projected lifetime. The only way to alter that sum is not to pay the bill. This results in a worker being told after he or she has performed the work that the employer either cannot or will not pay him or her. The City has no debt to retirees on their pension claims because it already fully paid those pension credits. Since the City has no such debt to retirees the debt cannot be adjusted.

A pension plan's overall liabilities for accrued benefits is the sum of two sub-liabilities, the plan's liability for funded benefits, and the City's liability for unfunded benefits. The GASB has proposed that funded liabilities would continue to be discounted at the expected return on the underlying assets (8%), while unfunded liabilities without underlying assets would be discounted by using a lower interest rate derived from high-quality municipal bonds. The Plan provides $0 for its UAL and $0 toward its required annual "normal cost" contribution until 2023. The City has no investment risk that justifies reducing PFRS assumed rate of return from 8% to 6.50%.

9

c. <u>Class 12 (OPEB) Claims Could Recover Substantially More Outside of Bankruptcy.</u>

Only in 2006 did the GASB begin to require that cities report their unfunded retiree healthcare obligations. But GASB did not require that any city fund its shortfalls. As a result, the funded healthcare obligations is 0% in most cities. Generally, cities including Detroit pre-petition, allow Pre-Medicare retirees to remain on their workplace health plan, pooling their risks with active employees.

In order to assist the City in mitigation of costs, retirees agreed to pay the City's full cost of continuing this practice referred to as the "implicit rate subsidy," including paying any reasonable administrative expenses the City incurred. Instead the City, in an affront to retirees, offered continued coverage at massively inflated rates of 250-300%, of the City's previous costs per retiree. No analysis (e.g., costs of the program's continuation) was provided.

The City should not be able to use bankruptcy as the fulcrum to crumble the longstanding shield to terminate retiree healthcare. It must show that it explored less onerous solutions, and that the cuts were reasonable and necessary, *Mascio v. Public Emps. Ret. Sys of Ohio*, 160 F.3d 310 (6th Cir. 1998). Impairing a contract is not necessary if "a less drastic modification" would have allowed the contract to remain in place. *United States Trust Co.*, 431 U.S. 25 (1977).

The Supreme Court admonished that "a State is not free to impose a drastic impairment when (a more) moderate course would serve its purposes equally well." *Id*. In any event, any impairment must be reasonable under the circumstances. *Id*. "(The City) should not be allowed to impose health care cuts, foreclose on their other viable options, and use said foreclosure to abrogate duly bargained for contracts," *Welch v. Brown*, 935 F.Supp.2d 875 (ED Mich. 2013).

10

Class 12 claim-holders could recover substantially more outside of Chapter 9. See e.g., *Duncan v. Retired Public Employees of Alaska, Inc.*, 71 P.3d 882 (AK. 2003) (When determining if (healthcare) changes were reasonable (must focus) on the entire group of employees rather than individuals); *Law Enforcement Labor Services, Inc. v. Mower*, 483 N.W.2d 696 (Minn.1992) (vested right under agreement; county employer could not modify employer fully paid benefits); *Weiner v. County of Essex*, 620 A.2d 1071 (N.J. 1992) (postretirement medical benefits conferred by resolution were property rights which county could not unilaterally terminate); *Della Rocco v. Schenectady*, 683 N.Y.S.2d 622 (1998) (held that retired firefighters and police were entitled under collective bargaining agreements to the same or equivalent health insurance coverage during their retirement as the coverage in effect at retirement); *People v Attorney General of Illinois*, (Doc. No. 115635, 115645, July 3, 2014) (subsidized healthcare premiums for retired state employees are protected under Illinois Constitution).

The City's Auditor General's recommendations to the EM in August 2013 on how to substantially reduce OPEB costs, were largely ignored (e.g.,11 insurance providers; 58 program options; 15 systems; over 10,000 medical payroll deductions, 40,000 payroll codes and 56,000 transactions per month) and insurance bills were not reconciled and merely paid as received.

d. <u>There are Hundreds of Millions of Dollars of Delinquent Tax and Other Revenues Available to Pay Retirees</u>.

The City has the lowest revenue collection rate of any city in the country (Metro Times, 8-20-2003). With the exception of Kalamazoo and Detroit, every other city lets its county collect its taxes. Wayne County's collection rate, is 96 percent, or a rate, that would yield <u>$540 million dollars</u> more annually to the City's coffers or more than half of the City's current annual budget.

11

Detroit has one of the broadest tax bases of any U.S. city (Bloomberg, 12-4-2013), but it is meaningless if monies owed can be ignored with impunity. A 2010 study conducted by Conway Mackenzie found that in 2009 the City failed to collect $6.6 million from non-residents who work in Detroit; $21.8 million in corporate taxes; $155 million in income taxes from Detroit residents and; $142.3 million in taxes from residents who worked outside the City (see, Crains, 4-20-2012). Half of property owners don't pay taxes (Det. News, 2-21-2013). Business owners owe millions in back taxes (Det. F.P; 12-18-2012). Some City revenue generating entities are indefensibly inefficient ("Detroit Spends More to Issue Parking Tickets than it Collects," Fox News, 3-20-2014) (Half of Detroiters do not pay their water bills, Flashpoint, 6-29-2014) [Ford Field (55k), Comerica Park (80k) owe past due water bills. MSNBC; 7-7-2014)].

The Plan does not satisfy the best interests test and dismissal of the case would be a welcome improvement over the treatment the City now proposes. Any allegedly dire consequences of dismissal, or an unraveling of the monumental work that already has been done, is squarely on the City that has the burden to prove that retirees (not just creditors generally) would fare worse in the event of dismissal of this case. The City cannot do so.

3. To Meet the "Best Interests" Test the City Must Maximize the Value of its Assets to Enhance Creditor Recoveries.

The EM while stating, "...we have to look at ways to monetize underutilized assets to generate revenue for a city that's revenue-starved." (Kevyn Orr, Crains; 12-5-13) ignores major assets (e.g., Windsor offered 75 million for Detroit's interest in tunnel) and turns a blind eye to the real value of City owned art. Yes, the City benefits from famous paintings, but it would benefit more from safer streets, public transportation, trash removal and well lit neighborhoods.

12

**B. The Plan Improperly Classifies and Unfairly Discriminates against Retiree's Claims.**

Although the "unfair discrimination" standard technically applies only under 1129(b), a Court should consider a confirmation objection based on alleged improper classification raised by a dissenting creditor in an accepting class if the combination of separate classification and materially different treatment results in substantially different economic effects between the two classes and the effect is other than (good faith), *In re Lettick Typo. Inc.,* 103 BR 32 (1989).

1. The Plan Improperly Classifies Class 10 Claims.

Class 10 (PFRS) consists of three categories of claims. "Old Plan" retirees which comprises about 40% (3,587) of Class 10 receive COLA based on active employee raises. The remainder of Class 10 annually receive 2.25% non-compounded or 2.25% compounded COLA.

Active employees haven't had a wage increase since 2008. In fact, they have taken a 10% wage reduction since 2008. If the Plan's "assumed" wage inflation proves to be sacrosanct, active employees, will not see an increase of their 2008 wages until 2019, therefore, "Old Plan" retirees would not be, even theoretically, eligible for an increase in COLA until at least 2019.

The gravamen of the City's implicit argument appears to be that "Old Plan" retirees, have voting rights because of future possible impairment. But that argument flies in the face of even the broadest interpretation of the Bankruptcy Code and relegates the concept of impairment to mere speculation, conjecture and hypothesis. It is more likely, depending on investment returns, that the Plan's proposed restoration provision would allow retirees that actually currently receive COLA, to be fully restored as early as 2015, or four years prior to "Old Plan" retirees having any obscure or remote possibility of a COLA reduction. Any notion of "Old Plan" retirees being "nominally" impaired is overreaching and not supported by the Bankruptcy Code.

13

A creditor's claim or interest under Section 1124 is defined, as impaired "if the plan fails to restore the creditor to its pre-petition position," *In re U.S. Truck*, 47 B.R. 940 (6th Cir. 1986). Assuming, for the sake of argument, there is "nominally" impairment, there are essentially "two divergent approaches with respect to the application of the Code's impairment standard to a class of claims that is found to be nominally impaired." *In re Swartville LLC*, (11-08676) (N.C. 2012).

On one hand, some courts engage in an analysis to determine whether a nominally impaired class truly qualifies as "impaired" for purposes of 1129(a)(10) (cramdown). Other courts analyze it under 1129(a) (3) (good faith). The City's classification of "Old Plan" claim-holders as impaired is unsupported by either approach. The ability of a creditor whose claim is "impaired" to vote on a Chapter 9 plan is one of the most important rights conferred on creditors under the Code. The voting process is an indispensable aspect of safeguards built into the statute designed to ensure that any plan ultimately confirmed meets with the approval of requisite majorities of a the City's creditors and satisfies certain minimum standards of fairness.

    a.  <u>The City's Plan Improperly Combines Impaired and Unimpaired Claims to Gerrymander Class 10</u>.

In order to be in the same class, a claim or interest must be "substantially similar to the other claims or interests of such class. *In re Boston Post Rd. Ltd.*, 21 F.3d 477 (2d Cir. 1994), Most circuits have found that gerrymandering to satisfy section 1129(a) (10) is.... improper, *In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir.1991). See, *In re Windsor on the River*, 7 F.3d 127 (8th Cir. 1993) (rejected plan paying claims in 60 days in full), *In re ACandS, Inc.* 311 B.R. 36, (Del. 2004) ("it is "fundamentally unfair that one claimant…will be paid in full, while (another risks) receiving nothing….The court is informed that other judges have confirmed plans with such discriminatory classifications. This judge cannot do so in good conscience.").

14

2. <u>The Plan Contains an Improper Voting "Death Trap."</u>

The Plan proposes an inequitable "death trap" provision that promises a greater claim payout for Class 10 and 11 if both classes accept the Plan. This "death trap" has effectively put a gun to the heads of scared and vulnerable retirees making the Plan unconscionable and unconfirmable. Albeit, there is a split in the circuits on the issue, but in *MCorp Financial, Inc*., 137 B.R. 219 (Tex. 1992), the Court denied confirmation of a plan of reorganization which authorized a possible payout to three classes of equity holders but only if certain classes of equity holders voted in favor of the plan. See also *In re Allegheny Intl., Inc*. 118 B.R. 282 (Pa. 1990) (rejecting a death trap provision stipulating that if any class of equity holders voted against the plan, neither that class nor any junior class would receive a distribution).

On the other hand, in *In re Drexel Burnham Lambert Group,* 138 B.R. 714 (NY 1992), the Court approved a death trap provision offered as an inducement to accept a plan where the affected creditors were otherwise entitled to nothing at all. The City proposes that Class 10 will receive no reductions in their pensions and the elimination of COLA if they reject the Plan but it will increase to receipt of 45% of their COLA if Classes 10 and 11 vote to accept the Plan. Class 11 will receive a 27% reduction in their pensions and elimination of COLA if they reject the Plan but it will increase to a reduction of 4.5% of their pension and elimination of COLA if Class 10 and 11 vote to accept the Plan. By contrast, to *Drexel,* the death trap employed here manifests the extraordinary effort by the City to dilute Class 10's rightful entitlements and avoid proper value allocation through whimsical plan tactics. The City may argue that Classes 10-11 are offered value that they would not otherwise be entitled, as consideration for voting to accept the Plan. This is untrue because the Plan pays a $0 recovery toward the retirement system's UAL.

15

The City is unable to prove that PFRS would not be able to fully pay existing pensions for the lifetime of current retirees, and is hoping for the acceptance by Classes 10-11, so they will not have to. PFRS, like all public pension funds typically have 30 years, to close any funding gaps. For example, the Pittsburgh Police System is 34% funded; Little Rock Police (39%); Omaha Police (39.3%) and; Philadelphia Municipal (47%). None of those systems have reduced benefits but rather have taken responsible steps, to close the funding gap in the future.

The Plan takes away value from Class 10 and 11 claim holders to which they are entitled, unless they accept the Plan. Under the *Dow Corning* approach, if there is an allegation of materially lower recovery or a greater risk of non-payment to the dissenting class, a plan proponent may rebut the presumption of unfairness by demonstrating that the treatment, (e.g., is consistent with the risk assumed by the parties before the bankruptcy). *In re Dow Corning Corp.*, 280 F.3d 648, 696 (6th Cir. 2002). The City is unable to overcome this presumption.

3. The Retiree Settlement Agreement for 2014 OPEB Violated the Spirit of Rule 9019.

Generally, the decision rests solely with the debtor to consent to a Rule 9019 hearing. While the "2014 OPEB" settlement agreement did not require a 9019 hearing, the lack of the Court's evaluation of the settlement, which formed the foundation for the Plan's future treatment of OPEB, is contrary to the public policy purpose that is the raison d'etre of Rule 9019.

The policy behind Rule 9019, as articulated by several courts, is to prevent debtors from entering into secret agreements and to provide interested creditors the **right to weigh and review the proposed settlement and, if necessary, object** (emphasis added). *In re Masters, Inc.,* 141 B.R. 13 (E.D.N.Y. 1992) (stating that the "clear purpose of Rule 9019 is to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court.").

16

The Stockton Court, in response to a creditor's request for a Rule 9019 hearing denied the request and stated "the day of reckoning comes at the plan confirmation hearing." If Class 12 accepts the Plan's treatment, the City's day of "reckoning" will never come. Rule 9019 preserves the sanctity of the process by requiring notice, an opportunity to be heard, as well as judicial oversight over. Absent the requirement of notice and court approval, the entire claims allowance process would be an empty shell.

### C. The Plan violates Section 943(b) (4) of the Bankruptcy Code Because the City's proposes to Violate Michigan Law Post-bankruptcy.

Congress did not intend bankruptcy to be a haven for cities who want to violate state law. There exists "(a) delicate state-federal relationship of mutual sovereigns in which the Tenth Amendment looms large (and) provides the framework for Chapter 9." Sections 903 and 904 honor the state-federal balance "by reserving certain state powers and by correlatively limiting the powers of the federal government," *In re City of Stockton*, 493 B.R. 772, (E.D. Cal. 2013).

From the outset, Congress was aware that municipal bankruptcy laws created significant potential for interference in state affairs. Under the plain terms of 903, the states retain control over their political subdivisions during a Chapter 9 case. State control is so absolute that the legislative history indicates that "withdrawal of state consent at any time will terminate the case." Bankruptcy courts may feel, and rightly so, that their authority is lessened by the limitations of Sections 903 and 943(b) (4), in comparison to the broad authority they enjoy under other Chapters of the Code. But it is the will of Congress and must be given effect.

17

1. **The Michigan Constitution (*Art. IX, Section 24*) requires that Pension Benefits be Annually Funded in the Year they were earned.**

Assuming arguendo, that 943(b)(4) does not prohibit the impairment of pensions in bankruptcy, the logical interpretation of the purpose of 943(b)(4) is that it applies after an obligation is restructured in Chapter 9, not necessarily to the restructuring itself. In *Sanitary & Improvement District*, 90 B.R. at 974-75, bondholders challenged a proposed Plan that would have restructured their bonds, and replaced them with bonds that provided for a buy-back by the municipality at less than the full nominal value of the bonds.

The court concluded that 943(b) (4) did not prevent a restructuring of the bonds. "To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debt is not," the court concluded, "a logical or necessary result." *Id*. at 974. The court ruled that the restriction applied to the bonds as restructured but rejected the Plan, allowing redemption following confirmation at a value slightly less than their actual present value, which was prohibited by state law, and therefore was prohibited by Section 943(b) (4) of the Code.

The Michigan Supreme Court in addressing the annual funding requirement stated, "In the years prior to the 1963 Mich. Constitution, the Legislature did not always make adequate appropriations to maintain (the state pension system) …on an actuarially sound basis…the practical effect of this underfunding was that many pensioners had accumulated years of service for which insufficient money had been set aside in the pension reserve fund to pay the benefits their years of service entitled." *Kosa v Treasury State of Michigan*, 408 Mich. 356, 365, (1980).

18

2. <u>The "Grand Bargain" to Partially Fund the City's Required Annual Contribution to PFRS is an Illusory Promise and is prohibited under State Law (MCL 600.1405).</u>

It is axiomatic that proposed recoveries cannot be "illusory." They are illusory if there is no real enforceable obligation between the parties. If one party can breach the agreement and walk away without any consequences, then that is no agreement at all. The "Grand Bargain," as it is colloquially referred, is no bargain, and is a "Grand Illusion," more appropriate in a David Copperfield show than in the City's Plan of Adjustment. In case of a default, the promisors have the exclusive right to determine whether the breach was justified.

> "All Funders (including The DIA, both as to any DIA Deficiency and with respect to the Guaranty) (to) have the right to rely upon the determination of the Board of Directors of the Supporting Organization as to whether the conditions to a scheduled payment have been satisfied and, if not initially satisfied, whether they have been timely cured."

The "Grand Bargain" was the result of the yeomanlike efforts of Judge Rosen, however, when illusory promises are all that support a purported bilateral agreement, there is no mutuality of obligation and, thus, there is no agreement. The promise is illusory because it fails to bind the promisor, "Words of promise which by their terms make performance entirely optional with the "promisor" do not constitute a promise," *Hess v Cannon Twp*, 265 Mich 582 (2005).

> "Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1). A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person." (MCL 600.1405).

The City's Plan proposes: "(there) will be no third-party beneficiaries to the rights of the City.... (or to assert) any claim against any Funder in respect of the obligations arising under the (agreement)." This Plan provision violates Michigan law and Section 943 of the Code.

19

3. <u>The Governor of the State of Michigan does not have the Authority to Violate the Michigan Constitution</u>.

The Michigan Constitution requires all elected officers of the state to take an Oath to support the Constitutions of this state. It **<u>does not</u>** say I will support the Constitution of the state when I agree with it."  Governor Rick Snyder took an oath to uphold the state constitution. And now he must. That's the thing about oaths. You have to keep them, even when it's not politically expedient. Imagine the judicial outrage if a governor simply chose to assign no meaning to other parts of the state Constitution — like the equal protection clause. It wouldn't be tolerated.

"This is no trivial matter. If Snyder blows through a constitutional obligation, enshrined in the very document that gives him the authority to govern, or comes up with a cowardly way to avoid it, it would de-legitimize his authority as the state's chief executive, and make him into the dictator his harshest critics already believe him to be" (Detroit Free Press Editorial, 12-5-2013).

**D. The City's Plan is Not Feasible**

The court has an affirmative obligation to scrutinize a plan to determine whether it is feasible. *In re Treasure Bay Corp.,* 212 B.R. 520, 547 (Bankr. S.D. Miss. 1997) (quoting *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506) (Bankr. S.D. Tex. 1989). Those Cities that exited bankruptcy without a feasible Plan quickly found themselves in fiscal distress again.

The city of Mack's Creek, Missouri, for example, filed for bankruptcy in 1998, then for a second time in 2000, and in 2012 the city was dissolved altogether. Westminster, Texas filed in 2000, and then again only four years later. Prichard, Alabama filed for bankruptcy at the end of 1999, came out of bankruptcy in 2007, and in 2009 found itself again in bankruptcy.

20

1.    <u>The City is Not Capable of Implementing the Plan, therefore, the Plan is Not Feasible</u>.

The Objectors do not assert that the Plan is not feasible economically. In fact, since the Plan proposes to pay $0 to PFRS "normal cost" contribution and $0 to PFRS UAL, the Plan is clearly is feasible from a purely economic viewpoint. The court must look at the probability of *actual* performance of the proposed plan. "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises." *In re Clarkson,* 767 F.2d 417 (8th Cir. 1985). The court may not rely on highly speculative and unduly optimistic assumptions and must base its findings of feasibility on the evidence presented. See *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438 (S.D.N.Y. 1994).

Among the factors bankruptcy courts consider in determining the feasibility of a plan are: "the debtor's prior performance" and the "ability of management." See, *In re Canal Place Ltd. P'ship,* 921 F.2d at 579 (5th Cir. 1991); also, *In re U.S. Truck Co.,* 800 F.2d 581 (N.D. Ill. 1992).

2.    <u>The City's Prior Performance and the Inability of its Management makes the Plan Not Feasible</u>.

Past financial performance may cause concern about the debtor's ability to perform under any proposed plan. Where a plan is to be funded from the debtor's operating revenues, the debtor's past and present financial performance is probative of feasibility. See, *In re Eastland Partners, L.P;* 149 B.R. 105, 108 (Bankr. E.D. Mich. 1992). See e.g., *In re Canal Place* F.2d at 579, ("Debtor's prior performance is probative of the feasibility of any plan of reorganization"). See also, *In re C&P Gray Farms, Inc.,* 70 B.R. 704 (Bankr. W.D. Mo. 1987) (individuals who performed actual farming for debtor corporation were "good farmers"), also, *In re Gulph Woods Corp.,* 84 B.R. 961 (Bankr. E.D. Pa. 1988) (confirmation denied where plan depended on debtor's principal, and principal had doubtful managerial skills).

21

While the City's prior mismanagement is well documented, unfortunately the actions of the City's current administration, despite assurances to the contrary, have not instilled confidence in their ability to implement the Plan successfully. For example, while nobly asking for a "shared sacrifice" the City continues its post-petition prodigal spending; paying its police chief ($225,000)[3] and providing its Mayor with a City owned residence. The Mayor's residence is an over 4,000 square foot, 15 room riverfront home, that counts among its amenities a bowling alley, swimming pool, boathouse and cabana ( including $121,000 annually for its maintenance and; $1.9 million for the Mayor's around the clock security).

Detroit continues to provide unlimited use of take-home City vehicles to employees, most who live outside the City limits, including free gas and City liability insurance.[4]  The City remodeled its main public library replete with $1,100 trash cans and $1,092 chairs (Detroit News, $1,100 Trash Cans Part of Library Fix-up, Detroit News; 4-28-11). The City, while crying poverty, has been forced to return millions of dollars in grants (e.g., City tries to spend $20 million by May, Huffington Post, 3-6-12). The City has an ambitious blight removal program but the City is loath to explain why considerable free resources to remove blight was spurned (Why Did Mayor Duggan Sideline Anti-Blight Crusader Pulte, Forbes; 4-17-14), (Detroit Misspent, $3 Million Dollars Meant for the Poor, State tells City Council, Det. Free Press; 3-12-2012), (Parking Violators owe Detroit $82 Million Dollarsines in Unpaid F, WDIV; 3-6-2014)

---

[3]The highest salary for a police chief in the country outside of California.
[4] The City is self-insured but incurs liability for accidents or other acts occurring off-duty with City owned vehicles.

22

The City's history of mismanagement is well documented and was recognized by Governor Snyder:

> "Realistically, if you step back, if you were lending to the city of Detroit in the last few years, didn't you understand there were major issues and problems? Look at the yields they're obtaining compared to other bonds. They were getting a premium...... Basically, Detroit hasn't had a positive fund balance since 2004. So this isn't a recent occurrence." (CNSNEWS, 7-22-2013).

The City's reckless spending, squandering of the City's resources while calling retirees "ungrateful" for wanting what they earned, and what the City is capable of affording by overhauling its delinquent revenue collections and monetizing its non-core assets, is reminiscent of Marie Antoinette's callous retort when telling the peasants who did not have bread to eat "let them eat cake" which became the symbol of a decadent monarchy."

The City has not met its burden of proving that the Plan is feasible as required by Section 943(b) (7). The City's opaque and vague Plan, its ambiguous discussion of "reinvestment" and providing "adequate," but undefined municipal services, does not instill confidence that the City's Plan has a "reasonable assurance of success." The "feasibility test," requires a finding that confirmation of the Plan is not likely to be followed by the need for further reorganization. See, *Kane v. Johns-Manville*, 843 F.2d 636 (2d Cir. 1988); *In re Belco Vend.* 67 B.R. 234 (1986).

3. The City's Plan Does Not Define "Adequate Municipal Services."

In resolving whether the Plan is feasible under 943(b) (7), the Court must independently determine that the City can provide essential government services. See, *In re Mount Carbon Metropolitan District*, 242 BR 18 Colo. 1999). The City has offered evidence of "service insolvency," (e.g., a purported 58 minute police response).

23

There was only one problem - it was not true. The City subsequently retracted the assertion (Detroit News; 8-8-13).The City also said that its police response exceeded the national average of 11 minutes. There are no national averages (Denver, Police Audit June 2014). The City's retort when creditors or retirees question any assertion, is reminiscent of a Groucho Marx punchline, "Who are you going to believe, me or your own eyes."

Detroit has the 3rd highest per capita ratio of officers to citizens (25 largest cities). Rodney Dangerfield was once asked, "How do you like your wife?" His answer was, "Compared to what?" The City's Plan contains no quantifiable metrics (e.g., how many police officers they believe are needed, fire-fighters, etc.) to objectively prove what improved services should look like.  The EM and Mayor come up with pithy anecdotes regarding poor services at the drop of a hat – the underlying truth of which is often undeniable, but fail to answer the basic question of why are services so bad when the City's budget is much larger than more populous cities?[5]

The Governor continues to sidestep the inconvenient truth that it has been the state's abdication of its legal responsibilities that has brought the City to this point.  The Plan's lack of quantifiable benchmarks to judge the adequacy of city services, makes it more than likely, that the City "reinvest" in services by throwing money at a problem and hope it works. Hope is not a Plan that this court should confirm. **Research shows Cities spend what they spend because they choose to spend it.[6]**

---

[5] Detroit is the 18th most populous city. Its budget is twice as large (1.1 billion) as Charlotte, NC (561 million). Also it is important to note that NY reduced police personnel by 20% between 1999 and 2009 and the crime rate declined by 44%.   From January 1, 2002 through March 31, 2014 crime in Detroit is down by over 35%.
[6] White Paper, David Edwards, *IBM, Smarter, Faster, Cheaper, an Operations Efficiency Benchmark Study of 100 American Cities* (2011).

24

Gordon Bethune, the former CEO of Continental Airlines said "A bankruptcy judge can fix your balance sheet, but he cannot fix your company." Bankruptcy worked so well for Continental Airlines in 1983 that it went back again in 1990.

### E. The Court's *Sua Sponte* Determination of the Constitutional Question of Whether Pensions could be Impaired Should Have Been Avoided.

Sir Francis Bacon said "*A court has nothing to do with what is not before it*," The requirement that points not argued are not considered, is more than just a prudential rule of convenience. Its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one, *United States v. Burke*, 504 U.S. 229 (1992). Unasserted arguments are not considered because the premise of our legal system is the adversary process in which advocates present the parties' facts and arguments to neutral decision-makers. The "judicial power is one to render dispositive judgments," not advisory opinions. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211,219 (1995).

Under the doctrine of constitutional avoidance, Courts avoid constitutional determinations when a case can be resolved on other grounds. See, *Ashwander v. TVA*, 297 U.S. 288 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case"). See also *Muller Optical Co. v. EEOC*, 743 F.2d 380 (6th Cir.1984) ("The duty to avoid constitutional questions (is) based upon the general policy of judicial restraint"). When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution. See *Siler v. Louisville & Nashville R.R.* Co., 213 U.S. 175 (1909).

25

In essence, this Court decided a constitutional question (diminishment of pensions), not because it was unavoidable, but because it believed that putting the issue behind it would facilitate the administration of the case. This was not appropriate. "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States*, 196 U.S. 283, 295 (1905); *Adams v. City of Battle Creek*, 250 F.3d 980,986 (6th Cir. 2001). See *Taylor v Auditor General*, 360 Mich 146 (1960) rev'd in part on other grounds 468 Mich 763 NW2d 185 (2003) ("Few) principles of judicial interpretation are more firmly grounded than this: a court does not grapple with a constitutional issue except as a last resort"). The Court's pension determination should have been left for another day.

It weakened the retiree's negotiating posture. There is a well-known negotiating principle called the "anchoring principle." Simply stated, "People tend to irrationally fixate on the first number put forth in a negotiation - the anchor - no matter how arbitrary it may be. The Court's ruling opened the door for the City to "fixate" on cutting pensions without any evidence being offered that justified the cuts. The City had an opening and they drove a truck through it.

Even when it's known that the anchor has limited relevance, people fail to sufficiently adjust their judgments away from it."[7] However, the Court's ruling did not invalidate the state's constitutional protection of pensions, as some have suggested. It only affirmed a power that the Court has always had, the ability to alter contracts. But state officials are still required to uphold the Michigan Constitution which still holds the same power it did before the Court's ruling.

---

[7] *"Anchoring Expectations,"* by David A. Lax (principal, Lax Sebenius LLC) and James K. Sebenius (professor, Harvard Business School), first published in the *Negotiation* newsletter. (2-14-2011).

26

**F. The Court Should Not Grant Third-Party Releases of Non-Debtors.**

The Code neither expressly prohibits nor authorizes bankruptcy courts to release claims against a non-debtor over a dissenting creditor's objection. Some circuits have held that bankruptcy courts lack the power to prevent a creditor from enforcing a judgment against a non-debtor party, see e.g., *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995) (bankruptcy court lacks power to confirm plan which discharges non-debtor).

A bankruptcy court lacks jurisdiction over the operation of the Third Party Release as applied to state litigation (Michigan's definition of standing is broader than the federal "case or controversy" requirement). A bankruptcy court's reach is limited to jurisdiction over the debtors and the creditors, not over non-creditors whose legal proceedings involve non-debtors (State of Michigan). It is conceivable, that even if the parties of interest provide the state with a release, it is likely that non-parties could challenge a wide variety of actions in state court (e.g., P.A 436, diminishment of pensions, etc.), *Lansing Sch. Educ. Ass'n v. Bd. of Educ.*, 792 N.W.2d 686 (Mich. 2010).

**G. The Court's Site "Tour" of the City is more Prejudicial than Probative.**

The City has couched its desire to conduct what in reality would be a "ruin porn" tour as a "site tour" meant to benefit the Court. However, it is prejudicial, a waste of time and violative of Rule 403 of the Federal Rules of Evidence (FRE) which provides:

> (Case) law recognizes that certain circumstances call for the exclusion of evidence that is of unquestioned relevance. These circumstances entail risks that range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value and need for the evidence against the harm likely to result from its admission, *Fed. R. Evidence 403 advisory committee's no*te.

The Supreme Court provided a three-step analysis to be used when employing a Rule 403 test. In the first step, "the court would decide whether a particular item of evidence raised a danger of unfair prejudice." Second, the court would "evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well." Finally, "[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk." *Old Chief v United States,* 519 U.S. I72 (1997).

The City's proposed site tour fails the *Old Chief* balancing test as there are many alternatives that would provide the Court the same information in a more complete context that would allow the parties to cross examine and present evidence. The tour will not be able to show the City's failed policies destroyed many neighborhoods and packed poor people in areas leading to a concentration of poverty and crime. The City wants to have a site tour of **the crime scene they created**.

For example, the former "Warehouse District"(South of Jefferson and East of the Renaissance Center), contained many popular restaurants and night-spots that were razed for casinos that never materialized and left the area blighted; in Southwest Detroit, Marathon Refinery purchased large numbers of homes in return for promises to give Detroiters jobs. The homes were razed, and now the area is blighted, etc. ($175 Million Dollar Tax Break for Marathon Refinery buys Detroiters 15 Jobs, Detroit Free Press; 3-14-14).

28

The City used eminent domain to seize property and gave it to General Motors, for a new auto plant. The City cleared 465 acres of land in the center of the city–some 1,500 homes, 600 businesses, 16 churches, a school and a hospital were razed–some 3,500 person were forced out– for a new factory that would employ 6,500 workers. Ultimately, the auto plant employed less than half the promised 6,500 workers and more jobs were lost from the destruction of Pole Town than were created by the factory. The city also believed that the new plant would attract other, feeder plants, nearby which never materialized. (Orange County Register, 8-29-2004). It remains one of the most blighted, areas in the City.

The City's Plan is eerily incongruous when juxtaposed with state and city leader's statements reveling in the City's progress (e.g., "Detroit is one of the hottest places to live in the country," Governor Snyder, CNN, 6-20-2014); ("Downtown (is) imitating such desirable NY addresses as Chelsea or Tribeca (it is) nearly impossible to find a vacant apartment to rent in downtown", NY Times, 10-18-2012); "Detroit One of Best Places to be a Business," Forbes, 6-29-2011); Detroit sells $1 million of vacant homes in auction, Mayor Duggan "there's (high) *demand for good homes in Detroit's neighborhoods*." Land Bank President, "*we have the potential to add 1,000 or more residents to the city each year, which ties in perfectly with the Mayor's goal of increasing the city's population for the first time in more than 50 years*," (WDIV, 6-26-2014).

29

### H.  Other Objections

There are a number of constitutional provisions at issue here; not just the contract clause. The U.S. Constitution says no state shall pass a law impairing the obligation contract. Yet, Michigan passed PA 436 which allows a bankruptcy filing for the purpose of violating the pension contract guaranteed by the Michigan Constitution. So the issue is whether PA 436, which is the basis for allowing the bankruptcy filing, impairs the obligation of contract.

Also at issue is whether bankruptcy provisions conflict with the federalism clause in the Tenth Amendment of the U.S. Constitution which provides that all powers not granted to Congress are reserved to the states. Congress does not regulate state and local government pensions due to this Amendment. How then, can it regulate them through the bankruptcy law?

## IV. RESERVATION OF RIGHTS

The objectors reserve all rights to object to the Plan on any and all grounds, including, without limitation, those not mentioned in this Objection.

## V.  CONCLUSION

For all of the foregoing reasons, the Objectors request that the Court deny confirmation of the Plan or grant such other and further relief that protects the Objector's substantive and procedural rights or that the Court deems appropriate under the circumstances.


/s/ Jamie S. Fields_____
Jamie S. Fields (P-52808)
555 Brush #2409
Detroit, Mich. 48226
(313) 570-3906

Date: July 6, 2014

30