UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------ X

In re . Chapter 9

CITY OF DETROIT, MICHIGAN . Case No. 13-53846

Debtor . Hon. Steven W. Rhodes

------------------------------------ X

## OBJECTION TO CONFIRMATION OF CITY OF DETROIT'S
## FOURTH AMENDED PLAN OF ADJUSTMENT

Gail M. Wilson, a recipient of retiree benefits through the General Retirement System of the City of Detroit, Michigan, does hereby file this objection to the City of Detroit's Fourth Amended Plan as follows:

I. **The Plan Of Adjustment Fails To Comply With
The City's Obligations Pursuant to The
Urban Mass Transportation Act, Section 13 (c)**

Pursuant to Section 13 (c) of the Urban Mass Transportation Act of 1964, as amended, recipients of grant funds for the purpose of implementing projects, maintenance and/or operations involving mass transportation, must first voluntarily agree to enter into a Protective Agreement with the affected labor organization(s) to ensure that members of the labor organization are not harmed as a result of the

project. No aid [or grant] can be provided under UMTA unless arrangements are made to provide "fair and equitable" treatment for employees affected by the aid. Specifically, the Act states:

> It shall be a condition of any assistance under 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interest of employees affected by such assistance. Such protective assistance **shall** include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges and benefits **_(including pension rights and benefits)_** under existing collective bargaining agreements or otherwise ... (emphasis added)

See. 49 U.S.C. § 1609 (c) (1976).

The City of Detroit Department of Transportation has requested, and received, federal grant assistance for transportation related projects for the past several decades. Accordingly, the City of Detroit Department of Transportation and AFSCME Local 312[1] are parties to a Protective Agreement, approved by the Department of Labor, which guarantees, among other things, the preservation of employment rights, employment benefits and collective bargaining rights. Moreover, at the recommendation of the Department of Labor, in 1991 the Agreement was updated to specifically provide that the "pension rights and benefits for employees covered by the Agreement, **_including employees having_**

---

[1] AFSCME Local 214 and the Amalgamated Transit Union Local 26 are also believed to be parties to separate protective agreements under Section 13 (c) with similar or identical protective language.

***already retired under the existing collective bargaining agreement or otherwise ... shall be preserved and continued".*** (emphasis added).

On July 18, 2013 the City of Detroit filed for Chapter 9 bankruptcy protection pursuant to the U.S. Bankruptcy Code. In each version of the Plan and Disclosure statement submitted to the U.S. District Court, Eastern District of Michigan, Bankruptcy Division, the City has proposed to change, alter, modify and/or eliminate employment terms, including wages and benefits, for active employees and pension terms and benefits for retired employees. As to active members of AFSCME Local 312 and retired employees who were members of AFSCME Local 312 at the time of their employment, these proposed changes are in violation of the parties' Protective Agreement. The employment terms, wages and benefits should not be subject to revision under the Bankruptcy Code because the Protective Agreement was negotiated as a requirement of, and for the receipt of, federal funds sought by the City of Detroit for various transportation projects. Indeed, it can be reasonably argued that the City sought and received prior grant funds pursuant to a Protective Agreement it entered into under false pretenses. In fact, the record created during the Eligibility Trial established, without refutation, that the City knew, or had reason to know, as early as 2011 that the municipality would seek bankruptcy protection and would further seek to abrogate its responsibility under the Protective Agreement. To be clear, the City had

no intention of complying with the terms of the Protective Agreement after certifying to the U.S. Department of Labor and the affected Locals representing current actives and retirees covered by the Agreement that it would do so. Indeed, in filing and seeking support for its Fourth Amended Plan of Adjustment, the City has, once again, ignored its obligation under the Protective Agreement. In its Disclosure Statement supporting its Fourth Amended Plan, the City acknowledges the obligation to bargain with affected employees as a condition of Section 13 (c):

> Pursuant to Section 13 (c) of the Federal Transit Act (the "FTA") the City is required to engage in collective bargaining with labor unions representing transportation workers and has certain limitations in terms of its rights to make unilateral changes to employment terms including, but not limited to, wages, work rules and benefits (including health and pensions). The City will work within the framework established by the FTA to achieve any labor cost reductions for these workers through collective bargaining.

*See, Disclosure Statement, pg. 179 (366 of 406).*

The City has completely ignored its obligation to "preserve and continue" the "pension rights and benefits" of those already retired, as provided by the Act and in the Protective Agreement currently in place before requesting that the Court implement significant reductions to pension payments and pension benefits otherwise covered by the Protective Agreement. Stated differently, the City's collective bargaining

4

negotiations can control the extent of protection provided to future retirees going forward, but that does not give the City the authority to ignore the retirees that already exist. Essentially, the City is requesting that this Court acquiesce in the abrogation of its obligations under the Protective Agreement, which will necessarily result in a violation of the Act.

Moreover, the City cannot reasonably assert that compliance with the Protective Agreement will cause, or result in, economic hardship to the City. In its Fourth Amended Plan the City acknowledges that continued receipt of federal grant funds is essential to the successful operation of the Detroit Department of Transportation. However, what the City does not reveal is that there is nothing in the federal grant application process, nor in the receipt of the funds, that prohibits the City from using a portion (and in this case, a minor portion) of the grant funds to pay its obligations under the Protective Agreement. Accordingly, the City could, quite conceivably, request sufficient grant funds to cover the cost of continuing the pension and benefit payments for the limited number of affected retirees (approximately 1100) and still retain adequate funds to complete the project identified in the grant request.

It must also be mentioned that the City cannot rely upon the Court's designation that the City is "service insolvent" to argue that it cannot afford to use the grant funds to comply with the Protective

Agreement. Incompetence and corruption, not compliance with the Protective Agreement, are the culprits of the transportation insolvency within the City. The Court need only look to a few recent examples to assess that the City has not made effective use of prior grant funds to the benefit of its citizens. One glaring example is the City's request for, and receipt of, grant funds for the purchase of new coaches (i.e. busses), all of which, when received, were parked on the property of a D-DOT service garage where they remained for no less than 3 years. None of these coaches were ever placed in "service" for the citizens. Rather, city transportation users were required to ride on coaches that had been overused, malfunctioned frequently and were often infected with roaches and bed bugs, while new coaches to sat, unused, for several years, before being sold, at a discount, to the SMART system. Another example is the request for, and receipt of, grant funds to update and remodel one of the D-DOT service garages. Part of the remodel included the removal and replacement of underground fuel tanks. A portion of the construction contract was awarded to Ferguson Enterprises, the owner of which is currently a guest of the federal penitentiary system. After several years of "construction", the newly installed underground fuel tanks curiously breached the concrete surface and rose above ground, causing a reasonable person to conclude that neither the tanks nor the concrete had been installed according to specifications. Hence, the

continued shut-down of the service garage, as well as the corresponding delay in service delivery, while the "remodel" continued. Clearly, these designated uses of grant funds – which did not address or improve the transportation service insolvency -- cannot be said to be more appropriate than using a small portion of the funds to maintain compliance with the federal Act and the Protective Agreement that the City voluntarily entered into to receive the grants.

Finally, the City acknowledges that the failure to comply with the terms of Section 13 (c) should have significant consequences:

> The City's failure to comply with the terms of Section 13 (c) of the FTA with respect to these transportation workers' employment terms could result in the loss of hundreds of millions of dollars in Federal transit grants.

See, Disclosure Statement, pg. 179 (366 of 406). Thus, it was never contemplated that the City would be allowed to "take the money and run" under the guise of bankruptcy protection. Moreover, to add insult to injury, the City has, during the course of this bankruptcy, once again requested federal grant assistance where the proposed Protective Agreement contains identical language to that set forth above, notwithstanding the fact that the City has failed and refused to resolve its non-compliance with current retirees.

Section 13 (c) agreements are not mere common law contracts. The Agreements' existence results from Section 13 (c). They are the

earned by the System. While this position provides an interesting media sound bite and gives the appearance that the City is the righter of all wrongs, it fails to take into account several key points. First, the annuity recipient had absolutely nothing to do with the determination of the interest amount that would be attributed to the fund. The Retirement System (i.e. the Pension Board) was the sole determinant of the interest assessment, and, oddly enough, the City always had representatives on the Board. Accordingly, if there was an inappropriate assessment made to the annuity account, it is the System, including the Board participants (which encompasses City representatives), who should be made to bear the burden of reimbursement. In its Fourth Amended Plan and Disclosure Statement, the City has asserted that the decisions made by the Retirement System constituted a breach of their fiduciary duty, negligence and potential malfeasance in the exercise of their obligations toward the pension fund and the retirees who are beneficiaries of the fund. See, *Disclosure Statement, pg. 118 (305 of 406)*. Nevertheless, the City has elected to avoid seeking restitution from the Retirement System, or absorbing the loss since it's representatives were complicit in the alleged error, (focusing instead on individual retirees and their survivors), and has further demanded that the retirees exculpate and release the System and Board members from liability for any decisions made regarding the fund (notwithstanding the City's assertions of negligence

9

and malfeasance). I have tried incessantly to understand the City's logic, but I continue to get hampered by this point: if the retiree had nothing to do with creating the wrong, how is it that the retiree is solely responsible for making it right?

Second, the Plan proposes to "recoup" a "cap" of the excess interest attributed during a limited time frame, but, in fact, will actually recoup an amount far in excess of the amount allegedly owed. The "recoupment" will take the form of a reduction in the affected retiree's monthly pension check and will continue for the life of the retiree without regard to whether the retiree reaches the repayment amount purportedly owed. It would, therefore, appear that the City hypocritically asserts that the retiree received more money (in the form of excess interest) than s/he should have received, but finds no problem with the notion that the City will "recoup" more monies than were actually assessed. Apparently, the "do as I say, but not as I do" standard is being applied by the City in its Plan.

Accordingly, I object to the inclusion of an Annuity Savings Fund Recoupment in the Plan of Adjustment.

### III. The Voting Structure Established By The City Places An Undue Burden on Class 11 Participants

The City's Fourth Amended Plan of Adjustment requires that both classes 10 and 11 vote "yes" to confirm the Plan before retirees in the

General Retirement System can receive the "advantage" of a reduced across-the-board cut to their pension, the elimination of COLA and the elusive "cap" on ASF recoupment. To be clear, GRS retirees will not receive these benefits if Class 10 (retirees of the PFRS) votes to reject the Plan. Ironically, members of the PFRS can rest on their laurels, stand up for their "principles" and vote to reject the Plan without fear of reprisal or retribution for doing so. Whether they vote to affirm or reject, members of the PFRS will not receive a reduced pension benefit (with the exception of the loss of the escalator – a benefit that not every member of PFRS would receive anyway). On the other hand, members of the GRS are subject to a 4.5% across-the-board reduction, loss of all of the COLA (a benefit all GRS members received and which equaled, on average, 13% over the lifetime of the retiree) and "recoupment" in the ASF, as applicable, if the Plan is affirmed and a huge, unjustifiable penalty if the Plan is rejected. The problem is that the GRS members will be subject to the penalty even if the Plan is rejected as a result of the PFRS vote. Tying classes 10 and 11 together for the purposes of voting, places the GRS members in the untenable position of not being able to control their own fate.

Additionally, upon rejection of the Plan, whether as a result of their vote or that of the PFRS, members of the GRS will be subject to an enormous penalty which will reduce their pension benefit by 27% across-the-board, a loss of COLA and an ASF "recoupment" that does not

11

13-53846-tjt    Doc 5883    Filed 07/09/14    Entered 07/09/14 15:55:13    Page 10 of 12

include the "pain cap" of 15.5%. While the GRS Plan settlement includes contributions from the State and various foundations, the City has failed to demonstrate that a rejection of the Plan and the corresponding loss of the State and foundations contributions, amount to an additional 22.5% shortfall or that the "recoupment" of the ASF would require removal of the "cap". Rather, it appears that the sole purpose of the penalty imposed upon rejection of the Plan is to demean, demoralize and economically strangle GRS retirees. If the rationale for the bankruptcy filing was to allegedly rectify prior poor financial decisions made by the City, a justifiable result would be to impose no more than is absolutely necessary to resolve the purported pension shortfall. Anything more is punitive and uniquely designed to force retirees to abandon their objections, withdraw their appeals, waive their guaranteed right to a pension (as asserted by Michigan Attorney General Bill Schuette), and vote "yes" on a Plan of Adjustment merely to retain sufficient pension benefits to survive. How is this possible?

Finally, the release of claims proposed by the City does not address the right of the retiree to abstain from the voting process. Rather, a retiree who does not want to support the Plan, but who doesn't want to vote to reject the Plan, does not have the option of abstaining from the vote without being subject to the terms of the release. Additionally, it is unclear
12

whether an abstention requires active submission of an unsigned ballot or will be accepted by the mere act of not voting.

For all of the foregoing reasons, I object to confirmation of the City of Detroit's Fourth Amended Plan of Adjustment. Additionally, I reserve the right to object to confirmation of the Plan on issues not specifically enumerated herein.

Respectfully submitted,

*Gail M. Wilson* (signature)
Gail M. Wilson
27107 W. Skye Dr.
Farmington Hills, Michigan 48334
(313) 410 2333
gail@gailwilson.com

Dated:   July 6, 2014