| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| Debtor. | ) | |
| | | Hon. Steven W. Rhodes |

## OBJECTION OF Estella L. Ball

## TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

2. I am a creditor, and a member of Class 11 (General Retirement System pension recipient) and Class 12 (OPEB recipient), a citizen of the United States of America, a resident of Detroit Michigan of African American Descent. I hereby object to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (the "Plan") (Docket No. 4392) because: the Comprehensive State Release (the "Release") is improper; the Annuity Savings Fund ("ASF") Recoupment is illegal, inequitable and unfair; the Plan is inequitable and unfair; and the Plan cannot be confirmed because it will require the Debtor (the "City of Detroit" or the "City") to take an action that is forbidden under the Constitution of the State of Michigan, the Charter of the City of Detroit and the United States Constitution. The adoption of this Plan will affect all the citizens of the City of Detroit and nullify their due process right to "elect representatives with general legislative power." and is in direct violation of 24 U.S.C. § 1983 and Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, P.A. 436 violated the VRA and the United States Constitution.

1

## A. Non-Debtor Releases and Injunctions

The Release that the Plan seeks to enforce upon both consenting and dissenting members of Class 11 and Class 12, should those classes vote to accept the plan, is an improper non-consensual release of third parties that fails the 7-part test for "unusual circumstances" established by the 6th Circuit Court.

1. Within the 6th Circuit, in the case of In re SL Liquidating, Inc., the United States Bankruptcy Court for the Southern District of Ohio affirmed that all of the factors are important and must be present.

2. In respect to the first factor in the 7-part test, there is no identity of interests between the City and the State of Michigan (the "State"). There is no indemnity relationship between the two. Further, a suit against the State of Michigan would not affect the assets of the City of Detroit.

3. In respect to the second factor, the State of Michigan's "contribution" to the reorganization could be viewed as not being substantial in light of the overall debt load of the City, the unfunded portion of the pensions, per the City's own numbers, and the State's projected billion dollar budget surplus in 2014. While the State of Michigan will reportedly contribute $195 million dollars to the "Grand Bargain", this number represents approximately 1% of the total debt and obligations originally reported for the City ($18 billion) and approximately 2.6% of the debt owed to the GRS and PFRS pension claims and OPEB claims ($7,355,000,000). It could also be argued that the State's $195 million is not truly a contribution at all, at least not one that warrants a release from all future liabilities, considering that it is being given as part of a "Grand Bargain" that requires the City to transfer an asset (the DIA collection) that is worth considerably more than the funds being provided by the "Grand Bargain". Without that asset, the State would not be making its "contribution".

4. In respect to the third factor, the Release is not essential to reorganization. In fact, the Plan

2

already anticipates that the Release might not be approved by the court and provides for an alternative that would allow the reorganization to move forward.

5. In respect to the fifth factor, the Plan does not provide any mechanism to pay for all or substantially all of the claims of Class 11 or Class 12:

    a) Class 11 actually has no guaranteed payment to the creditors as several factors could trigger additional reductions even after the City exits bankruptcy. Future pension payments to members of Class 11 are contingent upon third-party contributions over 20 years, and escalated DWSD pension obligation payments over 9 years, that might result in steeper cuts if they are not paid as expected. There does not appear to be a ceiling for how high the pension benefit cuts would be allowed to go;

    b) Certain members of Class 11 will have their pensions cut by up to 20%;

    c) Class 12 will receive approximately 10% of the total claim for that class, again with no guarantee of future benefits;

    d) The City proposes a number of scenarios that could lead to restoration of pension benefits. But those scenarios require the funds to outperform the City's new assumed rate of return for a substantial number of years. If the City truly believes the funds will outperform its new assumed rate, then this calls into question the very formula the City used to: a) determine the unfunded portion of the pensions and b) determine by how much pension benefits should be reduced. Restorations cannot be assumed;

    e) This factor should be evaluated in terms of what is being guaranteed, and that is not substantially all of the claims of Class 11 and Class 12.

6. In respect to the 6th factor, the Plan provides no opportunity for those who choose not to settle to recover in full. There is no ability to "opt out" of the settlement.

7. Given that in Chapter 9 reorganization the court is unable to compel the sale of municipal assets, or to even propose an alternate plan that compels the debtor to contribute more of its

3

assets to the creditors' claims, there is even less reason in Chapter 9 to enjoin creditors from pursuing full recovery from non-debtor third-parties than there is in Chapter 11.

The "Comprehensive State Release" does not meet the standard for "unusual circumstances set by the 6th Circuit and should not be granted.

### B. Annuity Savings Fund Recoupment

The Plan proposes a seizure of the assets of creditors in Class 11, without due process, that is not supported by bankruptcy or non-bankruptcy law and is a violation of the Detroit Municipal Code and the United States Constitution.

1. The City has not brought any action (lawsuit, avoidance action or criminal proceeding) under bankruptcy or non-bankruptcy law that would provide the legal basis for "recouping" annuity savings interest from non-consenting employees and retirees.
2. Avoidance due to preferential treatment is not applicable:
   a) The City ended the practice of giving guaranteed minimum returns and bonus distributions in 2011, as a result of a new City ordinance. There would therefore be no "excessive interest" applied to accounts within the time-frame allowed for avoidance due to preferential treatment;
   b) U.S. 11 – 547(c) (2) would also prevent avoidance on the basis of preferential treatment because the transfer was to satisfy an obligation created in the ordinary course of doing business and the transfer was made in the ordinary course of doing business.
2. Avoidance due to Fraudulent Conveyance, actual or constructive, is not applicable:
   a) There has been no action brought alleging fraud in the issuance of interest or bonus distributions. However, if it were ever determined that GRS assets should be forfeited as a result of some illegal activity, then any penalty or recovery should be applied evenly to all

4

retirees and active employees, even those who did not participate in the annuity savings plan, as it could not be determined that only the assets of the ASF were involved;

b) In 1996, a charter proposal (Proposal T) was placed on the ballot. It sought to limit the amount of interest, beyond the assumed rate of return, that employees would receive on annuity savings. The citizens of Detroit defeated that proposal, allowing and sanctioning the continuation of bonus distributions (annuity interest and 13th checks);

c) All interested parties had access to knowledge that employees were receiving a minimum rate based on the assumed rate of return;

d) There is no evidence of falsification of financial reports for the GRS and those reports are published and readily available to government officials and the public;

e) No evidence has been presented to show that money to fund annuity interest shortfalls came from any place other than the fund designated for such transfers in the city municipal code;

f) Claims that funds were improperly mixed is misleading. The funds are accounted for separately, but invested jointly. There is nothing illegal or fraudulent about this;

g) Applying a 2011 municipal ordinance prohibiting bonus distributions to periods prior to 2011 for purposes of determining "excessive" interest is inappropriate because that legislation was prospective. Adopted in November 2011, it was scheduled to take effect December 2011.

3. If the city asserts that actions were taken that constitute fraud solely under bankruptcy law, then the "look-back" period would only be two years prior to the bankruptcy filing. Since the practice was stopped in 2011, there should be little to nothing to recover. U.S. 11 – 548(e)(1) is the only provision that allows 10-year look-back and it requires the debtor to have, among other things, transferred to a self-settled trust that benefits the debtor **and** to have done so with actual intent to hinder, delay or defraud other creditors.

4. The different treatment of those in Class 11 who had annuity savings accounts in the years

5

2003-2013 and those who did not is a violation of 11 U.S. 1123(a)(4) which calls for all claims within a particular class to be treated the same:

a) All employees in the GRS had an opportunity to participate in the annuity savings plan once it was created. That some chose not to was an individual decision;

b) There was nothing preventing or discouraging the use of the plan by any particular group of employees. It did not require a specific dollar amount to participate, only a percentage of the salary, with the lowest being a mere 3%. If this is considered preferential to ASF participants, or unfair to non-participants, then the new hybrid plan proposed by the City for current employees continues to be preferential and unfair because it also has an optional component for additional employee contributions based on various percentages of income;

c) If someone retired in 2002 or earlier, and took an annuity distribution, they are not having anything recovered from them but are benefiting from funds recovered from others. Nor are assets being recouped from retirees who received 13th checks during 2003-2013, some of whom might never have made a contribution into the system during their employment.

5. There is no reason to believe the City would have reinvested the excess interest to the benefit of the Defined Benefit Fund (for pension payments). On the contrary, in past years, when the City received its share of the excess interest, it was used to lower the City's required annual contribution to the system rather than as an increased contribution to improve the health of the fund. Proposal T was designed to change the proportion of the excess distribution (not to end it,) so that the City could have a larger portion and further reduce its future obligations.

6. The City is asking the bankruptcy court to exercise avoiding powers without actually bringing an action against creditors that could be defended.

7. The Plan deprives certain creditors in Class 11 of their right to defend against allegations that they received unfair or unlawful enrichment, as a result of malfeasance, negligence, fraud or preferential treatment, by binding their fate to the vote of others in their class. However, the

6

overwhelming majority of the class is not being subjected to ASF Recoupment. At a minimum the creditors subjected to ASF Recoupment should have been placed in a different class.

8. Employees who retired and took ASF withdrawals during the Recoupment period did so in reliance upon a transfer of all rights in such funds, with no liens or other claims of right by the City to any residual interest in them:

   a) The City, via the Pension Division of the City's Finance Department, kept employees informed of the assets they had in their annuity accounts and the interest they had earned;

   b) The City performed the transactions that allowed the employees to withdraw money from their accounts, obtain loans against their accounts or convert their assets to an annuity upon retirement;

   c) The City especially does not have a legitimate cause for recouping money that the City gave the former ASF participants every reason to believe was theirs free and clear, when the City was aware for decades of the practice of bonus distribution, participated in the practice and is aware that its citizens upheld the practice by their vote on Proposal T in 1996.

9. The reduction in pension benefits for former ASF participants is not a correction due to pension benefit errors. It is a mechanism for recovering money the City believes the ASF owes to the Defined Benefits Fund. This makes it a debt. The Plan proposes a method of repayment that can result in retirees continuing to make payments long after the principal and interest have been satisfied, even if they only live to average life expectancy. Even if the city allows lump sum payment, retirees who cannot make a lump sum payment should not have to continue making payments via reduced pension benefits after the principal has been fully paid. This amounts to usury.

10. Employees who retired and took ASF withdrawals during the Recoupment period did so in reliance upon a transfer of all rights in such funds, with no liens or other claims of right by the City to any residual interest in them. Therefore, the City is estopped from recouping such funds

7

by the justifiable reliance interest of these former ASF participants.

The court should declare the ASF Recoupment inappropriate and illegal.

### C. Fair and Equitable Treatment

The Plan does not provide fair and equitable treatment to Class 11 creditors.

1. The City's financial condition has improved since the bankruptcy filing but this has not been taken into consideration when determining what the City could pay to its creditors.
2. The Plan does not provide a guaranteed percentage of payment for Class 11 claims. Members of Class 11 are subject to continued reductions after the City exits bankruptcy.
3. The Plan does not require the City itself to make any payments to Class 11 until 2023, negatively affecting the health of the GRS pension fund and the assets available to provide pension benefits. It is possible that the City might not ever make a single payment to Class 11 claims.

### D. Oversight Committees Unconstitutional

1. This plan requires the establishment of the City of Detroit Oversight committee and the Oversight Committee of the Pension Fund which effectively takes all decision making away from the elected officials of the City of Detroit and the Pension Board as set up by the City Charter. It is a violation of my rights and all residents of the City of Detroit's substantive due process right to "elect representatives with general legislative power and is in direct violation of 24 U.S.C. § 1983 and Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, P.A. 436 violated the VRA and the United States Constitution.

2. The plan requires negating the City Charter provision that the GRS Board currently makes all administrative, actuarial and investment related decisions for the GRS. This plan requires "Upon the Effective Date under the POA, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. ...Each successor Independent Member of this shall be selected in accordance with the provisions above and shall serve until his or her **death**, incapacity, resignation or removal ........." This plan also violates **Sec. 9-601 of the City code**, Retired general city employees are entitled to be represented in the city legislative and budgetary proceedings on issues affecting their interest by persons elected by them. And **Sec. 13-105. Employees Benefit Plan.** The governing provisions of the City of Detroit employees benefit plan ... The governing body of the employees benefit plan shall be the General Retirement System Board of Trustees, except the civilian member. This oversight can continue forever or until all the committee members die. This twenty (20) year requirement and possibly longer time frame will affect the residents of Detroit, their children and their grandchildren. This injustice must not be affirmed.

### E. Plan Confirmation

The Plan cannot be confirmed because it requires the Debtor to take actions that violate the law and it is not in the best interests of Class 11 creditors.

1. The Michigan Constitution forbids the impairment of pensions. It does not simply say pensions are contractual obligations, it says pensions are contractual obligations that must not be impaired.

9

4. Since the bankruptcy court cannot propose a Plan of Adjustment, but can only confirm or reject the plan proposed by the City, then it is the City, and not the bankruptcy court that is impairing the accrued pension benefits. It is within the City's power to leave pension benefits out of the bankruptcy, just as it is within the City's power to continue to make payments to the pension funds, even while in bankruptcy.

5. The Michigan Constitution requires the City to make annual contributions to the pension fund, but under the Plan the City would not make any contributions prior to 2023. Even if other contributors (foundations, DWSD, etc.) do not make their promised payments, the City is still not planning to make up the difference to fund even the reduced benefits, but instead will reduce the benefits even further.

6. After the City exits bankruptcy, the Plan allows the City to continue impairing the new level of accrued benefits, in violation of the Michigan Constitution. While consenting creditors might have voluntarily given up their constitutional rights, non-consenting creditors cannot be denied their constitutional rights.

7. The Plan is not in the best interest of Class 11 creditors because those creditors would be better off outside of bankruptcy with the clear protection of the Michigan Constitution.

8. The bankruptcy court does not have the power to impair the accrued benefits of the members of Class 11 without the consent of the State of Michigan. To do so would violate the Tenth Amendment. The State of Michigan cannot give that consent because the State is bound by the Michigan Constitution that forbids impairment of accrued pension benefits. Neither the City of Detroit nor the GRS Board of Trustees has the authority to consent to impair accrued pension benefits. The Michigan Legislature cannot enact laws that authorize local governments to violate the Michigan Constitution, and the Legislature's enactment of Public Act 436—specifically the bankruptcy authorization in § 18(1), Mich. Comp. Laws § 141.1558(1)—must thus be construed according to this basic legal principle. This means that when the Legislature

enacted Public Act 436 and empowered the City and its emergency manager to pursue bankruptcy, the City and the manager's actions in proposing a reorganization plan remain subject to applicable Michigan law, including article IX, § 24 of Michigan's Constitution.

9. Non-consenting creditors in Class 11 who are objecting on the basis of the Michigan Constitution are in effect consenting to have the Michigan Constitution prescribe the nature of the City's obligation (or the method of composition of indebtedness) to accrued pension benefits. Federal bankruptcy code only forbids State laws from binding creditors who do not consent to the State law's prescription.

10. The residents of the City of Detroit will lose and have severe restrictions imposed on their right to vote and to participate in public affairs and 50% of African American citizens will have their voting rights taken from them. Michigan's PA 436, the basis by which the Emergency Manger has filed this bankruptcy in the name of the City has been ruled unconstitutional (Webster & Thomas vs State of Michigan July 19, 2013) and in violation of Article IX, Section 24 of the Michigan constitution. The plan proposed by the EM establishes a new form of local government that is repugnant to the constitutional liberties of all Americans. Under this law, the people become subject to government that is composed of unelected officials who wield absolute power over all aspects of local government and whose decisions are without review by either local elected officials or local voters. This plan violates the Constitutional rights and voting rights of Michigan citizens. In effect this proposal takes over the assets and operations of the GRS pension fund from the employees, pensioners and the citizens of Detroit whose tax dollars were used to establish and maintain this fund.

11. I respectfully ask the court to not make legal what is illegal and immoral in this United States of America. This plan must not be affirmed for so many reasons.

11

Dated: July 4, 2014                    Respectfully Submitted, *Estella L. Ball*
                                       Name :      Estella L. Ball (
                                       Address:    751 W. Bethune
                                                   Detroit, MI  48202
                                       Telephone:  313-874-2707
                                       Email :     eballw@sbcglobal.net