July 8, 2014

Judge Steven W. Rhodes
United States Bankruptcy Court
Eastern District of Michigan
211 West Fort Street
Detroit, Michigan 48226

Subject: Case No. 13-53846, Objection to City of Detroit Plan of Adjustment, Docket No. 4392 (and any future amended versions of the document)

Dear Judge Rhodes,

The Gail Wilson Turner, a retiree from the Detroit Police Department, objects to the City of Detroit's Plan of Adjustment (Plan) based on the following issues:

A. I am a creditor and a member of Class 10 and 12 retired effective March 1, 2011.

As an individual creditor I object to the Fourth Amended Plan of Adjustment (the "Plan") because it may not legally be confirmed under the terms of Chapter 9 of the federal bankruptcy code that controls all decisions of this court. A more detailed statement of the reasons for my objection is contained in the brief filed by the California Public Employees" Retirement System ("CalPERS") in the appeal of this Court's decision regarding eligibility now pending before the Sixth Circuit Court of Appeals. A copy of this brief (without attachments) is attached to this objection and incorporated by reference.

B. Class 10 and 12 treatment: The Plan contains no provisions that permit improved benefits to retirees should the City's financial status improve in the future. Although it may not seem feasible at this time, there is a possibility that the City will see an economic resurgence; however, since the Plan is projecting dire future revenues, it restricts the City from rescinding any of the retiree benefit cuts. In fact, the City's Plan expressly prohibits any changes of terms for the pension system for a period of 10 years:

No Changes in Terms for Ten Years. Except as may be required to maintain the tax-qualified status of the PFRS, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS

Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

C. Class 10 treatment, COLA reduction: The City plans to make no payments to the underfunded Police and Fire Retirement System through June 30, 2023. If the City were to contribute some level of funding to the system through 2023, imposition of a reduction, currently proposed to be 55% for an undetermined number of years with no chance of being fully restored, to the undersigned's annual escalator (referred to a COLA) could be eliminated or reduced.

D. Class 10 treatment, Additional Pension Benefit Reductions Potentially Exist: The City's Plan does not provide adequate assurances that pension funding will not be negatively impacted in the future. The Plan imposes a further pension reduction should there be a lack of funding by the DIA funders. Specifically, the Plan states:

> Modification of Benefits for PFRS Participants. During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default…" A review of the Plan reveals that no other creditor is put in the position of having a payment default clause as part of their terms.

E. Other Post-Employment Benefits (OPEBs) (Class 12): On March 1, 2014, the City of Detroit imposed significant reductions for retiree health care benefits, dental and vision benefits and death benefits without: 1) prior approval from the Court, 2) allowing this creditor, and other similarly situated, the chance to cast a ballot on the issue. Although the Plan includes terms of a settlement agreement reached with the Official Committee of Retirees on these issues, there has not been any evidence that the Court has approved the imposition of the terms of the agreement nor has there been any determination made by the retirees who are only now in the process of casting ballots on the issue.

F. OPEBs for 2014 (Class 12): As of March 1, 2014 the undersigned was required to obtain health care insurance as an individual since the City discontinued offering retiree health care insurance. The result is a more than 400% monthly payment increase for health care insurance through December of 2014. The undersigned is currently without

dental or vision insurance due to the high costs. This impairment appears to be significantly more than what other creditors are being asked to be absorb.

G. OPEBs 2015 and beyond, establishment of a Voluntary Employees' Beneficiary Association (VEBA) (Class 12): Based on the information contained in the Plan under Article III, Section 3.1 it states that:

> Detroit Contributions. The Trust Fund shall accept from Detroit the Detroit Police and Fire VEBA Contribution. Apart from the Detroit Police and Fire VEBA Contribution, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the Plan.

The City's Plan does not include any information as to the amount that the undersigned will receive other than it likely will be less than what I am currently receiving in 2014, which apparently will equate to a much more significant monthly increase for health care insurance.

## CERTIFICATE OF SERVICE

I, Gail Wilson Turner, hereby certify that the foregoing Objection Creditor. Gail Wilson Turner, Identification of Legal Issues and Objection to Confirmation was filed and served case filing and noticing systems to Federal Court on July 9, 2014.

Respectfully yours,

Gail Wilson Turner
13086 Karl Dr.
Plymouth, MI.
313-580-6619
Gwb161@aol.com

Nos. 14-1208; 14-1209; 14-1211;
14-1212; 14-1213; 14-1214 & 14-1215

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re CITY OF DETROIT, MICHIGAN,

*Debtor.*

On Direct Appeal from the United States Bankruptcy Court for the
Eastern District of Michigan, Bankruptcy Case No. 13-53846
(Hon. Steven W. Rhodes)

## BRIEF OF *AMICUS CURIAE* CALIFORNIA PUBLIC
## EMPLOYEES' RETIREMENT SYSTEM IN SUPPORT OF
## APPELLANTS URGING REVERSAL

Michael J. Gearin
Michael K. Ryan
K&L GATES LLP
925 Fourth Ave., Suite 2900
Seattle, Washington 98104
Telephone: (206) 623-7580
michael.gearin@klgates.com
michael.ryan@klgates.com

Michael B. Lubic
K&L GATES LLP
10100 Santa Monica Blvd.
7th Floor
Los Angeles, California 90067
Telephone: (310) 552-5000
michael.lubic@klgates.com

*Attorneys for Amicus Curiae*
*CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM*

# CORPORATE DISCLOSURE STATEMENT

The California Public Employees' Retirement System ("CalPERS") is a governmental agency of the State of California, which performs the sovereign function of administering the State's public pension system. *See* Cal. Gov't Code § 20002 (CalPERS "is a unit of the Government Operations Agency"). Because CalPERS is a governmental party, it is not required to file a Corporate Disclosure Statement. *See* Fed. R. App. P. 26.1(a). In addition, given that CalPERS is an arm of the State of California, no Corporate Disclosure Statement is required under the Sixth Circuit Rules. *See* 6 Cir. R. 26.1.

# TABLE OF CONTENTS

Page

INTERESTS OF AMICUS CURIAE ........................................................ 1

SUMMARY OF ARGUMENT.............................................................. 3

ARGUMENT ........................................................................................ 4

I.    The Constitutional Question of Whether Pensions Could Be
Impaired, Consistent with the Tenth Amendment, Should Have
Been Avoided ............................................................................ 4

II.   Section 903 of the Code and the Supreme Court's Recent Bond
Decision Highlight the Flaws in the Court's "Consent" Analysis ....... 7

A.   Section 903 of the Code Protects State Sovereignty ................. 8

B.   The Supreme Court's Bond Decision Undercuts the
Bankruptcy Court's Theory of Consent ................................... 19

III.  Congress Mandates Strict Compliance With Eligibility Criteria
and No Presumption In Favor of Eligibility Exists ........................... 22

CONCLUSION .................................................................................. 27

i

# TABLE OF AUTHORITIES

## CASES

*Adams v. City of Battle Creek,*
  250 F.3d 980 (6th Cir. 2001) ....................................................................... 5

*Alden v. Maine,*
  527 U.S. 706 (1999) ..................................................................................... 7

*In re Applebaum,*
  422 B.R. 684 (9th Cir. BAP 2009) ............................................................. 12

*Arizona v. United States,*
  132 S. Ct. 2492 (2012) ................................................................................ 21

*Arya v. CalPERS,*
  943 F. Supp.2d 1062 (E.D. Cal. 2013) ......................................................... 7

*Ashton v. Cameron Cnty. Water Improvement. Dist. No. 1,*
  298 U.S. 513 (1936) .............................................................................passim

*Ashwander v. TVA,*
  297 U.S. 288 (1936) ..................................................................................... 5

*Bond v. United States,*
  131 S. Ct. 2355 (2011) ................................................................ 7, 19, 20, 21

*Burton v. United States,*
  196 U.S. 283 (1905) ..................................................................................... 5

*In re City of Bridgeport,*
  128 B.R. 688 (Bankr. D. Conn. 1991) ........................................................ 26

*In re City of Bridgeport,*
  129 B.R. 332 (Bankr. D. Conn. 1991) ........................................................ 22

*In re City of Desert Hot Springs,*
  339 F.3d 782 (9th Cir. 2003) ...................................................................... 25

*In re City of Detroit,*
  504 B.R. 97 (Bankr. E.D. Mich. 2013) .................................................passim

*In re City of Harrisburg,*
  465 B.R. 744 (Bankr. M.D. Pa. 2011) ........................................................ 10

*In re City of Stockton,*
    478 B.R. 8 (Bankr. E.D. Cal. 2012) ........................................................ 8

*Clark v. Martinez,*
    543 U.S. 371 (2005) ........................................................................... 5

*Corley v. United States,*
    556 U.S. 303 (2009) ......................................................................... 16

*In re Cottonwood Water & Sanitation Dist., Douglas Cnty.,*
    138 B.R. 973 (Bankr. D. Colo. 1992) ........................................... 24, 25

*In re County of Orange,*
    183 B.R. 594 (Bankr. C.D. Cal. 1995) ............................................. 26

*Dir., Office of Workers'' Comp. Programs, Dep't of Labor v. Newport News*
    *Shipbuilding & Dry Dock Co.,*
    514 U.S. 122 (1995) ......................................................................... 23

*In re Dumont,*
    581 F.3d 1104 (9th Cir. 2009) ......................................................... 24

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
    316 U.S. 502 (1942) ......................................................................... 12

*Feinstein v. Lewis,*
    477 F. Supp. 1256 (S.D.N.Y. 1979), *aff'd* 622 F.2d 573 (2d Cir. 1980) ............... 2

*Flast v. Cohen,*
    392 U.S. 83 (1968) ............................................................................. 4

*In re Flores,*
    735 F.3d 855 (9th Cir. 2013) (en banc) ........................................... 24

*Florida Dep't of Revenue. v. Piccadilly Cafeterias, Inc.,*
    554 U.S. 33 (2008) ..................................................................... 24, 26

*Garcia v. San Antonio Metropolitan Transit Authority,*
    469 U.S. 528 (1985) ......................................................................... 13

*In re Hamilton Creek Metro. Dist.,*
    143 F.3d 1381 (10th Cir. 1998) ....................................................... 26

*Hayburn's Case,*
    2 U.S. 408 (1792) ............................................................................... 4

*Hightower v. Tex. Hosp. Ass'n,*
    65 F.3d 443 (5th Cir. 1995) ............................................................... 2

iii

*Jasper v. Davis,*
164 Cal. App. 2d 671 (1958).............................................................................. 2

*In re Jefferson Cnty.,*
484 B.R. 427 (Bankr. N.D. Ala. 2012) ............................................................ 10

*Kaplan v. CalPERS,*
221 F.3d 1348, 2000 WL 540932 (9th Cir. May 3, 2000) ................................... 7

*Leco Props. v. R.E. Crummer & Co.,*
128 F.2d 110 (5th Cir. 1942)............................................................................ 25

*Mission Independent School District v. Texas,*
116 F.2d 175 (5th Cir. 1940)............................................................................ 17

*Myers v. TooJay's Mgmt. Corp.,*
640 F.3d 1278 (11th Cir. 2011)........................................................................ 24

*National League of Cities v. Usery,*
426 U.S. 833 (1976) ......................................................................................... 13

*In re New York City Off-Track Betting Corp.,*
434 B.R. 131 (Bankr. S.D.N.Y. 2010) ............................................................ 10

*New York v. United States,*
505 U.S. 144 (1992) ......................................................................................... 19

*OfficeMax, Inc. v. United States,*
428 F.3d 583 (6th Cir. 2005)............................................................................ 23

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) ........................................................................................... 5

*In re Pleasant View Utility District of Cheatham County Tenn.,*
24 B.R. 632 (Bankr. M.D. Tenn. 1982) ........................................................... 26

*Richmond Unified Sch. Dist.,*
133 B.R. 221 (Bankr. N.D. Cal. 1991)............................................................... 9

*Rodriguez v. United States,*
480 U.S. 522 (1987) ......................................................................................... 23

*Ry. Labor Executives' Ass'n v. Gibbons,*
455 U.S. 457 (1982) ......................................................................................... 12

*In re Schafer,*
689 F.3d 601 (6th Cir. 2012)............................................................................ 12

*Sinas v. City of Lansing,*
170 N.W.2d 23 (Mich. 1967) ........................................................................... 10

13-53846-tjt   Doc 5914   Filed 07/10/14   Entered 07/10/14 15:16:37   Page 9 of 40

| CLAIM # | NAME | NATURE OF CLAIM | RELIEF REQ | STATUS |
|---|---|---|---|---|
| 3420 | **UAW** (representing active & retired employees-civilian police investigators; City Law attorneys & paralegals; waste-water treatment operators; Library employees & retirees) | Pending grievances re: civilian police investigators; Law dept attys; Wastewater treatment supervisors; MERC claims; Pension Claims re: Library employees | | |
| 1862 | **DPOA** | Pending lawsuits: 1]W.C.C. No. 12-010859 & 12-000080 MK(cases are consolidated and are pending before the Ct of Appeals) re: Constitutionality of Public Act 4; enforceability of the CET; enforcement of compulsory arbitration 2] W.C.C. No. 13-004974-CL-challenge to part of March 2013 Act 312 award | Repeal of Public Act 4; monetary amount requested is unliquidated, however it will consist of wage increases, healthcare, pension, overtime, vacation pay and longevity pay | |

*Sossamon v. Texas,*
  131 S. Ct. 1651 (2011) ................................................................ 21

*In re Suffolk Reg'l Off-Track Betting Corp.,*
  462 B.R. 397 (Bankr. E.D.N.Y. 2011) ........................................ 24

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,*
  165 B.R. 60 (Bankr. D.N.H. 1994) ........................................ 25, 26

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) .................................................................. 16

*United States v. Bekins,*
  304 U.S. 27 (1938) ........................................ 11, 15, 18, 20

*United States v. Felts,*
  674 F.3d 599 (6th Cir. 2012) ................................................ 20

*Wheeler v. Bd. of Admin. of PERS,*
  25 Cal. 3d 600 (1979) .............................................................. 1

*Ysursa v. Pocatello Educ. Ass'n,*
  555 U.S. 353 (2009) ............................................................ 6, 10

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) .............................................................. 18

## CONSTITUTIONAL PROVISIONS

Cal. Const. art. XVI, § 17 ............................................................ 2

Mich. Const. art. IX, § 24 ................................ 14, 17, 18, 21

U.S. Const. amend X .......................................................... passim

U.S. Const. art I, § 10 .............................................................. 12

U.S. Const. art XI, cl. 2 ............................................................ 12

## STATUTES

11 U.S.C. § 365 ...................................................................... 14

11 U.S.C. § 903 ................................................................ passim

11 U.S.C. § 904 ................................................................ passim

11 U.S.C. § 921(c) ........................................................ 4, 22, 23

11 U.S.C. § 943(b)(4) .......................................................... 16, 17

Cal. Gov't Code § 20000 ............................................................ 2

Cal. Gov't Code § 20002.................................................................1

Cal. Gov't Code § 20487...............................................................14

Cal. Gov't Code § 20506.................................................................2

## RULES

29(c)(5)..........................................................................................3

## OTHER SOURCES

Beth Almeida, *DB Pensions: The Real Deal*, Journal of Pension Benefits
    (Aspen 2010) ...........................................................................1

Emily D. Johnson & Ernest A. Young, *The Constitutional Law of State Debt*,
    7 DUKE J. CONST. L. & PUB. POL'Y 117 (2012) .................................11

Facts at a Glance, April 2014 ...........................................................1

Giles J. Patterson, *Municipal Debt Adjustment Under the Bankruptcy Act*, 90
    U. PA. L. REV. 520 (1942) ...........................................................20

H.R. REP. NO. 94-686 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539..........12, 13, 14

H.R. REP. NO. 95-598, at 262-64 (1978), *reprinted in* 1978 U.S.C.C.A.N.
    4717, 6220-22.........................................................................13

Nathan Bomey, *et al.*, *Detroit pension leaders, city reach landmark deal on
    retiree cuts* ...........................................................................6

Omer Kimhi, *Chapter 9 of the Bankruptcy Code: A Solution in Search of a
    Problem*, 27 YALE J. ON REG. 351, 355-360 (2010)...............................25

S. COMM. ON THE JUDICIARY, REP. NO. 407 (1934)...................................11

vi

INTERESTS OF *AMICUS CURIAE*

The California Public Employees' Retirement System ("CalPERS") is the largest State-run pension system in the United States, and one of the largest sovereign pension funds in the world. It is an arm of the State of California. *See* Cal. Gov't Code § 20002. It currently administers the pensions for nearly 1.7 million current and former public employees, who are drawn from over 3000 California public employers.[1] It has been involved in at least five chapter 9 bankruptcies in California, and is currently involved in the second and third largest municipal bankruptcies in United States history--the cities of Stockton and San Bernardino.

The CalPERS system was created during the Depression, and serves two primary objectives: "to induce persons to enter and continue in public service, and to provide subsistence for disabled or retired employees and their dependents." *Wheeler v. Bd. of Admin. of PERS*, 25 Cal. 3d 600, 605 (1979). *See also* Beth Almeida, *DB Pensions: The Real Deal*, Journal of Pension Benefits (Aspen 2010) (explaining three major benefits of defined benefit plans, including retention and recruitment of talented employees).[2]

---

[1] *See* Facts at a Glance, April 2014, https://www.calpers.ca.gov/eip-docs/about/facts/facts-at-a-glance.pdf (last visited April 30, 2014).

[2] http://www.nirsonline.org/index.php?option=content&task=view&id=415 (last visited Apr. 28, 2014).

1

The administration of public pension funds, especially when administered by an arm of the State like CalPERS, is a sovereign function in which "the Federal Government should not interfere." *Feinstein v. Lewis*, 477 F. Supp. 1256, 1261 (S.D.N.Y. 1979) (quoting ERISA's legislative history), *aff'd* 622 F.2d 573 (2d Cir. 1980). *See also Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995). CalPERS and its relationship with public employers and employees is governed by California statutes and the California Constitution. *See generally* Cal. Gov't Code § 20000 *et seq.* & Cal. Const. art. XVI, § 17. Once a city elects to participate in CalPERS, it is bound by all of the statutory provisions governing the system and the decisions of CalPERS' Board. *See* Cal. Gov't Code § 20506.

CalPERS provides retirement benefits to employees through a three-way structure: (1) the municipality has a "contract"[3] with CalPERS, triggering the application of statutes and other laws governing the provision of pension benefits through CalPERS; (2) the public servant has an employment contract with the municipality that includes pension benefits; and (3) CalPERS has a fiduciary responsibility to provide and protect the pension benefits of its employee members. CalPERS administers a prefunded, defined benefit program, whereby its members' employees are entitled to a pre-determined amount of benefits upon retirement. CalPERS' member employers determine compensation for their employees, and

---

[3] This "contract" is not of the same character as a commercial contract. *Jasper v. Davis*, 164 Cal. App. 2d 671, 675 (1958).

2

CalPERS' Board and actuarial staff in turn determine the contribution rates and ultimate benefits based on statutory formulas and actuarial calculations. Impairment of obligations to the CalPERS system by a municipality in bankruptcy could increase the financial burden on the other members of the system and may threaten the actuarial soundness of the system as a whole.

The decision below was the first of its kind, determining that a municipality can impair the rights of a public pension system in bankruptcy despite express State law prohibitions to the contrary. While significant differences exist between CalPERS and the pension systems at issue on appeal, the decision below raises issues that are of critical importance to CalPERS and its 1.7 million members.[4] CalPERS authorized the filing of this Brief.

## SUMMARY OF ARGUMENT

The bankruptcy court's conclusion that, once a State authorizes one of its subdivisions to file for chapter 9, that State's laws and constitution no longer control the actions of the municipal debtor is wrong on several levels. *First*, it was not absolutely necessary to the determination of whether the Detroit was eligible for relief and therefore constitutes an improper advisory opinion. *Second*, the decision nullifies section 903 of the Bankruptcy Code (the "Code"), which

---

[4] No person other than CalPERS or its counsel authored this brief in whole or in part, or contributed money intended to fund its preparation and submission. *See* Fed. R. App. P. 29(c)(5).

3

expressly preserves a State's laws governing its creatures notwithstanding the filing of a chapter 9 petition. In doing so, the court misconstrued the Tenth Amendment and the limitations it places on a State's ability to "consent" to violations of State laws and constitutional provisions. *Finally*, the court improperly created a presumption in favor of eligibility in interpreting the good faith filing requirement of 11 U.S.C. § 921(c).

## ARGUMENT

**I.   The Constitutional Question of Whether Pensions Could Be Impaired, Consistent with the Tenth Amendment, Should Have Been Avoided.**

This Court should vacate that portion of the bankruptcy court's opinion determining that pensions could be impaired in a manner consistent with the Tenth Amendment. *In re City of Detroit*, 504 B.R. 97, 145-54 (Bankr. E.D. Mich. 2013). Both the United States and the City urged that this claim was not ripe below, *see id.* at 140; nevertheless, the court improperly rendered an advisory opinion on the matter. Whether viewed through the lens of avoidance of constitutional questions or ripeness, the result is the same: the court improperly issued an advisory opinion on a constitutional question of the highest order.

Federal courts lack the power under Article III to issue advisory opinions, and this prohibition is as old as the Judiciary itself. *Hayburn's Case*, 2 U.S. 408 (1792); *Flast v. Cohen*, 392 U.S. 83, 97 n.14 (1968). The "'judicial Power' is one to render dispositive judgments," not advisory opinions. *Plaut v. Spendthrift*

4

*Farm, Inc.*, 514 U.S. 211, 219 (1995) (quotations omitted). In this case, the court rendered a dispositive judgment--Detroit was eligible for relief. This should have ended the matter because it was unnecessary to rule on the Tenth Amendment as-applied challenge. It did so, because, in its view, "if the Tenth Amendment [as-applied] challenge to chapter 9 is resolved now, the parties and the Court can focus on whether the City's plan" can be confirmed. *Detroit*, 504 B.R. at 141.

In essence, the bankruptcy court decided a constitutional question, not because it was unavoidable, but because it believed that putting the issue behind it would facilitate negotiations and the administration of the case. This was not appropriate. "It is not the habit of the court to decide questions of a constitutional nature *unless absolutely necessary to a decision of the case*." *Burton v. United States*, 196 U.S. 283, 295 (1905) (emphasis added); *see also Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandies, J., concurring); *Adams v. City of Battle Creek*, 250 F.3d 980, 986 (6th Cir. 2001). *Cf. Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (explaining doctrine of constitutional avoidance in interpreting statutes). Here, it was not "absolutely necessary" to decide the question of whether the Tenth Amendment, as applied, prohibited the impairment of constitutionally protected pension benefits. That decision should have been left for another day.

Even assuming the issue was constitutionally ripe, a dubious proposition given that there was no certainty that pension rights would actually be impaired in

5

the plan ultimately presented to the bankruptcy court,[5] the court was duty-bound to avoid, not confront, this significant constitutional question. A desire to move the case along cannot overcome the prohibition against Federal courts issuing advisory opinions and requiring them to avoid constitutional questions. Because it was improper for the court to opine on this issue at the eligibility stage, that portion of the court's opinion should be vacated.

Vacation of this aspect of the eligibility decision is important to *amicus* because such a precedent can be, and has been, misconstrued for the broad proposition that *all* pensions are subject to impairment in chapter 9. This is too simplistic a view. Significant differences exist between the pension systems at issue in this case and CalPERS. While the pensions systems here are municipal run and created by the Detroit City Charter, the CalPERS system is a created by State law and is run by an arm of the State of California. Thus, impacts on the CalPERS system have a statewide, not only local, effect. Most notably, States and their arms enjoy sovereign status, while municipalities do not. *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009) (affirming municipalities are not

---

[5] Subsequent events demonstrated why such a ruling was unnecessary. The City's plan has been amended since it was initially filed and will certainly be amended again before it is presented for confirmation. Various news sources report that the parties have reached agreement relating to pensions. *See, e.g.*, Nathan Bomey, *et al.*, *Detroit pension leaders, city reach landmark deal on retiree cuts, available at* http://www.freep.com/article/20140415/NEWS01/304150090/Detroit-bankruptcy-pension-deal-Kevyn-Orr (last visited Apr. 30, 2014).

sovereigns).[6] Accordingly, if this Court determines that it was proper for the bankruptcy court to reach this issue and affirms the court, *amicus* requests that this Court issue a narrow holding, taking into account the differences between State-run pension plans and municipal-run pension plans, given the different role States and municipalities play in our constitutional plan.

## II. Section 903 of the Code and the Supreme Court's Recent *Bond* Decision Highlight the Flaws in the Court's "Consent" Analysis.

The nub of the bankruptcy court's conclusion regarding "consent" is that once a State authorizes its municipalities to file for chapter 9, municipal debtors are freed from the strictures of any State law that may impede a municipality's ability to restructure its debts. *Detroit*, 504 B.R. at 161. This conclusion rests on two fundamentally incorrect premises: (1) Section 903 of the Code means nothing; and (2) federalism only protects the States and States alone. The fact that a State may have authorized its subdivision to *file* for chapter 9 does not mean that it relinquishes all control over its creature and issues its creature a license to violate State laws that may inconvenience the reorganization process. Both section 903 and the Tenth Amendment prevent this.

---

[6] Sovereign immunity highlights this difference. The Ninth Circuit has determined that CalPERS is entitled to sovereign immunity. *Kaplan v. CalPERS*, 221 F.3d 1348, 2000 WL 540932, at *1 (9th Cir. May 3, 2000) (affirming dismissal on Eleventh Amendment grounds); *see also Arya v. CalPERS*, 943 F. Supp.2d 1062, 1071-72 (E.D. Cal. 2013) (same). Municipalities, however, are not entitled to sovereign immunity. *Alden v. Maine*, 527 U.S. 706, 756 (1999).

7

**A.    Section 903 of the Code Protects State Sovereignty.**

Although not central to its analysis, the bankruptcy court's decision includes overly-simplistic language regarding the import of section 903. *Detroit*, 504 B.R. at 161 (quoting *In re City of Stockton*, 478 B.R. 8 (Bankr. E.D. Cal. 2012)).[7] This language should be repudiated. It undermines what section 903 seeks to accomplish and, in turn, casts a shadow upon the constitutionality of chapter 9.

Section 903 expressly maintains a State's control over and governance of its municipalities. The provision has substantive meaning and independent force. It was placed into chapter 9 to alleviate the constitutional tension that exists when an instrumentality of the Federal Government is called upon to assist a municipality in readjusting its debts. Without the State law controls put in place by the plain terms of section 903, a municipal debtor would be free to violate any State law it chooses because 11 U.S.C. § 904 severely restricts a court's ability to interfere with the actions of a municipal debtor.[8] Any reading of section 903 that does not respect

---

[7] The *Stockton* passage relied on by the bankruptcy court is *dictum*. Indeed, the Stockton court made that precise point, noting it was not bound by its off-the-cuff remarks about the import of section 903 in its decision addressing the limitations of section 904 on the court's power. *See* Attachment A (transcript).

[8] Section 904 provides: "Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with--(1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property."

8

the right of a State to control its municipalities ignores the delicate balance Congress attempted to strike in crafting municipal bankruptcy legislation.

Given the structure of our Nation's constitutional design, and the control States have over their municipalities, "any federal debt relief legislation affecting municipalities must be sufficiently narrow in scope to avoid intrusion by the federal courts on the sovereign power of the states." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 224 (Bankr. N.D. Cal. 1991). Section 903 reflects this by protecting the rights of States *qua* States by allowing States to control the affairs of their political subdivisions even while such subdivisions are in chapter 9.

Entitled "Reservation of State power to control municipalities," section 903 provides:

> *This chapter does not limit or impair the power of a State to control, by legislation or otherwise*, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, *including expenditures for such exercise*, but—
>
> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and
>
> (2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

Section 903 (emphasis added). Thus, section 903 honors the long-standing tradition that municipalities are merely instrumentalities of the State, to which a "State may withhold, grant or withdraw powers and privileges as it sees fit."

9

*Ysursa*, 555 U.S. at 362 (2009) (quotations omitted). *See also Ashton v. Cameron Cnty. Water Improvement. Dist. No. 1*, 298 U.S. 513, 529-30 (1936); *Sinas v. City of Lansing*, 170 N.W.2d 23, 25 (Mich. 1967).

Simply because a municipality seeks chapter 9 protection, the State is far from powerless to control the affairs of its own instrumentalities during the bankruptcy proceeding. Section 903 preserves such control because it is an express limit on a municipality's ability to consent to the interference of the Federal court in the internal affairs of a municipal debtor. *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010) ("The ability of a chapter 9 debtor to consent under section 904 is limited by section 903 of the Bankruptcy Code and federalism concerns."); *see also In re Jefferson Cnty.*, 484 B.R. 427, 463 (Bankr. N.D. Ala. 2012); *In re City of Harrisburg*, 465 B.R. 744, 755 (Bankr. M.D. Pa. 2011).

To preserve the constitutionality of chapter 9, section 903 provides that any State law or agency governing the relationship between a municipality and its parent State prior to entering into chapter 9 continues to control the actions of the municipality notwithstanding the filing of a chapter 9 petition. Although a court cannot interfere with the debtor's use of its property by virtue of section 904, the State *can*—"by legislation or otherwise," including "expenditures." Given the limitations imposed on courts by section 904, without section 903's explicit

10

reservation of state control a municipal debtor would be free to violate any and every State law merely by filing a chapter 9 petition. Unless section 903 constrains it, a municipal debtor, freed from court oversight of its property and revenues by section 904, would become a lawless entity because State law defines entirely the powers, duties and rights of municipalities.

This construction of the meaning and effect of section 903 is consistent with the legislative history surrounding section 903 and its precursor. From the outset, Congress was aware that municipal bankruptcy laws created significant potential for interference in State affairs; thus, the first such law contained a provision similar to section 903. *Ashton*, 298 U.S. at 526 (quoting Section 80(k)). Legislative history from the 1934 Act explains that this language was put into the law "as a further limitation upon Federal power and in respect for the rights and responsibilities of the States[.]" S. COMM. ON THE JUDICIARY, REP. NO. 407, at 2 (1934) (Attachment B).[9] Similar language was carried over into the 1937 Act, which the Court upheld in *United States v. Bekins*, 304 U.S. 27 (1938).[10]

---

[9] For ease of reference, *amicus* attaches all of the cited legislative history.

[10] *Ashton* and *Bekins* must be viewed in their historical context because "the two cases were decided a year on either side of the Court's famous 1937 'switch in time'--mak[ing] it hard to say how they would fit into contemporary federalism jurisprudence." Emily D. Johnson & Ernest A. Young, *The Constitutional Law of State Debt*, 7 DUKE J. CONST. L. & PUB. POL'Y 117, 157 (2012).

11

In 1946, subparts (1) and (2) were added to section 903 in an effort to overrule *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942), where the Court upheld a state bankruptcy (composition) law regarding municipal bonds against Contract and Supremacy Clause challenges. At that time, Congress did not amend the operative language of section 903 that is relevant to this appeal. Congress's stated concern in adding subparts (1) and (2) was one of uniformity. H.R. REP. NO. 94-686, at 19 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539, 557 (discussing prior legislative history of § 83(i)) (Attachment C). Thus, section 903's primary language, and its application, did not, at least in Congress's eyes, raise any uniformity or Supremacy Clause concerns.[11]

In the 1970s, Congress reworked federal bankruptcy laws, culminating in the creation of the Bankruptcy Code in 1978. The legislative history of section 903's precursor notes the original understanding of the provision:

> It is to prevent the statute or the court from interfering with the power constitutionally reserved to the State by the Tenth Amendment. . . . *Any State law that governs municipalities or regulates the way in which they may conduct their affairs controls in all cases. Likewise, any State agency that has been given control over any of the affairs of a municipality will continue to*

---

[11] This makes sense given the "uniformity clause" is a limitation on Congress, not the States. *In re Applebaum*, 422 B.R. 684, 692 (9th Cir. BAP 2009) (citing *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 469 (1982); *see also generally In re Schafer*, 689 F.3d 601, 608-612 (6th Cir. 2012). It also makes sense in the context of the Supremacy Clause because section 903 is part of the Code and therefore reigns supreme if in actual conflict with a State law.

> *control the municipality in the same way, in spite of a Chapter IX*
> *petition.*

H.R. REP. NO. 94-686, at 19 (emphasis added). Thus, Congress intended that under

section 903, State laws and constitutional provisions continued to control the

actions of a municipal debtor during a chapter 9 proceeding.

During this same period, Congress was acutely aware of the Court's decision

in *National League of Cities v. Usery*, which held there are certain "attributes of

sovereignty" that "may not be impaired by Congress, not because Congress may

lack an affirmative grant of legislative authority to reach the matter, but because

the Constitution prohibits it from exercising the authority in that manner." 426

U.S. 833, 845 (1976).[12] Based on the Court's "developing ideas of Federalism,"

Congress re-affirmed its commitment to State sovereignty by including section 903

in the Code. H.R. REP. NO. 95-598, at 262-64 (1978), *reprinted in* 1978

U.S.C.C.A.N. 4717, 6220-22 (Attachment D).

Under the plain terms of section 903 and its legislative history (dating back

to its inception), the States retain control over their political subdivisions even

during a chapter 9 case. State control is so absolute that the legislative history

indicates that "withdrawal of State consent at any time will terminate the case[.]"

---

[12] Although *Usery* was overruled in part by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 531 (1985); its holding is still important because it provides the backdrop against which Congress was legislating.

13

H.R. Rep. No. 94-686, at 8, *reprinted in* 1976 U.S.C.C.A.N. 539, 545 (<u>Attachment</u> <u>E</u>). The form of control that States retain over their subdivisions varies.

For example, California has expressly chosen to control its municipalities in chapter 9 by preventing municipalities from rejecting their relationship with CalPERS under 11 U.S.C. § 365. *See* Cal. Gov't Code § 20487. Likewise, Michigan has chosen to control its political subdivisions by making it unconstitutional to diminish or impair accrued pension benefits and by requiring that those benefits be annually funded. *See* Mich. Const. art. IX, § 24 ("Pension Clause"). This is a point that has been well articulated by Michigan's chief legal officer. *See, e.g.*, Dkt. No. 481 (main case). The fact that a municipality is in bankruptcy does not alter the State's control over the municipality vis-à-vis the Pension Clause or, for example, Cal Gov't Code § 20487. Congress did not intend to provide municipal debtors with a license to ignore State laws governing their conduct simply because those laws may make it harder for them to adjust their debts. Such adjustment cannot be done at the expense of State law. Section 903 of the Code makes this clear.

The bankruptcy court equated State consent to file for bankruptcy under 11 U.S.C. § 109(c)(2) with the remarkable notion that a State cedes all control over its charge during a chapter 9 case. Why would Congress place section 903 into the

14

Code if it did not want it to have any independent force and meaning? Surely, it cannot be that one of the constitutional underpinnings of chapter 9 means nothing.

*Bekins* upheld the constitutionality of the revised law precisely because it protected State control over its municipalities. "The statute is carefully drawn so as not to impinge upon the sovereignty of the State. . . . The bankruptcy power is exercised . . . *only* in a case where the action of the taxing agency *in carrying out a plan of composition* approved by the bankruptcy court is authorized by *state law*." 304 U.S. at 51 (emphasis added). The Court determined that "the exercise of the federal bankruptcy power *in dealing with a composition of the debts* of the irrigation district, upon its voluntary application and *with the State's consent*," did not violate the essential sovereignty of the State. *Id.* at 49 (emphasis added). The State must do more than simply consent to a municipality's filing of its bankruptcy petition in order to satisfy this essential underpinning of the constitutionality of chapter 9. *Bekins* made it clear that the *scope* of the State's consent includes State consent to the terms of the municipality's plan for adjustment of debts. And section 903 is the reflection in the Code of this important principle.

Reading section 903 as having no independent force or meaning and as being merely co-extensive with section 109(c)(2), as the bankruptcy court did, violates at least three rules of statutory construction.

15

*First*, it renders section 903 meaningless surplusage. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

*Second*, it fails to read the statute as a whole. *Corley v. United States*, 556 U.S. 303, 314 n.5 (2009). Section 109(c)(2) specifically addresses State consent to *authorize a filing*, but does not address the interplay between State law and control reflected in section 903 *after* a petition is filed. If Congress only sought to limit State control at the incipient stage of its grant of authority to file a bankruptcy petition, it would not have included section 903 in the Code. These provisions must be read in conjunction with one another. Moreover, section 903 must also be read in the context of chapter 9 as a whole. Sections 109(c)(2), 903 and 904 all reflect a healthy respect for State sovereignty and State law. The final safeguard of State sovereignty is 11 U.S.C. § 943(b)(4), which requires, as a condition of confirmation of a plan, that "the debtor is not prohibited by law from taking any action necessary to carry out the plan." As explained, this means State law.

The bankruptcy court did not address these issues of statutory construction. Instead, it adopted simplistic *dictum* that "[a] state cannot rely on the § 903 reservation of state power to condition or to qualify, i.e. to 'cherry pick,' the application of the Bankruptcy Code provisions that apply in chapter 9 after such a case has been filed." *Detroit*, 504 B.R. at 161 (citation & quotation omitted). But

16

generally applicable State laws do not constitute "cherry picking."[13] They are the essence of what governs a municipal debtor during the pendency of bankruptcy under section 903. They are also the final hurdle to plan confirmation under section 943(b)(4). Putting a pejorative label on State laws does not justify a failure to adhere to criteria that Congress has commanded the courts to respect in chapter 9. Bankruptcy courts may feel that their authority is lessened by the limitations of sections 903 and 943(b)(4), in comparison to the broad authority they enjoy under other chapters of the Code. And so it is. But it is the will of Congress and must be given effect.

The decision below ignores State sovereignty by placing the desire to make it easier for a municipal debtor to reorganize above the sovereign interests of Michigan in having its organic laws respected. If such laws, like the Pension Clause, cannot be viewed as the State controlling "a municipality" in the

---

[13] When authorizing its municipalities to file for chapter 9, a State understands that it continues to control that municipality under section 903. Thus, any accusation of "cherry picking" by seeking to enforce the plain terms of section 903 is puzzling. In this sense, the alternate holding in *Mission Independent School District v. Texas*, 116 F.2d 175 (5th Cir. 1940), is wrong. The opinion fails to mention the precursor to section 903. Nonetheless, *Mission Independent* does not apply on its own terms. At issue was whether Texas could exempt bonds it held "as an investment" in order to obtain a "better right to repayment" than other bondholders in "the same class." *Id.* at 178. Texas was a market participant and held the bonds as means to generate revenue. In sharp contrast, pensions are not held by any governmental entity "as an investment" for gains to the State's coffers.

17

"exercise" of its "political or governmental powers" "including expenditures for such exercise," it is hard to imagine what, if anything, section 903 accomplishes.

*Third*, merging 903 and 109(c)(2) raises serious constitutional concerns because it elevates a State's subdivision above compliance with State law, the very source of its existence. Courts must construe statutes in a manner that avoids, not creates, constitutional issues. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). Not only is it "fairly possible," *id.*, that Congress intended to allow States to retain control over their subdivisions while in bankruptcy, it is expressly so stated in section 903. If the bankruptcy court is correct, and the Pension Clause crumbles in chapter 9, then the entirety of chapter 9 is called into constitutional doubt because the very concerns at the heart of *Ashton* and *Bekins*—States' control over their political subdivisions and *States'* ability to control their fiscal affairs—is lost.

Congress did not envision that chapter 9 would become a haven for municipalities that seek to ignore and break State laws and constitutional provisions in order to adjust their debts. Without the control section 903 provides for through State law, a municipal debtor would be free to violate any and every State law once it filed a chapter 9 petition. If construed otherwise, the whole *raison d'être* of section 903—a healthy respect for State control over their creatures and a State's fiscal affairs—is lost and the constitutionality of chapter 9 as a whole is thrown into constitutional doubt.

18

**B.** **The Supreme Court's *Bond* Decision Undercuts the Bankruptcy Court's Theory of Consent.**

The bankruptcy court's theory of "consent" is at odds with Supreme Court federalism decisions. Even if there was any doubt about what the Court meant in *New York v. United States*, 505 U.S. 144 (1992), such doubt has been laid to rest by *Bond v. United States*, 131 S. Ct. 2355 (2011), where the Court made clear that the Tenth Amendment, at its heart, protects individuals.

In *New York*, the Court held: "State officials thus *cannot* consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." 505 U.S. at 182 (1992) (emphasis added). This pronouncement followed on the heels of the acknowledgment that federalism, at its core, was designed "for the protection of individuals." *Id.* at 181. Despite the clarity of the Court's language, the bankruptcy court said the Court did not really mean what it said. *Detroit*, 504 B.R. at 149 ("states *can* 'consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution.") (emphasis added) (quoting *New York*).

Inherent in the bankruptcy court's understanding of the Tenth Amendment is the view that rights emanating from the Amendment belong to the States and to the States alone. Not only did *New York* reject this view, but the Court recently unanimously rejected an identical argument that "States and States alone" can assert a challenge that "state sovereignty" has been violated under the Tenth

Amendment. *Bond*, 131 S. Ct. at 2363. The Court made clear that Tenth Amendment "rights in this regard do not belong to a State." *Id.* at 2364. "Fidelity to principles of federalism is not for the States alone to vindicate." *Id.*; *see also United States v. Felts*, 674 F.3d 599, 607 (6th Cir. 2012) (discussing *Bond*). Remarkably, despite its direct application, the court never addressed *Bond*.

In light of *Bond*, the bankruptcy court's dismissal of certain "puzzling language in *New York*" is just plain wrong. 504 B.R. at 148-49. *New York*, when read in light of *Bond*, could not be clearer: Because federalism's protections are not designed solely to protect the States alone, those rights cannot be consented away by the State.[14] How can a State give something away that it does not solely possess? The answer is: It cannot. It is far too simplistic to say that Michigan, or any other State, by authorizing one of its creatures to file for chapter 9, consented away the enforcement of State statutory and constitutional law protecting individuals to benefit a single, financially distressed municipality.

Even assuming the protections of federalism could be consented away, the real answer lies in the scope of such consent. The bankruptcy court assumed the

---

[14] While State consent is important, if consent to *filing* was the be-all and end-all, *Ashton* would not have struck down the law, where Texas authorized the filing. 298 U.S. at 527 (1936). Likewise, *Bekins* would not have upheld the law on its face because the law did not require "approval of the petition by a governmental agency of the State." 304 U.S. at 49. *See also* Giles J. Patterson, *Municipal Debt Adjustment Under the Bankruptcy Act*, 90 U. PA. L. REV. 520, 531 (1942) (noting *Bekins* reaffirmed *Ashton* regarding the no-interference principle).

20

scope of consent was exceedingly broad, but nothing supports this conclusion. In fact, clues to the scope of such consent can readily be found in the authorization statute and the actions of Michigan's chief legal officer.

Nothing in the authorization law provides any "clear declaration" or "unequivocal" expression that Michigan consented to have its constitution displaced based on the needs of a single debtor. That is the test employed in determining whether sovereign immunity, which *can* be waived, has been waived. *Sossamon v. Texas*, 131 S. Ct. 1651, 1658 (2011). Unlike sovereign immunity, federalism's protections cannot be waived by a State given those protections are not the "States and States alone." *Bond*, 131 S. Ct. at 2363. Thus, the test to determine whether a State consented away enforcement of its laws and constitutional provisions that protect individual rights should be stricter, not less strict, than in the sovereign immunity context. Indeed, the idea that Michigan impliedly "consented" to a violation of its Pension Clause has been expressly refuted by Michigan's chief legal officer. *See* Dkt. No. 481 (main case). Because nothing supports the bankruptcy court's broad view of "consent" it should be rejected.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). This

simple principle answers this case. Allowing a municipal debtor to ignore the plain dictates of State laws and constitutional provisions designed to ensure the integrity of pension benefits simply because it filed for bankruptcy is a grave intrusion upon the sovereignty of the States and is not supported by section 903 of the Code or the Supreme Court's view of federalism. Consequently, if this Court reaches this question, it must reverse the bankruptcy court on this point.

## III. Congress Mandates Strict Compliance With Eligibility Criteria and No Presumption In Favor of Eligibility Exists.

Unlike other sections of the Code, a municipal petitioner must satisfy certain criteria before being determined eligible for relief. Under 11 U.S.C. § 109(c), an entity can be a debtor "if and only if" it satisfies certain requirements. 11 U.S.C. § 109(c)(1)-(5)(A)-(D). In addition, 11 U.S.C. § 921(c) requires a petition be filed "in good faith." The burden is on the municipality to show good faith. *In re City of Bridgeport*, 129 B.R. 332, 334 (Bankr. D. Conn. 1991). Here, the bankruptcy court determined that the "good faith" requirement *must* be construed to advance the "broad remedial purposes" of the Code and that if the section 109(c) factors are satisfied, then a "strong presumption in favor of" relief arises. *Detroit*, 504 B.R. at 180 (quotation omitted). Not only does this "strong presumption" lack textual support, it improperly flips the burden of good faith onto the objectors. This legal error should be corrected.

22

Reliance upon the so-called "broad remedial purposes" of the Code was doubly wrong because it created an extra-statutory presumption in favor of eligibility that can be met whenever a petitioner shows it is financially distressed. The Supreme Court has rejected such purpose-driven statutory construction.

> Additionally, and most impermissibly, the Court of Appeals relied on its understanding of the broad purposes of [the act] . . . . But no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam) (emphasis in original); *see also OfficeMax, Inc. v. United States*, 428 F.3d 583, 593-94 (6th Cir. 2005). The Supreme Court has referred to the invocation of such "purposes" as the "last redoubt of losing causes" because "[e]very statute proposes, not only to achieve certain ends, but also to achieve them by particular means—and there is often a considerable legislative battle over what those means ought to be." *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995). Congress chose to require municipal petitioners to have filed their petitions in good faith and the plain language of section 921(c) creates no presumption, let alone a "strong" one, in favor of a municipal petitioner.

23

In rejecting similar reasoning, the Supreme Court concluded that "the Bankruptcy Code . . . is not a remedial statute" in the sense that it is designed to protect and secure specific interests. *Florida Dep't of Revenue. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008); *In re Flores*, 735 F.3d 855, 861 (9th Cir. 2013) (en banc); *In re Dumont*, 581 F.3d 1104, 1111 (9th Cir. 2009); *Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1286 (11th Cir. 2011). Thus, the court's invocation of the "broad remedial purposes" of the Code was improper.

Unlike other chapters of the Code, chapter 9 is distinctive in imposing specific hurdles a municipal petitioner must overcome to obtain relief, one of which is that a petition be filed in good faith. The good faith requirement is not a mere formality. "Congress consciously sought 'to limit accessibility to the bankruptcy court' by municipalities." *In re Cottonwood Water & Sanitation Dist., Douglas Cnty.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (quoting legislative history). A municipal debtor must show that it both needs and is deserving of such protection. *See, e.g., In re Suffolk Reg'l Off-Track Betting Corp.*, 462 B.R. 397, 414 (Bankr. E.D.N.Y. 2011) ("[C]hapter 9 petitions should be viewed 'with a jaded eye.'") (quotation omitted). Although always inappropriate, broadly construing the Code in favor of a debtor is even less appropriate in chapter 9.

The first municipal bankruptcy law was declared unconstitutional because it invaded State sovereignty by allowing a federal court too much control over a

24

municipal debtor, a creature of the state. *Ashton*, 298 U.S. at 529-31 (1936). Thus, a constitutional tension exists in chapter 9 that exists nowhere else under the Code. For this reason, courts lack basic controls over the debtor in chapter 9. *See* § 904. A court's control over a municipal debtor is "strictly limited to disapproving or to approving and carrying out a proposed composition." *Leco Props. v. R.E. Crummer & Co.*, 128 F.2d 110, 113 (5th Cir. 1942). Therefore, the eligibility requirements, including good faith, must have real meaning and force. *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr. D.N.H. 1994).

While chapter 9 provides some creditor protections, such protection is considerably less than provided elsewhere in the Code. *In re City of Desert Hot Springs*, 339 F.3d 782, 789 (9th Cir. 2003); *see also* Omer Kimhi, *Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*, 27 YALE J. ON REG. 351, 355-360 (2010) (same). For example, chapter 9 debtors "may borrow and spend money without court authority," and only the debtor can propose a plan of adjustment. *Desert Hot Springs* at 789 (quotation omitted). As one court recognized in rejecting the very same broad interpretation employed below, the eligibility factors serve as a form of "creditor protection" that is otherwise absent from chapter 9 and giving them force helps level the "playing field." *Cottonwood*, 138 B.R. at 979.

While some courts have concluded that the eligibility requirements must be broadly construed to effectuate chapter 9's purposes, such construction is contrary to the Supreme Court's decision in *Piccadilly* and other Circuit Court decisions, which all reject the notion that the Code reflects a singular, overriding purpose that drives statutory construction. As the Tenth Circuit recognized: "Chapter 9 does not offer relief to a municipality simply because it is economically distressed." *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1387 (10th Cir. 1998).[15] Congress envisioned that municipal debtors would come to bankruptcy with clean hands by expressly including a good faith filing requirement. Here, despite the fact that the bankruptcy court acknowledged there is "some substantial truth" in the claim that

---

[15] While there is *dictum* in *Hamilton Creek* supporting a "broad" interpretation, 143 F.3d at 1384, reliance on it is improper for several reasons.

*First*, it predates the Supreme Court's *Piccadilly* decision and is contrary to other, more recent, Circuit Court cases.

*Second*, the court relied on *Sullivan County* for the proposition, which in turn cited *In re City of Bridgeport*, 128 B.R. 688 (Bankr. D. Conn. 1991) and *In re Pleasant View Utility District of Cheatham County Tenn.*, 24 B.R. 632 (Bankr. M.D. Tenn. 1982). *Sullivan County*, 165 B.R. at 73. The relevant statements in *Sullivan County* involved the question of whether the term "generally authorized" in former § 109(c)(2) should be broadly or narrowly construed. *Id.* The other courts concluded, based on the legislative history of that particular section, that Congress intended the "generally authorized" requirement to be read expansively. *Bridgeport*, 128 B.R. at 695; *Pleasant View*, 24 B.R. at 638. These cases are no longer good law on this point because in 1994 Congress amended § 109(c)(2) to require specific authorization. *See In re County of Orange*, 183 B.R. 594, 604 (Bankr. C.D. Cal. 1995).

*Finally*, even applying a "broad construction," the court determined that the debtor did not meet the insolvency requirement, affirming dismissal of the case. *Hamilton Creek*, 143 F.3d. at 1387.

the City did not file in good faith, *Detroit*, 504 B.R. at 187, it nonetheless concluded that the objectors had not overcome the extra-statutory "strong presumption" of a good faith filing. Exactly what the result would have been had the court not improperly injected its own notions of Congress's purposes into the analysis is unknown, but this Court should review this finding with a "jaded eye."

## CONCLUSION

*Amicus curiae* respectfully requests that this Court REVERSE and/or VACATE certain portions of the opinion consistent with the foregoing arguments.

Dated: May 1, 2014

Respectfully Submitted,

K&L GATES LLP

By:  s/ *Michael K. Ryan*
    Michael K. Ryan
    Michael J. Gearin
    Michael B. Lubic
    K&L GATES LLP
    Seattle, Washington 98104
    Telephone: (206) 623-7580
    michael.gearin@klgates.com
    michael.lubic@klgates.com
    michael.ryan@klgates.com

    *Attorneys for Amicus Curiae*
    *California Public Employees'*
    *Retirement System*

27

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

The undersigned hereby certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,817 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and,

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Office Word in Times New Roman.

Dated:  May 1, 2014                          Respectfully Submitted,


K&L GATES LLP

By:  *s/ Michael K. Ryan*
     Michael K. Ryan

     Attorneys for California Public
     Employees' Retirement System