UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re :                                                                              Chapter 9

CITY OF DETROIT, MICHIGAN,                                    Case No. 13-53846

            Debtor.                                                              Hon. Steven W. Rhodes

_____/

**OBJECTING CREDITOR MICHAEL J. KARWOSKI'S OBJECTIONS TO CONFIRMATION OF THE FOURTH AMENDED PLAN OF ADJUSTMENT**

I am a creditor (Doc. No. 264), and a member of Class 11 (General Retirement System pension recipient) and Class 12 (OPEB recipient). I filed an Identification of Legal Issues (Doc. No. 5089). I hereby object to the Fourth Amended Plan (the "Plan") for the reasons stated in that Identification document and herein, particularly because the Annuity Savings Fund ("ASF") Recoupment, as an element of the proposed GRS reduction, is illegal, inequitable and unfair as it is applied within Class 11. Therefore the Plan does not meet the requirements for Confirmation.

Specifically, the Plan fails the requirements of Sections1129(a)(3) and 1123(a)(4), as made applicable in Chapter 9 by Section 901(a), for the following reasons:

      THE PLAN IS NOT PROPOSED IN GOOD FAITH AND IS FORBIDDEN BY LAW

The Plan fails the requirement of Sec. 1129(a)(3) that "The plan has been proposed in good faith and not by any means forbidden by law." The ASF Recoupment proposed in the Plan has been created out of thin air by the Debtor (the "City"), is arbitrary in its structure and application, and has no basis in law, in fact, or in equity. When the City goes so far as to state: "Indeed, the excess ASF returns had more in common with a Ponzi scheme than a retirement plan" (City's Consolidated Reply to Certain Objections to Confirmation, Doc. No. 5034, p. 177), it is fair to conclude that something less than good faith is motivating the City.

When the allegations of excess payments first surfaced, it was alleged that nearly $1 billon ($951 million, <u>Detroit Free Press</u>, Sept. 8, 2013) had been paid out in the form of "13th checks" to retirees, and excess interest credited to ASF accounts between 1985 and 2008. By the time ASF Recoupment was incorporated into the Plan, the City's monetary Recoupment goal was scaled

back to $238 million[1], to be collected only from certain unlucky ASF participants. The alleged overpayments in the form of 13th checks disappeared, and a ten-year ASF Recoupment Period was arbitrarily defined, as discussed below.

In its Consolidated Reply (Doc. No. 5034), the City gives its rationale at "VII. The ASF Recoupment is Lawful and Proper", pages 170-178. The City alleges, without any factual support, that "In many years, however, the GRS Trustees chose to credit employees' ASF accounts with rates of return that were far greater than the actual rate of return earned on investments by the GRS. These inflated rates of return on ASF accounts were funded *by diverting assets attributable to the City's contributions to fund the GRS's traditional defined benefit pension plan (the 'GRS Traditional Pension Plan')* [emphasis added]. Hundreds of millions of dollars of GRS Traditional Pension Plan assets intended to support the defined benefit pensions that the City had promised were reallocated to the ASF accounts, and these dollars provided a windfall to the ASF account-holders. These inflated rates of interest had the effect of of improperly boosting the value of ASF accounts while increasing the underfunding, and consequent need for cuts, in the GRS Traditional Pension Plan." (Doc. No. 5034, p. 170.)

In short, the City basically blames the ASF program for a large portion of the unfunded accrued liability of the GRS pension plan. The City further states that, in allocating the alleged "excess interest" to ASF accounts, it "*believes* that the GRS Trustees breached their duties to the GRS Traditional Pension Plan, and its participants and beneficiaries . . . " and that "The City also *believes* that the GRS Trustees breached their duty of loyalty to all GRS Traditional Pension Plan participants . . ." (Emphasis added.) The City offers no evidence in support of these 'beliefs'.

These assertions ignore the existence of Annuity Savings Fund and Annuity Reserve Fund accounts, separately maintained by the GRS and accounted for in each Annual Report of the Board of Trustees. For example, the ASF Savings Fund balance at the end of the fiscal year ended June 30, 2012, the most recent published report (available on-line at the GRS website), was $484,575,009, and the Annuity Reserve Fund balance was $92,108,331. Upon information and belief, this Annuity Reserve Fund was used to receive "excess interest", not all of which was credited to individual accounts (represented by the larger ASF Savings Fund balance), but kept in reserve to make up for years when the overall GRS fund earnings fell short of the actuarial rate of return, which was 7.9% for the years within the Recoupment period.

The 7.9% rate of return on ASF fund balances, while sometimes referred to as "guaranteed", only reflected the actuarially assumed rate of return on the GRS fund. If the GRS fund performed as targeted, over time it would average a 7.9% return, so it was not *per se* unreasonable for the GRS Trustees to credit that rate to ASF accounts even in years when the GRS fund underperformed.

---

[1] When it was discovered that the initial ballot mailing to Class 11 retirees included an 11th year, July 1, 2002 - June 30, 2003, contrary to representations in the Plan, new ballots were issued to some 3,200 voters in Class 11. Upon information and belief, approximately 1,100 were no longer subject to ASF Recoupment, others had their alleged "excess interest" reduced, and the total amount which the City is now seeking to recover is reduced to about $230 million.

Page 2

There were years, some within the Recoupment Period (fiscal years ending June 30th 2004, 2006, 2011, and 2013), when the interest awarded to ASF accounts was *less than* the market rate of return. In those years, the excess interest *earned on ASF participants' fund balances went the other way*, some to the Annuity Reserve Fund and, reportedly, some to the GRS fund itself. Over time, the ASF program should average out to the actuarial rate of return projected for the GRS fund. However, by manipulating the Recoupment Period, as discussed below, it is possible to arbitrarily create a slice of time during which the appearance of excess interest can be created.

It is not the burden of objectors to disprove the existence of "excess interest" having been unjustly awarded to ASF accounts. As the Court noted at the motion hearing on June 26, 2014, "The City has the burden of proof on each of the elements for Confirmation." As to ASF Recoupment, the City has offered no proofs, only conclusory, pejorative allegations.

These bald assertions are not a basis to conclude that the GRS Trustees "breached their duties" to the GRS Traditional Pension Plan, nor that a $230 million Recoupment is warranted from ASF participants who were, and are, good faith partners in a supplemental retirement saving plan[2], created and run pursuant to City ordinances (codified as the "City Code") and incorporated into collective bargaining agreements. The Trustees have operated the ASF program in accordance with the City Code[3], with full participation by City officers and appointees in Trustee positions[4]. They did not operate it by stealth or under cover of darkness; its benefits were equally available to all GRS category City employees, and a high percentage of them have participated in it.

It was, and is, in every respect a City-created and City-operated program; if there was any mismanagement, breach of trust or other dereliction of duties, the City is *in pari delecto* and cannot now seek to benefit through ASF Recoupment from active and retired ASF participants who are innocent third parties. If the City wants to pursue its allegations of bad faith or other wrongdoing against the GRS Trustees, their counsel, their actuaries or other financial advisors, it has that right. It should not substantially and inequitably penalize an arbitrarily-defined subset of of GRS pension Class 11 ASF participants in the aggregate amount of $230 million.

---

[2] In his PowerPoint presentation at the GRS Informational Meetings in June 2014 (on-line at the GRS website), Michael VanOverbeke, General Counsel, defined the Annuity Savings Fund, as:
  "-- A voluntary, individual account pension program
  -- Contributions of 0%, 3%, 5%, or 7% of gross pay, post-tax
  -- Assets commingled with other GRS Assets
  -- GRS Board *granted discretion* to declare interest credits to the ASF Accounts
  -- After 25 years of service, active employees may elect to withdraw from their ASF Account
  -- Upon retirement, withdraw lump sum or annuitize". (Emphasis added.)

[3] 1984 Detroit City Code, as amended, Chapter 47, Retirement Systems

[4] 1984 City Code, Sec. 47-1-4. City officers include the Mayor, one City Council member, and the City Treasurer, all *ex officio*. In addition, one Detroit resident who is neither a City employee nor eligible to receive Retirement System benefits is appointed by the Mayor subject to approval by the Board. Five employee members are elected, as is one retiree who is receiving benefits.

## THE MYTH OF "EXCESS INTEREST"

The notion that the GRS Trustees abused their discretion by awarding "excess interest" to ASF participant accounts in certain years is at the core of the City's ASF Recoupment theory. The theory is flawed for two reasons:

One, the definition of "excess interest" is derived by retroactively applying a "collar" of restrictions on the GRS Trustees' "discretion to declare interest credits to the ASF Accounts" (VanOverbeke presentation, Footnote 2.) that did not exist during most of the ASF Recoupment Period, and certainly not during the high Recoupment years. These restrictions only came into being through Ordinance No. 37-11, enacted with an *effective date of November 29, 2011*. While the Ordinance only had prospective effect, the City applied it in an *ex post facto* manner to use its more restrictive parameters for calculating "excess interest."

The definition of "excess interest" is implicit in the City's definition of "Actual Return" (Doc. No. 4392, Article I, A., Defined Terms, No. 7.) "'Actual Return' means for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; <u>provided</u> that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%." (Emphasis in original.)

This "collar" of between 0.0% and 7.9% is the same as the restriction in City Code Sec. 47-1-18(c), enacted by Ordinance No. 37-11. Subsection 18(c) reads:

"The Retirement System and the trustees charged with management of the System shall not provide any savings plan, annuity plan, or other participant investment or savings vehicle that provides an annual return to investing participants which in any year is greater than the actual investment return new [sic] of expenses of the Retirement System invested reserves for the year in which the return is earned and accrued, provided, that such return shall neither be greater than the assumed annual return as expressed in the plan's valuation for that year nor less than zero. *This prohibition shall apply to all payments made to participants in the Defined Contribution Plan of 1973 from the effective date of this amendment*." (Emphasis added.)

The "assumed annual return" for the years in question was 7.9%. The "Defined Contribution Plan of 1973" is the ASF program.

The Michigan Constitution of 1963, Article I, Declaration of Rights, Sec. 10, states: "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." While Ordinance No. 37-11 is not an *ex post facto* law on its face, it is applied by the City in an *ex post facto* manner to create the definition of alleged "excess interest." And it is applied in derogation of the stated intent that it be applied only prospectively.

Page 4

The second reason the City's Recoupment theory is flawed is that, even with the retroactive application of the "collar", the City has presented no evidence that the GRS Trustees exceeded their discretion in awarding bonus interest on ASF Accounts in high-earning years, or in awarding the 7.9% assumed actuarial rate of return in years where the GRS funds earned less.

By the City's own calculations, derived from GRS data[5], there was only *one year* out of the ten, the fiscal year ending June 30th of 2007, where the 7.9% ASF interest rate, plus an ASF Interest Bonus of 15.0857%, actually exceeded the fiscal year market rate of return, 18.938%. Within the ASF Recoupment Period there are years where the ASF interest rate, plus interest bonus if any, were *less than* the market rate of return, and some of the excess earned on the ASF Accounts principal amounts necessarily went either into the Annuity Reserve Fund, or were returned directly to the ASF general fund.

The City's calculation of alleged "excess interest" does not give credit to individual ASF participants subject to Recoupment for these 'return' years.

Admittedly there were years in which the GRS Trustees credited the actuarial assumed rate of return of 7.9% where the GRS funds earned less, or even lost money. The City has not offered any evidence to show that, by the standards in effect at the time (without the 2011 interest "collar") it was not within the Trustees' discretion to do so. This account was, after all, structured as an annuity account. Having been solicited upon retirement by several investment advisors marketing annuities of all sorts, I can attest and the Court may take judicial notice, that it is not unusual for an annuity to offer a guaranteed rate of return, with an opportunity to earn bonus interest if investment returns exceed targets, and to have a floor that does not go below zero. The ASF program is competing for the entirely voluntary investment dollars of employees who have many other choices available to them. Attracting more funds into ASF accounts through incentives like a projected rate of return of 7.9% is not *per se* mismanagement or a breach of trustee duties.

## ANY ASF RECOUPMENT IS LIMITED TO A MAXIMUM OF SIX YEARS

If the City's alleged basis for ASF Recoupment is unjust enrichment, the longest arguably applicable statute of limitations is six (6) years. The Plan proposes a claw-back period for ASF Recoupment of ten (10) years, from July 1, 2003, through June 30, 2013, exceeding the longest statute of limitations by four (4) years.

A federal court is required to follow the statute of limitations of the forum state. *Mackey v. Judy's Foods, Inc.*, 867 F.2nd 325, 328 (6th Cir. 1989). Under the theories of liability proposed by the City, if ASF Recoupment is permitted to remain in the Plan at all, the Recoupment Period should be limited to no longer than six (6) years.

---

[5] VanOverbeke Presentation, June 2014, ASF Interest Credits chart for Recoupment Period.

Unjust enrichment is an equitable claim. The elements are receipt of a benefit from the plaintiff by the defendant, which is inequitable for the defendant to retain. The City claims that the "diversion" of the alleged ASF "excess interest" from the GRS Traditional Pension Plan increased the underfunding of that Plan, and put a greater burden on the City to make up for such lost funding. However, since the City admittedly has not made its own Constitutionally-required[6] payments to the GRS for the past two years (other than certain DWSD payments), it does not have "clean hands" to make this claim in equity.

The law will imply a contract between the parties in order to prevent the unjust enrichment of another party. However, a contract will be implied "only if there is no express contract covering the same subject matter." Where there is an express contract, summary disposition of the unjust enrichment claim is properly granted. *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478-479; 666 N.W.2d 271 (2003).

In this case this City has express employment contracts with its employees. For example, in the case of most Law Department attorneys, it is the collective bargaining agreement ("CBA") between the City and U.A.W. Local 2211, which expressly incorporates the City's retirement plan into the contract. On information and belief, all of the City's union contracts incorporate the City's retirement plan into the respective CBAs. Since there is an express contract between the City and its retirees, a court cannot employ the equitable remedy of unjust enrichment to imply a contract with respect to the same subject matter. If the City wants to attempt to recoup money from current employee ASF participants and retired participants, it is limited to a breach of contract action.

The statute of limitations for enforcing a contract under Michigan law is six (6) years. MCL 600.5807(8). Therefore, even if ASF Recoupment is allowed as part of the Plan, the period for which the City may attempt to recoup "overpayments" to ASF accounts is six, not ten years. To do this the City must prove that ASF active and retiree participants -- not the GRS trustees -- breached the contract.

Also under Michigan law, actions to recover money wrongfully paid that are not based on breach of contract are governed by the six-year statute of limitations in MCL 600.5813. *Borman's Inc. v. Lake State Development Co.*, 60 Mich. App. 175, 189; 230 NW2d 363 (1975). The City's claim for unjust enrichment or restitution of trust funds is subject to the six-year statute of limitations provided by MCL 600.5813, which applies whether the claim is legal or equitable. MCL 600.5815.

---

[6] Article IX, Michigan Constitution of 1963, provides: § 24 Public pension plans and retirement systems, obligation. "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

The Plan also fails the requirement of Sec. 1129(a)(3) in that it fails to disclose that the proposed monthly Recoupment amount presented on the ballot of each Class 11 retiree subject to ASF Recoupment, includes the charging of interest at the rate of 6.75%. The failure to disclose the charging of interest, and the rate of such interest, violates both Michigan and federal lending, and consumer protection laws. Because the Plan proposes continuing to collect monthly Recoupment payments through pension reduction even where a retiree outlives his or her actuarial life expectancy, at such time the effective interest rate goes to 100% because the full amount of "excess interest" principal will have been collected and the further collection is all interest. Even with the cash buyout option, the City still proposes to impose 6.75% interest on any remaining balance where an ASF Recoupment participant is not allowed to pay off the full amount if the $30 million collective cap is exceeded, and of course for those who do not choose, or cannot afford, the lump-sum buyout.

## THE PLAN DOES NOT PROVIDE EQUAL TREATMENT FOR EACH INTEREST GROUP IN CLASS 11

In its Order Identifying Legal Issues (Doc. No. 5235), in Item 5 the Court identified an issue which may be determined as a matter of law with respect to whether certain Plan provisions for the PFRS pension Class 10 relating to classification satisfy Sec. 1123(a)(4). In Items 4 and 5 of my Identification of Legal Issues Relating to Confirmation (Doc. No. 5089), I propose that the violation of Sec. 1123(a)(4) is at least as troublesome with respect to the two distinct retiree groups that are lumped together in Class 11, those subject to ASF Recoupment, and those *not* subject to it. Because the number of those subject to ASF Recoupment is *slightly less than half* the total number in the Class, on a numerical vote basis they *could not defeat* the Plan treatment of Class 11 even if 100% of them voted against it. Conversely, those *not* subject to ASF Recoupment could numerically impose a "Yes" outcome on the ASF Recoupment minority.

Combining these two groups, who are treated significantly differently, to the detriment of one group and to the advantage of the other, in the same measure, i.e., $230 million collectively, violates the Sec. 1123(a)(4) requirement that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest." I call the Court's attention to the detailed analysis of this issue in John P. Quinn's Objections to Fourth Amended Plan of Adjustment (Doc. No. 5723), and incorporate his arguments, particularly those in Items 2 and 3, pages 1-9, of his writing here by reference.

The unfair treatment of the ASF Recoupment participants, now about 3,700 upon information and belief, is particularly inequitable when one takes note of the completely arbitrary way in which the City has defined the ASF Recoupment Period. Out of the decades in which the ASF plan has existed (within the framework of the GRS, in accordance with the City Code and CBAs), the City has chosen one ten-year stretch for which to seek Recoupment, "beginning July 1, 2003 and ending June 30, 2013." (Article I, A. Defined Terms, No. 22, Doc. No. 4392). No rationale is given for this period, and one may cynically surmise that exceeding the six-year

statute of limitations to this extent is deliberately designed to reach back to one of the "fatter" years for recouping alleged "excess interest", the fiscal year ending on June 30, 2007.

Only those ASF participants who had active accounts, or retired during or shortly after, this Period are caught in the Recoupment net. Other participants who retired earlier may have had "excess interest" awarded to their accounts too, but they are not subject to Recoupment. Nor are any retirees who received "13th checks" which were part of the City's original $951 million in alleged "overpayments." However, because the current, arbitrary Recoupment target of $230 million will be assessed *only* against the ASF Recoupment subset, the remaining Class 11 participants will save themselves substantially larger[7] than 4.5% across-the-board pension cuts by voting in favor of the Plan. If Classes 10 and 11 do not both vote in favor of the Plan, the "Grand Bargain" supplemental funding disappears, the City proposes a 27% across-the-board pension cut for GRS, and the ASF Recoupment "pain cap" limitation[8] disappears, with the result that some ASF participants will lose their entire pensions due to unlimited monthly clawback amounts.

Within Class 11, the ASF Recoupment unfairly places the burden of repaying some $230 million of alleged "excess" interest on a subset of the Class by reducing their pensions by wildly varying amounts depending upon the happenstance of when they participated in ASF, when they retired, and (with respect to the proposed monthly reductions) their age at the time of Confirmation, if the Plan is approved. Other than certain DWSD contributions, under the Plan, the City is not proposing to put any general fund money into the GRS until 2023; by that time, if investment returns exceed the actuarial 6.75% target, the City may not be liable for *any* shortfall.

---

[7] The GRS informational Meeting PowerPoint presentation, pp. 16-17, states that under either Alternative A or Alternative B (rejection of the Plan by either or both Classes 10 and 11), "Annuity Savings Fund Recoupment [is worth] (Approx. 8.8% reduction in liabilities to GRS)". This suggests that if ASF Recoupment, valued at $230 million, is struck from the Plan, the equivalent across-the-board cut to GRS pensions would be an additional 8.8%.

[8] If the Plan ("Alternative A") is approved, there is an "Additional Cap of 15.5% of total pension benefit applied to Retirees and Active Employees who have withdrawn their ASF Account." If the Plan fails, the "Additional Cap of 15.5% WILL NOT APPLY" (Emphasis in original, GRS PowerPoint presentation, *ibid.*)

## CONCLUSION

For these reasons, the Plan should be denied Confirmation unless it is stripped of all ASF Recoupment provisions. In the alternative, if ASF Recoupment is allowed, the GRS voters subject to Recoupment should be allowed an opportunity to vote in a separate pension class from GRS retirees who are not subject to ASF Recoupment. If any ASF Recoupment is ultimately allowed, the 'claw back' period should be limited to not more than six (6) years.

Respectfully submitted,

/s/ Michael J. Karwoski
Michael J. Karwoski (P26658)
26015 Felicity Landing
Harrison Township, MI 48045
Telephone: 313-378-7642
mjkarwoski@alumni.nd.edu

Dated: July 10, 2014

## CERTIFICATE OF SERVICE

I, Michael J. Karwoski, hereby certify that the foregoing Objecting Creditor Michael J. Karwoski's Objections to Confirmation of the Fourth Amended Plan of Adjustment was filed and served via the Court's electronic case filing and noticing system on July 10, 2014.

/s/ Michael J. Karwoski