

FILED

2014 JUL 11 A 10: 10

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

In the matter of:

CITY OF DETROIT, MICHIGAN                    Case No. 13-53846-swr

                                             Chapter 9

_____Debtor____/            Hon. STEVEN W. RHODES

### OBJECTION TO CITY OF DETROIT'S PLAN OF ADJUSTMENT [DOCKET 2708]

FILED BY: Roger N. Cheek

Roger N. Cheek hereby states his OBJECTION TO:

CITY OF DETROIT'S PLAN OF ADJUSTMENT

for the following reasons.

     1.     I am interested in the Bankruptcy of the City of Detroit because I am a City retiree who is a member of the General Retirement System (GRS) and the City 's Plan of Adjustment will cause all GRS retirees to lose a portion their base pension amounts, eliminate their entire yearly COLA, and erase a huge portion of their OPEBs

     2.     I object to the above filing because of two (2) main reasons:

     a)     One main reason is that the plan calls for the GRS retirees to lose a greater percentage of their pensions than the City retirees in the Police and Fire retirement System (PFRS) will lose and I do not believe that can be properly justified. The EM's often-stated reason for paying the differences in the two sets of pensions is that the GRS is more underfunded than the PFRS. I contend that such reasoning is flawed because it amounts to holding each GRS retiree personally accountable for "paying off" his or her supposed portions of the underfunding difference. The problem with that stance is that there has not been any credible showing that GRS retirees are somehow personally responsible for causing the underfunding difference. Furthermore, it is not feasible that any reasonable proof of such personal responsibility will ever be produced since all of the operations of the GRS are conducted of by majority votes of a 10-member GRS Board of Trustees, composed of five elected employees, three ex-officio management persons, one Mayor-appointed citizen member, and one elected retiree members. The PFRS situation is substantially similar to that of the GRS. First, it is

trying to accomplish the same general pension administration objectives as the GRS, but most relevant is the fact that is also is operated in accordance with the majority votes by a Board of Trustees composed of elected employees, and ex-officio management persons. This means that the PFRS retirees are also not capable of being held personally responsible for the underfunding level of their system, and neither can they be given any personal "positive" credit for their system currently being less underfunded than the GRS.

b) I contend that what all of this means is that the voiced concern and attention given to the amount of GRS underfunding versus the amount of the PFRS underfunding was irrelevant. It should not have had any influence in pension payment decisions. This is because, all retirees had earned their full pensions and the City had originally promised and fully intended to pay all its retirees in both systems their full promised pensions. But once the City determined it must enter bankruptcy because it found it claimed it could no longer afford to pay all of its debts in full, yet decided that it would still pay the full base pension amount and about one-half of the yearly COLA to PFRS retirees, then I strongly contend that it was obligated to also pay the same full base pension amount and about one-half of the yearly COLA amount to GRS retirees. Therefore, I am asking the Court to grant this request for equality of treatment in the degree of impairment of equally or similarly situated creditors' claims. I also believe that the requested result will also much more likely satisfy the fairness and equity standards called for in a Chapter 9 bankruptcy proceeding and that is a good result for all parties involved.

2) A second main reason I am filing this objection is that the plan of adjustment will impose a substantial financial harm on many GRS retirees because the EM has ordered the "recoupment" of certain sums of the ASF money they received in good faith and are relying on to fund their standards of living. The EM claims the funds he is trying to get back actually represents a large sum of money that the City had the right to retain in its coffers, but that it was improperly transferred into the subject GRS retirees' individual Annuity Savings Fund accounts. I assert that the EM is wrong, and that all of the decisions made and actions that were taken by the GRS Board of Trustees in determining the rates of interest and deciding on the amounts of excess money it would transfer to the retirees' ASF accounts. were all conducted or performed in full accordance with the authority provided by City Charter and City Code provisions. In support of this assertion, I cite the provisions of City Code Sec. 47-2- 17. *Funds*, and 47-2-18. *Method of Financing* (Ord. No. 29-01, 11-30-01), and in particular, 47-2-18, Subsection (f)

which is most directly on point and which clearly shows that the Board of Trustees possessed the very specifically spelled out authority to make the transfers of the money the EM is trying to reverse by his recoupment order. See also, certain phraseology contained in the final sentence of Sec. 47-2-18 (f) seem to me to be very instructive for evaluating the EM's observations that some unjust enrichments may have taken place due to some Board decisions about regular interest credit versus some lower "actual earnings" experienced during the 2004-2011 period.

      a)    Consider also that all the disputed earnings decisions and transfer actions within the 2004-2011 period encompassing the "recoupment" being sought, were undertaken and concluded long before the EM was appointed to his post in 2013.

      b)    In sum, the EM's goal is to achieve a result that could only come from either an *ex post facto* rules change or his exercise of an *ultra vires* act, and I am asking the Court to rule that notwithstanding the extraordinary powers pertaining to this EM's appointment and the considerable breadth of claims resolutions that are permissible in a Chapter 9 bankruptcy proceeding, neither of those mechanisms should be permitted, and instead the City should be prohibited from making this recoupment as it is most unfair and very harsh financial penalty retirees would suffer.

    3.    I have attached an additional two (2) sheets to this objection document that are excerpts from City Code Sec. 47-2-18 (a), (c), and (f) which establish my position that the excess funds that were transferred from the income account of the GRS fund to the affected individuals' ASF accounts were both determined correctly and permissibly transferred and do not represent unjust enrichments as the EM asserts.

    I hereby certify that the statements made herein are true and correct under penalty of perjury and contempt of Court under the laws of the United States of America.

    Wherefore I request that Court will deny the relief sought in said filing.

Name: _ROGER N. CHEEK_

Signature: _Roger n Cheek_

Address: _5120 UNDERWOOD DETROIT, MICHIGAN 48204_

Email: _roger.cheek@yahoo.com_

Dated: _7/11/14_

## Sec. 47-2-17. Funds.

The *1973 Defined Benefit/Defined Contribution (Annuity) Plan* shall consist of the *Annuity Savings Fund*, the *Annuity Reserve Fund*, the *Pension Accumulation Fund*, the *Pension Reserve Fund*, and the *Income Fund*.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. 47-2-18. Method of financing. 129

(a)  *Annuity Savings Fund of the 1973 Defined Contribution Plan.* 130

(1)  The *Annuity Savings Fund* of the 1973 *Defined Contribution Plan* shall be the fund in which shall be accumulated at regular interest, the contributions of members to provide their annuities. At the election of the member, the amount of the basic contribution of a member to the Retirement System may be zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation. If a member elects three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act,* 26 USC 3101 *et seq.* (Act), plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that Act.

(2)  The contribution rate elected by the member under Section 47-2-18(a)(1) of this Code shall be deducted from the members' compensation notwithstanding that the minimum compensation provided by law for any member shall be reduced thereby. Payment of compensation, less said deductions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said member during the period covered by such payment, except as to benefits provided under this Article.

(3)  Upon retirement of a member with a Retirement Allowance, the member's accumulated contributions shall be transferred from the *Annuity Savings Fund* to the *Annuity Reserve Fund,* refunded to the member, or a combination thereof.

(b)  *Annuity Reserve Fund.* 131 The *Annuity Reserve Fund* shall be the fund from which all annuities and benefits in lieu of annuities payable as provided in this Article, shall be paid. If a disability retiree is reinstated to active City service, the retiree's *Annuity Reserve* at that time shall be transferred from the *Annuity Reserve Fund* to the *Annuity Savings Fund* and credited to his or her individual account therein.

(c)  *Pension Accumulation Fund.* 132 The *Pension Accumulation Fund* shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from contributions made by the City, and from which shall be paid pensions and other benefits on account of members with prior service credit, and transfers as provided in this Section. Contributions to and payments from the *Pension Accumulation Fund* shall be made as follows:

(1)  Upon the basis of such mortality and other tables of experience and regular interest, as the Board shall adopt from time to time, the Actuary shall annually compute the amount of contributions, which, when paid annually by the City during the entire prospective City service of members without prior service credit, will be sufficient to provide the pension reserves required at the time the members leave City employment, to cover the pensions to which they might be entitled or which might be payable because of their City employment. Upon the

retirement of a member without prior service credit, or upon a member's death in the performance of duty, the *Pension Reserve* for the pension or pensions to be paid on the member's account shall be transferred from the *Pension Accumulation Fund* to the *Pension Reserve Fund*.

(2)    Upon the basis of such mortality and other tables of experience and regular interest as the Board shall adopt from time to time, the Actuary shall compute annually the pension reserve liabilities for pensions being paid to retirees and beneficiaries.

(3)    On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the System. The Council shall appropriate and the City shall pay such contributions during the ensuing fiscal year. When paid, such contributions shall be credited to the *Pension Accumulation Fund*.

(4)    If the amount appropriated by the City and paid to the System for any fiscal year is insufficient to make the transfers and pay the pensions from the *Pension Accumulation Fund* as provided in this Section, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d)    *Pension Reserve Fund. 132* The *Pension Reserve Fund* shall be the fund from which pensions shall be paid to beneficiaries. Should a disability retiree be reinstated to active service, the retiree's pension reserve at that time, shall be transferred from the *Pension Reserve Fund* to the *Pension Accumulation Fund*.

(e)    *Expense Fund. 132* The *Expense Fund* shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the System.

(f)    *Income Fund. 135* The *Income Fund* shall be the fund to which shall be credited all interest, dividends, and other income derived from the investments of the System, all gifts and bequests received by the System, and all other moneys the dispositions of which is not specifically provided for in this Article. There shall be paid or transferred from the *Income Fund*, all amounts required to credit regular interest to the various Funds of the Retirement System. Whenever the balance in the *Income Fund* is more than sufficient to cover current charges to the fund, such excess amount may be used for contingency reserves or may be transferred to any of the other Charter-created funds of the Retirement System within this *Article II* except the *Expense Fund*, to cover special needs of the Funds as the Board shall determine. In the event the balance in the *Income Fund* is insufficient to cover the charges to the Fund, the amount of the insufficiency shall be transferred from the *Pension Accumulation Fund* to the *Income Fund*.

(g)    *Maintenance of Reserves. 136*

(1)    The maintenance of proper reserves in the various charter-based funds of the Retirement System within this *Article II* except the *Expense Fund* are hereby made obligations of the Pension Accumulation Fund.

(2)    City contributions to the Retirement System to the extent necessary to provide pensions on account of members who are employees of a revenue-supported division of the City shall be made from the revenues of the said division. Any City contribution to the Retirement System from any Fund by law with a certain and definite purpose shall at the direction of the Finance Director, be accounted for separately.

(Ord. No. 29-01, § 1, 11-30-01)