**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------------------x
:
In re                                       Chapter 9
:
:
CITY OF DETROIT, MICHIGAN,          Case No. 13-53846
:
                     Debtor.      Hon. Steven W. Rhodes
:
:
-------------------------------------------------------------------x

**BRIEF OF THE OFFICIAL COMMITTEE OF RETIREES**
**IN SUPPORT OF OBJECTION TO MOTION FOR TEMPORARY**
**ALLOWANCE OF CLAIM OF THE MACOMB INTERCEPTOR**
**DRAIN DRAINAGE DISTRICT PURSUANT TO RULE 3018(a)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

ARGUMENT .............................................................................................................. 3

I.   The MID Claims are Precluded by Express Provisions of a 2009 Settlement
     Agreement ...................................................................................................... 3

II.  All Claims in the Complaint are Deficient as a Matter of Law ...................................... 5

     A.   MID Fails to Allege or Establish Fraud Under Michigan Law ............................. 6

          1.   MID's Alleged Misrepresentations are Deficient as a Matter of Law.............. 7

               a.   Alleged Misrepresentation as to Rights Transferred ................................. 8

               b.   Alleged Misrepresentation as to Public Officials Abiding by Law
                    and City Failing to Disclose Threatened Litigation................................... 9

          2.   MID's Allegation of Silent Fraud Also Fails.................................................. 13

     B.   MID Fails to Allege Innocent Misrepresentation Under Michigan Law............... 14

     C.   MID's Unjust Enrichment Claims are Precluded by the 2010 Acquisition
          Agreement ...................................................................................................... 16

     D.   The Breach of Contract Claim is Deficient as a Matter of Law .......................... 17

III. MID's Alleged Damages Are Speculative And Unproven......................................... 19

IV.  The MID Claims Are Barred by *Res Judicata*........................................................... 24

V.   MID's Fraud and Misrepresentation Claims Are Barred by Governmental
     Immunity Under Michigan Law ...................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Armstrong v. Rushton (In re Armstrong),*
   292 B.R. 678 (B.A.P. 10th Cir. 2003)..................................................................2

*Artie Fields Prods., Inc. v. Channel Seven,*
   97 F.3d 1451 (6th Cir. 1996) ........................................................................24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)......................................................................................18

*Bye v. Nationwide Mut. Ins. Co.,*
   733 F. Supp. 2d 805 (E.D. Mich. 2010)........................................................16

*Daubert v. Merrell Dow Pharms.,*
   509 U.S. 579 (1993)......................................................................................22

*Dingman v. OneWest Bank,*
   859 F. Supp. 2d 912 ...............................................................................14, 15

*Frank v. Dana Corp.,*
   547 F.3d 564 (6th Cir. 2008) ........................................................................10

*Gilbert v. Ferry,*
   413 F.3d 578 (6th Cir. 2005) ..........................................................................8

*Hazen v. Best Buy, Co.,*
   No. 12-11290, 2012 WL 2476784 (E.D. Mich. June 22, 2012) ...................15

*Hooker v. Fed. Election Comm'n.,*
   21 Fed. Appx. 402 (6th Cir. 2001)................................................................26

*Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*
   532 N.W.2d 541 (Mich. Ct. App. 1995) .......................................................12

*In re FRG, Inc.,*
   121 B.R. 451 (Bankr. E.D. Pa. 1990) .............................................................2

*In re Plastech Engineered Prods., Inc.,*
   399 B.R. 1 (Bankr. E.D. Mich. 2008)..............................................................2

*In re Silver Mill Frozen Foods, Inc.* (*Edelman v. McMullin Orchards*),
   32 B.R. 783 (Bankr. W.D. Mich. 1983)........................................................25

*J.Z.G. Res., Inc. v. Shelby Ins. Co.,*
   84 F.3d 211 (6th Cir.1996) ...........................................................................24

iii

*Local Emergency Fin. Assistance Loan Bd. v. Blackwell,*
    832 N.W.2d 401 (Mich. Ct. App. 2013) ...............................................................27

*Lozar v. Birds Eye Foods, Inc.,*
    529 Fed. Appx. 527 (6th Cir. June 30, 2013) ......................................................22

*MacDonald v. Thomas M. Cooley Law School,*
    724 F.3d 654 (6th Cir. 2013) ....................................................................... passim

*Marks v. Bank of America,*
    No. 13-12060, 2014 WL 700478 (E.D. Mich. Feb. 24, 2014)...............................24

*Matis v. Midwest Realty Ventures, LLC,*
    1:13-cv-108, 2014 WL 1463875 (W.D. Mich. Apr. 15, 2014)...............................14

*New Props., Inc. v. George D. Newpower, Jr., Inc.,*
    762 N.W.2d 178 (Mich. Ct. App. 2009) ................................................................9

*Nelson v. N.W. Savs. & Loan Assoc.,*
    381 N.W.2d 757 (Mich. Ct. App. 1986) ..............................................................15

*Northern Warehousing Inc. v. Michigan Dep't of Educ. (On Remand),*
    No. 260598, 2006 WL 2419189 (Mich. Ct. App. Aug. 22, 2006).........................27

*Smith v. Bank of America,*
    485 Fed. Appx. 749 (6th Cir.2012)......................................................................10

*Springs v. U.S. Dep't of Treasury,*
    No. 13-1521, 2014 WL 2566102 (6th Cir. June 9, 2014)......................................24

*Tamraz v. Lincoln Elec. Co.,*
    620 F.3d 665 (6th Cir. 2010) ..............................................................................22

*Titan Ins. Co. v. Hyten,*
    817 N.W.2d 562 (Mich. 2012)............................................................................15

*U.S. Fidelity & Guar. Co. v. Black,*
    313 N.W.2d 77 (Mich. 1981)...............................................................................15

*Uhl v. Komatsu Forklift Co.,*
    512 F.3d 294 (6th Cir. 2008) ..............................................................................12

*Wargelin v. Bank of Am., NA,*
    No. 12-cv-15003, 2013 WL 5587817 (E.D. Mich. Oct. 10, 2013)............6, 7, 10, 13

*Williams v. Wayne Cnty.,*
    No. 09-14328, 2011 WL 479959 (E.D. Mich. Feb. 4, 2011)................................26

*Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*,
   761 N.W.2d 151 (Mich. Ct. App. 2008) ...............................................................27

**RULES & STATUTES**

Fed. R. Civ. P. 9(b) .................................................................................................14

Fed. R. of Evid. 702 ................................................................................................22

M.C.L. § 691.1401(a) ..............................................................................................26

M.C.L. § 691.1401(b) ..............................................................................................26

M.C.L. § 691.1401(e) ..............................................................................................26

M.C.L. § 691.1407(1) ..............................................................................................26

The Official Committee of Retirees (the "**Committee**") has objected [Dkt. 5135, the "**Committee Objection**"] to the Motion for Temporary Allowance of Claim of the Macomb Interceptor Drain Drainage District ("**MID**") pursuant to Rule 3018(a) [Dkt. 5155] ("**Temporary Allowance Motion**") and submits this brief pursuant to the Court's June 25, 2014 minute entry, and states as follows:

1.      The claimant, MID, filed its proof of claim (Claim No. 3683)[1] (the "**MID Claims**") on May 5, 2014, seeking "not less than $26 million" in damages for alleged fraud, misrepresentation and breach of contract in connection with the Macomb Acquisition Agreement by and between the City of Detroit, Michigan ("**City**"), the MID and the County of Macomb ("**Macomb**"), dated September 2, 2010 (the "**2010 Acquisition Agreement**").[2] The MID Claims attach a state-court complaint dated June 25, 2013 (the "**Complaint**")[3]—filed shortly before the City's Chapter 9 case and removed to federal court—brought by MID against the City, based largely on a federal criminal indictment and convictions against certain former Detroit officials, including former Mayor Kilpatrick.

2.      On May 15, 2014, the City filed its Objection [Dkt. 4954] (the "**City's Objection**") to the MID Claims. On May 30, 2014, MID filed its Temporary Allowance Motion. On June 13, 2014, the City and the Committee filed their objections [respectively, Dkt. 5312 and Dkt. 5315].

---

[1] MID's proof of claim is attached as part of Exhibit 1 to the City's Objection.

[2] The 2010 Acquisition Agreement is attached as Exhibit 20 to the Debtor's Brief in Support of its Response in Opposition to the Temporary Allowance Motion (the "**Debtor's Brief**").

[3] The Complaint is attached as part of MID's proof of claim.

3.     As noted in the Committee Objection, the MID Claim is subject to a substantial objection by the City and therefore has no prima facie validity.  (Committee Objection, ¶ 8);  *In re Plastech Engineered Prods., Inc.*, 399 B.R. 1, 10 (Bankr. E.D. Mich. 2008).   Further, as movant for temporary allowance of an unliquidated claim for voting purposes, MID must carry its burden to establish the MID Claim by a preponderance of the evidence.  *See Armstrong v. Rushton (In re Armstrong)*, 292 B.R. 678, 686 (B.A.P. 10th Cir. 2003) ("Because a temporary allowance order only arises if there is an objection to a claim, we conclude that the burden of proof should be on the claimant to present sufficient evidence that it has a colorable claim capable of temporary evaluation.");  *In re FRG, Inc.*, 121 B.R. 451, 456-57 (Bankr. E.D. Pa. 1990) ("[T]he burdens of proofs in the B. Rule 3018(a) estimation process is the same as in deciding objections to proofs of claim[.] . . . [Claimant] therefore ha[s] the burden of proving the validity of all elements of his claims by a *preponderance of the truncated evidence* presented at the hearing.") (emphasis added).

4.     The Temporary Allowance Motion should be denied because:

- The MID Claims are precluded by express provisions of a 2009 Settlement Agreement by and among the City, the Detroit Water and Sewerage Department (the "**DWSD**"), Macomb and the County of Oakland (the "**2009 Settlement Agreement**")[4] [Dkt. 2219, *U.S. v. City of Detroit, et al.*, 2:77-cv-71100-SFC (E.D. Mich. May 18, 2009)];

- All claims in the Complaint are deficient as a matter of law;

- Even if the MID Claims were not otherwise precluded, MID's asserted damages are speculative and unproven;

- The MID Claims are barred by *Res Judicata*; and

- MID's fraud and misrepresentation claims are barred by governmental immunity under Michigan law.

---

[4] The 2009 Settlement Agreement is attached as Exhibit 19 to the Debtor's Brief.

2

<u>**ARGUMENT**</u>

**I.      The MID Claims are Precluded by Express Provisions of a 2009 Settlement Agreement**

5.      The 2010 Acquisition Agreement was preceded by a letter of intent, which was Exhibit D to the 2009 Settlement Agreement.  The 2009 Settlement Agreement was intended to "resolve all currently outstanding disputes pending under *U.S. v. City of Detroit, et al.* (Case No. 77-71100) …. before the U.S. District Court for the Eastern District of Michigan … including, but not limited to:

> (ii) All Disputes related to the *allocation of repair costs* related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes (the "2004 Collapse Claims");
>
> (iii) All Disputes related to the interest rate charged to Macomb related to debt service associated with the cost of repairs of the 2004 Collapse, with subsequent repairs to the Macomb Interceptors and with the construction of the Garfield Interceptor (the "Interceptor Interest Rate Claims"); [and]
>
> (iv) *All Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers* listed in Exhibit 1 of Exhibit D of this Agreement, including any disputes and claims between the Parties relating to the associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and all property otherwise described in Exhibit D (collectively, the "Interceptors")."

(2009 Settlement Agreement, ¶ 1.A.(ii)-(iv)(emphasis added.)

6.      Paragraph 2.B. of the 2009 Settlement Agreement discharges certain of the above claims:

> The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate Claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000.

(2009 Settlement Agreement, ¶ 2.B.) Moreover, paragraph 3 of the Settlement Agreement, entitled Interceptor Transfer, confirms that a "closing contemplated by Exhibit D [Letter of Intent whereby the City would transfer the Macomb System to Macomb] shall fully resolve all claims in the Action regarding the Interceptors, including but not limited to those regarding the condition and or need for repair of the Interceptors… ." (2009 Settlement Agreement, ¶ 3.)[5]

7.      Paragraph 9 of the 2009 Settlement Agreement specifies that "[t]he rights and benefits under th[e 2010 Acquisition Agreement] shall inure to the benefit of and be binding upon the respective Parties hereto, their agents, successors and assigns." (2009 Settlement Agreement, ¶ 9.D.) Therefore, the agreement binds both Macomb and its successor entity, MID (created to take ownership of the Macomb System). No one has sought to void the 2009 Settlement Agreement, which was a global settlement resolving a panoply of issues in the federal Case No. 77-71100.

---

[5] The intent of the parties for the 2009 Settlement Agreement to provide a broad release is underscored by that certain Settlement and Release of Certain Rate Disputes by and between Macomb, MID and the City effective on the closing of the 2010 Acquisition Agreement (the "**Release Letter**"). The Release Letter includes a waiver and release with regard to the following:

> a. The cost of all projects and contracts shown on Schedule 3.8b to the [2010 Acquisition] Agreement and the calculation of all credits, charges and adjustments set forth in that Schedule.
>
> ***
>
> f. Except as provided in Section 2 below and rights arising under this Agreement, Macomb [] waives and releases its claims against Detroit and Detroit waives and releases its claims against Macomb [] with regard to all other known or unknown claims or disputes with regard to rates charges to the [Macomb County Wastewater Disposal District] as a separate user class for all rate years up to and including the FY2009/10.

Release Letter, ¶¶ 1(a) &(f). The Release Letter is attached as Exhibit 22 to the Debtor's Brief.

4

## II.    All Claims in the Complaint are Deficient as a Matter of Law

8.    The Complaint asserts a scheme involving multiple contractors and City officials, commencing in 2002 and continuing to at least 2006, to fraudulently overcharge for repairs and rehabilitation work in connection with the Macomb Interceptor System, most specifically in connection with the "15 Mile Interceptor Project" (as such term is used in the Complaint) commencing in 2004.  (Complaint, ¶¶ 29-53.)  It further alleges that when Macomb acquired the assets of the Macomb Interceptor System from the City in 2010, the City engaged in misrepresentation and failed to disclose fraud.  (Complaint, ¶¶ 84, 88.)  Macomb alleges that as a result it "paid in full the costs associated with the [15 Mile Interceptor] Project" (Complaint, ¶ 86) and is entitled to recover fraudulent overcharges and usage charges.

9.    The 2010 Acquisition Agreement transferred to MID, which was newly created in 2009, the Macomb System as that System is further described in Schedule 1.20 of the 2010 Acquisition Agreement.  The Purchase Price (as defined in Section 2.3 of the 2010 Acquisition Agreement) was a sum equal to the System Debt (as defined in Section 1.37 of the 2010 Acquisition Agreement and calculated in Schedule 3.8).  As more fully defined in Section 1.37 of the 2010 Acquisition Agreement, the System Debt was "the outstanding pro rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to facilities comprising the Macomb System and charged to Macomb County in the DWSD Sewer Rate Model for FY 2009-10 on other than a 'common to all' basis… ."  (2010 Acquisition Agreement, § 1.37.)  The 15 Mile Interceptor Project constituted a portion of the work on DWSD Contract CS-1368, and MID asserts that Schedule 3.8 of the 2010 Acquisition Agreement shows a line item for $54,467,200 in connection with repairs to the 15 Mile Interceptor Project under Contract CS-1368.  [Dkt. 5498 at ¶ 10].  The Purchase Price, in addition to being the sum of certain bonded debt also reflects a credit of $17,341,485 in favor of MID, as purchaser, on

5

account of a "long-standing dispute" between the City and Macomb pertaining to the cost of

repairs on the 15 Mile Interceptor Project.  Transcript of Settlement Hearing, *U.S. v. City of

Detroit et al.*, 2:77-cv-71100-SFC, (E.D. Mich. Dec. 18, 2008) [Dkt. 2186 at pp. 5-6].[6]

A.  **MID Fails to Allege or Establish Fraud Under Michigan Law**

10.  The elements of fraud under Michigan law were recently set forth by the Sixth

Circuit as follows:

> Under Michigan law, to prove that a defendant committed
> fraudulent misrepresentation, a plaintiff must prove six elements:
> (1) the defendant made a material representation; (2) the
> representation was false; (3) when the defendant made the
> representation, it knew that it was false, or made the representation
> recklessly, without any knowledge of its truth, and as a positive
> assertion; (4) the defendant made the representation with the
> intention that it should be acted on by the plaintiff; (5) the plaintiff
> acted in reliance on the representation; and (6) the plaintiff
> suffered injury due to his reliance on the representation. *Hord v.
> Envtl. Research Inst. of Mich.*, 463 Mich. 399, 617 N.W.2d 543,
> 546 (2000) (per curiam) (citing *Hord v. Envtl. Research Inst. of
> Mich.*, 228 Mich.App. 638, 579 N.W.2d 133, 135 (1998)).
>
> An additional requirement for element five is that the plaintiffs'
> reliance on the alleged misrepresentation must have been
> reasonable. *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich.App.
> 675, 599 N.W.2d 546, 553–54 (1999); *Nieves v. Bell Indus., Inc.*,
> 204 Mich.App. 459, 517 N.W.2d 235, 238 (1994).

*MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 662-63 (6th Cir. 2013).

11.  Moreover, fraud must be plead with particularity.  As set forth in *Wargelin v.*

*Bank of Am., NA*,:

> Pursuant to Federal Rule of Civil Procedure 9(b) a claim of fraud
> must be pled with particularity.  "To meet the particularity
> requirement, a complaint must (1) specify the statements that the
> plaintiff contends were fraudulent, (2) identify the speaker, (3)
> state where and when the statements were made, (4) explain why
> the statements were fraudulent." *Smith v. Bank of America*, 485
> Fed. Appx. 749, 752 (6th Cir.2012) (quoting *Frank v. Dana Corp.*,

---

[6] The transcript of the December 18, 2008 settlement hearing is attached as **Exhibit 1** hereto.

547 F.3d 564, 570 (6th Cir.2008)). To properly allege fraud under
Rule 9(b), a plaintiff must "at a minimum ... allege the time,
place[,] and contents of the misrepresentation upon which they
relied." *Smith*, 485 Fed. Appx. at 752 (citation omitted). Finally, a
plaintiff must also set forth enough facts such that "it could be
concluded that their reliance was reasonable." *Id.* (citing *Novak v.
Nationwide Mut. Ins.*, Co., 235 Mich.App. 675, 599
(Mich.Ct.App.1999)).

No. 12-CV-15003, 2013 WL 5587817, at *2 (E.D. Mich. Oct. 10, 2013).

### 1.   MID's Alleged Misrepresentations are Deficient as a Matter of Law

12.     MID's fraud claims boil down to two alleged misrepresentations, which MID

asserts it relied on entering into the 2010 Acquisition Agreement.  (Complaint, ¶¶ 84-86.)  These

misrepresentations, which are inadequate to state a claim as a matter of law, are as follows:

> **First**, that the City misrepresented leading up to and in the 2010
> Acquisition Agreement that all tangible and intangible rights
> regarding the Project were being acquired by Plaintiff.  (Complaint,
> ¶ 83.)

> **Second**, that the City misrepresented that its public officials abided
> by all applicable law and failed to disclose pending or threatened
> litigation relating to the Macomb Interceptor System.  (Complaint,
> ¶¶ 84-85.)[7]

---

[7] MID also alleges that on or about December 2008, the City concealed a scheme that artificially
inflated the repair price on certain infrastructure and grossly inflated overcharges resulting
therefrom from Judge Feikens and MID, and was known to City executives.  (Complaint, ¶ 41.)
However, the City could not have concealed anything from MID in 2008 because MID did not
exist at that time.  MID was only created "in 2009 for the express purpose of purchasing the
Macomb System."  Opinion and Order Granting Concurring Defendants' Amended Motion for
Summary Judgment, *Macomb Interceptor Drain Drainage District et al. v. Kilpatrick et al.*,
2:11-cv-13101 (E.D. Mich. Sept. 27, 2012) [Dkt. 237 at pg. 6] (stating that "[MID] did not exist
at the time of the alleged wrongdoing, and thus cannot be owed directly a legal duty giving rise
to state-law tort claims").

The City was an intervening plaintiff in *Macomb Interceptor Drain Drainage District et al. v.
Kilpatrick et al.*, No. 11-13101 (E.D. Mich.).  That action will be referred to as the "**Prior
Action**" and is the basis for the *res judicata* argument *supra*.   The September 27, 2012 Opinion
of Judge Cleland in the Prior Action will be referred to as the "**Prior Dismissal Order**").  A
copy of the Prior Dismissal Order is attached as Exhibit 8 to the Debtor's Brief.

### a.    Alleged Misrepresentation as to Rights Transferred

13.    The alleged representation as to transfer of intangible rights is precluded by express provisions of the 2010 Acquisition Agreement. The crux of this allegation appears to be disagreement with Judge Cleland's September 17, 2012 ruling in the Prior Action. (Complaint, ¶¶ 54-64.) Judge Cleland's order expressly held that section 2.4[8] of the 2010 Acquisition Agreement "expresses an intent to transfer only the City of Detroit's 'rights under all contracts, warranties and guarantees' and does not operate as a transfer or assignment of claims arising out of state tort law or federal statutory law." (Prior Dismissal Order at 16.) The order granted a motion for summary judgment against MID, supported by the City as intervening plaintiff; it held that MID lacked standing to prosecute claims against Kilpatrick and other former government officials relating to the Macomb Interceptor System. (*Id.*)

14.    Judge Cleland rejected MID's arguments based on a bill of sale and other extraneous evidence because the 2010 Acquisition Agreement contract terms were unambiguous and the Agreement has an integration clause precluding reliance on such extraneous matter. *See* (Complaint, ¶¶ 43-48) (where MID alleges extraneous evidence in an attempt to re-litigate the same issue here). In this Circuit, a fraud claim based on statements that allegedly contradict plaintiff's executed contract is invalid as a matter of law. *MacDonald,* 724 F.3d at 662-63. The claim is also barred by collateral estoppel based on Judge Cleland's ruling, since the City successfully litigated the same issue against MID in the Prior Action.[9]

---

[8] Section 2.4 of the 2010 Acquisition Agreement states, in relevant part, as follows: "Detroit shall assign to the MID all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System."

[9] All elements of collateral estoppel under Michigan law are met since the issue was litigated and the City was adverse and joined summary judgment against MID. *Gilbert v. Ferry*, 413 F.3d 578, 580-81 (6th Cir. 2005) (noting that Michigan law requires a defendant to set forth two elements to assert defensive collateral estoppel: "(1) a question of fact essential to the judgment must have

8

15.     With respect to the second alleged misrepresentation underpinning the fraud count the Complaint is deficient for several reasons.  First, the Complaint fails to adequately allege fraudulent intent.  The Complaint asserts that the City knew of the alleged fraud (which it allegedly failed to disclose) because of "the involvement of its own Mayor, Director of DWSD" and other employees.  (Complaint, ¶ 89.)  However, the Mayor "involved" in the alleged fraud (Kilpatrick) ceased being mayor on September 18, 2008, and the director of the DWSD "involved" in the alleged fraud (Mercado) ceased being director on or before July 2008.[10] (Indictment, ¶¶ 1,4.)  The only other City employee mentioned in the Complaint, Derrick Miller, also an indictee,[11] ceased to be employed by the City on or before July 2007.  (Indictment, ¶ 5.)

16.     As a matter of law, the knowledge of such indicted and/or convicted former officials cannot be imputed to the City at the time it executed the 2010 Acquisition Agreement.  "The general rule which imputes an agent's knowledge to his principal is subject to an exception where the agent acts in his own interest, adversely to his principal." *New Props., Inc. v. George D. Newpower, Jr., Inc.*, 762 N.W.2d 178, 188 (Mich. Ct. App. 2009) (finding agent's knowledge could not be imputed to principal where agent embezzled money from principal).  As alleged in the Complaint (referencing the First Superseding Indictment), these individuals were acting in their own interests and adversely to their principal, the City.  *See* (Complaint, ¶ 33) (alleging that

---

been actually litigated and determined by a valid and final judgment, (2) the same parties must have had a full and fair opportunity to litigate the issue … .")

[10] A Fourth Superseding Indictment was entered in the criminal case against, *inter alia,* Kwame Kilpatrick and Victor Mercado.  *See U.S. v. Kilpatrick*, Criminal No. CR-10-20403-NGE (E.D. Mich. Feb. 15, 2012) [Dkt. 74 ].  The Fourth Superseding Indictment is referred to as the "**Indictment**" and is attached as Exhibit 21 to the Debtor's Brief.

[11] *See* (Complaint, ¶¶ 12-13.)

"[i]n return for these unlawful and excessive contract awards, profits, fees, expenses, and costs, the contractors and subcontractors made unlawful payments and/or provided unlawful gratuities to Kilpatrick, Ferguson, and Miller.").  As to any other employees "involved" in the matter, if any, the Complaint is completely vague and fails the "particularity" requirements set forth in this District in *Wargelin, supra* (quoting *Smith v. Bank of Am.*, 485 Fed. Appx.  749, 752 (6th Cir. 2012) and *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).

17.     Second, the basic allegation is undercut by the structure and text of the 2010 Acquisition Agreement.  The allegation in full is as follows:

> Defendant knowingly and intentionally misrepresented that its public officials had abided by all state, federal and local laws and regulations in the performance of their job duties and, in particular, with respect to their involvement with the Macomb Interceptor Sewer system and the Project.  In fact, Defendant made affirmative promises in the Macomb [2010] Acquisition Agreement that there was no known possible or pending litigation relating to the Macomb Interceptor Sewer System including:
>
> a.    Paragraph 3.7 "<u>Litigation</u>. Except as set forth in Schedule 3.7 hereto, there is no <u>action, suit or proceeding pending or, to Detroit's Knowledge, threatened</u> against or affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement." (emphasis added)
>
> b.    Paragraph 5.3 "<u>Litigation and Claims</u>.  Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement."

(Complaint, ¶ 84.)

18.     The first sentence of the allegation -- alleged misrepresentation that "public officials had abided" by applicable law in performance of their jobs -- is completely lacking in

10

any specificity as to time, place and identity of speaker.  In fact, it appears to be MID's mere inference from the contractual provision noted in the next sentence of the Complaint, which is paragraph 3.7 of the 2010 Acquisition Agreement.  In section 3.7, the City represents that "there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or affecting Detroit ... ."  However, that representation pertains only to an "action, suit or proceeding …" and under the structure of the 2010 Acquisition Agreement does not pertain to an investigation by a governmental entity.   The 2010 Acquisition Agreement uses the defined term "Claims" (Section 1.6) to encompass such "investigation" by a governmental entity, but section 3.7 specifically omits any reference to "Claims."[12]

19.     Furthermore, the representation in section 3.7 only pertains to "Detroit's Knowledge" defined in section 1.10 of the 2010 Acquisition Agreement to mean "the actual knowledge of its Directors, its Assistant Corporation Counsel assigned to DWSD matters, its Assistant Chief of Engineering or its Engineering Support Manager Craig Stanley."   There is no allegation that any of the individuals who held any of these offices in 2010 had such "actual knowledge."[13]

_____

[12] The 2010 Acquisition Agreement provides that "Claims" shall mean any "Order, any investigation announced or performed by a Governmental Entity, or any actual or alleged complaints, claims or charges, demands for relief or damages, suits, hearings, causes of action, proceedings or litigation … ." (2010 Acquisition Agreement, § 1.6.)

[13] The deposition testimony in connection with the Temporary Allowance Motion confirms lack of knowledge as to what charges pertaining to Contract CS-1368, if any, might or might not be included in the indictment.

(a) Ramesh Shukla ("**Shukla**"), the DWSD assistant director of engineering, testified at his deposition that he had been called by the grand jury and interviewed by the federal government. (Shukla Dep. 116:8-13.)  In his deposition testimony, Shukla stated that the government's "main questioning was [whether Bobby] Ferguson t[ook] advantage of his position to get some contracts with the City of Detroit" and Shukla's response was "No." (Shukla Dep. 116:11-14.) Shukla testified that he was not asked about "excessive charges" as part of his grand jury testimony or government interviews.  (Shukla Dep. 116:24-25.)  The transcript of the Shukla deposition is attached as Exhibit 12 to the Debtor's Brief.

11

20. As to section 5.3 of the 2010 Acquisition Agreement, that provision is a covenant (Article 5) of the Agreement relating to the City's future performance - not a representation or warranty (Article 3) like section 3.7. In section 5.3 the City agreed to promptly inform MID in writing of any "Claims" affecting the Macomb System. Since that section is a promise of performance under the contract, it is not a basis for fraud in the inducement. *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 304 (6th Cir. 2008) ("fraud in the inducement is not available for a breach of a contract's terms, lest fraud in the inducement claims swallow all breach-of contract claims …") (citing *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.,* 532 N.W.2d 541, 546 (Mich. Ct. App. 1995)). There is no allegation in the Complaint that the relevant City officials actually became aware of the charges as to the Macomb System included in the

---

(b) Robert Walter ("**Walter**"), senior assistant corporation counsel with the City assigned to represent the DWSD, testified that he was interviewed by the United States attorneys office but was not asked about the "sinkhole project" or any specific contracts. (Walter Dep. 16:4-17. ) He testified that he was not interviewed "in connection with [Contract CS-] 1368." (Walter Dep. 91:6.) In addition, Mr. Walter detailed the "Claims" that were disclosed to MID in connection with the 2010 Acquisition Agreement and further testified "those were the claims we were aware of … ." (Walter Dep. 93:1-23.) The transcript of the Walter deposition, dated July 11, 2014, is attached as **Exhibit 2** hereto.

(c) Daryl Latimer ("**Latimer**"), who signed the 2010 Acquisition Agreement, was the Deputy Director of DWSD in 2010. (Latimer Dep. 9:20). Although he was interviewed by federal agents, he did not recall being interviewed about the quote "sinkhole project" and did not believe that he had been interviewed on that subject. (Latimer Dep. 19:13-17). Nor did he recall being questioned about Contract CS-1368 when he appeared before the grand jury. (Latimer Dep. 35:16-17.) The transcript of the Latimer deposition, dated July 11, 2014, is attached as **Exhibit 3** hereto.

(d) Marc Jacobs ("**Jacobs**"), outside counsel who represented the City in connection with the 2010 Acquisition Agreement, testified "[t]he knowledge I had about the scope of that investigation was so vague and general there was no way it could have alerted me to that -- any connection between that investigation and [the 2010 Acquisition Agreement] transaction." (Jacobs Dep. 36:17-21.) The transcript of the Jacobs deposition, dated July 11, 2014, is attached as **Exhibit 4** hereto.

indictment prior to issuance of the indictment on December 15, 2010 -- other than MID's

deficient attempt to impute knowledge of the indictees.[14]

## 2. MID's Allegation of Silent Fraud Also Fails

21.     As to silent fraud, the Sixth Circuit in *MacDonald* explained:

> This cause of action prohibits " '[a] fraud arising from the
> suppression of the truth[,]' " which can harm a plaintiff as much as
> " 'that which springs from the assertion of a falsehood[;]' " courts
> in Michigan, therefore, " 'have not hesitated to sustain recoveries
> where the truth has been suppressed with the intent to defraud.' "
> *Noel*, 522 N.W.2d 724, at 725 (quoting *Williams v. Benson*, 3
> Mich.App. 9, 141 N.W.2d 650, 654 (1966)).
>
> ***
>
> But to state a claim for the tort of silent fraud, a plaintiff must
> allege more than non-disclosure; a plaintiff must establish that the
> defendant had "a legal duty to make a disclosure." *Hord*, 617
> N.W.2d 543, 550 (citing *U.S. Fid. & Guar. Co. v. Black*, 412
> Mich. 99, 313 N.W.2d 77, 88 (1981))

*MacDonald*, 724 F.3d at 665-66.  Moreover, to state a claim for silent fraud, plaintiff must "meet

the particularity requirement in Rule 9(b) … ."  *Wargelin*, 2013 WL 5587817, at *8.

22.     MID's allegation as to silent fraud is as follows:

> Even apart from these express misrepresentation and the promise
> to disclose, Defendant had a legal duty to disclose this material and
> relevant information regarding the Macomb Interceptor system and
> the Project, especially given that the costs for the Project is an
> express line item in the calculated total consideration due to
> acquire the sewer system.

(Complaint, ¶ 85.)

---

[14] Moreover, section 5.3 of the 2010 Acquisition Agreement pertains only to matters which the
parties to the 2010 Acquisition Agreement "may become legally and/or contractually obligated
to defend against … ."  There is no allegation or basis for any of the parties to the Agreement
(Macomb, MID or the City) to be legally or contractually obligated to pay or defend against the
indictment.

23.     The silent fraud allegation is manifestly deficient as to particulars, as required by

Rule 9(b).  It fails to allege intent to defraud, notwithstanding the requirement of *MacDonald*

that silent fraud requires that "the truth has been suppressed with the intent to defraud."

*MacDonald*, 724 F.3d at 665 (internal citations and quotations omitted).[15]  To the extent MID

relies upon imputation of knowledge of Kilpatrick and other indictees, such imputation is invalid

for the reasons stated in paragraph 16 *supra*.

24.     MID also fails to allege a basis for a legal duty to disclose.  The only specific

matter in the silent fraud allegation (Complaint, ¶ 85) is that "cost of the Project is an express

line item in the calculated total consideration due to acquire the sewer system."  However, the

only "line item pertaining to the consideration" paid by MID is the listing in Schedule 3.8

(Computation of Purchase Price) of the 2010 Acquisition Agreement.  Schedule 3.8 is a schedule

of "System Debt" as defined in Section 1.37 of the Agreement.  It is not a listing of "costs" as

alleged in paragraph 85 of the Complaint.  There is no allegation that the System Debt is

inaccurately scheduled.  Nor is there any explanation as to how such schedule relates to a "silent

fraud."

### B.     MID Fails to Allege Innocent Misrepresentation Under Michigan Law

25.     "A claim of innocent misrepresentation is shown if a party detrimentally relies

upon a false representation in such a manner that the injury suffered by that party injures [sic] to

the benefit of the party who made the representation."  *Dingman v. OneWest Bank*, 859 F. Supp.

2d 912, 920 (E.D. Mich. 2012) (internal citations and quotations omitted).  Moreover, "[t]he

innocent misrepresentation rule adds the requirements that the misrepresentation be made in

---

[15] "A silent fraud claim is essentially the same as a fraudulent misrepresentation claim except
that it is based on a defendant suppressing a material fact that he or she was legally obligated to
disclose, rather than making an affirmative misrepresentation." *Matis v. Midwest Realty Ventures,
LLC*, No. 1:13-CV-108, 2014 WL 1463875, at *4 (W.D. Mich. Apr. 15, 2014).

connection with making a contract … ." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 568 n.5 (Mich. 2012) (citing *U.S. Fidelity and Guar. Co. v. Black*, 313 N.W.2d 77, 85 (Mich. 1981)).

26.     The requirement that the misrepresentation be pled with particularity applies. *Dingman*, 859 F. Supp. 2d at 921 ("Plaintiffs have failed to plead any actual facts as to the innocent or negligent misrepresentations made … plaintiffs have not meet [sic] the particularity requirement.")  Furthermore, to state a claim for innocent misrepresentation "there must be a breach of duty separate and distinct per duties imposed by contract." *Hazen v. Best Buy, Co.*, No. 12-11290, 2012 WL 2476784, at *3 (E.D. Mich. June 22, 2012) (relying on *Nelson v. N.W. Savs. & Loan Assoc.*, 381 N.W.2d 757 (Mich. Ct. App. 1986)).

27.     MID asserts two innocent misrepresentations, neither of which is actionable:

> 94.     Defendant represented that no claims existed regarding the Macomb System at the time of negotiations when, in fact, Defendant had actual knowledge of the Kilpatrick Enterprise and the corruption and bid rigging scheme occurring with DWSD and its Directors as was evidenced by the criminal convictions in Criminal Case #10-20403.

> 95.     Defendant represented that it had abided by all laws with respect to the Macomb System when, in fact, Defendant knew or should have known that its Mayor, Director of DWSD and others employed by Detroit, the DWSD and/or the Water Board had grossly inflated, or assisted with the gross inflation, of the charges being passed on to Plaintiff regard to the Project and were otherwise engaged in a large-scale illegal conspiracy with regard to bidding, awarding and approving construction contracts for Detroit.

(Complaint, ¶¶ 94-95.)

28.     The first quoted "innocent misrepresentation" is simply an inaccurate restatement of the representation of paragraph 3.7 of the 2010 Acquisition Agreement.  A tort action for innocent misrepresentation cannot be based on breach of a contract provision.  *Hazen*, 2012 WL 2476784, at *3.  Furthermore, to the extent that the representation in paragraph 94 of the MID

15

Compliant differs from the actual representation of paragraph 3.7 of the 2010 Acquisition Agreement, the misrepresentation could not be relied upon as a matter of law. *See MacDonald*, 724 F.3d at 662-63. Underscoring this point, the 2010 Acquisition Agreement has an express integration clause that explicitly eliminates and specifically explodes any attempted reliance on any such inaccurately restated matter:

> "Agreement constitutes the sole understanding of the parties [t]hereto with respect to the matters provided for [t]herein and supersedes any previous agreements and understandings between the Parties with respect to the subject matter [t]hereof."

(2010 Acquisition Agreement, § 12.5.)

29. As to the second quoted "innocent misrepresentation" -- that the City broadly "had abided by all laws with respect to the Macomb System" -- is not one of those negotiated representations which appears in Article 3 and is contrary to the 2010 Acquisition Agreement's integration clause quoted above. (2010 Acquisition Agreement, § 12.5.) There is no other indication of a speaker, place or even a time, when MID arguably relied. The matter is subsumed by the 2010 Acquisition Agreement and reliance on any such representation is non-actionable as a matter of law. *MacDonald*, 724 F.3d at 662-63.

### C. MID's Unjust Enrichment Claims are Precluded by the 2010 Acquisition Agreement

30. Under Michigan law, a claim for unjust enrichment will be dismissed where an express contract between the parties covers the same subject matter. *Bye v. Nationwide Mut. Ins. Co.*, 733 F. Supp. 2d 805, 830 (E.D. Mich. 2010) ("[A] contract will be implied only if there is no express contract covering the same subject matter.") (quotations omitted). In substance, MID's unjust enrichment allegations are that (a) it overpaid for the Macomb System (Complaint, ¶¶ 110-111) and (b) the City asserted claims against contractors and retained settlement funds. The Purchase Price and the issue of the City's rights to pursue claims against contractors are

covered by the 2010 Acquisition Agreement. Indeed, the Prior Dismissal Order definitively resolved the City's rights pursuant to the 2010 Acquisition Agreement to pursue tort claims against third parties. (Prior Dismissal Order at 16.) The unjust enrichment claim fails as a matter of law.

### D. The Breach of Contract Claim is Deficient as a Matter of Law

31. MID's allegations as to alleged breach are set forth in paragraph 100 of its complaint. The first six breached contract terms, which are set forth in subparagraphs "a-f" relate to the contract's alleged assignment of non-tangible rights to sue third parties for tort recoveries relating to the Macomb System. MID alleges that "Defendant breached these provisions by initiating a claim in Case 11-13101 directly adverse to Plaintiff … ." As noted in paragraph 14 n.4 *supra* the City litigated that issue against MID in the Prior Action (Case 11-1301) and prevailed. The 2010 Acquisition Agreement did not assign such rights to MID. Collateral estoppel bars the claim now. The elements of collateral estoppel are set forth in footnote 14 n.4 *supra*.

32. MID also asserts a breach of the representation in paragraph 3.7 of the 2010 Acquisition Agreement, which relates to "Detroit's Knowledge" (actual knowledge of certain individuals as defined in paragraph 1.10 of the Agreement). As explained in paragraphs 15-16, that allegation is completely lacking in substance and relies on imputation of knowledge of persons not within the definition of "Detroit's Knowledge" under the Agreement. The City's failure to allege substance renders the allegation non-actionable. In assessing the Complaint, the Court "must ascertain whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *MacDonald*, 724 F.3d at 660.

33. Likewise, MID sets forth no facts to substantiate a breach of paragraph 3.8 of the 2010 Acquisition Agreement, which requires disclosure of System Debt. *See* (Complaint, ¶

17

100.h.)  The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

34.    Finally, as to the assertion of section 5.3, which requires that the City "shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware … ", no supporting facts are alleged.  Specifically, there is no allegation of fact in the Complaint that the City became aware of the charges as to the Macomb System included in the indictment prior to issuance of the indictment on December 15, 2010 -- other than MID's deficient attempt to impute knowledge of the indictees.   Moreover, section 5.3 only applies to "Claims" as defined in paragraph 1.6 of the 2010 Acquisition Agreement, and "Claims" are limited in that definition to matters "which the parties hereto may become legally and/or contractually obligated to pay or defend against … ."  (2010 Acquisition Agreement, § 1.6.) There is no suggestion in the Complaint that any of the parties to the 2010 Acquisition Agreement (Macomb, MID and the City) could be "obligated to pay or defend against" the indictment.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

35.    Moreover, even assuming that the City did not inform MID in writing of the indictment when it issued on December 15, 2010, there is no allegation or suggestion in the Complaint as to how such possible technical breach could be sufficiently material to result in compensable damages arising thereafter.[16]

---

[16] As Robert Walter, assistant corporation counsel in 2010, testified  "the investigation was all over the newspapers and the TV stations." (Walter Dep. 14:18:19.)   Although Walter was interviewed by the United States Attorney's office, he was not asked about the "sinkhole project," (Walter Dep. 16:16-17), and  did not know what contracts were being investigated. (Walter Dep.

18

### III. MID's Alleged Damages Are Speculative And Unproven

36.     MID alleges that the City "amortized the grossly inflated costs for the Project into the usage charges assessed to MID[] for the Macomb Interceptor Sewer system in the rate years 2005-2006 through 2009-2010, together with Seven and a Half Percent (7.5%) interest annually." (Complaint, ¶ 74.)  In addition, MID asserts that an unspecified portion of the allegedly inflated costs are reflected in the schedule of System Debt listed on Schedule 3.8 of the 2010 Acquisition Agreement, upon which the Purchase Price was calculated.  *See* (Complaint, ¶ 45); MID's Reply to Temporary Allowance Motion, ¶ 10  [Dkt. 5498].[17]  MID seeks recovery of both "inflated usage charges"  and allegedly accepted Purchase Price of the Macomb System assets.  (Complaint, ¶ 90.)

37.     MID nowhere alleges or suggests what portion of the alleged "fraudulent" charges were amortized as usage charges and what potion, if any, is reflected on the schedule of System Debt in Schedule 3.8 of the 2010 Acquisition Agreement.  In the Prior Action, Judge Cleland analyzed precisely the same damage theories and found such damage claims speculative and impossible or difficult to prove.

38.     As to damages related to usage charges, Judge Cleland states:

> Addressing the second claimed injury first—paying higher system
> usage charges—Macomb Interceptor has proffered no evidence in
> support of its allegation that as an "end user of the Detroit sewer

---

16:4-9.)  His principal source of information was "reading the newspapers." (Walter Dep. 14:13-14.)

[17] MID asserts that the City's  Intervening Compliant in the Prior Action  alleges $23 million in inflated invoices for repairs to the 15 Mile Project. MID's Reply to Temporary Allowance Motion, ¶ 10 [Dkt. 5498.] However,  the City's allegation in the City's Intervening Complaint in the Prior Action merely incorporates the allegation of MID's Complaint in that action. (Intervening Complaint,  ¶ 101.)  The existence of any such recoverable damages is exactly what Judge Cleland found to be speculative or difficult or impossible to prove as described in paragraphs 37-39 *infra*.  The "**Intervening Complaint**" is attached to the Debtor's Brief as Exhibit 7.

system" it was "damaged by the scheme because DWSD amortized the inflated costs for the Project into usage charges for the system in the years before the Macomb Agreement." (Compl. ¶ 47). Having been created only in 2009 for the express purpose of purchasing the Macomb System, [MID] (as opposed to [Macomb]—not a party to this suit) apparently never purchased water and sewerage services from the City of Detroit. Nor is there any evidence that the City of Detroit passed on the inflated repair costs by incorporating those costs in the usage charges for the system.

(Prior Dismissal Order at 21-22.)

39.     As to MID's assertion that it overpaid for the Macomb Interceptor System on account of fraudulent charges, Judge Cleland states:

On the one hand, Macomb Interceptor avers that the entire price of the 15 Mile Interceptor Repair Project was passed on to it through the Acquisition Agreement, and thus, it "paid in full for the 15 Mile Interceptor repair." (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 24; see also Compl. ¶ 44.) But Macomb Interceptor also maintains that the City of Detroit passed on the cost of the Project to users of water and sewerage services in southeast Michigan for at least four years prior to the Acquisition Agreement. (See Comp. ¶ 47; Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 29.) The court would therefore be tasked with analyzing usage rates charged to counties, municipalities, and end users over the course of four years to determine what amount was passed on through usage rates and what amount was passed on to Macomb Interceptor through the Acquisition Agreement.

(Prior Dismissal Order at 25.) Judge Cleland described the necessary calculations as "Gordian," and he questioned whether such analysis would even be possible—"Even if this [the damage calculation] were possible, a dubious assumption to say the least… " (Prior Dismissal Order at 25-26.)

40.     MID's own expert, Lyle Winn, confirms that MID's damages are speculative. Winn testified at his deposition that the "expert" work that MID relies on was not in fact performed by Winn, but by a former employee of his firm (Nancy Shirkey) back in February or

March of 2011. (Winn Dep. 20:10-22:11.)[18]  More fundamentally, the "expert" work consists of

a comparison of the initial budget for the subject work given by Inland Waters Pollution Control,

Inc. in September 2004 (Ex. 2 to Winn Dep.) against the final project cost.  *See* Winn Deposition

Ex. 4.  In fact, Inland (the contractor on the Project) materially increased its budget during the

project from an initial estimate of $33.7 million (as shown on Ex. 2 to Winn Dep.) to a final

estimate of $52.9 million (as shown on Ex. 3 to Winn Dep.).  Winn, however, had no knowledge

whatsoever of what events and occurrences took place during the interceptor work to warrant an

increase in price.  Winn testified:

> [BY MR. ADDIS]
>
> Q.  Okay.  In the estimate that you provided to Macomb, what was your final number, the budget?
>
> A.  $28,828, 490.
>
> Q.  And the final number that you finally located was what, the final price paid?
>
> A.  54 million, and I don't know the change after that.
>
> MR. ADDIS:  I don't have anything more.
>
> RE-EXAMINATION  BY MS. HATHAWAY:
>
> Q.  Your estimate was based on largely your review of the Inland budget, correct?
>
> A.  And the NTH plans.

---

[18] Mr. Winn testified:

> Q:  Do you know why Macomb isn't relying on the person who actually did the work here … if you know?
>
> A:  No, I don't.

(Winn Dep. 22:8-11.)  The transcript of the Lyle Winn deposition, dated July 10, 2014, is attached as Exhibit 11 to the Debtor's Brief.

Q.      All right.  The Inland budget changed significantly as they
        did the project.

A.      At some point it changed.  All I have is the beginning
        budget and the final summary.

Q.      All right.  So Inland thought that it was going to cost
        substantially less than it did until they got in and saw the
        work that needed to be done, right?

A.      I don't know why their cost changed.

Q.      And you don't know what happened in the project different
        from what their preliminary budget was?

A.      That is correct.

MS. HATHAWAY:  I have no more questions.

(Winn Dep. 80:7-81:9).

41.      Winn's testimony is not admissible under Federal Rule of Evidence 702 since it is

not "based upon sufficient facts or data" and does not appear to be "the product of reliable

principles and methods."  Fed. R. Evid. 702.  The method of relying upon the estimates of others

without knowledge of the underlying relevant facts lacks the reliability required by *Daubert v.*

*Merrell Dow Pharms.*, 509 U.S. 579 (1993).  Expert testimony must be based upon a reliable

methodology or analysis that fits within the facts of the case.  *See Tamraz v. Lincoln Elec. Co.*,

620 F.3d 665, 668 (6th Cir. 2010) (citing *Fed. R. Evid.* 702 and *Daubert*, 509 U.S. at 597).  "To

be reliable, the opinion must not have too great an analytical gap between the expert's

conclusion, on the one hand, and the data that allegedly supports it, on the other.  *Lozar v. Birds*

*Eye Foods, Inc.*, 529 Fed. Appx. 527, 530 (6th Cir. June 30, 2013) (internal quotations and

citations omitted) (finding expert's damages testimony unreliable where it ignored contrary data

that undercut expert's damages conclusion).

42.     The DWSD engineer in charge of the Project, Ramesh C. Shukla,[19] gave chapter and verse at his deposition as to the relevant and critical matters ignored by Winn -- the unforeseen circumstances giving rise to and increase of the Inland estimate from $35 million to in excess of $50 million. (Shukla Dep. 63:17-65:19; 112:2-114:6.)  Shukla explained that the Project "turned out to be much more complicated than what he had anticipated when … [the DWSD] w[as] originally thinking about these are the steps that we are going to take to effect the repairs … ."[20]  There were multiple significant unanticipated facts not accounted for in the original design including (a) that the sinkhole was 25 feet deeper than initially forecast;[21] (b) equipment failed after extended use 24 hours a day for an eight to nine month period; and (c) "the water table was very high.  It took us a lot longer time to dewater the site so that we can dig up … ."  (Shulka Dep. 65:13-16.)  "So these are some of the examples that I can tell that happened along the way."  (Shukla Dep. 65:18-19.)  On redirect, Shukla detailed additional unanticipated facts, including (a) "the sinkholes getting bigger and bigger and … becoming a threat to houses… ",[22] and (b) expenses to monitor water mains and air quality in the area. (Shukla Dep. 113:1-114:6.)  Based upon his intimate knowledge of the Project, Mr. Shukla expressed his opinion that the charges for the Project, when accounting for unanticipated circumstances, were "reasonable." (Shukla Dep. 115:12-14.)

---

[19] Shukla  had first hand knowledge of Contract CS 1368 as field engineer "in charge of" a repair project with respect to "the sinkhole in 15 Mile Road between Hayes an Schoenher." (Shukla Dep. 16:8-19.)

[20] (Shukla Dep. 63:17-22.)

[21] Shukla testified that "when we went down there, we found out that the sinkhole which was supposed to be 70 feet deep, it was actually another 25 feet deeper than that." (Shukla Dep. 64:6-10.)

[22] (Shukla Dep. 113:23-24.)

43.     Winn's "expert" testimony neither constitutes a preponderance of the evidence on the circumstances surrounding the actual cost  increases, nor even credible "expert" testimony.

## IV.     The MID Claims Are Barred by *Res Judicata*

44.     In the Sixth Circuit, "res judicata bars the same parties from relitigating issues that either were actually litigated or that could have been raised in an earlier action." *Marks v. Bank of Am.*, No. 13-12060, 2014 WL 700478, at *3 (E.D. Mich. Feb. 24, 2014) (citing *J.Z.G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 214 (6th Cir.1996)).  *Res judicata* extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *J.Z.G. Res., Inc.*, 84 F.3d at 215 (citing Restatement (Second) Judgments § 24 (1982)).[23]

45.     The Prior Dismissal Order amply demonstrates that *res judicata* bars the MID Claims.  As pertinent to identity of the causes of action, Judge Cleland states:

> The claims arise from Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan, (hereafter, the "15 Mile Interceptor Repair Project" or "Project").  Macomb Interceptor avers that Defendant Kwame Kilpatrick, then the Mayor of the City of Detroit, along with various City of Detroit officials conspired with the principal contractor overseeing the 15 Mile Interceptor Repair Project, Defendant Inland Waters Pollution Control, Inc., and numerous subcontractors to "overcharge the Detroit Water and Sewerage Department . . . for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road."  (Pl.'s Compl. ¶ 5, Dkt. #1.)

---

[23] The decision cited by MID at page 30 of its Temporary Allowance Motion, *Artie Fields Prods., Inc. v. Channel Seven*, 97 F.3d 1451 (6th Cir. 1996), is an unpublished Sixth Circuit 1996 decision which deals with the technical difference between the right to license the format of a production as opposed to the right to license material for advertising and promotional purposes. The unpublished *Artie* decision cites no law, 6th Circuit precedent or otherwise, as to the standard for determining identity of causes of action for res judicata purposes.  It does nothing to change the established rule set forth in *J.Z.G. Res., Inc.*, which adopts the Restatement (Second) of Judgments standard and has been followed in numerous Sixth Circuit cases, as recently as June 9, 2014.  *See Springs v. U.S. Dep't of Treasury*, No. 13-1521, 2014 WL 2566102, at *4 (6th Cir. June 9, 2014).

24

> Macomb Interceptor further alleges that the misconduct was part of a widespread corruption scheme during Defendant Kwame Kilpatrick's tenure as Mayor of Detroit.

(Prior Dismissal Order at 2.)

***

> Macomb Interceptor argues that the following two alleged injuries maintain its federal claims: (1) paying an inflated price for the Macomb System as a result of 15 Mile Interceptor Repair Project's cost overruns caused by Concurring Defendants' actions and (2) paying higher system usage charges during the time between the 15 Mile Interceptor Repair Project and the execution of the Acquisition Agreement.

(Prior Dismissal Order at 16.) In short, the same transactions and the same damages were at issue in both the Prior Action and the present Complaint.[24] Indeed, MID asserted standing in the Prior Action by virtue of an alleged assignment of rights under the 2010 Acquisition Agreement -- the very same contract which it raises as a basis for Count 3 of the Complaint. (*See* Prior Dismissal Order at 6-16; Complaint Count 3, ¶¶ 98-108.)

46.     As to identity of parties, it is true that the City was an intervening plaintiff, not a defendant. But unquestionably, the City was adverse to MID. As the Prior Dismissal Order notes, the City maintained that MID lacked legal standing to assert tort claims pertaining to the Macomb Interceptor System. (Prior Dismissal Order at 3-4.) It filed a brief in support of defendants' motion for summary judgment, which was granted, and in opposition to MID. (Prior Dismissal Order at 4.) What matters for *res judicata* purposes is that the City and MID were adverse, not how they were aligned in the caption. *In re Silver Mill Frozen Foods, Inc.* (*Edelman v. McMullin Orchards*), 32 B.R. 783, 785 (Bankr. W.D. Mich. 1983) ("It is clear that res judicata can be applied to bind co-parties," where they are adverse.).

---

[24] *Compare* paragraphs 8-9 *supra* describing the present Complaint.

47.     Moreover, the federal decision in the Prior Action was a final resolution of the issue of MID's right and standing to bring tort claims relating to the alleged Macomb Interceptor System fraud.  In a footnote in an unpublished decision, the Sixth Circuit has suggested in *dicta* that standing may be a source of *res judicata* even where a decision is not on the merits.  *Hooker v. Fed. Election Comm'n.*, 21 Fed. Appx. 402,  405 n. 2 (6th Cir. 2001).  MID's Claims could have and should have been raised in the Prior Action.  MID's decision not to join (or realign) the City as a defendant was doubtless a tactical choice, which it believed would maximize a recovery.

## V.     MID's Fraud and Misrepresentation Claims Are Barred by Governmental Immunity Under Michigan Law

48.     Under Michigan law, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." M.C.L. § 691.1407(1).  The statute defines "governmental agency" as "this state or a political subdivision," M.C.L. § 691.1401(a), and a political subdivision includes municipal corporations like the City.  M.C.L. § 691.1401(e).  A "governmental function" includes "an activity that is expressly or impliedly mandated or authorized by constitution, statute,  local charter or ordinance, or other law." M.C.L. § 691.1401(b).   "In assessing whether an  activity is a governmental function, the focus is on the general activity, not the specific conduct giving rise to the tort claim."  *See Williams v. Wayne Cnty.,* No. 09-14328, 2011 WL 479959, at *7 (E.D. Mich. Feb. 4, 2011).

49.     The Michigan governmental immunity statute extends to all tort claims, including fraud, fraudulent inducement, silent fraud and misrepresentation claims.  *See Id*. (stating that immune government agencies "enjoy statutory tort immunity for any claim relating to the discharge of this function" and dismissing fraud claim against county relating to foreclosure

sale); *Local Emergency Fin. Assistance Loan Bd. v. Blackwell*, 832 N.W.2d 401, 405 (Mich. Ct. App. 2013) (affirming summary dismissal of plaintiff's claim that fraud about city finances and actual affairs caused him to agree to serve as emergency financial manager); *Northern Warehousing Inc. v. Mich. Dep't of Educ. (On Remand)*, Case No. 260598, 2006 WL 2419189, at \*4 (Mich. Ct. App. Aug. 22, 2006) (finding school district was likely statutorily immune from silent fraud claim); *e.g.*, *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 165-166 (Mich. Ct. App. 2008) ("[I]nnocent misrepresentation claims sound in tort.")

50.     As a "governmental agency" the City is statutorily immune from all tort liability alleged to have been incurred in the exercise of its "governmental function" -- the City's legally authorized transfer of property to MID under the 2010 Acquisition Agreement.  Accordingly, the MID's fraud (Count I) and misrepresentation (Count II) claims, which pertain exclusively to representations made by the City (a governmental agency) in connection with the transfer of property pursuant to the 2010 Acquisition Agreement (a governmental function) are barred by governmental immunity.

## CONCLUSION

For the reasons stated, the Temporary Allowance Motion should be denied.


Dated: July 14, 2014
New York, New York                         Respectfully submitted,


By: /s/ Claude D. Montgomery
Claude D. Montgomery                       Sam Alberts
Carole Neville                             Dan Barnowski
DENTONS US LLP                             DENTONS US LLP
1221 Avenue of the Americas                1301 K Street, NW, Suite 600 East Tower
New York, New York 10020                   Washington, DC 20005
Tel:    (212) 768-6700                     Tel: (202) 408-6400
Fax:    (212) 768-6800                     Fax: (202) 408-6399
claude.montgomery@dentons.com              sam.alberts@dentons.com
carole.neville@dentons.com                 dan.barnowski@dentons.com

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct:  (248) 971-1711
Cell:  (248) 882-8496
Fax:  (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*