## EXHIBIT 2

**Transcript of Deposition of Robert Walter dated July 11, 2014**

IN RE: CITY OF DETROIT

ROBERT C. WALTER

July 11, 2014

*Prepared for you by*



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

---

```
 1          UNITED STATES BANKRUPTCY COURT
 2          EASTERN DISTRICT OF MICHIGAN
 3               SOUTHERN DIVISION
 4
 5    _____
 6    In re:                )     Case No. 13-53845
 7    CITY OF DETROIT, MICHIGAN )
 8                          )     Chapter 9
 9          Debtor          )
10    _____)     Hon. Steven W. Rhodes
11
12
13          The Deposition of ROBERT C. WALTER,
14          Taken at 150 W. Jefferson, Suite 2500,
15          Detroit, Michigan,
16          Commencing at 10:27 a.m.,
17          Friday, July 11, 2014,
18          Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

---

```
 1    APPEARANCES:
 2
 3    RAECHEL M. BADALAMENTI (P64361)
 4    SCOTT SIERZENGA (P77633)
 5    Kirk, Huth, Lange & Badalamenti, PLC
 6    19500 Hall Road
 7    Suite 100
 8    Clinton Township, Michigan 48038
 9    586.412.4900
10    rbadalamenti@khlblaw.com
11    ssierzenga@khlblaw.com
12        Appearing on behalf of the Macomb Interceptor
13        Drain Drainage District.
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
 1    ALBERT B. ADDIS (P31084)
 2    KEITH C. JABLONSKI (P62111)
 3    THOMAS D. ESORDI (P45428)
 4    O'Reilly Rancilio PC
 5    12900 Hall Road
 6    Suite 350
 7    Sterling Heights, Michigan, 48313
 8    586.726.1000
 9    aaddis@orlaw.com
10    kjablonski@orlaw.com
11    sesordi@orlaw.com
12        Appearing on behalf of the Macomb Interceptor
13        Drain Drainage District.
14
15    W. MACK FAISON
16    M. MISBAH SHAHID (P73450)
17    Miller Canfield Paddock & Stone, PLC
18    150 W. Jefferson Avenue
19    Suite 2500
20    Detroit, Michigan 48226
21    313.963.6420
22    faison@millercanfield.com
23    shahid@millercanfield.com
24        Appearing on behalf of the City of
25        Detroit and the Witness.
```

---

1 ARTHUR H. RUEGGER

2 JOSEPH SELBY

3 Salans FMC SNR Denton

4 1221 Avenue of the Americas

5 New York, New York 10020

6 212.768.6881

7 arthur.ruegger@dentons.com

8 joseph.selby@dentons.com

9     Appearing on behalf of the

10    Official Committee of Retirees

11    of the City of Detroit.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                 TABLE OF CONTENTS

2

3  WITNESS                                    PAGE

4  ROBERT C. WALTER

5     EXAMINATION BY MS. BADALAMENTI            6

6

7  EXHIBIT                                    PAGE

8     (Exhibits attached to transcript.)

9

10    DEPOSITION EXHIBIT 1                     23

11    DEPOSITION EXHIBIT 2                     25

12    DEPOSITION EXHIBIT 3                     35

13    DEPOSITION EXHIBIT 4                     39

14    DEPOSITION EXHIBIT 5                     76

15    DEPOSITION EXHIBIT 6                     79

16    DEPOSITION EXHIBIT 7                     97

17

18

19

20

21

22

23

24

25



1  Detroit, Michigan

2  Friday, July 11, 2014

3  10:27 a.m.

4                 (Mr. Sierzenga not present at

5                 10:27 a.m.)

6          ROBERT C. WALTER,

7  was thereupon called as a witness herein, and

8  after having first been duly sworn to testify to

9  the truth, the whole truth and nothing but the

10 truth, was examined and testified as follows:

11          EXAMINATION

12 BY MS. BADALAMENTI:

13 Q.  Sir, can you tell us your name for the record.

14 A.  Robert Charles Walter.

15 Q.  And, Mr. Walter, you're an attorney?

16 A.  Yes.

17 Q.  So you understand the deposition process?

18 A.  I do.

19 Q.  I have a tendency of getting a little ahead of

20    myself.  If I cut you off before you're finished

21    answering a question, let me know that I'll back

22    up.  And the same thing, even if you can

23    anticipate my question, make sure you wait and

24    let me finish it --

25 A.  Okay.

1  Q.  -- so the court reporter can get down what we're

2      saying.

3              Are you currently employed?

4  A.  No.  I'm retired.

5  Q.  When did you retire?

6  A.  March of 2012.

7  Q.  Where did you retire from?

8  A.  City of Detroit Law Department.

9  Q.  What was your position?

10 A.  Senior assistant corporation counsel.

11 Q.  Who was above you in the Law Department?

12 A.  At that time, my supervisor was Judith Turner and

13     then the director and -- was Krystal Crittendon,

14     and the deputy director was Edward Keelean.

15 Q.  The highest ranking person in that department was

16     Ed Keelean?

17 A.  No, he was the deputy director.  Krystal

18     Crittendon was the director.

19 Q.  What would your day-to-day duties have been as an

20     assistant -- senior assistant corporation

21     counsel?

22 A.  I was assigned to represent the Detroit Water and

23     Sewerage Department, and basically general counsel

24     work for whatever they wanted me to do.  I didn't

25     do litigation.  I wrote and reviewed contracts,




1    negotiated contracts, advised the department on
2    any legal issues that they wanted advice on.
3 Q. Advise the DWSD?
4 A. Yes, that was -- I did some work for the Public
5    Lighting Department, but mostly DWSD.
6 Q. When did you take the position of senior
7    assistant corporation counsel?
8 A. I got promoted in the mid-90s -- '95 or '96.
9 Q. And were you always in that position assigned to
10    the DWSD?
11 A. I was assigned to DWSD from the time I started at
12    the Law Department in 1982 until I retired.
13 Q. With respect to any criminal investigations or
14    outside agencies investigating the DWSD, would
15    that have been something that you would become
16    involved with?
17 A. No. I was not involved in that.
18 Q. What -- who would have been involved?
19 A. Someone higher than me. There were two federal
20    investigations of the department while I worked
21    there, when I just started there, in 1982, when
22    the director of the department, Charles Beckham
23    was indicted and subsequently convicted. And that
24    was handled by my supervisor, Darryl Alexander,
25    and they add lawyer from Dykema -- a criminal

1    lawyer from Dykema Gossett named Howard O'Leary
2    who worked on that.
3        And then the one in the Kilpatrick
4    administration was an headed by Edward Keelean,
5    the deputy director of the department.
6 Q. And when did that investigation begin, to the
7    best of your knowledge?
8 A. I don't remember a date. I became aware of it
9    when I was -- when Mr. Keelean and another lawyer
10    named Dennis Mazurek showed me a grand jury
11    subpoena for Water and Sewerage Department
12    documents and asked me who at the Water Board
13    Building they would contact to find all the files
14    that responded to that subpoena.
15 Q. Do you know what time frame that was?
16 A. I don't.
17 Q. Did that grand jury subpoena request files or
18    people to testify?
19 A. The ones that I saw -- and there were several of
20    them -- were all for documents. They did subpoena
21    individuals to testify before the grand jury, but
22    I was not involved in that at all.
23 Q. Do you know what came first, the subpoenas for
24    documents or subpoenas for individuals?
25 A. I think it was the documents.



1 Q. And so you were asked to compile the documents?
2 A. No, I was not. Mr. Mazurek and Mr. Keelean
3    compiled the documents. They just -- because I
4    was familiar with all of the water board's
5    contracting processes, they always asked me who
6    was the project manager for this contract that
7    they were having to find documents on and I would
8    tell them which building to go to and which people
9    to contact to find the files, but I did not look
10    at the files or compile them myself.
11 Q. Would you recognize those subpoenas if you saw
12    them now?
13 A. I don't know. I might.
14 Q. Have you reviewed any grand jury subpoenas before
15    or in preparation for your deposition today?
16 A. No, I have not.
17 Q. Did you keep a separate file that --
18 A. I did not. Ed or Mr. Mazurek would show me the
19    subpoena and I would tell them where to find --
20    look for the files responsive to the subpoena, and
21    that was it. I didn't keep copies of the
22    subpoenas myself.
23 Q. Was Mr. Mazurek an attorney?
24 A. Yes.
25 Q. What was his position?

1 A. Chief assistant corporation counsel.
2 Q. Did you work with him on other things or just
3    this one?
4 A. I worked with Dennis on a number of issues. He
5    was the head of what's called the municipal
6    section, which handled -- they responded to
7    subpoenas in actions where the city was not a
8    party. They advised the city council on ordinance
9    drafting, and they handled all the Freedom of
10    Information Act requests, so anytime the Water and
11    Sewerage Department got FOIAs, and things like
12    that, I would deal with him.
13 Q. How about Ed Keelean? How often did you interact
14    with him?
15 A. Not all that often. Primarily I dealt with my
16    supervisors. In the chain of command above me
17    there was my supervisor, Judith Turner, and then
18    she reported to Dennis Mazurek, who reported to Ed
19    Keelean and Krystal Crittendon.
20 Q. When you were shown the grand jury subpoenas, do
21    you know what year that was?
22 A. I don't.
23 Q. When you were shown the grand jury subpoenas, was
24    that the first time that Mr. Keelean had asked
25    you to get something or direct him in the right



1    way since you became -- or since he became the
2    director?
3  A.  I think so, yes.  I mean, basically I would deal
4    with him if was writing a legal opinion for the
5    Law Department that either he or the corporation
6    counsel had to sign off on, but it was just
7    projects like that.  An average week, I had no
8    contact with him.
9  Q.  Did you -- in order to answer his questions, did
10   you have to ask him about the investigation and
11   the nature -- the nature of the investigation?
12  A.  Yes.  And although I don't know how much the
13   federal investigators were telling him, he was the
14   liaison between the federal investigators and the
15   city.  And I don't know what they told him.
16  Q.  What did he tell you?
17  A.  That he was receiving subpoenas, that he was
18   compiling documents, and that he also sat in on
19   some of the interviews where the federal
20   investigators were interviewing city employees.
21   This was before some of them got called before the
22   grand jury.
23  Q.  Had you sat in on any interviews?
24  A.  No, but I was interviewed by the assistant U.S.
25   attorney who was on the investigation.

1  Q.  When was that?
2  A.  I don't remember the date.  It was several months
3    before the indictment came out.
4  Q.  In 2010?
5  A.  It might have been.  Either late 2009 or early
6    2010.
7  Q.  So going back to the conversation with
8    Mr. Keelean, did he tell you what was being
9    investigated?
10  A.  I don't know if this is privileged or not, but --
11       MR. FAISON:  If you think it might be
12   privileged, then establish the parameters, and
13   then we can figure out whether it's privileged or
14   not.
15       THE WITNESS:  He told me general --
16       MR. FAISON:  Not what -- in terms of
17   the conversation, how did the conversation come
18   up, and did you feel that you were offering law
19   advice to him?
20       THE WITNESS:  Well, no, I wasn't
21   offering any legal advice.  There were
22   investigations as far as it involved the
23   department that I worked with, of kickbacks being
24   paid by contractors or extorted from contractors,
25   and there was also in a housing department




1    contract that I got stuck working on an allegation
2    of bid rigging.
3  BY MS. BADALAMENTI:
4  Q.  You said kickbacks that were paid by or extorted
5    from contractors.  Do you know which one was
6    being investigated?
7  A.  No.
8  Q.  Did Mr. Keelean tell you it was one or the other
9    or did you gather that information on your own?
10  A.  A lot of that came from just reading the
11   newspapers and watching the television news.  The
12   news media were -- I probably got more information
13   about the investigation from reading the
14   newspapers than I did from talking to Ed Keelean.
15  Q.  Would that have been at the time that you were
16   answering these subpoenas you saw this
17   information going on in the news?
18  A.  The investigation was all over the newspapers and
19   the TV stations.
20  Q.  What was the housing project?
21  A.  That was a fed -- the federal government, the
22   Department of Housing and Urban Development, was
23   putting up the money to rebuild an old public
24   housing project on the west side of Detroit.  The
25   old one had demolished -- been demolished, and

1    they were going to build a new one, and I got
2    involved as special assignment away from my
3    regular work, to get involved in negotiating that
4    contract between the city and the federal
5    government.
6  Q.  Was it within your -- the course and scope of
7    your employment to negotiate contracts that
8    involved the DWSD?
9  A.  Yes.
10  Q.  Did you actually write those contracts?
11  A.  The department had some standard contract forms
12   for construction contracts, consultant contracts,
13   water service contracts and sewer service
14   contracts with suburbs, and I was involved in
15   developing all of those basic format contracts.
16   And then we'd start with that and -- for the
17   construction contracts and consultant contract,
18   they didn't change very much.  In fact, we just --
19   the water service contracts, there were a few
20   provisions we would tweak or touch, but mostly it
21   was boilerplate.  But I was involved in writing
22   them, yes.
23  Q.  The presubpoena, during the interview process by
24   the United States Attorney's Office, what did you
25   understand the nature of the investigation to be?



1   A.   It dealt with misconduct involving city contracts.
2   Q.   DWSD contracts or other city contracts?
3   A.   Both.
4   Q.   Did you learn during the course of those
5        interviews that you attended or your own
6        interview what contracts were being investigated?
7   A.   I didn't -- the only interviews that I attended
8        was my own, and they were not asking me about
9        specific contracts.  They were asking me what the
10       city's normal contracting procedures were, how did
11       contracts get awarded, how did the bid process
12       start, how did the bid evaluation process work.
13       And it was more general background information.
14       They did not ask me about any specific contracts
15       or contractors.
16  Q.   Did they ask you about the sinkhole project?
17  A.   No.
18  Q.   Did they ask you about Inland Waters?
19  A.   No.
20  Q.   Did they ask you about Tony Soave?
21  A.   No.
22  Q.   Any representatives, employees, agents of Inland
23       Waters?
24  A.   No.
25  Q.   What was the typical DWSD contracting process,



1        the bidding process?
2   A.   Well, there were two types of contracts,
3        construction contract -- well, more than two, but
4        I'll start with -- construction contracts would
5        start with a design.  You would give the design, a
6        whole sheaf of engineering drawings and the
7        boilerplate contract documents to the bidders.
8        They would submit sealed competitive bids, and the
9        lower bidder was supposed to get the contract.
10            Then you would have what were called
11       professional services contracts, which were either
12       contracts for services by engineering firms in
13       which there was a bid evaluation process where
14       price was a factor but there were other factors
15       like professional competence, experience in doing
16       the type of work to be covered by that contract.
17            And then you had for some big projects
18       design-build contracts where you would be
19       evaluating -- where you would give them project
20       scope and they would process a basic design and a
21       construction and design budget, and that was
22       evaluated.  It wasn't a pure competitive bid
23       situation.  You would look at the price but also
24       look at the design and the competence of the
25       contractors who were on the bid team.  Those were



1        usually a joint venture between the general
2        contractor and the design firm.
3   Q.   What was the -- which of these examples would the
4        sinkhole project be characterized as?
5   A.   The sinkhole project was kind of unique.  That was
6        an emergency.  So what they did was they took an
7        existing sewer repair contract with Inland Waters,
8        who was already working on sewer repair and had
9        their equipment and team mobilized and were
10       available.  They moved them all out to the
11       sinkhole and had them stabilize the situation and
12       build an emergency bypass around the sinkhole to
13       keep the sewage flowing and keep it from backing
14       up in all the sewers upstream.
15  Q.   That contract was -- that was already in place
16       was CS-1368?
17  A.   Yes.
18  Q.   How was CS-1368 awarded?  Was it through --
19  A.   That was a professional -- CS stands for
20       consultant services.
21            MR. FAISON:  You're going to have to
22       let her finish her question.
23            THE WITNESS:  I'm sorry.
24  BY MS. BADALAMENTI:
25  Q.   Which of the three types of contracts that you



1        just referred to would CS-1368 fall within?
2   A.   That was a professional service -- actually, wait.
3        It was a professional services contract but they
4        were managing sewer repairs.
5   Q.   Who was the -- so that would have been subject to
6        a bid evaluation process?
7   A.   Yeah.  That contract would have been an
8        evaluation, not a pure competitive bid.
9   Q.   So a pure competitive bid the low bidder gets it,
10       period?
11  A.   Yes.
12  Q.   In a professional services contract, bidders are
13       evaluated on a rating system?
14  A.   There's a rating system.  When the contracts go
15       out for bids, the contractors are told what the
16       basic criteria are.  They are not told how those
17       are weighted.  And they are not told -- I don't
18       think -- they were not told the identity of the
19       committee that was going to evaluate the bid.
20  Q.   And is it your understanding that Inland Waters
21       was evaluated before it was awarded CS-1368?
22  A.   Yes.
23  Q.   Who did that evaluation?
24  A.   I don't know who the members of the committee
25       were.  For every bid evaluation the director of






1       the department would appoint a committee to do the
2       evaluation.  I don't know who was on the committee
3       for that contract.  I did not serve on the bid
4       evaluation committees.
5   Q.  Do you remember a contract CS-1372?
6   A.  No.
7   Q.  Do you remember that the sinkhole or sewer
8       lining -- sorry -- the sewer lining work that was
9       to be performed under CS-1368 was originally the
10      subject of a different contract with Lakeshore
11      who had been awarded through the bid process?
12  A.  No, I was not aware of that.
13                      (Mr. Sierzenga present at
14                       10:45 a.m.)
15  BY MS. BADALAMENTI:
16  Q.  Okay.  But your understanding is CS-1368 was
17      competitively bid?
18  A.  Yes.
19  Q.  As a professional services contract?
20  A.  Yes.
21  Q.  And you have no knowledge of the contract that
22      was initially awarded to Lakeshore and then
23      cancelled?
24  A.  No.
25  Q.  And moved over to 1368?

1   A.  I may have heard about it at the time, but I don't
2       remember anything about it.
3   Q.  If you had heard about it, who would that have
4       been from?
5   A.  Probably Darryl Latimer.  He was running the
6       contracts and grants group in those days.
7   Q.  Had there ever been something like that happen
8       where a contract -- professional services
9       contract had been awarded and it was cancelled
10      and a different contractor was given the award?
11  A.  Contracts were awarded and terminated on a regular
12      basis usually, so it would not raise any red flags
13      to me if work got shifted from one to the other.
14  Q.  Do you know who would direct such a process to
15      occur?
16  A.  That would come from the director.
17  Q.  The director of?
18  A.  The Water and Sewerage Department.
19  Q.  And at this time who would that have been?
20  A.  Victor Mercado.
21  Q.  Do you remember having any conversations with
22      Victor Mercado about 1372 being cancelled?
23  A.  No.
24  Q.  Was it your understanding that when 1372 was
25      cancelled and it was moved over to some different


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1       contractor, was the process completed again?  Was
2       the evaluation process completed again?
3   A.  Well, when 1368 was awarded, there would have been
4       an evaluation.  If work was added to or taken out
5       of the scope of the contract, that would have been
6       done by a contract amendment after the contract
7       was awarded.
8   Q.  Okay.
9   A.  I mean, there's a scope of work in the contract
10      when it goes out for bids, but that can be changed
11      by amendments that either add work or take work
12      out.
13  Q.  So if 1372 was cancelled and that was moved over
14      to a different contractor, it would be your
15      belief that would be due to a different scope of
16      work than on 1368?
17  A.  I don't understand the question.
18  Q.  The contract CS-1368 was awarded to Inland
19      Waters, correct?
20  A.  Yes.
21  Q.  And your belief is that it was awarded pursuant
22      to a bidding process?
23  A.  Yes.
24  Q.  A professional services evaluation process,
25      right?

1   A.  Yes.
2   Q.  My question is whether -- what information you
3       have regarding that award process.
4   A.  I really don't remember anything about the award
5       of that specific contract, because generally I was
6       not involved in evaluation of bids.  Once the
7       contract was signed, I would review it before it
8       went to the Board of Water Commissioners for
9       approval.
10                      MARKED FOR IDENTIFICATION:
11                      DEPOSITION EXHIBIT 1
12                      10:50 a.m.
13  BY MS. BADALAMENTI:
14  Q.  Do you recognize the document that I have just
15      handed you?
16  A.  This is Amendment No. 1 to Contract 1368.
17  Q.  Do you recognize the exhibit that's been --
18      document that's been marked Exhibit 1?
19  A.  I do.
20  Q.  Were you involved in the award of this Amendment
21      1 to CS-1368?
22  A.  No.
23  Q.  Were you involved in the preparation of this
24      Amendment 1?
25  A.  The preparation was done by the contracts and

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

1     grants group.  I would review it after the
2     negotiation was finalized, but typically the
3     negotiation of an amendment was done by the
4     contracts and grants group and engineers who were
5     the project managers for the contract.  I
6     generally was not involved in them.
7  Q.  What was the scope of the work that was covered
8     by this Amendment 1?
9  A.  The scope of the work is -- actually there is no
10    scope of work in this amendment, which means that
11    the scope of work that was in the initial contract
12    would remain in place.  And it looks like this one
13    was simply adding additional funding to cover more
14    of the same types of work.
15 Q.  Who would be -- who would initiate an amendment
16    like this where they're approving more money for
17    the same work?
18 A.  That would typically be the engineering department
19    that was administering the contract.  If they
20    found that there was more work that needed to be
21    done, then they would ask for a budget increase
22    and a contract amendment putting more money.  And
23    sometimes they would add work to the scope of a
24    contract.  And this one -- this amendment doesn't
25    do that.  It's just sewer inspection and relining,



1     and there are unit prices for various sizes of
2     pipe.
3  Q.  Is it your understanding that the work had
4     changed in some aspect or that it had -- the
5     scope of the original work was different when
6     they got in to do it, or what was the reason that
7     amendment was necessary?
8  A.  Well, the explanation is in the second and third
9     pages of this exhibit.  There's a memorandum to
10    the Board of Water Commissioners from the director
11    explaining the need for the contract amendment,
12    which simply says that they're inspecting and
13    relining old sewers, and that they want to have
14    additional work done, but it's the same type of
15    work.  They're just adding more money.
16 Q.  Is it additional work or are they relining a
17    different areas or --
18 A.  This covers sewers for the whole area of the
19    city -- service area.
20 Q.  Did the original 1368 cover the same scope?
21 A.  I haven't seen the original -- the scope of work
22    is in contract -- the original contract document,
23    which I do not have before me.
24                    MARKED FOR IDENTIFICATION:
25                    DEPOSITION EXHIBIT 2



1                    10:55 a.m.
2  BY MS. BADALAMENTI:
3  Q.  I marked as Exhibit 2 a document that is titled
4     Contract CS-1368.  Do you recognize that
5     document?
6  A.  Yes, I do.
7  Q.  Is that the original contract?
8  A.  This is the original contract that Exhibit 1
9     amended.
10 Q.  With that now in front of you, are you able to
11    tell me whether or not the area or type or
12    anything about the scope of work changed?
13 A.  The scope of work was not changed by the
14    amendment.  The scope of work involves inspecting
15    sewers owned by the Detroit Water and Sewerage
16    Department, evaluating their condition, and
17    repairing and relining the ones that needed
18    repair.
19 Q.  So did the job change to necessitate Amendment 1
20    or did something else occur to necessitate
21    Amendment 1?
22 A.  As I read these two documents, what happened was
23    they spent the full budget on the original
24    contract and decided they needed to have more of
25    that work done and more sewers inspected, so they



1     added additional money to the budget for more
2     sewer inspection and relining.
3  Q.  Would there have been any review to determine why
4     the full budget was spent but the project not
5     complete in that sort of circumstance?
6  A.  Well, the City of Detroit has over a thousand
7     miles of sewers, and so there is a constant need
8     to inspect and repair, because many of them are
9     over 50 years old and some of them are
10    deteriorating.  So you can't ever say the sewer
11    system is fixed and it's set.  It's always
12    changing.
13 Q.  So it's your understanding that simply that more
14    work needed to be done?
15 A.  For Amendment 1, yes.
16 Q.  What was the date of the original contract?
17 A.  The original contract was approved by the Detroit
18    City Council on June 26, 2002.
19 Q.  And would you agree with me that it contemplated
20    three years' worth of sewer lining work?
21 A.  Yes, actually 4.03 of the contract says the
22    contract duration is three years.
23 Q.  So it wasn't that we were going outside of that
24    original three-year term and the sewers still
25    needed to be inspected and repaired and lined;




1     we're within that time frame, right, when we
2     enter into Amendment 1?
3  A.  Amendment 1 was approved by the city council on
4     February 2nd, 2005, so --
5  Q.  Amendment 1 is -- there's a motion to the Board
6     of Water Commissioners as of August 25th of 2004,
7     correct?
8  A.  Right.
9  Q.  So the board might not approve it until 2005, but
10    they've used up their budget from the original --
11 A.  At some point.
12 Q.  Hold on.  Let me finish.  They've used up their
13    budget from 2002 to August 25th of 2004?  That's
14    when they request additional funding?
15 A.  They requested an additional $10 million to do
16    more work and they did not -- this Amendment No. 1
17    did not extend the time of performance.
18 Q.  So within the same three-year time frame we're
19    upping the budget $10 million?
20 A.  Yeah.
21         MR. FAISON:  I object to the suggestion
22    that all money had been used up on the contract at
23    the time the motion was filed.  There is no
24    evidence to support that suggestion.
25         MS. BADALAMENTI:  I appreciate the

1     testimony, counsel, but I think Mr. Walter
2     testified that as of the motion, but I'll ask him.
3  BY MS. BADALAMENTI:
4  Q.  As of the date of the motion, it looks to me like
5     Victor Mercado is representing in page 2 and 3
6     that additional funding is necessary, but what is
7     your understanding?
8  A.  He's saying -- it's on the second page of the
9     motion -- and I'll quote:  "In order to provide
10    the department with the means necessary to
11    continue the rehabilitation work described above,
12    and respond to potential sewer repair emergencies
13    until a new contract is in place, it is
14    recommended that the budget for Contract CS-1368
15    be increased by $10,000,000 to close out the
16    contract."
17 Q.  In the first line of page 3 it says "The current
18    balance of approximately $12,200,000.00 is
19    insufficient to cover the monthly cost of
20    rehabilitation," which is about $1,600,000 per
21    month.  Is it your understanding that that
22    $1.6 million per month was what was originally
23    contemplated by CS-1368 or that that amount was
24    more, such that the funding was going to run out
25    during the three-year term?



1  A.  I think the original anticipation was that the
2     budget was going to be -- in the original
3     contract, was going to be sufficient for the
4     three-year term, but obviously they found
5     additional work.  You don't know what state the
6     sewers are in until you actually get in there and
7     take a look at them.  And obviously they found
8     more deterioration in the sewers and they wanted
9     to have more work done.
10 Q.  So in the professional services context you told
11    me that there is a design process that goes into
12    the proposal submitted by the professional.  So
13    is it your testimony now that they might not have
14    known what design or nature or how much sewer
15    they were going to be covering --
16 A.  Well --
17         MR. FAISON:  Hold on.  Let her --
18         MS. BADALAMENTI:  That's okay.
19         MR. FAISON:  Let her finish her
20    question.  That way I can figure out whether the
21    question is objectionable or not before you
22    answer.
23         THE WITNESS:  Okay.  This was not
24    really a design contract.  This was more an
25    as-needed inspection and rehabilitation work for

1     relining old sewers that were deteriorated.  You
2     just look at the condition of the sewer, and if
3     it's cracking or pitting, you reline it.
4  BY MS. BADALAMENTI:
5  Q.  So this CS-1368 wasn't really any of those three
6     types of contracts.  That's what you're telling
7     me now.  It wasn't construction contracts; it
8     wasn't a professional services contract; it
9     wasn't a design-build contract.  It was something
10    different.  Now we have a fourth category of
11    contract?
12 A.  Well, this -- this would be more of -- the scope
13    of work here is inspecting sewers and relining the
14    ones that need to be relined.  So the inspection
15    work and evaluation is professional services, and
16    the relining work is basically construction work;
17    so they were doing both in this contract.
18 Q.  So is it your testimony that this is a fourth
19    type of contract?  It's not one of those three?
20 A.  Yeah, there -- yeah.
21 Q.  What other contracts were as-needed contracts?
22 A.  Oh, the sludge hauling contracts for the
23    wastewater treatment plant.  Depending on how many
24    tons of sludge the plant produces -- you'd have
25    trucking companies on call.  You would have what






1     were called as-needed design services where you'd

2     have engineering firms under contract and you

3     would assign projects to them.

4          You had what was called skilled

5     maintenance contracts where you would have

6     contractors that would provide skilled trades work

7     at pump stations and water treatment plants and

8     the sewer plant. And that was all on an as-needed

9     basis. Some days they'd be doing nothing and some

10    days they'd have a full crew.

11 Q. Those contracts would have a total contract

12     amount and they would work for a certain period

13     of time within that contract amount, right?

14 A. You would start -- yeah, you would have a contract

15     amount that they could not go over without an

16     amendment increasing the price, and there would be

17     an initial time frame, and that would require a

18     contract amendment to shorten or extend it.

19 Q. The sludge hauling contracts, the engineering

20     contracts, were those -- were there typically

21     amendments in connection with those types of

22     contracts?

23 A. Yes.

24 Q. Would the amendments not extend the time but

25     extend the budget?

1 A. You could get any combination of that. You could

2     have a time-only extension. You could have a

3     budget extension or you could have both.

4 Q. Tell me some of the amendments that you're aware

5     of on these as-needed-type contracts where the

6     time is not extended but the budget is. Any

7     other example you can give me?

8 A. Oh, sometimes on the sludge hauling contracts, if

9     you've got -- if the plant was producing more

10    sludge than normal, things like that.

11 Q. Any others?

12 A. It could happen on any type of contract.

13 Q. Was this the only contract that you were involved

14     with where the City of Detroit was contracting

15     with a contractor or professional services

16     provider to inspect the sewer system?

17 A. No. There were a number of those contracts over

18     the years.

19 Q. Who were some of the other contractors?

20 A. There was a company called Insituform --

21     Insituform of Michigan, which was owned by the

22     same holding company that owns Inland Waters.

23     There was a company called Lanzo Construction that

24     had a contract for relining some of the larger

25     sewers and outfalls on the Detroit River. Those

1     are the ones I can think of off the top of my

2     head.

3 Q. Would the contract with Lanzo have an amendment

4     like this one where it was not extending the time

5     but it did extend the budget?

6 A. I don't know.

7 Q. Do you know what that contract number was?

8 A. No.

9 Q. How about the contract with Insituform? Were

10    there extensions of the budget without extensions

11    of time for performance?

12 A. There were amendments to that contract. There

13     were several contracts with Insituform over the

14     years because for a long time Insituform owned the

15     patent on the sewer relining process, and they

16     were the only company that could do that kind of

17     work, and then -- and there were amendments to

18     that contract. Typically those were extending

19     both the time and increasing the budget. And

20     eventually there came some other processes that

21     competed with Insituform that came onto the

22     market, and then we could start competitively

23     bidding those contracts.

24 Q. The next amendment that comes to CS-1368,

25     Amendment 2, I am marking as Exhibit 3.

1                 MARKED FOR IDENTIFICATION:

2                 DEPOSITION EXHIBIT 3

3                 11:08 a.m.

4 BY MS. BADALAMENTI:

5 Q. Do you recognize that document?

6 A. Um-hmm. I do.

7 Q. When do you believe that Amendment 2 was entered

8     into?

9 A. By city charter the official date of the contract

10    is the date of city council approval, which in

11    this case is -- well, it says December 20 --

12    either 20 or 30. I can't read the purchasing

13    director's handwriting, but it's December either

14    the 20th or 30th of 2004.

15 Q. And what do you understand Amendment 2 to cover?

16 A. This is the contract for the emergency work after

17     the sewer collapsed on 15 Mile Road.

18 Q. That sewer collapse occurred August 22, 2004.

19     Does that sound about right now?

20 A. That sounds right.

21 Q. Would this -- there have been some discussions

22     with Inland Waters about the terms of this

23     amendment when it was put on the sinkhole repair

24     project, in other words, immediately or within

25     days of its occurrence?






1  A.  Yeah.  Somebody at the department would have

2      talked to them about what it was going to take to

3      get them out there, get them mobilized, and get

4      the initial emergency stabilization work done.

5  Q.  Who would -- when you say someone at the

6      department, do you mean your department?

7  A.  Not me.  Someone at the Water and Sewerage

8      Department.

9  Q.  Any idea who would have that type of conversation

10     or any idea who had that conversation?

11 A.  Well, on something this big, the director, Victor

12     Mercado, would have been involved, and some -- he

13     would have had some people from the engineering

14     department involved in that as well.  I was not

15     involved in the meetings with Inland Waters.

16 Q.  When you -- when you do get involved, what do you

17     -- I guess what time frame do you get involved?

18     Is it within days or weeks?

19 A.  I was actually out at the site of the collapse a

20     couple days after it happened.

21 Q.  And why is that?

22 A.  Because it was a big emergency project and I

23     worked with Darryl Latimer on putting this

24     contract amendment together.

25 Q.  What information did you take from the site visit

1      to put this contract together?

2  A.  Well, the site visit was just to go out there and

3      see how bad the situation was.  It was a huge hole

4      about 60 feet deep and there were four houses with

5      half their backyard in the bottom of the hole.

6      There was going to be a lot of work for lawyers on

7      a project like that.

8  Q.  A lot of work for what?

9  A.  Lawyers on a project like that.  And so basically

10     Darryl and I took the scope of work that the

11     engineers worked out with Inland Waters in the

12     original budget and put it in the city's amendment

13     form and fast-tracked it through the Board of

14     Water Commissioners for approval.

15         MR. FAISON:  Can you keep your voice

16     up.

17         THE WITNESS:  Okay.

18 BY MS. BADALAMENTI:

19 Q.  So by the time you got out there a couple days

20     later, the scope and the budget is already

21     decided on?

22 A.  They were being worked out.

23 Q.  Being worked out by whom?

24 A.  By the department's engineers and the Inland

25     Waters project managers who were out there at the

1      site.

2  Q.  Was Victor Mercado out there at the site?

3  A.  He was out there at the site, yes.

4  Q.  When you say the project engineers, who do you

5      remember being out there?

6  A.  Ramesh -- for the City of Detroit it was Ramesh

7      Shukla, and there were some other people out

8      there, too, but he was the one that was the DWSD

9      point person.  And I think Mercado said that he

10     was out there every day for the first month.

11 Q.  That he himself or he, Shukla?

12 A.  No -- well, both of them.

13 Q.  Do you know if the mayor was ever out there?

14 A.  He went out there once that I know of, because I

15     saw photos of him with -- out there wearing a hard

16     hat and a safety vest.  I don't know if he went

17     out there again, but I know Mercado gave him a

18     tour of the site.

19 Q.  Are there actually in the City of Detroit --

20     prior to city council approval, can amounts be

21     paid on contracts that are awarded but not

22     formalized by council approval?

23 A.  There is a procedure in the city's purchasing

24     ordinance for an emergency contract where you

25     have -- which the purchasing director has to

1      declare that this is an emergency and can award a

2      contract immediately, and I don't know if that was

3      done in this case or not.  Actually, since I don't

4      see anything in here that says it was an

5      emergency, it may not have been done.  If there

6      was an emergency declaration for this amendment --

7      okay, yeah.  I take that back.  There is.  There

8      is an emergency order.  There is the first page of

9      an emergency order awarding this contract

10     amendment, which is probably why the date of city

11     council approval is blank.  It wasn't approved by

12     the city council.  This was awarded under an

13     emergency procedure.  This was a special

14     administrative order, but this is just the first

15     page of it.  There had to be a second page,

16     because it's incomplete.  This is incomplete.  And

17     this is different from the procedure under the

18     purchasing ordinance that I just outlined.

19 Q.  Let me show you Exhibit 4.

20         MARKED FOR IDENTIFICATION:

21         DEPOSITION EXHIBIT 4

22         11:16 a.m.

23 BY MS. BADALAMENTI:

24 Q.  It has what looks to be a similar page 1.

25 A.  Okay.  Is Amendment No. 3.  Yeah, this is -- yeah,





1    this is the full emergency order.
2  Q.  Okay.
3  A.  So the second page of this order, there is a
4      similar -- there has to be a similar page to
5      Amendment 2 that somehow isn't in the document,
6      but it would look a lot like this.
7  Q.  And the -- would that be something that was
8      retained with the City of Detroit, page 2 of this
9      order?
10 A.  Yeah, there would have to be a second page because
11     it would require the mayor's signature.  So there
12     is a second page to the order for Amendment No. 2.
13     It's just not in this package of documents I have
14     in front of me.
15 Q.  Do you know when that would have been signed?
16 A.  No.  The date isn't in here, so -- well, I'll tell
17     you all of the resolutions or the signatures are
18     dated in November of 2004, so it might have been
19     done then.
20 Q.  And the reason why an emergency order or an order
21     like this is done that's on page 2 of Exhibit 3
22     and page 2 and 3 of Exhibit 4 -- tell me again
23     why is this done.
24 A.  This is -- this is a long story, but this was --
25     the authority to issue orders like this was given

1    to the mayor of Detroit in an order signed by
2    Judge Jon Feikens of the U.S. District Court.
3    Here in Detroit -- and this goes back to a lawsuit
4    that the Environmental Protection Agency filed
5    against the Detroit Water and Sewerage Department
6    in 1977, which was assigned to Judge Feikens in
7    1977.  And he was the judge on that case till
8    about 2003, when his health -- when he was in his
9    90s, and at that time his health got too bad that
10   it was transferred to Judge Sean Cox.  But Judge
11   Feikens basically was overseeing the operations of
12   the department, because it was having -- over the
13   years it fell -- the sewage system fell out of
14   compliance with the Clean Water Act a number of
15   times, and twice during the over 30 years that
16   that lawsuit lasted, Judge Feikens entered orders
17   appointing the mayor of Detroit as what he called
18   the special administrator of the wastewater
19   system.  He did it once during the Young
20   administration and again during the Archer
21   administration, and which basically gave the mayor
22   of Detroit the authority to bypass the city
23   council and award contracts for necessary services
24   to keep the water system operating -- the sewage
25   system operating and in compliance with the Clean

1    Water Act.  And when Kwame Kilpatrick became the
2    mayor, he entered an order transferring the
3    special administrative powers from Mayor Archer to
4    Mayor Kilpatrick which basically gave the mayor
5    the power to award contracts without going through
6    the purchasing department.
7        The City of Detroit's purchasing
8    process is incredibly cumbersome, and from the
9    start to finish of awarding a contract it could
10   take over a year.  That's how dysfunctional the
11   city's purchasing department is, which made it
12   very, very hard to buy spare parts for the
13   equipment at the sewage plant which broke down and
14   couldn't be prepared because we couldn't get
15   parts.
16       So basically the judge in a fit of
17   exasperation or inspiration or whatever gave the
18   mayor the power to bypass the whole purchasing
19   system and just award contracts.  And there were
20   monthly reports to the judge on what was done
21   under that power, and so this was not done under
22   the purchasing director's emergency powers.  This
23   was done under the emergency powers that the judge
24   gave to the mayor.
25 Q.  Prior to the order for Amendment 2 to CS-1368,

1    were you aware of any other contract that had
2    been awarded by the mayor on this type of basis?
3  A.  There were several of them, and I don't remember
4      the numbers.
5  Q.  By Mayor Kilpatrick?
6  A.  By Mayor Kilpatrick, by Mayor Archer, and by Mayor
7      Young.
8  Q.  Which were awarded by Mayor Kilpatrick under
9      this --
10 A.  I don't remember the numbers.
11 Q.  Any others to Inland that you're aware of?
12 A.  I don't remember any, but that doesn't mean it
13     didn't happen.
14 Q.  Okay.  When the federal investigation -- you were
15     interviewed in connection with the federal
16     investigation, was that part of what you were
17     asked about, this special administrative order?
18 A.  I think I explained the process to them, yes.  It
19     only applied to contracts for the sewage system.
20     They could not award contracts like that for
21     anything related to the water system, just sewage.
22 Q.  So the order's issued.  And we don't know the
23     date for Amendment 2.
24 A.  There was an order issued -- since the signature
25     resolutions which would have been done around the





1     same time are dated -- it was sometime in 2005,
2     but I'm not going to guess at the date.
3  Q.  I see city acknowledgement's dated --
4  A.  Yeah, November 2005, so that might be when this
5     was signed.
6  Q.  Let me stop you.  I see them dated November 2004.
7  A.  I'm sorry.
8  Q.  Resolution of corporate authority dated
9     November 10, 2004.
10 A.  Yeah.  And which was a few months after the
11    collapse in August of 2004.
12 Q.  And this contract is eventually put through city
13    council; would you agree with that, or did that
14    not even occur?
15 A.  Well, if it's awarded by an emergency order by the
16    mayor, it did not have to go through city council,
17    so it would not have been submitted to the city
18    council.  And the space on the boilerplate
19    signature form for entry of the city council
20    approval date is blank, which suggests that it was
21    never submitted to city council.  It didn't need
22    to be.
23 Q.  Okay.  So by November, you would agree with me --
24    November 2004, that at least some of the work had
25    begun on the sinkhole repair?



1  A.  They began work in August.  They were out on the
2     emergency bypass, yeah.
3  Q.  Would there have been payments made prior to the
4     November date, if that's the date?
5  A.  I don't know when the payment --
6  Q.  If -- assuming the November resolution dates are
7     the date of the order, the pages we don't have to
8     this order, would that mean that there were
9     payments issued prior to or not?
10 A.  I don't know when the payments on this contract
11    were made.  I never reviewed the invoices.
12 Q.  Is this order something -- a form that you would
13    prepare?
14 A.  No.  That -- those were typically prepared by Mark
15    Jacobs of Dykema Gossett.  I never prepared one of
16    those.
17         MR. FAISON:  Are you talking about
18    emergency orders?
19         THE WITNESS:  The emergency orders,
20    award of contracts under the emergency powers as
21    special administrator, Mark drafted those.
22 BY MS. BADALAMENTI:
23 Q.  Are they emergency orders that -- the title
24    doesn't refer to emergency orders.  Is that what
25    you're understanding is, that the special --

1  A.  Well --
2  Q.  Hold on.  Let me finish.  Is it your
3     understanding that the special administrator, the
4     mayor, could only issue an order like this that
5     bypasses the traditional contract approval system
6     in an emergency situation?
7  A.  No.  They were called special administrative
8     orders.  I'm using the "emergency" word because
9     this project was a catastrophic emergency.  But
10    they were awarded for any type of contractual
11    service that the city needed that could not be --
12    the purchasing department could not supply in a
13    timely way.
14 Q.  And would you be provided with an order like this
15    when it was done for a particular contract that
16    you had worked on?
17 A.  I would review the contract for the Law Department
18    and then my supervisor would sign on the bottom
19    line of the signature page because the city
20    charter requires Law Department approval of all
21    contracts.  So I would review this before my
22    supervisor signed it.
23 Q.  So going to -- there's a page in the document --
24 A.  Which document are we looking at?  Which exhibit
25    number?

1  Q.  Amendment 2, which I believe is Exhibit 3.
2  Q.  Amendment 2, which is Exhibit 3, okay.
3  Q.  There is a cover page for Exhibit B-2, Costing
4     Summary for Exhibit A-1.  Do you see that there?
5  A.  Um-hmm.
6  Q.  Behind that cover page is a document prepared by
7     Mr. Shukla, who was from the engineering
8     department, right?
9  A.  Um-hmm.
10 Q.  Is that a yes?
11 A.  Yes.  Yes.
12 Q.  Do you recognize this document?
13         MR. FAISON:  Let me find it.  Where are
14    we?
15         THE WITNESS:  We're right here.
16 BY MS. BADALAMENTI:
17 Q.  You're in the original contract.  We're in
18    Amendment 2.
19         MR. FAISON:  Exhibit what?
20         MS. BADALAMENTI:  3.
21         THE WITNESS:  Exhibit 3.
22         MR. FAISON:  How far back?
23         MS. BADALAMENTI:  Near the back.  The
24    cover sheet looks like this.
25         MR. FAISON:  Exhibit B-2.

1           MS. BADALAMENTI:  Exhibit B-2.

2           MR. FAISON:  Thank you.

3  BY MS. BADALAMENTI:

4  Q.  Do you recognize this document authored by

5      Mr. Shukla?

6  A.  Well, it's part of the contract amendment, yes.

7  Q.  Is it something you would have reviewed?

8  A.  I would have reviewed this when I reviewed the

9      whole amendment, yes.

10 Q.  The document is dated September 20, 2004.  Do you

11     have a recollection of a costing summary being

12     prepared around that time?

13 A.  I did not prepare -- I don't prepare costing

14     supplements.  I don't prepare costing documents

15     for these contracts.

16 Q.  Would you need to approve the language?

17 A.  I would review it as part of the Law Department

18     review, yes.

19 Q.  Are costing supplements things that were used by

20     the DWSD?

21 A.  Yeah, there's -- well, there was a cost summary in

22     every contract.  There's a lump sum -- there's a

23     total price, and then in a construction contract,

24     it's a lump sum.  But in a contract like this,

25     there would be a breakdown what those costs were.

1      There might be unit prices.  There might be hourly

2      rates.  It would depend on the type of contract.

3      There would be something breaking it down.

4  Q.  So the costing summary for CS-1368, the original

5      sewer lining project, is that something that we

6      see in these documents here?

7  A.  Well, the costing summary in Exhibit 1 is several

8      pages -- more than several -- of unit prices for

9      sewer lining based on the diameter of the sewer

10     and then the linear feet of pipe rehabilitated.

11 Q.  That would be Exhibit B-2?

12 A.  This is Exhibit B, captioned Cost Information

13     Sheet.

14 Q.  Okay.  Let me get the record situated here.  It

15     would be Exhibit B to the document titled

16     Contract CS-1368, which we've marked as

17     Exhibit 2?

18 A.  Yes.

19 Q.  Okay.  Exhibit B to Exhibit 2 has these unit

20     prices, right?

21 A.  Yeah.  Exhibit B to Exhibit 2 is a long list of

22     unit prices based on the diameter of the sewer and

23     the number of linear feet rehabilitated or

24     realigned.

25 Q.  What I don't see in this cost information sheet

1      in Exhibit 2 is any sort of information about

2      overtime, mobilization of equipment.  Why is that

3      now dealt with in Amendment 2?

4  A.  Because Amendment 2 was for a different type of

5      work.  Amendment -- the original contract document

6      is they go in and inspect the sewer.  If it's a

7      small sewer, they run a television camera through

8      it.  If it' a big sewer, you can walk through it.

9      And then this is a linear -- and I'm looking

10     for -- well --

11 Q.  Let me see if I can help you with it.  Is it the

12     case that the cost information sheet in the

13     original contract would include the manpower

14     required to inspect --

15 A.  Yes.

16          MR. FAISON:  Let her finish.  You have

17     to let her finish the question, because the court

18     reporter has to take it down, as you know,

19     Robert --

20          THE WITNESS:  Yeah.

21          MR. FAISON:  -- her question and your

22     answer, and I have to hear her question to find

23     out whether or not I have an objection to it.  So

24     if you would -- we're dealing with two fast

25     talkers here.  Slow down the process a little bit.

1           THE WITNESS:  Okay.

2  BY MS. BADALAMENTI:

3  Q.  So the unit price that's shown in this cost

4      information sheet would include everything that

5      went into that particular type of work, the

6      inspection service, use of television equipment,

7      the manpower required?  Everything would be

8      included within the unit price?

9  A.  The unit price includes labor and material,

10     inspection work, everything.  The contractor has

11     to set that price high enough to cover all of its

12     costs.

13 Q.  Does this original CS-1368 document provide for

14     overtime?

15 A.  No.  It provides for unit prices, and if the

16     contractor has to work overtime, it has to take

17     the overtime -- pay for its employees out of this

18     unit price.

19 Q.  September 20th of 2004 we see Mr. Shukla now

20     providing for labor, overhead, markups, overtime.

21     These types of things are now going to be

22     included within the amounts that Inland can

23     charge; is that correct?

24 A.  On the project covered by this amendment, which

25     was the sewer collapse on 15 Mile Road only.





1 Q.  Okay.  Who would authorize Mr. Shukla to execute
2     a costing supplement like this?
3 A.  The director, Mr. Mercado.
4 Q.  Who would authorize Mr. Mercado to do that?
5 A.  As the director of the Water and Sewerage
6     Department, he had the authority to do that.  I
7     don't know if he discussed it with the mayor or
8     not.
9 Q.  The next page is dated April 4, 2005.
10 A.  Okay.  We're still in Exhibit 3, okay.
11 Q.  Right.  This April 4, 2005 document is a letter
12     by Victor Mercado.  Do you see that there?
13 A.  Yes.
14 Q.  Is this something you've seen before?
15 A.  It's part of the contract.  Yes, I've seen it
16     before.
17 Q.  By April 4, 2005, has most of the work or some of
18     the work been done on the project?
19 A.  Some of the work has been done.  I think that
20     project ran into June or July of 2005, before all
21     of it was done.
22 Q.  This document by Victor Mercado dated April 4,
23     2005, is proposing a different costing
24     supplement.  Do you understand that to be the
25     case?



1 A.  No.  This is just talking about the kind of
2     documentation they have to submit with their
3     invoices to get the invoices approved.  That's how
4     I read it.
5 Q.  So the -- the paragraph reads "The other cost
6     guidelines contained in the attached costing
7     supplement will govern all work performed on the
8     contract from its inception until final
9     completion."  Do you see that there?
10 A.  Yes.
11 Q.  So this document is intended to provide a
12     different costing framework going all the way
13     back to August, when the project began.  Would
14     you agree with that?
15 A.  This references some negotiations over the
16     pricing, and the costing supplement is on the next
17     page.
18 Q.  Okay.  So my question was:  Would you agree that
19     this document is going to provide a new costing
20     framework for Inland Waters going back -- the
21     language is from its inception of the work until
22     final completion.
23 A.  From the inception of the work covered by this
24     contract amendment, which is 15 Mile Road.
25 Q.  So from August 22nd or as soon as they started



1     work thereafter -- August 22, 2004 collapse, they
2     start work.  In April of 2005, we're now going to
3     go backwards and impose these -- this costing
4     framework; is that accurate?
5 A.  It looks like this is maybe modifying the
6     September 20th letter that Mr. Shukla wrote.
7 Q.  Who would, again, give Mr. Mercado -- let me ask
8     it this way:  You said earlier Mr. Mercado would
9     have had the authority to direct Mr. Shukla to do
10     the first costing summary.
11 A.  Yes.
12 Q.  Would Mr. Mercado have authority, then, to do a
13     new costing summary?
14 A.  Yes, he would.
15 Q.  Would he need to get the mayor's approval to do
16     that, to the best of your knowledge?
17 A.  I don't know how much the mayor delegated that to
18     him.  And I'm not sure --
19 Q.  I don't want to cut you off.  Were you --
20 A.  No, go ahead.
21 Q.  Was this document something that you would have
22     reviewed, the letter dated April 4, 2005, or the
23     costing supplement that follows?  Was that
24     something that you reviewed before it was made a
25     part of the contract?

1 A.  I might not have because this was signed in
2     November 2004.  I might not have depending on the
3     date of the administrative order.  This may have
4     been added afterwards.  I'm not sure.
5 Q.  Well, it's dated well after November 2004.  You
6     would agree with that, right?
7 A.  Right.
8 Q.  You have no reason to believe that that was
9     something that was done before April of 2005, do
10     you?
11 A.  No.
12 Q.  The signature on the bottom, do you recognize
13     that to be Victor Mercado's signature?
14 A.  That's his handwriting.
15 Q.  Dennis Oszust from -- he signs as the vice
16     president, general manager of the company, Pipe
17     Rehabilitation Group?
18 A.  No, that's the group within Inland Waters.  The
19     company is Inland Waters Pollution Control,
20     Incorporated.  The Pipe Rehab Group was a group
21     within that company.
22 Q.  Okay.  Did you know Mr. Oszust?
23 A.  Yes, I've met him a number of times.
24 Q.  Did you meet him in connection with this project
25     or with this Amendment 2, I should say?




1   A.   Not with this amendment.  I was dealing with DWSD
2        staff on this amendment.  I didn't talk to him
3        about this.
4   Q.   Were you present when this document was signed by
5        Mr. Mercado --
6   A.   No.
7   Q.   -- or Mr. Oszust?
8             The pages that follow, CS-1368
9        Amendment No. 2 costing supplement, there are some
10       initials there on the document and there's a date
11       of 3/17 of '05.  I deposed Mr. Shukla, and he
12       indicated that one of those initials were his.  Do
13       you recognize the other one?
14  A.   No.  It looks like D.O., which would mean Dennis
15       Oszust, but I'm guessing.
16  Q.   In your dealings with contracts for the DWSD, had
17       you had occasion to see a costing supplement that
18       was redone like was done in this case, where
19       there's actually a second costing supplement that
20       issues for the same contract?
21  A.   No.
22  Q.   Do you know how this -- or who directed that this
23       was done?
24  A.   This would have to come from Mr. Mercado.
25  Q.   Did you know what the standard markup or layers

1        of markups were for DWSD contracts?
2   A.   It varies from contract to contract, and it's
3        negotiated with the contractor.
4   Q.   Was this costing supplement something you were
5        asked about when you were interviewed by the FBI?
6   A.   No.
7   Q.   I think you said you didn't --
8   A.   Actually I was interviewed by a U.S. attorney, not
9        an FBI --
10  Q.   I thought it was probably a bad question when I
11       said it, so thank you for correcting me.  I know
12       you weren't around when it was done, this
13       April 4, 2005 costing supplement, but did you
14       have occasion to see it when it became -- or at
15       any point before retiring from the Law
16       Department?
17  A.   I don't remember seeing it.  I may have -- I may
18       have looked at this when I was reviewing Amendment
19       No. 3, because typically you look at the previous
20       amendments in the contract to see what changes are
21       being made.
22  Q.   So looking at Amendment No. 3, which I think is
23       the document that we marked as 4 --
24  A.   Yes.
25  Q.   -- Exhibit 4, so Amendment No. 3, what is the



1        date of that?
2   A.   The date of the special administrator order is
3        May 18, 2005.
4             MS. BADALAMENTI:  I'm going to indicate
5        that appears to be two pages on the back of
6        exhibit where they don't belong.  I just noticed
7        that.  If you want to pull them off, everybody --
8        they should not be on that document.  It will just
9        cause confusion later on.
10            THE WITNESS:  You can have that back.
11            MS. BADALAMENTI:  We'll mark it
12       separate.
13  BY MS. BADALAMENTI:
14  Q.   Do you recognize the date that Amendment 3 was
15       entered into?
16  A.   It's the date of the special administrative order,
17       which is May 18, 2005.
18  Q.   Do you know how far in advance of May 18, 2005,
19       this amendment would have been proposed or
20       discussed by somebody at DWSD in order for it to
21       be -- you know, in order for the order to be
22       signed on 5/18 of '05?
23  A.   I don't.
24  Q.   Is it a process that takes days or weeks or
25       months?

1   A.   It depends on the complexity of the project.  It
2        can -- it can take weeks.  You know, at some point
3        engineering staff would have to propose something
4        like this to the director who would have to review
5        it and approve it.
6   Q.   Well, in the case of Amendment 2, we know that
7        the sinkhole collapse occurred in August and we
8        don't see the -- we don't see the resolutions
9        dated until November.  Is that a typical time
10       frame or would you expect to see it shorter or
11       longer than that?
12  A.   That's the time frame it took to get that
13       amendment written, agreed, but the contractor
14       actually started work before then.  And by city
15       purchasing standards, that's actually pretty fast.
16  Q.   Okay.  So Amendment 3 would have to also be
17       written, prepared, approved by everybody so --
18  A.   Yes.
19  Q.   -- it would be a matter of months between the
20       time that the discussions begin so that, hey, we
21       need an Amendment 3 here until --
22  A.   It could be --
23  Q.   -- until the time you see Mayor Kilpatrick
24       signing this order?
25  A.   It could be a couple of months or a couple of



```
 1        weeks.  I'm not sure.  It depends on the project.
 2   Q.   Okay.  And Amendment 3 is issued for the purpose
 3        of increasing the budget for the sinkhole
 4        repairs; is that true?
 5   A.   Yes.
 6   Q.   The amount of the increase is --
 7   A.   $23 million.
 8   Q.   -- $23 million added to the amount of the
 9        Amendment 2?
10   A.   Yeah.  It's on page 3.  Add 23 million, so the
11        new -- so the new total is 118 million.
12   Q.   Was that for work that had been done up to that
13        point and going forward, or was all of that 23
14        million still to be done?
15   A.   I don't know.  It is fairly common in the city
16        contracting process for when a contract runs out
17        of money, the contractor will keep working while
18        the amendment putting more money into the project
19        is processed, but they can't get paid until the
20        amendment's approved.  Contractor will sometimes
21        take on the risk f the amendment not being
22        approved, but in this case, it was.
23   Q.   So -- well, in this case it was approved by
24        special order, right?
25   A.   Yes.
```



```
 1   Q.   So fair to say the contractor would know from his
 2        discussions with the mayor or Victor Mercado that
 3        the special order was going to issue to approve?
 4   A.   During the negotiation the contractor should have
 5        been told that there would be a special
 6        administrator order approving it, so if the
 7        contract had run out of money, they would have
 8        kept working knowing that they would be paid
 9        eventually.
10   Q.   Would the contractor have known that a special
11        order was the means by which Amendment 2 was
12        approved?  In other words, would they know that
13        skipped the city council's purchasing approval
14        process?
15   A.   I was not involved in that discussion.  I'm sure
16        that that would have been discussed and they would
17        have been told that, yes.
18   Q.   Do you know what necessitated this additional
19        $23 million in Amendment 3?
20   A.   I did not -- I don't know what the -- all of the
21        work that was done out there.  I do know that
22        every time they got into the tunnel, they found
23        things were deteriorating and getting worse.
24   Q.   Did you ever ask why $23 million more?
25   A.   At some point I would have asked Shukla that
```




```
 1        question, and if he said there's more work to be
 2        done, I would have taken his word for it.
 3   Q.   The work to be done had already at least been
 4        started at that point, correct?
 5   A.   I don't -- well, the whole project, the work that
 6        Inland Waters started in August, and --
 7   Q.   Of '04?
 8   A.   Of '04, and they had been working -- they and
 9        their subcontractors had been working out there
10        continuously.
11   Q.   So was it your understanding at the time
12        Amendment 3 is entered into that the whole budget
13        had been used or that the whole budget had been
14        used and there was more money due already?
15   A.   My understanding would have been that the current
16        budget was not enough, and that they were going to
17        use -- need more money to complete the work.
18        Whether that was -- whether they had spent
19        everything or whether they had some left, they
20        were going to run out, I don't know.
21   Q.   Was that something you customarily checked on,
22        how much had they spent -- "We're entering into
23        this Amendment 3 and we're preparing this
24        document.  How much has been spent so far?"
25   A.   I generally didn't ask that question.  I did not
```

```
 1        review -- I never reviewed the contractor
 2        invoices.  I just -- if they told me that they
 3        were running out, that the budget needed to be
 4        increased to complete the project, I would believe
 5        that and do it.
 6   Q.   And who other than Mr. Shukla would give you that
 7        information?
 8   A.   Either Darryl Latimer or Mr. Mercado.
 9   Q.   Did Darryl Latimer have any discussions with you
10        in connection with Amendment 3 about amounts that
11        had been disallowed with respect to the sinkhole
12        repair work?
13   A.   No.
14   Q.   Did anyone discuss with you before Amendment 3
15        was drafted or executed that there were concerns
16        about overcharges on the project?
17   A.   No.
18   Q.   Did you actually prepare the text of the
19        amendment?
20   A.   No.  Those amendments are boilerplate forms that
21        the contracts administration group would prepare.
22        And Darryl Latimer was the head of that group at
23        that time.
24   Q.   Does this amendment extend the time and budget or
25        just the budget?
```



1  A.   This is amendment No. 4.

2  Q.   Amendment No. 3, Exhibit No. 4.

3  Q.   Okay.  Well, this just increases the budget

4       without increasing the time.

5  Q.   Were you aware of any of the communications back

6       and forth between Mr. Shukla or Mr. Mercado or

7       Mr. Latimer that lead to Amendment 3?

8  A.   No.

9  Q.   Is that something that would typically go through

10      the Law Department?

11 A.   No.  Typically they would negotiate the contract

12      and then submit the whole contract to the Law

13      Department.

14 Q.   Did you in connection with Exhibit 2 -- I'm

15      sorry, in connection with Exhibit 3, which is

16      marked -- which is actually Amendment 2, and the

17      costing supplement at the back of that

18      document -- Mr. Mercado's costing supplement

19      dated April 4, 2005, were you aware of any drafts

20      that had gone back and forth about that costing

21      supplement?

22 A.   No.

23 Q.   Were you aware of who proposed those terms,

24      whether it was the contractor or Inland Waters

25      who proposed the materials?

1  A.   Inland Waters was the contractor, and I don't know

2       who proposed.

3  Q.   I'm sorry.  Were you aware whether Inland Waters

4       proposed terms for the costing supplement or

5       whether it was something Mr. Mercado wanted?

6  A.   I don't know.

7  Q.   Okay.

8            MS. BADALAMENTI:  Do you want to take a

9       break?

10           MR. FAISON:  Sure.

11           (Off the record at 11:50 a.m.)

12           (Back on the record at 12:09 p.m.)

13 BY MS. BADALAMENTI:

14 Q.   What was your involvement -- let me ask it this

15      way:  At some point there begin to be, in the

16      context of that 1977 case you were talking about,

17      disputes between Macomb County, Oakland County

18      and the City of Detroit.  Are you aware of that?

19 A.   There was a constant series of disputes.

20 Q.   What sort of disputes were you aware of?

21 A.   Mostly over sewer rates.

22 Q.   Over -- I'm sorry?

23 A.   Sewer rates that the city was charging.  The

24      counties were constantly arguing that they were

25      too high.



1  Q.   Was there other disputes that arose in the

2       context of that 1977 case?  Let me ask it this

3       way:  Do you recall a dispute over the radio

4       system?

5  A.   Yes.

6  Q.   What do you recall about that?

7  A.   The city built -- what happened, the Federal

8       Communications -- the Federal Communications

9       Commission reallocated radio frequencies and

10      required all local governments and governments to

11      switch their radio communications to the 800

12      megahertz band.  So the city built a new radio

13      communications system for all -- that was to be

14      used by all departments that used two-way radios

15      if their vehicles to communicate -- police, fire,

16      Department of Public Works and the Detroit Water

17      and Sewerage Department.  And the counties,

18      Oakland, Macomb and Wayne County, complained that

19      the city allocated too much of the cost to the

20      Water and Sewerage Department and too little to

21      what were collectively called the general fund

22      departments.

23 Q.   The general fund departments were City of Detroit

24      departments?

25 A.   Yeah.  Basically the Water and Sewerage Department

1       is what the city calls a revenue department.  It's

2       self-supporting off the water and sewer revenues.

3       And general fund departments are the ones that are

4       funded by tax revenues.

5  Q.   Do you recall a dispute involving the allocation

6       of the repair costs for the sinkhole?

7  A.   Yes.

8  Q.   What was the nature of that dispute?

9  A.   At some point Macomb County suggested that the

10      cost should be allocated to all of the customers

11      of the sewer system, and the Water and Sewerage

12      Department had allocated the full cost to Macomb

13      County.

14 Q.   It was determined that it was a Macomb-only

15      project?

16 A.   Yes.

17 Q.   And the dispute in the 1977 case wasn't with the

18      amount -- the total amount of the project.  It

19      was with the allocation of it to Macomb only?

20 A.   Which project?  Is that the sewer repair project

21      or the 800 megahertz project?

22 Q.   Let me ask more clearly.  With respect to the

23      2004 sewer collapse and the repairs, that

24      project, was the dispute in the 1977 case limited

25      to whether or not the repair costs should be

1      allocated to Macomb only?
2  A.  There came a time eventually when Macomb
3      questioned the total cost, but the initial dispute
4      was just over the allocation.
5              MR. FAISON:  Just a minute.  Are we
6      talking about 1997 or 2004?
7              MS. BADALAMENTI:  I'm talking about the
8      2004 repair costs.
9              THE WITNESS:  2004 collapse, there was
10     a dispute in which Macomb County suggested that
11     the project -- that the cost of the repair should
12     be spread over other communities served by the
13     Detroit sewage system and not just Macomb County.
14 BY MS. BADALAMENTI:
15 Q.  The Judge Feikens made a determination on that
16     question of whether or not it's a Macomb-only
17     project or not, didn't he?
18 A.  He did.  Mr. -- I read the opinion, I think,
19     Tuesday of this week, earlier, yeah.
20 Q.  Was that the first time that you had read it?
21 A.  I probably -- I'm sure I read it when he issued
22     it.
23 Q.  Were you the liaison between DWSD and the
24     attorneys representing DWSD --
25 A.  Yes.

1  Q.  -- in that lawsuit?
2              Was there anybody else from your
3      department who was involved?
4  A.  By 2004, yeah, there was lawyer named Laurie
5      Koester who was working with me.
6  Q.  Can you say that name again?
7  A.  K-o-e-s-t-e-r, pronounced "coaster," but she had
8      just started working with me and she really wasn't
9      up to speed.
10 Q.  And the attorneys -- the outside counsel for the
11     city in that case was Mark Jacobs; is that right?
12 A.  Mark Jacobs and a partner of his named Marilyn
13     Peters, and they may have used Bob Franzinger,
14     F-r-a-n-z-i-n-g-e-r, on that case.  I'm not sure.
15 Q.  And Marilyn Peters was the litigation counsel and
16     Mark Jacobs was sort of the counsel who handled
17     the contracting or negotiations; is that fair?
18 A.  Mark -- Mark is an environmental law specialist at
19     Dykema.  He's in their environmental department,
20     but he did general counsel and contracting work
21     along with me.  Marilyn Peters is a litigator with
22     Dykema.
23 Q.  And I think you said earlier you don't litigate?
24 A.  I stopped doing litigation in the early 90s.  I
25     just transitioned into more transactional work.



1  Q.  Okay.  You said at one point Macomb did question
2      the total amount of the repairs in connection
3      with the 1977 lawsuit.  When was that?
4  A.  It wasn't really in connection with the lawsuit,
5      but at some point they got -- they had an engineer
6      look at it and asked him for an opinion on if the
7      cost could have been lower.  He said that it could
8      have been lower.
9  Q.  Was that after the federal indictment came out?
10     Do you remember -- let me just make it clear --
11     after the first superseding indictment came out
12     against Kwame Kilpatrick, Victor Mercado and
13     others?
14 A.  I don't remember the date of the first superseding
15     indictment.  I saw -- I think -- I saw his report
16     when I was reviewing documents in getting ready
17     for this dep, and it was 2011 or something
18     like that, which would have been after the
19     indictment.
20 Q.  At any time prior to that do you recall Macomb
21     questioning the total of project costs?
22 A.  No.
23 Q.  Do you remember providing information for that
24     lawsuit to Mark Jacobs or Marilyn Peters
25     regarding the total costs or the breakdown of the

1      total costs on the repair project?
2              MR. FAISON:  Just a minute.
3              THE WITNESS:  I'm a little confused.
4              MR. FAISON:  Object to the question.
5      There's been no testimony about a lawsuit per se,
6      not yet.
7  BY MS. BADALAMENTI:
8  Q.  Okay.  In the context of that 1977 case and the
9      claims that Macomb asserted regarding the
10     allocation of those repair costs to it as opposed
11     to spread out to all communities, did you provide
12     any documents to Macomb or to your counsel on
13     that case to be provided to Macomb?
14 A.  I did not, no.
15 Q.  Are you aware of whether or not any documents
16     breaking down the repair costs were provided?
17 A.  I did not do any active work on that case.  Mark
18     and Marilyn did that.
19 Q.  So you would not have been involved with the
20     creation of any spreadsheets or other documents
21     that were provided to Macomb that itemized the
22     total costs?
23 A.  No.
24 Q.  Okay.  What other disputes were involved in the
25     1977 case -- let me see if I can streamline it



1    for you.  There was questions about phantom
2    improvements that were included within the rates;
3    is that right?
4  A.  That was not in part of the 1977 -- the way the
5    1977 lawsuit was administered, there were a series
6    of consent judgments that were entered by Judge
7    Feikens, so every time there was a dispute between
8    one of the counties and DWSD, rather than filing a
9    lawsuit, they would file a motion in that lawsuit
10   as a way of keeping it in front of Judge Feikens.
11   So that was -- it was a unique procedure, unique
12   to Judge Feikens.  You don't file a complaint.
13   You have to file a motion or something.  But
14   that's the way it was done.  And the phantom
15   projects issue was not raised.  It was sort of
16   raised when we were negotiating the transfer of
17   the interceptor to Macomb and Oakland counties,
18   which was part of the resolution -- ultimate
19   resolution of that lawsuit.  But Craig Hupp, I
20   think, who was Macomb County's lawyer in those
21   negotiations created the word "phantom projects."
22  Q.  And phantom project, as it was referred to at
23   that time, was a project that was included in
24   part of the rates that the local communities were
25   paying the DWSD, but the project had not actually

1    been constructed?
2  A.  That was the way it was explained by Craig.  And
3    there were a couple of projects that were put into
4    the capital improvement program and put into the
5    rates that were charged to Macomb County that
6    never got built, and part of the price negotiation
7    involved in the transfer -- the transfer agreement
8    was pulling those -- identifying those projects,
9    pulling them out -- back out of the rate base and
10   giving Macomb County a credit for them on the
11   purchase price.
12  Q.  Was that credit referred to as the global
13   settlement amount?
14  A.  The global -- no, the global settlement is a
15   settlement agreement that the parties entered into
16   with Judge -- before Judge Feikens to resolve a
17   number of issues that were out there.  That was --
18   and part of that was that the community -- the
19   City of Detroit and Oakland and Macomb counties
20   would negotiate the sale of the interceptor to
21   drainage districts to be created by those two
22   counties, and the price resolution was done in the
23   context of the transfer agreement.  I don't think
24   it -- I don't think it was in the settlement
25   agreement.  I think it was worked out as we were

1    setting the price to be paid for the sewer.
2  Q.  So the settlement agreement was essentially an
3    agreement to reach an agreement on the purchase?
4  A.  That was part of it.  We also resolved the
5    disputes over the cost allocation for the 800
6    megahertz project and a couple of other disputed
7    issues as well.
8  Q.  Was the settlement agreement the means by which
9    the cost allocation of 15 Mile and Hayes was
10   resolved or was that resolved in its entirety by
11   Judge Feikens' ruling?
12  A.  Judge Feikens resolved the allocation issue, that
13   it was Macomb County only.  And I don't recall
14   Macomb County ever filing a formal complaint about
15   the total cost of it.  At some point Mr. Marrocco
16   showed us -- shared with us the report that said
17   it could have been done for a lower cost, but I
18   don't recall him ever filing a formal litigation
19   pleading over that.
20  Q.  In the '77 case?
21  A.  Or in any case, I don't think.
22  Q.  There was also a dispute in the 1977 lawsuit
23   about the interest rate that was being charged by
24   DWSD.  Are you familiar with that?
25  A.  Yes.

1  Q.  There was a dispute over whether or not the bond
2    interest rate could be added onto by DWSD and
3    there was a claim that DWSD was trying to make a
4    profit on that?
5  A.  There was a claim by Macomb County that the
6    interest rate was higher than it should have been,
7    and they asked that that interest rate be reduced,
8    and that was done in the context of the
9    negotiation of the purchase price of the sewer,
10   and they did get a credit on that.  Detroit agreed
11   to recalculate the interest rate, get a lower
12   rate, and give them a credit for the difference.
13  Q.  And was that credit part of the global
14   settlement?
15  A.  No, that was part -- well, the agreement
16   transferring the sewer was one component of the
17   global settlement, but it's a separate contract.
18   There's a settlement agreement that says we will
19   negotiate the transfer of the interceptor, and
20   then there was the actual contract transferring
21   the interceptor.  So it's two separate documents.
22  Q.  The discussions about the first component, which
23   was that we're going to agree to transfer the
24   Macomb Interceptor system to Macomb --
25  A.  Yes.







```
 1   Q.   -- that -- what led to that?  Was it all of these
 2        disputes or was it the interest rate?
 3   A.   It was the whole collective thing, and another
 4        thing that led -- that drove that was after the
 5        sewer collapse had been repaired, the city hired
 6        an engineering firm to do a survey and inspection
 7        of the whole interceptor -- the entire length of
 8        it.  And they came back with a report that said
 9        there was deterioration throughout the whole
10        length of all of the interceptors, and with an
11        estimated repair cost of over $100 million, and
12        that was what really started the conversation
13        about the interceptor transfer going.
14   Q.   Was that consultant NTH Consultants?
15   A.   Yes.
16   Q.   Was that report complete by the time that the
17        settlement agreement is entered into?
18   A.   I don't know.  It was certainly complete by the
19        time the sewer transfer contract was completed.  I
20        don't know if it was completed by the time the
21        global settlement agreement was signed, but it was
22        certainly done by the time the sewer transfer
23        contract was signed.
24                       MARKED FOR IDENTIFICATION:
25                       DEPOSITION EXHIBIT 5
```



```
 1                       12:25 p.m.
 2   BY MS. BADALAMENTI:
 3   Q.   Okay.  I've marked as Exhibit 5 the document
 4        titled Settlement Agreement.  Do you recognize
 5        that document?
 6   A.   Yeah, this is the document we referred to as the
 7        global settlement agreement.
 8                  MR. FAISON:  Counsel, I have a
 9        question.  Are you purporting that this document,
10        Exhibit 5, is the complete settlement agreement.
11                  MS. BADALAMENTI:  I'm asking the
12        witness.
13                  THE WITNESS:  I think there was some
14        exhibits to it.  There are exhibits referenced in
15        this document that are not attached to the exhibit
16        that you handed me.
17   BY MS. BADALAMENTI:
18   Q.   Okay.  This document was designed to resolve
19        claims in the 1977 lawsuit by way of an agreement
20        -- to reach an agreement on the purchase by
21        Macomb of the sewer system; is that right?
22   A.   Let me correct something that I just said.  The
23        interest rate adjustment that I say was included
24        in the sewer transfer agreement is also in this
25        settlement agreement.  I had forgotten that.  But
```



```
 1        it's in here.  The amount was $17,050,000, and it
 2        was given to Macomb County as a credit on the
 3        purchase price.
 4   Q.   Were you involved in the negotiation of those
 5        credits?
 6   A.   I was involved in the negotiation of the
 7        settlement agreement.  The credits on the interest
 8        rates were done -- were not done by me.  The
 9        negotiators for DWSD on that issue were Bart
10        Foster and Mark Jacobs.
11   Q.   At the time of the settlement agreement did you
12        understand that the price for the purchase of the
13        Macomb system was going to be calculated by
14        making a determination of the system debt?
15   A.   Yes.  There was a general agreement among Detroit,
16        Oakland County and Macomb County that the purchase
17        price would be the outstanding bond debt on that
18        interceptor, and then adjusted by the interest
19        rate credit and the so-called phantom projects.
20        Those would be resolved by giving credits on the
21        amount of the outstanding debt.  And that's how we
22        worked out the purchase price.
23   Q.   The settlement agreement refers to a Letter of
24        Intent.  Are you familiar with the Letter of
25        Intent?
```



```
 1   A.   Yes.
 2   Q.   Do you know whether that Letter of Intent was
 3        ever executed?
 4   A.   I believe it was.
 5   Q.   Just to make the record clear, the document that
 6        I handed you that's titled Settlement Agreement
 7        has been marked as Exhibit 5; is that correct?
 8   A.   Yes.
 9                       MARKED FOR IDENTIFICATION:
10                       DEPOSITION EXHIBIT 6
11                       12:30 p.m.
12   BY MS. BADALAMENTI:
13   Q.   The document that I've marked as Exhibit 6 is
14        titled the Macomb Acquisition Agreement.  It's
15        dated September 2nd of 2010.  Do you recognize
16        that document?
17   A.   Yeah.  This is -- it's got an Exhibit A marked all
18        over it, too.  I assume that's from something
19        else.
20   Q.   Short of that Exhibit A, do you recognize the
21        document?
22   A.   Yeah, this is the contract under which the City of
23        Detroit transferred the Macomb Interceptor to the
24        the Macomb Interceptor Drain Drainage District and
25        the County of Macomb.
```



1           MR. FAISON:  Counsel, again, does this
2    document purport to be the complete document?
3           MS. BADALAMENTI:  I'm asking the
4    witness.
5           MR. FAISON:  Well, let me say for the
6    record, I mean, you produced the document.  You,
7    produced the document.  You identified it.  If
8    it's not a complete document and you don't want to
9    say so, then you have to ask the witness whether
10   this is a complete document or not.
11          MS. BADALAMENTI:  Well, generally the
12   attorney asking the questions decides what
13   questions are appropriate to ask, but I haven't
14   asked the witness anything other than whether or
15   not he recognizes the document, so why don't you
16   give me opportunity to ask him about the document,
17   and then if you're not satisfied, you can follow
18   up.
19          MR. FAISON:  If you're going to
20   represent a document to be something, I'm entitled
21   to at least understand what your representation
22   is.
23          MS. BADALAMENTI:  Okay.  Your objection
24   is on the record.
25          THE WITNESS:  What's the question now?

1    BY MS. BADALAMENTI:
2    Q.   Do you recognize this document to be the Macomb
3         Acquisition Agreement?
4    A.   Yes.
5    Q.   Okay.  Do you believe there to be any schedules
6         or exhibits that are missing or would you even be
7         able to answer that?
8    A.   I can't answer that.  There are a lot of -- this
9         one has a number of schedules and exhibits with
10        it, and I don't know if it's all of them, but
11        certainly most of them.
12   Q.   Were you part of the negotiations that led to
13        this acquisition agreement being executed?
14   A.   Yes, I was.
15   Q.   Were you part of the disclosures that were made
16        in connection with the execution of this
17        document?
18   A.   I don't know what type of disclosures you are
19        referring to?
20          MR. FAISON:  Can I just ask for a
21        moment.  Did this document get marked as
22        Exhibit 6?
23          MS. BADALAMENTI:  It did.
24          MR. FAISON:  Thank you.
25   BY MS. BADALAMENTI:

1    Q.   Let me ask it a different way.  There was due
2         diligence that was contemplated by this
3         agreement.  Are you familiar with that?
4    A.   Yes.
5    Q.   Were you part of any of the due diligence under
6         taken by Macomb or Detroit in connection with
7         this agreement?
8    A.   The due diligence was undertaken by Macomb.  I
9         don't recall Detroit doing any at all.  And I was
10        involved in all of the negotiation meetings that
11        led to this document.  If there were separate due
12        diligence meetings, I don't think I was part of
13        those.
14   Q.   You had said that Bart Foster was involved in
15        this process.  Do you know what his involvement
16        was?
17   A.   Bart is a water and sewerage rate consultant.
18        He's the one that creates the water and sewage
19        rates for the city.  He's very involved in the
20        department's finances and rate setting.  And he is
21        also works on the city's bond issues.  He was the
22        one who really went into the bond documents and
23        determined what the amount of the outstanding debt
24        was.  And then he had some meetings with Macomb
25        County's lawyer, Craig Hupp, who have looked at

1         the same documents and they -- they're the two who
2         ultimately did most of the negotiating, looked at
3         the final numbers.
4    Q.   I took the deposition of Bart Foster, so let me
5         try to streamline some of these questions.
6    A.   Okay.
7    Q.   It's my understanding that Bart Foster was
8         provided with some project information and a
9         project total for any project that was undertaken
10        to repair, construct the facilities that were
11        going to be a part of this purchase.  Is that a
12        fair characterization?
13   A.   I would assume that he had that information, yes.
14   Q.   Do you know whether he was provided with project
15        files or invoices or ever reviewed the legitimacy
16        of charges?
17   A.   I don't know if he did that or not.
18   Q.   Do you know whether it was his custom and
19        practice to do that for Detroit?
20   A.   Bart was not involved in administering or
21        overseeing construction projects in any way, so he
22        probably looked at -- I'm not going to speculate,
23        but he was not involved in managing the repair
24        work or overseeing any other construction projects
25        for the department.





1  Q.  In the course of calculating that system debt
2      total, were you asked to provide any project
3      files to Bart or to Macomb County?
4  A.  No.
5  Q.  Were you asked to provide any project information
6      or project totals to Macomb County?
7  A.  No.
8  Q.  Do you know that Mr. Shukla provided some
9      information regarding projects?
10 A.  I'm not aware of that.
11 Q.  Do you know who provided Bart Foster with the
12     information that he needed?
13 A.  It wasn't me.  I don't know who he talked to.
14 Q.  The document -- the negotiation surrounding this
15     purchase went on for a number of years, as I
16     understand.  Is that your understanding?
17 A.  I don't know about years, but certainly several
18     months.
19 Q.  The document is dated September 2nd, 2010.  How
20     long before that do you think the negotiations
21     began?
22 A.  We started the negotiation sometime in 2009.  I
23     don't remember exactly when, but --
24 Q.  The settlement agreement that's in front of you
25     is marked May 12, 2009.  Would the negotiations

1      regarding the purchase of the system have
2      predated that?
3  A.  I think this -- they would have started -- I think
4      they would have started after this.
5  Q.  The settlement agreement contemplated purchase of
6      the system; is that right?
7  A.  Yes.
8  Q.  And how long did the negotiations go on prior --
9      with respect to the execution of the settlement
10     agreement and those terms?
11 A.  Several months.
12 Q.  Okay.  Into 2008 or before that?
13 A.  Oh, they would have started in 2008, sure.
14 Q.  2007 were there discussion about Macomb's
15     purchase of the system?
16 A.  I don't remember.  The real catalyst that -- my
17     recollection is that the catalyst that started the
18     discussion about transferring the interceptor was
19     the NTH report on the condition of it, so it would
20     have been after that report was provided to the
21     counties.
22 Q.  There is a schedule 3.8 within these documents.
23     I'll let you get to it.  It's marked on the top
24     page ID 3613.  Have you seen this document?
25 A.  Yes.



1  Q.  Were you involved in the preparation of this
2      document?
3  A.  This was put together primarily by Craig Hupp and
4      Bart Foster.  I was not involved in those
5      meetings.
6  Q.  There's a line item for CS-1368, the 2004
7      repairs, and there's a total of in excess of
8      $54 million.  Do you see that there?
9  A.  Yes.
10 Q.  Do you know how that total was arrived at?
11 A.  No, I don't.
12 Q.  Do you know what disclosures were made with
13     respect to that amount?
14 A.  No, I don't.
15 Q.  Were there any questions from Macomb County
16     regarding that amount?
17 A.  Not to me.
18 Q.  Are you aware of whether or not there were any
19     representations made to Macomb County by anyone
20     regarding CS-1368?
21 A.  No.  I mean, I didn't make any.  I don't know what
22     anybody else might have said.
23 Q.  Were any of these -- let me take you back.  On
24     page 2 of 25 of the acquisition agreement there's
25     paragraph 1.10.  Do you see that?

1  A.  Okay.
2  Q.  "'Detroit's knowledge' shall mean the actual
3      knowledge of its Director, its Assistant
4      Corporation Counsel assigned to DWSD matters, its
5      Assistant Chief of Engineering or its Engineering
6      Support Manager Craig Stanley."  Do you see that?
7  A.  Yes.
8  Q.  Who was the director being referred to in that
9      paragraph?
10 A.  At that point the director of the department was
11     Pamela Turner.
12 Q.  And when did Pamela Turner become the director?
13 A.  After Victor Mercado resigned.  I don't remember
14     the date.  But she was the deputy director under
15     Mercado.  She -- she came in after Mercado.
16 Q.  Was there an interim director that served
17     somewhere in there, too?
18 A.  Yeah.
19 Q.  Who was that?
20 A.  Anthony Adams.
21 Q.  Anyone else?
22 A.  No.  My recollection is that after Mercado -- Pam
23     Turner, I believe, was the deputy director under
24     Mercado, and when he resigned, Anthony Adams
25     became interim director for about six months.  And

```
1        then Pam became director.
2   Q.   How long did Pam serve as the director?
3   A.   Oh, three or four years.
4   Q.   And who --
5   A.   She retired after I did.
6   Q.   Okay.
7   A.   Wait.  I'm sorry.  She retired -- she retired
8        about six months before I did.
9   Q.   Did someone else take her position that you knew
10       of?
11  A.   Yeah.
12  Q.   Who was that?
13  A.   Susan McCormick, I think, is her name.
14  Q.   The assistant corporation counsel assigned to
15       DWSD matters referred to in this paragraph, would
16       that be you?
17  A.   Yes.
18  Q.   The assistant chief of engineering at that time
19       would have been who?
20  A.   I don't remember.
21  Q.   And --
22  A.   One of Shukla's assistants, but I'm not sure what
23       is.
24  Q.   Shukla was chief of engineering at the time?
25  A.   He was the assistant director at that time --
```

```
1        assistant director in charge of engineering.  The
2        department had four or five assistant directors in
3        those days.
4   Q.   Victor Mercado resigned in 2008; is that right?
5   A.   I believe so, yes.
6   Q.   In connection with the 1977 lawsuit, did you
7        become aware at any point of Victor having
8        requested from Judge Feikens that he be appointed
9        as special administrator in the place of
10       Mr. Kilpatrick?
11  A.   No.
12  Q.   Do you know what the circumstances of Victor's
13       resignation were?
14  A.   No.
15  Q.   Do you know the reason he gave for resigning?
16  A.   No.
17  Q.   Do you know if he was asked to resign?
18  A.   I don't.
19  Q.   Do you know if there was tension between
20       Mr. Mercado and Mayor Kilpatrick at the time he
21       resigned or prior to?
22  A.   I don't know.
23  Q.   In your capacity as assistant corporation counsel
24       on the DWSD matters, have you had occasion to
25       have meetings with Mr. Ferguson --
```



```
1   A.   Never.
2   Q.   -- Bobby Ferguson?
3   A.   No.
4   Q.   Other than the instances that you told me, did
5        you have discussions with Inland?
6   A.   No.
7   Q.   The representations in this --
8   A.   I'll take that back.  Inland Waters has done many
9        contracts over the years, and I had conversations
10       with Dennis Oszust about other projects.  I didn't
11       deal with him directly on this one.
12  Q.   Okay.  I'll take you to paragraph 3.7 of the
13       acquisition agreement.  Paragraph 3.7 provides
14       "Except as set forth in Schedule 3.7...there is
15       no action, suit or proceeding pending or, to
16       Detroit's Knowledge, threatened against or
17       affecting Detroit before any governmental entity
18       in which there is a reasonable possibility of an
19       adverse decision which could have a material
20       adverse effect upon the ability of Detroit to
21       perform its obligations."  Do you see that?
22  A.   Yes.
23  Q.   "...or which in any manner questions the validity
24       of this agreement."  The capitalized term "to
25       Detroit's Knowledge" would include your
```

```
1        knowledge, right?
2   A.   Yes.
3   Q.   And prior to this, September 2nd, 2010 date, you
4        had been interviewed by a U.S. attorney in
5        connection with 1368; is that true?
6   A.   Not in connection with 1368.  In connection with
7        general city contracting procedures.  They never
8        asked me specific questions about 1368.
9   Q.   Were you ever present when Mr. Shukla was
10       interviewed?
11  A.   No.
12  Q.   The documents that you were asked to put together
13       for the grand jury subpoenas, were those
14       documents including documents related to 1368?
15  A.   I was never asked to put together documents in
16       response to a grand jury subpoena.  I was shown
17       the subpoena and asked by either Mr. Mazurek or
18       Mr. Keelan where in the Water Board Building
19       those files would be and who would be the
20       custodian of them.  They're the ones who actually
21       went and found the documents and put together the
22       document packages for the grand jury.
23  Q.   Was that an inquiry with respect to 1368?
24  A.   I don't remember the specific contracts that were
25       mentioned in the subpoenas.  I would have known it
```





1    at the time, but I have honestly forgotten all
2    that.
3    Q.   Paragraph 3.8 Disclosure of System Debt, do you
4         see that paragraph?
5    A.   Yes.
6    Q.   The last sentence of that paragraph, "None of the
7         written data or information furnished or made
8         available to Macomb County by Detroit as part of
9         the due diligence," do you know what material was
10        furnished to Macomb County as part of the due
11        diligence?
12   A.   No, I don't.
13   Q.   Would Mr. Shukla or anybody else who's included
14        within that category of Detroit's knowledge know
15        what documents were provided?
16   A.   Shukla was not on the negotiating team for this
17        acquisition agreement, so it would not have been
18        him.  The due diligence mostly related to the
19        finances, so that would have been Bart Foster.
20   Q.   Paragraph 5.3 of this agreement provides that
21        Detroit shall promptly inform the Macomb County
22        and MID of any claims which it becomes aware that
23        might reasonably be expected to become the
24        subject of litigation affecting the Macomb
25        system.  Did you make any disclosures to Macomb



1    County about claims or threatened claims which
2    you were aware at that point?
3    A.   We had a couple of lawsuits arising out of the
4         sewer collapse which were disclosed to Macomb
5         County during the negotiations, and there is a
6         second later on about retained liabilities.  There
7         were property damage lawsuits by people who owned
8         property adjacent to the sewer collapse, and one
9         of them I -- we settled both of them.  One of them
10        I know we settled before this document was signed.
11        The other one was -- I don't remember if we did it
12        before or after, but Detroit -- that was the
13        lawsuit with the homeowners whose backyards were
14        at the bottom of the hole.  There were about ten
15        of them.  DWSD settled those.  And I don't
16        remember if that was done before or after this
17        lawsuit was signed, but DWSD kept that liability
18        and paid the settlement.
19   Q.   Other than those disclosures, did you make any
20        other disclosures to Macomb County in accordance
21        with this paragraph?
22   A.   No, I don't recall any.  No.  Those were the
23        claims we were aware of, and by the time this was
24        signed, the statute of limitations for filing
25        claim -- lawsuits for tort -- statute of

1    limitations for tort lawsuits in Michigan is three
2    years, so by this time this was done, the -- well,
3    okay.  The statute of limitations for those had
4    run out, if there were any others that were
5    pending out there.
6         The other thing that was out there that
7    we became aware of during this negotiation and
8    during -- which actually was discovered, I think,
9    by NTH when they did their survey of the whole
10   sewer is that back in the early 1960s when the
11   sewer was built, there were times when the tunnel
12   boring machine that was 50 feet underground
13   strayed out of the path of the easement, and there
14   were several parts -- segments of that sewer
15   system where the sewer was outside the scope of
16   the easement, which means it was a trespass.  And
17   we certainly notified them of that.  They got that
18   information when they had the NTH report.  And
19   there was an agreement, which I think is spelled
20   out in here, in the agreement.  We weren't going
21   to hold up the agreement to the contract to
22   correct all the easements.  There was an agreement
23   that Macomb County would take responsibility for
24   obtaining the easements for the -- Macomb County
25   would obtain new easements for where the sewer



1    actually was, and Detroit would reimburse them for
2    that cost.
3    Q.   Did you become aware of before you retired a
4         claim that was asserted by the City of Detroit
5         against the contractors and subcontractors
6         involved in 1368?
7    A.   Yes.
8    Q.   What do you know about that?
9    A.   What I know about that is that at some point
10        somebody in the city -- and I think it was the
11        director of the Law Department, determined
12        after -- I think this was after the convictions in
13        the criminal prosecution of Mayor Kilpatrick and
14        Bobby Ferguson and Victor Mercado, that there was
15        a possibility of suing those companies for the
16        amounts that they were paying in bribes and
17        kickbacks, and my involvement in that was
18        Ms. Crittendon asked me to sit on the interviews
19        with the law firms that she was considering hiring
20        to do that work.  And so I sat in on interviews
21        with about four different law firms, and
22        Ms. Crittendon made her selection.  And then those
23        cases were filed, and at that point I was getting
24        ready to retire, and I wasn't much involved in the
25        cases that were filed.



1  Q.  During that process did you come to learn the
2      amount that Detroit would claim was overcharged
3      on 1368 or used or paid out in the kickbacks?
4  A.  No.  I was just involved in interviewing the law
5      firms.  I think I wrote the legal services
6      contract for Miller Canfield after Ms. Crittendon
7      selected them, but after that, I was out of it.
8  Q.  What other firms were interviewed other Miller
9      Canfield?
10 A.  Dykema Gossett, and there were two others and I
11     don't remember -- I think Butzel Long might have
12     been one of them, and there -- there was another
13     one, and I don't remember who it was.  I seem to
14     remember interviewing four law firms.
15 Q.  Did you interview Bodman?
16 A.  I don't think they applied for it.  That would
17     have been a real conflict of interest given their
18     representation of Macomb County.  No, I don't
19     think they were on the list.
20 Q.  Did you learn before your retirement that Detroit
21     had recovered in excess of -- I should say at
22     least $7 million in settlements with the
23     contractors and subcontractors they had asserted
24     those claims against?
25 A.  I think those settlements came after I retired.  I

1      was not involved in those cases in any way.
2  Q.  The acquisition agreement, and in particular,
3      schedule 3.8 provides or has Macomb County paying
4      for the entire cost of the sinkhole repair
5      project.  Would you agree with that?
6  A.  This just has a number on it which is higher than
7      the total price of the contract amendment,
8      although, as I said, the contract with Inland
9      Waters covered more than just this work.
10 Q.  Do you understand the sinkhole repair to have
11     cost more -- total of the repairs to have been
12     more than $54 million?
13 A.  No, it's my understanding that that was the total
14     cost.
15 Q.  Okay.  And you're unfamiliar with the settlements
16     between Detroit and the contractors and
17     subcontractors?
18 A.  I was not involved in those at all.
19 Q.  Just so we have a good record, I'm going to mark
20     this as Exhibit 7.
21             MARKED FOR IDENTIFICATION:
22             DEPOSITION EXHIBIT 7
23             12:53 p.m.
24 BY MS. BADALAMENTI:
25 Q.  Is this the Letter of Intent -- did I say I



1      marked it as Exhibit 7?  Is this the Letter of
2      Intent we were referring to earlier?
3  A.  This is the Letter of Intent, although this copy
4      is not signed.
5  Q.  But do you believe it was signed?
6  A.  My recollection is that it was, but I don't see a
7      signed copy here.  Maybe it wasn't.  My
8      recollection is that it was, but --
9  Q.  Section 9, Conduct of Operations, refers to in
10     several paragraphs that you were to obtain the
11     consent of the transferee to any -- in certain
12     circumstances.  In particular, paragraph 9(d)
13     provides obtaining consent of the transferee to
14     any extraordinary transaction or any transaction
15     which is not at arm's length with any person or
16     entity, in either case relating to the property."
17     Did you ever obtained Macomb County's consent to
18     any extraordinary transaction or transaction not
19     at arm's length?
20 A.  I did not.
21 Q.  Who were you interviewed by at the United States
22     Attorney's Office?  Who were you interviewed by?
23 A.  It was an assistant U.S. attorney and an
24     investigator from the Environmental Protection
25     Agency's Inspector General, a man and a woman.  I

1      don't remember their names.
2  Q.  Did you have counsel with you?
3  A.  Yeah, Ed -- well, the interview took place in Ed
4      Keelean's office, and he was there.
5  Q.  Did you and Ed Keelean discuss who else had been
6      interviewed through that point?
7             MR. FAISON:  I'm sorry, I didn't hear
8      the question.
9  BY MS. BADALAMENTI:
10 Q.  Did you and Ed Keelean discuss who else had been
11     interviewed by these same individuals?
12 A.  No.  He -- Mr. Keelean sat in on a number of
13     interviews with city employees with the federal
14     investigators, and he did not share their names
15     with me.
16             MS. BADALAMENTI:  I think I might be
17     done, but if I could just have a couple minutes.
18             MR. FAISON:  Sure.
19             (Off the record at 12:56 p.m.)
20             (Back on the record at 12:59 p.m.)
21 BY MS. BADALAMENTI:
22 Q.  Do you recall any of the agents that interviewed
23     you to be Carol Paszkiewicz?
24 A.  It was Paszkiewicz, yes.  She was one.
25 Q.  Do you recall Mark Chutkow interviewing you from




1     the U.S. Department of Justice?

2  A.  I don't remember that name.  It might have been

3     him.  I don't remember.  But I do remember

4     Ms. Paszkiewicz.

5  Q.  Looking for a final time at Exhibit 7, the Letter

6     of Intent, the Letter of Intent requires that you

7     promptly notify -- and I'm referring to paragraph

8     9 (e) -- that you promptly notify the transferee,

9     Macomb, of any emergency or other change in the

10    normal course relating to the property.  Did you

11    notify Macomb about any change in the normal

12    course of 1368?

13  A.  This is long after 1368.  This is after the work

14    on 1368 was done, so this doesn't cover that.

15  Q.  So did you notify Macomb that there had been a

16    change in the normal course as to 1368?

17          MR. FAISON:  Just a minute.  Is the

18    question whether he did within the period of the

19    due diligence?

20          MS. BADALAMENTI:  Sure.

21  BY MS. BADALAMENTI:

22  Q.  In the period of due diligence, did you notify

23    Macomb that there had been a change in the way

24    that Amendment 2 to 1368 was awarded or anything

25    else about the normal course of --

1  A.  No, because that contract had been closed out by

2    the time this was executed.  This doesn't cover

3    anything under that.  This deals with events going

4    from the date it was executed going forward.  So

5    that wouldn't cover anything under 1368 because

6    that contract had already been completed and

7    closed out.

8  Q.  Did you have a discussion with Mark Jacobs or

9    anybody else about crafting the language in a way

10    that would only relate to things going forward as

11    opposed to things going back?

12  A.  This -- this language was worked out by myself,

13    Mark Jacobs, Craig Hupp and Joe Colaianne.  This

14    is not just my language.  This was a collaborative

15    effort by Macomb County's lawyers and Oakland

16    County's lawyers.

17  Q.  Did you walk through some of the acquisition

18    agreement with Mark Jacobs before it was executed

19    by Mr. Latimer?

20  A.  Yes.  Mark and I were both in the negotiation

21    team.

22  Q.  And you knew that the document would contain the

23    definition of Detroit's knowledge, and that would

24    include you?

25  A.  Yes.



1  Q.  With respect to the Letter of Intent, my last

2    question, is respect to paragraph 9(f).  It

3    indicates that you will in the due diligence

4    period promptly notify the transferee, Macomb, of

5    any governmental, regulatory or third party

6    complaints, claims, investigations or hearings.

7    Other than what you've told me about, did you

8    notify Macomb about any complaints, claims,

9    investigations or hearings?

10  A.  No.

11         MS. BADALAMENTI:  That's it.

12         THE WITNESS:  Thank you.

13         MR. FAISON:  Thank you.

14       (The deposition was concluded at 1:02 p.m.

15    Signature of the witness was not requested by

16    counsel for the respective parties hereto.)

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF NOTARY

2  STATE OF MICHIGAN  )

3               ) SS

4  COUNTY OF MACOMB   )

5

6        I, MELINDA S. MOORE, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing

9    questions and answers were recorded by me

10    stenographically and reduced to computer

11    transcription; that this is a true, full and

12    correct transcript of my stenographic notes so

13    taken; and that I am not related to, nor of

14    counsel to, either party nor interested in the

15    event of this cause.

16

17

18

19

20

21

22          MELINDA S. MOORE, CSR-2258

23          Notary Public,

24          Macomb County, Michigan

25    My Commission expires:  September 6, 2016

