# EXHIBIT 4

**Transcript of Deposition of Mark Jacobs dated July 11, 2014**

# IN RE: CITY OF DETROIT

# MARK D. JACOBS

July 11, 2014

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

---

```
 1              UNITED STATES BANKRUPTCY COURT
 2                EASTERN DISTRICT OF MICHIGAN
 3                     SOUTHERN DIVISION
 4
 5   _____
 6   In re:                 )    Case No. 13-53845
 7   CITY OF DETROIT, MICHIGAN )
 8                          )    Chapter 9
 9        Debtor            )
10   _____)    Hon. Steven W. Rhodes
11
12
13        The Deposition of MARK D. JACOBS,
14        Taken at 150 W. Jefferson, Suite 2500,
15        Detroit, Michigan,
16        Commencing at 3:29 p.m.,
17        Friday, July 11, 2014,
18        Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```



---

```
 1   APPEARANCES:
 2
 3   RAECHEL M. BADALAMENTI (P64361)
 4   SCOTT SIERZENGA (P77633)
 5   Kirk, Huth, Lange & Badalamenti, PLC
 6   19500 Hall Road
 7   Suite 100
 8   Clinton Township, Michigan 48038
 9   586.412.4900
10   rbadalamenti@khlblaw.com
11   ssierzenga@khlblaw.com
12        Appearing on behalf of the Macomb Interceptor
13        Drain Drainage District.
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
 1   ALBERT B. ADDIS (P31084)
 2   KEITH C. JABLONSKI (P62111)
 3   THOMAS D. ESORDI (P45428)
 4   O'Reilly Rancilio PC
 5   12900 Hall Road
 6   Suite 350
 7   Sterling Heights, Michigan, 48313
 8   586.726.1000
 9   aaddis@orlaw.com
10   kjablonski@orlaw.com
11   sesordi@orlaw.com
12        Appearing on behalf of the Macomb Interceptor
13        Drain Drainage District.
14
15   JEROME R. WATSON (P27082)
16   M. MISBAH SHAHID (P73450)
17   Miller Canfield Paddock & Stone, PLC
18   150 W. Jefferson Avenue
19   Suite 2500
20   Detroit, Michigan 48226
21   313.963.6420
22   watson@millercanfield.com
23   shahid@millercanfield.com
24        Appearing on behalf of the City of
25        Detroit.
```



```
 1   ARTHUR H. RUEGGER
 2   JOSEPH SELBY
 3   Salans FMC SNR Denton
 4   1221 Avenue of the Americas
 5   New York, New York 10020
 6   212.768.6881
 7   arthur.ruegger@dentons.com
 8   joseph.selby@dentons.com
 9        Appearing on behalf of the
10        Official Committee of Retirees
11        of the City of Detroit.
12
13   ROBERT J FRANZINGER (P25539)
14   Dykema Gossett PLLC
15   400 Renaissance Center
16   Detroit, Michigan 48243
17   313.568.6690
18   rfranzinger@dykema.com
19        Appearing on behalf of the Witness.
20
21
22
23
24
25
```



```
 1                 TABLE OF CONTENTS
 2
 3   WITNESS                                    PAGE
 4   MARK D. JACOBS
 5        EXAMINATION BY MR. ADDIS                6
 6
 7   EXHIBIT                                    PAGE
 8        (Exhibits attached to transcript.)
 9
10        DEPOSITION EXHIBIT 11                   15
11        DEPOSITION EXHIBIT 12                   38
12
```

```
 1   Detroit, Michigan
 2   Friday, July 11, 2014
 3   3:29 p.m.
 4                    MARK D. JACOBS,
 5        was thereupon called as a witness herein, and
 6        after having first been duly sworn to testify to
 7        the truth, the whole truth and nothing but the
 8        truth, was examined and testified as follows:
 9                      EXAMINATION
10   BY MR. ADDIS:
11   Q.   Sir, can you state your name and professional
12        address for the record, please.
13   A.   Mark Jacobs, 400 Renaissance Center, Detroit,
14        Michigan 48243.
15   Q.   And are you affiliated with the firm Dykema
16        Gossett at that location?
17   A.   Yes, I am.
18   Q.   And are you a partner at Dykema Gossett?
19   A.   Yes.
20   Q.   You have counsel here with you; is that correct?
21   A.   That's correct.
22   Q.   And the identity of counsel is?
23   A.   Jerome Watson --
24   Q.   Okay.
25   A.   -- and my partner, Robert Franzinger.
```

```
 1   Q.   Is Mr. Franzinger general counsel for Dykema?
 2   A.   No, he is not.
 3   Q.   Okay.  You're an attorney, sir, but I don't know
 4        your past.  I know that you were involved in
 5        these transactions.  Have you given a deposition
 6        before?
 7   A.   No.
 8   Q.   God, you're a lucky one.  Well, I'll give you the
 9        basic rules, but I'm pretty sure you know them.
10        This young lady to the right is going to take
11        down everything you say.  Since we're both
12        lawyers, we have the propensity to know where the
13        other guy is going.  I'll do my best not to talk
14        over you if you could do the same for me.  It
15        would make her life a lot easier.  All the
16        answers have to be verbal.  Uh-huh and huh-uhs
17        don't do very well.  And certainly, sir, if I ask
18        you any question you don't understand -- and that
19        is bound to happen sooner or later -- just let me
20        know and I'll be happy to rephrase it.  Fair
21        enough?
22   A.   Fair enough.  Just try to make the questions as
23        clear as possible.
24   Q.   I'll do my best.  Can you give us a little bit of
25        your educational background, college, law school,
```




```
 1      things likes that?
 2  A.  I graduated from the University of Michigan in
 3      1975 with a degree in zoology and anthropology.  I
 4      graduated from the University of Michigan School
 5      of Public Health in 1978 with a degree in
 6      environmental science.  I graduated from
 7      University of Detroit Law School in 1988.
 8  Q.  Okay.  And is there a special area that you
 9      practice in?
10  A.  I practice environmental law.
11  Q.  Okay.  Now, for somebody who does not practice
12      environmental law, can you explain what that
13      entails.
14  A.  The practice of environmental law can involve many
15      different things depending on the individual
16      practitioner.  My work involves many transactional
17      matters, mergers and acquisitions, real estate
18      transactions, and other types of transactions.  It
19      also involves defending typically companies or
20      individuals who are the subject of state or
21      federal environmental enforcement actions.  I
22      represent developers seeking to obtain
23      environmental permits for developments.  I handle
24      water and sewer rate matters for the Detroit Water
25      and Sewer Department.
```

```
 1  Q.  If nothing else, my curiosity, when you say you
 2      handle rate matters, is that disputes over rates
 3      or the setting of rates, or both?
 4  A.  Both.
 5  Q.  During your practice -- have you been with Dykema
 6      Gossett during your entire law practice?
 7  A.  Yes, I have.
 8  Q.  When did you first become involved with
 9      representing the City of Detroit in any capacity?
10  A.  To the best of my recollection, around 1989.
11  Q.  And was it always the Detroit Water and Sewer
12      Department or were there other departments?
13  A.  It was always the Detroit Water and Sewer
14      Department.
15  Q.  Sir, I don't think it's any surprise that the --
16      we're here largely about the acquisition from the
17      Detroit Water and Sewer Department by the Macomb
18      Interceptor Drain Drainage District of the Macomb
19      portion of the Detroit sewerage system in Macomb
20      County, which I think has been described here
21      previously as north of 8 Mile.  I'm sure it goes
22      in other directions also.  All right?
23          Sir, when, to your knowledge, did
24      negotiations first begin for Macomb to purchase
25      the system?
```

```
 1  A.  Do you mean the negotiations of the transactional
 2      document or the overall deal?
 3  Q.  Let's start overall and then we'll go to the
 4      document.
 5  A.  Sometime in 2005 -- I'm not real good with dates
 6      -- or 2006 DWSD's former director Victor Mercado
 7      and Macomb County, whatever his title is, Tony
 8      Marrocco, discussed the possibility of Macomb
 9      County acquiring the Macomb portion of the
10      Oakland-Macomb Interceptor.
11  Q.  How did you become aware of that discussion?
12  A.  I think one of the first discussions may have
13      occurred in chambers in Judge Feikens' chambers,
14      so I may have been present.
15  Q.  So I can assume by that answer that you were
16      involved in the Feikens litigation -- what we'll
17      call the Feikens litigation?
18  A.  I was.
19  Q.  Okay.  And what was your involvement in the
20      Feikens litigation?
21  A.  Do you want the history back to the beginning?
22  Q.  As briefly as you can state it so that we
23      understand, that would be enough for me.
24  A.  When I first got involved in 1989, the State of
25      Michigan had issued a national pollutant discharge
```

```
 1      elimination system to the Detroit Water and Sewer
 2      Department's wastewater treatment plant.  That
 3      contained a number of new and onerous requirements
 4      that would have involved in excess of 4 or
 5      $5 billion to comply with.  We filed an
 6      administrative appeal of the permit, and we also
 7      filed a petition with Judge Feikens to take
 8      jurisdiction over the permit.  And so we spent the
 9      next roughly five years fighting over that permit.
10          And then over the years, there have
11      been just multiple different assignments involving
12      everything from construction litigation to
13      disputes -- I did not -- not as a litigator --
14      rate disputes that came up almost annually with
15      wholesale customers, efforts by the Detroit Water
16      and Sewer Department to do things required by the
17      NPDS permit that were interfered with by third
18      parties that we had to deal with, notably the Army
19      Corps of Engineers, and many, many other different
20      capacities.  The assignments have been more
21      numerous than I could even begin to recall.
22  Q.  All right.  So at some point in time, now that we
23      know what your involvement has been -- and it's
24      been broad ranged; would that be fair to say? --
25      you became aware that Macomb and Detroit were
```

1     willing to talk about a purchase of the Macomb
2     portion of the system; is that correct?
3 A. I'm not sure I understand the question.
4 Q. Okay. At some point -- I think you said it was
5     about 2005 or '06 you became aware Mr. Mercado
6     and Mr. Marrocco were talking about a Macomb
7     purchase of the system, correct?
8 A. That is correct.
9 Q. Okay. Was there a time or a date in which you
10    were officially brought into or involved in those
11    discussions?
12 A. I suppose I got involved in the Macomb discussions
13    sometime after Oakland County acquired the
14    Clinton-Oakland portion -- the Clinton-Oakland and
15    the Edison Corridor portion of the Oakland-Macomb
16    Interceptor District. Actually it was the
17    Oakland-Macomb Interceptor Drain Drainage District
18    that acquired the Oakland portion.
19 Q. Okay.
20 A. After that transaction closed, we shortly
21    thereafter commenced discussions on the Macomb
22    piece.
23 Q. Okay. When you said you commenced discussions,
24    who did you commence discussions with?
25 A. It was largely the same team of people that were



1     involved in the negotiation of the Oakland portion
2     of the Oakland-Macomb Interceptor with the
3     exception of the Oakland specific representatives.
4 Q. Okay. By that I mean what people were you
5     talking to from Macomb?
6 A. Principal representatives of Macomb County on
7     those discussions were Craig Hupp, their outside
8     attorney at Bodman, and Bill Misterovich, chief
9     deputy something something from the county who's
10    also a lawyer, and perhaps one or more of their
11    technical/engineering people. I don't recall
12    exactly who all was involved.
13 Q. Now we're to the part of the formal discussions.
14    How did the formal negotiations begin from your
15    side of the table? By that I mean, so I can make
16    my question clear, did you put together a list of
17    information that you wanted or a due diligence
18    list of some sort?
19 A. The discussions were led by Macomb County. As the
20    purchaser, they were the ones asking for
21    information. We weren't offering up information.
22 Q. Okay. So you would respond to their requests
23    when you thought it was appropriate?
24 A. Correct.
25 Q. Okay. Do you know, sir, what type of information



1     or can you recall what kinds of information they
2     requested and you provided?
3 A. The business terms of the transaction that were
4     agreed to between Tony Marrocco and Victor Mercado
5     was that the purchase price would be equal to the
6     outstanding principal balance on the bonds
7     allocated to the assets that comprise the Macomb
8     system. And it was that financial information
9     that Macomb County asked DWSD to provide.
10 Q. Okay. And did DWSD provide that information to
11    them?
12 A. They did.
13 Q. Okay. What time frame are we talking here?
14 A. I don't recall exactly when the Oakland-Macomb --
15    the Oakland system closed, but it was from within
16    months of that closing through the closing of the
17    Macomb transaction, which I think was
18    September 2010.
19 Q. We have an acquisition agreement signed
20    September 2, 2010. Is that --
21 A. That sounds correct.
22 Q. That sounds correct to you?
23        MR. ADDIS: Are we just continuing to
24    number the --
25        MR. WATSON: Yeah, I assume we will

1     for --
2        MARKED FOR IDENTIFICATION:
3        DEPOSITION EXHIBIT 11
4        3:43 p.m.
5 BY MR. ADDIS:
6 Q. Sir, I've handed you what's entitled an
7     Interceptor Transfer Due Diligence Information
8     List, which says "Revision 1/23/09" on it. Do
9     you recognize this document?
10 A. No, I don't.
11 Q. Okay. You don't believe you've seen this
12    document before?
13 A. Not that I recall.
14 Q. Okay. So this is not a document that you
15    prepared?
16 A. No, it is not. Looking at the footer on the
17    document, it appears to have been generated by Mr.
18    Hupp.
19 Q. Okay. Sir, I want to be clear. Did Mr. Hupp
20    ever sit down and discuss this document with you,
21    perhaps without giving it to you? Had you seen
22    it before in his possession?
23 A. The topics covered by this due diligence
24    information list were discussed at length between
25    the parties. It appears to be a document that

```
 1        perhaps was provided to Detroit directly.
 2        Certainly I would have none of this information.
 3   Q.   Sir, as I understand it, you believe you
 4        discussed, at least with this brief review of it,
 5        many of the matters contained in this list -- in
 6        this exhibit, correct?
 7   A.   That's correct.
 8   Q.   With Mr. Hupp?
 9   A.   With Mr. Hupp and others.
10   Q.   And Mr. Misterovich?
11   A.   Yes.
12   Q.   And representatives of DWSD, were they --
13   A.   Yes.
14   Q.   Discuss those matters with you?
15   A.   Yes.
16   Q.   When you were negotiating, for lack of a better
17        term, and communicating or doing both with
18        Mr. Misterovich and/or Mr. Hupp, who was acting
19        with you?  Were there members of DWSD, either
20        Mr. Mercado or others that were involved with you
21        in those negotiations?
22   A.   I don't recall exactly who participated in the
23        meetings on a day-to-day basis, but Bob Walter and
24        myself were there as the lawyers, and there may
25        have been various administrative representatives
```



```
 1        from time to time.  I don't recall who was in the
 2        director's seat at that time.  It may have been
 3        Pam Turner.  I don't recall.  But I don't believe
 4        that Victor was in office at that point.
 5   Q.   Let me just interrupt, if I may, because I want
 6        to keep a timeline.  When the discussions first
 7        start, it was Victor Mercado and Marrocco in
 8        informal discussions, correct?
 9   A.   Correct.
10   Q.   And then they made some informal agreement as to
11        how they were going to set the price attached to
12        the debt, correct?
13   A.   Correct.
14   Q.   So far I've got it right, okay.  And then at some
15        point in time when official discussions started,
16        which included you and Mr. Misterovich and Mr.
17        Hupp and Mr. Walter -- and Mr. Mercado was not
18        ever involved in those?
19   A.   I believe so, no.
20   Q.   Okay.
21   A.   I also omitted Bart Foster, who was DWSD's
22        financial advisor and rate consultant who was the
23        primary spokesperson for DWSD on the numbers.
24   Q.   Okay.  Before we go to just the acquisition
25        agreement, in your position of helping DWSD over
```



```
 1        these years providing them counsel, were you
 2        aware of other issues other than just this
 3        purchase -- other issues that existed between
 4        Macomb and Detroit; is that correct?
 5   A.   What do you mean by other issues?
 6   Q.   Well, did they often have issues over rates?
 7   A.   Yes, they did.
 8   Q.   Okay.  Over interest rates?
 9   A.   Interest rates, yes.
10   Q.   Over 800 mega hertz radio system?
11   A.   Yes, they did.
12   Q.   Okay.  Didn't they have -- in other words, were
13        you aware that they had a number of disputes?
14   A.   I am aware of that, yes.
15   Q.   All right.  And these disputes were, of course,
16        subjects for Judge Feikens from time to time,
17        correct?
18   A.   They were often before Judge Feikens.
19   Q.   In your representation of DWSD at any time, did
20        you ever give them any advice regarding any
21        criminal matters?
22   A.   No, I did not.
23   Q.   Did you have somebody in your firm advise DWSD on
24        any criminal matters?
25   A.   No, we did not.
```

```
 1   Q.   Up until even today, from when you first started
 2        representing them to today, have you or your firm
 3        ever handled any criminal matters for DWSD?
 4   A.   No, we have not.
 5             MR. WATSON:  I'll object to foundation.
 6        You can answer if you can.
 7             THE WITNESS:  The answer is no.
 8   BY MR. ADDIS:
 9   Q.   I'm assuming you do not practice criminal law?
10   A.   I do not.
11   Q.   Okay.  Now, you mentioned to me earlier that you
12        guys would meet and many times not everybody
13        would be at every meeting, so sometimes it would
14        be Misterovich by himself, sometimes Misterovich
15        with others, with Hupp.  I'm assuming there would
16        be times where it would be just you and Mr. Hupp?
17   A.   There were different people at different times.  I
18        don't believe that Misterovich would have appeared
19        without Craig Hupp being present.
20   Q.   Okay.  Give me a time frame.  How often did these
21        negotiations take place, these meetings, no
22        matter who was there?
23   A.   I can't really recall.  It was intermittent in the
24        early stages.  As we got closer and closer to the
25        closing date, it was at least weekly.
```

1  Q.  Okay. And the early stages began, again? It's
2      been a long day.
3  A.  Sometime after the closing of the Oakland portion
4      of the overall interceptor system.
5          MR. ADDIS: Does anybody know when that
6      was? Give me an approximate date.
7          MS. BADALAMENTI: Not long before ours,
8      maybe '09.
9  BY MR. ADDIS:
10 Q.  About '09, she says. Would that make sense to
11     you? I won't hold you to it.
12 A.  It's certainly a ballpark number that I would work
13     with.
14 Q.  We can look it up, when did they close. And then
15     after that Mr. Marrocco and his crowd began to
16     pursuing buying their section of it?
17 A.  That's correct.
18 Q.  And it finally culminated in September 2010 with
19     an agreement, correct?
20 A.  That's correct.
21 Q.  Okay. Now, I don't know what we did with your
22     exhibits, but -- right here. We've had these
23     previously marked. Exhibit 5 is the acquisition
24     agreement. Can you describe to me, sir, the
25     process by which this agreement was hammered out.

1      By that I mean did somebody --
2          MR. ADDIS: Exhibit 6. I apologize.
3  BY MR. ADDIS:
4  Q.  Negotiations take place. We've established that.
5      And then eventually an acquisition agreement is
6      put together and laid on paper. What I'm
7      interested in is the process of how this
8      acquisition agreement was written and approved.
9      By that -- let me ask the first question. Did
10     someone submit a first draft?
11 A.  The first draft was the Oakland transactional
12     document, because with limited exceptions, other
13     than the purchase price, the Macomb acquisition
14     agreement mirrors the Oakland acquisition
15     agreement.
16 Q.  And do we know who put together the Oakland
17     acquisition agreement?
18 A.  It was the same group of parties.
19 Q.  Okay. That would include you?
20 A.  Me.
21 Q.  Was Mr. Hupp involved in that?
22 A.  Yes, he was.
23 Q.  Okay. And Mr. Hupp represented who? Oakland?
24 A.  The Oakland Macomb Interceptor Drain Drainage
25     District, I believe. I don't believe he was there



1      for Oakland specifically.
2  Q.  I understand. Okay. Anybody else in that
3      process?
4  A.  Oakland may have had its other attorneys involved.
5      Oh, Joe Colaianne from the Water Resource
6      Commissioner's Office was a lawyer. John
7      McCulloch was involved. Those were the principal
8      players for Oakland County.
9  Q.  Okay. By the time we got down to the signing
10     date of this acquisition agreement, did you ever
11     compare this acquisition agreement side by side
12     to the Oakland agreement?
13 A.  Not that I recall.
14 Q.  Okay. Do you know whether Mr. Hupp had done
15     that?
16 A.  I would have no idea.
17 Q.  Okay. Or Mr. Misterovich?
18 A.  I wouldn't know.
19 Q.  Okay. So it's fair to say that the Oakland
20     agreement as a model was used for this agreement?
21 A.  To the best of my recollection, the only things
22     that were changed were the things that were
23     specific to Macomb County that were not specific
24     to Oakland County.
25 Q.  Okay. Negotiations started in, we believe, '09,

1      consummated with this agreement in September of
2      '10. During that period of time, sir, were you
3      ever made aware of DWSD employees being
4      investigated by either federal or state
5      authorities?
6  A.  I don't recall whether I had heard anything about
7      that during this period of time.
8  Q.  Okay. Did any of the DWSD employees -- I always
9      forget Pam's last name.
10 A.  Pam Turner.
11 Q.  Did Pam Turner ever report to you that she had
12     been told by some of her employees that they had
13     been questioned by the U.S. Attorney's Office?
14 A.  No, she did not.
15 Q.  Had you ever been told by Mr. Walters that he was
16     made aware that some of the DWSD officials and
17     employees had been questioned by the U.S.
18     Attorney's Office?
19 A.  I don't believe he ever discussed it with me.
20 Q.  Okay. I'm going to jump ahead, and we may come
21     back to some other things. There comes a time
22     that everybody meets in a room and signs this
23     document. Sir, can you tell me who was in that
24     room on September 2nd, 2010.
25 A.  Craig Hupp and myself, the persons who signed the





```
 1       document.  There were several Bodman lawyers who
 2       prepared many of the business-related documents,
 3       assistants of various types from Bodman who were
 4       helping assemble exhibits, myself, Bob Walter.
 5  Q.   Okay.
 6  A.   And possibly others.
 7  Q.   All right.  At some point in time we know that
 8       Victor Mercado left and then we know that Pam --
 9       I forgot her name again.
10  A.   Pam Turner.
11  Q.   Pam Turner left, and Darryl Latimer, the deputy
12       director, if you agree with this, was pretty much
13       left in charge.  Would that be an accurate
14       statement?
15  A.   You know, I don't recall who was in the driver's
16       seat after Pam stepped down, but he would probably
17       have been the most senior man standing.
18  Q.   Okay.  Same term he used.  Had you worked with
19       Mr. Latimer before?
20  A.   Yes.
21  Q.   Okay.  Had you worked with him extensively or
22       just a few matters?  How would you describe it?
23  A.   Intermittently on miscellaneous minor items over
24       the years.
25  Q.   Okay.  There came a time when Mr. Latimer was in
```

```
 1       that room with you to sign that document.  Before
 2       he signed that document, did you sit down with
 3       him and go over that document paragraph by
 4       paragraph?
 5  A.   I did not.
 6  Q.   Okay.  Did you give him a general explanation of
 7       what this document was about?
 8  A.   Yes.
 9  Q.   Okay.
10  A.   At least I let him know what the business -- what
11       the purchase price was.
12  Q.   Okay.
13            MR. WATSON:  Can I -- hold on.  Let me
14       talk to my counsel here for a second.
15            MR. ADDIS:  Okay.
16            (Off the record at 3:57 p.m.)
17            (Back on the record at 4:00 p.m.)
18            MR. WATSON:  Brief statement:  We
19       didn't assert any privilege the last couple of
20       questions.  I think we got right to the edge,
21       maybe even a little bit over, but that's as far as
22       I'm going to let him go in regard to the
23       discussions he had with Mr. Latimer where Macomb
24       County wasn't present.
25            MR. ADDIS:  Well, I think -- and I
```



```
 1       understand your position.  But I think the
 2       backdrop of that question was they were all in the
 3       room to sign these documents, okay, and so I'm not
 4       sure privilege would attach when everybody was in
 5       the room.
 6            MR. WATSON:  To the extent you're
 7       asking questions of what he told Latimer in
 8       general discussions with everyone at the table, I
 9       think you're right.  One-on-one discussions with
10       Latimer or with Latimer and other Detroit
11       officials, I plan to assert the privilege.
12            MR. ADDIS:  Okay.  I understand,
13       Jerome.  Thanks.
14  BY MR. ADDIS:
15  Q.   Sir, you understand that your counsel has
16       asserted the privilege for any private
17       conversations that you had with your clients?
18  A.   I do.
19  Q.   Okay.  And so we're going to honor that.  I may
20       not agree, but we're going to a honor it and move
21       forward with those ground rules.  If I come close
22       to stepping on them, you can feel free to stop
23       me.  I'm sure Jerome will beat you to it, but in
24       case he doesn't.
25            However, let's go back to where we're
```

```
 1       all in the room, okay?  While everybody is in that
 2       room, did Mr. Latimer express any questions or
 3       comments regarding the contents of the agreement?
 4  A.   I don't recall any conversation specifically with
 5       or from Darryl Latimer.
 6  Q.   Okay.  Generally?
 7  A.   I don't recall anything.
 8  Q.   Okay.  Did you witness or did you see Mr. Latimer
 9       reading the document?
10  A.   I don't remember.
11  Q.   Do you know whether your co-counsel at the time,
12       Mr. Walters, or brother counsel, Mr. Walters,
13       spent any time with Mr. Latimer away from that
14       meeting room?
15  A.   I wouldn't know.
16  Q.   But on the day the signing took place -- let's
17       talk about that day.  Where did the signing take
18       place?
19  A.   In a conference room at Bodman's offices at Ford
20       Field.
21  Q.   Okay.  And about what -- do you remember what
22       time of day?
23  A.   Sometime during that September 2nd, whatever.  I
24       don't remember what time of day it was.
25  Q.   Okay.  How long did the process take?
```




1  A.  I don't really recall.  I could guess three or
2      four hours.
3  Q.  Okay.  During that three or four hours what was
4      discussed at the table?
5  A.  We were trying to just assemble all the documents
6      that went into this package.
7  Q.  Which means not only the agreement which had
8      pretty much been -- I'm assuming the agreement
9      had already been provided, correct -- an
10     agreement without attachments?
11 A.  On the day of closing no negotiations were taking
12     place.
13 Q.  So an agreement was there, but there were a
14     number of exhibits and attachments that had to be
15     added to it, correct?
16 A.  That's correct.
17 Q.  All right.  And so you and Mr. Walters and Mr.
18     Hupp and Mr. Misterovich and whoever else was
19     there.  You mentioned another couple gentlemen.
20     You were assembling and may I assume agreeing on
21     which documents should be properly attached?
22 A.  We were just making sure they were already there.
23     It was already understood what was going to be
24     attached.
25 Q.  It had all been agreed up, but putting it



1      together was a matter that took some time?
2  A.  Yes.
3  Q.  Okay.  And I take it, then, that the agreement
4      was not signed until all of the exhibits were
5      attached or was it signed first by Mr. Latimer,
6      who then left, and the rest of the work was done,
7      if you recall?
8  A.  I don't recall.
9  Q.  Do you recall if Mr. Latimer ever was shown the
10     exhibits or attachments?
11 A.  I don't remember.  I know the only things he saw
12     were the things that he had to sign.  Otherwise,
13     it wouldn't have been presented to him.
14 Q.  Was there ever any discussion -- prior to the
15     execution of this agreement, was there ever any
16     discussion as to whether or not Mr. Latimer had
17     the authority to sign it?
18 A.  I don't recall any discussions on that subject.
19 Q.  Okay.  Do you know whether your office or Mr.
20     Hupp's office or Mr. Misterovich's office or any
21     of the lawyers' offices had contact with either
22     the mayor's office or, if Judge Feikens was still
23     in charge, either Judge Feikens or Judge Cox's
24     office as to whether or not that gentleman had
25     the authority to sign that agreement?



1             MR. FRANZINGER:  You should only answer
2      that question with respect to non-clients.
3             MR. ADDIS:  I agree.  I understand.
4             THE WITNESS:  Could you rephrase that
5      question.
6  BY MR. ADDIS:
7  Q.  Yeah, I wish I could.  Let me try it again.
8      That's fair enough.  We're all sitting around
9      and, was there ever any discussion between the
10     lawyers, not with clients, between the lawyers as
11     to whether or not Mr. Latimer had the requisite
12     authority to sign this contract and make it
13     binding?
14            MR. FRANZINGER:  Between the lawyers
15     for the respective parties --
16            MR. ADDIS:  Yes.
17            MR. FRANZINGER:  -- as opposed to, for
18     example, Mr. Jacobs and Mr. Walter?
19            MR. ADDIS:  Between the respective
20     parties.
21            THE WITNESS:  I don't recall any such
22     discussion.  Quite frankly, he showed up; I
23     assumed he had the authority to sign it.
24 BY MR. ADDIS:
25 Q.  Okay.  Do you know who told him to show up and



1      sign it?
2  A.  I have no idea.
3  Q.  Okay.  Did you tell him he had the authority to
4      sign it?
5  A.  I wouldn't have the knowledge to tell him that.
6  Q.  Okay.  Do you know whether Mr. Hupp issued an
7      opinion to him as to whether he had the authority
8      to sign?
9  A.  I doubt it.
10 Q.  Okay.  You don't recall him saying --
11 A.  I don't recall.
12 Q.  Okay.  I want to take you to certain paragraphs,
13     and you may or may not have knowledge of this, so
14     we'll find out.  On the acquisition agreement,
15     page 2 of 25, paragraph 1.10, do you know who
16     authored this paragraph?
17 A.  I don't know who authored it.  I know that Macomb
18     County wanted knowledge to be based on knowledge
19     of people who would presumably have some actual
20     knowledge about the physical condition of the
21     assets that were being conveyed.
22 Q.  Okay.
23 A.  And so these were the people that DWSD designated
24     as having such knowledge.
25 Q.  Okay.  DWSD said that these people here, meaning



1       -- and I'll quote.  One is the director, correct?
2   A.  Yes.
3   Q.  Okay.  At that time, however, DWSD didn't have a
4       director, did it?
5   A.  I'm not sure.
6           MR. WATSON:  I'm going to object to the
7       form of the question.  We're not really sure when
8       this language was drafted.
9           MR. ADDIS:  Well, I'm not sure that was
10      the testimony.  Let me ask it.  If I'm lacking
11      foundation, I'll try to build one.
12  BY MR. ADDIS:
13  Q.  Do you know when this language was drafted and
14      when did all the parties assent to it prior to
15      signature?
16  A.  I do not.  This could have been a carryover from
17      the prior transaction.  It most likely was.
18  Q.  Okay.  Do you know who supplied the -- I notice
19      that in this paragraph regarding Detroit's
20      knowledge it lists director, assistant
21      corporation counsel assigned to DWSD matters, and
22      assistant chief of engineering or engineering
23      support manager, Craig Stanley.  I know that
24      Mr. Stanley is the only guy directly named in
25      this thing.  Do you know the genesis of that?

1   A.  I do not recall.
2   Q.  Okay.  So it would be fair to say you don't know
3       if Macomb requested that it be Craig Stanley or
4       DWSD offered him up?
5   A.  Correct.
6   Q.  Do you know who Craig Stanley is?
7   A.  I do not.
8   Q.  Had you ever worked with him before?
9   A.  Never met the man.
10  Q.  Do you know whether anybody ever talked to
11      Mr. Stanley about whether he wanted the
12      responsibility of being the keeper of Detroit's
13      knowledge?
14  A.  I do not.
15  Q.  I want to take you to page 11 of 25, paragraph
16      3.7, entitled Litigation.  And I'm going to just
17      read it for the record.  "Except as set forth in
18      Schedule 3.7 hereto, there is no action, suit or
19      proceeding pending or, to Detroit's knowledge,
20      threatened against or affecting Detroit before
21      any governmental entity in which there is a
22      reasonable possibility of an adverse decision
23      which could have a material adverse effect upon
24      the ability of Detroit to perform its obligations
25      under this agreement or which in any manner

1       questions the validity of this agreement."
2           Sir, at the time -- either prior to or
3       at the actual time of signing this, did anybody in
4       the room ask Mr. Latimer if he had any such
5       knowledge?
6   A.  I don't believe anybody asked them that.
7   Q.  As of the date of this signing, were you aware --
8       strike that.
9           Was Mr. Latimer the only DWSD employee
10      at that meeting?
11  A.  At which meeting?
12  Q.  At the signing itself.
13  A.  I don't recall.
14  Q.  Can you tell me which -- can you tell me whether
15      anybody within the City of Detroit other than
16      their counsel did a full review of this
17      acquisition agreement before signing?
18  A.  I'm not sure who reviewed it.
19  Q.  Did anybody ever communicate to you that they
20      reviewed it?
21          MR. FRANZINGER:  Objection.  You
22      shouldn't disclose any discussions you had with
23      your client.
24          THE WITNESS:  I don't recall.  My --
25      for what it's worth, I believe that this

1       acquisition had to be approved by the Detroit
2       Water Board, so there presumably was some review
3       at that level, but I want -- I didn't appear
4       before them.  I don't know how they -- how or
5       where or when they addressed this.
6   BY MR. ADDIS:
7   Q.  Okay.  I want to take you to paragraph 5.3, sir,
8       Litigation and Claims.  And this is on 14 of 25.
9       I'm sorry.  I should have told you that first.
10      And, again, reading for the record, "Detroit
11      shall promptly inform the Macomb County and MID
12      in writing of any claims of which Detroit is or
13      becomes aware that are or might reasonably be
14      expected to become the subject of litigation
15      affecting the Macomb system or the transactions
16      contemplated by this agreement."
17          Now, sir, using that as a foundation,
18      did there come a time, sir, when you became aware
19      that DWSD employees were being questioned by the
20      FBI, a grand jury, or the U.S. Attorney's Office
21      regarding the practices of DWSD?
22          MR. FRANZINGER:  Again, you should not
23      disclose any conversations that you had with the
24      client or that are based upon knowledge that you
25      had based on discussions you had with your client.

1   MR. WATSON: And I'll object to the
2   foundation of the question, too.
3   THE WITNESS: In any event, I don't
4   recall any specific conversations with anybody
5   about those activities. I heard rumors just like
6   everybody else. I don't know where I heard them,
7   how I heard them, but I just heard scuttlebutt.
8   There was no one-on-one conversations with anybody
9   about that subject.
10  BY MR. ADDIS:
11  Q.  Okay. When you heard these rumors or
12      scuttlebutt, okay, as you call it -- and I
13      understand how that goes through any office --
14      did you consider whether or not a written
15      notification of at least these rumors should have
16      been sent to Macomb County under paragraph 5.3?
17  A.  The knowledge I had about the scope of that
18      investigation was so vague and general there was
19      no way it could have alerted me to that -- any
20      connection between that investigation and this
21      transaction.
22  Q.  So the answer is you did not?
23  A.  I suppose that's the answer. I can't remember the
24      question exactly.
25  Q.  1.13 on page 2 of 25, Global Settlement

1       Agreement, were you familiar, sir, with the
2       Global Settlement Agreement?
3   A.  Yes, I was.
4   Q.  Were you familiar with what subjects that Global
5       Settlement Agreement applied to?
6   A.  Yes.
7   Q.  What were those subjects that it applied to?
8   A.  Well, at the time I was very familiar with it,
9       even though it had been a few years, but today
10      sitting here today, I could only try to remember.
11      Interest rates, 800 megahertz radio, and a
12      gentleman's agreement, the Letter of Intent to
13      consummate these transactions.
14  Q.  And was that Global Settlement Agreement, sir,
15      something that was reached in conjunction with
16      the Feikens case?
17  A.  Yes.
18  Q.  Were you part of those negotiations in front of
19      Judge Feikens -- or might not have been in front
20      of him, but under the control of Judge Feikens
21      that led to that Global Settlement Agreement?
22  A.  Yes.
23  Q.  And as a result of that Global Settlement
24      Agreement, certain actions were applied to the
25      pricing of this acquisition agreement; is that



1       correct?
2   A.  One of the issues addressed in the Global
3       Settlement Agreement was carried forward as a
4       credit on the purchase price.
5   Q.  Okay. And which one do you believe that was?
6   A.  That was the roughly $17 million interest rate
7       dispute resolution.
8   Q.  So the $17 million that I've seen on that
9       sheet --
10  A.  Yes.
11  Q.  -- and now that you've seen is for that interest
12      rate dispute resolution, correct?
13  A.  Correct.
14  Q.  Thank you.
15                  (Mr. Ruegger not present at 4:18
16                  p.m.)
17                  MARKED FOR IDENTIFICATION:
18                  DEPOSITION EXHIBIT 12
19                  4:18 p.m.
20  BY MR. ADDIS:
21  Q.  Sir, I'm showing you what has been now marked as
22      Exhibit 12, and I believe that that is from that
23      agreement that we talked about, the Global
24      Settlement Agreement. What I mean is what is in
25      there under the term "global settlement," about

1       three-quarters of the way down, says, as you can
2       see, $17,050,000, correct?
3   A.  I see that, yes.
4   Q.  Yes. And that is a recording, so to speak -- a
5       written recording of what you just testified to
6       as the settlement money for the interest rate
7       dispute, correct?
8   A.  That's correct.
9   Q.  And that's what that reflects?
10  A.  That's correct.
11  Q.  Thank you. When did you first become aware of an
12      investigation into Mr. Kilpatrick, Ferguson
13      and/or Mercado?
14  A.  You know, I really don't remember when I first
15      heard about it. Like I said, it was just stuff I
16      heard on the street. When it happened, I really
17      couldn't tell you.
18  Q.  Were you ever contacted by either the Department
19      of Justice, U.S. Attorney's Office, the FBI or
20      anybody regarding any knowledge you might have of
21      the operations of DWSD?
22  A.  No.
23  Q.  And to this day you have not been?
24  A.  I have not been.
25  Q.  Did any of the employees of the city -- of DWSD




```
 1       ever supply you with copies of their subpoenas to
 2       appear before grand juries?
 3   A.  They did not.  As I said, I never spoke to anybody
 4       about it.
 5   Q.  Okay.  So basically what you're telling me is you
 6       have had absolutely no contact with DWSD
 7       employees regarding the investigation of DWSD and
 8       the subsequent prosecution of Kilpatrick, et al.?
 9   A.  Well, that's two different questions.
10   Q.  Okay.
11   A.  I never talked to anybody at DWSD about the
12       investigation.  Once the trial started, yeah,
13       everybody was talking about it.
14   Q.  I agree with that.  My point was this:  Were you
15       ever asked, approached or offer anybody any
16       advice or counsel regarding those issues raised
17       in U.S. vs. Kilpatrick regarding contracts of
18       DWSD?
19   A.  Absolutely not.
20   Q.  Okay.  That takes care of a large number.
21                Going back to the $17 million
22       settlement, were you involved in those
23       negotiations?
24   A.  I was involved in the negotiation of the 800
25       global settlement -- what was called the Global
```

```
 1       Settlement Agreement.  The $17 million, as with
 2       all the numbers, are numbers that were generated
 3       by financial people.  It was what it was.
 4   Q.  All right.  I want to take you to paragraph --
 5       page 6 of 25, paragraph 2.4, under Article II,
 6       the Purchase and Sale.  Were you, sir, involved
 7       in the negotiation of that particular paragraph,
 8       which talks about assignment of warranty and
 9       guarantee rights?
10   A.  I was around when this topic was discussed.
11   Q.  Okay.  Was it -- did your firm author the first
12       draft of paragraph 2.4 or was it Mr. Bodman or
13       Mr. Misterovich?
14           MR. WATSON:  Object to the form of the
15       question.  You can answer, if you can.
16           MR. ADDIS:  If he know.
17           THE WITNESS:  Just to make this easy,
18       all the provisions of this agreement, like this
19       one, were things addressed -- subjects that Macomb
20       County wanted, so they originated with Macomb
21       County.  They said they wanted all these things.
22       They proposed language.  There may have been some
23       negotiation, but all of these sorts of provisions
24       originated with Macomb.
25   BY MR. ADDIS:
```




```
 1   Q.  Okay.  And I'll accept that as your answer, sir,
 2       but do you remember any specific discussion about
 3       2.4?  Was there any warranty or guarantee or
 4       right that Detroit specifically refused to give
 5       up?
 6   A.  I'm not aware there was anything we refused to
 7       give up.
 8   Q.  Okay.  Thank you.  I'm taking my time moving
 9       through this so we can limit our time at this
10       table.
11                There has been, sir, I believe -- are
12       you aware, sir, that there has been litigation
13       commenced by MIDD against Inland?
14   A.  I've heard that there was some claims against the
15       contractors.  I didn't know who in particular the
16       claims were against.
17   Q.  In the course of your representation of the City
18       of Detroit, did you have cause to interact with
19       Inland?
20   A.  I only had one interaction with Inland in my
21       professional career working for DWSD.  I went out
22       to the site of the sewer collapse and there were
23       some Inland guys there, who I may have met.  That
24       was the one and only time I ever had contact with
25       anyone from Inland.
```

```
 1   Q.  What caused you to go to the DWSD -- to the site
 2       of the sewer collapse?
 3   A.  I don't remember what took us out there.  I think
 4       it was just to see it.
 5   Q.  Okay.  That was long before this negotiation
 6       process of this agreement, correct?
 7   A.  When was the collapse?  '04?  '03?
 8   Q.  '04.
 9   A.  I think I just wanted to see it.
10   Q.  Okay.
11   A.  It was quite a sight.
12   Q.  Those of us who lived near it tried to avoid it.
13   A.  Then you know it was quite a sight.
14   Q.  It was quite a sight.
15           MR. ADDIS:  If you give me five minutes
16       here, please.
17                (Off the record at 4:29 p.m.)
18                (Back on the record at 4:42 p.m.)
19   BY MR. ADDIS:
20   Q.  When I tell you that I have just one question for
21       you, I mean it.  All right.  I started to tell
22       you about some ongoing litigation outside of this
23       particular litigation.  Have you been asked by
24       any party to provide information regarding or
25       testimony -- information or testimony regarding
```



```
 1      MIDD vs. Inland pending in U.S. federal court?
 2  A.  I have not.
 3              MR. ADDIS:  I'm all done.
 4              MR. WATSON:  No questions.
 5           (The deposition was concluded at 4:43 p.m.
 6      Signature of the witness was not requested by
 7      counsel for the respective parties hereto.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                  CERTIFICATE OF NOTARY
 2  STATE OF MICHIGAN   )
 3                      ) SS
 4  COUNTY OF MACOMB    )
 5
 6           I, MELINDA S. MOORE, certify that this
 7      deposition was taken before me on the date
 8      hereinbefore set forth; that the foregoing
 9      questions and answers were recorded by me
10      stenographically and reduced to computer
11      transcription; that this is a true, full and
12      correct transcript of my stenographic notes so
13      taken; and that I am not related to, nor of
14      counsel to, either party nor interested in the
15      event of this cause.
16
17
18
19
20
21
22           MELINDA S. MOORE, CSR-2258
23           Notary Public,
24           Macomb County, Michigan
25  My Commission expires:  September 6, 2016
```

