## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
---------------------------------------------  x
                                               :
In re                                          :        Chapter 9
                                               :
CITY OF DETROIT, MICHIGAN,                     :        Case No. 13-53846
                                               :
                    Debtor.                    :        Hon. Steven W. Rhodes
                                               x
```

_____

**DEBTOR'S BRIEF IN SUPPORT OF ITS RESPONSE (Dkt. 5312) IN OPPOSITION TO MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S MOTION (Dkt. 5155) FOR TEMPORARY ALLOWANCE OF CLAIM PURSUANT TO RULE 3018(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PURPOSES OF ACCEPTING OR REJECTING DEBTOR'S FOURTH AMENDED PLAN OF ADJUSTMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ..............................................................................1

STATEMENT OF LEGAL PROCEEDINGS ........................................2

    I.     The Kwame Kilpatrick Criminal Trial ..................................2

    II.    MIDDD Federal Lawsuit ......................................................3

    III.   MIDDD's State Court Lawsuit ............................................5

    IV.   MIDDD's Claim in Bankruptcy ...........................................6

    V.    MIDDD's Rule 3018(a) Motion ............................................7

    VI.   Discovery on the Rule 3018 Motion .....................................7

STATEMENT OF FACTS .....................................................................8

    I.     Background on Romeo Arm Interceptor ..............................8

    II.    CS-1368 Sinkhole Repair .....................................................9

    III.   The Global Settlement Agreement Entered Into Between the City and MIDDD ................................................................11

    IV.   Creation of MIDDD and OMIDDD ....................................13

    V.    The Macomb Acquisition Agreement .................................13

    VI.   The Federal Investigation ...................................................18

ARGUMENT ......................................................................................19

    I.     Legal Standard for Rule 3018(a) Motion ...........................19

    II.    MIDDD's Bankruptcy Claim Is Barred Due To Release And Waiver ................................................................................20

          A.    MIDDD's Bankruptcy Claim is Barred by the September 2, 2010 Settlement Agreement ..............................20

          B.    MIDDD's Bankruptcy Claim is Barred By the Global Settlement Agreement ..........................................21

    III.   MIDDD's Bankruptcy Claim Is Barred by Res Judicata and Collateral Estoppel .........................................................23

          A.    MIDDD's Bankruptcy Claim Is Barred by Res Judicata.........23

-i-

B.    MIDDD's Bankruptcy Claim Is Barred By Issue Preclusion.................................................................25

IV.   MIDDD's Bankruptcy Claim Fails Because the Underlying Breach of Contract Claim Fails as a Matter of Law .........................27

A.    MIDDD's Complaint Does Not Establish a Breach of Any Provision of the Acquisition Agreement .........................27

B.    MIDDD's Cannot Rely on Parol Evidence to Prove Its Breach of Contract Claim ........................................................33

V.    MIDDD's Bankruptcy Claim Fails Because the Underlying Quasi-Contractual Claim Fails as a Matter of Law............................35

VI.   MIDDD's Bankruptcy Claim Fails Because The Underlying Fraud Claims Fail as a Matter of Law..................................................36

A.    MIDDD Fails to State Claims for Fraud Because It Has Failed to Plead Fraud with Particularity as Required by Federal Rule of Civil Procedure 9(b).......................................36

B.    Alternatively, even if MIDDD Had Sufficiently Stated a Claim for Fraud, MIDDD's Fraud Claims Fail as a Matter of Law...........................................................................38

i.    A Tort Claim cannot be based on a breach of contract ........................................................................38

ii.    MIDDD's Fraud Claims Are Barred by Governmental Immunity.................................................40

iii.    MIDDD Cannot Prove A Prima Facie Claim of Fraud, Fraudulent- Inducement, or Innocent Misrepresentation ..........................................................41

1.    MIDDD's Fraud Claims Fail ...............................41

2.    MIDDD's Silent Fraud Claim Fails ....................45

3.    MIDDD's Fraudulent Inducement Claim Fails ....................................................................45

4.    MIDDD's Innocent Misrepresentation Claim Fails ...........................................................46

**TABLE OF CONTENTS**
(continued)

VII.   MIDDD Cannot Prove Any Damages ................................................47

CONCLUSION .....................................................................................53

CERTIFICATE OF SERVICE ................................................................55

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Abdulshafi v. General Mot. Corp.*, Case No. 242061, 2003 WL
22961709 (Mich. App. 2003) ...........................................................26

*Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp.
484 (E.D. Mich. 1993) ....................................................................35

*Appleway Equipment Leasing, Inc. v. River City Equipment Sales,
Inc.*, 2012 WL 6177067 (Mich.App. 2012) ......................................38

*Armstrong v. Rushton (In re Armstrong)*, 292 B.R. 678 (B.A.P. 10th
Cir. 2003) ......................................................................................19

*Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111 (6th Cir. 1976) .......................38

*Central Transp., Inc. v. Four Phase Sys.*, 936 F.2d 256 (6th Cir. 1991).................25

*Cloverdale Equip. Copmany v. Simon Aerials, Inc.*, 869 F.2d 934 (6th
Cir. 1989) ......................................................................................35

*Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 756 F.2d 443 (6th
Cir. 1985) ......................................................................................34

*Coffey v. Foamex L.P.*, 2 F.3d 157 (6th Cir. 1993)................................................36

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) ...........................50

*Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424
F. Supp. 2d 970 (E.D. Mich. 2006) .................................................43

*Edelman v. McMullin Orchards*, 32 B.R. 783 (Bankr. W.D. Mich.
1983) .............................................................................................25

*Federated Capital Servs. v. Dextours, Inc.*, 2002 WL 868273 (Mich.
App. 2002) ....................................................................................42

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008)..............................................36

*Fultz v. Union-Commerce Assocs.*, 470 Mich. 460 (2004).....................................38

iv

*Greenville Mfg., LLC v. NextEnergy Center*, 2012 WL 3101826 ..........................45

*Hamade v. Sunoco, Inc. (R & M),* 271 Mich.App. 145 (2006)..........................34, 43

*Hart v. Ludwig*, 347 Mich. 559 (1956) ....................................................38

*Hord v. Envtl. Research Inst*., 463 Mich. 399 (2000)...............................44

*Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc.,*
    209 Mich. App 365 (1995) .........................................................37, 45

*J.Z.G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211 (6th Cir. 1996) ...........................23

*Kashat v. Paramount Bancorp, Inc.*, 2010 WL 538295 (E.D. Mich.
    Feb. 10, 2010) ..........................................................................37

*Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459 (2003) ...........................33

*Lee State Bank v. McElheny,* 227 Mich. 322 (1924) ................................33

*Local Emergency Fin. Assistance Loan Bd. v. Blackwell*, 299 Mich.
    App. 727, 832 N.W.2d 401 (2013) ....................................................40

*M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22 (Mich. App. 1998).................41

*Macomb Interceptor Drain Drainage District v. Kilpatrick et. al.*,
    Case No. 2:11-cv-13101 (the "MIDDD Federal Case"). (Exhibit 3,
    MIDDD Federal Case Complaint.).......................................................3, 25, 27

*Marks v. Bank of America*, No. 13-12060, 2014 WL 700478 (E.D.
    Mich. Feb. 24, 2014).....................................................................23

*Montana v. United States*, 440 U.S. 147 (1979) .....................................25

*National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900 (6th Cir.
    2001) .......................................................................................25

*Northern Warehousing Inc. v. Michigan Dep't of Educ. (On Remand)*,
    Case No. 260598, 2006 WL 2419189 (Mich. App. Aug. 22, 2006) ...........40, 43

*Northern Warehousing, Inc. v. State of Michigan*, 475 Mich. 859
    (2006)......................................................................................43

*Riachi v. Detroit*, Case No. 258940, 2006 WL 859416 (Mich. App. April 4, 2006)........................................................................................40

*Rinaldo's Constr. Corp. v. Michigan Bell Telephone Co.*, 454 Mich. 65 (1997)........................................................................................38

*Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895 (6th Cir. 2002)...............................................................................................25

*Samuel D Begola Services, Inc v. Wild Bros,* 210 Mich.App 636 (1995)............................................................................................44, 45

*Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574 (1990).................33

*Skotak v. Vic Tanny Int'l, Inc.*, 203 Mich. App. 616 (1994) ...................................21

*Thomas v. Detroit*, Case No. 06-10453, 2007 WL 674593 (E.D. Mich. Feb. 28, 2007) .....................................................................................40

*U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007) ...............................................................................................36

*U.S. v. City of Detroit, et al*. (Case No. 77-71100)...............................................21

*UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486 (1998)....................................................................................34, 43

*United States of America v. City of Detroit*, 483 F. Supp. 2d. 565 (2007) .............................................................................................11

*United States of America v. Kilpatrick, et al.*, Case No. 10-20403. (Exhibit 1, First Superseding Indictment.) .................................................2, 3, 18

*United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99 (1981) .................46

*United States v. City of Detroit, et al.*, Case No. 77-71100..............................10, 11

*Vertex Dev. LLC v. Fifth Third Bank,* No. 308822, 2013 WL 85904 (Mich. App. Jan. 8, 2013) ...................................................................................21

*Whitesell Corp. v. Whirlpool Corp.*, 2009 WL 3270265 (W.D. Mich. 2009) ..............................................................................................42

*Williams v. Wayne Cnty.*, Case No. 09-14328, 2011 WL 479959 (E.D. Mich. Feb. 4, 2011) .............................................................................40

*Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16 (2008) ........................................................................................................40

**Statutes**

MCL § 691.1401(b) ....................................................................................39

**Court Rules**

Fed. R. Civ. P. 9(b) ..............................................................................35, 37

Fed. R. Evid. 702 ......................................................................................50

Fed. R. Evid. 703 ......................................................................................50

The City of Detroit (the "City" or "Debtor"), through its undersigned counsel, hereby submits its Brief, pursuant to the Court's June 25, 2014 minute entry, in support of its Response (Dkt. 5312) In Opposition To Macomb Interceptor Drain Drainage District's Motion (Dkt. 5155) For Temporary Allowance Of Claim Pursuant To Rule 3018(a) Of The Federal Rules Of Bankruptcy Procedure For Purposes Of Accepting Or Rejecting Debtor's Fourth Amended Plan Of Adjustment.

## INTRODUCTION

MIDDD has aggressively asserted a bankruptcy claim against Debtor City of Detroit in an amount not less than $26 million, although its claim is devoid of support from the facts or the law, and is entirely speculative. Certain of its foundational causes of action have already been dismissed and are barred by the ruling in an earlier federal court proceeding. Others have been released or are invalid as a matter of law. MIDDD's claim will not survive the legal scrutiny of a summary disposition proceeding.

Relying upon this soon-to-be discredited bankruptcy claim, MIDDD is now aggressively pursuing a motion seeking a temporary allowance of the claim for purposes of permitting MIDDD to vote the full amount of the claim in connection with the Debtor's Fourth Amended Plan of Adjustment. As the moving party seeking a temporary allowance of a contingent and unliquidated claim for voting

purposes, MIDDD has the burden of establishing its claim by a preponderance of the evidence. For the reasons discussed above and in greater detail herein, MIDDD will not be able to sustain this burden of proof. Accordingly, MIDDD's motion for a temporary allowance of its speculative claim should be denied or granted only to the extent that MIDDD is given the right to vote in a very nominal amount.[1]

## STATEMENT OF LEGAL PROCEEDINGS

**I.     The Kwame Kilpatrick Criminal Trial**

On December 15, 2010, the United States filed a First Superseding Criminal Indictment against former Detroit Mayor Kwame Kilpatrick; Bobby W. Ferguson, a close friend of Mr. Kilpatrick; Bernard Kilpatrick, Mr. Kilpatrick's father; Victor M. Mercado, the former head of the City of Detroit Water and Sewerage Department ("DWSD"); and several other persons, in *United States of America v. Kilpatrick, et al.*, Case No. 10-20403. (Exhibit 1, First Superseding Indictment.) The First Superseding Criminal Indictment alleged a broad range of criminal conduct by Mr. Kilpatrick and his associates in relation to a number of City of

---

[1] The purpose of this brief is for claims estimation only under Rule 3018(a). A claim adjustment hearing on MIDDD's claim is currently scheduled for October 2014, prior to which there will be continued discovery and litigation related to MIDDD's claim. The City reserves the right to raise additional defenses and arguments and engage in additional discovery with respect to MIDDD's claim prior to the hearing.

- 2 -

13-53846-tjt    Doc 6015    Filed 07/14/14    Entered 07/14/14 23:41:47    Page 10 of 63

Detroit projects, including the DWSD project at issue in this case: the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan, under Amendments 2 and 3 to DWSD contract CS-1368. (*Id*.) After a lengthy jury trial in federal court, a jury returned a verdict of guilty against Kwame Kilpatrick, Mr. Ferguson and Bernard Kilpatrick, on various criminal charges. (Exhibit 2, Jury Verdict Forms.)

## II. MIDDD Federal Lawsuit

On July 18, 2011, Macomb Interceptor Drain Drainage District ("MIDDD") filed a lawsuit in the United States District Court for the Eastern District of Michigan against Kwame Kilpatrick, Bobby Ferguson, Victor Mercado, and various other DWSD contractors and sub-contractors, captioned *Macomb Interceptor Drain Drainage District v. Kilpatrick et. al.*, Case No. 2:11-cv-13101 (the "MIDDD Federal Case"). (Exhibit 3, MIDDD Federal Case Complaint.) In the MIDDD Federal Case, MIDDD asserted various claims for civil RICO, antitrust violations, breach of contract, fraud, and other tort claims against the Defendants relating to Contract No. CS-1368. (*Id*.) The case was assigned to Judge Robert Cleland. (*Id*.) After numerous of the contractor/vendor defendants in that case moved to dismiss MIDDD's tort claims against them on the basis that MIDDD did not have standing to assert them, the City, through DWSD, moved to intervene as a plaintiff in that case, asserting that the tort claims belonged to the

City. (Exhibit 4, Docket Sheet from MIDDD Federal Case; Exhibit 5, DWSD Motion to Intervene.) On May 7, 2012, Judge Cleland issued an Opinion and Order granting the City leave to intervene, but only as to the claims related to CS-1368. (Exhibit 6.) On May 21, 2012, the City filed its Intervening Complaint. (Exhibit 7.)

In its Intervening Complaint, the City asserted that Kwame Kilpatrick, Bobby Ferguson, Victor Mercado, and others agreed to conceal – and were successful in fraudulently concealing – their unlawful activities from disclosure to the DWSD Board and other DWSD officials; the City, including the City Council; and the federal judiciary, including the long-tenured federal judge who presided over the City of Detroit Environmental Case. (*Id.*) The City further asserted that its first notice of the Kilpatrick criminal conspiracy was the filing by the federal government of the First Superseding Criminal Indictment on December 15, 2010. (*Id.* at ¶117.)

The issue as to which party owned the tort and federal statutory claims asserted by MIDDD was argued by the various parties in a July 25, 2012 hearing before Judge Cleland. (Exhibit 4.) On September 17, 2012, Judge Cleland issued a 30-page Opinion and Order ruling that under the plain language of the September 2, 2010 Acquisition Agreement between the City of Detroit, MIDDD, and Macomb County ("Acquisition Agreement"), the City, not MIDDD, had exclusive

standing to pursue the tort and federal statutory claims, (the "Cleland Opinion") (Exhibit 8, Cleland Opinion.) Although MIDDD argued that it was assigned all tort and federal statutory claims pursuant to Section 2.4 of the Acquisition Agreement, Judge Cleland disagreed, ruling:

> Macomb Interceptor's argument that the use of "all of its rights" in the assignment clause constituted an absolute assignment of any and all rights the City of Detroit had must be rejected . . . The inclusion of "rights under contracts, warranties and guarantees" in section 2.4 unambiguously reveals the intent of the contracting parties to assign only contractually-created rights. . . . Macomb Interceptor's reliance on extraneous evidence is unavailing in support of its argument that section 2.4 was an absolute assignment of all claims, known or unknown at the time of contracting, related to the 15 Mile Interceptor Repair Project. Where contractual provisions are unambiguous, as sections 2.4 and 2.9(b)(8) are, extrinsic evidence to assist in interpretation of the provisions is not permitted. . . . Accordingly, section 2.4's unambiguous language expresses an intent to transfer only the City of Detroit's "rights under all contracts, warranties and guarantees" and does not operate as a transfer or assignment of claims arising out of state tort law or federal statutory law.
>
> *       *       *
>
> Furthermore, the proffered affidavit of an attorney [R. Craig Hupp] who represented Macomb Interceptor during the negotiation of the Acquisition Agreement is not only inadmissible as extrinsic evidence of the parties' intent, but it is also speculative.

(*Id.* at 10-15.)

## III.   MIDDD's State Court Lawsuit

A few weeks prior to the City's Chapter 9 bankruptcy filing, MIDDD filed a complaint against the City in Macomb County Circuit Court (the "MIDDD Complaint"). (MIDDD Complaint, Dkt. 4954-2.) The MIDDD Complaint contained four counts: (I) Fraud, Fraud in the Inducement, and Silent Fraud; (II)

Innocent Misrepresentation; (III) Breach of Contract; and (IV) Quantum Meruit/Unjust Enrichment. (*Id.*) Attached to the MIDDD Complaint as Exhibits were the Acquisition Agreement, Amendment No. 2 to Contract No. CS-1368, the Acquisition Agreement Bill of Sale, the Affidavit of R. Craig Hupp, and the jury verdicts from the criminal trial of Kwame Kilpatrick and Bobby Ferguson. (*Id.*) The relief requested in the MIDDD Complaint included a request for reformation and/or rescission of the Acquisition Agreement, and an award of damages in an amount in excess of $26 million. (*Id.*) Prior to the City filing a responsive pleading, the matter was stayed by this Court.

## IV.    MIDDD's Claim in Bankruptcy

On or around May 5, 2014, MIDDD filed Proof of Claim No. 3683. As "proof" of its claims and damages in the amount of $26,000,000 it attached the MIDDD Complaint and its attachments, with no other explanation as to why its claims are not contingent (Dkt. 4954, Exhibit A). The City filed an Objection to MIDDD's Proof of Claim (Dkt. 4954), asserting that this claim amounted to no more than litigation that has yet to be tested, let alone resolved. The City argued that MIDDD simply has no claim to assert because it does not have a right to payment for the asserted liability as there is no proof of liability in the active lawsuit. (*Id.*)

## V.    MIDDD's Rule 3018(a) Motion

MIDDD has now filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of their claim for purposes of voting on the City's plan of adjustment. (Dkt. 5155).   In its motion, MIDDD argued that the facts demonstrate that the City knew or should have known that charges related to the 15 Mile Road Repair proejct costs were excessive and intentionally concealed and misrepresented these facts.  Further, it argued that res judicata based upon Judge Cleland's prior opinion is not a valid defense.

The City and the Retiree Committee filed Objections to the MIDDD's 3018(a) Motion (Dkts. 5312 and 5315, respectively).  In the City's Objection, it argued that as MIDDD's only support for its Proof of Claim is an untested Complaint containing unproven damage calculations; its claim is entirely contingent and speculative and should be given no value. (Dkt. 5312).  The City further argued that MIDDD has not carried its burden in any of its pleadings to demonstrate that the City would be held liable to MIDDD at all, let alone for $26 million.  (*Id.*)  The City finally argued that *res judicata* applied to this claim and to many of MIDDD's causes of action.   MIDDD filed a reply brief in support of its Rule 3018(a) Motion (Dkt. 5498).

## VI.    Discovery on the Rule 3018 Motion

On June 25, 2014, after a hearing regarding MIDDD's Rule 3018 motion,

the Court issued a minute entry permitting limited discovery and briefing before the Court's July 17, 2014 hearing on MIDDD's Rule 3018 motion. (Exhibit 9, June 25, 2014 Minute Entry.) Since June 25, 2014, MIDDD and the City have exchanged written discovery requests and documents. MIDDD took depositions of the following witnesses: Ramesh Shukla, Darryl Latimer, Bart Foster, Marc Jacobs, and Robert Walter. The City took depositions of the following witnesses: Lyle Winn, Anthony Marrocco, William Misterovich and R. Craig Hupp. (Exhibit 10, Marrocco Tr.; Exhibit 11, Winn Tr.; Exhibit 12, Shukla Tr.)

In support of the present Brief, the City incorporates herein and attaches the Affidavits or Declarations of Mark Foster, Robert Walter, Darryl Latimer and Mark Jacobs. (Exhibit 13, Foster Aff.; Exhibit 14, Walter Aff.; Exhibit 15, Latimer Aff.; Exhibit 16, Jacobs Decl.)

## STATEMENT OF FACTS

### I.    Background on Romeo Arm Interceptor

The Romeo Arm Interceptor that is the subject of this dispute is part of the Macomb Interceptor System and runs along Garfield Road from Clinton River to 15 Mile Road, in Sterling Heights, Michigan, and provides sewerage service to Macomb County residents. (Exhibit 17, Brief of the City of Detroit.) During the period of time that DWSD owned and operated the Interceptor (late 1960's to September 2010), sewer rates for Macomb County and the Clinton Oakland

District were designed to recover the "cash basis" revenue requirements associated with it so that debt service and operating costs associated with those facilities were "passed through" to the users.  (Exhibit 13, Foster Affid., ¶5.)

## II.    CS-1368 Sinkhole Repair

In the early morning hours of Sunday, August 22, 2004, a major collapse and sinkhole began to form along 15 Mile Road, in Sterling Heights, County of Macomb, Michigan.  (Exhibit 17; Exhibit 16, Jacobs Dec., ¶4; Exhibit 15, Latimer Affid., ¶4, Exhibit 14, Walter Affid., ¶4.)   It was quickly determined that the sinkhole was caused by damage to the Romeo Arm, located beneath 15 Mile Road. (Exhibit 17.)   Within hours, the sinkhole expanded to a depth of 30 feet and extended a distance of approximately 245 feet in east-west direction along 15 Mile Road, necessitating immediate and emergency repairs.  (*Id.*)  (Exhibit 16, Jacobs Dec., ¶4; Exhibit 15, Latimer Affid., ¶4.)  DWSD acted quickly to stabilize the sinkhole and began repair and reconstruction.  (Exhibit 17; Exhibit 16, Jacobs Dec., ¶4; Exhibit 15, Latimer Affid., ¶4.)

DWSD immediately sought to obtain a repair estimate to complete the repairs.   Inland Waters Pollution Control, Inc. ("Inland"), a City contractor, provided the City with an initial estimate of $35 million.   (MIDDD Complaint, ¶34.)  Upon receiving that estimate, DWSD agreed to have Inland serve as general contractor for the Project.   On September 28, 2004, Kwame Kilpatrick issued

Special Administrator Order Number 2004-5, authorizing Victor Mercado to enter into an emergency amendment (Amendment 2) to CS-1368 increasing the contract by $35 million and increasing the total amount of the contract to $95 Million ("CS-1368-2"). (Exhibit 15, Latimer Affid., ¶13).   On or about June 16, 2005, again, pursuant to a Special Administrator Order issued by Kwame Kilpatrick, Amendment No. 3 was added to CS-1368-3, which increased the amount of CS-1368 by another $23 million, increasing the total amount of the contract up to $118 million. (Exhibit 15, Latimer Affid., ¶13)   The two amendments (Nos. 2 and 3) in the amounts of $35 million and 23 million, respectively, set the cost of the 15 Mile Road Repair Project at $58 million (hereinafter referred to as "the Project"). (MIDDD Complaint, ¶34; Exhibit 15, Latimer Affid., ¶14)[2]   Between August 23, 2004 and March 14, 2005, DWSD designed, contracted for, implemented and completed the full reconstruction of the Romeo Arm.  (MIDDD Complaint, ¶34.)

---

[2] The original CS 1368 awarded to Inland Waters covered a variety of projects and the original contract plus amendments 1, 4 and 5 were "as needed" contracts pertaining to only sewer lining tasks and were priced on a unit pricing system. (Exhibit 15, Latimer Affid., ¶13.)  These amendments did not cover the Project. (Exhibit 15, Latimer Affid., ¶13.)  Amendments 2 and 3 to CS 1368 covered the cost of the Project and were "cost plus fees" contracts that were submitted because of the change in type of work and the emergency nature of the same.  The unit pricing model simply did not apply to these amendments.  (Exhibit 15, Latimer Affid., ¶14.)

## III. The Global Settlement Agreement Entered Into Between the City and MIDDD

The repairs for the Project soon became a hotly contested issue between Macomb County, Oakland County, and the City. In 1977, Judge John Feikens presided over the landmark case, *United States v. City of Detroit, et al.*, Case No. 77-71100, which required lengthy federal oversight over the DWSD. (MIDDD Complaint, ¶7.) In 2005, after DWSD determined that the cost of the repairs on the Project would be paid for through rate increases charged to Macomb County, Macomb County filed a claim in the 1977 case and sought an injunction to enjoin DWSD from collecting the cost of the repairs to the Romeo Arm of the Macomb interceptor system. (Exhibit 18, Macomb County's Motion for Preliminary Injunction.) DWSD defended its right to charge the cost of the project to Macomb County. Judge Feikins ultimately denied Macomb County's request to alter rate allocations for the costs of the Project. *See United States of America v. City of Detroit*, 483 F. Supp. 2d. 565 (2007). After the repairs, the parties determined that the best approach to resolve and avoid future disputes was to transfer ownership of the system to two new entities. (Exhibit 13, Foster Affid., ¶6.)

On May 12, 2009, the City, DWSD, Macomb County, Oakland County, and Wayne County agreed to resolve **all outstanding disputes** pending at the time, including who would pay the cost of the Project, under *United States v. City of Detroit, et al.*, Case No. 77-71100, by entering into a settlement agreement (the

"Global Settlement Agreement"). (Exhibit 19, Global Settlement Agreement; Exhibit 10, Marrocco Tr., pp. 16-17.) The Global Settlement Agreement was filed with the court on May 18, 2009. (Exhibit 19.) One of the purposes of the Global Settlement Agreement was to resolve all disputes regarding repair costs related to the collapse of the Macomb Interceptor. (*Id.* p. 1; Exhibit 10, Marrocco Tr. at 17.) In furtherance of this purpose, the Global Settlement Agreement provided as follows:

> The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000. These adjustments shall be implemented as described in the Implementation Outline attached to this Agreement as Exhibit B.

(Exhibit 19, §B.)

> The Global Settlement Agreement further provided as follows:

> As described in the Letter of Intent attached hereto as Exhibit D, the City intends to transfer ownership of the Interceptors from DWSD to the Interceptor Transferees. The closing contemplated by Exhibit D shall fully resolve all claims in the Action regarding the Interceptors, including but not limited to those regarding the condition and or need for repair of the Interceptors, as well as such other matters as may be stated in Exhibit D.

(*Id.*, pp. 3-4) Exhibit C to the Global Settlement Agreement indicated that Macomb County's pending Motion for Reconsideration at that time, which challenged the cost of the repairs for the Project, was resolved. (*Id.*)

## IV. Creation of MIDDD and OMIDDD

The Macomb Interceptor and related appurtenances were some of the only sewer assets owned by the City that were outside of the City's border. (Exhibit 16, Jacobs Dec., ¶5; Exhibit 15, Latimer Affid., ¶7; Exhibit 14, Walter Affid., ¶5.) The Macomb Interceptor was also the only central trunk line which brought all sewer flow from Macomb County into the DWSD system. (Exhibit 16, Jacobs Dec., ¶5; Exhibit 14, Walter Affid., ¶5.) Both Oakland and Macomb counties had a variety of disputes with DWSD and vice versa, which were ultimately resolved in the Global Settlement. (Exhibit 16, Jacobs Dec., ¶5; Exhibit 14, Walter Affid., ¶5.) The Global Settlement was intended to settle all outstanding disputes between DWSD, Oakland County, and Macomb County, and resulted in the creation of MIDDD and the Oakland Macomb Interceptor Drain Drainage District ("OMIDDD") with the express intent of finalizing the sale of certain DWSD assets to each entity respectively. (Exhibit 16, Jacobs Dec., ¶¶5-9; Exhibit 14, Walter Affid., ¶¶5-9.) DWSD, OMIDDD and MIDDD then negotiated two deals transferring the appropriate assets to each new entity. (Exhibit 13, Foster Affid., ¶7.)

## V. The Macomb Acquisition Agreement

On September 2, 2010, after years of negotiation and approval by the DWSD Water Board and Detroit City Counsel, Macomb County, MIDDD, and the

City entered into an Acquisition Agreement through which the City conveyed to MIDDD "the Macomb System" for a purchase price that was ultimately calculated as of June 30, 2010, as $89,996,704. (Exhibit 20, Acquisition Agreement, Schedule 3.8; Exhibit 15, Latimer Affid. ¶8; Exhibit 13, Foster Affid. ¶¶4, 5, 7, 13.) At the time the Acquisition Agreement was executed, neither former Mayor Kilpatrick nor former DWSD Director Mercado were employed with the City. (Exhibit 21, Fourth Superseding Indictment.)

The underlying premise of the Acquisition Agreement was that MIDDD would purchase the Macomb-only portions of the sewer system by paying the outstanding pro-rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to certain facilities ("System Debt"), less various amounts negotiated by the parties. (Exhibit 15, Latimer Affid. ¶9; Exhibit 16, Jacobs Dec. ¶9). This agreement was first informally reached between Director of DWSD Victor Mercado and Macomb County Public Works Commissioner Anthony Marrocco around 2006. (Exhibit 16, Jacobs Dec. ¶9; Exhibit 13, Foster Affid. ¶7.)

The final agreement thus called for creating Schedule 3.8, which outlined a purchase price based on the concept of making the City whole for its investment in the system, including recovery of all outstanding debt remaining on the system. In essence, the agreement called for: (a) determining the book value (original cost) of

all MIDDD facilities including cost of additional projects and repairs since the system's construction ("Original Investment"); (b) determining the total value of principal payments that had been included in determining rates charged to applicable MIDDD customers through FY 2009-2010; and (c) deducting (b) from (a) to determine the "System Debt" envisioned by the agreement. (Exhibit 13, Foster Affid., ¶8.)

The Acquisition Agreement was an adaptation of a previous agreement that was negotiated by the parties over a significant amount of time. (Jacobs Dec. ¶10; Walter Affid., ¶10.) The primary changes to the Acquisition Agreement were in Schedule 3.8. (Exhibit 16, Jacobs Dec. ¶10; Exhibit 14, Walter Affid., ¶10.) Schedule 3.8 was also negotiated over a lengthy period of time through arms-length negotiations. (Exhibit 16, Jacobs Dec. ¶10; Exhibit 14, Walter Affid., ¶10.) At the time of the agreement between Director Mercado and Commissioner Marrocco, DWSD estimated that the Macomb System Debt would be over $116 million by the time the sale would conclude. (Exhibit 16, Jacobs Dec. ¶11; Exhibit 13, Foster Affid. ¶7; Exhibit 14, Walter Affid., ¶11.)

The assets transferred to MIDDD had initially cost Detroit $231,847,508. (Exhibit 14, Foster Affid., ¶¶9, 17). Macomb was given credit of $112,355,536 for principal payments for 2009 and $3,291,159 for principal payments made in

2010. (Exhibit 13, Foster Affid., ¶¶10, 17). At that time, therefore, the outstanding System Debt was $116,200,813. (*Id.*, Foster Affid., ¶¶11, 17)

However, Macomb did not pay $116,200,813 for the assets. The Original Investment related to CS 1368-2 and CS-1368-3 was, for example, $60,829,019. (*Id.*, Foster Affid., ¶12.) As part of the negotiations, DWSD agreed to subtract $7,367,167 for "internal costs" and $1,786,947 for interest expense and related adjustments. (*Id.*, Foster Affid., ¶18.) The "Adjusted System Debt" was $107,046,704. (*Id.*, Foster Affid. ¶18.) Finally, Macomb insisted on additional deductions of $17,050,000 as part of the negotiations in the Global Settlement. (*Id.*, Foster Affid., ¶19.) Thus, the final Purchase Price of $89,996,704 was significantly less than $231,000,000 cost paid by DWSD for the assets, or the $116,000,000 outstanding System Debt. (*Id.*, Foster Affid. ¶19; Exhibit 16, Jacobs Dec. ¶11; Exhibit 13, Foster Affid. ¶13.) Of note, is that only $54,000,000 of costs related to CS-1368-2 and CS-1368-3 were part of Schedule 3.8 to the Acquisition Agreement. (Exhibit 20, referred to as "2004 Repairs.")

At no time prior to the signing of the Macomb Acquisition Agreement were any representations ever made that the costs associated with the Project or any other item in Schedule 3.8 were fair and reasonable. (Exhibit 16, Jacobs Dec. ¶12; Exhibit 15, Latimer Affid. ¶10; Exhibit 14, Walter Affid. ¶ 12; Exhibit 13, Foster Affid. ¶¶15-16). MIDDD never claimed that the costs were fraudulently excessive

prior to the Acquisition Agreement nor ever questioned its cost or asked for a reduction beyond normal negotiations (Exhibit 15, Latimer Affid., ¶10) and the City is unaware of excessive charges for 2004-2005 Project costs. (*Id.*, Latimer Affid., ¶14). The first time DWSD's counsel heard that MIDDD was suggesting that any portion of the Project Costs reflected in Schedule 3.8 of the Acquisition Agreement was inaccurate, fraudulent, excessive, or question it in any way was immediately prior MIDDD filing its complaint tin the MIDDD Federal Case. (Exhibit 16, Jacobs Dec., ¶12; Exhibit 14, Walter Affid., ¶13). MIDDD had the ability, over many years, to undertake due diligence to satisfy itself regarding the underlying transaction. (Exhibit 16, Jacobs Dec., ¶14; Exhibit 14, Walter Affid., ¶13). Even assuming there were excessive charges, which the City denies, it is not assured that the Macomb Acquisition Agreement would have been ratified for a lesser amount, given the number of overall and specific concessions given to MIDDD during negotiation, which may not have been otherwise granted had DWSD known that MIDDD would challenge the validity of Project costs. (Exhibit 15, Latimer Affid. ¶15; Exhibit 14, Walter Affid. ¶16; Exhibit 13, Foster Affid., ¶20.)

The Acquisition Agreement also contained and incorporated a September 2, 2010 Settlement Agreement through which the City, Macomb County, and MIDDD agreed as follows:

Detroit and Macomb County waive and release any claims with regard to the following matters:

a.    The cost of all projects and contracts shown on Schedule 3.8 to the MID Agreement and the calculation of all credits, charges and adjustments set forth in that Schedule.

(Exhibit 22, September 2, 2010 Settlement Agreement.)   The purpose of this Settlement Agreement was to resolve and release all claims between the parties that related in any way whatsoever to the Macomb Interceptor, any items in the Acquisition Agreement, and/or any disputes between DWSD, Macomb County or MIDDD.  (Exhibit 15, Latimer Affid., ¶11; Exhibit 14, Walter Affid., ¶15.)

The Macomb Acquisition Agreement contained a merger and integration clause  (Exhibit 20, §12.5), which stated that this "Agreement constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous agreements and understandings between the Parties with respect to the subject matter hereof…")

Finally, the Acquisition Agreement contained a Bill of Sale, also dated September 2, 2010.  (Exhibit 23, Bill of Sale.)

## VI.    The Federal Investigation

The United States Attorney's Office and Federal Bureau of Investigations interviewed City employees prior to the First Superseding Indictment.  Some of these employees were also subpoenaed by a Grand Jury.  At no time until the date of the First Superseding Indictment in the *Kilpatrick* case was made public, was

the City aware that there were any claims that are or were reasonably expected to become the subject of litigation affecting the Macomb System, as defined in the Acquisition Agreement, or the transactions contemplated by the Acquisition Agreement. (Exhibit 15, Latimer Aff., ¶¶16-18; Exhibit 16, Jacobs Dec., ¶17; Exhibit 14, Walter Aff., ¶¶17-18).[3]

## ARGUMENT

### I.   Legal Standard for Rule 3018(a) Motion

As the moving party seeking temporary allowance of a contingent and unliquidated claim for voting purposes, MIDDD must carry its burden to establish its claim by a preponderance of the evidence. *See Armstrong v. Rushton (In re Armstrong)*, 292 B.R. 678, 686 (B.A.P. 10th Cir. 2003) ("Because a temporary allowance order only arises if there is an objection to a claim, we conclude that the burden of proof should be on the claimant to present sufficient evidence that it has a colorable claim capable of temporary evaluation."); *FRG, Inc.,* 121 B.R. at 456-57 ("[T]he burdens of proofs in the B. Rule 3018(a) estimation process is the same as in deciding objections to proofs of claim[.] . . . [Claimant] therefore ha[s] the

---

[3] There is no evidence that any of these interviews or testimony led anyone at DWSD or the City to believe that there were excessive or fraudulent charges related to CS-1368-2 or CS-1368-3. (Exhibit 15, Latimer Aff., ¶¶16-17; Exhibit 14, Walter Aff., ¶¶17-18.)  The thrust of the investigation seemed to be on the City Local Economic Development Department (LED), not DWSD. (Exhibit 15, Latimer Aff., ¶16.)

burden of proving the validity of all elements of his claims by a preponderance of the *truncated* evidence presented at the hearing.") (emphasis added); *see also* Russell, 2 Bankruptcy Evidence Manual, § 301:50, at 295 ("The burdens of proof in estimating a claim to temporarily allow it for the purposes of accepting or rejecting a plan are the same as in deciding objections to proofs of claim."). MIDDD has failed to meet its burden.

## II.    MIDDD's Bankruptcy Claim Is Barred Due To Release And Waiver

### A.    MIDDD's Bankruptcy Claim is Barred by the September 2, 2010 Settlement Agreement

The MIDDD Claim fails because MIDDD released its underlying causes of action pursuant to the September 2, 2010 Settlement Agreement, which was a part of the Acquisition Agreement.  In the September 2, 2010 Settlement Agreement, the City, Macomb County, and MIDDD agreed as follows:

> Detroit and Macomb County waive and release any claims with regard to the following matters:
>
> a.    The cost of all projects and contracts shown on Schedule 3.8 to the MID Agreement and the calculation of all credits, charges and adjustments set forth in   that Schedule.

(Exhibit 22.)   Schedule 3.8 to the Acquisition Agreement includes costs incurred for the 15 Mile Road Project under Contract No. CS-1368.  (*Id.*)  MIDDD's Claim is based on the allegation that the City misrepresented the value of the charges for

the "Project,"[4] which the City passed on to MIDDD. (MIDDD Complaint, ¶¶83-91, 93-97, 99-108, 110-115.) CS-1368 was the contract under which the Project repairs were made. (MIDDD Complaint, ¶31.)

Michigan law favors settlements. *Vertex Dev. LLC v. Fifth Third Bank,* No. 308822, 2013 WL 85904, at *2 (Mich. App. Jan. 8, 2013). A presumption should follow that when parties settle they intend to put to an end to their disagreements, and if they wish to preserve disputes for the future, they will do so explicitly. The September 2, 2010 Settlement Agreement states that it applies to "[t]he cost of all projects and contracts shown on Schedule 3.8 to the MID Agreement and the calculation of all credits, charges and adjustments set forth in that Schedule…" (Exhibit 20, emphasis added.) "[T]here is no broader classification than the word all." *Skotak v. Vic Tanny Int'l, Inc*., 203 Mich. App. 616, 619 (1994). Here, MIDDD's purported claim for passed on overcharges is covered by the broad language of the release, and therefore, MIDDD's claims are barred.

### B. MIDDD's Bankruptcy Claim is Barred By the Global Settlement Agreement

The Global Settlement Agreement was intended to "resolve all currently outstanding disputes pending under *U.S. v. City of Detroit, et al*. (Case No. 77-

---

[4] The "Project" is defined in the MIDDD Complaint as "[t]he stabilization and repair of the Macomb Interceptor sewer at 15 Mile Road in the City of Sterling Heights…" (MIDDD Complaint, ¶30.) Macomb acknowledges that the Project was conducted pursuant to Contract No. CS-1368. (MIDDD Complaint, ¶31.)

71100) . . . before the U.S. District Court for the Eastern District of Michigan . . .

including, but not limited to:

> (ii) All Disputes related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes (the "2004 Collapse Claims");

> (iii) All Disputes related to the interest rate charged to Macomb related to debt service associated with the cost of repairs of the 2004 Collapse, with subsequent repairs to the Macomb Interceptors and with the construction of the Garfield Interceptor (the "Interceptor Interest Rate Claims"); [and]

> (iv) All Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement, including any disputes and claims between the Parties relating to the associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and all property otherwise described in Exhibit D (collectively, the "Interceptors")."

(Exhibit 19, Global Settlement Agreement, ¶1.A.(ii)-(iv).) Paragraph 2.B. of the

2009 Settlement Agreement discharges certain of the above claims:

> The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate Claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000.

(*Id.*, ¶2.B.) Moreover, paragraph 3 of the Settlement Agreement, entitled

Interceptor Transfer, confirms that a "closing contemplated by Exhibit D [Letter of

Intent whereby the City would transfer the Macomb System to MIDDD] shall fully

resolve all claims in the Action regarding the Interceptors, including but not

limited to those regarding the condition and or need for repair of the Interceptors…" (*Id.*, ¶ 3.)

Paragraph 9 of the 2009 Settlement Agreement specifies that "[t]he rights and benefits under the [Acquisition Agreement] shall inure to the benefit of and be binding upon the respective Parties hereto, their agents, successors and assigns." (*Id.*, ¶9.) Therefore, the agreement binds both Macomb and its successor entity MIDDD (created to take ownership of the Macomb System).

## III. MIDDD's Bankruptcy Claim Is Barred by *Res Judicata* and Collateral Estoppel

### A. MIDDD's Bankruptcy Claim Is Barred by *Res Judicata*

"[R]es judicata bars the same parties from relitigating issues that either were actually litigated or that could have been raised in an earlier action." *Marks v. Bank of America*, No. 13-12060, 2014 WL 700478, at *3 (E.D. Mich. Feb. 24, 2014) (citing *J.Z.G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 214 (6th Cir. 1996)). *Res judicata* extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *J.Z.G. Res., Inc.*, 84 F.3d at 215 (citing Restatement (Second) Judgments § 24 (1982)). The Cleland Opinion bars the MIDDD Claim. Pertinent to the identity of the causes of action, Judge Cleland stated:

The claims arise from Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan, (hereafter, the "15 Mile Interceptor Repair Project" or "Project"). Macomb Interceptor avers that Defendant Kwame Kilpatrick, then the Mayor of the City of Detroit, along with various City of Detroit officials conspired with the principal contractor overseeing the 15 Mile Interceptor Repair Project, Defendant Inland Waters Pollution Control, Inc., and numerous subcontractors to "overcharge the Detroit Water and Sewerage Department . . . for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road." (Pl.'s Compl. ¶ 5, Dkt. #1.) Macomb Interceptor further alleges that the misconduct was part of a widespread corruption scheme during Defendant Kwame Kilpatrick's tenure as Mayor of Detroit.

(Exhibit 8, at 2.) Judge Cleland further stated:

Macomb Interceptor argues that the following two alleged injuries maintain its federal claims: (1) paying an inflated price for the Macomb System as a result of 15 Mile Interceptor Repair Project's cost overruns caused by Concurring Defendants' actions and (2) paying higher system usage charges during the time between the 15 Mile Interceptor Repair Project and the execution of the Acquisition Agreement.

(*Id.*, at 16.) Thus, it is clear that same transactions and the same damages were at issue in the MIDDD case. Indeed, MIDDD asserted standing in the MIDDD case by virtue of an alleged assignment of rights under the Acquisition Agreement – the very same contract MIDDD relies to support its contract claim in the MIDDD Claim. (*See id.*, at 6-16; MIDDD Complaint, ¶¶ 98-108.)

The identities of the parties are the same as well. While the City was an intervening plaintiff in the MIDDD case, undoubtedly, the City was adverse to MIDDD in that case. As the Cleland Opinion makes clear, the City argued that

MIDDD lacked legal standing to assert tort and federal statutory claims pertaining to the Macomb Interceptor System. (Exhibit 8, at 3-4.) The City argued in support of the contractor defendants' motion for summary judgment, in opposition to MIDDD's claim, which motion was granted. (*Id.* at 4.) What matters for *res judicata* purposes is if the City and MIDDD were adverse. *Edelman v. McMullin Orchards*, 32 B.R. 783, 785 (Bankr. W.D. Mich. 1983) ("It is clear that res judicata can be applied to bind co-parties," where they are adverse.). Indeed, the City and MIDDD were adverse.

Moreover, the Cleland Opinion was a final resolution of the issue of MIDDD's right and standing to bring tort and federal statutory claims relating to the alleged overcharges. MIDDD's claims, which it is asserting in this action, could have and should have been raised in the MIDDD Case. MIDDD did not do so.

**B.     MIDDD's Bankruptcy Claim Is Barred By Issue Preclusion**

Collateral estoppel – *i.e.*, issue preclusion – also bars MIDDD from relitigating any issue that another court has actually and necessarily determined against MIDDD when issuing a final decision. *See Montana v. United States*, 440 U.S. 147, 153 (1979); *Central Transp., Inc. v. Four Phase Sys.*, 936 F.2d 256, 260 (6th Cir. 1991). "[S]ummary judgment is recognized as a final judgment for the purpose of issue preclusion." *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253

F.3d 900, 910 (6th Cir. 2001) (citing *Mayer v. Distel Tool & Mach. Co.*, 556 F.2d 798 (6th Cir. 1977)). An order granting summary judgment is a final decision under the preclusion doctrines. *See* 18A Charles Alan Wright *et al.*, *Federal Prac. & Proc. Juris.* § 4444 (2d ed. 2014). The same is true under Michigan law. *See Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 905 (6th Cir. 2002) ("[I]t is clear Michigan law permits preclusion of issues decided by a judge as part of a summary disposition."); *Abdulshafi v. General Mot. Corp.*, Case No. 242061, 2003 WL 22961709, at *1 (Mich. App. 2003) ("Summary dispositions constitute determinations on the merits."). Therefore, it is clear that the Cleland Opinion is final and binding on MIDDD

On September 17, 2012, Judge Cleland held that based on the unambiguous contractual language in the Acquisition Agreement, the City owned all tort claims relating to the 15 Mile Road Sewer Project. (Exhibit 8.) Judge Cleland ruled, among other things, that the unambiguous language of the Acquisition Agreement barred MIDDD from pursuing tort and statutory claims related to the Macomb Interceptor System. (*Id.* at 10-15.) MIDDD is now estopped from protesting any of the findings of Judge Cleland in his September 17, 2012 Opinion and Order in this proceeding.

**IV.    MIDDD's Bankruptcy Claim Fails Because the Underlying Breach of Contract Claim Fails as a Matter of Law**

**A.    MIDDD's Complaint Does Not Establish a Breach of Any Provision of the Acquisition Agreement**

In Count III of the MIDDD Complaint, MIDDD asserts a general claim for breach of the Acquisition Agreement. Unfortunately, it is difficult to argue against MIDDD's vague and scattered claims without reviewing each of the eleven contract paragraphs on which the alleged breaches are predicated.

First, MIDDD alleges that the City breached Section 2.4 of the Acquisition Agreement, which states that "Detroit shall assign to the [MIDDD] all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System." (Complaint, ¶100(a).) MIDDD makes a similar allegation regarding Section 2.9(b)(8) of the Acquisition Agreement, which states that the City is to provide "[a]n assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System…." (Complaint, ¶100(d).)

In the MIDDD Complaint, MIDDD fails to allege any actions by the City in breach of Sections 2.4 and 2.9(b)(8) of the Acquisition Agreement. It is presumed, however, MIDDD will claim these provisions of the Acquisition Agreement were breached (1) when the City did not transfer tort and federal statutory claims to MIDDD in connection with the Acquisition Agreement; or (2)

when the City intervened in the MIDDD Federal Case to assert its rights to the tort and federal statutory claims.  As to the first point, the affidavit of R. Craig Hupp, relied upon by MIDDD, indicates that the City's right to assert tort and federal statutory claims was not considered or discussed during negotiations of the Acquisition Agreement.  (Dkt. 4954-2, Pg. ID 88, Affidavit of R. Craig Hupp, ¶13.)  As to the second point, Judge Cleland has ruled as follows:

> The court agrees with Concurring Defendants and the City of Detroit. The incorporation of the clause "under all contracts, warranties and guarantees" expressly limits the preceding assignment of "all of its rights." Accordingly, the City of Detroit assigned to Macomb Interceptor the City's rights to contracts related to the 15 Mile Interceptor Repair Project, including the right to recover for damages caused by breaches of those contracts, but not the City's rights to then-unknown causes of action sounding in state tort law or federal statutory law.

(Exhibit 8, at 11.)

Second, MIDDD alleges that the City breached Section 2.6(b) of the Acquisition Agreement, which states that "Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities."  (Complaint, ¶100(b).)  "Assumed Liabilities" is specifically defined as "any and all Liabilities excluding: (i) the retained Liabilities, and (ii) Claims by and among any or all of Detroit, the District, Macomb County or Oakland County and the [MIDDD]."  (Exhibit 20, §1.3.)  There is nothing in this paragraph that sets forth <u>any</u> duty owed by the City, rather, it defines the liabilities that <u>MIDDD assumed</u>.  Thus, MIDDD has

failed to allege or prove a breach of Section 2.6(b) by the City, especially since only MIDDD could breach this provision.

Third, MIDDD alleges that the City breached Section 2.9(b)(4) of the Acquisition Agreement, which states that the City must deliver to MIDDD "[a]n executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to [MIDDD] and its counsel and executed by Detroit." (Complaint, ¶100(c).) Once again, a Bill of Sale was executed by Detroit and is attached to the Acquisition Agreement as Exhibit B, which identified and transferred certain intangible personal property related to the Interceptor. (Exhibit 23.)

Fourth, MIDDD alleges that the City breached Paragraph 2.9(b)(9) of the Macomb Acquisition Agreement, which states that the City will deliver:

> [a] certificate executed by Detroit as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing.

(Complaint, ¶¶100(e)-(f).) MIDDD does not allege that the certificate was not provided, and does not state what provision, if any, of the certificate was breached by the City. (*See* Compl.)

Fifth, MIDDD alleges that the City breached Section 3.3 of the Acquisition Agreement, which states that the:

execution, delivery and performance by Detroit of this Agreement, the compliance by Detroit with any of the provisions hereof, and the consummation by Detroit of the transactions contemplated hereby…(i) do not violate any provision of the City Charter…ordinances...bond covenants (ii) do not require the …authorization of any Person other than the Board of Water Commissioners and the Detroit City Council; (iii) do not conflict with or violate and Applicable Law or any order, judgment, award or decree…and (iv) do not conflict with…any right…or the creation of any encumbrance…of any amounts owing under any indenture, mortgage, debt of trust, lease or other agreement to which Detroit is a party….

(Complaint, ¶100(h).)   MIDDD has failed to allege any facts suggesting a violation of the City Charter, ordinances, or any other applicable law in the "execution, delivery and performance by Detroit" of the Agreement.   This provision is solely a promise that the execution, delivery, and performance of the Acquisition Agreement, by conveying the Macomb Interceptor to MIDDD, does not conflict with any law.

Sixth, MIDDD alleges that the City breached Section 3.7 of the Acquisition Agreement, which provides that, except as listed in the Agreement:

there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened   against or affecting Detroit before any Governmental Entity in which there is a    reasonable possibility of an adverse decision which could have a material adverse  effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement.

(MIDDD Complaint, ¶100(g).)   MIDDD has failed to allege or identify an "action, suit or proceeding threatened against or effecting Detroit" pending at the time the Acquisition Agreement was signed, in which there was "a reasonable

possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under the Agreement or which . . . questions the validity of the Agreement." At best, the only action, suit, or proceeding which MIDDD may claim was not disclosed by Detroit was the Kilpatrick criminal case. The City asserted that its first notice of the Kilpatrick criminal case, however, came with the filing of the First Superseding Criminal Indictment on December 15, 2010.

Seventh, MIDDD alleges that the City breached Section 3.8 ("Disclosure of System Debt") which provides that Schedule 3.8 of the Acquisition Agreement "sets forth all System Debt…." (Complaint, ¶100(h).) Clearly, Schedule 3.8 of the Acquisition Agreement sets forth the agreed upon "System Debt." That MIDDD now disagrees with the amount of the System Debt, although it did not do so at the time Schedule 3.8 was agreed upon by the parties, does not afford a basis for a breach of that provision. Schedule 3.8 merely lays out, properly, what the system debt was as of June 30, 2013.

Eighth, MIDDD alleges that the City breached Section 5.3 of the Acquisition Agreement, which states:

> Detroit shall promptly inform the Macomb County and [MIDDD] in writing of any Claims of which Detroit is or becomes aware of that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

(Complaint, ¶100(i).) (emphasis added). The plain language of Section 1.6 makes clear that a "Claim" that must be disclosed by the City is only an investigation or litigation to which Detroit, Macomb County, or MIDDD "may become legally and/or contractually obligated to defend against . . . which are related in any way to the Macomb System." (Exhibit 20, §1.6.) The Kilpatrick criminal case does not constitute a "Claim" because it did not involve any matter in which Detroit, Macomb County, or MIDDD could become legally or contractually obligated to defend against. In addition, it has already been established that the City did not get notice of the Kilpatrick criminal case until the filing of the First Superseding Indictment on December 15, 2010.

Ninth, MIDDD alleges the City breached Section 5.4 which provides that the City shall inform Macomb County and MIDDD if the City:

> becomes aware that any representation or warranty made by Detroit in [the Acquisition Agreement] has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by [the Acquisition Agreement].

(Complaint, ¶100(j).) To the extent the filing of the First Superseding Indictment in the Kilpatrick criminal case forms the basis for MIDDD's claim for breach of Section 5.4, clearly no breach occurred on September 2, 2010 as the filing of the First Superseding Indictment became public knowledge on the date of its filing.

Finally, MIDDD alleges that the City breached Section 8.1 of the Acquisition Agreement, which merely states that the City's representations and warranties in the Acquisition Agreement were "true and correct." (Complaint, ¶100(k).) Again, MIDDD has not identified a single representation or warranty made in the Acquisition Agreement that was untrue.

Clearly, MIDDD's contract claim has no value and does not provide support for MIDDD's motion for temporary allowance.

## B. MIDDD Cannot Rely on Parol Evidence to Prove Its Breach of Contract Claim

It is expected that MIDDD will rely upon parol evidence to form the basis of its breach of contract claim. MIDDD does not claim the Acquisition Agreement is ambiguous. Parol evidence is not admissible to prove the terms of an unambiguous contract.

"Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574, 580 (1990). Behind "nearly every written instrument lies a parol agreement, merged therein." *Lee State Bank v.*

*McElheny,* 227 Mich. 322, 327 (1924).[5]  Only when a contract is ambiguous may

the court consider extrinsic evidence.  *See Klapp v. United Ins. Group Agency,*

*Inc.,* 468 Mich. 459, 469 (2003).

> Additionally, the Acquisition Agreement contains an integration clause:
>
> This Agreement constitutes the sole understanding of the parties hereto with
> respect to the matters provided for herein and supersedes any previous
> agreements and understandings between the Parties with respect to the
> subject matter hereof….

(Exhibit __, §12.5.)  An integration clause nullifies all prior and contemporaneous

agreements, understandings, and representations.  *Hamade v. Sunoco, Inc. (R &*

*M),* 271 Mich. App. 145, 171 (2006).  The purpose of an integration clause is to

prevent either party from relying on statements or representations made during

negotiations that were not included in the final agreement.  *Coal Resources, Inc. v.*

*Gulf & Western Indus., Inc.,* 756 F.2d 443, 447 (6th Cir. 1985); *see also, UAW–*

*GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 507 n.

14 (1998) ("The raison d'être of an integration clause is to prohibit consideration of

parol evidence by nullifying agreements not included in the written agreement.")

An explicit integration clause is conclusive evidence that an agreement is "the final

---

[5] "The practical justification for the rule lies in the stability that it gives to written
contracts; for otherwise either party might avoid his obligation by testifying that a
contemporaneous oral agreement released him from the duties that he had
simultaneously assumed in writing."  4 Williston, Contracts, § 631.

embodiment of [the parties'] understanding." *Id.*[6]

## V. MIDDD's Bankruptcy Claim Fails Because the Underlying Quasi-Contractual Claim Fails as a Matter of Law

MIDDD's claim for quantum meruit/unjust enrichment (Count IV) also fails as a matter of law. "A quasi-contractual theory of recovery is inapplicable when the parties are bound by an express contract." *Cloverdale Equip. Copmany v. Simon Aerials, Inc.*, 869 F.2d 934, 939 (6th Cir. 1989). "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract…" *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993). Here, the parties do not dispute the existence of a contract – the Acquisition Agreement – but instead disagree on its scope, terms, and effect. Therefore, MIDDD's quasi-contractual claims are meritless.

---

[6] MIDDD's allegations of fraud, fraud in the inducement, silent fraud and innocent misrepresentation do not change the fact that the integration clause is binding, and that MIDDD cannot rely on any statement made outside of the four corners of the Acquisition Agreement. In *UAW-GM Human Resource Center v. KSL Recreation Corp.*, *supra*, the court held that "the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *Id.* Here, as in *UAW-GM*, MIDDD made no allegations of fraud that would invalidate the contract or the merger clause itself. The written agreement is detailed and complete on its face, (*see* 3 Corbin, Contracts, § 57), and its words are unambiguous. Thus, the integration clause itself is not void for any reason.

## VI. MIDDD's Bankruptcy Claim Fails Because The Underlying Fraud Claims Fail as a Matter of Law

### A. MIDDD Fails to State Claims for Fraud Because It Has Failed to Plead Fraud with Particularity as Required by Federal Rule of Civil Procedure 9(b)

MIDDD asserts two fraud claims in the MIDDD Complaint: fraud/fraud in the inducement/silent fraud (Count I) and innocent misrepresentation (Count II). The Federal Rules provide heightened pleading requirements for claims of fraud, as have been alleged here. Fed. R. Civ. P. 9(b).

To meet the particularity requirements of Rule 9(b), under that heightened standard, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008). "A plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007). "[A]llegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993).

MIDDD has not alleged any specific misrepresentations by the City; and thus does not satisfy the "minimum" requirement in fraud cases that it "allege the time, place, and content of the alleged misrepresentation on which [it] relied." *Bledsoe*, 501 F.3d at 504. At best, MIDDD alleges that the City (without specifying who, what or when), made (1) misrepresentations with respect to whether "all" of Detroit's tangible and intangible rights, including the right to assert "any and all" claims regarding the Project were being acquired by Plaintiff, (2) that its public officials abided by all state, federal and local laws a regulations, and (3) that no claims existed regarding the Macomb system. (MIDDD Complaint, ¶¶83, 84, 94, 95.) MIDDD's threadbare, non-specific allegations are plainly insufficient to meet the particularity requirements of Rule 9(b). *See Kashat v. Paramount Bancorp, Inc.*, 2010 WL 538295 at *5 (E.D. Mich. Feb. 10, 2010) ("Plaintiff's argument that the misrepresentations must have been made around the time of closing is inadequate because this is insufficient information to permit Defendants to respond meaningfully to the allegations.").

If MIDDD chooses to seek leave to amend its complaint to assert properly plead fraud claims, the City will respond at that point. Under Rule 9(b)'s heightened pleading requirements, MIDDD's allegations as plead are simply insufficient to plead a fraud claim against the City.

**B.** **Alternatively, even if MIDDD Had Sufficiently Stated a Claim for Fraud, MIDDD's Fraud Claims Fail as a Matter of Law**

   **i.** * A Tort Claim cannot be based on a breach of contract*

 In Count I and II of the MIDDD Complaint, MIDDD pleads fraud, innocent misrepresentation and silent fraud. These are tort claims under Michigan law, and in order to plead a tort claim, MIDDD must allege that the claimed tort duty arose separate from the parties' contract. They have not, and cannot, do this.

 Misrepresentations relating to the performance of a contract do not give rise to an independent cause of action in tort. *Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc.,* 209 Mich. App 365, 373 (1995). A party may bring a tort claim (such as fraud) against another party with whom it has a contract only when it alleges the "violation of a legal duty *separate and distinct* from the contractual obligation." *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 466 (2004); *see also Hart v. Ludwig*, 347 Mich. 559, 567 (1956); *Rinaldo's Constr. Corp. v. Michigan Bell Telephone Co.*, 454 Mich. 65, 83 (1997) ("the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation"). Fraud must be <u>extraneous</u> to the contract in order to cause harm distinct from that caused by the breach of contract. The plaintiff must establish a "violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Constr Corp v. Mich. Bell Tel Co.,* 454 Mich. 65, 84; 559 NW2d 647 (1997). No cognizable cause of action in tort exists when the

- 38 -

13-53846-tjt  Doc 6015  Filed 07/14/14  Entered 07/14/14 23:41:47  Page 46 of 63

plaintiff fails to allege violation of an independent duty. *Appleway Equipment Leasing, Inc. v. River City Equipment Sales, Inc*., 2012 WL 6177067, at *2 (Mich.App. 2012) (in order to recover on a tort theory the fraud alleged must be extraneous to the alleged contract). Thus, "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz*, 470 Mich. at 466. The rule reflects the common sense notion that "it is no tort to breach a contract," *Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111, 117 (6th Cir. 1976).

Here, MIDDD's fraud claims are plainly not extraneous to, nor independent of, the Acquisition Agreement. The subject matter of the allegedly fraudulent statements—i.e., (1) misrepresentations with respect to whether "all" of the City's tangible and intangible rights, including the right to assert "any and all" claims regarding the Project were being acquired by Plaintiff, (2) that public officials abided by all state, federal and local laws a regulations, and (3) that no claims existed regarding the Macomb system — were addressed repeatedly and specifically in the Acquisition Agreement. (MIDDD Complaint, ¶¶83, 84, 94, 95); (Exhibit 20, §3.7, 3.8, 5.3, 5.4, 8.1.) Indeed, MIDDD even acknowledges it is own Complaint that the subject matter of its fraud claims are covered by the terms of the Acquisition Agreement: MIDDD re-pleads all of its fraud claims as breaches of the Acquisition Agreement. (MIDDD Complaint, ¶¶100-101.)

### ii. MIDDD's Fraud Claims Are Barred by Governmental Immunity

MIDDD's fraud claims are also barred by governmental immunity. In Michigan, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. L. § 691.1407(1). The City of Detroit is a "[g]overnmental agency," *see* Mich. Comp. L. § 691.1401(a),(d),(e), and "[g]overnmental functions" include the activity related to asset-sales here.

A "governmental function" includes any "activity that is expressly or impliedly mandated or authorized by . . . statute . . . or other law." MCL § 691.1401(b). There is no question that the City, through DWSD, was legally authorized to sell the property and assets sold to MIDDD.

Allegations of fraud do not take government conduct outside the statutory immunity. *Local Emergency Fin. Assistance Loan Bd. v. Blackwell*, 299 Mich. App. 727, 736, 832 N.W.2d 401, 405 (2013).[7] Instead, the Michigan governmental immunity statute bars claims – like MIDDD's – that fraud induced the plaintiff to enter a contract. *Id.* at 735 (plaintiff claimed that fraud about city's finances and

---

[7] "In assessing whether an activity is a governmental function, the focus is on the general activity, not the specific conduct giving rise to the tort claim." *Williams v. Wayne Cnty.*, Case No. 09-14328, 2011 WL 479959 (E.D. Mich. Feb. 4, 2011) (citing *Herman v. Detroit,* 261 Mich. App. 141, 680 N.W.2d 71, 75 (Mich. App. 2004)).

actual affairs caused him to agree to serve as emergency financial manager). The statute also bars claims for silent fraud. *See Northern Warehousing Inc. v. Michigan Dep't of Educ. (On Remand)*, Case No. 260598, 2006 WL 2419189, at *4 (Mich. App. Aug. 22, 2006). Indeed, governmental immunity bars fraud claims in general. *See, e.g.*, *Williams v. Wayne Cnty.*, Case No. 09-14328, 2011 WL 479959, at *7 (E.D. Mich. Feb. 4, 2011); *Thomas v. Detroit*, Case No. 06-10453, 2007 WL 674593, at *6 (E.D. Mich. Feb. 28, 2007); *Riachi v. Detroit*, Case No. 258940, 2006 WL 859416, at *1-*2 (Mich. App. April 4, 2006). In addition, "innocent misrepresentation claims sound in tort." *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 40 (2008). Therefore, because MIDDD's fraud claims are barred by governmental immunity, Counts I and II of the MIDDD Complaint would be dismissed.

### iii. MIDDD Cannot Prove A Prima Facie Claim of Fraud, Fraudulent-Inducement, or Innocent Misrepresentation

#### 1. MIDDD's Fraud Claims Fail

Even if MIDDD could somehow get around these arguments, MIDDD's fraud claims as presently plead are meritless because MIDDD cannot prove a prima facie claim of fraud, fraudulent-inducement or innocent misrepresentation. Under Michigan law, to state a claim for fraud, a plaintiff must prove the following elements: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that

it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 27 (Mich. App. 1998). MIDDD has not sufficiently pleaded these elements, let alone proven them.

First, MIDDD cannot establish the necessary element of reliance for any of fraud claims that are based upon pre-agreement statements because they expressly and affirmatively stated in the Acquisition Agreement that the *only* representations that were made by the City were those in the Acquisition Agreement and that there are no others. (Exhibit 20, Article III.) MIDDD confirmed that the Acquisition Agreement represented the entire understanding of the parties, and that Article III of the Agreement represented the only representations made by Detroit. That acknowledgment precludes MIDDD from establishing that it, in fact, relied upon any pre-contractual understandings as to the value of the property purchased by MIDDD. *See Federated Capital Servs. v. Dextours, Inc.*, 2002 WL 868273, *1 (Mich. App. 2002).

Second, even if MIDDD could establish that it, in fact, relied upon the allegedly fraudulent pre-Agreement statements, it could not establish that such reliance was reasonable under Michigan law. Indeed, the language in the

Agreement "directly and explicitly makes reliance on [alleged pre-Agreement] statements unreasonable." *Whitesell Corp. v. Whirlpool Corp.*, 2009 WL 3270265, at *4 (W.D. Mich. 2009); *see also Federated Capital*, 2002 WL 868273 at *1. The Agreement is fully enforceable against MIDDD—and thus precludes a finding of reasonable reliance—because MIDDD is a "sophisticated" entity who enlisted sophisticated counsel in drafting the Agreement. *See Whitesell*, 2009 WL 3270265 at *4 (listing criteria for enforceability of no-reliance clauses).

The integration clause of the Agreement—which provides that "[t]his Agreement constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous agreements and understandings between the Parties with respect to the subject matter hereof…" (Exhibit 20, § 12.5)—further renders unreasonable any claimed reliance by MIDDD on pre-Agreement matters. Indeed, "[r]eliance on pre-contractual representations is unreasonable as a matter of law when the contract contains an integration clause." *Northern Warehousing, Inc. v. State of Michigan*, 475 Mich. 859, 859 (2006); *see Hamade v. Sunoco*, 271 Mich. App. 145, 171 (2006).[8]

The only exception to the rule is when a party alleges fraud that "would

---

[8] *Northern Warehousing* and *Hamade* superseded a line of cases, including this Court's decision in *Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424 F. Supp. 2d 970 (E.D. Mich. 2006), holding that Michigan did not have a per se rule rendering reliance unreasonable in the face of an integration clause.

invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*, 228 Mich. App. 486, 503 (1998) (citing 3 Corbin, Contracts, § 578). MIDDD here alleges and has proven neither. MIDDD does not allege that the City engaged in misconduct with respect to the merger clause itself. And MIDDD has likewise failed to allege fraud that would invalidate the entire contract. Indeed, instead of seeking to void the Agreement, MIDDD expressly plead and *affirmed* the Agreement, and expressly seeks damages for alleged breaches of it. (*See, e.g.*, MIDDD Complaint; Counts II for breach of contract.) The integration clause therefore renders MIDDD's alleged reliance unreasonable, and all of MIDDD's fraud claims fail to the extent they are based on alleged pre-Agreement statements.

Finally, MIDDD has failed to plead and prove a material misstatement by the City, or that the City knew it was making a false statement at the time it made any representation to MIDDD with the intention that MIDDD rely on the misstatement. MIDDD cannot prove that the City was aware of any alleged overcharges on the CS-1368 contract. Indeed, MIDDD has not even proven that there were in fact any such overcharges.

## 2.    MIDDD's Silent Fraud Claim Fails

MIDDD'S claim of silent fraud also fails.  A claim of silent fraud exists only where a defendant is under a legal duty to disclose.  *Hord v. Envtl. Research Inst.*, 463 Mich. 399, 412 (2000).  Such a duty may arise when a defendant receives a specific inquiry and where the defendant responds by providing incomplete or untruthful information.  *Id.*  Here, MIDDD has not alleged or proven specific facts sufficient to show that Detroit had any legal duty of disclosure to MIDDD.

## 3.    MIDDD's Fraudulent Inducement Claim Fails

In addition, MIDDD's fraudulent inducement claim fails.  Generally, "actionable fraud must be predicated on a statement relating to a past or existing fact." *Samuel D Begola Services, Inc v. Wild Bros,* 210 Mich.App 636, 639 (1995). "Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Id.*  A finding of fraud in the inducement would render the contract on which it was based voidable "at the option of the defrauded party." *Id.* at 640.  "Fraud in the inducement, however, addresses a situation where the claim is that one party was tricked into contracting." *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 371 (1995).  Generally, future promises are contractual and do not constitute fraud unless the promises were made in bad faith without the present intention to

perform.  *Greenville Mfg., LLC v. NextEnergy Center*, 2012 WL 3101826 at *2,

citing *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336-338 (1976).

Here, MIDDD is not seeking to void this contract, but instead seeks to

enforce a contract or promise.  MIDDD also fails to allege a misstatement relating

to future conduct.  According to Commissioner Marrocco, MIDDD's claim is

solely based upon actions or disclosures that Detroit allegedly made or should have

made *prior to* the Acquisition Agreement, not after.  (Exhibit 10, Marrocco Tr., at

68, 81.)  Therefore, MIDDD cannot assert a claim for fraudulent inducement.

### 4.     *MIDDD's Innocent Misrepresentation Claim Fails*

MIDDD's innocent misrepresentation claim also fails.  A claim of innocent

misrepresentation is shown if a party detrimentally relies upon a false

representation in such a manner that the injury suffered by that party inures to the

benefit of the party who made the representation. *United States Fidelity &*

*Guaranty Co. v. Black,* 412 Mich. 99, 118 (1981).  The innocent misrepresentation

rule represents a species of fraudulent misrepresentation but has, as its

distinguishing characteristics, the elimination of the need to prove a *fraudulent*

*purpose* or an intent on the part of the defendant that the misrepresentation be

acted upon by the plaintiff, and has, as added elements, the necessity that it be

shown that an unintendedly false representation was made in connection with the

making of a contract and that the injury suffered as a consequence of the

misrepresentation inures to the benefit of the party making the misrepresentation. *United States Fidelity & Guarant. Co.*, 412 Mich. at 118.

In light of the Acquisition Agreement integration clause and the fact that MIDDD cannot establish that the City made any misrepresentation of or any misrepresentation on which MIDDD relied, MIDDD's innocent misrepresentation claim has no merit.

## VII. MIDDD Cannot Prove Any Damages

Even if the MIDDD's Claim could proceed, the MIDDD Claim should be valued at $1.00 or some other nominal amount, because MIDDD cannot prove any damages. MIDDD alleges that the City "amortized the grossly inflated costs for the Project into the usage charges assessed to MIDDD for the Macomb Interceptor Sewer system in the rate years 2005-2006 through 2009-2010, together with Seven and a Half Percent (7.5%) interest annually." (MIDDD Complaint, ¶74.) In addition, MIDDD asserts that an unspecified portion of the allegedly inflated costs are reflected in the schedule of System Debt listed on Schedule 3.8 of the Acquisition Agreement, upon which the Purchase Price was calculated. (MIDDD Complaint, ¶45; Dkt. 5498, MIDDD's Reply to Temporary Allowance Motion,

¶10.).[9] MIDDD seeks recovery of the allegedly inflated usage charges and inflated purchase price. (MIDDD Complaint, ¶90.)

MIDDD nowhere alleges or suggests what portion of the alleged "fraudulent" charges were amortized as usage charges and what portion, if any, is reflected on the schedule of System Debt in Schedule 3.8 of the Acquisition Agreement. In the MIDDD Federal Case, Judge Cleland analyzed precisely the same damage theories and found such damage claims speculative and impossible or difficult to prove. As to damages related to usage charges, Judge Cleland held:

> Addressing the second claimed injury first—paying higher system usage charges—Macomb Interceptor has proffered no evidence in support of its allegation that as an "end user of the Detroit sewer system" it was "damaged by the scheme because DWSD amortized the inflated costs for the Project into usage charges for the system in the years before the Macomb Agreement." (Compl. ¶ 47). Having been created only in 2009 for the express purpose of purchasing the Macomb System, Macomb Interceptor (as opposed to Macomb County—not a party to this suit) apparently never purchased water and sewerage services from the City of Detroit. Nor is there any evidence that the City of Detroit passed on the inflated repair costs by incorporating those costs in the usage charges for the system.

(Exhibit 8, at 21-22.)

---

[9] MIDDD asserts that the City's Intervening Compliant in MIDDD's lawsuit alleges $23 million in inflated invoices for repairs to the 15 Mile Project. (Dkt. 5498, MIDDD's Reply to Temporary Allowance Motion, ¶ 10.) The City's allegation in the Intervening Complaint in the prior action merely incorporated as one of its claims the claim asserted by MIDDD in the MIDDD Complaint. (Exhibit 7, Intervening Complaint, ¶101.) The existence of any such recoverable damages is exactly what Judge Cleland found to be speculative or difficult or impossible to prove.

As to MIDDD's assertion that it overpaid for the Macomb Interceptor System on account of fraudulent charges, Judge Cleland held:

> On the one hand, Macomb Interceptor avers that the entire price of the 15 Mile Interceptor Repair Project was passed on to it through the Acquisition Agreement, and thus, it "paid in full for the 15 Mile Interceptor repair." (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 24; see also Compl. ¶ 44.) But Macomb Interceptor also maintains that the City of Detroit passed on the cost of the Project to users of water and sewerage services in southeast Michigan for at least four years prior to the Acquisition Agreement. (See Comp. ¶ 47; Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 29.) The court would therefore be tasked with analyzing usage rates charged to counties, municipalities, and end users over the course of four years to determine what amount was passed on through usage rates and what amount was passed on to Macomb Interceptor through the Acquisition Agreement.

(Exhibit 8, at 25.) Judge Cleland described the necessary calculations as "Gordian," and he questioned whether such analysis would even be possible— "Even if this [the damage calculation] were possible, a dubious assumption to say the least… " (*Id.* at 25-26.)

Moreover, MIDDD's own expert, Lyle Winn, confirms that MIDDD's damages are completely speculative. Winn testified at his deposition that the "expert" work that MIDDD relies on was not in fact performed by Winn, but by a former employee of his firm (Nancy Shirkey) back in February or March of 2011. (Exhibit 11, Winn Dep. 20:10-22:11.)[10] More fundamentally, the "expert" work

---

[10] Mr. Winn testified he did not know why MIDDD was relying on his expert opinion when did not actually do the work or analysis. (Winn Dep. 22:8-11.)

solely consisted of a comparison of the initial budget for the subject work given by Inland Waters Pollution Control, Inc. in September 2004 (*Id.*, Ex. 2 to Winn Dep.) against the final project cost.  (*See* Winn Deposition Ex. 4.)  In fact, Inland (the general contractor on the Project) materially increased its budget during the project from an initial estimate of $33.7 million (as shown on Ex. 2 to Winn Dep.) to a final estimate of $52.9 million (as shown on Ex. 3 to Winn Dep.).  Winn, however, had no knowledge whatsoever of what events and occurrences took place during the work to warrant an increase.  Winn testified:

> Q.   Okay.  In the estimate that you provided to
>       Macomb, what was your final number, the budget?
> A.   $28,828, 490.
>
> Q.   And the final number that you finally located was
>       what, the final price paid?
> A.   54 million, and I don't know the change after that.

RE-EXAMINATION  BY MS. HATHAWAY:

> Q.   Your estimate was based on largely your review of
>       the Inland budget, correct?
> A.   And the NTH plans.
>
> Q.   All right.  The Inland budget changed significantly
>       as they did the project.
> A.   At some point it changed.   All I have is the
>       beginning budget and the final summary.
>
> Q.   All right.  So Inland thought that it was going to
>       cost substantially less than it did until they got in
>       and saw the work that needed to be done, right?
> A.   I don't know why their cost changed.

> Q.    And you don't know what happened in the project
>       different from what their preliminary budget was?
> A.    That is correct.

(*Id.*, Winn Dep. 80:7-81:9).  Winn's testimony is simply not admissible under Federal Rule of Evidence 702 since it is not "based upon sufficient facts or data and is not the product of reliable principles and methods."  Fed. R. Evid. 702.  It lacks sufficient reliability for admissibility under Rules 702 and 703.  It also lacks the reliability of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and the case law following *Daubert*.

The DWSD engineer in charge of the Project, Ramesh Shukla[11] provided detailed testimony as to why the Inland estimate increased from $35 million to in excess of $50 million. (Exhibit 12, Shukla Dep. 63:17-65:19; 112:2-114:6). Shukla explained that the Project "turned out to be much more complicated than what he had anticipated when … [the DWSD] w[as] originally thinking about these are the steps that we are going to take to effect the repairs … ."[12]  There were multiple significant unanticipated facts not accounted for in the original

---

[11] Shukla had first-hand knowledge of Contract CS 1368 as field engineer "in charge of" a repair project with respect to "the sinkhole in 15 Mile Road between Hayes an Schoenher." (Exhibit 12, Shukla Dep. 16:8-19.)

[12] (Shukla Dep. 63:17-22.)

design including: (a) that the sinkhole was 25 feet deeper than initially forecast;[13] (b) equipment failed after extended use 24 hours a day for an eight to nine month period; and (c) "the water table was very high. It took us a lot longer time to dewater the site so that we can dig up … ." (*Id.*, Shulka Dep. 63:13-16). "So these are some of the examples that I can tell that happened along the way." (*Id.*, Shukla Dep. 63:18-19). On redirect, Shukla detailed additional unanticipated facts, including: (a) "the sinkholes getting bigger and bigger and … becoming a threat to houses… ",[14] and (b) expenses to monitor water mains and air quality in the area. (*Id.*, Shukla Dep. 113:1-114:2). Based upon his intimate knowledge of the Project, Mr. Shukla expressed his opinion that the charges for the Project, when accounting for unanticipated circumstances, were "reasonable." (*Id.*, Shukla Dep. 115:12-14).

In addition, the damages supporting the MIDDD Claim are entirely speculative and cannot be proven with any certainty because there were a variety of other concessions and discounts given to MIDDD to expedite and close on the Acquisition Agreement. (Exhibit 15, Latimer Affid. ¶15; Exhibit 14, Walter Affid. ¶16; Exhibit 13, Foster Affid. ¶20). Darryl Latimer, Bart Foster, and Robert Walter all testified that they do not know if any of those concessions would have

---

[13] Shukla testified that "when we went down there, we found out that the sinkhole which was supposed to be 70 feet deep, it was actually another 25 feet deeper than that." (Shukla Dep. 64:6-10.)

[14] (Shukla Dep. 113:23-24.)

been granted if MIDDD also challenged the validity of Project repairs. (*Id.*) Commissioner Marrocco also testified that he actually spoke to DWSD about reducing the Project costs, which they agreed to do as part of the Global Settlement. (Exhibit 10, Marrocco Tr., p. 32). Thus, MIDDD's damages are entirely speculative.

Because MIDDD has failed to prove any damages, the MIDDD Claim has no value.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Debtor respectfully requests that the Court deny MIDDD's motion for temporary allowance, or that the Court value MIDDD claim at $1.00, or a very nominal amount, and grant such other and further relief to the City as the Court may deem proper.

Dated: July 14, 2014          Respectfully submitted,

            By: /s/ Stephen S. LaPlante
            Jonathan S. Green (MI P33140)
            Stephen S. LaPlante (MI P48063)
            Jerome R. Watson (MI P27082)
            MILLER, CANFIELD, PADDOCK AND
            STONE, P.L.C.
            150 West Jefferson, Suite 2500
            Detroit, Michigan 48226
            Telephone: (313) 963-6420
            Facsimile: (313) 496-7500

            David G. Heiman (OH 0038271)
            Heather Lennox (OH 0059649)
            JONES DAY
            901 Lakeside Avenue
            Cleveland, Ohio 44114
            Telephone: (216) 586-3939
            Facsimile: (216) 579-0212

            ATTORNEYS FOR THE CITY OF DETROIT

## CERTIFICATE OF SERVICE

I, Stephen S. LaPlante, hereby certify that the foregoing Debtor's Brief In Support Of Its Response (DKT. 5312) In Opposition To Macomb Interceptor Drain Drainage District's Motion (DKT. 5155) For Temporary Allowance Of Claim Pursuant To Rule 3018(A) Of The Federal Rules Of Bankruptcy Procedure For Purposes Of Accepting Or Rejecting Debtor's Fourth Amended Plan Of Adjustment was filed and served via the Court's electronic case filing and noticing system on this 14th day of July, 2014.

/s/ Stephen S. LaPlante

22629996.6\022765-00202