UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,
    Plaintiff,                                                                     Case No: 2:11-cv-13101
vs.                                                                                          Hon.

KWAME KILPATRICK, VICTOR MERCADO,
DERRICK A. MILLER, FERGUSON'S ENTERPRISES, INC.
F/K/A FERGUSON ENTERPRISES, INC., BOBBY W. FERGUSON,
a Michigan corporation, INLAND WATERS POLLUTION CONTROL, INC.,
a Michigan corporation, DENNIS OSZUST, ROBERT L. WILLIAMS,
WALTER ROZYCKI, ANTHONY SOAVE, L. D'AGOSTINI & SONS, INC.,
a Michigan corporation, ANTONIO D'AGOSTINI, L. ROBERT D'AGOSTINI,
JAMES D'AGOSTINI, MERSINO DEWATERING, INC., a Michigan Corporation,
RODNEY A. MERSINO, MARCO MERSINO, J-MACK AGENCY, LLC D/B/A
J-MACK SECURITY, a Michigan limited liability company, JOSEPH M. MACKSOUND,
ROTOR ELECTRIC COMPANY OF MICHIGAN, LLC F/K/A ROTOR ELECTRIC
COMPANY, a Michigan limited liability company, BENJAMIN ROSENBERG,
PATRIOT PUMPS, LLC D/B/A THOMPSON PUMP MIDWEST, an Indiana corporation,
BRIAN LENAGHAN, ROHRSCHEIB SONS CAISSONS, INC., a Michigan corporation,
STEVE ROHRSCHEIB, HAYWARD BAKER, INC. D/B/A DENVER GROUTING, a
Delaware corporation and wholly owned subsidiary of KELLER FOUNDATIONS INC.,
a Maryland corporation, JOE HARRIS, GREAT LAKES DIVING & SALVAGE, INC., a
Michigan corporation, WENDY GOUIN, THOMAS GOUIN, O'LAUGHLIN
CONSTRUCTION COMPANY, a Michigan corporation, MARK E. O'LAUGHLIN,
DUBAY'S LANDSCAPING SERVICES, INC., a Michigan corporation,
LAWRENCE R. DUBAY, LAKE SHORE, INC. D/B/A LAKESHORE ENGINEERING
SERVICES, INC., a Michigan corporation, AVINASH RACHMALE, SUPERIOR
ENGINEERING ASSOCIATES, INC., a Michigan corporation, BHARAT PATEL,
FUTURENET GROUP, INC.  D/B/A MULTI SOLUTIONS GROUP, INC.,
a Michigan corporation and PERRY MEHTA,
    Defendants.
_____

| | |
|---|---|
| KIRK, HUTH & LANGE, P.L.C. | O'REILLY RANCILIO, P.C. |
| By: ROBERT W. KIRK (P35627) | By: LAWRENCE M. SCOTT (P30228) |
| RAECHEL M. BADALAMENTI (P64361) | Co-Counsel for Plaintiff |
| Attorneys for Plaintiff | 12900 Hall Road, Ste. 350 |
| 19500 Hall Road, Ste. 100 | Sterling Heights, MI 48313 |
| Clinton Township, MI  48038 | (586) 997-6462 |
| (586) 412-4900 | lscott@orlaw.com |
| rkirk@khlplc.com | |
| rbadalamenti@khlplc.com | |

1

William W. Misterovich (P32512)
Co-Counsel for Plaintiff
Chief Deputy, Macomb County Public
Works Commissioner's Office
21777 Dunham Rd
Clinton Township, MI  48036
(586) 307-8210
william.misterovich@macombcountymi.gov
_____/

## COMPLAINT

**NOW COMES** Plaintiff Macomb Interceptor Drain Drainage District, by and through its counsel Kirk, Huth & Lange, P.C., O'Reilly Rancilio, P.C. and William W. Misterovich, Esq., and complains as follows:

## PRELIMINARY STATEMENT

1.      This civil action is brought to recover damages arising from illegal activities prohibited by 18 USC 1964(a) and (c) ("Civil RICO"), 15 USC §1 of the Sherman Act, 15 USC §13 and §13a of the Clayton Antitrust Act and for breach of contract, fraud and tortious interference; for damages and other remedies authorized by these federal statutes and under state law including consequential and exemplary damages; and for all other relief which this Honorable Court deems just and proper under the circumstances set forth herein.

## JURISDICTIONAL ALLEGATIONS

2.      This Court has jurisdiction over this matter pursuant to 15 USC §4 and §5 (federal antitrust), 18 USC §1964(a) (Civil RICO), 28 USC §1331 (federal question) and 28 USC §1337 (commerce) because the claims brought are under federal statutes and involve federal questions.

3.      Venue is properly established in the Court pursuant to 28 USC §1391(b)(2) because the events giving rise to this claim occurred in the City of Sterling Heights, County of Macomb, which is included within the Eastern District of Michigan.  Venue is further established

pursuant to 28 USC 1391(b)(2) and/or (3) given that a substantial number of the Defendants did and/or continue to reside within the Eastern District of Michigan.

## THE PARTIES AND FACTUAL BACKGROUND

4. Plaintiff is a special purpose public corporation established under the Drain Code, PA 40 of 1956, MCL 280.1 et seq. operating and existing under the Michigan Constitution and the laws of the State of Michigan.

5. The primary cause of this action is a widespread scheme to overcharge the Detroit Water and Sewerage Department ("DWSD") for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road in the City of Sterling Heights, County of Macomb, in the Eastern District for the State of Michigan (hereinafter the "Project") which is specifically identified in the *First Superceding Indictment* issued in Criminal Case No. 10-20403-NGE for a criminal RICO conspiracy, bribery, extortion, fraud, obstruction of justice, tax evasion and aiding and abetting. **Exhibit A**.

6. The predicate acts of the scheme were principally advanced by the exertion of authority from the former Mayor of the City of Detroit Kwame Kilpatrick ("Kilpatrick"), the former Director of the City of Detroit Water and Sewer Department Victor Mercado ("Mercado") and the former Deputy Chief of Staff to Michigan State Representative Kilpatrick namely Derrick A. Miller ("Miller"). **See e.g. Exhibit B**.

7. On information and belief, Kilpatrick and Mercado, with the assistance of Miller, schemed to receive financial compensation out of the Project for themselves and for their long-time companion Bobby W. Ferguson and his business Ferguson's Enterprises, Inc. f/k/a Ferguson Enterprises, Inc. (collectively hereinafter "Ferguson").

3

8. More particularly, these individuals began the scheme by approving and/or executing Amendment No. 2 in or about November 2004 ("Amendment 2") to Contract No. CS-1368 for Consulting Services between Inland Waters Pollution Control, Inc. and DWSD dated in or about February 2002 (the "Inland Contract").  **Exhibit C**.

9. Amendment 2 to the Inland Contract designated Inland, as opposed to other qualified competitors, as general contractor/consultant on the Project and was executed only after Inland Waters Pollution Control, Inc., by and through its President Robert L. Williams, Vice President/General Manager Dennis Oszust and Project Managers Walter Rozycki and Tony Soave (collectively hereinafter referred to as "Inland"), agreed to the cooperate in the scheme. **Exhibit D**.

10. Importantly, Inland represented that the Project would not exceed a total cost of $35,000,000.00 in Amendment 2 to the Inland Contract.  **Exhibit D, p. 3, 15.**

11. However, as a result of the scheme, the Project totaled $54,467,200.00.

12. Additionally, Inland submitted a budget dated 9/30/04 identifying a Project total of $33,702,881.70.  A gate structure that was not installed that accounted for $1,980,000.00 of this total, making the actual budget for the Project $31,722,881.70, *according to Inland* (hereinafter the "Inland Budget").  **Exhibit E**.  The actual costs charged upon completion exceed the Inland Budget by $23,000,000.00.

13. The Inland Budget identified that the total cost of the Project should not have exceeded $33,702,881.70, including the following totals for relevant categories of work:

    a. Bypass pumping and Bulkhead sewers: $11,473,961.59;

    b. Temporary earth retention system and removal/replacement of damaged sewer pipes: $6,862,466.12;

    c. Sewer cleaning charges: $585,200.00;

4

      d. Pavement restoration charges: $880,000.00; and

      e. Landscape restoration charges: $275,000.00.

14. Plaintiff's independent evaluation of the Project confirms that the total cost of the Project should not have exceeded $29,000,000.00, including the following totals for relevant categories of work:

      a. Bypass pumping and Bulkhead sewers: $7,968,200.00;

      b. Temporary earth retention system and removal/replacement of damaged sewer pipes: $4,555,400.00;

      c. Sewer cleaning charges: $825,000.00;

      d. Pavement restoration charges: $957,200.00; and

      e. Landscape restoration charges: $160,300.00.00.

15. To accomplish the scheme, Inland presented and received payment from DWSD upon grossly inflated and inaccurate invoices, assessed unreasonable and bad-faith profit markups and approved excessive subcontractor overcharges pursuant to unlawful agreements to participate in and further the scheme in the means described in **Exhibit A** and otherwise.

16. In April 2005, Mercado and Inland even added a "Costing Supplement" to Amendment 2 to the Inland Contract to increase the profits to be received by designating new "multipliers" on the Project and indicating that overages will be paid only on "negotiated" terms. **Exhibit D, p. 18-21**.

17. As a product of the scheme, Inland benefitted by receipt of at least $5,013,911.00.

18. On information and belief, Inland paid Ferguson the sum of $350,000.00 for work Ferguson did not do in exchange for approval of at least one of the amendments to the Inland Contract. **See Exhibit A**.

19. Ferguson accomplished the scheme by invoicing for work not actually performed and for charging grossly improper rates for work it did perform. Indeed, discrepancies are prevalent in the charges assessed by Ferguson and the work identified to have been actually performed by them in the daily reports associated with the Project.

20. As a product of the scheme, Ferguson benefitted by receipt of at least $2,483,258.00.

21. Subcontractor L. D'Agostini & Sons, Inc., by and through its President Antonio D'Agostini, Vice President L. Robert D'Agostini and Secretary/Treasurer James D'Agostini (collectively hereinafter referred to as "LDS"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

22. To wit, LDS reached an agreement with Kilpatrick, Ferguson, Miller and/or Mercado whereby inflated invoices they submitted on the Project would be approved for payment so long as Ferguson received an amount equal to the amount to be paid to LDS.

23. As a product of the scheme, LDS benefitted by receipt of at least $16,379,231.00.

24. LDS accomplished the scheme by charging for personnel and equipment being on-site that was not on-site and/or not necessary to their performance. LDS further accomplished the scheme by assessing exorbitant mark-ups on the charges of their subcontractors and suppliers.

25. Subcontractor Mersino Dewatering, Inc., by and through its President Rodney A. Mersino and Project Manager Marco Mersino (collectively hereinafter referred to as "Mersino"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

26. In particular, Mersino charged an approximate sum of $4,503,204.00 for dewatering services when actual charges on the Project should not have exceeded $2,119,480.00, according the Inland Budget.

27. As a product of the scheme Mersino benefitted by receipt of a total sum of $4,503,204.00. Mersino accomplished the scheme of overcharging by invoicing for personnel and equipment that was not on-site and/or not necessary to performance of their tasks.

28. Subcontractor J-Mack Agency, LLC d/b/a J-Mack Security, by and through its President Joseph M. Macksound (collectively hereinafter referred to as "J-Mack"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

29. In particular, J-Mack charged an approximate sum of $743,160.00 for security services when actual charges over the 11 month period should not have exceeded $120,700.00, according to the Inland Budget. J-Mack accomplished the scheme of overcharging by charging unreasonable rates for services and for more personnel than were on-site and/or were necessary to accomplish their tasks.

30. Subcontractor Rotor Electric Company of Michigan, LLC f/k/a Rotor Electric Company, by and through its President Benjamin Rosenberg, (collectively hereinafter referred to as "Rotor"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

31. In particular, Rotor received the inordinate sum of $1,888,191 for electrical services provided on the Project when actual charges were not to exceed $605,000.00, according to the Inland Budget. Rotor accomplished the scheme of overcharging by indentifying personnel and equipment on-site which were not on-site and/or not necessary to performance of their tasks.

32. Subcontractor Patriot Pumps, LLC d/b/a Thompson Pump Midwest, by and through its President Brian Lenaghan (collectively hereinafter referred to as "Thompson Pump"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

33. In particular, Thompson Pump charged an approximate sum of $5,188,422.00 for pump rental and maintenance for bypass pumping on the Project when actual charges for same should not have exceeded $4,504,561.59, according to the Inland Budget. Thompson accomplished these scheme of overcharging by indentifying personnel and equipment on-site that was not on-site and/or not necessary to performance of its tasks.

34. Rohrscheib Sons Caissons, Inc., by and through its President and Project Manager Steve Rohrscheib (collectively hereinafter referred to as "Rohrscheib"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

35. In particular, Rohrscheib received the extraordinary sum of $3,956,038.00 for constructing three (3) access shafts and assisting with construction of the temporary earth retention system. Rohrscheib accomplished the scheme of overcharging by charging grossly excessive rates, double billing and submitting invoices for work claimed to have been done months after their assignments were complete and they were off-site.

36. Subcontractor Hayward Baker, Inc., a wholly owned subsidiary of Keller Foundations Inc., and d/b/a Denver Grouting, by and through its Secretary and Project Manager Joe Harris (collectively hereinafter "Hayward-Denver") was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

37. In particular, Hayward-Denver received the sum of $510,598.00 for jet grouting on the Project. Hayward-Denver accomplished the scheme charging for jet grouting services twice; once as Hayward Baker, Inc. and then again as Denver Grouting. Hayward-Denver further accomplished the scheme by submitting invoices for work claimed to have been done months after their assignments were complete and they were off-site.

38. Subcontractor Great Lakes Diving & Salvage, Inc., by and through its President Wendy Gouin and Vice President Thomas Gouin (collectively hereinafter "Great Lakes"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

39. In particular, Great Lakes received the sum of $872,317.00 for diving for sewer clean-out and bulkhead removal/installation. Great Lakes accomplished the scheme of overcharging by invoicing at unreasonable rates because of a union picket and submitting invoices for work claimed to have been done months after their assignments were complete and they were off-site.

40. Subcontractor O'Laughlin Construction Company by and through its President Mark E. O'Laughlin (collectively hereinafter referred to as "OLCC"), participated in the scheme by presenting invoices for and receiving payment on the sum of $2,042,158.00 for purportedly providing "assistance" to other contractors on the Project though there is no indication that OLCC provided services commensurate with this compensation in the daily reports associated with the Project.

41. Subcontractor Dubay's Landscaping Services, Inc., by and through its President Lawrence R. Dubay (collectively hereinafter "Dubay") participated in the scheme by presenting

invoices for and receiving payment on the sum of $85,663.00 though there is no indication that they actually provided necessary services in the daily reports associated with the Project.

42. On information and belief, Dubay was a subcontractor of Ferguson.

43. Subcontractors Lakeshore Engineering Services, Inc., by and through its President Avinash Rachmale (collectively hereinafter "Lakeshore"), Superior Engineering Associates, Inc., by and through its Vice President Bharat Patel (collectively hereinafter "Superior") and FutureNet Group, Inc. d/b/a Multi Solutions Group, Inc., by and through its President Perry Mehta (collectively hereinafter "Multi Solutions") participated in the scheme by presenting invoices and receiving payment for engineering and other services though there is no indication that they actually provided necessary services in the daily reports associated with the Project.

44. The grossly inflated Project total of $54,467,200.00 became the direct responsibility of Plaintiff by way of the Macomb Interceptor Acquisition Agreement by and between the City of Detroit and Plaintiff dated September 2, 2010 (the "Macomb Agreement") wherein Plaintiff acquired certain assets of the DWSD, including the 15 Mile Road Interceptor in Sterling Heights. **Exhibit F**.

45. Plaintiff financed the acquisition of DWSD assets, including payment on the Project total of $54,467,200.00, through the sale of drain bonds.

46. Importantly, Paragraphs 2.4 and 2.9(b)(8) of the Macomb Agreement assign to the Plaintiff any and all rights held by the City of Detroit "under any contracts, warranties or guaranties that apply to services or goods" relating to the Project. **Exhibit F**.

47. Plaintiff was further damaged by the scheme because DWSD amortized the inflated costs for the Project into usage charges for the system in the years before the Macomb

Agreement, more specifically beginning with the rate-year 2005-2006 and ending with the rate-year 2009-2010, together with Seven and a Half Percent (7.5%) interest annually.

48. Plaintiff learned of the scheme when the *First Superceding Indictment* issued in Criminal Case No. 10-20403-NGE on or about December 15, 2010 identifying a criminal RICO conspiracy, bribery, extortion, fraud, obstruction of justice, tax evasion and aiding and abetting by and among these Defendants and describing the incidence of such illegal activities on the Project.  **See Exhibit A**.

## COUNT I – VIOLATION OF CIVIL RICO STATUTES
## ALL DEFENDANTS

49. Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

50. Plaintiff and Defendants are "persons" as described USC Sections 1961(3) and/or 1964(c).

51. By virtue of the scheme illustrated in the preceding paragraphs, all Defendants did acquire and maintain, directly or indirectly, an interest in and/or control of a RICO enterprise of individuals who were associated in fact with respect to the Project and who did engage in, and whose activities did affect, interference with commerce in violation of 18 USC §1951, as set forth in 18 USC §1961(1)(B).

52. Additionally, Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS, aiding and abetting each other, did commit calculated and premeditated violations of Civil RICO in a manner in which they operated under color of official right and/or intentionally threatened continuity of contracts of and between themselves and by and between the other Defendants in violation of 18 USC §1951, as set forth in 18 USC §1961(1)(B).

11

53. Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS, all aiding and abetting each other, did also knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from DWSD, by themselves or through Inland, LDS, Ferguson and/or Mersino in connection with the Project which were induced by wrongful fear of economic harm and under color of official right in violation of 18 USC §1951, as set forth in 18 USC §1961(1)(B).

54. Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS, all aiding and abetting each other, did also knowingly and unlawfully violate MCL 750.117 and 750.118 which charges as a felony the bribery of a public officer, agent, servant or employee in order to influence such person's action and a felony to accept such a bribe.

55. *Respondeat superior* renders any and all principals/contractors liable for their agents/subcontractors misconduct where they have knowledge of, operate, participate in and/or receive a benefit from a RICO enterprise.

56. The aforementioned racketeering activities did affect interstate commerce in that, among other things, they prevented legitimate bidding and performance by non-participating contractors and subcontractors on the Project.

57. The effect of the enterprise was grossly inflated charges for the Project, which were in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget, causing damage to Plaintiff who paid for same via the Macomb Agreement and in system usage charges and is thereby entitled to recover threefold the damages sustained and the cost of the suit, including reasonable attorney fees, pursuant to 18 USC §1964(c).

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for threefold the damages sustained as a result of Defendants' participation in a

Racketeer Influenced and Corrupt Organization, and the cost of this action, including reasonable attorney fees, as provided for by 18 USC §1964(c) and such other relief as may be appropriate.

## COUNT II – VIOLATION OF SHERMAN ACT
## ALL DEFENDANTS

58. Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

59. During the relevant time period, and as set forth in more detail in the preceding paragraphs, all Defendants did enter into contracts and agreements with and between each other and various non-parties that unreasonably restrained trade with regard to the Project in violation of 15 USC §1 of the Sherman Act.

60. More particularly, the Defendants agreed to use and authorized Inland as general contractor on the Project in order to coordinate prices and terms to further their scheme of overcharging, to obtain wrongful benefit and to pay individuals who did not perform work on the Project in exchange for continuity.

61. The agreements harmed competition by foreclosing the possibility that Plaintiffs would have obtained lower prices from these and/or other contractors and subcontractors and secured better contract terms, but for the collusion.

62. The coordination on prices and terms regarding the Project was not necessary to protect any legitimate interests.

63. These agreements resulted in grossly inflated charges for the Project, which were in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget, causing damage to Plaintiff who paid for same.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' violation of the Sherman Act and

13

the cost of this action, including reasonable attorney fees, as provided for by 15 USC §1 and such other relief as may be appropriate.

## COUNT III – VIOLATION OF CLAYTON ANTITRUST ACT
## ALL DEFENDANTS

64. Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

65. During the relevant time period, and as set forth in the preceding paragraphs, Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS did, either directly or indirectly, discriminate in price and terms between different contractors, subcontractors and material suppliers, of like experience, grade and quality, so as to prevent or substantially lessen competition and tend to create a monopoly with regard to those providing services to and materials for the Project in violation of 15 USC §13(a) and §13a of the Clayton Antitrust Act.

66. All Defendants, as set forth in the preceding paragraphs, did contribute to the discrimination in price and terms between different contractors, subcontractors and material suppliers by agreeing to the scheme to put them on unequal footing with others, participating in and contracting upon same and knowingly invoicing for and receiving payment on grossly inflated charges for time, labor and materials provided related to the Project in violation of 15 USC §13(e)-(f) and §13a of the Clayton Antitrust Act.

67. Additionally, Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS did contract for and/or receive premiums, commissions, compensation, benefit or other value on unequal terms to others not involved in or agreeable to the scheme in violation of 15 USC §13(c)-(d) of the Clayton Antitrust Act.

68. These violations of the Clayton Antitrust Act caused Plaintiff to pay inflated rates for time, labor and materials on the Project in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget and causing damage to Plaintiff who paid for same.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' violation of the Clayton Antitrust Act and the cost of this action, including reasonable attorney fees, as provided for by 15 USC §13 and such other relief as may be appropriate.

## COUNT IV – BREACH OF CONTRACT
## DEFENDANTS INLAND

69. Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

70. DWSD and Inland were parties to the Inland Contract and Amendment 2 thereof.

71. By way of the Macomb Agreement, Plaintiff is the assignee of all rights of DWSD under Amendment 2 to the Inland Contract.

72. DWSD and/or Plaintiff fully performed its obligations under Amendment 2 to the Inland Contract including full payment for the Project.

73. Inland breached the Inland Contract by (a) failing to fulfill its warranty that "all of the prices, terms, warranties and benefits [on the Project] are comparable to or better than the equivalent terms presently being offered by [Inland] to any other customer for the performance of like services pursuant to paragraph 20.01 of the Inland Contract; (b) failing to provide all subcontracts and seek approval of all payments to subcontractors pursuant to paragraph 12.01-12.02 of the Inland Contract; (c) demanding payment in excess of the specified contract amount for the Project, which was $35,000,000.00 per Amendment 2; (d) failing to perform in a "satisfactory and proper manner" as required by Amendment 2; and (e) refusing to comply with

15

and/or require its associates to comply with applicable Federal, state and local laws, ordinances, code(s), regulations and policies pursuant to paragraph 15.01 of the Inland Contract.

74. These breaches of the parties' agreements resulted in damage to Plaintiff in that it was required to pay inflated rates for time, labor and materials on the Project in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' breach of contract, together with costs and attorney fees and such other relief as may be appropriate.

### COUNT V – FRAUDULENT MISREPRESENTATION
### ALL DEFENDANTS

75. Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

76. By way of the Inland Contract, Amendment 2 to the Inland Contract, the Inland Budget, submission of contractor and subcontractor invoices and daily logs and during on-site daily reports, Defendants made various representations with regard to the Project including the following:

    a. Defendants represented that they would use their best efforts to complete the Project in a cost-efficient manner not to exceed $35,000,000.00;

    b. Defendants represented that they select only subcontractors and material suppliers who agreed to use their best efforts to complete the Project in a cost-efficient manner;

    c. Defendants represented that the Project should not exceed the costs in the budget they submitted dated 9/30/04; and

16

    d. Defendants represented that the invoices submitted for charges associated with the Project were accurate and listed only services and materials actually provided on the Project.

77. These representations by the Defendants were knowingly and/or innocently false when made and were reasonably relied upon by DWSD, of which the Plaintiff is the assignee.

78. In fact, the costs of the Project exceeded Amendment 2 to the Inland Contract and the Inland Budget by at least $23,000,000.00.

79. These representations did induce Plaintiff, as assignee to DWSD, and to its substantial detriment, to pay Defendants the full amount set forth by them for time, labor and materials associated with the Project.

80. Plaintiff suffered substantial economic loss as a result of these misrepresentations and their losses have substantially benefited Defendants.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' fraud, as determined by the trier of fact, together with costs and attorney fees and such other relief as may be appropriate.

### COUNT VI – TORTIOUS INTERFERENCE
### ALL DEFENDANTS

81. Plaintiffs incorporate, by reference, the preceding paragraphs hereof as though fully re-stated herein.

82. Plaintiffs, as assignees of DWSD, did have an ongoing business relationship and expectancy with regard to the Project of which the Defendants were well-aware.

83. Defendants intentionally and improperly interfered with the business relationship and expectancy of the Plaintiff by orally agreeing as follows:

    a. To pay certain individuals and/or entities for work they did not perform;

    b. To select only contractors, subcontractors and material suppliers who would assist them in the scheme to overcharge for the Project;

    c. By threatening to discontinue contractors, subcontractors and/or materials suppliers from the Project if they did not assist with and/or participate in the scheme to overcharge for the Project or cover-up of the same;

    d. By agreeing on price and terms of contracts related to the Project, rather than permitting open bidding and/or allowing interested contractors, subcontractors and/or material suppliers to bid on equal footing with one another; and/or

    e. By representing that charges would not exceed the amount identified in Amendment 2 to the Inland Contract or the Inland Budget.

84. Defendants' intentional and improper interference directly resulted in a grossly inflated total of $54,467,200.00 for the Project --- which is $23,000,000.00 more than it should have cost according to the Inland Budget and $26,000,000.00 more than it should have cost according to independent evaluation.

85. If not for the grossly inflated charges on the Project, the Macomb Agreement had a reasonable likelihood of future economic benefit for Plaintiff.

86. As a direct and proximate result of Defendants' wrongful conducts, Plaintiff has suffered substantial economic injury in that it paid the grossly inflated charges assessed on the Project and lost business opportunities otherwise available for such funds.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' interference, as determined by the trier of fact, together with costs and attorney fees and such other relief as may be appropriate.

                                    Respectfully submitted,

|  |  |  |
|---|---|---|
|  | By: | s/Raechel M. Badalamenti |
|  |  | KIRK, HUTH & LANGE, PLC |
|  |  | ROBERT W. KIRK (P35627) |
|  |  | RAECHEL M. BADALAMENTI (P64361) |
|  |  | Email: rbadalamenti@khlplc.com |
|  |  | Attorney for Plaintiff |
|  |  | 19500 Hall Road, Suite 100 |
|  |  | Clinton Township, MI  48038 |
| Dated: July 18, 2011 |  | (586) 412-4900 |

                                    AND

|  |  |  |
|---|---|---|
|  | By: | s/Lawrence M. Scott |
|  |  | LAWRENCE M. SCOTT (P30228) |
|  |  | O'REILLY RANCILIO, P.C. |
|  |  | Email: lscott@orlaw.com |
|  |  | Co-Counsel for Plaintiff |
|  |  | 12900 Hall Road, Ste. 350 |
|  |  | Sterling Heights, MI 48313 |
| Dated: July 18, 2011 |  | (586) 997-6462 |

                                      AND

|  |  |  |
|---|---|---|
|  | By: | s/William W. Misterovich |
|  |  | William W. Misterovich (P32512) |
|  |  | Email: william.misterovich@macombcountymi.gov |
|  |  | Chief Deputy |
|  |  | Macomb County Public Works Commr's Office |
|  |  | 21777 Dunham Rd |
|  |  | Clinton Township, MI  48036 |
| Dated: July 18, 2011 |  | (586) 307-8210 |