UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-------------------------------------------------X
                                            :

In re                                 :         Chapter 9

CITY OF DETROIT, MICHIGAN,    :         Case No. 13-53846

                 Debtor.       :         Hon. Steven W. Rhodes

-------------------------------------------------X

## AFFIDAVIT OF ROBERT WALTER

STATE OF _____ )
                           ) SS.
COUNTY OF _____ )

I, Robert Walter, being first duly sworn, depose and state as follows:

1. I am an adult and otherwise competent to testify to the facts stated below. If called as a witness, I can testify to the following facts from my own personal knowledge. I make this Affidavit based upon my own personal knowledge and my review of records kept in the ordinary course of business.

2. I was deposed on Friday July 11, 2014 in relation to this matter and my affidavit is consistent with my testimony.

3. I am an attorney who represented the Detroit Water and Sewerage Department ("DWSD") as part of my duties in the Detroit Legal Department from 1982 until my retirement in 2012. I was involved in the negotiation and completion of the May 19, 2009 Settlement Agreement ("Global Settlement Agreement") (attached as Exhibit A), negotiation and completion of the sale of certain DWSD assets to the Oakland Macomb Interceptor Drain Drainage District ("OMIDDD") (attached as Exhibit B) ("OMIDDD Acquisition Agreement"), and negotiation and September 2, 2010 completion of the sale of certain DWSD assets to the Macomb Interceptor Drain Drainage District ("MIDDD") (attached as Exhibit C) ("MIDDD Acquisition Agreement").

4. There was a major collapse of the Macomb Interceptor System ("Macomb Interceptor") on 15 Mile at or around Hayes in August of 2004, creating a massive sinkhole and necessitating immediate and emergency repairs due to the risk to the public safety and well-being ("2004-2005 Sinkhole Repairs"). These repairs began immediately and were completed in 2005.

2

5. The Macomb Interceptor and related appurtenances were one of the few sewer assets owned by the City of Detroit that were outside of the City's border. The Macomb Interceptor was a central trunk line which brought sewer flow from Macomb County into the DWSD system via the Oakland-Macomb Interceptor which carried flow from Oakland County. Both Oakland and Macomb counties had a variety of disputes with DWSD and vice versa, ultimately culminating in the Global Settlement Agreement resolving many disputes for financial consideration. The Global Settlement Agreement was intended to settle all outstanding disputes between DWSD and Oakland and Macomb Counties and to codify an agreement to create the OMIDDD and MIDDD with the express intent of finalizing the sale of certain DWSD assets to each entity respectively.

6. The underlying premise of the OMIDDD Acquisition Agreement was that OMIDDD would Oakland-only portions of the system and portions of the systems serving both Oakland and Macomb counties by paying the outstanding pro-rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to certain facilities("Oakland System Debt"), less various amounts negotiated by the parties.

7. My understanding is that the OMIDDD Acquisition Agreement was initially drafted by counsel for OMIDDD and Macomb County, Craig Hupp, a Bodman attorney. The team negotiating on behalf of OMIDDD included representatives from Macomb County, chiefly Mr. William Misterovich and Mr. Hupp. Many of the provisions in the OMIDDD Acquisition Agreement were proposed by OMIDDD through Mr. Hupp and negotiated by all the parties over a significant period of time through arms-length discussions. The value of the Oakland System Debt and negotiated concessions to it was similarly negotiated by all parties over a significant period of time through arms-length discussions.

3

8. After execution of the OMIDDD Acquisition Agreement, the same parties (including Mr. Misterovich, but not including Oakland County representatives) began negotiating transfer of Macomb-only assets to the MIDDD through the MIDDD Acquisition Agreement.

9. Similar to the OMIDDD Acquisition Agreement, the underlying premise of the MIDDD Acquisition Agreement was that MIDDD would purchase Macomb-only portions of the system by paying the outstanding pro-rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to certain facilities ("Macomb System Debt"), less various amounts negotiated by the parties. This agreement was first informally reached between Director of DWSD Victor Mercado and Macomb County Public Works Commissioner Anthony Marrocco around 2006.

10. The MIDDD Acquisition Agreement used, as a baseline, the OMIDDD Acquisition Agreement, which had already been thoroughly negotiated by the same parties through lengthy arms-length negotiations. The primary changes to the MIDDD Acquisition Agreement were in Schedule 3.8, which outlined Macomb System Debt, less various amounts negotiated by the parties that are outlined therein. Schedule 3.8 was also negotiated over a lengthy period of time through arms-length negotiations.

11. The Macomb System Debt, at the time of the agreement between Director Mercado and Commissioner Marrocco, was projected by DWSD to be over $116 million at the time of the sale. The final Macomb System Debt amount in Schedule 3.8 of the Macomb Acquisition Agreement – after extensive negotiation and review by MIDDD – was less than $90 million.

12. To my knowledge, I was present at or copied on all communications between DWSD and MIDDD regarding the amount of Macomb System Debt. At no point during the negotiations or during the closing of the Macomb Accusation Agreement on September 2, 2010, did anyone from MIDDD ever, in any respect, indicate or suggest that any portion of the 2004-2005 Sinkhole Repair Costs reflected in Schedule 3.8 (referred to on that schedule as "2004 Repairs") of the MIDDD Acquisition Agreement was inaccurate, fraudulent, excessive, or question it in any way whatsoever. Prior to the MIDDD Federal District Court litigation in front of Judge Cleland, it was never otherwise brought to my attention that MIDDD made such a claim either.

13. MIDDD had the ability, over the many years of negotiations of the OMIDDD Acquisition Agreement and MIDDD Acquisition Agreement, to undertake any due diligence necessary to satisfy itself regarding the underlying transaction.

14. As far as I knew then (and know now) the Macomb System Debt, including the charges for the 2004-2005 Sinkhole Repair, was a legitimate and not excessive amount that was arrived at after extensive negotiation and concession by both DWSD and MIDDD.

15. On September 2, 2010, MIDDD and DWSD also signed the Settlement and Release Agreement attached as Exhibit D to this affidavit, which agreement was part of the closing documents associated with the Macomb Acquisition Agreement. This Settlement and Release Agreement was intended to resolve and release all claims known and unknown between the parties that related in any way whatsoever to the Macomb Interceptor, any items in the Macomb Acquisition Agreement, or any disputes between DWSD, Macomb County or MIDDD.

16. Even assuming there are excessive charges in the Macomb System Debt, which I do not concede, I do not believe that the Macomb Acquisition Agreement would have

5

necessarily been ratified for a lesser amount. There were a variety of concessions and discounts given to MIDDD to expedite and close on the agreement. I do not know if those concessions would have been granted if MIDDD was also challenging the validity and/or amount of 2004-2005 Sinkhole Repairs.

17. I was interviewed by the Federal Bureau of Investigations or the United States Attorney's Office. The subject of my interview was the City of Detroit's contract procedures. At no point in my conversation did the 2004-2005 Sinkhole Repairs, CS-1368 or fraud or excessive charges come up.

18. I do not recall anyone representing Macomb County or MIDDD mentioning excessive charges for the 2004-2005 Sinkhole Repairs to me at any time before the December 2010 First Superseding Indictment in the *Kilpatrick* criminal investigations. In fact, at no time until the date the First Superseding Indictment in the *Kilpatrick* case was released, was I aware that there were any claims that are or were reasonably expected to become the subject of litigation affecting the Macomb System, as defined in the Macomb Acquisition Agreement, or the transactions contemplated by the Macomb Acquisition Agreement, except for property damage claims by residents near the Sinkhole that were settled prior to the September 2, 2010 Macomb Acquisition Agreement closing.

Further Affiant sayeth not.

_____
Robert Walter

STATE OF MICHIGAN )
                                ) SS
COUNTY OF WAYNE )

On July 14, 2014, before me, the undersigned, a Notary Public in and for said state, personally appeared Robert Walter, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed it.

Subscribed and sworn to before me
this 14 day of July, 2014.

*Monica R. Barnes*
Notary Public
_____ County, _____
Acting in _____ County, _____

My Commission Expires: _____

MONICA R. BARNES
NOTARY PUBLIC-STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires June 28, 2015

22633486.1\022765-00202