UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-------------------------------------------------------X
:
In re : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No. 13-53846
:
Debtor. : Hon. Steven W. Rhodes
:
:
-------------------------------------------------------X

# AFFIDAVIT OF DARRYL LATIMER

STATE OF _____ )
                        ) SS.
COUNTY OF _____ )

I, Darryl Latimer, being first duly sworn, depose and state as follows:

1. I am an adult and otherwise competent to testify to the facts stated below. If called as a witness, I can testify to the following facts from my own personal knowledge. I make this Affidavit based upon my own personal knowledge and my review of records kept in the ordinary course of business.

2. I have a Bachelor's Degree from Wayne State University in General Business Studies and a Master's Degree from Central Michigan University in General Administration.

3. I began working for the City of Detroit over 28 years ago. I began by working in the Recreation Department as a play leader. I then moved to the Detroit Water and Sewerage Department ("DWSD") as a messenger. I was the head of the Contracts and Grants Department during the 2004-2005 time period in question.

4. There was a major collapse of the Macomb Interceptor System ("Macomb Interceptor") on 15 Mile at or around Hayes in August of 2004, creating a massive sinkhole and necessitating immediate and emergency repairs due to the risk to the public safety and well-being ("2004-2005 Sinkhole Repairs"). These repairs began immediately and were completed in 2005.

5. The Contracts and Grants Department within DWSD reviews all invoices or other requests for payments based on whether the request conforms with the terms of the contract under which the payment is being requested. The Engineering Department, on the other hand, makes the determination regarding whether work is necessary or reasonable.

6. On or around February 2010, I was promoted by Director Pam Turner to Deputy Director of DWSD. Director Pam Turner left the department and retired on or around July 2010,

2

leaving me as the highest ranking employee in DWSD, but I was never formally given the title of Interim Director or Director of DWSD.

7. The Macomb Interceptor and related appurtenances were some of the only sewer assets owned by City's that was outside of the City's border. For a variety of reasons, the City decided to sell these assets.

8. At the time I became the Deputy Director of DWSD around February 2010, the terms of the Acquisition Agreement ("Acquisition Agreement") (attached as Exhibit A) were nearly complete. I signed the September 2, 2010 Acquisition Agreement transferring certain assets to the Macomb Interceptor Drain Drainage District ("MIDDD") based upon the recommendation of Counsel and after the Acquisition Agreement was approved by the DWSD Water Board and City Counsel. By the time the Acquisition Agreement was signed, Director Pam Turner had retired, and it was my responsibility to sign on behalf of the DWSD. I did not read the agreement in depth – but I was well aware that DWSD and MIDDD had negotiated the terms for a few years.

9. The underlying premise of the Acquisition Agreement was that MIDDD would purchase the Macomb Interceptor System debt owed on the system ("System Debt"), less various amounts negotiated by the parties.

10. I was not involved in negotiating any of the terms of the Acquisition Agreement, including but not limited to what the System Debt was, and as far as I knew then (and know now) the System Debt, including the charges for the 2004-2005 Sinkhole Repair, was legitimate and not excessive. The Acquisition Agreement was signed in 2010, while the repairs were completed in 2005. It never crossed my mind that MIDDD would take the position, years after the repairs were completed, that the charges for them were excessive and that MIDDD was

3

somehow defrauded by DWSD. To my knowledge, MIDDD never questioned the amount of the System Debt by accusing DWSD that any amount was fraudulent or excessive. Further, I was never personally made aware that MIDDD complained about the cost of any item in the Acquisition Agreement beyond negotiations in the normal course of coming to an agreement with which both parties were comfortable.

11. On September 2, 2010, I also signed the Settlement and Release Agreement attached as Exhibit B to this affidavit, which agreement was part of the closing documents associated with the Acquisition Agreement. Again, I signed on the advice of counsel as the DWSD representative, and I was not involved in the negotiation of the Settlement and Release Agreement. That being said, my general understanding regarding this Settlement and Release Agreement was that it resolved and released all claims known and unknown between the parties that related in any way whatsoever to the Macomb Interceptor, any items in the Acquisition Agreement, and/or any disputes between DWSD, Macomb County or MIDDD.

12. I am aware that in this matter, MIDDD has taken the position that the City of Detroit knew about allegedly excessive repair costs charged for the 2004-2005 Sinkhole Repairs that were eventually incorporated in the calculation of System Debt in the Acquisition Agreement prior to the signing of the agreement.

13. Consultant Services contract 1368 ("CS-1368"), awarded to Inland Waters ("Inland"), covered a variety of projects – the 2004-2005 Sinkhole Repairs being only one of them. The original CS-1368, as well as amendments 1, 4 and 5 were "as needed" contracts pertaining only to sewer lining tasks and were priced on a unit pricing system; they did not pertain the 2004-2005 Sinkhole Repairs. While CS 1368-4 contained language indicating that it

4

13-53846-tjt    Doc 6015-16    Filed 07/14/14    Entered 07/14/14 23:41:47    Page 4 of 7

was for sewer repairs, the CS 1368-4 amounts were not part of the 2004-2005 Sinkhole Repair costs.

14. The 2004-2005 Sinkhole Repairs were covered by CS-1368 through amendments two and three. These amendments, CS 1368-2 in the amount of $35,000,000 and CS 1368-3 in the amount of $23,000,000, totaled $58,000,000 and were "cost plus fees" contracts that were submitted because of the change in both type of work (from lining to extensive repair) and the emergency nature of the same. The unit pricing model simply did not apply to this contract. While I believe there were two requests for payment on 1368-2 and 3 which Engineering disallowed then partially restored, I believe these payments amounted to two or three hundred thousand dollars. I have not seen or heard anything to lead me to believe that there were excessive charges totaling millions of dollars for 2004-2005 Sinkhole Repairs. In fact, I have not seen or heard anything to lead me to believe there were *any* excessive charges for 2004-2005 Sinkhole Repairs. As far as I am concerned, MIDDD's claim that there were $26,000,000 of excessive charges is ludicrous.

15. Even assuming there are excessive charges in the Macomb System Debt, which I do not concede, I do not believe that the Macomb Acquisition Agreement would have necessarily been ratified for a lesser amount. As I understand, There were a variety of concessions and discounts given to MIDDD to expedite and close on the agreement. I do not know if those concessions would have been granted if MIDDD was charged a lower amount for the 2004-2005 Sinkhole Repairs.

16. I was interviewed more than once by the Federal Bureau of Investigations ("FBI") and the U.S. attorney's Office and testified once or twice before the Grand Jury. I believe these interviews and testimony began around February 2010. The thrust of their investigation seemed

to be on the City Local Economic Development Department (LED), not DWSD. I gathered that the FBI and U.S. Attorney's Office believed that the LED was showing favoritism to Bobby Ferguson Enterprises and, thus, giving him excessive credit in the rating system for instance for being a Detroit based company or a Minority company. This credit was considered in deciding who would be awarded contracts, and, thus, Ferguson Enterprises could have received contracts which it should have not gotten. Ferguson was a subcontractor, not the general contractor, on the 2004-2005 Sinkhole Repairs. I believe that the general contractor, Inland Waters, selected him, and LED would not have been involved.

17. I believe that there may have been brief mention of CS-1368 in my interviews with the FBI, the U.S. Attorney's office or Grand Jury testimony. However, I do not recall any discussion about excessive charges paid to cover the 2004-2005 Sinkhole Repairs, nor do I recall any suggestion that there may have been fraud in connection with the 2004-2005 Sinkhole Repairs.

18. Further, I do not recall anyone mentioning excessive charges to me until the 2011 indictment allegations by counsel for DWSD. At no time until the date the First Superseding Indictment in the *Kilpatrick* case was released, was I aware that there were any claims that are or were reasonably expected to become the subject of litigation affecting the Macomb System, as defined in the Macomb Acquisition Agreement, or the transactions contemplated by the Acquisition Agreement.

Further Affiant sayeth not.

_____
Darryl Latimer

STATE OF MICHIGAN      )
                       ) SS
COUNTY OF WAYNE        )

On July 14, 2014, before me, the undersigned, a Notary Public in and for said state, personally appeared Darryl Latimer, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed it.

Subscribed and sworn to before me this 14 day of July, 2014.

_____
Notary Public
Wayne County, Michigan
Acting in Wayne County, Michigan
My Commission Expires: 3-2-2018

22633381.1\022765-00202

```
DEBRA L RAGLAND
Notary Public - Michigan
Wayne County
My Commission Expires Mar 2, 2018
Acting in the County of Wayne
```