40

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff and Counter-Defendant

vs.

**Civil Action No. 77-71100**
**Honorable John Feikens**

STATE OF MICHIGAN,

      Defendant and Cross-Plaintiff
      And Cross-Defendant,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT

      Defendant and Cross-Plaintiff,

vs.



ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES

*et al*

_____/

## MACOMB COUNTY'S MOTION
### FOR PRELIMINARY INJUNCTION

    Anthony V. Marrocco, Macomb County Public Works Commissioner, as County Agency

for the Macomb County Wastewater Disposal System, moves for entry of an order to show cause

and a preliminary injunction against the City of Detroit and the Detroit Water and Sewerage

Department.

    This motion is based on Macomb County's Complaint and its Brief in Support of this

motion, all filed together.

Macomb County has requested DWSD's concurrence in the relief requested, through DWSD's counsel and at a meeting of both clients and counsel that occurred April 14, 2005. Neither DWSD nor its counsel have responded to those requests, making this motion necessary.

WHEREFORE, Macomb County prays that this Court enter its Order Directing DWSD to show cause why the Court should not order that:

1.     Pending resolution of Macomb's Complaint, DWSD shall not impose on Macomb County the $3 million charge it proposes for Fiscal Year 2005-2006, relating to the 2004 collapse of a portion of the Oakland-Macomb Interceptor, and shall not impose on Macomb County any charge relating to that collapse exceeding $300,000 per year.

2.     As an alternative to ¶ 1, pending resolution of Macomb's Complaint, DWSD shall charge the $3 million charge to the Emergency Repair and Replacement Fund, pending determination of the cause(s) of the 2004 collapse.

3.     DWSD shall forthwith file with the Court a written report to the Court summarizing and detailing (a) the maintenance and inspection, repair and refurbishing activities in the Oakland-Macomb Interceptor undertaken by DWSD since rendition of the Army Corps Report of 1980 and (b) DWSD's current and future program of inspection and preventive maintenance and other measures to prevent additional collapses in the Oakland-Macomb Interceptor.

4.     DWSD shall promptly provide to the Court and all parties a report of its investigation(s), if any, of the cause of the 2004 collapse. In the event that DWSD has made no investigation, such investigations shall be made, in a fashion consistent with the investigations made by the Army Corps of Engineers in 1980, at DWSD's cost.

2

Detroit_628795_1

5.    Macomb County requests that the Court convene an independent study of the condition of the entire Interceptor with the purpose of identifying all sections of the Interceptor which are at risk for failure and recommending a program of inspection and maintenance intended to prevent any additional failures,

Respectfully Submitted,

BODMAN LLP

By: _____

R. Craig Hupp (P26254)
James A. Smith (P20667)
Sarah Williams (P67510)
100 Renaissance Center, 34th Floor
Detroit, MI 48243
(313) 259-7777

Attorneys for Macomb County

June 21, 2005

3

Detroit_628795_1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff and Counter-Defendant

vs.

STATE OF MICHIGAN,

        Defendant and Cross-Plaintiff
        And Cross-Defendant,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT

        Defendant and Cross-Plaintiff,

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES

*et al*

_____/

Civil Action No. 77-71100
Honorable John Feikens

At a session of said Court held
the _____ day of June, 2005,
present the Hon. John Feikens,
United States District Judge

ORDER TO SHOW CAUSE

    Anthony V. Marrocco, Macomb County Public Works Commissioner, has filed a rate

challenge complaint and moved for entry of an order to show cause and a preliminary injunction

Detroit_628809_1

against the City of Detroit and the Detroit Water and Sewerage Department, with supporting brief and proof of service on DWSD's counsel.

NOW THEREFORE, IT IS ORDERED that the City of Detroit and the Department of Water and Sewerage appear before this Court on _____, 2005, to show cause why the Court should not order that:

1.      Pending resolution of Macomb's Complaint, DWSD shall not impose on Macomb County the $3 million charge it proposes for Fiscal Year 2005-2006, relating to the 2004 collapse of a portion of the Oakland-Macomb Interceptor,  and shall not impose on Macomb County any charge relating to that collapse exceeding $300,000 per year.

2.      As an alternative to ¶ 1, pending resolution of Macomb's Complaint, DWSD shall charge the $3 million charge to the Emergency Repair and Replacement Fund, pending determination of the cause(s) of the 2004 collapse.

3.      DWSD shall forthwith file with the Court a written report to the Court summarizing and detailing (a) the maintenance and inspection, repair and refurbishing activities in the Oakland-Macomb Interceptor undertaken by DWSD since rendition of the Army Corps Report of 1980 and (b) DWSD's current and future program of inspection and preventive maintenance and other measures to prevent additional collapses in the Oakland-Macomb Interceptor.

4.      DWSD shall promptly provide to the Court and all parties a report of its investigation(s), if any, of the cause of the 2004 collapse.  In the event that DWSD has made no investigation, such investigations shall be made, in a fashion consistent with the investigations made by the Army Corps of Engineers in 1980, at DWSD's cost.

2

Detroit_628809_1

5       Counsel for Macomb County shall promptly serve a copy of this Order on Counsel for DWSD.

_____

John Feikens, United States District Judge

3



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff and Counter-Defendant

vs.

STATE OF MICHIGAN,

        Defendant and Cross-Plaintiff
        And Cross-Defendant,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT

        Defendant and Cross-Plaintiff,

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES

*et al*

                             /

**Civil Action No. 77-71100**
**Honorable John Feikens**

RECEIVED
JUN 2 7 2005
CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

**FILED**
JUN 2 7 2005
CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

## MACOMB COUNTY'S BRIEF IN SUPPORT
## OF PRELIMINARY INJUNCTION

Bodman LLP
Attorneys for Macomb County
R. Craig Hupp (P36254)
James A. Smith (P20667)
Sarah J. Williams (P67510)
34th Floor, 100 Renaissance Center
Detroit MI 48243
313-259-7777

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

INDEX OF EXHIBITS ................................................................................................... ii

STATEMENT OF ISSUES PRESENTED ................................................................. iii

CONTROLLING AUTHORITIES ............................................................................. iv

SUMMARY ..................................................................................................................... 1

    FACTS ....................................................................................................................... 2

        A.  The Macomb-Detroit Contract. ................................................................. 2

        B.  The First Collapse ......................................................................................... 3

        C.  The Second Collapse ..................................................................................... 4

        D.  The 1980 Rate Rule ...................................................................................... 4

        E.  The Third Collapse and New Rates ........................................................ 5

        F.  The Cause of the Collapses ........................................................................ 6

    ARGUMENT ........................................................................................................... 11

        1.  Summary ........................................................................................................ 11

        2.  Likelihood of Success ................................................................................ 12

            (a)  It Is Likely The Collapse Was Caused By DWSD's Negligent Failure
                To Prevent Groundwater Leaks And To Take Recommended
                Preventative Measures. ........................................................................ 13

            (b)  DWSD May Not Recover From Its Suburban Customers Costs
                Incurred Because Of Its Mismanagement. ...................................... 14

                (i)  The Costs of the Repair Are Not Chargeable To the Ratepayers
                     Because It Was Imprudent of DWSD to Fail to Act To Prevent
                     The 2004 Collapse. ...................................................................... 14

                (ii)  It Is Likely That Macomb's Objection to the Dispute Rate will
                     Prevail on a Cost of Service Approach. ................................... 21

                (iii)  DWSD Is Obliged Under the Contract To Hold Macomb
                     Harmless for DWSD's Failure to Insure the Tunnel Was Properly
                     Built. .............................................................................................. 22

                (iv)  The Preliminary Relief Requested Is Consistent With DWSD
                     Policy and Court-ordered Relief in Prior Disputes. ............ 23

        3.  Relative Harm ............................................................................................. 24

        4.  Public Interest ............................................................................................. 26

CONCLUSION ............................................................................................................ 27

## INDEX OF EXHIBITS

Exhibit 1.    The 1967 Detroit/Macomb Contract

Exhibit 2.    1982 Rate Settlement (excerpts) (approved July 21, 1982)

Exhibit 3.    Smith, Hinchman and Grylls Associates, Design Report For Repair of Romeo Interceptor (March 1980) (excerpts)

Exhibit 4.    1980 Rate Settlement (filed August 26, 1980) (excerpts)

Exhibit 5.    Letter from W. Carney, DWSD, to K. Bonin, Macomb County (Sept. 19, 1986)

Exhibit 6.    Letter from DWSD Director Beckham to DWSD Board (December 11, 1980)

Exhibit 7.    DWSD Board Minutes (February 6, 1980)

Exhibit 8.    Statement by Macomb County Public Works Commissioner Anthony V. Marrocco to Detroit City Council (February 10, 2005)

Exhibit 9.    Letter, Anthony Marrocco to Victor Mercado (November 16, 2004)

Exhibit 10.   Order Re: Macomb County's Amended Petition Re: Oakland-Macomb Interceptor Break (March 7, 1980)

Exhibit 11.   U.S. Army Corps of Engineers, 15 Mile Road/Edison Corridor Sewer Tunnel Failure Study (September 1980)

Exhibit 12.   Hearing Transcript (November 5, 1980)

Exhibit 13.   Jenny Engineering, Interim Report Upon Inspection of Sewer Tunnel Built Under Contract No. PCI-7 (June 1981)

Exhibit 14.   Jenny Engineering, Interim Report Upon Inspection of Sewer Tunnel Built Under Contract No. PCI-12A (June 1981)

Exhibit 15.   DWSD Website, Macomb Interceptor Information Page (August 30, 2004) (www.dwsd.org/projects/update 0830.htm)

Exhibit 16.   DWSD Website, Macomb Interceptor Information Page (November 12, 2004) (www.dwsd.org/projects/update 1112.htm)

Exhibit 17.   AWWA Water Rates Manual M1 (4th ed.) (excerpts)

Exhibit 18.   Second Amended Consent Judgment (August 3, 2000)

Exhibit 19.   Order Re Mathematical Model (February 22, 1991)

Exhibit 20.   1999 Rate Settlement Agreement (excerpts)

Exhibit 21.   Letter, Morgan Guaranty Trust Company to DWSD (November 14, 1980)

Exhibit 22.   The Foster Group, Report on FY 2005-06 Sewer Rates and FY 2003-04 Look-Back Adjustments (March 2005) (excerpts)

## STATEMENT OF ISSUES PRESENTED

1.      DWSD proposes to charge Macomb County $3 million in FY 2006 and potentially as much as or more than $5.5 million in FY 2007 and later years, to pay for repairs to the Oakland-Macomb Interceptor.  The repairs of a 2004 break were required because of negligent construction overseen and accepted by DWSD and negligent inspection and repair of the construction defects by DWSD.  May DWSD charge Macomb for the consequences of DWSD's errors and fault?

2.      DWSD could have avoided the 2004 break by prudent management but failed to do so.  May DWSD charge the cost of imprudent investment to Macomb or does the prudent investment rule for utilities, applicable in Michigan, forbid that charge?

3.      Does the proposed charge to Macomb violate the Detroit-Macomb contract?

4.      Does the proposed charge to Macomb alone violate a 1980 Rate Rule adopted by the Board of Water Commissioners, that remained in place when the 2004 break occurred?

5.      Can DWSD charge Macomb twice for the same facility when the necessity of rebuilding it is entirely DWSD's fault?

iii

Detroit_613022_7

# CONTROLLING AUTHORITIES

*Missouri ex rel Southwestern Bell Tel Co. v. Public Service Comm.*, 262 U.S. 276, 290 (n.1) (1923)

*Gulf States Utilities Co. v. Louisiana Public Service Comm.*, 578 So. 2d 71 (La. 1991), *cert denied*, 502 U.S. 1004 (1991)

*Union Carbide Corp. v. Public Service Commission*, 431 Mich. 135, 149; 428 N.W.2d 322 (1988)

*Triple E. Produce Corp. v Mastranardi Produce*, 209 Mich. App. 165, 174, 530 N.W. 2d 772 (1995), lv. dn., 450 Mich 897, 899, 541 N.W. 2d 772 (1995)

*Association of Businesses Advocating Tariff Equity v. Michigan Public Service Comm.*, 208 Mich. App. 248, 527 N.W. 2d. 533 (1994), lv. den. 450 Mich. 890 (1995)

*Consumers Power Co. v. Mich. Pub. Svc. Comm.*, 196 Mich. App. 687, 493 N.W. 2d 494 (1992)

*In re Detroit Edison Co.*, 24 P.U.R.4th 362 (Mich. Pub. Svc. Com.) (1978)

American Water Works Association Water Rates Manual (4th ed.)

## MACOMB COUNTY'S BRIEF IN
## SUPPORT OF PRELIMINARY INJUNCTION

### SUMMARY

Macomb County[1] challenges one component of the sewage rates set by Detroit for Fiscal Year 2005/2006 – a $3 million annual charge allocated to Macomb County alone.  DWSD asserts that this charge is made to finance repairs of a 2004 collapse of the Oakland-Macomb Interceptor and a massive sinkhole which destroyed 15 Mile Road.  Macomb County asserts that Detroit and only Detroit must pay the costs of restoring the interceptor and the road surface. Macomb asks the Court to issue a preliminary injunction (1) forbidding DWSD from imposing the entire cost of repairs upon Macomb and (2) requiring that DWSD either spread those costs to the entire system and all customers or charge them to its Emergency Repair and Replacement Fund. The injunction should continue until the 2004 collapse can be investigated and the parties and the Court can be equipped with facts concerning the collapse, its causes and its costs.

A preliminary injunction is proper here because:

1.       The last peaceable, uncontested status among the parties was a rate system adopted by the Detroit Water Board in 1980 in which extraordinary costs of major repairs and improvements were spread to all customers on a common to all basis.

2.       The collapse would have been avoided if DWSD had heeded its engineers' 1981 advice that collapses were inevitable unless careful monitoring and preventative maintenance were conducted on an ongoing basis.

---

[1] Macomb County Public Works Commissioner Anthony V. Marrocco, serves as County Agency for of the Macomb County Wastewater Disposal District.

1

3.      The Court has previously exercised its jurisdiction over rate disputes to impose temporary orders requiring that costs be spread common to all until fact investigations could be made and completed.

4.      DWSD's Emergency Repair and Replacement fund is adequate to defray the charge imposed on Macomb alone for the period necessary to make investigation and resolve the issue by judicial decision, if necessary.

# I

## FACTS

Detroit City Council in March, 2005, over Macomb's strong protest, adopted sewerage rates for the 2005/2006 fiscal year which impose on Macomb County the annual amortization of $30,000,000 in repairs that DWSD has incurred to address the failure and collapse of the Oakland Macomb Interceptor under 15 Mile Road near Hayes Road in Sterling Heights.[2] That annual charge is $3,000,000 from Macomb in the fiscal year beginning July 1, 2005. DWSD has informed Macomb that total repair costs are in excess of $53,000,000, so the rate will nearly double in 2006/2007. Because the cost of the repairs is amortized over 30 years, if DWSD has its way Macomb will ultimately pay over $100,000,000 to DWSD as a result of the sewer collapse.

## A.      The Macomb-Detroit Contract.

The 1967 service contract between Macomb and Detroit, (Ex. 1) obligates Detroit to build, own and maintain the Oakland-Macomb Interceptor. The Interceptor was built in the late

---

[2] The 1982 Rate Settlement requires that all major repairs be paid through debt and amortized over 30 years. Ex. 2, 1982 Rate Settlement (excerpts), ¶ 6. It is Macomb's understanding that DWSD has recently undertaken borrowing consistent with that settlement to cover the costs incurred to repair the 2004 collapse.

2

Detroit_613022_7

1960s and early 1970s as a continuous project. It runs from 8 Mile Road to 15 Mile Road in the Edison Corridor, in Warren and Sterling Heights. At 15 Mile Road, the interceptor splits into two arms extending east and west along 15 Mile Road. The Contract provides that Detroit will own the interceptor in perpetuity, Contract § 21, and that only DWSD may maintain it. *Id.* Detroit must "save harmless [Macomb] from all liability, claims, suits, actions, or cause of action for damages for injuries, including death, or otherwise by reason of the construction work." *Id.* Macomb claims that the 2004 collapse resulted from original construction defects and Detroit's failure to heed the lessons taught by earlier collapses. The 2004 collapse site is between the 1978 and 1980 collapses and is traceable to the same conditions.

## B.     The First Collapse.

On July 29, 1978, a collapse was discovered in the vicinity of 15 Mile and Hayes in a section of the interceptor known as PCI-12A, evidenced by serious buckling and settlement of the south lane of 15 Mile Road. Ex. 3, Smith, Hinchman and Grylls Associates, Design Report for Repair of Romeo Arm Interceptor (March 1980) ("SH&G Report"), p. I-1. Claerhout Brothers, a contractor engaged by the City of Fraser, was at work at Hayes/15 Mile, dewatering soils in preparation for installation of a new connection to the interceptor. The 1978 collapse was commonly attributed to Claerhout's activities. The SH&G Report states that the damaged section of tunnel was filled with loose fine sand and silt, *id.* at II-2, II-4, and that in the area of the collapse groundwater had carried those materials into the tunnel. *Id.* at II-4, II-5. These observations, when considered in the context of the subsequent Corps of Engineers and Jenny Engineering reports discussed below, suggest that the root cause of the sewer failure leading to the 1978 collapse was not Claerhout Brothers' activities, although the dewatering may have contributed to the actual collapse.

3

The repairs took over three years to carry out. The costs of repair were estimated in 1981 to be in excess of $34,400,000 in 1981 dollars (the equivalent of $65,200,000 today[3]). Ex. 4, 1980 Rate Settlement (excerpts), ¶ 2. Macomb bore a large share of the temporary repair costs, but that share was capped at $12.4 million. Ex. 4, § 2(c). The remaining temporary repair costs were borne by all customers. *Id.* The permanent repair costs were borne largely by federal and state grants and by a recovery from Claerhout Brothers' insurer. A portion of the permanent repair costs was borne by Macomb under an agreement which capped the portion allocated to Macomb at $4.4 million. Ex. 4. Macomb's share actually worked out to less than $2 million. Ex 5, Sept. 19, 1986 letter from W. Carney, DWSD, to K. Bonin, Macomb County.

## C.    The Second Collapse.

In January, 1980, a trio of collapses was discovered in the interceptor in the Edison Corridor. Two were partial. One was complete. The 1980 collapses were south and downstream of 15 Mile Road, in a section of the interceptor known as PCI-7. This repair was estimated in 1980 to cost at least $19,500,000 ($37,000,000 in current dollars), Ex. 6, Letter from DWSD Director Beckham to DWSD Board (Dec. 11, 1980), and took at least 2 years to complete.

## D.    The 1980 Rate Rule

In February, 1980, immediately after discovery of the Edison Corridor collapses, the Detroit Board of Water Commissioners resolved that the costs of the 1980 interceptor collapse and all future "extraordinary costs incurred in connection with water and sewer mains, water intake facilities and the sewage treatment plant, be borne by users of the entire system without

---

[3] Based on the U.S. Army Corps of Engineers, Civil Works Construction Cost Index System (updated through September 30, 2004), Table A-2.

4

reference to where a problem might have occurred." Ex. 7, DWSD Board Minutes (February 6, 1980), p. 11.

In December 1980, DWSD management submitted to the Water Board a rate proposal that conformed with the February 1980 Resolution. It apportioned the costs of repair to all customers of the system, a rate increment of 10¢ per mcf. DWSD's Director explained to the Water Board that the 1980 collapse differed from the 1978 collapse because the 1980 collapse was "caused by natural forces." Ex. 6, Beckham Letter. Director Beckham stated:

> "Based on our analysis of the facts and also in recognition of the position expressed by the Board in February, 1980, shortly after the damage was discovered, it is our recommendation that this expense be allocated on a system-wide basis. I recommend that the Board take action affirming this recommendation." *Id.*

The Water Board approved that "system-wide" allocation.

Wayne County challenged that decision. The parties tried that issue in this case in 1981 but, before any decision by this Court, they reached a negotiated settlement (Ex. 2, the 1982 Rate Settlement) that lifted part *but not all* of the cost from Wayne County and redistributed it to all other customers, adding 1¢ per MCF to their rates. That rate adjustment has continued to the present day and will continue until the bonding to cover those repairs is repaid in full.

**E.      The Third Collapse and New Rates.**

In August 2004, a massive sinkhole developed on 15 Mile Road, adjacent to the 1978 collapse. DWSD took prompt action to bypass the collapse, but did not engage in any competitive bidding of final repair work and did not confer with Macomb or any other customer about potential cost-saving measures. Ex. 8, Statement by Macomb County Public Works

5

Commissioner Anthony V. Marrocco to Detroit City Council (February 10, 2005). DWSD says that the cost of repair is at least $53,000,000.

Since the 2004 collapse, Macomb asked DWSD for information concerning the cause of the new collapse, but has been given none. Ex. 9. Letter, Anthony Marrocco to Victor Mercado, (November 16, 2004). By comparison, in 1980, the Court ordered DWSD to share all information about the 1980 collapse and to provide access to the Edison Corridor site during the repair process. Ex. 10, Order Re: Macomb County's Amended Petition Re: Oakland-Macomb Interceptor Break (March 7, 1980).

DWSD management ignored and violated the Water Board's 1980 Rule when it set the 2005/2006 rates. DWSD did not spread the 2004 extraordinary costs "system-wide" as required by the 1980 Rule, and as it did in connection with the 1980 collapse. Instead, DWSD imposed *all costs* of the new collapse on Macomb alone, effectively requiring Macomb to hold DWSD harmless and turning the Contract on its head. DWSD's rate presentation merely asserted that it was treating the 2004 collapse as it had treated the 1978 collapse, a statement completely at odds with the true situation – DWSD does not propose to use grant funds to pay for a large part of the cost of the repair, DWSD does not propose to cap Macomb's contribution towards the cost of the repair, and DWSD does not propose to allocate the remaining costs to all customers.

**F.     The Cause of the Collapses.**

The 1980 collapse shed substantial doubt on the parties' assumption that Claerhout Brothers alone caused the 1978 collapse. Indeed, the SH&G Report for the repair of the 1978 collapse noted the presence of fine soils in the collapsed interceptor and attributed it to the action

of groundwater in carrying soils into the interceptor, Ex. 3, SH&G Report, pp. II-4,5, the same circumstances which caused the 1980 collapse.

The concern raised by the 1980 collapse was so great that the Court invited the Army Corps of Engineers to investigate. EPA joined in the request. The Corps concluded that the second group of collapses resulted solely and "inevitably" from defects in the original construction of the interceptor which were not caught by DWSD before it accepted the construction work. Those defects in concrete pouring permitted groundwater carrying fine sands and soils to leak into the interceptor, eroding its support and leading to its collapse. As the interceptor began to fail, the cracks opened wider and the flow of groundwater and fine soils into the tunnel increased, exacerbating the failure. Excerpts from the Corps Report, September 1980, are attached as Ex. 11. The Corps Report became the subject of a hearing at which its authors were examined. [4]

The Corps Report stated that the contractor who constructed the original Interceptor had created "open joints" and "cold pours" which permitted water to leak into the interceptor.[5] The Corps Report found that concrete was poured in "substantial placement lengths," of "generally 105 ft." These placement lengths "directly increased the potential for cold joints in the concrete liner. This potential was frequently realized due to the late arrival of concrete trucks and plugged concrete drop pipes, resulting in pour delays." *Id.*, Finding 107.c., p. 181.

---

[4] Army Corps witness Hoff, Mitchell and Albert were simultaneously sworn and testified about various matters. The transcript is attached as Ex. 12, Transcript (Nov. 5, 1980).

[5] Leaks can occur in concrete tunnels where concrete from a prior pour or placement of concrete has cured sufficiently that the next pour of concrete does not bond to it. This may be done intentionally as a matter of design, creating an "open joint," or may occur because of unintended delays in making the new pour, creating a "cold pour."

7

Detroit_613022_7

While the interceptor was being tunneled, the surrounding soil was dewatered. Mitchell, Ex. 12, p. 17. For most of the tunnel, except a short segment, no seepage was noted during construction. Corps Report, ¶¶ 51, 53, pp. 44-45. DWSD inspected the construction while the dewatering pumps still operated. Albert, Ex. 12, p. 18. DWSD inspected the contractor's work on PCI-7 on July 12, 1972, Corps Report, ¶ 14, p. 11. The dewatering wells were still running then and were operated until early to mid August. *Id.*, ¶ 51, p. 44, *Id.*, Table 6. After inspection, the dewatering ceased and ground water was permitted to rise around the interceptor. *Id.* The "distress actually began immediately following construction as soon as the groundwater level was sufficiently high to initiate piping of soil through open construction and cold joints." Ex. 11, Finding 109, p. 183.

The Corps found that "[s]tratification of the glacial lake deposits along the tunnel showed uniformly fine to medium graded beach sand unit along the base of the tunnel." *Id.*, Finding 107.e, p. 181.

> "[F]ine to medium sands, silty sands, and silts from the site were susceptible to piping through small crack openings under water pressures of less than 2 psi, but the uniformly graded fine to medium sands were *highly* susceptible to piping under water pressures of less than 1 psi." *Id.*, Finding 107.f., p. 181 [emphasis in original].
>
> "Staining in construction joints and from cold joints indicated leakage through these joints. Evidence of sand infiltration through construction joints and cold joints was found during field work." *Id.*, Finding 107.i, p. 182.
>
> "As material piped into the tunnel, the tunnel lost bottom and side support," *Id.*, Conclusion 108.f, p. 183.
>
> The Corps Report concluded:
>
> "* * * This piping took place over a significant period of time. As greater loss of support occurred, the concrete liner deformed, the cracks opened wider, and more soil was allowed to pipe into the tunnel. These events progressed until the

8

distress was manifested by the crack pattern found, and by total collapse at Distressed Area No. 1 and partial collapse at Distressed Area No. 3." *Id.*, Conclusion 109, p. 183.

Corps witness Mitchell stated that, given the conditions observed in the interceptor, the piping of fines into the interceptor was "inevitable." Ex. 12, p. 26.

The Corps "didn't make any condition survey or we did not look for other disturbed areas outside of the section we were charged with." *Id.*, p. 15. Witness Mitchell described how to find other problem sections:

> "Two things: a mapping of the interior of the tunnel to locate all joints that are not water-tight; and then a detailed mapping of the soil profile outside of the tunnel to pinpoint co-locations of open joints and piping material.

> Q.    "Do you happen to be able to tell me whether your core drillings and observations from those done by the City of Detroit before the construction was done, indicate that there are other areas along this section you have studied which have pipeable silts near the locus of the interceptor?

> A.    "Yes.  We will expect this would be just about anywhere you would have the lake bed deposits." *Id.*, p. 16.

DWSD retained Jenny Engineering Corp., a nationally recognized tunnel design firm from the East Coast, to carry out an inspection along the lines of the Corps' recommendation. That inspection confirmed the Corps' testimony – there were many more leaky sections with similar problems posing similar risks.

In June, 1981, Jenny Engineering reported on "PCI-7," the segment in the Edison Corridor where the 1980 collapses had occurred. Jenny Engineering found that there were 177 leaks in that segment and that leaking water "contained soil particles."   Ex. 13, Jenny Engineering, Interim Report Upon Inspection of Sewer Tunnel Built Under Contract PCI-7 (June 1981), p. 7-5-2. Jenny Engineering's unqualified opinion was that "Leakage of soil particles into

9

Detroit_613022_7

the tunnel will eventually lead to failure of the tunnel lining." *Id.*   Jenny Engineering further warned that: "Structures overhead will settle and be damaged by a tunnel failure, or eventually by the loss of ground outside the tunnel." *Id.*   Jenny Engineering recommended grouting all cracks, an effective means of preventing the leaks that would otherwise doom the tunnel. *Id.*

Also in June, 1981, Jenny Engineering issued a similar report on segment PCI-12A, the eastern extension along 15 Mile Road where the 1978 and 2004 collapses occurred. That report concluded that the segment "is located in various combinations of sand, gravel and silt with very little clay in the downstream half." Ex. 14, Jenny Engineering, Interim Report Upon Inspection of Sewer Tunnel Built Under Contract PCI-12A (June 1981). The downstream half includes the site of the 2004 collapse. Again, Jenny Engineering's unqualified opinion was that "Leakage of soil particles into the tunnel, although not serious at present, will eventually lead to failure of the tunnel lining." *Id.*, p. 12A-5-2. Again, Jenny Engineering made the point that a tunnel failure would cause structures overhead to settle and be damaged. *Id.*   Jenny Engineering again recommended grouting to prevent the leaks and soil intrusion. In this section, groundwater is 20' to 30' above the top of the tunnel. [6] Ex. 14, Figure 12A-2.

The SH&G Report in March, 1980 made this same point in discussing whether a new tunnel should be used to replace the 1978 collapsed section.

> "Although an unreinforced section [of tunnel] has sufficient strength and is often used, it is very sensitive to distortion and cracking should the loading on the section become unbalanced. The possibilities of this occurring in the replacement tunnel should be considered. Changes in loading usually result from losses of ground in the immediate zone of the tunnel. This can be caused by future

---

[6] The Corps observed "piping" of soils through cracks in the tunnel at groundwater pressures below 1 psi. Ex. 11, Corps Report, ¶ 71, p. 109. Groundwater twenty feet above the top tunnel would exert more than 9 psi on the tunnel.

construction near the tunnel or by groundwater carrying surrounding soils into the tunnel through cracks or poor joints (piping)....[T]he fine surrounding soils are very susceptible to piping. Piping would result in a progressive loss of earth and would ultimately cause failure." Ex. 3, SH&G Report, pp. III–4, 5.

DWSD has apparently concluded that the 2004 collapse occurred in the manner predicted by the Corps, Jenny Engineering and SH&G. DWSD explains the 2004 collapse as being the result of a break of undetermined origin and size, leading to leakage into the sewer, which carried soil into the sewer, eroding support for the sewer and leading to its collapse. Ex. 15, DWSD Website, Macomb Interceptor Information page, August 30, 2004. The explanation is completely consistent with the conclusion of the Corps, Jenny Engineering and SH&G that collapse is the inevitable result of cracks permitting leakage into the sewer, causing failure to progress from small leaks to large cracks to complete collapse. Accordingly, it appears likely that the 2004 collapse has a common cause with the 1980 and 1978 collapses, was predicted and thus avoidable.

In summary, DWSD's failure to inspect to make sure the interceptor was constructed properly in the first instance and its subsequent failure after the 1980 collapse to monitor the interceptor in order to detect signs of the inevitable collapse predicted by the Corps, Jenny Engineering and SH&G, are the direct causes of the 2004 collapse. These causes were under DWSD's control because it had exclusive control over the design of the tunnel, inspection of construction, and inspection and preventative maintenance after construction.

## ARGUMENT

### 1.    Summary

Macomb County seeks a preliminary order requiring the Board to abide by its 1980 Rate Rule until such time as the Board has demonstrated a factual and legal basis for allocating costs

11

of the repair on some other principled basis consistent with established ratemaking principles and standards and with the Contract. The relief requested will preserve the *status quo ante* of recovering the cost of such unusual and extensive repairs on the basis of a common to all allocation.

As an alternative, Macomb County asks the Court to direct that those costs be defrayed from the Emergency Repair and Replacement Fund, putting the cost on no customer until the issues are resolved.

The standard for a preliminary injunction is straightforward.

> "The issuance of a preliminary injunction is governed by Fed.R. Civ. P. 65. There are four factors to be balanced when considering a motion for a preliminary injunction: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.' *Rock and Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). The plaintiff carries the burden of persuasion. *Leary v. Daeschner*, 228 F. 3d. 729, 739 (6th Cir. 2000) citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)." *Michigan Rehabilitation Clinic Incorporated, P.C. v. City of Detroit*, 310 F. Supp. 2d 867, 869 (E.D. Mich 2004).

2.    **Likelihood of Success**

Macomb County will prevail in this dispute if it can show that DWSD may not charge the cost of the repair to its suburban customers under established ratemaking principles or the Contract. Facts known to date support the very strong likelihood that the 2004 collapse was the result of construction defects which were identified by the Corps and Jenny Engineering in 1980 and 1981, from which they and SH&G predicted future failures at any location where water carrying fine soils was permitted to leak into the tunnel. If DWSD did not continue an active and ongoing program after 1981 to identify and correct leaks into the tunnel, then it guaranteed

tunnel collapses would occur. Well accepted ratemaking principles provide that a utility may not pass on to its customers the costs of imprudent decisions made by the utility. What could be more imprudent than a utility, after two extensive tunnel collapses, failing to heed its engineers' unequivocal predictions that further expensive collapses were certain to occur unless monitoring and precautionary measures were taken? In addition, the Contract places the burden on Detroit to bear the risk and liability from defective tunnel construction from which the current collapse surely proceeded. Accordingly, there is a strong likelihood that Macomb will prevail in this rate dispute.

### (a)   It Is Likely The Collapse Was Caused By DWSD's Negligent Failure To Prevent Groundwater Leaks And To Take Recommended Preventative Measures.

This is not merely a matter of *res ipsa loquitur*, although that doctrine alone would justify Macomb's complaint. DWSD has ignored Macomb's questions whether DWSD has investigated the cause of the 2004 collapse. However, some things are known. First and foremost, collapses were predicted as certain by the Corps, Jenny Engineering and SH&G unless leaking areas of the tunnel identified in Jenny Engineering's Report and any new leaks were grouted. Second, a substantial  part of the ground around the interceptor simply disappeared,  leaving a large sinkhole. It could have gone but one place, into the sewer. Third, there was sand in the area, reflective of glacial lake beaches, as stated in the Corps Report and as reported in soil profiles in the SH&G Report. Fourth, the presence of sand in the collapsed tunnel is confirmed by DWSD's report that "crews are removing a mixture of sand and sludge from the portion of the interceptor to be repaired." Ex. 16, DWSD Website, Macomb Interceptor Information page (November 12, 2004). Finally, there were no contractors interfering with the interceptor, nor were there any

13

earthquakes. These facts point to leaking of groundwater into the tunnel, eroding supporting soil into the interceptor until collapse occurred.

The history of this interceptor teaches that the problems identified by the Corp, Jenny Engineering and SH&G could not be ignored. Once a leak develops, failure and a collapse can occur within a few years (in less than 6 years in the case of the 1978 collapse).

The only entity with authority and control over the interceptor is Detroit. No other party had the power to inspect or maintain it. No other party could determine whether problems like those discovered in 1980 existed on 15 Mile Road, or do something about them. A predicted but preventable collapse occurred, in all likelihood through DWSD's fault and inaction.

If the DWSD is at fault for the collapse, may it pass the cost of the repair on to its customers? For the reasons which follow, the answer is "No!"

> **(b)** **DWSD May Not Recover From Its Suburban Customers Costs Incurred Because Of Its Mismanagement.**
>
>> **(i)** **The Costs of the Repair Are Not Chargeable To the Ratepayers Because It Was Imprudent of DWSD to Fail to Act To Prevent The 2004 Collapse.**

Because utilities like DWSD exercise something akin to monopoly power, courts and ratemaking bodies have adopted rules of law to protect consumers from gouging and improvident expenditures by the utility. Utilities are not permitted to behave willy nilly nor may they operate carte blanche on the credit of their customers.

One of the basic principles of ratemaking intended to protect consumers is the rule of prudent investment. That rule permits a utility to recover from its customers prudent and reasonable costs of assets and activities designed to serve those customers but bars the recovery

14

of unreasonable or imprudent costs.  When a utility  incurs unreasonable or imprudent costs, it

must absorb them itself and may not recover from its customers.

The prudence standard originated from Justice Brandeis' dissent in *Missouri ex rel*

*Southwestern Bell Tel Co. v. Public Service Comm.*, 262 U.S. 276, 290 (n.1) (1923):

> "The term 'prudent investment' is not used in a critical sense.  There should not
> be excluded from the finding of the base, investments which, under ordinary
> circumstances, would be deemed reasonable.  The term is applied for the purpose
> of excluding what might be found to be dishonest or obviously wasteful or
> imprudent expenditures.  Every investment may be assumed to have been made in
> the exercise of reasonable judgment, unless the contrary is shown."

The primary justification for the imposition of the prudent investment standard against

utility companies is that:

> "The principle of prudence has developed in part to counterbalance the monopoly
> power of public utilities.  As one Public Service Commission has observed: 'If a
> competitive enterprise tried to impose on its customers costs from imprudent
> actions, the customers could take their business to a more efficient provider.  A
> utility's ratepayers have no such choice.  A utility's motivation to act prudently
> arises from the prospect that imprudent costs may be disallowed'" *Gulf States
> Utilities Co. v. Louisiana Public Service Comm.*, 578 So. 2d 71, 85, n6 (La.
> 1991), *cert denied*, 502 U.S. 1004 (1991) (citations omitted).

As explained in the "Water Rates" Manual of the American Water Works Association,

municipal utilities are analogous to public utilities in this regard.  "A government owned utility

may be considered to be the property of the citizens within the city.  Customers within the city

are owner customers, who must bear risks and responsibilities of utility ownership.  Outside-city

customers are non-owner customers and, as such, bear a different responsibility for costs than do

owner customers." Ex. 17, AWWA Water Rates Manual (4[th] ed.), pp. 22-23.  The effect of the

prudent investment rule is to  place the risk of loss from mismanagement and failure to safeguard

15

Detroit_613022_7

physical assets on the owner customers who can affect the composition of the "Board" of the utility just like shareholders in a publicly owned utility – through the election process.

Several decisions have characterized a utility's obligation to its ratepayers as a duty. *Georgia Power Co. v. Georgia Public Service Comm.*, 396 S.E.2d 562, 569 (Ga. Ct. App.), *cert den.* 1990 Ga. LEXIS 483 (Oct. 23, 1990) ("The concept of prudence implies a standard or duty of care owed to others.); *Re Union Electric Co.*, 66 P.U.R. 4[th] 202 at 214(1985) ("[A] standard of reasonable care requiring due diligence is appropriate for determining whether [a utility's] actions during the course of the project were prudent."). See also, the MPSC's holding in the *ABATE* and *Detroit Edison* cases *infra*.

The rule of prudent investment has been adopted and applied in Michigan. In *Association of Businesses Advocating Tariff Equity v. Michigan Public Service Comm.*, 208 Mich. App. 248, 527 N.W. 2d. 533 (1994), lv. den. 450 Mich. 890 (1995) ("*ABATE*"), Consumers Power appealed the MPSC's conclusion that although Consumers Power Company's decision to build a nuclear plant at Midland was not imprudent when made, its subsequent decision to continue construction after serious problems arose was imprudent. Because costs incurred (totaling over $1.3 billion) after the decision to continue in July 1980 could have been avoided by prudent measures, the Court of Appeals affirmed the MPSC's decision that they could not be recovered from ratepayers. Consumers Power absorbed that cost.

The conclusion of the MPSC, as summarized and quoted with approval by the Court of Appeals, has application here:

"In its opinion, at 199-202, the PSC explained that from July 2, 1980, Consumers adopted a path that was virtually certain to fail and was unduly influenced by its

16

Detroit_613022_7

relationship with Dow at the expense of its obligations to ratepayers.

> 'By early 1980, Consumers' management and Board of Directors knew or should have known that construction of the Midland plant was not going well. They knew or should have known as they faced critical decisions in 1980 that the probability of success was unacceptably low. Although the Commission recognizes the company's duty to its shareholders, it also had a duty to its ratepayers. Consequently, prudence would have required Consumers' management to recommend and the Board of Directors to approve at the July 2, 1980 meeting a decision to alter their strategy of continuing at all costs to try to meet the Dow drop-dead date without adequate consideration of the company's duty to its ratepayers. The path chosen by the company was so risky that it had by then become clear that it was virtually certain to fail at enormous cost to the company's ratepayers or investors or both.'"
> *Id.* at 254, 255.

For similar decisions disallowing billions in improvident continuing expenses in power plant construction, see also, *Gulf States Utilities Co. v Louisiana Public Service Comm.*, 578 So. 2d 71 (La. 1991), *cert denied*, 502 U.S. 1004 (1991), where the court approved of the commission's disallowance of the utility company's $1.4 billion of continuing costs related to the construction of a nuclear power plant. *Id.* at 93-97. In affirming that the utility company acted imprudently in continuing the project, the court stated that "the inquiry encompasses a public utility's continuation of an investment as well as its decision to enter into that investment … and requires the utility to respond prudently to changing circumstances or new challenges that arise as a project progresses." *Id.* at 85. In *Entergy Gulf States, Inc. v. Public Utility Comm. of Texas*, 112 S.W.3d 208 (Tex. App. 2003), *petition for review den.*, 2004 Tex. LEXIS 795 (Sept. 10, 2004), the court in affirming the disallowance of $1.453 billion in imprudently incurred expenses to complete a nuclear power plant stated the standard of prudence as:

> "The exercise of judgment and the choosing one of that select range of options which a reasonable utility manager would exercise or choose in the same or

17

similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen." *Id.* at 210, n2.

The rule of prudent investment applies to all of a utility's operations, not just expenditures on plant. *See, In re Detroit Edison Co.,* 24 P.U.R.4th 362 (Mich. Pub. Svc. Com.) (1978) ("[P]ublic utility has a duty to ratepayers to conduct its business in a reasonable, thoughtful manner so as to subject the ratepayers to as little frivolous expense as possible."); *Union Carbide Corp. v. Public Service Commission,* 431 Mich. 135, 149; 428 N.W.2d 322 (1988) ("The commission acted properly in preventing Consumers from passing on to ratepayers any additional fuel expenses incurred while operating the Karn generating' units out of economic order." ("Economic order" means placing on-line units with the cheapest fuel costs first. 431 Mich. at 139, n. 1.)); *Consumers Power Co. v. Mich. Pub. Svc. Comm.,* 196 Mich. App. 687, 493 N.W. 2d 494 (1992) (Court upheld MPSC order disallowing $38.5 million paid by utility to settle claims under imprudent "take or pay" fuel contract.)

Utility companies are routinely denied their requests for increases in their rate base where the expenses claimed are deemed either imprudently incurred or excessive. In *Iowa-Illinois Gas and Electric Co. v Iowa State Commerce Comm.,* 412 N.W.2d 600, 603-04 (Ia. 1987), the court affirmed a $14.3 million disallowance, stating that "the utility's consumers should not be required to absorb parts of the … investment which later events have proved unnecessary and excessive." *Id.* at 608.

Excessive costs which are the product of bad management will be disallowed as imprudent. In *Entergy Gulf States, Inc. v. Louisiana Public Service Comm.,* 726 So. 2d 870, 880 (La. 1999), the court stated that "inadequate and unreasonable management practices," causing various outages, "furnish a proper basis for a finding of imprudence," when it approved the

18

disallowance of $34.24 million in charges. The court criticized the practices as a "longstanding pattern of overriding poor management practices which ... were pervasive, affecting all levels of plant operation." *Id.* In *Georgia Power Co. v. Georgia Public Service Comm.*, 396 S.E.2d 562, 565 (Ga. Ct. App. 1990), *cert den.*, 1990 Ga. LEXIS 483 (Ga. Oct. 23, 1990), the court approved of the commission's disallowance of $951 million of the utility company's requested increase in the rate base. The court found that there was evidence to support the finding of imprudent management; specifically, the court noted that the evidence established the existence of improper construction practices as well as computer and other technical problems. *Id* at 572. "If the subcontractor ... or the supplier ... was contractually or negligently responsible for the delays, the Company has remedies against those parties and that loss need not be visited upon the ratepayers." *Id.* at 573. Likewise, the Missouri Public Service Commission disallowed as imprudent $384 million in costs associated with construction of a power plant that were the result of a failure to adequately integrate the construction and engineering schedules, a failure to correctly assess the remaining amount of work to be completed until very late in the project, and a failure to fully implement an effective cost accounting system. *Re Union Electric Company*, 66 P.U.R. 4th 202, 228 (1985)(excerpts attached).

The courts have emphasized that the prudent investment rule is not applied with hindsight but based on what the utility knew at the time of the decision.

> "The standard by which management action is to be judged is that of reasonableness under the circumstances, given what was known or should have been known at the time the decision was made or the action was taken." *Georgia Power Co.*, 396 S.E.2d at 569

19

Detroit_613022_7

In *ABATE*, the Court of Appeals held that the decision to continue with construction after July 1980 was imprudent based on what Consumers knew at that time it decided to continue the project.

> "The construction problems in the past gave little reason to believe that there would be few or no problems in the future, a necessary circumstance for success under the schedule [for continued construction] adopted by Consumers. All of these facts and circumstances were known to Consumers in July 1980. The PSC's decision [in refusing the authorize rates to cover such costs] was not based on hindsight." 208 Mich. App. at 264.

Hindsight is no issue here. By mid 1981, DWSD had 20/20 foresight. Three engineering experts had advised it that leakage into the sewer in areas of silty, sandy or fine soils would lead inevitably to sewer failure. DWSD clearly recognized the risk of repeated tunnel failures and retained Jenny Engineering to inspect and advise on the entire system. Jenny Engineering's inspection confirmed the worst; without vigilance and ongoing preventative measures, further failures were certain to occur because of the original construction defects or any leaks in areas of fine or sandy soils. In these circumstances, prudence dictated ongoing regular inspections because the 1978 and 1980 failures made clear that serious failure could occur in just a few years. Failure to inspect frequently and then address identified problems created a real risk that a leak in progress could turn into a failure before it could be caught by infrequent inspection. And that chicken came home to roost in 2004.

Macomb does not dispute that it has an obligation to pay for assets that serve Macomb. But Macomb has done that once. Detroit designed and built the Oakland Macomb Interceptor with an intended useful service life of 100 years[7] but failed to perform initial inspections

---

[7] Interceptors and regulators are depreciated over an estimated useful life of 100 years. DWSD Sewage Disposal Fund Financial Statements, June 30, 2004 and 2003, Note 1(b), p. 6.

20

Detroit_613022_7

required to achieve that service life. Per the Contract, Macomb has paid to amortize the cost of the Interceptor. No contract and no rule of ratemaking obliges Macomb to pay *twice* for the same asset, or to pay for costs that could have been avoided by proper construction and subsequent maintenance and routine inspection. It is up to the system owner to maintain its assets to achieve their full service life and to bear the loss of replacing plant which fails untimely due to improper design, construction and/or maintenance.

There is prior precedent in this case for barring DWSD from passing on to any of its ratepayers the consequences and costs of its mismanagement of the system. In the late 1990s, DWSD failed to operate its plant to meet effluent limitations after nearly 20 years of court oversight and the expenditure of hundreds of millions of dollars. This Court was so concerned it convened a special citizens task force to report on the causes of DWSD's permit violations. MDEQ imposed a $1,575,000 civil penalty including enforcement and oversight costs on DWSD. The Second Amended Consent Decree expressly provides that the penalty not be paid by DWSD's suburban customers. Ex. 18, Second Amended Consent Judgment, p. 9.

### (ii)   It Is Likely That Macomb's Objection to the Dispute Rate will Prevail on a Cost of Service Approach.

A second principal of ratemaking is that ratepayers be charged in proportion to the costs incurred to provide them service. See generally, Ex. 17, AWWA, Manual Water Rates, Ch. 2. It is this principle which supports, for example, establishment of a rate to Macomb and Clinton-Oakland sufficient to cover the capital cost of the Oakland Macomb Interceptor. On the other hand, and by comparison, the $1,575,000 penalty imposed on DWSD by USEPA in 2000 was not prompted by serving any customer but arose from mismanagement of the treatment plant. No demand for service placed on the system by a customer prompted that penalty. Accordingly,

21

the Second Amended Consent Decree appropriately bars DWSD from recouping that civil penalty from the suburban ratepayers.

The Board's 1980 rate policy is generally consistent with this principle and DWSD's proposed rate with regard to the 2004 collapse is inconsistent. Although it is appropriate for a customer to pay for the initial cost of a capital improvement, the customer is entitled to a sound, working asset. Director Beckham's insurance analogy indicates appropriately that unexpected failures, not caused by a customer, are best seen as a cost to the system and appropriately, but not necessarily, charged as common to all. The latest tunnel collapse was not caused by demand on or use of the interceptor by Macomb, but instead by inadequate design and construction and a failure of preventative maintenance.

### (iii)     DWSD Is Obliged Under the Contract To Hold Macomb Harmless for DWSD's Failure to Insure the Tunnel Was Properly Built.

Under the Contract, DWSD agreed to hold Macomb harmless against "any and all" liabilities and claims for injuries, including death, or otherwise, arising out of the construction of the interceptor. Ex. 1, § 21. Words like "all" and "any" are interpreted to provide the "broadest possible indemnification." *Triple E. Produce Corp. v Mastranardi Produce*, 209 Mich. App. 165, 174, 530 N.W. 2d 772 (1995), lv. dn., 450 Mich 897, 899, 541 N.W. 2d 772 (1995). DWSD also has a contractual obligation to maintain the interceptor and has breached its contract if it fails to do so – as it appears it has so failed. Although the last and most direct proximate cause of the 2004 collapse is likely to be DWSD's failure to carry out a preventative maintenance program, a fair reading of the Corps' 1980 report indicates that the proximate cause reaches back 30 years - the tunnel design was ill-considered for sections of tunnel passing through saturated fine or sandy soils, and poor construction practices were not caught and corrected by DWSD

22

before the interceptor was accepted by DWSD and placed into service. Hence, the repair costs arise out of the construction of the interceptor and Macomb has the right to be held harmless from them. DWSD attempts to turn that obligation on its head by having Macomb hold it harmless in the guise of ratemaking from the consequences of its mismanagement.

### (iv)   The Preliminary Relief Requested Is Consistent With DWSD Policy and Court-ordered Relief in Prior Disputes.

The rate proposed by DWSD violates the Water Board rule adopted in 1980. DWSD cannot change the rules after the fact. DWSD has undertaken numerous rate and rate-related studies since adoption of its policy in February 1980. Macomb is unaware of any study or rate readjustment which has been recommended to DWSD to support a revision of its policy. If it wishes to change its ratemaking policies on a going forward basis, it may do so prospectively so long as it is in conformance with other applicable ratemaking principles. It is another thing do so retroactively.

In addition to the treatment of the 1980 collapse, there is other precedent for a common to all approach to extraordinary capital expenses. In 1990, DWSD faced substantial costs to design, install and operate storm flow metering facilities and computer modeling programs. That work was needed to design facilities to prevent combined sewer overflows ("CSOs") from interceptors in Detroit that carried sewage and storm flow from retail and wholesale customers.

The Court deferred consideration of all rate challenges related to the study until the monitoring could be done and information needed to understand the storm flows could be gathered. During that period of data collection, the Court ordered that monitoring costs be allocated common to all, subject to the right of any party to assert later that they should be reallocated. Ex. 19, *Order re Mathematical Model* (February 22, 1991). The Order was

23

extended by three supplemental orders while the investigation went on. In 1999, those measuring and modeling costs were confirmed as common to all under the 1999 Rate Settlement Agreement reached by the parties' partnering efforts with previous DWSD management and approved by the Court. The 1991 preliminary order was a common sense way to set rates and allow the facts to emerge while harming no customer. Macomb's present request for a preliminary order will serve the same end.

The 1999 Rate Settlement Agreement, Ex. 20, provides another example - costs associated with design and construction of combined sewer overflow control facilities inside Detroit, the largest capital program in recent years, are first pooled together and then the total pooled cost is apportioned to all customers in various negotiated percentages, regardless which interceptor(s) or CSO basins(s) serves those customers. Thus costs of these major CSO facilities are borne by all customers, regardless of their location. Accordingly, a cost overrun in the construction of a CSO facility serving flows from just one suburban customer or presumably a catastrophic repair of that facility, will be added to the pool cost and borne by all customers according to their negotiated percentages, even though the specific facility prompting the costs increase serves the flows of just one customer.

3.    **Relative Harm**

The $3 million annual charge proposed for 2005/2006 to Macomb is the equivalent of $1.36 per mcf and is likely to double the next year, when the full $53 million begins to be amortized. For comparison, Macomb's commodity rate, computed without that charge, is $10.21/mcf. The imposition of an immediate $1.36 and perhaps double that next year is drastic and unwarranted, and will disrupt the budgets of Macomb's constituent communities.

24

To cite a recent comparison, the 1999 Settlement Agreement, § 11, Ex. 20, dealt with a situation in which adjustments resulting from the newly measured storm flows and allocations of CSO costs would have imposed a drastic burden on Detroit retail ratepayers. To alleviate that problem, a ten-year phased adjustment was worked out, in which suburban ratepayers paid some of the Detroit increases in the early years, with Detroit customers scheduled to repay those amounts in later years through phased increases. The stated purpose of § 11 of the Agreement was "to avoid dramatic fluctuations in rate increases or decreases to all customers of the system."

Macomb County ratepayers are in jeopardy of just such dramatic fluctuations. They face a nearly 15% increase this year and a likely 30% increase next year. They have demonstrated that the new increase is not their fault, nor the fault of any third party. They have demonstrated a substantial likelihood of proving that the fault lies entirely with DWSD, from original construction to failure to inspect and maintain. When Macomb prevails in these proofs, its rate will immediately drop and it will be owed a refund for any amounts collected, while Detroit customers will have to bear a large increase.

In contrast to imposing an increase of $1.36/mcf on Macomb alone, spreading the costs during the pendency of this dispute consistent with DWSD's long established "common-to-all" policy would impact other customers by only 14¢/mcf - on the order of a 1% increase. The harm to Macomb clearly outweighs the harm to others.

As an alternative, the interim annual amortized cost could be charged to the Emergency Repair and Replacement Fund. This Fund had its origins in the aftermath of the 1980 collapse and was created for precisely this kind of situation. DWSD's advisors, Morgan Stanley, recommended that DWSD create a "funded reserve for extraordinary repairs and replacements."

25

Ex. 21, Letter, Morgan Stanley to DWSD (November 14, 1980), p. 2.  Now, the Fund is maintained at 15% of annual revenue requirements. Ex. 22, Foster Report, p. 10.  Based on the revenue requirements for FYs 2005 and 2006, the Fund exceeds $28 million.  Resort to the Emergency Repair and Replacement Fund would harm no customer before this matter is resolved, and avoid the harm to Macomb that would come from rapidly fluctuating rates.

4.     **Public Interest**

The Water Board made a legislative declaration of the public interest in 1980, when it resolved that extraordinary costs of repair after major disasters to interceptors, water mains, water treatment plants and sewage treatment plants should be charged to all customers, regardless where the damage occurs.  The AWWA recognizes that in allocating costs between inside-city and outside city customers, factors other than direct costs of service (such as facilities required, ownership and risk) can be considered in setting rates Ex. 17, AWWA, Water Rates Manual, p. 19.  The Water Board resolution specifically mentions the 1980 interceptor collapse in Macomb County as such a major disaster.  The 2004 collapse is another.

When DWSD prepared rates for the 1980 costs, its Director, Charles Beckham, wrote to the Water Board.  He observed that this type of expense could be covered by insurance.

> "If the Department would insure for this type of damage, the cost of insurance would be a system-wide costs as there would be no way to tell in advance where a break might occur.  Since we are, in effect, self-insured, the cost of such a break should be spread in the same way as the insurance would have been.  That is, on a system-wide basis." Ex. 6, Beckham letter.

The Director's letter pointed out that a charge to Macomb and Clinton Oakland alone would cost them $1.21/mcf.  Allocation to all would cost 10¢/mcf.

26

This dramatic parallel demonstrates that the public interest is served by a preliminary order spreading the cost to all users. The relative cost per mcf, to Macomb and to the system, is close today to what it was in 1980. Then, DWSD followed the directive of the Water Board. Now, it does not.

## CONCLUSION

This Court should enter a preliminary injunctive order requiring DWSD during the pendency of this proceeding to either recover the cost of the 15 Mile sewer collapse repairs on a common to all basis consistent with existing ratemaking policy adopted by DWSD's Board, or to fund the amortized cost of the repair from the Emergency Repair and Replacement Fund. Macomb has made an initial demonstration that it is likely to prevail on the merits because DWSD's mismanagement probably caused the collapse and ratemaking law requires the utility's owner (that is, the City of Detroit) and not the ratepayers to bear the costs arising out of mismanagement.

Respectfully Submitted,

BODMAN LLP

By: _____
R. Craig Hupp
James A. Smith
Sarah Williams
100 Renaissance Center, 34th Floor
Detroit, MI 48243
(313) 259-7777

Attorneys for Macomb County

June 21, 2005

27

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

       Plaintiff and Counter-Defendant,

                                   Civil Action  No. 77-71100
                                   Honorable John Feikens

vs.

STATE OF MICHIGAN,

       Defendant and Cross-Plaintiff
       And Cross-Defendant,

vs.

CITY OF DETROIT,  a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT

       Defendant and Cross-Plaintiff

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT  FOR
SEWAGE TREATMENT SERVICES

*et al.*

_____/

**NOTICE OF HEARING**

## NOTICE OF HEARING

      Macomb County's Motion for a Preliminary Injunction affecting the imposition of the City of Detroit's 2005/2006 sewer rates will be brought on for hearing at a time and place to be set by the Court.

BODMAN LLP

By: _____

R. Craig Hupp (P36254)
James A. Smith (P20667)
Sarah Williams (P67510)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
(313) 259-7777
Attorneys for Macomb County