

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff and Counter-Defendant,

vs.

Civil Action No. 77-71100
Hon. John Feikens



STATE OF MICHIGAN,

      Defendant and Counter-Plaintiff,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT,

      Defendant and Cross-Plaintiff,

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES,

et al.

_____/

### SETTLEMENT AGREEMENT

DET- Claim No. 3883-000180

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made May 12, 2009 by and among the City of Detroit ("City"), the Detroit Water and Sewerage Department ("DWSD"), the County of Macomb ("Macomb"), the County of Oakland ("Oakland"), and the County of Wayne ("Wayne"), collectively, the "Parties." For valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

1.      **Background and Purpose.**

A.      Under the terms of this Agreement, including but not limited to Section 9(A), the Parties collectively wish to resolve all currently outstanding disputes pending under *United States v. City of Detroit, et al.* (Case No. 77-71100) (the "Action") before the U.S. District Court for the Eastern District of Michigan (the "Court") (the "Disputes"), including, but not limited to:

      (i)      All Disputes related to 800 MHz radio system, including the use of the Court's power to approve the contract or allocation of costs among the various ratepayers (the "Radio Contract Claims");

      (ii)     All Disputes related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes (the "2004 Collapse Claims");

      (iii)    All Disputes related to the interest rate charged to Macomb related to debt service associated with the cost of repairs of the 2004 Collapse, with subsequent repairs to the Macomb Interceptors and with the construction of the Garfield Interceptor (the "Interceptor Interest Rate Claims");

      (iv)    All Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement, including any disputes and claims between the Parties relating to the associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and all property otherwise described in Exhibit D (collectively, "the Interceptors");

      (v)     All Disputes related to the continuing oversight of contracts exceeding $500,000 by the Infrastructure Management Group at the direction and supervision of the Court for the duration of the activity under the Action; and

      (vi)    All Disputes related to the efforts to find a global settlement of issues regarding DWSD governance, including but not limited to the motions, petitions, and requests involving the work of F. Thomas Lewand, Timothy O'Brien, Public Sector Consultants, the Infrastructure Management Group, and the Community Leadership Group (formerly the Business Leadership Group).

DET: Claim No. 3683-n00181
AnnArbor_142387_19

B.      The Interceptors have been a source of disagreements since their construction by DWSD, and as other customers own analogous interceptors, the Parties wish to avoid future questions regarding the Interceptors by transferring liability for, ownership of, and operations of the Interceptors to Macomb, Oakland, or any of them or such entity as Macomb or Oakland may designate (collectively, the "Interceptor Transferees").

C.      The Parties recognize the need to create a mechanism other than litigation for the resolution of future disputes, and recognize the successes that have come through the Southeast Michigan Consortium for Water Quality (the "Consortium"), the Technical Advisory Committee (the "TAC"), the Sewer Steering Committee (the "SSC"), and their various subcommittees. Building on this foundation, the Parties seek to create a mechanism that is an alternative to litigation of any future disputes and to formalize processes for disclosure of information at earlier stages to prevent disputes from arising.

D.      The Parties recognize the importance of acting cooperatively to secure collective benefits and wish to work together to secure outside sources of funding for the regional water and sewer infrastructure challenges facing all DWSD ratepayers.

2.      **Existing Motions**

As of the Effective Date of this Agreement, all motions, petitions, or requests that are pending in the Action are resolved as follows:

A.      <u>Radio Contract</u>

(i)      In complete satisfaction of the Radio Contract Claims and pending motions related thereto, all Parties agree to accept without objection the recommendation of the U.S. District Court Judge Gerald Rosen, attached hereto as Exhibit A. The Parties acknowledge that the settlement amount shall be Twenty Seven Million Dollars ($27,000,000.00) ("the Radio Contract Claims Settlement"). The funds comprising the Radio Contract Claims Settlement shall be transferred to DWSD from the City no later than 30 days after the Execution Date and shall be deposited on a pro rata basis into the DWSD funds from which DWSD made payments for the 800 MHz radio system. It is the intent of the Parties that $23,990,785 of the settlement be credited to radio capital costs, $2,680,033.11 be treated as nonoperating income, and $329,181.89 as attorney fees, recognizing that when the relevant audit is performed, another treatment may be required by the auditors. After settlement sums are credited to radio capital costs, the total capital cost for the 800 MHz radio system allocated to DWSD shall be $19,544,000. The Sewer Rates Work Group shall determine the method for allocation of i) capital and operating costs for the 800 MHz radio system between DWSD's water and sewer operations, ii) and, with regard to sewer operations, between wholesale and retail customers. The portion treated as nonoperating income will be treated

DET- Claim No. 3683-2900182
AnnArbor_142387_19

consistent with the treatment of other nonoperating income in the sewer rate model.

(ii)     The Parties also acknowledge that in an effort to fairly distribute litigation costs among the customers benefited by this settlement, DWSD agrees to act as a conduit by which the attorney fees of certain customers are distributed via rates to all benefited customers. To that end, DWSD shall pay attorneys fees in the amount of $621,829.47. Of that amount $329,181.89 shall be paid from amounts received from Detroit's General Fund as follows: to Macomb $90,500.00; to Wayne $50,000.00; to Oakland $188,681.89. The balance of attorneys fees in the amount of $292,647.58 ("Additional Attorney Fees") shall be paid as follows: to Macomb $76,371.55; to Wayne $49,250.34; and to Oakland $167,025.69. The Additional Attorney Fees shall be recovered by DWSD through treatment in the rates of all first-tier (non-Detroit) sewer customers as common to all expenditures.

(iii)    The Radio Contract Claims Settlement Payment shall operate to resolve any and all disputes, damages and causes of action related to the Radio Contract Claims.

B.     2004 Collapse Claims, 2006 Interceptor Repairs, Interceptor Interest Rate

The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate Claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000. These adjustments shall be implemented as described in the Implementation Outline attached to this Agreement as Exhibit B.

C.     Remaining Motions

The Parties expressly agree that all other pending motions, petitions, or requests shall be dismissed without prejudice, including but not limited to those motions, petitions, or requests related to those subjects listed in Section 1(a) of this Agreement, including all those listed in Exhibit C. The dismissals shall convert to dismissals with prejudice upon occurrence of the closing contemplated by the Asset Purchase Agreement or other agreement fulfilling the transaction described in the Letter of Intent attached hereto as Exhibit D and described below. In the event that any Party declares this Agreement to be null and void under Section 9(A) of this Agreement, the Parties shall have 30 days from the date of such voiding to refile any matter. If any matter is not refiled within 30 days, the dismissal of such matter shall convert to a dismissal with prejudice.

3.     **Interceptor Transfer**

As described in the Letter of Intent attached hereto as Exhibit D, the City intends to transfer ownership of the Interceptors from DWSD to the Interceptor Transferees. The closing contemplated by Exhibit D shall fully resolve all claims in the Action regarding the Interceptors,

including but not limited to those regarding the condition and or need for repair of the
Interceptors, as well as such other matters as may be stated in Exhibit D. Exhibit D shall be
deemed dated as of the Execution Date.

4.     **Model Contract**

The Parties have agreed on certain revisions to the "Model Contract" for sewerage
services that have been proposed by DWSD after consultation with its customers. The Parties to
this Agreement who have the power to enter into the contract as revised have done or will do so
on or before the Effective Date. Those Parties who do not have the authority to enter into the
Model Contract will, in good faith, attempt to secure approval of that contract. All Parties will
recommend adoption of the Model Contract to customer communities that have not previously
entered into the Model Contract. The Model Contract is attached hereto as Exhibit E.

The Parties have entered into a number of Rate Settlement Agreements in the Action (the
"Rate Agreements"). The Parties agree to work in good faith to identify those portions of the
Rate Settlement Agreements that still apply to the rates as currently determined and create a
restatement of the Rate Agreements that contain only those portions of the Rate Agreements that
are still relevant. The Parties agree that the purpose of the restatement is not to re-negotiate or
alter any provisions of the Rate Agreements, but only to consolidate those portions of the Rate
Agreements still in effect.

5.     **Director's Council**

DWSD hereby establishes a Director's Council. The Director's Council's function shall
be to work cooperatively to address concerns and issues raised by wholesale customers as to (i)
DWSD decisions regarding the operation of sewer facilities owned or operated by DWSD that
serve the wholesale customers; (ii) rates, or (iii) other issues. The Director's Council shall be
comprised of the Mayor of the City of Detroit or on the Mayor's behalf, the Director of DWSD;
the Public Works Commissioner of Macomb County; the Water Resources Commissioner of
Oakland County; the Wayne County Executive or on the Executive's behalf, the Director of
Department of Environment; and the Working Chair of the Consortium, who shall serve at the
discretion of the Council. The Director's Council shall be chaired by the Director of DWSD.
The Council shall meet not less than quarterly. The Director's Council may be expanded by
mutual agreement of its participants and any Party may substitute and/or replace its designated
representative on an annual basis, or as otherwise required from time to time. The Director's
Council does not replace or limit the functions of any other current working groups or
committees.

At the Chair's discretion, representatives of the TAC, the SSC, or other First Tier sewer
customers may be invited to attend Director's Council meetings. Should the TAC or SSC ask to
have representatives attend a specific meeting of the Director's Council, the Director's Council
Chair may issue such an invitation. If a meeting will address topics directly impacting a First
Tier sewer customer, the Chair shall issue an invitation to participate if such invitation is
requested by such customer.

Matters or issues not resolved pursuant to committees/work groups under the applicable sewer contracts and not otherwise controlled by the dispute resolution clause in those contracts shall be subject to the dispute resolution procedures set forth in the Model Contract, which is subject to Section 4 of this Agreement.

## 6.   Cooperation in Seeking Outside Funding

The Parties agree to make a cooperative effort to seek funding from outside sources to help address regional water and sewer infrastructure projects. Each Party will make good faith efforts to secure such funding. No Party shall be required to participate in any such funding effort unless that Party shall benefit from the funds sought.

## 7.   Duration

This Agreement shall be effective on the day it is entered as part of an Order of the Court (the "Effective Date") in the Action. Unless otherwise specified, all provisions of the Agreement shall survive the conclusion of the Action or the cessation of any Consent Decree in the Action. Upon the last day of the execution of the last Party to execute this Agreement (the "Execution Date"), all Parties agree to seek approval and entry of the Agreement by the Court.

## 8.   Consent Judgment

Upon the closing contemplated by the Letter of Intent attached as Exhibit D ("the Closing"), the Parties hereby agree to file a joint Motion for Relief (the "Motion") pursuant to Fed. R. Civ. P. 60(b)(5) and the provisions of the Second Amended Consent Judgment entered by this Court on August 3, 2000 (the "SACJ"). The Motion may seek a replacement of the SACJ with a Third Amended Consent Judgment consisting of this Agreement and the restatement described in Section 4 of this Agreement.

## 9.   Miscellaneous

A.   Mutual Interdependence

(i)   The Parties acknowledge that all of the terms and conditions of this Agreement are mutually interdependent and are essential consideration for the rights, obligations and claims entered into or released by each Party under this Agreement. Until the closing of the transfer of the interceptors contemplated in the Letter of Intent attached as Exhibit D, if any of the provisions of this Agreement or its application to any person or circumstance is determined by any court of competent jurisdiction to be invalid to any extent, unenforceable or is not implemented or performed for any reason, then any Party may, within 30 days, declare any provision of this Agreement void and without effect. After the closing of the transfer of the interceptors, if any provision of this Agreement or its application to any person or circumstance shall to any extent be invalid or

5

DET- Claim No. 3683-000185

unenforceable, the remainder of this Agreement shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

(ii)    If the Parties fail to reach agreement on the terms of a definitive agreement regarding the transfer of the Interceptor within 180 days from the Execution Date, or if no Closing occurs within 360 days of the Execution Date (each a "Triggering Date"), any Party may, within 30 days of the first-occurring Triggering Date, declare any provision of this Agreement void and without effect. If any provision of this Agreement or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

B.    This Agreement, and the Exhibits, contains the entire agreement between the Parties with regard to the matters addressed in this Agreement. No Party has made any representations except those expressly set forth in this Agreement, and no rights or remedies are, or shall be, acquired by any Party by implication or otherwise unless expressly set forth in this Agreement.

C.    This Agreement may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Agreement. Upon the Execution Date, the Parties hereby authorize F. Thomas Lewand to file this Agreement on their behalf with the Court with an accompanying motion for entry of this Agreement by the Court in which all Parties expressly join.

D.    The rights and benefits under this Agreement shall inure to the benefit of and be binding upon the respective Parties hereto, their agents, successors, and assigns.

E.    Any and all Exhibits referred to in this Contract are and shall be incorporated by reference herein.

F.    This Agreement shall be deemed to be mutually drafted. The Exhibits have been mutually drafted by the Parties signatory thereto.

*Signature Page to Follow*

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _Pamela Turner_

Title: _Interim Director_

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _Pamela Turner_

Title: _Interim Director_

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____

Title: _____

COUNTY OF WAYNE

By: _____

Title: _____

7

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _____

Title: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

Title: _____

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____

Title: _____

COUNTY OF WAYNE

By: _____

Title: _____

7

AnnArbor_142387_17

DET- Claim No. 3683- 000188

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _____

Title: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

Title: _____

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____
      John P. McCulloch
Title: Water Resources Commissioner

COUNTY OF WAYNE

By: _____

Title: _____

DET- Claim No. 3833 C00189

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _____

Title: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

Title: _____

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____

Title: _____

COUNTY OF WAYNE

By: _____

Title: _Assistant County Executive___

7

AnnArbor_i42387_i7

DET- Claim No. 3683- 000190

## Index of Exhibits

Exhibit A          Recommendation of U.S. District Court Judge Gerald Rosen

Exhibit B          Implementation Outline

Exhibit C          List of Matters Resolved

Exhibit D          Letter of Intent

Exhibit E          Model Sewer Contract



DET- Claim No. 3683- 000192

December 18, 2008


Judge John Feikens
231 W. Lafayette Blvd.
Room 851
Detroit, MI 48226

Re:    Civil Action No. 77-71100

Dear Judge Feikens:

On March 23, 2007, you issued an Opinion and Order Regarding 800 MHz Radio Contract Cost Allocation in the above matter. You then asked me to assist in attempting a settlement.

I have conducted several lengthy negotiations at which all parties were present. Initially the parties were significantly apart.

I have reviewed the facts carefully, including your opinion, the arguments of the parties and recommendations of the Special Master and his colleagues on interest charges.

I recommend a settlement of $27,000,000.00 to be paid by the City general fund to DWSD promptly upon execution of a settlement document.


Very Truly Yours,



Judge Gerald E. Rosen

DET- Claim No. 3683- 000193



## EXHIBIT B

### Implementation Outline - December 2008

### Effect of Deductions to Principal Amounts Owed by Macomb

12/17/2008

| | | Macomb County | Wayne County (c) | Oakland County | Detroit Retail | Total |
|---|---|---|---|---|---|---|
| 1 Original Settlement Amount | | $ (17,600,000) | | | | $ (17,600,000) |
| 2 Responsibility for Original Settlement Amount - % | (a) | | 27.9% | 26.2% | 45.9% | |
| 3 Responsibility for Original Settlement Amount | | | $ 4,910,000 | $ 4,610,000 | $ 8,080,000 | $ 17,600,000 |
| 4 Portion of Original Settlement Related to Force Acct | | $ (3,950,000) | | | | $ (3,950,000) |
| 5 Responsibility for Original Settlement Amount - % | (a) | | 27.9% | 26.2% | 45.9% | |
| 6 Responsibility for Original Settlement Amount | | | $ 1,100,000 | $ 1,030,000 | $ 1,820,000 | $ 3,950,000 |
| **Wayne County Adjustment** | | | | | | |
| 7 Reallocation of Wayne County's Force Account Portion - Line (6) | | | $ (1,100,000) | | | $ (1,100,000) |
| 8 Responsibility for "Non-Macomb" Amount - % | (a) | | | 36.3% | 63.7% | |
| 9 Responsibility for Adjusted Amount | | $ 550,000 | | $ 200,000 | $ 350,000 | $ 1,100,000 |
| 10 Impact of Adjusted Settlement Amount | (b) | $ (17,050,000) | $ 3,810,000 | $ 4,810,000 | $ 8,430,000 | $ |

(a) Based on projected System allocation volumes for FY 2009-10
(b) Lines (1) + (3) + (7) + (9)
(c) Includes individual contract communities (Allen Park, Dearborn, etc.)

DET- Claim No. 3683- 000195



DET- Claim No. 3683- 000196

**Exhibit C**
List of Matters Resolved

1.   **800 MHz Radio**

06/06/2007   <u>2064</u>   ORDER Concerning Further Settlement Discussions in the 800 MHZ Radio Contract Cost Allocation Case (a single dispute in the above-captioned case). Signed by Honorable John Feikens. (CCoh) (Entered: 06/06/2007)

03/23/2007   <u>2029</u>   OPINION and ORDER Regarding 800 mhz Radio Contract Cost Allocation - Signed by Honorable John Feikens. (CCoh) (Entered: 03/23/2007)

2.   **Briefing Order re Compliance and Succession Planning**

06/13/2008   <u>2137</u>   MOTION Set Aside Order Regarding Compliance re <u>2122</u> Order by Oakland Cnty. (Quadrozzi, Jaye)[OAKLAND COUNTY'S OBJECTION TO ORDER REGARDING COMPLIANCE] Modified on 6/16/2008 (PPau). (Entered: 06/13/2008)

3.   **Facilitator (Timothy O'Brien)**

06/13/2008   <u>2141</u>   Amended MOTION Explain the precise nature of the role of Timothy O'Brien re <u>2106</u> Order, <u>2128</u> Order *and Objection to Orders for Payments of Fees and Expenses* by Oakland Cnty. (Quadrozzi, Jaye)[SECOND AMENDED REQUEST FOR CLARIFICATION] Modified on 6/16/2008 (PPau). (Entered: 06/13/2008)

06/14/2007   <u>2067</u>   REQUEST *Amended Request for Clarification of the Role of Timothy O'Brien and for Reconsideration of the Court's Prohibition of Representation of the Parties by Counsel* by Oakland Cnty. (Gotthelf, Beth) (Entered: 06/14/2007)

4.   **Infrastructure Management Group**

06/13/2008   <u>2140</u>   MOTION Withdraw Order Extending IMG Contract and approving payment re <u>2119</u> Order, <u>2126</u> Order, <u>2105</u> Order by Oakland Cnty. (Quadrozzi, Jaye)[OBJECTION TO ORDER EXTENDING IMG CONTRACT] Modified on 6/16/2008 (PPau). (Entered: 06/13/2008)

AnnArbor_148132_1

DET- Claim No. 3683- 000197

5.   **2004 Interceptor Collapse**

04/06/2007   2035   MOTION for Reconsideration re 2028 Order on
Petition/Request/Application by Macomb, County of. (Hupp, R.)
(Entered: 04/06/2007)

6.   **Interceptor Interest Rate**

05/14/2007   2059   RESPONSE to 2053 MOTION ADOPT IN PART AND MODIFY IN
PART ADJUNCTS REPORT AND RECOMMENDATION
REGARDING INTERCEPTOR INTEREST RATE DISPUTE re 2031
Report of Special Master MOTION ADOPT IN PART AND MODIFY
IN PART ADJUNCTS REPORT AND RECOMMENDATION
REGARDING INTERCEPTOR INTEREST RATE DISPUTE re 2031
Report of Special Master filed by Detroit, City of, Detroit Water and
Sewerage Department. (Peters, Marilyn) (Entered: 05/14/2007)

04/30/2007   2053   MOTION ADOPT IN PART AND MODIFY IN PART ADJUNCTS
REPORT AND RECOMMENDATION REGARDING
INTERCEPTOR INTEREST RATE DISPUTE re 2031 Report of
Special Master by Macomb, County of (Hupp, R.) (Entered:
04/30/2007)

02/08/2007   2003   MOTION for Summary Judgment *on Interest Rate Issues* by Macomb,
County of. (Hupp, R.) (Entered: 02/08/2007)

7.   **Leadership Group**

07/25/2007   2076   MOTION Joinder in Oakland county's Renewed Motion for Clarification
for Activities of the Business Group and Clarification of Court's June 21,
2007 letter by Wayne, County of. (McCauley, Patrick) (Entered:
07/25/2007)

7/19/2007   2074   MOTION for Reconsideration */Renewed Motion for Clarification for
Activities of the Business Group and Clarification of Court's June 21,
2007 Letter* by Oakland Cnty. (Gotthelf, Beth) (Entered: 07/19/2007)

8.   **Public Sector Consultants**

06/13/2008   2139   Renewed MOTION Objection to Court Order for Payments PSC re 2110
Order, 1978 Request, 2118 Order, 2099 Order *Supplemental Objection*
by Oakland Cnty. (Quadrozzi, Jaye)[SUPPLEMENTAL OBJECTION
TO COURT ORDER OF NOVEMBER 30, 2006] Modified on
6/16/2008 (PPau). (Entered: 06/13/2008)

2

AnnArbor_148132_1

DET- Claim No. 3683- 000198

12/08/2006   1978   REQUEST *Objection to Order of November 30, 2006 Approving Payment for Services of PSC* by Oakland Cnty. (Miller, Donald) (Entered: 12/08/2006)

9.   **Special Master (F. Thomas Lewand)**

06/13/2008   2138   Third MOTION Clarification of Role of Special Master re 2075 MOTION for Reconsideration */Second Supplement to Motion for Further Clarification of Role of Special Master, and Continuation of Objection to Activities of Special Master*, 1977 MOTION for Order *Further Clarifying Role of Special Master (Supplemental Motion)* by Oakland Cnty. (Quadrozzi, Jaye)[THIRD SUPPLEMENT TO OAKLAND COUNTY'S MOTION FOR FURTHER CLARIFICATION] Modified on 6/16/2008 (PPau). (Entered: 06/13/2008)

07/19/2007   2075   MOTION for Reconsideration */Second Supplement to Motion for Further Clarification of Role of Special Master, and Continuation of Objection to Activities of Special Master* by Oakland Cnty. (Gotthelf, Beth) (Entered: 07/19/2007)

12/08/2006   1977   MOTION for Order *Further Clarifying Role of Special Master* by Oakland Cnty. (Miller, Donald) (Entered: 12/08/2006)

3

AnnArbor_148132_1

DET- Claim No. 3685- 000199



DET- Claim No. 3683- 000200

# LETTER OF INTENT

This Letter of Intent is dated _____, 2009 and is by and among the City of Detroit ("City"), the County of Macomb ("Macomb"), and the County of Oakland ("Oakland"), each of the State of Michigan, and sets forth the principal terms and conditions of the proposed transaction (the "Transaction") pursuant to which the City would transfer to Macomb, Oakland, or any of them or such entity as Macomb or Oakland may designate ("Transferee Entity"), ownership of certain interceptor sewers and related property, in accordance with the terms hereof and of that certain Settlement Agreement of even date herewith between the parties and the Detroit Water and Sewerage Department ("Settlement Agreement"). Macomb, Oakland and such entity, or any of them, are referred to herein as the "Transferee."

1.    Acquired Property.  The Transferee would acquire all of City's right, title and interest in and to the interceptor sewers listed on Exhibit "1", associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and other related property as agreed by the parties, and as generally described in Exhibit "1" (collectively, the "Property"), and pursuant to the terms of definitive transfer agreements (collectively, the "Transfer Agreement") to be negotiated and entered into by the parties in accordance with the terms hereof, one between the City and Macomb for the portion of the Property that will be transferred solely to Macomb, and the other between the City and Oakland and Macomb (or the Transferee Entity, as determined by Oakland and Macomb) for the portion of the Property that will be transferred to Oakland and Macomb (or the Transferee Entity). The Property would be acquired by the Transferee free and clear of all liens, claims and encumbrances of whatever nature.

2.    Assumed Obligations, Responsibilities and Liabilities.  After the Closing (as defined in Paragraph 7 below) and transfer of the control of the Property, Transferee agrees to assume all responsibilities, liabilities and obligations for the operation, maintenance and repair of the Property, except for Claims (as defined herein) that accrued prior to the transfer of control. The City shall remain responsible for all Claims that accrue prior to Closing and transfer of control of the Property. To the extent permitted by applicable law, the City agrees to defend and hold harmless the Transferee for a period not to exceed the applicable statute of limitations for said Claims. Claims shall be defined as any alleged third-party: losses, claims, complaints, demands for relief or damages, suits, causes of action, proceedings, judgments, deficiencies, liability, penalties, litigation, costs, and expenses, including, but not limited to, reimbursement for reasonable attorney fees, witness fees, court costs, investigation expenses, litigation expenses, amounts paid in settlement, and/or other amounts or liabilities of any kind which are imposed on, incurred by, or asserted against the parties, or for which the parties may become legally and/or contractually obligated to pay or defend against, whether direct, indirect or consequential, whether based upon any alleged violation of the federal or the state constitution, any federal or state statute, rule, regulation, or any alleged violation of federal or state common law, whether any such claims are brought in law or equity, tort, contract, or otherwise, and/or whether commenced or threatened. In this paragraph, the term "Claims" pertains to third-party claims only and does not include claims between the parties.

Detroit_883034_6

3.   _Consideration._ The consideration (the "Consideration") for the acquisition of the Property would be an amount equal to the outstanding debt (including accrued interest) owed by the City that is allocated to the Property in the Sewer Rate Model as of the Closing, and subject, in the case of the Macomb Interceptor, to an adjustment in the amount of $17,050,000, and to such other adjustments to be agreed upon by the parties. At the Closing, Transferee would deliver to City cash equal to the Consideration (the "Closing Cash Consideration").

4.   _Additional Agreements._ In addition to the Transfer Agreement, the following agreements would be entered into in connection with the consummation of the Transaction:

(a)   a bill of sale for all of the Property that is tangible personal property executed by the City;

(b)   an assignment of all of the Property that is intangible personal property executed by the City;

(c)   for each interest in real property, a recordable warranty deed, an Assignment of Rights of Way and Easements, or such other appropriate document or instrument of transfer, as the case may require;

(d)   such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by the Transferee; and

(e)   a Transition Services Agreement, if determined necessary by Transferee and subject to the agreement of the parties.

5. _Access and Investigation._ Between the date of this Letter of Intent and the Closing of the Transaction (the "Diligence Period"), the City shall afford (and shall cause City's officials, employees, attorneys, accountants and other agents to afford) to the Transferee and its agents and representatives reasonable access to the Property, and the files, agreements, permits, authorizations, documents, and books and records of the City (including, without limitation, financial information, engineering data and information, as built plans, computer programs, tapes and other records) related to the Property as well as access to City's personnel, employees and contractors whose job activities relate to the Property, and the opportunity to make notes, abstracts and copies therefrom, as may be requested by the Transferee in order that the Transferee may have full opportunity to make such investigations as it shall desire with respect to the Property in connection with the transactions contemplated hereby and the City shall furnish the Transferee with such additional financial and operating data and other data and information as to the Property as the Transferee shall, from time to time, reasonably request for such purpose. In addition, the Transferee shall have the right to have any real property and tangible personal property which is part of the Property inspected and investigated by the Transferee's agents and representatives, at the Transferee's cost and expense, for purposes of determining the physical condition and legal characteristics of the real property and tangible personal property. In the event subsurface or other destructive testing is recommended by any of the Transferee's agents or representatives, the Transferee shall, subject to obtaining the City's prior consent, be permitted to have the same performed. In the event any such investigations

2

DET-Claim No. 3683- 000202

disturb any portion of the Property, the Transferee shall, at its sole cost and expense, promptly restore such property to its prior condition.

The Transferee agrees to perform its inspection of the Property in a safe and lawful manner and agrees to be responsible for any damage to any person or to the Property arising out of the acts or omissions of the Transferee or its agents and representatives. To the extent permitted by applicable law, and without waiving any rights and privileges under Michigan law, the Transferee also shall be responsible for and shall defend, indemnify and hold the City harmless from and against any claim, loss, liability, action, suit, penalty, cost, damage or expense (including, without limitation, reasonable attorneys' fees, court costs, consultants' fees and expenses) which may be imposed upon, incurred by or asserted against the City arising out of the acts or omissions of the Transferee or its agents and representatives in connection with the inspection of the Property.

The Transferee shall notify the City at least 48 hours in advance of all entries onto the Property and shall schedule and inspections of the Property so that the City's representative may observe such inspection and shall coordinate such inspection with any activities of the City's representatives. The Transferee and its agents and representatives shall conduct the inspection of the Property at reasonable times and in a manner which does not interfere with the City's use or operation of the Property or its contractors' activities.

Throughout all phases of the Transferee's inspection of the Property, the Transferee's agents and representatives shall keep in force, at its sole cost and expense, with insurance companies licensed to do business in the State of Michigan, insurance coverages reasonably required by the City with respect to all of the Transferee's agents' and representatives' activities at the Property. The City shall be named as additional insured on all policies of insurance (except Workers' Compensation).

The City does not assume any risk, liability, or responsibility or duty of care as to the Transferee or its agents and representatives when on the Property, and the Transferee acknowledges and agrees that the Transferee and its agents and representatives enter the Property and conduct the inspections thereof at their own risk.

6.  Conditions. The parties' obligations to consummate the Transaction would be subject to the satisfaction of each of the following conditions at or prior to Closing, any of which may be waived in whole or in part by the parties to the extent permitted by applicable law:

(a)  The parties agree to make a cooperative effort to seek funding from outside sources to help address infrastructure needs. Each party will make good faith efforts to secure such funding. Obtaining funds on terms and conditions satisfactory to Oakland and Macomb, in amounts sufficient to address such infrastructure needs, will be a required condition to consummate the Transaction.

(b)  In addition, the parties' obligations to consummate the Transaction would be subject to conditions and satisfaction of conditions to Closing customary in transactions of this type including, but not limited to:

3

DET- Claim No. 3683- 000203

(i)  execution of the Transfer Agreement and related agreements and documents reflecting the terms of the proposed Transaction as set forth herein or otherwise agreed to in writing by the parties, including, without limitation, the agreements identified in Paragraph 4 hereof (collectively with the Transfer Agreement, the "Definitive Agreements") and containing representations, warranties, covenants, and conditions of the parties customary in transactions of this type, satisfactory in form and substance to the parties;

(ii)  organization of the Transferee Entity;

(iii)  execution of an agreement between Oakland and Macomb Counties with regard to the creation and operation of the Transferee Entity;

(iv)  the satisfactory completion in the Transferee's sole discretion of the Transferee's due diligence investigations of the Property, including, without limitation, with respect to all operational, financial, environmental, engineering, legal and accounting matters;

(v)  receipt of all governmental and third-party permits, licenses, consents and approvals required under applicable court orders, laws, third party contracts and the charter documents of the parties, including, but not limited to, as applicable under the circumstances of the Transaction as set forth in the Definitive Agreements (collectively, the "Approvals"):

(vi)  approval of the City's Board of Water Commissioners;

(vii)  approval of the City's City Council;

(viii)  approval of Macomb's Board of Commissioners (if required under the circumstances of the Transaction);

(ix)  approval of Oakland's Board of Commissioners (if required under the circumstances of the Transaction);

(x)  approval of Oakland's Water Resources Commissioner;

(xi)  approval of Macomb's Public Works Commissioner;

(xii)  approval of the governing body of any entity designated by Oakland and Macomb to be the Transferee;

(xiii)  any approvals or permits required by the Michigan Department of Environmental Quality;

(xiv)  receipt by the parties of legal opinions customary in a transaction of this type, and including an opinion of bond counsel to the City stating that the Transaction will not violate any applicable bond ordinances of the City;

4

(xv)   absence of any material adverse change in the Property;

(xvi)   full disclosure by the City of the manner in which sewer rates will be computed for the Transferee Entity subsequent to the Transaction, in detail satisfactory to Transferee in its sole reasonable discretion;

(xvii)   resolution of all outstanding disputes related to sewer services between Oakland and Macomb on the one hand and the City and the City of Detroit Water and Sewerage Department on the other;

(xviii)   the obtaining of financing by the Transferee Entity on terms and conditions satisfactory to Oakland, Macomb and Transferee Entity in their sole discretions, in an amount sufficient to pay the Consideration and expected repairs to Property;

(xix)   execution of a sewer services contract between the Transferee Entity and the City;

(xx)   execution of new sewer services contracts between the Transferee Entity and all of the governmental units discharging directly or indirectly into the Property with substantially the same material terms as the sewer services contract between the City and the Transferee Entity;

(xxi)   contractual arrangements with third parties reasonably necessary for Transferee to operate the Property after the Closing;

(xxii)   absence of defects within and necessary repairs to the Property that are materially greater or different than those disclosed in the NTH inspection reports previously provided to Transferee; and/or

(xxiii)   the absence of any injunction, restraining order or decree of any nature that restrains or prohibits the Transaction.

7.    Definitive Agreements; Closing.  As soon as practical after this Letter of Intent has been executed, the Transferee's counsel will prepare the initial drafts of the Definitive Agreements and the parties will negotiate the Definitive Agreements in good faith and will use their reasonable efforts to obtain all necessary Approvals and execute and deliver the Transfer Agreement within 180 days after the date of this Letter of Intent. The closing of the proposed Transaction (the "Closing") would occur as soon as practicable following the satisfaction of the conditions to Closing set forth in the Transfer Agreement.  The parties will work toward a Closing within 360 days after the date of this Letter of Intent. The date on which the Closing occurs is referred to herein as the "Closing Date."

8.    Consents.  The parties will cooperate with each other to obtain all Approvals necessary in connection with the consummation of the proposed Transaction and the operation of the Property by the Transferee after the Closing as promptly as is reasonably practicable.

5

DET- Claim No. 3683- 000205

9.  Conduct of Operations. Except as otherwise agreed in writing by the Transferee, during the Diligence Period, the City shall:

(a)    Provide the Transferee reasonable notice prior to making any capital expenditures or implementing any maintenance, repair or operational decisions of a material nature relating to the Property and reasonably consider any objections of Transferee thereto;

(b)    Maintain the Property in a state of repair and condition consistent with the City's normal conduct of the operation of the Property;

(c)    Obtain the consent of the Transferee to any sale, assignment, or other transfer of all or any part of City's right, title or interest in and to any portion of the Property;

(d)    Obtain the consent of the Transferee to any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the Property;

(e)    Promptly notify the Transferee of any emergency or other change in the normal course relating to the Property (or communications indicating that the same may be contemplated) if such emergency or change would be material, individually or in the aggregate, to the Property and its operation and/or the prospects of the City's ability to consummate the proposed Transaction;

(f)    Promptly notify the Transferee of any governmental, regulatory or third party complaints, claims, investigations or hearings (or communications indicating that the same may be contemplated);

(g)    Comply with all legal requirements and contractual obligations applicable to the Property; and

(h)    Maintain all books and records relating to the Property in the ordinary course of business.

10.    Expenses.  The City and the Transferee shall each bear their own expenses incurred by them in connection with the proposed Transaction, including without limitation, consultants' fees, legal fees and accounting fees, whether or not the proposed Transaction is consummated. As between Oakland and Macomb, the expenses of the Transferee shall be allocated as they shall reasonably determine among themselves.

11.    Counterparts; Facsimile; Electronic Transmission. This Letter of Intent may be signed in one or more counterparts, each of which will be deemed to be an original of this Letter of Intent and all of which, when taken together, will be deemed to constitute one and the same agreement. This Letter of Intent may be delivered by facsimile or other electronic transmission with the same effect as if a manually signed original were personally delivered.

6

DET- Claim No. 3683- 000206

12.   _Governing Law_.  This Letter of Intent shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Michigan.

13.   _Entire Agreement_.  This Letter of Intent and the Settlement Agreement, including Exhibits A, B, C and E attached thereto (collectively, the "Related Documents"), constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior or contemporaneous oral or written agreements, understandings, representations and warranties, and courses of conduct and dealing between the parties regarding the subject matter hereof. This Letter of Intent is not intended to modify or abrogate the Related Documents, and may be amended or modified only by a writing executed by the parties after receipt of all required Approvals.

14.   _Binding Effect_.  Except for Paragraphs 5 and 10 through 13 hereof, the provisions of which the parties acknowledge and agree are legally binding upon them, this Letter of Intent is not contractual in nature and will not give rise to any legally binding obligation on the part of any of the parties hereto. Except as provided in Paragraphs 5 and 10 through 13 hereof, or as may be expressly provided in the Definitive Agreements or other binding written agreement that the parties may hereafter execute and deliver, no past or future course of conduct, or failure to act relating to the proposed Transaction, or relating to the negotiation of the terms of the possible definitive agreements therefor, will give rise to or serve as the basis for any obligation or liability, legally or otherwise, on the part of any of the parties hereto.

[SIGNATURE PAGE FOLLOWS]

7

DET- Claim No. 3683- 000207

## SIGNATURE PAGE

In witness whereof, the persons named below have affixed their signatures on behalf of the parties.

WITNESS

COUNTY OF MACOMB

_____

By: _____

_____

Its: _____

COUNTY OF OAKLAND

_____

By: _____

_____

Its: _____

CITY OF DETROIT

_____

By: _____

_____

Its: _____

8

DET- Claim No. 3683- 000208



DET- Claim No. 3683- 000209

WASTEWATER DISPOSAL SERVICES CONTRACT
BETWEEN
CITY OF DETROIT
AND

_____

This Wastewater Disposal Services Contract ("Contract") is made this _____ day of _____, 20_____, by and between the City of Detroit, a municipal corporation ("City"), by its Board of Water Commissioners ("Board"), and _____, a municipal corporation ("Customer"). The Board and Customer may be referred to individually as "Party" or collectively as the "Parties."

Whereas, the City owns a System which is operated by the Board; and

Whereas, the City has contracted to supply Services to numerous governmental entities in southeastern Michigan; and

Whereas, Customer desires to obtain Services from the City; and

Whereas, the System owned by the City and operated by the Board is currently subject to the jurisdiction of the United States District Court for the Eastern District of Michigan and consent judgments and settlement agreements entered in *United States Environmental Protection Agency v City of Detroit*, Civil Action No. 77-77100; and

Whereas, the Board implemented a voluntary partnering effort with its First Tier Customers, of which the Steering Committee is a central part, which assists the Board in data gathering, alternative evaluations and recommendations; and

Whereas, the various work groups are key components of the Steering Committee;

ACCORDINGLY, THE PARTIES AGREE AS FOLLOWS:

### Article 1. Definitions

1.01    The following words and expressions, or pronouns used in their stead, shall be construed as follows:

"Board" shall mean the Board of Water Commissioners of the City of Detroit.

"CFS" shall mean cubic feet per second.

"City" shall mean the City of Detroit, a municipal corporation, acting by and through its Board of Water Commissioners.

{G:\DOCS\CONTRACT\bohwf\a42000\contract\L-H2523.DOC}

Detroit_893369_1

DET- Claim No. 3683- 000210

"Contract" shall mean each of the various provisions and parts of this document, including all attached Exhibits and any amendments thereto, as may be executed by the duly authorized representatives of the Parties, and approved by Customer, the Board of Water Commissioners and the Detroit City Council.

"Customer" shall mean the First Tier Customer that is designated herein as a Party to this Contract.

"Customer Overflow Volume" shall mean that volume of wastewater generated in Customer's service area during a wet weather event that exceeds the capacity of the Customer's system and is discharged before entering the Board's System

"Detroit City Council" shall mean the legislative body of the City of Detroit.

"DWSD" shall mean the Detroit Water and Sewerage Department.

"Exhibit A" shall be a description of the locations of the meters, data acquisition equipment and meter pits serving the Customer.

"Exhibit B" shall be a description of the Customer's Service Area from which wastewater may be delivered to the System. It shall depict the corporate limits of Customer, the agreed upon Service Area, the specific location of the points of metered and/or non-metered connection, and Customer's Maximum Allowable Flow Limit at the points of metered and/or non-metered connection.

"Exhibit C" shall be a description of the purpose, responsibilities, and membership of the DWSD Design Standards Committee.

"Exhibit D" shall be a description of the terms of the Industrial Waste Control Program that has been adopted by the DWSD and the Customer.

"Exhibit E" shall be a description of the alternative dispute resolution procedure established by Section 9.01.

Exhibit F shall be the list of rate settlement agreements cited in Section 20.05, which shall be developed in accordance with the 2009 Settlement Agreement in the case of U.S. Environmental Protection Agency v City of Detroit, et al, E.D. Mich. No. 77-77100.

"First Tier Customer(s)" shall mean all directly contracted Services customers of the System.

"Flow" shall mean wastewater delivered by Customer from Customer's Service Area to the System. It shall include sanitary flow, dry weather infiltration and inflow, and a wet weather flow component. It shall also include wastewater from industrial and/or commercial facilities in compliance with the City of Detroit's Industrial Pretreatment Ordinance, Detroit City Code Section 56-3-56.1 et seq., as amended.

"GDRSS" shall mean the Greater Detroit Regional Sewer System.

"GDRSS Technical Work Group" shall mean the committee consisting of representatives of the DWSD, and its First Tier Customers, and its respective sub-work groups, and shall include its successor or replacement if altered or discontinued. Customer shall have the right to attend all meetings of this committee.

"Instantaneous Flow" shall mean Flow that is calculated and registered by a metering device designed to measure wastewater flow at specified intervals over a specified period of time in accordance with GDRSS flow metering standards.

"Maximum Allowable Flow Limit" shall mean the maximum allowable Flow that Customer may deliver to the System. This limit shall be expressed in units of cubic feet per second and shall be determined by calculating an average of meter readings over a rolling sixty minute time frame.

"Meter" shall mean a wastewater billing meter.

"MGD" shall mean million gallons per day.

"Notices" shall mean all notices, consents, approvals, requests and other communications required to be given under the terms of this Contract.

"Service Area" shall mean the service area of Customer designated in Exhibit B to this Contract.

"Steering Committee" shall mean the advisory committee consisting of representatives of DWSD, its First Tier Customers, and the committee's work groups, and shall include its successor or replacement if altered or discontinued. The committee may, in its discretion, agree to add additional members. Customer shall have the right to attend all meetings of this committee.

"Services" shall mean the collection, transportation, and treatment of wastewater by the DWSD.

"System" shall mean the wastewater disposal system owned, operated and maintained by the City acting through its Board.

"WWTP" shall mean the DWSD's Wastewater Treatment Plant.

### Article 2.
### Delivery of Flow; Maximum Allowable Flow Limit; Enforcement

2.01   Maximum Allowable Flow Limit. Customer's Maximum Allowable Flow Limit shall be _____ CFS.

CHOOSE ONE SECTION 2.02

Option 1: All Flow

2.02   Delivery of All Flow.   The City agrees to accept and Customer agrees to deliver all Flow from Customer originating within Customer's Service Area, excluding any Customer Overflow Volumes, up to Customer's Maximum Allowable Flow Limit.

Option 2: Percentage of Flow

2.02   Delivery of Percentage of Flow.   The City agrees to accept and Customer agrees to deliver no less than _____% of all instantaneous Flow generated within Customer's Service Area and existing as of the date of the Detroit City Council's approval of this Contract.

2.03   Calculation of Charges.   Customer shall pay the City for Services for Flow delivered into the System at such rates as the City may establish during its cost allocation and rate design processes, which rates shall be established in accordance with Article 20 of this Contract.

2.04   Enforcement of Maximum Allowable Flow Limit.   The Parties acknowledge that Customer deviations over the Maximum Allowable Flow Limit may occur.  If Customer has multiple incidents of Flow exceeding the Maximum Allowable Flow Limit which evidence a pattern of exceedances, as determined in the sole and reasonable discretion of the City, the City shall give written notice of such exceedances to Customer.  Thereafter, the City and Customer shall meet and attempt to develop a plan for reducing or eliminating the exceedances. If, in the opinion of the City, the Parties are unable to agree on a plan, the City shall have the right to assert any available remedies for breach of contract.

2.05   Nothing in this Article 2 shall be construed to preclude Customer from constructing or operating wastewater facilities for the purpose of reducing or eliminating  Customer Overflow Volumes or improving the operation of Customer's sewage system.

### Article 3.
### Meter Ownership, Maintenance, and Accuracy; Data Collection

3.01   Ownership and Maintenance Responsibility.   The City shall own and maintain all Meters, data acquisition equipment, and meter pits used for the City's billing purposes.  A list of the Meters, data acquisition equipment and meter pits located in Customer's Service Area is attached as Exhibit A.

3.02   Meter Maintenance.   The City shall maintain its Meters and associated data acquisition equipment in accordance with the GDRSS Phase IV Technical Memoranda 8, or subsequent modifications thereto.   The City shall collect data from its Meters in accordance with the Good Metering Practice specified in the GDRSS Phase IV Technical Memoranda 8, or subsequent modifications thereto.  The City may contract for any such services.

3.03   Meter Accuracy. The City will ensure the accuracy of its Meters.  Customer shall have the right to inspect the Meters and check for proper operation, including inspection of records.  The City and the GDRSS Technical Work Group shall review the accuracy of the Meters on a regular basis and compare the findings to the then-best available technology.  In the event that the accuracy of a Meter is found to be unsatisfactory, as determined by the GDRSS Technical Work Group and approved by the City, the City shall, as soon as practicable, repair, rehabilitate or replace the Meter.

### Article 4.
### Service Area; Acceptance of Flow

4.01   Service Area.  The area for which the City agrees to provide Services shall be as shown in Exhibit B (the "Service Area").  Customer shall not deliver to the System any Flow originating in any area outside of the specified Service Area without the written consent of the City.  A temporary delivery of Flow from outside the Service Area may be authorized by a memorandum of understanding between Customer and the City.  A permanent change in the Service Area shall require amendment of this Contract.

CHOOSE ONE SECTION 4.02

Option 1: Directly Metered Customer

Note:  Supplementary language may be necessary in the contracts with Oakland County and Macomb County to properly describe the situation with the interceptors, meters and meter pits.

4.02   Acceptance of Flow.  The City will accept Flow from Customer, as limited by the terms of this Contract, at the points of metered connection evidenced on Exhibit B.  The points of connection between the wastewater collection system owned, operated and maintained by Customer and the System shall also be shown on Exhibit B.  The City shall have no responsibility for operating and maintaining any portions of the wastewater collection system upstream of the points of connection shown on Exhibit B. (Note: Supplementary language may be inserted here to address exceptions to this sentence.)  The City owns and is responsible for operating and maintaining all parts of its System downstream from Customer's wastewater collection system.

Option 2: Customers Metered By System Meter

4.02   Acceptance of Flow.  Due to the configuration of the wastewater collection system owned, operated and maintained by Customer and the System, the City will accept Flow from Customer, as limited by the terms of this Contract, at any of the system-metered points of connection evidenced on Exhibit B.  The points of connection between the wastewater collection system owned, operated and maintained by Customer and the System shall also be shown on Exhibit B.  The City shall have no responsibility for operating and maintaining any portions of the wastewater collection system upstream of the points of connection shown on Exhibit B. (Note: Supplementary language may be inserted here to address exceptions to this sentence.)  The City owns and is responsible for operating and maintaining all parts of its System downstream from Customer's wastewater collection system.

{G:\DOCS\CONTRACT\bobwh\s42000\contract\L-H2523.DOC}5

Detroit_893369_1

DET- Claim No. 3683- 000214

4.03   Change in Service Area. The boundaries of the Service Area may be changed only by the express written agreement of the City and Customer and shall be embodied in an amendment to this Contract.

### Article 5. Flow Measurement

5.01   The GDRSS Technical Work Group shall make all reasonable efforts to use the best available information to establish Customer's estimated (1) sanitary flows, (2) dry weather infiltration and inflow, (3) wet weather inflow that reaches the WWTP, and (4) wet weather inflow that does not reach the WWTP.

CHOOSE ONE SECTION 5.02

Option 1: Directly Metered Customer

5.02   Process. The GDRSS Technical Work Group shall decide on the type of analyses, and shall carry out analyses of Flow from Customer using Meter information and other relevant data. The results of such analyses shall be utilized by the City, in its sole and reasonable discretion, in its annual cost allocation and rate design processes and shall form the basis of billings for Customer.

Option 2: Customers Metered By System Meter

5.02   Process. The GDRSS Technical Work Group shall decide on the type of analyses, and shall carry out analyses to estimate Flow from Customer using the best available information. Customer shall submit to the City, on a monthly basis, water sales data for its individual wastewater customers. The water sales data, in combination with other best available information, shall be utilized by the City, in its sole and reasonable discretion, in its annual cost allocation and rate design processes and shall form the basis of billings for Customer.

5.03   The GDRSS Technical Work Group shall have the responsibility for reviewing the information it obtains pursuant to this Article 5 for the purpose of verifying that the information is acceptable from a technical basis. The City shall have the authority, in its sole and reasonable discretion , for determining how best to utilize the information analyzed by the GDRSS Technical Work Group.

### Article 6. Flow Re-Allocation

6.01   Flow Re-Allocation. Should Customer terminate or reduce its Flow into the System, whether at the end of this Contract's term, by mutual agreement, or due to a breach of this Contract by Customer, that portion of its Maximum Allowable Flow Limit so terminated or reduced shall be re-allocated at the discretion of the City for the benefit of the System. Flow re-allocation between First Tier Customers may occur only with the prior written approval of the City.

6.02   <u>Responsibility for Capital Cost Recovery</u>.  If Customer reduces or terminates its Flow into the System, Customer shall remain responsible for any remaining capital costs for facilities built to provide Customer its Maximum Allowable Flow Limit.  In the event that Customer terminates its participation in the System, Customer shall either (1) pay in full all outstanding capital costs accumulated to the date of its termination of participation in the System, or (2) enter into a contract guaranteeing monthly payments to the City of the remaining capital costs, or (3) assign the responsibility for the remaining capital costs to the First Tier Customer to whom Customer has re-allocated its Flow (the "RAF Customer") provided that Customer shall remain ultimately responsible for the remaining capital costs in the event the RAF Customer fails to timely pay said capital costs.

### Article 7.
### Contract Term; Renewal and Termination

7.01   <u>Term</u>.  The City shall provide Services to Customer in accordance with the terms and conditions of this Contract for a period of thirty years from the effective date of this Contract and any ten-year renewal terms (collectively the "Contract Term").  The effective date of this Contract shall be the date that this Contract is approved by the Detroit City Council or Customer's legislative body whichever is later.  This Contract replaces and supersedes any prior wastewater disposal services contracts between the Parties.

7.02   <u>Renewal</u>.  This Contract shall automatically renew at the conclusion of the thirty-year term for an additional ten-year term, unless a Party provides written notification to the other Party in accordance with Article 16 on or before the conclusion of the twenty-fifth year of the thirty-year term stating its intent not to renew this Contract.  Thereafter, this Contract shall automatically renew every ten years for an additional ten-year term, unless a Party provides written notification to the other Party in accordance with Article 16 on or before the conclusion of the fifth year of the then current ten-year term stating its intent not to renew this Contract.  The automatic renewals of this Contract shall not preclude a review of its terms and the Parties are encouraged to reaffirm or amend its terms as necessary.  The Parties may, in writing, mutually agree upon a longer renewal term.

7.03   Customer's obligations under Article 6, if any, shall survive the expiration or termination of this Contract and continue until such obligations are satisfied.

### Article 8.   Construction Standards

8.01   Customer shall abide by the design specifications and construction standards as adopted by the City.  DWSD shall form a Design Standards Committee.  The Design Standards Committee shall create a set of design standards and shall make a recommendation to the City regarding adoption of the design standards.  Customer shall submit plans and specifications for new wastewater collection or transport facilities for review and approval to DWSD prior to the installation of such facilities.  DWSD will review the plans and specifications and provide Customer with a determination as to its approval or disapproval of the plans and specifications.  If Customer does not agree with the outcome

of the DWSD review, Customer may request a review by the Design Standards Committee. The Design Standards Committee will be governed by the guidelines described in Exhibit C.

### Article 9. Dispute Resolution

9.01   Any and all claims alleging a breach of this Contract shall be submitted to the alternative dispute resolution process set forth in Exhibit E of this Contract.

### Article 10. Payment for Services

10.01  Bills for Services shall be rendered to Customer on a *INSERT CUSTOMER'S CURRENT BILL CYCLE* basis. All such bills shall be due and payable not more than forty-five calendar days from the date shown on the bill. Any portion of the charges related to accuracy that is not paid by the due date shall be subject to a finance charge at a rate of 1.5% per month for each month that they remain unpaid. Any portion of the total bill, plus any finance charges applied to the bill which are not paid by the next billing date, shall be shown on the next bill as arrears. If the accuracy of a bill is in dispute, Customer shall place the disputed amount of the bill in an interest bearing escrow account maintained by a bank located in Michigan or a County Treasurer pending resolution of the dispute and the finance charge shall thereupon cease. Accrued interest on the escrow account shall be allocated between the Parties directly proportional with the resolution of the dispute. The cost, if any, of maintaining the escrow account shall be allocated between the Parties inversely proportional with the resolution of the dispute. Disputes related to rates for Services charged by the City are specifically excluded from the application of this Article 10. Claims for interest in any other billing dispute shall be resolved by the Director's Council or a court of competent jurisdiction.

### Article 11. Emergency Situations

11.01  No failure or delay in performance of this Contract, by either Party, shall be deemed to be a breach thereof when such failure or delay is caused by a force majeure event, including but not limited to, any Act of God, strikes, lockouts, wars, acts of terrorism, riots, epidemics, explosions, sabotage, breakage or accident to machinery or lines of pipe, the binding order of any court or governmental authority, or any other cause, whether of the kind enumerated in this Article 11 or otherwise, not within the control of a Party, except that no cause or contingency shall relieve Customer of its obligation to make payment for Services provided by the City.

### Article 12. Default Provisions

12.01  In the event either Party commits a material breach of this Contract, the Party alleging the breach shall give written notice of the breach to the other Party within a reasonable time of discovering the breach. The Party in breach shall be given a reasonable time to cure the breach. If the Party in breach fails to cure the breach, the non-breaching Party may declare this Contract in default and pursue all available legal remedies, including termination of this Contract for cause.

## Article 13. Assignment

13.01  This Contract shall not be assigned, in whole or in part, by either Party without the prior written consent of the other Party. Consent to an assignment by either Party shall not be unreasonably withheld.

## Article 14. Steering Committee

14.01  Establishment. The Steering Committee is formed to facilitate a cooperative working partnership between the City, DWSD and First Tier Customers by facilitating discussion and development of recommendations regarding System operation, maintenance, rates, and best practices to DWSD and the City, and is based on the free flow of information regarding financial and operational functions. The Steering Committee shall maintain bylaws that govern the way it conducts its business. In the event of a conflict between the terms of the bylaws adopted by the Steering Committee and the terms of this Contract, the terms of this Contract shall control.

14.02  General Responsibilities. The Steering Committee shall periodically review and evaluate the rates, rate methodology, operation, and maintenance of the System. The Steering Committee shall have the opportunity each year to review the Capital Improvement Program as prepared by DWSD, prior to its adoption by the City.

14.03  Annual Report by City. The City will present an annual report to the Steering Committee that shall consist of (1) a general report on System operation and maintenance and (2) a report that lists those contracts for Services, if any, that have been entered into by the City and another customer(s) where the terms of the contract(s) invoke the application of Article 21 of this Contract.

14.04  Annual Meeting and Report by Steering Committee. The Steering Committee will meet annually with and report to the Board. The Steering Committee may otherwise meet and communicate with the Board as the Steering Committee deems necessary.

14.05  Work Groups. The Steering Committee may create work groups to address specific issues facing the System. The work groups in existence as of January 1, 2009 are the Best Practices Work Group, the GDRSS Technical Work Group, the Public Information Work Group, the Rates Work Group, and the Wet Weather Work Group. Any reference to a particular work group in this Contract shall include its successor or replacement if altered or discontinued.

## Article 15. Amendment

15.01  The Parties may from time to time consider it in their best interests to change, modify or extend a term, condition or covenant of this Contract. Any such change, addition, deletion, extension or modification, which is mutually agreed upon by the City and Customer shall be incorporated in written amendments to this Contract. Such amendments shall not invalidate this Contract nor relieve or release either Party of any of its respective obligations under this Contract unless so stated in the amendment.

15.02   No amendment to this Contract shall be effective and binding upon the parties unless it expressly makes reference to this Contract, is in writing, is signed and acknowledged by duly authorized representatives of both Parties, is approved by Customer's legislative body, and is approved by the Board and Detroit City Council.

## Article 16. Notices

16.01   Except as otherwise specified in this Contract, all notices, consents, approvals, requests and other communications (collectively, "Notices") required or permitted under this Contract shall be given in writing and mailed by first class mail, addressed as follows:

    If to the Board:

        Director
        Detroit Water and Sewerage Department
        735 Randolph
        Detroit, Michigan 48226

    If to the Customer:

        Title _____
        Address _____
        _____
        _____

16.02   All Notices shall be deemed given on the day of post-marked mailing. Any Notice given by a Party hereunder must be signed by an authorized representative of such Party.

16.03   Notwithstanding the requirement above as to the use of first-class mail, change of address notices, termination notices, and other Notices of a legal nature, shall be sent by certified first-class mail, postage prepaid, return receipt requested.

## Article 17. Industrial Waste Control Program

17.01   Customer agrees to abide by the requirements of the Industrial Waste Control Program as set forth in Exhibit D. To the extent that Exhibit D obligates Customer in the future to adopt any new or modified ordinance, rule, or regulation based upon a future amendment to the City of Detroit's Industrial Pretreatment Ordinance or any successor or similar ordinance, such amendment shall be consistent with the then-current rules and regulations of the United States Environmental Protection agency (USEPA) and Michigan Department of Environmental Quality (MDEQ), but may be more stringent than USEPA and MDEQ rules and regulations.

## Article 18. Rights-of-Way

CHOOSE ONE SECTION 18.01

Option 1: Customer is a County

18.01   The Customer shall assist the Board to obtain permission to use streets, highways, alleys, and/or easements in the local governmental units within the Customer's jurisdiction for the purpose of constructing, maintaining, and operating wastewater disposal facilities to adequately service the Customer's jurisdiction and other areas. This assistance shall include assisting with regard to obtaining the consent of the local governmental units, as provided in Article 7, Section 29, Michigan Constitution of 1963. In the event of such construction, the Board shall request the Customer and local governmental units within the Customer's jurisdiction to execute such separate instruments granting rights-of-way in its streets, highways, and alleys as may be reasonably required by the Board. The Board shall restore all existing structures and/or improvements laying in the right-of-way of construction to as good a condition as before the construction took place. Any such facilities constructed, maintained and operated under this section shall remain the property of the Board and shall not be operated or maintained by any entity other than the Board or its authorized representatives.

Option 2: Customer is a City

18.01   The Customer shall assist the Board to obtain permission to use streets, highways, alleys, and/or easements within the Customer's jurisdiction for the purpose of constructing, maintaining, and operating wastewater disposal facilities to adequately service the Customer's jurisdiction and other areas. In the event of such construction, the Board shall request the Customer to execute such separate instruments granting rights-of-way in its streets, highways, and alleys as may be reasonably required by the Board. The Board shall restore all existing structures and/or improvements laying in the right-of-way of construction to as good a condition as before the construction took place. Any such facilities constructed, maintained and operated under this section shall remain the property of the Board and shall not be operated or maintained by any entity other than the Board or its authorized representatives.

18.02 Relocation of Facilities.  Should future construction by any federal, state or county agency require relocation of a wastewater interceptor, Meter or other City facility, the cost incurred by the City for such relocation, if not reimbursed by the agency requiring the relocation, will be charged in future rates as a common-to-all cost to all System users for the relocation of a common-to-all facility, or as a customer-specific cost to a specific customer or customers for the relocation of a customer-specific facility.

18.03   Easements.  Subject to the provisions of Section 18.01 and to the extent that Customer has jurisdiction, the City shall be granted temporary and permanent easements, and shall be permitted to use the streets, alleys and highways within Customer's legal jurisdiction for the purpose of constructing, operating and maintaining the System. This consent by Customer is given in compliance with Article 7, Sec. 29 of the Michigan Constitution of

1963, provided that the City shall provide Customer with a written explanation of the type of easement required and the duration thereof.

## Article 19.  Miscellaneous

19.01   Enforceability.   If any provision of this Contract or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Contract shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

19.02   Integration.   Subject to Section 20.05, this Contract contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Contract.  Neither Party has made any representations except those expressly set forth in this Contract, and no rights or remedies are, or shall be, acquired by either Party by implication or otherwise unless expressly set forth in this Contract.

19.03   Headings.   The headings of the sections of this Contract are for convenience only and shall not be used to construe or interpret the scope or intent of this Contract or in any way affect the same.

19.04   Jurisdiction.   The rights and remedies set forth in this Contract are not exclusive and are in addition to any of the rights or remedies provided by law or equity.  This Contract and all actions arising under it shall be governed by, subject to, and construed according to the law of the State of Michigan.   Each Party agrees, consents and submits to the exclusive personal jurisdiction of any state or federal court of competent jurisdiction in Michigan, for any action arising out of this Contract.

19.05   Execution of Contract.   This Contract may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Contract.  Promptly after the execution of this Contract, the City shall provide a copy to the Customer.

19.06   Contract Beneficiaries.   The rights and benefits under this Contract shall inure to the benefit of and be binding upon the Parties, their agents, successors, and assigns.

19.07   No Third Party Beneficiaries.   There are no third party beneficiaries to this Contract and this Contract shall not be construed to benefit any persons other than the City and Customer.

## Article 20.  Rates

20.01   Rates.   Customer agrees to pay for all Services supplied by the City at such rates as the City may establish.  Rates shall be reasonable in relation to the costs incurred by the City for the provision of the Services.  The City shall give written notice of any changes in the rates.  Notice shall be made in accordance with Section 5e of Public Act 279 of 1909, Michigan Compiled Laws, Sec. 117.5e, as amended ("Act 279").

20.02   Notification of Rates.   As soon as possible in the ratemaking process, the City shall provide information on proposed rates and the draft data and information used in the calculation of proposed rates in a format that will enable Customer to assist in the ratemaking process. Not less than thirty calendar days prior to the hearing required by Act 279, the City shall provide Customer with written notice of a proposed rate and the underlying data used to calculate the rate. The City shall meet with Customer to review the rate and the data. The City shall provide Customer, upon written request, a copy of the rate notebook containing the detailed tabulations supporting the establishment of the final rates for the next rate year and the look back adjustments.

20.03   Disclosure of Rate Information by Customer.   Each year, Customer will disclose to its customers information related to its rates and other charges, and information regarding what portion of those costs is related to charges from DWSD and/or other major service providers.

20.04   Estimate of Usage.   In the event meters fail to correctly measure the quantity of wastewater transmitted by Customer for any period of time, the City shall provide a reasonable estimate of the quantity of wastewater generated by Customer for such period provided that there is a reasonable basis for the estimate. Customer and the City shall, either through their respective technical representatives, the GDRSS Technical Work Group and/or the Steering Committee, seek agreement upon a method to estimate such quantities. In the event the Parties are unable to agree upon a method to estimate such quantities, the City's determination of a method shall be conclusive and the Customer agrees to accept the estimate established by the City.

20.05   The Parties acknowledge that certain provisions of certain prior rate settlement agreements and consent judgments, as described in Exhibit F, are in effect as of the effective date of this Contract. It is not the intent of this Contract to contradict or nullify the provisions of any court approved settlements, and court approved settlements shall continue in full force and effect to the extent they have not been otherwise fully performed, amended, or superceded. Nothing in this Contract shall prohibit a party from requesting that a court modify or terminate the provisions of a settlement agreement or consent judgment and any modification or termination granted by the court shall not require the amendment of this Contract.

20.06   The City recognizes that Customer's allocation of rates and charges to its customers may vary depending upon the nature, location and purpose of the particular project carried out by the City. Accordingly, when requested by Customer in writing, the City shall provide reasonable information to assist Customer in the accounting of expenses for a specified project.

## Article 21.  Ensuring Equality of Contract Terms

21:01   If the City enters into any contract, and any amendments thereto, with a wastewater disposal services customer other than Customer, and the material terms of such other contract are more favorable than the material terms of Customer's Contract, Customer may elect to adopt all of such other material terms. However, if Customer exercises the option provided for in this Article 21, Customer must accept all material terms of the

other contract in their entirety and may not select among various terms contained in multiple other contracts by, for example, selecting the Contract Term from one contract and the Rates provision of another contract. The terms and conditions of Exhibits A and B of this Contract are specifically excluded from the application of this Article 21.

(Signatures appear on next page)

**In Witness Whereof,** the City and Customer, by and through their duly authorized officers and representatives, have executed this Contract.

**Customer:**

By: _____
　　　　　　　(Signature)

　　　_____
　　　　　　　(Print name)

Its: _____
　　　　　　　(Title)

**City of Detroit:**

By: _____
　　　Kenneth V. Cockrel, Jr.

Its:　　Mayor

APPROVED BY
CUSTOMER'S LEGISLATIVE BODY ON:

_____
　　　　　　Date

APPROVED BY
BOARD OF WATER COMMISSIONERS ON:

_____
　　　　　　Date

APPROVED BY
DETROIT CITY COUNCIL ON:

_____
　　　　　　Date

{G:\DOCS\CONTRACT\hohwl\s42000\contract\L-H2523.DOC} 15

Detroit_893369_1

DET- Claim No. 3683- 000224

EXHIBIT A

Meters, Data Acquisition Equipment and Meter Pits Serving Customer's Service Area

EXHIBIT B
Customer's Service Area

This Exhibit contains the following information:

1.   The corporate limits of Customer;

2.   The Service Area of Customer;

3.   The agreed upon sewer service area within the corporate limits of Customer;

4.   The points of metered or non-metered connection;

5.   The specific location of points of connection shown; and

6.   The Customer's Maximum Allowable Flow Limit.

EXHIBIT C
DWSD Design Standards Committee

<u>Name.</u> The name of this committee is the Detroit Water and Sewerage Department Design Standards Committee (hereinafter, the "Committee").

<u>Purpose/General Responsibilities.</u> The Committee is formed to discuss and make recommendations to the Board, or its designee, on the appropriate specifications and standards which shall govern the design, use of material, and construction of wastewater collection and transport facilities which may, from time to time, be constructed by a First Tier Customer for the purpose of collecting and transporting wastewater to the Board's System. To effectuate this purpose, First Tier Customers may request a review of construction plans and specification by the Committee. In such a case, the Committee shall make the requested review and shall make its recommendations thereon to the Board or its designee.

<u>Membership.</u> The entities comprising the Committee shall consist of one (1) representative from the DWSD and one (1) representative from each First Tier Customer. The DWSD member shall also serve as Chairperson of the Committee.

<u>Meetings.</u> Committee meetings shall be held as follows:

(a) <u>Meetings and Notice Thereof.</u> The Committee shall meet at an agreed upon date and time. The time and place of such meeting shall be fixed by the Chairperson. Meetings shall be held as may be necessary and at such times and places as shall be determined by the Committee.

(b) <u>Meeting Quorum.</u> A majority of all the members present shall constitute a quorum.

(c) <u>Recordkeeping.</u> The Committee shall keep a journal of its proceedings which shall include a record of each vote and each recommendation made to the Board, or its designee, by the Committee.

(d) <u>Voting.</u> The Committee shall act by motion. Passage of any measure shall require a simple majority affirmative vote of the quorum present. Deliberation and consideration are required prior to any vote. Each member shall be entitled to one (1) vote adhering to the principle of "one person, one vote".

(e) <u>Committee Recommendation.</u> All Committee recommendations shall be transmitted to the Board, or its designee, for consideration and final determination.

<u>Dissolution.</u> The Committee shall continue in existence until dissolved by action of the Committee membership.

<u>Effective Date.</u> The Committee shall become effective upon the approval and adoption by DWSD and its First Tier Customers.

<u>Appeals Procedure.</u> Any First Tier Customer who is aggrieved by a decision of the Board, or its designee, relating to a determination based upon a Committee recommendation may appeal to the Director of the DWSD for possible relief of that grievance. Any such appeal shall be made in writing. The determination of the Director of the DWSD shall be final.

EXHIBIT D
Industrial Waste Control Program

I.     The Customer agrees that it shall adopt and enforce, and shall cause each of the local governmental units within its jurisdiction for sewage treatment and disposal service as provided by the Board to adopt and enforce, rules and regulations to implement and maintain a revenue system whereby, as a minimum, the operation, maintenance and replacement portion of the Board's rates are distributed proportionately to each user or user class that is tributary to the Board's treatment works. In particular, these rules and regulations shall provide that surcharges established by the Board for the recovery of incremental operation, maintenance and replacement costs of treating extraordinary concentrations of sewage, shall be billed to and collected from individual firms as identified by the Board in its billings. These rules and regulations shall conform to Section 204 (b) (1) (A) of Public Law 92-500, as amended, and regulations of the United States Environmental Protection Agency (hereinafter referred to as the U.S. EPA), being 40 CFR 35.929 through 35.929-3, and shall achieve a proportionate User Charge System which is effective throughout the Board's service area. The rules and regulations shall provide for monitoring of commercial, governmental and industrial users and shall be consistent with the monitoring rules and regulations of the City of Detroit. The Board shall have the right under said rules and regulations to audit all monitoring activities including the right to perform monitoring tests itself to verify the accuracy of monitoring results.

II.    The Customer agrees that it shall adopt and enforce, and shall cause each of the local governmental units within its jurisdiction for sewage treatment and disposal service as provided by the Board to adopt and enforce, rules and regulations pertaining to the use, design and construction of sewers, and the discharge of industrial or commercial wastes into sewers, where such sewers are tributary to the Board's treatment works. Such rules and regulations shall be consistent with and at least as stringent as all applicable provisions of the pertinent ordinances adopted by the City of Detroit, these being the 1979 amendments to Chapter 56, Article 1, and Chapter 56, Article 6, of the Municipal Code of the City of Detroit as they may be adopted and amended from time to time. In the event any municipality or other governmental unit shall fail to adopt an ordinance as required herein, or shall fail to diligently enforce the same, the Board shall take appropriate action which may include suit in an appropriate court of general jurisdiction alleging such municipality's failure to adopt or enforce an ordinance, and following a hearing on the merits, should the court find that the allegations in the Board's petition are true, it is agreed that such court may, in such instance, grant appropriate injunctive relief against said municipality or any individual discharger there; terminate the municipality's contractual right to discharge waste waters into the Board's system and/or to grant the Board such other relief as may be appropriate under the circumstances. These actions shall enable the Board to:

A.     Deny or condition new or increased contributions of pollutants or changes in the nature of pollutants, to the waste collection system by Industrial and Commercial Users. The terms "Industrial and Commercial" user shall mean those users defined in Section 56-6-3(H) and (P) of Detroit Ordinance No. 353-H of Chapter

56 of Article 6 passed on November 7, 1979 and as may be amended from time to time.

B.  Require compliance with applicable current and future national Pretreatment Standards and other more restrictive requirements as may be imposed by the Board promulgated by the U.S. EPA under the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq.

C.  Control, through permit, contract order, or similar means, the contribution to the waste collection system by Industrial and Commercial Users to ensure compliance with paragraph B above.

D.  Require the development of compliance schedules by Industrial and Commercial Users for the installation and facilities required to meet applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by the Board.

E.  Require the submission of notices and self-monitoring reports from Industrial and Commercial Users to assess and assure compliance with National Pretreatment Standards and other more restrictive requirements as may be imposed by the Board.

F.  Carry out all inspection, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial and Commercial Users, compliance or noncompliance with applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by the Board. It being further understood that the Board may contract with qualified parties to carry out the inspection, surveillance and monitoring procedures of this paragraph.

G.  Seek injunctive relief for noncompliance with National Pretreatment Standards and other more restrictive requirements as may be imposed by the Board.

H.  Require Industrial and Commercial Users to install containment facilities to protect the treatment works from accidental spills of critical or hazardous materials.

* * * *