MACOMB INTERCEPTOR

ACQUISITION AGREEMENT

BY AND BETWEEN

CITY OF DETROIT

MACOMB INTERCEPTOR DRAIN DRAINANGE DISTRICT

AND THE

COUNTY OF MACOMB

DATED SEPTEMBER 2, 2010

i

__Bodman 9/2/2010__

Doc 946709v12

DET- Claim No. 3883- 000002

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT ("**Agreement**") is made this 2nd day of September, 2010, by and between the City of Detroit, Michigan ("**Detroit**"), the Macomb Interceptor Drain Drainage District ("**MID**")and the County of Macomb ("**Macomb County**") (each individually a "Party" and collectively, the "Parties").

### RECITALS:

A.     Detroit and Macomb County have determined that it is in their respective best interests for Macomb County to acquire, upon the terms and subject to the conditions set forth herein, the Macomb System (as defined herein).

B.     In furtherance thereof, the Macomb Interceptor Drain Drainage District has been established under Chapter 20 of the Drain Code of 1956 to acquire the Macomb System property described in Schedule 1.20 hereto for the mutual consideration set forth in the Agreement below.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties and agreements herein contained, Detroit and Macomb County and MID hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings given to them in this Article I, unless defined elsewhere in this Agreement.

1.1     "**Agreement**" shall have the meaning such term is given in the introductory paragraph hereof.

1.2     "**Applicable Law**" shall mean shall mean any applicable federal, state or local law, statute, ordinance, rule, regulation and any other executive or legislative proclamation of any Governmental Entity.

1.3     "**Assumed Liabilities**" shall mean any and all Liabilities excluding:   (I) the Retained Liabilities, and (ii) Claims by and among any or all of Detroit, Macomb County and the MID.

1.4     "**Business Day**" shall mean any day other than Saturday, Sunday or any day municipalities in the State of Michigan are authorized or obligated by law, executive order or regulation to close.

9/2/2010
Doc 946709v12

DET- Claim No. 3883- 000003

1.5 **"Macomb County's Knowledge"** shall mean the actual knowledge of the Macomb County Public Works Commissioner and legal counsel assigned or retained to represent the offices of the Commissioner.

1.6 **"Claims"** shall mean any Order, any investigation announced or performed by a Governmental Entity, or any actual or alleged complaints, claims or charges, demands for relief or damages, suits, hearings, causes of action, proceedings or litigation which the parties hereto may become legally and/or contractually obligated to pay or defend against, whether direct, indirect or consequential, whether based upon any alleged violation of the federal or the state constitution, any federal or state statute, rule, regulation, or any alleged violation of federal or state common law, whether any such claims are brought in law or equity, tort, contract, or otherwise, and/or whether commenced or threatened, which are related in any way to the Macomb System.

1.7 **"Closing"** shall have the meaning such term is given in Section 2.7 hereof.

1.8 **"Closing Date"** shall have the meaning given such term in Section 2.7 hereof.

1.9 **"Default"** shall mean, as to any party to this Agreement, (a) a default by such party in the performance of any of its Material obligations hereunder and the continuation of such default for a period of thirty (30) Business Days after written notice is delivered by the non-defaulting party to the defaulting party that a default has occurred, or (b) the breach of any representation or warranty hereunder.

1.10 **"Detroit's Knowledge"** shall mean the actual knowledge of its Director, its Assistant Corporation Counsel assigned to DWSD matters, its Assistant Chief of Engineering or its Engineering Support Manager Craig Stanley.

1.11 **"Encumbrance"** shall mean any security interest, mortgage, pledge, claim, lien, charge, option, defect, encumbrance, lease, tenancy, license, covenant, condition, restriction, right of way, easement, judgment, or other right or interest of any nature.

1.12 **"Environmental Requirements"** shall mean all federal, state and local statutes, regulations, and ordinances concerning pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, as such requirements are enacted and in effect on or prior to the Closing Date.

1.13 **"Global Settlement Agreement"** means the settlement agreement between Detroit and Macomb, Oakland and Wayne Counties executed by the parties to that agreement effective May 12, 2009, and approved by the U.S. District Court on that date.

9/2/2010
Doc 946709v12

DET- Claim No. 3583- 000004

1.14 "**Governmental Entity**" shall mean the United States of America, any state, county, city, municipality and any subdivision thereof, any court, administrative or regulatory agency, commission, department or body or other governmental authority or instrumentality or any entity or person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.15 "**Indemnified Party**" shall have the meaning such term is given in Section 11.1.

1.16 "**Indemnifying Party**" shall have the meaning such term is given in Section 11.1.

1.17 "**Liability**" means any responsibility, liability, obligation, expense, Claim, Loss, damage, indebtedness (other than System Debt), principal, interest, penalty, guaranty or endorsement of or by any Person, asserted, absolute or contingent, known or unknown, accrued or unaccrued, due or to become due, liquidated or unliquidated, which is related to or arising out of the ownership, condition, operation, maintenance and repair of the Macomb System.

1.18 "**Loss**" or "**Losses**" means any damages (excluding consequential), deficiencies, dues, principal, interest, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses, related to or arising out of the condition, operation, maintenance and repair of the Macomb System (other than the System Debt) or out of the breach of any representation, warranty or covenant of this Agreement or expense under Section 10.4.

1.19 "**Macomb County**" means the County of Macomb, Michigan.

1.20 "**Macomb System**" means the Macomb Interceptor System, to-wit, all of the interceptor sewers, meters, pump station and appurtenant facilities and associated tangible and intangible personal property commonly known as the Clintondale Pump Station and the Romeo Arm, Garfield, 15 Mile, Macomb, and Lakeshore and Lakeshore Extension Interceptors, and commencing in several branches northwards and eastwards from the intersection of the Edison Corridor Interceptor and 15 Mile Road, Macomb County, Michigan, as specifically described in Schedule 1.20, excluding such property as specifically identified in Schedule 1.20. Meters shall be deemed to include the lead-in sewer beginning at the downstream site of the manhole immediately upstream from the meter.

1.21 "**MID**" means the Macomb Interceptor Drain Drainage District, created pursuant to Chapter 20 of the Drain Code of 1956.

1.22 "**Material**" or "materially" means, depending on the context, any condition, change or effect that, individually or when taken together with all other such conditions, i) is or is reasonably likely to be significantly adverse to the condition of the Macomb System, ii) will or is reasonably likely to prevent the consummation of the transactions contemplated hereby or

3/25

the validity of this Agreement or defeat the purpose of this Agreement, or iii) if such change or condition had occurred before the execution of this Agreement is of such a nature that it would have induced a Party not to enter into this Agreement

1.23 **"MDNRE"** means the Michigan Department of Natural Resources and the Environment.

1.24 **"NPDES"** means the National Pollutant Discharge Elimination System.

1.25 **"Oakland County"** means the County of Oakland, Michigan.

1.26 **"Macomb System Real Property Agreements"** shall mean the easement agreements, rights of way, licenses, deeds and/or other agreements, instruments or grants evidencing Detroit's rights and obligations with respect to the use and operation of the Macomb System at the properties described on _3.5(a)(1)._

1.27 **"Macomb System Real Property Rights"** shall mean the easements, rights of way, licenses and other interests in real property necessary for the use and routine operation of Macomb System

1.28 **"OMI System"** means the Oakland-Macomb Interceptor System transferred from the City of Detroit to the Oakland-Macomb Interceptor Drain Drainage District effective October 22, 2009, to-wit, all of the interceptor sewers, meters and appurtenant facilities and associated tangible and intangible personal property commonly known as the Edison Corridor Interceptor, the Oakland Arm Interceptor and the Avon Arm Interceptor and commencing northwards from the north city line of the City of Detroit. The Northeast Sewerage Pump Station and that part of the Edison Corridor Interceptor located within the city limits of Detroit are not part of the OMI System and were not transferred to the District.

1.29 **"Order"** shall mean any decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any Governmental Entity.

1.30 **"Ordinary Course of Business"** shall mean shall an action taken by a Person with respect to the Macomb System which is consistent in nature, scope and magnitude with the past practices of such Person with respect to the Macomb System and is taken in the ordinary course of the normal, day-to-day operations of such Person with respect to the Macomb System.

1.31 **"Person"** shall mean any individual, corporation, association, partnership, joint venture, trust, estate, unincorporated organization or Governmental Entity.

1.32 **"Purchase Price"** shall have the meaning set forth in Section 2.3 hereof.

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000006

1.33 **"Representative"** with respect to a particular Person means any officer, employee, agent, consultant, engineer, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

1.34 **"Requisite Regulatory Approvals"** shall have the meaning such term is given in Section 5.1 hereof.

1.35 **"Retained Liabilities"** shall mean only those Liabilities which arise out of or are otherwise related to Claims asserted by a third party which accrue prior to the Closing Date or arise out of contracts for services provided to DWSD by third parties prior to the Closing, excluding any and all Claims by and among Detroit, Macomb County and MID. Notwithstanding the foregoing, for the purposes of this Agreement, any Claim, whether in trespass or other cause of action, whenever (whether before or after Closing), against whomever asserted, and arising out of any allegation that a) Detroit, Macomb County or MID did or does not have an easement, right of way or other interest in real property sufficient to entitle Detroit, Macomb County or MID to use, maintain and operate the Macomb System or b) Detroit, Macomb County or MID is otherwise in violation of or has any unsatisfied obligations arising under any Macomb Real Property Agreement, shall be deemed to have accrued on or before the Closing and be deemed a Retained Liability.

1.36 **"Schedules"** shall mean each schedule specifically referenced in this Agreement.

1.37 **"System Debt"** means the outstanding pro rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to facilities comprising the Macomb System and charged to Macomb County in the DWSD Sewer Rate Model for FY 2009-10 on other than a "common to all" basis, as adjusted to reflect resolution of certain outstanding rate issues, with the exception of debt and debt service for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs. The calculation of System Debt as of 6/30/2009 is set forth in Schedule 3.8. The FY 2009-10 sewer rates and charges will remain in place for the entire fiscal year, even if Closing occurs prior to the end of the fiscal year. In order to determine the "System Debt" on the Closing Date, the District will be credited with i) the difference between debt service on the relevant facilities billed through the rates and the interest on the associated debt for such facilities paid through the Closing Date, assuming interest calculated at a simple interest rate of 5.17% (which the Parties agree fairly approximates the system weighted interest rate for FY 2009-10), and ii) debt service paid in the rates between the Closing and the end of the fiscal year. That calculation, assuming a Closing Date of 6/30/2010, is shown on Schedule 3.8. The Parties agree that this Schedule will be updated to the Closing Date as part of the closing documents.

1.38 **"Third Party Claim"** shall have the meaning such term is given in Section 11.2 hereof.

9/2/2010
Doc 946709v12

     1.39   "**Wastewater Disposal Services Contract**" shall mean that certain Wastewater Disposal Services Contract by and between Detroit and the Oakland Macomb Interceptor Drain Drainage District dated October 22, 2009.

## ARTICLE II
## THE PURCHASE AND SALE

     2.1   <u>Transfer to the MID</u>.  In accordance with the provisions of this Agreement, in consideration for the payment of the Purchase Price and other good and valuable consideration, and subject to the contingencies set forth in ARTICLE VII and ARTICLE VIII, Detroit shall transfer and convey the Macomb System to MID free and clear of all liens and encumbrances pursuant to an Assignment of Rights of Way and Easements, <u>Exhibit A</u>, and other instruments of transfer to be delivered at the Closing in accordance with the provisions relating to the Closing.

     2.2   <u>Acquisition by the MID</u>.  MID, in reliance upon the covenants, representations, and warranties of Detroit contained herein, hereby agrees to acquire the Macomb System from Detroit.

     2.3   <u>Payment of the Purchase Price</u>.  As part of the consideration for the transfer and conveyance of the Macomb System to the MID from Detroit, the MID shall make a payment to Detroit in a sum equal to the System Debt (the "**Purchase Price**").

     2.4   <u>Assignment of Warranty and Guarantee Rights</u>.  Detroit shall assign to the MID all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System.  Upon written request by the MID, Detroit shall use its best efforts to cause its engineering and other contractors to provide their work product created before the Closing related to the Macomb System to the MID and MID agrees to bear the costs, if any, incurred by the engineers and contractors in providing such work product.

     2.5   <u>MACOMB SYSTEM</u>.  THE MACOMB SYSTEM SHALL BE CONVEYED BY SELLER TO PURCHASER IN "AS IS" PHYSICAL CONDITION, WITH NO ADDITIONAL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PHYSICAL CONDITION OF THE MACOMB SYSTEM THAT EXTEND BEYOND THE WARRANTIES EXPRESSLY STATED IN THIS AGREEMENT.  EXCEPT FOR ANY EXPRESS WARRANTIES STATED IN THIS AGREEMENT, THE MACOMB SYSTEM SHALL BE CONVEYED WITH NO EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE.

     2.6   <u>Retained and Assumed Liabilities</u>.

        (a)   At and as of the Closing, Detroit shall retain, and Macomb County or MID shall in no way assume, the obligation to pay, discharge, perform or defend, as applicable and

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000008

when due, any and all of the Retained Liabilities. Detroit shall pay, discharge, perform and satisfy all of the Retained Liabilities when due.

(b)    At and as of the Closing, MID shall assume, and Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities. MID shall pay, discharge, perform and satisfy all of the Assumed Liabilities when due.

2.7    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Bodman LLP at 1901 St. Antoine, Detroit, Michigan, on such date as shall be mutually acceptable to the parties on or before June 30, 2010, or such other date as mutually acceptable to the Parties (the "**Closing Date**").

2.8    Account Number.  No later than three Business Days prior to the Closing Date, Detroit shall deliver to MID in writing the account number of the account into which the Purchase Price is to be transferred at Closing.

2.9    Deliveries.  At the Closing, the transactions listed below shall occur.

(a)    MID shall deliver to Detroit:

(1)    An original certified resolution of the MID authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

(2)    An opinion of counsel to MID covering such matters and in form and substance satisfactory to Detroit and its counsel;

(3)    A certificate executed by MID as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing; and

(4)    The Purchase Price by wire transfer.

(b)    Detroit shall deliver to MID:

(1)    A certified resolution of the Board of Water Commissioners of Detroit authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

7/25

(2)     A certified resolution of Detroit City Council authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

(3)     An executed bill of sale for all of the Macomb System that is tangible personal property in form and substance satisfactory to MID and its counsel and executed by Detroit;

(4)     An executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to MID and its counsel and executed by Detroit;

(5)     An assignment of the Macomb System Real Property Agreements by a quitclaim deed, an Assignment of Rights of Way and Easements, or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to MID and its counsel and executed by Detroit;

(6)     Such additional certificates, affidavits, undertakings and other evidence as may be required to induce MID's title company ("Title Company") to issue such title insurance policies, in form and substance satisfactory to MID, as MID may elect to purchase with respect to the real property identified in Schedule 3.5(a)(1);

(7)     Such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by MID, each in form and substance satisfactory to MID and its counsel and executed by Detroit;

(8)     An assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System except NTH Contract CS-1372, the METCO Services Contract CS-1241, and the Martin Controls contract which shall not be assigned;

(9)     A certificate executed by Detroit as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing;

9/2/2010
Doc 946709v12

DET- Claim No. 3583- 000010

(10)    An opinion of bond counsel to Detroit providing, in substance, that the transactions contemplated by this Agreement do not violate covenants made by Detroit to its bondholders; and

(11)    An opinion of the legal department of Detroit, reasonably satisfactory to MID, providing that the transactions contemplated by this Agreement do not violate the City Charter of Detroit and such additional matters and in such form satisfactory to MID and its counsel.

(c)    Each of Detroit and MID shall deliver to the other Party hereto an executed original counterpart of the following documents:

(1)    Clintondale Pump Station Transition Services Agreement.

2.10    <u>Transfer of Operation.</u> Effective as of 11:59 p.m. on the Closing Date, MID shall take over from the City all of the operation, maintenance and administration of the Macomb System, except as provided by the Clintondale Pump Station Transition Services Agreement executed on even date herewith.

2.11    <u>Termination of Wastewater Contracts.</u> Effective as of 11:59 p.m. on the Closing Date, the existing Wastewater Disposal Services Contract between Detroit and the Macomb County Wastewater Disposal District shall be terminated, subject to the survival of the following rights and obligations:

(a)    The rights and obligations to credits or for additional assessments, respectively, arising under the Look Back process for rate years and rates paid prior to the termination of the existing contracts; and

(b)    The payment for wastewater services provided by Detroit to the Macomb County Wastewater Disposal District through the date of termination of the existing contract but not billed or paid until after its termination.

2.12    <u>Expenses.</u> Detroit, Macomb County and MID shall each bear their own expenses incurred by them in connection with the transactions contemplated by this Agreement, including without limitation, consultants' fees, legal fees and accounting fees, whether or not such transaction is consummated, except as may otherwise be provided in Section 5.5 and ARTICLES X and XI.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF DETROIT

Detroit makes the following representations and warranties to Macomb County and MID, except as otherwise set forth in the written disclosure schedules (the "**Schedules**")

9/25

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000011

delivered to Macomb County and MID on or prior to the date hereof, a copy of which is attached hereto:

3.1 <u>Corporate Organization</u>. Detroit is a municipal corporation duly organized, validly existing and in good standing under the laws of the State of Michigan.

3.2 <u>Authorization</u>. Detroit has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and thereby. Assuming due and valid authorization, this Agreement will constitute a legal, valid and binding obligation of Detroit, enforceable against Detroit in accordance with its terms, except as the enforcement thereof may be limited by applicable principles of bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors and subject to general principles of equity.

3.3 <u>No Conflict</u>. The execution, delivery and performance by Detroit of this Agreement, the compliance by Detroit with any of the provisions hereof, and the consummation by Detroit of the transactions contemplated hereby: (i) do not violate any provision of the City Charter of Detroit, ordinances of Detroit or any bond covenants associated with the System Debt; (ii) do not require the consent, approval, clearance, waiver, order or authorization of any Person other than the Board of Water Commissioners and the Detroit City Council; (iii) do not conflict with or violate any Applicable Law or any order, judgment, award or decree of any court or other Governmental Entity to which Detroit or the Macomb System is subject; and (iv) do not conflict with, or result in any breach of, or default or loss of any right under (or an event or circumstance that, with notice or the lapse of time, or both, would result in a default), or the creation of any encumbrance pursuant to, or cause or permit the acceleration prior to maturity of any amounts owing under any indenture, mortgage, deed of trust, lease or other agreement to which Detroit is a party or to which any of the Macomb System is subject, in each case, which failure, violation, conflict or breach would, in the aggregate, materially hinder or impair the consummation of the transactions contemplated by this Agreement.

3.4 <u>No Material Transactions</u>. Except for the execution of this Agreement, Detroit has not engaged in any Material transactions related to the Macomb System since January 1, 2009 except contracts or contract amendments for the design of the Clintondale pump station improvements under Contract CS-1241, or associated with NTH Contract CS-1372.

3.5 <u>Easements and Rights of Way</u>.

(a) <u>Schedule 3.5(a) (1)</u> identifies all of the real property occupied by the Macomb System. <u>Schedule 3.5 (a) (2)</u> sets forth all Macomb System Real Property Agreements in Detroit's possession and control.

(b) To Detroit's knowledge, except as disclosed on <u>Schedule 3.5(b)</u>, Detroit possesses all necessary, permanent, perpetual and transferable Macomb System Real Property

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000012

Rights (not including easements, licenses or rights of way by prescription, necessity, implication or acquiescence) necessary for the use and routine operation of Macomb System.

(c)　　Except as disclosed on Schedule 3.5(c), Detroit has good and marketable title to the Macomb System and to the rights arising under the Macomb System Real Property Rights, free and clear of all Encumbrances

(d)　　To Detroit's Knowledge, except as disclosed in Schedule 3.5(d), Detroit has not breached any provision of and is not in default (and no event or circumstance exists that with notice or the lapse of time, or both, would constitute such default) under the terms of any Macomb System Real Property Agreement and all of such Macomb System Real Property Agreements are in full force and effect.

(e)　　There are no pending or, to Detroit's Knowledge, threatened disputes or pending or threatened litigation with respect to any Macomb System Real Property Rights.

3.6　　Environmental Requirements.　Detroit has complied in all material respects with all Environmental Requirements in connection with the ownership, operation and administration of the Macomb System, including, without limitation, NPDES permits and MDNRE requirements, and has not received notice of any violation of any of the foregoing.

3.7　　Litigation.　Except as set forth in Schedule 3.7 hereto, there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement.

3.8　　Disclosure of System Debt.　Schedule 3.8 sets forth all System Debt (with the exception of debt for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs), including for each facility or improvement in the Macomb System, and the allocated outstanding principal as of June 30, 2009, together with such charges and adjustments on which the Parties have agreed to resolve all outstanding issues related to debt and rates associated with the Macomb System.　None of the written data or information furnished or made available to Macomb County by Detroit as part of the due diligence process with regard to System Debt or other debt or rate-related matters contains an untrue statement of a Material fact or omits to state a Material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading.

3.9　　Disclosure of Pending Contracts.　To Detroit's Knowledge, Schedule 3.9 sets forth all pending contracts associated with the operation, maintenance and repair of any facility within the Macomb System.

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000013

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF MACOMB COUNTY AND MID

MID and Macomb County make the following representations and warranties to Detroit, except as otherwise set forth in the Schedule delivered to Detroit on or prior to the date hereof, a copy of which is attached hereto:

4.1 <u>Corporate Organization</u>. MID is a Chapter 20 drainage district duly organized and validly existing under the laws of the State of Michigan and has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.

4.2 <u>Authorization</u>. MID has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and thereby. This Agreement will constitute a legal, valid and binding obligation of MID, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable principles of bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors and subject to general principles of equity.

4.3 <u>No Conflict</u>. Except as set forth in <u>Schedule 4.3</u> hereto, the execution, delivery and performance by MID of this Agreement, the compliance by MID with any of the provisions hereof and thereof, and the consummation by MID of the transactions contemplated hereby and thereby: (i) do not violate any Applicable Law; (ii) do not require the consent, approval, clearance, waiver, order or authorization of any Person; and (iii) do not conflict with, or result in any breach of, or default or loss of any right under (or an event or circumstance that, with notice or the lapse of time, or both, would result in a default), or the creation of any encumbrance pursuant to, or cause or permit the acceleration prior to maturity of any amounts owing under any indenture, mortgage, deed of trust, lease or other agreement to which MID is a party, which failure, violation, conflict or breach would, in the aggregate, materially hinder or impair the consummation of the transactions contemplated by this Agreement.

4.4 <u>Litigation</u>. Except as set forth in <u>Schedule 4.4</u> hereto, there is no action, suit or proceeding pending or, to the Macomb County's Knowledge, threatened against or affecting Macomb County or MID before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of MID to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement.

4.5 <u>Due Diligence</u>. MID acknowledges that it is being afforded the opportunity to conduct due diligence and investigation with respect to the transactions contemplated by this Agreement. MID further acknowledges that, to the extent that Macomb County, MID or their advisors, agents, consultants or representatives, by reason of such due diligence and investigation actually knew that any representation and warranty made herein by Detroit is

9/2/2010
Doc 946709v12

inaccurate or untrue, this constitutes a release and waiver of any and all actions, claims, suits, damages or rights to indemnity, at law or in equity, against Detroit by MID or Macomb County arising out of breach of that representation and warranty. Nothing herein shall be deemed to limit or waive Macomb County's of MID's rights against Detroit arising out of any other representation and warranty made herein by Detroit.

## ARTICLE V
## COVENANTS OF DETROIT

Detroit covenants and agrees with Macomb County and MID as follows:

5.1 <u>Governmental Approvals; Consents</u>. Detroit shall use reasonable efforts and shall cooperate with Macomb County or MID (including, to the extent necessary, after the Closing), to obtain all permits, approvals and consents, and to make all filings, necessary or required to be obtained or made for MID to have full use and enjoyment of the Macomb System subsequent to the Closing and for the consummation of the transactions contemplated by this Agreement under Applicable Law (all such permits, approvals, filings and consents being referred to as the **"Requisite Regulatory Approvals"**).

5.2 <u>Operation and Maintenance of the Macomb System until Closing.</u> Between the date of this Agreement and the Closing, Detroit shall:

(a) Operate the Macomb System in the Ordinary Course of Business;

(b) Obtain the consent of Macomb County or MID prior to implementing operational decisions of a Material nature;

(c) Maintain the Macomb System in a state of repair and condition consistent with Detroit's conduct of the operation of the Macomb System prior to Closing;

(d) Comply in all material respects with Applicable Law and contractual obligations applicable to the operation of the Macomb System;

(e) Maintain all books and records relating to the operation of the Macomb System in the Ordinary Course of Business.

(f) Provide to Macomb County and MID reasonable notice prior to making any capital expenditures or implementing any maintenance, repair or operational decisions of a material nature relating to the Macomb System and reasonably consider any objections of the Macomb County thereto;

(g) Refrain from entering into any sale, assignment, or other transfer of all or any part of Detroit's right, title or interest in and to any portion of the Macomb System without first obtaining the consent of Macomb County and MID;

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000015

(h)     Refrain from entering into any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the Macomb System without first obtaining the consent of Macomb County and MID; and

(i)     Promptly notify the Macomb County of any emergency or other change in the normal course relating to the Macomb System (or communications indicating that the same may be contemplated) if such emergency or change would be Material.

5.3     Litigation and Claims.  Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

5.4     Notice of Changes.  Detroit shall inform Macomb County and MID in writing if it becomes aware that any representation or warranty made by Detroit in this Agreement has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by this Agreement to be performed or complied with by Detroit.

5.5     Post-Closing Covenants.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, Detroit will take such further action (including the execution and delivery of such further instruments and documents) as Macomb County or MID may reasonably request, all at the sole cost and expense of MID, unless such action is a result of any Default or breach of any representation, warranty or covenant by Detroit under this Agreement or is covered by Section 10.4, in which cases it will be at the sole cost and expense of Detroit.

5.6     Adjustment of Sewer Disposal Rates After Acquisition  Detroit will adjust its sewer rate model such that no debt service associated with System Debt is charged directly or indirectly to Macomb County, MID, or the Oakland-Macomb Interceptor Drain Drainage District after the Closing Date nor any costs formerly included in the sewer rate model associated with the operation and maintenance of the Macomb System, with the exception of debt service for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs.  Schedule 5.6 shows in detail the manner in which the post Closing sewer rates for Oakland-Macomb Interceptor Drain Drainage District will be calculated if the transfers of the Macomb System and the OMI System were effectuated on June 30, 2010.  The Parties agree that before November 30, 2010, they will mutually agree on how the FY2009-10 Look Back calculations should conducted in light of the System Debt adjustments set forth in Section 1.37.

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000016

## ARTICLE VI
## COVENANTS OF MID AND MACOMB COUNTY

The MID and Macomb County hereby covenant and agree with Detroit as follows:

6.1     Cooperation.  Subject to the terms and conditions of this Agreement, Macomb County and MID shall cooperate with Detroit to use its best efforts to secure all necessary consents, approvals, authorizations, exemptions and waivers from all Persons and Governmental Entities as shall be requested by Detroit or required to be obtained in order to consummate the transactions contemplated hereby.

6.2     Litigation and Claims.  MID shall promptly inform Detroit in writing of any Claims (or communications indicating that the same may be contemplated) of which MID is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

6.3     Notice of Changes.  MID shall inform Detroit in writing if it becomes aware that any representation or warranty made by Macomb County or MID in this Agreement has ceased to be accurate or if MID becomes aware of the occurrence of any breach of any covenant or other agreement required by this Agreement to be performed or complied with by the Macomb County.

6.4     New Service Contracts.  Prior to Closing, Macomb County shall enter into a wastewater disposal services contract with the Oakland-Macomb Interceptor Drain Drainage District.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF DETROIT

The obligations of Detroit to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Detroit) on or prior to the Closing of all of the following conditions:

7.1     Accuracy of Representations and Warranties.  Except as set forth in the Schedules, the representations and warranties of Macomb County and MID set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing.

7.2     Performance of Covenants and Agreements.  Macomb County or MID, as their respective liabilities lie, shall have duly performed and complied in all Material respects with the covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing. None of the events or conditions entitling Detroit to terminate this Agreement under ARTICLE IX hereof shall have occurred and be continuing.

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000017

7.3     Consents.  Any consent required for the consummation of this purchase and sale under any agreement, contract, license or other instrument described in any exhibit hereto or referred to herein, or for the continued enjoyment by Detroit of any benefits of such agreement, contract, license or other instrument after the Closing, which consent Macomb County or MID is specifically obligated to obtain pursuant to this Agreement shall have been obtained and be effective.

7.4     Governmental Approvals.  All Requisite Regulatory Approvals shall have been obtained or made and shall be in full force and effect.  There shall be no injunction, restraining order or decree of any nature that restrains or prohibits the transactions contemplated by this Agreement.

7.5     No Proceedings.  Since the date of this Agreement, there shall not have been commenced or threatened against Detroit, Macomb County or MID or their constituent counties or municipalities any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

7.6     Resolutions.  Detroit shall have received certified copies of the resolutions identified in Sections  2.10(a)(1), 2.10(b)(1) and 2.10(b)(2).

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF MACOMB COUNTY AND MID

The obligations of Macomb County and MID to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Macomb County or MID) on or prior to the Closing, of all of the following conditions:

8.1     Accuracy of Representations and Warranties.  Except as set forth in the Schedules, the representations and warranties of Detroit set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing.

8.2     Performance of Covenants and Agreements.  Detroit shall have duly performed and complied in all Material respects with the covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing. None of the events or conditions entitling MID or Macomb County to terminate this Agreement under ARTICLE IX hereof shall have occurred and be continuing.

8.3     Resolutions.  MID and Macomb County shall have received certified copies of the resolutions identified in Sections 2.10(a)(1), 2.10(b)(1) and 2.10(b)(2).

8.4     Consent.  Any consent required for the consummation of the transactions contemplated by this Agreement under any agreement, contract, license or other instrument

16/25

described in any schedule or exhibit hereto or referred to herein, which consent Detroit is specifically obligated to obtain pursuant to this Agreement shall have been obtained and shall be effective.

8.5     Governmental Approvals.  All Requisite Regulatory Approvals shall have been obtained or made and shall be in full force and effect.  There shall be no injunction, restraining order or decree of any nature that restrains or prohibits the transactions contemplated by this Agreement.

8.6     No Proceedings.  Since the date of this Agreement, there shall not have been commenced or threatened against Detroit, Macomb County of MID or their constituent counties or municipalities any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

8.7     Financing Contingency.   MID shall have obtained financing on terms and conditions reasonably satisfactory to MID in an amount equal to System Debt plus associated financing costs.

8.8     New Service Contracts  Macomb County shall have entered into a new wastewater disposal services contract with the Oakland-Macomb Interceptor Drain Drainage District.

8.9     Resolution of all Certain Disputes.  Macomb County and Detroit shall have executed an agreement acknowledging that all pending disputes between such parties with respect to rates and all other matters have been resolved.

8.10    Title Insurance and Surveys.  MID shall have obtained title commitments and searches and, if MID elects, also title insurance policies and surveys with respect to Macomb System Real Property Rights, from title companies, surveyors and engineering firms, as applicable, and in form and substance, satisfactory to MID.

## ARTICLE IX
## TERMINATION PRIOR TO CLOSING

9.1     Termination.

(a)     This Agreement may be terminated at any time prior to the Closing:

(1)     By the mutual written consent of Detroit, MID and Macomb County;

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000019

(2) By Detroit in writing if Macomb County or MID shall be in Default;

(3) By Macomb County or MID in writing if Detroit shall be in Default;

(4) By written notice of either Party hereto to the other Party hereto if, after the date of this Agreement but prior to the Closing, defects within and necessary repairs to the Macomb System have become Materially greater or different than those disclosed in the following reports prepared by NTH Consultants, Ltd.:

    (A) Report on Sewer Condition Investigation & Evaluation Romeo Arm, Oakland-Macomb Interceptor, PCI-12A, DWSD Contract CS-1368 ER_B Task 37-1 (June 5, 2006);and

    (B) Report of Sewer Condition Assessment Inspection DWSD Construction Contracts PCI 13, 14, 15B, 15C, 24, 25, 42A, and 45, Project No. 15-060131-00 (June 7, 2006).

(5) By Macomb County, MID or Detroit if the transaction is not approved by all their respective governing bodies; and

(6) By any Party hereto if the other Party hereto shall fail to timely satisfy those conditions set forth in ARTICLE VII or ARTICLE VIII hereto, as appropriate.

(b) This Agreement may be terminated by Macomb County in writing on or before January 1, 2010 if it shall not have been satisfied in its sole discretion with the results of Macomb County's continuing due diligence investigations of the Macomb System, including, without limitation, with respect to all operational, financial, environmental, legal and accounting matters.

9.2   <u>Effect on Obligations</u>. Termination of this Agreement pursuant to this ARTICLE IX shall terminate all obligations of the Parties hereto; provided, however, that termination pursuant to Sections 9.1(a)(2) or 9.1(a)(3) hereof shall not relieve any defaulting party from any liability to the other party hereto resulting from such Default. Notwithstanding the foregoing, any and all existing agreements (other than this Agreement) between Detroit and Macomb County and/or any constituent entity thereof which are related to the Macomb System shall remain in full force and effect following any termination of this Agreement unless and until such existing agreements are otherwise terminated pursuant to the terms thereof.

9/2/2010
Doc 946709v12

DET-Claim No. 3685-000020

## ARTICLE X
## REMEDIES FOR BREACHES OF THIS AGREEMENT

10.1 <u>Survival of Representations and Warranties.</u> All of the representations, warranties and covenants of Macomb County and MID and Detroit contained in this Agreement and the schedules and exhibits hereto shall survive the Closing and continue in full force and effect forever thereafter (subject only to any applicable statutes of limitations applicable to their breach).

10.2 <u>Remedies Generally</u> Unless expressly limited by this Agreement, in addition to any remedies provided in Sections 10.3, 10.4 and 10.5, the Parties shall have all remedies available at law and equity for a breach of contract for any breaches of any terms of this Agreement.

10.3 <u>Remedies for Breach of Representations, Warranties and Covenants</u>. If a Party sustains any Losses because the representations or warranties provided by the other Party are incorrect or untrue or because the other Party has breached its covenants given herein, the other Party shall be liable for all Losses incurred by the Party to cure such representations, warranties or covenants. In addition or in the alternative, the Party may require the other Party to take such actions as required to cure such misrepresentations, warranties or breached covenants.

10.4 <u>Remedies to Cure Title Issues</u>. In the event that Detroit does not possess all necessary, permanent, perpetual and transferable Macomb System Real Property Rights, or if any of those Macomb Real Property Rights are in the form of easements, rights of way or licenses arising by prescription, necessity, acquiescence or implication, MID may obtain by purchase, condemnation or otherwise such easements, rights of way, licenses or other agreements on terms reasonably acceptable to MID and in any case sufficient to entitle MID to use and operate the Macomb System in the same manner as used and operated by Detroit prior to Closing. MID shall use good faith efforts to minimize the cost of obtaining such easements, rights of way, licenses or other agreements. MID shall consult with Detroit before extending offers to purchase, finalizing any appraisals, or extending any settlement offers, and shall reasonably consider any comments or objections made by Detroit with regard to same. In the event that condemnation proceedings are commenced or other litigation related to Macomb System Real Property Rights occurs, MID shall inform Detroit of the commencement of such proceedings and provide advance notice of hearings and settlement conferences scheduled in such proceedings. Detroit, at its sole cost and expense, shall cooperate in taking all actions requested by MID to assist MID in obtaining such easements and other interests in property. Within 60 days of demand, as may be made from time to time by MID, Detroit shall reimburse the Macomb County or MID in an amount equal to any and all costs incurred by Macomb County or MID to obtain such easements and other interests in property including, but not limited to, costs of acquisition or condemnation awards (including the condemnation defendant's attorneys fees and costs) and all legal, expert and professional fees and costs incurred by Macomb County or MID and any Losses actually incurred by the Macomb County

19/25

9/2/2010
Doc 946709v12

or MID arising out of Claims asserted against Macomb County or MID by third parties based on the failure to have an easement, right of way, license or other agreement for real property necessary for the use and routine operation of Macomb System. These reimbursable costs include the cost incurred by the Macomb County before Closing to ascertain the location of any improvements constituting any part of the Macomb System or to compare the location of the Macomb easements to the "as-built" designs of the Macomb System. Further, within 60 days of demand, as may be made from time to time by Macomb County or MID, Detroit shall reimburse Macomb County or MID for all Losses actually incurred by Macomb County or MID arising out of Claims asserted against Macomb County or MID arising out of any obligation occurring under the OMI Real Property Agreements before Closing.

10.5    Limitations on Certain Remedies.

(a)    Notwithstanding anything in Sections 10.2, 10.3 and 10.4 to the contrary, any right to damages arising under those Sections shall be net of the dollar amount of any insurance proceeds actually received by the Party from any third party insurer with respect to the Claim.

(b)    The injured Party will take reasonable steps to mitigate all Losses relating to the Claim, including availing itself of any defenses, limitations, and will provide such evidence and documentation of the nature and extent of the Claim as may be reasonably requested by the other Party. The injured Party's reasonable steps include the reasonable expenditure of money to mitigate or otherwise reduce or eliminate any loss or expense for which a remedy would otherwise be due under this ARTICLE X, and the reimbursing Party will reimburse the injured Party for the injured Party's reasonable expenditures in undertaking the mitigation.

(c)    Notwithstanding anything contained to the contrary in any other provision of this Agreement, except in cases of a Party's gross negligence, willful misconduct or fraud, the obligations of each Party under Sections 10.2, 10.3 and 10.4, and the recovery by any injured Party of any liabilities suffered or incurred by it as a result of any breach or non-fulfillment by a Party or any of its representations, warranties, covenants, agreements or other obligations under this Agreement, shall be limited to actual damages (but excluding consequential damages).

(d)    Survival of Remedies  The rights and obligations to remedies given in Article X shall survive the Closing indefinitely.

## ARTICLE XI

## PROCEDURES IN THE EVENT OF CLAIMS BY THIRD PARTIES

11.1    Remedies For Third Party Claims Asserted Against One Party Arising out of or Related to Liabilities Assumed or Retained by the Other Party.  In the event that a Third Party

9/2/2010
Doc 946709v12

Claim, as defined below, is asserted against one Party (**"Indemnified Party"**) arising out of or related to matters for which the other Party (**"Indemnifying Party"** (which includes the City of Detroit, Macomb County and MID)) has assumed liability under this Agreement, the Indemnifying Party shall defend the Indemnified Party from such Third Party Claims and shall reimburse the Indemnified Party for any Loss incurred by the Indemnified Party resulting from such Third Party Claims.

11.2    Defense and Settlement of Third Party Claims

(a)    If any third party shall notify an Indemnified Party with respect to any matter (a **"Third Party Claim"**) which arises out of a matter for which liability was expressly assumed or retained by the Indemnifying Party under this Agreement or arises out of the breach of a representation, warranty or covenant given in this Agreement, the Indemnified Party shall promptly (and in any event within 30 days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing. Third Party Claim does not include any Claim covered by Section 10.4. Failure to give the required notice shall not bar the rights of the Indemnified Party under this Agreement except to the extent that such failure prejudices the Indemnifying Party's ability to defend and settle the Third Party Claim.

(b)    To the extent permitted by Applicable Law, the Indemnifying Party will have the right at any time to assume and thereafter conduct the Indemnified Party's defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party provided that within 30 days after receipt of the notice of the claim the Indemnifying Party confirms in writing its responsibility therefore; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party and includes a full and complete release of the Indemnified Party as an unconditional term thereof.

(c)    Unless and until the Indemnifying Party timely assumes the defense of the Third Party Claim as provided in Section 11.2(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d)    In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without seeking the prior written consent of the Indemnifying Party (not to be withheld unreasonably).

(e)    The Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense) and the Indemnified Party shall be entitled to have sole entire control over the defense or settlement of the Claim or portion of a Claim to the extent the Claim or portion of a Claim seeks an order, injunction, non-monetary or other equitable relief

9/2/2010
Doc 946709v12

against the Indemnified Party which if successful, could materially interfere with the business, operations assets, condition (financial or otherwise) or prospects of the Indemnified Party.

11.3    <u>Release and Covenant Not To Sue</u>.  Each Party releases and covenants not to sue the other for Liabilities expressly assumed or retained by the Party under this Agreement except to enforce the terms of this Agreement.

11.4    <u>Survival of Remedies</u>.  The rights and remedies given in Article XI shall survive the Closing indefinitely.

## ARTICLE XII
## MISCELLANEOUS

12.1    <u>Continued Support.</u>  In the event and for so long as any party hereto actively is contesting or defending against any Claim in connection with (a) any transaction contemplated under this Agreement, (b) the resolution of any encroachments or trespasses by MID or Macomb County, encroaching easements, Encumbrances or rights-of-way, (c) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Macomb System, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending party is entitled to reimbursement therefor under ARTICLE X and XI above).  The rights and obligations in this Section 12.1 shall survive the Closing indefinitely.

12.2    <u>Cooperation on Repairs</u>  After the Closing, Detroit shall cooperate with the MID in taking actions to facilitate the ongoing repairs to the Macomb System.

12.3    <u>Construction.</u>    The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

12.4    <u>Incorporation of Schedules.</u>    The Schedules and exhibits identified in this Agreement are incorporated herein by reference and made a part hereof

12.5    <u>Entire Agreement.</u>  This Agreement constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000024

agreements and understandings between the Parties with respect to the subject matter hereof. No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by Detroit and MID and in compliance with Section12.12.

12.6 <u>Successors and Assigns</u>. This Agreement will inure to the benefit of and be binding upon Detroit, Macomb County and MID and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either Party hereto without the prior written consent of the other Party hereto.

12.7 <u>Taking of Necessary Action</u>. Subject to the terms and conditions of this Agreement, each of the parties hereto agrees, subject to Applicable Law, to use all reasonable best efforts promptly to take or cause to betaken all action and to promptly do or cause to be done all things necessary, proper or advisable under Applicable Laws and regulations to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing and subject to the terms and conditions of this Agreement, the parties shall use their commercially reasonable efforts to obtain and make all Required Regulatory Approvals. Each party hereto shall cooperate with the other in good faith to help the other satisfy its obligations hereunder.

12.8 <u>Invalidity</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the practical, economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible. Invalid provisions shall be severed from this Agreement.

12.9 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument. This Agreement may be executed by facsimile signatures which shall be considered originals.

12.10 <u>Headings</u>. The headings of the articles, sections and paragraphs of this Agreement and of the exhibits hereto are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof or thereof.

12.11 <u>Construction and References</u>. Words used in this Agreement, regardless of the number or gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context shall require. Unless otherwise specified, all references in this Agreement to articles, sections,

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000025

paragraphs or clauses are deemed references to the corresponding articles, sections, paragraphs or clauses in this Agreement, and all references in this Agreement to exhibits are references to the corresponding exhibits attached to this Agreement.

12.12 <u>Modification and Waiver</u>. Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provisions hereof (whether or not similar). Oral modifications of this Agreement are not permitted. Modification or amendment of this Agreement shall require the approval of MID's Board, the Board of Water Commissioners and the Detroit City Council.

12.13 <u>Dispute Resolution</u>. Any and all claims alleging a breach of this Agreement shall be submitted to the alternative dispute resolution process set forth in <u>Exhibit B</u> hereto

12.14 <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party shall be in writing and delivered personally, via telecopy (with receipt confirmed)or by registered or certified mail, postage prepaid:

    (a)    if to the MID or Macomb County, to:

        Anthony V. Marrocco
        Macomb County Public Works Commissioner
        21777 Dunham Road
        Clinton Township, MI 48036

        if to Detroit, to:

        Director
        Detroit Water and Sewerage Department
        735 Randolph
        Detroit, Michigan 48226

12.15 <u>Governing Law; Interpretation</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Michigan. The parties hereto (a) consent to the personal jurisdiction of the state and federal courts located in Detroit, Michigan in connection with any controversy related to this Agreement including, but not limited to, counterclaims or third party demands raised as a result of third party counterclaims initiated in any other jurisdiction; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Macomb County or Detroit in connection with this Agreement may be brought in either the state or federal courts located in Detroit, Michigan; and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000026

*Macomb Acquisition Agreement*

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY OF DETROIT**, a Michigan municipal corporation

By: _[signature]_
Name: Darryl Latimer
Title: Deputy Director
Detroit Water and Sewerage Department

**MACOMB COUNTY**

By: _[signature]_
Name: William Misterovich
Title: Chief Deputy
Macomb County Public Works Commissioner and County Agency pursuant to 1939 P.A. 342.

**MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT**

By: _[signature]_
Name William Misterovich
Title Acting Chairperson, Macomb Interceptor Drain Drainage District

25/25

9/2/2010
Doc 946709v12

DET- Claim No. 3683- 000027

# EXHIBIT A

## SEE TABS 11 AND 12

DET- Claim No. 3683- 000028

# EXHIBIT B

## DISPUTE RESOLUTION PROCEDURES

The Parties agree that it is in their collective best interest to establish a dispute resolution procedure to allow for faster resolution of problems, reduce expenses for attorneys, fees and costs, and improve working relationships. These procedures shall be utilized in the event that a dispute arises between the Parties arising under the Acquisition Agreement.

All capitalized terms shall have the meaning defined in the Contract.

## 1.     General Dispute Resolution Policy

Any and all claims alleging a breach of or arising under the Acquisition Agreement, other than claims requiring immediate relief to prevent irreparable harm to a party, public health or the environment, shall first be submitted to the alternative dispute resolution ("ADR") process set forth in this Exhibit B. No litigation, other than a suit seeking immediate relief to prevent irreparable harm to a party, public health or the environment may be initiated until the Parties have complied with the Informal Negotiation (Section 2) and Formal ADR Procedures (Sections 3 & 4) set forth here.

Unless expressly agreed in writing by the Parties, all alternative dispute resolution procedures utilized shall be nonbinding.

No resolution achieved under these procedures shall be binding on any other First Tier Customer unless such customer has agreed in writing to the resolution.

All dispute resolution proceedings under this Contract shall be private and confidential, and any written or oral communications will similarly be deemed to be confidential, and may not be disclosed unless the parties agree otherwise. Documents created by the parties for use in any ADR process shall not be filed with any court or made available as evidence in any court proceeding by any other party. However, evidence or information which is otherwise admissible or subject to discovery does not become inadmissible or protected from discovery solely by reason of its disclosure or its use in mediation. Any person involved in the ADR process who is not an agent or employee of a Party shall not testify regarding matters disclosed during the

DET- Claim No. 3683- 000029

mediation process, but may testify only as to the final outcome of the ADR process, and the parties to the Dispute agree they shall not seek testimony from any such person with regard to information or knowledge obtained by such person as the result of participating in an ADR process under this Contract.

## 2. Informal Negotiations

Each party agrees to undertake informal negotiations before invoking formal ADR procedures under this Contract or litigation. This process shall be commenced by written notice from the initiating party to the other describing the subject matter of the dispute. The notice shall contain such information as is necessary to advise of the exact nature of the dispute and the relief requested. Upon issuance of such written notice, the parties shall engage in good faith informal negotiations among themselves to attempt to develop a mutually acceptable resolution to the dispute. The time frame for conducting informal negotiations shall not exceed 45 days from the date of issuance of the written notice, unless all parties agree to a longer informal negotiation timeframe.

## 3. Invocation of Formal ADR Procedures

In the event a dispute arises between the Parties that is not resolved by informal discussions between them, either Party may initiate the formal alternative dispute resolution process under Sections 3 and 4 by giving notice in writing to the other Party, the Director's Council and the Chair(s) of the Steering Committee. The notice shall contain such information as is necessary to advise of the exact nature of the dispute and the relief requested.

Unless the parties reach a settlement within the 120-day period or agree in writing within the 120-day period to continue the ADR process and to continue toll the running of the statute of limitations, at the end of the 120-day period any party may commence litigation and the statute of limitations shall commence to run.

## 4. Formal ADR Procedures

    (a)    Role of Steering Committee and Work Groups

    (b)    Role of Director's Council

2

DET- Claim No. 3683- 000030

Either Board or the Customer may notify the Director's Council of the policy issue with a request that the Director's Council address the issue through good faith discussion and negotiations, and attempt to resolve the issue in a manner which provides a fair balancing of the interests of the Board and its First Tier Customers. Within 30 days of receiving such a notice, the Director's Council shall agree on an ADR process to address the policy issue in a manner which fairly accommodates the interests of the Parties. Thereafter, the Director's Council shall act expeditiously to assist in resolving the dispute within the balance of the 120-day period.

5.    **Mediation**

If informal negotiation and the ADR process under the aegis of the Director's Council is not successful in resolving the dispute, the matter shall be referred to mediation. Mediation is defined to be a non-binding dispute resolution process in which an impartial neutral facilitates negotiations among the parties in an attempt to help reach a settlement.

(1)    *Selection of Mediator*

The mediator of the dispute must be neutral and impartial, with no conflict of interest with any party, and no financial or personal interest in the outcome of the mediation. The mediator shall be selected within thirty (30) days following the conclusion of informal negotiations by the parties. The mediator shall be selected by agreement of the Board, the wholesale customer initiating the dispute resolution process, and at least one of the other wholesale customers affected by the subject matter in dispute. If no mutually acceptable mediator is identified and selected within thirty (30) days, then the dispute resolution process under this Step shall be terminated.

(2)    *Costs*

The costs for the mediator shall be paid by the Board as an operating expense, unless it is mutually agreed that some alternative cost apportionment for the mediator's expenses is acceptable.

### (3)  Conduct of Mediation

Each wholesale customer and/or the Board involved in the dispute shall designate a decision-maker to serve as their representative to participate in the mediation, and that person shall be vested with authority to negotiate on behalf of the community and/or the Board, and to settle the dispute or, if required, recommend settlement to the governing board of the wholesale customer. Each wholesale customer and/or the Board who is party to the dispute may also be represented during the process by an attorney and/or technical consultants if it so chooses, provided that the costs of any such participation are borne solely by that wholesale customer and/or the Board.

The mediator shall be free to meet and communicate separately as he/she deems appropriate with each party, but will schedule joint meetings of all parties with the time, place and agenda to be established by the mediator in consultation with the parties. No stenographic, video or record will be made of meetings conducted by the mediator, and formal rules of evidence and procedure will not apply to materials presented and discussed.

The mediation process may be terminated by the mediator at any time if the mediator determines that one or more parties is not acting in good faith, or if the mediator concludes that further dispute resolution efforts would not be useful in achieving a settlement. The mediation process will automatically terminate after 90 days from the date the mediator is retained, unless the time period is extended by agreement of all parties and the mediator.

If a settlement is reached, a preliminary Memorandum of Understanding will be prepared and signed or initialed before the parties separate. Thereafter, either the mediator or the parties themselves will promptly and not later than thirty (30) days following the execution of the Memorandum of Understanding draft a written settlement document incorporating the terms of any such settlement. This draft document will be circulated, amended as necessary, and then formally executed. It is anticipated that in some cases, formal execution of any settlement agreement may be deferred pending review and consideration of the document by the governing bodies of the wholesale customer and/or the DWSD.

**6.** Proceedings After Unsuccessful Mediation

If mediation is terminated for any reason prior to resolution of the dispute, the parties or the mediator (if any) may discuss with the parties the possibility of proceeding with binding arbitration as a form of dispute resolution in lieu of litigation. If binding arbitration is acceptable to all parties, the parties may request that the mediator (if any) assist in structuring a procedure to generate a prompt and economical decision; for example, by use of the Commercial Rules of the American Arbitration Association. The mediator (if any) shall not serve as arbitrator unless all parties agree.

If no resolution is reached through the mediation process, and if the parties decide not to pursue voluntary binding arbitration as discussed above, any party may then exercise its right to pursue resolution of the matter in a court of appropriate jurisdiction.

DET- Claim No. 3683- 000033

Any and all right, title and interst that Detroit has in the interceptor sewers, meters, pump stations, flow control gates and appurtenant facilities and associated tangible and intangible personal property commonly know as the Romeo Arm Interceptor, Garfield Interceptor, Sterling Heights Arm, 15 Mile Interceptor, Lakeshore Interceptor and Lakeshore Interceptor Extension and the Clintondale Pump Station, consisting of the facilities constructed pursuant to the contracts listed below.

| Interceptors | DWSD Contract # | Diameter | Length | Location | Municipality |
|---|---|---|---|---|---|
| Macomb Element | PCI-28 | 27 | 4,882 | 23 Mile from Garfield to Hayes | Macomb Twp |
| Macomb Element | PCI-28 | 48 | 10,755 | Garfield from 23 Mile to 21 Mile | Macomb Twp |
| | | | | | |
| Romeo Arm | PCI-12A and PCI-37 | 126 | 9,060 | Garfield from Clinton River Road to 15 Mile and 15 Mile from Garfield to Maple Lane | Clinton Twp |
| Romeo Arm | PCI-24 | 108 | 7,224 | Garfield from 18 Mile to Clinton River Road | Clinton Twp |
| Sterling Heights Arm | PCI-25 | 42 | 5,185 | 18 Mile from Hayes to Garfield | Clinton Twp |
| Garfield | PCI-45 | 84 | 16,108 | Garfield from 21 Mile to 18 Mile | Clinton & Macomb Twps |
| | | | | | |
| 15 Mile Road (force main) | PCI-15C | 60 | 15,150 | 15 Mile from Garfield to Maynard | Clinton Twp |
| 15 Mile Road (force main) | PCI-15B | 60 | 8,037 | 15 Mile from Maynard to I 94 | Clinton Twp |
| | | | | | |
| Lakeshore Arm | PCI-13 | 132 | 11,600 | I 94 from 15 Mile to Bonaire | Harrison Twp |
| Lakeshore Arm | PCI-14 | 132 | 11,400 | I 94 from Hayes to Garfield | Harrison Twp |
| | | | | | |
| Lakeshore Interceptor Extension | PCI-42A | 42 | 11,600 | I 94 from Joy to 21 Mile | Harrison Twp |
| Lakeshore Interceptor Extension | PCI-42A | 27 | 1,300 | I-94 and 21 Mile Road/Brandenburg Rd. | Harrison Twp |
| | | | | | |
| **Pump Stations** | | | | | |
| | | | | | |
| Clintondale Pump Station | PC-218 | | | 36965 Union Lake Road (tax ID 11-36-103-007) | Clinton Twp |
| | | | | | |
| **Meters** | | Upstream Manhole | | | |
| CH-S-5 | PCI-42A | In-Line with sewer | | PCI-42A | |
| CT-S-1 | PC-261 | CT-S-1 MH-3 | | PCI-12A | |
| CT-S-2 | PC-262A | CT S-2 MH-2 | | PCI-13 | |
| CT-S-3 | PC-289 | CT-S-3 MH2 | | PCI-24 | |
| CT-S-4 | PCI-291A | CT-S-4 MH-2 | | PCI-15C | |
| FR-S-1 | PC-261 | FR-S-1 MH-3 | | PCI-12A | |
| HR-S-1 | PC-262B | HR-S-1 MH-2 | | PCI-14 | |
| HR-S-2 | PC-262B | HR-S-2 MH-2 | | PCI-3 | |
| HR-S-3 | PC-262A | HR-S-3 MH-2 | | PCI-13 | |
| MA-S-2 | PCI-45 | MA-S-2 MH2 | | PCI-45 | |
| ST-S-5 | PC-262A | ST-S-5 MH-3 | | PCI-12A | |
| ST-S-6 | PC-289 | None | | PCI-25 | |
| SY-S-3 | PCI-45 | SY-S-3 MH-2 | | PCI-45 | |
| MC-S-1 | Unknown and CS-1368 | In-Line with sewer | | PCI-42A | |
| Various | CS-1292 | NA | | Odor Control | |
| Various | PC-707 | NA | | Meter Rehabilitation | |

Note: Meters being transferred include the lead-in sewer to the meter beginning at the downstream side of the manhole that is immediatley upstream of the meter for those meters with an upstream manhole. Manholes are as identified on Macomb Interceptor Sewer Alignment Drawings (August 2010)

| Repairs and Rehabilitation | | | | | |
|---|---|---|---|---|---|
| Romeo Arm | PCI-37 | | | 1978 15 & Hayes Repair | |
| Romeo Arm | CS-978 | | | Repairs along Garfield | |
| Romeo Arm | CS-1368 | | | 2004 15 Mile Repair | |
| Romeo Arm | CS-1372 | | | 2006 - 2009 Repairs | |
| Clintondale Pump Station | CS-1421 | | | Pump Station Rehabilitation | |
| | | | | | |
| **Flow Control Gates** | | | | | |
| | | | | | |
| Garfield Interceptor | PCI-45 | | | Garfield at 18 Mile Road at PCI-24, Sta. 72+28 | |
| Garfield Interceptor | PCI-12A | | | Garfield north of 15 Mile Road | |
| Romeo Arm | PCI-45 | | | 15 Mile Road at PCI 12A, Sta. 123+00 | |

| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-1 | PCI-12 P-1 | 12A-12 | 27' Easement for sewer by AWO AKA Old PE-36 | Adolf & Inge Reif; City of Detroit Water Board | 03/23/70 | 07/30/70 | 2123 | 753 | Garfield-15 Associates L.L.C. | 11-31-229-009 | WS10445 | 127 + 15 | 129 + 50 |
| M-2 | PCI-12 P-2 | 12A-12 | 27' Easement for sewer by AWO. AKA Old PE-37. | Trenarco Corp.; City of Detroit Water Board | 10/27/70 | 02/02/71 | 2164 | 485 | The Southland Corporation | 11-31-229-010 | WS10447 R-1 | 129 + 50 | 131 + 50 |
| M-3 | PCI-12 P-3 | 15-C-1 | 20' Easement for sewer by AWO. AKA Old PE-38. | Sun Oil Company; City of Detroit Water Board | 04/20/70 | 08/18/70 | 2127 | 732 | Independent Newspapers, Inc. | 11/29/353-008 | WS10448 | 0 – 75 | 1 + 30 |
| M-4 | PCI-13 P-1 | 13-7 | 25' Easement for sewer by AWO. Also Job #92-31 encroachment. | Ito & Winifred Smith; City of Detroit Water Board | 01/14/74 | 02/28/74 | 2477 | 783 | Ito & Winifred Smith, husband and wife | 11-24-378-016 | WS10462 | 64+90 | 65+55 |
| M-5 | PCI-13 P-2 | 13-7 | 30' Easement for sewer by AWO. | Charles J. Rogers Construction Co; City of Detroit Water Board | 01/12/76 | 04/30/76 | 2679 | 408 | Joh R. DuBay, a single man | 11-24-378-007 | WS10483 | 65+55 | 66+75 |
| M-6 | PCI-13 P-3 | 13-8 & 13-9 | 30' Easement for sewer by AWO. AKA Old PE-45 | Hilda Georgeson & Hilda Anne Meazles; City of Detroit Water Board | 12/27/71 | 03/13/72 | 2270 | 308 | Carl D. Harlow and Christy Harlow, husband and wife | 11-24-403-011 | WS10436 | 83+15 | 89+35 |
| M-7 | PCI-13 P-4 | 13-9 | Triangular easement for sewer by AWO. AKA Old PE-46 | Lawrence & Jo Ellen Spearman; City of Detroit Water Board | 10/4/71 07/08/74 | 12/17/71 09/09/74 | 2249 2532 | 257 523 | Ronald R. and Donna L Sogge, husband and wife | 11-24-426-006 | WS10464 | 90+50 | 91+10 |
| M-8 | PCI-14 P-1 | 14-3 | 30' Easement for sewer by AWO. | Michigan State Highway Commission; City of Detroit Water Board | 02/27/74 | 05/20/74 | 2499 | 704 | State Highway Commissioner of the State of Michigan | 11-13-427-001 | WS10465 | 32+00 | 34+10 |
| M-9 | PCI-14 P-2 | 14-3 | 30' Easement for sewer by AWO. AKA Old PE-55 | Taylor Brothers, Inc.; City of Detroit Water Board | 10/15/73 | 12/07/73 | 2459 | 551 | UNKNOWN Currently - Captains Quarters Condominium | UNKNOWN | WS10466 | 29+00 | 30+65 |
| M-10 | PCI-14 P-3 | 14-4 | 50' Easement for sewer by AWO. AKA Old PE-53 | Arnold & Judith Stroshein, his wife, and Bertha Stroshein; City of Detroit Water Board | 7/12/72 11/13/72 | 7/3/73 7/3/73 | 2410 2410 | 741 745 | Street Up, L.L.C. | 11-13-277-022 (part of) Note: Now within Lot 14 of Assessor's Plat No. 1, Liber 65, Pages 3 and 4 of Plats | WS10476 (same as M-11) | 37+80 | 43+40 |
| M-11 | PCI-14 P-4 | 14-4 | 50' Easement for sewer by AWO. AKA Old PE-52 | Arnold, Judith, & Bertha Stroshein; City of Detroit Water Board | 7/12/72 11/13/72 | 7/3/73 7/3/73 | 2410 2410 | 741 745 | Street Up, L.L.C. | 11-13-277-022 (part of) Note: Now within Lot 14 of Assessor's Plat No. 1, Liber 65, Pages 3 and 4 of Plats | WS10476 (same as M-10) | 37+80 | 43+40 |
| M-12 [see M-62 for Meter] | PCI-14 P-5 | 14-10 through 42A-3 | 60' Easement for sewer by AWO. AKA Old PE-50. Also see Job #74-9 encroachment | Ralph & Marie Beaufait; City of Detroit Water Board | 07/11/72 | 01/15/73 | 2360 | 909 | C. Marie Beaufait, as Trustee | 12-06-300-008 | WS10477 | PCI-14 STA 112+10 | PCI-42A STA 140+35 |
| M-13 (See also PCI 42A-P-3 M-50) | PCI-14 P-6 | 14-10 | Easement for sewer and construction road granted to DWSD at Selfridge Air Base. | Secretary of the Air Force; City of Detroit Water Board 1973 Unrecorded Easement and 1987 Supplemental Agreement between the Department of the Air Force and the City of Detroit | 3-28-73 12-16-87 | Unrecorded 1-2-88 | 4358 | 258 | United States of America | 12-07-101-002 12-07-151-001 | WS10527 | 103 + 90 | 104 + 40 |



| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-14 | PCI-15 P-1 | 15C-12 | 20' Easement for sewer by AWO. AKA PE-47. | Donald Carlo; City of Detroit Water Board | 09/20/71 | 10/15/71 | 2231 | 169 | Baker College of Clinton Township | 11-34-101-017 | WS10476R-1 | 119 + 80 | 120 + 20 |
| M-15 | PCI-15 P-2 | 15C-12 | 20' Easement for sewer by AWO. AKA Old PE-48. | Norman & Isabel Sholz; City of Detroit Water Board | 04/05/71 | 07/30/71 | 2207 | 381 | Simon Ljutjduraj | 11-34-126-001 | WS10479 | 120 + 70 | 121 + 10 |
| M-16 | PCI-15 P-3 | 15 B-7 | 20' Easement for sewer by AWO. AKA Old PE-39 | Dan & Lillian Mattingly; City of Detroit Water Board | 06/21/71 | 08/04/71 | 2208 | 873 | In-Line Hockey of America, L.L.C, B N Engineering & Associates Co. Clinton Land Investment Company Leonard Carl Carnaghl, Trustee | various Note: A portion of the property platted now in the Clinton East Industrial Subdivision | WS10480 | 216 + 50 | 227 + 15 |
| M-17 | PCI-15 P-4 | 15 B-8 | 50' Easement for sewer by AWO. AKA Old PE-40. Also see encroachment Job #84-15. | Clinton Township; City of Detroit | 03/22/72 | 05/26/72 | 2290 | 714 | Peter W. Doe City of Detroit as to the part of the property | 11-36-108-010 | WS10461 | 227 + 15 | 229 + 65 |
| M-18 | PCI-24 | 24-1 thru 7 | 2004 Construction encroachment permit by DWSD to contractor for 12" storm sewer | No Easements Transfer any interest of DWSD/Macomb to District |  |  |  |  |  |  |  |  |  |
| M-19 | PCI-25 | 25-1 thru 5 | 2004 Construction encroachment permit by DWSD to contractor for 8" water main | No Easements Transfer any interest of DWSD/Macomb to District |  |  |  |  |  |  |  |  |  |
| M-20 | PCI-28 P-1 | 28-1,2,3 | 60' Easement for sewer | Transfer any interest of DWSD/Macomb to District | 07/20/72 | 07/21/72 | 2307 | 644 | Part of the property conveyed to the Board of County Road Commissioners for Macomb County/The rest of the property dedicated to the public use- Pompen Gardens Subdivision | Unknown Garfield Road and 21 Mile Road | WS10632 | 0+00 | 20+71 |
| M-21 | PCI-28 P-2 | 28-3,4,5 | 60' Easement for sewer | Omer and Louise Reygaert, husband and wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/26/72 | 03/07/72 | 2268 | 732 | Board of County Road Commissioners for Macomb County Oil and gas lease legal description now changed - now east 60 ft of Garfield Road dedication contained in the Rose Pointe Estates Subdivision | Unknown/ Garfield Road | WS10633 | 26+71 | 46+32 |
| M-22 | PCI-28 P-3 | 28-5 | 60' Easement for sewer | Arnold and Elsie Marcath, husband and wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/02/72 | 03/07/72 | 2268 | 733 | Ronald A. Hewton, a single man | 08-29-100-003 | WS10634 | 46+32 | 49+82 |
| M-23 | PCI-28 P-4 | 28-5 | 60' Easement for sewer | Dorothy C. Reygaert/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/26/72 | 03/08/72 | 2269 | 79 | Amato Brother's Inc. | 08-29-100-002 | WS10635 | 49+82 | 51+32 |
| M-24 | PCI-28 P-5 MS-68 | 28-6,7 | 60' Easement for sewer | Arthur and Ruth Ploetz, his wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD/also Declaration of Taking | 12/31/1973 undated | 1/10/1974 2-14-74 | 2466 2474 | 675 852 | Joseph R. Van Assche, III, Trustee | 08-20-300-001 | WS10574 | 53 + 40 | 80 + 10 |

176891_9

| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-25 | PCI-28 P-8 | 28-11 | 27' Easement for sewer | L.R. Rose Realty Co./County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/30/73 | 11/23/73 | 2455 | 843 | May Development Company - as to the part of the property/ Future Development Company - as to the part of the property | 08-17-300-001 | WS10636 | 0-50 | 1+00 |
| M-26 | PCI-28 P-9 | 28-11 | 27' Easement for sewer | Adam and Lillian Nowicki, his wife /County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/16/73 | 11/23/73 | 2455 | 848 | Township of Macomb as to the part of the property/The Board of County Road Commissioners as to the part | 08-18-400-009 | WS10637 | 0+00 | 3+30 |
| M-27 | PCI-28 P-10 | 28-11 | 27' Easement for sewer | Karol and Sophie Kuchski, his wife (land contract buyers) and Irma Blomme (titleholder),/ County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/15/73 | 10/18/73 | 2446 | 474 | The Board of County Road Commissioners | 23 Mile Road | WS10638 | 3+30 | 6+65 |
| M-28 | PCI-28 P-11 | 28-11 | Easement for sewer | Jovanka Knistic/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/31/73 | 11/02/73 | 2450 | 677 | The Board of County Road Commissioners | 23 Mile Road | WS10639 | 6+65 | 13+30 |
| M-29 | PCI-28 P-13 | 28-12 | 22' Easement for sewer | Waclaw Gmurowski/ County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/09/73 | 10/15/73 | 2445 | 280 | The Board of County Road Commissioners | 23 Mile Road | WS10640 | 10+50 | 18+10 |
| M-30 | PCI-28 P-14 | 28-12 | 27' Easement for sewer | Angela Romano, Peter and Bernice Terebasy, his wife (titleholders), Mitchell and Rita Rzepka, his wife (land contract buyers)/ County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/15/73 | 12/14/73 | 2461 | 50 | The Board of County Road Commissioners/B utunit evidence that Larry Tersigni and Loreto Tersigni are names for the same person Assessed legal description appears to be in error and does not close The south 60 ft road should have been excepted | 08-18-400-019 | WS10641 | 18+10 | 20+15 |
| M-31 | PCI-28 P-15 | 28-13 | 27' Easement for sewer | John Radlick, Mitchell and Rita Rzepka, his wife, Norbert and Dorothy Radlick, his wife (land contract holders)/ County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/27/73 | 01/10/74 | 2466 | 671 | The Board of County Road Commissioners The South 60 feet now dedicated to the use of public by plat dedication in the Milano Industrial Subdivision | 23 Mile Road | WS10642 | 20+15 | 23+40 |
| M-32 | PCI-28 P-17 | 28-13 | 27' Easement for sewer | Walter Kaiser/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/09/73 | 10/15/73 | 2445 | 282 | The Board of County Road Commissioners | 23 Mile Road | WS10643 | 26+00 | 27+65 |
| M-33 | PCI-28 P-18 | 28-13, 14 | Easement for sewer | Robert and Diane Sans, his wife and Martha Buchholz/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 01/21/74 | 01/30/74 | 2471 | 311 | Quadrale Development, L.L.C., as part of the property/The Board of County Road Commissioners | 23 Mile Road | WS10644 | 27+65 | 32+45 |

| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REG. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-34 | PCI-28 P-19 | 28-14 | 27' Easement for sewer | Herbert and Elsie Warczak, his wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/19/73 | 11/23/73 | 2455 | 845 | The Board of County Road Commissioners | 23 Mile Road | WS10645 | 32+45 | 36+10 |
| M-35 | PCI-28 P-20 | 28-14 | 27' Easement for sewer | Consumers Power Company/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/04/74 | 03/13/74 | 2481 | 184 | Consumers Power Company | 08-18-300-017 | WS10646 | 36+85 | 37+75 |
| M-36 | PCI-28 P-21 | 28-14, 15 | Easement for sewer | Emil Meersheert County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/14/73 | 11/23/73 | 2455 | 833 | The Board of County Road Commissioners and Hayes Land Development Group | 23 Mile Road | WS10647 | 37+80 | 46+25 |
| M-37 | PCI-28 (M-S 67) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | Macomb County Board of Road Commissioners | 21 Mile Road | WS10565 | Not in area of mapped alignment | |
| M-38 | PCI-28 (M-S 65) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Township of Macomb as to the part of the property/Wayne Oehmke and Mary Yvonne Ahrens, joint tenants | 08-32-201-037 | WS10566 | Not in area of mapped alignment | |
| M-39 | PCI-28 (M-S 66) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Township of Macomb as to the part of the property/Malcolm and Martha Beckman, husband and wife | 08/32-201-004 | WS10567 | Not in area of mapped alignment | |
| M-40 | PCI-28 (M-S 17) | 28-13 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | Macomb County Road Commission | 23 Mile Road | WS10568 | 23+40 | 26 + 60 |
| M-41 | PCI-28 (M-S 68) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | John and Kathleen Daley, husband and wife | 08-32-226-002 | WS10569 | Not in area of mapped alignment | |
| M-42 | PCI-28 (M-S 78) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Marvin and Rosemary Braekevelt, husband and wife | 08-31-202-004 | WS10570 | Not in area of mapped alignment | |
| M-43 | PCI-28 (M-S 57) | 28-8, 9, 10 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Township of Macomb | 08-20-100-009 | WS10571 | 80 + 10 | 105 + 70 |
| M-44 | PCI-28 (M-S 8) | 28-8, 9, 10 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | Township of Macomb | 08-20-100-007 | WS10572 | 80 + 10 | 108 + 70 |
| M-45 | PCI-28 (M-S 7) | 45-14 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | George Wallace and Julianne McLarney, husband and wife | 08-31-226-003 | WS10573 | 149 + 90 | 150 + 90 |

176891_9    55 of 7    BODMAN LLP

| MACOMB EASEMENT I.D. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-46 | PCI-37 | 12A-7 12A-8 | Easement for public way and meter station | Ronald and Hazel Stock/City of Fraser. Unrecorded assignment to Detroit Water Board | 12/20/77 | 12/05/78 | 3039 | 508 | Ronald G. Stock and Hazel I Stock, husband and wife | | WS10764 | 69+73 | 83+27 |
| M-47 | PCI-42A P-1A | 42A-3 | 60' Easement for sewer | Declaration of taking/City of Detroit Lakeshore Interceptor Extension 1988 | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Annette Marlan Ross and Janet Ann Slebodnik, w/full right of survivorship | 12-06-300-002 | WS10512 | 25+60 | 30+55 |
| M-48 | PCI-42A P-1B | 42A-3 & 42A-4 | 60' Easement for sewer | Declaration of taking/City of Detroit Lakeshore Interceptor Extension 1988 | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Annette Marlan Ross and Janet Ann Slebodnik, w/full right of survivorship | 12-06-100-010 | WS10513 | 30+55 | 45+25 |
| M-49 | PCI-42A P-2 | 42A-4 & 42A-5 | Easement for sewer | Michigan Department of Transportation/ City of Detroit DWSD | 05/26/88 | 07/06/88 | 4453 | 555 | Michigan State Highway Commissioner | 12-06-100-011 | WS10462 | 45+25 | 52+10 |
| M-50 | PCI-42A P-3 | 42A-5 & 42A-6 | 60' Easement for sewer | Easement for North Gratiot Interceptor to Macomb County Public Works Liber 19509 P 589 | 01/24/08 | 10/02/08 | 19509 | 589 | The United States of America | 12-06-200-002 | WS10528 | 52+10 | 61+30 |
| M-51 | PCI-42A P-4A | | Temporary easement | OMIT | | | | | | | | | |
| M-52 | PCI-42A P-4B | | Temporary easement | OMIT | | | | | | | | | |
| M-53 | PCI-42A P-4C | 42A-6 & 42A-7 | 60' Easement for sewer | Declaration of taking/City of Detroit Lakeshore Interceptor Extension | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Michigan Department of Transportation | 09-31-377-001 | WS10514 | 67+00 | 77+00 |
| M-54 | PCI-42A P-4D | 42A-7 & 42A-8 | 60' Easement for sewer | Declaration of taking/City of Detroit Lakeshore Interceptor Extension | 02/26/88 | 3/14/1968 Amended | 4378 4587 | 270 351 | Chesterfield Town Center, LLC | 09-31-402-004 . Now part of Parcel 09-31-476-003 | WS10515 | 77+00 | 91 + 30 |
| M-55 | PCI-42A P-5 | 42A-8 | 60' Easement for sewer | Declaration of taking/City of Detroit Lakeshore Interceptor Extension | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Raymond Seguin (4/9 interest) Joseph E. Michelich (2/9 Interest) Joseph Diatto and Frances Buttazzoni, as Co-Trustees (3/9 interest) | 09-31-251-002 | WS10516 | 91 + 30 | 90+95 |
| M-56 | PCI-42A P-6 | | Temporary easement | OMIT | | | | | | | | | |
| M-57 | PCI-42A P -7A | 42A-8, 9, 10, 11 | 60' Easement for sewer by AWO | Chesterfield Township; City of Detroit Water Board | 02/19/87 | 04/09/87 | 4166 4166 4166 | 924 - 7A 934 - 7B 944 - 7C | Chesterfield Town Center, LLC/ Township of Chesterfield/ Michigan Department of Transportation | 09-31-251-003 Now part of Parcel 09-31-476-003 | WS10463 | 90+95 | 114+25 |
| M-58 | PCI-42A P-7B | 42A-8, 9, 10, 11 | Easement for sewer by AWO | Chesterfield Township; City of Detroit Water Board | 02/19/87 | 04/09/87 | 4166 4166 4166 | 924 934 944 | Chesterfield Town Center, LLC/ Township of Chesterfield | 09-31-276-002 | WS10508 | 113+90 | 114+00 |
| M-59 | PCI-42A P-7C | 42A-8, 9, 10, 11 | 60' Easement for sewer by AWO | Chesterfield Township; City of Detroit Water Board | 02/19/87 | 04/09/87 | 4166 4166 4166 | 924 934 944 | Chesterfield Town Center, LLC/Michigan Department of Transportation | 09-31-476-003 21 Mile Rd | WS10509 | 114+25 | 128+05 |
| M-60 | PCI-42A P-8 | 42A-12 | 20' Easement for sewer by AWO. Also see Job #92-7 [60 ft in width] | Maria DeMuynck and Sheldon W. Port/City of Detroit Declaration of Taking Lakeshore Interceptor Extension | 02/06/88 | 03/04/88 | 4378 | 270 | Briar Towns Condominium Association Recorded 1992 | unknown | WS10517 | 4+00 | 9+00 |
| M-61 | PCI-42A P-9A | | Temporary easement | OMIT | | | | | | | | | |
| M-62 | PCI-42A P-9B Meter CH-S-5 | 42A-1 | | Declaration of taking/City of Detroit Lakeshore Interceptor Extension (Meter) | 02/26/88 | 03/04/88 | 4378 | 250 | City fo Detroit owns meter site | 12-06-300-008 (part of) | WS10529 | 0-35 | 0+35 |




176891_8                              DET- Claim No. 3683- 000039
                                      BODMAN LLP


| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-63 | PCI-45 Meter SY-S-3 also | 45-15 | Temporary and permanent easements Garfield Interceptor. Easement obtained by Macomb County Public Works and assigned to DWSD, Garfield ROW | Rosa Manzella, survivor of herself and her deceased husband Salvatore Manzella; Garfield Interceptor, c/o Macomb County Public Works Office, assigned to the City of Detroit | 1/20/99 7/13/99 | 6/25/99 7/15/99 | 8938 8938 8977 8977 | 719 722 630 632 | Ventimiglia | 08-30-400-022 formerly 08-30-400-006 | WS10761 | 161+08 | 161+06 |
| M-64 | PCI-45 | | Temporary Garfield Interceptor easement obtained by Macomb County Public Works and assigned to DWSD. | Macomb Community College to Macomb County; Assigned to City of Detroit OMIT | 6/15/99 | 6/25/1999 | 8938 8977 1840 | 710 634 124 | Macomb Community College | 11-06-200-005 44575 Garfield Clinton Twp | WS10763 6-10-10 | OMIT | |
| M-65 | | | Garfield Interceptor Temporary and permanent easement - Temporary and permanent easement | Ventimiglia to Macomb Public Works assigned to DWSD | | | 8938 8938 8977 8977 | 725 728 626 628 | Ventimiglia | 08-30-400-022 formerly 08-30-400-006 | WS10761 | | |
| M-66 | PCI-45 | 45-1 | Garfield Interceptor Temporary Easement obtained by Macomb County Public Works and assigned to DWSD. | Nieman to Macomb County; City of Detroit assigned to DWS | 06/03/99 | 07/13/99 | 8971 Assignment 8977 | 849-853 636 | Nieman | 11-07-476-003 | WS10762 6-10-10 | OMIT | |
| ADD | | 13-1 through 14-10 | Construction Agreement Harrison Twp/DWSD | Construction Agreement - Harrison Twp/DWSD | 12/27/72 | 03/13/72 | 2270 | 314 | various | | none | 0 + 0 PCI-1 | + 70 PCI- |
| Meter 1 | CT-S-2 | 13 - 1 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Clinton Township | 11-25-357-008 | WS10754 | 2 + 10 | 3+20 |
| Meter 2 | HR-S-3 | 13 - 1 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter HR-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Harrison Equity Group | 11-25-378-003 | WS10755 | 8+10 | 9+0 |
| Meter 3 | HR-S-2 | 13-11 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter HR-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Nelson DeSchepper | 11-24-226-016 11-24-226-015 | WS10756 WS10757 | 114+25 | 115+05 |
| Meter 4 M-63 | SY-S-3 | 45-15 | Meter in Easement | Ownership from the downstream side of the first manhole upstream from Meter SY-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Ventimiglia | 08-30-400-022 | WS10761 | 161+08 | 161+08 |
| Meter 5 | HR-S-1 | 14-9 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter HR-S-1 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 97+50 | |
| Meter 6 See M-62 | CH-S-5 | 42A-1 | Meter in Easement | Meter in line with sewer | | | | | | 12-06-300-008 | WS10529 | 0+10 | |

| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Meter 7 | | | | | | | | | | | | | |
| | ST-S-5 | 12A-2 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter ST-S-5 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 18+60 | |
| Meter 8 | | | | | | | | | | | | | |
| | FR-S-1 | 15C-1 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter FR-S-1 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 0+0 | |
| Meter 9 | | | | | | | | | | | | | |
| | CT-S-4 | 15C-5 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-4 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 42+40 | |
| Meter 10 | | | | | | | | | | | | | |
| | CT-S-1 | 12A-20 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-1 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 84+60 | |
| Meter 11 | | | | | | | | | | | | | |
| | CT-S-3 | 24-7 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 69+50 | |
| Meter 12 | | | | | | | | | | | | | |
| | MA-S-2 | 45-15 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter MA-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 159+00 | |
| Meter 13 | | | | | | | | | | | | | |
| | ST-S-6 | 0 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter ST-S-6 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 62+15 | |
| Meter 14 | | | | | | | | | | | | | |
| | MC-S-1 | 12A-3 | Meter in R.O.W. | Meter in line with sewer | | | | | | | | | |



| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 15C-6, 15C-7 | 63+00 | 64+00 | GTW Railroad at 15 Mile Road | 11-28-501-002 | Y (SDA) | Y | None | | | WS10814 | SDA 7-14-2010 | Contact GTW Easement to MCRC No permit or easement for railroad property |
| 4 | 13-1 | 8+50 | 9+10 | Unknown Union Lake Road at Shook Rd. | 11-25-378-003 | 1 | Y | 3742 | 652 | HR-S-3 | WS10755 | AEW 8-23-2010 | Get 10' additional easement adjacent to Union Lake Road ROW Harrison Township Sewer Easement Own from downstream side of first manhole upstream from Meter HR-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement |
| 5 | 13-6 | 60+30 | 62+00 | Clinton River Spillway Inter-County Drain Drainage District | 11-24-378-013 | Y | Y | None | | | WS10680 | Post Closing | L887 P22 – Clinton River Spillway Inter-County Drain Drainage District No easement of record Get Easement post closing from Clinton River Spillway Inter-County Drain Drainage District |
| 6 | 13-6, 13-7 | 61+50 | 64+90 | Clinton River Spillway Inter-County Drain Drainage District | 11-24-378-010, 11-24-378-011 | Y | Y | | | | WS10681, WS10682 | Post Closing | L887 P22 – Clinton River Spillway Inter-County Drain Drainage District No easement of record Get Easement post closing from Clinton River Spillway Inter-County Drain Drainage District |

Bodman LLP

DET- Claim No. 3683- 000042

174086_16.XLS

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels, Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 M-4 M-5 | 13-7 | 64+90 | 66+75 | | 11-24-378-016, 11-24-378-007 | N | Y | 2477 2679 | 783 408 | | WS10463 M-5, WS10462 M-4 | AEW 8-17-2010 (2) | Title search on house on 11-24-378-007 - Parcel owned by John DuBay - Subject to gap in chain of title per AEW House is not in easement Minor encroachment outside of easement South of Ballard Street |
| 8 | 13-7 | 67+50 | 67+75 | MDOT | 11-24-451-002 | | Y | | | | | AEW 8-17-2010 | File Affidavit of interest - near Ballard St |
| 9 M-7 | 13-9 | 90+50 | 91+10 | Ronald and Donna Soggie, husband and wife | 11-24-426-006 | N | Y | 2532 Amendment to Liber 2249 P 257 | 523 | | WS 10464 | X AEW 8-23-2010 | Minor encroachment outside of easement North of Crocker Blvd. |
| 10 | 13-11 | 114+30 | 115+10 | Unknown Meter West of Reimold Rd. | 11-24-226-016, 11-24-226-015 | Y | | | | HR-S-2 | WS10756 WS10757 | AEW 8-23-2010 (2) | Get an additional 10' of easement for meter. Own from downstream side of first manhole upstream from Meter HR-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement |
| 13 | 14-3 no search | 27+00 | 29+00 | Drain District? Clinton River | None | | Y | None | | | None | AEW 8-17-2010 | Obtain easement or permit from CoE and MDNRE Easement required for Clinton River? |

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 M-9 | 14-3 | 29+00 | 30+85 | Unknown North of Clinton River | 11-13-428-011 | Y | Y | 2459 | 551 | | W/S 10466 | | Condo docs do not disclose the easement. Captains Quarters Condo recorded after easement for sewer. Condominium unit and boat slip encroaches on sewer easement; curvilinear section of sewer may be outside easement. Very minor possible encroachment. Drain District to bring suit to clear easement of encroachments |
| 15 | 14-4, 14-5, 14-6, 14-7, 14-8, 14-9 | 43+00 | 93+60 | Unknown Executive Drive | 11-13-277-017, 11-13-228-005, 11-13-228-004, 11-13-228-002, 11-12-477-003, 11-12-477-002, 12-07-353-001, 12-07-301-018, 12-07-301-004 | Y | Y | None | | | 11-12-477-003 WS10686 12-07-353-001 WS10688 12-07-301-018 WS10689 12-07-301-004 WS10690 11-13-227-017 WS10683 11-13-228-004 WS 10684 11-13-228-002 WS 10685 11-13-228-005 WS10759 11-12-477-002 | AEW (9) 8-17-2010 | Some sections of ROW are covered by Notice of Taking. Harrison Twp sewer line Liber 2386 P138 Harrison Twp sewer easement Liber 2386 P138 for 11-13-228-002 and 11-12-477-002 No sewer easement of record to DWSD |

Bodman LLP

DET- Claim No. 3683- 000044

174086_16.XLS

13-53846-tjt    Doc 6015-21    Filed 07/14/14    Entered 07/14/14 23:41:47    Page 43 of 55

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 M-60 | 42A-12 | 4+00 | 9+00 | Unknown | 09-31-202-001, Briar Towne Condo. M.C.C.P. No. 401 | No issues | Y | 4378 | 270 | | WS 10693 | | Lakeshore Interceptor Extension Liber 4378 P 270. Easement predated Condo. Easement lies within common elements of Condo. Add to list of assets transferred. District to file action to clear easement if encroachments exist |
| 20 | 45-10, 45-11 | 109+60 | 111+50 | Macomb County | 08-32-300-018 | Y | | | | | None | HRC (Area 3) 8-23-2010 | Garfield Road North of Hall Rd. Sewer is within 5 feet of easement, but not outside. Get easement from Macomb County. |
| 21 | 45-12 | 123+80 | 127+20 | Unknown Garfield Rd. | Unknown (2B) 08-32-300-024 (2A) | Y | | | | | WS10823 | X HRC (Area 2A)* HRC (Area 2B) 8-23-2010 | Get an additional 20' of ROW - Warwich Village Condominium Assoc. Curvilinear section, may encroachment outside of Garfield R.O.W. |
| 22 M-63 M-65 | 45-15 | | | Garfield Rd. at 21 Mile Rd | 08-30-400-022 | | | | | SY-S-3 | WS10761 (see WS10762 and WS10763) | HRC(1) 8-23-2010 | Garfield Interceptor Temporary and permanent easement for interceptor and appurtenances. Additional easement for access drive to meter needed |

Bodman LLP

DET- Claim No. 3683- 000045

174086_16.XLS

13-53846-tjt   Doc 6015-21   Filed 07/14/14   Entered 07/14/14 23:41:47   Page 44 of 55

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23A1 M-25 | 28-11 | 0-60 | 0+100 | L.R. Rose Co./County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 08-17-300-001 | Y | Y | 2455 | 843 | | WS10636 (uninsurable) | AEW 8-24-2010 | Grantor did not have right to grant easement. Macomb to correct post-closing. |
| 23B M-35 | 28-14 | 36+85 | 37+75 | Consumers Power Jog at 23 Mile Rd. | 08-18-300-017 | Y | Y | 2481 | 184 | | WS10646 | AEW 8-17-2010 | JOG Existing easement M-35 does not solve problem per AEW |
| 24 | 13-7, 13-8, 14-3, 14-4, 14-9, 14-10, 42A-5 & 42A-6 | | | MDOT I-94 | | | | 2270 | 314 | | None | POST CLOSING | Harrison Twp. Constr. Agreement. Confirm sewer location with MDOT. Contact MDOT to determine how best to create record of sewer location. |
| 25 | 42A-7, 42-A11 & 42A-12 | | | MDOT I-94 | | | | | | | None | POST CLOSING | Confirm sewer location with MDOT. Contact MDOT to determine how best to create record of sewer location |
| M-13 | 14-10 | 103+90 | 104+40 | U. S. Air Force | 12-07-101-002 12-07-151-001 | | | 4358 | 258 | | WS 10527 | | Terminates in 2023 and other restrictions |
| M-17 | 15B-8 | 27+15 | 29+65 | Peter W. Doe | 11-36-108-010 | | | 2290 | 714 | | WS 10481 | | Minor error in easement legal description. |

174086_16.XLS

Bodman LLP

DET- Claim No. 3683- 000046

## Schedule 3.5(d)

## Exceptions to Non-Breach of MID Agreements

None.

DET- Claim No. 3683- 000047

## Schedule 3.7

## DWSD Litigation

None.

DET- Claim No. 3683- 000048

Schedule 3.8
Computation of Purchase Price as of June 30, 2010

| Contract | Asset | 6/30/09 "System Debt" Before Adjustments |
|---|---|---|
| **A. Projects Covered by Global Settlement** | | |
| PCI-45 | Garfield Interceptor | $ 20,203,529 |
| PCI-45 | Flow Control Gates | $ 3,203,500 |
| CS-1368 | 2004 Repairs | $ 54,467,200 |
| CS-1372 | Macomb Int. 2008 Repairs | $ 19,283,707 |
| | Subtotal | $ 97,157,935 |
| | Adjustment for FY 2009-10 Payments | $ (3,192,570) |
| | Adjusted Purchase Price - 6/30/2010 | $ 93,965,366 |
| | | |
| **B. Other Projects in Rates** | | |
| CS-1421 | Clintondale Rehab *(a)* | $ 1,290,858 |
| CS-1288 | 8 ft Gravity Sewer Clintondale | $ 1,343,821 |
| | Subtotal | $ 2,634,679 |
| | Adjustment for FY 2009-10 Payments | $ (50,610) |
| | Adjusted Purchase Price - 6/30/2010 | $ 2,584,069 |
| | | |
| **C. Other Projects Never or Only Partially in Rates** | | |
| PCI-42A | Lakeshore Arm | $ 5,033,238 |
| CS-978 | Garfield Repair (1986) | $ 1,269,681 |
| CS-1292 | Odor Control | $ 1,194,147 |
| Meters Being Transferred | | $ 3,701,752 |
| Meter Credit | MC-S-1 (estimated) | $ (400,000) |
| | Subtotal | $ 10,798,818 |
| | Adjustment for FY 2009-10 Payments | $ (10,064) |
| | Adjusted Purchase Price - 6/30/2010 | $ 10,788,754 |
| | | |
| **SUBTOTAL PURCHASE PRICE 6/30/2009** | | $ 110,591,433 |
| | **Total Adjustment for FY 2009-10 Payments** | $ (3,253,244) |
| **RESTATED PURCHASE PRICE 6/30/2010** | | $ 107,338,189 |
| | | |
| **ADJUSTMENTS** | | |
| Projects Charged but not Constructed | | |
| | Mt. Clemens Arm | $ (30,210) |
| PC-687 | Clinton Twp/Fraser Control Fac | $ (1,532,954) |
| | Subtotal | $ (1,563,164) |
| | | |
| Global Settlement | | $ (17,050,000) |
| | | |
| Interest on Omitted Macomb Projects | | $ 2,141,931 |
| | | |
| Balance of OMI/Macomb Misc. Rate Settlement | | $ (870,252) |
| **TOTAL ADJUSTMENTS** | | $ (17,341,485) |
| | | |
| **ADJUSTED FINAL PRICE as of JUNE 30, 2010** | | $ 89,996,704 |

*(a) Based on interim contract cost of $1,488,936, less princpal payments
credited in sewer rates through 6/30/2009*

## Schedule 3.9

## All Pending DWSD Contracts

Contract with Martin Controls.

DET- Claim No. 3683- 000050

Macomb Interceptor Acquisition Agreement

Schedule 4.3

<u>MID Exceptions to "No Conflict"</u>

NONE

DET- Claim No. 3683- 000051

Macomb Interceptor Acquisition Agreement

Schedule 4.4

<u>MID Litigation</u>

NONE

Dennis 4015796.1
DET- Claim No. 3683- 000052

Macomb Acquisition Agreement
Schedule 5.0...
FY2010/11 Sewer Rates

OMI District Sewer Rate Calculation (OAKLAND DRSS)
FY 2010-11 Rate Year

### Part 1 - Units of Service

| Line | | Unit | Amount | Reference | Comment |
|---|---|---|---|---|---|
| 1 | Metered Flow | Mcf | 3,750,000 | | |
| 2 | Sanitary | Mcf | 3,144,110 | | 90% of Water Sales |
| 3 | Local Dry Weather Infiltration | Mcf | 428,219 | GDRSS Data | Local Community only |
| 4 | Common Sewers Dry Weather Infiltration | Mcf | 196,907 | GDRSS Data | Represents share of common sewers "downstream" of connection |
| 5 | Wet Weather Inflow | Mcf | 177,671 | GDRSS Data | |
| 6 | Overflow Credit | | 30.8% | | |
| 7 | Net Wet Weather Inflow | Mcf | 122,948 | (5) x [1-(6)] | Universal for all customers |
| 8 | Total Allocation Volume | Mcf | 3,892,185 | (2)+(3)+(4)+(7) | |
| 9 | System Volume | Mcf | 27,588,045 | | |
| 10 | OMI District Share | | 14.11% | (8)/(9) | Represents Customer's share of "common" flow costs |
| 11 | BOD | lbs | 28,178,966 | 116 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 12 | TSS | lbs | 37,422,077 | 154 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 13 | PHOS | lbs | 814,221 | 3.4 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 14 | FOG | lbs | 4,661,165 | 19.2 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 15 | Wet Weather | | 2.65% | 1999 RSA | Represents Customer's share of DWSD New CSO Facilities cost |

### Part 2 - Cost Allocation

| Line | | (1) Units | (2) Unit Cost (a) | (3) Allocated Rev Req't (J)*(2) | Comment |
|---|---|---|---|---|---|
| 1 | City Only | 0 | 2.190 | 0 | Collection System Costs |
| 2 | Wholesale Only | 3,892,185 | 0.390 | 1,518,727 | Collection System Costs |
| 3 | Oakland Only | 1,595,471 | 1.021 | 1,629,072 | Collection System Costs |
| 4 | Macomb Only | 2,296,714 | 1.246 | 2,861,702 | Collection System Costs |
| 5 | Common | 3,892,185 | 4.955 | 19,286,822 | Common Collection & WWTP Costs |
| 6 | BOD | 28,178,966 | 0.302 | 8,508,636 | WWTP Costs |
| 7 | TSS | 37,422,077 | 0.378 | 14,149,610 | WWTP Costs |
| 8 | PHOS | 814,221 | 4.140 | 3,371,245 | WWTP Costs |
| 9 | FOG | 4,661,165 | 0.233 | 1,086,119 | WWTP Costs |
| 10 | New WW Facilities | 2.65% | | 944,916 | Represents Unadjusted Annual Revenue Requirement Allocated to Customer |
| 11 | Total | 35,641,176 | | 53,356,849 | |

(a) Unit Costs are uniform for every customer

PRELIMINARY PROPOSED

TFG
THE FOSTER GROUP

1/21/2010

1/4

DEF - Claim No. 3683 - 000053

# OMI District Sewer Rate Calculation
## FY 2010-11 Rate Year

### Part 3 – Adjustments and Rate Calculation

| Line | Amount | Reference | Comment |
|---|---|---|---|
| 1. Rev Req't Allocation | 53,356,849 | | From Part 2 |
| 2. Adjustment A | 1,215,913 | 1978 RSA | Indirect Benefits – allocates rev req'ts from Detroit to Suburbs |
| 3. Adjustment B4 | 103,061 | 1980 RSA | 15 Mile & Hayes Repairs – reallocates common costs to Macomb Co. only |
| 4. Wayne Co. Adj | 10.592 | 1982 RSA | 15 Mile & Corridor Collapse – reallocates costs from Wayne Co. to all others |
| 5. Adjusted Rev Req't | 54,686,420 | | Represents Annual Revenue Requirement from Customer |

### Part 4 – Rate Calculation

| Line | Total | Fixed | Commodity | Existing Charge | Comment / Percent Change |
|---|---|---|---|---|---|
| 6 Direct | 4,600,774 | 4,600,774 | | | Direct allocations and adjustments |
| 7 New VFW Facilities | 944,916 | 944,916 | | | From Part 2 |
| 8 Wholesale Only Costs | 1,518,727 | 1,518,727 | | | |
| 9 Other | 47,622,003 | | | | |
| 10 Allocated to Sanitary | 38,469,097 | | 38,469,097 | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 2)/(Part 1,Line 8)] |
| 11 Allocated to Infiltration | 7,648,601 | | 7,648,601 | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 3&4)/(Part 1,Line 8)] |
| 12 Allocated to Inflow | 1,504,305 | 1,504,305 | | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 7)/(Part 1,Line 8)] |
| 13 Total | 54,686,420 | 8,568,722 | 46,117,698 | | Total Lines 10 thru 16 |
| 14 Units | | 12 | 3,750,000 | | Months / Mcf |
| 15 Fixed Charge | | $714,060 | | $1,281,276 | (Line 16)/(Line 17) -44.3% |
| 16 Commodity Charge | | | $12.30 | NA | (Line 16)/(Line 17) 0.0% |
| 17 "All Commodity" Unit Charge | | | $16.58 | NA | Total (Line 16)/(Line 17) 0.0% |

DET. Claim No. 3683-000054

1/21/2010

# Macomb County Sewer Rate Calculation
## FY 2010-11 Rate Year

### Part 1- Units of Service

| Line | | Unit | Amount | Reference | Comment |
|------|--|------|--------|-----------|---------|
| 1 | Metered Flow | Mcf | 2,200,000 | | |
| 2 | Sanitary | Mcf | 1,871,488 | (1)-(3)-(5) | Metered less Local Community Infiltration/Inflow (Lns 3 & 5) |
| 3 | Local Dry Weather Infiltration | Mcf | 208,972 | GDRSS Data | Local Community only |
| 4 | Common Sewers Dry Weather Infiltration | Mcf | 133,532 | GDRSS Data | Represents share of common sewers "downstream" of connection |
| 5 | Wet Weather Inflow | Mcf | 119,539 | GDRSS Data | |
| 6 | Overflow Credit | | 30.8% | | Universal for all customers |
| 7 | Net Wet Weather Inflow | Mcf | 82,721 | (5) x [1-(6)] | |
| 8 | Total Allocation Volume | Mcf | 2,296,714 | (2)+(3)+(4)+(7) | Higher than metered flow due to common sewer/interceptor I/I |
| 9 | System Volume | Mcf | 27,588,045 | | |
| 10 | Macomb County Share | | 8.33% | (8)/(9) | |
| 11 | BOD | lbs | 16,627,941 | 116 mg/l | Represents Customer's share of "common" flow costs |
| 12 | TSS | lbs | 22,082,148 | 154 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 13 | PHOS | lbs | 480,458 | 3.4 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 14 | FOG | lbs | 2,750,476 | 19.2 mg/l | Lower than volume share due to higher strengths of monitored industries |
| 15 | Wet Weather | | 1.60% | 1999 RSA | Represents Customer's share of DWSD New CSO Facilities cost |

### Part 2 - Cost Allocation

| Line | | (1) Units | (2) Unit Cost (a) | (3) Allocated Rev Req't (1)*(2) | Comment |
|------|--|-----------|-------------------|--------------------------------|---------|
| 1 | City Only | 0 | 2.190 | 0 | Collection System Costs |
| 2 | Wholesale Only | 2,296,714 | 0.390 | 896,176 | Collection System Costs |
| 3 | Oakland Only | 0 | 1.021 | 0 | Collection System Costs |
| 4 | Macomb Only | 2,296,714 | 1.246 | 2,861,702 | Collection System Costs |
| 5 | Common | 2,296,714 | 4.955 | 11,380,834 | Common Collection & WWTP Costs |
| 6 | BOD | 16,627,941 | 0.302 | 5,020,805 | WWTP Costs |
| 7 | TSS | 22,082,148 | 0.378 | 8,349,451 | WWTP Costs |
| 8 | PHOS | 480,458 | 4.140 | 1,989,316 | WWTP Costs |
| 9 | FOG | 2,750,476 | 0.233 | 640,901 | WWTP Costs |
| 10 | New W/W Facilities | 1.60% | | 571,891 | |
| 11 | Total | 35,641,176 | | 31,711,075 | Represents Unadjusted Annual Revenue Requirement Allocated to Customer |

(a) Unit Costs are uniform for every customer

PRELIMINARY PROPOSED

TFG
THE FOSTER GROUP

3/4

1/21/2010

# Macomb County Sewer Rate Calculation
## FY 2010-11 Rate Year

### Part 3 – Adjustments and Rate Calculation

| Line | Amount | Reference | Comment |
|---|---|---|---|
| 1 Rev'l Req't Allocation | 31,711,075 | | From Part 2 |
| 2 Adjustment A | 722,642 | 1978 RSA | Indirect Benefits – allocates rev req'ts from Detroit to Suburbs |
| 3 Adjustment B4 | 110,000 | 1980 RSA | 15 Mile & Hayes Repairs – reallocates common costs to Macomb Co. only |
| 4 Wayne Co. Adj | 6,253 | 1982 RSA | 15 Mile & Corridor Collapse – reallocates costs from Wayne Co. to all others |
| 5 Adjusted Rev Req't | 32,549,971 | | Represents Annual Revenue Requirement from Customer |

### Part 4 – Rate Calculation

| Line | Total | Fixed | Commodity | Existing Charge | Comment / Percent Change |
|---|---|---|---|---|---|
| 6 Direct | 2,971,702 | 2,971,702 | | | Direct allocations and adjustments |
| 7 New WTW Facilities | 571,891 | 571,891 | | | From Part 2 |
| 8 Wholesale Only Costs | 896,176 | 896,176 | | | |
| 9 Other | 28,110,202 | | | | |
| 10 Allocated to Sanitary | 22,905,735 | | 22,905,735 | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 2)/(Part 1,Line 8)] |
| 11 Allocated to Infiltration | 4,192,015 | | 4,192,015 | | Other allocated based on Part 1: (Line 12) * [(Part 1,Lns 3&4)/(Part 1,Line 8)] |
| 12 Allocated to Inflow | 1,012,451 | 1,012,451 | | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 7)/(Part 1,Line 8)] |
| 13 Total | 32,549,971 | 5,452,220 | 27,097,750 | | Total Lines 10 thru 16 |
| 14 Units | | 12 | 2,200,000 | | Months / Mcf |
| 15 Fixed Charge | | $454,352 | | $1,156,555 | (Line 16)/(Line 17)   -60.7% |
| 16 Commodity Charge | | | $12.32 | $11.59 | (Line 16)/(Line 17)   6.3% |
| 17 "All Commodity" Unit Charge | | | $74.30 | $17.90 | Total (Line 16)/(Line 17)   -17.4% |

PRELIMINARY PROPOSED

TFG
THE FOSTER GROUP

4/4

1/21/2010

DET - Claim No. 3683-000056