# EXHIBIT F

**Designation of Deposition Testimony of Bart Foster**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: ) | Case No. 13-53845 |
| CITY OF DETROIT, MICHIGAN ) | |
| ) | Chapter 9 |
| Debtor ) | |
| ) | Hon. Steven W. Rhodes |

The Deposition of BARLETT D. FOSTER,
Taken at 150 W. Jefferson Avenue, Suite 2500,
Detroit, Michigan,
Commencing at 4:30 p.m.,
Wednesday, July 9, 2014,
Before Melinda S. Moore, CSR-2258.

MS. HATHAWAY: Did he do or do you do? You want actually what he did in this particular instance, right?

MS. BADALAMENTI: Right.

THE WITNESS: We were made aware of the general construct of the intended purchase price, and probably consulted -- no, definitely consulted on the applicability of that general construct, and then were requested to complete an analysis of -- additional analysis in order to kind of determine the purchase price.

BY MS. BADALAMENTI:

Q. So when you said the construct of the purchase price, what do you mean?

A. Our understanding that the original arrangement for transfer of the asset was to set the purchase price at a term -- a defined term in the agreement of system debt. System debt was defined in the agreement as the investment that DWSD has made in the facilities being transferred less whatever amounts that Macomb had paid in sewer rates that were associated with principal -- not interest, but principal on debt service that was allocated to those assets. That was the general construct of the deal for the purchase price.

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Q. At the time that you are initially consulted with, has there already been a determination that there are certain Macomb-only projects that will be -- that were assessed in the rates a certain way and that will or will not be passed along with the purchase price a certain way?

MS. HATHAWAY: Object to the form of the question. It's vague.

THE WITNESS: I don't understand your question. I'm sorry.

BY MS. BADALAMENTI:

Q. Was there -- I guess let me ask it this way: You were involved in the rate calculations at the time for DWSD; is that the true?

A. True.

MS. HATHAWAY: When you say "at the time," what time are we talking about now?

BY MS. BADALAMENTI:

Q. The four-year time period that -- I guess the beginning of the 4-year time period that you're calculating the system debt.

During that time period you were involved in determining the rates, correct?

A. That's correct.

Q. And you would determine the rates for Macomb?


BIENENSTOCK
www.bienenstock.com

A. The wholesale rates -- wholesale sewer rates charged by DWSD to Macomb, yes.

Q. What would go into that analysis?

A. Well, there's a rather rigorous analysis for the DWSD sewer rates that establishes wholesale charges -- cost allocations and wholesale charges for all the contract customers of DWSD, including Macomb. Macomb and to a lesser extent the Clinton Oakland District of Oakland County were the only wholesale customers that there were facilities that DWSD owned, built -- financed, built, owned and operated specifically for the benefit of one contract customer. All the other county contract customers had built their own interceptor systems. The original arrangement with Detroit and Macomb and the Clinton Oakland District of Oakland County was that Detroit would finance, construct, own and operate what's now the Macomb Intercepter District, and so in the rate design, there needed to be a direct assignment of the costs associated with that -- those facilities to Macomb. That was part of the rate design at the time.

Q. So the -- when you say that you're going to determine the investment made by DWSD less the amounts Macomb paid by the rate, you would know

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

what Macomb was paying towards what debt; would that be a fair assessment? You would already have that information?

A. That was part of the annual evaluation of rates, yes.

Q. So the rest of what you told me is that there would be some debt service that was allocated to Macomb. That would be that debt service that was allocated to Macomb previously? In other words, it didn't change for purposes of this analysis? It was what Macomb was already allocated?

MR. RUEGGER: I'll object to the form of that.

MS. HATHAWAY: Me, too.

BY MS. BADALAMENTI:

Q. Let me ask it a different way. Your analysis of the investment made by the DWSD less the amounts Macomb paid by its rates didn't change the rate or the allocation that Macomb was already paying; it just calculated what Macomb had paid to date? Is that a better way of asking it?

A. I'm struggling with the way that you characterize it. I don't think I can confirm exactly what you said the way that you said it.

Q. Well, tell me how did you then determine at the

BIENENSTOCK
www.bienenstock.com

time that you were going to set the system debt what Macomb had paid via its rates towards principal, not interest, on the debt service that was allocated.

A. We reviewed the construct of the rates that had been charged going all the way back to the mid-80s, and did a retrospective analysis of how much of that rate was associated with principal on each one of those -- of the bonds that were allocated to the Macomb-specific assets.

Q. Okay. So to answer that question, did you need any additional information -- information that you did not already have or get from engineering or accounting to come up with that analysis?

A. The only additional information we needed was rate -- records of rate analyses through the years, much of which was already in our possession.

Q. Okay. Did you have any discussions with the contract department of the City of Detroit for any of the information that you need to make this calculation of system debt? Contracts and grants department, to be more specific?

A. I don't believe so. I don't recall any specific conversations with contracts and grants.

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

A. The final number on 1368 sinkhole repairs was established a fair amount of time -- I don't know -- a year before the final agreement was reached. A year at least, I would say. Any other ongoing contracts did not include the sinkhole repair beyond that time.
Q. The totals you were given for that sinkhole repair are something that's specifically referenced in the schedules as opposed to something that went into your calculation of system debt; is that a fair statement?
A. I don't understand the distinction you're drawing.
Q. You told me that you calculated system debt by a specific mathematical method, right?
A. Okay.
Q. And my question is: Did the analysis of charges on 1368 go into that same analysis?
A. The total charges on the sinkhole repair defined by 1368 was an input to the calculation.
Q. Okay. Do you remember who provided you with the information -- what that final number was?
A. It would have been the DWSD accounting division.
Q. And what did they give you when they give you a total like that? Is it a sheet of paper? A final pay estimate? What is it that you would

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

receive?

A. The records I got -- the records we received from accounting would generally indicate total amount on the fixed asset books separated by contractual services costs or construction contract cost, and then other indirect costs such as internal labor cost, allocated overheads, and capital interest -- capitalized interest, those type of things. There would be four or five fields leading up to a total investment figure.

Q. Are those documents you received in connection with this calculation something that you still have?

A. I don't know.

Q. In any event, was there anything unusual or different about the calculation that you were provided on 1368 different than any other time you had gotten information from DWSD?

A. No.

Q. Did you question anybody about the information or was it just input into your calculation?

A. It was input into the calculation. We did make inquiries to fully understand the nature of what was being reported.

Q. What types of inquiries?

A. We wanted to make sure we understood the capitalized interest piece and what went into the internal cost piece.

Q. Do you remember what the internal cost was?

A. I can picture a schedule, but my recollection is that the total book value for the repairs was in the low $60 million range, and that of that -- roughly $3 million was internal cost and roughly $4 million was capitalized interest, which left a net of $56 million or so as being the contractual amounts for that project. That's just from memory. I haven't looked at it for a while.

Q. That's pretty good. You're pretty close. The documents -- the actual acquisition agreement references a $54 million number. Do you know how it went from 56 to 54?

A. Not without looking back at things, no.

Q. Okay. What is it that you would need to look at so I don't put a bunch of things in front of you that you don't need to see, because I know you have a plane to catch.

A. There are Exhibit 3.8 and I'm sure that there are somewhere in your records additional calculations that support that.

Q. Were you ever questioned as part of a criminal

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

investigation in connection with the work you performed for DWSD?

A. Can you repeat the question.

Q. Were you ever questioned by federal investigators in connection with your work?

A. I was not.

MS. BADALAMENTI: Let's mark this as 1.

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 1
5:18 p.m.

BY MS. BADALAMENTI:

Q. I've put in front of you -- and we'll just go through them as quickly as possible, but I put in front of you what appears to be a report dated February 6, 2007 from The Foster Group. Do you recognize the document?

A. Yes.

Q. What was this document prepared for?

A. This document was related to negotiations on the transfer of the Macomb Intercepter District to Macomb County that I would characterize were part of negotiations for adjustments to the system debt as defined by the original construct of the deal.

Q. So I see in here as Exhibit 3 15 Mile and Hayes Repairs. I see that $56,861,900 as a total. Is

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

that the total you were provided?

A. That is the -- this is 2007. My belief is that that is the net contractual cost of the repairs which would not include the capitalized interest nor the internal cost that we mentioned a few minutes ago, yes.

Q. Okay. So -- and the footer on the bottom is dated 1/29 of 2007. So by that time you would have had the total project cost?

A. I believe so. I would not want to be definitive about that without looking through records, but I believe so.

Q. Okay. So then the negotiations surrounding Macomb's purchase would have begun prior to -- at least prior to this February 6, 2007 letter?

A. Correct.

Q. Do you know how much prior to this letter?

A. I do not. I could speculate, but I could not be precise.

Q. What would you approximate? If you can approximate --

A. 2005 at the earliest, likely 2006.

Q. Were you involved at all in the litigation case that was ongoing before Judge Feikens with respect to some of these issues?

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

conversations, I don't know that I could represent this memorandum as being definitive as to what led to that. There were constant conversations going on looking at some of this information through the negotiation process.

Q. Okay. I am looking at a page in that. The top of it reads "Table B Debt Reconciliation Table." Line item 10 has the 54,577,052 total contract cost per Foster 2009 as one of the items in the schedule. Do you see that there? It would be 10-F?

A. I'm sorry, 10-F? I'm -- oh, the 54,500,000, I see that number, yes.

Q. And that column F is total contract cost per Foster 2009. Do you know what that is referring to?

MS. HATHAWAY: Is that 9 or 8.

THE WITNESS: It's 2009. So later on in this package, the first page after something handwritten tab 2, there is an exhibit entitled Table 1 - Investment Costs of DWSD OMI Assets.

BY MS. BADALAMENTI:

Q. I found tab 3 but I can't find tab 2: Okay. Table 1, okay.

A. Line 30, CS-1358 15/Hayes repairs, the 54 million

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Q. Did you review that settlement agreement before it was entered into?
A. Yes, I did.
Q. Did you help prepare it?
A. I did.
Q. There was a letter of intent that was executed in connection with the purchase or the settlement agreement. Did you help prepare that?
A. I don't recall.
Q. What new information, if any, went into your preparation of the settlement agreement?
MS. HATHAWAY: Object to the form of the question. He didn't prepare the settlement agreement. He said he helped.
THE WITNESS: I'd ask you to define new information.
BY MS. BADALAMENTI:
Q. Did you need any new information about the contracts, the projects? Did you recalculate the system debt? Or did you simply look at the tables and schedules that you had already calculated and incorporate that information?
A. My recollection is that we did not make any material changes to the system debt portion of the purchase price, but rather the global settlement

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

affected adjustments to the system debt that then became part of the purchase price. That had nothing to do with the original premise of system debt.

Q. Okay. Was it an agreed upon calculation of that amount? First of all, what was that amount? Do you remember -- the global settlement amount?

A. The global settlement had several facets to it. I believe on recollection that the effect to the Macomb Intercepter purchase price was an offset from system debt in the neighborhood of $17 million dollars.

Q. And what was the total of system debt, if you can remember?

A. Approximate figures, I think the system debt cost -- system debt calculation was $107 million, and after an offset of roughly $17 million, got down to 91 million -- $90 million and change.

Q. Was that calculated price agreed upon by everybody? In other words, at the point in time that that is the total debt you're calculating, does Macomb dispute that that's the total? Or does the global settlement or the offset of 17 million go to something else?

MS. HATHAWAY: Object to the form of

BIENENSTOCK
www.bienenstock.com

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF MACOMB )

I, MELINDA S. MOORE, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

Melinda S. Moore

MELINDA S. MOORE, CSR-2258
Notary Public,
Macomb County, Michigan
My Commission expires: September 6, 2016