# EXHIBIT H

**Designation of Deposition Testimony of Mark Jacobs**

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

In re: ) Case No. 13-53845

CITY OF DETROIT, MICHIGAN )

) Chapter 9

Debtor )

) Hon. Steven W. Rhodes

The Deposition of MARK D. JACOBS,
Taken at 150 W. Jefferson, Suite 2500,
Detroit, Michigan,
Commencing at 3:29 p.m.,
Friday, July 11, 2014,
Before Melinda S. Moore, CSR-2258.

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

willing to talk about a purchase of the Macomb portion of the system; is that correct?

A. I'm not sure I understand the question.

Q. Okay. At some point -- I think you said it was about 2005 or '06 you became aware Mr. Mercado and Mr. Marrocco were talking about a Macomb purchase of the system, correct?

A. That is correct.

Q. Okay. Was there a time or a date in which you were officially brought into or involved in those discussions?

A. I suppose I got involved in the Macomb discussions sometime after Oakland County acquired the Clinton-Oakland portion -- the Clinton-Oakland and the Edison Corridor portion of the Oakland-Macomb Interceptor District. Actually it was the Oakland-Macomb Interceptor Drain Drainage District that acquired the Oakland portion.

Q. Okay.

A. After that transaction closed, we shortly thereafter commenced discussions on the Macomb piece.

Q. Okay. When you said you commenced discussions, who did you commence discussions with?

A. It was largely the same team of people that were

or can you recall what kinds of information they requested and you provided?

A. The business terms of the transaction that were agreed to between Tony Marrocco and Victor Mercado was that the purchase price would be equal to the outstanding principal balance on the bonds allocated to the assets that comprise the Macomb system. And it was that financial information that Macomb County asked DWSD to provide.

Q. Okay. And did DWSD provide that information to them?

A. They did.

Q. Okay. What time frame are we talking here?

A. I don't recall exactly when the Oakland-Macomb -- the Oakland system closed, but it was from within months of that closing through the closing of the Macomb transaction, which I think was September 2010.

Q. We have an acquisition agreement signed September 2, 2010. Is that --

A. That sounds correct.

Q. That sounds correct to you?

MR. ADDIS: Are we just continuing to number the --

MR. WATSON: Yeah, I assume we will

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

By that I mean did somebody --

MR. ADDIS: Exhibit 6. I apologize.

BY MR. ADDIS:

Q. Negotiations take place. We've established that. And then eventually an acquisition agreement is put together and laid on paper. What I'm interested in is the process of how this acquisition agreement was written and approved. By that -- let me ask the first question. Did someone submit a first draft?

A. The first draft was the Oakland transactional document, because with limited exceptions, other than the purchase price, the Macomb acquisition agreement mirrors the Oakland acquisition agreement.

Q. And do we know who put together the Oakland acquisition agreement?

A. It was the same group of parties.

Q. Okay. That would include you?

A. Me.

Q. Was Mr. Hupp involved in that?

A. Yes, he was.

Q. Okay. And Mr. Hupp represented who? Oakland?

A. The Oakland Macomb Interceptor Drain Drainage District, I believe. I don't believe he was there

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

for Oakland specifically.

Q. I understand. Okay. Anybody else in that process?

A. Oakland may have had its other attorneys involved. Oh, Joe Colaianne from the Water Resource Commissioner's Office was a lawyer. John McCulloch was involved. Those were the principal players for Oakland County.

Q. Okay. By the time we got down to the signing date of this acquisition agreement, did you ever compare this acquisition agreement side by side to the Oakland agreement?

A. Not that I recall.

Q. Okay. Do you know whether Mr. Hupp had done that?

A. I would have no idea.

Q. Okay. Or Mr. Misterovich?

A. I wouldn't know.

Q. Okay. So it's fair to say that the Oakland agreement as a model was used for this agreement?

A. To the best of my recollection, the only things that were changed were the things that were specific to Macomb County that were not specific to Oakland County.

Q. Okay. Negotiations started in, we believe, '09,

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

questions the validity of this agreement."

Sir, at the time -- either prior to or at the actual time of signing this, did anybody in the room ask Mr. Latimer if he had any such knowledge?

A. I don't believe anybody asked them that.

Q. As of the date of this signing, were you aware -- strike that.

Was Mr. Latimer the only DWSD employee at that meeting?

A. At which meeting?

Q. At the signing itself.

A. I don't recall.

Q. Can you tell me which -- can you tell me whether anybody within the City of Detroit other than their counsel did a full review of this acquisition agreement before signing?

A. I'm not sure who reviewed it.

Q. Did anybody ever communicate to you that they reviewed it?

MR. FRANZINGER: Objection. You shouldn't disclose any discussions you had with your client.

THE WITNESS: I don't recall. My -- for what it's worth, I believe that this

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

acquisition had to be approved by the Detroit Water Board, so there presumably was some review at that level, but I want -- I didn't appear before them. I don't know how they -- how or where or when they addressed this.

BY MR. ADDIS:

Q. Okay. I want to take you to paragraph 5.3, sir, Litigation and Claims. And this is on 14 of 25. I'm sorry. I should have told you that first. And, again, reading for the record, "Detroit shall promptly inform the Macomb County and MID in writing of any claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb system or the transactions contemplated by this agreement."

Now, sir, using that as a foundation, did there come a time, sir, when you became aware that DWSD employees were being questioned by the FBI, a grand jury, or the U.S. Attorney's Office regarding the practices of DWSD?

MR. FRANZINGER: Again, you should not disclose any conversations that you had with the client or that are based upon knowledge that you had based on discussions you had with your client.

BIENENSTOCK
www.bienenstock.com

Agreement, were you familiar, sir, with the Global Settlement Agreement?

A. Yes, I was.

Q. Were you familiar with what subjects that Global Settlement Agreement applied to?

A. Yes.

Q. What were those subjects that it applied to?

A. Well, at the time I was very familiar with it, even though it had been a few years, but today sitting here today, I could only try to remember. Interest rates, 800 megahertz radio, and a gentleman's agreement, the Letter of Intent to consummate these transactions.

Q. And was that Global Settlement Agreement, sir, something that was reached in conjunction with the Feikens case?

A. Yes.

Q. Were you part of those negotiations in front of Judge Feikens -- or might not have been in front of him, but under the control of Judge Feikens that led to that Global Settlement Agreement?

A. Yes.

Q. And as a result of that Global Settlement Agreement, certain actions were applied to the pricing of this acquisition agreement; is that

correct?
A. One of the issues addressed in the Global Settlement Agreement was carried forward as a credit on the purchase price.
Q. Okay. And which one do you believe that was?
A. That was the roughly $17 million interest rate dispute resolution.
Q. So the $17 million that I've seen on that sheet --
A. Yes.
Q. -- and now that you've seen is for that interest rate dispute resolution, correct?
A. Correct.
Q. Thank you.

(Mr. Ruegger not present at 4:18 p.m.)

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 12
4:18 p.m.

BY MR. ADDIS:
Q. Sir, I'm showing you what has been now marked as Exhibit 12, and I believe that that is from that agreement that we talked about, the Global Settlement Agreement. What I mean is what is in there under the term "global settlement," about

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

three-quarters of the way down, says, as you can see, $17,050,000, correct?
A. I see that, yes.
Q. Yes. And that is a recording, so to speak -- a written recording of what you just testified to as the settlement money for the interest rate dispute, correct?
A. That's correct.
Q. And that's what that reflects?
A. That's correct.
Q. Thank you. When did you first become aware of an investigation into Mr. Kilpatrick, Ferguson and/or Mercado?
A. You know, I really don't remember when I first heard about it. Like I said, it was just stuff I heard on the street. When it happened, I really couldn't tell you.
Q. Were you ever contacted by either the Department of Justice, U.S. Attorney's Office, the FBI or anybody regarding any knowledge you might have of the operations of DWSD?
A. No.
Q. And to this day you have not been?
A. I have not been.
Q. Did any of the employees of the city -- of DWSD

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF MACOMB )

I, MELINDA S. MOORE, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

Melinda S. Moore

MELINDA S. MOORE, CSR-2258
Notary Public,
Macomb County, Michigan

My Commission expires: September 6, 2016