# **EXHIBIT K**

**Designation of Deposition Testimony of Lyle Winn**

```
 1            UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5     _____
 6     In re:                          )    Case No. 13-53845
 7     CITY OF DETROIT, MICHIGAN       )
 8                                     )    Chapter 9
 9              Debtor                 )
10     _____)    Hon. Steven W. Rhodes
11
12
13         The Deposition of LYLE E. WINN, PE,
14         Taken at 51301 Schoenherr Road,
15         Shelby Township, Michigan,
16         Commencing at 2:08 p.m.,
17         Thursday, July 10, 2014,
18         Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```

```
 1        livelihood?
 2   A.   No, I'm not aware of that.
 3   Q.   Are you aware of any litigation at all
 4        involving --
 5              MR. ADDIS:  What period of time?
 6              MS. HATHAWAY:  Let me finish my
 7        question.
 8   BY MS. HATHAWAY:
 9   Q.   -- involving homeowners or business people whose
10        use of their home or business were affected?
11   A.   No, I'm not aware of those.
12   Q.   All right.  Let's go through what has been marked
13        as Exhibit 4.  What is this first page?
14   A.   This first page is the cost estimate we prepared
15        for the repair project.
16   Q.   By saying "we," you mean Nancy?
17   A.   "We" as in the company.
18   Q.   Okay.  You didn't do it?
19   A.   I did not do it.
20   Q.   Okay.  The first item is Emergency Work Estimate
21        (Rounded through September 30, 2004).  Then
22        there's a number of 11,600,000, more or less.
23   A.   Yes.
24   Q.   How was that arrived at?
25   A.   That was -- specifically to that date, it ties to
```

```
 1        the budget estimate prepared by Inland Waters that
 2        had that same date.  It was a date that was
 3        determined to be where the initial emergency was
 4        abated, if you will, stabilized, and then
 5        following that would have been the repair efforts.
 6   Q.   You say the initial emergency was abated.  What
 7        had been done up through September 30th of 2004
 8        on this project?
 9   A.   Based on what I've reviewed, it appears that the
10        main object was to -- there were several.  There
11        was to provide bypass pumping of the sewage flows
12        that were coming to that location, so in order to
13        maintain sewage flows, and secondly to stabilize
14        the soils around the sinkhole.
15   Q.   And what did they have to do to accomplish those
16        goals?
17   A.   To accomplish the bypass pumping they had to --
18   Q.   Well, to abate the emergency is my question.
19   A.   Okay.  They had to install a pumping system, pipes
20        that transport what they were pumping to an
21        outlet, provide bulkheads on the existing sewer
22        lines so that they could -- they didn't have
23        sewage flowing into the sinkhole area where the
24        work was going to occur.  And they had to install
25        steel sheeting to stabilize the soils that were
```

```
 1         around the sinkhole.
 2    Q.   What about pressure grouting?
 3    A.   I saw references to pressure grouting.  I don't
 4         know where all it was applied in all cases.
 5    Q.   What is pressure grouting?
 6    A.   Pressure grouting is essentially pumping called a
 7         grout material.  It's sometimes cementitious or
 8         other materials to solidify the soils and stop
 9         flow -- water flow going through the soils.
10    Q.   Have you ever used pressure grouting?
11    A.   Yes.
12    Q.   Do you know how much of it was necessary here in
13         order to stabilize the soils?
14    A.   I do not.
15    Q.   Do you know if Ms. Shirkey knew when she was
16         doing her work?
17    A.   I do not.
18    Q.   All right.  So what does this 11,600,000 -- where
19         did that come from?
20    A.   I believe that was a summary of the work from the
21         final estimate summary of the first two months,
22         August and September.
23    Q.   So that was a number that she got from --
24    A.   The documents that were provided.
25    Q.   -- an estimate from Inland?
```

1    A.    No.
2    Q.    You agree that there was an emergency and
3         emergency bypass needed to be created, correct?
4    A.    At the onset of the project, yes.
5    Q.    Do you know what the dewatering company did prior
6         to the bypass being put in?
7    A.    No, I don't.
8    Q.    What do you think they did? What would they
9         normally do if you were trying to create a bypass
10        in the situation?
11    A.    Well, quite frankly, we viewed everything that
12        occurred prior to September 30th as we were not
13        disputing that; so we did not question or even
14        evaluate what they were doing at that point. We
15        took it as it was a true emergency, these are the
16        expenses, and we just took it at face value.
17    Q.    Why was it an emergency? What were the risks
18        associated with it?
19    A.    The main emergency is the fact that the sewage
20        flows will back up and flood basements upstream
21        from that.
22    Q.    And that's a real health risk?
23    A.    That's a significant health risk.
24    Q.    All right. Do you know how many dewatering wells
25        were eventually used?

```
 1              MR. ADDIS:  Anthony.
 2                    (Off the record at 3:57 p.m.)
 3                    (Back on the record at 3:58 p.m.)
 4   BY MS. HATHAWAY:
 5   Q.   Mr. Marrocco, did you ever talk to Mr. Marrocco
 6        about anything associated with this assignment?
 7   A.   I have not.
 8              MS. HATHAWAY:  All right.  I'm done.
 9        Thank you very much.
10              THE WITNESS:  Thank you.
11                        EXAMINATION
12   BY MR. ADDIS:
13   Q.   I don't normally do this, but I have just a few
14        clarifying questions.
15              MS. HATHAWAY:  You know that means I'll
16        have clarifying questions.
17              MR. ADDIS:  I know it will.
18   BY MR. ADDIS:
19   Q.   You were just asked a question about contacts
20        with Mr. Marrocco.
21   A.   Yes.
22   Q.   Prior to this litigation did Mr. Marrocco ever
23        ask you to do anything on this case directly?
24   A.   Myself, no.
25   Q.   Okay.  At some point in time, as you provided
```

```
 1        that here, AEW did a review of Inland's budget.
 2        Is that correct or incorrect?
 3   A.   That is correct.
 4   Q.   In fact, is it correct or incorrect that Inland
 5        had two budgets, first a preliminary one and then
 6        a final one?  Do I have that right?
 7   A.   Yes.
 8   Q.   And if I'm wrong, tell me, okay?
 9             What were you asked to provide to
10        Macomb, AEW, and when were you asked to provide
11        it?
12   A.   We were asked to provide an engineer's opinion of
13        cost for the repair work, and that was in roughly
14        March, I believe, of '11 -- 2011.
15   Q.   Okay.  And as you testified here today, in that
16        comparison, you were sometimes higher than Inland
17        on some portions and lower than Inland on others;
18        is that accurate or inaccurate?
19             MS. HATHAWAY:  Objection, leading.
20   BY MR. ADDIS:
21   Q.   You can say yes or no.
22   A.   Yes.
23             MS. HATHAWAY:  That means it's leading,
24        doesn't it?
25   BY MR. ADDIS:
```

```
 1   Q.   Accurate or inaccurate?
 2   A.   Accurate.
 3   Q.   How did you become aware of the final price?
 4   A.   We saw the final price in the agreement for the
 5        purchase of the sewer system from Detroit by
 6        Macomb County.
 7   Q.   Okay.  In the estimate that you provided to
 8        Macomb, what was your final number, the budget?
 9   A.   $28,828,490.
10   Q.   And the final number that you finally located was
11        what, the final price paid?
12   A.   54 million, and I don't know the change after
13        that.
14   Q.   Okay.
15             MR. ADDIS:  I don't have anything more.
16                      RE-EXAMINATION
17   BY MS. HATHAWAY:
18   Q.   Your estimate was based on largely your review of
19        the Inland budget, correct?
20   A.   And the NTH plans.
21   Q.   All right.  The Inland budget changed
22        significantly as they did the project.
23   A.   At some point it changed.  All I have is the
24        beginning budget and the final summary.
25   Q.   All right.  So Inland thought that it was going
```

LYLE E. WINN, PE
July 10, 2014

Page 82

```
 1                CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN    )
 3                        ) SS
 4   COUNTY OF MACOMB     )
 5
 6            I, MELINDA S. MOORE, certify that this
 7   deposition was taken before me on the date
 8   hereinbefore set forth; that the foregoing
 9   questions and answers were recorded by me
10   stenographically and reduced to computer
11   transcription; that this is a true, full and
12   correct transcript of my stenographic notes so
13   taken; and that I am not related to, nor of
14   counsel to, either party nor interested in the
15   event of this cause.
16
17
18
19
20                         Melinda S. Moore
21
22   MELINDA S. MOORE, CSR-2258
23   Notary Public,
24   Macomb County, Michigan
25   My Commission expires:  September 6, 2016
```

13-53846-tjt   Doc 6016-12   Filed 07/14/14   Entered 07/14/14 23:46:14   Page 10 of 10

BIENENSTOCK
www.bienenstock.com