UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                             .        Detroit, Michigan
                             .        July 14, 2014
                Debtor.       .        10:07 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. (#5326) MOTION FOR COSTS RELATING TO CLAWBACK
OF DEBTOR'S DOCUMENT PRODUCTION FILED BY CREDITOR
ASSURED GUARANTY MUNICIPAL CORP.; (#5259) STATUS HEARING
REGARDING PLAN CONFIRMATION PROCESS (RE. FIFTH AMENDED
ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING
DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT); STATUS
HEARINGS REGARDING PLAN CONFIRMATION PROCESS TO BE HELD
ON 6/26/2014 AND 10:00 A.M. AND 7/14/2014 AT 10:00 A.M.;
(#2984) HEARING TO DETERMINE CLAIMING PARTIES' RIGHT TO
VOTE REGARDING PLAN
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  GEOFFREY IRWIN
                            GREGORY SHUMAKER
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

For Assured            Chadbourne & Parke, LLP
Guaranty Municipal     By:  ROBERT SCHWINGER
Corp.:                 30 Rockefeller Plaza
                       New York, NY  10112
                       (212) 408-5364

For the Detroit        Erman, Teicher, Zucker &
Fire Fighters            Freedman, P.C.
Association and        By:  BARBARA A. PATEK
the Detroit Police     400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI 48034
tion:                  (248) 827-4100

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By: STEPHEN C. HACKNEY<br>300 North LaSalle<br>Chicago, IL 60654<br>(312) 862-2157 |
| For U.S. Bank: | Waller Lansden Dortch & Davis, LLP<br>By: PAUL DAVIDSON<br>Nashville City Center<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>(615) 850-8942 |
| For National Public Finance Guarantee Corporation: | Jaffe, Raitt, Heuer & Weiss, PC<br>By: PAUL R. HAGE<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034-8214<br>(248) 351-3000 |
| Court Recorder: | Kristel Trionfi<br>United States Bankruptcy Court<br>211 West Fort Street, 21st Floor<br>Detroit, MI 48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI 49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  Case Number 13-53846, City of Detroit,

2  Michigan.

3    MR. SCHWINGER:  Good morning, your Honor.  Robert

4  Schwinger from Chadbourne & Parke for the movant, Assured

5  Guaranty Municipal Corporation.  As your Honor knows, back in

6  May we had a motion that was made by Assured to claw back the

7  city's document production because it contained numerous

8  documents, the disclosure of which was prohibited by the

9  Court's mediation order.  The Court granted that motion and

10  said at the time that the parties who had incurred costs in

11  connection with that motion and the costs of complying with

12  the clawback could make a motion for their costs to the

13  Court, and that's the motion we're here for today.

14    Under Rule 37, costs for violation of a discovery

15  order of the Court are essentially mandatory unless the party

16  that violated the order can show that its position was

17  substantially justified, and we don't think that the city can

18  show that here.  The city's response to our motion was to

19  present a lot of detail about the mechanics of their document

20  production process, but the one thing that the city

21  apparently never did -- and they don't represent that they

22  did it -- is that they never simply ran a word search against

23  their document production for phrases like "mediation order"

24  and "mediation privilege" because that's how we found many of

25  the documents in question.  Given that, I don't think the

1    city is in much of a position to argue that the procedures it

2    followed here were reasonable in terms of insuring compliance

3    with this Court's order on the mediation protections.

4         In addition, the way the motion -- the original

5    clawback motion came about essentially shows that the city

6    took an unfortunate situation and essentially made it worse

7    and, thus, created costs that didn't need to be -- to happen.

8    What had happened here -- and it was set forth in the

9    original motion -- is that one party initially in this case

10   notes that there was a mediation document in the city's

11   production like the day after the production was made.  We

12   all had just gotten -- we had all just gotten the disk

13   drives.  They had started to load it, and they spotted the

14   document.  They raised the issue with the city, and the city

15   said -- responded and said, "Okay.  We'll claw back that

16   document or documents."  Assured then responded immediately

17   to the city and said, "Look don't do that.  You know, the

18   production just went out yesterday.  Just get back the disk

19   drives, clean everything up, and then redo the production."

20   And also that will help minimize the ability of people to

21   zero in on the very documents that shouldn't have been in the

22   production in the first place because that's what happens

23   when you specifically identify documents by number and ask

24   people to pluck them out one by one.  The city unilaterally

25   and without any further discussion with Assured didn't do

1  that.  They issued a clawback notice for a small number of
2  documents, and as a result of that, Assured then immediately
3  raced into court with the clawback motion, and that motion
4  was granted.  It was then revealed that there were, in fact,
5  hundreds of documents, not just the few that were in the
6  city's clawback notice, that needed to be clawed back.  Those
7  documents never would have been revealed or at least not in a
8  timely manner had Assured not made its motion and focused the
9  city's and the Court's attention on this issue, and, in fact,
10  if the city had just called back the disk drives at the time
11  when Assured asked them to do so and went through its
12  production and cleaned it up, there would have been no costs
13  whatsoever for all practical purposes.  People would have
14  said, "All right.  Fine.  Here's your disk drive back."  It
15  would have been the cost of a FedEx back to Jones Day.  So
16  the situation here and the costs that were incurred were
17  entirely unnecessary, and it was because the city, rather
18  than taking the Court's mediation order with the seriousness
19  that it warranted, instead decided to just try to give it the
20  back of its hand and not have to deal with the issue, and
21  that's why we ended up spending time on it and making a
22  motion and having to deal with the clawback of the production
23  and then ultimately why we're here this morning, so for these
24  reasons, we believe that the imposition of costs under Rule
25  37 is appropriate here.

1          THE COURT:  I was concerned that your request for

2     costs is as high as it is.  $45,000 seems like a very big

3     number for this problem.  You want to address that?

4          MR. SCHWINGER:  Sure.  And the point is very simple,

5     your Honor, is we put into the motion papers the time and

6     expenses that actually were recorded.  If the Court -- I mean

7     laid out all the details precisely so the Court could make

8     those kind of judgments.  If the Court feels that the number

9     is excessive and wants to scale it back in terms of what's

10    being done under Rule 37 here, you know, that's the Court's

11    judgment, and we accept it.  That's why we gave the Court all

12    the information.  But these are the charges that were

13    actually recorded in terms of dealing with this process.  We

14    don't think that they were unreasonable, but if the Court

15    differs, that's precisely why we gave the information, and we

16    are fine with the Court making that judgment.

17         THE COURT:  Thank you, sir.

18         MR. SCHWINGER:  Thank you.

19         MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

20    Jones Day, on behalf of the city.  Your Honor, the -- and

21    with the Court's indulgence, I have a little bit of a cold

22    this morning, so I --

23         THE COURT:  Okay.

24         MR. IRWIN:  -- hope it doesn't catch up with me, and

25    I'll try to be brief because we did lay out a lot of what we

1    want to say in the papers.  I think the core points that we

2    have tried to make and one which I don't know how much

3    disagreement there is on this point is that there is no

4    accusation, there's no allegation, there's no charges that

5    this was intentional or anything close to intentional.  There

6    is precedent that we've cited, and many courts who consider

7    these issues do look at whether there was, in fact, bad faith

8    or intentional conduct.  There was a mistake that's been made

9    here.  No one's document production in this case has been

10   more transparent than the city's.  No one's document

11   production has been subject to more scrutiny than the city's.

12   We have laid out in great detail in several affidavits that

13   the Court may recall that the original Hale affidavit that we

14   were required to provide after the first hearing on these

15   points, if you print out, is this thick.  It is a like a

16   little phone book.  It contains all of the details of the

17   city's collection and production.  It contains the index that

18   we were required to produce.  It contains all the

19   instructions and materials that were provided to the contract

20   lawyers in the case, and we have explained in that affidavit

21   and particularly in the recent affidavit that we submitted in

22   connection with our response to this motion exactly what

23   happened here.  And we live in an age of electronic discovery

24   and e-mails where there is a massive amount of information

25   for lawyers to have to review.  There is technology and

1  software that allows lawyers to attempt to catch up with that

2  and review those on an expedited basis, but the fact of the

3  matter is that simple processing mistakes like what happened

4  here in the handoff of files from a vendor to Jones Day can,

5  in fact, impact the review of documents, and a mistake was

6  made, and there were documents that were released.

7        THE COURT: Well, it wasn't Ambac's mistake.

8        MR. IRWIN: It was not.

9        THE COURT: So why should Ambac bear any of the

10  burden of it?

11        MR. IRWIN: You mean Assured, your Honor?

12        THE COURT: Sorry. I do mean Assured.

13        MR. IRWIN: The burden is simply associated with the

14  costs of bringing the motion at this point. They have not

15  claimed any prejudice. The cases that discuss these matters

16  talk about litigation or legal prejudice that flows from

17  mistakes like this where a court order is violated. There

18  have been no allegations of that sort in this matter. We are

19  simply talking about the costs that they claim with bringing

20  the motion. And to that end, Mr. Schwinger talks about the

21  events that transpired on Thursday, the 8th, and Friday, the

22  9th. These were the days right before the Monday hearing.

23  The city did not know the magnitude of the problem on

24  Thursday, the 8th, so it is easy in hindsight to say that the

25  city should have done "X" or "Y" knowing what we know now as

1    it is easy to say that the city could have run a search on

2    its production for terms like "mediation" to locate some of

3    these documents.  Again, it's easy to say that with the

4    benefit of hindsight, but the real analysis should be what it

5    is that the city knew about its document production at the

6    time.  Was the city aware that it had a problem?

7              THE COURT:  There was a violation of a court order.

8              MR. IRWIN:  There was.

9              THE COURT:  Does the rule require any more than

10   that?

11             MR. IRWIN:  The rule requires an analysis of whether

12   the violation, in order to -- the way the rule reads, a

13   sanction is permissible except when there is a showing of

14   substantial justification or where the circumstances

15   otherwise make an award of sanctions unjust.  That's in Rule

16   37.

17             THE COURT:  Where's the injustice given that Assured

18   bore none of the fault for the circumstances that led to its

19   incurring of legal expenses?

20             MR. IRWIN:  I would say that there is injustice

21   associated with requiring the city to pay $45,000 associated

22   with a motion for costs in connection with a motion that was

23   filed before the city was given an opportunity to address

24   the -- assess the situation, address the problem, make a

25   proper decision about what to do about it, where the

1   procedures, as don't seem to be contested other than this

2   back-end search across the production for a few terms -- the

3   procedures were otherwise designed and there was layers of

4   redundancies to catch things like this, and this has been

5   laid out in detail.  There seems to be no challenge to that

6   where the process was reasonable, designed to catch these

7   matters, and but for a --

8           THE COURT:  But it failed.

9           MR. IRWIN:  But failed but for a completely

10  inadvertent and honest mistake.

11          THE COURT:  It failed.

12          MR. IRWIN:  Correct, your Honor.  It was not

13  intentional.  It failed in ways that in this age of massive

14  electronic discovery happen.  This happens in large-scale

15  document productions.

16          THE COURT:  I don't know that, but I'll accept your

17  representation that that's so.  Still, why should Assured pay

18  for it?

19          MR. IRWIN:  The only thing that Assured is being

20  asked to pay for -- and I would like to draw this

21  distinction, your Honor, because this came up at the first

22  hearing.  Your Honor put this question to -- the same

23  question to me at the hearing, and Assured has cited the same

24  question in its papers.  I believe -- and the Court will tell

25  me if I misunderstand this, but we had this colloquy at the

1  last hearing where the Court asked me the question.  I
2  believe the context at the time and my -- certainly my
3  interpretation of it was what happens if the parties, upon
4  receipt of the re-production that was ordered at the time,
5  are unable to use the work that has gone into coding?  When
6  you receive an electronic production, there's a lot of coding
7  and databases that are built to allow attorneys to review
8  something once and get the benefit of that and be able to
9  search for documents easily and locate key documents and
10  things like that, and the issue that came up at the hearing
11  was, well, what's going to happen to that?  What happens when
12  you make this re-production to everyone on Friday and all of
13  the work that I put into coding this database is gone, and
14  that is a cost to me?  And I thought that the Court was
15  sensitive to that.  The Court put the question to us very
16  directly, and it is the very reason why both the city and a
17  number of parties caucused during a break.  We arrived at a
18  solution, and the city agreed and, in fact, delivered on its
19  commitment to make that re-production in a form that allowed
20  everyone to have saved the work they did and slide it right
21  into the new document production.  That's why there are the
22  number of pages that are cited that say, you know, pages
23  intentionally left blank and things like that.  And I think
24  that's a fair question to the city.  If that had, in fact,
25  happened -- and I took that to be the spirit of at least in

 1    part the Court's question to me -- what happens?  Why should

 2    the objectors pay in that form for a mistake that's made by

 3    the city?  And that was the intent of trying to do just that.

 4    That is not what Assured is complaining about here.  They are

 5    not saying that we are prejudiced, that we had to expend

 6    additional costs because of this mistake that we would not

 7    have had to incur but for the fact that this re-production

 8    had to be made.  They're simply saying we want the costs of

 9    our motion, and the motion itself was borne from a very

10    simple exchange on the Thursday that led to a unilateral

11    decision by Assured to file its motion on Friday, which,

12    again, was a seven-page motion with no legal authority that

13    required nine, ten lawyers to work on, 20 hours of drafting

14    or editing, and it results in a $45,000 bill to the city.  We

15    don't think that's fair under the circumstances.  We think

16    that the procedures that were in place were reasonable.  We

17    think that mistakes like this absolutely happen in large-

18    scale electronic document productions of this type, of this

19    nature, under the circumstances that we've described, and set

20    against the reasonable precautions that the city had in place

21    to protect against this, it simply happened.

22            I mean one thing the city could have done, your

23    Honor, because this is very difficult to do -- people act

24    like we should have just pressed a button and a computer

25    would have spit out all of the documents that were protected

1   by mediation and that we should have run a search at the end

2   of the productions for a root of mediation, and that would

3   have, you know, solved this problem for us.  It doesn't.

4   There are numerous parties involved in these mediations all

5   the time, and they've played out over a very long period of

6   time.

7         THE COURT:  But the order prohibiting the disclosure

8   of mediation documents was absolute.

9         MR. IRWIN:  No doubt.

10         THE COURT:  It wasn't don't produce them unless it's

11   too hard not to produce them.

12         MR. IRWIN:  I understand that, your Honor.  That

13   doesn't change the fact that it is very, very difficult to do

14   an execution, and the city did its very best to protect

15   against just that.  And the fact that mediation --

16         THE COURT:  Okay.  So why was the response to

17   Assured after the problem was brought to light, "Tell us

18   which documents you want clawed back, and we will claw back

19   those documents"?

20         MR. IRWIN:  Your Honor, that was the purpose of the

21   clawback letter that we issued on Thursday.  We took all of

22   the documents, and at that time -- I don't have an exact

23   count.  I don't believe there were more than a dozen or so,

24   which, again, speaks to what the city appreciated at the time

25   about the magnitude of the problem.  We thought that could be

1  handled by a simple clawback letter.  We use every one of the
2  documents that had been brought to our attention.  It
3  occurred in one day, and so we didn't just rely on that.

4         THE COURT:  But it wasn't Assured's responsibility
5  to go through the production and identify to you which of the
6  documents violated the court order.  That was not their
7  responsibility.

8         MR. IRWIN:  I understand that, your Honor, but it
9  does relate to the costs that were incurred in connection
10  with filing a motion and the -- whose fault is this and what
11  could or should the city have done differently.  I do think
12  we have to take into account what it is that the city knew
13  about the problem at the time it was presented, and the city
14  could have and we believe should have been given an
15  opportunity to do something about it so that a motion like
16  this would not have been needed to be filed.

17         THE COURT:  Why wasn't the first response as
18  suggested by Assured, "Okay.  This is so serious we need to
19  get back all the hard drives first thing"?

20         MR. IRWIN:  We did not understand -- we didn't even
21  know what all of the documents contained.  We simply wanted
22  time to collect the documents, assess the documents, and make
23  a determination as to what to do about it.

24         THE COURT:  But the longer the documents --
25  protected documents are out there, the more mischief is

1  potentially caused.

2      MR. IRWIN:  Correct, your Honor, but if it was a

3  small number of documents -- and based on the nature of the

4  documents, there may not have been the prejudice that Assured

5  or someone else would have claimed.  There could be documents

6  that are strictly the city's documents.

7      THE COURT:  Right, but why take that chance?  Why

8  not just get the hard drives back?

9      MR. IRWIN:  It seemed to the city at the time, given

10  the number of documents that it understood were affected,

11  that a clawback letter was the most appropriate thing to do

12  in the schedule, and it is, in fact, what other parties have

13  done in this case when they have produced mediation

14  documents.  Where mediation documents have been produced by

15  other parties since all of this happened, they have proceeded

16  by way of clawback because there were a small number of

17  documents involved, and we are lawyers.  We are officers of

18  the court.  We will certify that we will destroy clawback

19  documents once they're indicated to us, and that request has

20  been made.  And we think other parties have reacted that way

21  for that reason, and the city was simply in the same

22  position.  It happened very quickly.  It happened over the

23  course of, you know, a single day or 36 hours into Friday

24  when the motion was filed.  The city was being made aware of

25  this for the first time.  We were scrambling to find out

1     exactly what the problem was and how severe it was. We felt

2     it was appropriate to issue a clawback letter. We did that,

3     and then the next thing we knew, the next day the motion to

4     compel was filed.

5          THE COURT: All right. Thank you, sir.

6          MR. SCHWINGER: Just a few words in response, your

7     Honor. The city focuses, I think, tremendously on trying to

8     establish their good faith and good intentions and so on, and

9     I think in their papers they are trying to rely on case law

10     that deals with the imposition of sanctions under the Court's

11     inherent authority rather than the more specific rule dealing

12     with the imposition of sanctions under Federal Rule of Civil

13     Procedure 37 and its bankruptcy counterpart, which deals with

14     sanctions in the context of violation of an actual existing

15     court order. So I think the city's focus on its own conduct

16     here is misplaced in terms of what the applicable test is,

17     which is here is that sanctions are essentially presumed

18     under Rule 37 to be automatic unless the city's conduct can

19     be shown to be substantially justified.

20          Despite everything which Mr. Irwin just related,

21     several points come out. Number one was at the time this

22     problem was first emerged, the city did not know the source

23     of the problem, and so they had no ability to make any

24     judgments whatsoever about its dimension. Nevertheless, they

25     made assumptions about its dimension, and those assumptions

1    proved to be wildly incorrect.  And as a result, we were

2    forced to make the motion and incur the costs.

3            By the way, a comment on the -- Mr. Irwin's comment

4    about the costs that were run up in making the motion.  The

5    costs, as set forth in the papers, are not simply about

6    drafting motion papers.  It was a number of attorneys

7    spending hours on that Thursday trying to figure out what was

8    going on in the production, what was there, searching for

9    documents and so on to see exactly what was going on in the

10   production.  It wasn't just one document.  There were

11   multiple documents.  And at the end of the day, despite the

12   reasonableness that Mr. Irwin claims for the city's actions,

13   they never really fully explained what caused this problem to

14   occur, but at the end, the fact of the matter is that the

15   simplest thing they could have done, which was the first

16   thing that we did, which is search for the word like

17   "mediation order" or "mediation privilege," would have

18   spotted it in a second, and that was not done.  And in this

19   situation, especially when the problem was brought to their

20   attention, had the city done that, they would have already

21   seen the problem as much larger than they thought it had

22   been, so by that standard alone, I think the city's conduct

23   was unreasonable here.

24           We are not seeking costs for recoding the

25   production.  That was done appropriately.  We thank the city

1  for doing that once the clawback was done. They did it in a

2  way that people could preserve whatever work had been done up

3  to that point, but the fact is that there were costs

4  incurred, and Assured in this situation was blameless, and we

5  should get some compensation for having done this.

6          You know, the sanction here, you know, is -- we

7  should put it in perspective here. It is just dollars. No

8  one is being sent to jail. Well, I shouldn't presume, but

9  I'm predicting that no one is going to be sent to jail over

10 this, but I think it is not unimportant that the Court send a

11 message that its orders need to be taken seriously,

12 especially something as serious and important to this

13 bankruptcy process as the mediation order in this case, and I

14 think it would send a very bad signal if the city were let

15 off here with no sanction whatsoever. Thank you.

16         THE COURT: All right. Thank you. I'm going to

17 take this matter under advisement for ten minutes, and then

18 I'll give you my decision. We'll reconvene at 10:40, please.

19         THE CLERK: All rise. Court is in recess.

20      (Recess at 10:30 a.m., until 10:40 a.m.)

21         THE CLERK: All rise. Court is in session. Please

22 be seated. Recalling Case Number 13-53846, City of Detroit,

23 Michigan.

24         THE COURT: Counsel are present. The motion before

25 the Court is under Rule 37(b)(2)(C) of the Federal Rules of

1  Civil Procedure.  That rule states, "Instead of or in
2  addition to the orders above, the court must order the
3  disobedient party, the attorney advising that party, or both
4  to pay the reasonable expenses, including attorney fees,
5  caused by the failure, unless the failure was substantially
6  justified or other circumstances make an award of expenses
7  unjust."  The record clearly establishes -- indeed, it is not
8  contested -- that the Court's mediation order and
9  specifically the confidentiality provisions of it were
10 violated by the city and its counsel.  In the circumstances,
11 therefore, the Court is required to grant the motion unless
12 the failure to abide by the court order was substantially
13 justified or other circumstances make an award of expenses
14 unjust.  The Court certainly cannot find that the failure to
15 comply with its order was substantially justified.  There was
16 no legal justification for failing to comply with the order.
17 The question then becomes whether other circumstances make
18 the award of expenses unjust.  The city and its counsel argue
19 that it took all of the necessary and appropriate and
20 reasonable precautions to avoid violating the mediation
21 confidentiality order.  The difficulty with that argument is
22 that the city and its counsel then made a second mistake, and
23 that is to assume that the scope of the problem was such that
24 a clawback letter would reasonably take care of it as opposed
25 to simply clawing back the entire hard drive with all of the

1  documents on it.  That was, indeed, a second mistake.

2  Therefore, the Court cannot find here that there are

3  circumstances that make an award of expenses unjust.  Assured

4  and its counsel should, in all equity, not be required to

5  bear any of the expenses of the city's two mistakes.

6       The question then becomes what costs should be

7  awarded.  The Court was actually quite outraged at the

8  request of $45,000 to bring this matter to the Court's

9  attention by way of the motion and its argument and, in all

10  honesty, very nearly denied the motion because of how

11  outrageous the request was, in the Court's view.

12  Nevertheless, the Court concludes that it is appropriate to

13  grant the motion, and the Court will award fees against

14  counsel and the city in the amount of $10,000.  The Court

15  will prepare an order.

16       (Recess at 10:44 a.m., until 11:03 a.m.)

17       THE CLERK:  Recalling Case Number 13-53846, City of

18  Detroit, Michigan.

19       MR. SHUMAKER:  Good morning, your Honor.  Greg

20  Shumaker of Jones Day for the city.  I thought what might be

21  helpful to the Court would be a brief progress report and

22  then raise a couple of issues with your Honor which I think

23  are fairly straightforward and really not all that

24  controversial.  Since we last were together, the parties for

25  the most part, I think, have been cooperating on the

1    discovery process and figuring out how to get all these

2    depositions done, and the depositions are proceeding apace.

3    Just so your Honor knows, there were seven Band 1 witnesses.

4    Two of those witnesses' depositions have been complete.

5    Three will go forward this week, Mr. Malhotra, Mr. Hill, and

6    Mr. Buckfire, and there will be two next week, Mr. Orr and

7    Mr. Moore.

8              As for the Band 2 witnesses, it can be a little bit

9    difficult to quantify how many Band 2 fact witnesses there

10   are.  I think there were about 51 in the deposition protocol

11   order that your Honor entered.  The number is being narrowed,

12   and there have been a few additions, I would say, but for the

13   most part we're narrowing.  In fact, last night the parties

14   entered into a stipulation that -- with the city and FGIC and

15   Syncora and National -- I believe National was a part of it,

16   but they may not have been.  In any event, that ended up

17   eliminating six witnesses from the roster, so progress is

18   being made in that regard.  About half of the DWSD-related

19   witnesses have been deposed, and the other 40 to 50 are in

20   various stages of scheduling, so we're moving forward.

21   Obviously August 4th is coming very quickly, but with regard

22   to the fact witnesses, we're moving along.

23             July 8th your Honor knows that the city identified

24   its expert witnesses.  Seven of those 12 have been scheduled.

25   The other five I'm sure will be soon.  And the city, of

1    course, awaits for the objectors' identification of their

2    witnesses and providing their expert reports on July 25th,

3    and we will commence those depositions shortly thereafter, so

4    that's kind of where things are, your Honor, on the discovery

5    front.  If you have any questions about that, I'd be happy to

6    answer them.

7            THE COURT:  Thank you.

8            MR. SHUMAKER:  Then my other two minor issues, one,

9    as your Honor knows, the expert -- the city's experts

10    delivered their expert reports to the objectors last week.

11    Your Honor's order -- scheduling order indicated that those

12    reports should be served.  It did not indicate anything about

13    filing.  With your Honor's permission, the city would propose

14    to publish those expert reports, put it on the emergency

15    manager's website so that everyone could see them, but we

16    didn't want to do that without your permission.

17            THE COURT:  Well, that's up to you.  I do not want

18    any expert's reports filed.

19            MR. SHUMAKER:  Understood, your Honor.

20            THE COURT:  Served, yes; filed, no.

21            MR. SHUMAKER:  Understood.  Okay.  We'll proceed

22    accordingly then.  And the last is somewhat of a trial issue,

23    but I wanted to flag it as early as possible, your Honor.

24    One of the city's witnesses is Robert Cline.  He is at Ernst

25    & Young.  He knows a lot about the forecasting of tax

1   revenues, and that's what his testimony will be on.  He is

2   retiring from Ernst & Young at the end of this month or

3   around there, and he's going to work for the OECD in Paris.

4   He is being deposed this week, but we've had to work things

5   out with the United States government about when Mr. Cline

6   could come back from Paris to testify.  As your Honor knows,

7   the trial starts on August 14th.  The city would like to slot

8   Mr. Cline in for Monday, August 18th, and perhaps Tuesday,

9   August 19th, to allow him to testify and to get back over to

10   Paris, and, with your Honor's permission, we would plan on

11   doing that.

12        THE COURT:  Have you discussed that with opposing

13   counsel?

14        MR. SHUMAKER:  We have not, your Honor.  I have not.

15   I've spoken with Mr. Hackney, but we had not raised it with

16   them.

17        THE COURT:  All right.  I don't see any issue with

18   it.  If any of the opposing counsel do have an issue with it,

19   you can get me on the phone, and we can see about working it

20   out.

21        MR. SHUMAKER:  Certainly, your Honor.  And unless

22   you have questions, your Honor, that was what I had today.

23        THE COURT:  All right.  Thank you.

24        MR. SHUMAKER:  Thank you.

25        THE COURT:  Would anyone else like to bring up

1   anything? Mr. Hackney.

2         MR. HACKNEY: Your Honor, good morning. Stephen

3   Hackney on behalf of Syncora. Briefly responding to Mr.

4   Shumaker, what I told him in the hall was -- I said, "It's

5   your case in chief, so I think you get to call your witnesses

6   when you want them." There's a little hidden issue in there,

7   though, your Honor, which is the notion of whether witnesses

8   can be examined adversely in the city's case or whether

9   you're limited on cross to what they raised in the scope of

10   their direct, and you may have to decide with respect to that

11   one witness.

12         THE COURT: The answer is no.

13         MR. HACKNEY: Yeah, so -- oh --

14         THE COURT: The answer is, no, the scope of cross is

15   not limited to the scope of direct.

16         MR. HACKNEY: That's where I thought you would come

17   out, but that also makes sense to me. I'll also be brief,

18   your Honor. I had three issues. I wanted to give you some

19   sense of progress. We've taken five depositions on the COPs

20   side to date, the city assessor, its HR director, city's

21   senior urban planner, a Retirement System administrator, and

22   a Milliman employee named Glenn Bowen. This is a big week

23   for depositions. In the next two weeks -- or I should say

24   the next two weeks, almost a dozen COPs-related depositions

25   will be taken, so we are out there chopping wood.

1    We have been -- there have been additional

2  productions of documents since the June 20, you know,

3  substantially complete date, and we're grappling with some of

4  those follow-on production issues, but I do think, your

5  Honor, we're starting to get closer to a more fundamental

6  issue with respect to plan construction that I wanted to at

7  least raise for you for you to consider, so let me tell you

8  some of the things that we don't have as we stand here today

9  about a month from trial.

10    The LTGO recently settled, and we have neither a

11  definitive settlement agreement for them nor do we really

12  even have the term sheet of their agreement, and I'll tell

13  you a little bit about what we've got on them so you can kind

14  of assess it a moment.  We do not have many of the collective

15  bargaining agreements that the city has recently entered

16  into.  We do not have the definitive documents for the DIA

17  and OPEB settlements.  We do not have the definitive

18  documents for the UTGO settlement.  On those last two

19  categories, your Honor, what you have are fairly -- you know,

20  you have a good sense of the guts of the deal in a

21  description of principal terms, but you do not have the

22  definitive documents, and I'll offer for a second kind of a

23  conversation about the extent to which, you know, the

24  continuum matters, but I wanted to be very precise about what

25  I'm saying.

1          Documents that we have gotten only recently include
2     some of the collective bargaining agreements that were
3     approved and that have been ratified by the State of
4     Michigan, and then, for example, something as important as
5     the forecast was only recently updated.  That is a big model,
6     and I don't think, as I stand here today, that I have a
7     working version of the electronic model of the forecast, and
8     I cannot tell you how material the changes were, but
9     certainly with experts and people that are in progress, when
10    you change these forecasts, you know, a bunch of things start
11    happening in terms of all the analysis that's been done to
12    date.
13          So what I mainly wanted to say was, you know, I've
14    been following carefully -- when you had the disclosure
15    statement hearing, I think you were kind of pointing out to
16    counsel the conundrum of, you know, I don't want the plan to
17    have to be set in stone before we start to litigate it
18    because I want the process to allow for continued settlement
19    and discussion, and you've been borne out because there have
20    been additional settlements along the way.  I think on the
21    other side of it, though, there may come a point where you
22    have to actually say this is the plan and stick a fork in it,
23    and then, second, I think you have --
24          THE COURT:  I share your concern about that, and it
25    was one of my questions that I was going to get to for the

1    city.

2              MR. HACKNEY:  Okay.  I wanted to pair that for your

3    consideration with, I think, some consideration of what is

4    enough to try the plan, okay, so -- and I actually don't know

5    all the different possible answers to questions that you

6    could ask, but for -- I can see circumstances where if I have

7    the term sheet, I don't need the definitive documents to

8    litigate the plan.  There are other circumstances, though,

9    where the specifics of the definitive documents may matter to

10   things like the legality of the plan or the economic -- I

11   mean it's hard to know, so what I think -- what I was

12   thinking about on this -- and certainly like on LTGO, okay,

13   as a COPs holder, you look up at the LTGO number, which you

14   can infer from some of the expert reports is 34 cents on the

15   dollar on the unsecured portion of their claim.  Certainly

16   you'd like to know to make sure there are no other terms, and

17   I tried to confirm this with LTGO, and their counsel said

18   that wasn't exactly their understanding, so I don't know what

19   it is.  I'm telling you what I've tried to piece together,

20   but just to tie it up to the substance, you can see how it

21   matters to me because you're looking up and saying, wow,

22   they're getting a 350-percent recovery over a COP holder, and

23   they are one of the nearest things to a COP holder I would

24   say in this plan in terms of the characteristics of their

25   bonds.  And I know that they would shout me down for saying

1  that, but you get the sense of the -- you get the sense of

2  the substance of it.

3  On the collective bargaining agreements, if you look

4  even at Mr. Moore's report, he talks about the onerous work

5  rules that have been imposed upon the city -- not his report

6  but in his other work product -- that have limited its

7  efficiency and have had an impact on it, and I think the

8  financial review team also talked about this, so we have been

9  eager to get these collective bargaining agreements and lay

10  them side by side with the other ones from before and see

11  like how did you do in terms of bumping rights or seniority,

12  have you freed up the city to be able to operate in a way

13  that it needs, so the later those come in the process, the

14  harder it gets.

15  So that was the main point that I wanted to make to

16  you.  I did have a -- I think I had somewhat in the way of a

17  suggestion, which is I think we need a date certain at which

18  they decide when they're -- at least with respect to a

19  particular settlement, when they're going to document it or

20  whether -- when they're just going to go with what they've

21  got in the description in the plan, and then that leaves it

22  to me to say then maybe my objection is, well, that's not

23  good enough for purposes of this plan confirmation, so the

24  city has made a mistake there or whatever.

25  There is a last point I wanted to raise, and then

```
 1   I'll sit down.  You will remember that last year in August
 2   you and I actually and Ms. Ball had an argument around the
 3   casino proceeds, the so-called cash trap, and that was in
 4   August of 2013.  And you ruled that the -- you ruled against
 5   my client.  You said that the casino proceeds were property
 6   of the estate.  They were subject to the automatic stay.  We
 7   appealed that ruling, and it was fully briefed before Judge
 8   Friedman, but then it got stayed before Judge Friedman
 9   because of the eligibility appeal that's ahead of it.  After
10   a period, we sought a mandamus petition from the Sixth
11   Circuit saying that we thought that it was important that the
12   appeals in front of Judge Friedman go forward.  The Sixth
13   Circuit issued -- granted the petition for a writ on July
14   2nd, and I wanted to bring to your attention something that
15   they said that may have implications for the schedule because
16   what they said in their opinion was they said, "The question
17   presented in Syncora's appeal - whether a substantial revenue
18   stream is rightly considered property of the bankruptcy
19   estate - is precisely the type of issue that should be
20   reviewed before the bankruptcy court confirms the plan of
21   adjustment.  Without a final decision on that question, the
22   city will not know what amount its coffers will contribute to
23   the bankruptcy estate, the creditors cannot know the size of
24   the pie they are being asked to share, and the bankruptcy
25   court cannot be confident that it is considering a legally
```

1  and financially viable plan."

2        They ordered Judge Friedman to rule on July 14th,

3  but on July 11th he actually beat their deadline, and he

4  affirmed your ruling in a two-and-a-half-page opinion that he

5  filed on Friday.  I think it actually got filed in this case

6  this morning.  We filed a notice of appeal of his ruling on

7  Friday and have not heard anything back from the Sixth

8  Circuit, but the reason for this long soliloquy from me was

9  mainly I didn't want to step up at a status conference and

10  not tell you that we are evaluating the extent to which there

11  is crosstalk between what's happening in the Sixth Circuit

12  and what's happening here and that that is something we may

13  return to on with a more informed view as we learn more about

14  how the Sixth Circuit intends to proceed.  And that was all I

15  wanted to say on that, your Honor.  It dovetails a little bit

16  with the other issues of what are we doing here in terms of

17  getting definitive documents or, you know, which term sheets

18  and the like, so there are kind of a couple things moving

19  around here that may have implications for the schedule.

20        THE COURT:  Well, I have to say I thought it was

21  interesting that neither Judge Friedman nor the Sixth Circuit

22  dealt with what I thought was a fairly obvious jurisdictional

23  issue there, which was whether that order finding that the

24  casino revenues are property of the city is even a final

25  appealable order.

1          MR. HACKNEY:  You may be talking to someone else

2     right now, but not me, your Honor, but if you're --

3          THE COURT:  Well, no.  I'm talking to everybody.

4          MR. HACKNEY:  Okay.  Well, I don't know if you

5     wanted me to respond.

6          THE COURT:  No, no.

7          MR. HACKNEY:  Okay.

8          THE COURT:  It's not my issue.  You know, I'm done

9     with it.

10         MR. HACKNEY:  Your Honor, those --

11         THE COURT:  At the same time, if I remember my order

12    correctly, which there's a 50/50 chance of, I said that that

13    finding was without prejudice to your right to move for

14    relief from the stay, which you never did.

15         MR. HACKNEY:  I don't remember your ruling well

16    enough to answer that.

17         THE COURT:  Whether I said it or not, as a matter of

18    law, it's so.

19         MR. HACKNEY:  That's true.  We did not move for

20    relief from the stay, your Honor.

21         THE COURT:  Well, it's also so that you have that

22    opportunity under Section 362.

23         MR. HACKNEY:  I haven't looked at the --

24         THE COURT:  Again, with this comment, I'm talking to

25    everyone in the room.

1          MR. HACKNEY:  Okay.  All right.  Some of this may be

2     going over my head, your Honor, but I've made -- I guess I

3     wanted to bring it to your attention because I do think it's

4     a salient issue.

5          THE COURT:  I appreciate that.

6          MR. HACKNEY:  Yeah.  I assume you'd seen it.

7          THE COURT:  I saw the same language and wondered the

8     very same question.

9          MR. HACKNEY:  I thought it was highly likely that

10     you had seen this development.  I did not want to be in a

11     position where --

12          THE COURT:  Right.

13          MR. HACKNEY:  -- this went forward and the Sixth

14     Circuit later said to us, "You dummies never told the

15     Bankruptcy Court about our ruling," so --

16          THE COURT:  Okay.  Fair enough.

17          MR. HACKNEY:  Thank you.

18          THE COURT:  Anyone else want to raise any issues?

19          MR. SCHWINGER:  Good morning, your Honor.  Robert

20     Schwinger again.  I just wanted to address one or two things

21     with respect to the DWSD side of the case.  I think Mr.

22     Shumaker gave a very able summary of the status of

23     depositions and moving along nicely, and I don't think we've

24     been having any problems with getting scheduled what we need

25     to have scheduled.

1          One issue came up on Friday, and I don't know if

2    this is the forum in which to raise it, but your Honor has

3    invited the parties to get informal resolutions when

4    discovery issues crop up.  We had an issue at a deposition

5    about a document which we used at the deposition.  The city

6    lawyers looked at it and said, "We think this is privileged.

7    We want to claw it back," so they clawed it back on the spot,

8    but we advised the city that we did not agree with the

9    assertion of privilege.  I've asked the city attorneys, and

10   they have, to bring a copy of the document with them for in

11   camera review since the fundamental aspect of the issue is is

12   that even if it was sent to an attorney or from an attorney,

13   we don't think the subject matter is legal issues as opposed

14   to business issues, so I put that in front of your Honor

15   to -- for guidance as to how and when you'd like to address

16   that here today.

17          THE COURT:  I think if it's possible to deal with it

18   today, we should.

19          MR. SCHWINGER:  Okay.

20          THE COURT:  So how would you suggest I proceed?

21          MR. SCHWINGER:  Mr. Irwin has a copy of the

22   document.  I don't know if the Court wants to hear anything

23   further from the parties before the Court reads the document.

24          THE COURT:  What is the document?

25          MR. SCHWINGER:  It's a three-page document, and it

1   has no -- it's not addressed to anyone or signed by anyone,

2   but it reads as if it like -- as if it were a letter, but

3   it's just text, and it's discussing certain issues that are

4   of importance to DWSD.  It seems to be largely focused on

5   operational and financial issues such as things that might be

6   done in order to improve bond ratings, and so it didn't seem

7   to us that it was about any kind of legal issues even if it

8   was sent by an attorney to an attorney, and there's no

9   indication of that on the face of the document anyway.

10          THE COURT:  Mr. Irwin, can you shed some light on

11  this?

12          MR. IRWIN:  I'm not sure I can, but I'll try.  The

13  document, your Honor, I think Mr. Schwinger described it.  It

14  is a -- it is a narrative that doesn't -- is not captioned in

15  any way and doesn't on its face give all of the information

16  associated with it, but we have investigated the document,

17  your Honor.  It is, in fact, a draft version of a legal

18  memorandum that was prepared by DWSD's general counsel and

19  two of DWSD's outside attorneys.  It is addressed to Ms.

20  Lennox directly, and it's dated February 11th, 2014, so what

21  you have is a draft of the memorandum that was inadvertently

22  produced as to a document over which the city has, in fact,

23  claimed privileged as -- and there's a legend on the final

24  document establishing just that.  And the contents of the

25  final version, which read very much like the draft, make it

1    pretty plain that this is the DWSD's general counsel and its

2    outside lawyers' opportunity to comment on a draft version of

3    the plan and make suggestions about the writing of the plan

4    itself that we think plainly falls within the construct of

5    attorney-client privilege, but I have the documents for the

6    Court to review if it wishes.

7           THE COURT:  I will in a moment.  And for the record,

8    who are the authors?  Who are those lawyers that you are

9    referring to?

10          MR. IRWIN:  The lawyers are Mr. William Wolfson.

11   He's the general counsel of DWSD.  It is co-authored by

12   Matthew Schenk, who was in house in the law department at the

13   DWSD for a long time.  As of the date of this document, he

14   had left and is now -- was at this time and is now a lawyer

15   at an outside law firm, and it's also co-signed by Mr.

16   Kilpatrick, Richardo Kilpatrick, who is bankruptcy counsel to

17   the DWSD.  So those three lawyers are providing their

18   comments to Ms. Lennox, and it's in the first --

19          THE COURT:  You have no objection if I look at

20   these, sir?

21          MR. SCHWINGER:  It's not my document, so I have no

22   objection to the Court seeing it, your Honor.

23          THE COURT:  All right.

24          MR. SCHWINGER:  I think the subject matter is --

25   certainly has much in the way of nonlegal material even if

1    there is some legal issues interwoven.

2              THE COURT:  Let me have a look at them then, please.

3              MR. IRWIN:  May I approach?

4              THE COURT:  Please.

5              MR. IRWIN:  It's a draft.

6              THE COURT:  Okay.  Thank you.  Stand by, please.

7    All right.  The Court will sustain the city's assertion of

8    privilege in regard to the three-page draft of the memorandum

9    as well as the memorandum itself.  Although there is much in

10   the document that relates to business and operational

11   information regarding the DWSD, it's clear that the document

12   was prepared for Jones Day in Jones Day's work in

13   representing the city in preparing the plan in the case, so

14   the claim of privilege is sustained, and I'll return the

15   documents to you.

16             MR. SCHWINGER:  Your Honor, just one final question

17   I would like to address to the Court was, as you mentioned,

18   the document does contain some operational, et cetera, type

19   material in there, and the question I raise with the Court is

20   whether it would be appropriate to direct the city to produce

21   a redacted version of the document that eliminates the legal

22   discussion but leaves in the operational material, which,

23   quite frankly, is what we care about, such as comments about

24   bond ratings and so on.

25             THE COURT:  Well, the attorney-client privilege is

1  broad enough to include factual information.  It doesn't just

2  cover the legal advice, so, no, I won't order that.  All

3  right.  Any other issues?  Let me ask you, sir, remind me who

4  your client is.

5          MR. SCHWINGER:  It's Assured Guaranty Municipal

6  Corporation.

7          THE COURT:  Okay.  Is there a representative of the

8  ad hoc committee here today this morning?  No?  Or the

9  trustee for the water bonds?

10         MR. SCHWINGER:  I don't believe so, your Honor.

11         THE COURT:  Sorry?

12         MR. SCHWINGER:  I don't believe so, your Honor.

13         THE COURT:  No.  I'm sorry.  Would you repeat that,

14 sir?

15         MR. DAVIDSON:  This is Paul Davidson on behalf of

16 U.S. Bank.

17         THE COURT:  Okay.  But there's no one here for the

18 ad hoc committee or on the line?  All right.  I want to have

19 a in-chambers conference with the two of you when we're done

20 with this status conference, so, Mr. Davidson, we're going to

21 have to get you back on the line to do that, so will you at

22 the appropriate time provide us with your contact

23 information?

24         MR. DAVIDSON:  Yes, your Honor.

25         THE COURT:  All right.  Thank you.  Would anyone

1  else like to raise any other issues regarding the status

2  conference?  All right.  Here's what I have to discuss with

3  you all.  First, in regard to the legal arguments that are

4  set for Wednesday, the question is the extent to which issues

5  one and five, one relating to the ten-year injunction and

6  five relating to an issue of classification or unfair

7  discrimination in regard to the pension plans, will still be

8  argued on behalf of the fire fighters given that the Police

9  Officers Association has settled.  Anybody have any sense of

10  that question for us?

11          MS. PATEK:  Your Honor, Barbara Patek, and with me

12  is Earle Erman on behalf of the fire fighters and the DPOA.

13  With respect to issues one and five, Mr. Legghio is handling

14  those issues on behalf of the fire fighters and as of this

15  time intends to proceed --

16          THE COURT:  Okay.

17          MS. PATEK:  -- on Wednesday.

18          THE COURT:  Okay.  Good.  The next question is the

19  question that Mr. Hackney raised, which is at what point is

20  the city going to file an amended plan?  Is it going to file

21  an amended plan that covers the more recent settlements

22  specifically with regard to the LTGO and now the DPOA, and,

23  more generally, how does it plan to deal with this issue of

24  continuing settlements, which we don't want to discourage,

25  but we want to allow parties an opportunity to review before

 1   they are called to deal with them in a hearing on the

 2   confirmation of the plan?

 3            MS. LENNOX:  So let me take those in turn, your

 4   Honor.  For the record, Heather Lennox of Jones Day on behalf

 5   of the city.  You asked me this question a couple weeks ago

 6   at the last hearing about when we're going to see an amended

 7   plan, and, frankly, I was hoping to have filed one last

 8   Friday because I was hoping that the final touches to both

 9   the UTGO and the LTGO settlements would be completed by that

10   time.  The parties are still negotiating.  I think we are

11   down to one issue that we just need to work on mechanics on

12   for the UTGO.  LTGO, of course, was settled more recently,

13   and there are some aspects of that -- you know, it's one

14   thing to reach a handshake deal in mediation, and we have

15   told Mr. Hackney that there was no term sheet that was

16   executed by the parties at the time.  Given the timing of it,

17   we wanted to move straight to, you know, regular

18   documentation and not waste a week or two negotiating a term

19   sheet.  So those issues that come up when you're negotiating,

20   definitive documents that come up, again, the parties I will

21   assure your Honor -- and I don't know if anybody from Ambac

22   is on the phone, but I would assure your Honor that the

23   parties have a goal to finish that this week if at all

24   humanly possible.  We had considered filing a plan at the end

25   of last week that didn't have the full settlement in it, but

1   we figured that would be kind of a waste of time, so that is

2   our expected timing.  I can't guarantee that the LT will be

3   done.  We are working and trying to move heaven and earth to

4   get that done, but we intend to file a plan just as soon as

5   that's wrapped up, and we hope that to be in the near term.

6           With respect to other issues that are still

7   outstanding, while we have a variety of objections still

8   pending to the plan, we have two large groups of creditors

9   with whom we have not yet settled.  We have the DWSD

10  financial creditors, and we have the COPs groups.

11  Fortunately, those two don't cross, so if we settled, for

12  example, with the DWSD creditors, that is not going to affect

13  Mr. Hackney's preparation for trial because he doesn't have a

14  dog in the DWSD fight.  If we -- similarly, if we settle with

15  the COPs --

16          THE COURT:  I'm not sure Mr. Hackney would agree

17  with that.

18          MS. LENNOX:  Well, I'd like him to articulate how he

19  thinks he's got an interest in it then.

20          THE COURT:  Okay.

21          MS. LENNOX:  Similarly, if we settle with the COPs,

22  that doesn't affect the DWSD because the DWSD financials are

23  contained in an enterprise, and their financials are separate

24  than the general fund financials.  So I think that if we

25  settle with either of those parties, even if it approaches

 1  trial or maybe even, you know, goes a little bit past the

 2  beginning of the trial, the settling parties certainly aren't

 3  going to care because they will have settled with us, and it

 4  will not affect the other, so it shouldn't affect either's

 5  preparation for trial.

 6      Again, we are in discussions with both of them,

 7  mediations actually, and, you know, I think the parties are

 8  working, and I know the mediators are working as hard as they

 9  can to move this along as quickly as we can.

10      THE COURT:  I'm inclined to think it would assist

11  your progress this week if I held another status conference

12  next Monday to see where you are.

13      MS. LENNOX:  With respect to the first, the UT, the

14  LT?

15      THE COURT:  With respect to filing an amended plan

16  that makes the disclosures necessary for review of the --

17  whatever settlements you have.

18      MS. LENNOX:  That's fine, your Honor.

19      THE COURT:  And you're negotiating with the fire

20  fighters, too.  Yes?

21      MS. LENNOX:  Yes, we are, your Honor.

22      THE COURT:  We do have a hearing on a motion for

23  class certification of proofs of claims of Hyde Park and

24  others at ten o'clock next Monday.  Is there any objection to

25  a renewed status conference at that time or --

1          MS. LENNOX:  None from the city.

2          THE COURT:  All right.  Let's tentatively set that

3    then.  And if you file your plan by Friday, that would be

4    fabulous.

5          MS. LENNOX:  I agree, your Honor.

6          THE COURT:  Is it still the city's plan to make the

7    results of the voting public a week from today?

8          MS. LENNOX:  Yes, your Honor.

9          THE COURT:  Not sooner?

10         MS. LENNOX:  Not sooner.  The financial tabulation

11   is a little complicated.

12         THE COURT:  Right.  Okay.  I went back and reviewed

13   my order appointing my expert witness to see what her process

14   would be for disclosure of her report, and I think all it

15   said was serve the report by the date.

16         MS. LENNOX:  I believe that's true.

17         THE COURT:  In the circumstances, since she is my

18   expert, I have come to the conclusion, subject to your

19   comments, that it would be a good idea for me to look at the

20   report before it is served.  Anyone object to that?

21         MS. LENNOX:  We have no objection, your Honor.

22         THE COURT:  Any objections?  All right.  So I'm

23   going to enter an amended order and discuss that with

24   Ms. Kopacz this afternoon.

25         MS. LENNOX:  Thank you, your Honor.

1        THE COURT:  Okay.  Is there anything else anyone

2   would like to bring up?  Mr. Hackney.

3        MR. HACKNEY:  Your Honor, if I could address that

4   maybe, I guess, on the one hand, it's sort of intuitive that

5   you're like, "I'd like to see my expert's report before she

6   serves it to everybody," and so I understand that desire of

7   yours.  I don't have a necessarily visceral negative reaction

8   to it except that I do know also that it's clear that the way

9   you had set it up was that there wouldn't be ex parte

10  communications between you and her, so --

11       THE COURT:  Not on substantive matters.

12       MR. HACKNEY:  Okay.  Perhaps I didn't know if you

13  wanted to give some thought -- maybe I didn't understand why

14  you wanted to see her report, but in my context, I usually

15  want to see expert reports so that I can give them feedback

16  on the report that is substantive, so --

17       THE COURT:  Well, I think it's appropriate to be

18  sure that Ms. Kopacz answers the questions that I have asked

19  her to answer.

20       MR. HACKNEY:  Okay.

21       THE COURT:  That's it.

22       MR. HACKNEY:  Okay.  So I guess --

23       THE COURT:  I'm not going to be playing around in

24  the weeds and asking her off the record why this and why that

25  and why the other.

1          MR. HACKNEY:  Maybe a way to tie it up would be in

2     the subsequent deposition of Ms. Kopacz, do you feel that

3     your comments -- communications with her --

4          THE COURT:  Absolutely.

5          MR. HACKNEY:  They would be subject --

6          THE COURT:  Subject, yeah.  I don't claim any

7     attorney-client privilege.

8          MR. HACKNEY:  I wasn't saying that you were.  I just

9     wanted to get it ironed out.  So that's a good way to handle

10    it.

11         THE COURT:  Yes.  I have asked her to keep a log --

12    to include in her log of everyone's contacts with her her

13    contacts with me, and it's all subject to your discovery.

14         MR. HACKNEY:  That's perfectly fine.  I just wanted

15    to iron it out.

16         THE COURT:  Okay.  All right.  I want to talk with

17    Mr. Davidson and Mr. Schwinger regarding -- and counsel for

18    the city regarding the legal arguments on the DWSD bonds,

19    specifically issue number four, but I want to do that off the

20    record in chambers, so let's convene with that in about five

21    minutes.  Chris, would you get Mr. Davidson's contact

22    information so that we can call him when we are in chambers?

23    All right.

24         Regarding the -- one second, sir.  Regarding the

25    status conference for the bus tour, I'm going to have to ask

1  you to be patient with me and do that after lunch.  There's

2  two reasons for that.  First is I have a judges' meeting at

3  noon, and, second, our IT people have asked for a break so

4  that they can prepare the room for it to be closed, so we'll

5  reconvene for that at 1:30.

6          MR. HAGE:  Your Honor, one point.  Excuse me.  Paul

7  Hage, National Public Finance Guarantee Corporation.  We're

8  also one of the financial creditors with respect to the DWSD

9  bonds and wonder --

10          THE COURT:  Oh, then you're welcome to attend as

11  well.

12          MR. HAGE:  Thank you.

13          MR. SCHWINGER:  Your Honor, I just wanted to clarify

14  on the legal issues.  My partner, Mr. Sam Kohn, will be

15  addressing that for Assured.

16          THE COURT:  Okay.  You can both attend or just one

17  of you.  However you work that out is fine with me.

18          MR. HACKNEY:  One more point, your Honor.  Did you

19  want everyone here for the bus tour, or --

20          THE COURT:  No.  I just want the city's

21  representatives and the two people who you have identified to

22  negotiate the terms of the bus tour.

23          MR. HACKNEY:  Thank you.

24          THE COURT:  And then the room will be closed.  Okay.

25  So give me five minutes and then come back into chambers.

1          THE CLERK:  All rise.

2          THE COURT:  Oh, my staff reminds me to clarify with

3     you that all of the notices of asserted rights to vote claims

4     have been resolved.  Are there any left?  Any issues left on

5     that?  All right.  I'm seeing a lot of negative response to

6     that, so I will assume they are all resolved.  Thank you.

7          (Proceedings concluded at 11:39 a.m.)

INDEX

WITNESSES:

    None

EXHIBITS:

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett            July 15, 2014
_____     _____
Lois Garrett