# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____ )
In re: )
  ) Case No. 13-53846
CITY OF DETROIT, MICHIGAN )
  ) Chapter 9
Debtor )
  ) Hon. Steven W. Rhodes
_____ )

**NOTICE OF FILING OF MACOMB INTERCEPTOR DRAIN DRAINAGE
DISTRICT'S CORRECTED BRIEF IN SUPPORT OF TEMPORARY
ALLOWANCE OF CLAIM PURSUANT TO RULE 3018(a) OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PURPOSES
OF ACCEPTING OR REJECTING THE DEBTOR'S FOURTH
<u>AMENDED PLAN OF ADJUSTMENT</u>**

    **PLEASE TAKE NOTICE** that, on July 14, 2014, Macomb Interceptor Drain Drainage

District ("<u>MIDDD</u>") filed *Macomb Interceptor Drain Drainage District's Brief in Support of*

*Temporary Allowance of Claim Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy*

*Procedure for Purposes of Accepting or Rejecting the Debtor's Fourth Amended Plan of*

*Adjustment* [Docket No. 6016] (the "<u>Original Brief</u>").

    **PLEASE TAKE FURTHER NOTICE** that the Original Brief contained a mistake on

page 4 thereof.

    **PLEASE TAKE FURTHER NOTICE** that MIDDD hereby files *Macomb Interceptor*

*Drain Drainage District's Corrected Brief in Support of Temporary Allowance of Claim*

*Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Purposes of*

*Accepting or Rejecting the Debtor's Fourth Amended Plan of Adjustment* (the "<u>Corrected</u>

<u>Brief</u>"), which is attached hereto as Annex A. The Corrected Brief replaces the following

mistaken statement from the Original Brief:

At this time, Inland submitted a budget that identified the expected total 15 Mile Project costs to be $52,953,895.88. See Exhibit 1 to Exhibit A.

with the following sentence:

At this time, Inland submitted a budget that identified the expected total 15 Mile Project costs to be $33,702,881.70. See Exhibit 2 to Exhibit D.

Dated: July 16, 2014

Respectfully submitted,

DECHERT LLP

By: /s/ Allan S. Brilliant
Allan S. Brilliant
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

-and-

KIRK, HUTH, LANGE & BADALAMENTI

By: /s/ Raechel M. Badalamenti
Raechel M. Badalamenti
19500 Hall Road, Suite 100
Clinton Township, MI 48038
Telephone: (586) 412-4900
Facsimile: (586) 412-4949
rbadalamenti@khlblaw.com

*Attorneys for Macomb Interceptor Drain Drainage District*

2

**Annex A**

_____ )
In re:                                )
                                      )        Case No. 13-53846
CITY OF DETROIT, MICHIGAN             )
                                      )        Chapter 9
                        Debtor        )
                                      )        Hon. Steven W. Rhodes
_____ )

**MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S
CORRECTED BRIEF IN SUPPORT OF TEMPORARY ALLOWANCE OF
CLAIM PURSUANT TO RULE 3018(a) OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE FOR PURPOSES OF
ACCEPTING OR REJECTING THE DEBTOR'S FOURTH
AMENDED PLAN OF ADJUSTMENT**

Pursuant to the Court's directive at the hearing held on June 25, 2014, Macomb

Interceptor Drain Drainage District (the "MIDDD"), a creditor and party in interest in the above-

captioned Chapter 9 bankruptcy case, hereby submits this brief in support of temporary

allowance of its claim in the amount of $26 million for the sole purpose of voting to accept or

reject the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No.

4392] (the "Plan").[1]  In support of the Motion, MIDDD respectfully states as follows:

<u>STATEMENT OF FACTS</u>

**I.      Procedural Background**

On November 21, 2013, the Court entered the *Order Establishing Bar Dates for Filing*

*Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 1782] (the

"Bar Date Order").  Pursuant to the Bar Date Order, MIDDD timely filed its proof of claim on

May 5, 2014 (the "MIDDD Proof of Claim"), approximately one month prior to the June 3, 2014

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

bar date set for governmental claims.  The MIDDD Proof of Claim asserts $26 million in liquidated, unsecured claims plus additional unliquidated claims (the "MIDDD Claim").

On March 11, 2014, the Court entered the Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment [Docket No. 2984] (the "Solicitation Procedures Order").  Under the Solicitation Procedures Order, if a party whose claim was objected to prior to May 15, 2014 wishes to vote its claim for more than $1.00, it is required to file a motion for temporary allowance under Bankruptcy Rule 3018(a).  Solicitation Procedures Order at ¶ 13 and Exhibit 1 (the "Amended Tabulation Rules").

On May 5, 2014, the Debtor filed the Plan and its accompanying amended disclosure statement [Docket No. 4391] (the "Disclosure Statement").  Also on May 5, 2014, the Court entered an order approving the Disclosure Statement and authorizing the Debtor to solicit votes to approve or reject the Plan [Docket No. 4401].  That order set July 11, 2014 at 5:00 p.m. as the deadline for parties to submit votes on the Plan (the "Voting Deadline").

On May 15, 2014, the City filed its objection to the MIDDD Proof of Claim [Docket No. 4961] (the "Claim Objection").  The Claim Objection contained no specific basis for an objection to the claim, and stated only that the City expected to vigorously contest the claim and that it **may** be barred by res judicata.

On May 30, 2014, in accordance with the Solicitation Procedures Order, MIDDD filed the *Motion for Temporary Allowance of Claim of the Macomb Interceptor Drain Drainage District Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Purposes of Accepting or Rejecting the Debtor's Fourth Amended Plan of Adjustment* [Docket No. 5155] (the "3018 Motion").

2

On June 13, 2014, the City and the Official Committee of Retirees (the "Retiree Committee") filed objections to the Rule 3018 Motion.[2]

On June 18, 2014, MIDDD filed its response to the Claim Objection [Docket No. 5421] ("Claim Objection Response").

On June 20, 2014, MIDDD filed its reply to the City Objection and the Retiree Committee Objection [Docket No. 5498] (the "Rule 3018 Reply").

At a hearing on June 25, 2014, the Court set a briefing schedule and hearing on the Rule 3018 Motion.

## II. Claim Background

In or about early mid 1970's, the sewer systems in Macomb and Oakland Counties were constructed and financed through bonds by the City. The systems were operated and maintained by the Detroit Water and Sewerage Department (the "DWSD") which assessed certain rates to Macomb and Oakland Counties. By 1977 these sewer systems had fallen into such a state of disrepair that the Environmental Protection Agency ("EPA") filed suit in the United States District Court for the Eastern District of Michigan (the "District Court") to force compliance with federal clean water and health standards, which was captioned *U.S. v. State of Michigan*, *et. al.,* Case No. 77-71100 and assigned to Judge Feikens (the "EPA Case"). See MCPW Commissioner Marrocco's Declaration at Exhibit A and Tr. Deposition of Commissioner Anthony Marrocco, July 10, 2014, designation attached hereto at Exhibit B ("Marrocco Designation") at 12:1-12:21. The EPA Case remained open for more than 35 years and became the exclusive forum for Macomb, Wayne and Oakland Counties to assert claims against City to

---

[2]    The objection filed by the City is at Docket No. 5312 (the"City Objection"), and the objection filed by the Retiree Committee is at Docket No. 5315 (the "Retiree Committee Objection").

challenge its operation and maintenance of the sewer systems and assessment of water and sewer rates.  See Tr. Deposition of R. Craig Hupp, July 14, 2014, designation attached hereto at Exhibit C ("Hupp Designation") at 9:15-12:3.

On August 22, 2004, there was a major failure of a portion of the Macomb Interceptor at 15 Mile and Hayes Road in Sterling Heights, Macomb County, Michigan that caused a large collapse or "sinkhole."  See Exhibit A.  The DWSD contracted with Inland Waters Pollution Control Company Inc. ("Inland") for the "emergency" work to stabilize the sinkhole and install a bypass sewer and also for the balance of work to repair and restore the failed interceptor for a total cost of $35 Million.  See Exhibit 1 to Exhibit D, Lyle Winn Declaration.  DWSD added this scope of work (the "15 Mile Project"), to the existing DWSD Contract CS-1368 with Inland which originally included some $50 million in sewer lining and inspection services over a 3 year term beginning February 2002.[3]  See Walter Designation at 28:12-28:20.  The "emergency" work was complete with the installation of the bypass by September 30, 2004.  See Winn Designation at 57:2-57:16.  At this time, Inland submitted a budget that identified the expected total 15 Mile Project costs to be $33,702,881.70.  See Exhibit 2 to Exhibit D.   Amendment 2 to DWSD Contract CS-1368 was correspondingly approved for a total of $35 Million.  See Exhibit E, Amendment 2 to CS-1368.  For reasons not known to MIDDD at the time, the total charges on the 15 Mile Project exceeded $56 Million.  See Exhibit A; Tr. Deposition of Bart Foster July 9,

---

[3]     Macomb would later learn that even prior to the award of Amendment 2, Inland had been given an addition $10 Million for the sewer lining work via Amendment 1 to CS-1368 which increased the budget without any extension of work for work that was being undertaken.  See Tr. Deposition of Robert Walter, July 11, 2014, designation attached hereto at Exhibit G ("Walter Designation") at 24:7-25:15.  Corporation Counsel assigned to the DWSD Bob Walter acknowledged that this was a somewhat usual occurrence for DWSD.  See Walter Designation at 30:10-33:18.

2014, designation attached hereto at Exhibit F ("Foster Designation") at 35:1-37:6; Indictment at Exhibit 7 to Exhibit A.

Beginning with rate charges in the 2005-2006 fiscal year, the City allocated 100% of the 15 Mile Project costs to MIDDD. See Foster Designation at 26:25-27:10. As had been done with other rate disputes, MIDDD asserted a challenge to this "Macomb-only" allocation by way of a Motion filed in the EPA Case. See Exhibit A, ¶2; EPA Case, Docket No. 1900; Hupp Designation at 17:23-18:9. Thereafter, Macomb, Oakland and Wayne Counties asserted various other challenges in the EPA Case to the rates and allocations by the DWSD including (a) challenges to the City's allocation of radio system charges; (b) objections to the City's markup on bond interest rates; and (c) complaints regarding charges for rehabilitation and maintenance though the systems were in a total state of disrepair. See Walter Designation 12:12-12:18; Exhibit 3 to Exhibit A; Hupp Designation at 17:23-18:9. As a result of these disputes, the City and MIDDD[4] began to negotiate the terms whereby MIDDD would purchase the Macomb System which is described as all of the interceptor sewers, meters, pump station and appurtenant facilities and associated tangible and intangible personal property commonly known as the Clintondale Pump Station and the Romeo Arm, Garfield, 15 Mile, Macomb, and Lakeshore and Lakeshore Extension Interceptors, and commencing in several branches northwards and eastwards from the intersection of the Edison Corridor Interceptor and 15 Mile Road, Macomb

---

[4] The City and Oakland began similar negotiations whereby Oakland would purchase the OMI System at about the same time. The due diligence was undertaken jointly for MIDDD and Oakland and the OMI Agreement was finalized first in 2009. See Tr. Deposition of Mark Jacobs, July 11, 2014, designation attached hereto at Exhibit H ("Jacobs Designation") at 12:12-12:18; Walter Designation at 82:1-82:4.

5

County, Michigan.  Attorneys Robert Walter and Mark Jacobs represented the City during these

negotiations.  Attorney R. Craig Hupp and others from Bodman, LLP represented MIDDD.[5]

The parties agreed that the purchase price to be paid to acquire the Macomb Interceptor

System would be the calculated "System Debt," which was jointly understood to mean the costs

of capital improvements made to the system by City to date less amounts Macomb County

already paid in its rates and less any agreed-upon credits in connection with the claims raised by

MIDDD in the EPA case and otherwise.  See Foster Designation at 26:25-27:10.  The terms of a

credit against the System Debt to resolve open disputes between the parties was initially agreed

upon late in 2006.  See Hupp Designation at 24:17-25:3.  However, Macomb's Motion that

challenged the "Macomb-only" allocation of the sinkhole repair costs was denied sua sponte and

with prejudice by Order dated March 23, 2007 in the EPA Case.  See EPA Case, Docket No.

2028.  Given the rejection of Macomb's Motion, the City withdrew its assent to the initial

agreement and sought payment of the total costs of the 15 Mile Project from MIDDD, as it

itemized in a spreadsheet produced by DWSD in discovery.  See Exhibit 1 to Exhibit A.  The

negotiations for MIDDD's purchase of the system were revived, subject to this caveat, in or

about 2008 with the appointment of a facilitator in the EPA Case.  See Hupp Designation at

15:8-16:8.

Given that the total charges on the 15 Mile Project seemed extraordinary to MIDDD's

Chairman Anthony V. Marrocco ("Marrocco"), who has served as the Macomb County Public

---

[5]  Mr. Hupp assisted in putting together the acquisition agreement on behalf of the Oakland Macomb Interceptor
Drain Drainage District.  See Jacobs Designation at 21:23-22:8.

6

Works Commissioner since 1993, MIDDD inquired of the City and its counsel whether the spreadsheet provided by the City was a record of regular and legitimate charges and whether there were any irregularities in the City's contract processes for the 15 Mile Project. See Exhibit A, ¶10; Hupp Designation at 64:11-64:18; Due Diligence Memo at Exhibit 4 to Exhibit A. In response to this inquiry, the City represented that there were no irregularities and that the total amount charged by Inland for the 15 Mile Project was legitimately incurred and paid. See Exhibit A, ¶13; Walter dep., p. 73:12-74:19; Misterovich Designation at 24:14-25:6. In reliance on these representations, Macomb executed the Settlement Agreement dated May 12, 2009 and a corresponding Letter of Intent ("LOI")[6] which set forth a process by which a final agreement for purchase of the Macomb System would be executed. See Exhibit A, ¶14; Walter Designation at 73:12-74:7; Exhibit 2 to Exhibit A. As contained within these documents, the parties agreed that MIDDD would receive a $17,050,000 credit against the purchase price in consideration of the interest rate and other disputes still open in the EPA Case. See Exhibit 5, pg. 49 to Exhibit A. This credit was paid in principle 27.9% by Wayne County, 26.2% by Oakland County and 43.9% by Detroit. See Exhibit 5, p. 28-32 to Exhibit A. These documents further contemplate a due diligence process wherein the City agreed to make full disclosures including with respect to the following:

"[D]uring the Due Diligence Period, the City shall:

(d) Obtain the consent of [Macomb] to any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the property;

---

[6] The signed version of the LOI has not been located by MIDDD or produced by City to date. However, corporation counsel for City testified that the LOI was executed and relied upon. See Walter Designation at 79:2-79:4, 97:25-98:8.

(e) Promptly notify [Macomb] of any emergency or other change in the normal course relating to the Property …if such emergency or change would be material, individually or in the aggregate, to the Property and its operation…;

(f) Promptly notify [Macomb] of any governmental, regulatory, or third party complaints, claims, investigations, or hearings (or communications indicating that the same may be contemplated)…

(h) Maintain all books and records relating to the Property in the ordinary course of business."

Exhibit 2, p. 6 to Exhibit A.  In this due diligence period, the City and its counsel provided documents and information that were relied on to be true and accurate representations of the debts associated with the Macomb System.  See Jacobs Designation at 14:3-14:12.  Remarkably, the City overtly misrepresented that there were no known, threatened, or pending claims against any contractor or other person arising out of or related to the relevant facilities.  See Exhibit 2 to Exhibit A.

In reality, officials and employees from the City's Engineering, Contracts and Grants, Personnel, Accounting and DWSD departments had been interviewed beginning in 2008 as part of a joint investigation by the Federal Bureau of Investigation (FBI), the United States Department of Justice and the Environmental Protection Agency's Inspector General.  See Walter Designation at 98:21-99:4; Tr. Deposition of Darryl Latimer, July 11, 2014, designation attached hereto at Exhibit I ("Latimer Designation") at 13:17-16:8; Tr. Deposition of Ramesh Shukla July 9, 2014, designation attached hereto at Exhibit J ("Shukla Designation") at 71:19-73:7, 78:21-81:12.  By late 2009-early 2010, the City's Law Department was served with grand jury subpoenas in connection with this investigation.  See Walter Designation at 9:8-9:25, 11:20-13:22. The City had actual knowledge that this investigation was into improprieties in the award and administration of DWSD contracts.  See Latimer Designation at 14:2-17:15.  As admitted by

8

the then-Director of Engineering, who was interrogated on the subject with corporation counsel present, the federal investigation was targeting the irregularities and overcharges on DWSD Contract CS-1368, including the 15 Mile Project. See Shukla Designation at 71:14-73:7. In fact, corporation counsel assigned to the DWSD since 1982 knew that the 15 Mile Project was awarded by "Special Order" of then-Mayor Kilpatrick and had never seen anything like the back-dated Costing Supplement issued in April 2005 that re-negotiated markups and other allowable charges for the 15 Mile Project. See Walter Designation at 7:9:-8:12, 49:4-49:24, 51:3-:53:24, 56:16-56:21. All involved also knew that Amendments 3, 4 and 5 were passed via "Special Order" to approve increases to the "emergency" repair budget, without review, from $35 Million to more than $56 Million. See Latimer Designation at 47:20-52:12.

All of this having been misrepresented and concealed from MIDDD, at the conclusion of the due diligence period, MIDDD entered into the *Acquisition Agreement between the City of Detroit and the County of Macomb dated September 2, 2010* (the "Agreement") whereby it purchased the Macomb Interceptor system with certain express rights and remedies in exchange for the payment of $89,996,704.00. See Exhibit 5, p. 49 to Exhibit A. This "System Debt" purchase price was calculated by DWSD Advisor Bart Foster who admittedly did not review, audit or even obtain backup for the total charges on the DWSD projects that made up the "System Debt" total. See Foster Designation at 23:13-23:25, 33:1-35:12, 61:18-62:4. Additional credits to this debt calculation shown in Schedule 3.8 reflect credit for certain capital improvements that had been allocated to the Macomb System in error (referred to as "phantom improvements" by the attorneys involved) and certain other interest rate disputes and also the Interest Rate. See Settlement Agreement at Exhibit 3 to Exhibit A; Walter Designation at 71:24-74:1; Hupp Designation at 18:19-20:18, 42:6-43:9. Counsel for City confirms that these credits

9

did not resolve all open disputes between the parties, but was primarily to account for the excessive interest rate that had been charged by DWSD in recent years.  See Jacobs Designation at 37:4-39:8.  In fact, the parties had already once gone back to credit another $100,000 or $200,000 against the purchase price given information uncovered some 6 months after the Agreement was executed.  See Hupp Designation at 43:11-43:25.  Given that Judge Feikens had ruled against the challenge to the "Macomb-only" allocation of the sinkhole repair costs, Schedule 3.8 shows the stated-total[7] of $54,467,200 was charged to and paid by MIDDD as part of the purchase price.  See Exhibit 5, p. 48 to Exhibit A.

Even after execution of the Agreement, the City did not notify MIDDD of the criminal enterprise, its potential claims, the presence of overcharges or the ongoing criminal investigation contrary to plain requirements of Sections 3.7 and 5.3 of the Agreement. See also Exhibit 4 to Exhibit A. MIDDD only learned of the criminal enterprise by way the *First Superseding Indictment* dated December 15, 2010 in the United States Eastern District Case No. 10-20403 captioned *U.S. v. Kilpatrick, et. al*., dated December 15, 2010 (the "Indictment") which charged:

> a.     Officials and representatives of the City, including the former Mayor Kwame Kilpatrick ("Kilpatrick"), the former Director of the City of Detroit Water and Sewer Department Mercado and the former Deputy Chief of Staff Derrick A. Miller ("Miller") engaged in widespread scheme that resulted in overcharges to the Detroit Water and Sewerage Department ("DWSD") for time, labor and materials on certain DWSD projects undertaken between 2000-2009. Exhibit 7, p. 4-12 to Exhibit A.
>
> b.     More specifically, these City representatives manipulated, fixed, redirected, held, cancelled, renewed, and amended DWSD contracts during this time frame and avoided competitive bidding so that contracts and subcontracts would be awarded only to contractors who were willing scheme participants including Kilpatrick's long-time companion Bobby W. Ferguson, owner and

---

[7]     This project total is less the nearly $2 Million paid by MIDDD prior to September 2, 2010 in the water and sewer rates which had included the 15 Mile Project costs since the 2005-2006 fiscal year 'look-back' report. See Foster Designation at 35:1-35:24, 46:6-46:21.

10

operator of Ferguson Enterprises, Inc. and Xcel Construction Services, Inc., (collectively "Ferguson"). Id.

c.      As part of the scheme, City allowed multiple amendments and change orders on DWSD contracts to allow contractors to charge excessive, duplicative and/or unlawful rates, mark-ups, fees, expenses, and costs for time, material, and equipment. Exhibit 7, p. 10-12 to Exhibit A.

d.      In furtherance of the scheme, City changed reporting and approval processes for DWSD contracts so that, among other things, charges submitted could be passed through and paid without scrutiny. Exhibit 7, p. 10-12 to Exhibit A.

e.      The scheme perpetuated DWSD Contract CS-1368 including Amendments 2 and 3 thereto for the stabilization and repair of a sewer collapse and sinkhole at 15 Mile and Hayes Roads in the City of Sterling Heights, County of Macomb which resulted in extraordinary overcharges on this Project. Id.

f.      Participants in the scheme were unjustly and/or unlawfully enriched. Exhibit 7, p. 3-12 to Exhibit A.

The criminal enterprise, and the fact that it was perpetrated in connection with the 15 Mile

Project, has been confirmed by the following:

a.      Exhibit 8 to Exhibit A which is a true and correct copy of a guilty plea entered by former Detroit Chief Administration Officer and Chief Information Officer Derrick Miller on August 19, 2011 in U.S. v. Kilpatrick, et. al. Case No. 10-CR-20403-NGE where Miller admits that at the behest of Kilpatrick and with assistance from Mercado and others in Detroit's administration, he steered millions of dollars from DWSD contracts to Kilpatrick's long-time companion Ferguson and influenced the award of DWSD contracts or 'reevaluated' and fixed bids of any contractor unwilling to participate in the scheme. Exhibit G, p. 5-6.

b.      Exhibit 9 to Exhibit A which is a true and correct copy of a guilty plea entered by former DWSD Director Mercado on or about November 5, 2012 U.S. v. Kilpatrick, et. al. Case No. 10-CR-2040-NGE where Mercado, who served as Director of DWSD from June 2002 to June 2008 admits guilt to Count I that charged a violation of 18 USC §371 for, in part, in carrying out the criminal conspiracy of Kilpatrick and Ferguson, as well as his own role in influencing the procurement process, including directing a bidder to include Ferguson on a contract in exchange for being awarded a bid. Exhibit H, p. 2-3.

c.      Exhibit 10 to Exhibit A which contains excerpts of the trial transcript from U.S. v. Kilpatrick, et. al. Case No. 10-CR-20403-NGE where participants attest that the scheme perpetrated DWSD CS-1368 including those Amendments thereto

which relate to the Project and that the City representatives directed, aided and benefited from the scheme. Exhibit 10, Vol. 40 (Latimer) p. 41, 44; Exhibit 10-1, Vol. 44 (Soave) p. 116-121, 126-128; Exhibit 10-2, Vol. 46 (McCann) p. 65-66,71,73-74,76-77,86, 97, 107, 122; Exhibit 10-3, Vol. 53 (Parker) p. 83-84, 88.

d.     Exhibit 11 to Exhibit A which is a true and correct copy of the guilty verdict dated March 11, 2013 which finds Kilpatrick, Ferguson, and others, guilty on 24 of the 30 charges including those that pertain to the Project, to wit:

> **Count 1: Racketeering conspiracy** from 2000-2009 for the criminal enterprise ran through the City whereby Ferguson would be guaranteed a portion of the work and the money on all DWSD contracts awarded, including DWSD Contract CS-1368;
>
> **Count 2: Extortion** regarding sewer lining contracts awarded from 2002-2006 whereby top-ranking City officials and Ferguson received payments of more than $23.7 Million from the contractor on DWSD Contract CS-1368 [Inland] and specifically in connection with the Project; and
>
> **Count 3: Extortion** regarding sewer lining contracts awarded from 2004-2005 whereby top-ranking City officials and Ferguson received payments of at least $175,000 to approve the amendment to DWSD CS-1368 specifically for charges on the Project.

After learning of the Indictment, MIDDD engaged municipal engineering consultants from Anderson Eckstein & Westrick, Inc. ("AEW") to determine if the 15 Mile Project legitimately cost $56 Million. See Exhibit A ¶ 22; Marrocco Designation at 38:16-39:10; Exhibit D ¶ 5. AEW attests that the repair project charges should not have exceeded $28,828,490.00, which is more consistent with the September 2004 Budget of $33,702,881.70 from Inland and the approved amount of $35 million in Amendment 2 to DWSD Contract CS-1368 than the ultimate total of $56 million in charges. See Tr. Deposition of Lyle E. Winn, July 10, 2014, designation attached hereto at Exhibit K ("Winn Designation") at 28:15-:29:5, 80:4-80:20; Exhibit D, ¶10-11, 13. Importantly, the AEW calculation relies on the (partial) project record and independent As-Built Plans from City so as to include the actual time and materials needed for the sinkhole repair. Id. Additionally, the AEW calculation conservatively accepts at

face-value the more than $11 million charged for the 'emergency' sinkhole stabilization and

bypass install which were complete by September 30, 2004. Id. Though a complete forensic

analysis has yet to be completed, AEW noted the following during its review:

a. Charges for bypass pumping by Thompson Pump Midwest from October 1 through March 31, 2005 total $1,542,985.94 per month which is an astronomical number for this service.

b. Charges for dewatering by Mersino Pump and Power for a 12 month time period beginning October 1, 2004 total $464,212.30 per month which is seven-times in excess of a reasonable estimated charge of $65,533.33 per month which was calculated by accepting Inland Waters' September 30, 2004 budgeted cost.

c. Charges for security appear excessive at $80,535.00 per month. Even accepting that multiple armed security guards were needed all day, every day over an eleven month timeframe, 3 armed guard(s) (at that the moderate-to-high average rate for armed guard of $40 per hour) to be at the project on this schedule would only have been $28,800 per month.

d. Markups on work and subcontractor work are far in excess of any accepted practice or industry standard including (i) Inland added a 15% markup to its own invoices for the first 4 months on the project and a 10% markup to its own invoices for the balance of the project; (ii) Inland added an 8% markup to subcontractor invoices for the first 4 months on the project and a 5% markup to subcontractor invoices for the balance of the project; (iii) subcontractors including L. D'Agostini & Sons added 10-15% markups on their own invoices; and (iv) subcontractors including L. D'Agostini & Sons added between 5% markups to their sub-subcontractor charges, which were in addition to markups by general contractor Inland Waters.

e. It appears that changes for the project were to be covered by Amendment 2 to DWSD Contract CS-1368 (Exhibit 1) which was in the amount of $35,000,000.00 in December 2004 but Amendment 3 had to be issued in June 2005 to cover the additional charges of $23,000,000.00 though there is no indication of a change in circumstances or an unanticipated condition. Additionally, Amendment 4 issued in June 2005 to approve another $12,000,000.00 for ongoing work for inspection and in-place rehabilitation.

f. The daily field reports of DWSD show employees and equipment on site from Ferguson-entities on an almost daily basis while the daily reports by NTH Consultants have Ferguson-entities only on-site occasionally.

Exhibit D, ¶14.

13

Given the AEW calculation, MIDDD retained counsel to commence a lawsuit in the District Court, which was captioned *MIDDD v Kilpatrick, et. al.,* District Court Case No. 11-13101 (the "<u>District Court Case</u>") against various contractors and subcontractors who overcharged and/or benefited from the enterprise (the "<u>Non-City Defendants</u>"). <u>See</u> Exhibit A, ¶23-25; Exhibit 12 to Exhibit A. In January 2012, the City moved to intervene in *MIDDD v Kilpatrick, et. al.* after the defendant-contractors asserted that MIDDD did not acquire intangible rights associated with the Macomb System by way of the Agreement. <u>See</u> Exhibit A; Exhibit 13 to Exhibit A**.**

Upon the City's request for intervention in the case, certain of the Non-City Defendants challenged MIDDD's standing to assert tort and antitrust claims as assignee under the Agreement. On September 17, 2012, the District Court issued an opinion and order (the "<u>USDC Opinion and Order</u>") holding that MIDDD did not have standing to assert tort and antitrust claims against the Non-City Defendants based on the language of the Agreement and limiting MIDDD's claims to those which arose from the Non-City Defendants' breach of contract CS-1368 as it pertained to the 15 Mile Project. District Court Case, Docket No. 237.[8] The District Court was not presented with and did not rule on any claims between MIDDD and the City.

Notably, in the Opinion and Order, the District Court recognized that the City "appear[ed] to concede that [MIDDD] can, on satisfactory proofs, establish that it suffered an 'injury-in-fact' by showing that the [15 Mile Project's] cost overrun, allegedly caused by anticompetitive conduct and a RICO conspiracy, was a but-for cause of its paying a higher price to acquire the [Macomb Interceptor System] through the [Agreement]." Exhibit A; Exhibit 16, p. 17 to Exhibit A.

---

[8] This Opinion and Order is attached the Objection at Exhibit 2.

Upon this determination that the Agreement assigned only contract rights to MIDDD, see Exhibit 14 to Exhibit A, the City asserted tort and federal statutory claims against contractors and subcontractors for overcharges on the Projection, and asserted that the cost of repairs was artificially inflated by at least $23 million due to the criminal conspiracy. See Exhibit A; Exhibit 15 to Exhibit A.

As evidenced by the documents at Exhibit 17 to Exhibit A, the City settled the claims against the contractors and subcontractors who overcharged for the 15 Mile Project (without consulting MIDDD as required by 5.2(g),(h), and(i) of the Agreement) in an amount of at least $7,000,000.00. Exhibit A; Exhibit 17 to Exhibit A. Despite having been paid in full by MIDDD, the City has not distributed any of those settlement proceeds to MIDDD or otherwise returned a portion of the $54,467,200.00 paid by MIDDD under the terms of the Agreement.

## ARGUMENT

### I. TEMPORARY ALLOWANCE IS IN THE COURT'S DISCRETION

Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court, in its discretion, can make a "speedy and rough estimation of … claims for purposes of determining [a claimant's] voice in the Chapter 11 proceedings." In re Chateaugay Corp., 944 F.2d 997, 1006 (2d Cir. 1991). Where a claim is disputed, courts have analyzed facts presented by the parties to evaluate the probabilities regarding the claim's amount and/or validity. See, e.g., In re Ralph Lauren Womenswear, Inc., 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996); In re Zolner, 173 B.R. 629, 632-33 (Bankr. N.D. Ill. 1994).

### II. THE MIDDD PROOF OF CLAIM IS *PRIMA FACIE* VALID

Pursuant to section 1126(a) of the Bankruptcy Code, a "holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." 11 U.S.C. § 1126(a). Under

15

section 502(a), a claim for which a proof of claim has been filed "is deemed allowed, unless a party in interest … objects." 11 U.S.C. § 502(a). Bankruptcy Rule 3018(a) provides that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Fed. R. Bank. P. 3018(a). Without the protections of Bankruptcy Rule 3018(a), a debtor could unilaterally control voting on its plan of reorganization by arbitrarily objecting to certain claims prior to the voting deadline.

Pursuant to Bankruptcy Rule 3001(f), "a proof of claim executed and filed in accordance with [the Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim." Fed. R. Bank. P. 3011(f). Although an objection to a claim may shift the burden to the claimant to submit evidence to sustain a claim, "the party objecting to the claim bears the initial burden of producing sufficient evidence to rebut the *prima facie* effect of the proof of claim." In re Plastech Engineered Prods, Inc., 399 B.R. 1, 10 (Bankr. E.D. Mich. 2008); see also In re O'Connor, 153 F.3d 258, 260 (5th Cir. 1998) ("If the Trustee objects, it is his burden to present enough evidence to overcome the *prima facie* effect of the claim."). "A bald assertion, a mere conclusory statement, is, in and of itself, insufficient to rebut the presumption of validity." In re Hollars, 198 B.R. 270, 271 (Bankr. S.D. Ohio 1996). Thus, in determining which party has the evidentiary burden with regard to the temporary allowance of the MIDDD Claim, the Court should pay special attention to whether the Claim Objection is sufficient to shift that burden to MIDDD.

In the Claim Objection, the City merely states that it "expects to vigorously contest the lawsuit once the matter proceeds, either through the claims objection process or through other litigation," Claim Objection ¶ 12, but offers no evidence, or even argument, that the factual bases

16

for liability or damages on the face of the MIDDD Proof of Claim are invalid in any way.  The

Claim Objection goes further to state that the City **may** assert that the MIDDD Claim and the

underlying lawsuit are barred by res judicata, Claim Objection ¶ 13, but the City makes no

attempt to establish the strict requirements of a res judicata defense.  These bald assertions and

conclusory statements, devoid of evidence or legal analysis, do not meet the standard necessary

to rebut the presumption of validity of the MIDDD Claim and are insufficient to shift the burden

to MIDDD.[9]  Moreover, the bare bones nature of the Claim Objection strongly suggests that,

because the MIDDD claim is large and may influence the voting results in Class 14, the Debtor

filed it to manipulate voting on the Plan.[10]  That is exactly the kind of abuse that temporary

allowance of claim claims is designed to prevent.  In re Armstrong, 292 B.R. at 686.

Because the MIDDD Claim is still deemed *prima facie* valid, on this basis alone, the

Court should grant the Motion, and allow MIDDD to vote the claim in the amount of $26

million.  Evidence and objections provided as part of the temporary allowance process should

not be considered for purposes of shifting the burden.  Even if, however, the Court were to

---

[9]    As the Retiree Committee has argued (Retiree Committee Objection at 3), the Tenth Circuit Bankruptcy
Appellate Panel concluded in In re Armstrong that "the burden of proof should be on the claimant to present
sufficient evidence that it has a colorable claim capable of temporary evaluation" because "a temporary
allowance order only arises if there is an objection to a claim."  In re Armstrong, 292 B.R. 678, 686 (B.A.P.
10th Cir. 2003). In re Armstrong, however, provides no reason to doubt that the claim objection prompting the
motion for temporary allowance was sufficient to rebut the *prima facie* validity of the proof of claim at issue.
On the other hand, the Claim Objection here is woefully insufficient to shift to MIDDD the burden of proving
the validity and amount of the MIDDD Claim.  Further, because the In re Armstrong court relied on the fact that
temporary allowance "only arises if there is an objection to a claim," there is no reason to suspect that the court
would not have concluded differently if the claims objection at issue did not meet the standard for shifting the
burden to the claimant.

[10]   The Debtor has argued that it was prevented from filing a more comprehensive objection because the MIDDD
Proof of Claim was filed on May 5, 2014 (well in advance of the bar date for claims of governmental units), and
that, to prevent MIDDD from voting in an amount greater than $1.00, it was required to file an objection by
May 15, 2014.  Even if the City could claim ignorance of the year-old lawsuit on which the MIDDD Claim was
based (which it cannot), ten days is more than enough time to articulate a basis for an objection to a claim other
than an unsupported assertion that it may be barred by res judicata.

conclude that the Claims Objection was sufficient to shift the burden—which it should not—as

explained below, the evidence currently available after limited discovery supports the validity

and amount of the MIDDD Claim such that the Court should estimate it for voting purposes in

the amount of $26 million.

## III.   MIDDD HAS A VALID CLAIM IN THE AMOUNT OF NOT LESS THAN $26 MILLION

### A. MIDDD IS LIKELY TO PREVAIL ON COUNT I FOR FRAUD DUE TO THE CITY'S OVERTLY FRAUDULENT MISREPRESENTATIONS.

Under Michigan law, a claim for fraudulent misrepresentation consists of the following

elements: (1) defendant made a material representation; (2) the representation was false; (3)

defendant knew, or should have known, that the representation was false when making it; (4)

defendant made the representation with the intent that plaintiff rely on it; (5) and plaintiff

incurred damages as a result of acting in reliance.  Hi-Way Motor Co. v. Int'l Harvester Co., 398

Mich. 330, 336; 247 N.W.2d 813 (1976).  As the evidence demonstrates, each of those elements

is present with respect to the City's representations to MIDDD in connection with the execution

of the Agreement.  Thus, MIDDD is highly likely to prevail on its claim and accordingly should

be allowed to submit a vote on the Plan in the amount of no less than $26 million.

Prior to the execution of the Agreement, representatives of the City made various

representations, including:

> Mercado's express representation to Marrocco that the total charges of more than $54 million for the 15 Mile Project was the result of an arm's length transaction undertaken without irregularities.  See  Exhibit A, par. 3.
>
> In response to MIDDD's request that the City "[d]escribe any facts of which DWSD or Detroit is aware which would give rise to or support a claim against any contractor or other person arising out of or related to the facilities and state whether such claim been

18

asserted," the City responded that "DWSD is not aware of any known, threatened or pending claims…" <u>See</u> Exhibit 4 to Exhibit A; Hupp Designation at 63:1-64:10.

The purchase price under the Agreement included $54 million for the cost of the 15 Mile Project, out of the $89 million total purchase price. Moreover, Commissioner Marrocco has testified that MIDDD would not have entered into the Agreement if he had known about overcharges on the Project or that there was an open criminal investigation into the propriety of DWSD's award and administration of contracts. <u>See</u> Marrocco Designation at 84:21-85:2. Thus, these representations, as they relate to the 15 Mile Project, are clearly material and therefore satisfy the first element of a fraudulent misrepresentation claim.

Further, there can be no dispute that these representations were false and that City knew and/or should have known of the falsity, thus meeting the second and third elements of a fraudulent misrepresentation claim. The City's top-ranking officials, including the former Mayor and former DWSD Director, were at the head of the criminal enterprise affecting the 15 Mile Project. Indeed, Mercado pled guilty for his role in the criminal conspiracy that resulted in bid-rigging and overcharging on the 15 Mile Project as part of a large-scale criminal enterprise impacting DWSD projects. <u>See</u> Exhibit 9 to Exhibit A. Similarly, the persons who are defined to have "Detroit's knowledge" for purposes of the Agreement, per paragraph 1.10 from the DWSD (Turner and Latimer), the City's Engineering Department (Shukla) and the Legal Department (Walters and Keelan) had <u>actual knowledge</u> and were cooperating witnesses in an ongoing criminal investigation by the United States Attorney, in conjunction with the FBI and Environmental Protection Agency Office of the Inspector General, beginning in 2008. <u>See</u> Walter Designation at 11:20-13:25; Latimer Designation at 13:17-22:23; Shukla Designation at 71:19-73:7. In fact, the City's counsel had attended several FBI interviews in 2008, 2009 and

19

2010 where questions were specifically asked regarding overcharges and anticompetitive practices on the 15 Mile Project and the irregularities in DWSD contract processes during that time period. See Shukla Designation at 80:8-81:12; Latimer Designation at 13:17-14:21, 18:19-19:1; Shukla Designation at 71:19-73:7. To this end, Assistant Corporation Counsel assigned to the DWSD since 1982 testified that he had never seen post-hoc Costing Supplements like those for the sinkhole repair work performed under DWSD CS-1368 and its Amendments. See Walter Designation at 56:7-56:21.

It has long been established in Michigan jurisprudence that "a false representation of value … intentionally made to a person ignorant of value, with the purpose that such statement is to be relied upon…will support an action of fraud." Gugel v. Neitzel, 248 Mich. 312, 317-8; 226 N.W. 869 (1929); See also Foreman v. Foreman, 266 Mich.App. 132, 142; 701 N.W.2d 167 (2005) ("statements of opinion … made in bad faith by a party who is possessed of superior knowledge respecting such matters, with a design to deceive and mislead [are actionable]… Representations by an individual who has personal knowledge of the value or condition of land or property cannot be construed as a mere expression of opinion, but rather constitute a statement of fact."). The City's representations regarding the cost of the 15 Mile Project created a false impression of the value of the Macomb System, and thus are exactly the kind of statements that support an action of fraud.

Moreover, a promise of future conduct made in bad faith, *i.e.* made without the intention to perform, constitutes fraud. Derderian v. Genesys Health Care Systems, 263 Mich. App. 364, 378-9; 689 N.W.2d 145 (2004).[11] The City's representations regarding its cooperation with due diligence were made without the intention to perform, thus constituting fraud. In fact, Assistant

---

[11]    This is an exception to the general rule that a promise of future conduct cannot be a fraud.

Corporation Counsel and the City's signatory to the Agreement confirmed that City did not comply with these terms and that City already knew of such information by way of grand jury subpoenas received and interviews held before the United States Department of Justice which was being concealed from MIDDD. See Shukla Designation at 71:19-73:7; Latimer Designation 23:22-24:2; Walter Designation at 11:20-13:6.

In addition or in the alternative, these representations are actionable where they were made in reckless disregard for their falsity. A party representing a material fact to a person in privity of contract with him is under a legal obligation to determine its truthfulness prior to making the representation. Strand v. Librascope, Inc., 197 F. Supp. 743, 745 (E.D. Mich. 1961) (citing Aldrich v. Scribner, 154 Mich. 23, 30-31; 117 N.W. 581 (1908)). Here, the signatory for City admitted that he never read or even attempted to review the terms of the Agreement and counsel for the City failed to explain the same to him before it was executed. See Latimer Designation at 72:24-73:2. In fact, counsel for the City admits that it never reviewed or sought to confirm the representations being made. See Walter Designation at 54:21-55:4, 62:21-63:5; Jacobs Designation at 34:14-35:5.

Michigan law presumes that representations made in the course of contract bargaining are made for purposes of inducing the other party to enter into the contract. U.S. Fidelity and Guaranty Co. v. Black, 412 Mich. 99, 119 (1981). The City cannot rebut this presumption because, according to the evidence, MIDDD would not have entered into the Agreement if it had known of the relevant overcharges. See Marrocco Designation at 84:21-85:9; Hupp Designation at 64:20-65:19. Thus, MIDDD meets the fourth element of a fraudulent misrepresentation claim—that the defendant made the representation with the intent that plaintiff rely on it.

21

Finally, due to the City's misrepresentations, MIDDD suffered material damages.  The actual losses to MIDDD are the difference between what the 15 Mile Project should have cost and what MIDDD actually paid for the repairs as a result of the fraud.  School Dist. of City of Pontiac v. Sachse, 274 Mich. 345, 354; 264 N.W. 396 (1936) (Where fraud was committed against a buyer, the true measure of damages is the difference between what plaintiff paid for the property and what it could have purchased it for had the defendant made a full disclosure.); See also Gorman v. Soble, 120 Mich. App. 831, 328 N.W.2d 119 (1982).  In the case where fraud is undertaken by design or with malicious motive, the buyer may also "recover exemplary damages resulting from the willful wrong committed." Oppenhuizen v. Wennersten, 2 Mich. App. 288, 297-8; 139 N.W.2d 765 (1966).  According to Lyle Winn, P.E., Anderson Eckstein & Westrick, Inc., who has been administering and managing municipal sewer projects like this one for more than 40 years, the repair costs should not have exceeded $28,828,490.00.  See Exhibit D, ¶10. This project total takes account of the actual time and materials needed for the sinkhole repair as described in the records provided by the City, including As-Built Plans.  See Exhibit D, ¶7-8.

**B.  THE CITY'S ACTIONS CONSTITUTE FRAUDULENT CONCEALMENT.**

Even if the City had not made the overtly false misrepresentations described above in the course of negotiation of the Agreement, it would still be liable to MIDDD for fraudulent concealment of the criminal conduct and massive overcharges.  Long ago, the United States Supreme Court recognized that a deliberate concealment is equivalent to a deliberate falsehood. Crosby v. Buchanan, 90 U.S. 420 (1874).  The District Court has affirmed this rule, recognizing that "a party is under a duty to use diligence in making a complete disclosure of facts where partial disclosure may convey false impressions and mislead the plaintiff.  Such half-truths or

non-disclosures are considered to be concealment of facts and, therefore, misrepresentations."

Strand v. Librascope, Inc., 197 F. Supp. 743, 753 (E.D. Mich., 1961).[12]  Likewise, in Michigan, a

claim for concealment is "essentially the same [as a claim for misrepresentation] except that it is

based on a defendant suppressing a material fact that he or she was legally obligated to disclose,

rather than making an affirmative misrepresentation." Alfieri v. Bertorelli, 295 Mich. App. 189,

193; 813 N.W.2d 772 (2012).  In the context of parties to a contract:

> It is true that silence as to a material fact is not necessarily, as a
> matter of law, equivalent to a false representation.  But mere
> silence is quite different from concealment… if, with intent to
> deceive, either party to a contract of sale conceals or suppresses a
> material fact, which he is in good faith bound to disclose, this is
> evidence of and equivalent to a false representation, because the
> concealment or suppression is in effect a representation that what
> is disclosed is the whole truth.  The gist of the action is
> fraudulently producing a false impression upon the mind of the
> other party.

 M & D, Inc. v. W.B. McConkey, 231 Mich. App. 22, 31; 585 N.W.2d 32 (1998) (citing Wolfe

v. A E Kusterer & Co., 269 Mich. 424, 427-8; 257 N.W. 729 (1934)).  The duty to disclose may

arise by law or by equity.  M & D, Inc., 231 Mich. App. at 31-33.  More specifically, an

equitable duty to disclose exists during contract negotiations where the buyer expresses a

particularized concern or directly inquires of the seller.  M & D, Inc., 231 Mich. App. at 33.

In this case, representatives of Macomb and MIDDD specifically inquired of the City as

to the legitimacy of the total costs incurred by City on the 15 Mile Project.  See  Exhibit A, ¶10;

Tr. Deposition of William Misterovich, July 14, 2014, designation attached hereto at Exhibit L

("Misterovich Designation") at 20:11-21:5. Counsel also inquired of City regarding potential

---

[12]    Where responses to inquiries "were in such form as naturally tended to reassure plaintiffs and to cause them to proceed on the assumption" that the facts were different than they actually were, "the concealment of the true facts and the deliberate creating of false impressions and inferences is the equivalent of an express and intentional misrepresentation."  Groening v. Opsata, 323 Mich. 73, 82; 34 N.W.2d 560 (1948); See also Wolfe v. A. E. Kusterer & Co., 269 Mich. 424, 430; 257 N.W. 729 (1934).

claims against contractors involved in the capital improvement projects on which the 'System Debt' purchase price was calculated for purposes of the Agreement.  See Hupp Designation at 62:1-64:10; Exhibit 4 to Exhibit A.  In response to MIDDD's specific due diligence request that the City "[d]escribe any facts of which DWSD or Detroit is aware which would give rise to or support a claim against any contractor or other person arising out of or related to the facilities and state whether such claim been asserted," the City responded that "DWSD is not aware of any known, threatened or pending claims…"[13]  See Exhibit 4 to Exhibit A; Hupp Designation at 63:1-64:10.

 In reality, corporation counsel for City Ed Keelan and Bob Walter, the then-Director of DWSD Latimer, the former-Directors of DWSD Turner and Mercado, and the Director of Engineering Shukla—at least—knew of the large-scale federal investigation into irregularities in DWSD contract processes since 2008 and that the sinkhole repair project was the subject of, among other things, Costing Supplements that post-dated performance of work that allowed markups unlike anything that corporation counsel assigned to the DWSD for 30 years had ever seen.  See Walter Designation at 7:9:-8:12, 9:8-9:25, 11:20-13:22, 49:4-49:24, 51:3-:53:24, 56:16-56:21, 98:21-99:4; Latimer Designation at 13:17-17:15, 47:20-52:12; Shukla Designation at 71:19-73:7, 78:21-81:12.

 It is indisputable that if this information had been disclosed to Macomb and MIDDD, the Settlement Agreement at Exhibit 3 to Exhibit A and the Acquisition Agreement at Exhibit 5 to Exhibit A which require MIDDD to pay the extraordinary sinkhole repair charges of more than

---

[13]  The minutes of the March 18, 2009 diligence meeting containing this statement were transmitted by email to, among others, Walter and Jacobs on March 19, 2009.  The email requested that the recipients inform Hupp if there were any errors in the minutes.  To MIDDD's knowledge, no City representative or agent corrected the minutes.

$54 million would never have been agreed-to or executed.  <u>See</u> Marrocco Designation at 38:15-39:2, 84:21-85:9, Exhibit D ¶12.  Given these undisputed facts and circumstances, MIDDD is highly likely to prevail on Count I of its Complaint which has a value of, at least, the $26 Million in actual damages.

### C.  THE CITY WAS UNJUSTLY ENRICHED.

"The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another."  <u>Morris Pumps v. Centerline Piping, Inc.</u>, 273 Mich. App. 187, 194; 729 N.W.2d 898 (2006).  The plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant.  <u>Id.</u> at 195.  If established, the law will imply a contract in order to prevent unjust enrichment only if there is no express contract covering the same subject matter.  <u>Martin v. East Lansing School Dist.</u>, 193 Mich. App. 166, 177; 483 N.W.2d 656 (1992).  The correct measure of damages in an unjust enrichment claim is the benefit conferred on a party.  <u>B & M Die Co. v. Ford Motor Co.</u>, 167 Mich. App. 176, 183-184; 421 N.W.2d 620 (1988).  One need not prove fraud to recover on a theory of unjust enrichment.  <u>Kern v. City of Flint</u>, 125 Mich.App. 24, 28; 355 N.W.2d 708 (1983).

Here, (exclusive of amounts already paid in rate charges in the years before the Agreement) MIDDD paid the City $54,467,200.00 for the 15 Mile and Hayes Road sinkhole repair.  This is the <u>sum total</u> of what Detroit was invoiced by Inland, including at least $26 Million in overcharges.  <u>See</u> Exhibit A, ¶7-14; Exhibit D, ¶9-13. MIDDD should not have to bear the burden of paying for these overcharges; it has no obligation to cover the costs of a criminal

enterprise that was being perpetrated by top officials of the City. These amounts must be disgorged under B & M Die.

Additionally, although the City was paid in full by MIDDD for the extraordinary sinkhole repair costs, it settled and retained at least another $7,000,000.00 that was paid by contractors and subcontractors who benefited from the illegal enterprise by overcharging for the sinkhole repairs. More specifically, the City asserted a claim against Inland and primary subcontractor L. D'Agostini, and others, in District Court Case No. 11-13101, Docket No. 205 for the overcharges they received for the sinkhole repairs given their participation in the criminal enterprise. See Exhibit 15, ¶128-142, 168-176 to Exhibit A.

Attached as Exhibit 17 to Exhibit A are the Settlement Agreements resulting from this action. Remarkably, the City retained the entire benefit from these settlements—in addition to the project total paid by MIDDD. Thus, a proper claim for unjust enrichment is established under these circumstances. Michigan Ed. Employees Mut. Ins. Co. v. Morris, 460 Mich. 180, 199-200; 596 N.W.2d 142 (1999). A constructive trust is an appropriate interim remedy and is prayed for by MIDDD. Coveyou Meadows Prop. Owners Ass'n. v. Coveyou, No. 204778, 1999 WL 33453955 (Mich. Ct. App. February 23, 1999); Potter v. Lindsay, 337 Mich. 404, 412; 60 N.W.2d 133 (1953) (A constructive trust is imposed …because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property).

### D.  ANY ASSERTED DUE DILIGENCE DEFENSE IS WITHOUT MERIT.

The City may assert as a defense that MIDDD was represented by counsel when it executed the Agreement and had a right to review records and conduct due diligence. Thus, in the City's view, MIDDD could have uncovered the criminal enterprise and discover that it was

overpaying for the sewer repairs.  This is not a legitimate defense.  First, the criminal enterprise

was only uncovered by the federal government using the vast resources and powers available to

it during several years of an investigation.  Second, and perhaps more important, is that the

doctrines of actionable fraud and silent fraud in the procurement of a contract do not require the

plaintiff to prove that the fraud could not have been discovered through the exercise of

reasonable diligence.  Titan Ins. Co. v. Hyten, 491 Mich. 547; 817 N.W.2d 562 (2012).

Moreover, when the defrauded party does undertake to examine some extrinsic evidence

provided to it in support of a false statement, that party owes no duty to the defrauder to exercise

diligence to uncover additional evidence that would disprove the defrauder's representations.

Alfieri v. Bertorelli, 295 Mich. App. 189, 195 (2012), 295 Mich. App. at 195 (citing Smith v.

Werkheiser, 152 Mich. 177, 179–180; 115 N.W. 964 (1908)).

　　　　Here, the Director of the DWSD was asked by MIDDD whether there were overcharges

on the 15 Mile Project and denied the same.  See  Exhibit A, ¶10, 13.  Additionally, MIDDD's

counsel asked, and the City agreed, to determine "any facts of which DWSD or Detroit is aware

which would give rise to or support a claim against any contractor or other person arising out of

or related to the facilities and state whether such claim has been asserted."  Exhibit 4 to Exhibit

A. The City thereafter provided records to imply the legitimacy and necessity of the

extraordinary total of more than $54 Million for the 15 Mile Project.  See Exhibit A, ¶ 7-18;

Exhibit D, ¶6-13.  MIDDD had no access to information separate and apart from what City was

providing in response to its inquiries.  But, even if it had such access, under Titan and Alferi,

MIDDD was under no duty to perform a forensic review of the 15 Mile Project or to otherwise

challenge the veracity of the City's responses to its inquiries regarding the legitimacy of the $54

Million total for these repairs.  This is not a defense to the claim.  Any assertion otherwise is simply frivolous.

### E. THE CITY MAY NOT AVOID LIABILITY FOR FRAUD MERELY BECAUSE THE AGREEMENT INCLUDES A MERGER CLAUSE.

The Agreement contains a representation by the City that amounts in "Schedule 3.8 [of the Agreement] sets forth all System Debt…  None of the written data or information furnished or made available to Macomb County by Detroit as part of the due diligence process with regard to System Debt or other debt or rate-related matters contains an untrue statement of Material fact or omits to state a Material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading."  <u>See</u>  Exhibit 5 to Exhibit A.  As the cost of the 15 Mile Project is included in "System Debt," the City represented that the cost was not false or misleading.[14]  Because this representation was untrue, the City breached the Agreement.   Even if, however, the City had not so represented, it would not preclude a finding of fraud.

The parol evidence rule provides that where a written agreement is clear and unambiguous, parol evidence of prior negotiations may not be admitted to alter or vary the terms of the written agreement.  <u>Salzman v. Maldaver</u>, 315 Mich. 403, 412; 24 N.W.2d 161 (1946).  A number of exceptions to this rule exist; one is where fraud is claimed.  <u>Goodwin, Inc. v. Orson E. Coe Pontiac, Inc.</u>, 392 Mich. 195, 204; 220 N.W.2d 664 (1974).

More specifically, parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract is inadmissible to

---

[14]  City's failure to perform this and other terms of the Agreement form the basis of Count – of MIDDD's complaint for breach of contract.  <u>See</u> Exhibits 2, 3 and 5 to Exhibit A. The representations and warranties in these Agreements expressly survive closing.  <u>See</u> Exhibit 5, ¶  3,7 to Exhibit A. Corporation counsel for City admitted that the City failed for perform these terms.  <u>See</u> Walter Designation at 92:6-92:12.

28

determine whether the contract was integrated. <u>UAW–GM Human Resource Ctr. v. KSL Recreation Corp.</u>, 228 Mich. App. 486, 494; 579 N.W.2d 411 (1998). However, this rule does not apply to a case where plaintiffs are not asserting a conflict over the terms of a valid contract but, rather, are asserting that the contract was fraudulently obtained. <u>Barclae v. Zarb</u>, 300 Mich. App. 455, 480-1; 834 N.W.2d 100 (2013).

> There is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation. It stretches the UAW–GM ruling too far to say that any pre-contractual factual misrepresentations made by a party to a contract are wiped away by simply including a merger clause in the final contract. Such a holding would provide protection for disreputable parties who knowingly submit false accountings, doctored credentials and/or already encumbered properties as security to unknowing parties as long as they were savvy enough to include a merger clause in their contracts. In fact, the UAW–GM court considered the effect of fraud allegations on a contract with a merger clause and determined that evidence was admissible to prove fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause.

<u>Barclae</u>, 300 Mich. App. at 481 (citing 3 Corbin, Contracts, § 578).

Even this year, the Michigan Court of Appeals affirmed that "where the inducements for the execution of a contract are fraudulent representations as to existing facts, testimony as to such representations is not within the parol evidence rule. They do not vary, change, or alter the terms of the written contract and are admissible in evidence, as bearing upon the question of whether a contract, fair on its face, was procured by fraud." <u>Abbo v. Wireless Toyz Franchise, L.L.C.</u>, 2014 WL 1978185 (Mich. App., May 13, 2014), citing <u>Robinson v. Great Lakes College, Inc.</u>, 294 Mich. 192, 196; 292 N.W. 701 (1940).

In this case, MIDDD does not assert that some contemporaneous agreement varies or contradicts the terms of the Agreement. MIDDD's claims are based on the City's fraudulent misrepresentation and/or concealment of material facts that induced the execution of the Agreement. Accordingly, under <u>Barclae</u> and <u>Abbo</u>, the fact that the Agreement includes a merger clause does not "provide protection" for the City from MIDDD's claim.

**F. MIDDD'S CLAIM HAS AN ESTIMATED VALUE OF AT LEAST $26 MILLION, NEARLY ALL OF WHICH IS ACKNOWLEDGED TO BE THE OVERCHARGE ON THE 15 MILE PROJECT BY CITY IN ITS OWN PLEADINGS AGAINST CONTRACTORS WHO PROFITED FROM THE CRIMINAL ENTERPRISE.**

In its vague objections to this claim, the City seems to suggest that there were no overcharges at all on the 15 Mile Project such that MIDDD's claim should not be assessed any value for purposes of voting. For this Court to accept such a notion it would have to disregard the admissions by and verdicts against the City and its top-ranking officials. It would have to disregard the guilty plea of former DWSD Director Victor Mercado. <u>See</u> Exhibit 8 to Exhibit A. It would have to disregard the jury's finding of guilt as to the other criminal defendants for:

> Count 1: Racketeering conspiracy regarding DWSD contracts, including CS-1368 specifically, between 2000-2009 wherein contractors who sought work in the City had to include Bobby Ferguson or otherwise rig bids to allow for kickbacks to top-ranking City officials;

> Count 2: Extortion between 2002-2006 whereby Kilpatrick and Ferguson received more than **$23.7 million** in contract revenues from Inland Waters, in large part for work done on the sinkhole repair; and

> Count 3: Extortion specifically in connection with the 2004 amendment to DWSD CS-1368 whereby Kilpatrick and Ferguson received payments from Inland Waters of more than **$175,000**.

This Court would also have to disregard the estimate prepared by a 40 year veteran on such projects who concluded that based on the actual As-Built Plans describing the repairs in detail,

30

the project total should have been at least $26 Million less.  See  Exhibit D, ¶7-12. This estimate

is even conservative in that it accepts the "emergency' nature of the bypass install (work through

9/30/2004), the time and materials delineated in Inland's pay estimates and the charges for

'emergency' work at face value.  Id.

And, finally and perhaps most compelling, this Court would have to disregard that the

City's own estimate that "as a result of inflated invoices submitted on the [15 Mile Project], the

cost of repairs of the [15 Mile Project] was increased by at least $23 million." See Exhibit 14,

¶128 to Exhibit A.  After review by City's expert the City pled that "the $58 million amount that

was allocated to the [15 Mile Project] was $27 million more than NTH's[15] estimate of $31

million" if not for the criminal enterprise.  Id. at ¶123. Given this record, the City cannot now

deny that the overcharges on which MIDDD's principal claims in are based are at least to be

valued at $26 million.

## G.  THE MIDDD CLAIM IS NOT BARRED BY RES JUDICATA

The City's assertion, in the Claim Objection, that the MIDDD Claim may be barred by

res judicata is without merit.  The City has not attempted to, and cannot, demonstrate the

requirements for a res judicata defense.  As demonstrated in the Rule 3018 Motion (at 9-14), the

Rule 3018 Reply (at 5-8), and the Claim Objection Response (at 7-13), which are incorporated

by reference as if fully set forth herein, there was no final decision on the merits by a court of

competent jurisdiction, no subsequent action between the same parties or their privies, no issue

in the subsequent action which was litigated or which should have been litigated in the prior

action, and no identity of the causes of action.  Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521,

---

[15]    NTH Consultants, Ltd. was hired to evaluate and design the repair of the 15 Mile Project.  Ibid, ¶ 85.

529 (6th Cir. 2006).  For all of the reasons set forth in those pleadings, the Court should find that the MIDDD Claim is not barred by res judicata.

IV.   **MIDDD HAS NOT WAIVED THE RIGHT TO TEMPORARY ALLOWANCE OF ITS CLAIM**

As explained in the Rule 3018 Reply (at 3-5), which is incorporated by reference as if fully set forth herein, the City's argument that MIDDD somehow waived its right to temporary allowance of its claim pursuant to Rule 3018(a) by not objecting to the solicitation procedures is wholly without merit.  Although the Amended Tabulation Rules attached to the Solicitation Procedures Order provide that a claim to which an objection has been filed automatically will be temporarily allowed in the amount of $1.00, the Solicitation Procedures Order expressly provides that "[i]f any claimant seeks **different treatment** of a claim for voting purposes, **other than in accordance with the Amended Tabulation Rules**, such claimant shall be required to file a motion pursuant to Bankruptcy Rule 3018(a) for an order temporarily allowing such claim in a different amount or classification for purposes of voting…"  Solicitation Procedures Order ¶ 13 (emphasis added).  Thus, it is clear that the Solicitation Procedures Order does not purport to suspend the application of Bankruptcy Rule 3018, and expressly allows creditors to contest the default $1.00 voting amount under the Amended Tabulation Rules.

32

WHEREFORE, MIDDD respectfully requests that the Court enter an order temporarily allowing the MIDDD Claim for voting purposes in the amount of $26 million.

Dated: July 16, 2014

Respectfully submitted,

DECHERT LLP

By:    /s/ Allan S. Brilliant
Allan S. Brilliant
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

-and-

KIRK, HUTH, LANGE & BADALAMENTI

By:    /s/ Raechel M. Badalamenti
Raechel M. Badalamenti
19500 Hall Road, Suite 100
Clinton Township, MI 48038
Telephone: (586) 412-4900
Facsimile: (586) 412-4949
rbadalamenti@khlblaw.com

*Attorneys for Macomb Interceptor Drain Drainage District*

33