# EXHIBIT A

**Declaration of Anthony V. Marrocco**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

--------------------------------------------------------x

In re                      :          Chapter 9

                          :

CITY OF DETROIT, MICHIGAN,    :          Case No. 13-53846

                          :

         Debtor.            :          Hon. Steven W. Rhodes

--------------------------------------------------------x

## <u>DECLARATION OF ANTHONY V. MARROCCO</u>

I, Anthony V. Marrocco, do hereby state and declare the following:

1.      I am currently the Public Works Commissioner for the County of Macomb, State of Michigan ("<u>Macomb</u>") and have held this position since 1993. I have also held the position of County Agency for the Macomb County Wastewater Disposal District and Chairman of the Drainage Board of the Macomb Interceptor Drain Drainage District ("<u>MIDDD</u>") at all relevant times.

2.      In my capacity of County Agency, I was involved in the matter of *U.S. v. State of Michigan*, United States District Court Case No. 77-71100, wherein Macomb County asserted various challenges to rates and charges being imposed by the City of Detroit and the Detroit Water and Sewerage Department (collectively the "<u>City</u>") including (a) the sewer debt interest rates; and (b) the assessment of the repair costs on the 15 Mile and Hayes Road interceptor in Sterling Heights,

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

Macomb County, Michigan after its failure and collapse on August 22, 2004 to Macomb—only.

3. Oakland County and Wayne County also were involved in this matter.

4. By Order dated March 23, 2007, Judge Feikens ruled that the 15 Mile and Hayes Road repair costs could be assessed by the City as a Macomb-only project. Following this ruling, and to resolve multiple other open disputes that had been asserted by Oakland County, Macomb and the City, these parties began to discuss the purchase of certain sewer systems from the City.

5. Following this ruling, Macomb and the City continued to negotiate the terms whereby MIDDD would purchase the Macomb System which is described as all of the interceptor sewers, meters, pump station and appurtenant facilities and associated tangible and intangible personal property commonly known as the Clintondale Pump Station and the Romeo Arm, Garfield, 15 Mile, Macomb, and Lakeshore and Lakeshore Extension Interceptors, and commencing in several branches northwards and eastwards from the intersection of the Edison Corridor Interceptor and 15 Mile Road, Macomb County, Michigan.

6. Attorneys Robert Walter and Mark Jacobs represented the City during these negotiations.

2

7. As part of these negotiations, the City itemized the totals paid for the 15 Mile and Hayes Road repair in a spreadsheet that is attached hereto as **Exhibit 1.**

8. In doing so, it was represented and implied to me by the City official Victor Mercado ("Mercado") and counsel for the City that **Exhibit 1** was a record of regular and legitimate charges and implied that there was nothing unusual about the repair project or the City's processing and payment of the charges therefore.

9. It was further represented to me that the total of $52 Million in **Exhibit 1** was not final as the City was still receiving invoices and making payments for the repairs. In or about 2009, I was provided a draft Schedule that calculated the repair project total at $54,467,200.00.

10. I questioned the reasonableness of both totals and asked the City whether there were any irregularities in connection with the award or performance of the repair project.

11. I recall that a conference followed wherein Judge Feikens excused all of the attorneys and directed myself and City official Mercado to discuss and resolve open issues so that negotiations could move forward.

12. I knew Mercado to be the Director the Detroit Water and Sewerage Department at the time that the work on the 15 Mile and Hayes Road repair project

(the "Project") occurred and thus inquired of him whether there had been any irregularities on the repair project to cause the total charges to exceed $52 Million.

13.     Mercado responded in the negative and represented on behalf of the City that the amounts in **Exhibit 1** and **Schedule 3.8 at Exhibit 3, p. 48** were legitimately incurred and paid.

14.     In reliance on these representations, Macomb agreed to the terms of a 2009 Letter of Intent regarding purchase of the assets from the City and entered into a Settlement Agreement dated 5/12/2009. **Exhibit 2 and Exhibit 3**.

15.     In fact, the City agreed to:

> (d)  Obtain the consent of the [MIDDD] to any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the Property;
> * * *
> (f) Promptly notify the [MIDDD] of any governmental, regulatory or third party complaints, claims, investigations or hearings (or communications indicating that the same may be contemplated). **Exhibit 2, p. 6.**

16.     In connection with the due diligence contemplated by the LOI, the City and its counsel provided documents and information that were relied on to be true and accurate representations of the debts associated with the Macomb System. As the minutes from due diligence coordination meetings reflect (see **Exhibit 4**), the City stated that it was not aware of any known, threatened, or pending claims against any contractor or other person arising out of or related to the relevant facilities.

4

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

17. In reliance on all of these representations, Macomb entered into the *Acquisition Agreement between the City of Detroit and the County of Macomb dated September 2, 2010* (the "Agreement", **Exhibit 5**) whereby MIDDD purchased the system with certain express rights and remedies in exchange for the payment of $89,996,704.00.

18. The purchase price was itemized in Schedule 3.8 thereof and specifically included the total repair project cost of $54,467,200.00. **Exhibit 5, p. 48**.

19. The City knew or should have known of involvement of its top-ranking officials and employees in the federal criminal investigation, because the law department had cooperated during the criminal investigation by at least May 2, 2010, as shown in **Exhibit 6** hereto. However, prior to execution of the Agreement, the City did not disclose the investigation into the criminal enterprise whereby its top-ranking officials, including Mercado, awarded contracts and permitted overcharges on DWSD projects including the 15 Mile and Hayes Road repair project so as to cause the total to be in excess of $54 Million, or that the City had changed its record-keeping, review and payment protocols to facilitate and conceal the enterprise.

20. In fact, even after execution of the Agreement, the City did not notify MIDDD of the criminal enterprise, its potential claims, the presence of overcharges

5

or the ongoing criminal investigation contrary to these plain terms. Instead, Macomb and MIDDD learned of the criminal enterprise by way of **Exhibit 7,** hereto which is a true and correct copy of the *First Superseding Indictment* dated December 15, 2010 in the United States Eastern District Case No. 10-20403 captioned *U.S. v. Kilpatrick, et. al.*, dated December 15, 2010 (the "Indictment") which charged:

    a.    Officials and representatives of the City, including the former Mayor Kwame Kilpatrick ("Kilpatrick"), the former Director of the City of Detroit Water and Sewer Department Mercado and the former Deputy Chief of Staff Derrick A. Miller ("Miller") engaged in widespread scheme that resulted in overcharges to the Detroit Water and Sewerage Department ("DWSD") for time, labor and materials on certain DWSD projects undertaken between 2000-2009. **Exhibit 7, p. 4-12.**

    b.    More specifically, these City representatives manipulated, fixed, redirected, held, cancelled, renewed, and amended DWSD contracts during this time frame and avoided competitive bidding so that contracts and subcontracts would be awarded only to contractors who were willing scheme participants including Kilpatrick's long-time companion Bobby W. Ferguson, owner and operator of Ferguson Enterprises, Inc. and Xcel Construction Services, Inc., (collectively "Ferguson"). **Exhibit 7, p. 4-12.**

    c.    As part of the scheme, City allowed multiple amendments and change orders on DWSD contracts to allow contractors to charge excessive, duplicative and/or unlawful rates, mark-ups, fees, expenses, and costs for time, material, and equipment. **Exhibit 7, p. 10-12.**

    d.    In furtherance of the scheme, City changed reporting and approval processes for DWSD contracts so that, among other things, charges submitted could be passed through and paid without scrutiny. **Exhibit 7, p. 10-12.**

6

e.   The scheme perpetuated DWSD Contract CS-1368 including Amendments 2 and 3 thereto for the stabilization and repair of a sewer collapse and sinkhole at 15 Mile and Hayes Roads in the City of Sterling Heights, County of Macomb which resulted in extraordinary overcharges on this Project. **Exhibit 7, p. 10-12.**

f.   Participants in the scheme were unjustly and/or unlawfully enriched. **Exhibit 7, p. 3-12**

21.   The criminal enterprise, and the fact that it was perpetrated in connection with the Project, was confirmed by the following:

a.   **Exhibit 8** is a true and correct copy of a guilty plea entered by former Detroit Chief Administration Officer and Chief Information Officer Derrick Miller on August 19, 2011 in *U.S. v. Kilpatrick, et. al.* Case No. 10-CR-20403-NGE where Miller admits that at the behest of Kilpatrick and with assistance from Mercado and others in Detroit's administration, he steered millions of dollars from DWSD contracts to Kilpatrick's long-time companion Ferguson and influenced the award of DWSD contracts or 'reevaluated' and fixed bids of any contractor unwilling to participate in the scheme. **Exhibit 8, p. 5-6.**

b.   **Exhibit 9** is a true and correct copy of a guilty plea entered by former DWSD Director Mercado on or about November 5, 2012 *U.S. v. Kilpatrick, et. al.* Case No. 10-CR-2040-NGE where Mercado, who served as Director of DWSD from June 2002 to June 2008 admits guilt to Count I that charged a violation of 18 USC §371 for, in part, in carrying out the criminal conspiracy of Kilpatrick and Ferguson, as well as his own role in influencing the procurement process, including directing a bidder to include Ferguson on a contract in exchange for being awarded a bid. **Exhibit 9, p. 2-3.**

c.   **Exhibit 10** has excerpts of the trial transcript from *U.S. v. Kilpatrick, et. al.* Case No. 10-CR-20403-NGE where participants attest that the scheme perpetrated DWSD CS-1368 including those Amendments thereto which relate to the Project and that the City representatives directed, aided and benefited from the scheme. **Exhibit 10, Vol. 40 (Latimer) p. 41, 44; Exhibit 10-1, Vol. 44 (Soave) p. 116-121, 126-128; Exhibit 10-2, Vol. 46 (McCann) p. 65-**

7

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

**66,71,73-74,76-77,86, 97, 107, 122; Exhibit 10-3, Vol. 53 (Parker) p. 83-84, 88.**

d.     **Exhibit 11** is a true and correct copy of the guilty verdict dated March 11, 2013 which finds Kilpatrick, Ferguson, and others, guilty on 24 of the 30 charges including those that pertain to the Project, to wit:

> **Count 1: Racketeering conspiracy** from 2000-2009 for the criminal enterprise ran through the City whereby Ferguson would be guaranteed a portion of the work and the money on all DWSD contracts awarded, including DWSD Contract CS-1368;

> **Count 2: Extortion** regarding sewer lining contracts awarded from 2002-2006 whereby top-ranking City officials and Ferguson received payments of more than $23.7 Million from the contractor on DWSD Contract CS-1368 [Inland Waters] and specifically in connection with the Project; and

> **Count 3: Extortion** regarding sewer lining contracts awarded from 2004-2005 whereby top-ranking City officials and Ferguson received payments of at least $175,000 to approve the amendment to DWSD CS-1368 specifically for charges on the Project.

22.     Upon learning of the First Superseding Indictment, I engaged Municipal Engineering Consultants from Anderson Eckstein & Westrick, Inc. ("AEW") to determine if the total of $54,467,200.00 for the 15 Mile and Hayes Road repair project was reasonable.

23.     Based, in part, on the AEW estimate that charges for the repair project should have been $28,828,490.00, MIDDD commenced a lawsuit in the United States District Court captioned *MIDDD v Kilpatrick, et. al.,* District Court Case No. 11-13101 against various contractors and subcontractors who overcharged

8

and/or benefited from the enterprise. **See Complaint at Docket No. 1 of District Case #11-13101 at Exhibit 12.**

24.    In January 2012, the City moved to intervene in *MIDDD v Kilpatrick, et. al.* after the defendant-contractors asserted that MIDDD did not acquire intangible rights associated with the Macomb System by way of the Agreement. **See Motion to Intervene at Docket No. 145 of District Case #11-13101 at Exhibit 13.**

25.    Upon determination by Judge Cleland that the Agreement assigned only contract rights to MIDDD, [See **Opinion and Order at Docket No. 202 of District Case #11-13101 at Exhibit 14**] the City asserted tort and federal statutory claims against contractors and subcontractors for overcharges on the Projection, and asserted that the cost of repairs was artificially inflated by at least $23 million due to the criminal conspiracy. **Intervening Complaint at Docket No. 205 of District Case #11-13101 at Exhibit 15.** The District Court recognized that, in so pleading, the City "appear[ed] to concede that [MIDDD] can, on satisfactory proofs, establish that it suffered an 'injury-in-fact' by showing that the [15 Mile Project's] cost overrun, allegedly caused by anticompetitive conduct and a RICO conspiracy, was a but-for cause of its paying a higher price to acquire the [Macomb Interceptor System] through the [Agreement]." **Opinion and Order at Docket No. 237 of District Case #11-13101, p. 17 at Exhibit 16.**

9

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

26.     As evidenced by the documents at **Exhibit 17,** the City settled these claims for a total sum of at least $7,000,000.00.

27.     Despite having been paid in full by MIDDD for the 15 Mile and Hayes Road repair project, the City has not distributed any of those settlement proceeds to MIDDD or otherwise returned a portion of the $54,467,200.00 paid by MIDDD under the terms of the Agreement.

28.     I make this Declaration based upon my own personal knowledge.

29.     If called upon to testify, I could testify competently to the facts set forth in this declaration.

_____
Anthony V. Marrocco
Macomb County Public Works Commissioner

Subscribed and sworn to before me on
July 14                           , 2014.
Suite Bull         , Notary Public
State of Michigan, County of  Macomb.
My Commission Expires:  August 1, 2015
Acting in the County of  Macomb.

10

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------x

In re                                  :        Chapter 9
                                       :
CITY OF DETROIT, MICHIGAN,             :        Case No. 13-53846
                                       :
            Debtor.                    :        Hon. Steven W. Rhodes

-------------------------------------------------------x

## DECLARATION OF ANTHONY V. MARROCCO INDEX OF EXHIBITS

EXHIBIT 1:       Final Estimate Summary

EXHIBIT 2:       2009 Letter of Intent

EXHIBIT 3:       May 12, 2009 Settlement Agreement

EXHIBIT 4:       Due Diligence Meeting Minutes

EXHIBIT 5:       Macomb Acquisition Agreement

EXHIBIT 6:       Investigations/Subpoenas to Testify Before a Grand Jury

EXHIBIT 7:       First Superseding Indictment: Case No. CR-10-20403

EXHIBIT 8:       Derrick Miller Plea Agreement: Case No. CR-10-20403

EXHIBIT 9:       Victor Mercado Plea Agreement: Case No. CR-10-20403

EXHIBIT 10:      Vol. 40 Trial Transcript (Latimer): Case No. Cr-10-20403
EXHIBIT 10-1:    Vol. 44 Trial Transcript (Soave): Case No. Cr-10-20403
EXHIBIT 10-2:    Vol. 46 Trial Transcript (McCann): Case No. Cr-10-20403
EXHIBIT 10-3:    Vol. 53 Trial Transcript (Parker): Case No. Cr-10-20403

EXHIBIT 11:      Verdict Form: Case No. Cr-10-20403

EXHIBIT 12:      Complaint at Docket No. 1 of District Case #11-13101

EXHIBIT 13:      Motion to Intervene at Docket No. 145 of District Case #11-13101

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

EXHIBIT 14:     Opinion and Order at Docket No. 202 of District Case #11-13101

EXHIBIT 15:     Intervening Complaint at Docket No. 205 of District Case #11-13101

Exhibit 16:     Opinion and Order at Docket No. 237 of District Case #11-13101

EXHIBIT 17:     November 28, 2012 Inland and City Settlement Agreement
EXHIBIT 17-1:   February 11, 2013 Walbridge and City Settlement Agreement
EXHIBIT 17-2:   February 2013 Lakeshore and City Settlement Agreement
EXHIBIT 17-3:   March 2013 L.D. & S and City Settlement Agreement

KIRK, HUTH, LANGE & BADALAMENTI, P.L.C.

2



*Exhibit 1*

# FINAL ESTIMATE SUMMARY

**INLAND WATERS POLLUTION CONTROL, INC**
**15 MILE AND HAYES SINKHOLE - COST PROJECTION**

| | Aug - Est 1 | Sept - Est 2 | Oct - Est 3 | Nov - Est 4 | Dec - Est 5 | Jan - Est 6 | Feb - Est 7 | Mar - Est 8 | Apr - Est 9 | May - Est 10 | June - Est 11 | July - Est 12 | August - Est 13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IWPC Field Operations | | | | | | | | | | | | | | |
| Labor | | | | | | | | | | | | | | |
| Health & Security | | | | | | | | | | | | | | |
| Equipment | | | | | | | | | | | | | | |
| Fuel / Bonded / Special Insurance | | | | | | | | | | | | | | |
| 15% ML T4 - 10% 5 ON | | | | | | | | | | | | | | |
| IWPC Total | | | | | | | | | | | | | | |
| TOTAL TO DATE | | | | | | | | | | | | | | |



*Exhibit 2*

# LETTER OF INTENT

This Letter of Intent is dated _____, 2009 and is by and among the City of Detroit ("City"), the County of Macomb ("Macomb"), and the County of Oakland ("Oakland"), each of the State of Michigan, and sets forth the principal terms and conditions of the proposed transaction (the "Transaction") pursuant to which the City would transfer to Macomb, Oakland, or any of them or such entity as Macomb or Oakland may designate ("Transferee Entity"), ownership of certain interceptor sewers and related property, in accordance with the terms hereof and of that certain Settlement Agreement of even date herewith between the parties and the Detroit Water and Sewerage Department ("Settlement Agreement"). Macomb, Oakland and such entity, or any of them, are referred to herein as the "Transferee."

1.     <u>Acquired Property</u>. The Transferee would acquire all of City's right, title and interest in and to the interceptor sewers listed on Exhibit "1", associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and other related property as agreed by the parties, and as generally described in Exhibit "1" (collectively, the "Property"), and pursuant to the terms of definitive transfer agreements (collectively, the "Transfer Agreement") to be negotiated and entered into by the parties in accordance with the terms hereof; one between the City and Macomb for the portion of the Property that will be transferred solely to Macomb, and the other between the City and Oakland and Macomb (or the Transferee Entity, as determined by Oakland and Macomb) for the portion of the Property that will be transferred to Oakland and Macomb (or the Transferee Entity). The Property would be acquired by the Transferee free and clear of all liens, claims and encumbrances of whatever nature.

2.     <u>Assumed Obligations, Responsibilities and Liabilities</u>. After the Closing (as defined in Paragraph 7 below) and transfer of the control of the Property, Transferee agrees to assume all responsibilities, liabilities and obligations for the operation, maintenance and repair of the Property, except for Claims (as defined herein) that accrued prior to the transfer of control. The City shall remain responsible for all Claims that accrue prior to Closing and transfer of control of the Property. To the extent permitted by applicable law, the City agrees to defend and hold harmless the Transferee for a period not to exceed the applicable statute of limitations for said Claims. Claims shall be defined as any alleged third-party: losses, claims, complaints, demands for relief or damages, suits, causes of action, proceedings, judgments, deficiencies, liability, penalties, litigation, costs, and expenses, including, but not limited to, reimbursement for reasonable attorney fees, witness fees, court costs, investigation expenses, litigation expenses, amounts paid in settlement, and/or other amounts or liabilities of any kind which are imposed on, incurred by, or asserted against the parties, or for which the parties may become legally and/or contractually obligated to pay or defend against, whether direct, indirect or consequential, whether based upon any alleged violation of the federal or the state constitution, any federal or state statute, rule, regulation, or any alleged violation of federal or state common law, whether any such claims are brought in law or equity, tort, contract, or otherwise, and/or whether commenced or threatened. In this paragraph, the term "Claims" pertains to third-party claims only and does not include claims between the parties.

Detroit_883034_6

3.    Consideration. The consideration (the "Consideration") for the acquisition of the Property would be an amount equal to the outstanding debt (including accrued interest) owed by the City that is allocated to the Property in the Sewer Rate Model as of the Closing, and subject, in the case of the Macomb Interceptor, to an adjustment in the amount of $17,050,000, and to such other adjustments to be agreed upon by the parties.  At the Closing, Transferee would deliver to City cash equal to the Consideration (the "Closing Cash Consideration").

4.    Additional Agreements.  In addition to the Transfer Agreement, the following agreements would be entered into in connection with the consummation of the Transaction:

(a)    a bill of sale for all of the Property that is tangible personal property executed by the City;

(b)    an assignment of all of the Property that is intangible personal property executed by the City;

(c)    for each interest in real property, a recordable warranty deed, an Assignment of Rights of Way and Easements, or such other appropriate document or instrument of transfer, as the case may require;

(d)    such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by the Transferee; and

(e)    a Transition Services Agreement, if determined necessary by Transferee and subject to the agreement of the parties.

5.  Access and Investigation.  Between the date of this Letter of Intent and the Closing of the Transaction (the "Diligence Period"), the City shall afford (and shall cause City's officials, employees, attorneys, accountants and other agents to afford) to the Transferee and its agents and representatives reasonable access to the Property, and the files, agreements, permits, authorizations, documents, and books and records of the City (including, without limitation, financial information, engineering data and information, as built plans, computer programs, tapes and other records) related to the Property as well as access to City's personnel, employees and contractors whose job activities relate to the Property, and the opportunity to make notes, abstracts and copies therefrom, as may be requested by the Transferee in order that the Transferee may have full opportunity to make such investigations as it shall desire with respect to the Property in connection with the transactions contemplated hereby and the City shall furnish the Transferee with such additional financial and operating data and other data and information as to the Property as the Transferee shall, from time to time, reasonably request for such purpose. In addition, the Transferee shall have the right to have any real property and tangible personal property which is part of the Property inspected and investigated by the Transferee's agents and representatives, at the Transferee's cost and expense, for purposes of determining the physical condition and legal characteristics of the real property and tangible personal property. In the event subsurface or other destructive testing is recommended by any of the Transferee's agents or representatives, the Transferee shall, subject to obtaining the City's prior consent, be permitted to have the same performed. In the event any such investigations

2

disturb any portion of the Property, the Transferee shall, at its sole cost and expense, promptly restore such property to its prior condition.

The Transferee agrees to perform its inspection of the Property in a safe and lawful manner and agrees to be responsible for any damage to any person or to the Property arising out of the acts or omissions of the Transferee or its agents and representatives. To the extent permitted by applicable law, and without waiving any rights and privileges under Michigan law, the Transferee also shall be responsible for and shall defend, indemnify and hold the City harmless from and against any claim, loss, liability, action, suit, penalty, cost, damage or expense (including, without limitation, reasonable attorneys' fees, court costs, consultants' fees and expenses) which may be imposed upon, incurred by or asserted against the City arising out of the acts or omissions of the Transferee or its agents and representatives in connection with the inspection of the Property.

The Transferee shall notify the City at least 48 hours in advance of all entries onto the Property and shall schedule and inspections of the Property so that the City's representative may observe such inspection and shall coordinate such inspection with any activities of the City's representatives. The Transferee and its agents and representatives shall conduct the inspection of the Property at reasonable times and in a manner which does not interfere with the City's use or operation of the Property or its contractors' activities.

Throughout all phases of the Transferee's inspection of the Property, the Transferee's agents and representatives shall keep in force, at its sole cost and expense, with insurance companies licensed to do business in the State of Michigan, insurance coverages reasonably required by the City with respect to all of the Transferee's agents' and representatives' activities at the Property. The City shall be named as additional insured on all policies of insurance (except Workers' Compensation).

The City does not assume any risk, liability, or responsibility or duty of care as to the Transferee or its agents and representatives when on the Property, and the Transferee acknowledges and agrees that the Transferee and its agents and representatives enter the Property and conduct the inspections thereof at their own risk.

6. <u>Conditions</u>. The parties' obligations to consummate the Transaction would be subject to the satisfaction of each of the following conditions at or prior to Closing, any of which may be waived in whole or in part by the parties to the extent permitted by applicable law:

(a) The parties agree to make a cooperative effort to seek funding from outside sources to help address infrastructure needs. Each party will make good faith efforts to secure such funding. Obtaining funds on terms and conditions satisfactory to Oakland and Macomb, in amounts sufficient to address such infrastructure needs, will be a required condition to consummate the Transaction.

(b) In addition, the parties' obligations to consummate the Transaction would be subject to conditions and satisfaction of conditions to Closing customary in transactions of this type including, but not limited to:

3

(i)     execution of the Transfer Agreement and related agreements and documents reflecting the terms of the proposed Transaction as set forth herein or otherwise agreed to in writing by the parties, including, without limitation, the agreements identified in Paragraph 4 hereof (collectively with the Transfer Agreement, the "Definitive Agreements") and containing representations, warranties, covenants, and conditions of the parties customary in transactions of this type, satisfactory in form and substance to the parties;

(ii)     organization of the Transferee Entity;

(iii)     execution of an agreement between Oakland and Macomb Counties with regard to the creation and operation of the Transferee Entity;

(iv)     the satisfactory completion in the Transferee's sole discretion of the Transferee's due diligence investigations of the Property, including, without limitation, with respect to all operational, financial, environmental, engineering, legal and accounting matters;

(v)     receipt of all governmental and third-party permits, licenses, consents and approvals required under applicable court orders, laws, third party contracts and the charter documents of the parties, including, but not limited to, as applicable under the circumstances of the Transaction as set forth in the Definitive Agreements (collectively, the "Approvals"):

(vi)     approval of the City's Board of Water Commissioners;

(vii)     approval of the City's City Council;

(viii)     approval of Macomb's Board of Commissioners (if required under the circumstances of the Transaction);

(ix)     approval of Oakland's Board of Commissioners (if required under the circumstances of the Transaction);

(x)     approval of Oakland's Water Resources Commissioner;

(xi)     approval of Macomb's Public Works Commissioner;

(xii)     approval of the governing body of any entity designated by Oakland and Macomb to be the Transferee;

(xiii)     any approvals or permits required by the Michigan Department of Environmental Quality;

(xiv)     receipt by the parties of legal opinions customary in a transaction of this type, and including an opinion of bond counsel to the City stating that the Transaction will not violate any applicable bond ordinances of the City;

4

(xv)    absence of any material adverse change in the Property;

(xvi)   full disclosure by the City of the manner in which sewer rates will be computed for the Transferee Entity subsequent to the Transaction, in detail satisfactory to Transferee in its sole reasonable discretion;

(xvii)  resolution of all outstanding disputes related to sewer services between Oakland and Macomb on the one hand and the City and the City of Detroit Water and Sewerage Department on the other;

(xviii) the obtaining of financing by the Transferee Entity on terms and conditions satisfactory to Oakland, Macomb and Transferee Entity in their sole discretions, in an amount sufficient to pay the Consideration and expected repairs to Property;

(xix)   execution of a sewer services contract between the Transferee Entity and the City;

(xx)    execution of new sewer services contracts between the Transferee Entity and all of the governmental units discharging directly or indirectly into the Property with substantially the same material terms as the sewer services contract between the City and the Transferee Entity;

(xxi)   contractual arrangements with third parties reasonably necessary for Transferee to operate the Property after the Closing;

(xxii)  absence of defects within and necessary repairs to the Property that are materially greater or different than those disclosed in the NTH inspection reports previously provided to Transferee; and/or

(xxiii) the absence of any injunction, restraining order or decree of any nature that restrains or prohibits the Transaction.

7.    <u>Definitive Agreements; Closing</u>.  As soon as practical after this Letter of Intent has been executed, the Transferee's counsel will prepare the initial drafts of the Definitive Agreements and the parties will negotiate the Definitive Agreements in good faith and will use their reasonable efforts to obtain all necessary Approvals and execute and deliver the Transfer Agreement within 180 days after the date of this Letter of Intent. The closing of the proposed Transaction (the "Closing") would occur as soon as practicable following the satisfaction of the conditions to Closing set forth in the Transfer Agreement.  The parties will work toward a Closing within 360 days after the date of this Letter of Intent. The date on which the Closing occurs is referred to herein as the "Closing Date."

8.  <u>Consents</u>.  The parties will cooperate with each other to obtain all Approvals necessary in connection with the consummation of the proposed Transaction and the operation of the Property by the Transferee after the Closing as promptly as is reasonably practicable.

5

9. <u>Conduct of Operations</u>. Except as otherwise agreed in writing by the Transferee, during the Diligence Period, the City shall:

(a)     Provide the Transferee reasonable notice prior to making any capital expenditures or implementing any maintenance, repair or operational decisions of a material nature relating to the Property and reasonably consider any objections of Transferee thereto;

(b)     Maintain the Property in a state of repair and condition consistent with the City's normal conduct of the operation of the Property;

(c)     Obtain the consent of the Transferee to any sale, assignment, or other transfer of all or any part of City's right, title or interest in and to any portion of the Property;

(d)     Obtain the consent of the Transferee to any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the Property;

(e)     Promptly notify the Transferee of any emergency or other change in the normal course relating to the Property (or communications indicating that the same may be contemplated) if such emergency or change would be material, individually or in the aggregate, to the Property and its operation and/or the prospects of the City's ability to consummate the proposed Transaction;

(f)     Promptly notify the Transferee of any governmental, regulatory or third party complaints, claims, investigations or hearings (or communications indicating that the same may be contemplated);

(g)     Comply with all legal requirements and contractual obligations applicable to the Property; and

(h)     Maintain all books and records relating to the Property in the ordinary course of business.

10.     <u>Expenses</u>. The City and the Transferee shall each bear their own expenses incurred by them in connection with the proposed Transaction, including without limitation, consultants' fees, legal fees and accounting fees, whether or not the proposed Transaction is consummated. As between Oakland and Macomb, the expenses of the Transferee shall be allocated as they shall reasonably determine among themselves.

11.     <u>Counterparts; Facsimile; Electronic Transmission</u>. This Letter of Intent may be signed in one or more counterparts, each of which will be deemed to be an original of this Letter of Intent and all of which, when taken together, will be deemed to constitute one and the same agreement. This Letter of Intent may be delivered by facsimile or other electronic transmission with the same effect as if a manually signed original were personally delivered.

6

12.     Governing Law.  This Letter of Intent shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Michigan.

13.     Entire Agreement.  This Letter of Intent and the Settlement Agreement, including Exhibits A, B, C and E attached thereto (collectively, the "Related Documents"), constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior or contemporaneous oral or written agreements, understandings, representations and warranties, and courses of conduct and dealing between the parties regarding the subject matter hereof. This Letter of Intent is not intended to modify or abrogate the Related Documents, and may be amended or modified only by a writing executed by the parties after receipt of all required Approvals.

14.     Binding Effect.  Except for Paragraphs 5 and 10 through 13 hereof, the provisions of which the parties acknowledge and agree are legally binding upon them, this Letter of Intent is not contractual in nature and will not give rise to any legally binding obligation on the part of any of the parties hereto. Except as provided in Paragraphs 5 and 10 through 13 hereof, or as may be expressly provided in the Definitive Agreements or other binding written agreement that the parties may hereafter execute and deliver, no past or future course of conduct, or failure to act relating to the proposed Transaction, or relating to the negotiation of the terms of the possible definitive agreements therefor, will give rise to or serve as the basis for any obligation or liability, legally or otherwise, on the part of any of the parties hereto.

**[SIGNATURE PAGE FOLLOWS]**

7

## SIGNATURE PAGE

In witness whereof, the persons named below have affixed their signatures on behalf of the parties.

WITNESS

COUNTY OF MACOMB

By: _____

Its: _____

COUNTY OF OAKLAND

By: _____

Its: _____

CITY OF DETROIT

By: _____

Its: _____

# EXHIBIT "1"

## Oakland-Macomb Interceptor System
## Property to be Transferred

The property to be transferred to Macomb, Oakland, or any of them, or the Transferee Entity, consists of the following interceptors, along with certain pump stations, meters, meter pits, and flow control chambers. Legal descriptions of the rights of way are contained in the records of DWSD for the contracts under which the interceptors were built and are incorporated by reference.

The Edison Corridor Interceptor

A 12'9' diameter interceptor running north-south from Eight Mile Rd. to Fifteen Mile Rd,, constructed under DWSD Contracts PCI-5, PCI-6 and PCI-7.

The Oakland Arm Interceptor

An 8' to 9'6" interceptor running from the Edison Corridor Interceptor at Fifteen Mile Rd. to Dequindre Rd. north of 20 Mile Rd. in the City of Rochester Hills, constructed under DWSD Contracts PCI-8, PCI-9, PCI-10A and PCI-10B.

The Avon Arm Interceptor

A 42"-48" interceptor running west from the Oakland Arm Interceptor along 20 Mile Rd. constructed under DWSD Contract PCI-11A.

The Romeo Arm Interceptor

An 11' interceptor running east from the Edison Corridor along Fifteen Mile Rd. constructed under DWSD Contract PCI-12A.

The Garfield Interceptor

An interceptor running north from the Romeo Arm Interceptor along Garfield Rd. constructed under DWSD Contracts PCI-12A, PCI-24, PCI-25, PCI-26, and PCI-45.

The Fifteen Mile Rd. Interceptor

A 5' diameter interceptor running east along Fifteen Mile Rd. from the intersection of the Romeo Arm Interceptor and the Garfield Interceptor, constructed under DWSD Contracts PCI-15B, and PCI-15C.

Detroit_883034. 6

The Lakeshore Interceptor

*Note: DWSD and Macomb have agreed that the Lakeshore Interceptor will be abandoned after Macomb completes construction of the North Gratiot Interceptor. Should it be included in the transfer?*

An interceptor running north from the east end of the Fifteen Mile Rd. Interceptor, constructed under DWSD Contracts PC-13, PC-14, and PCI-42A

Meters

CHAS-1 Chesterfield Township
CLS-1 Center Line
CTS-1,2, 3 & 4 Clinton Township
FRS-1 Fraser
HRS-1,2 & 3 Harrison Township
MCS-1 Macomb Township
OC-S-2 Clinton-Oakland SDS
RC-S-1 Rochester Hills/Gibson Arm
RC-S-2 Oakland County/Rochester Hills/SOCRRA
STS-1-6 Sterling Heights
SYS-1 & 2 Shelby Township
UTS-1 Utica

Pump Station

Clintondale Pump Station

*Note: Whether the transfer includes Northeast Pump Station is an issue for negotiation of the Transfer Agreement. The Edison Corridor Interceptor flows into the Northeast Pump Station.*

2



*Exhibit 3*

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made May 12, 2009 by and among the City of Detroit ("City"), the Detroit Water and Sewerage Department ("DWSD"), the County of Macomb ("Macomb"), the County of Oakland ("Oakland"), and the County of Wayne ("Wayne"), collectively, the "Parties." For valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

1.    **Background and Purpose.**

A.    Under the terms of this Agreement, including but not limited to Section 9(A), the Parties collectively wish to resolve all currently outstanding disputes pending under *United States v. City of Detroit, et al.* (Case No. 77-71100) (the "Action") before the U.S. District Court for the Eastern District of Michigan (the "Court") (the "Disputes"), including, but not limited to:

   (i)    All Disputes related to 800 MHz radio system, including the use of the Court's power to approve the contract or allocation of costs among the various ratepayers (the "Radio Contract Claims");

   (ii)   All Disputes related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes (the "2004 Collapse Claims");

   (iii)  All Disputes related to the interest rate charged to Macomb related to debt service associated with the cost of repairs of the 2004 Collapse, with subsequent repairs to the Macomb Interceptors and with the construction of the Garfield Interceptor (the "Interceptor Interest Rate Claims");

   (iv)   All Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement, including any disputes and claims between the Parties relating to the associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and all property otherwise described in Exhibit D (collectively, "the Interceptors");

   (v)    All Disputes related to the continuing oversight of contracts exceeding $500,000 by the Infrastructure Management Group at the direction and supervision of the Court for the duration of the activity under the Action; and

   (vi)   All Disputes related to the efforts to find a global settlement of issues regarding DWSD governance, including but not limited to the motions, petitions, and requests involving the work of F. Thomas Lewand, Timothy O'Brien, Public Sector Consultants, the Infrastructure Management Group, and the Community Leadership Group (formerly the Business Leadership Group).

B.      The Interceptors have been a source of disagreements since their construction by DWSD, and as other customers own analogous interceptors, the Parties wish to avoid future questions regarding the Interceptors by transferring liability for, ownership of, and operations of the Interceptors to Macomb, Oakland, or any of them or such entity as Macomb or Oakland may designate (collectively, the "Interceptor Transferees").

C.      The Parties recognize the need to create a mechanism other than litigation for the resolution of future disputes, and recognize the successes that have come through the Southeast Michigan Consortium for Water Quality (the "Consortium"), the Technical Advisory Committee (the "TAC"), the Sewer Steering Committee (the "SSC"), and their various subcommittees. Building on this foundation, the Parties seek to create a mechanism that is an alternative to litigation of any future disputes and to formalize processes for disclosure of information at earlier stages to prevent disputes from arising.

D.      The Parties recognize the importance of acting cooperatively to secure collective benefits and wish to work together to secure outside sources of funding for the regional water and sewer infrastructure challenges facing all DWSD ratepayers.

2.   **Existing Motions**

As of the Effective Date of this Agreement, all motions, petitions, or requests that are pending in the Action are resolved as follows:

A.      <u>Radio Contract</u>

(i)     In complete satisfaction of the Radio Contract Claims and pending motions related thereto, all Parties agree to accept without objection the recommendation of the U.S. District Court Judge Gerald Rosen, attached hereto as Exhibit A. The Parties acknowledge that the settlement amount shall be Twenty Seven Million Dollars ($27,000,000.00) ("the Radio Contract Claims Settlement"). The funds comprising the Radio Contract Claims Settlement shall be transferred to DWSD from the City no later than 30 days after the Execution Date and shall be deposited on a pro rata basis into the DWSD funds from which DWSD made payments for the 800 MHz radio system. It is the intent of the Parties that $23,990,785 of the settlement be credited to radio capital costs, $2,680,033.11 be treated as nonoperating income, and $329,181.89 as attorney fees, recognizing that when the relevant audit is performed, another treatment may be required by the auditors. After settlement sums are credited to radio capital costs, the total capital cost for the 800 MHz radio system allocated to DWSD shall be $19,544,000. The Sewer Rates Work Group shall determine the method for allocation of i) capital and operating costs for the 800 MHz radio system between DWSD's water and sewer operations, ii) and, with regard to sewer operations, between wholesale and retail customers. The portion treated as nonoperating income will be treated

2

DET- Claim No. 3683-000182
Ann Arbor_142387_192

consistent with the treatment of other nonoperating income in the sewer rate model.

(ii)    The Parties also acknowledge that in an effort to fairly distribute litigation costs among the customers benefited by this settlement, DWSD agrees to act as a conduit by which the attorney fees of certain customers are distributed via rates to all benefited customers. To that end, DWSD shall pay attorneys fees in the amount of $621,829.47. Of that amount $329,181.89 shall be paid from amounts received from Detroit's General Fund as follows: to Macomb $90,500.00; to Wayne $50,000.00; to Oakland $188,681.89. The balance of attorneys fees in the amount of $292,647.58 ("Additional Attorney Fees") shall be paid as follows: to Macomb $76,371.55; to Wayne $49,250.34; and to Oakland $167,025.69. The Additional Attorney Fees shall be recovered by DWSD through treatment in the rates of all first-tier (non-Detroit) sewer customers as common to all expenditures.

(iii)   The Radio Contract Claims Settlement Payment shall operate to resolve any and all disputes, damages and causes of action related to the Radio Contract Claims.

B.    2004 Collapse Claims, 2006 Interceptor Repairs, Interceptor Interest Rate

The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate Claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000. These adjustments shall be implemented as described in the Implementation Outline attached to this Agreement as Exhibit B.

C.    Remaining Motions

The Parties expressly agree that all other pending motions, petitions, or requests shall be dismissed without prejudice, including but not limited to those motions, petitions, or requests related to those subjects listed in Section 1(a) of this Agreement, including all those listed in Exhibit C. The dismissals shall convert to dismissals with prejudice upon occurrence of the closing contemplated by the Asset Purchase Agreement or other agreement fulfilling the transaction described in the Letter of Intent attached hereto as Exhibit D and described below. In the event that any Party declares this Agreement to be null and void under Section 9(A) of this Agreement, the Parties shall have 30 days from the date of such voiding to refile any matter. If any matter is not refiled within 30 days, the dismissal of such matter shall convert to a dismissal with prejudice.

3.    **Interceptor Transfer**

As described in the Letter of Intent attached hereto as Exhibit D, the City intends to transfer ownership of the Interceptors from DWSD to the Interceptor Transferees. The closing contemplated by Exhibit D shall fully resolve all claims in the Action regarding the Interceptors,

3

including but not limited to those regarding the condition and or need for repair of the Interceptors, as well as such other matters as may be stated in Exhibit D. Exhibit D shall be deemed dated as of the Execution Date.

## 4.   Model Contract

The Parties have agreed on certain revisions to the "Model Contract" for sewerage services that have been proposed by DWSD after consultation with its customers. The Parties to this Agreement who have the power to enter into the contract as revised have done or will do so on or before the Effective Date. Those Parties who do not have the authority to enter into the Model Contract will, in good faith, attempt to secure approval of that contract. All Parties will recommend adoption of the Model Contract to customer communities that have not previously entered into the Model Contract. The Model Contract is attached hereto as Exhibit E.

The Parties have entered into a number of Rate Settlement Agreements in the Action (the "Rate Agreements"). The Parties agree to work in good faith to identify those portions of the Rate Settlement Agreements that still apply to the rates as currently determined and create a restatement of the Rate Agreements that contain only those portions of the Rate Agreements that are still relevant. The Parties agree that the purpose of the restatement is not to re-negotiate or alter any provisions of the Rate Agreements, but only to consolidate those portions of the Rate Agreements still in effect.

## 5.   Director's Council

DWSD hereby establishes a Director's Council. The Director's Council's function shall be to work cooperatively to address concerns and issues raised by wholesale customers as to (i) DWSD decisions regarding the operation of sewer facilities owned or operated by DWSD that serve the wholesale customers, (ii) rates, or (iii) other issues. The Director's Council shall be comprised of the Mayor of the City of Detroit or on the Mayor's behalf, the Director of DWSD; the Public Works Commissioner of Macomb County; the Water Resources Commissioner of Oakland County; the Wayne County Executive or on the Executive's behalf, the Director of Department of Environment; and the Working Chair of the Consortium, who shall serve at the discretion of the Council. The Director's Council shall be chaired by the Director of DWSD. The Council shall meet not less than quarterly. The Director's Council may be expanded by mutual agreement of its participants and any Party may substitute and/or replace its designated representative on an annual basis, or as otherwise required from time to time. The Director's Council does not replace or limit the functions of any other current working groups or committees.

At the Chair's discretion, representatives of the TAC, the SSC, or other First Tier sewer customers may be invited to attend Director's Council meetings. Should the TAC or SSC ask to have representatives attend a specific meeting of the Director's Council, the Director's Council Chair may issue such an invitation. If a meeting will address topics directly impacting a First Tier sewer customer, the Chair shall issue an invitation to participate if such invitation is requested by such customer.

4

OET- C/aam\uloa3,64238X10984

Matters or issues not resolved pursuant to committees/work groups under the applicable sewer contracts and not otherwise controlled by the dispute resolution clause in those contracts shall be subject to the dispute resolution procedures set forth in the Model Contract, which is subject to Section 4 of this Agreement.

6.   **Cooperation in Seeking Outside Funding**

The Parties agree to make a cooperative effort to seek funding from outside sources to help address regional water and sewer infrastructure projects. Each Party will make good faith efforts to secure such funding. No Party shall be required to participate in any such funding effort unless that Party shall benefit from the funds sought.

7.   **Duration**

This Agreement shall be effective on the day it is entered as part of an Order of the Court (the "Effective Date") in the Action. Unless otherwise specified, all provisions of the Agreement shall survive the conclusion of the Action or the cessation of any Consent Decree in the Action. Upon the last day of the execution of the last Party to execute this Agreement (the "Execution Date"), all Parties agree to seek approval and entry of the Agreement by the Court.

8.   **Consent Judgment**

Upon the closing contemplated by the Letter of Intent attached as Exhibit D ("the Closing"), the Parties hereby agree to file a joint Motion for Relief (the "Motion") pursuant to Fed. R. Civ. P. 60(b)(5) and the provisions of the Second Amended Consent Judgment entered by this Court on August 3, 2000 (the "SACJ"). The Motion may seek a replacement of the SACJ with a Third Amended Consent Judgment consisting of this Agreement and the restatement described in Section 4 of this Agreement.

9.   **Miscellaneous**

A.   Mutual Interdependence

(i)   The Parties acknowledge that all of the terms and conditions of this Agreement are mutually interdependent and are essential consideration for the rights, obligations and claims entered into or released by each Party under this Agreement. Until the closing of the transfer of the interceptors contemplated in the Letter of Intent attached as Exhibit D, if any of the provisions of this Agreement or its application to any person or circumstance is determined by any court of competent jurisdiction to be invalid to any extent, unenforceable or is not implemented or performed for any reason, then any Party may, within 30 days, declare any provision of this Agreement void and without effect. After the closing of the transfer of the interceptors, if any provision of this Agreement or its application to any person or circumstance shall to any extent be invalid or

5

DET- Claim No. 3683-000185
AnnArbor_142387.19

unenforceable, the remainder of this Agreement shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

(ii)   If the Parties fail to reach agreement on the terms of a definitive agreement regarding the transfer of the Interceptor within 180 days from the Execution Date, or if no Closing occurs within 360 days of the Execution Date (each a "Triggering Date"), any Party may, within 30 days of the first-occurring Triggering Date, declare any provision of this Agreement void and without effect. If any provision of this Agreement or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

B.    This Agreement, and the Exhibits, contains the entire agreement between the Parties with regard to the matters addressed in this Agreement. No Party has made any representations except those expressly set forth in this Agreement, and no rights or remedies are, or shall be, acquired by any Party by implication or otherwise unless expressly set forth in this Agreement.

C.    This Agreement may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Agreement. Upon the Execution Date, the Parties hereby authorize F. Thomas Lewand to file this Agreement on their behalf with the Court with an accompanying motion for entry of this Agreement by the Court in which all Parties expressly join.

D.    The rights and benefits under this Agreement shall inure to the benefit of and be binding upon the respective Parties hereto, their agents, successors, and assigns.

E.    Any and all Exhibits referred to in this Contract are and shall be incorporated by reference herein.

F.    This Agreement shall be deemed to be mutually drafted. The Exhibits have been mutually drafted by the Parties signatory thereto.

*Signature Page to Follow*

6

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _Pamela Turner_

Title: _Interim Director_

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _Pamela Turner_

Title: _Interim Director_

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____

Title: _____

COUNTY OF WAYNE

By: _____

Title: _____

7

AnnArbor_142387_19

DET- Claim No. 3683- 000187

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _____

Title: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

Title: _____

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____

Title: _____

COUNTY OF WAYNE

By: _____

Title: _____

7

AnnArbor_142387_17

DET- Claim No. 3683- 000188

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _____

Title: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

Title: _____

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____
        John P. McCulloch
Title: Water Resources Commissioner

COUNTY OF WAYNE

By: _____

Title: _____

7

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN DUPLICATE ORIGINAL BY DULY AUTHORIZED LEGAL REPRESENTATIVES OF THE PARTIES, AFTER ALL DULY REQUIRED APPROVALS HAVE BEEN MADE.

CITY OF DETROIT

By: _____

Title: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

Title: _____

COUNTY OF MACOMB

By: _____

Title: _____

COUNTY OF OAKLAND

By: _____

Title: _____

COUNTY OF WAYNE

By: _____

Title: Assistant County Executive ____

7

AnnArbor_142387_17

DET- Claim No. 3683- 000190



*Exhibit 4*

Revision 3/19/09

## Minutes of Due Diligence Coordination Meetings

### Interceptor Transfer Due Diligence Information List
### Annotated Per Meetings on January 29, March 12 and March 18

*Notes from January 29 are in italics.*

Notes from March 12 and 18 are in Arial font.

**Bold Items indicated follow up tasks**

**Misc. Items**

The Counties' RFP for an engineering review of NTH's reports will select an engineering firm within 3 weeks. Part of that scope for work includes an inspection of the two pump stations. The Counties will schedule that through Sam Smalley.

The Water Board approved the settlement on Wednesday, January 28. The matter will be forwarded to City Council for action. It is not clear the procedure Council will follow to adopt, it may go to committee or may be placed on the agenda for action.

Bill Misterovich identified two facilities not included on the list of assets to be transferred that was attached to the Letter of Intent. Mark Jacobs stated that list will be update to correct/include any omitted or mis-described facilities.

**Action on Due Diligence Items**

The person responsible and nature of follow up for each item is annotated below in italics.

The parties will have a follow up meeting on Wednesday, February 18 at 10 a.m., at DWSD to go over status of producing engineering/operational items. Bart Foster will distribute his response in batches and expects to begin doing so before February 18. He can provide a progress report by telephone during the meeting.

**Debt and Rates**

1.     Provide a detailed report, covering the FY 2008-09 and 2009-10 rate years (budgeted amounts) and the FY2006-07 and FY2007-08 rate years (actual amounts), for all meters, pump stations, interceptors and any appurtenant facilities that will be transferred as part of the Oakland Macomb Interceptor System (the Northeast pump station and meter(s) at the Northeast pump station should be included), setting forth for each facility:

Detroit_902125_2

*Debt figures are those used in the rate model. DWSD does not agreed at this point whether it is prepared to transfer the Northeast pump station but will identify the outstanding debt.*

*Bart, Rafael and Woodrow will assemble this information.*

- **On March 12, Bart provided a multi-page breakdown of OMI and Macomb O&M costs. He will provide a breakdown of the debt behind the debt service charges billed to the OMI.**
- **Bart/DWSD will complete analysis of Garfield pump station costs. It is presently thought that these represent electricity charges for meters in the vicinity of the Garfield interceptor.**
- **The detailed cost support reports provided by Bart do not appear to include labor and other costs. DWSD will check. There were other inconsistencies which Bart/DWSD will check as well.**
- **Bart/DWSD will identify meter maintenance costs for meters on OMI and Macomb systems.**

(a)     all outstanding debt, (including for each bond, the date of original issue and refinancing (if applicable), and the final payoff date)

    (i)     The report of debt should indicate the individual bond issue(s) associated with each facility, and each facility's allocated share of the specific bond issue as included in rate model for each year

(b)     the debt service allocated to Macomb County and to the Clinton-Oakland District,

(c)     actual or budgeted operating and maintenance expenses,

(d)     extraordinary repair expenses,

(e)     any allocated overhead, and

(f)     any other costs charged to these facilities.

2.     Provide a detailed accounting and documentary support for all charges associated with the facilities and included in the Macomb County and Clinton-Oakland sewer rates for the past 6 years.

*Bart, Rafael and Woodrow will assemble this information.*

See comments under Item 1.

3.     Provide an example rate recalculation for the new entity to be created to own and operated the Edison Corridor interceptor (the "Entity") for the rate year 2009-2010 together with supporting detail using the same flows and budgets as used in developing the actual 2009-10 rates.

2

Detroit_902125_2

*Bart will do. The recalculation will be for Macomb and the Clinton-Oakland District, not for the new entity.*

**Bart will do.**

4.  If it is DWSD's position that any of the debt or operating and maintenance costs for the OMI or Macomb interceptors will not be eliminated from calculation of the rates for the new entity, DWSD will so indicate and, if so, explain. If these debt and operating costs are not included in the sewer rates for the new entity, DWSD will disclose whether it proposes that part or all of such charges will be redistributed to any other customers and, if so, explain how it proposes to do so in the context of the rate calculation process.

*Jacobs, Walter & Foster will address.*

**Remains to be done by DWSD. Need a written response from DWSD that the debt service cost of the retired debt will not be included in suburban rates.**

5.  Is it Detroit's position that that part of PCI-5 within the City of Detroit and the Northeast pump station would be subject to Detroit's real and personal taxes? If so, identify the book value of those facilities.

*Jacobs, Walter & Foster will address.*

DWSD proposes that PCI-5 be bifurcated and only the portion north of 8 Mile be transferred. If so, concept was discussed of the new OMI entity entering into a long-term contract to operate and maintain the piece of PCI-5 in Detroit.

DWSD proposes to keep Northeast pump station and to negotiate an agreement on operating protocols. Counties repeated their desire to acquire the pump station because they see it as an integral part of the OMI system and because they are concerned that it and the Edison Corridor not be operated to achieve stormwater retention without some form of compensation to the Counties. Detroit responded that under existing ratemaking procedures it did not met the criteria for "common to all." They are prepared to agree to accept contract flow consistent with the terms of the new contract, whatever those terms are. Macomb requested information from DWSD that would indicate how the pump station is operated in wet weather events in order to have the facts to determine whether, at least from the Counties' point of view, the pump station and Edison Corridor are being managed in a fashion to provide wet weather storage. **DWSD did not commit to provide the requested information but said it would get back to Macomb.** Attendees agreed the issue of pump station ownership may need to be referred to the Directors' Council for resolution.

The back flush flow from the Northeast Water treatment plant flows into the pump station via a metered connection. It was represented that this flow was somehow adjusted from the flow allocated to the OMI. **A better description of the manner in which this adjustment was made was requested.**

DWSD's position is that any OMI facilities in Detroit would not be subject to real and personal property tax. Further, this point is moot if no facilities within the City are transferred.

6.  State whether Detroit has a policy of imposing payments in lieu of taxes on publicly owned tax exempt infrastructure.

3

Detroit_902125_2

*Jacobs, Walter & Foster will address as this issue would related to that portion of PCI-5within Detroit and, if relevant, the Northeast Pump Station.*

Detroit has no such policy nor is such a policy anticipated if the Counties own facilities in Detroit.

**Inspection, Maintenance and Repair of the Oakland Macomb Interceptor**

*NTH (Swaffar) provided a memo (January 27, 2009) summarizing documents NTH has responsive to the Due Diligence list items related to tunnel inspections and condition. Hupp will review. NTH will assemble and make available for review the boxes previously produced for the 2004 collapse litigation discovery. Hupp will review. Based on that review, various requests below will be refined and refocused.*

7. DWSD's inspection and maintenance protocols, plans, practices or procedures for the facilities for the period 1981 to the present.

DET Claim No. 3834-00328

10. DWSD operation, maintenance and repair records for the facilities for the past 5 years including work orders, inspection reports, supplier/contractors invoices and all operator logs.

*Smalley will do. He will start with the electronic work order records. After review by Buchholz, a decision will be made whether paper work orders, etc. from prior years will be inspected.*

These documents for Clintondale are available at Huber. Records for Northeast has not been assembled. No records for the interceptors.

11. Plans or recommendations for equipment replacement, repair, or upgrading over the next 5 years.

*The Counties have the 3 NTH reports and Macomb has a copy of DWSD's evaluation of the Clintondale pump station. DWSD will provide any plans or recommendations for other repairs or improvements including the new meter at the Northeast pump station.*

Plans/proposals for ongoing OMI improvements and Clintondale have already been provided to Macomb or via documents at NTH.

**Other than that, there are two meter projects pending: OCS-2 and a Macomb meter, ID unknown. DWSD/Shukla will check and report on the status of both of these projects**

12. All current or pending contracts for any types of engineering, maintenance, repair or construction activities associated with the facilities and all contracts for work completed in the past 5 years or work now underway or expected to begin before December 31, 2009.

*Smalley & Shukla. This will consist of invoices and supporting vouchers for work performed under PC749 and 759 contracts. Smalley stated there are no specific scopes of work for work performed.*

At the meeting, Shukla provided a manila files with responsive documents.

There was a recent minor project to replace carbon filters for odor control at several locations. No need to provide these records.

13. Engineering and construction contracts, work plans and schedules for repairs now planned or underway for OMI and Macomb interceptors plus all daily reports, inspection records and the like for any investigation or repair performed on these interceptors since January 1, 2006

*Smalley & Shukla plus NTH.*

Reviewed and copied as appropriate by Bodman at NTH.

5

Detroit_902125_2

14. All documents, including contracts and warranties, containing any form of warranties or guaranties related to services performed or equipment provided associated with the facilities.

*Smalley & Shukla*

None, with the possible exception of the new generator at Clintondale. Any related document would be in Clintondale materials brought by Shukla to the meeting.

DWSD's standard contract provides for a one-year warranty from time of substantial completion.

15. Any insurance policies of any kind which may provide coverage for the facilities, the equipment, or claims arising out of the ownership or operation of the facilities.

*Probably no insurance but Woodrow will check.*

Woodrow confirmed, no insurance.

16. Identify all personnel in the past 5 years who have had direct staff supervision or engineering responsibility for the facilities.

*Key personnel are Sam Smalley, Terry King, Ramesh Shukla and Martin Craig.*

In addition, Lou Jarvis.

17. Identify all contractors in the past 5 years who have provided significant services related to inspection, operation, repair or maintenance of the facilities (excluding the major interceptor repair and maintenance activities undertaken since 2004) and identify the project manager for each contractor.

*Smalley & Shukla*

Contract documents were produced by NTH to Bodman.

18. Provide copies of all budgets prepared in the past 5 years for the operation, maintenance and repair of the facilities.

*Bart stated this work is not budgeted at the facility level. DWSD (Bart and Woodrow) will provide actual costs for the past 5 years.*

**Woodrow will see whether meter costs can be broken out.**

19. The NTH January 2008 for PCI 8 – 11 states at p.3, "Concurrent with the submittal of this report we are undertaking additional investigations to evaluate contributing conditions in the OMIS network. The results of those investigations will be provided in a supplemental report(s)." Are there any supplemental reports related to PCI 8 -11? Essentially the same statement is made at page 62 of the NTH report for PCI 5 – 7. Are

Detroit_902125_2

there any supplemental reports for these sections beyond the August 2008 supplemental report for PCI-5?

*Harry Price said there is one more report and he will provide it.*

NTH has provided to Bodman.

20. Records for energy use for the past five years at any facilities for which energy usage/consumption records are available.

*Chirolla will provide energy records for the Clintondale and Northeast pump stations. He will provide electrical records for meter electrical costs if they are not minimal.*

Rafael has provided a disk with electrical billing records for Northeast and Clintondale together with a 2 page annotation showing how DWSD allocated NE pump station charges between water and sewer.

### Records of Construction of OMI and Macomb Interceptors

For each interceptor segment or other facility and for the repairs associated with the 1978, 1980 and 2004 sewer collapses, please provide:

*See comment above about NTH memo and production of boxes of documents.*

Items 21, 22 and 23. NO records beyond what NTH produced to Bodman.

21. Preliminary and final design reports, engineering and construction contracts, final specifications and plans, design calculations, shop drawings, "as built" plans and specifications, change orders and inspectors' reports, daily reports and final inspection reports for each of the facilities

22. All geotechnical and groundwater studies, reports and data related to the facilities or their vicinity.

23. Copies of all contracts with engineers, general contractors and companies principally responsible for the tunneling and construction of each segment and the repair of the 1978, 1980 and 2004 collapse.

24. Copies and indices of all leases, easements, licenses and other right-of-way documents for the real estate to be transferred or as may be required in order to operate the facilities together with all associated title work and title insurance, and all documents evaluating DWSD's right to use the right of way and any defects in such right or title

**Prior Sewer Collapses**

25. Reports, technical analyses and engineering opinions regarding the nature and cause of the 1978, 1980 and 2004 sewer collapses, documents and photographs describing the conditions within the section of the interceptor at or before collapse and after the collapse, and engineering reports and studies with regard to alternatives evaluated to repair the collapse and the basis for selecting the method of repair which was undertaken, including but not limited to, studies by U.S. COE, Jenny Engineering, Smith Hinchman & Grylls, NTH, and Mueser, Rutledge, Johnston & Desimone.

Obtained from NTH. DWSD has nothing else.

26. All documents related to Jenny Engineering's inspection and assessment in the 1980-1983 time frame of the condition all of the OMI and Macomb Interceptors, and DWSD's contract(s) with Jenny Engineering to perform those services.

*NTH has Jenny volumes 1, 2 & 4 wand will provide if they do not cover PCI-7 & 12A. DWSD (Shukla) will check files for any other Jenny materials.*

Obtained from NTH. DWSD has nothing else.

**Permits, Compliance and Liabilities**

27. Identify all federal, state or local approvals, licenses, permits, other than DWSD's NPDES permit, required to own, occupy or operate the facilities.

*Chirolla will check for AQ permits for generators, any registration forms for any USTs and any other permits needed to operate. One-time permits related to related to right of way access are not needed. Copies of permits under Part 41 and/0r 399 are desired in order to document that all design modifications were MDNR/MDEQ approved.*

Clintondale air permit is in the Clintondale materials provided. NE pump station probably also has an air permit for its generator.

28. State whether the facilities conform to local zoning and building codes and whether any special use or similar permits are required.

*DWSD will check.* **Responsible person not identified.**

DWSD represents that facilities conform.

29. Describe any regulatory complaints or notices of violations issued on Detroit or DWSD in the past 5 years arising out of or related to the operation of the facilities.

8

Detroit_902125_2

*Jacobs and Walter*

None.

30. Describe any civil claims asserted or threatened in the past 5 years arising out of the

[redacted]

35. If ACM or PACM materials are present at any facility, provide the relevant asbestos management plans.

*Shukla.*

See Clintondale assessment referenced above.

36. Provide copies of all plans required under environmental regulations which may apply to the facilities (e.g., an SPCC plan)

*Shukla & Smalley.*

No plans for Clintondale. No info on plans related to Northeast.

37. Identify the location, size and contents of any ASTs or USTs now or ever previously located at the facilities.

*Smalley.*

There is an AST for the generator at Clintondale. Details are in the Clintondale materials provided. No information provided re Northeast.

38. Describe any workers compensation claims arising out or related to injuries suffered by employees while working at or associated with the facilities that have ever arisen.

*Walter*

Information still to be provided.

39. Identify any areas of known or suspected contamination at any of the facilities and provide any Phase I or Phase II environmental site assessments or similar reports addressing any of the facilities.

*Smalley*

None

40. Provide copies of any release or off-site migration notices related to the facilities and copies of any manifests for hazardous materials disposed of from the facilities.

*Smalley*

None

10

Detroit_902125_2



*Exhibit 5*

Exhibit "A"

*Macomb Aequisition Agreement*

MACOMB INTERCEPTOR

ACQUISITION AGREEMENT

BY AND BETWEEN

CITY OF DETROIT

MACOMB INTERCEPTOR DRAIN DRAINANGE DISTRICT

AND THE

COUNTY OF MACOMB

DATED SEPTEMBER 2, 2010

i

Bodman 9/2/2010

Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT ("**Agreement**") is made this 2rd day of September, 2010, by and between the City of Detroit, Michigan ("**Detroit**"), the Macomb Interceptor Drain Drainage District ("**MID**")and the County of Macomb ("**Macomb County**") (each individually a "Party" and collectively, the "Parties").

### RECITALS:

A.     Detroit and Macomb County have determined that it is in their respective best interests for Macomb County to acquire, upon the terms and subject to the conditions set forth herein, the Macomb System (as defined herein).

B.     In furtherance thereof, the Macomb Interceptor Drain Drainage District has been established under Chapter 20 of the Drain Code of 1956 to acquire the Macomb System property described in Schedule 1.20 hereto for the mutual consideration set forth in the Agreement below.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties and agreements herein contained, Detroit and Macomb County and MID hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings given to them in this Article I, unless defined elsewhere in this Agreement.

1.1     "**Agreement**" shall have the meaning such term is given in the introductory paragraph hereof.

1.2     "**Applicable Law**" shall mean shall mean any applicable federal, state or local law, statute, ordinance, rule, regulation and any other executive or legislative proclamation of any Governmental Entity.

1.3     "**Assumed Liabilities**" shall mean any and all Liabilities excluding: (I) the Retained Liabilities, and (ii) Claims by and among any or all of Detroit, Macomb County and the MID.

1.4     "**Business Day**" shall mean any day other than Saturday, Sunday or any day municipalities in the State of Michigan are authorized or obligated by law, executive order or regulation to close.

1/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

1.5    **"Macomb County's Knowledge"** shall mean the actual knowledge of the Macomb County Public Works Commissioner and legal counsel assigned or retained to represent the offices of the Commissioner.

1.6    **"Claims"** shall mean any Order, any investigation announced or performed by a Governmental Entity, or any actual or alleged complaints, claims or charges, demands for relief or damages, suits, hearings, causes of action, proceedings or litigation which the parties hereto may become legally and/or contractually obligated to pay or defend against, whether direct, indirect or consequential, whether based upon any alleged violation of the federal or the state constitution, any federal or state statute, rule, regulation, or any alleged violation of federal or state common law, whether any such claims are brought in law or equity, tort, contract, or otherwise, and/or whether commenced or threatened, which are related in any way to the Macomb System.

1.7    **"Closing"** shall have the meaning such term is given in Section 2.7 hereof.

1.8    **"Closing Date"** shall have the meaning given such term in Section 2.7 hereof.

1.9    **"Default"** shall mean, as to any party to this Agreement, (a) a default by such party in the performance of any of its Material obligations hereunder and the continuation of such default for a period of thirty (30) Business Days after written notice is delivered by the non-defaulting party to the defaulting party that a default has occurred, or (b) the breach of any representation or warranty hereunder.

1.10   **"Detroit's Knowledge"** shall mean the actual knowledge of its Director, its Assistant Corporation Counsel assigned to DWSD matters, its Assistant Chief of Engineering or its Engineering Support Manager Craig Stanley.

1.11   **"Encumbrance"** shall mean any security interest, mortgage, pledge, claim, lien, charge, option, defect, encumbrance, lease, tenancy, license, covenant, condition, restriction, right of way, easement, judgment, or other right or interest of any nature.

1.12   **"Environmental Requirements"** shall mean all federal, state and local statutes, regulations, and ordinances concerning pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, as such requirements are enacted and in effect on or prior to the Closing Date.

1.13   **"Global Settlement Agreement"** means the settlement agreement between Detroit and Macomb, Oakland and Wayne Counties executed by the parties to that agreement effective May 12, 2009, and approved by the U.S. District Court on that date.

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

1.14   **"Governmental Entity"** shall mean the United States of America, any state, county, city, municipality and any subdivision thereof, any court, administrative or regulatory agency, commission, department or body or other governmental authority or instrumentality or any entity or person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.15   **"Indemnified Party"** shall have the meaning such term is given in Section 11.1.

1.16   **"Indemnifying Party"** shall have the meaning such term is given in Section 11.1.

1.17   **"Liability"** means any responsibility, liability, obligation, expense, Claim, Loss, damage, indebtedness (other than System Debt), principal, interest, penalty, guaranty or endorsement of or by any Person, asserted, absolute or contingent, known or unknown, accrued or unaccrued, due or to become due, liquidated or unliquidated, which is related to or arising out of the ownership, condition, operation, maintenance and repair of the Macomb System.

1.18   **"Loss"** or **"Losses"** means any damages (excluding consequential), deficiencies, dues, principal, interest, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses, related to or arising out of the condition, operation, maintenance and repair of the Macomb System (other than the System Debt) or out of the breach of any representation, warranty or covenant of this Agreement or expense under Section 10.4.

1.19   **"Macomb County"** means the County of Macomb, Michigan.

1.20   **"Macomb System"** means the Macomb Interceptor System, to-wit, all of the interceptor sewers, meters, pump station and appurtenant facilities and associated tangible and intangible personal property commonly known as the Clintondale Pump Station and the Romeo Arm, Garfield, 15 Mile, Macomb, and Lakeshore and Lakeshore Extension Interceptors, and commencing in several branches northwards and eastwards from the intersection of the Edison Corridor Interceptor and 15 Mile Road, Macomb County, Michigan, as specifically described in Schedule 1.20, excluding such property as specifically identified in Schedule 1.20. Meters shall be deemed to include the lead-in sewer beginning at the downstream site of the manhole immediately upstream from the meter.

1.21   **"MID"** means the Macomb Interceptor Drain Drainage District, created pursuant to Chapter 20 of the Drain Code of 1956.

1.22   **"Material"** or "materially" means, depending on the context, any condition, change or effect that, individually or when taken together with all other such conditions, i) is or is reasonably likely to be significantly adverse to the condition of the Macomb System, ii) will or is reasonably likely to prevent the consummation of the transactions contemplated hereby or

3/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

the validity of this Agreement or defeat the purpose of this Agreement, or iii) if such change or condition had occurred before the execution of this Agreement is of such a nature that it would have induced a Party not to enter into this Agreement

1.23   "**MDNRE**" means the Michigan Department of Natural Resources and the Environment.

1.24   "**NPDES**" means the National Pollutant Discharge Elimination System.

1.25   "**Oakland County**" means the County of Oakland, Michigan.

1.26   "**Macomb System Real Property Agreements**" shall mean the easement agreements, rights of way, licenses, deeds and/or other agreements, instruments or grants evidencing Detroit's rights and obligations with respect to the use and operation of the Macomb System at the properties described on  3.5(a)(1).

1.27   "**Macomb System Real Property Rights**" shall mean the easements, rights of way, licenses and other interests in real property necessary for the use and routine operation of Macomb System

1.28   "**OMI System**" means the Oakland-Macomb Interceptor System transferred from the City of Detroit to the Oakland-Macomb Interceptor Drain Drainage District effective October 22, 2009, to-wit, all of the interceptor sewers, meters and appurtenant facilities and associated tangible and intangible personal property commonly known as the Edison Corridor Interceptor, the Oakland Arm Interceptor and the Avon Arm Interceptor and commencing northwards from the north city line of the City of Detroit. The Northeast Sewerage Pump Station and that part of the Edison Corridor Interceptor located within the city limits of Detroit are not part of the OMI System and were not transferred to the District.

1.29   "**Order**" shall mean any decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any Governmental Entity.

1.30   "**Ordinary Course of Business**" shall mean shall an action taken by a Person with respect to the Macomb System which is consistent in nature, scope and magnitude with the past practices of such Person with respect to the Macomb System and is taken in the ordinary course of the normal, day-to-day operations of such Person with respect to the Macomb System.

1.31   "**Person**" shall mean any individual, corporation, association, partnership, joint venture, trust, estate, unincorporated organization or Governmental Entity.

1.32   "**Purchase Price**" shall have the meaning set forth in Section 2.3 hereof.

4/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

1.33 "**Representative**" with respect to a particular Person means any officer, employee, agent, consultant, engineer, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

1.34 "**Requisite Regulatory Approvals**" shall have the meaning such term is given in Section 5.1 hereof.

1.35 "**Retained Liabilities**" shall mean only those Liabilities which arise out of or are otherwise related to Claims asserted by a third party which accrue prior to the Closing Date or arise out of contracts for services provided to DWSD by third parties prior to the Closing, excluding any and all Claims by and among Detroit, Macomb County and MID. Notwithstanding the foregoing, for the purposes of this Agreement, any Claim, whether in trespass or other cause of action, whenever (whether before or after Closing), against whomever asserted, and arising out of any allegation that a) Detroit, Macomb County or MID did or does not have an easement, right of way or other interest in real property sufficient to entitle Detroit, Macomb County or MID to use, maintain and operate the Macomb System or b) Detroit, Macomb County or MID is otherwise in violation of or has any unsatisfied obligations arising under any Macomb Real Property Agreement, shall be deemed to have accrued on or before the Closing and be deemed a Retained Liability.

1.36 "**Schedules**" shall mean each schedule specifically referenced in this Agreement.

1.37 "**System Debt**" means the outstanding pro rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to facilities comprising the Macomb System and charged to Macomb County in the DWSD Sewer Rate Model for FY 2009-10 on other than a "common to all" basis, as adjusted to reflect resolution of certain outstanding rate issues, with the exception of debt and debt service for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs. The calculation of System Debt as of 6/30/2009 is set forth in Schedule 3.8. The FY 2009-10 sewer rates and charges will remain in place for the entire fiscal year, even if Closing occurs prior to the end of the fiscal year. In order to determine the "System Debt" on the Closing Date, the District will be credited with i) the difference between debt service on the relevant facilities billed through the rates and the interest on the associated debt for such facilities paid through the Closing Date, assuming interest calculated at a simple interest rate of 5.17% (which the Parties agree fairly approximates the system weighted interest rate for FY 2009-10), and ii) debt service paid in the rates between the Closing and the end of the fiscal year. That calculation, assuming a Closing Date of 6/30/2010, is shown on Schedule 3.8. The Parties agree that this Schedule will be updated to the Closing Date as part of the closing documents.

1.38 "**Third Party Claim**" shall have the meaning such term is given in Section 11.2 hereof.

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

1.39 **"Wastewater Disposal Services Contract"** shall mean that certain Wastewater Disposal Services Contract by and between Detroit and the Oakland Macomb Interceptor Drain Drainage District dated October 22, 2009.

## ARTICLE II
## THE PURCHASE AND SALE

2.1 <u>Transfer to the MID</u>. In accordance with the provisions of this Agreement, in consideration for the payment of the Purchase Price and other good and valuable consideration, and subject to the contingencies set forth in ARTICLE VII and ARTICLE VIII, Detroit shall transfer and convey the Macomb System to MID free and clear of all liens and encumbrances pursuant to an Assignment of Rights of Way and Easements, Exhibit A, and other instruments of transfer to be delivered at the Closing in accordance with the provisions relating to the Closing.

2.2 <u>Acquisition by the MID</u>. MID, in reliance upon the covenants, representations, and warranties of Detroit contained herein, hereby agrees to acquire the Macomb System from Detroit.

2.3 <u>Payment of the Purchase Price</u>. As part of the consideration for the transfer and conveyance of the Macomb System to the MID from Detroit, the MID shall make a payment to Detroit in a sum equal to the System Debt (the **"Purchase Price"**).

2.4 <u>Assignment of Warranty and Guarantee Rights</u>. Detroit shall assign to the MID all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System. Upon written request by the MID, Detroit shall use its best efforts to cause its engineering and other contractors to provide their work product created before the Closing related to the Macomb System to the MID and MID agrees to bear the costs, if any, incurred by the engineers and contractors in providing such work product.

2.5 <u>MACOMB SYSTEM</u>. THE MACOMB SYSTEM SHALL BE CONVEYED BY SELLER TO PURCHASER IN "AS IS" PHYSICAL CONDITION, WITH NO ADDITIONAL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PHYSICAL CONDITION OF THE MACOMB SYSTEM THAT EXTEND BEYOND THE WARRANTIES EXPRESSLY STATED IN THIS AGREEMENT. EXCEPT FOR ANY EXPRESS WARRANTIES STATED IN THIS AGREEMENT, THE MACOMB SYSTEM SHALL BE CONVEYED WITH NO EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE.

2.6 <u>Retained and Assumed Liabilities</u>.

(a) At and as of the Closing, Detroit shall retain, and Macomb County or MID shall in no way assume, the obligation to pay, discharge, perform or defend, as applicable and

6/25

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

when due, any and all of the Retained Liabilities. Detroit shall pay, discharge, perform and satisfy all of the Retained Liabilities when due.

(b)    At and as of the Closing, MID shall assume, and Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities. MID shall pay, discharge, perform and satisfy all of the Assumed Liabilities when due.

2.7    Closing. The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Bodman LLP at 1901 St. Antoine, Detroit, Michigan, on such date as shall be mutually acceptable to the parties on or before June 30, 2010, or such other date as mutually acceptable to the Parties (the **"Closing Date"**).

2.8    Account Number. No later than three Business Days prior to the Closing Date, Detroit shall deliver to MID in writing the account number of the account into which the Purchase Price is to be transferred at Closing.

2.9    Deliveries. At the Closing, the transactions listed below shall occur.

(a)    MID shall deliver to Detroit:

(1)    An original certified resolution of the MID authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

(2)    An opinion of counsel to MID covering such matters and in form and substance satisfactory to Detroit and its counsel;

(3)    A certificate executed by MID as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing; and

(4)    The Purchase Price by wire transfer.

(b)    Detroit shall deliver to MID:

(1)    A certified resolution of the Board of Water Commissioners of Detroit authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

7/25

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

(2) A certified resolution of Detroit City Council authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

(3) An executed bill of sale for all of the Macomb System that is tangible personal property in form and substance satisfactory to MID and its counsel and executed by Detroit;

(4) An executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to MID and its counsel and executed by Detroit;

(5) An assignment of the Macomb System Real Property Agreements by a quitclaim deed, an Assignment of Rights of Way and Easements, or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to MID and its counsel and executed by Detroit;

(6) Such additional certificates, affidavits, undertakings and other evidence as may be required to induce MID's title company ("Title Company") to issue such title insurance policies, in form and substance satisfactory to MID, as MID may elect to purchase with respect to the real property identified in Schedule 3.5(a)(1);

(7) Such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by MID, each in form and substance satisfactory to MID and its counsel and executed by Detroit;

(8) An assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System except NTH Contract CS-1372, the METCO Services Contract CS-1241, and the Martin Controls contract which shall not be assigned;

(9) A certificate executed by Detroit as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing;

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

(10)   An opinion of bond counsel to Detroit providing, in substance, that the transactions contemplated by this Agreement do not violate covenants made by Detroit to its bondholders; and

(11)   An opinion of the legal department of Detroit, reasonably satisfactory to MID, providing that the transactions contemplated by this Agreement do not violate the City Charter of Detroit and such additional matters and in such form satisfactory to MID and its counsel.

(c)   Each of Detroit and MID shall deliver to the other Party hereto an executed original counterpart of the following documents:

(1)   Clintondale Pump Station Transition Services Agreement.

2.10   Transfer of Operation. Effective as of 11:59 p.m. on the Closing Date, MID shall take over from the City all of the operation, maintenance and administration of the Macomb System, except as provided by the Clintondale Pump Station Transition Services Agreement executed on even date herewith.

2.11   Termination of Wastewater Contracts. Effective as of 11:59 p.m. on the Closing Date, the existing Wastewater Disposal Services Contract between Detroit and the Macomb County Wastewater Disposal District shall be terminated, subject to the survival of the following rights and obligations:

(a)   The rights and obligations to credits or for additional assessments, respectively, arising under the Look Back process for rate years and rates paid prior to the termination of the existing contracts; and

(b)   The payment for wastewater services provided by Detroit to the Macomb County Wastewater Disposal District through the date of termination of the existing contract but not billed or paid until after its termination.

2.12   Expenses. Detroit, Macomb County and MID shall each bear their own expenses incurred by them in connection with the transactions contemplated by this Agreement, including without limitation, consultants' fees, legal fees and accounting fees, whether or not such transaction is consummated, except as may otherwise he provided in Section 5.5 and ARTICLES X and XI.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF DETROIT

Detroit makes the following representations and warranties to Macomb County and MID, except as otherwise set forth in the written disclosure schedules (the "Schedules")

9/25

9/2/2010
Doc 946709v12

**Exhibit "A"**

delivered to Macomb County and MID on or prior to the date hereof, a copy of which is attached hereto:

3.1 <u>Corporate Organization</u>. Detroit is a municipal corporation duly organized, validly existing and in good standing under the laws of the State of Michigan.

3.2 <u>Authorization</u>. Detroit has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and thereby. Assuming due and valid authorization, this Agreement will constitute a legal, valid and binding obligation of Detroit, enforceable against Detroit in accordance with its terms, except as the enforcement thereof may be limited by applicable principles of bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors and subject to general principles of equity.

3.3 <u>No Conflict</u>. The execution, delivery and performance by Detroit of this Agreement, the compliance by Detroit with any of the provisions hereof, and the consummation by Detroit of the transactions contemplated hereby: (i) do not violate any provision of the City Charter of Detroit, ordinances of Detroit or any bond covenants associated with the System Debt; (ii) do not require the consent, approval, clearance, waiver, order or authorization of any Person other than the Board of Water Commissioners and the Detroit City Council; (iii) do not conflict with or violate any Applicable Law or any order, judgment, award or decree of any court or other Governmental Entity to which Detroit or the Macomb System is subject; and (iv) do not conflict with, or result in any breach of, or default or loss of any right under (or an event or circumstance that, with notice or the lapse of time, or both, would result in a default), or the creation of any encumbrance pursuant to, or cause or permit the acceleration prior to maturity of any amounts owing under any indenture, mortgage, deed of trust, lease or other agreement to which Detroit is a party or to which any of the Macomb System is subject, in each case, which failure, violation, conflict or breach would, in the aggregate, materially hinder or impair the consummation of the transactions contemplated by this Agreement.

3.4 <u>No Material Transactions</u>. Except for the execution of this Agreement, Detroit has not engaged in any Material transactions related to the Macomb System since January 1, 2009 except contracts or contract amendments for the design of the Clintondale pump station improvements under Contract CS-1241, or associated with NTH Contract CS-1372.

3.5 <u>Easements and Rights of Way</u>.

(a) <u>Schedule 3.5(a) (1)</u> identifies all of the real property occupied by the Macomb System. <u>Schedule 3.5 (a) (2)</u> sets forth all Macomb System Real Property Agreements in Detroit's possession and control.

(b) To Detroit's knowledge, except as disclosed on <u>Schedule 3.5(b)</u>, Detroit possesses all necessary, permanent, perpetual and transferable Macomb System Real Property

10/25

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

Rights (not including easements, licenses or rights of way by prescription, necessity, implication or acquiescence) necessary for the use and routine operation of Macomb System.

      (c)    Except as disclosed on <u>Schedule 3.5(c)</u>, Detroit has good and marketable title to the Macomb System and to the rights arising under the Macomb System Real Property Rights, free and clear of all Encumbrances

      (d)    To Detroit's Knowledge, except as disclosed in <u>Schedule 3.5(d)</u>, Detroit has not breached any provision of and is not in default (and no event or circumstance exists that with notice or the lapse of time, or both, would constitute such default) under the terms of any Macomb System Real Property Agreement and all of such Macomb System Real Property Agreements are in full force and effect.

      (e)    There are no pending or, to Detroit's Knowledge, threatened disputes or pending or threatened litigation with respect to any Macomb System Real Property Rights.

      3.6    <u>Environmental Requirements</u>. Detroit has complied in all material respects with all Environmental Requirements in connection with the ownership, operation and administration of the Macomb System, including, without limitation, NPDES permits and MDNRE requirements, and has not received notice of any violation of any of the foregoing.

      3.7    <u>Litigation</u>. Except as set forth in <u>Schedule 3.7</u> hereto, there is no action, suit or proceeding pending or, to Detroit's Knowledge, threatened against or affecting Detroit before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under this Agreement or which in any manner questions the validity of this Agreement.

      3.8    <u>Disclosure of System Debt</u>. <u>Schedule 3.8</u> sets forth all System Debt (with the exception of debt for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs), including for each facility or improvement in the Macomb System, and the allocated outstanding principal as of June 30, 2009, together with such charges and adjustments on which the Parties have agreed to resolve all outstanding issues related to debt and rates associated with the Macomb System. None of the written data or information furnished or made available to Macomb County by Detroit as part of the due diligence process with regard to System Debt or other debt or rate-related matters contains an untrue statement of a Material fact or omits to state a Material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading.

      3.9    <u>Disclosure of Pending Contracts</u>. To Detroit's Knowledge, <u>Schedule 3.9</u> sets forth all pending contracts associated with the operation, maintenance and repair of any facility within the Macomb System.

11/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF MACOMB COUNTY AND MID

MID and Macomb County make the following representations and warranties to Detroit, except as otherwise set forth in the Schedule delivered to Detroit on or prior to the date hereof, a copy of which is attached hereto:

4.1     Corporate Organization. MID is a Chapter 20 drainage district duly organized and validly existing under the laws of the State of Michigan and has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.

4.2     Authorization. MID has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and thereby. This Agreement will constitute a legal, valid and binding obligation of MID, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable principles of bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors and subject to general principles of equity.

4.3     No Conflict. Except as set forth in Schedule 4.3 hereto, the execution, delivery and performance by MID of this Agreement, the compliance by MID with any of the provisions hereof and thereof, and the consummation by MID of the transactions contemplated hereby and thereby: (i) do not violate any Applicable Law; (ii) do not require the consent, approval, clearance, waiver, order or authorization of any Person; and (iii) do not conflict with, or result in any breach of, or default or loss of any right under (or an event or circumstance that, with notice or the lapse of time, or both, would result in a default), or the creation of any encumbrance pursuant to, or cause or permit the acceleration prior to maturity of any amounts owing under any indenture, mortgage, deed of trust, lease or other agreement to which MID is a party, which failure, violation, conflict or breach would, in the aggregate, materially hinder or impair the consummation of the transactions contemplated by this Agreement.

4.4     Litigation. Except as set forth in Schedule 4.4 hereto, there is no action, suit or proceeding pending or, to the Macomb County's Knowledge, threatened against or affecting Macomb County or MID  before any Governmental Entity in which there is a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of MID to perform its  obligations under this Agreement or which in any manner questions the validity of this Agreement.

4.5     Due Diligence. MID acknowledges that it is being afforded the opportunity to conduct due diligence and investigation with respect to the transactions contemplated by this Agreement. MID further acknowledges that, to the extent that Macomb County, MID or their advisors, agents, consultants or representatives, by reason of such due diligence and investigation actually knew that any representation and warranty made herein by Detroit is

12/25

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

inaccurate or untrue, this constitutes a release and waiver of any and all actions, claims, suits, damages or rights to indemnity, at law or in equity, against Detroit by MID or Macomb County arising out of breach of that representation and warranty. Nothing herein shall be deemed to limit or waive Macomb County's of MID's rights against Detroit arising out of any other representation and warranty made herein by Detroit.

## ARTICLE V
## COVENANTS OF DETROIT

Detroit covenants and agrees with Macomb County and MID as follows:

5.1   Governmental Approvals; Consents. Detroit shall use reasonable efforts and shall cooperate with Macomb County or MID (including, to the extent necessary, after the Closing), to obtain all permits, approvals and consents, and to make all filings, necessary or required to be obtained or made for MID to have full use and enjoyment of the Macomb System subsequent to the Closing and for the consummation of the transactions contemplated by this Agreement under Applicable Law (all such permits, approvals, filings and consents being referred to as the **"Requisite Regulatory Approvals"**).

5.2   Operation and Maintenance of the Macomb System until Closing. Between the date of this Agreement and the Closing, Detroit shall:

(a)   Operate the Macomb System in the Ordinary Course of Business;

(b)   Obtain the consent of Macomb County or MID prior to implementing operational decisions of a Material nature;

(c)   Maintain the Macomb System in a state of repair and condition consistent with Detroit's conduct of the operation of the Macomb System prior to Closing;

(d)   Comply in all material respects with Applicable Law and contractual obligations applicable to the operation of the Macomb System;

(e)   Maintain all books and records relating to the operation of the Macomb System in the Ordinary Course of Business.

(f)   Provide to Macomb County and MID reasonable notice prior to making any capital expenditures or implementing any maintenance, repair or operational decisions of a material nature relating to the Macomb System and reasonably consider any objections of the Macomb County thereto;

(g)   Refrain from entering into any sale, assignment, or other transfer of all or any part of Detroit's right, title or interest in and to any portion of the Macomb System without first obtaining the consent of Macomb County and MID;

13/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

(h)   Refrain from entering into any extraordinary transaction or any transaction which is not at arm's length with any person or entity, in either case relating to the Macomb System without first obtaining the consent of Macomb County and MID; and

(i)   Promptly notify the Macomb County of any emergency or other change in the normal course relating to the Macomb System (or communications indicating that the same may be contemplated) if such emergency or change would be Material.

5.3   Litigation and Claims. Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

5.4   Notice of Changes. Detroit shall inform Macomb County and MID in writing if it becomes aware that any representation or warranty made by Detroit in this Agreement has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by this Agreement to be performed or complied with by Detroit.

5.5   Post-Closing Covenants. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, Detroit will take such further action (including the execution and delivery of such further instruments and documents) as Macomb County or MID may reasonably request, all at the sole cost and expense of MID, unless such action is a result of any Default or breach of any representation, warranty or covenant by Detroit under this Agreement or is covered by Section 10.4, in which cases it will be at the sole cost and expense of Detroit.

5.6   Adjustment of Sewer Disposal Rates After Acquisition   Detroit will adjust its sewer rate model such that no debt service associated with System Debt is charged directly or indirectly to Macomb County, MID, or the Oakland-Macomb Interceptor Drain Drainage District after the Closing Date nor any costs formerly included in the sewer rate model associated with the operation and maintenance of the Macomb System, with the exception of debt service for the permanent repairs of the 1978 interceptor collapse which shall continue to be paid according to the terms of the court orders and settlement agreements related to those repairs. Schedule 5.6 shows in detail the manner in which the post Closing sewer rates for Oakland-Macomb Interceptor Drain Drainage District will be calculated if the transfers of the Macomb System and the OMI System were effectuated on June 30, 2010. The Parties agree that before November 30, 2010, they will mutually agree on how the FY2009-10 Look Back calculations should conducted in light of the System Debt adjustments set forth in Section 1.37.

9/2/2010
Doc 946709v12

<div align="right">Exhibit "A"</div>

*Macomb Acquisition Agreement*

## ARTICLE VI
## COVENANTS OF MID AND MACOMB COUNTY

The MID and Macomb County hereby covenant and agree with Detroit as follows:

6.1    Cooperation. Subject to the terms and conditions of this Agreement, Macomb County and MID shall cooperate with Detroit to use its best efforts to secure all necessary consents, approvals, authorizations, exemptions and waivers from all Persons and Governmental Entities as shall be requested by Detroit or required to be obtained in order to consummate the transactions contemplated hereby.

6.2    Litigation and Claims. MID shall promptly inform Detroit in writing of any Claims (or communications indicating that the same may be contemplated) of which MID is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement.

6.3    Notice of Changes. MID shall inform Detroit in writing if it becomes aware that any representation or warranty made by Macomb County or MID in this Agreement has ceased to be accurate or if MID becomes aware of the occurrence of any breach of any covenant or other agreement required by this Agreement to be performed or complied with by the Macomb County.

6.4    New Service Contracts. Prior to Closing, Macomb County shall enter into a wastewater disposal services contract with the Oakland-Macomb Interceptor Drain Drainage District.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF DETROIT

The obligations of Detroit to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Detroit) on or prior to the Closing of all of the following conditions:

7.1    Accuracy of Representations and Warranties. Except as set forth in the Schedules, the representations and warranties of Macomb County and MID set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing.

7.2    Performance of Covenants and Agreements. Macomb County or MID, as their respective liabilities lie, shall have duly performed and complied in all Material respects with the covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing. None of the events or conditions entitling Detroit to terminate this Agreement under ARTICLE IX hereof shall have occurred and be continuing.

<div align="center">15/25</div>

<div align="right">9/2/2010<br>Doc 946709v12</div>

Exhibit "A"

*Macomb Acquisition Agreement*

7.3    Consents. Any consent required for the consummation of this purchase and sale under any agreement, contract, license or other instrument described in any exhibit hereto or referred to herein, or for the continued enjoyment by Detroit of any benefits of such agreement, contract, license or other instrument after the Closing, which consent Macomb County or MID is specifically obligated to obtain pursuant to this Agreement shall have been obtained and be effective.

7.4    Governmental Approvals. All Requisite Regulatory Approvals shall have been obtained or made and shall be in full force and effect. There shall be no injunction, restraining order or decree of any nature that restrains or prohibits the transactions contemplated by this Agreement.

7.5    No Proceedings. Since the date of this Agreement, there shall not have been commenced or threatened against Detroit, Macomb County or MID or their constituent counties or municipalities any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

7.6    Resolutions. Detroit shall have received certified copies of the resolutions identified in Sections  2.10(a)(1), 2.10(b)(1) and 2.10(b)(2).

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF MACOMB COUNTY AND MID

The obligations of Macomb County and MID to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Macomb County or MID) on or prior to the Closing, of all of the following conditions:

8.1    Accuracy of Representations and Warranties. Except as set forth in the Schedules, the representations and warranties of Detroit set forth in this Agreement shall be true and correct in all Material respects as of the date when made and at and as of the Closing.

8.2    Performance of Covenants and Agreements. Detroit shall have duly performed and complied in all Material respects with the covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing. None of the events or conditions entitling MID or Macomb County to terminate this Agreement under ARTICLE IX hereof shall have occurred and be continuing.

8.3    Resolutions. MID and Macomb County shall have received certified copies of the resolutions identified in Sections 2.10(a)(1), 2.10(b)(1) and 2.10(b)(2).

8.4    Consent. Any consent required for the consummation of the transactions contemplated by this Agreement under any agreement, contract, license or other instrument

16/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

described in any schedule or exhibit hereto or referred to herein, which consent Detroit is specifically obligated to obtain pursuant to this Agreement shall have been obtained and shall be effective.

8.5    Governmental Approvals.  All Requisite Regulatory Approvals shall have been obtained or made and shall be in full force and effect.  There shall be no injunction, restraining order or decree of any nature that restrains or prohibits the transactions contemplated by this Agreement.

8.6    No Proceedings.  Since the date of this Agreement, there shall not have been commenced or threatened against Detroit, Macomb County of MID or their constituent counties or municipalities any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

8.7    Financing Contingency.   MID shall have obtained financing on terms and conditions reasonably satisfactory to MID in an amount equal to System Debt plus associated financing costs.

8.8    New Service Contracts   Macomb County have entered into a new wastewater disposal services contract with the Oakland-Macomb Interceptor Drain Drainage District.

8.9    Resolution of all Certain Disputes.  Macomb County and Detroit shall have executed an agreement acknowledging that all pending disputes between such parties with respect to rates and all other matters have been resolved.

8.10   Title Insurance and Surveys.  MID shall have obtained title commitments and searches and, if MID elects, also title insurance policies and surveys with respect to Macomb System Real Property Rights, from title companies, surveyors and engineering firms, as applicable, and in form and substance, satisfactory to MID.

## ARTICLE IX
## TERMINATION PRIOR TO CLOSING

9.1    Termination.

(a)    This Agreement may be terminated at any time prior to the Closing:

(1)    By the mutual written consent of Detroit, MID and Macomb County;

17/25

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

(2)     By Detroit in writing if Macomb County or MID shall be in Default;

(3)     By Macomb County or MID in writing if Detroit shall be in Default;

(4)     By written notice of either Party hereto to the other Party hereto if, after the date of this Agreement but prior to the Closing, defects within and necessary repairs to the Macomb System have become Materially greater or different than those disclosed in the following reports prepared by NTH Consultants, Ltd.:

> (A)     Report on Sewer Condition Investigation & Evaluation Romeo Arm, Oakland-Macomb Interceptor, PCI-12A, DWSD Contract CS-1368 ER_B Task 37-1 (June 5, 2006);and
>
> (B)     Report of Sewer Condition Assessment Inspection DWSD Construction Contracts PCI 13, 14, 15B, 15C, 24, 25, 42A, and 45, Project No. 15-060131-00 (June 7, 2006).

(5)     By Macomb County, MID or Detroit if the transaction is not approved by all their respective governing bodies; and

(6)     By any Party hereto if the other Party hereto shall fail to timely satisfy those conditions set forth in ARTICLE VII or ARTICLE VIII hereto, as appropriate.

(b)     This Agreement may be terminated by Macomb County in writing on or before January 1, 2010 if it shall not have been satisfied in its sole discretion with the results of Macomb County's continuing due diligence investigations of the Macomb System, including, without limitation, with respect to all operational, financial, environmental, legal and accounting matters.

9.2     Effect on Obligations.     Termination of this Agreement pursuant to this ARTICLE IX shall terminate all obligations of the Parties hereto; provided, however, that termination pursuant to Sections 9.1(a)(2) or 9.1(a)(3) hereof shall not relieve any defaulting party from any liability to the other party hereto resulting from such Default. Notwithstanding the foregoing, any and all existing agreements (other than this Agreement) between Detroit and Macomb County and/or any constituent entity thereof which are related to the Macomb System shall remain in full force and effect following any termination of this Agreement unless and until such existing agreements are otherwise terminated pursuant to the terms thereof.

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

## ARTICLE X
## REMEDIES FOR BREACHES OF THIS AGREEMENT

10.1   Survival of Representations and Warranties.   All of the representations, warranties and covenants of Macomb County and MID and Detroit contained in this Agreement and the schedules and exhibits hereto shall survive the Closing and continue in full force and effect forever thereafter (subject only to any applicable statutes of limitations applicable to their breach).

10.2   Remedies Generally   Unless expressly limited by this Agreement, in addition to any remedies provided in Sections 10.3, 10.4 and 10.5, the Parties shall have all remedies available at law and equity for a breach of contract for any breaches of any terms of this Agreement.

10.3   Remedies for Breach of Representations, Warranties and Covenants.   If a Party sustains any Losses because the representations or warranties provided by the other Party are incorrect or untrue or because the other Party has breached its covenants given herein, the other Party shall be liable for all Losses incurred by the Party to cure such representations, warranties or covenants. In addition or in the alternative, the Party may require the other Party to take such actions as required to cure such misrepresentations, warranties or breached covenants.

10.4   Remedies to Cure Title Issues.   In the event that Detroit does not possess all necessary, permanent, perpetual and transferable Macomb System Real Property Rights, or if any of those Macomb Real Property Rights are in the form of easements, rights of way or licenses arising by prescription, necessity, acquiescence or implication, MID may obtain by purchase, condemnation or otherwise such easements, rights of way, licenses or other agreements on terms reasonably acceptable to MID and in any case sufficient to entitle MID to use and operate the Macomb System in the same manner as used and operated by Detroit prior to Closing. MID shall use good faith efforts to minimize the cost of obtaining such easements, rights of way, licenses or other agreements. MID shall consult with Detroit before extending offers to purchase, finalizing any appraisals, or extending any settlement offers, and shall reasonably consider any comments or objections made by Detroit with regard to same. In the event that condemnation proceedings are commenced or other litigation related to Macomb System Real Property Rights occurs, MID shall inform Detroit of the commencement of such proceedings and provide advance notice of hearings and settlement conferences scheduled in such proceedings. Detroit, at its sole cost and expense, shall cooperate in taking all actions requested by MID to assist MID in obtaining such easements and other interests in property. Within 60 days of demand, as may be made from time to time by MID, Detroit shall reimburse the Macomb County or MID in an amount equal to any and all  costs incurred by Macomb County or MID to obtain such easements and other interests in property  including, but not limited to, costs of acquisition or condemnation awards (including the condemnation defendant's attorneys fees and costs) and all legal, expert and professional fees and costs incurred by Macomb County or MID and any Losses actually incurred by the Macomb County

19/25

**Exhibit "A"**

*Macomb Acquisition Agreement*

or MID arising out of Claims asserted against Macomb County or MID by third parties based on the failure to have an easement, right of way, license or other agreement for real property necessary for the use and routine operation of Macomb System. These reimbursable costs include the cost incurred by the Macomb County before Closing to ascertain the location of any improvements constituting any part of the Macomb System or to compare the location of the Macomb easements to the "as-built" designs of the Macomb System. Further, within 60 days of demand, as may be made from time to time by Macomb County or MID, Detroit shall reimburse Macomb County or MID for all Losses actually incurred by Macomb County or MID arising out of Claims asserted against Macomb County or MID arising out of any obligation occurring under the OMI Real Property Agreements before Closing.

10.5   Limitations on Certain Remedies.

(a)    Notwithstanding anything in Sections 10.2, 10.3 and 10.4 to the contrary, any right to damages arising under those Sections shall be net of the dollar amount of any insurance proceeds actually received by the Party from any third party insurer with respect to the Claim.

(b)    The injured Party will take reasonable steps to mitigate all Losses relating to the Claim, including availing itself of any defenses, limitations, and will provide such evidence and documentation of the nature and extent of the Claim as may be reasonably requested by the other Party. The injured Party's reasonable steps include the reasonable expenditure of money to mitigate or otherwise reduce or eliminate any loss or expense for which a remedy would otherwise be due under this ARTICLE X, and the reimbursing Party will reimburse the injured Party for the injured Party's reasonable expenditures in undertaking the mitigation.

(c)    Notwithstanding anything contained to the contrary in any other provision of this Agreement, except in cases of a Party's gross negligence, willful misconduct or fraud, the obligations of each Party under Sections 10.2, 10.3 and 10.4, and the recovery by any injured Party of any liabilities suffered or incurred by it as a result of any breach or non-fulfillment by a Party or any of its representations, warranties, covenants, agreements or other obligations under this Agreement, shall be limited to actual damages (but excluding consequential damages).

(d)    Survival of Remedies  The rights and obligations to remedies given in Article X shall survive the Closing indefinitely.

## ARTICLE XI

## PROCEDURES IN THE EVENT OF CLAIMS BY THIRD PARTIES

11.1   Remedies For Third Party Claims Asserted Against One Party Arising out of or Related to Liabilities Assumed or Retained by the Other Party.  In the event that a Third Party

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

Claim, as defined below, is asserted against one Party ("Indemnified Party") arising out of or related to matters for which the other Party ("Indemnifying Party" (which includes the City of Detroit, Macomb County and MID)) has assumed liability under this Agreement, the Indemnifying Party shall defend the Indemnified Party from such Third Party Claims and shall reimburse the Indemnified Party for any Loss incurred by the Indemnified Party resulting from such Third Party Claims.

11.2   <u>Defense and Settlement of Third Party Claims</u>

(a)    If any third party shall notify an Indemnified Party with respect to any matter (a "**Third Party Claim**") which arises out of a matter for which liability was expressly assumed or retained by the Indemnifying Party under this Agreement or arises out of the breach of a representation, warranty or covenant given in this Agreement, the Indemnified Party shall promptly (and in any event within 30 days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing. Third Party Claim does not include any Claim covered by Section 10.4. Failure to give the required notice shall not bar the rights of the Indemnified Party under this Agreement except to the extent that such failure prejudices the Indemnifying Party's ability to defend and settle the Third Party Claim.

(b)    To the extent permitted by Applicable Law, the Indemnifying Party will have the right at any time to assume and thereafter conduct the Indemnified Party's defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party provided that within 30 days after receipt of the notice of the claim the Indemnifying Party confirms in writing its responsibility therefore; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party and includes a full and complete release of the Indemnified Party as an unconditional term thereof.

(c)    Unless and until the Indemnifying Party timely assumes the defense of the Third Party Claim as provided in Section 11.2(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d)    In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without seeking the prior written consent of the Indemnifying Party (not to be withheld unreasonably).

(e)    The Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense) and the Indemnified Party shall be entitled to have sole entire control over the defense or settlement of the Claim or portion of a Claim to the extent the Claim or portion of a Claim seeks an order, injunction, non-monetary or other equitable relief

9/2/2010
Doc 946709v12

Exhibit "A"

*Macomb Acquisition Agreement*

against the Indemnified Party which if successful, could materially interfere with the business, operations assets, condition (financial or otherwise) or prospects of the Indemnified Party.

11.3 <u>Release and Covenant Not To Sue</u>. Each Party releases and covenants not to sue the other for Liabilities expressly assumed or retained by the Party under this Agreement except to enforce the terms of this Agreement.

11.4 <u>Survival of Remedies</u>. The rights and remedies given in Article XI shall survive the Closing indefinitely.

### ARTICLE XII
### MISCELLANEOUS

12.1 <u>Continued Support.</u> In the event and for so long as any party hereto actively is contesting or defending against any Claim in connection with (a) any transaction contemplated under this Agreement, (b) the resolution of any encroachments or trespasses by MID or Macomb County, encroaching easements, Encumbrances or rights-of-way, (c) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Macomb System, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending party is entitled to reimbursement therefor under ARTICLE X and XI above). The rights and obligations in this Section 12.1 shall survive the Closing indefinitely.

12.2 <u>Cooperation on Repairs</u> After the Closing, Detroit shall cooperate with the MID in taking actions to facilitate the ongoing repairs to the Macomb System.

12.3 <u>Construction.</u> The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

12.4 <u>Incorporation of Schedules.</u> The Schedules and exhibits identified in this Agreement are incorporated herein by reference and made a part hereof

12.5 <u>Entire Agreement.</u> This Agreement constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous

9/2/2010
Doc 946709v12

*Macomb Acquisition Agreement*

agreements and understandings between the Parties with respect to the subject matter hereof. No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by Detroit and MID and in compliance with Section 12.12.

12.6   Successors and Assigns.   This Agreement will inure to the benefit of and be binding upon Detroit, Macomb County and MID and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either Party hereto without the prior written consent of the other Party hereto.

12.7   Taking of Necessary Action.   Subject to the terms and conditions of this Agreement, each of the parties hereto agrees, subject to Applicable Law, to use all reasonable best efforts promptly to take or cause to be taken all action and to promptly do or cause to be done all things necessary, proper or advisable under Applicable Laws and regulations to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing and subject to the terms and conditions of this Agreement, the parties shall use their commercially reasonable efforts to obtain and make all Required Regulatory Approvals. Each party hereto shall cooperate with the other in good faith to help the other satisfy its obligations hereunder.

12.8   Invalidity.   If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the practical, economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible. Invalid provisions shall be severed from this Agreement.

12.9   Counterparts; Facsimile Signatures.   This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument. This Agreement may be executed by facsimile signatures which shall be considered originals.

12.10   Headings.   The headings of the articles, sections and paragraphs of this Agreement and of the exhibits hereto are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof or thereof.

12.11   Construction and References.   Words used in this Agreement, regardless of the number or gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context shall require. Unless otherwise specified, all references in this Agreement to articles, sections,

9/2/2010
Doc 946709v12

<div align="right">Exhibit "A"</div>

*Macomb Acquisition Agreement*

paragraphs or clauses are deemed references to the corresponding articles, sections, paragraphs or clauses in this Agreement, and all references in this Agreement to exhibits are references to the corresponding exhibits attached to this Agreement.

    12.12  Modification and Waiver.  Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provisions hereof (whether or not similar). Oral modifications of this Agreement are not permitted. Modification or amendment of this Agreement shall require the approval of MID's Board, the Board of Water Commissioners and the Detroit City Council.

    12.13  Dispute Resolution.  Any and all claims alleging a breach of this Agreement shall be submitted to the alternative dispute resolution process set forth in Exhibit B hereto

    12.14  Notices.  Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party shall be in writing and delivered personally, via telecopy (with receipt confirmed)or by registered or certified mail, postage prepaid:

        (a)    if to the MID or Macomb County, to:

                Anthony V. Marrocco
                Macomb County Public Works Commissioner
                21777 Dunham Road
                Clinton Township, MI 48036

                if to Detroit, to:

                Director
                Detroit Water and Sewerage Department
                735 Randolph
                Detroit, Michigan 48226

    12.15  Governing Law; Interpretation.  This Agreement shall be construed in accordance with and governed by the laws of the State of Michigan.  The parties hereto (a) consent to the personal jurisdiction of the state and federal courts located in Detroit, Michigan in connection with any controversy related to this Agreement including, but not limited to, counterclaims or third party demands raised as a result of third party counterclaims initiated in any other jurisdiction; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Macomb County or Detroit in connection with this Agreement may be brought in either the state or federal courts located in Detroit, Michigan; and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

<div align="center">24/25</div>

Exhibit "A"

*Macomb Acquisition Agreement*

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY OF DETROIT**, a Michigan municipal corporation

By: _____

Name: Darryl Latimer

Title: Deputy Director
       Detroit Water and Sewerage
       Department

_____

**MACOMB COUNTY**

By: _____

Name: William Misterovich

Title: Chief Deputy
       Macomb County Public Works
       Commissioner and County Agency
       pursuant to 1939 P.A. 342.

**MACOMB   INTERCEPTOR   DRAIN DRAINAGE DISTRICT**

By: _____

Name   William Misterovich

Title   Acting   Chairperson,   Macomb
        Interceptor Drain Drainage District

25/25

9/2/2010
Doc 946709v12

Exhibit "A"

# EXHIBIT A

## SEE TABS 11 AND 12

## EXHIBIT B

## DISPUTE RESOLUTION PROCEDURES

The Parties agree that it is in their collective best interest to establish a dispute resolution procedure to allow for faster resolution of problems, reduce expenses for attorneys, fees and costs, and improve working relationships. These procedures shall be utilized in the event that a dispute arises between the Parties arising under the Acquisition Agreement.

All capitalized terms shall have the meaning defined in the Contract.

1.   **General Dispute Resolution Policy**

Any and all claims alleging a breach of or arising under the Acquisition Agreement, other than claims requiring immediate relief to prevent irreparable harm to a party, public health or the environment, shall first be submitted to the alternative dispute resolution ("ADR") process set forth in this Exhibit B. No litigation, other than a suit seeking immediate relief to prevent irreparable harm to a party, public health or the environment may be initiated until the Parties have complied with the Informal Negotiation (Section 2) and Formal ADR Procedures (Sections 3 & 4) set forth here.

Unless expressly agreed in writing by the Parties, all alternative dispute resolution procedures utilized shall be nonbinding.

No resolution achieved under these procedures shall be binding on any other First Tier Customer unless such customer has agreed in writing to the resolution.

All dispute resolution proceedings under this Contract shall be private and confidential, and any written or oral communications will similarly be deemed to be confidential, and may not be disclosed unless the parties agree otherwise. Documents created by the parties for use in any ADR process shall not be filed with any court or made available as evidence in any court proceeding by any other party. However, evidence or information which is otherwise admissible or subject to discovery does not become inadmissible or protected from discovery solely by reason of its disclosure or its use in mediation. Any person involved in the ADR process who is not an agent or employee of a Party shall not testify regarding matters disclosed during the

Detroit_960667_2

mediation process, but may testify only as to the final outcome of the ADR process, and the parties to the Dispute agree they shall not seek testimony from any such person with regard to information or knowledge obtained by such person as the result of participating in an ADR process under this Contract.

## 2. Informal Negotiations

Each party agrees to undertake informal negotiations before invoking formal ADR procedures under this Contract or litigation. This process shall be commenced by written notice from the initiating party to the other describing the subject matter of the dispute. The notice shall contain such information as is necessary to advise of the exact nature of the dispute and the relief requested. .Upon issuance of such written notice, the parties shall engage in good faith informal negotiations among themselves to attempt to develop a mutually acceptable resolution to the dispute. The time frame for conducting informal negotiations shall not exceed 45 days from the date of issuance of the written notice, unless all parties agree to a longer informal negotiation timeframe.

## 3. Invocation of Formal ADR Procedures

In the event a dispute arises between the Parties that is not resolved by informal discussions between them, either Party may initiate the formal alternative dispute resolution process under Sections 3 and 4 by giving notice in writing to the other Party, the Director's Council and the Chair(s) of the Steering Committee. The notice shall contain such information as is necessary to advise of the exact nature of the dispute and the relief requested.

Unless the parties reach a settlement within the 120-day period or agree in writing within the 120-day period to continue the ADR process and to continue toll the running of the statute of limitations, at the end of the 120-day period any party may commence litigation and the statute of limitations shall commence to run.

## 4. Formal ADR Procedures

(a)     Role of Steering Committee and Work Groups

(b)     Role of Director's Council

2

Detroit_960667_2

Either Board or the Customer may notify the Director's Council of the policy issue with a request that the Director's Council address the issue through good faith discussion and negotiations, and attempt to resolve the issue in a manner which provides a fair balancing of the interests of the Board and its First Tier Customers. Within 30 days of receiving such a notice, the Director's Council shall agree on an ADR process to address the policy issue in a manner which fairly accommodates the interests of the Parties. Thereafter, the Director's Council shall act expeditiously to assist in resolving the dispute within the balance of the 120-day period.

5.   **Mediation**

If informal negotiation and the ADR process under the aegis of the Director's Council is not successful in resolving the dispute, the matter shall be referred to mediation. Mediation is defined to be a non-binding dispute resolution process in which an impartial neutral facilitates negotiations among the parties in an attempt to help reach a settlement.

### (1)   *Selection of Mediator*

The mediator of the dispute must be neutral and impartial, with no conflict of interest with any party, and no financial or personal interest in the outcome of the mediation. The mediator shall be selected within thirty (30) days following the conclusion of informal negotiations by the parties. The mediator shall be selected by agreement of the Board, the wholesale customer initiating the dispute resolution process, and at least one of the other wholesale customers affected by the subject matter in dispute. If no mutually acceptable mediator is identified and selected within thirty (30) days, then the dispute resolution process under this Step shall be terminated.

### (2)   *Costs*

The costs for the mediator shall be paid by the Board as an operating expense, unless it is mutually agreed that some alternative cost apportionment for the mediator's expenses is acceptable.

3

Detroit_960667_2

(3)   *Conduct of Mediation*

Each wholesale customer and/or the Board involved in the dispute shall designate a decision-maker to serve as their representative to participate in the mediation, and that person shall be vested with authority to negotiate on behalf of the community and/or the Board, and to settle the dispute or, if required, recommend settlement to the governing board of the wholesale customer. Each wholesale customer and/or the Board who is party to the dispute may also be represented during the process by an attorney and/or technical consultants if it so chooses, provided that the costs of any such participation are borne solely by that wholesale customer and/or the Board.

The mediator shall be free to meet and communicate separately as he/she deems appropriate with each party, but will schedule joint meetings of all parties with the time, place and agenda to be established by the mediator in consultation with the parties. No stenographic, video or record will be made of meetings conducted by the mediator, and formal rules of evidence and procedure will not apply to materials presented and discussed.

The mediation process may be terminated by the mediator at any time if the mediator determines that one or more parties is not acting in good faith, or if the mediator concludes that further dispute resolution efforts would not be useful in achieving a settlement. The mediation process will automatically terminate after 90 days from the date the mediator is retained, unless the time period is extended by agreement of all parties and the mediator.

If a settlement is reached, a preliminary Memorandum of Understanding will be prepared and signed or initialed before the parties separate. Thereafter, either the mediator or the parties themselves will promptly and not later than thirty (30) days following the execution of the Memorandum of Understanding draft a written settlement document incorporating the terms of any such settlement. This draft document will be circulated, amended as necessary, and then formally executed. It is anticipated that in some cases, formal execution of any settlement agreement may be deferred pending review and consideration of the document by the governing bodies of the wholesale customer and/or the DWSD.

4

Detroit_960661_2

Exhibit "A"

6.    Proceedings After Unsuccessful Mediation

If mediation is terminated for any reason prior to resolution of the dispute, the parties or the mediator (if any) may discuss with the parties the possibility of proceeding with binding arbitration as a form of dispute resolution in lieu of litigation. If binding arbitration is acceptable to all parties, the parties may request that the mediator (if any) assist in structuring a procedure to generate a prompt and economical decision; for example, by use of the Commercial Rules of the American Arbitration Association. The mediator (if any) shall not serve as arbitrator unless all parties agree.

If no resolution is reached through the mediation process, and if the parties decide not to pursue voluntary binding arbitration as discussed above, any party may then exercise its right to pursue resolution of the matter in a court of appropriate jurisdiction.

5

Detroit_960667_2

Exhibit "A"

Preliminary

Schedule 1.20
Facilities in the Macomb System

Any and all right, title and interst that Detroit has in the interceptor sewers, meters, pump stations, flow control gates and appurtenant facilities and associated tangible and intangible personal property commonly know as the Romeo Arm Interceptor, Garfield Interceptor, Sterling Heights Arm, 15 Mile Interceptor, Lakeshore Interceptor and Lakeshore Interceptor Extension and the Clintondale Pump Station, consisting of the facilities constructed pursuant to the contracts listed below.

| Interceptors | DWSD Contract # | Diameter | Length | Location | Municipality |
|---|---|---|---|---|---|
| Macomb Element | PCI-28 | 27 | 4,882 | 23 Mile from Garfield to Hayes | Macomb Twp |
| Macomb Element | PCI-28 | 48 | 10,755 | Garfield from 23 Mile to 21 Mile | Macomb Twp |
| | | | | Garfield from Clinton River Road to 15 Mile | Clinton Twp |
| Romeo Arm | PCI-12A and PCI-37 | 126 | 9,060 | and 15 Mile from Garfie'd to Maple Lane | Clinton Twp |
| Romeo Arm | PCI-24 | 108 | 7,224 | Garfield from 18 Mile to Clinton River Road | Clinton Twp |
| Sterling Heights Arm | PCI-25 | 42 | 5,185 | 18 Mile from Hayes to Garfield | Clinton & Macomb Twps |
| Garfield | PCI-45 | 84 | 16,108 | Garfield from 21 Mile to 18 Mile | |
| | | | | | Clinton Twp |
| 15 Mile Road (force main) | PCI-15C | 60 | 15,150 | 15 Mile from Garfield to Maynard | Clinton Twp |
| 15 Mile Road (force main) | PCI-15B | 60 | 8,037 | 15 Mile from Maynard to I 94 | |
| | | | | | Harrison Twp |
| Lakeshore Arm | PCI-13 | 132 | 11,600 | I 94 from 15 Mile to Bonaire | Harrison Twp |
| Lakeshore Arm | PCI-14 | 132 | 11,400 | I 94 from Bonaire to Joy | |
| | | | | | Harrison Twp |
| Lakeshore Interceptor Extension | PCI-42A | 42 | 11,600 | I 94 from Joy to 21 Mile | Harrison Twp |
| Lakeshore Interceptor Extension | PCI-42A | 27 | 1,300 | I-94 and 21 Mile Road/Brandenburg Rd. | |
| | | | | | |
| Pump Stations | | | | 36965 Union Lake Road (tax ID 11-36-103- | |
| Clintondale Pump Station | PC-218 | | | 007) | Clinton Twp |

| Meters | | Upstream Manhole | | | |
|---|---|---|---|---|---|
| CH-S-5 | PCI-42A | In-Line with sewer | PCI-42A | | |
| CT-S-1 | PC-261 | CT-S-1 MH-3 | PCI-12A | | |
| CT-S-2 | PC-262A | CT-S-2 MH-2 | PCI-13 | | |
| CT-S-3 | PC-289 | CT-S-3 MH2 | PCI-24 | | |
| CT-S-4 | PC-291A | CT-S-4 MH-2 | PCI-15C | | |
| FR-S-1 | PC-261 | FR-S-1 MH-3 | PCI-12A | | |
| HR-S-1 | PC-262B | HR-S-1 MH-2 | PCI-14 | | |
| HR-S-2 | PC-262B | HR-S-2 MH-2 | PCI-3 | | |
| HR-S-3 | PC-262A | HR-S-3 MH-2 | PCI-13 | | |
| MA-S-2 | PC-45 | MA-S-2 MH2 | PCI-45 | | |
| ST-S-5 | PC-262A | ST-S-5 MH-3 | PCI-12A | | |
| ST-S-6 | PC-289 | None | PCI-25 | | |
| SY-S-3 | PCI-45 | SY-S-3 MH-2 | PCI-45 | | |
| MC-S-1 | Unknown and CS-1368 | In-Line with sewer | PCI-12A | | |
| Various | CS-1292 | NA | Odor Control | | |
| Various | PC-707 | NA | Meter Rehabilitation | | |

Note: Meters being transferred include the lead-in sewer to the meter beginning at the downstream side of the manhole that is immediately upstream of the meter for those meters with an upstream manhole. Manholes are as identified on Macomb Interceptor Sewer Alignment Drawings (August 2010)

| Repairs and Rehabilitation | | | | | |
|---|---|---|---|---|---|
| Romeo Arm | PCI-37 | | | 1978 15 & Hayes Repair | |
| Romeo Arm | CS-978 | | | Repairs along Garfield | |
| Romeo Arm | CS-1368 | | | 2004 15 Mile Repair | |
| Romeo Arm | CS-1372 | | | 2006 - 2009 Repairs | |
| Clintondale Pump Station | CS-1421 | | | Pump Station Rehabilitation | |

| Flow Control Gates | | | | Garfield at 18 Mile Road at PCI-24, Sta | |
|---|---|---|---|---|---|
| Garfield Interceptor | PCI-45 | | | 72+28 | |
| Garfield Interceptor | PCI-12A | | | Garfield north of 15 Mile Road | |
| Romeo Arm | PCI-45 | | | 15 Mile Road at PCI 12A, Sta. 123+00 | |

9/1/2010  8 01 AM
1008248_7

Bodman LLP

Exhibit "A"

Combined Schedule 3.5(a)(1) and (2)
Macomb Interceptor

| MACOMB EASEMENT NO. | EASEMENT ID | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR/GRANTEE | EIL DATE | REC DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-1 | PCI-12 P-1 | 12A-12 | 20' Easement for sewer by AWO   AKA Old PE-36 | Adolf & Inge Reif, City of Detroit Water Board | 03/23/70 | 03/30/70 | 2123 | 753 | Garfield-15 Associates L L C | 11-31-229-009 | WS10448 | 127 + 15 | 129 + 50 |
| M-2 | PCI-12 P-2 | 12A-12 | 20' Easement for sewer by AWO, AKA Old PE-37 | Fineneco Corp, City of Detroit Water Board | 10/29/70 | 02/02/71 | 2164 | 655 | The Southland Corporation | 11-31-229-010 | WS10447 M-1 | 129 + 50 | 131 + 50 |
| M-3 | PCI-12 P-3 | 15-C-1 | 20' Easement for sewer by AWO, AKA Old PE-38 | Sun Oil Company, City of Detroit Water Board | 04/20/70 | 05/18/70 | 2127 | 732 | Independent Newspapers, Inc | 11/29/355-008 | WS10446 | 0 - 75 | 1 + 30 |
| M-4 | PCI-13 P-1 | 13-7 | 25' Easement for sewer by AWO.  Also Job #92-31 encroachment | Ira & Winifred Smith, City of Detroit Water Board | 01/13/74 | 02/28/74 | 2477 | 783 | Ira & Ira and Smith, husband and wife | 11-24-378-016 | WS10462 | 64+90 | 65+55 |
| M-5 | PCI-13 P-2 | 13-7 | 30' Easement for sewer by AWO. | Charles J. Rogers Construction Co, City of Detroit Water Board | 03/12/76 | 04/30/76 | 2078 | 408 | John R. Crosby, a single man | 11/24 378-007 | WS10463 | 65+55 | 66+75 |
| M-6 | PCI-13 P-3 | 13-8 & 13-9 | 30' Easement for sewer by AWO. Old PE-45 | Hilda Georgeson & Hilda Anna (Naples), City of Detroit Water Board | 12/27/71 | 03/13/72 | 2278 | 039 | Gaid O. Harlow and Christy Harlow, husband and wife | 11-24-403-011 | WS10435 | 83+15 | 89+35 |
| M-7 | PCI-13 P-4 | 13-9 | Triangular easement for sewer by AWO, AKA Old PE-46 | Lawrence & Jo Ellen Stoshein, City of Detroit Water Board | 10/4/71 | 12/1/71 03/06/74 | 2240 2532 | 257 523 | Ronald R. and Donna L. Boggs, husband and wife | 11-24-423-006 | WS10464 | 90+50 | 91+10 |
| M-8 | PCI-14 P-1 | 14-3 | 30' Easement for sewer by AWO | Michigan State Highway Commission, City of Detroit Water Board | 02/21/74 | 05/20/74 | 2499 | 704 | State Highway Commissioner of the State of Michigan | 11-13-427-001 | WS10455 | 12+30 | 31+15 |
| M-9 | PCI-14 P-2 | 14-3 | 30' Easement for sewer by AWO, AKA Old PE-55 | Taylor Brothers, Inc City of Detroit Water Board | 10/15/73 | 12/07/73 | 2459 | 551 | UNKNOWN Currently - Caprahs Quarters Condominium | UNKNOWN | WS10466 | 29+00 | 30+85 |
| M-10 | PCI-14 P-3 | 14-4 | 50' Easement for sewer by AWO, AKA Old PE-53 | Arnold & Judith Stoshein, his wife, and Bertha Stoshein, City of Detroit Water Board | 7/3/72 11/13/72 | 7/3/73 7/3/73 | 2410 2410 | 741 745 | Strait Up, L L C | 11-13-277-022 (part of) Note: Now within Lot 14 of Assessor's Plat No. 1, Liber 65, Pages 3 and 4 of Plats | WS10476 (same as M-11) | 31+93 | 43+40 |
| M-11 | PCI-14 P-4 | 14-4 | 30' Easement for sewer by AWO, AKA Old PE-52 | Arnold, Judith, & Bertha Stoshein, City of Detroit Water Board | 7/3/72 11/13/72 | 7/3/73 7/3/73 | 2410 2410 | 741 745 | Strait Up, L L C | 11-13-277-022 (part of) Note: Now within Lot 14 of Assessor's Plat No. 1, Liber 65, Pages 3 and 4 of Plats | WS10476 (same as M-10) | 31+93 | 43+40 |
| M-12 [see M-62 for Meta] | PCI-14 P-5 | 14-10 through 42A-3 | 60' Easement for sewer by AWO, AKA Old PE-50. Also see Job #74-9 encroachment | Ralph & Marie Beaufait, City of Detroit Water Board | 07/11/72 | 01/15/73 | 2360 | 609 | G. Marie Beaufait, as Trustee | 12-05-300-008 | WS10417 | PCI-14 STA 112+10 | PCI-42A STA 142+35 |
| M-13 [See Also PCI-42A-P-3 M-50] | PCI-14 P-6 | 14-10 | Easement for sewer and construction road granted to DWSD at S-Bridge Air Base | Secretary of the Air Force, City of Detroit Water Board 1973 Unrecorded Easement and 1987 Supplemental Agreement between the Department of the Air Force and the City of Detroit | 3-28-73 12-16-87 | Unrecorded 1-2 88 | 4258 | 218 | United States of America | 12-07-431-032 12-07-451-001 | WS12571 | 103 + 90 | 104 + 40 |

Exhibit "A"

Combined Schedule 3.5(a)(1) and (2)
Macomb Interceptor

| MACOMB EASEMENT NO. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR/GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID NO. | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-14 | PCI-15 P-1 | 15C-12 | 20' Easement for sewer by AWO. AKA PE-47 | Donald Cano, City of Detroit Water Board | 09/20/71 | 10/15/71 | 2331 | 760 | Baker County of Clinton Township | 11-34-101-017 | WS10474R-1 | 119 + 60 | 120 + 20 |
| M-15 | PCI-15 P-2 | 15C-12 | 20' Easement for sewer by AWO. AKA Old PE-48 | Norman & Isabel Shook, City of Detroit Water Board | 04/26/71 | 07/30/71 | 2207 | 261 | Smart (a) (detail) | 11-34-126-301 | WS10479 | 120 + 70 | 121 + 10 |
| M-16 | PCI-15 P-3 | 15 B-7 | 20' Easement for sewer by AWO. AKA Old PE-39 | Dan & Lillian Mattingly, City of Detroit Water Board | 06/21/71 | 08/04/71 | 2208 | 873 | In-Line Hockey of America, L L C B H Engineering & Associates Co Clinton Land Investment Company Leonard Carr Co (right) Trustee | various State. A portion of the property plotted over in the Clinton East Industrial Subdivision | WS10490 | 216 + 50 | 227 + 15 |
| M-17 | PCI-15 P-4 | 15 B-8 | 50' Easement for sewer by AWO. AKA Old PE-40. Also see encroachment Job 664-15. | Clinton Township, City of Detroit | 03/22/72 | 05/26/72 | 2314 | 714 | Peter W. Ooot City of Detroit as to the port of the property | 11-35-108-010 | WS10461 | 227 + 15 | 229 + 85 |
| M-18 | PCI-24 | 24-1 thru 2 | 2004 Construction encroachment permit by DWSD to contractor for 12" storm sewer | No Easements Transfers any interest of DWSD/Macomb to District | | | | | | | | | |
| M-19 | PCI-25 | 25-1 thru 5 | 2004 Construction encroachment permit by DWSD to contractor for 6" water main | No Easements Transfers any interest to DWSD/Macomb to District | | | | | | | | | |
| M-20 | PCI-26 P-1 | 26-1, 2, 3 | 60' Easement for sewer | Transfer any interest of DWSD/(A)acomb to District | 07/20/72 | 07/21/72 | 2307 | 541 | Part of the property conveyed to the Board of County Road Commissioners for Macomb County/the rest of the property dedicated to the public use Pompea Gardens Subdivision | Unknown Garfield Road and 21 Mile Road | WS10632 | 0 + 00 | 26 + 71 |
| M-21 | PCI-26 P-2 | 26-3, 4, 5 | 60' Easement for sewer | Omer and Louise Raygaert, husband and wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/28/72 | 03/07/72 | 2268 | 732 | Board of County Road Commissioners for Macomb County Of and gas lease legal description - now east 60 ft of Garfield Road dedicated in contract with the Rose Pointe Estates Subdivision | Unknown Garfield Road | WS10633 | 26 + 71 | 45 + 32 |
| M-22 | PCI-26 P-3 | 26-5 | 60' Easement for sewer | Arnold and Elise Metcalf, husband and wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/02/72 | 03-07/72 | 2268 | 733 | Ronald A. Morrow, a single man | 08-29-100-003 | WS10634 | 45 + 32 | 49 + 62 |
| M-23 | PCI-26 P-4 | 26-5 | 60' Easement for sewer | Dorothy G. Raygaert/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 03/29/72 | 03/16/72 | 2269 | 79 | Amato Brothers Inc | 08-29-100-002 | WS10635 | 49 + 62 | 2 + 30 |
| M-24 | PCI-26 P-5 | 26-6, 7 | 60' Easement for sewer | Arthur and Ruth Ploetz, his wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD/also Declaration of Taking | 12/31/1973 undated | 1/10/1974 2-14-74 | 676 2474 | 675 652 | Joseph R Van Assche et Trustee | 08-29-300-001 | WS10578 | 53 + 40 | 80 + 10 |
| | MS-68 | | | | | | | | | | | | |

Exhibit "A"

Combined Schedule 3.6(a)(1) and (2)
Macomb Interceptor

| MACOMB EASEMENT NO | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR/GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-25 | PCI-28 P-8 | 28-11 | 27' Easement for sewer | L.R. Rose Realty Co./County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/30/73 | 11/23/73 | 2455 | 843 | May Development Company - 85 to the part of the property/ Future Development Company - 85 to the part of the property | 08-17-300-001 | WS10535 | 0+00 | 1+00 |
| M-26 | PCI-28 P-9 | 28-11 | 27' Easement for sewer | Adam and Eline Nowicki, his wife /County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/16/73 | 11/23/73 | 2455 | 848 | Township of Macomb as to the part of the property/The Board of County Road Commissioners as to the part | 08-18-400-009 | WS10537 | 0+00 | 3+30 |
| M-27 | PCI-28 P-10 | 28-11 | 27' Easement for sewer | Karol and Sophie Kucinski, his wife (land contract buyers) and Anna Blevinac (stakeholder) /County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/15/73 | 10/19/73 | 2446 | 474 | The Board of County Road Commissioners | 23 Mile Road | WS10538 | 3+30 | 6+55 |
| M-28 | PCI-28 P-11 | 28-11 | Easement for sewer | Jovanka Krals/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/31/73 | 11/02/73 | 2450 | 677 | The Board of County Road Commissioners | 23 Mile Road | WS10539 | 6+55 | 13+30 |
| M-29 | PCI-28 P-13 | 28-12 | 22' Easement for sewer | Waclaw Gruszewski /County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/08/73 | 10/15/73 | 2445 | 280 | The Board of County Road Commissioners | 23 Mile Road | WS10540 | 18+50 | 18+50 |
| M-30 | PCI-28 P-14 | 28-12 | 27' Easement for sewer | Angela Romano, Peter and Beatrice Terebesy, his wife (stakeholders), (Alcheh) and Rita Rzepka, his wife (land contract buyers) /County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/15/73 | 10/14/73 | 2461 | 50 | The Board of County Road Commissioners/Submit evidence that Lacy Terebesy and Lorato Terebesy are names for the same person. Assessed legal description appears to be in error and does not close. The south 82 ft road should have been excepted | 08-18-400-018 | WS10541 | 18+10 | 20+15 |
| M-31 | PCI-28 P-15 | 28-13 | 27' Easement for sewer | John Redlick, Mitchell and Rita Rzepka, his wife, Norbert and Dorothy Radlick, his wife (land contract holders)/ County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/21/73 | 01/18/74 | 2466 | 571 | The Board of County Road Commissioners. The South 60 ft et now dedicated to the use of public by plat dedication in the Milano Industrial Subdivision | 23 Mile Road | WS10542 | 20+15 | 25+40 |
| M-32 | PCI-28 P-17 | 28-13 | 27' Easement for sewer | Walter Kasper/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 10/09/73 | 10/15/73 | 2445 | 282 | The Board of County Road Commissioners | 23 Mile Road | WS10543 | 26+50 | 27+55 |
| M-33 | PCI-28 P-18 | 28-13, 14 | Easement for sewer | Robert and Diane Sens, his wife and Martha Buchholz/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 01/21/74 | 01/30/74 | 2471 | 311 | Quabbut Development I.L.C. as part of the property/The Board of County Road Commissioners | 23 Mile Road | WS10544 | 27+55 | 32+45 |

Exhibit "A"

Combined Schedule 3.5(a)(1) and (2)
Macomb Interceptor

| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT/FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-34 | PCI-28 P-19 | 28-14 | 27' Easement for sewer | Herbert and Elsie Warczak, his wife/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/19/73 | 11/23/73 | 2455 | 845 | The Board of County Road Commissioners | 23 Mile Road | WS10843 | 32+45 | 36+10 |
| M-35 | PCI-28 P-20 | 28-14 | 27' Easement for sewer | Consumers Power Company/County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 02/04/74 | 02/13/74 | 2481 | 184 | Consumers Power Company | 08-18-300-017 | WS10846 | 16+85 | 31+75 |
| M-36 | PCI-28 P-21 | 28-14, 15 | Easement for sewer | Emil Menshawl County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 11/19/73 | 11/23/73 | 2455 | 833 | The Board of County Road Commissioners and Hayes Land Development Group | 23 Mile Road | WS10847 | 37+60 | 46+25 |
| M-37 | PCI-28 (M-S 67) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | Macomb County Board of Road Commissioners | 21 Mile Road | WS10565 | Not in area of mapped alignment | |
| M-38 | PCI-28 (M-S 65) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Township of Macomb as in the part of the property/Wayne Oehmke and Mian Yvonne Ahrens, joint tenants | 08-32-201-037 | WS10565 | Not in area of mapped alignment | |
| M-39 | PCI-28 (M-S 66) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Township of Macomb as in the part of the property/Malcolm and Emilia Beckman, husband and wife | 08-32-201-004 | WS10567 | Not in area of mapped alignment | |
| M-40 | PCI-28 (M-S 17) | 28-13 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | Macomb County Road Commission | 23 Mile Road | WS10568 | 23+40 | 26+60 |
| M-41 | PCI-28 (M-S 68) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | John and Kathleen Oxley, husband and wife | 08-32-226-032 | WS10569 | Not in area of mapped alignment | |
| M-42 | PC-28 (M-S 78) | not mapped | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Melvin and Rosemary Brackett, husband and wife | 08-31-202-004 | WS10570 | Not in area of mapped alignment | |
| M-43 | PCI-28 (M-S 57) | 28-9, 8, 10 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb | undated | 02/14/74 | 2474 | 852 | Township of Macomb | 08-20-100-009 | WS10571 | 80+10 | 106+70 |
| M-44 | PCI-28 (M-S 8) | 28-8, 9, 10 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | Township of Macomb | 08-20-100-007 | WS10572 | 80+10 | 106+70 |
| M-45 | PCI-28 (M-S 71) | 28-14 | 60' Easement | Declaration of Taking by Macomb County Drain Commissioner and the Township of Macomb recorded in Liber 2474, Page 852 | undated | 02/14/74 | 2474 | 852 | George Wallace and JoAnne McLarney, husband and wife | 08-31-226-003 | WS10573 | 149+90 | 159+90 |

**Exhibit "A"**

Combined Schedule 3.5(a)(1) and (2)
Macomb Interceptor

| EASEMENT NO | EASEMENT NO | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-46 | PCI-37 | 12A-7 12A-8 | Easement for public way and meter station | Ronald and Hazel Sobik/City of Fraser Unrecorded assignment to Detroit Water Board | 12/20/77 | 12/05/76 | 3038 | 605 | Ronald G. Sobik and Hazel I. Sobik, husband and wife | | WS10704 | 69+33 | 83+37 |
| M-47 | PCI-42A P-1A | 42A-3 | 60' Easement for sewer | Declaration of Taking/City of Detroit Lakeshore Interceptor Extension 1988 | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Annette Marion Ross and Janet Ann Strzednik, w/full right of survivorship | 12-06-500-092 | WS10512 | 25+60 | 20+55 |
| M-48 | PCI-42A P-1B | 42A-3 & 42A-4 | 60' Easement for sewer | Declaration of Taking/City of Detroit Lakeshore Interceptor Extension 1988 | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Annette Marion Ross and Janet Ann Strzednik, w/full right of survivorship | 12-06-100-010 | WS10513 | 20+55 | 45+25 |
| M-49 | PCI-42A P-2 | 42A-4 & 42A-5 | Easement for sewer | Michigan Department of Transportation/ City of Detroit DWSD | 05/26/88 | 07/06/88 | 4453 | 555 | Michigan State Highway Commissioner | 12-06-500-011 | WS10482 | 45+25 | 52+10 |
| M-50 | PCI-42A P-3 | 42A-5 & 42A-6 | 60' Easement for sewer | Easement for North Gratiot Interceptor to Macomb County Public Works Liber 19509 P 586 | 10/31/00 | 10/02/08 | 19509 | 589 | The United States of America | 12-06-500-007 | WS10526 | 52+10 | 81+30 |
| M-51 | PCI-42A P-4A | | Temporary easement | GMRT | | | | | | | | | |
| M-52 | PCI-42A P-4B | | Temporary easement | GMRT | | | | | | | | | |
| M-53 | PCI-42A P-4C | 42A-6 & 42A-7 | 60' Easement for sewer | Declaration of Taking/City of Detroit Lakeshore Interceptor Extension | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Michigan Department of Transportation | 09-31-377-001 | WS10514 | 67+00 | 77+00 |
| M-54 | PCI-42A P-4D | 42A-7 & 42A-8 | 60' Easement for sewer | Declaration of Taking/City of Detroit Lakeshore Interceptor Extension | 02/26/88 | 3/14/1988 Amended | 4378 4587 | 270 351 | Chezdedell Town Center, LLC | 09-31-402-004 Now part of Parcel 09-31-476-003 | WS10515 | 77+00 | 91+30 |
| M-55 | PCI-42A P-5 | 42A-8 | 60' Easement for sewer | Declaration of Taking/City of Detroit Lakeshore Interceptor Extension | 02/26/88 | 3/4/1988 Amended | 4378 4587 | 270 351 | Raymond Seguin, Joseph Interceptor, Joseph E. LeChlech (2/9 interest) Joseph Drahn and Frances Burbazzad as Co-Trustees (2/9 interest) | 09-31-251-002 | WS10515 | 91+30 | 99+95 |
| M-56 | PCI-42A P-6 | | Temporary easement | GMRT | | | | | | | | | |
| M-57 | PCI-42A P-7A | 42A-8, 9, 10 | 60' Easement for sewer by AWO | Chesterfield Township, City of Detroit Water Board | 02/19/87 | 04/09/87 | 4165 4165 4165 | 924 - 7A 934 - 70 944 - 7C | Chesterfield Town Center, LLC/ Township of Chesterfield/ Michigan Department of Transportation | 09-31-251-003 Now part of Parcel 09-31-476-003 | WS10482 | 96+95 | 114+25 |
| M-58 | PCI-42A P-7B | 42A-9, 10, 11 | Easement for sewer by AWO | Chesterfield Township, City of Detroit Water Board | 02/19/87 | 04/09/87 | 4165 4165 4165 | 924 934 944 | Chesterfield Town Center, LLC/ Township of Chesterfield | 09-31-276-003 | WS10508 | 112+99 | 114+06 |
| M-59 | PCI-42A P-7C | 42A-9 & 10, 11 | 60' Easement for sewer by AWO | Chesterfield Township, City of Detroit Water Board | 02/19/87 | 04/09/87 | 4165 4165 4165 | 924 934 944 | Chesterfield Town Center, LLC/Michigan Department of Transportation | 09-31-476-003 21 Mile Rd | WS10509 | 114+25 | 126+00 |
| M-60 | PCI-42A P-8 | 42A-12 | 60' Easement for sewer by AWO  Also see Job #92-7 (60.ft width) | Maria DeMuyack and Sheldon W. Park/City of Detroit Declaration of Taking Lakeshore Interceptor Extension | 02/06/86 | 03/04/86 | 4378 | 270 | Briar Farms Condominium Association Recorded 1992 | unknown | WS10517 | 6+00 | 9+00 |
| M-61 | PCI-42A P-9A | | Temporary easement | GMRT | | | | | | | | | |
| M-62 | PCI-42A P-9B Meter Ctrl-5-1 | 42A-1 | | Declaration of Taking/City of Detroit Lakeshore Interceptor Extension Meters | 02/28/85 | 03/04/83 | 4378 | 270 | City to Direct (DWS) meter site (part of) | 12-06-500-008 (part of) | WS10579 | 0-35 | 0-35 |

**Exhibit "A"**

Combined Schedule 3.5(a)(1) and (2)
Macomb Interceptor

| MACOMB EASEMENT NO. | EASEMENT I.D. | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | EX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-63 | PCI-45 Meter SY-S-3 also | 45-15 | Temporary and permanent easements Garfield Interceptor Easement obtained by Macomb County Public Works and assigned to DWSD. Garfield ROW | Rosa Manzella, survivor of herself and her deceased husband Salvatore Manzella, Garfield Interceptor, c/o Macomb County Public Works Office, assigned to the City of Detroit | 1/20/99 7/13/99 | 6/25/99 7/15/99 | 8936 8936 8917 8977 | 719 722 630 632 | Venturella formerly 08-30-400-006 | 08-30-400-022 | WS19751 | 161+50 | 151+00 |
| M-64 | PCI-43 | | Temporary Garfield Interceptor easement obtained by Macomb County Public Works and assigned to DWSD. OMIT | Macomb Community College to Macomb County, Assigned to City of Detroit OMIT | 6/15/99 | 6/25/1999 | 8936 8977 1840 | 710 634 124 | Macomb Community College | 11-06-200-005 44575 Garfield Clinton Twp | WS10763 6-10-10 | OMIT | |
| M-65 | | | Garfield Interceptor Temporary and permanent easement Temporary and permanent easement | Venturella to Macomb Public Works assigned to DWSD | | | 8936 8936 8917 8977 | 725 728 626 628 | Venturella formerly 08-30-400-009 | 08-30-400-022 | WS10769 | | |
| M-66 | PCI-43 | 45-1 | Garfield Interceptor Temporary Easement obtained by Macomb County Public Works and assigned to DWSD. | Nieman to Macomb County, City of Detroit assigned to DWS | 05/03/99 | 07/13/99 | 8971 Assignment 8977 | 849 853 616 | Nieman | 11-07-476-003 | WS10762 6-10-10 | OMIT | |
| ADD | | 13-1 through 14-10 | Construction Agreement Harrison Twp/DWSD | Construction Agreement Harrison Twp/DWSD | 12/27/72 | 03/13/72 | 2270 | 314 | various | none | | 2 + 0 PCI-1 | 2 PCI-1 |
| Meter 1 | CT-S-2 | 13-1 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Clinton Township | 11-25-357-008 | WS10754 | 2 + 10 | 3 + 20 |
| Meter 2 | HR-S-3 | 13-1 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter HR-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Harrison Equity Group | 11-25-378-003 | WS10755 | 8 + 10 | 9 + 0 |
| Meter 3 | HR-S-2 | 13-11 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter HR-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Nelson DeSchepper | 11-24-226-016 11-24-226-015 | WS10756 WS10757 | 114+25 | 115+05 |
| Meter 4 M-63 | SY-S-3 | 45-15 | Meter in Easement | Ownership from the downstream side of the first manhole upstream from Meter SY-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | Venturella | 08-30-400-022 | WS10761 | 151+00 | 151+50 |
| Meter 5 | HR-S-1 | 14-9 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter HR-S-1 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 57+50 | |
| Meter 6 See M-62 | CH-S-5 | 12A-1 | Meter in Easement | Meter in line with sewer | | | | | | 13-06-100-005 | WS10528 | 8+40 | |

Page 39 of

Exhibit "A"

Combined Schedule 3.5(a)(1) and (2)
Macomb Interceptor

| MACOMB EASEMENT NO. | EASEMENT ID | ALIGNMENT DRAWING | DESCRIPTION | GRANTOR / GRANTEE | PX. DATE | REC. DATE | LIBER | PAGE | CURRENT FEE OWNERSHIP | TAX ID | TITLE COMMITMENT NO. | Approx. Start Station | Approx. End Station |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Meter 7 | ST-S-5 | 12A-2 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter ST-S-5 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 18+50 | |
| Meter 8 | FR-S-1 | 15C-1 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter FR-S-1 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 0+0 | |
| Meter 9 | CT-S-4 | 15C-5 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-4 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 42+40 | |
| Meter 10 | CT-S-1 | 12A-20 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-1 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 84+50 | |
| Meter 11 | CE-S-3 | 24-7 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter CT-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 66+50 | |
| Meter 12 | MA-S-2 | 55-15 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter MA-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 156+00 | |
| Meter 13 | ST-S-5 | 0 | Meter in R.O.W. | Ownership from the downstream side of the first manhole upstream from Meter ST-S-5 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement | | | | | | | | 32+15 | |
| Meter 14 | MC-S-1 | 12A-5 | Meter in R.O.W. | Meter in line with sewer | | | | | | | | | |

Exhibit "A"

Combined Sch... 3.5(b) and (c)
Exceptions to MID System Real Property Rights and to Marketable Title

174086_16.XLS

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Parcel Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber None | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 15C-5, 13C-7 | 62+00 | 64+00 | GTW Railroad at 15 Mile Road | 11-28-501-002 | (SDA) | | | | | WS10814 | | Contact GTW. Easement to MCRC. No permit or easement for railroad property. |
| 4 | 13-1 | 8+50 | 9+10 | Unknown Union Lake Road at Shook Rd. | 11-25-378-003 | 1 | Y | 3742 | 652 | HR-S-3 | WS10755 | AEW 8-23-2010 | Get 10' additional easement adjacent to Union Lake Road ROW. Harrison Township Sewer Easement. Own from downstream side of first manhole upstream from Meter HR-S-3 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement. |
| 5 | 13-6 | 60+30 | 52+00 | Clinton River Spillway Inter-County Drain Drainage District | 11-24-378-013 | Y | Y | None | | | WS10690 | Post Closing | L887 P22 - Clinton River Spillway Inter-County Drain Drainage District. No easement of record. Get Easement post closing from Clinton River Spillway Inter-County Drain Drainage District. |
| 6 | 13-6, 13-7 | 61+50 | 64+90 | Clinton River Spillway Inter-County Drain Drainage District | 11-24-378-010, 11-24-378-011 | | | | | | WS10681, WS10682 | SDA 7.14.2010 | L887 P22 - Clinton River Spillway Inter-County Drain Drainage District. No easement of record. Get Easement post closing from Clinton River Spillway Inter-County Drain Drainage District. |

Page 1 of 5

Bodman LLP

Exhibit "A"

**Combined Sch... 3.5(b) and (c)**
**Exceptions to MID System Real Property Rights and to Marketable Title**

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 14-3 no search | 27+00 | 29+00 | Drain District/ Clinton River | None | | | None | | None | None | AEW 8-17-2010 | Obtain easement or permit from CoE and MDNRE Easement required for Clinton River? |
| 10 | 13-11 | 114+30 | 115+10 | Unknown Meter West of 016, 11-24-226-015 Remold Rd. | 11-24-226-002 | Y | | 2532 Amendment to Liber 2249 P.257 | | HR-S-2 WS-0756 WS10757 | | AEW (2) 8-23-2010 | Get an additional 10' of easement for meter. Own from downstream side of first manhole upstream from Meter HR-S-2 as identified in Schedule 1.2 to the Macomb Interceptor Acquisition Agreement |
| 9 M-7 | 13-9 | 90+50 | 91+10 | Ronald and Donna Soggie, husband and wife | 11-24-426-006 | N | Y | 523 | | WS 10464 | | X AEW 8-23-2010 | Minor encroachment outside of easement North of Crocker Blvd. |
| 8 | 13-7 | 67+50 | 67+75 | MDOT | 11-24-451-002 | N | Y | | | | | AEW 8-17-2010 | File Affidavit of Interest - near Ballard St |
| 7 M-4 M-5 | 13-7 | 64-90 | 66-75 | | 11-24-378-007, 016, 11-24-378-007 | N | | 2477 2579 | 783 408 | | WS10463 M-5 WS10462 M-4 | AEW 8-17-2010 (2) | Title search on house on 11-24-378-007 - Parcel owned by John DuRay - Subject to gap in chain of title per AEW House is not in easement. Minor encroachment outside of easement South of Ballard Street |

Exhibit "A"

Combined Soft... le 3.5(b) and (c)
Exceptions to MID System Real Property Rights and to Marketable Title

| Macomb Easmt. No. | Drawing Number | Approx. Start Station | Approx. End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14.IX.9 | 14-3 | 29-00 | 30-85 | Unknown North of Clinton River | 11-13-428-011 | | | | | | WS 10466 | | Condo does not disclose the easement. Captains Quarters Condo recorded after easement for sewer. Condominium unit and boat slip encroaches on sewer easement, cul-linear section of sewer may be outside easement. Very minor possible encroachment. Drain District to bring suit to clear easement of encroachments |
| 15 | 14-4, 14-5, 14-6, 14-7, 14-8, 14-9 | 43-00 | 93-60 | Unknown Executive Drive | 11-13-277-017, 11-13-228-005, 11-13-228-004, 11-13-228-002, 11-12-477-003, 11-12-477-002, 12-07-353-100, 12-07-301-004 | Y | Y | 2459 | 551 | None | 11-12-477-003 WS10686 12-07-353-001 WS10688 12-07-301-018 WS10689 12-07-301-004 WS10690 11-13-227-017 WS10683 11-13-228-004 WS 10684 11-13-228-002 WS 10685 11-13-228-005 WS10755 11-12-477-002 | AEW (9) 8-17-2010 | Some sections of ROW are covered by Notice of Taking. Harrison Twp sewer line Harrison Twp sewer easement Liber 2396 P138 for 11-13-228-002 and 11-12-477-002 No sewer easement of record to DWSD |

Exhibit "A"

174086_16.XLS

**Combined Sch... e 3.5(b) and (c)**
**Exceptions to MID System Real Property Rights and to Marketable Title**

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Easmt. Meter | Title Commitment | Prescr. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19/M-60 | 42+12 | 4+00 | 9+00 | Unknown | 09-31-202-001, Bitar Towne Condo, M.C.C.P. No. 401 | | Y | 4378 | 270 | | WS 10693 | | Lakeshore Interceptor Extension Liber 4378 P 270. Easement predated Condo. Easement lies within common elements of Condo. Add to list of assets transferred. Decid to file action to clear easement if encroachments exist |
| 20 | 45-10, 45-11 | 109+50 | 111+50 | Macomb County | 08-32-300-018 | Y | | | | | None | HRC (Area 3) 8-23-2010 | Garfield Road North of Hall Rd. Sewer is within 5 feet of easement, but not outside. Get easement from Macomb County |
| 21 | 45-12 | 123+80 | 127+20 | Unknown (Garfield Rd.) | Unknown (2B) 08-32-300-024 (2A) | Y | | | | | WS10823 | X HRC (Area 2A) HRC (Area 2B) 8-23-2010 | Get an additional 20' of ROW - Warwick Village Condominium Assoc. Curvilinear section may encroachment outside of Garfield R.O.W. |
| 22 M-63 M-65 | 45-15 | | | Garfield Rd. at 21 Mile Rd | 08-30-400-022 | | | | | SY-S-3 | WS10761 (see WS10762 and WS10763) | HRC(1) 8-23-2010 | Garfield Interceptor. Temporary and permanent easement for interceptor and appurtenances. Additional easement for access drive to meter needed |

Bodman LLP

Exhibit "A"

**Combined Sch... 3.5(b) and (e)**
**Exceptions to MID System Real Property Rights and to Marketable Title**

| Macomb Easmt. No. | Drawing Number | Approx Start Station | Approx End Station | Owner of Affected Parcels | Impacted Parcels Tax Id # | Possible Easmt. Issue | Outside Easement | Easmt. Liber | Easmt. Page | Motor | Title Commitment | Presct. Easmt. Dwg. | Comments/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23A1/M-25 | 28-11 | 0-60 | 0-100 | L.R. Rose Realty Co./County of Macomb Drain Commissioner Unrecorded Assignment to DWSD | 08-17-300-001 | Y | Y | 2455 | 343 | | WS10636 (unissuable) | AEW 8-24-2010 | Grantor did not have right to grant easement, Macomb to correct post closing. |
| 23|M-35 | 28-14 | 36-85 | 37-75 | Consumers Power Jog at 23 Mile Rd. | 08-18-300-017 | Y | Y | 2481 | 184 | | WS10646 | JOG 8-17-2010 | Existing easement M-35 does not solve problem per AEW |
| 24 | 13-7, 13-8, 14-3, 14-4, 14-9, 14-10, 42A-5 & 42A-8 | | | MDOT I-94 | | | | 2270 | 314 | | None | POST CLOSING | Hanson Twp Constr. Agreement. Confirm sewer location with MDOT. Contact MDOT to determine how best to create record of sewer location. |
| 25 | 42A-7, 42-A11 & 42A-12 | | | MDOT I-94 | | | | | | | None | POST CLOSING | Confirm sewer location with MDOT. Contact MDOT to determine how best to create record of sewer location. |
| M-13 | 14-10 | 103-90 | 104+40 | U. S. Air Force | 12-07-101-002, 12-07-151-001 | | | 4358 | 258 | | WS 10527 | | Terminates in 2023 and other restrictions. |
| M-17 | 15B-8 | 27-15 | 29-65 | Peter W. Doe | 11-36-108-010 | | | 2290 | 714 | | WS 10481 | | Minor error in easement legal description. |

Exhibit "A"

**Schedule 3.5(d)**

**Exceptions to Non-Breach of MID Agreements**

None.

Detroit_1031775_1

Exhibit "A"

**Schedule 3.7**

**DWSD Litigation**

None.

Detroit_1031775_1

Exhibit "A"

Schedule 3.8
Computation of Purchase Price as of June 30, 2010

| | | 6/30/09 "System Debt" Before Adjustments |
|---|---|---|
| Contract | Asset | |
| **A. Projects Covered by Global Settlement** | | |
| PCI-45 | Garfield Interceptor | $  20,203,529 |
| PCI-45 | Flow Control Gates | $   3,203,500 |
| CS-1368 | 2004 Repairs | $  54,467,200 |
| CS-1372 | Macomb Int. 2008 Repairs | $  19,283,707 |
| | Subtotal | $  97,157,935 |
| | Adjustment for FY 2009-10 Payments | $  (3,192,570) |
| | Adjusted Purchase Price - 6/30/2010 | $  93,965,366 |
| **B. Other Projects In Rates** | | |
| CS-1421 | Clintondale Rehab *(a)* | $   1,290,858 |
| CS-1288 | 8 ft Gravity Sewer Clintondale | $   1,343,821 |
| | Subtotal | $   2,634,679 |
| | Adjustment for FY 2009-10 Payments | $     (50,610) |
| | Adjusted Purchase Price - 6/30/2010 | $   2,584,069 |
| **C. Other Projects Never or Only Partially in Rates** | | |
| PCI-42A | Lakeshore Arm | $   5,033,238 |
| CS-978 | Garfield Repair (1986) | $   1,269,681 |
| CS-1292 | Odor Control | $   1,194,147 |
| Meters Being Transferred | | $   3,701,752 |
| Meter Credit | MC-S-1 (estimated) | $    (400,000) |
| | Subtotal | $  10,798,818 |
| | Adjustment for FY 2009-10 Payments | $     (10,064) |
| | Adjusted Purchase Price - 6/30/2010 | $  10,788,754 |
| **SUBTOTAL PURCHASE PRICE 6/30/2009** | | $ 110,591,433 |
| | Total Adjustment for FY 2009-10 Payments | $  (3,253,244) |
| **RESTATED PURCHASE PRICE 6/30/2010** | | $ 107,338,189 |
| **ADJUSTMENTS** | | |
| Projects Charged but not Constructed | | |
| | Mt. Clemens Arm | $     (30,210) |
| PC-687 | Clinton Twp/Fraser Control Fac | $  (1,532,954) |
| | Subtotal | $  (1,563,164) |
| Global Settlement | | $ (17,050,000) |
| Interest on Omitted Macomb Projects | | $   2,141,931 |
| Balance of OMI/Macomb Misc. Rate Settlement | | $    (870,252) |
| **TOTAL ADJUSTMENTS** | | $ (17,341,485) |
| **ADJUSTED FINAL PRICE as of JUNE 30, 2010** | | $  89,996,704 |

*(a) Based on interim contract cost of $1,488,936, less principal payments credited in sewer rates through 6/30/2009*

8/27/10

Exhibit "A"

## Schedule 3.9

### All Pending DWSD Contracts

Contract with Martin Controls.

Detroit_1031781_1

**Exhibit "A"**

Macomb Interceptor Acquisition Agreement

Schedule 4.3

MID Exceptions to "No Conflict"

NONE

Detroit_1017701_1

**Exhibit "A"**

Macomb Interceptor Acquisition Agreement

Schedule 4.4

<u>MID Litigation</u>

NONE

Detroit_1017706_1

Exhibit "A"

## Macomb Acquisition Agreement
### Schedule 5.6
### FY2010/11 Sewer Rates

OMI District Sewer Rate Calculation (with Cost DATA)
FY 2010-11 Rate Year

### Part 1 - Units of Service

| Line | | Unit | Amount | Reference | | Comment |
|---|---|---|---|---|---|---|
| 1 | Metered Flow | Mcf | 3,750,000 | | | |
| 2 | Sanitary | Mcf | 3,144,110 | | | 90% of Water Sales |
| 3 | Local Dry Weather Infiltration | Mcf | 428,210 | GDRSS Data | | Local Community only |
| 4 | Common Sewers Dry Weather Infiltration | Mcf | 196,907 | GDRSS Data | | Represents share of common sewers "downstream" of connection |
| 5 | Wet Weather Inflow | Mcf | 177,571 | GDRSS Data | | |
| 6 | Overflow Credit | | 30.8% | | | Universal for all customers |
| 7 | Net Wet Weather Inflow | Mcf | 122,948 | (5) x (1 - (6)) | | |
| 8 | Total Allocation Volume | Mcf | 3,892,185 | (2)+(3)+(4)+(7) | | |
| 9 | System Volume | Mcf | 27,588,045 | | | |
| 10 | OMI District Share | | 14.11% | (8)/(9) | | Represents Customer's share of "common" flow costs |
| 11 | BOD | lbs | 28,178,966 | 116 mg/l | | Lower than volume share due to higher strength of monitored industries |
| 12 | TSS | lbs | 37,422,077 | 154 mg/l | | Lower than volume share due to higher strength of monitored industries |
| 13 | PHOS | lbs | 814,221 | 3.4 mg/l | | Lower than volume share due to higher strength of monitored industries |
| 14 | FOG | lbs | 4,661,165 | 19.2 mg/l | | Lower than volume share due to higher strength of monitored industries |
| 15 | Wet Weather | | 2.65% | 1999 RSA | | Represents Customer's share of DWSD New CSO Facilities cost |

### Part 2 - Cost Allocation

| Line | | (1) Units | (2) Unit Cost(a) | (3) Allocated Revenue Req't (1)*(2) | Comment |
|---|---|---|---|---|---|
| 1 | City Only | 0 | 2.190 | 0 | Collection System Costs |
| 2 | Wholesale Only | 3,892,185 | 0.390 | 1,518,727 | Collection System Costs |
| 3 | Oakland Only | 1,595,471 | 1.021 | 1,629,072 | Collection System Costs |
| 4 | Macomb Only | 2,296,714 | 1.246 | 2,861,702 | Collection System Costs |
| 5 | Common | 3,892,185 | 4.955 | 19,286,622 | Common Collection & WWTP Costs |
| 6 | BOD | 28,178,966 | 0.302 | 8,508,636 | WWTP Costs |
| 7 | TSS | 37,422,077 | 0.378 | 14,149,610 | WWTP Costs |
| 8 | PHOS | 814,221 | 4.140 | 3,371,245 | WWTP Costs |
| 9 | FOG | 4,661,165 | 0.233 | 1,086,119 | WWTP Costs |
| 10 | New WW Facilities | 2.65% | | 944,916 | |
| 11 | Total | 35,641,176 | | 53,356,849 | Represents Unadjusted Annual Revenue Requirement Allocated to Customer |

(a) Unit Costs are uniform for every customer

PRELIMINARY PROPOSED

**TFG**
THE FOSTER GROUP

1/4

1/21/2010

Exhibit "A"



## OMI District Sewer Rate Calculation
### FY 2010-11 Rate Year

**Part 3 - Adjustments and Rate Calculation**

| Line | | Amount | Reference | Comment |
|---|---|---|---|---|
| 1 Rev Req't Allocation | | 53,356,849 | | From Part 2 |
| 2 Adjustment A | | 1,215,913 | 1978 RSA | Indirect Benefits - allocates rev req'ts from Detroit to Suburbs |
| 3 Adjustment B4 | | 103,061 | 1980 RSA | 15 Mile & Hayes Repairs - reallocates common costs to Macomb Co. only |
| 4 Wayne Co. Adj | | 10,397 | 1982 RSA | 15 Mile & Corridor Collapse - reallocates costs from Wayne Co. to all others |
| 5 Adjusted Rev Req't | | 54,686,220 | | Represents Annual Revenue Requirement from Customer |

**Part 4 - Rate Calculation**

| | Total | Fixed | Commodity | Existing Charge | Comment / Percent Change |
|---|---|---|---|---|---|
| | | | | | Direct allocations and adjustments |
| 6 Direct | 4,600,774 | 4,600,774 | | | From Part 2 |
| 7 New W/W Facilities | 944,916 | 944,916 | | | |
| 8 Wholesale Only Costs | 1,518,727 | 1,518,727 | | | |
| 9 Other | 47,622,003 | | | | |
| 10 Allocated to Sanitary | 38,469,097 | | 38,469,097 | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 2)/(Part 1,Line 8)] |
| 11 Allocated to Infiltration | 7,648,601 | | 7,648,601 | | Other allocated based on Part 1: (Line 12) * [(Part 1,Lnt 3&4)/(Part 1,Line 8 |
| 12 Allocated to Inflow | 1,504,305 | 1,504,305 | | | Other allocated based on Part 1: (Line 12) * [(Part 1,Line 7)/(Part 1,Line 8)] |
| 13 Total | 54,686,420 | 8,568,722 | 46,117,698 | | Total Lines 10 thru 16 |
| 14 Units | | 12 | 3,750,000 | | Months / Mcf |
| 15 Fixed Charge | | $714,060 | | $1,281,276 | (Line 16)/(Line 17) |
| 16 Commodity Charge | | | $12.30 | NA | (Line 16)/(Line 17) |
| 17 "All Commodity" Unit Charge | | | $14.58 | NA | Total (Line 16)/(Line 17) |

PRELIMINARY PROPOSED

TFG
THE FOSTER GROUP

2 / 4

1/21/2010

Exhibit "A"

# Macomb County Sewer Rate Calculation
## FY 2010-11 Rate Year

### Part 1 - Units of Service

| Line | | Unit | Amount | Reference | Comment |
|---|---|---|---|---|---|
| 1 | Metered Flow | Mcf | 2,200,000 | | |
| 2 | Sanitary | Mcf | 1,871,488 | (1)-(3)-(5) | Metered less Local Community Infiltration/Inflow (Lns 3&5) |
| 3 | Local Dry Weather Infiltration | Mcf | 208,972 | GDRSS Data | Local Community only |
| 4 | Common Sewers Dry Weather Infiltration | Mcf | 133,532 | GDRSS Data | Represents share of common sewers "downstream" of connection |
| 5 | Wet Weather Inflow | Mcf | 119,539 | GDRSS Data | |
| 6 | Overflow Credit | | 30.8% | | Universal for all customers |
| 7 | Net Wet Weather Inflow | Mcf | 82,721 | (5) x [1-(6)] | |
| 8 | Total Allocation Volume | Mcf | 2,296,714 | (2)+(3)+(4)+(7) | Higher than metered flow due to common sewer/interceptor I/I |
| 9 | System Volume | Mcf | 27,583,045 | | |
| 10 | Macomb County Share | | 3.33% | (8)/(9) | |
| 11 | BOD | lbs | 16,627,941 | 116 mg/l | Represents Customer's share of "common" flow costs |
| 12 | TSS | lbs | 22,082,148 | 154 mg/l | Lower than volume share due to higher strength of monitored industries |
| 13 | PHOS | lbs | 480,458 | 3.4 mg/l | Lower than volume share due to higher strength of monitored industries |
| 14 | FOG | lbs | 2,750,476 | 19.2 mg/l | Lower than volume share due to higher strength of monitored industries |
| 15 | Wet Weather | | 1.60% | 1999 RSA | Represents Customer's share of DWSD New CSO Facilities cost |

### Part 2 - Cost Allocation

| Line | | (1) Units | (2) Unit Cost (a) | (3) Allocated Rev Req't (1)*(2) | Comment |
|---|---|---|---|---|---|
| 1 | City Only | 0 | 2.190 | 0 | Collection System Costs |
| 2 | Wholesale Only | 2,296,714 | 0.390 | 896,176 | Collection System Costs |
| 3 | Oakland Only | 0 | 1.021 | 0 | Collection System Costs |
| 4 | Macomb Only | 2,296,714 | 1.246 | 2,861,702 | Collection System Costs |
| 5 | Common | 2,296,714 | 4.955 | 11,380,834 | Common Collection & WWTP Costs |
| 6 | BOD | 16,627,941 | 0.302 | 5,020,805 | WWTP Costs |
| 7 | TSS | 22,082,148 | 0.378 | 8,349,451 | WWTP Costs |
| 8 | PHOS | 480,458 | 4.140 | 1,989,316 | WWTP Costs |
| 9 | FOG | 2,750,476 | 0.233 | 640,901 | WWTP Costs |
| 10 | New WW Facilities | 1.60% | 35,641,176 | 571,891 | |
| 11 | Total | | | 31,711,075 | Represents Unadjusted Annual Revenue Requirement Allocated to Customer |

(a) Unit Costs are uniform for every customer

PRELIMINARY PROPOSED

TFG
THE FOSTER GROUP

3/4

1/21/2010

Exhibit "A"



## Macomb County Sewer Rate Calculation
### FY 2010-11 Rate Year

**Part 3 - Adjustments and Rate Calculation**

| Line | | Amount | Reference | Comment |
|---|---|---|---|---|
| | | | | From Part 2 |
| 1 Rev Req't Allocation | | 31,711,075 | | Indirect Benefits - allocate rev req't from Detroit to Suburbs |
| 2 Adjustment A | | 722,642 | 1978 RSA | 15 Mile & Hayes Repairs - reallocates common costs to Macomb Co. only |
| 3 Adjustment B | | 110,000 | 1980 RSA | 15 Mile & Corridor Collapse - reallocates costs from Wayne Co. to all others |
| 4 Wayne Co. Adj | | 6,253 | 1982 RSA | |
| 5 Adjusted Rev Req't | | 32,549,971 | | Represents Annual Revenue Requirement from Customer |

**Part 4 - Rate Calculation**

| Line | Total | Fixed | Commodity | Existing Charge | Comment / Percent Change |
|---|---|---|---|---|---|
| | | | | | Direct allocations and adjustments |
| | | | | | From Part 2 |
| 6 Direct | 2,971,702 | 2,971,702 | | | |
| 7 New WW Facilities | 571,891 | 571,891 | | | |
| 8 Wholesale Only Costs | 896,176 | 896,176 | | | |
| 9 Other | 28,110,202 | | 22,905,735 | | Other allocated based on Part 1:  (Line 12) * [(Part 1,Line 2)/(Part 1,Line 8)] |
| 10 Allocated to Sanitary | 22,905,735 | | 22,905,735 | | Other allocated based on Part 1:  (Line 12) * [(Part 1,Line 3rty)/(Part 1,Line 8)] |
| 11 Allocated to Infiltration | 4,192,015 | | 4,192,015 | | Other allocated based on Part 1:  (Line 12) * [(Part 1,Line 7)/(Part 1,Line 8)] |
| 12 Allocated to Inflow | 1,012,451 | 1,012,451 | | | |
| 13 Total | 32,549,971 | 5,452,220 | 27,097,750 | | Total Lines 10 thru 16 |
| 14 Units | 12 | 12 | 2,200,000 | | Months / Mcf |
| 15 Fixed Charge | | $454,352 | | | $1,156,555  (Line 16)/(Line 17) |
| 16 Commodity Charge | | | $12.32 | | $11.59  (Line 19)/(Line 17)  -60.7% |
| 17 *"All Commodity" Unit Charge* | | | *$74.80* | | $17.90  Total (Line 16)/(Line 17)  6.3% |
| | | | | | -17.4% |

**PRELIMINARY PROPOSED**

**TFG**
THE FOSTER GROUP

4 / 4

1/21/2010



*Exhibit 6*

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:   Iris Ojeda                                    Grand Jury No. 08-5-1:607

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place:  Grand Jury | Date and Time:  Wednesday, |
|---|---|
| Theodore Levin U.S. Courthouse<br>231 W. Lafayette Blvd., Room 1056 (10th Floor)<br>Detroit, MI 48226 | June 9, 2010 at 1:00 P.M. |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*DAVID J. WEAVER, CLERK OF COURT*

Date:  March 15, 2010

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

AUSA MARK CHUTKOW
U.S. Attorney's Office
211 W. Fort Street, Suite 2001, Detroit, MI  48226
Phone: 313-226-9168

DWSDINV000795

DET-Claim No. 3683-000626

| | |
|---|---|
| **From:** | "Chutkow, Mark (USAMIE)" <Mark.Chutkow@usdoj.gov> |
| **To:** | <keele@detroitmi.gov>, "Bullotta, Michael (USAMIE)" <Michael.Bullotta@us... |
| **Date:** | 6/8/2010 2:47 PM |
| **Subject:** | Iris Ojeda |

Ed,

Let's postpone the date of Iris Ojeda's appearance so we can interview her first.  Michael Bullotta will call you to arrange a time that is good for you and Ms. Ojeda.

Thanks,

Mark

Mark Chutkow
Assistant U.S. Attorney, E.D. Michigan
211 W. Fort St., Ste. 2001 | Detroit, MI  48226 | (313) 226-9168
(Office) | (313) 613-7502 (Cell) | (313) 226-3413 (fax) |
Mark.Chutkow@usdoj.gov (email)

DWSDINV000794

# UNITED STATES DISTRICT COURT
### for the

Eastern District of Michigan

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:   Frederick M. Rottach                    Grand Jury No. 08-5-1:528

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury<br>Theodore Levin U.S. Courthouse<br>231 W. Lafayette Blvd., Room 1056 (10th Floor)<br>Detroit, MI 48226 | Date and Time: Wednesday,<br>January 6, 2010 at 9:00 A.M. |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

DAVID J. WEAVER, CLERK OF COURT

Date:   December 28, 2009

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

AUSA MARK CHUTKOW
U.S. Attorney's Office
211 W. Fort Street, Suite 2001, Detroit, MI 48226
Phone: 313-226-9168

DWSDINV000191

DET-Claim No. 3683-000647

# UNITED STATES DISTRICT COURT
· for the

## Eastern District of Michigan

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:    Terrence D. King                              Grand Jury No. 10-3-11:18

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury<br>Theodore Levin U.S. Courthouse<br>231 W. Lafayette Blvd., Room 1056 (10th Floor)<br>Detroit, MI 48226 | Date and Time: Wednesday,<br>May 12, 2010 at 9:00 A.M. |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*DAVID J. WEAVER, CLERK OF COURT*

Date:  April 21, 2010

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

AUSA MARK CHUTKOW
U.S. Attorney's Office
211 W. Fort Street, Suite 2001, Detroit, MI 48226
Phone: 313-226-9168

DWSDINV000808

DET-Claim No. 3683-000655

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: City of Detroit                Grand Jury No. 10-3-11:82
     Human Rights Department

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury<br>Theodore Levin U.S. Courthouse<br>231 W. Lafayette Blvd., Room 1056 (10th Floor)<br>Detroit, MI 48226 | Date and Time: June 16, 2010 at 9:00 A.M.<br>IF RECORDS ARE RECEIVED<br>PRIOR TO THIS DATE, YOU<br>NEED NOT APPEAR IN COURT |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

SEE ATTACHMENT

Note: You are requested not to disclose the existence of this grand jury subpoena to any third party — including parties named in the subpoena or parties named in records provided in response to the subpoena — indefinitely. Federal law permits but does not require you to comply with this request for nondisclosure. However, any disclosure could obstruct and impede the investigation being conducted, and thereby interfere with the enforcement of the law.

        **\*\* IF YOU HAVE ANY QUESTIONS REGARDING THIS SUBPOENA, PLEASE**
        **CONTACT U.S. EPA SPECIAL AGENT CAROL PASZKIEWICZ (734) 692-7656\*\***

*DAVID J. WEAVER, CLERK OF COURT*

Date: May 26, 2010

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

    AUSA MARK CHUTKOW
    U.S. Attorney's Office
    211 W. Fort Street, Suite 2001, Detroit, MI 48226
    Phone: 313-226-9168

DWSDINV000789

DET-Claim No. 3683-000657

CITY OF DETROIT
HUMAN RIGHTS DEPARTMENT

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1026
DETROIT, MICHIGAN 48226
PHONE: 313·224·4950 TTY:311
FAX: 313·224·3434
WWW.DETROITMI.GOV

# ------------------TRANSMITTAL --------------
## FROM HUMAN RIGHTS -- TO LAW DEPT

RECEIVED
MAY 26 2010
CITY OF DETROIT
LAW DEPARTMENT

TO:  ED KEELAN, Deputy Director, Law Dept.

FROM:  CHRISTINE GRANGER, Director, HRD

RE:  CERTIFICATION FILE:  DLZ

NO. OF FILES: _13_

FILE NO: _2004 - 2010_

ORIGINAL  _X_  COPY _____

| | DATE | TIME | PERSONNEL |
|---|---|---|---|
| HAND DELIVERED TO LAW DEPT | 5/27/10 | 2:47 PM | A. Payton |
| PICK – UP FROM HRD | | | |
| RETURNED TO HRD (ORIGINAL) | | | |

DWSDINV000792

DET-Claim No. 3683-000662

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:    Daniel Edwards                                Grand Jury No. 08-5-1:712

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury | Date and Time: Wednesday, |
|---|---|
| Theodore Levin U.S. Courthouse | August 4, 2010 at 1:00 P.M. |
| 231 W. Lafayette Blvd., Room 1056 (10th Floor) | |
| Detroit, MI 48226 | |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*DAVID J. WEAVER, CLERK OF COURT*

Date:  June 24, 2010

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

AUSA MARK CHUTKOW
U.S. Attorney's Office
211 W. Fort Street, Suite 2001, Detroit, MI 48226
Phone: 313-226-9168

DWSDINV000769

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:     Ramesh C. Shukla                                    Grand Jury No. 10-3-11:43

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury<br>Theodore Levin U.S. Courthouse<br>231 W. Lafayette Blvd., Room 1056 (10th Floor)<br>Detroit, MI 48226 | Date and Time: Wednesday,<br>June 30, 2010 at 1:00 P.M.<br>*CANCELLED* |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

11:30 *[handwritten]*

*DAVID J. WEAVER, CLERK OF COURT*

Date: May 4, 2010

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

AUSA MARK CHUTKOW
U.S. Attorney's Office
211 W. Fort Street, Suite 2001, Detroit, MI  48226
Phone:  313-226-9168

DWSDINV000763

| | |
|---|---|
| **From:** | Edward Keelean |
| **To:** | mark.chutkow@usdoj.gov; Paszkiewicz.Carol@epamail.epa.gov |
| **Date:** | 7/15/2010 2:09 PM |
| **Subject:** | Fwd: Thursday July 28th |
| **Attachments:** | Thursday July 28th |

**CC:**          smalley@dwsd.org

Mr Smalley has a conflict with the 7/28 grand jury subpoena as noted, can he reschedule or do you still want him after the interview?

Edward V. Keelean
Deputy Corporation Counsel
City of Detroit Law Department
1650 First National Building
Detroit, Michigan 48226
(313) 237-3059
keele@detroitmi.gov

This communication may be subject to the attorney-client privilege or the work product doctrine. If you are not the intended recipient, you are notified that any use, dissemination, duplication, or retention of the communication is neither allowed nor intended.

DWSDINV000755

AO 110 (Rev. 01/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
for the

### Eastern District of Michigan

#### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:   Doshia Barton                    Grand Jury No. 08-5-1:539

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury | Date and Time: Wednesday, |
|---|---|
| Theodore Levin U.S. Courthouse | January 6, 2010 at 9:00 A.M. |
| 231 W. Lafayette Blvd., Room 1056 (10th Floor) | |
| Detroit, MI 48226 | |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*DAVID J. WEAVER, CLERK OF COURT*

Date:  December 30, 2009

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

AUSA R. MICHAEL BULLOTTA
U.S. Attorney's Office
211 W. Fort Street, Suite 2001, Detroit, MI  48226
Phone: 313-226-9507

DWSDINV000185

**From:** Edward Keelean
**To:** mark.chutkow@usdoj.gov
**Date:** 8/24/2010 10:48 AM
**Subject:** Fwd: Subpoena for Grand Jury
**Attachments:** Subpoena for Grand Jury

**CC:** mdixon@dwsd.org

Mark, I assume she should not appear for the grand jury. Agreed?

Edward V. Keelean
Deputy Corporation Counsel
City of Detroit Law Department
1650 First National Building
Detroit, Michigan 48226
(313) 237-3059
keele@detroitmi.gov

This communication may be subject to the attorney-client privilege or the work product doctrine. If you are not the intended recipient, you are notified that any use, dissemination, duplication, or retention of the communication is neither allowed nor intended.

DWSDINV000724

DET-Claim No. 3683-000676

Thanks for you help.

Edward V. Keelean
Deputy Corporation Counsel
City of Detroit Law Department
1650 First National Building
Detroit, Michigan 48226
(313) 237-3059
keele@detroitmi.gov

This communication may be subject to the attorney-client privilege or
the work product doctrine. If you are not the intended recipient, you
are notified that any use, dissemination, duplication, or retention of
the communication is neither allowed nor intended.

This message has been scanned for malware by SurfControl plc.
www.surfcontrol.com

DWSDINV000706

From:       Edward Keelean
To:         Beackman, Robert F. (FBI); Bruni, Ana (USAMIE); Bullotta, Michael (USA...
Date:       9/21/2010 2:51 PM
Subject:    RE: Metro v. City

CC:         Crittendon, Krystal

As for **Grand Jury** appearances:

Doshi - Oct. 13 or a Wednesday thereafter;

Shukla - Oct. 6, 13 or 20.  Not Oct. 27th.

Latimer - Sept. 29, Oct. 6 or Oct. 20 or 27.

**Interviews**:

9/23:

1:30 Workens
2:00 Welborne
2:30 Dixon
3:00 Davis (tentative)
3:30 KVR

This work?


Edward V. Keelean
Deputy Corporation Counsel
City of Detroit Law Department
1650 First National Building
Detroit, Michigan  48226
(313) 237-3059
keele@detroitmi.gov


This communication may be subject to the attorney-client privilege or the
work product doctrine.  If you are not the intended recipient, you are
notified that any use, dissemination, duplication, or retention of the
communication is neither allowed nor intended.

DWSDINV000704

Edward Keelean - RE: Metro v. City

**From:**
**To:** "Edward Keelean"
**Date:** 9/21/2010 8:01 PM
**Subject:** RE: Metro v. City
**CC:** "Robert F. (FBI) Beeckman" , "Ana (USAMIE) Bruni" , "Mark (USAMIE) Chutkow" ,
"Michael (USAMIE) Bullotta" , "Krystal Crittendon"

Sounds like a plan. Thanks Ed.

Carol Paszkiewicz
Resident Agent in Charge
U.S. EPA CID
Detroit Resident Office
(734) 692-7656
(734) 692-7654 (fax)

*999 -3 177*

-----"Edward Keelean" <KeelE@detroitmi.gov> wrote: -----

> To: Carol Paszkiewicz/R5/USEPA/US@EPA, "Robert F. (FBI) Beeckman"
> <Robert.Beeckman@ic.fbi.gov>, "Ana (USAMIE) Bruni" <Ana.Bruni@usdoj.gov>,
> "Mark (USAMIE) Chutkow" <Mark.Chutkow@usdoj.gov>, "Michael (USAMIE) Bullotta"
> <Michael.Bullotta@usdoj.gov>
> From: "Edward Keelean" <KeelE@detroitmi.gov>
> Date: 09/21/2010 02:51PM
> cc: "Krystal Crittendon" <CritK@detroitmi.gov>
> Subject: RE: Metro v. City

As for Grand Jury appearances:

Doshi - Oct. 13 or a Wednesday thereafter;

Shukla - Oct. 6, 13 or 20.  Not Oct. 27th.

Latimer - Sept. 29, Oct. 6 or Oct. 20 or 27.

Interviews:

9/23:

1:30 Workens
2:00 Welborne
2:30 Dixon
3:00 Davis (tentative)
3:30 KVR

This work?

DWSD/INV000690
DET-Claim No. 3683-000683

Edward V. Keelean
Deputy Corporation Counsel
City of Detroit Law Department
1650 First National Building
Detroit, Michigan 48226
(313) 237-3059
keele@detroitmi.gov

This communication may be subject to the attorney-client
privilege or the work product doctrine. If you are not the
intended recipient, you are notified that any use,
dissemination, duplication, or retention of the communication
is neither allowed nor intended.

This message has been scanned for malware by SurfControl plc.
www.surfcontrol.com

Click here to report this email as spam.

DWSDINV000691

file://C:\Documents and Settings\keele\Local Settings\Temp\XPgrpwise\4C990F22CTEN...   9/22/2010
DET-Claim No. 3683-000684
13-53846-tjt   Doc 6061-1   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 120 of 274



*Exhibit 7*



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. CR-10-20403-NGE |
| Plaintiff, | HON. NANCY G. EDMUNDS |
| v. | VIOLATIONS: |
| | 18 U.S.C. § 1962(d) (RICO conspiracy) |
| D-1 KWAME M. KILPATRICK, | 18 U.S.C. § 666(a) (bribery) |
| D-2 BOBBY W. FERGUSON, | 18 U.S.C. § 1951 (extortion) |
| D-3 BERNARD N. KILPATRICK, | 18 U.S.C. §§ 1341, 1343 (mail/wire fraud) |
| D-4 VICTOR M. MERCADO, and | 18 U.S.C. § 1512 (obstruction of justice) |
| D-5 DERRICK A. MILLER, | 26 U.S.C. § 7206(1) (false tax return) |
| | 26 U.S.C. § 7201 (tax evasion) |
| Defendants. | 18 U.S.C. § 2 (aiding & abetting) |
| _____/ | 18 U.S.C. § 1963 (forfeiture) |

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times relevant to this indictment:

1.      Defendant KWAME M. KILPATRICK ("KWAME KILPATRICK") served as a

representative to the Michigan House of Representatives from 1996 through 2001. He was

elected Mayor of the City of Detroit in November 2001 and re-elected in November 2005. He

held the position of Mayor from January 1, 2002 to September 18, 2008. During that time, his

annual salary ranged from about $158,000 to $176,000. The City of Detroit ("City") was a unit

of local government, a municipal corporation and a political subdivision of the State of Michigan

within the Eastern District of Michigan. The City provided services to its citizens through

departments, agencies and offices of the executive branch of the City, which was headed by

KWAME KILPATRICK. KWAME KILPATRICK's duties and responsibilities included

supervising the officers and employees of the executive departments, agencies and offices of the City. He had authority or influence over the following agencies, departments or entities, among others, which were supervised, operated, funded or influenced in whole or in part by the City: the Detroit Water and Sewerage Department; the City of Detroit Buildings & Safety Engineering Department; the Detroit Building Authority; the Cobo Civic Center; the City of Detroit General Retirement System; the City of Detroit Police and Fire Pension Fund; the Detroit Economic Growth Corporation; the Economic Development Corporation of the City of Detroit; and the Downtown Development Authority.

2. Defendant BOBBY W. FERGUSON ("FERGUSON") owned, operated or controlled Ferguson Enterprises, Inc. and Xcel Construction Services, Inc., two businesses located in the City which obtained contracts or subcontracts for work to be performed for the City, its departments and agencies.

3. Defendant BERNARD N. KILPATRICK ("BERNARD KILPATRICK"), the father of KWAME KILPATRICK, was the president and owner of Maestro Associates, LLC, a purported consulting company located within the City which was paid by clients who sought contracts, subcontracts or investments with the City and its pension funds.

4. Defendant VICTOR M. MERCADO ("MERCADO") was the Director of the Detroit Water and Sewerage Department ("DWSD") from about June 2002 to July 2008. During that time, his annual salary ranged from about $230,000 to $240,000. During his tenure as DWSD's Director, MERCADO had supervisory authority over the administration and awarding of more than $2 billion of contracts between DWSD and private contractors.

-2-

5. Defendant DERRICK A. MILLER ("MILLER") was Deputy Chief of Staff to Michigan State Representative KWAME KILPATRICK from about 2000 to 2002. Between about 2002 and 2008, MILLER served first as Chief Administrative Officer then as Chief Information Officer for Detroit Mayor KWAME KILPATRICK. Among his duties at the Mayor's Office, MILLER acted as a liaison between the Mayor's Office and both the Cobo Civic Center and the DWSD.

6. The City received federal assistance in excess of $10,000 during each of calendar years 2002 through 2008. During this time period, the City contracted with and purchased goods and services from companies engaged in interstate commerce.

## COUNT ONE
(18 U.S.C. § 1962(d) – Racketeering Conspiracy)

**D-1  KWAME M. KILPATRICK**
**D-2  BOBBY W. FERGUSON**
**D-3  BERNARD N. KILPATRICK**
**D-4  VICTOR M. MERCADO**
**D-5  DERRICK A. MILLER**

7. The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above as if they were set forth in full herein.

## THE ENTERPRISE

8. At all times relevant to this indictment, defendants KWAME KILPATRICK, BOBBY FERGUSON, BERNARD KILPATRICK, VICTOR MERCADO, DERRICK MILLER and others known and unknown, were a group of individuals associated in fact which constituted an enterprise as defined by 18 U.S.C. § 1961(4). This enterprise is referred to for purposes of this count as the Kilpatrick Enterprise. The Kilpatrick Enterprise, including its members and

-3-

associates, constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Kilpatrick Enterprise was engaged in, and its activities affected, interstate commerce.

## OBJECTIVES OF THE ENTERPRISE

9.   The objectives of the Kilpatrick Enterprise included the following:

a.   Financially enriching Enterprise members, associates and their families by using the power and authority of KWAME KILPATRICK's position as a member of the Michigan House of Representatives and Mayor of the City of Detroit to commit extortion, bribery and fraud;

b.   Financially enriching Enterprise members, associates and their families by defrauding donors to nonprofit entities under the control of Enterprise members, including the Kilpatrick Civic Fund, Kilpatrick for Mayor and the Kilpatrick Inaugural Committee; and

c.   Concealing and protecting the activities of the Enterprise from detection by law enforcement officials and the federal judiciary, as well as from exposure by the Detroit City Council and the news media, through means that included, among other things, perjury, witness tampering and obstruction of justice.

## THE RACKETEERING CONSPIRACY

10.   Beginning in or about 2000, and continuing until about 2009, in the Eastern District of Michigan and elsewhere, defendants KWAME KILPATRICK, BOBBY FERGUSON, BERNARD KILPATRICK, VICTOR MERCADO and DERRICK MILLER, together with other persons known and unknown, being persons employed by the City and/or associated with the

-4-

Kilpatrick Enterprise, which engaged in and the activities of which affected interstate commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), by conducting and participating directly and indirectly in the conduct of the Enterprise's affairs through a pattern of racketeering activity involving multiple acts indictable or chargeable under the following provisions of federal law:

    a.    18 U.S.C. § 1951 (extortion);
    b.    18 U.S.C. § 1341 (mail fraud);
    c.    18 U.S.C. § 1343 (wire fraud);
    d.    18 U.S.C. § 1512 (obstruction of justice);

and multiple acts involving state offenses chargeable under the following provisions of state law:

    c.    M.C.L. 750.213 (malicious threats to extort money);
    f.    M.C.L. 750.118 (public officer accepting bribes).

11.    It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

## THE MEANS AND METHODS OF THE RACKETEERING ACTIVITY

Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the racketeering activity of the Kilpatrick Enterprise were the following:

**I.    EXTORTION OF MUNICIPAL CONTRACTORS AND RIGGING OF PUBLIC CONTRACTS**

12.    As set forth more fully in this section, below, in and between 2002 and 2008, KWAME KILPATRICK, BOBBY FERGUSON, BERNARD KILPATRICK, VICTOR MERCADO and DERRICK MILLER, assisted by other members of the Enterprise, extorted

-5-

municipal contractors by coercing them to include FERGUSON in public contracts and/or by rigging the award of public contracts to ensure FERGUSON obtained a portion of the revenue from those contracts. As a result of their extortion and contract rigging, FERGUSON obtained tens of millions of dollars of work and revenues from municipal contracts and municipal contractors, a portion of which FERGUSON shared with other members of the Enterprise.

**A. Kwame Kilpatrick, Assisted by Mercado, Miller and Bernard Kilpatrick Held Up *Company I*'s $50 Million Sewer Lining Contract Until *Company I* Agreed to Give Ferguson Work Which Ultimately Totaled $24.7 Million After Extensions**

13. As set forth more fully in this subsection, below, between in or about early 2002 and November 2006, KWAME KILPATRICK, assisted by VICTOR MERCADO, DERRICK MILLER and BERNARD KILPATRICK, held up a $50 million sewer lining contract that had been approved by the DWSD and its Board of Water Commissioners to be awarded to *Company I*. After KWAME KILPATRICK, MERCADO, MILLER and FERGUSON extorted *Company I* through the fear of economic harm (i.e., losing the contract), *Company I* agreed to replace its minority subcontractor with FERGUSON, causing FERGUSON to receive sewer work and revenues totaling more than $23.7 million, following change orders and amendments which increased the total contract amount.

14. In or about early 2002, BERNARD KILPATRICK alerted KWAME KILPATRICK that *Company I* was planning to use a certain minority subcontractor on the sewer lining contract, instead of FERGUSON.

15. In or about early 2002, KWAME KILPATRICK refused to approve the lining contract between DWSD and *Company I*, although the contract already had been approved by the

DWSD and its Board of Water Commissioners, because FERGUSON was not part of the contract.

16. In or about early 2002, MILLER, the Chief Administrative Officer of the City, contacted a representative of *Company 1* to instruct him to meet FERGUSON and give FERGUSON 5% of the lining contract.

17. In or about April 2002, KWAME KILPATRICK told a representative of *Company 1* that if the company wanted KWAME KILPATRICK to sign the lining contract, FERGUSON needed to be substituted for *Company 1*'s selected minority subcontractor.

18. In or about May 2002, FERGUSON met with representatives of *Company 1* and demanded that they pay him a base minimum profit of about $1.5 million, unrelated to any work FERGUSON would perform.

19. On or about June 1, 2002, MILLER asked a *Company 1* representative who was attending the Mackinac Island Regional Policy Conference whether *Company 1* had reached an agreement with FERGUSON on the lining contract.

20. In or about June 2002, FERGUSON entered an agreement with *Company 1* where he would get at least $10 million worth of work on the lining contract, with an assured minimum profit of about $1.5 million. FERGUSON reached this deal with *Company 1* by exploiting the company's fear that KWAME KILPATRICK would continue to hold up its contract or would otherwise harm its business interests if *Company 1* failed to reach an agreement with FERGUSON.

-7-

**B.** **Kwame Kilpatrick and Mercado Cancelled *Company L*'s $10 Million Sewer Repair Contract Because *Company L* Refused Ferguson's Demand for a 25% Share, then Awarded the Work to *Company I* after *Company I* Agreed to Give Ferguson a Portion of the Contract**

21.     As set forth more fully in this subsection, below, in and between February and July 2003, after *Company L* refused FERGUSON's extortionate demand for a 25% share of a $10 million as-needed emergency sewer repair contract, KWAME KILPATRICK and MERCADO cancelled the contract. Concurrently, after *Company I* agreed to give FERGUSON work on the as-needed emergency sewer contract if *Company I* were to receive it, MERCADO incorporated the $10 million contract into *Company I*'s existing sewer lining contract.

22.     On or about February 20, 2003, *Company L* paid BERNARD KILPATRICK $2,500.

23.     On or about February 26, 2003, MERCADO sent a memo to the Board of Water Commissioners asking it to authorize MERCADO to give the as-needed sewer repair contract to *Company L*. The Board approved MERCADO's request.

24.     On or about March 25, 2003, FERGUSON asked KWAME KILPATRICK to place a lengthy hold on the as-needed sewer repair contract so FERGUSON could determine whether *Company L* or *Company I* would give him a better deal as a subcontractor on the contract. FERGUSON asked, "YOU HAVENT RELEASED THAT CONTRACT RIGHT[?]" KWAME KILPATRICK responded, "RIGHT. THEY KNOW I'm HOLDING IT." FERGUSON replied, "ITS STILL 'COOL' WITH YOU. I NEED TO HOLD IT FOR A LONG TIME ITS KNOW [*no*] NEED FOR IT AND SOMETHING ELSE ALSO."

-8-

25.    In or about the Spring of 2003, FERGUSON went to the home of a *Company L* representative and told him that FERGUSON wanted 25% of *Company L*'s as-needed sewer repair contract. FERGUSON told the *Company L* representative that, even though the Board of Water Commissioners approved the contract, the contract could be stopped by KWAME KILPATRICK, who had yet to approve it. *Company L* refused to give FERGUSON a 25% share of the contract.

26.    In or about the Spring of 2003, a representative of *Company L* met with BERNARD KILPATRICK to seek assistance in gaining approval of the contract. BERNARD KILPATRICK advised the *Company L* representative that BERNARD KILPATRICK would arrange a meeting with FERGUSON, which he did.

27.    On or about May 8, 2003, MERCADO asked a representative of *Company I* to provide DWSD with *Company I*'s unit pricing for the work contemplated by the as-needed sewer repair contract.

28.    In or about May 2003, FERGUSON reached an agreement with *Company I* about the share of work FERGUSON would receive on the as-needed sewer repair contract.

29.    On or about July 28, 2003, *Company L*'s as-needed sewer repair contract was cancelled by MERCADO.

30.    In or about September 2003, DWSD agreed to include the as-needed sewer repair work in *Company I*'s existing sewer lining contract.

-9-

**C. Kwame Kilpatrick Steered Work to Ferguson at a Sewer Collapse, then Held Up a $12 Million Amendment to *Company I*'s Sewer Lining Contract Until *Company I* Agreed to Give Ferguson $350,000**

31. As set forth more fully in this subsection, below, in and between about September 2004 and December 2005, FERGUSON and KWAME KILPATRICK schemed together in an effort to steer work to FERGUSON at a large sewer collapse at 15 Mile Road in Sterling Heights ("the sewer collapse"). Then, from about May to December 2005, FERGUSON and KWAME KILPATRICK, assisted by MILLER, threatened *Company I* and its partner that the City would hold up a $12 million amendment to *Company I*'s sewer lining contract until FERGUSON was satisfied with his financial compensation from *Company I* for work that FERGUSON wanted, but did not receive, at the sewer collapse. After *Company I* agreed to give FERGUSON an additional $350,000 for work he did not do, KWAME KILPATRICK and MERCADO approved the $12 million amendment.

32. On or about September 1, 2004, after visiting the site of the sewer collapse, KWAME KILPATRICK schemed with FERGUSON about how they could get FERGUSON work at the site. FERGUSON advised KWAME KILPATRICK that although *Company I* would be overseeing the overall project, *Subcontractor DA* had hired all the subcontractors at the site. KWAME KILPATRICK responded, "Perfect! That's what I needed." FERGUSON replied that FERGUSON and KWAME KILPATRICK needed to meet about how FERGUSON would "move in" given the arrangement of companies, saying, "We need to mee [*meet*] on how, I move in, I got a great idea sir".

33. On or about September 7, 2004, KWAME KILPATRICK asked FERGUSON whether FERGUSON had determined his share of work at the sewer collapse. FERGUSON

-10-

responded that *Subcontractor DA* wanted to share the work with Ferguson on 50/50 basis, but that KWAME KILPATRICK had to instruct MERCADO about the arrangement, including that KWAME KILPATRICK would personally review *Subcontractor DA's* invoices to ensure that FERGUSON was getting his share: "just let victor [*MERCADO*] know [*if Subcontractor DA*] makes 2.00 fei [*Ferguson Enterprises, Inc.*] needs to make 2.00 also you will look at the invoices to make sure."

34.    On or about May 3, 2005, FERGUSON told representatives of *Company I* that people "Downtown" would not understand it if FERGUSON did not get sufficient revenue from work on the sewer collapse, which might hurt *Company I*'s chances of obtaining a contract amendment increasing the scope of its sewer lining contract. The representatives understood that FERGUSON's reference to people "Downtown" meant the Mayor's Office.

35.    On or about July 27, 2005, MERCADO moved the Board of Water Commissioners for authorization to amend *Company I*'s sewer lining contract to increase its scope by $12 million (hereafter, "the amendment").

36.    In or about the Summer of 2005, at various locations in Detroit, FERGUSON told representatives of *Company I* and *Company I*'s partner that DWSD would not authorize the amendment if they did not pay FERGUSON $500,000 to $700,000, representing profits FERGUSON claimed he should have received had he been given more work at the sewer collapse.

37.    In or about the Fall of 2005, MERCADO asked a representative of *Company I* if the company had resolved things yet with FERGUSON.

-11-

38.     In or about December 2005, at FERGUSON's office, FERGUSON told a representative of *Company I*'s partner that the amendment would sit on the Mayor's desk unapproved until FERGUSON got the compensation he wanted for the sewer collapse.

39.     In or about late 2005, MILLER told a representative of *Company I* that *Company I* had to resolve FERGUSON's complaint about the sewer collapse.

40.     On or about December 16, 2005, at a restaurant in Detroit, FERGUSON, after conferring separately in the restaurant with MILLER, approached a representative of *Company I* and demanded $350,000 for the sewer collapse.

41.     In or about late December 2005, *Company I* and *Company I*'s partner agreed to pay FERGUSON a total of $350,000 for the profits FERGUSON believed he should have received at the sewer collapse. FERGUSON obtained these agreed payments from *Company I* and *Company I*'s partner by exploiting their fear that KWAME KILPATRICK would continue to hold up approval of the amendment if they did not pay FERGUSON.

42.     On or about December 23, 2005, KWAME KILPATRICK and MERCADO signed a Special Administrator Order authorizing the amendment, which called for a $12 million increase in the scope of *Company I*'s sewer lining contract.

### D.     Ferguson Extorted *Company L* out of $1.7 Million from a $27.9 Million Sewer Outfalls Contract

43.     As set forth more fully in this subsection, below, in and between about January 2004 and July 2007, FERGUSON, exploiting the fear of economic harm created by previous actions of KWAME KILPATRICK and MERCADO, extorted *Company L* and its partner out of $1.7 million in proceeds from a $27.9 million sewer outfalls contract.

-12-

FERGUSON and his companies did no work on the sewer outfalls contract in exchange for the $1.7 million in extorted payments.

44.     On or about January 26, 2004, while meeting with representatives of *Company L* and another company about partnering on future DWSD projects, FERGUSON sent a text message to DERRICK MILLER about the progress of the meeting, including the fact that *Company L* now understood that they could not win a DWSD contract without having FERGUSON on their team. Specifically, FERGUSON advised MILLER that the representative of *Company L* "is here saying the same thing you are saying and telling them no deal without me, he gotten smart, I am just sitting here listening."

45.     In or about April 2005, DWSD awarded *Company L* the outfalls contract. *Company L*'s bid identified Ferguson Enterprises as one of its subcontractors.

46.     In or about July 2005, FERGUSON demanded that *Company L* pay him $1 million from the revenues of the outfalls contract, plus a profit share of more than $300,000. FERGUSON obtained these payments, despite the fact that he and his companies would not do any work to earn the money, by exploiting *Company L's* fear that if they did not pay him, FERGUSON would use his influence with KWAME KILPATRICK to harm *Company L*'s current and future City contracts, as he had done in the past.

47.     In or about September 2005, after work had begun on the project, FERGUSON told a representative of *Company L* that he wanted a 5% share, or $450,000, of *Company L's* revenues arising from change orders for the following DWSD contracts: (a) $375,000 of the revenues from a change order *Company L* was seeking to rehabilitate six more outfalls; and (b) $75,000 from a change order *Company L* was seeking to abate asbestos at

-13-

DWSD facilities, a contract in which FERGUSON had no previous involvement. FERGUSON was able to obtain these payments, despite the fact that he and his companies would do no work for the money, by exploiting *Company L*'s fear that FERGUSON would use his influence with KWAME KILPATRICK to reject its change orders if they did not pay him.

48. In or about September 2005, FERGUSON demanded that *Company L* immediately give him $25,000 of the $450,000 he previously demanded. Fearing that FERGUSON would use his influence to adversely impact *Company L*'s contracts, *Company L* employees collected $25,000 in cash which a *Company L* official hand delivered to FERGUSON that same evening at FERGUSON's offices in Detroit, even though *Company L* and FERGUSON understood that FERGUSON would do no work for the money.

49. On or about September 23, 2005, in order to conceal the payments he demanded, FERGUSON gave *Company L* an invoice for $450,000 from his wife's company, Johnson Consulting Services, describing environmental services Johnson Consulting purportedly provided to *Company L*, when FERGUSON knew Johnson Consulting had not performed, and would not perform, any of the work described in the invoice.

50. During the period from about October 7, 2005 to about July 18, 2007, *Company L* and its property management arm paid Johnson Consulting Services and a joint venture of Johnson Consulting Services/A & F Environmental Services a total of more than $1.7 million from the revenues of the outfalls contract even though FERGUSON and his affiliated companies did not perform any work for the money.

-14-

### E. Kwame Kilpatrick, Ferguson, Miller and Mercado Schemed to Increase Ferguson's Revenues on a $19.8 Million Downtown Water Main Contract Administered by *Company D*

51.    As set forth more fully in this subsection, below, in or about 2003 and 2004, KWAME KILPATRICK, FERGUSON, MILLER and MERCADO schemed together to steer subcontracts and emergency task orders to FERGUSON in connection with a $19.8 million downtown water main replacement contract administered by *Company D*. Following the intervention into the contracting process by KWAME KILPATRICK, MILLER and MERCADO, including giving FERGUSON downtown work originally assigned to the lowest bidder, FERGUSON received over $4.8 million in work on the downtown water main project through about 2007.

52.    In or about June 2003, MERCADO and KWAME KILPATRICK authorized *Company D* to perform design and construction oversight of the downtown water main project under an arrangement whereby *Company D* would evaluate bids and provide DWSD with a ranking of the contractors who bid to perform the work.

53.    On or about October 14, 2003, FERGUSON asked KWAME KILPATRICK to have MILLER review and approve the water main replacement work before *Company D* did so, specifically asking: "is it ok , if zeke [*MILLER*] reveiew and aprrove the watermain  replacement work priorto victor [*MERCADO*] assigning a new task to his new consultant team."

54.    On or about February 18, 2004, FERGUSON advised KWAME KILPATRICK and MILLER that they needed to be part of the decision-making for the downtown water main contracts because *Company D* had stopped negotiations with FERGUSON and was trying to give the contract to one of FERGUSON's competitors.

-15-

55. On or about March 16, 2004, KWAME KILPATRICK and FERGUSON had an urgent meeting with MERCADO regarding the downtown water main project.

56. On or about March 18, 2004, at FERGUSON's request, MERCADO interceded with *Company D* to change the deadline of FERGUSON's emergency water main project in order to benefit FERGUSON.

57. On March 19, 2004, a DWSD employee accepted *Company D*'s recommendation that the first round of downtown water main replacement contracts be assigned to three City contractors who submitted the lowest bids. FERGUSON, whose bid was 45% higher than the lowest bidder, was not among these three low bidders.

58. On or about March 22, 2004, at FERGUSON's urging, KWAME KILPATRICK told MILLER to advise MERCADO that MILLER would review recommendations of contractors for the downtown water main project before MERCADO made a final decision. Specifically, FERGUSON told KWAME KILPATRICK, "I need zeke [*MILLER*] to call victor [*MERCADO*] and tell him he wonts to review recomendations for the downtown contrators prior to the final decision being made." KWAME KILPATRICK replied, "COOL." FERGUSON added, "You will tell him sir, real soon they are tring to move fast, thank you not rushing the boss just don't won't this to get by us."

59. On or about March 30, 2004, FERGUSON told KWAME KILPATRICK and MILLER that MERCADO had told FERGUSON that MERCADO could not remove the lowest bidder from the downtown water main project because the City's purchasing ordinance prohibited it.

-16-

60.     On or about April 1, 2004, MERCADO assured KWAME KILPATRICK that he was trying to look for grounds to disqualify the lowest bidder and that he might look into delaying the project.

61.     In or about the Spring of 2004, MERCADO instructed *Company D* to give FERGUSON the downtown water main work originally assigned to the lowest bidder.  To compensate the lowest bidder for the loss of its downtown work, a DWSD employee instructed *Company D* to give the lowest bidder work at the northeast water plant, outside of the downtown area.

62.     In or between about 2004 and late December 2005, FERGUSON received more than $4.8 million in water main work downtown, including the emergency task orders and the downtown work originally assigned to the lowest bidder.

**F.     Kwame Kilpatrick and Mercado Rigged a Water Main Contract for the East Side of the City so Ferguson's Team Would Win, after which Ferguson Extorted more than $12.9 Million in Work from Other Members of the Winning Team**

63.     As set forth more fully in this subsection, below, between in or about the Winter of 2006 and 2008, KWAME KILPATRICK and MERCADO rigged the evaluation and award of a $15 million contract to improve the City's eastside water mains so *Company D*, which had not teamed with FERGUSON, would lose and *Company L*, which was paired with FERGUSON, would win the contract.  After change orders increased the scope of the contract, FERGUSON, assisted by KWAME KILPATRICK, extorted *Company L* and its affiliated company, *Company A*, into giving Ferguson Enterprises and FERGUSON's affiliated company, Xcel Construction Services, a total of more than $12.9 million in work from the contract.

-17-

64.     On or about January 25, 2006, DWSD sent out requests for proposals for the eastside water main contract as well as a contract for improvements of water mains on the west side of the City.

65.     In or about late Winter of 2006, FERGUSON told representatives of *Company L* that he would join their team's proposal for both the eastside and westside water main contracts, but they had to identify *Company E* in place of FERGUSON on their bid because FERGUSON's affiliated company, Xcel Construction Services, was already bidding on the same contracts in partnership with another company. FERGUSON recruited *Company E* to serve as his proxy on *Company L*'s bid despite the fact that *Company E* had a single crew which was unable to perform the volume of work set forth in the proposal.

66.     On or about March 23, 2006, *Company L* submitted a proposal to DWSD for both water main contracts. At FERGUSON's direction, *Company L* submitted a bid which intentionally concealed FERGUSON's participation by listing *Company E*, rather than FERGUSON, and falsely credited *Company E* with FERGUSON's work experience. At the time, FERGUSON and *Company L* both knew that FERGUSON would be substantially participating in the contract if it were awarded to *Company L*.

67.     In or about the Spring of 2006, FERGUSON reassured a representative of *Company L* that he had spoken with MERCADO about the water main contracts and *Company L* was in good shape.

68.     On or about May 14, 2006, after bid evaluations revealed that *Company L* was ranked behind *Company D*, a rival bidder not aligned with FERGUSON, KWAME KILPATRICK summoned an official from the City's Human Rights Division to the Manoogian

-18-

Mansion, the Mayor's official residence. When the official arrived, KWAME KILPATRICK turned up the volume on a television so that his conversation with the official would not be overheard, then ordered the official to revoke the Detroit Headquartered Certification of *Company D*, which would adversely impact *Company D*'s bid ranking.

69.     On or about May 18, 2006, pursuant to KWAME KILPATRICK's directive and with MERCADO's knowledge, the City's Human Rights Division, contrary to its policy and practice, revoked the Detroit Headquartered Certification of *Company D* without notifying *Company D* or allowing them to respond or appeal, thereby eliminating *Company D* from contention for the contract and improving *Company L*'s bid position.

70.     On or about May 22, 2006, at the direction of KWAME KILPATRICK, the City's Human Rights Division awarded a Detroit Headquartered Certification to *Company A*, a partner in the *Company L* bid, thereby improving *Company L*'s bid position.

71.     On or about May 23, 2006, at the direction of MERCADO, a DWSD employee credited *Company A* with Detroit Headquartered status, improving *Company L*'s bid ranking.

72.     On or about May 25, 2006, DWSD recommended that *Company L* receive the eastside water main contract and Xcel Construction Services's joint venture receive the westside water main contract, thereby giving FERGUSON part of both contracts.

73.     In or about the Spring of 2006, after *Company L* won the eastside contract, FERGUSON told a representative of *Company A*, which was on *Company L*'s team, to pay FERGUSON's affiliated company Xcel Construction Services a consulting fee of $200,000, even though *Company A* did not need consulting services. FERGUSON was able to make *Company A* pay the fee by exploiting *Company A*'s fear that FERGUSON would use his relationship with

-19-

KWAME KILPATRICK to harm the economic interests of *Company A* and *Company L* if they refused to pay.

74.     On or about August 10, 2006, MERCADO signed an acknowledgment of contract form awarding *Company L* the eastside water main contract and Xcel Construction Services's joint venture the westside water main contract.

75.     On or about June 11, 2007 and January 25, 2008, in response to FERGUSON's previous demands, *Company A* paid FERGUSON's affiliated company, Xcel Construction Services, a total of more than $540,000 for purported consulting and construction management services, although Xcel did not earn this amount of money. FERGUSON was able to make *Company A* pay this money by exploiting the company's fear that FERGUSON would harm *Company A*'s business with the City if it refused to pay.

76.     On or about August 29, 2008, in response to a demand from FERGUSON, *Company L* paid FERGUSON's affiliated company, Xcel Construction Services, a total of $200,000 for purported consulting services, although Xcel did not earn this amount of money. FERGUSON was able to make *Company L* pay this money by exploiting the company's fear that FERGUSON would use his relationship with KWAME KILPATRICK to harm the economic interests of *Company L*'s business with the City if it refused to pay.

77.     After post-award change orders increased the size of the eastside contract, *Company L* and *Company A* gave Ferguson Enterprises and Xcel Construction Services a total of more than $12.9 million in work.

-20-

### G. Ferguson Extorted *Company L* out of $5 million in Work on a Sewer Repair Contract for East Side of City

78. As set forth more fully in this subsection, below, between in or about June 2006 and September 2008, FERGUSON made *Company L* give FERGUSON more than $5 million in earthwork and point repair work arising out of a sewer repair contract for the east side of the City by exploiting *Company L*'s fear that FERGUSON would use his relationship with KWAME KILPATRICK to harm *Company L's* business interests if *Company L* did not give him the work.

79. On or about June 12, 2006, DWSD sent out requests for proposals for the eastside sewer repair contract.

80. In or about the Summer of 2006, FERGUSON told representatives of *Company L* that he was going to be part of their proposal to repair sewers, demanding 50% of the work, including all the earthwork and point repair work on the project. FERGUSON instructed *Company L* not to list his company, Ferguson Enterprises, on the bid proposal because another of his companies, Xcel Construction Services, was on *Company I's* competing proposal. FERGUSON convinced *Company L* to do this by exploiting *Company L*'s fear that FERGUSON would use his relationship to KWAME KILPATRICK to harm *Company L*'s chances of winning the contract if they did not do so.

81. On or about August 2, 2006, *Company L* submitted a bid to DWSD identifying *Subcontractor DC*, instead of Ferguson Enterprises, for the earthwork and point repair work. *Company L* did this, at FERGUSON's instruction, to conceal FERGUSON's role in the proposal because he also was teamed up with one of the competing bidders, *Company I*.

-21-

82.     On or about November 2, 2006, MERCADO notified *Company L* that DWSD had selected it for negotiations for the eastside sewer repair contract.

83.     On or about the Winter of 2006, *Company L* entered into a contract with *Subcontractor DC* to perform the earthwork and point repair work on the eastside sewer repair contract because Ferguson Enterprises's crews were busy on other City projects. *Subcontractor DC* provided a performance bond and performed the work from about December 2006 to about July 2007.

84.     In or about July 2007, FERGUSON had his crew bring their equipment to the job site and kick *Subcontractor DC*'s crew off. Despite the fact that FERGUSON refused to sign a contract with *Company L* or provide or pay for a performance bond for his work, *Company L* permitted FERGUSON to take over *Subcontractor DC*'s work after FERGUSON threatened to shut the job down if *Subcontractor DC* did not leave the job site.

### H.     Ferguson Extorted *Company I* out of $5 million in Sewer Repair Work on the West Side of City

85.     As set forth more fully in this subsection, below, between in or about June 2006 and 2008, FERGUSON caused *Company I* to give Ferguson Enterprises more than $5 million in sewer repair work on the west side of the City by exploiting his relationship with KWAME KILPATRICK and MERCADO to cause *Company I* to believe they would not win the contract if they did not agree to FERGUSON's terms.

86.     On or about June 9, 2006, at *Company I*'s offices, FERGUSON told *Company I* representatives that *Company I* must enter into a joint venture with FERGUSON's company,

-22-

Xcel Construction Services, in order to win one of DWSD's two upcoming contracts to rehabilitate sewers on the east and west side of the City.

87. On or about June 12, 2006, DWSD sent out requests for proposals for the sewer repair contracts.

88. On or about August 2, 2006, a joint venture of *Company I* and FERGUSON's affiliated company Xcel Construction Services submitted a proposal for the work, with Ferguson Enterprises identified as a subcontractor.

89. On or about December 21, 2006, MERCADO sent *Company I* a letter of DWSD's intent to enter into the westside sewer repair contract with the *Company I* / Xcel joint venture and further authorized *Company I* / Xcel to begin work on the contract immediately.

90. In or about December 2006, FERGUSON threatened *Company I* representatives that if FERGUSON did not get paid more money, FERGUSON would hold up the westside sewer repair contract just like he had done with the $12 million amendment to their previous sewer lining contract. FERGUSON further threatened that he could make more money working with *Company L*, which the *Company I* representative interpreted to mean that FERGUSON would join *Company L* on future DWSD projects, meaning that *Company I* would not get the work, given FERGUSON's influence with KWAME KILPATRICK, MERCADO and DWSD.

91. In or about December 2006, fearing that FERGUSON would carry out his threat to hold up the contract, *Company I* agreed to give FERGUSON nearly all of *Company I*'s profits from the point repair work, as well as an assured minimum profit for the overall project.

-23-

**I.** **Ferguson, Assisted by Miller and Mercado, Extorted *Company W* out of $5 Million in Work for Ferguson on the Baby Creek / Patton Park Contract**

92.     As set forth more fully in this subsection, below, in and between about February 2003 and 2008, FERGUSON, assisted by KWAME KILPATRICK, MILLER and MERCADO, caused *Company W* to give Ferguson Enterprises more than $2.7 million in work at the Baby Creek combined sewer overflow facility ("Baby Creek contract"), as well as to give FERGUSON and his affiliated company, Xcel Construction Services, more than $2.4 million of construction work at the neighboring Patton Park recreational facility, which was part of the Baby Creek contract. FERGUSON obtained this work by exploiting *Company W*'s fear that FERGUSON would use his relationship with KWAME KILPATRICK and other members of the Mayor's Office to adversely impact *Company W*'s chances of winning the contract if they did not do so.

93.     On or about September 30, 2002, DWSD requested proposals for the Baby Creek contract.

94.     On or about February 6, 2003, *Company W* submitted a bid for the construction of the Baby Creek facility. *Company W* was the second lowest bidder before application of preferences given to Detroit-based and Detroit-headquartered businesses.

95.     On or about February 8, 2003, MILLER told a representative from *Company W* that if his company wanted to win the contract it needed to put FERGUSON on its team, even though *Company W* already had agreed to hire a different subcontractor whose quotation for excavation work was 23% lower than FERGUSON's quotation.

96.     On or about February 10, 2003, MILLER gave FERGUSON non-public information about the bidding evaluation process, including the City's adjusted ranking of the bidders, so that FERGUSON could use that information to his advantage in negotiations with *Company W.* Specifically, FERGUSON told MILLER, "I need for you to talk [*to the City Purchasing Director*], baby creek before she [*announces*] her decision, to give it to you first." MILLER replied, "I did."

97.     On or about February 10, 2003, DWSD declared *Company W* the lowest responsive equalized bidder after giving the company preference for being a Detroit-headquartered business.

98.     On or about February 14, 2003, *Company W* agreed with FERGUSON that if it were awarded the Baby Creek contract, it would give FERGUSON $2.73 million in mass site work at Baby Creek, as well as a $10 million provisionary allowance to improve the Patton Park recreational facility.

99.     On or about February 18, 2003, DWSD declared *Company W* the lowest responsible bidder.

100.    On or about April 8, 2003, KWAME KILPATRICK, as Special Administrator of DWSD, signed an order awarding the contract to *Company W.*

101.    On or about July 1, 2003, *Company W* subcontracted about $2.7 million worth of site preparation work at the Baby Creek facility to FERGUSON.

102.    On or about August 11, 2003, FERGUSON told an upper level member of the administration that KWAME KILPATRICK had authorized DWSD and the Recreation

-25-

Department to reduce *Company W*'s administrative fee for the construction of the Patton Park recreation facility, enabling FERGUSON to obtain the balance for himself.

103. On or about July 2004, MERCADO directed *Company W* to reduce its administrative fee for the recreation facility by about $150,000. FERGUSON or his affiliated company, Xcel Construction Services, received more than $1.3 million in administrative fees.

104. During execution of the contract, FERGUSON threatened a representative of *Company W* that FERGUSON would take matters to the "inner circle" of the City administration if a dispute arose with *Company W*. *Company W* thereafter gave FERGUSON a total of more than $5 million in work on the combined sewer overflow facility and the Patton Park recreational facility.

**J. Kwame Kilpatrick and Mercado, Assisted by Miller, Rigged the Award of a $21 Million Security Contract to Ensure Ferguson's Team Won, Causing Ferguson to Receive $1.2 Million in Work**

105. As set forth more fully in this subsection, below, in or between about August 14, 2003 and October 2004, KWAME KILPATRICK and MERCADO, assisted by MILLER, rigged the evaluation and award of a contract to upgrade security systems at various DWSD facilities ("security contract") so FERGUSON's team would win the contract. MERCADO helped conceal the scheme by funneling additional work for the contract into an unrelated contract, then misleading an inquiry authorized by a federal judge into the propriety of the security contract. FERGUSON obtained more than $1.2 million of work on the security contract.

-26-

106.    In or about late September 2003, FERGUSON, in an effort to influence DWSD's evaluation of bids for the security contract, advised MERCADO that FERGUSON would be part of a joint venture that was forming to bid on the contract.

107.    On or about October 15, 2003, FERGUSON became a 15% partner in a joint venture formed to bid on the security contract (hereafter, "FERGUSON's team").

108.    On or about November 3, 2003, FERGUSON's team and *Company MC* submitted competing bids for the security contract.

109.    In or about January 2004, DWSD's evaluation committee advised MERCADO that the committee had determined that *Company MC* was the most qualified bidder.

110.    On or about January 13 and 14, 2004, shortly after the evaluation committee met for the last time, KWAME KILPATRICK, MERCADO and MILLER, at FERGUSON's urging, strategized about how to prevent DWSD's evaluation committee from awarding the security contract to *Company MC* rather than FERGUSON's team. Specifically, on or about January 14, 2004, a few minutes after asking KWAME KILPATRICK whether he had spoken with MERCADO, FERGUSON asked MILLER, "Zeke [*MILLER*] did you talk to victor [*MERCADO*] yesterday it real important." MILLER said "Yes." FERGUSON replied, "Thank you sir,we straight." MILLER clarified, "Not yet but will be." Shortly thereafter, FERGUSON warned MILLER, "Zeke [*MILLER*] its happen right now it had to be done yesterday, if you don't call asap its over, and [*Company MC*] will have won again, eng [*Engineering*] is send ing the decesion right now." MILLER asked, "Call whom?" FERGUSON answered, "Victor [*MERCADO*]."

-27-

111. On or about January 27, 2004, MERCADO, contrary to DWSD practice and against the advice of DWSD's attorneys and staff, directed DWSD's evaluation committee to negotiate simultaneously with both FERGUSON's team and *Company MC* for the security contract.

112. On or about February 11, 2004, after FERGUSON met with MERCADO, a DWSD employee relayed MERCADO's directive to the evaluation committee that high-level DWSD management would be taking an active role in the negotiations.

113. On or about February 25, 2004, MERCADO asked the Board of Water Commissioners to allow him to conduct contract negotiations simultaneously with both *Company MC* and FERGUSON's team.

114. On or about April 19, 2004, MERCADO rejected a recommendation by the members of DWSD's evaluation committee to discontinue contract negotiations with FERGUSON's team and to proceed only with *Company MC* whose proposal was a better value to DWSD. MERCADO directed his staff to reject the committee's recommendation on the pretextual ground that it was contrary to the Board of Water Commissioner's intentions, and further directed his staff to continue to negotiate simultaneously with both FERGUSON's team and *Company MC*.

115. On or about August 5, 2004, MERCADO recommended that DWSD award the security contract to FERGUSON's team despite the fact that its amended proposal was over $2.4 million more than *Company MC*'s proposal.

-28-

116.    On or about September 22, 2004, MERCADO moved the Board of Water Commissioners to authorize DWSD to negotiate the terms of the security contract with FERGUSON's team.

117.    On or about October 4, 2004, KWAME KILPATRICK signed an order as Special Administrator authorizing MERCADO to enter into the security contract with FERGUSON's team.

118.    In or about January 2006, after a federal judge authorized an investigation into the appropriateness of the award of the security contract to FERGUSON's team, MERCADO directed his staff to find other contracts, besides the security contract, to fund an extension of the security system to five additional water treatment plants.

119.    In or about January 2006, MERCADO asked a City contractor to fund the extension of the security system to the water treatment plants using extra money left over from a separate project the contractor had completed. When the representative declined to provide the funds in the manner MERCADO wanted, MERCADO ordered him out of his office, then directed a DWSD employee to place an indefinite hold on change orders requested by that contractor.

120.    In or about January 2006, MERCADO persuaded a different City contractor to submit a $3.9 million change order to DWSD for an existing pump station project, $3.1 million of which would be used as a pass-through to fund the extension of the security system to the water treatment plants.

121.    On or about February 10, 2006, MERCADO testified at a deposition authorized by a federal judge investigating the appropriateness of the award of the security

-29-

contract to FERGUSON's team, given FERGUSON's purported relationship to Mayor KWAME KILPATRICK and the fact that FERGUSON's team's bid was higher. MERCADO falsely testified that the security contract was completed on time and on budget without extras or change orders. When asked whether he had any conversations with FERGUSON, MERCADO testified, "Absolutely not. I don't talk to bidders when they're bidding." MERCADO further denied having any contact with members of the Mayor's Office during the negotiations over the security contract. As MERCADO well knew at that time, however, the security contract would require more time and money before it was completed. In order to obscure any additional security system costs, MERCADO, in the weeks leading up to his deposition, authorized that additional security system work at DWSD facilities be funded out of an unrelated pump station contract, rather than the security contract. Moreover, contrary to his deposition testimony, MERCADO had a number of meetings and conversations with FERGUSON and MILLER at critical stages during DWSD's evaluation of the security contract, including with MILLER on January 13, 2004 and with FERGUSON on February 11, 2004.

122.    On or about February 27, 2006, KWAME KILPATRICK asked a federal judge to approve a $3.9 million change order for the pump station, the bulk of which was to be used for the security system. Three of the other four change orders identified in KILPATRICK's letter to the judge were to pay FERGUSON on unrelated contracts.

123.    From the start of work on the security contract, until he received his last payment on or about late June 2008, FERGUSON obtained more than $1.2 million in work on the project.

-30-

**K. . Ferguson, Assisted by Kwame Kilpatrick and Mercado, Attempted to Extort**
*Company W* **to Give Ferguson a Substantial Portion of a $140 Million**
**Oakwood Pump Station Contract**

124.    As set forth more fully in this subsection, below, in and between about late

January and early February 2007, FERGUSON, with the assistance of KWAME KILPATRICK

and MERCADO, attempted to extort *Company W* through fear of economic harm to give

FERGUSON a substantial portion of a $140 million DWSD contract for work on the Oakwood

pump station ("Oakwood contract"). When *Company W* refused to agree to terms with

FERGUSON, the Oakwood contract was awarded instead to another team.

125.    On or about January 31, 2007, about a month after DWSD requested proposals

for the Oakwood contract, FERGUSON told a *Company W* representative that the Mayor's

Office wanted *Company W* to enter into a joint venture on the Oakwood contract with

FERGUSON and another firm. FERGUSON added that MERCADO would be contacting

*Company W* to discuss *Company W* teaming with FERGUSON.

126.    On or about the morning of February 1, 2007, MERCADO called a

*Company W* representative and told that representative that their conversation was " just between

you and I." MERCADO said he understood *Company W* would be taking on FERGUSON as a

"mentor-partner" on the Oakwood contract, and that "if you [*Company W*] want go in that

direction [*i.e. partnering with FERGUSON*] we [*DWSD*] would approve it." The representative

asked MERCADO if MERCADO's "big guy" (KWAME KILPATRICK) had authorized the

approval. MERCADO answered "yes."

127.    On or about February 8, 2007, during a meeting with a *Company W*

representative, FERGUSON demanded a 35% joint venture share of *Company W*'s proposal for

-31-

the Oakwood contract, warning the *Company W* representative, "there's a new boy in town . . . this isn't like when you called somebody up with [*a former Detroit Mayor*] and gave him 20% and he went away."

128.  On or about February 8, 2007, KWAME KILPATRICK requested that a *Company W* representative meet with him at the Manoogian Mansion.

129.  On or about February 8, 2007, MERCADO advised a *Company W* representative that KWAME KILPATRICK asked MERCADO to contact him "to make sure there were no issues between" *Company W* and FERGUSON.

130.  On or about Saturday, February 10, 2007, a *Company W* representative met with KWAME KILPATRICK at the Manoogian Mansion. KWAME KILPATRICK told the representative he wanted *Company W* to "play fair," with respect to the Oakwood contract, which the representative understood to mean that *Company W* needed to partner with FERGUSON.

131.  In or about March 2007, FERGUSON rejected *Company W*'s offer of a 15% share of the Oakwood contract because FERGUSON refused to share a corresponding percentage of risk of loss on the project.

132.  On or about March 21, 2007, KWAME KILPATRICK instructed a DWSD employee to postpone the bid deadline by one week so that a high-level aide to KWAME KILPATRICK could meet in person with a *Company W* representative in an effort to work out a joint venture between *Company W* and FERGUSON.

133.  In or about March 2007, *Company W* declined to partner with FERGUSON after FERGUSON again refused to share a risk of loss equaling his share of the project.

-32-

134. In or about April 2007, DWSD awarded the Oakwood Contract to a rival bidder rather than to *Company W*.

### L. Attempt to Find a Replacement for Mercado

135. As set forth more fully in this subsection, below, in or about the Winter of 2008, after MERCADO had announced that he was going to leave his post as DWSD Director, KWAME KILPATRICK confidentially asked an official at the Buildings & Safety Engineering Department ("B&SE") to take the job of DWSD Director, even though that official did not have the training or experience for the job. KWAME KILPATRICK made the offer in the hope that the B&SE official would take over MERCADO's role of steering DWSD contracts and funds to FERGUSON through extortion and contract rigging.

136. In or about the Winter of 2008, shortly after KWAME KILPATRICK's confidential job offer to the B&SE official, FERGUSON invited that official to FERGUSON's offices where FERGUSON urged the official to take the job of DWSD Director, saying that if he did, FERGUSON and the official could make over a million dollars for KWAME KILPATRICK in two weeks.

### M. Kwame Kilpatrick Attempted to Get Ferguson the Tiger Stadium Demolition

137. As set forth more fully in this subsection, below, in or between about February to April 2008, KWAME KILPATRICK used his position as Mayor of Detroit in an attempt to coerce an official of the Detroit Economic Growth Corporation ("DEGC") to recommend that FERGUSON get the contract to demolish Tiger Stadium in Detroit, even though FERGUSON was not the low bidder. When the DEGC official refused, KWAME KILPATRICK tried to retaliate against the official by having him removed from his position.

138.     On or about November 30, 2007, a joint venture which included Ferguson Enterprises (hereafter, "FERGUSON's joint venture") submitted a bid to the City of Detroit Economic Development Corporation ("EDC") to demolish Tiger Stadium in Detroit.

139.     In or about late February or early March 2008, KWAME KILPATRICK contacted a DEGC official who was helping the EDC evaluate the bids, telling him that KWAME KILPATRICK wanted FERGUSON's joint venture to win the demolition contract.

140.     On or about April 21, 2008, KWAME KILPATRICK expressed his concern and unhappiness to the DEGC official after learning that the EDC's staff had recommended that the EDC negotiate a contract with a different demolition team whose bid was $300,000 lower than FERGUSON's joint venture. KWAME KILPATRICK instructed the DEGC official to delay submitting the recommendation to the EDC board so KWAME KILPATRICK could have an official at the Building & Safety Engineering Department (who served at KWAME KILPATRICK's pleasure) review the recommendation. The DEGC official declined to delay the board's vote.

141.     On or about April 30, 2008, after the EDC board unanimously voted to award the contract to the low bidder, rather than the FERGUSON joint venture, a high-level official from the Mayor's Office, at KWAME KILPATRICK's direction, called the DEGC official to warn him that he had made a bad decision, that he was not a team player, and that from now on the Mayor's Office would review all staff recommendations before they were given to the board.

142.     On or about April 30, 2008, KWAME KILPATRICK, who was upset with the DEGC official in part for not recommending that the FERGUSON joint venture receive the Tiger

-34-

Stadium demolition contract, sent his Chief of Staff, Kandia Milton, to the office of the DEGC official to ask for his resignation. The DEGC official declined to resign.

### N. Kwame Kilpatrick Attempted to Get Ferguson Demolition Work at the Book Cadillac Hotel

143. As set forth more fully in this subsection, below, from in or about the Spring of 2003 to the Spring of 2004, KWAME KILPATRICK and FERGUSON schemed together in an attempt to ensure that FERGUSON would receive a multi-million dollar subcontract to conduct the interior demolition and hazardous material abatement as part of the renovation of the Book Cadillac Hotel in Detroit, which was overseen and partly funded by departments and agencies affiliated with the City, including the Detroit Economic Growth Corporation ("DEGC") and the Downtown Development Authority ("DDA").

144. On or about March 31, 2003, FERGUSON told KWAME KILPATRICK that the *Construction Management Firm* overseeing the renovation of the Book Cadillac wanted to subcontract with a demolition company other than FERGUSON for the interior demolition of the hotel. FERGUSON reassured KWAME KILPATRICK, however, that a City official had arranged for FERGUSON to accompany that official to an event attended by the *Construction Management Firm* to let the *Construction Management Firm* know how close FERGUSON was to the City Administration. KWAME KILPATRICK replied, "COOL!"

145. On or about April 11, 2003, FERGUSON warned KWAME KILPATRICK that the *Construction Management Firm* still wanted to hire another subcontractor for the Book Cadillac demolition work. KWAME KILPATRICK replied, "Let's go to work" and they arranged to meet that afternoon to discuss the matter further.

-35-

146. On or about April 17, 2003, FERGUSON advised KWAME KILPATRICK, "I NEED YOUR HELP" before a meeting on the Book Cadillac project.

147. In or about the Spring of 2003, while attending a Detroit Red Wings game in a suite at the Joe Louis Arena in Detroit with representatives of the *Construction Management Firm*, KWAME KILPATRICK brought FERGUSON into the suite, introduced him to a *Construction Management Firm* representative, then explained that FERGUSON was his "friend" and would be "good" for the Book Cadillac project. The *Construction Management Firm* representative believed that KWAME KILPATRICK was pressuring his firm to hire FERGUSON or risk adverse consequences to the *Construction Management Firm*'s future business prospects in the City.

148. On or about April 25, 2003, FERGUSON was awarded the Book Cadillac demolition subcontract.

149. On or about May 7, 2003, the DDA board approved the selection of the developer for the Book Cadillac renovation.

150. On or about January 13, 2004, FERGUSON told KWAME KILPATRICK that the developer had discontinued work on the Book Cadillac development, leaving FERGUSON with money in the project that he needed to recoup. FERGUSON stated, "Is over, . . . I have over $300,000.00 out of my pockets cash money tied up in this job." KWAME KILPATRICK reassured FERGUSON that they would find another developer to take over the project, "Its not over! We WILL have a deal. If [*the developer*] doesn't do it, we have another Company that will." FERGUSON said, "Cool,i need to recope what I spent so far". KWAME KILPATRICK replied, "NO QUESTION!"

-36-

151. On or about May 17, 2004, while discussing the Book Cadillac project, FERGUSON told KWAME KILPATRICK that because of KWAME KILPATRICK, "I am famous now. just need to get some money." KWAME KILPATRICK agreed, "Lol! Right. Let's get you some [*i.e., money*]." FERGUSON corrected KWAME KILPATRICK, saying, "Us."

## II. DEFRAUDING THE STATE OF MICHIGAN AND DONORS TO NONPROFITS OF MONIES MEANT TO HELP THE COMMUNITY OR TO FUND CAMPAIGN EXPENSES

152. As set forth more fully in this section, below, beginning in or about 1999, and continuing until 2009, KWAME KILPATRICK, FERGUSON and BERNARD KILPATRICK, assisted by other members of the Enterprise, obtained monies from the State of Michigan, as well as from donors to nonprofit entities they controlled, including the Kilpatrick Civic Fund, Kilpatrick for Mayor and the Kilpatrick Inaugural Committee, under the false pretense that such monies would be used for purposes consistent with bettering the community or for campaign expenses when, in truth and in fact, these monies were used for personal or otherwise impermissible expenses of members of the Kilpatrick Enterprise. KWAME KILPATRICK, FERGUSON and BERNARD KILPATRICK executed their pattern of fraud, in part, by causing items to be delivered by U.S. mail or interstate carrier or by transmitting information by means of wire communication in interstate commerce. The total amount of money obtained by fraud from the State of Michigan and donors to nonprofits was over $650,000.

-37-

**A.  Kwame Kilpatrick and Ferguson Defrauded the State of Michigan of Over $280,000 In Grant Monies Meant to Help the Community**

153.   As set forth more fully in this subsection, below, in and between 2000 and 2002, KWAME KILPATRICK, while a member of the State House of Representatives and with the assistance of FERGUSON, committed fraud on the State of Michigan by directing over $280,000 in grant money from the State of Michigan to nonprofit entities controlled by KWAME KILPATRICK's wife and FERGUSON. The State grant money, which was supposed to help children and seniors in the Detroit area, was spent in large part by KWAME KILPATRICK or his wife on personal expenses and by FERGUSON to refurbish the offices of Ferguson Enterprises on Wyoming Avenue in Detroit.

154.   In or about 2000, KWAME KILPATRICK, using his position as Democratic Floor Leader in the Michigan House of Representatives, agreed to support a proposed budget for the State of Michigan on condition that the State Budget Office award Arts, Cultural and Quality of Life grants ("State grants"), as follows: a $500,000 grant to Detroit Three Dimensional Community Development Corporation ("Detroit 3D"), a purported non-profit entity controlled by FERGUSON; and a $300,000 grant to another Detroit-based nonprofit ("*Nonprofit V*").

155.   On or about June 22, 2000, KWAME KILPATRICK, acting as a member of the Michigan House of Representatives, sent a letter to the State Budget Office supporting the award of State grants to Detroit 3D and *Nonprofit V*.

156.   On or about June 30, 2000, KWAME KILPATRICK caused an application from Detroit 3D to be sent to the State Budget Office seeking a $500,000 State grant to help children and senior citizens. In or about August 2000, KWAME KILPATRICK asked a

-38-

representative of *Nonprofit V* to hire KWAME KILPATRICK's wife using some of the State grant funds awarded to *Nonprofit V*.

157.    On or about October 2, 2000, the State of Michigan mailed a $250,000 check to Detroit 3D and a $150,000 check to *Nonprofit V*, equaling half of their respective State grants.

158.    On or about October 12, 2000, unbeknownst to the State Budget Office or the Michigan legislature, *Nonprofit V* gave $37,500 of its State grant to a for-profit company controlled by KILPATRICK's wife called "Using Nonviolence to Influence Total Education, Inc." ("U.N.I.T.E."), for peer mediation classes for children, which services were never provided.

159.    On or about December 15, 2000, unbeknownst to the State Budget Office or the Michigan legislature, Detroit 3D gave $100,000 of its State grant to U.N.I.T.E.

160.    Between October 2000 and April 2002, most of the $137,500 in State grant money given to U.N.I.T.E. was used for personal expenses for KWAME KILPATRICK and his wife, including $91,000 in salary to his wife, which, as KWAME KILPATRICK well knew at that time, was contrary to the purpose of the grant.

161.    In or about the Spring of 2001, KWAME KILPATRICK complained to a representative of the State Budget Office that the State wanted too much detail from Detroit 3D and *Nonprofit V* about how they spent the State grant money.

162.    In or about the Spring of 2001, MILLER met with a representative of the State Budget Office to help Detroit 3D and *Nonprofit V* get the second half of their State grants.

163.    In or about the Summer of 2001, FERGUSON used about $100,000 of Detroit 3D's State grant money to renovate his company offices and to repair his company's rooftop air

-39-

conditioning units, which, as FERGUSON knew at the time, was contrary to the purpose of the grant.

165.    On or about June 11, 2001, a letter signed by FERGUSON's wife was sent to the State Budget Office asking for the second half of the State grant to Detroit 3D.

165.    On or about January 15, 2002, a letter signed by FERGUSON's wife was sent to the State Budget Office claiming that Detroit 3D spent the first half of its State grant to renovate a dwelling in Detroit for displaced seniors and runaway youth, when in truth and fact, as FERGUSON knew at the time, the renovations were made at Ferguson Enterprises's facility.

**B.    Kwame Kilpatrick Defrauded Donors to Kilpatrick for Mayor, the Kilpatrick Inaugural Committee and Other Kilpatrick-Related Nonprofits by Taking Cash Kickbacks of Over $286,000 from His Fundraising Director**

166.    As set forth more fully in this subsection, below, in and between August 2003 and May 2008, KWAME KILPATRICK, assisted by a person employed to fund raise for his nonprofits (the *"Fundraiser"*), caused solicitations for donations to be sent by U.S. mail to potential donors to Kilpatrick for Mayor (KWAME KILPATRICK's campaign fund), the Kilpatrick Inaugural Committee (a fund to pay for KWAME KILPATRICK's inaugural ceremonies) and the Kilpatrick Civic Fund (KWAME KILPATRICK's social welfare nonprofit). During this same time period, KWAME KILPATRICK and the *Fundraiser* received donations to these entities by U.S. mail. KWAME KILPATRICK and the *Fundraiser* represented to donors that their donations would be used for the purposes of these nonprofits, i.e., that the donations to Kilpatrick For Mayor would be used for KWAME KILPATRICK's mayoral campaigns, donations to the Kilpatrick Inaugural Committee would be used to pay for KWAME KILPATRICK's inaugural ceremonies and donations to the Kilpatrick Civic Fund would be used

-40-

for social welfare causes. KWAME KILPATRICK and the *Fundraiser* never told any of the donors that KWAME KILPATRICK would be taking cash kickbacks from the commissions paid to the *Fundraiser* by the nonprofit entities. The cash kickbacks taken by KWAME KILPATRICK totaled over $286,000.

167.    On or about August 6, 2003, KWAME KILPATRICK told the *Fundraiser* that he wanted her to give him a portion of the commissions she received for her fund raising efforts. Thereafter, from about August 6, 2003 to about May 8, 2008, at KWAME KILPATRICK's direction, the *Fundraiser* met with KWAME KILPATRICK to give him the following amounts of cash, representing his personal "share" of her commission checks:

| Par. No. | Date | Non-Profit | Cash to Kilpatrick |
|----------|------|------------|--------------------|
| 168. | 8/6/03 | Kilpatrick for Mayor | $50,000.00 |
| 169. | 12/11/03 | Kilpatrick for Mayor | $5,000.00 |
| 170. | 1/23/04 | Kilpatrick for Mayor | $7,500.00 |
| 171. | 8/26/04 | Kilpatrick for Mayor | $40,000.00 |
| 172. | 5/18/05 | Kilpatrick for Mayor | $5,000.00 |
| 173. | 8/29/05 | Kilpatrick for Mayor | $2,000.00 |
| 174. | 1/17/06 | Kilpatrick Inaugural Committee | $25,000.00 |
| 175. | 2/7/06 | Kilpatrick Inaugural Committee | $20,000.00 |
| 176. | 3/17/06 | Kilpatrick Inaugural Committee | $5,000.00 |
| 177. | 6/8/06 | Kilpatrick for Mayor | $30,000.00 |
| 178. | 5/4/07 | Kilpatrick Inaugural Committee | $20,000.00 |
| 179. | 7/6/07 | Kilpatrick Inaugural Committee | $10,000.00 |
| 180. | 9/20/07 | Kilpatrick Civic Fund | $7,000.00 |
| 181. | 12/18/07 | Kilpatrick for Mayor | $25,000.00 |

-41-

| Par. No. | Date | Non-Profit | Cash to Kilpatrick |
|----------|------|------------|--------------------|
| 182. | 12/26/07 | Kilpatrick Civic Fund | $15,000.00 |
| 183. | 4/17/08 | Kilpatrick for Mayor | $10,000.00 |
| 184. | 5/8/08 | Kilpatrick for Mayor | $10,000.00 |
| | Total | | $286,500.00 |

**C.     Kwame Kilpatrick, With the Assistance of Members of the Kilpatrick Enterprise, Defrauded Donors to the Kilpatrick Civic Fund by Using Civic Fund Monies for Personal and Campaign Expenses**

185.    Beginning in or about 1999, and continuing until at least February of 2009, as explained in further detail in Counts 16 through 28 below, which is incorporated by reference herein, KWAME KILPATRICK, assisted by other members of the Kilpatrick Enterprise, committed mail and wire fraud on donors to the Kilpatrick Civic Fund, a social welfare organization, by using donated monies for personal and political expenses. At least $159,000 in Civic Fund monies were used by KWAME KILPATRICK on personal expenses.

**III.     BRIBERY AND ACQUISITION OF MONEY AND PROPERTY UNDER COLOR OF OFFICIAL RIGHT AND BY FEAR OF ECONOMIC HARM**

186.    As set forth more fully in this section, below, during the course of the conspiracy, Enterprise members KWAME KILPATRICK, BERNARD KILPATRICK, DERRICK MILLER and other associates and City officials solicited and accepted payments and property from individuals seeking business with the City or its General Retirement System or Police and Fire pension funds. These items of value, which totaled more than $1.2 million, were obtained by making wrongful use of KWAME KILPATRICK's mayoral office as they were items not due to KWAME KILPATRICK or BERNARD KILPATRICK, and they knew when

-42-

they received the items that they were given in return for official acts and favorable treatment by

KWAME KILPATRICK as Mayor of the City. In addition, KWAME KILPATRICK and

BERNARD KILPATRICK also obtained items from some of these same individuals through the

fear of economic harm.

### A. Kwame Kilpatrick, Bernard Kilpatrick and Miller Solicited and Took Bribes Totaling at Least $360,000 From Cobo Contractor Karl Kado; Bernard Kilpatrick Attempted to Extort Kado

187.   As set forth more fully in this subsection, below, from in or about 2001

to 2005, KWAME KILPATRICK, BERNARD KILPATRICK and MILLER solicited and took

bribes of at least $360,000 in cash from Cobo Civic Center contractor Karl Kado for favorable

treatment on millions of dollars in Cobo service contracts sought or held by Kado. Moreover, in

about 2008, BERNARD KILPATRICK attempted to extort Kado out of a percentage of money

the City owed Kado for work performed at the City's Department of Administrative Hearings

Building.

188.   In and between about 2001 and 2002, KWAME KILPATRICK obtained a

number of cash payments totaling at least $80,000 from Kado, knowing that, in return, Kado

expected to receive favorable treatment on service contracts Kado sought or held at Cobo Hall.

189.   In or about 2001, MILLER obtained $10,000 cash from Kado at the request of

KWAME KILPATRICK.

190.   In or about 2001, MILLER obtained $10,000 cash from Kado knowing that, in

return, Kado expected to receive favorable treatment on contracts Kado sought or held at Cobo

Hall.

-43-

191.    Early in the administration of Mayor Kilpatrick, MILLER obtained another $10,000 cash from Kado, knowing that, in return, Kado expected to receive favorable treatment on contracts Kado sought or held at Cobo Hall.

192.    In and between about 2002 and 2005, BERNARD KILPATRICK obtained a number of cash payments totaling at least $250,000 from Kado knowing that, in return, Kado expected to receive favorable treatment from the City on contracts Kado sought or held at Cobo Hall.  The payments included a single cash payment of $100,000 in 2005.

193.    In or about April 2002, KWAME KILPATRICK and MILLER agreed to assign the exclusive Cobo Hall cleaning contract to Kado's company, Metro Services Organization, Inc. ("MSO").

194.    On or about April 17, 2002, BERNARD KILPATRICK told MILLER to instruct Lou Pavledes, director of the Cobo Civic Center, to award the Cobo Hall electrical contract to Kado, saying, "LAST THING (FOR TODAY) YOU HAVE TO CALL LOU [*Pavledes*] AND GIVE O.K.FOR KARL [*Kado*] TO DEAL WITH THE ELECTRICAL CONTRACT IN JUNE."

195.    On or about April 24, 2002, BERNARD KILPATRICK reminded MILLER to call Pavledes to award the Cobo electrical contract to Kado, adding that MILLER should do it exactly like they did it for Kado's cleaning/maintenance contract at Cobo: "ITS TIME TO CALL LOU [*Pavledes*] ON THE CARL [*Kado*] DEAL..EXACTLY LIKE THE MAINTENANCE."

196.    On or about January 25 and 28, 2003, and February 2, 2003, BERNARD KILPATRICK prodded MILLER to complete the Cobo Hall electrical services contract with Kado.

-44-

197. On or about February 5, 2003, KWAME KILPATRICK and MILLER agreed to assign the exclusive electrical contract for Cobo Hall to MSO. KWAME KILPATRICK and MILLER later agreed to extend MSO's electrical contract until December 20, 2006.

198. In or about mid and late January 2004, KWAME KILPATRICK called Kado on the telephone.

199. On or about February 4, 2004, KWAME KILPATRICK and MILLER agreed to a $600,000 annual increase of MSO's cleaning contract at Cobo Hall.

200. On or about July 18, 2005, KWAME KILPATRICK and MILLER agreed to a $1.75 million increase of MSO's cleaning contract at Cobo Hall.

201. In or about September 2005, shortly after Kado showed BERNARD KILPATRICK a letter indicating that Kado was the target of a federal investigation, BERNARD KILPATRICK told Kado that the Kilpatrick Administration was ready to give Kado ten more years of Cobo service contracts if Kado agreed to "work with" the Administration.

202. On or about January 11, 2006, KWAME KILPATRICK and MILLER agreed to extend MSO's cleaning contract at Cobo Hall until December 20, 2006.

203. In or about the Winter of 2008, BERNARD KILPATRICK told an official at the City of Detroit Buildings & Safety Engineering Department to authorize payments to Kado for work Kado performed at the City's Department of Administrative Hearings Building. BERNARD KILPATRICK told the official that he wanted the City to pay Kado so BERNARD KILPATRICK could get paid.

204. On or about March 1, 2008, at a Detroit restaurant, BERNARD KILPATRICK attempted to extort payments from Kado if he did not pay BERNARD KILPATRICK 10% of the

-45-

money the City owed Kado for the Administrative Hearings Building. BERNARD KILPATRICK told Kado, "You don't even wanna pay me, huh? . . . It would take you two years to go through lawyers to get your money, man." After Kado declined to pay BERNARD KILPATRICK, the City did not pay Kado.

**B.** **Kwame Kilpatrick and Bernard Kilpatrick Solicited and Took Bribes of Over $500,000 From Jon Rutherford, Who Sought a Casino Development**

205. As set forth more fully in this subsection, below, KWAME KILPATRICK and BERNARD KILPATRICK solicited and took more than $500,000 in cash, non-profit donations and campaign-related payments from Jon Rutherford in return for the support of KWAME KILPATRICK, MILLER and other officials in the Mayor's Office for Rutherford's riverfront casino development plan.

206. On or about September 19 and 27, 2000, Rutherford gave checks totaling about $100,000 to an entity associated with the Michigan Democratic Party to assist KWAME KILPATRICK in becoming the Democratic leader in the State House of Representatives.

207. In or about October 2000, Rutherford gave $23,000 to a television and radio political analyst to support KWAME KILPATRICK's mayoral campaign.

208. On or about October 19, 2000, Rutherford gave $40,000 to the Kilpatrick Civic Fund as a way to fund KWAME KILPATRICK's mayoral campaign.

209. On or about May 2, 2001, Rutherford gave $20,000 to the Kilpatrick Civic Fund as a way to fund KWAME KILPATRICK's mayoral campaign.

210. On or about June 6, 2001, Rutherford gave $34,000 to Next Generation Detroit, a political action committee controlled by KWAME KILPATRICK.

-46-

211. On or about June 6, 2001, Rutherford gave $34,000 to the Detroit Ecumenical Minister Alliance on behalf of KWAME KILPATRICK.

212. On or about July 2, 2001, Rutherford gave $30,000 to the Kilpatrick Civic Fund as a way to fund KWAME KILPATRICK's mayoral campaign.

213. On or about October 25, 2001, Rutherford gave $3,000 to Kilpatrick for Mayor.

214. Between October 26, 2001 and November 6, 2001 (election day), Rutherford provided four checks totaling $97,275 to Community Coalition to pay for costs associated with KWAME KILPATRICK's mayoral campaign.

215. On or about November 6, 2001, at the request of BERNARD KILPATRICK, Rutherford gave $20,000 to BERNARD KILPATRICK for KWAME KILPATRICK's campaign expenses, including paying poll workers.

216. In or about 2001, during KWAME KILPATRICK's campaign for mayor and after KWAME KILPATRICK was elected mayor, Rutherford told KWAME KILPATRICK about his plan to develop a casino on the Detroit river front. KWAME KILPATRICK agreed to support this plan.

217. On or about November 17, 2001, in Las Vegas, Rutherford gave KWAME and BERNARD KILPATRICK tickets worth $2,400 to a heavyweight boxing match.

218. Between about June 4, 2002 and March 7, 2003, as KWAME KILPATRICK well knew, Rutherford paid BERNARD KILPATRICK between $5,000 and $15,000 per month for purported consulting services, almost none of which BERNARD KILPATRICK actually

-47-

performed. The total amount Rutherford paid BERNARD KILPATRICK during this time period was more than $130,000.

219.   In or about the Spring of 2002, in Las Vegas, KWAME KILPATRICK asked Rutherford for $5,000 cash, which Rutherford gave to him.

220.   In or about May 2002, KWAME KILPATRICK asked Rutherford for $10,000 cash so that KWAME KILPATRICK would have spending money when he visited the United Arab Emirates. Rutherford provided the cash to KWAME KILPATRICK.

221.   On or about October 22, 2002, at BERNARD KILPATRICK's request, Rutherford gave $5,000 to the Next Vision Foundation, a nonprofit run by KWAME KILPATRICK's sister. BERNARD KILPATRICK advised KWAME KILPATRICK of this contribution.

222.   In or about 2004, Rutherford gave KWAME KILPATRICK at least $10,000 in cash, which KWAME KILPATRICK said he needed to support a plan to elect City Council members by geographic districts.

223.   Between about 2002 and 2005, KWAME KILPATRICK and MILLER took a number of official actions to further Rutherford's river front casino development deal, either personally or through other representatives of the KILPATRICK administration, including attending meetings with architects, casino executives and members of the Detroit City Council and the Detroit/Wayne County Port Authority, at which KILPATRICK, MILLER or other mayoral representatives discussed the logistics of Rutherford's river front casino plan and expressed that the Mayor's Office supported the plan.

-48-

C.   **Kwame Kilpatrick, Bernard Kilpatrick and Miller Solicited and Took Money, Private Jet Flights and Entertainment Expenses Worth at least $100,000 from James Rosendall; Bernard Kilpatrick Attempted to Extort Rosendall for $5,000**

224.   As set forth more fully in this subsection, below, from about 2001 to about 2008, KWAME KILPATRICK, BERNARD KILPATRICK and MILLER solicited and took money, private jet flights, entertainment expenses and donations to KWAME KILPATRICK's non-profits and political entities worth more than $100,000 from James Rosendall, an executive of *Company S*, in exchange for the support of KWAME KILPATRICK, MILLER and other members of the Mayor's Office for a $47 million per year sewage sludge disposal contract (the "sludge contract"). In about 2008, BERNARD KILPATRICK attempted to extort about $5,000 from Rosendall by threatening to "kill" the sludge contract if he was not paid.

225.   In or about mid-2001, in a house near the State Capital in Lansing, Rosendall told KWAME KILPATRICK that *Company S* wanted to take over the contract the City had entered with another company to handle its wastewater sludge, then gave KWAME KILPATRICK and an aide three bundled campaign checks totaling more than $10,000 for KWAME KILPATRICK's campaign for Mayor.

226.   In about late 2002, KWAME KILPATRICK met Rosendall in a hotel suite in Grand Rapids, Michigan and instructed Rosendall to work with KILPATRICK's aide, MILLER, on the sludge contract.

-49-

227.    In or about March 2003, *Company S* submitted a proposal to DWSD to revise an existing waste disposal and hauling contract between DWSD and another company with the intent that *Company S* would take over the sludge contract.

228.    In or about early 2003, at a fund raiser at the Manoogian Mansion, KWAME KILPATRICK introduced Rosendall to BERNARD KILPATRICK, telling Rosendall he wanted Rosendall to work with BERNARD KILPATRICK on the sludge contract. Rosendall understood this to mean that KWAME KILPATRICK wanted Rosendall to hire BERNARD KILPATRICK.

229.    In or about early 2003, shortly after the fund raiser at the Manoogian Mansion, BERNARD KILPATRICK introduced Rosendall to Rayford Jackson, explaining that Jackson would be Rosendall's point of contact in the sludge deal. Thereafter, BERNARD KILPATRICK spent little time helping to obtain the approval of the DWSD or the Detroit City Council for the sludge contract, although he periodically would ask Rosendall for money, including requests for "loans," totaling at least $25,000, which were never repaid.

230.    From about 2003 to 2007, acting on the instructions of KWAME KILPATRICK, City officials including MILLER and Kandia Milton lobbied the DWSD and the Detroit City Council to support the sludge contract. This included resolving financial, liability, environmental and regulatory issues.

231.    In or about 2003 or 2004, MERCADO declined to open the sludge contract to competitive bidding despite a request to do so by DWSD staff involved in the negotiation of the contract.

232.    In or about the Fall of 2003, Rosendall chartered a private jet costing more than $19,000 to take KWAME KILPATRICK, MILLER and several of their associates to Las

-50-

Vegas over the weekend of September 12, 2003. Rosendall spent more than $2,000 entertaining the group while in Las Vegas. Neither KILPATRICK, MILLER, nor their associates reimbursed Rosendall for the flight or the other expenses.

233. In or about the Spring of 2004, Rosendall chartered a private jet costing more than $15,000 to take MILLER and several of his associates to Las Vegas over the weekend of April 2, 2004. Rosendall spent more than $4,000 for food, lodging and entertainment for the group while in Las Vegas. Neither MILLER nor his associates reimbursed Rosendall for the flight or the other expenses.

234. On or about October 31, 2005, Rosendall wrote a check for $7,500 to the Kilpatrick Civic Fund.

235. On or about November 11, 2005, Rosendall wrote a check for $10,000 to Generations PAC, KWAME KILPATRICK's political action committee.

236. On or about January 3, 2006, Rosendall wrote a check for $5,000 to the Kilpatrick Inaugural Committee.

237. On or about February 13, 2006, at BERNARD KILPATRICK's request, Rosendall gave BERNARD KILPATRICK $5,000 as a purported loan, which was never repaid.

238. On or about August 18, 2006, at BERNARD KILPATRICK's request, Rosendall gave BERNARD KILPATRICK a $5,000 check, labeled as a loan, which was never repaid.

239. In or about 2006, BERNARD KILPATRICK advised Rosendall that BERNARD KILPATRICK had an agreement with Rayford Jackson giving BERNARD

-51-

KILPATRICK 50% of all proceeds Jackson received from the sludge contract, totaling about $1 million over three years.

240. In or about 2006, BERNARD KILPATRICK introduced Rosendall to BERNARD KILPATRICK's girlfriend, saying she would be in charge of recruiting and hiring minority contractors to help build and operate the sludge processing facility. BERNARD KILPATRICK instructed Rosendall that his girlfriend, rather than BERNARD KILPATRICK, should be named in any *Company S* contracts involving BERNARD KILPATRICK to conceal BERNARD KILPATRICK's role.

241. On or about May 19, 2007, Rosendall wrote a check for $3,400 to Kilpatrick for Mayor.

242. In or about June 2007, Rosendall chartered a private plane to return KWAME KILPATRICK and BERNARD KILPATRICK to Detroit from Mackinac Island. Rosendall was not reimbursed for the flight.

243. In or about June 2007, DWSD approved the contract with *Company S*.

244. On or about September 26, 2007, BERNARD KILPATRICK told Kandia Milton that he would see if he could make it MERCADO's "urgency" to complete the sludge deal.

245. On or about November 27, 2007, KWAME KILPATRICK signed a resolution approving the sludge contract, valued at about $47 million per year, with a 25-year term.

246. On or about December 4, 2007, BERNARD KILPATRICK and his girlfriend met Rosendall at a restaurant in Birmingham, at which time BERNARD KILPATRICK explained that he had an unwritten agreement with Rayford Jackson that any profits Jackson

-52-

derived from the sludge contract would be split as follows: 45% to BERNARD KILPATRICK, 45% to Jackson and 10% to BERNARD KILPATRICK's girlfriend, with the payment to BERNARD KILPATRICK structured through his girlfriend to conceal BERNARD KILPATRICK's interest.

247.    On or about December 20, 2007, in a parking lot in Detroit, BERNARD KILPATRICK attempted to extort Rosendall, threatening him that "we" would "kill" the sludge contract if BERNARD KILPATRICK was not compensated to his satisfaction. Rosendall gave BERNARD KILPATRICK about $300 in cash, hidden in a pack of chewing gum, in an effort to temporarily pacify him.

248.    On or about March 5, 2008, outside BERNARD KILPATRICK's residence in Detroit, BERNARD KILPATRICK held up five fingers, indicating he wanted Rosendall to give him $5,000. Later that day, BERNARD KILPATRICK took $2,500 in cash from Rosendall, saying he was "the one guy that made [*the sludge contract*] happen" and confirming that if he had not been paid, he would have told KWAME KILPATRICK, "Do what you can to stop it [*the sludge contract*] for a year. Stop it for two years."

249.    On or about April 16, 2008, in a restaurant parking lot in Southfield, BERNARD KILPATRICK took $2,500 in cash from Rosendall in connection with the sludge contract.

**D.** **Kwame Kilpatrick Solicited and Took Private Jet Flights Worth Over $300,000 From a Representative of *Company I***

250.    As set forth more fully in this subsection, below, from about August 2003 to January 2008, KWAME KILPATRICK requested the use of the private jets of a representative of *Company I* on at least eighteen occasions for the personal use of KWAME KILPATRICK and his friends and family, including BOBBY FERGUSON and BERNARD KILPATRICK, without reimbursing the representative. The representative provided this free private jet service, worth over $260,000, in part so KWAME KILPATRICK and the Mayor's Office would not harm the representative's business interests in the City, including *Company I*.

251.    In or about 2006, after KWAME KILPATRICK had used the private jets a number of times, the representative of *Company I* asked KILPATRICK if he thought he should start paying for some of the flights because "it did not look good" for the representative to provide the flights for free. KILPATRICK said he would see about it but never otherwise responded to the representative of *Company I*.

252.    In or about 2006, one of the representative's employees suggested to a high-level member of the Mayor's administration that they consider setting up a nonprofit entity which could receive donations to pay for KWAME KILPATRICK's flights. The City official said they were not interested in doing this.

253.    The representative of *Company I* continued to pay for KWAME KILPATRICK's flights in part because he knew KWAME KILPATRICK could adversely impact his businesses in the City if he refused. The flights, having a fair market value to KWAME

-54-

KILPATRICK of more than $260,000 and an added variable cost to the representative of more than $120,000, were as follows:

| Par. No. | Date(s) | Destination(s) | Flights | Passen-gers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 254. | 2/25/04 to 2/28/04 | Washington, D.C. | 2 | 4 | $4,473.59 | $7,750.00 |
| 255. | 4/12/04 to 4/16/04 | Orlando | 2 | 8 | $8,947.19 | $11,760.00 |
| 256. | 7/24/04 to 7/25/04 | East Hamptons Boston | 2 | 3 | $3,890.08 | $10,466.00 |
| 257. | 10/15/04 to 10/16/04 | Houston | 2 | 6 | $10,114.20 | $14,659.00 |
| 258. | 5/19/05 | Cleveland | 2 | 9 | $1,167.02 | $2,025.00 |
| 259. | 5/27/05 to 5/28/05 | Greensboro, NC | 2 | 1 | $4,279.08 | $6,160.00 |
| 260. | 7/7/06 to 7/8/06 | Houston | 2 | 2 | $9,919.70 | $16,919.00 |
| 261. | 8/2/06 to 8/6/06 | Bermuda | 3 | 9 | $11,281.23 | $20,382.00 |
| 262. | 10/27/06 to 10/28/06 | Tallahassee | 2 | 3 | $7,974.66 | $10,480.00 |
| 263. | 4/12/07 | Naples, FL to Detroit | 1 | 5 | $4,668.10 | $13,765.00 |
| 264. | 5/1/07 | Tallahassee | 2 | 7 | $7,196.65 | $10,360.00 |
| 265. | 5/27/07 to | Tallahassee | 2 | 7 | $7,391.15 | $20,625.00 |

-55-

| Par. No. | Date(s) | Destination(s) | Flights | Passengers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| | 5/29/07 | | | | | |
| 266. | 6/13/07 to 6/14/07 | Tallahassee | 2 | 3 | $7,196.65 | $10,360.00 |
| 267. | 6/30/07 to 8/14/07 | Tallahassee | 2 | 7 | $7,196.65 | $22,240.00 |
| 268. | 9/16/07 to 9/17/07 | Tallahassee | 2 | 3 | $7,391.15 | $20,720.00 |
| 269. | 11/2/07 to 11/5/07 | Tallahassee Miami | 3 | 6 | $10,308.71 | $26,880.00 |
| 270. | 12/27/07 | Tallahassee | 1 | 5 | $3,890.08 | $10,360.00 |
| 271. | 1/23/08 to 1/27/08 | Tallahassee | 2 | 5 | $7,585.66 | $28,582.00 |
| | Totals | | | | $124,871.55 | $264,493.00 |

### E. Kwame Kilpatrick Obtained More than $75,000 in Free Private Jet Flights and Entertainment From A Representative of *Company M*

272. As set forth more fully in this subsection, below, in or between 2006 and 2007, KWAME KILPATRICK obtained free private jet service and entertainment expenses worth more than $74,000 from *Company M*, by exploiting *Company M*'s fear that if it did not do so, KWAME KILPATRICK and his *ex officio* representatives and allies on the City of Detroit Police and Fire ("P&F") pension fund and the City of Detroit General Retirement System ("GRS")

-56-

would financially harm *Company M*'s business managing over $150 million in properties owned by the P&F and a $10 million GRS investment.

273.    In or about 2006, at the direction of KWAME KILPATRICK, two upper-level officials in the Mayor's Office, including one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, warned a representative of *Company M* that KWAME KILPATRICK was upset with the representative for supporting KWAME KILPATRICK's opponent in the November 2005 election for mayor.

274.    In or about April 2007, in an attempt to reconcile with KWAME KILPATRICK, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, permitted KWAME KILPATRICK and five of his associates to fly on a private jet *Company M* chartered to Las Vegas over the weekend of April 13, 2007, for a golfing trip. *Company M* paid for greens fees, lodging, meals, limousine service, concert tickets and massages for KWAME KILPATRICK and his group at a cost of more than $16,000, which was never reimbursed.

275.    In or about mid-July 2007, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, chartered a private plane for KWAME KILPATRICK at a cost of more than $24,000 so KWAME KILPATRICK could go on a trip to Tallahassee, Florida over the weekend of July 20, 2007. No one from *Company M* went on this trip nor was *Company M* reimbursed by KWAME KILPATRICK.

276.    In or about mid-September 2007, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, chartered a private plane for KWAME KILPATRICK at a cost of more than $34,000 so KWAME

-57-

KILPATRICK could fly to Bermuda over the weekend of October 4, 2007 with KWAME

KILPATRICK's wife, BERNARD KILPATRICK and BERNARD KILPATRICK's companion.

No one from *Company M* went on this trip nor was *Company M* reimbursed by KWAME

KILPATRICK.

**F. Kwame Kilpatrick Directed Marc Andre Cunningham to Pay Bernard Kilpatrick Part of Cunningham's Commission for Pension Fund Investments**

277.    As set forth more fully in this subsection, below, in or between about 2006

and 2007, at the direction of KWAME KILPATRICK, the Mayor's executive assistant, Marc

Andre Cunningham, paid BERNARD KILPATRICK at least $15,000 of Cunningham's

commission on a pension fund consulting deal, in return for KWAME KILPATRICK's support

of investments by the City of Detroit's General Retirement System ("GRS") and Police and Fire

("P&F") pension funds to a firm Cunningham represented.

278.    In or about the Summer of 2006, at a restaurant in Detroit, KWAME

KILPATRICK, through one of his high-level aides, directed Cunningham to pay BERNARD

KILPATRICK a portion of the commissions Cunningham received from a venture capital firm

("the Firm") for Cunningham's assistance obtaining a $30 million investment from the GRS and

the P&F pension funds. KWAME KILPATRICK and MILLER were both present when

Cunningham was told to make these payments.

279.    On or about October 4, 2006, at the direction of KWAME KILPATRICK,

Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center

and provided BERNARD KILPATRICK at least $4,000 in cash. It was understood between

Cunningham and KWAME KILPATRICK that this and future payments were to be made to

-58-

BERNARD KILPATRICK to reward KWAME KILPATRICK for his support of the GRS and P&F investments and to obtain favorable treatment by KWAME KILPATRICK in any future business that might arise between Cunningham and the City of Detroit.

280. On or about January 29, 2007, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.

281. On or about June 27, 2007, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.

282. Between about October 2006 and June 2007, KWAME KILPATRICK asked Cunningham when he was going to be paid his commission, as a way to remind Cunningham to pay BERNARD KILPATRICK when he received the commission payment.

283. In or about the Fall of 2007, following a media report of an FBI undercover corruption investigation that implicated Cunningham, KWAME KILPATRICK told Cunningham to stop paying BERNARD KILPATRICK.

**G. Ferguson Directed Owner of *Company E* to Pay Bernard Kilpatrick $40,000**

284. In or about January 2005, FERGUSON directed the owner of *Company E* to pay BERNARD KILPATRICK $40,000 so *Company E* could obtain business with the City.

285. On or about January 21, 2005, the owner of *Company E* paid BERNARD KILPATRICK $40,000.

286. Following the payment, BERNARD KILPATRICK did not help *Company E* obtain any City business.

-59-

### H. Miller Directed A Theater Developer to Pay Bernard Kilpatrick For the Opportunity to Purchase and Renovate Ford Auditorium

287. In or about 2003, MILLER met with a theater developer who offered to purchase and renovate City-owned Ford Auditorium in Detroit. MILLER told the theater developer that he liked the offer.

288. During the month following the meeting with MILLER in 2003, the theater developer obtained artist renderings, a renovation proposal, insurance quotes and an assessment on asbestos relating to his plan to renovate Ford Auditorium.

289. In or about 2003, after the theater developer spent time and money on a proposal to renovate Ford Theater, he met again with MILLER. During this meeting, MILLER provided a business card for BERNARD KILPATRICK and told the theater developer that he needed to hire BERNARD KILPATRICK in order to conclude an agreement with the City. The theater developer refused, and the renovation of Ford Auditorium did not go forward.

## IV. PROCEEDS FROM THE RACKETEERING ACTIVITY

### A. Ferguson Shared Proceeds of the Racketeering Activity With Kwame Kilpatrick

290. In or about early July 2003, FERGUSON gave KWAME KILPATRICK about $7,000 in cash.

291. In or about late July 2003, FERGUSON collected more than $200,000 in campaign donations for KWAME KILPATRICK's campaign fund, with KWAME KILPATRICK's knowledge, although FERGUSON was not among the identified donors.

-60-

292. In or about late May 2004, FERGUSON gave KWAME KILPATRICK at least $12,500 in cash on consecutive dates, consisting of at least $8,500 cash on one day and at least $4,000 cash the next day.

293. In or about mid July 2004, in violation of State campaign finance laws, FERGUSON caused the purchase of more than $40,000 in money orders using funds from Ferguson Enterprises, which were then given to employees, friends, relatives and associates of FERGUSON (hereafter, "straw donors") to sign and endorse to "Kilpatrick for Mayor" in order to conceal that FERGUSON and his company were the true source of the donations.

294. From about June to July 2005, FERGUSON and his associates instructed some of the "straw donors" identified in the previous paragraph to lie to federal investigators and a federal grand jury about the fact that FERGUSON had paid for their donations to the "Kilpatrick for Mayor" campaign, including the following:

a. In or about June 2005, FERGUSON told *Straw Donor A* to tell FBI agents that she had paid for the money orders she signed for "Kilpatrick for Mayor," when in truth and fact, as they both well knew, FERGUSON had funded the donations. After *Straw Donor A* reported back to FERGUSON that she had told the FBI agents that she paid for the money orders, FERGUSON told her to stick to that story because otherwise they both could go to jail. FERGUSON further instructed *Straw Donor A* to tell one of her family members, who also made a straw donation to "Kilpatrick for Mayor," to claim that the family member had paid for her donation, when in truth and fact, as they both well knew, FERGUSON had funded it.

-61-

b.　In or about July 2005, shortly before *Straw Donor B* was to testify before a federal grand jury, FERGUSON showed up unannounced at her house and instructed her to deny to the grand jury that the money orders she signed for "Kilpatrick for Mayor" came from FERGUSON, when in truth and fact, as they both well knew, FERGUSON paid for the money orders. FERGUSON warned *Straw Donor B* that if she told the grand jury that FERGUSON had paid for the money orders, she would get one of her family members in trouble.

c.　In or about June 2005, an associate of FERGUSON told *Straw Donor C* to tell investigators that he paid for his money order to "Kilpatrick for Mayor," when in truth and fact as they both well knew, FERGUSON paid for the donation.

295.　In or about late March 2008, FERGUSON gave $75,000 to the Kilpatrick Civic Fund.

296.　In or about the Summer of 2008, FERGUSON went to *Courier A*'s room at the Athenium Hotel in Detroit and gave him a bag containing $90,000 in cash with instructions to hold the money for KWAME KILPATRICK. At KWAME KILPATRICK's direction, *Courier A* delivered the cash to KWAME KILPATRICK in two installments, giving him $50,000 cash at the Hilton Hotel in Southlake, Texas in or about mid-September 2008, and $40,000 cash at the Park Shelton Apartments in Detroit in or about late October 2008.

**B.　Kwame Kilpatrick Used Cash Proceeds from the Racketeering Activity**

297.　In or about the following years, KWAME KILPATRICK used the following amounts of cash, derived from the racketeering activity, to make deposits into his bank accounts, pay his credit card and other bills, purchase cashier's checks and clothing and repay loans:

-62-

| Par. No. | Year | Type of Cash Transactions | Total Cash Amount |
|---|---|---|---|
| 298. | 2002 | cash bank deposits and cash payments for credit card and clothing | $29,314.00 |
| 299. | 2003 | cash bank deposits and cash payments for credit card and clothing | $80,070.00 |
| 300. | 2004 | cash bank deposits and cash payments for credit card and clothing | $68,548.00 |
| 301. | 2005 | cash bank deposits, cash payments for credit card and clothing, cash purchases of cashier's checks | $80,200.00 |
| 302. | 2006 | cash bank deposits and cash payments for credit card and clothing | $92,474.00 |
| 303. | 2007 | cash bank deposits, cash payments for credit card and clothing, cash purchase of cashier's check | $105,961.00 |
| 304. | 2008 | cash bank deposits, cash payments for credit card, clothing and crisis manager, cash purchases of cashier's checks, cash loan repayments | $124,379.00 |
| 305. | 2009 | cash payments on credit card and cash loan repayments | $13,913.00 |
| | Total | | $594,859.00 |

-63-

## C. Bernard Kilpatrick Used Cash Proceeds From the Racketeering Activity

306. In or about the following years, BERNARD KILPATRICK deposited the following amounts of cash from the racketeering activity into his personal bank accounts:

| Par. No. | Year | Type of Cash Transactions | Yearly Total Amount of Cash Deposits |
|----------|------|---------------------------|--------------------------------------|
| 307. | 2002 | cash bank deposits | $122,810.00 |
| 308. | 2003 | cash bank deposits | $134,240.00 |
| 309. | 2004 | cash bank deposits | $123,700.00 |
| 310. | 2005 | cash bank deposits | $88,300.00 |
| 311. | 2006 | cash bank deposits | $59,905.00 |
| 312. | 2007 | cash bank deposits | $50,200.00 |
| 313. | 2008 | cash bank deposits | $23,900.00 |
| | Total | | $603,055.00 |

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
(18 U.S.C. § 1951 -- Interference with Commerce by Extortion -- Sewer Lining Contract)

**D-1 KWAME M. KILPATRICK**
**D-2 BOBBY W. FERGUSON**
**D-3 BERNARD N. KILPATRICK**
**D-5 DERRICK MILLER**

1. The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2. From in or about April 2002 to November 2006, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK and DERRICK A. MILLER, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained

-64-

payments from *Company I* consisting of contract revenues of more than $23.7 million, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right. That is, KWAME KILPATRICK, aided and abetted by FERGUSON, BERNARD KILPATRICK and MILLER, held up a $50 million sewer lining contract that previously had been awarded to *Company I* until the company agreed to replace its minority subcontractor with FERGUSON on terms acceptable to FERGUSON.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

### COUNT THREE
(18 U.S.C. § 1951 – Interference with Commerce by Extortion
Amendment to Sewer Lining Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**
**D-5    DERRICK A. MILLER**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in and between September 2004 and December 23, 2005, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON and DERRICK A. MILLER, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company I* of about $175,000 in connection with an amendment to a sewer lining contract, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

-65-

## COUNT FOUR
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Baby Creek/Patton Park)

**D-1 KWAME M. KILPATRICK**
**D-2 BOBBY W. FERGUSON**
**D-4 VICTOR M. MERCADO**
**D-5 DERRICK A. MILLER**

1. The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2. From in and between February 2003 and 2008, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, VICTOR M. MERCADO and DERRICK A. MILLER, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained from *Company W* more than $5 million in work for FERGUSON and his affiliated companies at Baby Creek and Patton Park, with the consent of *Company W* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT FIVE
(18 U.S.C. § 1951 – Attempted Interference with Commerce by Extortion
Oakwood Pump Station)

**D-1 KWAME M. KILPATRICK**
**D-2 BOBBY W. FERGUSON**
**D-4 VICTOR M. MERCADO**

1. The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2. From in or about January 2007 to about April 2007, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON and VICTOR M.

-66-

MERCADO, aiding and abetting each other, did knowingly and unlawfully attempt to obstruct, delay and affect interstate commerce through extortion, in that defendants KWAME KILPATRICK, FERGUSON and MERCADO pressured *Company W* to consent to partner with FERGUSON in a $140 million construction project at the Oakwood pump station, and attempted to induce that consent by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT SIX**
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds
Downtown Water Main Repairs)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    In or between about 2003 and 2007, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during each of the calendar years of 2003 through 2007, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept a stream of gratuities totaling more than $5,000 from defendant BOBBY W. FERGUSON, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit. That is, in exchange for items of value from FERGUSON, KWAME KILPATRICK, with the assistance of other City officials, steered subcontracts and emergency task orders to FERGUSON in connection with a $19.8 million downtown water main replacement contract administered by *Company D*.

-67-

Following their intervention into the contracting process, including giving FERGUSON downtown work originally assigned to the lowest bidder, FERGUSON, from the start of the contract through the Spring of 2007, obtained more than $4 million in work on the downtown water main project.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

<u>**COUNT SEVEN**</u>
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Outfalls Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about the Summer of 2005 to about the Summer of 2007, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company L* and *Company A* of more than $1.7 million from a sewer outfalls contract for no services rendered, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

-68-

## COUNT EIGHT
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Asbestos Abatement)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     From in or about October 2005 to about February 2007 in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company L* of about $75,000 in relation to an asbestos contract for no services rendered, with the consent of *Company L* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**


## COUNT NINE
(18 U.S.C. § 1951 – Interference with Commerce by Extortion
Repair of Eastside Water Mains)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     From in or about the Spring of 2006 to about August 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that FERGUSON and his affiliated company, Xcel Construction Services,

-69-

obtained payments and subcontracts from *Company L* and *Company A* worth more than

$12.9 million from a contract to repair water mains on the east side of the City, with the consent

of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of

official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

<div align="center">

### COUNT TEN
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Eastside Sewer Repairs)

</div>

**D-1  KWAME M. KILPATRICK**
**D-2  BOBBY W. FERGUSON**

1. The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General

Allegations" above, as well as Count One above, as if they were set forth in full herein.

2. From in or about the Summer of 2006 to about 2008, in the Eastern District of

Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, did knowingly

and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they

obtained more than $5 million in earthwork and point repair work from *Company L* and

*Company A* arising out of a sewer repair contract for the east side of the City, with the consent of

*Company L* and *Company A* induced by wrongful fear of economic harm and under color of

official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

<div align="center">

-70-

</div>

## COUNT ELEVEN
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Westside Sewer Repairs)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about June 2006 to about 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that FERGUSON obtained more than $5 million in sewer repair work on the westside of the City from *Company I*, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT TWELVE
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds
Security Systems Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    In or between about 2003 and 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during each of the calendar years of 2003 to 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept

-71-

a stream of gratuities totaling more than $5,000 from defendant BOBBY W. FERGUSON, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit. That is, in exchange for items of value from FERGUSON, KWAME KILPATRICK, with the assistance of other City officials, rigged the evaluation and award of a contract to upgrade security systems at various DWSD facilities ("security contract") so FERGUSON's team would win the contract. From the start of the work to about June 2008, FERGUSON obtained more than $1.2 million of work on the security contract.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

## COUNT THIRTEEN
(18 U.S.C. § 1512(c) – Obstruction of Justice – Mercado Deposition)

**D-4    VICTOR M. MERCADO**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    In or about January and February 2006, in the Eastern District of Michigan, defendant VICTOR M. MERCADO did corruptly obstruct, influence and impede an official proceeding, that is an investigation authorized by a federal judge into the appropriateness of the award of a security contract by the Detroit Water and Sewerage Department. In particular, on or about February 10, 2006, during a deposition authorized by a federal judge investigating the appropriateness of a security contract awarded to a team including defendant BOBBY W. FERGUSON, MERCADO testified that the contract was completed on time and on budget without extras or change orders. When asked whether he had any conversations with

-72-

FERGUSON, MERCADO testified, "Absolutely not. I don't talk to bidders when they're bidding." MERCADO further denied having any contact with members of the Mayor's Office regarding the negotiations over the security contract. In truth and in fact, as MERCADO well knew at that time, the contract would require more time and money before it was completed. In order to obscure any additional security system costs, MERCADO, in the weeks leading up to his deposition, authorized that additional security system work at DWSD facilities be funded out of an unrelated pump station contract, rather than the security contract. Moreover, MERCADO, as he well knew and contrary to his deposition testimony, had a number of meetings and conversations with FERGUSON and MILLER at critical stages during DWSD's evaluation of the security contract, including with MILLER on January 13, 2004 and with FERGUSON on February 11, 2004.

**All in violation of Title 18, United States Code, Sections 1512(c).**

## COUNT FOURTEEN
(18 U.S.C. § 1951 – Attempted Interference with Commerce by Extortion – Sludge Contract)

**D-3    BERNARD N. KILPATRICK**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about December 20, 2007 to about April 18, 2008, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK did knowingly and unlawfully attempt to obstruct, delay and affect interstate commerce through extortion, namely, demanding payments from James Rosendall, including a payment of about $5,000 for no services rendered,

-73-

and attempted to induce the consent of Rosendall by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951.**

## COUNT FIFTEEN
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds – $90,000 Bribe)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     On or between about mid September 2008 and late October 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during the calendar year 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept about $90,000 in cash from defendant BOBBY W. FERGUSON, which was delivered in installments on or about mid September 2008, in Southlake, Texas, and on or about late October 2008, in Detroit, Michigan, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit, that is, KWAME KILPATRICK's assistance in steering City contracts to FERGUSON and pressuring persons with City contracts to hire or pay FERGUSON.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

-74-

**COUNT SIXTEEN**
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds – $75,000 Bribe)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    On or about mid March 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during the calendar year 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept $75,000 from defendant BOBBY W. FERGUSON's company, Ferguson Enterprises, Inc., which was deposited into the Kilpatrick Civic Fund, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit, that is, KWAME KILPATRICK's assistance in steering City contracts to FERGUSON and pressuring persons with City contracts to hire or pay FERGUSON.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

**COUNTS SEVENTEEN THROUGH TWENTY-NINE**
(18 U.S.C. §§ 1341, 1343: Mail and Wire Fraud)

**D-1 KWAME M. KILPATRICK**

**General Allegations As to Counts Seventeen Through Twenty-Nine**

1.    On or about July 8, 1999, the Kilpatrick Civic Fund, Inc. ("the Civic Fund"), controlled by KWAME KILPATRICK, received federal tax exempt status as a social welfare organization pursuant to Section 501(c)(4) of the Internal Revenue Code after KWAME

-75-

KILPATRICK caused an application to be submitted to the United States Department of the Treasury ("the Treasury Department") ("the application"), which contained the following representations:

a.    The application claimed that the Civic Fund's purposes were the following:

i.    Promoting community activities that enhance the neighborhoods in which the citizens of Detroit reside as well as those activities that contribute to the betterment of the lives of the youth of Detroit and its surrounding communities;

ii.    Providing information to the citizens of the City of Detroit and the State of Michigan about legislative issues affecting their lives and promoting the importance of voting and related activities; and

iii.    Participating in those activities that contribute to the redevelopment of a positive image of the City of Detroit and benefit the community at large.

b.    The application further claimed that the Civic Fund had not spent and did not plan to spend any money attempting to influence the selection, nomination, election or appointment of any person to any federal, state, or local public office.

c.    The application further claimed that, "[*the Civic Fund*] shall not participate or intervene in ... any political campaign on behalf of or against any candidate for public office."

d.    The application further claimed that the Civic Fund would operate exclusively for charitable and educational purposes and that it would receive and

-76-

administer its assets exclusively for charitable, educational, religious or scientific purposes.

e.    The application further claimed that, "in the event of the dissolution [*of the Civic Fund*], all of [*the Civic Fund's*] assets ... shall be distributed to a 501(c)(4) organization with a similar purpose by majority vote of the Board of Director[*s*]."

## The Scheme and Artifice to Defraud

2.    Beginning In or about 1999, KWAME KILPATRICK devised a scheme and artifice to defraud donors to the Civic Fund of monies they donated to it.

3.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would claim to the Internal Revenue Service, the public and potential donors that the Civic Fund was a social welfare organization that spent its funds in ways consistent with the purposes stated in its application for tax exempt status. In truth and in fact, as he well knew, KWAME KILPATRICK used monies donated to the Civic Fund for personal expenses and for his political campaigns, neither of which was identified as one of the purposes of the Civic Fund.

4.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would hold events to raise money for the Civic Fund, at which he and others would claim to potential donors that the Civic Fund spent its funds in ways consistent with the purposes stated in its application for tax exempt status.

5.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would falsely claim to the news media that the Civic Fund was not used for his political campaigns.

-77-

6. It was part of the scheme and artifice to defraud that KWAME KILPATRICK would send and cause to be sent letters to donors and potential donors which claimed that the Civic Fund used its funds consistent with the purposes outlined in its application for tax exempt status and specifically stated that "No funds of the Civic Fund are donated to a political campaign."

7. It was part of the scheme and artifice to defraud that KWAME KILPATRICK caused Civic Fund Returns of Organization Exempt from Income Tax, Forms 990, to be submitted to the Department of the Treasury, Internal Revenue Service, for tax years 2003 through 2008, which misrepresented how the Civic Fund spent its funds.

8. Contrary to the representations KWAME KILPATRICK made and caused to be made to the IRS, the public and donors to the Civic Fund, KWAME KILPATRICK used monies donated to the Civic Fund for the following personal expenses, among others:

    a. Cash kickbacks to KWAME KILPATRICK from an individual who worked for the Civic Fund, consisting of nearly half of the money the Civic Fund paid to that individual;

    b. Money to friends and relatives, including BERNARD KILPATRICK, disguised as payments for purported services rendered to the Civic Fund;

    c. Counter-surveillance and anti-bugging equipment;

    d. Yoga lessons for KWAME KILPATRICK;

    e. Golf-related expenses for KWAME KILPATRICK and others, including lessons, a set of Nike golf clubs and a personalized golf bag;

    f. Summer camp for KWAME KILPATRICK's children;

-78-

g.    College tuition for relatives of KWAME KILPATRICK;

h.    A birthday party for a relative of KWAME KILPATRICK;

i.    A video documenting KWAME KILPATRICK's family history;

j.    A crisis manager to manage KWAME KILPATRICK's public image following the public disclosure of text messages sent to and received by KWAME KILPATRICK on a city-owned paging device;

k.    Personal moving costs for KWAME KILPATRICK and his family after he left office;

l.    Lease of a personal residence for KWAME KILPATRICK and his family after they departed from the mayoral residence;

m.    Personal travel, including hotel costs and airfare for KWAME KILPATRICK and his relatives and friends;

n.    Lease of a Cadillac DeVille for KWAME KILPATRICK; and

o.    Rental cars.

9.    KWAME KILPATRICK used monies donated to the Civic Fund for his campaigns for election and reelection to the office of Mayor of the City of Detroit, including, among other things, polling, focus groups, public relations and political consulting.

10.    It was also part of the scheme and artifice to defraud that KWAME KILPATRICK, when he resigned as Mayor of Detroit in September 2008, attempted to purchase furniture from the Manoogian Mansion Restoration Society with money from the Civic Fund.

-79-

## Execution of the Scheme and Artifice to Defraud

11.    On or about each of the dates set forth below, in the Eastern District of Michigan, Southern Division, defendant KWAME KILPATRICK did, for the purposes of executing the scheme and artifice to defraud described above, and attempting to do so, knowingly caused the items described below to be delivered by U.S. mail or commercial interstate carrier (Federal Express), such items being delivered according to the directions thereon, each such mailing constituting a separate count of this indictment:

| Count | Date and Item Sent via U.S. Mail or Federal Express |
|-------|------------------------------------------------------|
| 17 | June 22, 2006, donor check for $10,000 payable to the Civic Fund sent via Federal Express. |
| 18 | February 13, 2007, letter explaining the Civic Fund to donor sent via U.S. mail. |
| 19 | September 26, 2007, donor check for $5,000 payable to the Civic Fund sent via U.S. mail. |
| 20 | April 3, 2008, Civic Fund check in the amount of $4,500 for summer camp sent via Federal Express. |
| 21 | May 23, 2008, letter soliciting a donation and explaining the Civic Fund to donor sent via U.S. mail |
| 22 | June 4, 2008, Civic Fund check in the amount of $2,640 for summer camp sent via Federal Express. |
| 23 | June 4, 2008, donor check for $10,000 payable to the Civic Fund sent via Federal Express. |
| 24 | June 25, 2008, donor check for $1,000 payable to the Civic Fund sent via U.S. mail. |
| 25 | June 30, 2008, donor check for $4,000 payable to the Civic Fund sent via Federal Express. |
| 26 | July 23, 2008, letter explaining the Civic Fund to donor sent via U.S. mail. |

**All in violation of Title 18, United States Code, Section 1341.**

-80-

12. On or about each of the dates set forth below, in the Eastern District of Michigan, Southern Division, KWAME KILPATRICK did, for the purposes of executing the scheme and artifice to defraud described above, and attempting to do so, knowingly caused to be transmitted by means of wire communication (fax) in interstate and foreign commerce certain documents, as listed below, each wire communication constituting a separate count of this indictment:

| Count | Date and Description of Wire Communication |
|-------|---------------------------------------------|
| 27 | August 24, 2007, letter soliciting a donation and explaining the Civic Fund sent to donor via fax. |
| 28 | April 3, 2008, letter explaining the Civic Fund sent to donor via fax. |
| 29 | June 20, 2008, letter soliciting a donation and explaining the Civic Fund sent to donor via fax. |

**All in violation of Title 18, United States Code, Section 1343.**

## COUNT THIRTY
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1 KWAME M. KILPATRICK**

1. On or about April 11, 2004, in the Eastern District of Michigan, KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury, and which KWAME KILPATRICK did not believe to be true and correct as to every material matter. Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private

-81-

jet flights and personal expenses paid for by the Civic Fund, amounting to at least $67,181, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $188,227, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

### COUNT THIRTY-ONE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.    On or about April 15, 2005, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury, and which KWAME KILPATRICK did not believe to be true and correct as to every material matter.  Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash and private jet flights, amounting to at least $74,925, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $167,940, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-TWO
(26 U.S.C. § 7206(1) -- Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.    On or about April 17, 2006, in the Eastern District of Michigan, defendant
KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a
joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2005, which was verified
by a written declaration that it was made under the penalties of perjury, and which KILPATRICK
did not believe to be true and correct as to every material matter. Specifically, KWAME
KILPATRICK did not believe the tax return to be true and correct as to every material matter in
that: (a) it failed to disclose that he had additional income in the form of cash and private jet
flights, amounting to at least $11,279, which he well knew at that time he was required by law
and regulation to disclose; and (b) it stated on line 22 that his total income was $156,329,
whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(I).**

## COUNT THIRTY-THREE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.    On or about April 16, 2007, in the Eastern District of Michigan, defendant
KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a
joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2006, which was verified
by a written declaration that it was made under the penalties of perjury and which KWAME
KILPATRICK did not believe to be true and correct as to every material matter. Specifically,

-83-

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $122,997, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $153,024, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-FOUR
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.    On or about April 15, 2008, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2007, which was verified by a written declaration that it was made under the penalties of perjury and which KWAME KILPATRICK did not believe to be true and correct as to every material matter. Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $194,569, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $167,005, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

-84-

(26 U.S.C. § 7201 – Income Tax Evasion)

**D-1    KWAME M. KILPATRICK**

1.    During the calendar year 2008, defendant KWAME KILPATRICK had and received unreported taxable income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $261,751.

2.    KWAME KILPATRICK owed the United States of America an income tax of $85,397 for this unreported taxable income.

3.    Well-knowing and believing the foregoing facts, KWAME KILPATRICK, in and between January 1, 2008 and April 13, 2009, in the Eastern District of Michigan, Southern Division, and elsewhere, did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his spouse to the United States of America for the calendar year 2008 and did take affirmative action to evade these taxes. Specifically, he concealed income from the Internal Revenue Service in the following ways: (a) he caused to be filed a false joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2008; (b) he caused an individual employed by his mayoral campaign and associated non-profits to kick cash back to him from wages paid to the individual by the campaign and non-profits; and (c) he caused the Civic Fund to pay for certain of his personal expenses and concealed such payments; and (d) he accepted a $90,000 cash payment from FERGUSON.

All in violation of Title 26, United States Code, Section 7201.

-85-

## COUNT THIRTY-SIX
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 5, 2005, in the Eastern District of Michigan, defendant

BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe

a U.S. Individual Income Tax Return, Form 1040, for calendar year 2004, which was verified by

a written declaration that it was made under the penalties of perjury, and which BERNARD N.

KILPATRICK did not believe to be true and correct as to every material matter. Specifically,

BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every

material matter in that: (a) it failed to disclose that he had additional income amounting to at least

$35,632, which he well knew at that time he was required by law and regulation to disclose; and

(b) it stated on line 22 that his total income was $336,625, whereas, as he well knew at that time,

his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-SEVEN
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 10, 2006, in the Eastern District of Michigan, defendant

BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe

a U.S. Individual Income Tax Return, Form 1040, for calendar year 2005, which was verified by

a written declaration that it was made under the penalties of perjury, and which BERNARD N.

KILPATRICK did not believe to be true and correct as to every material matter. Specifically,

-86-

BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $150,329, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $220,259, whereas, as he well knew at that time, his total income was in excess of that amount.

All in violation of Title 26, United States Code, Section 7206(1).


## COUNT THIRTY-EIGHT
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 15, 2008, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for calendar year 2007, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $172,655, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $70,529, whereas, as he well knew at that time, his total income was in excess of that amount.

All in violation of Title 26, United States Code, Section 7206(1).

-87-

## CRIMINAL FORFEITURE ALLEGATIONS
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.    Upon conviction of one or more counts of bribery as alleged in Counts Six,

Twelve, Fifteen and Sixteen of this Superseding Indictment, defendants KWAME M.

KILPATRICK and BOBBY W. FERGUSON shall forfeit to the United States, pursuant to

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 666.

2.    Upon conviction of one or more counts of attempted interference with commerce

by extortion as alleged in Counts Two through Five, Seven through Eleven, and Fourteen of this

Superseding Indictment, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON,

BERNARD N. KILPATRICK, VICTOR M. MERCADO and DERRICK A. MILLER shall

forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any

property, real or personal, which constitutes or is derived from proceeds traceable to a violation

of 18 U.S.C. § 1951.

3.    Upon conviction of obstruction of official proceeding as alleged in Count

Thirteen of this Superseding Indictment, defendant VICTOR M. MERCADO shall forfeit to the

United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real

or personal, which constitutes or is derived from proceeds traceable to a violation of

18 U.S.C. § 1512.

4.    Upon conviction of one or more counts of wire fraud or mail fraud as alleged in

Counts Seventeen through Twenty-Nine of this Superseding Indictment, defendant

KWAME M. KILPATRICK shall forfeit to the United States, pursuant to

-88-

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1341 or 18 U.S.C. § 1343.

     5.    Substitute Assets. Pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c), defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK, VICTOR M. MERCADO and DERRICK A. MILLER shall forfeit any of their property, real or personal, up to the value of property described in Paragraphs 1 through 4 above, if as a result of any act or omission of a defendant, property subject to forfeiture:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be divided without difficulty.

        THIS IS A TRUE BILL

        s/Foreperson
        FOREPERSON

        BARBARA L. McQUADE
        United States Attorney

s/Mark Chutkow              s/R. Michael Bullotta
MARK CHUTKOW             R. MICHAEL BULLOTTA
Assistant United States Attorney     Assistant United States Attorney

Date:  December 15, 2010

<center>-89-</center>

| United States District Court<br>Eastern District of Michigen | Criminal Case Cover Sheet<br>**ORIGINAL** | Case Number<br>10-CR-20403 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

**Reassignment/Recusal Information** This matter was opened in the USAO prior to August 15, 2008 **[Yes]**

| **Companion Case Information** | Companion Case Numbers:<br>U.S. v. Karl Kado<br>08-CR-20418; Hon. Marianne O. Battani<br><br>U.S. v. James Rosendell, Jr.,<br>09-CR-20025; Hon. Avern Cohn |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | |
| ■ Yes    □ No | AUSA's Initials: _MrC_ |

Case Title: USA v.  D-1  KWAME M. KILPATRICK
D-2  BOBBY W. FERGUSON
D-3  BERNARD N. KILPATRICK
D-4  VICTOR M. MERCADO
D-5  DERRICK A. MILLER

County where offense occurred :  **Wayne**

Check One:      ■ Felony              □ Misdemeanor                      □ Petty

____Indictment/____Information --- **no prior complaint.**

____Indictment/____Information --- **based upon prior complaint** [Case number:          ]

_X_ **Indictment based upon** LCrR 57.10 (d) *[Complete Superseding section below].*

## Superseding Case Information

**Superseding to Case No:** ___10-CR-20403_____      **Judge:**  **NANCY G. EDMUNDS**

□    Original case was terminated; no additional charges or defendants.
□    Corrects errors; no additional charges or defendants.
□    Involves, for plea purposes, different charges or adds counts.
■    **Embraces same subject matter but adds the additional defendants or charges below:**

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| **See attached** | | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

December 15, 2010
Date

MARK CHUTKOW
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9168
Mark.Chutkow@usdoj.gov

[1] Companion cases are those in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

# Superseding Case Information

**Superseding to Case No:** _____10-CR-20403_____   **Judge:** **NANCY G. EDMUNDS**

- ☐ Original case was terminated; no additional charges or defendants.
- ☐ Corrects errors; no additional charges or defendants.
- ☐ Involves, for plea purposes, different charges or adds counts.
- ■ Embraces same subject matter but adds the additional defendants or charges below:

| Defendant name | Charges | Prior Complaint |
|---|---|---|
| D-1  KWAME M. KILPATRICK | 18 USC § 1962(d)<br>18 USC §§ 1951 and 2<br>18 USC §§ 666(a) and 2<br>18 USC § 1963 | N/A |
| D-2  BOBBY W. FERGUSON | 18 USC § 1962(d)<br>18 USC §§ 1951 and 2<br>18 USC §§ 866(a) and 2<br>18 USC § 1963 | N/A |
| D-3  BERNARD N. KILPATRICK | 18 USC § 1962(d)<br>18 USC §§ 1951 and 2<br>26 USC §§ 7206(1)<br>18 USC § 1963 | N/A |
| D-4  VICTOR M. MERCADO | 18 USC § 1962(d)<br>18 USC §§ 1951 and 2<br>18 USC § 1512(c)<br>18 USC § 1963 | N/A |
| D-5  DERRICK A. MILLER | 18 USC § 1962(d)<br>18 USC §§ 1951 and 2<br>18 USC § 1963 | N/A |



*Exhibit 8*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. CR-10-20403-NGE |
| | HON. NANCY G. EDMUNDS |
| -vs- | Offenses: |
| | 18 U.S.C. § 666(a); and |
| D-5    DERRICK MILLER, | 26 U.S.C. § 7206(1) |
| | Statutory Maximum Penalties: 10 years imprisonment (666), 3 years imprisonment (7206); $250,000 fine per count, 3 years supervised release |
| Defendant. | |

_____/

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant

Derrick MILLER and the government agree as follows:

1. GUILTY PLEAS

    A.    Counts of Conviction

The defendant will enter a plea of guilty to Count One of the Second

Superseding Information, which charges a violation of Title 18, United States

Code, Section 666(a) (federally funded program violation), and for which the

penalty is a maximum term of imprisonment of ten years and a fine of up to

$250,000. The defendant also will enter a plea of guilty to Count Two of the

Second Superseding Information, which charges a violation of Title 26, United

States Code, Section 7206(1) (false statement in tax return), and for which the

penalty is up to 3 years imprisonment and a fine of up to $250,000. The two

counts will be served concurrently. The defendant also is subject to a special assessment of $200 and up to three years of supervised release.

### B.  Elements of Offenses

The elements of Count One (federally funded program violation), are:

One:  An agent of a local government corruptly solicited, demanded, accepted, or agreed to accept something of value;

Two:  The agent demanded, accepted, or agreed to accept the item of value for the purpose of being influenced or rewarded in connection with his official duties;

Three:  The solicitation, demand, acceptance, or agreement to accept the thing of value was in connection with a transaction or series of transactions of the local government involving anything of value of $5,000 or more; and

Four:  The local government, in a one year period, received benefits of more than $10,000 under any Federal program involving a grant, contract subsidy, loan, guarantee, insurance or other assistance.

The elements of Count Two (false statement on tax return), are:

One:  The defendant made and subscribed a return, statement, or other document which was false as to a material matter;

Two:  The return, statement, or other document contained a written declaration that it was made under the penalties of perjury;

Three:  The defendant did not believe the return, statement, or other document to be true and correct as to every material matter; and

Four:  The defendant falsely subscribed to the return, statement, or other document willfully, with the specific intent to violate the law.

- 2 -

C.   Factual Basis for Guilty Pleas

The following facts are a sufficient and accurate basis for defendant's guilty

pleas:

During the period from 2005 to 2007, DERRICK MILLER served as Chief Administrative Officer and Chief Information Officer for the City of Detroit. In these capacities, MILLER had authority or influence over the lease and sale of certain properties owned by the City of Detroit. During that time period, MILLER accepted a total of $115,000 from a real estate broker who received commissions in connection with the lease and/or sale of City of Detroit properties. MILLER accepted the $115,000 intending to be corruptly rewarded in connection with the transactions. The $115,000 involved a series of transactions of the City, each valued at more than $5,000. In each of the years from 2005 to 2007, the City of Detroit received more than $10,000 in federal funds.

On or about October 15, 2008, MILLER made and subscribed an individual income tax return for the 2007 tax year which contained a written declaration, electronically authorized by MILLER, indicating that it was made under the penalty of perjury. On this return, MILLER willfully made statements, which he knew were not true and correct, regarding the amount of income derived from two of his companies, Atrium Financial LLC and Citivest LLC, with the specific intent of concealing that income from the Internal Revenue Service ("IRS"), knowing that such concealment would impact the IRS's determination of his personal tax liability for 2007.

MILLER failed to report on his individual income tax return for 2007 the $46,725 he received that year from the real estate broker (representing a portion of the $115,000 described above). MILLER also failed to report on his tax return a total of $568,000 he received in 2007 for his assistance to a real estate company that entered into a purchase and leaseback of a portfolio of properties. Specifically, in October 2007, the real estate company paid MILLER a retainer fee of $22,000. Then, on December 21, 2007, the real estate company paid MILLER's company, Atrium Financial LLC, another $546,000 as a consulting fee for MILLER's work on the purchase/leaseback deal. MILLER intentionally failed to report these amounts, above, on his tax return for 2007. The total amount of additional tax due and owing for tax year 2007 was $240,858.

- 3 -

2. SENTENCING GUIDELINES

   A. Standard of Proof

   The Court will find sentencing factors by a preponderance of the evidence.

   B. Guideline Range

   The parties disagree on the applicability of the following guidelines:

U.S.S.G. §§ 2C1.1(b)(1) (regarding number of payments), 2C1.1(b)(2) and

2B1.1(b)(1) (regarding amount of loss as a result of federally funded program

violations), and 2C1.1(b)(3) (regarding public official in high-level decision-making

position). The government calculates the top of defendant's guideline range as

120 months, as set forth on the attached worksheets. Defendant recommends

that the Court determine that his guideline range is 41 to 51 months, based on

his calculation of the guidelines, as set forth on the attached worksheets. The

Court is not bound by either party's recommendation concerning the guideline

range, and defendant understands that he will have no right to withdraw his guilty

plea if the Court does not follow his recommendation.

   If the Court finds:

   a) that defendant's criminal history category is higher than reflected

   on the attached worksheets, or

   b) that the offense level should be higher because, after pleading

   guilty, defendant made any false statement to or withheld information

   from his probation officer; otherwise demonstrated a lack of

-4-

acceptance of responsibility for his offenses; or obstructed justice or committed any crime,

and if any such finding results in a guideline range higher than is recommended by the parties, then the higher guideline range becomes each party's recommended range. However, if the Court finds that defendant is a career offender, an armed career criminal, or a repeat and dangerous sex offender as defined under the sentencing guidelines or other federal law, and that finding is not already reflected in the attached worksheets, this paragraph does *not* authorize a corresponding increase in either party's recommended range. Neither party may take a position in this Court contrary to any position of that party reflected on the worksheets or worksheet addendum, except as necessary to the Court's determination regarding subsections a) and b), above.

### C. Relevant Conduct

The relevant conduct in this case includes the following:

In about 2003 and 2004, while serving as Chief Administrative Officer for the City, DERRICK MILLER twice received $10,000 from Karl Kado, owner of Metro Services Organization ("MSO"), for MILLER's assistance to MSO in obtaining and keeping contracts for electrical and cleaning services at Cobo Civic Center. MILLER also delivered $10,000 from Kado to Kwame Kilpatrick in about late 2001, when Kilpatrick was running for Mayor of Detroit.

During the period 2006 to 2007, while serving as Chief Information Officer for the City, MILLER authorized that at least $4.4 million in funds from the U.S. Department of Homeland Security ("DHS") be paid to Security Communications Alert Network ("SCAN") to install security cameras and television screens in the City to detect and alert the public about potential threats to the public. MILLER received more than $10,000 from Andrew Park, one of the owners of SCAN, in part because of MILLER's assistance in obtaining the DHS funding.

- 5 -

At the direction of then-Mayor Kwame Kilpatrick, MILLER and other members of the City administration assisted Kilpatrick and Bobby Ferguson by steering millions of dollars of City business to Ferguson. Kilpatrick or one of his top assistants, such as MILLER or Victor Mercado, pressured contractors to put Ferguson on City contracts they had received, or risk having the contracts held up or canceled. Mercado and other City officials influenced the award of contracts to teams that included Ferguson on them, including reevaluating bids if Ferguson was not part of the winning team. MILLER and other City officials also gave Ferguson inside information about contracts or bid evaluations to give Ferguson's team an edge over competing bidders.

3.   SENTENCE

The Court will impose a sentence pursuant to 18 U.S.C. §3553, and in doing so must consider the sentencing guideline range.

   A.   Imprisonment

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B) the government makes a non-binding recommendation that the sentence of imprisonment be no more than 120 months and defendant recommends that the Court determine that his guideline range is 41 to 51 months.

   B.   Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is 3 years. The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

- 6 -

C.    Special Assessment

Defendant will pay a special assessment of $200 and must provide the government with a receipt for the payment before sentence is imposed.

D.    Fine

The parties agree that the fine will be no more than the maximum amount of $200,000.

E.    Restitution

The Court shall order restitution to every identifiable victim of defendant's offenses. The government recommends that restitution be limited to the amount of money or items of value the defendant personally received or benefitted from, and the amount of losses, if any, of which he was personally aware. The Court will determine who the victims are and the amounts of restitution they are owed.

4.    COOPERATION

Defendant agrees to assist the United States Attorney's Office in the investigation and prosecution of others involved in criminal activities, as specified below.

A.    Truthful Information and Testimony. Defendant will provide truthful and complete information concerning all facts of this case known to him. Defendant will provide full debriefings as requested to the U.S. Attorney, and federal, state, and local law enforcement agencies. Defendant will provide truthful testimony at all proceedings, criminal, civil,

- 7 -

or administrative, as requested by the U.S. Attorney. Such testimony may include, but is not limited to, grand jury proceedings, trials, and pretrial and post-trial proceedings. Defendant agrees to be available for interviews in preparation of all testimony. Defendant further agrees to submit, upon request, to government-administered polygraph examinations to verify defendant's full and truthful cooperation. Defendant understands that this obligation to provide cooperation continues after sentencing and that failure to follow through constitutes a breach of this agreement.

     B.   <u>Nature of Cooperation.</u> The defendant agrees to cooperate in good faith, meaning that the defendant will not only respond truthfully and completely to all questions asked, but will also volunteer all information that is reasonably related to the subjects discussed in the debriefing. In other words, the defendant may not omit facts about crimes, participants, or defendant's involvement, and then claim not to have breached this agreement because defendant was not specifically asked questions about those crimes, participants, or involvement. Defendant will notify the U.S. Attorney in advance if defendant intends to offer a statement or debriefing to other persons other than defendant's attorney. Defendant is not prevented in any way from providing truthful information helpful to the defense of any person. Any actions or statements inconsistent with continued cooperation under this agreement, including but not limited to

- 8 -

criminal activity, or a statement indicating a refusal to testify, or any other conduct which in any way undermines the effectiveness of defendant's cooperation, constitutes a breach of this agreement.

C.    Government's Authority Regarding Substantial Assistance

1)    Substantial Assistance Determination.    It is exclusively within the government's discretion to determine whether defendant has provided substantial assistance. Upon the government's determination that defendant's cooperation amounts to substantial assistance in the investigation or prosecution of others, the government will either seek a downward departure from the upper end range of imprisonment set forth in paragraph 3, above, at the time of sentencing under U.S.S.G. § 5K1.1, or a reduction of sentence pursuant to Fed. R. Crim. P. 35, as appropriate. If the government makes such a motion, the amount of the reduction, if any, will be determined by the Court.

2)    Use of Information Against Defendant.    In exchange for defendant's agreement to cooperate with the government, as outlined above, the government agrees not to use new information that defendant provides (pursuant to this agreement) about defendant's own criminal conduct against defendant at sentencing in this case. Such information may be revealed to the Court but may

- 9 -

not be used against the defendant in determining defendant's sentence range, choosing a sentence within the range, or departing from the range. There shall be no such restrictions on the use of information: (1) previously known to law enforcement agencies; (2) revealed to law enforcement agencies by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; or (4) in the event there is a breach of this agreement.

5. TAX RELATED MATTERS

A. Filing of Return

The defendant agrees to file accurate individual income tax returns (original or amended) for the tax years 2005 to 2009 prior to the time of sentencing. Nothing in this agreement forecloses or limits the ability of the Internal Revenue Service to examine and make adjustments to the defendant's returns after they are filed.

Upon request, defendant will make himself available to the Internal Revenue Service for a face to face interview and will provide the Service with all documentation requested for the purpose of a civil audit.

B. Cooperation with the Internal Revenue Service

The defendant agrees to cooperate with the Internal Revenue Service in the determination of the defendant's income tax liability for the tax years 2005 to

- 10 -

2009. Cooperation is defined to include the following:

1) Face to face interview with a representative of the Internal Revenue Service Examination Division within 60 days of sentencing or at a time set by the examining agent.

2) At the request of the Internal Revenue Service, the defendant will provide source documentation relevant to the returns at issue. Source documentation includes, but is not limited to, bank records including checks, books and records of related businesses, substantiation for deductions and expenses claimed, names and addresses of individuals for which payments were made, and investment records.

C.   Internal Revenue Service Forms

1) The defendant agrees to submit prior to the sentencing Form 433-A, Collection Information Statement for Wage Earners and Self Employed Individuals, and if applicable, Form 433-B, Collection Information Statement for Businesses.

2) The defendant agrees to submit prior to the sentencing a Consent to Disclose Taxpayer Information for the years at issue and subsequent years to allow the Internal Revenue Service to disclose taxpayer information of the defendant to the United States Attorney's Office for the Eastern District of Michigan and the United States Probation Department.

- 11 -

6. <u>USE OF WITHDRAWN GUILTY PLEA</u>

If the Court allows defendant to withdraw his guilty plea for a "fair and just reason" pursuant to FED. R. CRIM. P. 11(d)(2)(B) , defendant waives his rights under FED. R. EVID. 410, and the government may use his guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against him in any proceeding.

7. OTHER CHARGES

If the Court accepts this agreement, the government will dismiss all remaining charges in this case at the time of defendant's sentencing.

8. EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT

The recommendations in Part 3 are not binding on the Court. Defendant has no right to withdraw his guilty plea and the parties have no right to withdraw from this agreement if the Court decides not to follow them.

9. WAIVER OF APPEAL

Defendant waives any right he may have to appeal his conviction. If the sentence imposed does not exceed the 120 month maximum allowed by Part 3 of this agreement, defendant also waives any right he may have to appeal his sentence. If the sentence imposed is within the guideline range recommended by the government as determined by Paragraph 2B the government agrees not to appeal the sentence, but retains its right to appeal any sentence below that range.

- 12 -

10. **CONSEQUENCES OF WITHDRAWAL OF**
    **GUILTY PLEA OR VACATION OF CONVICTION**

If defendant is allowed to withdraw his guilty pleas or if any convictions entered pursuant to this agreement are vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing him to withdraw his guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

11. **PARTIES TO PLEA AGREEMENT**

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

12. **SCOPE OF PLEA AGREEMENT**

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the

- 13 -

defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

13.   ACCEPTANCE OF AGREEMENT BY DEFENDANT

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by 5:00 P.M. on August 19, 2011. The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

BARBARA MCQUADE
*United States Attorney*

KATHRYN MCCARTHY
*Assistant United States Attorney*
*Chief, Public Corruption Unit*

MARK CHUTKOW
*Assistant United States Attorney*

R. MICHAEL BULLOTTA
*Assistant United States Attorney*

Date: August 26, 2011

- 14 -

By signing below, defendant acknowledges that he has read (or been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorney's advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his lawyer, and has had all of his questions answered by his lawyer.

DERRICK MILLER
*Defendant*

BYRON PITTS
*Attorney for Defendant*

Date: August _18_, 2011

- 15 -



*Exhibit 9*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

CRIMINAL NO. CR-10-20403-NGE

-vs-

HON. NANCY G. EDMUNDS

Offense: 18 U.S.C. § 371

D-4    VICTOR M. MERCADO,

Defendant.

Statutory Maximum Penalties:
5 years imprisonment,
$250,000 fine,
3 years supervised release

_____/

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant

Victor M. MERCADO and the government agree as follows:

1.    GUILTY PLEA

    A.    Count of Conviction

The defendant will enter a plea of guilty to Count One of the Fifth

Superseding Information, which charges conspiracy to violate the Hobbs Act, in

violation of Title 18, United States Code, Sections 371 and 1951, and for which

the penalty is a maximum term of imprisonment of five years and a fine of up to

$250,000. The defendant also is subject to a special assessment of $100 and up

to three years of supervised release.

## B.    Elements of Offense

The elements of Count One (conspiracy to commit a Hobbs Act violation), are:

1.    That two or more persons agreed to violate the Hobbs Act as described in paragraph 1.B.4., below;

2.    That the defendant knowingly and voluntarily joined the conspiracy knowing of and intending to help accomplish one or more of its objects;

3.    That a member of the conspiracy took one of the overt acts described in the charging document for the purpose of advancing or helping the conspiracy.

4.    <u>Object of Conspiracy – Hobbs Act – 18 U.S.C. § 1951</u>

    (a)    One of the co-conspirators wrongfully obtained property from another with that person's consent;

    (b)    The property was obtained under color of official right or by fear of economic harm; and

    (c)    Interstate commerce, or an item moving in interstate commerce, was delayed, obstructed, or affected in any way or degree.

## A.    Factual Basis for Guilty Pleas

The following facts are a sufficient and accurate basis for defendant's guilty pleas:

During the period from June 2002 to June 2008, MERCADO served as Director of the Detroit Water & Sewerage Department (DWSD). In this capacity, MERCADO was responsible for administering over $2 billion in contracts with private companies. During this time, MERCADO reported to the Mayor of Detroit, Kwame M. Kilpatrick. From January 2002 to January 2006, Kilpatrick served as Special Administrator over the DWSD. That designation, arising from a federal consent decree resolving a lawsuit alleging federal environmental violations, gave Kilpatrick authority to award DWSD contracts directly with outside parties,

-2-

bypassing city procurement procedures, and also gave Kilpatrick responsibility over the operation of DWSD's wastewater treatment plant to ensure compliance with environmental standards.

Kilpatrick used his position as Mayor of Detroit and Special Administrator of DWSD to pressure city contractors—who submitted proposals to or were awarded contracts by DWSD—to give subcontracts or payments obtained under those contracts to Bobby W. Ferguson, or risk having the contracts delayed, awarded to competitors, or canceled, resulting in economic harm. Invoking and otherwise exploiting his well-known affiliation with former Mayor Kilpatrick, Ferguson pressured city contractors to hire or pay him for DWSD contracts. Both DWSD and the contractors who were pressured did business in interstate commerce. The extortionate actions impacted interstate commerce.

MERCADO—at the direction of Kilpatrick and his associates—took steps to help Ferguson receive a large portion of contracts, subcontracts or payments for DWSD business. These steps included influencing the procurement process to Ferguson's advantage, as well as directing a bidder to include Ferguson on a DWSD contract in order to receive favorable consideration on the bid. MERCADO took these steps as a result of regular and consistent pressure from former Mayor Kilpatrick and his staff to help Ferguson obtain DWSD business regardless of procurement policies, rules and regulations. MERCADO tried to avoid this pressure, but from time to time he influenced the process to Ferguson's benefit in order to pacify and placate the former Mayor.

2. SENTENCING GUIDELINES

A. Standard of Proof

The Court will find sentencing factors by a preponderance of the evidence.

B. Guideline Range

Absent a downward departure, the government calculates that the top of

defendant's guideline range would be higher than **60 (sixty) months**, which

represents the statutory maximum term of imprisonment for a violation of

Title 18, United States Code, Section 371. Accordingly, the 60-month statutory

- 3 -

maximum becomes the top of the guidelines range. The parties agree that the Court should grant a downward departure from the applicable guideline range under U.S.S.G. § 5K.2.0 because there exists mitigating circumstances of a kind and to a degree not adequately taken into consideration in the sentencing guidelines in advancing the objectives set forth in 18 U.S.C. §§ 3553(a)(2) and (b)(1). In particular MERCADO took the actions set forth in the factual basis, above, because of duress, under circumstances not amounting to a complete defense. The parties agree that if the Court grants this downward departure, MERCADO's guidelines range should be no higher than **eighteen (18) months.**

3.    SENTENCE

The Court will impose a sentence pursuant to 18 U.S.C. §3553, and in doing so must consider the sentencing guideline range.

A.    Imprisonment

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) the sentence of imprisonment in this case may not exceed the top of the sentencing guideline range of **eighteen (18) months**, as determined by Paragraph 2B.

B.    Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is **3 years.** The agreement concerning imprisonment described above

- 4 -

in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

### C. Special Assessment

Defendant will pay a special assessment of **$100** and must provide the government with a receipt for the payment before sentence is imposed.

### D. Fine

The parties agree that the fine will be no more than the maximum amount of $100,000.

### E. Restitution

The Court shall order restitution to every identifiable victim of defendant's offenses. The government recommends that restitution be limited to the amount of money or items of value the defendant personally received or benefitted from, and the amount of losses, if any, of which he was personally aware. The Court will determine who the victims are and the amounts of restitution they are owed.

### 4. USE OF WITHDRAWN GUILTY PLEA

If the Court allows defendant to withdraw his guilty plea for a "fair and just reason" pursuant to FED. R. CRIM. P. 11(d)(2)(B) , defendant waives his rights under FED. R. EVID. 410, and the government may use his guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against him in any proceeding.

5.    OTHER CHARGES

If the Court accepts this agreement, the government will dismiss all remaining charges in this case at the time of defendant's sentencing.

6.    EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT

Defendant may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than the maximum allowed by Part 2. This is the only reason for which defendant may withdraw from this agreement. The Court shall advise defendant that if he does not withdraw his guilty plea under this circumstance, the Court may impose a sentence greater than the maximum allowed by Part 2.

7.    WAIVER OF APPEAL

Defendant waives any right he may have to appeal his conviction. If the sentence imposed does not exceed the 18- month maximum allowed by Part 3 of this agreement, defendant also waives any right he may have to appeal his sentence. If the sentence imposed is within the guideline range recommended by the government as determined by Par. 2B the government agrees not to appeal the sentence, but retains its right to appeal any sentence below that range.

8.    CONSEQUENCES OF WITHDRAWAL OF
      GUILTY PLEA OR VACATION OF CONVICTION

If defendant is allowed to withdraw his guilty pleas or if any convictions entered pursuant to this agreement are vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months

- 6 -

after the date the order vacating defendant's conviction or allowing him to withdraw his guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## 9.  PARTIES TO PLEA AGREEMENT

Unless otherwise indicated, this agreement does not bind any government agency except the U.S. Attorney's Office for the Eastern District of Michigan.

## 10.  SCOPE OF PLEA AGREEMENT

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

- 7 -

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

## 11. ACCEPTANCE OF AGREEMENT BY DEFENDANT

This plea offer expires unless it has been received, fully signed, at the U.S. Attorney by **9:00 a.m. on Nov. 5, 2012**. The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

BARBARA MCQUADE
*United States Attorney*

MARK CHUTKOW
*Assistant United States Attorney*
*Chief, Public Corruption Unit*

R. MICHAEL BULLOTTA
*Assistant United States Attorney*

JENNIFER BLACKWELL
*Assistant United States Attorney*

ERIC DOEH
*Assistant United States Attorney*

Date: November 1, 2012

By signing below, defendant acknowledges that he has read (or been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorneys' advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his lawyers, and has had all of his questions answered by his lawyers.

VICTOR MERCADO
*Defendant*

MARTIN CRANDALL

JOHN MINOCK
*Attorneys for Defendant*

Date: November 5, 2012

- 8 -



*Exhibit 10*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,           Case No. 10-CR-20403
                                         Hon. Nancy G. Edmunds
     v.

D-1 KWAME M. KILPATRICK,
D-2 BOBBY W. FERGUSON, and
D-3 BERNARD N. KILPATRICK,

                    Defendants.
_____/


JURY TRIAL
VOLUME 40

Detroit, Michigan – Thursday, November 29, 2012

APPEARANCES:

For the Government:

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

Counsel for Defendant Kwame M. Kilpatrick:

James C. Thomas
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

1  Q.  And they lost.

2  A.  Yes.

3  Q.  Now, you earlier testified that after this contract, 1361

4  was awarded, Mr. Ferguson became a subcontractor on Inland's

5  other contract, 1368, do you recall that?

6  A.  Yes.

7          **MR. CHUTKOW:**  And if we could take a look at Exhibit

8  IN1-19, please.

9  **BY MR. CHUTKOW:**

10  Q.  This was the subcontractor approval form that you received

11  from Inland Waters reflecting that?

12  A.  Yes.

13  Q.  What was the date on this?

14  A.  March 13, 2003.

15  Q.  So about three weeks after the Board of Water Commissioners

16  had approved Lakeshore's 1361 contract?

17  A.  Yes.

18  Q.  It indicates on there what percentage of Inland Waters'

19  1368 contract was Mr. Ferguson to receive?

20  A.  Twenty percent.

21  Q.  He wasn't on their original bid in this contract, was he?

22  A.  I don't believe so.

23  Q.  Now, you were asked a number of questions on cross

24  examination about whether Mr. Mercado is the final authority,

25  whether he was the final authority in canceling this contract,

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   this?  There is no good faith basis for that question.

2             **THE COURT:**  Does he have any knowledge of any

3   conversation --

4             **MR. THOMAS:**  There isn't any evidence that it

5   happened.

6             **THE COURT:**  Overruled.

7   A.  No.

8   **BY MR. CHUTKOW:**

9   Q.  As the Contracts and Grants manager, can you think of any

10  reason that the mayor would be discussing one of the water

11  department contracts with the subcontractor?

12            **MR. THOMAS:**  Again, Judge, objection.

13            **THE COURT:**  Overruled.

14  A.  No.

15  **BY MR. CHUTKOW:**

16  Q.  You can't -- as the Contracts and Grants manager, you can't

17  see a reason for that?

18  A.  No, I cannot.

19  Q.  Now, did any of the Lakeshore Engineering representatives,

20  Mr. Rachmale or Mr. Hardiman, did they ever tell you that they

21  had declined to give Mr. Ferguson 25 percent of that contract,

22  1361?

23  A.  No, they never told me that.

24  Q.  Now, in cross examination, you testified that the current

25  director has canceled contracts before?

1

2

3                              -   -   -

4                    **C E R T I F I C A T I O N**

5    I, Suzanne Jacques, Official Court Reporter for the United States

6    District Court, Eastern District of Michigan, Southern Division,

7    hereby certify that the foregoing is a correct transcript of the

8    proceedings in the above-entitled cause on the date set forth.

9
     Date: November 28, 2012
10

11
     s:/Suzanne Jacques
12     Suzanne Jacques

13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 10-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,          Case No. 10-CR-20403
                                        Hon. Nancy G. Edmunds
     v.

D-1 KWAME M. KILPATRICK,
D-2 BOBBY W. FERGUSON, and
D-3 BERNARD N. KILPATRICK,

                    Defendants.
_____/


JURY TRIAL
VOLUME 44

Detroit, Michigan - Wednesday, December 5, 2012

APPEARANCES:

For the Government:

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

Counsel for Defendant Kwame M. Kilpatrick:

James C. Thomas
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

1   waiting for?

2   Q.   Yes.

3   A.   Yes.

4   Q.   So the work started, correct?

5   A.   Yes.

6   Q.   And Ferguson worked with folks at your company?

7   A.   Yes, he did.

8   Q.   And did that include dealings with Kathleen McCann and --

9   A.   Yes, she was the overseer, and she would deal with Oszust,

10  you know, Dennis Oszust.

11  Q.   And did Mr. Oszust and Ms. McCann, did they tell you about

12  their interactions with Bobby Ferguson?

13  A.   Mrs. McCann, she would tell me mostly.

14          **MR. RATAJ:**   Your Honor, I'm going to object, that's

15  hearsay, hearsay.

16          **MR. BULLOTTA:**   I'm going to --

17          **THE COURT:**   He hasn't asked for the hearsay yet.  If

18  he asks what she said, then it's hearsay.

19          **MR. BULLOTTA:**   Well, I intend -- can we have a

20  sidebar then?  This is going to go to why he did what he did

21  later, and I can give an offer of proof at sidebar if you'd

22  like.

23          **THE COURT:**   All right.

24          (The following sidebar conference was held:)

25          **MR. BULLOTTA:**   I intend to ask this witness about

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   conversations that he had with Kathleen McCann about Ferguson's
2   interactions where he threatened them using his relationship
3   with the mayor, and it affects the reasons why he decided not
4   to cut off Ferguson, to keep him working on these contracts,
5   and it also affects, he'll say why he did certain things for
6   the mayor, he wanted to make the mayor happy, and he wanted to
7   make Ferguson happy.

8          So it goes directly to his state of mind.  It's not
9   offered for the truth that these things were said.  That's
10  going to come in through McCann herself who is testifying.
11  They can cross examine McCann about that.  This is going to his
12  state of mind.  He's the ultimate decision-maker.

13         **THE COURT:**  Okay.  I'll permit it.

14         (End of discussion at sidebar.)

15         **THE COURT:**  And I should just tell the jury that I
16  have ruled that the statements that Mr. Bullotta is about to
17  elicit are admissible, but you should understand that they're
18  not admitted for the truth of what those statements are.  In
19  other words, he's going to ask what Ms. McCann said, and
20  they're not offered for the truth of what she said, but just to
21  establish the witness's state of mind for what he did on this
22  contract.

23  **BY MR. BULLOTTA:**

24  Q.  Mr. Soave, did you have conversations with Kathleen McCann
25  about Bobby Ferguson and her dealings with him?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1  A.  Yes.

2  Q.  And can you describe some of the issues that she told you

3  about?

4  A.  Well, she was always having issues with him, I mean,

5  regarding one thing or another.  She was always negotiating or

6  meeting with him, and she would come back and tell me that she

7  was having, she was having problems or he's a handful.

8  Q.  Did she ever talk to you about, specifically about Ferguson

9  making statements about his, about why you got the contract?

10  A.  Well, yes.  I mean, he on occasions would say, "Do you

11  realize you're here because of me?"  You know, so that used to

12  not make us feel good.

13  Q.  Why did you say that didn't make you feel good?

14  A.  Well, because it sounds like a little threat, you know,

15  when you hear that.

16  Q.  Would Ms. McCann talk to you about the fact that Ferguson

17  would remind her of his relationship with Mayor Kilpatrick?

18  A.  I don't know exactly how he stated it, but, you know,

19  saying, "Do you realize you're here because of me?" that says a

20  lot.  Saying, "See, you don't get it.  You realize you're here

21  because of me?"  So that's what she came back and told me, so I

22  understand what that means.

23  Q.  What did you take that to mean?

24  A.  That means that, that "You probably better get along with

25  me."

1  Q.  Why?

2  A.  "Or it could be consequences," you know, I guess.  I mean,

3  he didn't say "or," he didn't say what would happen.  He just

4  said that, and people understand that very well.

5  Q.  Were you happy as the head of, an owner of Inland Waters,

6  were you happy with Ferguson's work performance?

7  A.  Well, he was, he was -- he was a troubling contractor for

8  us.  We had a lot of problems with handling him one way or

9  another, and with his wanting more work, more money, you know,

10  more things all the time.  So Kathleen could probably address

11  that a little better, but she would come back and complain to

12  me all the time.

13          Now what happened?

14          **MR. SHEA:**  Sometimes the mic cuts out.

15          **THE COURT:**  It's just the sound system, it's not

16  you, nothing personal.

17          **THE WITNESS:**  Okay.  Thank you.

18  BY MR. BULLOTTA:

19  Q.  Can you repeat that last part where you -- the microphone

20  malfunctioned?

21  A.  She would complain to me, you know, all the time about her

22  meetings with him because they were, they were not fun meetings

23  for her, you know.  She was having trouble with him asking for

24  things all the time, and I had -- on certain occasions there

25  was some work that wasn't being done, and we had a problem with

1    him.  But that was over the period of time now, you know,

2    because he worked for us for a long time.

3    Q.  And then was there an occasion when these problems were

4    occurring where you spoke with Mayor Kilpatrick about their

5    relationship?

6    A.  I think a couple times I brought it up to him.  I mentioned

7    to him --

8    Q.  Mentioned to whom?  I'm sorry.

9    A.  I mentioned to the mayor, "Is Bobby Ferguson still your

10   guy?"  And he said, "Yes, he's still my guy."  So I understood

11   he was still friends with him.

12   Q.  Why did you ask the mayor, "Is Bobby still your guy?"

13   A.  Well, I mean, we would be able to act accordingly then, you

14   know, because we would've probably, I don't know, we would have

15   probably cut his workload down, or we would have done some sort

16   of thing like that.

17          It was unusual for a subcontractor to talk to us the

18   way he was talking to us.

19   Q.  So it wasn't a normal subcontractor relationship?

20   A.  No, it definitely wasn't.

21   Q.  At some point during the contract, did you learn that

22   Bobby Ferguson wanted to become a partner with Inland?

23   A.  Oh, that was the, one of the meetings that he, Mrs. McCann

24   came back and said, "Do you want to hear the latest?"  I forgot

25   exactly how she said it.  I said, "Yes, tell me."

1            And she said that Bobby said the next time we bid on

2    the next contract, he wants to be our partner, he wants to bid

3    50-50 or something like that.

4    Q.   And what --

5    A.   Either a partner or 50-50.

6    Q.   And how was that received by you?

7    A.   I told her you can tell him to go F himself.  I'd rather

8    not have the work than be partners with him.

9    Q.   In 2005, did you sell your majority shares, your 80 percent

10   shares of Inland Waters?

11   A.   Yes, I did.

12   Q.   Was that to a company called Strong Capital?

13   A.   Yes.

14   Q.   But you still retained 20 percent share?

15   A.   Yes.

16   Q.   Did you become less involved then with Inland Waters?

17   A.   Yes.

18   Q.   Do you know if Inland Waters went on to do additional work

19   with Ferguson?

20   A.   I believe they did, yes.

21   Q.   But you weren't involved in that?

22   A.   I wasn't.  We still owned 20 percent, and Kathleen, I

23   think, was on the board, her and Yale Levin, I think, were both

24   on the board, so they had to have some contact.  It wasn't like

25   we didn't have any contact.

1  Falcon's a little larger, you can get ten in.  The other two, I

2  think it was eight, I believe.  The Lear is eight and a jump

3  seat, that's nine, so -- and the Turbo Commander, I think that

4  was eight.  I don't have that any longer.

5  Q.  Directing your attention back to August of 2003, do you

6  recall that there was a blackout in the Midwest, including the

7  Michigan area, southeast Michigan area?

8  A.  Yes.

9  Q.  And did you at some point provide a private jet for the use

10 of Kwame Kilpatrick?

11 A.  Yes.  We couldn't pick him up, but I think we brought him

12 back.  Our plane couldn't get out to go pick him up.

13 Q.  Could you maybe back up a little bit from the microphone?

14 A.  Okay.  How is that?

15 Q.  That's good.  So you said that you took him back, you're

16 talking about Mayor Kilpatrick?

17 A.  Yes.

18 Q.  And back to where?

19 A.  We were asked if we could pick him up, and we tried but we

20 couldn't get out, the plane couldn't get out, so we didn't pick

21 him up.  I don't know how he got here.  He was in the Bahamas,

22 I believe, and so --

23 Q.  In the Bahamas?

24 A.  I think he was in the Bahamas.  I think that's where he

25 was.

1           And we brought him back after it got stabilized here

2      or whatever happened.

3      Q.   Do you know who asked you to get involved, do you know?

4      A.   I think that Derrick Miller called me.  I think he called

5      for a plane to go pick him up.

6      Q.   Okay.  But then you said that you couldn't do that.  Was

7      that because of the blackout conditions?

8      A.   Yes, we couldn't get out.  The pilot couldn't get clearance

9      to get out of the airport.

10     Q.   But then you said Mayor Kilpatrick got here and then --

11     A.   Yes.

12     Q.   -- then he wanted to go back to Nassau --

13     A.   Yes.

14     Q.   -- to the Bahamas?

15     A.   Yes.  His family was down there.

16     Q.   And did you provide a jet for him to, a jet flight for him

17     back down there?

18     A.   I believe I brought him back down, and I don't know if I

19     brought the family back or not.  I don't remember.  I think so.

20     Q.   And after that, the flight that you were talking about

21     there, were there additional times where you provided jet

22     service for Kwame Kilpatrick?

23     A.   Yes.

24     Q.   And how many flights in total, do you recall,

25     approximately?

1   A.  Well, I think we have a list here, and I think it's about

2   20 round trips.

3   Q.  Okay.  So 40 flights, 20 rounds trips about?

4   A.  Yes.

5   Q.  I have what's been marked JET, JET3.  Do you see JET3 in

6   front of you?  Do you see that chart?

7   A.  Yes.

8   Q.  And is that a chart that was prepared by individuals in

9   your organization, Soave Enterprises?

10  A.  Yes.

11          **MR. BULLOTTA:**  I would move in JET3, Your Honor.

12          **THE COURT:**  Received.

13          (Government's Exhibit JET3 received into

14          evidence.)

15          **MR. BULLOTTA:**  Can we see, maybe we could highlight

16  this first, this first column.

17  **BY MR. BULLOTTA:**

18  Q.  We were talking about August of 2003 and the blackout, do

19  you remember?  Do you see --

20  A.  Yes.

21  Q.  Do you see a departure date of August 16, 2003 and the

22  departure city, Detroit, destination city --

23          **A JUROR:**  I can't see it.

24          **THE COURT:**  He can't really see it.  You need to

25  blow it up a little more.

- - -

# C E R T I F I C A T I O N

I, Suzanne Jacques, Official Court Reporter for the United States

District Court, Eastern District of Michigan, Southern Division,

hereby certify that the foregoing is a correct transcript of the

proceedings in the above-entitled cause on the date set forth.

Date: December 5, 2012

s:/Suzanne Jacques
Suzanne Jacques

Official Court Reporter

# *Exhibit 10-2*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,            Case No. 10-CR-20403
                                          Hon. Nancy G. Edmunds
        v.

D-1 KWAME M. KILPATRICK,
D-2 BOBBY W. FERGUSON, and
D-3 BERNARD N. KILPATRICK,

                    Defendants.
_____/


JURY TRIAL
VOLUME 46

Detroit, Michigan - Friday, December 7, 2012

APPEARANCES:

For the Government:

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

Counsel for Defendant Kwame M. Kilpatrick:

James C. Thomas
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

1  Q.  You said you never had the opportunity to do that.  What

2  did you mean by that?

3  A.  Well, once the contract got stuck, for lack of a better

4  description, there was -- it became clear that there was a

5  reason why, and Mr. Soave went and met with the mayor and was

6  asked or instructed to replace Mr. Ferguson -- or Mr. Williams

7  with Mr. Ferguson.

8  Q.  Now, I'll get to that in a moment.

9  A.  Yeah.

10  Q.  But I want to still understand what the plans had

11  previously been with Mr. Williams.  Where was it envisioned

12  that he would establish his business?

13  A.  In Detroit.

14  Q.  And at the time were there any minority companies doing

15  this technical type of lining work?

16  A.  Not to my knowledge.

17  Q.  And then when you said you were going to take it

18  nationally, why did you think that that was a possibility with

19  Mr. Williams?

20  A.  Well, the opportunity was pretty, was pretty significant.

21  He had, again, an incredible resumé.  He'd led the largest

22  water and sewer department, maybe in the country.  He had

23  certainly established credibility for his own name, and Detroit

24  was obviously well-known throughout the nation.  There are many

25  large cities that have contract -- that let contracts that

13-53846-tjt   Doc 6061-1   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 257 of
274

1  require minority content, and so to have a company in that

2  space, particularly one that was credible, that had technology,

3  that had the experience working with a company like Inland who

4  also had a good reputation, would have been in a position to

5  really take advantage of these opportunities across the

6  country.

7  Q.  Now, after, and we'll get to the issues with Mr. Ferguson

8  in a moment, but after replacing Mr. Williams with

9  Mr. Ferguson, did you all just basically wash your hands of

10  Mr. Williams?

11  A.  Well, Mr. Williams was talked to and told of the current

12  circumstances.  He was disappointed, but we ended up making an

13  economic payment to him to help ease the, you know, ease the

14  hurt of being asked to remove himself from this contract which,

15  you know, he had been an active part of the bidding process

16  with.

17  Q.  I'll get to that in a moment, but I'm just talking about

18  going forward in the future, did you guys have continuing

19  business relationships with Mr. Williams?

20  A.  Yes, we did, yes, we did.

21  Q.  Can you describe that to the jury?

22  A.  Sure.  An example of one of those relationships is that

23  Soave was an investor in a company called MPS Group, is still

24  today, as a matter of fact.

25      MPS Group is a minority business enterprise.

1  A.  Not in those exact words, but yes.

2  Q.  Now, at that time, did you know who Mr. Ferguson was?

3  A.  No, I did not.

4  Q.  And did you investigate to determine who he was?

5  A.  I don't recall doing a deep investigation.  I know that we

6  asked the folks at Inland if they were familiar with him and

7  they had -- they were indeed.

8  Q.  Did you have any discussions with Mr. Williams to break the

9  news to him that he had been replaced?

10  A.  Yes.

11  Q.  What was his reaction?

12       **MR. GUREWITZ:**  Objection, Your Honor.

13       **MS. VAN DUSEN:**  Your Honor --

14       **MR. GUREWITZ:**  Hearsay.

15       **MS. VAN DUSEN:**  Clearly calling for hearsay.

16       **THE COURT:**  What was -- you can describe how he

17  acted.  Don't repeat what he said.  You can just describe his

18  reaction without articulating any specific words that he said.

19  A.  Mr. Williams was very disappointed.

20  **BY MR. CHUTKOW:**

21  Q.  Now, at some point, did you have a meeting with

22  Mr. Ferguson?

23  A.  Yes.

24  Q.  About when did that occur?

25  A.  It was later in the spring of 2002.

1    specifically said what he would do on this contract.

2    Q.   Did he have a -- did it appear to you that he had a focus

3    in what he wanted to talk about?

4    A.   One of the focuses was how much money he would make on the

5    contract.

6    Q.   And specifically what was he saying in regards to that?

7    A.   My recollection is that he was interested in realizing a

8    material portion of the profits from the contract, and

9    3~percent was his target.

10   Q.   He wanted 3~percent of the entire contract?

11   A.   It wasn't completely clear to me during the course of our

12   conversation what he meant.  Yale believed that he meant he

13   wanted 3~percent of the profits --

14          **MS. VAN DUSEN:**  Your Honor, I would object.

15   A.   -- on the entire contract.

16          **THE COURT:**  Wait, wait.

17          **THE WITNESS:**  Sorry.

18          **MS. VAN DUSEN:**  Yes, I would object to Ms. McCann

19   recounting what Mr. Levin told her.

20          **MR. CHUTKOW:**  It goes to their decision-making

21   process later, Your Honor.

22          **THE COURT:**  No, I sustain the objection.

23   **BY MR. CHUTKOW:**

24   Q.   Now, when -- but 3~percent, from your understanding, did

25   that just cover 3~percent of the work that he would, do or a

1  broader amount?

2  A.  It was confusing to me, to be honest.  The focus on profit

3  as opposed to how much revenue I will do under the contract was

4  unusual, so there was not a lot of diving into detail during

5  this initial conversation.

6  Q.  Why was it unusual to you that Mr. Ferguson was focusing on

7  the profits he would receive rather than the revenues?

8  A.  Most contractors focus on the top line and internally

9  determine how much profit they're going to make based on the

10 efforts that they provide for that revenue.

11 Q.  And, but that wasn't what he was expressing to you in this

12 conversation.

13 A.  That's not my recollection.

14 Q.  Now, 3~percent profit on a $50 million contract is what?

15 A.  A million and-a-half dollars.

16 Q.  Now, did you talk to him about areas that you thought that

17 he could assist your company?

18 A.  Whether it was in that meeting or subsequent meetings, we

19 talked about various opportunities.  Dig-up support, material

20 support, equipment support, lining support by providing labor

21 and crews, so there were a number of different ways that

22 Mr. Ferguson's company could have contributed to the contract.

23 Q.  And when you would discuss these things, these

24 opportunities, at least early on in your conversations, what

25 was his reaction?

1   Q.  Is it typically in that situation where, if you're the
2   prime, you're the customer, so to speak?
3   A.  Yes.
4   Q.  Did you feel like in your --
5               **MS. VAN DUSEN:**  Your Honor --
6               **THE COURT:**  Are you going to object?
7               **MS. VAN DUSEN:**  No.
8   **BY MR. CHUTKOW:**
9   Q.  Did you feel in this situation when you met with
10  Mr. Ferguson on this first encounter that he was treating you
11  like the customer?
12  A.  No, no, we didn't.
13  Q.  And why not?
14  A.  Normally, when you have an opportunity for a subcontractor
15  to do $10 million of work with you, they will be very
16  aggressive in trying to get to the finish line, "Get the
17  contract signed, put me to work, here's what I can do," and
18  quickly reconcile issues that are in the way so you can get to
19  work.
20          This was not that type of circumstance at all.
21  Q.  How did you perceive his attitude in these initial
22  meetings?
23  A.  Again, difficult.  There was a substance-over-form issue.
24  There could be conversation that he was interested in getting
25  to work, but the actual movement on getting contracts to the

1    appropriate place would take a very long time, so that happened

2    repeatedly, not just with me, but with the folks at Inland.

3    Q.  Given that kind of attitude and the fact that you described

4    yourself as the customer, why didn't you just tell him, "We can

5    go find somebody else"?

6          **MS. VAN DUSEN:**  Your Honor, it's an entirely

7    hypothetical question which I think is improper and not based

8    on the facts.

9          **THE COURT:**  Overruled.  You may answer.

10   A.  We were essentially in a forced marriage, and we knew that

11   this was a relationship that we were going to have to endure,

12   and so we did our very best to ultimately get to these

13   contractual arrangements in order to satisfy the promise we

14   made to the City of Detroit to do this work under the DWSD

15   contract.

16   **BY MR. CHUTKOW:**

17   Q.  When you say "forced marriage," who did you perceive was

18   forcing you to be in this marriage?

19   A.  Well, Mr. Ferguson's company had been chosen by

20   Mayor Kilpatrick as our subcontractor.

21         **MR. CHUTKOW:**  Your Honor, if I may, I apologize for

22   this, may I have a brief sidebar on an issue that's just about

23   to come up?

24         **THE COURT:**  Yes.

25         (The following sidebar conference was held:)

1   so the bids are -- however they administratively deal with it

2   inside the department, I don't know, but obviously they open

3   all the bids and they rank the various bids that have been

4   submitted based on the criteria that they use to judge their

5   appropriateness for the city.

6   Q.  And the fact that a cabinet level official had approached

7   you about your negotiations with Mr. Ferguson, did that concern

8   you as, that there was undue influence?  What was your concern?

9        **MS. VAN DUSEN:**  Your Honor, objection to the leading

10   nature.

11        **THE COURT:**  Yeah, let's just take the question, what

12   was your concern, the question as originally phrased.  What was

13   your concern?

14   A.  My concern was that our contract was not yet done, and to

15   the extent that a member of the cabinet was asking me how the

16   negotiations were going with Mr. Ferguson, not only in a public

17   setting but paying that close of attention, it let me know

18   again that these negotiations needed to be completed before the

19   contract was let.

20   **BY MR. CHUTKOW:**

21   Q.  While you were at the policy conference, did you run into

22   the mayor of Detroit?

23   A.  Yes.

24   Q.  And did you have any conversations with him about

25   Mr. Ferguson?

1    A.   Mr. Ferguson took credit for the contracts that Inland had

2    with the Detroit Water and Sewer Department, even 1368, the

3    $50 million contract that we had won through the bidding

4    process.

5    Q.   And he had not been on the bid?

6    A.   He had not.

7    Q.   Did he explain how he should receive credit for getting you

8    that contract?

9    A.   His theme was he was disrespected, we did not give him the

10   credit that he deserved for us having this contract, that he

11   could have done this work with anyone and chose to do it with

12   us.   That was a recurrent theme.

13   Q.   Even though your company was the one that had won the

14   contract?

15   A.   Yes.

16   Q.   Did he ever take credit for amendments to the contracts

17   that you received?

18   A.   Thematically, yes.  15 Mile Road was a big sinkhole that

19   Inland came in and was the emergency contractor on, and he took

20   the responsibility for that, saying that we were there only

21   because of him.

22   Q.   Did you take any sort of diary notes or keep any sort of

23   records of your interactions with Mr. Ferguson?

24   A.   I did.  I kept some records of conversations and

25   memorialized in longer form longer conversations.

1   administration, and felt that that was a violation of their

2   relationship.

3            There were a number of other things on the -- during

4   the conversation, but he essentially said we have also some

5   things to fix and your people know what they are, and I'm

6   surprised they haven't told you, but essentially I suggest you

7   find out, and then we'll make a decision about how to go

8   forward.

9   Q.  Now, I may have misheard you.  Did you say this was a

10  troubling meeting for you?

11  A.  Yes.

12  Q.  And why was that?

13  A.  Well, the litany of topics covered, the fact that Inland

14  was still essentially, had this sword dangling over their head,

15  the fact that Mr. Ferguson acted as if if he had full power in

16  order to keep Inland getting work or not getting work.  This

17  was going to be his decision about whether or not he went

18  forward with us.

19  Q.  Did he have anything to say about Victor Mercado who was

20  the director of the water department?

21  A.  There was a, as part of the conversation regarding 15 Mile

22  and his disappointment that he received so little revenue on

23  that job, we explained to him that we had made repeated

24  attempts to look for work that he could do, and indeed Inland

25  had had a conversation with Victor Mercado about minority

1  her mistaken belief.

2      **THE COURT:** Her mistaken belief has nothing to do

3  with this. I will tell you that, I mean, I've heard this

4  argument now for the last two weeks with all these witnesses.

5  The fact is, whether he had the power, they believed he had the

6  power, and it was being held up, and the salient fact is what

7  occurred at that meeting and what happened afterwards.

8      **MS. VAN DUSEN:** Occurred at which meeting,

9  Your Honor?

10     **THE COURT:** The meeting that Mr. Soave had with the

11 mayor.

12     **MS. VAN DUSEN:** Oh, okay.

13     **THE COURT:** So, you know, if they were wrong, they

14 were wrong. Big deal. We've done this, like, at least four

15 times.

16     **MR. THOMAS:** Judge, they keep on putting witnesses

17 up to say what their motivation was. We have to be able to

18 challenge the motivation. If it was based on Mr. Soave's

19 representation, and we want to argue that it didn't -- it did

20 not occur the way Mr. Soave remembers --

21     **THE COURT:** What did not occur?

22     **MR. THOMAS:** That Mr. Soave had a conversation with

23 the mayor and that the mayor had a, he had a clear impression

24 that the mayor wanted Bobby Ferguson. Let's say, for the sake

25 of argument, that we argue Mr. Soave's credibility, and that

13-53846-tjt   Doc 6061-1   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 267 of 274

1

2                          -   -   -

3                 **C E R T I F I C A T I O N**

4   I, Suzanne Jacques, Official Court Reporter for the United States

5   District Court, Eastern District of Michigan, Southern Division,

6   hereby certify that the foregoing is a correct transcript of the

7   proceedings in the above-entitled cause on the date set forth.

8

    Date: December 7, 2012

9

10

    s:/Suzanne Jacques
11   Suzanne Jacques

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 10-3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,              Case No. 10-CR-20403
                                            Hon. Nancy G. Edmunds
        v.

D-1 KWAME M. KILPATRICK,
D-2 BOBBY W. FERGUSON, and
D-3 BERNARD N. KILPATRICK,

                    Defendants.
_____/


JURY TRIAL
VOLUME 53

        Detroit, Michigan – Wednesday, December 19, 2012

APPEARANCES:

For the Government:

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

Counsel for Defendant Kwame M. Kilpatrick:

James C. Thomas
Michael C. Naughton
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

1  **BY MR. CHUTKOW:**

2  Q.  What did he say specifically as it related to what

3  Mr. Mercado's call was?

4  A.  Bobby indicated at the meeting that Victor Mercado would be

5  calling Ron Hausmann to tell him that we should partner on the

6  project.

7  Q.  But this is an open competitive bid, is that right?

8  A.  Yes.

9       **THE COURT:**  Back off that mic just a little bit and

10  it won't keep cutting out like that.

11  **BY MR. CHUTKOW:**

12  Q.  This was going to be open competitive bid?

13  A.  Yes.

14  Q.  And other companies were going to compete also for this

15  project?

16  A.  Yes.

17  Q.  And at the time was Mr. Mercado the head of the water

18  department?

19  A.  Yes.

20  Q.  So ultimately the decision-maker on these bids?

21  A.  Yes.

22  Q.  Did you believe that it was appropriate for the water

23  department director to get involved in who was going to joint

24  venture with who in a project that hadn't been awarded yet?

25       **MR. EVELYN:**  Objection, his opinion is of no matter

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    in this regard, Your Honor.  It's irrelevant what he thought.

2            **THE COURT:**  Overruled.

3    **BY MR. CHUTKOW:**

4    Q.  You can go ahead.

5    A.  No.

6    Q.  You didn't think it was appropriate?

7    A.  That's correct.

8    Q.  Why not?

9    A.  Because he's the director of the water department,

10   Walbridge is a private company, Ferguson is a private company,

11   and we're sitting here trying to make a decision on how to go

12   after a project.

13   Q.  Did Mr. Ferguson explain why it was that Mr. Mercado was

14   going to make a call to a Walbridge official about this?

15   A.  No, not --

16   Q.  Now, did you later have any further meetings with

17   Mr. Ferguson and Mr. Hausmann related to this Oakwood CSO

18   project?

19   A.  Yes.

20   Q.  And where did that occur?

21   A.  During the afternoon at Bobby's office on Wyoming, Ferguson

22   Enterprises.

23   Q.  And who was there at this meeting?

24   A.  Myself, Ron Hausmann and Bobby Ferguson and Calvin Hall.

25   Q.  And what was discussed at this meeting?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   project.

2   **BY MR. CHUTKOW:**

3   Q.  Would get Mr. Ferguson involved?

4   A.  Yes.

5   Q.  And when you said that he was going to get the bid delayed

6   so that Victor and Ron could get together, who are you talking

7   about there?

8   A.  Ron Hausmann, who at that time -- I don't remember his

9   title, but he was an officer at Walbridge, and then

10  Victor Mercado, who was the director.

11  Q.  Did that surprise you that he said that he was going to get

12  the bid delayed so that he could, you know, make his deal with

13  Walbridge?

14  A.  Absolutely.  Normally when you get a bid delayed, it's

15  usually a number of contractors that will write letters because

16  they have clarifications or questions regarding the project,

17  and then on the other side, sometimes the city isn't ready

18  to -- there are some things that the city needs to do in

19  preparation for the bid opening.

20  Q.  So it's an open process if a bid is delayed?

21  A.  Yes.

22  Q.  One party can't just, private contractor can't just get it

23  delayed?

24  A.  That's correct.

25  Q.  Did you think Mr. Ferguson could accomplish that, get the

1

2

3

4

5                         —   —   —

6                  C E R T I F I C A T I O N

7    I, Suzanne Jacques, Official Court Reporter for the United States

8    District Court, Eastern District of Michigan, Southern Division,

9    hereby certify that the foregoing is a correct transcript of the

10   proceedings in the above-entitled cause on the date set forth.

11

     Date: December 19, 2012

12

13

     s:/Suzanne Jacques
14   Suzanne Jacques

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25