

*Exhibit 11*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-1   KWAME M. KILPATRICK,
D-2   BOBBY W. FERGUSON,
D-3   BERNARD N. KILPATRICK,

Defendants.

Case No. CR-10-20403-NGE

HON. NANCY G. EDMUNDS

_____/

## VERDICT FORM

We, the Jury, after due deliberation, find the following unanimous verdict on the

charges in the fourth superseding indictment:

### Count One: Racketeering Conspiracy

**Defendant Kwame M. Kilpatrick**

   Not Guilty _____   Guilty _X_

**Defendant Bobby W. Ferguson**

   Not Guilty _____   Guilty _X_

**Defendant Bernard N. Kilpatrick**

   Not Guilty _____   Guilty _____          *no*
                                            *consensus*
                                            *for B. Kilpatrick*

Count Two: Extortion - Sewer Lining Contract (CS 1368)

**Defendant Kwame M. Kilpatrick**

Not Guilty _____   Guilty _X_

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _X_

Induced by wrongful fear of economic harm _X_

**Defendant Bobby W. Ferguson**

Not Guilty _____   Guilty _X_

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _X_

2

**Count Three: Extortion - Amendment to Sewer Lining Contract (CS 1368)**

**Defendant Kwame M. Kilpatrick**

      **Not Guilty** _____ **Guilty** _X_

      If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

      Induced under color of official right _X_

      Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

      **Not Guilty** _____ **Guilty** _X_

      If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

      Induced under color of official right _X_

      Induced by wrongful fear of economic harm _X_

3

## Count Four: Extortion – Baby Creek/Patton Park (PC 748)

### Defendant Kwame M. Kilpatrick

Not Guilty _____ Guilty  X

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right  X

Induced by wrongful fear of economic harm  X

### Defendant Bobby W. Ferguson

Not Guilty _____ Guilty  X

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right  X

Induced by wrongful fear of economic harm  X

4

**Count Five: Attempted Extortion – Oakwood Pump Station** (PC 755)

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____   Guilty __X__

    If you find the defendant guilty of attempted extortion, you must indicate which method(s) you determined, beyond a reasonable doubt, were used to commit the attempted extortion:

    Induced under color of official right __X__

    Induced by wrongful fear of economic harm __X__

**Defendant Bobby W. Ferguson**

    Not Guilty _____   Guilty __X__

    If you find the defendant guilty of attempted extortion, you must indicate which method(s) you determined, beyond a reasonable doubt, were used to commit the attempted extortion:

    Induced under color of official right __X__

    Induced by wrongful fear of economic harm __X__

5

**Count Seven: Extortion – Outfalls Contract (DWS 849)**

**Defendant Kwame M. Kilpatrick**

    Not Guilty _____   Guilty _____

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

    Not Guilty \_\_\_\_\_   Guilty _X_

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _X_

*No concasus on K. Kilpatrik*

6

**Count Eight: Extortion – Asbestos Abatement**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _____

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

Not Guilty _____ Guilty _X_

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _X_

7

## Count Nine: Extortion - Repair of Eastside Water Mains (CM 2014)

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X_

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _X_

Induced by wrongful fear of economic harm _X_

**Defendant Bobby W. Ferguson**

Not Guilty _____ Guilty _X_

If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

Induced under color of official right _X_

Induced by wrongful fear of economic harm _X_

8

**Count Ten: Extortion – Eastside Sewer Repair (DWS 865)**

**Defendant Kwame M. Kilpatrick**

    Not Guilty __X__   Guilty _____

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _____

**Defendant Bobby W. Ferguson**

    Not Guilty __X__   Guilty _____

    If you find the defendant guilty of extortion, you must indicate which method(s)

you determined, beyond a reasonable doubt, were used to commit the extortion:

    Induced under color of official right _____

    Induced by wrongful fear of economic harm _____

9

**Count Fifteen: Attempted Extortion – Sludge Contract**

**Defendant Bernard N. Kilpatrick**

Not Guilty __X__ Guilty _____

If you find the defendant guilty of attempted extortion, you must indicate which method(s) you determined, beyond a reasonable doubt, were used to commit the attempted extortion:

Induced under color of official right _____

Induced by wrongful fear of economic harm _____

10

**Count Sixteen: Bribery - $90,000 Bribe**      *NO Consensus*

Defendant Kwame M. Kilpatrick          *on #16*

    Not Guilty _____ Guilty _____          *16*

Defendant Bobby W. Ferguson

    Not Guilty _____ Guilty _____

**Count Seventeen: Bribery - $75,000 Bribe**

Defendant Kwame M. Kilpatrick

    Not Guilty _____ Guilty X

Defendant Bobby W. Ferguson

    Not Guilty _____ Guilty X

11

**Count Eighteen: Mail Fraud**

Defendant Kwame M. Kilpatrick

     Not Guilty _____ Guilty _X_

**Count Nineteen: Mail Fraud**

Defendant Kwame M. Kilpatrick

     Not Guilty _____ Guilty _X_

12

**Count Twenty: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X__

**Count Twenty-One: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty _X__

13

**Count Twenty-Two: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____   Guilty __X__

**Count Twenty-Three: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____   Guilty __X__

14

**Count Twenty-Four: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

　　　Not Guilty _____   Guilty  $X$ ___

**Count Twenty-Five: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

　　　Not Guilty _____   Guilty  $X$ ___

15

**Count Twenty-Six: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty _____ Guilty $X$

**Count Twenty-Seven: Mail Fraud**

**Defendant Kwame M. Kilpatrick**

Not Guilty $X$ Guilty _____

16

**Count Twenty-Eight: Wire Fraud**

**Defendant Kwame M. Kilpatrick**

      Not Guilty _____ Guilty _X_

**Count Twenty-Nine: Wire Fraud**

**Defendant Kwame M. Kilpatrick**

      Not Guilty _X_ Guilty _____

17

**Count Thirty: Wire Fraud**

Defendant Kwame M. Kilpatrick

    Not Guilty _____ Guilty  X 

**Count Thirty-One: Subscribing False Tax Return**

Defendant Kwame M. Kilpatrick

    Not Guilty _____ Guilty  X 

18

**Count Thirty-Two: Subscribing False Tax Return**

Defendant Kwame M. Kilpatrick

    Not Guilty _____ Guilty  $\times$ 



**Count Thirty-Three: Subscribing False Tax Return**

Defendant Kwame M. Kilpatrick

    Not Guilty _____ Guilty  $\times$ 

19

**Count Thirty-Four: Subscribing False Tax Return**

Defendant Kwame M. Kilpatrick

     Not Guilty \_\_\_\_\_   Guilty \_X\_\_

**Count Thirty-Five: Subscribing False Tax Return**

Defendant Kwame M. Kilpatrick

     Not Guilty \_\_\_\_\_   Guilty X\_\_

20

**Count Thirty-Six: Income Tax Evasion**

**Defendant Kwame M. Kilpatrick**

> Not Guilty _____ Guilty  X

**Count Thirty-Seven: Subscribing False Tax Return**

**Defendant Bernard N. Kilpatrick**

> Not Guilty  X   Guilty _____

21

## Count Thirty-Eight: Subscribing False Tax Return

**Defendant Bernard N. Kilpatrick**

Not Guilty _____  Guilty  X

s/Jury Foreperson

In compliance with the Privacy Policy adopted by
the Judicial Conference, the verdict form with the
original signature has been filed under seal.

Dated: 3/8/13

22



*Exhibit 12*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,
     Plaintiff,                              Case No: 2:11-cv-13101
vs.                                       Hon.

KWAME KILPATRICK, VICTOR MERCADO,
DERRICK A. MILLER, FERGUSON'S ENTERPRISES, INC.
F/K/A FERGUSON ENTERPRISES, INC., BOBBY W. FERGUSON,
a Michigan corporation, INLAND WATERS POLLUTION CONTROL, INC.,
a Michigan corporation, DENNIS OSZUST, ROBERT L. WILLIAMS,
WALTER ROZYCKI, ANTHONY SOAVE, L. D'AGOSTINI & SONS, INC.,
a Michigan corporation, ANTONIO D'AGOSTINI, L. ROBERT D'AGOSTINI,
JAMES D'AGOSTINI, MERSINO DEWATERING, INC., a Michigan Corporation,
RODNEY A. MERSINO, MARCO MERSINO, J-MACK AGENCY, LLC D/B/A
J-MACK SECURITY, a Michigan limited liability company, JOSEPH M. MACKSOUND,
ROTOR ELECTRIC COMPANY OF MICHIGAN, LLC F/K/A ROTOR ELECTRIC
COMPANY, a Michigan limited liability company, BENJAMIN ROSENBERG,
PATRIOT PUMPS, LLC D/B/A THOMPSON PUMP MIDWEST, an Indiana corporation,
BRIAN LENAGHAN, ROHRSCHEIB SONS CAISSONS, INC., a Michigan corporation,
STEVE ROHRSCHEIB, HAYWARD BAKER, INC. D/B/A DENVER GROUTING, a
Delaware corporation and wholly owned subsidiary of KELLER FOUNDATIONS INC.,
a Maryland corporation, JOE HARRIS, GREAT LAKES DIVING & SALVAGE, INC., a
Michigan corporation, WENDY GOUIN, THOMAS GOUIN, O'LAUGHLIN
CONSTRUCTION COMPANY, a Michigan corporation, MARK E. O'LAUGHLIN,
DUBAY'S LANDSCAPING SERVICES, INC., a Michigan corporation,
LAWRENCE R. DUBAY, LAKE SHORE, INC. D/B/A LAKESHORE ENGINEERING
SERVICES, INC., a Michigan corporation, AVINASH RACHMALE, SUPERIOR
ENGINEERING ASSOCIATES, INC., a Michigan corporation, BHARAT PATEL,
FUTURENET GROUP, INC.  D/B/A MULTI SOLUTIONS GROUP, INC.,
a Michigan corporation and PERRY MEHTA,
     Defendants.

_____

KIRK, HUTH & LANGE, P.L.C.           O'REILLY RANCILIO, P.C.
By: ROBERT W. KIRK (P35627)       By: LAWRENCE M. SCOTT (P30228)
RAECHEL M. BADALAMENTI (P64361)   Co-Counsel for Plaintiff
Attorneys for Plaintiff              12900 Hall Road, Ste. 350
19500 Hall Road, Ste. 100         Sterling Heights, MI 48313
Clinton Township, MI  48038        (586) 997-6462
(586) 412-4900                  lscott@orlaw.com
rkirk@khlplc.com
rbadalamenti@khlplc.com

1

William W. Misterovich (P32512)
Co-Counsel for Plaintiff
Chief Deputy, Macomb County Public
Works Commissioner's Office
21777 Dunham Rd
Clinton Township, MI  48036
(586) 307-8210
william.misterovich@macombcountymi.gov
_____/

## COMPLAINT

**NOW COMES** Plaintiff Macomb Interceptor Drain Drainage District, by and through its

counsel Kirk, Huth & Lange, P.C., O'Reilly Rancilio, P.C. and William W. Misterovich, Esq.,

and complains as follows:

## PRELIMINARY STATEMENT

1.      This civil action is brought to recover damages arising from illegal activities

prohibited by 18 USC 1964(a) and (c) ("Civil RICO"), 15 USC §1 of the Sherman Act, 15 USC

§13 and §13a of the Clayton Antitrust Act and for breach of contract, fraud and tortious

interference; for damages and other remedies authorized by these federal statutes and under state

law including consequential and exemplary damages; and for all other relief which this

Honorable Court deems just and proper under the circumstances set forth herein.

## JURISDICTIONAL ALLEGATIONS

2.      This Court has jurisdiction over this matter pursuant to 15 USC §4 and §5 (federal

antitrust), 18 USC §1964(a) (Civil RICO), 28 USC §1331 (federal question) and 28 USC §1337

(commerce) because the claims brought are under federal statutes and involve federal questions.

3.      Venue is properly established in the Court pursuant to 28 USC §1391(b)(2)

because the events giving rise to this claim occurred in the City of Sterling Heights, County of

Macomb, which is included within the Eastern District of Michigan.  Venue is further established

2

pursuant to 28 USC 1391(b)(2) and/or (3) given that a substantial number of the Defendants did and/or continue to reside within the Eastern District of Michigan.

## THE PARTIES AND FACTUAL BACKGROUND

4.      Plaintiff is a special purpose public corporation established under the Drain Code, PA 40 of 1956, MCL 280.1 et seq. operating and existing under the Michigan Constitution and the laws of the State of Michigan.

5.      The primary cause of this action is a widespread scheme to overcharge the Detroit Water and Sewerage Department ("DWSD") for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road in the City of Sterling Heights, County of Macomb, in the Eastern District for the State of Michigan (hereinafter the "Project") which is specifically identified in the *First Superceding Indictment* issued in Criminal Case No. 10-20403-NGE for a criminal RICO conspiracy, bribery, extortion, fraud, obstruction of justice, tax evasion and aiding and abetting.  **Exhibit A**.

6.      The predicate acts of the scheme were principally advanced by the exertion of authority from the former Mayor of the City of Detroit Kwame Kilpatrick ("Kilpatrick"), the former Director of the City of Detroit Water and Sewer Department Victor Mercado ("Mercado") and the former Deputy Chief of Staff to Michigan State Representative Kilpatrick namely Derrick A. Miller ("Miller").  **See e.g. Exhibit B**.

7.      On information and belief, Kilpatrick and Mercado, with the assistance of Miller, schemed to receive financial compensation out of the Project for themselves and for their long-time companion Bobby W. Ferguson and his business Ferguson's Enterprises, Inc. f/k/a Ferguson Enterprises, Inc. (collectively hereinafter "Ferguson").

3

8.     More particularly, these individuals began the scheme by approving and/or executing Amendment No. 2 in or about November 2004 ("Amendment 2") to Contract No. CS-1368 for Consulting Services between Inland Waters Pollution Control, Inc. and DWSD dated in or about February 2002 (the "Inland Contract").  **Exhibit C**.

9.     Amendment 2 to the Inland Contract designated Inland, as opposed to other qualified competitors, as general contractor/consultant on the Project and was executed only after Inland Waters Pollution Control, Inc., by and through its President Robert L. Williams, Vice President/General Manager Dennis Oszust and Project Managers Walter Rozycki and Tony Soave (collectively hereinafter referred to as "Inland"), agreed to the cooperate in the scheme. **Exhibit D**.

10.     Importantly, Inland represented that the Project would not exceed a total cost of $35,000,000.00 in Amendment 2 to the Inland Contract.  **Exhibit D, p. 3, 15.**

11.     However, as a result of the scheme, the Project totaled $54,467,200.00.

12.     Additionally, Inland submitted a budget dated 9/30/04 identifying a Project total of $33,702,881.70.  A gate structure that was not installed that accounted for $1,980,000.00 of this total, making the actual budget for the Project $31,722,881.70, *according to Inland* (hereinafter the "Inland Budget").  **Exhibit E**.  The actual costs charged upon completion exceed the Inland Budget by $23,000,000.00.

13.     The Inland Budget identified that the total cost of the Project should not have exceeded $33,702,881.70, including the following totals for relevant categories of work:

    a.  Bypass pumping and Bulkhead sewers: $11,473,961.59;

    b.  Temporary earth retention system and removal/replacement of damaged sewer pipes: $6,862,466.12;

    c.  Sewer cleaning charges: $585,200.00;

4

      d. Pavement restoration charges: $880,000.00; and

      e. Landscape restoration charges: $275,000.00.

14.    Plaintiff's independent evaluation of the Project confirms that the total cost of the Project should not have exceeded $29,000,000.00, including the following totals for relevant categories of work:

      a. Bypass pumping and Bulkhead sewers: $7,968,200.00;

      b. Temporary earth retention system and removal/replacement of damaged sewer pipes: $4,555,400.00;

      c. Sewer cleaning charges: $825,000.00;

      d. Pavement restoration charges: $957,200.00; and

      e. Landscape restoration charges: $160,300.00.00.

15.    To accomplish the scheme, Inland presented and received payment from DWSD upon grossly inflated and inaccurate invoices, assessed unreasonable and bad-faith profit markups and approved excessive subcontractor overcharges pursuant to unlawful agreements to participate in and further the scheme in the means described in **Exhibit A** and otherwise.

16.    In April 2005, Mercado and Inland even added a "Costing Supplement" to Amendment 2 to the Inland Contract to increase the profits to be received by designating new "multipliers" on the Project and indicating that overages will be paid only on "negotiated" terms. **Exhibit D, p. 18-21**.

17.    As a product of the scheme, Inland benefitted by receipt of at least $5,013,911.00.

18.    On information and belief, Inland paid Ferguson the sum of $350,000.00 for work Ferguson did not do in exchange for approval of at least one of the amendments to the Inland Contract. **See Exhibit A**.

5

19.     Ferguson accomplished the scheme by invoicing for work not actually performed and for charging grossly improper rates for work it did perform.   Indeed, discrepancies are prevalent in the charges assessed by Ferguson and the work identified to have been actually performed by them in the daily reports associated with the Project.

20.     As a product of the scheme, Ferguson benefitted by receipt of at least $2,483,258.00.

21.     Subcontractor L. D'Agostini & Sons, Inc., by and through its President Antonio D'Agostini, Vice President L. Robert D'Agostini and Secretary/Treasurer James D'Agostini (collectively hereinafter referred to as "LDS"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

22.     To wit, LDS reached an agreement with Kilpatrick, Ferguson, Miller and/or Mercado whereby inflated invoices they submitted on the Project would be approved for payment so long as Ferguson received an amount equal to the amount to be paid to LDS.

23.     As a product of the scheme, LDS benefitted by receipt of at least $16,379,231.00.

24.     LDS accomplished the scheme by charging for personnel and equipment being on-site that was not on-site and/or not necessary to their performance.   LDS further accomplished the scheme by assessing exorbitant mark-ups on the charges of their subcontractors and suppliers.

25.     Subcontractor Mersino Dewatering, Inc., by and through its President Rodney A. Mersino and Project Manager Marco Mersino (collectively hereinafter referred to as "Mersino"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

6

26.     In particular, Mersino charged an approximate sum of $4,503,204.00 for dewatering services when actual charges on the Project should not have exceeded $2,119,480.00, according the Inland Budget.

27.     As a product of the scheme Mersino benefitted by receipt of a total sum of $4,503,204.00.  Mersino accomplished the scheme of overcharging by invoicing for personnel and equipment that was not on-site and/or not necessary to performance of their tasks.

28.     Subcontractor J-Mack Agency, LLC d/b/a J-Mack Security, by and through its President Joseph M. Macksound (collectively hereinafter referred to as "J-Mack"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

29.     In particular, J-Mack charged an approximate sum of $743,160.00 for security services when actual charges over the 11 month period should not have exceeded $120,700.00, according to the Inland Budget.  J-Mack accomplished the scheme of overcharging by charging unreasonable rates for services and for more personnel than were on-site and/or were necessary to accomplish their tasks.

30.     Subcontractor Rotor Electric Company of Michigan, LLC f/k/a Rotor Electric Company, by and through its President Benjamin Rosenberg, (collectively hereinafter referred to as "Rotor"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

31.     In particular, Rotor received the inordinate sum of $1,888,191 for electrical services provided on the Project when actual charges were not to exceed $605,000.00, according to the Inland Budget.  Rotor accomplished the scheme of overcharging by indentifying personnel and equipment on-site which were not on-site and/or not necessary to performance of their tasks.

7

32.     Subcontractor Patriot Pumps, LLC d/b/a Thompson Pump Midwest, by and through its President Brian Lenaghan (collectively hereinafter referred to as "Thompson Pump"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

33.     In particular, Thompson Pump charged an approximate sum of $5,188,422.00 for pump rental and maintenance for bypass pumping on the Project when actual charges for same should not have exceeded $4,504,561.59, according to the Inland Budget.   Thompson accomplished these scheme of overcharging by indentifying personnel and equipment on-site that was not on-site and/or not necessary to performance of its tasks.

34.     Rohrscheib Sons Caissons, Inc., by and through its President and Project Manager Steve Rohrscheib (collectively hereinafter referred to as "Rohrscheib"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

35.     In particular, Rohrscheib received the extraordinary sum of $3,956,038.00 for constructing three (3) access shafts and assisting with construction of the temporary earth retention system.   Rohrscheib accomplished the scheme of overcharging by charging grossly excessive rates, double billing and submitting invoices for work claimed to have been done months after their assignments were complete and they were off-site.

36.     Subcontractor Hayward Baker, Inc., a wholly owned subsidiary of Keller Foundations Inc., and d/b/a Denver Grouting, by and through its Secretary and Project Manager Joe Harris (collectively hereinafter "Hayward-Denver") was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

8

37.     In particular, Hayward-Denver received the sum of $510,598.00 for jet grouting on the Project.  Hayward-Denver accomplished the scheme charging for jet grouting services twice; once as Hayward Baker, Inc. and then again as Denver Grouting.  Hayward-Denver further accomplished the scheme by submitting invoices for work claimed to have been done months after their assignments were complete and they were off-site.

38.     Subcontractor Great Lakes Diving & Salvage, Inc., by and through its President Wendy Gouin and Vice President Thomas Gouin (collectively hereinafter "Great Lakes"), was aware of and participated in the scheme by, among other things, presenting and receiving payment upon grossly inflated and inaccurate invoices.

39.     In particular, Great Lakes received the sum of $872,317.00 for diving for sewer clean-out and bulkhead removal/installation.  Great Lakes accomplished the scheme of overcharging by invoicing at unreasonable rates because of a union picket and submitting invoices for work claimed to have been done months after their assignments were complete and they were off-site.

40.     Subcontractor O'Laughlin Construction Company by and through its President Mark E. O'Laughlin (collectively hereinafter referred to as "OLCC"), participated in the scheme by presenting invoices for and receiving payment on the sum of $2,042,158.00 for purportedly providing "assistance" to other contractors on the Project though there is no indication that OLCC provided services commensurate with this compensation in the daily reports associated with the Project.

41.     Subcontractor Dubay's Landscaping Services, Inc., by and through its President Lawrence R. Dubay (collectively hereinafter "Dubay") participated in the scheme by presenting

9

invoices for and receiving payment on the sum of $85,663.00 though there is no indication that they actually provided necessary services in the daily reports associated with the Project.

42.     On information and belief, Dubay was a subcontractor of Ferguson.

43.     Subcontractors Lakeshore Engineering Services, Inc., by and through its President Avinash Rachmale (collectively hereinafter "Lakeshore"), Superior Engineering Associates, Inc., by and through its Vice President Bharat Patel (collectively hereinafter "Superior") and FutureNet Group, Inc.  d/b/a Multi Solutions Group, Inc., by and through its President Perry Mehta (collectively hereinafter "Multi Solutions") participated in the scheme by presenting invoices and receiving payment for engineering and other services though there is no indication that they actually provided necessary services in the daily reports associated with the Project.

44.     The grossly inflated Project total of $54,467,200.00 became the direct responsibility of Plaintiff by way of the Macomb Interceptor Acquisition Agreement by and between the City of Detroit and Plaintiff dated September 2, 2010 (the "Macomb Agreement") wherein Plaintiff acquired certain assets of the DWSD, including the 15 Mile Road Interceptor in Sterling Heights.  **Exhibit F**.

45.     Plaintiff financed the acquisition of DWSD assets, including payment on the Project total of $54,467,200.00, through the sale of drain bonds.

46.     Importantly, Paragraphs 2.4 and 2.9(b)(8) of the Macomb Agreement assign to the Plaintiff any and all rights held by the City of Detroit "under any contracts, warranties or guaranties that apply to services or goods" relating to the Project.  **Exhibit F**.

47.     Plaintiff was further damaged by the scheme because DWSD amortized the inflated costs for the Project into usage charges for the system in the years before the Macomb

10

Agreement, more specifically beginning with the rate-year 2005-2006 and ending with the rate-year 2009-2010, together with Seven and a Half Percent (7.5%) interest annually.

48.     Plaintiff learned of the scheme when the *First Superceding Indictment* issued in Criminal Case No. 10-20403-NGE on or about December 15, 2010 identifying a criminal RICO conspiracy, bribery, extortion, fraud, obstruction of justice, tax evasion and aiding and abetting by and among these Defendants and describing the incidence of such illegal activities on the Project.  **See Exhibit A**.

**COUNT I – VIOLATION OF CIVIL RICO STATUTES**
**ALL DEFENDANTS**

49.     Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

50.     Plaintiff and Defendants are "persons" as described USC Sections 1961(3) and/or 1964(c).

51.     By virtue of the scheme illustrated in the preceding paragraphs, all Defendants did acquire and maintain, directly or indirectly, an interest in and/or control of a RICO enterprise of individuals who were associated in fact with respect to the Project and who did engage in, and whose activities did affect, interference with commerce in violation of 18 USC §1951, as set forth in 18 USC §1961(1)(B).

52.     Additionally, Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS, aiding and abetting each other, did commit calculated and premeditated violations of Civil RICO in a manner in which they operated under color of official right and/or intentionally threatened continuity of contracts of and between themselves and by and between the other Defendants in violation of 18 USC §1951, as set forth in 18 USC §1961(1)(B).

11

53.     Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS, all aiding and abetting each other, did also knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from DWSD, by themselves or through Inland, LDS, Ferguson and/or Mersino in connection with the Project which were induced by wrongful fear of economic harm and under color of official right in violation of 18 USC §1951, as set forth in 18 USC §1961(1)(B).

54.     Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS, all aiding and abetting each other, did also knowingly and unlawfully violate MCL 750.117 and 750.118 which charges as a felony the bribery of a public officer, agent, servant or employee in order to influence such person's action and a felony to accept such a bribe.

55.     *Respondeat superior* renders any and all principals/contractors liable for their agents/subcontractors misconduct where they have knowledge of, operate, participate in and/or receive a benefit from a RICO enterprise.

56.     The aforementioned racketeering activities did affect interstate commerce in that, among other things, they prevented legitimate bidding and performance by non-participating contractors and subcontractors on the Project.

57.     The effect of the enterprise was grossly inflated charges for the Project, which were in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget, causing damage to Plaintiff who paid for same via the Macomb Agreement and in system usage charges and is thereby entitled to recover threefold the damages sustained and the cost of the suit, including reasonable attorney fees, pursuant to 18 USC §1964(c).

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for threefold the damages sustained as a result of Defendants' participation in a

12

Racketeer Influenced and Corrupt Organization, and the cost of this action, including reasonable attorney fees, as provided for by 18 USC §1964(c) and such other relief as may be appropriate.

<u>**COUNT II – VIOLATION OF SHERMAN ACT**</u>
<u>**ALL DEFENDANTS**</u>

58.    Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

59.    During the relevant time period, and as set forth in more detail in the preceding paragraphs, all Defendants did enter into contracts and agreements with and between each other and various non-parties that unreasonably restrained trade with regard to the Project in violation of 15 USC §1 of the Sherman Act.

60.    More particularly, the Defendants agreed to use and authorized Inland as general contractor on the Project in order to coordinate prices and terms to further their scheme of overcharging, to obtain wrongful benefit and to pay individuals who did not perform work on the Project in exchange for continuity.

61.    The agreements harmed competition by foreclosing the possibility that Plaintiffs would have obtained lower prices from these and/or other contractors and subcontractors and secured better contract terms, but for the collusion.

62.    The coordination on prices and terms regarding the Project was not necessary to protect any legitimate interests.

63.    These agreements resulted in grossly inflated charges for the Project, which were in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget, causing damage to Plaintiff who paid for same.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' violation of the Sherman Act and

13

the cost of this action, including reasonable attorney fees, as provided for by 15 USC §1 and such other relief as may be appropriate.

**COUNT III – VIOLATION OF CLAYTON ANTITRUST ACT**
**ALL DEFENDANTS**

64.     Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

65.     During the relevant time period, and as set forth in the preceding paragraphs, Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS did, either directly or indirectly, discriminate in price and terms between different contractors, subcontractors and material suppliers, of like experience, grade and quality, so as to prevent or substantially lessen competition and tend to create a monopoly with regard to those providing services to and materials for the Project in violation of 15 USC §13(a) and §13a of the Clayton Antitrust Act.

66.     All Defendants, as set forth in the preceding paragraphs, did contribute to the discrimination in price and terms between different contractors, subcontractors and material suppliers by agreeing to the scheme to put them on unequal footing with others, participating in and contracting upon same and knowingly invoicing for and receiving payment on grossly inflated charges for time, labor and materials provided related to the Project in violation of 15 USC §13(e)-(f) and §13a of the Clayton Antitrust Act.

67.     Additionally, Defendants Kilpatrick, Mercado, Miller, Ferguson, Inland and LDS did contract for and/or receive premiums, commissions, compensation, benefit or other value on unequal terms to others not involved in or agreeable to the scheme in violation of 15 USC §13(c)-(d) of the Clayton Antitrust Act.

14

68.    These violations of the Clayton Antitrust Act caused Plaintiff to pay inflated rates for time, labor and materials on the Project in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget and causing damage to Plaintiff who paid for same.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' violation of the Clayton Antitrust Act and the cost of this action, including reasonable attorney fees, as provided for by 15 USC §13 and such other relief as may be appropriate.

## COUNT IV – BREACH OF CONTRACT
## DEFENDANTS INLAND

69.    Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

70.    DWSD and Inland were parties to the Inland Contract and Amendment 2 thereof.

71.    By way of the Macomb Agreement, Plaintiff is the assignee of all rights of DWSD under Amendment 2 to the Inland Contract.

72.    DWSD and/or Plaintiff fully performed its obligations under Amendment 2 to the Inland Contract including full payment for the Project.

73.    Inland breached the Inland Contract by (a) failing to fulfill its warranty that "all of the prices, terms, warranties and benefits [on the Project] are comparable to or better than the equivalent terms presently being offered by [Inland] to any other customer for the performance of like services pursuant to paragraph 20.01 of the Inland Contract; (b) failing to provide all subcontracts and seek approval of all payments to subcontractors pursuant to paragraph 12.01-12.02 of the Inland Contract;  (c) demanding payment in excess of the specified contract amount for the Project, which was $35,000,000.00 per Amendment 2; (d) failing to perform in a "satisfactory and proper manner" as required by Amendment 2; and (e) refusing to comply with

15

and/or require its associates to comply with applicable Federal, state and local laws, ordinances, code(s), regulations and policies pursuant to paragraph 15.01 of the Inland Contract.

74.    These breaches of the parties' agreements resulted in damage to Plaintiff in that it was required to pay inflated rates for time, labor and materials on the Project in direct contradiction to Amendment 2 to the Inland Contract and the Inland Budget.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' breach of contract, together with costs and attorney fees and such other relief as may be appropriate.

## COUNT V – FRAUDULENT MISREPRESENTATION
## ALL DEFENDANTS

75.    Plaintiff incorporates, by reference, the preceding paragraphs hereof as though fully re-stated herein.

76.    By way of the Inland Contract, Amendment 2 to the Inland Contract, the Inland Budget, submission of contractor and subcontractor invoices and daily logs and during on-site daily reports, Defendants made various representations with regard to the Project including the following:

        a.    Defendants represented that they would use their best efforts to complete the Project in a cost-efficient manner not to exceed $35,000,000.00;

        b.    Defendants represented that they select only subcontractors and material suppliers who agreed to use their best efforts to complete the Project in a cost-efficient manner;

        c.    Defendants represented that the Project should not exceed the costs in the budget they submitted dated 9/30/04; and

16

    d.   Defendants represented that the invoices submitted for charges associated with the Project were accurate and listed only services and materials actually provided on the Project.

77.    These representations by the Defendants were knowingly and/or innocently false when made and were reasonably relied upon by DWSD, of which the Plaintiff is the assignee.

78.    In fact, the costs of the Project exceeded Amendment 2 to the Inland Contract and the Inland Budget by at least $23,000,000.00.

79.    These representations did induce Plaintiff, as assignee to DWSD, and to its substantial detriment, to pay Defendants the full amount set forth by them for time, labor and materials associated with the Project.

80.    Plaintiff suffered substantial economic loss as a result of these misrepresentations and their losses have substantially benefited Defendants.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' fraud, as determined by the trier of fact, together with costs and attorney fees and such other relief as may be appropriate.

### COUNT VI – TORTIOUS INTERFERENCE
### ALL DEFENDANTS

81.    Plaintiffs incorporate, by reference, the preceding paragraphs hereof as though fully re-stated herein.

82.    Plaintiffs, as assignees of DWSD, did have an ongoing business relationship and expectancy with regard to the Project of which the Defendants were well-aware.

83.    Defendants intentionally and improperly interfered with the business relationship and expectancy of the Plaintiff by orally agreeing as follows:

    a.   To pay certain individuals and/or entities for work they did not perform;

17

b.  To select only contractors, subcontractors and material suppliers who would assist them in the scheme to overcharge for the Project;

c.  By threatening to discontinue contractors, subcontractors and/or materials suppliers from the Project if they did not assist with and/or participate in the scheme to overcharge for the Project or cover-up of the same;

d.  By agreeing on price and terms of contracts related to the Project, rather than permitting open bidding and/or allowing interested contractors, subcontractors and/or material suppliers to bid on equal footing with one another; and/or

e.  By representing that charges would not exceed the amount identified in Amendment 2 to the Inland Contract or the Inland Budget.

84.    Defendants' intentional and improper interference directly resulted in a grossly inflated total of $54,467,200.00 for the Project --- which is $23,000,000.00 more than it should have cost according to the Inland Budget and $26,000,000.00 more than it should have cost according to independent evaluation.

85.    If not for the grossly inflated charges on the Project, the Macomb Agreement had a reasonable likelihood of future economic benefit for Plaintiff.

86.    As a direct and proximate result of Defendants' wrongful conducts, Plaintiff has suffered substantial economic injury in that it paid the grossly inflated charges assessed on the Project and lost business opportunities otherwise available for such funds.

**WHEREFORE PLAINTIFF REQUESTS** that this Honorable Court enter a judgment in its favor for the damages sustained as a result of Defendants' interference, as determined by the trier of fact, together with costs and attorney fees and such other relief as may be appropriate.

18

Respectfully submitted,

By:    s/Raechel M. Badalamenti
        KIRK, HUTH & LANGE, PLC
        ROBERT W. KIRK (P35627)
        RAECHEL M. BADALAMENTI (P64361)
        Email: rbadalamenti@khlplc.com
        Attorney for Plaintiff
        19500 Hall Road, Suite 100
        Clinton Township, MI  48038

Dated: July 18, 2011    (586) 412-4900

        AND

By:    s/Lawrence M. Scott
        LAWRENCE M. SCOTT (P30228)
        O'REILLY RANCILIO, P.C.
        Email: lscott@orlaw.com
        Co-Counsel for Plaintiff
        12900 Hall Road, Ste. 350
        Sterling Heights, MI 48313

Dated: July 18, 2011    (586) 997-6462

        AND

By:    s/William W. Misterovich
        William W. Misterovich (P32512)
        Email: william.misterovich@macombcountymi.gov
        Chief Deputy
        Macomb County Public Works Commr's Office
        21777 Dunham Rd
        Clinton Township, MI  48036

Dated: July 18, 2011    (586) 307-8210

19



*Exhibit 13*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT, a municipal
corporation, and its Detroit Water and
Sewerage Department,

                  Intervening Plaintiff,

vs.

KWAME KILPATRICK, an individual;
BERNARD N. KILPATRICK, an individual;
VICTOR M. MERCADO, an individual;
DERRICK A. MILLER, an individual;
BOBBY W. FERGUSON, an individual;
FERGUSON ENTERPRISES, INC., a
Michigan corporation; XCEL
CONSTRUCTION SERVICES, INC., a
Michigan corporation; INLAND WATERS
POLLUTION CONTROL, INC., a Michigan
corporation; INLAND/XCEL LLC, a
Michigan limited liability corporation;
LAKESHORE ENGINEERING SERVICES,
INC., a Michigan corporation; and L.
D'AGOSTINI & SONS, INC. D/B/A LD&S,
a Michigan corporation;

                  Defendants;

                  and

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,

  Plaintiff,

vs.

KWAME KILPATRICK, et al.,

  Defendants.

Case No. 2:11-CV-13101

Hon. Robert H. Cleland
Mag. Judge Mona K. Majzoub

**INTERVENING-PLAINTIFF
CITY OF DETROIT AND ITS
DETROIT WATER AND
SEWERAGE DEPARTMENT'S
MOTION TO INTERVENE AS A
MATTER OF RIGHT UNDER
FED. R. CIV. P. 24(A)**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**INTERVENING-PLAINTIFF CITY OF DETROIT AND ITS DETROIT WATER AND SEWERAGE DEPARTMENT'S MOTION TO INTERVENE AS A MATTER OF <u>RIGHT UNDER FED. R. CIV. P. 24(A)</u>**

For the reasons set forth in the Brief filed concurrently with this Motion, Intervening-Plaintiff City of Detroit and its Detroit Water and Sewerage Department, through its attorneys Miller, Canfield, Paddock and Stone, P.L.C., respectfully asks the Court to enter an order allowing it to intervene in this lawsuit as a matter of right pursuant to Fed. R. Civ. P. 24(a).

On January 9 and 10, counsel for the Intervening-Plaintiff attempted to contact the attorney of record for Plaintiff and each Defendant or, where appropriate, the Defendant and to explain the nature of the relief sought in this Motion.  Pursuant to their counsel, Joseph M. Macksound, the J-Mack Agency, Anthony Soave, Perry Mehta, FutureNet Group, Inc., Dubay's Landscaping Services, Inc., Lawrence R. Dubay, Superior Engineering Associates, Inc., and Bharat Patel do not oppose the relief sought.  Counsel for the Intervening-Plaintiff was unable to obtain concurrence from any other Defendant in the relief sought, thereby necessitating this Motion.

WHEREFORE, Intervening-Plaintiff City of Detroit and its Detroit Water and Sewerage Department requests this Court grant its Motion and enter an order allowing it to intervene in this lawsuit as a matter of right pursuant to Fed. R. Civ. P. 24(a).

///


///


///

-2-

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jerome R. Watson (P27082)
W. Mack Faison (P13274)
Irene Bruce Hathaway (P32198)


By: /s/Jerome R. Watson

      Jerome R. Watson
      Attorneys for Intervening Plaintiffs
      150 West Jefferson, Suite 2500
      Detroit, MI  48226
      (313) 963-6420
      watson@millercanfield.com

Dated:  January 10, 2012

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-3-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT, a municipal
corporation, and its Detroit Water and
Sewerage Department,

               Intervening Plaintiff,

vs.

KWAME KILPATRICK, an individual;
BERNARD N. KILPATRICK, an individual;
VICTOR M. MERCADO, an individual;
DERRICK A. MILLER, an individual;
BOBBY W. FERGUSON, an individual;
FERGUSON ENTERPRISES, INC., a
Michigan corporation; XCEL
CONSTRUCTION SERVICES, INC., a
Michigan corporation; INLAND WATERS
POLLUTION CONTROL, INC., a Michigan
corporation; INLAND/XCEL LLC, a
Michigan limited liability corporation;
LAKESHORE ENGINEERING SERVICES,
INC., a Michigan corporation; and L.
D'AGOSTINI & SONS, INC. D/B/A LD&S,
a Michigan corporation;

               Defendants;

               and

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,

  Plaintiff,

vs.

KWAME KILPATRICK, et al.,

  Defendants.

Case No. 2:11-CV-13101

Hon. Robert H. Cleland
Mag. Judge Mona K. Majzoub

**INTERVENING-PLAINTIFF
CITY OF DETROIT AND ITS
DETROIT WATER AND
SEWERAGE DEPARTMENT'S
BRIEF IN SUPPORT OF ITS
MOTION TO INTERVENE AS A
MATTER OF RIGHT UNDER
<u>FED. R. CIV. P. 24(A)</u>**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED.................................................................. ii

INDEX OF AUTHORITIES.................................................................................... iii

I.     STATEMENT OF FACTS ......................................................................... 2

II.    ARGUMENT .............................................................................................. 4

       A. Applicable Standards Under Rule 24.................................................. 4

       B. DWSD Has an Interest Related to the Transactions that Are the Subject of the Action........................................................................................................ 5

       C. Without Intervention, Disposition of the Lawsuit Will  Impair or Impede DWSD's Ability to Protect Its Interests as a Practical Matter............................. 6

       D. MID Cannot Adequately Represent DWSD ......................................... 8

       E. The Motion Is Timely .......................................................................... 9

III.   CONCLUSION......................................................................................... 10

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**STATEMENT OF ISSUES PRESENTED**

I.    Are the City of Detroit and its Detroit Water and Sewerage Department (together referred

to as "DWSD") entitled to intervene in this lawsuit as a matter of right under Fed. R. Civ.

P. 24(a) because: (1) DWSD has legal interests related to the transactions that are the

subject of action; (2) the disposition of the action may, as a practical matter, impair or

impede DWSD's ability to protect its legal interests; (3) DWSD's legal interests are not

adequately represented by existing parties; and (4) DWSD's application to intervene is

timely?


Intervening-Plaintiff City of Detroit answers: "Yes"

Plaintiff Macomb Interceptor Drain Drainage District answers:

Defendants answer:

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## MOST APPROPRIATE OR CONTROLLING AUTHORITIES

**Page(s)**

CASES

*Commodities Exp. Co. v. City of Detroit*, 09-CV-11060-DT, 2009 WL 5171844 (E.D. Mich. Dec. 21, 2009) (Cleland, J.) (Ex. 3)............................................................6, 11

*Donaldson v. United States*, 400 U.S. 517 (1971) ...........................................................7

*Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999)..............................................7, 8, 10

*Horrigan v. Thompson*, 145 F.3d 1331 .....................................................................7, 9

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997)..........................7, 8

*NAACP v. New York*, 413 U.S. 345 (1973)...................................................................11

*Purnell v. City of Akron*, 925 F.2d 941 (6th Cir. 1991) .....................................9, 10, 11

*Rodgers v. Ohio Valley CFM, Inc.*, 1985 WL 12787 (6th Cir. Sept. 13, 1985) .............8

*Trbovich v. United Mine Wkrs.*, 404 U.S. 528 (1972) ..................................................10

*United States v. Detroit Intern. Bridge Co.*, 7 F.3d 497 (6th Cir. 1993) ...............6, 9, 10

COURT RULES

Federal Rule of Civil Procedure 24(a) .............................................................4, 6, 7, 11

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

iii

**INTERVENING-PLAINTIFF CITY OF DETROIT AND ITS DETROIT WATER AND
SEWERAGE DEPARTMENT'S BRIEF IN SUPPORT OF ITS MOTION TO
<u>INTERVENE AS A MATTER OF RIGHT UNDER FED. R. CIV. P. 24(A)</u>**

Last July, Plaintiff Macomb Interceptor Drain Drainage District ("MID") sued 39
Defendants – including City of Detroit officials, a principal contractor and various
subcontractors – alleging that Defendants engaged in a widespread corruption scheme against the
City of Detroit and the Detroit Water and Sewerage Department (together referred to as
"DWSD") in connection with the repair of a sewer collapse at 15 Mile Road in the City of
Sterling Heights in Macomb County. (Compl., ECF No. 1 at 3.)  MID alleges that the unlawful
activities arising out of this corrupt scheme were committed against DWSD.  MID also alleges,
however, that it holds all of DWSD's rights of recovery for these unlawful activities as a result of
the Macomb Interceptor Acquisition Agreement.   In that Agreement, MID purchased from
DWSD certain Macomb County sewer assets (the "Macomb System"), including the assets
involved in the 15 Mile Road sewer repair, and MID was assigned all "rights under all contracts,
warranties and guaranties that apply to services or goods related to the Macomb System."

MID's claims in this lawsuit include not only a breach of DWSD's sewer-repair contract,
but also various statutory and common-law torts based upon the unlawful activities committed
against DWSD.  In motions to dismiss, contrary to MID's allegations, certain of the Defendants
argue that the tort claims belong to DWSD and that MID lacks standing to bring these claims.
(*See, e.g.*, Defs.' Mots. to Dismiss, ECF Nos. 33, 40, 58.)  DWSD seeks to intervene because the
Defendants have placed its entitlement to the tort claims squarely at issue.  Without attempting to
resolve the issue at this point, it is clear that DWSD has an interest in this lawsuit.

DWSD also seeks to intervene because its interests here are significantly broader than the
issues raised in the Complaint and related motions.  MID incorporates by reference in its
Complaint the First Superseding Indictment in a related criminal matter, *United States v. Kwame*

*Kilpatrick, et al.*, E.D. Mich. Case No. 10-CR-20403, where the federal government not only alleges misconduct in relation to the 15 Mile Road collapse by some of the same parties who are Defendants here, but also describes a broad criminal conspiracy against DWSD in a wide variety of sewer and non-sewer related projects (the "Kilpatrick Indictment"). Adverse decisions in this case could impact DWSD's broader interests, including its right to recover damages against Defendants for the other projects, which are the focus of the Kilpatrick Indictment. Neither MID nor any other party to the lawsuit is in a position to advocate for and protect DWSD's broader interests.

Accordingly, pursuant to Federal Rule of Civil Procedure 24(a), DWSD timely files this motion seeking to intervene by right while this lawsuit is still in the early pleading stages.[1] For the reasons set forth herein, DWSD's motion should be granted.

## I.      STATEMENT OF FACTS

On July 18, 2011, MID filed a six-count Complaint against 39 city officials and contractors, alleging that:

> The primary cause of this action is a widespread scheme to overcharge the Detroit Water and Sewerage Department ("DWSD") for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road in . . . Sterling Heights . . . which is specifically identified in the *First Superseding Indictment* issued in Criminal Case No. 10-20403-NGE for a criminal RICO conspiracy, bribery, extortion, fraud, obstruction of justice, tax evasion and aiding and abetting. (Compl. ECF No. 1 ¶ 5.)

MID's Complaint contains claims for breach of contract, civil RICO, violations of the Sherman Antitrust Act, violations of the Clayton Antitrust Act, fraud, and tortious interference with business relations. MID's Complaint also incorporates by reference the First Superseding Indictment in *United States v. Kwame Kilpatrick, et al.*, E.D. Mich. Case No. 10-CR-20403,

---

[1] A copy of DWSD's Proposed Intervenor Complaint is attached to this motion as Exhibit 4.

-2-

which includes the 15 Mile Road project as part of a broad criminal conspiracy committed by a number of parties in the present lawsuit.

Although Defendants committed their misconduct with respect to the 15 Mile Road collapse against DWSD, MID alleges that it obtained the right to the claims flowing from this misconduct as part of the Macomb Interceptor Acquisition Agreement (the "Macomb Acquisition Agreement"). (*Id.* ¶ 44.) The Macomb Acquisition Agreement transferred to MID the water/sewer assets located in Macomb County in exchange for payment of an amount equal to the "System Debt" as defined in the agreement. (*See* Exh. 1: Acquisition Agreement at art. 2.) Assigning to MID the "rights under all contracts, warranties and guaranties that apply to services or goods related to the Macomb System," (*see, e.g.*, Exh. 1 ¶ 2.4), the Macomb Acquisition Agreement was part of a global settlement of disputes between the City of Detroit, DWSD and the Counties of Wayne, Oakland and Macomb, which were pending in *United States v. City of Detroit*, E.D. Mich. Case. No. 77-71100). (*See* Exh. 2: Settlement Agreement.)

The parties do not dispute that the assignment transferred DWSD's contractual rights to MID in connection with the 15 Mile Road sewer-repair contract, which rights are set forth in Amendment No. 2 to the Consulting Services Contract entered into between the City of Detroit and Inland Waters Pollution Control, Inc. ("Inland Waters"). MID argues that the assignment clauses in the Macomb Acquisition Agreement also transferred tort claims. In motions to dismiss, various Defendants, including Inland Waters and L. D'Agostini & Sons, Inc., specifically dispute this point. LD&S argues that "the limited assignment clauses invoked by the [MID] do not assign tort claims." (ECF No. 33 at 7.) These Defendants also argue that MID lacks standing as a matter of law to assert the federal statutory claims because it cannot piggy-back on the harm suffered by DWSD. (*See, e.g.*, ECF No. 33 at 9-10.) According to them, none of the various tort claims were ever assigned by DWSD.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

It is clear from these pleadings and motions to dismiss that either MID or DWSD holds the tort claims. With both in the lawsuit, the matter can be determined on the merits with the full participation of all interested parties. Despite MID's efforts to pursue the Defendants' misconduct, there is a significant possibility that its approach will not fully advocate and protect DWSD's interests. There are significant differences in MID's and DWSD's approaches to the present litigation. For example, unlike the proposed Intervention Complaint, MID's Complaint does not allege fraudulent concealment, common-law conspiracy, or breach of fiduciary duty (or aiding and abetting or knowingly participating in a breach of fiduciary duty), and does not seek damages for disgorgement of profits or unjust enrichment.

The lawsuit is still in the early stages. Pursuant to the Court's Order, some Defendants' answers to the Complaint were not due until this month. In the meantime, some Defendants have filed answers. Others have filed motions to dismiss, including D'Agostini & Sons, Inc. (and the individual Defendants related to it), Inland Waters, and Anthony Soave. (*See* ECF Nos. 33, 40, 41, 58.) Almost all of the motions to dismiss raise the issues that are the subject matter of this Motion to Intervene. None of the motions have yet been heard.

## II.   ARGUMENT

### A.   Applicable Standards Under Rule 24.

Intervention may be by right or by permission. DWSD seeks to intervene as a matter of right. Fed. R. Civ. P. 24(a). Under Rule 24(a), DWSD is entitled to intervene as a matter of right upon a showing that: (1) DWSD has an interest related to the transactions that are the subject of action; (2) the disposition of the action may, as a practical matter, impair or impede DWSD's ability to protect that interest; (3) DWSD's interest is not adequately represented by existing parties; and (4) the application to intervene is timely. *United States v. Detroit Intern. Bridge Co.*, 7 F.3d 497, 499 (6th Cir. 1993); *see Commodities Exp. Co. v. City of Detroit*, 09-CV-11060-DT,

2009 WL 5171844 at *1-*2 (E.D. Mich. Dec. 21, 2009) (Cleland, J.) (Exh. 3). Each of these requirements is met here.

**B.     DWSD Has an Interest Related to the Transactions that Are the Subject of the Action.**

DWSD has an interest in the tort claims alleged in this lawsuit.  Defendants themselves argue that the tort claims asserted by MID actually belong to DWSD. The Sixth Circuit "opted for a rather expansive notion of the interest sufficient to invoke intervention of right." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997).  Although a party seeking intervention must show a "significantly protectable" interest at issue in the litigation, *Donaldson v. United States*, 400 U.S. 517, 532 (1971), which is "direct[ and] substantial," *Jansen*, 904 F.2d at 341, the Sixth Circuit reads these requirements broadly.  "For example, an intervenor need not have the same standing necessary to initiate a lawsuit." *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) (citing *Miller*, 103 F.3d at 1245; *Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991)).  In addition, an intervenor does not have to have "a specific legal or equitable interest."  *Miller*, 103 F.3d at 1245, *quoted in Grutter*, 188 F.3d at 398 (concluding interest in gaining admission to university was substantial enough).  "[C]lose cases should be resolved in favor of recognizing an interest under Rule 24(a)," *id.* at 1247; let alone cases like this one where the interest is obvious.

A litigant is entitled to intervene where it could be entitled to a portion of the recovery. *See Horrigan v. Thompson*, 145 F.3d 1331 (Table), 1998 WL 246008, at *2 (6th Cir. May 7, 1998). If Defendants are right and MID's tort claims actually belong to DWSD, then DWSD would certainly be entitled to a portion of any recovery awarded on those claims.

In addition, "[t]he possibility of adverse *stare decisis* effects provides intervenors with sufficient interest to join an action." *Jansen*, 904 F.2d at 342 (class of intervenors whose interests

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

were protected by consent decree had sufficient interest to intervene in suit interpreting the decree because adverse interpretation of agreement could bind them).  The torts here concern misconduct that, according to the federal criminal indictment, is a part of a broader fraudulent scheme perpetrated against the DWSD.  DWSD's interests are likewise broader than MID's.  Decisions about the part of the scheme raised by MID (such as whether a racketeering conspiracy existed, what its aims were and who it included) could have adverse *stare decisis* effects on DWSD's efforts to obtain redress for the whole scheme.  This is sufficient to demonstrate the kind of interest that entitles DWSD to intervene.  In light of its clear legal interests in the current lawsuit, DWSD is entitled to intervene by right.

### C.    Without Intervention, Disposition of the Lawsuit Will Impair or Impede DWSD's Ability to Protect Its Interests as a Practical Matter.

The potentially negative impact that resolution of the lawsuit may have on DWSD's interests also favors intervention.  "To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is minimal." *Miller*, 103 F.3d at 1247 (emphasis added), *quoted in Grutter*, 188 F.3d at 399. *See also Grutter*, 188 F.3d at 400 (potential impairment of students' access to the university was enough to satisfy element).

Denial of DWSD's motion to intervene could impair or impede DWSD's interests for at least three reasons.  First, procedurally the Court could reach an adverse decision as to the tort claims, such as finding that they are barred by relevant statutes of limitations.  The statute of limitations defenses raised by some of the Defendants in motions to dismiss will likely involve conduct and action of DWSD, including what information DWSD knew or should have known.  At least some of the Defendants ostensibly argue that as DWSD's assignee, MID's right to toll

the various statutes of limitations depends not upon what MID knew or should have known, but rather upon what DWSD knew or should have known.

Second, it is possible that the Court could make a decision on the merits without first determining whether the tort claims belong to MID or DWSD. Such a decision could impair DWSD's interests in these claims without providing DWSD an opportunity to be heard.

Third, requiring DWSD to resort to another forum in an effort to protect its interests would place it at a severe disadvantage because it would:

(1)    face the possibility that a court might find some or all of its claims or interests to be precluded by the results here if this case reaches a judgment first, *see generally Detroit Intern. Bridge Co.*, 7 F.3d at 501 (potential decision elsewhere about interests);

(2)    lose the benefit of this Court's growing knowledge and experience about this case, *see Horrigan*, 1998 WL 246008, at *3;

(3)    face the prospect that this Court will determine the overall pool of the damages based solely on MID's and Defendants' evidence (without allowing the DWSD to plead and prove facts that might increase the overall recovery), *see Purnell*, 925 F.2d at 949.

In addition, and as noted earlier, DWSD could face "the possibility of adverse *stare decisis* effects" if it is not allowed to intervene to protect its broader interests. *Jansen*, 904 F.2d at 342. The tort claims here involve some of the same misconduct, conspiracies and schemes that are alleged in other projects set forth in the Kilpatrick Indictment. Adverse decisions on various factual and legal issues could impact DWSD's rights to recover on these other projects.

Any one of these practical disadvantages would support finding a right to intervene. Taken together, they compel the conclusion that DWSD is entitled to intervene in this lawsuit.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-7-

D.    **MID Cannot Adequately Represent DWSD.**

Courts do not impose a substantial burden to establish whether another party might fall short in representing the intervenor's interests. "[T]he burden of making that showing should be minimal." *Trbovich v. United Mine Wkrs.*, 404 U.S. 528, 538 n.10 (1972). If the existing parties are unlikely to make all the same arguments, that can suffice. *Grutter*, 188 F.3d at 400 (quoting *Miller*, 103 F.3d at 1247). The DWSD need only show a "*potential* for inadequate representation." *Grutter*, 188 F.3d at 400.

Here, from both a liability and a damages perspective, MID is not likely to adequately represent DWSD's interests, especially the broader interests discussed above. *See Purnell*, 925 F.2d at 949-50 (discussing "interest adverse to the proposed intervenor"). In regard to liability, intervention is appropriate where the intervenor and representative might disagree about some of the arguments to be made, regardless of whether they share common interests in the overall approach to the claims. *See Grutter*, 188 F.3d at 401 (university might not present all the same arguments as students); *Jansen*, 904 F.2d at 343 (black intervenors in reverse discrimination suit shared goal with city of enforcing consent decree to remedy past discrimination but had sufficiently different interests where they interpreted the decree differently, advanced different arguments, and said the city's hiring process failed to comply with the consent decree); *Detroit Intern. Bridge Co.*, 7 F.3d at 502 (in condemnation suit, intervening land holders were not adequately represented by major landholder who also had an interest in the intervenors' competitor). Here, MID has not asserted all the claims that DWSD alleges in its Intervention Complaint or all the allegations about Defendants' fraudulent concealment of the cause of action, which bears upon the tolling of various statutes of limitations. (*Compare* Exh. 4, *with* Compl., ECF No. 1.) Further, even if parties seek the same kinds of damages, their interests are still sufficiently adverse where, as here, their individual damages differ or their interests are not

-8-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

identical. *Purnell*, 925 F.2d at 949-50.  The difference in the approaches that MID and DWSD

will likely pursue – as discussed above – is enough to entitle DWSD to intervene.

### E.   The Motion Is Timely.

Finally, this Motion is timely.  Rule 24 does not prescribe a deadline for the petition.

"Timeliness is to be determined from all the circumstances." *NAACP v. New York*, 413 U.S. 345,

366 (1973). The Sixth Circuit uses a five-factor test that considers:

> (1) the point to which the suit has progressed; (2) the purpose for which
> intervention is sought; (3) the length of time preceding the application during
> which the proposed intervenors knew or should have known of their interest in the
> case; (4) the prejudice to the original parties due to the proposed intervenors'
> failure to promptly intervene after they knew or reasonably should have known of
> their interest in the case; and (5) the existence of unusual circumstances militating
> against or in favor of intervention.

*Jansen*, 904 F.2d at 340. Intervention can be timely even after motions for summary judgment

have been filed, depending on the circumstances. *Id.* (petition filed within weeks of learning that

city's response to summary judgment failed to adequately represent the intervenors' arguments

and interests in the litigation). This Court found a request to be timely even after discovery

closed and the parties had nearly completed briefing a motion for permanent injunction and

declaratory judgment. *See Commodities Exp. Co.*, 2009 WL 5171844 at *2 (Exh. 3).

This lawsuit has just begun. The time for responding to the Complaint will soon elapse,

and motions to dismiss have not yet been heard.  Intervention would not cause any prejudice to

the litigants and would promote judicial economy.  DWSD's request to intervene should be

deemed to be timely.

### III.   CONCLUSION

For each of the foregoing reasons, DWSD respectfully asks that the Court grant its

Motion to Intervene by right and award such other relief as the Court deems appropriate.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jerome R. Watson (P27082)
W. Mack Faison (P13274)
Irene Bruce Hathaway (P32198)


By: /s/ Jerome R. Watson
       Jerome R. Watson
       Attorneys for Intervening Plaintiff
       150 West Jefferson, Suite 2500
       Detroit, MI  48226
       (313) 963-6420
       watson@millercanfield.com

Dated:  January 10, 2012

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2012, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record and to Victor Mercado, who are all CM/ECF participants. In addition, I initiated efforts to serve via process server Bobby Ferguson, Ferguson Enterprises, Inc., Bernard Kilpatrick, and Derrick Miller, who ostensibly have evaded attempts at service by other parties in this lawsuit.

s/Jerome R. Watson
Jerome R. Watson
Miller Canfield Paddock and Stone, PLC
150 W. Jefferson Avenue, Suite 2500
Detroit,  MI  48226
(313) 963-6420

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.



*Exhibit 14*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

MACOMB INTERCEPTOR DRAIN DRAINAGE
DISTRICT,

        Plaintiff,

v.                                       Case No. 11-13101

KWAME KILPATRICK, et al.,

        Defendants.

_____/

**OPINION AND ORDER GRANTING CITY OF DETROIT AND DETROIT**
**WATER AND SEWERAGE DEPARTMENT'S MOTION TO INTERVENE,**
**IMPOSING BRIEFING SCHEDULES, AND REINSTATING**
**RULE 12 RESPONSIVE PLEADINGS DEADLINES**

      Nonparties the City of Detroit and the Detroit Water and Sewerage Department

(collectively the "City of Detroit" or the "City") filed a motion to intervene in this litigation.

Numerous Defendants filed responses in opposition to the City's motion.  The court

heard oral arguments on April 4, 2012 .  For the reasons stated below, the court will

grant the motion.

**I. BACKGROUND**

      On July 18, 2011, Plaintiff Macomb Interceptor Drain Drainage District ("Macomb

Interceptor") initiated this case against 40 Defendants alleging violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68,

the Sherman Antitrust Act, 15 U.S.C. §§ 1-7, the Clayton Antitrust Act, 15 U.S.C. §§ 12-

27, and asserting various state-law contract and tort claims.  Plaintiff's claims arise from

Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15

Mile Road in Sterling Heights, Michigan, (hereinafter the "15 Mile Road Repair Project").

Specifically, Plaintiff alleges that Defendant Kwame Kilpatrick, then the Mayor of the

City of Detroit, along with various City of Detroit officials conspired with the principal

contractor overseeing the 15 Mile Road Repair Project, Defendant Inland Waters

Pollution Control Inc., and numerous subcontractors to "overcharge the Detroit Water

and Sewerage Department . . . for time, labor and materials to stabilize and repair a

sewer collapse at 15 Mile Road."  (Pl.'s Compl. ¶ 5, Dkt. #1.)  Plaintiff further avers that

the alleged misconduct of Defendants related to the 15 Mile Road Repair Project was

part of a much larger corruption scheme during Defendant Kwame Kilpatrick's tenure as

Mayor of Detroit, principally involving Defendants Kwame Kilpatrick, Victor Mercado,

Derrick Miller, Bobby Ferguson, and nonparty Bernard Kilpatrick.[1]  This broader scheme

is alleged to have operated for nearly a decade seeking to steer public works contracts

and illicit benefits to associates of Defendant Kwame Kilpatrick and officials throughout

his administration.  (*See* Pl.'s Compl. Ex. A, Dkt. #1-1.)

        Although Defendants' alleged scheme was perpetrated against the Detroit Water

and Sewerage Department, Plaintiff contends that it obtained the right to assert its

claims when, in September 2010, it entered into the Macomb Interceptor Acquisition

Agreement ("Macomb Agreement") with the Detroit Water and Sewerage Department.

(Pl.'s Resp. to D'Agostini Defendants' Mot. to Dismiss 15-17, Oct. 6, 2011, Dkt. # 62.)

The Macomb Agreement transferred to Plaintiff sewer assets located in Macomb

---

        [1]The concept of an overarching municipal corruption scheme is the central
allegation in a criminal case currently pending before Hon. Nancy G. Edmunds.  *See
United States v. Kilpatrick*, Case No. 10-20403 (E.D. Mich.).  Plaintiff incorporates by
reference in its complaint the first superseding indictment from this case.

2

County formerly owned by the Detroit Water and Sewerage Department and assigned to Plaintiff "all of [Detroit Water and Sewerage Department's] rights under all contracts, warranties, and guarantee to apply to services or goods related to the Macomb System." (Pl.'s Compl. Ex. F ¶ 2.4, Dkt. # 1-6.) At least some Defendants have maintained that this assignment of rights did not assign to Plaintiff the rights to any tort claims arising from the 15 Mile Road Repair Project, and that therefore the Detroit Water and Sewerage Department, not Plaintiff, has standing to assert such claims. (*See e.g.*, D'Agostini Defendants' Mot. to Dismiss 7, Sept. 1, 2011, Dkt. # 33.) These same Defendants have also argued that Plaintiff lacks standing to assert its statutory claims because indirect purchasers lack standing under RICO and antitrust laws to sue for overcharges. (*Id.* at 9.)

The City of Detroit now seeks to intervene in this case arguing that it has a substantial interest in the resolution of the dispute about who may properly assert the statutory and tort claims arising out of the 15 Mile Road Repair Project. (City of Detroit's Br. Supp. Mot. Intervene 1, Jan. 10, 2012, Dkt. # 145.) The City further contends that its interest in the overarching corruption scheme is broader than Plaintiff's interest and, as a result, it should be permitted to file an intervening complaint broader in scope than Plaintiff's. The proposed intervening complaint is not limited to the 15 Mile Road Repair Project and instead asserts claims spanning the entire length of the alleged corruption scheme. While broadening the scope of the corruption scheme, the City asserts claims against only 11 Defendants, eight of whom are named and three of whom are unnamed in Plaintiff's original complaint.

3

## II. STANDARD

Motions to intervene are governed by Federal Rule of Civil Procedure 24, which

provides, in part, that:

> (a) Intervention of Right. On timely motion, the court must permit anyone
> to intervene who:
>
>> (1) is given an unconditional right to intervene by a federal statute;
>> or
>> (2) claims an interest relating to the property or transaction that is
>> the subject of the action, and is so situated that disposing of the
>> action may as a practical matter impair or impede the movant's
>> ability to protect its interest, unless existing parties adequately
>> represent that interest.
>
> (b) Permissive Intervention.
>
>> (1) In General. On timely motion, the court may permit anyone to
>> intervene who:
>>
>>> (A) is given a conditional right to intervene by a federal
>>> statute; or
>>> (B) has a claim or defense that shares with the main action a
>>> common question of law or fact.
>
> . . .
>
> (c) Notice and Pleading Required. A motion to intervene must be served
> on the parties as provided in Rule 5. The motion must state the grounds
> for intervention and be accompanied by a pleading that sets out the claim
> or defense for which intervention is sought.

Fed. R. Civ. P. 24.

## III. DISCUSSION

The City of Detroit contends that it is entitled to intervention as of right.  The

criteria that must be satisfied before an intervention as of right will be granted pursuant

to Federal Rule of Civil Procedure 24(a) are: (1) timeliness of the application to

intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the

4

applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court. *United States v. Tennessee*, 260 F.3d 587, 591-92 (6th Cir. 2001) (citing *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997)). "The applicant has the burden of demonstrating the four prongs, and the failure to satisfy any of the four prongs prevents the applicant from intervening as of right." *Johnson v. City of Memphis*, 73 F. App'x 123, 131 (6th Cir. 2003) (citing *Linton v. Comm'n of Health & Env't*, 973 F.2d 1311, 1317 (6th Cir. 1992)). Upon review of each prong, explained below, the court concludes that the City of Detroit has satisfied the requirements to intervene as of right, but further finds that the City's intervention should be restricted to the scope of the claims, *i.e.*, those claims arising directly from the 15 Mile Road Repair Project, asserted in Plaintiff's original complaint.

### A. Timeliness

The D'Agostini Defendants[2] argue that the City of Detroit's motion is untimely because the case was pending for nearly six months before the City filed its motion to intervene. (D'Agostini Defs.' Resp. to City of Detroit's Mot. Intervene 11-12, Jan. 27, 2012, Dkt. # 169.) Mere delay in filing a motion to intervene, however, is insufficient to establish the untimeliness of the motion. Instead, the United States Court of Appeals for the Sixth Circuit has held that the following factors should be considered in determining the timeliness prong when considering a motion to intervene:

---

[2]The D'Agostini Defendants include Defendants L. D'Agostini & Sons, Inc., Antonio D'Agostini, L. Robert D'Agostini, and James D'Agostini.

5

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Johnson*, 73 F. App'x at 131.  Here, the D'Agostini Defendants claim that the six month delay has prejudiced them because the stigma and the harm to their business interests this case has caused will persist further into the future as a result of the City of Detroit's intervention.  (D'Agostini Defs.' Resp. to City of Detroit's Mot. Intervene 12.)  The prejudice complained of by the D'Agostini Defendants, however, is not derived from the City of Detroit's six month delay in filing its motion, but rather from the mere fact that the D'Agostini Defendants are named defendants in the original complaint.  Indeed, were the court to deny the City of Detroit's motion, the City would be free to intitiate an independent lawsuit naming the D'Agostini Defendants as defendants, and thus subjecting the D'Agostini Defendants to exactly the same impact they attribute to the City's delay.  Furthermore, the court finds that the remaining timeliness factors militate in favor of finding the City of Detroit's motion timely.  The case is still in a nascent phase; the court has not entered a scheduling order nor has court-supervised discovery commenced.  In fact, the City of Detroit filed its motion before the final Defendants were even served by Plaintiff.  Additionally, the purpose of intervention, at least in part, is to determine the threshold question of who has standing to assert the statutory and tort claims arising from the 15 Mile Road Repair Project.  This issue affects the viability of

6

nearly every claim Plaintiff asserts and it should be addressed with the participation of the City of Detroit.  The City of Detroit's motion to intervene is timely.

### B. Interest in Case and Impairment of the City of Detroit's Ability to Protect its Interest in the Absence of Intervention

While a nonparty seeking intervention must demonstrate that it has a substantial interest in the pending litigation, the Sixth Circuit has adopted a "rather expansive notion of the interest sufficient to invoke intervention of right."  *Miller*, 103 F.3d at 1245.  "For example, an intervenor need not have the same standing necessary to initiate a lawsuit."  *Id.*  Here, neither Plaintiff nor Defendants argue that the City of Detroit fails to demonstrate it has a substantial interest in the case.  Further, upon the court's independent review of the City of Detroit's motion and the record, it is apparent that the original parties pointedly dispute whether it is the City of Detroit or Plaintiff that has standing to assert the statutory and tort claims expressed in Plaintiff's complaint.  The City of Detroit has no less than a substantial interest in this case.

Although they do not challenge the City of Detroit's interest in the case, Defendants nevertheless argue that the City of Detroit's motion to intervene would be moot if the court first determined who has standing to assert the statutory and tort claims in Plaintiff's complaint.  (*See e.g.*, Def. Soave's to City of Detroit's Mot. Intervene1, Jan. 26, 2012, Dkt. # 163*;* Inland Waters Pollution Control Defs.' Resp. to City of Detroit's Mot. Intervene 10, Jan. 27, 2012, Dkt. # 168; D'Agostini Defs.' Resp. To City of Detroit's Mot. Intervene 12-14,.)  As the City of Detroit observes, however, adjudicating an intervenor's interests in a case before deciding a pending motion to intervene would invariably moot any motion to intervene.  (City of Detroit's Reply to

7

Inland Waters Pollution Control Resp. 4, Feb. 3, 2012, Dkt. # 175.)  Moreover, the court reiterates now what it originally stated in its order denying the D'Agostini Defendants' motion for reconsideration, (2/7/2012 Order 3, Dkt. # 178): were the court to adopt Defendants' proposed order of operation, the City of Detroit would be denied a meaningful opportunity to argue on behalf of its purported interests in the statutory and tort claims and would be subjected to the very impairment that Rule 24 seeks to avoid. Accordingly, the court finds that adjudicating the standing issue prior to granting the City of Detroit intervention as of right would impair the City's ability to protect its interests. The court declines the invitation to determine whether the City of Detroit or Plaintiff has standing to raise the statutory and tort claims without first permitting the City of Detroit to intervene and properly articulate its interest in the claims.

### C. Adequacy of Representation of the City of Detroit's Interest by Original Parties

The parties do not contest the City of Detroit's argument that Plaintiff and Defendants fail to adequately represent Detroit's possible interests in this case, and the court finds that the City's claimed interests in the statutory and tort claims arising from the 15 Mile Road Repair Project are adverse to both Plaintiff's and Defendants's interest in this case.  Plaintiff cannot adequately represent the City of Detroit's interests in the claims arising from 15 Mile Road Repair Project because Plaintiff is adverse to Detroit, maintaining that the Detroit assigned those very claims to it in the Macomb Agreement. Further, the City of Detroit's position in this case is in direct opposition to the interests of Defendants, who cannot be expected to properly represent the City's interest in this case.

8

### D. Defendants' Futility Objections to the City of Detroit's Motion

Finally, numerous Defendants challenge the City of Detroit's intervention in this case on the grounds that the claims asserted in the City's proposed complaint are futile and fail as a matter of law.  (*See e.g.*, D'Agostini Defs.' Resp. to City of Detroit's Mot. Intervene 7, 9.)  Specially, the D'Agostini Defendants argue that the City of Detroit failed to properly plead its proposed breach of fiduciary duty claim and that, in any event, the claim is time barred, (*id.*), and the Lakeshore Engineering Defendants maintain that the City of Detroit failed to properly plead the constituent elements of a civil RICO claim, (Def. Lakeshore Eng'g Servs., Inc.'s Resp. to City of Detroit's Mot. Intervene 5-12, Jan. 27, 2012,  Dkt. # 170).  While the D'Agostini Defendants cite numerous cases from other district and circuit courts supporting the proposition that an intervenor must state a well-pleaded claim or defense in order to succeed on a motion to intervene, no Defendant proffers a single Sixth Circuit case, nor is the court familiar with any such case, adopting a futility exception to intervention.  Indeed, such an exception to intervention as of right would likely contradict the Sixth Circuit's expansive intervention doctrine, a doctrine that does not require an intervenor to have standing to initiate its own lawsuit or even "a specific legal or equitable interest" in the case.  *Miller*, 103 F.3d at 1245 (quoting *Purnell*, 925 F.2d at 948) (internal quotation marks omitted).  Even were the court to adopt a futility exception, the City of Detroit's claims, at least on initial review, are not plainly meritless.  Unlike the intervening plaintiff in *SEC v. American Board of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987), a case cited by the D'Agostini Defendants in which the United States Court of Appeals for the Second Circuit affirmed

9

a district court's denial of a motion to intervene as of right because the proposed claims were "frivolous on their face" and "clearly meritless," 830 F.2d at 443, the City of Detroit's complaint is not so meritless or otherwise deficient that the court could state that the City's claims are "frivolous on their face."  The most prudent course of action, especially given the City of Detroit's abbreviated opportunity to address Defendants' futility arguments in its reply briefs, is to allow the City to assert its claims and then permit Defendants to attack them, if they so choose, in fully-briefed Rule 12 motions. This will ensure Defendants have an opportunity early in the proceedings to challenge the legal sufficiency of the City of Detroit's claims while also permitting the City to more fairly and completely defend its positions.

### E. Scope of Intervention

Having determined that the City of Detroit satisfies the requirements for intervening as of right, the court now considers Defendants' request to limit the scope of the City of Detroit's intervention to participation in the adjudication of the issue of whether the City of Detroit or Plaintiff has standing to bring the statutory and tort claims arising out of the 15 Mile Road Repair Project.  Defendants argue that the City of Detroit's proposed intervening complaint "seeks to significantly expand the scope of this litigation from one relating to the work performed on one discrete project over the course of a limited time period . . . to include claims regarding various distinct contracts and necessitating a review of the entire relationship between the [Detroit Water and Sewerage Department] and numerous Defendants, spanning more than six years." (Inland Waters Pollution Control's Resp. to City of Detroit's Mot. Intervene 12.)  The City of Detroit acknowledges that its proposed intervening complaint is broader than

10

Plaintiff's but argues that it should nevertheless be permitted to "bring all its claims related to the same underlying scheme in order to avoid piecemeal litigation and potential preclusion issues." (City of Detroit's Reply to Inland Waters Pollution Control Defs.' Resp. 2.)

As the United States Court of Appeals for the First Circuit has observed, "the extent to which an [intervenor] can enlarge the issues in the case beyond those that the original plaintiff and defendant wish to litigate . . . is fraught with difficulty." *Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 36 (1st Cir. 2000). On one hand, once a court grants intervention as of right, "the intervener becomes a 'party,' [sic] within the meaning of the Rules, 'entitled to litigate fully on the merits.'" *Hartley Pen Co. v. Lindy Pen Co.* 16 F.R.D. 141, 153 (S.D. Cal. 1954) (quoting *Park & Tilford v. Schulte*,160 F.2d 984, 989 n.1 (2d Cir. 1947)); *see also In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006) ("Once a court grants intervention . . . , the 'intervenor is treated as if [it] were an original party and has equal standing with the original parties.'" (quoting *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir.1978)) (per curiam)). On the other hand, there is Supreme Court guidance holding that "an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding." *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944). Further, the advisory committee's note to the 1966 Amendment to Federal Rule of Civil Procedure 24 provides: "An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." And, while the advisory

11

committee's note has been challenged by at least one leading federal procedure treatise for failing to cite any authority in support of this statement, *see* 7C Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure*, § 1922, pp. 630-31 (3d ed. 2007), courts have interpreted the language to allow district courts to impose restrictions on an intervenor as of right, *see e.g.*, *Southern v. Plumb Tools*, 696 F.2d 1321, 1322 (11th Cir. 1983) ( "[C]onditions can be imposed even when a party intervenes as a matter of right under Rule 24(a)(2)."); *Newport News Shipbuilding and Drydock Co. v. Penisula Shipbuilders' Ass'n*, 646 F.2d 117, 122 (4th Cir. 1981) ("Even intervention of right may properly be made conditional by the exigencies of the particular case."); *Santiago-Sepulveda v. Esso Standard Oil* Co. *(Puerto Rico)*, 256 F.R.D. 39, 43-44 (D. P.R. 2009) (restricting the scope of intervention of a successor in interest by preventing counterclaims and observing that the intervenor "effectively seek[s] to create a separate case within a case. . . [by] naming new parties and raising new issues that were not raised by the principal parties"); *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 383 (1987) (Brennan, J., concurring) ("[R]estrictions on participation may also be placed on an intervenor of right and on an original party."  (citing Rule 24(a) advisory committee's note)).

Defendants' request to limit the City of Detroit's intervention to the threshold question of who has standing to assert the statutory and tort claims contained in Plaintiff's complaint plainly contravenes the principle that an intervenor, once permitted to intervene, is "entitled to litigate fully on the merits," *Hartley Pen Co.* 16 F.R.D. at 153, and "has equal standing with the original parties," *Marcaida* 569 F.2d at 831. Accordingly, the court declines to limit the City of Detroit's intervention to solely the

12

standing determination.  Nevertheless, granting the City of Detroit unrestricted intervention at this time and permitting it to file its proposed intervening complaint would exponentially broaden the scope of the current litigation.  The City of Detroit does not contest Defendants' assertion that its proposed intervening complaint is substantially broader in scope and introduces additional parties and claims not directly arising from the 15 Mile Road Repair Project.  Indeed, the City of Detroit itself states that its interests "are significantly broader than the issues raised in the Complaint."  (City of Detroit's Br. Supp. Mot. Intervene 1.)  As the court in *Santiago-Sepulveda* observed, granting an intervenor's request to add additional parties and issues that were not raised by the original parties "is effectively seeking to create a separate case within a case" and "would . . . grant an impermissible 'enlargement' of the case."  256 F.R.D. at 44. Limiting the City of Detroit's intervention to only those claims directly arising out of the 15 Mile Road Repair Project, and not the broader, overarching corruption scheme, ensures that the City of Detroit has a meaningful opportunity to protect its purported interests in the claims asserted by Plaintiff while also preventing the impermissible enlargement of the scope of the issues contained in Plaintiff's original complaint.

The court finds unpersuasive the City of Detroit's contention that restricting intervention to only those claims arising out of the 15 Mile Road Repair Project will not fully protect the City's interests in the case.  In its briefs, and during oral arguments, the City of Detroit alludes to broader interests in the alleged corruption scheme that may be impaired or impeded if it is not permitted to file its proposed complaint.  Specifically, it suggests that "[d]ecisions about the part of the scheme raised by [Macomb Interceptor] (such as whether a racketeering conspiracy existed, what its aims were and who it

13

included) could have adverse *stare decisis* effects on [the Detroit Water and Sewer Department's] efforts to obtain redress for the whole scheme," (City of Detroit's Br. Supp. Mot. to Intervene Br. 6), and may cause "potential preclusion issues," (City of Detroit's Reply to Inland Waters Pollution Control Resp. 2).  However, any potential impairment of the City of Detroit's interests in the broader scheme due to the possible effect of issue preclusion will be accounted for by immediately resolving, once the City of Detroit files its intervening complaint, the issue of standing to assert the claims arising from the 15 Mile Road Repair Project.  The doctrine of issue preclusion, also referred to as collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated [between the parties or their privies] and resolved in a valid court determination essential to the prior judgment."  *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).  In the instant case, if the court determines that the City of Detroit does not have standing and is not a proper party to this action, any claims it wishes to assert that arise from the broader corruption scheme will not be barred by a court determination in this case.  Alternatively, if the court ultimately determines that the City of Detroit, and not Plaintiff, has standing to assert the tort and statutory claims arising from the 15 Mile Road Repair Project, Plaintiff's tort and statutory claims will be dismissed, and the City may avoid the consequences of issue preclusion by filing a motion for leave to amend to add additional claims arising out of the broader corruption scheme.[3]  The City's

---

[3]During oral arguments counsel for the Inland Water Pollution Control Defendants argued that if the court finds that the City of Detroit has standing to assert the statutory and tort claims arising out of the 15 Mile Road Repair Project, the court would likely, under the prevailing law related to supplemental jurisdiction, dismiss Plaintiff's complaint in its entirety.  As a result, counsel maintained, the court would necessarily have to dismiss the City's intervening complaint, thereby forcing the City to

14

contention, asserted during oral arguments, that its interests in the broader corruption

scheme may nonetheless be practically harmed because factual determinations in this

case may informally influence a district judge's ruling in an independent action brought

the City is without merit.  Such an argument assumes that a federal court will either

ignore the well-established limits of the doctrine of issue preclusion or misapply the

doctrine.  The court is unwilling to make such an assumption.

Finally, determining the threshold issue of standing renders moot the City of

Detroit's additional arguments that its interests will be impaired if the court "makes a

decision on the merits without first determining whether the tort claims belong to

[Plaintiff or the City]" or reaches "an adverse decision as to the tort claims, such as

finding that they are barred by relevant statutes of limitations," (City of Detroit's Br.

Supp. Mot. Intervene 6-7).

Accordingly, limiting the City of Detroit's intervention to those claims arising

directly from the 15 Mile Road Repair Project properly protects the City's interests in this

case while preventing an impermissible expansion of the scope of the original lawsuit.

## IV. CONCLUSION

---

initiate a new and independent action.  Contrary to counsel's contention, however, a
plaintiff-intervenor with an independent jurisdictional basis for his claims may continue
to litigate even after the dismissal of the original plaintiff.  *United States Steel v. Envtl.
Prot. Agency*, 614 F.2d 843, 845 (3d Cir. 1979) (citing *Magdoff v. Saphin Television &
Appliance, Inc.*, 228 F.2d 214 (5th Cir. 1955) and *Hunt Tool Co. v. Moore, Inc.*, 212 F.2d
685 (5th Cir. 1955)) ("The weight of authority in the United States Courts of Appeals
supports the principle that an intervenor can continue to litigate after dismissal of the
party who originated the action."); 7C Charles Alan Wright, Arthur R. Miller, & Mary Kay
Kane, *Federal Practice and Procedure* § 1920, pp. 612-13 (3d ed. 2007) ("The case law
is scanty and unsatisfactory on when and whether a claim of an intervenor can proceed
to decision after a dismissal of the original action.  It is clear that this is proper if there
are independent grounds for jurisdiction of the intervenor's claim.")

For the reasons stated above, IT IS ORDERED that nonparties the City of Detroit and the Detroit Water and Sewerage Department's motion to intervene [Dkt. # 145] is GRANTED.  The City of Detroit and Detroit Water and Sewerage Department are DIRECTED to file an intervening complaint, limited in scope to only those claims directly arising out of the 15 Mile Road Repair Project, on or before **May 21, 2012**.  The Clerk of the Court is DIRECTED to add the City of Detroit and the Detroit Water and Sewerage Department as intervening Plaintiffs.

IT IS FURTHER ORDERED that Plaintiff Macomb Interceptor Drain Drainage District is DIRECTED to file a response to Defendants' "Joint Motion for Summary Judgment" [Dkt. ## 188, 190] on or before **May 21, 2012**.[4]  Plaintiff-Intervenors the City of Detroit and the Detroit Water and Sewerage Department are DIRECTED to file a

---

[4]Plaintiff Macomb Interceptor requested during oral arguments that its pending motion for leave to amend the original complaint be decided before the court addresses Defendants' joint dispositive motion.  After reviewing Macomb Interceptor's motion and Defendants' various response briefs, the court believes that the motion can be adjudicated simultaneously with Defendants' dispositive motion.  Defendants challenge Macomb Interceptor's request for leave to amend on several grounds, but primarily argue that amendment would be futile because Plaintiff does not have standing to assert any tort or statutory claims arising out of the 15 Mile Road Repair Project. (*See, e.g.*, D'Agostini Defs.' Resp. to Pl. Macomb Interceptor's Mot. Leave Amend 3, 5, Feb. 17, 2012, Dkt. # 185; Inland Waters Pollution Control Defs.' Resp. to Pl. Macomb Interceptor's Mot. Leave Amend 3, Feb. 17, 2012, Dkt. # 186; Def. Soave's Resp. to Pl. Macomb Interceptor's Mot. Leave Amend 4, Feb. 16, 2012, Dkt. # 183.)  The same argument is the basis of Defendants' pending dispositive motion, and the challenge to Plaintiff's standing applies with equal force to both the original complaint and the proposed amended complaint.  Accordingly, whether Plaintiff's proposed amended complaint is futile relies, in large part, on a determination of whether Plaintiff has standing to assert its claims.  By deciding the two pending motions contemporaneously, the court will in effect provide Plaintiff the full opportunity to address Defendants' no-standing argument that Plaintiff in its reply brief argues it would not have. (Pl. Macomb Interceptor's Reply 1, Feb. 23, 2012, Dkt. # 187).

16

response on or before **May 28, 2012**.  Any replies shall be filed on or before **June 4, 2012**.

Finally, IT IS ORDERED that the deadlines for the service of responsive pleadings contemplated by Federal Rule of Civil Procedure 12, originally tolled in the court's January 13, 2012 order, are REINSTATED.


        s/Robert H. Cleland                    
        ROBERT H. CLELAND
        UNITED STATES DISTRICT JUDGE

Dated:  May 7, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 7, 2012, by electronic and/or ordinary mail.


        s/Lisa G. Wagner                      
        Case Manager and Deputy Clerk
        (313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\11-13101.KILPATRICK.Grant.Detroit.Intervention.jrc.5.wpd



*Exhibit 15*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT, a municipal corporation, through the Detroit Water and Sewerage Department,

                Intervening Plaintiff,

vs.

KWAME KILPATRICK, an individual; VICTOR M. MERCADO, an individual; DERRICK A. MILLER, an individual; BOBBY W. FERGUSON, an individual; FERGUSON ENTERPRISES, INC., a Michigan corporation; INLAND WATERS POLLUTION CONTROL, INC., a Michigan corporation; and L. D'AGOSTINI & SONS, INC., D/B/A LD&S, a Michigan corporation;

                Defendants;

                and

MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT,

  Plaintiff,

vs.

KWAME KILPATRICK, et al.,

  Defendants.

Case No. 2:11-CV-13101

Judge Robert H. Cleland
Mag. Judge Mona K. Majzoub

**INTERVENING COMPLAINT OF THE PLAINTIFF CITY OF DETROIT THROUGH THE DETROIT WATER AND SEWERAGE DEPARTMENT**

**JURY TRIAL DEMANDED**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## INTERVENING COMPLAINT OF THE PLAINTIFF CITY OF DETROIT THROUGH THE DETROIT WATER AND SEWERAGE DEPARTMENT

Intervening Plaintiff City of Detroit ("City of Detroit") through the Detroit Water and Sewerage Department ("DWSD") (collectively, "Intervening Plaintiff"), by its undersigned counsel, state for its Complaint against Defendants Kwame M. Kilpatrick, Victor M. Mercado, Derrick A. Miller, Bobby W. Ferguson, Ferguson Enterprises, Inc., Inland Waters Pollution Control, Inc., and L. D'Agostini & Sons, Inc., d/b/a LD&S, as follows:

## GENERAL PATTERN OF ILLEGAL CONDUCT

1.      The City of Detroit and DWSD seek to recover damages caused by former Mayor Kwame M. Kilpatrick and persons and entities that diverted or helped to divert roughly $58 million in City of Detroit monies for their own private gain. Their illegal conduct involved bribery, extortion, money laundering, and unlawful contract fixing (often bid-rigging) between 2004 and 2006, with money and/or other gratuities ultimately flowing back to Kilpatrick and his friends. Kilpatrick, DWSD Director Victor Mercado, and Kilpatrick's friend Bobby Ferguson were the chief architects of and participants in the illegal conduct. Other individual participants included Derrick Miller, a key member of Kilpatrick's mayoral administration. The contractor and subcontractor participants included Inland Waters Pollution Control, Inc. and Ferguson Enterprises, Inc. Each participant willingly participated in order to get a share of the ill-gotten profits at the taxpayers' expense.

2.      Defendants availed themselves of and relied upon the unlawful use by Kilpatrick of his authority and influence as Mayor and as the federal Court-appointed Special Administrator of DWSD, with the assistance of Mercado and Miller, to manipulate and amend DWSD contracts so that those contracts, amendments, and the payments made under them would be disproportionally awarded to Ferguson, Ferguson Enterprises, Inc., Inland Waters, and

-2-

subcontractors associated with these companies. These contractors and subcontractors benefited from the ability to amend their contracts without scrutiny, oversight, or competitive bidding. Once the public works projects were awarded, the contractors and subcontractors received the enhanced profits associated with water and sewerage contracts, together with excessive management and consulting fees, costly extra services, and, in some instances, padded invoices as to time, material, and equipment.

3.     To obtain these excessive and unlawful profits, fees, expenses, and costs, some participants in the illegal conduct, through known and unknown current and past owners, officers, employees, agents and representatives, made unlawful payments and/or provided unlawful gratuities to Kilpatrick, Ferguson, and Ferguson-controlled entities.  Participants who may not have been actively involved in bribery, extortion, and bid rigging "turned a blind eye" to these unlawful activities but willingly facilitated and benefited from them.  Moreover, all of the participants actively participated or were involved in money laundering and other unlawful activities.

4.     The illegal conduct was fraudulently concealed from disclosure to other officials of the City of Detroit, including the Detroit City Council, the DWSD Board of Water Commissioners, federal and state law enforcement, and the news media.  Upon information and belief, Defendants hid their ill-gotten gains, including bribery and extortion payments by, among other things, passing invoices and costs through the City of Detroit's billing and invoicing system.  By misusing this system, Defendants helped to conceal the misconduct and launder the money.  The fraudulent concealment continued until the federal government, using the vast resources available to it, empanelled a grand jury and issued a First Superseding Indictment, dated December 15, 2010.

-3-

5.     Pursuant to the Court's 05/07/2012 Order (ECF No. 202), this Intervening Complaint is limited to claims that directly arise from Amendments 2 and 3 of CS-1368, one of the numerous DWSD contracts that involve misconduct by Defendants and others.[1]  The two amendments alone cost the City of Detroit about $58 million.    The Intervening Plaintiff intervenes to assert its rights to recover damages against the named Defendants, including RICO, tort-related damages, contract damages, unjust enrichment damages and disgorgement of unlawfully obtained profits.

## JURISDICTION

6.     Pursuant to 28 U.S.C. § 1331, this Court has federal question subject-matter jurisdiction over the Intervening Plaintiff's claims under the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

7.     The Court has supplemental subject-matter jurisdiction over the Intervening Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367 because those claims are so related to (a) the Intervening Plaintiff's federal claims as to form part of the same case or controversy, and (b) the federal claims of Plaintiff Macomb Interceptor Drain Drainage District as to form part of the same case or controversy.

8.     The Court has personal jurisdiction over the individual Defendants pursuant to Mich. Comp. L. § 600.701 because each of the individual Defendants either currently resides in Michigan or consented to Michigan's jurisdiction.  This Court also has personal jurisdiction over Defendants Kwame M. Kilpatrick, Victor M. Mercado, and Derrick A. Miller pursuant to Mich.

---

[1] Consistent with the Court's Order, the Intervening Plaintiff reserves the right to assert broader conspiracy claims and other claims that – although related in some manner to these two amendments – actually arise out of various other DWSD contracts and a larger and longer pattern of Defendants' misconduct.

-4-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Comp. L. § 600.715 because they transacted the business described herein within Michigan and performed or caused the tortious acts and consequences described herein within Michigan.

9.    The Court has personal jurisdiction over the corporate Defendants pursuant to Mich. Comp. L. § 600.711 because they are incorporated under Michigan's laws, have consented to jurisdiction, and/or have carried on a continuous and systematic part of their general business in Michigan.

10.    As discussed more fully below, each of the Defendants engaged in activity evincing sufficient minimum contacts with the State of Michigan.

## VENUE

11.    Venue is proper here pursuant to the general provisions of 18 U.S.C. § 1391(b)(2) for reasons including that a substantial part of the events or omissions giving rise to the claim occurred in this District and the water and sewer system property at issue is located here.

12.    Venue is also proper here pursuant to 18 U.S.C. § 1965 as the Intervening Plaintiff is asserting civil RICO claims, and the Defendants transacted relevant business in this District.

## RELEVANT TIME PERIOD

13.    The "relevant time period" of the misconduct that forms the basis of the claims asserted herein is from approximately August 2004 to approximately 2006.  The period of the fraudulent concealment of the misconduct continued until December 15, 2010.

## PARTIES

### Intervening Plaintiff

14.    The City of Detroit is a municipal corporation located in Wayne County, Michigan.  It was incorporated pursuant to the Michigan Home Rule Cities Act, Mich. Comp. L. § 117.1, and is a political subdivision of the State of Michigan.  DWSD, a department of the City

-5-

of Detroit, provides water service and wastewater treatment services to residents of the City of Detroit and neighboring southeastern Michigan communities.  In general, DWSD is governed by a Board of Water Commissioners (the "DWSD Board").  During the relevant time period, a Director was in charge of the day-to-day affairs of DWSD.

**Plaintiff**

15.     Macomb Interceptor Drain Drainage District ("MID") is a special purpose public corporation established under the Michigan Drain Code of 1956, Mich. Comp. L. 280.1 *et seq.*, operating and existing under the Michigan Constitution and the laws of Michigan.

**Defendants**

16.     Defendant Kwame M. Kilpatrick ("Kilpatrick"), an individual, is currently a resident of Texas.  Kilpatrick was the elected Mayor of the City of Detroit from 2002 to 2008.  In his capacity as Mayor, Kilpatrick was the chief executive officer for the City of Detroit, and his duties included supervising and directing the DWSD, which were operated and funded by the City of Detroit.  From January 2002 to January 2006, Kilpatrick was also the federal Court-appointed "Special Administrator" of DWSD.  In this capacity – discussed more fully below – Kilpatrick had extensive power and authority to control, manage, and operate DWSD and other departments of the City of Detroit.  Kilpatrick is also the lead criminal Defendant in *United States v. Kilpatrick, et al.*, E.D. Mich. Case No. 10-CR-20403 (the "Kilpatrick Prosecution"), which concerns some of the same misconduct alleged here.

17.     Defendant Victor M. Mercado ("Mercado"), an individual, is, upon information and belief, a resident of Florida.  Mercado served as the Director of DWSD from 2002 to 2008.  As the Director of DWSD, Mercado was responsible for the overall direction and administration of DWSD.  As alleged in indictments in the Kilpatrick Prosecution, from 2002 to 2008 Mercado had supervisory authority over the awarding of more than $2 billion of contracts between DWSD

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-6-

and private contractors. At various times, Mercado also served as the designee (i.e., designated agent) of Special Administrator Kilpatrick and performed duties and functions on behalf of the Special Administrator. Mercado is named as a Defendant in the Kilpatrick Prosecution.

18.     Defendant Derrick A. Miller ("Miller"), an individual, is currently a resident of Virginia. Miller worked in Kilpatrick's mayoral administration from 2002 to 2007, serving in various positions including as Chief Administrative Officer and Chief Information Officer for the City of Detroit. During this period, Miller became involved in the bidding and awarding of DWSD contracts. Miller is named as a Defendant in the Kilpatrick Prosecution. On August 19, 2011, Miller signed a plea agreement ("Miller Plea Agreement") admitting that he engaged in two of the crimes charged (bribery and filing a false tax return), as set forth in a Second Superseding Information in the Kilpatrick Prosecution. (Ex. 1: Miller Plea Agreement, which is incorporated by reference herein.)

19.     Defendant Bobby W. Ferguson ("Ferguson"), an individual, is, upon information and belief, a resident of Wayne County, Michigan. During the relevant time period, Ferguson was Kilpatrick's close friend and confidant. Ferguson owned, operated, and/or controlled Ferguson Enterprises, Inc. Ferguson is named as a Defendant in the Kilpatrick Prosecution.

20.     Defendant Ferguson Enterprises, Inc. ("FEI"), a Michigan for-profit corporation, is a Ferguson-controlled company that was primarily engaged in the business of providing construction, demolition, and/or excavation services. FEI has its principal place of business in Wayne County, Michigan. During the relevant time period, FEI entered into contracts or subcontracts to perform work for DWSD and performed work for DWSD as a contractor or subcontractor within this judicial district.

21.     Defendant Inland Waters Pollution Control, Inc. ("Inland Waters"), a Michigan for-profit corporation, is primarily engaged in the business of waste collection and transportation.

-7-

Inland Waters has its principal place of business in Oakland County, Michigan.  During the relevant time period, Inland Waters entered into contracts to perform work for DWSD and performed work for DWSD as a contractor or subcontractor within this judicial district.

22.     Defendant L. D'Agostini & Sons, Inc., d/b/a LD&S ("LD&S"), a Michigan for-profit corporation, is primarily engaged in providing general contracting and/or construction services.  LD&S has its principal place of business in Macomb County, Michigan.  During the relevant time period, LD&S entered into contracts or subcontracts to perform work for DWSD and performed work for DWSD as a contractor or subcontractor within this judicial district.

## THE KILPATRICK INDICTMENT AND PROSECUTION

23.     The Intervening Plaintiff's claims are based upon conduct first unveiled in the Kilpatrick Prosecution.  On December 15, 2010, a grand jury returned a First Superseding Indictment in the Kilpatrick Prosecution, naming Kilpatrick, Ferguson, Bernard Kilpatrick, Mercado, and Miller as Defendants.  That indictment alleged a criminal RICO conspiracy, bribery, extortion, obstruction of justice, mail fraud, wire fraud, and money laundering in relation to a number of projects entered into by DWSD, including the DWSD project at issue in this case: the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan under Amendments 2 and 3 to DWSD contract CS-1368.

24.     On August 19, 2011, Miller agreed to enter a guilty plea to certain crimes in the Kilpatrick Prosecution.  A Second Superseding Information was issued against Miller on September 12, 2011.  As part of his plea agreement, Miller admitted that, at Kilpatrick's direction, he steered millions of dollars of City of Detroit business to Ferguson.  Miller admitted that Kilpatrick with assistance from Mercado and Miller pressured contractors to add Ferguson-controlled companies to DWSD contracts they had received, or risk having the contracts held up or canceled.  Miller admitted that Mercado and other City of Detroit officials influenced the

-8-

awarding of contracts to teams that included Ferguson-controlled companies, including reevaluating or fixing bids if Ferguson's companies were not part of the winning team. Miller admitted that he and other City of Detroit officials gave Ferguson inside information about contracts or bid evaluations to give Ferguson an edge over competing bidders.

25.     On November 16, 2011, the grand jury returned a Third Superseding Indictment, which essentially expanded upon some of the facts and occurrences as set forth in the First Superseding Indictment, including criminal RICO conspiracy, bribery, extortion, obstruction of justice, mail fraud, wire fraud, and money laundering. On February 15, 2012, the grand jury returned a Fourth Superseding Indictment, which essentially expanded upon the same facts and occurrences. (Ex. 2: 4th Superseding Indictment, which is incorporated by reference herein.)

## GENERAL ALLEGATIONS

### I.     Kilpatrick is Elected Mayor and Appointed as the Federal Court's Special Administrator

26.     Kilpatrick's term as Mayor began on January 2, 2002, following his election in November 2001.

27.     When Kilpatrick became Mayor, an environmental lawsuit was pending in the United States District Court for the Eastern District of Michigan entitled *United States v. City of Detroit, Detroit Water and Sewerage Department and State of Michigan*, E.D. Mich. Case No. 77-71100. Judge John Feikens presided over the lawsuit, which concerned the City of Detroit and DWSD's compliance with provisions of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (the "City of Detroit Environmental Case").

28.     On December 3, 2001, Judge Feikens entered an order entitled "Order Continuing Special Administratorship for the Detroit Water and Sewerage Department," in which he appointed Kilpatrick as the federal Court's Special Administrator of DWSD, effective as of

-9-

January 1, 2002.  Judge Feikens' December 3, 2001 Order granted to Kilpatrick (as prior orders of the Court had granted to former Mayors Coleman Young and Dennis Archer) broad federal powers over DWSD, including authority over the contracting and procurement operations of the DWSD Board.  The Order also gave Kilpatrick authority over all other departments of the City of Detroit insofar as their powers affected the City of Detroit's compliance with the Clean Water Act and related environmental laws (as set forth in a series of consent judgments entered by the Court).  (Ex. 3: Packet of Court Orders, which is incorporated by reference herein.)

29.     Kilpatrick's appointment as Special Administrator did not authorize him to violate federal, state or local criminal laws or render him in any manner immune from civil liability.

30.     The December 3, 2001 Order required Kilpatrick to "find and hire a Director of the DWSD [who] shall be clearly and completely responsible for the overall success of the [DWSD] in achieving its mission, goals and objectives . . . ."

31.     Pursuant to Kilpatrick's authority as Special Administrator, in or around June 2002, Kilpatrick appointed Mercado as the Director of DWSD.

32.     Sometime in early 2002, Kilpatrick appointed Miller as Chief Administrative Officer, and Miller became involved in the bidding and awarding of DWSD contracts.

33.     On November 25, 2002, Judge Feikens issued an Order in the City of Detroit Environmental Case, which authorized Kilpatrick as Special Administrator to retain Infrastructure Management Group ("IMG"), a consulting group, to advise Kilpatrick and Mercado on "potential cost containment strategies related to the operation and maintenance activities of DWSD" and on issues related to DWSD's contracting and procurement operations. The Court "note[d] that IMG is a national leader in utility services and has expertise in contract design and procurement processes . . . ."  The Order required "that as to contracts which are in a monetary amount over $500,000.00, IMG shall report monthly its comments regarding those

-10-

contracts and related procurement practices to the Special Administrator and to this Court." (Ex. 4: 11/25/2002 Order, which is incorporated by reference herein.)

34. The contract at issue in this case, CS-1368 (Amendments 2 and 3), is in a monetary amount over $500,000.

## II. Background Information as to CS-1368, Amendments 2 and 3

35. In November 2001, DWSD, through the DWSD Board, approved Inland Waters to receive Contract CS-1368 and Contract CS-1362. The scope of these two contracts encompassed sewer inspection, lining, and rehabilitation services for sewers within the City of Detroit. CS-1362 pertained to smaller-diameter sewer pipes, and CS-1368 pertained to larger-diameter sewer pipes. Each contract was in the amount of $25 million.

36. In or around December 2001, DWSD, through the DWSD Board, approved combining CS-1362 with CS-1368 to produce a single contract for sewer inspection, lining, and rehabilitation services throughout the City of Detroit. The combined contract continued under the designation CS-1368. (Ex. 5: Contract CS-1368, which is incorporated by reference herein.) The work was to be completed on the basis of individual task orders, with the total amount paid on the contract not to exceed $50 million.

37. CS-1368 included covenants in which Inland Waters, the CONSULTANT, covenanted, warranted and agreed as follows:

> 13.01 The CONSULTANT covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of the Services under this Contract. The CONSULTANT further covenants that, in the performance of this Contract, no person having any such interest shall be employed.
>
> The CONSULTANT further covenants that no officer, member or employee of the CITY and no other public official who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of this Contract has any personal or

-11-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

financial interest, direct or indirect, in this Contract or in the proceeds thereof in accordance with Article 2, Section 2-106 "Standards of Conduct" of the Charter of the City of Detroit.

13.02  The CONSULTANT also hereby warrants that it has not and will not employ any person to solicit or secure this Contract upon any agreement or arrangement for payment of a commission, percentage, brokerage, or contingent fee, either directly or indirectly.  The CONSULTANT further agrees that if this warranty is breached, the CITY may, at its option, terminate this Contract without penalty, liability or obligation, or may at its election, deduct from any amounts owed to the CONSULTANT hereunder any amounts of such commission, percentage, brokerage, or contingent fee.

* * * * *

13.04  The CONSULTANT shall include the provisions of this article in any subcontract it enters into pursuant to this Contract.

38.     CS-1368 also contained the following contractual provisions to which Inland Waters agreed:

- To "perform in a satisfactory and proper manner, as determined within the sole and reasonable discretion of the DWSD, the Services" specified in the contract (Article 2.01);

- To provide the labor, materials, and equipment to fully perform (on an as-needed basis) the inspection, cleaning, and rehabilitation/lining repairs discussed therein and to provide informational updates to DWSD about the work (Article 2.05, as set forth in 2.05a-2.05bb);

- To obtain the DWSD Director's prior approval of all subcontracts for work under CS-1368, as amended (Article 3.01);

- To "furnish 'as-built' information to DWSD . . . [o]n completion of each Task Order [under the contract]" (Article 2.01a);

- To "deliver in a timely fashion and on a regular schedule a CPM Scheduling and Monitoring Report or other presentation such as a Gantt Chart meeting the approved standards of DWSD. The CPM Report shall include detailed tasks, schedules, deliverables, decision points, and subcontractor participation, and shall be loaded to indicate scheduled personnel requirements" (Article 2.01b);

- "To submit a written Progress Status Report monthly describing progress on the work of the Contract by updating the CPM Report" detailing

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-12-

"which activities were reformed [sic] by [Inland Waters] and which were performed by Subcontractors," as well as the obligation that "[a]t regular intervals, [Inland Waters'] supervisors, higher than the Project Manager (if any) will make checks on verifications of the reports" (Article 6.07c);

- To "maintain full and complete books, ledgers, journals, accounts, or records . . . in which are kept all entries reflecting its operation pursuant to this Contract" (Article 6.09);

- To allow the City of Detroit to audit Inland Waters' books and records at any time in relation to Inland Waters' work on CS-1368 (Articles 6.09, 6.10, and 7.02);

- To submit invoices based on the work actually completed as set forth in accurate Scheduling and Monitoring reports (Article 8);

- To indemnify the City of Detroit against all attorney fees and costs incurred "by reason of . . . any negligent or tortious act, error or omission of [Inland Waters] or any of its Associates" in connection with the contract (Article 9.01);

- To tender upon request and upon the completion of the contract, all of its original work product (or copies if originals are unavailable), including documents, data, drawings, maps, photographs, files, supplies, notes, reports, and other materials related to the contract, which are the City of Detroit's property (Article 11.04);

- To deliver to DWSD an executed copy of any subcontract, within 15 days of receiving it, and to refrain from seeking payment as to a subcontractor before delivering such executed copy of that subcontractor's subcontract (Article 12.01); and

- To "comply with and [to] require its Associates to comply with (a) all applicable Federal, state and local laws, ordinances, code(s), regulations and policies, including, but not limited to, all security regulations in effect from time to time on the CITY's premises; and (b) all applicable codes and regulations for materials, belonging to the CITY or developed in relation to this contract," (Article 15.01).

39.    As part of the process in the awarding of the combined CS-1368 to Inland Waters, the DWSD Board approved the specific Detroit-based and/or small-business subcontractors who were to work with Inland Waters on CS-1368: C.J. Williams & Associates, Superior Engineering Associates, Inc., Willie McCormick & Associates, Inc., LD&S, and Superior Construction &

-13-

Management LLC. Although all of the Ferguson-controlled companies are Detroit-based, not one Ferguson-controlled company, including FEI, was among the approved subcontractors.

40.     In or about early 2002, and as alleged in the Kilpatrick Indictment, Kilpatrick's father, Bernard Kilpatrick, alerted Mayor Kilpatrick that Inland Waters' approved list of subcontractors on CS-1368 did not contain any Ferguson-controlled company.

41.     As alleged in the Kilpatrick Indictment, in or about early 2002, despite the DWSD Board's decision to award CS-1368 to Inland Waters, Kilpatrick used his powers as Special Administrator to refuse to approve CS-1368 for the single reason that no Ferguson-controlled company had been retained as a subcontractor on CS-1368.

42.     Apparently acting for Kilpatrick, as alleged in the Kilpatrick Indictment, in or about early 2002, Miller instructed a representative of Inland Waters to give Ferguson 5% of the work on CS-1368.

43.     In furtherance of Kilpatrick's scheme to have a Ferguson-controlled company retained as a subcontractor on CS-1368, as alleged in the Kilpatrick Indictment, in or about April 2002, Kilpatrick told an Inland Waters representative that, if Inland Waters wanted to receive approval of CS-1368, a Ferguson-controlled company needed to be substituted for Inland Waters' minority contractor.

44.     Inland Waters subsequently subcontracted work on CS-1368 to FEI.

45.     Inland Waters did not advise the DWSD Board of the existence of its discussions relative to the awarding of subcontractor work to Ferguson on CS-1368 and, in fact, concealed this information from the DWSD Board, the Detroit City Council, and the general public.

46.     In November 2004, through a first amendment to CS-1368 ("CS-1368-1"), Inland Waters received additional DWSD work projects. Amendment 1 to CS-1368, in the amount of $10 million, increased the total amount of CS-1368 to $60 million.

-14-

47.     CS-1368-1 provides in Section IV that "[e]xcept as herein amended, the terms and conditions of the Contract, dated July 26, 2002 [CS-1368], shall remain the same and govern the relationship of the parties."  CS-1368-1 did not contain any amendment that rescinded, changed, revised or affected in any manner the covenants, warranties and agreements as set forth in Articles 13.01, 13.02 or 13.04 of CS-1368.  CS-1368-1 also did not contain any amendment that rescinded, changed, revised or affected in any manner the agreements as set forth in Articles 2.01, 2.01a, 2.01b, 2.05, 3.01, 6.07c, 6.09, 6.10, 7.02, 8, 9.01, 11.04, 12.01, or 15.01 of CS-1368.

48.     As alleged in the Kilpatrick Indictment, during the relevant time period, on at least 18 occasions Kilpatrick requested the use of the private jets of Inland Waters for the personal use of Kilpatrick and his friends, family, and associates, including Bernard Kilpatrick and Ferguson.

49.     As alleged in the Kilpatrick Indictment, Kilpatrick did not reimburse Inland Waters for the use of its private jets.

50.     As alleged in the Kilpatrick Indictment, and upon information and belief, Inland Waters, or persons or corporations authorized by and working in the interest of Inland Waters, provided this free private jet service, worth over $260,000, in part so Kilpatrick and the Mayor's Office would promote the business interests of Inland Waters with the City of Detroit, and Inland Waters knowingly received and accepted the benefits derived from these bribes and unlawful gratuities.

51.     As alleged in the Kilpatrick Indictment, in or about 2006, after Kilpatrick had used the private jets a number of times, a representative of Inland Waters asked Kilpatrick if he thought he should start paying for some of the flights because "it did not look good" for the representative to provide the flights for free.  As alleged in the Kilpatrick Indictment, Kilpatrick said he would see about it but never otherwise responded to Inland Waters' representative.

-15-

52.     Upon information and belief, Inland Waters continued to provide Kilpatrick's flights for the purpose of promoting the business and profits that Inland Waters received from contracts with the City of Detroit.

53.     As alleged in the Kilpatrick Indictment, the flights had a fair market value to Kilpatrick of more than $260,000 and an added variable cost to Inland Waters (and/or its representative) of more than $120,000.

54.     As alleged in the Kilpatrick Indictment, the flights provided to Kilpatrick are as follows:

| Para. No. | Date(s) | Destination (s) | Flights | Passen-gers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 55. | 2/25/04 - 2/28/04 | Washington, DC | 2 | 4 | $4,473.59 | $7,750.00 |
| 56. | 4/12/04 - 4/16/04 | Orlando | 2 | 8 | $8,947.19 | $11,760.00 |
| 57. | 7/24/04 - 7/25/04 | East Hamptons, Boston | 2 | 3 | $3,890.08 | $10,466.00 |
| 58. | 10/15/04 - 10/16/04 | Houston | 2 | 6 | $10,114.20 | $14,659.00 |
| 59. | 5/19/05 | Cleveland | 2 | 9 | $1,167.02 | $2,025.00 |
| 60. | 5/27/05 - 5/28/05 | Greensboro, NC | 2 | 1 | $4,279.08 | $6,160.00 |
| 61. | 7/7/06 - 7/8/06 | Houston | 2 | 2 | $9,919.70 | $16,919.00 |
| 62. | 8/2/06 - 8/6/06 | Bermuda | 3 | 9 | $11,281.23 | $20,382.00 |
| 63. | 10/27/06 - 10/28/06 | Tallahassee | 2 | 3 | $7,974.66 | $10,480.00 |
| 64. | 4/12/07 | Naples, FL to Detroit | 1 | 5 | $4,668.10 | $13,765.00 |
| 65. | 5/1/07 | Tallahassee | 2 | 7 | $7,196.65 | $10,360.00 |
| 66. | 5/27/07 - 5/29/07 | Tallahassee | 2 | 7 | $7,391.15 | $20,625.00 |
| 67. | 6/13/07 - 6/14/07 | Tallahassee | 2 | 3 | $7,196.65 | $10,360.00 |
| 68. | 6/30/07 - 8/14/07 | Tallahassee | 2 | 7 | $7,196.6 | $22,240.00 |
| 69. | 9/16/07 - 9/17/07 | Tallahassee | 2 | 3 | $7,391.15 | $20,720.00 |

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-16-

| 70. | 11/2/07 - 11/5/07 | Tallahassee, Miami | 3 | 6 | $10,308.71 | $26,880.00 |
| 71. | 12/27/07 | Tallahassee | 1 | 5 | $3,890.08 | $10,360.00 |
| 72. | 1/23/08 - 1/27/08 | Tallahassee | 2 | 5 | $7,585.66 | $28,582.00 |
|  | **Totals** |  |  |  | **$124,871.55** | **$264,493.00** |

73.     In the months after Inland Waters began providing free flights to Kilpatrick (and partly as a result of those flights), Inland Waters received an additional series of amendments to CS-1368, including Amendments 2 and 3, which pertain to the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan.  Amendments 2 and 3 were in the amount of $35 million and $23 million, respectively, without any requirement that Inland Waters had to competitively bid on the amendments.

III.     **CS-1368, Amendments 2 and 3**

**Kilpatrick, Mercado, Ferguson, and Inland Waters Unlawfully Steer CS-1368 Work on the 15-Mile Road Interceptor Sewer Collapse Project to Ferguson, and Allow Ferguson and Possibly Other Contractors to Submit Inaccurate and Padded Invoices**

74.     On or about August 22, 2004, a sewer collapse occurred at 15 Mile Road in the City of Sterling Heights, Michigan.

75.     DWSD immediately began a program to repair the 15 Mile Road Sewer Collapse (the "15 Mile Road Sewer Collapse Project").

76.     Within days of the sewer collapse, Mercado and/or his designee held daily morning meetings to discuss repairs at the 15 Mile Road Sewer Collapse Project.

77.     As alleged in the Kilpatrick Indictment, on or about September 1, 2004, after visiting the site of the sewer collapse, Kilpatrick discussed with Ferguson about how they could get work for a Ferguson-controlled company at the site.  As alleged in the Kilpatrick Indictment, Ferguson advised Kilpatrick that although Inland Waters would be overseeing the overall repair

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

project, subcontractor LD&S hired all the subcontractors at the site.  As alleged in the Kilpatrick Indictment, Kilpatrick responded, "Perfect! That's what I needed," and Ferguson replied, "We need to mee [meet] on how, I move in [to get the work], I got a great idea sir."

78.    As alleged in the Kilpatrick Indictment, on or about September 7, 2004, Kilpatrick asked Ferguson whether Ferguson had determined his share of the work on the 15 Mile Road Collapse Project.  As alleged in the Kilpatrick Indictment, Ferguson responded that LD&S wanted to share the work with Ferguson on a 50/50 basis, but that Kilpatrick had to instruct Mercado about the arrangement, including that Kilpatrick would personally review LD&S's invoices to ensure that Ferguson was getting his share: "just let victor [Mercado] know [if LD&S] makes 2.00 fei [FEI] needs to make 2.00 also you will look at the invoices to make sure."   Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that LD&S divided the available work on the 15 Mile Road Collapse Project between itself and a Ferguson-controlled company, so that both could profit.

79.    Until the 15 Mile Road Collapse Project, DWSD maintained a standard practice on its other sewer and water-repair projects of requiring DWSD inspectors at sewer repair sites to prepare "Daily Engineering Inspection Reports," which detailed, among other things, the time each employee of each contractor or subcontractor spent on the job each day and the equipment used or stored on the job site each day.

80.    Rather than use the standard "Daily Engineering Inspection Reports" for the 15 Mile Road Collapse Project, Mercado instructed DWSD inspectors to use a "Daily Press Report," which did not contain the actual hours worked by each employee each day or the equipment used on the site each day.

-18-

81.     Use of Daily Press Reports instead of the standard Daily Engineering Inspection Reports resulted in substantially reducing the amount of accurate information as to the work being performed each day on the 15 Mile Road Sewer Collapse Project and, upon information and belief, made it much more difficult to monitor and evaluate the work activities of Inland Waters and its subcontractors, including FEI.

82.     Mercado knew that the Daily Press Reports made it substantially more difficult to monitor and evaluate the work activities on the 15 Mile Road Sewer Collapse Project.

83.     Mercado also approved and set into place a work monitoring and payment system for the 15 Mile Road Sewer Collapse Project, which relied almost entirely on Inland Waters' review of subcontractors' submitted time and equipment sheets.  This system operated without effective checks and monitoring by DWSD inspectors and other officials.

84.     By reducing the involvement of DWSD staff in supervising the contractors' work, by transferring management and supervisory responsibilities to outside contractors, and by reducing or eliminating portions of DWSD's written record of the contractor's purported activities, Mercado aided, abetted, participated in and furthered the pattern of racketeering through which Defendants conducted the Kilpatrick Enterprise.

85.     As alleged in the Kilpatrick Indictment, in approximately September 2004, NTH Consultants, Ltd. ("NTH") was hired to evaluate and design the repair of the 15 Mile Road Sewer Collapse.  NTH estimated that the cost of the repairs at the 15 Mile Road Sewer Collapse would be about $31 million.

**Entry into CS-1368-2**

86.     On September 28, 2004, Kilpatrick issued Special Administrator Order Number 2004-5, authorizing Mercado to enter into an emergency amendment (Amendment 2) to CS-1368 increasing the contract by $35 million and increasing the total amount of the contract to $95

-19-

Million ("CS-1368-2").   (Ex. 6: Amendment CS-1368-2, which is incorporated by reference herein.)

87.    CS-1368-2 was executed for Inland Waters by Robert Williams, its President, and Renne Pricopio, Kathryn Dickey, Rechanda Cespedes and Debra Roland.

88.    CS-1368-2 provides in Section VI that "[e]xcept as herein amended, the terms and conditions of the Contract, dated July 26, 2002 [CS-1368], and as previously amended, shall remain the same and govern the relationship of the parties."  CS-1368-2 did not contain any amendment that rescinded, changed, revised or affected in any manner the covenants, warranties and agreements as set forth in Articles 13.01, 13.02 or 13.04 of CS-1368.  CS-1368-2 also did not contain any amendment that rescinded, changed, revised or affected in any manner the agreements as set forth in Articles 2.01a, 2.01b, 2.05, 3.01, 6.07c, 6.09, 6.10, 7.02, 8, 9.01, 11.04, 12.01 or 15.01 of CS-1368.  Although CS-1368-2 expanded the scope of services in Article 2.01, it did not contain any amendment that rescinded, changed, revised or affected in any manner Inland Waters' agreement in that Article to "perform in a satisfactory and proper manner, as determined within the sole and reasonable discretion of the DWSD," the services required under the contract.

89.    The $35 million increase was $4 million more than NTH's estimate of the cost for repairs at the 15 Mile Road Sewer Collapse.

90.    During the Winter of 2004 and Spring of 2005, Inland Waters exceeded its budget on the work on the 15 Mile Road Sewer Collapse.

91.    As alleged in the Kilpatrick Indictment, on or about May 3, 2005, Ferguson told representatives from Inland Waters that people "Downtown" would not understand if he did not get sufficient revenue from work on the sewer collapse, which could hurt Inland Waters' chances of getting another amendment increasing the scope of CS-1368.  As alleged in the Kilpatrick

-20-

Indictment, Inland Waters' representatives understood that Ferguson's reference to people "Downtown" meant the Mayor's Office.

**Entry into CS-1368-3**

92.     On May 18, 2005, Kilpatrick issued Special Administrator Order Number 2005-7, authorizing Mercado to enter into Amendment 3 to CS-1368 with Inland Waters "to add funding to complete the repairs and restoration of the Romeo Arm [at 15 Mile Road] ("CS-1368-3"). (Ex. 7: Amendment CS-1368-3, which is incorporated by reference herein.)

93.     On or about June 16, 2005, DWSD approved CS-1368-3, which increased the amount of CS-1368 by another $23 million, increasing the new total amount of the contract up to $118 million.

94.     At this point, the $58 million amount that was allocated to the 15 Mile Road Sewer Collapse was $27 million more than NTH's estimate of $31 million.

95.     Victor Mercado (by authorization) signed CS-1368-3 as Special Administrator. On behalf of Inland Waters, the following officers executed CS-1368-3: President Robert Williams, Kathryn Dickey, Carrie Pendolino, Rechanda Cespedes and Debra Roland.

96.     CS-1368-3 provides that "[e]xcept as herein amended, the terms and conditions of the Contract, dated July 26, 2002 [CS-1368], and as previously amended, shall remain the same and govern the relationship of the parties."   CS-1368-3 did not contain any amendment that rescinded, changed, revised or affected in any manner the covenants, warranties and agreements as set forth in Articles 13.01, 13.02 or 13.04 of CS-1368.   CS-1368-3 also did not contain any amendment that rescinded, changed, revised or affected in any manner the agreements as set forth in Articles 2.01 (as amended by CS-1368-2), 2.01a, 2.01b, 2.05, 3.01, 6.07c, 6.09, 6.10, 7.02, 8, 9.01, 11.04, 12.01 or 15.01 of CS-1368.

-21-

**Additional Wrongful Conduct Related to CS-1368-3**

97.     Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that during the repair of the 15 Mile Road Sewer Collapse, Inland Waters, FEI, LD&S, and the other subcontractors knew that Ferguson had a close personal relationship with Kilpatrick, that a by-product of this close personal relationship was that Kilpatrick wanted Ferguson to get whatever work Ferguson wanted on the 15 Mile Road Sewer Collapse Project, and that Ferguson took advantage of this relationship to secure payment for work which was not done and/or for equipment that was not used.

98.     Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that Inland Waters knew that FEI's requests for payment included work which was not done and/or equipment that was not used but nonetheless submitted FEI's payment requests to the City of Detroit representing that they were accurate and complete and later representing that they had been audited and found to be accurate and complete.

99.     Relying upon the representations of Inland Waters as to the accuracy and completeness of FEI's and all other subcontractor invoices, as well as the accuracy and completeness of its own invoices, the City of Detroit paid the invoices submitted by Inland Waters.

100.     During the period of the repairs to the 15 Mile Road Sewer Collapse, Inland Waters and FEI knew that Inland Waters' process of paying FEI's invoices and passing on FEI's costs to the City of Detroit was intended to conceal and did conceal the unlawful nature, source, ownership, and/or control of proceeds that FEI, Ferguson, Kilpatrick, and/or others gained through bribery, extortion, and other unlawful conduct in connection with the repair work.

-22-

101.    Without waiver of its claims and without limitation as to its damages, Intervening Plaintiff adopts and incorporates herein Plaintiff MID's claim that as a result of inflated invoices submitted on the 15 Mile Road Sewer Collapse, the cost of the repairs of the 15 Mile Road Sewer Collapse was increased by at least $23 million.

## IV.    Aftermath and Consequences of CS-1368, Amendments 2 and 3

102.    As alleged in the Kilpatrick Indictment, in July 2005, Mercado asked the DWSD Board for authorization to amend CS-1368 for the fourth time, in the amount of $12 million to fund the original sewer-inspection project until two new sewer rehabilitation contracts could be formulated ("CS-1368-4").   (Ex. 8: Amendment CS-1368-4, which is incorporated by reference herein.)

103.    As alleged in the Kilpatrick Indictment, in or about the Summer of 2005, Ferguson told representatives of Inland Waters and its partner (who is not named in the Indictment) that DWSD would not authorize the $12 million sewer-lining amendment if they did not pay him $500,000 to $700,000, representing profits Ferguson claimed he should have received had he been given more work on the 15 Mile Road Sewer Collapse Project.

104.    As alleged in the Kilpatrick Indictment, in or about the Fall of 2005, Mercado asked a representative of Inland Waters if the company had resolved things yet with Ferguson. Mercado's inquiry reveals that he was aware of and supported Ferguson's attempt to condition Mercado's and/or Kilpatrick's approval of CS-1368-4 on Inland Waters' payment of these additional monies.

105.    As alleged in the Kilpatrick Indictment, in or about December 2005, at Ferguson's office, Ferguson told a representative of Inland Waters' partner that the $12 million sewer-lining amendment would sit on the Mayor's desk unapproved until Ferguson got the compensation he wanted for the sewer collapse.

-23-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

106.    As alleged in the Kilpatrick Indictment, in or about late 2005, Miller told a representative of Inland Waters that Inland Waters must resolve Ferguson's complaint about the 15-Mile sewer collapse.    Miller's statement reveals that he was aware of and supported Ferguson's attempt to condition Kilpatrick and Mercado's approval of CS-1368-4 on Inland Waters' payment of the additional monies to Ferguson.

107.    As alleged in the Kilpatrick Indictment, on or about December 16, 2005, at a restaurant in the City of Detroit, Ferguson, after conferring separately in the restaurant with Miller, approached a representative of Inland Waters and demanded $350,000 on the 15 Mile Road Sewer Collapse Project.

108.    As alleged in the Kilpatrick Indictment, in or about late December 2005, Inland Waters and its partner agreed to pay Ferguson a total of $350,000 for alleged profits that Ferguson demanded on the 15 Mile Road Collapse Project.

109.    Inland Waters was aware that Ferguson was not lawfully entitled to $350,000 in profits on the 15 Mile Road Collapse Project.

110.    Upon information or belief, Inland Waters agreed to pay $350,000 to Ferguson with the expectation and for the purpose of making substantial profits on CS-1368, further amendments to CS-1368, and certain future DWSD contracts.

111.    Upon information and belief, Inland Waters directly or indirectly paid the $350,000 that Ferguson demanded.

-24-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**V.** **Kilpatrick, Mercado, Ferguson, Miller, FEI, Inland Waters, and LD&S Fraudulently Conceal their Activities in Connection with (a) the Manipulation and Fixing of the Awarding of DWSD Contracts and the Profits from those Contracts, (b) the Submission of Invalid and Inaccurate Invoices and Other Payment-Related Documents on DWSD contracts, and/or (c) the Participating in Other Tortious or Unlawful Activity Including Bribery, Extortion, and/or Money Laundering**

112. Kilpatrick, Mercado, Ferguson, Miller, FEI, and Inland Waters agreed to conceal – and were successful in fraudulently concealing – their unlawful activities from disclosure to the DWSD Board and other DWSD officials; the City of Detroit, including the City Council; the federal judiciary, including the long-tenured federal judge who presided over the City of Detroit Environmental Case; IMG, the consulting group approved by the Court to assist Mayor Kilpatrick and Mercado on matters related to DWSD contracting and procurement operations and to report monthly to the Court on contracts valued at over $500,000; federal, state, and city law enforcement officials; and the inquiring and investigatory efforts of the media. Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that LD&S participated in these efforts in order to fraudulently conceal its own wrongdoing.

113. Defendants' concealment efforts were made impregnable by virtue of (a) Kilpatrick's positions as Mayor and DWSD Special Administrator; (b) Mercado's positions as Director of DWSD and sometimes special-designee of the Special Administrator, with the ultimate authority with respect to day-to-day operations at DWSD; and (c) Miller's position as a trusted fiduciary and confidant of Mayor Kilpatrick.

114. Kilpatrick and Mercado developed practices and procedures with respect to the awarding and implementation of DWSD contracts which obscured the unlawful activities in relation to the rigging of bids and contracts; the use of amendments to expand the contract amounts without the scrutiny competitive bidding process; the submission of invalid and padded

-25-

invoices as to the time, material, and equipment used; the positioning of DWSD officials, such as engineers and inspectors, on projects in such a way that they were not aware of the unlawful activities; and the effective limiting of oversight, review, and approval of invoices to just the prime contractor on a project.

115.    For the purpose of concealing unlawful activities, Mercado's practices and procedures included (a) reducing the DWSD staff who had been responsible for reviewing and overseeing outside contractors' work; (b) reducing the DWSD's internal documentation relating to the work performed on a contract; and (c) using Defendants (who were outside companies) to perform the review and oversight tasks that DWSD employees previously performed.   For example, with respect to the 15 Mile Road Sewer Collapse Project, Mercado (a) used Daily Press Reports instead of the standard Daily Engineering Inspection Reports; (b) decreased the authority and opportunity of the DWSD inspectors to inspect and evaluate the daily activities of the contractors on site; and (c) allowed Inland Waters effectively to become the sole arbiter of the validity and correctness of the invoices submitted by its contractors.

116.    Through express and implied threats, Kilpatrick, Mercado, and Ferguson were able to create an environment where non-Defendant contractors who may have known of or suspected unlawful conduct refused to come forward and disclose such information to persons who were not a part of the unlawful conduct.

117.    The Intervening Plaintiff did not learn of Defendants' wrongful conduct or realize that it had been injured or damaged as a result of this wrongful conduct until the United States unveiled the First Superseding Indictment in the Kilpatrick Prosecution on December 15, 2010.

118.    Defendants conducted their bribery, extortion, other racketeering crimes, and other tortious misconduct in secret and only between the participants.   Defendants' wrongful conduct – and the deciphering, interpretation, and revealing of its tortious, injurious, and

-26-

potentially criminal nature – came to light only through law enforcement use of wire taps and the
disclosure of email and text messages.

119.   Between the time of Defendants' conduct and December 15, 2010, the
Intervening Plaintiff acted in a reasonably diligent manner when it:

- Reviewed and relied upon the contracts that were presented to it, including the covenants Defendants made about the lack of conflicts of interest in relation to the contracts;

- Relied upon the City of Detroit's published ordinances, rules, and formal written Standards of Conduct, which prohibited – among other things – public officials from performing official acts for private gain, disclosing confidential information to third-parties for private gain, and using municipal resources for commercial gain;

- Relied upon the oversight and supervision of DWSD and its operations by Judge Feikens, the presiding judge in the City of Detroit Environmental Case;

- Relied on the review and analysis of contracts in excess of $500,000 by IMG, the consulting firm approved and appointed in the City of Detroit Environmental Case;

- Relied upon Kilpatrick's authority as Special Administrator, which essentially preempted any conflicting efforts or authority of the DWSD Board and other City of Detroit officials;

- Relied upon the provisions of the City of Detroit Charter which vested the authority to investigate and/or initiate a lawsuit in the Mayor's Office; and

- Relied upon Kilpatrick, Mercado, and Miller to fulfill their fiduciary duties under federal and state law and the City of Detroit Charter, including disclosing any breaches of fiduciary duties committed by themselves or others.

-27-

**INTERVENING PLAINTIFF'S CLAIMS**

**COUNT 1: Civil RICO – Conducting an Enterprise Through Racketeering Under
18 U.S.C. § 1962(c)
(All Defendants except LD&S)**

120.    For purposes of the Intervening Plaintiff's civil RICO claim, the City of Detroit is a person within the meaning of 18 U.S.C. §§ 1961(3).

THE KILPATRICK ENTERPRISE:  MEMBERS AND ASSOCIATES

121.    For purposes of the Intervening Plaintiff's civil RICO claim, each of the following Defendants is a person within the meaning of 18 U.S.C. §§ 1961(3), who, during the relevant time period, was a member and associate of and a participant in the Kilpatrick Enterprise:

- Former Mayor Kwame Kilpatrick

- Bobby W. Ferguson

- Victor M. Mercado

- Derrick A. Miller

- Inland Waters Pollution Control, Inc.

- Ferguson Enterprises, Inc.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-28-

122.    As set forth in detail below, each of the above Defendants engaged in conduct as a member or associate of and a participant in the Kilpatrick Enterprise, which conduct included a pattern of racketeering activity.

123.    As set forth in detail above and below, the pattern of racketeering activity, which included numerous related and repeated predicate acts, took place over a period of four (4) years or more and was part of a longer pattern of racketeering activity that partly falls outside of the scope of this initial Intervention Complaint (as limited by the Court's 05/07/2012 Order).

124.    As set forth in detail below, the predicate acts included bribery, extortion, and money laundering.

125.    As set forth in detail below, the pattern of racketeering activity caused injury to the business and property of the City of Detroit and DWSD.

<u>THE KILPATRICK ENTERPRISE:  OBJECTIVES</u>

126.    Based upon information and belief, and as set forth in the Kilpatrick Indictment, Defendants Kilpatrick, Ferguson, Mercado, Miller, Inland Waters, and FEI and other participants known and unknown, associated together in an ongoing organization for the common purpose of financially enriching themselves and their friends and associates in connection with work performed for DWSD.  They operated as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Kilpatrick Enterprise" or "Enterprise").

127.    The Kilpatrick Enterprise engaged in, and its affairs substantially affected and involved, interstate commerce as a result of its members and their agents procuring contracts with out-of-state companies for the goods and services involved in performing work for DWSD, and using interstate wires to transmit funds, to send and receive billing and payment-related documents and for other communications.

-29-

128.    The members of the Kilpatrick Enterprise hid, disguised, and fraudulently concealed their unlawful activities from disclosure to the City of Detroit officials, including the Detroit City Council, the DWSD Board, the federal court, law enforcement and the media.  The concealment was made possible as Kilpatrick and Mercado -- in their positions of authority, including Kilpatrick's position as the federal Court-appointed Special Administrator for DWSD -- essentially controlled the actions of DWSD.

<u>THE KILPATRICK ENTERPRISE:  MEANS AND METHODS OF
CONDUCTING THE KILPATRICK ENTERPRISE
THROUGH A PATTERN OF RACKETEERING ACTIVITY</u>

129.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, including the sections entitled "General Pattern of Illegal Conduct," "The Kilpatrick Indictment and Prosecution," "Jurisdiction," "Venue," "Parties" and "General Allegations," including specifically the sections pertaining to the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan:

I.      Kilpatrick is Elected Mayor and Appointed the Federal Court's Special Administrator;

II.     Background Information as to CS-1368, Amendments 2 and 3, which includes allegations concerning the manipulating and fixing of the contract to award subcontractor work to Ferguson and his company and the payment of bribes by Inland Waters;

III.    CS-1368, Amendments 2 and 3, which includes allegations concerning the continued steering of subcontractor work to Ferguson and his company, the submission of inaccurate and padded invoices, the awarding of exorbitant amendments to the contract, and the cover-up of unlawful activity;

IV.     Aftermath and Consequences of CS-1368, Amendments 2 and 3, which includes allegations concerning the continued unlawful activity of the contractors involved in CS-1368, Amendments 2 and 3; and

V.      Kilpatrick, Mercado, Ferguson, Miller, FEI, Inland Waters, and LD&S Fraudulently Concealed their Activities in Connection with (a) the Manipulation and Fixing of the Awarding of DWSD Contracts and the Profits from those Contracts, (b) the Submission of Invalid and Inaccurate Invoices and Other Payment-Related Documents on

-30-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

DWSD contracts, and/or (c) the Participating in Other Tortious or Unlawful Activity Including Bribery, Extortion, and/or Money Laundering;

which are referred to herein collectively as the "Intervening Plaintiff's Allegations."

130.   The Kilpatrick Enterprise was conducted through an overall pattern of misconduct, racketeering activity, and fraudulent concealment, which encompassed and weaved its way through a number of DWSD contracts for the period from approximately January 1, 2002 to approximately December 31, 2008.  The contract at issue in the present action is CS-1368, Amendments 2 and 3, which pertains to repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan.

131.   During the relevant time period, known and unknown current and past owners, officers, employees, agents and representatives of some or all of the corporate entities that were part of the Kilpatrick Enterprise were authorized to act and did act for the benefit of their affiliated corporate entity in furtherance of the Kilpatrick Enterprise.

132.   During the relevant time period, at various times, known and unknown persons or entities were authorized to act and did act for the benefit of one or more of the corporate entities that were part of the Kilpatrick Enterprise.

133.   During the relevant time period, the corporate entities that were part of the Kilpatrick Enterprise knowingly accepted and received the benefit from the acts of the persons and entities set forth above.

134.   By their actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendants Kilpatrick, Mercado, and Miller willingly committed the following acts while participating in and conducting the affairs of the Kilpatrick Enterprise:

- participated in bribery in violation of 18 U.S.C. § 201;

- acted as willing associates of the Kilpatrick Enterprise; and

-31-

- participated in the activity of the Kilpatrick Enterprise in manipulating and fixing the unlawful awarding of DWSD contracts and profits.

135. By their actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendants Ferguson, and FEI willingly committed the following acts while participating in and conducting the affairs of the Kilpatrick Enterprise:

- participated in, aided, and abetted bribery in violation of 18 U.S.C. § 201;

- participated in money laundering in violation of 18 U.S.C. § 1956;

- participated in extortion in violation of 18 U.S.C. § 1951;

- acted as a willing associate of the Kilpatrick Enterprise; and

- participated in the activity of the Kilpatrick Enterprise in manipulating and fixing the unlawful awarding of DWSD contracts and profits.

136. By its actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendant Inland Waters willingly committed the following acts while participating in and conducting the affairs of the Kilpatrick Enterprise:

- paid a bribe in violation of 18 U.S.C. § 201;

- engaged in money laundering in violation of 18 U.S.C. § 1956;

- acted as a willing associate of the Kilpatrick Enterprise; and

- participated in the activity of the Kilpatrick Enterprise in manipulating and fixing the unlawful awarding of DWSD contracts and profits.

137. By their actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendants' racketeering activities directly, legally, and proximately caused millions of dollars in injury to the City of Detroit and DWSD and their business and property.

138. Defendants FEI and Inland Waters would not have been awarded or allowed to participate as contractors or subcontractors in CS-1368, Amendments 2 and 3, if these Defendants had not engaged in the racketeering activities specified in this Complaint. As a result

-32-

of their racketeering activities, Defendants FEI and Inland Waters obtained gross receipts of about $58 million on CS-1368, Amendments 2 and 3.

139.    The damages to the City of Detroit and DWSD include:

(1)    increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;

(2)    lost value and excess costs due to bribery;

(3)    payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and

(4)    any and all other appropriate damages.

140.    As a result of Defendants' violations of 18 U.S.C. § 1962, the City of Detroit and DWSD are entitled under 18 U.S.C. 1961, *et seq.*, to recover an amount equal to the total gross receipts obtained by these Defendants on CS-1368, Amendments 2 and 3, which are approximately $58 million.

141.    Alternatively, as a result of Defendants' violations of 18 U.S.C. § 1962, the City of Detroit and DWSD are entitled under 18 U.S.C. 1961, *et seq.*, to recover an amount equal to all profits received by these Defendants on CS-1368, Amendments 2 and 3, which, upon information and belief, exceeds $10 million.

142.    As a result of Defendants' violations of 18 U.S.C. § 1962, the City of Detroit and DWSD are entitled under 18 U.S.C. § 1964(c) to recover treble damages, attorney fees, and costs.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against these Defendants (except LD&S) in an amount and manner to be determined at trial together with gross receipts or profits, treble damages, interest, costs, and attorneys' fees.

-33-

**COUNT 2: Breach of Fiduciary Duty**
**(Defendants Kilpatrick, Mercado, and Miller)**

143.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

144.    Defendant Kilpatrick, as Mayor and the federal Court's appointed Special Administrator, was a fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

145.    Defendant Mercado, as the Director of DWSD and the sometimes-designated agent acting on behalf of the Special Administrator, was a fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

146.    Defendant Miller, as a member of Kilpatrick's mayoral administration who served as Chief Administrative Officer and Chief Information Officer for the City of Detroit, was a fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

147.    Kilpatrick, Mercado, and Miller owed fiduciary duties to the City of Detroit, DWSD, and the citizens of the City of Detroit, including the duties of loyalty, honesty, good faith, fair dealing, prudence, and competency.

148.    Moreover, as the public officers who were in charge of the administration and operation of DWSD, Kilpatrick and Mercado were charged and entrusted with the fiduciary duty and obligation to manage and operate DWSD so as to protect, promote, and advance the interests of the City of Detroit, DWSD, and the public, including ensuring that the public funds of the City of Detroit and DWSD were lawfully spent in the best interests of the City of Detroit, DWSD and the citizens of the City of Detroit.

149.    Also, as the public officers who were in charge of the administration and operation of DWSD, Kilpatrick and Mercado had the fiduciary duty to make certain that the

-34-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

public funds of the City of Detroit and DWSD were not spent for or diverted to the personal gain of themselves or their friends and associates, or unlawfully paid, transferred or delivered to entities and individuals who did business with DWSD as contractors or subcontractors.

150.    In his position as the federal Court's appointed Special Administrator of DWSD, although entrusted with extensive power and authority to control, manage, and operate DWSD, Kilpatrick nonetheless could not exercise that power and authority (or delegate that power and authority to be used) in his self-interest or in the pecuniary interest of his friends, associates, and business partners, or exercise that power and authority (or delegate that power and authority to be used) against the interest of the City of Detroit, DWSD, and the citizens of the City of Detroit and for the benefit of particular entities or individuals who did business with DWSD as contractors or subcontractors. As Special Administrator, neither Kilpatrick nor anyone to whom he delegated his power and authority was authorized to violate federal, state, or local criminal laws or was immune from civil liability, restitution, equitable remedies, or civil retribution.

151.    By their acts as specifically set forth in the "General Allegations" section of this Complaint, including engaging in bribery, extortion, money laundering, and contract-rigging or bid-rigging, Defendants Kilpatrick, Mercado, and Miller breached their fiduciary duties to the City of Detroit, DWSD, and the citizens of the City of Detroit.  These breaches legally, proximately, and actually caused damage to the City of Detroit and DWSD.

152.    The damages to the City of Detroit and DWSD include:

(1)    increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;

(2)    lost value and excess costs due to bribery;

(3)    payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and

(4)    any and all other appropriate damages.

-35-

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against Defendants Kilpatrick, Mercado, and Miller, jointly and severally, in an amount to be determined at trial, including exemplary, enterprise, and unjust enrichment damages and disgorgement of profits, together with interest, costs and attorneys' fees.

### COUNT 3: Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duties (All Defendants)

153.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

154.    Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S knew that Kilpatrick, Mercado, and Miller had the fiduciary duties identified in the preceding Count.

155.    Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S knew that when Defendants Kilpatrick, Mercado, and Miller engaged in the actions specifically set forth in the "General Allegations" section of this Complaint, including engaging in bribery, extortion, money laundering, and contract-rigging or bid-rigging, Kilpatrick, Mercado, and Miller breached their fiduciary duties to the City of Detroit, DWSD, and the citizens of the City of Detroit.

156.    By their actions as specifically set forth in the "General Allegations" section of this Complaint, including engaging in bribery, extortion, money laundering, and contract-rigging or bid-rigging, Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S substantially assisted in, aided, abetted and facilitated Kilpatrick, Mercado, and Miller's above-described breaches of their fiduciary duties.  Such assistance legally, proximately, and actually caused damage to the City of Detroit and DWSD.

-36-

157.    The damages to the City of Detroit and DWSD include:

(1)    increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;

(2)    lost value and excess costs due to bribery;

(3)    payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and

(4)    any and all other appropriate damages.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S, jointly and severally, in an amount to be determined at trial, including exemplary, enterprise, and unjust enrichment damages and disgorgement of profits, together with interest, costs and attorneys' fees.

## COUNT 4: Civil Bribery
## (Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, and Inland Waters)

158.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

159.    Defendant Kilpatrick, as Mayor and the federal Court's appointed Special Administrator, was a public governmental official, agent and fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

160.    Defendant Mercado, as the Director of DWSD and the sometimes-designated agent acting on behalf of the Special Administrator, was a public governmental official, agent and fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

161.    As detailed in the Complaint, including the "General Allegations" section, Kilpatrick and Mercado solicited and/or demanded that:

- they personally be given cash, and/or plane rides, and/or other valuable consideration; and/or

- Ferguson and/or Ferguson-controlled companies be given cash, valuable contracts, and/or other valuable consideration;

-37-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

in exchange for their willingness to be influenced in the performance of their official acts and/or to be induced to do, or to omit to do, one or more acts in violation of their official duties.

162.    As detailed in the Complaint, including the "General Allegations" section, Ferguson, FEI, and Inland Waters corruptly and voluntarily made unlawful promises or agreed to the solicitations and/or demands of Kilpatrick and Mercado that:

- they personally be given cash, and/or plane rides, and/or other valuable consideration; and/or

- Ferguson and/or Ferguson-controlled companies be given cash, valuable contracts, and/or other valuable consideration;

in exchange for their willingness to be influenced in the performance of their official acts and/or to be induced to do, or to omit to do, one or more acts in violation of their official duties.

163.    Kilpatrick, Mercado, and possibly other public officials acting at the direction of Kilpatrick and Mercado accepted the valuable consideration and promises offered by Ferguson, FEI, and Inland Waters.

164.    It was the intent of Ferguson, FEI, and Inland Waters that the valuable consideration or promises provided by them to Kilpatrick, Mercado, and possibly other public officials influence Kilpatrick, Mercado and possibly other public officials in the performance of their official acts and/or induce them to do, or to omit to do, one or more acts in violation of their official duties.

165.    As stated in previous counts, Ferguson, FEI, and Inland Waters knew that Kilpatrick, Mercado, and possibly other public officials had the fiduciary duties identified in the preceding counts.

166.    It was the intent of Ferguson, FEI, and Inland Waters that the valuable consideration provided by them to Kilpatrick, Mercado, and possibly other public officials including Miller caused them to breach their fiduciary duties.

-38-

167.    The solicitations, demands, gifts, offerings, promises, and/or agreements to give the above-described bribes legally, proximately, and actually caused the City of Detroit and DWSD to suffer substantial economic and other injuries.

WHEREFORE, Intervening Plaintiff requests entry of a judgment against Kilpatrick, Mercado, Miller, Ferguson, FEI, and Inland Waters, jointly and severally, in an amount to be determined at trial together with interest, costs and attorneys' fees.

### COUNT 5: Fraudulent Inducement
### (Inland Waters)

168.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

169.    As set forth more specifically above, in order to induce DWSD to enter into CS-1368, and specifically Amendments 2 and 3 of CS-1368, Defendant Inland Waters made the material representations that (a) it has no interest and would not acquire any interest that would conflict with the performance of its services and duties under Amendments 2 and 3 of CS-1368; (b) no city official who has the responsibility for overseeing the awarding or the review of Amendments 2 and 3 of CS-1368 has any personal or financial interest in Amendments 2 and 3 of CS-1368; and (c) it will not employ any person to secure or assist in the securing of Amendments 2 and 3 of CS-1368 upon agreement or arrangement for payment or payments made to that person. (*See* Compl. ¶¶ 37-38, *supra*.)

170.    As set forth more specifically above, the representations in the preceding paragraph were false when Inland Waters made them.

171.    When Inland Waters made the above representations, it either (a) knew that Kilpatrick, Mercado, Ferguson, and FEI had conflicts of interest and yet were involved in

-39-

soliciting or obtaining the contract; or (b) made the representations recklessly without knowledge of their truth.

172.   When Inland Waters made the above representations, it intended that DWSD would rely upon those representations in awarding Amendments 2 and 3 of CS-1368 to Inland Waters.

173.   DWSD actually did rely upon the Defendants' above representations.

174.   As a result of the DWSD's reliance upon Defendant's above misrepresentations, Inland Waters directly harmed and damaged the City of Detroit and DWSD.

175.   The damages to the City of Detroit and DWSD include:

> (1)   increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;
>
> (2)   lost value and excess costs due to bribery;
>
> (3)   payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and
>
> (4)   any and all other appropriate damages.

176.   The City of Detroit's and DWSD's injuries were also enhanced by the pattern of amending (rather than competitively bidding) contracts.   This pattern provided Defendants opportunities for even more excessive profits and other fees, expenses, and costs.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against Inland Waters in an amount to be determined at trial together with interest, costs and attorneys' fees.

### COUNT 6: Unjust Enrichment
### (All Defendants Except LD&S)

177.   The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-40-

178.    Defendants Kilpatrick, Mercado, and Miller have been unjustly enriched through the corrupt allocation of public contracts by the receipt of kickbacks, portions of profits, and other monies to which they were not legally entitled, with an inequity resulting to the City of Detroit from the retention of the benefits by these Defendants.

179.    Defendants Ferguson, FEI, and Inland/Xcel have been unjustly enriched by the receipt of profits and/or benefits attributable to fraud, dishonest services, and/or to purported work not performed and/or services not provided, with an inequity resulting to the City of Detroit from the retention of the benefits by these Defendants.  As set forth more specifically above, the value of the services each Defendant provided was inadequate in relation to the payments the City of Detroit rendered for such services.

180.    All the Defendants (except LD&S) have received and retained benefits from the City of Detroit by virtue of their above described fraudulent, inequitable, or otherwise improper actions.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment, including but not limited to the disgorgement of profits, against all Defendants except LD&S in an amount to be determined at trial, together with interest, costs and attorneys' fees.

### COUNT 7: Constructive Trust
### (All Defendants Except LD&S)

181.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

182.    As set forth in this Complaint, the Defendants (except LD&S) obtained the Intervening Plaintiff's money, property, and/or valuable consideration through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of a weakness in the Intervening Plaintiff's standard practices or personnel, or taking undue advantage of the

-41-

Intervening Plaintiff's necessities, and/or other similar conduct which render it unconscionable for these Defendants to hold that money, property, and/or valuable consideration.

183.    The money, property, and/or valuable consideration referenced in the preceding paragraph – together with any interest, profits, or additional consideration that Defendants received on the money, property, and/or valuable consideration referenced in the preceding paragraph – should be deemed to be held in constructive trust for the benefit of the Intervening Plaintiff.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against all Defendants (except LD&S), which includes but is not limited to the imposition of a constructive trust on the money, property, profits, interest, and other items of value described above.

### COUNT 8: Action for Accounting
### (All Defendants)

184.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

185.    As a result and consequence of the claims which have been asserted by the Intervening Plaintiff in this action, Defendants have a duty to account to the Intervening Plaintiff because they received the Intervening Plaintiff's monies under circumstances that on their face appear to be the result of fraud, unjust enrichment, concealment or other improper or inequitable conduct.

186.    Each of the Defendants has failed to account to the Intervening Plaintiff for the monies they received.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment compelling all Defendants to render an accounting, including all evidence of the services they provided for the monies they received.

-42-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jerome R. Watson (P27082)
W. Mack Faison (P13274)
Irene Bruce Hathaway (P32198)
Saura J. Sahu (P69627)


By: /s/ Jerome R. Watson
      Jerome R. Watson
Attorneys for the Intervening Plaintiff
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420
watson@millercanfield.com


Dated:  May 21, 2012

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

20,155,373.3\022765-00197

-43-



*Exhibit 16*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MACOMB INTERCEPTOR DRAIN DRAINAGE
DISTRICT,

        Plaintiff,

and

CITY OF DETROIT and DETROIT WATER AND
SEWERAGE DEPARTMENT,

        Plaintiff-Intervenors,

v.                                Case No. 11-13101

KWAME KILPATRICK, et al.,

        Defendants.

_____/

**OPINION AND ORDER (1) GRANTING CONCURRING DEFENDANTS' "AMENDED
MOTION FOR SUMMARY JUDGMENT"; (2) GRANTING DEFENDANTS
FUTURENET GROUP, INC., AND PERRY MEHTA'S "MOTION FOR PARTIAL
SUMMARY JUDGMENT"; (3) DIRECTING PLAINTIFF MACOMB INTERCEPTOR TO
SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT BE GRANTED IN
FAVOR OF NON-MOVING DEFENDANTS ON NON-CONTRACTUAL CLAIMS; (4)
DENYING PLAINTIFF MACOMB INTERCEPTOR'S "MOTION FOR LEAVE TO FILE
FIRST AMENDED COMPLAINT"; AND (5) TERMINATING AS MOOT THE
D'AGOSTINI DEFENDANTS' "MOTION TO STRIKE REPLY TO RESPONSE . . ."**

      Pending before the court are Concurring Defendants' "Amended Motion for

Summary Judgment," Defendants Futurenet Group, Inc., and Perry Mehta's "Motion for

Partial Summary Judgment," and Plaintiff Macomb Interceptor Drain Drainage District's

("Macomb Interceptor's) "Motion for Leave to File First Amended Complaint."  Because

Macomb Interceptor lacks standing to assert its non-contractual claims, the court will

grant the motions for summary judgment and deny the motion for leave to amend.  The

court will also direct Macomb Interceptor, pursuant to Federal Rule of Civil Procedure 56(f), to show cause why summary judgment should not be entered in favor of the non-moving Defendants on each of the non-contractual claims.

## I. BACKGROUND

Macomb Interceptor sues forty Defendants for allegedly violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, the Clayton Antitrust Act, 15 U.S.C. §§ 12–27, and state contract and tort laws.  The claims arise from Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan, (hereafter, the "15 Mile Interceptor Repair Project" or "Project").  Macomb Interceptor avers that Defendant Kwame Kilpatrick, then the Mayor of the City of Detroit, along with various City of Detroit officials conspired with the principal contractor overseeing the 15 Mile Interceptor Repair Project, Defendant Inland Waters Pollution Control, Inc., and numerous subcontractors to "overcharge the Detroit Water and Sewerage Department . . . for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road."  (Pl.'s Compl. ¶ 5, Dkt. # 1.)  Macomb Interceptor further alleges that the misconduct was part of a widespread corruption scheme during Defendant Kwame Kilpatrick's tenure as Mayor of Detroit.  This broader scheme is alleged to have operated for nearly a decade seeking to steer public works contracts and illicit benefits to associates of Defendant Kwame Kilpatrick and officials throughout his administration.  (*See* Pl.'s Compl. Ex. A, Dkt. #1-1.)

It is undisputed that the scheme as alleged was perpetrated against Plaintiff-Intervenors, the City of Detroit and the Detroit Water and Sewerage Department

2

(collectively, the "City of Detroit" or "City"), not Macomb Interceptor.  Macomb

Interceptor, though, maintains that it has standing to assert claims arising from the

Project based on two independent grounds: (1) it obtained the right, through an

assignment clause, to assert any claims, whether sounding in state tort or contract law

or federal statutory law, originally possessed by the City of Detroit when, in September

2010, Macomb Interceptor and the City of Detroit entered into the Macomb Interceptor

Acquisition Agreement ("Acquisition Agreement" or "Agreement"); and (2) the Project's

alleged scheme-inflated cost resulted in Macomb Interceptor paying a higher price to

acquire the Macomb System and users paying a higher rate for the water and sewerage

system before the execution of the Agreement.  The Acquisition Agreement, which is

part of a larger global settlement in *United States v. City of Detroit*, No. 77-71100 (E.D.

Mich.), a decades-long lawsuit related to the City of Detroit's compliance with federal

environmental laws, transferred to Macomb Interceptor sewer assets located in

Macomb County formerly owned by the City of Detroit and also assigned "all of [Detroit

Water and Sewerage Department's] rights under all contracts, warranties, and

guarantees that apply to services or goods related to the Macomb System."

(Acquisition Agreement art. II, § 2.4, Dkt. # 206-2.)

On May 7, 2012, the court granted the City of Detroit's motion to intervene,

recognizing that a dispute exists about who may properly assert the non-contractual

claims arising from the 15 Mile Interceptor Repair Project.  Since the initiation of this

case, many Defendants have maintained that the City of Detroit, not Macomb

Interceptor, has standing to assert the statutory and tort law claims contained in the

Complaint.  A large number of these Defendants (referred to hereafter as the

3

"Concurring Defendants")[1], filed a joint motion for summary judgment, seeking dismissal of Counts I, II, III, V, and VI of the Complaint on the grounds that Macomb Interceptor lacks standing to maintain these Counts. Exhaustive briefing ensued, with Macomb Interceptor filing a response in opposition and the City of Detroit filing a response in support of Concurring Defendants' motion. The Concurring Defendants and Macomb Interceptor replied.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "The central issue is 'whether the

---

[1]The Concurring Defendants are: Anthony Soave; D'Agostini & Sons, Inc.; L. Robert D'Agostini; James D. D'Agostini; Inland Waters Pollution Control, Inc.; Robert L. Williams; Dennis Oszust; Walter Rozycki; Merisno Dewatering, Inc.; Rodney A. Mersino; Marco Mersino; Drian Lenaghan; Patriot Pumps, Inc.; Rohrscheib Sons Caissons, Inc.; Steve Rohrscheib; O'Laughlin Construction Company; Mark E. O'Laughlin; Dubay's Landscaping Services; Lawrence R. Dubay; Victor M. Mercado; and Hayward Baker.

Defendants Futurenet Group, Inc., and Perry Mehta filed an independent motion for summary judgment, in which they join in Concurring Defendants' joint motion for summary judgment. In their motion, these two Defendants indicate that Macomb Interceptor's counsel stated that she did not object to them joining Concurring Defendants' motion for summary judgment. Defendants Rotor Electric Company of Michigan, LLC, and Benjamin Rosenberg also submitted an unopposed motion to join the Concurring Defendants' joint motion for summary judgment. Accordingly, as a matter of efficiency, the court will include Defendants Futurenet Group, Inc., Perry Mehta, Rotor Electric Company of Michigan, LLC, and Benjamin Rosenberg in the group of Concurring Defendants.

4

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252.

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

5

evidence to support the fact."  *Id.* 56(c)(1)(B).  "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

## III.  DISCUSSION

Macomb Interceptor's Complaint alleges three federal claims and three state-law claims.  Macomb Interceptor did not exist at the time of the alleged wrongdoing, and thus cannot be owed directly a legal duty giving rise to state-law tort claims, so its standing to assert state-law claims here is premised on its contention that the City of Detroit, through the Acquisition Agreement, assigned to it all rights to pursue claims arising from the 15 Mile Interceptor Repair Project.  Macomb Interceptor also relies, in part, on this same assignment argument to establish its standing to bring the federal claims, but alternatively argues that it suffered injuries, wholly independent and distinct from the City of Detroit's, that permit it to recover under the federal antitrust statutes and RICO.  In their motion for summary judgment, Concurring Defendants argue that Macomb Interceptor has standing to assert only the breach of contract claim against Defendant Inland Waters Pollution Control and has failed to establish that it has standing, whether through an assignment or based on independent injury, to maintain the Complaint's non-contractual claims.

### A.  Standing Based on Assignment in Macomb Agreement

Macomb Interceptor argues that it acquired the City of Detroit's rights to pursue all claims arising from the 15 Mile Interceptor Repair Project, whether sounding in state-law or federal statutory law, through an assignment clause in the Acquisition Agreement.  Specifically, in the Complaint, Macomb Interceptor points to sections 2.4

6

and 2.9(b)(8) of the Agreement, which provide, respectively, that "Detroit shall assign to [Macomb Interceptor] all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System," (Acquisition Agreement art. II, § 2.4), and that "[a]t closing, . . . Detroit shall deliver to MID . . . an assignment of all rights under any contracts, warranties, or guarantees that apply to services or goods related to the facilities comprising the Macomb System," (*id.* at art. II, § 2.9(b)(8)).

Concurring Defendants and the City of Detroit concede that these clauses assign to Macomb Interceptor state-law contract claims arising out of the 15 Mile Interceptor Repair Project, but maintain that the clauses do not assign claims sounding in tort or federal statutory law. The court agrees with Concurring Defendants and the City of Detroit. The incorporation of the clause "under all contracts, warranties and guarantees" expressly limits the preceding assignment of "all of its rights." Accordingly, the City of Detroit assigned to Macomb Interceptor the City's rights to contracts related to the 15 Mile Interceptor Repair Project, including the right to recover for damages caused by breaches of those contracts, but not the City's rights to then-unknown causes of action sounding in state tort law or federal statutory law.

Under Michigan law, "[a]n assignment is a contract between the assignor and the assignee and is interpreted according to the rules of contract construction." *Burkhart v. Lapham*, No. 291705, 2010 WL 4905568, at *2 (Mich. Ct. App. Dec. 2, 2010) (citing 6 Am. Jur. 2d Assignments § 109). "The primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000) (citing *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). "In ascertaining the meaning of a contract, [the court] give[s] the words

7

used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005) (citing *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003)).  Additionally, "[e]very word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer*, 77 N.W.2d 384, 386 (Mich. 1956) (quoting *Laevin v. St. Vincent de Paul Soc'y*, 36 N.W.2d 163, 164 (Mich. 1949)) (internal quotation marks omitted).

If a court determines that "the contractual language is unambiguous, [it] must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999)). Accordingly, a court may not consider extrinsic evidence of the parties' intent to vary the meaning of a contract that is clear and unambiguous. *Burkhardt v. Bailey*, 680 N.W.2d 453, 464 (Mich. Ct. App. 2004).  Where a court concludes, as a matter of law, that a contract is ambiguous, extrinsic evidence may be admissible for interpretive purposes. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998).  "A contract is ambiguous when two provisions 'irreconcilably conflict with each other,'" *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007) (quoting *Klapp*, 663 N.W.2d at 453), "or 'when [a term] is equally susceptible to more than a single meaning,'" *id.* (alteration in original) (quoting *Mayor of Lansing v. Mich. Pub. Serv. Comm.*, 680 N.W.2d 840, 847 (Mich. 2004)).  "[I]f a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not

8

be said to be ambiguous or, indeed, fatally unclear." *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982). Furthermore, "the parties' disagreement regarding the meaning of contract language does not, by itself, create an ambiguity." *Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 589 n.3 (Mich. Ct. App. 2007) (citing *Gortney v. Norfolk & W. Ry. Co.*, 549 N.W.2d 612, 615 (Mich. Ct. App. 1996)).

Macomb Interceptor focuses on the use of the phrase "all of its rights" in sections 2.4 and 2.9(b)(8) in arguing that the assignment contained in section 2.4 is an absolute assignment to it to pursue all claims arising from the 15 Mile Interceptor Repair Project, and quotes *Skotak v. Vic Tanny Intern, Inc.*, 513 N.W.2d 428 (Mich. Ct. App. 1994) for the proposition that "there is no broader classification than the word 'all[,]' [and] [i]n its ordinary and natural meaning, the word 'all' leaves no room for exceptions." 513 N.W. 2d at 430. To be sure, Macomb Interceptor is correct that the use of the word "all" is unambiguous and does not permit the imposition of unenumerated exceptions or limitations. But the word "all" does not alone signal an absolute assignment of any and all rights to causes of action initially belonging to an assignor. The contractual language at issue in *Skotak*, a liability waiver contained in a gym membership contract, illustrates this point and reveals the weakness in Macomb Interceptor's reliance on *Skotak*'s declaration regarding the breadth of the word "all."

The plaintiff in that case, the wife of a gym member who suffered a fatal heart attack at the gym, argued that the liability waiver signed by her husband was ambiguous and did not extend to claims of negligent training and supervision. The Michigan Court of Appeals, rejecting the ambiguity argument and holding that the waiver covered "all"

9

claims, observed that the waiver's inclusive language, which provided for the waiver of "any and all claims, demands, damages, rights of action, or causes of action, . . . arising out of the Member's . . . use of the facility" was a clear expression of the defendant's "intention to disclaim liability for all negligence, including its own." *Id.* at 619 (ellipses in original). The unambiguous intent of the defendant in that case to waive all liability was not premised simply on the incorporation of the phrase "any and all," but instead on the relationship between that phrase and the succeeding contractual language, which provided necessary context to the phrase "any and all."

Here, Macomb Interceptor's interpretation of "all of its rights" fails to account for the contractual language that follows "all of its rights" and which provides the necessary context required to give meaning to section 2.4's assignment. Unlike the breadth of the language that followed "any and all" in *Skotak*, the assignment of "all of its rights" contained in section 2.4 is *limited*: it refers specifically to "all" those rights under "contracts, warranties and guarantees that apply to services or goods related to the Macomb System." (Acquisition Agreement art. II, § 2.4.) For the court to accept Macomb Interceptor's contention that "all" assigns any right that the City of Detroit may have had in a cause of action arising from the 15 Mile Interceptor Repair Project, it would have to effectively excise the crucial language following the invocation of the word "all" that explains what is actually being assigned. Because Michigan law provides that "[e]very word in the agreement must be taken to have been used for a purpose," *Associated Truck Lines, Inc.*, 77 N.W.2d at 386 (quoting *Laevin*, 36 N.W.2d at 164) (internal quotation marks omitted), Macomb Interceptor's argument that the use of "all of its rights" in the assignment clause constituted an absolute assignment of any and all

10

rights the City of Detroit had must be rejected.  Accordingly, the key to deciding whether

section 2.4 assigned the City of Detroit's rights to non-contractual claims related to the

Project is determining the proper interpretation of the unambiguous language, "rights

under all contracts, warranties and guarantees."

        In spite of the parties' conflation of the two concepts, an assignment provision

incorporating the language "rights under all contracts" does not *per se* assign claims or

causes of action, but instead assigns only rights and obligations arising under a

contract.  *See* Restatement (Second) of Contracts § 328 (1981) ("[A]n assignment of

'the contract' or of 'all my rights under the contract' or an assignment in similar general

terms is an *assignment of the assignor's rights and a delegation of his unperformed*

*duties under the contract*." (emphasis added)); Mich. Comp. Laws § 440.2210(5)

(same).  To the extent that such an assignment permits the assignee to assert claims or

causes of action, it does so on the grounds that among the rights that arise under a

contract is the right to enforce the provisions of the contract and to recover damages for

noncompliance with those provisions.  However, the ability of an assignee to enforce

contractually-created rights does not necessarily permit the assignee to also bring tort

or statutory claims that are merely related somehow to the contractual relationship but

that arose outside of the rights created by the contract.  *See Int'l Design Concepts, LLC*

*v. Sakes Inc.*, 486 F. Supp. 2d 229, 236 (S.D.N.Y. 2007) (applying New York law, which

like Michigan has incorporated the Restatement's and Uniform Commercial Code's

construction of an assignment of "all my rights under the contract," and observing that

"an assignment of all contractual rights does not necessarily include an assignment of

all tort claims; rather whether tort claims are encompassed within the assignment is a

matter of contract interpretation"). This is so because rights arising under contracts, which include warrantee and guarantee rights, are fundamentally distinct from common-law tort or statutorily-created legal duties. *See Fultz v. Union-Commerce Assocs.*, 683 N.W.2d 587, 592 (Mich. 2004) ("[A] tort action stemming from misfeasance of a contractual obligation [is] the 'violation of a legal duty separate and distinct from the contractual obligation.'" (quoting *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647 (Mich. 1997))). Accordingly, where an assignment clause does no more than assign rights arising from contracts, it cannot be read to include an assignment of non-contractual claims. *See Fox v. Hirschfeld*, 142 N.Y.S. 261, 263 (N.Y. App. Div. 1913) (holding that the contractual provision, "'I hereby sell, assign, transfer, and set over . . . all my right, title, and interest in and to the within contract' . . . was not appropriate to assign a cause of action arising, not under the contract, but for the fraudulent representations of defendant *dehors* the contract").

The inclusion of "rights under contracts, warranties and guarantees" in section 2.4 unambiguously reveals the intent of the contracting parties to assign only contractually-created rights. These do not include claims arising under tort or federal statutory law. Therefore, Macomb Interceptor lacks standing, as an assignee of the City of Detroit, to assert the claims contained in Counts I, II, III, V, and VI of the Complaint.

Macomb Interceptor's reliance on extraneous evidence is unavailing in support of its argument that section 2.4 was an absolute assignment of all claims, known or unknown at the time of contracting, related to the 15 Mile Interceptor Repair Project. Where contractual provisions are unambiguous, as sections 2.4 and 2.9(b)(8) are, extrinsic evidence to assist in interpretation of the provisions is not permitted.

12

*Burkhardt*, 680 N.W.2d at 464.  Moreover, the evidence itself does not establish that

section 2.4 assigns all possible claims related to the Project.

In its briefing and during oral argument, Macomb Interceptor repeatedly quotes

language in the Bill of Sale, which, based on the integration clause in the Acquisition

Agreement, is not a formal part of the contracting parties' Agreement.  (*See* Acquisition

Agreement art. XII, § 12.5 ("This Agreement constitutes the sole understanding of the

parties hereto with respect to the matters provided for herein . . . .  No amendment,

modification or alteration of the terms or provisions of this Agreement shall be binding

unless the same shall be in writing and duly executed by Detroit and [Macomb

Interceptor] and in compliance with Section 12.12.").)  Specifically, it argues that the

following provision of the Bill of Sale transferred to it the right to prosecute "any and all

claims" arising out of the Project:

> Without limiting the prior paragraph, Detroit hereby constitutes and appoints the District the true and lawful agent and attorney-in-fact of Detroit, with full power of substitution and resubstitution, in whole or in part, in name and stead of Detroit but on behalf and for the benefit of the District and its successors and assigns, from time to time:
>
> > (a) to demand, receive and collect any and all of the Transferred Assets and to give receipts and releases for and with respect to the same, or any part thereof;
> >
> > (b) to institute and prosecute, in the name of Detroit or otherwise, any and all proceedings at law, in equity or otherwise, that the District or its successors and assigns may deem proper in order to collect or reduce to possession any of the Transferred Assets and *in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be*; and
> >
> > (c) to do all things legally permissible, required or reasonably deemed by the District to be required to recover and collect the Transferred Assets and to use Detroit's name in such manner

13

as the District may reasonably deem necessary for the
collection and recovery of same.

(Bill of Sale 1, Dkt. # 206-3 (emphasis added).)  Although broad in scope, this

appointment of Macomb Interceptor as a "lawful agent and attorney-in-fact of Detroit,"

does not, as Macomb Interceptor argues, transfer the right to prosecute "any and all

claims."  Subsection (b) of the above-quoted language expressly provides, with respect

to the assignment of claims and rights, that Macomb Interceptor's authority to "institute

and prosecute" legal and equitable proceedings is limited to those proceedings deemed

proper "in order to collect or enforce any claim or right of any kind *hereby assigned or

transferred, or intended so to be.*"  (*Id.* (emphasis added).)  Contrary to Macomb

Interceptor's argument, the Bill of Sale does not grant it the right to prosecute "any and

all claims" of every description, but only all such claims and rights transferred or

assigned in the Acquisition Agreement.  Subsection (b) strengthens the conclusion that

section 2.4 did not transfer or assign non-contractual claims arising from the Project and

strengthens the court's determination that Macomb Interceptor does not have standing

as an assignee to bring its non-contractual claims.

Furthermore, the proffered affidavit of an attorney who represented Macomb

Interceptor during the negotiation of the Acquisition Agreement is not only inadmissible

as extrinsic evidence of the parties' intent, but it is also speculative.  At most, it may

serve as evidence of Macomb Interceptor's subjective intent.  In support of its assertion

that the "expressed intent of these parties" was for Macomb Interceptor to obtain the

City of Detroit's rights to pursue non-contract based claims related to the Project,

Macomb Interceptor relies on the affidavit as its evidence:  "[b]ecause Macomb County

14

was taking on all risk and obligations (except accrued tort and a few other expressly

defined liabilities), it intended to obtain all of Detroit's rights and interests of whatever

kind associated with the facilities and real estate-related rights being transferred so that

the County would stand in Detroit's shoes after the transaction for anything related to

the facilities being transferred." (Hupp Aff. ¶ 11, Dkt. # 206-4) (*see* Pls.' Resp. to

Concurring Defs.' Mot. Summ. J. 23).  The affidavit, though, says nothing of the parties'

*expressed* intent, and shows only that Macomb County—presumably the entity

negotiating the terms of the Acquisition Agreement before the creation of Macomb

Interceptor—had a *subjective* intent to obtain any and all claims arising from the Project.

It does not show that such an intent was actually expressed to the City of Detroit, that

the City of Detroit had the same intent, or that such an intent was reflected in the

Agreement.

Finally, the affidavit's concluding paragraph, also cited by Macomb Interceptor, is

likely inadmissible, irrespective of the prohibition against extrinsic evidence, as

speculative.  The affiant states:

> [A]t the time the acquisition agreement was negotiated and at the time the
> Macomb transaction closed, Macomb County was completely unaware of the
> alleged fraudulent and tortious acts set forth in the Kilpatrick indictment or
> any other tort or other claims Detroit might have had associated with the
> facilities being transferred.  Accordingly, no reference to such claims was
> made in the acquisition agreement nor was the possibility of such claims
> expressly considered when the terms of the transaction were negotiated.
> However, any rights Detroit might have had to assert a tort or other claim
> associated with the facilities being transferred would likewise have been
> regarded by Macomb County as being part and parcel of what it was
> acquiring from Detroit.  I have no doubt that had possible tort or other claims
> against third parties related to a Macomb County sewer been known at the
> time of the transaction, they would have been specifically listed among the
> assets transferred to Macomb County.

15

(*Id.* ¶ 13.)  That Macomb Interceptor's attorney who negotiated the terms of the Acquisition Agreement *now* "has no doubt" that the non-contractual claims would have been expressly included in the Agreement had the parties known of the claims at the time of contracting does not demonstrate that the parties intended, at the time of contracting, to transfer such claims to Macomb Interceptor.  The statement is, in fact, not much more than conjecture as to how two contracting parties may have acted if they had additional information.

Accordingly, section 2.4's unambiguous language expresses an intent to transfer only the City of Detroit's "rights under all contracts, warranties and guarantees" and does not operate as a transfer or assignment of claims arising out of state tort law or federal statutory law.  Therefore, Macomb Interceptor lacks standing as an assignee.

## B.  Standing Based on Injury Suffered as Purchaser of the Macomb System and as Ratepayer

Concurring Defendants' motion also challenges the Complaint's assertion that Macomb Interceptor has standing, independent of any assignment by the City of Detroit, to bring the federal antitrust and RICO claims, because Macomb Interceptor has suffered independent injuries redressable under these federal statutes.  Macomb Interceptor argues that the following two alleged injuries maintain its federal claims: (1) paying an inflated price for the Macomb System as a result of 15 Mile Interceptor Repair Project's cost overruns caused by Concurring Defendants' actions and (2) paying higher system usage charges during the time between the 15 Mile Interceptor Repair Project and the execution of the Acquisition Agreement.

16

Although Macomb Interceptor focuses on constitutional standing principles to establish its right to bring its federal claims, Concurring Defendants challenge Macomb Interceptor's standing on an analytically distinct ground: the more stringent requirements a plaintiff must satisfy to demonstrate that his particular alleged injury permits him to bring a claim under the antitrust statutes and RICO. *See Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 845-51 (6th 1989) (acknowledging the distinction between constitutional standing requirements and those requirements judicially imposed for RICO and federal antitrust claims). The question, therefore, is not simply whether Macomb Interceptor suffered a concrete, particularized injury, traceable to the challenged actions, and redressable by a favorable ruling—indeed, Concurring Defendants and the City of Detroit appear to concede that Macomb Interceptor can, on satisfactory proofs, establish that it suffered an "injury-in-fact," by showing that the 15 Mile Interceptor Repair Project's cost overrun, allegedly caused by anticompetitive conduct and a RICO conspiracy, was a but-for cause of its paying a higher price to acquire the Macomb System through the Acquisition Agreement—but instead whether the claimed injuries suffered by Macomb Interceptor permit it to maintain causes of action under the antitrust statutes and RICO.

Concurring Defendants contend that Macomb Interceptor, an entity not in existence during the alleged injurious conduct, is an "indirect purchaser" barred from maintaining claims under the federal statutes. Macomb Interceptor argues that the indirect purchaser doctrine cited by Concurring Defendants bars only claims brought by plaintiffs who suffer "damages other than those resulting from the alleged misconduct," (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 26), and argues

17

that the doctrine does not apply here because it "is the only entity having actually paid the fixed amount of $54,467,200.00 for the repair project to have been completed by the named-Defendants," (*id.* at 27).

### 1.  Antitrust Standing

Section 4 of the Clayton Act defines the class of persons entitled to seek damages under the antitrust statutes and provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States."  15 U.S.C. § 15.  Although broad on its face, the language "has of necessity been judicially confined to limit the remed[ies] available . . . to particular classes of persons and for redress of particular forms of injury."  *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1081 (6th Cir. 1983).  Specifically, the United States Supreme Court has limited the scope of § 4 by identifying several factors a court must consider before finding that a plaintiff has standing under the antitrust statutes, *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) (establishing five factors courts should consider when deciding whether a plaintiff has standing to assert antitrust claims), and by establishing the indirect purchaser doctrine, which bars individuals who are not direct purchasers from seeking relief under the statutes, *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

Under the indirect purchaser doctrine, a plaintiff who does not purchase directly from an alleged antitrust violator generally lacks standing to sue under the antitrust statutes.  *See id.* at 729; *Jewish Hosp. Assoc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971, 973 (6th Cir. 1980).  The genesis of the doctrine can be found in *Hanover Shoe,*

18

2:11-cv-13101-RHC-MKM   Doc # 237   Filed 09/17/12   Pg 19 of 30   Pg ID 4024

*Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), in which the Supreme Court "rejected an antitrust defendant's argument that [a] plaintiff could have suffered no legally cognizable injury from illegal overcharges that were reflected, in turn, in the prices charged by the plaintiff to its own customers." *Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir. 1989) (citing *Hanover Shoe*, 392 U.S. at 489). Later, in *Illinois Brick*, the Supreme Court extended the reasoning of *Hanover Shoe* to bar the *offensive* use of what it called the pass-on theory, holding that an "overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning" of § 4 of the Clayton Act. *Illinois Brick*, 431 U.S. at 729.

In *Illinois Brick*, various governmental entities sued concrete brick manufacturers for conspiring to raise the cost of concrete bricks. The governmental entities, though, did not purchase the bricks directly from the defendants, and could only demonstrate injury by invoking the pass-on theory of injury, *i.e.*, by proving "that the overcharge was passed on to them through intervening links in the distribution chain." *Id.* at 727-28. The bricks at issue in that case were first purchased directly from the manufacturers "by masonry contractors and used by them to build masonry structures." *Id.* at 726. General contractors then incorporated these structures into buildings, which were ultimately sold to the governmental entities. *Id.* In concluding that the governmental entities did not suffer cognizable antitrust injuries because the defendants had not

19

13-53846-tjt   Doc 6061-2   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 144 of 233

directly sold any concrete bricks to them, the Supreme Court established a near-categorical bar against the offensive use of a pass-on theory by indirect purchasers.[2]

Illinois Brick identified two principal concerns underlying the bar against indirect-purchaser claims.  First, it observed that "allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants." Id. at 730.  A one-sided application of Hanover Shoe's bar against the defensive use of pass-on "substantially increases the possibility of inconsistent adjudications and therefore of unwarranted multiple liability for the defendant by presuming that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the plaintiff." Id.  Simply put, the Supreme Court said that it was "unwilling to 'open the door to duplicative recoveries' under § 4." Id. at 731 (quoting Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 264 (1972)).

Second, it reasoned that the "principal basis for the decision in Hanover Shoe was the Court's perception of the uncertainties and difficulties" associated with applying the pass-on concept, including the need to analyze economic decisions in the real world as opposed to an "economist's hypothetical model," and that "the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom" applied with equal, if not greater, force to cases involving the offensive pass-on theory.  Id. at 731-32.  Because "[e]fforts to apportion the recovery among everyone who could have absorbed part of the overcharge 'would

---

[2] There are two narrow exceptions not relevant in this case: (1) cases involving "cost-plus" contracts between the direct and indirect purchasers and (2) cases alleging that "the direct purchaser is owned or controlled by its customer."  Illinois Brick, 431 U.S. 720, 736 n.16.

20

add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness[,]'" *Cnty. of Oakland*, 866 F.2d at 848 (quoting *Illinois Brick*, 431 U.S. at 737), the Supreme Court reaffirmed its conclusion in *Hanover Shoe* "that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431 U.S. at 735.

The Supreme Court, while acknowledging that the difficulties and uncertainties associated with applying the pass-on theory may "be less substantial in some contexts than in others," *id.* at 743, has resisted calls to carve out exceptions (other than the two already recognized, *see* n.2, above) to the categorical bar on the offensive and defensive use of the pass-on concept, *see id.* at 743-745; *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216-17 (1990) ("[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4.").

Addressing the second claimed injury first—paying higher system usage charges—Macomb Interceptor has proffered no evidence in support of its allegation that as an "end user of the Detroit sewer system" it was "damaged by the scheme because DWSD amortized the inflated costs for the Project into usage charges for the system in the years before the Macomb Agreement." (Compl. ¶ 47). Having been created only in 2009 for the express purpose of purchasing the Macomb System, Macomb Interceptor

21

(as opposed to Macomb County—not a party to this suit) apparently never purchased water and sewerage services from the City of Detroit.  Nor is there any evidence that the City of Detroit passed on the inflated repair costs by incorporating those costs in the usage charges for the system.

In any event, this type of injury is precisely the type that the indirect purchaser doctrine says is not cognizable under the antitrust statutes.  Macomb Interceptor's reliance on *County of Oakland*, to argue otherwise is misplaced.  In that case, the counties were suing both the bid-rigging contractors and the City of Detroit, alleging that the City of Detroit was a constituent part of the alleged anticompetitive scheme and RICO conspiracy.  Accordingly, the Sixth Circuit concluded that the counties were direct buyers, who purchased sewerage services directly from a member of the alleged scheme and who then themselves passed on the overcharges to end-users of the sewerage system.  Here, the City of Detroit is neither named as a defendant nor alleged to have been a part of the scheme.  Macomb Interceptor, instead, argues that its alleged injury of paying higher usage rates was the result of the City of Detroit incorporating the Project's inflated costs and passing them on to users further down the sewerage distribution line.  Thus, Macomb Interceptor stands in the position of an indirect purchaser who has not suffered an "injury" under the antitrust statutes.

Macomb Interceptor's other asserted injury, the paying of an inflated acquisition price for the Macomb System, is premised on facts that are in some respects different from the facts in a typical indirect-purchaser action.  For example, unlike the alleged overcharge at issue in *Illinois Brick*, which was passed on through traditional channels of manufacturing and distribution, Macomb Interceptor alleges that the overcharge from

22

the 15 Mile Interceptor Repair Project was passed on to it through the Acquisition Agreement, the terms of which were extensively negotiated and which was a part of a larger global settlement in a lawsuit related to municipal water and sewerage services in southeastern Michigan.  Nevertheless, the concerns animating the doctrine and the Supreme Court's resistence to carving out exceptions to the near-categorical rule convince this court that the doctrine applies with equal force to bar Macomb Interceptor's antitrust claims.

First, Macomb Interceptor's contention that the doctrine operates only to bar claims brought by individuals who suffer "damages other than those resulting from the alleged misconduct," (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 26), is inconsistent with the Supreme Court's statement that an indirect purchaser is anyone who is not the "immediate buyer from the alleged antitrust violators." *UtiliCorp United*, 497 U.S. at 207.  Here, Macomb Interceptor neither purchased any services from Concurring Defendants nor signed any contract related to the 15 Mile Interceptor Repair Project.  Indeed, it would be logically impossible for Macomb Interceptor to claim as much because it was not created until 2009, four years after the completion of the Project.  The direct purchaser of such services was the City of Detroit, or more accurately, the DWSD, which entered into Contract No. CS-1368 and subsequent amendments with Defendant Inland Waters Pollution Control for consulting services, (Compl. ¶ 8), and which, upon being presented with allegedly "grossly inflated and inaccurate invoices" related to the Project, paid the demanded amounts.

Macomb Interceptor's purported injuries—paying a higher price to the City of Detroit to acquire the Macomb System and paying a higher sewerage system usage fee

23

as a result of Concurring Defendants' alleged conduct—parallels the harm suffered by the governmental entities in *Illinois Brick*.  Even if satisfactorily proven, these injuries are necessarily predicated on an initial injury suffered by the City of Detroit, the direct purchaser, and then passed on to Macomb Interceptor.  As much has been admitted by Macomb Interceptor when it alleges in the Complaint that "[t]he primary cause of this action is a *widespread scheme to overcharge the Detroit Water and Sewerage Department* . . . for time, labor and materials to stabilize and repair a sewer collapse." (Compl. ¶ 5 (emphasis added).)  Accordingly, Macomb Interceptor is an indirect purchaser, whose alleged injuries were a result of the City of Detroit's purportedly passing on the cost of the Project through the Acquisition Agreement and usage rates.

Moreover, as the court suggests above, the two primary concerns underlying the indirect purchaser doctrine are present in this case and support the court's conclusion that Macomb Interceptor, as an indirect purchaser, has not suffered a cognizable antitrust injury.  First, contrary to Macomb Interceptor's repeated assertions to the effect that "[it] is undisputed that Detroit cannot recover the overcharges being sought by [Macomb Interceptor]," (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 24), *Hanover Shoe*, *Illinois Brick*, and *County of Oakland* make clear that a direct purchaser, such as the City of Detroit, has standing to bring antitrust claims, irrespective of the fact that the relevant overcharge may have been entirely passed on to indirect purchasers.  Thus, given the City of Detroit's standing to seek recovery of treble damages on the entire overcharge, allowing Macomb Interceptor to seek the same damages would expose Concurring Defendants to duplicative liability, a result the Supreme Court in *Illinois Brick* foreclosed when it held that it was "unwilling to 'open the

24

door to duplicative recoveries' under § 4." 431 U.S. at 731 (quoting *Standard Oil Co. Of Cal.*, 405 U.S. at 264).

Additionally, to avoid the bar against duplicative recoveries while also allowing Macomb Interceptor to establish standing as an indirect purchaser, the court would need to address the "difficulties and uncertainties" that accompany an attempt to apportion damages between direct and indirect purchasers. Macomb Interceptor's own conflicting assertions illustrate this point. On the one hand, Macomb Interceptor avers that the entire price of the 15 Mile Interceptor Repair Project was passed on to it through the Acquisition Agreement, and thus, it "paid in full for the 15 Mile Interceptor repair." (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 24; *see also* Compl. ¶ 44.) But Macomb Interceptor also maintains that the City of Detroit passed on the cost of the Project to users of water and sewerage services in southeast Michigan for at least four years prior to the Acquisition Agreement. (*See* Compl. ¶ 47; Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 29.) The court would therefore be tasked with analyzing usage rates charged to counties, municipalities, and end users over the course of four years to determine what amount was passed on through usage rates and what amount was passed on to Macomb Interceptor through the Acquisition Agreement. Even if this were possible, a dubious assumption to say the least, the court would still be required to analyze the Acquisition Agreement, which was the product of a global settlement in a much larger case involving a decades-long legal battle amongst the federal government, the City of Detroit, and several counties in southeast Michigan, to determine what portion of the price paid by Macomb Interceptor to acquire the entire Macomb System is attributable

25

to the 15 Mile Interceptor Repair Project's cost.  And, if these Gordian calculations were not enough, the court, having permitted Macomb Interceptor to establish standing based on a pass-on theory of injury, would have to decide whether any other indirect purchasers of water and sewerage services, such as other counties, municipalities, or individual users, could also establish standing as an indirect purchaser.  These complex and unwieldy determinations are the very thing the Supreme Court has said "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings."  *Illinois Brick*, 431 U.S. at 732.

As Macomb Interceptor's purported injuries are premised entirely on the theory that the City of Detroit passed on to it overcharges caused by a corruption scheme, *Illinois Brick* forecloses recovery and Macomb Interceptor is barred from asserting claims under the federal antitrust statutes.

## 2.  RICO Standing

The antitrust-standing analysis also bars Macomb Interceptor from establishing standing to assert its RICO claim.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen." (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268-69 (1992); *Illinois Brick*, 431 U.S. at 729)); *Cnty. of Oakland*, 866 F.2d at 851 (after determining that the plaintiffs, as direct purchasers, were the proper party to bring antitrust claims, observing that "[a]lthough we have focused primarily on the antitrust laws in the foregoing discussion, most of what we have said is applicable also to the treble damage provision of RICO").  Patterned after § 4 of the Clayton Act, the civil action provision of RICO provides that

26

"[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  And consistent with judicial interpretation of § 4's language, courts have held that "mere allegation and/or evidence that an injury to the plaintiff would not have occurred "but for" the defendant's alleged RICO violation (that is, that the plaintiff sustained a mere "injury in fact") is insufficient to establish" a right to sue under RICO.  *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889 (6th Cir. 2000) (citing *Holmes*, 503 U.S. at 265-68)).  In *Holmes*, the Supreme Court adopted its § 4 jurisprudence and held that a plaintiff establishes a right to sue under RICO only by showing that a defendant's alleged violation was also the proximate cause of his injury, and noted that at common law "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."  503 U.S. at 268-69. The Court explained why "directness of relationship" was an imperative part of standing to sue under both the antitrust statutes and RICO:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.  Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.  And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269-70 (citations omitted).

27

In the instant case, Macomb Interceptor's alleged injuries do not flow directly from the alleged acts of Concurring Defendants, but indirectly, from "the misfortunes visited upon a third person," *i.e.*, the City of Detroit.  Accordingly, consistent with the conclusion that Macomb Interceptor lacks standing to bring its antitrust claims, it likewise is unable to sue under RICO.

### C.  Macomb Interceptor's State-law Breach of Contract Claim Against Defendant Inland Water Pollution Control

Generally, when all federal claims are dismissed before trial, pendant state-law claims should be dismissed or remanded to the state court.  *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir.1996).  However, "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial."  *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991).  In light of the scope of this action and the fact that the case will proceed on the City of Detroit's Intervening Complaint, the court finds this to be a rare instance in which judicial economy dictates the exercise of supplemental jurisdiction over a remaining state-law claim.

### D.  Macomb Interceptor's Pending Motion for Leave to Amend Complaint

Because Macomb Interceptor lacks standing to assert its non-contractual claims, its motion for leave to amend the complaint must be denied as futile.  While leave to amend under Federal Rule of Civil Procedure 15 is generally freely granted, the presence of factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

28

prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment" counsel in favor of denying leave. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999).  In the case of futility, "[a]mendment of a complaint is futile when the proposed amendment would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817.

Macomb Interceptor's proposed amended complaint incorporates a large number of additional factual allegations related to the underlying corruption scheme and adds three additional state-law claims, for fraudulent concealment, civil conspiracy, and aiding and abetting.  Because standing to assert the non-contractual claims in the proposed amended complaint remains predicated on the assignment in the Acquisition Agreement and the alleged independent injuries discussed above, the proposed amendment would not withstand a motion to dismiss.  Therefore, the motion for leave will be denied.

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Concurring Defendants' "Amended Motion for Summary Judgment" [Dkt. # 190] and Defendants Futurenet Group, Inc., and Perry Mehta's "Motion for Partial Summary Judgment" [Dkt. # 209] are GRANTED.  Summary Judgment will be entered in favor of Concurring Defendants and Defendants Futurenet Group, Inc., Perry Mehta, Rotor Electric Company of Michigan, LLC, and Benjamin Rosenberg on Counts I, II, III, V, and VI.

IT IS FURTHER ORDERED that Plaintiff Macomb Interceptor is DIRECTED TO SHOW CAUSE, in writing, on or before **September 24, 2012**, why summary judgment

should not be entered in favor of all remaining non-moving Defendants on the non-

contractual claims.

IT IS FURTHER ORDERED that Plaintiff Macomb Interceptor's "Motion for Leave

to File First Amended Complaint" [Dkt. # 176] is DENIED.

IT IS FURTHER ORDERED that the D'Agostini Defendants' "Motion to Strike

Reply to Response . . ." [Dkt. # 191] is TERMINATED AS MOOT.


 s/Robert H. Cleland                                      
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  September 17, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, September 17, 2012, by electronic and/or ordinary mail.


 s/Lisa Wagner                                           
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\11-13101.KILPATRICK.Grant.Summ.J.Standing.jrc.FINAL.RHC.ckb.3.wpd



*Exhibit 17*

November 28, 2012

This letter agreement (the "Agreement") sets forth the terms of an agreement entered into among Inland Waters Pollution Control, Inc., a Michigan corporation ("IWPC"), Inland Management, Inc., a Michigan corporation, and Inland Pipe Rehabilitation LLC, a Michigan limited liability company (collectively, the "Inland Entities"), Anthony Soave and the City of Detroit, Michigan, acting through and with the authority of, its Water and Sewerage Department (the "DWSD") and its Board of Water Commissioners (the "BOWC").[1]

The present BOWC has gone to great lengths to investigate past practices of the DWSD and its contractors, and to address the issues identified in the United States of America v. Kilpatrick, et al., Fourth Superseding Indictment, dated February 15, 2012 (and all previous versions of such indictment) (collectively, the "Kilpatrick Indictment"). The Inland Entities applaud and support those efforts, and have provided great assistance to the BOWC so that going forward, the BOWC can improve the bidding process and the operation of the DWSD. Additionally, both the BOWC and the Inland Entities recognize the importance of an ethical, fair and unbiased competitive bidding process. Such a process serves the best interest of the DWSD and its customers, as well as the interests of DWSD contractors.

In furtherance of the BOWC's efforts, the parties to this Agreement, on behalf of themselves and their respective successors and assigns, agree as follows:

(1)     IWPC has not submitted a bid on any DWSD jobs as either prime contractor or subcontractor, from August 2009 to the date of this Agreement (the "No Bid Period"). IWPC has, however, responded to specific proposal requests from other prime contractors of the DWSD to perform very specific and specialized work since August 2009. These proposals were not in connection with any DWSD bid process. After the date of this Agreement, Inland Entities may bid on any DWSD contract or project and they will neither be prejudiced with respect to any such bid nor subjected to any review process previously initiated by the BOWC regarding their past practices and activities relating to the award of any DWSD contract or project and the BOWC or the DWSD shall not utilize the matters discussed in this Agreement or related to this Agreement in any manner that is detrimental or materially adverse to the Inland Entities.

(2)     This Agreement will not, in any way, affect existing contracts, DWS-876 and DWS-877 (the "Current Contracts"), which were awarded prior to the No Bid Period, and which the Inland Entities shall continue to perform in accordance with the terms of the Current Contracts through final completion.

(3)     The Inland Entities agree to pay the DWSD the sum of Four Million Five Hundred Thousand Dollars ($4,500,000), to be paid as follows: (a) One Million Five Hundred Thousand Dollars ($1,500,000) within five (5) days following the execution of this Agreement; and (b) the remainder to be paid in equal annual installments of Five Hundred Thousand Dollars

---

[1] The BOWC and the DWSD represent that they have the authority to enter into this Agreement and bind the City of Detroit based on Orders signed by Judge Cox in *United States of America v. City of Detroit, et al.*, Case No. 77-cv-71100 (E.D. Mich.)., including but not limited to the Order dated November 4, 2011.

Error! Bookmark not defined.

November 28, 2012
Page 2

($500,000) each during the six (6) year period following the execution of this Agreement (each, an "Installment Payment" and collectively, the "Installment Payments"). The Installment Payments shall be made each December 1st, commencing on December 1, 2013 and continuing until December 1, 2018; provided, however, that if the Inland Entities consummate a Change of Control (defined below) prior to making all of the Installment Payments, then any remaining Installment Payments shall become due and payable immediately prior to the consummation of such Change of Control, but shall be conditioned upon the consummation of a Change of Control. The Inland Entities agree to provide the BOWC and the DWSD with written notice of a Change of Control at least forty eight (48) hours prior to the consummation of such Change of Control. If the Inland Entities fail to make any of the payments described in this paragraph 3 when due and such failure is not cured within forty five (45) days after receipt of written notice of such failure from the BOWC or the DWSD (the "Cure Period"), then the remaining Installment Payments shall become immediately due and payable and the Inland Entities shall grant the BOWC and the DWSD a consent judgment for the amount of such remaining Installment Payments; provided, however, that during the Cure Period with respect to any such missed Installment Payment, the Inland Entities, the BOWC and the DWSD shall meet and negotiate in good faith to explore alternative means to resolve such missed Installment Payment. If the parties are unable to amicably resolve their differences or reach a mutually acceptable agreement with respect to any missed Installment Payment, then the BOWC and the DWSD shall be entitled to the consent judgment described in the previous sentence. The BOWC and the DWSD acknowledge and agree that their sole remedy for a default by the Inland Entities with respect to any Installment Payment shall be for money damages only. For purposes of this Agreement, the term "Change of Control" means the sale of all or substantially all of the assets or equity interests of the Inland Entities (whether by direct sale, merger, consolidation or otherwise) to a *bona fide* third party (or parties) in one transaction or a series of related transactions.

(4)    Effective upon execution of this Agreement, the BOWC and the DWSD fully and unconditionally release the Inland Entities, Inland Industrial Services Group LLC, a Michigan limited liability company ("IISG"), Inland Waters Pollution Control Services LLC, a Michigan limited liability company ("IWPCS"), and any and all of their respective current or former subsidiaries, partners, affiliates, owners, beneficial owners, indirect owners, parents, shareholders, officers, directors, members, managers, principals, employees, insurers, agents, representatives, successors and assigns, as well as any person or entity that has, or had, directly or indirectly, at any time, a legal equitable or beneficial interest in the Inland Entities, IISG or IWPCS, including, but not limited to, Anthony Soave (collectively, the "Released Inland Parties"), from any and all claims, demands, damages, losses, liability or conduct, whether known or unknown, arising out of or related to the Kilpatrick Indictment, the Intervention Complaint described in paragraph 7 below, the "Responsible Vendor Proceedings" (described in paragraph 5 below), the Notices (including the allegations made in the Notices) (as described in paragraph 5 below) and any other matters associated with, or ancillary to, the Kilpatrick Indictment, the Intervention Complaint (including the proposed Intervention Complaint), the "Responsible Vendor Proceedings" or the Notices, including, but not limited to, any threatened lawsuits and any conduct by the Released Inland Parties occurring or arising prior to the effective date of this Agreement, the only exception to this being claims for performance or non-performance of Services (as defined in the Current Contracts) under the Current Contracts and

Error! Bookmark not defined.

surviving warranty claims under completed contracts. Each of the BOWC and the DWSD acknowledge that it has not assigned, transferred or purported to assign or transfer to any person, entity or governmental authority whatsoever any of the matters covered by the release set forth in this paragraph 4; provided, however the Inland Entities acknowledge that the City of Detroit, Michigan (the "City of Detroit") and Macomb Interceptor Drain Drainage District have entered into that certain Macomb Interceptor Acquisition Agreement dated September 2, 2010. Each of the BOWC and the DWSD covenants and agrees that it shall not sue any of the Released Inland Parties with respect to any of the matters covered by the release set forth in this paragraph 4. Each of the BOWC and the DWSD waives any right to any form of recovery, compensation or other remedy in any such action brought by it, on its behalf or by any person, entity or governmental authority claiming through it with respect to the release set forth in this paragraph 4, and agrees that the release set forth in paragraph 4 shall be a complete bar to any such action. For the avoidance of doubt, each of the BOWC and the DWSD represents and warrants to the Released Inland Parties that the release and other covenants set forth in this paragraph 4 shall be a complete bar to any future action brought by, through or on behalf of the City of Detroit with respect to any of the matters covered by the release and other covenants set forth in this paragraph 4.

(5)     The BOWC agrees that its "Responsible Vendor Proceedings" as to the Inland Entities and the related notices dated January 26, 2012 and February 24, 2012 (the "Notices") are withdrawn, dismissed, void *ab initio* and of no further force and effect. Based on the Responsible Vendor Proceedings and the related Notices, the BOWC hereby finds that each Inland Entity is presently a "Responsible Vendor". The BOWC and the DWSD further agree that no other suspension or debarment proceedings shall be commenced against any Released Inland Party based on the matters referenced in the release set forth in paragraph 4 above or the other matters set forth in this Agreement.

(6)     In accordance with the full, unconditional release of the DSWD and the BOWC set forth in paragraph 8 below, the Inland Entities will forthwith dismiss (or will cause to be dismissed) with prejudice and without costs to any party, the pending lawsuit, and any and all allegations, claims and damages asserted (or that could have been asserted) by the Inland Entities against the DWSD and the BOWC in the pending lawsuit, filed by the Inland Entities challenging the Notices, styled as Inland Waters Pollution Control, Inc., Inland Management, Inc., and Inland Pipe Rehabilitation LLC v. City of Detroit, Case No. 12-cv-10434 (U.S. District Court, Eastern District of Michigan).

(7)     In accordance with the full, unconditional release of the Released Inland Parties set forth in paragraph 4 above, upon receipt of the initial payment described in paragraph 3 above, the BOWC and the DWSD will forthwith dismiss (or will caused to be dismissed), with prejudice and without costs to any party, any and all allegations, claims and damages asserted (or that could have been asserted) by the DWSD against the Inland Entities in the pending lawsuit, styled as Macomb Interceptor Drain Drainage District v. Kilpatrick, et al, Case No. 11-cv-13101 (U.S. District Court, Eastern District of Michigan) (the "MIDDD Litigation"), including any and all allegations, claims and damages asserted (or that could have been asserted) by the BOWC and/or the DWSD in their proposed intervention Complaint in the MIDDD Litigation (the

Error! Bookmark not defined.

"Intervention Complaint") or any other threatened lawsuit arising out of any of the matters referenced in the release in paragraph 4 above.

(8)     Effective upon execution of this Agreement, the Released Inland Parties fully and unconditionally release the BOWC and the DWSD and any and all of their respective current or former officers, directors, employees, insurers, agents, representatives, successors and assigns (the "Released DWSD Parties") from any and all claims, demands, damages, losses or liability, whether known or unknown, arising out of the Kilpatrick Indictment, the Intervention Complaint, the "Responsible Vendor Proceedings" and the Notices (including the allegations made in the Notices) and any other matters associated with, or ancillary to, the Kilpatrick Indictment, the Intervention Complaint or the Notices. Each Released Inland Party acknowledges that it or he has not assigned, transferred or purported to assign or transfer to any person, entity or governmental authority whatsoever any of the matters covered by the release set forth in this paragraph 8. Each Inland Entity and Anthony Soave covenants and agrees that it or he shall not sue any of the Released DWSD Parties with respect to any of the matters covered by the release set forth in this paragraph 8. Each Inland Entity and Anthony Soave waives any right to any form of recovery, compensation or other remedy in any such action brought by it or him, on its or his behalf or by any person, entity or governmental authority claiming through it or him with respect to the release set forth in this paragraph 8, and agrees that the release set forth in paragraph 8 shall be a complete bar to any such action. For the avoidance of doubt, each of the Inland Entities and Anthony Soave (for themselves and on behalf of the Released Inland Parties) represent and warrant to the Released DWSD Parties that the release and other covenants set forth in this paragraph 8 shall be a complete bar to any future action brought by the Released Inland Parties with respect to any of the matters covered by the release and other covenants set forth in this paragraph 8. The release set forth in this paragraph 8 shall not, in any way, impact the ability of the Released Inland Parties to assert any claims or defenses that the Released Inland Parties have or may have in the ongoing MIDDD Litigation or against the Macomb Interceptor Drain Drainage District; provided, however, that the Released Inland Parties agree that they shall not be entitled to any recovery from the DWSD or the BOWC as a result of such claims or defenses.

(9)     The BOWC, the DWSD and the Released Inland Parties agree that terms of this Agreement are not intended to be, and shall not be, an admission of fault, liability or misconduct but instead is intended to avoid the time, cost and expense of litigation. The Inland Entities also specifically agree to withdraw any letters or protests regarding the BOWC's and the DWSD's actions which have been sent on behalf of the Inland Entities to the City of Detroit.

(10)     The BOWC and the DWSD, on the one hand, and the Inland Entities, on the other hand, agree to use their reasonable best efforts to cooperate with each other, and provide each other information, with respect to matters described in the Kilpatrick Indictment, the Intervention Complaint and all other related DWSD matters. Such cooperation shall include the exchange of documents, providing witness testimony and supplying other relevant information as requested by BOWC and the DWSD, on the one hand, or the Inland Entities, on the other hand.

(11)     The BOWC, the DWSD and the Released Inland Parties, agree that this Agreement shall not be used for any purpose whatsoever in any present or future proceeding involving, directly or indirectly, all or any one of the parties to this Agreement, whether civil,

Error! Bookmark not defined.

criminal, administrative or otherwise, except for a proceeding brought by any party to this Agreement alleging a breach of the terms of this Agreement. The parties further agree that should the BOWC or the DWSD terminate this Agreement due to an alleged failure to pay one or more of the Installment Payments in accordance with paragraph 3 above, the Inland Entities will not contest the fact of such non-payment in any of the proceedings previously referenced in this paragraph, including but not limited to a proceeding before the BOWC pursuant to DWSD's Procurement Policy, as in effect at the time of such termination; provided, however, that the Inland Entities shall be entitled to contest the validity of any termination of this Agreement on the basis that the Installment Payments were, in fact, made in accordance with the terms of this Agreement.

(12)    In addition to the commitments in paragraph 11 above, the BOWC and the DWSD agree that if a lawsuit or other binding proceeding (a "Proceeding") is filed by the City of Detroit, an agency or Department of the City of Detroit, and/or an official of the City of Detroit, purporting to act in their official capacity on behalf of the City of Detroit, against any party to this Agreement, challenging the authority of the BOWC to bind the City of Detroit by approving this settlement and entering into this Agreement, including the releases set forth in this Agreement and the covenants contained in paragraph 5 above then DWSD shall defend such Proceeding. The Released Inland Parties agree that, if named in such a Proceeding, they will not take a position or support a position adverse to the BOWC or DWSD in that Proceeding, including but not limited to, contesting, or supporting a claim contesting, the authority of the BOWC to approve this Agreement and bind the City of Detroit through that action. The parties further agree that if a Proceeding is filed or initiated, they shall meet to consider and if appropriate enter into a joint defense agreement for that Proceeding.

(13)    Nothing in Paragraph 12 above shall not preclude the Released Inland Parties (or any one or more of them) from asserting any and all other claims or defenses that may exist to the claims and allegations made in such Proceeding and intervene in such Proceeding if not originally named as defendant parties. Further, in the event that such a Proceeding is filed or initiated, the parties agree that they will establish an escrow account into which all Installment Payments that may become due pursuant to Paragraph 3 of this Agreement shall be paid pending the resolution of such Proceeding.

(14)    In the event that a Proceeding names only the Released Inland Parties (or any one or more of them), but does not name BOWC or the DWSD, then within three (3) business days of its receipt of the official notice of such Proceeding, the party (or parties) to this Agreement named in such Proceeding will notify the BOWC and the DWSD in writing of such Proceeding at the following address and the BOWC and the DWSD shall immediately move to intervene as a matter of right in such Proceeding as an indispensable party:

Detroit Water and Sewerage Department<br>
735 Randolph<br>
Detroit, Michigan 48226<br>
Attn: Director

(15)    In the event that a Proceeding names only the DWSD or the BOWC but does not name the Released Inland Parties (or any one or more of them) then within three (3) business

Error! Bookmark not defined.

days of the BOWC's or the DWSD's receipt of the official notice of such Proceeding, the party (or parties) to this Agreement named in such Proceeding will notify counsel for the Released Inland Parties in writing of such Proceeding at the following address:

Jaffe, Raitt, Heuer & Weiss, P.C.
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Attn: Michael F. Jacobson

(16)    If a Proceeding results in a final judgment by a trial court or binding authority finding that the BOWC and the DWSD did not have the authority to bind the City of Detroit by approving this settlement and entering into this Agreement and the BOWC and DWSD choose not to appeal that judgment or exhaust all appeals from that judgment, then DWSD shall return all monies to the Inland Entities that it has received pursuant to this Agreement. The return payment shall be made (a) within seven (7) days from the date the time to appeal a final judgment as a matter of right under the applicable Michigan or Federal Court Rules expires and the BOWC and the DWSD have not, during that time period, filed a claim of appeal of right; or (b) in the event the BOWC and the DWSD timely file an appeal of right of a final judgment, within seven (7) days of the date of an order by the applicable court of appeals denying the merits of the BOWC's and the DWSD's appeal or other dismissal of such appeal for any other reason.

[Signature Page Follows]

Error! Bookmark not defined.

By the signatures below, as Chairperson of the BOWC and Director of the DWSD represent that the BOWC and the DWSD agree to the terms of this Agreement. If the Inland Entities and the Released Inland Parties also agree to the terms of this Agreement, please have an authorized representative of the Inland Entities and Anthony Soave sign a copy of this Agreement and return one original to me. This Agreement shall not take effect until signed by all of the parties listed below.

Sincerely,

CITY OF DETROIT, a Michigan municipal corporation, acting through, and with the authority of, its Water and Sewerage Department and its Board of Water Commissioners

By: _____
James G. Fausone, Chairman
Board of Water Commissioners

By: _____
Sue F. McCormick, Director
Water and Sewerage Department

If you agree with the above, and agree to be bound, please sign a copy of this Agreement confirming its terms and return the original to me.

AGREED:

INLAND PIPE REHABILITATION LLC
INLAND MANAGEMENT, INC.
INLAND WATERS POLLUTION CONTROL, INC.

By: _____
Its: _PRESIDENT / CEO_

_____
ANTHONY SOAVE

Error! Bookmark not defined.



*Exhibit*

*17-1*

February 11, 2013

This letter agreement (the "Agreement") sets forth the terms of an agreement entered into among Walbridge Aldinger Company, a Michigan corporation ("Walbridge Aldinger"), and the City of Detroit, Michigan, acting through and with the authority of its Water and Sewerage Department and its Board of Water Commissioners (the "DWSD")

The present Board of Water Commissioners ("BOWC") has gone to great lengths to investigate past practices of the DWSD and its contractors, and to address the issues identified in United States of America v. Kilpatrick, et al., Fourth Superseding Indictment, dated February 15, 2012 (and all previous versions of such indictment) (the "Kilpatrick Indictment") including counts in the Kilpatrick Incictment that reference Walbridge Aldinger .

Walbridge Aldinger has also claimed that it has been constructively disbarred by the DWSD from all projects with the DWSD after it refused to acquiesce to unethical behavior alleged in the Kilpatrick Indictment, including DWSD Contracts Nos. PC 755 (Oakwood CSO Control Facility & Pump Staion), PC-774 (Complex I and II Incinerator Improvements) and PC 786, Rouge River Outfal No. 2 (the "Walbridge Aldinger Claims").

After conducting its investigation and meeting with representatives of Walbridge Aldinger Company the DWSD has concluded that it no is longer interested in investigating Walbridge Aldinger and Walbridge Aldinger has agreed to release the DWSD from the Walbridge Aldinger Claims.

Now therefore, in consideration of the mutual releases stated herein, and without any exchange of monetary compensation, the parties to this Agreement, on behalf of themselves and their respective successors and assigns, agree as follows:

(1)    Effective upon execution of this Agreement, the BOWC and the DWSD fully and unconditionally release and shall not bring any action or proceeding, civil, criminal admistrative, or otherwise, at a law or in equity against Walbridge Aldinger and/or its sureties and/or any and all of their respective current or former subsidiaries, partners, affiliates, owners, beneficial owners, indirect owners, parents, shareholders, officers, directors, members, managers, principals, employees, insurers, agents, representatives, successors and assigns, as well as any person or entity that has, or had, directly or indirectly, at any time, a legal equitable or beneficial interest in that entity ("The Released Walbridge Aldinger Parties") from any and all claims, demands, damages, losses, liability or conduct, whether known or unknown, arising out of or related to the Kilpatrick Indictment, PC 748, the Responsible Vendor Proceedings and any other matters associated with, or ancillary to, the Kilpatrick Indictment, including, but not limited to, any threatened lawsuits and any conduct by Walbridge Aldinger occurring or arising on or before the effective date of this Agreement, the only exception to this being claims for performance or non-performance of services under current contracts between Walbridge Aldinger and the DWSD for which Walbridge Aldinger has not received final payment, if any, and surviving warranty claims under completed contracts between Walbridge Aldinger and the DWSD. BOWC and the DWSD acknowledge that they have not assigned, transferred or purported to assign or transfer to any person, entity or governmental authority whatsoever any of the matters

covered by the release set forth in this paragraph 1. BOWC and DWSD covenant and agree that they shall not bring any action or proceeding, civil, criminal admistrative, or otherwise, at a law or in equity againstany of the Released Walbridge Aldinger Parties with respect to any of the matters covered by the release set forth in this paragraph. The BOWC and the DWSD waive any right to any form of recovery, compensation or other remedy in any such action brought by them, on their behalf or by any person, entity or governmental authority claiming through it with respect to the release set forth in this paragraph, and agree that the release set forth in this paragraph shall be a complete bar to any such action. For the avoidance of doubt, each of the BOWC and the DWSD represents and warrants to the Released Parties that the release and other covenants set forth in this paragraph shall be a complete bar to any future action brought by, through or on behalf of the City of Detroit with respect to any of the matters covered by the release and other covenants set forth in this paragraph.

(2)    Effective upon execution of this Agreement, the Released Walbridge Aldinger Parties fully and unconditionally release and shall not bring any action or proceeding, civil, criminal admistrative, or otherwise, at a law or in equity against the DWSD and/or any and all of their respective current or former officers, directors, employees, Board of Water Commissioners Members, insurers, agents, representatives, successors and assigns (the "Released DWSD Parties") from any and all claims, demands, damages, losses or liability, whether known or unknown, arising out of the Kilpatrick Indictment, PC 748, the "Responsible Vendor Proceedings" and any other matters associated with, or ancillary to, the Kilpatrick Indictment, the non-award of business related to DWSD contracts, and/or any work done for the DWSD on or before the execution date of this Agreement, the only exception to this being claims for payment for services under current contracts between Walbridge Aldinger and the DWSD for which Walbridge Aldinger has not received final payment, if any. Each Released Walbridge Aldinger Party acknowledges that it or he has not assigned, transferred or purported to assign or transfer to any person, entity or governmental authority whatsoever any of the matters covered by the release set forth in this paragraph. Each of The Released Walbridge Aldinger Parties covenants and agrees that it, or he, shall not bring any action or proceeding, civil, criminal admistrative, or otherwise, at a law or in equity against any of the Released DWSD Parties with respect to any of the matters covered by the release set forth in this paragraph. Each Walbridge Aldinger Party waives any right to any form of recovery, compensation or other remedy in any such action brought by it or him, on its behalf or by any person, entity or governmental authority claiming through it with respect to the release set forth in this paragraph, and agrees that the release set forth in this paragraph shall be a complete bar to any such action. For the avoidance of doubt, each of the Walbridge Aldinger Parties (for themselves and on behalf of the Released Walbridge Aldinger Parties) represent and warrant to the Released DWSD Parties that the release and other covenants set forth in this paragraph shall be a complete bar to any future action brought by the Released Walbridge Aldinger Parties with respect to any of the matters covered by the release and other covenants set forth in this paragraph.

(3)    DWSD and the Released Walbridge Aldinger Parties agree that terms of this Agreement are not intended to be, and shall not be, an admission of fault, liability or misconduct. The Parties expressly acknowledge that this Agreement will permit Walbridge Aldinger to compete for future contracts with all other potential vendors, in accordance with DWSD's Procurement Policy.

(4)    DWSD, on the one hand, and the Walbridge Aldinger on the other hand, agree for a period of one hundred twenty days to to reasonably cooperate with each other, and provide each other information, with respect to matters described in the Kilpatrick Indictment, and the Walbridge Claims. Such cooperation shall, except as prohibited by law or rule, include the exchange of non-privleged documents and supplying other relevant, non-privleleged information as requested by BOWC and the DWSD, on the one hand, or the Walbridge Aldinger on the other hand.   To the extent Walbridge Aldinger incurs any extraordinary or out of pocket costs or fees in cooperating with the DWSD, the DWSD shall reimburse Walbridge Aldinger for such cost and fees.  DWSD and the BOWC shall keep all information provided by Walbridge Aldinger confidential to the extent permitted by law.  In the event of a breach or alleged breach of this paragraph by any party to this agreement, said breach or alleged breach, whether proved or not, shall not affect the validity and enforceability of the Releases in paragraphs 1 and 2.

(5)    The BOWC the DWSD and the Released Walbridge Aldinger Parties agree that this Agreement shall not be used offensively in any present or future proceeding involving, directly or indirectly, all or any one of the parties to this Agreement, whether civil, criminal, administrative or otherwise, except for a proceeding brought by any party to this Agreement alleging a breach of the terms of this Agreement.

By the signatures below, as Chairperson of the BOWC and Director of the DWSD, we represent that the BOWC and the DWSD agree to the terms of this Agreement and that we have authority to bind the City of Detroit. If the Released Walbridge Aldinger Parties also agree to the terms of this Agreement, please have an authorized representative of the Entities sign a copy of this Agreement and return one original to us. This Agreement shall not take effect until signed by all of the individuals listed below.

Sincerely,

CITY OF DETROIT, a Michigan municipal corporation, acting through, and with the authority of, its Water and Sewerage Department

By: _____
       James G. Fausone, Chairman
       Board of Water Commissioners


By: _____
       Sue F. McCormick, Director
       Water and Sewerage Department

If you agree with the above, and agree to be bound, please sign a copy of this Agreement confirming its terms and return the original to me.

AGREED:

February 11, 2013
Page 4

Walbridge Aldinger Company

By: _____

Its: _____VP/GC_____

4/4



*Exhibit*

*17-2*

## MUTUAL SETTLEMENT AND RELEASE AGREEMENT

This Mutual Settlement and Release Agreement ("Agreement") is entered into this _____ day of February, 2013, by and among the City of Detroit, a Michigan municipal corporation, acting through and with the authority of its Detroit Water and Sewerage Department and its Board of Water Commissioners[1] (collectively "DWSD") on the one hand and on the other, Lakeshore Engineering Services, Inc., a Michigan corporation ("Lakeshore"), Lakeshore TolTest Corporation, a Delaware corporation ("LTC"), TolTest, Inc., an Ohio corporation ("TolTest"), A & H Contractors, Inc., a Michigan corporation, ("A&H"), Sky Group Grand LLC, a Michigan limited liability company ("Sky Group"), Avinash Rachmale, an individual ("Rachmale"), and Thomas Hardiman, an individual ("Hardiman"). Lakeshore, LTC, Toltest, A&H, Sky Group, Rachmale, and Hardiman will all collectively be referred to as the "Contractor Parties".

DWSD and the Contractor Parties are sometimes referred to collectively in this Agreement as "Parties" and each respective side as a "Party". Capitalized terms appearing in this Agreement shall have the meanings ascribed to them in this Agreement.

## RECITALS

A.    The City of Detroit is a municipal corporation located in Wayne County, Michigan and is a political subdivision of the State of Michigan. The Detroit Water and Sewerage Department, a department of the City, provides water service and wastewater treatment services to residents of the City and certain southeastern Michigan communities.

B.    The Detroit Water and Sewerage Department periodically solicits the services of contractors to perform various engineering, construction, and management services.

C.    Lakeshore provides general construction, engineering, environmental and energy services to federal and municipal governmental agencies, as well as commercial clients. In the past, Lakeshore served as the prime contractor on a number of DWSD contracts.

D.    LTC is the parent of Lakeshore Engineering and TolTest.

E.    Sky Group is an Affiliate of Rachmale's, and Rachmale directly or indirectly owns a controlling interest in Sky Group.

F.    Rachmale is a director, shareholder, and former officer of LTC.

---

[1] The Board of Water Commissioners and the Detroit Water and Sewerage Department represent that they have the authority to enter into this Agreement and bind the City of Detroit based on Orders signed by Judge Cox in *United States of America v. City of Detroit, et al.*, Case No. 77-cv-71100 (E.D. Mich.), including but not limited to the Order dated November 4, 2011.

20,881,226.1

G.   Hardiman was a director, officer, and shareholder of Lakeshore and is a shareholder and the President of A&H.

H.   DWSD maintains that (i) Lakeshore has liability arising from Lakeshore's activities in relation to three DWSD contracts, namely, DWS-849, CM-2014, and DWS-865 (these three contracts are collectively referred to as the "Contracts"); and (ii) some or all of the other Contractor Parties participated in performing these Contracts or engaged in other actions that may have made the other Contractor Parties jointly and severally liable to DWSD.

I.   The Contractor Parties have denied any wrongdoing concerning the Contracts and reject any claim by DWSD that DWSD suffered any damages.

J.   Lakeshore contends that DWSD wrongfully violated certain of Lakeshore's legal and equitable rights when several of Lakeshore's awarded contracts were revoked, cancelled, and/or reassigned to other contractors. Lakeshore also claims that it reached earlier agreements with DWSD that were intended as a full and final resolution of all respective claims between Lakeshore and DWSD.

K.   DWSD denies any wrongdoing or that a settlement was ever reached as claimed by Lakeshore.

L.   The instant settlement is made in good faith and is made to avoid the risk, cost, and time of any civil or other proceeding. The Parties recognize the value of the resolution and the value of avoiding any further delay in putting to rest any and all potential or actual, accrued and unaccrued claims in accordance with the terms of this Agreement.

M.   The Parties further recognize that this settlement avoids the uncertainty of litigation.  On the one hand, a trial could result in a verdict greater than the settlement, and on the other hand the Contractor Parties have defenses and Counterclaims that they could be expected to assert.  A trial could result in a verdict lower than the amount DWSD could obtain by reason of this settlement, or in no recovery at all.

N.   The Contractor Parties contend that they are not equitably or legally liable and that no law was violated, and DWSD contends that the settlement is not intended to be punitive or a penalty but rather a resolution with DWSD that is compensatory in nature.

O.   DWSD, on the one hand, and the Contractor Parties, on the other hand, now desire to settle, compromise and resolve all of their respective actual or potential disputes, claims, or actions against the other Parties in accordance with the terms of this Agreement.

The Parties agree as follows:

## AGREEMENT

1.    <u>Consideration</u>.  As part of the consideration for this Agreement, Rachmale shall pay a Total Balance of $2,575,000.00 to the Detroit Water and Sewerage Department, on behalf of DWSD, via wire transfer or certified funds in the following installments (each, an "Installment"):

    (i)     $825,000 on or before June 30, 2013;
    (ii)    $500,000 on or before June 30, 2014;
    (iii)   $500,000 on or before June 30, 2015;
    (iv)   $500,000 on or before June 30, 2016; and
    (v)    $250,000 on or before June 30, 2017.

Nothing herein shall be construed to prevent any Contractor Party from paying the Total Balance – or any portion thereof – before the installment due dates above. In the event that Rachmale fails to timely pay any Installment in full, DWSD shall give all Contractor Parties notice by certified mail and fax at the addresses and fax numbers shown on "Exhibit C" attached hereto, and the Contractor Parties shall have 45 days from the date of the notice (the "Cure Period") to pay to the Detroit Water and Sewerage Department, on behalf of DWSD, the unpaid balance of the then due Installment. If the Contractor Parties fail to pay that unpaid balance within the Cure Period, the entire unpaid portion of the Total Balance shall become immediately due, and DWSD shall be entitled to have a Judgment entered against the Contractor Parties for that entire unpaid amount, together with interest as well as the costs and reasonable attorney fees required to obtain said Judgment.

In addition, the consideration for this Agreement also includes a transfer of certain real property or its cash equivalent. Subject to the terms and conditions of this Agreement, within three (3) days after the Board of Water Commissioners votes to approve this Agreement pursuant to Section 13, *infra*, Rachmale shall cause the holder of the fee simple interest in the real property described in the Legal Description attached hereto as "Exhibit A" (the "Property") to execute the Transfer Agreement attached as "Exhibit B" to this Agreement. That Transfer Agreement speaks for itself, but Rachmale's and DWSD's general intent is that the Property holder shall agree to convey and transfer the Property to DWSD or DWSD's designee in "as is – where is" condition and free of all liens and encumbrances except those deemed to be "Permitted Exceptions" pursuant to the Transfer Agreement. If the Property is conveyed and transferred to DWSD or DWSD's designee in accordance with the Transfer Agreement, then a "Transfer" will be deemed to occur under this Agreement, *except that* a "Transfer" will not be deemed to have occurred under this Agreement if DWSD terminates the Transfer Agreement in writing pursuant to Section 2.3 or Section 3.3 of the Transfer Agreement. If a Transfer does not occur as a result of the occurrence of events under Sections 2.3 or 3.3 or other improper action of the Transferor that prevents the transfer of the Property, then the Parties agree that,

instead, the Contractor Parties shall pay an additional $2,500,000.00 (which represents the settlement value of the Property) to the Detroit Water and Sewerage Department by wire transfer or certified funds by remitting an additional $250,000 on or before June 30, 2017, and $500,000 on or before the annual anniversary of such date for each of the three (3) consecutive years thereafter, and $750,000 on or before June 30, 2021. The default provisions of Section 1 above including the Cure Period shall likewise apply to all such payments.

DWSD acknowledges and agrees that although the consideration for this Agreement includes the Transfer of the Property (which Rachmale owns or controls), Rachmale voluntarily offered such consideration and, as far as DWSD knows, the other Contractor Parties have no interest in and do not otherwise possess or control the Property in any way. If a Transfer occurs in accordance with this Agreement, nothing herein shall be construed to impose any obligation or liability whatsoever on the other Contractor Parties with respect to the condition of the Property, or any contamination existing on, at, or about such Property.

The Parties agree that all relevant statutes of limitations on the Released Claims (defined below) shall be tolled until this Agreement and the Transfer Agreement are fully signed, but no later than February 28, 2013.

2. <u>Mutual Release</u>. The "DWSD Releasees" are the Detroit Water and Sewerage Department, its Director, its Board of Commissioners, its Affiliates, its parent organization (i.e., the City) in such capacity, as well as any and all of their members, officers, employees, agents, attorneys, representatives, heirs, executors, administrators, legal representatives, successors, and assigns. DWSD agrees to the terms of this Section 2 on behalf of all the DWSD Releasees.

The "Contractor Releasees" are the Contractor Parties, their predecessors, their parents, their subsidiaries, and their Affiliates, as well as any and all of those entities' respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys, representatives, heirs, executors, administrators, legal representatives, successors, and assigns. Each of the Contractor Parties agrees to the terms of this Section 2 on its own behalf and on behalf of its parents, subsidiaries, Affiliates, and each of its and their shareholders, partners, members, managers, directors, officers, employees, agents, attorneys, representatives, heirs, executors, administrators, legal representatives, successors, and assigns.

"Claims" are any and all obligations, claims, damages, demands, causes of action, suits, cross claims, counterclaims, indemnity and contribution claims, duties, liabilities, promises, and agreements of any nature or kind, in law or in equity, whether known or unknown, accrued or unaccrued, which any of the DWSD Releasees or the Contractor Releasees had or could have had at any time on or before the date of this Agreement. Claims include but are not limited to legal claims related to or arising under (a) the performance in any capacity of construction work, project management services, and consulting services; (b) real property; (c) bidding challenges, contract-

award processes, debarment or responsible vendor proceedings, and voluntary no-bid periods; and (d) federal or state statutes, common law, municipal ordinances, rules, regulations, the Michigan or United States Constitutions, the Detroit City Charter, and/or the Detroit City Code, regardless of which DWSD Releasees or Contractor Releasees might bring them.

The DWSD Releasees hereby forever release, discharge, and hold harmless the Contractor Releasees of and from any and all Claims, as defined above, including, without limitation, Claims relating to or arising under the Contracts, with the exception of (i) any and all Claims to enforce this Agreement or the Transfer Agreement; and (ii) performance and warranty claims on open contracts, PC-779 and DWS-879, or warranty claims on completed contracts containing unexpired construction warranty periods. For purposes of this clause (ii), DWSD relies on Lakeshore's assertion that the only open contracts are PC-779 and DWS-879. The DWSD Releasees represent that they have no knowledge of any warranty claims as of the signing of this Agreement. Except as to the enforcement of this Agreement, the Contractor Releasees hereby forever release, discharge, and hold harmless the DWSD Releasees of and from any and all Claims as defined above. The Claims released by this paragraph are hereinafter referred to as the "Released Claims."

The Parties acknowledge that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the Released Claims, but the Parties intend to fully, finally, and forever settle and release all the Released Claims. The releases given under this Section 2 shall be and remain in full and complete effect regardless of the discovery or existence of any additional or different facts relating to the Released Claims.

Each of the Parties represent and warrant that it has not assigned any of the Released Claims to a Person who is not bound by this Section 2, except that DWSD represents that it assigned certain rights to the Macomb Interceptor Drain Drainage District and/or the County of Macomb effective on or about September 2, 2010 through the Macomb Interceptor Acquisition Agreement, the "Settlement Agreement" (between the same parties), and the Bill of Sale executed contemporaneously with Macomb Interceptor Acquisition Agreement, all of which documents DWSD has provided to the Contractor Parties (collectively, the "Assignment"). The Parties are aware of and acknowledge the Assignment and agree that any claims asserted by Macomb County or any other third party as a result of the Assignment are not the responsibility of DWSD or any of the DWSD Releasees.

Each Party agrees to waive (if waivable) the benefits of any state or federal statutory provision that would otherwise forgive any Party from releasing a Claim that the Party was not aware of when it executed this Agreement.

3.   No Acknowledgement of Liability or Wrongdoing. The execution of this Agreement by the Parties shall not constitute an admission of any wrongdoing or an acknowledgement of any liability in relation to any of the Released Claims.

4. **Further Assurances**. After the execution and delivery of this Agreement, and without receiving any additional consideration, each Party shall execute and deliver any further legal instruments and perform any acts that are or may become necessary or desirable to effectuate the purposes of this Agreement.

5. **Responsible Bidder Status**. DWSD agrees that when henceforth determining whether a Contractor Party (or any parent, subsidiary, or Affiliate thereof) is a responsible or non-responsible vendor for purposes of contracting with DWSD, DWSD will neither consider nor deem relevant (a) the existence of this Agreement; (b) the facts underlying its execution; (c) the Released Claims; or (d) the actual or perceived existence of any facts supporting the Released Claims.

6. **Cooperation.** Rachmale, Hardiman, A&H, and Sky Group agree to cooperate fully and truthfully with DWSD's investigation of improper actions or wrongdoing in the Detroit Water and Sewerage Department, the outcome of which investigation shall be deemed confidential and shall not be disclosed to any third party, unless otherwise required by law. Lakeshore and LTC agree to provide Rachmale access to any documents related to the Contracts in their possession that Rachmale may need to facilitate his cooperation.[2] Any Person interviewed by a representative of DWSD may require that his, her, or its counsel be present during such interview. No information obtained by DWSD through its exercise of its rights under this Section 6 shall be used to rescind, unwind, nullify, negate, or reverse any of the transactions or releases effectuated or consideration tendered or exchanged pursuant to this Agreement.

7. **Effect of Breaches**. Except as stated in this Agreement to the contrary, (i) a particular Party's breach of Section 6 shall not render any other Party liable for such breach or any resultant damages; and (ii) any Party's breach of this Agreement shall not constitute cause for the rescission of this Agreement, in whole or in part, or the unwinding, nullification, negation, or reversal of any release or transaction effectuated under this Agreement or any consideration tendered or exchanged under this Agreement. The exclusive remedy for breach of this Agreement is a contractual claim for the amount owed under this Agreement.

8. **Definitions of Affiliate and Person.**

   A. **Affiliate**. For purposes of this Agreement, "Affiliate" means, with respect to any individual: (i) each other member of such individual's Family; (ii) any Person that is directly or indirectly controlled by any one or more members of such individual's Family; (iii) any Person in which members of such individual's Family hold (individually or in the aggregate) a Material Interest; and (iv) any Person with respect to which one or more members of such individual's Family serves as a director, officer,

---

[2] The current management team of Lakeshore and LTC were retained after April, 2011.

manager, partner, executor or trustee (or in a similar capacity); and with respect to any Person other than an individual, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person. As used in this definition:

(i) "control" (including, with correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise);

(ii) the "Family" of an individual means (i) the individual, (ii) the individual's spouse, (iii) any other natural Person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural Person who resides with such individual; and

(iii) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

B. <u>Person</u>. For purposes of this Agreement, "Person" means an individual, a partnership (general or limited), corporation, limited liability company, joint venture, business trust, cooperative, association, or other form of business organization, whether or not regarded as a legal entity under applicable law, a trust (inter vivos or testamentary), an estate of a deceased, disabled, or incompetent Person, a quasi-governmental entity, a government or any agency, authority, political subdivision, or other instrumentality thereof, or any other entity.

9. <u>Provisions Severable</u>. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement, or the application thereof to any Person or circumstances, shall for any reason to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to the unaffected Persons or circumstances, shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

10. <u>Fees and Expenses</u>. Each Party shall bear its own attorneys' fees and expenses incurred in connection with the negotiation, preparation, and performance of this Agreement, unless otherwise expressed in this Agreement.

11. <u>Entire Agreement; Amendment</u>. This Agreement and the exhibits attached hereto set forth the entire Agreement of the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings, and communications of the Parties, oral

or written, respecting such subject matter. This Agreement shall not be amended or modified except by an agreement in writing duly executed by all of the Parties.

12.     Choice of Law; Venue.  This Agreement shall be enforced in accordance with the laws of the state of Michigan, irrespective of its conflict of laws principles. The Parties agree that the United States District Court for the Eastern District of Michigan, Southern Division – or, alternatively, the Wayne County Circuit Court if federal jurisdiction is lacking – shall be the only Court that has jurisdiction over this Agreement and that any disputes arising out of or related in any manner to this Agreement shall be brought only in such Court.

13.     Required Approvals.  Upon execution of this Agreement, DWSD shall place the matter of the Agreement on the agenda of the next Board of Water Commissioners Meeting for a vote on and approval of the Agreement. DWSD warrants that approval by the Board of Water Commissioners is all that is necessary for DWSD to validly execute and enter into the Agreement.

14.     Waiver.  Unless a Party executes a written waiver, none of the following actions shall be deemed to waive the Party's right to demand that any other Person strictly comply with the Agreement: (a) the Party's failure to exercise any right or remedy under this Agreement; (b) the Party's failure to exercise any right or remedy otherwise available to the Party; (c) the Party's failure to insist that some additional Person strictly comply with the Agreement; or (d) any Party's engagement in a customary practice in variance with the terms hereof. Any such written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations.

15.     Construction.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of construction shall be applied against any Party.

16.     Successors and Assigns.  This Agreement shall be fully binding upon and inure to the benefit of the Parties and their respective successors, assigns, heirs, personal representatives, administrators, executors, and agents.

17.     Counterparts; Deliveries.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including pdf files), shall be treated in all manner and respects for all purposes as an original agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

City of Detroit, a Michigan municipal corporation, acting through, and with the authority of, its Water and Sewerage Department and its Board of Water Commissioners

By: _James G. Fausone_ (signature)
James G. Fausone

Its: Chairman, Board of Water Commissioners

and

By: _Sue M'Cormick_ (signature)
Sue F. McCormick

Its: Director, Detroit Water and Sewerage Department

Lakeshore Engineering Services, Inc., a Michigan corporation

By:_____

Its:_____

Lakeshore TolTest Corporation, a Delaware corporation

By:_____

Its:_____

A & H Contractors, Inc., a Michigan corporation

By:_____

Its:_____

Sky Group Grand LLC, a Michigan limited liability company

By:_____

Its:_____

_____
Avinash Rachmale, an individual

_____
Thomas Hardiman, an individual

Toltest, Inc., an Ohio corporation

By:_____

Its:_____

**EXHIBIT A**

**LEGAL DESCRIPTION**

**(See attached)**

1

*(Attached to and becoming a part of Covenant Deed dated: August 12, 2011 between Alliance Leasing & Rental, L.L.C., a Michigan limited liability company by Amicus Management Inc., a Michigan corporation Court Appointed Receiver in Wayne County Circuit Court Case No. 09-005122-CH, as Grantor(s) and Zug Island Investments LLC, a Michigan limited liability company, as Grantee(s).)*

# EXHIBIT A

Land situated in the City of Detroit, County of Wayne, State of Michigan, described as follows:

PARCEL B:
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at a point on the West line of said Lot 4, said point located distant North 40 degrees 15 minutes East along said West line 251.24 feet from the Southwest corner of said Lot 4; thence continuing North 40 degrees 15 minutes East along the Westerly line of said Lots 4, 5, 6, 7, 8, and 9, a distance of 716.95 feet to the Westerly line of Michigan Central Railroad Right-of-Way; thence along said Westerly line the following six courses and distance South 46 degrees 24 minutes East 85.22 feet and on a curve to the right (radius 279.0 feet, long chord bears South 9 degrees 39 minutes 02 seconds East 333.86 feet) a distance of 357.90 feet, and South 27 degrees 05 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet) a distance of 136.09 feet, and on a curve to the right (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and South 27 degrees 05 minutes 56 seconds West 9.31 feet to the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way; thence North 61 degrees 20 minutes 20 seconds West along said North line 297.97 feet; thence North 28 degrees 39 minutes 40 seconds East 147.50 feet; thence North 61 degrees 20 minutes 20 seconds West 194.75 feet to the point of beginning.

EXCEPTING THEREFROM: A parcel of land being a part of Lot 8 and 9 of PLATS OF CICOTTE FARM, Town 3 South, Range 11 East on Private Claim 589, according to the plat thereof as recorded in Liber 1, Pages 222 and 223, Wayne County Records and more particularly described as: Beginning at the intersection of the Easterly line of West Jefferson (66 feet wide) with the Southerly line of the Michigan Central Right-of-Way as described in Warranty Deed dated October 27, 1947 and recorded in Liber 9019 of Wayne County Records at Page 23; thence South 46 degrees 24 minutes East along the Southerly line of the Michigan Central Railroad Right-of-Way 85.20 feet to a point of curve; thence Southeasterly continuing along a line of the Michigan Central Railroad Right-of-Way on a curve to the right 90.26 feet (measured along the arc of said curve, having a radius of 279 feet and a central angle of 18 degrees 32 minutes 10 seconds, the chord of said curve bears South 37 degrees 07 minutes 55 seconds East and has a length of 89.87 feet; thence North 61 degrees 04 minutes West 176.68 feet to the point on the Easterly line of West Jefferson, thence North 40 degrees 15 minutes East 59.31 feet to the point of beginning.

PER ASSESSORS *DDC. 10/20/2011*

Tax Item No. 78-0/Ward 20

PARCEL C-1:
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at the point of intersection of the Easterly line of Michigan Central Railroad Right-of-Way and the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way, said point located distant North 40 degrees 15 minutes East 100.74 feet along the Westerly line of said Lot 4, and South 61 degrees 20 minutes 20 seconds East along said Northerly line, 555.47 feet from the Southwest corner of Lot 4; thence continuing South 61 degrees 20 minutes 20 seconds East along said Northerly line, 1414.84 feet to a point of traverse on the Westerly shore of the Rouge River, said point later referred to as the first mentioned point in said traverse; thence continuing South 61 degrees 20 minutes 20 seconds East 10 feet to said Westerly shore; thence Northerly along the Westerly shore 1250 feet, more or less; thence North 60 degrees 11 minutes 27 seconds West 10 feet to a point, said point located North 47 degrees 01 minutes 34 seconds West 681.22 feet, and North 52 degrees 58 minutes 58 seconds East 297.37 feet, and North 8 degrees 41 minutes 45 seconds West 495.22 feet from the first mentioned point in said traverse; thence continuing North 60 degrees 11 minutes 27 seconds West 179.10 feet; thence South 28 degrees 39 minutes 40 seconds West 68.71 feet; thence North 61 degrees 20 minutes 20 seconds West 519.83 feet to said Easterly line of Michigan Central Railroad Right-of-Way; thence along said Easterly line, the following five courses and distances; on a curve to the right (radius = 311.50 feet, long chord bears South 9 degrees 20 minutes 31 seconds West 190.0 feet) a distance of 193.08 feet, and South 27 degrees 00 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and on a curve to the right (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet), distance of 136.09 feet, and South 27 degrees 05 minutes 5 seconds West 10.20 feet to the point of beginning.
Together with a right of access for vehicular and pedestrian traffic as reserve in a certain Deed from Detroit Sulphite Pulp

and Paper Company to Toledo, Canada Southern and Detroit Railway Company dated July 8, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

EXCEPTING THEREFROM the following described land: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as recorded in Liber 1 of plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (65 feet wide), said point being 60 feet Southerly (measured along the East line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension Westerly of the Southerly line of land conveyed to a Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said Southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence North 28 degrees 34 minutes East, 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge, Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning. Together with a Right of Access for vehicular and pedestrian traffic as reserved in a certain Deed from Detroit Sulphite Pulp and Paper Company to Toledo, Canada Southern and Detroit Railway Company, dated July 7, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

PARCEL C-2: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as recorded in Liber 1 of Plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (66 feet wide), said point being 60 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in a certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension of Westerly of the Southerly line of land conveyed to Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge; Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning.

Tax Item No. 78/Ward 20, as to Parcel C-1 and C-2

Tax Parcel Number: 78/Ward 20, 78-0/Ward 20

Pt of - DOC

PER ASSESSORS 10/20/2011

**EXHIBIT B**

**TRANSFER AGREEMENT**

**(See attached)**

## TRANSFER AGREEMENT

This Transfer Agreement ("Agreement") is made and entered into this __ day of _____, 2013 [date upon which the Board of Commissioners approved the Settlement Agreement, hereinafter referred to as the "Effective Date"], by and between Zug Island Investments, LLC, a Michigan limited liability company ("Transferor"), and the City of Detroit, a Michigan municipal corporation ("City"), acting through and with the authority of its Detroit Water and Sewerage Department and its Board of Water Commissioners[1] (the City and Detroit Water and Sewerage Department, collectively, "Transferee").

Transferor and Transferee are sometimes referred to in this Agreement, individually, as a "Party" and, collectively, as the "Parties". Except as otherwise indicated, capitalized terms in this Agreement shall have the meaning ascribed to them in this Agreement.

### Recitals:

A. Transferor is a limited liability company owned and/or controlled by Avinash Rachmale ("Rachmale").

B. Transferee, Rachmale, and other persons and entities, have entered into a Mutual Settlement and Release Agreement (the "Settlement Agreement"). The Settlement Agreement requires, in partial satisfaction of Rachmale's obligations, the conveyance to Transferee of the real property referenced in this Agreement by Transferor.

C. This Agreement constitutes Exhibit B of the Settlement Agreement.

### Article 1

### Transfer and Consideration

1.1    Transfer.  Subject to the terms and conditions of this Agreement, Transferor shall convey, via covenant deed, and Transferee shall accept, that certain tract or parcels of land situated in the City of Detroit, Wayne County, Michigan, and as more particularly described upon Attachment 1, which consists of the Transferor's Covenant Deed (the "Property").

1.2    Permitted Exceptions.  The Property shall be conveyed subject to the matters deemed to be permitted exceptions pursuant to Section 2.3 hereof (the "Permitted Exceptions").

---

[1] The Board of Water Commissioners and the Detroit Water and Sewerage Department represent that they have the authority to enter into this Transfer Agreement and bind the City of Detroit based on Orders signed by Judge Cox in *United States of America v. City of Detroit, et al.*, Case No. 77-cv-71100 (E.D. Mich.), including but not limited to the Order dated November 4, 2011.

1

1.3  Consideration.  The Property is given as partial consideration for the execution of the Settlement Agreement by Transferee, and, for purposes of the Settlement Agreement and this Agreement, the Transferee has deemed the fair market value of the Property to be $2,500,000 ("Price").  Transferee acknowledges and agrees that notwithstanding the fact that the Property is given by Transferor in settlement of the obligations of all of the Contractor Parties (as such other parties are identified in the Settlement Agreement), nothing herein shall be construed as an admission, acknowledgement or to otherwise suggest or conclude that any other Contactor Party has or has had an interest in or any control of or over the Property or Transferor in any way.

Article 2

Title and Survey

2.1  Commitment for Title Insurance. Within 5 business days after the Effective Date, Transferee will order a title commitment (the "Title Commitment"), which will inure to the benefit of Transferee as the party to be insured and which may contain permitted exceptions, from which will be issued at closing an ALTA (2006) owner's title insurance policy without standard exceptions (the "Title Policy").  The cost of the premium for the Title Policy shall be paid by Transferor.  As a reference, Transferor attached as Attachment 2 hereto its Title Policy dated August 12, 2011 ("Transferor's Title Policy"), which identifies certain exceptions shown on Schedule B-II.

2.2  Survey.  Immediately upon the Effective Date, Transferor shall provide to Transferee any survey within Transferor's possession, provided one exists.  Within 5 business days after the Effective Date, Transferee may order, at its sole cost and expense, an update to the existing survey (if any) or a new survey of the Property (the "New Survey").

2.3  Title Review Period.  Transferee shall have ten (10) business days (the "Review Period") after the later to occur of (i) its receipt of the Title Commitment (including copies of all instruments referenced therein which Transferee shall promptly request) and (ii) its receipt of the New Survey, should one have been obtained, to notify Transferor, in writing, of such objections as Transferee may have to anything contained in the Title Commitment or concerning any matters of survey.  Except as otherwise provided in Exhibit B to Attachment 3 (Covenant Deed), any (x) item or exception contained in Transferor's Title Policy, or (y) any item contained in the Title Commitment or any survey delivered to which Transferee does not object during the Review Period, shall be deemed a Permitted Exception and may be listed as an exception upon the Covenant Deed at Closing.  Transferee shall not be required to object to any mortgage lien, construction lien or other lien or encumbrance, (together, "Encumbrances") which may be discharged by payment of a specified or ascertainable amount of money or posted bond, and any such Encumbrances shall not be or become Permitted Exceptions but shall be discharged by Transferor at or before Closing.  Failure of

Transferee to send written notice of its objections prior to expiration of the Review Period shall be deemed a waiver of its right to object and Transferee shall accept such title as Transferor is able to convey without reduction in the Price. In the event Transferee notifies Transferor of objections to the Title Commitment prior to the expiration of the Review Period, Transferor shall have fifteen (15) business days after receipt of notification of such objections (the "Cure Period") to either (a) fulfill the requirements in the Title Commitment or remedy the title defects set forth in said written objection, or (b) obtain title insurance insuring over any such defect. If the Transferor is unable to furnish satisfactory title within the time specified, the Transferee shall have the option of (1) providing Transferor with additional time as Transferee determines appropriate to enable Transferor to remedy the title defects, (2) waiving its title objections and proceeding to Closing, or (3) terminating this Agreement in writing, in which event Section 1 of the Settlement Agreement shall apply. Notwithstanding the foregoing, Transferee acknowledges and agrees that the Property shall be transferred restricting, and any deed effectuating such transfer shall restrict, the use of the Property to non-residential uses and prohibit the use of groundwater.

## Article 3

### Property Condition

3.1 <u>Transferor's BEA</u>. Pursuant to MCL 324.20116, Transferor hereby notifies Transferee that the Property is a "facility" as that term is defined in MCL 324.20101, and that the general nature and extent of known releases thereon are described in the BEA document provided to Transferee, the receipt of which Transferee hereby acknowledges. Transferor has provided the BEA for Transferee's information only, and to satisfy any obligations it may have under MCL 324.20116 and this Agreement, and Transferor does not warrant the information contained therein. Transferee acknowledges that use of groundwater on the Property is prohibited and the Property is restricted to non-residential uses and any deed conveyed shall reflect such restriction.

3.2 <u>Transferee's BEA</u>. Transferee shall, within the statutorily prescribed time period, have its environmental consultant prepare a BEA report for each parcel of the Property found to be a "facility". Transferee shall disclose the BEA(s) to the State of Michigan in accordance with MCL 324.20126 and MAR 299.5901 et seq. Transferee shall provide BEA documents to Transferor and its counsel for approval prior to submission to the State of Michigan. Transferor and its counsel shall promptly provide any comments to Transferee and shall not unreasonably withhold such approvals. Transferee also agrees to comply with MCL 324.20107a.

The purpose for conducting a BEA is to provide Transferee with all of the protections offered by Part 201 in its capacity as a purchaser of a "facility". Except as specifically set forth herein, nothing in this Agreement shall be read to diminish or limit the protections offered to the Transferee by state, federal or local laws, including, but not limited to, MCL § 324.20126(2), so called "innocent landowner" provisions, so called "bona fide purchaser" provisions, and those provided in any subsequent

amendments to the Michigan act, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 USC §§ 9601 et seq., or similar state, local or federal environmental law. "Hazardous Material" or "Hazardous Materials" means any chemical, pollutant, contaminant, pesticide, petroleum or petroleum product or by product, radioactive substance, solid waste (hazardous or extremely hazardous), special, dangerous or toxic waste, substance, chemical or material regulated, listed, limited or prohibited under any Environmental Law, including without limitation: (i) asbestos, asbestos-containing material, presumed asbestos-containing material, polychlorinated biphenyls ("PCBs"), solvents and waste oil; (ii) any "hazardous substance" as defined under CERCLA; and (iii) any "hazardous waste" as defined under RCRA.

3.3    Environmental Inspection Period.

(a) Transferee shall have sixty (60) calendar days following the Effective Date (such period is referred to as the "Environmental Inspection Period") to inspect or cause to be inspected the environmental condition of the Property, and Transferor shall allow reasonable access to the Property to Transferee and Transferee's consultants and agents at all reasonable times during the Inspection Period for such purpose. Such inspection may include such testing as is reasonably required to determine the environmental condition of the Property by an environmental engineer or other similar expert, including environmental and geotechnical testing and soil borings. Transferee and its consultant's and agents shall be solely responsible for any disturbance, damage or exacerbation caused by its investigations and shall return the Property to the condition existing prior to such investigation. Prior to commencing any physically intrusive testing, Transferee and/or its agents or consultants shall provide proof of insurance, reasonably satisfactory to Transferor, covering Transferee's obligations herein, including but not limited to Contractor's Pollution Liability Coverage.

(b) In the event that, after conducting the inspections referred to above, Transferee's investigations reveal the presence of Hazardous Materials on or about the Property the presence of which were not reasonably disclosed in Transferor's BEA or other environmental reports disclosed to Transferee which would preclude Transferee's, or its assigns, industrial use of the Property, Transferee shall so notify Transferor in writing, which notice (the "Notice of Environmental Objection") must be given on or before expiration of the Environmental Inspection Period. In the event the Transferee fails to timely give such Notice of Environmental Objection for any reason or no reason, the Parties shall proceed to Closing in accordance with the terms hereof, subject to the contingencies described herein. If the Transferee provides, during the Environmental Inspection Period, (i) a Notice of Environmental Objection and (ii) written notice that it wishes to terminate the Agreement due to the environmental condition disclosed in the Notice of Environmental Objection (a "Termination Notice"), this Agreement shall terminate and become null and void, and Transferee shall be relieved of any and all liability hereunder, except for any liability arising under Section 3.3(a) hereof.

3.4    Property to be Acquired "AS IS".    Except as otherwise described in Section 3.1 above, in the representations and warranties provided in Section 5 and in the Deed to be provided to Transferee, at Closing, Transferee shall accept the Property in its "AS IS" condition, with all faults, including, but not limited to, existing environmental soil and water contamination. Except as otherwise set forth herein, Transferor is making no representations or warranties, whether express or implied, by operation of law or otherwise, with respect to the quality, physical condition or value of the Property, or the compliance of the Property with applicable building or fire codes, local, state or federal environmental laws and regulations, or other laws or regulations. Transferor makes no warranty of habitability, suitability, merchantability or fitness for a particular purpose. Transferor is not liable or bound by any guarantees, promises, statements, representations or information pertaining to the Property made or furnished by any financial advisor, real estate agent, broker, employee, servant or other person representing or purporting to represent Transferor, except as and to the extent expressly set forth herein. Transferee shall assume responsibility for all costs and expenses required to cause the property to comply with all applicable building and fire codes, municipal ordinances and other laws, rules and regulations (including, without limitation, the ADA and any codes, municipal ordinances, laws, rules or regulations).

EXCEPT AS OTHERWISE PROVIDED HEREIN, TRANSFEREE ACKNOWLEDGES AND AGREES THAT TRANSFEROR HAS MADE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER WITH RESPECT TO THE ENVIRONMENTAL CONDITION OF THE PROPERTY AND ANY INFORMATION PROVIDED BY OR ON BEHALF OF TRANSFEROR WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT TRANSFEROR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. TRANSFEROR IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON EXCEPT FOR TRANSFEROR'S REPRESENTATIONS IN SECTION 5.1 HEREOF. TRANSFEREE FURTHER ACKNOWLEDGES AND AGREES THAT TRANSFEREE IS A SOPHISTICATED AND EXPERIENCED TRANSFEREE OF PROPERTIES SUCH AS THE PROPERTY AND HAS BEEN DULY REPRESENTED BY COUNSEL IN CONNECTION WITH THE NEGOTIATION OF THIS AGREEMENT. EXCEPT AS SET FORTH IN THIS AGREEMENT, TRANSFEROR HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE ANY OF THE PROPERTY. TRANSFEREE ALSO ACKNOWLEDGES THAT THE VALUE IT HAS ASSIGNED TO THE PROPERTY REFLECTS AND TAKES INTO ACCOUNT THAT THE PROPERTY IS BEING SOLD "AS-IS, WHERE-IS."

TRANSFEREE ACKNOWLEDGES AND AGREES THAT IT IS AWARE OF THE GENERAL NATURE AND EXTENT OF CONTAMINATION ON AND ABOUT THE PROPERTY AND WILL RELY SOLELY UPON ITS OWN INVESTIGATIONS OF SAME, AND NOT ON ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF

OF TRANSFEROR OR ITS EMPLOYEES OR AGENTS WITH RESPECT THERETO. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, UPON CLOSING, TO THE EXTENT PERMITTED BY LAW, TRANSFEREE SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY TRANSFEREE'S INVESTIGATIONS. AND, EXCEPT AS SET FORTH IN THIS AGREEMENT, TRANSFEREE, UPON CLOSING, SHALL BE DEEMED TO HAVE AND HEREBY DOES WAIVE, RELINQUISH AND RELEASE TRANSFEROR AND THE CONTRACTOR RELEASEES AS DEFINED IN THE SETTLEMENT AGREEMENT   A FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR PURSUANT TO ENVIRONMENTAL STATUTES), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH TRANSFEREE MIGHT HAVE ASSERTED OR ALLEGED AGAINST TRANSFEROR AND/OR ANY OF THE CONTRACTOR RELEASEES AS DEFINED IN THE SETTLEMENT AGREEMENT AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PROPERTY OCCURRING DURING OR RELATING TO ANY AND ALL PERIODS OCCURRING ON AND/OR PRIOR TO THE CLOSING DATE, INCLUDING BUT NOT LIMITED TO ANY CLAIMS WHICH MAY ARISE ON ACCOUNT OF OR IN ANY WAY BE CONNECTED WITH ANY PRE-EXISTING CONTAMINATION OR HAZARDOUS MATERIAL EXISTING ON, AT OR ABOUT THE PROPERTY ON OR PRIOR TO THE CLOSING DATE.

NOTWITHSTANDING THE FOREGOING NOTHING HEREIN SHALL BE DEEMED TO RELEASE TRANSFEROR OR CONTRACTOR RELEASEES AS DEFINED IN THE SETTLEMENT AGREEMENT FOR ANY LIABILITY THEY MAY HAVE, IF ANY, TO THIRD PARTIES FOR CLAIMS BROUGHT BY SUCH THIRD PARTIES AGAINST TRANSFEROR OR CONTRACTOR RELEASEES AS DEFINED IN THE SETTLEMENT AGREEMENT AND ARISING OUT OF THE ACTS OR OMISSIONS OF TRANSFEROR OR CONTRACTOR RELEASEES AS DEFINED IN THE SETTLEMENT AGREEMENT WHILE IN POSSESSION OF THE PROPERTY.

The provisions of this Section 3.4 shall survive Closing and the delivery of the deed or any expiration or termination of this Agreement without limitation as to time, except for the time periods expressly delineated herein or therein.

Article 4

Closing

4.1    Time and Place. The conveyance of title and closing (the "Closing") shall be held on a mutually agreeable date, but no later than 10 business days after the last to occur of (a) the expiration of the Cure Period referenced in Section 2.3 of this Agreement and (b) the expiration of the Environmental Inspection Period referenced in Section 3.3(a) of this Agreement.

4.2    Closing Instruments and Representations. At Closing:

(a)    Transferor shall deliver to Transferee (1) a Covenant Deed (the "Deed") executed and acknowledged by Transferor in the form attached as Attachment 3, conveying the Property to Transferee and (2) a Certificate of Non-Foreign Status executed by Transferor in the form attached as Attachment 4;

(b)    Transferor represents that it will be liable for any transfer fees, taxes and costs associated with the transfer of the Property; and

(c)    Transferor shall deliver to Transferee an Owner's Affidavit in such form as is acceptable to the Title Company, indicating that, without limitation, (i) that Transferor is the owner of the Property and no bankruptcy or insolvency proceedings are pending with respect to the Transferor or the Property, (ii) that Transferor is in possession of the Property and there are no other parties in possession or claiming a right to possession of the Property, (iii) that Transferor has no knowledge of any unrecorded easements or other unrecorded interests in the Property, (iv) that no work has been performed on the Property during the preceding 90 days for which a construction lien may attach or that Transferor has been able to bond off and (v) that no proceedings are pending which might result in a lien or special assessment on the Property.

4.3    Payments by Transferor.  Transferor shall pay all (i) real estate taxes, calculated on a due date basis  (ii) water and sewer charges, (iii) costs of utilities; and (iv) current installments of real estate special assessments, if any, that relate to the Property, up to, but not including, the Closing date.  If Transferor has paid any real estate taxes encompassing a period that includes or extends beyond the Closing date, Transferee shall pay to Transferor at Closing the applicable prorated amount.

4.4    Closing Costs. The Parties shall share equally any escrow or other charges required by the Title Company. Transferee shall pay all recording fees. The Parties shall bear their own attorney fees resulting from this transaction.

Article 5

Representations, Warranties and Covenants

5.1    Transferor's Representations and Warranties.  Transferor makes the following representations and warranties, and acknowledges that Transferee shall rely on such representations and warranties in acquiring the Property, each of which shall survive the Closing for a period of 1 year.

(a) Transferor has not entered into any lease or other agreement for possession with any person or entity (except Transferee) pursuant to which such person or entity has any current or future right or interest to occupy, possess or use all or any portion of the Property.

(b) Transferor has not received any written notice sent by any governmental authority or agency having jurisdiction over the Property that the Property or its use is in material violation of any law, ordinance or regulation (including, without limitation, any environmental law, ordinance or regulation).

(c) Transferor is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

(d) The Property is not subject to any pending litigation, and to Transferor's knowledge no such litigation has been threatened.

5.2     Pre-Closing Transferor Covenants. So long as this Agreement remains in full force and effect:

(a) Without the prior written consent of Transferee, which shall not be unreasonably withheld or delayed, Transferor shall not convey any interest in the Property (including any leasehold interest) and shall not subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters after the date of this Agreement.

(b) Transferor shall not make any material alterations to the Property without Transferee's consent, which shall not be unreasonably withheld or delayed.

(c) Transferor shall maintain the Property in substantially the same condition as of the Effective Date, ordinary wear and tear excepted.

5.3     Joint Representations and Warranties. In addition to any other express agreements of the Parties contained herein, the following constitute representations and warranties of the Parties each to the other:

(a) Each Party has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate this transaction.

(b) All requisite action (corporate, trust, partnership or otherwise) has been taken by each party in connection with the entering into of this Agreement, the instruments referenced herein, and the consummation of this transaction. No further consent of any partner, shareholder, creditor, investor, judicial or administrative body, governmental authority or other party is required in connection with entering into this Agreement.

(c) The individuals executing this Agreement and the instruments referenced herein on behalf of each party and the partners, officers or trustees of each party, if any, have the legal power, right, and actual authority to bind each party to the terms and conditions of those documents.

## Article 6

## Miscellaneous Provisions

6.1 <u>Assignment</u>. Transferor may not assign its rights, duties and obligations under this Agreement without the prior written consent of Transferee, which consent may be given or withheld in the sole discretion of Transferee. Transferee may not assign its rights, duties and obligations under this Agreement without the prior written consent of Transferor, which consent shall not be unreasonably withheld by Transferor.

6.2 <u>Notices</u>. All notices and communications required under this Agreement shall be in writing and delivered or sent by:

(a) hand delivery;

(b) registered or certified mail (return receipt requested) with postage prepaid; or

(c) a nationally recognized overnight delivery service (receipt requested);

to the addresses set forth below, or to such other address as a Party may designate in writing to the other Party:

| | |
|---|---|
| <u>If to Transferor</u>: | Avinash Rachmale<br>7310 Woodward Ave., Suite 500<br>Detroit, Michigan 48202 |
| <u>With copies to</u>: | Hertz Schram PC<br>1760 S. Telegraph Rd., Ste. 300<br>Bloomfield Hills, MI 48302-0183<br>Attn: Robert P. Geller, Esq. |
| | Lakeshore TolTest Corporation<br>7310 Woodward Ave., Ste. 500<br>Detroit, MI 48202<br>Attn: Andrew Haliw III, Esq. |
| <u>If to Transferee</u>: | Detroit Water and Sewerage Department<br>735 Randolph Street, Room 701<br>Detroit, MI 48226<br>Attn: William Wolfson, Esq. |
| <u>With copies to</u>: | Miller, Canfield, Paddock and Stone, P.L.C.<br>150 West Jefferson, Suite 2500<br>Detroit, MI 48226<br>Attn: Jerome Watson, Esq. |

9

Any such notice or communication shall be deemed to have been given when:

(x)     delivered (if hand-delivered or sent by overnight delivery service); or

(y)     if mailed registered or certified mail (return receipt requested), on the next business day after the day on which the written receipt of such mail is signed.

6.3    Modifications. This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it, in whole or in part, unless such executory agreement is in writing and is signed by each Party.

6.4    Calculation of Time Periods. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday nor legal holiday.

6.5    Successors and Assigns. The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.

6.6    Entire Agreement. This Agreement, including any exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior agreements and understandings between the parties pertaining to such subject matter.

6.7    Counterparts. This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement.

6.8    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

6.9    Captions. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any section or any subsection hereof.

6.10   Specific Performance. In the event that the Closing does not occur in the time and manner provided by this Agreement by reason of any default by Transferor, Transferee shall be entitled to specific performance of the terms of this Agreement.

6.11   Possession of Property. Transferor shall deliver possession of the Property, free from the rights of any occupants, to Transferee immediately upon the Closing.

6.12   Governing Law; Venue. The Parties agree that this Agreement shall be governed by, interpreted under, and construed and enforced in accordance with the

laws of the State of Michigan. The Parties agree that the United States District Court for the Eastern District of Michigan, Southern Division, shall be the only court that has jurisdiction over this Agreement and that any disputes arising out of or related in any manner to this Agreement shall be brought only in such court; provided, however, that in the event that jurisdiction does not lie in the United States District Court for the Eastern District of Michigan, Southern Division, the Parties agree that any dispute arising out of related in any manner to this Agreement shall be brought in the Wayne County Circuit Court.

Remainder of page intentionally left blank

[Signature Page to Transfer Agreement]

TRANSFEROR:

Date: _____, 2013          By: _____

                                  Its: _____


TRANSFEREE:

Date: _____, 2013          By: _Sue M Cormick_____

                                  Its: _____

**ATTACHMENT 1**

**COVENANT DEED RECEIVED BY TRANSFEROR**

**(See attached)**

1

Bernard J. Youngblood
Wayne County Register of Deeds
October 24, 2011 12:07 PM
Liber 49430 Page 1063-1068
#2011371557  DO  FEE: $30.00

**P.A. 327 OF 1968
AFFIDAVIT FILED**

METROPOLIT

# COVENANT DEED

(Platted/Condominium)

| | | |
|---|---|---|
| **Drafted By:**<br>Daniel J. Yeomans, President<br>Amicus Managment Inc.<br>555 Cascade West Parkway<br>Grand Rapids, MI 49546 | **Return To:**<br>Zug Island Investments LLC<br>c/o Lakeshore Toltest Corporation,<br>7310 Woodward Ave, Fifth Floor<br>Detroit, MI 48202 | **Send Tax Bills To:**<br>Zug Island Investments LLC<br>c/o Lakeshore Toltest Corporation,<br>7310 Woodward Ave, Fifth Floor<br>Detroit, MI 48202 |

| | | |
|---|---|---|
| Recording Fee: $<br>File Number: 477166 | State Transfer Tax: $<br>County Transfer Tax: $ | Tax Parcel No.: 78/Ward 20, 78-<br>0/Ward 20 |

*THIS CONVEYANCE* is made this August 12, 2011, *BETWEEN*
**Alliance Leasing & Rental, L.L.C., a Michigan limited liability company by Amicus Management Inc., a Michigan corporation Court Appointed Receiver in Wayne County Circuit Court Case No. 09-005122-CH** whose address is 555 Cascade West Parkway, Grand Rapids, MI 49546, Grantor, and
**Zug Island Investments LLC, e Michigan limited liability company**
whose address is c/o Lakeshore Toltest Corporation, 7310 Woodward Ave, Fifth Floor, Detroit, MI 48202, Grantee

The Grantor, for and in consideration of the sum of

**Real Estate Transfer Valuation Affidavit Filed Herewith**

said sum having been paid by the Grantee, the receipt whereof is hereby confessed and acknowledged, all right title and interest in a certain parcel of land known and described as follows as situated in the City of **Detroit**, County of **Wayne**, State of Michigan, to wit:

(SEE ATTACHED EXHIBIT A)

More commonly known as: **9121 and 9125 West Jefferson, Detroit, MI 48209 Together with those items as set forth on the attached Exhibit B.**

**Subject To:**
Existing building and use restrictions, easements of record, and zoning ordinances, if any.

This is to certify that there are not tax items or trees in this property and that taxes are paid for FIVE YEARS previous to date of this instrument EXCEPT
No. __9875__ _____ Date __10-24-11__
WAYNE COUNTY TREASURER    Clerk _____



**First American Title Insurance Company**

*Together* with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder or remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim or demand whatsoever, of the Grantor, either in Law or Equity, of, in, and to the above bargained premises, with the said hereditaments and appurtenances; to have and to hold the premises as before described, with the appurtenances, unto the Grantee, their heirs and assigns, forever.

And the Grantor, for itself, its successors and assigns, does covenant, grant, bargain and agree to and with the Grantee, their heirs and assigns, that the Grantor, has not heretofore done, committed or wittingly or willingly suffered to be done or committed any act, matter, or thing whatsoever, whereby the premises hereby granted, or any part thereof, is, or shall or may be charged or encumbered in title, estate or otherwise howsoever.

Dated this August 12, 2011.

*(Attached to and becoming a part of Covenant Deed dated: August 12, 2011 between Alliance Leasing & Rental, L.L.C., a Michigan limited liability company by Amicus Management Inc., a Michigan corporation Court Appointed Receiver in Wayne County Circuit Court Case No. 09-005122-CH, as Grantor(s) and Zug Island Investments LLC, a Michigan limited liability company, as Grantee(s).)*

**Seller(s):**

Alliance Leasing & Rental, L.L.C., a Michigan
limited liability company by Amicus
Management Inc., a Michigan corporation
Court Appointed Receiver in Wayne County
Circuit Court Case No. 09-005122-CH

By: Daniel J. Yeomans, President

State of Michigan
County of Kent

The foregoing instrument was acknowledged before me
this August 12, 2011 by Daniel J.
Yeomans, President of Amicus Management Inc., a
Michigan corporation Court Appointed Receiver in Wayne
County Circuit Court Case No. 09-005122-CH for Alliance
Leasing & Rental, L.L.C., a Michigan limited liability
company by.

Notary Public: Gary L. Wadsworth
Notary County/State: Kent / MI
County Acting In: Kent
Commission Expires: September 6, 2011

# EXHIBIT A

Land situated in the City of Detroit, County of Wayne, State of Michigan, described as follows:

PARCEL 8:
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at a point on the West line of said Lot 4, said point located distant North 40 degrees 15 minutes East along said West line 251.24 feet from the Southwest corner of said Lot 4; thence continuing North 40 degrees 15 minutes East along the Westerly line of said Lots 4, 5, 6, 7, 8, and 9, a distance of 716.95 feet to the Westerly line of Michigan Central Railroad Right-of-Way; thence along said Westerly line the following six courses and distance South 46 degrees 24 minutes East 85.22 feet and on a curve to the right (radius 279.0 feet, long chord bears South 9 degrees 39 minutes 02 seconds East 333.86 feet) a distance of 357.90 feet, and South 27 degrees 05 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet) a distance of 136.09 feet, and on a curve to the right (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and South 27 degrees 05 minutes 56 seconds West 9.31 feet to the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way; thence North 61 degrees 20 minutes 20 seconds West along said North line 297.97 feet; thence North 28 degrees 39 minutes 40 seconds East 147.50 feet; thence North 61 degrees 20 minutes 20 seconds West 194.75 feet to the point of beginning.

EXCEPTING THEREFROM: A parcel of land being a part of Lot 8 and 9 of PLATS OF CICOTTE FARM, Town 3 South, Range 11 East on Private Claim 589, according to the plat thereof as recorded in Liber 1, Pages 222 and 223, Wayne County Records and more particularly described as: Beginning at the intersection of the Easterly line of West Jefferson (66 feet wide) with the Southerly line of the Michigan Central Railroad Right-of-Way as described in Warranty Deed dated October 27, 1947 and recorded in Liber 9019 of Wayne County Records at Page 23; thence South 46 degrees 24 minutes East along the Southerly line of the Michigan Central Railroad Right-of-Way 85.20 feet to a point of curve; thence Southeasterly continuing along a line of the Michigan Central Railroad Right-of-Way on a curve to the right 90.26 feet (measured along the arc of said curve, having a radius of 279 feet and a central angle of 18 degrees 32 minutes 10 seconds, the chord of said curve bears South 37 degrees 07 minutes 55 seconds East and has a length of 89.87 feet; thence North 61 degrees 04 minutes West 176.68 feet to the point on the Easterly line of West Jefferson, thence North 40 degrees 15 minutes East 59.31 feet to the point of beginning.

PER ASSESSORS *DDC. 10/20/2011*

Tax Item No. 78-0/Ward 20

PARCEL C-1:
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at the point of intersection of the Easterly line of Michigan Central Railroad Right-of-Way and the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way, said point located distant North 40 degrees 15 minutes East 100.74 feet along the Westerly line of said Lot 4, and South 61 degrees 20 minutes 20 seconds East along said Northerly line, 555.47 feet from the Southwest corner of said Lot 4; thence continuing South 61 degrees 20 minutes 20 seconds East along said Northerly line, 1414.84 feet to a point of traverse on the Westerly shore of the Rouge River, said point later referred to as the first mentioned point in said traverse; thence continuing South 61 degrees 20 minutes 20 seconds East 10 feet to said Westerly shore; thence Northerly along the Westerly shore 1250 feet, more or less; thence North 60 degrees 11 minutes 27 seconds West 10 feet to a point, said point located North 47 degrees 01 minutes 34 seconds West 681.22 feet, and North 52 degrees 58 minutes 58 seconds East 297.37 feet, and North 8 degrees 41 minutes 45 seconds West 495.22 feet from the first mentioned point in said traverse; thence continuing North 60 degrees 11 minutes 27 seconds West 179.10 feet; thence South 28 degrees 39 minutes 40 seconds West 68.71 feet; thence North 61 degrees 20 minutes 20 seconds West 519.83 feet to said Easterly line of Michigan Central Railroad Right-of-Way; thence along said Easterly line, the following five courses and distances; on a curve to the right (radius = 311.50 feet, long chord bears South 9 degrees 20 minutes 31 seconds West 190.0 feet) a distance of 193.08 feet, and South 27 degrees 00 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and on a curve to the right (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet), distance of 136.09 feet, and South 27 degrees 05 minutes 5 seconds West 10.20 feet to the point of beginning.
Together with a right of access for vehicular and pedestrian traffic as reserve in a certain Deed from Detroit Sulphite Pulp

and Paper Company to Toledo, Canada Southern and Detroit Railway Company dated July 8, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

EXCEPTING THEREFROM the following described land: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as recorded in Liber 1 of plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (65 feet wide), said point being 60 feet Southerly (measured along the East line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension Westerly of the Southerly line of land conveyed to a Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said Southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes West 3 feet; thence North 28 degrees 34 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge, Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning. Together with a Right of Access for vehicular and pedestrian traffic as reserved in a certain Deed from Detroit Sulphite Pulp and Paper Company to Toledo, Canada Southern and Detroit Railway Company, dated July 7, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

PARCEL C-2: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as record in Liber 1 of Plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (66 feet wide), said point being 60 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in a certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension of Westerly of the Southerly line of land conveyed to Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes West 3 feet; thence North 28 degrees 34 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge; Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning.

Tax Item No. 78/Ward 20, as to Parcel C-1 and C-2

Tax Parcel Number: 78/Ward 20, 78-0/Ward 20

Pt of DDC

PER ASSESSORS 10/20/2011

## EXHIBIT B

(a) All rights of Grantor in and to all air, mineral and riparian rights, and all tenements, hereditaments, privileges and appurtenances belong or in any way appertaining thereto;

(b) All recorded easements benefiting the Property, but only to the extent of Grantor's interest, if any, therein;

(c) All improvements; and

(d) All of Grantor's interest in tax abatements or any existing or future tax appeals.

**ATTACHMENT 2**

**TITLE POLICY DATED AUGUST 12, 2011**

**(See attached)**

2

Policy or Policies issued pursuant to this commitment are underwritten by:

# First American Title Insurance Company

## SCHEDULE A

~~Commitment No.~~ Policy No.: 477166
2212    Gary Wadsworth

Revision D  Date Printed: August 11, 2011

1. ~~Commitment Date: July 08, 2011 @ 8:00 AM~~ 8-12-2011 OR DATE OF RECORDING WHICHEVER IS LATER

2. Policy or Policies to be issued:    Policy Amount
   (a) ALTA Owners Policy (6-17-06)

   ~~Proposed Insured:~~
   Zug Island Investments LLC, a Michigan limited liability company

   Policy or Policies to be issued:    Policy Amount
   (b) ALTA Loan Policy (6-17-06)

   Proposed Insured:

3. The Fee Simple interest in the land described in this Commitment is owned, at the Commitment Date, by:
   ~~Alliance Leasing & Rental, L.L.C., a Michigan limited liability company~~

4. The land referred to in this Commitment, situated in the County of Wayne, City of Detroit, State of Michigan, is described as follows:

(SEE EXHIBIT A LEGAL DESCRIPTION)

9121 and 9125 West Jefferson Detroit MI 48209



Issued By:  First American Title Insurance Company
For questions regarding this commitment contact;
(616)975-4102 or fax to (866)416-9827
5730 Eagle Drive Southeast
Grand Rapids, MI 49512

First American Title Insurance Company
5730 Eagle Drive Southeast
Grand Rapids, MI 49512

# Schedule B – Section I
## REQUIREMENTS

Commitment No.: 477166

*General Requirements*

The following requirements must be met:

(a) Payment of the full consideration to, or for the account of, the grantors or mortgagors should be made.
(b) Payment of all taxes, charges, assessments, levied and assessed against subject premises, which are due and payable should be made.
(c) Pay us the premiums, fees and charges for the policy.
(d) You must tell us in writing the name of anyone not referred to in this Commitment who will receive an interest in the land or who will make a loan on the land. We may make additional requirements or exceptions.
(e) Submit completed Owner's Estoppel/Affidavit/ALTA Statement on the form provided by this company and signed by or on behalf of all owners.

*Specific Requirements*

Documents satisfactory to us creating the interest in the land and/or mortgage to be insured must be signed, delivered and recorded:

1. OMIT.

2. OMIT.

3. OMIT.

4. DISCHARGE(S) OF THE MORTGAGE(S) EXCEPTED ON SCHEDULE B - SECTION II. IN THE EVENT ANY LIEN TO BE PAID, SATISFIED AND RELEASED OF RECORD IS AN EQUITY LINE OR FUTURE ADVANCE MORTGAGE, WE REQUIRE A WRITTEN PAYOFF REQUEST AUTHORIZED AND SIGNED BY THE MORTGAGOR TO THE LENDER REQUESTING THE PAYOFF AMOUNT AND INSTRUCTING THE LENDER, UPON RECEIPT OF THE REQUEST, TO FREEZE THE ACCOUNT, MAKE NO FURTHER ADVANCES AND TO RECORD A DISCHARGE OF MORTGAGE UPON RECEIPT OF PAYOFF FUNDS.
PRIOR TO OR AT CLOSING, SUBMIT AN AFFIDAVIT BY SELLER ATTESTING THAT SELLER HAS MADE NO WITHDRAWALS BY CHECK, DRAFT, ELECTRONIC TRANSFER OR OTHERWISE THAT WOULD INCREASE THE BALANCE DUE SINCE THE PROVISION OF A PAYOFF AMOUNT FOR THE ACCOUNT.

5. DISCHARGE(S) OF THE ASSIGNMENT(S) OF RENTS EXCEPTED ON SCHEDULE B - SECTION II.

6. DISCHARGE(S) OF THE FINANCING STATEMENT(S) EXCEPTED ON SCHEDULE B - SECTION II.

7. RELEASE OF LIS PENDENS, RECORDED IN LIBER 47757, PAGE 105, AND SUBMIT SATISFACTORY EVIDENCE THAT THE LAND TO BE INSURED IS NO LONGER THE SUBJECT OF PENDING LITIGATION.

8. OMIT.

9. OMIT.

10. OMIT.

11. OMIT.

12. COVENANT DEED FROM AMICUS MANAGEMENT, INC., A MICHIGAN CORPORATION, COURT APPOINTED RECEIVER ON BEHALF OF ALLIANCE LEASING & RENTAL, L.L.C., A MICHIGAN LIMITED LIABILITY COMPANY TO ZUG ISLAND INVESTMENTS LLC, A MICHIGAN LIMITED LIABILITY COMPANY.

13. RELEASE(S) OF LIENS(S) RECORDED IN LIBER 48974, PAGE 7, OR IT/THEY SHALL APPEAR ON THE FINAL POLICY.

2

14. ORDER APPOINTING RECEIVER PURSUANT TO WAYNE COUNTY CIRCUIT COURT CASE NO. 09-005122-CH.

15. ORDER AUTHORIZING RECEIVER TO SELL PROPERTY PURSUANT TO WAYNE COUNTY CIRCUIT COURT CASE NO. 09-005122-CH.

16. ORDER APPROVING SALE PURSUANT TO WAYNE COUNTY CIRCUIT COURT CASE NO. 09-005122-CH, PURSUANT TO MCL 507.1124.

3

First American Title Insurance Company
5730 Eagle Drive Southeast
Grand Rapids, MI 49512

# Schedule B – Section II
# EXCEPTIONS

Commitment No.:  477166

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

Defects, liens encumbrances adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the Proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

## Part One: General Exceptions
Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction:

1. Rights or claims of parties in possession not shown by the public records.
2. Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises.
3. Easements, or claims of easements, not shown by the public records.
4. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown on the public records.
5. Taxes or special assessments which are not shown as existing liens by the public records.

## Part Two: Specific Exceptions

1. Interest of Amicus Management, Inc., as court appointed receiver, subject to Order Granting Plaintiff's Motion for Appointment of Receiver, being Case No. 09-005122-CH, recorded in Liber 47964, page 1266.

2. Future Advance Mortgage in the original amount of $1,300,000.00 executed by Alliance Leasing & Rental, L.L.C., a Michigan limited liability company to Fifth Third Bank, dated December 28, 2005, recorded January 20, 2006, in Liber 44194, page 779, which mortgage was amended on February 14, 2006, by Instrument recorded June 14, 2006, in Liber 44828, page 148 and in First Amendment to Mortgage dated September 25, 2007, recorded October 17, 2007, in Liber 46741, page 276.

   **This Mortgage states that it secures an Equity Line/Revolving Line of Credit. If this loan is to be paid off in this transaction then proper steps should be taken to ensure that the company will be provided with a Full Satisfaction or Full Reconveyance for recording after payoff.**

3. Assignment of Rents from Alliance Leasing & Rental, L.L.C., a Michigan limited liability company to Fifth Third Bank, dated December 28, 2005, recorded January 20, 2006, in Liber 44194, page 795 and First Amendment to Assignment of Rents dated September 25, 2007, recorded October 17, 2007, in Liber 46741, page 269.

4. Financing Statement between Alliance Leasing & Rental, L.L.C., a Michigan Limited Liability Company, Debtor(s), and Fifth Third Bank, Secured Party, recorded January 20, 2006, in Liber 44194, page 805. Continuation of Financing Statement, recorded January 4, 2011 in Liber 48922, page 1183.

5. Mortgage in the original amount of $321,350.24 executed by Alliance Leasing & Rental, LLC to Kent Commerce Bank, dated January 26, 2007, recorded January 31, 2007, in Liber 45924, page 701.

6. Future Advance Mortgage executed by Alliance Leasing & Rental, L.L.C., a Michigan limited liability company to Comerica Bank, dated May 7, 2008, recorded May 12, 2008, in Liber 47224, page 520.

   **This Mortgage states that it secures an Equity Line/Revolving Line of Credit. If this loan is to be paid off in this transaction then proper steps should be taken to ensure that the company will be provided with a Full Satisfaction or Full Reconveyance for recording after payoff.**

4

7.   Notice of Lis Pendens dated March 9, 2009, recorded March 13, 2009, in Liber 47757, page 105, Fifth Third Bank (Western Michigan), a Michigan banking corporation, Plaintiff, vs. Alliance Leasing & Rental, LLC, a Michigan limited liability company, et. al., Defendant, Case No. 09-005122-CH, Wayne County Circuit Court.

8.   Terms and Conditions contained in Deed as disclosed by instrument recorded in Liber 676, page 84.

9.   Easement in favor of Michigan Consolidated Gas Company, a Michigan corporation and the Covenants, Conditions and Restrictions contained in Instrument recorded in Liber 26718, page 358.

10.  Environmental Access Easement in favor of Fifth Third Bank, a Michigan banking corporation and the Covenants, Conditions and Restrictions contained in Instrument recorded in Liber 44194, page 812.

11.  Terms and Conditions contained in Zoning Letter as disclosed by instrument recorded in Liber 44691, page 413.

12.  Rights of the railroad company servicing the railroad siding located on insured premises in and to the ties, rails and other properties constituting the railroad siding or in and to the use thereof, and also rights of others thereto entitled in and to the use thereof.

13.  Rights of the United States, State of Michigan and the public for commerce, navigation, recreation and fishery, in any portion of the land comprising the bed of Rouge River, or land created by fill or artificial accretion.

14.  The nature, extent or lack of riparian rights or the riparian rights of riparian owners and the public in and to the use of the waters of Rouge River.

15.  Rights of tenants, if any, under any unrecorded leases.

16.  Lien for outstanding water or sewer charges, if any.

17.  Omit.

18.  Omit.

19.  Notice of Judgment Lien in the amount of $507,648.89, plus costs and interest, against Trails End Club, LLC, MRS Development, Alliance Leasing & Rentals, LLC, James R. Rosendall and Carol Rosendall, in favor of Comerica Bank as evidenced by Case No. 10-01708-CK recorded February 7, 2011 in Liber 48974, page 7 in the Office of the Wayne County Court Clerk.

     Right of any interested party, by appeal or other direct proceeding, to have set aside, modified, or reversed, within the time allowed by law, the judgment or decree entered on July 8, 2011 in Case No. 09-005122-CH, in the Wayne County Circuit Court Court of Wayne County, Michigan.

21.  Claim of Lien in the amount of $260,468.80 from Systematic Recycling, LLC, against property commonly known as 9121 and 9125 W. Jefferson recorded July 22, 2011 in Liber 49287, page 613.

22.  All Taxes paid to and including 2009
     2010 Summer Taxes DUE
     2010 Winter Taxes DUE in the amount of $1,073.39
     2011 Summer Taxes DUE in the amount of $9,924.40
     Tax Item No. 78-0/Ward 20, as to Parcel B

23.  All Taxes paid to and including 2009
     2010 Summer Taxes DUE
     2010 Winter Taxes DUE in the amount of $7,768.91
     2011 Summer Taxes DUE in the amount of $71,286.29
     Tax Item No. 78/Ward 20, as to Parcel C2

     *TAXES PAID CURRENT AT CLOSE*

     NOTE: .On the above tax amount(s), there may also be due an amount for interest, penalty and collection fee.

     NOTE: If subject property is connected to public/community water or sewer, furnish a copy of the current bill to First American Title Insurance Company showing that all charges have been paid to date or the Policy to be issued will include an exception on Schedule B for water and sewer charges which became a lien prior to the date of the Policy.

5

# EXHIBIT A
## LEGAL DESCRIPTION

File No.: 477166

The land referred to in this Commitment, situated in the County of Wayne, City of Detroit, State of Michigan, is described a  llows:

**PARCEL 8:**
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at a point on the West line of said Lot 4, said point located distant North 40 degrees 15 minutes East along said West line 251.24 feet from the Southwest corner of said Lot 4; thence continuing North 40 degrees 15 minutes East along the Westerly line of said Lots 4, 5, 6, 7, 8, and 9, a distance of 716.95 feet to the Westerly line of Michigan Central Railroad Right-of-Way; thence along said Westerly line the following six courses and distance South 46 degrees 24 minutes East 85.22 feet and on a curve to the right (radius 279.0 feet, long chord bears South 9 degrees 39 minutes 02 seconds East 333.86 feet) a distance of 357.90 feet, and South 27 degrees 05 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet) a distance of 136.09 feet, and on a curve to the right (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and South 27 degrees 05 minutes 56 seconds West 9.31 feet to the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way; thence North 61 degrees 20 minutes 20 seconds West along said North line 297.97 feet; thence North 28 degrees 39 minutes 40 seconds East 147.50 feet; thence North 61 degrees 20 minutes 20 seconds West 194.75 feet to the point of beginning.

EXCEPTING THEREFROM: A parcel of land being a part of Lot 8 and 9 of PLATS OF CICOTTE FARM, Town 3 South, Range 11 East on Private Claim 589, according to the plat thereof as recorded in Liber 1, Pages 222 and 223, Wayne County Records and more particularly described as: Beginning at the intersection of the Easterly line of West Jefferson (66 feet wide) with the Southerly line of the Michigan Central Right-of-Way as described in Warranty Deed dated October 27, 1947 and recorded in Liber 9019 of Wayne County Records at Page 23; thence South 46 degrees 24 minutes East along the Southerly line of the Michigan Central Railroad Right-of-Way 85.20 feet to a point of curve; thence Southeasterly continuing along a line of the Michigan Central Railroad Right-of-Way on a curve to the right 90.26 feet (measured along th~ arc of said curve, having a radius of 279 feet and a central angle of 18 degrees 32 minutes 10 seconds, the chord of s  curve bears South 37 degrees 07 minutes 55 seconds East and has a length of 89.87 feet; thence North 61 degrees 04 minutes West 176.68 feet to the point on the Easterly line of West Jefferson, thence North 40 degrees 15 minutes East 59.31 feet to the point of beginning.

Tax Item No. 78-0/Ward 20

**PARCEL C-1:**
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at the point of intersection of the Easterly line of Michigan Central Railroad Right-of-Way and the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way, said point located distant North 40 degrees 15 minutes East 100.74 feet along the Westerly line of said Lot 4, and South 61 degrees 20 minutes 20 seconds East along said Northerly line, 555.47 feet from the Southwest corner of Lot 4; thence continuing South 61 degrees 20 minutes 20 seconds East along said Northerly line, 1414.84 feet to a point of traverse on the Westerly shore of the Rouge River, said point later referred to as the first mentioned point in said traverse; thence continuing South 61 degrees 20 minutes 20 seconds East 10 feet to said Westerly shore; thence Northerly along the Westerly shore 1250 feet, more or less; thence North 60 degrees 11 minutes 27 seconds West 10 feet to a point, said point located North 47 degrees 01 minutes 34 seconds West 681.22 feet, and North 52 degrees 58 minutes 58 seconds East 297.37 feet, and North 8 degrees 41 minutes 45 seconds West 495.22 feet from the first mentioned point in said traverse; thence continuing North 60 degrees 11 minutes 27 seconds West 179.10 feet; thence South 28 degrees 39 minutes 40 seconds West 68.71 feet; thence North 61 degrees 20 minutes 20 seconds West 519.83 feet to said Easterly line of Michigan Central Railroad Right-of-Way; thence along said Easterly line, the following five courses and distances; on a curve to the right (radius = 311.50 feet, long chord bears South 9 degrees 20 minutes 31 seconds West 190.0 feet) a distance of 193.08 feet, and South 27 degrees 00 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and on a curve to the right (radius 0.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet), distance of 136.09 feet, and South 27 degrees 05 minutes 5 seconds West 10.20 feet to the point of beginning.
Together with a right of access for vehicular and pedestrian traffic as reserve in a certain Deed from Detroit Sulphite Pulp

6

and Paper Company to Toledo, Canada Southern and Detroit Railway Company dated July 8, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

EXCEPTING THEREFROM the following described land: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as recorded in Liber 1 of plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: ...mencing at a point on the Easterly line of West Jefferson Avenue (65 feet wide), said point being 60 feet Southerly (...easured along the East line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension Westerly of the Southerly line of land conveyed to a Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said Southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes West 3 feet; thence North 28 degrees 34 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet): thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge, Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning. Together with a Right of Access for vehicular and pedestrian traffic as reserved in a certain Deed from Detroit Sulphite Pulp and Paper Company to Toledo, Canada Southern and Detroit Railway Company, dated July 7, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

PARCEL C-2: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as record in Liber 1 of Plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (66 feet wide), said point being 60 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in a certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension of Westerly of the Southerly line of land conveyed to Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes West 3 feet; thence North 28 degrees 34 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge; Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning.

Tax Item No. 78/Ward 20, as to Parcel C-1 and C-2

**Commitment for Title Insurance**
**FIRST AMERICAN TITLE INSURANCE COMPANY.**

First American Title Insurance Company, a California corporation ("Company"), for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment.

This Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A by the Company.

All liability and obligation under this Commitment shall cease and terminate six (6) months after the effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not the fault of the Company.

The Company will provide a sample of the policy form upon request.

First American Title Insurance Company

Dennis J. Gilmore
President

Timothy Kemp
Secretary

**CONDITIONS:**

1. The term mortgage, when used herein, shall include deed of trust, trust deed, or other security instrument.

2. If the proposed Insured has or acquired actual knowledge of any defect, lien, encumbrance, adverse claim of other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions and Stipulations.

3. Liability of the Company under this Commitment shall be only to the named proposed Insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions and Conditions and Stipulations and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4. This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

5. The policy to be issued contains an arbitration clause. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. You may review a copy of the arbitration rules at http://www.alta.org/.

Issued by: **First American Title Insurance Company**
5730 Eagle Drive Southeast
Grand Rapids, Michigan 49512
Ph: (616)975-4102 or Fax to: (866)416-9827

B

## NOTICE OF YOUR FINANCIAL PRIVACY RIGHTS

We want you to know that the privacy and confidentiality of your personal information is very important to First American Title Insurance Company . We value your business and we want to retain your trust. In the course of providing products and services to you, we may obtain nonpublic personal information about you. We are required by law to provide you
v    this notice in order to inform you how Metropolitan Title Company collects, uses and safeguards your nonpublic personal information. This notice also tells you how you can limit our disclosure of personal information about you.

### What Information Do We Collect
We may obtain nonpublic personal information about you from the following sources:
- Information we receive from you from applications or other forms;
- Information about your transaction with us from our files or from our affiliates;
- Information about your transaction with nonaffiliated third parties such as your real estate agent or lender;
The information we obtain includes, but is not limited to, your name, address, social security number, employer, income, account information from financial institutions, parties to a transaction and credit card usage.

### What Information Do We Disclose
To meet your needs with quality products and services we may disclose any of the above information that we collect about our customers or former customers to our affiliates or to nonaffiliated third parties as permitted by law.

AFFILIATES
Our affiliates are the family of companies controlled by First American Title Insurance Company  or under common control with another company. We may share the types of information described above, as permitted by law, with our affiliates for purposes of marketing or market research.

NON-AFFILIATES
Nonaffiliated third parties are those not part of the family of companies controlled by First American Title Insurance Company or not under common control with another company.

Service Providers, Contractors·
Any service providers or contractors used by First American Title Insurance Company are required to follow the terms of our Privacy Policy. Access to your nonpublic personal information by a service provider or contractor is restricted to the purpose for which they have been retained by First American Title Insurance Company .

Joint Marketing
We may disclose your personal information to a nonaffiliated third party that we have an agreement with to perform joint r   eting of products or services that we feel may interest you.

Other Non-Affiliates
We also may disclose this information about our customers or former customers to the following types of nonaffiliated companies:
- Financial service providers such as companies engaged in banking, consumer finance, securities and insurance.
- Non-financial companies such as envelope stuffers and other fulfillment service providers.

FIRST AMERICAN TITLE INSURANCE COMPANY  DOES NOT DISCLOSE ANY NONPUBLIC PERSONAL INFORMATION ABOUT THEIR CUSTOMERS OR FORMER CUSTOMERS EXCEPT, AS PERMITTED OR REQUIRED BY LAW.

### The Confidentiality and Security of Your Nonpublic Personal Information
First American Title Insurance Company  restricts the access to your nonpublic personal information to those employees who need to know the information in order to provide products and/or services to you. Our employees are required to maintain the confidentiality and privacy of our customers. We maintain physical, electronic and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Changes to this policy
We may amend this policy at any time, and we will inform you of any changes as required by law.

Your Privacy Choices
The law allows us to share with our affiliates your personal information and information about our transactions or experiences with you. The law also allows us to share your personal information with our contractors and service providers.

If you prefer that we not disclose information about you to nonaffiliated third parties, you may direct us not to share this information by contacting our Office at comments.mi@firstam.com . Please provide your name, address including city and state of the property and our file number.

# ENDORSEMENT

Issued By: First American Title Insurance Company

Attached to Policy No.: 477166
File No.: 477166, Zug Island Investments LLC, 9121 and 9125 West Jefferson, Ln#

**Court Ordered Removal of Improvements - Violation of Otherwise Excepted Matter**

The Company insures the Insured against loss or damage which the Insured may sustain by reason of any final court order or judgment to enforce or foreclose on the claim of lien filed in the Wayne County Michigan ROD at Liber 49287 Page 613 on July 22, 2011  (the improvement) solely as the result of the order or judgment determining that the improvements violate the excepted by Exception in Schedule B.

21

This Endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Authorized Agent:
**First American Title Insurance Company**
(616)975-4102

## DISCLOSURE AND ACKNOWLEDGMENT

**Date:** August 12, 2011
**Property Address:** 9121 and 9125 West Jefferson, Detroit, MI 48209

By signing this statement the undersigned acknowledge the following:

1. That all closing documents prepared by First American Title Insurance Company are prepared at the direction and request of all parties to the transaction, their real estate agent(s)/broker(s) or attorney(s).

2. That **First American Title Insurance Company is not acting as my agent, attorney, representative or fiduciary**, at this real estate closing.

3. That First American Title Insurance Company's employee who has attended this closing represents only First American Title Insurance Company.

4. That First American Title Insurance Company's employee who has identified certain documents to me as he/she has presented them to me for signing, but **has not given me legal advice as to the meaning or effect of the documents.** I understand that any of his/her statements about the documents are not legal advice to me. If I have an attorney, that attorney is my only attorney in this transaction.

5. That I have either read all of the closing documents or am responsible for my own failure to have read them. **I understand that First American Title Insurance Company is not responsible for explaining to me the effect of the documents I have signed.**

6. That the title policy, when issued, will contain all of the exceptions noted on the commitment, unless such exceptions are removed to the satisfaction of First American Title Insurance Company at closing.

7. **That I have read this statement and understand it.**

**Seller(s):**

Alliance Leasing & Rental, L.L.C., a

By: _Daniel J. Yeomans_

Daniel J. Yeomans, President Amicus Managment Inc.,
Court Appointed Receiver

**Buyer(s):**

Zug Island Investments LLC, a Michigan limited liability
company

By: _[signature]_

Brian Caldwell, Authorized Signatory

**First American Title Insurance Company**

File No: 477166

# OWNER'S AFFIDAVIT/COMPLIANCE AGREEMENT

**ile Number:** 477166

**ate:** August 12, 2011

**eference:** Zug Island Investments LLC / Alliance Leasing & Rental, L.L.C.

**ro` ty Address:** 9121 and 9125 West Jefferson, Detroit, MI 48209

**Forwarding Address:**
555 Cascade West Parkway
Grand Rapids, MI 49546

*(To be executed by all parties shown as vested owners in the commitment for title insurance.)*

ffiant makes the representations contained herein to induce the purchaser to consummate the transaction referenced in the ommitment, to obtain the proceeds of the sale, and to induce First American Title Insurance Company to issue a policy(s) of title isurance on behalf of the underwriter named in the commitment. Affiant further agrees that in the event it is determined there re unpaid charges which were due and payable prior to and including the date of closing, that the Affiant shall pay any and all mounts so charged and shall provide proof of payment of same to First American Title Insurance Company. Affiant further grees and covenants, if requested by First American Title Insurance Company, to fully cooperate and adjust for clerical errors in ny closing documents, including but not limited to, repayment of any overpayments and executing duplicate closing documents.

**he undersigned, being first duly sworn, deposes and says as follows:**

. That Affiant is 18 years of age or older, is a citizen of the United States, has not married or divorced since purchasing the real estate, and has not used or been known by any other name;

> RECEIVER
. That Affiant is the owner of certain premises described in Commitment No. **477166**, and has not filed, nor is subject to any bankruptcy, receivership, or insolvency proceedings;

. That the Affiant is in the possession of said property and there are no other parties in possession or claiming rights of possession; (NONE, unless noted) _____

. That Affiant has no knowledge of any unrecorded water, mineral, gas or oil rights unrecorded easements or claims of easements, boundary line disputes or claims of such grants or rights relative thereto; (NONE, unless noted)
_____

. .t there are no proceedings instituted or undertaken by anyone which will result in a lien or special assessment upon the premises. There are no delinquent taxes, special assessments, (including but not limited to any Barrett Law Assessments if property is located in the State of Indiana), water bills, sewer bills and assessments, weed cutting bills, board-up fees, tap-in fees, utility bills, or Homeowner's Association fees covering subject property; (NONE, unless noted)
_____

. That there have been no improvements made nor labor or materials furnished to the premises within the last 90 days; (NONE, unless noted) _____

. That Affiant has no knowledge of any other matters affecting the title including but not limited to: mortgages, liens, land contracts, options or other encumbrances other than those which are being paid from the loan proceeds. (NONE, unless noted) _____

 **First American Title Insurance Company**

File No: 477166

## OWNER'S AFFIDAVIT/COMPLIANCE AGREEMENT - *continued*

ubscribed and sworn to before me this August 12, 2011 by
aniel J. Yeomans, President of Amicus Management Inc.
ourt Appointed Receiver for Alliance Leasing & Rental, L.L.C..

otary Public: Gary L. Wadsworth
otary County/State: Kent / Michigan
ounty Acting In: Kent
ommission Expires: September 6, 2011

**Vested Owner(s):**

Alliance Leasing & Rental, L.L.C., a Michigan
limited liability company by Amicus
Management Inc., a Michigan corporation
Court Appointed Receiver in Wayne County
Circuit Court Case No. 09-005122-CH

By: Daniel J. Yeomans, President

 **First American Title Insurance Company**

File No: 477166

*(To be executed by the Purchasers)*

ne undersigned makes the representations contained herein to induce First American Title Insurance Company to issue a
olicy(s) of title insurance on behalf of the underwriter named in the commitment. The undersigned further agrees that in the
vent it is determined there are unpaid charges which were due and payable prior to and including the date of closing, and which
e       responsibility and obligation of the undersigned, that the undersigned shall pay any and all amounts so charged and shall
rovide proof of payment of same to First American Title Insurance Company .

ne undersigned further agrees and covenants, if requested by First American Title Insurance Company, to fully cooperate and
djust for clerical errors in any closing documents, including but not limited to, repayment of any overpayments and executing
iplicate closing documents.

ne undersigned further certify that they are 18 years of age or older.


ubscribed and sworn to before me this August 12, 2011 by       **Purchaser(s):**
·ain Caldwell, Authorized Signatory of Zug Island Investments
.C.

otary Public: Gary L. Wadsworth
otary County/State: Kent / Michigan                              Zug Island Investments LLC, a Michigan
ounty Acting In: Oakland                                         limited liability company
ommission Expires: September 6, 2011

                                                                 By:  Brian Caldwell, Authorized Signatory


**First American Title Insurance Company**

                                                  File No: 477166

## CERTIFICATION OF NON-FOREIGN STATUS
()

**File Number:** 477166

Γ̄   Ɂ:            August 12, 2011

ʰ. ᵖerty Address:    9121 and 912S West Jefferson, Detroit, MI 48209

Subscribed and sworn to before me this August 12, 2011.

Section 1445 of the Internal Revenue code provides that a transferee (Purchaser) of a U.S. Real Property Interest must withhold tax if the transferor (Seller) is a foreign person. For U.S. Tax purposes (including section 1445) the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee (Purchaser) that withholding of tax is not required upon the disposition of a U.S. Real Property Interest by transferor (Seller), the undersigned hereby certifies the following on behalf of transferor (Seller):

1. **Alliance Leasing & Rental, L.L.C.** is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in this Internal Revenue Code and Income Tax Regulations);

2. **Alliance Leasing & Rental, L.L.C.** is not a disregarded entity, as defined in Treas. Req. §1.1445-2(b)(2)(iii);

3. **Alliance Leasing & Rental, L.L.C.'s** U.S. employer identification number is 38-3326665; and

4. **Alliance Leasing & Rental, L.L.C.** office address is:
   SSS Cascade West Parkway
   Grand Rapids, MI 49546

**Alliance Leasing & Rental, L.L.C.** understands that this certification may be disclosed to the Internal Revenue Service b̲  ᵃⁿsferee (Purchaser), and that any false statement contained herein could be punishable by fine, imprisonment, or b̲  ;

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of **Alliance Leasing & Rental, L.L.C.**.

Seller(s):

Alliance Leasing & Rental, L.L.C., a Michigan
limited liability company by Amicus
Management Inc., a Michigan corporation
Court Appointed Receiver in Wayne County
Circuit Court Case No. 09-005122-CH

By: Daniel J. Yeomans, President
Amicus Management Inc.

**First American Title Insurance Company**

File No: 477166

State of Michigan
County of Kent

Daniel J. Yeomans, President Amicus Managment Inc.
Court Appointed Receiver of Alliance Leasing & Rental,
L.L.C. subscribed and sworn to before me this August 12,
2011.

_Gary L. M_____

Notary Public: Gary L. Wadsworth
Notary County/State: Kent / MI
County Acting In: Kent
Commission Expires: September 6, 2011

This certification must be retained by the transferee (Purchaser), until "the end of the fifth taxable year following the
taxable year in which the transfer takes place".

**First American Title Insurance Company**

File No: 477166

## ATTACHMENT 3

### COVENANT DEED

**The Grantor,** Zug Island Investments, LLC, a Michigan limited liability company, whose address is 7310 Woodward Ave., Suite 500, Detroit, MI 48202, conveys to the City of Detroit, a Michigan municipal corporation, by and through its Detroit Water and Sewerage Department, whose address is 735 Randolph Street, Room 701, Detroit, MI 48226, Attn: William Wolfson, Esq. ("Grantee), the following property ("Property") located in the City of Detroit, County of Wayne, and State of Michigan:

### See Exhibit A

For the amount set forth upon the attached Real Estate Transfer Tax Valuation Affidavit, together with all buildings and other improvements situated thereon, all fixtures and all right, title and interest of Grantor in and to adjacent streets, alleys and rights-of-way, and all tenements, hereditaments, and appurtenances, including, without limitation, rights, if any, to strips or gores between the Property described above, and further subject to the permitted exceptions set forth on **Exhibit B** hereto.

Grantor covenants to, and agrees with, Grantee, that Grantor will warrant and defend the Property conveyed unto the Grantee, its successors and assigns, forever, against the lawful claims and demands of all persons claiming by, from, or under the Grantor, but against no other claims or persons.

In no event shall the Property be used for a residence, lodging, domicile, daycare center, school, church, playground, agricultural use, or for any other residential or recreational use.

In no event shall any groundwater be extracted from the Property for consumptive use. In no event shall any contaminated groundwater be extracted from the Property for irrigation, production or other non-consumptive uses except as part of a response activity approved by applicable governmental authorities.

The property described herein may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

Date: _____

Zug Island Investments, LLC

By: _____

Its: _____

3

STATE OF _____

COUNTY OF _____ }SS

       The foregoing instrument was acknowledged before me this _____ day of _____, 2013 by _____, the _____, of Zug Island Investments, LLC, a Michigan limited liability company, on behalf of said limited liability company.

_____
                            , Notary Public
_____ County, _____
My commission expires_____

Drafted by:
Kenneth F. Silver, Esq.
Hertz Schram PC
1760 S Telegraph Road, Suite 300
Bloomfield Hills, Michigan 48302

Send tax bills to: Grantee

Tax item #'s 20-26-351-023 & 20-26-351-024

When recorded return to: Grantee

4

**EXHIBIT A**

**LEGAL DESCRIPTION**

5

*(Attached to and becoming a part of Covenant Deed dated: August 12, 2011 between Alliance Leasing & Rental, L.L.C., a Michigan limited liability company by Amicus Management Inc., a Michigan corporation Court Appointed Receiver in Wayne County Circuit Court Case No. 09-005122-CH, as Grantor(s) and Zug Island Investments LLC, a Michigan limited liability company, as Grantee(s).)*

# EXHIBIT A

Land situated in the City of Detroit, County of Wayne, State of Michigan, described as follows:

**PARCEL B:**
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at a point on the West line of said Lot 4, said point located distant North 40 degrees 15 minutes East along said West line 251.24 feet from the Southwest corner of said Lot 4; thence continuing North 40 degrees 15 minutes East along the Westerly line of said Lots 4, 5, 6, 7, 8, and 9, a distance of 716.95 feet to the Westerly line of Michigan Central Railroad Right-of-Way; thence along said Westerly line the following six courses and distance South 46 degrees 24 minutes East 85.22 feet and on a curve to the right (radius 279.0 feet, long chord bears South 9 degrees 39 minutes 02 seconds East 333.86 feet) a distance of 357.90 feet, and South 27 degrees 05 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet) a distance of 136.09 feet, and on a curve to the right (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and South 27 degrees 05 minutes 56 seconds West 9.31 feet to the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way; thence North 61 degrees 20 minutes 20 seconds West along said North line 297.97 feet; thence North 28 degrees 39 minutes 40 seconds East 147.50 feet; thence North 61 degrees 20 minutes 20 seconds West 194.75 feet to the point of beginning.

EXCEPTING THEREFROM: A parcel of land being a part of Lot 8 and 9 of PLATS OF CICOTTE FARM, Town 3 South, Range 11 East on Private Claim 589, according to the plat thereof as recorded in Liber 1, Pages 222 and 223, Wayne County Records and more particularly described as: Beginning at the intersection of the Easterly line of West Jefferson (66 feet wide) with the Southerly line of the Michigan Central Railroad Right-of-Way as described in Warranty Deed dated October 27, 1947 and recorded in Liber 9019 of Wayne County Records at Page 23; thence South 46 degrees 24 minutes East along the Southerly line of the Michigan Central Railroad Right-of-Way 85.20 feet to a point of curve; thence Southeasterly continuing along a line of the Michigan Central Railroad Right-of-Way on a curve to the right 90.26 feet (measured along the arc of said curve, having a radius of 279 feet and a central angle of 18 degrees 32 minutes 10 seconds, the chord of said curve bears South 37 degrees 07 minutes 55 seconds East and has a length of 89.87 feet; thence North 61 degrees 04 minutes West 176.68 feet to the point on the Easterly line of West Jefferson, thence North 40 degrees 15 minutes East 59.31 feet to the point of beginning.

Tax Item No. 78-0/Ward 20                    PER ASSESSORS *DDC.  10/20/2011*

**PARCEL C-1:**
Part of Lots 4, 5, 6, 7, 8, and 9 of CICOTTE FARMS SUBDIVISION, Town 3 South, Range 11 East, on Private Claim 589, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats, Pages 222 and 223 of Wayne County Records, is described as: Beginning at the point of intersection of the Easterly line of Michigan Central Railroad Right-of-Way and the Northerly line of a 30 foot wide City of Detroit Sewer Right-of-Way, said point located distant North 40 degrees 15 minutes East along the Westerly line of said Lot 4, and South 61 degrees 20 minutes 20 seconds East along said Northerly line, 555.47 feet from the Southwest corner of Lot 4; thence continuing South 61 degrees 20 minutes 20 seconds East along said Northerly line, 1414.84 feet to a point of traverse on the Westerly shore of the Rouge River, said point later referred to as the first mentioned point in said traverse; thence continuing South 61 degrees 20 minutes 20 seconds East 10 feet to said Westerly shore; thence Northerly along the Westerly shore 1250 feet, more or less; thence North 60 degrees 11 minutes 27 seconds West 10 feet to a point, said point located North 47 degrees 01 minutes 34 seconds West 681.22 feet, and North 52 degrees 58 minutes 58 seconds East 297.37 feet, and North 8 degrees 41 minutes 45 seconds West 495.22 feet from the first mentioned point in said traverse; thence continuing North 60 degrees 11 minutes 27 seconds West 179.10 feet; thence South 28 degrees 39 minutes 40 seconds West 68.71 feet; thence North 61 degrees 20 minutes 20 seconds West 519.83 feet to said Easterly line of Michigan Central Railroad Right-of-Way; thence along said Easterly line, the following five courses and distances; on a curve to the right (radius = 311.50 feet, long chord bears South 9 degrees 20 minutes 31 seconds West 190.0 feet) a distance of 193.08 feet, and South 27 degrees 00 minutes 56 seconds West 301.86 feet, and on a curve to the left (radius = 368.06 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 124.45 feet) a distance of 125.05 feet, and on a curve to the right (radius = 400.56 feet, long chord bears South 17 degrees 21 minutes 56 seconds West 135.44 feet), distance of 136.09 feet, and South 27 degrees 05 minutes 5 seconds West 10.20 feet to the point of beginning.
Together with a right of access for vehicular and pedestrian traffic as reserve in a certain Deed from Detroit Sulphite Pulp

and Paper Company to Toledo, Canada Southern and Detroit Railway Company dated July 8, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

EXCEPTING THEREFROM the following described land: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as recorded in Liber 1 of plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (65 feet wide), said point being 60 feet Southerly (measured along the East line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension Westerly of the Southerly line of land conveyed to a Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said Southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes West 3 feet; thence North 28 degrees 34 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge, Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning. Together with a Right of Access for vehicular and pedestrian traffic as reserved in a certain Deed from Detroit Sulphite Pulp and Paper Company to Toledo, Canada Southern and Detroit Railway Company, dated July 7, 1907 and recorded on December 8, 1907 in Liber 678, Page 84, Wayne County Records.

PARCEL C-2: A parcel of land being part of Lots 8 and 9 of PLAT OF CICOTTE FARM, Town 3 South, Range 11 East, on Private Claim 589, according to the plat thereof as record in Liber 1 of Plats, on Pages 222 and 223, Wayne County Records, City of Detroit, Wayne County, Michigan, more particularly described as: Commencing at a point on the Easterly line of West Jefferson Avenue (66 feet wide), said point being 60 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the line between said Lots 8 and 9, said point also being 105.90 feet Southerly (measured along the Easterly line of West Jefferson Avenue) from the Southerly line of the Michigan Central Railroad Right-of-Way, as described in a certain Warranty Deed recorded in Liber 9019, Page 23; thence South 61 degrees 26 minutes East, parallel to the line between said Lots 8 and 9, along the extension of Westerly of the Southerly line of land conveyed to Peerless Portland Cement Company, a Michigan Corporation, by Deed dated January 12, 1925 and recorded in Liber 2002 of Deeds, Page 46, Wayne County Records, and along such Southerly line, 800 feet to a corner formed by the change in direction of said southerly line abruptly Northward, which corner is also the point of beginning of the parcel herein described; thence North 61 degrees 26 minutes West 3 feet; thence North 28 degrees 34 minutes East 87.50 feet to a point (said course being measured as North 28 degrees 39 minutes East 88.71 feet); thence South 61 degrees 26 minutes East 178.22 feet to a point on the Westerly line of the River Rouge, as now marked by an existing dock (the last course being measured as South 60 degrees 44 minutes 27 seconds East 179.10 feet); thence South 9 degrees 11 minutes East along the Westerly line of the River Rouge; Southerly 36.35 feet to a point on the Northerly line of Lot 8, CICOTTE'S SUBDIVISION; thence North 61 degrees 26 minutes West along the line between Lots 8 and 9, 185.32 feet to a point; thence South 40 degrees 15 minutes West, parallel to the East line of West Jefferson Avenue, a distance of 60 feet to the point of beginning.

Tax Item No. 78/Ward 20, as to Parcel C-1 and C-2

Tax Parcel Number: 78/Ward 20, 78-0/Ward 20

Pt of DOC

PER ASSESSORS 10/20/2011

# EXHIBIT B

## PERMITTED EXCEPTIONS TO COVENANT DEED

### (See attached)

### [To be determined prior to Closing pursuant to Sections 1.2 and 2.3] <u>PERMITTED EXCEPTIONS FROM TRANSFEROR'S TITLE POLICY</u>

1. Rights or claims of parties in possession not shown by the public records.

2. Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises.

3. Terms and conditions contained in Deed as disclosed by instrument recorded in Liber 676, page 84.

4. Easement in favor of Michigan Consolidated Gas Company, a Michigan corporation and the Covenants, Conditions, and Restrictions contained in instrument recorded in Liber 26718, page 358.

5.* Environmental Access Easement in favor of Fifth Third Bank, a Michigan banking corporation and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 44194, page 812;

6. Terms and Conditions contained in Zoning Letter as disclosed by instrument recorded in Liber 44691, page 413.

7.* Rights of the railroad company servicing the railroad siding located on insured premises in and to the ties, rails and other properties constituting the railroad siding or in and to the use thereof, and also rights of others thereto entitled in and to the use thereof.

8. Rights of the United States, State of Michigan and the public for commerce, navigation, recreation and fishery, in any portion of the land comprising the bed of Rouge River, or land created by fill or artificial accretion.

9. The nature, extent or lack of riparian rights or the riparian owners and the public in and to the use of the waters of Rouge River.

    * This Exception shall not appear as a Permitted Exception if the Exception materially impedes Transferee's ability to use the Property for Transferee's intended industrial use, and Transferee so notifies Transferor within thirty (30) days after Transferee's receipt of the Title Commitment as referenced in Section 2.3.

6

**ATTACHMENT 4**

**FORM OF CERTIFICATE OF NON-FOREIGN STATUS**

CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Zug Island Investments, LLC, a Michigan limited liability company ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust and foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Transferor's U.S. employer identification number is _____; and

3. Transferor's office address is 7310 Woodward Ave., Suite 500, Detroit, Michigan 48202.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign the document on behalf of the Transferor.

Zug Island Investments, LLC,
a Michigan limited liability company

By:_____

Name:_____

Title:_____

7

**EXHIBIT C**

**ADDRESSES AND FACSIMILE NUMBERS**

| | |
|---|---|
| Lakeshore Engineering Services, Inc.<br>Attn: Andrew Haliw, III, Esq.<br>7310 Woodward Ave., Ste. 500<br>Detroit, MI 48202<br>Facsimile No.: (313) 875-2924 | Sky Group Grand LLC<br>Attn: Avinash Rachmale<br>7310 Woodward Ave., Ste. 500<br>Detroit, MI 48202<br>Facsimile No.: (313) 875-2924 |
| Lakeshore TolTest Corporation<br>Attn: Andrew Haliw, III, Esq.<br>7310 Woodward Ave., Ste. 500<br>Detroit, MI 48202<br>Facsimile No.: (313) 875-2924 | Avinash Rachmale<br>7310 Woodward Ave., Ste. 500<br>Detroit, MI 48202<br>Facsimile No.: (313) 875-2924 |
| A&H Contractors, Inc.<br>Attn: Thomas Hardiman<br>_____<br>_____<br>Facsimile No.: _____ | Thomas Hardiman<br>_____<br>_____<br>Facsimile No.: _____ |

8

# *Exhibit*

# *17-3*

## MUTUAL SETTLEMENT AND RELEASE AGREEMENT

This Mutual Settlement and Release Agreement ("Agreement") is entered into this _____ day of March, 2013, by and among the City of Detroit, a municipal corporation, acting through and with the authority of its Detroit Water and Sewerage Department (collectively "DWSD") on the one hand, and on the other, L. D'Agostini & Sons, Inc., a Michigan corporation ("D'Agostini").

DWSD and D'Agostini are sometimes also referred to collectively in this Agreement as "Parties" and each respective side as a "Party." Capitalized terms appearing in this Agreement shall have the meanings ascribed to them in this Agreement.

## RECITALS

This Agreement is made under the following circumstances:

A.    The City of Detroit is a municipal corporation located in Wayne County, Michigan and is a political subdivision of the State of Michigan. The Detroit Water and Sewerage Department, a department of the City, provides water service and wastewater treatment services to residents of the City and certain southeastern Michigan communities.

B.    The Detroit Water and Sewerage Department periodically solicits the services of contractors to perform various engineering, construction and management services.

C.    D'Agostini provides general construction, engineering, environmental and energy services to federal and municipal governmental agencies, as well as commercial clients. During the past and for many years, D'Agostini served as a contractor on a number of DWSD contracts.

D.    DWSD filed an intervening complaint asserting claims against D'Agostini in a lawsuit titled *Macomb Interceptor Drain Drainage District v. Kwame Kilpatrick, et al.*, Case No. 2:11-cv-13101, which complaint is currently pending before the Honorable Robert H. Cleland, United States District Court, Eastern District of Michigan (the "Cleland Litigation"), although the claims against D'Agostini were dismissed without prejudice on February 11, 2013 and DWSD has not filed any new or amended claims.

E.    D'Agostini filed a lawsuit asserting claims against the City and DWSD in a lawsuit titled *L. D'Agostini & Sons, Inc. v. City of Detroit*, Case No. 12-cv-10041-JCO-MKM, which was pending before the Honorable John C. O'Meara, United States District Court, Eastern District of Michigan, which was dismissed with prejudice on August 16, 2012 by order of the district court, and is currently pending on appeal to the United States Court of Appeals for the Sixth Circuit, Case No. 12-2311 (the "O'Meara Litigation").

F.    DWSD and the City, on the one hand, and D'Agostini, on the other hand, now desire to settle, compromise and resolve all of their respective actual or potential disputes, claims, or actions against the other Parties in accordance with the terms of this Agreement.

The Parties agrees as follows:

## AGREEMENT

1.     <u>Dismissal of the DWSD Lawsuit</u>. The Parties agree that the Cleland Litigation shall be dismissed with prejudice and without costs or attorney's fees. The Parties agree to stipulate to entry of the Stipulated Order of Dismissal attached as Exhibit A to this Agreement.

2.     <u>Dismissal of the D'Agostini Lawsuit</u>. The Parties agree that the O'Meara Litigation shall be dismissed with prejudice and without costs or attorney's fees. The Parties agree to stipulate to entry of the Joint Motion to Dismiss Appeal With Prejudice attached as Exhibit B to this Agreement.

3.     <u>Mutual Release</u>. The "DWSD Releasees" are the Detroit Water and Sewerage Department, its Director, its Board of Commissioners, its Affiliates, its parent organization (i.e., the City) in such capacity, as well as any and all of their members, officers, employees, agents, attorneys, representatives, heirs, executors, administrators, legal representatives, successors, and assigns. DWSD agrees to the terms of this Section 3 on behalf of all the DWSD Releasees.

The "Contractor Releasees" are D'Agostini, and its predecessors, their parents, subsidiaries, and their Affiliates, as well as any and all of those entities' respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys, representatives, insurers, sureties, heirs, executors, administrators, legal representatives, successors, and assigns. Each of the Contractor Releasees agrees to the terms of this Section 3 on its own behalf and on behalf of its parents, subsidiaries, Affiliates, and each of its and their shareholders, partners, members, managers, directors, officers, employees, agents, attorneys, representatives, heirs, executors, administrators, legal representatives, successors, and assigns.

"DWSD's Claims" are any and all obligations, claims, damages, demands, causes of action, suits, cross claims, counterclaims, indemnity and contribution claims, administrative proceedings, quasi-legal proceedings, duties, liabilities, promises, and agreements of any nature or kind, in law or in equity, whether known or unknown, accrued or unaccrued, which any of the DWSD Releasees had or could have had at any time on or before the date of this Agreement, asserted in or relating to the subject matter of DWSD's intervention complaint in the Cleland Litigation.

"D'Agostini's Claims" are any and all obligations, claims, damages, demands, causes of action, suits, cross claims, counterclaims, indemnity and contribution claims, duties, liabilities, promises, and agreements of any nature or kind, in law or in equity, whether known or unknown, accrued or unaccrued, which any of the Contractor Releasees had or could have had at any time on or before the date of this Agreement, asserted in or relating to the subject matter of the O'Meara Litigation.

The DWSD Releasees hereby forever release, discharge, and hold harmless the Contractor Releasees of and from any and all of DWSD's Claims and claims relating to or

2

arising under DWSD Contracts 748, 812, 849, 864, 865, 1368, 2012, and 2014. This paragraph does not apply to (i) claims to enforce this Agreement, and (ii) any performance or warranty claims for defective work or materials. The Contractor Releasees hereby forever release, discharge, and hold harmless the DWSD Releasees of and from any and all of D'Agostini's Claims as defined above, including, without limitation, claims relating to or arising under DWSD's suspension of D'Agostini in December 2011 (later voided *ab initio*) and DWSD's approval and enforcement of a Responsible Vendor Policy. This paragraph does not apply to (i) any claims to enforce this Agreement, and (ii) any and all claims for unpaid work including, without limitation, DWS-812. The claims released by this paragraph are hereinafter referred to as the "Released Claims."

The Parties acknowledge that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the Released Claims, but the Parties intend to fully, finally, and forever settle and release all the Released Claims. The releases given under this Section 3 shall be and remain in full and complete effect regardless of the discovery or existence of any additional or different facts relating to the Released Claims.

Each of the Parties represent and warrant that it has not assigned any of the Released Claims to a Person who is not bound by this Section 3, except that DWSD represents that it assigned certain rights to the Macomb Interceptor Drain Drainage District and/or the County of Macomb effective on or about September 2, 2010 through the Macomb Interceptor Acquisition Agreement, the "Settlement Agreement" (between the same parties), and the Bill of Sale executed contemporaneously with Macomb Interceptor Acquisition Agreement, all of which documents DWSD has provided to the Contractor Parties (collectively, the "Assignment"). The Parties are aware of and acknowledge the Assignment and agree that any claims assigned to Macomb County or any other third party as a result of the Assignment are not the responsibility of DWSD or any of the DWSD Releasees.

Each Party agrees to waive (if waivable) the benefits of any state or federal statutory provision that would otherwise forgive any Party from releasing a Claim that the Party was not aware of when it executed this Agreement.

4.     No Acknowledgement of Liability or Wrongdoing.     The execution of this Agreement by the Parties shall not constitute an admission of any wrongdoing or an acknowledgement of liability by any Party for any Claims that had been or may be asserted by a Party but for the execution of this Agreement.

5.     Opportunity to Consult with Counsel.     The Parties respectively represent and certify that they secured independent legal advice and consultation in connection with this Agreement and any rights they may be relinquishing hereby, and that they have not relied upon any representations or statements made by any other Party or by any other Party's counsel or representatives in executing this Agreement, other than as stated expressly herein.

6.     Responsible Bidder Status.     The City and DWSD agree that the existence of this Agreement and the facts underlying its execution, or the actual or perceived existence of any Claims held by the City or DWSD prior to the execution of this Agreement against any of the

3

Contractor Releasees, shall not be considered or deemed relevant in any determination of the status of D'Agostini, or its parent, subsidiaries or Affiliates, as a responsible or non-responsible vendor for purposes of bidding on any contracts let by DWSD. D'Agostini agrees that this Agreement releases any claims it has relating to the Responsible Vendor Policy.

7.  Provisions Severable.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Agreement, or the application thereof to any person or circumstances, shall for any reason to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to the unaffected persons or circumstances, shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

8.  Fees and Expenses.  The Parties bear their own costs, attorney's fees, and other expenses incurred in the Cleland Litigation and the O'Meara litigation.

9.  Entire Agreement; Amendment.  This Agreement and the exhibits attached hereto set forth the entire Agreement of the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the Parties, oral or written, respecting such subject matter.  This Agreement shall not be amended or modified except by an agreement in writing duly executed by all of the Parties.

10.  Choice of Law; Venue.  This Agreement shall be enforced in accordance with the laws of the state of Michigan, irrespective of its conflict of laws principles.  The Parties agree that the United States District Court for the Eastern District of Michigan, Southern Division, or Wayne County Circuit Court, shall have exclusive jurisdiction over this Agreement and that any disputes arising out of or related in any manner to this Agreement shall be properly brought only in such Court.

11.  Required Approvals.  Upon execution of this Agreement, the City and DWSD shall take all actions reasonably necessary to effect the covenants and understandings provided in this Agreement and take such steps as are necessary to ensure that all required approvals of relevant city government authorities, including but not limited to the City Council and the Mayor, are obtained.

12.  Waiver.  No failure of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party or to insist upon strict compliance by any other Party with its or his obligations hereunder and no customer practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof, unless such waiver is set forth in writing and executed by such Party.  Any such written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations of other non-specified breaches or violations unless, and to the extent, expressly set forth herein.

13.  Construction.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of construction shall

4

be applied against any Party.

14. <u>Successors and Assigns</u>. This Agreement shall be fully binding upon and inure to the benefit of the Parties and their respective successors, assigns, heirs, personal representatives, administrators, executors and agents.

15. <u>Counterparts; Deliveries</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument, and to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including pdf files), shall be treated in all manner and respects for all purposes as an original agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

5

City of Detroit, a Michigan municipal corporation, acting through, and with the authority of, its Water and Sewerage Deparmtent and its Board of Water Commissioners

By:_____
     James G. Fausone

Its: Chairman, Board of Water Commissioners

and

By:_____
     Sue F. McCormick

Its: Director, Detroit Water and Sewerage Department

L. D'Agostini & Sons, Inc., a Michigan corporation

By:_____

Its: _Sec, Treas & General Counsel_

20,895,433.2\022765-00201

6