# **EXHIBIT C**

**Designation of Deposition Testimony of R. Craig Hupp**

1           UNITED STATES BANKRUPTCY COURT

2           EASTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4

5    ————————————————————————

6    In re:            )   Case No. 13-53845

7    CITY OF DETROIT, MICHIGAN )

8                   )   Chapter 9

9         Debtor      )

10   ————————————————————————)   Hon. Steven W. Rhodes

11

12              ROUGH DRAFT

13        The Deposition of R. CRAIG HUPP,

14        Taken at 21777 Dunham Road,

15        Clinton Township, Michigan,

16        Commencing at 8:10 a.m.,

17        Monday, July 14, 2014,

18        Before Melinda S. Moore, CSR-2258.

19

20

21

22

23

24

25

| 1 | | Macomb County? |
|---|---|---|
| 2 | A. | Our firm has represented the Office of Public |
| 3 | | Works since 1977 on matters related to DWSD rates |
| 4 | | and the county's contract for wastewater services. |
| 5 | | That continues through today. I have handled -- |
| 6 | | provided environmental advice on a bunch of |
| 7 | | environmental issues as they have arisen for the |
| 8 | | department, wetlands, soil sedimentation issues. |
| 9 | | With others I've been involved in several lawsuits |
| 10 | | involving construction claims, at least one |
| 11 | | lawsuit to recover environmental cleanup costs, |
| 12 | | you know. There have certainly been other matters |
| 13 | | but that kind of gives you a general picture, I |
| 14 | | hope. |
| 15 | Q. | Have you been involved in representing Macomb |
| 16 | | County in what we've referred to in this |
| 17 | | litigation as the Feikens case? |
| 18 | A. | Yes. |
| 19 | Q. | What types of things have you done in that |
| 20 | | Feikens case? |
| 21 | A. | First and foremost the Feikens case was filed in |
| 22 | | 1977. And that became the litigation or the place |
| 23 | | or the forum -- forum, I guess, where disputes |
| 24 | | over rates and charges from Detroit mostly got |
| 25 | | played out. That's something that arose as soon |

1    as the 1977 case was filed.  And thereafter there

2    were occasions when one or more of the wholesale

3    customers challenged some aspect of the charges in

4    state court.  Detroit removed it to federal court.

5    Judge Feikens made clear he believed those

6    disputes belonged in his court.  He made that

7    point often enough by 1982 or 1983 that thereafter

8    nobody tried to go to state court, because they

9    were just going to end up in front of Judge

10   Feikens.

11              And so most -- until actually the

12   global settlement in 2008, most -- any significant

13   rate dispute wound up playing out in front of

14   Judge Feikens through contested motions or other

15   sorts of matters.  In addition, often under the

16   court's oversight or whatever, in various periods

17   of history, the court became involved in

18   overseeing and attempting to rectify DWSD

19   management with the objective of having DWSD be

20   able to comply with the Clean Water Act; and that

21   would involve wholesale customer involvement in

22   the process in terms of consent decrease intended

23   to accomplish management reforms, disputes over

24   whether certain sorts of projects need to comply

25   with the law could go ahead over various reasons.

1       At one point there was various ancillary disputes

2       that would arise in the case. It just -- and then

3       ultimately at the time of Judge Feikens's

4       retirement and the transfer Judge Cox, the larger

5       question of restructuring DWSD governance and

6       getting DWSD separated from Detroit, which was a

7       process that counties weren't very much involved

8       with continued, and sort of the regional authority

9       negotiations that have gone over the last year

10      have been a part of that continuum. So there's

11      been this -- over the 35 plus years, there's been

12      a very broad type of activities that occurred in

13      that case.

14  Q.   Now, one thing I think I heard you say is that

15      after a point it became pretty clear that if an

16      entity like Macomb had a dispute with DWSD, that

17      would be heard in federal court before Judge

18      Feikens?

19  A.   Yeah. That wasn't universally true. If it

20      involved rates and charges or the management of

21      DWSD, that was certainly the case. That was the

22      case up until Judge Feikens's retired. There were

23      other cases -- Macomb County had a dispute with

24      Detroit over some potential damage to a Macomb

25      County facility, and that case proceeded in state

```
 1        court, for example.  But if it involved rates and
 2        charges or anything like that, one way or the
 3        other, it would wind up in front of Judge Feikens.
 4   Q.   Are you familiar with a settlement agreement, I
 5        think, that was actually dated May 2009 between
 6        Macomb and Detroit and Oakland counties, perhaps
 7        other entities?
 8   A.   I am.
 9   Q.   And what was your involvement in that settlement
10        agreement, if any?
11   A.   I represented with others -- I'm sure there were
12        other lawyers at Bodman.  I was the principal
13        lawyer involved.  I represented Macomb County
14        Office of Public Works in a negotiation of that
15        settlement agreement and its documentation.
16               MR. WATSON:  I'm going to get this one
17        marked.  It's been marked before, but I didn't
18        bring the exhibits from the other dep.  Maybe
19        we'll just mark that as Hupp Exhibit 1.
20                    MARKED FOR IDENTIFICATION:
21                    DEPOSITION EXHIBIT 1
22                    8:20 a.m.
23   BY MR. WATSON:
24   Q.   Mr. Hupp, you've been handed what's been marked
25        as Hupp Exhibit 1.  Is that the settlement
```

| | | |
|---|---|---|
| 1 | | me, some concerns as well that were not addressed |
| 2 | | by this. |
| 3 | Q. | Well, let's look at exhibit -- you say Exhibit C |
| 4 | | was the list of matters resolved. |
| 5 | A. | Generally, yes. |
| 6 | Q. | And I'm looking down Exhibit C, and I see the |
| 7 | | name Infrastructure Management Group. Are you |
| 8 | | familiar with that entity? What is that? |
| 9 | A. | It is my understanding that the Infrastructure |
| 10 | | Management Group was a consulting firm of some |
| 11 | | sort retained, by DWSD, I believe, at the urging |
| 12 | | of the court to oversee the DWSD contracting |
| 13 | | process. |
| 14 | Q. | As I understand it, it oversaw contracts over |
| 15 | | $500,000. Do you recall that? |
| 16 | A. | I don't have that level of information personally |
| 17 | | about what their task was. |
| 18 | Q. | Did you ever have any dealings with them? |
| 19 | A. | No. |
| 20 | Q. | I'm looking at the next page, No. 5, interceptor |
| 21 | | collapse. |
| 22 | A. | Yes. |
| 23 | Q. | And it resolves apparently a motion for |
| 24 | | reconsideration. What was that about? |
| 25 | A. | In February of -- Macomb County had filed a |

```
 1        proceeding in the 1977 case challenging its
 2        liability for the costs incurred by DWSD in
 3        repairing a sewer collapse that occurred in August
 4        of 2004.  In February of 2007, sua sponte, without
 5        notice to the parties, Judge Feikens issued an
 6        order dismissing Macomb County's claims with
 7        prejudice.  Macomb County moved for
 8        reconsideration of that order, apparently,
 9        according to this, on April 6, 2007.
10   Q.   And so this global settlement resolved that
11        dispute in full?
12   A.   I think a fair answer was we thought so at the
13        time.  It's been clear since it didn't.
14   Q.   How so?
15   A.   Well, there's this matter that I'm being deposed
16        in today and I know Macomb County has had two
17        lawsuits pending over those costs that remain in
18        court.
19   Q.   And then it says "Interceptor interest rate."
20        What was the dispute about in regard to
21        interceptor interest rate?
22   A.   Under Detroit's rate setting procedures, as far as
23        I know, at least since mid-1970s, the cost of
24        capital projects are recovered in the rates by --
25        depending on the project, determining what
```

| | | |
|---|---|---|
| 1 | | System Property to Be Transferred." What I'm |
| 2 | | trying to figure out is the sewer that collapsed, |
| 3 | | is that amongst the properties listed in this |
| 4 | | Exhibit 1? |
| 5 | A. | Yes, it is. |
| 6 | Q. | Okay. If you would go back to the settlement |
| 7 | | agreement, Hupp Deposition Exhibit 1, I'm looking |
| 8 | | at what's marked at the bottom as 3 of the |
| 9 | | settlement agreement. It's actually page 4 as |
| 10 | | I'm counting, but it says 3 at the bottom. |
| 11 | A. | Yes. |
| 12 | Q. | And section B reads in part "The parties, in |
| 13 | | complete satisfaction of the 2004 collapse |
| 14 | | claims," and then it goes on, and it talks about |
| 15 | | an amount of $17,050,000. What was the |
| 16 | | $17,050,000 for? Do you know? |
| 17 | A. | It's as stated in that sentence, Macomb had |
| 18 | | asserted a challenge to the liability for the 2004 |
| 19 | | collapse. I forget what the dispute over the 2006 |
| 20 | | repairs were. And they had challenged the manner |
| 21 | | in which Detroit was calculating interest rate on |
| 22 | | the 2004 collapse cost as well as on another |
| 23 | | interceptor project, so they had asserted a |
| 24 | | variety of claims stating they were being either |
| 25 | | overcharged or charged for things that they |

1      shouldn't be liable for, and ultimately all those

2      claims were -- resulted in a judgment in Macomb

3      County's favor of $17,050,000.

4   Q.   And I guess the logical question becomes:   An

5        adjustment to what?

6   A.   As collectively the documents indicate, as part of

7        settling these and other claims that Oakland and

8        Macomb County had, with some ancillary adjustments

9        to Wayne County as well, these claims and Oakland

10       County's claims would get settled, and in

11       consideration for that, Oakland County and Macomb

12       County would take over the interceptor system

13       north of 8 Mile Road, and they would reimburse

14       Detroit for the outstanding debt being charged in

15       the rates for those assets being transferred to

16       the two counties or an entity to be created by

17       those counties.

18   Q.   Okay.  So as I understand, the basic agreement

19        the parties were working on, if we just focus on

20        Macomb County, is that Macomb County would

21        purchase the Macomb Interceptor system by paying

22        Detroit the amount of debt on the system?

23   A.   The transaction to begin with, as reflected in the

24        settlement agreement, was really more of a unitary

25        transaction in the sense that I don't believe

 1          might have come back by way of e-mail, so I

 2          couldn't testify here today that that was provided

 3          at a meeting as opposed to at a subsequent

 4          communication, but there would have been a

 5          subsequent communication where they got back to me

 6          and said we're not aware of any known threat or

 7          pending claims.

 8     Q.   And they would be Jacobs and Walters on behalf of

 9          DWSD?

10     A.   That is correct.

11     Q.   At any point prior to execution of the

12          acquisition agreement did anybody from Detroit

13          inform you that there was an ongoing criminal

14          investigation into the irregularities in DWSD

15          construction contracts?

16               MR. RUEGGER:  Objection to form.

17               THE WITNESS:  I have no recollection of

18          anybody from DWSD saying that.

19     BY MS. BADALAMENTI:

20     Q.   If such an investigation had been going on and

21          DWSD had notice, was that the information you

22          were being looking for in response to those three

23          paragraphs that are identified in this due

24          diligence memo?

25               MR. RUEGGER:  Objection, form.

| | | |
|---|---|---|
| 1 | | Before that it was Anthony Adams, and before that |
| 2 | | it was Victor Mercado or somebody -- I mean, |
| 3 | | Mercado was gone by the time we were working on |
| 4 | | this. |
| 5 | Q. | Do you know when Mercado left? Was it 2008? |
| 6 | | 2009? |
| 7 | A. | He left in the June of 2008. |
| 8 | Q. | June of 2008. I note that this settlement |
| 9 | | agreement has a court caption on it. Were the |
| 10 | | negotiations supervised by the court and |
| 11 | | encouraged by the court? Why was the court |
| 12 | | involved in this? |
| 13 | A. | Anything of this -- because it resolved disputes, |
| 14 | | quite a number of them -- there's a list of them |
| 15 | | in one of the attachments of all of the disputes. |
| 16 | | This became known as the global settlement. And |
| 17 | | there's a list in here somewhere. Exhibit C is a |
| 18 | | list of all of the matters pending before Judge |
| 19 | | Feikens that this global settlement resolved. So |
| 20 | | there are a variety of motions and orders and |
| 21 | | opinions, et cetera that were resolved. And, |
| 22 | | again, as I mentioned before, his court had become |
| 23 | | the forum for all disputes over rates and charges, |
| 24 | | DWSD management and the like. |
| 25 | | At some point -- in further answer to |

```
 1        your question, at some point Judge Feikens
 2        appointed Mr. Timothy O'Brien to serve as kind of
 3        a facilitator, and Mr. O'Brien orchestrated the
 4        discussions that generated a settlement in
 5        December of 2008 that did not get formally entered
 6        as a settlement agreement with the court until May
 7        of 2009, but the agreement was reached in December
 8        of 2008.
 9   Q.   I take it that this agreement was intended to
10        resolve all pending disputes between, among
11        others, DWSD and Macomb?
12   A.   No.  That's not correct.
13   Q.   Were there disputes between the two that it
14        didn't resolve that you're aware of?
15   A.   Yes.
16   Q.   What were those?
17   A.   There were a variety of rate-related disputes.  In
18        fact, that's why there is a specific
19        enumeration -- why the parties put together a
20        specific enumeration of what was getting resolved,
21        was there were other things pending.  I know I'd
22        have a hard time listing them right now, but
23        Macomb County had a variety of more mundane rate
24        disputes then pending, and I'd be virtually
25        certain Oakland County had some stuff -- excuse
```

1          proceeding in the 1977 case challenging its

2          liability for the costs incurred by DWSD in

3          repairing a sewer collapse that occurred in August

4          of 2004.  In February of 2007, sua sponte, without

5          notice to the parties, Judge Feikens issued an

6          order dismissing Macomb County's claims with

7          prejudice.  Macomb County moved for

8          reconsideration of that order, apparently,

9          according to this, on April 6, 2007.

10    Q.   And so this global settlement resolved that

11         dispute in full?

12    A.   I think a fair answer was we thought so at the

13         time.  It's been clear since it didn't.

14    Q.   How so?

15    A.   Well, there's this matter that I'm being deposed

16         in today and I know Macomb County has had two

17         lawsuits pending over those costs that remain in

18         court.

19    Q.   And then it says "Interceptor interest rate."

20         What was the dispute about in regard to

21         interceptor interest rate?

22    A.   Under Detroit's rate setting procedures, as far as

23         I know, at least since mid-1970s, the cost of

24         capital projects are recovered in the rates by --

25         depending on the project, determining what

1          customer classes are served by the capital

2          project, and the debt service cost -- annual debt

3          service cost to the project is then put in the

4          rates to the class of customers served by the

5          project.  So in the case of an interceptor or any

6          other facility that would serve only Macomb

7          County, if DWSD borrowed money to construct a

8          facility, the debt service associated with that

9          project as tracked by DWSD's accounting system

10         would be put in DWSD -- excuse me -- would be put

11         in Macomb County's rates and nobody else's.

12                  And there was one and then it turned

13         out two projects where, from Macomb County's point

14         of view, the manner in which DWSD was calculating

15         and attributing the debt service to Macomb County

16         was incorrect and inconsistent with long-standing

17         understandings and agreements as to how the

18         capital cost would be recovered.

19                  Basically to make it simple, Detroit

20         borrowed the money at 5%, and then charged -- they

21         were charging Macomb County about 7 to 7-1/2%.

22   Q.    Had there been a formal agreement between Detroit

23         and Macomb County pinning down the interest rate

24         at 5% or whatever percent it was?

25   A.    I believe the answer to that is yes.  I believe it

1    was set forth in the rate setting protocols that

2    Detroit and its wholesale customers had developed

3    and agreed to over the years.

4  Q.  Let me ask this because I'm not sure my

5    understanding is correct.  As I understood, there

6    had been a formal agreement that had pretty much

7    expired.  Detroit and Macomb had not reached a

8    new agreement.  Detroit was charging the 7% or so

9    that Macomb felt was too high.  Is that how it

10   happened?

11 A.  No.

12 Q.  How did it happen that Detroit charged the 7% or

13   7-1/2%, whatever it was?

14 A.  I could never figure out what prompted Detroit to

15   do that.  It was clearly inconsistent with all

16   practices.

17 Q.  Nevertheless, the matter was settled?

18 A.  The matter was settled.

19 Q.  Okay.  Let's look at a few of the provisions of

20   the acquisition agreement.

21           MS. BADALAMENTI:  Of Exhibit 1 or the

22   acquisition agreement?

23           MR. WATSON:  I'm sorry, the settlement

24   agreement.  Thank you.

25           THE WITNESS:  If we could go off the

| | | |
|---|---|---|
| 1 | | Rate Settlement."  Do you see that? |
| 2 | A. | I do. |
| 3 | Q. | Do you recall what that was about? |
| 4 | A. | Yes. |
| 5 | Q. | What was it? |
| 6 | A. | That is a catchall.  There were -- again, moving |
| 7 | | back to recognizing that the OMI deal and the |
| 8 | | Macomb deal were part and parcel of what started |
| 9 | | out as a global joint settlement, and in working |
| 10 | | through an equivalent schedule in the OMI deal, |
| 11 | | which closed roughly 10 months before this, there |
| 12 | | were a variety of rate disputes, and there was a |
| 13 | | dispute over some meter charges that Detroit said |
| 14 | | should be part of the rates, and -- part of the |
| 15 | | price, and Oakland Macomb said no, they shouldn't. |
| 16 | | And at the end of the day, that dispute went up to |
| 17 | | the week of the closing, if not the day before the |
| 18 | | closing on the OMI deal.  It was under a very |
| 19 | | tight time schedule.  And at the end, to resolve |
| 20 | | all of those things, DWSD made a proposal that |
| 21 | | here's all of these objections, they pertain to a |
| 22 | | block of meters, some of which are going to |
| 23 | | Macomb, some of which are going to go to OMI. |
| 24 | | There's a number of these other rate disputes, so |
| 25 | | I'll tell you what, why don't we just give you |

```
 1        another $3 million credit on the price.  That was
 2        accepted, and then that -- at that point in time
 3        the outstanding debt on the OMI assets was roughly
 4        $2.2 million.  The OMI system didn't have any
 5        cash.  So if we took 2.2 of the 3 million and
 6        applied it to the OMI deal, the OMI deal could
 7        close without paying any cash.  So 2.2 of 3.0 was
 8        attributed to the OMI deal, and the balance was
 9        set aside and it was applied here.
10   Q.   The 870,252?
11   A.   Right.  That's what's left of a $3 million
12        settlement.  The other thing I will note, so it's
13        clear -- and I don't know whether it applies to
14        this Schedule 3.8 or the 3.8 on the OMI deal, but
15        there was a revised schedule issued six months
16        after one of the two closings that had a
17        subsequent adjustment that affected this credit,
18        and I don't -- and so for that reason I can't
19        testify today that this Schedule 3.8 is the actual
20        "final" final schedule or not.  The final
21        adjustment moved about -- I don't know -- 100, 200
22        grand, so it wasn't a material amount.  So for the
23        record I want that clear.
24   Q.   Is it fair to say that the parties did extensive
25        negotiation back and forth before arriving at the
```

| | | |
|---|---|---|
| 1 | | any civil claims asserted or threatened in the |
| 2 | | past 5 years arising out of the operation of the |
| 3 | | facilities which have been asserted against |
| 4 | | Detroit/DWSD or of which Detroit has knowledge." |
| 5 | | Do you see that? |
| 6 | A. | Yes. |
| 7 | Q. | And the italicized names there are "Jacobs & |
| 8 | | Walter will address." Would that have come, |
| 9 | | again, from the January meeting? |
| 10 | A. | Yes, that would reflect their commitment to come |
| 11 | | back and answer that question. |
| 12 | Q. | And there are three claims that are identified |
| 13 | | here in response to paragraph 30 in |
| 14 | | non-italicized font. That would be information |
| 15 | | that was provided then from Jacobs and Walters |
| 16 | | during the March meetings; is that correct? |
| 17 | A. | Yes, it certainly came from them, and that matches |
| 18 | | the meetings on March 12th and 18, yes. That's |
| 19 | | when they would have gotten back. And then this |
| 20 | | was kind of -- I think it's apparent this was a |
| 21 | | document that just kind of grew with -- just got |
| 22 | | edited. Every time we got more information or had |
| 23 | | a meeting, the document would get amended to |
| 24 | | reflect subsequent information. So that's |
| 25 | | information they would have responded to in March. |

| | | |
|---|---|---|
| 1 | Q. | So then taking you to paragraph 32, 32 asks the |
| 2 | | city to "Describe any facts of which DWSD or |
| 3 | | Detroit is aware which would give rise to or |
| 4 | | support a claim against any contractor or other |
| 5 | | person arising out of or related to the |
| 6 | | facilities and state whether should claim [has] |
| 7 | | been asserted." Do you see that? |
| 8 | A. | I do. |
| 9 | Q. | And, again, italicized "Jacobs & Walter will |
| 10 | | address." That would have, again, been |
| 11 | | information provided during the January meetings? |
| 12 | A. | Yes. That would reflect the fact they said we'll |
| 13 | | follow up and get you an answer to this. |
| 14 | Q. | The non-italicized language underneath there, it |
| 15 | | indicates "DWSD is not aware of any known, |
| 16 | | threatened or pending claims other than those |
| 17 | | identified in ITEM 30." Do you see that? |
| 18 | A. | I do. |
| 19 | Q. | That would come from Jacobs and Walters, then, |
| 20 | | from the March meetings; is that correct? |
| 21 | A. | That's correct. My guess with that wording, |
| 22 | | that's -- actually that looks like that would have |
| 23 | | been their wording, but maybe not. So, yes. And |
| 24 | | I would just -- in further answer to your |
| 25 | | question, sometimes the answer to this information |

1      might have come back by way of e-mail, so I

2      couldn't testify here today that that was provided

3      at a meeting as opposed to at a subsequent

4      communication, but there would have been a

5      subsequent communication where they got back to me

6      and said we're not aware of any known threat or

7      pending claims.

8   Q.   And they would be Jacobs and Walters on behalf of

9        DWSD?

10  A.   That is correct.

11  Q.   At any point prior to execution of the

12       acquisition agreement did anybody from Detroit

13       inform you that there was an ongoing criminal

14       investigation into the irregularities in DWSD

15       construction contracts?

16            MR. RUEGGER:  Objection to form.

17            THE WITNESS:  I have no recollection of

18       anybody from DWSD saying that.

19  BY MS. BADALAMENTI:

20  Q.   If such an investigation had been going on and

21       DWSD had notice, was that the information you

22       were being looking for in response to those three

23       paragraphs that are identified in this due

24       diligence memo?

25            MR. RUEGGER:  Objection, form.

```
 1                    MR. WATSON:  I'll object, counselor,
 2          speculation.  Object to form.
 3                    MR. RUEGGER:  Misstates the document.
 4                    THE WITNESS:  That certainly would have
 5          been among the things that we wanted to find out
 6          about and prompted that question.
 7     BY MS. BADALAMENTI:
 8     Q.   Is it your understanding that if Macomb would
 9          have been informed of such information, it would
10          not have executed the acquisition agreement on
11          the terms and for the price that it did?
12                    MR. RUEGGER:  Objection, form.
13                    MR. WATSON:  Object, form, calls for
14          speculation.
15                    THE WITNESS:  I do not believe it would
16          have -- the lawyers' advice would have been stop
17          and get to the bottom of this.  And I guess I
18          can't tell you what Commissioner Marrocco's
19          opinion would be because that's privileged.
20     BY MS. BADALAMENTI:
21     Q.   The documents that have been put in front of you,
22          the Letter of Intent, the settlement agreement,
23          the acquisition agreement, is it your opinion
24          that any of these documents seek or require that
25          DWSD affirmatively represent whether or not there
```