# EXHIBIT F

**Designation of Deposition Testimony of Bart Foster**

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5       _____
 6       In re:                    )    Case No. 13-53845
 7       CITY OF DETROIT, MICHIGAN )
 8                                 )    Chapter 9
 9              Debtor             )
10       _____)    Hon. Steven W. Rhodes
11
12
13            The Deposition of BARLETT D. FOSTER,
14            Taken at 150 W. Jefferson Avenue, Suite 2500,
15            Detroit, Michigan,
16            Commencing at 4:30 p.m.,
17            Wednesday, July 9, 2014,
18            Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```

```
 1                MS. HATHAWAY:  Did he do or do you do?
 2      You want actually what he did in this particular
 3      instance, right?
 4                MS. BADALAMENTI:  Right.
 5                THE WITNESS:  We were made aware of the
 6      general construct of the intended purchase price,
 7      and probably consulted -- no, definitely consulted
 8      on the applicability of that general construct,
 9      and then were requested to complete an analysis
10      of -- additional analysis in order to kind of
11      determine the purchase price.
12   BY MS. BADALAMENTI:
13   Q.  So when you said the construct of the purchase
14      price, what do you mean?
15   A.  Our understanding that the original arrangement
16      for transfer of the asset was to set the purchase
17      price at a term -- a defined term in the agreement
18      of system debt.  System debt was defined in the
19      agreement as the investment that DWSD has made in
20      the facilities being transferred less whatever
21      amounts that Macomb had paid in sewer rates that
22      were associated with principal -- not interest,
23      but principal on debt service that was allocated
24      to those assets.  That was the general construct
25      of the deal for the purchase price.
```

```
 1   Q.   At the time that you are initially consulted
 2        with, has there already been a determination that
 3        there are certain Macomb-only projects that will
 4        be -- that were assessed in the rates a certain
 5        way and that will or will not be passed along
 6        with the purchase price a certain way?
 7             MS. HATHAWAY:  Object to the form of
 8        the question.  It's vague.
 9             THE WITNESS:  I don't understand your
10        question.  I'm sorry.
11   BY MS. BADALAMENTI:
12   Q.   Was there -- I guess let me ask it this way:  You
13        were involved in the rate calculations at the
14        time for DWSD; is that the true?
15   A.   True.
16             MS. HATHAWAY:  When you say "at the
17        time," what time are we talking about now?
18   BY MS. BADALAMENTI:
19   Q.   The four-year time period that -- I guess the
20        beginning of the 4-year time period that you're
21        calculating the system debt.
22             During that time period you were
23        involved in determining the rates, correct?
24   A.   That's correct.
25   Q.   And you would determine the rates for Macomb?
```

BIENENSTOCK
www.bienenstock.com

1  A.  The wholesale rates -- wholesale sewer rates
2      charged by DWSD to Macomb, yes.
3  Q.  What would go into that analysis?
4  A.  Well, there's a rather rigorous analysis for the
5      DWSD sewer rates that establishes wholesale
6      charges -- cost allocations and wholesale charges
7      for all the contract customers of DWSD, including
8      Macomb.  Macomb and to a lesser extent the Clinton
9      Oakland District of Oakland County were the only
10     wholesale customers that there were facilities
11     that DWSD owned, built -- financed, built, owned
12     and operated specifically for the benefit of one
13     contract customer.  All the other county contract
14     customers had built their own interceptor systems.
15     The original arrangement with Detroit and Macomb
16     and the Clinton Oakland District of Oakland County
17     was that Detroit would finance, construct, own and
18     operate what's now the Macomb Intercepter
19     District, and so in the rate design, there needed
20     to be a direct assignment of the costs associated
21     with that -- those facilities to Macomb.  That was
22     part of the rate design at the time.
23 Q.  So the -- when you say that you're going to
24     determine the investment made by DWSD less the
25     amounts Macomb paid by the rate, you would know

BIENENSTOCK
www.bienenstock.com
13-53846-tjt    Doc 6061-7    Filed 07/16/14    Entered 07/16/14 10:50:57    Page 5 of 16

```
 1        what Macomb was paying towards what debt; would
 2        that be a fair assessment?  You would already
 3        have that information?
 4   A.   That was part of the annual evaluation of rates,
 5        yes.
 6   Q.   So the rest of what you told me is that there
 7        would be some debt service that was allocated to
 8        Macomb.  That would be that debt service that was
 9        allocated to Macomb previously?  In other words,
10        it didn't change for purposes of this analysis?
11        It was what Macomb was already allocated?
12             MR. RUEGGER:  I'll object to the form
13        of that.
14             MS. HATHAWAY:  Me, too.
15   BY MS. BADALAMENTI:
16   Q.   Let me ask it a different way.  Your analysis of
17        the investment made by the DWSD less the amounts
18        Macomb paid by its rates didn't change the rate
19        or the allocation that Macomb was already paying;
20        it just calculated what Macomb had paid to date?
21        Is that a better way of asking it?
22   A.   I'm struggling with the way that you characterize
23        it.  I don't think I can confirm exactly what you
24        said the way that you said it.
25   Q.   Well, tell me how did you then determine at the
```

1    time that you were going to set the system debt
2    what Macomb had paid via its rates towards
3    principal, not interest, on the debt service that
4    was allocated.
5 A. We reviewed the construct of the rates that had
6    been charged going all the way back to the
7    mid-80s, and did a retrospective analysis of how
8    much of that rate was associated with principal on
9    each one of those -- of the bonds that were
10   allocated to the Macomb-specific assets.
11 Q. Okay. So to answer that question, did you need
12   any additional information -- information that
13   you did not already have or get from engineering
14   or accounting to come up with that analysis?
15 A. The only additional information we needed was
16   rate -- records of rate analyses through the
17   years, much of which was already in our
18   possession.
19 Q. Okay. Did you have any discussions with the
20   contract department of the City of Detroit for
21   any of the information that you need to make this
22   calculation of system debt? Contracts and grants
23   department, to be more specific?
24 A. I don't believe so. I don't recall any specific
25   conversations with contracts and grants.

```
 1   A.   The final number on 1368 sinkhole repairs was
 2        established a fair amount of time -- I don't
 3        know -- a year before the final agreement was
 4        reached.  A year at least, I would say.  Any other
 5        ongoing contracts did not include the sinkhole
 6        repair beyond that time.
 7   Q.   The totals you were given for that sinkhole
 8        repair are something that's specifically
 9        referenced in the schedules as opposed to
10        something that went into your calculation of
11        system debt; is that a fair statement?
12   A.   I don't understand the distinction you're drawing.
13   Q.   You told me that you calculated system debt by a
14        specific mathematical method, right?
15   A.   Okay.
16   Q.   And my question is:  Did the analysis of charges
17        on 1368 go into that same analysis?
18   A.   The total charges on the sinkhole repair defined
19        by 1368 was an input to the calculation.
20   Q.   Okay.  Do you remember who provided you with the
21        information -- what that final number was?
22   A.   It would have been the DWSD accounting division.
23   Q.   And what did they give you when they give you a
24        total like that?  Is it a sheet of paper?  A
25        final pay estimate?  What is it that you would
```

```
 1            receive?
 2      A.    The records I got -- the records we received from
 3            accounting would generally indicate total amount
 4            on the fixed asset books separated by contractual
 5            services costs or construction contract cost, and
 6            then other indirect costs such as internal labor
 7            cost, allocated overheads, and capital interest --
 8            capitalized interest, those type of things.  There
 9            would be four or five fields leading up to a total
10            investment figure.
11      Q.    Are those documents you received in connection
12            with this calculation something that you still
13            have?
14      A.    I don't know.
15      Q.    In any event, was there anything unusual or
16            different about the calculation that you were
17            provided on 1368 different than any other time
18            you had gotten information from DWSD?
19      A.    No.
20      Q.    Did you question anybody about the information or
21            was it just input into your calculation?
22      A.    It was input into the calculation.  We did make
23            inquiries to fully understand the nature of what
24            was being reported.
25      Q.    What types of inquiries?
```

```
 1   A.   We wanted to make sure we understood the
 2        capitalized interest piece and what went into the
 3        internal cost piece.
 4   Q.   Do you remember what the internal cost was?
 5   A.   I can picture a schedule, but my recollection is
 6        that the total book value for the repairs was in
 7        the low $60 million range, and that of that --
 8        roughly $3 million was internal cost and roughly
 9        $4 million was capitalized interest, which left a
10        net of $56 million or so as being the contractual
11        amounts for that project. That's just from
12        memory. I haven't looked at it for a while.
13   Q.   That's pretty good. You're pretty close. The
14        documents -- the actual acquisition agreement
15        references a $54 million number. Do you know how
16        it went from 56 to 54?
17   A.   Not without looking back at things, no.
18   Q.   Okay. What is it that you would need to look at
19        so I don't put a bunch of things in front of you
20        that you don't need to see, because I know you
21        have a plane to catch.
22   A.   There are Exhibit 3.8 and I'm sure that there are
23        somewhere in your records additional calculations
24        that support that.
25   Q.   Were you ever questioned as part of a criminal
```

```
 1      investigation in connection with the work you
 2      performed for DWSD?
 3   A. Can you repeat the question.
 4   Q. Were you ever questioned by federal investigators
 5      in connection with your work?
 6   A. I was not.
 7              MS. BADALAMENTI:  Let's mark this as 1.
 8              MARKED FOR IDENTIFICATION:
 9              DEPOSITION EXHIBIT 1
10              5:18 p.m.
11   BY MS. BADALAMENTI:
12   Q. I've put in front of you -- and we'll just go
13      through them as quickly as possible, but I put in
14      front of you what appears to be a report dated
15      February 6, 2007 from The Foster Group.  Do you
16      recognize the document?
17   A. Yes.
18   Q. What was this document prepared for?
19   A. This document was related to negotiations on the
20      transfer of the Macomb Intercepter District to
21      Macomb County that I would characterize were part
22      of negotiations for adjustments to the system debt
23      as defined by the original construct of the deal.
24   Q. So I see in here as Exhibit 3 15 Mile and Hayes
25      Repairs.  I see that $56,861,900 as a total.  Is
```

```
 1       that the total you were provided?
 2  A.   That is the -- this is 2007. My belief is that
 3       that is the net contractual cost of the repairs
 4       which would not include the capitalized interest
 5       nor the internal cost that we mentioned a few
 6       minutes ago, yes.
 7  Q.   Okay. So -- and the footer on the bottom is
 8       dated 1/29 of 2007. So by that time you would
 9       have had the total project cost?
10  A.   I believe so. I would not want to be definitive
11       about that without looking through records, but I
12       believe so.
13  Q.   Okay. So then the negotiations surrounding
14       Macomb's purchase would have begun prior to -- at
15       least prior to this February 6, 2007 letter?
16  A.   Correct.
17  Q.   Do you know how much prior to this letter?
18  A.   I do not. I could speculate, but I could not be
19       precise.
20  Q.   What would you approximate? If you can
21       approximate --
22  A.   2005 at the earliest, likely 2006.
23  Q.   Were you involved at all in the litigation case
24       that was ongoing before Judge Feikens with
25       respect to some of these issues?
```

```
 1            conversations, I don't know that I could represent
 2            this memorandum as being definitive as to what led
 3            to that.  There were constant conversations going
 4            on looking at some of this information through the
 5            negotiation process.
 6       Q.   Okay.  I am looking at a page in that.  The top
 7            of it reads "Table B Debt Reconciliation Table."
 8            Line item 10 has the 54,577,052 total contract
 9            cost per Foster 2009 as one of the items in the
10            schedule.  Do you see that there?  It would be
11            10-F?
12       A.   I'm sorry, 10-F?  I'm -- oh, the 54,500,000, I see
13            that number, yes.
14       Q.   And that column F is total contract cost per
15            Foster 2009.  Do you know what that is referring
16            to?
17                 MS. HATHAWAY:  Is that 9 or 8.
18                 THE WITNESS:  It's 2009.  So later on
19            in this package, the first page after something
20            handwritten tab 2, there is an exhibit entitled
21            Table 1 - Investment Costs of DWSD OMI Assets.
22       BY MS. BADALAMENTI:
23       Q.   I found tab 3 but I can't find tab 2:  Okay.
24            Table 1, okay.
25       A.   Line 30, CS-1358 15/Hayes repairs, the 54 million
```

```
 1   Q.   Did you review that settlement agreement before
 2        it was entered into?
 3   A.   Yes, I did.
 4   Q.   Did you help prepare it?
 5   A.   I did.
 6   Q.   There was a letter of intent that was executed in
 7        connection with the purchase or the settlement
 8        agreement.  Did you help prepare that?
 9   A.   I don't recall.
10   Q.   What new information, if any, went into your
11        preparation of the settlement agreement?
12             MS. HATHAWAY:  Object to the form of
13        the question.  He didn't prepare the settlement
14        agreement.  He said he helped.
15             THE WITNESS:  I'd ask you to define new
16        information.
17   BY MS. BADALAMENTI:
18   Q.   Did you need any new information about the
19        contracts, the projects?  Did you recalculate the
20        system debt?  Or did you simply look at the
21        tables and schedules that you had already
22        calculated and incorporate that information?
23   A.   My recollection is that we did not make any
24        material changes to the system debt portion of the
25        purchase price, but rather the global settlement
```

```
 1      affected adjustments to the system debt that then
 2      became part of the purchase price.  That had
 3      nothing to do with the original premise of system
 4      debt.
 5  Q.  Okay.  Was it an agreed upon calculation of that
 6      amount?  First of all, what was that amount?  Do
 7      you remember -- the global settlement amount?
 8  A.  The global settlement had several facets to it.  I
 9      believe on recollection that the effect to the
10      Macomb Intercepter purchase price was an offset
11      from system debt in the neighborhood of $17
12      million dollars.
13  Q.  And what was the total of system debt, if you can
14      remember?
15  A.  Approximate figures, I think the system debt
16      cost -- system debt calculation was $107 million,
17      and after an offset of roughly $17 million, got
18      down to 91 million -- $90 million and change.
19  Q.  Was that calculated price agreed upon by
20      everybody?  In other words, at the point in time
21      that that is the total debt you're calculating,
22      does Macomb dispute that that's the total?  Or
23      does the global settlement or the offset of 17
24      million go to something else?
25              MS. HATHAWAY:  Object to the form of
```

BIENENSTOCK
www.bienenstock.com

```
 1                    CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN    )
 3                         ) SS
 4    COUNTY OF MACOMB     )
 5
 6              I, MELINDA S. MOORE, certify that this
 7    deposition was taken before me on the date
 8    hereinbefore set forth; that the foregoing
 9    questions and answers were recorded by me
10    stenographically and reduced to computer
11    transcription; that this is a true, full and
12    correct transcript of my stenographic notes so
13    taken; and that I am not related to, nor of
14    counsel to, either party nor interested in the
15    event of this cause.
16
17
18
19
20    [signature: Melinda S. Moore]
21
22              MELINDA S. MOORE, CSR-2258
23              Notary Public,
24              Macomb County, Michigan
25         My Commission expires:  September 6, 2016
```