# **EXHIBIT G**

**Designation of Deposition Testimony of Robert Walter**

1           UNITED STATES BANKRUPTCY COURT

2           EASTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DIVISION

4

5      _____

6    In re:                    )    Case No. 13-53845

7    CITY OF DETROIT, MICHIGAN )

8                              )    Chapter 9

9           Debtor            )

10    _____ )    Hon. Steven W. Rhodes

11

12

13        The Deposition of ROBERT C. WALTER,

14        Taken at 150 W. Jefferson, Suite 2500,

15        Detroit, Michigan,

16        Commencing at 10:27 a.m.,

17        Friday, July 11, 2014,

18        Before Melinda S. Moore, CSR-2258.

19

20

21

22

23

24

25

BIENENSTOCK
www.bienenstock.com

1  Q.  -- so the court reporter can get down what we're

2      saying.

3                      Are you currently employed?

4  A.  No.  I'm retired.

5  Q.  When did you retire?

6  A.  March of 2012.

7  Q.  Where did you retire from?

8  A.  City of Detroit Law Department.

9  Q.  What was your position?

10 A.  Senior assistant corporation counsel.

11 Q.  Who was above you in the Law Department?

12 A.  At that time, my supervisor was Judith Turner and

13     then the director and -- was Krystal Crittendon,

14     and the deputy director was Edward Keelean.

15 Q.  The highest ranking person in that department was

16     Ed Keelean?

17 A.  No, he was the deputy director.  Krystal

18     Crittendon was the director.

19 Q.  What would your day-to-day duties have been as an

20     assistant -- senior assistant corporation

21     counsel?

22 A.  I was assigned to represent the Detroit Water and

23     Sewerage Department, and basically general counsel

24     work for whatever they wanted me to do.  I didn't

25     do litigation.  I wrote and reviewed contracts,

| | | |
|---|---|---|
| 1 | | negotiated contracts, advised the department on |
| 2 | | any legal issues that they wanted advice on. |
| 3 | Q. | Advise the DWSD? |
| 4 | A. | Yes, that was -- I did some work for the Public |
| 5 | | Lighting Department, but mostly DWSD. |
| 6 | Q. | When did you take the position of senior |
| 7 | | assistant corporation counsel? |
| 8 | A. | I got promoted in the mid-90s -- '95 or '96. |
| 9 | Q. | And were you always in that position assigned to |
| 10 | | the DWSD? |
| 11 | A. | I was assigned to DWSD from the time I started at |
| 12 | | the Law Department in 1982 until I retired. |
| 13 | Q. | With respect to any criminal investigations or |
| 14 | | outside agencies investigating the DWSD, would |
| 15 | | that have been something that you would become |
| 16 | | involved with? |
| 17 | A. | No.  I was not involved in that. |
| 18 | Q. | What -- who would have been involved? |
| 19 | A. | Someone higher than me.  There were two federal |
| 20 | | investigations of the department while I worked |
| 21 | | there, when I just started there, in 1982, when |
| 22 | | the director of the department, Charles Beckham |
| 23 | | was indicted and subsequently convicted.  And that |
| 24 | | was handled by my supervisor, Darryl Alexander, |
| 25 | | and they add lawyer from Dykema -- a criminal |

```
 1          lawyer from Dykema Gossett named Howard O'Leary
 2          who worked on that.
 3                  And then the one in the Kilpatrick
 4          administration was an headed by Edward Keelean,
 5          the deputy director of the department.
 6    Q.    And when did that investigation begin, to the
 7          best of your knowledge?
 8    A.    I don't remember a date.  I became aware of it
 9          when I was -- when Mr. Keelean and another lawyer
10          named Dennis Mazurek showed me a grand jury
11          subpoena for Water and Sewerage Department
12          documents and asked me who at the Water Board
13          Building they would contact to find all the files
14          that responded to that subpoena.
15    Q.    Do you know what time frame that was?
16    A.    I don't.
17    Q.    Did that grand jury subpoena request files or
18          people to testify?
19    A.    The ones that I saw -- and there were several of
20          them -- were all for documents.  They did subpoena
21          individuals to testify before the grand jury, but
22          I was not involved in that at all.
23    Q.    Do you know what came first, the subpoenas for
24          documents or subpoenas for individuals?
25    A.    I think it was the documents.
```

BIENENSTOCK
www.bienenstock.com

```
 1    A.    Chief assistant corporation counsel.

 2    Q.    Did you work with him on other things or just

 3          this one?

 4    A.    I worked with Dennis on a number of issues.  He

 5          was the head of what's called the municipal

 6          section, which handled -- they responded to

 7          subpoenas in actions where the city was not a

 8          party.  They advised the city council on ordinance

 9          drafting, and they handled all the Freedom of

10          Information Act requests, so anytime the Water and

11          Sewerage Department got FOIAs, and things like

12          that, I would deal with him.

13    Q.    How about Ed Keelean?  How often did you interact

14          with him?

15    A.    Not all that often.  Primarily I dealt with my

16          supervisors.  In the chain of command above me

17          there was my supervisor, Judith Turner, and then

18          she reported to Dennis Mazurek, who reported to Ed

19          Keelean and Krystal Crittendon.

20    Q.    When you were shown the grand jury subpoenas, do

21          you know what year that was?

22    A.    I don't.

23    Q.    When you were shown the grand jury subpoenas, was

24          that the first time that Mr. Keelean had asked

25          you to get something or direct him in the right
```

```
 1        way since you became -- or since he became the
 2        director?
 3    A.  I think so, yes.  I mean, basically I would deal
 4        with him if was writing a legal opinion for the
 5        Law Department that either he or the corporation
 6        counsel had to sign off on, but it was just
 7        projects like that.  An average week, I had no
 8        contact with him.
 9    Q.  Did you -- in order to answer his questions, did
10        you have to ask him about the investigation and
11        the nature -- the nature of the investigation?
12    A.  Yes.  And although I don't know how much the
13        federal investigators were telling him, he was the
14        liaison between the federal investigators and the
15        city.  And I don't know what they told him.
16    Q.  What did he tell you?
17    A.  That he was receiving subpoenas, that he was
18        compiling documents, and that he also sat in on
19        some of the interviews where the federal
20        investigators were interviewing city employees.
21        This was before some of them got called before the
22        grand jury.
23    Q.  Had you sat in on any interviews?
24    A.  No, but I was interviewed by the assistant U.S.
25        attorney who was on the investigation.
```

BIENENSTOCK
www.bienenstock.com

1    Q.    When was that?

2    A.    I don't remember the date.  It was several months

3          before the indictment came out.

4    Q.    In 2010?

5    A.    It might have been.  Either late 2009 or early

6          2010.

7    Q.    So going back to the conversation with

8          Mr. Keelean, did he tell you what was being

9          investigated?

10   A.    I don't know if this is privileged or not, but --

11              MR. FAISON:  If you think it might be

12         privileged, then establish the parameters, and

13         then we can figure out whether it's privileged or

14         not.

15              THE WITNESS:  He told me general --

16              MR. FAISON:  Not what -- in terms of

17         the conversation, how did the conversation come

18         up, and did you feel that you were offering law

19         advice to him?

20              THE WITNESS:  Well, no, I wasn't

21         offering any legal advice.  There were

22         investigations as far as it involved the

23         department that I worked with, of kickbacks being

24         paid by contractors or extorted from contractors,

25         and there was also in a housing department

BIENENSTOCK
www.bienenstock.com

```
 1    contract that I got stuck working on an allegation
 2    of bid rigging.
 3    BY MS. BADALAMENTI:
 4    Q.   You said kickbacks that were paid by or extorted
 5         from contractors.  Do you know which one was
 6         being investigated?
 7    A.   No.
 8    Q.   Did Mr. Keelean tell you it was one or the other
 9         or did you gather that information on your own?
10    A.   A lot of that came from just reading the
11         newspapers and watching the television news.  The
12         news media were -- I probably got more information
13         about the investigation from reading the
14         newspapers than I did from talking to Ed Keelean.
15    Q.   Would that have been at the time that you were
16         answering these subpoenas you saw this
17         information going on in the news?
18    A.   The investigation was all over the newspapers and
19         the TV stations.
20    Q.   What was the housing project?
21    A.   That was a fed -- the federal government, the
22         Department of Housing and Urban Development, was
23         putting up the money to rebuild an old public
24         housing project on the west side of Detroit.  The
25         old one had demolished -- been demolished, and
```

BIENENSTOCK
NATIONWIDE COURT REPORTERS & VIDEO
www.bienenstock.com

```
 1        grants group.  I would review it after the
 2        negotiation was finalized, but typically the
 3        negotiation of an amendment was done by the
 4        contracts and grants group and engineers who were
 5        the project managers for the contract.  I
 6        generally was not involved in that.
 7   Q.   What was the scope of the work that was covered
 8        by this Amendment 1?
 9   A.   The scope of the work is -- actually there is no
10        scope of work in this amendment, which means that
11        the scope of work that was in the initial contract
12        would remain in place.  And it looks like this one
13        was simply adding additional funding to cover more
14        of the same types of work.
15   Q.   Who would be -- who would initiate an amendment
16        like this where they're approving more money for
17        the same work?
18   A.   That would typically be the engineering department
19        that was administering the contract.  If they
20        found that there was more work that needed to be
21        done, then they would ask for a budget increase
22        and a contract amendment putting more money.  And
23        sometimes they would add work to the scope of a
24        contract.  And this one -- this amendment doesn't
25        do that.  It's just sewer inspection and relining,
```

```
 1        and there are unit prices for various sizes of

 2        pipe.

 3   Q.   Is it your understanding that the work had

 4        changed in some aspect or that it had -- the

 5        scope of the original work was different when

 6        they got in to do it, or what was the reason that

 7        amendment was necessary?

 8   A.   Well, the explanation is in the second and third

 9        pages of this exhibit.  There's a memorandum to

10        the Board of Water Commissioners from the director

11        explaining the need for the contract amendment,

12        which simply says that they're inspecting and

13        relining old sewers, and that they want to have

14        additional work done, but it's the same type of

15        work.  They're just adding more money.

16   Q.   Is it additional work or are they relining a

17        different areas or --

18   A.   This covers sewers for the whole area of the

19        city -- service area.

20   Q.   Did the original 1368 cover the same scope?

21   A.   I haven't seen the original -- the scope of work

22        is in contract -- the original contract document,

23        which I do not have before me.

24                     MARKED FOR IDENTIFICATION:

25                     DEPOSITION EXHIBIT 2
```

1          we're within that time frame, right, when we

2          enter into Amendment 1?

3     A.   Amendment 1 was approved by the city council on

4          February 2nd, 2005, so --

5     Q.   Amendment 1 is -- there's a motion to the Board

6          of Water Commissioners as of August 25th of 2004,

7          correct?

8     A.   Right.

9     Q.   So the board might not approve it until 2005, but

10         they've used up their budget from the original --

11    A.   At some point.

12    Q.   Hold on.  Let me finish.  They've used up their

13         budget from 2002 to August 25th of 2004?  That's

14         when they request additional funding?

15    A.   They requested an additional $10 million to do

16         more work and they did not -- this Amendment No. 1

17         did not extend the time of performance.

18    Q.   So within the same three-year time frame we're

19         upping the budget $10 million?

20    A.   Yeah.

21              MR. FAISON:  I object to the suggestion

22         that all money had been used up on the contract at

23         the time the motion was filed.  There is no

24         evidence to support that suggestion.

25              MS. BADALAMENTI:  I appreciate the

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

```
1    A.    I think the original anticipation was that the
2          budget was going to be -- in the original
3          contract, was going to be sufficient for the
4          three-year term, but obviously they found
5          additional work.  You don't know what state the
6          sewers are in until you actually get in there and
7          take a look at them.  And obviously they found
8          more deterioration in the sewers and they wanted
9          to have more work done.
10   Q.    So in the professional services context you told
11         me that there is a design process that goes into
12         the proposal submitted by the professional.  So
13         is it your testimony now that they might not have
14         known what the design or nature or how much sewer
15         they were going to be covering --
16   A.    Well --
17               MR. FAISON:  Hold on.  Let her --
18               MS. BADALAMENTI:  That's okay.
19               MR. FAISON:  Let her finish her
20         question.  That way I can figure out whether the
21         question is objectionable or not before you
22         answer.
23               THE WITNESS:  Okay.  This was not
24         really a design contract.  This was more an
25         as-needed inspection and rehabilitation work for
```

```
 1        relining old sewers that were deteriorated.  You
 2        just look at the condition of the sewer, and if
 3        it's cracking or pitting, you reline it.
 4   BY MS. BADALAMENTI:
 5   Q.   So this CS-1368 wasn't really any of those three
 6        types of contracts.  That's what you're telling
 7        me now.  It wasn't construction contracts; it
 8        wasn't a professional services contract; it
 9        wasn't a design-build contract.  It was something
10        different.  Now we have a fourth category of
11        contract?
12   A.   Well, this -- this would be more of -- the scope
13        of work here is inspecting sewers and relining the
14        ones that need to be relined.  So the inspection
15        work and evaluation is professional services, and
16        the relining work is basically construction work;
17        so they were doing both in this contract.
18   Q.   So is it your testimony that this is a fourth
19        type of contract?  It's not one of those three?
20   A.   Yeah, there -- yeah.
21   Q.   What other contracts were as-needed contracts?
22   A.   Oh, the sludge hauling contracts for the
23        wastewater treatment plant.  Depending on how many
24        tons of sludge the plant produces -- you'd have
25        trucking companies on call.  You would have what
```

```
 1        were called as-needed design services where you'd
 2        have engineering firms under contract and you
 3        would assign projects to them.
 4              You had what was called skilled
 5        maintenance contracts where you would have
 6        contractors that would provide skilled trades work
 7        at pump stations and water treatment plants and
 8        the sewer plant.  And that was all on an as-needed
 9        basis.  Some days they'd be doing nothing and some
10        days they'd have a full crew.
11    Q.  Those contracts would have a total contract
12        amount and they would work for a certain period
13        of time within that contract amount, right?
14    A.  You would start -- yeah, you would have a contract
15        amount that they could not go over without an
16        amendment increasing the price, and there would be
17        an initial time frame, and that would require a
18        contract amendment to shorten or extend it.
19    Q.  The sludge hauling contracts, the engineering
20        contracts, were those -- were there typically
21        amendments in connection with those types of
22        contracts?
23    A.  Yes.
24    Q.  Would the amendments not extend the time but
25        extend the budget?
```

BIENENSTOCK
www.bienenstock.com

```
 1   A.   You could get any combination of that.  You could

 2        have a time-only extension.  You could have a

 3        budget extension or you could have both.

 4   Q.   Tell me some of the amendments that you're aware

 5        of on these as-needed-type contracts where the

 6        time is not extended but the budget is.  Any

 7        other example you can give me?

 8   A.   Oh, sometimes on the sludge hauling contracts, if

 9        you've got -- if the plant was producing more

10        sludge than normal, things like that.

11   Q.   Any others?

12   A.   It could happen on any type of contract.

13   Q.   Was this the only contract that you were involved

14        with where the City of Detroit was contracting

15        with a contractor or professional services

16        provider to inspect the sewer system?

17   A.   No.  There were a number of those contracts over

18        the years.

19   Q.   Who were some of the other contractors?

20   A.   There was a company called Insituform --

21        Insituform of Michigan, which was owned by the

22        same holding company that owns Inland Waters.

23        There was a company called Lanzo Construction that

24        had a contract for relining some of the larger

25        sewers and outfalls on the Detroit River.  Those
```

BIENENSTOCK
www.bienenstock.com

```
 1          There might be unit prices.  There might be hourly

 2          rates.  It would depend on the type of contract.

 3          There would be something breaking it down.

 4    Q.    So the costing summary for CS-1368, the original

 5          sewer lining project, is that something that we

 6          see in these documents here?

 7    A.    Well, the costing summary in Exhibit 1 is several

 8          pages -- more than several -- of unit prices for

 9          sewer lining based on the diameter of the sewer

10          and then the linear feet of pipe rehabilitated.

11    Q.    That would be Exhibit B-2?

12    A.    This is Exhibit B, captioned Cost Information

13          Sheet.

14    Q.    Okay.  Let me get the record situated here.  It

15          would be Exhibit B to the document titled

16          Contract CS-1368, which we've marked as

17          Exhibit 2?

18    A.    Yes.

19    Q.    Okay.  Exhibit B to Exhibit 2 has these unit

20          prices, right?

21    A.    Yeah.  Exhibit B to Exhibit 2 is a long list of

22          unit prices based on the diameter of the sewer and

23          the number of linear feet rehabilitated or

24          realigned.

25    Q.    What I don't see in this cost information sheet
```

1                    THE WITNESS:  Okay.

2    BY MS. BADALAMENTI:

3    Q.   So the unit price that's shown in this cost

4         information sheet would include everything that

5         went into that particular type of work, the

6         inspection service, use of television equipment,

7         the manpower required?  Everything would be

8         included within the unit price?

9    A.   The unit price includes labor and material,

10        inspection work, everything.  The contractor has

11        to set that price high enough to cover all of its

12        costs.

13   Q.   Does this original CS-1368 document provide for

14        overtime?

15   A.   No.  It provides for unit prices, and if the

16        contractor has to work overtime, it has to take

17        the overtime -- pay for its employees out of this

18        unit price.

19   Q.   September 20th of 2004 we see Mr. Shukla now

20        providing for labor, overhead, markups, overtime.

21        These types of things are now going to be

22        included within the amounts that Inland can

23        charge; is that correct?

24   A.   On the project covered by this amendment, which

25        was the sewer collapse on 15 Mile Road only.

BIENENSTOCK
www.bienenstock.com

```
 1   Q.   Okay.  Who would authorize Mr. Shukla to execute
 2        a costing supplement like this?
 3   A.   The director, Mr. Mercado.
 4   Q.   Who would authorize Mr. Mercado to do that?
 5   A.   As the director of the Water and Sewerage
 6        Department, he had the authority to do that.  I
 7        don't know if he discussed it with the mayor or
 8        not.
 9   Q.   The next page is dated April 4, 2005.
10   A.   Okay.  We're still in Exhibit 3, okay.
11   Q.   Right.  This April 4, 2005 document is a letter
12        by Victor Mercado.  Do you see that there?
13   A.   Yes.
14   Q.   Is this something you've seen before?
15   A.   It's part of the contract.  Yes, I've seen it
16        before.
17   Q.   By April 4, 2005, has most of the work or some of
18        the work been done on the project?
19   A.   Some of the work has been done.  I think that
20        project ran into June or July of 2005, before all
21        of it was done.
22   Q.   This document by Victor Mercado dated April 4,
23        2005, is proposing a different costing
24        supplement.  Do you understand that to be the
25        case?
```

BIENENSTOCK
www.bienenstock.com

1  A.   No.  This is just talking about the kind of

2       documentation they have to submit with their

3       invoices to get the invoices approved.  That's how

4       I read it.

5  Q.   So the -- the paragraph reads "The other cost

6       guidelines contained in the attached costing

7       supplement will govern all work performed on the

8       contract from its inception until final

9       completion."  Do you see that there?

10  A.   Yes.

11  Q.   So this document is intended to provide a

12      different costing framework going all the way

13      back to August, when the project began.  Would

14      you agree with that?

15  A.   This references some negotiations over the

16      pricing, and the costing supplement is on the next

17      page.

18  Q.   Okay.  So my question was:  Would you agree that

19      this document is going to provide a new costing

20      framework for Inland Waters going back -- the

21      language is from its inception of the work until

22      final completion.

23  A.   From the inception of the work covered by this

24      contract amendment, which is 15 Mile Road.

25  Q.   So from August 22nd or as soon as they started

```
 1         work thereafter -- August 22, 2004 collapse, they
 2         start work.  In April of 2005, we're now going to
 3         go backwards and impose these -- this costing
 4         framework; is that accurate?
 5    A.   It looks like this is maybe modifying the
 6         September 20th letter that Mr. Shukla wrote.
 7    Q.   Who would, again, give Mr. Mercado -- let me ask
 8         it this way:  You said earlier Mr. Mercado would
 9         have had the authority to direct Mr. Shukla to do
10         the first costing summary.
11    A.   Yes.
12    Q.   Would Mr. Mercado have authority, then, to do a
13         new costing summary?
14    A.   Yes, he would.
15    Q.   Would he need to get the mayor's approval to do
16         that, to the best of your knowledge?
17    A.   I don't know how much the mayor delegated that to
18         him.  And I'm not sure --
19    Q.   I don't want to cut you off.  Were you --
20    A.   No, go ahead.
21    Q.   Was this document something that you would have
22         reviewed, the letter dated April 4, 2005, or the
23         costing supplement that follows?  Was that
24         something that you reviewed before it was made a
25         part of the contract?
```

1   A.   I might not have because this was signed in

2        November 2004.  I might not have depending on the

3        date of the administrative order.  This may have

4        been added afterwards.  I'm not sure.

5   Q.   Well, it's dated well after November 2004.  You

6        would agree with that, right?

7   A.   Right.

8   Q.   You have no reason to believe that that was

9        something that was done before April of 2005, do

10       you?

11   A.   No.

12   Q.   The signature on the bottom, do you recognize

13       that to be Victor Mercado's signature?

14   A.   That's his handwriting.

15   Q.   Dennis Oszust from -- he signs as the vice

16       president, general manager of the company, Pipe

17       Rehabilitation Group?

18   A.   No, that's the group within Inland Waters.  The

19       company is Inland Waters Pollution Control,

20       Incorporated.  The Pipe Rehab Group was a group

21       within that company.

22   Q.   Okay.  Did you know Mr. Oszust?

23   A.   Yes, I've met him a number of times.

24   Q.   Did you meet him in connection with this project

25       or with this Amendment 2, I should say?

```
 1    A.   Not with this amendment.  I was dealing with DWSD
 2         staff on this amendment.  I didn't talk to him
 3         about this.
 4    Q.   Were you present when this document was signed by
 5         Mr. Mercado --
 6    A.   No.
 7    Q.   -- or Mr. Oszust?
 8              The pages that follow, CS-1368
 9         Amendment No. 2 costing supplement, there are some
10         initials there on the document and there's a date
11         of 3/17 of '05.  I deposed Mr. Shukla, and he
12         indicated that one of those initials were his.  Do
13         you recognize the other one?
14    A.   No.  It looks like D.O., which would mean Dennis
15         Oszust, but I'm guessing.
16    Q.   In your dealings with contracts for the DWSD, had
17         you had occasion to see a costing supplement that
18         was redone like was done in this case, where
19         there's actually a second costing supplement that
20         issues for the same contract?
21    A.   No.
22    Q.   Do you know how this -- or who directed that this
23         was done?
24    A.   This would have to come from Mr. Mercado.
25    Q.   Did you know what the standard markup or layers
```

BIENENSTOCK
www.bienenstock.com

```
 1          question, and if he said there's more work to be
 2          done, I would have taken his word for it.
 3    Q.    The work to be done had already at least been
 4          started at that point, correct?
 5    A.    I don't -- well, the whole project, the work that
 6          Inland Waters started in August, and --
 7    Q.    Of '04?
 8    A.    Of '04, and they had been working -- they and
 9          their subcontractors had been working out there
10          continuously.
11    Q.    So was it your understanding at the time
12          Amendment 3 is entered into that the whole budget
13          had been used or that the whole budget had been
14          used and there was more money due already?
15    A.    My understanding would have been that the current
16          budget was not enough, and that they were going to
17          use -- need more money to complete the work.
18          Whether that was -- whether they had spent
19          everything or whether they had some left, they
20          were going to run out, I don't know.
21    Q.    Was that something you customarily checked on,
22          how much had they spent -- "We're entering into
23          this Amendment 3 and we're preparing this
24          document.  How much has been spent so far?"
25    A.    I generally didn't ask that question.  I did not
```

BIENENSTOCK
www.bienenstock.com

```
 1        review -- I never reviewed the contractor
 2        invoices.  I just -- if they told me that they
 3        were running out, that the budget needed to be
 4        increased to complete the project, I would believe
 5        that and do it.
 6   Q.   And who other than Mr. Shukla would give you that
 7        information?
 8   A.   Either Darryl Latimer or Mr. Mercado.
 9   Q.   Did Darryl Latimer have any discussions with you
10        in connection with Amendment 3 about amounts that
11        had been disallowed with respect to the sinkhole
12        repair work?
13   A.   No.
14   Q.   Did anyone discuss with you before Amendment 3
15        was drafted or executed that there were concerns
16        about overcharges on the project?
17   A.   No.
18   Q.   Did you actually prepare the text of the
19        amendment?
20   A.   No.  Those amendments are boilerplate forms that
21        the contracts administration group would prepare.
22        And Darryl Latimer was the head of that group at
23        that time.
24   Q.   Does this amendment extend the time and budget or
25        just the budget?
```

1       been constructed?

2  A.   That was the way it was explained by Craig.  And

3       there were a couple of projects that were put into

4       the capital improvement program and put into the

5       rates that were charged to Macomb County that

6       never got built, and part of the price negotiation

7       involved in the transfer -- the transfer agreement

8       was pulling those -- identifying those projects,

9       pulling them out -- back out of the rate base and

10      giving Macomb County a credit for them on the

11      purchase price.

12  Q.  Was that credit referred to as the global

13      settlement amount?

14  A.  The global -- no, the global settlement is a

15      settlement agreement that the parties entered into

16      with Judge -- before Judge Feikens to resolve a

17      number of issues that were out there.  That was --

18      and part of that was that the community -- the

19      City of Detroit and Oakland and Macomb counties

20      would negotiate the sale of the interceptor to

21      drainage districts to be created by those two

22      counties, and the price resolution was done in the

23      context of the transfer agreement.  I don't think

24      it -- I don't think it was in the settlement

25      agreement.  I think it was worked out as we were

```
 1           setting the price to be paid for the sewer.
 2      Q.   So the settlement agreement was essentially an
 3           agreement to reach an agreement on the purchase?
 4      A.   That was part of it.  We also resolved the
 5           disputes over the cost allocation for the 800
 6           megahertz project and a couple of other disputed
 7           issues as well.
 8      Q.   Was the settlement agreement the means by which
 9           the cost allocation of 15 Mile and Hayes was
10           resolved or was that resolved in its entirety by
11           Judge Feikens' ruling?
12      A.   Judge Feikens resolved the allocation issue, that
13           it was Macomb County only.  And I don't recall
14           Macomb County ever filing a formal complaint about
15           the total cost of it.  At some point Mr. Marrocco
16           showed us -- shared with us the report that said
17           it could have been done for a lower cost, but I
18           don't recall him ever filing a formal litigation
19           pleading over that.
20      Q.   In the '77 case?
21      A.   Or in any case, I don't think.
22      Q.   There was also a dispute in the 1977 lawsuit
23           about the interest rate that was being charged by
24           DWSD.  Are you familiar with that?
25      A.   Yes.
```

```
 1   A.   Yes.
 2   Q.   Do you know whether that Letter of Intent was
 3        ever executed?
 4   A.   I believe it was.
 5   Q.   Just to make the record clear, the document that
 6        I handed you that's titled Settlement Agreement
 7        has been marked as Exhibit 5; is that correct?
 8   A.   Yes.
 9                      MARKED FOR IDENTIFICATION:
10                      DEPOSITION EXHIBIT 6
11                      12:30 p.m.
12   BY MS. BADALAMENTI:
13   Q.   The document that I've marked as Exhibit 6 is
14        titled the Macomb Acquisition Agreement.  It's
15        dated September 2nd of 2010.  Do you recognize
16        that document?
17   A.   Yeah.  This is -- it's got an Exhibit A marked all
18        over it, too.  I assume that's from something
19        else.
20   Q.   Short of that Exhibit A, do you recognize the
21        document?
22   A.   Yeah, this is the contract under which the City of
23        Detroit transferred the Macomb Interceptor to the
24        the Macomb Interceptor Drain Drainage District and
25        the County of Macomb.
```

BIENENSTOCK
www.bienenstock.com
13-53846-tjt   Doc 6061-8   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 28 of 34

```
 1    Q.   Let me ask it a different way.  There was due
 2         diligence that was contemplated by this
 3         agreement.  Are you familiar with that?
 4    A.   Yes.
 5    Q.   Were you part of any of the due diligence under
 6         taken by Macomb or Detroit in connection with
 7         this agreement?
 8    A.   The due diligence was undertaken by Macomb.  I
 9         don't recall Detroit doing any at all.  And I was
10         involved in all of the negotiation meetings that
11         led to this document.  If there were separate due
12         diligence meetings, I don't think I was part of
13         those.
14    Q.   You had said that Bart Foster was involved in
15         this process.  Do you know what his involvement
16         was?
17    A.   Bart is a water and sewerage rate consultant.
18         He's the one that creates the water and sewage
19         rates for the city.  He's very involved in the
20         department's finances and rate setting.  And he is
21         also works on the city's bond issues.  He was the
22         one who really went into the bond documents and
23         determined what the amount of the outstanding debt
24         was.  And then he had some meetings with Macomb
25         County's lawyer, Craig Hupp, who have looked at
```

```
 1        at the time, but I have honestly forgotten all
 2        that.
 3    Q.  Paragraph 3.8 Disclosure of System Debt, do you
 4        see that paragraph?
 5    A.  Yes.
 6    Q.  The last sentence of that paragraph, "None of the
 7        written data or information furnished or made
 8        available to Macomb County by Detroit as part of
 9        the due diligence," do you know what material was
10        furnished to Macomb County as part of the due
11        diligence?
12    A.  No, I don't.
13    Q.  Would Mr. Shukla or anybody else who's included
14        within that category of Detroit's knowledge know
15        what documents were provided?
16    A.  Shukla was not on the negotiating team for this
17        acquisition agreement, so it would not have been
18        him.  The due diligence mostly related to the
19        finances, so that would have been Bart Foster.
20    Q.  Paragraph 5.3 of this agreement provides that
21        Detroit shall promptly inform the Macomb County
22        and MID of any claims which it becomes aware that
23        might reasonably be expected to become the
24        subject of litigation affecting the Macomb
25        system.  Did you make any disclosures to Macomb
```

1           was not involved in those cases in any way.

2      Q.   The acquisition agreement, and in particular,

3           schedule 3.8 provides or has Macomb County paying

4           for the entire cost of the sinkhole repair

5           project.  Would you agree with that?

6      A.   This just has a number on it which is higher than

7           the total price of the contract amendment,

8           although, as I said, the contract with Inland

9           Waters covered more than just this work.

10     Q.   Do you understand the sinkhole repair to have

11          cost more -- total of the repairs to have been

12          more than $54 million?

13     A.   No, it's my understanding that that was the total

14          cost.

15     Q.   Okay.  And you're unfamiliar with the settlements

16          between Detroit and the contractors and

17          subcontractors?

18     A.   I was not involved in those at all.

19     Q.   Just so we have a good record, I'm going to mark

20          this as Exhibit 7.

21                         MARKED FOR IDENTIFICATION:

22                         DEPOSITION EXHIBIT 7

23                         12:53 p.m.

24     BY MS. BADALAMENTI:

25     Q.   Is this the Letter of Intent -- did I say I

1     marked it as Exhibit 7?  Is this the Letter of

2     Intent we were referring to earlier?

3  A.  This is the Letter of Intent, although this copy

4     is not signed.

5  Q.  But do you believe it was signed?

6  A.  My recollection is that it was, but I don't see a

7     signed copy here.  Maybe it wasn't.  My

8     recollection is that it was, but --

9  Q.  Section 9, Conduct of Operations, refers to in

10     several paragraphs that you were to obtain the

11     consent of the transferee to any -- in certain

12     circumstances.  In particular, paragraph 9(d)

13     provides obtaining consent of the transferee to

14     any extraordinary transaction or any transaction

15     which is not at arm's length with any person or

16     entity, in either case relating to the property."

17     Did you ever obtained Macomb County's consent to

18     any extraordinary transaction or transaction not

19     at arm's length?

20  A.  I did not.

21  Q.  Who were you interviewed by at the United States

22     Attorney's Office?  Who were you interviewed by?

23  A.  It was an assistant U.S. attorney and an

24     investigator from the Environmental Protection

25     Agency's Inspector General, a man and a woman.  I

```
 1        don't remember their names.

 2   Q.   Did you have counsel with you?

 3   A.   Yeah, Ed -- well, the interview took place in Ed

 4        Keelean's office, and he was there.

 5   Q.   Did you and Ed Keelean discuss who else had been

 6        interviewed through that point?

 7                  MR. FAISON:  I'm sorry, I didn't hear

 8        the question.

 9   BY MS. BADALAMENTI:

10   Q.   Did you and Ed Keelean discuss who else had been

11        interviewed by these same individuals?

12   A.   No.  He -- Mr. Keelean sat in on a number of

13        interviews with city employees with the federal

14        investigators, and he did not share their names

15        with me.

16                  MS. BADALAMENTI:  I think I might be

17        done, but if I could just have a couple minutes.

18                  MR. FAISON:  Sure.

19                  (Off the record at 12:56 p.m.)

20                  (Back on the record at 12:59 p.m.)

21   BY MS. BADALAMENTI:

22   Q.   Do you recall any of the agents that interviewed

23        you to be Carol Paszkiewicz?

24   A.   It was Paszkiewicz, yes.  She was one.

25   Q.   Do you recall Mark Chutkow interviewing you from
```

```
1                      CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN      )

3                           ) SS

4    COUNTY OF MACOMB        )

5

6               I, MELINDA S. MOORE, certify that this

7        deposition was taken before me on the date

8        hereinbefore set forth; that the foregoing

9        questions and answers were recorded by me

10       stenographically and reduced to computer

11       transcription; that this is a true, full and

12       correct transcript of my stenographic notes so

13       taken; and that I am not related to, nor of

14       counsel to, either party nor interested in the

15       event of this cause.

16

17

18

19

20                        Melinda S. Moore

21

22                        MELINDA S. MOORE, CSR-2258

23                        Notary Public,

24                        Macomb County, Michigan

25       My Commission expires:   September 6, 2016
```