# **EXHIBIT H**

**Designation of Deposition Testimony of Mark Jacobs**

```
 1              UNITED STATES BANKRUPTCY COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5      _____
 6      In re:                          )    Case No. 13-53845
 7      CITY OF DETROIT, MICHIGAN       )
 8                                      )    Chapter 9
 9              Debtor                  )
10      _____)    Hon. Steven W. Rhodes
11
12
13         The Deposition of MARK D. JACOBS,
14         Taken at 150 W. Jefferson, Suite 2500,
15         Detroit, Michigan,
16         Commencing at 3:29 p.m.,
17         Friday, July 11, 2014,
18         Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```

```
 1       willing to talk about a purchase of the Macomb
 2       portion of the system; is that correct?
 3   A.  I'm not sure I understand the question.
 4   Q.  Okay.  At some point -- I think you said it was
 5       about 2005 or '06 you became aware Mr. Mercado
 6       and Mr. Marrocco were talking about a Macomb
 7       purchase of the system, correct?
 8   A.  That is correct.
 9   Q.  Okay.  Was there a time or a date in which you
10       were officially brought into or involved in those
11       discussions?
12   A.  I suppose I got involved in the Macomb discussions
13       sometime after Oakland County acquired the
14       Clinton-Oakland portion -- the Clinton-Oakland and
15       the Edison Corridor portion of the Oakland-Macomb
16       Interceptor District.  Actually it was the
17       Oakland-Macomb Interceptor Drain Drainage District
18       that acquired the Oakland portion.
19   Q.  Okay.
20   A.  After that transaction closed, we shortly
21       thereafter commenced discussions on the Macomb
22       piece.
23   Q.  Okay.  When you said you commenced discussions,
24       who did you commence discussions with?
25   A.  It was largely the same team of people that were
```

```
 1        or can you recall what kinds of information they
 2        requested and you provided?
 3   A.   The business terms of the transaction that were
 4        agreed to between Tony Marrocco and Victor Mercado
 5        was that the purchase price would be equal to the
 6        outstanding principal balance on the bonds
 7        allocated to the assets that comprise the Macomb
 8        system. And it was that financial information
 9        that Macomb County asked DWSD to provide.
10   Q.   Okay. And did DWSD provide that information to
11        them?
12   A.   They did.
13   Q.   Okay. What time frame are we talking here?
14   A.   I don't recall exactly when the Oakland-Macomb --
15        the Oakland system closed, but it was from within
16        months of that closing through the closing of the
17        Macomb transaction, which I think was
18        September 2010.
19   Q.   We have an acquisition agreement signed
20        September 2, 2010. Is that --
21   A.   That sounds correct.
22   Q.   That sounds correct to you?
23             MR. ADDIS: Are we just continuing to
24        number the --
25             MR. WATSON: Yeah, I assume we will
```

```
 1            By that I mean did somebody --
 2                 MR. ADDIS:  Exhibit 6.  I apologize.
 3       BY MR. ADDIS:
 4       Q.   Negotiations take place.  We've established that.
 5            And then eventually an acquisition agreement is
 6            put together and laid on paper.  What I'm
 7            interested in is the process of how this
 8            acquisition agreement was written and approved.
 9            By that -- let me ask the first question.  Did
10            someone submit a first draft?
11       A.   The first draft was the Oakland transactional
12            document, because with limited exceptions, other
13            than the purchase price, the Macomb acquisition
14            agreement mirrors the Oakland acquisition
15            agreement.
16       Q.   And do we know who put together the Oakland
17            acquisition agreement?
18       A.   It was the same group of parties.
19       Q.   Okay.  That would include you?
20       A.   Me.
21       Q.   Was Mr. Hupp involved in that?
22       A.   Yes, he was.
23       Q.   Okay.  And Mr. Hupp represented who?  Oakland?
24       A.   The Oakland Macomb Interceptor Drain Drainage
25            District, I believe.  I don't believe he was there
```

```
 1       for Oakland specifically.
 2   Q.  I understand.  Okay.  Anybody else in that
 3       process?
 4   A.  Oakland may have had its other attorneys involved.
 5       Oh, Joe Colaianne from the Water Resource
 6       Commissioner's Office was a lawyer.  John
 7       McCulloch was involved.  Those were the principal
 8       players for Oakland County.
 9   Q.  Okay.  By the time we got down to the signing
10       date of this acquisition agreement, did you ever
11       compare this acquisition agreement side by side
12       to the Oakland agreement?
13   A.  Not that I recall.
14   Q.  Okay.  Do you know whether Mr. Hupp had done
15       that?
16   A.  I would have no idea.
17   Q.  Okay.  Or Mr. Misterovich?
18   A.  I wouldn't know.
19   Q.  Okay.  So it's fair to say that the Oakland
20       agreement as a model was used for this agreement?
21   A.  To the best of my recollection, the only things
22       that were changed were the things that were
23       specific to Macomb County that were not specific
24       to Oakland County.
25   Q.  Okay.  Negotiations started in, we believe, '09,
```

```
 1    questions the validity of this agreement."
 2              Sir, at the time -- either prior to or
 3    at the actual time of signing this, did anybody in
 4    the room ask Mr. Latimer if he had any such
 5    knowledge?
 6  A.  I don't believe anybody asked them that.
 7  Q.  As of the date of this signing, were you aware --
 8    strike that.
 9              Was Mr. Latimer the only DWSD employee
10    at that meeting?
11  A.  At which meeting?
12  Q.  At the signing itself.
13  A.  I don't recall.
14  Q.  Can you tell me which -- can you tell me whether
15    anybody within the City of Detroit other than
16    their counsel did a full review of this
17    acquisition agreement before signing?
18  A.  I'm not sure who reviewed it.
19  Q.  Did anybody ever communicate to you that they
20    reviewed it?
21              MR. FRANZINGER: Objection. You
22    shouldn't disclose any discussions you had with
23    your client.
24              THE WITNESS: I don't recall. My --
25    for what it's worth, I believe that this
```

```
 1      acquisition had to be approved by the Detroit
 2      Water Board, so there presumably was some review
 3      at that level, but I want -- I didn't appear
 4      before them.  I don't know how they -- how or
 5      where or when they addressed this.
 6  BY MR. ADDIS:
 7  Q.  Okay.  I want to take you to paragraph 5.3, sir,
 8      Litigation and Claims.  And this is on 14 of 25.
 9      I'm sorry.  I should have told you that first.
10      And, again, reading for the record, "Detroit
11      shall promptly inform the Macomb County and MID
12      in writing of any claims of which Detroit is or
13      becomes aware that are or might reasonably be
14      expected to become the subject of litigation
15      affecting the Macomb system or the transactions
16      contemplated by this agreement."
17              Now, sir, using that as a foundation,
18      did there come a time, sir, when you became aware
19      that DWSD employees were being questioned by the
20      FBI, a grand jury, or the U.S. Attorney's Office
21      regarding the practices of DWSD?
22          MR. FRANZINGER:  Again, you should not
23      disclose any conversations that you had with the
24      client or that are based upon knowledge that you
25      had based on discussions you had with your client.
```

MARK D. JACOBS
July 11, 2014

Page 37

```
 1           Agreement, were you familiar, sir, with the
 2           Global Settlement Agreement?
 3    A.     Yes, I was.
 4    Q.     Were you familiar with what subjects that Global
 5           Settlement Agreement applied to?
 6    A.     Yes.
 7    Q.     What were those subjects that it applied to?
 8    A.     Well, at the time I was very familiar with it,
 9           even though it had been a few years, but today
10           sitting here today, I could only try to remember.
11           Interest rates, 800 megahertz radio, and a
12           gentleman's agreement, the Letter of Intent to
13           consummate these transactions.
14    Q.     And was that Global Settlement Agreement, sir,
15           something that was reached in conjunction with
16           the Feikens case?
17    A.     Yes.
18    Q.     Were you part of those negotiations in front of
19           Judge Feikens -- or might not have been in front
20           of him, but under the control of Judge Feikens
21           that led to that Global Settlement Agreement?
22    A.     Yes.
23    Q.     And as a result of that Global Settlement
24           Agreement, certain actions were applied to the
25           pricing of this acquisition agreement; is that
```

BIENENSTOCK
www.bienenstock.com

13-53846-tjt    Doc 6061-9    Filed 07/16/14    Entered 07/16/14 10:50:57    Page 9 of 12

```
 1         correct?
 2    A.   One of the issues addressed in the Global
 3         Settlement Agreement was carried forward as a
 4         credit on the purchase price.
 5    Q.   Okay. And which one do you believe that was?
 6    A.   That was the roughly $17 million interest rate
 7         dispute resolution.
 8    Q.   So the $17 million that I've seen on that
 9         sheet --
10    A.   Yes.
11    Q.   -- and now that you've seen is for that interest
12         rate dispute resolution, correct?
13    A.   Correct.
14    Q.   Thank you.
15                    (Mr. Ruegger not present at 4:18
16                    p.m.)
17                    MARKED FOR IDENTIFICATION:
18                    DEPOSITION EXHIBIT 12
19                    4:18 p.m.
20    BY MR. ADDIS:
21    Q.   Sir, I'm showing you what has been now marked as
22         Exhibit 12, and I believe that that is from that
23         agreement that we talked about, the Global
24         Settlement Agreement. What I mean is what is in
25         there under the term "global settlement," about
```

```
 1            three-quarters of the way down, says, as you can
 2            see, $17,050,000, correct?
 3     A.     I see that, yes.
 4     Q.     Yes.  And that is a recording, so to speak -- a
 5            written recording of what you just testified to
 6            as the settlement money for the interest rate
 7            dispute, correct?
 8     A.     That's correct.
 9     Q.     And that's what that reflects?
10     A.     That's correct.
11     Q.     Thank you.  When did you first become aware of an
12            investigation into Mr. Kilpatrick, Ferguson
13            and/or Mercado?
14     A.     You know, I really don't remember when I first
15            heard about it.  Like I said, it was just stuff I
16            heard on the street.  When it happened, I really
17            couldn't tell you.
18     Q.     Were you ever contacted by either the Department
19            of Justice, U.S. Attorney's Office, the FBI or
20            anybody regarding any knowledge you might have of
21            the operations of DWSD?
22     A.     No.
23     Q.     And to this day you have not been?
24     A.     I have not been.
25     Q.     Did any of the employees of the city -- of DWSD
```

```
 1                  CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN     )
 3                         ) SS
 4   COUNTY OF MACOMB      )
 5
 6             I, MELINDA S. MOORE, certify that this
 7   deposition was taken before me on the date
 8   hereinbefore set forth; that the foregoing
 9   questions and answers were recorded by me
10   stenographically and reduced to computer
11   transcription; that this is a true, full and
12   correct transcript of my stenographic notes so
13   taken; and that I am not related to, nor of
14   counsel to, either party nor interested in the
15   event of this cause.
16
17
18
19
20                         Melinda S. Moore
21
22             MELINDA S. MOORE, CSR-2258
23             Notary Public,
24             Macomb County, Michigan
25       My Commission expires:  September 6, 2016
```