# EXHIBIT I

**Designation of Deposition Testimony of Darryl Latimer**

```
 1              UNITED STATES BANKRUPTCY COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5    _____

 6    In re:                    )    Case No. 13-53845

 7    CITY OF DETROIT, MICHIGAN )

 8                              )    Chapter 9

 9              Debtor          )

10    _____)    Hon. Steven W. Rhodes

11

12

13          The Deposition of DARRYL A. LATIMER,

14          Taken at 150 W. Jefferson, Suite 2500,

15          Detroit, Michigan,

16          Commencing at 1:15 p.m.,

17          Friday, July 11, 2014,

18          Before Melinda S. Moore, CSR-2258.

19

20

21

22

23

24

25
```

| 1 | | and counsel can correct me if I'm wrong -- was |
|---|---|---|
| 2 | | executed on September 2, 2010, okay? And I'm |
| 3 | | going to refer you to page 25 of 25. |
| 4 | A. | Okay. |
| 5 | Q. | All right. And, sir, your signature is attached |
| 6 | | thereof, is it not? |
| 7 | A. | Correct. |
| 8 | Q. | And you signed on behalf of the -- I'm sorry, the |
| 9 | | City of Detroit? |
| 10 | A. | Yes. |
| 11 | Q. | Okay. And did you understand that you had the |
| 12 | | authority to sign for the City of Detroit at that |
| 13 | | time? |
| 14 | A. | Yes. I was told that by our lawyers. |
| 15 | Q. | Okay. And that would include Mr. Jacobs? |
| 16 | A. | Yes. |
| 17 | Q. | Okay. Now, we know that things surrounding this |
| 18 | | case have had a long torturous history, including |
| 19 | | a trial. Do you recall, sir, when or if you were |
| 20 | | ever contacted by the U.S. attorney's office or |
| 21 | | the FBI or the Office of Inspector General |
| 22 | | regarding an investigation of the bid process in |
| 23 | | Detroit? |
| 24 | A. | In general or any particular -- |
| 25 | Q. | Let's start in general. |

```
 1    A.    Okay.  In general, I believe it was February 2010.

 2    Q.    What happened in February 2010 of an

 3          investigative nature?

 4    A.    I was contacted by the FBI.

 5    Q.    Do you recall who it was who contacted you?

 6    A.    I believe it was Robert Beckman and Carol -- I

 7          can't remember Carol's last name.

 8    Q.    Paszkiewicz?

 9    A.    Yeah, I think that sounds.

10    Q.    Something like that?

11    A.    Yeah.

12    Q.    And by what method did they contact you?

13    A.    They came to my house.

14    Q.    Okay.  And when they came to your house, did they

15          question you there?

16    A.    Yes.

17    Q.    Did they tell you what the nature of their

18          investigation was aimed at?

19    A.    I believe so.  I don't know exactly the wording

20          that they used, but they talked about the

21          investigation of the Kilpatrick administration.

22    Q.    At that time did they mention the bid process for

23          contracts with DWSD?

24    A.    They may have.  They started off showing me a lot

25          of text messages, and asking me -- asking me the
```

BIENENSTOCK
www.bienenstock.com

```
 1        question of what certain things mean that were
 2        said in those text messages and what were they
 3        referring to; so a lot of questions really
 4        centered around that.
 5   Q.   They started by showing you text messages from
 6        who to whom?
 7   A.   Variety of people.  There was text messages, I
 8        believe, that had Bobby Ferguson, Bernard
 9        Kilpatrick, Victor Mercado, and could have been
10        others, but those are the names that come to mind.
11   Q.   Did they bring to your attention any of your own
12        text messages?
13   A.   No.
14   Q.   So they were asking you to comment on other
15        people's text messages; is that accurate?
16   A.   Correct.
17   Q.   Did they explain to you or did they proceed on
18        the presumption that you knew these people well?
19   A.   No.  They were asking because there were certain
20        things that were said relative to certain
21        documents, and they were trying to understand what
22        did they mean by some of the things that were
23        said.
24   Q.   Do you recall what those documents were?
25   A.   Those documents were documents that were generated
```

```
 1              by the City of Detroit's Human Rights Department,
 2              and they were certifications for local economic
 3              development.
 4      Q.      Would it be fair to say that beginning in
 5              February 2010, from that time on you had more
 6              meetings with people from the FBI or the U.S.
 7              Attorney's Office?
 8      A.      Yes.
 9      Q.      Do you know how many meetings in total you had
10              with them?
11      A.      No.  There was multiple meetings because I also
12              had later on some meetings with the prosecutors --
13              federal prosecutors.
14      Q.      Okay.  Mr. Chutko?
15      A.      Yes.
16      Q.      In February of 2010, at that first meeting, did
17              the -- did any of the people questioning you ask
18              you about DWSD?
19      A.      They may have.  I can't remember any specifics.
20      Q.      Okay.  You're not sure whether they did or
21              didn't, but they could have?
22      A.      Correct.
23      Q.      Okay.  Do you remember them by any chance
24              mentioning the 15 Mile Road sinkhole project?
25      A.      I don't recall.
```

1   Q.   You don't recall one way or another?

2   A.   In the first meeting you're speaking of?

3   Q.   Yes.

4   A.   I don't recall.

5   Q.   At some point in time were you asked about DWSD

6        contracts?

7   A.   Yes.

8   Q.   Okay. Do you recall when you were first asked by

9        law enforcement about DWSD contracts?

10  A.   They may have asked me in that first meeting, but

11       not any specifics, more about processes.

12  Q.   Okay. And you would be familiar with those

13       processes because you used to do a lot of the

14       bidding work, correct?

15  A.   Correct.

16  Q.   Okay. And we'll get to that in a minute. At

17       some -- do you have in your mind -- can you give

18       me a breakdown of the different times that you

19       met with -- let's just say, between February of

20       2010 and the end of 2010, how many times you

21       responded to questions from law enforcement?

22  A.   It could have been five to six times. Some of the

23       documentation that was an issue in the meeting

24       they had with me, I sent them some documentation

25       and I referred them at the time to contracts and

BIENENSTOCK
www.bienenstock.com

```
 1          grants because a lot of what they were asking was
 2          in files, so I referred them to contracts and
 3          grants, and they spent a great deal of time there
 4          looking through files.
 5     Q.   What documentation did you provide to them?
 6     A.   There was a letter that came from Human Rights
 7          about a certification for a particular company --
 8          company I can't think of offhand.  And I just told
 9          them that we had a certification document, and I
10          sent it to them.
11     Q.   And then you referred them to another division of
12          government, so to speak, for whatever else they
13          wanted, correct?
14     A.   Still within the Water Department, but it was
15          contracts and grants, where that -- that housed
16          all the documents associated with some of the
17          questions they were asking me with regard to local
18          economic development.
19     Q.   Okay.  And as part of those documents, were they
20          requesting -- were they looking for bid
21          documents?
22     A.   They were looking for a combination of everything.
23          They were just looking through all the files.
24     Q.   And everything would include bid documents,
25          correct?
```

BIENENSTOCK
www.bienenstock.com

```
 1   A.   Yes.

 2   Q.   And you were aware of that by the time they

 3        started to ask you these questions, correct?

 4   A.   Yes.

 5   Q.   Did there ever come a time where they asked you

 6        specifically about any contract?

 7   A.   They asked me some questions about some specific

 8        contracts.

 9   Q.   Okay.  Did they ask you about Contract CS-1368?

10   A.   They may have and I don't recall.

11   Q.   Okay.  And do you recall what Contract 1368 was?

12   A.   I believe it's the sewer lining contract.

13   Q.   Okay.  Did they ever interview you about the

14        sinkhole project that was part -- became part of

15        CS-1368?

16   A.   I don't recall.  I don't believe so, but I don't

17        recall.

18   Q.   Okay.  You signed this acquisition agreement on

19        September 2nd of 2010, and were you told you had

20        the authority do it; is that correct?

21   A.   Correct.

22   Q.   Before you signed it, did you go through the

23        contract?

24   A.   In its entirety, no.  I relied on legal counsel.

25   Q.   Okay.  And you relied on legal counsel to tell
```

```
 1        you that the contract was appropriate for your
 2        signature?
 3   A.   Yes.
 4   Q.   Did he give you a general explanation of what the
 5        contract was?
 6   A.   For the most part.
 7   Q.   Okay.  During those conversations with counsel,
 8        did you ever mention to him that you had been
 9        questioned by federal authorities regarding DWSD
10        practices?
11   A.   At some point our attorneys knew that I was being
12        questioned.
13   Q.   Okay.  When you say "our attorneys," who was
14        that?
15   A.   Bob Walter, Ed Keelean.  And I don't know if I
16        told Mark Jacobs.  I may have.  I can't remember.
17   Q.   Is it fair to say, sir, at the time you signed
18        this document -- and, again, I'm referring to the
19        acquisition agreement -- that at least some of
20        the lawyers representing DWSD or the City of
21        Detroit at that time were aware that the
22        investigation was ongoing regarding DWSD
23        practices?
24             MR. WATSON:  Object to foundation.  The
25        witness can answer, if he knows.
```

BIENENSTOCK
www.bienenstock.com

```
 1                    THE WITNESS:  I'm not aware if they
 2        knew the details.
 3   BY MR. ADDIS:
 4   Q.   I didn't ask that.  I think you just testified
 5        previously that you -- that Mr. Keelean was aware
 6        and Mr. Walters was aware.  You're not sure if
 7        Mr. Jacobs; is that correct?
 8   A.   Correct.
 9   Q.   Okay.  As of the time you signed this document,
10        correct?
11   A.   Correct.
12   Q.   Did Mr. -- did any lawyer suggest to you that you
13        had any duties to tell anybody about that
14        investigation if you signed that document?
15   A.   Not that -- not that I recall.
16   Q.   Okay.  Now, you mentioned that you did come in at
17        the end of this process?
18   A.   Correct.
19   Q.   And that was after Mr. Mercado left, correct?
20   A.   No, it was after Pam Turner left.
21   Q.   After both of them left?
22   A.   Yeah.
23   Q.   All right.  Do you know why Mr. Mercado left?
24   A.   From my understanding, he took another job.
25   Q.   Okay.  And do you know why Pam left?
```

BIENENSTOCK
www.bienenstock.com

```
 1   A.   She had mentioned to me at the time that she asked
 2        me to be the deputy director that she was -- she
 3        was planning to leave before the year was out, so
 4        she did mention that to me.
 5   Q.   Okay.  Prior to September 2nd of 2010, did you
 6        become aware of any other employees of DWSD that
 7        were being questioned by law enforcement?
 8   A.   Prior to 2010?
 9   Q.   Prior to September 2nd of 2010.
10   A.   I'm not for sure.  Not for sure.
11   Q.   If you're not for sure, sometimes it could mean
12        maybe, maybe not.
13   A.   Maybe, maybe not.  I'm not for sure.
14   Q.   For those maybes, who would those be?
15   A.   I don't know.  I mean, I'm not for sure, because
16        when I started to get questioned, the first time I
17        was questioned, I let the director know that I had
18        been questioned at the time.  So maybe in a
19        conversation she may have told me that others may
20        have been questioned, but maybe not given me any
21        names.
22   Q.   Which director was that?
23   A.   Pam Turner.
24   Q.   Okay.  Are you familiar with Ramesh Shukla?
25   A.   Yes.
```

```
 1   Q.   Okay.  And Mr. Shukla works for the DWSD or did

 2        in 2010?

 3   A.   Yes.

 4   Q.   Okay.  Does he still work there?

 5   A.   No.

 6   Q.   Okay.  Did you ever become aware of him being

 7        subpoenaed -- did he ever make you aware of being

 8        subpoenaed to the grand jury?

 9   A.   No.

10   Q.   On June 30th of 2010 what was Mr. Shukla's

11        position, if you recall?

12   A.   Assistant director of engineering.

13   Q.   And as assistant director of engineering, would

14        he have answered to you as the deputy director?

15   A.   Yes.

16   Q.   And it's your testimony that he never advised you

17        that he had been subpoenaed to testify before a

18        grand jury?

19   A.   I don't recall him advising me of that.

20   Q.   Did you become aware of it through any other

21        source?

22   A.   Yes, I may have become aware of it through other

23        sources.

24   Q.   And how did you become aware of it?

25   A.   Through probably conversations maybe with other
```

```
 1         staff.  It could have been our lawyers, but I'm
 2         not for sure who it was.
 3    Q.   And did you become aware of it in June of 2010?
 4    A.   I'm not for sure when I became aware of it.
 5    Q.   Were you aware of it by September 2 of 2010?
 6    A.   Not for sure.
 7    Q.   When you signed that document -- I'm just trying
 8         to refresh your recollection -- did you know that
 9         members of the -- I'm sorry, employees of DWSD
10         had appeared before grand juries?
11    A.   I'm not for sure when I --
12    Q.   It's possible, but you're not certain?
13    A.   Yeah, I'm not certain.
14              MR. WATSON:  By that document, you're
15         referring to the acquisition agreement dated
16         9/2/2010?
17              MR. ADDIS:  Correct.
18    BY MR. ADDIS:
19    Q.   Now, coming back to what would be my previous
20         question, as you came in at the end of these
21         negotiations, so to speak, did you ever sit at
22         the table during the negotiation process for this
23         acquisition agreement?
24    A.   Not that I recall.  I may have, but I don't recall
25         sitting at negotiations.  From what I remember, it
```

BIENENSTOCK
www.bienenstock.com
13-53846-tjt   Doc 6061-10   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 14 of 23

```
 1   A.   I'm not for sure who the project manager was at
 2        the time.  The process is that when you look at a
 3        contract, it says "director."  It has the
 4        director's name in there.  The director designates
 5        a contracting officer.  The contracting officer is
 6        the person that if there's a dispute, he will
 7        represent the department in language and things
 8        like that, if you're unable to resolve whatever
 9        with the project manager.  The contracting officer
10        sends a letter that has a designee on it, so you
11        have a director putting over his representative at
12        the contracting officer.  The contracting officer
13        designates a designee, and that's the person that
14        works on the contract in the field.
15   Q.   Okay.  Were you aware, sir, during your time at
16        DWSD -- especially your time as deputy director,
17        were you aware that Mayor Kilpatrick had special
18        administrative powers?
19   A.   Yes.
20   Q.   And do you know whether or not part of those
21        powers was that he could award or direct the
22        awarding of an emergency amendment to a contract?
23   A.   Correct.
24   Q.   Do you know whether he did that with CS-1368?
25   A.   I believe so.
```

DARRYL LATIMER
July 11, 2014

```
 1   Q.   How did you become aware of that?
 2   A.   Typically you receive a letter that's signed that
 3        states that.
 4   Q.   Okay.  Sir, in front of you you have an Exhibit 3
 5        -- previously marked Exhibit 3.  Sir, I want to
 6        take your attention -- just turn over the cover
 7        page and page -- it's called page 3 of 25 on the
 8        top at the right-hand side.  Do you see that?  It
 9        will be right here on the second page.
10   A.   It's not there.
11             MR. WATSON:  Not on Exhibit 3.  Can I
12        see the first page of whatever you're looking at.
13   BY MR. ADDIS:
14   Q.   What I'm looking for is Amendment No. 2 to
15        Contract No. CS-1368.
16   A.   I believe that's it.
17   Q.   Okay.
18   A.   But it's -- the second page is not marked the same
19        way as yours.
20   Q.   I see that.  The copy is not at the top.  Okay.
21        I just want you to flip over the top page and
22        there is -- a document that reads at the top in
23        bold print "Special Administrator of the Detroit
24        Water and Sewerage Department."  That would be
25        Mayor Kilpatrick at the time, correct?
```

BIENENSTOCK
www.bienenstock.com
13-53846-tjt   Doc 6061-10   Filed 07/16/14   Entered 07/16/14 10:50:57   Page 16 of 23

```
 1   A.   Correct.
 2   Q.   "Order Number 2004-5," so that's an order,
 3        correct?
 4   A.   Correct.
 5   Q.   All right.  Is that the type of letter you're
 6        talking about that would be sent if he wanted to
 7        make an emergency change in a contract?
 8   A.   Yes.
 9   Q.   Okay.  I want you to read the subject matter of
10        this letter, sir.  And I'll read it out loud for
11        the record.  "Subject:  Award of
12        Emergency/Amendment (Amendment 2) to Dismiss
13        Contract No. CS-1368 with Inland Waters Pollution
14        Control, Incorporated."  Do you have any idea
15        what that means to dismiss contract?
16   A.   I would have to see the other page, so that I can
17        make a determination.
18   Q.   Okay.  We'll have someone look for that and come
19        back to it.  Both pages are in there.  We found
20        it in the process.
21                Let's move on.
22                MR. ADDIS:  Give me Amendment No. 3,
23        then.  Because it's a question about form, rather
24        than substance.
25   BY MR. ADDIS:
```

BIENENSTOCK
www.bienenstock.com

| 1 | Q. | Sir, let's go to Exhibit No. 4. And now I'm |
|---|----|--------------------------------------------|
| 2 | | going to take you to -- if you flip over, the |
| 3 | | title page of that is Amendment No. 3, Contract |
| 4 | | No. CS-1368. I want to take you to -- again, the |
| 5 | | Special Administrator for the Detroit Water and |
| 6 | | Sewerage Department, Order No. 2005-7. Again, |
| 7 | | this is the letter -- the type of letter you're |
| 8 | | referring to that would come from Mayor |
| 9 | | Kilpatrick when he wanted to make an emergency |
| 10 | | change; is that correct? |
| 11 | A. | Correct. |
| 12 | Q. | All right. I want to direct you to the last |
| 13 | | paragraph, where it reads "I hereby authorize |
| 14 | | DWSD Director Victor Mercado to enter |
| 15 | | expeditiously into an emergency amendment |
| 16 | | (Amendment 3) to Contract No. CS-1368 with Inland |
| 17 | | Waters Pollution Control, Incorporated for the |
| 18 | | completion, the repair and restoration of the |
| 19 | | Romeo Arm and related restoration of 15 Mile |
| 20 | | Road. This contract complies with Ordinance |
| 21 | | 13-04 because it is for services that are |
| 22 | | supplemental to those provided by DWSD employees. |
| 23 | | This Order is issued pursuant to the powers |
| 24 | | vested in me as Special Administrator of the |
| 25 | | Detroit Water and Sewerage Department by Orders |

```
1       of the Federal District Court."
2                     Sir, did I read that correctly?
3    A.   Yes.
4    Q.   Okay.  Now, if I understand how this process
5         works, what we've established so far, if the
6         mayor as special administrator sees the need for
7         an emergency amendment or an amendment, he can
8         direct Victor Mercado to complete that
9         transaction, correct?
10   A.   Correct.
11   Q.   Okay.  If you could turn to page 3 of that
12        contract.  Looking down one, two, three -- four
13        paragraphs where it reads "Whereas, it is the
14        mutual desire of the parties hereto to amend the
15        contract to increase compensation by $23 million
16        setting a new total contract of $118 million."
17        Okay.  Do you see that?
18   A.   Yes.
19   Q.   Okay.  Now, it was your understanding during your
20        time at DWSD that if the mayor wished to change
21        the compensation of a contract -- of a contract
22        for services on an emergency basis, that he could
23        do so, including the amount of compensation?
24   A.   Yes.
25   Q.   All right.  And could he do that without approval
```

```
 1        of anybody else?
 2   A.   Yes.
 3   Q.   Has anybody ever made you aware of the number of
 4        times that CS-1368 was amended?
 5   A.   I'm quite sure at some point I knew, but I don't
 6        recall right now.
 7   Q.   Okay.  After these amendments were approved, did
 8        your division, the part that you were, bids and
 9        contracts and things like that -- did you guys do
10        an investigation as to the actual necessity of
11        the increase in compensation?
12   A.   No.
13                  MR. WATSON:  I'll object to form.
14   BY MR. ADDIS:
15   Q.   Was it your position to do so?  Maybe it was
16        outside of your position.  I don't want to be
17        unfair to you.
18   A.   It's not something we would look at.  That's an
19        engineering function.
20   Q.   Okay.  Are you aware on any amendment to CS-1368
21        of anybody who investigated whether or not the
22        claimed increase in compensation was necessary?
23   A.   I don't remember.
24   Q.   Okay.  You don't remember anybody doing that?
25   A.   I mean, it could have.  I just don't remember if
```

```
 1          Detroit Water and Sewerage Department or with
 2          respect to any contract that it had entered into
 3          with a contractor.
 4    A.    I remember that I was contacted by FBI sometime in
 5          2008 -- October or November of 2008, that they
 6          want -- they left a message on my office phone
 7          saying that they want to come and talk to me, so I
 8          called them back and they came back and talked to
 9          me.
10    Q.    What did they talk to you about?
11    A.    Basically they were talking about the various
12          contracts that we are doing, and was --
13          specifically the thrust was did Ferguson -- was
14          Ferguson -- how do I put it?  Did Ferguson take
15          advantage of his position with the mayor's office
16          to get contracts from City of Detroit DWSD.
17          That's what they were trying to talk to me about.
18    Q.    Was 1368, Amendments 2, 3, 4, 5 the subject of
19          any of the discussions?
20    A.    I don't remember if they talked -- at that
21          particular time in 2008 if they talked
22          specifically of any amendment, but they did talk
23          about the sinkhole, yes.  That was talked about.
24    Q.    Do you remember what they asked you about the
25          sinkhole project?
```

```
 1        document, but I don't remember reading it in its

 2        totality.  I relied on general counsel.

 3   Q.   Your testimony is that this document was signed

 4        by you on the reliance of counsel that it was an

 5        appropriate document to sign?

 6   A.   Correct.

 7   Q.   And that you had the authority to sign it?

 8   A.   Correct.

 9   Q.   Were you involved in the negotiations of any

10        settlements of any ancillary matters?  We talked

11        about this earlier, the 800 megahertz system.

12        Were you involved in any of those negotiations?

13   A.   No.

14   Q.   The bond percentage rates?

15   A.   No.

16             MR. WATSON:  I'm going to object to

17        form and to the word "involve."  I'm not sure what

18        you mean by that.

19   BY MR. ADDIS:

20   Q.   Did you take part in?  Did you sit down with

21        people from Macomb and talk about it?

22   A.   No.

23   Q.   Okay.  Have you ever met Mr. Marrocco?

24   A.   Yes.

25   Q.   Have you ever met Mr. Misterovich?
```

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN        )

3                             ) SS

4    COUNTY OF MACOMB         )

5

6              I, MELINDA S. MOORE, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing

9    questions and answers were recorded by me

10   stenographically and reduced to computer

11   transcription; that this is a true, full and

12   correct transcript of my stenographic notes so

13   taken; and that I am not related to, nor of

14   counsel to, either party nor interested in the

15   event of this cause.

16

17

18

19

20                      Melinda S. Moore

21

22                   MELINDA S. MOORE, CSR-2258

23                   Notary Public,

24                   Macomb County, Michigan

25        My Commission expires:  September 6, 2016