# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------- x
                                             :
In re                                        :          Chapter 9
                                             :
CITY OF DETROIT, MICHIGAN,                    :          Case No. 13-53846
                                             :
            Debtor.                          :          Hon. Steven W. Rhodes
                                             x
```
_____

## DEBTOR'S REPLY BRIEF IN SUPPORT OF ITS RESPONSE (Dkt. 5312) IN OPPOSITION TO MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S MOTION (Dkt. 5155) FOR TEMPORARY ALLOWANCE OF CLAIM PURSUANT TO RULE 3018(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PURPOSES OF ACCEPTING OR REJECTING DEBTOR'S FOURTH AMENDED PLAN OF ADJUSTMENT

**TABLE OF CONTENTS**

Page

INDEX OF AUTHORITIES...................................................................................II

ARGUMENT .............................................................................................................1

I.      MIDDD Has Abandoned Or Waived Its Breach Of Contract Claims And Certain Tort Claims Based Upon The Acquisition Agreement ...................................................................................1

II.     Applicable Timeline .............................................................................2

III.    MIDDD Has Failed to Prove Any Damages .....................................4

      A.      MIDDD Has Not Proven Any Damages ...................................4

            1.     The Testimony of Lyle Winn is Inadmissible and Does Not Prove Any Damages.......................................4

            2.     MIDDD's Reliance on the Kilpatrick Jury Verdicts is Misplaced.................................................6

            3.     MIDDD's Reliance on the City's Allegations Is Misplaced ....................................................7

      B.      MIDDD Grossly Underpaid For the Assets It Received..........8

      C.      Ferguson Enterprises Was Paid Only $3 Million for the Project.....................................................................................9

IV.    MIDDD's Fraud Claims Fail Despite MIDDD'S Gross Misrepresentations Of The Record.................................................10

V.     The Merger Clause of the Acquisition Agreement Forecloses MIDDD from Claiming Any Misrepresentation Outside the Contract ...........................................................................................21

VI.    MIDDD's Unjust Enrichment Claims Fail .......................................25

VII.   MIDDD Admits It Waived Its Own Claims .....................................26

CONCLUSION ......................................................................................................26

CERTIFICATE OF SERVICE.............................................................................27

-i-

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Abbo v. Wireless Toyz Franchise, LLC*, 2014 WL 1978185 (Mich. App. May 13, 2014)..............................................................................23, 24, 25

*Appleway Equipment Leasing, Inc. v. River City Equipment Sales, Inc.*, 2012 WL 6177067 (Mich. App. 2012)..................................................2

*Barclae v. Zarb*, 300 Mich. App. 455 (2013) ....................................................23

*Brenner v. Cumberland Farms, Inc.*, Case No. 14-60075-CIV, 2014 WL 1384421 (S.D. Fla. April 9, 2014)..........................................................7

*Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 756 F.2d 443 (6th Cir. 1985) .......................................................................................................22

*Hamade v. Sunoco, Inc. (R&M)*, 271 Mich. App. 145 (2006)......................22

*Hughes v. Vanderbilt University*, 215 F.3d 543 (6th Cir. 2000)....................5

*In re NM Holdings Co., LLC*, 407 B.R. 232 (Bankr. E.D. Mich. 2009) .......7

*In re Raiford*, 695 F.2d 521 (11th Cir. 1983).....................................................7

*Jackson v. PNC Bank, N.A.*, 2014 WL 2931396 (E.D. Mich. 2014) ............1

*Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich.App. 543 (1992)..........................................................................................................22

*Radtke v. Miller, Canfield, Paddock & Stone*, 453 Mich. 413 (1996) (explaining Mich. Ct. R. 2.312 and Fed. R. Civ. P. 36) .............................7

*Rinaldo's Constr Corp v. Mich. Bell Tel Co.*, 454 Mich. 65; 559 NW2d 647 (1997) .....................................................................................2

*Salzman v. Maldaver*, 315 Mich. 403 (1946)..................................................21

*Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927 (E.D. Mich. 2005)..........................................................................23

*UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich.
App. 486 (1998)...............................................................................................................22

**Court Rules**

Fed. R. Civ. P. 702....................................................................................................................5

## ARGUMENT

**I. MIDDD Has Abandoned Or Waived Its Breach Of Contract Claims, And Its Tort Claims Based Upon The Acquisition Agreement Fail As A Matter Of Law**

In support of its Proof of Claim,[1] MIDDD did not provide any discussion in its brief in support of its 3018(a) motion (Dkt. 6016, "MIDDD's Brief") as to breach of contract claims. Thus, MIDDD did not address the arguments made by the City in its Brief that MIDDD's contract claims do not state a claim and are not supported by the evidence. Further, by not discussing at all its breach of contract claims, or reaffirming in some manner its intent to rely upon these claims in its Brief, MIDDD has abandoned or waived these claims.[2] *See generally, Jackson v. PNC Bank*, *N.A.*, 2014 WL 2931396 (E.D. Mich. 2014). Similarly, MIDDD did not address in its Brief its silent fraud and innocent misrepresentation claims. Therefore, MIDDD has also abandoned or waived these claims. *Id.*

MIDDD's various fraud claims relating to the Acquisition Agreement are merely a restatement of its claims for breach of contract. As such, they fail as a matter of law. As asserted in the City's Brief, fraud must be <u>extraneous</u> to the

---

[1] Detroit's principal Brief (Dkt. 6015) focused on the MIDDD Complaint attached to MIDDD's Proof of Claim because it was the only support furnished by MIDDD at that time to support its Proof of Claim.

[2] Having failed to discuss its breach of contract claims in its principal Brief, MIDDD should not be allowed to resurrect its breach of contract claims in its Reply Brief.

contract in order to cause harm distinct from that caused by the breach of contract. (Dkt. 6015, pp. 38-40). A plaintiff must establish a "violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Constr Corp v. Mich. Bell Tel Co.,* 454 Mich. 65, 84; 559 NW2d 647 (1997). No cognizable cause of action in tort exists when the plaintiff fails to allege violation of an independent duty. *Appleway Equipment Leasing, Inc. v. River City Equipment Sales, Inc*., 2012 WL 6177067, at *2 (Mich. App. 2012). Thus, MIDDD cannot maintain its fraud claims against the City either.

## II.    Applicable Timeline

MIDDD's claims must be examined within the time frame in which the claims arose. To assist in this examination, the following chronology is set forth:

- August 22, 2004: 15 Mile Road Macomb Interceptor Collapse
  (Dkt. 6015-18; Dkt. 6015-17, Jacobs Dec., ¶4; Dkt. 6015-16, Latimer Affid., ¶4.)

- March 2005: 15 Mile Road Macomb Interceptor repairs are completed (Dkt. 4954-2, ¶34.)

- 2005-2006: City allocates 100% of 15 Mile Road Macomb Interceptor repair costs to Macomb County sewer rates (Exhibit B, Foster Tr. at 26-27.)

- March 10, 2006: Macomb County files Petition in Case No. 77-71100 (assigned to Judge Feikens) challenging DWSD Sewer Rates allocating costs for 15 Mile Road repairs to Macomb County (Case No. 77-71100, Dkt. 1900.)

- Summer 2006: Macomb, Oakland and Wayne Counties asserted various challenges to rate allocations by DWSD in Case No. 77-71100. (Exhibit A,

2

Hupp Tr. at 17-18.) As a result, the parties began to negotiate terms whereby MIDDD would purchase the Macomb Interceptor from DWSD. (Exhibit C, Jacobs Tr. at 12.)

- Late summer/early fall 2006: A purported tentative agreement is reached between Mercado and Marrocco as to cost of 15 Mile Road repairs (Exhibit A, Hupp Tr. at 30-32.)

- January 16, 2007: Settlement Conference in Case No. 77-71100 held, minute entry indicates that "[t]he parties agreed on a number and the general terms of a release of liability on the interceptor repair numbers." (Exhibit D, Docket Sheet.)

- March 23, 2007: Judge Feikens issues Opinion and Order Denying Macomb's Request for Interceptor Repair Cost Dispute, scuttling the purported tentative agreement reached between the parties (Exhibit A, Hupp Tr. at 30-32.) (Exhibit E, Misterovich Tr. at 15.)

- Spring 2008: Court Facilitator Timothy O'Brien initiates settlement discussions between the parties (Exhibit E, Misterovich Tr. at 15.)

- June 2008: Victor Mercado resigns as Director of DWSD (Exhibit A, Hupp Tr. at 14-15.)

- June 2008 to May 2009: Arms-length settlement discussions continue primarily between Craig Hupp (Macomb's attorney), William Misterovich, Mark Jacobs (DWSD's attorney), and Robert Walter (Exhibit E, Misterovich Tr. at 12-13, 23-24; Dkt. 6015-17, Jacobs Dec., ¶10; Exhibit F, Walter Tr. at 84-95, 101.)

- May 12, 2009: Global Settlement Agreement Signed by the City, DWSD, Macomb County, Oakland County, and Wayne County releasing all disputes "related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes . . . [and] [a]ll Disputes and claims between the Parties related to the costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement…" (Dkt. 6015-20.)

- September 2, 2010: Acquisition Agreement signed, along with September 2, 2010 Settlement Agreement, in which the parties "waive[ed] and release[d] any claims with regard to . . . the cost of all projects and contracts shown on Schedule 3.8 to the [Acquisition Agreement] and the calculation of all credits, charges and adjustments set forth in that Schedule." (Dkt. 6015-22, 6015-23.)

## III.  MIDDD Has Failed to Prove Any Damages

### A.  MIDDD Has Not Proven Any Damages

MIDDD claiming to have suffered damages in the amount of $26 million for purported overcharges on CS-1368-2 and 3 relies upon the following: (1) the declaration of Lyle Winn; (2) the fact that Victor Mercado pled guilty and Kwame Kilpatrick was found guilty for, in part, extortion related to the Project; and (3) DWSD's position in the Federal Case that it had been overcharged $23 million by contractors and sub-contractors.

### 1.  *The Testimony of Lyle Winn is Inadmissible and Does Not Prove Any Damages*

First, Mr. Winn, an engineer who reviewed Inland's initial estimate and some supporting documents (Dkt. 6015-12, Winn Tr., at 14-15.), provided a declaration (Dkt. 6016-5) that does not support the $26 million allegation. During his deposition, he testified that there was a "discrepancy" between the initial *estimate* of costs, and what the project's final cost was (Dkt. 6015-12, Winn Tr at 54) and that he agreed with the initial estimate but that he did not know why the cost of the project increased over the initial estimate (*Id.*, p. 81) or what difficulties

4

were encountered. (*Id.,* pp. 36, 39, 44, 49, 55, 69-72.). He admitted that <u>he did not discover any fraudulent activity in his review</u> (*Id.,* pp. 25-26), that he had not spoken to anyone with independent knowledge of the project (*Id.*, p. 26) and that he had no knowledge of what happened in the project after the initial estimate. (*Id.*, p. 81.). Finally, he admitted he did not know what was actually spent on the various portions of the project and whether it was appropriate, or not. (*Id.*, pp. 51, 52, 53, 63 ("once again, I do not know what they spent.")). In other words, all Winn knew was that the project cost increased as Inland Waters did the work: he did not know why and he could not testify that there was any wrongdoing in regard to the increased costs.[3] That is not a sufficient basis for expert testimony under Fed. R. Civ. P. 702 and is not a viable basis for a damages claim.

MIDDD has produced an affidavit by Mr. Winn made after his deposition, which affidavit is contradicted by his sworn testimony. It is well-established that a party cannot use an affidavit to contradict prior deposition testimony. *Hughes v. Vanderbilt University*, 215 F.3d 543, 549 (6th Cir. 2000). Winn's affidavit should be stricken.

Even if the Court considers it, the affidavit is deficient. Winn admits that he "did not attempt to perform a forensic analysis of all of the charges to determine

---

[3] Indeed, it is clear that many difficulties occurred throughout the Project. (Exhibit H, Article.)

the amount of overcharges" (Dkt. 6016-5, ¶8); he readily admits he was not aware of any of the difficulties and conditions causing increased costs for the Project; and he acknowledges he never visited the site of the repairs to observe any of the difficulties that occurred during the Project. Further, the statements in his affidavit do not "match" MIDDD's allegations that Bobby Ferguson's work was the cause of a $23 million dollar increase in the cost of the Project. Indeed, in his affidavit Winn questions the charges for work done by many entities that had nothing to do with the Kilpatrick indictment such as Mersino Pump, Thompson Pump, O'Laughlin Construction, L. D'Agostini & Sons, and certain security services. (*Id.*, ¶¶14a, 14b, and 14c).

## 2. *MIDDD's Reliance on the Kilpatrick Jury Verdicts is Misplaced*

<u>Second</u>, MIDDD relies on the Kilpatrick jury verdict forms to purportedly show that Ferguson "received more than $23.7 million in contract revenues from Inland Waters, in large part for work done on the sinkhole repair" and that he received more than $175,000 in other payments. (Dkt. 6016, p. 30.). However, nothing in the jury verdict forms state a finding was made that Detroit overpaid Ferguson by $23.7 million, or that a large part of this amount was for the Project. The jury solely found that Ferguson committed extortion. Some of the work was done by Ferguson at the expense of other contractors who would otherwise have

6

done it.  The jury verdict is not a finding that DWSD (and by extension, MIDDD) overpaid for the project.  *See infra.*

### 3. *MIDDD's Reliance on the City's Allegations Is Misplaced*

<u>Third</u>, the City's allegations in the Federal Case are not binding judicial admissions.  "[A]n admission made in a different case is not conclusively binding, unless judicial estoppel applies." *In re NM Holdings Co., LLC*, 407 B.R. 232, 285 (Bankr. E.D. Mich. 2009). Michigan courts hold that a judicial admission in one proceeding cannot be used in other proceedings, and ordinary "party admissions" are not conclusively binding. *See Radtke v. Miller, Canfield, Paddock & Stone*, 453 Mich. 413, 419-421 (1996) (explaining Mich. Ct. R. 2.312 and Fed. R. Civ. P. 36). This is especially true for damage allegations.  For example, when cases are removed to federal court, "the fact that Plaintiff had previously admitted that her damages exceeded $75,000 in her 2012 case is beside the point. . . . [J]udicial admissions are normally 'binding for the purpose of the case in which the admissions were made, not in separate and subsequent cases.' " *Brenner v. Cumberland Farms, Inc.*, Case No. 14-60075-CIV, 2014 WL 1384421, at *2 (S.D. Fla. April 9, 2014) (citation omitted); *see In re Raiford*, 695 F.2d 521, 523 (11th Cir. 1983) ("Normally judicial admissions are binding for the purpose of the case in which the admissions are made, not in separate and subsequent cases.") (citing 4 J. Wigmore, *Evidence* § 1066 at 86 (Chadbourn rev. 1972)). *See also* The Late

Charles Alan Wright, et al., 18A *Fed. Prac. & Proc. Juris.* § 4443 (2d ed. 2014) ("In older practice, admission of facts set out in an opposing pleading by demurrer or failure to deny could give rise to issue preclusion. Today it seems to be agreed on all sides that issue preclusion does not apply. . . . [P]leading maneuvers in one suit should not carry such consequences in other suits.") (footnotes omitted).

## B.     MIDDD Grossly Underpaid For the Assets It Received

In 2010, the parties entered into the Acquisition Agreement which contained at Schedule 3.8 the calculation of the purchase price of the System.  DWSD paid $231.85 million for the system (including $60,829,019 paid on CS-1368-2 and 3 for the Project).  After deducting what Macomb had paid off in its rates over the years, the principal amount had been reduced $115.65 million.  (Dkt. 6015-14, Affid. of Foster).  Thus, the total outstanding debt was $116.20 million.  However, Macomb did not pay the full amount of the outstanding debt of $115 million, rather it negotiated a decrease in price, resulting in a purchase price of $89,996,704 ("Purchase Price").  (*Id.*).  Thus, MIDDD paid approximately $27 million dollars *less* than the system debt at the time of the Acquisition Agreement in 2010.  For Macomb to now claim that it paid $23 million too much for the system is ludicrous.  It purchased an asset on which the City had $116 million in debt for $89,996,704.  Even if the original amount of system debt were high (of which there is no proof) Macomb still paid $27 million less than Detroit did, therefore its

8

claims of $23 million in overpayments is simply invented out of whole cloth and has no basis in reality.

Moreover, MIDDD repeatedly argues that if it had been made aware of the alleged fraud, it would not have entered into the Acquisition Agreement. Witnesses on the behalf of the City similarly argued that the City would not have provided MIDDD nearly $17 million in concessions during negotiations if it had known that MIDDD intended to one day challenge the validity of any amount in Section 3.8 of the Acquisition Agreement. (Dkt. 6015-16, Latimer Affid. ¶15; Dkt. 6015-15, Walter Affid. ¶16; 6015-14, Foster Affid., ¶20.) This is nothing but a case of sour grapes – MIDDD wants to retain the benefits of a contract with a revisionist history in an effort to rewrite the parts of the contract it does not like.

### C. Ferguson Enterprises Was Paid Only $3 Million for the Project

Even assuming MIDDD somehow proved the factual and legal basis of its complaint and had a viable claim for damages, the record indicates that although Ferguson Enterprises was paid over $23,000,000 for work on Contract No. CS-1368; only $3,017,007.62 of that amount was for work on CS 1368-2 and CS 1368-3, which are the two amendments of CS 1368 that covered the cost of the 15 Mile Road sewer collapse repairs. (Exhibit I, Fact Sheet; Dkt. 6015-16, Latimer Affid. ¶13.) The bulk of the amounts paid to Ferguson Enterprises by Inland

Waters Pollution Control, Inc., was for sewer lining and point repair work that was not part of CS 1368-2 or CS 1368-3.  (*Id.*)

## IV.  MIDDD's Fraud Claims Fail Despite MIDDD'S Gross Misrepresentations Of The Record

MIDDD claims that the City made fraudulent misrepresentations regarding the Acquisition Agreement related to the purchase price of the Acquisition Agreement relying on: (1) the testimony and affidavits of MIDDD witnesses regarding representations made to it during negotiations and/or prior to closing the Acquisition Agreement; (2) testimony of City Witnesses that purport to demonstrate the "actual knowledge" of City witnesses when the Acquisition Agreement was signed; (3) the fact that top ranking officials were at the head of the criminal enterprise affecting the Project and pled guilty and that other individuals were interviewed by the United States Attorney and/or the FBI; and (4) the fact that the City should have provided information pursuant to the "due diligence reports." Even if the Court considers MIDDD's intentional fraud, silent fraud, and fraudulent concealment claims, they fail as a matter of law.

First, the MIDDD witnesses admit that the City never made any representations regarding the reasonableness of any amounts included in the Acquisition Agreement and Anthony Marrocco's testimony and affidavit are contradictory.  There were five people principally involved in negotiating the Acquisition Agreement: Misterovich and Hupp for MIDDD, and Jacobs, Walter

10

and Foster for the City. (*see,* Exhibit C, Jacobs Tr., p. 12-13; Exhibit E, Misterovich Tr., pp. 12-13, 23-24.). Marrocco was not involved. (Dkt. 6015-11, Marrocco Tr. at 23-24, 29, 32-33.). Misterovich and Hupp admitted that there were never any representations regarding the reasonableness or propriety of the Project costs. (Ex A, Hupp Tr. at 34, 49; Ex E Misterovich Tr. at 20-21, 24-25).[4] As such, the five individuals actually negotiating the Acquisition Agreement all testified that there were no such representations made. (*Id.; see also* Dkt. 6015-17, Jacobs Dec. ¶12; Dkt. 6015-16, Latimer Affid. ¶10; Dkt. 6015-15, Walter Affid. ¶ 12; Dkt. 6015-14, Foster Affid. ¶¶15-16)).[5] Furthermore, MIDDD witnesses admit that Director Victor Mercado left DWSD in June 2008 and was not even present for the finalization of the Global Settlement Agreement or the Acquisition Agreement, including the Project costs included in Schedule 3.8. (Exhibit A, Hupp Tr. at 14-15). Anthony Marrocco testified that the only person who ever made representations regarding the reasonableness of the Project costs was Victor Mercado. (Dkt. 6015-11, Marrocco Tr at 49.) Thus, the crux of MIDDD's claim is its reliance upon statements allegedly made by a *former* employee of the City

_____

[4] The MIDDD Brief repeatedly refers to the Project as "emergency" in quotation marks, suggesting that the Project was not an emergency that threatened the health and safety of the public. This was refuted by several witnesses. (Exhibit F, Walter Tr. at 44, 46; Dkt. 6015-12, Winn Tr. at 12, 57; Exhibit J, Shukla Tr. at 25.)

[5] Hupp also testified that there were a lot of compromises on a lot of different issues to arrive at an agreeable number – this was only one. (Ex A, Hupp Tr. at 47).

who was not part of the negotiation team and who allegedly made the statements years before the date of the Acquisition Agreement.[6]

Even if Mercado had made such a representation, which the City denies, MIDDD's argument that it relied on the City's alleged representations is further belied by the fact that Macomb County (and specifically, Anthony Marrocco) had a representative who was at the 15 Mile Road repair site daily, and was "keeping an eye" on the project and making "sure it was moving along." (Dkt. 6015-11, Marrocco Tr. at 72-73). As such, MIDDD's reliance is not reasonable.

Beyond these facts, the testimony and affidavits of Marrocco and Misterovich contradict themselves and one another as follows:

| Witness | Deposition Testimony | Conflicting Affidavit or Testimony |
|---------|---------------------|-----------------------------------|
| A. Marrocco | **Version 1:** Marrocco claims that the negotiations in regard to the sale of the system to Macomb started in approximately 2007. (Dkt. 6015-11, p. 11.) Mercado allegedly told him that "everything is proper" and the charges were "fair and accurate." (*Id.* p. 30-31). Misterovich may have been present, according to Marracco. | Misterovich's testimony contradicts this testimony to the extent that he was never present at any statements made by Mercado. (Ex E, Misterovich Tr., at 10). In his affidavit Marrocco affirmed that Mercado and counsel for the City represented that the final estimate summary, Exhibit 1 |

---

[6] Furthermore, to the extent the City relies on Section 1.10 of the Acquisition Agreement, which defines "Detroit's Knowledge" to include the knowledge of the DWSD Director, Victor Mercado had left the City over two years prior to the signing of the Acquisition Agreement.

12

| Witness | Deposition Testimony | Conflicting Affidavit or Testimony |
|---|---|---|
| A. Marrocco | **Version 2:** When asked to provide further information about when those conversations took place, he testified that the first allegedly occurred six weeks after the August 2004 collapse at an unknown location.  (Dkt. 6015-11, p. 46-48.).  Marrocco asked Mercado why so much equipment was on the site and nothing else was discussed. (*Id.*).  The next conversation occurred in the spring of 2006, when Mercado allegedly said that if a contractor does not use equipment it will not be paid for it.  (*Id.*, p. 46)  Marrocco next said there were many more conversations with Mercado where he represented that the costs were fair and reasonable but could not identify any specific date, place, time, or content.  (*Id.*, p. 49). | to his declaration was a record of regular and legitimate charges (Dkt. 6016-1, Ex. A, ¶8); he inquired of Mercado whether there had been any irregularities on the repair project to cause the total cost to exceed $52 Million (*Id.* ¶12); and Mercado responded in the negative and said Exhibit 1 and Schedule 3.8 were legitimately incurred and paid (*Id.* ¶13).

Not only are these statements much more definite than, if not in conflict with, his deposition testimony, but they seem untrustworthy in that Schedule 3.8 of the Acquisition Agreement was a closing document, and the only conversations Marrocco dated occurred in 2004 and 2005. |
| A. Marrocco | **Version 3**: Marrocco later affirmed that Mercado was the only person who ever made any representations about the cost of the project being fair. (Dkt. 6015-11, p. 81.)  He somehow remembered another conversation where Mercado came to his office and said he would give Marrocco credit on the Project costs.  (*Id.*, pp. 81-82.)  In yet another | |

| Witness | Deposition Testimony | Conflicting Affidavit or Testimony |
|---------|---------------------|-----------------------------------|
| | recollection, this time in Mercado's Detroit office, Mercado told him that they would make adjustments. If there's anything wrong, "we'll give you an adjustment back, this and that." | |
| W. Miseterovich | MIDDD relies upon Misterovich's testimony for the proposition that during negotiations Marrocco inquired whether the spreadsheet utilized to detail the sink hole repair costs reflected regular and legitimate charges. Allegedly in response to this inquiry, the City represented that there were no irregularities and that the total amount paid was legitimately incurred and paid. (Dkt. 6016, p. 7.) | Misterovich testified that there were some discussion regarding the value of the Project costs on Schedule 3.8 "in general terms, Macomb felt the numbers were high and Detroit assured us they were accurate." When asked if a discussion regarding the reasonableness of the costs, Misterovich stated that only general terms were discussed and "Macomb County felt the figures were high and Detroit continued to assert that the numbers were valid." (Exhibit E, Misterovich Tr. at 24-25.)<br><br>This vague testimony is simply not enough to prove a fraud claim. Misterovich's testimony indicates that Detroit was simply stating the amounts paid pursuant to CS-1368, not the reasonableness of the amounts. |

14

Second, MIDDD's claims as to the knowledge of City witnesses grossly mischaracterize the record.[7] There is no evidence that any of these interviews or testimony led anyone at DWSD or the City to believe that there were excessive or fraudulent charges related to CS-1368-2 or CS-1368-3. (Dkt. 6015-16, Latimer Affid., ¶¶16-17; Dkt. 6015-15, Walter Affid., ¶¶17-18.) The thrust of the investigation seemed to be on the City Local Economic Development Department (LED), not DWSD. (Dkt. 6015-16, Latimer Affid., ¶16.)[8] Robert Walter also testified that the only item ever discussed with him was the City's contracting procedures. (Dkt. 6015-15, Walter Affid., ¶17). MIDDD also severely

---

[7] In some cases, MIDDD purports to state what Corporation Counsel Mr. Ed Keelean knew or should have known without any record citation; there is no record because MIDDD elected not to dispose him after the City produced him pursuant their request.

Further, to the extent that MIDDD argues that these individuals constituted those who defined "Detroit's Knowledge" in Section 1.10 of the Acquisition Agreement, MIDDD conflates its breach of contract claim with its fraud claim. Dkt. 6015, Section V.B.i, pp. 38-40.

[8] In their affidavits, City Witnesses testified as follows:

- At no time prior to the signing of the Macomb Acquisition Agreement were any representations ever made that the costs associated with the Project or any other item in Schedule 3.8 were fair and reasonable. (Dkt. 6015-17, Jacobs Dec. ¶12; Dkt. 6015-16, Latimer Affid. ¶10; Dkt. 6015-15, Walter Affid. ¶ 12; Dkt. 6015-14, Foster Affid. ¶¶15-16).

- MIDDD never claimed that the costs were fraudulently excessive prior to the Acquisition Agreement nor ever questioned its cost or asked for a reduction beyond normal negotiations (Dkt. 6015-16, Latimer Affid., ¶10) and the City is unaware of excessive charges for 2004-2005 Project costs. (*Id.*, Latimer Affid., ¶14).

15

mischaracterizes the deposition testimony of Darryl Latimer, Mark Jacobs and Bob

Walter as follows:

| Witness | MIDDD Claim | Actual Testimony |
|---|---|---|
| M. Jacobs | MIDDD cites Jacobs' testimony for the proposition that the City and its counsel provided documents and information that were relied upon to be true and accurate representations of the debts associated with the Macomb System. (Dkt. 6016, p. 8, citing pg. 14 of Ex. H) | Jacobs' cited testimony did not state that Macomb and its counsel relied on the documents. He merely testified that Macomb within months of the closing asked DWSD to provide financial information "that the purchase price would be equal to the outstanding principal balance on the bonds allocated to the assets of the system. And it was that financial information that Macomb asked DWSD to provide." DWSD provided such information. |
| M. Jacobs | MIDDD cites Jacobs' testimony for the proposition that counsel for the City admits that it never reviewed or sought to confirm the representations being made. (Dkt. 6016, p. 21, citing pg. 34-35 of Ex. H) | Jacobs' cited testimony makes no such admission. He was asked who in the City, other than counsel, did a full review of the Acquisition Agreement before signing. He stated that he was not sure. |
| D. Latimer | MIDDD cites Latimer's testimony for the proposition that City employees were interviewed by the FBI starting in 2008. (Dkt. 6016, pp. 8, citing Exhibit I, pp. 13-17). | Latimer's cited testimony does not support this. His first interview was in February 2010. |
| D. Latimer | MIDDD claims that Latimer testified that the investigation was about improprieties in the award and administration of DWSD contracts. (Dkt. 6016, pp. 8, citing Exhibit I, pp. 14-17). | In the cited pages, Latimer basically said the FBI primarily asked about the City's Human Rights Department, specifically Local Economic Development, granting Ferguson undue credit which would increase his score |

16

| Witness | MIDDD Claim | Actual Testimony |
|---------|-------------|------------------|
| | | and assist his chances to secure contracts. Thus Latimer did not think the inquiry was focused on the actions of DWSD. |
| D. Latimer | MIDDD states that Latimer never read the agreement or attempted to review its terms. (Dkt. 6016, p. 21) | In the cited pages, Latimer testified that while he did not read it in its entirety, he relied on the advice of counsel.<br><br>Anthony Marrocco testified similarly. (Dkt. 6015, Ex. 10, Marrocco Tr. at15) |
| D. Latimer | MIDDD also discusses the "mark ups" and mischaracterizes Latimer's testimony. (Dkt. 6016, p. 21) | While Latimer did testify, in the cited pages, that certain mark-ups were not appropriate and thus disallowed, the amounts totaled no more than $150,000 on an invoice that was over $5.6 Million. Latimer disallowed it because they appeared to be mark-ups on mark-ups and there can only be mark-ups on work actually performed. (Exhibit G, Latimer at 55) |
| R. Walter | MIDDD mischaracterizes Robert Walter's testimony regarding interviews he gave to the United States Attorney. | Apart from the testimony through affidavit (*supra*), Walter testified that the questions focused on the contractual procedure used by the City and DWSD and he was not asked about the Project, CS-1368, or Inland Waters. (Exhibit F, Walter Tr. at 16, 91). Walter testified that his only other involvement in the investigation was providing information to Corporation Counsel regarding where in the Water Board building |

17

| Witness | MIDDD Claim | Actual Testimony |
|---------|-------------|------------------|
| | | files could be found. He did not remember whether any of the grand jury subpoenas requested documents related to CS-1368. (*Id.*, p. 91). Walter had no information regarding any other interviews or grand jury witnesses. (*Id.* pp. 98-99). |
| R. Walter | MIDDD mischaracterizes Walters' testimony regarding the negotiating process and representations made therein. (e.g. Dkt. 6016, p. 7, citing Exhibit G, pp. 73-74). | Walter's testimony does not refer to the amount charged by Inland Waters for the Project, nor that the amount legitimately incurred and paid. (Exhibit F, Walter Tr. at 73-74). In fact, Walter testified that he made no representations regarding the reasonableness of any items during the negotiations. (*Id.*, p. 86). Finally, Walter testified that at no time prior to the first superseding indictment did he recall MIDDD questioning the total cost of the project. (*Id.*, p. 70). |
| R. Walter | MIDDD stated that a signed version of the Letter of Intent associated with the Global Settlement Agreement has not been located but that Robert Walter, a member of the City's Corporation Counsel, testified that the Letter of Intent was executed and relied upon. (Dkt. 6016, page 7, fn 6, citing Exhibit G pp. 79 and 97-98). | Walter's cited testimony states that it was his belief that the Letter of Intent was executed but – after reviewing the document – stated that it may have not been executed and the copy he had was not executed. Moreover, he did not testify that the Letter of Intent was relied upon by the City or anyone else to his knowledge. |
| R. Shukla | MIDDD claims that Shukla was interrogated during the federal investigation with Corporation | Shukla's testimony never states anything regarding Corporation Counsel's presence, nor did he say |

| Witness | MIDDD Claim | Actual Testimony |
|---------|-------------|------------------|
| | Counsel present and that federal investigation targeted irregularities and overcharges on CS-1368. (Dkt. 6016, p. 9, citing Exhibit J, pp. 71-73, 19, 80-81) | that the questions targeted CS-1368 overcharges. The investigation, rather, focused on whether Ferguson took advantage of his position to get contracts and related to corruption in bidding, not necessarily over charges. |
| R. Shukla | MIDDD claims that Asst. Corp Counsel and City's signatory confirmed that City did not cooperate with MIDDD's due diligence and that City already knew of grand jury subpoenas. (Dkt. 6016, p. 20-21, citing Exhibit J, pp. 71-73) | Shukla's testimony does not state anything of this nature. |
| R. Shukla | MIDDD alleges that Shukla testified that the Project was the subject of post-dated documentation for work and allowed extraordinary markups. (Dkt. 6016, p. 24, citing Exhibit J, pp. 71-73, 78-81) | Shukla's testimony does not state anything of this nature. Shukla testified that Inland Waters had to audit each invoice from a sub-contractor and all audits were signed. (Exhibit J, Shukla Tr., p. 108). These invoices were for all time, material and equipment and no payment could be made without the audit. (*Id.*) Shukla, who worked on the job site 7 days a week for 16 hours a day at minimum was adamant that all charges were reasonable and there were no overcharges. (*Id.* at p. 106, 115). |

Third, Mercado and Kilpatrick's guilty plea and verdict do not establish that the City defrauded MIDDD. These were high ranking officials who used their power to conceal their criminal activities. Even if the City knew about portions of

the alleged criminal conspiracy prior to the First Superseding Indictment and conclusion of the Acquisition Agreement, there is no evidence that such knowledge translated into knowledge that there were overcharges or fraud related to CS-1368 or the Project.

The fact of the matter is that at no time until the date of the First Superseding Indictment in the *Kilpatrick* case was made public, was the City aware that there were any claims that are or were reasonably expected to become the subject of litigation affecting the Macomb System, as defined in the Acquisition Agreement, or the transactions contemplated by the Acquisition Agreement. (Dkt. 6015-16, Latimer Affid., ¶¶16-18; Dkt. 6015-17, Jacobs Dec., ¶17; Dkt. 6015-15, Walter Affid., ¶¶17-18). Contrary to the gross misrepresentations of City witness testimony by MIDDD, none of the City's witnesses testified that they were aware that there were excessive or fraudulent charges related to CS 1368-2 or CS 1368-3 prior to release of the First Superseding Indictment. In fact, MIDDD admits that "**the criminal enterprise was only uncovered by the federal government using the vast resources and powers available to it during several years of investigation**." (Dkt. 6016, p. 27) (emphasis added).

Fourth, as to Macomb's use of Jacobs Deposition Exhibit 11, the so called Interceptor Due Diligence Information List, Jacobs testified that he had not seen the document before and it appears to be something generated by Mr. Hupp. It

could have been provided to Detroit directly, however. (Exhibit C, Jacobs Tr. at 15-16). In any event, this document is inadmissible hearsay.

As such, MIDDD's claim that the City made false representations or that they know or should have known of their falsity fails.

## V. The Merger Clause of the Acquisition Agreement Forecloses MIDDD from Claiming Any Misrepresentation Outside the Contract

In its Brief, MIDDD argues that it can use parole evidence (*i.e.* evidence from outside the four corners of the Acquisition Agreement and the Global Settlement Agreement) to prove its claims – despite the fact that the Acquisition Agreement and Global Settlement Agreement both contain a merger and integration clause. (Dkt. 6016 at 28-30.) MIDDD is wrong. In reality, this is nothing but a thinly veiled attempt by MIDDD to have the Court re-write and enforce an entirely different contract using parole evidence.

MIDDD readily admits that, in general, parol evidence is not permitted to alter or vary the terms of a contract. *Salzman v. Maldaver*, 315 Mich. 403, 413 (1946). MIDDD further admits that it is seeking to introduce parol evidence regarding purported representations made by Mercado to MIDDD. (Dkt. 6016 at 28.) Specifically, MIDDD's entire argument is based on its allegation that while the Acquisition Agreement contains a detailed calculation of the purchase price for the Macomb Interceptor System based on a calculation of "System Debt," that the

real agreement was that MIDDD would pay a "fair" and "reasonable" amount for the 15 Mile Road repairs. This would constitute a different agreement.

Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, are not admissible to vary the terms of a contract. *UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 492 (1998). Merger clauses, such as those MIDDD admits it agreed to, prevent one party to a contract from introducing parol evidence to prove an agreement other than the one actually signed. *Coal Resources, Inc. v. Gulf & Western Indus., Inc.,* 756 F.2d 443, 446–447 (6th Cir. 1985) (a plaintiff cannot "assert a claim for an alleged breach of an express warranty arising only by virtue of [pre-contractual] representations"); *Kamalnath v. Mercy Memorial Hosp. Corp.,* 194 Mich.App. 543, 554-555 (1992) ("The reasoning behind [the parol evidence rule] is clear: a party may not complain that they relied on oral promises regarding additional or contrary contract terms when there is written proof, signed by both parties, to the contrary.") MIDDD cannot use any prior alleged representations made by Mercado to vary the terms of the Acquisition Agreement and Global Settlement Agreement.

Moreover, the merger and integration clauses from these agreements nullify "all prior and contemporaneous agreements, understandings, representations and warranties" made by a party. *Hamade v. Sunoco, Inc. (R&M)*, 271 Mich. App.

145, 171 (2006). Because any pre-contractual statements were "collateral agreements or understandings between two parties that [were] not expressed in a written contract," they are "eviscerated by [the] merger clause[.]" *Barclae v. Zarb*, 300 Mich. App. 455, 481 (2013).

To get around the parol evidence rule, relying on *Barclae v. Zarb*, 300 Mich. App. 455 (2013) and *Abbo v. Wireless Toyz Franchise, LLC*, 2014 WL 1978185 (Mich. App. May 13, 2014), MIDDD tries to claim that the purported representations of Mercado are not being used to vary the terms of the contract, but instead, are representations of fact which support its fraud claim. (Dkt. 6016 at 29.) MIDDD's argument fails for three reasons.

First, MIDDD cannot rely on extraneous statements because the purported representations are covered by the express terms of the Global Settlement Agreement. In *Barclae*, the Michigan Court of Appeals held that a merger clause undermines this kind of reliance on extraneous statements, when they relate to matters covered by the contract. *Barclae*, 300 Mich. App. at 481. "The reasoning behind this is clear, one should not be heard to complain that they relied on oral promises regarding additional or contrary terms when there is written proof signed by both parties, to the contrary." *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 930 (E.D. Mich. 2005). Here, MIDDD admits that the Global Settlement Agreement contains a provision resolving "[a]ll Disputes and

claims between the Parties related to costs for repairs and renovation of the interceptor sewers…" (Dkt. 6105-20.) Clearly, the purported representations are covered by the Global Settlement Agreement.

Second, in any event, MIDDD cannot prevail because MIDDD's reliance on the purported representations by Mercado were not reasonable. The purported statements of Mercado were made years before the Acquisition Agreement was signed and he left DWSD over two years before the Acquisition Agreement was executed. Nor was Mercado involved on the team that negotiated the Acquisition Agreement. Finally, any reliance on Mercado's alleged statement about the reasonableness of the repair costs was unreasonable because the Global Settlement Agreement expressly resolved any repair cost claims and the two Macomb attorneys negotiating the agreement should have known that any repair cost disputes could not be raised later.

Third, the merger and integration clause contained in the Global Settlement Agreement expressly covers all pre-contractual representations. MIDDD's reliance on *Abbo v. Wireless Toyz Franchise, LLC*, 2014 WL 1978185 (Mich. App. May 13, 2014) is completely misplaced. In *Abbo*, the court noted that the merger clause at issue did not make reference to prior "representations" or "inducements," and enforced the plain language of the contract. *Id.* at *6. Here, the Global Settlement Agreement merger clause states that:

This Agreement, and the Exhibits, contains the entire agreement between the Parties with regard to the matters addressed in this Agreement. No Party has made any representations except those expressly set forth in this Agreement, and no rights or remedies are, or shall be, acquired by any Party by implication or otherwise unless expressly set forth in this Agreement.

(Dkt. 6015-20, §9(B).) The Global Settlement Agreement resolved "(ii) [a]ll Disputes related to the allocation of repair costs related to the August 15, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes . . . [and] (iv) [a]ll Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement…" (*Id.*, §1.) Thus, unlike *Abbo*, the merger clause at issue expressly disclaimed all representations except those set forth in the Global Settlement Agreement, and the Global Settlement Agreement expressly dealt with any claims pertaining to the costs for the repairs. Thus, for all these reasons, MIDDD cannot rely on parol evidence to support its claim.

## VI. MIDDD's Unjust Enrichment Claims Fail

MIDDD argues that it should receive the settlement funds received by Detroit in constructive trust for Detroit's settlement of the Federal Case. This argument lacks merit. As detailed in the City's response, res judicata applies to MIDDD's claim, as well as Detroit's settlement and dismissal from the MIDDD Federal Case. Moreover, MIDDD repeatedly admits in its brief that it entered into the Acquisition Agreement. Therefore, its unjust enrichment claims are barred.

## VII.  MIDDD Admits It Waived Its Own Claims

Anthony Marrocco, William Misterovich, and MIDDD's attorney, Craig Hupp, admit that the Global Settlement Agreement waived all of the claims related to the Project and its costs.  (Exhibit A, Hupp Tr. at 50; Exhibit E, Misterovich Tr. at 18, 23-24, 30-32; Dkt. 6015-11, Marrocco Tr. at 16-17, 22 ("it settled everything")).  Hupp, MIDDD's attorney, also testified that the Global Settlement Agreement and the 2010 Settlement and Release Agreement released any claims related to the costs of the repairs of the Project.  (Exhibit A, Hupp Tr. at 18, 23, 24, 54.)

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Debtor respectfully requests that the Court deny MIDDD's motion for temporary allowance, or that the Court value MIDDD claim at $1.00, or a very nominal amount, and grant such other and further relief to the City as the Court may deem proper.

Dated: July 16, 2014            Respectfully submitted,

By: /s/ Stephen S. LaPlante
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
Jerome R. Watson (MI P27082)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

26

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

ATTORNEYS FOR THE CITY OF DETROIT

## CERTIFICATE OF SERVICE

I, Stephen S. LaPlante, hereby certify that the foregoing Debtor's Reply Brief To Docket 6016 In Support Of Its Response (Dkt. 5312) In Opposition To Macomb Interceptor Drain Drainage District's Motion (Dkt. 5155) For Temporary Allowance Of Claim Pursuant To Rule 3018(A) Of The Federal Rules Of Bankruptcy Procedure For Purposes Of Accepting Or Rejecting Debtor's Fourth Amended Plan Of Adjustment was filed and served via the Court's electronic case filing and noticing system on this 16th day of July, 2014.

/s/ Stephen S. LaPlante

22639743.4\022765-00202

27