# In The Matter Of:

*City of Detroit, Michigan*

*R. Craig Hupp*
*July 14, 2014*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File HUPP_R. CRAIG.txt*
*Min-U-Script® with Word Index*

**Page 1**

```
 1            UNITED STATES BANKRUPTCY COURT
 2             EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5    _____
 6    In re:                    )    Case No. 13-53845
 7    CITY OF DETROIT, MICHIGAN )
 8                              )    Chapter 9
 9          Debtor              )
10    _____)   Hon. Steven W. Rhodes
11
12
13         The Deposition of R. CRAIG HUPP,
14         Taken at 21777 Dunham Road,
15         Clinton Township, Michigan,
16         Commencing at 8:10 a.m.,
17         Monday, July 14, 2014,
18         Before Melinda S. Moore, CSR-2258.
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   RAECHEL M. BADALAMENTI (P64361)
 4   Kirk, Huth, Lange & Badalamenti, PLC
 5   19500 Hall Road
 6   Suite 100
 7   Clinton Township, Michigan 48038
 8   586.412.4900
 9   rbadalamenti@khlblaw.com
10       Appearing on behalf of the Macomb Interceptor
11        Drain Drainage District.
12
13   ALBERT B. ADDIS (P31084)
14   O'Reilly Rancilio PC
15   12900 Hall Road
16   Suite 350
17   Sterling Heights, Michigan, 48313
18   586.726.1000
19   aaddis@orlaw.com
20       Appearing on behalf of the Macomb Interceptor
21        Drain Drainage District.
```

**Page 3**

```
 1   JEROME R. WATSON (P27082)
 2   Miller Canfield Paddock & Stone, PLC
 3   150 W. Jefferson Avenue
 4   Suite 2500
 5   Detroit, Michigan 48226
 6   313.963.6420
 7   watson@millercanfield.com
 8       Appearing on behalf of the City of
 9        Detroit.
10
11   ARTHUR H. RUEGGER
12   Salans FMC SNR Denton
13   1221 Avenue of the Americas
14   New York, New York 10020
15   212.768.6881
16   arthur.ruegger@dentons.com
17       Appearing on behalf of the
18        Official Committee of Retirees
19        of the City of Detroit.
```

**Page 4**

```
 1   GEORGE G. KEMSLEY
 2   Bodman PLC
 3   6th Floor at Ford Field
 4   1901 St. Antoine Street
 5   Detroit, Michigan 48226
 6   313.259.7777
 7   gkemsley@bodmanlaw.com
 8       Appearing on behalf of the Witness.
```

Page 5

1  TABLE OF CONTENTS
2
3  WITNESS                                    PAGE
4  R. CRAIG HUPP
5  EXAMINATION BY MR. WATSON                  6
6  EXAMINATION BY MS. BADALAMENTI             59
7  RE-EXAMINATION BY MR. WATSON               68
8
9  EXHIBIT                                    PAGE
10 (Exhibits attached to transcript.)
11
12 DEPOSITION EXHIBIT 1                       12
13 DEPOSITION EXHIBIT 2                       21
14 DEPOSITION EXHIBIT 3                       36
15 DEPOSITION EXHIBIT 4                       40
16 DEPOSITION EXHIBIT 5                       55
17 DEPOSITION EXHIBIT 6                       56
18 DEPOSITION EXHIBIT 7                       58
19
20
21
22
23
24
25

Page 6

1  Clinton Township, Michigan
2  Monday, July 14, 2014
3  8:10 a.m.
4  (Mr. Ruegger not present at 8:10
5  a.m.)
6  R. CRAIG HUPP,
7  was thereupon called as a witness herein, and
8  after having first been duly sworn to testify to
9  the truth, the whole truth and nothing but the
10 truth, was examined and testified as follows:
11     MR. WATSON:  Let the record reflect
12 that this will be a deposition taken pursuant to
13 Notice, to be used for all purposes appropriate
14 under the applicable rules.
15     EXAMINATION
16     BY MR. WATSON:
17 Q.  Mr. Hupp, I'm going to ask you a series of
18 questions.  If you don't understand the question,
19 you want me to rephrase it or anything of that
20 nature, please let me know and I'll try to
21 accommodate you.  Otherwise, I will assume that
22 you've heard the question and are responding to
23 it.  Okay?
24 A.  Yes.
25 Q.  Have you ever been deposed before?

Page 7

1  A.  Yes.
2  Q.  So you know you have to answer verbally.  The
3  court reporter can't take down non-verbal
4  gestures.
5  A.  Yes.
6  Q.  Would you tell us your educational background.
7  A.  I have a bachelor of science in mechanical
8  engineering from the University of Virginia.  I
9  have a master's degree in engineering science from
10 the University of New South Wales, a law degree
11 from Wayne State, and a graduate certificate in
12 dispute resolution from Wayne State.
13 Q.  When did you first start practicing as an
14 attorney?
15 A.  I was admitted to the bar in February or March of
16 1984.
17 Q.  And who --
18 A.  It would have been a little later than that.  It
19 would have been May of '84.  Bar exam was in
20 February.
21 Q.  I understand you work at Bodman?
22 A.  I've worked at Bodman my entire career.
23 Q.  Okay.  And what area are you in?
24 A.  I practice in two practice groups,
25 environmental -- the environmental practice group

Page 8

1  and the litigation practice group.
2  Q.  What are your main focuses in the environmental
3  practice group?  What do you do?
4  A.  There's three general activities.  There's general
5  counseling of corporate clients mostly on almost
6  any possible question under environmental law.  I
7  do a lot of work with banks when environmental
8  issues arise in loan agreements or workouts or
9  foreclosures, and do a certain amount -- not much
10 lately of environmental litigation, typically
11 over -- under the various statues and hazardous
12 waste laws, cost recovery, and the like.
13 Q.  In this matter, you know there are a couple loan
14 agreements at issue, the settlement agreement and
15 an acquisition agreement.  You have experience in
16 drafting such agreements?
17 A.  I have experience in drafting parts of such
18 agreements, but not agreements as a whole.
19 Q.  How long have you done work for Macomb County?
20 A.  My first assignment for Macomb County was probably
21 1998 or 1999.
22 Q.  And have you worked continuously for them since
23 then?
24 A.  Yes.
25 Q.  What are the types of legal work you've done for

Page 9

Macomb County?

A. Our firm has represented the Office of Public Works since 1977 on matters related to DWSD rates and the county's contract for wastewater services. That continues through today. I have handled -- provided environmental advice on a bunch of environmental issues as they have arisen for the department, wetlands, soil sedimentation issues. With others I've been involved in several lawsuits involving construction claims, at least one lawsuit to recover environmental cleanup costs, you know. There have certainly been other matters but that kind of gives you a general picture, I hope.

Q. Have you been involved in representing Macomb County in what we've referred to in this litigation as the Feikens case?

A. Yes.

Q. What types of things have you done in that Feikens case?

A. First and foremost the Feikens case was filed in 1977. And that became the litigation or the place or the forum -- forum, I guess, where disputes over rates and charges from Detroit mostly got played out. That's something that arose as soon

Page 10

as the 1977 case was filed. And thereafter there were occasions when one or more of the wholesale customers challenged some aspect of the charges in state court. Detroit removed it to federal court. Judge Feikens made clear he believed those disputes belonged in his court. He made that point often enough by 1982 or 1983 that thereafter nobody tried to go to state court, because they were just going to end up in front of Judge Feikens.

And so most -- until actually the global settlement in 2008, most -- any significant rate dispute wound up playing out in front of Judge Feikens through contested motions or other sorts of matters. In addition, often under the court's oversight or whatever, in various periods of history, the court became involved in overseeing and attempting to rectify DWSD management with the objective of having DWSD be able to comply with the Clean Water Act; and that would involve wholesale customer involvement in the process in terms of consent decrease intended to accomplish management reforms, disputes over whether certain sorts of projects need to comply with the law could go ahead over various reasons.

Page 11

At one point there was various ancillary disputes that would arise in the case. It just -- and then ultimately at the time of Judge Feikens's retirement and the transfer to Judge Cox, the larger question of restructuring DWSD governance and getting DWSD separated from Detroit, which was a process that counties weren't very much involved with continued, and sort of the regional authority negotiations that have gone over the last year have been a part of that continuum. So there's been this -- over the 35 plus years, there's been a very broad type of activities that occurred in that case.

Q. Now, one thing I think I heard you say is that after a point it became pretty clear that if an entity like Macomb had a dispute with DWSD, that would be heard in federal court before Judge Feikens?

A. Yeah. That wasn't universally true. If it involved rates and charges or the management of DWSD, that was certainly the case. That was the case up until Judge Feikens's retired. There were other cases -- Macomb County had a dispute with Detroit over some potential damage to a Macomb County facility, and that case proceeded in state

Page 12

court, for example. But if it involved rates and charges or anything like that, one way or the other, it would wind up in front of Judge Feikens.

Q. Are you familiar with a settlement agreement, I think, that was actually dated May 2009 between Macomb and Detroit and Oakland counties, perhaps other entities?

A. I am.

Q. And what was your involvement in that settlement agreement, if any?

A. I represented with others -- I'm sure there were other lawyers at Bodman. I was the principal lawyer involved. I represented Macomb County Office of Public Works in a negotiation of that settlement agreement and its documentation.

MR. WATSON: I'm going to get this one marked. It's been marked before, but I didn't bring the exhibits from the other dep. Maybe we'll just mark that as Hupp Exhibit 1.

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 1
8:20 a.m.

BY MR. WATSON:

Q. Mr. Hupp, you've been handed what's been marked as Hupp Exhibit 1. Is that the settlement

1  agreement between City of Detroit, DWSD, Macomb
2  County, Oakland County, Wayne County?
3  A.  Yes.  I'm not sure if it has all of the exhibits
4  attached to it, but the main body of this is
5  the -- this is the agreement, yes.
6  Q.  Were you involved in drafting this agreement?
7  A.  Yes.
8  Q.  Were you the principal drafter of the agreement,
9  or do you know who was the principal drafter was?
10 A.  My recollection is this was very much of a joint
11 effort by all of the attorneys for the various
12 parties were very actively involved in drafting
13 this.
14 Q.  Who else was involved?  First let's say the
15 attorneys.
16 A.  For the City of Detroit, it would have been Mark
17 Jacobs, Bob Walters.  For Oakland County, it would
18 have been Joe Colaianne, C-o-l-a-i-a-n-n-e, who
19 was in-house counsel for the Office of Water
20 Resources Commissioner, Oakland County.  And
21 Jaye -- excuse me -- Jaye, J-a-y-e, Quadrozzi,
22 Q-u-a-d-r-o-z-z-i, outside counsel for Oakland
23 County.  For Wayne County, it would have been
24 Patrick McCulloch and -- who was outside counsel,
25 and Lavonda Jackson who was assistant Wayne County

Page 14

1  corp counsel, and then on my side -- on the Macomb
2  County side of the table were myself.  I don't
3  recall specifically who else within Bodman would
4  have looked at this.  And then Mr. Misterovich
5  wearing his lawyer's hat for Macomb County.
6  Q.  As far as the client representatives for Macomb
7  County and DWSD, can you identify those
8  individuals.
9  A.  From Macomb County, ultimately I reported to
10 Commissioner Marrocco.  On a kind of a day
11 reporting basis, it was to Mr. Misterovich, his
12 chief deputy, and Mr. James Pistilli, who was the
13 -- I don't remember his title exactly, but he
14 effectively chief engineer for wastewater
15 services.  I don't think that particular title had
16 been created at that point.
17 Q.  What about for DWSD?
18 A.  It would have inside DWSD Bob Walters and
19 occasionally other representatives of DWSD
20 management, but in this time period, there was a
21 shifting through maybe three or four
22 individuals -- or in this time period, Mr. Mercado
23 had left, and Ms. Pamela Turner was interim
24 director, so as of the fall -- as of the kind of
25 spring of 2009, it would have been Pamela Turner.

Page 15

1  Before that it was Anthony Adams, and before that
2  it was Victor Mercado or somebody -- I mean,
3  Mercado was gone by the time we were working on
4  this.
5  Q.  Do you know when Mercado left?  Was it 2008?
6  2009?
7  A.  He left in the June of 2008.
8  Q.  June of 2008.  I note that this settlement
9  agreement has a court caption on it.  Were the
10 negotiations supervised by the court and
11 encouraged by the court?  Why was the court
12 involved in this?
13 A.  Anything of this -- because it resolved disputes,
14 quite a number of them -- there's a list of them
15 in one of the attachments of all of the disputes.
16 This became known as the global settlement.  And
17 there's a list in here somewhere.  Exhibit C is a
18 list of all of the matters pending before Judge
19 Feikens that this global settlement resolved.  So
20 there are a variety of motions and orders and
21 opinions, et cetera that were resolved.  And,
22 again, as I mentioned before, his court had become
23 the forum for all disputes over rates and charges,
24 DWSD management and the like.
25     At some point -- in further answer to

Page 16

1  your question, at some point Judge Feikens
2  appointed Mr. Timothy O'Brien to serve as kind of
3  a facilitator, and Mr. O'Brien orchestrated the
4  discussions that generated a settlement in
5  December of 2008 that did not get formally entered
6  as a settlement agreement with the court until May
7  of 2009, but the agreement was reached in December
8  of 2008.
9  Q.  I take it that this agreement was intended to
10 resolve all pending disputes between, among
11 others, DWSD and Macomb?
12 A.  No.  That's not correct.
13 Q.  Were there disputes between the two that it
14 didn't resolve that you're aware of?
15 A.  Yes.
16 Q.  What were those?
17 A.  There were a variety of rate-related disputes.  In
18 fact, that's why there is a specific
19 enumeration -- why the parties put together a
20 specific enumeration of what was getting resolved
21 was there were other things pending.  I know I'd
22 have a hard time listing them right now, but
23 Macomb County had a variety of more mundane rate
24 disputes then pending, and I'd be virtually
25 certain Oakland County had some stuff -- excuse

Page 17

1 me, some concerns as well that were not addressed
2 by this.
3 Q. Well, let's look at exhibit -- you say Exhibit C
4 was the list of matters resolved.
5 A. Generally, yes.
6 Q. And I'm looking down Exhibit C, and I see the
7 name Infrastructure Management Group. Are you
8 familiar with that entity? What is that?
9 A. It is my understanding that the Infrastructure
10 Management Group was a consulting firm of some
11 sort retained by DWSD, I believe, at the urging of
12 the court to oversee the DWSD contracting process.
13 Q. As I understand it, it oversaw contracts over
14 $500,000. Do you recall that?
15 A. I don't have that level of information personally
16 about what their task was.
17 Q. Did you ever have any dealings with them?
18 A. No.
19 Q. I'm looking at the next page, No. 5, interceptor
20 collapse.
21 A. Yes.
22 Q. And it resolves apparently a motion for
23 reconsideration. What was that about?
24 A. In February of -- Macomb County had filed a
25 proceeding in the 1977 case challenging its

Page 18

1 liability for the costs incurred by DWSD in
2 repairing a sewer collapse that occurred in August
3 of 2004. In February of 2007, sua sponte, without
4 notice to the parties, Judge Feikens issued an
5 order dismissing Macomb County's claims with
6 prejudice. Macomb County moved for
7 reconsideration of that order, apparently,
8 according to this, on April 6, 2007.
9 Q. And so this global settlement resolved that
10 dispute in full?
11 A. I think a fair answer was we thought so at the
12 time. It's been clear since it didn't.
13 Q. How so?
14 A. Well, there's this matter that I'm being deposed
15 in today and I know Macomb County has had two
16 lawsuits pending over those costs that remain in
17 court.
18 Q. And then it says "Interceptor interest rate."
19 What was the dispute about in regard to
20 interceptor interest rate?
21 A. Under Detroit's rate setting procedures, as far as
22 I know, at least since mid-1970s, the cost of
23 capital projects are recovered in the rates by --
24 depending on the project, determining what
25 customer classes are served by the capital

Page 19

1 project, and the debt service cost -- annual debt
2 service cost to the project is then put in the
3 rates to the class of customers served by the
4 project. So in the case of an interceptor or any
5 other facility that would serve only Macomb
6 County, if DWSD borrowed money to construct a
7 facility, the debt service associated with that
8 project as tracked by DWSD's accounting system
9 would be put in DWSD -- excuse me -- would be put
10 in Macomb County's rates and nobody else's.
11     And there was one and then it turned
12 out two projects where, from Macomb County's point
13 of view, the manner in which DWSD was calculating
14 and attributing the debt service to Macomb County
15 was incorrect and inconsistent with long-standing
16 understandings and agreements as to how the
17 capital cost would be recovered.
18     Basically to make it simple, Detroit
19 borrowed the money at 5%, and then charged -- they
20 were charging Macomb County about 7 to 7-1/2%.
21 Q. Had there been a formal agreement between Detroit
22 and Macomb County pinning down the interest rate
23 at 5% or whatever percent it was?
24 A. I believe the answer to that is yes. I believe it
25 was set forth in the rate setting protocols that

Page 20

1 Detroit and its wholesale customers had developed
2 and agreed to over the years.
3 Q. Let me ask this because I'm not sure my
4 understanding is correct. As I understood, there
5 had been a formal agreement that had pretty much
6 expired. Detroit and Macomb had not reached a
7 new agreement. Detroit was charging the 7% or so
8 that Macomb felt was too high. Is that how it
9 happened?
10 A. No.
11 Q. How did it happen that Detroit charged the 7% or
12 7-1/2%, whatever it was?
13 A. I could never figure out what prompted Detroit to
14 do that. It was clearly inconsistent with all
15 practices.
16 Q. Nevertheless, the matter was settled?
17 A. The matter was settled.
18 Q. Okay. Let's look at a few of the provisions of
19 the acquisition agreement.
20     MS. BADALAMENTI: Of Exhibit 1 or the
21 acquisition agreement?
22     MR. WATSON: I'm sorry, the settlement
23 agreement. Thank you.
24     THE WITNESS: If we could go off the
25 record briefly.

City of Detroit, Michigan

R. Craig Hupp
July 14, 2014

Page 21
Page 22
Page 23
Page 24

**Page 21**

1  (Off the record at 8:35 a.m.) eye
2  (Back on the record at 8:35 a.m.)
3  **BY MR. WATSON:**
4  Q.  Looking at -- on the second page, 1 A 4, it says?
5  A.  I don't believe I have the document you're looking
6     at.  Is this the settlement agreement?
7  Q.  Yeah, the settlement agreement?
8  A.  What page?
9  Q.  Second page, 1-A(iv).
10 A.  Okay.
11 Q.  It reads "All disputes and claims between the
12    parties related to costs for repairs and
13    renovation of the interceptor sewers listed in
14    Exhibit 1 of Exhibit D of this agreement."  And I
15    was wondering if the interceptor -- 15 Mile Road
16    interceptor collapsed -- interceptor that
17    collapsed was one of those.
18    MS. BADALAMENTI:  I'm going to object.
19    There isn't an Exhibit 1 to Exhibit D, and there
20    hasn't been a version of this document that we've
21    seen.  But you can go ahead.
22    MR. WATSON:  I might not have brought
23    it.  And you don't remember offhand if -- let's
24    see here.  Let's have that marked Exhibit 2.
25    **MARKED FOR IDENTIFICATION:**

**Page 22**

1     DEPOSITION EXHIBIT 2
2     8:37 a.m.
3     **BY MR. WATSON:**
4  Q.  You've been handed, Mr. Hupp, what's been marked
5     Exhibit 2.  And my understanding is that that's
6     the same Letter of Intent that's attached to this
7     settlement agreement, but that happens to have
8     the Exhibit 1 to Exhibit D.  If you could take a
9     look at Exhibit 1 to Exhibit D.
10    MS. BADALAMENTI:  You want him to look
11    at Exhibit 1 of your marked Exhibit 2?
12    MR. WATSON:  Right.
13    MS. BADALAMENTI:  Because there is no
14    Exhibit 1 to Exhibit D on Exhibit 1, right?
15    MR. WATSON:  Well, Exhibit D, I think,
16    is Exhibit 2 -- Deposition Exhibit 2.
17    **BY MR. WATSON:**
18 Q.  If you could confirm that those two documents are
19    the same.  And then look -- as far as Exhibit 2,
20    look at Exhibit 1 to Exhibit 2, and my question
21    is whether or not the sewer that collapsed is
22    listed amongst those.
23    MS. BADALAMENTI:  That was a lot of
24    questions, but --
25    **BY MR. WATSON:**

**Page 23**

1  Q.  Do you understand the question at all?
2     MS. BADALAMENTI:  Let me do it this
3     way:  I'm going to place a continuing objection to
4     any question that suggests that Exhibit 1 was
5     attached as Exhibit D for the settlement agreement
6     that we've marked here as Exhibit 1.  But subject
7     to that objection, you can go ahead and answer.
8     **BY MR. WATSON:**
9  Q.  So I guess the first task I have assigned to you
10    is if you could confirm that Exhibit D of the
11    settlement agreement is the same as the
12    Exhibit 2, Letter of Intent.
13 A.  Obviously without reviewing them word for word, I
14    can't say whether they're identical or not.  They
15    appear to be the same.  They have the same
16    document number on the first lower right corner of
17    the first page.  So, again, they appear to be the
18    same, but I have not done a literal word-for-word
19    comparison.
20 Q.  If you could look at Exhibit 2, which at the top
21    says "Letter of Intent," correct?
22 A.  Yes.
23 Q.  And if you would look at Exhibit 1 to Exhibit 2,
24    Exhibit 1 reads "Oakland-Macomb Interceptor
25    System Property to Be Transferred."  What I'm

**Page 24**

1     trying to figure out is the sewer that collapsed,
2     is that amongst the properties listed in this
3     Exhibit 1?
4  A.  Yes, it is.
5  Q.  Okay.  If you would go back to the settlement
6     agreement, Hupp Deposition Exhibit 1, I'm looking
7     at what's marked at the bottom as 3 of the
8     settlement agreement.  It's actually page 4 as
9     I'm counting, but it says 3 at the bottom.
10 A.  Yes.
11 Q.  And section B reads in part "The parties, in
12    complete satisfaction of the 2004 collapse
13    claims," and then it goes on, and it talks about
14    an amount of $17,050,000.  What was the
15    $17,050,000 for?  Do you know?
16 A.  It's as stated in that sentence, Macomb had
17    asserted a challenge to the liability for the 2004
18    collapse.  I forget what the dispute over the 2006
19    repairs were.  And they had challenged the manner
20    in which Detroit was calculating interest rate on
21    the 2004 collapse cost as well as on another
22    interceptor project, so they had asserted a
23    variety of claims stating they were being either
24    overcharged or charged for things that they
25    shouldn't be liable for, and ultimately all those

1  claims were -- resulted in a judgment in Macomb
2  County's favor of $17,050,000.
3  Q.  And I guess the logical question becomes:  An
4  adjustment to what?
5  A.  As collectively the documents indicate, as part of
6  settling these and other claims that Oakland and
7  Macomb County had, with some ancillary adjustments
8  to Wayne County as well, these claims and Oakland
9  County's claims would get settled, and in
10 consideration for that, Oakland County and Macomb
11 County would take over the interceptor system
12 north of 8 Mile Road, and they would reimburse
13 Detroit for the outstanding debt being charged in
14 the rates for those assets being transferred to
15 the two counties or an entity to be created by
16 those counties.
17 Q.  Okay.  So as I understand, the basic agreement
18 the parties were working on, if we just focus on
19 Macomb County, is that Macomb County would
20 purchase the Macomb Interceptor system by paying
21 Detroit the amount of debt on the system?
22 A.  The transaction to begin with, as reflected in the
23 settlement agreement, was really more of a unitary
24 transaction in the sense that I don't believe
25 until December of 2008, when this agreement really

1  was done, that Oakland and Macomb County had
2  decided how the assets being transferred would be
3  owned.  I think that at that time the possibility
4  had not been eliminated that the counties would
5  put together just one entity to own all of the
6  assets, which could have been done.  There were
7  plenty of state statutes that could have been done
8  that way.  And it was at some time after the
9  settlement in December of 2008 that Wayne and
10 Oakland County decided they will own a joint
11 entity called the Oakland-Macomb Interceptor Drain
12 Drainage District, and these assets would be
13 transferred to a Macomb Interceptor Drain Drainage
14 District.
15 Q.  What about the time of the settlement agreement?
16 Was it still under consideration to go to this
17 one -- I think you said unitary system -- or had
18 it been decided at this time, by May 2009, that
19 there would be is sort of two systems -- I call
20 it the OMI system -- and the Macomb system?
21     MS. BADALAMENTI: I'm going to object
22 to the extent that the question calls for him to
23 divulge privileged information.  It's my
24 understanding neither county has waived their
25 privilege.  Certainly Macomb has not.  You can

1  answer to the extent it does not do so.
2     THE WITNESS: Thank you.  What I think
3  is important to recognize is that this document
4  entered in court in May of -- May 18, 2009, these
5  documents were done in the form you see them
6  essentially in December of 2008.  The delay
7  between reaching the settlement as reflected in
8  these documents and entry with the court was
9  because in that time period, there was a question
10 as to whether the other parties in the 1977 case
11 required notice or not, because this was a
12 settlement agreement in the 1977 case, and in the
13 1977 case, all of DWSD's wholesale customers, of
14 whom there are 17 are parties.  So between
15 December and May, there was initial conference
16 with the court about what's the procedure for
17 entering this settlement agreement, and
18 ultimately, if memory serves me, there was -- I
19 don't know whether there was a notice and show
20 cause or just a general notice of the parties that
21 they could file objections.  So even though this
22 is a May settlement agreement, these documents
23 represent the parties' thinking in December.
24     What I can tell you, by May, by the
25 time this went to court, the decision had been

1  made to have two entities, and steps were underway
2  to create the OMI.
3     BY MR. WATSON:
4  Q.  Okay.  Are you aware when the initial
5  negotiations started for the purchase by Macomb
6  or maybe a joint entity of the Macomb Interceptor
7  system?  When did that -- when did that -- those
8  negotiations first start?  And this sort of
9  documents that the parties intended something
10 like that to be done.  Do you recall when those
11 negotiations first started taking place?
12 A.  There was an attempt at settlement in the
13 2006-2007 time frame to which Macomb was the only
14 customer -- wholesale customer party.
15 Q.  Was there --
16 A.  That settlement came to naught when Judge Feikens
17 dismissed Macomb County's claims; thereafter no
18 settlement was possible, because the judge had
19 said Macomb County is out of court.  It was about
20 probably sometime -- so that's the spring of 2007.
21 I think sometime in the spring of 2008 Judge
22 Feikens appoints Tim O'Brien as a facilitator to
23 attempt to get matters resolved.  Macomb County's
24 motion for rehearing was still pending a year
25 later.  And obviously Macomb still had all sorts

of rights of appeal.

    Shortly after Mr. O'Brien -- it's my recollection shortly after Mr. O'Brien's introduction into the discussions, he raised the possibility that settlement might go better if Macomb -- if Oakland County were involved, and there was an attempt to accomplish a global settlement of all of the things that are listed on Exhibit C to the settlement agreement. In fact, history proved that Mr. O'Brien had found a correct formulation, because once the discussion was broadened to cover all of these disputes, the parties were able to work forward to a resolution. And once Oakland County became part of the mix, then the question was, well, if Macomb is going to take this set of interceptors, but Oakland and Macomb share these other interceptors here, why don't you, the two counties, take all of them. And the counties agreed to do that, and sometime later figured out who would -- you know, what entities would then manage them.

    But that's basically the genesis of the settlement that came to be. We started with Mr. O'Brien, and -- sometime in the spring of 2008, and by December had gotten to what the

settlement agreement says.

Q. Now, I was told by someone that early on there had been, like in 2006 or 2007, some type of handshake agreement between Mr. Marrocco and Mr. Mercado that Macomb would purchase the system by assuming the debt on the system. Were you aware of anything like that?

A. Yes.

    MS. BADALAMENTI: I'm going to object to that question to the extent that it calls for him to divulge privileged information of the county.

    BY MR. WATSON:

Q. Were you around for any type handshake agreement like that? Did you witness that?

A. I was aware of it. I didn't witness it.

Q. Any idea of when that might have occurred?

A. Late summer/early fall of 2006.

Q. But apparently that was pretty much scuttled by the Feikens decision. And then things got resurrected, you were saying, spring 2008 or so, and then that led to what eventually became the deal?

A. Yes. Well, whatever had been understood to exist, you know, went out the window with Judge Feikens'

decision. Furthermore, by that time there were other disputes going hot and heavy like the interest rate dispute, which any prior understanding of the -- what to do about the 2004 collapse didn't include. So when things get restarted, the effort was let's get everything settled. And meanwhile, something we haven't touched on, the 800 megahertz radio dispute that's mentioned on Exhibit 2 to the settlement agreement, that, again, was a dispute by the wholesale customers that involved 30 to $50 million, and was obviously a huge issue as well.

    So there was essentially a fresh start after February of 2007.

Q. Okay. O'Brien gets in, there are new negotiations, and eventually resulted in this settlement agreement which you say was reached primarily by December of '08, but documented or signed here in May of 2009?

A. It was entered with the court in May of 2009.

Q. Okay.

A. But the court was informed in December of 2008 that a settlement had been reached, and I believe the drafts of all of these documents which are --

were essentially identical to these documents were provided -- were certainly done by the parties, and I think they were provided to the court as a matter of information in December of 2008.

Q. And turn to page 6 of the agreement. 6-B contains an integration clause. Were you involved in drafting that clause and assisting it be placed in this agreement?

A. I have no recollection who specifically wrote this clause or where it came from. It was certainly reviewed by all of the attorneys that looked at this, and --

Q. Okay. And going to the next page, I see it's -- there is a signature of Pam Turner. Do you see that?

A. Yes.

Q. Was she involved in the negotiations at all?

A. I don't recall. It would have been -- I'm just trying to remember dates. Victor Mercado left in June. Anthony Adams was appointed as either director or interim director. He served until sometime in the fall. And then between that point and December, I think -- I think by December -- I'm not sure. Ms. Turner might have been interim director by December. I think she probably was.

Page 33

1  I don't remember meetings with her where
2  substantive matters were negotiated or discussed.
3  Q. In negotiating the agreement, is it accurate to
4  say that the primary negotiators were the
5  attorneys for the parties?
6  A. That was my impression of -- only partially
7  correct. I would say on the DWSD side Mark Jacobs
8  and Bob Walters were very active. For this
9  agreement, Bart Foster was not -- was involved
10 when it came to negotiating dollars. On the
11 county side there was really kind of -- my
12 impression, was a team of people where the lawyers
13 were working very closely with either their
14 principal client, the commissioner, or their
15 senior engineering people. Certainly the
16 legalese, you know, ultimately was a matter for
17 the lawyers involved, but the overall agreements
18 were the product of very active involvement by, on
19 the county side, all of the counties.
20 Q. So Misterovich and Marrocco were actively
21 involved for Macomb County?
22 A. My regular contact was Mr. Misterovich. I
23 certainly met with Commissioner Marrocco when
24 there were big decisions to be made. And then
25 there were, I'd say, their engineering staff at

Page 34

1  Macomb and the other counties that had detailed
2  knowledge of the systems themselves that was
3  important in this whole process.
4  Q. Was there any discussion during the negotiations
5  that you can recall in regard to the
6  reasonableness of the cost of the repairs paid by
7  DWSD to cover the sewer collapse? Was that part
8  of any negotiations you were in?
9  A. I believe that -- I'm not sure -- that the
10 Complaint we filed with Feikens certainly
11 challenged Macomb's liability for the costs of the
12 collapse. I don't recall whether there were
13 specific allegations that, even if they were
14 liable, the project cost too much. That certainly
15 was a concern that at various times was expressed
16 to DWSD as the discussions proceed.
17 Q. Who expressed that?
18 A. I couldn't tell you today.
19 Q. Why was the Letter of Intent attached?
20    Let me strike that and ask you: What
21 was the purpose of this Letter of Intent, if you
22 know?
23 A. It was to -- I believe it was not prepared at
24 Macomb's request, to my recollection. Someone
25 thought there should be one. And I think its

Page 35

1  purpose is plain from reading it. It was an
2  attempt to state the terms of the deal in more
3  detail than what the consent judgment --
4  settlement agreement itself said. So I think the
5  idea was the settlement agreement will cover all
6  of the matters that are being settled, and it will
7  have attachments to it to lay out some of the
8  details, like what are the facilities and so on.
9  Q. In this case we filed -- both sides filed witness
10 lists, and both sides listed on their witness
11 list, I believe, 30(b)(6) witnesses, and we
12 listed two for 30(b)(6), the Macomb County
13 witness or attorney most knowledgeable about the
14 allegations of the Complaint filed by Macomb in
15 Macomb Circuit Court, but what might be
16 applicable here, the Macomb County corporate
17 representative who could talk about the
18 acquisition agreement. Do you know -- have you
19 been designated as Macomb's 30(b)(6) witness who
20 can talk about the acquisition agreement?
21 A. I don't know.
22    MR. WATSON: Raechel, is Craig the guy
23 for that?
24    MS. BADALAMENTI: I think the response
25 to those 30(b)(6) notices were objections by

Page 36

1  myself and Mr. Brilliant. They're overbroad and
2  outside and exceed the scope of what the court has
3  permitted as limited discovery for purposes of
4  this proceeding and evaluation of Macomb's claim
5  at this time. Subject to those objections, our
6  indication was that Mr. Misterovich and Mr. Hupp
7  would be able to answer the questions that you
8  might have, but you will recall that they were
9  offered as witnesses prior to that 30(b)(6)
10 notice.
11    BY MR. WATSON:
12 Q. Regardless of that, I'm going to ask you a few
13 questions about the acquisition agreement.
14 A. Sure.
15    MARKED FOR IDENTIFICATION:
16    DEPOSITION EXHIBIT 3
17    9:04 a.m.
18    BY MR. WATSON:
19 Q. All right. I have it in front of me --
20    MS. BADALAMENTI: Can I ask, because
21 are you suggesting -- a lot of these documents
22 have gone back and forth in the course of
23 questioning. Are you going to ask him if this is
24 the entire document including all the schedules or
25 are you suggesting it is?

Page 37

1 MR. WATSON: No, I'm not suggesting it
2 is. My understanding is when that document was
3 executed, there were -- I don't know -- hundreds
4 of pages of documents that accompanied it. I
5 think that copy he's got might have a few of the
6 exhibits attached to it, but certainly not all the
7 documents that were reviewed on the same date it
8 was signed or at the closing when it was signed.
9   MS. BADALAMENTI: Okay.
10   BY MR. WATSON:
11 Q. Are you familiar with the document, Mr. Hupp?
12 A. Yes.
13 Q. And it says "Macomb Acquisition Agreement" near
14   the top, does it not?
15 A. Yes.
16 Q. Did you play any role in drafting that document?
17 A. I assisted in drafting this document.
18 Q. Who else drafted it?
19 A. This was a combined effort of a number of
20   attorneys, Mark Jacobs -- Bob Walters actually did
21   the first draft, I think. Mark Jacobs and I wound
22   up being the -- this document went from the Dykema
23   word-processing system to the Bodman
24   word-processing system, back to Bodman. But in
25   addition, certainly lawyer representatives of the

Page 38

1 clients were involved and commented, added and
2 subtracted to it as the document went along.
3   (Mr. Ruegger present at 9:07
4   a.m.)
5   BY MR. WATSON:
6 Q. I'm looking at 25 of 25.
7 A. Yes.
8 Q. And I see the signatures on the document appear
9   to be William Misterovich and Darryl Latimer.
10   Are you familiar with those two gentlemen?
11 A. I know Mr. Misterovich.
12 Q. What about Latimer?
13 A. I now Mr. Misterovich. I know Mr. Latimer.
14 Q. How involved was Mr. Latimer in negotiating this?
15 A. I have no recollection of Mr. Latimer's
16   involvement, keeping in mind that this document --
17   97 percent of this document was negotiated as part
18   of the first OMI transaction, and it was the
19   understanding of the parties at the time that was
20   done that the document would then be the basic
21   model for the Macomb transaction as well, but
22   mostly a change of name and change of list of
23   assets. So in the time period that the work --
24   most of the work was done on this document, I
25   don't think Mr. Latimer was -- he might have been

Page 39

1 deputy director at this time period, but certainly
2 in the first go around on this document for the
3 OMI transaction, I have no recollection of
4 Mr. Latimer being involved.
5 Q. Did you recommend that Misterovich go ahead or
6   Macomb County enter into this agreement?
7 A. I recommended that this agreement appeared to
8   comport with what Macomb County was seeking to
9   accomplish in the deal, and that it reflected the
10   terms and concerns of the client, so I recommended
11   the document. The client itself obviously had
12   made the decision about whether to do the deal or
13   not.
14 Q. As I understand, the broad parameters of the
15   agreement was that basically Macomb would assume
16   the debt on the system as a purchase price and
17   there would be certain amounts deducted from that
18   system debt.
19 A. The correct characterization is that Macomb County
20   would pay to DWSD the amount of outstanding debt
21   on the capital projects that were being
22   transferred. It was not assuming any debt.
23 Q. Okay. Thank you. And as I understand the debt
24   on the system, at one time it was something like
25   $116 million? Do you recall what the debt was on

Page 40

1 that system?
2 A. That's obviously a question of at what point in
3   time.
4 Q. Okay.
5 A. At what point in time are you asking about the 116
6   million?
7 Q. Do you recall when it was 116 million, the point
8   of time it was at that amount?
9 A. I don't remember 116 million one way or the other,
10   but keep in mind, capital projects got done and
11   debt went up. Capital projects got paid off and
12   the debt went down. So that number moved all over
13   the place.
14 Q. Okay.
15   MARKED FOR IDENTIFICATION:
16   DEPOSITION EXHIBIT 4
17   9:11 a.m.
18   THE WITNESS: All right. I have the
19 exhibit in front of me.
20   BY MR. WATSON:
21 Q. You've been handed what's marked Exhibit 4,
22   Mr. Hupp. Can you tell us what that is.
23 A. That's Schedule 3.8 to the Macomb Acquisition
24   Agreement. It's titled Computation of Purchase
25   Price as of June 30, 2010, and sets out the agreed

Page 41

1  upon debt for the assets being transferred that
2  had debt associated with them, plus a summary of a
3  variety of adjustments to that debt to reach an
4  adjusted final price as of June 30, 2010.
5  Q.  Okay.  In regard to adjustments, I see about
6  three-fourths of the way down, maybe a little
7  more, the global settlement says $17,050,000.
8  That was the biggest adjustment, was it not?
9  A.  The reason I can't answer that question the way
10 you ask it is there were a variety of adjustments
11 of these various projects in order to get to this
12 table.  I'll make up a number.  DWSD might have
13 said we think the debt on PCI 45 is $30 million,
14 and after they were pressed for better records or
15 whatever, they might have said it turns out the
16 number is really $20 million.  So there's a bunch
17 of adjustments in the debt that don't appear here.
18 As reflected in adjustments specifically showing
19 on this page, the global settlement is the
20 largest -- is probably the largest adjustment.
21 Q.  I'm looking at two lines under that $17,050,000,
22 the $870,252.
23 A.  Yes.
24 Q.  And it says "Balance of OMI/Macomb Miscellaneous
25 Rate Settlement."  Do you see that?

Page 42

1  A.  I do.
2  Q.  Do you recall what that was about?
3  A.  Yes.
4  Q.  What was it?
5  A.  That is a catchall.  There were -- again, moving
6  back to recognizing that the OMI deal and the
7  Macomb deal were part and parcel of what started
8  out as a global joint settlement, and in working
9  through an equivalent schedule in the OMI deal,
10 which closed roughly 10 months before this, there
11 were a variety of rate disputes, and there was a
12 dispute over some meter charges that Detroit said
13 should be part of the rates, and -- part of the
14 price, and Oakland-Macomb said no, they shouldn't.
15 And at the end of the day, that dispute went up to
16 the week of the closing, if not the day before the
17 closing on the OMI deal.  It was under a very
18 tight time schedule.  And at the end, to resolve
19 all of those things, DWSD made a proposal that
20 here's all of these objections, they pertain to a
21 block of meters, some of which are going to
22 Macomb, some of which are going to go to OMI.
23 There's a number of these other rate disputes, so
24 I'll tell you what, why don't we just give you
25 another $3 million credit on the price.  That was

Page 43

1  accepted, and then that -- at that point in time
2  the outstanding debt on the OMI assets was roughly
3  $2.2 million.  The OMI system didn't have any
4  cash.  So if we took 2.2 of the 3 million and
5  applied it to the OMI deal, the OMI deal could
6  close without paying any cash.  So 2.2 of 3.0 was
7  attributed to the OMI deal, and the balance was
8  set aside and it was applied here.
9  Q.  The 870,252?
10 A.  Right.  That's what's left of a $3 million
11 settlement.  The other thing I will note, so it's
12 clear -- and I don't know whether it applies to
13 this Schedule 3.8 or the 3.8 on the OMI deal, but
14 there was a revised schedule issued six months
15 after one of the two closings that had a
16 subsequent adjustment that affected this credit,
17 and I don't -- and so for that reason I can't
18 testify today that this Schedule 3.8 is the actual
19 "final" final schedule or not.  The final
20 adjustment moved about -- I don't know -- 100, 200
21 grand, so it wasn't a material amount.  So for the
22 record I want that clear.
23 Q.  Is it fair to say that the parties did extensive
24 negotiation back and forth before arriving at the
25 adjusted final price of 89,996,704?

Page 44

1  A.  Partly negotiation, partly just verification of
2  Detroit's debt figures.
3  Q.  As I understand, prior to signing the acquisition
4  agreement, Macomb was entitled to secure
5  documents, whatever documents it wanted from
6  Detroit in regard to the system, ask whatever
7  questions it wanted, inspect portions of the
8  system if it desired to do so.  Is that accurate?
9  Could Macomb have done all those things if it
10 wanted to?
11 A.  Only partially.
12 Q.  What part's not accurate?
13 A.  The part is that Detroit -- DWSD's financial
14 system for much of this stuff was and to a certain
15 extent even today is in significant disorder.
16 From what I know about DWSD's financial system
17 from dealing with it as Macomb's attorney for a
18 long time, I don't think Macomb County would have
19 been able to independently audit at least these
20 debt prices.  Bart Foster, their expert who's done
21 their rate work for 30 years -- Bart couldn't do
22 it.  It took a year to just get these numbers on
23 3.  It took more than a year.  I doubt Macomb
24 County would ever have been able to get into those
25 numbers and figure them out.

Page 45

1 Q. Did Macomb ask to look at any DWSD documents? Do
2 you know?
3 A. We did not. Well, I mean, in what context?
4 Q. Well, in --
5 A. There had been discovery in the lawsuits obviously
6 seeking cost documents focused on -- focused on
7 the collapse. We had certainly acquired documents
8 over time related to the interceptor collapse. As
9 part of verifying the debt numbers, we certainly
10 had asked for a certain amount of backup
11 documentation. So we certainly had asked for
12 some. In some cases we got what we asked for and
13 some cases the answer was we haven't got it or we
14 can't give it to you or whatever; we never got a
15 response.
16 Q. Did you ever ask for anything that DWSD had that
17 they didn't turn over to you or give you a copy
18 of?
19 A. I couldn't answer that question today given the
20 long tortured history of these negotiations and so
21 on and so forth. I have a suspicion if I went
22 back and looked at discovery requests, I'd say,
23 you know, I don't think they really gave us
24 everything we asked for, which is typical of
25 everybody when they look at discovery requests.

Page 46

1 Q. Did Macomb inspect the system at all before it
2 purchased it?
3 A. I don't know.
4 Q. Was it entitled to if it wanted to?
5 A. Yes.
6 Q. Did you have any questions of DWSD or anyone at
7 Macomb have questions of DWSD that were asked but
8 were not answered before the purchase?
9 A. I would say in trying to get to the bottom of the
10 debt, which was the piece that I mostly dealt
11 with, the answer is I did not get satisfactory
12 answers to many things, and ultimately had to
13 reach the conclusion that DWSD did not have the
14 kind of records that would permit conclusive
15 determination of debt for various projects, and,
16 in fact, that's represented -- you can see it, for
17 example, on Schedule 3.8, halfway down the page
18 under section C, there's a line that says "Meter
19 Credit" -- "Meter Credit MC-S-1 (estimated)
20 400,000" bucks. That's the case where we knew
21 there was work done on meter MC-S-1. Under the
22 rate agreement, Macomb County, and under our
23 contract, Macomb County was not liable for the
24 cost of that work. DWSD had contracted for that
25 work as part of a much larger contract for which

Page 47

1 customers were liable. The conclusion was that
2 there was no way to figure out exactly how much of
3 that contract was spent on MC-S-1 as opposed to
4 other work that could be charged. Ultimately
5 after discussion with people on both sides, a
6 guesstimate was prepared that, well, I don't know,
7 that repair probably cost something in the order
8 of $400,000, but -- and I only offer that to you
9 as a very specific example shown on this schedule.
10 We had that kind of discussion with a variety of
11 these projects. This table represents -- I don't
12 know -- a hundred hours -- couple hundred hours of
13 trying to get to the bottom of -- even if DWSD
14 could figure out whether they built certain
15 projects or not, because they call projects by
16 different names. So, no, I never was -- nobody at
17 Oakland and Macomb were ever fully satisfied that
18 these numbers were exactly right in their complete
19 totality. It was very frustrating.
20 Q. There were a lot of compromise on a lot of
21 different issues, it sounds like.
22 A. There certainly was to get to a number.
23 Q. Did you get the feeling that DWSD, the folks you
24 were dealing with there, were trying to take
25 unfair advantage or cheat Oakland or Macomb

Page 48

1 County, or was it the situation where their
2 records were just not really very good and a
3 precise answer could not be secured, or do you
4 know?
5    MS. BADALAMENTI: I'm just going to
6 object to foundation. Calls for him to speculate
7 on the motives of Detroit.
8    BY MR. WATSON:
9 Q. Do you have any impression one way or the other
10 on that?
11 A. The longer I dealt with DWSD, the more I became
12 concerned that they could not -- they were not
13 organized internally to accurately keep track of
14 costs, I guess would be my answer, regardless of
15 whatever the motives were on the other side of the
16 table. There were problems back in the DWSD
17 accounting area.
18 Q. I'm looking at page 6 of 25. The system was sold
19 as is?
20 A. 6 of 25?
21 Q. Yeah.
22 A. Which line?
23 Q. Under 2.5 Macomb System. The first sentence
24 reads "The Macomb System shall be conveyed by
25 seller to purchaser in 'as is' physical

Page 49

1  condition, with no additional warranties, express
2  or implied, with respect to the physical
3  condition of the Macomb system." Then it goes
4  on. Do you see that language?
5  A. Yes.
6  Q. Was it your understanding that the system was
7  being sold as is?
8  A. Yes.
9  Q. Do you recall any discussion during these
10 acquisition agreement negotiations about the
11 reasonableness of the cost of repairs? Was that
12 a matter --
13 A. This is a discussion with Detroit?
14 Q. With Detroit. First I'll ask, did you have any
15 such discussion with Detroit?
16 A. I don't have a recollection one way or the other.
17 Q. Do you recall anyone else having a discussion
18 with Detroit?
19     MS. BADALAMENTI: I'm going to object
20 to the extent it calls for you to divulge
21 privileged information. Other than that, you can
22 answer.
23     THE WITNESS: I recall a meeting -- I
24 forget whether it was before or after we filed --
25 Macomb County filed their challenge between -- at

Page 50

1  the Macomb County Office of Public Works offices,
2  so 2005, I'm guessing is the year. And I don't
3  know whether it was a meeting after we filed a
4  motion or a motion intending to head off the
5  motion challenging the cost, at which Commissioner
6  Marrocco and various staff were present, and at
7  which Mercado and staff and probably lawyers were
8  present, of which Macomb County aired its concern
9  about the project and its cost and reasonableness
10 or unreasonableness of asking Macomb County to pay
11 for the system.
12    BY MR. WATSON:
13 Q. Was that before or after Macomb sued about that?
14 A. I don't remember now. That's the thing. I can't
15 put those -- I don't remember before or after.
16 Q. But that suit was resolved by the 2009 settlement
17 agreement?
18 A. Yeah, that got resolved. You know, we had a
19 number of settlement conferences with Judge
20 Feikens. I don't have a specific recollection,
21 but it would not surprise me if Macomb County's
22 concerns were not aired vigorously by Commissioner
23 Marrocco.
24 Q. Was Macomb County entitled to back out or not
25 sign this agreement if it couldn't secure the

Page 51

1  information it felt was necessary for it to
2  assure itself that the deal it was entering into
3  was a good one for Macomb?
4     MS. BADALAMENTI: I'm going to object.
5  I think that's a mischaracterization in terms of
6  the document, but you can go ahead.
7     BY MR. WATSON:
8  Q. Well, you don't even have to answer. Let's go to
9  page 12 of 25. I'll withdraw that question.
10 A. I'm looking at 12 of 25.
11 Q. 4.5 Due Diligence. First sentence talks about
12 Macomb acknowledging that it's being afforded the
13 opportunity to conduct due diligence. Did Macomb
14 have that opportunity?
15 A. Within a variety of the limitations I've already
16 described to you, and certainly on the financial
17 front, that was, as a practical matter a limited
18 ability. I would note for the record in this time
19 period DWSD didn't even have a complete audit, so
20 auditors couldn't complete their due diligence and
21 do the audit for DWSD in this time period.
22 Q. Then I'm going to page 18 of 25, section (b),
23 which is a little puzzling. It starts off "This
24 agreement may be terminated by Macomb County in
25 writing on or before January 1, 2010 if it shall

Page 52

1  not have been satisfied in its sole discretion
2  with the results of Macomb County's continuing
3  due diligence investigations of the Macomb
4  system." Do you see that language?
5  A. I do.
6  Q. And did Macomb have the opportunity to back out
7  if it was not satisfied?
8  A. That's what the language appears to say.
9  Q. Were you ever called to testify before the grand
10 jury?
11 A. What grand jury?
12 Q. The grand jury investigating the Ferguson,
13 Kilpatrick, Miller, Mercado potential wrongdoing
14 at the City of Detroit?
15 A. I was not.
16 Q. Do you know whether any Macomb employees were
17 interviewed by the FBI or U.S. Attorney's Office
18 or testified before the grand jury?
19 A. I have no knowledge.
20 Q. At some point did you become aware of the grand
21 jury investigation?
22 A. Yes.
23 Q. And do you know when that was?
24 A. No.
25 Q. Was it before the indictment that hit the papers

Page 53

1  in December 2010?
2  A. Yes.
3  Q. And do you know what was the -- your awareness --
4  what do you know about that?
5     MS. BADALAMENTI: About what?
6     BY MR. WATSON:
7  Q. The grand jury investigation. What's your
8  understanding of the subject matter of the
9  investigation?
10 A. My understanding was, I guess, whatever I might
11 have gotten from the Free Press, that there was a
12 corruption probe.
13 Q. Were you aware Ferguson and Kilpatrick were
14 friends?
15 A. I have no idea. At some point that was part of
16 the newspaper coverage.
17 Q. So your information is just the newspaper?
18 A. Whatever I read in the Free Press.
19 Q. Was there ever any discussion about that
20 corruption and potential corruption in Detroit
21 during the negotiations?
22 A. I don't recall one way or the other.
23 Q. Do you recall that there was a settlement
24 agreement -- settlement and release of certain
25 rate disputes executed at the time of the

Page 54

1  acquisition agreement?
2  A. For MID? For Macomb? Yes.
3  Q. What was the purpose of that?
4  A. I think the purpose was two-fold. One, it was --
5  biggest thing was to memorialize as best possible
6  all of the things that were getting settled,
7  because as the settlement agreement, I believe, or
8  Letter of Intent reflects, there were a variety --
9  and actually the acquisition agreement reflects
10 there were a number of pending rate disputes, and
11 the transaction was going to affect rates going
12 forward. And so the purpose of the agreement was
13 to document both what -- to try to concisely state
14 what was being settled as well as to try to
15 explain how the settlements would affect the rates
16 that Detroit was going to set thereafter for
17 Macomb County, how they were going to calculate
18 the rates now that these assets weren't in the
19 rates anymore.
20 Q. As far as you know, did that settlement and
21 release agreement resolve all of the disputes you
22 knew about between Detroit and Macomb? Was there
23 any disputes outstanding that you were aware of?
24 A. Based on the facts as we knew them then, I don't
25 think so.

Page 55

1     MR. WATSON: Because we mentioned it, I
2  should mark that and have him identify it. I
3  don't plan to question him about it.
4     MARKED FOR IDENTIFICATION:
5     DEPOSITION EXHIBIT 5
6     9:34 a.m.
7     BY MR. WATSON:
8  Q. Let me hand you what's been marked Hupp
9  Exhibit 5. Is that the Macomb Interceptor
10 Acquisition Settlement and Release of Certain
11 Rate Disputes agreement?
12 A. Yes, it is.
13 Q. I'm looking at the last page. It appears to be
14 signed by Misterovich and Latimer. Are those the
15 two individuals who signed the acquisition
16 agreement?
17 A. Yes.
18 Q. And as far as you recall, was this settlement
19 agreement signed at the same time as the
20 acquisition agreement?
21 A. Yes, it was.
22 Q. Did you read the Complaint filed by Macomb County
23 in Macomb Circuit Court against the City of
24 Detroit?
25 A. I don't believe I have read it.

Page 56

1  Q. Okay. Were you consulted prior to the filing of
2  this Complaint?
3  A. I was not.
4     MARKED FOR IDENTIFICATION:
5     DEPOSITION EXHIBIT 6
6     9:36 a.m.
7     BY MR. WATSON:
8  Q. Let me hand you, Mr. Hupp, what's been marked
9  Exhibit 6. That appears to be an affidavit
10 signed by you filed in United States federal
11 district court.
12 A. Yes.
13 Q. Do you recall this affidavit?
14 A. Yes.
15 Q. Were you asked to prepare it?
16 A. Yes.
17 Q. Did you actually draft this or was it drafted for
18 you?
19 A. I don't -- I think -- my memory is a little hazy
20 on that. I think a draft came to me and I edited
21 it, but I'm really not sure enough to really
22 answer that conclusively, but I'm pretty sure
23 that's what the sequence was.
24 Q. Do you recall that in the federal district court
25 case Judge Cleland decided that the tort claims

Page 57

1  arising out of the potential fraudulent
2  activities pertaining to the sewer collapse
3  repair belonged to Detroit rather than Detroit?
4  A. I'm aware of that.
5  Q. And in your affidavit, I believe you state that
6  had the tort claims -- the gist of it, as I
7  recall, had these tort claims been considered,
8  the parties would have decided through the
9  acquisition agreement to -- that they would
10 belong to Macomb?
11     MS. BADALAMENTI: I'm not sure I
12 understand the question. Are you asking him what
13 he discussed with his client or are you asking him
14 to read from the affidavit?
15     MR. WATSON: No. Let me rephrase the
16 question.
17     BY MR. WATSON:
18 Q. Number one, the tort claims such as the claims
19 asserted in federal district court, as I
20 understand, were never brought up or considered
21 during the negotiation of the settlement
22 agreement.
23 A. I have no recollection of them coming up.
24 Q. And in your affidavit you basically state, had
25 they come up, you have little doubt that the

Page 58

1  parties would have agreed that they should go to
2  Macomb as opposed to Detroit?
3  A. That was my opinion of that hypothetical in -- two
4  years ago.
5  Q. Now, as an experienced attorney, doesn't Judge
6  Cleland's decision resolve the issue in regard to
7  the tort claims?
8     MS. BADALAMENTI: I'm going to object.
9  It calls for a legal conclusion. He's not here in
10 his capacity to evaluate the decisions in that
11 case.
12    THE WITNESS: I don't have an opinion.
13 I know that case is still going and the right of
14 appeal is going. I can give you a quote from a
15 former partner and jurist, if that would help.
16    BY MR. WATSON:
17 Q. No. I'll ask you after the deposition. Let me
18 talk to counsel here.
19    (Off the record at 9:39 a.m.)
20    (Back on the record at 9:56 a.m.)
21    MR. WATSON: I have no further
22 questions.
23    MS. BADALAMENTI: I just have a couple
24 questions.
25    MARKED FOR IDENTIFICATION:

Page 59

1     DEPOSITION EXHIBIT 7
2     9:56 a.m.
3     EXAMINATION
4     BY MS. BADALAMENTI:
5  Q. I've marked as Exhibit 7, Mr. Hub, a document
6  titled Minutes of the Due Diligence Coordination
7  Meetings. This is a revision, and looks like it
8  is dated 3/19/09, and has written "Draft" in the
9  background of the document. Do you recognize
10 this document?
11 A. I do.
12 Q. Did you prepare or play a role in preparing this
13 document?
14 A. I did. I probably prepared it.
15 Q. What was it prepared for?
16 A. Basically this was to serve the function -- it
17 states it's minutes. The county had a team of
18 people looking at the transaction and asking
19 various questions and the like. It fell to me
20 probably because I was the one with the secretary
21 as part of the collective group, to do the
22 minutes. And so this reflects, it looks like --
23 for the top meetings, this would have been with
24 what I'll call it at this point in time -- you
25 know, we're all together. We're working through

Page 60

1  the global settlement that was reached in December
2  of 2008, and now we're in January through March of
3  2009. We're working through the details. And
4  this reflects meetings between representatives of
5  the counties on one side, Oakland and Macomb, and
6  DWSD on the other that would have occurred on
7  these dates, January 29th, March 12th and
8  March 18th.
9  Q. So this document refers to due diligence items.
10 There was due diligence being undertaken by
11 Macomb and Oakland County?
12 A. Yes.
13 Q. Taking you to page 8 of this document, the
14 paragraph 29 indicates that as part of the due
15 diligence, Macomb and Oakland are looking for the
16 city to "Describe any regulatory complaints or
17 notices of violations issued on Detroit or DWSD
18 in the past 5 years arising out of or related to
19 the operation of the facilities." Do you see
20 that?
21 A. I do.
22 Q. And then italics --
23    MR. WATSON: Can you tell me where are
24 you with that?
25    MS. BADALAMENTI: 29.

Page 61

1 　MR. WATSON: 29?
2 　BY MS. BADALAMENTI:
3 　Q. In italics are the names Jacobs and Walter. Why
4 　are those names italicized there?
5 　A. The intent was to try to indicate in some cases
6 　the answer we got, the other cases who would
7 　follow up to get the information. The front of
8 　this says "Notes from January 29 are in italics."
9 　I have -- my recollection is the county team put
10 　together a list of questions numbering through 34,
11 　35 or whatever, and at the meeting with DWSD, we'd
12 　go through the questions, and italics reflected
13 　what occurred on January 29th, and then other
14 　typeface to indicate subsequent.
15 　　So I believe the reference to Jacobs
16 　and Walter after No. 29 was at that first meeting
17 　in January, Jacobs and Walter, one or the other of
18 　them, two lawyers from Detroit, would get back
19 　with the answer to that question.
20 　Q. And underneath those two names not italicized is
21 　the word "none." What would that be there for?
22 　A. That would be their answer that, in fact, there
23 　were no regulatory complaints or notices.
24 　Q. The next paragraph 30 asks the city to "Describe
25 　any civil claims asserted or threatened in the

Page 62

1 　past 5 years arising out of the operation of the
2 　facilities which have been asserted against
3 　Detroit/DWSD or of which Detroit has knowledge."
4 　Do you see that?
5 　A. Yes.
6 　Q. And the italicized names there are "Jacobs &
7 　Walter will address." Would that have come,
8 　again, from the January meeting?
9 　A. Yes, that would reflect their commitment to come
10 　back and answer that question.
11 　Q. And there are three claims that are identified
12 　here in response to paragraph 30 in
13 　non-italicized font. That would be information
14 　that was provided then from Jacobs and Walters
15 　during the March meetings; is that correct?
16 　A. Yes, it certainly came from them, and that matches
17 　the meetings on March 12th and 18, yes. That's
18 　when they would have gotten back. And then this
19 　was kind of -- I think it's apparent this was a
20 　document that just kind of grew with -- just got
21 　edited. Every time we got more information or had
22 　a meeting, the document would get amended to
23 　reflect subsequent information. So that's
24 　information they would have responded to in March.
25 　Q. So then taking you to paragraph 32, 32 asks the

Page 63

1 　city to "Describe any facts of which DWSD or
2 　Detroit is aware which would give rise to or
3 　support a claim against any contractor or other
4 　person arising out of or related to the
5 　facilities and state whether such claim [has]
6 　been asserted." Do you see that?
7 　A. I do.
8 　Q. And, again, italicized "Jacobs & Walter will
9 　address." That would have, again, been
10 　information provided during the January meetings?
11 　A. Yes. That would reflect the fact they said we'll
12 　follow up and get you an answer to this.
13 　Q. The non-italicized language underneath there, it
14 　indicates "DWSD is not aware of any known,
15 　threatened or pending claims other than those
16 　identified in ITEM 30." Do you see that?
17 　A. I do.
18 　Q. That would come from Jacobs and Walters, then,
19 　from the March meetings; is that correct?
20 　A. That's correct. My guess with that wording,
21 　that's -- actually that looks like that would have
22 　been their wording, but maybe not. So, yes. And
23 　I would just -- in further answer to your
24 　question, sometimes the answer to this information
25 　might have come back by way of e-mail, so I

Page 64

1 　couldn't testify here today that that was provided
2 　at a meeting as opposed to at a subsequent
3 　communication, but there would have been a
4 　subsequent communication where they got back to me
5 　and said we're not aware of any known threat or
6 　pending claims.
7 　Q. And they would be Jacobs and Walters on behalf of
8 　DWSD?
9 　A. That is correct.
10 　Q. At any point prior to execution of the
11 　acquisition agreement did anybody from Detroit
12 　inform you that there was an ongoing criminal
13 　investigation into the irregularities in DWSD
14 　construction contracts?
15 　　MR. RUEGGER: Objection to form.
16 　　THE WITNESS: I have no recollection of
17 　anybody from DWSD saying that.
18 　　BY MS. BADALAMENTI:
19 　Q. If such an investigation had been going on and
20 　DWSD had notice, was that the information you
21 　were looking for in response to those three
22 　paragraphs that are identified in this due
23 　diligence memo?
24 　　MR. RUEGGER: Objection, form.
25 　　MR. WATSON: I'll object, counselor,

1  speculation. Object to form.
2     MR. RUEGGER: Misstates the document.
3     THE WITNESS: That certainly would have
4  been among the things that we wanted to find out
5  about and prompted that question.
6     BY MS. BADALAMENTI:
7  Q. Is it your understanding that if Macomb would
8  have been informed of such information, it would
9  not have executed the acquisition agreement on
10 the terms and for the price that it did?
11    MR. RUEGGER: Objection, form.
12    MR. WATSON: Object, form, calls for
13 speculation.
14    THE WITNESS: I do not believe it would
15 have -- the lawyers' advice would have been stop
16 and get to the bottom of this. And I guess I
17 can't tell you what Commissioner Marrocco's
18 opinion would be because that's privileged.
19    BY MS. BADALAMENTI:
20 Q. The documents that have been put in front of you,
21 the Letter of Intent, the Settlement Agreement,
22 the Acquisition Agreement, is it your opinion
23 that any of these documents seek or require that
24 DWSD affirmatively represent whether or not there
25 are any such investigations or claims?

Page 66

1     MR. RUEGGER: Objection to form, no
2  foundation.
3     MR. WATSON: I'll join.
4     THE WITNESS: In fact, I believe that
5  the city did undertake obligations to disclose.
6  In the settlement agreement -- excuse me. In the
7  acquisition agreement, I believe, there is a
8  representation by Detroit that they have not made
9  any material misstatements or withheld any
10 information that would be material to the
11 evaluation of the asset being acquired, and that's
12 what I'm looking for. I've looked at a number of
13 these documents before this deposition. Paragraph
14 4.5 on page 12 of 25, in the Hupp Exhibit 3,
15 Macomb Acquisition Agreement, at the top of --
16 that's not it. I'm sorry. That pertains to
17 Macomb's knowledge.
18    BY MS. BADALAMENTI:
19 Q. Let me see if -- are you referring to either
20 paragraphs 3.7 or 3.8 of the agreement?
21 A. Yes. It's 3.8. Thank you. The 3.8, the last
22 sentence provides "None of the written data or
23 information furnished or made available to Macomb
24 County by Detroit as part of the due diligence
25 process with regard to system debt or other debt

Page 67

1  or rate-related matters contains an untrue
2  statement of a material fact or omits to state a
3  material fact required to be stated therein or
4  necessary to make the statements made, in the
5  context in which made, not false or misleading."
6  And if Detroit were aware that there was fraud in
7  the costs associated with the 2004 collapse,
8  certainly as a lawyer I would have advised my
9  client that that was material.
10 Q. The last question I have is with respect to
11 Exhibit 7. I don't think I asked you. I will
12 represent to you that this document was produced
13 by the City of Detroit in connection with this
14 proceeding that your deposition was requested in.
15 Do you know how the City of Detroit would have
16 obtained your memorandum?
17 A. My general approach with this document was it
18 started out as a document with a list of items and
19 questions that would have come from the team to
20 Detroit. We would have met. I would have
21 created, as kind of a recording secretary, an
22 update, and then I would have circulated it to
23 everyone at the meeting, both on the county side
24 and Detroit side, with a transmittal e-mail --
25 transmittal certainly would have been by e-mail

Page 68

1  with a note that says "Please review my notes from
2  the meeting. Advise as to whether there's any
3  corrections or additions." And that was my
4  routine practice, and so I would expect that
5  that's what I did with this, and if this was
6  actually produced by Detroit, then I think that
7  indicates that drafts went back and forth
8  according to my usual practice.
9     MS. BADALAMENTI: I don't have any
10 other questions.
11    RE-EXAMINATION
12    BY MR. WATSON:
13 Q. I've got a few follow-up. Looking at paragraph
14 29 of Hupp Exhibit 7, are you aware of any
15 regulatory complaints or notices of violations
16 issued on Detroit or DWSD in the past five years
17 prior to, I guess, early 2009?
18    MS. BADALAMENTI: Are you asking if
19 he's aware now?
20    BY MR. WATSON:
21 Q. Yeah, are you aware now? Were you aware then?
22 Are there any, to your knowledge?
23 A. This would be the period 2004 to 2009, roughly. I
24 don't know. I wasn't tracking the violations, if
25 there was environmental complaints. I think

1  that's why we were asking the question.
2  Q. Are you aware of any violations? Because this
3  says "None." Are you aware that's an untrue
4  statement?
5  A. Even as I sit here today, I don't know whether
6  that's true or untrue.
7  Q. Going to 30, it says "Describe any civil claims
8  asserted or threatened in the past 5 years," and
9  it goes on and they list three. Are you aware of
10  any claims in addition to those three?
11  A. At what time period?
12  Q. Well, are you aware now or were you aware back
13  then when DWSD listed the three?
14  A. As of the date of the transaction, I was not aware
15  of any other civil claims. I don't know whether
16  there are any today that are applicable. I don't
17  know whether the -- like, for example, the
18  corruption stuff qualifies as civil claim or not,
19  but we certainly weren't aware of those claims
20  then. I certainly wasn't.
21  Q. All right. Then it says No. 32, "Describe any
22  facts of which DWSD or Detroit is aware which
23  would give rise to or support a claim against any
24  contractor or other person arising out of or
25  related to the facilities and state whether such

Page 70

1  claim has been asserted." Do you see that
2  language?
3  A. I do.
4  Q. And then the response was "DWSD is not aware of
5  any known, threatened or pending claims other
6  than those identified in item 30." Do you know
7  whether or not that was a true statement, that
8  DWSD was not aware of any known, threatened or
9  pending claims other than those identified in 30?
10  A. I don't know what DWSD's knowledge was at that
11  time.
12  Q. Back in 2009 were you aware of any ongoing
13  irregularities that DWSD should have reported but
14  didn't?
15     MS. BADALAMENTI: Was he aware then?
16  Is that what you're asking?
17     MR. WATSON: Yeah, back in 2009.
18     THE WITNESS: No.
19     BY MR. WATSON:
20  Q. We talked about -- or you testified about
21  paragraph 3.8.
22  A. In what document, sir?
23  Q. That was in the acquisition agreement, page 11 of
24  25.
25  A. 3.8?

Page 71

1  Q. Yeah.
2  A. Yes.
3  Q. And then I believe you focused on the last
4  sentence, which reads: "None of the written data
5  or information furnished or made available to
6  Macomb County by Detroit as part of the due
7  diligence process with regard to system debt or
8  other debt or rate-related matters contains an
9  untrue statement of a material fact or omits to
10  state a material fact required to be stated
11  therein or necessary to make the statements made,
12  in the context in which made, not false or
13  misleading." As you sit here today, do you know
14  whether or not Detroit breached that provision?
15  A. I don't know one way or the other as a matter of
16  fact.
17  Q. Is it fair to say that you don't know back in
18  2009, when these statements were made, what the
19  knowledge of Detroit was?
20  A. That's correct.
21     MR. WATSON: That's all I've got.
22     MS. BADALAMENTI: That's it.
23     (The deposition was concluded at 10:16 a.m.
24  Signature of the witness was not requested by
25  counsel for the respective parties hereto.)

Page 72

                CERTIFICATE OF NOTARY
STATE OF MICHIGAN    )
                     ) SS
COUNTY OF MACOMB     )


         I, MELINDA S. MOORE, certify that this
    deposition was taken before me on the date
    hereinbefore set forth; that the foregoing
    questions and answers were recorded by me
    stenographically and reduced to computer
    transcription; that this is a true, full and
    correct transcript of my stenographic notes so
    taken; and that I am not related to, nor of
    counsel to, either party nor interested in the
    event of this cause.




                MELINDA S. MOORE, CSR-2258
                     Notary Public,
                Macomb County, Michigan
    My Commission expires: September 6, 2016