# In The Matter Of:

*City of Detroit, Michigan*

*William Misterovich*
*July 14, 2014*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File MISTEROVICH_WILLIAM.txt*
*Min-U-Script® with Word Index*

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2               EASTERN DISTRICT OF MICHIGAN
 3                     SOUTHERN DIVISION
 4
 5    _____
 6    In re:                    )    Case No. 13-53845
 7    CITY OF DETROIT, MICHIGAN )
 8                              )    Chapter 9
 9         Debtor               )
10    _____)   Hon. Steven W. Rhodes
11
12
13         The Deposition of WILLIAM MISTEROVICH,
14         Taken at 21777 Dunham Road,
15         Clinton Township, Michigan,
16         Commencing at 10:28 a.m.,
17         Monday, July 14, 2014,
18         Before Melinda S. Moore, CSR-2258.
```

Page 2

```
 1  APPEARANCES:
 2
 3  RAECHEL M. BADALAMENTI (P64361)
 4  Kirk, Huth, Lange & Badalamenti, PLC
 5  19500 Hall Road
 6  Suite 100
 7  Clinton Township, Michigan 48038
 8  586.412.4900
 9  rbadalamenti@khlblaw.com
10      Appearing on behalf of the Macomb Interceptor
11       Drain Drainage District.
12
13  ALBERT B. ADDIS (P31084)
14  O'Reilly Rancilio PC
15  12900 Hall Road
16  Suite 350
17  Sterling Heights, Michigan, 48313
18  586.726.1000
19  aaddis@orlaw.com
20      Appearing on behalf of the Macomb Interceptor
21       Drain Drainage District.
```

Page 3

```
 1  JEROME R. WATSON (P27082)
 2  Miller Canfield Paddock & Stone, PLC
 3  150 W. Jefferson Avenue
 4  Suite 2500
 5  Detroit, Michigan 48226
 6  313.963.6420
 7  watson@millercanfield.com
 8      Appearing on behalf of the City of
 9      Detroit.
10
11  ARTHUR H. RUEGGER
12  Salans FMC SNR Denton
13  1221 Avenue of the Americas
14  New York, New York 10020
15  212.768.6881
16  arthur.ruegger@dentons.com
17      Appearing on behalf of the
18      Official Committee of Retirees
19      of the City of Detroit.
```

Page 4

TABLE OF CONTENTS

```
WITNESS                                  PAGE
WILLIAM MISTEROVICH
EXAMINATION BY MR. WATSON                   5

EXHIBIT                                  PAGE
(No exhibits offered.)
```

Page 5

1 Clinton Township, Michigan
2 Monday, July 14, 2014
3    10:28 a.m.
4    WILLIAM MISTEROVICH,
5 was thereupon called as a witness herein, and
6 after having first been duly sworn to testify to
7 the truth, the whole truth and nothing but the
8 truth, was examined and testified as follows:
9    MR. WATSON: Let the record reflect
10 this will be a deposition taken pursuant to Notice
11 and to be used for all pumps under the applicable
12 court rules.
13    EXAMINATION
14    BY MR. WATSON:
15 Q. Mr. Misterovich, I'll be asking you a series of
16   questions. If you don't understand the question,
17   wish me to rephrase it or anything of that
18   nature, please ask that I do so and I'll try to
19   accommodate you. Otherwise, I'll assume that
20   you've heard the question, understand it, and are
21   responding to it. Okay?
22 A. Yes.
23 Q. Have you been deposed before?
24 A. Yes. I did want to mention that I've had carotid
25   artery surgery about two weeks ago, and today is

Page 6

1   my first full day back in the office, and I still
2   have some problem speaking fully. My -- the side
3   of my face and throat are still suffering from the
4   effects of the surgery, so from time to time I may
5   mispronounce some words or it may be difficult to
6   understand what I'm saying, so I'm just putting
7   everybody on notice of that condition.
8 Q. Okay. We'll try to promptly proceed through this
9   thing.
10 A. Okay.
11 Q. Would you briefly tell us your educational
12   background.
13 A. Well, I earned a bachelor's degree in political
14   science from the University of Michigan in 1965,
15   and a law degree from Detroit College of Law in
16   1981.
17 Q. How long have you worked for Macomb County?
18 A. Since 1971.
19 Q. And can you take us through the progression of
20   your positions at Macomb.
21 A. I've had two -- two positions, as project
22   coordinator and legal coordinator. That's one
23   job. And since the year 2000 I've been Chief
24   Deputy Public Works Commissioner.
25 Q. And as Chief Deputy Public Works Commissioner, do

Page 7

1   you report directly to Mr. Marrocco?
2 A. I do.
3 Q. As part of your duties have you had business
4   dealings involving the DWSD?
5 A. Yes.
6 Q. Can you describe for us the nature of the, I
7   guess, business dealings you've had with DWSD.
8 A. DWSD has an extensive system in place called the
9   partnering project or outreach reach program in
10   which DWSD has set up this program that involves
11   DWSD and communities that are served by the City
12   of Detroit Water and Sewerage Department. They
13   have, perhaps, five or six different committees
14   that meet on a regular basis. And early on I was
15   an active participate in those types of committee
16   meetings. And periodically there would be
17   separate meetings between our office and the
18   officials of DWSD. My involvement in the DWSD
19   outreach program has been limited of late, and I
20   deferred our office's representation to Craig Hupp
21   of Bodman, Longley, Bodman now.
22 Q. What are your job duties -- what's the title of
23   your current position, deputy?
24 A. Chief deputy. We have two deputies, regular and
25   chief.

Page 8

1 Q. Who's the other deputy?
2 A. Richard Sulaka.
3 Q. What are your job duties as chief deputy?
4 A. Let me just mention about Richard Sulaka. He is a
5   new appointee. I think he came on board in about
6   August of last year.
7 Q. Okay.
8 A. My duties?
9 Q. Yes.
10 A. In connection with DWSD?
11 Q. Well, let's say generally first.
12 A. Oh, generally.
13 Q. And then second in connection with DWSD.
14 A. Generally speaking, I stand in the shoes of the
15   commissioner and manage the Public Works
16   Department. We have a staff of approximately 60
17   employees located at this office and the City of
18   St. Clair Shores at a facility called the Chapaton
19   Retention Basin. So at those two locations we
20   have staff. And I manage the personnel and
21   administration of the staff.
22    And in connection with management of
23   the office, I represent the commissioner on
24   various boards and other bodies such as Chapter 20
25   Drain Boards, Chapter 21 Drain Board, and other

Page 9

1  drain districts, also the other drain districts
2  include projects that are wastewater in nature,
3  not stormwater. I mention that because there
4  could be some confusion. We process these
5  projects under the drain code, but the drain code
6  allows the projects to consist of wastewater
7  facilities. So the Macomb Interceptor drain,
8  which obviously is one of the parties of interest
9  here, that's one of the projects that has been
10 carried out under Chapter 20 through our office.
11 Q. And what have your dealings been with Detroit,
12 DWSD?
13 A. What have the dealings been?
14 Q. For instance, were you involved in litigation
15 before Judge Feikens involving Macomb and DWSD?
16 A. Yes. I would say I served as in-house counsel for
17 those proceedings, and would advise our retained
18 counsel, would work with them in consultation on
19 various issues that would come up, and that did
20 come up over the next 30 years, I guess, 35 years.
21 Q. Do you recall at some point Detroit and Macomb
22 entered into negotiations in regard to Macomb
23 purchasing the Macomb Interceptor system?
24 A. I do remember that, and I believe I was one of the
25 originators of that concept.

Page 10

1 Q. Do you recall when those negotiations first
2 started?
3 A. I really can't give you a specific date, but I
4 would say approximately two years before -- two
5 and a half years before the acquisition agreement
6 was signed, so I guess it would be maybe 2007 or
7 so.
8 Q. And the negotiations started prior to that
9 settlement agreement?
10 A. Perhaps somewhat.
11 Q. Do you recall there being some type of handshake
12 agreement in principle between Commissioner
13 Marrocco and DWSD Director Mercado in regard to
14 the purchase of the Macomb Interceptor proposal?
15 A. I was not present for those discussions. I know
16 they occurred. And the commissioner's
17 understanding of the conversation with Mr. Mercado
18 is that the City of Detroit would agree to -- to
19 reducing our costs for the sewer repair.
20 Q. Did Mr. Marrocco ever tell you that he had
21 reached a tentative agreement with Mr. Mercado
22 that Detroit would sell the system to Macomb with
23 the purchase price being generally the cost of
24 the debt -- the amount of the debt on the system?
25    MS. BADALAMENTI: I'm just going to put

Page 11

1 an objection on the record to the extent that the
2 information is conveyed to him for purposes of
3 seeking or obtaining legal advice in his position
4 as in-house counsel to the Macomb County Public
5 Works Commissioner. You can go ahead.
6    BY MR. WATSON:
7 Q. Did he ever relate such a discussion to you?
8 A. He did mention that he had met with Mr. Mercado
9 and that there was this common understanding that
10 Detroit would grant Macomb County a credit.
11 Q. What do you mean by a credit?
12 A. Credit toward the purchase price -- the overall
13 purchase price of the -- what ended up being the
14 Macomb Interceptor drain system, which consists of
15 about 21 miles of sewer interceptor and pump
16 station and various other ancillary facilities.
17 Q. I want to hand you what's been marked as Hupp
18 Exhibit 1, and ask if you can tell us what that
19 is.
20 A. This is a settlement agreement commonly known
21 as -- referred to as the global settlement
22 involving the DWSD, Macomb County, Oakland County
23 and Wayne County.
24 Q. Were you involved in negotiating this agreement
25 at all?

Page 12

1 A. Yes.
2 Q. What was your involvement?
3 A. Well, there's various items. The settlement
4 agreement covers a lot of ground. Some of the
5 items referenced deal specifically with Macomb
6 County, such as the interceptor transfer and the
7 2004 collapse claims and 2006 interceptor repairs,
8 and the interceptor interest rate, plus the model
9 contract.
10 Q. And by model contract, are you referencing the
11 parties' intent that Detroit convey the system to
12 Macomb?
13 A. No, the model contract deals with the ongoing
14 relationship between Detroit and the counties for
15 provision of wastewater services. The agreement
16 you refer to is a separate acquisition agreement.
17 Q. And who negotiated this agreement for Macomb and
18 who for Detroit?
19 A. Craig Hupp of Bodman was our primary person
20 involved in the negotiations. For Detroit I would
21 say it would be Attorney Mark Jacobs of Dykema
22 Gossett, and Bob Walters, in-house attorney with
23 DWSD.
24 Q. Now, did you serve as in effect the client
25 representative for Macomb?

Page 13

1 A. Yes.
2 Q. And Walter was sort of the client representative
3 for Detroit?
4 A. Right.
5 Q. Both you guys are attorneys?
6 A. Right.
7 Q. So it's a bunch of attorneys reaching a deal?
8 A. Room full of them.
9 Q. And I won't even get into the Oakland and Wayne
10 County attorneys. We'll leave those out.
11 A. Okay.
12 Q. Looking at page 7 of the agreement -- 7 at the
13 bottom, it seems to be signed by Pamela Turner.
14 Do you see that?
15 A. Yeah. On my page 7 -- I guess there's two --
16 Q. I think there are three page 7s. We went through
17 this before. Don't ask me why. Well, they're
18 repeats of the same but they're different
19 signatures.
20 A. Pam Turner, yes, interim director.
21 Q. Was she involved in negotiating the deal at all?
22 A. I don't recall her ever being present at the
23 negotiations.
24 Q. Then the next page, if you look at that, seems to
25 be signed by Mr. Marrocco.

Page 14

1 A. That's correct.
2 Q. Was he involved in negotiating the deal? What
3 was his involvement, if you know?
4 A. Commissioner Marrocco would be kept informed of
5 the proceedings as they moved forward. The
6 negotiations themselves normally took place at the
7 DWSD office or at Bodman, and Commissioner
8 Marrocco was not usually present at those
9 meetings, but I was.
10 Q. Now, this says "Settlement Agreement." What did
11 it settle?
12 A. It settled about 10 or 15 different matters.
13 Q. After this was entered into, are you aware of any
14 outstanding disputes between Detroit and Macomb
15 that this -- did this sort of clear the slate at
16 that time or were there still things Detroit and
17 Macomb were arguing about?
18 A. It seems to me there were a certain number of
19 loose ends that needed to be addressed, and the
20 deliberations took place over a long period of
21 time and eventually resulted in a settlement
22 agreement.
23 Q. Now, let me ask you about this -- unnecessary
24 language there, but at the Hupp deposition
25 Mr. Hupp seemed to indicate that there was sort

Page 15

1 of this tentative broad framework of a deal
2 reached in maybe 2006 or '07 between Marrocco and
3 Mercado. But that was scuttled by Judge Feikens'
4 decision pretty much. Do you recall that?
5 A. I do recall that.
6 Q. And then, according to Mr. Hupp, the deal was
7 kind of resurrected or a new deal was initiated
8 when -- I'll find the name. There was another
9 gentleman that got involved.
10    MS. BADALAMENTI: O'Brien.
11    BY MR. WATSON:
12 Q. Mr. O'Brien sort of -- yeah, in spring of 2008
13 O'Brien became the facilitator and he helped the
14 parties to sort of initiate a new deal. Do you
15 recall that?
16 A. I do.
17 Q. And was that when -- was it those negotiations
18 that eventually resulted in the settlement
19 agreement and the acquisition agreement?
20 A. Yes.
21 Q. Thank you. Do you recall the negotiations that
22 O'Brien initiated?
23 A. Not really. I mean, I know he initiated them and
24 we discussed a lot of subjects, and I think it
25 covered most, if not many, of the items that are

Page 16

1 in the settlement agreement.
2 Q. Is it fair to say that the agreements reached
3 through those O'Brien-initiated discussions are
4 reflected in the settlement agreement?
5 A. I believe so.
6 Q. How did you become aware of that sinkhole
7 situation?
8 A. I think I heard or saw a report on television of
9 the sinkhole. I had been on vacation that week
10 prior, and I think it happened on a Saturday. I
11 actually went to the site.
12 Q. That Saturday?
13 A. Yes, and saw the sinkhole.
14 Q. I take it it was immense?
15 A. Oh, it looked like an earthquake.
16 Q. Do you know who ran that project on a day-to-day
17 basis?
18 A. Victor Mercado was in charge, and I believe the
19 project engineer or construction manager was
20 Mr. Shukla -- I don't recall his first name --
21 DWSD.
22 Q. Did you have any interaction with Shukla?
23 A. You know, I knew Mr. Shukla from a prior project
24 that DWSD did for us, but I can't say that I
25 recall having any direct conversations with him on

1   the 15 Mile and Hayes sewer repair.  I did attend
2   several meetings at the project site in a trailer.
3   I remember Mr. Mercado being present and a lot of
4   engineers from NTH.  And there were some people
5   from the DWSD engineering staff such as a fellow
6   named Awni Qaqish.  I don't believe he's with DWSD
7   any longer.
8   Q.  Did you have any formal role out there --
9   A.  No.
10  Q.  -- in managing the project?
11  A.  No.
12  Q.  Investigating, overseeing, anything like that?
13  A.  No, but I directed our construction department to
14  assign an inspector to monitor the activities.
15  Q.  Who in the construction department was assigned?
16  Do you know?
17  A.  The construction manager was Don Penrod, and he
18  assigned primarily a fellow by the name of Tom
19  Stockel, S-t-o-c-k-e-l.  Tom might have been --
20  let's see.  Let me back up a little bit.  Don
21  Penrod's title was construction engineer, and I
22  think Tom Stockel's title was construction manager
23  or inspector.  He was promoted some time during
24  this time frame.  But it was Tom Stockel who was
25  on site on a regular basis.

Page 18

1   Q.  Was Mr. Stockel there virtually every day at
2   least when the project started?
3   A.  I believe so.  Most every day if not every day.
4   Q.  Do you know if there were daily meetings on the
5   project between the team working on it?
6   A.  I don't know that.
7   Q.  Okay.  As far as you know, if Macomb wanted
8   information on the project, to inspect what was
9   going on or whatever, could it secure that from
10  Detroit?
11  A.  That was my understanding.
12  Q.  How long did the repairs take?  Do you recall?
13  A.  I think close to two years.
14  Q.  Do you recall the 1977 sewer collapse?
15  A.  I was here.
16  Q.  Okay.  Didn't it take longer to repair that one
17  than?
18  A.  It did, in part, though, because there was a long
19  period of time that was required for Detroit to
20  evaluate different options, present those options
21  to Macomb County, and get Macomb County's decision
22  on which way to proceed.
23  Q.  Was the 19 -- well, let me say, was the 2004
24  sewer collapse more of an emergency than the 1977
25  collapse?

Page 19

1       MS. BADALAMENTI:  I'm going to object
2   to foundation.
3       BY MR. WATSON:
4   Q.  If you know.
5   A.  I would say characterizing them -- I'm not sure
6   which one was more serious, but as I understand
7   the 2004 incident, there was never a complete
8   blockage overflow.  A certain amount of flow
9   continued through the pipe even though it was
10  collapsed at that time.  It was not a total
11  blockage.  The -- of course the decision was made
12  to construct a bypass so that the permanent
13  repairs could be made.  Once the bypass was in
14  place, then the danger of having a spill was
15  pretty much eliminated.
16  Q.  At least initially were the repairs made on an
17  emergency basis to the interceptor in 2004?
18  A.  Yes.  That bypass was constructed.
19  Q.  Was there a dispute between Detroit and Macomb in
20  regard to the repairs?
21  A.  We had a lot of questions regarding the project as
22  it neared completion, the costs that were involved
23  in the work that was taking place, and we felt
24  that it was requiring too much time.  It should
25  have been done sooner.

Page 20

1   Q.  And did that dispute eventually lead to
2   litigation in the Feikens case?
3   A.  I don't believe so.
4   Q.  You do or --
5   A.  I don't.
6   Q.  Did you or anyone else at Macomb ever complain
7   about the cost of the repairs?
8   A.  Sure.
9   Q.  And do you recall who you complained to?
10  A.  Each other.
11  Q.  Did you ever complain to anyone at Detroit or --
12  A.  I think comments were made back and forth, and as
13  this event unfolded and construction took place
14  and repair was made, we were having meetings with
15  DWSD on other issues.  We were meeting on a
16  regular basis every week or every two weeks.  And
17  so the subject of repair would come up in the
18  course of those conversations.  I can't give you a
19  date or time or exactly who was there, but we made
20  known the fact that we considered the cost that
21  was being incurred to be quite high.
22  Q.  Did you ever get a response from DWSD?  Do you
23  know who responded on DWSD?
24  A.  No, I can't give you a name.
25  Q.  Did anyone ever -- at DWSD, whether or not you

Page 21

1  remember the name, say, no, these aren't too
2  high?
3  A. That was the general response from DWSD, is that
4    the costs that they were incurring were valid,
5    bona fide and accurate.
6  Q. Do you know if anyone from the grand jury -- or
7    anyone from Macomb was ever questioned by the
8    grand jury?
9  A. Not to my knowledge.
10 Q. Or the FBI or U.S. Attorney's Office?
11 A. I don't believe anybody from Macomb County was
12   contacted, but I can't say for sure.
13 Q. At some point did you find out that the U.S.
14   Attorney's Office was investigating potential
15   wrongdoing in the City of Detroit by the
16   Kilpatrick administration?
17 A. Yes, I learned of that through newspaper reports
18   of the proceedings.
19 Q. Didn't know prior to the newspapers?
20 A. No.
21 Q. Other than the folks indicted -- I think Mercado
22   and Miller, Kilpatrick, Ferguson are the ones I
23   recall -- are you aware of whether anyone else at
24   DWSD or anyone at DWSD was aware of this
25   wrongdoing? Did you ever speak to anyone at DWSD

Page 22

1  about it?
2  A. No, never discussed it with DWSD. It was
3    obviously a very sensitive subject. We felt it
4    was best not to bring it up.
5  Q. Looking at page 7 of the document before you, the
6    second page 7, which contains -- it appears to be
7    Mr. Marrocco's signature.
8  A. Yes.
9  Q. Did you advise Marrocco to sign?
10 A. I did.
11 Q. Okay. Do you know if he went through and
12   carefully read this agreement before he signed
13   it?
14 A. I believe he was advised by Craig Hupp, our
15   representative, and myself that the document was
16   in order and that he should sign it.
17 Q. You don't recall him reading through it
18   carefully?
19 A. I don't recall that.
20 Q. Were you satisfied with the document, that it
21   accurately reflected the parties' decision?
22 A. Yes.
23 Q. Let me next hand to you what's been marked as
24   Exhibit 3 to the Hupp deposition. I'll ask you
25   if you can tell us what that is.

Page 23

1    MS. BADALAMENTI: Can we go off the
2  record.
3    (Off the record at 10:58 a.m.)
4    (Back on the record at 10:58 a.m.)
5    BY MR. WATSON:
6  Q. Can you tell us what this agreement is.
7  A. This is the acquisition agreement between Macomb
8    County, more accurately Macomb Interceptor Drain
9    Drainage District and the County of Macomb with
10   the City of Detroit for purposes of what is known
11   as the MID system, consisting of approximately 21
12   and a half miles of sanitary sewer and other
13   facilities.
14 Q. It's been testified to by, I believe, at least a
15   couple witnesses that this agreement was
16   patterned after the -- I call it the OMI
17   acquisition agreement. Is that true?
18 A. Yes.
19 Q. Were you involved in drafting this agreement at
20   all?
21 A. Yes. I participated in discussions that were held
22   concerning its terms and conditions.
23 Q. Is it fair to say that the Macomb team was pretty
24   much the same, you and Hupp, and the Detroit team
25   was pretty much the same, the primary players

Page 24

1  being pretty much Jacobs and Walter?
2  A. Right.
3  Q. I don't think we've marked in this particular
4    litigation that OMI acquisition agreement, but it
5    was entered into or executed in 2009; this one,
6    in 2010. Why did it take so long for this one?
7  A. I think the primary reason was the concern or
8    discussions over the purchase price. In the OMI
9    agreement, it basically was a wash. There were no
10   funds exchanged between OMI and the City of
11   Detroit, as opposed to the MID agreement, which we
12   had costs that in the end that added up to over
13   $90 million
14 Q. Let me show you what's been marked Hupp Exhibit 4
15   and I'll ask if you can tell us what that is.
16 A. This is the computation of purchase price of the
17   MID facilities.
18 Q. And two items -- I'm looking at "CS-1368 2005
19   repairs, $54,467,200." Do you see that?
20 A. Yes.
21 Q. Was there any discussion during the negotiations
22   about the cost of those repairs?
23 A. There was some discussion about the cost.
24 Q. Do you recall what that discussion was?
25 A. Just in general terms, Macomb County felt the

Page 25

1 numbers were high and Detroit assured us they were
2 accurate.
3 Q. And by accurate, Detroit indicated this is what
4 it paid for the repairs?
5 A. Yes.
6 Q. Was there any discussion that you can recall
7 about the reasonableness of the costs?
8 A. Again, just in general terms.
9 Q. What general terms were those?
10 A. Macomb County felt the figures were high and
11 Detroit continued to assert that the numbers were
12 valid.
13 Q. Okay. What about the $17,050,000, about 80% of
14 the way down the document, that global
15 settlement, what does that represent?
16 A. The 17 million was one of the items covered in the
17 global agreement dated 2009, and it represented a
18 credit to Macomb County for all of the costs that
19 were -- that are reflected in this Schedule 3.8.
20 Q. At one point was the system debt at something
21 like 116 million?
22 A. I don't recall it being quite that high.
23 Q. What do you recall? I see there's a 110.
24 A. Yes, that's the number I remember.
25 Q. And that was negotiated down, basically?

Page 26

1 A. Yes.
2 Q. And there were various, I take it, disputes
3 between Detroit and Macomb with Macomb saying,
4 look, bring the price down for this reason, and
5 Detroit trying to draw the line and say, no, it
6 shouldn't be lower? Is that the way the
7 negotiations went?
8 A. Yeah. Detroit resisted our request for credits,
9 but in the end, agreed to the $17 million figure,
10 and then the $17 million figure, I think, the
11 origin of it was Macomb County, when it filed a
12 complaint in front of Judge Feikens regarding the
13 cost, our position was that the cost of this
14 repair, instead of being assigned 100% to Macomb
15 County, should be spread to the regional sewer
16 system as a whole, and the 17 million, I think,
17 was the number that Macomb County -- it would have
18 benefitted Macomb County to the tune of about
19 $17 million if that had been put in place. So
20 that's the origin of it. But in the end, it was
21 applied not just to the 15 Mile sewer repair, but
22 to all the other projects as well, which included
23 the large amount for the Garfield interceptor,
24 $20 million, and then other repairs.
25 Q. Do you remember when negotiating the 2009

Page 27

1 settlement agreement Detroit agreed to reduce the
2 purchase price by $3 million for credits that
3 Oakland and Macomb wanted?
4 A. 3 million as opposed to the 17 million?
5 Q. Well, an additional 3 million on top of the 17
6 million. And I'm looking here at -- where it
7 says "Balance of OMI/Macomb Miscellaneous Rate
8 Settlement 870,252." Do you see that language?
9 A. No. Where?
10 Q. Almost right at the end, like three lines before
11 the bottom.
12 A. Yeah.
13 Q. Do you recall what that was for -- that credit?
14 A. I don't remember that.
15 Q. Were you satisfied with the acquisition
16 agreement?
17 A. In general, yes.
18     (Off the record at 11:07 a.m.)
19     (Back on the record at 11:07 a.m.)
20     BY MR. WATSON:
21 Q. Let me hand you, Mr. Misterovich, what's been
22 marked as Hupp Exhibit 5, which says near the top
23 "Macomb Interceptor Acquisition Settlement and
24 Release of Certain Rate Disputes." Do you see
25 that?

Page 28

1 A. Yes.
2 Q. What was the purpose of this agreement? Or was
3 it just a settlement of all the stuff listed in
4 here? Anything other than that?
5 A. I believe this settlement and release was signed
6 at the same time as the acquisition agreement, and
7 it was put together by Bodman to further define
8 and expound on certain items in the settlement
9 agreements such as the listing of the meters that
10 were being transferred, and other matters that
11 were referenced in the acquisition agreement but
12 apparently needed further briefing.
13 Q. To your understanding, once the acquisition
14 agreement was executed and this settlement and
15 release agreement was executed, were there any
16 outstanding disputes between Macomb and Detroit?
17 Was everything resolved that you were aware of --
18 all disputes?
19     MS. BADALAMENTI: I'm just going to
20 object to foundation, but you can go ahead if you
21 know the answer.
22     THE WITNESS: We've had ongoing
23 disputes with Detroit for so long that it's hard
24 to recall what our position was at this point in
25 time, but the global agreement did seem to settle

**Page 29**

1 most, if not all, matters.
2 BY MR. WATSON:
3 Q. When did you first --
4 A. You know, I would like to add something to that
5 answer, because since the acquisition agreement,
6 various other subject matters have come up in the
7 course of negotiations with Detroit over rates and
8 charges and annual rate increases and that type of
9 thing, and we have differed with Detroit on some
10 of its proposals, and we've argued with them and
11 eventually reached agreement, and I'm thinking in
12 particular of the so-called look-back adjustments
13 that have been put in place. So when you say did
14 this settlement agreement settle all matters with
15 Detroit, I guess I really need to modify my answer
16 and say it settled most agreements that existed or
17 were issues that existed at that time. However,
18 since then other issues have surfaced and we've
19 needed to deal with them as they have arisen.
20 Q. Do you recall any issues pending at that time?
21 The date of the acquisition agreement and the
22 settlement agreement were signed, September 2, I
23 believe, 2010 -- do you recall any agreements --
24 or disagreements or disputes with Detroit that
25 were pending then that weren't settled?

**Page 30**

1 A. I would say ongoing rate issues. We generally
2 would have questions when Detroit would propose
3 new scheduled rates for the upcoming fiscal year.
4 Q. Prior to the time Macomb entered into the
5 acquisition agreement, was it entitled under the
6 terms of the agreement to secure documents from
7 Detroit or inspect the system or take actions to
8 satisfy itself that it was getting what it was
9 paying for?
10 A. The question is did we seek documentation of --
11 Q. Well, the first question is: Were you entitled
12 to seek documents?
13 A. Yes.
14 Q. And did you do that?
15 A. We did. Engineering assessment or condition
16 assessment of the Macomb facilities was conducted
17 not by our office but by the engineering firm of
18 NTH under contract with DWSD. Those documents
19 were made available to us; so that report -- very
20 voluminous report documented the condition of the
21 sanitary sewers as they existed at that time.
22 Then separately we produced a detailed listing of
23 all the facilities and all of the contracts that
24 Detroit carried out to install the system, and it
25 was done over a period of years, in the 70s and

**Page 31**

1 80s, and I think even beyond the 80s. And so we
2 did that type of paper review as well.
3 Q. Did Macomb ever do a valuation of the system, try
4 to determine how much the system was worth?
5 A. I don't believe so. We understood that our cost
6 to acquire it would be the debt that existed at
7 that time.
8 Q. And I take it to rebuild the system like this
9 nowadays would be several times the cost?
10 MS. BADALAMENTI: I'm just going to
11 object to the foundation. I think your question
12 is ambiguous, too. Go ahead.
13 THE WITNESS: I'm not an engineer, so I
14 really can't evaluate what the current cost would
15 be.
16 BY MR. WATSON:
17 Q. Are you aware of, prior to entering into the
18 acquisition agreement, anyone at Macomb ever
19 requesting information as far as documents or
20 requesting an inspection that Detroit didn't
21 supply or comply with?
22 A. No, I don't recall that happening.
23 Q. And as I understand, the system was purchased as
24 is?
25 A. Yes.

**Page 32**

1 MR. WATSON: Let's take a break. I
2 want to speak to counsel here.
3 (Off the record at 11:16 a.m.)
4 (Back on the record at 11:18 a.m.)
5 MR. WATSON: I have nothing further.
6 MS. BADALAMENTI: I don't have any
7 questions.
8 (The deposition was concluded at 11:18 a.m.
9 Signature of the witness was not requested by
10 counsel for the respective parties hereto.)

```
 1                CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN      )
 3                          ) SS
 4   COUNTY OF MACOMB       )
 5
 6              I, MELINDA S. MOORE, certify that this
 7      deposition was taken before me on the date
 8      hereinbefore set forth; that the foregoing
 9      questions and answers were recorded by me
10      stenographically and reduced to computer
11      transcription; that this is a true, full and
12      correct transcript of my stenographic notes so
13      taken; and that I am not related to, nor of
14      counsel to, either party nor interested in the
15       event of this cause.
16
17
18
19
20              [signature: Melinda S. Moore]
21
22          MELINDA S. MOORE, CSR-2258
23              Notary Public,
24          Macomb County, Michigan
25    My Commission expires:  September 6, 2016
```