# In The Matter Of:

*City of Detroit*

---

*Robert C. Walter*

*July 11, 2014*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File WALTER_ROBERT C..txt*

*Min-U-Script® with Word Index*

Page 1

```
 1           UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4    _____
 5    _____
 6    In re:              )   Case No. 13-53845
 7    CITY OF DETROIT, MICHIGAN )
 8                        )      Chapter 9
 9         Debtor         )
10    _____)   Hon. Steven W. Rhodes
11
12
13         The Deposition of ROBERT C. WALTER,
14         Taken at 150 W. Jefferson, Suite 2500,
15         Detroit, Michigan,
16         Commencing at 10:27 a.m.,
17         Friday, July 11, 2014,
18         Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```

Page 2

```
 1    APPEARANCES:
 2
 3    RAECHEL M. BADALAMENTI (P64361)
 4    SCOTT SIERZENGA (P77633)
 5    Kirk, Huth, Lange & Badalamenti, PLC
 6    19500 Hall Road
 7    Suite 100
 8    Clinton Township, Michigan 48038
 9    586.412.4900
10    rbadalamenti@khlblaw.com
11    ssierzenga@khlblaw.com
12        Appearing on behalf of the Macomb Interceptor
13         Drain Drainage District.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    ALBERT B. ADDIS (P31084)
 2    KEITH C. JABLONSKI (P62111)
 3    THOMAS D. ESORDI (P45428)
 4    O'Reilly Rancilio PC
 5    12900 Hall Road
 6    Suite 350
 7    Sterling Heights, Michigan, 48313
 8    586.726.1000
 9    aaddis@orlaw.com
10    kjablonski@orlaw.com
11    sesordi@orlaw.com
12        Appearing on behalf of the Macomb Interceptor
13         Drain Drainage District.
14
15    W. MACK FAISON
16    M. MISBAH SHAHID (P73450)
17    Miller Canfield Paddock & Stone, PLC
18    150 W. Jefferson Avenue
19    Suite 2500
20    Detroit, Michigan 48226
21    313.963.6420
22    faison@millercanfield.com
23    shahid@millercanfield.com
24        Appearing on behalf of the City of
25         Detroit and the Witness.
```

Page 4

```
 1    ARTHUR H. RUEGGER
 2    JOSEPH SELBY
 3    Salans FMC SNR Denton
 4    1221 Avenue of the Americas
 5    New York, New York 10020
 6    212.768.6881
 7    arthur.ruegger@dentons.com
 8    joseph.selby@dentons.com
 9        Appearing on behalf of the
10         Official Committee of Retirees
11         of the City of Detroit.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1 TABLE OF CONTENTS
2
3 WITNESS                                    PAGE
4 ROBERT C. WALTER
5 EXAMINATION BY MS. BADALAMENTI          6
6
7 EXHIBIT                                   PAGE
8 (Exhibits attached to transcript.)
9

10 DEPOSITION EXHIBIT 1            23
11 DEPOSITION EXHIBIT 2            25
12 DEPOSITION EXHIBIT 3            35
13 DEPOSITION EXHIBIT 4            39
14 DEPOSITION EXHIBIT 5            76
15 DEPOSITION EXHIBIT 6            79
16 DEPOSITION EXHIBIT 7            97
17
18
19
20
21
22
23
24
25

Page 6

1 Detroit, Michigan
2 Friday, July 11, 2014
3    10:27 a.m.
4    (Mr. Sierzenga not present at
5    10:27 a.m.)
6    ROBERT C. WALTER,
7 was thereupon called as a witness herein, and
8 after having first been duly sworn to testify to
9 the truth, the whole truth and nothing but the
10 truth, was examined and testified as follows:
11    EXAMINATION
12    BY MS. BADALAMENTI:
13 Q. Sir, can you tell us your name for the record.
14 A. Robert Charles Walter.
15 Q. And, Mr. Walter, you're an attorney?
16 A. Yes.
17 Q. So you understand the deposition process?
18 A. I do.
19 Q. I have a tendency of getting a little ahead of
20    myself. If I cut you off before you're finished
21    answering a question, let me know that I'll back
22    up. And the same thing, even if you can
23    anticipate my question, make sure you wait and
24    let me finish it --
25 A. Okay.

Page 7

1 Q. -- so the court reporter can get down what we're
2    saying.
3    Are you currently employed?
4 A. No. I'm retired.
5 Q. When did you retire?
6 A. March of 2012.
7 Q. Where did you retire from?
8 A. City of Detroit Law Department.
9 Q. What was your position?
10 A. Senior assistant corporation counsel.
11 Q. Who was above you in the Law Department?
12 A. At that time, my supervisor was Judith Turner and
13    then the director and -- was Krystal Crittendon,
14    and the deputy director was Edward Keelean.
15 Q. The highest ranking person in that department was
16    Ed Keelean?
17 A. No, he was the deputy director. Krystal
18    Crittendon was the director.
19 Q. What would your day-to-day duties have been as an
20    assistant -- senior assistant corporation
21    counsel?
22 A. I was assigned to represent the Detroit Water and
23    Sewerage Department, and basically general counsel
24    work for whatever they wanted me to do. I didn't
25    do litigation. I wrote and reviewed contracts,

Page 8

1    negotiated contracts, advised the department on
2    any legal issues that they wanted advice on.
3 Q. Advise the DWSD?
4 A. Yes, that was -- I did some work for the Public
5    Lighting Department, but mostly DWSD.
6 Q. When did you take the position of senior
7    assistant corporation counsel?
8 A. I got promoted in the mid-90s -- '95 or '96.
9 Q. And were you always in that position assigned to
10    the DWSD?
11 A. I was assigned to DWSD from the time I started at
12    the Law Department in 1982 until I retired.
13 Q. With respect to any criminal investigations or
14    outside agencies investigating the DWSD, would
15    that have been something that you would become
16    involved with?
17 A. No. I was not involved in that.
18 Q. What -- who would have been involved?
19 A. Someone higher than me. There were two federal
20    investigations of the department while I worked
21    there, when I just started there, in 1982, when
22    the director of the department, Charles Beckham
23    was indicted and subsequently convicted. And that
24    was handled by my supervisor, Darryl Alexander,
25    and they add lawyer from Dykema -- a criminal

1  lawyer from Dykema Gossett named Howard O'Leary
2  who worked on that.
3     And then the one in the Kilpatrick
4  administration was an headed by Edward Keelean,
5  the deputy director of the department.
6  Q.  And when did that investigation begin, to the
7  best of your knowledge?
8  A.  I don't remember a date.  I became aware of it
9  when I was -- when Mr. Keelean and another lawyer
10  named Dennis Mazurek showed me a grand jury
11  subpoena for Water and Sewerage Department
12  documents and asked me who at the Water Board
13  Building they would contact to find all the files
14  that responded to that subpoena.
15  Q.  Do you know what time frame that was?
16  A.  I don't.
17  Q.  Did that grand jury subpoena request files or
18  people to testify?
19  A.  The ones that I saw -- and there were several of
20  them -- were all for documents.  They did subpoena
21  individuals to testify before the grand jury, but
22  I was not involved in that at all.
23  Q.  Do you know what came first, the subpoenas for
24  documents or subpoenas for individuals?
25  A.  I think it was the documents.

1  Q.  And so you were asked to compile the documents?
2  A.  No, I was not.  Mr. Mazurek and Mr. Keelean
3  compiled the documents.  They just -- because I
4  was familiar with all of the water board's
5  contracting processes, they always asked me who
6  was the project manager for this contract that
7  they were having to find documents on and I would
8  tell them which building to go to and which people
9  to contact to find the files, but I did not look
10  at the files or compile them myself.
11  Q.  Would you recognize those subpoenas if you saw
12  them now?
13  A.  I don't know.  I might.
14  Q.  Have you reviewed any grand jury subpoenas before
15  or in preparation for your deposition today?
16  A.  No, I have not.
17  Q.  Did you keep a separate file that --
18  A.  I did not.  Ed or Mr. Mazurek would show me the
19  subpoena and I would tell them where to find --
20  look for the files responsive to the subpoena, and
21  that was it.  I didn't keep copies of the
22  subpoenas myself.
23  Q.  Was Mr. Mazurek an attorney?
24  A.  Yes.
25  Q.  What was his position?

1  A.  Chief assistant corporation counsel.
2  Q.  Did you work with him on other things or just
3  this one?
4  A.  I worked with Dennis on a number of issues.  He
5  was the head of what's called the municipal
6  section, which handled -- they responded to
7  subpoenas in actions where the city was not a
8  party.  They advised the city council on ordinance
9  drafting, and they handled all the Freedom of
10  Information Act requests, so anytime the Water and
11  Sewerage Department got FOIAs, and things like
12  that, I would deal with him.
13  Q.  How about Ed Keelean?  How often did you interact
14  with him?
15  A.  Not all that often.  Primarily I dealt with my
16  supervisors.  In the chain of command above me
17  there was my supervisor, Judith Turner, and then
18  she reported to Dennis Mazurek, who reported to Ed
19  Keelean and Krystal Crittendon.
20  Q.  When you were shown the grand jury subpoenas, do
21  you know what year that was?
22  A.  I don't.
23  Q.  When you were shown the grand jury subpoenas, was
24  that the first time that Mr. Keelean had asked
25  you to get something or direct him in the right

1  way since you became -- or since he became the
2  director?
3  A.  I think so, yes.  I mean, basically I would deal
4  with him if was writing a legal opinion for the
5  Law Department that either he or the corporation
6  counsel had to sign off on, but it was just
7  projects like that.  An average week, I had no
8  contact with him.
9  Q.  Did you -- in order to answer his questions, did
10  you have to ask him about the investigation and
11  the nature -- the nature of the investigation?
12  A.  Yes.  And although I don't know how much the
13  federal investigators were telling him, he was the
14  liaison between the federal investigators and the
15  city.  And I don't know what they told him.
16  Q.  What did he tell you?
17  A.  That he was receiving subpoenas, that he was
18  compiling documents, and that he also sat in on
19  some of the interviews where the federal
20  investigators were interviewing city employees.
21  This was before some of them got called before the
22  grand jury.
23  Q.  Had you sat in on any interviews?
24  A.  No, but I was interviewed by the assistant U.S.
25  attorney who was on the investigation.

1 Q.  When was that?

2 A.  I don't remember the date.  It was several months

3 before the indictment came out.

4 Q.  In 2010?

5 A.  It might have been.  Either late 2009 or early

6 2010.

7 Q.  So going back to the conversation with

8 Mr. Keelean, did he tell you what was being

9 investigated?

10 A.  I don't know if this is privileged or not, but --

11    MR. FAISON: If you think it might be

12 privileged, then establish the parameters, and

13 then we can figure out whether it's privileged or

14 not.

15    THE WITNESS: He told me general --

16    MR. FAISON: Not what -- in terms of

17 the conversation, how did the conversation come

18 up, and did you feel that you were offering law

19 advice to him?

20    THE WITNESS: Well, no, I wasn't

21 offering any legal advice.  There were

22 investigations as far as it involved the

23 department that I worked with, of kickbacks being

24 paid by contractors or extorted from contractors,

25 and there was also in a housing department

1 contract that I got stuck working on an allegation

2 of bid rigging.

3    BY MS. BADALAMENTI:

4 Q.  You said kickbacks that were paid by or extorted

5 from contractors.  Do you know which one was

6 being investigated?

7 A.  No.

8 Q.  Did Mr. Keelean tell you it was one or the other

9 or did you gather that information on your own?

10 A.  A lot of that came from just reading the

11 newspapers and watching the television news.  The

12 news media were -- I probably got more information

13 about the investigation from reading the

14 newspapers than I did from talking to Ed Keelean.

15 Q.  Would that have been at the time that you were

16 answering these subpoenas you saw this

17 information going on in the news?

18 A.  The investigation was all over the newspapers and

19 the TV stations.

20 Q.  What was the housing project?

21 A.  That was a fed -- the federal government, the

22 Department of Housing and Urban Development, was

23 putting up the money to rebuild an old public

24 housing project on the west side of Detroit.  The

25 old one had demolished -- been demolished, and

1 they were going to build a new one, and I got

2 involved as special assignment away from my

3 regular work, to get involved in negotiating that

4 contract between the city and the federal

5 government.

6 Q.  Was it within your -- the course and scope of

7 your employment to negotiate contracts that

8 involved the DWSD?

9 A.  Yes.

10 Q.  Did you actually write those contracts?

11 A.  The department had some standard contract forms

12 for construction contracts, consultant contracts,

13 water service contracts and sewer

14 contracts with suburbs, and I was involved in

15 developing all of those basic format contracts.

16 And then we'd start with that and -- for the

17 construction contracts and consultant contract,

18 they didn't change very much.  In fact, we just --

19 the water service contracts, there were a few

20 provisions we would tweak or touch, but mostly it

21 was boilerplate.  But I was involved in writing

22 them, yes.

23 Q.  The presubpoena, during the interview process by

24 the United States Attorney's Office, what did you

25 understand the nature of the investigation to be?

1 A.  It dealt with misconduct involving city contracts.

2 Q.  DWSD contracts or other city contracts?

3 A.  Both.

4 Q.  Did you learn during the course of those

5 interviews that you attended or your own

6 interview what contracts were being investigated?

7 A.  I didn't -- the only interviews that I attended

8 was my own, and they were not asking me about

9 specific contracts.  They were asking me what the

10 city's normal contracting procedures were, how did

11 contracts get awarded, how did the bid process

12 start, how did the bid evaluation process work.

13 And it was more general background information.

14 They did not ask me about any specific contracts

15 or contractors.

16 Q.  Did they ask you about the sinkhole project?

17 A.  No.

18 Q.  Did they ask you about Inland Waters?

19 A.  No.

20 Q.  Did they ask you about Tony Soave?

21 A.  No.

22 Q.  Any representatives, employees, agents of Inland

23 Waters?

24 A.  No.

25 Q.  What was the typical DWSD contracting process,

**Page 17**

1 the bidding process?
2 A. Well, there were two types of contracts,
3 construction contract -- well, more than two, but
4 I'll start with -- construction contracts would
5 start with a design. You would give the design, a
6 whole sheaf of engineering drawings and the
7 boilerplate contract documents to the bidders.
8 They would submit sealed competitive bids, and the
9 lower bidder was supposed to get the contract.
10 Then you would have what were called
11 professional services contracts, which were either
12 contracts for services by engineering firms in
13 which there was a bid evaluation process where
14 price was a factor but there were other factors
15 like professional competence, experience in doing
16 the type of work to be covered by that contract.
17 And then you had for some big projects
18 design-build contracts where you would be
19 evaluating -- where you would give them project
20 scope and they would process a basic design and a
21 construction and design budget, and that was
22 evaluated. It wasn't a pure competitive bid
23 situation. You would look at the price but also
24 look at the design and the competence of the
25 contractors who were on the bid team. Those were

**Page 18**

1 usually a joint venture between the general
2 contractor and the design firm.
3 Q. What was the -- which of these examples would the
4 sinkhole project be characterized as?
5 A. The sinkhole project was kind of unique. That was
6 an emergency. So what they did was they took an
7 existing sewer repair contract with Inland Waters,
8 who was already working on sewer repair and had
9 their equipment and team mobilized and were
10 available. They moved them all out to the
11 sinkhole and had them stabilize the situation and
12 build an emergency bypass around the sinkhole to
13 keep the sewage flowing and keep it from backing
14 up in all the sewers upstream.
15 Q. That contract was -- that was already in place
16 was CS-1368?
17 A. Yes.
18 Q. How was CS-1368 awarded? Was it through --
19 A. That was a professional -- CS stands for
20 consultant services.
21 MR. FAISON: You're going to have to
22 let her finish her question.
23 THE WITNESS: I'm sorry.
24 BY MS. BADALAMENTI:
25 Q. Which of the three types of contracts that you

**Page 19**

1 just referred to would CS-1368 fall within?
2 A. That was a professional service -- actually, wait.
3 It was a professional services contract but they
4 were managing sewer repairs.
5 Q. Who was the -- so that would have been subject to
6 a bid evaluation process?
7 A. Yeah. That contract would have been an
8 evaluation, not a pure competitive bid.
9 Q. So a pure competitive bid the low bidder gets it,
10 period?
11 A. Yes.
12 Q. In a professional services contract, bidders are
13 evaluated on a rating system?
14 A. There's a rating system. When the contracts go
15 out for bids, the contractors are told what the
16 basic criteria are. They are not told how those
17 are weighted. And they are not told -- I don't
18 think -- they were not told the identity of the
19 committee that was going to evaluate the bid.
20 Q. And is it your understanding that Inland Waters
21 was evaluated before it was awarded CS-1368?
22 A. Yes.
23 Q. Who did that evaluation?
24 A. I don't know who the members of the committee
25 were. For every bid evaluation the director of

**Page 20**

1 the department would appoint a committee to do the
2 evaluation. I don't know who was on the committee
3 for that contract. I did not serve on the bid
4 evaluation committees.
5 Q. Do you remember a contract CS-1372?
6 A. No.
7 Q. Do you remember that the sinkhole or sewer
8 lining -- sorry -- the sewer lining work that was
9 to be performed under CS-1368 was originally the
10 subject of a different contract with Lakeshore
11 who had been awarded through the bid process?
12 A. No, I was not aware of that.
13 (Mr. Sierzenga present at
14 10:45 a.m.)
15 BY MS. BADALAMENTI:
16 Q. Okay. But your understanding is CS-1368 was
17 competitively bid?
18 A. Yes.
19 Q. As a professional services contract?
20 A. Yes.
21 Q. And you have no knowledge of the contract that
22 was initially awarded to Lakeshore and then
23 cancelled?
24 A. No.
25 Q. And moved over to 1368?

1 A. I may have heard about it at the time, but I don't
2 remember anything about it.
3 Q. If you had heard about it, who would that have
4 been from?
5 A. Probably Darryl Latimer. He was running the
6 contracts and grants group in those days.
7 Q. Had there ever been something like that happen
8 where a contract -- professional services
9 contract had been awarded and it was cancelled
10 and a different contractor was given the award?
11 A. Contracts were awarded and terminated on a regular
12 basis usually, so it would not raise any red flags
13 to me if work got shifted from one to the other.
14 Q. Do you know who would direct such a process to
15 occur?
16 A. That would come from the director.
17 Q. The director of?
18 A. The Water and Sewerage Department.
19 Q. And at this time who would that have been?
20 A. Victor Mercado.
21 Q. Do you remember having any conversations with
22 Victor Mercado about 1372 being cancelled?
23 A. No.
24 Q. Was it your understanding that when 1372 was
25 cancelled and it was moved over to some different

1 contractor, was the process completed again? Was
2 the evaluation process completed again?
3 A. Well, when 1368 was awarded, there would have been
4 an evaluation. If work was added to or taken out
5 of the scope of the contract, that would have been
6 done by a contract amendment after the contract
7 was awarded.
8 Q. Okay.
9 A. I mean, there's a scope of work in the contract
10 when it goes out for bids, but that can be changed
11 by amendments that either add work or take work
12 out.
13 Q. So if 1372 was cancelled and that was moved over
14 to a different contractor, it would be your
15 belief that would be due to a different scope of
16 work than on 1368?
17 A. I don't understand the question.
18 Q. The contract CS-1368 was awarded to Inland
19 Waters, correct?
20 A. Yes.
21 Q. And your belief is that it was awarded pursuant
22 to a bidding process?
23 A. Yes.
24 Q. A professional services evaluation process,
25 right?

1 A. Yes.
2 Q. My question is whether -- what information you
3 have regarding that award process.
4 A. I really don't remember anything about the award
5 of that specific contract, because generally I was
6 not involved in evaluation of bids. Once the
7 contract was signed, I would review it before it
8 went to the Board of Water Commissioners for
9 approval.
10 MARKED FOR IDENTIFICATION:
11 DEPOSITION EXHIBIT 1
12 10:50 a.m.
13 BY MS. BADALAMENTI:
14 Q. Do you recognize the document that I have just
15 handed you?
16 A. This is Amendment No. 1 to Contract 1368.
17 Q. Do you recognize the exhibit that's been --
18 document that's been marked Exhibit 1?
19 A. I do.
20 Q. Were you involved in the award of this Amendment
21 1 to CS-1368?
22 A. No.
23 Q. Were you involved in the preparation of this
24 Amendment 1?
25 A. The preparation was done by the contracts and

1 grants group. I would review it after the
2 negotiation was finalized, but typically the
3 negotiation of an amendment was done by the
4 contracts and grants group and engineers who were
5 the project managers for the contract. I
6 generally was not involved in that.
7 Q. What was the scope of the work that was covered
8 by this Amendment 1?
9 A. The scope of the work is -- actually there is no
10 scope of work in this amendment, which means that
11 the scope of work that was in the initial contract
12 would remain in place. And it looks like this one
13 was simply adding additional funding to cover more
14 of the same types of work.
15 Q. Who would be -- who would initiate an amendment
16 like this where they're approving more money for
17 the same work?
18 A. That would typically be the engineering department
19 that was administering the contract. If they
20 found that there was more work that needed to be
21 done, then they would ask for a budget increase
22 and a contract amendment putting more money. And
23 sometimes they would add work to the scope of a
24 contract. And this one -- this amendment doesn't
25 do that. It's just sewer inspection and relining,

1  and there are unit prices for various sizes of
2  pipe.
3  Q.  Is it your understanding that the work had
4  changed in some aspect or that it had -- the
5  scope of the original work was different when
6  they got in to do it, or what was the reason that
7  amendment was necessary?
8  A.  Well, the explanation is in the second and third
9  pages of this exhibit.  There's a memorandum to
10  the Board of Water Commissioners from the director
11  explaining the need for the contract amendment,
12  which simply says that they're inspecting and
13  relining old sewers, and that they want to have
14  additional work done, but it's the same type of
15  work.  They're just adding more money.
16  Q.  Is it additional work or are they relining a
17  different areas or --
18  A.  This covers sewers for the whole area of the
19  city -- service area.
20  Q.  Did the original 1368 cover the same scope?
21  A.  I haven't seen the original -- the scope of work
22  is in contract -- the original contract document,
23  which I do not have before me.
24      MARKED FOR IDENTIFICATION:
25      DEPOSITION EXHIBIT 2

1      10:55 a.m.
2      BY MS. BADALAMENTI:
3  Q.  I marked as Exhibit 2 a document that is titled
4  Contract CS-1368.  Do you recognize that
5  document?
6  A.  Yes, I do.
7  Q.  Is that the original contract?
8  A.  This is the original contract that Exhibit 1
9  amended.
10  Q.  With that now in front of you, are you able to
11  tell me whether or not the area or type or
12  anything about the scope of work changed?
13  A.  The scope of work was not changed by the
14  amendment.  The scope of work involves inspecting
15  sewers owned by the Detroit Water and Sewerage
16  Department, evaluating their condition, and
17  repairing and relining the ones that needed
18  repair.
19  Q.  So did the job change to necessitate Amendment 1
20  or did something else occur to necessitate
21  Amendment 1?
22  A.  As I read these two documents, what happened was
23  they spent the full budget on the original
24  contract and decided they needed to have more of
25  that work done and more sewers inspected, so they

1  added additional money to the budget for more
2  sewer inspection and relining.
3  Q.  Would there have been any review to determine why
4  the full budget was spent but the project not
5  complete in that sort of circumstance?
6  A.  Well, the City of Detroit has over a thousand
7  miles of sewers, and so there is a constant need
8  to inspect and repair, because many of them are
9  over 50 years old and some of them are
10  deteriorating.  So you can't ever say the sewer
11  system is fixed and it's set.  It's always
12  changing.
13  Q.  So it's your understanding that simply that more
14  work needed to be done?
15  A.  For Amendment 1, yes.
16  Q.  What was the date of the original contract?
17  A.  The original contract was approved by the Detroit
18  City Council on June 26, 2002.
19  Q.  And would you agree with me that it contemplated
20  three years' worth of sewer lining work?
21  A.  Yes, actually 4.03 of the contract says the
22  contract duration is three years.
23  Q.  So it wasn't that we were going outside of that
24  original three-year term and the sewers still
25  needed to be inspected and repaired and lined;

1  we're within that time frame, right, when we
2  enter into Amendment 1?
3  A.  Amendment 1 was approved by the city council on
4  February 2nd, 2005, so --
5  Q.  Amendment 1 is -- there's a motion to the Board
6  of Water Commissioners as of August 25th of 2004,
7  correct?
8  A.  Right.
9  Q.  So the board might not approve it until 2005, but
10  they've used up their budget from the original --
11  A.  At some point.
12  Q.  Hold on.  Let me finish.  They've used up their
13  budget from 2002 to August 25th of 2004?  That's
14  when they request additional funding?
15  A.  They requested an additional $10 million to do
16  more work and they did not -- this Amendment No. 1
17  did not extend the time of performance.
18  Q.  So within the same three-year time frame we're
19  upping the budget $10 million?
20  A.  Yeah.
21      MR. FAISON: I object to the suggestion
22  that all money had been used up on the contract at
23  the time the motion was filed.  There is no
24  evidence to support that suggestion.
25      MS. BADALAMENTI: I appreciate the

1 testimony, counsel, but I think Mr. Walter
2 testified that as of the motion, but I'll ask him.
3    BY MS. BADALAMENTI:
4 Q. As of the date of the motion, it looks to me like
5 Victor Mercado is representing in page 2 and 3
6 that additional funding is necessary, but what is
7 your understanding?
8 A. He's saying -- it's on the second page of the
9 **motion -- and I'll quote: "In order to provide**
10 **the department with the means necessary to**
11 **continue the rehabilitation work described above,**
12 **and respond to potential sewer repair emergencies**
13 **until a new contract is in place, it is**
14 **recommended that the budget for Contract CS-1368**
15 **be increased by $10,000,000 to close out the**
16 **contract."**
17 Q. In the first line of page 3 it says "The current
18 balance of approximately $12,200,000.00 is
19 insufficient to cover the monthly cost of
20 rehabilitation," which is about $1,600,000 per
21 month. Is it your understanding that that
22 $1.6 million per month was what was originally
23 contemplated by CS-1368 or that that amount was
24 more, such that the funding was going to run out
25 during the three-year term?

1 A. **I think the original anticipation was that the**
2 **budget was going to be -- in the original**
3 **contract, was going to be sufficient for the**
4 **three-year term, but obviously they found**
5 **additional work. You don't know what state the**
6 **sewers are in until you actually get in there and**
7 **take a look at them. And obviously they found**
8 **more deterioration in the sewers and they wanted**
9 **to have more work done.**
10 Q. So in the professional services context you told
11 me that there is a design process that goes into
12 the proposal submitted by the professional. So
13 is it your testimony now that they might not have
14 known what the design or nature or how much sewer
15 they were going to be covering --
16 A. Well --
17    MR. FAISON: Hold on. Let her --
18    MS. BADALAMENTI: That's okay.
19    MR. FAISON: Let her finish her
20 question. That way I can figure out whether the
21 question is objectionable or not before you
22 answer.
23    THE WITNESS: Okay. This was not
24 really a design contract. This was more an
25 as-needed inspection and rehabilitation work for

1 relining old sewers that were deteriorated. You
2 just look at the condition of the sewer, and if
3 it's cracking or pitting, you reline it.
4    BY MS. BADALAMENTI:
5 Q. So this CS-1368 wasn't really any of those three
6 types of contracts. That's what you're telling
7 me now. It wasn't construction contracts; it
8 wasn't a professional services contract; it
9 wasn't a design-build contract. It was something
10 different. Now we have a fourth category of
11 contract?
12 A. **Well, this -- this would be more of -- the scope**
13 **of work here is inspecting sewers and relining the**
14 **ones that need to be relined. So the inspection**
15 **work and evaluation is professional services, and**
16 **the relining work is basically construction work;**
17 **so they were doing both in this contract.**
18 Q. So is it your testimony that this is a fourth
19 type of contract? It's not one of those three?
20 A. **Yeah, there -- yeah.**
21 Q. What other contracts were as-needed contracts?
22 A. **Oh, the sludge hauling contracts for the**
23 **wastewater treatment plant. Depending on how many**
24 **tons of sludge the plant produces -- you'd have**
25 **trucking companies on call. You would have what**

1 were called as-needed design services where you'd
2 have engineering firms under contract and you
3 would assign projects to them.
4    You had what was called skilled
5 maintenance contracts where you would have
6 contractors that would provide skilled trades work
7 at pump stations and water treatment plants and
8 the sewer plant. And that was all on an as-needed
9 basis. Some days they'd be doing nothing and some
10 days they'd have a full crew.
11 Q. Those contracts would have a total contract
12 amount and they would work for a certain period
13 of time within that contract amount, right?
14 A. **You would start -- yeah, you would have a contract**
15 **amount that they could not go over without an**
16 **amendment increasing the price, and there would be**
17 **an initial time frame, and that would require a**
18 **contract amendment to shorten or extend it.**
19 Q. The sludge hauling contracts, the engineering
20 contracts, were those -- were there typically
21 amendments in connection with those types of
22 contracts?
23 A. **Yes.**
24 Q. Would the amendments not extend the time but
25 extend the budget?

1 A. You could get any combination of that. You could
2 have a time-only extension. You could have a
3 budget extension or you could have both.
4 Q. Tell me some of the amendments that you're aware
5 of on these as-needed-type contracts where the
6 time is not extended but the budget is. Any
7 other example you can give me?
8 A. Oh, sometimes on the sludge hauling contracts, if
9 you've got -- if the plant was producing more
10 sludge than normal, things like that.
11 Q. Any others?
12 A. It could happen on any type of contract.
13 Q. Was this the only contract that you were involved
14 with where the City of Detroit was contracting
15 with a contractor or professional services
16 provider to inspect the sewer system?
17 A. No. There were a number of those contracts over
18 the years.
19 Q. Who were some of the other contractors?
20 A. There was a company called Insituform --
21 Insituform of Michigan, which was owned by the
22 same holding company that owns Inland Waters.
23 There was a company called Lanzo Construction that
24 had a contract for relining some of the larger
25 sewers and outfalls on the Detroit River. Those

1 are the ones I can think of off the top of my
2 head.
3 Q. Would the contract with Lanzo have an amendment
4 like this one where it was not extending the time
5 but it did extend the budget?
6 A. I don't know.
7 Q. Do you know what that contract number was?
8 A. No.
9 Q. How about the contract with Insituform? Were
10 there extensions of the budget without extensions
11 of time for performance?
12 A. There were amendments to that contract. There
13 were several contracts with Insituform over the
14 years because for a long time Insituform owned the
15 patent on the sewer relining process, and they
16 were the only company that could do that kind of
17 work, and then -- and there were amendments to
18 that contract. Typically those were extending
19 both the time and increasing the budget. And
20 eventually there was some other processes that
21 competed with Insituform that came onto the
22 market, and then we could start competitively
23 bidding those contracts.
24 Q. The next amendment that comes to CS-1368,
25 Amendment 2, I am marking as Exhibit 3.

1 MARKED FOR IDENTIFICATION:
2 DEPOSITION EXHIBIT 3
3 11:08 a.m.
4 BY MS. BADALAMENTI:
5 Q. Do you recognize that document?
6 A. Um-hmm. I do.
7 Q. When do you believe that Amendment 2 was entered
8 into?
9 A. By city charter the official date of the contract
10 is the date of city council approval, which in
11 this case is -- well, it says December 20 --
12 either 20 or 30. I can't read the purchasing
13 director's handwriting, but it's December either
14 the 20th or 30th of 2004.
15 Q. And what do you understand Amendment 2 to cover?
16 A. This is the contract for the emergency work after
17 the sewer collapsed on 15 Mile Road.
18 Q. That sewer collapse occurred August 22, 2004.
19 Does that sound about right now?
20 A. That sounds right.
21 Q. Would this -- there have been some discussions
22 with Inland Waters about the terms of this
23 amendment when it was put on the sinkhole repair
24 project, in other words, immediately or within
25 days of its occurrence?

1 A. Yeah. Somebody at the department would have
2 talked to them about what it was going to take to
3 get them out there, get them mobilized, and get
4 the initial emergency stabilization work done.
5 Q. Who would -- when you say someone at the
6 department, do you mean your department?
7 A. Not me. Someone at the Water and Sewerage
8 Department.
9 Q. Any idea who would have that type of conversation
10 or any idea who had that conversation?
11 A. Well, on something this big, the director, Victor
12 Mercado, would have been involved, and some -- he
13 would have had some people from the engineering
14 department involved in that as well. I was not
15 involved in the meetings with Inland Waters.
16 Q. When you -- when you do get involved, what do you
17 -- I guess what time frame do you get involved?
18 Is it within days or weeks?
19 A. I was actually out at the site of the collapse a
20 couple days after it happened.
21 Q. And why is that?
22 A. Because it was a big emergency project and I
23 worked with Darryl Latimer on putting this
24 contract amendment together.
25 Q. What information did you take from the site visit

Page 37

1  to put this contract together?
2  A.  Well, the site visit was just to go out there and
3  see how bad the situation was.  It was a huge hole
4  about 60 feet deep and there were four houses with
5  half their backyard in the bottom of the hole.
6  There was going to be a lot of work for lawyers on
7  a project like that.
8  Q.  A lot of work for what?
9  A.  Lawyers on a project like that.  And so basically
10  Darryl and I took the scope of work that the
11  engineers worked out with Inland Waters in the
12  original budget and put it in the city's amendment
13  form and fast-tracked it through the Board of
14  Water Commissioners for approval.
15  MR. FAISON: Can you keep your voice
16  up.
17  THE WITNESS: Okay.
18  BY MS. BADALAMENTI:
19  Q.  So by the time you got out there a couple days
20  later, the scope and the budget is already
21  decided on?
22  A.  They were being worked out.
23  Q.  Being worked out by whom?
24  A.  By the department's engineers and the Inland
25  Waters project managers who were out there at the

Page 38

1  site.
2  Q.  Was Victor Mercado out there at the site?
3  A.  He was out there at the site, yes.
4  Q.  When you say the project engineers, who do you
5  remember being out there?
6  A.  Ramesh -- for the City of Detroit it was Ramesh
7  Shukla, and there were some other people out
8  there, too, but he was the one that was the DWSD
9  point person.  And I think Mercado said that he
10  was out there every day for the first month.
11  Q.  That he himself or he, Shukla?
12  A.  No -- well, both of them.
13  Q.  Do you know if the mayor was ever out there?
14  A.  He went out there once that I know of, because I
15  saw photos of him with -- out there wearing a hard
16  hat and a safety vest.  I don't know if he went
17  out there again, but I know Mercado gave him a
18  tour of the site.
19  Q.  Are there actually in the City of Detroit --
20  prior to city council approval, can amounts be
21  paid on contracts that are awarded but not
22  formalized by council approval?
23  A.  There is a procedure in the city's purchasing
24  ordinance for an emergency contract where you
25  have -- which the purchasing director has to

Page 39

1  declare that this is an emergency and can award a
2  contract immediately, and I don't know if that was
3  done in this case or not.  Actually, since I don't
4  see anything in here that says it was an
5  emergency, it may not have been done.  If there
6  was an emergency declaration for this amendment --
7  okay, yeah.  I take that back.  There is.  There
8  is an emergency order.  There is the first page of
9  an emergency order awarding this contract
10  amendment, which is probably why the date of city
11  council approval is blank.  It wasn't approved by
12  the city council.  This was awarded under an
13  emergency procedure.  This was a special
14  administrative order, but this is just the first
15  page of it.  There had to be a second page,
16  because it's incomplete.  This is incomplete.  And
17  this is different from the procedure under the
18  purchasing ordinance that I just outlined.
19  Q.  Let me show you Exhibit 4.
20  MARKED FOR IDENTIFICATION:
21  DEPOSITION EXHIBIT 4
22  11:16 a.m.
23  BY MS. BADALAMENTI:
24  Q.  It has what looks to be a similar page 1.
25  A.  Okay.  Is Amendment No. 3.  Yeah, this is -- yeah,

Page 40

1  this is the full emergency order.
2  Q.  Okay.
3  A.  So the second page of this order, there is a
4  similar -- there has to be a similar page to
5  Amendment 2 that somehow isn't in the document,
6  but it would look a lot like this.
7  Q.  And the -- would that be something that was
8  retained with the City of Detroit, page 2 of this
9  order?
10  A.  Yeah, there would have to be a second page because
11  it would require the mayor's signature.  So there
12  is a second page to the order for Amendment No. 2.
13  It's just not in this package of documents I have
14  in front of me.
15  Q.  Do you know when that would have been signed?
16  A.  No.  The date isn't in here, so -- well, I'll tell
17  you all of the resolutions or the signatures are
18  dated in November of 2004, so it might have been
19  done then.
20  Q.  And the reason why an emergency order or an order
21  like this is done that's on page 2 of Exhibit 3
22  and page 2 and 3 of Exhibit 4 -- tell me again
23  why is this done.
24  A.  This is -- this is a long story, but this was --
25  the authority to issue orders like this was given

1 to the mayor of Detroit in an order signed by
2 Judge Jon Feikens of the U.S. District Court.
3 Here in Detroit -- and this goes back to a lawsuit
4 that the Environmental Protection Agency filed
5 against the Detroit Water and Sewerage Department
6 in 1977, which was assigned to Judge Feikens in
7 1977. And he was the judge on that case till
8 about 2003, when his health -- when he was in his
9 90s, and at that time his health got too bad that
10 it was transferred to Judge Sean Cox. But Judge
11 Feikens basically was overseeing the operations of
12 the department, because it was having -- over the
13 years it fell -- the sewage system fell out of
14 compliance with the Clean Water Act a number of
15 times, and twice during the over 30 years that
16 that lawsuit lasted, Judge Feikens entered orders
17 appointing the mayor of Detroit as what he called
18 the special administrator of the wastewater
19 system. He did it once during the Young
20 administration and again during the Archer
21 administration, and which basically gave the mayor
22 of Detroit the authority to bypass the city
23 council and award contracts for necessary services
24 to keep the water system operating -- the sewage
25 system operating and in compliance with the Clean

1 Water Act. And when Kwame Kilpatrick became the
2 mayor, he entered an order transferring the
3 special administrative powers from Mayor Archer to
4 Mayor Kilpatrick which basically gave the mayor
5 the power to award contracts without going through
6 the purchasing department.
7     The City of Detroit's purchasing
8 process is incredibly cumbersome, and from the
9 start to finish of awarding a contract it could
10 take over a year. That's how dysfunctional the
11 city's purchasing department is, which made it
12 very, very hard to buy spare parts for the
13 equipment at the sewage plant which broke down and
14 couldn't be prepared because we couldn't get
15 parts.
16     So basically the judge in a fit of
17 exasperation or inspiration or whatever gave the
18 mayor the power to bypass the whole purchasing
19 system and just award contracts. And there were
20 monthly reports to the judge on what was done
21 under that power, and so this was not done under
22 the purchasing director's emergency powers. This
23 was done under the emergency powers that the judge
24 gave to the mayor.
25 Q. Prior to the order for Amendment 2 to CS-1368,

1 were you aware of any other contract that had
2 been awarded by the mayor on this type of basis?
3 A. There were several of them, and I don't remember
4 the numbers.
5 Q. By Mayor Kilpatrick?
6 A. By Mayor Kilpatrick, by Mayor Archer, and by Mayor
7 Young.
8 Q. Which were awarded by Mayor Kilpatrick under
9 this --
10 A. I don't remember the numbers.
11 Q. Any others to Inland that you're aware of?
12 A. I don't remember any, but that doesn't mean it
13 didn't happen.
14 Q. Okay. When the federal investigation -- you were
15 interviewed in connection with the federal
16 investigation, was that part of what you were
17 asked about, this special administrative order?
18 A. I think I explained the process to them, yes. It
19 only applied to contracts for the sewage system.
20 They could not award contracts like that for
21 anything related to the water system, just sewage.
22 Q. So the order's issued. And we don't know the
23 date for Amendment 2.
24 A. There was an order issued -- since the signature
25 resolutions which would have been done around the

1 same time are dated -- it was sometime in 2005,
2 but I'm not going to guess at the date.
3 Q. I see city acknowledgement's dated --
4 A. Yeah, November 2005, so that might be when this
5 was signed.
6 Q. Let me stop you. I see them dated November 2004.
7 A. I'm sorry.
8 Q. Resolution of corporate authority dated
9 November 10, 2004.
10 A. Yeah. And which was a few months after the
11 collapse in August of 2004.
12 Q. And this contract is eventually put through city
13 council; would you agree with that, or did that
14 not even occur?
15 A. Well, if it's awarded by an emergency order by the
16 mayor, it did not have to go through city council,
17 so it would not have been submitted to the city
18 council. And the space on the boilerplate
19 signature form for entry of the city council
20 approval date is blank, which suggests that it was
21 never submitted to city council. It didn't need
22 to be.
23 Q. Okay. So by November, you would agree with me --
24 November 2004, that at least some of the work had
25 begun on the sinkhole repair?

1 A. They began work in August. They were out on the
2 emergency bypass, yeah.
3 Q. Would there have been payments made prior to the
4 November date, if that's the date?
5 A. I don't know when the payment --
6 Q. If -- assuming the November resolution dates are
7 the date of the order, the pages we don't have to
8 this order, would that mean that there were
9 payments issued prior to or not?
10 A. I don't know when the payments on this contract
11 were made. I never reviewed the invoices.
12 Q. Is this order something -- a form that you would
13 prepare?
14 A. No. That -- those were typically prepared by Mark
15 Jacobs of Dykema Gossett. I never prepared one of
16 those.
17 MR. FAISON: Are you talking about
18 emergency orders?
19 THE WITNESS: The emergency orders,
20 award of contracts under the emergency powers as
21 special administrator, Mark drafted those.
22 BY MS. BADALAMENTI:
23 Q. Are they emergency orders that -- the title
24 doesn't refer to emergency orders. Is that what
25 you're understanding is, that the special --

1 A. Well --
2 Q. Hold on. Let me finish. Is it your
3 understanding that the special administrator, the
4 mayor, could only issue an order like this that
5 bypasses the traditional contract approval system
6 in an emergency situation?
7 A. No. They were called special administrative
8 orders. I'm using the "emergency" word because
9 this project was a catastrophic emergency. But
10 they were awarded for any type of contractual
11 service that the city needed that could not be --
12 the purchasing department could not supply in a
13 timely way.
14 Q. And would you be provided with an order like this
15 when it was done for a particular contract that
16 you had worked on?
17 A. I would review the contract for the Law Department
18 and then my supervisor would sign on the bottom
19 line of the signature page because the city
20 charter requires Law Department approval of all
21 contracts. So I would review this before my
22 supervisor signed it.
23 Q. So going to -- there's a page in the document --
24 A. Which document are we looking at? Which exhibit
25 number?

1 Q. Amendment 2, which I believe is Exhibit 3.
2 A. Amendment 2, which is Exhibit 3, okay.
3 Q. There is a cover page for Exhibit B-2, Costing
4 Summary for Exhibit A-1. Do you see that there?
5 A. Um-hmm.
6 Q. Behind that cover page is a document prepared by
7 Mr. Shukla, who was from the engineering
8 department, right?
9 A. Um-hmm.
10 Q. Is that a yes?
11 A. Yes. Yes.
12 Q. Do you recognize this document?
13 MR. FAISON: Let me find it. Where are
14 we?
15 THE WITNESS: We're right here.
16 BY MS. BADALAMENTI:
17 Q. You're in the original contract. We're in
18 Amendment 2.
19 MR. FAISON: Exhibit what?
20 MS. BADALAMENTI: 3.
21 THE WITNESS: Exhibit 3.
22 MR. FAISON: How far back?
23 MS. BADALAMENTI: Near the back. The
24 cover sheet looks like this.
25 MR. FAISON: Exhibit B-2.

1 MS. BADALAMENTI: Exhibit B-2.
2 MR. FAISON: Thank you.
3 BY MS. BADALAMENTI:
4 Q. Do you recognize this document authored by
5 Mr. Shukla?
6 A. Well, it's part of the contract amendment, yes.
7 Q. Is it something you would have reviewed?
8 A. I would have reviewed this when I reviewed the
9 whole amendment, yes.
10 Q. The document is dated September 20, 2004. Do you
11 have a recollection of a costing summary being
12 prepared around that time?
13 A. I did not prepare -- I don't prepare costing
14 supplements. I don't prepare costing documents
15 for these contracts.
16 Q. Would you need to approve the language?
17 A. I would review it as part of the Law Department
18 review, yes.
19 Q. Are costing supplements things that were used by
20 the DWSD?
21 A. Yeah, there's -- well, there was a cost summary in
22 every contract. There's a lump sum -- there's a
23 total price, and then in a construction contract,
24 it's a lump sum. But in a contract like this,
25 there would be a breakdown what those costs were.

Page 49

1　There might be unit prices. There might be hourly
2　rates. It would depend on the type of contract.
3　There would be something breaking it down.
4　Q. So the costing summary for CS-1368, the original
5　sewer lining project, is that something that we
6　see in these documents here?
7　A. Well, the costing summary in Exhibit 1 is several
8　pages -- more than several -- of unit prices for
9　sewer lining based on the diameter of the sewer
10　and then the linear feet of pipe rehabilitated.
11　Q. That would be Exhibit B-2?
12　A. This is Exhibit B, captioned Cost Information
13　Sheet.
14　Q. Okay. Let me get the record situated here. It
15　would be Exhibit B to the document titled
16　Contract CS-1368, which we've marked as
17　Exhibit 2?
18　A. Yes.
19　Q. Okay. Exhibit B to Exhibit 2 has these unit
20　prices, right?
21　A. Yeah. Exhibit B to Exhibit 2 is a long list of
22　unit prices based on the diameter of the sewer and
23　the number of linear feet rehabilitated or
24　realigned.
25　Q. What I don't see in this cost information sheet

Page 50

1　in Exhibit 2 is any sort of information about
2　overtime, mobilization of equipment. Why is that
3　now dealt with in Amendment 2?
4　A. Because Amendment 2 was for a different type of
5　work. Amendment -- the original contract document
6　is they go in and inspect the sewer. If it's a
7　small sewer, they run a television camera through
8　it. If it' a big sewer, you can walk through it.
9　And then there is a linear -- and I'm looking
10　for -- well --
11　Q. Let me see if I can help you with it. Is it the
12　case that the cost information sheet in the
13　original contract would include the manpower
14　required to inspect --
15　A. Yes.
16　　MR. FAISON: Let her finish. You have
17　to let her finish the question, because the court
18　reporter has to take it down, as you know,
19　Robert --
20　　THE WITNESS: Yeah.
21　　MR. FAISON: -- her question and your
22　answer, and I have to hear her question to find
23　out whether or not I have an objection to it. So
24　if you would -- we're dealing with two fast
25　talkers here. Slow down the process a little bit.

Page 51

1　　THE WITNESS: Okay.
2　　BY MS. BADALAMENTI:
3　Q. So the unit price that's shown in this cost
4　information sheet would include everything that
5　went into that particular type of work, the
6　inspection service, use of television equipment,
7　the manpower required? Everything would be
8　included within the unit price?
9　A. The unit price includes labor and material,
10　inspection work, everything. The contractor has
11　to set that price high enough to cover all of its
12　costs.
13　Q. Does this original CS-1368 document provide for
14　overtime?
15　A. No. It provides for unit prices, and if the
16　contractor has to work overtime, it has to take
17　the overtime -- pay for its employees out of this
18　unit price.
19　Q. September 20th of 2004 we see Mr. Shukla now
20　providing for labor, overhead, markups, overtime.
21　These types of things are now going to be
22　included within the amounts that Inland can
23　charge; is that correct?
24　A. On the project covered by this amendment, which
25　was the sewer collapse on 15 Mile Road only.

Page 52

1　Q. Okay. Who would authorize Mr. Shukla to execute
2　a costing supplement like this?
3　A. The director, Mr. Mercado.
4　Q. Who would authorize Mr. Mercado to do that?
5　A. As the director of the Water and Sewerage
6　Department, he had the authority to do that. I
7　don't know if he discussed it with the mayor or
8　not.
9　Q. The next page is dated April 4, 2005.
10　A. Okay. We're still in Exhibit 3, okay.
11　Q. Right. This April 4, 2005 document is a letter
12　by Victor Mercado. Do you see that there?
13　A. Yes.
14　Q. Is this something you've seen before?
15　A. It's part of the contract. Yes, I've seen it
16　before.
17　Q. By April 4, 2005, has most of the work or some of
18　the work been done on the project?
19　A. Some of the work has been done. I think that
20　project ran into June or July of 2005, before all
21　of it was done.
22　Q. This document by Victor Mercado dated April 4,
23　2005, is proposing a different costing
24　supplement. Do you understand that to be the
25　case?

1 A. No. This is just talking about the kind of
2 documentation they have to submit with their
3 invoices to get the invoices approved. That's how
4 I read it.
5 Q. So the -- the paragraph reads "The other cost
6 guidelines contained in the attached costing
7 supplement will govern all work performed on the
8 contract from its inception until final
9 completion." Do you see that there?
10 A. Yes.
11 Q. So this document is intended to provide a
12 different costing framework going all the way
13 back to August, when the project began. Would
14 you agree with that?
15 A. This references some negotiations over the
16 pricing, and the costing supplement is on the next
17 page.
18 Q. Okay. So my question was: Would you agree that
19 this document is going to provide a new costing
20 framework for Inland Waters going back -- the
21 language is from its inception of the work until
22 final completion.
23 A. From the inception of the work covered by this
24 contract amendment, which is 15 Mile Road.
25 Q. So from August 22nd or as soon as they started

1 work thereafter -- August 22, 2004 collapse, they
2 start work. In April of 2005, we're now going to
3 go backwards and impose these -- this costing
4 framework; is that accurate?
5 A. It looks like this is maybe modifying the
6 September 20th letter that Mr. Shukla wrote.
7 Q. Who would, again, give Mr. Mercado -- let me ask
8 it this way: You said earlier Mr. Mercado would
9 have had the authority to direct Mr. Shukla to do
10 the first costing summary.
11 A. Yes.
12 Q. Would Mr. Mercado have authority, then, to do a
13 new costing summary?
14 A. Yes, he would.
15 Q. Would he need to get the mayor's approval to do
16 that, to the best of your knowledge?
17 A. I don't know how much the mayor delegated that to
18 him. And I'm not sure --
19 Q. I don't want to cut you off. Were you --
20 A. No, go ahead.
21 Q. Was this document something that you would have
22 reviewed, the letter dated April 4, 2005, or the
23 costing supplement that follows? Was that
24 something that you reviewed before it was made a
25 part of the contract?

1 A. I might not have because this was signed in
2 November 2004. I might not have depending on the
3 date of the administrative order. This may have
4 been added afterwards. I'm not sure.
5 Q. Well, it's dated well after November 2004. You
6 would agree with that, right?
7 A. Right.
8 Q. You have no reason to believe that that was
9 something that was done before April of 2005, do
10 you?
11 A. No.
12 Q. The signature on the bottom, do you recognize
13 that to be Victor Mercado's signature?
14 A. That's his handwriting.
15 Q. Dennis Oszust from -- he signs as the vice
16 president, general manager of the company, Pipe
17 Rehabilitation Group?
18 A. No, that's the group within Inland Waters. The
19 company is Inland Waters Pollution Control,
20 Incorporated. The Pipe Rehab Group was a group
21 within that company.
22 Q. Okay. Did you know Mr. Oszust?
23 A. Yes, I've met him a number of times.
24 Q. Did you meet him in connection with this project
25 or with this Amendment 2, I should say?

1 A. Not with this amendment. I was dealing with DWSD
2 staff on this amendment. I didn't talk to him
3 about this.
4 Q. Were you present when this document was signed by
5 Mr. Mercado --
6 A. No.
7 Q. -- or Mr. Oszust?
8 The pages that follow, CS-1368
9 Amendment No. 2 costing supplement, there are some
10 initials there on the document and there's a date
11 of 3/17 of '05. I deposed Mr. Shukla, and he
12 indicated that one of those initials were his. Do
13 you recognize the other one?
14 A. No. It looks like D.O., which would mean Dennis
15 Oszust, but I'm guessing.
16 Q. In your dealings with contracts for the DWSD, had
17 you had occasion to see a costing supplement that
18 was redone like was done in this case, where
19 there's actually a second costing supplement that
20 issues for the same contract?
21 A. No.
22 Q. Do you know how this -- or who directed that this
23 was done?
24 A. This would have to come from Mr. Mercado.
25 Q. Did you know what the standard markup or layers

Min-U-Script®
Bienenstock Court Reporting & Video
Ph: 248.644.8888     Toll Free: 888.644.8080
(14) Pages 53 - 56
Page 15 of 27

13-53846-tjt    Doc 6093-7    Filed 07/16/14    Entered 07/16/14 22:08:58

1    of markups were for DWSD contracts?
2  **A.   It varies from contract to contract, and it's**
3  **negotiated with the contractor.**
4  Q.   Was this costing supplement something you were
5  asked about when you were interviewed by the FBI?
6  **A.   No.**
7  Q.   I think you said you didn't --
8  **A.   Actually I was interviewed by a U.S. attorney, not**
9  **an FBI --**
10  Q.   I thought it was probably a bad question when I
11  said it, so thank you for correcting me.  I know
12  you weren't around when it was done, this
13  April 4, 2005 costing supplement, but did you
14  have occasion to see it when it became -- or at
15  any point before retiring from the Law
16  Department?
17  **A.   I don't remember seeing it.  I may have -- I may**
18  **have looked at this when I was reviewing Amendment**
19  **No. 3, because typically you look at the previous**
20  **amendments in the contract to see what changes are**
21  **being made.**
22  Q.   So looking at Amendment No. 3, which I think is
23  the document that we marked as 4 --
24  **A.   Yes.**
25  Q.   -- Exhibit 4, so Amendment No. 3, what is the

1  date of that?
2  **A.   The date of the special administrator order is**
3  **May 18, 2005.**
4       **MS. BADALAMENTI:** I'm going to indicate
5  that appears to be two pages on the back of
6  exhibit where they don't belong.  I just noticed
7  that.  If you want to pull them off, everybody --
8  they should not be on that document.  It will just
9  cause confusion later on.
10       **THE WITNESS:** You can have that back.
11       **MS. BADALAMENTI:** We'll mark it
12  separate.
13       **BY MS. BADALAMENTI:**
14  Q.   Do you recognize the date that Amendment 3 was
15  entered into?
16  **A.   It's the date of the special administrative order,**
17  **which is May 18, 2005.**
18  Q.   Do you know how far in advance of May 18, 2005,
19  this amendment would have been proposed or
20  discussed by somebody at DWSD in order for it to
21  be -- you know, in order for the order to be
22  signed on 5/18 of '05?
23  **A.   I don't.**
24  Q.   Is it a process that takes days or weeks or
25  months?

1  **A.   It depends on the complexity of the project.  It**
2  **can -- it can take weeks.  You know, at some point**
3  **engineering staff would have to propose something**
4  **like this to the director who would have to review**
5  **it and approve it.**
6  Q.   Well, in the case of Amendment 2, we know that
7  the sinkhole collapse occurred in August and we
8  don't see the -- we don't see the resolutions
9  dated until November.  Is that a typical time
10  frame or would you expect to see it shorter or
11  longer than that?
12  **A.   That's the time frame it took to get that**
13  **amendment written, agreed, but the contractor**
14  **actually started work before then.  And by city**
15  **purchasing standards, that's actually pretty fast.**
16  Q.   Okay.  So Amendment 3 would have to also be
17  written, prepared, approved by everybody so --
18  **A.   Yes.**
19  Q.   -- it would be a matter of months between the
20  time that the discussions begin that, hey, we
21  need an Amendment 3 here until --
22  **A.   It could be --**
23  Q.   -- until the time you see Mayor Kilpatrick
24  signing this order?
25  **A.   It could be a couple of months or a couple of**

1  weeks.  I'm not sure.  It depends on the project.
2  Q.   Okay.  And Amendment 3 is issued for the purpose
3  of increasing the budget for the sinkhole
4  repairs; is that true?
5  **A.   Yes.**
6  Q.   The amount of the increase is --
7  **A.   $23 million.**
8  Q.   -- $23 million added to the amount of the
9  Amendment 2?
10  **A.   Yeah.  It's on page 3.  Add 23 million, so the**
11  **new -- so the new total is 118 million.**
12  Q.   Was that for work that had been done up to that
13  point and going forward, or was all of that 23
14  million still to be done?
15  **A.   I don't know.  It is fairly common in the city**
16  **contracting process for when a contract runs out**
17  **of money, the contractor will keep working while**
18  **the amendment putting more money into the project**
19  **is processed, but they can't get paid until the**
20  **amendment's approved.  Contractor will sometimes**
21  **take on the risk f the amendment not being**
22  **approved, but in this case, it was.**
23  Q.   So -- well, in this case it was approved by
24  special order, right?
25  **A.   Yes.**

1 Q. So fair to say the contractor would know from his
2 discussions with the mayor or Victor Mercado that
3 the special order was going to issue to approve?
4 A. During the negotiation the contractor should have
5 been told that there would be a special
6 administrator order approving it, so if the
7 contract had run out of money, they would have
8 kept working knowing that they would be paid
9 eventually.
10 Q. Would the contractor have known that a special
11 order was the means by which Amendment 2 was
12 approved? In other words, would they know that
13 skipped the city council's purchasing approval
14 process?
15 A. I was not involved in that discussion. I'm sure
16 that that would have been discussed and they would
17 have been told that, yes.
18 Q. Do you know what necessitated this additional
19 $23 million in Amendment 3?
20 A. I did not -- I don't know what the -- all of the
21 work that was done out there. I do know that
22 every time they got into the tunnel, they found
23 things were deteriorating and getting worse.
24 Q. Did you ever ask why $23 million more?
25 A. At some point I would have asked Shukla that

1 question, and if he said there's more work to be
2 done, I would have taken his word for it.
3 Q. The work to be done had already at least been
4 started at that point, correct?
5 A. I don't -- well, the whole project, the work that
6 Inland Waters started in August, and --
7 Q. Of '04?
8 A. Of '04, and they had been working -- they and
9 their subcontractors had been working out there
10 continuously.
11 Q. So was it your understanding at the time
12 Amendment 3 is entered into that the whole budget
13 had been used or that the whole budget had been
14 used and there was more money due already?
15 A. My understanding have been that the current
16 budget was not enough, and that they were going to
17 use -- need more money to complete the work.
18 Whether that was -- whether they had spent
19 everything or whether they had some left, they
20 were going to run out, I don't know.
21 Q. Was that something you customarily checked on,
22 how much had they spent -- "We're entering into
23 this Amendment 3 and we're preparing this
24 document. How much has been spent so far?"
25 A. I generally didn't ask that question. I did not

1 review -- I never reviewed the contractor
2 invoices. I just -- if they told me that they
3 were running out, that the budget needed to be
4 increased to complete the project, I would believe
5 that and do it.
6 Q. And who other than Mr. Shukla would give you that
7 information?
8 A. Either Darryl Latimer or Mr. Mercado.
9 Q. Did Darryl Latimer have any discussions with you
10 in connection with Amendment 3 about amounts that
11 had been disallowed with respect to the sinkhole
12 repair work?
13 A. No.
14 Q. Did anyone discuss with you before Amendment 3
15 was drafted or executed that there were concerns
16 about overcharges on the project?
17 A. No.
18 Q. Did you actually prepare the text of the
19 amendment?
20 A. No. Those amendments are boilerplate forms that
21 the contracts administration group would prepare.
22 And Darryl Latimer was the head of that group at
23 that time.
24 Q. Does this amendment extend the time and budget or
25 just the budget?

1 A. This is amendment No. 4.
2 Q. Amendment No. 3, Exhibit No. 4.
3 A. Okay. Well, this just increases the budget
4 without increasing the time.
5 Q. Were you aware of any of the communications back
6 and forth between Mr. Shukla or Mr. Mercado or
7 Mr. Latimer that lead to Amendment 3?
8 A. No.
9 Q. Is that something that would typically go through
10 the Law Department?
11 A. No. Typically they would negotiate the contract
12 and then submit the whole contract to the Law
13 Department.
14 Q. Did you in connection with Exhibit 2 -- I'm
15 sorry, in connection with Exhibit 3, which is
16 marked -- which is actually Amendment 2, and the
17 costing supplement at the back of that
18 document -- Mr. Mercado's costing supplement
19 dated April 4, 2005, were you aware of any drafts
20 that had gone back and forth about that costing
21 supplement?
22 A. No.
23 Q. Were you aware of who proposed those terms,
24 whether it was the contractor or Inland Waters
25 who proposed the materials?

1 A. Inland Waters was the contractor, and I don't know
2 who proposed.
3 Q. I'm sorry. Were you aware whether Inland Waters
4 proposed terms for the costing supplement or
5 whether it was something Mr. Mercado wanted?
6 A. I don't know.
7 Q. Okay.
8    MS. BADALAMENTI: Do you want to take a
9 break?
10    MR. FAISON: Sure.
11    (Off the record at 11:50 a.m.)
12    (Back on the record at 12:09 p.m.)
13    BY MS. BADALAMENTI:
14 Q. What was your involvement -- let me ask it this
15 way: At some point there begin to be, in the
16 context of that 1977 case you were talking about,
17 disputes between Macomb County, Oakland County
18 and the City of Detroit. Are you aware of that?
19 A. There was a constant series of disputes.
20 Q. What sort of disputes were you aware of?
21 A. Mostly over sewer rates.
22 Q. Over -- I'm sorry?
23 A. Sewer rates that the city was charging. The
24 counties were constantly arguing that they were
25 too high.

1 Q. Was there other disputes that arose in the
2 context of that 1977 case? Let me ask it this
3 way: Do you recall a dispute over the radio
4 system?
5 A. Yes.
6 Q. What do you recall about that?
7 A. The city built -- what happened, the Federal
8 Communications -- the Federal Communications
9 Commission reallocated radio frequencies and
10 required all local governments and governments to
11 switch their radio communications to the 800
12 megahertz band. So the city built a new radio
13 communications system for all -- that was to be
14 used by all departments that used two-way radios
15 if their vehicles to communicate -- police, fire,
16 Department of Public Works and the Detroit Water
17 and Sewerage Department. And the counties,
18 Oakland, Macomb and Wayne County, complained that
19 the city allocated too much of the cost to the
20 Water and Sewerage Department and too little to
21 what collectively called the general fund
22 departments.
23 Q. The general fund departments were City of Detroit
24 departments?
25 A. Yeah. Basically the Water and Sewerage Department

1 is what the city calls a revenue department. It's
2 self-supporting off the water and sewer revenues.
3 And general fund departments are the ones that are
4 funded by tax revenues.
5 Q. Do you recall a dispute involving the allocation
6 of the repair costs for the sinkhole?
7 A. Yes.
8 Q. What was the nature of that dispute?
9 A. At some point Macomb County suggested that the
10 cost should be allocated to all of the customers
11 of the sewer system, and the Water and Sewerage
12 Department had allocated the full cost to Macomb
13 County.
14 Q. It was determined that it was a Macomb-only
15 project?
16 A. Yes.
17 Q. And the dispute in the 1977 case wasn't with the
18 amount -- the total amount of the project. It
19 was with the allocation of it to Macomb only?
20 A. Which project? Is that the sewer repair project
21 or the 800 megahertz project?
22 Q. Let me ask more clearly. With respect to the
23 2004 sewer collapse and the repairs, that
24 project, was the dispute in the 1977 case limited
25 to whether or not the repair costs should be

1 allocated to Macomb only?
2 A. There came a time eventually when Macomb
3 questioned the total cost, but the initial dispute
4 was just over the allocation.
5    MR. FAISON: Just a minute. Are we
6 talking about 1997 or 2004?
7    MS. BADALAMENTI: I'm talking about the
8 2004 repair costs.
9    THE WITNESS: 2004 collapse, there was
10 a dispute in which Macomb County suggested that
11 the project -- that the cost of the repair should
12 be spread over other communities served by the
13 Detroit sewage system and not just Macomb County.
14    BY MS. BADALAMENTI:
15 Q. The Judge Feikens made a determination on that
16 question of whether or not it's a Macomb-only
17 project or not, didn't he?
18 A. He did. Mr. -- I read the opinion, I think,
19 Tuesday of this week, earlier, yeah.
20 Q. Was that the first time that you had read it?
21 A. I probably -- I'm sure I read it when he issued
22 it.
23 Q. Were you the liaison between DWSD and the
24 attorneys representing DWSD --
25 A. Yes.

**Page 69**

1  Q. -- in that lawsuit?

2     Was there anybody else from your

3  department who was involved?

4  A. By 2004, yeah, there was lawyer named Laurie

5  Koester who was working with me.

6  Q. Can you say that name again.

7  A. K-o-e-s-t-e-r, pronounced "coaster," but she had

8  just started working with me and she really wasn't

9  up to speed.

10  Q. And the attorneys -- the outside counsel for the

11  city in that case was Mark Jacobs; is that right?

12  A. Mark Jacobs and a partner of his named Marilyn

13  Peters, and they may have used Bob Franzinger,

14  F-r-a-n-z-i-n-g-e-r, on that case. I'm not sure.

15  Q. And Marilyn Peters was the litigation counsel and

16  Mark Jacobs was sort of the counsel who handled

17  the contracting or negotiations; is that fair?

18  A. Mark -- Mark is an environmental law specialist at

19  Dykema. He's in their environmental department,

20  but he did general counsel and contracting work

21  along with me. Marilyn Peters is a litigator with

22  Dykema.

23  Q. And I think you said earlier you don't litigate?

24  A. I stopped doing litigation in the early 90s. I

25  just transitioned into more transactional work.

**Page 70**

1  Q. Okay. You said at one point Macomb did question

2  the total amount of the repairs in connection

3  with the 1977 lawsuit. When was that?

4  A. It wasn't really in connection with the lawsuit,

5  but at some point they got -- they had an engineer

6  look at it and asked him for an opinion on if the

7  cost could have been lower. He said that it could

8  have been lower.

9  Q. Was that after the federal indictment came out?

10  Do you remember -- let me just make it clear --

11  after the first superseding indictment came out

12  against Kwame Kilpatrick, Victor Mercado and

13  others?

14  A. I don't remember the date of the first superseding

15  indictment. I saw -- I think -- I saw his report

16  when I was reviewing documents in getting ready

17  for this dep, and I think it was 2011 or something

18  like that, which would have been after the

19  indictment.

20  Q. At any time prior to that do you recall Macomb

21  questioning the total of project costs?

22  A. No.

23  Q. Do you remember providing information for that

24  lawsuit to Mark Jacobs or Marilyn Peters

25  regarding the total costs or the breakdown of the

**Page 71**

1  total costs on the repair project?

2     MR. FAISON: Just a minute.

3     THE WITNESS: I'm a little confused.

4     MR. FAISON: Object to the question.

5  There's been no testimony about a lawsuit per se,

6  not yet.

7     BY MS. BADALAMENTI:

8  Q. Okay. In the context of that 1977 case and the

9  claims that Macomb asserted regarding the

10  allocation of those repair costs is it as opposed

11  to spread out to all communities, did you provide

12  any documents to Macomb or to your counsel on

13  that case to be provided to Macomb?

14  A. I did not, no.

15  Q. Are you aware of whether or not any documents

16  breaking down the repair costs were provided?

17  A. I did not do any active work on that case. Mark

18  and Marilyn did that.

19  Q. So you would not have been involved with the

20  creation of any spreadsheets or other documents

21  that were provided to Macomb that itemized the

22  total costs?

23  A. No.

24  Q. Okay. What other disputes were involved in the

25  1977 case -- let me see if I can streamline it

**Page 72**

1  for you. There was questions about phantom

2  improvements that were included within the rates;

3  is that right?

4  A. That was not in part of the 1977 -- the way the

5  1977 lawsuit was administered, there were a series

6  of consent judgments that were entered by Judge

7  Feikens, so every time there was a dispute between

8  one of the counties and DWSD, rather than filing a

9  lawsuit, they would file a motion in that lawsuit

10  as a way of keeping it in front of Judge Feikens.

11  So that was -- it was a unique procedure, unique

12  to Judge Feikens. You don't file a complaint.

13  You have to file a motion or something. But

14  that's the way it was done. And the phantom

15  projects issue was not raised. It was sort of

16  raised when we were negotiating the transfer of

17  the interceptor to Macomb and Oakland counties,

18  which was part of the resolution -- ultimate

19  resolution of that lawsuit. But Craig Hupp, I

20  think, who was Macomb County's lawyer in those

21  negotiations created the word "phantom projects."

22  Q. And phantom project, as it was referred to at

23  that time, was a project that was included in

24  part of the rates that the local communities were

25  paying the DWSD, but the project had not actually

Page 73

1    been constructed?
2    A.  That was the way it was explained by Craig.  And
3    there were a couple of projects that were put into
4    the capital improvement program and put into the
5    rates that were charged to Macomb County that
6    never got built, and part of the price negotiation
7    involved in the transfer -- the transfer agreement
8    was pulling those -- identifying those projects,
9    pulling them out -- back out of the rate base and
10   giving Macomb County a credit for them on the
11   purchase price.
12   Q.  Was that credit referred to as the global
13   settlement amount?
14   A.  The global -- no, the global settlement is a
15   settlement agreement that the parties entered into
16   with Judge -- before Judge Feikens to resolve a
17   number of issues that were out there.  That was --
18   and part of that was that the community -- the
19   City of Detroit and Oakland and Macomb counties
20   would negotiate the sale of the interceptor to
21   drainage districts to be created by those two
22   counties, and the price resolution was done in the
23   context of the transfer agreement.  I don't think
24   it -- I don't think it was in the settlement
25   agreement.  I think it was worked out as we were

Page 74

1    setting the price to be paid for the sewer.
2    Q.  So the settlement agreement was essentially an
3    agreement to reach an agreement on the purchase?
4    A.  That was part of it.  We also resolved the
5    disputes over the cost allocation for the 800
6    megahertz project and a couple of other disputed
7    issues as well.
8    Q.  Was the settlement agreement the means by which
9    the cost allocation of 15 Mile and Hayes was
10   resolved or was that resolved in its entirety by
11   Judge Feikens' ruling?
12   A.  Judge Feikens resolved the allocation issue, that
13   it was Macomb County only.  And I don't recall
14   Macomb County ever filing a formal complaint about
15   the total cost of it.  At some point Mr. Marrocco
16   showed us -- shared with us the report that said
17   it could have been done for a lower cost, but I
18   don't recall him ever filing a formal litigation
19   pleading over that.
20   Q.  In the '77 case?
21   A.  Or in any case, I don't think.
22   Q.  There was also a dispute in the 1977 lawsuit
23   about the interest rate that was being charged by
24   DWSD.  Are you familiar with that?
25   A.  Yes.

Page 75

1    Q.  There was a dispute over whether or not the bond
2    interest rate could be added onto by DWSD and
3    there was a claim that DWSD was trying to make a
4    profit on that?
5    A.  There was a claim by Macomb County that the
6    interest rate was higher than it should have been,
7    and they asked that that interest rate be reduced,
8    and that was done in the context of the
9    negotiation of the purchase price of the sewer,
10   and they did get a credit on that.  Detroit agreed
11   to recalculate the interest rate, get a lower
12   rate, and give them a credit for the difference.
13   Q.  And was that credit part of the global
14   settlement?
15   A.  No, that was part -- well, the agreement
16   transferring the sewer was one component of the
17   global settlement, but it's a separate contract.
18   There's a settlement agreement that says we will
19   negotiate the transfer of the interceptor, and
20   then there was the actual contract transferring
21   the interceptor.  So it's two separate documents.
22   Q.  The discussions about the first component, which
23   was that we're going to agree to transfer the
24   Macomb Interceptor system to Macomb --
25   A.  Yes.

Page 76

1    Q.  -- that -- what led to that?  Was it all of these
2    disputes or was it the interest rate?
3    A.  It was the whole collective thing, and another
4    thing that led -- that drove that was after the
5    sewer collapse had been repaired, the city hired
6    an engineering firm to do a survey and inspection
7    of the whole interceptor -- the entire length of
8    it.  And they came back with a report that said
9    there was deterioration throughout the whole
10   length of all of the interceptors, and with an
11   estimated repair cost of over $100 million, and
12   that was what really started the conversation
13   about the interceptor transfer going.
14   Q.  Was that consultant NTH Consultants?
15   A.  Yes.
16   Q.  Was that report complete by the time that the
17   settlement agreement is entered into?
18   A.  I don't know.  It was certainly complete by the
19   time the sewer transfer contract was completed.  I
20   don't know if it was completed by the time the
21   global settlement agreement was signed, but it was
22   certainly done by the time the sewer transfer
23   contract was signed.
24       MARKED FOR IDENTIFICATION:
25       DEPOSITION EXHIBIT 5

Page 77

1    12:25 p.m.
2    BY MS. BADALAMENTI:
3    Q.  Okay. I've marked as Exhibit 5 the document
4    titled Settlement Agreement.  Do you recognize
5    that document?
6    A.  Yeah, this is the document we referred to as the
7    global settlement agreement.
8        MR. FAISON: Counsel, I have a
9    question.  Are you purporting that this document,
10   Exhibit 5, is the complete settlement agreement.
11       MS. BADALAMENTI: I'm asking the
12   witness.
13       THE WITNESS: I think there was some
14   exhibits to it.  There are exhibits referenced in
15   this document that are not attached to the exhibit
16   that you handed me.
17       BY MS. BADALAMENTI:
18   Q.  Okay.  This document was designed to resolve
19   claims in the 1977 lawsuit by way of an agreement
20   -- to reach an agreement on the purchase by
21   Macomb of the sewer system; is that right?
22   A.  Let me correct something that I just said.  The
23   interest rate adjustment that I say was included
24   in the sewer transfer agreement is also in this
25   settlement agreement.  I had forgotten that.  But

Page 78

1    it's in here.  The amount was $17,050,000, and it
2    was given to Macomb County as a credit on the
3    purchase price.
4    Q.  Were you involved in the negotiation of those
5    credits?
6    A.  I was involved in the negotiation of the
7    settlement agreement.  The credits on the interest
8    rates were done -- were not done by me.  The
9    negotiators for DWSD on that issue were Bart
10   Foster and Mark Jacobs.
11   Q.  At the time of the settlement agreement did you
12   understand that the price for the purchase of the
13   Macomb system was going to be calculated by
14   making a determination of the system debt?
15   A.  Yes.  There was a general agreement among Detroit,
16   Oakland County and Macomb County that the purchase
17   price would be the outstanding bond debt on that
18   interceptor, and then adjusted by the interest
19   rate credit and the so-called phantom projects.
20   Those would be resolved by giving credits on the
21   amount of the outstanding debt.  And that's how we
22   worked out the purchase price.
23   Q.  The settlement agreement refers to a Letter of
24   Intent.  Are you familiar with the Letter of
25   Intent?

Page 79

1    A.  Yes.
2    Q.  Do you know whether that Letter of Intent was
3    ever executed?
4    A.  I believe it was.
5    Q.  Just to make the record clear, the document that
6    I handed you that's titled Settlement Agreement
7    has been marked as Exhibit 5; is that correct?
8    A.  Yes.
9        MARKED FOR IDENTIFICATION:
10       DEPOSITION EXHIBIT 6
11       12:30 p.m.
12       BY MS. BADALAMENTI:
13   Q.  The document that I've marked as Exhibit 6 is
14   titled the Macomb Acquisition Agreement.  It's
15   dated September 2nd of 2010.  Do you recognize
16   that document?
17   A.  Yeah.  This is -- it's got an Exhibit A marked all
18   over it, too.  I assume that's from something
19   else.
20   Q.  Short of that Exhibit A, do you recognize the
21   document?
22   A.  Yeah, this is the contract under which the City of
23   Detroit transferred the Macomb Interceptor to the
24   Macomb Interceptor Drain Drainage District and
25   the County of Macomb.

Page 80

1        MR. FAISON: Counsel, again, does this
2    document purport to be the complete document?
3        MS. BADALAMENTI: I'm asking the
4    witness.
5        MR. FAISON: Well, let me say for the
6    record, I mean, you produced the document.  You,
7    produced the document.  You identified it.  If
8    it's not a complete document and you don't want to
9    say so, then you have to ask the witness whether
10   this is a complete document or not.
11       MS. BADALAMENTI: Well, generally the
12   attorney asking the questions decides what
13   questions are appropriate to ask, but I haven't
14   asked the witness anything other than whether or
15   not he recognizes the document, so why don't you
16   give me opportunity to ask him about the document,
17   and then if you're not satisfied, you can follow
18   up.
19       MR. FAISON: If you're going to
20   represent a document to be something, I'm entitled
21   to at least understand what your representation
22   is.
23       MS. BADALAMENTI: Okay.  Your objection
24   is on the record.
25       THE WITNESS: What's the question now?

BY MS. BADALAMENTI:

1  Q.  Do you recognize this document to be the Macomb
2  Acquisition Agreement?
3  A.  Yes.
4  Q.  Okay.  Do you believe there to be any schedules
5  or exhibits that are missing or would you even be
6  able to answer that?
7  A.  I can't answer that.  There are a lot of -- this
8  one has a number of schedules and exhibits with
9  it, and I don't know if it's all of them, but
10  certainly most of them.
11  Q.  Were you part of the negotiations that led to
12  this acquisition agreement being executed?
13  A.  Yes, I was.
14  Q.  Were you part of the disclosures that were made
15  in connection with the execution of this
16  document?
17  A.  I don't know what type of disclosures you are
18  referring to?
19     MR. FAISON: Can I just ask for a
20  moment.  Did this document get marked as
21  Exhibit 6?
22     MS. BADALAMENTI: It did.
23     MR. FAISON: Thank you.
24     BY MS. BADALAMENTI:

1  Q.  Let me ask it a different way.  There was due
2  diligence that was contemplated by this
3  agreement.  Are you familiar with that?
4  A.  Yes.
5  Q.  Were you part of any of the due diligence under
6  taken by Macomb or Detroit in connection with
7  this agreement?
8  A.  The due diligence was undertaken by Macomb.  I
9  don't recall Detroit doing any at all.  And I was
10  involved in all of the negotiation meetings that
11  led to this document.  If there were separate due
12  diligence meetings, I don't think I was part of
13  those.
14  Q.  You had said that Bart Foster was involved in
15  this process.  Do you know what his involvement
16  was?
17  A.  Bart is a water and sewerage rate consultant.
18  He's the one that creates the water and sewage
19  rates for the city.  He's very involved in the
20  department's finances and rate setting.  And he is
21  also works on the city's bond issues.  He was the
22  one who really went into the bond documents and
23  determined what the amount of the outstanding debt
24  was.  And then he had some meetings with Macomb
25  County's lawyer, Craig Hupp, who have looked at

1  the same documents and they -- they're the two who
2  ultimately did most of the negotiating, looked at
3  the final numbers.
4  Q.  I took the deposition of Bart Foster, so let me
5  try to streamline some of these questions.
6  A.  Okay.
7  Q.  It's my understanding that Bart Foster was
8  provided with some project information and a
9  project total for any project that was undertaken
10  to repair, construct the facilities that were
11  going to be a part of this purchase.  Is that a
12  fair characterization?
13  A.  I would assume that he had that information, yes.
14  Q.  Do you know whether he was provided with project
15  files or invoices or ever reviewed the legitimacy
16  of charges?
17  A.  I don't know if he did that or not.
18  Q.  Do you know whether it was his custom and
19  practice to do that for Detroit?
20  A.  Bart was not involved in administering or
21  overseeing construction projects in any way, so he
22  probably looked at -- I'm not going to speculate,
23  but he was not involved in managing the repair
24  work or overseeing any other construction projects
25  for the department.

1  Q.  In the course of calculating that system debt
2  total, were you asked to provide any project
3  files to Bart or to Macomb County?
4  A.  No.
5  Q.  Were you asked to provide any project information
6  or project totals to Macomb County?
7  A.  No.
8  Q.  Do you know that Mr. Shukla provided some
9  information regarding projects?
10  A.  I'm not aware of that.
11  Q.  Do you know who provided Bart Foster with the
12  information that he needed?
13  A.  It wasn't me.  I don't know who he talked to.
14  Q.  The document -- the negotiation surrounding this
15  purchase went on for a number of years, as I
16  understand.  Is that your understanding?
17  A.  I don't know about years, but certainly several
18  months.
19  Q.  The document is dated September 2nd, 2010.  How
20  long before that do you think the negotiations
21  began?
22  A.  We started the negotiation sometime in 2009.  I
23  don't remember exactly when, but --
24  Q.  The settlement agreement that's in front of you
25  is marked May 12, 2009.  Would the negotiations

1 regarding the purchase of the system have
2 predated that?
3 A. I think this -- they would have started -- I think
4 they would have started after this.
5 Q. The settlement agreement contemplated purchase of
6 the system; is that right?
7 A. Yes.
8 Q. And how long did the negotiations go on prior --
9 with respect to the execution of the settlement
10 agreement and those terms?
11 A. Several months.
12 Q. Okay. Into 2008 or before that?
13 A. Oh, they would have started in 2008, sure.
14 Q. 2007 were there discussion about Macomb's
15 purchase of the system?
16 A. I don't remember. The real catalyst that -- my
17 recollection is that the catalyst that started the
18 discussion about transferring the interceptor was
19 the NTH report on the condition of it, so it would
20 have been after that report was provided to the
21 counties.
22 Q. There is a schedule 3.8 within these documents.
23 I'll let you get to it. It's marked on the top
24 page ID 3613. Have you seen this document?
25 A. Yes.

1 Q. Were you involved in the preparation of this
2 document?
3 A. This was put together primarily by Craig Hupp and
4 Bart Foster. I was not involved in those
5 meetings.
6 Q. There's a line item for CS-1368, the 2004
7 repairs, and there's a total of in excess of
8 $54 million. Do you see that there?
9 A. Yes.
10 Q. Do you know how that total was arrived at?
11 A. No, I don't.
12 Q. Do you know what disclosures were made with
13 respect to that amount?
14 A. No, I don't.
15 Q. Were there any questions from Macomb County
16 regarding that amount?
17 A. Not to me.
18 Q. Are you aware of whether or not there were any
19 representations made to Macomb County by anyone
20 regarding CS-1368?
21 A. No. I mean, I didn't make any. I don't know what
22 anybody else might have said.
23 Q. Were any of these -- let me take you back. On
24 page 2 of 25 of the acquisition agreement there's
25 paragraph 1.10. Do you see that?

1 A. Okay.
2 Q. "'Detroit's knowledge' shall mean the actual
3 knowledge of its Director, its Assistant
4 Corporation Counsel assigned to DWSD matters, its
5 Assistant Chief of Engineering or its Engineering
6 Support Manager Craig Stanley." Do you see that?
7 A. Yes.
8 Q. Who was the director being referred to in that
9 paragraph?
10 A. At that point the director of the department was
11 Pamela Turner.
12 Q. And when did Pamela Turner become the director?
13 A. After Victor Mercado resigned. I don't remember
14 the date. But she was the deputy director under
15 Mercado. She -- she came in after Mercado.
16 Q. Was there an interim director that served
17 somewhere in there, too?
18 A. Yeah.
19 Q. Who was that?
20 A. Anthony Adams.
21 Q. Anyone else?
22 A. No. My recollection is that after Mercado -- Pam
23 Turner, I believe, was the deputy director under
24 Mercado, and when he resigned, Anthony Adams
25 became interim director for about six months. And

1 then Pam became director.
2 Q. How long did Pam serve as the director?
3 A. Oh, three or four years.
4 Q. And who --
5 A. She retired after I did.
6 Q. Okay.
7 A. Wait. I'm sorry. She retired -- she retired
8 about six months before I did.
9 Q. Did someone else take her position that you knew
10 of?
11 A. Yeah.
12 Q. Who was that?
13 A. Susan McCormick, I think, is her name.
14 Q. The assistant corporation counsel assigned to
15 DWSD matters referred to in this paragraph, would
16 that be you?
17 A. Yes.
18 Q. The assistant chief of engineering at that time
19 would have been who?
20 A. I don't remember.
21 Q. And --
22 A. One of Shukla's assistants, but I'm not sure what
23 is.
24 Q. Shukla was chief of engineering at the time?
25 A. He was the assistant director at that time --

1  assistant director in charge of engineering.  The
2  department had four or five assistant directors in
3  those days.
4  Q.  Victor Mercado resigned in 2008; is that right?
5  A.  I believe so, yes.
6  Q.  In connection with the 1977 lawsuit, did you
7  become aware at any point of Victor having
8  requested from Judge Feikens that he be appointed
9  as special administrator in the place of
10  Mr. Kilpatrick?
11  A.  No.
12  Q.  Do you know what the circumstances of Victor's
13  resignation were?
14  A.  No.
15  Q.  Do you know the reason he gave for resigning?
16  A.  No.
17  Q.  Do you know if he was asked to resign?
18  A.  I don't.
19  Q.  Do you know if there was tension between
20  Mr. Mercado and Mayor Kilpatrick at the time he
21  resigned or prior to?
22  A.  I don't know.
23  Q.  In your capacity as assistant corporation counsel
24  on the DWSD matters, have you had occasion to
25  have meetings with Mr. Ferguson --

1  A.  Never.
2  Q.  -- Bobby Ferguson?
3  A.  No.
4  Q.  Other than the instances that you told me, did
5  you have discussions with Inland?
6  A.  No.
7  Q.  The representations in this --
8  A.  I'll take that back.  Inland Waters has done many
9  contracts over the years, and I had conversations
10  with Dennis Oszust about other projects.  I didn't
11  deal with him directly on this one.
12  Q.  Okay.  I'll take you to paragraph 3.7 of the
13  acquisition agreement.  Paragraph 3.7 provides
14  "Except as set forth in Schedule 3.7...there is
15  no action, suit or proceeding pending or, to
16  Detroit's Knowledge, threatened against or
17  affecting Detroit before any governmental entity
18  in which there is a reasonable possibility of an
19  adverse decision which could have a material
20  adverse effect upon the ability of Detroit to
21  perform its obligations."  Do you see that?
22  A.  Yes.
23  Q.  "...or which in any manner questions the validity
24  of this agreement."  The capitalized term "to
25  Detroit's Knowledge" would include your

1  knowledge, right?
2  A.  Yes.
3  Q.  And prior to this, September 2nd, 2010 date, you
4  had been interviewed by a U.S. attorney in
5  connection with 1368; is that true?
6  A.  Not in connection with 1368.  In connection with
7  general city contracting procedures.  They never
8  asked me specific questions about 1368.
9  Q.  Were you ever present when Mr. Shukla was
10  interviewed?
11  A.  No.
12  Q.  The documents that you were asked to put together
13  for the grand jury subpoenas, were those
14  documents including documents related to 1368?
15  A.  I was never asked to put together documents in
16  response to a grand jury subpoena.  I was shown
17  the subpoena and asked by either Mr. Mazurek or
18  Mr. Keelean where in the Water Board Building
19  those files would be and who would be the
20  custodian of them.  They're the ones who actually
21  went and found the documents and put together the
22  document packages for the grand jury.
23  Q.  Was that in inquiry with respect to 1368?
24  A.  I don't remember the specific contracts that were
25  mentioned in the subpoenas.  I would have known it

1  at the time, but I have honestly forgotten all
2  that.
3  Q.  Paragraph 3.8 Disclosure of System Debt, do you
4  see that paragraph?
5  A.  Yes.
6  Q.  The last sentence of that paragraph, "None of the
7  written data or information furnished or made
8  available to Macomb County by Detroit as part of
9  the due diligence," do you know what material was
10  furnished to Macomb County as part of the due
11  diligence?
12  A.  No, I don't.
13  Q.  Would Mr. Shukla or anybody else who's included
14  within that category of Detroit's knowledge know
15  what documents were provided?
16  A.  Shukla was not on the negotiating team for this
17  acquisition agreement, so it would not have been
18  him.  The due diligence mostly related to the
19  finances, so that would have been Bart Foster.
20  Q.  Paragraph 5.3 of this agreement provides that
21  Detroit shall promptly inform the Macomb County
22  and MID of any claims which it becomes aware that
23  might reasonably be expected to become the
24  subject of litigation affecting the Macomb
25  system.  Did you make any disclosures to Macomb

1 County about claims or threatened claims which
2 you were aware at that point?
3 A. We had a couple of lawsuits arising out of the
4 sewer collapse which were disclosed to Macomb
5 County during the negotiations, and there is a
6 second later on about retained liabilities. There
7 were property damage lawsuits by people who owned
8 property adjacent to the sewer collapse, and one
9 of them I -- we settled both of them. One of them
10 I know we settled before this document was signed.
11 The other one was -- I don't remember if we did it
12 before or after, but Detroit -- that was the
13 lawsuit with the homeowners whose backyards were
14 at the bottom of the hole. There were about ten
15 of them. DWSD settled those. And I don't
16 remember if that was done before or after this
17 lawsuit was signed, but DWSD kept that liability
18 and paid the settlement.
19 Q. Other than those disclosures, did you make any
20 other disclosures to Macomb County in accordance
21 with this paragraph?
22 A. No, I don't recall any. No. Those were the
23 claims we were aware of, and by the time this was
24 signed, the statute of limitations for filing
25 claim -- lawsuits for tort -- statute of

1 limitations for tort lawsuits in Michigan is three
2 years, so by this time this was done, the -- well,
3 okay. The statute of limitations for those had
4 run out, if there were any others that were
5 pending out there.
6    The other thing that was out there that
7 we became aware of during this negotiation and
8 during -- which actually was discovered, I think,
9 by NTH when they did their survey of the whole
10 sewer is that back in the early 1960s when the
11 sewer was built, there were times when the tunnel
12 boring machine that was 50 feet underground
13 strayed out of the path of the easement, and there
14 were several parts -- segments of that sewer
15 system where the sewer was outside the scope of
16 the easement, which means it was a trespass. And
17 we certainly notified them of that. They got that
18 information when they had the NTH report. And
19 there was an agreement, which I think is spelled
20 out in here, in the agreement. We weren't going
21 to hold up the agreement to the contract to
22 correct all the easements. There was an agreement
23 that Macomb County would take responsibility for
24 obtaining the easements for the -- Macomb County
25 would obtain new easements for where the sewer

1 actually was, and Detroit would reimburse them for
2 that cost.
3 Q. Did you become aware of before you retired a
4 claim that was asserted by the City of Detroit
5 against the contractors and subcontractors
6 involved in 1368?
7 A. Yes.
8 Q. What do you know about that?
9 A. What I know about that is that at some point
10 somebody in the city -- and I think it was the
11 director of the Law Department, determined
12 after -- I think this was after the convictions in
13 the criminal prosecution of Mayor Kilpatrick and
14 Bobby Ferguson and Victor Mercado, that there was
15 a possibility of suing those companies for the
16 amounts that they were paying in bribes and
17 kickbacks, and my involvement in that was
18 Ms. Crittendon asked me to sit on the interviews
19 with the law firms that she was considering hiring
20 to do that work. And so I sat in on interviews
21 with about four different law firms, and
22 Ms. Crittendon made her selection. And then those
23 cases were filed, and at that point I was getting
24 ready to retire, and I wasn't much involved in the
25 cases that were filed.

1 Q. During that process did you come to learn the
2 amount that Detroit would claim was overcharged
3 on 1368 or used or paid out in the kickbacks?
4 A. No. I was just involved in interviewing the law
5 firms. I think I wrote the legal services
6 contract for Miller Canfield after Ms. Crittendon
7 selected them, but after that, I was out of it.
8 Q. What other firms were interviewed other Miller
9 Canfield?
10 A. Dykema Gossett, and there were two others and I
11 don't remember -- I think Butzel Long might have
12 been one of them, and there -- there was another
13 one, and I don't remember who it was. I seem to
14 remember interviewing four law firms.
15 Q. Did you interview Bodman?
16 A. I don't think they applied for it. That would
17 have been a real conflict of interest given their
18 representation of Macomb County. No, I don't
19 think they were on the list.
20 Q. Did you learn before your retirement that Detroit
21 had recovered in excess of -- I should say at
22 least $7 million in settlements with the
23 contractors and subcontractors they had asserted
24 those claims against?
25 A. I think those settlements came after I retired. I

1 was not involved in those cases in any way.
2 Q. The acquisition agreement, and in particular,
3 schedule 3.8 provides or has Macomb County paying
4 for the entire cost of the sinkhole repair
5 project. Would you agree with that?
6 **A. This just has a number on it which is higher than**
7 **the total price of the contract amount,**
8 **although, as I said, the contract with Inland**
9 **Waters covered more than just this work.**
10 Q. Do you understand the sinkhole repair to have
11 cost more -- total of the repairs to have been
12 more than $54 million?
13 **A. No, it's my understanding that that was the total**
14 **cost.**
15 Q. Okay. And you're unfamiliar with the settlements
16 between Detroit and the contractors and
17 subcontractors?
18 **A. I was not involved in those at all.**
19 Q. Just so we have a good record, I'm going to mark
20 this as Exhibit 7.
21 **MARKED FOR IDENTIFICATION:**
22 DEPOSITION EXHIBIT 7
23 12:53 p.m.
24 **BY MS. BADALAMENTI:**
25 Q. Is this the Letter of Intent -- did I say I

1 marked it as Exhibit 7? Is this the Letter of
2 Intent we were referring to earlier?
3 **A. This is the Letter of Intent, although this copy**
4 **is not signed.**
5 Q. But do you believe it was signed?
6 **A. My recollection is that it was, but I don't see a**
7 **signed copy here. Maybe it wasn't. My**
8 **recollection is that it was, but --**
9 Q. Section 9, Conduct of Operations, refers to in
10 several paragraphs that you were to obtain the
11 consent of the transferee to any -- in certain
12 circumstances. In particular, paragraph 9(d)
13 provides obtaining consent of the transferee to
14 any extraordinary transaction or any transaction
15 which is not at arm's length with any person or
16 entity, in either case relating to the property."
17 Did you ever obtained Macomb County's consent to
18 any extraordinary transaction or transaction not
19 at arm's length?
20 **A. I did not.**
21 Q. Who were you interviewed by at the United States
22 Attorney's Office? Who were you interviewed by?
23 **A. It was an assistant U.S. attorney and an**
24 **investigator from the Environmental Protection**
25 **Agency's Inspector General, a man and a woman. I**

1 don't remember their names.
2 Q. Did you have counsel with you?
3 **A. Yeah, Ed -- well, the interview took place in Ed**
4 **Keelean's office, and he was there.**
5 Q. Did you and Ed Keelean discuss who else had been
6 interviewed through that point?
7 **MR. FAISON:** I'm sorry, I didn't hear
8 the question.
9 **BY MS. BADALAMENTI:**
10 Q. Did you and Ed Keelean discuss who else had been
11 interviewed by these same individuals?
12 **A. No. He -- Mr. Keelean sat in on a number of**
13 **interviews with city employees with the federal**
14 **investigators, and he did not share their names**
15 **with me.**
16 **MS. BADALAMENTI:** I think I might be
17 done, but if I could just have a couple minutes.
18 **MR. FAISON:** Sure.
19 (Off the record at 12:56 p.m.)
20 (Back on the record at 12:59 p.m.)
21 **BY MS. BADALAMENTI:**
22 Q. Do you recall any of the agents that interviewed
23 you to be Carol Paszkiewicz?
24 **A. It was Paszkiewicz, yes. She was one.**
25 Q. Do you recall Mark Chutkow interviewing you from

1 the U.S. Department of Justice?
2 **A. I don't remember that name. It might have been**
3 **him. I don't remember. But I do remember**
4 **Ms. Paszkiewicz.**
5 Q. Looking for a final time at Exhibit 7, the Letter
6 of Intent, the Letter of Intent requires that you
7 promptly notify -- and I'm referring to paragraph
8 9 (e) -- that you promptly notify the transferee,
9 Macomb, of any emergency or other change in the
10 normal course relating to the property. Did you
11 notify Macomb about any change in the normal
12 course of 1368?
13 **A. This is long after 1368. This is after the work**
14 **on 1368 was done, so this doesn't cover that.**
15 Q. So did you notify Macomb that there had been a
16 change in the normal course as to 1368?
17 **MR. FAISON:** Just a minute. Is the
18 question whether he did within the period of the
19 due diligence?
20 **MS. BADALAMENTI:** Sure.
21 **BY MS. BADALAMENTI:**
22 Q. In the period of due diligence, did you notify
23 Macomb that there had been a change in the way
24 that Amendment 2 to 1368 was awarded or anything
25 else about the normal course of --

1 A.   No, because that contract had been closed out by
2 the time this was executed.  This doesn't cover
3 anything under that.  This deals with events going
4 from the date it was executed going forward.  So
5 that wouldn't cover anything under 1368 because
6 that contract had already been completed and
7 closed out.
8 Q.   Did you have a discussion with Mark Jacobs or
9 anybody else about crafting the language in a way
10 that would only relate to things going forward as
11 opposed to things going back?
12 A.   This -- this language was worked out by myself,
13 Mark Jacobs, Craig Hupp and Joe Colaianne.  This
14 is not just my language.  This was a collaborative
15 effort by Macomb County's lawyers and Oakland
16 County's lawyers.
17 Q.   Did you walk through the terms of the acquisition
18 agreement with Mark Jacobs before it was executed
19 by Mr. Latimer?
20 A.   Yes.  Mark and I were both in the negotiation
21 team.
22 Q.   And you knew that the document would contain the
23 definition of Detroit's knowledge, and that would
24 include you?
25 A.   Yes.

1 Q.   With respect to the Letter of Intent, my last
2 question, is respect to paragraph 9(f).  It
3 indicates that you will in the due diligence
4 period promptly notify the transferee, Macomb, of
5 any governmental, regulatory or third party
6 complaints, claims, investigations or hearings.
7 Other than what you've told me about, did you
8 notify Macomb about any complaints, claims,
9 investigations or hearings?
10 A.   No.
11      MS. BADALAMENTI: That's it.
12      THE WITNESS: Thank you.
13      MR. FAISON: Thank you.
14      (The deposition was concluded at 1:02 p.m.
15 Signature of the witness was not requested by
16 counsel for the respective parties hereto.)
17
18
19
20
21
22
23
24
25

1              CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN    )
3                      ) SS
4 COUNTY OF MACOMB     )
5
6        I, MELINDA S. MOORE, certify that this
7 deposition was taken before me on the date
8 hereinbefore set forth; that the foregoing
9 questions and answers were recorded by me
10 stenographically and reduced to computer
11 transcription; that this is a true, full and
12 correct transcript of my stenographic notes so
13 taken; and that I am not related to, nor of
14 counsel to, either party nor interested in the
15 event of this cause.
16
17
18
19
20
21
22      MELINDA S. MOORE, CSR-2258
23         Notary Public,
24       Macomb County, Michigan
25 My Commission expires:  September 6, 2016

13-53846-tjt    Doc 6093-7    Filed 07/16/14    Entered 07/16/14 22:08:58    Page 27 of 27