# In The Matter Of:

*City of Detroit*

---

*Darryl Latimer*

*July 11, 2014*

---



**BIENENSTOCK**

NATIONWIDE COURT REPORTING & VIDEO

www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**

Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File LATIMER_DARRYL.txt*

*Min-U-Script® with Word Index*

Page 1

```
 1          UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4  _____
 5
 6  In re:              )    Case No. 13-53845
 7  CITY OF DETROIT, MICHIGAN )
 8                      )      Chapter 9
 9      Debtor          )
10  _____)  Hon. Steven W. Rhodes
11
12
13       The Deposition of DARRYL A. LATIMER,
14       Taken at 150 W. Jefferson, Suite 2500,
15       Detroit, Michigan,
16       Commencing at 1:15 p.m.,
17       Friday, July 11, 2014,
18       Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2
 3  RAECHEL M. BADALAMENTI (P64361)
 4  SCOTT SIERZENGA (P77633)
 5  Kirk, Huth, Lange & Badalamenti, PLC
 6  19500 Hall Road
 7  Suite 100
 8  Clinton Township, Michigan 48038
 9  586.412.4900
10  rbadalamenti@khlblaw.com
11  ssierzenga@khlblaw.com
12      Appearing on behalf of the Macomb Interceptor
13       Drain Drainage District.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  ALBERT B. ADDIS (P31084)
 2  KEITH C. JABLONSKI (P62111)
 3  THOMAS D. ESORDI (P45428)
 4  O'Reilly Rancilio PC
 5  12900 Hall Road
 6  Suite 350
 7  Sterling Heights, Michigan, 48313
 8  586.726.1000
 9  aaddis@orlaw.com
10  kjablonski@orlaw.com
11  sesordi@orlaw.com
12      Appearing on behalf of the Macomb Interceptor
13       Drain Drainage District.
14
15  JEROME R. WATSON (P27082)
16  M. MISBAH SHAHID (P73450)
17  Miller Canfield Paddock & Stone, PLC
18  150 W. Jefferson Avenue
19  Suite 2500
20  Detroit, Michigan 48226
21  313.963.6420
22  watson@millercanfield.com
23  shahid@millercanfield.com
24      Appearing on behalf of the City of
25       Detroit and the Witness.
```

Page 4

```
 1  ARTHUR H. RUEGGER
 2  JOSEPH SELBY
 3  Salans FMC SNR Denton
 4  1221 Avenue of the Americas
 5  New York, New York 10020
 6  212.768.6881
 7  arthur.ruegger@dentons.com
 8  joseph.selby@dentons.com
 9      Appearing on behalf of the
10       Official Committee of Retirees
11       of the City of Detroit.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

TABLE OF CONTENTS

WITNESS                                              PAGE

DARRYL A. LATIMER

    EXAMINATION BY MR. ADDIS                           6

EXHIBIT                                              PAGE

    (Exhibits attached to transcript.)

    DEPOSITION EXHIBIT 8                                44

    DEPOSITION EXHIBIT 9                                54

    DEPOSITION EXHIBIT 10                               62

Page 6

1 Detroit, Michigan
2 Friday, July 11, 2014
3   1:15 p.m.
4     DARRYL A. LATIMER,
5 was thereupon called as a witness herein, and
6 after having first been duly sworn to testify to
7 the truth, the whole truth and nothing but the
8 truth, was examined and testified as follows:
9     **EXAMINATION**
10    **BY MR. ADDIS:**
11 Q.  Sir, will you state your full name, please, for
12   the record.
13 **A.  Darryl Andrew Latimer.**
14 Q.  Mr. Latimer, my name is Al Addis.  We just met a
15   few minutes ago.  I'm going to be asking you a
16   series of questions about your interactions with
17   the Detroit Water and Sewerage Department and
18   maybe some ancillary subjects along with that.
19     Have you given a deposition before?
20 **A.  Yes.**
21 Q.  And I know that you've testified in court before?
22 **A.  Yes.**
23 Q.  In fact, my guess would be you're getting pretty
24   tired of it.
25 **A.  Yes.**

Page 7

1 Q.  But, therefore, you know the rules?
2 **A.  Yes.**
3 Q.  And the rules are this young lady is taking down
4   everything that you say, so you and I are going
5   to have to try and not speak over each other.
6   I'm bad at that, and I'll try.  When I get caught
7   -- I'm sure counsel will tell me, okay?  Also all
8   your questions (sic) have got to be in an oral,
9   verbal fashion so that she can take it down.  We
10   all have a tendency to say uh-huh and things like
11   that.  That causes a problem for her and for a
12   clean record.  Is that understood?
13 **A.  Yes.**
14 Q.  Okay.  If at any time I ask you a question that
15   you don't understand, please convey that to me.
16   And I'll do my best to rephrase.  I'm not here to
17   trick you or to mislead you.  But if you answer a
18   question without telling me you didn't understand
19   it, it's going to be in that regard forever as
20   the truth.  Is that understood?
21 **A.  Yes.**
22 Q.  Okay.  Where are you currently employed?
23 **A.  City of Detroit Water and Sewerage Department.**
24 Q.  What are you doing there now presently?
25 **A.  I'm the deputy director/chief customer service**

Page 8

1   **officer.**
2 Q.  Okay.  And as deputy director, what are your job
3   functions briefly?
4 **A.  Just to assist in the director's absence.  I**
5   **assist with running the operations.**
6 Q.  Can you talk just a little bit about your
7   background -- your educational background.
8 **A.  I have a bachelor's from Wayne State in general**
9   **studies, master's degree from Central Michigan in**
10   **general administration.**
11 Q.  How long have you worked for the City of Detroit
12   in any capacity?
13 **A.  Little over 28 years.**
14 Q.  Sir, can you take me through your history of
15   positions with the City of Detroit.
16 **A.  I worked in the Recreation Department as a play**
17   **leader.  I left the Recreation Department, entered**
18   **the City of Detroit Water and Sewerage Department**
19   **as a messenger.  Then I became personnel payroll**
20   **clerk.  I'm trying to remember these titles.**
21 Q.  Okay.
22 **A.  I want to say senior clerk, because I worked in**
23   **the commercial division, but I'm not for sure if**
24   **that was the actual title.  I left the commercial**
25   **division and moved into contracts and grants as an**

1  analyst.  After leaving contracts and grants, I
2  became deputy director in 2003.
3  Q.  There was a period of time, was there not, where
4  you were the actual interim director of the
5  Detroit Water and Sewerage Department; isn't that
6  correct?
7  A.  No.
8  Q.  You were never the interim director?
9  A.  I was never named interim director.
10 Q.  Was there a time when you were in charge of the
11 Detroit Water and Sewerage Department?
12 A.  I was acting as the representative for the
13 department because at the time the director had
14 retired.
15 Q.  Okay.  After Victor Mercado left his position,
16 someone else took over; is that correct?
17 A.  Yes.
18 Q.  And then after that person left, is that when you
19 became the -- what you called acting director?
20 A.  I became the deputy director in February of 2010.
21 The director at the time left the department that
22 same year, somewhere around July 1st.
23 Q.  When you were the acting director, what did you
24 understand your duties to be?
25 A.  My duties still consisted of being a deputy

1  director, and I executed the same duties as the
2  deputy director, but in the absence of the
3  director, I performed some of the duties with
4  regards to representing the department.
5  Q.  Was there another director above you --
6  A.  No.
7  Q.  -- at that time?
8  A.  No.
9  Q.  Okay.  So were you the person of ultimate
10 executive authority within the Water Department
11 during that time that you refer to yourself as
12 acting director?
13 A.  Part of that time.
14 Q.  Okay.  What part of the time was that?
15 A.  I can't remember the exact dates, but the City of
16 Detroit appointed a COO, and at that time, I
17 started reporting to the COO, and that person was
18 responsible for the department.
19 Q.  Okay.  I'm going to show your counsel first a
20 transcript of -- this may just be a matter of
21 wording, okay?  I'm going to show your counsel a
22 transcript of your trial testimony from
23 November 27, 2012, at page 70, right at the top.
24     MR. WATSON:  Okay.  Do you want to ask
25 him about that?

1     MR. ADDIS:  Yeah, if you could show it
2  to him.
3     BY MR. ADDIS:
4  Q.  Read that to yourself.
5  A.  Yes.  That's just wording, because I was never
6  officially appointed interim director.
7  Q.  Okay.
8  A.  I was just deemed that because of being the last
9  executive at the highest level.
10 Q.  All right.  So you were the last executive at the
11 highest level?
12 A.  Correct.
13 Q.  Just so the record's clear, the question at line
14 2 of the trial transcript of November 27th of
15 People vs. Kilpatrick, et al.  -- I'm sorry,
16 United States vs. Kilpatrick, et al., the
17 question was:
18    "Q.  Was there a period of time where
19 you were the interim director for the Water
20 Department?"
21    And the answer was:
22    "A.  Yes, during the period of 2010
23 there -- August 2010 through August 2011."
24 Q.  What you're telling me today, if I get it right,
25 is that no one ever gave you that particular

1  title?
2  A.  Correct.
3  Q.  Okay.  But you were the last guy standing at the
4  top of the administrative list there for a while;
5  is that correct?
6  A.  Correct.
7  Q.  All right.  Sir, I'm going to show you what has
8  previously been marked, I believe, Exhibit 5.
9     MR. JABLONSKI:  6.
10    BY MR. ADDIS:
11 Q.  6, excuse me, the acquisition agreement.  Are you
12 familiar with this document?
13 A.  Yes.
14 Q.  Okay.  Let me ask a general question which can
15 also lead to more precise questions to follow.
16    What part, if any, did you have in the
17 negotiations of this acquisition agreement?
18 A.  Literally none.  I came at the tail end of the
19 agreement.  As I stated earlier, the director left
20 sometime around beginning of July.  This
21 document -- and this agreement was pretty much at
22 the end of its progression, and I came in
23 basically at the end in terms of representing the
24 department.
25 Q.  This document, I'm going to represent to you --

1  and counsel can correct me if I'm wrong -- was
2  executed on September 2, 2010, okay?  And I'm
3  going to refer you to page 25 of 25.
4  A.  Okay.
5  Q.  All right.  And, sir, your signature is attached
6  thereof, is it not?
7  A.  Correct.
8  Q.  And you signed on behalf of the -- I'm sorry, the
9  City of Detroit?
10 A.  Yes.
11 Q.  Okay.  And did you understand that you had the
12 authority to sign for the City of Detroit at that
13 time?
14 A.  Yes.  I was told that by our lawyers.
15 Q.  Okay.  And that would include Mr. Jacobs?
16 A.  Yes.
17 Q.  Okay.  Now, we know that things surrounding this
18 case have had a long torturous history, including
19 a trial.  Do you recall, sir, when or if you were
20 ever contacted by the U.S. attorney's office or
21 the FBI or the Office of Inspector General
22 regarding an investigation of the bid process in
23 Detroit?
24 A.  In general or any particular --
25 Q.  Let's start in general.

1  A.  Okay.  In general, I believe it was February 2010.
2  Q.  What happened in February 2010 of an
3  investigative nature?
4  A.  I was contacted by the FBI.
5  Q.  Do you recall who it was who contacted you?
6  A.  I believe it was Robert Beckman and Carol -- I
7  can't remember Carol's last name.
8  Q.  Paszkiewicz?
9  A.  Yeah, I think that sounds.
10 Q.  Something like that?
11 A.  Yeah.
12 Q.  And by what method did they contact you?
13 A.  They came to my house.
14 Q.  Okay.  And when they came to your house, did they
15 question you there?
16 A.  Yes.
17 Q.  Did they tell you what the nature of their
18 investigation was aimed at?
19 A.  I believe so.  I don't know exactly the wording
20 that they used, but they talked about the
21 investigation of the Kilpatrick administration.
22 Q.  At that time did they mention the bid process for
23 contracts with DWSD?
24 A.  They may have.  They started off showing me a lot
25 of text messages, and asking me -- asking me the

1  question of what certain things mean that were
2  said in those text messages and what were they
3  referring to; so a lot of questions really
4  centered around that.
5  Q.  They started by showing you text messages from
6  who to whom?
7  A.  Variety of people.  There was text messages, I
8  believe, that had Bobby Ferguson, Bernard
9  Kilpatrick, Victor Mercado, and could have been
10 others, but those are the names that come to mind.
11 Q.  Did they bring to your attention any of your own
12 text messages?
13 A.  No.
14 Q.  So they were asking you to comment on other
15 people's text messages; is that accurate?
16 A.  Correct.
17 Q.  Did they explain to you or did they proceed on
18 the presumption that you knew these people well?
19 A.  No.  They were asking because there were certain
20 things that were said relative to certain
21 documents, and they were trying to understand what
22 did they mean by some of the things that were
23 said.
24 Q.  Do you recall what those documents were?
25 A.  Those documents were documents that were generated

1  by the City of Detroit's Human Rights Department,
2  and they were certifications for local economic
3  development.
4  Q.  Would it be fair to say that beginning in
5  February 2010, from that time on you had more
6  meetings with people from the FBI or the U.S.
7  Attorney's Office?
8  A.  Yes.
9  Q.  Do you know how many meetings in total you had
10 with them?
11 A.  No.  There was multiple meetings because I also
12 had later on some meetings with the prosecutors --
13 federal prosecutors.
14 Q.  Okay.  Mr. Chutko?
15 A.  Yes.
16 Q.  In February of 2010, at that first meeting, did
17 the -- did any of the people questioning you ask
18 you about DWSD?
19 A.  They may have.  I can't remember any specifics.
20 Q.  Okay.  You're not sure whether they did or
21 didn't, but they could have?
22 A.  Correct.
23 Q.  Okay.  Do you remember them by any chance
24 mentioning the 15 Mile Road sinkhole project?
25 A.  I don't recall.

1 Q. You don't recall one way or another?

2 A. In the first meeting you're speaking of?

3 Q. Yes.

4 A. I don't recall.

5 Q. At some point in time were you asked about DWSD
6 contracts?

7 A. Yes.

8 Q. Okay. Do you recall when you were first asked by
9 law enforcement about DWSD contracts?

10 A. They may have asked me in that first meeting, but
11 not any specifics, more about processes.

12 Q. Okay. And you would be familiar with those
13 processes because you used to do a lot of the
14 bidding work, correct?

15 A. Correct.

16 Q. Okay. And we'll get to that in a minute. At
17 some -- do you have in your mind -- can you give
18 me a breakdown of the different times that you
19 met with -- let's just say, between February of
20 2010 and the end of 2010, how many times you
21 responded to questions from law enforcement?

22 A. It could have been five to six times. Some of the
23 documentation that was an issue in the meeting
24 they had with me, I sent them some documentation
25 and I referred them at the time to contracts and

1 grants because a lot of what they were asking was
2 in files, so I referred them to contracts and
3 grants, and they spent a great deal of time there
4 looking through files.

5 Q. What documentation did you provide to them?

6 A. There was a letter that came from Human Rights
7 about a certification for a particular company --
8 company I can't think of offhand. And I just told
9 them that we had a certification document, and I
10 sent it to them.

11 Q. And then you referred them to another division of
12 government, so to speak, for whatever else they
13 wanted, correct?

14 A. Still within the Water Department, but it was
15 contracts and grants, where that -- that housed
16 all the documents associated with some of the
17 questions they were asking me with regard to local
18 economic development.

19 Q. Okay. And as part of those documents, were they
20 requesting -- were they looking for bid
21 documents?

22 A. They were looking for a combination of everything.
23 They were just looking through all the files.

24 Q. And everything would include bid documents,
25 correct?

1 A. Yes.

2 Q. And you were aware of that by the time they
3 started to ask you these questions, correct?

4 A. Yes.

5 Q. Did there ever come a time where they asked you
6 specifically about any contract?

7 A. They asked me some questions about some specific
8 contracts.

9 Q. Okay. Did they ask you about Contract CS-1368?

10 A. They may have and I don't recall.

11 Q. Okay. And do you recall what Contract 1368 was?

12 A. I believe it's the sewer lining contract.

13 Q. Okay. Did they ever interview you about the
14 sinkhole project that was part -- became part of
15 CS-1368?

16 A. I don't recall. I don't believe so, but I don't
17 recall.

18 Q. Okay. You signed this acquisition agreement on
19 September 2nd of 2010, and were you told you had
20 the authority do it; is that correct?

21 A. Correct.

22 Q. Before you signed it, did you go through the
23 contract?

24 A. In its entirety, no. I relied on legal counsel.

25 Q. Okay. And you relied on legal counsel to tell

1 you that the contract was appropriate for your
2 signature?

3 A. Yes.

4 Q. Did he give you a general explanation of what the
5 contract was?

6 A. For the most part.

7 Q. Okay. During those conversations with counsel,
8 did you ever mention to him that you had been
9 questioned by federal authorities regarding DWSD
10 practices?

11 A. At some point our attorneys knew that I was being
12 questioned.

13 Q. Okay. When you say "our attorneys," who was
14 that?

15 A. Bob Walter, Ed Keelean. And I don't know if I
16 told Mark Jacobs. I may have. I can't remember.

17 Q. Is it fair to say, sir, at the time you signed
18 this document -- and, again, I'm referring to the
19 acquisition agreement -- that at least some of
20 the lawyers representing DWSD or the City of
21 Detroit at that time were aware that the
22 investigation was ongoing regarding DWSD
23 practices?

24    MR. WATSON: Object to foundation. The
25 witness can answer, if he knows.

1      THE WITNESS: I'm not aware if they
2  knew the details.
3      BY MR. ADDIS:
4  Q.  I didn't ask that.  I think you just testified
5  previously that you -- that Mr. Keelean was aware
6  and Mr. Walters was aware.  You're not sure if
7  Mr. Jacobs; is that correct?
8  A.  Correct.
9  Q.  Okay.  As of the time you signed this document,
10  correct?
11  A.  Correct.
12  Q.  Did Mr. -- did any lawyer suggest to you that you
13  had any duties to tell anybody about that
14  investigation if you signed that document?
15  A.  Not that -- not that I recall.
16  Q.  Okay.  Now, you mentioned that you did come in at
17  the end of this process?
18  A.  Correct.
19  Q.  And that was after Mr. Mercado left, correct?
20  A.  No, it was after Pam Turner left.
21  Q.  After both of them left?
22  A.  Yeah.
23  Q.  All right.  Do you know why Mr. Mercado left?
24  A.  From my understanding, he took another job.
25  Q.  Okay.  And do you know why Pam left?

1  A.  She had mentioned to me at the time that she asked
2  me to be the deputy director that she was -- she
3  was planning to leave before the year was out, so
4  she did mention that to me.
5  Q.  Okay.  Prior to September 2nd of 2010, did you
6  become aware of any other employees of DWSD that
7  were being questioned by law enforcement?
8  A.  Prior to 2010?
9  Q.  Prior to September 2nd of 2010.
10  A.  I'm not for sure.  Not for sure.
11  Q.  If you're not for sure, sometimes it could mean
12  maybe, maybe not.
13  A.  Maybe, maybe not.  I'm not for sure.
14  Q.  For those maybes, who would those be?
15  A.  I don't know.  I mean, I'm not for sure, because
16  when I started to get questioned, the first time I
17  was questioned, I let the director know that I had
18  been questioned at the time.  So maybe in a
19  conversation she may have told me that others may
20  have been questioned, but maybe not given me any
21  names.
22  Q.  Which director was that?
23  A.  Pam Turner.
24  Q.  Okay.  Are you familiar with Ramesh Shukla?
25  A.  Yes.

1  Q.  Okay.  And Mr. Shukla works for the DWSD or did
2  in 2010?
3  A.  Yes.
4  Q.  Okay.  Does he still work there?
5  A.  No.
6  Q.  Okay.  Did you ever become aware of him being
7  subpoenaed -- did he ever make you aware of being
8  subpoenaed to the grand jury?
9  A.  No.
10  Q.  On June 30th of 2010 what was Mr. Shukla's
11  position, if you recall?
12  A.  Assistant director of engineering.
13  Q.  And as assistant director of engineering, would
14  he have answered to you as the deputy director?
15  A.  Yes.
16  Q.  And it's your testimony that he never advised you
17  that he had been subpoenaed to testify before a
18  grand jury?
19  A.  I don't recall him advising me of that.
20  Q.  Did you become aware of it through any other
21  source?
22  A.  Yes, I may have become aware of it through other
23  sources.
24  Q.  And how did you become aware of it?
25  A.  Through probably conversations maybe with other

1  staff.  It could have been our lawyers, but I'm
2  not for sure who it was.
3  Q.  And did you become aware of it in June of 2010?
4  A.  I'm not for sure when I became aware of it.
5  Q.  Were you aware of it by September 2 of 2010?
6  A.  Not for sure.
7  Q.  When you signed that document -- I'm just trying
8  to refresh your recollection -- did you know that
9  members of the -- I'm sorry, employees of DWSD
10  had appeared before grand juries?
11  A.  I'm not for sure when I --
12  Q.  It's possible, but you're not certain?
13  A.  Yeah, I'm not certain.
14      MR. WATSON: By that document, you're
15  referring to the acquisition agreement dated
16  9/2/2010?
17      MR. ADDIS: Correct.
18      BY MR. ADDIS:
19  Q.  Now, coming back to what would be my previous
20  question, as you came in at the end of these
21  negotiations, so to speak, did you ever sit at
22  the table during the negotiation process for this
23  acquisition agreement?
24  A.  Not that I recall.  I may have, but I don't recall
25  sitting at negotiations.  From what I remember, it

Page 25

1  was pretty much -- pretty much completed.
2  Q.  Did someone make you aware when you became the
3  deputy director with no other director above
4  you -- did somebody make you aware at that time
5  that this agreement was almost finished?
6  A.  Yes.
7  Q.  Did you have any knowledge of the agreement
8  before that?
9  A.  Yes, I had some knowledge of what was taking
10  place.
11  Q.  Okay.  What did you understand was taking place?
12  A.  That the department was moving forward with a sale
13  of it's OMI interceptor to Macomb and Oakland
14  County.
15  Q.  Okay.  And an OMI interceptor is what?
16  A.  It's one of three large interceptors that are --
17  that take in sewage and convey it to our plants.
18  Q.  Would I be correct in saying this negotiation for
19  an acquisition agreement between Macomb and
20  Detroit was for Macomb to buy its portion of the
21  DWSD sewer?
22  A.  Yes.  It's my understanding everything that was
23  north of 8 Mile.
24  Q.  Okay.  Were you aware at that time, sir, or at
25  any time during your position at DWSD of issues

Page 26

1  that existed between Macomb and DWSD?
2  A.  Not really.  I knew that there was a few
3  disagreements for various things that came up, but
4  I really wasn't involved in them.
5  Q.  Were you aware, for instance, with disagreements
6  over rates?
7  A.  Somewhat, yes.
8  Q.  Were you aware perhaps of disagreements or were
9  you or were you not aware of disagreements over
10  interest being paid?
11  A.  Can't recall.
12  Q.  Okay.  How about a disagreement over use of a
13  central radio band?
14  A.  The 800 megahertz?
15  Q.  Yes.
16  A.  Yes.
17  Q.  You were aware of that?
18  A.  Yes.
19  Q.  As of September 2, 2010, was Mr. Shukla an
20  engineer there?
21  A.  He may have been.  I can't remember the date that
22  he actually retired, but he may have been at that
23  time still an engineer -- assistant director over
24  engineering.
25  Q.  He was the assistant director of engineering?

Page 27

1  A.  Yes.
2  Q.  Is that correct?
3  A.  Correct.
4  Q.  Do you know whether or not that you ever had a
5  title in the DWSD known as chief of engineering?
6  A.  I believe at one time we may have had that title.
7  Q.  How long ago would that have been?
8  A.  It may have been a while ago.  Because there was
9  one title I remember that had a chief title that
10  was associated with engineering at our wastewater
11  treatment plant, so that's -- that's been some
12  years ago.
13  Q.  And that was at the wastewater treatment plant?
14  A.  Correct.
15  Q.  That wasn't in the sewage division?
16  A.  Wastewater is a part of sewage.
17  Q.  I understand.  But treatment of wastewater had a
18  chief at one time; is that what you're telling
19  me?
20  A.  There was a chief engineer that was a part of the
21  wastewater operation.
22  Q.  Who was that?
23  A.  I believe his name was Dennis Christy.  Don't
24  quote me on that.  I think that may have been his
25  name.

Page 28

1  Q.  Do you know whether he held that title in
2  September of 2010?
3  A.  I don't think that at that time he was still in
4  that title.
5  Q.  Was anybody in that title?
6  A.  I don't think so.
7  Q.  Are you familiar with a gentleman named Craig
8  Stanley?
9  A.  Yes.
10  Q.  And what was his position in September 2010?
11  A.  He was a manager with engineering -- within
12  engineering, and he was in charge of property --
13  property acquisitions, property management.
14  Q.  Sir, I want to refer you now -- let's just stay
15  on them one at a time -- to the Macomb
16  Acquisition Agreement you have in front of you.
17  I want to point to you page 2 of 25, paragraph
18  1.10.  Do you see that there?
19  A.  Yes.
20  Q.  Okay.  And it reads "'Detroit's Knowledge' shall
21  mean the actual knowledge of its Director, its
22  Assistant Corporation Counsel assigned to DWSD
23  matters, its Assistant Chief of Engineering or
24  its Engineering Support Manager Craig Stanley."
25  Do you see it there?

1 A. Yes.

2 Q. And at that time you've already testified that

3 you were the deputy director?

4 A. Correct.

5 Q. Replacing the directors who had left, correct?

6 A. Yeah, Pam Turner.

7 Q. At that time there was nobody, if I understand

8 your testimony, with the title of director,

9 correct?

10 A. Correct.

11 Q. I want to direct your attention to paragraph

12 11 -- page 11 of 25, paragraph 3.7, under

13 Litigation. Do you see what I'm referring to,

14 sir?

15 A. Yes.

16 Q. Okay. I'm going to read it for the record:

17 "Except as set forth in Schedule 3.7 hereto,

18 there is no action, suit or proceeding pending

19 or, to Detroit's knowledge, threatened against or

20 affecting Detroit before any governmental entity

21 in which there is a reasonable possibility of an

22 adverse decision which could have a material

23 adverse effect upon the ability of Detroit to

24 perform its obligations under this agreement or

25 which in any manner questions the validity of the

1 agreement." Have I read that correctly, sir?

2 A. Yes.

3 Q. Sir, at the time that you signed or -- at the

4 time that you were authorized to sign this

5 agreement and signed this agreement, isn't it

6 true that you and others had been questioned by

7 the U.S. Attorney's Office, the FBI and other law

8 enforcement regarding practices of the Detroit

9 Water and Sewer Department?

10 A. Yes.

11 Q. Okay.

12     MR. SELBY: Objection, form.

13     MR. WATSON: I'm going join in. I

14 think he said he had been questioned. He wasn't

15 sure about others. And what practices are you

16 referring to?

17     MR. ADDIS: I'm sorry?

18     MR. WATSON: What practices are you

19 talking about, the process?

20     MR. ADDIS: I'm sorry, I don't

21 understand your question?

22     MR. WATSON: You said practices -- he

23 had been questioned about practice. I wasn't

24 sure --

25     BY MR. ADDIS:

1 Q. I did say the practices of the Detroit Water and

2 Sewer Department, okay, how they conduct

3 business. You were being questioned about that,

4 were you not?

5 A. I was being questioned about contracting process.

6 Q. Okay. Were you being questioned about how

7 contracts were processed?

8 A. Yes.

9 Q. And bid out?

10 A. Yes.

11 Q. Okay. And they considered you to be

12 knowledgeable in that?

13 A. Yes.

14 Q. And did you tell the investigators that you were

15 knowledgeable in that?

16 A. No.

17 Q. Okay. But you didn't deny it, did you?

18 A. They assumed it, I guess. I didn't go looking for

19 them.

20 Q. I don't blame you.

21     Sir, are you aware of anybody in the --

22 and I know you came in at the end of the process.

23 Were you ever made aware of anybody who

24 communicated to Macomb County representatives

25 during the negotiation process of this Macomb

1 agreement that there was an investigation of the

2 Detroit Water and Sewer Department in process?

3     MR. SELBY: Objection, faulty

4 assumption.

5     BY MR. ADDIS:

6 Q. I like my question, but I've been wrong before.

7 If you can answer it, sir.

8 A. I don't know.

9 Q. I'm sorry?

10 A. I don't know.

11 Q. So you don't know of anybody who did?

12 A. I don't know if they did or didn't. I don't know.

13 Q. So if the question were are you aware of somebody

14 on behalf of Detroit who did inform Macomb County

15 officials of a federal investigation of DWSD,

16 your answer would be that you were unaware of

17 any, correct?

18 A. Yes.

19 Q. Thank you.

20     MR. SELBY: Objection.

21     BY MR. ADDIS:

22 Q. Can I direct your attention to page 14 of 25,

23 paragraph 5.3 Litigation and Claims. See that

24 there, sir?

25 A. Yes.

1 Q. And, again, for the record I'll read it and
2 counsel can correct me if I read it in error.
3 "Detroit shall promptly inform the Macomb County
4 and MID in writing of any claims of which Detroit
5 is or becomes aware that are or might reasonably
6 be expected to become the subject of litigation
7 affecting the Macomb system or the transactions
8 contemplated by this agreement." Have I read
9 that correctly, sir?
10 A. Yes.
11 Q. Okay. Did you ever in writing at any time advise
12 Macomb County of an ongoing investigation by the
13 federal government into the Detroit Water and
14 Sewer Department?
15    MR. SELBY: Objection.
16 BY MR. ADDIS:
17 Q. Lawyers just do that.
18 A. **I don't know. I could have, just like the other**
19 **question you asked me with regards to did somebody**
20 **tell -- I don't know. They could have told me. I**
21 **don't know, to be honest. I don't remember.**
22 Q. I'm not asking if they told you.
23 A. **But I'm saying, I don't remember.**
24 Q. Okay.
25 A. **I just don't remember.**

1 Q. All right. And you don't remember if anybody
2 else did either?
3 A. **Yeah, I don't remember.**
4 Q. Okay. This may seem like an obvious question,
5 but you became aware at some point in time the
6 government was going to institute litigation
7 against Detroit Water and Sewerage Department --
8 against -- I'm sorry --
9    MR. SELBY: Objection.
10    MR. ADDIS: I'm stopping.
11 BY MR. ADDIS:
12 Q. Against certain individuals regarding, amongst
13 other things, contracts of the Detroit Water and
14 Sewer Department with private contractors,
15 correct?
16    MR. SELBY: Objection.
17    MR. WATSON: Object to foundation. He
18 can answer if he can.
19    THE WITNESS: I became aware at some
20 point. When, I don't know.
21 BY MR. ADDIS:
22 Q. Okay. You became aware at some point you were
23 going to be a witness in U.S. vs. Kilpatrick,
24 correct?
25 A. At some point.

1 Q. Yeah. When was that?
2 A. **Don't remember.**
3 Q. Okay. However -- and who advised you of that?
4 A. **Probably received a subpoena or something.**
5 Q. You were subpoenaed to the grand jury?
6 A. **Yeah.**
7 Q. Were you subpoenaed more than once?
8 A. **Don't recall if I went once or twice.**
9 Q. Do you recall when you were subpoenaed to the
10 grand jury?
11 A. No.
12 Q. In the grand jury process is it fair to say that
13 you were questioned about the bid process of
14 DWSD?
15 A. Yes.
16 Q. Were you questioned, sir, about the CS-1368?
17 A. **Don't recall.**
18 Q. Did you have a lawyer representing you at that
19 time personally?
20 A. No.
21 Q. Okay. Did the City of Detroit provide you a
22 lawyer during your grand jury testimony? And I
23 know they're not allowed in the room, but were
24 you advised by a lawyer provided by the City of
25 Detroit?

1 A. **I don't remember anybody -- anyone being with me.**
2 **I was just told to go over, I mean, and that's**
3 **what I did.**
4 Q. Okay. Were you familiar with also a Contract
5 CS-1361?
6 A. **I believe so.**
7 Q. I want to refer you to Exhibit No. 2 in the pile.
8 Have you seen that document before, sir?
9 A. **Yes.**
10 Q. And this document purports to be the contract for
11 consultant services between the City of Detroit,
12 Michigan, Board of Water Commissioners, and
13 Inland Waters Pollution Control, Incorporated,
14 "Inspection and in-place rehabilitation of
15 existing circular and non-circular sewers."
16 What, if any, was your involvement in either
17 negotiation of or the awarding of this contract
18 to Inland?
19 A. **Just processing for the most part. Contracts and**
20 **grants is basically a conduit for information that**
21 **flows. Contracts and grants doesn't have any**
22 **power to do anything. It's typically everything**
23 **flows from the engineers and all the folks that**
24 **participate in either evaluating or part of**
25 **project manager. And various recommendations**

1 based on the results of that information, it's
2 forwarded from contracts and grants to the
3 director.
4 Q. Okay. So would it be fair to say -- and you
5 correct me if I'm wrong on this. I'm just trying
6 to see what your position would be. You would
7 review certain bids; is that accurate?
8 A. Well, this per se is not a bid. This is a
9 proposal. So a proposal is reviewed by an
10 evaluation team, and that team scores the
11 proposals.
12 Q. We went through that with the previous witness,
13 so I can spare you the details.
14 A. All right.
15 Q. And as to this contract, Inland was awarded the
16 contract; is that correct?
17 A. I believe so, yes.
18 Q. Okay. Did there come a time, sir, in your
19 knowledge when a previous contract, CS-1361, was
20 rolled into CS-1368?
21 A. At some point, I do recall, yeah, I believe 1361
22 would have, yeah.
23 Q. And 1361 had previously been awarded to another
24 contractor; isn't that correct?
25 A. No.

1 Q. It had not been awarded to another contractor?
2 A. Correct.
3 Q. At any time?
4 A. It had not been awarded.
5 Q. If I told it had been awarded to -- do I have it
6 right? Lakeshore? Yeah, that it had been
7 awarded to Lakeshore?
8 A. It hadn't been awarded.
9 Q. Had Lakeshore been told that they were going to
10 have CS-1361?
11 MR. WATSON: Objection, foundation.
12 The witness can answer if he can.
13 THE WITNESS: Lakeshore was recommended
14 as the highest scoring company. It was never
15 awarded.
16 BY MR. ADDIS:
17 Q. Because the final award has to come from who?
18 A. The final award has to -- basically you have to
19 have approval to move forward from the director
20 and then you have to have the city council
21 approval and -- well, the board's approval, then
22 city council approval, and that executes the
23 contract.
24 Q. And that approval had never come to Lakeshore for
25 CS-1361?

1 A. Right, as far as city council executing.
2 Q. Do you recall ever having discussions with people
3 at Lakeshore that they had been the highest
4 scoring company?
5 A. I'm quite sure maybe at some point, yes.
6 Q. Who was it at Lakeshore that you had contact
7 with?
8 A. I don't know if it was Tom Hardiman or Rachmale,
9 whatever his name is. I can't remember his name.
10 Q. Do you recall there being a time when you were
11 asked by either Mr. Mercado or Mr. Kilpatrick to
12 advise Lakeshore that CS-1361 was being cancelled
13 and rolled into 1368?
14 A. Not for sure. I'm quite sure we advised them that
15 it was cancelled -- it wasn't going to move
16 forward, but I don't know if we, you know, told
17 them, you know, that we were going to roll it into
18 1368 or not.
19 Q. Okay. And I take it that was not news that they
20 received well?
21 A. Yes.
22 Q. Okay. Isn't it true, sir, that you were
23 reluctant to pass that news on to Lakeshore?
24 A. I don't recall.
25 Q. Did you take any action, sir, or make any

1 suggestions as to how CS-1368 could continue with
2 Lakeshore?
3 A. I may have. I don't remember.
4 Q. Okay. Did you feel at that time, if you recall,
5 that it was in the best interest of DWSD to
6 continue CS-1361 with Lakeshore -- to continue
7 the process of having them approved?
8 A. I don't recall.
9 Q. When you testified at trial, sir -- and I don't
10 mean any aspersions by this -- you testified
11 truthfully, correct?
12 A. Correct.
13 Q. Okay. And that was some time ago now, was it
14 not?
15 A. Yes. Try to forget it.
16 Q. Can't go by fast enough, can it?
17 A. Yes.
18 Q. All right. Okay. And, sir, if you testified in
19 trial regarding CS-1361, would it be fair to say
20 that we could rely on that testimony as being
21 truthful?
22 A. Correct.
23 Q. During any of your questioning by law enforcement
24 authorities, whether it's by interview or by
25 grand jury, were you asked about Inland Waters?

1 A. I may have been.

2 Q. Okay. Were you asked about Anthony Soave?

3 A. Don't remember, but I may have been.

4 Q. Were you asked about Mr. Ferguson?

5 A. Yes.

6 Q. Okay. What was the nature of your relationship

7 with Mr. Ferguson during your time at DWSD, if

8 any?

9 A. No relationship other than he was a contractor

10 that did business with the City of Detroit.

11 Q. You did not have a social relationship with him?

12 A. I may have seen him in social settings, but I

13 really didn't know him that well.

14 Q. Okay. How about with Mr. Kilpatrick? Were you

15 friends with Mr. Kilpatrick?

16 A. No. Someone I date, she knew him.

17 Q. Okay. And who was that?

18 A. My girlfriend, Nicole Poyntz, P-o-y-n-t-z.

19 Q. During the course of any, again, questioning by

20 any law enforcement officials, were you asked

21 questions about the relationship between

22 Mr. Kilpatrick and Inland Waters?

23 A. Not that I remember. I could have been, but I

24 don't remember.

25 Q. How about the relationship between Mr. Kilpatrick

1 and Anthony Soave?

2 A. Not that I remember. Same thing, I could have

3 been.

4 Q. How about the use of the Soave jets or airplanes

5 by Mr. Kilpatrick?

6 A. I don't think I was asked any of that, because I

7 really didn't know Mr. Soave. I don't think I've

8 ever met him.

9 Q. Okay. During the course of the questioning by

10 law enforcement, were you ever asked about

11 possible kickbacks for the awarding of contracts?

12 A. I could have been. I don't remember.

13 Q. Okay. Again, if you testified about such things

14 in the trial, we can rely on that trial testimony

15 as truthful, can we not?

16 A. Correct.

17 Q. We can rely on it?

18 A. Correct.

19 Q. Thank you. Let's talk about the 15 Mile Road

20 sinkhole for a minute. When did you first become

21 aware of that event?

22 A. I don't recall. I may have heard someone talking

23 about it and got the full gravity of what was

24 going on with it probably from the news.

25 Q. Okay. Were you ever part of the repairs of

1 CS-1368? And let me make that a more precise

2 question because that's pretty general. What

3 involvement, if anything, did you have with the

4 process of repairing the sinkhole at 15 Mile Road

5 in Macomb County?

6 A. I didn't have any involvement with the repair of

7 the sinkhole other than documentation flow through

8 contracts and grants to be executed, and that was

9 it.

10 Q. And those documents would include the contracts

11 and the amendments?

12 A. Yes.

13 Q. Did you personally review the contracts and

14 amendments to CS-1368?

15 A. I wouldn't say that I personally. Probably me and

16 my staff probably looked at it. Probably my

17 staff.

18 Q. Who on your staff would have looked at it?

19 A. Probably either Dan Edward or Miriam Dixon. I

20 believe Dan Edwards, though.

21 Q. You said that they were on your staff. By that

22 you mean they reported to you?

23 A. Yes.

24 Q. Okay. Did you ever become aware of Daniel

25 Edwards being subpoenaed to testify before a

1 grand jury in August of 2010?

2 A. Probably.

3 Q. Okay. Did Dan Edwards ever show you a subpoena

4 that he had been testifying -- that he had been

5 called to testify before the grand jury on

6 August 4, 2010?

7 A. He may have.

8 Q. If I show you that, would it refresh your

9 recollection?

10 A. Not really. He may have sent it to me, or he may

11 have showed it to me. I don't remember.

12 Q. Okay.

13 MARKED FOR IDENTIFICATION:

14 DEPOSITION EXHIBIT 8

15 2:04 p.m.

16 MR. ADDIS: So that the record is made

17 clear, we are starting with Exhibit No. 8 because

18 we had a previous agreement during the deposition

19 of previous witness to carry on from the exhibits

20 that were shown to him which were numbered 1

21 through 7. So this deposition we will refer to

22 the first exhibit of this deposition as Exhibit

23 No. 8.

24 BY MR. ADDIS:

25 Q. Sir, I just want to show you, just in case,

1 United States District Court, subpoena for Daniel

2 Edwards, if it helps. Do you recall seeing that

3 before?

4     **MR. ADDIS:** I have another copy for

5 you, counsel.

6     **MR. WATSON:** Thank you.

7     **THE WITNESS:** I may have, but I don't

8 recall.

9     **BY MR. ADDIS:**

10 Q. Would it be fair to say you're not sure?

11 A. I'm not sure.

12 Q. And that does not refresh your recollection?

13 A. No. I saw some of those myself, so --

14 Q. I understand. That is always a fun experience.

15     Let's talk about amendments to

16 contracts. When contracts come through your

17 department, what is the process by which they

18 would normally be amended?

19 **A. It depends. These contracts had an element of**

20 **construction, so they're different than pure**

21 **consultant engineering contract. These contracts**

22 **are handled more like change orders as opposed to**

23 **amendments. And change orders typically come from**

24 **the engineers.**

25 Q. Were you aware of the amendments? Did you

1 review -- you mentioned your staff would have

2 reviewed CS-1368 and made a recommendation,

3 correct?

4 **A. No, we wouldn't review and make a recommendation.**

5 **We would just make sure appropriate boilerplate**

6 **language is a part of whatever changes.**

7 Q. You would make sure the form of the contract was

8 appropriate to what DWSD required?

9 **A. Correct.**

10 Q. Is that a fair statement?

11 **A. Correct.**

12 Q. Okay. What are the number of ways in which --

13 generally speaking, in which a company awarded a

14 contract such as Inland, a consultant service

15 contract, how would they go about getting that

16 amended.

17 **A. They can send in a letter requesting an extension**

18 **of time, because you amend for a time. You amend**

19 **for changes in the scope. You amend for changes**

20 **in the amount of the contract. So they can**

21 **actually petition for more time or more money.**

22 **But they would probably go through the project**

23 **manager because he would pretty much have to agree**

24 **that it's needed.**

25 Q. Okay. And the project manager would be who?

1 **A. I'm not for sure who the project manager was at**

2 **the time. The process is that when you look at a**

3 **contract, it says "director." It has the**

4 **director's name in there. The director designates**

5 **a contracting officer. The contracting officer is**

6 **the person that if there's a dispute, he will**

7 **represent the department in language and things**

8 **like that, if you're unable to resolve whatever**

9 **with the project manager. The contracting officer**

10 **sends a letter that has a designee on it, so you**

11 **have a director putting over his representative at**

12 **the contracting officer. The contracting officer**

13 **designates a designee, and that's the person that**

14 **works on the contract in the field.**

15 Q. Okay. Were you aware, sir, during your time at

16 DWSD -- especially your time as deputy director,

17 were you aware that Mayor Kilpatrick had special

18 administrative powers?

19 **A. Yes.**

20 Q. And do you know whether or not part of those

21 powers was that he could award or direct the

22 awarding of an emergency amendment to a contract?

23 **A. Correct.**

24 Q. Do you know whether he did that with CS-1368?

25 **A. I believe so.**

1 Q. How did you become aware of that?

2 **A. Typically you receive a letter that's signed that**

3 **states that.**

4 Q. Okay. Sir, in front of you you have an Exhibit 3

5 -- previously marked Exhibit 3. Sir, I want to

6 take your attention -- just turn over the cover

7 page and page -- it's called page 3 of 25 on the

8 top at the right-hand side. Do you see that? It

9 will be right here on the second page.

10 **A. It's not there.**

11     **MR. WATSON:** Not on Exhibit 3. Can I

12 see the first page of whatever you're looking at.

13     **BY MR. ADDIS:**

14 Q. What I'm looking for is Amendment No. 2 to

15 Contract No. CS-1368.

16 **A. I believe that's it.**

17 Q. Okay.

18 **A. But it's -- the second page is not marked the same**

19 **way as yours.**

20 Q. I see that. The copy is not at the top. Okay.

21 I just want you to flip over the top page and

22 there is -- a document that reads at the top in

23 bold print "Special Administrator of the Detroit

24 Water and Sewerage Department." That would be

25 Mayor Kilpatrick at the time, correct?

Page 49

1 A. **Correct.**

2 Q. "Order Number 2004-5," so that's an order,

3 correct?

4 A. **Correct.**

5 Q. All right. Is that the type of letter you're

6 talking about that would be sent if he wanted to

7 make an emergency change in a contract?

8 A. **Yes.**

9 Q. Okay. I want you to read the subject matter of

10 this letter, sir. And I'll read it out loud for

11 the record. "Subject: Award of

12 Emergency/Amendment (Amendment 2) to Dismiss

13 Contract No. CS-1368 with Inland Waters Pollution

14 Control, Incorporated." Do you have any idea

15 what that means to dismiss contract?

16 A. **I would have to see the other page, so that I can**

17 **make a determination.**

18 Q. Okay. We'll have someone look for that and come

19 back to it. Both pages are in there. We found

20 it in the process.

21     Let's move on.

22     MR. ADDIS: Give me Amendment No. 3,

23 then. Because it's a question about form, rather

24 than substance.

25     BY MR. ADDIS:

Page 50

1 Q. Sir, let's go to Exhibit No. 4. And now I'm

2 going to take you to -- if you flip over, the

3 title page of that is Amendment No. 3, Contract

4 No. CS-1368. I want to take you to -- again, the

5 Special Administrator for the Detroit Water and

6 Sewerage Department, Order No. 2005-7. Again,

7 this is the letter -- the type of letter you're

8 referring to that would come from Mayor

9 Kilpatrick when he wanted to make an emergency

10 change; is that correct?

11 A. **Correct.**

12 Q. All right. I want to direct you to the last

13 paragraph, where it reads "I hereby authorize

14 DWSD Director Victor Mercado to enter

15 expeditiously into an emergency amendment

16 (Amendment 3) to Contract No. CS-1368 with Inland

17 Waters Pollution Control, Incorporated for the

18 completion, the repair and restoration of the

19 Romeo Arm and related restoration of 15 Mile

20 Road. This contract complies with Ordinance

21 13-04 because it is for services that are

22 supplemental to those provided by DWSD employees.

23 This Order is issued pursuant to the powers

24 vested in me as Special Administrator of the

25 Detroit Water and Sewerage Department by Orders

Page 51

1 of the Federal District Court."

2     Sir, did I read that correctly?

3 A. **Yes.**

4 Q. Okay. Now, if I understand how this process

5 works, what we've established so far, if the

6 mayor as special administrator sees the need for

7 an emergency amendment or an amendment, he can

8 direct Victor Mercado to complete that

9 transaction, correct?

10 A. **Correct.**

11 Q. Okay. If you could turn to page 3 of that

12 contract. Looking down one, two, three -- four

13 paragraphs where it reads "Whereas, it is the

14 mutual desire of the parties hereto to amend the

15 contract to increase compensation by $23 million

16 setting a new total contract of $118 million."

17 Okay. Do you see that?

18 A. **Yes.**

19 Q. Okay. Now, it was your understanding during your

20 time at DWSD that if the mayor wished to change

21 the compensation of a contract -- of a contract

22 for services on an emergency basis, that he could

23 do so, including the amount of compensation?

24 A. **Yes.**

25 Q. All right. And could he do that without approval

Page 52

1 of anybody else?

2 A. **Yes.**

3 Q. Has anybody ever made you aware of the number of

4 times that CS-1368 was amended?

5 A. **I'm quite sure at some point I knew, but I don't**

6 **recall right now.**

7 Q. Okay. After these amendments were approved, did

8 your division, the part that you were, bids and

9 contracts and things like that -- did you guys do

10 an investigation as to the actual necessity of

11 the increase in compensation?

12 A. **No.**

13     MR. WATSON: I'll object to form.

14     BY MR. ADDIS:

15 Q. Was it your position to do so? Maybe it was

16 outside of your position. I don't want to be

17 unfair to you.

18 A. **It's not something we would look at. That's an**

19 **engineering function.**

20 Q. Okay. Are you aware on any amendment to CS-1368

21 of anybody who investigated whether or not the

22 claimed increase in compensation was necessary?

23 A. **I don't remember.**

24 Q. Okay. You don't remember anybody doing that?

25 A. **I mean, it could have. I just don't remember if**

1 somebody did or if they didn't. I don't remember.
2 Q. Okay. If someone were to do that, you said it
3 would be an engineering function. Who would that
4 be?
5 A. Could be our engineering staff; could be a
6 consultant; could be a number of folks depending.
7 Q. Have you ever seen any documentation from an
8 engineering -- from your engineering staff or a
9 consultant regarding CS-1368 confirming that an
10 increase in compensation was reasonable and
11 necessary?
12 A. May have. Can't remember. I just can't remember.
13 Q. Is that something that would go through your
14 department?
15 A. Not necessarily. We may see it, but it's not
16 something that would -- that would have to be
17 justified to us. If the director wants to move
18 forward with it, we just process what the director
19 wants, so they wouldn't have to justify to me.
20 Q. You just do the paperwork?
21 A. Right.
22 Q. Sir, do you recall there came a time that you
23 reviewed some invoices from Inland?
24 A. Probably my staff.
25 Q. Okay. And do you recall communicating to Inland

1 that you were denying them some of their
2 requested payments?
3 A. Possibly.
4 Q. And under what circumstances would you have done
5 that?
6 A. What happens is the invoice goes to the project
7 manager. Project manager determines whether or
8 not to approve the invoice in its totality or part
9 of it, and if they deny part of it, they would put
10 down that they was disallowing certain portions
11 and will state why. The only other reason that we
12 would disallow something is if it was just outside
13 the scope of service, meaning that you might have
14 a subcontractor that may not be approved to do
15 work or something like that. But we wouldn't be
16 denying work based on whether or not it was
17 performed, because we wouldn't know.
18 MARKED FOR IDENTIFICATION:
19 DEPOSITION EXHIBIT 9
20 2:20 p.m.
21 BY MR. ADDIS:
22 Q. February 2, 2005 Letter to Dennis Mr Oszust at
23 Inland Waters Pollution, purportedly signed by
24 you, Mr. Latimer. Do you see that first page?
25 A. Yes.

1 Q. Is that in deed your signature?
2 A. Yes.
3 Q. If you take time to take a look at this, would
4 this help refresh your recollection that on
5 February 2nd of 2005 you disallowed a total of
6 $186,081.31 to Inland?
7 A. Yes.
8 Q. And can you explain the reason why you disallowed
9 that?
10 A. For the most part it's basically having markup on
11 markup for the most part.
12 Q. Explain that to me. What's markup? I don't even
13 pretend to understand some of this stuff, okay?
14 A. When you have a consultant contract, it's --
15 basically there's markups associated with overhead
16 during the job, and you basically get a chance to
17 mark up your overhead for indirect costs and
18 profit and those types of things.
19 Q. Okay. And the markups are approved as part of
20 the arrangement, correct? As part of the
21 agreement?
22 A. Correct.
23 Q. And they're normally a percentage number; is that
24 correct?
25 A. Correct.

1 Q. And what you're saying here is that on
2 February 2nd of 2005, you believed that Inland
3 Waters had incorrectly claimed markups. As you
4 put it, they were claiming markups on the already
5 approved markups, correct?
6 A. Correct.
7 Q. Do you know whether or not in the future somebody
8 approved those markups on the markups?
9 A. I don't know.
10 Q. Sir, do you ever recall or do you recall ever
11 denying Inland any other invoices that they
12 provided to your department?
13 A. I don't recall. Possibly.
14 MR. WATSON: Was this document marked
15 as an exhibit?
16 MR. ADDIS: Yes, it was.
17 MR. WATSON: What is the number?
18 MR. ADDIS: No. 9.
19 BY MR. ADDIS:
20 Q. Inside that document, sir -- within that
21 document, I'd like to direct you to a letter or,
22 I guess, a memo purportedly from you to John
23 Strychar, S-t-r-y-c-h-a-r. First of all, who is
24 he? Do you remember?
25 A. He worked in accounting division.

1 Q. Okay.

2    **MR. WATSON:** Where are you looking?

3    **MR. ADDIS:** April 28, 2006. It looks

4 like this.

5    **MR. WATSON:** Okay. I've got it.

6    **BY MR. ADDIS:**

7 Q. Okay. I'll read this for the record. "Please

8 release payment of $82,594.26 to Inland Waters

9 Pollution Control Inc. for previously

10 disallowance from Invoice No. 31 on DWSD contract

11 No. CS-1368." Do you recall sending this?

12 **A. I don't recall sending it.**

13 Q. Can you tell me what would lead you to send -- to

14 release a payment that you had previously

15 disallowed as being markup on markup?

16 **A. If calculations were incorrect.**

17 Q. Do you know if that was the case in this matter?

18 **A. I don't know.**

19 Q. Do you recall anybody above you ordering you to

20 do this?

21 **A. No.**

22 Q. Is it possible?

23 **A. It's possible, but, no. Typically if somebody**

24 **does ask what disallowance of -- a release of**

25 **disallowance, they would typically put it in**

1 **writing.**

2    **MR. WATSON:** Is there something that

3 connects this document with the February 2nd

4 document?

5    **MR. ADDIS:** It refers to invoice No.

6 31. Actually it doesn't need to refer, because

7 what it basically says, it had been previously

8 disallowed from invoice No. 31, and that it was

9 now being reinstated and allowed.

10    **THE WITNESS:** That doesn't connect to

11 it.

12    **BY MR. ADDIS:**

13 Q. I'm not suggesting that it does, okay?

14 **A. Okay.**

15 Q. All right.

16    **MR. ADDIS:** Let me take about a

17 five-minute break here.

18    (Off the record at 2:28 p.m.)

19    (Back on the record at 2:43 p.m.)

20    **BY MR. ADDIS:**

21 Q. Sir, I think we're back on the record. I think I

22 asked you this and you answered it, but you never

23 visited the site yourself of the sinkhole; is

24 that correct?

25 **A. Not that I recall.**

1 Q. Okay. What procedures or guidelines were in

2 place prior to September 2010, prior to the

3 acquisition agreement, to ensure that invoices

4 were properly submitted and were for necessary

5 work? What procedures were in place then?

6    **MR. WATSON:** Object to foundation. You

7 can answer, if you can.

8    **THE WITNESS:** That's a project

9 manager's responsibility.

10    **BY MR. ADDIS:**

11 Q. And the project manager on the sinkhole was who?

12 **A. I'm not for sure. It may have been Ramesh Shukla.**

13 Q. And how often during the course of this sinkhole

14 repair project would you have and Mr. Shukla

15 communicate with each other?

16 **A. We really didn't communicate a lot, unless there**

17 **was some issue he needed to talk to me about, but,**

18 **no.**

19 Q. I showed you earlier where you had disallowed a

20 cost --

21 **A. Right.**

22 Q. -- an invoice for a rather substantial amount of

23 money, at least in my world, okay? What was the

24 process, then, if Inland wanted to say to you,

25 no, that should be allowed? Did Mr. Shukla go

1 back and talk to him?

2 **A. No, they would send in a letter, and they would**

3 **notify me, project manager, and let them know that**

4 **they don't agree with the disallowance and give a**

5 **rationale for why.**

6 Q. Okay. And then your administrative group

7 would -- your group would look at that, the

8 people under you, and see whether or not you

9 should award it or not?

10 **A. No. It depends on what the disallowance is for.**

11 **If it's something that we disallowed solely on our**

12 **own, yes, then we would look at it. If it was**

13 **something disallowed by the engineer, the engineer**

14 **would make that determination.**

15 Q. Do you have any recollection at all of Mr. Shukla

16 ever disallowing a charge made by Inland on the

17 sinkhole project?

18 **A. I don't remember.**

19 Q. Do you recall ever having a discussion with

20 Mr. Shukla about what was being disallowed?

21 **A. Not that I can remember.**

22 Q. Did Mr. Shukla ever suggest to you that he had

23 had conversations with Mr. Ferguson as to how to

24 use the process to get things allowed?

25 **A. Not that I remember.**

1 Q. Okay. I mean, when you say you don't remember,
2 is it possible that you had that conversation
3 with Mr. Shukla?
4     MR. WATSON: Object to form. He can
5 answer.
6     THE WITNESS: No, I don't recall having
7 that conversation at all.
8     BY MR. ADDIS:
9 Q. Okay. This contract eventually reached
10 $118 million, CS-1368. Does that ring a bell
11 with you?
12 A. Yes.
13 Q. Okay. Do you know how much of that $118 million
14 was disallowed when all was said and done?
15 A. No.
16 Q. If it were a large sum, would it stick in your
17 mind?
18 A. No.
19 Q. Did Mr. Shukla ever come to you and say to you
20 that I think you disallowed things that shouldn't
21 be disallowed?
22 A. No.
23 Q. Did Mr. Shukla have the power to approve to you
24 what should be paid?
25 A. Yes.

1 Q. I'm going to show you and I'll have this marked.
2 This will be No. 10.
3     MARKED FOR IDENTIFICATION:
4     DEPOSITION EXHIBIT 10
5     2:50 p.m.
6     BY MR. ADDIS:
7 Q. Mr. Latimer, this is a March 1, 2005 City of
8 Detroit Intra-Departmental Memorandum from Shukla
9 to you. And I'm going to read it as a basis for
10 setting a foundation for my series of questions
11 that will follow. "This refers to invoice No.
12 31A prepared under the above mentioned project
13 for the month of January 2005 in the amount of
14 $5,657,169.24. IWPC includes in this invoice an
15 amount of $148,559.05 that was disallowed
16 previously through invoice No. 1 to 5 by DWSD-
17 Contract & Grants Manager.
18     "Please be informed that invoice No.
19 31A in the amount of $5,657,169.24 cannot be
20 approved unless the issue of the disallowed amount
21 is resolved between IWPC and DWSD Contracts &
22 Grants. However, this invoice in the amount of
23 $5,508,610.19 is hereby approved."
24     Now, Mr. Shukla uses the term
25 "approved." He had the power to approve an

1 amount; is that correct? It would be his
2 recommendation to you to approve it?
3     MR. WATSON: I'm going to object to the
4 form of the question. The witness can go ahead
5 and answer.
6     THE WITNESS: Yes, he approved amounts.
7 It wasn't my authority to approve what was taking
8 place on the job.
9     BY MR. ADDIS:
10 Q. All right.
11 A. I disallowed an amount for my own reasons.
12 Q. So he had the power to approve certain amounts
13 that he believed were appropriate; and he was at
14 the scene, correct?
15 A. Correct.
16 Q. All right. What type of things did your division
17 have the power to disapprove?
18 A. As stated in the letter of February 2, 2005 with
19 my signature, we looked at things, if it -- if it
20 was contrary to the contract document as to what
21 was agreed to. In this case, the markups were put
22 on top of -- it should have only been put on top
23 of the work, and they were put on top of the work
24 as well as the subcontractors' markup, so that
25 would be the type of thing that we would have

1 authority to say that we could disallow.
2 Q. Let me see if I have this right. Contracts and
3 grants, your portion of DWSD, you review the
4 invoices or the requests for payment based solely
5 on whether or not it on its face conforms with
6 the terms of the contract. Is that an accurate
7 statement?
8 A. Yes.
9 Q. Is it then true that it's the project engineer,
10 or in case CS-1368, Mr. Shukla, who makes the
11 determination and approves the actual necessity
12 and reasonableness of the work?
13 A. Correct.
14 Q. Did there ever come a time where Mr. Shukla
15 engaged you in a conversation where he thought
16 your reading of the contract and disallowance was
17 wrong?
18 A. Not that I'm aware of.
19 Q. Well, I mean, if he talked to you, you would be
20 aware of it. Are you saying you don't remember
21 any such conversation?
22 A. I don't remember such a conversation.
23 Q. Sir, I want to take you back to Amendment No. 2,
24 which is Exhibit No. 3. And I don't know if on
25 your copy these numbers are up in the corner that

1  are all on mine, but it's very near the back, within
2  three or four pages of the end of the document,
3  April 4, 2005. Okay. This is a letter to
4  Mr. Robert L. Williams; president of Inland
5  Waters from Victor Mercado. And it's regarding a
6  costing supplement for Amendment No. 2 to DWSD
7  Contract No. CS-1368. And then it goes on to
8  refer to the 15 Mile Road and Hayes sewer repair,
9  inspection and in-place rehabilitation, et
10 cetera, et cetera. Do you see that, sir?
11 A. Yes.
12 Q. Okay. And for purposes of the record, I'll read
13 that. "The Detroit Water and Sewerage Department
14 has established guidelines for payment of
15 contracts paid on an actual cost plus fee basis.
16 These guidelines govern allowable cost, markup
17 percentages and the type of documentation
18 required to substantiate charges. Please be
19 advised that all invoices submitted must contain
20 the required documentation. The markup rates
21 included in the supplement were established
22 through negotiations with DWSD and will be
23 effective on work performed beginning December 3,
24 2004." Do you see that, sir?
25 A. Yes.

1  Q. "The other cost guidelines contained in the
2  attached 'Costing Supplement' will govern all
3  work performed on the contract from its inception
4  until final completion. This supplement has been
5  added to Amendment No. 2 of Contract No. CS-1368,
6  Contract Costing, Exhibit B-2.
7     "DWSD has retained $597,945.95 of
8  invoice cost. The retained amount will be
9  released when the project is 95% complete, as
10 determined by the department."
11    And then it goes on to thank you for
12 your attention and tells people that if they have
13 questions to contact you, correct?
14 A. Correct.
15 Q. Sir, is this negotiated costing supplement --
16 does this effectively get around or avoid what
17 you disallowed previously?
18 A. No.
19 Q. Okay. It would seem to me that it goes backwards
20 to December 3rd of 2004 and says that they've
21 amended the markups with the costing supplement.
22 Wouldn't that change your review of those?
23 A. No. From my understanding, it was changing a
24 contract that was based on having unit pricing to
25 a cost plus fees.

1  Q. Okay. So they changed the contract -- the way
2  the payment was being made?
3  A. Yes.
4  Q. Okay. Did that change, then, your future reviews
5  of what was being presented to you?
6  A. No. No. You view it according to whatever was in
7     place.
8  Q. I want you to return to a page before that to
9  September 20th of 2004: This is from Inland
10 Waters, "Attention: Mr. Dennis Oszust." And it
11 is from Mr. Shukla. Do you see that document
12 there, sir?
13 A. Yes.
14 Q. Okay. And it's called DWSD Contract No. CS-1368
15 Task Number ER 37 Repair of Eleven Foot Sewer at
16 Hayes and 15 Mile. "The Detroit Water and
17 Sewerage Department confirms that the following
18 rate will be used for monthly invoices for this
19 task." Have you seen this before, sir?
20 A. I may have.
21 Q. Would you take a minute and look that over and
22 explain to me what effect this would have on your
23 ability to review the invoices that would be
24 submitted. Basically my question is this: Does
25 this change the rules again?

1  A. No, it basically speaks to the same thing the
2     letter speaks to. The original contract was for
3     unit pricing. Now you're going into cost plus
4     fees.
5  Q. It goes on to allow a profit on overhead,
6     correct? Under section 2, 1 dash -- looks like
7     1-2, Overtime. "Allowed profit on 1.5 times the
8     direct labor or 2 times direct labor. Allowed
9     profit on overhead."
10 A. Yes.
11 Q. That's changed from the original compensation
12    package, correct?
13 A. The original contract dealt with unit prices, and
14    these may have already been baked in the unit
15    prices.
16 Q. Okay. Now I'm confused. If they were already in
17    the unit prices, why is Mr. Shukla sending out
18    this document to Inland?
19 A. Because you're doing different work now.
20 Q. This refers to the 11-foot sewer. Are you
21    telling me that's different type of work than
22    what was contemplated in Amendment 2 to CS-1368?
23 A. It is still sewer work. All of it is sewer work,
24    but you're dealing with interceptor as opposed to
25    smaller lines, which we had unit pricing for. I

1  don't believe we had unit pricing for interceptor.
2  Q.  Okay.  I want to go back to where we started our
3  questioning earlier today, and that's with the
4  acquisition agreement, sir.  During the --
5  Mr. Jacobs told you you had the authority to sign
6  the agreement; is that correct?
7  A.  Either him or Bob Walters.
8  Q.  Or who?
9  A.  Bob Walters.
10  Q.  Okay.  Did either he or Bob Walters take you
11  through the agreement?
12  A.  Not in every detail, but for the most part, a
13  quick review of what was entailed in the
14  agreement.
15  Q.  During the course of that conversation did you
16  tell either Mr. Walters or Mr. Jacobs that you
17  had been questioned by the U.S. Attorney's Office
18  regarding practices of the Detroit Water and
19  Sewer Department?
20  MR. SELBY:  Objection to form.
21  BY MR. ADDIS:
22  Q.  He gets to do that.
23  A.  I don't know if when, because initially during all
24  that questioning, you were being questioned under
25  confidentiality, and you were told not to inform

1  anyone of that questioning, so I don't know --
2  Q.  Who informed you of that?
3  A.  The FBI.
4  Q.  Did you ever ask your personal lawyer or city
5  lawyer whether or not you were required to follow
6  that advice?
7  A.  I don't recall.
8  Q.  Let me take you back to that agreement.  At the
9  time you signed the acquisition agreement, sir,
10  you were aware Macomb County was purchasing its
11  portion of the DWSD sewage system, correct?
12  A.  Correct.
13  Q.  And I think I asked you this, but I want to be
14  sure.  Did you ever -- did either Mr. Jacobs or
15  Mr. Walters take you through what the duties were
16  that you would have or that others would have of
17  advising Macomb County of possible litigation?
18  A.  I'm not for sure.  As I answered before, I went
19  through -- came on the tail end, and I can't say
20  exactly what exactly was told to me in detail with
21  the agreement.
22  Q.  Did Mr. Walters ever tell you that he was aware
23  an investigation was going on?
24  A.  I can't remember.  He may have.  I don't remember.
25  Q.  How about Mr. Jacob?

1  A.  Can't remember.
2  Q.  He may have?
3  A.  May have, but I can't remember him telling me
4  that.
5  Q.  Was it ever reported to you that Mr. Shukla was
6  working with Mr. Ferguson to attempt to get paid
7  for work he didn't do?
8  A.  No.
9  Q.  No one ever suggested that to you?
10  A.  No.
11  Q.  Did the FBI ever ask you about that or the U.S.
12  Attorney's Office?
13  A.  Not that I remember.
14  Q.  Were you questioned during -- along those lines
15  in the grand jury testimony?
16  A.  Don't remember.
17  Q.  If it turns out that you were, can I properly
18  assume that your answers were truthful?
19  A.  Yes.
20  Q.  How many times did you meet with either Mr. Jacob
21  or Mr. Walters regarding this agreement before
22  you signed it?
23  A.  I don't know.
24  Q.  More than once?
25  A.  Maybe.  I honestly don't remember.

1  Q.  Correct me if I'm wrong, but -- how long had you
2  been with DWSD?
3  A.  At that time or now?
4  Q.  At that time.
5  A.  At that time, probably about 20, 21 years.
6  Q.  And in that period of time had you ever become
7  aware of DWSD selling a portion of its sewerage
8  system to an adjoining county?
9  A.  Not that I remember.
10  Q.  So at least in your mind this was a first?
11  A.  Not necessarily.  I wouldn't have been involved in
12  those types of transactions.
13  Q.  At least in your mind you had never heard of it?
14  A.  First time I have been involved in something like
15  that.
16  Q.  Would it be fair to say, sir, at least you were
17  made aware this was, for lack of a better term, a
18  pretty big deal?
19  A.  For the most part, yes.
20  Q.  Did either of those attorneys tell you to sit
21  down and read this document before you attach
22  your signature to it?
23  A.  I don't remember.
24  Q.  Would you remember sitting down and reading it?
25  A.  I remember sitting down at the time I signed the

1 **document, but I don't remember reading it in its**
2 **totality. I relied on general counsel.**
3 Q. Your testimony is that this document was signed
4 by you on the reliance of counsel that it was an
5 appropriate document to sign?
6 A. **Correct.**
7 Q. And that you had the authority to sign it?
8 A. **Correct.**
9 Q. Were you involved in the negotiations of any
10 settlements of any ancillary matters? We talked
11 about this earlier, the 800 megahertz system.
12 Were you involved in any of those negotiations?
13 A. **No.**
14 Q. The bond percentage rates?
15 A. **No.**
16 MR. WATSON: I'm going to object to
17 form and to the word "involve." I'm not sure what
18 you mean by that.
19 BY MR. ADDIS:
20 Q. Did you take part in? Did you sit down with
21 people from Macomb and talk about it?
22 A. **No.**
23 Q. Okay. Have you ever met Mr. Marrocco?
24 A. **Yes.**
25 Q. Have you ever met Mr. Misterovich?

1 A. **Yes.**
2 Q. Did you have any conversations with
3 Mr. Misterovich regarding the acquisition
4 agreement before you signed it?
5 A. **Don't remember if it took place in that meeting,**
6 **that we signed it or not. I do not remember.**
7 Q. Okay. Now, we're going to go to the meeting
8 where it's signed. Everyone is there at once,
9 correct?
10 A. **Correct.**
11 Q. Who do you remember being there?
12 A. **Lawyers, Mr. Misterovich. That's pretty much --**
13 **just lawyers.**
14 Q. Was Mr. Hupp there?
15 A. **I believe so.**
16 Q. And Mr. Jacob? Is it Jacob or Jacobs?
17 A. **Jacobs.**
18 Q. Mr. Jacobs, was he there?
19 A. **Yes.**
20 Q. Was Mr. Walters there?
21 A. **Yes.**
22 Q. Anybody else from DWSD there --
23 A. **Don't remember.**
24 Q. -- other than you?
25 A. **I don't remember.**

1 Q. Okay. Anybody from another county there?
2 A. **Don't remember.**
3 Q. All right.
4 MR. WATSON: By "other," you mean other
5 than Detroit?
6 MR. ADDIS: Other than Macomb.
7 THE WITNESS: I don't remember.
8 BY MR. ADDIS:
9 Q. Okay. I'm going to ask this question, and I know
10 I've asked a similar one, but I'm going to try to
11 get it and then we'll pretty well be done, okay?
12 How often, to your knowledge, was
13 Mr. Shukla at the sinkhole site?
14 MR. WATSON: I'm going to object to
15 foundation. The witness can answer.
16 BY MR. ADDIS:
17 Q. If you know.
18 A. **I would just be speculating because I wasn't out**
19 **there. I would say every day almost -- every**
20 **working day.**
21 Q. Okay. And was it his practice to come to you and
22 to report to you what was going on every day, or
23 was that not in your purview?
24 A. **Not in my purview.**
25 Q. Do you know who above him, if anybody, he would

1 report to as to the reasonableness or necessity
2 of the work that was being done?
3 A. **Either the director, the assistant director of**
4 **engineering at the time, or his head engineer at**
5 **the time. Those were -- would have been the**
6 **people he would have talked to.**
7 Q. And are those the people that in your mind, other
8 than whether or not it follows the wording of the
9 contract, whether or not the work that was done
10 there was reasonable/necessary?
11 A. **Those would be the people that would be**
12 **responsible.**
13 Q. Okay. Let's talk about cost for a second. Did
14 your division, the people that work for you --
15 were you ever required to do comparative studies
16 of similar services?
17 A. **Not that I recall.**
18 Q. In other words, were you ever -- I just want to
19 make sure you understand my question. Or did
20 anybody within DWSD ever -- that you're aware of
21 ever do studies of comparable services, for
22 instance, relining of 15-foot sewer?
23 MR. WATSON: Object to foundation. You
24 can answer if you can.
25 THE WITNESS: Not that I remember.

---

Page 77

**BY MR. ADDIS:**

1 Q. Okay. So the reliance, what you know of, they
2 relied on the consultant that they hired,
3 correct?
4 **MR. WATSON:** Object to foundation. He
5 can answer if he can.
6 **THE WITNESS:** I would guess.
7 **BY MR. ADDIS:**
8 Q. And that consultant would be on a day-to-day
9 basis communicating with -- almost, to your
10 knowledge, with Mr. Shukla as to what was going
11 on at the job?
12 **MR. WATSON:** Object to foundation.
13 **THE WITNESS:** You could assume that.
14 **BY MR. ADDIS:**
15 Q. Okay. I mean, that's who would give you the
16 information what was going on at the job, right,
17 Mr. Shukla?
18 **A. He didn't necessarily have to give me any**
19 **information that was going on at the job.**
20 Q. If you wanted information about what was going on
21 at the job -- did you ever want any information?
22 Did you ever ask for any?
23 **A. No.**
24 Q. Did he ever offer any?

---

Page 78

1 **A. Not that I'm aware of.**
2 Q. Did he ever discuss with you any complaints by
3 Mr. Ferguson that he wasn't being paid for
4 something?
5 **A. Not that I'm aware of.**
6 Q. Do you know whether or not he had any such
7 discussions with any of your staff members?
8 **A. Possible. I don't know. But I'm not aware.**
9 Q. All right. The scope of your examination of
10 invoices, just so I'm certain, is limited, if I
11 understand your testimony, to whether or not it
12 conforms with the written terms of the contract,
13 correct?
14 **A. Correct.**
15 Q. And that's why you could easily call out the
16 overpayment you saw and we pointed out to you?
17 **A. Correct.**
18 Q. Okay.
19 **MR. ADDIS:** Give me a second.
20 (Off the record at 3:14 p.m.)
21 (Back on the record at 3:19 p.m.)
22 **MR. WATSON:** I didn't object to certain
23 questions in regard to it, but dealings or
24 conversations between Mr. Latimer and counsel, I
25 don't want that to be interpreted as a general

---

Page 79

1 waiver of attorney-client privilege. That's all.
2 That's it.
3 **MR. ADDIS:** Mr. Latimer, I don't have
4 any further questions. That makes her feel like
5 this is over. That's the only reason I say that.
6 It's very dramatic. I have no further questions,
7 Mr. Latimer.
8 **THE WITNESS:** Thank you.
9 (The deposition was concluded at 3:19 p.m.
10 Signature of the witness was not requested by
11 counsel for the respective parties hereto.)

---

Page 80

1           CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN     )
3                       ) SS
4 COUNTY OF MACOMB      )
5
6        I, MELINDA S. MOORE, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing
9    questions and answers were recorded by me
10   stenographically and reduced to computer
11   transcription; that this is a true, full and
12   correct transcript of my stenographic notes so
13   taken; and that I am not related to, nor of
14   counsel to, either party nor interested in the
15    event of this cause.
16
17
18
19
20
21
22      MELINDA S. MOORE, CSR-2258
23         Notary Public,
24       Macomb County, Michigan
25   My Commission expires:  September 6, 2016