# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____
                              )

In re:                              )

                              )       Case No. 13-53846

CITY OF DETROIT, MICHIGAN     )

                              )       Chapter 9

             Debtor        )

                              )       Hon. Steven W. Rhodes

_____ )

## REPLY BRIEF IN SUPPORT OF MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S TEMPORARY ALLOWANCE OF CLAIM PURSUANT TO RULE 3018(a) FOR PURPOSES OF ACCEPTING OR REJECTING THE DEBTOR'S FOURTH AMENDED PLAN OF ADJUSTMENT

Macomb Interceptor Drain Drainage District (the "MIDDD"), a creditor and party in

interest in the above-captioned Chapter 9 bankruptcy case, hereby files this Reply to *Debtor's*

*Brief in Support of its Response (Dkt. 5312) in Opposition to Macomb Interceptor Drain*

*Drainage District's Motion (Dkt. 5155) for Temporary Allowance of Claims Pursuant to Rule*

*3018(a) of the Federal Rules of Bankruptcy Procedure for Purposes of Accepting or Rejecting*

*Debtor's Fourth Amended Plan of Adjustment* [Docket No. 6015] (the "City Brief") and the *Brief*

*of the Official Committee of Retirees in Support of Objection to Motion for Temporary*

*Allowance of Claim of the Macomb Interceptor Drain Drainage District Pursuant to Rule*

*3018(a)* [Docket No. 6013] (the "Retiree Committee Brief"), and respectfully states as follows:

## REPLY

In their briefs, the City[1] and the Retiree Committee (collectively, the "Objectors") assert

_____

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the *Macomb Interceptor Drain Drainage District's Corrected Brief in Support Temporary Allowance of Claim Pursuant to Rule 3018(a) of the*

19689591

various legal arguments that do not withstand scrutiny. As demonstrated below, pursuant to relevant case law, MIDDD's fraudulent inducement claims are not eviscerated by the presence of a merger/integration clause in the Agreement, nor are they barred by governmental immunity. Further, the Objectors arguments are based on dramatic mischaracterizations of the factual record. Based on testimony and documentary evidence of misrepresentations and failures to disclose material facts, MIDDD has established a high likelihood of success on both its fraud and breach of contract claims, such that its claim should be temporarily allowed for voting purposes. The City, in pleadings before the United States District Court for the Eastern District of Michigan (the "District Court"), has acknowledged and adopted claims for $23-27 million in overcharges against certain third-party contractors in connection with the criminal fraud in connection with the 15 Mile Project. Based on that acknowledgement, among other reasons, MIDDD's claim should be temporarily allowed in the full amount of the $26 million in overcharges that the City was able to pass on to MIDDD by fraudulent inducement.

## I. The Objectors Rely On Factual Assertions And Denials That Are Inconsistent With The Evidence.

The Objectors misstate certain facts and deny others in stark contradiction of the factual record, severely undermining the credibility of their arguments. Among the many examples, the City denies that there were **any** excessive charges on the 15 Mile Project. City Brief at 17. That the City would attempt do so with a straight face is confounding, as there is no denying that several former City officials and their co-conspirators were convicted of federal crimes and are serving lengthy prison sentences specifically for their extortion and anticompetitive conduct resulting in overcharges on that very project. See Exhibits 8, 9, 11 to Exhibit A to MIDDD

---

*Federal Rules of Bankruptcy Procedure for Purposes of Accepting or Rejecting the Debtor's Fourth Amended Plan of Adjustment* [Docket No. 6061] (the "MIDDD Brief").

2

Brief.

Moreover, the City intervened in a lawsuit brought by MIDDD against those City officials, as well as the contractors and subcontractors that worked on the 15 Mile Project.  In doing so, the City asserted before the District Court that it "adopts and incorporates [in its Intervening Complaint] Plaintiff [MIDDD's] claim that as a result of **inflated invoices submitted on the 15 Mile Road Sewer Collapse**, the cost of the repairs of the 15 Mile Road Sewer Collapse **was increased by at least $23 million**." <u>See</u> Exhibit 15 to Exhibit A to MIDDD Brief at ¶ 101 (emphasis added).  The City further asserted that its damages included "(1) **increased contract costs and lost savings** due to non-competitive bidding, bid-rigging, extortion, and money laundering; (2) **lost value and excess costs** due to bribery; (3) payments made pursuant to **excessive and unnecessary contract**, **consulting, and other fees, expenses, and costs**; and (4) any and all other appropriate damages," all related to the 15 Mile Project.[2] <u>See</u> Exhibit 15 to Exhibit A to MIDDD Brief at ¶ 138.  It is difficult to conceive that the City— represented by the same law firm here as it was in the District Court —would have alleged overcharges of that magnitude if the City did not believe it to be the case, given the consequences under Rule 11 of the Federal Rules of Civil Procedure for false representations to a federal court.[3]

---

[2]    Given that the City's position regarding overcharges on the 15 Mile Project in the District Court case is inconsistent with its position here, the City may be judicially estopped from arguing that there were no overcharges on the project.

[3]    In a contrived effort to show that it was adverse to MIDDD in the District Court Case, the City asserts that, in intervening in that case, it argued that "the tort claims belonged to the City."  City Brief at 3.  At the time City moved to intervene, however, (through the same counsel of record that suggests otherwise now) it expressly acknowledged that it was doing so to stand alongside, not adverse to, MIDDD to prevent dismissal of the claims against the third-parties on a challenge to MIDDD's standing.  In fact, the City pled: "DWSD seeks to intervene because the Defendants have placed its entitlement to the tort claims squarely at issue. Without attempting to resolve the issue at this point, it is clear that DWSD has an interest in this lawsuit.  DWSD also seeks to intervene because its interests here are significantly broader than the issues raised in the Complaint and related

Furthermore, the testimony from City's own witnesses and documentary evidence confirm that the overcharges were passed through DWSD by way of irregularities in the contract process that were known to the City officials who negotiated the terms of the Agreement with MIDDD in 2007 through 2010, including:

- That a costing supplement was added to CS-1368, with a backdate, by then-DWSD Director Mercado to allow payments to contractors and subcontractors on *negotiated* rates and markups that are unlike anything ever seen before at the City. See Walter Designation (Exhibit G to MIDDD Brief) at 48:10-50:15, 51:3-55:13, 56:8-56:24.

- That the costing supplement back-dated by Mercado allowed markups and layers of markups far in excess of the standard set by DWSD for sewer repair projects. See Shukla Deposition (Exhibit 12 to City Brief) at 94:4-95:25.

- That DWSD Contract CS-1372 was competitively bid and awarded to Lakeshore but cancelled by Kilpatrick in favor of a shift of that work to Inland under CS-1368. See Latimer Designation (Exhibit I to MIDDD Brief) at 38:5-38:15.

- That a "Special Order" for Amendment 2 to CS-1368 was signed without oversight to allow (former) Mayor Kilpatrick absolute authority to choose the contractor for this sinkhole repair project. See Walter Designation at 34:24-39:18, 40:20-42:24.

- That a second "Special Order" was signed to approve Amendment 3 to CS-1368 for payment of another $23 Million on the sinkhole repair project without review for reasonableness, competitive bidding or any extension of time or scope of work. See Walter Designation at 40:20-42:24, 57:22-58:14-17, 60:2-60:25; Latimer Designation at 50:1-52:2.

- That the Engineering Department facilitated rewrite of invoices with Inland and (now-convicted) contractor Ferguson so that amounts that had been disallowed could be put through

---

motions… Adverse decisions in this case could impact DWSD's broader interests…It is clear from these pleadings and motions to dismiss that either MID or DWSD holds the tort claims. With both in the lawsuit, the matter can be determined on the merits with the full participation of all interested parties." See Exhibit 13 to Exhibit A to MIDDD Brief at 3-8.

4

> differently to get approved (for example, as fuel surcharges).
> Docket Shukla Deposition (Exhibit 12 to City Brief) at 91:2-
> 92:14:25; see also Investigatory Report at Exhibit A hereto.

The City further states that at no time were any representations made to Macomb that the costs of the 15 Mile Project were fair and reasonable. City Brief at 16. This is simply wrong. Commissioner Marrocco has testified that he met with Mercado and inquired about the reasonableness of the charges for the 15 Mile Project, and Mercado assured him that the charges were legitimate and implied that there were no irregularities. See Exhibit A to MIDDD Brief at ¶ 8-15. Hupp testified that he recalls a meeting in which Marrocco and Mercado were present at which Macomb County aired its concern about the reasonableness of the cost of the 15 Mile Project. See Tr. Hupp Deposition, July 14, 2014, supplemental designation attached hereto as Exhibit B at 49:18-50:12.

The City also asserts that at no time prior to the date that the First Superseding Indictment of the Kilpatrick conspirators was made public was it aware that there were any claims that are or were reasonably expected to become the subject of litigation affecting the Macomb System. City Brief at 18-19. Again, this strains credulity in light of the evidence. According to the testimony, representatives of the DWSD, the City's Engineering Department, and the City's Legal Department, certain of which were involved in the negotiation of the Agreement, were interviewed several times by federal investigators regarding criminal activity related to the 15 Mile Project.

More specifically, the then-Director of Engineering, Shukla, testified that he and corporation counsel were on notice of the criminal enterprise as it concerned overcharges on the sinkhole repair project by 2008:

5

A.    I remember that I was contacted by FBI sometime in 2008 -- October or
      November of 2008, that they want -- they left a message on my office phone
      saying that they want to come and talk to me, so I called them back and they came
      back and talked to me.

Q.    What did they talk to you about?
A.     Basically they were talking about the various contracts that we are doing, and
      was -- specifically the thrust was did Ferguson – was Ferguson -- how do I put it?
      Did Ferguson take advantage of his position with the mayor's office to get
      contracts from City of Detroit DWSD.  That's what they were trying to talk to me
      about.

Q.    Was 1368, Amendments 2, 3, 4, 5 the subject of any of the discussions?
A.    I don't remember if they talked -- at that particular time in 2008 if they talked
      specifically of any amendment, but they did talk about the sinkhole, yes. That was
      talked about.

Q.    Do you remember what they asked you about the sinkhole project?
A.    Same issue, that did Ferguson use his position to get himself on the contract, who
      appointed him and all that, how did they get on the job and all that kind of
      questions. And I told them I didn't hire him, it was a decision of CS-1368
      contractor. My job was to make sure that the work gets done. That's what my job
      was.

Shukla Deposition (Exhibit 12 to City Brief) at 71:14-73:7.

      * * *
Q.    I was asking you earlier about your involvement in the criminal investigation, and
      I think you told me that you were first contacted October/November of 2008. Did
      you speak with law enforcement on a number of occasions or was it just once?
A.    No, I think I did talk to them quite at few times after that. That was the first time
      they talked to me.

Shukla Deposition (Exhibit 12 to City Brief) at 78:21-79:4.

      * * *
A.    The first agent who called me sometime in 2008, they said the same thing, and
      then the other agents who I talked to when I talked to them in our office -- not my
      office, but in the DWSD  office or their building those agents.

Shukla Deposition (Exhibit 12 to City Brief) at 80:8-80:12.

      * * *
Q.    Were you aware of anybody else at DWSD who had been speaking with law
      enforcement or received a subpoena to speak with them?

A.    I believe they talked to a lot of people in my department and in other departments.

Q.    Who do you know of from your department?
A.    I know they talked to Darryl Latimer, if I remember right, contracts and grants manager. I'm pretty sure they talked to Gary Fujita, the director. They talked to one my head engineers, Dennis Green; they talked to him. He was under me. They talked to some of my inspectors. I don't remember all the names. They talked to a lot of people.

Shukla Deposition (Exhibit 12 to City Brief) at 81:4-81:12.

        ***
Q.    Did you discuss the investigation with anybody from the Detroit Legal Department?
A.    Our Law Department?
Q.    Yes.
A.    Yeah, the Law Department was with me quite a few times. They were present, too, when the investigation was going on.
Q.    Who from the Law Department would go?
A.    I think it was Ed Keelean most of the time.

Shukla Deposition (Exhibit 12 to City Brief) at 105:16-105:24.

        Additionally, corporation counsel for City assigned to DWSD since 1982 admits he

participated in the investigation in late 2009-early 2010:

Q.    Had you sat in on any interviews?
A.    No, but I was interviewed by the assistant U.S. attorney who was on the investigation.

Q.    When was that?
A.    I don't remember the date. It was several months before the indictment came out.

Q.    In 2010?
A.     It might have been. Either late 2009 or early 2010.

Walter Deposition (Exhibit 14 to City Brief) at 12:23-13:6.

        ***
A.    Well, no, I wasn't offering any legal advice. There were  investigations as far as it involved the department that I worked with, of kickbacks being paid by contractors or extorted from contractors, and there was also in a housing department contract that I got stuck working on an allegation of bid rigging.

7

Walter Deposition (Exhibit 14 to City Brief) at 13:20-14:2

    ***

    Q.    The presubpoena, during the interview process by the United States Attorney's Office, what did you understand the nature of the investigation to be?
    A.    It dealt with misconduct involving city contracts.

    Q.    DWSD contracts or other city contracts?
    A.    Both.

Walter Deposition (Exhibit 14 to City Brief) at 15:23-16:3

    ***

    Q.    Was it within your -- the course and scope of your employment to negotiate contracts that involved the DWSD?
    A.    Yes.

Walter Deposition (Exhibit 14 to City Brief) at 15:6-15:9

    ***

    Q.    Does this amendment extend the time and budget or just the budget?
    A.    This is amendment No. 4.
    Q.    Amendment No. 3, Exhibit No. 4.
    A.    Okay. Well, this just increases the budget without increasing the time.

Walter Deposition (Exhibit 14 to City Brief) at 63:24 -64:4.

    ***

    Q.    In your dealings with contracts for the DWSD, had you had occasion to see a costing supplement that was redone like was done in this case, where there's actually a second costing supplement that issues for the same contract?
    A.    No.

Walter Deposition (Exhibit 14 to City Brief) at 56:16-56:21.

    ***

    Q.    Okay. Now, we know that things surrounding this case have had a long torturous history, including a trial. Do you recall, sir, when or if you were ever contacted by the U.S. attorney's office or the FBI or the Office of Inspector General regarding an investigation of the bid process in Detroit?
    A.    In general or any particular --
    Q.    Let's start in general.
    A.    Okay. In general, I believe it was February 2010.
    Q.    What happened in February 2010 of an investigative nature?

A.     I was contacted by the FBI.

Latimer Designation (Exhibit I to MIDDD Brief) at 13:17-14:4.

Further, pursuant to the 2009 Letter of Intent (the "LOI"), the City agreed, during the diligence period from the execution of the LOI to the closing on the Agreement, that it would "[p]romptly notify [Macomb] of any governmental, regulatory, or third party complaints, claims, investigations or hearings (or communications indicating that the same may be contemplated)." Exhibit 2 to Exhibit A to MIDDD Brief at § 9(f).  Although, as set forth above, City representatives involved in the negotiations knew about a federal investigation involving the 15 Mile Project, the City never disclosed that investigation to Macomb, which is a clear breach of the LOI.

Moreover, documentary evidence shows that Hupp, an attorney for Macomb, acted as scrivener during diligence meetings and made a record of the DWSD's response at March 12 and 18, 2009 meetings to Macomb's diligence request for a description of "any facts of which DWSD or Detroit is aware which would give rise to or support a claim against any contractor or other person arising out of or related to the [Macomb System] and state whether such claim has been asserted."  See Exhibit C attached hereto (the "Diligence Minutes").  Mr. Hupp noted that the DWSD represented that it was "not aware of any known, threatened or pending claims " related to the criminal conduct or overcharges.  Id.  Hupp transmitted this to, among others, Walter and Jacobs, requesting correction of any errors, and to MIDDD's knowledge, received none.  Id.

9

## II. The Objectors' Legal Arguments Do Not Withstand Scrutiny.

### A. MIDDD Does Not Have the Burden of Proof.

As explained in the MIDDD Brief, MIDDD does not have the burden of proof with respect to the Rule 3018 Motion because the Claim Objection contained mere bald assertions and conclusory statements that did not sufficiently refute the *prima facie* validity of the MIDDD Proof of Claim. Thus, it did not shift the burden to MIDDD. See MIDDD Brief at 15-18. The authority cited by City and Retiree Committee stating that the burdens of proof for Rule 3018(a) purposes are the same as in deciding objections to proofs of claim (City Brief at 19-20, Retiree Committee Brief at 2) supports MIDDD's position. Because the Claim Objection was insufficient to shift the burden for claim allowance purposes, it did not shift the burden for Rule 3018(a) purposes.

Even if the Court does find that the Claim Objection shifted the burden to MIDDD, as the case principally relied upon by both the City and Retiree Committee acknowledges, MIDDD need only show that it has a "colorable claim capable of temporary evaluation." Armstrong v. Rushton (In re Armstrong), 292 B.R. 678, 686 (B.A.P. 10th Cir. 2003). As shown in the MIDDD Brief and below, MIDDD has at least a "colorable" claim for the full $26 million in damages it seeks, which is a very unexacting standard. Thus, the Court should grant the Rule 3018 Motion and temporarily allow the MIDDD Claim for voting purposes in the amount of $26 million.

### B. MIDDD's Claim Is Not Barred By The Settlement Agreements.

The Debtor argues that MIDDD released or waived its claims where it agreed to the September 2, 2010 Settlement Agreement (as defined in the City Brief) and/or the Global Settlement (as defined in the City Brief). City Brief at 20-21. Both settlements were procured

10

through the same misrepresentations and omissions that induced MIDDD's execution of the

Agreement.  In particular, the releases under the Global Settlement Agreement were expressly

made interdependent with the execution and closing of the Agreement.  See Exhibit 3 to Exhibit

A to MIDDD Brief at § 9.  Unless the Agreement closed, the parties had the right to declare the

Global Settlement Agreement void and without effect.  Thus, absent the City's fraudulent

inducement of the Agreement, the Global Settlement would have had no effect on any claims.

Further, "waiver and estoppel are founded upon [defendant's] knowledge of facts."  J.C.

Wyckoff & Associates v. Standard Fire Ins. Co., 936 F.2d 1474, 1489 (6th Cir. 1991). "The

common law of contracts dictates that an agreement between two parties shall be enforced as

written, absent exceptional circumstances such as **fraud** or unconscionability." Ferro Corp. v.

Garrison Indus., Inc., 142 F.3d 926, 932 (6th Cir. 1998) (emphasis added).  A release is avoided

where it was procured under the guise of fraud.  Binard v. Carrington, 163 Mich. App. 599, 603,

414 N.W.2d 900, 902 (1987).  Here, the City misrepresented facts to secure the Settlement

Agreements thus they cannot operate as a valid release of claims.  "A waiver is a voluntary

relinquishment of a known right."  *McDonald v. Farm Bureau Ins. Co.*, 480 Mich. 191, 204, 747

N.W.2d 811, 819 (2008). Where MIDDD was unaware of the fraud due to the misrepresentations

of the City there can be no knowing waiver.

### C.  MIDDD Has A Valid Breach Of Contract Claim.

MIDDD's claim for breach of contract is premised on the City's failure to perform

pursuant to various sections of the Agreement.  Of particular relevance is Section 3.8, in which

the City represented that "[n]one of the written data or information furnished or made available

to Macomb County by Detroit as part of the due diligence process with regard to System Debt or

other debt or rate-related matters contains an untrue statement of Material fact or omits to state a

11

Material fact …" <u>See</u> Exhibit 5 to Exhibit A to MIDDD Brief at § 3.8. As discussed above, the City was specifically asked a diligence question requesting information regarding the City's knowledge of any actual or potential claims against the contractors and subcontractors on the 15 Mile Project, and responded that there were none. <u>See</u> p. 8-9, <u>supra</u>. Of course, if the City had divulged that there were potential claims against those contractors and subcontractors, MIDDD would have learned of the overcharges included in the System Debt, which is certainly a material fact that the City omitted in diligence.

Further, Section 5.3 of the Agreement provides that "Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware that are or might reasonably be expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by this Agreement." There is no dispute that these disclosures were not made.

Additionally, a letter of intent like the LOI is characterized as an agreement to agree at a later date and is as valid as any other contract. *Opdyke Investment Co. v. Norris Grain Co.,* 413 Mich. 354, 359-360, 320 N.W.2d 836 (1982). It is undisputed that the City did not comply with, at least, Sections 9(d) and 9(f) of that LOI constituting a breach. Walter Deposition (Exhibit 14 to City Brief) at 98:9-98:20, 102:1-102:10.

### D. MIDDD's Damages Are Not Speculative.

As the evidence shows: (1) there were express findings of guilt in the criminal case for overcharges and kickbacks specifically in connection with the 15 Mile Project; (2) MIDDD's expert's[4] As-Built project budget of $28,828,490.00 million setting forth what the 15 Mile

---

[4]  Rule 702 requires district courts to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." Lyle Winn has over 26 years of experience as a licensed professional engineer. Winn Designation (Exhibit I to MIDDD Brief) at 6:9-7:3. As such, he has experience in managing dozens of

Project should have cost in contrast to the $54 million that MIDDD paid because of the City's representation that there were no irregularities or investigation into irregularities regarding this project (see Exhibit D to MIDDD Brief ¶ 10); (3) the Inland Budget of $33,702,881.70 from September 2004, as covered by Amendment 2 to CS-1368, for completion of the 15 Mile Project which was exceeded by more than $20,764,319 that was covered by Kilpatrick's "Special Order" approving another $35 Million in payments without justification or any review within the City (See Exhibit 1 to Exhibit A to MIDDD Brief; Exhibit 1 to Exhibit D to MIDDD Brief; Exhibit 2 to Exhibit D to MIDDD Brief); (4) the City's own pleadings in the District Court Case which expressly *adopt* MIDDD's claim that inflated invoices submitted on the 15 Mile Project totaled $26 Million.  (See Exhibit 15 to Exhibit A to MIDDD Brief at 23); (4) the testimony regarding irregularities in Amendments 2 and 3 to DWSD Contract CS-1368 including extraordinary rates and markups allowed by post-hoc supplements to the contract.  See Deposition Citations at 4, supra.; and (5) the pre-discovery settlements of at least $7 Million from the third-parties against whom City asserted tort claims in the District Court Case for their participation in or benefit from the criminal enterprise.[5]  Any argument that MIDDD's damages are speculative is inconsistent with the weight of the evidence.

---

construction projects including initial build, design of a sewer interceptor and represent developers in submitting their projects for approval.  Winn Designation (Exhibit I to MIDDD Brief) at 8:9-10:4.

[5]  After the City filed its Intervening Complaint, it settled its claims against the contractors and subcontractors including Inland (the general contractor on the Sinkhole Repair Project), its affiliates and partners who were released from any and all claims "arising out of or related to the Kilpatrick Indictment, the Intervention Complaint…and any other matters associated with, or ancillary to, the Kilpatrick Indictment, the Intervention Complaint (including the proposed Intervention Complaint)… [and] any and all allegations, claims and damages asserted (or that could have been asserted) by the DWSD against Inland Entities" in the District Court Case for consideration of $4,500,000.  See Exhibit 17 to Exhibit A to MIDDD Brief at 4.  Similarly, the City released L. D'Agostini & Sons, Inc. ("LDA") (Inland's primary subcontractor) from "any and all obligations, claims… asserted in or related to the subject matter of DWSD's intervention complaint in the [District Court Case]" and stipulated to dismissal with prejudice of those claims in exchange for a release of LDA's claims against the City in an unspecified amount.  See Exhibit 17-3 to Exhibit A to MIDDD Brief at Section 3.

13

### E. The Continued Suggestion that Res Judicata or Collateral Estoppel Bar the MIDDD Claim is Wrong.

The Objectors continue to argue that the MIDDD Claim is barred by res judicata because, in the Objector's view, the District Court conclusively ruled on MIDDD's ability to bring any tort claims in connection with the 15 Mile Project. That is simply not the case, as the ruling held only that MIDDD did not have standing to bring tort claims against parties other than the City. Further, the District Court's ruling related only to claims against non-City parties regarding their activities with respect to the 15 Mile Project, and had nothing to do with the City's subsequent fraudulent conduct in passing the overcharges on to MIDDD under the Agreement—which is an entirely separate transaction or occurrence.

In the District Court Case, MIDDD and City assert contract and federal RICO/state tort claims, respectively, against contractors and subcontractors for the overcharges on the sinkhole repair project beginning in 2004 under the terms of DWSD Contract CS-1368.

In this the state court case, MIDDD asserts breach of contract and fraud against City for its failure to perform certain terms from the 2010 Agreement and for misrepresentations the City made to induce the execution of the 2010 Agreement.

The only relationship between the two cases is MIDDD's standing to assert claims against third parties turned on interpretation of the terms of the 2010 Agreement. There was no adjudication of claims between MIDDD and City. There was likewise no adjudication of whether the terms of the Agreement were procured by fraud and/or whether the City failed to perform the terms of the Agreement, the 2009 Letter of Intent and/or the 2009 Settlement Agreement. Accordingly, the Objectors err in reasserting res judicata as a defense in this case.

**F. MIDDD Relied on the City's False Statements of Fact and False Promises as a Matter of Law.**

The City's asserted defense that MIDDD did not rely or reasonably rely on the City's false misrepresentations of fact is contrary to law. See City Brief Pg 42-44.[6] Michigan law presumes that representations made in the course of contract bargaining are made for purposes of inducing the other party to enter into the contract. U.S. Fidelity and Guaranty Co. v. Black, 412 Mich. 99, 119 (1981). Moreover, the evidence is clear that MIDDD would not have entered into the Agreement if it had known of the relevant overcharges. See Marrocco Designation (Exhibit B to MIDDD Brief) at 84:21-85:9; Hupp Designation (Exhibit C to MIDDD Brief) at 64:20-65:19.

Further, the Retiree Committee's argument that "the knowledge of [Mercado] cannot be imputed to the City at the time it executed the 2010 Acquisition Agreement" is inapposite. See Retiree Committee Brief at 8-9. The imputation of an agent's knowledge is not at issue here. Mercado was the City's designated representative in charge of negotiating the initial terms of purchase with Commissioner Marrocco, and made certain false representations regarding the legitimacy of the 15 Mile Project costs at that time. Those representations were carried through

---

[6]    Equally absurd is the City's reliance on the Affidavit of DWSD Advisor Bart Foster. A party may not create a genuine issue of fact by offering an affidavit that contradicts the witness' prior sworn testimony. Peck v. Bridgeport Machines, Inc., 237 F.3d 614, 619 (6th Cir. 2001). "A directly contradictory affidavit should be stricken" from the record where presented without persuasive justification for the contradiction. Aerel S.R.L. v. PCC Airfoils, LLC, 448 F.3d 899, 908 (6th Cir., 2006). Additionally, an Affidavit must be based upon personal knowledge to be given effect. Fed Rule 56(e). Also, a court "should disregard conclusions of law (or 'ultimate fact')," F.R.C. Int'l v. U.S., 287 F.3d 641, 643-44 (6th Cir.2002), and hearsay statements in affidavits. State Mutual Life Assurance Co. v. Deer Creek Park, 612 F.2d 259, 264 (6th Cir., 1979). See also In re Quaker City Castings, Inc., 2005 WL 3078607 (B.A.P. 6th Cir. 2005); Fed. R. Bank .P. 9017; Fed. R. Evid. 801 and 802. In his affidavit, Foster speaks to the ultimate issues in the case. However, his deposition testimony reveals he has no personal knowledge from which to make such conclusory assertions—which are, at best, based on rumors or hearsay. Foster Designation, at 33:16-34:10, 34:20-35:12. Indeed, Foster was not part of the negotiations among the attorneys, is not an attorney himself and attended only some of the due diligence meetings. Foster's Designation, at 39:4-11, 53:16-19, 28:22-29:17, and 33:20-35:3. These conclusory and speculative assertions by Foster should be stricken. Given the inconsistencies, the hearsay and lack of personal knowledge and the attempt to formulate an opinion on the ultimate issues of law in the case, this Affidavit is properly stricken under Aerel S.R.L., O'Brien and In re Quaker. MIDDD intends to formally move to strike the Foster Affidavit at the hearing.

to the diligence period, in which Macomb inquired about potential claims against contractors (for example, for fraudulent overcharges) with respect to any of the projects identified on Schedule 3.8 to the Agreement and was told there were none.[7]

**G. Governmental Immunity Does Not Apply in this Case.**

The inducement of a contract by fraud is a recognized cause of action and is not barred by governmental immunity. In fact, such a claim was upheld in <u>Valentini v. City of Adrian</u>, 347 Mich. 530; 79 N.W.2d 885 (1956) where the plaintiff was awarded a contract to construct a sewer by the city only to later discover that "unusual quantities of quicksand and excessive subsoil water conditions which had not been shown on the plans and specifications on file for the sewer, as exhibited by the city; information as to which, although known to it, had been withheld by the city." <u>Id</u>. at 533. The Michigan Supreme Court observed, in relevant part:

> The withholding by the city of its knowledge of the known conditions, resulting in excessive cost of construction, forms an actionable basis for plaintiff's claim for damages. Nor does the requirement that the contractor examine the specifications and make a personal examination of the site bar the plaintiff from recovering damages caused by the undisclosed subsoil conditions.

<u>Id</u>. at 534. This rule has been affirmed in the arena of public contracts including in <u>Kensington Corp. v. State</u>, 74 Mich.App. 417, 424; 253 N.W.2d 781 (1977) regarding factual inaccuracies in

---

[7] Moreover, the City suggests that the representations it made about future disclosures are only a basis for MIDDD's breach of contract claim as opposed to a fraud. City Brief at 38-39, 45-46. The City is correct that its failure to perform under the Agreement constitutes a breach of contract. City Brief at 38-39. MIDDD has properly pled these claims as required by Federal Rule 8 and MCR 2.111. In addition, however, a promise of future conduct made in bad faith, *i.e.* made without the intention to perform, constitutes fraud. <u>Derderian v. Genesys Health Care Systems</u>, 263 Mich. App. 364, 378-79; 689 N.W.2d 145 (2004).[7] In order to meet this exception, the plaintiff need only show that the defendant did not intend to keep its promise. <u>J.T. French Co. v. Ferguson Dev. L.L.C.</u>, 265997, 2007 WL 1828379 at *3 (Mich. Ct. App. June 26, 2007) (finding fraud where the defendants hid cost mark-ups grossly in excess of industry standards while promising to be diligent in saving the plaintiff money on a going forward basis).

the plans and specifications from the State for a proposed construction project which "may give rise to a cause of action for misrepresentation if the inaccuracies have been relied upon..."

Additionally, governmental immunity only applies to claims for "non[-]contractual civil wrong for which a remedy may be obtained in the form of compensatory damages." In re Bradley Estate, 494 Mich. 367, 385; 835 N.W.2d 545 (2013). This rule "is not limited to suits expressly pleaded as traditional tort claims; instead, because a tort by definition encompasses an award of compensatory damages, the nature of the damages is precisely relevant in determining whether the type of liability imposed is tort liability." Id. Courts considering whether a claim involves tort liability for purposes of MCL 691.1407 should first focus on the nature of the duty that gives rise to the claim; if the wrong alleged is premised on the breach of a contractual duty, then no tort has occurred, and the Governmental Tort Liability Act (GTLA) is inapplicable. Id. More specifically, the GTLA "does not bar liability based on contract." Koenig v. City of South Haven, 460 Mich. 667, 675, 597 N.W.2d 99 (1999), citing Ross v. Consumers Power Co, 420 Mich. 567, 647, 363 N.W.2d 641 (1984) ("[G]overnmental immunity does not extend to contract actions even when the contract action arises out of the same facts that would support a tort action."). Here, MIDDD seeks reformation or rescission of the Agreement given the fraudulent inducement of its execution[8] and the City's breach of terms therein. "Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon... Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party."

---

[8]   "Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon... Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party." Samuel D Begola Services, Inc v Wild Brothers, 210 Mich.App 636, 639-40; 534 NW2d 217 (1995).

Samuel D Begola Services, Inc v Wild Brothers, 210 Mich.App 636, 639-40; 534 NW2d 217

(1995). In this case, MIDDD is entitled to the 'benefit of the bargain,' being the reduction of at

least $26 Million of the total paid via the Agreement if the true facts had been disclosed

regarding irregularities in the DWSD contract processes and the investigation of the same.

Thompson v. Paasche, 950 F.2d 306, 314 (6th Cir. 1991) ("Under Michigan law, a fraud plaintiff

is entitled to the benefit of the *bargain*—in other words, what the purchaser would have gotten

had the representations been true.").

 The City suggests that governmental immunity applies in this case by misplacing reliance

on Local Emergency Financial Assistance Loan Board v. Blackwell, 299 Mich.App. 727; 832

NW2d 401 (2013) wherein the Court of Appeals concludes that governmental immunity bars the

claim for fraud that "was based on the alleged failure to fully disclose the City's finances and the

actual state of the City before defendant accepted the appointment as the City's EFM and on

defendant's assertion that he was led to believe that he would be compensated for his work after

the first year…[since] The Board was exercising a governmental function when it appointed

defendant as the EFM of the City, negotiated his compensation, and executed an employment

contract and addenda." In particular, the Court in Blackwell found that the City was authorized

by the relevant Emergency Municipal Loan Act statutes "to appoint defendant as the EFM and

approve his compensation… [and] "to make, execute, and deliver contracts...." in connection

with his appointment to this position. In other words, the "alleged conduct on which defendant

based his fraud claim constitutes a governmental function because it was conduct that was

expressly authorized by statute. Because defendant failed to plead an applicable exception to

governmental immunity, the trial court properly granted summary disposition." Id, at 735-6.

These circumstances are quite different from <u>Valentini</u> and this claim against the City wherein the governmental entity has been shown to have misrepresented and/or intentionally concealed a material fact that, if known, would have caused the party with whom it was contracting with to have avoided the transaction. Certainly, the City can point to no statutory authority that would permit such illicit conduct. Reliance on <u>Northern Warehousing, Inc. v State Dept of Education</u>, 2006 WL 2419189 (Mich.App., August 22, 2006) is equally misplaced where the court there merely concluded that the plaintiff, a food warehouse and distribution company under contract with the state, failed to state a claim for fraud or ultra vires act when it asserted that the state's diversion of food commodities to state-formed cooperatives, as expressly authorized by the Urban Cooperation Act (UCA), given that there was no promise or undertaking in the contract between plaintiff and the state which was violated by doing so. The City further errs in misdirecting the Court by citation to a phrase from <u>Zaremba Equipment, Inc. v. Harco National Insurance Co.</u>, 280 Mich.App. 16, 40 (2008) to suggest it held that 'innocent misrepresentation claims sound in tort' so as to always be excluded by governmental immunity at Docket 6015, Pg. 41. <u>Zaremba</u> actually analyzes the nature of the relief sought by the plaintiff in the case and states that "because plaintiff's fraud and innocent misrepresentation claims sound in tort, MCL 600.6304 compels the conclusion that a jury must decide whether plaintiff's failure to read the policy constituted a proximate cause of its damages." Id, 280 Mich.App. at 40.

### H. Evidence that One Party Induced Another into Contract by Making False Representations of Fact is Not Parol Evidence.

The City is plainly wrong in suggesting that MIDDD's claim is barred by the parol evidence rule. As set forth in the MIDDD Brief at 28, the general rule is where the inducements for the execution of a contract are fraudulent representations as to existing facts, testimony as to

19

13-53846-tjt    Doc 6098    Filed 07/17/14    Entered 07/17/14 08:06:00    Page 19 of 45

such representations is not within the parol evidence rule.  More recently, <u>Jenson v. Gallagher</u>,

312739, 2014 WL 667790 at *4-5 (Mich. Ct. App. Feb. 18, 2014) considered the general rule

from <u>UAW-GM Human Resource Ctr. v. KSL Recreation Corp.</u>, 228 Mich. App. 486, 507 n. 14

(1998), which is the case relied on by City (City Brief at 42), to hold:

> There is an important distinction between (a) representations of
> fact made by one party to another to induce that party to enter into
> a contract, and (b) collateral agreements or understandings
> between two parties that are not expressed in a written contract. It
> is only the latter that are eviscerated by a merger clause, even if
> such were the product of misrepresentation. It stretches the *UAW–
> GM* ruling too far to say that any pre-contractual factual
> misrepresentations made by a party to a contract are wiped away
> by simply including a merger clause in the final contract. **Such a
> holding would provide protection for disreputable parties who
> knowingly submit false accountings, doctored credentials
> and/or already encumbered properties as security to
> unknowing parties as long as they were savvy enough to
> include a merger clause in their contracts** (emphasis added).

<u>See also</u>, <u>Barclae v. Zarb</u>, 300 Mich.App. 455, 834 N.W.2d 100, 118 (2013).[9]

Here, MIDDD is not asserting that a collateral agreement was entered into that varies the

terms of the Settlement Agreement, 2009 LOI or the Agreement.  MIDDD's claim is that the

City misrepresented facts to induce MIDDD to enter into the Agreement.   As provided for

<u>Jenson</u> and <u>Star</u>, proof of that misrepresentation of fact is not parol evidence.

---

[9]   The Retiree Committee chastises MIDDD for "ignoring" binding Sixth Circuit precedent and citing instead to
Michigan state case law such as <u>Barclae</u>.   The "binding" Sixth Circuit case law it refers to is the unpublished
decision in <u>Ram Intern., Inc. v. ADT Sec. Services, Inc.</u>, 555 Fed.Appx. 493 (6th Cir. 2014) which,
interestingly, recognizes that "a distinction must be drawn between fraud claims based on "collateral
agreements" not expressed in the contract—which a merger clause invalidates—and claims stemming from
"representations of fact made by one party to another to induce that party to enter into the contract"—which a
merger clause does *not* invalidate," and cites to <u>Barclae</u>.  <u>Ram Intern.</u>, 555 Fed. Appx. At 499-500.

WHEREFORE, MIDDD respectfully requests that the Court enter an order temporarily allowing the MIDDD Claim for voting purposes in the amount of $26 million.

Dated: July 17, 2014

Respectfully submitted,

DECHERT LLP

By: /s/ Allan S. Brilliant
Allan S. Brilliant
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

-and-

KIRK, HUTH, LANGE & BADALAMENTI

By: /s/ Raechel M. Badalamenti
Raechel M. Badalamenti
19500 Hall Road, Suite 100
Clinton Township, MI 48038
Telephone: (586) 412-4900
Facsimile: (586) 412-4949
rbadalamenti@khlblaw.com

*Attorneys for Macomb Interceptor
Drain Drainage District*

# Exhibit A

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0506-0026

**Case Title:**
Ferguson Enterprises Inc.

**Reporting Office:**
Detroit, MI, Resident Office

**Subject of Report:**
Interview of Walter Rozycki and Dennis Oszust, Inland Waters

**Activity Date:**
February 29, 2012

**Reporting Official and Date:**
Carol A. Paszkiewicz, ASAC
*02-MAR-2012, Signed by: Carol A. Paszkiewicz, ASAC*

**Approving Official and Date:**
Randall K. Ashe, SAC
*[pending]*

### SYNOPSIS

On February 29, 2012, U.S. EPA CID Special Agent (SA) Carol Paszkiewicz interviewed Walter
Rozycki, Senior Project Manager/Sales Manager, and Dennis Oszust, both of Inland Waters.

### DETAILS

On February 29, 2012, U.S. EPA CID Special Agent (SA) Carol Paszkiewicz interviewed Walter
Rozycki, Senior Project Manager/Sales Manager, and Dennis Oszust, both of Inland Waters.
Rozycki and Oszust were previously interviewed as a part of this investigation. Also present for the
interview were Chris Andreoff and Michael Jacobson, counsel representing Inland. Oszust was on
speakerphone during the interview. Both individuals being interviewed had previously signed a
Kastigar letter, the provisions of which were still in effect.

In his position at Inland Rozycki handles the bidding of contracts, project management duties and
oversees the overall execution of jobs. In 2004 and 2005 Rozycki was the highest ranking Inland
representative at the 15 Mile Road sinkhole. In this capacity Rozycki audited all pay applications
and invoices submitted to them by the subcontractors. The sinkhole repair and reconstruction
activities occurred between August of 2004 and June of 2005. When the sinkhole first happened
Detroit Water & Sewerage Department (DWSD) Director Victor Mercado was on site all day every
day, including many weekends. Mercado maintained this schedule until the emergency bypass
pipeline was installed and operational. After this time Ramesh Shukla was the highest ranking
DWSD official at the site.

While Mercado was on site he spent a significant amount of time with Rozycki and the two became
close from a colleague perspective. Mercado often complained to Rozycki that he was getting
"pressure from downtown" to get Ferguson work. As Mercado was wrapping up working at the site
on a daily basis he commented to Rozycki that Ferguson was "now Shukla's problem." Rozycki
also had a lot of interaction with Shukla as the two were counterparts at the site.

Rozycki recalled an instance during the 15 Mile sinkhole response involving an invoice from
Lakeshore Engineering Services (LES) which had been submitted by D'Agostini as a
subcontractor cost. The invoice from LES was for "engineering services" at a cost of $40,000. At
the time this seemed odd to Rozycki as Inland already had contracted with NTH for engineering
services. Rozycki gave Gino D'Agostini Sr. the invoice back, explaining that he could not
approve it given that they already had NTH performing those functions at the site. D'Agostini
commented to Rozycki that he "didn't want to do it but Shukla told me to do it." Rozycki
reiterated to D'Agostini that he could not approve the invoice. Rozycki never brought the invoice
up to Shukla. Rozycki made to sure to keep an eye out for a similar invoice during this job but one

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.



GOVERNMENT
EXHIBIT
K

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

Case Number
0506-0026

was never submitted. Rozycki believes this incident took place in December of 2004. Rozycki did not keep a copy of the LES invoice. There was no supporting documentation submitted with the invoice. The pay application with which this invoice was submitted was revised to delete the LES $40,000 charge.

At the time Rozycki did not share this story with anyone else, but later told Oszust. Oszust confirmed that Rozycki told him of the LES invoice and thought that this conversation took place six or seven years ago.

Another billing incident occurred on the 15 Mile Road sinkhole when Ferguson Enterprises submitted their equipment rates. Rozycki explained to SA Paszkiewicz that all of the sub-contractors on this site were paid on a time and materials basis. The practice was to submit "blue book" rates which is what the other contractors did. Ferguson however submitted rates which were higher than the industry standard blue book. Rozycki returned a modified equipment rates list to Bobby Ferguson who remarked that "you don't negotiate my rates with DWSD – I do." Ferguson then went to Shukla who in turn came to Rozycki. Shukla asked Rozycki why he couldn't pay Ferguson the rates that he wanted. Shukla told Rozycki that he was not cooperating and was causing him (Shukla) trouble. Rozycki commented that this was a phrase Shukla often used. Rozycki clarified to SA Paszkiewicz that the rate in question was for a tool truck. Ferguson wanted $70 an hour for the tool truck however blue book was $40. After Shukla stepped in, the issue was resolved with Ferguson being allowed to charge $60 an hour for the tool truck. Rozycki explained that the tool truck was on site each day until the temporary bypass was connected and then later in the project when Ferguson was doing restoration work. Rozycki estimated that the total amount of hours which Ferguson billed the DWSD for the tool truck was 1,000 which equated to an extra $20,000 over what he would have earned if he had been forced to accept blue book rates. Rozycki advised SA Paszkiewicz to look at the pay applications which were submitted by Ferguson to Inland for the designation "tool truck."

Rozycki believes that Shukla owed Ferguson for his later promotion to Deputy Director. Ferguson claimed to Oszust that he got Shukla his job, referring to the Deputy Director position. Oszust also knew that Terry King had once been an inspector on one of Ferguson's job sites and later was promoted to Deputy Director of Asset Maintenance.

Looking back at the years under the Kilpatrick Administration Oszust recalls ho w Ferguson would yell at Mercado, sees how certain contracts and amendments were seemingly approved without issues while others were not and knowing the working relationship between Derrick Miller, Mercado and Latimer figures that was how Ferguson was able to pressure so many contractors.

When the 15 Mile sinkhole first occurred Mercado told Rozycki that he didn't want Ferguson to do work at the site. Oszust characterized Mercado as trying to keep wraps on the job, and explained how Mercado was able to force contractors to decrease their rates on this job site. Mercado also instituted a sliding scale for rates, meaning the more work a contractor did on the site the lower the rate they were allowed to bill the DWSD.

Despite not wanting the DWSD engineering staff at the 15 Mile sinkhole, Oszust believes that Mercado trusted his employees to do the right thing. Mercado expected that the daily activities at

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0506-0026

the site to be documented by the DWSD staff. After returning to his normal daily duties Mercado still would visit the site in the evenings and weekends. Gary Fujita would also periodically come to the site when Mercado was not there, including on weekends.

Mercado also told Oszust that he was getting pressure from downtown to bring Ferguson onto the 15 Mile job. Oszust told Mercado that sooner or later Ferguson was going to be calling Inland trying to get work at the site. Mercado told Oszust that he "didn't want that guy out here." Oszust believed this conversation took place in 2004.

Rozycki was approached by Mercado to go and see D'Agostini could get Ferguson work on the sinkhole. As requested Rozycki spoke to D'Agostini who told Rozycki that he could do all of the work himself and that he didn't want that guy out here. Rozycki relayed this message to Mercado. Rozycki thought that Inland had brought Ferguson on to the job by October of 2004 to do excavation work and that Mercado's request for him to speak to D'Agostini was after Ferguson was already on site. Oszust recalls Rozycki telling him about this conversation a number of years ago.

Rozycki was sure that he did not see Ferguson listed on the pay applications submitted by D'Agostini. No ever told Rozycki or Oszust that Ferguson need to make the same amount as D'Agostini or that they would be checking invoices to make sure this occurred. Rozycki commented that it wasn't even feasible for Ferguson to make the same amount of money on this site as D'Agostini given the nature of their companies and work experience.

Near the end of the job Inland hired Ferguson to perform restoration work. Inland wanted Ferguson to accept unit prices for the work, meaning that he would be paid based on the work completed and not the time it took to perform it. Rozycki did this as a way to protect Inland and the DWSD from inflated invoices being submitted by Ferguson. Ferguson rejected the unit pricing arrangement and wanted a time and materials rate. Shukla again interceded telling Rozycki that he was not cooperating. Rozycki characterized Shukla as pressuring him to accept Ferguson's time and material rates. Rozycki stated that "it was not a blatant pressure but it was there." Rozycki explained that the unit pricing structure for restoration has a range of rates which is done to address differing site conditions. Shukla pressured Inland to set Ferguson's unit rates on the high end of the range. This was another instance of Ferguson telling an Inland representative that they didn't negotiate his rates with DWSD, he did.

Nearing the end of the job, Inland had to give some of the restoration work to D'Agostini as Ferguson was not completing it quickly enough. The project had a deadline of June 1st to re-open the road and the restoration had to be completed before this date. Rozycki told Fred Erdman of Ferguson that he was doing this. Ferguson later complained to Rozycki that he took work away from Ferguson to which Rozycki explained that he had to as Ferguson was behind schedule.

At the end of the job Inland received a slew of invoices from the sub contractors. Rozycki explained that the term CID means contractor invoice discrepancies. Rozycki believes these documents have been provided to agents as a part of this investigation. The influx of invoices by the sub-contractors was their attempt to make up for the CID's. D'Agostini submitted an invoice at the end of the job with the explanation that they deserved more compensation on the work that they had

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0506-0026

sinkhole was known as the Grand River sinkhole and Inland hired FEI as a sub contractor, which was in response to a discussion Rozycki had with Mayor Kwame Kilpatrick (this was previously covered in an interview with FBI SA Robert Beeckman). Ferguson submitted an invoice for his company's role in the sinkhole work for $676,000, which Rozycki reviewed and returned to Ferguson but at the lower value of $585,000. Ferguson returned the invoice to Inland but with a total cost even higher than the $676,000. Rozycki then received a call from Shukla who asked why Inland wasn't approving Ferguson's invoice. Shukla told Rozycki to take another look at the invoice. A meeting was then held with Shukla, Oszust, and Rozycki present. Shukla told the Inland representatives that the invoice had to be approved for $676,000. Oszust explained to Shukla that the highest they could go was $635,000 without more backup documentation of the costs. Shukla's response was that they would have to make up the difference. Shukla came up with the idea to allow Ferguson to bill for a fuel surcharge, something none of the other contractors were allowed to do. Rozycki explained that the fuel surcharge can be found in the pay applications and invoices for this contract. Rozycki also thought that this sinkhole was billed under Amendment 3 to CS 1368. Ferguson received fuel surcharges on subsequent contracts. Inland put an end to this practice once Kilpatrick was out of office. Ferguson tried to receive the fuel surcharge on work done under DWS 865 but George Rayes of the DWSD denied the cost.

Rozycki received emails from King who was asking why Inland was giving Ferguson time and materials rates on a certain contract. Rozycki believes the government has these emails already.

The Michigan Department of Transportation did not want Ferguson on the Grand River sinkhole work as they did not want to give him a traffic control/stoppage permit. Rozycki had to meet with the MDOT officials to convince them that Inland was going to stay involved in the work and assure them that the traffic control would be handled properly. MDOT's resistance to Ferguson was due to his history of poor restoration work. Al White also attended the meeting with MDOT.

Rozycki characterized Latimer as a good soldier. Rozycki believes Mercado was pushed to conduct fundraising on behalf Mayor Kilpatrick. Mercado complained to Rozycki that he hated doing the fundraising, that he had to do it, and asked if Inland would help him out. Mercado never complained about being worried he would lose his job if he didn't accommodate Ferguson. Mercado did complain about having to deal with City Council and would often receive calls from council members who complained that Mercado was cutting too many DWSD workers and about water rate issues.

Oszust saw Mercado at the Ferguson Enterprises anniversary party. Mercado kept to himself and seemed unhappy about having to be there.

Rozycki recalled how he once was at the DWSD offices and Mercado heard he was in the building. Mercado invited him to visit his office. When Rozycki got to Mercado's office, Mercado was sitting behind an accordion curtain in a lounge chair watching television.

Oszust heard a rumor that Mercado went to Judge Feikens and asked to be made the Special Administrator of the DWSD. When word of this got back to Kilpatrick he told Mercado he had a certain amount of time to resign.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# **Exhibit B**

1                UNITED STATES BANKRUPTCY COURT

2                  EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4

5     _____

6     In re:                    )    Case No. 13-53845

7     CITY OF DETROIT, MICHIGAN )

8                               )       Chapter 9

9              Debtor           )

10    _____)    Hon. Steven W. Rhodes

11

12

13         The Deposition of R. CRAIG HUPP,

14         Taken at 21777 Dunham Road,

15         Clinton Township, Michigan,

16         Commencing at 8:10 a.m.,

17         Monday, July 14, 2014,

18         Before Melinda S. Moore, CSR-2258.

19

20

21

22

23

24

25

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

```
 1          condition, with no additional warranties, express
 2          or implied, with respect to the physical
 3          condition of the Macomb system."  Then it goes
 4          on.  Do you see that language?
 5    A.    Yes.
 6    Q.    Was it your understanding that the system was
 7          being sold as is?
 8    A.    Yes.
 9    Q.    Do you recall any discussion during these
10          acquisition agreement negotiations about the
11          reasonableness of the cost of repairs?  Was that
12          a matter --
13    A.    This is a discussion with Detroit?
14    Q.    With Detroit.  First I'll ask, did you have any
15          such discussion with Detroit?
16    A.    I don't have a recollection one way or the other.
17    Q.    Do you recall anyone else having a discussion
18          with Detroit?
19                MS. BADALAMENTI:  I'm going to object
20          to the extent it calls for you to divulge
21          privileged information.  Other than that, you can
22          answer.
23                THE WITNESS:  I recall a meeting -- I
24          forget whether it was before or after we filed --
25          Macomb County filed their challenge between -- at
```

```
 1      the Macomb County Office of Public Works offices,
 2      so 2005, I'm guessing is the year.  And I don't
 3      know whether it was a meeting after we filed a
 4      motion or a motion intending to head off the
 5      motion challenging the cost, at which Commissioner
 6      Marrocco and various staff were present, and at
 7      which Mercado and staff and probably lawyers were
 8      present, of which Macomb County aired its concern
 9      about the project and its cost and reasonableness
10      or unreasonableness of asking Macomb County to pay
11      for the system.
12 BY MR. WATSON:
13 Q.   Was that before or after Macomb sued about that?
14 A.   I don't remember now.  That's the thing.  I can't
15      put those -- I don't remember before or after.
16 Q.   But that suit was resolved by the 2009 settlement
17      agreement?
18 A.   Yeah, that got resolved.  You know, we had a
19      number of settlement conferences with Judge
20      Feikens.  I don't have a specific recollection,
21      but it would not surprise me if Macomb County's
22      concerns were not aired vigorously by Commissioner
23      Marrocco.
24 Q.   Was Macomb County entitled to back out or not
25      sign this agreement if it couldn't secure the
```

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com
13-53846-tjt   Doc 6098   Filed 07/17/14   Entered 07/17/14 08:06:00   Page 30 of 45

```
 1        or rate-related matters contains an untrue
 2        statement of a material fact or omits to state a
 3        material fact required to be stated therein or
 4        necessary to make the statements made, in the
 5        context in which made, not false or misleading."
 6        And if Detroit were aware that there was fraud in
 7        the costs associated with the 2004 collapse,
 8        certainly as a lawyer I would have advised my
 9        client that that was material.
10   Q.   The last question I have is with respect to
11        Exhibit 7.  I don't think I asked you.  I will
12        represent to you that this document was produced
13        by the City of Detroit in connection with this
14        proceeding that your deposition was requested in.
15        Do you know how the City of Detroit would have
16        obtained your memorandum?
17   A.   My general approach with this document was it
18        started out as a document with a list of items and
19        questions that would have come from the team to
20        Detroit.  We would have met.  I would have
21        created, as kind of a recording secretary, an
22        update, and then I would have circulated it to
23        everyone at the meeting, both on the county side
24        and Detroit side, with a transmittal e-mail --
25        transmittal certainly would have been by e-mail
```

```
 1    with a note that says "Please review my notes from
 2    the meeting.  Advise as to whether there's any
 3    corrections or additions."  And that was my
 4    routine practice, and so I would expect that
 5    that's what I did with this, and if this was
 6    actually produced by Detroit, then I think that
 7    indicates that drafts went back and forth
 8    according to my usual practice.
 9              MS. BADALAMENTI:  I don't have any
10    other questions.
11                     RE-EXAMINATION
12    BY MR. WATSON:
13    Q.   I've got a few follow-up.  Looking at paragraph
14         29 of Hupp Exhibit 7, are you aware of any
15         regulatory complaints or notices of violations
16         issued on Detroit or DWSD in the past five years
17         prior to, I guess, early 2009?
18              MS. BADALAMENTI:  Are you asking if
19         he's aware now?
20    BY MR. WATSON:
21    Q.   Yeah, are you aware now?  Were you aware then?
22         Are there any; to your knowledge?
23    A.   This would be the period 2004 to 2009, roughly.  I
24         don't know.  I wasn't tracking the violations, if
25         there was environmental complaints.  I think
```

```
1                   CERTIFICATE OF NOTARY

2     STATE OF MICHIGAN      )

3                            ) SS

4     COUNTY OF MACOMB       )

5

6              I, MELINDA S. MOORE, certify that this

7     deposition was taken before me on the date

8     hereinbefore set forth; that the foregoing

9     questions and answers were recorded by me

10    stenographically and reduced to computer

11    transcription; that this is a true, full and

12    correct transcript of my stenographic notes so

13    taken; and that I am not related to, nor of

14    counsel to, either party nor interested in the

15    event of this cause.

16

17

18

19

20

21

22               MELINDA S. MOORE, CSR-2258

23               Notary Public,

24               Macomb County, Michigan

25          My Commission expires:  September 6, 2016
```

# Exhibit C

**Wolpert, Stephen**

| | |
|---|---|
| **From:** | Hupp, Craig [CHupp@BODMANLAW.COM] |
| **Sent:** | Thursday, March 19, 2009 2:18 PM |
| **To:** | 'Bob Walter (waltr@detroitmi.gov)'; 'Joe Colaianne (colaiannej@oakgov.com)'; ' (buchholzd@co.oakland.mi.us)'; 'William Misterovich'; 'Jim Pistilli (jim.pistilli@macombcountymi.gov)'; 'mjacobs@dykema.com' |
| **Subject:** | Due Diligence Meeting 3/18 Minutes |
| **Attachments:** | EAS |

Gentlemen:

I have updated the due diligence list to reflect our discussions yesterday.  Notes from yesterday's meeting are in ARIAL font.  "To do" items are in bold.  Please let me know if my notes are in error or incomplete.

R. Craig Hupp
BODMAN LLP
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
voice: 313-393-7599
fax  : 313-393-7579
email: chupp@bodmanllp.com
web  : http://www.bodmanllp.com <http://www.bodmanllp.com/>


CIRCULAR 230 DISCLOSURE In accordance with U.S. Treasury regulations, if this message from Bodman LLP (or any attachment) contains advice concerning one or more Federal tax issues, it is not a formal legal opinion and may not be used by any person for the avoidance of Federal tax penalties.

CONFIDENTIALITY NOTICE The contents of this message from Bodman LLP may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.



Attachments:
        bodman-email.jpg (18878 Bytes)
        902125_2.pdf (120056 Bytes)

Revision 3/19/09

## Minutes of Due Diligence Coordination Meetings

### Interceptor Transfer Due Diligence Information List
### Annotated Per Meetings on January 29, March 12 and March 18

*Notes from January 29 are in italics.*

Notes from March 12 and 18 are in Arial font.

**Bold Items indicated follow up tasks**

### Misc. Items

The Counties' RFP for an engineering review of NTH's reports will select an engineering firm within 3 weeks. Part of that scope for work includes an inspection of the two pump stations. The Counties will schedule that through Sam Smalley.

The Water Board approved the settlement on Wednesday, January 28. The matter will be forwarded to City Council for action. It is not clear the procedure Council will follow to adopt, it may go to committee or may be placed on the agenda for action.

Bill Misterovich identified two facilities not included on the list of assets to be transferred that was attached to the Letter of Intent. Mark Jacobs stated that list will be update to correct/include any omitted or mis-described facilities.

### Action on Due Diligence Items

The person responsible and nature of follow up for each item is annotated below in italics.

The parties will have a follow up meeting on Wednesday, February 18 at 10 a.m., at DWSD to go over status of producing engineering/operational items. Bart Foster will distribute his response in batches and expects to begin doing so before February 18. He can provide a progress report by telephone during the meeting.

### Debt and Rates

1.  Provide a detailed report, covering the FY 2008-09 and 2009-10 rate years (budgeted amounts) and the FY2006-07 and FY2007-08 rate years (actual amounts), for all meters, pump stations, interceptors and any appurtenant facilities that will be transferred as part of the Oakland Macomb Interceptor System (the Northeast pump station and meter(s) at the Northeast pump station should be included), setting forth for each facility:

Detroit_902125_2

*Debt figures are those used in the rate model. DWSD does not agreed at this point whether it is prepared to transfer the Northeast pump station but will identify the outstanding debt.*

*Bart, Rafael and Woodrow will assemble this information.*

- **On March 12, Bart provided a multi-page breakdown of OMI and Macomb O&M costs. He will provide a breakdown of the debt behind the debt service charges billed to the OMI.**
- **Bart/DWSD will complete analysis of Garfield pump station costs. It is presently thought that these represent electricity charges for meters in the vicinity of the Garfield interceptor.**
- **The detailed cost support reports provided by Bart do not appear to include labor and other costs. DWSD will check. There were other inconsistencies which Bart/DWSD will check as well.**
- **Bart/DWSD will identify meter maintenance costs for meters on OMI and Macomb systems.**

(a)     all outstanding debt, (including for each bond, the date of original issue and refinancing (if applicable), and the final payoff date)

    (i)     The report of debt should indicate the individual bond issue(s) associated with each facility, and each facility's allocated share of the specific bond issue as included in rate model for each year

(b)     the debt service allocated to Macomb County and to the Clinton-Oakland District,

(c)     actual or budgeted operating and maintenance expenses,

(d)     extraordinary repair expenses,

(e)     any allocated overhead, and

(f)     any other costs charged to these facilities.

2.     Provide a detailed accounting and documentary support for all charges associated with the facilities and included in the Macomb County and Clinton-Oakland sewer rates for the past 6 years.

*Bart, Rafael and Woodrow will assemble this information.*

See comments under Item 1.

3.     Provide an example rate recalculation for the new entity to be created to own and operated the Edison Corridor interceptor (the "Entity") for the rate year 2009-2010 together with supporting detail using the same flows and budgets as used in developing the actual 2009-10 rates.

2

Detroit_902125_2

*Bart will do. The recalculation will be for Macomb and the Clinton-Oakland District, not for the new entity.*

**Bart will do.**

4.    If it is DWSD's position that any of the debt or operating and maintenance costs for the OMI or Macomb interceptors will not be eliminated from calculation of the rates for the new entity, DWSD will so indicate and, if so, explain. If these debt and operating costs are not included in the sewer rates for the new entity, DWSD will disclose whether it proposes that part or all of such charges will be redistributed to any other customers and, if so, explain how it proposes to do so in the context of the rate calculation process.

*Jacobs, Walter & Foster will address.*

**Remains to be done by DWSD. Need a written response from DWSD that the debt service cost of the retired debt will not be included in suburban rates.**

5.    Is it Detroit's position that that part of PCI-5 within the City of Detroit and the Northeast pump station would be subject to Detroit's real and personal taxes? If so, identify the book value of those facilities.

*Jacobs, Walter & Foster will address.*

DWSD proposes that PCI-5 be bifurcated and only the portion north of 8 Mile be transferred. If so, concept was discussed of the new OMI entity entering into a long-term contract to operate and maintain the piece of PCI-5 in Detroit.

DWSD proposes to keep Northeast pump station and to negotiate an agreement on operating protocols. Counties repeated their desire to acquire the pump station because they see it as an integral part of the OMI system and because they are concerned that it and the Edison Corridor not be operated to achieve stormwater retention without some form of compensation to the Counties. Detroit responded that under existing ratemaking procedures it did not met the criteria for "common to all." They are prepared to agree to accept contract flow consistent with the terms of the new contract, whatever those terms are. Macomb requested information from DWSD that would indicate how the pump station is operated in wet weather events in order to have the facts to determine whether, at least from the Counties' point of view, the pump station and Edison Corridor are being managed in a fashion to provide wet weather storage. **DWSD did not commit to provide the requested information but said it would get back to Macomb.** Attendees agreed the issue of pump station ownership may need to be referred to the Directors' Council for resolution.

The back flush flow from the Northeast Water treatment plant flows into the pump station via a metered connection. It was represented that this flow was somehow adjusted from the flow allocated to the OMI. **A better description of the manner in which this adjustment was made was requested.**

DWSD's position is that any OMI facilities in Detroit would not be subject to real and personal property tax. Further, this point is moot if no facilities within the City are transferred.

6.    State whether Detroit has a policy of imposing payments in lieu of taxes on publicly owned tax exempt infrastructure.

3

*Jacobs, Walter & Foster will address as this issue would related to that portion of PCI-5within Detroit and, if relevant, the Northeast Pump Station.*

Detroit has no such policy nor is such a policy anticipated if the Counties own facilities in Detroit.

### Inspection, Maintenance and Repair of the Oakland Macomb Interceptor

*NTH (Swaffar) provided a memo (January 27, 2009) summarizing documents NTH has responsive to the Due Diligence list items related to tunnel inspections and condition. Hupp will review. NTH will assemble and make available for review the boxes previously produced for the 2004 collapse litigation discovery. Hupp will review. Based on that review, various requests below will be refined and refocused.*

7.    DWSD's inspection and maintenance protocols, plans, practices or procedures for the facilities for the period 1981 to the present.

*Sam Smalley will do.*

There are no protocols or records for interceptor inspections beyond NTH's post 2004 work. The heavy maintenance yard was discontinued in 2004 and there has been turnover in personnel. As a result no records have been located.

DWSD has not pulled the Northeast pump station records.

**Manuals etc. for Clintondale are available at the Huber location with a review by Jim Pistilli to be arranged through Sam Smalley.** To the extent that there are electronic records that have not been printed out already, Jim will discuss with Sam.

8.    All operating manuals for the equipment located at the facilities.

*Sam Smalley will do. He will copy those available electronically and assemble paper versions and wait for Counties' decision (Buchholz) whether to have copies made or to review them.*

Shukla brought copies of operating manuals for the Clintondale to the March 18 meeting.

9.    Inspection and condition reports documenting the condition of the facilities during the period 1999 to the present.

*The Counties have field inspection reports produced in the 2004 collapse litigation (about 30-40 reports), the 3 recent NTH inspection reports and supporting computerized files, and the Spalding DeDecker 2003 inspection report of the Garfield Interceptor (15 to 18 mile road) and Jenny reports (PCI-7 (1981), PCI-12A (1981) and Rehab. Of Interceptor Sewers Legal Assistance Final report (1983). Shukla/Smalley will provide any other inspection reports*

NTH has produced its reports to Bodman. Shukla says DWSD does not have anything beyond what NTH has.,

4

10. DWSD operation, maintenance and repair records for the facilities for the past 5 years including work orders, inspection reports, supplier/contractors invoices and all operator logs.

*Smalley will do. He will start with the electronic work order records. After review by Buchholz, a decision will be made whether paper work orders, etc. from prior years will be inspected.*

These documents for Clintondale are available at Huber. Records for Northeast has not been assembled. No records for the interceptors.

11. Plans or recommendations for equipment replacement, repair, or upgrading over the next 5 years.

*The Counties have the 3 NTH reports and Macomb has a copy of DWSD's evaluation of the Clintondale pump station. DWSD will provide any plans or recommendations for other repairs or improvements including the new meter at the Northeast pump station.*

Plans/proposals for ongoing OMI improvements and Clintondale have already been provided to Macomb or via documents at NTH.

**Other than that, there are two meter projects pending: OCS-2 and a Macomb meter, ID unknown. DWSD/Shukla will check and report on the status of both of these projects**

12. All current or pending contracts for any types of engineering, maintenance, repair or construction activities associated with the facilities and all contracts for work completed in the past 5 years or work now underway or expected to begin before December 31, 2009.

*Smalley & Shukla. This will consist of invoices and supporting vouchers for work performed under PC749 and 759 contracts. Smalley stated there are no specific scopes of work for work performed.*

At the meeting, Shukla provided a manila files with responsive documents.

There was a recent minor project to replace carbon filters for odor control at several locations. No need to provide these records.

13. Engineering and construction contracts, work plans and schedules for repairs now planned or underway for OMI and Macomb interceptors plus all daily reports, inspection records and the like for any investigation or repair performed on these interceptors since January 1, 2006

*Smalley & Shukla plus NTH.*

Reviewed and copied as appropriate by Bodman at NTH.

5

Detroit_902125_2

14. All documents, including contracts and warranties, containing any form of warranties or guaranties related to services performed or equipment provided associated with the facilities.

*Smalley & Shukla*

None, with the possible exception of the new generator at Clintondale. Any related document would be in Clintondale materials brought by Shukla to the meeting.

DWSD's standard contract provides for a one-year warranty from time of substantial completion.

15. Any insurance policies of any kind which may provide coverage for the facilities, the equipment, or claims arising out of the ownership or operation of the facilities.

*Probably no insurance but Woodrow will check.*

Woodrow confirmed, no insurance.

16. Identify all personnel in the past 5 years who have had direct staff supervision or engineering responsibility for the facilities.

*Key personnel are Sam Smalley, Terry King, Ramesh Shukla and Martin Craig.*

In addition, Lou Jarvis.

17. Identify all contractors in the past 5 years who have provided significant services related to inspection, operation, repair or maintenance of the facilities (excluding the major interceptor repair and maintenance activities undertaken since 2004) and identify the project manager for each contractor.

*Smalley & Shukla*

Contract documents were produced by NTH to Bodman.

18. Provide copies of all budgets prepared in the past 5 years for the operation, maintenance and repair of the facilities.

*Bart stated this work is not budgeted at the facility level. DWSD (Bart and Woodrow) will provide actual costs for the past 5 years.*

**Woodrow will see whether meter costs can be broken out.**

19. The NTH January 2008 for PCI 8 – 11 states at p.3, "Concurrent with the submittal of this report we are undertaking additional investigations to evaluate contributing conditions in the OMIS network. The results of those investigations will be provided in a supplemental report(s)." Are there any supplemental reports related to PCI 8 -11? Essentially the same statement is made at page 62 of the NTH report for PCI 5 – 7. Are

6

DRAFT

there any supplemental reports for these sections beyond the August 2008 supplemental report for PCI-5?

*Harry Price said there is one more report and he will provide it.*

NTH has provided to Bodman.

20. Records for energy use for the past five years at any facilities for which energy usage/consumption records are available.

*Chirolla will provide energy records for the Clintondale and Northeast pump stations. He will provide electrical records for meter electrical costs if they are not minimal.*

Rafael has provided a disk with electrical billing records for Northeast and Clintondale together with a 2 page annotation showing how DWSD allocated NE pump station charges between water and sewer.

### Records of Construction of OMI and Macomb Interceptors

For each interceptor segment or other facility and for the repairs associated with the 1978, 1980 and 2004 sewer collapses, please provide:

*See comment above about NTH memo and production of boxes of documents.*

Items 21, 22 and 23. NO records beyond what NTH produced to Bodman.

21. Preliminary and final design reports, engineering and construction contracts, final specifications and plans, design calculations, shop drawings, "as built" plans and specifications, change orders and inspectors' reports, daily reports and final inspection reports for each of the facilities

22. All geotechnical and groundwater studies, reports and data related to the facilities or their vicinity.

23. Copies of all contracts with engineers, general contractors and companies principally responsible for the tunneling and construction of each segment and the repair of the 1978, 1980 and 2004 collapse.

24. Copies and indices of all leases, easements, licenses and other right-of-way documents for the real estate to be transferred or as may be required in order to operate the facilities together with all associated title work and title insurance, and all documents evaluating DWSD's right to use the right of way and any defects in such right or title

*Walter and Shukla will review and provide general report of what is available and how organized.*

A printout of ROW files ws provided. Each file has a box or more of supporting documents. Total boxes is between 200 and 300. Boxes are at 6th Floor, Madison Building. Contact is Craig Stanley, 967-1540 (O); 999-0649 (cell). Counties will develop a plan to deal with ROW issues.

7

**Prior Sewer Collapses**

25. Reports, technical analyses and engineering opinions regarding the nature and cause of the 1978, 1980 and 2004 sewer collapses, documents and photographs describing the conditions within the section of the interceptor at or before collapse and after the collapse, and engineering reports and studies with regard to alternatives evaluated to repair the collapse and the basis for selecting the method of repair which was undertaken, including but not limited to, studies by U.S. COE, Jenny Engineering, Smith Hinchman & Grylls, NTH, and Mueser, Rutledge, Johnston & Desimone.

Obtained from NTH. DWSD has nothing else.

26. All documents related to Jenny Engineering's inspection and assessment in the 1980-1983 time frame of the condition all of the OMI and Macomb Interceptors, and DWSD's contract(s) with Jenny Engineering to perform those services.

*NTH has Jenny volumes 1, 2 & 4 wand will provide if they do not cover PCI-7 & 12A. DWSD (Shukla) will check files for any other Jenny materials.*

Obtained from NTH. DWSD has nothing else.

**Permits, Compliance and Liabilities**

27. Identify all federal, state or local approvals, licenses, permits, other than DWSD's NPDES permit, required to own, occupy or operate the facilities.

*Chirolla will check for AQ permits for generators, any registration forms for any USTs and any other permits needed to operate. One-time permits related to related to right of way access are not needed. Copies of permits under Part 41 and/0r 399 are desired in order to document that all design modifications were MDNR/MDEQ approved.*

Clintondale air permit is in the Clintondale materials provided. NE pump station probably also has an air permit for its generator.

28. State whether the facilities conform to local zoning and building codes and whether any special use or similar permits are required.

*DWSD will check.* **Responsible person not identified.**

DWSD represents that facilities conform.

29. Describe any regulatory complaints or notices of violations issued on Detroit or DWSD in the past 5 years arising out of or related to the operation of the facilities.

8

Detroit_902125_2

*Jacobs and Walter*

None.

30.    Describe any civil claims asserted or threatened in the past 5 years arising out of the operation of the facilities which have been asserted against Detroit/DWSD or of which Detroit has knowledge.

*Jacobs & Walter will address.*

Three claims.  #1 - claims and suits arising out of 15 Mile collapse; #2, "Collins" business interruption claims because of construction delays; #3, 21/ Garfield suit.  DWSD is retaining liability on items 1 and 2. No further information requested by Counties.

31.    Describe any circumstances of which DWSD or Detroit may be aware indicating that the facilities are not in compliance with environmental or employee health and safety laws and regulations.

*Shukla & Smalley.*

Not aware of any MIOSHA inspections.  DWSD makes no representation as to MIOSHA compliance and recommends facility compliance surveys.  **DWSD will check to see if there is any relevant safety information in its internal files.**

32.    Describe any facts of which DWSD or Detroit is aware which would give rise to or support a claim against any contractor or other person arising out of or related to the facilities and state whether such claim been asserted.

*Jacobs & Walter will address.*

DWSD is not aware of any known, threatened or pending claims other than those identified in Item 30.

33.    State whether PCBs, asbestos and lead-based paint are now or ever have been present at or on the facilities and provide any reports/plans/investigations re same.

*Shukla.*

No information one way or the other on PCBs.  Shukla provided an asbestos and Pb assessment for the Clintondale station.

34.    Disclose any condition of which DWSD is aware in which some part of the facilities is not in full compliance with applicable building, safety and OSHA/MIOSHA regulations.

*Smalley.*

"Don't know".

9

Detroit_902125_2

35.     If ACM or PACM materials are present at any facility, provide the relevant asbestos
        management plans.

*Shukla.*

See Clintondale assessment referenced above.

36.     Provide copies of all plans required under environmental regulations which may apply to
        the facilities (e.g., an SPCC plan)

*Shukla & Smalley.*

No plans for Clintondale.  No info on plans related to Northeast.


37.     Identify the location, size and contents of any ASTs or USTs now or ever previously
        located at the facilities.

*Smalley.*

There is an AST for the generator at Clintondale.  Details are in the Clintondale materials provided.  No
information provided re Northeast.

38.     Describe any workers compensation claims arising out or related to injuries suffered by
        employees while working at or associated with the facilities that have ever arisen.

*Walter*

Information still to be provided.

39.     Identify any areas of known or suspected contamination at any of the facilities and
        provide any Phase I or Phase II environmental site assessments or similar reports
        addressing any of the facilities.

*Smalley*

None

40.     Provide copies of any release or off-site migration notices related to the facilities and
        copies of any manifests for hazardous materials disposed of from the facilities.

*Smalley*

None

10

Detroit_902125_2

13-53846-tjt    Doc 6098    Filed 07/17/14    Entered 07/17/14 08:06:00    Page 45 of 45