UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**OFFICIAL COMMITTEE OF RETIREES' REPORT ON (A) INTEREST COMPONENT OF ASF RECOUPMENT AND (B) THE EFFECT OF FEDERAL TRANSIT ACT ON TREATMENT OF DDOT RETIREES**

The Official Committee of Retirees of the City of Detroit, Michigan (the "Committee") files this report with respect to (a) disclosure of the interest component of ASF Recoupment, and (b) the effect of the Federal Transit Act on the treatment of Detroit Department of Transportation ("DDOT") retirees as requested by the Court.

PRELIMINARY STATEMENT

At the hearing on July 15, 2014, retirees raised two issues with respect to the treatment of General Retirement System ("GRS") retirees under the Plan--one involving the adequacy of disclosure of the 6.75% interest calculation in the ASF Recoupment Amount and the other, regarding the effect of the Federal Transit Act requirements on the treatment of DDOT retirees. At the conclusion of the hearing, the Court asked for an additional report on both issues.

The timing and extent of the disclosure of the ASF Recoupment interest rate can be established by review of the documents filed by the City and the Retiree Committee in advance of and during the solicitation period. In summary, the fact that ASF Recoupment includes a 6.75% interest component was first disclosed in filings with the Court through a Stipulation and a proposed letter attached to the Stipulation with the Retiree Committee on June 2, 2014, after the solicitation process began. Notice of the interest rate was disclosed to retirees in the letter sent

only to the retirees affected by a change in the ballot shortly after the Court's approval of the Stipulation. However, retiree participants in the Committee's second two Town Hall meetings at Cobo Hall on May 23, 2014 received oral disclosure of the same information as did retiree participants in the General Retirement System's four informational meetings on June 5 and June 12, 2014.

The facts of the City's commitment to maintain pension and health care benefits for certain retirees pursuant to protective agreements with AFSCME under section 13(c) of the Federal Transit Act are not a matter of public record and require additional investigation by the objectors and the City. The issue of whether the Federal Transit Act protects these retirement benefits from impairment has not been fully briefed.

A.   **History of Disclosure of 6.75% Interest**

According to the City, ASF Recoupment serves the important purpose of keeping the overall cuts to the GRS pension benefits to a certain level without requiring additional contributions from the City's general fund.[1] If the holders of GRS Pension Claims in Class 11 vote for the Plan and the Plan is confirmed, the GRS retiree pension benefits will be reduced across the board by 4.5%, and they will not receive an annual escalator of cost of living adjustment (valued at an average 13% of their pension benefits over their actuarial determined lifetimes). In order to keep the pension reductions at that level, certain retirees are subject to ASF Recoupment, which will reduce their pensions by an additional 15.5%, referred to by the

---

[1] The City's rationale for the ASF Recoupment is disclosed in the Fourth Amended Disclosure Statement With Respect to the Fourth Amended Plan for Adjustment of Debts of the City of Detroit [Dkt/ No. 4392] at 24 as follows:

> In designing the Plan, the City addressed whether the Plan should: (a) contain higher across-the-board pension cuts for all GRS participants and not try to recover a portion of the excess ASF interest credits or (b) recover a portion of the excess ASF interest credits, which would result in lower across-the-board pension cuts for all GRS participants. The City decided on the second choice and, therefore, there will be both across-the-board pension cuts and a recovery of excess ASF interest credits. **As a result, the across-the-board cuts will be lower**. (emphasis in original).

Committee as the "Pain Cap." From the Committee's perspective, ASF Recoupment under the Plan is also a settlement of the issues surrounding the City's ability to achieve any recoupment from plan participants, as distinguished from Plan trustees, including past City officials. However, the 6.75 % interest component was not an express feature of the settlement.

The City previously estimated that ASF Recoupment will realize approximately $230 million for the City to meet the required contributions to the GRS pension plan. *See* Fourth Amended Disclosure Statement With Respect To Fourth subject Amended Plan For Adjustment of Debts For the City of Detroit at 24 ("Disclosure Statement") [Docket No. 4391] ("The City believes that the Annuity Savings Fund Recoupment process, to the 20% cap, will permit the City to recover approximately $230 million of such excess interest.").[2]

For those retirees who received a distribution from their annuity savings account during the ASF Recoupment Period, the City proposed that their ASF Recoupment will be converted into actuarially-determined monthly annuity amounts, and then deducted from the retirees' monthly pension checks for the remainder of their lives. The ASF Recoupment Amount is annuitized based on the City's 6.75% investment rate of return assumption used in the Plan and upon other factors, such as life expectancy of the retirees. However, the specific terms of the "annuity" are not disclosed in the Plan, Disclosure Statement or the special supplement sent to retirees. *See* Plan II. 3.r.ii.D.2. The relevant Plan section states in its entirety:

> The Annuity Savings Fund Excess Amount will be calculated for each ASF Distribution Recipient, will converted into monthly annuity amounts based on each ASF Distribution Recipient's life expectancy and other factors, and will be deducted from each ASF Distribution Recipient' s monthly pension check; <u>provided</u>, <u>however</u>, in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension check exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

---

[2] This amount has been reduced somewhat by the correction made to the ballots for the period commencing on July 1, 2003.

On May 2, 2014, the City filed its Notice of Final Exhibits in Connection with Corrected Motion of the City of Detroit for Entry of an Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment with Respect to Pension and OPEB Claims Filed by Debtor In Possession City of Detroit, Michigan [Docket No. 4378]. The exhibits include the plain English supplement sent to the GRS retirees regarding their treatment under the Plan and sample ballots for voting on the Plan. Although the exhibits were carefully scrutinized by all of the parties representing retiree interests, there is no mention of the 6.75% annuity interest rate because it was not a term raised in settlement discussions.

On June 4, 2014, the City filed Stipulation By and Between (i) City of Detroit (ii) the Official Committee of Retirees, and (iii) the Detroit Retired City Employees Association Re: Certain Class 11 and Class 10 Ballots [Dkt No.5206]. Both the stipulation and the letter to be sent to certain retirees whose Class 11 ballots reflected a change in the ASF Recoupment Amount disclosed that the annuity would be calculated with 6.75% interest. See ¶9 and letter annexed as Annex A. The letter was sent only to those GRS retirees whose ballots reflected a change based on the elimination of July 1, 2002-June 30, 2003 Excess Interest allocation and or annuity savings fund distribution.

The 6.75% interest rate was raised again in the Concurrence Filed by Retiree Committee Official Committee of Retirees (RE: related document(s)5478 Motion of the General Retirement System of the City of Detroit to Designate and Determine Additional Legal Issue Regarding Methodology for ASF Recoupment From Retirees. [Dkt. 5309] on June 23, 2014 in connection with a request for approval of the lump sum buyout.

Both the Committee and the Retirement System advised retirees, who attended town hall meetings at the COBO Center on May 24, 2014 and at various locations around the City on June 5, 2014 and June 12, 2004, that the ASF Recoupment Amount would include 6.75% interest over

- 4 -

13-53846-tjt    Doc 6146    Filed 07/20/14    Entered 07/20/14 23:51:43    Page 4 of 8

the retiree's lifetime. The Retirement System's presentation, with that disclosure, was posted on the General Retirement System website.[3]

The result of the conversion to an annuity at the 6.75% interest rate is that average retirees will invariably be paying substantially more in actual dollars than the 20% balance cap and many will exceed the second cap of 15.5% referred to in the Plan and Disclosure Statement. The amount paid will be substantially more than if they paid the recoupment amount from their own reserves or financed the payment privately at substantially lower current market rates of consumer secured borrowing. However, not all retirees can afford to take the lump sum election that was recently negotiated with the City.

B. **The Federal Transit Act**

As a condition of grant of federal assistance under the Federal Transit Administration, section 13(c) of the Federal Transit Act (formerly the Urban Mass Transportation Act) requires that the grantee must make protective arrangements for employees affected by the assistance. Section 13(c) of the Federal Transport Act provides:

> (1) As a condition of financial assistance under sections 5307-5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, and 5338(b) of this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance under sections 5307-5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, and 5338(b) shall specify the arrangements.
> (2) Arrangements under this subsection shall include provisions that may be necessary for--
> the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;
> the continuation of collective bargaining rights;
> the protection of individual employees against a worsening of their positions related to employment;
> assurances of employment to employees of acquired public transportation systems;

---

[3] The presentation can be seen at :
http://www.rscd.org/GRS%20Retiree%20Informational%20Meeting.pdf

assurances of priority of reemployment of employees whose employment is ended or who are laid off; and paid training or retraining programs.
(3) Arrangements under this subsection shall provide benefits at least equal to benefits established under section 11326 of this title.

49 U.S.C. 5333

See generally *City of Colorado Springs v. Solis*, 589 F.3d 1121, 1124 (10th Cir. 2009) ("Section 13(c) ... requires state and local governments seeking federal financial assistance for transit operations to have in place 'fair and equitable' provisions for the protection of employees. Each time an applicant requests funds.. . the Secretary of Labor must certify that § 13(c) is satisfied.").

This federal requirement is administered by the U.S. Department of Labor, which certifies that fair and equitable protective arrangement are in place. The parties may use an agreement that was in place in connection with prior grants. The statute is intended to protect employees engaged in transit operations. *See* G. Kent Woodman, Jane Sutter Starke, Leslie D. Schwartz and James B. McDaniel, Legal Research Digest, Transit Labor Protection - "A Guide to Section 13(c) Federal Transit Act," June 1995, No.4.at 15. A copy of the Legal Research Digest article is attached hereto as Exhibit A.

The objecting retirees contend that a protective agreement entered into with D-DOT and AFSCME Local 312 in 1991 and incorporated into the most recent grant application in May 2014 protects both their pension and health care benefits from impairment in the Plan. A copy of the original protective agreement, labeled a "counterproposal" is attached hereto as Exhibit B. The Committee has requested additional information from the City with respect to its past and current grant applications.

In addition to the factual questions raised by the retirees' objections based on the Federal Transit Act, there are a number of legal questions regarding the scope of coverage under the Act,

and reconciliation with the Bankruptcy Code that have not yet been addressed by the objecting retirees and the City.

Dated: July 20, 2014

Respectfully submitted,

DENTONS US LLP

By: */s/ Carole Neville*
Carole Neville
Claude D. Montgomery
1221 Avenue of the Americas
New York New York 10020
Tel: (212) 768-6700
carole.neville@dentons.com
claude.montgomery@dentons.com

and

Sam J. Alberts
DENTONS US LLP
1301 K Street, NW Suite 600, East Tower
Washington, DC 20005-3364
Tel: (202) 408-6400
sam.alberts@dentons.com

and

Matthew E. Wilkins
Paula A. Hall
BROOKS WILKINS SHARKEY & TURCO
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Tel: (248) 971-1800
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Retirees Committee*

**CERTIFICATE OF SERVICE**

I, Carole Neville, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on July 20, 2014.

                                  By:    */s/ Carole Neville*
                                                 Carole Neville