AGREEMENT PURSUANT TO SECTION 13(C) OF THE URBAN
MASS TRANSPORTATION ACT OF 1964, AS AMENDED

WHEREAS, the Department of Transportation of the City of Detroit, Michigan ("Recipient"), has filed applications under the Urban Mass Transportation Act of 1964, as amended ("Act"), for inter alia, capital grants to assist in the purchase of a 10 rubber-tired trolley style buses to be utilized in pre-existing linehaul service, a total of 46 replacement linehaul coaches, and an electronic fare collection system, as more fully described in the respective grant application ("Project"), and

WHEREAS, certain employees of the Recipient are represented by AFSCME, Michigan Council #25, Local 312 ("Union"), and

WHEREAS, Sections 3(e)(4), 9(e)(1) and 13(c) of the Act require as a condition of any assistance thereunder that fair and equitable arrangements be made, as determined by the Secretary of Labor, "to protect the interest of employees affected by such assistance," and

WHEREAS, the parties hereto have agreed upon such fair and equitable arrangements to protect the interests of employees covered by this Agreement,

NOW THEREFORE, it is agreed that in the event the Project is approved for assistance under the Act, the following terms and conditions shall apply:

(1) (a) The term "Project, as used in this Agreement, shall not be limited to the particular facility, service, or operation assisted by Federal funds, but shall include any changes, whether organizational, operational,

technological, or otherwise, which are a result of the assistance provided.

(b) The phrase "as a result of the Project" shall, as used in this Agreement, include events occurring in anticipation of, during, and subsequent to the Project and any program of efficiencies or economies related thereto and shall also include events and actions which are as a result of Federal assistance under the Act; provided, however, that volume rises and falls of business, or changes in volume and character of employment brought about by causes other than the Project (including any economies or efficiencies unrelated to the Project) are not within the purview of this Agreement.

(2) The Project, as defined in paragraph (1)(a), shall be performed and carried out in full compliance with the protective conditions described herein and in such a manner and upon such terms and conditions as will not adversely affect employees represented by the Union. The duty to minimize the effects is not intended to preclude all actions which would adversely affect employees, but to balance such actions in favor of the interests of employees.

(3) All rights, privileges and benefits (including pension rights and benefits) of employees covered by this Agreement including employees having already retired under existing collective bargaining or otherwise, or any revision or renewal thereof, shall be preserved and continued; provided, however, that such rights, privileges and benefits not previously vested may be modified or altered by collective bargaining and agreement of the parties thereto to substitute other rights, privileges, and benefits.

*[signature]*
5/23/91

*[signature]*
Local 312
5-16-91

(4) The collective bargaining rights of employees covered by this Agreement, as provided by applicable laws, policies and/or collective bargaining agreements, shall be preserved and continued; provided, however, that this provision shall not be interpreted so as to require the Recipient to retain any such rights which exist by virtue of a collective bargaining agreement after such agreement is no longer in effect, except (a) as may be required under applicable law, or (b) as may be required under the status quo provision in paragraph (18)(f) of this Agreement. The Recipient agrees that it will bargain collectively with the Union or otherwise arrange for the continuation of collective bargaining, and that it will enter into any agreements reached with the Union, or arrange for any such agreements reached with the Union, or arrange for any such agreements to be entered into, relative to all subjects which are, or may be proper subjects of collective bargaining under section 13(c) of the Act.

(5) Nothing in this Agreement shall be construed to enlarge or limit the right of the employees covered by this Agreement, or their employer, to utilize upon expiration of any collective bagaining agreement or otherwise any economic measures that are not inconsistent or in conflict with the collective bargaining agreement or applicable law.

(6) (a) When the Recipient contemplates a change in operations, services, or facilities of the Recipient as a result of the Project, which may result in the dismissal or displacement of employees or rearrangement of the working forces covered by this Agreement, the Recipient shall give at least

forty-five (45) days' written notice of such change, by sending a certified mail notice to the duly authorized bargaining representatives of such interested employees and by posting a notice on bulletin boards convenient to the interested employees. Such notice shall contain a full and adequate statement of the proposed changes to be effected, including an estimate of the number of employees of each classification affected by the intended change, and the number and classification of any jobs in the Recipient's employment available to be filled by such affected employees. The date and place of a conference between representatives of all the parties interested in such intended changes for the purpose of reaching agreements with respect to the application thereto of the provisions of this Agreement shall be agreed upon immediately after the receipt of such notice, and the conference shall commence within ten (10) days from the date of such notice. Changes in operations, services, or facilities which will not result in the displacement, dismissal or rearrangement of employees are not covered by this provision.

(b) Each intended change which may result in the dismissal or displacement of employees or rearrangement of the working forces other than as provided by collective bargaining agreements shall provide for the selection of forces from the employees involved on bases accepted as appropriate for application in the particular case, and any assignment of employees made necessary as a result of the Project shall be made on the basis of an agreement between the Recipient and the representatives of the employees affected. Any such agreement shall recognize the rights of employees to

follow their work as to operations or services performed by employees covered by this Agreement, but not in contravention of collective bargaining agreements. In the event of failure to agree within thirty (30) days from commencement of negotiations, the dispute may be submitted to arbitration by either party in the manner set forth in and in accordance with the provisions of paragraph (17) of this Agreement. In any such arbitration, the terms of this Agreement are to be interpreted and applied in favor of providing employee protections and benefits no less than those established pursuant to Section 5(2)(f) of the Interstate Commerce Act, as amended, currently codified at 49 U.S.C. Section 11347.

(7) (a) Whenever an employee, retained in service, recalled to service, or employed by the Recipient pursuant to paragraphs (6), (8)(e) or (21), hereof, is placed in a worse position with respect to the employee's compensation as a result of the Project, such employee shall be considered a displaced employee and shall be paid a monthly allowance, hereby designated a "displacement allowance," to be determined in accordance with subparagraph (b) of this paragraph (7). Such displacement allowance shall be paid during the protective period, which shall commence on the date on which the employee is first displaced and shall continue so long as the employee is unable in the normal exercise of the employee's seniority rights to obtain a position producing compensation equal to or exceeding the compensation of the position from which the employee was displaced, adjusted to reflect subsequent general wage adjustments (including cost-of-living adjustments where provided for),

provided that notice concerning positions producing equal or better compensation is posted on bulletin boards convenient to the interested employees.

(b) The displacement allowance shall be a monthly allowance determined by computing the total compensation received by the employee, including vacation allowances, pay for time lost on account of on-the-job injury, and compensation guarantees, and the employee's total time paid for during the last twelve (12) months in which the employee performed compensated service, more than fifty per centum in each such month based upon the employee's normal work schedule immediately preceding the date of the employee's displacement as a result of the Project and by dividing separately the total compensation and the total time paid for by twelve, or by the number of months in which the employee performed such compensated service if the employee had less than twelve months of such compensated service prior to the employee's displacement, thereby producing the average monthly compensation and the average monthly time paid for. If the employee's length of service is less than twelve (12) months, the average monthly compensation and average monthly time paid for shall be computed by dividing separately the total compensation and total time paid by the number of months in which such employee performed compensated service more than fifty (50) per centum of each such month. Such allowance shall be adjusted to reflect subsequent general wage adjustments (including cost of living adjustments where provided for).

(c) If the displaced employee's compensation in the employee's current position is less in any month during such employee's protective period than the aforesaid average compensation (adjusted to reflect subsequent general wage adjustments, including cost-of-living adjustments were provided for), the employee shall be paid the difference, less compensation for any time lost on account of voluntary absences or absences from service on account of injury, sickness, disability or discipline for cause, to the extent that the employee is not available for service equivalent to the employee's average monthly time paid for, but the employee shall be compensated in addition thereto at the rate of the current position for any time worked in excess of the average monthly time paid for. It is not intended that the provisions of this paragraph (7) shall affect in any way the retirement on pension or annuity rights and privileges of any employee.

(d) If a displaced employee fails to exercise the employee's seniority rights to secure another available position to which the employee is entitled under the then-existing collective bargaining agreement and which carries a wage rate and compensation exceeding that of the position which the employee elects to retain, the employee shall thereafter be treated, for the purposes of this paragraph, as occupying the position the employee elects to decline.

(e) If any employee who is entitled to a monthly displacement allowance served as an agent or a representative of employees on either a full or part-time basis in the twelve (12) months immediately preceding the

employee being adversely affected, the employee's monthly displacement allowance shall be computed by taking the average of the average monthly compensation and average monthly time paid for the protected employees in active service immediately above and below such employee on the same seniority roster or the employee's own monthly displacement allowance, whichever is greater.

(f) Any employee placed in a worse position as a result of the project with respect to hours, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during the employee's employment shall be entitled to receive offsetting benefits.

(g) The displacement allowance and/or offsetting benefits shall cease prior to the expiration of the protective period in the event of the displaced employee's resignation, death, retirement, or dismissal for cause in accordance with any labor agreement applicable to the employee's employment.

(8) (a) Whenever any employee is deprived of employment as a result of the Project, such employee shall be considered for the purposes of this Agreement a "dismissed employee" and shall be paid a monthly dismissal allowance. Such dismissal allowance shall be first paid each dismissed employee commencing not later than the thirtieth (30th) day following the day on which the employee is, by agreement of the Recipient or by final arbitration decision rendered in accordance with paragraph (17) of this Agreement, determined to be a "dismissed employee" and continue payable monthly during the protective period, as follows:

0350A

| Employee's length of service prior to adverse effect | Period of protection |
|---|---|
| 1 day to 6 years | equivalent period |
| 6 years or more | 6 years |

The monthly dismissal allowance shall be equivalent to one-twelfth (1/12th) of the total compensation received by the employee, including vacation allowances, pay for time lost on account of on-the-job injury, and compensation guarantees and the employee's total time paid for in the last twelve (12) months of the employee's employment in which the employee performed compensation service more than fifty per centum of each such months based on the employee's normal work schedule to the date on which the employee was first deprived of employment as a result of the Project. If the employee's length of service is less than twelve (12) months, the monthly dismissal allowance shall be computed by dividing the total compensation by a number equal to the number of months of the employee's employment in which the employee performed compensated service more than fifty (50) per centum of each such months based on the employee's normal work schedule to the date on which the employee was first deprived of employment as a result of the Project. Such allowance shall be adjusted to reflect subsequent general wage adjustments (including cost-of-living adjustments where provided for.)

(b) An employee shall be regarded as deprived of employment and entitled to a dismissal allowance when the position the employee holds is abolished as a result of the Project and the employee is unable by the exercise of the employee's seniority rights, or through the Recipient in

accordance with subparagraph (e), to obtain another position; or when the position the employee holds is not abolished but the employee loses that position as a result of seniority rights by an employee whose position is abolished as a result of the Project or as a result of exercise of seniority rights by other employees brought about as a result of the Project, and such employee is unable to obtain another position by the exercise of such employee's seniority rights, or through the Recipient in accordance with subparagraph (e). (Exercise of seniority rights in accordance with paragraph (6) of this Agreement can be required only after the provisions of paragraph (6) have been complied with.) In the absence of proper notice followed by an agreement or decision pursuant to paragraph (6) of this Agreement, no employee who has been deprived of employment as a result of the Project shall be required to exercise seniority rights to secure another position in order to qualify for a dismissal allowance hereunder.

(c) Each employee receiving a dismissal allowance shall keep the Recipient informed as to the employee's current address and the current name and address of any other person by whom the employee may be regularly employed, or if the employee is self-employed.

(d) The dismissal allowance shall be paid to the regularly assigned incumbent of the position abolished. If the position of an employee is abolished when the employee is absent from service, the employee will be entitled to the dismissal allowance when the employee is available for service. The employee temporarily filing said position at the time it was

abolished will be given a dismissal allowance on the basis of that position, until the regular employee is available for service, and thereafter shall revert to the employee's previous status and will be given the protections of this Agreement in such position, if any are due such employee.

(e) An employee receiving a dismissal allowance shall be subject to call to return to service by the employee's former employer after being notified in accordance with the terms of the then existing collective bargaining agreement. Prior to such call to return to work, the employee may be required by the Recipient to accept other reasonably comparable employment for which the employee is physically and mentally qualified, or for which the employee can become qualified after a reasonable training or re-training period, and which does not require a change in place of residence as described in paragraph (15)(e) hereof, if the employee's return does not infringe upon the employement rights of other employees under a then-existing collective bargaining agreement. An employee who accepts other reasonably comparable employment will not thereby lose the employee's seniority rights under the collective bargaining agreement applicable to the position the employee occupied at the time the employee was deprived of employment, nor will such rights be otherwise adversely affected.

(f) When an employee who is receiving a dismissal allowance returns to service in accordance with subparagraph (e) above, such allowance shall cease while the employee is so re-employed and the period of time during which the employee is so re-employed shall be deducted from the total

0350A

period for which the employee is entitled to receive a dismissal allowance. During the time of such re-employment, the employee shall be entitled to the protections of this Agreement, to the extent they are applicable, including displacement allowances to which the employee may be entitled under paragraph (7) of this Agreement.

(g) The dismissal allowance of any employee who is otherwise employed shall be reduced to the extent that the employee's combined monthly earnings in such other employment or self-employment (provided such employment was not held for more than five (5) months of the twelve (12) month period upon which the dismissal allowance is based), any benefits received from any unemployment insurance law, and the employee's dismissal allowance exceed the amount upon which the employee's dismissal allowance is based. The employee, or the employee's representative, and the Recipient shall agree upon a procedure by which the Recipient shall be kept currently informed of the earnings of such employee in employment other than with the employee's former employer, (including self-employment), and the benefits received, including any necessary releases to authorize the Social Security Administration to furnish the Recipient a statement of earnings.

(h) The dismissal allowance shall cease prior to its normal expiration date, as described in subparagraph (a) above, in the event of the failure of the employee without good cause to return to service in accordance with the collective bargaining agreement, or to accept reasonably comparable employment as provided under subparagraph (e), or in the event of the

employee's resignation, death, retirement, or dismissal for cause, in accordance with existing rules and agreements.

(i) A dismissed employee receiving a dismissal allowance shall actively seek and not refuse other reasonably comparable employment offered the employee for which the employee is physically and mentally qualifed and which does not require a change in residence as defined in paragraph (15)(e) hereof. Failure of the dismissed employee to comply with this obligation shall be grounds for discontinuance of the employee's allowance; provided that such dismissal allowance shall not be discontinued until final determination is made either by agreement between the Recipient and the employee or the employee's representative, or by final arbitration decision rendered in accordance with paragraph (17) of this Agreement that such employee did not comply with this obligation.

(j) If an employee receiving a dismissal allowance returns to active service, the period during which such employee received a dismissal allowance shall be counted as employment with the Public Body for purposes of determining such employee's eligibility for vacation days thereafter; provided that such employee shall not accrue actual vacation days for the period during which the dismissal allowance was received.

(9) A dismissed employee entitled to protection under this Agreement may, at the employee's option within thirty (30) days of the employee's dismissal or within sixty (60) days of the date of an arbitration award establishing that the employee is a dismissed employee, resign and (in lieu of

all other benefits and protections provided in this Agreement) accept a lump sum payment computed in accordance with Section 9 of the Washington Job Protection Agreement of May, 1936, as follows:

| Length of Service | | | Separation Allowance |
|---|---|---|---|
| 1 year and less than | 2 years | | 3 month's pay |
| 2 years " " " | 3 " | | 6 " " |
| 3 " " " " | 5 " | | 9 " " |
| 5 " " " " | 10 " | | 12 " " |
| 10 " " " " | 15 " | | 12 " " |
| 15 " " over | | | 12 " " |

If any dismissal allowance is paid as a result of the Project prior to exercising this option, it will be deducted from the lump sum payment.

In the case of an employee with less than one year's service, five days' pay, computed by multiplying by 5 the normal daily earnings (including regularly scheduled overtime, but excluding other overtime payments) received by the employee in the position last occupied, for each month in which the employee performed service, will be paid as the lump sum.

(a) Length of service shall be computed as provided in Section 7(b) of the Washington Job Protection Agreement, as follows:

> For the purpose of this agreement, the length of service of the employee shall be determined from the date he last acquired an employment status with the employing carrier and he shall be given credit for one month's service for each month in which he performed any service (in any capacity whatsoever)

of December 3, 1990
Page 15 of 36

and twelve such months shall be credited as one year's service. The employment status of an employee shall not be interrupted by furlough in instances where the employee has a right to and does return to service when called. In determining length of service of an employee acting as an officer or other official representative of an employee organization he will be given credit for performing service while so engaged on leave of absence from the service of a carrier.

(b) One month's pay shall be computed by multiplying by 30 the normal daily earnings (including regularly scheduled overtime, but excluding other overtime payments) received by the employee in the position last occupied prior to time of the employee's dismissal as a result of the Project.

(10) The term "Protective Period" as used in this Agreement, unless the context requires otherwise, means that period of time during which a displaced or dismissed employee is to be provided protection hereunder and extends from the date on which an employee is displaced or dismissed or otherwise worsened to the expiration of six (6) years therefrom, provided, however, that the protective period for any particular employee during which the employee is entitled to receive the benefits of these provisions shall not continue for a longer period following the date the employee was displaced or dismissed than the employee's length of service with the employer by which the

employee was employed prior to the date of the employee's displacement or dismissal, as shown by the records and labor agreements applicable to such employee's employment prior to the date of such displacement or dismissal.

(11) In determining length of service of a displaced or dismissed employee for purposes of this Agreement, such employee shall be given full service credits in accordance with the records and labor agreements applicable to the employee and the employee shall be given additional service credits for each month in which the employee receives a dismissal or displacement allowance as if the employee were continuing to perform services in the employee's former position.

(12) No employee shall be entitled to either a displacement or dismissal allowance or other offsetting benefits under paragraphs (7) or (8) hereof because of the abolishment of a position to which, at some future time, the employee could have bid, been transferred or promoted.

(13) (a) No employee affected as a result of the Project shall be deprived, during such employee's protected period, of any rights, privileges, or benefits attaching to the employee's employment, including, without limitation, group life insurance, hospitalization and medical care, free transportation for the employee and the employee's family, sick leave, continued status and participation under any disability or retirement program, and such other employee benefits as Railroad Retirement, Social Security, Worker's Compensation, and unemployment compensation, as well as any other benefits to which the employee may be entitled under the same conditions and

so long as such benefits continue to be accorded to other employees of the bargaining unit, in active service or furloughed, as the case may be.

(b) Nothing in this Agreement shall be construed to relieve the employers of the employees covered hereby of any obligations which they have under existing collective bargaining agreements, including but not limited to obligations arising from the benefits referred to in this paragraph (13), nor make any such employer a third-party beneficiary of the Recipient's obligations contained herein, nor deprive the Recipient of any right of subrogation.

(14) (a) Any employee affected as a result of the Project who is retained in service or who is later restored to service after being entitled to receive a dismissal allowance, and who is required to change the point of the employee's employment in order to retain or secure active employment with the Recipient in accordance with this Agreement, thereby requiring the employee to make a change in residence as defined in paragraph (15)(e) hereof, shall be reimbursed by the Recipient for all expenses of moving the employee's household and other personal effects, for the traveling and living expenses for the employee and members of the employee's immediate family, and for the employee's own actual wage loss during the time necessary for such transfer and for an additional reasonable time (not to exceed five (5) working days) to be used in securing a place of residence in the employee's new location. The exact extent of the responsibility of the Recipient under this paragraph (14) and the ways and means of transportation shall be agreed upon in advance