UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                              .        Detroit, Michigan
                              .        July 16, 2014
                Debtor.       .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. (#5021) ORDER REGARDING IDENTIFYING LEGAL
ISSUES RELATING TO CONFIRMATION - ISSUES 1-6, 8, 10-14
TO BE HEARD (RE. RELATED DOCUMENT(S) 5014 NOTICE
OF ADJOURNMENT OF HEARING (BK OTHER)) (CKATA) -
COMMENT:  ISSUE #12 RESOLVED - SEE ORDER AT DKT. #5668;
ISSUES #13 AND #14 RESOLVED - SEE ORDER AT #5924;
ISSUE #11 RESOLVED - SEE ORDER AT DKT. #6006;
HEARING ON LEGAL ISSUE #4 RESCHEDULED FOR 7/17/14
AT 9 AM PER NOTICE AT DKT. #6003
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street, Fiftieth Floor
                       Los Angeles, CA  90071
                       (213) 243-2382

For Creditors          Goodman & Hurwitz, PC
Ryan, Phillips,        By:  JULIE H. HURWITZ
Provience, Swift,      1394 E. Jefferson Avenue
Cuppetelli,            Detroit, MI  48207
Mendoza:               (313) 567-6170

For Dennis Trust:      Demorest Law Firm, PLLC
                       By:  MARK S. DEMOREST
                       322 West Lincoln Avenue, Suite 300
                       Royal Oak, MI  48067
                       (248) 723-5500

APPEARANCES (continued):

```
For County of         Dechert, LLP
Macomb, Michigan:     By:  ALLAN S. BRILLIANT
                      1095 Avenue of the Americas
                      New York, NY  10036
                      (212) 698-3600

For Oakland           Carson Fischer, PLC
County, Michigan:     By:  JOSEPH M. FISCHER
                      4111 Andover Road, West - Second Floor
                      Bloomfield Hills, MI  48302-1924
                      (248) 644-4840

For County of         Butzel Long, PC
Wayne, Michigan:      By:  MAX J. NEWMAN
                      Stoneridge West
                      41000 Woodward Avenue
                      Bloomfield Hills, MI  48304
                      (248) 258-2907

For National          Sidley Austin, LLP
Public Finance        By:  JEFFREY E. BJORK
Guaranty Corp.:       555 W. 5th Street, Suite 4000
                      Los Angeles, CA  90013
                      (213) 896-6037

For Detroit Fire      Legghio & Israel, PC
Fighters Associa-     By:  CHRISTOPHER LEGGHIO
tion, I.A.F.F.        306 South Washington, Suite 600
Local 344:            Royal Oak, MI  48067
                      (248) 398-5900

Court Recorder:       LaShonda Moss
                      United States Bankruptcy Court
                      211 West Fort Street, 21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  Calling Case Number 13-53846, City of

2     Detroit, Michigan.

3          THE COURT:  One moment, please.  Okay.  Good

4     morning.  I'd like to consult with you and review the

5     schedule of the issues to make sure we are all coordinated

6     here.  I'm showing that Issues 1, 2, and 3 are proceeding as

7     scheduled at 9, 9:30, and 10; that Issue 4 was moved to

8     tomorrow at nine o'clock.  Issue 5 is still on for today at

9     11:15, although if the attorneys show up before that, we can

10    accommodate them.  Issue 6, adjourned to July 31st at nine

11    o'clock.  Issue 7 is going as scheduled tomorrow at nine with

12    Issue 4.  Issue 8 was adjourned, I think, without date.  Yes?

13         MS. LENNOX:  Correct.

14         THE COURT:  Issue 9 was resolved.  Issue 10 is going

15    today at two, and Issues 11, 12, 13, and 14 have all been

16    resolved.

17         MS. LENNOX:  That's correct, your Honor.

18         THE COURT:  Yes?  Okay.  Then let's proceed with

19    Issue Number 1.

20         MR. LEGGHIO:  Good morning, your Honor.  Christopher

21    Legghio on behalf of the Detroit Fire Fighters Association.

22    Just as a matter of housekeeping, your Honor, argument five

23    is the argument that was filed by the DPOA, and the DFFA

24    joined with them on that.  And as the Court certainly knows,

25    the DPOA has tentatively reached agreement, so we are here on

1  behalf of argument five, and we're just going to rely on the

2  briefs, so I'm not going to --

3           THE COURT:  I might have some questions for you.

4           MR. LEGGHIO:  That's fine.

5           THE COURT:  So let's hold on that and see where we

6  are after Issue Number 3, okay --

7           MR. LEGGHIO:  Okay.  Your Honor, our --

8           THE COURT:  -- if you don't mind coming back or

9  being here until then.

10          MR. LEGGHIO:  Okay.  Our objections to the POA is

11  it's very discrete.  It deals with the hybrid pension plan

12  for fire fighters and the ten-year injunction that the city

13  has asserted into that plan.  We believe that this is an

14  effort to suspend the bargaining rights of the fire fighters

15  for the next ten years, and it is to relieve the city of its

16  duty to bargain for the next ten years.  In that sense, it's

17  a misuse of the POA, a bad faith use of the POA.

18          THE COURT:  Well, but is the standard under

19  applicable Michigan law whether that interval for collective

20  bargaining is reasonable?

21          MR. LEGGHIO:  That's one of the arguments that the

22  city made, and it's -- the answer to that is no.  The duty to

23  bargain, as I pointed out in the brief, is not a term that

24  has to be contextualized.  It's not an amorphus term.  It's

25  not -- this Court has no authority to suspend the duty of

1  bargaining for ten years.  The only time the duty to bargain
2  and the concept of reasonable time are addressed is when the
3  employer has sat down in a reasonable time after a union
4  election or after a certification vote.  If they avoid the
5  bargaining table for a period of time after that, the board
6  and the courts have found that that's not reasonable, but
7  here they're asking you to repeal PERA for ten years.  As I
8  stand here today, your Honor, the duty to bargain that was
9  suspended under the martial law of 436 snaps back in three
10  years, and about three years is in a few months.  It'll be
11  five years from its imposition, and the duty to bargain will
12  snap back.  They're asking you to approve an order, a plan
13  that will suspend that duty to bargain for another seven
14  years.  That's not reasonable.  That's not how the -- that's
15  not the test under the statute.  This Court has no ability to
16  judicially repeal PERA or relieve the city of its duty to
17  bargain.  They have their rights under 436.  They can impose
18  a hybrid.  They're asking you to do more.  They're asking to
19  do what you cannot do.
20        THE COURT:  What do the cases of AFSCME Local 25
21  versus Wayne County and Town & Country Plumbing & Heating
22  versus NLRB hold?
23        MR. LEGGHIO:  Your Honor, you have me at -- you have
24  me at an advantage.  I don't know what they hold, but they
25  don't hold that this Court can suspend the duty of bargaining

1 | for ten years.

2 | THE COURT: Right, but they're not bankruptcy cases.

3 | But what do they hold about the Public Employment Relations

4 | Act?

5 | MR. LEGGHIO: Your Honor, as I say, I can't quote

6 | the case.

7 | THE COURT: Yeah. Okay. All right. I'm sorry.

8 | Fair enough.

9 | MR. LEGGHIO: But I don't want to miss your point.

10 | If the Court wants to tell me what you're getting at, I'll be

11 | happy to respond.

12 | THE COURT: Well, my question was what do they say

13 | about the duty to bargain. It's just a question.

14 | MR. LEGGHIO: Okay. I'm not sure what the Court --

15 | well, I mean, look, the duty to bargain is a -- the duty to

16 | bargain has been enshrined in this country's labor policy for

17 | over 80 years and 50 years in this state, and it is not a

18 | concept that is lightly dismissed. And the suggestion that

19 | this Court has the jurisdiction to suspend it for ten years

20 | is not tied to any law. They don't cite any bankruptcy law.

21 | They've had several occasions to do that, to cite any

22 | bankruptcy law that says that this Court can suspend the duty

23 | to bargain or, for that matter, become the --

24 | THE COURT: Well, but you argue that it violates

25 | state law --

1          MR. LEGGHIO:  Correct.

2          THE COURT:  -- for the plan to have this so-called

3    suspension.  I mean we can argue about whether it's a

4    suspension or not, but -- so the issue is not whether

5    bankruptcy law allows it.  The issue is whether state law

6    allows it; right?

7          MR. LEGGHIO:  Well, we don't have any quibble on

8    that, your Honor.  436 suspended it.

9          THE COURT:  All right.  So what is it about state

10   law that requires bargaining before ten years from now or ten

11   years from confirmation?

12         MR. LEGGHIO:  Well, let me unpack what the Court has

13   just said.

14         THE COURT:  Um-hmm.

15         MR. LEGGHIO:  The duty to bargain is the duty to

16   bargain at reasonable times, and it is not for this Court to

17   decide ten years hence is the --

18         THE COURT:  All right.  So you concede that the duty

19   to bargain is a duty to bargain at reasonable times.

20         MR. LEGGHIO:  Your Honor, I'm not making any

21   concession.  That's in the statute.

22         THE COURT:  Okay.  Fair enough.  So then the

23   question becomes why isn't ten years a reasonable time?

24         MR. LEGGHIO:  A ten-year hiatus on bargaining is, in

25   effect, an abrogation of the duty to bargain.  There's no

1  case law that anybody can cite in this courtroom in which the

2  duty to bargain under any context, bankruptcy, non-

3  bankruptcy, where an employer got a pass for ten years on the

4  duty to bargain.

5       THE COURT:  Well, there's a lot about this case

6  that's sui generis; right?

7       MR. LEGGHIO:  Correct, your Honor, but it is --

8       THE COURT:  I mean it took 50 years for the

9  circumstances that gave rise to this bankruptcy to develop,

10 the city argues.  The emergency manager law, PA 436, suspends

11 the duty for at least five years.

12      MR. LEGGHIO:  Maximum.

13      THE COURT:  Five years.  In those circumstances, why

14 isn't ten a reasonable time?

15      MR. LEGGHIO:  Well, your Honor --

16      THE COURT:  The city needs some time period to be

17 able to predict with some degree of certainty what its

18 obligations are.  Yes?

19      MR. LEGGHIO:  Well, your Honor, that's the sophistry

20 of their argument.  By that standard, your Honor, as I

21 pointed out in my briefs, they shouldn't stop at ten years.

22 They should go 25 years of a hybrid plan.  They should

23 impose --

24      THE COURT:  Well, but fortunately for you, they're

25 not asking for that.

1          MR. LEGGHIO:  Well, no.

2          THE COURT:  They're asking for ten.

3          MR. LEGGHIO:  It's not unfortunate, your Honor.  The

4    Court is trivializing my argument.  It's not unfortunate for

5    me they didn't ask for that.  It's instructive.  They should

6    have asked for ten years on wage freezes and on holidays.

7    All of those things, your Honor, I pointed out in the brief

8    can be linked back to feasibility, but --

9          THE COURT:  Let me ask you this question about state

10   law.  If there is a duty to bargain after five years and the

11   bargaining fails, what does the Public Employment Relations

12   Act say happens next?

13         MR. LEGGHIO:  If the parties go to impasse, the city

14   can impose.  Very simple.  That's standard basic labor law.

15         THE COURT:  Um-hmm.

16         MR. LEGGHIO:  But, your Honor --

17         THE COURT:  There's no arbitration required?

18         MR. LEGGHIO:  There is a 312 arbitration, sure.

19         THE COURT:  There is arbitration?

20         MR. LEGGHIO:  There's 312 for police and fire;

21   correct, but, your Honor --

22         THE COURT:  So it's not that the city can impose.

23         MR. LEGGHIO:  Well --

24         THE COURT:  There's arbitration.

25         MR. LEGGHIO:  Your Honor, let me retract.

1          THE COURT:  Okay.

2          MR. LEGGHIO:  I'm operating in the world of 436,

3    this rare --

4          THE COURT:  No.  I'm talking about five years from

5    now.

6          MR. LEGGHIO:  I understand.  I understand.  312 is

7    the tribunal that breaks the deadlock, the impasse deadlock

8    between the employer and its public safety unions.  It has

9    been doing that for lo these many years.  Now, that, too, has

10   been suspended under 436, so we are not operating with that.

11   And as you know, there has been legislation bandied about

12   that was going to reformulate how 312 would operate, but

13   that's the answer --

14         THE COURT:  I actually don't know that, but okay.

15   It doesn't matter.

16         MR. LEGGHIO:  The answer to your question is it

17   is -- goes to 312, your Honor, but to get to your point, your

18   Honor, about why isn't ten years a reasonable time, I think,

19   with respect to the Court, you're looking out of the wrong

20   end of the telescope.  The state legislature limited the

21   suspension of the duty to bargain to five years.  They can't

22   do that under state law now.  They're telling you --

23         THE COURT:  I'm confused by your argument because,

24   on the one hand, you say they limited it to five years.  On

25   the other hand, you say it's a reasonable time.

1          MR. LEGGHIO:  I said the state legislature suspended
2    the duty to bargain for five years.

3          THE COURT:  In 436.

4          MR. LEGGHIO:  Correct.  They abrogated 436.

5          THE COURT:  But in PERA you say it's a reasonable
6    time.

7          MR. LEGGHIO:  That's what they repealed by 436.
8    They repealed the reasonable time requirement, and I called
9    it martial law.  The Court sighed a little bit because
10   perhaps you think that's a pejorative way to look at it, but
11   it's just --

12         THE COURT:  It's a little bit of an exaggeration.

13         MR. LEGGHIO:  Well, the suspension of the duty to
14   bargain is one of the first things that go in martial law,
15   and that's what happened here.

16         THE COURT:  All right.  Let's not have an argument
17   about what constitutes martial law.

18         MR. LEGGHIO:  I understand, your Honor, but I do
19   want to get back to your point.  What is happening here is
20   they are asking you to extend 436, something the legislature
21   did not do when it decided to suspend the duty to bargain,
22   suspend the duty to bargain at reasonable times -- they're
23   asking you to do that.  They're asking --

24         THE COURT:  Well, but at the same time, the
25   legislature also imposed a financial control board on the

1  city for 13 years.  Doesn't that suggest something about the
2  legislative insight and intent regarding the need for
3  financial stability and foreseeability for a long time,
4  longer than five years?
5          MR. LEGGHIO:  Your Honor, I'm not going to quibble
6  about the need for financial stability or predictability or
7  any of those things.  That's, of course --
8          THE COURT:  Well, but where's the predictability if
9  this is thrown into the hands of an arbitrator whose
10  decisions are unaccountable to anyone and unreviewable?
11         MR. LEGGHIO:  Well, that's not true.  A 312 panel
12  has a duty to consider a city's economic situation in
13  arbitration.
14         THE COURT:  Right, but they're not accountable to
15  anyone nor are their decisions reviewable; right?
16         MR. LEGGHIO:  Well, that's not -- your Honor, 312
17  is --
18         THE COURT:  Is that right?
19         MR. LEGGHIO:  No, it's not correct, your Honor.
20         THE COURT:  Who is the -- who are arbitrators
21  accountable to?
22         MR. LEGGHIO:  Courts, employers -- public employers
23  have challenged 312 arbitration decisions like they challenge
24  the decisions of --
25         THE COURT:  Oh, on what ground are they

1  challengeable?

2         MR. LEGGHIO:  That it exceeds their jurisdiction --

3         THE COURT:  Well --

4         MR. LEGGHIO:  -- to the extent that they did not

5  consider the financial status of the city.

6         THE COURT:  That's a pretty tough standard.

7         MR. LEGGHIO:  Your Honor, that's by design.  That's

8  what the courts want, that they want finality with the

9  arbitration process, so that's the standard.

10        THE COURT:  Toughness of the standard is what the

11 unions rely on in defending those arbitration awards, isn't

12 it?

13        MR. LEGGHIO:  The unions rely on the court's

14 preference for finality with arbitration.  That's what the

15 court -- that's what the unions rely on.  I would say to you,

16 your Honor, that street runs both ways, of course.  The

17 cities -- the public employer cities rely on that when they

18 want to enforce 312 awards also because --

19        THE COURT:  I'm sure.

20        MR. LEGGHIO:  And they look at the standards.

21        THE COURT:  Um-hmm.

22        MR. LEGGHIO:  But the Court -- your Honor, the

23 Court's arguments here are strange.

24        THE COURT:  Questions.  I'm asking questions.

25        MR. LEGGHIO:  Okay, your Honor.

1           THE COURT:  I've got questions for the city, too.

2           MR. LEGGHIO:  I heard them in the -- I heard them in

3     the register of argument, but I'll retract that.

4           THE COURT:  I've got questions for the city, too.

5           MR. LEGGHIO:  Okay.  Your Honor, I want to answer

6     more of your questions, but I also want to put into the

7     record three cases which I do not cite in my brief that I

8     think are informative.

9           THE COURT:  Okay.

10          MR. LEGGHIO:  One is In re. Alabama Symphony

11    Association.  It's 155 B.R. 556.  And there -- this was a --

12    this was a dispute between a symphony orchestra and an

13    employer, and there the Court said it would be inappropriate

14    for a Bankruptcy Court to sit at the head of the bargaining

15    table.  The Court is here merely to decide whether the

16    parties ought to be divorced, not to decide the terms under

17    which they shall live together.  Now, here, your Honor, the

18    Court has to look to Bildisco for some direction, and in

19    Bildisco we know that the Court has authority to abrogate a

20    collective bargaining agreement provided the appropriate

21    evidence is presented to the Court.  Here the state usurped

22    that by just imposing 436, and so we didn't have to come

23    here -- the city did not have to come here and ask you to

24    abrogate a current collective bargaining agreement, but they

25    are now asking you to decide the terms of a future collective

1   bargaining agreement.  As I say in my brief, this deforms and

2   kind of warps the process, and it deprives the union for the

3   next ten years of part of its inventory when it comes to

4   bargaining.  And it queers the process.  It makes it

5   impossible to bargain effectively if part of your inventory,

6   your negotiating coins, have been removed by this Court.  The

7   city's argument, at the end of the day, they get -- we

8   predicted this, as a matter of fact.  I have to tell you I've

9   thought -- I prophesized this in our initial brief before I

10   saw the city's argument -- is they get to this argument crab-

11   like, but they get to the argument that it's all linked to

12   feasibility.  And as I say, that argument has to fail because

13   by that argument, they could ask this Court to impose wages,

14   fringe benefits, holidays, compensation pay, pension plans.

15   To that point, your Honor, let me cite another case for you,

16   In re. Rath Packing, 36 B.R. 979.  The court said this court

17   does not have the choice to decrease or increase incentive

18   pay, to pay or not to pay for three days of sick leave, to

19   terminate or reinstate a pension plan.  This court doesn't

20   have the choice to mandate 7.24 an hour or eight dollars an

21   hour or 10.24 an hour.  And the court doesn't have the choice

22   of reducing or increasing benefits.  What they're telling

23   you, your Honor, is that you should set the wage and price

24   controls for the next ten years.  Now, think about it in this

25   terms.  Could the city come in here and ask you to impose on

1  a vendor for the next ten years the price of their products

2  to the city?  Is that what this Bankruptcy Court has

3  authority to do?  We think the elemental threshold

4  consideration is is are you a body that controls future

5  economic relationships?  You are not.  This Court affects

6  future -- the future of a debtor only by affecting the

7  debtor's current and past debts, and it's not the guardian of

8  what the city does in the future.

9       Your Honor, nobody wants to see the city fail going

10  forward, not my client, not any union that I'm aware of, not

11  this Court, not anybody in this courtroom, but if -- you

12  know, Frank Borman's quote about bankruptcy being to

13  capitalism what hell is to Christianity, you should not be

14  someone who tries to control the future of what the city does

15  ten years hence at the bargaining table.  That is beyond this

16  Court's jurisdiction.  That's what the --

17       THE COURT:  Even if the evidence establishes that

18  it's necessary to do that for the city to establish the

19  feasibility of its plan?

20       MR. LEGGHIO:  The answer to that is, your Honor, the

21  city cannot wave the feasibility flag to ask this Court to

22  march into the future for ten years and control what happens

23  at the bargaining table.  Now, we hope saner heads prevail.

24  We would assume they will.  But however noble this Court's

25  intent is, it is not -- you haven't been licensed to go ten

1  years forward and control the wages and the benefits.  And

2  the Court -- I don't mean to be pejorative, but the Court

3  kind of scoffed at the notion about ten or twenty or twenty-

4  five years, but that's the reality.  The feasibility argument

5  spun to its conclusion says let's set this up for 25 years.

6  Let's set up the wages and the benefits, and we will lock

7  down the feasibility question forever, but that isn't fair.

8  It isn't fair on a lot of levels, and it's certainly not fair

9  because there is state statute that prohibits it.

10      THE COURT:  Well, but isn't your proper response to

11  that argument not that it can't be done but that it isn't

12  necessary to establish feasibility as a matter of fact?

13      MR. LEGGHIO:  Your Honor, I'm always prepared to be

14  educated.  I would accept that as part of the argument, but I

15  also take the position that I don't know where the Court gets

16  the authority to dictate economic terms for not yet incurred

17  debts and to determine the economic relationship of future

18  party -- the future parties, the unions and the city.  I mean

19  how can -- where does the authority come from?

20      THE COURT:  It comes from the authority, if at all,

21  in PERA to determine what's a reasonable time.

22      MR. LEGGHIO:  Well, your Honor, that is -- that

23  argument, to be blunt, is nonsense.  Ten --

24      THE COURT:  What's nonsense about it?

25      MR. LEGGHIO:  The duty to bargain is measured by

1   when the duty starts.  When 312 expires, the city has a duty
2   to bargain.  What is the answer to that?  Does a duty to
3   bargain stop, your Honor, when an employer says, you know,
4   I've been having bad times, so I don't have to bargain?  Run
5   that up in front of the National Labor Relations Board.  See
6   how many cases there are where the board said we're going to
7   suspend for ten years the duty to bargain because you're
8   having bad economic times.  That's not the measurement.
9   That's not the test.  You don't contextualize that term.  It
10  is an absolute duty, and it's a duty measured -- the only
11  time there's any examination done as to what is a reasonable
12  time, it's in terms of, well, there was a union election in
13  January, and they didn't sit down till June.  Is that a
14  reasonable time, or is it if they wait 18 months, is that
15  unreasonable to dodge your duty to bargain?  It's not
16  measured by ten years, and it's -- and the employer cannot
17  offer as a defense to duty to bargain in a reasonable time
18  that, well, we're broke, so we just thought it wouldn't make
19  sense to bargain.  There's no case law that supports that,
20  and this is some -- your Honor, this is serious stuff.  This
21  is 80 years in the federal sector, 50 years in this state of
22  a duty to bargain, and it's been enshrined in a statute.  And
23  I think it should be instructive to this Court that what the
24  state legislature did -- and 436 is a heavy-handed statute,
25  your Honor, and they checked themselves at five years.  Hell,

1   they could have gone for ten years if they wanted to if they

2   really thought this was the way it was to go.  Now this Court

3   under the guise of reasonable time is going to say, well, I'm

4   going to graft onto 436 another five years of the duty --

5   suspend the duty to bargain.  That exceeds by miles anything

6   this Court can consider.

7           THE COURT:  Thank you, sir.

8           MS. LENNOX:  Good morning, your Honor.  For the

9   record, Heather Lennox of Jones Day on behalf of the city.

10  I'd like to actually just go through our reasoning, your

11  Honor, based on what the statutes actually say and how we

12  thought about this, so obviously we start with PERA.  And

13  Section 15(1) of PERA generally requires that a public

14  employer shall bargain collectively with the representatives

15  of its employees, and that means to meet at, as your Honor

16  pointed out, reasonable times and to confer in good faith

17  with respect to wages, hours, and other terms and conditions

18  of employment.  As Mr. Legghio acknowledged, PA 436 under

19  Section 27(3) suspends that for a period of five years.  It

20  suspends the duty in its entirety, which is something

21  different than we're doing here, but I'll get to that later.

22  It also didn't say -- it suspends it for five years, but it

23  didn't say but it couldn't go longer.  It put a particular

24  period in this portion of the statute, and it said nothing

25  beyond that.  In addition --

1    THE COURT:  Well, but isn't it implicit in the five-

2    year time limit that the statute, 436, prescribes that it

3    can't be longer than five?

4    MS. LENNOX:  I don't think so, your Honor, and I

5    think when PA 436 was enacted, I think it was trying to be a

6    comprehensive statute to deal with a particular emergency.

7    Of course, you never know how long an emergency is going to

8    last, and that gets into later statutes that I want to

9    discuss with you because I think they interact.  But when

10   this was enacted in PA 436, the legislature also amended PERA

11   itself, and they put in Section 15(7) of PERA that's a

12   complement to this that says that for contracts -- or

13   collective bargaining agreements enacted after March 16th,

14   2011, they shall have a provision that acknowledges that an

15   emergency manager can reject, modify, or terminate that

16   contract, and, in addition, PERA was further modified at that

17   time by Section 15(8) which says, and I quote, "This act,"

18   meaning PERA, "does not confer a right to bargain that would

19   infringe on the exercise of powers under the local government

20   and school district financial accountability act," which is

21   now PA 436.  So there is a determination at the time by the

22   Michigan legislature that the powers of the state to rectify

23   a fiscal emergency for one of its --

24   THE COURT:  Pause for a second.  You say "which is

25   now PA 436"?

1          MS. LENNOX:  Um-hmm.

2          THE COURT:  What do you mean by that?

3          MS. LENNOX:  Well, at the time this was amended, PA

4   4 was still in effect --

5          THE COURT:  Okay.  So what --

6          MS. LENNOX:  -- which was then replaced by PA 436.

7          THE COURT:  So what is there in PA 436 that makes

8   that language applicable to it?

9          MS. LENNOX:  I have to get back to that, your Honor,

10  but I believe that in many instances it replaces -- the two

11  just replace each other, but I would like to hold that for a

12  minute, your Honor.  But regardless of that --

13         THE COURT:  That's a link in your chain that needs

14  to be filled in.  I understand there may be some legislative

15  history suggesting this.

16         MS. LENNOX:  Right.

17         THE COURT:  But my question isn't that.  It's what's

18  in the statute?

19         MS. LENNOX:  Right.  I will reserve that, your

20  Honor.  But the point that I was trying to make here is at

21  the time the Michigan legislature enacted all of this stuff,

22  I think they made a determination that to rectify a fiscal

23  emergency for one of its municipalities, that sort of tempers

24  the ordinary legislature grant of the right of public

25  employees to collectively bargain that would apply in

1  ordinary nonemergency times, and that's evidenced by the

2  language embodied in 436 elsewhere, which generally grants

3  very broad powers.  First, Section 3 of PA 436 goes through

4  these purposes and reiterates these purposes.  The

5  legislature provided that the fiscal accountability of local

6  governments is vitally necessary to the interests of the

7  citizen of this state to assure the provision of necessary

8  governmental services essential to public health, safety, and

9  welfare.  In Section (b) of that, Section 3(b), they found

10  that it's a valid public purpose for the state to take action

11  and to assist a local government in a financial emergency.

12  In Section (c), they found and held that the fiscal stability

13  of local governments is necessary to the health, safety, and

14  welfare of the citizens of this state.  And in Section (d)

15  they found that the authority and the powers conferred by

16  this act constitute a necessary program and serve a valid

17  public purpose.

18          THE COURT:  Okay.  But how does all of that add up

19  to more than five years being permissible?

20          MS. LENNOX:  Okay.  Again, I'm going to take this

21  into the new statutes that were enacted because nothing in

22  there is -- nothing in the language of 27(3) says five years

23  and it shall never be more.  Those words were not added and I

24  think properly so because, again, when you're dealing with a

25  fiscal emergency, particularly one of a municipality --

1    THE COURT:  Well, but the words "or longer if
2  necessary to accomplish the purposes of this act" are also
3  not in there.

4    MS. LENNOX:  That's right, your Honor, and there's
5  probably a reason that they didn't put either one of them in,
6  to provide the flexibility that I think came later, but I
7  want to -- before I go on to the later statutes, I want to
8  talk about this one because I think there --

9    THE COURT:  Okay.

10    MS. LENNOX:  -- are two other provisions in PA 436
11  that are relevant.  Section 9(2) of PA 436 gives the
12  emergency manager broad powers to rectify the financial
13  emergency and to assure the fiscal accountability of the
14  local government.  There's no time frame on that.  And
15  Section 12(1) of PA 436 provides that the emergency manager
16  can analyze the factors contributing to the financial
17  emergency and initiate steps to correct the condition, so I
18  was surprised to read -- and Mr. Legghio argued it today --
19  in their brief when he was talking about the duty to bargain,
20  he said, "Stated another way, an employer's duty to bargain
21  is not assessed in the context of the employer's finances."
22  And I think when you try to read the interaction between PA
23  436 and PERA together, that cannot possibly be the case.  And
24  I said, well, wait a minute.  The legislature, in connection
25  with the grand bargain, just enacted a whole package of

1    statutes, some of which approved the funding for the grand

2    bargain, but some of which went way beyond that, so what did

3    the legislature have to say about that in the context of this

4    case now?  And here's what they said.  And I think their

5    legislative focus on the primacy --

6              THE COURT:  I have to ask you to pause before you

7    jump to the new legislation.  Is it your argument that those

8    broad powers that PA 436 gives to the emergency manager

9    somehow authorizes the emergency manager to suspend

10   collective bargaining for more than the five years otherwise

11   specified in PA 436?

12             MS. LENNOX:  I do, and I'll tell you why.

13             THE COURT:  That's a tough argument because normally

14   the rule of statutory construction is that the specific

15   prevails over the general.  Yes?

16             MS. LENNOX:  That is normally the rule, but, again,

17   this is going to hearken back at the end of the day after I

18   set the statutory predicate to what does "reasonable" mean

19   and what does "reasonable" mean in this context, and you have

20   to bring all this together, including the new statute and the

21   new legislation, all of it together to figure out what are we

22   doing in the plan.  And then I will go through, your Honor --

23             THE COURT:  Okay.

24             MS. LENNOX:  -- what are we doing in the plan and

25   how does this all fit together.  So the new legislation, I

1 think, continued the legislative focus on the primacy of the

2 long-term financial stability of this city in particular, and

3 there are two of the statutes that I'd like to focus on. The

4 first, as your Honor pointed out and your Honor noted,

5 there's a statute enacted at MCL 141.1631 to 1643, and that

6 was the statute which was formerly House Bill 5566, which

7 created the financial review commission. Again, Section 2 of

8 that act sets forth a laundry list of reasons why they were

9 doing this and the reasons for doing it and the purposes for

10 doing it, and those findings include the public policy of the

11 state and overseeing the long term financial stability of its

12 municipalities so they can provide for the financial safety

13 and welfare of the citizens. They specifically mention the

14 Detroit pensions. They said the underfunding of the pensions

15 that contributed to the financial and market uncertainty

16 across the state, not only in Detroit, and they also found

17 that the fiscal oversight over qualified cities will ensure

18 that those cities do not engage in the financial practices

19 that led to financial emergencies and insolvency. So to that

20 end, this new statute gives the financial review commission a

21 couple of powers. One, it is going to have to ensure that

22 the city complies with whatever plan of adjustment is

23 confirmed in this case, and the plan of adjustment, as your

24 Honor pointed out, contemplates a period much longer than the

25 next couple of years. In addition, Section 6(9) of the

1    statute provides that the financial review commission will

2    approve all CB -- collective bargaining agreements.  And a

3    companion statute to this package did amend Act 312, which

4    you were discussing with Mr. Legghio earlier, and it amended

5    Act 312 to provide that an arbitrator must consider the

6    municipality's financial ability to pay and that that is the

7    most important factor for an arbitrator to consider.  So I

8    think it's pretty clear under Michigan law now that the

9    city's duty to bargain is assessed in the context of the

10   city's finances.  They absolutely are looking for when you

11   figure out what is a reasonable period to bargain, you have

12   to look at it in the context of the city's finances.

13         THE COURT:  But isn't it a reasonable inference from

14   the legislature's inclusion of that mandatory consideration

15   for arbitration that the legislature assumed or considered

16   that there would be collective bargaining during that time

17   period?

18         MS. LENNOX:  I think they assumed that when there is

19   collective bargaining, that this is an important factor to

20   consider.  I don't think they say anything about what is a

21   reasonable period.  They are focusing on the financial

22   primacy or the financial stability of a municipality, and

23   it's not just Detroit because this applies to all the

24   municipalities in the state.

25         THE COURT:  Okay.  And the follow-up question is if

1   it's the state law that the arbitrator is supposed to take

2   into account the city's fiscal circumstances, doesn't that

3   suggest that under state law this Court should defer that

4   issue to the arbitrators when and if it ever gets there and

5   not impose a ten-year time limit?

6           MS. LENNOX:  Well, that begs the question of what we

7   need to talk about, which is the real question here, which is

8   when is the reasonable time to start bargaining on this.

9   That's the question.  Remember, the right to bargain under

10  PERA says you bargain at reasonable times.  You only get to

11  arbitration when everything breaks down after bargaining, so

12  you have to hearken back to when is the reasonable time to

13  bargain, and in light of that question, given all this

14  background, let's look at what the plan is actually doing for

15  that question.  So, first, I think it's an overstatement to

16  say that the plan doesn't prevent bargaining.

17          THE COURT:  To say what?

18          MS. LENNOX:  It's an overstatement to say that the

19  plan prohibits bargaining.  The plan -- people are going to

20  be bargaining after their contracts are up, assuming we ever

21  reach contracts, on any number of issues.  What the plan

22  does, it constrains what the city or the financial review

23  commission because it has to approve new contracts can

24  approve vis-a-vis pensions only and only on a temporary

25  basis, only through June 30th, 2023, and why is that

1    important because that hearkens back to the legislation and
2    traditional labor law?  Because I think, given the finding in
3    Section 2(b) of what was House Bill 5566 about the disastrous
4    effects that the city's pension's plans are having not only
5    on Detroit but on communities statewide and given the
6    legislature's emphasis on the critical need to bring fiscal
7    stability to Detroit and to restore the provision of adequate
8    services to Detroit's people, holding pension contributions,
9    which is a huge budget item, steady for the next ten -- or
10   the next nine years really is reasonable.  It is a reasonable
11   measure and a reasonable time frame.  It coincides with the
12   emergency manager's plan to give the city through fiscal year
13   2023 to stabilize itself and to provide the funds for the
14   critical reinvestment that we need for the city.  The whole
15   ten-year plan is based on these crucial assumptions.

16          Now, they say nine years is too long, but they're
17   looking at this through a prism of ordinary bargaining in
18   ordinary times, and that's all the cases that were cited,
19   ordinary bargaining in ordinary times.  These are
20   extraordinary times in a fiscal emergency.

21          THE COURT:  Well, but they also cite cases that say
22   that the duty to bargain applies regardless of the employer's
23   financial circumstances.

24          MS. LENNOX:  And we cite cases where courts have
25   held that fiscal emergencies warrant the suspension of

1 bargaining, and, again, this is not wholesale suspension of

2 bargaining. This is one issue. We have cited cases where

3 courts have held that this --

4 THE COURT: Let's pause on that. Does it make any

5 difference in analyzing Section 943 and the duty to bargain,

6 for that matter, that it's just the one pension issue and not

7 everything else?

8 MS. LENNOX: I think as a practical matter, your

9 Honor, it -- or as a legal matter, your Honor, it doesn't.

10 As a practical matter, your Honor, I think it does.

11 THE COURT: What do you mean by that?

12 MS. LENNOX: Because I mean that the parties -- I

13 think there is an implication that we are trying to wholesale

14 take away union bargaining rights, and that is simply not the

15 case. There's one issue that is of such critical importance

16 given the history of this to this city and given the next

17 nine years that we want to hold steady.

18 THE COURT: Okay. So Mr. Legghio argues in response

19 that if fiscal stability is so important, the plan would also

20 prohibit bargaining on the other economic issues, wages, for

21 example.

22 MS. LENNOX: And that --

23 THE COURT: But you don't do that.

24 MS. LENNOX: That's exactly right, and here's -- and

25 that proves the point that what we are trying to do is have a

 1   very narrowly tailored reasonable response for a reasonable
 2   period of time to a fiscal emergency, which is entirely
 3   consistent with the duty to bargain under PERA.  We could
 4   have tried to, in my view, go overboard and say we're not
 5   talking to any of our unions about anything for the next nine
 6   years.  We didn't do that, and so we think that given the
 7   reasonable -- the obligation to bargain at reasonable times
 8   under PERA and given the cases that we cite in our papers,
 9   including a Supreme Court case, that say that in fiscal
10   emergencies -- these cases that we cite on our paper are
11   talking about -- and our brief, your Honor, talk about courts
12   allowing actual breaking of contracts that are in existence
13   today in fiscal emergencies and suspending bargaining under
14   contracts that exist today in fiscal emergencies, and they
15   can modify contracts that already exist.  We are doing less
16   than that here.  We are not breaking contracts.  We don't
17   have a contract with the DFFA.  We seek -- what we're seeking
18   is a reasonable and temporary restriction on what pension
19   terms may exist for the next nine years, so it's prospective
20   only, to address the fiscal emergency and provide for the
21   assumption of adequate city services.  Given the fact this is
22   reasonable, temporary in time, and prospective in nature, I
23   think this complies particularly with the Blaisdell case that
24   the United States Supreme Court decided and with the Buffalo
25   Teachers Federation case that the Second Circuit decided that

1    we cited in our papers. Nothing in PERA, Section 15(1),

2    which imposes the duty to bargain statutorily, defines what a

3    reasonable period is to commence bargaining, and Mr. Legghio

4    admits that.

5          In light of what I've already run through, the city

6    believes that the plan sets forth a reasonable period in

7    which to start bargaining over one issue, future pension

8    terms. This doesn't violate PERA. It is actually, your

9    Honor -- what we've been trying to do here is we have three

10   sets of state statutes now, PA 436, the new legislation, and

11   PERA -- what we do in our plan is actually harmonize those

12   statutes so they can all work together, which is actually the

13   goal of statutory construction. Nothing in PERA says --

14   defines a time for reasonable. We think under the fiscal

15   emergency that we're under, we have defined a narrow

16   reasonable time on one issue, and we think this allows the

17   Court to read the statutes harmoniously together, and I have

18   yet to hear how there's a real violation of PERA.

19         THE COURT: Thank you. Mr. Legghio, any rebuttal?

20         MR. LEGGHIO: Yes, your Honor, I do. I'm going to

21   divide my rebuttal into two parts. One is to the argument --

22   the statutory argument that's made by the city about the

23   language in 436 and PERA and, secondly, on this -- the duty

24   to bargain, which has been kind of -- I think been contorted

25   in this presentation today. What the city is arguing to you

 1   is that the absence of language in PERA beyond the five years

 2   is an invitation to do anything; that the absence of language

 3   in PERA lets you do anything, which is an interesting

 4   statutory construction.

 5          THE COURT:  Mr. Legghio, I need you to be by the

 6   microphone when you're addressing the Court because --

 7          MR. LEGGHIO:  I apologize, your Honor.

 8          THE COURT:  -- we're making an audio recording here,

 9   yeah.

10          MR. LEGGHIO:  So this is the argument that the

11   absence of language in 436 that prohibits anything beyond

12   five years is the right to read anything you want into the

13   statute, but the statute actually favors a shorter period of

14   time.  The suspension of the duty to bargain under PERA,

15   under 436 says that it is -- it halts after five years or

16   when the receivership ends, whichever comes first.  So the

17   plain language of the statute is inconsistent with the

18   argument that you can do anything you want, so the logic of

19   no limitation language means you can do anything is clear.

20   The language of the statute suggests that the shorter the

21   period, the better, and I think that's a gesture toward the

22   significance of collective bargaining.   So the five-year

23   period suspension is not what applies.  What applies is when

24   the city goes out of receivership.

25          Now, on this reasonable time to bargain, I guess the

1  city's argument is that asking you to impose a ten-year
2  suspension on the duty to bargain is reasonable, and they say
3  that nothing in PERA says what's reasonable and that I know
4  that.  I also know what the Michigan Employment Relation
5  Commission decisions are.  We scoured those.  We haven't
6  found any that gave an employer ten years to not go to the
7  bargaining table or anything remotely close to that, but the
8  duty to bargain --

9           THE COURT:  Well, but none of those involve
10  municipal bankruptcies either.

11           MR. LEGGHIO:  Your Honor, fair enough, but if we're
12  going to interpret what the duty to bargain is, we do have to
13  go to the sources, those bodies that have been entrusted with
14  interpreting the statute, and MERC has never suggested ten
15  years is an appropriate time period.  But there's a
16  contortion here of what this duty to bargain is.  The duty to
17  bargain under the current scenario will snap back either in
18  five years or when the receivership ends, and from that
19  moment on the measurement starts.  What is reasonable time to
20  bargain?  They're suggesting that phrase is an empowering
21  phrase that gives you almost unlimited authority to continue
22  the suspension under 436.  The measurement starts when the
23  snap-back occurs, not -- it is not a phrase that is ambiguous
24  enough to empower a Bankruptcy Court to suspend that duty
25  beyond what the statute says, a statute which favors actually

1  a shorter period of time than five years if the circumstances

2  permit.

3        Now, I applaud the city's prudence and their virtue

4  in not trying to take all things away from the bargaining

5  table.  They're only taking the pension benefit away, but

6  that's a nonstarter.  Collective bargaining is a messy

7  process, and you use everything you can when you bargain.

8  They're asking you, as I said in the brief, to put your thumb

9  on the scale, to take away from the union the ability to

10  negotiate smaller pension changes in exchange for maybe

11  better wages or better healthcare or an extra day off.

12  That's what they're doing.  They're asking you to sit at the

13  bargaining table and side with them for the next ten years.

14  That's the advantage of doing only one thing.  That's not

15  virtue.  That's scheming, and that's what they're doing.

16  They're asking you to be a player with them for the next ten

17  years.

18        Your Honor, the duty to bargain, I think -- let me

19  take it out of my context.  The federal and state statutes in

20  this country have declared what the importance of the duty to

21  bargain is, and the history of duty to bargain was -- back in

22  the '30s it was designed to prevent violence, and it has been

23  by statute designed to solve workplace issues, and they are

24  asking you to solve a workplace issue.  I think it's beyond

25  this Court's office.  However lofty or noble this Court's

1   purposes may be, this Court doesn't have the jurisdiction to

2   affect the collective bargaining process for the next ten

3   years no more than this Court could set the electric rates

4   that the city has to pay for the next ten years with the

5   city -- with Detroit Edison.  You don't have that authority

6   to go into the future for a debt that's yet incurred for

7   labor that's not yet incurred.

8           THE COURT:  All right.  Thank you very much, sir.

9           MR. LEGGHIO:  Thank you, your Honor.  Your Honor, on

10  the --

11          THE COURT:  On Issue Number 5, I want to see if I'm

12  going to need you for that.  Okay?  Was it Number 5?

13          MR. LEGGHIO:  Yes, your Honor.

14          THE COURT:  Okay.  So give me just a moment.  And

15  let me ask while I'm checking this out whether the city would

16  agree to the waiver of oral argument on Issue 5.

17          MS. LENNOX:  There were two parties affected by

18  Issue 5, your Honor.  I'm perfectly happy to raise it -- to

19  waive it with respect to Mr. Legghio's client.

20          MR. LEGGHIO:  Who's the other one?

21          MS. LENNOX:  The other one is National Public

22  Finance, and I don't know if they plan to press that or not

23  today, so -- but I'm perfectly happy to raise the -- waive it

24  with respect to Mr. Legghio's client.

25          THE COURT:  Okay.  Their issue, although it's a

1  classification issue, is a --

2          MR. LEGGHIO:  Different issue.

3          THE COURT:  -- is a different classification issue;

4  right?

5          MS. LENNOX:  Correct.  That's correct.

6          THE COURT:  Okay.  Hold on.  Well, I actually had a

7  question for the city that was tangentially related to this

8  issue of classification.  I suppose the question is such that

9  we could deal with it at the confirmation hearing rather than

10  in today's context.  And the question relates to -- hold on

11  one second -- a little confusion on my part as to -- one more

12  second, please -- how the new PFRS active pension plan

13  formula works in relation to the new PFRS active pension plan

14  works.

15          MS. LENNOX:  The --

16          THE COURT:  I don't need or want an answer now.

17          MS. LENNOX:  Oh, okay.

18          THE COURT:  But it's a question that we're going to

19  have to address at some point.

20          MS. LENNOX:  Okay.  Happy to do that, your Honor.

21          THE COURT:  All right.  Otherwise I'll take this

22  matter under advisement, and we'll waive argument.

23          MR. LEGGHIO:  Thank you, your Honor.

24          THE COURT:  You're welcome.  Okay.  So now we can

25  turn our attention to the next argument, Issue Number 2.

1          MS. HURWITZ:  Good morning, your Honor.  My name is

2    Julie Hurwitz, and I represent a number of individual

3    plaintiffs in their respective claims brought under 42

4    U.S.C., Section 1983.  We have filed objections to the plan

5    insofar as we strongly believe that the abatement or the

6    intrusion into the rights of victims of constitutional

7    violations caused by officers of the City of Detroit and the

8    City of Detroit itself is an egregious violation of their

9    rights under the Constitution and a violation of federal law.

10         We come to this Court representing on behalf of

11   three -- four individual plaintiffs, and also in the

12   courtroom is Wolfgang Mueller, whose firm has also filed

13   objections on behalf of their clients, who were victims of

14   equally as serious violations of their constitutional rights.

15         We have fully briefed this issue, and, as the Court

16   knows, this is a case of first impression.  There has been no

17   adjudication of this issue by any court really in any

18   dispositive way.  I'm prepared at this time to present an

19   overview of our position and a brief response to the

20   arguments that were asserted by the debtor and Jones Day in

21   their pleading, Number 5707.

22         42 U.S.C., Section 1983, of the Civil Rights Act of

23   1871 is the single statutory enforcement mechanism under the

24   enforcement power given to Congress by Section 5 of the 14th

25   Amendment for violations of the United States Constitution

1  that are caused by individual persons -- are caused to

2  individual persons -- excuse me -- by municipalities and

3  their officers and agents acting under color of law.  The

4  purpose is to compensate the injured, on the one hand, but

5  also and equally as important to the purpose of Section 1983,

6  as has been stated time and time again by the United States

7  Supreme Court, is, in essence, to prevent and deter blatant

8  violations of the Constitution and what has been referred to

9  by the Sixth Circuit as official illegality cited by Jaco

10  versus Bloechle, which was cited in our brief.

11          Section 1983 was passed almost, as a matter of

12  history, simultaneous with the passage of the 14th Amendment

13  immediately on the heels of the end of the Civil War.  The

14  Civil Rights Act long predates the Bankruptcy Code and

15  certainly very long predates Chapter 9, which was first

16  enacted in 1934 and then amended in 1937 after being found

17  unconstitutional.  The United States Supreme Court and this

18  circuit have long held that the federal government, though

19  the passage of Section 1983 and the rights of individual

20  victims to seek recourse through the court, is the guarantor

21  of, and I quote, "the basic federal rights of individuals

22  against incursions by state power."

23          THE COURT:  Right, but has any court held that the

24  right to compensation for a constitutional violation is

25  itself a constitutional right?

1          MS. HURWITZ:  Well, your Honor, the United States

2   Supreme Court in _Owens_ versus _City of Independence_ has held

3   that a damages remedy against the offending party is a vital

4   component of any scheme for vindicating the cherished

5   constitutional guarantees, and the importance of assuring its

6   efficacy is only accentuated when the wrongdoer is the

7   institution that has been established to protect the very

8   right that it has transgressed, so --

9          THE COURT:  Again, right, but that's not --

10          MS. HURWITZ:  -- in answer to your --

11          THE COURT:  But that's not quite a statement that

12   the Constitution itself guarantees compensation for a

13   violation of it.

14          MS. HURWITZ:  Well, I would refer the Court to the

15   case of _Bivens_ versus six unnamed federal officers in which

16   the U.S. Supreme Court in the context of whether or not

17   federal officers should be held liable for constitutional

18   violations -- those rights do not arise under statute.  The

19   Supreme Court has held in no uncertain terms that when an

20   actor is acting under color of federal law, the right to

21   compensation stems directly from the Constitution, so I would

22   say that, yes, a court -- the courts have held and the U.S.

23   Supreme Court has held that the right to damages, the right

24   to relief, the right to vindicate one's violation of one's

25   constitutional rights stems directly from the Constitution.

1    THE COURT:  So Section 1983 is unnecessary.

2    MS. HURWITZ:  Section 1983 codifies the rights that

3  individuals have when those violations occur under color of

4  state law, so I don't know whether Section 1983 is

5  unnecessary, but, rather, Section 1983 specifically

6  articulates what the Congress believed at the time was a

7  right that emanates directly from the Constitution.  There is

8  no other way to enforce our rights as individual citizens and

9  residents of this country but for this right to go to court

10  and seek some semblance of relief through the use of monetary

11  compensatory damages.

12    THE COURT:  Right, but your argument is that

13  Congress didn't need to pass 1983 in order for there to be a

14  constitutional right to compensation for violation of a

15  constitutional right.

16    MS. HURWITZ:  I would suggest that given the

17  jurisprudence created by the Bivens case, that that's

18  correct.  And, you know, what was in the minds of Congress in

19  1871 to see fit to actually pass a law simply makes that

20  mechanism easier, but I don't know that I agree that -- I

21  don't think that it is technically necessary.

22    THE COURT:  Well, let me ask you if you agree with

23  this proposition --

24    MS. HURWITZ:  Okay.

25    THE COURT:  -- although you may not agree with the

1  premise.  If your clients' right to compensation is only a

2  statutory right and not a constitutional right, the

3  Bankruptcy Code would provide for its discharge.  Do you

4  agree with that?

5          MS. HURWITZ:  No.  I completely disagree with that.

6          THE COURT:  I ask that because the Bankruptcy Code

7  discharges many, many statutory claims, all statutory claims.

8          MS. HURWITZ:  It discharges them specifically.  I

9  understand that, your Honor.  And what's interesting about

10  the defendant's -- or excuse me -- about the debtor's

11  argument here -- and I think they do make that argument.  If

12  you look at the chronology -- the statutory and historical

13  chronology, I don't think that Congress was even thinking

14  about how a victim of a constitutional violation within the

15  context of a municipal bankruptcy would even play itself out.

16  And if you look at the chronology, 1871 Section 1983 is

17  enacted.  1934 Chapter 9 of the Bankruptcy Code is passed.

18  1936 Chapter 9 is found unconstitutional.  1937 Chapter 9 is

19  amended.  1961 the case of Monroe versus Pape is decided by

20  the United States Supreme Court in which they held that

21  individuals only and not municipalities can be liable for

22  constitutional violations which occur under color of state

23  law.  1976 the Bankruptcy Code was amended, and that's the

24  last time that Chapter 9 was ever touched by Congress, 1976.

25  At the time that Chapter 9 was amended in that wholesale way,

1 there was no cause of action against a municipality for the
2 violation of one's constitutional rights as interpreted by
3 the Supreme Court.  1978, two years later, Monell versus the
4 Department of Social Services was decided at which time the
5 Supreme Court overruled that portion of Monroe by holding
6 that it was not constitutionally valid to prevent an
7 individual from seeking a remedy directly against a
8 municipality for its customs, policies, and practices.  So my
9 suggestion to the Court and my strong belief is that when
10 Congress amended Chapter 9 in 1976, the concept of what
11 should occur when a municipality is responsible for the
12 violation of someone's constitutional rights didn't even
13 enter into their mind, and, therefore, they weren't
14 thinking --
15          THE COURT:  I have to ask you to pause there --
16          MS. HURWITZ:  Yes.
17          THE COURT:  -- and focus on Monell.
18          MS. HURWITZ:  Yes.
19          THE COURT:  Did that decision hold that it was
20 constitutionally required to allow an injured plaintiff
21 compensation against a municipality, or did it hold that, as
22 a matter of interpreting Section 1983, it includes claims
23 against municipalities?
24          MS. HURWITZ:  I would argue strongly that it is the
25 former, that what the Supreme Court was addressing at that

1    time when it decided _Monell_ went to the heart of what is

2    the -- what is the rights that we, as members of this

3    constitutional democracy, have and the extent to which a

4    municipality is responsible through its customs, policies,

5    and practices for the violations of fundamental

6    constitutional rights.  That goes to the heart of what the

7    Constitution and the 14th Amendment stands for.  And when

8    _Monell_ overruled _Monroe_ v. _Pape_, yes, they were looking at

9    what did Congress intend when they enacted Section 1983, but

10   you can't separate what Congress intended under 1983 and the

11   fundamental basis for our constitutional -- enforcing our

12   constitutional rights.  And I believe that _Monell_ stands for

13   the proposition that it was unconstitutional to prevent an

14   individual from vindicating our constitutional rights when a

15   municipality is, through its customs, policies, and

16   practices, directly responsible for the violations of those

17   rights.  Without access to the courts and the right to full

18   compensation, there is no way for us to enforce our

19   constitutional rights in this community or in this country,

20   so the Bankruptcy Code cannot trump the Constitution, your

21   Honor.  I believe that the debtor's argument is just flat out

22   incorrect on that point.

23         I also believe, speaking of the arguments being made

24   by the debtor on this issue, they also rely on the analysis

25   of the Supreme Court in _Will_ versus the State of Michigan,

1  and I believe that reliance as well is totally misplaced.  In
2  <u>Will</u> the Supreme Court held that a state is not a person
3  within the meaning of Section 1983, and, again, they somehow
4  skip over -- they suggest to this Court that this is not a
5  constitutional analysis.  This is, again, a statutory
6  analysis.  However, <u>Will</u> versus the State of Michigan was
7  based entirely on an interpretation not of Section 1983 but
8  of the 11th Amendment and the extent to which the 11th
9  Amendment bars direct causes of action against the state
10  regardless of the existence of the statute, Section 1983, so
11  it is a constitutional argument.  It's not a statutory
12  ruling.

13          Jones Day argues, again, that -- and I quote them --
14  "Nothing in the Bankruptcy Code suggests that Section 1983
15  claims are not subject to impairment," and I go back to the
16  chronology and the context in which the Bankruptcy Code
17  evolved as well as Section 1983 has been consistently
18  interpreted over the last 150 years.  The last time that
19  Congress spoke regarding Chapter 9, as I said earlier, there
20  was not even a legal basis for a private cause of action
21  under 1983 against a municipality, so the fact that Congress
22  didn't speak, Congress also did not specifically identify --

23          THE COURT:  Well, but it is true at that time, I
24  assume, that municipalities were taking financial
25  responsibility for judgments or settlements that were entered

1 | against their officers.

2 |      MS. HURWITZ:  That's true on a community-by-

3 | community basis, yes.  I mean I would agree that in the vast

4 | majority of cases --

5 |      THE COURT:  So Congress could have dealt with that

6 | liability.  Yes?

7 |      MS. HURWITZ:  Congress could have -- with respect to

8 | Chapter 9, you mean?

9 |      THE COURT:  Yes, of course.

10 |      MS. HURWITZ:  Well, I would at this juncture direct

11 | the Court to the V.W. ex rel. Barber versus City of Vallejo

12 | case, a Bankruptcy Court decision in which the Court there

13 | expressly held that Section 1983 claims against individual

14 | city officials are not ones against the city for bankruptcy

15 | discharge purposes even if the state law requires the city to

16 | indemnify the official.  The fact that an individual judgment

17 | for a 1983 claim may ultimately come out of a municipal

18 | treasury is not relevant to the question of whether an

19 | individual's potential liability for violating someone's

20 | constitutional rights should be discharged under Chapter 9.

21 | And the only case that exists with respect -- that addresses

22 | that issue is the Vallejo case in which the Court held in no

23 | uncertain terms that that does not apply and should not be

24 | able to be used by a municipality to discharge its potential

25 | financial obligation to indemnify an officer who violates

1  someone's constitutional rights.

2          THE COURT:  Before you close your argument, I have

3  one more question for you.

4          MS. HURWITZ:  Certainly.

5          THE COURT:  It is argued that the 14th -- the

6  language of the 14th Amendment is palpably different from the

7  language of the 5th Amendment because the 5th Amendment

8  specifically speaks to compensation.  It establishes an

9  explicit constitutional right to money.  14th Amendment

10 doesn't do that.  How do you deal with that argument?

11         MS. HURWITZ:  Well, the underlying foundation and

12 basis for the vast majority of cases brought under Section

13 1983 incorporate the rights that were created under both the

14 14th and the 5th Amendments.  The 5th Amendment is the

15 provision in the Constitution that brings the 14th Amendment

16 rights to the states.

17         THE COURT:  Okay.  But the provision for

18 compensation in the 5th Amendment only applies to takings.

19 It doesn't apply, by its language, to due process violations.

20         MS. HURWITZ:  Well, your Honor, I can only refer to

21 and rely on how our United States Supreme Court has

22 interpreted the rights created under Section 1983 as it

23 interprets our rights under the United States Constitution,

24 including the 14th Amendment.  Excuse me.  And as Mitchum

25 versus Foster in 1972 held, the very purpose of Section 1983

1  is to interpose the federal courts between the states and the
2  people as guardians of people's constitutional rights and to
3  protect people from unconstitutional actions.  If you don't
4  have what's been in existence since 1871 when the Civil
5  Rights Act was passed, if you don't have that fundamental
6  right and access to the courts, then we have no rights.
7  There is no way to enforce or protect our rights not to have
8  state officers and municipal police officers, in particular,
9  run ramshod over our citizens.  And I would suggest to the
10  Court that that's, in fact, what exists in the City of
11  Detroit today.  Since the stays have been imposed, since the
12  bankruptcy petition has been filed, the Constitution in the
13  City of Detroit has been suspended.  I've heard -- and
14  albeit, it's anecdotal, but I've heard story after story
15  after story of people who've been abused, confronted,
16  wrongfully arrested, assaulted and treated like animals by
17  various members of the Detroit Police Department, and they
18  have -- and these victims have no recourse.  There's a
19  doctrine under Section 1988, which is the -- I can't remember
20  the layperson's name of the statute, but it's basically the
21  attorneys' fees provision for prevailing plaintiffs in 1983
22  cases, and the doctrine is called the private attorney
23  general doctrine.  And that is when someone's fundamental
24  rights are violated, there is a public interest in ensuring
25  that they have a recourse and access to the courts, and

1   that's why there's an attorney fee provision in Section 1988
2   that allows prevailing plaintiffs to recover attorneys' fees,
3   costs, and so forth if they win their constitutional claims.
4           THE COURT:  Well, but isn't it for --
5           MS. HURWITZ:  No lawyer --
6           THE COURT:  Isn't it for --
7           MS. HURWITZ:  -- in the universe --
8           THE COURT:  Isn't it for Congress --
9           MS. HURWITZ:  -- is going to take any of these
10  cases.
11          THE COURT:  Fair enough, but isn't it for Congress
12  to make that determination about whether those rights and,
13  indeed, the right to compensation for a constitutional claim
14  should prevail over bankruptcy or whether bankruptcy should
15  prevail over those claims?
16          MS. HURWITZ:  It may be, but Congress has been
17  silent on that question to --
18          THE COURT:  Well --
19          MS. HURWITZ:  -- date, and it is our --
20          THE COURT:  Congress could have included a provision
21  for the nondischargeability of 1983 claims.
22          MS. HURWITZ:  In fact, under Chapters 7 and 11, I
23  would say that Congress has made an exception for the
24  nondischargeability of bankruptcy claims --
25          THE COURT:  Right, but we're in Chapter 9.

1          MS. HURWITZ:  -- when they made it -- excuse me?

2          THE COURT:  We're in Chapter 9.

3          MS. HURWITZ:  And Chapter 9, when it was enacted,

4     did not -- Congress didn't even have within their radar the

5     potential for Section 1983 to play any part --

6          THE COURT:  Okay.

7          MS. HURWITZ:  -- in a Chapter 9 bankruptcy, so it's

8     up to this Court to set the law straight and to interpret it

9     with -- consistent with ensuring that our constitutional

10    rights are protected.

11         THE COURT:  All right.  Let me ask you to wrap up,

12    please.

13         MS. HURWITZ:  Thank you, your Honor.  The rights

14    that are issue -- the rights that are at issue under our

15    Constitution and which Congress saw fit to make individually

16    enforceable through 42 U.S.C., Section 1983, in 1871 are

17    sacrosanct.  If anything, this Court should not be examining

18    whether there's anything in Chapter 9 that suggests that

19    there -- that this debt should not be dischargeable.  Rather,

20    this Court should be examining whether there is anything in

21    this chapter that affirmatively suggests that the

22    constitutional rights of municipal residents of the City of

23    Detroit are subject to impairment.  Anything short of that

24    inquiry is a dangerous threat to our constitutional democracy

25    in this community and in this country, and I would ask this

1  Court to do the right thing and to remove from the scope of
2  all of the impairments that are being imposed on claimants
3  under the bankruptcy plan of adjustment and allow these
4  claimants to go forward and allow the Constitution to be
5  enforced.  Thank you, your Honor.

6          THE COURT:  Thank you.

7          MR. BENNETT:  Good morning, your Honor.  Bruce
8  Bennett from Jones Day on behalf of the city.

9          THE COURT:  Actually, before you argue, is there
10 other counsel who wants to be heard on this before the city
11 responds?

12         ATTORNEY:  No, your Honor.  Nothing further.

13         THE COURT:  Thank you, sir.  You may proceed.

14         MR. BENNETT:  Your Honor, there are really two
15 approaches to resolving this problem both pointing in the
16 same direction.  First, on a technical level, which really
17 deals with the very last point just before the summation, it
18 does look like when you read the Bankruptcy Code as a whole
19 that Congress was aware of the issue that when it was dealing
20 in the Bankruptcy Code there were some federally created
21 rights that were going to be affected by the bankruptcy
22 provisions, and it comes up in a number of different places.
23 We, of course, have priority provisions for the most part not
24 applicable in Chapter 9 that give priority to certain
25 federally created rights.  We also, by the way, have 510(b)

1  subordination, which it's not the only space in which it

2  operates, but for the most part it subordinates particular

3  claims that arise under federal law.  And there's been the

4  discussion about the discharge provisions, which, of course,

5  in Chapter 9 aren't effective but in Chapter 7 clearly are.

6       I would point out that one of -- that I agree that

7  we could -- if we weren't in a Chapter 9 case, there could be

8  a big fight over whether or not particular 1983 claims are

9  nondischargeable.  You could find, I think, some of the

10  categories it might well fit in, but those provisions, as the

11  Court that was dealing with the Vallejo case pointed out,

12  they're just not part of Chapter 9.  I would also point out

13  that you could also just -- in terms of Congress' attention

14  to the point, there are the provisions that relate to

15  liabilities under election laws which show up in the

16  nondischargeability provisions, so they were focusing on, you

17  know, some of the, I guess --

18       THE COURT:  Well, but in that context, how do you

19  deal with Ms. Hurwitz's argument that at the time Chapter 9

20  was enacted in the '30s or amended in the '70s there were no

21  1983 claims against cities, they were only against

22  individuals --

23       MR. BENNETT:  Right, but as a matter of --

24       THE COURT:  -- so there was no claim to -- for

25  Congress to decide whether it should be discharged or

1 subordinated or not?

2         MR. BENNETT:  Well, there certainly was in 1988,

3 which was also a substantive amendment of Chapter 9, which,

4 of course, is an important subject for the matters that will

5 be discussed tomorrow morning.  I mean the Bankruptcy Code as

6 a whole has been amended multiple times since the '76 law

7 that became effective in '79, but Chapter 9 in particular was

8 amended in 1988.  And I can't remember whether there were

9 other technical amendments in connection with BAPCPA, but

10 there may well have been.  I just don't remember.  The bottom

11 line is is that Congress has returned to it.  By the way,

12 Congress has returned to the dischargeability list many

13 times, including in the BAPCPA context, so there were all

14 kinds of opportunities for Congress to look at this again,

15 and, frankly, in the numerous opportunities that it's had to

16 work on the Bankruptcy Code, it hasn't.

17         But I mentioned there were two ways to go with this,

18 and one is the technical level, which is to point out that

19 it's not as if Congress was ignorant of this whole issue.

20 They clearly weren't.  There's ample footprints through the

21 statute that shows that Congress focused on it, that they

22 could easily have said any right created under federal law is

23 not dischargeable.  Any right created under federal law has

24 priority.  They didn't do anything of the sort, but they did,

25 in fact, grant priority to some things that arose under

1  federal law, subordinate some things that were allowed under

2  federal law, created nondischargeability provisions for other

3  things that were specifically allowed under federal law, and

4  effectively said everything else is the same as other claims.

5          Now, let's go at this from a different direction,

6  which is as a substantive matter.  Much is made of the idea

7  that this is a right created under the Constitution.  Well,

8  first of all, I think it isn't and can't be because if it was

9  a right created under the Constitution, the whole idea of

10  finding the limits of it under the statute wouldn't have been

11  an exercise anyone would have conducted, so when you -- for

12  the first time, the Supreme Court decides, no, this is

13  something that doesn't extend to municipalities, they didn't

14  even consider a constitutional dimension.  They read the

15  statute to find the answer.  And, similarly, when they

16  extended it to municipalities in 1978, I guess it was, when

17  the Supreme Court extended it, they didn't discuss it as

18  we're now looking at the contours of the Constitution.  We're

19  reconsidering the statute.  So, frankly, the Supreme Court's

20  mode of analysis is explaining that this is a statutory

21  created right like many other statutory created rights, which

22  may well be implementing something referred to in the

23  Constitution, but they didn't think -- the Supreme Court, at

24  any rate, didn't think that was important.  But even if it

25  were, let's think about this a second and think, once again,

1   a little bit about the structure of the Constitution.

2   Remember that part at the end of the Bill of Rights about

3   that there are all of the other rights, the fact that they're

4   not mentioned, they're retained by the people?  It's part of

5   the general recognition that there's lots of very important

6   law in this country that isn't constitutional law and isn't

7   grounded on a constitutional provision.  And there isn't, I

8   don't think, a value judgment in the Constitution that the

9   rights created here are more important than rights created

10  elsewhere, the rights that were reserved.  In fact, it

11  suggests to the contrary.  And so the issue really is is

12  because you can trace a particular right to something that

13  was mentioned in the Constitution, does it wind up having a

14  different status in a bankruptcy case when there's not enough

15  to go around?  I would argue, I think, first of all, the

16  statute is giving us the hint on that question with what I

17  just went through, that Congress has done some sorting, but

18  let's remember here we heard that an important part of this

19  constitutional right is that it's going to deter conduct as

20  well as compensate.  Well, our entire tort law is intended to

21  modify conduct as well as compensate.  It's to set rules to

22  cause people to act in a certain way, and it's supposed to

23  compensate.

24          THE COURT:  Well, but isn't deterring constitutional

25  violations more important than deterring other kinds of

1  personal rights violations?

2        MR. BENNETT:  Well, that's, I think, the point I'm

3  making with respect to the structure of the Constitution.

4  The fact that you don't mention a right -- I think it's the

5  10th Amendment itself says that the fact that we didn't

6  mention it doesn't mean it isn't important.  Everything we

7  didn't talk about is still reserved to the people.  It's

8  not -- the Constitution isn't a list of these are all the

9  rights that are important.  I suspect that if that was the

10  way they wrote the Constitution, people might be -- might

11  well have said the right to be free of torts is also

12  important as well, so I don't see in the -- in anchoring,

13  frankly, a statute as implementing the Constitution versus a

14  statute or law that implements another right, I don't see in

15  that an immediate suggestion that there is a preference.

16  There are many, many important rights which, if violated,

17  result in damage claims, and to -- we don't have a system

18  where apart from the statutorily created priorities that we

19  decide, okay, this right is more important, so we're going to

20  make that one nondischargeable, which I think is essentially

21  the relief that's being requested here, or grant it priority.

22  Either way it's -- the same thing is being requested.  I

23  think that thinking, that approach is far into our system.

24  We don't rank the importance of claims in determining

25  distribution.  We determine whether claims are allowable, and

1    then we treat them in accordance with the rest of the

2    provisions of the Bankruptcy Code.

3          THE COURT: Well, but how do you deal with the

4    argument that says federal courts, including the Bankruptcy

5    Court, should not stand in the way of the full enforcement of

6    citizens' rights under the 14th Amendment; in fact, the

7    federal courts, including the Bankruptcy Court, should stand

8    for their enforcement?

9          MR. BENNETT: Well, I don't think you can say we're

10    going to stand for the enforcement of them and not a whole

11    bunch of other rights, and I've got -- I start to have a very

12    important line drawing problem because, once again, in a

13    Chapter 9 case --

14          THE COURT: Well, the only line counsel is asking

15    for is the constitutional line.

16          MR. BENNETT: Then why is -- would we treat --

17    election law has a lot to do with constitutional provisions,

18    not every -- each and every provision, but we certainly know

19    that it commands a lot of the Supreme Court's attention, and

20    there's a lot of constitutional law in the area. How is it

21    that we wound up with Congress then putting election law as

22    nondischargeable in the Bankruptcy Code, therefore, clearly

23    recognizing that it focused on the question, but not making

24    it nondischargeable in a Chapter 9 case or, for that matter,

25    in a Chapter --

1        THE COURT:  But your response is that this is a

2   judgment for Congress to make, not the courts.

3        MR. BENNETT:  It is definitely a judgment for

4   Congress to make, and Congress could make it; that there are

5   provisions for priorities.  There are provisions for

6   nondischargeable claims.  And Congress -- again, I think it's

7   important that Congress has made it in certain places and

8   didn't make it here.

9        Now, let me just -- last point on this issue of why

10  we should or should we be making a special distinction here.

11  The court in Carey versus -- and I'm probably going to

12  mispronounce this -- Piphus I think is the way you pronounce

13  it -- is actually instructive for everything in the case

14  besides the fact that it was dealing with a variant of the

15  1983 claims, which is it was plumbing the dimensions.  It had

16  to figure out exactly what are the dimensions of this damage

17  claim.  And to summarize, it said we're following tort law

18  with one exception, and it's only -- and it's kind of not --

19  almost not really an exception.  The exception is is that in

20  tort law when we sit around in law school and when we list

21  elements of claims, one of the elements of the claim is

22  damages, and so they basically say, well, in this context,

23  that's not going to be the rule, that you can still have a

24  claim even if you don't have damages, but if you prove one

25  without damages, you can recover no more than a dollar.  So,

 1    yes, they modified tort law in one way as it's going to
 2    govern the parameters of 1983 claims, and in the way they
 3    modified it, it's essentially economically trivial.  So when
 4    the Supreme Court decided -- they were asked to form a new
 5    constitutional doctrine to govern these claims, and the
 6    Supreme Court said not really, that tort law is kind of right
 7    for this with this one very tiny exception, and I think that,
 8    too, is discouraging this Court from inventing a new
 9    dimension to this statutory right that is absolutely
10    vindicating a constitutional right, but as I said before, I
11    don't think this is unique.  I'm not saying it's not
12    important.  It isn't unique.  It creates a whole bunch of
13    line drawing problems if you decide to -- that the courts are
14    in the business of ranking federally created claims that
15    validate, vindicate, enforce constitutional interests because
16    this isn't going to be the only one.  And as I said before,
17    I'm persuaded by the fact that Congress has at least treated
18    a whole bunch of federally created or federal statutory
19    rights that create private liability differently and even
20    talk explicitly about one that has a constitutional dimension
21    and explicitly didn't give it priority in Chapter 9.
22          THE COURT:  How do you deal with the City of Vallejo
23    case that Ms. Hurwitz relied on in her argument?
24          MR. BENNETT:  Well, the City of Vallejo case,
25    there's -- I don't think we take issue with the part of the

1   objection that deals with individual claims against
2   individuals, the out of the power authority part, and that's
3   the only part of the Vallejo cases that support their
4   pleadings.
5           THE COURT:  I'm sorry.  What is it that you don't
6   take issue with?
7           MR. BENNETT:  The plan provision that we're
8   discussing here does not protect individual people with
9   respect to their personal liability as distinguished from the
10  acting on behalf of the city basis.  The plan doesn't purport
11  to bar those claims.  So to the extent that --
12          THE COURT:  Oh, I thought it did.
13          MR. BENNETT:  Not the ones that are -- where there
14  are --
15          THE COURT:  Aren't they indirect claims -- I forgot
16  what your language is.
17          MR. BENNETT:  There's two categories.  In the
18  Vallejo case, they recognize two categories of claims that
19  could come against individuals.  Those that are effectively
20  indirect claims, those are barred.  The only category that
21  Vallejo carved out is the claim against an individual for
22  individual conduct that was not effectively a claim against
23  the city, and so --
24          THE COURT:  Carved out in the sense that they're not
25  discharged?

1        MR. BENNETT:  They're not discharged, so --

2        THE COURT:  They're not claims against the debtor,

3   in any event.

4        MR. BENNETT:  Correct.

5        THE COURT:  So whether they're constitutionally

6   based or not is irrelevant.

7        MR. BENNETT:  I agree.  We don't take --

8        THE COURT:  So what does your plan do?  Your plan

9   says --

10       MR. BENNETT:  That the discharge applies to the

11  fullest extent permitted, which under even the Vallejo cases

12  include cases against individual officers that were acting --

13  and I'm going to get the exact words, you know, but on behalf

14  of the -- on behalf of the municipality.  If I sit down a

15  second, I'll find the exact quote in those cases, but there's

16  two categories of claims against individuals, one of which is

17  covered by the discharge, one is not.  We are following that

18  line that Vallejo recognizes.

19       THE COURT:  So you are seeking the discharge of

20  claims against individuals when the city is responsible to

21  pay those claims?

22       MR. BENNETT:  Yes.  And that was -- and that's --

23  Vallejo said that was perfectly appropriate.  There was only

24  one category that the two Vallejo cases -- they're all about

25  the same incident --

1          THE COURT:  Okay.

2          MR. BENNETT:  -- carved out.  I found it.  The ones

3   that are discharged are claims against the city and against

4   the individual defendants in their official capacities.

5   Those are the ones that are covered by the discharge.  The

6   other category --

7          THE COURT:  Well, but hang on.  Your plan proposes

8   to discharge claims against individuals whether or not the

9   city is a defendant so long as the city takes responsibility

10  for the debt.

11         MR. BENNETT:  And those would be the ones where

12  they're acting in their official capacity.  The ones the city

13  is not going to take responsibility for are the class that

14  the Vallejo cases said you couldn't discharge.

15         THE COURT:  Oh, I'm sorry.  I thought you said that

16  the group that Vallejo said could be -- could not be

17  discharged are those where the individuals and the city were

18  liable.

19         MR. BENNETT:  No, no.  The ones that --

20         THE COURT:  Okay.

21         MR. BENNETT:  -- it's just the individuals in their

22  individual capacities, and that's not exactly the words that

23  were used in Vallejo either, but it's -- we are following the

24  Vallejo -- the line in the Vallejo cases.

25         THE COURT:  Anything further, sir?

1        MR. BENNETT:  Not unless you have any questions.

2        THE COURT:  Okay.  Thank you.

3        MR. BENNETT:  Thank you.

4        MS. HURWITZ:  I have a few remarks in response to

5   the debtor's argument here.  First, to talk about the Vallejo

6   case -- and I'm sorry.  I don't know your name.

7        MR. BENNETT:  Bruce Bennett.

8        MS. HURWITZ:  Bennett, Mr. Bennett.

9        MR. BENNETT:  Nice to meet you.

10        MS. HURWITZ:  I haven't been in the Bankruptcy Court

11   proceedings long enough to learn everyone's names.  Mr.

12   Bennett is simply wrong in his interpretation of the Vallejo

13   case, and having practiced civil rights law for the past 30-

14   some years, I can tell you that when the Court refers to

15   liability in one's official capacity versus liability in

16   one's individual capacity, it has nothing to do with whether

17   or not that individual was acting within the scope of his

18   employment or on behalf of the municipality.  You cannot hold

19   an individual officer liable under 1983 unless he was acting

20   within the scope of his duties on behalf of the municipality.

21   The distinction the Court makes in the --

22        THE COURT:  Well, the language is under color of

23   state law; right?

24        MS. HURWITZ:  Correct.  And an officer doesn't act

25   under color of state law unless he's acting on behalf of the

1    municipality in his capacity as an officer of the

2    municipality.  When the Court refers to official versus

3    individual capacities, that's language that are terms of art

4    that emerges out of the Monell decision, and when one is

5    liable in one's official capacity, one is not acting as an

6    individual.  One is acting as the municipality.  Only those

7    officers or elected officials who have the decision-making

8    power to implement or create policy on behalf of the

9    municipality can be held liable in their official capacity,

10   so when the Court in Vallejo distinguished between those

11   claims that are dischargeable and those that are not, all the

12   Court was saying was -- consistent with this distinction

13   between an individual and official capacity, what the Court

14   was saying was any claims in which the municipality is, in

15   essence, the defendant are dischargeable.  And the only

16   reason, by the way, the Court in Vallejo even went that far

17   was because -- it didn't want to -- it was quite alarmed that

18   the plaintiffs in that case conceded as quickly as they did

19   on the issue of municipal dischargeability, and I'll talk

20   about that in a second, but what the Court specifically said

21   was as to those claims against individual police officers who

22   are held liable in their individual capacity, it doesn't

23   matter whether that judgment will ultimately come out of the

24   treasury of that municipality that is in a Chapter 9

25   bankruptcy.  That claim is not dischargeable even though it

1  will come out of the municipal treasury.  As a matter of law,

2  as a matter of constitutional jurisprudence, those claims

3  cannot be dischargeable in a Chapter 9 bankruptcy.

4         THE COURT:  By "those claims," you mean the claims

5  against the individuals?

6         MS. HURWITZ:  Against the individuals who were

7  acting in their capacity as state actors, whose judgments

8  will be indemnified by the city.  They are not dischargeable.

9         THE COURT:  Does the plaintiff have a right to

10  payment by the city when an officer is found liable for a

11  1983 violation in his individual capacity?

12         MS. HURWITZ:  Yes --

13         THE COURT:  What does Vallejo --

14         MS. HURWITZ:  -- as the Court in Vallejo held.

15         THE COURT:  And what does Vallejo say about the

16  dischargeability of that?

17         MS. HURWITZ:  What Vallejo says -- excuse me.

18         THE COURT:  Because we have to distinguish between

19  the officer's right and the plaintiff's right.  The officer's

20  right is not a constitutional claim at all.  It's a matter of

21  collective bargaining or statute or whatever it is.

22         MS. HURWITZ:  That's correct.

23         THE COURT:  The plaintiff's right is of a different

24  character.  Where does that right come from?

25         MS. HURWITZ:  The right for the plaintiff to be paid

1    out of the municipal treasury?

2              THE COURT:  Yes.

3              MS. HURWITZ:  That right comes from state law.  That

4    comes from whatever --

5              THE COURT:  If it comes from state law and not the

6    Constitution, why isn't it dischargeable?

7              MS. HURWITZ:  The right to be paid comes from state

8    law.  The right to be compensated and the right to hold that

9    officer liable for the violation of the plaintiff's

10   constitutional rights comes from the Constitution in Section

11   1983.  What the Court in --

12             THE COURT:  Well, but let's be crystal clear about

13   this.  The plaintiff has, we'll assume for the moment, either

14   a statutory or a constitutional right to compensation from

15   the individual officer; right?  What's the source of the

16   plaintiff's right to have that judgment paid by the

17   municipality because if it's state law, I have to ask isn't

18   that dischargeable because there's no constitutional basis

19   for it?

20             MS. HURWITZ:  Not according to the -- that's a

21   separate issue that is not before the Court today and doesn't

22   have to be before the Court.  Once --

23             THE COURT:  Well, frankly, I'm not concerned about

24   the dischargeability of a claim against an individual because

25   that's not a claim against the estate.  I should say the

1    municipality because there's no estate, but --

2            MS. HURWITZ:  I'm looking for the language in

3    Vallejo where it talks about this, but I can tell you that

4    the claim -- what the Court in Vallejo distinguished between

5    was whether the claim itself, regardless of who's going to

6    pay it -- the Court was looking at what the claim is because

7    that's the issue that goes to dischargeability is whether

8    those claims are dischargeable, not who's going to pay the

9    claims ultimately, and when -- and in Vallejo the Court held

10   that a claim against the state official is not essentially

11   one against the state for -- well, he's talking about state

12   law, but -- I mean issues involving the state itself, but it

13   applied that reasoning to the municipality.  Under the same

14   reasoning, a claim against a city official is not essentially

15   one against the city for bankruptcy discharge purposes even

16   if state law requires the city to indemnify the official.

17           THE COURT:  And that's exactly --

18           MS. HURWITZ:  And in theory --

19           THE COURT:  That's exactly what the city relies on

20   here in saying that the claim against the city is not a

21   constitutional claim and, therefore, is subject to discharge.

22   How do I deal with that?

23           MS. HURWITZ:  But that's between the officer and the

24   city.

25           THE COURT:  Precisely.

1           MS. HURWITZ:  And that's got to be resolved in a

2    different proceeding.  Whatever the plaintiff ends up --

3    wherever the plaintiff ends up going ultimately for

4    enforcement of the judgment --

5           THE COURT:  Here's the underlying question.  When a

6    police officer uses excessive force or unlawfully detains or

7    arrests a citizen, is there a constitutional claim against

8    the city, or is there just a constitutional claim against

9    that officer for which the city is liable as a matter of

10   state law or contract with the officer because if it's the

11   latter, I see discharge written all over that?

12          MS. HURWITZ:  That's discharge between the officer

13   and the city.  That has nothing to do with the plaintiff's

14   right.  The plaintiff should have an absolute right to seek

15   enforcement of a hundred percent of whatever the judgment or

16   settlement number is.

17          THE COURT:  Against whom?

18          MS. HURWITZ:  Against the officer.

19          THE COURT:  And the city does not --

20          MS. HURWITZ:  And the officer -- that's a right.

21          THE COURT:  Okay.

22          MS. HURWITZ:  Now, if there's --

23          THE COURT:  But we're dealing with the -- the

24   officer isn't the debtor here.  We're dealing with a claim

25   against the city.

 1          MS. HURWITZ:  That's right.

 2          THE COURT:  Does the plaintiff have a right to a

 3  100-percent payment against the city?

 4          MS. HURWITZ:  I would argue that it does, but --

 5          THE COURT:  What's it based on?

 6          MS. HURWITZ:  -- I don't think that that -- I'm

 7  sorry?

 8          THE COURT:  What's it based on?  What is the claim

 9  against the city based on?

10          MS. HURWITZ:  The officer's claim against the city?

11          THE COURT:  The plaintiff's claim against the city.

12          MS. HURWITZ:  The plaintiff's claim --

13          THE COURT:  You don't represent the officers.

14          MS. HURWITZ:  No, but the plaintiff can go wherever

15  she or he needs to go to enforce the judgment and should have

16  a right to do that.

17          THE COURT:  And what is that right based on?  State

18  law?

19          MS. HURWITZ:  The right to seek enforcement against

20  the city for a judgment against the individual would

21  ultimately be based on state law, yes, and that -- but that

22  is not what's before the Court today.  What's before the

23  Court today is the claim itself, the extent to which the

24  claim should be discharged, and whether or not the

25  indemnification --

1          THE COURT:  The claim against the officer?

2          MS. HURWITZ:  I'm sorry.

3          THE COURT:  The claim against the officer.

4          MS. HURWITZ:  On that issue, yes.  We're talking

5   about the --

6          THE COURT:  Yeah.

7          MS. HURWITZ:  -- claim against the officer.  We

8   certainly are taking the position that as a matter of

9   fundamental constitutional principles and jurisprudence, none

10  of the claims that 1983 plaintiffs have against the

11  municipality should be dischargeable either, but they're two

12  different questions that are before the Court, and --

13         THE COURT:  In your suits, can you just tell me

14  generally are both the city and the officers defendants or

15  just the officers or just the city?

16         MS. HURWITZ:  In all of our claims, and I believe as

17  in Mr. Mueller's clients as well, there are both individuals

18  and the city who are named defendants.

19         THE COURT:  I have to ask you to wrap up now because

20  I'm way behind schedule.

21         MS. HURWITZ:  I will, your Honor.  I just want to

22  address one other -- I just want to just briefly touch on

23  what I believe I heard Mr. Bennett suggest to the Court, and

24  that is, hey, what's the Constitution?  It's just another

25  tort.  And I think that is a serious, serious error for this

1    Court to treat a fundamental constitutional right as no

2    different from any other tort.

3           And just to wrap up, I want to touch on the <u>Carey</u>

4    versus <u>Piphus</u> case.  Yes, it's true that the primary issue

5    before the Court in <u>Carey</u> was this question of how to define

6    the damages and whether -- you know, whether nominal damages

7    are sufficient to apply in a 1983 case, but during the course

8    of its analysis, the Court in <u>Carey</u> made very clear the

9    significant importance of compensatory damages in the ability

10   to enforce one's constitutional rights, and I quote, "To the

11   extent that Congress intended that awards under Section 1983

12   should deter the deprivation of constitutional rights, there

13   is no evidence that it meant to establish a deterrent more

14   formidable than that inherent in the award of compensatory

15   damages."  And I would ask this Court to take very seriously

16   its constitutional duty to ensure that our constitutional

17   rights and the democracy in which we live are preserved and

18   protected, and access to the courts for a full recovery of a

19   victim of constitutional violation's right to damages should

20   be protected dearly.  Thank you, your Honor.

21          THE COURT:  Thank you.  Thank you.

22          MR. BENNETT:  Your Honor, I just found the right

23   words, so just for the -- your last question, which was the

24   inquiry under --

25          THE COURT:  Okay.  Go ahead.

1        MR. BENNETT:  Okay.  First of all, it kind of works
2   in two steps.  One is whether a claim against the city
3   official is essentially one against the city, and if that's
4   the case, then we think it's discharged.  The Court in
5   Barber, by the way, questions whether that should be, but
6   that's not what was involved in Barber.  In Barber the case
7   involved claims against the officer that were only optionally
8   the subject of indemnification.  They were claims not against
9   the city but as to which the city could indemnify as to part
10  of them, and then there was a punitive damage claim, which
11  the city could never be liable for.  So Barber is like this
12  narrow class of claims where it's not -- doesn't fit in your
13  hypothetical where the city is liable anyway.  It's just the
14  officer that's liable.  The only reason the city is involved
15  is if it had to indemnify, and in that case it didn't have
16  to.  It just did indemnify.  And then there was the punitive
17  damage component.  So Barber is a very --
18        THE COURT:  What in state law requires the city to
19  indemnify officers?  I thought we'd previously determined in
20  this case that it was entirely optional with the City
21  Council.
22        MR. BENNETT:  Okay.  That may be, but your Honor
23  posited and I think -- and this is now well outside the scope
24  of my expertise, but your Honor talked about the situation
25  where the city was also liable by statute.  And if the city

1    is -- if the city is also liable with the officer, then

2    that's in the class of it's essentially won against the city.

3    So I think that's where the lines are, and I didn't know that

4    we were drawing that line today, but I think Barber is a

5    very -- Barber opens up a narrow category of continuing

6    exposure for the individual officer, but it's not when the

7    city is on the hook.

8         THE COURT:  All right.  Thank you.  I want to take a

9    15-minute recess, and then we will move on to Issue Number 3,

10   so let's reconvene at 11 o'clock, please.

11        THE CLERK:  All rise.  Court is in recess.

12      (Recess at 10:44 a.m., until 11:00 a.m.)

13        THE CLERK:  All rise.  Court is back in session.

14   You may be seated.  Recalling Case Number 13-53846, City of

15   Detroit.

16        MR. BENNETT:  Your Honor, if I could, with respect

17   to the next argument, there was a little bit in the

18   simultaneous briefing of ships passing in the night on this

19   one, so I do want to make sure I properly frame the issue,

20   which I think will simplify the argument some.

21        We do not take the position that in a case where

22   ownership is not yet disturbed, where a piece of property is

23   owned by the original property owner and the -- and no part

24   of a condemnation process has already deprived the owner of

25   title -- if the ownership -- I should say the word

1  "ownership" as opposed to "title."  If ownership is still

2  there and if ownership is still in the hands of the original

3  owner and not of the city, we are dealing with a different

4  situation than a situation where ownership has already been

5  modified or extinguished and all that is left is a claim for

6  damages.  It turns out, we concede, that it gets complicated

7  in some of the cases, and we haven't had a chance to plumb

8  the depths of the facts of the individual situations, but I

9  did want to make clear that we're not talking about here in

10  terms of the city is not treating this as a complete

11  unsecured claim in a situation where ownership is, as of the

12  petition date, in the hands of the claimant.

13          THE COURT:  Well, I need you -- I need some

14  clarification of all of that.  So, for example, we have this

15  concept called inverse condemnation --

16          MR. BENNETT:  We were talking about that in the

17  break.

18          THE COURT:  -- where the plaintiff, the claimant,

19  still has ownership but claims damages on an inverse

20  condemnation theory.

21          MR. BENNETT:  I think --

22          THE COURT:  Is it your -- is it the city's position

23  that those claims should or should not be discharged?

24          MR. BENNETT:  You're going to love the answer.  It

25  depends, and I think what --

1          THE COURT:  On what?

2          MR. BENNETT:  Okay.  I'll explain.  If the situation

3     is that the city has basically already cut a corner off the

4     property years ago and the lawsuit was started to claim

5     compensation for it, I would regard that as the pre-petition

6     conduct was the taking, and we're dealing with a normal

7     unsecured claim.  If there is -- if there's some form of

8     nuisance-type inverse condemnation, it might be different,

9     but here I think these are the issues that we have to

10    understand the facts better, and I concede we have to

11    understand the facts better in the inverse condemnation cases

12    that fall within this group where it might not be susceptible

13    to the same bright line treatment of ownership versus

14    nonownership.  We concede this area is a little more complex.

15         THE COURT:  Oy.

16         MR. BENNETT:  Yes.  That is the technical term that

17    comes to mind.

18         THE COURT:  All right.  Well, let's just proceed

19    with the argument as best we can, and if there are factual

20    issues, so be it.  We'll deal with it.

21         MR. DEMOREST:  Good morning, your Honor.  Mark

22    Demorest, and with me, my associate, Lisa Okasinski.  We're

23    here on behalf of three parties that are involved in either

24    inverse condemnation or formal condemnation litigation with

25    the city.  I had hoped that we would get some clarification

1   on the issues from the statement by the city's counsel.

2   Unfortunately, I don't think it cleared up very much.  I'll

3   try to address those as I proceed here.

4           We object to the city's plan because we believe that

5   treating either a condemnation or an inverse condemnation

6   plaintiff as an unsecured creditor would violate the 5th and

7   14th Amendments of the Constitution.  Remember that only the

8   government has the power of eminent domain.  They can take

9   property for public use, which is what's involved with all

10  three of our clients.  They all have property near the City

11  Airport, what's now called Coleman Young Airport.  It's all

12  within a safety zone, which by FAA rules there are not

13  supposed to be any buildings in that area, so the city has an

14  obligation to buy the properties but has -- for funding

15  reasons and other reasons has dragged its feet for years and

16  years in acquiring the property; in the meantime, has taken

17  various actions which adversely affected these property

18  owners.

19          The Constitution is very clear under the 5th

20  Amendment that private property may not be taken without just

21  compensation.  The government simply cannot confiscate

22  property which would be, I believe, the result, your Honor,

23  if the condemnation and inverse condemnation claimants'

24  claims were treated as unsecured claims.  Just compensation

25  is not dependent upon the financial circumstances of the City

1  of Detroit.  It's what the value of the property is and the
2  value of the right taken.  Ten percent of just compensation
3  paid over 20 years is not just compensation.  There are not
4  many cases that have dealt with the constitutionality, the
5  relationship between bankruptcy statutes and the 5th
6  Amendment, but there are a couple of very, very important
7  Supreme Court cases.  The first one was the Louisville Joint
8  Stock Land Bank Case, a 1935 opinion authored by Justice
9  Brandies.  In that case, there was a bankruptcy amendment
10 that was passed that would have imposed a moratorium on
11 repossession of property after a foreclosure.  Justice
12 Brandies wrote that, "The Fifth Amendment commands that,
13 however great the nation's need, private property shall not
14 thus be taken even for a wholly public use without just
15 compensation," so I think -- the Louisville case was decided
16 during the Great Depression.  There were obviously financial
17 circumstances that prompted Congress to enact the law just as
18 the City of Detroit has exigent financial circumstances
19 today, but the Supreme Court was very clear in the Louisville
20 case that those financial circumstances did not outweigh the
21 5th Amendment.  In fact, the Court went on to say that if
22 public interest requires and permits the taking of property,
23 quote, "resort must be had to proceedings by eminent domain,"
24 so that if the city needs to acquire property in the vicinity
25 of the airport for safety reasons, they have to either

1    initiate formal condemnation proceedings, or, if they fail to

2    do so, a property owner can bring an inverse condemnation

3    claim to essentially get the city to do what it should have

4    done in the first place, which is to pay just compensation.

5           The other key Supreme Court case is from 1982, U.S.

6    versus Security Industrial Bank, which, again, reaffirmed

7    that the 5th Amendment takes precedence and that a bankruptcy

8    act cannot limit the compensation that would be paid to a

9    property owner.

10          The city takes an interesting position in this case.

11   They acknowledge those two Supreme Court cases, and they

12   acknowledge that the -- the primacy of the 5th Amendment, but

13   they then somehow reach the conclusion that that limitation

14   only applies if it affects property of the debtor.  There's

15   certainly nothing in either of those two decisions that deals

16   with that issue.  One case involve --

17          THE COURT:  Those two decisions dealt with and

18   addressed statutes that themselves effectuated the taking.

19          MR. DEMOREST:  That is correct.

20          THE COURT:  There's nothing about Chapter 9 here

21   that effectuates taking of your clients' property.  That's

22   already been done.

23          MR. DEMOREST:  Well --

24          THE COURT:  Does that make a difference?

25          MR. DEMOREST:  Well, let me, first of all, quibble

1    with your assumption, Judge, is  --

2              THE COURT:  Okay.  Feel free.

3              MR. DEMOREST:  -- there is -- there's an issue about

4    whether -- in some of these cases whether the taking has

5    taken place or has not, so we represent three different

6    clients with three different factual circumstances.  One has

7    a judgment for inverse condemnation under which the city is

8    obligated to make monthly payments for as long as it

9    restricts the use of the property.

10             Another client, the Dennis Trust, had a -- it was

11   a -- Mr. and Mrs. Dennis had a house near the airport.  They

12   began an inverse condemnation case.  The city then converted

13   it to a formal condemnation case with an inverse condemnation

14   counterclaim.  In that case, under Michigan law, with the

15   payment of just compensation, title has vested in the city.

16             And the last case is an inverse condemnation case

17   where title still rests in HRT Enterprises, although there's

18   an issue that would be raised at trial about what is the date

19   of taking.  So I have to --

20             THE COURT:  But that issue arises because the

21   plaintiff asserts that the taking has already taken place.

22             MR. DEMOREST:  There wouldn't be a basis to file the

23   case if that had not been the case.

24             THE COURT:  But in any of those three cases, it was

25   not the bankruptcy act that effectuated the taking.  It was

1     something the city did.  It's flying airplanes near your

2     clients' property.

3            MR. DEMOREST:  The Bankruptcy Code, Chapter 9, did

4     not effectuate the taking.

5            THE COURT:  All right.  So that's a distinction.

6     The question is is it a distinction that makes a difference

7     in the outcome here.

8            MR. DEMOREST:  I don't think so, your Honor.  I

9     think if you --

10           THE COURT:  Okay.  Why not?

11           MR. DEMOREST:  Well, if you read those two Supreme

12     Court cases as precedent, they clearly indicate that the 5th

13     Amendment promise that property will not be taken without

14     just compensation prevails over Congress' power to enact the

15     Bankruptcy Code and that -- so to the extent that Congress

16     passes a bankruptcy act that would purport to reduce or

17     eliminate or modify the 5th Amendment right to taking without

18     just compensation, it would -- Congress would be acting

19     unconstitutionally in excess of its authority, so I think

20     that's the fundamental premise, and that's really what those

21     two cases say.  The facts of those cases are different, but

22     the fundamental premise that the 5th Amendment part of the

23     Bill of Rights remains, you know, does not change.

24            The city then tries to make an analogy between

25     vendors and trade creditors who voluntarily enter into

1  contracts with the city, and we would submit, Judge, that

2  someone who sold a product to the city or leased a building

3  to the city entered into a voluntary commercial transaction

4  with the city.  In this case, none of the condemnation or

5  inverse condemnation claimants had any choice about this.  I

6  mean they would prefer to be operating their factory.  They'd

7  prefer to be in their house.  It was the city that decided

8  unilaterally to take the property, so I think that's a

9  fundamental distinction and the analogy that the city is

10  trying to make between these claimants and a claimant who

11  is -- simply has a contract claim does not hold up.

12        I think another important distinction, Judge, is

13  that, as we cited in our brief, that the issue of title is

14  one that's come up in the city's argument and also in your

15  comments that title -- the title of -- the title to the

16  property and the payment of money are inextricably linked.

17  What the case law says is that title passes to the United

18  States only when the compensation is paid, and I'm referring

19  to, among other things, the Seneca Nation of Indians case,

20  United States versus Dow, which we cite in our brief, so

21  that --

22        THE COURT:  Well, you're citing federal law?

23        MR. DEMOREST:  Those are ultimately, yes, 5th

24  Amendment takings cases.

25        THE COURT:  But that's not the state law, is it?

1          MR. DEMOREST:  The Michigan --

2          THE COURT:  The state gets a title first and then

3  litigates payment and value later; right?

4          MR. DEMOREST:  In a formal condemnation proceeding,

5  that is correct under the Uniform Condemnation Procedures

6  Act, so it's called a quick take statute, and the --

7          THE COURT:  Yeah.

8          MR. DEMOREST:  There is -- under stature, there's a

9  transfer of title in an inverse condemnation case, which is

10  what we're talking about in all three of our cases.  The

11  Uniform Condemnation Procedures Act does not apply to inverse

12  condemnation cases.

13          THE COURT:  Right.  But the plaintiff's claim is

14  that, in all practical senses, the taking has occurred by the

15  conduct and act of the city, and now you want your

16  compensation.

17          MR. DEMOREST:  That is correct, your Honor.

18          THE COURT:  So there's no unity of taking and

19  compensation in an inverse condemnation situation at all, is

20  there?

21          MR. DEMOREST:  Well, in a sense there is, Judge,

22  because, again, it's an involuntary situation.  It's not a

23  question of having entered into a note in a mortgage or some

24  other transaction.  It's something done unilaterally by the

25  city.

1          THE COURT:  Right, but the city did what it did,

2    which effectuated the taking that the plaintiff complains

3    of --

4          MR. DEMOREST:  Um-hmm.

5          THE COURT:  -- and then files a lawsuit for

6    compensation later.

7          MR. DEMOREST:  For compensation for the government's

8    exercise of its power of eminent domain, and --

9          THE COURT:  Yeah.  Okay.

10          MR. DEMOREST:  -- so, you know, they don't occur

11    simultaneously.

12          THE COURT:  But here's a --

13          MR. DEMOREST:  Obviously you don't have standing to

14    bring -- you don't have standing to bring the inverse

15    condemnation claim before the taking has occurred.  If you

16    sue too early, which in a couple of cases judges have told me

17    we did, then they say you're not ripe.  Come back some other

18    time.

19          THE COURT:  Okay.

20          MR. DEMOREST:  But the -- so --

21          THE COURT:  But the point of those decisions based

22    on ripeness is you have to have a taking before you can ask

23    for compensation.

24          MR. DEMOREST:  I would agree with that, your Honor.

25          THE COURT:  How do you deal with the argument that

 1   says even if the right to just compensation is a

 2   constitutional right, as you argue, and, therefore, of a

 3   different character than a statutory right, it is subject to

 4   valid statutory limitations such as statute of limitations.

 5   That is right, isn't it?

 6          MR. DEMOREST:  There are statute of limitations with

 7   regard to those types of claims, yes.

 8          THE COURT:  So if it's subject to a valid statutory

 9   limitation such as a period of limitations, why isn't it also

10   subject to a bankruptcy limitation, which is also statutory

11   and constitutionally based, by the way?

12          MR. DEMOREST:  Well, that's an interesting argument,

13   your Honor.  First of all, there's nothing in -- you know,

14   one way or the other in Chapter 9 about it, which you can use

15   that to argue both ways, but I would say this, Judge, that

16   statute of --

17          THE COURT:  Well, but pause there.  There's nothing

18   in Article IX that would establish the nondischargeability of

19   your claim; right?

20          MR. DEMOREST:  That is correct.

21          THE COURT:  Nothing explicit.

22          MR. DEMOREST:  That is correct.  You know, we would

23   be relying on the U.S. Constitution and the cases

24   interpreting it from the Supreme Court.  I think there's a

25   difference between the fundamental right to just compensation

1  and the statute of limitations, which essentially is

2  procedural; that is, it says if you have this type of claim,

3  you have to bring it within a certain number of years so that

4  witnesses can remember what happened, documents exist, you

5  can't come back.  There are going to be some certainty --

6              THE COURT:  The person whose attorney --

7              MR. DEMOREST:  I'm sorry.

8              THE COURT:  -- blew the statute of limitations

9  doesn't feel it's procedural.  They don't get their

10 compensation.

11             MR. DEMOREST:  That is true, your Honor, and I would

12 also say your hypothetical is a moot point because all the

13 claims on the clients that I'm representing before you today

14 all timely filed their cases, but I understand the --

15             THE COURT:  And I don't mean to suggest that they

16 didn't.

17             MR. DEMOREST:  I understand the analogy.

18             THE COURT:  Okay.  But the point is there are

19 statutory limitations that can be valid -- constitutionally

20 valid against constitutional claims.

21             MR. DEMOREST:  That is correct, your Honor.

22             THE COURT:  Why isn't bankruptcy one of those valid

23 limitations?

24             MR. DEMOREST:  I think there's a substantial

25 difference, Judge, between saying that there are certain

1  limitations in terms of timing or procedures of how you bring

2  forth a claim to essentially saying that the claim is

3  completely eliminated.  I mean what we have here, for

4  example, in the case of HRT Enterprises is they had a case

5  pending in front of Cohn.  It was scheduled -- the city's

6  motion for summary judgment had been denied.  It was

7  scheduled to go to trial within weeks after the petition was

8  filed.  We had no control over whether the petition was going

9  to be filed or not.  So I think essentially what the city is

10  arguing is not to somehow limit a claim but essentially to

11  eliminate the claim.

12          THE COURT:  Well, but that's what statute of

13  limitations do, too.

14          MR. DEMOREST:  But in a sense, Judge, as long as

15  one --

16          THE COURT:  In fact, in a sense -- in a sense, the

17  bankruptcy limitation is less onerous than the statute of

18  limitations limitation because there is some payout in

19  bankruptcy, not in statute of limitations issues.

20          MR. DEMOREST:  Well, here's, I think, a fundamental

21  difference, Judge, is a statute of limitations is never, you

22  know, retroactive.  You know, you know that you have a

23  certain amount of time to bring your claim, and as long as

24  you --

25          THE COURT:  Um-hmm.

1　　　　MR. DEMOREST:　-- act timely, you can preserve your

2　claim.

3　　　　THE COURT:　Um-hmm.

4　　　　MR. DEMOREST:　In here -- in these cases with our

5　clients, we were pursuing all the claims vigorously, and the

6　only thing that occurred was the city filed its petition.

7　　　　THE COURT:　Petition, yeah.

8　　　　MR. DEMOREST:　So I think that's a fundamental

9　distinction as to whether the plaintiff did something

10　voluntarily or through inaction to lose their rights versus

11　having a unilateral action by the city's filing its petition.

12　　　　THE COURT:　Oh, okay.

13　　　　MR. DEMOREST:　Judge, I don't have any other --

14　　　　THE COURT:　Okay.

15　　　　MR. DEMOREST:　-- comments at this point unless you

16　have questions for me.

17　　　　THE COURT:　No.

18　　　　MR. BENNETT:　Okay.　I'll be very brief, and I --

19　you know, point number one, which I think your Honor

20　recognized, is the Bankruptcy Code does not provide for the

21　taking of property without just compensation.　In fact, it

22　kind of does the opposite.　It bends over backwards.　That's

23　why we have concepts like adequate protection and why we have

24　concepts of indubitable equivalents, and your Honor is

25　correct.　We are not relying upon the Bankruptcy Code to

1    implement any takings.  What we are dealing with is the

2    aftermath of takings, as narrowed by my original comments.

3    And we are definitely aware that the statute in Michigan

4    provides for in some of the cases that the title passes and

5    ownership has been extinguished and then there's fighting

6    over compensation.  We are also aware of circumstances where

7    a taking has already occurred and compensation is sought for

8    that.  And in all of those circumstances where all of the

9    relevant acts are pre-petition acts, that the consequence of

10   that, the claim for compensation, is, in fact, covered under

11   Chapter 9 and is dealt with like other claims.  The statutory

12   cite for that, of course, is the definition of claim.  It's

13   unbelievably broad.  There isn't an exception for why the

14   claim came about.  And I would make the point just very

15   briefly here that we talked about a little bit with respect

16   to the last argument, that there are lots and lots and lots

17   of claims for compensation of all different kinds and for

18   very severe injuries that are being treated in this case as

19   unsecured claims because that's what they are.  There's no

20   question that as a matter of equity all those claims should

21   be paid in full.  The problem is the city can't afford to pay

22   all of them in full, and, accordingly, they don't pay any of

23   them in full.  That's the way the insolvency process works.

24          You know, I don't think there's -- you know, there's

25   rally anything else to add on this point.  I mean, again, the

1  statute of limitations analogy is a good one that I haven't
2  thought of, and clearly here claims are not being eliminated.
3  They are being recognized.  They are being allowed, but the
4  distribution on account of those claims is going to be
5  substantially short of a hundred cents on the dollar.

6      As to the line drawing problem, we will dig in in
7  the individual cases and figure out what the exact status of
8  title is, and we have an other secured claims class, which
9  is, I suppose, what we will do with the -- or just not impair
10  those where title hasn't passed.

11      THE COURT:  Well, my confusion persists here.

12      MR. BENNETT:  Okay.

13      THE COURT:  How would you articulate the class of
14  condemnation or inverse condemnation claims, takings claims,
15  which you concede should not be discharged?

16      MR. BENNETT:  Okay.  In the case of the condemnation
17  claim, a condemnation claim where the property remains owned
18  by -- where the title hasn't passed for any reason and the
19  property remains owned by the claimant, we would regard those
20  cases as cases where to take the property hundred cent
21  dollars have to be paid because there's a property ownership
22  interest that's entitled to adequate protection or
23  indubitable equivalents.

24      THE COURT:  As of when?

25      MR. BENNETT:  As of the petition date.

1          THE COURT:  Doesn't the confirmation of the plan
2     discharge claims as of the confirmation date?
3          MR. BENNETT:  Yes, it does, your Honor, and I guess
4     I'm being excessively generous because if someone was paying
5     attention and there was a condemnation case that moved past
6     the title stage, they probably should have come in and asked
7     for adequate protection, and your Honor would have given it
8     to them, and so I'm trying to be fair and just in the
9     circumstances.
10         THE COURT:  My question may be entirely
11    hypothetical.
12         MR. BENNETT:  Okay.  So I don't know if there's that
13    situation, but I think that the --
14         THE COURT:  Right.
15         MR. BENNETT:  -- that there's a remedy for someone
16    who was stuck in that situation so that they shouldn't be
17    trapped.  I think that the only hard cases are the inverse
18    condemnation cases, and I'll tell you the class of the cases.
19    I think, without being certain because I didn't actually dig
20    into the actual pleadings -- I looked at the characterization
21    by the claimant.  There is one case where the Court has
22    already decided that a taking occurred but has basically put
23    a monthly fee on it and has said the monthly fee stops if you
24    stop doing it, and so that -- if those are, in fact, the
25    facts, that suggests to me that the line might still be --

1   this one might be the confirmation date line and that if the

2   city is still doing it after confirmation, it's got to pay

3   the freight, but for pre-confirmation -- for pre-confirmation

4   events and for pre-confirmation time periods, it would be an

5   unsecured claim.  So that I think is the case that gets

6   difficult where it's something that the lower court has

7   recognized could stop and that the city should think about

8   stopping.  In other cases where the taking -- where something

9   happened a long time ago, that has had an impact even if it's

10  continuing as a pre-petition claim.

11          THE COURT:  All right.  So how do you deal with the

12  more fundamental argument which says that the right of

13  compensation is recognized in the Constitution, and the

14  Bankruptcy Code, therefore, is subject to it?

15          MR. BENNETT:  Well, that goes to the question of --

16          THE COURT:  Unlike in the 1983 context.

17          MR. BENNETT:  Okay.  Your Honor, I read the case,

18  particularly the Indian case about Niagara Falls where they

19  talk about the existence of -- well, title doesn't pass until

20  payment, but payment never happened.  And the statute of

21  limitations expired, and they said the transfer still

22  occurred.  So while I understand that that rhetoric has been

23  used to describe the impact of the 5th Amendment, the case

24  actually before them did not enforce that rhetoric and did

25  not regard that rhetoric as definitive for all purposes.

1       I guess, your Honor, if the Michigan -- if the
2  Michigan statute that provides for a mechanism for the state
3  or city to acquire title before making payment while people
4  fight about payment, if that's unconstitutional, then maybe
5  takings under it are unconstitutional and we have to look at
6  the different --
7       THE COURT:  No.  The unconstitutionality results
8  from the failure to provide compensation, not from the taking
9  itself.
10       MR. BENNETT:  Well, actually, yes.  To the extent
11  that the statute enables seizures without cash payment, it's
12  unconstitutional I guess is the way I would have put it.  I
13  don't think we're that different, but it's not just the fact
14  that the --
15       THE COURT:  The Supreme Court has held that the
16  constitutional violation occurs not from the taking but from
17  the failure to provide compensation for the payment.
18       MR. BENNETT:  Except that -- well, the rule, I
19  think, that's causing you trouble, as articulated in the two
20  Supreme Court cases, was the rule that title doesn't pass
21  until payment is in full.  That's the aspect of it.  Many,
22  many bankruptcy claims are compensation.  They are,
23  nevertheless, still subject to adjustment in a debt
24  adjustment case.  So you could have a world -- and I think
25  we, in fact, do have a world where the compensation for a

 1  taking is a claim, the amount of which gets sorted out over

 2  time and is paid at some future time.  Okay.  There is

 3  nothing wrong with that system, and bankruptcy adjustment of

 4  the claim that results is no problem.  The conflict, if there

 5  is one, comes from the two sentences in the cases -- one in

 6  each case that talks about title doesn't pass until payment

 7  is made.  Now, it turns out that's not even true in the case

 8  they even decided, and it's not actually done that way as a

 9  matter of Michigan law.  If it's not done that way as a

10  matter of Michigan law and Michigan law is constitutional,

11  then we have a compensation claim, one of many, many, many

12  other compensation claims, that can be adjusted in a

13  bankruptcy case.

14          THE COURT:  Right, but it's a compensation that the

15  Constitution says has to be made.

16          MR. BENNETT:  Again, I --

17          THE COURT:  So why isn't that subject to bankruptcy?

18          MR. BENNETT:  It is subject to a bankruptcy.

19          THE COURT:  I said it backwards.  Why isn't

20  bankruptcy subject to that?

21          MR. BENNETT:  Okay.  And I come back to basically

22  the same points that we've made before is that Congress has

23  still got the power to prescribe uniform laws of

24  bankruptcies.  It didn't say except when a compensation is

25  grounded in a constitutional provision, and our Bankruptcy

1    Code has exceptions.  We talked about there's three different

2    kinds.  There's the priority rules, the discharge rules, and

3    subordination rules.  And this one hasn't been granted a

4    special priority.  So I do think it's about -- the

5    cleavage -- the limits on bankruptcy power, for better or for

6    worse -- it's just where we are as a matter of our

7    Constitution -- is whether there exists on the petition date

8    a property right or not.  That's the primary rule.  Much

9    follows from that whether you're in a world where you are

10   subject to pretty much unfettered impairment as a result

11   of -- after the application of, of course, numerous tests

12   that are generally protective of creditors or whether you're

13   in the landscape of adequate protection, indubitable

14   equivalents, and the 1129(b)(1) suitable for tomorrow.

15           THE COURT:  Isn't there a third category in addition

16   to property right and not property right, and that third

17   category is constitutional right?

18           MR. BENNETT:  I don't think so, your Honor.

19           THE COURT:  Constitutional right to be paid for

20   whatever; in our case, a taking.

21           MR. BENNETT:  I am aware of -- I am aware of no case

22   that creates such a right.  I think -- let's talk again about

23   the --

24           THE COURT:  Or any case which denies such a right?

25           MR. BENNETT:  Well, again, the one specific -- and,

1   remember, there's a number of unspecific, but I think they're

2   also informative.  If you tick down the list of the non -- of

3   claims that are nondischargeable in a Chapter 7 case, okay,

4   tick down that list of nondischargeable claims, and you come

5   to many that, frankly, could potentially be -- encapsulate

6   constitutional issues -- and the one I picked, in particular,

7   was elections because it was -- it's called out as elections

8   as opposed to willful and malicious somethings.  Okay.  And I

9   skipped over depository institution-related claims because

10   that didn't sound constitutional, but that's still an

11   important federal area of compensation.  The one that does

12   have a constitutional dimension is election law, so I focused

13   on that and said we have a situation where Congress

14   recognizes that a class of claims, which has in some

15   instances a constitutional dimension, are going to be

16   nondischargeable, but they're dischargeable in Chapter 9

17   anyway, so I don't think that when Congress said all claims

18   are dischargeable in Chapter 9, when they made a carveout for

19   some kinds of claims they thought were important in other

20   chapters, they didn't say all those claims are dischargeable

21   in Chapter 9 unless they're constitutional.  So we're dealing

22   with a statute that --

23          THE COURT:  Isn't it equally arguable that Congress

24   decided that it didn't need to include an exception for just

25   compensation claims because the Constitution already says it?

1          MR. BENNETT:  Then they might have also not bothered

2     with the one on elections.  That's my point.

3          THE COURT:  Because there's nothing in the

4     Constitution that says you're entitled to compensation if

5     your election rights have been violated --

6          MR. BENNETT:  But you're going to be --

7          THE COURT:  -- unlike the 5th Amendment.

8          MR. BENNETT:  Okay.  The 5th Amendment is more

9     explicit, but it doesn't mean there aren't other damage

10    claims grounded upon other constitutional rights that are

11    going to be created from time to time, and I made the point

12    with respect to the 1983 part.  While in the 1983 case it

13    seems particularly clear that it's statutory and not

14    constitutional, I said to your Honor even if it was

15    constitutional, I don't think it makes a difference.  It's

16    not as if we really have a special place for constitutional

17    compensation claims.  A lot of compensation claims are

18    important, and the framers didn't want the administrative --

19         THE COURT:  But why aren't the laws of the United

20    States subject to people's constitutional rights?

21         MR. BENNETT:  They are, but under the Bankruptcy

22    Code the -- and your Honor said it correctly.  It's not the

23    Bankruptcy Code that takes a property right away.  It's

24    another statute that does.  What the Bankruptcy Code is,

25    picks up in the middle, and it asks the question on the

1    petition date --

2            THE COURT:  The Bankruptcy Code here does take the

3    constitutional right away, which is the constitutional right

4    to compensation.

5            MR. BENNETT:  No.  It modifies the compensation

6    claim based upon ability to pay.  That's what it does.  It

7    didn't say no compensation.

8            THE COURT:  The claim is discharged.

9            MR. BENNETT:  It lines up --

10           THE COURT:  The claim is discharged.

11           MR. BENNETT:  After payment to the extent available,

12   but so are so many other compensation claims that I

13   wouldn't -- that I wouldn't denigrate and the structure of

14   the Constitution wouldn't denigrate either.  They didn't --

15   when the Constitution was written, they didn't think they

16   were listing all the rights that are important.  They listed

17   some.  They admitted that there were others that were equally

18   important.  That to me is the best evidence that they did not

19   intend to subordinate claims arising from the validation of

20   all other rights to those that were specifically mentioned in

21   the Constitution.  The structure still matters, and I think

22   in this instance it has important clues.

23           THE COURT:  Does that argue that all of those claims

24   are dischargeable, or does it argue that they're all

25   nondischargeable?

1           MR. BENNETT:  No.  It argues that they -- that

2    making them nondischargeable effectively gives them priority,

3    effectively -- and so I think it says they're all

4    dischargeable after being treated equally, equivalently under

5    the various provisions of the Bankruptcy Code.  I don't see a

6    basis for a priority or a preference.  I also don't see a

7    basis for subordination.  I just think they're the same.  And

8    I'm admitting that to Congress -- someday Congress may decide

9    that the idea of treating all claims the same was a terrible

10   idea and they ought to take testimony as to whether or not

11   there should be a different ranking, and then we'll have a

12   year's worth of hearings because every interest group in the

13   world is going to come and make arguments as to why their

14   claims are better than other claims and how they should fit.

15   I don't think we do that.  We are not in that business.

16   Whether we should or shouldn't be, that's a question clearly

17   for Congress.

18           THE COURT:  Thank you.

19           MR. DEMOREST:  May I respond, your Honor?

20           THE COURT:  Yes, sir.

21           MR. DEMOREST:  The Constitution doesn't say anything

22   about ability to pay.  It focuses on the property owner's

23   right to receive just compensation.  Just compensation is

24   what the property is worth.

25           THE COURT:  Well, the Constitution has a bankruptcy

1  clause.

2          MR. DEMOREST:  It does, but the Supreme Court has

3  said that the bankruptcy clause is subordinate to the 5th

4  Amendment.  They've said that in two very specific cases,

5  Judge, that the 5th Amendment takes precedence over the

6  bankruptcy protection.

7          The issue of the Michigan Uniform Condemnation and

8  Procedures Act I think is a bit of a red herring, Judge, for

9  two reasons.  One is it has nothing to do with any of the

10  inverse condemnation claims because the statute doesn't

11  apply, but if Congress doesn't have power to limit the

12  compensation to someone whose property has been taken by the

13  government either through formal condemnation proceedings or

14  through a de facto taking, certainly the Michigan legislature

15  does not, and the Michigan --

16          THE COURT:  Well, let me just -- let me just pause

17  and ask both of you this question.  Is this the entire

18  universe of either condemnation or inverse condemnation

19  claims that have been filed against the debtor, the city?

20          MR. DEMOREST:  I know it's not, your Honor, because

21  they -- there were certain condemnation claims that they

22  asked -- the city asked the stay to be lifted so they could

23  proceed with those.  For some reason, they decided to leave

24  the Dennis case off that list, so I know that there are at

25  least some condemnation cases that are in the works.

1        THE COURT:  These are condemnation cases?

2        MR. DEMOREST:  Yes.  In terms of the inverse

3 condemnation cases, I do not know, Judge.  I only know about

4 the ones that we're handling.

5        THE COURT:  Well, Mr. Bennett, let me ask you.  In

6 regard to the condemnation cases where the stay was lifted so

7 that the city could proceed with its case, is the city going

8 to pay those claims in full, or is it going to pay them on a

9 bankruptcy basis?

10        MR. BENNETT:  Your Honor, I don't have personal

11 knowledge of them.  I'll look into it and get you an answer

12 tomorrow.

13        THE COURT:  Well, let's do it on the record at the

14 status conference on Monday.

15        MR. BENNETT:  Okay.

16        MR. DEMOREST:  Okay.  Another point, Judge, that I

17 thought was interesting is the judgment that T&T Management

18 has is there's a piece of land near the airport that the city

19 said you can't build anything on, and that --

20        THE COURT:  The city says that or the FAA?

21        MR. DEMOREST:  Well, the city did because the city

22 denied the building permits.  The city did it as a result of

23 FAA rules --

24        THE COURT:  Okay.  All right.

25        MR. DEMOREST:  -- their grant agreements with the

1   FAA, et cetera.  But the city paid a lump sum judgment for
2   past damages of several million dollars, and then there's
3   essentially a rent amount that continues forever as long as
4   the restrictions are in place.  That's not fundamentally
5   different from any of the cases.  All of the cases that we're
6   dealing with here are dealing with situations where the city
7   has essentially said we need this property to be leveled of
8   buildings, so the effects of that are ongoing for as long as
9   there's an airport.  So the dividing line between pre-
10  petition and post-petition, pre-confirmation and post-
11  confirmation is pretty murky.
12          THE COURT:  Well, but the difference is for this
13  specific client, the client retains title, and presumably, at
14  least, the judge foresaw some reasonable possibility of
15  regaining full use of the property --
16          MR. DEMOREST:  Partially correct, your Honor.
17          THE COURT:  -- like a landlord.
18          MR. DEMOREST:  Actually, that plaintiff was a
19  tenant, so it was their leasehold interest that was
20  interfered with.
21          THE COURT:  Right.  I forgot about that little
22  wrinkle.
23          MR. DEMOREST:  Yeah; yeah; right; right.  And then
24  HRT Enterprises is the owner of the property that holds
25  title.  Two of its tenants have received inverse condemnation

1 judgments, but it still owns the property, and the city has

2 never bought it.

3          THE COURT:  Right.

4          MR. DEMOREST:  The last thing, Judge, is I saw that

5 you had asked the U.S. Attorney General to supply a brief,

6 and we'd just like the opportunity to reply to whatever they

7 say.  I don't know what position they're going to take.

8          THE COURT:  We'll work that out.

9          MR. DEMOREST:  Okay.  Thank you, Judge.

10          THE COURT:  Absolutely.  All right.  Thank you.

11          MR. DEMOREST:  Thank you, Judge.

12          THE COURT:  Hold on one second.  Okay.  So is that

13 it until two o'clock?

14          MR. BENNETT:  Yes, your Honor.

15          MS. LENNOX:  Yes, your Honor.

16          THE COURT:  Okay.  We'll see you then.

17          THE CLERK:  All rise.  Court is in recess.

18     (Recess at 11:38 a.m., until 2:00 p.m.)

19          THE CLERK:  All rise.  Court is in session.  You may

20 be seated.  Calling Case Number 13-53846, City of Detroit,

21 Michigan.

22          THE COURT:  Good afternoon.

23          MR. BJORK:  Good afternoon, your Honor.

24          THE COURT:  One second, please.  Okay.  Let's

25 proceed with argument on legal issue Number 10.

1          MS. LENNOX:  Your Honor, before we do that, did you

2    want us to put something on the record with respect to Issue

3    Number 5?

4          THE COURT:  Oh, I did, yes.  Stand by for just one

5    moment for us.  This will just take a minute.

6          MR. BJORK:  Thank you, your Honor.  Jeff Bjork from

7    Sidley Austin on behalf of National Public Finance Guaranty

8    Corporation.  We had raised the objection with respect to

9    Issue Number 5.  We're fine to rest on our papers with

10   respect to that objection, and I think the city is as well.

11         MS. LENNOX:  We concur, your Honor.

12         THE COURT:  Okay.  So it's not resolved.  It's still

13   an open issue, just not to be argued.

14         MR. BJORK:  Correct.

15         THE COURT:  All right.  That's fine.  We'll note it

16   accordingly.  Alicia, would you be sure that Chris gets this

17   message?  All right.  Now we're ready for you, sir.

18         MR. BRILLIANT:  Thank you, your Honor.  For the

19   record, Allan Brilliant from Dechert, LLP, on behalf of

20   Macomb County by and through its county agency, the

21   Commissioner of Public Works, Anthony Marrocco.  Your Honor,

22   we heard a lot of argument this morning, very interesting

23   arguments about constitutional law, but I think here,

24   although there is a small constitutional element, I think

25   it's better to start with the Bankruptcy Code.  Before I get

1    started, your Honor, I'm going to argue on behalf of Macomb.

2    Oakland and Wayne also wants to make their own arguments,

3    and --

4              THE COURT:  Sure.

5              MR. BRILLIANT:  -- so I just want to make sure your

6    Honor should know I don't intend to use all the time for our

7    side.

8              THE COURT:  Okay.

9              MR. BRILLIANT:  Your Honor, under Section 1128 of

10   the Bankruptcy Code --

11             THE COURT:  We have a little flexibility with our

12   time since so many of the other arguments went away.

13             MR. BRILLIANT:  Thank you, your Honor.  Under

14   Section 1128 of the Bankruptcy Code, which is made applicable

15   to Chapter 9, a party in interest has standing to object to a

16   plan.  You know, a party in interest has been broadly

17   construed to create a broad right of participation in a

18   Chapter 11 case, and it's granted to anyone who has a

19   protected legal interest in the outcome of the case.  As the

20   Sixth Circuit BAP has said, courts have construed a party in

21   interest to be anyone who has an actual pecuniary interest in

22   the outcome of the case, anyone who has a protected stake in

23   the outcome of the case, or anyone who would be impacted by a

24   plan in a significant way.  Macomb easily meets this

25   standard.  The plan, as proposed by the debtor, would provide

 1   for certain occurrences which we believe are illegal, you

 2   know, violative of Michigan law, Detroit city law, and the

 3   bylaws of DSW -- DWSD.  Among them, your Honor, the plan

 4   requires for a payment of the -- what they believe is the --

 5   or propose is the fair amount of the UAAL over nine years.

 6   We believe that the way it's been calculated has been

 7   calculated inappropriately; that they used --

 8           THE COURT:  Well, I get that, but how does that

 9   impact Macomb County?

10           MR. BRILLIANT:  Sure.  Well, to the extent that,

11   your Honor, you know, we believe that they're being -- that

12   they're asking DWSD to pay more than its fair share of the

13   UAAL, and --

14           THE COURT:  Right, but how does that impact Macomb

15   County?

16           MR. BRILLIANT:  Sure.  Well, Macomb County as well

17   as Oakland and Wayne, you know, are the principal customers

18   of the DWSD, and, consequently, it pays rates based upon, you

19   know, the cash flows of the DWSD, so to the extent that DWSD

20   pays more than its fair share of the UAAL, that by its very

21   nature means that --

22           THE COURT:  Well, but doesn't it just pass those

23   costs on to its customers?

24           MR. BRILLIANT:  It passes them on to its customers,

25   the main ones being Wayne, Oakland, and Macomb County.

1      THE COURT:  No.  I'm asking doesn't Macomb pass
2  those costs on to its customers?

3      MR. BRILLIANT:  Well, your Honor, I mean it can do
4  that, but there's an effect to that.  I mean at some point
5  its customers can't afford to pay the -- you know, the
6  amounts, in which case you have issues there.  It also, by
7  charging its customers more, may cause some people to leave
8  the county because, you know, the affordability of sewage
9  services, it has adverse effects on Macomb.  But I don't
10  think, your Honor -- this is not a situation, I think, where
11  the person who has to come in, you know, would be, you know,
12  some ad hoc group of, you know, people who, you know, are,
13  you know, homeowners or business owners in Macomb.  Macomb
14  has a real interest here as a governmental entity in making
15  sure that it's part of its governmental function to provide
16  sewage services for its citizens and to make sure that
17  they're affordable and appropriate, and it has an interest in
18  seeing that that occurs as both a pecuniary interest -- as I
19  said, if rates go up, they have to pay more and may not be
20  able to pass it all along to their own customers or it may
21  create other problems within the county, but more than that,
22  it's -- through its governmental function, if the plan is --
23  makes the company unfeasible or dramatically raises rates, it
24  adversely affects Macomb County, you know, as a whole, you
25  know, through -- by having, you know, sewer rates which are,

1   you know, inappropriate and too high for its citizens.

2           THE COURT:  Well, do you agree with the proposition

3   that as the party to a -- to an executory contract which is

4   not in default, Macomb County cannot object to an assumption

5   of the contract on the grounds that the city cannot show

6   adequate assurance of future performance?

7           MR. BRILLIANT:  I think, your Honor, that is

8   something -- whether or not there is a default and whether or

9   not the plan itself will create a default such that the plan

10  can't be assumed is, I think, for another day, you know,

11  but --

12          THE COURT:  I need you to answer my question.

13          MR. BRILLIANT:  Okay.  Well, the Bankruptcy Code,

14  your Honor, does provide that, you know, assumption, you

15  know, and assignment, adequate assurance, you know -- you

16  know, requires that there be a default, so I don't --

17          THE COURT:  All right.

18          MR. BRILLIANT:  So I don't disagree with that, your

19  Honor.

20          THE COURT:  If there's no default, a question we can

21  determine for another day, although I don't think you have

22  asserted one, but -- so my question is really a question of

23  statutory interpretation.  If the city is not required to

24  show adequate assurance of future performance to assume this

25  contract and that's the only relationship that Macomb has

1  with the city, why should the Bankruptcy Code be read,

2  interpreted to permit you to make what amounts to essentially

3  the same argument within the guise of feasibility?

4            MR. BRILLIANT:  Your Honor, again, it goes back

5  to -- and, first of all, we should set a few things out.

6  Obviously we're talking about Macomb and we're not talking

7  about MIDD, which is subject to the hearing tomorrow, which

8  is a creditor.

9            THE COURT:  Right; right.

10            MR. BRILLIANT:  And so that's a --

11            THE COURT:  I got that.

12            MR. BRILLIANT:  That's a different -- that's a

13  different issue.

14            THE COURT:  Yeah.

15            MR. BRILLIANT:  But the issue here, your Honor, is

16  whether we're a party in interest.  If we're a party in

17  interest under 1109, we have the right, which is adopted in

18  Chapter 9 -- we have the right to object to a plan, and this

19  is Mount Carbon, your Honor.  I think this is really on all

20  fours with Mount Carbon where Judge Kreiger in the Bankruptcy

21  Court in the District of Colorado was dealing with a

22  situation where there was a -- you know, a municipal entity

23  in Chapter 9, two municipalities that bordered with it who

24  had infrastructure contracts.  The debtor asserted that there

25  was no default under the contracts.  The other parties

1   objected to that, and we're not there yet.  As your Honor

2   knows, the debtors just filed their motion to assume

3   contracts, so whether there's -- you know, whether there are

4   defaults pursuant to the plan, you know, the, you know -- you

5   know, the bankruptcy filing or pre-petition stuff, that

6   hasn't been, you know, analyzed yet, and I can't tell you at

7   this point that there aren't any defaults.  I suspect that,

8   you know, given the long-term history we've had with the DW,

9   you know, SD, I suspect there are some defaults of some sort,

10  if not necessarily, you know, monetary defaults, but in Mount

11  Carbon, you had a situation -- you had two adjoining

12  municipalities, had infrastructure contracts with the debtor.

13  Debtors took the position that they were not in default and

14  also took the position that since they were assuming the

15  contract that the two entities, you know, had no standing to

16  object to the plan on the basis of feasibility or any other

17  issue, and Judge Kreiger, in a very scholarly and well

18  thought out decision, went through the history of party in

19  interest, went through, you know, the Bankruptcy Code, and

20  talked about the fact how important it is, especially in a

21  Chapter 9 case, to have broad participation by all those

22  parties who are going to be affected by the outcome of the --

23  of a plan of reorganization and found that a party who was a

24  party in interest, even if their contract was going to be

25  assumed and, therefore, arguably they would be unimpaired

1  under the plan, still had the right to raise all the other
2  943 arguments, illegality of the plan, feasibility, et
3  cetera, and, in fact, in that case, she granted, you know,
4  standing to the two governmental entities.  The Court then
5  wrote a second opinion, you know, which is cited in the
6  briefs on the confirmation of the plan, and she actually in
7  that case denied confirmation of the plan based upon, you
8  know, the counties' -- they're not counties -- on the two
9  governmental entities' objections even though the creditors
10  had overwhelmingly supported the plan, and she goes back
11  through it again and analyzes the fact how important it is
12  that parties whose, you know, outcome is being affected by
13  the plan, you know, have the right to file 943, you know,
14  objections.  And, your Honor, this is -- another case I think
15  that is -- arose in the context of Chapter --

16         THE COURT:  Well, let me just ask in that case, had
17  those two governmental entities filed proofs of claim?

18         MR. BRILLIANT:  You know, I don't recall that
19  particular issue.  I do know that there was an issue as to
20  whether or not there was a default.  As part of the standing
21  argument, the municipality had argued that there was no
22  default, and, therefore, they had no right to participate.
23  The judge, you know, left that for the confirmation, you
24  know -- you know, hearing, and I don't recall in the
25  confirmation opinion whether she actually ultimately

1    addressed that, but instead she just -- she denied, you know,

2    confirmation on the basis of -- you know, of feasibility.

3    And she went to great lengths in the decision to talk about

4    the importance of having people raise these types of issues

5    so they can be decided appropriately, you know, by the Court

6    and not, you know, create burden, you know, on the Court to

7    sua sponte, you know -- you know, raise and think about

8    whether all the 943 arguments are approved.

9          Your Honor, another decision which I think is

10   equally applicable, although in the Chapter 11 case, is the

11   Third Circuit decision, you know, in Global Industries, which

12   is cited in everyone's, you know, briefs.  That was a

13   situation where there were insurers, and there's a lot of

14   asbestos, you know, cases that are, you know, cited in the

15   city's and the retirees' briefs, which I think are really

16   inapplicable, but the only one of these decisions on the

17   standing issue that I'm aware of that actually went to the

18   Court of Appeals was the Global Industries case.  It's not an

19   asbestos case but a silica case, and there you had insurance

20   companies who had insured, you know, the debtors.  And their

21   insurance contracts were going to be assigned to a

22   liquidating trust.  And the issue there, your Honor, was the

23   debtors argued that because the contract was being assigned

24   and was being assumed and they were not giving up any -- you

25   know, any rights other than the assignment which the

1    Bankruptcy Court found was appropriate because it was
2    unenforceable as a matter of bankruptcy law, they argued that
3    the insurance companies had no standing to, you know, oppose
4    the plan.  The District Court on appeal after confirmation of
5    the plan affirmed, and it went to the Third Circuit Court of
6    Appeals.  And the Third Circuit Court of Appeals reversed,
7    and the Court there said that, you know, parties who have --
8    whose, you know, money is being taken out of their pocket,
9    even if their -- you know, their contract is not being
10   changed in any way, you know -- you know, have standing, you
11   know, to object because they have an interest in the outcome
12   of the case, and their rights are being affected by the case,
13   and they had the right to raise objections relating to the
14   legality, the good faith and various other issues with
15   respect to the case.  The debtor's counsel in that case
16   argued, well, the judge ruled on all these things, ruled on
17   all the 1129, you know, standards, so it doesn't matter.  The
18   Third Circuit said, well, it does matter.  They had the right
19   to appear, to be heard, had their arguments heard at the case
20   and reversed and remanded, you know, for, you know, a new
21   confirmation hearing.
22            THE COURT:  So does Macomb County have a contract
23   with the City of Detroit?
24            MR. BRILLIANT:  We are, your Honor, a third-party
25   beneficiary to a contract.  We are not the direct contractual

1   party, which is OMI.  Instead, we are the third-party

2   beneficiary to the contract.

3            THE COURT:  So what does that mean?

4            MR. BRILLIANT:  Okay.  It means two things, your

5   Honor.  Under the contract, it expressly says we're the

6   third-party beneficiary.  As we point out in our brief and --

7   or, you know, it's conceded as they have to, under Michigan

8   statutory law a third-party beneficiary has the right to

9   enforce the contract, you know, sue for breach, has the right

10  to -- you know, has a contingent claim with relate to it, you

11  know, in case of a -- you know, a default or a breach of the

12  contract, you know, under Michigan law, so, you know, we have

13  the right -- if your Honor hasn't read it, should read the --

14  I think it's a Troy-Osprey case or Osprey-Troy case from the

15  appellate courts in Michigan which basically says that a, you

16  know, express third-party beneficiary has the right to stand

17  in the shoes of the -- you know, the named party and to

18  enforce the contract, so although we are not the -- there's a

19  pass-through entity, you know, OMI, you know, the, you know,

20  Oakland Macomb Interceptor, you know, which is the nominal,

21  you know, party with respect to the sewer services, it's just

22  a pass-through contract.  We're the third-party beneficiary.

23  We are designated as a first-tier customer.  We are the

24  wholesale customer of the DWSD in Macomb County, so it is if,

25  your Honor --

1          THE COURT: Who are Macomb County's customers?

2          MR. BRILLIANT: Macomb County's customers, your

3 Honor, are the -- you know, the businesses and, you know,

4 citizens of Macomb County who buy --

5          THE COURT: Okay. So your customers are the retail

6 customers. You don't operate through the various townships

7 and cities of Macomb County.

8          MR. BRILLIANT: With respect to sewage, your Honor,

9 I believe we sell to -- with water I know they contract

10 directly with DWSD. I believe with respect to sewage, we

11 contract either through the municipalities or in some cases

12 with individual, you know --

13          THE COURT: Okay.

14          MR. BRILLIANT: -- large, you know, businesses and

15 landowners, but it's either entirely or mostly with -- you

16 know, with retail customers, but we are considered to be the

17 wholesale customer under the -- you know, under the

18 agreement.

19          THE COURT: So when a homeowner gets a water bill,

20 who does the homeowner write the check to or make the payment

21 to?

22          MR. BRILLIANT: I believe it may be to a

23 municipality, your Honor. The homeowner would be to the

24 municipality.

25          THE COURT: So for both water and sewer?

1          MR. BRILLIANT:  I believe that that's right, your

2     Honor.  If it's -- you know, your Honor, I can check this

3     with the -- you know, with the clients and either send you a,

4     you know, supplemental brief or --

5          THE COURT:  So there are a series -- there are a

6     series of obligations that wind its way back and forth

7     between Detroit and the ultimate end user?

8          MR. BRILLIANT:  Correct, your Honor, but that's true

9     with -- I mean this is obviously a municipality, but that's

10    true of every business as well --

11         THE COURT:  Right.

12         MR. BRILLIANT:  -- you know, who doesn't deal

13    directly with -- you know, with retailers, but we are

14    designated under the agreement to be the -- you know, to be

15    the customer, and we have all the rights, you know, under the

16    contract as if we were, you know, the contractual

17    counterparty, you know, to the agreement.  And then with

18    respect to the DWSD with respect to governance, we have

19    additional rights.  We have, you know, the right to -- you

20    know, to nominate, you know, someone to be on the -- you

21    know, on the water board, so, you know -- you know, we are,

22    you know -- you know, viewed pursuant to the contractual

23    relationship, you know, as the real customer that, you know,

24    is the wholesale, you know, tier one, you know, customer of

25    the city with respect to -- with respect to sewer.

1          Your Honor, even if the -- you know, and I think

2     it's just absolutely clear that we have all the -- you know,

3     the same rights under the contract as the counterparties.

4     You know, the city, you know -- you know, concedes that, you

5     know, as I said, as they have to, that the Michigan statute,

6     you know, says that a third-party beneficiary, which we are

7     an express one, you know, has the right to enforce the

8     contract.  They say but you have the right to enforce the

9     contract, but the statute doesn't give you the right to --

10    you know, to file an objection to a plan of reorganization.

11    You know, that's a distinction, your Honor, that has no

12    difference, you know, under Michigan law.  We have the right,

13    you know -- again, if you look at Troy-Osprey case, we have

14    the right to step into the shoes of the debtor because

15    it's -- you know, it's our -- it's recognized that it's our

16    rights that are being, you know, affected here.  The

17    contractual agreement, the promises that are being made, you

18    know, by the city are being made to the third-party

19    beneficiary as well, but even if your Honor found under

20    Michigan law that somehow, you know, that doesn't make us a

21    party in interest, I would ask that your Honor, you know --

22    you know, look at the Ninth Circuit Bonneville decision that

23    we cited, you know, in our brief.  Now, that's not in the

24    bankruptcy context, not Chapter 11 or Chapter -- or 9, but

25    instead is in a situation where, you know, Bonneville, which

1    is a large electrical utility, governmental electrical
2    utility in the northwest -- it resells electricity that comes
3    from, you know -- you know, dams, you know, hydroelectricity,
4    and there they were entering into a settlement agreement.
5    You know, a party objected to the settlement.  Bonneville
6    argued they had no standing because they purchased their
7    electricity not directly but through a pass-through entity,
8    which is very similar to OMI, and the Court said, you know --
9    you know, that that was -- you know, said they do have
10   standing and said that was a technicality that, you know,
11   defied common sense, that they were the real party who would
12   be harmed by higher rates.  There the argument that was made
13   was that the settlement agreement was inappropriate and it
14   would cause the rates to go up, and, therefore, they had, you
15   know -- you know, they were adverse -- it would adversely
16   affect them, and they had the ability to file an objection.
17   And, you know, the Court in the decision -- ultimately the
18   Ninth Circuit, you know, ultimately affirmed the approval of
19   the settlement, but -- which is on the merits, but said that
20   clearly, you know, this party, you know, which also was a
21   reseller of electricity as well just like, you know, the
22   three counties are here, you know -- you know, said that
23   they -- you know, if the rates would, you know, arguably, you
24   know, increase, they have, you know, standing to be heard,
25   you know, in connection with this case.  And I think it's

 1   important, your Honor, from the -- you know, from the fact
 2   pattern and the legal analysis, which is very analogous to
 3   our situation, but also the, you know -- you know, the Third
 4   Circuit and other courts have said that the -- you know, the
 5   party in interest standing -- standard and the -- you know,
 6   the -- you know, the Article III -- I told you I was going to
 7   mention the Constitution before we were done -- that the
 8   Article III, you know, issues with respect to, you know,
 9   standing basically, you know, came together and were the --
10   you know, were the same thing.  And, you know -- you know,
11   here -- and under that standing, it's just if you have any
12   trifle, you know, of alleged injury that you have the -- you
13   know, you have the right, you know, to have standing, and
14   clearly we have shown, you know, much more than that.
15           The one thing I would say, your Honor, is that, you
16   know -- you know, the standing cases really, you know, talk
17   about how the effect -- you shouldn't really conflate the
18   issue of the -- you know, the likelihood of us being able to
19   prove that we're going to be, you know, injured with whether
20   or not we have standing, you know.  If we allege it, then,
21   you know -- you know, and it's something that, you know --
22   you know, doesn't defy, you know -- you know, logic, then we
23   have, you know, good faith standing to raise it.  It may be
24   that your Honor concludes that -- you know, that we're just
25   wrong, that, you know, even if the plan is -- you know, is

1   illegal or, you know, the -- you know, the discount rate was

2   set inappropriately and, you know, the -- you know, the

3   provision that -- you know, that allows the debtors to, you

4   know -- you know -- you know, transfer, you know, lease the

5   assets or transfer assets from DWSD and pay the monies into

6   the, you know, GRS general fund and into the city's, you

7   know, general, you know, coffers, you know, doesn't harm us.

8   I don't see how your Honor could do that, but even if you

9   found that, you know, it doesn't change the fact that we have

10  standing, you know, to raise the argument.

11          You know, the last thing I would say, your Honor,

12  before turning it over to the other counties to talk is that,

13  you know, there's this issue, as Welsh raised, of prudential

14  standing, whether the issues that we've raised, you know,

15  affect, you know, the -- you know, the counties, affect us,

16  you know, directly.  And all the issues that we have raised,

17  your Honor, you know, feasibility, you know, issues with

18  respect to the legality of various parts of the plan, you

19  know, the ability to assume the -- you know, the -- you know,

20  the contracts all relate to the, you know, issues that

21  directly affect us, and so I believe we have, you know,

22  potential, you know, standing to raise all those issues as

23  well.

24          THE COURT:  What's your standing if the evidence at

25  the hearing establishes an unlikelihood that the rates will

1  go up?

2        MR. BRILLIANT:  I think, your Honor, the -- I mean

3  ultimately if your Honor concludes that, you know, the rates

4  won't go up and we're not, you know, injured, you know, then

5  maybe with respect to that, we, you know -- you know, I think

6  we had standing to raise the argument.  We had standing to be

7  heard on the argument, which is what standing is all about,

8  but obviously your Honor should then, you know, overrule, you

9  know, those objections, you know, to the extent we're not,

10 you know -- you know, harmed by them, but I don't think that

11 your Honor can really find that if you find that the

12 provisions that we are concerned about are unlawful.  To the

13 extent that, you know, they are unlawful and they cause

14 assets to be dissipated from the DWSD, they logically have to

15 cause the rates to go up.

16        THE COURT:  Well, but facially that argument has

17 some appeal, but the city argues at the same time that there

18 are aspects of its plan that will have the effect of driving

19 rates down.

20        MR. BRILLIANT:  Right, but I think, your Honor --

21        THE COURT:  I don't know how it balances out, but

22 just --

23        MR. BRILLIANT:  Yeah.  Okay.

24        THE COURT:  -- examining the waterfront here.

25        MR. BRILLIANT:  All right.  I understand your

1    question.

2         THE COURT:  Oops.  Sorry.  That was bad.  That was

3    bad.

4         MR. BRILLIANT:  I lived in Chicago long enough to

5    understand what -- you know, what that means, but, your

6    Honor, I think the -- you know, the answer to that is it's --

7    this isn't a -- you know, it's not a net game.  It's not a

8    situation where the plan might be unlawful and those unlawful

9    provisions, you know, might cause the rates to go up with

10   respect to that but that there's other benefits that the --

11   that DWSD and the counties would get, you know, which, you

12   know, make that, you know -- you know, make it such that on a

13   net -- you know, on a net basis that the rates will go down

14   rather than go up.  You know, based upon the disclosure

15   statement, you know, that's not what we understand.  I mean

16   they're projecting that the rates will, you know, go up by

17   approximately four percent per year on a go-forward basis,

18   not go down, but it's not a -- I don't, you know -- you know,

19   the rule of law is not such that you just kind look at it and

20   say, oh, well, you know, you don't have to pay the COPs

21   anymore.  You don't have to pay, you know, the -- you know,

22   the issue with respect to OPEB and the fact that maybe, you

23   know, on the pension side you're paying too much, you know,

24   that's okay, you know.  You know -- you know, to the extent

25   that, you know, the plan provides, you know, that it -- you

1    know, that -- you know, something that is unlawful, then it

2    just -- it can't be, you know -- you know, confirmed unless,

3    you know -- you know, unless amended, and I think the law

4    here is that the DWSD's revenues can only be used to provide

5    for services. And one of the things we pointed out and

6    attached some exhibits, you know, in -- you know, because,

7    you know, Macomb only has the -- you know, the direct

8    interest in the sewage, we only had access to information on

9    the -- you know, on the sewage, but, you know, the city

10   really doesn't have an investment in DWSD. Clearly it's a

11   department of the city, as it always has been, but the monies

12   that the city had put in to start the DWSD was recouped by

13   the -- you know, by the -- you know, by the city a long time

14   ago, and the -- all the economic interest, you know, in the

15   DWSD, not the legal interest -- I'm not saying it's not part

16   of the city. It clearly is a department of the city. But

17   all of the economic interest really, you know -- you know --

18   you know, belongs to the ratepayers because, you know, there

19   is no city investment, you know, in the -- you know, the

20   DWSD, at least as it relates to sewers, and hasn't been, you

21   know, for -- you know, for 40 years, you know, which is

22   another reason that we're, you know, as a, you know -- you

23   know, a large retail --

24            THE COURT:  Well, but the city is responsible for

25   its operations, at least as of now.

1        MR. BRILLIANT:  Absolutely.  Like I said, your

2   Honor, I'm not suggesting that they're not responsible for

3   it, that it's not part of, you know, the city.  And, you

4   know, we have a disagreement as to how its governance it

5   should work in this context of the Chapter 9 case, but the

6   only point I was making is that, you know, in this

7   particular, you know, municipal monopoly that provides water

8   and sewer to a good portion of the State of Michigan, not

9   just Detroit --

10       THE COURT:  Well, I get that argument, and it's an

11  interesting argument, but by the same argument Macomb County

12  has no interest in it either because it's a pass-through --

13       MR. BRILLIANT:  Well, it's not.

14       THE COURT:  -- I mean except for the -- you know,

15  the water fountains and sinks in its buildings.

16       MR. BRILLIANT:  Yeah.  It's not.  It clearly, you

17  know -- you know, it's more than just the -- you know, the

18  water used in the parks and the -- you know, it's a customer.

19  There's no doubt it's a customer, and it's a different pass-

20  through than -- your Honor, it's a different pass-through,

21  you know, than -- you know, than like OMI is because, you

22  know, OMI is just an entity that -- you know, that's created

23  for, you know -- you know -- you know, convenience and to

24  deal with intergovernmental, you know -- you know, issues,

25  and the contract makes that very clear, but it can't be here,

1  your Honor -- and, you know, I, you know, would ask your
2  Honor to look at the -- you know, the nonbankruptcy cases on
3  this.  It can't be a situation where, you know, the -- you
4  know, the largest wholesale customers who are also
5  individual, you know, customers through its own water use
6  have no standing in that the appropriate party with standing
7  would have been to get either, you know, the -- you know, the
8  individual homeowners here.  That would not solve the issues
9  here.  And in determining party in interest, that's one of
10 the things, you know, that the Court should look at and other
11 courts have looked at, which is whether or not if you didn't
12 allow, you know -- you know -- you know, standing for a
13 party, whether the issues would be represented.
14         THE COURT:  Well, all right.  Let's talk about
15 alternative standing, and I'm going to very roughly divide
16 your issues into feasibility and legality.  Okay?
17         MR. BRILLIANT:  Sure.
18         THE COURT:  Wouldn't the State of Michigan have
19 standing to assert illegality in regards to the allocation of
20 the pension underfunding?
21         MR. BRILLIANT:  Well, like I said, you know, there's
22 three types of standing; right?  There's constitutional
23 standing.  You know, then there's party in interest standing,
24 you know, and then lastly there's prudential, you know -- you
25 know, standing, you know.  You know, Macomb, you know, has

1  standing by virtue of the fact that it affects it directly as

2  a customer.  I don't know to what extent -- you know, the

3  state is not a wholesale customer the way Macomb, Oakland,

4  and Wayne are.  You know, the state, you know, may have, you

5  know -- you know -- you know, standing or your Honor could

6  give them the right to intervene, you know, on particular

7  issues as you've -- you know, had asked the -- you know, the

8  U.S. Attorney General in connection with another issue to

9  come on board and to make a ruling, but I don't believe that

10  this is something that directly affects them the same way

11  that it affects the customers, so it may be that, you know,

12  if it was something that, you know, they cared about -- now,

13  the state has a lot of issues in connection with -- you know,

14  with this, you know, particular Chapter 9, and I don't think

15  that your Honor, you know, should take any solace on the fact

16  that since the state hasn't objected to this particular

17  issue --

18          THE COURT:  Wouldn't Article IX, Section 24, give

19  the state standing?  That's the one that says pension rights

20  are unimpaired.

21          MR. BRILLIANT:  You're talking about the -- oh,

22  you're talking about the Michigan Constitution.

23          THE COURT:  Yes.  I'm sorry.

24          MR. BRILLIANT:  Oh, I'm sorry.

25          THE COURT:  I didn't say that.

1          MR. BRILLIANT:  I was -- you know, I was --

2          THE COURT:  Yes.  Article IX, Section 24, of the

3   Michigan Constitution.  Doesn't that give the state standing

4   to assert that a pension plan is properly managed?

5          MR. BRILLIANT:  You know, I -- you know, I haven't

6   thought about it, your Honor.  It would be -- the question

7   would be how it directly affects them, but, again, the fact

8   that they're not here, you know, in connection with this

9   issue I don't think, you know -- I don't think your Honor can

10  find that -- now, if the state would have come in and raised

11  the same objections that we're raising, then I think your

12  Honor might be able to think about this and say, okay, well,

13  I have somebody else, you know, raising these specific

14  issues, you know, and --

15         THE COURT:  I assume from the fact that the state is

16  not here that the state concludes that what the city proposes

17  to do is not illegal.

18         MR. BRILLIANT:  You know, I don't think that that's

19  an appropriate assumption, your Honor, you know.

20         THE COURT:  No?

21         MR. BRILLIANT:  No.  It could very well be that

22  they -- as a lot of parties do, that, you know, they have

23  bigger interests or other interests, and they, therefore, you

24  know --

25         THE COURT:  I can't imagine that they have a bigger

1    interest at this point in time than assuring the viability of

2    the Detroit pension plan.

3            MR. BRILLIANT:  Well, I think they have interests in

4    seeing that --

5            THE COURT:  I hope that's true.

6            MR. BRILLIANT:  I think, your Honor, they have --

7    you know, but I don't know that we're necessarily talking

8    about the viability of the pension plan or -- you know, we're

9    talking about the viability of DWSD.  We're talking about

10   keeping the rates down, you know, with respect to DWSD, and

11   we're talking about whether or not what DWSD plans to do, you

12   know -- you know, violates, you know, the law.  The state, as

13   your Honor says, has a big interest in seeing, you know,

14   Detroit emerge from Chapter 9.  It has an interest in seeing

15   the grand bargain, which it's negotiated, you know, come into

16   fruition.  It has other interests.

17           THE COURT:  I'm sure Ms. Lennox will argue that the

18   reason the city is proposing to do what it's doing with the

19   unfunded pension liability vis-a-vis DWSD is to maintain the

20   viability of the GRS.

21           MR. BRILLIANT:  Well, you know --

22           THE COURT:  Am I right about that?

23           MS. LENNOX:  That's correct, your Honor.

24           MR. BRILLIANT:  Right.  But, again, that's not an

25   issue -- I don't believe that's a standing issue, your Honor.

1  That may be ultimately an issue as to whether or not you

2  should confirm the plan, but that doesn't really deal with,

3  you know, the issues that we raise, that the discount rate is

4  inappropriate, that the amount of administrative and

5  professional fees that are being charged to DWSD are

6  inappropriate, that if they were to, you know, sell assets in

7  the future and transfer them outside of the pension --

8  outside of DWSD, outside of the pension plan, even into the

9  city's coffers, you know, just into, you know, its general

10  fund, you know, is unlawful and doesn't deal with, you know,

11  our other issues.  The state, your Honor, you know, has --

12  undoubtedly has many issues, but the fact that they're not

13  here on this issue I don't think means that they necessarily

14  you know, agree with --

15          THE COURT:  Right, but I only -- I didn't really

16  raise the issue to go there.  I raised the issue because you

17  said who would have standing if it isn't the counties --

18          MR. BRILLIANT:  Well, I guess what I, you know --

19          THE COURT:  -- and that it's impractical, you

20  know --

21          MR. BRILLIANT:  Yeah.

22          THE COURT:  -- to rely on a group of retail

23  ratepayers, which is probably true.

24          MR. BRILLIANT:  Right.  I mean I think that -- I

25  think that's the -- I think that's the point, your Honor.  In

1  looking at the issue, these issues haven't been raised by

2  anyone except for the counties, and I think it's important

3  that they be raised.

4       Your Honor, the last thing I just want to talk about

5  is the Addison decision, which we don't think is applicable

6  at all, you know.  The legal analysis from the Court in that,

7  you know, which says that, you know, standing, you know,

8  should be -- party in interest should be broadly construed

9  and, you know -- you know, we think, you know, is accurate,

10  we're not at all like the concerned citizens in that group.

11  We have specific issues that we raised.

12       And then I think, your Honor, the last thing I'm

13  going to say is that, you know, there your Honor was

14  concerned, you know, in part about opening the floodgates for

15  other people like in this situation, you know, the homeowners

16  and, you know -- you know -- you know -- you know, the

17  business owners, you know, the municipalities in connection

18  with -- you know, with the counties.  You know, here it's

19  just the three of us.  The way your Honor has set up the

20  confirmation hearing, there's a limited amount of time that's

21  been set up.  We've been allocated, you know, our amount of

22  time.  It's not going to create any much -- any additional

23  amount of burden on the confirmation hearing.  If anything,

24  we take away time from the -- you know, the other DWSD, you

25  know, bondholders or -- you know, or other, you know,

1   creditors, but don't otherwise, you know, burden the estate.

2   And given that the objection deadline, you know, has, you

3   know --

4           THE COURT:  Um-hmm.

5           MR. BRILLIANT:  -- already expired, giving us, you

6   know, standing doesn't, you know, open up the floodgates for

7   anybody else to come in.

8           THE COURT:  Thank you, sir.

9           MR. BRILLIANT:  Thank you.

10          MR. FISCHER:  Good afternoon, your Honor.  Joe

11  Fischer from Carson Fischer on behalf of Oakland County.  I

12  think I learned some time ago with your Honor that less is

13  more, so what I'm going to try to do is not repeat everything

14  that your Honor just heard nor am I going to go into

15  territory where I believe it is inapplicable to Oakland

16  County.

17          Just as an overview, your Honor, this morning you

18  made a statement that I think is important as we approach our

19  argument with you, and you said something to the effect that

20  nothing is sui generis in this case, and there's --

21          THE COURT:  Well, actually I said the opposite.

22  Everything is.

23          MR. FISCHER:  Okay.  All right.  Then I misread or

24  misinterpreted your remarks, but what is interesting in terms

25  of the foundation of Oakland County's position is that,

1    frankly, this Chapter 9 is a case that, as we all know, is of

2    unprecedented size and complexity.  I, very frankly, your

3    Honor, did not think we would find a case like the Mount

4    Carbon case that would be so directly, you know, on point

5    with regard to the issue of standing.  Not to be different

6    than Macomb, but we are different than Macomb and similar to

7    Wayne in the sense that we are a counterparty to a number of

8    contracts with the City of Detroit and --

9            THE COURT:  Is the city in default on any of them?

10           MR. FISCHER:  Your Honor, not to my knowledge as I'm

11   here before you.  Discovery is ongoing, but I'm going to try

12   to address that in a different vein if I might for a

13   moment --

14           THE COURT:  Um-hmm.

15           MR. FISCHER:  -- because I want to stay on the Mount

16   Carbon piece --

17           THE COURT:  Sure.  Go ahead.

18           MR. FISCHER:  -- because much has been made, by the

19   way, in terms of the city's response of we're not a party in

20   interest because we haven't alleged an event of default when,

21   in fact, the Mount Carbon case was not based upon an event of

22   default giving the counterparty to the executory contract

23   standing.  And, in fact, your Honor -- and I'm sure you've

24   read the papers and you've reviewed the case, so I don't want

25   to repeat it other than to say that there was a material

1 dispute with regard to whether there was even an event of
2 default, so to try to now make this hearing, meaning the
3 hearing on standing, about a hearing that relates to 365 and
4 adequate assurance of future performance or even something
5 akin like a 2609 demand for assurance of future performance
6 is not what I believe the focus of the hearing should be.  I
7 say that respectfully.

8 　　　　THE COURT:  Well, I couldn't agree more, which is
9 why I asked one of my first questions to Mr. Brilliant.  If
10 that's not an issue, adequate assurance of future
11 performance, why should the Bankruptcy Code be read to allow
12 a counterparty to an executory contract that's not in default
13 to argue what amounts to the same thing but in the guise of
14 feasibility?

15 　　　　MR. FISCHER:  I don't believe it's in the guise of
16 feasibility, and let me explain that in the following manner.

17 　　　　THE COURT:  Okay.

18 　　　　MR. FISCHER:  Your Honor, feasibility, as defined
19 underneath a Chapter 9, is more than just the ability of the
20 debtor to make its proposed payments to creditors.  It must
21 be able to demonstrate to the Court that it is going to be
22 able to execute upon and deliver the services to the
23 citizenry of the municipality.  In fact, though, in order to
24 be able to do that, they have to have a water and sewerage
25 department that can operate, and it has to operate in a way

1  that it's not a busted play.  And I see your Honor is

2  pausing, and I don't want to -- I don't want to interrupt the

3  Court.

4         THE COURT:  You know, you're walking right into the

5  argument I'm concerned about because surely Oakland does not

6  have standing to argue the ability of the DWSD to deliver

7  water and sewerage services to its own residents.

8         MR. FISCHER:  That is correct, your Honor, but --

9         THE COURT:  So when you talk about feasibility and

10 the ability of the DWSD to deliver water and sewer services,

11 you're talking about its ability to deliver those services to

12 the residents of Oakland County.

13        MR. FISCHER:  To Oakland County and the townships.

14        THE COURT:  And that's exactly -- and that's exactly

15 what adequate assurance of future performance is, which they

16 are not required to show.  That's exactly what it is.  That's

17 their obligation under the contract.  And if they were in

18 default, they'd have to show that they could do that, but

19 they're not, so they don't.

20        MR. FISCHER:  May I respond, please?  I'd like to go

21 to our objections that we filed initially.

22        THE COURT:  Okay.

23        MR. FISCHER:  And those objections, your Honor --

24 I'm just going to take them in terms of category, but in the

25 objections that were filed, they do contain specificity with

1  regard to the feasibility of the plan.

2          THE COURT:  Okay.

3          MR. FISCHER:  And they relate in part to the

4  projections that the city references in Exhibit M to their

5  fourth amended plan of adjustment.  And with regard to those

6  projections, I would just point to one thing that I think is

7  just an example because we divided the objections into the

8  fact that the DWSD capital improvement needs are not

9  adequately addressed in the plan.

10         THE COURT:  Um-hmm.

11         MR. FISCHER:  And specifically, your Honor, the city

12 in Exhibit M indicates that it relies upon a ten-year study

13 completed by the OHM advisors -- we've referred to it as the

14 OHM report -- for purposes of estimating the funding needs of

15 the city's CIP.  That would be their capital improvements

16 program, your Honor.  However, the OHM report by its own

17 terms deems itself to be insufficient and limited by

18 affordability constraints.  In fact, the OMH -- excuse me --

19 the OHM report says, quote, "The piping costs that are

20 allocated only to the City of Detroit could have been

21 estimated at significantly higher costs but were limited by

22 the recognition that affordability is a serious constraint."

23 My point is is that in order for the plan to be feasible -- I

24 think your Honor at one time in one of our hearings

25 referenced the DWSD as the only cash generator.  That's what

1    I think I remember you referencing it as.  Now, maybe you

2    just called it a cash generator.  My point, though, is that

3    that if it's not -- and this is just an example of where it's

4    going -- then this plan will not be feasible.  And we have

5    the standing to be able to make those objections.

6         THE COURT:  Okay.  But I have to ask why the

7    Bankruptcy Code should be read to allow you to argue that

8    specific point, that there isn't enough money here for

9    infrastructure, when Section 365 doesn't permit you to make

10   that argument.

11        MR. FISCHER:  Your Honor, but underneath Mount

12   Carbon, one and two, that was recognized -- and I'm not

13   saying that it's controlling on your Honor, but it certainly

14   has some precedential value.

15        THE COURT:  Absolutely, but what's the logic behind

16   it?  What's the good reason to say we're going to -- we're

17   going to allow you to jump over the specific of Section 365

18   and take advantage of the general of feasibility in --

19        MR. FISCHER:  In Mount --

20        THE COURT:  -- Section 943?

21        MR. FISCHER:  I'm sorry, your Honor.  Didn't mean to

22   interrupt you.  In Mount Carbon, the Court reasoned that the

23   impact of the plan, its implementation, could and would

24   affect the inter -- excuse me -- the inter-governmental

25   contracts that it had with the other municipalities.  What

1    I'm suggesting is there's something here that is of the same

2    vein.  So if the plan isn't feasible, if it's dependent --

3              THE COURT:  Okay.  So the Court distinguished

4    between the impact of assuming the contract, on the one hand,

5    and confirming the plan, on the other hand.

6              MR. FISCHER:  That's correct, your Honor, because

7    it's -- good.  All right.  I won't dig a hole any deeper, but

8    that's my point, your Honor.

9              THE COURT:  You're not digging a hole.  You're doing

10   fine.

11             MR. FISCHER:  Well, at least I have you smiling.

12             THE COURT:  So the argument goes that because the

13   issue isn't assumption of the contract --

14             MR. FISCHER:  Correct.

15             THE COURT:  -- it's what's the impact of plan

16   confirmation, then all of the plan confirmation issues are

17   open?

18             MR. FISCHER:  Precisely, your Honor.

19             THE COURT:  Okay.  Well, we'll see what the city

20   says about that.

21             MR. FISCHER:  Okay.  Thank you very much, your

22   Honor.

23             MR. NEWMAN:  Your Honor, Max Newman of Butzel Long

24   on behalf of Wayne County.

25             THE COURT:  Keep your voice up for me.

1        MR. NEWMAN:  Oh, sorry about that, your Honor.
2   Sure.  Mr. Fischer, I think, ably answered the Court's
3   question, but I want to add one part to it, which is the
4   Court asked him at one point what is the logic behind all of
5   that, and the logic behind all of that, the logic behind
6   giving a broader view to plan confirmation than to contract
7   assumption is that plan confirmation fundamentally changes
8   the nature of what the DWSD is going to be in the future
9   versus what it has been.  It may have been operating with no
10  default in the past, and let's imagine a scenario that I
11  doubt we'll be able to prove but that is possible, that we
12  can show you at the confirmation hearing that default is
13  inevitable.  The argument is that you would have to ignore
14  that because you would only consider whether a default
15  existed at this time, and you can confirm a plan where a
16  default under the DWSD provisions is inevitable.  And I say,
17  no, that's not what the Code means, that's not what the case
18  law says, it's not what Mount Carbon says, and it's
19  fundamentally not logical.  The plan is changing who our
20  contract counterparty is, and this is what they said in the
21  Mount Carbon case.  It is changing it in fundamental ways.
22  It is changing the budget of it in some respects.  It may
23  change the governance of it.  And it is of critical
24  importance that we, as governmental entities representing the
25  citizens of our counties, be able to present those arguments

1  to the Court so that the Court can ultimately be the

2  evaluator of fact as to what will happen with this and

3  whether the plan is feasible and not --

4       THE COURT:  What's the case law that gives a

5  governmental entity standing on account of its

6  representational capacity over its citizens?

7       MR. NEWMAN:  Your Honor, I don't think I have to be

8  that broad, so let me amend my remarks.

9       THE COURT:  Okay.

10      MR. NEWMAN:  We are doing it because we have a duty

11 to our citizens as representing them, you know.  We don't do

12 anything for the sake of being government.  We represent the

13 citizens of our county.  Each of us represent the citizens of

14 our county in taking any action, and in so doing we have a

15 duty to assure them -- maybe that's a dangerous word, but

16 assure them that they will continue to get provided services.

17 We have a duty to examine the city's plan and say what is the

18 impact upon the citizens of our county.  We don't have

19 standing because we're government.  We have a duty because

20 we're government, and we have standing because we're contract

21 counterparties or in my county's interest, we have another

22 one, which, of course, is that the City of Detroit and Wayne

23 County are interrelated in so many ways that Detroit is 20

24 percent of the physical area and 40 percent of the population

25 of Wayne County.  And I threw in some illustrations of

1  governmental overlap.  The city says, yes, those are nice.
2  It's inevitable that there be some government overlap, but
3  that doesn't give you standing.  I think it is critical to
4  consider those because each of those is an area where the
5  plan, if it is not feasible, gives a -- causes a pecuniary
6  impact on Wayne County and causes a -- in which Wayne County
7  has a protected state.  What we would love as Wayne County
8  because each of these areas could be devastated by the
9  confirmation of a nonfeasible plan by the city -- what we
10 would love is the confirmation of a feasible plan on behalf
11 of the city.  To the extent that the plan is not feasible in
12 any of its nature but particularly with respect to the DWSD,
13 it is going to have an enormous impact on the services given
14 by the county and on the county's economic interests.  I
15 don't think I even have to get there to get standing because
16 we do have the executory contracts, but I do think that it --
17 and it's -- the issue is overwhelming.
18       The Court asked the question -- moving on to a
19 different topic, the Court asked the question wouldn't the
20 state have standing to assert the illegality of --
21       THE COURT:  I withdraw the question.
22       MR. NEWMAN:  Thank you.  All right.
23       THE COURT:  What?  I'm allowed to do that.
24       MR. NEWMAN:  No, of course you are.  Of course you
25 are, and I'm allowed -- and I think I'm allowed to be thrown

1    off completely my train of thought by that.

2            THE COURT:  All right.  I'll grant you that one,

3    too.

4            MR. NEWMAN:  The Court also asked previously, you

5    know, that if the rates don't go up, is there an economic

6    interest to the county if you ultimately conclude that the

7    rates will not go up.  Finding that we don't have standing --

8            THE COURT:  Mr. Brilliant did a very nice job

9    answering that question.

10           MR. NEWMAN:  Okay.  I'll move on from that one as

11   well, your Honor.  And with that, having checked my notes, I

12   think that's all I --

13           THE COURT:  Okay.

14           MR. NEWMAN:  -- wish to add.

15           THE COURT:  Thank you.

16           MR. NEWMAN:  I don't know if the Court would

17   consider any rebuttal after the city's argument.  I know

18   we've gone --

19           THE COURT:  Well, we'll see if it's necessary.

20           MR. NEWMAN:  Thank you, your Honor.

21           MS. LENNOX:  Good afternoon, your Honor.  For the

22   record, Heather Lennox on behalf of the city.  I'd like to do

23   this analysis one county by county because I think they all

24   have different factual attributes, and the facts matter.  So

25   first with Macomb County because I think they have the most

1  trouble, Macomb County itself is not a creditor, didn't file

2  a proof of claim.  We didn't list it as a creditor, has no

3  contracts with the city, something that it admits.  It has no

4  standing as a creditor.  But the Macomb County objections all

5  relate to DWSD and what may or may not happen for DWSD under

6  the plan.  It claims that it can sneak into creditor status

7  by being a third-party beneficiary of the contract that OMI

8  has with the city, but, as we've pointed out in our brief,

9  Macomb's rights in that situation are derivative with the

10  actual contract counterparties' rights and under the case law

11  that we cite in our brief is insufficient to confer standing.

12       Mr. Brilliant is right.  Under Michigan law a third-

13  party beneficiary can enforce the contract, but we're

14  performing under the contract.  There's no default alleged.

15  The city avers that no defaults exist, and there's nothing to

16  enforce.  So where you have no enforcement rights and you

17  have no status as a creditor and you have no relationship

18  from a pecuniary -- a direct particularized concrete

19  pecuniary interest with the city that can -- a third-party

20  beneficiary status cannot give rise to more general broad

21  rights to object to this plan as a party in interest.

22       I'd like to go through because actually Oakland

23  started this process for me, but we have gone through the

24  objections that Macomb County filed to the plan, and in the

25  context of objecting to a bankruptcy plan, even assuming you

1  can get past all of the facts that I just articulated, an

2  objecting party has to have standing with respect to each

3  specific objection that it makes because it may have standing

4  in some and it may not for others.  Again, plenty of case law

5  that cites that.  We cite it in our brief.  I don't need to

6  go through it now.  So going through the objections, the

7  first five of them all relate to DWSD.  They object because

8  they allege that the DWSD funding of the UAAL violates state

9  and local laws.  Again, I would think that if there was a

10 statute in Michigan that conferred standing on these

11 counties, they would have cited it to me.  I haven't found

12 one.  They haven't cited one.  I don't think one exists.

13       Their second objection is the plan provides for a

14 tax on suburban ratepayers that requires electoral approval.

15 The third is that the plan violates DWSD bylaws and the OMI

16 Detroit agreement, not the OMI agreement with Macomb, but

17 OMI's agreement with Detroit, pure third-party agreement.

18 And then they complain that the DWSD pension funding is not a

19 sound exercise of business judgment and the plan is not

20 feasible.  There's one more objection, but let's talk about

21 those.

22       For all of the above objections, Macomb has not

23 alleged, hasn't filed a claim for, and cannot establish any

24 direct, particularized, concrete, pecuniary relationship with

25 DWSD or the city for an injury that is specific to Macomb to

1  establish the injury, in fact, that would be required under
2  the Lujan standard, so they're not a part --
3        THE COURT:  Well, Macomb says that its rates -- or
4  the rates that it will have to charge to its customers will
5  have to go up.
6        MS. LENNOX:  Well, let's go --
7        THE COURT:  This will drive residents and businesses
8  away.
9        MS. LENNOX:  That to me is a very generalized,
10 particularized, speculative argument that applies to Macomb,
11 Oakland, Wayne, every other customer that we have and the
12 millions of ratepayers that we have.  There's no injury
13 alleged before this Court that is sufficient under the
14 constitutional or prudential standing requirements that can
15 get past that.  I get that these counties -- and I understand
16 why these counties are very interested in what this plan
17 does, and it --
18       THE COURT:  What's your assessment of that?
19       MS. LENNOX:  I think this plan does nothing that
20 would alter the current status quo of what's happening --
21       THE COURT:  That wasn't my question, and I'm sorry.
22 My question was what is your assessment of why the counties
23 are objecting here?
24       MS. LENNOX:  I think -- and, again, I'll speculate
25 because I don't know, but I think that there has clearly been

1    a history of problems, well-documented problems, federal

2    court case for 30 years, with the operations of DWSD.  I've

3    not heard any complaints.  I've not heard any allegations of

4    wrongdoing or anything that the current management team and

5    the current board of water commissioners overseeing this

6    management team have done anything other than a yeoman's job

7    of actually trying to comply with Judge Cox's orders and turn

8    this department around.  So I get the history, and I get the

9    bad blood, and I get the suspicion, but the fact of the

10    matter is is that DWSD is on the right course.  It has new

11    management that I think most people have -- in fact, I

12    haven't heard one person that doesn't have confidence in

13    them, and that DWSD is providing water, providing sewage

14    services, and performing under the contracts.

15          THE COURT:  Right, but the counties say that they

16    have a stake in the continuing ability of DWSD to meet its

17    obligations under the plan.

18          MS. LENNOX:  Sure.  And anybody that --

19          THE COURT:  They have a -- that stake gives them

20    standing, they argue.

21          MS. LENNOX:  That stake is nonparticularized.  That

22    stake applies to my millions of people that DWSD services as

23    end user customers.  It applies to the hundreds or thousands

24    of communities with which we have contracts.  That is a very

25    generalized interest.  It's a perfectly understandable

1  interest. I get it. But it is not that kind of interest

2  that allows seven million people to come traipsing into the

3  court claiming standing. If you analogize this, Macomb says,

4  "Well, I'm a customer." I have not been in a Chapter 11 case

5  where a customer of a debtor that didn't have a claim, wasn't

6  listed as a creditor, and didn't have a contract that was in

7  default had standing to raise anything. They have a great

8  interest. In a corporate debtor, they would have a great

9  interest.

10        THE COURT: So how do we deal with Mount Carbon?

11        MS. LENNOX: Well, let's talk about Mount Carbon

12  because, as I started to say, facts mean everything. And if

13  the -- the facts of the Mount Carbon case make this

14  completely distinguishable. And I also think it's very

15  interesting that all of us found one case from the District

16  of Colorado in 1999 that would stand for the proposition for

17  which this stands for. And here are the facts. Here is why

18  the Mount Carbon judge went out of her way to find standing

19  for these landowners because -- and I will read you the facts

20  that this hung on. Quote, "The success of the Plan is

21  dependent upon aggressive, extensive residential and

22  commercial development. Such development depends upon repair

23  and installation of new infrastructure. The Plan anticipates

24  that the cost of repair, replacement, and installation of new

25  infrastructure will be borne by the property owners." There

1    was a plan, an extensive plan, a plan for which rates were

2    not set, that the property owners were being forced to

3    basically pay for, and it was direct, it was concrete, it was

4    immediate, it was there.  Those facts don't exist in this

5    case.  I get it why this judge wanted to go out of her way to

6    find that these folks had standing.  There was a real direct

7    imminent injury that they were staring -- they were staring

8    at.  That doesn't exist here.  So this case, in my view, is

9    entirely distinguishable on the facts.  Plus we also had a

10   question, although I think this is minor, about whether

11   certain contracts were actually in default or not.  I don't

12   think we have that issue here either.  Don't know what I did

13   there.

14        Macomb raises one more objection.  It says that we

15   can't -- we cannot assume our agreement with OMI because we

16   can't cure defaults and provide adequate assurance of future

17   performance.  Well, first of all, no one has alleged it's in

18   default.  To my knowledge, we're not in default.  And as your

19   Honor pointed out, the Code wouldn't require us to do that.

20        So based on everything and all the facts we know

21   about Macomb and notwithstanding their perfectly

22   understandable interest here, they don't have standing under

23   any theory to object to the plan.

24        THE COURT:  What's the best case you found, you

25   think, for the proposition that an entity with an executory

1    contract with the debtor that's not in default does not have

2    standing to object to confirmation of the debtor's plan?

3            MS. LENNOX:  To object to confirmation?

4            THE COURT:  Confirmation, yes.

5            MS. LENNOX:  Well, I think you have to look beyond

6    that, okay, because standing to object -- if we're talking

7    about a creditor that only has an executory contract and is

8    not a creditor in any other sense and only has this, we

9    have -- hang on a minute.  Let me look at my cases here.

10           THE COURT:  Okay.

11           MS. LENNOX:  I actually think, your Honor, that the

12   cases not on that particular point, but I agree with your

13   Honor that we cited cases in our brief, and they are the

14   Rachels case, the Partridge case, which are Bankruptcy Court

15   cases that simply reiterate that if there's no default under

16   the contract, then you don't have to provide adequate

17   assurance of future performance.  Like your Honor, I do not

18   see any distinction or it's certainly a distinction without a

19   difference between what the counties would like to say is

20   feasibility and adequate assurance of future performance.

21   The way they're defining it, well, your CAPEX isn't enough.

22   Well, I'm worried that, you know, your pipes are old.  That's

23   one and the same.  It all boils down to the same issue of can

24   we continue to provide water and sewer services under our

25   contracts.

1    THE COURT:  Right.  So the counties distinguish

2  between standing vis-a-vis the consequences of assuming an

3  executory contract --

4    MS. LENNOX:  Um-hmm.

5    THE COURT:  -- and standing vis-a-vis the

6  consequences of confirming the plan.

7    MS. LENNOX:  And then -- so in order to get there,

8  you have to go back to all of the standing things we just

9  went through.  Are they a party in interest?  If so, they

10  have standing to object to the plan notwithstanding the fact

11  that I may not have to provide adequate assurance of future

12  performance.  Do they have constitutional standing?  Do they

13  have prudential standing?  At least in Macomb's case, they

14  have none.  They have none of those.  So if you can't get

15  past all three standing qualifications, I don't know how you

16  get to, well, why can't they just object, so I think that's

17  all I have to say on Macomb.  Let's take Oakland.

18    THE COURT:  Okay.

19    MS. LENNOX:  Again, your Honor, Oakland itself is

20  not a creditor.  Oakland did not file a proof of claim as a

21  creditor in this case nor did the city list it as a creditor.

22  As Mr. Fischer acknowledges, Oakland is a signatory to

23  several tri-party contracts among certain of its municipal

24  subdivisions and the city.  Again, and I think Mr. Fischer

25  admitted those contracts are not in default.  They have

1     alleged they are -- were performing.  So, again -- and then
2     Mr. Fischer went through Oakland's objections, again, which
3     all relate to feasibility of the plan.  Feasibility of the
4     plan in this instance equates with adequate assurance of
5     future performance, which we do not have to show.  So, again,
6     as a contract counterparty where we're not in default and
7     they have no other claim against us, I don't see how that
8     rises to the level of being able to object to the plan.
9     They're not a creditor.  They don't have any concrete
10    particularized harm, just like we went through with Macomb,
11    that would provide them constitutional standing.  And then
12    prudential standing probably isn't implicated here because I
13    think they're -- well, actually, it is.  To the extent that
14    they're trying to present their residents' interests, again,
15    I don't see anything in the statutes -- in the Michigan
16    statutes that give them standing to do that.

17           Finally, Oakland does have one objection that Macomb
18    didn't have, and it objects to the injunction and the release
19    provisions of Section 3.D.5 and 3.D.7 of the plan, but,
20    again, those provisions don't affect Oakland at all.  Section
21    3.D.5 of the plan is the plan -- is a release provision where
22    folks that voted in favor of the plan, voted to accept the
23    plan, would grant the release, consensual release.  Oakland
24    is not a creditor, didn't vote on the plan.  The release
25    doesn't affect it.

1    The other release provision is Section 3.D.7 of the
2    plan where the state would receive a release from pension
3    claimants.  Again, Oakland is not affected by that.  Oakland
4    has no standing to object to that.  So, again, similar to
5    Macomb, I don't see how under anything that we've discussed
6    that Oakland has standing to object to anything.  They have a
7    great interest.  I get it.  But they don't have statutory,
8    constitutional, or prudential standing.

9    Moving on to Wayne, Wayne County didn't file its own
10   objection.  It joined in Oakland and Macomb's objections, so
11   the same arguments I've gone through with respect to the
12   substance of those objections would apply equally to Wayne.
13   Wayne does have contracts with the city for water and sewer
14   services, not in default.  Wayne has not alleged that they
15   are, and we believe we're performing.  So all the arguments
16   that I went through and I won't repeat for Macomb and Oakland
17   with respect to those contracts apply here.

18   But Wayne asserts another potential argument for
19   standing, and they basically say, well, we should have
20   standing because Detroit is within our jurisdictional
21   boundaries, and we kind of interact.  I get that.  I will
22   admit that.  We're in their boundaries; then we interact.
23   But Wayne doesn't allege that any demonstrable injury flows
24   from this.  What they say is, well, if the plan doesn't work,
25   then maybe we could be required to provide these services or

1  maybe we might have to do that or maybe we might be burdened

2  some other way.  Pure conjecture.  There's nothing concrete,

3  immediate, particularized that they have articulated.  So

4  while they may have more interest in this case than perhaps

5  Oakland and Macomb do because Detroit resides within its

6  borders, again, there's been no injury alleged.

7        Now, I will say that Wayne has asserted a small

8  $11,000 claim that's DWSD-related.  It's for inspection fees

9  against the city.  So for that it has standing to object to

10  the plan as a holder of a Class 14 claim, which is the

11  general unsecured claims against this -- against the city.

12  That doesn't -- the Class 14 claims will receive under the

13  plan, if confirmed, what we're calling new B notes, which are

14  notes that will be issued by the city, not by DWSD, and will

15  be relied on on the credit of the city, so if Wayne County

16  would like to inquire as to the business plan for the general

17  fund, certainly has standing to do that, but it's not being

18  paid by DWSD, and I don't -- it's not related to the DWSD

19  operations' satisfaction of this claim, so, again, I don't

20  think even Wayne County has standing to object to anything

21  related to DWSD's feasibility.

22        And then I'd like to address what I'm going to call

23  loosely the ratepayer argument because I think it's either

24  explicitly or implicitly advanced by all three counties in

25  their standing assertions.  And I'm going to assume that

1  they're ratepayers in some capacity without knowing or

2  admitting that.  But we do think the Court got it right in

3  the Chapter 9 case of Addison, and the facts may have been

4  different.  You were dealing with a citizen group instead of,

5  you know, counties that have some governmental status, but

6  that doesn't change the appropriate reasoning, which is by

7  allowing a large number of noncreditors to be heard on this

8  action, you would be granting a blanket invitation to all

9  parties in the area serviced by the hospital, which would

10  hamper, unduly delay -- and unduly delay the debt adjustment

11  process.  We have millions of ratepayers for DWSD.  Let's

12  assume we have three of them here.  If the only reason these

13  folks have standing on DWSD matters is because they're

14  ratepayers, then we could have millions of people walk into

15  this court saying, "I would like to object to DWSD,

16  confirmation on that basis."

17       THE COURT:  How do you deal with the argument that's

18  made here that by reason of their status as counties, they

19  have a duty to provide to their residents and businesses

20  water and sewerage services and that duty gives them standing

21  to address any issues with the plan as it may affect their

22  ability to fulfill that duty?

23       MS. LENNOX:  First of all, I don't know what their

24  various charters say about what their duties are to their

25  residents.  I have not investigated that.  But I would say

1   they're complying with it.  Either they have contracted with

2   DWSD or they have permitted their municipalities to contract,

3   to the extent they can and that's not a state function, with

4   DWSD to provide water and sewer services.  In fact, for water

5   customers, DWSD contracts with their individual

6   municipalities directly and not with the counties.  Sewer is

7   where we go through the counties --

8              THE COURT:  Ah, okay.

9              MS. LENNOX:  -- as wholesale customers.

10             THE COURT:  So they're not impeding the

11  municipality's ability to get water and sewer services.  To

12  the extent they have contracts with us that facilitate that,

13  they are fulfilling their duties, but that doesn't change the

14  fact that in terms of having standing to object to the plan,

15  they have no standing to do so.  And as long -- their duties

16  involve making sure that that's continuing.  I have not heard

17  any allegation that the service is not continuing, that DWSD

18  is in default of providing it.  I think they fulfilled their

19  duties by making -- already by making sure that this is --

20             THE COURT:  Well, no.  Part of the plan objections,

21  as I think you reviewed, suggest that if the plan is

22  implemented as proposed --

23             MS. LENNOX:  Um-hmm.

24             THE COURT:  -- the city will not be able to provide

25  adequate at least sewer services because of lack of funding

1   of necessary infrastructure enhancements or improvements.

2        MS. LENNOX:  And how is the county's objection to

3   the plan going to change the actual physical provision of

4   those services even assuming that to be true, which, by the

5   way, is pure conjecture and speculation?

6        THE COURT:  I assume it means they want you to spend

7   more money on that.

8        MS. LENNOX:  Well, your Honor, if we had more money

9   to spend, we'd do it, but, again, don't get me wrong.  I

10  understand that interest.  I understand that interest.  It is

11  a valid interest, and I'm not trying to --

12       THE COURT:  But why isn't it legally sufficient to

13  give them standing to assert the insufficiency of the plan on

14  that grounds?

15       MS. LENNOX:  Why would that legal ground give them

16  standing to do it where it wouldn't give an individual

17  homeowner or an individual business standing to come in and

18  say, "Hey, I get water and sewer services from DWSD, and I

19  want to make sure they" --

20       THE COURT:  The answer they give is that unlike the

21  individual customer, as a county, they have a duty to provide

22  all of their residents and businesses that service.

23       MS. LENNOX:  Well, I'm not sure they have a duty

24  because -- they've alleged it, but I'm not sure that that

25  duty actually exists.

1        THE COURT:  Assume it for a second.

2        MS. LENNOX:  But let's assume it does.  Again, while

3   an individual homeowner may not come in, I don't know why GM

4   couldn't come in and make the same argument.  It's a big

5   business with a lot of money.  So, again, you're opening up

6   that door, and they have cited to your Honor no Michigan

7   statute that gives them standing to do this.  The entity --

8        THE COURT:  Okay.  Then they ask who does have

9   standing, who do we rely on --

10       MS. LENNOX:  And that's --

11       THE COURT:  -- to create the adversary process

12  necessary for the Court to adequately review the issue of

13  feasibility of DWSD going forward?

14       MS. LENNOX:  Well, I think that, as your -- well,

15  your Honor didn't suggest this.  You asked a question, but I

16  would suggest that it falls to the state because Macomb

17  County and Oakland County and Wayne County have no

18  jurisdiction over how Detroit runs.  The only one that can

19  create a municipality and pass laws over a municipality and

20  have any kind of control over a municipality is the state.

21  And it would seem to me that if something needed to be

22  enforced, if a law was being broken, the state would have

23  jurisdiction and standing to come in and do it.  I think it's

24  not -- it's not exactly on point, but it's similar to the

25  case of Lash versus City of Traverse City, which is a

1  Michigan Supreme Court case from 2007, that found where a
2  statute contains neither a comprehensive enforcement
3  provision or an express private right of action, Michigan law
4  does not permit one to infer a private right of action, and I
5  think here what we've got is that kind of analogy.  We have
6  some of our customers with no claims that relate to DWSD
7  trying to enforce something -- I'm not sure what -- against
8  DWSD.

9           THE COURT:  I hate to extend this, but I've got to
10 ask the next question, which is you say the state would have
11 standing to assert a claim that the DWSD was violating some
12 law.  Okay.  But we're dealing with contracts here, not laws.

13          MS. LENNOX:  Well, Macomb is alleging -- or Oakland,
14 one of them, is alleging that we're breaking the law.

15          THE COURT:  Well, but I'm talking about in regard to
16 adequate capital improvement, for example.

17          MS. LENNOX:  Again, this goes back to the colloquy
18 we've had before, which is -- and I would say -- who has the
19 ability to enforce that?  Your Honor because your Honor has
20 to make a feasibility decision, and that rests squarely --

21          THE COURT:  Well, I like to have an adversary
22 process where I can.  I've done it --

23          MS. LENNOX:  Well, I think --

24          THE COURT:  -- but it is hard to be a lawyer and a
25 judge at the same time.

1          MS. LENNOX:  I think -- well, first of all, I think
2     your Honor made it quite clear to us that even if there were
3     no objections, you were going to require proof on
4     feasibility.  We took you at your word, and we intend to have
5     to do that, so there doesn't have to be an adversary for that
6     to go on.  Currently, I would also say that there are other
7     DWSD objecting parties who are very worthy adversaries, who,
8     among other things, are objecting to feasibility of DWSD.  We
9     have an adversary process even if the counties were excused
10    from it, so --
11          THE COURT:  Who are you talking about?  The
12    bondholders?
13          MS. LENNOX:  Yes, sir.
14          THE COURT:  Are they arguing the inadequacy of
15    capital improvements?
16          MS. LENNOX:  I think they're arguing the laundry
17    list right now, although perhaps Mr. Bjork can clarify that
18    if I'm wrong if he's still here.  He's not.  I think their
19    objections are rather comprehensive with respect to DWSD, and
20    they are certainly arguing about pension funding, which I
21    take it is really part of the heart of the feasibility
22    argument here.  So, again, unless your Honor has --
23          THE COURT:  Right.
24          MS. LENNOX:  -- any other questions --
25          THE COURT:  Thank you.

1          MS. LENNOX:  Thank you.

2          THE COURT:  All right.  Rebuttal, please.

3          MR. BRILLIANT:  Yes, your Honor.  Your Honor, I'm

4    not going to do this in any particular order.  I think the

5    first thing I want to state is, you know, Ms. Lennox says

6    that -- you know, that you should look at the cases they

7    cited, which basically say that third-party beneficiaries,

8    you know, have no rights.  Your Honor, they cite -- and I'm

9    sure your Honor has read their papers and has looked at the

10   cases.  They cite no -- whereas we cite cases under Michigan

11   law which explain the statute and basically says that we step

12   into the shoes and we have all the rights of the parties who

13   are the equitable parties to the contract, the only cases

14   they cite are three Bankruptcy Court -- well, three decisions

15   arising out of bankruptcy cases.  You know, one of those is a

16   Fourth Circuit decision, you know, and in their own

17   parentheticals they say that they stand for the position that

18   debtor had standing to sue for breach of agreement, which was

19   a third-party beneficiary; the second case generally

20   recognizing the right of a third-party beneficiary to enforce

21   a contract but concluding that the party in question was not,

22   in fact, a third-party beneficiary; and then they cite a --

23   actually, it's just the second case, and that's just the

24   affirmance.  They cite no cases under Michigan law that a

25   third-party beneficiary doesn't step into the shoes of the

1  party and have the same rights that the party has.  As I

2  said, your Honor, we cited, you know, the applicable, you

3  know, cases on point, and Ms. Lennox has -- and we would ask

4  your Honor to look at the cases they cited, but they make no

5  real argument here other than they say as a matter, you know,

6  of this argument that a third-party beneficiary, you know,

7  can enforce the contract but has no right to object in

8  bankruptcy.  They cite no cases that are on point.

9       The other cases they cite, the derivative cases, are

10  very different than our situation.  The Lehman case, which

11  they actually have a block quote from, has nothing to do with

12  this situation.  That's a situation where a party sort of

13  like an indenture trustee, an English party, you know, claims

14  under English law they had the standing to raise arguments

15  that were not their own claims but derivative claims of

16  the -- you know, the past swap certificates.  It's a

17  complicated decision, but the bottom line is it's not our

18  situation.  We are not claiming that we derivatively have the

19  right to raise OMI's issues.  We're saying, as a specifically

20  third-party beneficiary under the contract, that we have the

21  right to enforce that, and we are a contingent creditor, you

22  know, just like any other creditor.

23       Your Honor, Ms. Lennox, you know, goes to the

24  constitutional standard, and -- you know, and, you know --

25  you know, basically the Lujan standard, the U.S. Supreme

1  Court standard, you know, and seems to, you know -- you know,

2  kind of conflate that with Section 1109.  If we are a party

3  in interest in this case, under the Bankruptcy Code under

4  1109, we have the right to file objections to -- you know, to

5  confirmation.

6         You know, Ms. Lennox says she understands that we

7  have an interest here in what goes on.  That interest, your

8  Honor, you know, makes us a party in interest, you know, in

9  this case.  You don't have to be a creditor to be a party in

10  interest in the case, which is really what our argument comes

11  down to is that, you know, she would basically say that, you

12  know, unless you're a creditor, you have no party in

13  interest -- you're not a party in interest, and that's just

14  not right.  I mean all the courts who have looked at, you

15  know, the question of who a party in interest is says that

16  should be interpreted broadly, and parties that have a stake

17  in the outcome of the case who will be affected by the

18  outcome of the case have a right to participate in the

19  Bankruptcy Code.  They are a party in interest, and albeit

20  statutorily, you know, have the right to file an objection to

21  confirmation, and, therefore, your Honor, I think it's very

22  clear even based on her own comments that she understands why

23  we're here and she understands the interest we have.  That

24  makes us a party in interest.  It's not just that we are, you

25  know, contract counterparties or have the rights under a

1  contract to enforce it, but we have interests here.  We have

2  a stake in the outcome of the case.  She doesn't deny that we

3  have a stake in the outcome of this case, and, therefore, we

4  are parties in interest.

5          As for this issue of whether our claims are direct

6  and particularized, they are, your Honor.  As we've said over

7  and over again, our claims arise out of, one, upholding the

8  rule of law, which, based upon the contracts we have, keeps

9  the -- you know, the rates, you know, appropriately set based

10  on our contracts.

11          THE COURT:  Well, but Ms. Lennox asks how is it any

12  more specific and particularized compared to any particular

13  ratepayer -- I'm going to use the word "customer" --

14          MR. BRILLIANT:  Right.

15          THE COURT:  -- residential --

16          MR. BRILLIANT:  Right.

17          THE COURT:  -- retail customer?

18          MR. BRILLIANT:  Right; right.  Well, your Honor,

19  first of all, this is a Chapter 9 case, not a Chapter 11

20  case, so I think who's a party in interest is just different

21  by the very nature of, you know -- you know, the difference

22  between, you know, the two statutes.  I'm not going to say

23  that every particular, you know, ratepayer, you know -- you

24  know, is a party in interest, but if there was a specific

25  issue that they, you know -- you know, wanted to raise, you

1  know -- you know, it might be, but we don't have that
2  situation here.  This is not a situation where, you know,
3  concerned citizens from the, you know -- you know, that are
4  customers of DWSD -- we are large wholesale customers that
5  are governmental entities who have governmental
6  responsibilities who pay a large portion of all of the
7  revenues of the DWSD, who each of us get to a point of, you
8  know, parties to the DWSD, you know -- you know -- you know,
9  water board, you know.  We are -- have a huge interest in
10 making sure that DWSD is successful, that the plan is
11 appropriate, and that the rule of law with respect to, you
12 know, the rights and responsibilities of DWSD are respected.
13 And, you know, we have a -- we only have to show a trifle,
14 you know, under the standard that she's, you know, adopting
15 from the Supreme Court, just a trifle of injury, and clearly
16 not having the rule of law, you know -- you know -- you know,
17 apply here and allowing the DWSD --
18         THE COURT:  Well, but an individual ratepayer could
19 argue the same trifle.
20         MR. BRILLIANT:  Right.  I understand, your Honor.
21 And like I said, you know, the -- you know, we're not an
22 individual ratepayer, but I don't think that the standard
23 could be we're not a party in interest because if we're a
24 party in interest every other individual would be a party in
25 interest.  We're wholesale customers, you know, which have

1    other interests in the DWSD.

2              THE COURT:  Do Oakland and Wayne County also --

3    Counties also have representation on the DWSD board?

4              MR. BRILLIANT:  I know that Oakland does, and I

5    believe that Wayne does as well.

6              MR. FISCHER:  Oakland has one.

7              MS. NEWMAN:  Wayne does as well, your Honor.

8              MR. BRILLIANT:  I should make it clear, your Honor,

9    I think with the way you asked the question back was a little

10   different than what I said.  We have the right to designate

11   people to be on the board.  We don't actually, you know,

12   necessarily have somebody, you know, from -- you know, an

13   official of Macomb County who's on the board, but we have the

14   right to --

15             THE COURT:  Okay.

16             MR. BRILLIANT:  -- designate somebody other than

17   that.  Your Honor, the -- you know, the -- you know, the --

18   when asked, you know -- you know, why she -- you know,

19   Ms. Lennox thought, you know -- you know, we were here and

20   she said, well, they're, you know -- you know, it's all this

21   historical, you know, mistrust and various other issues and

22   they're on the right course now, but, your Honor, that's

23   not -- I don't think that's the point.  We're here because we

24   are affected by this plan.  We'll be affected by the outcome

25   of the plan.  We believe that the plan, you know, violates

1   Section 943 because it violates, you know, various, you know,

2   state law provisions and that it has the effect of, you know,

3   violation of state law to take assets out of DW, you know --

4   you know, SD inappropriately, and these are important

5   interests, you know, that -- you know, that we have, and

6   that's why we're here.  If this was a plan that -- you know,

7   that -- you know, that we agreed to, we wouldn't be, you

8   know -- you know, objecting, but, you know, we're here

9   because there are particular issues that concern us that we

10  believe are unlawful and which preclude, you know,

11  confirmation of the plan.  And we shouldn't, as, you know, I

12  said earlier and the case law makes very clear, you really

13  shouldn't try to conflate, as I believe the city is doing in

14  their argument, you know, the merits of their argument, you

15  know, with whether we have standing, you know.  You know,

16  we -- as the largest customers and contract counterparties or

17  in Macomb's situation a third-party beneficiary with the

18  right to enforce under Michigan law, you know, the contract,

19  you know, we are parties in interest in this case.  We have

20  the right to object to it, and we've only objected to things

21  that would affect us.

22          THE COURT:  Thank you, sir.  Anything further,

23  Mr. Fischer?

24          MR. FISCHER:  Just very briefly, your Honor.  You

25  asked Ms. Lennox to cite a case to support the proposition

1  that Oakland County, in particular, had to have an event of

2  default in order to have standing to object to confirmation.

3  If your Honor will review their responses, meaning the city's

4  responses, to our brief, you will see that there is no case,

5  so I think a more forthright response would have been there

6  is no case authority to support that proposition.

7         It's true, your Honor, we haven't filed a proof of

8  claim.  I can't stand here in front of your Honor and

9  represent to the Court as an officer of the Court that I know

10  of a specific event of default that exists right now in the

11  numerous contracts that exist between Oakland County and the

12  city.  There may be, but I don't want to -- by the statement

13  that was made by Ms. Lennox that Mr. Fischer did not identify

14  an event of default, to suggest to your Honor that for

15  certain there is no event of default.  I just don't know,

16  your Honor.

17         The next thing that I also want to clear up for the

18  record -- and maybe I'm misinformed, and I don't mean to

19  state that Ms. Lennox is inaccurate, but at least the

20  information that was given to me is that our contracts with

21  the city are not just sewage contracts.  Oakland County has

22  water contracts as well with the city.  So I want to make

23  sure that your Honor knows that we have both water and sewage

24  dependency.

25         Your Honor, I want to go back to Mount Carbon just

1  very briefly because there's a couple things that your Honor
2  noted that I think are important, and in that regard, the
3  Court held that objections to confirmability of a proposed
4  plan are of a different nature than those based upon a plan's
5  treatment of a creditor.  Whether the plan is feasible or
6  proposed in good faith or otherwise satisfies the requirement
7  of 11 U.S.C. 943 addresses whether the plan is confirmable as
8  a matter of law.  Insofar as our positions are, your Honor,
9  they were not limited in terms of our objections to
10  feasibility.  We did object that the plan was not proposed in
11  good faith and violates applicable state law.  To the extent
12  that one dollar, just one dollar, your Honor, in excess of
13  the allocable burden that DWSD should discharge in terms of
14  its obligations to its pension component is paid, then that's
15  illegal, cannot be done.  And, your Honor, they can't propose
16  a plan that's forbidden by law, so suffice it to say all
17  those issues are open with regard to objections to
18  confirmation.  That's the last statement I want made.  Thank
19  you.
20          MR. NEWMAN:  Your Honor, I want to address two
21  points.  The first -- and it should be a relatively simple
22  point -- is that the DWSD bondholders have very different
23  interests than the counties and cannot adequately represent
24  our interests, cannot replace us as the person raising
25  feasibility from our unique perspective.

1    The other issue that I'd like to raise is Ms.
2  Lennox's comment in response to one of your questions where
3  she said the plan does nothing to alter the status quo.  It
4  does.  This is fundamentally why we are able to object to the
5  plan even if we wouldn't be able to object to the assumption
6  of the contract.  DWSD is a different entity than it was when
7  they went into bankruptcy.  For just --
8    THE COURT:  Well, what she means is on the day after
9  confirmation, assuming there is such a day, the same water
10 service and sewer service will be provided as the day before.
11   MR. NEWMAN:  Your Honor, but it's done with a
12 different budget.  It's done with different expenses.  It's
13 done in a completely different way.  Some may be improved.
14 Some may be worse, but it is -- it is unquestionably
15 different.  They're charging DWSD $20 million in
16 administrative fees as a result of the restructuring of DWSD.
17 There is no question that it is not status quo.  Whether it
18 winds up, you know, on a different route to get to the same
19 point may very well be and will be for proof at the
20 confirmation hearing, but to say that it is -- remains status
21 quo and that there's nothing different and, therefore, no
22 reason to examine what the plan does to us as contract
23 counterparties is simply to oversimplify what's happened here
24 to a degree that I think cannot stand.
25   THE COURT:  All right.  Thank you.  I'll take this

1  under advisement, and I think that's it for today.  All

2  right.  We'll be in recess.

3            THE CLERK:  All rise.

4        (Proceedings concluded at 3:32 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett             July 21, 2014
_____      _____
Lois Garrett