UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        July 16, 2014
                Debtor.         .        9:00 a.m.
. . . . . . . . . . . . . . . . .

EXCERPT OF HEARING RE. (#5021) ORDER REGARDING IDENTIFYING
LEGAL ISSUES RELATING TO CONFIRMATION - ISSUES 1-6, 8, 10-14
        TO BE HEARD (RE. RELATED DOCUMENT(S) 5014 NOTICE
          OF ADJOURNMENT OF HEARING (BK OTHER)) (CKATA) -
    COMMENT:  ISSUE #12 RESOLVED - SEE ORDER AT DKT. #5668;
        ISSUES #13 AND #14 RESOLVED - SEE ORDER AT #5924;
            ISSUE #11 RESOLVED - SEE ORDER AT DKT. #6006;
        HEARING ON LEGAL ISSUE #4 RESCHEDULED FOR 7/17/14
                AT 9 AM PER NOTICE AT DKT. #6003
                    (LEGAL ISSUE NUMBER 1)
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street, Fiftieth Floor
                       Los Angeles, CA  90071
                       (213) 243-2382

For Creditors          Goodman & Hurwitz, PC
Ryan, Phillips,        By:  JULIE H. HURWITZ
Provience, Swift,      1394 E. Jefferson Avenue
Cuppetelli,            Detroit, MI  48207
Mendoza:               (313) 567-6170

For Dennis Trust:      Demorest Law Firm, PLLC
                       By:  MARK S. DEMOREST
                       322 West Lincoln Avenue, Suite 300
                       Royal Oak, MI  48067
                       (248) 723-5500

APPEARANCES (continued):

```
For County of          Dechert, LLP
Macomb, Michigan:      By:  ALLAN S. BRILLIANT
                       1095 Avenue of the Americas
                       New York, NY  10036
                       (212) 698-3600

For Oakland            Carson Fischer, PLC
County, Michigan:      By:  JOSEPH M. FISCHER
                       4111 Andover Road, West - Second Floor
                       Bloomfield Hills, MI  48302-1924
                       (248) 644-4840

For County of          Butzel Long, PC
Wayne, Michigan:       By:  MAX J. NEWMAN
                       Stoneridge West
                       41000 Woodward Avenue
                       Bloomfield Hills, MI  48304
                       (248) 258-2907

For National           Sidley Austin, LLP
Public Finance         By:  JEFFREY E. BJORK
Guaranty Corp.:        555 W. 5th Street, Suite 4000
                       Los Angeles, CA  90013
                       (213) 896-6037

For Detroit Fire       Legghio & Israel, PC
Fighters Associa-      By:  CHRISTOPHER LEGGHIO
tion, I.A.F.F.         306 South Washington, Suite 600
Local 344:             Royal Oak, MI  48067
                       (248) 398-5900

Court Recorder:        LaShonda Moss
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```
Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Calling Case Number 13-53846, City of

2    Detroit, Michigan.

3          THE COURT:  One moment, please.  Okay.  Good

4    morning.  I'd like to consult with you and review the

5    schedule of the issues to make sure we are all coordinated

6    here.  I'm showing that Issues 1, 2, and 3 are proceeding as

7    scheduled at 9, 9:30, and 10; that Issue 4 was moved to

8    tomorrow at nine o'clock.  Issue 5 is still on for today at

9    11:15, although if the attorneys show up before that, we can

10   accommodate them.  Issue 6, adjourned to July 31st at nine

11   o'clock.  Issue 7 is going as scheduled tomorrow at nine with

12   Issue 4.  Issue 8 was adjourned, I think, without date.  Yes?

13         MS. LENNOX:  Correct.

14         THE COURT:  Issue 9 was resolved.  Issue 10 is going

15   today at two, and Issues 11, 12, 13, and 14 have all been

16   resolved.

17         MS. LENNOX:  That's correct, your Honor.

18         THE COURT:  Yes?  Okay.  Then let's proceed with

19   Issue Number 1.

20         MR. LEGGHIO:  Good morning, your Honor.  Christopher

21   Legghio on behalf of the Detroit Fire Fighters Association.

22   Just as a matter of housekeeping, your Honor, argument five

23   is the argument that was filed by the DPOA, and the DFFA

24   joined with them on that.  And as the Court certainly knows,

25   the DPOA has tentatively reached agreement, so we are here on

1  behalf of argument five, and we're just going to rely on the

2  briefs, so I'm not going to --

3              THE COURT:  I might have some questions for you.

4              MR. LEGGHIO:  That's fine.

5              THE COURT:  So let's hold on that and see where we

6  are after Issue Number 3, okay --

7              MR. LEGGHIO:  Okay.  Your Honor, our --

8              THE COURT:  -- if you don't mind coming back or

9  being here until then.

10             MR. LEGGHIO:  Okay.  Our objections to the POA is

11  it's very discrete.  It deals with the hybrid pension plan

12  for fire fighters and the ten-year injunction that the city

13  has asserted into that plan.  We believe that this is an

14  effort to suspend the bargaining rights of the fire fighters

15  for the next ten years, and it is to relieve the city of its

16  duty to bargain for the next ten years.  In that sense, it's

17  a misuse of the POA, a bad faith use of the POA.

18             THE COURT:  Well, but is the standard under

19  applicable Michigan law whether that interval for collective

20  bargaining is reasonable?

21             MR. LEGGHIO:  That's one of the arguments that the

22  city made, and it's -- the answer to that is no.  The duty to

23  bargain, as I pointed out in the brief, is not a term that

24  has to be contextualized.  It's not an amorphus term.  It's

25  not -- this Court has no authority to suspend the duty of

1  bargaining for ten years.  The only time the duty to bargain
2  and the concept of reasonable time are addressed is when the
3  employer has sat down in a reasonable time after a union
4  election or after a certification vote.  If they avoid the
5  bargaining table for a period of time after that, the board
6  and the courts have found that that's not reasonable, but
7  here they're asking you to repeal PERA for ten years.  As I
8  stand here today, your Honor, the duty to bargain that was
9  suspended under the martial law of 436 snaps back in three
10 years, and about three years is in a few months.  It'll be
11 five years from its imposition, and the duty to bargain will
12 snap back.  They're asking you to approve an order, a plan
13 that will suspend that duty to bargain for another seven
14 years.  That's not reasonable.  That's not how the -- that's
15 not the test under the statute.  This Court has no ability to
16 judicially repeal PERA or relieve the city of its duty to
17 bargain.  They have their rights under 436.  They can impose
18 a hybrid.  They're asking you to do more.  They're asking to
19 do what you cannot do.
20      THE COURT:  What do the cases of AFSCME Local 25
21 versus Wayne County and Town & Country Plumbing & Heating
22 versus NLRB hold?
23      MR. LEGGHIO:  Your Honor, you have me at -- you have
24 me at an advantage.  I don't know what they hold, but they
25 don't hold that this Court can suspend the duty of bargaining

1  for ten years.

2          THE COURT:  Right, but they're not bankruptcy cases.

3  But what do they hold about the Public Employment Relations

4  Act?

5          MR. LEGGHIO:  Your Honor, as I say, I can't quote

6  the case.

7          THE COURT:  Yeah.  Okay.  All right.  I'm sorry.

8  Fair enough.

9          MR. LEGGHIO:  But I don't want to miss your point.

10  If the Court wants to tell me what you're getting at, I'll be

11  happy to respond.

12          THE COURT:  Well, my question was what do they say

13  about the duty to bargain.  It's just a question.

14          MR. LEGGHIO:  Okay.  I'm not sure what the Court --

15  well, I mean, look, the duty to bargain is a -- the duty to

16  bargain has been enshrined in this country's labor policy for

17  over 80 years and 50 years in this state, and it is not a

18  concept that is lightly dismissed.  And the suggestion that

19  this Court has the jurisdiction to suspend it for ten years

20  is not tied to any law.  They don't cite any bankruptcy law.

21  They've had several occasions to do that, to cite any

22  bankruptcy law that says that this Court can suspend the duty

23  to bargain or, for that matter, become the --

24          THE COURT:  Well, but you argue that it violates

25  state law --

1          MR. LEGGHIO:  Correct.

2          THE COURT:  -- for the plan to have this so-called

3    suspension.  I mean we can argue about whether it's a

4    suspension or not, but -- so the issue is not whether

5    bankruptcy law allows it.  The issue is whether state law

6    allows it; right?

7          MR. LEGGHIO:  Well, we don't have any quibble on

8    that, your Honor.  436 suspended it.

9          THE COURT:  All right.  So what is it about state

10   law that requires bargaining before ten years from now or ten

11   years from confirmation?

12         MR. LEGGHIO:  Well, let me unpack what the Court has

13   just said.

14         THE COURT:  Um-hmm.

15         MR. LEGGHIO:  The duty to bargain is the duty to

16   bargain at reasonable times, and it is not for this Court to

17   decide ten years hence is the --

18         THE COURT:  All right.  So you concede that the duty

19   to bargain is a duty to bargain at reasonable times.

20         MR. LEGGHIO:  Your Honor, I'm not making any

21   concession.  That's in the statute.

22         THE COURT:  Okay.  Fair enough.  So then the

23   question becomes why isn't ten years a reasonable time?

24         MR. LEGGHIO:  A ten-year hiatus on bargaining is, in

25   effect, an abrogation of the duty to bargain.  There's no

1  case law that anybody can cite in this courtroom in which the

2  duty to bargain under any context, bankruptcy, non-

3  bankruptcy, where an employer got a pass for ten years on the

4  duty to bargain.

5        THE COURT:  Well, there's a lot about this case

6  that's sui generis; right?

7        MR. LEGGHIO:  Correct, your Honor, but it is --

8        THE COURT:  I mean it took 50 years for the

9  circumstances that gave rise to this bankruptcy to develop,

10  the city argues.  The emergency manager law, PA 436, suspends

11  the duty for at least five years.

12        MR. LEGGHIO:  Maximum.

13        THE COURT:  Five years.  In those circumstances, why

14  isn't ten a reasonable time?

15        MR. LEGGHIO:  Well, your Honor --

16        THE COURT:  The city needs some time period to be

17  able to predict with some degree of certainty what its

18  obligations are.  Yes?

19        MR. LEGGHIO:  Well, your Honor, that's the sophistry

20  of their argument.  By that standard, your Honor, as I

21  pointed out in my briefs, they shouldn't stop at ten years.

22  They should go 25 years of a hybrid plan.  They should

23  impose --

24        THE COURT:  Well, but fortunately for you, they're

25  not asking for that.

1            MR. LEGGHIO: Well, no.

2            THE COURT: They're asking for ten.

3            MR. LEGGHIO: It's not unfortunate, your Honor. The

4 Court is trivializing my argument. It's not unfortunate for

5 me they didn't ask for that. It's instructive. They should

6 have asked for ten years on wage freezes and on holidays.

7 All of those things, your Honor, I pointed out in the brief

8 can be linked back to feasibility, but --

9            THE COURT: Let me ask you this question about state

10 law. If there is a duty to bargain after five years and the

11 bargaining fails, what does the Public Employment Relations

12 Act say happens next?

13            MR. LEGGHIO: If the parties go to impasse, the city

14 can impose. Very simple. That's standard basic labor law.

15            THE COURT: Um-hmm.

16            MR. LEGGHIO: But, your Honor --

17            THE COURT: There's no arbitration required?

18            MR. LEGGHIO: There is a 312 arbitration, sure.

19            THE COURT: There is arbitration?

20            MR. LEGGHIO: There's 312 for police and fire;

21 correct, but, your Honor --

22            THE COURT: So it's not that the city can impose.

23            MR. LEGGHIO: Well --

24            THE COURT: There's arbitration.

25            MR. LEGGHIO: Your Honor, let me retract.

1          THE COURT:  Okay.

2          MR. LEGGHIO:  I'm operating in the world of 436,

3     this rare --

4          THE COURT:  No.  I'm talking about five years from

5     now.

6          MR. LEGGHIO:  I understand.  I understand.  312 is

7     the tribunal that breaks the deadlock, the impasse deadlock

8     between the employer and its public safety unions.  It has

9     been doing that for lo these many years.  Now, that, too, has

10    been suspended under 436, so we are not operating with that.

11    And as you know, there has been legislation bandied about

12    that was going to reformulate how 312 would operate, but

13    that's the answer --

14         THE COURT:  I actually don't know that, but okay.

15    It doesn't matter.

16         MR. LEGGHIO:  The answer to your question is it

17    is -- goes to 312, your Honor, but to get to your point, your

18    Honor, about why isn't ten years a reasonable time, I think,

19    with respect to the Court, you're looking out of the wrong

20    end of the telescope.  The state legislature limited the

21    suspension of the duty to bargain to five years.  They can't

22    do that under state law now.  They're telling you --

23         THE COURT:  I'm confused by your argument because,

24    on the one hand, you say they limited it to five years.  On

25    the other hand, you say it's a reasonable time.

1     MR. LEGGHIO:  I said the state legislature suspended
2  the duty to bargain for five years.
3          THE COURT:  In 436.
4          MR. LEGGHIO:  Correct.  They abrogated 436.
5          THE COURT:  But in PERA you say it's a reasonable
6  time.
7          MR. LEGGHIO:  That's what they repealed by 436.
8  They repealed the reasonable time requirement, and I called
9  it martial law.  The Court sighed a little bit because
10  perhaps you think that's a pejorative way to look at it, but
11  it's just --
12          THE COURT:  It's a little bit of an exaggeration.
13          MR. LEGGHIO:  Well, the suspension of the duty to
14  bargain is one of the first things that go in martial law,
15  and that's what happened here.
16          THE COURT:  All right.  Let's not have an argument
17  about what constitutes martial law.
18          MR. LEGGHIO:  I understand, your Honor, but I do
19  want to get back to your point.  What is happening here is
20  they are asking you to extend 436, something the legislature
21  did not do when it decided to suspend the duty to bargain,
22  suspend the duty to bargain at reasonable times -- they're
23  asking you to do that.  They're asking --
24          THE COURT:  Well, but at the same time, the
25  legislature also imposed a financial control board on the

1  city for 13 years.  Doesn't that suggest something about the

2  legislative insight and intent regarding the need for

3  financial stability and foreseeability for a long time,

4  longer than five years?

5      MR. LEGGHIO:  Your Honor, I'm not going to quibble

6  about the need for financial stability or predictability or

7  any of those things.  That's, of course --

8      THE COURT:  Well, but where's the predictability if

9  this is thrown into the hands of an arbitrator whose

10  decisions are unaccountable to anyone and unreviewable?

11      MR. LEGGHIO:  Well, that's not true.  A 312 panel

12  has a duty to consider a city's economic situation in

13  arbitration.

14      THE COURT:  Right, but they're not accountable to

15  anyone nor are their decisions reviewable; right?

16      MR. LEGGHIO:  Well, that's not -- your Honor, 312

17  is --

18      THE COURT:  Is that right?

19      MR. LEGGHIO:  No, it's not correct, your Honor.

20      THE COURT:  Who is the -- who are arbitrators

21  accountable to?

22      MR. LEGGHIO:  Courts, employers -- public employers

23  have challenged 312 arbitration decisions like they challenge

24  the decisions of --

25      THE COURT:  Oh, on what ground are they

1   challengeable?

2          MR. LEGGHIO:  That it exceeds their jurisdiction --

3          THE COURT:  Well --

4          MR. LEGGHIO:  -- to the extent that they did not

5   consider the financial status of the city.

6          THE COURT:  That's a pretty tough standard.

7          MR. LEGGHIO:  Your Honor, that's by design.  That's

8   what the courts want, that they want finality with the

9   arbitration process, so that's the standard.

10         THE COURT:  Toughness of the standard is what the

11  unions rely on in defending those arbitration awards, isn't

12  it?

13         MR. LEGGHIO:  The unions rely on the court's

14  preference for finality with arbitration.  That's what the

15  court -- that's what the unions rely on.  I would say to you,

16  your Honor, that street runs both ways, of course.  The

17  cities -- the public employer cities rely on that when they

18  want to enforce 312 awards also because --

19         THE COURT:  I'm sure.

20         MR. LEGGHIO:  And they look at the standards.

21         THE COURT:  Um-hmm.

22         MR. LEGGHIO:  But the Court -- your Honor, the

23  Court's arguments here are strange.

24         THE COURT:  Questions.  I'm asking questions.

25         MR. LEGGHIO:  Okay, your Honor.

1       THE COURT:  I've got questions for the city, too.

2       MR. LEGGHIO:  I heard them in the -- I heard them in

3  the register of argument, but I'll retract that.

4       THE COURT:  I've got questions for the city, too.

5       MR. LEGGHIO:  Okay.  Your Honor, I want to answer

6  more of your questions, but I also want to put into the

7  record three cases which I do not cite in my brief that I

8  think are informative.

9       THE COURT:  Okay.

10      MR. LEGGHIO:  One is In re. Alabama Symphony

11  Association.  It's 155 B.R. 556.  And there -- this was a --

12  this was a dispute between a symphony orchestra and an

13  employer, and there the Court said it would be inappropriate

14  for a Bankruptcy Court to sit at the head of the bargaining

15  table.  The Court is here merely to decide whether the

16  parties ought to be divorced, not to decide the terms under

17  which they shall live together.  Now, here, your Honor, the

18  Court has to look to Bildisco for some direction, and in

19  Bildisco we know that the Court has authority to abrogate a

20  collective bargaining agreement provided the appropriate

21  evidence is presented to the Court.  Here the state usurped

22  that by just imposing 436, and so we didn't have to come

23  here -- the city did not have to come here and ask you to

24  abrogate a current collective bargaining agreement, but they

25  are now asking you to decide the terms of a future collective

1    bargaining agreement.  As I say in my brief, this deforms and
2    kind of warps the process, and it deprives the union for the
3    next ten years of part of its inventory when it comes to
4    bargaining.  And it queers the process.  It makes it
5    impossible to bargain effectively if part of your inventory,
6    your negotiating coins, have been removed by this Court.  The
7    city's argument, at the end of the day, they get -- we
8    predicted this, as a matter of fact.  I have to tell you I've
9    thought -- I prophesized this in our initial brief before I
10   saw the city's argument -- is they get to this argument crab-
11   like, but they get to the argument that it's all linked to
12   feasibility.  And as I say, that argument has to fail because
13   by that argument, they could ask this Court to impose wages,
14   fringe benefits, holidays, compensation pay, pension plans.
15   To that point, your Honor, let me cite another case for you,
16   In re. Rath Packing, 36 B.R. 979.  The court said this court
17   does not have the choice to decrease or increase incentive
18   pay, to pay or not to pay for three days of sick leave, to
19   terminate or reinstate a pension plan.  This court doesn't
20   have the choice to mandate 7.24 an hour or eight dollars an
21   hour or 10.24 an hour.  And the court doesn't have the choice
22   of reducing or increasing benefits.  What they're telling
23   you, your Honor, is that you should set the wage and price
24   controls for the next ten years.  Now, think about it in this
25   terms.  Could the city come in here and ask you to impose on

1  a vendor for the next ten years the price of their products
2  to the city?  Is that what this Bankruptcy Court has
3  authority to do?  We think the elemental threshold
4  consideration is is are you a body that controls future
5  economic relationships?  You are not.  This Court affects
6  future -- the future of a debtor only by affecting the
7  debtor's current and past debts, and it's not the guardian of
8  what the city does in the future.

9        Your Honor, nobody wants to see the city fail going
10 forward, not my client, not any union that I'm aware of, not
11 this Court, not anybody in this courtroom, but if -- you
12 know, Frank Borman's quote about bankruptcy being to
13 capitalism what hell is to Christianity, you should not be
14 someone who tries to control the future of what the city does
15 ten years hence at the bargaining table.  That is beyond this
16 Court's jurisdiction.  That's what the --

17       THE COURT:  Even if the evidence establishes that
18 it's necessary to do that for the city to establish the
19 feasibility of its plan?

20       MR. LEGGHIO:  The answer to that is, your Honor, the
21 city cannot wave the feasibility flag to ask this Court to
22 march into the future for ten years and control what happens
23 at the bargaining table.  Now, we hope saner heads prevail.
24 We would assume they will.  But however noble this Court's
25 intent is, it is not -- you haven't been licensed to go ten

1  years forward and control the wages and the benefits.  And

2  the Court -- I don't mean to be pejorative, but the Court

3  kind of scoffed at the notion about ten or twenty or twenty-

4  five years, but that's the reality.  The feasibility argument

5  spun to its conclusion says let's set this up for 25 years.

6  Let's set up the wages and the benefits, and we will lock

7  down the feasibility question forever, but that isn't fair.

8  It isn't fair on a lot of levels, and it's certainly not fair

9  because there is state statute that prohibits it.

10         THE COURT:  Well, but isn't your proper response to

11  that argument not that it can't be done but that it isn't

12  necessary to establish feasibility as a matter of fact?

13         MR. LEGGHIO:  Your Honor, I'm always prepared to be

14  educated.  I would accept that as part of the argument, but I

15  also take the position that I don't know where the Court gets

16  the authority to dictate economic terms for not yet incurred

17  debts and to determine the economic relationship of future

18  party -- the future parties, the unions and the city.  I mean

19  how can -- where does the authority come from?

20         THE COURT:  It comes from the authority, if at all,

21  in PERA to determine what's a reasonable time.

22         MR. LEGGHIO:  Well, your Honor, that is -- that

23  argument, to be blunt, is nonsense.  Ten --

24         THE COURT:  What's nonsense about it?

25         MR. LEGGHIO:  The duty to bargain is measured by

1  when the duty starts.  When 312 expires, the city has a duty
2  to bargain.  What is the answer to that?  Does a duty to
3  bargain stop, your Honor, when an employer says, you know,
4  I've been having bad times, so I don't have to bargain?  Run
5  that up in front of the National Labor Relations Board.  See
6  how many cases there are where the board said we're going to
7  suspend for ten years the duty to bargain because you're
8  having bad economic times.  That's not the measurement.
9  That's not the test.  You don't contextualize that term.  It
10 is an absolute duty, and it's a duty measured -- the only
11 time there's any examination done as to what is a reasonable
12 time, it's in terms of, well, there was a union election in
13 January, and they didn't sit down till June.  Is that a
14 reasonable time, or is it if they wait 18 months, is that
15 unreasonable to dodge your duty to bargain?  It's not
16 measured by ten years, and it's -- and the employer cannot
17 offer as a defense to duty to bargain in a reasonable time
18 that, well, we're broke, so we just thought it wouldn't make
19 sense to bargain.  There's no case law that supports that,
20 and this is some -- your Honor, this is serious stuff.  This
21 is 80 years in the federal sector, 50 years in this state of
22 a duty to bargain, and it's been enshrined in a statute.  And
23 I think it should be instructive to this Court that what the
24 state legislature did -- and 436 is a heavy-handed statute,
25 your Honor, and they checked themselves at five years.  Hell,

1  they could have gone for ten years if they wanted to if they

2  really thought this was the way it was to go.  Now this Court

3  under the guise of reasonable time is going to say, well, I'm

4  going to graft onto 436 another five years of the duty --

5  suspend the duty to bargain.  That exceeds by miles anything

6  this Court can consider.

7          THE COURT:  Thank you, sir.

8          MS. LENNOX:  Good morning, your Honor.  For the

9  record, Heather Lennox of Jones Day on behalf of the city.

10  I'd like to actually just go through our reasoning, your

11  Honor, based on what the statutes actually say and how we

12  thought about this, so obviously we start with PERA.  And

13  Section 15(1) of PERA generally requires that a public

14  employer shall bargain collectively with the representatives

15  of its employees, and that means to meet at, as your Honor

16  pointed out, reasonable times and to confer in good faith

17  with respect to wages, hours, and other terms and conditions

18  of employment.  As Mr. Legghio acknowledged, PA 436 under

19  Section 27(3) suspends that for a period of five years.  It

20  suspends the duty in its entirety, which is something

21  different than we're doing here, but I'll get to that later.

22  It also didn't say -- it suspends it for five years, but it

23  didn't say but it couldn't go longer.  It put a particular

24  period in this portion of the statute, and it said nothing

25  beyond that.  In addition --

1      THE COURT:  Well, but isn't it implicit in the five-

2  year time limit that the statute, 436, prescribes that it

3  can't be longer than five?

4      MS. LENNOX:  I don't think so, your Honor, and I

5  think when PA 436 was enacted, I think it was trying to be a

6  comprehensive statute to deal with a particular emergency.

7  Of course, you never know how long an emergency is going to

8  last, and that gets into later statutes that I want to

9  discuss with you because I think they interact.  But when

10  this was enacted in PA 436, the legislature also amended PERA

11  itself, and they put in Section 15(7) of PERA that's a

12  complement to this that says that for contracts -- or

13  collective bargaining agreements enacted after March 16th,

14  2011, they shall have a provision that acknowledges that an

15  emergency manager can reject, modify, or terminate that

16  contract, and, in addition, PERA was further modified at that

17  time by Section 15(8) which says, and I quote, "This act,"

18  meaning PERA, "does not confer a right to bargain that would

19  infringe on the exercise of powers under the local government

20  and school district financial accountability act," which is

21  now PA 436.  So there is a determination at the time by the

22  Michigan legislature that the powers of the state to rectify

23  a fiscal emergency for one of its --

24      THE COURT:  Pause for a second.  You say "which is

25  now PA 436"?

1          MS. LENNOX:  Um-hmm.

2          THE COURT:  What do you mean by that?

3          MS. LENNOX:  Well, at the time this was amended, PA

4  4 was still in effect --

5          THE COURT:  Okay.  So what --

6          MS. LENNOX:  -- which was then replaced by PA 436.

7          THE COURT:  So what is there in PA 436 that makes

8  that language applicable to it?

9          MS. LENNOX:  I have to get back to that, your Honor,

10 but I believe that in many instances it replaces -- the two

11 just replace each other, but I would like to hold that for a

12 minute, your Honor.  But regardless of that --

13         THE COURT:  That's a link in your chain that needs

14 to be filled in.  I understand there may be some legislative

15 history suggesting this.

16         MS. LENNOX:  Right.

17         THE COURT:  But my question isn't that.  It's what's

18 in the statute?

19         MS. LENNOX:  Right.  I will reserve that, your

20 Honor.  But the point that I was trying to make here is at

21 the time the Michigan legislature enacted all of this stuff,

22 I think they made a determination that to rectify a fiscal

23 emergency for one of its municipalities, that sort of tempers

24 the ordinary legislature grant of the right of public

25 employees to collectively bargain that would apply in

1    ordinary nonemergency times, and that's evidenced by the

2    language embodied in 436 elsewhere, which generally grants

3    very broad powers.  First, Section 3 of PA 436 goes through

4    these purposes and reiterates these purposes.  The

5    legislature provided that the fiscal accountability of local

6    governments is vitally necessary to the interests of the

7    citizen of this state to assure the provision of necessary

8    governmental services essential to public health, safety, and

9    welfare.  In Section (b) of that, Section 3(b), they found

10   that it's a valid public purpose for the state to take action

11   and to assist a local government in a financial emergency.

12   In Section (c), they found and held that the fiscal stability

13   of local governments is necessary to the health, safety, and

14   welfare of the citizens of this state.  And in Section (d)

15   they found that the authority and the powers conferred by

16   this act constitute a necessary program and serve a valid

17   public purpose.

18        THE COURT:  Okay.  But how does all of that add up

19   to more than five years being permissible?

20        MS. LENNOX:  Okay.  Again, I'm going to take this

21   into the new statutes that were enacted because nothing in

22   there is -- nothing in the language of 27(3) says five years

23   and it shall never be more.  Those words were not added and I

24   think properly so because, again, when you're dealing with a

25   fiscal emergency, particularly one of a municipality --

1    THE COURT:  Well, but the words "or longer if

2  necessary to accomplish the purposes of this act" are also

3  not in there.

4    MS. LENNOX:  That's right, your Honor, and there's

5  probably a reason that they didn't put either one of them in,

6  to provide the flexibility that I think came later, but I

7  want to -- before I go on to the later statutes, I want to

8  talk about this one because I think there --

9    THE COURT:  Okay.

10    MS. LENNOX:  -- are two other provisions in PA 436

11  that are relevant.  Section 9(2) of PA 436 gives the

12  emergency manager broad powers to rectify the financial

13  emergency and to assure the fiscal accountability of the

14  local government.  There's no time frame on that.  And

15  Section 12(1) of PA 436 provides that the emergency manager

16  can analyze the factors contributing to the financial

17  emergency and initiate steps to correct the condition, so I

18  was surprised to read -- and Mr. Legghio argued it today --

19  in their brief when he was talking about the duty to bargain,

20  he said, "Stated another way, an employer's duty to bargain

21  is not assessed in the context of the employer's finances."

22  And I think when you try to read the interaction between PA

23  436 and PERA together, that cannot possibly be the case.  And

24  I said, well, wait a minute.  The legislature, in connection

25  with the grand bargain, just enacted a whole package of

1    statutes, some of which approved the funding for the grand

2    bargain, but some of which went way beyond that, so what did

3    the legislature have to say about that in the context of this

4    case now?  And here's what they said.  And I think their

5    legislative focus on the primacy --

6              THE COURT:  I have to ask you to pause before you

7    jump to the new legislation.  Is it your argument that those

8    broad powers that PA 436 gives to the emergency manager

9    somehow authorizes the emergency manager to suspend

10   collective bargaining for more than the five years otherwise

11   specified in PA 436?

12             MS. LENNOX:  I do, and I'll tell you why.

13             THE COURT:  That's a tough argument because normally

14   the rule of statutory construction is that the specific

15   prevails over the general.  Yes?

16             MS. LENNOX:  That is normally the rule, but, again,

17   this is going to hearken back at the end of the day after I

18   set the statutory predicate to what does "reasonable" mean

19   and what does "reasonable" mean in this context, and you have

20   to bring all this together, including the new statute and the

21   new legislation, all of it together to figure out what are we

22   doing in the plan.  And then I will go through, your Honor --

23             THE COURT:  Okay.

24             MS. LENNOX:  -- what are we doing in the plan and

25   how does this all fit together.  So the new legislation, I

1  think, continued the legislative focus on the primacy of the
2  long-term financial stability of this city in particular, and
3  there are two of the statutes that I'd like to focus on.  The
4  first, as your Honor pointed out and your Honor noted,
5  there's a statute enacted at MCL 141.1631 to 1643, and that
6  was the statute which was formerly House Bill 5566, which
7  created the financial review commission.  Again, Section 2 of
8  that act sets forth a laundry list of reasons why they were
9  doing this and the reasons for doing it and the purposes for
10  doing it, and those findings include the public policy of the
11  state and overseeing the long term financial stability of its
12  municipalities so they can provide for the financial safety
13  and welfare of the citizens.  They specifically mention the
14  Detroit pensions.  They said the underfunding of the pensions
15  that contributed to the financial and market uncertainty
16  across the state, not only in Detroit, and they also found
17  that the fiscal oversight over qualified cities will ensure
18  that those cities do not engage in the financial practices
19  that led to financial emergencies and insolvency.  So to that
20  end, this new statute gives the financial review commission a
21  couple of powers.  One, it is going to have to ensure that
22  the city complies with whatever plan of adjustment is
23  confirmed in this case, and the plan of adjustment, as your
24  Honor pointed out, contemplates a period much longer than the
25  next couple of years.  In addition, Section 6(9) of the

1 statute provides that the financial review commission will
2 approve all CB -- collective bargaining agreements.  And a
3 companion statute to this package did amend Act 312, which
4 you were discussing with Mr. Legghio earlier, and it amended
5 Act 312 to provide that an arbitrator must consider the
6 municipality's financial ability to pay and that that is the
7 most important factor for an arbitrator to consider.  So I
8 think it's pretty clear under Michigan law now that the
9 city's duty to bargain is assessed in the context of the
10 city's finances.  They absolutely are looking for when you
11 figure out what is a reasonable period to bargain, you have
12 to look at it in the context of the city's finances.

13        THE COURT:  But isn't it a reasonable inference from
14 the legislature's inclusion of that mandatory consideration
15 for arbitration that the legislature assumed or considered
16 that there would be collective bargaining during that time
17 period?

18        MS. LENNOX:  I think they assumed that when there is
19 collective bargaining, that this is an important factor to
20 consider.  I don't think they say anything about what is a
21 reasonable period.  They are focusing on the financial
22 primacy or the financial stability of a municipality, and
23 it's not just Detroit because this applies to all the
24 municipalities in the state.

25        THE COURT:  Okay.  And the follow-up question is if

1  it's the state law that the arbitrator is supposed to take

2  into account the city's fiscal circumstances, doesn't that

3  suggest that under state law this Court should defer that

4  issue to the arbitrators when and if it ever gets there and

5  not impose a ten-year time limit?

6          MS. LENNOX:  Well, that begs the question of what we

7  need to talk about, which is the real question here, which is

8  when is the reasonable time to start bargaining on this.

9  That's the question.  Remember, the right to bargain under

10  PERA says you bargain at reasonable times.  You only get to

11  arbitration when everything breaks down after bargaining, so

12  you have to hearken back to when is the reasonable time to

13  bargain, and in light of that question, given all this

14  background, let's look at what the plan is actually doing for

15  that question.  So, first, I think it's an overstatement to

16  say that the plan doesn't prevent bargaining.

17          THE COURT:  To say what?

18          MS. LENNOX:  It's an overstatement to say that the

19  plan prohibits bargaining.  The plan -- people are going to

20  be bargaining after their contracts are up, assuming we ever

21  reach contracts, on any number of issues.  What the plan

22  does, it constrains what the city or the financial review

23  commission because it has to approve new contracts can

24  approve vis-a-vis pensions only and only on a temporary

25  basis, only through June 30th, 2023, and why is that

1   important because that hearkens back to the legislation and

2   traditional labor law?  Because I think, given the finding in

3   Section 2(b) of what was House Bill 5566 about the disastrous

4   effects that the city's pension's plans are having not only

5   on Detroit but on communities statewide and given the

6   legislature's emphasis on the critical need to bring fiscal

7   stability to Detroit and to restore the provision of adequate

8   services to Detroit's people, holding pension contributions,

9   which is a huge budget item, steady for the next ten -- or

10  the next nine years really is reasonable.  It is a reasonable

11  measure and a reasonable time frame.  It coincides with the

12  emergency manager's plan to give the city through fiscal year

13  2023 to stabilize itself and to provide the funds for the

14  critical reinvestment that we need for the city.  The whole

15  ten-year plan is based on these crucial assumptions.

16          Now, they say nine years is too long, but they're

17  looking at this through a prism of ordinary bargaining in

18  ordinary times, and that's all the cases that were cited,

19  ordinary bargaining in ordinary times.  These are

20  extraordinary times in a fiscal emergency.

21          THE COURT:  Well, but they also cite cases that say

22  that the duty to bargain applies regardless of the employer's

23  financial circumstances.

24          MS. LENNOX:  And we cite cases where courts have

25  held that fiscal emergencies warrant the suspension of

1   bargaining, and, again, this is not wholesale suspension of

2   bargaining.  This is one issue.  We have cited cases where

3   courts have held that this --

4          THE COURT:  Let's pause on that.  Does it make any

5   difference in analyzing Section 943 and the duty to bargain,

6   for that matter, that it's just the one pension issue and not

7   everything else?

8          MS. LENNOX:  I think as a practical matter, your

9   Honor, it -- or as a legal matter, your Honor, it doesn't.

10  As a practical matter, your Honor, I think it does.

11         THE COURT:  What do you mean by that?

12         MS. LENNOX:  Because I mean that the parties -- I

13  think there is an implication that we are trying to wholesale

14  take away union bargaining rights, and that is simply not the

15  case.  There's one issue that is of such critical importance

16  given the history of this to this city and given the next

17  nine years that we want to hold steady.

18         THE COURT:  Okay.  So Mr. Legghio argues in response

19  that if fiscal stability is so important, the plan would also

20  prohibit bargaining on the other economic issues, wages, for

21  example.

22         MS. LENNOX:  And that --

23         THE COURT:  But you don't do that.

24         MS. LENNOX:  That's exactly right, and here's -- and

25  that proves the point that what we are trying to do is have a

1    very narrowly tailored reasonable response for a reasonable

2    period of time to a fiscal emergency, which is entirely

3    consistent with the duty to bargain under PERA. We could

4    have tried to, in my view, go overboard and say we're not

5    talking to any of our unions about anything for the next nine

6    years. We didn't do that, and so we think that given the

7    reasonable -- the obligation to bargain at reasonable times

8    under PERA and given the cases that we cite in our papers,

9    including a Supreme Court case, that say that in fiscal

10    emergencies -- these cases that we cite on our paper are

11    talking about -- and our brief, your Honor, talk about courts

12    allowing actual breaking of contracts that are in existence

13    today in fiscal emergencies and suspending bargaining under

14    contracts that exist today in fiscal emergencies, and they

15    can modify contracts that already exist. We are doing less

16    than that here. We are not breaking contracts. We don't

17    have a contract with the DFFA. We seek -- what we're seeking

18    is a reasonable and temporary restriction on what pension

19    terms may exist for the next nine years, so it's prospective

20    only, to address the fiscal emergency and provide for the

21    assumption of adequate city services. Given the fact this is

22    reasonable, temporary in time, and prospective in nature, I

23    think this complies particularly with the Blaisdell case that

24    the United States Supreme Court decided and with the Buffalo

25    Teachers Federation case that the Second Circuit decided that

1   we cited in our papers.  Nothing in PERA, Section 15(1),

2   which imposes the duty to bargain statutorily, defines what a

3   reasonable period is to commence bargaining, and Mr. Legghio

4   admits that.

5           In light of what I've already run through, the city

6   believes that the plan sets forth a reasonable period in

7   which to start bargaining over one issue, future pension

8   terms.  This doesn't violate PERA.  It is actually, your

9   Honor -- what we've been trying to do here is we have three

10  sets of state statutes now, PA 436, the new legislation, and

11  PERA -- what we do in our plan is actually harmonize those

12  statutes so they can all work together, which is actually the

13  goal of statutory construction.  Nothing in PERA says --

14  defines a time for reasonable.  We think under the fiscal

15  emergency that we're under, we have defined a narrow

16  reasonable time on one issue, and we think this allows the

17  Court to read the statutes harmoniously together, and I have

18  yet to hear how there's a real violation of PERA.

19          THE COURT:  Thank you.  Mr. Legghio, any rebuttal?

20          MR. LEGGHIO:  Yes, your Honor, I do.  I'm going to

21  divide my rebuttal into two parts.  One is to the argument --

22  the statutory argument that's made by the city about the

23  language in 436 and PERA and, secondly, on this -- the duty

24  to bargain, which has been kind of -- I think been contorted

25  in this presentation today.  What the city is arguing to you

1    is that the absence of language in PERA beyond the five years

2    is an invitation to do anything; that the absence of language

3    in PERA lets you do anything, which is an interesting

4    statutory construction.

5              THE COURT:  Mr. Legghio, I need you to be by the

6    microphone when you're addressing the Court because --

7              MR. LEGGHIO:  I apologize, your Honor.

8              THE COURT:  -- we're making an audio recording here,

9    yeah.

10             MR. LEGGHIO:  So this is the argument that the

11   absence of language in 436 that prohibits anything beyond

12   five years is the right to read anything you want into the

13   statute, but the statute actually favors a shorter period of

14   time.  The suspension of the duty to bargain under PERA,

15   under 436 says that it is -- it halts after five years or

16   when the receivership ends, whichever comes first.  So the

17   plain language of the statute is inconsistent with the

18   argument that you can do anything you want, so the logic of

19   no limitation language means you can do anything is clear.

20   The language of the statute suggests that the shorter the

21   period, the better, and I think that's a gesture toward the

22   significance of collective bargaining.   So the five-year

23   period suspension is not what applies.  What applies is when

24   the city goes out of receivership.

25             Now, on this reasonable time to bargain, I guess the

1    city's argument is that asking you to impose a ten-year

2    suspension on the duty to bargain is reasonable, and they say

3    that nothing in PERA says what's reasonable and that I know

4    that. I also know what the Michigan Employment Relation

5    Commission decisions are. We scoured those. We haven't

6    found any that gave an employer ten years to not go to the

7    bargaining table or anything remotely close to that, but the

8    duty to bargain --

9           THE COURT: Well, but none of those involve

10    municipal bankruptcies either.

11           MR. LEGGHIO: Your Honor, fair enough, but if we're

12    going to interpret what the duty to bargain is, we do have to

13    go to the sources, those bodies that have been entrusted with

14    interpreting the statute, and MERC has never suggested ten

15    years is an appropriate time period. But there's a

16    contortion here of what this duty to bargain is. The duty to

17    bargain under the current scenario will snap back either in

18    five years or when the receivership ends, and from that

19    moment on the measurement starts. What is reasonable time to

20    bargain? They're suggesting that phrase is an empowering

21    phrase that gives you almost unlimited authority to continue

22    the suspension under 436. The measurement starts when the

23    snap-back occurs, not -- it is not a phrase that is ambiguous

24    enough to empower a Bankruptcy Court to suspend that duty

25    beyond what the statute says, a statute which favors actually

1  a shorter period of time than five years if the circumstances
2  permit.

3        Now, I applaud the city's prudence and their virtue
4  in not trying to take all things away from the bargaining
5  table.  They're only taking the pension benefit away, but
6  that's a nonstarter.  Collective bargaining is a messy
7  process, and you use everything you can when you bargain.
8  They're asking you, as I said in the brief, to put your thumb
9  on the scale, to take away from the union the ability to
10 negotiate smaller pension changes in exchange for maybe
11 better wages or better healthcare or an extra day off.
12 That's what they're doing.  They're asking you to sit at the
13 bargaining table and side with them for the next ten years.
14 That's the advantage of doing only one thing.  That's not
15 virtue.  That's scheming, and that's what they're doing.
16 They're asking you to be a player with them for the next ten
17 years.

18       Your Honor, the duty to bargain, I think -- let me
19 take it out of my context.  The federal and state statutes in
20 this country have declared what the importance of the duty to
21 bargain is, and the history of duty to bargain was -- back in
22 the '30s it was designed to prevent violence, and it has been
23 by statute designed to solve workplace issues, and they are
24 asking you to solve a workplace issue.  I think it's beyond
25 this Court's office.  However lofty or noble this Court's

1  purposes may be, this Court doesn't have the jurisdiction to

2  affect the collective bargaining process for the next ten

3  years no more than this Court could set the electric rates

4  that the city has to pay for the next ten years with the

5  city -- with Detroit Edison.  You don't have that authority

6  to go into the future for a debt that's yet incurred for

7  labor that's not yet incurred.

8           THE COURT:  All right.  Thank you very much, sir.

9           MR. LEGGHIO:  Thank you, your Honor.  Your Honor, on

10  the --

11          THE COURT:  On Issue Number 5, I want to see if I'm

12  going to need you for that.  Okay?  Was it Number 5?

13          MR. LEGGHIO:  Yes, your Honor.

14          THE COURT:  Okay.  So give me just a moment.  And

15  let me ask while I'm checking this out whether the city would

16  agree to the waiver of oral argument on Issue 5.

17          MS. LENNOX:  There were two parties affected by

18  Issue 5, your Honor.  I'm perfectly happy to raise it -- to

19  waive it with respect to Mr. Legghio's client.

20          MR. LEGGHIO:  Who's the other one?

21          MS. LENNOX:  The other one is National Public

22  Finance, and I don't know if they plan to press that or not

23  today, so -- but I'm perfectly happy to raise the -- waive it

24  with respect to Mr. Legghio's client.

25          THE COURT:  Okay.  Their issue, although it's a

1  classification issue, is a --

2           MR. LEGGHIO:  Different issue.

3           THE COURT:  -- is a different classification issue;

4  right?

5           MS. LENNOX:  Correct.  That's correct.

6           THE COURT:  Okay.  Hold on.  Well, I actually had a

7  question for the city that was tangentially related to this

8  issue of classification.  I suppose the question is such that

9  we could deal with it at the confirmation hearing rather than

10 in today's context.  And the question relates to -- hold on

11 one second -- a little confusion on my part as to -- one more

12 second, please -- how the new PFRS active pension plan

13 formula works in relation to the new PFRS active pension plan

14 works.

15          MS. LENNOX:  The --

16          THE COURT:  I don't need or want an answer now.

17          MS. LENNOX:  Oh, okay.

18          THE COURT:  But it's a question that we're going to

19 have to address at some point.

20          MS. LENNOX:  Okay.  Happy to do that, your Honor.

21          THE COURT:  All right.  Otherwise I'll take this

22 matter under advisement, and we'll waive argument.

23          MR. LEGGHIO:  Thank you, your Honor.

24          THE COURT:  You're welcome.

25                              - - -

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett          July 21, 2014
_____      _____
Lois Garrett