UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: CITY OF DETROIT, MICHIGAN, | . | Docket No. 13-53846 |
| | . | Detroit, Michigan |
| | . | July 21, 2014 |
| Debtor. | . | 10:00 a.m. |

. . . . . . . . . . . . . . . . . .

FURTHER HEARING RE. (#5155) MOTION FOR TEMPORARY ALLOWANCE OF CLAIM OF THE MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT PURSUANT TO RULE 3018(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PURPOSES OF ACCEPTING OR REJECTING THE DEBTOR'S FOURTH AMENDED PLAN OF ADJUSTMENT; (#5354) MOTION FOR CLASS CERTIFICATION OF PROOF OF CLAIMS #2638, 2651, 2654, 2659, 2676, 2683, 2689 AND 2692 FILED BY CREDITOR HYDE PARK CO-OPERATIVE, ET AL.; (#5259) FIFTH AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor: Jones Day
By: HEATHER LENNOX
222 East 41st Street
New York, NY 10017
(212) 326-3837

Miller, Canfield, Paddock & Stone, PLC
By: TIMOTHY FUSCO
STEPHEN S. LAPLANTE
150 West Jefferson Avenue, Suite 2500
Detroit, MI 48226
(313) 963-6420

For Hyde Park Co-Operative, et al.: Thornbladh Legal Group, PLLC
By: KURT THORNBLADH
7301 Schaefer
Dearborn, MI 48126
(313) 943-2678

Becker & Wasvary, PLLC
By: CARL BECKER
2401 W. Big Beaver Road, Suite 100
Troy, MI 48084
(248) 649-5667

APPEARANCES (continued:)

| | |
|---|---|
| For David Sole: | Jerome D. Goldberg, PLLC<br>By: JEROME GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI 48207<br>(313) 393-6001 |
| For County of Macomb, Michigan: | Dechert, LLP<br>By: ALLAN S. BRILLIANT<br>1095 Avenue of the Americas<br>New York, NY 10036<br>(212) 698-3600 |
| For Syncora Holdings, Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By: RYAN BENNETT<br>300 North LaSalle<br>Chicago, IL 60654<br>(312) 862-2074 |
| For U.S. Bank: | Waller Lansden Dortch & Davis, LLP<br>By: DAVID LEMKE<br>Nashville City Center<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>(615) 244-6380 |
| For City of Detroit Water and Sewerage Dept.: | Kilpatrick & Associates<br>By: RICHARDO KILPATRICK<br>903 N. Opdyke Road, Suite C<br>Auburn Hills, MI 48326<br>(248) 377-0700 |
| For Adversary Proceeding Plaintiffs Maurikia Lyda, et al.: | Edwards & Jennings, PC<br>By: ALICE JENNINGS<br>Cadillac Tower Building<br>65 Cadillac Square, Suite 2710<br>Detroit, MI 48226<br>(313) 961-5000 |
| For ACLU: | ACLU Fund of Michigan<br>By: KARY MOSS<br>2966 Woodward Avenue<br>Detroit, MI 48201<br>(313) 578-6183 |
| For the Official Committee of Retirees: | Dentons US, LLP<br>By: CAROLE NEVILLE<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY 10020-1089<br>(212) 768-6700 |

APPEARANCES (continued):

For Faith Institutions: Unitarian Universalist Service Committee
By: DR. PATRICIA JONES
689 Massachusetts Ave.
Cambridge, MA 02139
(617) 868-6600

Detroit Water and Sewerage Department
Mr. Darryl Latimer, Deputy Director and Chief Customer Service Officer

Court Recorder: Kristel Trionfi
United States Bankruptcy Court
211 West Fort Street, 21st Floor
Detroit, MI 48226-3211
(313) 234-0068

Transcribed By: Lois Garrett
1290 West Barnes Road
Leslie, MI 49251
(517) 676-5092

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

THE CLERK: Case Number 13-53846, City of Detroit, Michigan.

THE COURT: Good morning. I'd like to begin this morning with the motion for class certification, please. I don't think that will actually take very long, and then we can move to our status conference. Are counsel here on that?

MR. FUSCO: Good morning, your Honor. Timothy Fusco, Miller Canfield, for the City of Detroit.

MR. THORNBLADH: Your Honor, Kurt Thornbladh on behalf of Hyde Park and the similarly situated claimants. We have no objection to going last.

THE COURT: You have no objection what?

MR. THORNBLADH: We have no objection to waiting until the status conference is held.

THE COURT: Oh, no. I want to proceed with this, but I have to say, counsel, let me address both of you at the lectern, please. As I read your papers, it looked to me like there was an agreement that the issue of whether the class should be certified and the extent of any relief to be granted to the plaintiffs, whether as a class or not, should be heard and determined by the state court. Is that right, or am I missing something?

MR. THORNBLADH: That is no longer the position of the claimants. The claimants sent a letter to Jones Day dated November 11, 2013, with a proposed stipulation to send

this issue back to state court. We've been waiting on Jones Day, the plaintiff's -- I'm sorry -- the debtor's attorney, all this time. We think with the passage of time it would be more expeditious and more helpful to the overall case of the City of Detroit if it stayed in this court.

MR. FUSCO: Your Honor, it has been and continues to be the position of the city that this is best resolved in state court. The narrow matter before us today is certification under Rule 9014 and 7023 of the class, but we still have then the issue of liquidation. Now, your Honor has previously ruled in the context of a class action seeking injunctive relief against regulatory action that the best forum is a state court. Mr. Thornbladh --

THE COURT: This has been up and down in the appellate process.

MR. FUSCO: It's been to the Supreme Court and back, and --

THE COURT: So, Mr. Thornbladh, why isn't it best just to remand this to -- not remand it but abstain and allow the state court to continue with the litigation given its experience with the case?

MR. THORNBLADH: Well, we think because the Court would like to move the overall City of Detroit Chapter 9 along expeditiously, and --

THE COURT: Well, but this is just a claim. I mean

there's no necessity to resolve a claim to move the case along, is there?

MR. THORNBLADH: I would think it would be in this case, your Honor --

THE COURT: Okay. Why?

MR. THORNBLADH: -- because we have to determine what the amount of the damages under the damage portion of the complaint are in time to get a good claim in and get payments on the claim.

THE COURT: Why is there any reason to believe this Court would do it quicker than the state court?

MR. THORNBLADH: May I ask my co-counsel if he can address -- he's more experienced in that court -- why he believes --

THE COURT: Okay. You may.

MR. THORNBLADH: -- this Court could do it more quickly?

MR. FUSCO: And, your Honor, just for the record, we did send prior to this a proposed stipulation weeks ago to Mr. Thornbladh and Mr. Becker offering to lift the stay and send all of these matters back to the state court, and in the objection -- the resolution of the objection to the class claims, we agreed that certification by the state court would -- this claim would then be treated as a class claim so that you're not giving up anything by proceeding in the state

court. I know some courts have ruled that a prior certification in state court may not be binding, but we've agreed it will be.

MR. BECKER: Your Honor, Carl Becker on behalf of the plaintiff.

THE COURT: Thank you, sir.

MR. BECKER: This particular matter, as the Court noted, went from the Court of Appeals to the Supreme Court and back down again. In the interim, the judge that originally made the decision in the case retired, and so no one in the state court --

THE COURT: So have I.

MR. BECKER: You're right.

THE COURT: Can't you tell?

MR. BECKER: We believe that we can move this matter along. It's been literally sitting in the system well before the bankruptcy got filed. It just sat in the state court and wasn't moving along. We tried to make this matter move along by talking -- by sending a proposal to opposing counsel many, many, many months ago, and they just simply ignored everything that we did. And here we are today, and at the 11th -- 11:59 they decide at the last second --

THE COURT: One second.

MR. BECKER: -- that they want to do something.

THE COURT: One second, please. Okay. I'm sorry to

impose this upon you, but we need to take a pause here. We're having apparently technical difficulties with the audio in the overflow room, so let me ask you to just stand down briefly while we address this issue. Are we good now, sir?

UNIDENTIFIED SPEAKER: Yes.

THE COURT: Oh, okay. All right. Let's resume then.

MR. BECKER: In any event, so we go back to November, and we were trying as best as we could to try and see what we could do to move this along. We then get contacted by the city attorney, Mr. Mike Muller, who's been handling this matter, who starts to discuss with us settlement, and we start to put together documents for a settlement. Now they want to move it back down again, and it seems to me that we should be given an opportunity to see if this matter was settleable because that's what's been happening for the last two months. We've been compiling information to provide to the city to reach a settlement, and it's hard to tell what's going on here because Mr. Muller indicates that he accepts a Headlee Amendment variation on our -- on an amended complaint, let's get the class settled, and then all of a sudden we get these motions from Jones Day, and it's like totally inconsistent. And maybe perhaps --

THE COURT: Wait a minute. Did Jones Day --

MR. BECKER: -- with everybody here --

THE COURT: Did Jones Day file a motion on this?

MR. BECKER: Well, I'm sorry. The motion that was filed in this case --

MR. THORNBLADH: It was an objection to --

MR. BECKER: -- objection to the claim. I'm sorry.

THE COURT: Okay.

MR. BECKER: I'm sorry, your Honor. And so to say we're getting pulled from one end and then getting pulled from another -- and I think that maybe perhaps the best approach to take on this matter is if it could stay here long enough to see if everybody can get together and get a resolution to this matter. I don't even understand how two different attorneys say two different things, one objecting to the claim and the other one saying we're fine, let's try to solve it.

MR. FUSCO: They're not inconsistent, your Honor. The stipulation said the city --

THE COURT: Yeah. In this Court we litigate and mediate at the same time.

MR. BECKER: Okay.

THE COURT: It's what we do.

MR. BECKER: Well, in any event, that -- we believe that --

MR. THORNBLADH: If I may, your Honor, I'd like to --

THE COURT: By the microphone, please.

MR. THORNBLADH: If I may, your Honor, that statement is why you should keep the case because the pressure to mediate this in the state court based on the experience of all the attorneys that have handled it in the state court, very slow-going. It's got its own problems like the City of Detroit does. If we can keep it here at least for awhile longer, we could probably get this resolved and move on.

MR. FUSCO: Your Honor, again, you dealt with this in another matter I handled, LaSalle, where you issued an opinion and said that claims of this type are not suited to the ADR and the mediation process set up principally because they're seeking injunctive relief on a regulatory matter on a prospective basis, which cannot be dealt with in mediation and because it deals with the regulatory scheme of the city.

Now, what the plaintiffs, I think, most want is a determination of reasonableness and an injunction, which we can only deal with in the state court. The Sixth Circuit has said it's within your discretion to determine whether under Rule 9014 you're going to apply 7023 and reach a decision, and one of the factors that you consider, the complexity of the matter and the delay and the effect on the underlying bankruptcy case. Well, as we all know, there are a whole bunch of things pending right now that are of great

importance in this case. And the best way to deal with this is simply under 9014 decline to apply 7023, and then we will -- even though no motion was filed -- and I want to add that. I mean if the complaint was nobody responded to the letter -- and I don't know anything about that -- we within two weeks of getting this motion agreed to lift the stay and to send everything back to state court. No stay relief motion has ever been filed. In Mr. Thornbladh's objection to the Jones Day claim objection, he said since this case involves a constitutional issue, the Court should remand the matter to state court for a determination for the amount of liability. Now, he said that in reply to our motion and his motion itself this should go back to state court, and I think that's not only consistent with your prior rulings, it just makes sense because all we have today is a narrow piece of this. The liquidation process is best done in state court that can give complete relief to the plaintiffs. I've talked to the city attorneys. There are three matters pending right now before the Circuit Court, a motion to file a second amended complaint, a motion for class certification, and a motion for a status conference. Now, one minute after we lift the stay, go forward with that, and that, I think, is the best way to move this case forward. And we're doing halfway relief because you still have what won't be resolved here is the prospective rates to be charged to these people.

THE COURT: All right. Anything further either --

MR. BECKER: I just wanted to point out to the Court when counsel suggests that this is a complex issue, it is not a complex issue. It is facially unreasonable, as we pointed out in our brief --

THE COURT: Well, now is not the time to argue the merits of it, but how do you deal with the argument that says that even if I keep it, that doesn't get you the prospective relief you need?

MR. BECKER: That's an issue that we have to -- I agree with counsel on that.

THE COURT: All right. In the circumstances, I agree with the city that the best way to get this matter resolved as efficiently and expeditiously as possible is to lift the stay, abstain, and allow the state court to proceed. The city has agreed to an order which binds them in this case on whatever decision the state court makes regarding class certification. Yes?

MR. FUSCO: We have, your Honor.

THE COURT: And so let me ask you to agree upon the terms of an order at least in form and submit it to the Court.

MR. THORNBLADH: Thank you, your Honor.

MR. BECKER: Thank you, your Honor.

MR. FUSCO: When you say "abstain," just to be

clear, your Honor, abstaining from the case or are you --

THE COURT: Abstaining from deciding the proof of claim until the state court resolves it, and then that will be the proof of claim. That'll be the allowed amount of the claim.

MR. FUSCO: All right. Thank you.

MR. THORNBLADH: Thank you, your Honor.

THE COURT: All right. So let's turn our attention to the status conference, please. I have an agenda of eight items, and I'd like to tell you what they are and ask if anyone objects to any of these or has any additional items. Okay. First, I want to give a resolution to the Macomb County district request for a claim estimation, and then I want to inquire whether there is any disclosure the city is prepared to make at this point today regarding the creditors' vote on the plan. I want to have the further up conversation with Mr. Latimer regarding water shutoffs. I want to make sure that the distribution of Ms. Kopacz's report of last Friday has been fully accomplished. And then I want to have a further conversation regarding the ASF interest rate disclosure, and I suppose with that we can also talk about how to handle the issue that was raised regarding the Department of Transportation legal protections and then a conversation about whether the trial can be shortened in light of the settlements that have come in and in that

context also Syncora's motion to adjourn, and in that context I suppose we'll also discuss when and if the city plans to file a new plan, and then finally a closed courtroom conversation regarding the site visit. So is that okay with everyone? Okay. So let's begin with the Macomb County district estimation. Are the attorneys here on that?

MR. GOLDBERG: Your Honor, if I could address one item with the --

THE COURT: Yes. Would you stand at the microphone, please, sir?

MR. GOLDBERG: Jerome Goldberg appearing, your Honor. With regard to the item dealing --

THE COURT: Who do you represent, sir?

MR. GOLDBERG: I'm sorry.

THE COURT: Who do you represent here?

MR. GOLDBERG: I represent David Sole, interested party. In this case, though, I'm here with several attorneys who, just with regard to the item with Mr. Latimer, we did want to inform the Court that attorneys have filed an adversary proceeding on behalf of victims of water shutoffs, and if we could just perhaps address that in the context of the discussion with Mr. Latimer.

THE COURT: Okay.

MR. GOLDBERG: Thank you.

MR. BRILLIANT: Your Honor, this is Allan Brilliant

on behalf of Macomb County. I'm on the phone, and I believe Ms. Badalamenti should be in the courtroom.

MR. LEMKE: Your Honor, David Lemke with Waller Lansden on behalf of U.S. Bank, the trustee for the water and sewer bonds. I was hoping I might be able to ask your Honor to add an item to your agenda.

THE COURT: Okay.

MR. LEMKE: There is a -- we would like your Honor -- to ask your Honor to revisit the issue of the responses that the city has received to the RFI's on the privatization. Back on May 12th you ruled that they would not be produced because the process was ongoing, and there were some proprietary information. We think the process has potentially progressed far enough now that the same issues the city articulated back on May 12th may no longer exist.

THE COURT: Okay. We'll add that perhaps in the context of the motion to adjourn and the length of the trial.

MR. LEMKE: Very good. Thank you.

MR. LAPLANTE: Good morning, your Honor. Stephen LaPlante of Miller Canfield appearing on behalf of the city.

THE COURT: Okay. So on the Macomb County district estimation, keeping in mind that the purpose of the estimation is to determine whether and to what extent the county and the district should be permitted to vote on the plan, the Court concludes that the record establishes a

sufficient likelihood of success on the merits of the claim that for voting purposes it should be allowed in the requested amount of $26 million, so the Court will enter an order that for voting purposes the district's claim is allowed for that purpose. It must be understood by all concerned that this estimation will carry absolutely no weight whatsoever in actually fixing the amount of the claim, which will be done at a later date. Okay. So anything further on that, counsel?

MR. BRILLIANT: Your Honor, this is Allan Brilliant. Thank you, your Honor. Do you want us to submit a proposed order, or will your Honor be doing that by minute order?

THE COURT: I'll take care of it. I'll take care of it actually in a written order.

MR. BRILLIANT: Thank you, your Honor.

MR. LAPLANTE: Nothing further, your Honor.

THE COURT: Okay. So let's move on then in our agenda and ask the city if there's anything it wishes or proposes to disclose regarding the creditors' vote on the plan at this time.

MS. LENNOX: Good morning, your Honor. Heather Lennox of Jones Day on behalf of the city. Given the fact that not all of the tallies for all of the classes are completely nailed down as of this morning, it probably would be imprudent for us to say anything, but obviously we do

intend to file the declaration today, and we will.

THE COURT: Okay. Thank you. Okay. Is Mr. Latimer here? You're not Mr. Latimer.

MR. KILPATRICK: No, I'm not, your Honor. I'm Richardo Kilpatrick, and I'm here on behalf of the Detroit Water and Sewage Department. I'm actually their counsel in the Chapter 9 case, and I simply wanted to indicate that I do have Mr. Latimer here, and he's here to -- pursuant to the Court's request, to explain the additional customer outreach that the department is going to engage in prospectively to address your concerns.

MR. LATIMER: Good morning. In response to your Honor's directives, the Detroit Water and Sewage Department has reassessed its current collections campaign. Let me begin my comments by saying that the department is committed to be proactive and as aggressive in our efforts to communicate with our customers. Today we are refocusing, reassessing our efforts in that regard. Today we are beginning a citywide aggressive communication and engagement campaign to help our customers who are in need of assistance. We will detail some of our plan of action in a few minutes.

I also want to announce to the Court that DWSD is instituting a 15-day pause on residential shutoffs effective immediately. We are not changing our course in our efforts to run the department more efficiently, but we need time to

make sure that our aggressive communication efforts can reach our customers and that those who have financial difficulties can learn how they can get the help they need to keep their water on.

DWSD's goals are simple. We want to ensure that everyone has access to water; that they are -- that they are current and/or are on their way to getting current on any overdue owed amounts. In recent years, the department has experienced a significant increase in the number of accounts 60 days or more past due. Declining collection rates, increasing bad debt, population loss, abandoned properties, declining employment, median annual household income decline to approximately 15 percent of the national average are among the contributing factors to the delinquencies. These factors, when taken in context with the department's historical lack of rigor in the collections process, has resulted in 83-percent collections in rates -- collection rate and approximately $50 million in bad debt in annual retail water and sewage billings.

The impact of these circumstances are clear. Detroiters who pay their bills are compensating for those who don't through higher rates. For the rates effective July 1st, 2014, approximately ten percent of the increase was due to bad debt, billing uncollected from those who are receiving services. Placing this burden on the shoulders of those who

do pay will result in affordability challenges for a larger population of Detroit customers. While Detroit has historically made collection efforts, including shutoffs, we have not been at the level necessary to adequately address the outstanding delinquencies on an ongoing basis. Notifying customers they might be shut off without performing a shutoff has contributed to the growing number of our customers paying in arrears, if at all.

Beginning in the summer of 2013, the department began increasing the number of shutoffs for accounts that were noticed as delinquent and in shutoff status. For our customers who came to us with affordability issues, we worked to keep their service on and also finding assistance and referrals and payment plans.

While there has been a significant amount of media and other communications on this issue, on occasion it has been brought to our attention that we have a customer either out of service or on the path to shutoff who is not aware of what we have in terms of program practices that can assist them in keeping their service active, and they have an affordability issue. We have invited those that have expressed compassion for our customers in these circumstances to bring their customers forward so that we can assist them. A very small handful of those have been brought forward; however, the impression remains that there may be a

significant number of customers who cannot afford water service and have had service disconnected. DWSD does not want to put our customers out of service. We want and need our customers to contact us to pay bill, make arrangements to catch up on arrearage, and/or identify the need and apply for assistance. This will allow us best service our community and our customers in stabilizing our rates. Our goals are to eliminate shutoffs and restore water to residential customers with qualifying documented affordability issues, to increase customer awareness of affordable payment assistance options for residential customers, expand and enhance outreach through partnerships with grass root organizations.

Our vision. DWSD employees, customers, and other stakeholders will work together to inform customers with affordability issues of the need to come forward to avoid shutoffs, to have service restored. As I stated, we will suspend shutoffs for 15 days. We will continue to focus public attention on the issue through the media, communications, organizations, communication with customers and other means partnering with clergy, interested groups to help DWSD get payment and financial assistance information to our customers, responding promptly to restore service for qualified customers, suspending those shutoffs for qualified customers while assistance is sought, and measure and report results.

By 7-18-14, 2014, preparing fliers, the payment assistance options available for DWSD customers with contact information, widely distributing that in conjunction with other efforts.

7-21, establish a grass root mechanism with clergy, the Department of Neighborhood and other groups to distribute fliers, inform these constituents and identify unique customer circumstances for DWSD to follow up, partnering with THAW to reach out to DWSD customers in shutoff status that THAW has qualified for bill assistance with other utility providers. Due to confidentiality provisions, THAW would mail or otherwise contact DWSD customers at those addresses.

On 8-4, 2014, compare local -- locations of shutoffs not returned to service with database of abandoned structure, identify Detroit blight taskforce efforts to assist in clarifying accounts' status for properties.

On 7-18, 2014, initiate the second round of bill inserts calling attention to the affordability program availability to DWSD residential customers. All households will receive inserts over a four-week period.

On 8-2, 2014, host a water affordability fair at the Eastside Service Center from 8 a.m. to 5 a.m. -- p.m. to assist customers with bill payment assistant arrangements. In addition to these specific actions over the next 15 days, DWSD will focus on the following: increased communication

efforts on the affordability program for those that need assistance with water bills as follows. Continue effort to utilize media, DWSD's web page, bill massaging, social media, et cetera, to disseminate information. Distribute information on bill payment assistant, payment plans, budget plans, et cetera, and the application process for these programs in partnership with the following groups: the City of Detroit Department of Neighborhood district managers, senior centers, clergy, customer advocacy groups. Also, we're going to continue with nonresidential account collections at accounts previously shut off. Through the methods described and the actions above, we will identify addresses where residential properties are occupied and are out of service. For any customer legally occupying a property who identifies an affordability issue with their water bill, we will hold their shutoff in abey while we work through qualifications for assistance, establish a payment plan, or other near-term solutions to keeping them in service. Pursue -- we will continue to pursue illegal turn-ons, place all identified unoccupied properties in inactive status.

This is just an overview of DWSD -- what DWSD has in store for the next month. Communications with customers will take center stage in coming weeks as -- in the coming weeks as we help to get customers current in their billing and keep

their water service on. DWSD is committed to providing the best service it can to all its customers, and we look forward to doing just that. Thank you.

MR. KILPATRICK: Your Honor, it is our sincere hope that this addresses all of the concerns that the Court voiced last week. Do you have any questions for us?

THE COURT: No. No questions. Let me just take this opportunity to thank you. Obviously you, Mr. Latimer, and your staff and your department put a lot of thought and effort into this presentation and into the plan that it represents, and so I want to express my thanks and appreciation to you for that. It is not this Court's role or function certainly at this point in time to rule on or even further address the adequacy of this. I can only say that it does address the concerns that I raised last week. Anyone else want to be heard regarding this?

MS. JENNINGS: Yes, your Honor. Good morning, your Honor. I am Alice Jennings. I am appearing today. We just this morning filed a claim before this Court, a class action for the citizens for residential water usage and sewage usage.

THE COURT: Ma'am, I want to interrupt to be --

MS. JENNINGS: Yes.

THE COURT: -- sure you understand today is not a status conference on that adversary proceeding nor really for

any proceedings relating to that adversary proceeding. I appreciate your letting me know that it was filed --

MS. JENNINGS: Yes.

THE COURT: -- although I did see it.

MS. JENNINGS: Okay. Very well.

THE COURT: And I read it.

MS. JENNINGS: And, your Honor, if I may, I would like to just address the Court for a moment about -- and I understand and appreciate what Mr. Latimer said, but there are dozens of citizens, in fact hundreds across the City of Detroit today who have had their water shut off. There are two families that I know of --

THE COURT: Okay.

MS. JENNINGS: -- with children --

THE COURT: Okay. But there's nothing for me to do about that today.

MS. JENNINGS: Okay. Well, your Honor, I'm sure that we will follow the procedure established, and we will open up discussions with Mr. Latimer insofar as we can. Is there --

THE COURT: That's a really good idea. One second. Mr. Kilpatrick, I would encourage you on behalf of the department to work with Ms. Jennings and -- did I get your name correctly --

MS. JENNINGS: Alice Jennings, your Honor.

THE COURT: -- Jennings and the other attorneys and groups that are interested in this on a continuing and ongoing basis to solve this problem. This is a solvable problem, as I said last time, and I think that with the creativity of everyone involved, it can be solved.

MS. JENNINGS: Yes. And we're not looking for litigation. We're looking for solutions, your Honor.

THE COURT: Absolutely.

MS. JENNINGS: Thank you.

THE COURT: We've got people without water, and they need their water.

MS. JENNINGS: Yes.

MS. MOSS: Judge, I'm Kary Moss. I'm the director of the ACLU of Michigan, and I just wanted to bring to your attention that we also filed this morning with you a letter that we wrote in partnership with the NAACP Legal Defense Fund. Particularly we're concerned not just simply about how the department is communicating with Detroit residents but with actually the processes that they have in place and the adequacy of the system, so we also look forward to these conversations.

THE COURT: Thank you. Thank you, ma'am.

MS. MOSS: Would you like a copy of this?

THE COURT: I actually saw it already.

MS. MOSS: Okay. Thank you.

THE COURT: Yes.

MR. GOLDBERG: Your Honor, if I just may add very briefly, I just want to say to the Court that I give a lot of credit to the Court for at least bringing this process based on a grass roots objector, Ms. Hamel, bringing this in front of the Court, and that it's -- and that it put at least a temporary stop to this process and allows for time to get this done. It's unfortunate this wasn't done before, but I do think the Court deserves a lot of credit, and that's what -- and we've been meeting with representatives and will follow the procedures of this Court to --

THE COURT: Oh, you have been. Good.

MR. GOLDBERG: -- ensure the negotiation but want to thank the Court for its intervention.

DR. JONES: Your Honor, my name is Dr. Patricia Jones, and we've also filed last night a permissive petition for intervention on behalf of faith institutions.

THE COURT: I saw that, and I saw the motion for an expedited hearing, and I will be addressing that very shortly.

DR. JONES: Thank you, sir.

THE COURT: Tell me who you're on behalf of again.

DR. JONES: Unitarian Universalist Service Committee, Michigan Welfare Rights Organization. There are several petitioners.

THE COURT: Yeah.

MR. THORNBLADH: Your Honor, Dr. Jones has great credentials, and I helped them put this motion together, so --

THE COURT: I saw that.

MR. THORNBLADH -- I thought I would address it in case you had a question.

THE COURT: Yeah. I will address the motion for an expedited hearing very shortly. Ms. Jennings, Mr. Goldberg, Mr. Thornbladh, and Mr. Kilpatrick, let me see you at the side of the bench for a moment, please.

MR. THORNBLADH: Certainly.

(Conference at side bar)

MR. KILPATRICK: Thank you, your Honor.

MR. THORNBLADH: Thank you, your Honor.

THE COURT: You're welcome. You're welcome. Okay. I want to turn attention now to my feasibility expert's report and just to get a statement on the record if it's appropriate that everyone who was entitled to it got it.

MS. LENNOX: It was served on Friday night, your Honor.

THE COURT: Okay. And who was it served on in a sort of general way?

MS. LENNOX: I believe it was -- well, we utilized KCC, so they served through normal channels, e-mail channels.

Unless the Court restricted --

THE COURT: Okay. Perhaps it would be appropriate to ask them to file a declaration of service.

MS. LENNOX: Certainly, your Honor. We can do that.

THE COURT: And then that'll take care of that.

MS. LENNOX: We'll do that.

THE COURT: Okay. While you're still there, let's talk about the ASF interest rate disclosure, and I did read what Ms. Neville filed regarding that.

MS. LENNOX: Um-hmm. So I'll add just a little bit to that because I thought that was a very helpful piece, your Honor. First, I want to make clear that this is only applicable to those who have previously taken ASF distributions in lump sum, and that's not everyone. When someone takes an ASF distribution, they're offered the choice of taking it in lump sum or receiving an amount as an annuity, so the participants who have taken ASF are already familiar with the concept of annuitization, and we have confirmed with the General Retirement System that the interest factor that they used when annuitizing that is the 7.9-percent interest factor that the GRS uses, so, in fact, the plan is using a lower interest factor.

In fact, to remind participants, we disclosed that they had this option at the top of page 24 of the amended disclosure statement, which says, and I quote, "Upon

retirement, an employee may elect to receive a lump sum distribution, or to annuitize some or all of his ASF account balance, which is added to his or her monthly pension payment and is separately identified on a retiree's pension check. Any portion of the ASF balance that is not annuitized upon retirement is paid to the retiree in a partial or total lump sum distribution at the retiree's request." So when a person retires and receives a distribution from ASF, they are made aware of the annuitization option and the interest rate that goes along with it. So throughout the plan of adjustment and the disclosure statement as well as in the plain language notice that accompanied the original ballots, we used the language -- the same language in all places when we discussed the annuitization of the recoupment, and we said, quote, "That amount will then be converted into monthly annuity amounts based on your life expectancy and other factors." That language appears at page 34 in the plan, page 25 of the disclosure statement, and pages 18 to 19 of the plain language statement.

THE COURT: I've been asked to ask you to speak louder.

MS. LENNOX: Oh, sure. In the plain language statement, again, we also gave an example, number one, that explained how this would work, so there was an example provided as well. In addition, when we had the issue

where -- that caused us to provide replacement ballots, there was a stipulation that was filed by the Retiree Committee and the city on June 4th, and specifically on page 9 of that stipulation the 6.75 interest rate was disclosed in a publicly filed document. It was also included to the retirees who received the replacement ballots on page 2 of the letter. It was clearly disclosed there.

In addition, on June 5th, the General Retirement Systems made a presentation available to all persons who could attend the session, and in that presentation, which I have a copy of if your Honor wants to see it, they did talk about the 6.75-percent interest rate for the annuitization. That presentation was immediately placed on their website, and it remains there today.

In addition, on each person's specific ballot we disclosed to them the total amount of the recoupment and the monthly amount that would be deducted from the check, so persons were not left to wonder how this would affect their check going forward.

So we believe that we have given sufficient disclosure of this, particularly with the way the ASF worked in the past with annuitization and an interest rate component, so between that -- the disclosures that I've identified and the additional disclosures that the Retiree Committee made that Ms. Neville identified, I believe that we

have sufficient disclosure of this item.

THE COURT: Ms. Neville, is there anything you would like to add?

MS. NEVILLE: Yes, your Honor. Carole Neville on behalf of the Retiree Committee. We filed a report last night to respond to your Honor's inquiry about this matter. I agree with everything that Ms. Lennox said about disclosure, but that stipulation was only filed on the docket and only served on a comparatively small group of people. In addition, not everybody attended the retiree town halls, so although it was disclosed and we made every effort to disclose it as soon as we discovered the 6.75-percent interest rate, it was never disclosed in any official document that the retirees received. And, in fact, even if you looked at the monthly annuity on each ballot, people would assume, as many did, that once they had finished paying the amount, their time -- their pension deductions would be over. So, your Honor, I don't have a solution for the problem, but I don't think that there was disclosure of the 6.75 percent, adequate disclosure of it, at any point until just recently when the retirees obviously know about it since many have filed objections to it.

THE COURT: Well, the issue of adequate disclosure of the interest rate is a different issue from whether there was adequate disclosure of how long people would be required

to pay. You can't mix those up; right?

MS. NEVILLE: No, your Honor, you cannot, but both issues are connected, although it does say in the description of the annuity that it's based on your lifetime expectancy. Now, I don't know how much a retiree would understand about that, but the 6.75 percent increases the amount of the payment dramatically.

THE COURT: But that increase -- that increased amount is disclosed?

MS. NEVILLE: No, it is not. What is --

THE COURT: I thought each individual retiree was told how much their monthly recoupment amount would be.

MS. NEVILLE: What the ballot does is it has your current pension, the total ASF reduction, and then a monthly amount. And if you divide the monthly amount into the assumption to the total amount, you would get ten years, say, but your actuarial life might be twenty-five years, and you have no way of knowing what the interest component of the monthly annuity amount is.

THE COURT: Right, but that monthly amount that's disclosed includes interest. In other words, interest isn't added to that.

MS. NEVILLE: No, no. It does include interest, yes.

THE COURT: What's not disclosed is how much of that

amount is interest and how --

MS. NEVILLE: Correct.

THE COURT: -- much of it is --

MS. NEVILLE: That's correct.

THE COURT: -- the base --

MS. NEVILLE: That's correct.

THE COURT: -- the base obligation.

MS. NEVILLE: That's correct. So when people voted -- and the letter that did go out that does explain it went out to the population whose ballots were affected by taking off the 2000 to 2003 period and not to the larger population and not to the people who don't have ASF recoupment who might have considered that in their vote as well.

THE COURT: But you're not requesting any relief as a result of this at this point in time?

MS. NEVILLE: No, your Honor, we're not. I would like to continue to speak to Ms. Lennox about how to deal with this. Your Honor has a number of individual objections that were filed after the date that your Honor picked the individuals to --

THE COURT: Right.

MS. NEVILLE: And I'm not sure what you intend to do with those new objections that were filed, which focus much more on issues that came up later in the solicitation

procedure, so I think we can continue to try and figure out a solution to this problem.

THE COURT: Well, all right. It's nothing to rule on today. The only thing I can say is that if you seek relief based on your position that there was an inadequate disclosure, you can file a motion, and, likewise, the city can file a motion to obtain a court ruling that the disclosure was adequate under the Bankruptcy Code, and then we'll deal with it --

MS. NEVILLE: I realize that, your Honor.

THE COURT: -- legally in due course.

MS. NEVILLE: Yes.

THE COURT: All right.

MS. NEVILLE: Thank you.

THE COURT: Regarding the Department of Transportation protections, I didn't really intend to have a further discussion with you about it before our confirmation hearing. I just suggested that I thought that was something that should be addressed at the confirmation hearing --

MS. LENNOX: That's what I understood, your Honor.

THE COURT: -- probably by means of legal briefs.

MS. NEVILLE: Your Honor, that is another objection. It's not a committee objection, but that is an objection that has been raised by a number of retirees, individual retirees.

THE COURT: Right, yes. So I thought the city

should address it since it was -- didn't appear in any of its responses to anything that was filed.

MS. LENNOX: Thank you, your Honor. That's how we understood your directive, and we do intend to brief that for your Honor.

THE COURT: Yeah. Okay. All right. So let's talk about Syncora's motion to adjourn and the length of the trial in a conversation here. The reason why I want to bring up the issue of the length of the trial is because in my last order I think I did say that if parties settled in the meantime, that might be cause to reduce the hours that each side was allotted for the trial, and in the meantime the LTGO's, who appear to have been allocated approximately 13 hours, and the DPOA, who had shared with the DFFA four hours, have settled, and, of course, if we reduce time on the creditors' side on that account, whatever time we do decide to reduce, we should also reduce the city's time correspondingly, so I invite any thoughts on this question from people who are here.

MS. LENNOX: Thank you, your Honor. I think, first of all, DPOA has partially settled. Remember, we do have to reach a collective bargaining agreement with them by the end of the month. If not, their objections spring back into life. So I think we should put that --

THE COURT: Yes. Thank you for reminding me of

that.

MS. LENNOX: -- we should put that one in abeyance for now. I am -- given the fact that my litigation partners have been handling the details of hours for trial, I am not as familiar with that as I would perhaps like to be at this particular moment, but the LTGO's were largely represented by Ambac as an insurer. Ambac is also an insurer in the DWSD group of insurers, so I am unfamiliar if the time was allotted to Ambac or to the LTGO issues. If they were allotted to the LTGO issues, I do think we would need a little bit of time to present 9019 information with respect to the settlement, but obviously I don't think that would take 13 hours, your Honor.

MR. BENNETT: Good morning, Judge. Ryan Bennett on behalf of Syncora. From Syncora's perspective, Judge, the amount of time that we need as to the trial hasn't changed. You know, in terms of shortening it, you know, discovery is ongoing right now, and discovery will, you know, dictate from our vantage how much time we actually need and if we --

THE COURT: Yeah. I wasn't proposing reducing your time.

MR. BENNETT: Right. I just wanted to make that point clear. In terms of, you know, we may actually require -- you know, depending on where the LTGO settlement settles and what the details are, we're going to have to

address that in the context of our presentation, and that's, quite frankly, one of the subjects of our motion, which we didn't notice up for today, but we certainly want a dialogue with your Honor about it. You know, that's, for example, as we talked about last week, a scenario where another --

THE COURT: Well, you know, both of you raise an interesting point. We don't really need a resolution of the issue of the length of the trial today. We can just say it's out there, and it's something that has to be addressed probably sooner than later but not necessarily today.

MR. BENNETT: I think that's right, your Honor.

THE COURT: Let me ask, Ms. Lennox, are you prepared to deal with Syncora's motion to adjourn today, or would you prefer another date for that?

MS. LENNOX: I can deal with that today if that's what your Honor wishes.

THE COURT: All right. Are you prepared, sir?

MR. BENNETT: I am, sir, yeah. So, as I noted, at the last pretrial conference we had a conversation with your Honor about some concerns we had with respect to the incomplete nature of the plan and some of the detail that underlied what we understand from the various media reports, you know, are settlements that the city has reached or -- for example, that's with the LTGO and then with respect to the stuff that's in the plan, the fact that it's all qualified by

definitive documentation that we've yet to see, that relates to the UTGO, which we have a pending objection on its legality, as well as the DIA grand bargain, which is the cornerstone of the entire plan. We've yet to receive these documents. We were told at the last pretrial conference there was going to be an amended plan filed on Friday. There was a stipulation, I think, filed with the Retiree Committee last week.

THE COURT: Well, hang on. What Ms. Lennox said was that she hoped to file one by Friday.

MR. BENNETT: Understood, your Honor. And I think the stipulation filed last --

THE COURT: Wasn't a commitment and certainly wasn't an order.

MR. BENNETT: Yeah. Agree. And then we saw something in the stipulation with the Retiree Committee last week that said that a plan would be perhaps hopefully forthcoming on Saturday. That wasn't -- -- that didn't happen either. And in any case, you know, our motion is really focused on the fact that, you know, under 1128(b), as a party in interest, we've got a right to object to the plan, and -- but right now we don't know what that plan is still. It's very similar to when you and I sat here and talked about the disclosure statement. We were talking about inadequate versus incomplete. You know, here we've got an incomplete

plan that we're entitled to object to as a party in interest, and until that plan is complete, we cannot adequately put together our objection and put together the prep for that objection. I'll give you an example. Tomorrow Steve Hackney is going to be interviewing -- or deposing Mr. Orr. We'd like to focus some of that deposition on what went into the LTGO settlement, the specific terms of that settlement, how it was reached, what the city considered in the context of whatever trades and terms are part of that agreement, but we can't do that because we don't have that agreement. We don't know the terms. We know some economics, but we don't know if it includes specific provisions, for example, maybe a most favored nations clause that says that if the COPs get a certain treatment above the LTGO's, the LTGO's rise with it. Well, we'd like to know that kind of information. We don't right now, yet the trial schedule still goes forward, and so we believe that an adjournment would be appropriate so the city could finally catch up, file a complete document, and then the trial schedule could map on, and we could all proceed efficiently. All right. Thank you.

THE COURT: Thank you, sir.

MS. LENNOX: Thank you, your Honor. I suppose I'll use this also to give your Honor an update on where we are with the plan filing, some of which we put in our papers that we filed last night. What Mr. Bennett seems to be really

focused on is the UTGO and the LTGO settlements. I don't think he disputes -- I don't think he disputes that a term sheet for the UTGO settlement was attached to the plan, and a very detailed term sheet for the DIA settlement was attached to the plan.

We have finally last week reached agreement on the final terms of the actual settlement documentation for UTGO's, so we expect to file that when we file the plan this week, and we will file the plan this week. We are working on, as I indicated on LTGO, some last-minute mechanical issues, and they have to be worked out among the parties. The parties are in dialogue about that, and I fully expect them to be worked out this week, so that would be included in the plan as well. Given the fact that Syncora understands the actual terms of the DIA settlement and the UTGO settlement because they were in the plan that's been filed for two months and they understand the economics of the LTGO settlement because it was in the expert reports, and, in fact, Mr. Hackney confirmed them in an e-mail to me last week, which we've attached to our papers, I fail to see how Syncora says that they're prejudiced enough to warrant a six-week delay of the confirmation hearing. So certainly if plans are filed and if details occur that people weren't expecting, I'm confident we're going to hear objections about it, but they can't claim objections for not knowing the

material terms of the deals because those have been disclosed. So I think, your Honor -- and we laid most of this out in our papers, so I'm not going to belabor it, but we don't think that there's any prejudice to Syncora. We don't think there's any reason for delay, and, in fact, if there is a delay, particularly one of this length, that would prejudice not only the city and its residents but the other creditors who are participants in this case as well.

THE COURT: Thank you. Mr. Bennett, anything further?

MR. BENNETT: I have nothing further, your Honor.

THE COURT: All right. I'm going to take this under advisement and issue an order on it in the next day or so.

MR. BENNETT: Thank you, sir.

MR. LEMKE: Your Honor, David Lemke again on behalf of the trustee for the water and sewer bonds. I appreciate you allowing me to add something to the agenda. What we're asking about here is for your Honor to reconsider a prior ruling that you made with respect to the responses that the city has received to the RFI's on the public-private partnership on the water-sewer system.

THE COURT: Let me ask you to pause here and ask if you gave the city any notice of your intent to raise this here today.

MR. LEMKE: We did, your Honor. My partner, Paul

Davidson, had conversations last week with some of Ms. Lennox's partners, and I have an e-mail here exchange. To my knowledge, the city is not willing to produce them at this point, but, yes, we did try to get this resolved, so --

THE COURT: Okay.

MR. LEMKE: So, your Honor, just to kind of refresh everybody's memory on this, one of the reasons we had asked for these responses is we do believe that they will be very telling and insightful for both our consulting expert, who may be a testifying expert on the water and sewer system, particularly as it relates to the city's projections -- financial projections for the water-sewer systems, and --

THE COURT: Why is that?

MR. LEMKE: Well, because these system -- or I'm sorry -- these parties that responded to the RFI will have taken into account and they will have identified potential places for revenue enhancements, for cost savings, for capital expenditure needs, and that will have been baked in, if you will, to their response to the RFI. And so that information will be very helpful to basically test the adequacy of the city's projections with respect to those exact same items and will be beneficial certainly to our expert, who tells us that this would be one of the more valuable pieces of information he could look at or some of the more valuable information he could look at, and it may be

equally as valuable then to the Court to the extent it becomes relevant and is admissible as part of his overall expert testimony, so that is the reason we need it. It will have this additional information that should shed important light on the underlying issues regarding, in essence, the feasibility of that aspect of the city's plan with respect to the DWSD.

THE COURT: All right. Ms. Lennox, are you prepared to deal with this today?

MS. LENNOX: Yes, your Honor, I think I can. We still object to producing these documents. As your Honor indicated when we had this colloquy in May, that trying to produce documents which aren't done in the middle of a process can only -- to the creditors can only chill the process. This process probably hasn't moved as fast as anybody would have thought it would have given the fact that there is an interrelationship between this and what is currently being discussed in the DWSD mediation, and obviously I can't get into the specifics of that here, but suffice it to say that this process is not yet completed. We did inform counsel for the trustee that this process was not yet completed, and, therefore, we didn't think it advisable to produce anything related to something that is still up in the air.

As to the reason that the trustee has given that his

expert wants to see it, I don't think this will hinder their expert from providing a report because remember what they're opining on is the plan in front of your Honor today. What it sounds like they want here is what some other party thinks that cost savings might be on a wholly different structure that exists for DWSD than the one that is currently in the plan, and that, your Honor, is speculation, so we don't think it is relevant, and we don't think it's appropriate to produce these documents again in the middle of the process for the reasons we stated on the record in May.

MR. LEMKE: Your Honor, I guess I'll address the relevance issue first, and I suppose that is an issue that if we were to have access to this information, you would ultimately have to decide if it became a part of our expert's considerations and how it affected the opinion as to whether or not it is relevant and whether or not it should be properly considered, but I can tell you that our consultant is telling us that it will provide relevant information to his opinion. It may not be the determining information, but it will certainly be something that he, as an expert in this area, feels like he can and should rely on and that somebody in his position who's being asked to provide this sort of expert testimony regarding the operations of the system and the finances of the system would rely on.

Now, in terms of whether or not it's appropriate at

this time to provide it, it is helpful to have heard what Ms. Lennox said. I was relying -- and I think we were relying primarily on the statements back in May that all of these bids would be in by the end of June and that the real concern appeared to be to let some of this information out, some of the responses out prior to all the bids coming in, and we had assumed that, in fact, all the bids had been received. They may not have been selected yet, but that, in essence, the information that is going to be provided or that was going to be provided by each of the responding parties has been provided and that that would no longer at this point then chill the process at all if we had access to it. We certainly are more than willing to enter into a protective order -- an appropriate protective order to make sure that the information is used solely for the purpose of allowing our expert to review it and see how it informs his opinion. And to the extent any of that information then would have to find its way into the report or find its way into the record, the protective order would have to address that as well perhaps requiring some of the report to be filed under seal and perhaps some of the testimony to be somehow under seal, but we are certainly willing to work with that to make sure the city does not get prejudiced, but we do feel the need to have access to this information, your Honor. Thank you.

THE COURT: All right. Excuse me. In resolving

this matter, as before, the Court concludes it's appropriate to weigh and balance the need of the city to maintain strict confidentiality of the information that's requested with the needs of the creditors who request this. In weighing and balancing those again here today, the Court does not come to any different conclusion than it did the last time, and, accordingly, the Court concludes that the record fails to establish cause for reconsideration here. The Court accepts and understands why the city believes that maintaining strict confidentiality of this information is important to its longer-term objective of restructuring the department to the extent that it continues to have that objective. On the other hand, the need of the creditors to have this information doesn't appear to be that strong. It appears to the Court that the creditors and their experts can do their work without this information, so the request is denied, but it is denied without prejudice because circumstances may change and may warrant a different result at a later time.

Okay. Next I was hoping to have a conversation with the people involved in the site visit. Is everyone here who's involved in that? Is Mr. Hertzberg available?

MR. LEMKE: Your Honor, may I be excused? I am not involved in this.

THE COURT: Yes, yes. Everyone who's not involved in the site visit is excused, and, in fact, we're going to

close the courtroom if we're actually going to proceed with this conference. Ms. Lennox, I know I didn't give notice of this, and I'm sure that's why Mr. Hertzberg is not here. Should we choose another date to do this?

MS. LENNOX: That might be wise, your Honor. We had -- when we heard your Honor's agenda, we went out and tried to contract Mr. Hertzberg, and we've e-mailed and called, and we haven't gotten a response back yet, so --

THE COURT: Okay.

MS. LENNOX: -- we haven't heard. And Mr. Shumaker, who's the other person who knows, has a deposition today.

THE COURT: Yeah. All right. Well, then I think it would be appropriate to take this off of the agenda, and we'll find another time for it hopefully in the next few days, perhaps even by telephone.

MS. LENNOX: Thank you, your Honor.

THE COURT: All right. So that's all I had on my agenda. I will think about whether it's appropriate to schedule another status conference before trial commences, but that may depend on what I decide to do with the trial itself.

MS. LENNOX: Thank you, your Honor.

THE COURT: Does anyone else have anything they want to bring up in the meantime? Okay. We're done.

THE CLERK: All rise. Court is adjourned.

(Proceedings concluded at 11:05 a.m.)

- - -

INDEX

WITNESSES:

None

EXHIBITS:

None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    July 23, 2014

Lois Garrett