# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
:

In re                         :          Chapter 9
:

CITY OF DETROIT, MICHIGAN,    :          Case No. 13-53846
:

               Debtor.    :          Hon. Steven W. Rhodes
:
:
:

------------------------------------------------------x

# NOTICE OF FILING OF REDLINED
# VERSION OF CORRECTED FIFTH AMENDED
# PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

## PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On May 5, 2014, the City of Detroit (the "City") filed the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (the "Fourth Amended Plan").

2.      Solicitation of votes to accept or reject the Fourth Amended Plan was completed on May 12, 2014, and the deadline for such voting was July 11, 2014.  On July 21, 2014, the City filed the Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes on, And the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6179).

3.      On July 25, 2014, the City filed the Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6257) (the "<u>Fifth Amended Plan</u>").

4.      Contemporaneously herewith, the City has filed the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (the "<u>Corrected Fifth Amended Plan</u>").

5.      Attached hereto as <u>Exhibit A</u> is a redline of the Fifth Amended Plan against the Corrected Fifth Amended Plan.  Attached hereto as <u>Exhibit B</u> is a redline of the Fourth Amended Plan against the Corrected Fifth Amended Plan.

6.      Pursuant to section 942 of the Bankruptcy Code, the City "may modify the [P]lan at any time before confirmation," and "after the [City] files a modification, the [P]lan as modified becomes the [P]lan."  11 U.S.C. § 942.  At the Confirmation Hearing, the City will seek a ruling that the amendments to the Fourth Amended Plan, as reflected in the Corrected Fifth Amended Plan, do not adversely affect any Holder of any Claim such that no re-solicitation of votes is required as a result of such amendments.

Dated: July 29, 2014

Respectfully submitted,

/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------ x
                                        :
In re                                   :     Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :     Case No. 13-53846
                                        :
                Debtor.                 :     Hon. Steven W. Rhodes
                                        :
                                        :
------------------------------------------------------------ x
```

**CORRECTED FIFTH AMENDED PLAN**
~~FIFTH AMENDED PLAN~~ FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
**(July ~~25~~29, 2014)**

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
  PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND
    COMPUTATION OF TIME .......................................................................... 1

    A.    Defined Terms. ................................................................................. 1

    B.    Rules of Interpretation and Computation of Time. ........................ 26

        1.    Rules of Interpretation. ...................................................... 26

        2.    Computation of Time. ......................................................... 26

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN; EXECUTORY
    CONTRACTS AND UNEXPIRED LEASES ....................................... 27

    A.    Unclassified Claims. ...................................................................... 27

        1.    Payment of Administrative Claims. ................................... 27

        2.    Bar Dates for Administrative Claims. ................................ 27

    B.    Classified Claims. .......................................................................... 28

        1.    Designation of Classes. ...................................................... 28

        2.    Subordination; Reservation of Rights to Reclassify Claims. ... 29

        3.    Treatment of Claims. ......................................................... 29

    C.    Confirmation Without Acceptance by All Impaired Classes. ........ 41

    D.    Treatment of Executory Contracts and Unexpired Leases. ............ 41

        1.    Assumption. ........................................................................ 41

        2.    Assumption of Ancillary Agreements. ............................... 41

        3.    Approval of Assumptions and Assignments. ...................... 41

        4.    Payments Related to the Assumption of Executory Contracts and
            Unexpired Leases. .............................................................. 42

        5.    Contracts and Leases Entered Into After the Petition Date. ... 42

        6.    Rejection of Executory Contracts and Unexpired Leases. ... 42

        7.    Rejection Damages Bar Date. ............................................. 42

        8.    Preexisting Obligations to the City Under Rejected Executory
            Contracts and Unexpired Leases. ....................................... 42

        9.    Insurance Policies. ............................................................. 43

ARTICLE III CONFIRMATION OF THE PLAN ......................................... 43

    A.    Conditions Precedent to the Effective Date. .................................. 43

    B.    Waiver of Conditions to the Effective Date. .................................. 44

C.     Effect of Nonoccurrence of Conditions to the Effective Date. ......... 44

D.     Effect of Confirmation of the Plan. ......... 44

    1.     Dissolution of Retiree Committee. ......... 44

    2.     Preservation of Rights of Action by the City. ......... 44

    3.     Comprehensive Settlement of Claims and Controversies. ......... 44

    4.     Discharge of Claims. ......... 45

    5.     Injunction. ......... 45

    6.     Exculpation. ......... 46

    7.     Releases ......... 47

E.     No Diminution of State Power ......... 48

F.     Effectiveness of the Plan. ......... 48

G.     Binding Effect of Plan. ......... 48

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ......... ~~48~~49

A.     DWSD. ......... ~~48~~49

    1.     Rates and Revenues. ......... ~~48~~49

    2.     DWSD CBAs. ......... 49

    3.     The New DWSD Bonds and New Existing Rate DWSD Bonds. ......... 49

B.     The New B Notes and New LTGO Bonds. ......... 49

C.     The UTGO Settlement. ......... 49

D.     The State Contribution Agreement. ......... ~~49~~50

    1.     State Contribution. ......... 50

    2.     Income Stabilization Payments. ......... 50

    3.     Conditions to State's Participation. ......... 50

    4.     Release of Claims Against the State and State Related Entities. ......... 51

E.     The DIA Settlement. ......... 51

    1.     Funding Contributions. ......... 51

    2.     Transfer of DIA Assets. ......... 51

    3.     Conditions to the DIA Funding Parties' Participation. ......... ~~51~~52

F.     Contingent Payment Rights ......... 52

    1.     Special Restoration ......... 52

    2.     General Restoration ......... ~~52~~53

G.     The OPEB Settlement. ......... 53

| | | | |
|---|---|---|---|
| H. | The LTGO Settlement. | | 53 |
| I. | Prosecution of COP Litigation. | | 53 |
| | 1. | Creation of Litigation Trust. | 53 |
| | 2. | Direction of COP Litigation. | 53 |
| | 3. | Payment of Fees and Expenses. | ~~53~~54 |
| | 4. | Settlement of COP Litigation. | 54 |
| J. | Issuance of the New Securities. | | 54 |
| K. | Cancellation of Existing Bonds and Bond Documents. | | ~~54~~55 |
| L. | Release of Liens. | | 55 |
| M. | Professional Fees | | 55 |
| | 1. | Professional Fee Reserve | 55 |
| | 2. | Fee Review Order | ~~55~~56 |
| | 3. | Dismissal of the Fee Examiner | ~~55~~56 |
| | 4. | Court-Appointed Expert | 56 |
| N. | Assumption of Indemnification Obligations. | | 56 |
| O. | Incorporation of Retiree Health Care Settlement Agreement. | | 56 |
| P. | Payment of Workers' Compensation Claims. | | 56 |
| Q. | 36th District Court Settlement. | | ~~56~~57 |
| R. | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | | ~~56~~57 |
| S. | Payment of Tax Refund Claims. | | 57 |
| T. | Utility Deposits. | | 57 |
| U. | Pass-Through Obligations. | | 57 |
| V. | Exit Facility. | | ~~57~~58 |
| W. | Post-Effective Date Governance. | | ~~57~~58 |
| ~~X.~~ | ~~Post-Effective Date Reporting.~~ | | ~~58~~ |
| | ~~1.~~ | ~~Appointment of Plan Monitor.~~ | ~~58~~ |
| | ~~2.~~ | ~~Qualifications of Plan Monitor.~~ | ~~58~~ |
| | ~~3.~~ | ~~Roles; Post-Effective Date Reporting.~~ | ~~58~~ |
| | ~~4.~~ | ~~Powers of Plan Monitor.~~ | ~~59~~ |
| | ~~5.~~ | ~~Powers of the Bankruptcy Court.~~ | ~~59~~ |
| | ~~6.~~ | ~~Officer of the Bankruptcy Court; Immunity.~~ | ~~60~~ |
| | ~~7.~~ | ~~Confidentiality.~~ | ~~60~~ |

8.    Payment of the Plan Monitor.                                          60

9.    Replacement Plan Monitor.                                             60

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN
      6158

A.    Appointment of Disbursing Agent.                                     6158

B.    Distributions on Account of Allowed Claims.                         6158

C.    Certain Claims to Be Expunged.                                       6158

D.    Record Date for Distributions; Exception for Bond Claims.           6158

E.    Means of Cash Payments.                                             6259

F.    Selection of Distribution Dates for Allowed Claims.                 6259

G.    Limitations on Amounts to Be Distributed to Holders of Allowed Claims
      Otherwise Insured.                                                  6259

H.    City's Rights of Setoff Preserved.                                  6259

I.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.
      6260

      1.    Delivery of Distributions Generally.                          6260

      2.    Delivery of Distributions on Account of Bond Claims.          6260

      3.    De Minimis Distributions / No Fractional New Securities.      6360

      4.    Undeliverable or Unclaimed Distributions.                     6360

      5.    Time Bar to Cash Payment Rights.                              6360

J.    Other Provisions Applicable to Distributions in All Classes.       6361

      1.    No Postpetition Interest.                                     6361

      2.    Compliance with Tax Requirements.                            6461

      3.    Allocation of Distributions.                                  6461

      4.    Surrender of Instruments.                                     6461

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS                       6562

A.    Treatment of Disputed Claims.                                       6562

      1.    General.                                                      6562

      2.    ADR Procedures.                                               6562

      3.    Tort Claims.                                                  6562

B.    Disputed Claims Reserve.                                            6663

C.    Objections to Claims.                                               6663

      1.    Authority to Prosecute, Settle and Compromise.                6663

2.       Expungement or Adjustment of Claims Without Objection. ........ 6663

3.       Extension of Claims Objection Bar Date. ........ 6664

4.       Authority to Amend List of Creditors. ........ 6664

ARTICLE VII RETENTION OF JURISDICTION ........ 6764

ARTICLE VIII MISCELLANEOUS PROVISIONS ........ 6865

A.       Plan Supplements. ........ 6865

B.       Modification of the Plan. ........ 6865

C.       Revocation of the Plan. ........ 6865

D.       Severability of Plan Provisions. ........ 6866

E.       Effectuating Documents and Transactions. ........ 6966

F.       Successors and Assigns. ........ 6966

G.       Plan Controls. ........ 6966

H.       Notice of the Effective Date. ........ 6966

I.       Governing Law. ........ 6966

J.       Request for Waiver of Automatic Stay of Confirmation Order. ........ 6967

K.       Term of Existing Injunctions and Stays. ........ 7067

L.       Service of Documents ........ 7067

1.       The City ........ 7067

2.       The Retiree Committee ........ 7068

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.6 | Principal Terms of 36th District Court Settlement |
| Exhibit I.A.72 | Schedule of COP Swap Agreements |
| Exhibit I.A.89 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.93 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.102 | Principal Terms of DIA Settlement |
| Exhibit I.A.103 | Form of DIA Settlement Documents |
| Exhibit I.A.121 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.128 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.131 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.146 | Principal Terms of Exit Facility |
| Exhibit I.A.172 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.182 | Interest Rate Reset Chart |
| Exhibit I.A.187 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.198 | Form of LTGO Settlement Agreement |
| Exhibit I.A.206 | Principal Terms of New B Notes |
| Exhibit I.A.207 | Form of New B Notes Documents |
| Exhibit I.A.209 | Principal Terms of New DWSD Bonds |
| Exhibit I.A.211 | Principal Terms of New Existing Rate DWSD Bonds |
| Exhibit I.A.212.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.212.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.216.a | Form of New PFRS Active Pension Plan |
| Exhibit I.A.216.b | Principal Terms of New PFRS Active Pension Plan |
| Exhibit I.A.244 | Prior GRS Pension Plan |
| Exhibit I.A.245 | Prior PFRS Pension Plan |

| | |
|---|---|
| Exhibit I.A.255 | Restoration Trust Agreement |
| Exhibit I.A.261 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.270 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.294 | State Contribution Agreement |
| Exhibit I.A.310 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit I.A.317 | Form of UTGO Settlement Agreement |
| Exhibit II.B.3.q.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.q.ii.C | Terms of PFRS Pension Restoration |
| Exhibit II.B.3.r.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.r.ii.C | Terms of GRS Pension Restoration |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

# INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.**    **Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.    "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.    "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.    "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.    "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6.    "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.6.

7.  "Active Employee" means an active employee of the City on and after the Confirmation Date.

8.  "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

9.  "Adjusted Pension Amount" means the GRS Adjusted Pension Amount or the PFRS Adjusted Pension Amount, as applicable.

10.  "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

11.  "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

12.  "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

13.  "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

14.  "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

15.  "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

16.  "Ambac" means Ambac Assurance Corporation.

17.    "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

18.    "Annuity Savings Fund Excess Amount" means the following, as calculated by the GRS:  (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

19.    "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.167, plus the ASF Recoupment.

20.    "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

21.    "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

22.    "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

23.    "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

24.    "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

25.    "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

26.    "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

27.     "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

28.     "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

29.     "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

30.     "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

31.     "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

32.     "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.317.

33.     "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

34.     "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

35.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

36.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

37.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

38.     "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

39.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the

docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

40.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

41.     "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

42.     "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

43.     "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds or the Secured GO Bonds.

44.     "Bondholder" means any beneficial or record holder of a Bond.

45.     "Bond Insurance Policies" means those policies, surety policies or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

46.     "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

47.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

48.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

49.     "Cash" means legal tender of the United States of America and equivalents thereof.

50.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

51.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

52.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

53.     "City" means the City of Detroit, Michigan.

54.     "City Council" means the duly-elected City Council of the City.

55.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

56.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

57.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the latest of (a) 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

58.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

59.     "Class" means a class of Claims, as described in Section II.B.

60.     "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

61.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

62.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

63.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

64.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

65.     "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

66.     "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

67.     "COP Claim" means a Claim under or evidenced by the COP Service Contracts.  For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to:  (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP

Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

68.     "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

69.     "COP Litigation Counsel" means counsel to the Litigation Trust in the COP Litigation.

70.     "COP Service Contracts" means, collectively, the (a) GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

71.     "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

72.     "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.72, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

73.     "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

74.     "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

75.     "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

76.     "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

77.     "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

78.     "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

79.     "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on

March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

80. "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

81. "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

82. "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

83. "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

84. "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

85. "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

86. "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OPEB Claim.

87. "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

88. "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

89. "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.89.

90. "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

91. "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and

regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

92.　　"Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

93.　　"Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.93.

94.　　"DIA" means The Detroit Institute of Arts, a museum and cultural institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

95.　　"DIA Assets" means the "Museum Assets" as defined in the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102.

96.　　"DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

97.　　"DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments to contribute monies in furtherance of the DIA Settlement, solely in their capacity as participants in the DIA Settlement.

98.　　"DIA Funding Parties" means the Foundations, the DIA Funders and DIA Corp.

99.　　"DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

100.　　"DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

101.　　"DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

102.　　"DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.102.

103.　　"DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.103, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.102.

104.　　"Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

105.　　"Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and

approved by the Bankruptcy Court in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

106.    "Disclosure Statement Order" means the Order Approving the Proposed Disclosure Statement (Docket No. 4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

107.    "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

108.    "Disputed Claim" means any Claim that is not Allowed.

109.    "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.A.

110.    "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

111.    "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

112.    "Distribution Date" means any date on which a Distribution is made.

113.    "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

114.    "District Court" means the United States District Court for the Eastern District of Michigan.

115.    "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

116.    "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

117.    "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

118.    "DRCEA" means the Detroit Retired City Employees Association.

119.    "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

120.    "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

121.    "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.121, as the same may have

been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

122.    "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.121.

123.    "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

124.    "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

125.    "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

126.    "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

127.    "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

128.    "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.128, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

129.    "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.128.

130.    "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

131.    "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.131, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

132.    "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.131.

133.    "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

134.    "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

135.    "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

136.    "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

137.    "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

138.    "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

139.    "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

140.    "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

141.    "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

142.    "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

143.    "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties and (j) the UTGO Exculpated Parties.  For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

144.    "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

145.    "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed.  The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.  For the avoidance of

doubt, Exhibits I.A.103 and I.A.146 will be Filed only if the transactions related to or underlying such Exhibits are to be consummated by the City.

146. "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.146.

147. "Exit Facility Agent" means the agent under the Exit Facility.

148. "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

149. "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

150. "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

151. "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

152. "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

153. "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

154. "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, (b) those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan and (c) the Fee Examiner Parties. For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

155. "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

156. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

157. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

158. "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

159. "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

160. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

161. "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102.

162. "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

163. "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

164. "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

165. "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

166. "GRS" means the General Retirement System for the City of Detroit.

167. "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction

in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

168.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

169.    "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

170.    "Holder" means an Entity holding a Claim.

171.    "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

172.    "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.172, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

173.    "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.172.

174.    "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

175.    "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

176.    "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined

by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

177. "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

178. "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners. The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

179. "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the 36th District Court Settlement.

180. "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

181. "Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

182. "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.182.

183. "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

184. "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

185. "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

186. "Limited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

187. "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.187, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

188. "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.187.

189. "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

190. "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries or schedules may be amended, restated, supplemented or otherwise modified.

191. "Litigation Trust" means a trust to be established on the Effective Date to which the City will transfer all of its rights and interest in the COP Litigation.

192. "Litigation Trustee" means the trustee of the Litigation Trust, which shall be selected by the LTGO Insurer and the Retiree Committee and must be acceptable to the City.

193. "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

194. "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

195. "LTGO Independent Party" means an entity chosen by the Retiree Committee, the LTGO Insurer and the City to resolve certain disputes regarding the COP Litigation involving the City, VEBA Trust Representatives or the LTGO Insurer pursuant to the LTGO Settlement Agreement.

196. "LTGO Insurer" means Ambac, solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

197. "LTGO Litigation Parties" means, collectively, the LTGO Insurer, the VEBA Trust Representatives and the City.

198. "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.198.

199. "Macomb County" means the County of Macomb, Michigan.

200. "Mayor" means the duly-elected mayor of the City.

201. "MFA" means the Michigan Finance Authority.

202. "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the MFA in accordance with the UTGO Settlement Agreement and applicable law.

203.	"NPFG" means National Public Finance Guarantee Corporation.

204.	"Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

205.	"Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

206.	"New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.206.

207.	"New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.207.

208.	"New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New DWSD Bonds.

209.	"New DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.209.

210.	"New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds.

211.	"New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.211.

212.	"New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.212.a and the material terms of which are attached hereto as Exhibit I.A.212.b.

213.	"New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to

participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

214. "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

215. "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

216. "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.216.a and the material terms of which are set forth at Exhibit I.A.216.b.

217. "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final five or ten years of service, as set forth on Exhibit I.A.216.b, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

218. "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes, the New LTGO Bonds and the Municipal Obligation.

219. "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

220. "Oakland County" means the County of Oakland, Michigan.

221. "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

222. "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

223. "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

224. "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim

or a Subordinated Claim. For the avoidance of doubt, Section 1983 Claims and Indirect Employee Indemnity Claims are included within the definition of Other Unsecured Claim.

225. "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

226. "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

227. "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

228. "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

229. "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

230. "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development Authority, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

231. "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

232. "Petition Date" means July 18, 2013.

233. "PFRS" means the Police and Fire Retirement System for the City of Detroit.

234. "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b) If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement: (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded

liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

235. "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

236. "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

237. "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

238. "Plan Monitor" means the individual appointed under Section IV.X.1.[Paragraph intentionally left blank.]

239. "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.

240. "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement or Ordinance No. 05-09 of the City.

241. "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

242. "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

243. "Postpetition Financing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

244. "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.244.

245. "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.245.

246. "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a

particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

247. "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.M.1.

248. "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

249. "Quarterly Reports" means the quarterly reports of the Plan Monitor as described in Section IV.X.3.[Paragraph intentionally left blank.]

250. "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

251. "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

252. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

253. "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the DIA Funding Parties and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

254. "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

255.    "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.255.

256.    "Restructured UTGO Bonds" means the bonds to be issued by the MFA to the current Holders of Unlimited Tax General Obligation Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the MFA and shall be secured as more particularly described in the UTGO Settlement Agreement.

257.    "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

258.    "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

259.    "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

260.    "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

261.    "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.261.

262.    "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

263.    "Retirement Systems" means, collectively, the GRS and the PFRS.

264.    "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

265.    "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

266.    "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

267. "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

268. "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

269. "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

270. "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

271. "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

272. "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

273. "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

274. "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

275. "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

276. "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

277. "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

278. "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

279.    "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

280.    "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

281.    "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

282.    "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

283.    "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

284.    "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

285.    "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

286.    "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

287.    "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

288.    "Settled COP Claims" means those Disputed COP Claims with respect to which the City enters into a settlement prior to the Effective Date.

289.    "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.6.

290.    "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

291.    "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.F.

292.    "State" means the state of Michigan.

293.    "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.

294.    "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.294.

295.    "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

296.    "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

297.    "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

298.    "Subject COP Litigation Action" means any of the following actions, if proposed to be taken by the Litigation Trustee: (a) replacing the COP Litigation Counsel with new counsel to the Litigation Trust in the COP Litigation; (b) a determination not to appeal an adverse decision on any claim or defense related to the COP Litigation; or (c) the voluntary dismissal of a substantive claim or counterclaim in the COP Litigation or termination by any other means of the COP Litigation.

299.    "Subject COP Litigation Settlement" means any settlement with a Holder or Holders of COP Claims with respect to 40% or more of the face amount of COP Claims held by such Holder(s) that proposes to release a Pro Rata share of New B Notes (or equivalent currency) from the Disputed COP Claims Reserve to such Holder(s).

300.    "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

301.    "Swap Insurance Policies" means those policies or other instruments insuring the COP Swap Agreements and obligations related thereto.

302.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or

successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

303. "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of: (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

304. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

305. "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class. For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

306. "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

307. "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

308. "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

309. "Unlimited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

310. "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.310, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

311. "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.310.

312. "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

313. "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

314. "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

315. "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

316. "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

317. "UTGO Settlement Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.317.

318. "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

319. "VEBA Trust Representatives" means (a) the chair of the board of trustees of the Detroit General VEBA and (b) the chair of the board of trustees of the Detroit Police and Fire VEBA.

320. "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

321. "Wayne County" means the Charter County of Wayne, Michigan.

**B.    Rules of Interpretation and Computation of Time.**

**1.    Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

2.       **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II
## CLASSIFICATION OF CLAIMS; CRAMDOWN;
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.       **Unclassified Claims.**

1.       **Payment of Administrative Claims.**

a.       **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

b.       **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

2.       **Bar Dates for Administrative Claims.**

a.       **General Bar Date Provisions.**

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be

specifically fixed by a Final Order for objecting to such Administrative Claims. The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

### b. Ordinary Course Claims

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

### c. Claims Under the Postpetition Financing Agreement.

Holders of Administrative Claims that are Postpetition Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

### d. No Modification of Bar Date Order.

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## B. Classified Claims.

### 1. Designation of Classes.

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| *Secured Claims* | | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.121) | Unimpaired/Nonvoting or Impaired/Voting, as set forth on Exhibit I.A.121 |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.128) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.131) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |

13-53846-tjt    Doc 6381    Filed 07/29/14    Entered 07/29/14 17:24:45    Page 42 of 172

| Class | Name | Impairment |
|:---:|:---|:---|
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

       **2.**       **Subordination; Reservation of Rights to Reclassify Claims.**

       Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

       **3.**       **Treatment of Claims.**

       **a.**       **Class 1A – DWSD Bond Claims.**

       **i.**       **Classification and Allowance.**

       DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.121, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.121.

### ii. Treatment.

#### A. Unimpaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as Unimpaired on Exhibit I.A.121 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

#### B. Impaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as Impaired on Exhibit I.A.121 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

_Treatment Option for Classes that Accept the Plan_: Each Holder of an Allowed DWSD Bond Claim in an Impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

### b. Class 1B – DWSD Revolving Sewer Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.128, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.128.

#### ii. Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### c. Class 1C – DWSD Revolving Water Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.131, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.131.

ii.        **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

d.        **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

e.        **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

f.        **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

g.        **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h.        **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i.        **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

j.        **Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### k. Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### l. Class 5 – COP Swap Claims.

#### i. Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

#### ii. Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either: (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

### m. Class 6 – Parking Bond Claims.

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### n. Class 7 – Limited Tax General Obligation Bond Claims.

#### i. Allowance.

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,544,770.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, (X) a Pro Rata share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions from the Disputed COP Claims Reserve in accordance with Section II.B.3.p.iii.B.

### iii. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### o. Class 8 – Unlimited Tax General Obligation Bond Claims.

#### i. Allowance.

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement.  Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Stub UTGO Bonds, subject to Sections I.A.32 and IV.C, which Stub UTGO Bonds shall be reinstated.

### p. Class 9 – COP Claims.

#### i. Disputed.

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Litigation Trust.  If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

#### ii. Assignment.

Those COP Claims or portions thereof that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis on and as of the Effective Date, solely for purposes of facilitating Distributions under this Plan and for no other purpose.  Each beneficial holder shall be deemed to receive such COP Claims or portions thereof in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs.

#### iii. Treatment.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

A.    **Disputed COP Claims Reserve.**

On the Effective Date, the City shall establish the Disputed COP Claims Reserve.  The Disputed COP Claims Reserve shall contain:  (a) an Unsecured Pro Rata Share of New B Notes calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs other than those giving rise to the Settled COP Claims (or such other amount as may be required by an order of the Bankruptcy Court); and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.  In addition, in the event any Holder of a Disputed COP Claim enters into a settlement of such Claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and distributed from the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.B.

B.    **Distributions From The**
        **Disputed COP Claims Reserve.**

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes.  Upon the entry of a Final Order resolving any objection to any Disputed COP Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for:  (a) an amount of New B Notes or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed to the City, on the terms set forth in Section IV.I; and (b) following such distribution, the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (ii) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (iii) 15% to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14.

iv.    **Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

q.    **Class 10 – PFRS Pension Claims.**

i.    **Allowance.**

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

ii.     Treatment.

A.     Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

B.     Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

C.     Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

D.     Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

E.     Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

F.     Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### G.    No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### H.    State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r.    Class 11 – GRS Pension Claims.

#### i.    Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii.    Treatment.

##### A.    Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

### B.  Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

### C.  Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C.  For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement.  In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D.  Annuity Savings Fund Recoupment.

#### 1.  ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap.  In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2.  ASF Distribution Recipients.

##### i.  Monthly Deduction

For each ASF Distribution Recipient that does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated and converted into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, gender and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

##### ii.  Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient.  The ASF Election Form shall explain that the amount of the ASF Recoupment

Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I.    State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s.    Class 12 – OPEB Claims.

#### i.    Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii.    Treatment.

##### A.    Detroit General VEBA.

Establishment of Detroit General VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.89, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees.  With respect to the initial appointment of the board of trustees, the DRCEA and the Retiree Committee will each appoint two board members, and the City will appoint three board members.  The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the City will fill board member vacancies created by the departure of members initially appointed by the City.  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

##### B.    Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.  The Detroit Police and Fire VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.93, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees.  With respect to the initial appointment of the board of trustees, the RDPFFA

and the Retiree Committee will each appoint two board members, and the City will appoint three board members. The RDPFFA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the RDPFFA, and the City will fill board member vacancies created by the departure of members initially appointed by the City. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

    Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

### C. No Further Responsibility.

    From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

### t. Class 13 – Downtown Development Authority Claims.

#### i. Allowance.

    On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii. Treatment.

    Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### u. Class 14 – Other Unsecured Claims.

#### i. Treatment.

    Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### v. Class 15 – Convenience Claims.

#### i. Treatment.

    Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an

election by such Holder in accordance with Section I.A.65) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

### w.   Class 16 – Subordinated Claims.

#### i.   Treatment.

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

### x.   Class 17 – Indirect 36th District Court Claims.

#### i.   Treatment.

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive:  (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

#### ii.   Further Obligation of City, State and 36th District Court.

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims.  Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

## C.   Confirmation Without Acceptance by All Impaired Classes.

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

## D.   Treatment of Executory Contracts and Unexpired Leases.

### 1.   Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.

2. **Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

3. **Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph.  An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4. **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5. **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6. **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date or (b) the resolution of any objection to the proposed

rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

### 7. Rejection Damages Bar Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

### 8. Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.

Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

### 9. Insurance Policies.

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

## ARTICLE III
## CONFIRMATION OF THE PLAN

### A. Conditions Precedent to the Effective Date.

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2.      The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.      All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5.      All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the LTGO Settlement Agreement.

6.      Any legislation that must be passed by the State legislature to effect any term of the Plan shall have been enacted.

7.      The MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

8.      The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

9.      The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.B.

10.     If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

11.     The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in Section III.A.7 and Section III.A.8, which conditions cannot be waived.

**C.      Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in

Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

## D.     Effect of Confirmation of the Plan.

### 1.     Dissolution of Retiree Committee.

On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

### 2.     Preservation of Rights of Action by the City.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 3.     Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable.  For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

### 4.     Discharge of Claims.

#### a.     Complete Satisfaction, Discharge and Release.

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b.    **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; provided that such discharge will not apply to (i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5.    **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a.    **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1.    **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);**

2.    **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

3.    **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

4.    **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

5.    **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

6.    **taking any actions to interfere with the implementation or consummation of the Plan.**

b.    **All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against**

any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

       6.       Exculpation.

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement) and (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement); provided, further, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan; provided, further, that this Section III.D.6 shall not affect any liability of any of the COP Swap Exculpated Parties to Syncora Guarantee Inc., Syncora Capital Assurance Inc. or Financial Guaranty Insurance Company in connection with the COP Swap Settlement.

       7.       Releases

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

       a.       each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

       i.       all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against

the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity; and

      ii.      all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.      if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims or

any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds.

**E.     No Diminution of State Power**

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

**F.     Effectiveness of the Plan.**

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**G.     Binding Effect of Plan.**

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.     DWSD.**

**1.     Rates and Revenues.**

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Rates will be determined by the Board of Water Commissioners.  The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

**2.     DWSD CBAs.**

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

3. **The New DWSD Bonds and New Existing Rate DWSD Bonds.**

DWSD shall, as necessary: (a) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.209, and distribute the New DWSD Bonds as set forth in the Plan; and (b) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.211, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

B. **The New B Notes and New LTGO Bonds.**

On the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.206, and distribute the New B Notes as set forth in the Plan; and (b) execute the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.198, and distribute the New LTGO Bonds as set forth in the Plan.

C. **The UTGO Settlement.**

On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement Agreement, a copy of which is attached hereto as Exhibit I.A.317. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things: (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

D. **The State Contribution Agreement.**

Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.294.

1. **State Contribution.**

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

## 2. Income Stabilization Payments.

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner. In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System. In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

## 3. Conditions to State's Participation.

The payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution; (g) evidence satisfactory to the State of an irrevocable commitment by the Foundations to fund $366 million (or the net present value thereof) as part of the DIA Settlement; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

4.     **Release of Claims Against the State and State Related Entities.**

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

E.     **The DIA Settlement.**

On the Effective Date, the City, the Foundations and DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.103 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.102. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

1.     **Funding Contributions.**

The DIA Settlement will be funded as follows: (a) irrevocable commitments in an aggregate amount of at least $366 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors (subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to the "Agreed Required Minimum Schedule" and subject to the Foundations' and the DIA Funders' option at any time for the "Present Value Discount," as set forth in Exhibit I.A.102. Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2.     **Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3.     **Conditions to the DIA Funding Parties' Participation.**

The DIA Funding Parties participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.102; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities' obligations under such agreements to pay millage proceeds to DIA Corp.;

(i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution; (k) the occurrence of the Effective Date no later than December 31, 2014; and (l) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

## F.     Contingent Payment Rights

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust. The City shall issue the DWSD CVR to the Restoration Trust. If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire. The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities: (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS. If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made. The DWSD CVR may not be transferred.

### 1.     Special Restoration

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration. In such case, the City will perform a Value Determination and arrive at the Discounted Value. The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable. In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C. In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored. In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate. In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

### 2.     General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the

restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## G.      The OPEB Settlement.

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## H.      The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan.  Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement.  In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I.      Prosecution of COP Litigation.

### 1.      Creation of Litigation Trust.

From and after the Effective Date, the City will remain a named plaintiff and defendant in the COP Litigation, but shall transfer all of its rights and interests in the COP Litigation to the Litigation Trust.  The beneficiaries of the Litigation Trust, for the purpose of the COP Litigation, shall be the LTGO Litigation Parties and the Holders of Allowed Other Unsecured Claims.  The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Insurer and the City.

### 2.      Direction of COP Litigation.

The Litigation Trustee shall follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein.  The Litigation Trustee and VEBA Trust Representatives shall meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Litigation Parties, as requested, to discuss the COP Litigation.  The Litigation Trustee shall provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the LTGO Litigation Parties.  Upon request from a LTGO Litigation Party, the Litigation Trustee will provide to such LTGO Litigation Party drafts of court papers that will be Filed by the Litigation Trustee as early as practicable under the circumstances.

### 3.      Payment of Fees and Expenses.

The cost of all fees and expenses incurred by the Litigation Trustee in connection with the COP Litigation shall be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.A.  The Litigation Trustee's fees shall be fixed and consented to by the LTGO Insurer and the VEBA Trustee Representatives.

The Litigation Trustee shall submit to the City on a monthly basis invoices for its fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees.

The City shall pay such invoices within 30 days of receipt of such invoices, pending reimbursement from the Disputed COP Claims Reserve. Reimbursement of the City from the Disputed COP Claims Reserve will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.

In the event that a Final Order is entered against the City or the Litigation Trust, as successor in interest to the City, in the COP Litigation such that the New B Notes in the Disputed COP Claims Reserve are subject to Distribution to the Holders of Allowed COP Claims in accordance with the Plan, the City will reimburse the Disputed COP Claims Reserve for any amounts withdrawn from the Disputed COP Claims Reserve prior to the date of such Final Order becoming a Final Order.

### 4. Settlement of COP Litigation.

The Litigation Trustee shall consult with the LTGO Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee shall provide the LTGO Litigation Parties with advance notice, as early as practicable under the circumstances, of any COP Litigation settlement negotiations, and the LTGO Litigation Parties and their counsel shall have the right to participate in such negotiations. Any potential settlement of the COP Litigation must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against any party. The Litigation Trustee will not take any Subject COP Litigation Actions without the consent of the LTGO Litigation Parties. The Litigation Trustee will not enter into a Subject COP Litigation Settlement without the consent of the LTGO Insurer.

In the event that, after consultation with the Litigation Trustee, (i) the LTGO Insurer does not consent to the Litigation Trustee entering into a Subject COP Litigation Settlement or (ii) the LTGO Litigation Parties do not consent to the Litigation Trustee taking a Subject COP Litigation Action, the Litigation Trustee or any LTGO Litigation Party may present the issue to the LTGO Independent Party for mediation and resolution. The LTGO Independent Party shall conduct a mediation to attempt to consensually resolve the issue. If a consensual resolution cannot be reached, the LTGO Independent Party shall resolve the issue or issues, which resolution will be binding on the LTGO Insurer or the LTGO Litigation Parties, as the case may be, and the Litigation Trustee. Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction in the COP Litigation. The City, the COP Litigation Counsel, the VEBA Trust Representatives and the LTGO Insurer shall take any steps that may be required to preserve applicable privileges of the City and the COP Litigation Counsel with regard to the COP Litigation.

### J. Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

### K. Cancellation of Existing Bonds and Bond Documents.

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bonds and Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all

the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers or (b) Holders of COP Claims with respect to claims under applicable policies or other instruments insuring the COPs and obligations related thereto. For the avoidance of doubt, this Section IV.K shall not apply to any Bonds that are Reinstated pursuant to the Plan.

**L.     Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.L.

**M.     Professional Fees**

**1.     Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks) and (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

**2.     Fee Review Order**

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order. For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any

such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

### 3.    Dismissal of the Fee Examiner

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder. The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

### 4.    Court-Appointed Expert

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

### N.    Assumption of Indemnification Obligations.

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.N shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.N.

### O.    Incorporation of Retiree Health Care Settlement Agreement.

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.261, are incorporated herein by reference and shall be binding upon the parties thereto.

### P.    Payment of Workers' Compensation Claims.

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law. The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**Q.      36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.6.  The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

**R.      Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows:  (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable).  Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1).  The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.R, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**S.      Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures.  The City expressly reserves the right to challenge the validity of any claim for an income tax refund or property tax refund.

**T.      Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**U.      Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

V.    **Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

W.    **Post-Effective Date Governance.**

Prior to or on the Effective Date, the Financial Review Commission shall be established pursuant to and in accordance with the Financial Review Commission Act.  The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that promote more efficient and effective delivery of services to City residents.  The City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

X.    Post-Effective Date Reporting.

1.    Appointment of Plan Monitor.

As soon as practicable after the Confirmation Date, the Bankruptcy Court shall appoint an individual to serve as Plan Monitor.  The Plan Monitor shall have the qualifications set forth in Section IV.X.2. In the Confirmation Order, or in a separate Order, the Bankruptcy Court shall establish a process for:  (a) interested, qualified individuals to submit applications to be considered for the role of Plan Monitor; and (b) selected candidates to be interviewed by the Bankruptcy Court, if desired.  The individual selected as Plan Monitor shall be identified in an Order of the Bankruptcy Court.

2.    Qualifications of Plan Monitor.

The Plan Monitor shall demonstrate the following qualifications to the satisfaction of the Bankruptcy Court:

a.    The Plan Monitor shall be a neutral party, independent of the City and the State and free of all conflicts;

b.    The Plan Monitor shall not be an appointed or elected official of any governmental unit currently serving in such capacity and shall not be a former appointed or elected official of the City or the State;

c.    The Plan Monitor shall have experience in the areas of municipal finance, planning and budgeting, preferably involving municipalities with annual revenues of $250 million or more;

d.    The Plan Monitor shall have an accounting or other financial background sufficient to review, analyze and prepare complex financial analyses; and

e.    The Plan Monitor shall have experience in complex financial and operational restructurings, preferably including municipal restructurings.

Other relevant experience and expertise may be considered by the Bankruptcy Court in selecting a Plan Monitor, including, solely by way of example, experience and expertise with public pensions, health care and other post-employment benefits, governmental labor relations, actuarial science, grant management, information technology systems and procedures, internal controls and public safety.

3. **Roles; Post-Effective Date Reporting.**

The Plan Monitor's sole role and responsibility will be to evaluate the City's ongoing compliance with the Plan and the Confirmation Order and to report to the Bankruptcy Court on such matters on a periodic basis in writing. Unless otherwise ordered by the Bankruptcy Court, the Plan Monitor shall report to the Bankruptcy Court through Quarterly Reports.

The Quarterly Reports shall be Filed with the Bankruptcy Court and available publicly; provided that such Quarterly Reports shall not include any confidential or sensitive non-public information. In the discretion of the Plan Monitor, and with the prior approval of the Bankruptcy Court, portions of a Quarterly Report may be redacted and Filed under seal.

Quarterly Reports shall be due on the first Business Day that is at least 45 days after the end of each calendar quarter. The first such Quarterly Report shall cover the period from the Effective Date until the end of the calendar quarter during which the Effective Date falls; provided that, if the period from the Effective Date to the end of such calendar quarter is less than 30 days, the initial Quarterly Report shall cover this stub period along with the subsequent calendar quarter.

The Quarterly Reports shall be in a format acceptable to the Bankruptcy Court. The Quarterly Reports shall report on some or all of the following topics: (a) distributions made by Plan Class and to unclassified Claims (including professionals), and the status of any reserves established under the Plan; (b) compliance with the DIA Settlement and the status of funding thereunder; (c) compliance with the State Contribution Agreement and the status of funding thereunder (including the funding of the Income Stabilization Payments); (d) current funding levels of GRS and PFRS and any significant actions taken by the trustees of GRS or PFRS; (e) the status of DWSD and any transaction related thereto; (f) the status of the Restoration Trust and any DWSD CVR; (g) the status of the Detroit General VEBA and the Detroit Police and Fire VEBA, including the respective level of funding and benefits provided; (h) the status of the LTGO Settlement Agreement, the UTGO Settlement Agreement and any other settlements incorporated into the Plan; (i) the status of the COP Litigation; (j) the status of any appeals of key orders of the Bankruptcy Court in the Chapter 9 Case, including the order for relief dated December 5, 2013 (Docket No. 1946) and, if applicable, the Confirmation Order; (k) the funding and status of the Exit Facility; (l) the scheduled payments under debt instruments issued or Reinstated pursuant to the Plan and the status of payments and compliance thereunder; (m) the status of the City's efforts to resolve Claims, either through settlement, mediation, the ADR Procedures or claims litigation; (n) any identified areas of non-compliance with the Plan, the Confirmation Order or related agreements; and (o) any other matter relevant to the City's compliance with, and successful implementation of, the Plan and the Confirmation Order.

Not less than ten Business Days prior to Filing any Quarterly Report or other report, the Plan Monitor shall provide an advance copy of such report to the Mayor (or the Mayor's designee), the City's Chief Financial Officer, the City's Corporation Counsel and the notice parties for the City identified in Section VIII.L.1 and thereby provide the City with an opportunity to (i) propose any corrections or clarifications and (ii) identify any confidential or sensitive non-public information included in the report. In its discretion, the City may File a response to any Quarterly Report or other report Filed by the Plan Monitor.

In addition to the Quarterly Reports, the Plan Monitor also may File reports on an *ad hoc* basis with respect to any significant or extraordinary developments of a material nature that could impact the City's compliance with the Plan, the Confirmation Order and the restructuring contemplated thereby.

Unless otherwise ordered by the Bankruptcy Court, the Plan Monitor shall File Quarterly Reports until the entry of an Order closing the Chapter 9 Case.

4. **Powers of Plan Monitor.**

Officers of the City, the trustees of GRS and PFRS, the trustees of the Detroit General VEBA and the Detroit Police and Fire VEBA and the Litigation Trustee shall cooperate with the Plan Monitor by

providing information reasonably requested by the Plan Monitor in connection with the preparation of Quarterly Reports. The City also shall promptly provide to the Plan Monitor copies of any reports given to, or received from, the Financial Review Commission. Disputes relating to the City's cooperation with the Plan Monitor, including with respect to the reasonableness of the Plan Monitor's information requests, may be brought by motion to the Bankruptcy Court for determination. The Plan Monitor's requests for information from the City shall be made in writing to the Mayor (or the Mayor's designee), the City's Chief Financial Officer, the City's Corporation Counsel and the notice parties for the City identified in Section VIII.L.1. The Plan Monitor will have the power to issue subpoenas to obtain information reasonably necessary to prepare the Quarterly Reports.

**5. Powers of the Bankruptcy Court.**

In its discretion, the Bankruptcy Court may conduct regular or periodic status conferences in connection with the Quarterly Reports or other reports Filed by the Plan Monitor. Unless otherwise ordered, such status conferences shall be on the record and open to the public. In its discretion, the Bankruptcy Court may request that the Plan Monitor prepare additional reports on designated topics.

**6. Officer of the Bankruptcy Court; Immunity.**

The Plan Monitor will serve as an officer of the Bankruptcy Court, appointed solely for the purposes of, and to fulfill the duties set forth in, this Section IV.X. The Plan Monitor will have no role at the City and no powers to direct the City to take, or forbear from taking, any action. The Plan Monitor will assist the Bankruptcy Court by reporting on the City's compliance with the Plan and the Confirmation Order through the mechanisms described herein. The Plan Monitor shall not participate in any *ex parte* communications with the Bankruptcy Court.

As an officer of the Bankruptcy Court, the Plan Monitor is hereby provided with the maximum immunity permitted by law from civil actions for all acts taken or not taken in the performance of his/her duties and the exercise of his/her powers. No person or entity shall commence an action against the Plan Monitor in connection with such duties and powers except in the Bankruptcy Court, and with the prior approval of the Bankruptcy Court, which retains exclusive jurisdiction therefor.

**7. Confidentiality.**

To protect privileged or confidential material received by the Plan Monitor from the City and other parties to the maximum extent possible under applicable law, the following will apply:

The City or any other party providing information to the Plan Monitor may designate confidential and sensitive non-public information as "confidential" or otherwise establish a protocol with the Plan Monitor to clearly identify any confidential information. Any such confidential information shall be held by the Plan Monitor in confidence as an officer of the Bankruptcy Court and not as a party to the Chapter 9 Case or any other case or proceeding. Such confidential information shall be used by the Plan Monitor to carry out his/her duties under the Plan and not for any other purpose. Confidential information and any summaries thereof (a) shall not be disclosed by the Plan Monitor to any third parties (except with the written consent of the party providing the information), (b) shall not be included in any publicly available report and (c) shall not be available to third parties by discovery of the Plan Monitor.

Because the Plan Monitor may receive and hold information on a confidential basis as an officer of the Bankruptcy Court, the attorney-client privilege and any other privileges attaching to this material are fully preserved to the extent otherwise valid and shall not be deemed waived or limited in any manner or for any purpose by virtue of the City or any other party having provided the Plan Monitor with such information in accordance with this Section IV.X. In addition, all applicable privileges related to the information provided to the Plan Monitor belongs solely to the party providing such information, and the Plan Monitor may not raise or waive any applicable privileges (except with the written consent of the party providing the information).

13-53846-tjt   Doc 6381   Filed 07/29/14   Entered 07/29/14 17:24:45   Page 75 of 172

The Plan Monitor is not a public body and is not subject to (a) the State's Open Meetings Act, Public Act 267 of 1976, as amended; (b) the State's Freedom of Information Act, Public Act 442 of 1976, as amended; or (c) any similar law.

8.    Payment of the Plan Monitor.

The City will pay the reasonable and appropriate fees, and reimburse the reasonable and actual out-of-pocket expenses, of the Plan Monitor. To obtain payment of its fees and expenses, the Plan Monitor shall File applications with the Bankruptcy Court subject to the standards of section 330 of the Bankruptcy Code. The City will have the right to challenge any such application.

9.    Replacement Plan Monitor.

The Plan Monitor's appointment may be terminated by order of the Bankruptcy Court in its discretion on a motion of a party in interest or on the Bankruptcy Court's own initiative. Appropriate cause to terminate the appointment of the Plan Monitor includes (a) the failure of the Plan Monitor to timely fulfill his/her duties and obligations, (b) the failure of the Plan Monitor to prepare complete and accurate reports, (c) a conflict of interest or the appearance of a conflict or (d) unprofessional conduct.

A vacancy in the role of Plan Monitor, whether due to the termination of his/her appointment, resignation, death, incapacity or any other reason, shall be promptly filled by the Bankruptcy Court. The Bankruptcy Court may establish a process for the submission of applications for consideration by the Bankruptcy Court. A replacement Plan Monitor shall have the qualifications set forth in Section IV.X.2.

ARTICLE V
PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

A.    Appointment of Disbursing Agent.

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

B.    Distributions on Account of Allowed Claims.

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

C.    Certain Claims to Be Expunged.

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an

Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.      Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.      Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.      City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and

Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

## I.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### 1.    Delivery of Distributions Generally.

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

### 2.    Delivery of Distributions on Account of Bond Claims.

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### 3.    De Minimis Distributions / No Fractional New Securities.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

### 4.    Undeliverable or Unclaimed Distributions.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 5.    Time Bar to Cash Payment Rights.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the

date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

**J.       Other Provisions Applicable to Distributions in All Classes.**

**1.       No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

**2.       Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

**3.       Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**4.       Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be

Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make or preserve a claim under any applicable policies or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

## ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.      **Treatment of Disputed Claims.**

1.      **General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

2.      **ADR Procedures.**

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

3.      **Tort Claims.**

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or

any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**B.      Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

**C.      Objections to Claims.**

**1.      Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

2. **Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

3. **Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

4. **Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.     Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.     Confirm the maturity date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law);

C.     Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.     Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.      Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.      Adjudicate, decide or resolve (1) any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code, (2) any disputes relating to information requested by the Plan Monitor under Section IV.X.4, (3) requests for approval of fees and expenses of the Plan Monitor under Section IV.X.8 and (4) any actions against the Plan Monitor and any requests to commence such actions pursuant to Section IV.X.6;;

K.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

L.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

N.      Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

O.      Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

A.      **Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**B.      Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**C.      Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be: (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**D.      Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.      Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.      Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

**G.      Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.      Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

**I.      Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.      Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.      Term of Existing Injunctions and Stays.**

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**L.      Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

**1.      The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071

Telephone: (213) 243 2382
Facsimile: (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

(Counsel to the City)

2.       **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)

Dated: July 2529, 2014                 Respectfully submitted,

The City of Detroit, Michigan

By:      _/s/  Kevyn D. Orr_____
Name:  Kevyn D. Orr
Title:    Emergency Manager for the City of Detroit, Michigan

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

**EXHIBIT B**

THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------- x
                                          :
In re                                     :    Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                 :    Case No. 13-53846
                                          :
                Debtor.                    :    Hon. Steven W. Rhodes
                                          :
                                          :
------------------------------------------------------------- x
```

## CORRECTED FIFTH AMENDED PLAN
FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
(May 5 July 29, 2014)

| | | |
|---|---|---|
| DAVID G. HEIMAN | BRUCE BENNETT | JONATHAN S. GREEN |
| HEATHER LENNOX | JONES DAY | STEPHEN S. LAPLANTE |
| THOMAS A. WILSON | 555 South Flower Street | MILLER, CANFIELD, |
| JONES DAY | Fiftieth Floor | PADDOCK AND STONE, P.L.C. |
| North Point | Los Angeles, California 90071 | 150 West Jefferson |
| 901 Lakeside Avenue | Telephone: (213) 489-3939 | Suite 2500 |
| Cleveland, Ohio 44114 | Facsimile: (213) 243-2539 | Detroit, Michigan 48226 |
| Telephone: (216) 586-3939 | bbennett@jonesday.com | Telephone: (313) 963-6420 |
| Facsimile: (216) 579-0212 | | Facsimile: (313) 496-7500 |
| dgheiman@jonesday.com | | green@millercanfield.com |
| hlennox@jonesday.com | | laplante@millercanfield.com |
| tawilson@jonesday.com | | |

ATTORNEYS FOR THE DEBTOR

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND
    COMPUTATION OF TIME ............................................................................... 1

  A.    Defined Terms. .................................................................................................. 1

  B.    Rules of Interpretation and Computation of Time. ................................... ~~24~~26

      1.    Rules of Interpretation. ......................................................................... ~~24~~26

      2.    Computation of Time. ............................................................................ ~~24~~26

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY
    CONTRACTS AND UNEXPIRED LEASES ............................................. ~~24~~27

  A.    Unclassified Claims. ....................................................................................... ~~25~~27

      1.    Payment of Administrative Claims. ..................................................... ~~25~~27

      2.    Bar Dates for Administrative Claims. .................................................. ~~25~~27

  B.    Classified Claims. ........................................................................................... ~~26~~28

      1.    Designation of Classes. .......................................................................... ~~26~~28

      2.    Subordination; Reservation of Rights to Reclassify Claims. .............. ~~27~~29

      3.    Treatment of Claims. ............................................................................. ~~27~~29

  C.    Confirmation Without Acceptance by All Impaired Classes. .................... ~~37~~41

  D.    Treatment of Executory Contracts and Unexpired Leases. ....................... ~~37~~41

      1.    Assumption. ............................................................................................. ~~37~~41

      2.    Assumption of Ancillary Agreements. .................................................. ~~37~~41

      3.    Approval of Assumptions and Assignments. ........................................ ~~37~~41

      4.    Payments Related to the Assumption of Executory Contracts and
          Unexpired Leases. ................................................................................... ~~38~~42

      5.    Contracts and Leases Entered Into After the Petition Date. ............... ~~38~~42

      6.    Rejection of Executory Contracts and Unexpired Leases. ................... ~~38~~42

      7.    Rejection Damages Bar Date. ................................................................ ~~38~~42

      8.    Preexisting Obligations to the City Under Rejected Executory
          Contracts and Unexpired Leases. ......................................................... ~~39~~42

      9.    Insurance Policies. .................................................................................. ~~39~~43

ARTICLE III CONFIRMATION OF THE PLAN ............................................... ~~39~~43

  A.    Conditions Precedent to the Effective Date. ............................................... ~~39~~43

  B.    Waiver of Conditions to the Effective Date. ............................................... ~~40~~44

C.     Effect of Nonoccurrence of Conditions to the Effective Date........4044

D.     Effect of Confirmation of the Plan........4044

    1.     Dissolution of Retiree Committee........4044

    2.     Preservation of Rights of Action by the City........4044

    3.     Comprehensive Settlement of Claims and Controversies........4144

    4.     Discharge of Claims........4145

    5.     Injunction........4145

    6.     Exculpation........4246

    7.     Releases........4347

E.     No Diminution of State Power........4348

F.     Effectiveness of the Plan........4448

G.     Binding Effect of Plan........4448

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN........4449

A.     DWSD........4449

    1.     Rates and Revenues........4449

    2.     DWSD CBAs........4449

    3.     The New DWSD Bonds and New Existing Rate DWSD Bonds.
    4449

B.     The New B Notes and New LTGO Bonds........4449

C.     The Plan COPUTGO Settlement........4549

D.     The UTGO Settlement........45

ED.     The State Contribution Agreement........4550

    1.     State Contribution........4550

    2.     Income Stabilization Payments........4550

    3.     Conditions to State's Participation........4650

    4.     Release of Claims Against the State and State Related Entities.
    4651

FE.     The DIA Settlement........4651

    1.     Funding Contributions........4651

    2.     Transfer of DIA Assets........4751

    3.     Conditions to the FoundationsDIA Funding Parties' Participation.
    4752

GF.     Contingent Payment Rights........4752

|   | 1. | Special Restoration | 4752 |
|   | 2. | General Restoration | 4853 |
| HG. | | The OPEB Settlement. | 4853 |
| H. | | The LTGO Settlement. | 53 |
| I. | | Prosecution of COP Litigation. | 53 |
|   | 1. | Creation of Litigation Trust. | 53 |
|   | 2. | Direction of COP Litigation. | 53 |
|   | 3. | Payment of Fees and Expenses. | 54 |
|   | 4. | Settlement of COP Litigation. | 54 |
| IJ. | | Issuance of the New Securities. | 4854 |
| JK. | | Cancellation of Existing Bonds and Bond Documents. | 4855 |
| KL. | | Release of Liens. | 4955 |
| M. | | Professional Fees | 55 |
|   | L1. | Professional Fee Reserve | 4955 |
|   | 2. | Fee Review Order | 56 |
|   | 3. | Dismissal of the Fee Examiner | 56 |
|   | 4. | Court-Appointed Expert | 56 |
| MN. | | Assumption of Indemnification Obligations. | 4956 |
| NO. | | Incorporation of Retiree Health Care Settlement Agreement. | 4956 |
| OP. | | Payment of Workers' Compensation Claims. | 4956 |
| Q. | | 36th District Court Settlement. | 57 |
| PR. | | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | 5057 |
| QS. | | Payment of Tax Refund Claims. | 5057 |
| RT. | | Utility Deposits. | 5057 |
| SU. | | Pass-Through Obligations. | 5057 |
| TV. | | Exit Facility. | 5058 |
| UW. | | Post-Effective Date Governance. | 5158 |
| ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN | | | 5158 |
| A. | | Appointment of Disbursing Agent. | 5158 |
| B. | | Distributions on Account of Allowed Claims. | 5158 |
| C. | | Certain Claims to Be Expunged. | 5158 |

D.    Record Date for Distributions; Exception for Bond Claims. .................................................... 51~~58~~

E.    Means of Cash Payments. .................................................... 52~~59~~

F.    Selection of Distribution Dates for Allowed Claims. .................................................... 52~~59~~

G.    Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. .................................................... 52~~59~~

H.    City's Rights of Setoff Preserved. .................................................... 52~~59~~

I.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................................................... 52~~60~~

    1.    Delivery of Distributions Generally. .................................................... 52~~60~~

    2.    Delivery of Distributions on Account of Bond Claims. .................................................... 52~~60~~

    3.    De Minimis Distributions / No Fractional New Securities. .................................................... 53~~60~~

    4.    Undeliverable or Unclaimed Distributions. .................................................... 53~~60~~

    5.    Time Bar to Cash Payment Rights. .................................................... 53~~60~~

J.    Other Provisions Applicable to Distributions in All Classes. .................................................... 53~~61~~

    1.    No Postpetition Interest. .................................................... 53~~61~~

    2.    Compliance with Tax Requirements. .................................................... 54~~61~~

    3.    Allocation of Distributions. .................................................... 54~~61~~

    4.    Surrender of Instruments. .................................................... 54~~61~~

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS .................................................... 55~~562~~

A.    Treatment of Disputed Claims. .................................................... 55~~562~~

    1.    General. .................................................... 55~~562~~

    2.    ADR Procedures. .................................................... 55~~562~~

    3.    Tort Claims. .................................................... 55~~562~~

B.    Disputed Claims Reserve. .................................................... 56~~63~~

C.    Objections to Claims. .................................................... 56~~63~~

    1.    Authority to Prosecute, Settle and Compromise. .................................................... 56~~63~~

    ~~2.~~    ~~Application of Bankruptcy Rules.~~ .................................................... ~~56~~

    ~~3~~2.    Expungement or Adjustment of Claims Without Objection. .................................................... 56~~63~~

    ~~4~~3.    Extension of Claims Objection Bar Date. .................................................... 56~~64~~

    ~~5~~4.    Authority to Amend List of Creditors. .................................................... 56~~64~~

ARTICLE VII RETENTION OF JURISDICTION .................................................... 57~~64~~

ARTICLE VIII MISCELLANEOUS PROVISIONS .................................................... 58~~65~~

A.    Plan Supplements. .................................................... 65

| | | |
|---|---|---:|
| A~~AB~~. | Modification of the Plan. | ~~58~~65 |
| ~~B~~C. | Revocation of the Plan. | ~~58~~65 |
| ~~C.~~ | ~~Disclosure of Amounts to Be Paid for Chapter 9 Case Services.~~ | ~~58~~ |
| D. | Severability of Plan Provisions. | ~~58~~66 |
| E. | Effectuating Documents and Transactions. | ~~59~~66 |
| F. | Successors and Assigns. | ~~59~~66 |
| G. | Plan Controls. | ~~59~~66 |
| H. | Notice of the Effective Date. | ~~59~~66 |
| I. | Governing Law. | ~~59~~66 |
| J. | Request for Waiver of Automatic Stay of Confirmation Order. | ~~59~~67 |
| K. | Term of Existing Injunctions and Stays. | ~~59~~67 |
| L. | Service of Documents | ~~60~~67 |
| | 1. The City | ~~60~~67 |
| | 2. The Retiree Committee | ~~60~~68 |

**TABLE OF EXHIBITS**

Exhibit I.A.6            Principal Terms of 36th District Court Settlement

Exhibit I.A.~~61~~72     Schedule of COP Swap Agreements

Exhibit I.A.~~78~~89     Form of Detroit General VEBA Trust Agreement

Exhibit I.A.~~82~~93     Form of Detroit Police and Fire VEBA Trust Agreement

Exhibit I.A.~~91~~102    Principal Terms of DIA Settlement

Exhibit I.A.~~92~~103    Form of DIA Settlement Documents

Exhibit I.A.~~110~~121   Schedule of DWSD Bond Documents & Related DWSD Bonds

Exhibit I.A.~~117~~128   Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds

Exhibit I.A.~~120~~131   Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds

Exhibit I.A.~~135~~146   Principal Terms of Exit Facility

Exhibit I.A.~~159~~172   Schedule of HUD Installment Note Documents & Related HUD Installment Notes

Exhibit I.A.~~168~~182   Interest Rate Reset Chart

Exhibit I.A.~~173~~187   Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds

Exhibit I.A.198          Form of LTGO Settlement Agreement

Exhibit I.A.~~183~~206   Principal Terms of New B Notes

Exhibit I.A.~~184~~207   Form of New B Notes Documents

Exhibit I.A.~~186~~209   Principal Terms of New DWSD Bonds

Exhibit I.A.~~188~~211   Principal Terms of New Existing Rate DWSD Bonds

Exhibit I.A.~~189~~212.a Form of New GRS Active Pension Plan

Exhibit I.A.~~189~~212.b Principal Terms of New GRS Active Pension Plan

Exhibit I.A.~~191~~216.a Form of New PFRS Active Pension Plan

Exhibit I.A.~~191~~216.b Principal Terms of New PFRS Active Pension Plan

~~Exhibit I.A.214~~      ~~Form of Plan COP Settlement Documents~~

Exhibit I.A.~~220~~244   Prior GRS Pension Plan

| | |
|---|---|
| Exhibit I.A.~~221~~245 | Prior PFRS Pension Plan |
| Exhibit I.A.255 | Restoration Trust Agreement |
| Exhibit I.A.~~236~~261 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.~~244~~270 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.~~268~~294 | State Contribution Agreement |
| Exhibit I.A.~~279~~310 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit I.A.~~285~~ | ~~Principal Terms~~317 Form of UTGO Settlement Agreement |
| Exhibit II.B.3.q.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.q.ii.C | Terms of PFRS Pension Restoration |
| Exhibit II.B.3.r.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.r.ii.C | Terms of GRS Pension Restoration |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

**INTRODUCTION**

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

A. **Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1. "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2. "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3. "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4. "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5. "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6. "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.6.

6~~7~~.     "Active Employee" means an active employee of the City on and after the Confirmation Date.

7~~8~~.     "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

8~~9~~.     "Adjusted Pension Amount" means the GRS Adjusted Pension Amount ~~and/~~or the PFRS Adjusted Pension Amount, as applicable.

9~~10~~.     "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code ~~and/~~or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee ~~(other than the Retiree Committee)~~ or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

~~10~~11.     "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

~~11~~12.     "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

~~12~~13.     "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

~~13~~14.     "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

~~14~~15.     "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

16.     "Ambac" means Ambac Assurance Corporation.

15_17_. "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

16_18_. "Annuity Savings Fund Excess Amount" means the following, as calculated by the GRS: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

17_19_. "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.154_167_, plus the ASF Recoupment.

18_20_. "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

19_21_. "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

22. "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

23. "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

24. "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

25. "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

26. "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

2027. "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

2128. "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

29. "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

30. "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

2231. "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

2332. "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Reinstated Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.285317.

33. "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

2434. "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

2535. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

2636. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

2737. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

2838. "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

2939. "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the

docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

3040. "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

3141. "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

3242. "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

3343. "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/or the Secured GO Bonds.

3444. "Bondholder" means any beneficial or record holder of a Bond.

3545. "Bond Insurance Policies" means those policies, surety policies and/or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

3646. "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

3747. "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

3848. "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

3949. "Cash" means legal tender of the United States of America and equivalents thereof.

4050. "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

4151. "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

4252. "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

43 53.  "City" means the City of Detroit, Michigan.

44 54.  "City Council" means the duly-elected City Council of the City.

45 55.  "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

46 56.  "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

47 57.  "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later latest of (a) one year 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

48 58.  "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

49 59.  "Class" means a class of Claims, as described in Section II.B.

50 60.  "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

51 61.  "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

52 62.  "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

53 63.  "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

54 64.  "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

55 65.  "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

56 66.  "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

57 67.  "COP Claim" means a Claim under or evidenced by the COP Service Contracts.  For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to:  (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP

Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

58 68. "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

69. "COP Litigation Counsel" means counsel to the Litigation Trust in the COP Litigation.

59 70. "COP Service Contracts" means, collectively, the (a) GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

60 71. "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

61 72. "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.61 72, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

62 73. "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

63 74. "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

64 75. "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

65 76. "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

66 77. "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

78. "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

67 79. "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on

March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

6880.  "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

6981.  "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

70.  "Creditor Representative" means (a) if all Retiree Classes accept the Plan and the Retiree Committee supports the Plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 rejects the Plan, a person or committee of persons appointed by the Emergency Manager.

7182.  "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

7283.  "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

7384.  "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

7485.  "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

7586.  "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OBEBOPEB Claim.

7687.  "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

7788.  "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

7889.  "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.7889.

7990. "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

8091. "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

8192. "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

8293. "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.8293.

8394. "DIA" means The Detroit Institute of Arts, a museum and cultural facilityinstitution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

8495. "DIA Assets" means the assets identified on Exhibit A to"Museum Assets" as defined in the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, to the extent that the City holds title to any such assets as of the Effective Date102.

8596. "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

8697. "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91102, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments to contribute monies in furtherance of the DIA Settlement, solely in their capacity as participants in the DIA Settlement.

8798. "DIA Funding Parties" means the Foundations, the DIA Funders and DIA Corp.

8899. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.FE.1.

89100. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

90101. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

91102. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.FE and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.91102.

92103. "DIA Settlement Documents" means the definitive documentation, including grant award letters, to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.92103, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.91102.

93104. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

94105. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

95106. "Disclosure Statement Order" means the [_____]Order Approving the Proposed Disclosure Statement (Docket No. [___]4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____]May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

96107. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

97108. "Disputed Claim" means any Claim that is not Allowed.

98109. "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.B.1A.

99110. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

100111. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

101112. "Distribution Date" means any date on which a Distribution is made.

102113. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

103114. "District Court" means the United States District Court for the Eastern District of Michigan.

104115. "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

105116. "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

106117. "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown

Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

107118. "DRCEA" means the Detroit Retired City Employees Association.

108119. "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

109120. "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

110121. "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.110121, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

111122. "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.110121.

112123. "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

113124. "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

114125. "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

115126. "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

116127. "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

117128. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.117128, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

118129. "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.117128.

119130. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

120131. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.120131, as the same may have been subsequently amended, restated, supplemented or

otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

121132. "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.120131.

122133. "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

123134. "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

124135. "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

125136. "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

126137. "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continuedcontinue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

127138. "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

128139. "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

129140. "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

130141. "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

131142. "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

132143. "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers

Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors ~~and~~, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties and (j) the UTGO Exculpated Parties. For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

~~133~~144.     "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

~~134~~145.     "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed. The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website. For the avoidance of doubt, Exhibits I.A.~~92~~103 and I.A.~~135~~146 will be Filed only if the transactions related to ~~and/~~or underlying such Exhibits are to be consummated by the City.

~~135~~146.     "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.~~135~~146.

~~136~~147.     "Exit Facility Agent" means the agent under the Exit Facility.

~~137~~148.     "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

~~138~~149.     "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

~~139~~150.     "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

~~140~~151.     "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

~~141~~152.     "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

~~142~~153.     "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

~~143~~154.     "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of

compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order ~~and~~, (b) those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan and (c) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

~~144~~155.    "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

~~145~~156.    "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

~~146~~157.    "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 ~~and~~/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

158.    "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

159.    "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

~~147~~160.    "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year.  A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

~~148~~161.    "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.~~91, solely in their capacity as participants in the DIA Settlement~~102.

~~149~~162.    "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

~~150~~163.    "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

~~151~~164.    "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

152165.    "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

153166.    "GRS" means the General Retirement System for the City of Detroit.

154167.    "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

155168.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

156169.    "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

157170.    "Holder" means an Entity holding a Claim.

158171.    "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

159172.    "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.159172, as the same may have been subsequently

amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~160~~173.         "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.~~159~~172.

~~161~~174.         "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

~~162~~175.         "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

~~163~~176.         "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

~~164~~177.         "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

~~165~~178.         "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

~~166~~179.         "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the ~~treatment accorded to any Allowed Other Unsecured Claims held by the~~ 36th District Court ~~pursuant to Section II.B.3.u.~~Settlement.

~~167~~180.         "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification ~~and/~~or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

181.         "Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

~~168~~182.         "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.~~168~~182.

~~169~~183.         "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective

Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

~~170~~184.        "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

~~171~~185.        "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

~~172~~186.        "Limited Tax General Obligation Bond ~~Claims~~Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

~~173~~187.        "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.~~173~~187, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~174~~188.        "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.~~173~~187.

189.        "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

~~175~~190.        "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

~~176.        "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible, but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.~~

191.        "Litigation Trust" means a trust to be established on the Effective Date to which the City will transfer all of its rights and interest in the COP Litigation.

192.        "Litigation Trustee" means the trustee of the Litigation Trust, which shall be selected by the LTGO Insurer and the Retiree Committee and must be acceptable to the City.

193.        "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

194.        "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their

respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

195. "LTGO Independent Party" means an entity chosen by the Retiree Committee, the LTGO Insurer and the City to resolve certain disputes regarding the COP Litigation involving the City, VEBA Trust Representatives or the LTGO Insurer pursuant to the LTGO Settlement Agreement.

177196. "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

197. "LTGO Litigation Parties" means, collectively, the LTGO Insurer, the VEBA Trust Representatives and the City.

198. "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.198.

178199. "Macomb County" means the County of Macomb, Michigan.

179200. "Mayor" means the duly-elected mayor of the City.

201. "MFA" means the Michigan Finance Authority.

180202. "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the Michigan Finance AuthorityMFA in accordance with the UTGO Settlement Agreement and applicable law.

203. "NPFG" means National Public Finance Guarantee Corporation.

181204. "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

182205. "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction. In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

183206. "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.183206.

184207. "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.184207.

185208.        "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New DWSD Bonds.

186209.        "New DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.186209.

187210.        "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds.

188211.        "New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.188211.

189212.        "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.189212.a and the material terms of which are attached hereto as Exhibit I.A.189212.b.

190213.        "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

214.        "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

215.        "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

191216.        "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.191216.a and the material terms of which are set forth at Exhibit I.A.191216.b.

192217.        "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10five or ten years of service, as set forth on Exhibit I.A.216.b, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

193218.        "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes, the New LTGO Bonds and the Municipal Obligation.

219. "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

194220. "Oakland County" means the County of Oakland, Michigan.

195221. "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

196222. "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

197223. "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

198224. "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a Subordinated Claim. For the avoidance of doubt, Section 1983 Claims, and Indirect Employee Indemnity Claims and Indirect 36th District Court Claims are included within the definition of Other Unsecured Claim.

199225. "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

200226. "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

201227. "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

202228. "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

203229. "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

204230. "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development Authority, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment

Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

~~205.~~ ~~"Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, *et seq.*~~

~~206~~231.   "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

~~207~~232.   "Petition Date" means July 18, 2013.

~~208~~233.   "PFRS" means the Police and Fire Retirement System for the City of Detroit.

~~209~~234.   "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan ~~and/~~or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

~~210~~235.   "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any  other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

~~211~~236.   "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

~~212~~237.   "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

238.   [Paragraph intentionally left blank.]

213.   "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.iii.A and more definitively set forth in the Plan COP Settlement Documents.

214.   "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.214.

215239.   "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.   A Plan Supplement or Plan Supplements containing Exhibits 189.a, 191.a, 220, 221 and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline.  All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

216240.   "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement and/or Ordinance No. 05-09 of the City.

217241.   "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

218242.   "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

219243.   "Postpetition PurchaserFinancing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

220244.   "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.220244.

221245.   "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.221245.

222246.   "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

223247.   "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.LM.1.

224248.   "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and

manage, the City's water and/or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

249. [Paragraph intentionally left blank.]

225250. "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

226251. "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

227. "Reinstated Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,410,000 that, from and after the Effective Date, will remain outstanding and will be payable from the UTGO Bond Tax Levy, as more particularly described on Exhibit I.A.285.

228252. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

229253. "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the DIA Funding Parties and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

230254. "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) to hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

255. "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.255.

231256. "Restructured UTGO Bonds" means the bonds to be issued by the Michigan Finance AuthorityMFA to the current Holders of Unlimited Tax General Obligation BondsBond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,500,000287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the Michigan Finance

AuthorityMFA and shall be secured as more particularly described on Exhibit I.A.285in the UTGO Settlement Agreement.

232257. "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

233258. "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

234259. "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

235260. "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

236261. "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.236261.

237. "Retiree Health Plan" means the City of Detroit Retiree Health Plan, a welfare benefit plan sponsored and administered by the City, which, effective for the period beginning March 1, 2014 and ending December 31, 2014, provides health, dental and vision care benefits to retired officers and employees of the City who enrolled in the plan as of March 1, 2014.

238262. "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS and/or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

239263. "Retirement Systems" means, collectively, the GRS and the PFRS.

240264. "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

241265. "Section 1983 Claim" means any claimClaim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

242266. "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

243267. "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

244268.        "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

245269.        "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

246270.        "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.244270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

247271.        "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

248272.        "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

249273.        "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.244270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

250274.        "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

251275.        "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

252276.        "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.244270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

253277.        "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

254278.        "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

255279.        "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.244270, as the same may have been subsequently amended, restated, supplemented or otherwise

modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

256280. "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

257281. "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

258282. "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.244270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

259283. "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

260284. "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

261285. "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.244270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

262286. "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

263287. "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

264. "Settling COP Claimant" means a beneficial holder of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely returned Ballot.

288. "Settled COP Claims" means those Disputed COP Claims with respect to which the City enters into a settlement prior to the Effective Date.

289. "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.6.

290. "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

265291. "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.GF.

266292. "State" means the state of Michigan.

267293. "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement. References to the "disbursement of the State Contribution" in the Plan shall be construed to refer to either the distribution of the discrete lump sum payments to GRS and PFRS or the payment of the first installment of the State Contribution to GRS and PFRS, as the case may be.

268294. "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.ED, in substantially the form attached hereto as Exhibit I.A.268294.

269295. "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

270296. "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

297. "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

298. "Subject COP Litigation Action" means any of the following actions, if proposed to be taken by the Litigation Trustee: (a) replacing the COP Litigation Counsel with new counsel to the Litigation Trust in the COP Litigation; (b) a determination not to appeal an adverse decision on any claim or defense related to the COP Litigation; or (c) the voluntary dismissal of a substantive claim or counterclaim in the COP Litigation or termination by any other means of the COP Litigation.

299. "Subject COP Litigation Settlement" means any settlement with a Holder or Holders of COP Claims with respect to 40% or more of the face amount of COP Claims held by such Holder(s) that proposes to release a Pro Rata share of New B Notes (or equivalent currency) from the Disputed COP Claims Reserve to such Holder(s).

271300. "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

272301.    "Swap Insurance Policies" means those policies and/or other instruments insuring the COP Swap Agreements and obligations related thereto.

273302.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

303.    "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of: (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

274304.    "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

305.    "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class.  For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

275306.    "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

276307.    "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

277308.    "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

278309.    "Unlimited Tax General Obligation Bond ClaimsClaim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

279310.    "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth in Exhibit I.A.279310, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related theretoBond Insurance Policies.

280311.    "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.279310.

281312.        "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

282313.        "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

283314.        "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

315.        "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

284316.        "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

285317.        "UTGO Settlement" means the comprehensive settlement regarding Unlimited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, the principal terms of which are Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.285 and described in Section IV.D317.

286318.        "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

319.        "VEBA Trust Representatives" means (a) the chair of the board of trustees of the Detroit General VEBA and (b) the chair of the board of trustees of the Detroit Police and Fire VEBA.

287320.        "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

288.        "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

289321.        "Wayne County" means the Charter County of Wayne, Michigan.

**B.        Rules of Interpretation and Computation of Time.**

**1.        Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter

gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

      **2.**     **Computation of Time.**

      In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

      Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

**A.**     **Unclassified Claims.**

      **1.**     **Payment of Administrative Claims.**

            **a.**     **Administrative Claims in General.**

      Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee ~~(other than the Retiree Committee)~~ or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

### b. Claims Under the Postpetition Financing Agreement.

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition ~~Purchaser~~Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

### 2. Bar Dates for Administrative Claims.

#### a. General Bar Date Provisions.

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City ~~pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order,~~ no later than ~~30~~45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

#### b. Ordinary Course Claims

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

#### ~~b~~c. Claims Under the Postpetition Financing Agreement.

Holders of Administrative Claims that are Postpetition ~~Purchaser~~Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

#### ~~c~~d. No Modification of Bar Date Order.

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**B. Classified Claims.**

**1. Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| | *Secured Claims* | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.~~110~~121) | Unimpaired/Nonvoting or Impaired/Voting, as set forth on Exhibit I.A.~~110~~121 |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.~~117~~128) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.~~120~~131) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

### 2. Subordination; Reservation of Rights to Reclassify Claims.

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

### 3. Treatment of Claims.

#### a. Class 1A – DWSD Bond Claims.

##### i. Classification and Allowance.

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.~~110~~121, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~110~~121.

##### ii. Treatment.

###### A. Unimpaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as ~~unimpaired~~Unimpaired on Exhibit I.A.~~110~~121 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

###### B. Impaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as ~~impaired~~Impaired on Exhibit I.A.~~110~~121 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

<u>Treatment Option for Classes that Accept the Plan</u>: Each Holder of an Allowed DWSD Bond Claim in an ~~impaired~~Impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution

Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

b.        **Class 1B – DWSD Revolving Sewer Bond Claims**

i.        **Classification and Allowance.**

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.~~117~~128, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.~~117~~128.

ii.        **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

c.        **Class 1C – DWSD Revolving Water Bond Claims**

i.        **Classification and Allowance.**

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.~~120~~131, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~120~~131.

ii.        **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

d.        **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

e.        **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

f.        **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

g.      **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h.      **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i.      **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

j.      **Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

k.      **Class 4 – HUD Installment Note Claims.**

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

l.      **Class 5 – COP Swap Claims.**

i.      **Allowance.**

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

ii.      **Treatment.**

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged

Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

### m. Class 6 – Parking Bond Claims.

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### n. Class 7 – Limited Tax General Obligation Bond Claims.

#### i. Allowance.

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $~~163,543,187.86~~163,544,770.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed ~~Claim~~Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, ~~an Unsecured~~(X) a Pro Rata ~~Share of New~~share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions from the Disputed COP Claims Reserve in accordance with Section II.B~~ Notes~~.3.p.iii.B.

#### iii. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### o. Class 8 – Unlimited Tax General Obligation Bond Claims.

#### i. Allowance.

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds. ~~ Such~~ as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement.  Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the ~~Reinstated~~ Stub UTGO Bonds, subject to Sections I.A.~~23~~32 and IV.~~D~~C, which Stub UTGO Bonds shall be reinstated.

p.    **Class 9 – COP Claims.**

i.    **Disputed.**

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the ~~Creditor Representative~~Litigation Trust.  If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

ii.    **Assignment.**

~~Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of~~Those COP Claims or portions thereof that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis~~, with each~~ on and as of the Effective Date, solely for purposes of facilitating Distributions under this Plan and for no other purpose.  Each beneficial holder shall be deemed to receive such ~~portions of~~COP Claims or portions thereof in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. ~~ Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.~~

iii.    **Treatment.**

~~A.    Plan COP Settlement Option.~~

~~Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.~~

~~B.    Non-Settling Holders.~~

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

~~1~~A.    **Disputed COP Claims Reserve.**

On the Effective Date, the City shall establish the Disputed COP Claims Reserve.  The Disputed COP Claims Reserve shall contain ~~no less than:~~ (a) an Unsecured Pro Rata Share of New B Notes, calculated as if such Disputed COP Claims were Allowed ~~(i)~~ in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs ~~not subject~~other than those giving rise to the ~~Plan~~Settled COP ~~Settlement or (ii) in~~Claims (or such ~~lesser~~other amount as may be required by an order of the Bankruptcy Court~~,~~); and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.  In addition, in the event any Holder of a Disputed COP Claim enters into a settlement of such Claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and distributed from the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.B.

**2B.** **Distributions From The Disputed COP Claims Reserve.**

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of ~~an order by the trial court having jurisdiction over the objections to the~~ a Final Order resolving any objection to any Disputed COP ~~Claims resolving all objections to the Disputed COP Claims~~ Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for, ~~any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows~~: (a) an amount of New B Notes ~~and~~/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed to the City~~;~~, on the terms set forth in Section IV.I; and (b) following such distribution, ~~65% of~~ the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; ~~and (c) following such distribution, the remaining New B Notes and distributions thereon shall revert to the City, provided that the City, in its sole discretion, may choose to distribute such remaining property~~(ii) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in ~~Classes~~Class 7~~, 13~~; and~~/or~~ (iii) 15% to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14.

### iv. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### q. Class 10 – PFRS Pension Claims.

#### i. Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

#### ii. Treatment.

##### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

**B.      Investment Return Assumption.**

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

**C.      Modification of Benefits for PFRS Participants.**

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C.  For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement.  In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.FE.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

**D.      Contingent Payment Rights.**

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.GF.

**E.      Accrual of Future Benefits.**

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

**F.      Governance.**

On or as soon as reasonably practicable after the Effective Date, PFRS shall establish an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

**G.      No Changes in Terms for Ten Years.**

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor trust or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including**

collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### H. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii. Treatment.

##### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain ~~City sources,~~ pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution ~~and~~, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

##### B. Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

##### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described

in the State Contribution Agreement.  In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.~~F~~E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D.    Annuity Savings Fund Recoupment.

### 1.    ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap.  In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

### 2.    ASF Distribution Recipients.

#### i.    Monthly Deduction

~~The~~For each ASF Distribution Recipient that does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated ~~for each ASF Distribution Recipient, will then be~~and converted into monthly annuity amounts based on ~~each~~common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy ~~and other factors and will~~, gender and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

#### ii.    Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient.  The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date.  ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check.  If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as

provided for in Section II.B.3.r.ii.D.2.i. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.GF.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, GRS shall establish an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I. State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

s.  **Class 12 – OPEB Claims.**

i.  **Allowance.**

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

ii.  **Treatment.**

A.  **Detroit General VEBA.**

<u>Establishment of Detroit General VEBA</u>:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a <u>seven member</u> board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.~~78~~<u>89</u>, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees.  ~~The~~<u>With respect to the initial appointment of the board of trustees, the</u> DRCEA and the Retiree Committee will each ~~be able to~~ appoint <u>two</u> board members ~~in equal numbers, and such appointees will constitute a majority of the initial Detroit General VEBA board;~~<u>, and</u> the City will appoint ~~the remaining~~<u>three board</u> members.  <u>The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the City will fill board member vacancies created by the departure of members initially appointed by the City.</u>  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

<u>Distributions to Detroit General VEBA</u>:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.~~2.~~

B.  **Detroit Police and Fire VEBA.**

<u>Establishment of Detroit Police and Fire VEBA</u>:  On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.  The Detroit Police and Fire VEBA will be governed by a <u>seven member</u> board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.~~82~~<u>93</u>, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees.  ~~The~~<u>With respect to the</u> initial ~~board members will be~~<u>appointment of the board of trustees, the RDPFFA and the Retiree Committee will each appoint two board members, and the City will appoint three board members.  The RDPFFA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the RDPFFA, and the City will fill board member vacancies created by the departure of members initially</u> appointed by the City~~, the Retiree Committee and the RDPFFA~~.  Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

<u>Distributions to Detroit Police and Fire VEBA</u>:  On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in

satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2.

### C. No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

### t. Class 13 – Downtown Development Authority Claims.

#### i. Allowance.

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### u. Class 14 – Other Unsecured Claims.

#### i. Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### v. Class 15 – Convenience Claims.

#### i. Treatment.

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.5565) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

### w. Class 16 – Subordinated Claims.

#### i. Treatment.

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain

any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

**x.** **Class 17 – Indirect 36th District Court Claims.**

**i.** **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive: (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

**ii.** **Further Obligation of City, State and 36th District Court.**

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

**C.** **Confirmation Without Acceptance by All Impaired Classes.**

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

**D.** **Treatment of Executory Contracts and Unexpired Leases.**

**1.** **Assumption.**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.

**2.** **Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

3. **Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4. **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5. **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6. **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that

such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

### 7. Rejection Damages Bar Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) ~~30~~45 days after the Effective Date; or (b) ~~30~~45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

### 8. Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.

~~Rejection~~Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall ~~not~~ constitute a breach of such contract or lease and not a termination ~~of preexisting~~thereof, and all obligations ~~owed~~owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

### 9. Insurance Policies.

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

## ARTICLE III
## CONFIRMATION OF THE PLAN

### A. Conditions Precedent to the Effective Date.

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2. The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts,

instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.      All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5.      All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the ~~UTGO~~LTGO Settlement Agreement.

6.      Any legislation that must be passed by the ~~Michigan Legislature~~State legislature to effect any term of the Plan shall have been enacted.

7.      The ~~Michigan Finance Authority~~MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

8.      The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

~~8~~9.      The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.~~A~~B.

~~9~~10.      If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

~~10~~11.      The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in Section III.A.7 and Section III.A.8, which conditions cannot be waived.

**C.      Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then ~~upon motion by the City made,~~ before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the ~~Confirmation Order will be vacated by~~City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section III.C: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

D. **Effect of Confirmation of the Plan.**

1. **Dissolution of Retiree Committee.**

~~Following~~On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case~~, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.p.i. If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown. All fees and expenses of the Creditor Representative shall be subject to the approval of the City. All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court. No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.~~.

2. **Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans ~~and/~~or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

3. **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

4. **Discharge of Claims.**

a. **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code,

(ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

        **b.**        **Discharge.**

        In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all ~~Claims and other~~ debts ~~and Liabilities against~~of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged ~~Claim~~debt; provided that such discharge will not apply to (i) ~~Claims~~debts specifically exempted from discharge under the Plan; and (ii) ~~Claims~~debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

        **5.**        **Injunction.**

        **On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

        **a.**        **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

        **1.**        **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims, and (C) Indirect Employee Indemnity Claims);**

        **2.**        **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

        **3.**        **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

        **4.**        **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

        **5.**        **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

        **6.**        **taking any actions to interfere with the implementation or consummation of the Plan.**

        **b.**        **All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly**

or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. **Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.**

6. **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided, however that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement) and (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement); provided, further, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan; provided, further, that this Section III.D.6 shall not affect any liability of any of the COP Swap Exculpated Parties to Syncora Guarantee Inc., Syncora Capital Assurance Inc. or Financial Guaranty Insurance Company in connection with the COP Swap Settlement.

7. **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

    a.    each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

        i.    all Liabilities in any way relating to the City, the Chapter 9 Case, (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or

the Disclosure Statement, in each case that such ~~entity~~holder has, had or may have against the City, ~~or~~ its ~~Related Entities, the State, the State Related Entities and the Released Parties (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code);~~current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity; and

       ii.    all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against such City's Related Entities, the State, the State Related Entities and the Released Parties; provided that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct~~, provided further that this Section III.D.7.a shall not apply to any Exculpated Party~~; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; ~~and~~provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.    if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees ~~and~~/or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law ~~and~~/or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the

COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims or any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds.

## E.     No Diminution of State Power

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the ~~State's~~State's exercise of such rights.

## F.     Effectiveness of the Plan.

The Plan shall become effective on the Effective Date. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## G.     Binding Effect of Plan.

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan. The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.     DWSD.

### 1.     Rates and Revenues.

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues. Rates will be determined by the Board of Water Commissioners. The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

## 2. DWSD CBAs.

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

## 3. The New DWSD Bonds and New Existing Rate DWSD Bonds.

DWSD shall, as necessary: (a) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.~~186~~209, and distribute the New DWSD Bonds as set forth in the Plan; and (b) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.~~188~~211, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

## B. The New B Notes and New LTGO Bonds.

On the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.~~183~~206, and distribute the New B Notes as set forth in the Plan~~.~~

; and (b) execute ~~C.~~ ~~The Plan COP Settlement.~~

~~The City shall consummate the Plan COP Settlement on the Effective Date~~the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.~~214. Settling COP Claimants shall receive the treatment described in Section II.B.3.p.iii.A.~~198, and distribute the New LTGO Bonds as set forth in the Plan.

## ~~D~~C. The UTGO Settlement.

~~The~~On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement ~~on the Effective Date, substantially on the terms set forth on~~Agreement, a copy of which is attached hereto as Exhibit I.A.~~285~~317. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things: (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the ~~Municipal Finance Authority~~MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (~~4~~5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**ED.** **The State Contribution Agreement.**

~~On~~Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.~~268~~294.

**1.** **State Contribution.**

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

**2.** **Income Stabilization Payments.**

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner. In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System. In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

**3.** **Conditions to State's Participation.**

The ~~State's~~ payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than ~~September 30~~December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than ~~December 31~~April 1, ~~2014~~2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 ~~as it relates to the City~~ or (ii) seeking to

enforce Article IX, Section 24 of the Michigan Constitution, ~~or equivalent assurances of finality of such litigation~~; (g) ~~a firm~~evidence satisfactory to the State of an irrevocable commitment by the Foundations to ~~contribute an aggregate amount of not less than~~fund $366 million ~~to fund~~(or the net present value thereof) as part of the DIA Settlement; and (h) ~~a firm~~evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to ~~raise at least~~fund $100 million ~~from its donors to fund~~(or the net present value thereof) as part of the DIA Settlement~~; (i) assurances that the State Contribution may only be used to fund payments to Holders of Pension Claims in accordance with the terms of the State Contribution Agreement; (j) assurances that the Retirement Systems must at all times during the 20 years following the Effective Date maintain an Investment Committee for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement; (k) assurances that an income stabilization program will be operated; (l) assurances that the provisions of the State Contribution Agreement regarding governance of the Retirement Systems will be approved; (m) the execution of the State Contribution Agreement acceptable in form and substance to the City and the State; and (n) the passage of legislation prior to Confirmation authorizing the State Contribution.~~.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

#### 4. Release of Claims Against the State and State Related Entities.

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### ~~F~~E. The DIA Settlement.

On the Effective Date, the City, the Foundations and DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA ~~Assets~~ to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.~~92~~103 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.~~91~~102. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

#### 1. Funding Contributions.

The DIA Settlement will be funded as follows: (a) ~~an~~ irrevocable ~~commitment~~commitments in an aggregate amount of at least $366 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors (subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to ~~an~~the "Agreed Required Minimum Schedule" and subject to the Foundations' and the DIA Funders' option at any time for the "Present Value Discount," as set forth in Exhibit I.A.~~91~~102. Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of

certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

**2.      Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

**3.      Conditions to the ~~Foundations~~DIA Funding Parties' Participation.**

The DIA Funding Parties participation in the DIA Settlement is conditioned upon, among other things, the following:  (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.~~F~~E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.~~F~~E.2; (e) ~~the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders~~approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.102; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the ~~existence of appropriate~~adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the ~~affirmation by County~~amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities ~~of certain existing funding~~' obligations ~~with respect~~under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution ~~in an aggregate amount of $350 million~~; (k) the occurrence of the Effective Date no later than December 31, 2014; and (l) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

**~~G~~F.      Contingent Payment Rights**

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust.  The City shall issue the DWSD CVR to the Restoration Trust.  If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire.  The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities:  (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS.  If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made.  The DWSD CVR may not be transferred.

**1.      Special Restoration**

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration.  In such case, the City will perform a Value Determination and arrive at the Discounted Value.  The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable.  In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept

the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C. In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored. In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate. In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

## 2. General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## ~~H~~G. The OPEB Settlement.

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims. ~~The Plan reflects~~, the terms of ~~that~~which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## H. The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I. Prosecution of COP Litigation.

### 1. Creation of Litigation Trust.

From and after the Effective Date, the City will remain a named plaintiff and defendant in the COP Litigation, but shall transfer all of its rights and interests in the COP Litigation to the Litigation Trust. The beneficiaries of the Litigation Trust, for the purpose of the COP Litigation, shall be the LTGO Litigation Parties and the Holders of Allowed Other Unsecured Claims. The document creating the Litigation Trust shall include

indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Insurer and the City.

**2.     Direction of COP Litigation.**

The Litigation Trustee shall follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein. The Litigation Trustee and VEBA Trust Representatives shall meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Litigation Parties, as requested, to discuss the COP Litigation. The Litigation Trustee shall provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the LTGO Litigation Parties. Upon request from a LTGO Litigation Party, the Litigation Trustee will provide to such LTGO Litigation Party drafts of court papers that will be Filed by the Litigation Trustee as early as practicable under the circumstances.

**3.     Payment of Fees and Expenses.**

The cost of all fees and expenses incurred by the Litigation Trustee in connection with the COP Litigation shall be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.A. The Litigation Trustee's fees shall be fixed and consented to by the LTGO Insurer and the VEBA Trustee Representatives.

The Litigation Trustee shall submit to the City on a monthly basis invoices for its fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees. The City shall pay such invoices within 30 days of receipt of such invoices, pending reimbursement from the Disputed COP Claims Reserve. Reimbursement of the City from the Disputed COP Claims Reserve will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.

In the event that a Final Order is entered against the City or the Litigation Trust, as successor in interest to the City, in the COP Litigation such that the New B Notes in the Disputed COP Claims Reserve are subject to Distribution to the Holders of Allowed COP Claims in accordance with the Plan, the City will reimburse the Disputed COP Claims Reserve for any amounts withdrawn from the Disputed COP Claims Reserve prior to the date of such Final Order becoming a Final Order.

**4.     Settlement of COP Litigation.**

The Litigation Trustee shall consult with the LTGO Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee shall provide the LTGO Litigation Parties with advance notice, as early as practicable under the circumstances, of any COP Litigation settlement negotiations, and the LTGO Litigation Parties and their counsel shall have the right to participate in such negotiations. Any potential settlement of the COP Litigation must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against any party. The Litigation Trustee will not take any Subject COP Litigation Actions without the consent of the LTGO Litigation Parties. The Litigation Trustee will not enter into a Subject COP Litigation Settlement without the consent of the LTGO Insurer.

In the event that, after consultation with the Litigation Trustee, (i) the LTGO Insurer does not consent to the Litigation Trustee entering into a Subject COP Litigation Settlement or (ii) the LTGO Litigation Parties do not consent to the Litigation Trustee taking a Subject COP Litigation Action, the Litigation Trustee or any LTGO Litigation Party may present the issue to the LTGO Independent Party for mediation and resolution. The LTGO Independent Party shall conduct a mediation to attempt to consensually resolve the issue. If a consensual resolution cannot be reached, the LTGO Independent Party shall resolve the issue or issues, which resolution will be binding on the LTGO Insurer or the LTGO Litigation Parties, as the case may be, and the Litigation Trustee. Subject to such mediation, the Litigation Trustee shall have the authority to take whatever

action may be required to avoid potentially adverse or prejudicial consequences of inaction in the COP Litigation. The City, the COP Litigation Counsel, the VEBA Trust Representatives and the LTGO Insurer shall take any steps that may be required to preserve applicable privileges of the City and the COP Litigation Counsel with regard to the COP Litigation.

## ~~I.~~J.    Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

## ~~J.~~K.    Cancellation of Existing Bonds and Bond Documents.

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bonds and Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder ~~and/~~or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such Bonds ~~and/~~or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders ~~and/~~or Bond Agents with respect to claims under applicable Bond Insurance Policies ~~and/~~or against the Bond Insurers or (b) Holders of COP Claims with respect to claims under applicable policies ~~and/~~or other instruments insuring the COPs and obligations related thereto. For the avoidance of doubt, this Section IV.K shall not apply to any Bonds that are Reinstated pursuant to the Plan.

## ~~K.~~L.    Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 ~~Termination Statements~~termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.~~K.~~L.

## M.    Professional Fees

### ~~L.~~1.    Professional Fee Reserve

On the Effective Date, the City shall establish and fund the Professional Fee Reserve. ~~The Professional Fee Reserve shall be funded~~ from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of

the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks) and (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund. or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

   **2.**     **Fee Review Order**

          The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order. For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

   **3.**     **Dismissal of the Fee Examiner**

          Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder. The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

   **4.**     **Court-Appointed Expert**

          The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

**MN.**     **Assumption of Indemnification Obligations.**

          Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.MN shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in

Section III.D.5.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.~~M~~N.

**~~N~~O.      Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.~~236~~261, are incorporated herein by reference and shall be binding upon the parties thereto.

**~~O~~P.      Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law.  The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**Q.      36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.6.  The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

**~~P~~R.      Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

~~If the City determines to maintain self-insurance with respect to the operation of its motor vehicles in a notice Filed not less than ten days before the Confirmation Hearing, this Section IV.P will apply. Subject to the foregoing, from~~From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows:  (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any one accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable).  ~~If this Section IV.P becomes effective, nothing~~Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1).  The City expressly reserves the right to challenge the validity

of any Claim subject to this Section IV.~~P~~R, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**~~Q~~S.** **Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund ~~and/~~or property tax refund.

**~~R~~T.** **Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**~~S~~U.** **Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**~~T~~V.** **Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**~~U~~W.** **Post-Effective Date Governance.**

Prior to or on the Effective Date, ~~a financial oversight board~~the Financial Review Commission shall be established pursuant to and in accordance with ~~State law now in effect or hereafter enacted~~the Financial Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that ~~should result in~~promote more efficient and effective delivery of services to City residents. The ~~financial oversight board shall be composed of individuals with recognized financial competence and experience and shall have the authority to, among other things, impose limits on City borrowing and expenditures and require the use of financial best practices.~~City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.** **Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.** **Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes

an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

### C. Certain Claims to Be Expunged.

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

### D. Record Date for Distributions; Exception for Bond Claims.

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

### E. Means of Cash Payments.

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### F. Selection of Distribution Dates for Allowed Claims.

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

### G. Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim

has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.      City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

**I.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.      Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

**2.      Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery ~~and/~~or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

**3.      De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

4. **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5. **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

J. **Other Provisions Applicable to Distributions in All Classes.**

1. **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

2. **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making

a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 ~~and/~~or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

**3.      Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**4.      Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender.  In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness.  For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make ~~and/~~or preserve a claim under any applicable policies ~~and/~~or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs.  Notwithstanding the foregoing, such Bonds ~~and/~~or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

**ARTICLE VI**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**A.      Treatment of Disputed Claims.**

**1.      General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim.  Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.  Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

2.      **ADR Procedures.**

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order.  For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order.  Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

3.      **Tort Claims.**

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction ~~selected by the City~~ that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue.  The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures).  Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section.  If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan.  Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan.  Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code.  All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

B.      **Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court.  On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date.  If a Disputed Claim is disallowed by Final Order, the property reserved on

account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

C.      **Objections to Claims.**

1.      **Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

~~2.      Application of Bankruptcy Rules.~~

~~To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).~~

~~3~~2.      **Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

~~4~~3.      **Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

~~5~~4.      **Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

**ARTICLE VII**
**RETENTION OF JURISDICTION**

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain

exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      ~~Enforce~~Confirm the ~~term (~~maturity~~)~~ date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, ~~notwithstanding any~~which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law ~~to the contrary~~);

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.      Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.      Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

~~J~~K.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

~~K~~L.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or

document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L**M**.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

M**N**.     Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

N**O**.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.     Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

A**B**.     **Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

B**C**.     **Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

C.     Disclosure of Amounts to Be Paid for Chapter 9 Case Services.

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan.  Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

**D.     Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or

interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

## E.      Effectuating Documents and Transactions.

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

## F.      Successors and Assigns.

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

## G.      Plan Controls.

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

## H.      Notice of the Effective Date.

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

## I.      Governing Law.

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

## J.      Request for Waiver of Automatic Stay of Confirmation Order.

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

K.      **Term of Existing Injunctions and Stays.**

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

L.      **Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.      **The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)

Dated: ~~May 5~~July 29, 2014        Respectfully submitted,

The City of Detroit, Michigan

By:    /s/  Kevyn D. Orr
Name:  Kevyn D. Orr
Title:    Emergency Manager for the City of Detroit, Michigan

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

## CERTIFICATE OF SERVICE

    I, Heather Lennox, hereby certify that the foregoing Notice of Filing of Redlined Version of Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 29th day of July, 2014.

    /s/ Heather Lennox